Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  April 18, 2019

17                  10:46 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:   UNKNOWN

1    HEARING re Debtors Motion to (A) Enforce Asset Purchase

2    Agreement and Automatic Stay Against Transform Holdco LLC

3    and (B) Compel Turnover of Estate Property, and (II)

4    Response to Transform Holdco LLCs Motion to Assign Matter to

5    Mediation (related document(s)2766) (document #2796)

6

7    HEARING re Motion to Compel Payment of Post-Petition Rent

8    and Related Lease Obligations Pursuant to 11 U.S.C. §§

9    105(a), 363(e), 365(d)(3) and 503(b)(l)(A) and to Pay All

10   Subsequent Amounts Owed On a Timely Basis filed by Robert L.

11   LeHane on behalf of Trustees of the Estate of Bernice Pauahi

12   Bishop (document #2414)

13

14   HEARING re Initial Supplemental Brief in Response to

15   Debtors' Motion to (A) Enforce Asset Purchase Agreement and

16   Automatic Stay Against Transform Holdco LLC and (B) Compel

17   Turnover of Estate Property, dated April 2, 2019 (REDACTED)

18   (related document(s)2796) filed by Abena Mainoo on behalf of

19   Transform Holdco LLC (document #3011)

20

21   HEARING re Debtors' Supplemental Memorandum of Law in

22   Further Support of Their Motion to Enforce the Automatic

23   Stay (related document(s)2796, 2864) (document #3079)

24

25

```
 1    HEARING re Transform Holdco LLC's Supplemental Reply Brief

 2    in Response to Debtors' Motion (A) Enforce Asset Purchase

 3    Agreement and Automatic Stay Against Transform Holdco LLC

 4    and (B) Compel Turnover of Estate Property

 5    [REDACTED] (related document(s)3079, 2796) filed by Abena

 6    Mainoo on behalf of Transform Holdco LLC. (document #3156)

 7

 8    HEARING re Transform Holdco LLC's Response to Debtors' (I)

 9    Motion to (A) Enforce Asset Purchase Agreement and Automatic

10    Stay Against Transform Holdco LLC and (B) Compel Turnover of

11    Estate Property and Reply in Further Support of Its Motion

12    to Assign Matter to Mediation (related document(s)2766,

13    2796) filed by Abena Mainoo on behalf of Transform Holdco

14    LLC. (document #2864)

15

16    HEARING re Joinder of the Official Committee of Unsecured

17    Creditors to Debtors (I) Motion to (A) Enforce Asset

18    Purchase Agreement and Automatic Stay Against Transform

19    Holdco LLC and (B) Compel Turnover of Estate Property, and

20    (II) Response to Transform Holdco LLC's Motion to Assign

21    Matter to Mediation (related document(s)2796) filed by Ira

22    S. Dizengoff on behalf of Official Committee of Unsecured

23    Creditors of Sears Holdings Corporation, et al. (document

24    #2808)

25
```

Page 4

1   HEARING re Motion of Wilmington Trust, National Association,

2   as Indenture Trustee and Collateral Agent to Prohibit or

3   Condition Debtors' Continued Use of Collateral, Including

4   Cash Collateral filed by Edward M. Fox on behalf of

5   Wilmington Trust, National Association (document #3050)

6

7   HEARING re Objection / Joinder of the Official Committee of

8   Unsecured Creditors to Debtors' Objection to Motion of

9   Wilmington Trust, National Association, as Indenture Trustee

10  and Collateral Agent, to Prohibit or Condition Debtors'

11  Continued Use of Collateral, Including Cash Collateral

12  (related document(s)3198)(document #3210)

13

14  HEARING re Motion of Debtors to Compel Turnover of Estate

15  Property filed by Sunny Singh on behalf of Sears Holdings

16  Corporation (document #2715)

17

18  HEARING re Community Unit School District 300's (I)

19  Objection to Debtors' Motion to Compel Turnover of Estate

20  Property  and (II) Reply to Debtors' Objection to Motion of

21  Community Unit School District 300 for Relief From the

22  Automatic Stay or, in the Alternative, Abstention (Related

23  Documents 652, 1280, 2715 and 2717) (related

24  document(s)2715, 652) filed by Allen G. Kadish on behalf of

25  Community Unit School District 300 (document #2996)

1    HEARING re Supplemental Objection to Debtors' Motion to

2    Compel Turnover of Estate Property (related document(s)2996,

3    2715) filed by Allen G. Kadish on behalf of Community Unit

4    School District 300 (document #3247)

5

6    HEARING re Motion of Community Unit School District 300 for

7    Relief from the Automatic Stay (document #652)

8

9    HEARING re Debtors' Objection (document #1280)

10

11   HEARING re Motion of Community Unit School District 300 for

12   Relief From the Automatic Stay or, in the Alternative, for

13   Abstention filed by Allen G. Kadish on behalf of Community

14   Unit School District 300 (document #652)

15

16   HEARING re Motion to Compel Payment of Post-Petition Rent

17   and Related Lease Obligations Pursuant to 11 U.S.C. §§

18   105(a), 363(e), 365(d)(3) and 503(b)(1)(A) and to Pay All

19   Subsequent Amounts Owed On a Timely Basis filed by Robert L.

20   LeHane on behalf of Trustees of the Estate of Bernice Pauahi

21   Bishop (document #2414)

22

23   HEARING re Objection of Transform Holdco (document #2832)

24

25

1    HEARING re Debtors' Response and Reservation of Rights (

2    document #3169)

3

4    HEARING re Response of Trustees of the Estate of Bernice

5    Pauahi Bishop ( document #2922)

6

7    HEARING re Motion to Compel Debtor in Possession to Assume

8    and Assign, Or, Alternatively, to Reject, Unexpired Lease on

9    Real Property (Sears Contract No. S8729-73-A) by Dedeaux

10   Inland Empire Properties filed by William P Fennell on

11   behalf of Dart Warehouse Corporation ( document #2980)

12

13   HEARING re Debtors' Objection ( document #3168)

14

15   HEARING re Motion for Payment of Administrative Expenses

16   Pursuant To 11 U.S.C. §503(a), 503 (b)(l)(A), and 507(a)(2)

17   for Mauldin At Butler LLC, Other Professional, period:

18   1/1/2018 to 12/31/2018, fee:$, expenses: $88,660.08. filed

19   by Mauldin At Butler LLC ( document #2690)

20

21   HEARING re Debtors' Objection (document #3163)

22

23   HEARING re Reply of Mauldin at Butler, LLC ( document #3225)

24

25

Page 7

1   HEARING re Motion of Debtors for Entry of an Order

2   Authorizing and Approving Procedures for Settling De Minimis

3   Affirmative Claims and Causes of Action of the Debtors (

4   document #3031)

5

6   HEARING re Limited Objection of Wilmington Trust, National

7   Association (document #3144)

8

9   HEARING re Motion for Payment of Administrative Expenses

10   Motion of Winners Industry Co., Ltd. for Allowance and

11   Payment of Administrative Expense Claims. filed by Winners

12   Industry Co., Ltd. (document #1386)

13

14   HEARING re Notice of Agenda of Matters Scheduled for Hearing

15   on April 18, 2019 at 10:00 a.m.

16

17   HEARING re Debtors' Objection (document #2839)

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   WEIL, GOTSHAL & MANGES LLP

4        Attorneys for the Debtor

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:  JARED FRIEDMANN

9        JACQUELINE MARCUS

10       OLGA F. PESHKO

11

12  CLEARY GOTTLIEB STEEN & HAMILTON LLP

13       Attorneys for Transform Holdco LLC

14       One Liberty Plaza

15       New York, NY 10006

16

17  BY:  LEWIS J. LIMAN

18

19  SEYFARTH SHAW LLP

20       Attorneys for Wilmington Trust, National Association.

21       599 Lexington Avenue

22       New York, NY 10022

23

24  BY:  EDWARD M. FOX

25

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for ESL Investments

4         One Liberty Plaza

5         New York, NY 10006

6

7    BY:  SEAN A. O'NEAL

8

9    MILBANK, TWEED, HADLEY & MCCLOY LLP

10        Attorneys for Attorneys for Cyrus Capital Partners

11        28 Liberty Street

12        New York, NY 10005

13

14   BY:  THOMAS R. KRELLER

15

16   GENSBURG CALANDRIELLO & KANTER, P.C.

17        Attorneys for Community Unit School District 300

18        200 West Adams Street, Suite 2425

19        Chicago, IL 60606

20

21   BY:  MATTHEW T. GENSBURG

22

23

24

25

Page 10

1   ROBBINS SCHWARTZ

2        Attorneys for Community Unit School District 300

3        631 East Boughton Road, Suite 200

4        Bolingbrook, IL 60440

5

6   BY:  KENNETH M. FLOREY

7

8   VEDDER PRICE P.C.

9        Attorneys for NorthStar Group Services, Inc.

10        1633 Broadway, 31st Floor

11        New York, NY 10019

12

13   BY:  MICHAEL SCHEIN

14

15   ALSO PRESENT TELEPHONICALLY:

16

17   COLLEEN MAKER

18   ARLENE R. ALVES

19   JENNIFER A. ASHER

20   ERIC C. DAUCHER

21   RANIERO D'AVERSA

22   PATRICK FITZGERALD

23   ROBERT E. FITZGERALD

24   DAVID J. GALLAGHER

25   KIMBERLY B. GIANIS

Page 11

 1   IVAN M. GOLD

 2   EVAN HOLLANDER

 3   PATRICK J. HOLOHAN

 4   WILLIAM S. HOLSTE

 5   VLADIMIR JELISAVCIC

 6   KELLY E. KLEIST

 7   MATTHEW KOCH

 8   STEVEN KOSSON

 9   ZACHARY D. LANIER

10   TERESA LII

11   CATHERINE LOTEMPIO

12   SCOTT LUFTGLASS

13   KATHERINE E. MASSEY

14   MICHAEL MITTELMAN

15   BRYANT OBERG

16   BRIAN A. RAYNOR

17   RYAN REINERT

18   COURTNEY A. SCHAEL

19   PAUL SCHWARTZBERG

20   MICHELLE E. SHRIRO

21   CHRIS STAUBLE

22   AUSTIN H. VINY

23   DAVID WANDER

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Okay, good morning.  In re Sears

 3      Holdings Corporation et al?

 4              MR. SCHROCK:  Good morning, Your Honor.  Ray

 5      Schrock, Weil Gotshal on behalf of the Debtors.  Your Honor,

 6      before we get started and move into the main agenda, I just

 7      had a quick update for the Court and parties in interest and

 8      some recent case developments.

 9              THE COURT:  Okay.

10              MR. SCHROCK:  First, Your Honor, I want to report

11      that the Debtors have selected two firms in consultation

12      with the Creditors' Committee to pursue preference

13      recoveries.  This is following a competitive process, you

14      know, working with the parties.  And we think what we have

15      are market leading recovery -- or market leading pricing for

16      contingency fees on those, so the ASK firm and

17      Acumen/(indiscernible) that have been selected by the estate

18      to pursue those recoveries.  And I believe, you know, the

19      Committee and the Debtors are both supportive of those.

20              THE COURT:  And these are basically preference

21      claims?

22              MR. SCHROCK:  These are just preference claims,

23      Your Honor.

24              THE COURT:  Okay.

25              MR. SCHROCK:  And you know, there's -- there were
```

1    roughly $3.8 billion of transfers in the 90 days before the

2    cases were commenced.  When you take out some of the low-

3    hanging fruit, the exclusions, you know, it's roughly $1.9

4    billion.  And you know, we do have some estimates that you

5    know, we believe will be recoverable, but we do think that

6    those firms getting started, getting demand letters out soon

7    and starting to get that process moving is crucial to, you

8    know, the plan process and driving the estate's recoveries.

9            THE COURT:  Okay.  Hopefully that process won't be

10   finished by the time our plan is confirmed in the case, so

11   obviously, I would hope you -- I would consider how to

12   integrate that into a plan --

13           MR. SCHROCK:  Yeah.

14           THE COURT:  -- a post-effective date plan

15   structure.

16           MR. SCHROCK:  We are, Your Honor, we would

17   contemplate that those firms would ultimately be retained by

18   a post-consummation trust born under the Chapter 11 plan.

19   And you know, those would continue also to work of course

20   with chambers so that we don't necessarily cause too much

21   trauma to your docket as well as we would put that protocol

22   together.

23           THE COURT:  Okay.  Well, and that's the other

24   point I just wanted to raise.  I don't know how many

25   potential defendants there are, but clearly, in other cases,

1    the adoption of sort of the overall procedures for dealing

2    with these types of claims has been successful, sort of

3    along the lines of what you've done with personal injury

4    claims in other contexts, so hopefully -- I hope they will

5    be considering that as a possibility, at least.

6            MR. SCHROCK:  We are, Your Honor, and we'll work

7    on the protocol and hope to get it through with the

8    Committee and get it in front of Your Honor, the Crothers

9    Committee that is, and get it in front of Your Honor here in

10   short order.

11           THE COURT:  Right.  It's obviously something you

12   want to discuss with the Committee.

13           MR. SCHROCK:  Of course, very much.

14           THE COURT:  Okay, all right.

15           MR. SCHROCK:  Your Honor, a quick Chapter 11 plan

16   update.  Following several weeks of discussions with the --

17   with certain Creditors and the Unsecured Creditor's

18   Committee, we have filed the Chapter 11 plan and a company

19   disclosure statement to wind up the affairs of these Chapter

20   11 cases.

21           A few notes on this point.  As everybody I'm sure

22   is very aware that the cases are -- they're expensive.  The

23   administrative costs are significant.  There's only one way,

24   we believe, to finish these cases, and that's to start the

25   clock.  We've set a -- asked for a disclosure statement

1   hearing for May 16th.  We think that by starting the clock

2   and working with the stakeholders and really driving the

3   process leading from the front and getting people to focus

4   on what's really necessary in order to wind up the estates,

5   that's the only way it's going to happen.

6            But this is after, you know, roughly serving out

7   60 days ago the first draft of a plan.  You know, I think

8   some claimants would say let's please wait.  And you know,

9   our view, our strong view here is that if you don't have

10  deadlines associated with the plan process, gravity will

11  take over.  And it's very difficult to get the estates

12  efficiently wound up.

13           There's still a significant amount of work.  Even

14  though the assets are largely gone associated with the

15  ongoing operations, there's very significant services that

16  are still being provided by the estate, including transition

17  services, issues related to executory contracts, cure

18  reconciliation.

19           And I wish I could tell Your Honor that it's just,

20  you know, it's a one-person job at Weil and Akin to, you

21  know, go through all of those claims, but it's not.  It's

22  literally, you know, hundreds of inquiries every day and

23  trying to work through the employee issues, the regulatory

24  issues, the bank issues.  There's still quite a bit that's

25  going on, so those transition services are ongoing, and you

1     know, we know that we have to wrap things up.

2           The plan overall, it's a non-consolidated plan.

3     It's a straight, what I call waterfall plan, with only one

4     settlement at this time incorporated, which is with the

5     PGBC.  The plan has a mechanic that's under discussion for

6     resolving inter-company claims, which remains open.  So like

7     any company, Sears did not have cash at every legal entity

8     within the structure.

9           Some entities have cash, some entities don't, some

10    have -- we know more assets, some have less, and that's very

11    common in our experience in any complex structure.  So to

12    deal with this issue, we have a non-consolidated plan and an

13    ability for one Debtor to make loans to another Debtor, if

14    they believe there are sufficient recoveries to deal with

15    it.

16          We're also in discussions with certain Creditors

17    around, is there a compromise around inter-company claims

18    that everybody can get behind.  As you might imagine, that's

19    a very -- it's a very complex negotiation, but we do think

20    we have at least one mechanic to preserve the integrity of a

21    non-consolidated plan.

22          The 503(b)(9) claims bar date has passed.  We

23    expect to complete the initial reconciliation of claims in

24    the next few days and we'll sit down with the Unsecured

25    Creditor's Committee and professionals to review them.  I

Page 17

1   think the good news is that based upon our preliminary

2   review, that we think valid claims are coming in right

3   around the range that we have previously disclosed to

4   parties in interest in the Court and in line with the

5   Debtor's expectations.

6          We do have, of course, the Transform Co

7   assumption, or not assumption, reimbursement of

8   approximately $140 million of those claims, which Mr.

9   O'Neill likes to remind me would be subject to offset, if

10  there are any costs that would be going the other direction.

11         507(b) claims, which parties in, you know, some

12  parties that are surveyed are very significant numbers are

13  just treated as a straight waterfall under the plan.  We do

14  not have a global settlement with 507(b) claimants at this

15  time.  We've had initial discussions with Cyrus, which I

16  would characterize as hopeful and somewhat productive.

17         I wouldn't say that they were vigorous at this

18  point.  But our focus was to sit down with the UCC, get to a

19  deal -- try and get to a deal.  We didn't reach a deal yet.

20  But at least file it and use the filing of the plan as a

21  mechanic to sit down with the large 507(b) claimants in

22  these cases, in the very near future.

23         So in that vein, our plan is to sit down in the

24  next week with the key stakeholders, including Cyrus,

25  Wilmington, ESL, so that we can address how some of those

1   507(b) claims can be teed up with the Court.  I've had some

2   initial discussions with ESL's counsel just around, you

3   know, if it's an estimation proceeding or the right, at

4   least procedural mechanic to get those in front of the Court

5   in conjunction with a plan process as well as a reserve

6   mechanic.

7           But we believe firmly that the structure in place

8   and the tension of a disclosure statement here and a

9   confirmation hearing, that we're going to be able to lead

10  parties to get to something that's workable to wind up the

11  affairs of the estate.  We have to wind this up some way,

12  and we believe this is the best way to do it.

13          There's a litigation or a post-consummation trust

14  that I referred to earlier that's in the plan.  That was

15  after a great deal of coordination among the tax

16  professionals at Akin and Weil that we believe that that's

17  the right structure for claim holders and beneficial

18  interest holders in the trust.

19          We've left the governance of the trust open as

20  TBD.  That's subject to ongoing negotiations with

21  stakeholders, including the 507(b) claimants in the UCC.

22  We've left the position of the litigation trustee open at

23  this time.  It's still being subject to negotiation.  You

24  know, we just also wanted to mention the administrative

25  claims bar date.

1          We do have that concept in the plan.  When the

2     particular date is still subject to discussion.  We've dealt

3     with this issue in two ways in prior cases, including cases

4     in front of this Court, where we've had the admin claims bar

5     date, you know, at confirmation or even sometimes in advance

6     of confirmation.  We've heard from stakeholders arguing each

7     way, but we'll certainly resolve that over the next couple

8     of weeks.

9          And then, finally, on releases.  There's a

10    mechanic in the plan that provides that if a party's named

11    in a plan supplement document or otherwise in a complaint,

12    they will not be released.  The releases under -- are under

13    the exclusive authority within the Debtors of the

14    restructuring subcommittee, consistent with their mandate.

15    Those issues are still being under discussion, but that's

16    the mechanic that's in there right now.

17          THE COURT:  And you're referring to releases by

18    the Debtor's estate?

19          MR. SCHROCK:  Yes, thank you, Judge.  Yes, just

20    Debtor releases.  There is not non-consensual -- there are

21    no non-consensual third party releases in the plan.

22          THE COURT:  Okay.

23          MR. SCHROCK:  And then finally, Your Honor, just

24    as I referred to earlier, there's, you know, related to the

25    other work that's ongoing at the estate, there's quite a few

Page 20

1    disputes that we're still working through with Transform Co.

2    Some of those are up today.

3            We are providing, you know, pretty extensive

4    transition services at this point, and we still have all of

5    the employees that are still employed effectively by the

6    Debtors and are being leased to Transform Co.  So we have

7    numerous deals that have to be worked out with Creditors and

8    Transform Co to allow those parties to have a fresh start

9    with new Sears, and as well, still balance the estate

10   interests that we're not compromising the claims that have

11   been reserved for the benefit of the estate, namely the

12   preferences and the other litigation issues.

13           But the work is time intensive.  We are very

14   mindful of the costs in this case, and we are going to do

15   our level best to try and get these estates through a

16   confirmed plan process by July.  And we have, you know,

17   tentatively talked with parties about, you know, a date for

18   confirmation around the third week in July.

19           So we don't have broad support for the plan at

20   this time, but we believe the getting in on file and driving

21   the process is the right answer for these estates.  And

22   then, finally Your Honor, I know that the parties made

23   notice we did -- the restructuring subcommittee did file a

24   complaint last -- late last evening against a number of

25   parties.  I'm sure there'll be plenty of time for discussion

1    on those issues at another point.  But you know, that action

2    is in fact under way.

3              THE COURT:  Okay.  Does anyone have anything to

4    say on that report?  Okay.  Well, obviously, the Debtors and

5    their professionals have the task of moving the case along

6    as promptly and efficiently as possible.  I appreciate there

7    are a number of steps that need to be taken before you're

8    nearly at the point to confirm a plan, but it clearly to me

9    makes sense to be moving forward as you are within active

10   consultation with the key parties in interest.

11             It's in their interest, too, except perhaps,

12   although I think it's in their interest also, parties that

13   may view themselves more as litigation targets than

14   Creditors.  But frankly, I think resolving the cases

15   promptly is in everyone's interest.

16             And in that regard, I only have a couple of

17   observations.  The first is that if the cost of doing your

18   company analysis or the difficulty of it exceeds the

19   benefit, you know, there is an alternative, which is

20   substantive consolidation, so that's something to be aware

21   of.

22             MR. SCHROCK:  Yes, Your Honor.  We're chiefly

23   aware of that and --

24             THE COURT:  Okay.

25             MR. SCHROCK:  -- I think we're hopeful that

1   reasonable minds will agree on something.

2          THE COURT:  Well, it depends – I mean it's a

3   factual show, if you can actually make the analysis, then

4   ignore what I just said.

5          MR. SCHROCK: Yes.

6          THE COURT:  Secondly, as far as the necessary

7   reconciliation of claims is concerned necessary for

8   confirming a plan that is, you're absolutely right.  They're

9   under the authority to estimate claims.

10         And given the actual outcome of the sale and the

11  related GOB sales, that should be a much easier process.  So

12  again, it's not something that I think parties should spend

13  a lot of time and money on trying to negotiate, if there's

14  just an impasse.  I think you may just want to tee up an

15  estimation on that -- on that score.

16         MR. SCHROCK:  That's -- that was our thinking

17  exactly, Your Honor.

18         THE COURT:  Okay.  I mean, unlike when it was

19  being discussed during the sale hearing, when I was asked to

20  compare alternatives as far as 507(b) claims are concerned,

21  we don't have an alternative scenario here.  We actually

22  have the facts, so I think it's a lot easier to decide at

23  this point.

24         MR. SCHROCK:  Thanks very much.

25         THE COURT:  Okay.  So why don't we proceed then

Page 23

1    with the agenda?

2          MR. SCHROCK:  Yes, Your Honor.  The first item on

3    the agenda is the Debtor's motion to enforce the asset

4    purchase agreement automatic stay against Transform Holdco,

5    and I'll cede the podium to my partner, Mr. Friedmann.

6          THE COURT:  Okay.

7          MR. FRIEDMANN:  Good morning, Your Honor, Jared

8    Friedmann from Weil, Gotshal on behalf of the Debtors.

9    Before I get into the credit card accounts receivable issue

10   we were discussing at the last hearing, I wanted to put on

11   the record where we are with respect to the interim

12   agreement we advised you of at the last hearing regarding

13   the two other categories of assets that we've moved on in

14   our motion to enforce the automatic stay.

15          THE COURT:  Okay.

16          MR. FRIEDMANN:  As we advised you then, the basis

17   of that agreement was that there were initial payments that

18   were to be made to Debtors on March 26th.  And then, we gave

19   Transform until April 3rd to complete the reconciliation

20   process and pay us whatever the remainder was of the

21   undisputed amounts.

22          So with respect to the cash in transit, and those

23   are the pre-closing proceeds that ended up in Transform,

24   because we had transferred the cash management system over

25   to Transform at closing, so these were pre-closing proceeds

Page 24

1    that ended up in the bank accounts they were intended for,

2    but those bank accounts were no longer in our possession so

3    they went over to Transform and we were moving to get them

4    back.

5            So on March 26th, consistent with our agreement,

6    the Debtors were paid $3 million and they were produced

7    documentation regarding the reconciliation at that point.

8    On April 3rd, pursuant to the agreement, Transform was

9    supposed to pay Debtors any amount above and beyond that $3

10   million initial payment and to also provide us with

11   additional reconciliation.

12           On April 4th, Transform confirmed that the total

13   amount of cash in transit in the cash management system was

14   $22.5 million, so $19 and a half million more than they had

15   paid us on March 26th.  There is no dispute regarding that

16   $22.5 million number.  To date, however, Transform has

17   refused to turn over that $19 and a half million delta in

18   cash in transit proceeds.  And again, these are dollars that

19   we would have had in our bank accounts, had we not given

20   them our bank accounts.

21           THE COURT:  And what's the stated rationale for

22   not paying it?

23           MR. FRIEDMANN:  The stated rationale, as we

24   understand it, and this is for both the cash in transit as

25   well as the rent proration, which I'll discuss in a moment,

1    is, as we understand it, that there are other set-offs.  And

2    in our discussions, we've reminded Transform of Your Honor's

3    admission at the last hearing that set off our -- an excuse

4    and they still violate the automatic stay.  It hasn't worked

5    yet so far.

6             So as -- we're willing to give Transform until

7    next Thursday to turn over these funds to us, otherwise, we

8    anticipate moving on an expedited basis to have another

9    hearing because we need these dollars now.

10            THE COURT:  And has Transform identified to you

11   what the basis for the claims over are?

12            MR. FRIEDMANN:  There are a series of various

13   setoffs and reconciliations that necessarily are happening

14   between the companies and we're happy to work through those.

15   Our point with respect to both the cash in transit and the

16   rent proration, these are announced at our estate property

17   and were supposed to be turned over to us immediately.

18            No doubt there would be later reconciliations on a

19   number of other issues, which we're happy to work through

20   with them, but these are -- this is estate property that

21   they're holding onto and not turning over on the rent

22   proration and the APA --

23            THE COURT:  Can I interrupt you?

24            MR. FRIEDMANN:  Please.

25            THE COURT:  I understand reconciliations.  That

1    presumes that the parties still trying to work out what is

2    owing.  But I'm trying to understand whether Trans Co has

3    asserted that there are actually separate and apart from

4    just trying to figure out the ultimate purchase price,

5    whether there are amounts owing by the Debtors to it, that

6    would be the set off.  The rest is a reconciliation of

7    amounts that are to be paid and still to be decided to be

8    paid, in other words.

9              MR. FRIEDMANN:  Yeah, so it's a series of other

10   set offs, and there are other buckets where monies are owed

11   from Debtors to Transform Co.

12             THE COURT:  Okay.

13             MR. FRIEDMANN:  And so, they're using those other

14   buckets to offset the cash in transit and the real estate

15   prorations, as we understand it at this point.

16             THE COURT:  Are those owed under the purchase

17   agreement?  It's asserted as being owed under the purchase

18   agreement?  I don't understand.  They're the buyer.  Why

19   would the Debtor be owing them money except as part of

20   reconciling the ultimate purchase price?

21             MR. FRIEDMANN:  Yeah, so that's exactly what --

22   it's reconciling -- they should --

23             THE COURT:  Well, but that's reconciling amounts

24   that were made to be paid as opposed to amounts that are

25   already owing.

Page 27

1                MR. FRIEDMANN:  Correct.

2                THE COURT:  I think that's the important

3        distinction.  So I just reiterated what I said last time.  I

4        don't see any basis not to pay this money, unless you know,

5        they disagree and say that the Debtors independently owe

6        Trans Co something, as opposed to Trans Co has the right

7        under the purchase agreement to adjust remaining amounts,

8        not these amounts, but other amounts that are still to be

9        fixed.

10               MR. FRIEDMANN:  The -- just to be on the record

11       also, respectfully, the rent -- the February rent proration,

12       they are too consistent with the agreement on March 26th,

13       Transform paid Debtors $5 million and produced documentation

14       at that time, calculating where -- how they've gotten there

15       so far.

16               On April 3rd, they were supposed to pay any

17       amounts over that $5 million owed in rent proration and

18       provided Debtors with backup.  On April 4th, Transform

19       advised and it confirmed that $14.9 million in rent

20       proration was due.  They were still reconciling apparently

21       another $1.3 million of that.

22               Now while we believe that the $1.3 million is also

23       due and owing to the Debtors, the $9.9 million delta between

24       the $5 million they gave us on March 26th and what they had

25       already determined was owed by April 4th has also not been

Page 28

1    paid.  So in total, there is the $19.5 million in cash in

2    transit, plus the $9.9 million in rent proration.

3            So $29.4 million in total that we believe is

4    estate property that should be turned over immediately, and

5    as I said, it is -- we've -- you know, we're happy to wait

6    until next Thursday for them to do what needs to be done to

7    get that money to us, but if we do not receive that money by

8    next Thursday, we do anticipate moving the Court on an

9    expedited basis.

10           THE COURT:  Okay.

11           MR. FRIEDMANN:  And the turn now to the credit

12   card receivables account at issue.  So as I -- a preliminary

13   matter, I just wanted to move into evidence the second

14   supplemental declaration of (indiscernible) in support of

15   the motion to enforce, which is Document 3080.

16           THE COURT:  Okay.  As I understood it, the parties

17   were not going to be treating this as a hearing with live

18   testimony.  Is that correct?

19           MR. FRIEDMANN:  I believe from my discussions with

20   my colleagues at Cleary that neither of us intend to call

21   any witnesses today.

22           THE COURT:  Okay, all right, so if there's no

23   objection to the admission of that declaration, subject to

24   sometime in the future if need be, you have the right to

25   examine the witness on anything other than just the

1    documents that were provided.  Okay, I'll admit it, then.

2        (Document 3080 Admitted Into Evidence)

3            MR. FRIEDMANN:  So Your Honor, the Court asked the

4    party to submit a supplemental briefing addressing whether

5    the credit card processing agreements filed by the buyer on

6    the eve of the March 21st hearing helped clarify in any way

7    whether or not the reserve accounts at issue fall within the

8    APA's definition of credit card accounts receivable.

9            THE COURT:  Right.  And I also wanted to make sure

10   I had all of those agreements, which I believe I do now, I

11   have.

12           MR. FRIEDMANN:  They would know better than we do,

13   and we're assuming that they've pre-solved them.

14           THE COURT:  Okay.

15           MR. FRIEDMANN:  And frankly, I'm not sure it

16   matters that much because from the agreements that we've

17   seen, those agreements demonstrate or at least do nothing to

18   refute that the reserve accounts do in fact fall within the

19   definition of credit card accounts receivable.

20           The buyer's initial brief and then their

21   subsequent reply brief repeat the same argument over and

22   over again, and because the reserve accounts describe their

23   treated something and as they -- a security in the

24   processing agreements, that therefore, those reserve

25   accounts must also be a security deposit and cannot be

Page 30

1    credit card accounts receivable within the meaning of the

2    APA.

3              And that argument, we submit, is fundamentally

4    flawed.  The fact that the reserve accounts are described or

5    treated as security under the processing agreements does not

6    mean that they'd be -- necessarily become security deposits

7    within the meaning of the APA.  All that matters here is how

8    the Debtor and the buyer define credit card accounts

9    receivable in the APA, and whether the reserve accounts fall

10   within that definition, which they plainly do.  Likewise --

11             THE COURT:  That's because the operative paragraph

12   is Paragraph 10?

13             MR. FRIEDMANN:  I think the operative paragraph is

14   the definition of credit card accounts receivable, which is

15   --

16             THE COURT:  Well, I understand, but --

17             MR. FRIEDMANN:  Right.  And then 10.9.

18             THE COURT:  It flows through Paragraph 10 because

19   that's the mechanism where credit cards accounts receivable

20   comes into play.

21             MR. FRIEDMANN:  That's correct, Your Honor.  But -

22   -

23             THE COURT:  Okay.

24             MR. FRIEDMANN:  -- and credit card -- it includes

25   the defined term credit card accounts receivable, which

Page 31

1    requires you to go back to the definition.

2            THE COURT:  Right.

3            MR. FRIEDMANN:  Likewise, the fact that the

4    reserve account serve a security under collateral to protect

5    the processors from default doesn't change the fact that the

6    reserve accounts are ultimately due and payable to Sears, a

7    fact that the buyer does not and cannot really dispute.  In

8    fact, in their initial moving brief, they cite the American

9    Express amended agreement in Section 2, which explains that

10   although American Express was not currently obligated to pay

11   Sears anything in their reserve accounts, it ultimately is

12   obligated to return an amount equal to the amount in the

13   reserve, not of any current obligations.  So at all times,

14   that money is due and owing to Sears, there just may not be

15   a payment obligation right away.

16           The buyer also argues in their reply brief that

17   the terms in the same and related agreement should be given

18   the same meaning.  But of course, the APA and the processing

19   agreements are not in the same, nor are they even related

20   agreements.  In all the cases the buyer sites for that

21   proposition are at opposite because they concern provisions

22   that are in the same agreement or transactions that were

23   intertwined or multiple contracts in a single transaction,

24   so none of that case law is applicable here.

25           Similarly, the buyer's argument in their reply

Page 32

1    that the processing agreements are integrated into the APA,

2    (indiscernible) by the integration clause at 13.4 in the

3    APA.  The buyer also argues that the processing agreements

4    were the backdrop against which the APA was drafted.

5           Accepting that premise as true for a moment, Your

6    Honor, it's notable that not only are the reserve accounts

7    not carved out from the APA's definition of credit card

8    accounts receivable, but Section 2.10, which lists almost

9    every conceivable type of security from restricted cash to

10   letters of credit to utility deposits and everything in

11   between.  But what doesn't it include are reserve accounts

12   held by the credit card companies.

13          Why is that?  It's because they're already covered

14   and included within the broad definition of credit card

15   accounts receivable.  And Your Honor, as we discussed in the

16   last hearing, even if the reserve accounts are a type of

17   restricted cash or other security or whatever buyer is

18   arguing today about where it falls under 2.1, the APA's

19   specific definition of credit card accounts receivable

20   controls over that broad catch-all provision in 2.10 or even

21   2.1 (indiscernible).

22          And as I mentioned early -- earlier, what really

23   matters is how the APA defines credit card accounts

24   receivable and whether the reserve accounts are in fact

25   credit card accounts receivable within the meaning of the

Page 33

1    APA.   And we submit that they are.

2         The APA defines credit card accounts receivable as

3    each account together with its proceeds owed by the credit

4    card payment processor to a seller, resulting from charges

5    by a customer of a seller on credit cards that are processed

6    by such a processor in connection with the sale of goods by

7    a seller or services performed by a seller, in each case in

8    ordinary course of that seller's business.

9         And unless you twist the words of the definition

10   of credit card accounts receivable, these reserve accounts

11   satisfy every element of that definition.   The fact that as

12   we've learned recently First Data has agreed to release $15

13   million of the $28 million that its holding in reserve

14   accounts underscores our point that the reserve accounts are

15   in fact owed, and that they're far more liquid than the

16   buyer tried to portray.

17        Mr. Kamlani's latest declaration submitted with

18   the reply brief candidly admits in Paragraph 5 that the

19   reason First Data did not release the reserve accounts pre-

20   closing to Sears is that ESL refused to provide the

21   information that was requested.   He then goes on to explain

22   in the next paragraph that after the closing, when Transform

23   did provide that information, First Data is not prepared to

24   release $15 million.

25        So I want to stop there for a moment, because what

Page 34

1      it demonstrates is that that money, at the time of closing,

2      was available to be released.  It was owed, it was ready to

3      be released.  All that had to happen was for ESL to provide

4      the information that First Data was requesting, and then $15

5      million at that moment would have gone straight to debtors

6      and be in their pockets right now.  We wouldn't be having

7      this issue.

8              But what ESL did was to say, "We refuse to give

9      you the information right now."  As Mr. Kamlani says in his

10     declaration, they waited until after the closing and then

11     they went and gave that information, and now the $15 million

12     is available.

13             There also can be no dispute that had, following

14     the sale hearing, the deal for some reason fallen apart and

15     that there was no deal with ESL, and Sears had to go through

16     a liquidation, the amount in those reserve accounts would

17     have gone right to the debtors.

18             The agreements would have been done and save for

19     any chargebacks, but you go into a going out of business

20     deal, there are no returns.  There aren't even any

21     chargebacks.  There's a lot of money flowing in.  The

22     reserves clearly would have gone to debtors because that

23     money was always owed to debtors.

24             THE COURT:  Well, can I -- I want to make sure I

25     understand what you all are really fighting over,

1    practically.  10.9 of the APA is the provision that sets

2    forth an aggregate amount of inventory value, amounts due to

3    seller with respect to credit card accounts receivable, and

4    pharmacy receivables, and says that it should be at least

5    $1,657,000,000.

6            And then it says that to the extent that that

7    amount -- the amount of those three items exceeds,

8    $1,657,000,000, sellers may reduce such amount to be equal

9    to that number by first transferring inventory and second

10   retaining as an excluded asset, the oldest of any credit

11   cards account receivable.

12           So that's a mechanism that comes into place that

13   refers just to credit card accounts receivable, right?  It

14   doesn't have anything to deal with security deposits.

15           MR. FRIEDMANN:  That's correct.

16           THE COURT:  One can conclude, therefore I think,

17   that if something is both a credit card account receivable

18   and a security deposit, that paragraph would operate just

19   fine.  It doesn't matter whether a security deposit, you

20   just use the paragraph because it all refers to accounts

21   receivable.

22           MR. FRIEDMANN:  That's correct, Your Honor.

23           THE COURT:  Okay.  Is there some other provision

24   of the agreement that applies to require the security

25   deposits to be held?  In other words, are you saying that

1    you're entitled, the debtors are entitled to other money

2    constituting credit card accounts receivable because it's

3    not a security deposit?  Or are we just arguing about the

4    operation of 10.9?

5            MR. FRIEDMANN:  What we're arguing about is the

6    operation of 10.9, and I think the key factor here is

7    whether or not those reserve accounts were considered part

8    of the credit card receivables to get to the threshold.

9            THE COURT:  I understand that.  But in your

10   explanation about they should pay us the $15 million now, I

11   wanted to make sure I understood your basis for saying that.

12           MR. FRIEDMANN:  Let me reclarify also that point,

13   is that we do not dispute that what 10.9 entitles us to is

14   the oldest of any credit card accounts receivable.

15           THE COURT:  Okay.

16           MR. FRIEDMANN:  So if Your Honor was to order than

17   what we're entitled to is $14.6 million of the oldest credit

18   card receivables, and that First Data should release $14.6

19   million of only the oldest credit card receivables to us, we

20   have no issue with that.

21           THE COURT:  Okay.  So you're not arguing then that

22   Transform is obligated to release all of the reserve amounts

23   because they're credit card accounts receivable.  You're not

24   arguing that.

25           MR. FRIEDMANN:  No, and there's a suggestion in

Page 37

1    their brief that we're suggesting that the reserve accounts

2    were not transferred or we were arguing they should not have

3    been transferred.  All of the security deposits, all of the

4    accounts receivable, all of that went to Transform.

5              The point is that that in that happening, and in

6    light of the fact that there also were pre-closing

7    transactions that had not yet cleared, they ended up in

8    excess of the $1.657 -- not only by the $7 million that was

9    recognized at the closing which is why there was property,

10   inventory transfer, but it ended up being an additional

11   $14.6 million, as they learned about a week a later when all

12   those credit card transactions had cleared.

13             THE COURT:  Okay, all right.  That's fine.  I just

14   wanted to make sure I understood the extent of your claim or

15   your demand.

16             MR. FRIEDMANN:  And the last point I wanted to

17   make, Your Honor, was on this point exactly, which was that

18   at the closing, Transform conceded that the debtors had met

19   and exceeded this $1.657 billion threshold -- and that's

20   demonstrated in the emails between counsel for debtors and

21   ESL, which are attached to Mr. (indiscernible) declaration

22   that we just put into evidence.  It was only hours before

23   closing the parties had agreed that debtors would be

24   delivering in excess of $7 million above the aggregate

25   threshold in 10.9.

1          And the email shows that the parties agreed at

2     that point that at ESL's request, the debtors would take $7

3     million in prepaid inventory that was still at the vendor's

4     facility instead of taking inventory that was already in

5     transit.  And my understanding is the reason for that swap

6     was that the inventory already in transit could go towards

7     the borrowing base, whereas the prepaid inventory that was

8     still at the vendor could not.

9          So we agreed to accommodate them in order to get

10    this deal to close at that point, but -- and first of all,

11    the characterization by the way in the briefing that there

12    was some threat made that they had to do this, that's just

13    ridiculous.  But it's also not the point.

14         The point is that there would be no $7 million in

15    excess of inventory to be transferred unless the $1.657

16    threshold was met.  And that threshold is met only if the

17    reserve accounts were treated as part of the credit card

18    accounts receivable in 10.9 by both parties.

19         Your Honor, in the end, you have before you an

20    agreement whose terms are unambiguous.  The definition of

21    "credit card account receivable" is enough to clearly

22    embrace the reserve accounts, even in the context of what we

23    see in the proxy agreements.  At the end of the day, this is

24    about what the agreement says, not what ESL made, not which

25    they had negotiated.

1          For that reason, we ask the court to enforce the

2     automatic stay and order First Data to release, $14.6

3     million currently held in reserves to the buyer.  I'm sorry,

4     to the debtors.  Thank you.

5          THE COURT:  Okay.

6          MR. LIMAN:  Your Honor, Lewis Liman for Transform.

7     My colleague, (indiscernible), is prepared to answer briefly

8     the questions with respect to cash in transit, if Your Honor

9     has questions about that.  The bottom line is we didn't know

10    that that was on the agenda for today.

11         THE COURT:  No, I just wanted to makes sure I

12    understood it, because again, the issue about the automatic

13    stay is a serious one, and I wanted to make sure Transform

14    appreciates the difference between setting off a claim

15    against another claim or withholding cash based on a claim

16    setoff right, which would violate the automatic stay.

17         The difference of that concept from the concept of

18    adjusting accounts through a reconciliation process, which

19    is recoupment, which is not subject to the automatic stay.

20    And if it's the former, we should stop it.

21         MR. LIMAN:  Okay.  We have serious quarrels with

22    Mr. Friedmann's representations.

23         THE COURT:  Okay, that's fine.  We don't need to

24    get into that today.  I just wanted to give everyone a

25    head's up on how I think that issue should be viewed as far

Page 40

1    as the automatic stay is concerned.

2           MR. LIMAN:  Your Honor, with respect to the credit

3    card accounts receivable security deposit issue, we've got

4    several points that we wanted to highlight.  The first is

5    that, you're quite correct, that the operative language to

6    focus on is 10.9, which has two components as applicable

7    here.  One is that it has to be credit card accounts

8    receivable, and second it has to be due.

9           Now from the beginning of this case -- and I mean

10   from the beginning of this case -- there has been a

11   distinction drawn between the notion of credit card accounts

12   receivable payer to debtors and reserve accounts.  And when

13   I say, "from the beginning of this case," I'm referring to

14   the first stay order that was entered in this case.

15          It's Docket 1394, which refers separately to the

16   credit receivables payable to debtors, that's Paragraph 19,

17   and to the reserve accounts maintained by the payment

18   processors, and that's Paragraph 15.  And that is obviously

19   a backdrop against which this was drafted.

20          THE COURT:  Why is that?

21          MR. LIMAN:  Why is that?  Because I think, Your

22   Honor, the parties recognized from the very beginning -- and

23   I'll get into the detail with respect to this -- that

24   there's a difference between the amounts that were in the

25   reserve accounts and the credit payables.  Different rights

Page 41

1    that the credit card processors had with respect to those

2    funds.

3              THE COURT:  Well the processes, I understand that

4    issue.

5              MR. LIMAN:  And that, I think, ultimately

6    underlies a lot of the issues and a lot of the dispute

7    between us.  What I'd like to do -- should I ignore that?

8              THE COURT:  Well, let's see if anyone answers

9    that.  I think that was just a glitch with the call.

10             MR. LIMAN:  I'd like to focus on three or four

11   elements of the contract.  The first is the definition of

12   "credit card accounts receivable."  The second is the

13   definition of "due," the third is the notion of payment.  In

14   order for something to be a credit card accounts receivable,

15   there has to be at least two elements.

16             First of all, it has to be a payment intangible,

17   and second, the payment intangible has to be owed as a

18   result of card charges in the ordinary course.  Now we've

19   cited a case in our papers -- I noticed Mr. Friedmann did

20   not respond to it -- that a reserve account, payments that

21   are held in a reserve account, that were withheld from

22   payments otherwise due, do not constitute a payment

23   intangible.

24             The monies in essence of Sears of debtors that are

25   held by the card companies as security.  That's the

Page 42

1    Morristown Lincoln case, it's not answered.  The second

2    element is these need to be a payment intangible --

3              THE COURT:  Well, it says "account or payment

4    intangible."

5              MR. LIMAN:  That's correct, Your Honor.  And the

6    definition of "account," these would be an account under the

7    UCC as between the card processing companies and the

8    ultimate customers.  So I think under the UCC, these would

9    not fall within the definition of account.  They -- the

10   argument would be that they fall within the definition of

11   payment intangibles, but monies that have been held back on

12   behalf as security on behalf of another party are not

13   payment intangibles.

14             THE COURT:  Why isn't it an account?  It's owed.

15   They're holding it back because they have a right of set

16   off, which means there's another obligation which they owe,

17   which they're holding back to set off against.

18             MR. LIMAN:  It's because it's cash that is held by

19   the card processing companies in the form of cash.  So that,

20   I believe, under the UCC, would make it fall within the

21   definition of payment intangible, if anything.  I do want to

22   focus though on the language about owed as a result of card

23   charges in the ordinary course.  And I also want to focus on

24   the language of the card agreements.

25             Now Mr. Friedmann told you, and his briefs say,

Page 43

1    that you should not look at the card agreements for their

2    definitions.  I'd like to cite a couple of cases to you and

3    propositions that demonstrate that that's wrong.  It's the

4    restatement of contracts 214 says that when you have related

5    contracts and you're trying to interpret a term, you look to

6    those related contracts.  And after all, what we're trying

7    to figure out here is whether these monies that are, that

8    are held by First Data, AmEx and Discover, in each instance

9    fall within credit card accounts receivable.

10           The other case I'd like to cite to you is the

11   Shiftan case, Delaware 57.935, Note 15.  If you look, just

12   for example, and parse carefully the language of the First

13   Data agreement, that tells you what is payable from card

14   transactions in the ordinary course.  The language almost

15   tracks the language that is in the APA.  It refers to sales

16   data that come from card transactions in the ordinary

17   course.

18           And remember, ordinary course in the APA in this

19   instance is used in the lower case, not the formal upper

20   case, so it's got to be referring to something.  Our view is

21   that it best refers to that language in First Data and in

22   the other agreements.

23           And then it tells you what is payable out of those

24   card transactions in the ordinary course.  And what it tells

25   you is payable is a net amount.  It's not just monies that

Page 44

1    were furnished as a result of card transactions at the Sears

2    stores.   The amount that is payable is an amount that is net

3    of reserve account amounts.

4              Now, the debtors would say, well the title, you

5    should disregard the title of credit card accounts

6    receivable because receivable and payable are not referred

7    to within the definition.   But they also within the papers

8    say that the word "owed" equals payable.   That's their

9    Paragraph 18.

10             And we would respectfully submit that in order to

11   determine what is payable, or what was receivable out of

12   card transactions in the ordinary course, you don't need to

13   go beyond the First Data agreement at Paragraph 4.3 and the

14   other related provisions.

15             Now, Mr. Friedmann also told you that reserve is

16   not mentioned within the APA, but he has no answer to the

17   fact that security is referenced within the APA.   The

18   reserve is simply the account in which the asset is being

19   held.   There's no -- it shouldn't be a surprise that reserve

20   is not being mentioned.   The issue before Your Honor is what

21   to do and how to characterize that cash in the moment of

22   closing in the hands of the debtor.

23             And when the agreements before you refer in the

24   instance of First Data to an amount that is held for

25   protection against the risk of default, when they refer to

1    in the AmEx agreement as an amount that is collateral, when

2    they refer to in the Discover agreement as security, and in

3    the Discover agreement -- and I do have a correction I need

4    to make from my argument last time -- the Discover agreement

5    makes it quite clear that there is a security interest that

6    Discover has in these funds.

7            The correction that I have to make is that I fear

8    that I may have been misunderstood to suggest that the card

9    processing companies don't have a security interest in these

10   funds.  I think they do, and I think what you need to do is

11   look at the UCC paragraphs or sections 3.12 to 3.14.  It

12   says that when the funds are in the possession of the card

13   companies, that gives them a security interest without the

14   need for perfecting.  I've got two more points I'd like to

15   make --

16           THE COURT:  But they weren't granted a lien.  They

17   have a right of setoff.

18           MR. LIMAN:  They have a right of setoff.  Under

19   the UCC, they've got -- they don't need to -- and right of

20   setoff actually is quite important, and I want to get back

21   to that in a moment.  They don't need to have perfected

22   their filing --

23           THE COURT:  No, but that's a different point.

24   That's perfection as opposed to a lien.  And I think what

25   they have is a right of setoff, i.e., they owe Sears money,

Page 46

1    which they have a right to offset against.

2            MR. LIMAN:  That's correct, Your Honor.  Now there

3    are two additional points that I want to make with respect

4    to just the definition of credit card accounts receivable.

5    The first is that when you look at the argument in the

6    definition that the debtors urge you to apply, which is to

7    say that the funds that were used to satisfy the reserve

8    obligation were generated from credit card receipts.  As

9    we've pointed out, there is no limiting principle with

10   respect to that argument.

11           THE COURT:  I don't understand.

12           MR. LIMAN:  Well the point, Your Honor, is that in

13   each instance, Sears had an option when the card companies

14   said in order to continue to do business with us, we need

15   you to post security.  Until First Data -- what First Data

16   said is you need to post a letter of credit.  You've got an

17   option if you don't want to post a letter of credit to post

18   cash or to permit us to withhold.  Similar mechanisms under

19   the AmEx agreement and under the Discover agreement.  I

20   don't think there would be any dispute if the debtors here,

21   Sears chose pre-petition to deposit cash with the card

22   companies.  That money would not constitute a credit card

23   account receivable.  That money would be derived from credit

24   card transactions, and that's where Sears' money came from.

25   It's a retail business.  Its revenues are all derived from

1    there.

2              THE COURT:  But the parties actually use the term

3    "credit card accounts receivable."  They didn't use the term

4    "cash."  And that's the term that's used in 10.9.

5              MR. LIMAN:  They did not --

6              THE COURT:  I mean, I guess this is my ultimate

7    point.  Why can't something be both a credit card account

8    receivable and a security.

9              MR. LIMAN:  Your Honor, if you look at -- because

10   under 2.1D, we got the right to all of the acquired

11   receivables.  And under 2.1P2, all of the security deposits,

12   free and clear.

13             THE COURT:  Subject to 10.9.  10.9 doesn't take

14   those asway, it just says if the aggregate amount of the

15   three items listed in 10.9, including Item 2 of those 3, the

16   credit card accounts receivables exceeds $1 billion, $600

17   and some thousand, million dollars, then the debtors can

18   take from the bottom, from the oldest credit card accounts

19   receivable.  It doesn't take away what the debtors sold.  It

20   just says that the debtors actually sell more than the

21   billion six, they get this adjustment.

22             MR. LIMAN:  There are two reasons, two other

23   reasons why they can't on these facts be both.  One reason

24   is that what these funds on the facts of these agreements,

25   what these funds were doing was securing obligations of

1    Sears.  And so they were not, in fact, payable to Sears.

2    There was no obligation to pay these --

3             THE COURT:  It doesn't say "payable," it says

4    "owed."  It says "owed by."  And that's what a setoff is.

5    That's the underlying right to the -- that's the applicable

6    language in 2.10, setoff.

7             MR. LIMAN:  Your Honor, I don't think there's any

8    dispute that "owed" also is a synonym for "is payable."

9             THE COURT:  Then they would have used the word

10   "payable" instead of "owed."  One is present, and one is

11   both present and future.

12            MR. LIMAN:  But one of them is also has to be

13   derived, and this is the key language, that debt that is

14   owed has to be from the credit card transactions.  It can't

15   -- in these instances, that debt is not owed as a result of

16   the credit card transactions.

17            THE COURT:  Well how did -- I'm sorry, can we just

18   go through 1.1.  Each account, or credit card receivable,

19   each account or payment intangible, each is defined in the

20   UCC, together with all income, payments, and proceeds

21   thereof owed, right, credit card payment processor, or an

22   issuer of credit cards to a seller, resulting from charges

23   by a customer of the seller on credit cards processed by

24   such processor or issued by such issuer in connection with

25   the sale of goods by a seller or service performed by a

Page 49

1    seller in each case in the ordinary course of business.

2            So as I read the agreements, the credit card

3    processor agreements, they get the payments by the

4    purchasers, based on the processor or issuer being paid in

5    the ordinary course.  And they owe that money to the debtor,

6    but they have the right to hold as a basis of setoff as

7    against a reserve.

8            So I mean, again, this agreement -- and we

9    clarified this when I was here for the debtor's counsel --

10   does not require the buyer to pay over the amount that's

11   being held, but it does, I think, require the buyer to pay

12   over effectively or not buy anything above the billion 657

13   in the form of the oldest credit card accounts receivable.

14           So it's just a business deal, that that was the

15   receivable.  And it seems to me that these are credit card

16   accounts receivable -- I can't imagine that they aren't.

17   It's not -- that's the basis for the relationship.  There's

18   no separate lien, it's just an offset.

19           MR. LIMAN:  Your Honor, let me put it this way.

20   Let's imagine a different world in which First Data had

21   filed for bankruptcy.  And First Data -- and the question

22   was what is the character of those funds that were held by

23   First Data.  Remember, they're held in a separate account.

24   Only First Data gets access to those accounts.  It's a

25   separate account that is funded.

1          Now in that alternative world, there will be two

2     questions.  If it's an accounts receivable, then my

3     understanding is that that -- that Sears would be a general

4     unsecured creditor, just entitled to be paid on those

5     accounts receivable.  I don't think that that is the

6     argument that Sears would be making in that instance.

7          What Sears would be saying -- and they would be

8     correct -- is that the money in the reserve changed

9     character once it was withheld from the accounts payable and

10    used to satisfy their obligation under the agreement.  What

11    they would be saying in that instance is that they've got an

12    interest in those funds.

13          THE COURT:  Who does?

14          MR. LIMAN:  Sears would be saying that.  And

15    there's a case that I would cite, Your Honor, with respect

16    to that very proposition.  It's the Ionosphere case, 177

17    Bankruptcy 198.  That's what Sears would be saying.  And

18    what First Data would be saying is that by virtue of their

19    possession of those monies that belong to Sears, they've got

20    a security interest.  Now, if you look at the --

21          THE COURT:  No, there's no grant of a lien.  They

22    would say they have a -- they would say they have a secured

23    claim because of a right of setoff, a contractual right of

24    setoff.

25          MR. LIMAN:  And that would distinguish this from a

Page 51

1   accounts receivable.

2          THE COURT:  But the basis for the setoff is that

3   one party owes another party, and that party owes the other

4   party.  They both owe each other, so it is an account.

5          MR. LIMAN:  But let's take the American Express

6   Reserve for an example.  American Express Reserve, those

7   funds are held --

8          THE COURT:  Can I interrupt you for a second, sir?

9   The UCC definition of account means "a right to payment of a

10  monetary obligation, whether or not earned by performance."

11  And it includes, among other things, "arising out of the use

12  of a credit or charge card."  So why isn't this a monetary

13  obligation arising out of the use of a charge card owed by

14  the processor, which however, the parties have agreed can be

15  held based on a right to setoff.

16         MR. LIMAN:  Your Honor --

17         THE COURT:  So it's an account obligation.  It's

18  two mutual obligations.

19         MR. LIMAN:  Your Honor, there's commentary onto

20  the UCC, and I can provide you cases.  I don't have them

21  right here at the (indiscernible), but I'd be happy to

22  provide them this afternoon, that says that that language

23  from card transactions refers to the obligation between the

24  card company and the ultimate customer.

25         THE COURT:  Fine, but it's a right to payment, and

Page 52

1    that's what Sears has.  It has a right to payment.  It's not

2    earned yet.  I'm sorry -- it's not payable yet, but it has a

3    right to payment.

4            MR. LIMAN:  Your Honor, but let's just pass for

5    the moment the question of whether these are payment

6    intangibles or accounts.

7            THE COURT:  Okay.

8            MR. LIMAN:  They do need to result -- whether

9    they're accounts or payment intangibles, they're an

10   obligation.  That's what unites payment intangibles and

11   accounts.  They're obligations.  The question that the rest

12   of the definition addresses is what is that obligation

13   derived from.  It's not how is that obligation satisfied, it

14   is what is that obligation derived from.

15           THE COURT:  Well, it's --

16           MR. LIMAN:  That I think is the best --

17           THE COURT:  All right, but I think you're arguing

18   that it is not an obligation owed by a credit card payment

19   processor resulting from charges by a customer of the seller

20   on credit cards processed by such processor.

21           MR. LIMAN:  In the ordinary course.

22           THE COURT:  In each course, the ordinary course.

23   But these were credit cards.  The customers use them in the

24   ordinary course.  The obligation was charged in the ordinary

25   course.  And this agreement in each case lays out the

Page 53

1   obligation of the credit card processor to pay the amounts

2   over, except there's a reserve based on a right of setoff.

3   But if it's --

4           MR. LIMAN:  Your Honor --

5           THE COURT:  To me, it sounds like a credit card

6   account receivable.

7           MR. LIMAN:  I do want to make sure I address my

8   other two arguments.  I just want to make one more point

9   with respect to this.  When you look at the nature of the

10  obligation, I think it is important to look at what triggers

11  the obligation to pay.  In the case of credit card accounts

12  receivable, in the ordinary course there's a period of days

13  that come, and after those periods of days, you have to pay.

14          THE COURT:  Right.  I think our difference here

15  really stems ultimately from your view that the word "owed"

16  means payable.

17          MR. LIMAN:  I don't think so, Your Honor.

18          THE COURT:  Well, I mean to say that it's an

19  obligation to pay.  Clearly the credit card processor has an

20  obligation to pay eventually if it turns out that the

21  reserve is not required.

22          MR. LIMAN:  That's not our position.  That's not

23  our position.  Our position is not that these have to be

24  immediately payable.  Our position with respect to the

25  definition of credit card accounts receivable is that the

Page 54

1    obligation that was triggered that gave rise to the need to

2    put those monies with the card companies has to have been

3    triggered from card transactions in the ordinary course.

4            It can't be that it was triggered by the fact that

5    in the past there were card transactions.  There was a

6    lingering liability.  That's the facts here.  There's a

7    lingering liability.  The company is in financial strain,

8    financial distress that reserve accounts --

9            THE COURT:  But there's nothing in the credit card

10   agreements dealing with the company being in financial

11   distress.  This is an ordinary course arrangement.  They

12   always have the reserve.

13           MR. LIMAN:  That's not true, Your Honor.  That's

14   not true.

15           THE COURT:  Well the agreements don't speak about

16   financial distress.

17           MR. LIMAN:  They do.  If you look at 4.7 of the

18   First Data agreement.  I want to be careful about using the

19   precise language because it's confidential.  But you will

20   see that there's a trigger there that refers to the

21   revolving credit facility.

22           THE COURT:  But is there anything in the record to

23   suggest that this money was withheld on that basis as

24   opposed to on the basis of all the other language that lets

25   them create a reserve because of a concern about --

1          MR. LIMAN:  Yes, Your Honor.  I'm glad you asked

2     that question.  If you were to look at the Rolacheck

3     affidavit, Exhibit B, it tells you why that reserve account

4     was triggered.

5          THE COURT:  Well, I'm sorry -- when you say

6     triggered --

7          MR. LIMAN:  Why the obligation was created to put

8     funds in that reserve.  It's not the point within 4.4, which

9     is what the debtors had cited to you.  The provision that

10    First Data invokes, Section 4.7.  And the only triggering

11    condition under 4.7 is the provision with respect to the

12    revolving credit facility.

13         THE COURT:  Okay.

14         MR. LIMAN:  And Your Honor, I would understand

15    your argument if the card companies invoked separate

16    provisions that exist under each of the agreements for

17    delayed accounts payable.  They did not trigger to invoke

18    those here.  Let me just address briefly two other, we

19    think, dispositive points that I don't think are answered.

20    And that I think there's been some confusion about.

21         THE COURT:  Okay.

22         MR. LIMAN:  The first is with respect to whether

23    these count against the 10.9 path.  And if you read that

24    provision carefully as it was written, it has two elements.

25    One is that it has to be credit card accounts receivable,

1    and the second is due to sellers.  That's the language of

2    10.9.

3              Now my colleague would have you either say that

4    due to seller means immediately payable and would caricature

5    our argument.  And again, that is not our argument.  Or they

6    would say that that language is just surplusage and means

7    the same thing as owed, and that's contrary to principles of

8    contract interpretation.  It's also contrary to the purpose

9    of the provision and contrary to the APA itself.

10             And I'd like to cite a couple of things to Your

11   Honor.  The first in terms of how that language of due is

12   used in the APA, the drafters were quite careful to draw

13   distinctions between things that would be due or would

14   become due.  You can look at the definition of "liability"

15   under the APA.

16             You can also look at 2.3K little 1, which talks

17   about obligations that transforms obligation to pay

18   liabilities as they become due in the ordinary course.  If

19   there was an intent here to pick up things that would become

20   due in the ordinary course, that could be -- it could be

21   drafted that way.

22             So there could be an obligation that can become

23   payable in the future that is not currently due.  And for

24   that -- and the definition that the case law gives to that

25   is to say that you have an amount is due when there is a

Page 57

1    fixed, settled obligation.  It's in re: Hamilton Krieg, 143

2    F3rd, 1381; in re: Rubina Metro, 522 Bankruptcy 656; and

3    Black's Law Dictionary definition of "due."

4            And Your Honor, I think that language is

5    critically important.  First, it corresponds to what is in

6    fact payable under the card agreements.  In each of the

7    instances of card agreements, it refers to two separate

8    potential sums of money.  One is the sums of money that are

9    payable on the regular schedule three days, four days, five

10   days after the sales data is submitted.  There's no question

11   here that those would be credit card accounts receivable,

12   that even if they were not immediately payable, would count

13   against the 10.9 cap.

14           There is the separate provision -- and here Mr.

15   Friedmann, I think, made some critical concessions that are

16   the sums that are held in the reserve accounts.  Those

17   numbers first of all, you heard him say, we don't know what

18   they are.  They're going to be the amount that's in the

19   reserve less what the obligations are from chargebacks.

20           And if you look at the agreements themselves, in

21   terms of when if ever they would become payable or there

22   would be an immediately enforceable right, is entirely

23   unclear.  What is clear is that there was no immediately

24   enforceable right at the time of the closing to the return

25   of those monies.

1       In each instance, it had to be that there was

2    trigger conditions that were satisfied that had not been

3    satisfied, and as to which there was no date certain.  Now,

4    they misquoted Mr. Kamlani from his declaration.  I assume

5    you've got the declaration in front of you.  I'm not going

6    to just repeat that.  I do want to address --

7            THE COURT:  Well how did they misquote him?

8            MR. LIMAN:  They misquote him by saying that those

9    monies would have been -- if we had only delivered

10   Transform's financial condition and information about what

11   Transform's condition would look like post-closing, then

12   First Data would have released all of the reserves,

13   including the oldest of the reserves.

14           If you look at the letter from First Data and the

15   email that they quote, that's not what First Data says.  And

16   if you look at Mr. Kamlani's declaration, even today after

17   we've provided that information, it's not the position that

18   First Data and the others have taken.  Their position is

19   that they still have the right to a reserve, and we have no

20   entitlement to get any of that money back.

21           They're willing to put some, not released to us,

22   in reserve.  But they're not resisting the notion that we

23   have a current entitlement to it.  That's -- now, I don't

24   think that that is particularly here or there with respect

25   to what the communications were.  We plainly didn't have an

Page 59

1   obligation to turn over business information to First Data.

2   First Data still has not agreed to the turnover.  I do think

3   that there's one other -- two other critical points.

4              THE COURT:  Did they assign the First Data

5   agreements to transform?

6              MR. LIMAN:  The debtors did assign the First Data

7   agreements to Transform, pursuant to the APA, the moment

8   that the transaction closed, those agreements were assigned

9   to us and we've exercised the right to assume those.  And

10  those agreements have been assumed (indiscernible), with all

11  of the duties and rights that go with them.

12             And they were at the time the transaction closed,

13  we were delivered a schedule.  That schedule had listed on

14  them the reserves.  We believe that the reserves were being

15  delivered to us.  There was no effort made to hold back on

16  any of the reserves.  And that's what happened at the moment

17  of closing.  There was a dispute over the $7 million.

18             You've seen the different parties' views with

19  respect to that.  Our view that we were threatened.  They

20  say that they've got a different view.  We think our facts

21  would be right.  The point is that the moment that an

22  agreement was reached with respect to that $7 million, we

23  thought they had every expectation to believe that those

24  contracts with each of the card companies were our contracts

25  that were assigned to us.  And when we assume them, we had

Page 60

1   the right to assume them.

2          From the card companies' perspective, which I

3   think is also recorded, to look at from this perspective,

4   the card companies also had the right to assume that when

5   they decided not to object to the APA because there were

6   reserves there, that those reserves would be kept in place.

7          Mr. Friedmann has said that all you have to do is

8   order First Data to release the reserves.  I don't think

9   that that is what First Data had in mind at the time of the

10  sale hearing, and I don't think that that's what the APA has

11  in mind.

12         THE COURT:  Well, First Data hasn't taken a

13  position here though, right?

14         MR. LIMAN:  I think this is the first time that

15  we've heard the debtors say that Your Honor should enter an

16  order requiring them to turn over the reserves.  They've

17  been very unclear about exactly the type of relief that

18  they're seeking.  In our mind, the only relief --

19         THE COURT:  Well they -- okay, there's this

20  dispute as to whether they're prepared to turn them over.

21         MR. LIMAN:  I don't think there's even a dispute

22  as to whether they're prepared to release them.

23         THE COURT:  Well ultimately, the purpose of the

24  reserve is to protect them against returns and chargebacks.

25  Once they figure out that there aren't any returns or

Page 61

1   chargebacks, there's no reason to hold it.

2           MR. LIMAN:  Well Your Honor, imagine the

3   hypothetical that you would have to engage in to figure out

4   what the true amount of that -- those receivables looked

5   like at the time of closing.

6           THE COURT:  I'm sure they have records to show

7   that.  They processed the cards.

8           MR. LIMAN:  I don't think so, Your Honor, because

9   you'd have to figure out which chargebacks are associated

10  with which transactions, going back in time to figure out --

11          THE COURT:  But that's what you do.

12          MR. LIMAN:  No, no, Your Honor.  You don't always

13  link it to a particular transaction in order to figure it --

14  to do the tracing exercise.  This money exists to satisfy

15  the chargebacks, whether those chargebacks are pre-closing

16  chargebacks, which are their liabilities, or chargebacks as

17  a result of post-transactions, which --

18          THE COURT:  Right, but you can tell which is

19  which.  You could tell what's pre and what's post.

20          MR. LIMAN:  I don't know that you can in order to

21  figure out what the --

22          THE COURT:  Well then, they're not really doing

23  their job, because they have to keep records and they have

24  to know what they're doing.  I guess it's conceivable they

25  don't know, but then I don't know how they file proofs of

Page 62

1    claim and assert rights to collect.

2            MR. LIMAN:  They've got that reserved, but in any

3    event, the number's not going to be the $14 million or

4    whatever.  It's going to be a number net of the chargebacks

5    that would be associated with card transactions up until the

6    moment of sale.  And that I think is a reason why this is

7    fairly considered to be a contingent claim and not a sum

8    that is due knowing.

9            I do want to mention the notion that these have to

10   be -- that they have to have taken an action to retain the

11   cards, to come back to us of February 22nd and say the

12   reserves belong to us.  I think it's just not the notion

13   that is contemplated by the APA.  They say, well it's estate

14   property, so it will --

15           THE COURT:  But this is not, again, I think we

16   clarified this -- the debtors are not saying that the

17   reserve account needs to be turned over.  This is a

18   crediting mechanism under 10.9 of the APA.  The reserve

19   stays where it is.  It gets out as it gets worked out.  But

20   the crediting mechanism is the only thing that this relates

21   to, under 10.9.

22           MR. LIMAN:  Your Honor, if I understand the point

23   correctly, we would agree that the most that the creditors -

24   - sorry, the debtors would get is that if First Data, which

25   has the oldest of the reserves, agrees to release those

Page 63

1    oldest of the reserves to us, then we have an obligation to

2    turn them over.

3              THE COURT:  No, that's not what that -- I don't

4    think -- I mean, that's what I spent a few minutes with the

5    debtor's counsel on.  10.9 says that the amount over $1.657

6    billion goes to the debtor in the form of the two abilities

7    of the debtor to use the assets.  And one of them is the

8    oldest credit card accounts receivables.  Not reserve, but

9    the receivables, the oldest ones.

10             MR. LIMAN:  They get the right to retain --

11             THE COURT:  So you all pay it over, because you've

12   gotten them.

13             MR. LIMAN:  No, we haven't gotten them.  We don't

14   have them.

15             THE COURT:  But it's over -- it doesn't matter

16   whether you've gotten them or not.  If the defined term is

17   over $1.657 billion, then there's this purchase price

18   adjustment.

19             MR. LIMAN:  But no, that's not the -- the most

20   that they would get -- assume that these were 360-day-old

21   receivables, right?  They're 360-day-old receivables.  When

22   we -- a year after the closing, we get paid those -- some

23   portion of those receivables.

24             THE COURT:  Right.

25             MR. LIMAN:  Maybe we don't get paid any of them.

1              THE COURT:  I agree with that.  That's what

2    they're entitled to, which explains why this isn't such a

3    big deal as far as transforms credit and everything else,

4    because the reserve is still there.  They negotiated a

5    pretty good deal in 10.9 for themselves, which is that the

6    amount above $1.657 billion, the debtor is entitled to, but

7    it gets it in the two limited ways that that section

8    provides, which are first, transferring inventory that would

9    otherwise be acquired inventory, to a GLB-leased store or a

10   GLB-owned story.

11             And second, retaining as an excluded asset the

12   oldest of any credit card accounts receivable, which you can

13   do as a book adjustment as part of the reconciliation

14   process of the purchase price.  So it's not depriving

15   Transform of some sort of its benefit of this security

16   deposit.  It's a purchase price adjustment where the

17   purchase price adjustment comes in those two forms in that

18   order.

19             MR. LIMAN:  If I understand Your Honor correctly,

20   the inventory's all resolved, and that with respect to the

21   security deposit, it would be an obligation running from us

22   to them once that security deposit is -- those funds are

23   released.

24             THE COURT:  No, it's just -- you just credit back

25   to them the amount on the oldest credit card accounts

1    receivable.

2            MR. LIMAN:  Once we receive it.

3            THE COURT:  No, as part of the purchase price.

4            MR. LIMAN:  But it's not -- that's cash out to us.

5    And that's exactly what this was designed not to do.

6            THE COURT:  Well, then --

7            MR. LIMAN:  I mean, they get the --

8            THE COURT:  No one has briefed that issue.  But

9    that seems to be the only right that they have is to get

10   that provision enforced.  I agree with you, it's not to turn

11   over the money in the reserve account.

12           MR. LIMAN:  It's not to turn it over, and I think

13   we have briefed, and I don't think there's any dispute with

14   it, that the most that they would get is the contingent

15   right that if we recover, they recover.

16           THE COURT:  Well, I think it's a purchase price

17   adjustment.  I don't know how that's made, but that's a

18   separate issue.

19           MR. LIMAN:  But it's not designed as a purchase

20   price adjustment.  It's not designed as a purchase price

21   adjustment.  And I think -- and I may be overstaying my

22   welcome here, and I apologize if I am, but I think in order

23   to give -- the three points I want to leave you with --

24           THE COURT:  Well, it's just transferring.  You're

25   right.  Well it says "retaining," "retaining as an excluded

Page 66

1   asset."  I guess colloquially, that to me would be a

2   purchase price adjustment.  They're not selling you those

3   old receivables.  They retain it.

4           MR. LIMAN:  What they would have had to have done

5   is at the time of closing and before we exercised assumption

6   rights, they would have had to have said something to

7   indicate that they were holding back on it.  Just like, Your

8   Honor, if you read the provision with respect to the

9   inventory, what that says is at the time of closing, they

10  need to do something with respect to inventory.

11          We're going -- we're an operating business.  To

12  say to us a week and a half after closing, we're retaining

13  something, then we already have a right to assume --

14          THE COURT:  Well, but you don't know all the

15  credit card accounts receivables at the closing.  You just

16  told me they can't figure it out as of today, what's pre and

17  post.

18          MR. LIMAN:  They could make the claim as to --

19          THE COURT:  Why do they have to?  It's right in

20  the APA.

21          MR. LIMAN:  Because what it says in the APA is

22  they have to retain it.  They have to retain it.  They

23  didn't do anything --

24          THE COURT:  They don't have to.  It's in the APA.

25  It's (indiscernible).  I think this one you're not going to

1    convince me on.  I mean, it's not something you know at the

2    closing.

3          MR. LIMAN:  Your Honor, I would urge you to look

4    closely at the language of the card agreement.  I do think

5    under the restatement and under the integration clause,

6    they're part of the agreement, I think they define what is

7    payable in the ordinary course and what's receivable in the

8    ordinary course.

9          I do think you have to give independent meaning to

10   the notion of "due."  I think that does have the meaning of

11   law that says that it is immediately enforceable, it has to

12   be a fixed obligation.  It doesn't have to be payable

13   immediately.  It can be payable in 20 days, 30 days.  It has

14   to be a fixed obligation.  And I think their argument fails

15   on those grounds.

16         THE COURT:  Okay, thanks.

17         MR. LIMAN:  Thank you, Your Honor.

18         MR. FRIEDMANN:  Your Honor, if I may just quickly

19   respond and clarify to a couple of the points.  First of

20   all, Mr. Liman pointed to the Morrison Lincoln Mercury and

21   said we had no answer and, as we all know, lawyers hate to

22   be told they have no answer so we have an answer which I

23   have to give now.

24         They're pointing to this Eastern District

25   Tennessee case from 1983, which applied completely different

Page 68

1     facts, a totally different law in determining whether or not

2     a reserve account fell under the definition of account under

3     the UCC.

4          The Delaware UCC applicable here, as you pointed

5     out, defines account as a right to payment of a monetary

6     obligation arising out of the use of credit or charge card.

7     The reserve accounts here clearly represent a right to

8     payment of monetary obligations and, under the definition of

9     the credit card accounts receivable, the key is that these

10    are accounts and the proceeds thereof resulting from those

11    charges.  I don't really see how that's a disputable point.

12         The second point I wanted to make is that the

13    withholding of these credit card receivables in reserve

14    accounts does not change the fundamental character of those

15    proceeds.  They continue to be credit card transaction

16    proceeds that were now withheld.  They were not converted

17    and they ultimately and at all times were owed to Sears.

18         The third point is Mr. Liman was making much of

19    the term "due" in 10.9, but kept inserting the word

20    "immediately".  It doesn't say immediately due, it just says

21    due.  Due and owed are synonyms.  If it said immediately due

22    that might be a different story.  That would tie closer to

23    their notion of it being payable, but it just says due.

24         The final thing I just want to clarify in terms of

25    the relief we're seeking here, Your Honor is exactly right

Page 69

1    and what the mechanisms are after the fact are different,

2    but we're looking to demonstrate that credit card accounts

3    receivable includes the reserve accounts and that therefore

4    there's a credit due to the debtors of $4.6 million.

5              THE COURT:  What is your response to Mr. Liman's

6    argument that because -- well first of all, let me ask you

7    this question.  Is the money at issue here held exclusively

8    by First Data or are there other ones too that are holding

9    it?

10             MR. FRIEDMANN:  So there are reserves that are

11   held by the other credit card processors as well.  My

12   understanding is that First Data is holding approximately

13   $28 million and change and then the other credit card

14   processors have some smaller amounts.

15             In terms of determining what the oldest are, my

16   understanding is the oldest $13.3 million, if my number is

17   right, are with First Data.  You would then need to go one

18   of the other credit card processors if you're looking for

19   the oldest to get the next whatever that is --

20             THE COURT:  All right.

21             MR. FRIEDMANN:  One point whatever million.

22             THE COURT:  So, Mr. Liman's argument is that the

23   definition of credit card account receivable ends with the

24   clause in each case in the ordinary course of business and

25   his argument is that the reserve established by First Data

1    was not in the ordinary course of business because it was

2    premised upon a more recent fact, which was the lack of

3    availability of the revolving credit facility in this

4    specific amount or higher.

5                   So, what is your response to that argument?  This

6    isn't in the ordinary course, this deposit.

7                   MR. FRIEDMANN:  This is something that we

8    addressed in our brief and I think the key here is the term

9    in each case in the ordinary course of its business, what is

10   that modifying?  And what it's modifying is the clause that

11   directly precedes it, which is in connection with the sale

12   of goods by a seller or services performed by a seller in

13   each case in the ordinary course.

14                  It's describing how these charges came to be that

15   the credit card processor had.  So, they're owed --

16                  THE COURT:  So you're applying the last antecedent

17   rule.

18                  MR. FRIEDMANN:  Correct.

19                  THE COURT:  Okay.  It doesn't have to be owed by

20   the credit card processor in the ordinary course.

21                  MR. FRIEDMANN:  It's not owed in the ordinary

22   course.  It's owed from proceeds resulting from credit card

23   charges and then the key is that those credit card charges

24   were from the sale of goods or the services performed by the

25   seller in the ordinary course of seller's business.

Page 71

1           THE COURT:  Okay.

2           MR. FRIEDMANN:  Thank you, Your Honor.

3           THE COURT:  How do you envision this working in

4    practice?  You're saying you're above the $1.657 billion cap

5    right now or amount right now, right?

6           MR. FRIEDMANN:  That's correct.  My $14.6 million.

7           THE COURT:  Right.  Is that it or will there be

8    additional amounts beyond that or is this just based on the

9    reserves that you have now?  We know what the reserves are.

10          MR. FRIEDMANN:  Based on our understanding, based

11   on the aggregate threshold in 10.9, the $14.6 is the total

12   amount that we were above.

13          THE COURT:  Okay.  So then what happens?  Because

14   we clarified it's not necessarily to have the reserve

15   released, it's just that you're entitled to the excluded

16   assets or the other assets.

17          MR. FRIEDMANN:  To be honest, I think the debtors

18   at this point are flexible in terms of how we get the $14.6

19   million.  If they want to write a check for $14.6 million,

20   that works.  If it's --

21          THE COURT:  Or it's between you and the --

22          MR. FRIEDMANN:  -- us and First Data and whoever

23   other credit card processors --

24          THE COURT:  Or whoever has the oldest one.

25          MR. FRIEDMANN:  Correct.

1          THE COURT:  And if they still have a right to hold

2     it because of their right, you can contest that.

3          MR. FRIEDMANN:  That's something we'd have to work

4     out between us and the credit card processor.

5          THE COURT:  All right.

6          MR. FRIEDMANN:  I'm sorry, I stand corrected.  The

7     $7 million that we've been referring to where at the time of

8     closing there was this identified $7 million overage, that

9     was before we knew about the additional credit card

10    proceeds.

11         THE COURT:  Right.

12         MR. FRIEDMANN:  As I mentioned, the $7 million,

13    the deal that was agreed to was rather than taking the

14    inventory in transit, we instead agreed to take inventory

15    that was still with the vendor and that was supposed to be

16    shipped to the going out of business stores.

17         That truck has not arrived yet, Your Honor.  I

18    don't know how much traffic there was between the vendors

19    and the going out of business stores, but we have not gotten

20    that $7 million worth of inventory either.  So, it's really

21    $14.6 million of credit card (indiscernible) plus that $7

22    million in inventory.

23         THE COURT:  Okay.

24         MR. LIMAN:  Your Honor, if I could just respond to

25    that last point.  My understanding is that the debtors have

Page 73

1    never given any instruction to the vendors with respect to

2    it.

3              THE COURT:  On where that's supposed to go?

4              MR. LIMAN:  As to where it's supposed to go.  The

5    first we heard of a complaint with respect to that was in

6    their papers and I think they, frankly, have -- I understand

7    we've got a lot of balls in the air.  This one looks to me

8    that they've dropped.

9              I think, Your Honor, has the point with the $15

10   million that First Data has agreed to put in escrow.  It's

11   not the oldest of the reserves.

12             THE COURT:  Right.  Okay.  All right.  I have

13   before me the motion by the debtors in this case to compel

14   turnover of estate property under Section 542 of the

15   Bankruptcy Code.  At issue in the motion is the

16   interpretation and application of the asset purchase

17   agreement between the debtors and Transform Hold Co.  More

18   specifically, for purposes of this hearing, this ruling

19   without ignoring the rest of the motion which the parties

20   seem to be working through, whether certain reserves held by

21   credit card processing companies constitute credit card

22   accounts receivable, or CCAR, as defined in the asset

23   purchase agreement, of APA, and, in addition, whether if

24   they do in fact constitute credit card accounts receivable,

25   whether Section 10.9 of the APA has been triggered or not,

Page 74

1    which involves I believe as a contested basis only the issue

2    of whether such credit card accounts receivable and "due" to

3    the seller, i.e., the debtors.

4            I believe that this issue can and should be

5    decided based on the plain meaning of the asset purchase

6    agreement pursuant to APA Section 13.8, the laws of the

7    State of Delaware govern the agreement and construction of

8    contract language under Delaware law is a question of law.

9    Rhone-Poulenc company v. American Motorist Insurance

10   Company, 616 A.2d 1192, 1195, (Del. 1992).  The primary

11   consideration in interpreting contract is "to attempt to

12   fulfill to the extent possible the reasonable shared

13   expectations of the parties at the time they contracted."

14           Comrie v. Enterasys Networks Inc., 837 A.2d 1, 13

15   (Del. Ch. 2013) where contract language is clear and

16   unambiguous, under Delaware law the ordinary and usual

17   meaning of the chosen words will generally establish the

18   parties' intent, Matthew v. Laudamiel, 2012 WL 2508572 at

19   page 5 (Del. Ch. June 29, 2012).

20           Courts must be circumspect when considering a

21   contract's language, especially when the contract is between

22   sophisticated commercial entities.  Creating ambiguity and

23   ambiguity where none exists could in effect create a new

24   contract with rights, liabilities and duties to which the

25   parties have not assented.  Cypress Semiconductor Corp. v

1   SVTC Technologies., LLC, 2012 WL 2989169 at page 4,

2   Del.Super., 2012 June 29, 2012, O'Brien v. Progressive

3   Northern Insurance Company, 785 A.2d 281-288 (Del. 2001).

4           An ambiguity exists when the provisions in

5   controversy are fairly susceptible to or of different

6   interpretations or may have two or more different meanings,

7   GMG Capital Investments, LLC v. Athenian Venture Partners I,

8   L.P. 36 A.3d 776, (Del.Supr., January 03, 2012).

9           Contract language is not ambiguous merely because

10  the parties dispute what it means, Alta Berkeley VI C.V. v.

11  Omneon, Inc., 41 A.3d 381 (Del.Supr., 2012, March 05, 2012).

12          Delaware adheres to the objective theory of

13  contracts under which a contract is construed as it would be

14  understood by an objective reasonable party.

15          The Court, of course, should not interpret a

16  contract provision to yield an asserted result or a result

17  that would render other provisions null, Martin Marietta

18  Materials Inc., v. Vulcan Materials Company 2012 WL 2819464

19  (Del.Supr., May 14, 2012).  See also GMG Capital

20  Investments, 36 A.3d 779.

21          But again, based on my review of the parties'

22  agreement, I do not believe that I need to look at parol

23  evidence and that the clear and unambiguous ordinary usual

24  meaning of the words chosen by the parties in their context

25  should govern.

1           APA Section 1.1 defines credit card accounts

2    receivables, "Each Account or Payment Intangible each as

3    defined in the UCC together with all income payments and

4    proceeds that are owed by a credit card payment processor or

5    an issuer of credit cards to a seller", the seller meaning

6    the debtors, "resulting from charges by a customer of the

7    seller on credit cards processed by such processor or issued

8    by such issuer in connection with the sale of goods by a

9    seller of services performed by a seller in each case in the

10   ordinary course of its business."

11          This term becomes relevant for purposes of this

12   dispute because Section 10.9 of the APA entitled Inventory

13   and Receivables provides the following; "The aggregate

14   amount of 1) the inventory value of the acquired inventory,

15   excluding any pending inventories, 2) the amount due to

16   seller in respect to a) the credit card accounts receivable

17   and 3) pharmacy receivables shall be at least $1.657

18   billion.  To the extent that the aggregate amount of items 1

19   through 3 in the foregoing sentence exceeds $1.657 billion

20   on the closing date, the sellers may reduce such amount to

21   be equal to $1.657 billion by first, transferring at

22   sellers' expense and in consultation with buyer inventory

23   that would otherwise be acquired inventory to a GOB leased

24   store or a GOB owned store or any other location designated

25   by sellers that is not a property, until the inventory value

Page 77

1    of the acquired inventory is equal to $1.553 billion and

2    second, retaining as an excluded asset, that is an asset not

3    purchased by the buyer, the oldest of any credit card

4    accounts receivable or pharmacy receivables."

5            I believe it is undisputed that the $1.657 billion

6    threshold in Section 10.9 has been met and that there are

7    disputed assets, disputed in the sense that there are credit

8    card accounts receivable were not in excess of that number,

9    the debtors therefore contend that the excess oldest coming

10   first should be treated as an excluded asset and not part of

11   the assets purchased by Transform Hold Co.

12           Transform Hold Co disputes this provision or this

13   interpretation on two grounds.  First, it contends that the

14   disputed credit card accounts receivable are not credit card

15   accounts receivable, but are instead covered by a different

16   definition in the APA, namely the definition of a security

17   deposit, which is found in APA Section 2.1(o).

18           That section defines a security deposit as, "Any

19   and all rights to sellers in and to any restricted cash,

20   security deposits, letters of credit, escrow deposits and

21   cash collateral, including cash collateral given to obtain

22   or maintain letters of credit and cash drawn or paid on

23   letters of credit, utility deposits, performance, payment of

24   surety bonds, credits, allowance, prepaid rent or other

25   assets, charges, setoffs, prepaid expenses, other prepaid

1   items and other security, collectively security deposits,

2   together with all contracts, agreements or documents

3   evidencing or related to the same in each case to the extent

4   related to any acquired asset."

5           There is another potential definition that would

6   apply to the disputed credit card accounts receivable here,

7   which is the APA's definition of claim as all rights to

8   payment, which then tracks the Bankruptcy Code definition in

9   1015.

10          I have now had the chance to review all of the

11  credit card servicing agreements under which the disputed

12  credit card accounts receivable are governed and pursuant to

13  which those amounts are being held by the credit card

14  servicers.

15          Those agreements are filed under seal and I will

16  resist quoting extensively from them. Instead I will note

17  merely that based on my review of each of them, including

18  the First Data, AmEx and Discover agreements, there is a

19  common thread whereby each processor or servicer owes or has

20  an obligation to pay the Debtor and in one case aptly is

21  described as a provisional credit for all of the proceeds of

22  the credit card transactions at the Debtors' stores or

23  otherwise with the Debtor.

24          But has the right to setup a reserve account for

25  chargebacks, credits or adjustments, current or anticipated

Page 79

1   card organization fees or fines in the amount of any fees or

2   discounts due.  There is no formal security agreement

3   language in these contracts, but they each recognize that

4   the basis for such reserve amounts ultimately relies upon

5   the right of setoff and/or recoupment.

6        As I previously quoted, a right of setoff is one

7   of the rights that falls within the definition of security

8   deposit and I conclude that accordingly the funds being held

9   legitimately and there's been no dispute that they have been

10  illegitimately held by the credit card processors under

11  their respective reserve right agreements, would constitute

12  security deposits as a defined term under Section 2.1(o) of

13  the APA.

14       Again, the fundamental point being that they're

15  being held pursuant to a right of setoff recognizing that,

16  to the extent that there are no amounts owed over by Sears

17  in the nature of chargebacks, adjustments, fees and the

18  like, they would be owed by the credit card processors to

19  the debtors.

20       My conclusion that the money at issue here

21  constitutes a security deposit does not however lead me to

22  conclude that it is not also a credit card accounts

23  receivable.  There is no carveout in the definition of

24  credit card accounts receivable for security deposits and

25  the fact that it would be covered by the defined term

Page 80

1    security deposit, does not also mean that it wouldn't be

2    covered by the term credit card accounts receivable.

3              That is particularly the case given that the only

4    operative provision we're focusing on here as far as the

5    underlying dispute is 10.9, which itself does not make the

6    distinction or any distinction between credit card accounts

7    receivable and security deposits.

8              So, I believe that having now read all of the

9    relevant provisions of the credit card processing agreement,

10   the argument by Transform Hold Co that the money at issue is

11   a security deposit is a red herring.

12             That still leaves the issue of whether the money

13   does fall within the definition of credit card accounts

14   receivable.  Having carefully considered the parties'

15   arguments and reviewed the applicable provisions in the

16   context of the entire agreement, I conclude that the funds

17   at issue are credit card accounts receivable within the

18   meaning of APA Section 1.1.

19             I believe that under the parties' own definition,

20   this money does in fact constitute an account for purposes

21   of the UCC as well as a payment intangible.  Delaware's

22   version of the UCC provides in Section 9.1022 that an

23   account means a right to payment of a monetary obligation,

24   whether or not earned by performance.

25             It includes, among other things, in (g) arising

Page 81

1    out of the use of a credit or charge card or information

2    contained on or for use within the card.

3            Payment intangible in Section 61 of that section

4    of the Delaware UCC means a general intangible under which

5    the account debtors' principal obligation is a monetary

6    obligation.

7            As noted, the credit card processors have a

8    monetary obligation and owe money to the Debtors arising out

9    of their processing of credit cards used by customers of the

10   Debtors.

11           It's clear to me that they owe this money based on

12   my review of the processing agreements themselves which base

13   their right to hold the money on the mutual obligation that

14   the Debtor owes them for chargebacks and future other

15   amounts that would be owed either by nature of setoff or

16   recoupment under the processing agreements, i.e., these

17   reserves are being held on account of amounts owed mutually

18   by both parties to the transaction even though neither party

19   has an immediate payment obligation, hence the use of the

20   term "reserve."

21           Transform Holdco contends that those obligations,

22   and more specifically the mutual obligation owed by the

23   respective processors to the Debtors, is neither one in

24   connection with the sale -- I'm sorry, is not -- is neither

25   resulting from charges by a customer of a seller on credit

Page 82

1    card processed by such processor or in the ordinary course

2    of the -- of business.  On the latter point, it appears that

3    one of the processors, First Data, exercised its right to a

4    reserve based upon a specific triggering fact under Section

5    4.7 of its agreement pertaining to the availability of

6    revolving credit facility in the specified amount.

7              Transform Holdco also argues that the obligation

8    owed by the credit card processor to the Debtor is different

9    from the definition of account that I previously read and

10   does not result from charges by a customer of the Debtors

11   for the use of the credit cards processed by the processor.

12   As to that latter point, I disagree.  I believe that the

13   language is more than broad enough in the definition of

14   Section 1.1(a) both in its incorporation of the term

15   "account" and in its use of the phrase "resulting from" to

16   encompass the obligation, albeit not yet -- not necessarily

17   realized on the -- closing it as a due obligation that is

18   due in the sense of immediately due to make payment to the

19   Debtor, but nevertheless, it's a fairly owed obligation to

20   give rise to a right of setoff.

21             And it would ultimately be owed once the customer

22   chargeback and related grounds for setoff were determined,

23   resulting from language obviously on its face is quite broad

24   as is the definition of account in the Delaware UCC that I

25   have previously quoted, namely a right to payment whether or

Page 83

1    not earned by performance which can rise among other things

2    out of the use of the credit or charged card.  That's the

3    entire basis for the relationship between the processors and

4    the Debtor and I believe what was contemplated by this

5    provision.

6              That leaves the issue of the meaning of the phrase

7    at the end of the definition "in each case in the ordinary

8    course of its business."  It appears clear to me and as is

9    consistent with the last antecedent rule of interpretation

10   that this phrase refers to the ordinary course of incurrence

11   of the credit card charges in the first place and not any

12   unusual relationship separate and apart from that between

13   the processor and Sears.

14             That leaves the remaining defense raised by

15   Transform Holdco that notwithstanding the inclusion of the

16   reserved security -- the reserved amounts by the credit card

17   processors in the term "security deposit," such amounts are

18   also included within the term "credit card accounts

19   receivable."  The operation of Section 10.9 restricts the

20   particular credit cards receivable amounts that go to the

21   $1.657 billion cap to amounts due to the seller as

22   pertaining to amounts immediately due or actually and

23   presently due and payable to be paid to the seller

24   immediately.  Of course, those extra words are not in the

25   phrase.  The phrase merely uses the word "due to seller."

Page 84

1           The plain meaning of this term I believe is on all

2    fours with the term "owed" as opposed to immediately due.

3    And I believe that interpretation is consistent with the

4    definition of credit card accounts receivable and the

5    operation of this provision which I believe requires the

6    parties to look at the credit card accounts receivable with

7    a snapshot which however takes into account information they

8    learn post-closing as to whether they are in fact owed as of

9    the closing date.  You would not know that calculus until

10   after the closing date, and I believe that requires one to

11   take into account that they need not be immediately payable

12   but rather simply owing to the seller as of the closing

13   date.  I say that in part based on the nature of the

14   adjustment that's laid out in Section 10.9.

15           So in light of that conclusion, I will grant the

16   Debtors' motion insofar as it seeks to implement Section

17   10.9 by including within it all amounts in the respective

18   reserve accounts to the extent that they are not actually

19   applied by the credit card processors appropriately to

20   amounts that Sears owes the processors, again, as of the

21   closing date.

22           So the Debtors can email an order to that effect

23   to chambers.  You don't need to formally settle the order on

24   counsel for Transform Holdco, but you should run it by them

25   before you email it to chambers so that they can make sure

1   it's consistent with my ruling.

2          There is a separate aspect of the relief sought by

3   the Debtors for a declaration that Transform Holdco had

4   violated the automatic stay by not causing such funds to be

5   paid over.  It appears to me that this issue was complex

6   enough and that the funds in fact were being held by a third

7   party that to the extent there was any violation of the

8   automatic stay, given the prompt resolution of the matter,

9   there should be no damages flowing from it.  So I will deny

10  that aspect of the motion on that basis that to the extent

11  there's any violation of the stay, it would not give rise to

12  any independent or separate obligation by Transform Holdco

13  to the Debtors.

14         MR. SCHROCK:  Your Honor, Ray Schrock for the

15  Debtors.  Just to clarify, there were two other issues

16  raised in the motion to enforce the February rent proration

17  and the cash in transit.

18         THE COURT:  Right.  But as I understand, the

19  parties are still leaving those open at least for a few

20  days.

21         MR. SCHROCK:  Exactly, Your Honor.

22         THE COURT:  Okay.

23         MR. SCHROCK:  And my --

24         THE COURT:  So this is just a partial resolution

25  of the motion, this ruling.

1            MR. SCHROCK:  Understood.  Just as a matter of

2    procedure to make sure that, you know, we keep these issues

3    open, there were some other issues that were raised by

4    Transform Holdco related to amounts that the Debtors believe

5    are due to them and they believe their ongoing disputes were

6    working through them.

7            And just so that we can be efficient, Your Honor,

8    and make sure that these issues remain in front of the

9    Court, you know, we can always file I know a declaratory

10   judgment action to bring it in front of the Court, but we've

11   got a current motion, you know, to enforce.  If the parties

12   can't work these other open issues out that were raised by

13   Transform Holdco and the Debtors, you know, we'd like to

14   have an efficient vehicle to frankly put them up for a

15   hearing under the current motion.

16           THE COURT:  I mean you would have to give me

17   papers on them one way or the other because --

18           MR. SCHROCK:  Exactly.

19           THE COURT:  -- they're new issues.  So I leave it

20   up to the parties whether -- I mean you probably ought to

21   just file something new on it --

22           MR. SCHROCK:  Okay.  Fair enough, Judge.  That's

23   what --

24           THE COURT:  -- unless it's really an outgrowth of

25   the issues that are covered by this current motion.

1          MR. SCHROCK:  No, that's fine, Your Honor.  We'll

2     just file something new.  And I do want to raise them just

3     because they're -- you know, some of them like for instance,

4     you know, the payment of the $166 million other payables,

5     they're relevant to -- you know, there's a number of parties

6     that are requesting administrative payments.  And so they're

7     fresh so we're going to have to move on them, you know,

8     relatively quickly.

9          THE COURT:  Right.  Okay.

10          MR. SCHROCK:  Thanks very much, Your Honor.  I

11     believe the next item on the agenda is Wilmington Trust's

12     motion for related to cash collateral.

13          THE COURT:  Okay.  Now I've been going for a while

14     now.  I'm fine to keep going, but if anyone wants to take a

15     break, they can do it.  No?  Okay, let's go ahead with that

16     motion then.

17          MR. FOX:  Good afternoon, Your Honor.  Edward Fox

18     with Seyfarth Shaw on behalf of Wilmington Trust, National

19     Association as Indenture Trustee and Collateral Agent.  Your

20     Honor, this is a motion by Wilmington Trust to prohibit or

21     condition the Debtors' continued use of cash collateral.

22          At the outset, I just want to clear up one issue

23     the Debtors have raised in their objection a question about

24     Wilmington Trust's standing.  Mr. Schrock contacted me last

25     evening to advise that they were not going to pursue that

Page 88

1    objection and that they recognize that we are the collateral

2    agent and have standing to make the motion.

3              THE COURT:  Okay.

4              MR. SCHROCK:  That's correct, Your Honor.

5              THE COURT:  But you're not waiving your rights

6    that they may be unsecured or under secured?

7              MR. SCHROCK:  That's correct, Your Honor.  But I

8    believe that given that they're collateral agent for the

9    entire cap stack over there, we weren't going to frankly

10   waste a lot of time arguing about standing.

11             THE COURT:  Okay.  That's fine.

12             MR. FOX:  Your Honor, the Court entered an order

13   in November of 2018.  It's a final order authorizing the

14   Debtors to obtain and get financing in the roll-up DIP of

15   the first lien and also to use cash collateral.  And that

16   cash collateral is cash collateral in which the holders of

17   the pre-petition second lien obligations have an interest as

18   it secures their outstanding obligations as well.

19             Under the terms of the order, the Debtors were

20   authorized to use cash collateral subject to and consistent

21   with the terms of the approved budget which was a defined

22   term.  And the approved budget was annexed as Exhibit C to

23   the order that was entered.  And we included a copy at the

24   end of my declaration as well.  That budget, that approved

25   budget carried the Debtors through February 16, 2019 which

1    as it turned out was five days after the closing of the sale

2    substantially but not all of the Debtors' assets.

3            There as far as we know and have been advised

4    there was no extension of that budget, although I'll get to

5    the Debtors have a view about that.  But to the extent there

6    was any extension by the DIP ABL lenders, the Debtors would

7    concede that that did not take them beyond March 16th of

8    2019.

9            THE COURT:  Well, what the DIP ABL lenders paid

10   out?

11           MR. FOX:  Yes, they were.

12           THE COURT:  So why would they agree to -- why

13   would they bother to deal with an extension?

14           MR. FOX:  Well, we don't believe they ever did.

15   In fact, they told us to the contrary.

16           THE COURT:  So why -- because they're paid.

17           MR. FOX:  Yes.

18           THE COURT:  They shouldn't be spending any more

19   time on the file.

20           MR. FOX:  I agree, Your Honor.

21           THE COURT:  So why is that extension even

22   relevant?

23           MR. FOX:  Well, it's only relevant because the

24   Debtors have raised that as a defense.

25           THE COURT:  No.  But what I'm saying is you're

Page 90

1    relying on their not consenting to an extension of the

2    budget, but there's a pretty good reason why they're not

3    consenting, which is they're not paid.  That doesn't mean

4    that you somehow have a right to consent.

5            MR. FOX:  And we're not suggesting that we do,

6    Your Honor.

7            THE COURT:  So but the whole right is theirs.  And

8    it's a pretty good reason why they haven't consented.

9            MR. FOX:  I understand that, Your Honor, but the

10   order is conditioned -- it limits the Debtors to making

11   expenditures in accordance with that budget.  If there's no

12   budget anymore, then there's no right under the order for

13   the Debtors to continue to use cash collateral going

14   forward.

15           THE COURT:  So --

16           MR. FOX:  Otherwise what we end up with is an

17   order that as the Debtors read it would allow them to do

18   whatever they wish with respect to cash collateral with no

19   limitations whatsoever.  And according to them, the second

20   lien which is now the only remaining lien has no ability to

21   have anything to say about what they can or cannot do with

22   that cash collateral.  And according to them, it even

23   seemingly prevents us from coming back to the Court to ask

24   the Court to address that issue either by enforcing the

25   order or alternatively under 363(e).

1              So we're in a situation now where as I said, we

2    believe --

3              THE COURT:  So I'm sorry.  So you're saying that

4    the authority to use cash collateral ended on the payout of

5    the DIP lenders and ABL lenders?

6              MR. FOX:  Well, that's effectively what happened

7    because the Debtors' ability to comply with the terms of the

8    order that was entered no longer exists.

9              THE COURT:  Is there any disagreement about the

10   use of the cash collateral?

11             MR. FOX:  You mean going forward between us?

12             THE COURT:  Yes.

13             MR. FOX:  We've not had that discussion.  The

14   Debtors -- I mean we're open to having that.

15             THE COURT:  Well, don't you think you should do

16   that before precipitating a totally unnecessary crisis of

17   this case where the Debtors can't use any cash?

18             MR. FOX:  Your Honor, we wrote to the Debtors and

19   asked before filing the motion and asked them to explain the

20   basis on which they continue to believe that they're

21   entitled to spend cash collateral.  They responded and said

22   they were entitled to.  I spoke with Mr. Schrock before we

23   filed the motion, and we've had conversations since then and

24   there's --

25             THE COURT:  All right.  Well, maybe the question's

Page 92

1    addressed to the both of you.

2              MR. FOX:  I'm happy to have that --

3              THE COURT:  Well, I think you should.

4              MR. FOX:  Okay.

5              THE COURT:  I could go through this and I will if

6    you want, and I think pretty much come up with the argument

7    that as drafted, neither your argument nor the Debtors'

8    argument makes a whole lot of sense.  Normally there's a

9    provision in these that says that, you know, under

10   materially changed circumstances, lenders can come back and

11   dispute the use of cash collateral.  Well, that's not in

12   here as far as I can see.

13             On the other hand, to argue that you gave your

14   cash collateral rights up to the DIP and ABL lenders but

15   somehow got them back when they were paid in full, it's a

16   bit of a stretch to just throw the bomb into the case.  So I

17   think you all should meet, work through a process, and if

18   you can't do it, I'll decide it because that's really what

19   we're talking about here.

20             MR. FOX:  We're happy to do that.

21             THE COURT:  Okay.

22             MR. FOX:  It takes two to tango.

23             THE COURT:  Well, that's true.  So you all should

24   start tangoing.  Actually, it's three because the Committee

25   would be involved, too.  So that'll be an interesting dance,

Page 93

1    but that's how it works.

2             MR. SCHROCK:  Judge, I --

3             THE COURT:  And by the way, there's no limitations

4    under 506(c) and 105 either or 552 as far as the -- 506(c),

5    excuse me, on I think on certain parties here.  So, you

6    know, we should just get to what's real here which is if you

7    really believe the Debtors are wasting your cash collateral,

8    I understand.  If they aren't, then we should just move on

9    to get the case over with.

10            MR. FOX:  Our concern is, Your Honor, that there's

11   a limited amount of cash available and but for the previous

12   motion, there's nothing else coming into the estate.  So

13   what we're left with is seeing the cash continue to be spent

14   with nothing to replace it but for --

15            THE COURT:  Well -- but honestly, what's the

16   alternative?  I mean if they can't spend the cash at all,

17   then you're going to be dealing with the Trustee who you're

18   going to be paying.  And I guess I could understand why

19   targets of litigation might somehow think that's right,

20   although I imagine the Trustee would hire the same people

21   that analyzed those causes of action over the last few

22   months so that they can file a, you know, 110-page

23   complaint.

24            So I just think the parties should get real here

25   and see where they are as far as a timeline to get out of

Page 94

1   the case.  And I'm not suggesting you're not being real.  I

2   understand your point.  You see this glitch in the

3   agreement.  It's the type of glitch that would drive an

4   indenture trustee crazy.  I understand that.  Let's just be

5   realistic about it.

6         MR. SCHROCK:  And, Your Honor, we're happy to sit

7   down with them.  I think the fundamental issue just that is

8   going to before the parties.  So we have been using cash

9   collateral because we believe we're authorized to do so.  I

10  think they've raised this issue.  We looked at the order as

11  we did, you know, with the closing and we said, listen,

12  we're going to have to sit down obviously at some point to

13  deal with this.  I think they want us, some of the second

14  lien parties who don't have rights against the winddown

15  account are looking at the Debtor saying, hey, why don't you

16  use the winddown account proceeds at this point and start to

17  get --

18        THE COURT:  Well, I don't know.  I mean that --

19        MR. SCHROCK:  And so we have to work that out.

20        THE COURT:  That comes through very remotely in

21  the papers, but --

22        MR. SCHROCK:  Yes.

23        THE COURT:  -- those rights are defined.

24        MR. SCHROCK:  Yes.

25        THE COURT:  And the carveout is defined.

1          MR. SCHROCK:  Right.

2          THE COURT:  And frankly, the APA which lays out

3     the mechanism for what I think isn't covered by the carveout

4     and the winddown is something that clearly the movant and

5     the parties joining in this motion and the DIP lenders and

6     the ABL lenders were all perfectly fine with.  So, you know,

7     I don't know what we're talking about here except maybe

8     trying to get some leverage in the plan negotiation process

9     which isn't going to work.

10          MR. SCHROCK:  And, Your Honor, if I could just

11    make a suggestion then.  We'll sit down.  We'll try and work

12    it out.  If we can't we'll contact the Court and --

13          THE COURT:  Okay.

14          MR. SCHROCK:  -- just have a quick status

15    conference to discuss how to proceed --

16          THE COURT:  That's fine.

17          MR. SCHROCK:  -- if that's acceptable.

18          MR. FOX:  Sure.

19          THE COURT:  Okay.

20          MR. FOX:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. O'NEAL:  Sean O'Neal with Cleary Gottlieb on

23    behalf of the ESL.  I only stand up just to confirm that

24    we'll be part of those discussions as second lienholders.

25          THE COURT:  Well, I don't know.  I mean there are

Page 96

1    specific provisions of the DIP order that deal with ESL.

2    And your colleague behind you for --

3              MR. KRELLER:  Cyrus.

4              MR. O'NEAL:  Yes.

5              THE COURT:  So --

6              MR. O'NEAL:  Understood, Your Honor.  Though --

7              THE COURT:  I mean the indenture trustee is the

8    one with the lien.

9              MR. O'NEAL:  Well, also, let's be clear we're

10   talking about the collateral agent which is Bloomington

11   Trust.  He's also the indenture trustee for one of the

12   tranches.

13             THE COURT:  Look, if they try to --

14             MR. O'NEAL:  But ESL does --

15             THE COURT:  If they're trying to take something

16   away from your clients, you and Cyrus, yes, absolutely.

17             MR. O'NEAL:  Yes.

18             THE COURT:  If you want to be involved.

19             MR. O'NEAL:  Just to be clear that ESL as a second

20   lienholder does have adequate protection liens and claims.

21   We do have those.

22             THE COURT:  Well, there are lots of reserved

23   right.

24             MR. O'NEAL:  Yes.

25             THE COURT:  That's all I can say.

1          MR. O'NEAL:  But we actually have those liens.

2          THE COURT:  Right.

3          MR. O'NEAL:  And they're in the order and actually

4    discussed in the settlement.

5          THE COURT:  You do.  And it's to protect for

6    diminution of collateral in the process where ESL became the

7    buyer of the company.  So --

8          MR. O'NEAL:  Correct, Your Honor.

9          THE COURT:  -- you know, let's --

10          MR. O'NEAL:  Okay.  And I just wanted to --

11          THE COURT:  I think that also had -- let's get

12    real here.

13          MR. O'NEAL:  Thank you, Your Honor.

14          THE COURT:  Okay.  I.e, it goes what it wanted.

15    So it's hard to argue with diminished.

16          MR. KRELLER:  Your Honor, Thomas Kreller with

17    Milbank, LLP, on behalf of Cyrus Capital.  I'll be brief,

18    Your Honor.  Just to be clear and for the record, the notion

19    was not that the consent to the use of cash collateral was

20    being withdrawn, thereby leaving the Debtors with no ability

21    to use cash.

22          THE COURT:  Right.

23          MR. KRELLER:  We're exactly in the scenario, and

24    this is the adequate protection was negotiated this way.  We

25    negotiated for adequate protection.  We gave consent to cash

1    collateral.  The Debtors negotiated for a winddown reserve.

2    If you were to shut off the use of cash collateral, they

3    would turn to their winddown reserve which is if the

4    winddown reserve is not to cover the cost of the case post-

5    closing to plan confirmation, I don't know what else it is

6    for.

7              And if you look at the budget that the Debtors --

8              THE COURT:  Well, there's a carveout.

9              MR. KRELLER:  There's a --

10             THE COURT:  And there are certain -- let me just

11   see.

12             MR. KRELLER:  Your Honor, there's actually --

13             THE COURT:  There's a -- the waiver of 506(c) I

14   don't think covers your clients.  So, again --

15             MR. KRELLER:  Your Honor?

16             THE COURT:  -- it's not that simple.

17             MR. KRELLER:  Your Honor, I'm trying to make a

18   different point.  The Debtors attached a budget to their

19   reply where they show a winddown account with $93 million in

20   it.  So I don't think that it's a fair characterization to

21   say the lenders are stepping up, the second lien creditors

22   are stepping up trying to shut the Debtors off of the use of

23   cash collateral.  The Debtors have a $90 million --

24             THE COURT:  I'm not --

25             MR. KRELLER:  -- winddown budget.

1          THE COURT:  I mean I said to Mr. Fox I understand

2     why the collateral agent and indenture trustee brought this

3     motion.  But I think that who should be funding this case is

4     not nearly as simple as you posit.  The winddown account

5     among other things was meant to take into account and

6     protect against the risk of administrative insolvency, to

7     protect administrative expense creditors, to protect

8     503(b)(9) creditors who have administrative expense claims.

9     It wasn't just to wind down from now going forward.  That's

10    a nice name for it, but I believe it was meant to cover more

11    than that.  And instead, it wasn't -- we have the 506(c)

12    issues.

13          MR. KRELLER:  Understood, Your Honor.  I think

14    there's a burden on the 506(c), particularly with respect to

15    my client Cyrus who is not the buyer.  But that'll be for

16    another day.

17          THE COURT:  Well, it will because I think they're

18    fairly close to each other.

19          MR. KRELLER:  Your Honor, we'll make the record

20    clear on that.

21          THE COURT:  Okay.

22          MR. KRELLER:  We're not an insider.  We are not

23    the buyer.

24          THE COURT:  Okay.

25          MR. KRELLER:  The point is this, Your Honor.  The

Page 100

1    winddown budget, you're right, is there to protect

2    administrative creditors.  It's not at the moment protecting

3    super priority administrative creditors.  The debtors are

4    marshaling their cash and using cash collateral without

5    consent in a manner designed to allow them to pay

6    administrative expenses, regular way administrative expenses

7    during the case in a case where there may not be cash as

8    when we stand at the confirmation to pay the 507(b) claims.

9            THE COURT:  To the extent there are any, but

10   again, you have to look at -- again, that's where 506(c)

11   comes into place.  You know, I don't know what the snapshot

12   on the start of the case and the snapshot at the end of the

13   case will look like and whether as was argued to me the sale

14   which the ongoing administrative expenses clearly

15   contributed to the value of actually enhanced the value of

16   your client's collateral.  So those are all open issues.

17           MR. KRELLER:  Your Honor --

18           THE COURT:  It's not that easy to decide in

19   advance and it's probably something that the parties should

20   try to resolve not in terms of doing a budget that specifies

21   exactly where the money is going to come from, or at least

22   leaves open -- let's put it that way.  It should leave open

23   reallocation of it.  It's fungible in other words.

24           MR. KRELLER:  It is fungible, Your Honor, and

25   that's actually a good point.  Number one, we've begun that

Page 101

1   dialogue.  In fact, we made a proposal to the Debtors in the

2   beginning of March.  We are still awaiting a

3   counterproposal.

4              THE COURT:  Okay.

5              MR. KRELLER:  And just so to size this for you a

6   bit, we believe Cyrus' position is that our 507(b) claim is

7   in the neighborhood of $60 million to the point of closing

8   plus then whatever collateral of ours has been dissipated

9   since then in our position without our consent.

10             And, Your Honor, to the extent it's fungible, the

11  other problem that I want to alert you to because I think

12  what you would hear from Mr. Schrock is the DIP order says

13  we don't have a lien on the winddown budget and we can't

14  access that, what that means -- what that doesn't mean is

15  that doesn't override the requirement under 1129(a)(9) that

16  if we have an allowed 507(b) claim, it has to be paid in

17  full.

18             THE COURT:  That's true.

19             MR. KRELLER:  And so --

20             THE COURT:  But the key word there is "if."

21             MR. KRELLER:  Absolutely, Your Honor.

22             THE COURT:  Okay.

23             MR. KRELLER:  But my point is this.  What -- the

24  risk that we have is that come plan time, Mr. Schrock stands

25  up and says you don't have any rights to that winddown

Page 102

1   reserve and there's no other cash to pay our 507(b) claim.

2   I don't think they can override 1129(a)(9) in that fashion,

3   and I expect that's probably something we'll confront if

4   we're unable to resolve this consensually.

5            THE COURT:  Well, clearly, I can't confirm a plan

6   unless parties consent.  But that's not today's issue, which

7   is why I suggest that when you work out a budget, you leave

8   the issue of allocation to another day which is not that far

9   off.  It's like 30 days from now --

10           MR. KRELLER:  Your Honor --

11           THE COURT:  -- or 60 days from now.

12           MR. KRELLER:  -- we'll be happy to do that, to

13  work out a budget.  We would have to see a budget and this

14  is the first we've --

15           THE COURT:  Sure.

16           MR. KRELLER:  And our concern, Your Honor, is Mr.

17  Schrock stands here and says it's a simple waterfall plan.

18  The problem with that is you need water.  And it's not clear

19  there's a whole lot of water here.

20           THE COURT:  Well, okay.

21           MR. KRELLER:  So, Your Honor, we'll work -- and

22  the super priority claims to the extent they exist and are

23  ultimately allowed, are being made to bear that risk.

24           THE COURT:  Okay.

25           MR. KRELLER:  Thank you, Your Honor.

Page 103

1              MR. SCHROCK:  We'll be happy to sit down, Judge.

2              THE COURT:  Okay.

3              MR. SCHROCK:  They took all the water, but we're

4     trying to deal with that.  Thank you, and we'll be back in

5     touch with the Court if we can't work that out.

6              MR. FRIEDMAN:  Your Honor, Jared Friedman, Weil

7     Gotshal, on behalf of the Debtors.  The next two agenda

8     items, Number 3 is supposed to be the motion of Debtors to

9     compel turnover of estate property.

10             THE COURT:  Yes.

11             MR. FRIEDMAN:  And Number 4 is dealing with

12    related issues.  It's the motion of the Community Unit

13    School District 300 for relief from the automatic stay or in

14    the alternative for abstention.  I spoke to the school

15    district's counsel prior to the hearing today.  They

16    requested if it's amenable, the Court is amenable to it to

17    flip the order of those because the motion for stay also

18    includes a request for an abstention, they asked to have

19    that heard first because in the event that they're

20    successful on that, that might moot our motion for turnover.

21             We have no objection if they want to proceed in

22    that order, but we'd leave it to Your Honor to make that

23    determination.

24             THE COURT:  Okay.  That's fine.

25             MR. FRIEDMAN:  It's their motion.  I'll turn it

1    over to them.

2          THE COURT:  Okay.

3          MR. GENSBURG:  Good afternoon, Your Honor.  Matt

4    Gensburg on behalf of Community Unit School District 300.

5    Your Honor, I have a number of colleagues.  We sort of split

6    the tasks here, so I'd like to introduce a couple of folks

7    to you if I may.  I have Alan (indiscernible) is my co-

8    counsel in bankruptcy.  I got Ken Florey is municipal law

9    and tax counsel.  And Cory Atkinson who's also a municipal

10   law tax counsel.

11         Your Honor, there's really four matters in front

12   of you that all revolve around the same thing or related to

13   the same thing.  There's our motion to modify the stay, and

14   in that motion, we also included a request for abstention

15   under 1334(c)(2) and 1334(c)(1).  There's a motion of the

16   Debtor to compel turnover under 542.  And then there's a

17   related motion to strike the declaration of Mr. Meghji.

18         When you think about the flow of the analysis,

19   Your Honor, we thought it made sense for the Court to

20   consider the 1334(c)(2) matter first, mandatory abstention,

21   because we believe that all those elements are met and if

22   the Court agrees with us, that none of the other issues need

23   to be dealt with today.  And so with the Court's indulgence,

24   I'd like to go through our analysis of 1334(c)(2), answer

25   any questions Your Honor may have with respect to that.

Page 105

1            THE COURT:   Okay.  Before we start on that, what

2    would the school district get back under the EDA Act if the

3    funds are not distributed to the Debtor?

4            MR. GENSBURG:  So the school district, Your Honor,

5    is the largest taxing district involved.  We would get 60

6    percent of that.

7            THE COURT:  Okay.  All right.

8            MR. GENSBURG:  So, Your Honor, I'm going to start

9    with 1334(c)(2) which states basically that the Court must

10   abstain from the proceeding if six prerequisites are

11   satisfied.  Those prerequisites are timely motion has been

12   made, the proceeding is based on state law claim or state

13   law cause of action, the proceeding is related to a case

14   under Title 11, the proceeding does not arise under or arise

15   in a case under Title 11.  But absent jurisdiction under

16   1334, there would be no federal jurisdiction here at all

17   over this matter entitling adjudication of the Court

18   original jurisdiction.

19           Every one of those elements are met.  So let's

20   take each one.  First, timely motion.  We filed our motion

21   to modify the stay and our request for abstention on

22   November 12th of 2018.  You might recall, Your Honor, I'm

23   sure you read all the pleadings --

24           THE COURT:  No, I don't have an issue on your

25   client's timeliness.

Page 106

1          MR. GENSBURG:  I'm sorry, sir.

2          THE COURT:  I don't have an issue on that point.

3          MR. GENSBURG:  Okay.  We'll go on.  State law, I

4  don't think anyone's disputing that the matters at issue

5  right now between Sears and the school district involves

6  exclusively issues of state law and state law claims causes

7  of action.  This involves the Illinois EDA Act.  It's a

8  unique Illinois legislation, also involves an economic

9  development agreement entered into by Sears in 1990 which

10  implemented the Illinois EDA Act.

11          When you look at the briefs, a large portion of

12  the briefs are just voided to try and interpret this

13  legislation.  And, you know, we filed our action, the

14  Illinois action pre-petition.  If this case were to go away

15  and were to be dismissed for some reason or had never been

16  filed, this would still be out here as an issue.  It would

17  be resolved in the state court where the matter was

18  originally filed.  I don't think anyone's disputing the fact

19  that this is a state law issue.

20          THE COURT:  Well, the Debtors contend -- and if

21  they're right on the facts, I think they're right on the

22  law, that to get there, you have to make it -- I'll have to

23  conclude that it is a real issue, a difficult issue of state

24  law.  There has to be a limit, in other words, to the

25  argument that a non-debtor third party doesn't have to turn

Page 107

1    over property, doesn't have to perform an agreement or

2    otherwise exercise control over property of the estate and

3    force a debtor to go pursue its rights in some other forum.

4           MR. GENSBURG:  Actually, Your Honor, I think in

5    the way you framed it, you jumped a couple of steps forward

6    because that's not what it is.  The question here is whether

7    Sears complied with the terms of the Illinois EDA Act.

8           THE COURT:  I know, but if the -- I'm not -- I

9    don't have a view on this yet.  But if the answer to that is

10   yes, clearly, this is a no-brainer, then it really isn't an

11   issue guided by state law because it's not an issue.

12          MR. GENSBURG:  Well, right.  And it's sort of --

13   it gets a little circular here.

14          THE COURT:  Well, it doesn't because Congress

15   clearly did not mean that any party to which a debtor has

16   some dispute with can force the debtor to pursue it

17   notwithstanding the automatic stay, notwithstanding 542 in a

18   state court where it's perfectly clear that there really

19   isn't a dispute.  There's no real dispute.

20          MR. GENSBURG:  Your Honor, on that point, I guess

21   you and I are not going to disagree.

22          THE COURT:  Okay.

23          MR. GENSBURG:  Because clearly what you're talking

24   about is 542.  And we all know the case law under 542.  542

25   is meant to bring into property that's already undisputed

Page 108

1    property of the estate.

2            THE COURT:  Well, you can't just raise your hand

3    and say I dispute.  It has to be a real dispute.

4            MR. GENSBURG:  Oh, absolutely.

5            THE COURT:  Okay.

6            MR. GENSBURG:  Absolutely.  And that's what the

7    cases say.  You know, they use -- you know, and you look at

8    the verbiage in the cases and you see some cases say

9    frivolous.  It refers to frivolous dispute and not

10   legitimate dispute, not bona fide, not substantial.  And I

11   understand that.  And what the Debtors can convince Your

12   Honor is that this matter is not a bona fide dispute so that

13   it is under 542, then I think it's correct and falls within

14   the confines and it is in fact a core proceeding.

15           But, you know, the Supreme Court talked about this

16   a long time ago in Northern Pipeline.  In Northern Pipeline,

17   you'll recall is a breach of contract action, and the

18   contract would have augmented the estate.  And what the

19   Court did is it made a clear distinction between public

20   rights which govern Article I courts and private rights.

21   And what we have here, we have a contract and we have a

22   question.  You know, did Sears comply with the terms of the

23   contract or did not comply with the terms of the contract?

24           And it gets a little more complicated because

25   within that question, there's a question of, all right, what

Page 109

```
 1    year's relevant.  Sears says 2017.  We think it's 2018.  And
 2    then it gets even more complicated by saying, well, do you
 3    count tenants and contractor employees or do you limit it
 4    just to Sears employees.  And then you add on top of that
 5    the third issue is even if they're right about 2017-2018
 6    issue and even if you determine that they're entitled to
 7    count tenants and contractors, when you count those tenants
 8    and contractors, do they meet the limit.  Well, those are
 9    all the issues --
10            THE COURT:  I'm sorry.  When you say there's a
11    factual issue, even if you count the tenants and the
12    contractors?
13            MR. GENSBURG:  There is.
14            THE COURT:  Okay.
15            MR. GENSBURG:  There is and which drove our motion
16    to strike to a certain extent.  And so I guess, Your Honor,
17    I'm not debating the fact that if you -- and that's why I
18    have Mr. Florey here.  If Your Honor's going to tell me
19    that, counsel, this is as clear as day.  This legislation
20    that's not the epitome of clarity is clear as day.  You're a
21    loser.  I can see it.  That's sort of a 12(b)(6) argument.
22            In CIL, that's exactly how the court dealt with
23    it.  The court dealt with this turnover issue by treating it
24    almost like a 12(b)(6) issue had they stated a plausible
25    claim.
```

Page 110

1              THE COURT:  Right.

2              MR. GENSBURG:  I tried to figure out because when

3     you look at the decisions, the courts really don't explain,

4     well, how do you know --

5              THE COURT:  That's a fair analogy.

6              MR. GENSBURG:  And but there's other analogies

7     that even may be closer.  You know, under 303 of the

8     Bankruptcy Code involuntary, if you're a petitioning

9     creditor, you have to have a (indiscernible) subject to bona

10    fide dispute.  And so when Your Honor is dealing with are

11    there appropriate creditors here and one of the questions

12    you're asking I assume depending on the facts that arise, is

13    this a bona fide dispute.  This is the same issue to a

14    certain extent.

15             THE COURT:  No, that case law is very different

16    because of the policy against involuntaries.  But go ahead.

17             MR. GENSBURG:  Okay.

18             THE COURT:  It's okay.

19             MR. GENSBURG:  But where it gets a little -- in my

20    mind, a little unclear is -- and I get the impression Sears

21    is suggesting that you should actually resolve the dispute

22    to determine whether it's a bona fide dispute.  And that I

23    think would be inappropriate.  I don't think that's -- that

24    would just basically say, well, Northern Pipeline is

25    irrelevant.  You need to determine, look at the facts and

Page 111

1    determine whether there's really a dispute here.  And if

2    there is really a dispute here and this is the only basis

3    for them having jurisdiction, then the Court must abstain,

4    assuming that we've --

5              THE COURT:  Well --

6              MR. GENSBURG:  -- convinced you with respect to

7    the other elements of 1334(c)(2).

8              THE COURT:  Right.  Okay.

9              MR. GENSBURG:  So if that's where we're going and

10   whether there's a bona fide dispute and all the other

11   elements of 1334(c)(2) have been conceded, then --

12             THE COURT:  Well, I'm not sure they are.  Will the

13   pending Illinois action result in a timely adjudication?

14             MR. GENSBURG:  I believe it will, Your Honor.

15   And so let me address that.  So first of all, there's a --

16   you know, AOG Entertainment from this district dealt with

17   that issue.  And basically what that court says is it stated

18   that out of deference for -- to the paramount interest of

19   another sovereign and out of respect for principles of

20   comity and federalism, "Absent contrary evidence, a federal

21   court must presume that the state court will operate

22   efficiently and effectively in adjudicating the matters

23   before it."

24             And then another case from this district,

25   (indiscernible) Capital basically says that the burden

Page 112

1    should be on the Debtor to prove that the state cannot

2    adjudicate claims in a timely manner.  And, Your Honor, they

3    simply have not met their burden.  What the Debtors say in

4    their briefs is they say, well, Your Honor, can do it

5    faster.  Well, when I go on, I'll explain why --

6            THE COURT:  Just tell me what your projected

7    timeline is on this.

8            MR. GENSBURG:  Right now, Your Honor -- well, I

9    guess this should be if it's a straightforward as their

10   counsel suggests and it can be cited as a matter of law and

11   not as a -- I think this could be resolved in 30 to 60 days.

12   It's already pending before the Court.  They got stayed and

13   motion for injunctive relief.

14           THE COURT:  By?

15           MR. GENSBURG:  I'm sorry, Your Honor.

16           THE COURT:  That motion by whom for injunctive

17   relief?

18           MR. GENSBURG:  By the school district.  And it was

19   going to be -- it was set for argument and the bankruptcy

20   got filed and they stopped it.  If in fact this issue --

21           THE COURT:  And I'm sorry, that's to enjoin the

22   town from paying the money over?

23           MR. GENSBURG:  Yes, sir.

24           THE COURT:  Okay.

25           MR. GENSBURG:  And issues -- and that's basically

Page 113

1    the issue, right.  The issue is don't pay it if they don't

2    meet the prerequisites.  The Debtors stated that this is a

3    straightforward issue.  I get the impression they believe

4    that this Court can decide or any court can decide as a

5    matter of law.  There's no reason to believe if that's true

6    that that's can't be decided in 30 to 60 days in Illinois.

7    They certainly know how to do it.

8            And the statistics that I attached to our response

9    say, you know, 81 percent of the cases, civil motions filed

10   in Cook County now are resolved in 30 days.  So --

11           THE COURT:  Well, I would really like something

12   more specific on this case.  You know, a lot of the motions

13   filed in Cook Count involve cars.  So can you or one of your

14   colleagues tell me their projection of the timeline of this

15   case?  I mean obviously an injunction would not -- it would

16   give the parties a good idea what the Court believes the

17   merits -- where the merits go, but it wouldn't decide the

18   issues.

19           So I'm trying to -- I'm really trying to -- look,

20   the reason I'm saying this is this is not a two- or three-

21   year case.  This is a case where the Debtors have reduced

22   their hard assets to cash.  Their obligations and that cash

23   -- I'm sorry, their administrative expense obligations and

24   that cash are very close to each other, so time is really

25   important.  And any extra cash is really important.

1           Now they may have all sorts of litigations claims,

2     but those won't be realized for a long time and you can't

3     use those to fund the payment of administrative expenses

4     under a plan unless the administrative expense creditors

5     consent.  So resolving this case promptly is really

6     important.  And I think what Congress drafted or -- yes,

7     when Congress or the Supreme Court drafted these provisions,

8     when they used the word "timely," they wanted to take --

9     they wanted the bankruptcy court to take into account the

10    effect of the state court litigation on the bankruptcy case.

11          So what is your best --

12          MR. GENSBURG:  And what I'll do, Your Honor --

13          THE COURT:  Just what is your best estimate and

14    why of the likely -- I understand if there's going to be a

15    trial, that's a different issue.  You know, if there's going

16    to be a trial on whether even counting the third parties who

17    work at the site or worked at the site, that will take

18    months longer.  But just on a motion to dismiss type of

19    standard on either the 2017 versus 2018 and/or it has to be

20    Sears as opposed to Sears past people who worked there,

21    what's your best estimate of --

22          MR. GENSBURG:  Let me allow Mr. Florey --

23          THE COURT:  Okay.

24          MR. FLOREY:  Good morning, Judge.  Ken Florey from

25    Robin Schwartz on behalf of the School District 300.  Judge,

1    the state court case is still active pending the ruling from

2    this Court on the automatic stay.  And Cook County is used

3    to dealing with expedited cases.  There are election cases

4    that when there's a need for a quicker briefing schedule for

5    rulings and issues of the law, the courts are cooperative in

6    doing that.  That's exactly what we would be doing.

7              If you give us the relief, if you abstain and

8    we're back in the state court, we'll be filing motions next

9    week.  We'll get a hearing on the temporary restraining

10   order to be followed by a motion for summary judgment on the

11   issues of law.  And if counsel's right, there are not many

12   disputed fact issues, we could get a ruling very quickly.

13   We would be going under expedited briefing schedule.  We

14   would have it briefed.  You can expect the ruling within 30

15   to 60 days.

16             THE COURT:  Of the abstention or of the filing the

17   motion?

18             MR. FLOREY:  From tomorrow.

19             THE COURT:  Okay.  And it would seem to me that

20   your client would really want the money, right?  You

21   wouldn't be delaying the process knowing that there would be

22   some leverage on the Debtor if you did that?

23             MR. FLOREY:  Judge, this money will be going

24   towards -- first of all, the school district is 21

25   buildings.  There's --

1           THE COURT:  No, I'm sorry.  I didn't -- it wasn't

2    clear.  Would you undertake not to delay the process?

3           MR. FLOREY:  We want the money tomorrow.  We need

4    the money for --

5           THE COURT:  All right.

6           MR. FLOREY:  -- security measures to secure our

7    schools.

8           THE COURT:  So the answer to my question is yes,

9    you won't delay the process?

10          MR. FLOREY:  Yes, absolutely.

11          THE COURT:  Okay.

12          MR. FLOREY:  The money is -- the time of this

13   money is critical.

14          THE COURT:  Okay.  So why don't I hear from your

15   colleague then.

16          MR. GENSBURG:  On that point, Your Honor, I just

17   want to make one other point with respect to this Court.  If

18   I'm right, I think I am, that this matter is related to --

19   it's clearly related to -- but it's not core, then what we

20   ought to keep in mind is what's going to have to happen.

21   Your Honor's going to make findings of fact and conclusions

22   of law and that's got to be sent up to the district court to

23   consider.

24          The only way we avoid that is if Your Honor

25   determines that this is in fact court and I don't know how

Page 117

```
 1   --
 2              THE COURT:  Well, we're back to the 12(b)(6) type
 3   of point.
 4              MR. GENSBURG:  Yes, we are.
 5              THE COURT:  Okay.
 6              MR. GENSBURG:  And so I think in summary, Your
 7   Honor, with respect to 1334(c)(2), it sounds like those are
 8   the only two issues.  You got us into the time frame.  The
 9   school district, we filed this motion in November because we
10   needed the money.  We still need the money even more.  So we
11   have every incentive to get this done promptly.
12              And then the real question, Your Honor, is whether
13   this is -- the dispute is functionally frivolous or not bona
14   fide or -- and I wish I could find a case that actually
15   defined what does it mean not to be bona fide.  And that's
16   why I went to 303 because 303 actually uses the word "bona
17   fide."  And I was trying to find something similar to that
18   and you just don't find in the case law.  What you find is
19   cases that say, you know, for example, one decision in which
20   they argue that they didn't owe the money and there was a
21   dispute but the Court looked at the defense, I forget what
22   it was, and it said there's no possibility under this
23   agreement that that defense has any validity at all.  And
24   that's I think the Court that said it was frivolous.  That's
25   not where we are.
```

1              And so, I guess in trying to figure out what the

2     appropriate step is at this point, if Your Honor wants, I

3     can give it back to Mr. Florey.  Mr. Florey can explain to

4     you his analysis with respect to the statute, both the

5     years, you know, which year's applicable.  He could explain

6     to Your Honor the school district's analysis with respect to

7     can you count tenants and contractors or not because the

8     statute's not really clear on this point.  And then we can

9     deal with the issue of even if you can do all of that,

10    whether Sears up to this point has actually proven the

11    elements of the number of tenants that worked, full-time

12    equivalent tenants and number of contractors that were full-

13    time equivalent contractors because we have problems with

14    that.  And that's the motion to strike.

15             So, Your Honor, you know, I guess I ask the Court

16    to suggest how you'd like us to proceed.

17             THE COURT:  What is your proof on the latter

18    point?  What is your evidence on the -- that the third

19    parties don't add up to the number of -- the number in the

20    EDA along with Sears?

21             MR. GENSBURG:  Well, so our problem with that

22    point which led to our motion to strike is that we don't

23    know how and Mr. Meghji doesn't know how it was calculated.

24    So --

25             THE COURT:  Okay.  So let's say you don't need to

Page 119

1    present evidence on that because you just would cross-

2    examine him.

3                MR. GENSBURG:  Well --

4                THE COURT:  And depose him, of course.  We take

5    discovery on that.

6                MR. GENSBURG:  We sent him a notice of deposition

7    and we sent Sears a 30(b)(6) notice.

8                THE COURT:  Right.

9                MR. GENSBURG:  And he came and we asked that

10   question and he refers to a methodology, but he didn't what

11   it was.  And think about this.

12               THE COURT:  So, no, I'm sorry.  I understand your

13   point which is this isn't an evidentiary hearing and you

14   want to develop the record on that point.

15               MR. GENSBURG:  And some of the tenants, Your

16   Honor, (indiscernible) Sbarro.

17               THE COURT:  I'm sorry.

18               MR. GENSBURG:  Sbarro, you know, the authentic

19   Italian --

20               THE COURT:  Pizza?

21               MR. GENSBURG:  Yeah.

22               THE COURT:  Right.

23               MR. GENSBURG:  And I would suggest it would be

24   like, you know, Walmart that very few of their employees are

25   full-time equivalent employees in that everyone's part-time

Page 120

1   so you don't have to give them benefits.  But I don't -- I

2   have no idea how they calculated their numbers.  And I don't

3   think Mr. Meghji knows.  I can guarantee you he doesn't know

4   because he didn't tell us.  We asked him the question.  And

5   that's an important fact assuming we even get to that point.

6               THE COURT:  Right.  Okay.

7               MR. GANSBURG:  So, Your Honor, I guess -- would

8   you like Mr. Florey to walk you through --

9               THE COURT:  Yes.

10              MR. GANSBURG:  Yes.

11              MR. FLOREY:  Judge, a little background on Civil

12  District 300.  The school district has 21,000 students with

13  27,000 school buildings, and it is heavily reliant on

14  commercial property taxes.

15              THE COURT:  But can I just interrupt you for a

16  second?

17              MR. FLOREY:  Sure, Judge.

18              THE COURT:  This subsidy has been going on for a

19  while, right?  I mean, they had to have budgeted, I would

20  think, on the assumption that it would be paid again, right?

21              MR. FLOREY:  Every year this subsidy exists, the

22  costs grow.  With Illinois, there's a --

23              THE COURT:  Well, of course, that's a given with

24  schools.  But what I'm saying is it's not as if they built

25  into their budget getting this money.  It's a windfall,

1    right?

2            MR. FLOREY:  It is not a windfall, Judge.

3            THE COURT:  Well, all right.

4            MR. FLOREY:  It's not a windfall.  They've been

5    disputing this.  They've been demanding proof of compliance

6    since Sears realized it breached the agreement with the

7    state.  There are two subsidy agreements in place for the

8    facility, state subsidy-based income taxes, and the local

9    subsidy based on property taxes.

10           In Illinois, school districts are heavily

11   dependent for operations on commercial property taxes.  The

12   resident come in, they build houses, they create kids.  Each

13   kid is roughly $12,000.  You have two kids, that's $24,000.

14   You're going to get maybe four, five, six thousand dollars

15   on that house.  You're running a deficit for every single

16   house that is built.

17           Well, since Sears came in and built their facility

18   and homes grew, our burden just kept building and building

19   for funding the education of these students.  We're below

20   the state average.  We're at over 40 percent property --

21           THE COURT:  All right.  My only point is that's

22   arguing that the statute was a mistake in the first place.

23   I don't think...  It doesn't do any good with me to argue

24   that it would be nice for the school district to have the

25   money because it's a tautology.  I don't think there's

1    anything as far as beyond that.

2            MR. FLOREY:  But the statute does have recapture

3    provisions.

4            THE COURT:  Right.

5            MR. FLOREY:  And it was amended in --

6            THE COURT:  That's fair.  I understand that.

7            MR. FLOREY:  -- in 2012.

8            THE COURT:  I understand that.

9            MR. FLOREY:  Remanded in 2012.  There was a

10   question and a doubt about whether Sears would comply with

11   the 4,250-employee requirement.

12           THE COURT:  Right.

13           MR. FLOREY:  So, the recapture provision was

14   specifically -- went into both statutes, the state statute

15   and the local statute, to recover the funds.  And we're at

16   that point.  We're at the point that the school district has

17   been carefully monitoring since 2016.  They were dropping

18   employees like flies and were at that point where they

19   dropped below the 4,250 for the state statute, and similarly

20   they dropped below the 4,250 in the local statute.

21           Now the recapture provision has kicked in.  We're

22   in the position to be able to assert the recovery of those

23   dollars.  It's been -- it's desperately needed in the school

24   district.  You're talking about employees.  You've asked if

25   we budgeted for it.  They're running at a deficit as far as

1    education funding for their district.  This is necessary

2    money, Judge.

3           All right.  If you look to the statute, you're

4    talking about what we've talked about repeatedly.  What are

5    the relevant numbers, Judge?  What are the relevant -- what

6    do we look to for the account for the employees?

7           Clearly, when you only count Sears employees,

8    there's -- it's undisputed, they fail on that regard.  They

9    dropped below the 4,250 at least in early 2017, if not

10   earlier.  So, then Sears came up with the novel argument

11   that we're going to change the year of how we're accounting.

12           The Village, in 2017, asked for a certification

13   from Sears.  Are you in compliance with the jobs requirement

14   for 2017 data?  They provided that answer with 2017 data.

15           In 2018, the Village submitted a similar

16   (indiscernible).  Are you in compliance with the jobs count

17   for 2018, using 2018 data?  Sears response was, we're going

18   to use 2017 data.  We're going to count the data we want to

19   use twice, even though in that year there were all

20   indications that failed to comply with that, based on only

21   counting their own employees.

22           THE COURT:  So, the first issue is the year issue?

23           MR. FLOREY:  The year.  Which year's data are we

24   using?

25           THE COURT:  Okay.

Page 124

1              MR. FLOREY:  The statute talks about that.  And

2    Cook County taxation, I could put you to sleep with an

3    explanation of how that works.  But the critical terms are

4    levy taxes, levy new taxes paid.  The statute -- the EDA Act

5    talks about using the -- to satisfy the subsidy requirement

6    of 4,250 employees, you use the data from the year the taxes

7    are paid.  They didn't use the year the taxes are levied.

8              Sears' argument requires you to go back to a prior

9    year for the levy.  There's no term of levy in the EDA Act,

10   only paid, and it's used multiple times, as recited in our

11   brief.  So, based on that, just --

12             THE COURT:  Although they say that in practice

13   that's what the parties did.

14             MR. FLOREY:  No, just the opposite.

15             THE COURT:  You disagree with that?

16             MR. FLOREY:  Look at the documentation from the

17   Village.  The Village asks for 2017, provide us 2017.  For

18   2018, provide us 2018 data.  Sears did it in 2017, as

19   requested.  Sears started playing games and 2018 when they

20   realized they can't hit numbers.  Then they decided, we'll

21   just change the year, despite the practice, despite the

22   clear language in the statute.

23             And then when that didn't work, they said, we're

24   going to change the count.  We're going to now start --

25   we've never counted contractor employees; we've never

Page 125

1    counted tenants.  We'll even count employers that are miles

2    away from the campus.  But in theory, have some economic

3    development of Sears.

4            It continues to be a stretch for Sears to try to

5    demonstrate that they complied with the statute and then the

6    recapture provisions do not kick in.

7            THE COURT:  Okay.

8            MR. FLOREY:  So, the 2018, in our view, the

9    statute is clear, the past practice is clear; you need to be

10   using the 2018 data, not the 2017 data.  And then we get

11   into the employee count.

12           The statute talks about the developer.  And the

13   developer is not tied into Sears, but it has characteristics

14   that Sears is the only company that does comply.  It does

15   not talk about the developer and its contractors and its

16   third-party employers, or any other employers.  None of

17   which these employers receive any tax subsidies.

18           So, to claim that you can -- the burden of them

19   and those other entities employing people without any

20   benefit of a subsidy is a ridiculous interpretation of the

21   statute.

22           The statute talks about the development agreement.

23   It's much more specific and talks specifically about Sears

24   as the developer and having to create, retain and maintain

25   4,250 jobs.

1           Let's talk about the state statute, because it's

2    important, and these words that are in both the EDA Act, the

3    local statute and the state statute.  They use create,

4    retain and maintain.  Maintain is a critical word, Judge.

5           Maintain is the word used in the recapture

6    provision.  If Sears doesn't maintain 4,250 jobs, it loses

7    the subsidy.  Under the state statute, that's the exact term

8    that's used.  And if you're going to go outside the

9    statutory language, as Sears wants you to do, and look to

10   other statutes, cardinal rule of statutory construction, you

11   look to similar statutes with similar terms to get your

12   answer.  Maintain under the state statute, meant Sears

13   maintained the employees.

14           THE COURT:  And what is your authority for that?

15           MR. FLOREY:  The authority for just counting the

16   Sears employees?

17           THE COURT:  Yeah, that maintain means employ.

18           MR. FLOREY:  Because that's how Sears settled with

19   the state, saying, we did not -- Sears, as an entity alone,

20   did not maintain 4,250 employees.  So, under the state

21   statute, which is the same target of employee count, similar

22   subject, the maintain is, was, and been interpreted by both

23   parties to mean Sears employees.  So, that same word is used

24   --

25           THE COURT:  In --

1              MR. FLOREY:  -- in the recapture provision.

2              THE COURT:  In what context, though?

3              MR. FLOREY:  The same context.

4              THE COURT:  No.

5              MR. FLOREY:  The context of providing the

6     employees for the economic development.

7              THE COURT:  But -- I'm not being clear.  It's not

8     a judicial decision.

9              MR. FLOREY:  It is not a judicial decision;

10    correct.

11             THE COURT:  It is reflected in what?

12             MR. FLOREY:  It's reflected in the statute, how

13    it's been interpreted by the agency that -- the Department

14    of Economic Development is a state agency created to process

15    that statute.  That was the party that Sears (indiscernible)

16    was saying we did not reply with the jobs requirement.  The

17    state agency's interpretation of the statute are given a

18    high amount of deference in Illinois, as in most

19    jurisdictions.  The conduct of the parties using the Sears

20    employees only for the two --

21             THE COURT:  As part of the settlement, though.

22             MR. FLOREY:  It was a point of --

23             THE COURT:  As part of the settlement?

24             MR. FLOREY:  Correct.

25             THE COURT:  Okay.

Page 128

1           MR. FLOREY:  So, when you take the word maintain

2     that's used in both statutes, clearly, you're talking about

3     Sears employees only.  If the General Assembly of the

4     Illinois Legislature sought to expand Sears ability to count

5     other employers, you would have had language, express

6     language to do that.  In Illinois, as within most municipal

7     jurisdictions, you must have express statutory language to

8     authorize any type of conduct you're going to engage in.

9           THE COURT:  I'm sorry.  The statute you're relying

10    on was enacted before or after that settlement?

11          MR. FLOREY:  Prior to the settlement.  They were

12    both amended in 2012 --

13          THE COURT:  Okay.

14          MR. FLOREY:  -- to extend Sears' state and local

15    subsidies for another 15 years.

16          THE COURT:  Okay.

17          MR. FLOREY:  So, you get past the 2018, 2017

18    issue.  If we're correct, Sears is -- they lose.  They lose.

19    They don't come in compliance.  If you get to the employee

20    count issue, based on the statutory language, based on the

21    interpretation of how the state is interpreted, and most

22    importantly based on the legislative history, which we have

23    included in our documents.

24          Interesting, very critical debate of the sponsor

25    of the bill, the legislative history for our statute, before

Page 129

1    the EDA Act, the question was raised.  What if Sears drops

2    out its employees -- and they had the presence of mind to

3    ask this question in 2012 -- what if Sears has rough times,

4    drops out its employees, goes to a lower count, couple

5    hundred employees below the 4,250 number, and they have a

6    skeletal crew operating there?  Do they still receive the

7    subsidy?

8            The sponsor of the bill said the intention of this

9    statute is no.  If they drop to that level, they lose the

10   subsidy.  That's a clear indication of the legislative

11   intent, do you count other employees?  The sponsor could

12   have said, well, representative, you can also -- Sears is

13   going -- there's going to be other employers still.  There's

14   going to be -- because it's not just a Sears campus.

15           There could be another company that comes in here

16   and starts to lease the space with thousands of employees.

17   They didn't say because its Sears as original economic

18   development, they were going to continue to proceed with the

19   subsidy, even though they're still there, still in

20   existence, still operating on the campus.

21           That's critical that the General Assembly did not

22   intend Sears to count anyone but its own employees.  You

23   have the burden of the employees.  That's the only way you

24   can receive the benefit of the subsidy.

25           So, based on the clear language of the EDA Act,

Page 130

1    the development agreement which talks about Sears

2    maintaining the 4,250 jobs, the practice of the parties, the

3    legislative history, it's clear that only Sears employees

4    are counted, for the same reasons it's clear that the year

5    taxes are paid is the applicable year.

6           And if you get through all those levels, if you

7    still disagree with us, as counsel said, they have no idea

8    whether the numbers that they've presented, the documents

9    they've presented as contractor employees, tenant employees,

10   are liable numbers.  They haven't even provided a list of

11   the names of the tenants, the names of the contractors.

12   It's just a term on their spreadsheet.  They didn't -- it'd

13   be very simple to say these are our tenants, Sbarro, dry

14   cleaners, Dunkin' Donuts --

15           THE COURT:  Right.  And --

16           MR. FLOREY:  -- whoever they are.

17           THE COURT:  And the argument being made is that

18   Mr. Meghji wasn't fully informed so he couldn't be a 30 (b)6

19   witness on that issue.

20           MR. FLOREY:  He didn't even need to -- they just

21   need to produce documentation, give us a -- I'm assuming

22   they have leases.  Give us copies of the lease, give us a

23   list of the leases and the parties.  Who are your

24   contractors?  Who are you counting?  Who are the businesses?

25           If you can't even provide the names of the

Page 131

1    tenants, the names of the contractors, the names of these

2    other entities, how can you count for employees?

3              If you can't explain why we've -- and the term,

4    the second (indiscernible) Misty Redman, she said -- she

5    testified that the document they were relying on, Exhibit

6    13, hasn't been scrubbed.  She called it scrubbed.  No one

7    has gone through and removed part-time employees.

8              So, they're relying on an unscrubbed -- using

9    their terminology -- document to attempt to demonstrate to

10   this Court that you get through all others hoops about can

11   we count these obscure employees that we have no identity --

12   we don't identify the employers, we don't identify the

13   employees, where they're only verifying whether they're

14   full-time or part-time or anytime.

15             Any way you look at this, Judge, there is no basis

16   in fact or law to grant their motion to compel.  To the

17   contrary, the arguments that we raise in opposition to that,

18   as well as the demonstration of the bona fide dispute, it's

19   pretty clear that exists, as counsel has argued.  And I'll

20   leave the rest to the abstention argument.

21             THE COURT:  Okay.  Thanks.

22             MR. GANSBURG:  Your Honor, at this stage, I think

23   it's probably appropriate, unless you have more questions

24   for me, to hand it over to Mr. Friedmann.

25             THE COURT:  Okay.  That's fine.

Page 132

1          MR. FRIEDMANN:  Your Honor, Jared Friedmann, Weil

2     Gotscal & Manges, on behalf of the Debtors.  All right.  I'm

3     not even sure where to start.

4          Okay.  So, beginning with the fact that for a

5     mandatory abstention, all of our requirements need to be

6     addressed and they need to be met by the movant seeking

7     abstention here.

8          The issues here are clearly fundamental core

9     issues.  We're talking about property of the estate.  Now,

10    there --

11         THE COURT:  Well, no, it hasn't been decided yet -

12    -

13         MR. FRIEDMANN:  Well --

14         THE COURT:  -- that they can't be released.

15         MR. FRIEDMANN:  -- the Illinois action that they

16    want to pursue -- so this is a motion for -- it was a motion

17    for stay and also a motion for abstention, so the issues are

18    a little bit conflated.

19         But the -- when he's talking about the injunction

20    that's been filed and the complaint that's been filed, it

21    doesn't just involve the amounts in our motion for turnover,

22    which are the 2017 funds.  It also seeks to recoup funds

23    that were paid in 2016 and 2015, and I don't know how many

24    years back.

25         So, it's both the funds that have not yet been

Page 133

1    paid by the EDA, because they're sitting there right now,

2    and the EDA is waiting to pay them to us.  It includes funds

3    that we already were paid, which they'd really, even if they

4    were successful, not have -- just an unsecured claim, I

5    guess.  And it also seeks to seek a declaration going

6    forward for claims that aren't yet ripe in 2018, 2019 and so

7    on.

8              THE COURT:  Well, that --

9              MR. FRIEDMANN:  It's a lot broader than --

10             THE COURT:  You're not going to be covering 2019,

11   are you?

12             MR. FRIEDMANN:  Are we covering 2019 --

13             THE COURT:  I mean --

14             MR. FRIEDMANN:  Well, that's why we've moved on a

15   very narrow issue, Your Honor.

16             THE COURT:  Right.

17             MR. FRIEDMANN:  Which is that right now, there are

18   funds being held by the EDA for 2017, which we want to be

19   turned over.  That's the only thing we're moving on right

20   now (indiscernible) has the right.

21             THE COURT:  But the abstention is only as to the

22   turnover motion, right?  It's not -- the rest of it would be

23   stayed, right?

24             MR. FRIEDMANN:  I don't that's accurate.  I think

25   that the abstention motion was filed before we even moved

Page 134

```
 1    for turnover.  The --

 2              THE COURT:  Well --

 3              MR. FRIEDMANN:  The first filing here was a --

 4              THE COURT:  Well, let's clarify that.  I mean, I

 5    understand the point about the money that's sitting with the

 6    Town, but I mean, there's...  What's the action requesting?

 7              MR. GANSBURG:  Well, Your Honor -- and you

 8    probably saw it in our brief.  We offered a compromise on

 9    this point.  All we need to know is determine whether Sears

10    has complied with the terms of the EDA Act.  Has it the

11    4,250 employees, which --

12              THE COURT:  Well --

13              MR. GANSBURG:  -- picks up the other two issues?

14    And then, which would make sense, when did -- if it didn't

15    comply or fell out of compliance, when did it fall out of

16    compliance?  That's it.

17              THE COURT:  Well, that's a --

18              MR. GANSBURG:  That --

19              THE COURT:  That's not...

20              MR. GANSBURG:  It seems...  The only reason why I

21    added that second part, Your Honor, because it seems

22    efficient.

23              THE COURT:  Well --

24              MR. GANSBURG:  But if the Court --

25              THE COURT:  That's not mandatory of the statute.
```

Page 135

1             MR. GANSBURG:  Right.  Well, it would still fall

2      under the mandatory of the statute, but not withstanding

3      that --

4             THE COURT:  It's not efficient because you've been

5      litigating issues that might -- your client might get, you

6      know, five cents on the dollar on -- six years from now.

7      So, it's not efficient.

8             MR. GANSBURG:  Well --

9             THE COURT:  It would be efficient to decide the

10     core legal issues, which would then be a matter of

11     collateral estoppel on the claim.  And of course, then you

12     have the mandatory abstention issue for money that's being

13     held.

14            MR. GANSBURG:  And we'll go and look at that, Your

15     Honor.

16            THE COURT:  Okay.

17            MR. GANSBURG:  And so, just have these matters

18     resolved and then we'll come back to the Court and we can

19     discuss through other pleadings what's the consequences of

20     all that.

21            THE COURT:  Okay.

22            MR. FRIEDMANN:  All right.  So, the second issue

23     that we had discussed was timing, and you asked what, I

24     guess, what they guess is how long it would take?  I don't

25     know if anybody knows the answer to that.  I started hearing

Page 136

1    about injunctions and summary judgment motions, and I'm sure

2    that discovery would be taken in advance of all of that.

3           And based on the way in which it's been litigated

4    in this court, I have absolutely no doubt that if we prevail

5    in Illinois, there would then be appeals.  So, the notion of

6    30 to 60 days --

7           THE COURT:  Well, there'd be appeals --

8           MR. FRIEDMANN:  There would be --

9           THE COURT:  -- by me too.

10          MR. FRIEDMANN:  -- appeals here as well.  That's

11   fine.  But the notion that Illinois is a place for this can

12   be timely adjudicated, I don't know that there's any basis

13   for that at all, especially --

14          THE COURT:  Well, is there a -- do you have anyone

15   to represent to me how long you think it would take in

16   Illinois, including the appellate process?

17          MR. FRIEDMANN:  I don't.  But the burden is on

18   them to prove to you that in fact it would be timely

19   adjudicated there.  What I can --

20          THE COURT:  Well, I have an Illinois lawyer

21   telling me, so, you know, I need some response, I think.

22   That's generally how I deal with this is like the lawyers,

23   since it's their area of expertise, they know their court,

24   you know?  How long does it take?

25          MR. FRIEDMANN:  I know from one colleague who

Page 137

1    advised me with a matter she had an Cook County that in two

2    years they have not even gotten to summary judgment.  So, my

3    guess is that it depends on the type of case, and the nature

4    of the case, and all of that.

5            THE COURT:  Okay.

6            MR. FRIEDMANN:  But I don't know that I'd be

7    asking this Court to put a lot of weight on either of those

8    predictions in terms of what this will take.  I'm just

9    certain that -- whereas what I can predict is that because

10   the motion for turnover is up for an evidentiary hearing

11   today, we can hopefully have that resolved in the next

12   couple of hours, which will be much more efficient and much

13   more quick for the estate, than starting to go in Illinois.

14           THE COURT:  It's not teed for an evidentiary

15   hearing today.  I have not budgeted time with another 10

16   more items that are contested on the agenda to have an

17   evidentiary hearing today.

18           MR. FRIEDMANN:  Okay.

19           THE COURT:  Particularly with a motion to strike

20   Mr. Meghji's declaration because he wasn't sufficiently

21   prepared under 30(b)(6).

22           MR. FRIEDMANN:  We're happy to address that as

23   well.

24           THE COURT:  Okay.

25           MR. FRIEDMANN:  The other factor is that I believe

1    Mr. Gansburg said that there's no dispute that this is an

2    issue of state law.  And there is a dispute regarding that

3    because it's actually not a state-specific law.  It's

4    actually a debtor-specific law.

5            The EDA act -- not the Edge Act, which they kept

6    referring to -- the EDA Act is an act drafted by Sears for

7    Sears.  That's it.  It only affects Sears.  There is no

8    other company who's affected by it.  It's not an issue that

9    the Illinois state courts have issued many opinions on over

10   the years.  It's never been heard by any court anywhere.

11   And it only affects one party, which is the one that's

12   before your court here as the Debtor.

13           THE COURT:  I guess I didn't really understand

14   that argument because even if it were, as you say, a Sears-

15   specific statute, it's still governed by Illinois law.

16           MR. FRIEDMANN:  That's correct.

17           THE COURT:  And it's not like Sears is not a

18   department of the U.S. that's governed by federal law.

19   We're not in the Court of Claims.  But in any event, if we

20   were, it wouldn't be a bankruptcy.  It wouldn't be

21   bankruptcy jurisdiction.  It would be federal jurisdiction.

22           MR. FRIEDMANN:  That's correct, Your Honor.

23           THE COURT:  Okay.

24           MR. FRIEDMANN:  The point really being that there

25   is no -- there's nothing specific about this act --

Page 139

1              THE COURT:  But that's a point for discretionary

2     abstention, not mandatory abstention, I think.

3              MR. FRIEDMANN:  That's correct.

4              THE COURT:  Okay.

5              MR. FRIEDMANN:  So, also getting back to where we

6     are in the relative cases in terms of timing, so the -- a

7     case was in fact filed on the eve of bankruptcy by the

8     school district, just a couple days later.  As of this date,

9     nothing's happened.  It hasn't even been -- hasn't been a

10    responsive pleading filed in that case.

11             So, in terms of where the efficiency is and where

12    things are going to happen most quickly, under mandatory

13    abstention, I don't how there is evidence before this Court

14    that it's going to be timely adjudicated in Illinois,

15    certainly compared to -- even if there's no evidentiary

16    hearing today, if there's an evidentiary hearing at the next

17    omnibus hearing, or sometime before then, we've already had

18    documents produced here.  We've already responded to

19    interrogatories.  There's been depositions of two witnesses

20    in their individual capacity.  There's been a 30(b)(6)

21    deposition.  There have been discovery disputes.

22             All this stuff would have to happen all over again

23    in Illinois.

24             THE COURT:  Why would it?  Wouldn't the parties

25    use the same discovery?

Page 140

1          MR. FRIEDMANN:  My understanding is that my --

2          THE COURT:  They're nodding yes over there.

3          MR. FRIEDMANN:  Well, my understanding is that my

4    friends here have not been very happy with any of the

5    discovery so far here and --

6          THE COURT:  Well, that's different issue.

7          MR. FRIEDMANN:  -- would start all over again.

8          THE COURT:  I mean, they would raise that issue

9    with me too.  But --

10         MR. FRIEDMANN:  They can, but --

11         THE COURT:  -- in terms of the discovery that's

12   actually been had, you would start all over again, right?

13   No.  And you should say that louder so the record reflects

14   it.

15         MR. FRIEDMANN:  We're not going to waste legal

16   fees repeating ourselves and our school district --

17         THE COURT:  Okay.  All right.

18         MR. FRIEDMANN:  That -- well --

19         THE COURT:  And I'm seeing you're raising your

20   rights as to whether it was responsive discovery, but you're

21   not going to start it all over again.

22         MR. FRIEDMANN:  We (indiscernible).  Your Honor,

23   we'll move to permissive abstention as well.  And I don't

24   know if I'm addressing --

25         THE COURT:  No, I just want to focus on mandatory

Page 141

```
1    --
2              MR. FRIEDMANN:  Okay, sure.
3              THE COURT:  -- at this point.
4              MR. FRIEDMANN:  Yeah, I think from our perspective
5    is there's nothing there we've required -- unless they have
6    put in front of you evidence that this is going to proceed
7    more efficiently in Illinois, which they have not, other
8    than --
9              THE COURT:  I don't think that's the standard.  It
10   says timely adjudicated.  Now, I do take into account the
11   pressures in the particular bankruptcy case.  But -- and I
12   can always revisit it.  I mean, I can estimate the -- there
13   are things I could do in this case if it turns out that the
14   Illinois court, for whatever reason, just sits on this.
15             MR. FRIEDMANN:  The issue we have --
16             THE COURT:  But it's --
17             MR. FRIEDMANN:  -- is that right now there are
18   about $9.6 million sitting in an account with the Village
19   that should have been paid out to us --
20             THE COURT:  Well, can I --
21             MR. FRIEDMANN:  -- by the end of 2018.
22             THE COURT:  Could I stop you on that point?
23             MR. FRIEDMANN:  Yeah.
24             THE COURT:  Is that $9.6, is that -- would that
25   all go to this school district?
```

1              MR. FRIEDMANN:  Not -- no, absolutely not.  It's -

2      -

3              THE COURT:  Well, why doesn't -- they're the only

4      ones who raised this issue.  Why doesn't the rest of it go

5      out?

6              MR. FRIEDMANN:  I don't think anybody else wants

7      to raise the arguments that they raised because there is no

8      merit to them.

9              THE COURT:  Then I don't understand why the rest

10     of it doesn't go out.

11             MR. FRIEDMANN:  Oh, no, it's -- let me back up.

12     We were before Your Honor back in February, I believe, when

13     there was 100 percent of the EDA fund was there.  Sixty-five

14     percent of it goes to Sears -- I'm messing the numbers up --

15     55 percent goes to Sears, 45 percent goes to a bunch of

16     other municipalities, including the school district.

17             THE COURT:  Right.

18             MR. FRIEDMANN:  At Your Honor's -- I don't want to

19     say insistence, but suggestion, we went back afterwards and

20     reached a stipulation so that the children that we heard

21     about who need security and the budget that (indiscernible)

22     would not be held up by this dispute, and we stipulated to

23     the distribution of that 45 percent to the municipality,

24     including the school.  They've had that money since, I

25     believe, January.

Page 143

1           The only portion of the EDA funds we're talking

2    about right now are the 55 percent that are earmarked for

3    Sears.

4           THE COURT:  Okay.  I don't think my question was

5    clear.  That money you say should go to Sears, as I read the

6    statute there is more than one -- if it doesn't go to Sears,

7    there's more than one recipient of it.  My question is -- I

8    gathered from the answer I got that 65 percent of that would

9    go to this school district, or approximately that amount.

10   The rest should go to Sears.  No one else is asking for

11   that, right?

12          MR. FRIEDMANN:  I think that's probably right,

13   Your Honor.

14          THE COURT:  So, that should happen.  I don't see

15   why it shouldn't.  I don't understand why that doesn't

16   happen.  The school district.  It's not fighting for anyone

17   else.  It's just the school district.

18          MR. FRIEDMANN:  We made that offer

19   (indiscernible).

20          THE COURT:  So, that should definitely happen.

21          MR. FRIEDMANN:  And Your Honor, I'm reminded by my

22   colleague that the Village actually does have an attorney

23   here today, the Village, on behalf of the Village.  So, in

24   terms of why things have or not have happened by the

25   Village, I probably should not be responding on their

Page 144

 1    behalf.  And if you have questions --

 2            THE COURT:  Okay.  Well --

 3            MR. FRIEDMANN:  -- it would probably make sense

 4    for them to respond to those.

 5            THE COURT:  All right.  Well, maybe they want to

 6    just see who else got involved.  But at this point, no one

 7    else has gotten involved.  So, it seems to me the rest of

 8    the money, the money that's not...  I mean, before I deal

 9    with anything else, the rest of the money that's not,

10    depending on your point of view, going to go to the Village

11    -- I'm sorry -- going to go the school district, should be

12    paid by the Village or the Town to Sears.  Which is --

13            MR. FRIEDMANN:  Agreed.

14            THE COURT:  -- I think, 35 percent, or roughly.

15            MR. SCHEIN:  Your Honor, Michael Schein, Vedder

16    Price, on behalf of the Village of Hoffman Estates.  One

17    clarification there.  The way the statute works, if any

18    portion of the 55 percent is recaptured, that money -- the

19    money that doesn't go (indiscernible) -- of that 55 percent,

20    the way the recapture works is the Village would share in

21    some of the money that didn't otherwise go on that 55

22    percent, whereas the Village gets none of the 45 percent

23    under the statute.

24            So, the question becomes, assuming the parties can

25    all agree on what that number is, as long as we get an order

1    that's clear as to where that money goes, the Village will--

2              THE COURT:  So, the Village is --

3              MR. SCHEIN:  -- take the Court's direction.

4              THE COURT:  -- reserving its rights to share

5    something?

6              MR. SCHEIN:  Well, we would have -- that's the way

7    the statute's written.  So, we have to follow the statutes.

8              THE COURT:  I didn't really see that, but okay.

9              MR. SCHEIN:  That's how it works, because the

10   statute, if you look at 4(g)4(a) --

11             THE COURT:  How do you determine that?  The

12   Village has some sort of percentage of the --

13             MR. SCHEIN:  Yeah --

14             THE COURT:  school district

15             MR. SCHEIN:  Well, if you look at 4(g)4(a),

16   besides the 55 and 45 percent, there's another $5 million

17   that goes off the top and it comes to the Village.  And then

18   there's a bucket for costs.  So, the 40 --

19             THE COURT:  Is that we're talking about   bucket?

20             MR. SCHEIN:  No, we're not.  But what happens is

21   the way the statute's written, if any of the Sears money is

22   recaptured, as the district's arguing, then Sears at that --

23   I'm sorry -- then the Village at that point shares.  I don't

24   know offhand what that calculation is.  I just want the

25   Court to be clear about that.

1              THE COURT:  Okay.  Well, you could make that

2     calculation, though, right?

3              MR. SCHEIN:  Yes.  We could do it all, as long as

4     we get a direction from this Court to do so, we will do it.

5              THE COURT:  All right.  Well, I think you should

6     do that.

7              MR. SCHEIN:  We will, Your Honor.

8              THE COURT:  Obviously, if there's a dispute about

9     it, I'll hear it.  But I mean, no one else is interested in

10    this except you two, the school district and the Village.

11             MR. SCHEIN:  Correct, Your Honor.  Actually, this

12    dispute is with them.  We at the Village are just waiting

13    for your Judge to direct this.

14             THE COURT:  Well, no, you just told me that you

15    want some of it.

16             MR. SCHEIN:  Well, all we're saying is at some

17    point, some of it may come back.  It's not a question of

18    want.  It's what the statute says.

19             THE COURT:  Well, but no one else has asked for

20    it.

21             MR. SCHEIN:  Correct.

22             THE COURT:  You're asking for it.

23             MR. SCHEIN:  I'm just reserving -- I'm just

24    clarifying on the record that to the extent --

25             THE COURT:  Okay.

1          MR. SCHEIN:  -- we are entitled to a piece of it,

2     I want the Court aware of that.  That's all.

3          THE COURT:  All right.  So your rights are

4     preserved.  You're reserving your rights.  But I really

5     believe that the remaining money should go to Sears.

6          MR. SCHEIN:  And Your Honor...

7          THE COURT:  So can we pre-- I don't want to focus

8     on permissive extension for the moment -- abstention for the

9     moment. I want to focus on mandatory.  What -- I didn't, as

10    you can tell, I didn't accept the argument that this is a

11    Sears specific statute and therefore it's somehow core,

12    right?  I don't really accept the notion that turnover is

13    core unless, again, it's a no brainer.

14         MR. FRIEDMANN:  Well, that adds, I think -- that's

15    our other point, though, Your Honor, is I think it is a no-

16    brainer.  I think that you've got a lot of very -- they've

17    got a wonderful team here who've come up with some really

18    creative arguments, none of it is really supported, though,

19    by the statute.  So the Recapture Provision 4.5 it just

20    simply says that if we don't have the 4,250 employees during

21    the relevant year that -- it doesn't say that -- what that

22    relevant year is.  It doesn't say that it's the year in

23    which the taxes were levied versus the year in which the

24    taxes were paid.  That's something that they have read into

25    it, because it would be better for them if it was the year

1    in which the taxes were paid because then it -- we wouldn't

2    be eligible for it quite yet.

3              THE COURT:  Well, why aren't you also reading into

4    it?

5              MR. FRIEDMANN:  What we're doing is we are

6    treating it the same way it's been treated year, after year,

7    after year by the Village and Sears with nobody ever raising

8    an issue.  So every year, what happens is the taxes are

9    levied and, you know, so in this instance they were levied

10   in 2017, those taxes -- and they're paid in arrears.  So in

11   the early part and middle part of 2018 they're paid for 2017

12   and typically by December.  And in the record we've got --

13   showing both in the last two years this has happened, so by

14   December of 2018 there would have been a board meeting and

15   resolution of the Village to make that payment and

16   distribute that payment.

17             So what does that tell us about what year is

18   relevant?  Well, if the Recapture Provision allows you to

19   withhold payments in any month in which we were not in

20   compliance, if they're meeting in December 2018 regarding

21   2017, they can make a decision about every month in 2017.

22   What they can't do in December of 2018 is make a decision

23   about every month in 2018, and that's the way it's worked

24   every single year going back as far as we've seen records

25   for.  Is that it's that following year after collecting the

Page 149

1    funds, they go back and say, was Sears in compliance?  They

2    were, then the Village authorizes the payment to be made,

3    often enough in that same year, in that same year which the

4    taxes were collected, the taxes are reimbursement is paid,

5    so the course of dealing between the parties.

6            We also, again, we have Mr. Schein here from the

7    Village who can confirm our understanding and the

8    understanding between the only two parties to this

9    agreement, which are Sears and the Village.  And the Village

10   does not disagree with any -- I mean, the Village, as you

11   saw, did not file any kind of objection to our motion to

12   turn over funds that they're holding, even though, frankly

13   if we're wrong it's to the Village's benefit because that

14   money goes, amongst all the municipalities, they're one of

15   them.  But they didn't file any response because they would

16   have been saying something that's not accurate.

17           They don't challenge our compliance in 2017.  They

18   don't challenge that 2017 is the right year to be looking at

19   for these funds, the year in which the taxes were levied.

20   They don't challenge that the way in which the employees

21   were counted was appropriate, which employees in terms of

22   what --

23           THE COURT:  Well, you say "they" you're referring

24   to the Village?

25           MR. FRIEDMANN:  The Villages.

```
1              THE COURT:  Right.

2              MR. FRIEDMANN:  Excuse me.  Sorry.  To be more

3      specific.

4              So I don't think there really is a genuine dispute

5      here at all.  You have an opportunistic school district who,

6      in addition to getting the 45 percent we already agreed to

7      make sure that that was distributed to them and was not held

8      up by their own litigation, they have that money, now

9      they're looking for, as Your Honor put it, a windfall.  This

10     is above and beyond what they could have reasonable have

11     expected to get when they put their budget together, and

12     they're taking a shot at it.  And, you know they're lawyers

13     and that's the way lawyers make money, so I get it.  But

14     there really is no legitimate basis in the case law, other

15     than their creative lawyering.

16             Let me address one final thing on that is, you

17     know, they suggest that the record is not clear and Mr.

18     Meghji's deposition, he wasn't prepared for.  This is the

19     reality of being in bankruptcy, Your Honor, is that all the

20     employees who worked there in 2017 unfortunately are no

21     longer all employed by Sears.  So the two women who were

22     responsible for contemporaneously keeping track, on a

23     monthly basis, of our compliance with the EDA Act are not

24     there anymore.  Luckily all of their documents and records

25     are, so Mr. Meghji, as CFO -- CRO of the company, excuse me,
```

Page 151

1    gathered all those documents, went through them and was able

2    to see that consistent with what Sears confirmed to the

3    Village, in real-time, it was in compliance in every month

4    in 2017.

5             So what has been produced and what Mr. Meghji was

6    able to testify is the best available evidence and it's

7    unrebutted.  There's not -- it's not as those there's some

8    email that says, oh no, we're really not in compliance, what

9    are we going to do.  There, by the way, certain are email

10   that say, we better we careful, we're learning -- we're

11   losing a lot of employees, we've got to track this carefully

12   because in the future we may not be in compliance.  But

13   there is no evidence whatsoever suggesting that at any point

14   in 2017 they were not in compliance.

15            And really, at the end of the day, it's a counting

16   exercise.  This is not a complicated issue.  You count from

17   1 to 4,250 and when you hit that number you can stop because

18   you're in compliance.  You certify that to the Village and

19   the Village turns over the money.

20            THE COURT:  And that's with actual Sears

21   employees, not third parties?

22            MR. FRIEDMANN:  So, it depends on the timing.  So

23   in 2017, certainly the beginning of 2017, they were relying

24   solely on Sears employees at the Hoffman Estates campus.

25   And the numbers were significantly above 4,250 so as long as

1    they knew -- and then the actual number didn't matter, they

2    didn't have to certify that to the Village, they had to

3    certify that we are above the number.  So there were enough

4    employees, full-time employees at Sears at the time, they

5    were fine.  As the year went on and as they started getting

6    closer to that number, they started including, and there's

7    nothing in the EDA Act that prevents them from doing so,

8    they included other full-time employees that were also at

9    the Hoffman Estates campus, and that includes the --

10            THE COURT:  Employees of Sears?

11            MR. FRIEDMANN:  They're not employees of Sears,

12    they're employees who work at the EDA.

13            THE COURT:  All right.

14            MR. FRIEDMANN:  Which again, the -- there was

15    discussion about the Edge Act and the EDA Act --

16            THE COURT:  And this was in 2017?

17            MR. FRIEDMANN:  This was for 2017.  So in 2012 it

18    wasn't just -- the EDA Act and the Edge Act were both

19    amended.  Same piece of legislation, amended them both.  In

20    the Edge Act the language was they required Sears to "employ

21    a minimum of 4,250 full-time employees at its corporate

22    headquarters in Illinois at the time of the application."

23    Employ.  In the EDA Act, amended at the same time, same

24    legislation, uses very different language it says, "Sears is

25    required to maintain 4,250 jobs," they don't have that same

1    language "employed" because there never was an understanding

2    or a requirement that Sears employ all those people.  The

3    idea was Sears came out of the Hoffman Estates, which at the

4    time was Prairieland, put $100 million or so into that area

5    and now they're being reimbursed for that.  Not just because

6    it created Sears jobs, but it created jobs for probably a

7    lot of the parents of the kids that lived in -- live in the

8    Hoffman Estates area, whether or not they work for Sears or

9    work for some other company that, you know, was spurned by

10   the fact that Sears had moved there.

11            So there is not that requirement.  And once again,

12   as the Village can confirm, there's no dispute, as between

13   Sears and the Village, that it's not limited to just Sears

14   employees.  In fact, it's not only limited to Hoffman

15   Estates.  You could count employees in the entire EDA, and

16   Sears never did that, because it wasn't necessary.  Once

17   they got to 4,250 they stopped counting.  If it was

18   necessary to count through the entire EDA, they could have

19   done that they would have been even that much more over the

20   threshold.

21            But our view, Your Honor, is that there's no real

22   bona fide dispute here because neither the statute has the

23   language that the school district wishes it had, and in

24   terms of the numbers, they're there, they are what they are.

25   And it was counted contemporaneously, they're in business

1          records and it -- and Sears --

2                  THE COURT:  Well, the numbers for the Sears

3          employees.

4                  MR. FRIEDMANN:  Well, the numbers are in there for

5          both Sears employees and they also kept track of the non-

6          Sears employees.  They're all working at the Hoffman Estate

7          campus, so all these employees had to get registered badges

8          through the, what was it, real estate office, at Hoffman

9          Estates.  So Sears actually was able to easily keep track of

10         every -- all of the employees at the building, not just

11         Sears.

12                 THE COURT:  What about the school district's

13         argument that it shouldn't count part-time employees?

14                 MR. FRIEDMANN:  They did not count part-time

15         employees.  That's actually -- the documents that were

16         produced reflect they were only counting full-time

17         employees.  Now, by the way, I know the Village takes the

18         position that part-time employees could have been counted,

19         there's nothing that restricts Sears from doing so under the

20         EDA.  Because they were using information from the Edge Act

21         that they had already collected, which had more restrictions

22         on it, they limited themselves to only counting full-time

23         employees.  And the materials, the term "scrub" that was

24         used before, that was one of the things that was done, is

25         they would scrub it to make sure that they were only

1    including full-time employees.

2            THE COURT:  Okay.

3            MR. FRIEDMANN:  Thank you, Your Honor.

4            MR. GENSBURG:  Your Honor, may I address just a

5    couple matter?  I think this dialogue that I -- we've had

6    sort of establishes that this is simply not a statute that's

7    going to need clarity, as I said earlier.

8            But I want to point out a couple things.  First of

9    all, Mr. Friedmann mentions past practices.  You might

10   recall we had sent a letter to the Court about our ability

11   to get documentation from prior years and they objected

12   saying that 2017 was the only year that's relevant.  And now

13   he's arguing about years' prior past practices.  We've never

14   been given those documents, we've asked for that stuff,

15   haven't been given it and so I don't think it's appropriate

16   that he makes that argument right now.

17           He makes a point about how the Village's silence

18   is somehow acquiescence.  I'm not sure how you read that

19   into it.  You know, we've been active on this, and the

20   Village has been watching us and they know what's going on.

21   So their silence may be, you know, guys go for it, we're

22   supporting you.  I don't know what it is.  Or it could be

23   the fact that the Village gets -- as long as the EDA Act

24   remains in effect gets $5 million.  And then once the Act

25   disappears, because it's noncompliant, that $5 million goes

Page 156

1    away.  So it could be one of those two things, or maybe it's

2    a third, I don't know.

3              THE COURT:  Where does it go?

4              MR. GENSBURG:  It goes to the other taxing

5    districts.  The $5 million is their take under the EDA Act

6    while its in place.  And that's -- you know, if you were a

7    cynic you would say, well, that's why the Village is not

8    doing anything about this.  Or maybe they're looking at me

9    and saying, go for it, Gensburg.  I don't know.  But I think

10   the mere fact that they're silent is not necessarily

11   acquiescence and agreement.

12             Mr. Friedmann says that there's a -- that there

13   was -- there's no --

14             THE COURT:  Well, there's no -- isn't there -- I

15   mean, Sears had to certify compliance, there's no document

16   where they accept certification?

17             MR. GENSBURG:  Sears -- when you -- in actually

18   attaching some of the documents Sears sends a certification

19   letter that basically says, we've complied.

20             THE COURT:  Okay.

21             MR. GENSBURG:  And the Village says, great.  The

22   Village doesn't say, well, give the detail about how you

23   complied.

24             THE COURT:  But is -- I guess my point is, isn't

25   saying, great, enough to mean that they've agreed?

1               MR. GENSBURG:  I don't -- yeah, I don't think --

2       you know, the problem with those letters is the years.  So

3       Sears -- the Village was saying, give us data in 2017 for

4       2017, 2018 for 2018 and so there's that discrepancy.  But I

5       think, quite frankly, Your Honor, that the Village would be

6       thrilled to allow the EDA Act to remain in place because

7       they make money off of it.  And that's the $5 million.  I

8       don't know if that's what Michael Schein was talking about,

9       but that's the $5 million.  Once the Act disappears, that $5

10      million goes to all the taxing districts, it's not funds

11      that are just to the Village, which is a product of the

12      statute that Mr. Florey or Mr. Atkinson can walk the Court

13      through, if you want a little more detail on that.

14              And the problem with the 30(b)(6), you know, he

15      says, Mr. Meghji, all the employees are gone.  Well, you

16      know, 30(b)(6) is hard, it requires you to inform yourself.

17      And when you look at the case law that deals with 30(b)(6),

18      you can call them employees or nonemployees, you just have

19      to inform yourself.  And most of these employees are at

20      least employees under the agreement.  I'm not sure why this

21      is so difficult.  But the bottom line is, just saying there

22      was a methodology, and I can't tell you what it is, doesn't

23      inform me.  I have no idea how you determine that the people

24      at Sbarro's who make the pizza for lunch are full-time

25      employees.

Page 158

1              The other problem is, is that when you look at the

2     documentation that was provided in his declaration, Your

3     Honor, they refer to active badges for the Sears employees.

4     But there's also a column that says "daily swipes of

5     associates," which is employees.  It's half that number.  So

6     there's active badges of 4,300 and the daily swipes are

7     2,100.  And we asked him about that and he says, I don't

8     know, I didn't look at that.

9              The fact that there's a lot of active badges and

10    the company is shrinking dramatically doesn't necessarily

11    mean there's 4,300 full-time equivalent employees, the point

12    being there's a lot at issue here that needs to be resolved.

13    This is not a frivolous dispute, by any stretch of the

14    imagination.

15             THE COURT:  Let me ask your colleague, we talked

16    about, at the trial level -- at the appellate level, what is

17    your sense of getting -- let's assume there is contested, up

18    to at least the intermediate appellate court, what would

19    that time take?

20             MAN 1:  Well, there's also an expedited proceeding

21    in the appellate court as well.

22             THE COURT:  Right.  But can you just give me a

23    ball park sense?

24             MAN 1:  Again, an election case is probably the

25    best example where there's a critical need to get the answer

1    quickly, and it can be done in less than four months. You

2    have an expedited briefing schedule, you have an expedited

3    hearing schedule.  Most appellate courts don't take oral

4    argument, they just render the decision.  And if the

5    direction was clear from this Court to be on -- you simply

6    have to request to be on the expedited calendar.

7            THE COURT:  And that applies to matters like this?

8            MAN 1:  If --

9            THE COURT:  If the parties --

10           MAN 1:  -- we will inform --

11           THE COURT:  -- request it?

12           MAN 1:  Not just the parties but this Court.

13   They're going to understand that this -- there's a need for

14   expedited action so that we don't hold up any element of the

15   bankruptcy case.  That alone is enough to get the trial

16   court to expedite this to get the appellate court to

17   expedite it.

18           THE COURT:  Okay.

19           MAN 1:  Thank you.

20           THE COURT:  All right.

21           MR. FLOREY:  Your Honor, I just want to clarify a

22   few statements made on the record that the district raised.

23           First and foremost, the Village's responsibility

24   is to comply with the statute, and what's most important is

25   the district noted in its papers, the statute does not give

Page 160

1     the Village any audit or certification rights.  So the

2     Village is not with the power to go ahead and verify.  It

3     has no authority to go ahead and verify.  Prior to 2018 no

4     one disputed Sears' letters, Sears' statements, all the

5     Village did, in good faith, was, are you in compliance and

6     Sears said yes and we distributed the monies as the statute

7     directs us to do.  It is only just before this case and in

8     2018 that the district, or any party, let alone this

9     district, any district has disputed.

10            As a result, the bankruptcy happened, we are

11    stayed.  We came to this Court with the parties to

12    distribute the 45 percent that no one had an issue, and

13    we're here today asking this Court to make a determination,

14    or if it's going to be the state court, whoever it is, just

15    to tell us what to do with the money.  It is not for us to

16    make that interpretation.  You, or another judge, are

17    wearing the robes, its not for the Village.

18            As for a conflict of interest, which we take

19    personally, if any of this 55 percent comes back, it

20    actually goes to the Village.  So the Village would get a

21    piece of that, but right now we don't, so saying that we're

22    in favor of the Debtors or not in favor of the Debtors, it

23    would show that we, the Village, would not -- supporting the

24    Debtors, which we're not taking a position one way or

25    another, that's why our silence is here, Your Honor.

Page 161

1              And finally, the EDA Act, as we understand it,

2     just doesn't go away.  What they're fighting over now is

3     4.5(b) which is the statute within a section of the EDA Act

4     dealing with Recapture.  The EDA Act is still in effect,

5     we're still required to comply.  There is also an EDA

6     agreement, Your Honor, and really what that agreement was is

7     when this project was developed that was the basis to fund

8     the project, with -- most of it was funded by Sears.  And

9     what is being paid now is not really a subsidy, it's a

10    reimbursement of the advancement of the costs to Sears, that

11    is what the statute and the agreement is.

12              We also, probably, Your Honor, to give you a

13    heads-up, may very well be back before you at some point for

14    this year, depending how this Court or any other court

15    rules, because we have the issue of the EDA agreement is up

16    for assignment to the buyer, Transform Holdco.  So we're

17    only dealing with 2017 levy and the money we're holding.  We

18    are collecting and will be collecting from the Cook County

19    Treasurer this coming year's tax revenues from 2018 taxy

20    levy.  So we may eventually face this issue again.  I just

21    want to let the Court know that.

22              THE COURT:  Okay.  All right.  Okay.  I have

23    before me a motion of Community Unit School District 300 for

24    a relief from the automatic stay, or in the alternative, for

25    abstention.

1         The motion was actually filed before there was

2    anything really, I think, to abstain from, although since

3    then the Debtors have filed, and this is on for today's

4    calendar as well, a motion for turnover of property that the

5    Debtors contend is its property that's currently being held

6    by the Village party to the EDA Agreement, the Village of

7    Hoffman Estates.  And I'm applying the abstention piece of

8    the motion to that turnover motion, i.e. that it is the

9    turnover motion that I am being asked to abstain from.

10         The motion seeks abstention on both a permissive

11   and a mandatory basis.  28 USC Section 1334(c)(2) provides

12   for a mandatory abstention.  "Upon timely motion of a party

13   in a proceeding based upon a state law claim or state law

14   cause of action, related to a case under Title 11, but not

15   arising under Title 11 or arising in a case under Title 11,

16   with respect to which an action could not have been

17   commenced in a court of the United States absent

18   jurisdiction under this section."  The section referring,

19   generally, to Section 1334, which pertains to jurisdiction

20   of bankruptcy cases and proceedings.

21         Under those circumstances, continuing on with the

22   statute, "The district court shall abstain from hearing such

23   proceeding if an action is commenced and can be timely

24   adjudicated in a state forum of appropriate jurisdiction."

25   Under the general order of reference the issues before me is

1    to the district court.

2           Accordingly, Section 1334(c)(2) requires, requires

3    that is, abstention where the motion to abstain is timely

4    filed, the underlying is proceeding is based on a state law

5    claim or cause of action, there's a lack of a federal

6    jurisdictional basis, absent bankruptcy, the action is

7    commenced in a state forum of appropriate jurisdiction, the

8    abstention will result in a timely adjudication and the

9    proceeding is noncore for purposes of 28 USC 157(b), in that

10   it would not arise under, or arise in -- arise under Title

11   11, or arise in a Title 11 bankruptcy case.  See In Re:

12   WorldCom, Inc. Securities Litigation, 293 B.R. 308, 331

13   (S.D.N.Y. 2003).

14          Regarding the timely adjudication -- or subject to

15   timely adjudication requirement, there appears to be no

16   definitive standard for judging whether an action is capable

17   of timely adjudication.  However, it is reasonably clear

18   that the cases that address the issue focus on the needs of

19   the Chapter 11 case and not an absolute time frame.  See

20   Paragraph 3.05, Collier, 16th Edition, 2019, i.e., the Court

21   should not simply look at an objective argument as to

22   whether courts in the nonbankruptcy forum adjudicate their

23   cases within a certain time frame, but rather how the time

24   frame in which they adjudicate those cases relates to any

25   urgent needs of their particular Chapter 11 case where the

Page 164

1    bankruptcy court -- over which the bankruptcy court is

2    presiding.

3           The only basis for bankruptcy jurisdiction here

4    that is not related to jurisdiction, but rather core

5    jurisdiction, is the Debtor's argument that the money at

6    issue, which is being held by the Village of Hoffman

7    Estates, is clearly property of the Debtor's estate and

8    therefore must be turned over, under Section 542 of the

9    Bankruptcy Code, and that the movant school districts

10   attempt to prevent that turnover is a violation of the

11   automatic stay under Section 362(a).

12          That would clearly serve as a basis for defeating

13   the mandatory requirement under Section 1334(c)(2) if the

14   issue, indeed, were clear.  I conclude, however, based on

15   the record before me, that the issues underlying the dispute

16   as to the reallocation of the funds at issue under Section 4

17   of the EDA, is not clear and would require adjudication on

18   issues that cannot be decided on a clear basis.

19          The Debtor relies heavily on the fact that the

20   recipient of the funds and the entity to whom the Debtor's

21   compliance with the EDA and its requirement that a certain

22   level of jobs be maintained for the year at issue has

23   accepted that certification.  However, it is not clear to me

24   that that acceptance, which in fact is not an agreement, but

25   merely a lack of, at this point objection, qualifies as a

Page 165

1    binding determination or waiver that would control here over

2    the interests of the school district, which is a residual

3    beneficiary, if in fact Sears failed to maintain 4,250 jobs

4    at the EDA for the year in question, 2017.

5           The school district argues, to the contrary, that

6    the Debtor is using figures from the wrong year, which is

7    not specified in the actual statute.  And secondly, to the

8    extent its relying upon figures that include jobs that are

9    not jobs of direct Sears employees, the statute is not clear

10   on its face that that is the right method for calculation.

11          I believe that under the case law, considering 542

12   as a basis for core jurisdiction in the mandatory abstention

13   context, a Debtor needs to show more than that it has a good

14   shot at winning, or is likely to win.  Rather, it needs to

15   show whether there's a bona fide basis or it is clear that

16   the Debtor will prevail.  And I did not believe that the

17   Debtor's pleadings to date rise to that level of assurance

18   or lead me to rise to that level of assurance.

19          That leaves the issue, which I believe the Movant,

20   as with all of the factors in Section 1334(c)(2) as to carry

21   the burden of proof that the right to the funds being held

22   by the Village can be adjudicated on a timely basis by the

23   State Court.  When I consider timeliness here, I'm very much

24   motivated by the concern that the Sears Debtors are on a

25   fairly thin margin as to the ability to pay administrative

Page 166

1    expenses and, therefore, also, on a fine margin in their

2    ability without the consent of administrative expense

3    creditors to confirm with chapter 11 plan.  It's important

4    for the debtors to proceed promptly to confirm a plan which

5    requires them to determine their sources and uses of cash as

6    a condition precedent to that.  The Debtors have targeted an

7    outside date to do that, of July of this year, which to me

8    does not reflect wishful thinking, but rather is important

9    to do.  And I believe that the money at stake here, several

10   million dollars, is an important component of that analysis.

11           So, timely adjudication, I review in that context.

12   I have been told by an active member of the Illinois Bar who

13   practices in this area, that with proper guidance from the

14   parties as well as this Court, the Illinois Trial Court, as

15   well as the Appellate Courts, would likely treat this matter

16   on an expedited basis.  Counsel for the movants has

17   represented to me that under those circumstances he believes

18   there would be a final ruling on the merits of the issues

19   before me, which I briefly summarized, and which are well

20   set forth on the record within approximately 60 days of my

21   ruling on abstention, and that there is an expedited

22   procedure for appeal as well.

23           The Movants have also represented to me that they

24   would act to expedite the process and not to delay it,

25   including, for example, using discovery that has already

Page 167

1    been produced in seeking expedited treatment.  Based on

2    those representations I conclude that the matter can be

3    timely adjudicated, although I reserve my right to

4    reconsider my decision if it turns out to the contrary, that

5    the timeline for adjudication is not a matter of several

6    weeks, but rather several months or longer.  But based upon

7    the record before me, I will abstain under Section

8    1334(c)(2).  I believe there are at least colorable issues

9    going to the merits here, based on, A, the choice of year

10   for the certification and, B -- although this may never be

11   relevant, depending on the answer to issue number A, or

12   issue A, whether the statute permits the developer to

13   include in its calculations of jobs maintained, jobs of

14   workers who are not direct employees of Sears, and the

15   evidence to support that.  But I believe that given those

16   colorable issues I'm required to have the State Court decide

17   those issues, again, on the conditions that the Movants have

18   agreed to on an expedited basis.

19          So, I'll ask the Movants to submit an order to

20   that effect and you don't need to formally settle that

21   order, but you should provide a copy in advance to counsel

22   for the Debtors so they can be sure it's consistent with my

23   ruling.

24          I'm not deciding today whether the stay was

25   violated.  That's really an issue that will come up at the

Page 168

1   end of the day.  But I'm obviously permitting the underlying

2   facts to be decided by the State Court.

3            MR. FRIEDMANN:  Your Honor, just a point of

4   clarification.  With respect to the 40 percent that is not

5   issue, should that same order be addressing that?  Do you

6   want a separate -- I know it's important to the Village to

7   have something?

8            THE COURT:  No, I think there should be a separate

9   order.  It's really a separate issue.  I don't want to have

10  that hold up this.  I just think it should proceed promptly.

11  And I also want to make it clear that what I'm abstaining on

12  is the turnover motion.  The litigation should not delve

13  into the State Court litigation and decide the merits of the

14  claims that have been filed in this case for reallocation

15  for prior years, or for the future.  I'm hopeful that there

16  may be clarification, based on the State Court's decision,

17  that will inform those issues on a collateral estoppel

18  basis, but the only thing that's going to the State Court is

19  the particular issue of the right to the money that's being

20  held, that would otherwise go to the school district itself,

21  by the Village.

22           MR. FRIEDMANN:  And Judge, you asked earlier about

23  how do we figure out how much goes back to the other taxing

24  districts, all of a certain percent.

25           THE COURT:  Right.

Page 169

1          MR. FRIEDMANN:  It's very easy mathematics if you

2     figure out what goes.

3          THE COURT:  So, the only issue is what part the

4     Village keeps on account of your piece.

5          MR. FRIEDMANN:  Whether they keep it or their

6     silence gives it to Sears.

7          MR. FLOREY:  Yes, Your Honor, just for

8     clarification, we'll work with both of them.  They'll do the

9     calculation the Village technically has to go through a

10    finance committee and a board committee process which we'll

11    expedite to get that completed and submit an order.

12         THE COURT:  And if Sears disputes what should be

13    retained by the Village at all, I just suggest that you guys

14    leave that issue open.

15         MR. FLOREY:  Thank you, Your Honor.

16         MR. FRIEDMANN:  Your Honor, on the motion to

17    strike, I guess that --

18         THE COURT:  It's irrelevant.  It's moot.

19         MR. FRIEDMANN:  Withdraw without prejudice.

20         THE COURT:  Because it's not my issues.

21         MR. FRIEDMANN:  Right.  Thank you, Judge.

22         THE COURT:  In other words, I decided this issue

23    without my consideration of Mr. (indiscernible) declaration

24    one way or the other.  Okay.

25         MS. MARCUS:  Good afternoon, Your Honor,

Page 170

1    Jacqueline Marcus, Weil Gotshal & Manges on behalf of Sears

2    Holding Corporation, its affiliates.  The next item on the

3    agenda, I believe is number five.  It's the motion of the

4    Trustees of the Estate of Bernice Pauahi Bishop to compel

5    payment.  As indicated on the agenda, that matter has been

6    adjourned, but Mr. LeHane would like to address the Court.

7              THE COURT:  Okay.  This is the Hawaiian store.

8              MR. LEHANE:  That's correct, Your Honor.  Robert

9    LeHane, Kelley Drye and Warren, on behalf of the Trustees of

10   the Estate of Bernice Pauahi Bishop, which does business as

11   the Kamehameha Schools.  As Your Honor may recall, this

12   estate really is a school system.  Ms. Bishop left all of

13   her estate to the children of Hawaii.  There is a

14   significant shortfall in the rent.  The rent increased in

15   July of 2018 by fourfold.  And the Debtor has been paying

16   approximately 26 percent.  As of April 1st, the total

17   shortfall is $1.646 million.  We agreed, at the last

18   hearing, at the request of Transform and the Debtor to

19   adjourn the matter.  The Debtor did agree, in connection

20   with that adjournment, to put $500,000 into escrow as

21   adequate protection for the rent shortfall, and we very much

22   appreciate that.

23              They, again, asked for an adjournment of this

24   hearing because, at the time they made the requests, they

25   still were not sure the treatment of the lease.

Page 171

1    Subsequently, we were informed by Transform, as was the

2    Debtor that they were going to reject the lease, that the

3    store will be closing.

4             We're in the process of negotiating with Transform

5    what we believe may be a short-term lease that will allow

6    for that to be a more orderly process than closing the store

7    by the deadline to assume or reject on May 15.  The Debtor

8    has agreed to add another $250,000 to the escrow and we

9    appreciate that.  That is a percentage of what would be

10   allocated to the Debtor's share of the time during which

11   they've been in the premise.  From and after the closing,

12   really is the obligation of Transform and we would reserve

13   the right depending on how discussions go during the next

14   several weeks, to seek further adequate assurance from

15   Transform, which would be related to the time that they've

16   been in the premises, and base rent and tax obligations that

17   have come due since then.

18             THE COURT:  Under the APA, in essence.

19             MR. LEHANE:  Yeah, under the APA, that's correct,

20   Your Honor.  And what we've also discussed is we're

21   adjourning this to June 20, but with the understanding that

22   we really will try to resolve this.  If the parties are

23   unable to make significant progress in the next several

24   weeks, we will be submitting a scheduling order for the May

25   21, and use that as a status conference.

Page 172

 1                THE COURT:  Okay.

 2                MR. LEHANE:  So, that if we have to come back here

 3     before Your Honor, we would like that to be an evidentiary

 4     hearing.  In fact, we have folks from Hawaii ready to come

 5     out for today.  I obviously don't want to make that trip,

 6     frankly, if we don't have to, or more than once, Your Honor.

 7     So, that's essentially the update.  Sorry to hear that this

 8     store is going to be closing much sooner than we thought it

 9     would, but we hope we can resolve this.  To date, we've

10     heard no real substantive response to the issues that I

11     think were raised in our original motion.  So, we thank you

12     for that, Your Honor.

13                THE COURT:  Okay.  Very well.  Thanks.

14                MS. MARCUS:  I'm glad we've picked up the pace a

15     little bit.  The next item, Your Honor, is the motion of

16     Dedeaux Inland Empire Properties to compel the debtor in

17     possession to assume and assign or alternatively to reject.

18     It's Item Number Six on the agenda.

19                MR. FENNELL:  Good afternoon, Your Honor, William

20     Fennell on behalf of Dedeaux and on the Empire's.  Your

21     Honor, I believe that we have accomplished what they sought

22     to accomplish, which is communication with both Transform

23     Co. and the Debtor.  Literally at the 11th hour last night,

24     we had a conference call and I was informed that the Debtor

25     had been informed formally that Transform Co. will seek to

Page 173

1    assume its contract and, therefore, I understand that one of

2    the parties for the Debtor or for Transform Co. is willing

3    to put that on the record today.  It doesn't resolve the

4    cure issue items and we're hopeful that those could be done

5    promptly and in conjunction with the master services

6    agreement for the facility, but that would be left for

7    another day.

8             THE COURT:  All right.  So, it is on the, it's now

9    on the assigned list.

10            MS. MARCUS:  Your Honor, I believe it was on

11   Friday but it may have been on Thursday of last week, before

12   the designation rights period, and with respect to this

13   lease.  We did get the notice from Transform that they are

14   designating this lease for assumption.  We have not yet

15   formally -- we've kind of shared the work between transform

16   and the Debtors in terms of filing the notices with the

17   Court.  And I believe that Transform's counsel is going to

18   actually file the formal notice.

19            THE COURT:  So, this motion is really moot then.

20            MS. MARCUS:  From our perspective it is, Your

21   Honor.

22            THE COURT:  I mean, I'm not sure I would have

23   granted it, given the statute, but it's moot.

24            MS. MARCUS:  I was going to make the argument, but

25   given the time, I'm not going there, Your Honor.  Thank you.

1          THE COURT:  Okay, very well.

2          MR. FENNELL:  Is there somebody from Transform who

3    can confirm.

4          THE COURT:  The counsel is here.  They're not

5    disputing what you say.

6          MR. FENNELL:  Your Honor, I will have to confirm

7    with their office.  I'm sure, I mean we're working very

8    closely with Weil on this one but --

9          THE COURT:  I accept the Debtor's representation.

10         MR. FENNELL:  I do too.

11         THE COURT:  They're aware of the whole process

12   here.

13         MR. FENNELL:  Understood, Your Honor, but that

14   wasn't completely transparent to us, but we understand from

15   last evening and today's representations.  Thank you.

16         THE COURT:  Okay, very well.

17         MS. MARCUS:  The next one, Your Honor, number

18   seven, is the motion of Maudlin At Butler LLC for payment of

19   administrative expenses, and their counsel will handle that.

20         THE COURT:  Right.

21         MR. GOODHOUSE:  Good afternoon, Your Honor.

22   Brendan Goodhouse, Cutty & Feder for Maudlin At Butler, the

23   landlord.  This motion is for the payment of property taxes

24   that came due in November of 2018.

25         THE COURT:  Well --

Page 175

```
 1            MR. GOODHOUSE:  When --

 2            THE COURT:  I'm sorry, go ahead.

 3            MR. GOODHOUSE:  Sure.  I just wanted -- some

 4   housekeeping -- it's in the papers, but just so we're all on

 5   the same page.  When we first made a motion, the claim was

 6   for $88,660.08.  Subsequently, we learned that the Debtor

 7   had made a partial payment of those taxes in the amount of

 8   roughly $19,000.  So, the amount outstanding is $69,713.54.

 9            THE COURT:  And the Debtor contends that that

10   payment is in respect of the pro-rated post-petition

11   portion?

12            MR. GOODHOUSE:  Yeah.  Essentially, so, what the

13   dispute comes down to is, the Debtor's position, and

14   obviously they can state it better than I will, but that the

15   roughly $70,000 that's unpaid is not properly categorized as

16   administrative expense.  It should be considered a

17   prepetition claim because it's applicable to the earlier

18   part of 2018.

19            THE COURT:  The taxes themselves accrued pre-

20   petition?

21            MR. GOODHOUSE:  The taxes -- yes, that's right.

22   So, what we really come down to is just, I think, it's a

23   statutory interpretation argument.  And the key provision is

24   section 635(d)(3) of the code.

25            THE COURT:  Three sixty-five.
```

Page 176

1          MR. GOODHOUSE:  What did I say?  Sorry about that.

2          THE COURT:  You transposed a couple of numbers, no

3     problem, 365(d)(3).

4          MR. GOODHOUSE:  My temporary dyslexia; apologies.

5     It requires timely performance of obligations of the Debtor

6     arising from and after the order for relief under any

7     unexpired lease of nonresidential real property until such

8     lease is assumed or rejected.  Not many courts have actually

9     directly addressed this question here, where what you have

10    is property taxes that aren't billed until the end of the

11    year, which is what the case is in South Carolina, at least

12    in Greenville County, South Carolina, where what you have a

13    lease obligation that comes up following the petition.  But

14    the tax period covers both prepetition and post-petition

15    periods.  The question really boils down to, do you read

16    Section 365(d)(3) and give a plain meaning to those words,

17    or do you find that there's ambiguity in there, and starts

18    taking to account certain policy considerations that may

19    adjust how you're going to read this.  And you have

20    different -- different Courts have come to different

21    conclusions on this issue.

22          Now, the Debtor's notes the In re Child World

23    case, which found, as they would like Your Honor to hold

24    here, that the portion of the taxes applicable to the

25    prepetition period would not fall under 365(d)(3).  But then

1      about three months after that case came down, the In re RH

2      Macy case came down where Judge Sotomayor looked directly at

3      the Child World case, considered it and, I think in sum and

4      substance, that ruling came out to be -- I understand the

5      policy considerations being discussed in the Child World

6      matter.  I'm not going to read ambiguity into words of the

7      statute where I see none.  And it's really, you know, it's

8      the same thing, and I took note of it when you were issuing

9      the decision on the first motion here, in discussing the

10     rules and interpretation of contracts.  And it's really no

11     different with statutory language.  Yes, you have to

12     consider overall policy objectives, and you have to consider

13     the totality of the statute.  But that doesn't override the

14     actual words.  And just because two parties had different

15     understandings of their meanings, doesn't mean there's

16     ambiguity there.

17            Now, I think, frankly, what seems to me at least

18     to be the critical decision here is the term 'arise.'  Does

19     the obligation arise prepetition as the taxes are accruing

20     or does the obligation arise post-petition when the county

21     says the taxes are due, and then when they're do under the

22     lease?  And I think the plain English meaning of that is, it

23     doesn't arise until the county says it's due, and it doesn't

24     arise under the lease until the payment is due.  So, here,

25     the contrary example, or the example is, if Mauldin had,

1   some time in 2018, gone to K-Mart and said, "We want you --

2   ," for whatever reason, because they knew the bankruptcy was

3   brewing but that's really irrelevant; if they said, "We want

4   you to make a payment on your 2018 taxes," K-Mart would have

5   properly said, "No, we have no obligation to do that."  That

6   obligation doesn't arise under the lease until the county

7   bills them.  So, it's -- and the other --

8           THE COURT:  Of course, that's what Judge Posner

9   had a real problem with.  He said it didn't make any sense,

10  that very fact (indiscernible), and that's why he said in

11  Handy Andy that this can't be what --

12          MR. GOODHOUSE:  In Handy Andy, yes, I understand -

13  -

14          THE COURT:  -- this can't be what Congress meant.

15          MR. GOODHOUSE:  And the Third Circuit has gone

16  other way on it.  So, both parties in their briefing,

17  obviously, focused on this jurisdiction.

18          THE COURT:  So, you have some real heavyweights

19  talking here, right?

20          MR. GOODHOUSE:  So, you do --

21          THE COURT:  Posner, Sotomayor.

22          MR. GOODHOUSE:  -- certainly above my pay grade.

23  And the last thing --

24          THE COURT:  Right.  But actually, she recognized

25  too that it was kind of the logical ...  But I don't think

1    anyone argued to her that the statute may have been just a

2    timing issue; not the timing of accrual versus arise, but

3    the fact that you actually have to pay.

4         MR. GOODHOUSE:  I think, in that case, Judge,

5    actually, the parties' argument seemed to focus more on the

6    term 'obligation' than 'arise.'  I found that in looking at

7    some of the subsequent cases 'arise' struck me as being the

8    key issue here.  But one thing I would note about the policy

9    --

10        THE COURT:  But I think that the point is -- and

11   actually, I think Judge -- I think it was Judge Sweet,

12   another heavyweight, in the Loews case, talks about -- yeah,

13   it was Judge Sweet -- talks about the focus of the statute

14   being on immediate payment, not so much on the world

15   'arising' and he distinguished the situation in Lowe's from

16   the situation where taxes would be accruing over time, even

17   if they're payable as of one date.  So, I'm going to cut

18   this short.  You want to brief this very well.  This is an

19   issue that is clearly not decided in the Second Circuit yet,

20   and I believe it can go either way.  And my view is that

21   this should be pro-rated here, that the full tax bill isn't

22   required to be paid under 365(d)(3).  And I think that's the

23   majority view of the cases, generally.  I wouldn't limit it

24   just to tax bills.  I think you have to look at things that

25   accrue over time.  And you're absolutely right, there are

1   circuits that go the other way.  In fact, even though the

2   majority of courts apply the accrual analysis, the majority

3   of the circuit courts go the other way.  But I think Judge

4   Posner actually does a really good job of analyzing it in

5   Handy Andy Improvement Centers 144 F.3rd, 1125 Seventh

6   Circuit 1998.  And I do think it depends a lot on the

7   particular obligation, but I think with accruing taxes,

8   which is what Handy Andy covers, and of course with Child

9   World and Macy's did too, on contrary District Court

10  opinions, the better view would that Congress was trying to

11  do a lot of things in 365(d)(3), but the main ... but I

12  don't think it was intended, and I don't think the language

13  requires that tax bills that accrue over the length of the

14  prepetition period, as well as carrying over the post-

15  petition period have to be paid under 365(d)(3).  And I

16  think the Urban Realtek Properties versus Loews Cineplex

17  Entertainment Corp case 2002 US District LEXUS 6186, April

18  9, 2002, goes into this in some detail at pages 18 -- I'm

19  sorry, 17 through 24, where Judge Sweet recognizes it's

20  appropriate to pro-rate in some cases, particularly taxes,

21  but not in that case where there was one overall payment.

22         I recognize that CenterPoint Properties, In re

23  Montgomery Ward, goes the other way; 268 F.3rd 205 Third

24  Circuit 2001, as well as, of course, the Macy's case.  But I

25  think the majority of the cases doesn't, as discussed, for

1    example, in In re Rothman 2007 Bankruptcy LEXUS 2651,

2    Bankruptcy EDNY August 2, 2007.  And also note that, for

3    what it's worth, the ABI Commission on reforming the

4    Bankruptcy Code sided with the pro-rating courts as to how

5    the landlord's claim against the estate should be treated.

6    See First Glance: Legislative Update ABI Commission,

7    Creating More Certainty in Chapter 11 for All Parties, 34-4

8    ABI Journal 12, April 2015.  The recommendation is actually

9    at the very end of that article.  So, I just think that the

10    statute is sufficiently ambiguous to look at the overall

11    bankruptcy policy.  This is a lease that was rejected

12    ultimately, right?

13            MR. GOODHOUSE:  Yes.

14            THE COURT:  So, we look at 502(g) and 365(g), and

15    I'm going to deny your motion.

16            MS. MARCUS:  Number Eight on the agenda is

17    actually one of the Debtor's motions.  It's the motion of

18    the Debtors for entry of an order authorizing and approving

19    procedures for settling de minimis affirmative claims and

20    causes of action of the Debtors.

21            Basically, Your Honor, what we've proposed is a

22    procedure that would expedite the Debtor's ability to enter

23    into those kinds of settlements.  We have discussed it and

24    actually run the procedures by the Creditors Committee.  The

25    Creditors Committee made comments.  We responded to the

Page 182

1    comments and those comments are reflected in the proposed

2    procedures.  Essentially, we're seeking authority to settle

3    claims that have a settlement amount of less than $5

4    million.

5         We received only one objection to the motion.

6    That was the objection of Wilmington Trust, the successor

7    indentured trustee, with respect to the 2010 notes.

8    Wilmington asserts two objections.  First, that the Debtors

9    have not provided any evidence of how many de minimis claims

10   may exist and may be resolved before plan confirmation.

11   Given the size of the Debtors' estates and the compressed

12   period in which these cases have taken place, I don't

13   believe there's anyone who can guess as to how many claims

14   there would be.  Frankly, I don't know that I have one that

15   I can think of today, but we do think it would be in the

16   Debtor's estates and it would also assist the Court if we

17   were to approve these procedures.  There's no downside to

18   doing it, so if there were five or if they were 100, I don't

19   think that would make a difference.

20        The second objection asserted by Wilmington is

21   that given the replacement liens that they were granted

22   under the final DIP order, they should not be excluded from

23   the opportunity to review and object to the proposed

24   settlements.  Again, we're talking about the settlements

25   that are under $5 million.  On this, Your Honor --

Page 183

1          THE COURT:  I'm sorry, say that again, a

2    settlement ...?

3          MS. MARCUS:  Settlements that are less than $5

4    million, because settlements that have an amount more than

5    $5 million would be subject to the normal noticing

6    procedures.  I think in the last line of their objection,

7    Wilmington says, "Include us as a noticed party on those de

8    minimis settlements."  The Debtors' perspective is that we

9    leave it to Your Honor.  I think every time we add another

10   notice party on these kinds of matters, we're increasing the

11   cost and the delay and the hassle, frankly, of getting this

12   stuff done.

13         THE COURT:  Although I think they're right -- I

14   mean, they're the fulcrum security, arguably, so I would

15   include them in indentured trustee.  You don't have to give

16   it to every bond holder, it's just the indentured -- the

17   collateral agent and indentured trustee.

18         MS. MARCUS:  Okay.

19         THE COURT:  On the first point, these are -- it

20   doesn't say what you settled them for, right, it just says

21   settlement?

22         MS. MARCUS:  It says settlement amount.

23         THE COURT:  The settlement amount.

24         MS. MARCUS:  So, if the claim is one where the

25   other party -- and we didn't seek authority to actually make

Page 184

1    payments on any claims because these are affirmative claims

2    that belong to the estate.  So, if the amount that the

3    estate is going to get is less than $5 million, then we

4    don't need to -- we only notice the US Trustee, the

5    Creditors Committee and Wilmington Trust.

6              THE COURT:  Okay.  All right, Mr. Fox, you have

7    anything to say on this one?

8              MR. FOX:  No, Your Honor.

9              THE COURT:  Since you were on the second part.

10             MR. FOX:  Yes.  So, I don't have any -- we made a

11   motion as the collateral agent as well, which was for the

12   entire --

13             THE COURT:  That's right.  I keep saying -- it's

14   in both capacities.

15             MR. FOX:  Yes, thank you, Your Honor.

16             THE COURT:  Five million dollars is a lot of

17   money, obviously.  There needs to be some review as this

18   motion provided for.  And I think that the motion itself was

19   properly noticed under the case management order.  The only

20   party that objected was the second lien trustee and

21   collateral agent.  I take that very clearly to mean that

22   other parties of interest are comfortable with this

23   procedure.  But I believe given the position of the second

24   lien debt in the capital structure that it should be also a

25   notice party.  And with that change I'll grant the motion.

Page 185

1          MS. MARCUS:  Okay, Your Honor, we'll revise the

2    order and submit it to chambers with a copy to Mr. Fox in

3    advance.

4          THE COURT:  Okay.

5          MS. MARCUS:  The next item on the agenda is the

6    motion of Winners Industry.

7          MR. SMITH:  Good afternoon, Your Honor, James

8    Smith from McKool Smith on behalf of Industry Co.  Winners

9    originally moved for motion to grant administrative expense

10   priority for the goods that Winners sold to Debtors that

11   were received by the Debtors post-petition.  Debtors oppose

12   this motion, arguing that the relevant date with which to

13   assess when the transaction occurred isn't the date the

14   goods were received, but is rather the date the goods were

15   shipped, which is pre-petition.  So, Debtors are arguing

16   that because the goods were shipped pre-petition, the whole

17   transaction is a pre-petition transaction and doesn't fall

18   within the ambit of 503 --

19         THE COURT:  But since then, they've argued that

20   you should just follow the order that covers all of these

21   types of claims, procedurally.

22         MR. SMITH:  Our position is, we are urging Court

23   to adopt a reasoning of the Third Circuit in the In re World

24   Import case.

25         THE COURT:  There's a ... maybe I'm confusing

1    this.  Isn't there now a procedural order for dealing with

2    all of these types of claims?

3              MR. SMITH:  There's a procedural order for

4    503(b)(9) claims which are not at issue today, and we agree

5    with them that those are subject to that order and those

6    will be raised at the appropriate time.  With regard to the

7    503(b)(1) claims, there is an order on those procedures,

8    this specific motion, and this specific circumstance, in

9    which we're asking for a ruling on a very discreet legal

10   issue, was carved out of that order.  And we informed

11   Debtors of this last Tuesday.

12             THE COURT:  I'm not prepared to rule on this.

13   It's now 3:30.  I've been in court, basically, 12 hours a

14   day since Monday.  You're going to have to come back.

15             MR. SMITH:  Thank you, Your Honor.

16             THE COURT:  I'm sorry.  You had to wait several

17   hours but this is just not acceptable to me.

18             MR. SMITH:  Thank you, Your Honor.

19             MS. MARCUS:  The next matters, Your Honor, we

20   categorized as automatic stay matters.

21             MS. PESHKO:  Your Honor, the first of these

22   matters is the motion of Mario Aliano for relief from a

23   stay.  I'm no sure whether counsel is in the courtroom.

24             MS. HARRIS:  Good afternoon, Your Honor.  This is

25   Sharon Harris.  I'm on telephonically from Chicago.

1          THE COURT:  Good afternoon.

2          MS. HARRIS:  Good afternoon.  I represent Movant

3    Mario Aliano.  And this is motion to lift the stay in the

4    civil litigation.  All that's remaining in his case is on

5    appeal.  Just real briefly, the Circuit Court of Cook County

6    Illinois entered a judgment against Sears for violation of

7    the Illinois Consumer Fraud Act, and that was affirmed on

8    appeal by the Illinois Appellate Court in 2015.  And the

9    matter was remanded on issue of attorneys' fees.  There was

10   a three-day evidentiary hearing and the Court awarded

11   $267,470 in attorneys fees.  Sears appealed the Circuit

12   Court's award of the fees and Sears also (indiscernible) and

13   obtained an approval of an appeal bond.  The appeal bond

14   covers the award plus one year of statutory interest.

15          THE COURT:  But does it --

16          MS. HARRIS:  So, the only thing --

17          THE COURT:  I'm sorry.  Does it actually cover the

18   fees?  I thought that was the issue.

19          MS. HARRIS:  Debtors have raised the issue of the

20   defense cost.  The appeal has been fully briefed for several

21   months, and all that's awaiting is the decisions by the

22   Illinois Appellate Court.  Debtors raise that there could be

23   some cost involved in arguing the matter on appeal, but

24   there's no guarantee that the Appellate Court would set the

25   matter for oral argument.  It's within the Court's

1    discretion as to whether to set it for oral arguments.  And

2    we're willing to waive our request for oral argument on the

3    appeal in order for the matter to go forward.  And even if

4    here is oral argument, I think the cost to Debtors of

5    defending that would really be minimal because, as I said,

6    the matter has been fully briefed and it's just a matter of

7    whether the Court, Illinois Appellate Court orders there to

8    be oral argument in matter.

9              THE COURT:  Okay.

10             MS. HARRIS:  We've cited some cases in our brief

11    that the causative defending litigation by itself is not

12    necessarily enough to preclude relief from an automatic

13    stay.

14             THE COURT:  Okay.  Let me hear from the Debtor's

15    counsel.

16             MS. PESHKO:  Your Honor, for the record, Olga

17    Peshko, Weil Gotshal for the Debtors.  This particular

18    appeals bond is fully collateralized by Sears prepetition,

19    Your Honor, in the amount of over $290,000.  The Debtors

20    have an interest in this money and they're not willing to

21    waive their right to argue oral argument or to prepare for

22    that.  And there's a cost associated with that.  If the

23    Debtors do succeed at the appeal, then the matter may be

24    remanded, there may be other further proceedings.  And so,

25    our view is that there's cause to keep the automatic stay in

Page 189

1   place.  Furthermore, Your Honor, there is no insurance

2   available for the incident date related to this action to

3   cover the Debtors' defense costs.

4           THE COURT:  So, the appeal bond is collateralized,

5   it's not paid for, it's collateralized.

6           MS. PESHKO:  That's right.

7           THE COURT:  So, it's not like insurance.

8           MS. HARRIS:  Your Honor, if it makes a difference,

9   we are willing -- the appeal ban covers the award plus one-

10  year statutory interest.  We're willing to waive recovery

11  for attorneys' fees of any amount above and beyond the

12  appeal bond amount.

13          MS. PESHKO:  With respect, that does not account

14  for the Debtors having to expend defense defend costs now.

15          THE COURT:  Okay, but that does take care of the -

16  - I mean, the only issue that's on appeal is he defense

17  cost, right?  So, they're not going against the appeal bond

18  for that?

19          MS. PESHKO:  The issue on appeal are attorney fees

20  for the --

21          THE COURT:  The attorneys' fees.

22          MS. PESHKO:  Exactly.

23          THE COURT:  So, maybe I misunderstood counsel.  I

24  thought she was saying that they were not going to look to

25  the appeal bond for the attorneys' fees.

1          MS. PESHKO:  I think == I don't want to put words

2     in her mouth but -=

3          MS. HARRIS:  No, that's not what I meant, Your

4     Honor.  What I'm trying to say is the only issue that's on

5     appeal is the amount of attorneys' fees and the appeal bond

6     covers the amount that the Circuit Court awarded plus one

7     year's statutory interest.

8          THE COURT:  So, that would include --

9          MS. HARRIS:  So, it's been beyond --

10         THE COURT:  So, that would include the attorneys'

11    fees.  The appeal bond includes the attorneys' fees.

12         MS. HARRIS:  Yes.

13         THE COURT:  So, what were you saying, that you

14    would waive?  I thought I heard you say you would waive some

15    --

16         MS. HARRIS:  The statutory interest beyond one

17    year.

18         MS. PESHKO:  The appeals bond doesn't cover that.

19         THE COURT:  Okay.  So, we're not relating

20    anything.  All right.  Well ...  How would the Debtors

21    propose this get resolved otherwise, if I didn't lift the

22    stay?

23         MR. FAIL:  Your Honor, Garrett Fail, Weil Gotshal

24    & Manges for the Debtors as well.  Your Honor, this is one

25    of a large number of pending litigations that will have to

Page 191

1    be resolved post confirmation pursuant to a plan, whether

2    part of a liquidated trust or whatever structure is proposed

3    in that plan with the moneys available in judgments about

4    what's worth pursuing at that point.  At this point, though,

5    with cash limited and a desire to protect the assets, the

6    Debtors chose to oppose the motion to preserve the stay and

7    status quo for an additional period which, for the cases to

8    continue.

9          THE COURT:  So then, on the phone, do you have a

10   slot that you would lose with the Illinois Appellate Court

11   if I denied your motion for a stay of relief?  In other

12   words, let's say I adjourned it until a date that I believe

13   would be a reasonable date for a plan to be confirmed, so

14   that will be post-confirmation, some time in August or

15   September.  There will be a determination whether to go and

16   liquidate the claim at that point.  Other than the delay, do

17   you lose anything else, the delay between now and September?

18         MS. HARRIS:  Well, I would say that the Appellate

19   Court had the brief, fully-briefed, last August, I believe.

20   So, in that respect they didn't get the suggestion of

21   bankruptcy until October, and so we kind of lost our place

22   in line with the Appellate Court deciding that, because they

23   stayed the matter rather than ruling on the brief or

24   ordering oral arguments.

25         THE COURT:  So, it's still locked in place based

1    on the automatic stay.

2           MS. HARRIS:  Right.  I would just say we got the

3    judgment against Sears and December 2015 it was affirmed, so

4    we've been waiting all this time for the attorneys' fee.

5           THE COURT:  Well, you're going to be waiting

6    longer because it's -- the fees aren't covered anyway.  So,

7    this is a fairly close call under (indiscernible) but I will

8    determine to adjourn the motion.  I'm not going to require

9    you to refile it, but I'm going to adjourn it because I

10   believe the Debtors have a reasonable basis to win the

11   motion, but that's only for a relatively brief period until

12   the Debtors confirm a plan or something else dramatic

13   happens in the case.  So, you'll have to refile it.  But you

14   should get an adjourn date for the omnibus hearing in

15   August.

16          MS. HARRIS:  Thank you, Your Honor.  Okay.

17          THE COURT:  Okay.  It's just I don't think that

18   the result -- this is just liquidating a claim, except to

19   the extent that you would get paid by the bond, but that

20   hits the Debtor.  It's not the equivalent of having an

21   insurance policy that's already been paid for.  So, the

22   impact is significant and the reason to do it now as opposed

23   to a few months from now is not dramatic enough to warrant

24   lifting the stay, because it's a prepetition claim.  So,

25   I'll ask the Debtors to submit an order that adjourns the

Page 193

1   motion, making the finding that I need to make under 362(e).

2            MS. PESHKO:  Thank you, Your Honor, we will.  The

3   next item on the agenda is the motion of Steven Tuttle for

4   relief from the stay.  Your Honor, I wanted to note that the

5   counsel that filed this motion has withdrawn as attorney for

6   this party, so we don't know whether anyone is appearing on

7   behalf of Mr. Tuttle.

8            THE COURT:  Okay.  Is anyone here or on the phone

9   appearing on behalf of Steven Tuttle on this lift stay

10   motion to pursue litigation in respect of a prepetition

11   claim?

12            MS. PESHKO:  Your Honor, I wanted to also note

13   that while we file this objection to reserve our rights,

14   because we don't have any insurance available of our own, we

15   did confirm that a third-party insurer for the employer of

16   Mr. Tuttle at the time of the incident is paying defense

17   costs for Innovel, the debtor in this instance.  However,

18   after counsel withdrew we reached out to get contact

19   information for his former client and he has not agreed to

20   provide us with a phone number or email.  So, we've been

21   trying to reach out to reach a stipulation and we'd like to

22   just adjourn without a date, to be able to get in touch with

23   this party.

24            THE COURT:  Okay, that's fine.  We should provide

25   the same type of order that I just directed in the last

Page 194

1    matter.  Have you communicated to former counsel that you've

2    discovered this insurance at Innovel?

3              MS. PESHKO:  That's what they've argued in their

4    motion.

5              THE COURT:  No, I thought you said -- no, I'm not

6    talking about Sears.  I thought you said there's a third

7    party that as insurance, the actual employer of this

8    individual.

9              MS. PESHKO:  We haven't reached out to the

10   employer, Your Honor.

11             THE COURT:  No, no, I said, have you reached out

12   to Mr. Tuttle's former counsel to let former counsel know

13   that you've located this third-party insurance?

14             MS. PESHKO:  That's right.  That's who we reached

15   out to try to negotiate a stipulation.

16             THE COURT:  All right, so you told her that?

17             MS. PESHKO:  Right.

18             THE COURT:  All right.  Because I was going to

19   direct you to do that if you haven't, but you've already

20   done it.

21             MS. PESHKO:  We did it.  We did that too, and

22   tried to get the contact information afterwards.

23             THE COURT:  Okay.  All right, that's fine.  So,

24   you can just submit he adjournment order on that one.

25             MS. PESHKO:  Will do.

Page 195

1          THE COURT:  It's likely that I would have denied

2     the motion subject to a step dealing with going against the

3     third-party insurance.

4          MS. PESHKO:  Thank you, Your Honor.  The next item

5     is the motion of Jeffrey Pfeiffer to lift the stay.  I'm not

6     sure whether someone is here --

7          THE COURT:  This is Mr. Pfeiffer's motion?

8          MR. GALLAGHER:  Yes.  Good afternoon, Your Honor,

9     Dave Gallagher on behalf of Mr. Pfeiffer.

10          THE COURT:  Right, good afternoon.

11          MR. GALLAGHER:  Your Honor, if you'd like brief

12     argument I would just state this is a motion to lift the

13     stay with regards to a pre-suit action in Illinois that we

14     filed in the Circuit Court of Cook County against K-Marts as

15     well as a co-defendant, Monsanto, with regards to cancer

16     that my client developed after use of Roundup.  As the

17     Court's aware of the (indiscernible) factors, the big issue

18     with regards to the Defendant's objection -- the Debtor's

19     objection -- is that of insurance coverage.  The period of

20     time with which Mr. Pfeiffer claims he purchased this

21     Roundup spans from 1988 until 2014.  The Debtor's counsel,

22     their objection notes that their records with regards to

23     coverage only go back to 2005.  They do provide exhibits to

24     their spots, which indicate that coverage is exhausted for

25     multiple years.  However, they did not provide any

Page 196

1    explanation for coverage for the period of 2008 to 2009,

2    which leaves me to believe that there was, in fact, coverage

3    available for that time period.  Their coverage does provide

4    (indiscernible) defense for the case.  The Claimant here

5    simply seeks to move forward their claim.  We believe

6    there's available insurance coverage which would include the

7    cost of defense and, in exchange, the Debtors would get

8    complete relief from the claim other than whatever is

9    available, and insurance proceeds.  We believe it to be in

10   the benefit of the Debtors and it would expediate the

11   resolution of this claim.

12           THE COURT:  I'm sorry, I missed the last sentence.

13   I couldn't follow what you were saying.  Can you --?

14           MR. GALLAGHER:  Sure.  It would be to the benefit

15   of the Debtors, it would expediate the resolution of this

16   claim.

17           THE COURT:  It's a prepetition unsecured claim to

18   the extent it's not been discharged in K-Mart's bankruptcy.

19   If there is available insurance, I'm sure the Debtors would

20   lift the, agree to lift the stay to let you go against the

21   insurance.  They're saying there isn't available insurance.

22   You're saying that they haven't shown you that fact for 2008

23   through 2009?  Okay.

24           MR. GALLAGHER:  That's correct.

25           MS. PESHKO:  Your Honor, that's correct.  We have

1   not provided a certificate of exhaustion for that period.

2   The Debtors believe there is no -- the insurance has been

3   exhausted for that period.  However, we are trying to obtain

4   a copy from the insurer.  We informed counsel that we would

5   like an adjournment to be able to get information, also to

6   confirm the discharge issue and counsel has not agreed to

7   adjourn.

8           THE COURT:  Do you have any problem lifting the

9   stay solely as to 2008 and '09, to the extent that there is

10  insurance and that the Claimant waives any other claim

11  against K-Mart?

12          MS. PESHKO:  If we can confirm that there is

13  insurance we'll do that --

14          THE COURT:  If part of the stip stays this waives

15  a claim against the Debtors, except to the extent of any

16  available insurance policy and we make no representation

17  that there is one, is there any issue there?

18          MS. PESHKO:  We would be willing to do that

19  except, Your Honor, that Sears would be required to defend

20  itself.  I mean, K-Mart would be required to defend itself

21  in this action.  Or we could try to provide first a

22  statement from the insurer that it's not there so that we

23  don't have to proceed with the stipulation?

24          THE COURT:  Well, what efforts are you making to

25  determine that?

Page 198

```
 1              MS. PESHKO:  We have reached out to the Debtors

 2    and we're trying to work with them to get this letter of

 3    exhaustion.  It's just, we're just looking for additional

 4    time to do that, Your Honor.

 5              MR. GALLAGHER:  Your Honor, if I may, the issue

 6    for me is one of statute of limitations on my claims.  These

 7    claims are going to be going forward on a discovery basis.

 8    I'm not sure of your familiarity with the Roundup

 9    litigation, but this has really started to be a public --

10              THE COURT:  Well, it can certainly wait a month or

11    two, I'm assuming, right?

12              MR. GALLAGHER:  In theory, maybe.  It's going to

13    depend on what the parties respond as far as their response

14    to the pleading filed in the State Court.  But my client

15    could suffer prejudice in the loss of his ability to bring

16    these claims if we delay this inadvertently.

17              THE COURT:  Well, there's nothing in the motion

18    about whether he learned about Roundup, right?  And

19    apparently, he was buying it until 2014.

20              MR. GALLAGHER:  That's correct.  That's when he

21    was diagnosed.

22              THE COURT:  He was diagnosed in 2014?

23              MR. GALLAGHER:  That's correct.

24              THE COURT:  Okay.  So, what is the statute of

25    limitations for this type of claim in Illinois?
```

Page 199

1            MR. GALLAGHER:  It is two years from when you knew

2      or should have known of the harm and the potential cause.

3      So, the literature regarding the AML, my client's form of

4      leukemia, and his exposure to Roundup really started coming

5      out in 2017.  There's a critical article that was published

6      on November 9, 2017 that I would argue would be the point at

7      which he knew or should have known of the association

8      between AML and Roundup.

9            THE COURT:  Okay.  Adjourning this to the June

10     omnibus day doesn't seem to affect the statute of

11     limitations.  And I thought you already commenced this

12     lawsuit.  You didn't?  You haven't yet?  All right.

13            MR. GALLAGHER:  I have not yet.  I was aware of

14     the stay once I got --

15            THE COURT:  All right.  Have you filed a claim in

16     this case?

17            MR. GALLAGHER:  I did.

18            THE COURT:  All right, so that's enough.  You've

19     asserted the claim.  So, I'm going to adjourn this for two

20     months so the Debtors can see whether it's worthwhile to

21     enter into the type of stipulation that I mentioned for

22     2008, 2009.

23            MS. PESHKO:  Thank you, Your Honor.

24            MR. GALLAGHER:  Thank you, Your Honor.

25            MS. PESHKO:  That was the last matter on the

Page 200

1    agenda today.

2              THE COURT:  Okay, very well.

3              MAN 1:  Thank you very much for your

4    (indiscernible) today --

5              THE COURT:  I'm really impressed by those who

6    stayed for the whole thing.

7              (Whereupon these proceedings were concluded at

8    3:41 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2

3                         RULINGS

4                                           Page        Line

5    Grant Debtors' motion implementing       84          15

6    Section 10.9

7    Deny Debtor's claim of violation         85           9

8    of automatic stay

9    Deny motions re 502(g) and 365(g)       181          15

10   Grant Debtors motion for order authorizing  184        25

11   and approving procedures for settling

12   de minimis affirmative claims

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 202

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    

6    Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital@veritext.com,
c=US
Date: 2019.10.22 13:45:28 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 25, 2019

[& - 2017]                                                                                    Page 1

**&**

**&**   8:3,12 9:2,9,16
132:2 170:1
174:22 190:24

**0**

**03**   75:8
**05**   75:11
**09**   197:9

**1**

**1**   47:16 56:16
74:14 76:14,18
104:15 151:17
158:20,24 159:8
159:10,12,19
186:7 200:3
**1,657,000,000**
35:5,8
**1.1**   76:1 82:14
**1.1.**   48:18 80:18
**1.3**   27:21,22
**1.553**   77:1
**1.646**   170:17
**1.657**   37:8,19
38:15 63:5,17
64:6 71:4 76:17
76:19,21 77:5
83:21
**1.9**   13:3
**1/1/2018**   6:18
**10**   30:12,18
137:15
**10.9**   35:1 36:4,6
36:13 38:18 40:6
47:13,15 55:23
57:13 62:18 63:5
64:5 68:19 71:11
73:25 76:12 77:6
80:5 83:19 84:17
201:6
**10.9.**   30:17 37:25
47:4,13 56:2
62:21 84:14

**100**   142:13 153:4
182:18
**10005**   9:12
**10006**   8:15 9:5
**10019**   10:11
**10022**   8:22
**1015**   78:9
**10153**   8:6
**105**   2:9 5:18 93:4
**10601**   1:14
**10:00**   7:15
**10:46**   1:17
**11**   2:8 5:17 6:16
13:18 14:15,18,20
105:14,15 162:14
162:15,15 163:11
163:11,19,25
166:3 181:7
**110**   93:22
**1125**   180:5
**1129**   101:15 102:2
**11501**   202:23
**1192**   74:10
**1195**   74:10
**11th**   172:23
**12**   109:21,24
117:2 181:8
186:13
**12,000**   121:13
**12/31/2018**   6:18
**1280**   4:23 5:9
**12th**   105:22
**13**   74:14 131:6
**13.3**   69:16
**13.4**   32:2
**13.8**   74:6
**1334**   104:15,15,20
104:24 105:9,16
111:7,11 117:7
162:11,19 163:2
164:13 165:20
167:8

**1381**   57:2
**1386**   7:12
**1394**   40:15
**14**   62:3 75:19
**14.6**   36:17,18
37:11 39:2 71:6
71:11,18,19 72:21
**14.9**   27:19
**140**   17:8
**143**   57:1
**144**   180:5
**15**   33:12,24 34:4
34:11 36:10 40:18
43:11 73:9 128:15
171:7 201:5,9
**157**   163:9
**16**   88:25
**1633**   10:10
**166**   87:4
**16th**   15:1 89:7
163:20
**17**   180:19
**177**   50:16
**18**   1:16 7:15 44:9
180:18
**18-23538**   1:3
**181**   201:9
**184**   201:10
**19**   24:14,17 40:16
**19,000**   175:8
**19.5**   28:1
**198**   50:17
**1983**   67:25
**1988**   195:21
**1990**   106:9
**1992**   74:10
**1998**   180:6
**1st**   170:16

**2**

**2**   2:17 6:16 31:9
47:15 76:15
104:15,20,24
105:9 111:7,11

**117:7** 162:11
163:2 164:13
165:20 167:8
181:2
**2,100**   158:7
**2.1**   32:18,21 77:17
79:12
**2.10**   32:8,20 48:6
**2.1d**   47:10
**2.1p2**   47:11
**2.3k**   56:16
**20**   67:13 171:21
**200**   9:18 10:3
**2001**   75:3 180:24
**2002**   180:17,18
**2003**   163:13
**2005**   195:23
**2007**   181:1,2
**2008**   196:1,22
197:9 199:22
**2009**   196:1,23
199:22
**2010**   182:7
**2012**   74:18,19
75:1,2,2,8,11,11
75:18,19 122:7,9
128:12 129:3
152:17
**2013**   74:15
**2014**   195:21
198:19,22
**2015**   132:23 181:8
187:8 192:3
**2016**   122:17
132:23
**2017**   109:1 114:19
123:9,12,14,14,18
124:17,17,18
125:10 128:17
132:22 133:18
148:10,11,21,21
149:17,18 150:20
151:4,14,23,23

152:16,17 155:12
157:3,4 161:17
165:4 199:5,6
**2017-2018**  109:5
**2018**  88:13 105:22
109:1 114:19
123:15,17,17
124:18,18,19
125:8,10 128:17
133:6 141:21
148:11,14,20,22
148:23 157:4,4
160:3,8 161:19
170:15 174:24
175:18 178:1,4
**2019**  1:16 2:17
7:15 88:25 89:8
133:6,10,12
163:20 202:25
**205**  180:23
**21**  115:24 171:25
**21,000**  120:12
**214**  43:4
**21st**  29:6
**22.5**  24:14,16
**22nd**  62:11
**24**  180:19
**24,000**  121:13
**2414**  2:12 5:21
**2425**  9:18
**248**  1:13
**25**  201:10 202:25
**250,000**  171:8
**2508572**  74:18
**26**  170:16
**2651**  181:1
**267,470**  187:11
**268**  180:23
**2690**  6:19
**26th**  23:18 24:5
24:15 27:12,24
**27,000**  120:13

**2715**  4:16,23,24
5:3
**2717**  4:23
**2766**  2:5 3:12
**2796**  2:5,18,23 3:5
3:13,21
**28**  9:11 33:13
69:13 162:11
163:9
**2808**  3:24
**281-288**  75:3
**2819464**  75:18
**2832**  5:23
**2839**  7:17
**2864**  2:23 3:14
**29**  74:19 75:2
**29.4**  28:3
**290,000**  188:19
**2922**  6:5
**293**  163:12
**2980**  6:11
**2989169**  75:1
**2996**  4:25 5:2

**3**

**3**  2:9 5:18 24:6,9
47:15 76:17,19
103:8 175:24
176:3,16,25
179:22 180:11,15
**3.05**  163:20
**3.12**  45:11
**3.14.**  45:11
**3.8**  13:1
**30**  67:13 102:9
112:11 113:6,10
115:14 119:7
130:18 136:6
137:21 139:20
157:14,16,17
**300**  1:13 4:21,25
5:4,6,11,14 9:17
10:2 103:13 104:4
114:25 120:12

161:23 202:22
**300's**  4:18
**3011**  2:19
**303**  110:7 117:16
117:16
**3031**  7:4
**3050**  4:5
**3079**  2:23 3:5
**308**  163:12
**3080**  28:15 29:2
**3144**  7:7
**3156**  3:6
**3163**  6:21
**3168**  6:13
**3169**  6:2
**3198**  4:12
**31st**  10:10
**3210**  4:12
**3225**  6:23
**3247**  5:4
**330**  202:21
**331**  163:12
**34-4**  181:7
**35**  144:14
**36**  75:8,20
**360**  63:20,21
**362**  164:11 193:1
**363**  2:9 5:18 90:25
**365**  2:9 5:18 176:3
176:16,25 179:22
180:11,15 181:14
201:9
**381**  75:11
**3:30**  186:13
**3:41**  200:8
**3rd**  23:19 24:8
27:16

**4**

**4**  75:1 103:11
145:10,10,15,15
164:16
**4,250**  122:11,19
122:20 123:9

124:6 125:25
126:6,20 129:5
130:2 134:11
147:20 151:17,25
152:21,25 153:17
165:3
**4,300**  158:6,11
**4.3**  44:13
**4.4**  55:8
**4.5**  147:19 161:3
**4.6**  69:4
**4.7**  54:17 55:11
82:5
**4.7.**  55:10
**40**  121:20 145:18
168:4
**41**  75:11
**45**  142:15,23
144:22 145:16
150:6 160:12
**4th**  24:12 27:18
27:25

**5**

**5**  27:13,17,24
33:18 74:19
145:16 155:24,25
156:5 157:7,9,9
182:3,25 183:3,5
184:3
**500,000**  170:20
**502**  181:14 201:9
**503**  2:9 5:18 6:16
6:16 16:22 99:8
185:18 186:4,7
**506**  93:4,4 98:13
99:11,14 100:10
**507**  6:16 17:11,14
17:21 18:1,21
22:20 100:8 101:6
101:16 102:1
**522**  57:2
**542**  73:14 104:16
107:17,24,24,24

108:13 164:8
165:11
**55** 142:15 143:2
144:18,19,21
145:16 160:19
**552** 93:4
**57.935** 43:11
**599** 8:21

**6**

**6** 109:21,24 117:2
119:7 130:18
137:21 139:20
157:14,16,17
**60** 15:7 101:7
102:11 105:5
112:11 113:6
115:15 136:6
166:20
**600** 47:16
**60440** 10:4
**60606** 9:19
**61** 81:3
**616** 74:10
**6186** 180:17
**631** 10:3
**635** 175:24
**65** 143:8
**652** 4:23,24 5:7,14
**656** 57:2
**657** 49:12
**69,713.54.** 175:8

**7**

**7** 37:8,24 38:2,14
59:17,22 72:7,8
72:12,20,21
**70,000** 175:15
**767** 8:5
**776** 75:8
**779** 75:20
**785** 75:3

**8**

**81** 113:9
**837** 74:14
**84** 201:5
**85** 201:7
**88,660.08.** 6:18
175:6

**9**

**9** 16:22 99:8
101:15 102:2
180:18 186:4
199:6 201:7
**9.1022** 80:22
**9.6** 141:18,24
**9.9** 27:23 28:2
**90** 13:1 98:23
**93** 98:19

**a**

**a.2d** 74:10,14 75:3
**a.3d** 75:8,11,20
**a.m.** 7:15
**abena** 2:18 3:5,13
**abi** 181:3,6,8
**abilities** 63:6
**ability** 16:13
90:20 91:7 97:20
128:4 155:10
165:25 166:2
181:22 198:15
**abl** 89:6,9 91:5
92:14 95:6
**able** 18:9 122:22
151:1,6 154:9
193:22 197:5
**absent** 105:15
111:20 162:17
163:6
**absolute** 163:19
**absolutely** 22:8
96:16 101:21
108:4,6 116:10
136:4 142:1

179:25
**abstain** 105:10
111:3 115:7 162:2
162:9,22 163:3
167:7
**abstaining** 168:11
**abstention** 4:22
5:13 103:14,18
104:14,20 105:21
115:16 131:20
132:5,7,17 133:21
133:25 135:12
139:2,2,13 140:23
147:8 161:25
162:7,10,12 163:3
163:8 165:12
166:21
**accept** 147:10,12
156:16 174:9
**acceptable** 95:17
186:17
**acceptance**
164:24
**accepted** 164:23
**accepting** 32:5
**access** 49:24
101:14
**accommodate**
38:9
**accomplish**
172:22
**accomplished**
172:21
**account** 28:12
31:4 33:3 35:11
35:17 38:21 41:20
41:21 42:3,6,6,9
42:14 44:3,18
46:23 47:7 48:18
48:19 49:23,25
51:4,9,17 53:6
55:3 62:17 65:11
68:2,2,5 69:23

76:2 78:24 80:20
80:23 81:5,17
82:9,15,24 84:7
84:11 94:15,16
98:19 99:4,5
114:9 123:6
141:10,18 169:4
176:18 189:13
**accounting**
123:11
**accounts** 23:9
24:1,2,19,20 29:7
29:8,18,19,22,25
30:1,4,8,9,14,19
30:25 31:6,11
32:6,8,11,15,16
32:19,23,24,25
33:2,10,10,14,14
33:19 34:16 35:3
35:13,20 36:2,7
36:14,23 37:1,4
38:17,18,22 39:18
40:3,7,11,12,17
40:25 41:12,14
43:9 44:5 46:4
47:3,16,18 49:13
49:16,24 50:2,5,9
51:1 52:6,9,11
53:11,25 54:8
55:17,25 57:11,16
63:8 64:12,25
66:15 68:7,9,10
68:14 69:2,3
73:22,24 74:2
76:1,16 77:4,8,14
77:15 78:6,12
79:22,24 80:2,6
80:13,17 83:18
84:4,6,18
**accrual** 179:2
180:2
**accrue** 179:25
180:13

**accrued** 175:19
**accruing** 177:19
  179:16 180:7
**accurate** 133:24
  149:16 202:4
**acquiescence**
  155:18 156:11
**acquired** 47:10
  64:9 76:14,23
  77:1 78:4
**act** 105:2 106:7,10
  107:7 124:4,9
  126:2 129:1,25
  134:10 138:5,5,6
  138:6,25 150:23
  152:7,15,15,18,18
  152:20,23 154:20
  155:23,24 156:5
  157:6,9 161:1,3,4
  166:24 187:7
**action** 7:3 21:1
  62:10 86:10 93:21
  105:13 106:7,13
  106:14 108:17
  111:13 132:15
  134:6 159:14
  162:14,16,23
  163:5,6,16 181:20
  189:2 195:13
  197:21
**active** 21:9 115:1
  155:19 158:3,6,9
  166:12
**actual** 22:10
  151:20 152:1
  165:7 177:14
  194:7
**acumen** 12:17
**adams** 9:18
**add** 109:4 118:19
  171:8 183:9
**added** 134:21

**addition** 73:23
  150:6
**additional** 24:11
  37:10 46:3 71:8
  72:9 191:7 198:3
**address** 17:25
  53:7 55:18 58:6
  90:24 111:15
  137:22 150:16
  155:4 163:18
  170:6
**addressed** 70:8
  92:1 132:6 176:9
**addresses** 52:12
**addressing** 29:4
  140:14 168:5
**adds** 147:14
**adequate** 96:20
  97:24,25 170:21
  171:14
**adheres** 75:12
**adjourn** 170:19
  192:8,9,14 193:22
  197:7 199:19
**adjourned** 170:6
  191:12
**adjourning**
  171:21 199:9
**adjournment**
  170:20,23 194:24
  197:5
**adjourns** 192:25
**adjudicate** 112:2
  163:22,24
**adjudicated**
  136:12,19 139:14
  141:10 162:24
  165:22 167:3
**adjudicating**
  111:22
**adjudication**
  105:17 111:13
  163:8,14,15,17

164:17 166:11
  167:5
**adjust** 27:7
  176:19
**adjusting** 39:18
**adjustment** 47:21
  63:18 64:13,16,17
  65:17,20,21 66:2
  84:14
**adjustments**
  78:25 79:17
**admin** 19:4
**administrative**
  6:15 7:9,11 14:23
  18:24 87:6 99:6,7
  99:8 100:2,3,6,6
  100:14 113:23
  114:3,4 165:25
  166:2 174:19
  175:16 185:9
**admission** 25:3
  28:23
**admit** 29:1
**admits** 33:18
**admitted** 29:2
**adopt** 185:23
**adoption** 14:1
**advance** 19:5
  100:19 136:2
  167:21 185:3
**advancement**
  161:10
**advise** 87:25
**advised** 23:12,16
  27:19 89:3 137:1
**affairs** 14:19
  18:11
**affect** 199:10
**affidavit** 55:3
**affiliates** 170:2
**affirmative** 7:3
  181:19 184:1
  201:12

**affirmed** 187:7
  192:3
**afternoon** 51:22
  87:17 104:3
  169:25 172:19
  174:21 185:7
  186:24 187:1,2
  195:8,10
**agency** 127:13,14
**agency's** 127:17
**agenda** 7:14 12:6
  23:1,3 39:10
  87:11 103:7
  137:16 170:3,5
  172:18 181:16
  185:5 193:3 200:1
**agent** 4:2,10
  87:19 88:2,8
  96:10 99:2 183:17
  184:11,21
**aggregate** 35:2
  37:24 47:14 71:11
  76:13,18
**ago** 15:7 108:16
**agree** 22:1 62:23
  64:1 65:10 89:12
  89:20 144:25
  170:19 186:4
  196:20
**agreed** 33:12
  37:23 38:1,9
  51:14 59:2 72:13
  72:14 73:10
  144:13 150:6
  156:25 167:18
  170:17 171:8
  193:19 197:6
**agreement** 2:2,15
  3:3,9,18 23:4,12
  23:17 24:5,8
  26:17,18 27:7,12
  31:9,17,22 35:24
  38:20,24 43:13

44:13 45:1,2,3,4
46:19,19 49:8
50:10 52:25 54:18
59:22 67:4,6
73:17,23 74:6,7
75:22 79:2 80:9
80:16 82:5 94:3
106:9 107:1
117:23 121:6
125:22 130:1
149:9 156:11
157:20 161:6,6,11
161:15 162:6
164:24 173:6
**agreements** 29:5
29:10,16,17,24
30:5 31:19,20
32:1,3 34:18
38:23 42:24 43:1
43:22 44:23 47:24
49:2,3 54:10,15
55:16 57:6,7,20
59:5,7,8,10 78:2
78:11,15,18 79:11
81:12,16 121:7
**agrees** 62:25
104:22
**ahead** 87:15
110:16 160:2,3
175:2
**air** 73:7
**akin** 15:20 18:16
**al** 3:23 12:3
**alan** 104:7
**albeit** 82:16
**alert** 101:11
**aliano** 186:22
187:3
**allen** 4:24 5:3,13
**allocated** 171:10
**allocation** 102:8
**allow** 20:8 90:17
100:5 114:22

157:6 171:5
**allowance** 7:10
77:24
**allowed** 101:16
102:23
**allows** 148:18
**alta** 75:10
**alternative** 4:22
5:12 21:19 22:21
50:1 93:16 103:14
161:24
**alternatively** 6:8
90:25 172:17
**alternatives** 22:20
**alves** 10:18
**ambiguity** 74:22
74:23 75:4 176:17
177:6,16
**ambiguous** 75:9
181:10
**ambit** 185:18
**amenable** 103:16
103:16
**amended** 31:9
122:5 128:12
152:19,19,23
**american** 31:8,10
51:5,6 74:9
**amex** 43:8 45:1
46:19 78:18
**aml** 199:3,8
**amount** 15:13
24:9,13 31:12,12
34:16 35:2,7,7,8
43:25 44:2,2,24
45:1 47:14 49:10
56:25 57:18 61:4
63:5 64:6,25 70:4
71:5,12 76:14,15
76:18,20 79:1
82:6 93:11 127:18
143:9 175:7,8
182:3 183:4,22,23

184:2 188:19
189:11,12 190:5,6
**amounts** 2:10
5:19 23:21 26:5,7
26:23,24 27:7,8,8
27:17 35:2 36:22
40:24 44:3 53:1
69:14 71:8 78:13
79:4,16 81:15,17
83:16,17,20,21,22
84:17,20 86:4
132:21
**analogies** 110:6
**analogy** 110:5
**analysis** 21:18
22:3 104:18,24
118:4,6 166:10
180:2
**analyzed** 93:21
**analyzing** 180:4
**andy** 178:11,12
180:5,8
**annexed** 88:22
**announced** 25:16
**answer** 20:21 39:7
44:16 67:21,22,22
104:24 107:9
116:8 123:14
126:12 135:25
143:8 158:25
167:11
**answered** 42:1
55:19
**answers** 41:8
**antecedent** 70:16
83:9
**anticipate** 25:8
28:8
**anticipated** 78:25
**anybody** 135:25
142:6
**anymore** 90:12
150:24

**anyone's** 106:4,18
**anytime** 131:14
**anyway** 192:6
**aog** 111:16
**apa** 25:22 30:2,7,9
31:18 32:1,3,4,23
33:1,2 35:1 43:15
43:18 44:16,17
56:9,12,15 59:7
60:5,10 62:13,18
66:20,21,24 73:23
73:25 74:6 76:1
76:12 77:16,17
79:13 80:18 95:2
171:18,19
**apa's** 78:7
**apart** 26:3 34:14
83:12
**apa's** 29:8 32:7,18
**apologies** 176:4
**apologize** 65:22
**apparently** 27:20
198:19
**appeal** 166:22
187:5,8,13,13,20
187:23 188:3,23
189:4,9,12,16,17
189:19,25 190:5,5
190:11
**appealed** 187:11
**appeals** 136:5,7
136:10 188:18
190:18
**appearing** 193:6,9
**appears** 82:2 83:8
85:5 163:15
**appellate** 136:16
158:16,18,21
159:3,16 166:15
187:8,22,24 188:7
191:10,18,22
**applicable** 31:24
40:6 48:5 68:4

80:15 118:5 130:5
175:17 176:24
**application**  73:16
152:22
**applied**  67:25
84:19
**applies**  35:24
159:7
**apply**  46:6 78:6
180:2
**applying**  70:16
162:7
**appreciate**  21:6
170:22 171:9
**appreciates**  39:14
**appropriate**
110:11 118:2
131:23 149:21
155:15 162:24
163:7 180:20
186:6
**appropriately**
84:19
**approval**  187:13
**approve**  182:17
**approved**  88:21
88:22,24
**approving**  7:2
181:18 201:11
**approximately**
17:8 69:12 143:9
166:20 170:16
**april**  1:16 2:17
7:15 23:19 24:8
24:12 27:16,18,25
170:16 180:17
181:8 202:25
**aptly**  78:20
**area**  136:23 153:4
153:8 166:13
**aren't**  34:20
49:16 60:25

**arguably**  183:14
**argue**  92:13 97:15
117:20 121:23
188:21 199:6
**argued**  100:13
131:19 179:1
185:19 194:3
**argues**  31:16 32:3
82:7 165:5
**arguing**  19:6
32:18 36:3,5,21
36:24 37:2 52:17
88:10 121:22
145:22 155:13
185:12,15 187:23
**argument**  29:21
30:3 31:25 42:10
45:4 46:5,10 50:6
55:15 56:5,5
67:14 69:6,22,25
70:5 80:10 92:6,7
92:8 106:25
109:21 112:19
123:10 124:8
130:17 131:20
138:14 147:10
154:13 155:16
159:4 163:21
164:5 173:24
175:23 179:5
187:25 188:2,4,8
188:21 195:12
**arguments**  53:8
80:15 131:17
142:7 147:18
188:1 191:24
**arising**  51:11,13
68:6 80:25 81:8
162:15,15 176:6
179:15
**arlene**  10:18
**arrangement**
54:11

**arrears**  148:10
**arrived**  72:17
**article**  108:20
181:9 199:5
**asher**  10:19
**asked**  14:25 22:19
29:3 55:1 91:19
91:19 103:18
119:9 120:4
122:24 123:12
135:23 146:19
155:14 158:7
162:9 168:22
170:23
**asking**  110:12
137:7 143:10
146:22 160:13
186:9
**asks**  124:17
**aspect**  85:2,10
**assembly**  128:3
129:21
**assented**  74:25
**assert**  62:1 122:22
**asserted**  26:3,17
75:16 182:20
199:19
**asserts**  182:8
**assess**  185:13
**asset**  2:1,15 3:2,9
3:17 23:3 35:10
44:18 64:11 66:1
73:16,22 74:5
77:2,2,10 78:4
**assets**  15:14 16:10
23:13 63:7 71:16
71:16 77:7,11,25
89:2 113:22 191:5
**assign**  2:4 3:12,20
6:8 59:4,6 172:17
**assigned**  59:8,25
173:9

**assignment**
161:16
**assist**  182:16
**associated**  15:10
15:14 61:9 62:5
188:22
**associates**  158:5
**association**  4:1,5
4:9 7:7 8:20 87:19
199:7
**assume**  6:7 58:4
59:9,25 60:1,4
63:20 66:13
110:12 158:17
171:7 172:17
173:1
**assumed**  59:10
176:8
**assuming**  29:13
111:4 120:5
130:21 144:24
198:11
**assumption**  17:7
17:7 66:5 120:20
173:14
**assurance**  165:17
165:18 171:14
**asway**  47:14
**athenian**  75:7
**atkinson**  104:9
157:12
**attached**  37:21
98:18 113:8
**attaching**  156:18
**attempt**  74:11
131:9 164:10
**attorney**  143:22
189:19 193:5
**attorneys**  8:4,13
8:20 9:3,10,10,17
10:2,9 187:9,11
189:11,21,25
190:5,10,11 192:4

**audit** 160:1
**augmented** 108:18
**august** 181:2 191:14,19 192:15
**austin** 11:22
**authentic** 119:18
**authority** 19:13 22:9 91:4 126:14 126:15 160:3 182:2 183:25
**authorize** 128:8
**authorized** 88:20 94:9
**authorizes** 149:2
**authorizing** 7:2 88:13 181:18 201:10
**automatic** 2:2,16 2:22 3:3,9,18 4:22 5:7,12 23:4,14 25:4 39:2,12,16 39:19 40:1 85:4,8 103:13 107:17 115:2 161:24 164:11 186:20 188:12,25 192:1 201:8
**availability** 70:3 82:5
**available** 34:2,12 93:11 151:6 189:2 191:3 193:14 196:3,6,9,19,21 197:16
**avenue** 8:5,21
**average** 121:20
**avoid** 116:24
**awaiting** 101:2 187:21
**award** 187:12,14 189:9

**awarded** 187:10 190:6
**aware** 14:22 21:20,23 147:2 174:11 195:17 199:13

**b**

**b** 1:21 2:3,9,16 3:4,10,19 5:18 6:16 10:25 16:22 17:11,14,21 18:1 18:21 22:20 55:3 99:8 100:8 101:6 101:16 102:1 109:21,24 117:2 119:7 130:18 137:21 139:20 157:14,16,17 161:3 163:9 167:10 186:4,7
**b.r.** 163:12
**back** 24:4 31:1 42:11,15,17 45:20 58:20 59:15 61:10 62:11 64:24 66:7 90:23 92:10,15 103:4 105:2 115:8 117:2 118:3 124:8 132:24 135:18 139:5 142:11,12 142:19 146:17 148:24 149:1 160:19 161:13 168:23 172:2 186:14 195:23
**backdrop** 32:4 40:19
**background** 120:11
**backup** 27:18
**badges** 154:7 158:3,6,9

**balance** 20:9
**ball** 158:23
**balls** 73:7
**ban** 189:9
**bank** 15:24 24:1,2 24:19,20
**bankruptcy** 1:1 1:12,23 49:21 50:17 57:2 73:15 78:8 104:8 110:8 112:19 114:9,10 138:20,21 139:7 141:11 150:19 159:15 160:10 162:20 163:6,11 164:1,1,3,9 178:2 181:1,2,4,11 191:21 196:18
**bar** 16:22 18:25 19:4 166:12
**base** 38:7 81:12 171:16
**based** 17:1 39:15 49:4 51:15 53:2 71:8,10,10 74:5 75:21 78:17 81:11 82:4 84:13 105:12 121:8,9 123:20 124:11 128:20,20 128:22 129:25 136:3 162:13 163:4 164:14 167:1,6,9 168:16 191:25
**basically** 12:20 105:9 110:24 111:17,25 112:25 156:19 181:21 186:13
**basis** 2:10 5:19 23:16 25:8,11 27:4 28:9 36:11 49:6,17 51:2

54:23,24 74:1
79:4 83:3 85:10
91:20 111:2
131:15 136:12
150:14,23 161:7
162:11 163:6
164:3,12,18
165:12,15,22
166:16 167:18
168:18 192:10
198:7
**bear** 102:23
**beginning** 40:9,10 40:13,22 101:2 132:4 151:23
**begun** 100:25
**behalf** 2:11,18 3:6 3:13,22 4:4,15,24 5:3,13,20 6:11 12:5 23:8 42:12 42:12 87:18 95:23 97:17 103:7 104:4 114:25 132:2 143:23 144:1,16 170:1,9 172:20 185:8 193:7,9 195:9
**believe** 12:18 13:5 14:24 16:14 18:7 18:12,16 20:20 27:22 28:3,19 29:10 42:20 59:14 59:23 74:1,4 75:22 77:5 80:8 80:19 82:12 83:4 84:1,3,5,10 86:4,5 87:11 88:8 89:14 91:2,20 93:7 94:9 99:10 101:6 104:21 111:14 113:3,5 137:25 142:12,25 147:5 165:11,16,19

166:9 167:8,15
170:3 171:5
172:21 173:10,17
179:20 182:13
184:23 191:12,19
192:10 196:2,5,9
197:2
**believes** 113:16
166:17
**belong** 50:19
62:12 184:2
**beneficial** 18:17
**beneficiary** 165:3
**benefit** 20:11
21:19 64:15
125:20 129:24
149:13 196:10,14
**benefits** 120:1
**berkeley** 75:10
**bernice** 2:11 5:20
6:4 170:4,10
**best** 18:12 20:15
43:21 52:16
114:11,13,21
151:6 158:25
**better** 29:12
147:25 151:10
175:14 180:10
**beyond** 24:9
44:13 71:8 89:7
122:1 150:10
189:11 190:9,16
**big** 64:3 195:17
**bill** 128:25 129:8
179:21
**billed** 176:10
**billion** 13:1,4
37:19 47:16,21
49:12 63:6,17
64:6 71:4 76:18
76:19,21 77:1,5
83:21

**bills** 178:7 179:24
180:13
**binding** 165:1
**bishop** 2:12 5:21
6:5 170:4,10,12
**bit** 15:24 92:16
101:6 132:18
172:15
**black's** 57:3
**bloomington**
96:10
**board** 148:14
169:10
**boils** 176:15
**bolingbrook** 10:4
**bomb** 92:16
**bona** 108:10,12
110:9,13,22
111:10 117:13,15
117:16 131:18
153:22 165:15
**bond** 183:16
187:13,13 188:18
189:4,12,17,25
190:5,11,18
192:19
**bonds** 77:24
**book** 64:13
**born** 13:18
**borrowing** 38:7
**bother** 89:13
**bottom** 39:9 47:18
157:21
**boughton** 10:3
**brainer** 107:10
147:13,16
**breach** 108:17
**breached** 121:6
**break** 87:15
**brendan** 174:22
**brewing** 178:3
**brian** 11:16

**brief** 2:14 3:1
29:20,21 31:8,16
33:18 37:1 70:8
97:17 124:11
134:8 179:18
188:10 191:19,23
192:11 195:11
**briefed** 65:8,13
115:14 187:20
188:6 191:19
**briefing** 29:4
38:11 115:4,13
159:2 178:16
**briefly** 39:7 55:18
166:19 187:5
**briefs** 42:25
106:11,12 112:4
**bring** 86:10
107:25 198:15
**broad** 20:19 32:14
32:20 82:13,23
**broader** 133:9
**broadway** 10:10
**brought** 99:2
**bryant** 11:15
**bucket** 145:18,19
**buckets** 26:10,14
**budget** 88:21,22
88:24,25 89:4
90:2,11,12 98:7
98:18,25 100:1,20
101:13 102:7,13
102:13 120:25
142:21 150:11
**budgeted** 120:19
122:25 137:15
**build** 121:12
**building** 121:18
121:18 154:10
**buildings** 115:25
120:13
**built** 120:24
121:16,17

**bunch** 142:15
**burden** 99:14
111:25 112:3
121:18 125:18
129:23 136:17
165:21
**business** 33:8
34:19 46:14,25
49:1,14 59:1
66:11 69:24 70:1
70:9,25 72:16,19
76:10 82:2 83:8
153:25 170:10
**businesses** 130:24
**butler** 6:17,19,23
174:18,22
**buy** 49:12
**buyer** 26:18 29:5
30:8 31:7,16,20
32:3,17 33:16
39:3 49:10,11
76:22 77:3 97:7
99:15,23 161:16
**buyer's** 29:20
31:25
**buying** 198:19

| c |
| --- |

**c** 8:1 10:20 12:1
88:22 93:4,4
98:13 99:11,14
100:10 104:15,15
104:20,24 105:9
111:7,11 117:7
162:11 163:2
164:13 165:20
167:8 202:1,1
**c.v.** 75:10
**calandriello** 9:16
**calculated** 118:23
120:2
**calculating** 27:14
**calculation**
145:24 146:2

[calculation - certain]                                                                    Page 9

165:10 169:9
**calculations**
  167:13
**calculus**  84:9
**calendar**  159:6
  162:4
**call**  16:3 28:20
  41:9 157:18
  172:24 192:7
**called**  131:6
**campus**  125:2
  129:14,20 151:24
  152:9 154:7
**cancer**  195:15
**candidly**  33:18
**can't**  47:7,23
  48:14 49:16 54:4
  66:16
**cap**  57:13 71:4
  83:21 88:9
**capable**  163:16
**capacities**  184:14
**capacity**  139:20
**capital**  9:10 75:7
  75:19 97:17
  111:25 184:24
**card**  23:9 28:12
  29:5,8,19 30:1,8
  30:14,24,25 32:7
  32:12,14,19,23,25
  33:2,4,10 35:3,13
  35:17 36:2,8,14
  36:18,19,23 37:12
  38:17,21 40:3,7
  40:11 41:1,12,14
  41:18,25 42:7,19
  42:22,24 43:1,9
  43:13,16,24 44:1
  44:5,12 45:8,12
  46:4,8,13,21,22
  46:24 47:3,7,16
  47:18 48:14,16,18
  48:21 49:2,13,15

51:12,13,23,24
52:18 53:1,5,11
53:19,25 54:2,3,5
54:9 55:15,25
57:6,7,11 59:24
60:2,4 62:5 63:8
64:12,25 66:15
67:4 68:6,9,13,15
69:2,11,13,18,23
70:15,20,22,23
71:23 72:4,9,21
73:21,21,24 74:2
76:1,4,16 77:3,8
77:14,14 78:6,11
78:12,13,22 79:1
79:10,18,22,24
80:2,6,9,13,17
81:1,2,7 82:1,8
83:2,11,16,18
84:4,6,19
**cardinal**  126:10
**cards**  30:19 33:5
  35:11 48:22,23
  52:20,23 61:7
  62:11 76:5,7 81:9
  82:11 83:20
**care**  189:15
**careful**  54:18
  56:12 151:10
**carefully**  43:12
  55:24 80:14
  122:17 151:11
**caricature**  56:4
**carolina**  176:11
  176:12
**carried**  88:25
**carry**  165:20
**carrying**  180:14
**cars**  113:13
**carved**  32:7
  186:10
**carveout**  79:23
  94:25 95:3 98:8

**case**  1:3 12:8
  13:10 20:14 21:5
  31:24 33:7 40:9
  40:10,13,14 41:19
  42:1 43:10,11,19
  43:20 49:1 50:15
  50:16 52:25 53:11
  56:24 67:25 69:24
  70:9,13 73:13
  76:9 78:3,20 80:3
  83:7 91:17 92:16
  93:9 94:1 98:4
  99:3 100:7,7,12
  100:13 105:13,15
  106:14 107:24
  110:15 111:24
  113:12,15,21,21
  114:5,10 115:1
  117:14,18 137:3,4
  139:7,10 141:11
  141:13 150:14
  157:17 158:24
  159:15 160:7
  162:14,15 163:11
  163:19,25 165:11
  168:14 176:11,23
  177:1,2,3 179:4
  179:12 180:17,21
  180:24 184:19
  185:24 187:4
  192:13 196:4
  199:16
**cases**  13:2,25
  14:20,22,24 17:22
  19:3,3 21:14
  31:20 43:2 51:20
  108:7,8,8 113:9
  115:3,3 117:19
  139:6 162:20
  163:18,23,24
  179:7,23 180:20
  180:25 182:12
  188:10 191:7

**cash**  4:4,11 16:7,9
  23:22,24 24:13,13
  24:18,24 25:15
  26:14 28:1 32:9
  32:17 39:8,15
  42:18,19 44:21
  46:18,21 47:4
  65:4 77:19,21,21
  77:22 85:17 87:12
  87:21 88:15,16,16
  88:20 90:13,18,22
  91:4,10,17,21
  92:11,14 93:7,11
  93:13,16 94:8
  97:19,21,25 98:2
  98:23 100:4,4,7
  102:1 113:22,22
  113:24,25 166:5
  191:5
**catch**  32:20
**categories**  23:13
**categorized**
  175:15 186:20
**catherine**  11:11
**causative**  188:11
**cause**  13:20
  105:13 162:14
  163:5 188:25
  199:2
**causes**  7:3 93:21
  106:6 181:20
**causing**  85:4
**ccar**  73:22
**cede**  23:5
**centerpoint**
  180:22
**centers**  180:5
**cents**  135:6
**certain**  14:17
  16:16 58:3 73:20
  93:5 98:10 109:16
  110:14 137:9
  151:9 163:23

164:21 168:24
176:18
**certainly** 19:7
113:7 139:15
151:23 178:22
198:10
**certainty** 181:7
**certificate** 197:1
**certification**
123:12 156:16,18
160:1 164:23
167:10
**certified** 202:3
**certify** 151:18
152:2,3 156:15
**cfo** 150:25
**ch** 74:15,19
**challenge** 149:17
149:18,20
**chambers** 13:20
84:23,25 185:2
**chance** 78:10
**change** 31:5 68:14
69:13 123:11
124:21,24 184:25
**changed** 50:8
92:10
**chapter** 13:18
14:15,18,19
163:19,25 166:3
181:7
**character** 49:22
50:9 68:14
**characteristics**
125:13
**characterization**
38:11 98:20
**characterize**
17:16 44:21
**charge** 51:12,13
68:6 81:1
**chargeback** 82:22

**chargebacks**
34:19,21 57:19
60:24 61:1,9,15
61:15,16,16 62:4
78:25 79:17 81:14
**charged** 52:24
83:2
**charges** 33:4
41:18 42:23 48:22
52:19 68:11 70:14
70:23,23 76:6
77:25 81:25 82:10
83:11
**check** 71:19
**chicago** 9:19
186:25
**chiefly** 21:22
**child** 176:22
177:3,5 180:8
**children** 142:20
170:13
**choice** 167:9
**chose** 46:21 191:6
**chosen** 74:17
75:24
**chris** 11:21
**cil** 109:22
**cineplex** 180:16
**circuit** 178:15
179:19 180:3,6,24
185:23 187:5,11
190:6 195:14
**circuits** 180:1
**circular** 107:13
**circumspect**
74:20
**circumstance**
186:8
**circumstances**
92:10 162:21
166:17
**cite** 31:8 43:2,10
50:15 56:10

**cited** 41:19 55:9
112:10 188:10
**civil** 113:9 120:11
187:4
**claim** 18:17 37:14
39:14,15,15 50:23
62:1,7 66:18 78:7
101:6,16 102:1
105:12 109:25
125:18 133:4
135:11 162:13
163:5 175:5,17
181:5 183:24
191:16 192:18,24
193:11 196:5,8,11
196:16,17 197:10
197:15 198:25
199:15,19 201:7
**claimant** 196:4
197:10
**claimants** 15:8
17:14,21 18:21
**claims** 7:3,11
12:21,22 14:2,4
15:21 16:6,17,22
16:23 17:2,8,11
18:1,25 19:4
20:10 22:7,9,20
25:11 96:20 99:8
100:8 102:22
106:6 112:2 114:1
133:6 138:19
168:14 181:19
182:3,9,13 184:1
184:1 185:21
186:2,4,7 195:20
198:6,7,16 201:12
**clarification**
144:17 168:4,16
169:8
**clarified** 49:9
62:16 71:14

**clarify** 29:6 67:19
68:24 85:15 134:4
159:21
**clarifying** 146:24
**clarity** 109:20
155:7
**clause** 32:2 67:5
69:24 70:10
**cleaners** 130:14
**clear** 45:5 47:12
57:23 74:15 75:23
81:11 83:8 87:22
96:9,19 97:18
99:20 102:18
107:18 108:19
109:19,20 116:2
118:8 124:22
125:9,9 127:7
129:10,25 130:3,4
131:19 143:5
145:1,25 150:17
159:5 163:17
164:14,17,18,23
165:9,15 168:11
**cleared** 37:7,12
**clearly** 13:25 21:8
34:22 38:21 53:19
68:7 95:4 100:14
102:5 107:10,15
107:23 116:19
123:7 128:2 132:8
164:7,12 179:19
184:21
**cleary** 8:12 9:2
28:20 95:22
**client** 99:15
115:20 135:5
193:19 195:16
198:14
**client's** 100:16
105:25 199:3
**clients** 96:16
98:14

**clock** 14:25 15:1
**close** 38:10 99:18
  113:24 192:7
**closed** 59:8,12
**closely** 67:4 174:8
**closer** 68:22 110:7
  152:6
**closing** 23:23,25
  23:25 33:20,22
  34:1,10 37:6,9,18
  37:23 44:22 57:24
  58:11 59:17 61:5
  61:15 63:22 66:5
  66:9,12,15 67:2
  72:8 76:20 82:17
  84:8,9,10,12,21
  89:1 94:11 98:5
  101:7 171:3,6,11
  172:8
**code** 73:15 78:8
  110:8 164:9
  175:24 181:4
**collateral** 4:2,3,4
  4:10,11,11 31:4
  45:1 77:21,21
  87:12,19,21 88:1
  88:8,15,16,16,20
  90:13,18,22 91:4
  91:10,21 92:11,14
  93:7 94:9 96:10
  97:6,19 98:1,2,23
  99:2 100:4,16
  101:8 135:11
  168:17 183:17
  184:11,21
**collateralized**
  188:18 189:4,5
**colleague** 39:7
  56:3 96:2 116:15
  136:25 143:22
  158:15
**colleagues** 28:20
  104:5 113:14

**collect** 62:1
**collected** 149:4
  154:21
**collecting** 148:25
  161:18,18
**collectively** 78:1
**colleen** 10:17
**collier** 163:20
**colloquially** 66:1
**colorable** 167:8
  167:16
**column** 158:4
**come** 43:16 53:13
  62:11 92:6,10
  100:21 101:24
  121:12 128:19
  135:18 146:17
  147:17 167:25
  171:17 172:2,4
  175:22 176:20
  186:14
**comes** 30:20
  35:12 64:17 94:20
  100:11 129:15
  145:17 160:19
  175:13 176:13
**comfortable**
  184:22
**coming** 17:2 77:9
  90:23 93:12
  161:19 199:4
**comity** 111:20
**commenced** 13:2
  162:17,23 163:7
  199:11
**commentary**
  51:19
**comments** 181:25
  182:1,1
**commercial** 74:22
  120:14 121:11
**commission** 181:3
  181:6

**committee** 3:16
  3:22 4:7 12:12,19
  14:8,9,12,18
  16:25 92:24
  169:10,10 181:24
  181:25 184:5
**common** 16:11
  78:19
**communicated**
  194:1
**communication**
  172:22
**communications**
  58:25
**community** 4:18
  4:21,25 5:3,6,11
  5:13 9:17 10:2
  103:12 104:4
  161:23
**companies** 25:14
  32:12 41:25 42:7
  42:19 45:9,13
  46:13,22 54:2
  55:15 59:24 60:4
  73:21
**companies'** 60:2
**company** 14:18
  16:6,7,17 21:18
  51:24 54:7,10
  74:9,10 75:3,18
  97:7 125:14
  129:15 138:8
  150:25 153:9
  158:10
**compare** 22:20
**compared** 139:15
**compel** 2:3,7,16
  3:4,10,19 4:14,19
  5:2,16 6:7 73:13
  103:9 104:16
  131:16 170:4
  172:16

**competitive** 12:13
**complaint** 19:11
  20:24 73:5 93:23
  132:20
**complete** 16:23
  23:19 196:8
**completed** 169:11
**completely** 67:25
  174:14
**complex** 16:11,19
  85:5
**compliance** 121:5
  123:13,16 128:19
  134:15,16 148:20
  149:1,17 150:23
  151:3,8,12,14,18
  156:15 160:5
  164:21
**complicated**
  108:24 109:2
  151:16
**complied** 107:7
  125:5 134:10
  156:19,23
**comply** 91:7
  108:22,23 122:10
  123:20 125:14
  134:15 159:24
  161:5
**component**
  166:10
**components** 40:6
**compressed**
  182:11
**compromise**
  16:17 134:8
**compromising**
  20:10
**comrie** 74:14
**concede** 89:7
**conceded** 37:18
  111:11

conceivable  32:9
  61:24
concept  19:1
  39:17,17
concern  31:21
  54:25 93:10
  102:16 165:24
concerned  22:7
  22:20 40:1
concessions  57:15
conclude  35:16
  79:8,22 80:16
  106:23 164:14
  167:2
concluded  200:7
conclusion  79:20
  84:15
conclusions
  116:21 176:21
condition  4:3,10
  55:11 58:10,11
  87:21 166:6
conditioned  90:10
conditions  58:2
  167:17
conduct  127:19
  128:8
conference  95:15
  171:25 172:24
confidential  54:19
confines  108:14
confirm  21:8
  95:23 102:5 149:7
  153:12 166:3,4
  174:3,6 192:12
  193:15 197:6,12
confirmation  18:9
  19:5,6 20:18 98:5
  100:8 182:10
  191:1,14
confirmed  13:10
  20:16 24:12 27:19
  151:2 191:13

confirming  22:8
conflated  132:18
conflict  160:18
confront  102:3
confusing  185:25
confusion  55:20
congress  107:14
  114:6,7 178:14
  180:10
conjunction  18:5
  173:5
connection  33:6
  48:24 70:11 76:8
  81:24 170:19
consensual  19:20
  19:21
consensually
  102:4
consent  90:4
  97:19,25 100:5
  101:9 102:6 114:5
  166:2
consented  90:8
consenting  90:1,3
consequences
  135:19
consider  13:11
  104:20 116:23
  165:23 177:12,12
consideration
  74:11 169:23
considerations
  176:18 177:5
considered  36:7
  62:7 80:14 175:16
  177:3
considering  14:5
  74:20 165:11
consistent  19:14
  24:5 27:12 83:9
  84:3 85:1 88:20
  151:2 167:22

consolidated  16:2
  16:12,21
consolidation
  21:20
constitute  41:22
  46:22 73:21,24
  79:11 80:20
constitutes  79:21
constituting  36:2
construction  74:7
  126:10
construed  75:13
consultation
  12:11 21:10 76:22
consumer  187:7
consummation
  13:18 18:13
contact  95:12
  193:18 194:22
contacted  87:24
contained  81:2
contemplate
  13:17
contemplated
  62:13 83:4
contemporaneo...
  150:22 153:25
contend  77:9
  106:20 162:5
contends  77:13
  81:21 175:9
contest  72:2
contested  74:1
  137:16 158:17
context  38:22
  75:24 80:16 127:2
  127:3,5 165:13
  166:11
contexts  14:4
contingency
  12:16
contingent  62:7
  65:14

continue  13:19
  46:14 68:15 90:13
  91:20 93:13
  129:18 191:8
continued  4:3,11
  87:21
continues  125:4
continuing  162:21
contract  6:9 41:11
  56:8 74:8,11,15
  74:21,24 75:9,13
  75:16 108:17,18
  108:21,23,23
  173:1
contract's  74:21
contracted  74:13
contractor  109:3
  124:25 130:9
contractors  109:7
  109:8,12 118:7,12
  118:13 125:15
  130:11,24 131:1
contracts  15:17
  31:23 43:4,5,6
  59:24,24 75:13
  78:2 79:3 177:10
contractual  50:23
contrary  56:7,8,9
  89:15 111:20
  131:17 165:5
  167:4 177:25
  180:9
contributed
  100:15
control  107:2
  165:1
controls  32:20
controversy  75:5
conversations
  91:23
converted  68:16
convince  67:1
  108:11

convinced 111:6
cook 113:10,13
  115:2 124:2 137:1
  161:18 187:5
  195:14
cooperative 115:5
coordination
  18:15
copies 130:22
copy 88:23 167:21
  185:2 197:4
core 108:14
  116:19 132:8
  135:10 147:11,13
  164:4 165:12
corp 74:25 180:17
corporate 152:21
corporation 1:7
  3:23 4:16 6:11
  12:3 170:2
correct 27:1 28:18
  30:21 35:15,22
  40:5 42:5 46:2
  50:8 70:18 71:6
  71:25 88:4,7 97:8
  108:13 127:10,24
  128:18 138:16,22
  139:3 146:11,21
  170:8 171:19
  196:24,25 198:20
  198:23
corrected 72:6
correction 45:3,7
correctly 62:23
  64:19
corresponds 57:5
cory 104:9
cost 21:17 98:4
  183:11 187:20,23
  188:4,22 189:17
  196:7
costs 14:23 17:10
  20:14 120:22

145:18 161:10
  189:3,14 193:17
counsel 18:2
  37:20 49:9 63:5
  84:24 103:15
  104:8,9,10 109:19
  112:10 130:7
  131:19 166:16
  167:21 173:17
  174:4,19 186:23
  188:15 189:23
  193:5,18 194:1,12
  194:12 195:21
  197:4,6
counsel's 115:11
count 55:23 57:12
  109:3,7,7,11
  113:13 118:7
  123:7,16,18
  124:24 125:1,11
  126:21 128:4,20
  129:4,11,22 131:2
  131:11 151:16
  153:15,18 154:13
  154:14
counted 124:25
  125:1 130:4
  149:21 153:25
  154:18
counterproposal
  101:3
counting 114:16
  123:21 126:15
  130:24 151:15
  153:17 154:16,22
country 202:21
county 113:10
  115:2 124:2 137:1
  161:18 176:12
  177:20,23 178:6
  187:5 195:14
couple 19:7 21:16
  43:2 56:10 67:19

104:6 107:5 129:4
  137:12 139:8
  155:5,8 176:2
course 13:19
  14:13 17:6 31:18
  33:8 41:18 42:23
  43:14,17,18,24
  44:12 49:1,5
  52:21,22,22,24,25
  53:12 54:3,11
  56:18,20 67:7,8
  69:24 70:1,6,9,13
  70:20,22,25 75:15
  76:10 82:1 83:8
  83:10,24 119:4
  120:23 135:11
  149:5 178:8 180:8
  180:24
court 1:1,12 12:2
  12:7,9,20,24 13:9
  13:14,23 14:11,14
  17:4 18:1,4 19:4
  19:17,22 21:3,24
  22:2,6,18,25 23:6
  23:15 24:21 25:10
  25:23,25 26:12,16
  26:23 27:2 28:8
  28:10,16,22 29:3
  29:9,14 30:11,16
  30:18,23 31:2
  34:24 35:16,23
  36:9,15,21 37:13
  39:1,5,11,23
  40:20 41:3,8 42:3
  42:14 45:16,23
  46:11 47:2,6,13
  48:3,9,17 50:13
  50:21 51:2,8,17
  51:25 52:7,15,17
  52:22 53:5,14,18
  54:9,15,22 55:5
  55:13,21 58:7
  59:4 60:12,19,23

61:6,11,18,22
  62:15 63:3,11,15
  63:24 64:1,24
  65:3,6,8,16,24
  66:14,19,24 67:16
  69:5,20,22 70:16
  70:19 71:1,3,7,13
  71:21,24 72:1,5
  72:11,23 73:3,12
  75:15 85:18,22,24
  86:9,10,16,19,24
  87:9,13 88:3,5,11
  88:12 89:9,12,16
  89:18,21,25 90:7
  90:15,23,24 91:3
  91:9,12,15,25
  92:3,5,21,23 93:3
  93:15 94:18,20,23
  94:25 95:2,12,13
  95:16,19,21,25
  96:5,7,13,15,18
  96:22,25 97:2,5,9
  97:11,14,22 98:8
  98:10,13,16,24
  99:1,17,21,24
  100:9,18 101:4,18
  101:20,22 102:5
  102:11,15,20,24
  103:2,5,10,16,24
  104:2,19,22 105:1
  105:7,9,17,24
  106:2,17,20 107:8
  107:14,18,22
  108:2,5,15,19
  109:10,14,22,23
  110:1,5,15,18
  111:3,5,8,12,17
  111:21,21 112:6
  112:12,14,16,21
  112:24 113:4,4,11
  113:16 114:7,9,10
  114:13,23 115:1,2
  115:8,16,19 116:1

116:5,8,11,14,17
116:22,25 117:2,5
117:21,24 118:15
118:17,25 119:4,8
119:12,17,20,22
120:6,9,15,18,23
121:3,21 122:4,6
122:8,12 123:22
123:25 124:12,15
125:7 126:14,17
126:25 127:2,4,7
127:11,21,23,25
128:9,13,16
130:15,17 131:10
131:21,25 132:11
132:14 133:8,10
133:13,16,21
134:2,4,12,17,19
134:23,24,25
135:4,9,16,18,21
136:4,7,9,14,20
136:23 137:5,7,14
137:19,24 138:10
138:12,13,17,19
138:23 139:1,4,13
139:24 140:2,6,8
140:11,17,19,25
141:3,9,14,16,20
141:22,24 142:3,9
142:17 143:4,14
143:20 144:2,5,14
145:2,4,8,11,14
145:19,25 146:1,4
146:5,8,14,19,22
146:25 147:2,3,7
148:3 149:23
150:1 151:20
152:10,13,16
154:2,12 155:2,10
156:3,14,20,24
157:12 158:15,18
158:21,22 159:5,7
159:9,11,12,16,16

159:18,20 160:11
160:13,14 161:14
161:14,21,22
162:17,22 163:1
163:20 164:1,1
165:23 166:14,14
167:16 168:2,8,13
168:18,25 169:3
169:12,18,20,22
170:6,7 171:18
172:1,13 173:8,17
173:19,22 174:1,4
174:9,11,16,20,25
175:2,9,19,25
176:2 178:8,14,18
178:21,24 179:10
180:9 181:14
182:16 183:1,13
183:19,23 184:6,9
184:13,16 185:4
185:19,22,25
186:12,13,16
187:1,5,8,10,15
187:17,22,24
188:7,7,9,14
189:4,7,15,21,23
190:6,8,10,13,19
191:9,10,19,22,25
192:5,17 193:8,24
194:5,11,16,18,23
195:1,7,10,14
196:12,17 197:8
197:14,24 198:10
198:14,17,22,24
199:9,15,18 200:2
200:5
**court's**  104:23
145:3 168:16
187:12,25 195:17
**courtney**  11:18
**courtroom**  186:23
**courts**  74:20
108:20 110:3

115:5 138:9 159:3
163:22 166:15
176:8,20 180:2,3
181:4
**cover**  98:4 99:10
187:17 189:3
190:18
**coverage**  195:19
195:23,24 196:1,2
196:3,6
**covered**  32:13
77:15 79:25 80:2
86:25 95:3 192:6
**covering**  133:10
133:12
**covers**  98:14
176:14 180:8
185:20 187:14
189:9 190:6
**crazy**  94:4
**create**  54:25
74:23 121:12
125:24 126:3
**created**  55:7
127:14 153:6,6
**creating**  74:22
181:7
**creative**  147:18
150:15
**credit**  23:9 28:11
29:5,8,19 30:1,8
30:14,19,24,25
32:7,10,12,14,19
32:23,25 33:2,3,5
33:10 35:3,10,13
35:17 36:2,8,14
36:17,19,23 37:12
38:17,21 40:2,7
40:11,16,25 41:1
41:12,14 43:9
44:5 46:4,8,16,17
46:22,23 47:3,7
47:16,18 48:14,16

48:18,21,22,23
49:2,13,15 51:12
52:18,20,23 53:1
53:5,11,19,25
54:9,21 55:12,25
57:11 63:8 64:3
64:12,24,25 66:15
68:6,9,13,15 69:2
69:4,11,13,18,23
70:3,15,20,22,23
71:23 72:4,9,21
73:21,21,24 74:2
76:1,4,5,7,16 77:3
77:7,14,14,20,22
77:23 78:6,11,12
78:13,21,22 79:10
79:18,22,24 80:2
80:6,9,13,17 81:1
81:7,9,25 82:6,8
82:11 83:2,11,16
83:18,20 84:4,6
84:19
**crediting**  62:18,20
**creditor**  50:4
110:9
**creditors**  3:17,23
4:8 14:17 16:16
20:7 21:14 62:23
98:21 99:7,8
100:2,3 110:11
114:4 166:3
181:24,25 184:5
**creditors'**  12:12
**creditor's**  14:17
16:25
**credits**  77:24
78:25
**crew**  129:6
**crisis**  91:16
**critical**  57:15 59:3
116:13 124:3
126:4 128:24
129:21 158:25

177:18 199:5
**critically** 57:5
**cro** 150:25
**cross** 119:1
**crothers** 14:8
**crucial** 13:7
**cure** 15:17 173:4
**current** 31:13
  58:23 78:25 86:11
  86:15,25
**currently** 31:10
  39:3 56:23 162:5
**customer** 33:5
  48:23 51:24 52:19
  76:6 81:25 82:10
  82:21
**customers** 42:8
  52:23 81:9
**cut** 179:17
**cutty** 174:22
**cynic** 156:7
**cypress** 74:25
**cyrus** 9:10 17:15
  17:24 96:3,16
  97:17 99:15 101:6

**d**

**d** 1:22 2:9 5:18
  11:9 12:1 175:24
  176:3,16,25
  179:22 180:11,15
  201:1
**daily** 158:4,6
**damages** 85:9
**dance** 92:25
**dart** 6:11
**data** 33:12,19,23
  34:4 36:18 39:2
  43:8,13,16,21
  44:13,24 46:15,15
  49:20,21,23,24
  50:18 54:18 55:10
  57:10 58:12,14,15
  58:18 59:1,2,4,6

60:8,9,12 62:24
69:8,12,17,25
71:22 73:10 78:18
82:3 123:14,14,17
123:18,18,23
124:6,18 125:10
125:10 157:3
**date** 13:14 16:22
  18:25 19:2,5
  20:17 24:16 58:3
  76:20 84:9,10,13
  84:21 139:8
  165:17 166:7
  172:9 179:17
  185:12,13,14
  189:2 191:12,13
  192:14 193:22
  202:25
**dated** 2:17
**daucher** 10:20
**dave** 195:9
**david** 10:24 11:23
**day** 15:22 38:23
  63:20,21 99:16
  102:8 109:19,20
  151:15 168:1
  173:7 186:14
  187:10 199:10
**days** 13:1 15:7
  16:24 53:12,13
  57:9,9,10 67:13
  67:13 85:20 89:1
  102:9,11 112:11
  113:6,10 115:15
  136:6 139:8
  166:20
**de** 7:2 181:19
  182:9 183:7
  201:12
**deadline** 171:7
**deadlines** 15:10
**deal** 16:12,14
  17:19,19,19 18:15

34:14,15,20 35:14
38:10 49:14 64:3
64:5 72:13 89:13
94:13 96:1 103:4
118:9 136:22
144:8
**dealing** 14:1
  54:10 93:17
  103:11 110:10
  115:3 149:5 161:4
  161:17 186:1
  195:2
**deals** 20:7 157:17
**dealt** 19:2 104:23
  109:22,23 111:16
**debate** 128:24
**debating** 109:17
**debt** 48:13,15
  184:24
**debtor** 1:9 6:7 8:4
  16:13,13 19:20
  26:19 30:8 44:22
  49:5 63:6,7 64:6
  78:20,23 81:14
  82:8,19 83:4
  94:15 104:16
  105:3 106:25
  107:3,15,16 112:1
  115:22 138:4,12
  164:19 165:6,13
  165:16 170:15,18
  170:19 171:2,7
  172:16,23,24
  173:2 175:6,9
  176:5 192:20
  193:17
**debtor's** 164:5,7
  164:20 165:17
  171:10 174:9
  175:13 176:22
  181:17,22 182:16
  188:14 195:18,21

**debtors** 2:1,15,21
  3:2,8,17 4:3,8,10
  4:14,19,20 5:1,9
  6:1,13,21 7:1,3,17
  12:5,11,19 19:13
  20:6 21:4 23:8,18
  24:6,9 26:5,11
  27:5,13,18,23
  34:5,17,22,23
  36:1 37:18,20,23
  38:2 39:4 40:12
  40:16 41:24 44:4
  46:6,20 47:17,19
  47:20 55:9 59:6
  60:15 62:16,24
  69:4 71:17 72:25
  73:13,17 74:3
  76:6 77:9 78:22
  79:19 81:5,8,10
  81:23 82:10 84:16
  84:22 85:3,13,15
  86:4,13 87:21,23
  88:14,19,25 89:2
  89:5,6,24 90:10
  90:13,17 91:7,14
  91:17,18 92:7
  93:7 97:20 98:1,7
  98:18,22,23 100:3
  101:1 103:7,8
  106:20 108:11
  112:3 113:2,21
  132:2 160:22,22
  160:24 162:3,5
  165:24 166:4,6
  167:22 173:16
  181:18,20 182:8
  182:11 183:8
  185:10,11,11,15
  186:11 187:19,22
  188:4,17,19,23
  189:3,14 190:20
  190:24 191:6
  192:10,12,25

196:7,10,15,19
197:2,15 198:1
199:20 201:5,10
**debtor's** 17:5
19:18 23:3 49:9
63:5 201:7
**december** 148:12
148:14,20,22
192:3
**decide** 22:22
92:18 100:18
113:4,4,17 135:9
167:16 168:13
**decided** 26:7 60:5
74:5 113:6 124:20
132:11 164:18
168:2 169:22
179:19
**deciding** 167:24
191:22
**decision** 117:19
127:8,9 148:21,22
159:4 167:4
168:16 177:9,18
**decisions** 110:3
187:21
**declaration** 28:14
28:23 33:17 34:10
37:21 58:4,5,16
85:3 88:24 104:17
133:5 137:20
158:2 169:23
**declaratory** 86:9
**dedeaux** 6:9
172:16,20
**default** 31:5 44:25
**defeating** 164:12
**defend** 189:14
197:19,20
**defendant** 195:15
**defendant's**
195:18

**defendants** 13:25
**defending** 188:5
188:11
**defense** 83:14
89:24 117:21,23
187:20 189:3,14
189:16 193:16
196:4,7
**deference** 111:18
127:18
**deficit** 121:15
122:25
**define** 30:8 67:6
**defined** 30:25
48:19 63:16 73:22
76:3 79:12,25
88:21 94:23,25
117:15
**defines** 32:23 33:2
68:5 76:1 77:18
**definitely** 143:20
**definition** 29:8,19
30:10,14 31:1
32:7,14,19 33:9
33:11 38:20 41:11
41:13 42:6,9,10
42:21 44:7 46:4,6
51:9 52:12 53:25
56:14,24 57:3
68:2,8 69:23
77:16,16 78:5,7,8
79:7,23 80:13,19
82:9,13,24 83:7
84:4
**definitions** 43:2
**definitive** 163:16
**del** 74:10,15,19
75:3
**del.super.** 75:2
**del.supr.** 75:8,11
75:19
**delaware** 43:11
68:4 74:7,8,16

75:12 81:4 82:24
**delaware's** 80:21
**delay** 116:2,9
166:24 183:11
191:16,17 198:16
**delayed** 55:17
**delaying** 115:21
**delivered** 58:9
59:13,15
**delivering** 37:24
**delta** 24:17 27:23
**delve** 168:12
**demand** 13:6
37:15
**demanding** 121:5
**demonstrate**
29:17 43:3 69:2
125:5 131:9
**demonstrated**
37:20
**demonstrates**
34:1
**demonstration**
131:18
**denied** 191:11
195:1
**deny** 85:9 181:15
201:7,9
**department**
127:13 138:18
**depend** 198:13
**dependent** 121:11
**depending** 110:12
144:10 161:14
167:11 171:13
**depends** 22:2
137:3 151:22
180:6
**depose** 119:4
**deposit** 29:25
35:18,19 36:3
40:3 46:21 64:16
64:21,22 70:6

77:17,18 79:8,21
80:1,11 83:17
**deposition** 119:6
139:21 150:18
**depositions**
139:19
**deposits** 30:6
32:10 35:14,25
37:3 47:11 77:20
77:20,23 78:1
79:12,24 80:7
**depriving** 64:14
**derived** 46:23,25
48:13 52:13,14
**describe** 29:22
**described** 30:4
78:21
**describing** 70:14
**designated** 76:24
**designating**
173:14
**designation**
173:12
**designed** 65:5,19
65:20 100:5
**desire** 191:5
**desperately**
122:23
**despite** 124:21,21
**detail** 40:23
156:22 157:13
180:18
**determination**
103:23 160:13
165:1 191:15
**determine** 44:11
109:6 110:22,25
111:1 134:9
145:11 157:23
166:5 192:8
197:25
**determined** 27:25
82:22

**determines**
116:25
**determining** 68:1
69:15
**develop** 119:14
**developed** 161:7
195:16
**developer** 125:12
125:13,15,24
167:12
**development**
106:9 125:3,22
127:6,14 129:18
130:1
**developments**
12:8
**diagnosed** 198:21
198:22
**dialogue** 101:1
155:5
**dictionary** 57:3
**didn't** 17:19 39:9
47:3 58:25 66:23
147:9,10
**difference** 39:14
39:17 40:24 53:14
182:19 189:8
**different** 40:25
45:23 49:20 59:18
59:20 67:25 68:1
68:22 69:1 75:5,6
77:15 82:8 98:18
110:15 114:15
140:6 152:24
176:20,20,20
177:11,14
**difficult** 15:11
106:23 157:21
**difficulty** 21:18
**diminished** 97:15
**diminution** 97:6
**dip** 88:14 89:6,9
91:5 92:14 95:5

96:1 101:12
182:22
**direct** 146:13
165:9 167:14
194:19
**directed** 193:25
**direction** 17:10
145:3 146:4 159:5
**directly** 70:11
176:9 177:2
**directs** 160:7
**disagree** 27:5
82:12 107:21
124:15 130:7
149:10
**disagreement**
91:9
**disappears**
155:25 157:9
**discharge** 197:6
**discharged**
196:18
**disclosed** 17:3
**disclosure** 14:19
14:25 18:8
**discounts** 79:2
**discover** 43:8 45:2
45:3,4,6 46:19
78:18
**discovered** 194:2
**discovery** 119:5
136:2 139:21,25
140:5,11,20
166:25 198:7
**discreet** 186:9
**discrepancy**
157:4
**discretion** 188:1
**discretionary**
139:1
**discuss** 14:12
24:25 95:15
135:19

**discussed** 22:19
32:15 97:4 135:23
171:20 177:5
180:25 181:23
**discussing** 23:10
177:9
**discussion** 16:5
19:2,15 20:25
91:13 152:15
**discussions** 14:16
16:16 17:15 18:2
25:2 28:19 95:24
171:13
**dismiss** 114:18
**dismissed** 106:15
**dispositive** 55:19
**disputable** 68:11
**dispute** 24:15
31:7 34:13 36:13
41:6 46:20 48:8
59:17 60:20,21
65:13 75:10 76:12
79:9 80:5 92:11
107:16,19,19
108:3,3,9,10,12
110:10,13,21,22
111:1,2,10 117:13
117:21 131:18
138:1,2 142:22
146:8,12 150:4
153:12,22 158:13
164:15 175:13
**disputed** 77:7,7
77:14 78:6,11
115:12 160:4,9
**disputes** 20:1
77:12 86:5 139:21
169:12
**disputing** 106:4
106:18 121:5
174:5
**disregard** 44:5

**dissipated** 101:8
**distinction** 27:3
40:11 80:6,6
108:19
**distinctions** 56:13
**distinguish** 50:25
**distinguished**
179:15
**distress** 54:8,11
54:16
**distribute** 148:16
160:12
**distributed** 105:3
150:7 160:6
**distribution**
142:23
**district** 1:2 4:18
4:21,25 5:4,6,11
5:14 9:17 10:2
67:24 103:13
104:4 105:2,4,5
106:5 111:16,24
112:18 114:25
115:24 116:22
117:9 120:12,12
121:24 122:16,24
123:1 139:8
140:16 141:25
142:16 143:9,16
143:17 144:11
145:14 146:10
150:5 153:23
159:22,25 160:8,9
160:9 161:23
162:22 163:1
165:2,5 168:20
180:9,17
**district's** 103:15
118:6 145:22
154:12
**districts** 121:10
156:5 157:10
164:9 168:24

dizengoff 3:22
docket 13:21
  40:15
document 2:5,5
  2:12,18,19,23,23
  3:5,6,12,14,21,23
  4:5,12,12,16,24
  4:25 5:2,4,7,9,14
  5:21,23 6:2,5,11
  6:13,19,21,23 7:4
  7:7,12,17 19:11
  28:15 29:2 131:5
  131:9 156:15
documentation
  24:7 27:13 124:16
  130:21 155:11
  158:2
documents 4:23
  29:1 78:2 128:23
  130:8 139:18
  150:24 151:1
  154:15 155:14
  156:18
doesn't 31:5
  32:11 35:14,19
  47:13,19 48:3
  63:15 67:12
doing 21:17 47:25
  61:22,24 100:20
  115:6,6 148:5
  152:7 154:19
  156:8 182:18
dollar 135:6
dollars 24:18 25:9
  47:17 121:14
  122:23 166:10
  184:16
donuts 130:14
don't 13:20,24
  15:9 16:9 20:19
  22:21,25 26:18
  27:4 39:23 44:12
  45:9,19,21 46:11

46:17,20 48:7
50:5 51:20 53:17
54:15 55:19 57:17
58:23 60:8,10,21
61:8,12,20,25,25
63:3,13,25 65:13
65:17 66:14,24
147:7,12
doubt 25:18
  122:10 136:4
downside 182:17
draft 15:7
drafted 32:4
  40:19 56:21 92:7
  114:6,7 138:6
drafters 56:12
drain 1:22
dramatic 192:12
  192:23
dramatically
  158:10
draw 56:12
drawn 40:11
  77:22
drive 94:3
driving 13:8 15:2
  20:20
drop 129:9
dropped 73:8
  122:19,20 123:9
dropping 122:17
drops 129:1,4
drove 109:15
dry 130:13
drye 170:9
due 27:20,23 31:6
  31:14 35:2 40:8
  41:13,22 56:1,4
  56:11,13,14,18,20
  56:23,25 57:3
  62:8 67:10 68:19
  68:20,21,21,21,23
  69:4 74:2 76:15

79:2 82:17,18,18
83:21,22,23,25
84:2 86:5 171:17
174:24 177:21,23
177:24
dunkin 130:14
duties 59:11 74:24
dyslexia 176:4
d'aversa 10:21

## e

e 1:21,21 2:9 5:18
  8:1,1 10:23 11:6
  11:13,20 12:1,1
  90:25 193:1 201:1
  202:1
earlier 18:14
  19:24 32:22
  123:10 155:7
  168:22 175:17
early 32:22 123:9
  148:11
earmarked 143:2
earned 51:10 52:2
  80:24 83:1
easier 22:11,22
easily 154:9
east 10:3
eastern 67:24
easy 100:18 169:1
economic 106:8
  125:2 127:6,14
  129:17
ecro 1:25
eda 105:2 106:7
  106:10 107:7
  118:20 124:4,9
  126:2 129:1,25
  133:1,2,18 134:10
  138:5,6 142:13
  143:1 150:23
  152:7,12,15,18,23
  153:15,18 154:20
  155:23 156:5

157:6 161:1,3,4,5
161:15 162:6
164:17,21 165:4
edge 138:5 152:15
  152:18,20 154:20
edition 163:20
edny 181:2
education 121:19
  123:1
edward 4:4 8:24
  87:17
effect 74:23 84:22
  114:10 155:24
  161:4 167:20
effective 13:14
effectively 20:5
  49:12 91:6 111:22
efficiency 139:11
efficient 86:7,14
  134:22 135:4,7,9
  137:12
efficiently 15:12
  21:6 111:22 141:7
effort 59:15
efforts 197:24
eight 181:16
either 56:3 72:20
  81:15 90:24 93:4
  114:19 137:7
  179:20
election 115:3
  158:24
element 33:11
  42:2 159:14
elements 41:11,15
  55:24 104:21
  105:19 111:7,11
  118:11
eligible 148:2
email 38:1 58:15
  84:22,25 151:8,9
  193:20

emails 37:20
embrace 38:22
empire 6:10
  172:16
empire's 172:20
employ 126:17
  152:20,23 153:2
employed 20:5
  150:21 153:1
employee 15:23
  122:11 125:11
  126:21 128:19
employees 20:5
  109:3,4 119:24,25
  122:18,24 123:6,7
  123:21 124:6,25
  126:13,16,20,23
  127:6,20 128:3
  129:2,4,5,11,16
  129:22,23 130:3,9
  130:9 131:2,7,11
  131:13 134:11
  147:20 149:20,21
  150:20 151:11,21
  151:24 152:4,4,8
  152:10,11,12,21
  153:14,15 154:3,5
  154:6,7,10,13,15
  154:17,18,23
  155:1 157:15,18
  157:19,20,25
  158:3,5,11 165:9
  167:14
employer 193:15
  194:7,10
employers 125:1
  125:16,16,17
  128:5 129:13
  131:12
employing 125:19
enacted 128:10
encompass 82:16

ended 23:23 24:1
  37:7,10 91:4
ends 69:23
enforce 2:1,15,22
  3:2,9,17 23:3,14
  28:15 39:1 85:16
  86:11
enforceable 57:22
  57:24 67:11
enforced 65:10
enforcing 90:24
engage 61:3 128:8
english 177:22
enhanced 100:15
enjoin 112:21
enter 60:15
  181:22 199:21
enterasys 74:14
entered 40:14
  88:12,23 91:8
  106:9 187:6
entertainment
  111:16 180:17
entire 80:16 83:3
  88:9 153:15,18
  184:12
entirely 57:22
entities 16:9,9
  74:22 125:19
  131:2
entitled 36:1,1,17
  50:4 64:2,6 71:15
  76:12 91:21,22
  109:6 147:1
entitlement 58:20
  58:23
entitles 36:13
entitling 105:17
entity 16:7 126:19
  164:20
entry 7:1 181:18
envision 71:3

epitome 109:20
equal 31:12 35:8
  76:21 77:1
equals 44:8
equivalent 118:12
  118:13 119:25
  158:11 192:20
eric 10:20
escrow 73:10
  77:20 170:20
  171:8
esl 9:3 17:25
  33:20 34:3,8,15
  37:21 38:24 95:23
  96:1,14,19 97:6
esl's 18:2 38:2
especially 74:21
  136:13
essence 41:24
  171:18
essentially 172:7
  175:12 182:2
establish 74:17
established 69:25
establishes 155:6
estate 2:3,11,17
  3:4,11,19 4:14,19
  5:2,20 6:4 12:17
  15:16 18:11 19:18
  19:25 20:9,11
  25:16,20 26:14
  28:4 62:13 73:14
  93:12 103:9 107:2
  108:1,18 132:9
  137:13 154:6,8
  164:7 170:4,10,12
  170:13 181:5
  184:2,3
estates 15:4,11
  20:15,21 144:16
  151:24 152:9
  153:3,8,15 154:9
  162:7 164:7

182:11,16
estate's 13:8
estimate 22:9
  114:13,21 141:12
estimates 13:4
estimation 18:3
  22:15
estoppel 135:11
  168:17
et 3:23 12:3
evan 11:2
eve 29:6 139:7
evening 20:24
  87:25 174:15
event 62:3 103:19
  138:19
eventually 53:20
  161:20
everybody 14:21
  16:18
everyone's 119:25
everyone's 21:15
evidence 28:13
  29:2 37:22 75:23
  111:20 118:18
  119:1 139:13
  141:6 151:6,13
  167:15 182:9
evidencing 78:3
evidentiary
  119:13 137:10,14
  137:17 139:15,16
  172:3 187:10
exact 126:7
exactly 22:17
  26:21 37:17 60:17
  65:5 68:25 85:21
  86:18 97:23
  100:21 109:22
  115:6 189:22
examine 28:25
  119:2

**example** 43:12
51:6 117:19
158:25 166:25
177:25,25 181:1
**exceeded** 37:19
**exceeds** 21:18
35:7 47:16 76:19
**excess** 37:8,24
38:15 77:8,9
**exchange** 196:7
**excluded** 35:10
64:11 65:25 71:15
77:2,10 182:22
**excluding** 76:15
**exclusions** 13:3
**exclusive** 19:13
**exclusively** 69:7
106:6
**excuse** 25:3 93:5
150:2,25
**executory** 15:17
**exercise** 61:14
107:2 151:16
**exercised** 59:9
66:5 82:3
**exhausted** 195:24
197:3
**exhaustion** 197:1
198:3
**exhibit** 55:3 88:22
131:5
**exhibits** 195:23
**exist** 55:16 102:22
182:10
**existence** 129:20
**exists** 61:14 74:23
75:4 91:8 120:21
131:19
**expand** 128:4
**expect** 16:23
102:3 115:14
**expectation** 59:23

**expectations** 17:5
74:13
**expected** 150:11
**expediate** 196:10
196:15
**expedite** 159:16
159:17 166:24
169:11 181:22
**expedited** 25:8
28:9 115:3,13
158:20 159:2,2,6
159:14 166:16,21
167:1,18
**expend** 189:14
**expenditures**
90:11
**expense** 7:11
76:22 99:7,8
113:23 114:4
166:2 175:16
185:9
**expenses** 6:15,18
7:9 77:25 100:6,6
100:14 114:3
166:1 174:19
**expensive** 14:22
**experience** 16:11
**expertise** 136:23
**explain** 33:21
91:19 110:3 112:5
118:3,5 131:3
**explains** 31:9 64:2
**explanation** 36:10
124:3 196:1
**exposure** 199:4
**express** 31:9,10
51:5,6 128:5,7
**extend** 128:14
**extension** 89:4,6
89:13,21 90:1
147:8
**extensive** 20:3

**extensively** 78:16
**extent** 35:6 37:14
74:12 76:18 78:3
79:16 84:18 85:7
85:10 89:5 100:9
101:10 102:22
109:16 110:14
146:24 165:8
192:19 196:18
197:9,15
**extra** 83:24
113:25

**f**

**f** 1:21 8:10 202:1
**f.3rd** 180:5,23
**f3rd** 57:2
**face** 82:23 161:20
165:10
**facility** 38:4 54:21
55:12 70:3 82:6
121:8,17 173:6
**fact** 21:2 29:18
30:4 31:3,5,7,8
32:24 33:11,15
37:6 44:17 48:1
54:4 57:6 69:1
70:2 73:24 79:25
80:20 82:4 84:8
85:6 89:15 101:1
106:18 108:14
109:17 112:20
115:12 116:21,25
120:5 131:16
132:4 136:18
139:7 153:10,14
155:23 156:10
158:9 164:19,24
165:3 172:4
178:10 179:3
180:1 196:2,22
**factor** 36:6 137:25
**factors** 165:20
195:17

**facts** 22:22 47:23
47:24 54:6 59:20
68:1 106:21
110:12,25 168:2
**factual** 22:3
109:11
**fail** 123:8 190:23
190:23
**failed** 123:20
165:3
**fails** 67:14
**fair** 86:22 98:20
110:5 122:6
**fairly** 62:7 75:5
82:19 99:18
165:25 192:7
**faith** 160:5
**fall** 29:7,18 30:9
42:9,10,20 43:9
80:13 134:15
135:1 176:25
185:17
**fallen** 34:14
**falls** 32:18 79:7
108:13
**familiarity** 198:8
**far** 22:6,20 25:5
27:15 33:15 39:25
64:3 80:4 89:3
92:12 93:4,25
102:8 122:1,25
140:5 148:24
198:13
**fashion** 102:2
**faster** 112:5
**favor** 160:22,22
**fear** 45:7
**february** 27:11
62:11 85:16 88:25
142:12
**feder** 174:22
**federal** 105:16
111:20 138:18,21

163:5
**federalism** 111:20
**fee** 6:18 192:4
**fees** 12:16 79:1,1
79:17 140:16
187:9,11,12,18
189:11,19,21,25
190:5,11,11 192:6
**fell** 68:2 134:15
**fennell** 6:10
172:19,20 174:2,6
174:10,13
**fide** 108:10,12
110:10,13,22
111:10 117:14,15
117:17 131:18
153:22 165:15
**fifth** 8:5
**fighting** 34:25
143:16 161:2
**figure** 26:4 43:7
60:25 61:3,9,10
61:13,21 66:16
110:2 118:1
168:23 169:2
**figures** 165:6,8
**file** 17:20 20:20
20:23 61:25 86:9
86:21 87:2 89:19
93:22 149:11,15
173:18 193:13
**filed** 2:10,18 3:5
3:13,21 4:4,15,24
5:3,13,19 6:10,18
7:11 14:18 29:5
49:21 78:15 91:23
105:20 106:13,16
106:18 112:20
113:9,13 117:9
132:20,20 133:25
139:7,10 162:1,3
163:4 168:14
193:5 195:14

198:14 199:15
**filing** 17:20 45:22
91:19 115:8,16
134:3 173:16
**final** 68:24 88:13
150:16 166:18
182:22
**finally** 19:9,23
20:22 161:1
**finance** 169:10
**financial** 54:7,8
54:10,16 58:10
**financing** 88:14
**find** 117:14,17,18
117:18 176:17
**finding** 193:1
**findings** 116:21
**fine** 35:19 37:13
39:23 51:25 87:1
87:14 88:11 95:6
95:16 103:24
131:25 136:11
152:5 166:1
193:24 194:23
**fines** 79:1
**finish** 14:24
**finished** 13:10
**firm** 12:16
**firmly** 18:7
**firms** 12:11 13:6
13:17
**first** 12:10 15:7
21:17 23:2 33:12
33:19,23 34:4
35:9 36:18 38:10
39:2 40:4,14
41:11,16 43:8,12
43:21 44:13,24
46:5,15,15 49:20
49:21,23,24 50:18
54:18 55:10,22
56:11 57:5,17
58:12,14,15,18

59:1,2,4,6 60:8,9
60:12,14 62:24
64:8 67:19 69:6,8
69:12,17,25 71:22
73:5,10 76:21
77:10,13 78:18
82:3 83:11 88:15
102:14 103:19
104:20 105:20
111:15 115:24
121:22 123:22
134:3 155:8
159:23 175:5
177:9 181:6 182:8
183:19 186:21
197:21
**fitzgerald** 10:22
10:23
**five** 57:9 89:1
121:14 135:6
142:13 170:3
175:25 182:18
184:16
**fixed** 27:9 57:1
67:12,14
**flawed** 30:4
**flexible** 71:18
**flies** 122:18
**flip** 103:17
**floor** 10:10
**florey** 10:6 104:8
109:18 114:22,24
114:24 115:18,23
116:3,6,10,12
118:3,3 120:8,11
120:17,21 121:2,4
122:2,5,7,9,13
123:23 124:1,14
124:16 125:8
126:15,18 127:1,3
127:5,9,12,22,24
128:1,11,14,17
130:16,20 157:12

159:21 169:7,15
**flow** 104:18
**flowing** 34:21
85:9
**flows** 30:18
**focus** 15:3 17:18
40:6 41:10 42:22
42:23 140:25
147:7,9 163:18
179:5,13
**focused** 178:17
**focusing** 80:4
**folks** 104:6 172:4
**follow** 145:7
185:20 196:13
**followed** 115:10
**following** 12:13
14:16 34:13 76:13
148:25 176:13
**force** 107:3,16
**foregoing** 76:19
202:3
**foremost** 159:23
**forget** 117:21
**form** 42:19 49:13
63:6 199:3
**formal** 43:19 79:2
173:18
**formally** 84:23
167:20 172:25
173:15
**former** 39:20
193:19 194:1,12
194:12
**forms** 64:17
**forth** 35:2 166:20
**forum** 107:3
162:24 163:7,22
**forward** 21:9
90:14 91:11 99:9
107:5 133:6 188:3
196:5 198:7

**found** 77:17
  176:23 179:6
**four** 41:10 57:9
  104:11 121:14
  159:1
**fourfold** 170:15
**fours** 84:2
**fox** 4:4 8:24 87:17
  87:17 88:12 89:11
  89:14,17,20,23
  90:5,9,16 91:6,11
  91:13,18 92:2,4
  92:20,22 93:10
  95:18,20 99:1
  184:6,8,10,15
  185:2
**frame** 117:8
  163:19,23,24
**framed** 107:5
**frankly** 21:14
  29:15 73:6 86:14
  88:9 95:2 149:12
  157:5 172:6
  177:17 182:14
  183:11
**fraud** 187:7
**free** 47:12
**fresh** 20:8 87:7
**friday** 173:11
**friedman** 103:6,6
  103:11,25
**friedmann** 8:8
  23:5,7,8,16 24:23
  25:12,24 26:9,13
  26:21 27:1,10
  28:11,19 29:3,12
  29:15 30:13,17,21
  30:24 31:3 35:15
  35:22 36:5,12,16
  36:25 37:16 41:19
  42:25 44:15 57:15
  60:7 67:18 69:10
  69:21 70:7,18,21

71:2,6,10,17,22
71:25 72:3,6,12
131:24 132:1,1,13
132:15 133:9,12
133:14,17,24
134:3 135:22
136:8,10,17,25
137:6,18,22,25
138:16,22,24
139:3,5 140:1,3,7
140:10,15,18,22
141:2,4,15,17,21
141:23 142:1,6,11
142:18 143:12,18
143:21 144:3,13
147:14 148:5
149:25 150:2
151:22 152:11,14
152:17 154:4,14
155:3,9 156:12
168:3,22 169:1,5
169:16,19,21
**friedmann's**
  39:22
**friends** 140:4
**frivolous** 108:9,9
  117:13,24 158:13
**front** 14:8,9 15:3
  18:4 19:4 58:5
  86:8,10 104:11
  141:6
**fruit** 13:3
**fulcrum** 183:14
**fulfill** 74:12
**full** 92:15 101:17
  118:11,12 119:25
  131:14 152:4,8,21
  154:16,22 155:1
  157:24 158:11
  179:21
**fully** 130:18
  187:20 188:6,18
  191:19

**functionally**
  117:13
**fund** 114:3 142:13
  161:7
**fundamental**
  68:14 79:14 94:7
  132:8
**fundamentally**
  30:3
**funded** 49:25
  161:8
**funding** 99:3
  121:19 123:1
**funds** 25:7 41:2
  45:6,10,12 46:7
  47:24,25 49:22
  50:12 51:7 55:8
  64:22 79:8 80:16
  85:4,6 105:3
  122:15 132:22,22
  132:25 133:2,18
  143:1 149:1,12,19
  157:10 164:16,20
  165:21
**fungible** 100:23
  100:24 101:10
**furnished** 44:1
**further** 2:22 3:11
  171:14 188:24
**furthermore**
  189:1
**future** 17:22
  28:24 48:11 56:23
  81:14 151:12
  168:15

**g**

**g** 4:24 5:3,13 12:1
  80:25 145:10,15
  181:14,14 201:9,9
**gallagher** 10:24
  195:8,9,11 196:14
  196:24 198:5,12
  198:20,23 199:1

199:13,17,24
**games** 124:19
**gansburg** 120:7
  120:10 131:22
  134:7,13,18,20,24
  135:1,8,14,17
  138:1
**garrett** 190:23
**gathered** 143:8
  151:1
**general** 50:3 81:4
  128:3 129:21
  162:25
**generally** 74:17
  136:22 162:19
  179:23
**generated** 46:8
**gensburg** 9:16,21
  104:3,4 105:4,8
  106:1,3 107:4,12
  107:20,23 108:4,6
  109:13,15 110:2,6
  110:17,19 111:6,9
  111:14 112:8,15
  112:18,23,25
  114:12,22 116:16
  117:4,6 118:21
  119:3,6,9,15,18
  119:21,23 155:4
  156:4,9,17,21
  157:1
**genuine** 150:4
**getting** 13:6,6
  15:3 20:20 120:25
  139:5 150:6 152:5
  158:17 183:11
**gianis** 10:25
**give** 25:6 34:8
  39:24 65:23 67:9
  67:23 82:20 85:11
  86:16 113:16
  115:7 118:3 120:1
  130:21,22,22

156:22 157:3
158:22 159:25
161:12 176:16
183:15
**given**   22:10 24:19
31:17 73:1 77:21
80:3 85:8 88:8
120:23 127:17
155:14,15 167:15
173:23,25 182:11
182:21 184:23
**gives**   45:13 56:24
169:6
**glad**   55:1 172:14
**glance**   181:6
**glb**   64:9,10
**glitch**   41:9 94:2,3
**global**   17:14
**gmg**   75:7,19
**go**   15:21 31:1
34:15,19 38:6
44:13 48:18 59:11
69:17 73:3,4
83:20 87:15 92:5
104:24 106:3,14
107:3 110:16
112:5 113:17
124:8 126:8
135:14 137:13
141:25 142:4,10
143:5,6,9,10
144:10,11,19,21
147:5 149:1
155:21 156:3,9
160:2,3 161:2
168:20 169:9
171:13 175:2
179:20 180:1,3
188:3 191:15
195:23 196:20
**gob**   22:11 76:23
76:24

**goes**   33:21 63:6
97:14 129:4
142:14,15,15
145:1,17 149:14
155:25 156:4
157:10 160:20
168:23 169:2
180:18,23
**going**   15:5,25
17:10 18:9 20:14
28:17 34:19 57:18
58:5 61:10 62:3,4
66:11,25 72:16,19
87:7,13,14,25
88:9 90:13 91:11
93:17,18 94:8,12
95:9 99:9 100:21
105:8 107:21
109:18 111:9
112:19 114:14,15
115:13,23 116:20
116:21 120:18
121:14 123:11,17
123:18 124:24,24
126:8 128:8
129:13,13,14,18
133:5,10 139:12
139:14 140:15,21
141:6 144:10,11
148:24 151:9
155:7,20 159:13
160:14 167:9
168:18 171:2
172:8 173:17,24
173:25 176:19
177:6 179:17
181:15 184:3
186:14 189:17,24
192:5,8,9 194:18
195:2 198:7,7,12
199:19
**gold**   11:1

**good**   12:2,4 17:1
23:7 64:5 87:17
90:2,8 100:25
104:3 113:16
114:24 121:23
160:5 165:13
169:25 172:19
174:21 180:4
185:7 186:24
187:1,2 195:8,10
**goodhouse**   174:21
174:22 175:1,3,12
175:21 176:1,4
178:12,15,20,22
179:4 181:13
**goods**   33:6 48:25
70:12,24 76:8
185:10,14,14,16
**gotscal**   132:2
**gotshal**   8:3 12:5
23:8 103:7 170:1
188:17 190:23
**gotten**   27:14
63:12,13,16 72:19
137:2 144:7
**gottlieb**   8:12 9:2
95:22
**govern**   74:7 75:25
108:20
**governance**   18:19
**governed**   78:12
138:15,18
**grade**   178:22
**grant**   50:21 84:15
131:16 184:25
185:9 201:5,10
**granted**   45:16
173:23 182:21
**gravity**   15:10
**great**   18:15
156:21,25
**greenville**   176:12

**grew**   121:18
**grounds**   67:15
77:13 82:22
**group**   10:9
**grow**   120:22
**guarantee**   120:3
187:24
**guess**   47:6 61:24
66:1 93:18 107:20
109:16 112:9
118:1,15 120:7
133:5 135:24,24
137:3 138:13
156:24 169:17
182:13
**guidance**   166:13
**guided**   107:11
**guys**   155:21
169:13

### h

**h**   11:22
**hadley**   9:9
**half**   24:14,17
66:12 158:5
**hamilton**   8:12 9:2
57:1
**hand**   92:13 108:2
131:24
**handle**   174:19
**hands**   44:22
**handy**   178:11,12
180:5,8
**hanging**   13:3
**happen**   15:5 34:3
116:20 139:12,22
143:14,16,20
**happened**   59:16
91:6 139:9 143:24
148:13 160:10
**happening**   25:13
37:5
**happens**   71:13
145:20 148:8

192:13
**happy**  25:14,19
  28:5 51:21 92:2
  92:20 94:6 102:12
  103:1 137:22
  140:4
**hard**  97:15 113:22
  157:16
**harm**  199:2
**harris**  186:24,25
  187:2,16,19
  188:10 189:8
  190:3,9,12,16
  191:18 192:2,16
**hasn't**  25:4 60:12
**hassle**  183:11
**hate**  67:21
**haven't**  63:13
**hawaii**  170:13
  172:4
**hawaiian**  170:7
**headquarters**
  152:22
**heads**  161:13
**head's**  39:25
**hear**  101:12
  116:14 146:9
  172:7 188:14
**heard**  19:6 57:17
  60:15 73:5 103:19
  138:10 142:20
  172:10 190:14
**hearing**  2:1,7,14
  2:21 3:1,8,16 4:1
  4:7,14,18 5:1,6,9
  5:11,16,23 6:1,4,7
  6:13,15,21,23 7:1
  7:6,9,14,14,17
  15:1 18:9 22:19
  23:10,12 25:3,9
  28:17 29:6 32:16
  34:14 60:10 73:18
  86:15 103:15

115:9 119:13
  135:25 137:10,15
  137:17 139:16,16
  139:17 159:3
  162:22 170:18,24
  172:4 187:10
  192:14
**heavily**  120:13
  121:10 164:19
**heavyweight**
  179:12
**heavyweights**
  178:18
**held**  32:12 35:25
  39:3 41:21,25
  42:11,18 43:8
  44:19,24 49:11,22
  49:23 51:7,15
  57:16 69:7,11
  73:20 78:13 79:8
  79:10,15 81:17
  85:6 133:18
  135:13 142:22
  150:7 162:5 164:6
  165:21 168:20
**helped**  29:6
**herring**  80:11
**hey**  94:15
**high**  127:18
**higher**  70:4
**highlight**  40:4
**hire**  93:20
**history**  128:22,25
  130:3
**hit**  124:20 151:17
**hits**  192:20
**hoffman**  144:16
  151:24 152:9
  153:3,8,14 154:6
  154:8 162:7 164:6
**hold**  49:6 59:15
  61:1 72:1 73:17
  77:11,12 80:10

81:13 159:14
  168:10 176:23
**holdco**  2:2,4,16,19
  3:1,3,6,8,10,13,19
  3:20 5:23 8:13
  23:4 81:21 82:7
  83:15 84:24 85:3
  85:12 86:4,13
  161:16
**holder**  183:16
**holders**  18:17,18
  88:16
**holding**  25:21
  33:13 42:15,17
  66:7 69:8,12
  149:12 161:17
  170:2
**holdings**  1:7 3:23
  4:15 12:3
**hollander**  11:2
**holohan**  11:3
**holste**  11:4
**homes**  121:18
**hon**  1:22
**honest**  71:17
**honestly**  93:15
**honor**  12:4,5,10
  12:23 13:16 14:6
  14:8,9,15 15:19
  19:23 20:22 21:22
  22:17 23:2,7 29:3
  30:21 32:6,15
  35:22 36:16 37:17
  38:19 39:6,8 40:2
  40:22 42:5 44:20
  46:2,12 47:9 48:7
  49:19 50:15 51:16
  51:19 52:4 53:4
  53:17 54:13 55:1
  55:14 56:11 57:4
  60:15 61:2,8,12
  62:22 64:19 66:8
  67:3,17,18 68:25

71:2 72:17,24
  73:9 85:14,21
  86:7 87:1,10,17
  87:20 88:4,7,12
  89:20 90:6,9
  91:18 93:10 94:6
  95:10,20 96:6
  97:8,13,16,18
  98:12,15,17 99:13
  99:19,25 100:17
  100:24 101:10,21
  102:10,16,21,25
  103:6,22 104:3,5
  104:11,19,25
  105:4,8,22 107:4
  107:20 108:12
  109:16 110:10
  111:14 112:2,4,8
  112:15 114:12
  116:16,24 117:7
  117:12 118:2,6,15
  119:16 120:7
  131:22 132:1
  133:15 134:7,21
  135:15 138:22
  140:22 142:12
  143:13,21 144:15
  146:7,11 147:6,15
  150:9,19 153:21
  155:3,4 157:5
  158:3 159:21
  160:25 161:6,12
  168:3 169:7,15,16
  169:25 170:8,11
  171:20 172:3,6,12
  172:15,19,21
  173:10,21,25
  174:6,13,17,21
  176:23 181:21
  182:25 183:9
  184:8,15 185:1,7
  186:15,18,19,21
  186:24 188:16,19

189:1,8 190:4,23
190:24 192:16
193:2,4,12 194:10
195:4,8,11 196:25
197:19 198:4,5
199:23,24
honor's 109:18
116:21 142:18
honor's 25:2
hoops 131:10
hope 13:11 14:4,7
172:9
hopeful 17:16
21:25 168:15
173:4
hopefully 13:9
14:4 137:11
hour 172:23
hours 37:22
137:12 186:13,17
house 121:15,16
housekeeping
175:4
houses 121:12
hundred 129:5
hundreds 15:22
hyde 7:25 202:3,8
hypothetical 61:3

**i**

i.e 97:14
i.e. 45:25 74:3
81:16 162:8
163:20
idea 113:16 120:2
130:7 153:3
157:23
identified 25:10
72:8
identify 131:12,12
identity 131:11
ignore 22:4 41:7
ignoring 73:19

ii 2:3 3:20 4:20
il 9:19 10:4
illegitimately
79:10
illinois 106:7,8,10
106:14 107:7
111:13 113:6
120:22 121:10
127:18 128:4,6
132:15 136:5,11
136:16,20 137:13
138:9,15 139:14
139:23 141:7,14
152:22 166:12,14
187:6,7,8,22
188:7 191:10
195:13 198:25
imagination
158:14
imagine 16:18
49:16,20 61:2
93:20
immediate 81:19
179:14
immediately
25:17 28:4 53:24
56:4 57:12,22,23
67:11,13 68:20,20
68:21 82:18 83:22
83:24 84:2,11
impact 192:22
impasse 22:14
implement 84:16
implemented
106:10
implementing
201:5
import 185:24
important 27:2
45:20 53:10 57:5
113:25,25 114:6
120:5 126:2
159:24 166:3,8,10

168:6
importantly
128:22
impressed 200:5
impression
110:20 113:3
improvement
180:5
inadvertently
198:16
inappropriate
110:23
incentive 117:11
incident 189:2
193:16
include 32:11
165:8 167:13
183:7,15 190:8,10
196:6
included 32:14
83:18 88:23
104:14 128:23
152:8
includes 30:24
51:11 69:3 80:25
103:18 133:2
152:9 190:11
including 4:3,11
15:16 17:24 18:21
19:3 47:15 58:13
77:21 78:17 84:17
136:16 142:16,24
152:6 155:1
166:25
inclusion 83:15
income 48:20 76:3
121:8
incorporated 16:4
incorporation
82:14
increased 170:14
increasing 183:10

incurrence 83:10
indenture 4:2,9
87:19 94:4 96:7
96:11 99:2
indentured 182:7
183:15,16,17
independent 67:9
85:12
independently
27:5
indicate 66:7
195:24
indicated 170:5
indication 129:10
indications
123:20
indiscernible
12:17 28:14 32:2
32:21 37:21 39:7
51:21 59:10 66:25
72:21 104:7 110:9
111:25 119:16
123:16 127:15
131:4 133:20
140:22 142:21
143:19 144:19
169:23 178:10
187:12 192:7
195:17 196:4
200:4
individual 139:20
194:8
indulgence
104:23
industry 7:10,12
185:6,8
inform 157:16,19
157:23 159:10
168:17
information 33:21
33:23 34:4,9,11
58:10,17 59:1
81:1 84:7 154:20

193:19 194:22
197:5
**informed**   130:18
171:1 172:24,25
186:10 197:4
**initial**   2:14 16:23
17:15 18:2 23:17
24:10 29:20 31:8
**injunction**   113:15
132:19
**injunctions**   136:1
**injunctive**   112:13
112:16
**injury**   14:3
**inland**   6:10
172:16
**innovel**   193:17
194:2
**inquiries**   15:22
**inserting**   68:19
**insider**   99:22
**insistence**   142:19
**insofar**   84:16
**insolvency**   99:6
**instance**   43:8,19
44:24 46:13 50:6
50:11 58:1 87:3
148:9 193:17
**instances**   48:15
57:7
**instruction**   73:1
**insurance**   74:9
75:3 189:1,7
192:21 193:14
194:2,7,13 195:3
195:19 196:6,9,19
196:21,21 197:2
197:10,13,16
**insurer**   193:15
197:4,22
**intangible**   41:16
41:17,23 42:2,4
42:21 48:19 76:2

80:21 81:3,4
**intangibles**   42:11
42:13 52:6,9,10
**integrate**   13:12
**integrated**   32:1
**integration**   32:2
67:5
**integrity**   16:20
**intend**   28:20
129:22
**intended**   24:1
180:12
**intensive**   20:13
**intent**   56:19 74:18
129:11
**intention**   129:8
**inter**   16:6,17
**interest**   12:7 17:4
18:18 21:10,11,12
21:15 45:5,9,13
50:12,20 88:17
111:18 160:18
184:22 187:14
188:20 189:10
190:7,16
**interested**   146:9
**interesting**   92:25
128:24
**interests**   20:10
165:2
**interim**   23:11
**intermediate**
158:18
**interpret**   43:5
75:15 106:12
**interpretation**
56:8 73:16 77:13
83:9 84:3 125:20
127:17 128:21
160:16 175:23
177:10
**interpretations**
75:6

**interpreted**
126:22 127:13
128:21
**interpreting**
74:11
**interrogatories**
139:19
**interrupt**   25:23
51:8 120:15
**intertwined**   31:23
**introduce**   104:6
**inventories**   76:15
**inventory**   35:2,9
37:10 38:3,4,6,7
38:15 64:8,9 66:9
66:10 72:14,14,20
72:22 76:12,14,14
76:22,23,25 77:1
**inventory's**   64:20
**investments**   9:3
75:7,20
**invoke**   55:17
**invoked**   55:15
**invokes**   55:10
**involuntaries**
110:16
**involuntary**   110:8
**involve**   113:13
132:21
**involved**   92:25
96:18 105:5 144:6
144:7 187:23
**involves**   74:1
106:5,7,8
**ionosphere**   50:16
**ira**   3:21
**irrelevant**   110:25
169:18 178:3
**isn't**   42:14 51:12
64:2
**issue**   16:12 19:3
23:9 28:12 29:7
34:7 36:20 39:12

39:25 40:3 41:4
44:20 65:8,18
69:7 73:15 74:1,4
79:20 80:10,12,17
83:6 85:5 87:22
90:24 94:7,10
102:6,8 105:24
106:2,4,16,19,23
106:23 107:11,11
109:5,6,11,23,24
110:13 111:17
112:20 113:1,1,3
114:15 118:9
123:22,22 128:18
128:20 130:19
133:15 135:12,22
138:2,8 140:6,8
141:15 142:4
148:8 151:16
158:12 160:12
161:15,20 163:18
164:6,14,16,22
165:19 167:11,12
167:25 168:5,9,19
169:3,14,22 173:4
176:21 179:2,8,19
186:4,10 187:9,18
187:19 189:16,19
190:4 195:17
197:6,17 198:5
**issued**   48:24 76:7
138:9
**issuer**   48:22,24
49:4 76:5,8
**issues**   15:17,23,24
15:24 19:15 20:12
21:1 25:19 41:6
85:15 86:2,3,8,12
86:19,25 99:12
100:16 103:12
104:22 106:6
109:9 112:25
113:18 115:5,11

115:12 117:8
132:8,9,17 134:13
135:5,10 162:25
164:15,18 166:18
167:8,16,17
168:17 169:20
172:10
**issuing** 177:8
**it'd** 130:12
**italian** 119:19
**item** 23:2 47:15
87:11 170:2
172:15,18 185:5
193:3 195:4
**items** 35:7 47:15
76:18 78:1 103:8
137:16 173:4
**it's** 13:3 14:11
15:5,11,19,20,21
15:21 16:2,3,19
18:3,23 21:11,12
22:2,12,22 26:9
26:17,22 32:6,13
36:2 38:13 39:20
40:15 42:1,14,18
42:18 43:3,20,25
46:25 49:14,17,18
49:24 50:2,16
51:17,17,25 52:1
52:2,13,15 53:3
53:18 54:19 55:8
56:8 57:1 58:17
61:24 62:4,12,13
63:15 64:14,16,24
65:4,10,12,16,19
65:20,24 66:19,24
66:25 67:1 82:19
147:11,13
**ivan** 11:1
**i'd** 41:7,10 43:2
43:10 45:14 51:21
56:10

**i'll** 23:5 24:25
29:1 40:23
**i'm** 14:21 20:25
26:2 29:15 39:3
40:13 48:17 52:2
55:1,5 58:5 61:6
**i've** 18:1 45:14

**j**

**j** 8:17 10:24 11:3
**jacqueline** 8:9
170:1
**james** 185:7
**january** 75:8
142:25
**jared** 8:8 23:7
103:6 132:1
**jeffrey** 195:5
**jelisavcic** 11:5
**jennifer** 10:19
**job** 15:20 61:23
180:4
**jobs** 123:13,16
125:25 126:6
127:16 130:2
152:25 153:6,6
164:22 165:3,8,9
167:13,13
**joinder** 3:16 4:7
**joining** 95:5
**journal** 181:8
**judge** 1:23 19:19
86:22 93:2 103:1
114:24,25 115:23
120:11,17 121:2
123:2,5 126:4
131:15 146:13
160:16 168:22
169:21 177:2
178:8 179:4,11,11
179:13 180:3,19
**judging** 163:16
**judgment** 86:10
115:10 136:1

137:2 187:6 192:3
**judgments** 191:3
**judicial** 127:8,9
**july** 20:16,18
166:7 170:15
**jumped** 107:5
**june** 74:19 75:2
171:21 199:9
**jurisdiction**
105:15,16,18
111:3 138:21,21
162:18,19,24
163:7 164:3,4,5
165:12 178:17
**jurisdictional**
163:6
**jurisdictions**
127:19 128:7

**k**

**k** 178:1,4 195:14
196:18 197:11,20
**kadish** 4:24 5:3
5:13
**kamehameha**
170:11
**kamlani** 34:9 58:4
**kamlani's** 33:17
58:16
**kanter** 9:16
**katherine** 11:13
**keep** 61:23 86:2
87:14 116:20
154:9 169:5
184:13 188:25
**keeping** 150:22
**keeps** 169:4
**kelley** 170:9
**kelly** 11:6
**ken** 104:8 114:24
**kenneth** 10:6
**kept** 60:6 68:19
121:18 138:5
154:5

**key** 17:24 21:10
36:6 48:13 68:9
70:8,23 101:20
175:23 179:8
**kick** 125:6
**kicked** 122:21
**kid** 121:13
**kids** 121:12,13
153:7
**kimberly** 10:25
**kind** 149:11
173:15 178:25
191:21
**kinds** 181:23
183:10
**kleist** 11:6
**knew** 72:9 152:1
178:2 199:1,7
**know** 12:14,18,25
13:3,4,5,8,19,24
15:6,7,8,20,21,22
16:1,1,10 17:11
18:3,24 19:5,24
20:3,16,17,22
21:1,19 27:4 28:5
29:12 39:9 57:17
61:20,24,25,25
65:17 66:14 67:1
67:21 71:9 72:18
84:9 86:2,9,9,11
86:13 87:3,4,5,7
89:3 92:9 93:6,22
94:11,18 95:6,7
95:25 97:9 98:5
100:11,11 106:13
107:8,24 108:7,7
108:15,22 110:4,7
111:16 113:7,9,12
114:15 116:25
117:19 118:5,15
118:23,23 119:18
119:24 120:3
132:23 134:9

135:6,25 136:12
136:21,23,24,25
137:6 140:24
145:24 148:9
150:12,17 153:9
154:17 155:19,20
155:21,22 156:2,6
156:9 157:2,8,14
157:16 158:8
161:21 168:6
177:7 182:14
193:6 194:12
**knowing** 62:8
115:21
**known** 199:2,7
**knows** 120:3
135:25
**koch** 11:7
**kosson** 11:8
**kreller** 9:14 96:3
97:16,16,23 98:9
98:12,15,17,25
99:13,19,22,25
100:17,24 101:5
101:19,21,23
102:10,12,16,21
102:25
**krieg** 57:1

**l**

**l** 2:9,10 5:18,19
6:16
**l.p.** 75:8
**lack** 70:2 163:5
164:25
**laid** 84:14
**landlord** 174:23
**landlord's** 181:5
**language** 40:5
42:22,24 43:12,14
43:15,21 48:6,13
51:22 54:19,24
56:1,6,11 57:4
67:4 74:8,15,21

75:9 79:3 82:13
82:23 124:22
126:9 128:5,6,7
128:20 129:25
152:20,24 153:1
153:23 177:11
180:12
**lanier** 11:9
**large** 17:21
106:11 190:25
**largely** 15:14
**largest** 105:5
**late** 20:24
**latest** 33:17
**laudamiel** 74:18
**law** 2:21 31:24
56:24 57:3 67:11
68:1 74:8,8,16
104:8,10 105:12
105:13 106:3,6,6
106:19,22,24
107:11,24 110:15
112:10 113:5
115:5,11 116:22
117:18 131:16
138:2,3,4,15,18
150:14 157:17
162:13,13 163:4
165:11
**laws** 74:6
**lawsuit** 199:12
**lawyer** 136:20
**lawyering** 150:15
**lawyers** 67:21
136:22 150:12,13
**lays** 52:25 95:2
**lead** 18:9 79:21
165:18
**leading** 12:15,15
15:3
**learn** 84:8
**learned** 33:12
37:11 175:6

198:18
**learning** 151:10
**lease** 2:8 5:17 6:8
129:16 130:22
170:25 171:2,5
173:13,14 176:7,8
176:13 177:22,24
178:6 181:11
**leased** 20:6 64:9
76:23
**leases** 130:22,23
**leave** 65:23 86:19
100:22 102:7
103:22 131:20
169:14 183:9
**leaves** 80:12 83:6
83:14 100:22
165:19 196:2
**leaving** 85:19
97:20
**led** 118:22
**ledanski** 7:25
202:3,8
**left** 18:19,22
93:13 170:12
173:6
**legal** 16:7 135:10
140:15 186:9
202:20
**legislation** 106:8
106:13 109:19
152:19,24
**legislative** 128:22
128:25 129:10
130:3 181:6
**legislature** 128:4
**legitimate** 108:10
150:14
**legitimately** 79:9
**lehane** 2:11 5:20
170:6,8,9 171:19
172:2

**lenders** 89:6,9
91:5,5 92:10,14
95:5,6 98:21
**length** 180:13
**letter** 46:16,17
58:14 155:10
156:19 198:2
**letters** 13:6 32:10
77:20,22,23 157:2
160:4
**let's** 15:8 41:8
49:20 51:5 52:4
**leukemia** 199:4
**level** 20:15 129:9
158:16,16 164:22
165:17,18
**levels** 130:6
**leverage** 95:8
115:22
**levied** 124:7
147:23 148:9,9
149:19
**levy** 124:4,4,9,9
161:17,20
**lewis** 8:17 39:6
**lexington** 8:21
**lexus** 180:17
181:1
**liabilities** 56:18
61:16 74:24
**liability** 54:6,7
56:14
**liable** 130:10
**liberty** 8:14 9:4
9:11
**lien** 45:16,24
49:18 50:21 88:15
88:17 90:20,20
94:14 96:8 98:21
101:13 184:20,24
**lienholder** 96:20
**lienholders** 95:24

**liens** 96:20 97:1
182:21
**lift** 187:3 190:21
193:9 195:5,12
196:20,20
**lifting** 192:24
197:8
**light** 37:6 84:15
**lii** 11:10
**likes** 17:9
**likewise** 30:10
31:3
**liman** 8:17 39:6,6
39:21 40:2,21
41:5,10 42:5,18
45:18 46:2,12
47:5,9,22 48:7,12
49:19 50:14,25
51:5,16,19 52:4,8
52:16,21 53:4,7
53:17,22 54:13,17
55:1,7,14,22 58:8
59:6 60:14,21
61:2,8,12,20 62:2
62:22 63:10,13,19
63:25 64:19 65:2
65:4,7,12,19 66:4
66:18,21 67:3,17
67:20 68:18 72:24
73:4
**liman's** 69:5,22
**limit** 106:24 109:3
109:8 179:23
**limitations** 90:19
93:3 198:6,25
199:11
**limited** 7:6 64:7
93:11 153:13,14
154:22 191:5
**limiting** 46:9
**limits** 90:10
**lincoln** 42:1 67:20

**line** 17:4 39:9
157:21 183:6
191:22 201:4
**lines** 14:3
**lingering** 54:6,7
**link** 61:13
**liquid** 33:15
**liquidate** 191:16
**liquidated** 191:2
**liquidating**
192:18
**liquidation** 34:16
**list** 130:10,23
173:9
**listed** 47:15 59:13
**listen** 94:11
**lists** 32:8
**literally** 15:22
172:23
**literature** 199:3
**litigated** 136:3
**litigating** 135:5
**litigation** 18:13,22
20:12 21:13 93:19
114:10 150:8
163:12 168:12,13
187:4 188:11
193:10 198:9
**litigations** 114:1
190:25
**little** 56:16 107:13
108:24 110:19,20
120:11 132:18
157:13 172:15
**live** 28:17 153:7
**lived** 153:7
**llc** 2:2,16,19 3:3,6
3:10,14,19 6:17
6:19,23 8:13 75:1
75:7 174:18
**llc's** 3:1,8,20
**llcs** 2:4

**llp** 8:3,12,19 9:2,9
97:17
**loans** 16:13
**local** 121:8 122:15
122:20 126:3
128:14
**located** 194:13
**location** 76:24
**locked** 191:25
**loews** 179:12
180:16
**logical** 178:25
**long** 108:16 114:2
135:24 136:15,24
144:25 146:3
151:25 155:23
**longer** 24:2 91:8
114:18 150:21
167:6 192:6
**look** 43:1,5,11
45:11 46:5 47:9
50:20 53:9,10
54:17 55:2 56:14
56:16 57:20 58:11
58:14,16 60:3
67:3 75:22 84:6
96:13 98:7 100:10
100:13 106:11
108:7 110:3,25
113:19 123:3,6
124:16 126:9,11
131:15 135:14
145:10,15 157:17
158:1,8 163:21
179:24 181:10,14
189:24
**looked** 61:4 94:10
117:21 177:2
**looking** 69:2,18
94:15 149:18
150:9 156:8 179:6
198:3

**looks** 73:7
**lose** 128:18,18
129:9 191:10,17
**loser** 109:21
**loses** 126:6
**losing** 151:11
**loss** 198:15
**lost** 191:21
**lot** 22:13,22 34:21
41:6,6 73:7 88:10
92:8 102:19
113:12 133:9
137:7 147:16
151:11 153:7
158:9,12 180:6,11
184:16
**lotempio** 11:11
**lots** 96:22
**louder** 140:13
**low** 13:2
**lowe's** 179:15
**lower** 43:19 129:4
**luckily** 150:24
**luftglass** 11:12
**lunch** 157:24

**m**

**m** 4:4 8:24 10:6
11:1
**macy** 177:2
**macy's** 180:9,24
**main** 12:6 180:11
**mainoo** 2:18 3:6
3:13
**maintain** 77:22
125:24 126:4,4,5
126:6,12,17,20,22
128:1 152:25
165:3
**maintained** 40:17
126:13 164:22
167:13
**maintaining**
130:2

**majority** 179:23
180:2,2,25
**maker** 10:17
**making** 50:6
68:18 90:10 193:1
197:24
**man** 158:20,24
159:8,10,12,19
200:3
**management**
23:24 24:13
184:19
**mandate** 19:14
**mandatory**
104:20 132:5
134:25 135:2,12
139:2,12 140:25
147:9 162:11,12
164:13 165:12
**manges** 8:3 132:2
170:1 190:24
**manner** 100:5
112:2
**march** 23:18 24:5
24:15 27:12,24
29:6 75:11 89:7
101:2
**marcus** 8:9
169:25 170:1
172:14 173:10,20
173:24 174:17
181:16 183:3,18
183:22,24 185:1,5
186:19
**margin** 165:25
166:1
**marietta** 75:17
**mario** 186:22
187:3
**market** 12:15,15
**marshaling** 100:4
**mart** 178:1,4
197:11,20

**mart's** 196:18
**martin** 75:17
**marts** 195:14
**massey** 11:13
**master** 173:5
**materially** 92:10
**materials** 75:18
75:18 154:23
**mathematics**
169:1
**matt** 104:3
**matter** 1:5 2:4
3:12,21 28:13
35:19 63:15 85:8
86:1 104:20
105:17 106:17
108:12 112:10
113:5 116:18
135:10 137:1
152:1 155:5
166:15 167:2,5
170:5,19 177:6
187:9,23,25 188:3
188:6,6,8,23
191:23 194:1
199:25
**matters** 7:14
29:16 30:7 32:23
104:11 106:4
111:22 135:17
159:7 183:10
186:19,20,22
**matthew** 9:21
11:7 74:18
**maudlin** 174:18
174:22
**mauldin** 6:17,19
6:23 177:25
**mccloy** 9:9
**mckool** 185:8
**mean** 22:2,18 30:6
40:9 47:6 49:8
53:18 63:4 65:7

67:1 80:1 86:16
86:20 90:3 91:11
91:14 93:16 94:18
95:25 96:7 99:1
101:14 107:15
113:15 117:15
120:19 126:23
133:13 134:4,6
140:8 141:12
144:8 146:9
149:10 156:15,25
158:11 173:22
174:7 177:15
183:14 184:21
189:16 197:20
**meaning** 30:1,7
31:18 32:25 67:9
67:10 74:5,17
75:24 76:5 80:18
83:6 84:1 176:16
177:22
**meanings** 75:6
177:15
**means** 42:16 51:9
53:16 56:4,6
75:10 80:23 81:4
101:14 126:17
**meant** 99:5,10
107:25 126:12
178:14 190:3
**measures** 116:6
**mechanic** 16:5,20
17:21 18:4,6
19:10,16
**mechanism** 30:19
35:12 62:18,20
95:3
**mechanisms**
46:18 69:1
**mediation** 2:5
3:12,21
**meet** 92:17 109:8
113:2

**meeting** 148:14
148:20
**meghji** 104:17
118:23 120:3
130:18 150:25
151:5 157:15
**meghji's** 137:20
150:18
**member** 166:12
**memorandum**
2:21
**mention** 18:24
62:9
**mentioned** 32:22
44:16,20 72:12
199:21
**mentions** 155:9
**mercury** 67:20
**mere** 156:10
**merely** 75:9 78:17
83:25 164:25
**merit** 142:8
**merits** 113:17,17
166:18 167:9
168:13
**messing** 142:14
**met** 37:18 38:16
38:16 77:6 104:21
105:19 112:3
132:6
**method** 165:10
**methodology**
119:10 157:22
**metro** 57:2
**michael** 10:13
11:14 144:15
157:8
**michelle** 11:20
**middle** 148:11
**milbank** 9:9 97:17
**miles** 125:1
**million** 17:8 24:6
24:10,14,14,16,17

27:13,17,19,21,22
27:23,24 28:1,2,3
33:13,13,24 34:5
34:11 36:10,17,19
37:8,11,24 38:3
38:14 39:3 47:17
59:17,22 62:3
69:4,13,16,21
71:6,19,19 72:7,8
72:12,20,21,22
73:10 87:4 98:19
98:23 101:7
141:18 145:16
153:4 155:24,25
156:5 157:7,9,10
166:10 170:17
182:4,25 183:4,5
184:3,16
**mind** 60:9,11,18
110:20 116:20
129:2
**mindful** 20:14
**minds** 22:1
**mineola** 202:23
**minimal** 188:5
**minimis** 7:2
181:19 182:9
183:8 201:12
**minimum** 152:21
**minutes** 63:4
**misquote** 58:7,8
**misquoted** 58:4
**missed** 196:12
**mistake** 121:22
**misty** 131:4
**misunderstood**
45:8 189:23
**mittelman** 11:14
**modify** 104:13
105:21
**modifying** 70:10
70:10

**moment** 24:25
32:5 33:25 34:5
44:21 45:21 52:5
59:7,16,21 62:6
100:2 147:8,9
**monday** 186:14
**monetary** 51:10
51:12 68:5,8
80:23 81:5,8
**money** 22:13
26:19 27:4 28:7,7
31:14 34:1,21,23
36:1 45:25 46:22
46:23,24 49:5
50:8 54:23 57:8,8
58:20 61:14 65:11
69:7 79:20 80:10
80:12,20 81:8,11
81:13 100:21
112:22 115:20,23
116:3,4,12,13
117:10,10,20
120:25 121:25
123:2 134:5
135:12 142:24
143:5 144:8,8,9
144:18,19,21
145:1,21 147:5
149:14 150:8,13
151:19 157:7
160:15 161:17
164:5 166:9
168:19 184:17
188:20
**moneys** 191:3
**monies** 26:10
41:24 42:11 43:7
43:25 50:19 54:2
57:25 58:9 160:6
**monitoring**
122:17
**monsanto** 195:15

**montgomery**
180:23
**month** 148:19,21
148:23 151:3
198:10
**monthly** 150:23
**months** 93:22
114:18 159:1
167:6 177:1
187:21 192:23
199:20
**moot** 103:20
169:18 173:19,23
**morning** 12:2,4
23:7 114:24
**morrison** 67:20
**morristown** 42:1
**motion** 2:1,4,7,15
2:22 3:2,9,11,17
3:20 4:1,8,14,19
4:20 5:1,6,11,16
6:7,15 7:1,9,10
23:3,14 28:15
73:13,15,19 84:16
85:10,16,25 86:11
86:15,25 87:12,16
87:20 88:2 91:19
91:23 93:12 95:5
99:3 103:8,12,17
103:20,25 104:13
104:14,15,17
105:11,20,20
109:15 112:13,16
114:18 115:10,17
117:9 118:14,22
131:16 132:16,16
132:17,21 133:22
133:25 137:10,19
149:11 161:23
162:1,4,8,8,9,10
162:12 163:3
168:12 169:16
170:3 172:11,15

173:19 174:18,23
175:5 177:9
181:15,17 182:5
184:11,18,18,25
185:6,9,12 186:8
186:22 187:3
191:6,11 192:8,11
193:1,3,5,10
194:4 195:2,5,7
195:12 198:17
201:5,10
**motions** 113:9,12
115:8 136:1
181:17 201:9
**motivated** 165:24
**motorist** 74:9
**mouth** 190:2
**movant** 95:4
132:6 164:9
165:19 187:2
**movants** 166:16
166:23 167:17,19
**move** 12:6 28:13
87:7 93:8 140:23
196:5
**moved** 23:13
133:14,25 153:10
185:9
**moving** 13:7 21:5
21:9 24:3 25:8
28:8 31:8 133:19
**multiple** 31:23
124:10 195:25
**municipal** 104:8,9
128:6
**municipalities**
142:16 149:14
**municipality**
142:23
**mutual** 51:18
81:13,22
**mutually** 81:17

**n**

**n**  8:1 12:1 201:1
  202:1
**name**  99:10
**named**  19:10
**names**  130:11,11
  130:25 131:1,1
**narrow**  133:15
**national**  4:1,5,9
  7:6 8:20 87:18
**nature**  53:9 79:17
  81:15 84:13 137:3
**near**  17:22
**nearly**  21:8 99:4
**necessarily**  13:20
  25:13 30:6 71:14
  82:16 156:10
  158:10 188:12
**necessary**  15:4
  22:6,7 123:1
  153:16,18
**need**  21:7 25:9
  28:24 39:23 42:2
  44:12 45:3,10,14
  45:19,21 46:14,16
  52:8 54:1 66:10
  69:17 75:22 84:11
  84:23 102:18
  104:22 110:25
  115:4 116:3
  117:10 118:25
  125:9 130:20,21
  132:5,6 134:9
  136:21 142:21
  155:7 158:25
  159:13 167:20
  184:4 193:1
**needed**  117:10
  122:23
**needs**  28:6 62:17
  158:12 163:18,25
  165:13,14 184:17

**negotiate**  22:13
  194:15
**negotiated**  38:25
  64:4 97:24,25
  98:1
**negotiating**  171:4
**negotiation**  16:19
  18:23 95:8
**negotiations**
  18:20
**neighborhood**
  101:7
**neither**  28:20
  81:18,23,24 92:7
  153:22
**net**  43:25 44:2
  62:4
**networks**  74:14
**never**  73:1 106:15
  124:25,25 138:10
  153:1,16 155:13
  167:10
**nevertheless**
  82:19
**new**  1:2 8:6,15,22
  9:5,12 10:11 20:9
  74:23 86:19,21
  87:2 124:4
**news**  17:1
**nice**  99:10 121:24
**night**  172:23
**nodding**  140:2
**non**  16:2,12,21
  19:20,21 106:25
  154:5
**nonbankruptcy**
  163:22
**noncompliant**
  155:25
**noncore**  163:9
**nonemployees**
  157:18

**nonresidential**
  176:7
**normal**  183:5
**normally**  92:8
**northern**  75:3
  108:16,16 110:24
**northstar**  10:9
**notable**  32:6
**note**  43:11 78:16
  177:8 179:8 181:2
  193:4,12
**noted**  81:7 159:25
**notes**  14:21
  176:22 182:7
  195:22
**nothing's**  139:9
**notice**  7:14 20:23
  119:6,7 173:13,18
  183:10 184:4,25
**noticed**  41:19
  183:7 184:19
**notices**  173:16
**noticing**  183:5
**notion**  40:11
  41:13 58:22 62:9
  62:12 67:10 68:23
  97:18 136:5,11
  147:12
**notwithstanding**
  83:15 107:17,17
**novel**  123:10
**november**  88:13
  105:22 117:9
  174:24 199:6
**null**  75:17
**number**  20:24
  21:7 24:16 25:19
  35:9 62:4 69:16
  77:8 87:5 100:25
  103:8,11 104:5
  118:11,12,19,19
  129:5 144:25
  151:17 152:1,3,6

  158:5 167:11
  170:3 172:18
  174:17 181:16
  190:25 193:20
**numbers**  17:12
  57:17 120:2 123:5
  124:20 130:8,10
  142:14 151:25
  153:24 154:2,4
  176:2
**number's**  62:3
**numerous**  20:7
**ny**  1:14 8:6,15,22
  9:5,12 10:11
  202:23

**o**

**o**  1:21 12:1 77:17
  79:12 202:1
**o'brien**  75:2
**o'neal**  95:22,22
  96:4,6,9,14,17,19
  96:24 97:1,3,8,10
  97:13
**oberg**  11:15
**object**  60:5
  182:23
**objected**  155:11
  184:20
**objection**  4:7,8,19
  4:20 5:1,9,23 6:13
  6:21 7:6,17 28:23
  87:23 88:1 103:21
  149:11 164:25
  182:5,6,20 183:6
  193:13 195:18,19
  195:22
**objections**  182:8
**objective**  75:12,14
  163:21
**objectives**  177:12
**obligated**  31:10
  31:12 36:22

**obligation**  31:15
42:16 46:8 48:2
50:10 51:10,13,17
51:23 52:10,12,13
52:14,18,24 53:1
53:10,11,19,20
54:1 55:7 56:17
56:22 57:1 59:1
63:1 64:21 67:12
67:14 68:6 78:20
80:23 81:5,6,8,13
81:19,22 82:7,16
82:17,19 85:12
171:12 176:13
177:19,20 178:5,6
179:6 180:7
**obligations**  2:8
5:17 31:13 47:25
51:18 52:11 56:17
57:19 68:8 81:21
88:17,18 113:22
113:23 171:16
176:5
**obscure**  131:11
**observations**
21:17
**obtain**  77:21
88:14 197:3
**obtained**  187:13
**obviously**  13:11
14:11 21:4 40:18
82:23 94:12
113:15 146:8
168:1 172:5
175:14 178:17
184:17
**occurred**  185:13
**october**  191:21
**offer**  143:18
**offered**  134:8
**offhand**  145:24
**office**  154:8 174:7

**official**  3:16,22
4:7
**offs**  25:1 26:10
**offset**  17:9 26:14
46:1 49:18
**oh**  108:4 142:11
151:8
**okay**  12:2,9,24
13:9,23 14:14
19:22 21:3,4,24
22:18,25 23:6,15
26:12 28:10,16,22
29:1,14 30:23
35:23 36:15,21
37:13 39:5,21,23
52:7 55:13,21
60:19 67:16 70:19
71:1,13 72:23
73:12 85:22 86:22
87:9,13,15 88:3
88:11 92:4,21
95:13,19,21 97:10
97:14 99:21,24
101:4,22 102:20
102:24 103:2,24
104:2 105:1,7
106:3 107:22
108:5 109:14
110:17,18 111:8
112:24 114:23
115:19 116:11,14
117:5 118:25
120:6 123:25
125:7 127:25
128:13,16 131:21
131:25 132:4
135:16,21 137:5
137:18,24 138:23
139:4 140:17
141:2 143:4 144:2
145:8 146:1,25
155:2 156:20
159:18 161:22,22

169:24 170:7
172:1,13 174:1,16
183:18 184:6
185:1,4 188:9,14
189:15 190:19
192:16,17 193:8
193:24 194:23
196:23 198:24
199:9 200:2
**old**  63:20,21 66:3
202:21
**oldest**  35:10 36:14
36:17,19 47:18
49:13 58:13 62:25
63:1,8,9 64:12,25
69:15,16,19 71:24
73:11 77:3,9
**olga**  8:10 188:16
**omneon**  75:11
**omnibus**  139:17
192:14 199:10
**once**  50:9 60:25
64:22 65:2 82:21
153:11,16 155:24
157:9 172:6
199:14
**ones**  63:9 69:8
142:4
**ongoing**  15:15,25
18:20 19:25 86:5
100:14
**open**  16:6 18:19
18:22 85:19 86:3
86:12 91:14
100:16,22,22
169:14
**operate**  35:18
111:21
**operating**  66:11
129:6,20
**operation**  36:4,6
83:19 84:5

**operations**  15:15
121:11
**operative**  30:11
30:13 40:5 80:4
**opinions**  138:9
180:10
**opportunistic**
150:5
**opportunity**
182:23
**oppose**  185:11
191:6
**opposed**  26:24
27:6 45:24 54:24
84:2 114:20
192:22
**opposite**  31:21
124:14
**opposition**  131:17
**option**  46:13,17
**oral**  159:3 187:25
188:1,2,4,8,21
191:24
**order**  7:1 14:10
15:4 36:16 38:9
39:2 40:14 41:14
44:10 46:14 60:8
60:16 61:13,20
64:18 65:22 84:22
84:23 88:12,13,19
88:23 90:10,12,17
90:25 91:8 94:10
96:1 97:3 101:12
103:17,22 115:10
144:25 162:25
167:19,21 168:5,9
169:11 171:24
176:6 181:18
182:22 184:19
185:2,20 186:1,3
186:5,7,10 188:3
192:25 193:25
194:24 201:10

ordering  191:24
orderly  171:6
orders  188:7
ordinary  33:8
  41:18 42:23 43:14
  43:16,18,24 44:12
  49:1,5 52:21,22
  52:24,24 53:12
  54:3,11 56:18,20
  67:7,8 69:24 70:1
  70:6,9,13,20,21
  70:25 74:16 75:23
  76:10 82:1 83:7
  83:10
organization  79:1
original  105:18
  129:17 172:11
originally  106:18
  185:9
ought  86:20
  116:20
outcome  22:10
outgrowth  86:24
outset  87:22
outside  126:8
  166:7
outstanding  88:18
  175:8
overage  72:8
overall  14:1 16:2
  177:12 180:21
  181:10
override  101:15
  102:2 177:13
overstaying  65:21
owe  27:5 42:16
  45:25 49:5 51:4
  81:8,11 117:20
owed  2:10 5:19
  26:10,16,17 27:17
  27:25 33:3,15
  34:2,23 41:17
  42:14,22 44:8

48:4,4,8,10,14,15
48:21 51:13 52:18
53:15 56:7 68:17
68:21 70:15,19,21
70:22 76:4 79:16
79:18 81:15,17,22
82:8,19,21 84:2,8
owes  51:3,3 78:19
  81:14 84:20
owing  26:2,5,19
  26:25 27:23 31:14
  84:12
owned  64:10
  76:24
o'neal  9:7
o'neill  17:9

p

p  6:10 8:1,1 12:1
p.c.  9:16 10:8
pace  172:14
page  74:19 75:1
  93:22 175:5 201:4
pages  180:18
paid  24:6,15 26:7
  26:8,24 27:13
  28:1 49:4 50:4
  63:22,25 77:22
  83:23 85:5 89:9
  89:16 90:3 92:15
  101:16 120:20
  124:4,7,10 130:5
  132:23 133:1,3
  141:19 144:12
  147:24 148:1,10
  148:11 149:4
  161:9 179:22
  180:15 189:5
  192:19,21
papers  41:19 44:7
  73:6 86:17 94:21
  159:25 175:4
paragraph  30:11
  30:12,13,18 33:18

33:22 35:18,20
40:16,18 44:9,13
163:20
paragraphs  45:11
paramount
  111:18
parents  153:7
park  158:23
parol  75:22
parse  43:12
part  26:19 36:7
  38:17 64:13 65:3
  67:6 77:10 84:13
  95:24 119:25
  127:21,23 131:7
  131:14 134:21
  148:11,11 154:13
  154:14,18 169:3
  175:18 184:9
  191:2 197:14
partial  85:24
  175:7
particular  19:2
  61:13 83:20
  141:11 163:25
  168:19 180:7
  188:17
particularly
  58:24 80:3 99:14
  137:19 180:20
parties  12:7,14
  17:4,11,12 18:10
  20:8,17,22,25
  21:10,12 22:12
  26:1 28:16 37:23
  38:1,18 40:22
  47:2 51:14 73:19
  74:13,18,25 75:10
  75:21,24 80:14,19
  81:18 84:6 85:19
  86:11,20 87:5
  93:5,24 94:8,14
  95:5 100:19 102:6

113:16 114:16
118:19 124:13
126:23 127:19
130:2,23 139:24
144:24 149:5,8
151:21 159:9,12
160:11 166:14
171:24 173:2
177:14 178:16
179:5 181:7
184:22 198:13
parties'  59:18
partner  23:5
partners  9:10
  75:7
party  19:21 29:4
  42:12 51:3,3,3,4
  75:14 81:18 85:7
  106:25 107:15
  125:16 127:15
  138:11 160:8
  162:6,12 183:7,10
  183:25 184:20,25
  193:6,15,23 194:7
  194:13 195:3
party's  19:10
pass  52:4
passed  16:22
path  55:23
patrick  10:22
  11:3
pauahi  2:11 5:20
  6:5 170:4,10
paul  11:19
pay  2:9 5:18
  23:20 24:9 27:4
  27:16 31:10 36:10
  48:2 49:10,11
  53:1,11,13,19,20
  56:17 63:11 78:20
  100:5,8 102:1
  113:1 133:2
  165:25 178:22

179:3
**payable** 31:6
40:16 43:13,23,25
44:2,6,8,11 48:1,3
48:8,10 50:9 52:2
53:16,24 55:17
56:4,23 57:6,9,12
57:21 67:7,12,13
68:23 83:23 84:11
179:17
**payables** 40:25
87:4
**payer** 40:12
**paying** 24:22
93:18 112:22
170:15 193:16
**payment** 2:7 5:16
6:15 7:9,11 24:10
31:15 33:4 40:17
41:13,16,17,22
42:2,3,11,13,21
48:19,21 51:9,25
52:1,3,5,9,10,18
68:5,8 76:2,4
77:23 78:8 80:21
80:23 81:3,19
82:18,25 87:4
114:3 148:15,16
149:2 170:5
174:18,23 175:7
175:10 177:24
178:4 179:14
180:21
**payments** 23:17
41:20,22 48:20
49:3 76:3 87:6
148:19 184:1
**payout** 91:4
**pending** 76:15
111:13 112:12
115:1 190:25
**people** 15:3 93:20
114:20 125:19

153:2 157:23
**percent** 105:6
113:9 121:20
142:13,14,15,15
142:23 143:2,8
144:14,18,19,22
144:22 145:16
150:6 160:12,19
168:4,24 170:16
**percentage**
145:12 171:9
**perfected** 45:21
**perfecting** 45:14
**perfection** 45:24
**perfectly** 95:6
107:18
**perform** 107:1
**performance**
51:10 77:23 80:24
83:1 176:5
**performed** 33:7
48:25 70:12,24
76:9
**period** 6:17 53:12
173:12 176:14,25
180:14,15 182:12
191:7 192:11
195:19 196:1,3
197:1,3
**periods** 53:13
176:15
**permissive** 140:23
147:8 162:10
**permit** 46:18
**permits** 167:12
**permitting** 168:1
**person** 15:20
**personal** 14:3
**personally** 160:19
**perspective** 60:2,3
141:4 173:20
183:8

**pertaining** 82:5
83:22
**pertains** 162:19
**peshko** 8:10
186:21 188:16,17
189:6,13,19,22
190:1,18 193:2,12
194:3,9,14,17,21
194:25 195:4
196:25 197:12,18
198:1 199:23,25
**petition** 2:7 5:16
46:21 88:17
106:14 175:10,20
176:13,14 177:20
180:15 185:11,15
185:16,17
**petitioning** 110:8
**pfeiffer** 195:5,9
195:20
**pfeiffer's** 195:7
**pgbc** 16:5
**pharmacy** 35:4
76:17 77:4
**phone** 191:9
193:8,20
**phrase** 82:15 83:6
83:10,25,25
**pick** 56:19
**picked** 172:14
**picks** 134:13
**piece** 147:1
152:19 160:21
162:7 169:4
**pipeline** 108:16
108:16 110:24
**pizza** 119:20
157:24
**place** 18:7 35:12
60:6 83:11 100:11
121:7,22 136:11
156:6 157:6
182:12 189:1

191:21,25
**plain** 74:5 84:1
176:16 177:22
**plainly** 30:10
58:25
**plains** 1:14
**plan** 13:8,10,12
13:14,18 14:15,18
15:7,10 16:2,2,3,5
16:12,21 17:13,20
17:23 18:5,14
19:1,10,11,21
20:16,19 21:8
22:8 95:8 98:5
101:24 102:5,17
114:4 166:3,4
182:10 191:1,3,13
192:12
**plausible** 109:24
**play** 30:20
**playing** 124:19
**plaza** 8:14 9:4
**pleading** 139:10
198:14
**pleadings** 105:23
135:19 165:17
**please** 15:8 25:24
**plenty** 20:25
**plus** 28:2 72:21
101:8 187:14
189:9 190:6
**pm** 200:8
**pockets** 34:6
**podium** 23:5
**point** 13:24 14:21
17:18 20:4 21:1,8
22:23 24:7 25:15
26:15 33:14 36:12
37:5,16,17 38:2
38:10,13,14 45:23
46:12 47:7 53:8
55:8 59:21 62:22
68:11,12,18 69:21

71:18 72:25 73:9
79:14 82:2,12
94:2,12,16 98:18
99:25 100:25
101:7,23 106:2
107:20 116:16,17
117:3 118:2,8,10
118:18,22 119:13
119:14 120:5
121:21 122:16,16
122:18 127:22
134:5,9 138:24
139:1 141:3,22
144:6,10 145:23
146:17 147:15
151:13 155:8,17
156:24 158:11
161:13 164:25
168:3 179:10
183:19 191:4,4,16
199:6
**pointed** 46:9
67:20 68:4
**pointing** 67:24
**points** 40:4 45:14
46:3 55:19 59:3
65:23 67:19
**policy** 110:16
176:18 177:5,12
179:8 181:11
192:21 197:16
**portion** 63:23
106:11 143:1
144:18 175:11
176:24
**portray** 33:16
**posit** 99:4
**position** 18:22
53:22,23,23,24
58:17,18 60:13
101:6,9 122:22
154:18 160:24
175:13 184:23

185:22
**posner** 178:8,21
180:4
**possession** 6:7
24:2 45:12 50:19
172:17
**possibility** 14:5
117:22
**possible** 21:6
74:12
**post** 2:7 5:16
13:14,18 18:13
46:15,16,17,17
58:11 61:17,19
66:17 84:8 98:4
175:10 176:14
177:20 180:14
185:11 191:1,14
**potential** 13:25
57:8 78:5 199:2
**poulenc** 74:9
**power** 160:2
**practically** 35:1
**practice** 71:4
124:12,21 125:9
130:2
**practices** 155:9,13
166:13
**prairieland** 153:4
**pre** 23:23,25
29:13 33:19 37:6
46:21 61:15,19
66:16 88:17
106:14 147:7
175:19 185:15,16
185:17 195:13
**precedent** 166:6
**precedes** 70:11
**precipitating**
91:16
**precise** 54:19
**preclude** 188:12

**predict** 137:9
**predictions** 137:8
**preference** 12:12
12:20,22
**preferences** 20:12
**prejudice** 169:19
198:15
**preliminary** 17:1
28:12
**premise** 32:5
171:11
**premised** 70:2
**premises** 171:16
**prepaid** 38:3,7
77:24,25,25
**prepare** 188:21
**prepared** 33:23
39:7 60:20,22
137:21 150:18
186:12
**prepetition**
175:17 176:14,25
177:19 180:14
188:18 192:24
193:10 196:17
**prerequisites**
105:10,11 113:2
**presence** 129:2
**present** 10:15
48:10,11 119:1
**presented** 130:8,9
**presently** 83:23
**preserve** 16:20
191:6
**preserved** 147:4
**presiding** 164:2
**pressures** 141:11
**presume** 111:21
**presumes** 26:1
**pretty** 20:3 64:5
90:2,8 92:6
131:19

**prevail** 136:4
165:16
**prevent** 164:10
**prevents** 90:23
152:7
**previous** 93:11
**previously** 17:3
79:6 82:9,25
**price** 10:8 26:4,20
63:17 64:14,16,17
65:3,16,20,20
66:2 144:16
**pricing** 12:15
**primary** 74:10
**principal** 81:5
**principle** 46:9
**principles** 56:7
111:19
**prior** 19:3 103:15
124:8 128:11
155:11,13 160:3
168:15
**priority** 100:3
102:22 185:10
**private** 108:20
**pro** 175:10 179:21
180:20 181:4
**probably** 86:20
100:19 102:3
131:23 134:8
143:12,25 144:3
153:6 158:24
161:12
**problem** 101:11
102:18 118:21
157:2,14 158:1
176:3 178:9 197:8
**problems** 118:13
**procedural** 18:4
186:1,3
**procedurally**
185:21

**procedure** 86:2
166:22 181:22
184:23
**procedures** 7:2
14:1 181:19,24
182:2,17 183:6
186:7 201:11
**proceed** 22:25
95:15 103:21
118:16 129:18
141:6 166:4
168:10 197:23
**proceeding** 18:3
105:10,12,13,14
108:14 158:20
162:13,23 163:4,9
**proceedings**
162:20 188:24
200:7 202:4
**proceeds** 23:23,25
24:18 33:3 48:20
68:10,15,16 70:22
72:10 76:4 78:21
94:16 196:9
**process** 12:13
13:7,8,9 15:3,10
18:5 20:16,21
22:11 23:20 39:18
64:14 92:17 95:8
97:6 115:21 116:2
116:9 127:14
136:16 166:24
169:10 171:4,6
174:11
**processed** 33:5
48:23 52:20 61:7
76:7 82:1,11
**processes** 41:3
**processing** 29:5
29:24 30:5 31:18
32:1,3 42:7,19
45:9 73:21 80:9
81:9,12,16

**processor** 33:4,6
48:21,24 49:3,4
51:14 52:19,20
53:1,19 70:15,20
72:4 76:4,7 78:19
82:1,8,11 83:13
**processors** 31:5
40:18 41:1 69:11
69:14,18 71:23
79:10,18 81:7,23
82:3 83:3,17
84:19,20
**produce** 130:21
**produced** 24:6
27:13 139:18
151:5 154:16
167:1
**product** 157:11
**productive** 17:16
**professional** 6:17
**professionals**
16:25 18:16 21:5
**progress** 171:23
**progressive** 75:2
**prohibit** 4:2,10
87:20
**project** 161:7,8
**projected** 112:6
**projection** 113:14
**prompt** 85:8
**promptly** 21:6,15
114:5 117:11
166:4 168:10
173:5
**proof** 118:17
121:5 165:21
**proofs** 61:25
**proper** 166:13
**properly** 175:15
178:5 184:19
**properties** 6:10
172:16 180:16,22

**property** 2:3,17
3:4,11,19 4:15,20
5:2 6:9 25:16,20
28:4 37:9 62:14
73:14 76:25 103:9
107:1,2,25 108:1
120:14 121:9,11
121:20 132:9
162:4,5 164:7
174:23 176:7,10
**proposal** 101:1
**propose** 190:21
**proposed** 181:21
182:1,23 191:2
**proposition** 31:21
50:16
**propositions** 43:3
**proration** 24:25
25:16,22 27:11,17
27:20 28:2 85:16
**prorations** 26:15
**protect** 31:4 60:24
97:5 99:6,7,7
100:1 191:5
**protecting** 100:2
**protection** 44:25
96:20 97:24,25
170:21
**protocol** 13:21
14:7
**prove** 112:1
136:18
**proven** 118:10
**provide** 24:10
33:20,23 34:3
51:20,22 124:17
124:18 130:25
167:21 193:20,24
195:23,25 196:3
197:21
**provided** 15:16
27:18 29:1 58:17
123:14 130:10

158:2 182:9
184:18 197:1
**provides** 19:10
64:8 76:13 80:22
162:11
**providing** 20:3
127:5
**provision** 32:20
35:1,23 55:9,11
55:24 56:9 57:14
65:10 66:8 75:16
77:12 80:4 83:5
84:5 92:9 122:13
122:21 126:6
127:1 147:19
148:18 175:23
**provisional** 78:21
**provisions** 31:21
44:14 55:16 75:4
75:17 80:9,15
96:1 114:7 122:3
125:6
**proxy** 38:23
**public** 108:19
198:9
**published** 199:5
**purchase** 2:1,15
3:2,9,18 23:4 26:4
26:16,17,20 27:7
63:17 64:14,16,17
65:3,16,19,20
66:2 73:16,23
74:5
**purchased** 77:3
77:11 195:20
**purchasers** 49:4
**purpose** 56:8
60:23
**purposes** 73:18
76:11 80:20 163:9
**pursuant** 2:8 5:17
6:16 24:8 59:7
74:6 78:12 79:15

191:1
pursue 12:12,18
  87:25 107:3,16
  132:16 193:10
pursuing 191:4
put 13:21 23:10
  37:22 49:19 54:2
  55:7 58:21 73:10
  86:14 100:22
  124:2 137:7 141:6
  150:9,11 153:4
  170:20 173:3
  190:1

**q**

qualifies 164:25
quarrels 39:21
quarropas 1:13
question 49:21
  52:5,11 55:2
  57:10 69:7 74:8
  87:23 107:6
  108:22,25,25
  116:8 117:12
  119:10 120:4
  122:10 129:1,3
  143:4,7 144:24
  146:17 165:4
  176:9,15
question's 91:25
questions 39:8,9
  50:2 104:25
  110:11 131:23
  144:1
quick 12:7 14:15
  95:14 137:13
quicker 115:4
quickly 67:18
  87:8 115:12
  139:12 159:1
quite 15:24 19:25
  40:5 45:5,20
  56:12 82:23 148:2
  157:5

quo 191:7
quote 58:15
quoted 79:6 82:25
quoting 78:16

**r**

r 1:21 8:1 9:14
  10:18 12:1 202:1
raise 13:24 87:2
  108:2 131:17
  140:8 142:7
  187:22
raised 83:14
  85:16 86:3,12
  87:23 89:24 94:10
  129:1 142:4,7
  159:22 172:11
  186:6 187:19
raising 140:19
  148:7
range 17:3
raniero 10:21
rate 180:20
rated 175:10
  179:21
rating 181:4
rationale 24:21,23
ray 12:4 85:14
raynor 11:16
rdd 1:3
reach 17:19
  193:21,21
reached 59:22
  142:20 193:18
  194:9,11,14 198:1
read 49:2 55:23
  66:8 80:8 82:9
  90:17 105:23
  143:5 147:24
  155:18 176:15,19
  177:6
reading 148:3
ready 34:2 172:4

real 6:9 26:14
  93:6,24 94:1
  97:12 106:23
  107:19 108:3
  117:12 151:3
  153:21 154:8
  172:10 176:7
  178:9,18 187:5
realistic 94:5
reality 150:19
realized 82:17
  114:2 121:6
  124:20
reallocation
  100:23 164:16
  168:14
really 15:2,4 31:7
  32:22 34:25 53:15
  61:22 68:11 72:20
  86:24 92:18 93:7
  104:11 107:10,18
  110:3 111:1,2
  113:11,19,24,25
  114:5 115:20
  118:8 133:3
  138:13,24 145:8
  147:4,12,17,18
  150:4,14 151:8,15
  161:6,9 162:2
  167:25 168:9
  170:12 171:12,22
  173:19 175:22
  176:15 177:7,10
  178:3 180:4 188:5
  198:9 199:4 200:5
realtek 180:16
reason 33:19
  34:14 38:5 39:1
  47:23 61:1 62:6
  90:2,8 106:15
  113:5,20 134:20
  141:14 178:2
  192:22

reasonable 22:1
  74:12 75:14
  150:10 191:13
  192:10
reasonably
  163:17
reasoning 185:23
reasons 47:22,23
  130:4
recall 105:22
  108:17 155:10
  170:11
recapture 122:2
  122:13,21 125:6
  126:5 127:1
  144:20 147:19
  148:18 161:4
recaptured
  144:18 145:22
receipts 46:8
receivable 23:9
  29:8,19 30:1,9,14
  30:19,25 32:8,15
  32:19,24,25 33:2
  33:10 35:3,11,13
  35:17,21 36:2,14
  36:23 37:4 38:18
  38:21 40:3,8,12
  41:12,14 43:9
  44:6,6,11 46:4,23
  47:3,8,19 48:18
  49:13,15,16 50:2
  50:5 51:1 53:6,12
  53:25 55:25 57:11
  64:12 65:1 67:7
  68:9 69:3,23
  73:22,24 74:2
  76:16 77:4,8,14
  77:15 78:6,12
  79:23,24 80:2,7
  80:14,17 83:19,20
  84:4,6

**receivables** 28:12
35:4 36:8,18,19
40:16 47:11,16
61:4 63:8,9,21,21
63:23 66:3,15
68:13 76:2,13,17
77:4
**receive** 28:7 65:2
125:17 129:6,24
**received** 182:5
185:11,14
**recipient** 143:7
164:20
**recited** 124:10
**reclarify** 36:12
**recognize** 79:3
88:1 180:22
**recognized** 37:9
40:22 178:24
**recognizes** 180:19
**recognizing** 79:15
**recommendation**
181:8
**reconciliation**
15:18 16:23 22:7
23:19 24:7,11
26:6 39:18 64:13
**reconciliations**
25:13,18,25
**reconciling** 26:20
26:22,23 27:20
**reconsider** 167:4
**record** 23:11
27:10 54:22 97:18
99:19 119:14
140:13 146:24
148:12 150:17
159:22 164:15
166:20 167:7
173:3 188:16
202:4
**recorded** 60:3

**records** 61:6,23
148:24 150:24
154:1 195:22
**recoup** 132:22
**recoupment** 39:19
79:5 81:16
**recover** 65:15,15
122:15
**recoverable** 13:5
**recoveries** 12:13
12:18 13:8 16:14
**recovery** 12:15
122:22 189:10
**red** 80:11
**redacted** 2:17 3:5
**redman** 131:4
**reduce** 35:8 76:20
**reduced** 113:21
**refer** 44:23,25
45:2 158:3
**reference** 162:25
**referenced** 44:17
**referred** 18:14
19:24 44:6
**referring** 19:17
40:13 43:20 72:7
138:6 149:23
162:18
**refers** 35:13,20
40:15 43:15,21
51:23 54:20 57:7
83:10 108:9
119:10
**refile** 192:9,13
**reflect** 154:16
166:8
**reflected** 127:11
127:12 182:1
**reflects** 140:13
**reforming** 181:3
**refuse** 34:8
**refused** 24:17
33:20

**refute** 29:18
**regard** 21:16
123:8 186:6
**regarding** 23:12
24:7,15 138:2
148:20 163:14
199:3
**regards** 195:13,15
195:18,22
**registered** 154:7
**regular** 57:9
100:6
**regulatory** 15:23
**reimbursed** 153:5
**reimbursement**
17:7 149:4 161:10
**reinert** 11:17
**reiterated** 27:3
**reject** 6:8 171:2,7
172:17
**rejected** 176:8
181:11
**related** 2:5,8,18
2:23 3:5,12,21
4:12,22,23 5:2,17
15:17 19:24 22:11
31:17,19 43:4,6
44:14 78:3,4
82:22 86:4 87:12
103:12 104:12,17
105:13 116:18,19
162:14 164:4
171:15 189:2
**relates** 62:20
163:24
**relating** 190:19
**relationship**
49:17 83:3,12
**relative** 139:6
**relatively** 87:8
192:11
**release** 33:12,19
33:24 36:18,22

39:2 60:8,22
62:25
**released** 19:12
34:2,3 58:12,21
64:23 71:15
132:14
**releases** 19:9,12
19:17,20,21
**relevant** 76:11
80:9 87:5 89:22
89:23 109:1 123:5
123:5 147:21,22
148:18 155:12
167:11 185:12
**reliant** 120:13
**relief** 4:21 5:7,12
60:17,18 68:25
85:2 103:13
112:13,17 115:7
161:24 176:6
186:22 188:12
191:11 193:4
196:8
**relies** 79:4 164:19
**relying** 90:1 128:9
131:5,8 151:23
165:8
**remain** 86:8 157:6
**remainder** 23:20
**remaining** 27:7
83:14 90:20 147:5
187:4
**remains** 16:6
155:24
**remanded** 122:9
187:9 188:24
**remember** 43:18
49:23
**remind** 17:9
**reminded** 25:2
143:21
**remotely** 94:20

**removed** 131:7
**render** 75:17
  159:4
**rent** 2:7 5:16
  24:25 25:16,21
  27:11,11,17,19
  28:2 77:24 85:16
  170:14,14,21
  171:16
**repeat** 29:21 58:6
**repeatedly** 123:4
**repeating** 140:16
**replace** 93:14
**replacement**
  182:21
**reply** 3:1,11 4:20
  6:23 29:21 31:16
  31:25 33:18 98:19
  127:16
**report** 12:10 21:4
**represent** 68:7
  136:15 187:2
**representation**
  174:9 197:16
**representations**
  39:22 167:2
  174:15
**representative**
  129:12
**represented**
  166:17,23
**request** 38:2
  103:18 104:14
  105:21 159:6,11
  170:18 188:2
**requested** 33:21
  103:16 124:19
**requesting** 34:4
  87:6 134:6
**requests** 170:24
**require** 35:24
  49:10,11 164:17
  192:8

**required** 53:21
  141:5 152:20,25
  161:5 167:16
  179:22 197:19,20
**requirement**
  101:15 122:11
  123:13 124:5
  127:16 153:2,11
  163:15 164:13,21
**requirements**
  132:5
**requires** 31:1 84:5
  84:10 124:8
  157:16 163:2,2
  166:5 176:5
  180:13
**requiring** 60:16
**reservation** 6:1
**reserve** 18:5 29:7
  29:18,22,24 30:4
  30:9 31:4,6,11,13
  32:6,11,16,24
  33:10,13,14,19
  34:16 36:7,22
  37:1 38:17,22
  40:12,17,25 41:20
  41:21 44:3,15,18
  44:19 46:7 49:7
  50:8 51:6,6 53:2
  53:21 54:8,12,25
  55:3,8 57:16,19
  58:19,22 60:24
  62:17,18 63:8
  64:4 65:11 68:2,7
  68:13 69:3,25
  71:14 78:24 79:4
  79:11 81:20 82:4
  84:18 98:1,3,4
  102:1 167:3
  171:12 193:13
**reserved** 20:11
  62:2 83:16,16
  96:22

**reserves** 34:22
  39:3 58:12,13
  59:14,14,16 60:6
  60:6,8,16 62:12
  62:25 63:1 69:10
  71:9,9 73:11,20
  81:17
**reserving** 145:4
  146:23 147:4
**resident** 121:12
**residual** 165:2
**resist** 78:16
**resisting** 58:22
**resolution** 85:8,24
  148:15 196:11,15
**resolve** 19:7
  100:20 102:4
  110:21 171:22
  172:9 173:3
**resolved** 64:20
  106:17 112:11
  113:10 135:18
  137:11 158:12
  182:10 190:21
  191:1
**resolving** 16:6
  21:14 114:5
**respect** 23:11,22
  25:15 35:3 39:8
  40:2,23 41:1 46:3
  46:10 50:15 53:9
  53:24 55:11,22
  58:24 59:19,22
  64:20 66:8,10
  73:1,5 76:16
  90:18 99:14
  104:25 111:6,19
  116:17 117:7
  118:4,6 162:16
  168:4 173:12
  175:10 182:7
  189:13 191:20
  193:10

**respectfully** 27:11
  44:10
**respective** 79:11
  81:23 84:17
**respond** 41:20
  67:19 72:24 144:4
  198:13
**responded** 91:21
  139:18 181:25
**responding**
  143:25
**response** 2:4,14
  3:2,8,20 6:1,4
  69:5 70:5 113:8
  123:17 136:21
  149:15 172:10
  198:13
**responsibility**
  159:23
**responsible**
  150:22
**responsive** 139:10
  140:20
**rest** 26:6 52:11
  73:19 131:20
  133:22 142:4,9
  143:10 144:7,9
**restatement** 43:4
  67:5
**restraining** 115:9
**restricted** 32:9,17
  77:19
**restrictions**
  154:21
**restricts** 83:19
  154:19
**restructuring**
  19:14 20:23
**result** 41:18 42:22
  44:1 48:15 52:8
  61:17 75:16,16
  82:10 111:13
  160:10 163:8

192:18
**resulting**  33:4
  48:22 52:19 68:10
  70:22 76:6 81:25
  82:15,23
**retail**  46:25
**retain**  62:10 63:10
  66:3,22,22 125:24
  126:4
**retained**  13:17
  169:13
**retaining**  35:10
  64:11 65:25,25
  66:12 77:2
**return**  31:12
  57:24
**returns**  34:20
  60:24,25
**revenues**  46:25
  161:19
**review**  16:25 17:2
  75:21 78:10,17
  81:12 166:11
  182:23 184:17
**reviewed**  80:15
**revise**  185:1
**revisit**  141:12
**revolve**  104:12
**revolving**  54:21
  55:12 70:3 82:6
**rh**  177:1
**rhone**  74:9
**ridiculous**  38:13
  125:20
**right**  14:11,14
  17:2 18:3,17
  19:16 20:21 22:8
  27:6 28:22,24
  29:9 30:17 31:2
  31:15 34:6,9,17
  35:13 37:13 39:16
  42:15 45:17,18,19
  45:25 46:1 47:10

48:5,21 49:6
50:23,23 51:9,15
51:21,25 52:1,3
52:17 53:2,14
57:22,24 58:19
59:9,21 60:1,4,13
61:18 63:10,21,24
65:9,15,25 66:13
66:19 68:5,7,25
69:17,20 71:5,5,5
71:7 72:1,2,5,11
73:12,12 78:24
79:5,6,11,15
80:23 81:13 82:3
82:20,25 85:18
87:9 90:4,7,12
91:25 93:19 95:1
96:23 97:2,22
100:1 105:7 106:5
106:21,21 107:12
108:25 109:5
110:1 111:8 112:8
113:1 115:11,20
116:5,18 119:8,22
120:6,19,20 121:1
121:3,21 122:4,12
123:3 130:15
132:2 133:1,16,17
133:19,20,22,23
135:1,22 140:12
140:17 141:17
142:17 143:2,11
143:12 144:5
146:2,5 147:3,12
149:18 150:1
152:13 155:16
158:22 159:20
160:21 161:22
165:10,21 167:3
168:19,25 169:21
171:13 173:8
174:20 175:21
178:19,24 179:25

181:12 183:13,20
184:6,13 188:21
189:6,17 190:20
192:2 194:14,16
194:17,18,23
195:10 198:11,18
199:12,15,18
**rights**  6:1 40:25
  59:11 62:1 66:6
  74:24 77:19 78:7
  79:7 88:5 92:14
  94:14,23 101:25
  107:3 108:20,20
  140:20 145:4
  147:3,4 160:1
  173:12 193:13
**ripe**  133:6
**rise**  54:1 82:20
  83:1 85:11 165:17
  165:18
**risk**  44:25 99:6
  101:24 102:23
**road**  10:3 202:21
**robbins**  10:1
**robert**  1:22 2:10
  5:19 10:23 170:8
**robes**  160:17
**robin**  114:25
**rolacheck**  55:2
**roll**  88:14
**room**  1:13
**rothman**  181:1
**rough**  129:3
**roughly**  13:1,3
  15:6 121:13
  144:14 175:8,15
**roundup**  195:16
  195:21 198:8,18
  199:4,8
**rubina**  57:2
**rule**  70:17 83:9
  126:10 186:12

**rules**  161:15
  177:10
**ruling**  73:18 85:1
  85:25 115:1,12,14
  166:18,21 167:23
  177:4 186:9
  191:23
**rulings**  115:5
  201:3
**run**  84:24 181:24
**running**  64:21
  121:15 122:25
**ryan**  11:17

**s**

**s**  2:5,18,23 3:5,12
  3:21,22 4:12,24
  5:2 8:1 11:4 12:1
**s.d.n.y.**  163:13
**s8729-73**  6:9
**sale**  22:10,19 33:6
  34:14 48:25 60:10
  62:6 70:11,24
  76:8 81:24 89:1
  100:13
**sales**  22:11 43:15
  57:10
**satisfied**  52:13
  58:2,3 105:11
**satisfy**  33:11 46:7
  50:10 61:14 124:5
**save**  34:18
**saw**  134:8 149:11
**saying**  35:25
  36:11 50:7,11,14
  50:17,18 58:8
  62:16 71:4 89:25
  91:3 94:15 109:2
  113:20 120:24
  126:19 127:16
  146:16 149:16
  155:12 156:9,25
  157:3,21 160:21
  184:13 189:24

190:13 196:13,21
196:22
**says** 34:9 35:4,6
38:24 42:3 43:4
45:12 47:14,20
48:3,4 51:22
58:15 63:5 65:25
66:9,21 67:11
68:20,23 92:9
101:12,25 102:17
109:1 111:17,25
141:10 146:18
147:20 151:8
152:24 156:12,19
156:21 157:15
158:4,7 177:21,23
183:7,20,22
**sbarro** 119:16,18
130:13
**sbarro's** 157:24
**scenario** 22:21
97:23
**schael** 11:18
**schedule** 57:9
59:13,13 115:4,13
159:2,3
**scheduled** 7:14
**scheduling** 171:24
**schein** 10:13
144:15,15 145:3,6
145:9,13,15,20
146:3,7,11,16,21
146:23 147:1,6
149:6 157:8
**school** 4:18,21,25
5:4,6,11,14 9:17
10:2 103:13,14
104:4 105:2,4
106:5 112:18
114:25 115:24
117:9 118:6
120:12,13 121:10
121:24 122:16,23

139:8 140:16
141:25 142:16,24
143:9,16,17
144:11 145:14
146:10 150:5
153:23 154:12
161:23 164:9
165:2,5 168:20
170:12
**schools** 116:7
120:24 170:11
**schrock** 12:4,5,10
12:22,25 13:13,16
14:6,13,15 19:19
19:23 21:22,25
22:5,16,24 23:2
85:14,14,21,23
86:1,18,22 87:1
87:10,24 88:4,7
91:22 93:2 94:6
94:19,22,24 95:1
95:10,14,17
101:12,24 102:17
103:1,3
**schwartz** 10:1
114:25
**schwartzberg**
11:19
**score** 22:15
**scott** 11:12
**scrub** 154:23,25
**scrubbed** 131:6,6
**seal** 78:15
**sean** 9:7 95:22
**sears** 1:7 3:23
4:15 6:9 12:2 16:7
20:9 31:6,11,14
33:20 34:15 41:24
44:1 45:25 46:13
46:21 48:1,1 50:3
50:6,7,14,17,19
52:1 68:17 79:16
83:13 84:20 106:5

106:9 107:7
108:22 109:1,4
110:20 114:20,20
118:10,20 119:7
121:6,17 122:10
123:7,10,13,17
124:8,18,19 125:3
125:4,13,14,23
126:6,9,12,16,18
126:19,23 127:15
127:19 128:3,4,14
128:18 129:1,3,12
129:14,17,22
130:1,3 134:9
138:6,7,7,14,17
142:14,15 143:3,5
143:6,10 144:12
145:21,22 147:5
147:11 148:7
149:1,9 150:21
151:2,20,24 152:4
152:10,11,20,24
153:2,3,6,8,10,13
153:13,16 154:1,2
154:5,6,9,11,19
156:15,17,18
157:3 158:3 160:4
160:4,6 161:8,10
165:3,9,24 167:14
169:6,12 170:1
187:6,11,12
188:18 192:3
194:6 197:19
**sears'** 46:24
**second** 28:13 35:9
40:8 41:12,17
42:1 51:8 56:1
64:11 68:12 77:2
88:17 90:19 94:13
95:24 96:19 98:21
120:16 131:4
134:21 135:22
179:19 182:20

184:9,20,23
**secondly** 22:6
165:7
**section** 31:9 32:8
55:10 64:7 73:14
73:25 74:6 76:1
76:12 77:6,17,18
79:12 80:18,22
81:3,3 82:4,14
83:19 84:14,16
161:3 162:11,18
162:18,19 163:2
164:8,11,13,16
165:20 167:7
175:24 176:16
201:6
**sections** 45:11
**secure** 116:6
**secured** 50:22
88:6
**secures** 88:18
**securing** 47:25
**securities** 163:12
**security** 29:23,25
30:5,6 31:4 32:9
32:17 35:14,18,19
35:24 36:3 37:3
40:3 41:25 42:12
44:17 45:2,5,9,13
46:15 47:8,11
50:20 64:15,21,22
77:16,18,20 78:1
78:1 79:2,7,12,21
79:24 80:1,7,11
83:16,17 116:6
142:21 183:14
**see** 27:4 38:23
41:8 54:20 68:11
75:19 92:12 93:25
94:2 98:11 102:13
108:8 109:21
143:14 144:6
145:8 151:2

163:11,19 177:7
181:6 199:20
**seeing**  93:13
140:19
**seek**  133:5 171:14
172:25 183:25
**seeking**  60:18
68:25 132:6 167:1
182:2
**seeks**  84:16
132:22 133:5
162:10 196:5
**seemingly**  90:23
**seen**  29:17 59:18
148:24
**selected**  12:11,17
**sell**  47:20
**seller**  33:4,5,7,7
35:3 48:22,23,25
49:1 52:19 56:4
70:12,12,25 74:3
76:5,5,7,9,9,16
81:25 83:21,23,25
84:12
**seller's**  70:25
**sellers**  35:8 56:1
76:20,22,25 77:19
**seller's**  33:8
**selling**  66:2
**semiconductor**
74:25
**sends**  156:18
**sense**  21:9 77:7
82:18 92:8 104:19
134:14 144:3
158:17,23 178:9
**sent**  116:22 119:6
119:7 155:10
**sentence**  76:19
196:12
**separate**  26:3
49:18,23,25 55:15
57:7,14 65:18

83:12 85:2,12
168:6,8,9
**separately**  40:15
**september**  191:15
191:17
**series**  25:12 26:9
**serious**  39:13,21
**serve**  31:4 164:12
**service**  48:25
**servicer**  78:19
**servicers**  78:14
**services**  10:9
15:15,17,25 20:4
33:7 70:12,24
76:9 173:5
**servicing**  78:11
**serving**  15:6
**set**  14:25 25:1,3
26:6,10 42:15,17
112:19 166:20
187:24 188:1
**setoff**  39:16 45:17
45:18,20,25 48:4
48:6 49:6 50:23
50:24 51:2,15
53:2 79:5,6,15
81:15 82:20,22
**setoffs**  25:13
77:25
**sets**  35:1
**setting**  39:14
**settle**  84:23
167:20 182:2
**settled**  57:1
126:18 183:20
**settlement**  16:4
17:14 97:4 127:21
127:23 128:10,11
182:3 183:2,21,22
183:23
**settlements**
181:23 182:24,24
183:3,4,8

**settling**  7:2
181:19 201:11
**setup**  78:24
**seven**  174:18
**seventh**  180:5
**seyfarth**  8:19
87:18
**share**  144:20
145:4 171:10
**shared**  74:12
173:15
**shares**  145:23
**sharon**  186:25
**shaw**  8:19 87:18
**shiftan**  43:11
**shipped**  72:16
185:15,16
**short**  14:10 171:5
179:18
**shortfall**  170:14
170:17,21
**shot**  150:12
165:14
**shouldn't**  44:19
**show**  22:3 61:6
98:19 160:23
165:13,15
**showing**  148:13
**shown**  196:22
**shows**  38:1
**shrinking**  158:10
**shriro**  11:20
**shut**  98:2,22
**sided**  181:4
**significant**  14:23
15:13,15 17:12
170:14 171:23
192:22
**significantly**
151:25
**silence**  155:17,21
160:25 169:6

**silent**  156:10
**similar**  46:18
117:17 123:15
126:11,11,21
**similarly**  31:25
122:19
**simple**  98:16 99:4
102:17 130:13
**simply**  44:18
84:12 112:3
147:20 155:6
159:5 163:21
196:5
**singh**  4:15
**single**  31:23
121:15 148:24
**sir**  51:8 106:1
112:23
**sit**  16:24 17:18,21
17:23 94:6,12
95:11 103:1
**site**  114:17,17
**sites**  31:20
**sits**  141:14
**sitting**  133:1
134:5 141:18
**situation**  91:1
179:15,16
**six**  47:21 105:10
121:14 135:6
172:18
**sixty**  142:13
175:25
**size**  101:5 182:11
**skeletal**  129:6
**sleep**  124:2
**slot**  191:10
**smaller**  69:14
**smith**  185:7,8,8
185:22 186:3,15
186:18
**snapshot**  84:7
100:11,12

sold 47:19 185:10
solely 151:24
 197:9
solutions 202:20
solved 29:13
somebody 174:2
somewhat 17:16
sonya 7:25 202:3
 202:8
soon 13:6
sooner 172:8
sophisticated
 74:22
sorry 39:3 48:17
 52:2 55:5 62:24
 72:6 81:24 91:3
 106:1 109:10
 112:15,21 113:23
 116:1 119:12,17
 128:9 144:11
 145:23 150:2
 172:7 175:2 176:1
 180:19 183:1
 186:16 187:17
 196:12
sort 14:1,2 64:15
 104:5 107:12
 109:21 145:12
 155:6
sorts 114:1
sotomayor 177:2
 178:21
sought 85:2 128:4
 172:21
sounds 53:5 117:7
sources 166:5
south 176:11,12
southern 1:2
sovereign 111:19
space 129:16
spans 195:21
speak 54:15

specific 32:19
 70:4 82:4 96:1
 113:12 125:23
 138:3,4,15,25
 147:11 150:3
 186:8,8
specifically 73:18
 81:22 122:14
 125:23
specified 82:6
 165:7
specifies 100:20
spend 22:12 91:21
 93:16
spending 89:18
spent 63:4 93:13
split 104:5
spoke 91:22
 103:14
sponsor 128:24
 129:8,11
spots 195:24
spreadsheet
 130:12
spurned 153:9
stack 88:9
stage 131:22
stake 166:9
stakeholders 15:2
 17:24 18:21 19:6
stand 72:6 95:23
 100:8
standard 114:19
 141:9 163:16
standing 87:24
 88:2,10
stands 101:24
 102:17
start 14:24 20:8
 92:24 94:16
 100:12 105:1,8
 124:24 132:3
 140:7,12,21

started 12:6 13:6
 124:19 135:25
 152:5,6 198:9
 199:4
starting 13:7 15:1
 137:13
starts 129:16
 176:17
state 74:7 105:12
 105:12 106:3,6,6
 106:17,19,23
 107:11,18 111:21
 112:1 114:10
 115:1,8 121:7,8
 121:20 122:14,19
 126:1,3,7,12,19
 126:20 127:14,17
 128:14,21 138:2,3
 138:9 160:14
 162:13,13,24
 163:4,7 165:23
 167:16 168:2,13
 168:16,18 175:14
 195:12 198:14
stated 24:21,23
 109:24 111:17
 113:2
statement 14:19
 14:25 18:8 197:22
statements 159:22
 160:4
states 1:1,12
 105:9 162:17
statistics 113:8
status 95:14
 171:25 191:7
statute 118:4
 121:22 122:2,14
 122:15,19,20
 123:3 124:1,4,22
 125:5,9,12,21,22
 126:1,3,3,7,12,21
 127:12,15,17

128:9,25 129:7,9
 134:25 135:2
 138:15 143:6
 144:17,23 145:10
 146:18 147:11,19
 153:22 155:6
 157:12 159:24,25
 160:6 161:3,11
 162:22 165:7,9
 167:12 173:23
 177:7,13 179:1,13
 181:10 198:6,24
 199:10
statute's 118:8
 145:7,21
statutes 122:14
 126:10,11 128:2
 145:7
statutory 126:9
 126:10 128:7,20
 175:23 177:11
 187:14 189:10
 190:7,16
stauble 11:21
stay 2:2,16,23 3:3
 3:10,18 4:22 5:7
 5:12 23:4,14 25:4
 39:2,13,16,19
 40:1,14 85:4,8,11
 103:13,17 104:13
 105:21 107:17
 115:2 132:17
 161:24 164:11
 167:24 186:20,23
 187:3 188:13,25
 190:22 191:6,11
 192:1,24 193:4,9
 195:5,13 196:20
 197:9 199:14
 201:8
stayed 112:12
 133:23 160:11
 191:23 200:6

**stays**  62:19
  197:14
**steen**  8:12 9:2
**stems**  53:15
**step**  118:2 195:2
**stepping**  98:21,22
**steps**  21:7 107:5
**steven**  11:8 193:3
  193:9
**stip**  197:14
**stipulated**  142:22
**stipulation**  142:20
  193:21 194:15
  197:23 199:21
**stop**  33:25 39:20
  141:22 151:17
**stopped**  112:20
  153:17
**store**  64:9 76:24
  76:24 170:7 171:3
  171:6 172:8
**stores**  44:2 72:16
  72:19 78:22
**story**  64:10 68:22
**straight**  16:3
  17:13 34:5
**straightforward**
  112:9 113:3
**strain**  54:7
**street**  1:13 9:11
  9:18
**stretch**  92:16
  125:4 158:13
**strike**  104:17
  109:16 118:14,22
  137:19 169:17
**strong**  15:9
**struck**  179:7
**structure**  13:15
  16:8,11 18:7,17
  184:24 191:2
**students**  120:12
  121:19

**stuff**  139:22
  155:14 183:12
**subcommittee**
  19:14 20:23
**subject**  17:9 18:20
  18:23 19:2 28:23
  39:19 47:13 88:20
  110:9 126:22
  163:14 183:5
  186:5 195:2
**submit**  29:4 30:3
  33:1 44:10 167:19
  169:11 185:2
  192:25 194:24
**submitted**  33:17
  57:10 123:15
**submitting**  171:24
**subsequent**  2:10
  5:19 29:21 179:7
**subsequently**
  171:1 175:6
**subsidies**  125:17
  128:15
**subsidy**  120:18,21
  121:7,8,9 124:5
  125:20 126:7
  129:7,10,19,24
  161:9
**substance**  177:4
**substantial**
  108:10
**substantially**  89:2
**substantive**  21:20
  172:10
**succeed**  188:23
**successful**  14:2
  103:20 133:4
**successor**  182:6
**suffer**  198:15
**sufficient**  16:14
**sufficiently**
  137:20 181:10

**suggest**  45:8
  54:23 102:7
  118:16 119:23
  150:17 169:13
**suggesting**  37:1
  90:5 94:1 110:21
  151:13
**suggestion**  36:25
  95:11 142:19
  191:20
**suggests**  112:10
**suit**  195:13
**suite**  9:18 10:3
  202:22
**sum**  62:7 177:3
**summarized**
  166:19
**summary**  115:10
  117:6 136:1 137:2
**sums**  57:8,8,16
**sunny**  4:15
**super**  100:3
  102:22
**supplement**  19:11
**supplemental**
  2:14,21 3:1 5:1
  28:14 29:4
**support**  2:22 3:11
  20:19 28:14
  167:15
**supported**  147:18
**supporting**
  155:22 160:23
**supportive**  12:19
**supposed**  24:9
  25:17 27:16 72:15
  73:3,4 103:8
**supreme**  108:15
  114:7
**sure**  14:21 20:25
  29:9,15 34:24
  36:11 37:14 39:11
  39:13 53:7 61:6

  84:25 86:2,8
  95:18 102:15
  105:23 111:12
  120:17 132:3
  136:1 141:2 150:7
  154:25 155:18
  157:20 167:22
  170:25 173:22
  174:7 175:3
  186:23 195:6
  196:14,19 198:8
**surety**  77:24
**surplusage**  56:6
**surprise**  44:19
**surveyed**  17:12
**susceptible**  75:5
**svtc**  75:1
**swap**  38:5
**sweet**  179:11,13
  180:19
**swipes**  158:4,6
**synonym**  48:8
**synonyms**  68:21
**system**  23:24
  24:13 170:12

**t**

**t**  9:21 202:1,1
**take**  13:2 15:11
  38:2 47:13,18,19
  51:5 72:14 84:11
  87:14 89:7 96:15
  99:5 105:20 114:8
  114:9,17 119:4
  128:1 135:24
  136:15,24 137:8
  141:10 145:3
  156:5 158:19
  159:3 160:18
  184:21 189:15
**taken**  21:7 58:18
  60:12 62:10 136:2
  182:12

**takes** 84:7 92:22
  154:17
**talk** 125:15 126:1
**talked** 20:17
  108:15 123:4
  158:15
**talking** 92:19 95:7
  96:10 107:23
  122:24 123:4
  128:2 132:9,19
  143:1 145:19
  157:8 178:19
  182:24 194:6
**talks** 56:16 124:1
  124:5 125:12,22
  125:23 130:1
  179:12,13
**tango** 92:22
**tangoing** 92:24
**target** 126:21
**targeted** 166:6
**targets** 21:13
  93:19
**task** 21:5
**tasks** 104:6
**tautology** 121:25
**tax** 18:15 104:9
  104:10 125:17
  161:19 171:16
  176:14 179:21,24
  180:13
**taxation** 124:2
**taxes** 120:14
  121:8,9,11 124:4
  124:4,6,7 130:5
  147:23,24 148:1,8
  148:10 149:4,4,19
  174:23 175:7,19
  175:21 176:10,24
  177:19,21 178:4
  179:16 180:7,20
**taxing** 105:5
  156:4 157:10

168:23
**taxy** 161:19
**tbd** 18:20
**team** 147:17
**technically** 169:9
**technologies** 75:1
**tee** 22:14
**teed** 18:1 137:14
**telephonically**
  10:15 186:25
**tell** 15:19 61:18
  61:19 109:18
  112:6 113:14
  120:4 147:10
  148:17 157:22
  160:15
**telling** 136:21
**tells** 43:13,23,24
  55:3
**temporary** 115:9
  176:4
**tenant** 130:9
**tenants** 109:3,7,7
  109:11 118:7,11
  118:12 119:15
  125:1 130:11,13
  131:1
**tennessee** 67:25
**tension** 18:8
**tentatively** 20:17
**teresa** 11:10
**term** 30:25 43:5
  47:2,3,4 63:16
  68:19 70:8 76:11
  79:12,25 80:2
  81:20 82:14 83:17
  83:18 84:1,2
  88:22 124:9 126:7
  130:12 131:3
  154:23 171:5
  177:18 179:6
**terminology**
  131:9

**terms** 31:17 38:20
  56:11 57:21 68:24
  69:15 71:18 88:19
  88:21 91:7 100:20
  107:7 108:22,23
  124:3 126:11
  134:10 137:8
  139:6,11 140:11
  143:24 149:21
  153:24 173:16
**testified** 131:5
**testify** 151:6
**testimony** 28:18
**thank** 19:19 39:4
  67:17 71:2 95:20
  97:13 102:25
  103:4 155:3
  159:19 169:15,21
  172:11 173:25
  174:15 184:15
  186:15,18 192:16
  193:2 195:4
  199:23,24 200:3
**thanks** 22:24
  67:16 87:10
  131:21 172:13
**that's** 13:23 14:24
  15:5,24 16:5,10
  16:18 18:10,14,16
  18:20 19:15,16,25
  21:20 22:16 26:21
  26:23 27:2 30:11
  30:19,21 35:12,15
  35:22 37:13,19
  38:12 39:23 40:16
  40:18 41:25 42:5
  43:3 44:8 45:23
  45:24 46:2,24
  47:4,4 48:4,5,5
  49:10,17 50:17
  52:1,10 53:22,22
  54:6,13,13 56:1,7
  57:18 58:15,23

59:16 60:10 61:11
  63:3,4,19 64:1
  65:4,5,17,17
  95:17
**theirs** 90:7
**theory** 75:12
  125:2 198:12
**thereof** 48:21
  68:10
**there'll** 20:25
**there's** 12:25
  14:23 15:13,15,24
  18:13 19:9,24,25
  22:13 28:22 34:21
  36:25 40:24 42:16
  44:19 48:7 49:17
  50:15,21 51:19
  53:2,12 54:6,9,20
  55:20 57:10 59:3
  60:19,21 61:1
  63:17 65:13
**they'd** 30:6
**they're** 14:22 22:8
  25:21 26:13,18
  32:13 33:15 36:23
  42:15,17 49:23
  52:9,9,11 57:18
  58:21,22 60:18,20
  60:22 61:22,24
  63:21 64:2 66:2
  67:6
**they've** 27:14
  29:13 45:19 50:11
  50:19 59:20 60:16
  62:2
**thin** 165:25
**thing** 56:7 62:20
  68:24 104:12,13
  133:19 150:16
  168:18 177:8
  178:23 179:8
  187:16 200:6

**things**  16:1 51:11
56:10,13,19 80:25
83:1 99:5 139:12
141:13 143:24
154:24 155:8
156:1 179:24
180:11
**think**  12:14 13:5
15:1,7 16:19 17:1
17:2 21:12,14,25
22:12,14,22 27:2
30:13 35:16 36:6
39:25 40:21 41:5
41:9 42:8 45:10
45:10,24 46:20
48:7 49:11 50:5
52:16,17 53:10,14
53:17 55:19,19,20
57:4,15 58:24
59:2,20 60:3,8,10
60:14,21 61:8
62:6,12,15 63:4
65:12,13,16,21,22
66:25 67:4,6,9,10
67:14 70:8 71:17
73:6,9 91:15 92:3
92:6,17 93:5,19
93:24 94:7,10,13
95:3 97:11 98:14
98:20 99:3,13,17
101:11 102:2
104:18 106:4,18
106:21 107:4
108:13 109:1
110:23,23 112:11
114:6 116:18
117:6,24 119:11
120:3,20 121:23
121:25 131:22
133:24 136:15,21
139:2 141:4,9
142:6 143:4,12
144:14 146:5

147:14,15,16
150:4 155:5,15
156:9 157:1,5
162:2 168:8,10
172:11 175:22
177:3,17,22
178:25 179:4,10
179:11,11,22,24
180:3,6,7,12,12
180:16,25 181:9
182:15,15,19
183:6,9,13 184:18
188:4 190:1
192:17
**thinking**  22:16
166:8
**third**  19:21 20:18
41:13 68:18 85:6
106:25 109:5
114:16 118:18
125:16 151:21
156:2 178:15
180:23 185:23
193:15 194:6,13
195:3
**thomas**  9:14
97:16
**thought**  59:23
104:19 172:8
187:18 189:24
190:14 194:5,6
199:11
**thousand**  47:17
121:14
**thousands**  129:16
**thread**  78:19
**threat**  38:12
**threatened**  59:19
**three**  35:7 41:10
47:15 57:9 65:23
92:24 113:20
175:25 177:1
187:10

**threshold**  36:8
37:19,25 38:16,16
71:11 77:6 153:20
**thrilled**  157:6
**throw**  92:16
**thursday**  25:7
28:6,8 173:11
**tie**  68:22
**tied**  125:13
**time**  13:10 16:4
17:15 18:23 20:13
20:20,25 22:13
27:3,14 34:1 45:4
57:24 59:12 60:9
60:14 61:5,10
66:5,9 72:7 74:13
88:10 89:19
101:24 108:16
113:24 114:2
116:12 117:8
118:11,13 119:25
119:25 131:7,14
131:14 137:15
151:3 152:4,4,8
152:21,22,23
153:4 154:13,14
154:16,18,22
155:1 157:24
158:11,19 163:19
163:23,23 170:24
171:10,15 173:25
178:1 179:16,25
183:9 186:6
191:14 192:4
193:16 195:20
196:3 198:4
**timeline**  93:25
112:7 113:14
167:5
**timeliness**  105:25
165:23
**timely**  2:10 5:19
105:11,20 111:13

112:2 114:8
136:12,18 139:14
141:10 162:12,23
163:3,8,14,15,17
165:22 166:11
167:3 176:5
**times**  31:13 68:17
124:10 129:3
**timing**  135:23
139:6 151:22
179:2,2
**title**  44:4,5 105:14
105:15 162:14,15
162:15 163:10,11
**today**  20:2 28:21
32:18 39:10,24
58:16 66:16
103:15 104:23
137:11,15,17
139:16 143:23
160:13 167:24
172:5 173:3
182:15 186:4
200:1,4
**today's**  102:6
162:3 174:15
**told**  42:25 44:15
66:16 67:22 89:15
146:14 166:12
194:16
**tomorrow**  115:18
116:3
**top**  109:4 145:17
**total**  24:12 28:1,3
71:11 170:16
**totality**  177:13
**totally**  68:1 91:16
**touch**  103:5
193:22
**town**  112:22
134:6 144:12
**tracing**  61:14

**track** 150:22
151:11 154:5,9
**tracks** 43:15 78:8
**traffic** 72:18
**tranches** 96:12
**trans** 26:2 27:6,6
**transaction** 31:23
59:8,12 61:13
68:15 81:18
185:13,17,17
**transactions**
31:22 37:7,12
43:14,16,24 44:1
44:12 46:24 48:14
48:16 51:23 54:3
54:5 61:10,17
62:5 78:22
**transcribed** 7:25
**transcript** 202:4
**transfer** 37:10
**transferred** 23:24
37:2,3 38:15
**transferring** 35:9
64:8 65:24 76:21
**transfers** 13:1
**transform** 2:2,4
2:16,19 3:1,3,6,8
3:10,13,18,20
5:23 8:13 17:6
20:1,6,8 23:4,19
23:23,25 24:3,8
24:12,16 25:2,6
25:10 26:11 27:13
27:18 33:22 36:22
37:4,18 39:6,13
59:5,7 64:15
73:17 77:11,12
80:10 81:21 82:7
83:15 84:24 85:3
85:12 86:4,13
161:16 170:18
171:1,4,12,15
172:22,25 173:2

**transform's**
173:17
**transforms** 56:17
64:3
**transform's** 58:10
58:11
**transit** 23:22
24:13,18,24 25:15
26:14 28:2 38:5,6
39:8 72:14 85:17
**transition** 15:16
15:25 20:4
**transparent**
174:14
**transposed** 176:2
**trauma** 13:21
**treasurer** 161:19
**treat** 166:15
**treated** 17:13
29:23 30:5 38:17
77:10 148:6 181:5
**treating** 28:17
109:23 148:6
**treatment** 167:1
170:25
**trial** 114:15,16
158:16 159:15
166:14
**tried** 33:16 110:2
194:22
**trigger** 54:20
55:17 58:2
**triggered** 54:1,3,4
55:4,6 73:25
**triggering** 55:10
82:4
**triggers** 53:10
**trip** 172:5
**truck** 72:17
**true** 32:5 54:13,14
61:4 92:23 101:18
113:5 202:4

**trust** 4:1,5,9 7:6
8:20 13:18 18:13
18:18,19 87:18,20
96:11 182:6 184:5
191:2
**trust's** 87:11,24
**trustee** 4:2,9
18:22 87:19 93:17
93:20 94:4 96:7
96:11 99:2 182:7
183:15,17 184:4
184:20
**trustees** 2:11 5:20
6:4 170:4,9
**try** 17:19 20:15
95:11 96:13
100:20 106:12
125:4 171:22
194:15 197:21
**trying** 15:23
22:13 26:1,2,4
43:5,6 95:8 96:15
98:17,22 103:4
113:19,19 117:17
118:1 180:10
190:4 193:21
197:3 198:2
**tuesday** 186:11
**turn** 24:17 25:7
28:11 59:1 60:16
60:20 63:2 65:10
65:12 98:3 103:25
106:25 149:12
**turned** 25:17 28:4
62:17 89:1 133:19
164:8
**turning** 25:21
**turnover** 2:3,17
3:4,10,19 4:14,19
5:2 59:2 73:14
103:9,20 104:16
109:23 132:21
133:22 134:1

137:10 147:12
162:4,8,9 164:10
168:12
**turns** 53:20
141:13 151:19
167:4
**tuttle** 193:3,7,9,16
**tuttle's** 194:12
**tweed** 9:9
**twice** 123:19
**twist** 33:9
**two** 12:11 19:3
23:13 40:6 41:15
45:14 46:3 47:22
47:22 50:1 51:18
53:8 55:18,24
57:7 59:3 63:6
64:7,17 75:6
77:13 85:15 92:22
103:7 113:20
117:8 121:7,13
127:20 134:13
137:1 139:19
146:10 148:13
149:8 150:21
156:1 177:14
182:8 198:11
199:1,19
**type** 32:9,16
60:17 94:3 114:18
117:2 128:8 137:3
193:25 198:25
199:21
**types** 14:2 185:21
186:2
**typically** 148:12

**u**

**u.s.** 1:23 138:18
**u.s.c.** 2:8 5:17
6:16
**ucc** 17:18 18:21
42:7,8,20 45:11
45:19 48:20 51:9

51:20 68:3,4 76:3
80:21,22 81:4
82:24
**ultimate** 26:4,20
42:8 47:6 51:24
**ultimately** 13:17
31:6,11 41:5
53:15 60:23 68:17
79:4 82:21 102:23
181:12
**unable** 102:4
171:23
**unambiguous**
38:20 74:16 75:23
**unclear** 57:23
60:17 110:20
**underlies** 41:6
**underlying** 48:5
80:5 163:4 164:15
168:1
**underscores**
33:14
**understand** 24:24
25:1,25 26:2,15
26:18 30:16 34:25
36:9 41:3 46:11
55:14 62:22 64:19
73:6 85:18 90:9
93:8,18 94:2,4
99:1 108:11
114:14 119:12
122:6,8 134:5
138:13 142:9
143:15 159:13
161:1 173:1
174:14 177:4
178:12
**understanding**
38:5 50:3 69:12
69:16 71:10 72:25
140:1,3 149:7,8
153:1 171:21

**understandings**
177:15
**understood** 28:16
36:11 37:14 39:12
75:14 86:1 96:6
99:13 174:13
**undertake** 116:2
**undisputed** 23:21
77:5 107:25 123:8
**unexpired** 6:8
176:7
**unfortunately**
150:20
**unique** 106:8
**unit** 4:18,21,25
5:3,6,11,14 9:17
10:2 103:12 104:4
161:23
**united** 1:1,12
162:17
**unites** 52:10
**unknown** 1:25
**unnecessary**
91:16
**unpaid** 175:15
**unrebutted** 151:7
**unscrubbed** 131:8
**unsecured** 3:16
3:22 4:8 14:17
16:24 50:4 88:6
133:4 196:17
**unusual** 83:12
**update** 12:7 14:16
172:7 181:6
**upper** 43:19
**urban** 180:16
**urge** 46:6 67:3
**urgent** 163:25
**urging** 185:22
**usc** 162:11 163:9
**use** 4:3,11 17:20
35:20 47:2,3
51:11,13 52:23

63:7 68:6 81:1,2
81:19 82:11,15
83:2 87:21 88:15
88:20 90:13 91:4
91:10,17 92:11
94:16 97:19,21
98:2,22 108:7
114:3 123:18,19
124:6,7 126:3
139:25 171:25
195:16
**uses** 83:25 117:16
152:24 166:5
**usual** 74:16 75:23
**utility** 32:10 77:23

| v |
|---|

**v** 74:9,14,18,25
75:2,7,10,18
**valid** 17:2
**validity** 117:23
**value** 35:2 76:14
76:25 100:15,15
**various** 25:12
**vedder** 10:8
144:15
**vehicle** 86:14
**vein** 17:23
**vendor** 38:8 72:15
**vendors** 72:18
73:1
**vendor's** 38:3
**venture** 75:7
**verbiage** 108:8
**verify** 160:2,3
**verifying** 131:13
**veritext** 202:20
**version** 80:22
**versus** 114:19
147:23 179:2
180:16
**vi** 75:10
**view** 15:9,9 21:13
43:20 53:15 59:19

59:20 89:5 107:9
125:8 144:10
153:21 179:20,23
180:10 188:25
**viewed** 39:25
**views** 59:18
**vigorous** 17:17
**village** 123:12,15
124:17,17 141:18
143:22,23,23,25
144:10,12,16,20
144:22 145:1,2,12
145:17,23 146:10
146:12 148:7,15
149:2,7,9,9,10,24
151:3,18,19 152:2
153:12,13 154:17
155:20,23 156:7
156:21,22 157:3,5
157:11 160:1,2,5
160:17,20,20,23
162:6,6 164:6
165:22 168:6,21
169:4,9,13
**village's** 149:13
155:17 159:23
**villages** 149:25
**viny** 11:22
**violate** 25:4 39:16
**violated** 85:4
167:25
**violation** 85:7,11
164:10 187:6
201:7
**virtue** 50:18
**vladimir** 11:5
**voided** 106:12
**vulcan** 75:18

| w |
|---|

**wait** 15:8 28:5
186:16 198:10
**waited** 34:10

**waiting** 133:2
146:12 192:4,5
**waive** 188:2,21
189:10 190:14,14
**waiver** 98:13
165:1
**waives** 197:10,14
**waiving** 88:5
**walk** 120:8 157:12
**walmart** 119:24
**wander** 11:23
**want** 12:10 14:12
22:14 33:25 34:24
42:21,23 45:20
46:3,17 53:7,8
54:18 58:6 62:9
65:23 68:24 71:19
87:2,22 92:6
94:13 96:18
101:11 103:21
115:20 116:3,17
119:14 123:18
132:16 133:18
140:25 142:18
144:5 145:24
146:15,18 147:2,7
147:9 155:8
157:13 159:21
161:21 168:6,9,11
172:5 178:1,3
179:18 190:1
**wanted** 13:24
18:24 23:10 28:13
29:9 36:11 37:14
37:16 39:11,13,24
40:4 68:12 97:10
97:14 114:8,9
175:3 193:4,12
**wants** 87:14 118:2
126:9 142:6
**ward** 180:23
**warehouse** 6:11

**warrant** 192:23
**warren** 170:9
**waste** 88:10
140:15
**wasting** 93:7
**watching** 155:20
**water** 102:18,19
103:3
**waterfall** 16:3
17:13 102:17
**way** 14:23 15:5
18:11,12 19:7
21:2 29:6 38:11
49:19 56:21 86:17
93:3 97:24 100:6
100:22 107:5
116:24 129:23
131:15 136:3
144:17,20 145:6
145:21 148:6,23
149:20 150:13
151:9 154:17
160:24 169:24
178:16 179:20
180:1,3,23
**ways** 19:3 64:7
**we'd** 72:7 73:7
86:10 91:13,23
100:25 102:14
111:4 123:4
124:25,25 131:3
133:14 139:17,18
141:5 148:12,24
151:11 155:5,13
155:14,19 156:19
171:20 172:9,14
173:15 181:21
188:10 192:4
193:20
**wearing** 160:17
**week** 17:24 20:18
37:11 66:12 115:9
173:11

**weeks** 14:16 19:8
167:6 171:14,24
**weight** 137:7
**weil** 8:3 12:5
15:20 18:16 23:8
103:6 132:1 170:1
174:8 188:17
190:23
**welcome** 65:22
**went** 24:3 34:11
37:4 117:16
122:14 142:19
151:1 152:5
**weren't** 45:16
**west** 9:18
**we'll** 14:6 16:24
19:7
**we're** 16:16 18:9
20:1,10 21:22,25
25:6,14,19 28:5
29:13 36:5,17
37:1 43:6 66:11
66:11,12
**we've** 14:25 17:15
18:19,22 19:2,4,6
23:13 25:2 28:5
29:16 33:12 40:3
41:18 46:9 58:17
59:9 60:15
**whatsoever** 90:19
151:13
**what's** 15:4 24:21
61:19,19 66:16
67:7
**white** 1:14
**who've** 147:17
**william** 6:10 11:4
172:19
**willing** 25:6 58:21
173:2 188:2,20
189:9,10 197:18
**wilmington** 4:1,5
4:9 7:6 8:20 17:25

87:11,18,20,24
182:6,8,20 183:7
184:5
**win** 165:14 192:10
**wind** 14:19 15:4
18:10,11 99:9
**winddown** 94:14
94:16 95:4 98:1,3
98:4,19,25 99:4
100:1 101:13,25
**windfall** 120:25
121:2,4 150:9
**winners** 7:10,11
185:6,8,10
**winning** 165:14
**wish** 15:19 90:18
117:14
**wishes** 153:23
**wishful** 166:8
**withdraw** 169:19
**withdrawn** 97:20
193:5
**withdrew** 193:18
**withheld** 41:21
50:9 54:23 68:16
**withhold** 46:18
148:19
**withholding**
39:15 68:13
**withstanding**
135:2
**witness** 28:25
130:19
**witnesses** 28:21
139:19
**wl** 74:18 75:1,18
**women** 150:21
**wonderful** 147:17
**won't** 13:9
**word** 44:8 48:9
53:15 68:19 83:25
101:20 114:8
117:16 126:4,5,23

128:1
**words** 26:8 33:9
  35:25 74:17 75:24
  83:24 100:23
  106:24 126:2
  169:22 176:16
  177:6,14 190:1
  191:12
**work** 13:19 14:6
  15:13,23 19:25
  20:13 25:14,19
  26:1 72:3 86:12
  92:17 94:19 95:9
  95:11 102:7,13,21
  103:5 114:17
  124:23 152:12
  153:8,9 169:8
  173:15 198:2
**workable** 18:10
**worked** 20:7 25:4
  62:19 114:17,20
  118:11 148:23
  150:20
**workers** 167:14
**working** 12:14
  15:2 20:1 71:3
  73:20 86:6 154:6
  174:7
**works** 71:20 93:1
  124:3 144:17,20
  145:9
**world** 49:20 50:1
  176:22 177:3,5
  179:14 180:9
  185:23
**worldcom** 163:12
**worth** 72:20 181:3
  191:4
**worthwhile**
  199:20
**wouldn't** 17:17
  34:6

**wound** 15:12
**wrap** 16:1
**write** 71:19
**written** 55:24
  145:7,21
**wrong** 43:3
  149:13 165:6
**wrote** 91:18

| x |
| --- |

**x** 1:4,10 201:1

| y |
| --- |

**yeah** 13:13 26:9
  26:21 119:21
  126:17 141:4,23
  145:13 157:1
  171:19 175:12
  179:12
**year** 63:22 113:21
  120:21 123:11,19
  123:22,23 124:6,7
  124:9,21 130:4,5
  147:21,22,22,23
  147:25 148:6,6,7
  148:8,17,24,25
  149:3,3,18,19
  152:5 155:12
  161:14 164:22
  165:4,6 166:7
  167:9 176:11
  187:14 189:10
  190:17
**year's** 109:1 118:5
  123:23 161:19
  190:7
**years** 118:5
  128:15 132:24
  135:6 137:2
  138:10 148:13
  155:11,13 157:2
  168:15 195:25
  199:1
**yield** 75:16

**york** 1:2 8:6,15,22
  9:5,12 10:11
**you'd** 61:9
**you're** 19:17 21:7
  22:8 36:1,21,23
  40:5 43:5 52:17
  65:24 66:25 147:4
**you've** 14:3 46:16
  58:5 59:18 63:11
  63:16

| z |
| --- |

**zachary** 11:9