Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    ---------------------------------x

5    In re                              Chapter 11

6    SEARS HOLDINGS CORPORATION, et al.,   Case No. 1823538 (RDD)

7           Debtors.                   (Jointly Administered)

8    ---------------------------------x

9

10                  United States Bankruptcy Court

11                  300 Quarropas Street, Room 248

12                  White Plains, NY 10601

13

14                  July 31, 2019

15                  10:12 AM

16

17

18

19

20

21    B E F O R E :

22    HON ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  A. VARGAS

1    **HEARING re Notice of Hearing / Notice of Continuation of**

2    **Hearing on Debtors Rule 3012 Motion (related document(s)**

3    **4034)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **Transcribed by:  Sonya Ledanski Hyde**

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4          Attorneys for the Debtors

5          767 Fifth Avenue

6          New York, NY 10153

7

8    BY:  SUNNY SINGH

9          ANDREW WEAVER as counsel with Cleary Gottlieb

10         RAY C. SCHROCK

11         PAUL R. GENENDER

12

13   CLEARY GOTTLIEB STEEN & HAMILTON LLP

14         Attorneys for Transform / ESL

15         One Liberty Plaza

16         New York, NY 10006

17

18   BY:  SEAN O'NEAL

19

20   MILBANK, TWEED, HADLEY & MCCLOY LLP

21         Attorneys for Cyrus Capital Management

22         28 Liberty Street

23         New York, NY 10005

24

25   BY:  THOMAS R. KRELLER

Page 4

1   SEYFARTH SHAW LLP

2        Attorneys for Wilmington Trust National Association

3        620 Eighth Avenue

4        New York, NY 10018

5

6   BY:  EDWARD M. FOX

7        STEVEN PARADISE

8

9   AKIN GUMP STRAUSS HAUER & FELD LLP

10       Attorneys for Creditors Committee

11       One Bryant Park

12       New York, NY 10036

13

14   BY:  JOSEPH SORKIN

15       PHILIP DUBLIN

16       SARA L. BRAUNER

17

18   ALSO PRESENT TELEPHONICALLY:

19

20   BRYANT OBERG

21   ZACHARY D. LANIER

22   SOMA BISWAS

23   DONNA LIEBERMAN

24   RITA MARIE RITROVATO

25   JOSEPH RUSSICK

Page 5

1  KIMBERLY GIANIS

2  DAVID H. WANDER

3  ANDREW DIAZ

4  BRYAN CIMALA

5  JEFFREY H. SCHWARTZ

6  ANDREW THAU

7  ALIX BROZMAN

8  WILLIAM HOLSTE

9  MICHAEL WEINBERG

10  MATTHEW KOCH

11  JOSH SAUL

12  MARIA CHUTCHIAN

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  Okay, good morning.  In re Sears

3    Holdings Corporation, et al.  We concluded the factual

4    elements of the 507(b)/506(c) contested matters last week.

5    And today is for oral argument by the parties.

6              MR. WEAVER:  Your Honor, Andrew Weaver on behalf

7    of Transform.  One housekeeping item, if it's okay with Your

8    Honor, relating to a lease dispute that we just needed to

9    present to Your Honor this morning before the main event, if

10   that's agreeable to Your Honor.

11             THE COURT:  Is this the subject of the emails last

12   night?

13             MR. WEAVER:  Last night, yes.

14             THE COURT:  Yeah, that's fine.

15             MR. WEAVER:  Fine.

16             THE COURT:  There have been no changes to what was

17   said last night, right?

18             MR. WEAVER:  Correct.  And you have the Word

19   versions, Your Honor, and all parties consent.

20             THE COURT:  So those orders will be entered.

21             MR. WEAVER:  Thank you, Your Honor.

22             THE COURT:  Okay.

23             MR. O'NEAL:  Good morning, Your Honor.

24             THE COURT:  Good morning.

25             MR. O'NEAL:  Sean O'Neal, Cleary Gottlieb, on

Page 7

1      behalf of ESL Investments.  I think in terms of the order of

2      business, what we contemplate is that I will begin, then my

3      colleague Tom Kreller on behalf of Cyrus will proceed, and

4      then Ed Fox on behalf of Wilmington Trust will proceed, and

5      then Mr. Schrock on behalf of the debtors will proceed.

6                  THE COURT:  Okay, that's fine.

7                  MR. O'NEAL:  And I think what we'll do is we'll

8      first address 507(b) claims and liens, and then the 506(c)

9      surcharge.  We do have deck that we hope will help Your

10     Honor as we go through the evidence.  And with your

11     permission, I'd like to approach the bench to provide you

12     with a copy.

13                 THE COURT:  I think someone already did that.

14                 MR. O'NEAL:  Oh, good, very good to see.

15                 THE COURT:  Like radar.

16                 MR. O'NEAL:  Okay.  But before we get to the deck,

17     I do want to make some preliminary comments.  From the first

18     day of this case, the debtors' goal was to maximize value

19     for the non-insider creditors of this estate, and to do that

20     through a going concern sale.  And to the extent that the

21     debtors were unable to accomplish that, to attract a going

22     concern bid, they would then pivot to a liquidation.

23                 But until such time that they pivoted, the debtors

24     pursued this going concern sale, and they did it, you know,

25     vigorously.  They went out and they solicited bids and they

Page 8

1    tried to get the best and highest offer.  And they did this

2    with their eyes wide open, knowing that pursuing this option

3    would have its cost, but they determined that the cost were

4    worth the potential benefit of maximizing recoveries to the

5    non-insider creditors.

6           The 2L creditors, in turn, agreed to allow the

7    debtors to continue operating the business and using the

8    collateral so they could pursue this strategy.  But the

9    condition to that, as was set forth in the DIP order, was

10   that they received adequate protection, replacement liens

11   and super-priority claims and liens as well.  And these

12   protections were granted early in the case pursuant to the

13   DIP order.

14          Now, as part of this auction process, ESL for its

15   part submitted a series of bids, each one adding more value

16   than the last.  And the value actually came in different

17   forms: sometimes the value was, you know, additional

18   consideration; sometimes the value was assumption of

19   liabilities, or perhaps the agreement to reimburse costs;

20   and then also, limitations on the scope of releases that ESL

21   sought.

22          You will recall early on in the case, ESL was

23   attempting to obtain a full release as part of the sale

24   transaction.  All the meanwhile that the debtors were

25   vigorously pursuing bids and an action process trying to get

Page 9

1    a going concern sale, they had a data room and they had

2    investment bankers really trying to get in competing offers.

3    Throughout all of this time, the restructuring subcommittee-

4    -

5              THE COURT:  Those competing offers also included

6    going concern or orderly liquidation offers, too, right?

7              MR. O'NEAL:  Correct, Your Honor, yes.  You know,

8    like if Amazon had come in and wanted to buy Sears' assets,

9    all or a part of it, that was certainly something they were

10   trying to do.

11             THE COURT:  But they were also trying to obtain

12   bids from the liquidators.

13             MR. O'NEAL:  The liquidators, yes.  Correct, Your

14   Honor.  Per your -- actually, per your request that they

15   made those efforts as well.

16             THE COURT:  Okay.

17             MR. O'NEAL:  And as I noted that throughout all

18   this time, it was the restructuring subcommittee that was

19   driving this process, right.  The restructuring subcommittee

20   was set up almost immediately before the petition date, and

21   they were advised by counsel, separate counsel and advisors.

22             And, you know, throughout this time, none of these

23   decisions were made by -- or the restructuring subcommittee

24   for the benefit of ESL.  The subcommittee was making these

25   decisions for the benefit of the estate; they were

Page 10

1    fiduciaries.

2         And at the sale hearing, the debtors testified on

3    repeated occasions that the other creditors would benefit

4    substantially from this sale transaction, and that's why the

5    debtors asked Your Honor to approve this transaction.  And

6    if you look at the testimony that was presented by the CRO,

7    by the independent board members, by the financial advisors,

8    they all attested to these facts, that this was the best way

9    to maximize recoveries for the non-insider creditors.

10        Now, the UCC, for its part, contested all of these

11   decisions and litigated, instead seeking an immediate

12   liquidation, but that request was denied.

13        And for its part, this Court determined that the

14   ESL bid was in the best interest of the estates and

15   maximized the value to other creditors.  This bid that was

16   submitted and that was approved by this Court expressly

17   reserved ESL's rights to pursue adequate protection claims

18   and liens and to recover on those as part of the deal.

19   There were some limitations to the recovery, and we'll get

20   more into that later.

21        You know, looking back, that sale was really a

22   critical moment in the case.  Effectively, it resulted in a

23   reorganization of the business.  The business has continued,

24   the bulk of secured creditors have been paid, contracts and

25   leases have been assumed, hundreds of millions of dollars of

Page 11

1    liabilities have left the estates, and 45,000 jobs were

2    saved from immediate termination.

3            In preserving the business and creating this

4    process, such that there was maximization of value for other

5    creditors, was exactly the choice that the debtors made.

6    Because, being well advised, they believed that it was best

7    and consistent with their fiduciary duties to attempt to do

8    that.

9            Now, unfortunately, during this case, the value of

10   the second lien collateral substantially diminished, going

11   from a $245 million cushion, over secured cushion on the

12   petition date to a loss of more than $700 million through

13   the projected effective date.

14           As Your Honor is aware, the second lien lenders

15   have presented evidence to back up this diminution in value,

16   and the purpose of the presentation I'm going to go through

17   is, hopefully, to set that up.

18           But before I do that, before I turn to the

19   evidence, I do want to also comment briefly on the 506(c)

20   surcharge.  Obviously, the debtors carry the burden, and

21   they are really seeking what is an unprecedented amount of a

22   surcharge, a $1.4 billion surcharge.  We've never seen that;

23   we've never seen a case that supports that; we've never even

24   seen an argument that seeks a $1.4 billion 506(c) claim.  I

25   think it goes far beyond the reach of a 506(c) and we'll get

1    to that more.

2           Now, I think I want to end kind of the preliminary

3    comments with just noting that the stakes here are high.

4    It's bigger than just ESL.  It's bigger than just the second

5    lien creditors.  I think secured creditors around the nation

6    are looking at this case.  These stakes are high.

7           When we think about adequate protection, we think

8    about what is the purpose of adequate protection.  And when

9    you look at the legislative history, the purpose of adequate

10   protection, as I'm sure Your Honor is well aware, is, quote,

11   "To ensure that the secured creditor receives in value

12   essentially what he bargained for."  That legislative

13   history goes on to state that adequate protection is derived

14   from the Fifth Amendment protection of property, unquote.

15   But, quote, "It's based as much on policy grounds as it is

16   on constitutional grounds," unquote.

17          Here, the policy underlying adequate protection is

18   that secured creditors should be encouraged to lend money to

19   distressed companies, and should be encouraged to allow the

20   debtors to use collateral so that they can attempt to

21   reorganize or attempt to achieve the highest possible value

22   for the estate as a whole.

23          And I think when you look at Judge Chapman's

24   opinion in Sabine, she stated that, you know, accepting, in

25   that case, the committee's arguments on adequate protection

Page 13

1    would have been against the policy underlying adequate

2    protection.  It resulted in secured lenders insisting on a

3    quick sale and lenders being less likely to permit the use

4    of cash collateral, and then also of lenders, quote,

5    "dramatically changing", unquote, the borrowing base in

6    asset-based lending.

7            So I just say that just to kind of remind everyone

8    just kind of the stakes and the basic principles of adequate

9    protection.

10           THE COURT:  So you're saying the borrowing base is

11   the lender's expectation?

12           MR. O'NEAL:  No.  I'm saying that if we were to

13   actually not recognize adequate protection, I think folks

14   would take different actions and protect themselves on the

15   borrowing base.

16           THE COURT:  But I guess my question is a little

17   different, which is asset-based loans are based largely on

18   borrowing base calculations.

19           MR. O'NEAL:  Correct, yes.  But I think we're, if

20   your point is to suggest that we should be using the

21   borrowing base as the starting point for calculation of the

22   value of the collateral, we'll get to that later.

23           THE COURT:  Okay.

24           MR. O'NEAL:  Okay.  So I think with Your Honor's

25   permission, I'd like to start through the deck.  I don't --

1    some of these matters are kind of preliminary and I'm not

2    going to spend a lot of time on them.  But I think I just

3    would take us initially to slide 4, and that's really just

4    an excerpt of the DIP order and as a threshold matter,

5    there's no disagreement that the second lien creditors

6    received adequate protection liens and claims.  Those liens

7    were granted early in the case pursuant to the DIP.

8              And, importantly, those replacement liens and

9    super-priority liens and claims were granted to protect the

10   second lien creditors for any diminution in the value of the

11   second lien collateral due, in part, to the new money

12   portion of the senior DIP, the carveout, and the debtors

13   continued use of collateral, and I think that's laid out in

14   the language.  You see that also in slide 5, which talks

15   about the super-priority claims.  Those are just quotes from

16   the documents.

17             Moving on to slide 6, we're just -- here, we're

18   just summarizing the basic framework, and it's a bit hard to

19   read, but I think you get the gist.  The basic gist is that

20   the first step is determining the value of the second lien

21   collateral on the petition date.  That's the first step and

22   that's what you see above the first blue line.  The second

23   step is to subtract from that the relevant debt, the first

24   lien debt, and you see that's what going on below the second

25   blue line.

1          And you will see at the top of the page, we lay

2     out a few assumptions that kind of affect the analysis in

3     terms of what the collateral value is.  And this chart

4     actually focuses mostly on Schulte and Henrich because I

5     think Murray has a different analysis.  And under that

6     analysis, Murray is really going with a process that first

7     establishes the floor and then she builds up from there, but

8     we're kind of focused on the Henrich and Schulte for now.

9     Mr. Kreller will be available to talk about Murray.

10          And so, as I noted, the three -- the bottom line

11     is that all three experts of the second lien creditors

12     determined that the second liens were over-secured as of the

13     petition date.  The ESL expert, David Schulte, has

14     determined that we were over-secured by over 245 million

15     with an adequate protection claim of 718 million.

16          Going now to kind of like -- there's a few

17     assumptions and a few things that kind of critically drive

18     the analysis and the value, and those are listed at the top.

19     And I think the point of this deck is to show that if you

20     kind of -- if you reach a conclusion on these four issues,

21     even under the debtors' analysis, there's a substantial

22     adequate protection claim.

23          Number one, if it's determined that there's no

24     basis to apply the 85-cent valuation of inventory that the

25     debtors have proposed.  Number two, if you determine that

1    the second liens have a lien on the pharmacy assets, as we

2    say they do.  Number three, if you determine, as I think you

3    agree, that the carveout doesn't actually reduce the amount

4    of the super-priority liens and claims; it just has a

5    seniority, but it was actually -- it doesn't reduce our

6    claims and liens.  And then finally, that there's no basis

7    for the $1.4 billion surcharge.

8              That would mean that if you follow those

9    assumptions, we would pretty much -- we would have an

10   adequate protection claim of over $350 million; it's 368

11   million under this.  Then, of course, if you agree with us

12   that the undrawn LCs should not be included when we're

13   deducting the amount of debt from our collateral, then that

14   368 number would increase substantially by the amount of the

15   LCs.  And so, that's really the point of that slide.

16             I think slide 7 really just reminds us of the

17   relevant standard that the Supreme Court applies.  To

18   determine the value of the collateral, you look to the

19   debtors' use and disposition of the collateral.  I don't

20   think there's actually any disagreement that that's what

21   Rash says; I think there's some disagreement on what it

22   means.  But, you know, I think Rash is clear that the proper

23   standard is not always the liquidation of value; it's not

24   the foreclosure value, but it's the replacement value.

25             And here where the debtors have determined to

Page 17

1    continue to use the collateral so that they can generate

2    revenues that can be used by the estates, the proper

3    valuation is the replacement value.  Basically, the

4    inventory was being sold for value and then new inventory

5    was bought for value, and that was repeating every day in

6    this case.  And the debtors were using that collateral to

7    maximize the potential recoveries to the estates through,

8    hopefully, what they wanted to have, which was a going

9    concern sale.

10           And then, so what we do next is we just go through

11   the various buckets of collateral -- you know, you've got

12   inventory, you've got cash, you've got credit card

13   receivables, you've got pharmacy accounts receivable, you

14   have pharmacy scripts -- are kind of like the key collateral

15   pieces that we've looked at.

16           Slide 8 talks about Schulte's view and shows that

17   what we did with Schulte is he testified that book value is

18   roughly equivalent to replacement value.  Book value is the

19   amount that Sears used in its SEC filings.  And, you know, I

20   think what we found is that book value is roughly equivalent

21   to replacement value.

22           Now, the value -- and to calculate this, really

23   Schulte kind of separated out, and I think that's consistent

24   with ResCap and with Rash.  You look to the use of the

25   property.  So for inventory that was located in go-forward

Page 18

1    stores, you use the go-forward book value; that book value

2    was the replacement value.  And for -- and that's the going

3    concern value for that particular collateral, the inventory.

4    Then when you look to the inventory that was sold at the GOB

5    stores, you look to kind of the value that was sold in the

6    GOB stores, and that's what Mr. Schulte did.

7            Now, the starting point for Mr. Schulte for the

8    go-forward inventory was the book value, which was the

9    amount that was included on the borrowing base certificate,

10   the starting point.  And that includes all the inventory,

11   whether eligible or not eligible for the borrowing base, and

12   we think that's the appropriate standard.  The borrowing

13   base --

14           THE COURT:  I'm sorry.  Let me make sure I

15   understand that.  Is he using book value for non-eligible

16   items?

17           MR. O'NEAL:  Yes, he is.  Yes, because that's

18   still value, right?

19           THE COURT:  But he's using book value for it.

20           MR. O'NEAL:  Yes.  He's looking -- he's using book

21   value for the inventory, and he's not excluding ineligible

22   inventory.

23           THE COURT:  Okay.

24           MR. O'NEAL:  And that's because the inventory

25   still has value.

1          THE COURT:  Right, but he's ascribing book value

2     to it.

3          MR. O'NEAL:  Correct.

4          THE COURT:  Does the book value reflect any

5     discount because it's not eligible?

6          MR. O'NEAL:  No.  The book value does not reflect

7     a discount.  What the book value reflects is just the

8     replacement cost.  The book value deducts already kind of

9     the direct cost of selling the inventory, so it's really

10    what we view as the replacement cost.

11         THE COURT:  Why is that a proper measure here?

12         MR. O'NEAL:  Because, I mean, I think --

13         THE COURT:  When the lenders themselves don't use

14    it.

15         MR. O'NEAL:  Right.  Well, the lenders --

16         THE COURT:  And when Tiger doesn't use it.

17         MR. O'NEAL:  Sure, sure.

18         THE COURT:  And when Miss Murray doesn't use it.

19         MR. O'NEAL:  Sure.  And I think that's, if you

20    think about it, when the lenders are doing a borrowing base

21    and when they're lending money, they're lending money on the

22    basis of, you know, their credit assessment.  What Rash says

23    is you look to what a willing buyer and seller would pay and

24    accept.

25         THE COURT:  How is that reflected in book value,

Page 20

1    as opposed to actual market calculations?

2              MR. O'NEAL:  Right, because that is the actual

3    replacement value.  It does not include the cost of -- the

4    direct cost of selling the inventory.

5              THE COURT:  Okay.

6              MR. O'NEAL:  And so, the -- you know, so Rash

7    doesn't say that you look to what --

8              THE COURT:  Are you aware of any case that

9    actually ascribes full book value to ineligible inventory?

10             MR. O'NEAL:  I'm not aware of any case one way or

11   the other --

12             THE COURT:  Oh, really.

13             MR. O'NEAL:  -- that doesn't or that does.

14             THE COURT:  Okay, all right.  I'm going to cite

15   you a couple after this.

16             MR. O'NEAL:  All right.  All right, so I think one

17   of the things that Schulte did testify to, is that the

18   replacement value of the go-forward inventory based on book

19   value is actually a conservative approach.  It's a lower

20   number than the retail net value that he could have used.

21             I think slide 9 is really just intended to make

22   one point, which is that the debtors also began with

23   inventory book value as their starting point.  Now, you

24   know, obviously then what they did is they took an axe to it

25   and then they took a hatchet to it and then they kind of put

Page 21

1    a stick of dynamite on it, but in the end -- in the

2    beginning --

3            THE COURT:  Is that what borrowing bases are,

4    hatchets and dynamite?

5            MR. O'NEAL:  No, no.  I'm actually not referring

6    to the borrowing base.

7            THE COURT:  Okay.

8            MR. O'NEAL:  We'll get more to that later.  I'm

9    referring to the 15 percent discount.

10           THE COURT:  Right.

11           MR. O'NEAL:  And then also the 506(c) surcharge.

12           THE COURT:  Okay.

13           MR. O'NEAL:  So slide 9 -- I'm sorry -- slides 10

14   and 11, you'll see that -- how Schulte valued the GOB

15   inventory.  And the GOB inventory was based really on the

16   debtors' historic experience.  You have an experience

17   between 2014 and 2018 when Sears was, you know, kind of

18   closing down the more than -- there were approximately 700

19   stores, and you see that's between 95 and 100 percent.

20           THE COURT:  What is the source of this document?

21           MR. O'NEAL:  This is the ledger is the source.

22           THE COURT:  This is referenced in Footnote 84 of

23   Mr. Schulte's Declaration, but he doesn't really explain

24   where it comes from or what it is intended to show.  So can

25   you do that for me?

```
 1              MR. O'NEAL:  Sure.  I mean, it's really -- I mean,
 2     this is -- I mean, this is -- I don't think there's any
 3     contest that these are the recovery rates for the GOB
 4     stores.
 5              THE COURT:  Well, when you say the recovery rates,
 6     is this everything that was sold in the GOB stores?
 7              MR. O'NEAL:  Yes.
 8              THE COURT:  And did that include, for example,
 9     pharmacy assets?
10              MR. O'NEAL:  I don't -- I would have to confirm on
11     that one.
12              THE COURT:  And did it include goods in transit?
13     I'm assuming not, right?
14              MR. O'NEAL:  I will -- after I go through this,
15     I'll confirm, and I'll get back on the mic.
16              THE COURT:  Okay.  And do we know specifically
17     what was netted out?
18              MR. O'NEAL:  Yes.  What was netted out was --
19              THE COURT:  The four wall costs, right?
20              MR. O'NEAL:  That's correct.
21              THE COURT:  Okay.  And we don't know whether there
22     was ineligible inventory or just regular inventory; we don't
23     know the breakdown here, right?
24              MR. O'NEAL:  That's correct.  This would have
25     included conceivable ineligible.
```

Page 23

1              THE COURT:  But we don't know which was --

2              MR. O'NEAL:  What portion of it.

3              THE COURT:  -- what portion was.

4              MR. O'NEAL:  Yeah.  It's not --

5              THE COURT:  -- included.

6              MR. O'NEAL:  Correct.

7              THE COURT:  Okay.  Now, Mr. Henrich has a

8    different set of exhibits that has a different number at the

9    end of it and also a different number for total inventory at

10   cost sold.  That is -- well, it appears he has two different

11   exhibits.

12             MR. O'NEAL:  Right.

13             THE COURT:  It's Exhibit G and Exhibit H to his

14   declaration.  Can you explain why there's a difference?

15             MR. O'NEAL:  Yeah.  I mean, I think I'd have to

16   defer to Cyrus' counsel on explaining Henrich's methodology.

17   But I would say that I think at the hearing, I think you

18   asked the question of Mr. Griffith, who said that he

19   believed that Mr. Schulte's 95.6 number was the correct

20   number.

21             THE COURT:  Well, he said it was the more reliable

22   one.

23             MR. O'NEAL:  Yes.

24             THE COURT:  But I'm just -- I'm curious as to how

25   there could be two exhibits as to the results of GOB sales

Page 24

1    that could differ in these ways.

2            MR. O'NEAL:  Right, and the difference is not

3    completely substantial; it's, like, 1 percent.

4            THE COURT:  Right.

5            MR. O'NEAL:  Yeah.  But like I said, you know, I

6    think I would defer to Cyrus' counsel to explain that, but I

7    think the debtors are on record as saying that ours is the

8    more reliable.

9            And then I think what slide 11 does is it actually

10   shows what the GOB inventory was sold at during the

11   bankruptcy case, and that's the 95.6 percent.  And what's

12   interesting is -- and you see this on slide 13, which is in

13   both cases Schulte picked the lower number and we're trying

14   to be conservative here.

15           I think I want to turn now to slide 12.  There's

16   been some discussion about whether or not Schulte included

17   overhead in our valuations of the inventory collateral.  And

18   so, I think what I would say is that this -- and his

19   analysis doesn't include indirect overhead, but it certainly

20   includes direct overhead.  And I think that's clear on the

21   record that it includes the four-wall cost of selling the

22   inventory.

23           And there is still, even if you do that, there's

24   still a bit of a margin -- it's not huge, it's about $11

25   million -- in excess of that that could be available for

Page 25

1    overhead.  In addition, you know, there are other earnings

2    related to inventory that are not included in the debtors'

3    store letter -- store level financial statements,

4    particularly the vendor discounts and the rebates, which in

5    2018 was approximately 183 million.  And I think what we're

6    just saying here is that that 183 million, which was

7    generated by inventory but is not deducted from the value of

8    the inventory, would actually be available for use for

9    overhead, so that's 183 million at least.

10           And then I think our next point is that there are

11   other assets, other businesses that should also contribute

12   to the corporate overhead.  And I think Sabine is clear that

13   not all overhead should be allocated to a single piece of

14   collateral.

15           I think now I'd like to turn to slide 15, which

16   kind of adds -- or actually, I should say slide 14, which

17   kind of adds a little bit more detail to what I just talked

18   about.  If you look at slide 14, that's that $11 million --

19   $11.5 million is kind of margin from the sales of inventory

20   that would be available for indirect overhead, on top of the

21   amounts, you know, that we've already deducted for indirect

22   -- I'm sorry -- for direct costs.

23           If you turn to slide 15, this is where we have, if

24   you look in the middle of the chart, that 183 number, the

25   2018 number for vendor discounts and other adjustments.

Page 26

1    Again, those -- that amount would be available for overhead.

2    What we're doing here is we're just taking you through the

3    kind of -- the individual pieces that we talked about above.

4            Now, I'd like to talk about the 15 percent

5    discount, the 85 cents that the debtors have asserted.  You

6    know, and I think that -- I start with I think what Your

7    Honor ruled on the 23rd, which is that, you know, the APA is

8    clear, there's no allocation.  And so, we can't have parol

9    evidence on whether or not there was an allocation.

10           I think Your Honor was interested in whether these

11   disputed materials reflected any kind of view on value,

12   apart from the APA.  Now we, as you know, Mr. Moloney

13   actively objected to the admission of those documents, which

14   we viewed as, you know, settlement documents and irrelevant

15   and the like.  And I'm not going to repeat all of those

16   objections, but just to note that, you know, we are

17   maintaining all of our objections to the admissibility of

18   those documents.

19           But just setting that aside, we do believe that

20   those materials have no probative value.  First, the debtors

21   never accepted the bid that was described in the disputed

22   materials; in fact, they vociferously objected.  And they

23   wanted us to add more aggregate value and stated their

24   intention that they would liquidate rather than accept that

25   bid.

Page 27

1            And to the extent that the buyer, that is that ESL

2    or Transform had made an offer, that offer was a package

3    deal.  And if you go through that offer, one of the big

4    components of that offer, to the extent it was an offer, was

5    actually a global release, a global release of all claims

6    against ESL.  As you know, that did not happen.

7            So in this instance, we had neither a willing

8    seller or a willing buyer; nobody took that deal.  And from

9    a commercial standpoint, a bid is just a starting point;

10   it's an invitation to counter.  And if there's no deal,

11   there's no deal, there's no valuation.

12           And I think if you look at the Supreme Court's

13   decision in Rash, particularly Footnote 2, the Supreme Court

14   says that, to have -- to determine value, you have to look

15   at the price that a willing buyer and a willing seller would

16   agree to buy and sell at.  You didn't have that here.

17           Moreover, I think Judge Gropper's decision in

18   Tronox, a bit of a monster of a decision, but there's a note

19   and at note 86 where Judge Gropper says that, and it's

20   highlighted here on slide 16, "Courts give little weight to

21   unaccepted offers, especially where they lack finality."  As

22   the Court said in United States versus Smith, "It's well

23   settled that a mere offer unaccepted to buy or sell is

24   inadmissible to establish market value."  So we start with

25   the proposition there was no offer, there was no willing

Page 28

1    buyer.  Therefore, there is no -- and there was no willing

2    seller; therefore, there is no ability to determine value

3    based on that.

4            But there are additional issues that we have to

5    keep in mind, and those include that the deal substantially

6    changed from December and January, the early part of January

7    until the final acceptance of the bid in mid-January.

8    During that process, this auction process, Transform

9    ultimately agreed to add approximately 800 million in

10   additional assumed liabilities.  And this additional

11   consideration formed part of the aggregate purchase price,

12   but there was never an allocation to specific assets.  The

13   credit bid is only a piece of the consideration, and that

14   consideration was a package deal.

15           And third, we suggest that there's nothing in the

16   record to suggest that the 15 percent discount was a

17   valuation; in fact, the opposite is true.  What the

18   documents say is that these were assumptions for purposes of

19   the bid.  And it's kind of not surprising that that would

20   just be an assumption.  It was a starting bid, a starting

21   offer.  And I think we all know that at the time the GOB

22   store sales were at a substantially higher level than 85

23   cents.

24           Fourth, I think it's clear that there was no

25   testimony as to what was actually said during those

1     meetings, so it's -- I don't think it really is relevant.

2     So in the end, to the extent, you know, I think you've

3     already made the decision to admit those, but we submit that

4     they just have no probative value; they're not probative of

5     market.

6               Now I'd like to turn to cash.  Schulte's analysis,

7     and I think everybody's analysis, assumed and determined

8     that we would have -- that the first lien lenders would

9     effectively use first the cash.  We didn't have a lien on

10    the cash at the second lien level, but the first lien

11    lenders did.  And there's also no dispute, however, that to

12    the extent that any of the cash was related to proceeds from

13    inventory that that would be part of our lien; that's the

14    proceeds language.

15              Now I think Your Honor asked whether there had

16    been a tracing exercise and the response was no, there had

17    been no tracing exercise.  Instead, what we've done is we've

18    made the reasonable assumption that cash would be used first

19    by the first lien lenders.

20              THE COURT:  There's no -- there's a waiver of

21    marshaling, right?

22              MR. O'NEAL:  There is.  But I think marshaling is

23    a bit of a red herring because the marshaling wouldn't even

24    come into play until the first lien lenders were paid in

25    full.  So I don't think it really -- I just -- it's not

Page 30

1    relevant.  But I think we have to keep in mind that there's

2    actually a provision in the DIP agreement, and we've

3    highlighted it at the bottom of the page on Page 17, which

4    is that net proceeds from the sale of collateral, other than

5    the previously unencumbered assets which were to go over to

6    the winddown account, were to be used to pay down the ABL

7    lenders.

8           And I think you'll recall that at the hearing on

9    the APA issues, Mr. Friedman said that every time we got

10   money, we used it to pay down the ABL debt.  So I think, you

11   know --

12          THE COURT:  This is starting cash, right, that

13   you're referring to?

14          MR. O'NEAL:  That's correct.  This is the starting

15   cash on the books.

16          THE COURT:  On the petition date.

17          MR. O'NEAL:  That's correct, that's correct.

18          THE COURT:  So it wouldn't be from post-petition

19   sales.

20          MR. O'NEAL:  That's correct, but the next day, it

21   would be or, you know, immediately.  Actually, the day of

22   the petition it would be, right, because --

23          THE COURT:  Was there a cash sweep?

24          MR. O'NEAL:  Well, I think -- well, what the DIP

25   loan says is that, you know, cash is to be used to pay the

Page 31

1    ABL lenders, and I think that's consistent with what Mr.

2    Friedman --

3                THE COURT:  So there wasn't a cash sweep.

4                MR. O'NEAL:  Mr. Friedman called it a cash sweep.

5                THE COURT:  But that's from proceeds of sales.

6                MR. O'NEAL:  Correct.

7                THE COURT:  Okay.

8                MR. O'NEAL:  Let's look at credit card

9    receivables.  I think the only point here is I think there's

10   no debate that credit card receivables form a part of the

11   second lien collateral.  I think there's a bit of a debate

12   on what's the right number to use, I think.  We used the

13   general ledger book value, and that was based on kind of

14   actual, you know, kind of the actual data.  The debtors used

15   --

16               THE COURT:  What actual data?

17               MR. O'NEAL:  What's that?

18               THE COURT:  What actual data?

19               MR. O'NEAL:  The ledger.

20               THE COURT:  The ledger.

21               MR. O'NEAL:  Correct.

22               THE COURT:  The book ledger.

23               MR. O'NEAL:  Correct.

24               THE COURT:  Okay.  So no attempt to quantify

25   collectability on anything like that.

1          MR. O'NEAL:  No, Your Honor.  It was just what was

2      put on the ledger.  And I think what the debtors used is

3      actually a forecast.

4          THE COURT:  As did Tiger, as did Ms. Murray.

5          MR. O'NEAL:  I think that's -- I think that's

6      correct.

7          THE COURT:  So am I correct that every time he had

8      the opportunity to, Mr. Schulte used book value and didn't

9      do any other analysis as far as valuation is concerned?

10          MR. O'NEAL:  I think we used book -- that's

11     correct, except -- yeah, I think that's right.  I mean, the

12     starting -- we used, as the starting point, the book value.

13          THE COURT:  Well, ending point too, right, except

14     for --

15          MR. O'NEAL:  That's correct.

16          THE COURT:  Right.

17          MR. O'NEAL:  Okay.  So I think that takes us to

18     pharmacy assets.  There is a bit of a debate here between us

19     and the debtors on pharmacy assets.

20          THE COURT:  As to whether they're included in the

21     collateral package.

22          MR. O'NEAL:  That's correct, that's correct.  The

23     -- initially, with respect to pharmacy receivables, I think

24     the debtors' witness include the pharmacy receivables as

25     second lien collateral.  He then kind of changed his report.

Page 33

1    But our view is that pharmacy receivables are a part of our

2    collateral package; they are proceeds from inventory.  And

3    as you look at slide 19, we highlight the language in the

4    security agreements which talks about all inventory and

5    proceeds.

6           Now, you may ask the question, well, why did the

7    first lien security agreement refer to pharmacy receivables.

8    And I think the point is we're not a party to that

9    agreement, and I don't think that agreement controls what

10   our agreement is.  And under the terms of the agreement, we

11   had a lien on the proceeds from inventory.

12          In terms of pharmacy scripts -- and we've

13   highlighted the language here in Clause F -- as part of our

14   second lien security package, we got a lien on all books and

15   records pertaining to the collateral.  Pharmacy scrips are

16   really, it's the pharmacy's right to fill a prescription to

17   a given customer and so, we view that as a customer list.

18   And accordingly, it falls within books and records provision

19   of the security agreement.

20          THE COURT:  Do you have any case law to support

21   that?

22          MR. O'NEAL:  You know, we looked, and we didn't

23   see case law one way or the other on this particular point.

24   But, I mean, obviously, we consulted with our UCC experts,

25   and they all agree that, you know, books and records should

Page 34

1    include things such as customer lists and pharmacy scripts.

2             THE COURT:  But when you talk about scripts when

3    you're actually selling pharmacy assets, it's really just --

4    what would you actually sell?

5             MR. O'NEAL:  Yeah.  It's the right to sell to a

6    given customer.

7             THE COURT:  To a customer, right?

8             MR. O'NEAL:  Yeah, to a given customer.

9             THE COURT:  Because there's a written

10   prescription.

11            MR. O'NEAL:  That's correct.

12            THE COURT:  So the customer can go elsewhere.

13            MR. O'NEAL:  Yes.  The customer could go

14   elsewhere, but that doesn't mean it's not our collateral if

15   they don't.

16            THE COURT:  But it's different than a customer

17   list, right?  A list is so you can identify customers.

18            MR. O'NEAL:  Yeah, but that's exactly what the

19   pharmacy scripts is.  It's a list of customers that could

20   fill their prescriptions at a Sears pharmacy.

21            THE COURT:  Well, I'm just trying to conceive of

22   how this works from a buyer of a script.  So let's say that

23   -- I don't know -- Rite-Aid wants to buy the script.  What

24   is it buying?

25            MR. O'NEAL:  It's buying the list of customers

1    that can fill their prescriptions at Sears.

2              THE COURT:  Okay.

3              MR. O'NEAL:  All right.  And then so, I think we

4    turn to slide 21.  I think aside from the, you know, kind of

5    the --

6              THE COURT:  And he values that at book value,

7    right?

8              MR. O'NEAL:  That's correct.

9              THE COURT:  Full value.

10             MR. O'NEAL:  At book value.

11             THE COURT:  And he didn't read the Tiger report on

12   why that makes no sense.

13             MR. O'NEAL:  Well, actually, I think that's not

14   entirely accurate.

15             THE COURT:  Well, he testified he didn't read the

16   Tiger report.

17             MR. O'NEAL:  Yeah, yeah.  I think --

18             THE COURT:  I got the other part.

19             MR. O'NEAL:  Yeah.  Let me -- I'm talking about

20   the second part of your statement.

21             THE COURT:  Okay, all right.

22             MR. O'NEAL:  What we did is we relied on the value

23   of the pharmacy scrips that was in the debtors' books and

24   records.  We received from the debtors a document and

25   metadata, I think mid-September, that listed out the value

Page 36

1    of the pharmacy scripts, and that list was at 72.8.  Now,

2    there is a Tiger appraisal --

3              THE COURT:  Book value or the value value?

4              MR. O'NEAL:  This was the -- I mean, this was the

5    -- it is called the estimated script asset value is what the

6    -- that's what the --

7              THE COURT:  So he didn't do any analysis of that

8    separately.  He didn't determine how that number was

9    derived, anything like that?

10             MR. O'NEAL:  That's correct because it was in the

11   debtors' books and records.

12             THE COURT:  Right.  And we all know debtors' books

13   and records are always accurate, and the case law has always

14   held that, right?

15             MR. O'NEAL:  Well --

16             THE COURT:  I'm being facetious.  It hasn't ever.

17             MR. O'NEAL:  I understand.

18             THE COURT:  All right.

19             MR. O'NEAL:  But I do think that it's -- this is

20   the best evidence of the debtors' view.

21             THE COURT:  What sort of best -- all right, fine.

22             MR. O'NEAL:  Yeah.

23             THE COURT:  It also, obviously --

24             MR. O'NEAL:  Because the Tiger, let's look at the

25   Tiger --

Page 37

1              THE COURT:  -- is clearly beneficial to your

2      client.  And so, he didn't bother to dig into it and provide

3      any expert judgment as to it, right?  He just took it as a

4      given.

5              MR. O'NEAL:  I think that he took it as a given

6      that the debtors had valued it and had taken the time to

7      value it appropriately.  I think when you look at -- let's

8      think about the Tiger.

9              THE COURT:  But he didn't do any analysis of that.

10             MR. O'NEAL:  He did not.

11             THE COURT:  I don't really have any expert

12     testimony on that issue.

13             MR. O'NEAL:  He accepted --

14             THE COURT:  Except maybe Tiger's.

15             MR. O'NEAL:  Right, but let's think about Tiger.

16     Tiger is interesting because obviously Tiger was working for

17     the lenders, so obviously had a different perspective,

18     right?  They had a potential interest in reducing the value

19     of the scripts because, you know, it relates to the

20     borrowing base and the credit protection that they had

21     bargained for.

22             THE COURT:  Well, that's not necessarily an

23     interest to reduce.  It's just an interest to be accurate

24     because lenders don't want to set false guidelines because

25     then they'll be beaten out by other lenders --

1              MR. O'NEAL:  I agree that --

2              THE COURT:  -- that set up accurate guidelines.

3    And they're the ones that get the loans because lenders are

4    basically in the business of making loans, not managing

5    defaults.

6              MR. O'NEAL:  I agree with that, but I do think

7    that the --

8              THE COURT:  Well, that's not what you said.

9              MR. O'NEAL:  I do think that the appraisal is done

10   for the lenders; it's not done for the debtors.

11             THE COURT:  Right.  And the debtors haven't given

12   me an appraisal and neither have you on this issue.

13             MR. O'NEAL:  I've given you what's in the debtors'

14   books and records.

15             THE COURT:  Right, okay.

16             MR. O'NEAL:  And then I would say that --

17             THE COURT:  So on this point, though, this is

18   really just sort of an ongoing part of the business.  You

19   would have to value this if you're going to value it at all

20   on a liquidation basis, wouldn't you, because this is just

21   sort of people come to get their prescription.  It doesn't -

22   - it isn't a receivable yet.  It's just some sort of

23   inchoate right.

24             MR. O'NEAL:  It's --

25             THE COURT:  It only exists when you look to sell

Page 39

```
 1    it.  And when you would sell it, would only be, I think, if
 2    you're going out of business.
 3              MR. O'NEAL:  Right.
 4              THE COURT:  That's the only time I've seen
 5    companies sell it.
 6              MR. O'NEAL:  I think it has -- I guess it has
 7    value from a lending perspective.  It has value from a sale
 8    perspective.
 9              THE COURT:  Right.  But it's --
10              MR. O'NEAL:  But I think that that is -- that's
11    value, and it obviously has a greater value in a going
12    concern.
13              THE COURT:  I don't understand that.  It doesn't
14    have any value as a going concern because you don't realize
15    any money from it --
16              MR. O'NEAL:  Well, you --
17              THE COURT: -- as collateral.  You realize money as
18    a business because you have customers who show up.  But you
19    don't -- it's not -- it's not -- there's no value to it
20    unless you're going to sell it somewhere.
21              MR. O'NEAL:  And my point is that it has value
22    because customers are coming every day to fill their
23    prescriptions.
24              THE COURT:  But --
25              MR. O'NEAL:  It has intrinsic value.
```

1             THE COURT:  -- not as a -- not as a book and

2     record.  That's all I -- I mean, it has value when you sell

3     it, right?  I mean, it's not --

4             MR. O'NEAL:  Well, I think it has --

5             THE COURT:  If you carry it on your books as

6     having a value of 72 million, that doesn't -- that's like

7     carrying goodwill on your books.

8             MR. O'NEAL:  Right, but it does have value for --

9             THE COURT:  Well, so does -- but how is it

10    different than goodwill at this point?  I mean, it's just --

11    it's not realizable.  I don't see how it has collateral

12    value unless you're going to sell it.  And when you sell it,

13    you're in a situation where Rite-Aid, whatever, CVS knows

14    you're going out of business.

15            MR. O'NEAL:  Right.

16            THE COURT:  So they're going to put a big discount

17    on it.

18            MR. O'NEAL:  I think, Your Honor, the value is

19    that every day, customers are coming in because they've got

20    a relationship with --

21            THE COURT:  No, I get it, it's just like goodwill.

22    I mean, they're not -- they're obviously not going to be

23    coming into Sears because Sears is selling it.

24            MR. O'NEAL:  But that has val- --

25            THE COURT:  They're selling their prescription.

Page 41

```
 1                  MR. O'NEAL:  Understood.

 2                  THE COURT:  Which basically means --

 3                  MR. O'NEAL:  And that has value.

 4                  THE COURT:  Okay.

 5                  MR. O'NEAL:  And to your point, the Tiger

 6     valuation, there's the subsequent Tiger valuation, right,

 7     that was done in February that adjusted their prior estimate

 8     and doubled it.

 9                  THE COURT:  Right.  And there's no explanation as

10     to why that was.

11                  MR. O'NEAL:  That's only what's in the Tiger

12     report, and that was $54 million.

13                  THE COURT:  Right.

14                  MR. O'NEAL:  So if you use that number --

15                  THE COURT:  It puts a number on it.

16                  MR. O'NEAL:  Right.

17                  THE COURT:  It doesn't say why it changed the

18     earlier analysis.

19                  MR. O'NEAL:  And so, if you're looking, that means

20     that the bid between the parties is, you know, roughly 72

21     versus 54.

22                  THE COURT:  Only if you assume Tiger was right in

23     February and not on the petition date.

24                  MR. O'NEAL:  Correct, correct.

25                  THE COURT:  Or what the amount of the receivables
```

Page 42

1    was on the petition date, which wouldn't be in February.

2              MR. O'NEAL:  Correct.

3              THE COURT:  Right?  So why should I accept

4    February for anything?  Who knows what -- I mean, February

5    could basically say that the value went up --

6              MR. O'NEAL:  I think it was just --

7              THE COURT:  -- as opposed to down from the

8    petition date.

9              MR. O'NEAL:  Yeah.  For some reason, the Tiger

10   team revisited the valuation.

11             THE COURT:  Maybe there were more -- maybe people

12   were writing more prescriptions between those months.  They

13   are the months when people get colds.

14             MR. O'NEAL:  I do not know the answer to that.

15             THE COURT:  Okay.

16             MR. O'NEAL:  I think the next question we have is

17   in, you turn to the next step, which is deducting the

18   relevant first lien debt from the amount of collateral.

19             Now, as Your Honor is aware, there's a few

20   differences between our respective positions on this.  We

21   believe that unfunded or undrawn letters of credit should

22   not be deducted from the total amount of first lien debt

23   because they were not drawn; they were merely contingent

24   liabilities.  And in a going concern process, it's

25   reasonable to conclude that those letters of credit would

Page 43

1  not be drawn.  And I think the facts substantially bore that

2  out because, in the end, only 9.3 million I think letters of

3  credit have been drawn.

4            THE COURT:  Do you -- are you aware of any case

5  law that values debt in this context?

6            MR. O'NEAL:  Not in this context.

7            THE COURT:  I mean, there is -- Congress did, in

8  section 10 -- 132(a) arguably require a fair valuation of

9  debt, as well as assets as part of the defined term

10  insolvent.

11            MR. O'NEAL:  Right.  I don't know if that's

12  exactly on point, but I think there --

13            THE COURT:  Right.  I think -- I'm sorry to

14  interrupt you -- but I think it may indicate that,

15  otherwise, Congress intended people not to put a value on

16  debt.

17            MR. O'NEAL:  But I think here in this instance,

18  right, if it is unfunded debt, there is no funded liability

19  for the debtors to pay.  And I think it's very reasonable to

20  conclude that in a going concern process that those letters

21  of credit will never be drawn.  And I think it's also

22  consistent with the debtors' first day petition when Mr.

23  Riecker did not include the undrawn letters of credit in the

24  borrowed money.

25            THE COURT:  In an ongoing business, wouldn't it be

Page 44

1    equally reasonable to assume that there would not be a full

2    payment of the first lien bank debt; it would just roll

3    over?

4              MR. O'NEAL:  I'm not sure I follow your question.

5              THE COURT:  Well, you made the assumption that

6    with a going concern the letters of credit wouldn't be drawn

7    on.

8              MR. O'NEAL:  Correct.

9              THE COURT:  Isn't it reasonable to make a similar

10   assumption that the first lien debt would not be required to

11   be paid in full in cash, but would roll over?

12             MR. O'NEAL:  I guess you could make that

13   assumption.  In the end --

14             THE COURT:  I mean, isn't that kind of what

15   happened here?

16             MR. O'NEAL:  Yeah.

17             THE COURT:  There was no rollover of the first

18   lien debt?

19             MR. O'NEAL:  I was just going to say, I mean,

20   ultimately, that's what happened.  But I don't think that

21   affects the analysis that you don't have to deduct.

22             THE COURT:  I mean, wouldn't -- I mean, why are

23   you making the distinction?  The only distinction I can see

24   is the contingency, as opposed to the going concern point.

25             MR. O'NEAL:  Yeah, that's correct.  It was

Page 45

1     contingent debt.

2            THE COURT:  Because you -- I mean, in essence,

3     they rolled over the first lien debt too.  They replaced one

4     first lien facility with another first lien facility.

5            MR. O'NEAL:  Right.  But that shouldn't -- I mean,

6     certainly, that shouldn't penalize our adequate protection

7     claims.

8            THE COURT:  No, but that's not the point.  You're

9     basically saying you count one, you count the first lien

10    debt, but you don't count the LCs.

11           MR. O'NEAL:  Because they're --

12           THE COURT:  Both of them were rolled over as part

13    of the sale.

14           MR. O'NEAL:  Yes, but they're con- -- they were

15    contingent as of the petition date.  You have to look to the

16    petition date.  And on the petition date, they had not been

17    drawn and it was reasonable to conclude that they would not

18    be drawn.  They were not drawn on the petition date.

19           THE COURT:  Well, it's reasonable to conclude on

20    the petition date, given the values here, that the first

21    lien debt was fully covered and could be rolled over; same

22    thing.

23           MR. O'NEAL:  But --

24           THE COURT:  I mean, aren't you -- aren't you

25    really looking at what would, in this instance, the risk

1    that the second lien lenders are facing?

2             MR. O'NEAL:  We are, but --

3             THE COURT:  And that risk is materially one that

4    these LCs would be drawn?  I mean, they are -- they do count

5    under the DIP order.  They are subsumed in the definition of

6    prepetition obligations; they're not excluded.

7             MR. O'NEAL:  Understood.  But they were contin- --

8    they were -- just on the petition date, they were just --

9    they were contingent.  They were not drawn.  There was

10   nothing due under those facilities.

11            THE COURT:  But they're definitely ahead, right?

12   It's a risk that your clients faced.

13            MR. O'NEAL:  There was a risk that they could be

14   drawn, but they were not -- they were not drawn on the

15   petition date.  And the facts have borne out that they, you

16   know, only an immaterial portion of the letters of credit

17   have been drawn since then.

18            THE COURT:  And none of the first lien bank debt.

19            MR. O'NEAL:  I'm sorry?

20            THE COURT:  And none of the first lien bank debt

21   is outstanding either.

22            MR. O'NEAL:  That's correct.

23            THE COURT:  Because it was rolled over.

24            MR. O'NEAL:  Again --

25            THE COURT:  It's not like it was -- if it wasn't

Page 47

1    rolled over, it would have been paid out in a liquidation,

2    right?

3             MR. O'NEAL:  Well, there would have been --

4             THE COURT:  And similarly --

5             MR. O'NEAL:  -- they could have just, I mean, if

6    there was a liquidation.  But we didn't have -- on the

7    petition date, we weren't liquidating.

8             THE COURT:  I'm just going back to this point

9    about the LCs were taken care, they rolled over.  Same thing

10   happens with the bank debt.  It seems to me to prove too

11   much.  It doesn't really -- to me, it doesn't matter that

12   much.  I understand the point that the LCs, in essence,

13   collateralize debts that the company needs to collateralize

14   in order to do business, and not all of those debts will

15   necessarily come due.  I understand that aspect of the

16   contingency.

17            But no one's really made an effort to show me

18   which of those -- you know, where there's an over- -- put it

19   different -- where there's an over-collateralization.  I

20   mean, when companies go out of business, for example, they

21   look for any scraps of cash they can.  And they fight with

22   the governmental units in the various states that are

23   responsible for managing workers' compensation, and they try

24   to persuade them that you're way over collateralized, you

25   should give us back some of the money.  I understand that

1    argument.

2              MR. O'NEAL:  Mm hmm.

3              THE COURT:  But there's no evidence here as to

4    what that spread might be.  But just to say that it

5    shouldn't be counted as debt, to me, really says too much.

6    That's based on the theory that in a going concern

7    reorganization or going concern sale, it's rolled over.  But

8    that's what happens with the first lien debt that was

9    funded, same thing; it's still an obligation.

10             I don't see where Congress makes a distinction in

11   talking about this type of debt.  It knew -- it knows how to

12   make the distinction in section 132(a), which kind of makes

13   sense in the -- when you're valuing insolvent for purposes

14   of preferences analysis and fraudulent transfer analysis,

15   but it's just debt that's ahead.

16             MR. O'NEAL:  Yeah.  I mean, well, I think --

17             THE COURT:  It's also -- I'm sorry to interrupt

18   you.

19             MR. O'NEAL:  Yes.

20             THE COURT:  But it's also debt that Transform is

21   taking credit for, as far as the deal.

22             MR. O'NEAL:  Well, Transform's taking credit for a

23   lot of different forms of contingent liability.

24             THE COURT:  Right.

25             MR. O'NEAL:  That doesn't mean --

Page 49

1            THE COURT:  Paying debt, satisfying debt.

2            MR. O'NEAL:  But it doesn't mean that that's

3    funded debt.

4            THE COURT:  Well, but funded just seems to beg the

5    question: it's debt.

6            MR. O'NEAL:  But as of the, you know, under Rash,

7    you know, like, you know, obviously, 506(a) doesn't go into

8    great detail in terms of how you value the adequate

9    protection or how you value the collateral, but it does

10   instruct us to look at the petition date and at the proposed

11   use and disposition.  And at the time of the petition date,

12   the debtors were pursuing a going concern process, and in a

13   going concern process, you know, the LCs would not be drawn,

14   would not be drawn.

15           THE COURT:  So really Transform provided no value

16   when it arranged for the replacement of the first lien debt

17   or the replacement of the LC facilities?

18           MR. O'NEAL:  Well --

19           THE COURT:  That was just a -- it was a nothing?

20           MR. O'NEAL:  It's a contingent liability.

21           THE COURT:  Okay.

22           MR. O'NEAL:  I mean, it's just like --

23           THE COURT:  I think we probably --

24           MR. O'NEAL:  It's just like some of the other

25   contingent liabilities, right?  We agree that we would

1     assume up to a certain amount of 503(b)(9) expenses.

2              THE COURT:  Right.

3              MR. O'NEAL:  We would assume up to a certain

4     amount of severance expenses, all subject to a dollar-for-

5     dollar reduction in the event that assets weren't delivered.

6              THE COURT:  Right.

7              MR. O'NEAL:  Those were just contingent

8     obligations; we may never have to do this.

9              THE COURT:  But they were clearly debts, though;

10    when they're actually assumed, they're debts.

11             MR. O'NEAL:  That's -- this is -- and perhaps

12    that's the distinction between the contingent liability

13    nature of the LCs versus the claims that could exist.

14             THE COURT:  Okay.

15             MR. O'NEAL:  In terms of I think the next bucket

16    is post-petition interest.  Debtors added post-petition

17    interest of approximately $34 million.  I think that we're

18    not including that because that was not done on the petition

19    date.  There was no post-petition interest due on the

20    petition date.  And I think under Rash the key question is,

21    what's the value on the petition date.  And I think we have

22    to look at the kind of, you know, assets we had, the

23    collateral that we were dealing with here.

24             THE COURT:  Which actually, maybe the debtors were

25    too generous to you on, because they just assumed a

Page 51

1    reasonable liquidation period?

2            MR. O'NEAL:  Yeah, I would --

3            THE COURT:  And actually, if you're actually

4    looking at what happened, it's twice as long as that.

5            MR. O'NEAL:  Yeah, I would not --

6            THE COURT:  So why wouldn't the interest be longer

7    than if you're applying Rash?

8            MR. O'NEAL:  Respectfully, I would not call that

9    generous.  It was -- post-petition interest was not due on

10   the petition date.  And that debt --

11           THE COURT:  No, but --

12           MR. O'NEAL:  is not a cost of inventory.  Right?

13   That supported other things besides just inventory.

14           THE COURT:  But this isn't -- we're focusing on

15   the debt that's ahead of your clients that has to get paid.

16           MR. O'NEAL:  Right.  But on the petition date,

17   post-petition was not due.

18           THE COURT:  But let's just stick with Rash, all

19   right?  When did the Court determine the value of the car?

20   At the end in the hands of the debtor at the end of the

21   process.

22           MR. O'NEAL:  But also it valued it at the

23   beginning and at the end.

24           THE COURT:  In the hands of the debtor.

25           MR. O'NEAL:  Correct.

Page 52

```
 1              THE COURT:  And it's almost inconceivable to me to

 2     believe that one would just shut one's eyes to the debt,

 3     which would be owing under 507(b) to the senior creditors

 4     when measuring the -- what's left over to pay the junior

 5     creditors.  And the debtors have chosen a hypothetical date,

 6     which is when a liquidation would be done; that's where the

 7     34 million comes in.  But in actuality, if you're really

 8     going to look at what actually happened, it would be -- I

 9     don't know -- a month and a half, two months after that.

10              MR. O'NEAL:  Yeah.  I think one thing to keep in

11     mind is that the inventory was being sold every day.  There

12     was a book value every day.  There were proceeds being com-

13     -- were derived every day.  We're not dealing with a car

14     that was sold at the end of the case.  We're dealing with,

15     you know, going -- we're dealing with going concern and GOB

16     sales.

17              THE COURT:  Right.

18              MR. O'NEAL:  Those were happening every day and we

19     know the value of those.

20              THE COURT:  So I guess -- but isn't the 34 million

21     calculated based on what was actually paid down?  I don't

22     know.  That's a question I have.  I don't know if it is.

23              MR. O'NEAL:  Yeah.  I think the testimony was that

24     it was for an 11-week period.

25              THE COURT:  But you're saying that the --
```

1              MR. O'NEAL:  You looked at the value --

2              THE COURT:  -- the base number on what interest

3      would be calculated on was reduced during that period

4      because of the application of sale proceeds.

5              MR. O'NEAL:  That's correct.  But I'm also saying

6      that the collat- -- you know, unlike the deal in Rash, the

7      inventory was sold on a daily basis.  We have a value on

8      each day.

9              THE COURT:  Right.

10             MR. O'NEAL:  And on the petition date, we had a

11     book value.

12             THE COURT:  I don't -- so?  I don't understand the

13     significance of that.  It wasn't all sold on the petition

14     date.

15             MR. O'NEAL:  That's correct, but it was --

16             THE COURT:  In fact, most of it was sold, in terms

17     of a lump sum, well after the petition date.

18             MR. O'NEAL:  Well, I think, you know, at least

19     what is it, a billion, was bought and sold during the

20     bankruptcy?

21             THE COURT:  Yeah.  But not on the petition date

22     clearly, because then those sales would have been

23     unauthorized.

24             MR. O'NEAL:  I think my point is only that we have

25     a market price on the petition date.

1          THE COURT:  But it has to take into account

2    reality, which is that this -- again, Rash doesn't involve a

3    senior creditor; it just involves a car lender and a debtor.

4    You have to look at who's senior to you to see how you were

5    really diminished.

6          MR. O'NEAL:  Right.

7          THE COURT:  The senior creditors are entitled to

8    post-petition interest.

9          MR. O'NEAL:  And I --

10         THE COURT:  So to ignore that is just ignoring

11   something that shouldn't be ignored.

12         MR. O'NEAL:  Again, I think you look to the

13   petition date and that was not due on the petition date, but

14   I --

15         THE COURT:  Well, okay.  But under Rash, that's

16   not when the sale happened either.

17         MR. O'NEAL:  So I think at the hearing, Your Honor

18   had some questions about the carveout account.  I don't know

19   if that's still a live issue.

20         THE COURT:  No.  I just wanted to make sure we

21   were all on the same page on that point.

22         MR. O'NEAL:  Okay.  And it wasn't entirely clear

23   the debtors' position on that particular point.  But it's --

24   we believe that the carveout account doesn't actually reduce

25   our claim or our lien.

1            THE COURT:  Right.  It just -- it reduces the

2    money available to pay it.

3            MR. O'NEAL:  Correct, Your Honor.  I just wanted

4    to make sure we're on the same page there.  And I think, you

5    know, I think another point, and we make this on slide 26.

6    And I think -- I'm not sure if Your Honor -- I gathered from

7    prior discussions that Your Honor is not going to be dealing

8    with Wilmington cash collateral motion at this stage.  That

9    will be -- we will deal with that after Your Honor makes it.

10            THE COURT:  Well, you have to see the results of

11    this determination.

12            MR. O'NEAL:  That's --

13            THE COURT:  But as I recall it, there's an

14    agreement in place that, depending on the outcome of this

15    determination, puts the winddown account at risk for

16    amounts.

17            MR. O'NEAL:  That's correct, Your Honor.

18            THE COURT:  That went in it after the beginning of

19    April, April 4th, I guess.

20            MR. O'NEAL:  Okay.  And slide 16 lays out our

21    views on what our replacement liens should be valued at.

22    And we can deal with that once we deal with the winddown

23    account, if that's your preference.

24            THE COURT:  Okay.

25            MR. O'NEAL:  506(c) surcharge.

```
 1              THE COURT:  Well, before we get to that -- and

 2     this is another issue that may or may not be relevant

 3     depending on the outcome of the 507(b) calculation -- is the

 4     dispute over the 50 million cap --

 5              MR. O'NEAL:  Yes.

 6              THE COURT:  -- on the 507(b).

 7              MR. O'NEAL:  I'm happy to talk about that.

 8              THE COURT:  Right.  We should probably talk about

 9     that.

10              MR. O'NEAL:  We can do -- we can cover that right

11     now.  We actually have a slide on this too; it's slide 37.

12     And there, we put in the language from the APA.

13              THE COURT:  I'm sorry, slide what?

14              MR. O'NEAL:  It's slide 37, Your Honor.

15              THE COURT:  Okay.

16              MR. O'NEAL:  I think the debtors' position is that

17     the -- that ESL has access only to 50 million from the

18     proceeds of certain litigation.  And we think that's not how

19     the APA reads; it's not the deal that was bargained for.

20     What we've done on slide 16 is we've replicated the

21     language, and I think I'll just walk you through it and you

22     can ask me questions as you so choose.

23              We start with the language that ESL is entitled to

24     assert claims arising under 507(b) of the Bankruptcy Code

25     that it may have, so we have a broad statement that we get
```

Page 57

1   to assert all of our claims.  And then there are two

2   exceptions or limitations on that right.  One limitation is

3   that ESL is not going to get the benefit of any proceeds

4   from specified litigation; that's, you know, Seritage and

5   Lands' End and other, those kinds of causes of action.  The

6   second one is that, you know, any claims arising under

7   507(b) of the Bankruptcy Code shall be entitled to

8   distributions of no more than 50 million from the proceeds

9   of claims or causes of action with the debtors' estates,

10  other than the claims or causes of action described in

11  preceding clause C-1.

12          What that does is it says that our ability to

13  obtain recoveries from the proceeds of litigation, that's

14  other litigation, are limited to 50 million.  That -- but

15  nothing in that language suggests that the proceeds -- or

16  that ESL's only recourse is to the proceeds of litigation.

17  What it's saying is that, to the extent there are proceeds

18  from litigation, there's going to be a 50 million cap on

19  recovery from those proceeds.  And then there's nothing in

20  this agreement --

21          THE COURT:  So you read the defined term claims as

22  litigation claims?

23          MR. O'NEAL:  Yes.

24          THE COURT:  The definition of claims in the APA is

25  much broader than that.

Page 58

1           MR. O'NEAL:  Yes, Your Honor.  And I think this --

2     if you read this language, it's talking about from the

3     proceeds of any claims or causes of action where the

4     estates' other than claims or causes of action relating to

5     the preceding sentence.  And I don't -- it's not referring

6     to -- it's referring to the proceeds from litigation.

7           THE COURT:  It's referring to claims defined term,

8     which means, shall mean all rights to payment, whether or

9     not such right is reduced to judgment, liquidated or

10    unliquidated, fixed, mature or unmatured, disputed or

11    undisputed, et cetera.  So that would include accounts

12    receivable, right?  I mean, you've made that very point with

13    regard to the right to proceeds of inventory.  It's a claim

14    under the UCC.

15          MR. O'NEAL:  I think this language is not -- it

16    was not -- it's not broad enough to cover all kinds of

17    rights that the debtors may have and things that are, you

18    know, unrelated to litigation.

19          THE COURT:  It uses the term claims, all claims,

20    other than the claims and causes of -- it says, the proceeds

21    of any claims or causes of action, any claims.  Claims is

22    very broadly defined.

23          MR. O'NEAL:  Right.  But to the extent that the

24    debtors have assets, those are not actual claims; to the

25    extent that the debtor has in-hand assets, those -- there's

Page 59

```
 1    no limitation.

 2              THE COURT:  Proceeds of any claims.  The proceeds

 3    of any claims.  Accounts receivable; when they come in,

 4    they're proceeds.  You made that point in your brief about

 5    the pharmacy assets.  It's the same thing.

 6              MR. O'NEAL:  Well, I don't think that was --

 7    certainly not the -- I don't think that's the way the

 8    language reads.  And in any event, there's nothing in this

 9    provision that limits our replacement liens.

10              THE COURT:  No, you're entitled to only 50 million

11    though of the proceeds.

12              MR. O'NEAL:  But not with respect to our

13    replacement liens, Your Honor, because this refers only to--

14              THE COURT:  But we're talking about a 507(b).

15              MR. O'NEAL:  That's correct.

16              THE COURT:  Yes.

17              MR. O'NEAL:  So to the extent we have replacement

18    liens on the assets, then we -- our replacement liens are

19    not covered by the cap.

20              THE COURT:  Okay.  We'll ask the debtor about

21    that.  Okay.  What assets would those be?

22              MR. O'NEAL:  What's that?

23              THE COURT:  I thought we were just talking about

24    507 at this point.

25              MR. O'NEAL:  As part of the --
```

1          THE COURT:  That's the whole point of why you are

2    all focused on 507.

3          MR. O'NEAL:  Well, our pleadings in this whole

4    case is also about our replacement liens.

5          THE COURT:  On what?

6          MR. O'NEAL:  On the assets that the debtors

7    currently have.

8          THE COURT:  But what are those?

9          MR. O'NEAL:  We've laid them out: there's assets

10   in the winddown account; there's assets in the operating

11   account; there's assets that are to be -- to come later.

12         THE COURT:  Well, the winddown account wouldn't be

13   covered, except under the stipulation --

14         MR. O'NEAL:  Correct.

15         THE COURT:  -- with respect to 507(b), so I don't

16   -- anyway.  I'm just focusing on the 507(b) limitations.

17         MR. O'NEAL:  Right.  But we do have -- but the

18   507(b) cap by its terms doesn't apply to our replacement

19   liens.

20         THE COURT:  I agree with that.  I'm just not sure

21   what replacement lien collateral there is.

22         MR. O'NEAL:  As part of the DIP order.

23         THE COURT:  No, no, I understand the DIP order

24   gives you replacement lien.  I just thought the parties

25   whole focus now on 507(b) is because there isn't any other

1    collateral.

2              MR. O'NEAL:  We have -- I mean, our papers are

3    very much about exercising our rights for the -- on account

4    of our replacement liens as well.

5              THE COURT:  Okay.

6              MR. O'NEAL:  I don't know how much time Your Honor

7    wants to spend on the 506(c) surcharge.  You know, I think--

8              THE COURT:  Well, I'll tell you what.  The debtors

9    have the burden of proof on this.

10             MR. O'NEAL:  Yes.

11             THE COURT:  So I think you should feel free to,

12   particularly given your open remarks, to stand up after

13   they've given their --

14             MR. O'NEAL:  Okay.  I'll do that, Your Honor.

15             THE COURT:  -- say on it.

16             MR. O'NEAL:  We have a lot to say on it.

17             THE COURT:  Okay.

18             MR. O'NEAL:  Thank you, Your Honor.  I will now

19   yield to Mr. Kreller.

20             THE COURT:  Okay.

21             MR. KRELLER:  Good morning, Your Honor.  Thomas

22   Kreller of Milbank, Tweed, Hadley & McCloy, on behalf of

23   Cyrus Capital Partners.

24             THE COURT:  Right.

25             MR. KRELLER:  With me on the phone, Your Honor, my

Page 62

1    partners, Eric Reimer and Rob Liubicic.  Your Honor, I'll

2    try to avoid redundancy with Mr. O'Neal's presentation to

3    the extent I can.

4            I'm actually going to start with something that we

5    noted in our reply brief, but I thought it was worth

6    reiterating here.  Because I suspect one of the things you

7    may hear from the debtors, or at least will be suggested, is

8    that this issue needs to be resolved and it needs to be

9    resolved for zero claims in favor of the second lien lenders

10   because, otherwise, the debtors have a real problem

11   confirming their plan.

12           Your Honor, frankly, that should not be a

13   consideration in this hearing.  We have indicated --

14           THE COURT:  I agree with that.  And I could tell

15   you further that my analysis of these issues, the

16   507(b)/506(c) issues, in large part because of the way they

17   break out their component parts, is not one where I actually

18   know the end number.  I'm viewing them in the components.

19   And I may well in my ruling just give you my rulings on the

20   components and have the parties do the math because that's

21   how I've proposed it.

22           MR. KRELLER:  Understood, Your Honor.  And,

23   frankly, I don't know that there's another way to think

24   about it because of all of the moving parts --

25           THE COURT:  Right.

Page 63

1              MR. KRELLER:   -- and the interplay.

2              THE COURT:  Okay.

3              MR. KRELLER:  Your Honor, the other point -- I

4     guess, following on that, Your Honor.  We noted in our

5     reply, we're realists on this.  We're well aware of the

6     circumstances that the debtors find themselves in.

7              To the extent there are material 507(b) claims

8     found here, we've indicated to the debtors all along the way

9     and we've indicated to the Court, we understand that a large

10    507(b) claim that simply craters the plan could potentially

11    be some sort of a Pyrrhic victory.  And that the notion that

12    in that world, we might be better off looking to future

13    recoveries under the waterfall plan for our source of

14    recovery is something that's not lost on us.

15             And we've had discussions with the debtors on

16    this, we've had discussions with other second lien holders,

17    and we think folks are like-minded.  So any attempt to kind

18    of leverage this as a function of a need to confirm a plan

19    doesn't really exist, Your Honor.

20             THE COURT:  Okay.

21             MR. KRELLER:  The other thing that I would note,

22    Your Honor, just at the outset just in terms of the overall

23    context.  There's a lot of noise in the debtors' papers and,

24    to some degree, in the UCC's papers about somehow the notion

25    that the second lien lenders are now taking the position

Page 64

1     that they would have fared better on their second lien

2     collateral in a company-wide going out of business sale, as

3     opposed to the going concern sale that happened, is somehow

4     a contradiction or a flip-flop on the part of the second

5     lien lenders.

6          Your Honor, I think that's a fallacy and it's

7     noise that ought to be disregarded.  The truth of the matter

8     is there can be two things that appear to be inconsistent

9     here; and yet, they're both true.  One is that the company

10    decided to pursue a going concern sale.  It did so

11    successfully.  It stood here in February and made a very

12    strong showing to you as to why that was in the best

13    interest of the estate.

14         But that doesn't mean that that going concern sale

15    was actually the best outcome that the second lien lenders,

16    as second lien lenders, could have realized on their

17    collateral had this case gone a different direction at the

18    outset.  So I don't think -- I think those two different

19    scenarios can co-exist and both be true.

20         THE COURT:  I think that's a fair statement.  But

21    it does raise an interesting issue, which I think your

22    expert properly deals with, which is -- if I'm hearing the

23    statement correctly, the going concern sale actually has a

24    lower value for the collateral than a net orderly

25    liquidation.

Page 65

1              And consistent with Rash and Sunnyslide -- or

2      Sunnyslope, that argues perhaps with a lower value being the

3      value that's the starting point.  Now, she gets around that,

4      and perhaps properly so, by not just looking at book value

5      and saying that's what it is, but actually doing a net

6      orderly liquidation analysis.

7              MR. KRELLER:  Well, Your Honor, I think what that

8      really highlights is I think that it's important from the

9      507(b) context and the cases and actually some commentary

10     from you earlier in these cases, that the petition date --

11     the petition date calculation really should serve as an

12     anchor, and it doesn't in a lot of the analysis and the

13     discussions that we see, particularly from Mr. Griffith.

14             But if you're going to determine, which I think

15     you have to, right, if you're looking to calculate the

16     decrease in value of the second lien collateral that was

17     available to the second lien collaterals at the outset of

18     the case to the present, I think you have to do a true

19     calculation as of the petition date.

20             THE COURT:  Well, that's fair.  But if that the

21     premise is that these assets are actually worth less, as a

22     result of a going concern sale, which was the equivalent to

23     Mr. Rash having his truck, then it's been argued to me at

24     least that I should use that valuation at the start also, as

25     opposed to a net orderly liquidation value.  And, at least

Page 66

1    in the Ninth Circuit, that's the law, even if that outcome

2    is not the optimal outcome, Sunnyslope Housing.

3             And it's not necessarily -- I don't think Rash

4    requires that.  There's a very interesting opinion by Judge

5    Carey that came out in March that talks about doing a

6    valuation in a context where you have a going concern sale,

7    as opposed to a going concern reorganization, and giving the

8    Court some flexibility in deciding what's the appropriate

9    value, In Re. Arrow Group International, 2019 B.R. Lexus 904

10   (Bank. Delaware, March 26, 2019).

11            So in any event, but it strikes me that it's odd

12   to say you're bound by Rash; therefore, you're bound by the

13   actual course of the case, which is the sale process and

14   sale.  But nevertheless, that outcome isn't a reasonable one

15   in connection with the initial valuation or one required by

16   Rash as part of the initial valuation.

17            Now, I appreciate you -- your client didn't do

18   this.  Your client didn't do that; its expert did a net

19   orderly liquidation value analysis, and some aspect of that

20   may be appropriate here.  But just to say we're doing a

21   going concern sale, we got hammered in it.  Nothing about

22   the sale is complained about, right?  It's not like the

23   debtors did it badly.  And yet, say, well, on a going

24   concern basis, our starting valuation was three times the

25   actual value that resulted from the going concern sale.

Page 67

1    Those two things just don't seem to fit.

2            Now, as far as adequate protection is concerned, I

3    can certainly see a right to adequate protection based on

4    the actual value on the petition date and that value

5    declined.  But there, the actual value might well be, you

6    know, the actual value in a net orderly liquidation because,

7    you know, that's the only way it really declined.

8            MR. KRELLER:  Well, Your Honor, I'm not -- again,

9    I think that if you stay true to the context of adequate

10   protection, what happened during the case is exactly what we

11   got adequate protection for.

12           THE COURT:  Well, except if -- I think that's

13   right.  I think that's how you should look at adequate

14   protection.  But if people say that Rash means you have to

15   follow the actual result of the debtors' use, it's hard to

16   say that the actual result of the debtors' use here really

17   changed the value based on the actual result of the debtors'

18   use on the petition date, because it's not like the debtors

19   gave anyone any false information.

20           No one went into this believing that they were

21   going to realize on, you know, a hundred percent of the

22   inventory.  No one could conceivably have thought of that on

23   the petition date.  So if you apply Rash that way, it just

24   doesn't work, in other words.  You've got to have something

25   more realistic as far as the reasonable expectations of the

1   lenders, which would be the comparison to the outcome here.

2           MR. KRELLER:  Understood, Your Honor.  What, I

3   guess, I think it's actually less tricky in this situation

4   because, although we keep using terminology like going

5   concern sale, what we're talking about here is inventory and

6   receivables.

7           THE COURT:  Exactly.  I agree with that.

8           MR. KRELLER:  It's a --

9           THE COURT:  People look, they don't look at the

10   going concern value of the whole thing.  You look at

11   inventory and receivables in a specific context, which

12   asset-based lenders have been dealing with for decades.

13           MR. KRELLER:  So, Your Honor, with that -- so I

14   think there's --

15           THE COURT:  Which I think is -- I'm sorry to

16   interrupt you.

17           MR. KRELLER:  That's fine.

18           THE COURT:  Which I think is what your expert

19   does.

20           MR. KRELLER:  I think she does too, Your Honor.

21   And I think it also goes back to your earlier remarks, which

22   is it's why I think that this -- you have to view this as

23   the components --

24           THE COURT:  Right.

25           MR. KRELLER:  -- breakout, because it's a much

Page 69

1    more discreet exercise than it appears to be because there's

2    so much else going on in this case.  And as we wrote in our

3    brief, this isn't about what happened around the inventory

4    and receivables.

5              THE COURT:  Okay.

6              MR. KRELLER:  And in fact, I think that we've

7    demonstrated, and I think Ms. Murray has demonstrated, and I

8    think the other second lien experts have some things that

9    are additive to that that demonstrate a pretty significant

10   diminution in value from when you start in the truest sense

11   of what did -- what collateral coverage did the second lien

12   lenders have as of the petition date.  Because that's what

13   we bargained for adequate protection of.  And to the extent

14   that decreased, that's what the 507(b) claim is.

15             THE COURT:  Okay. But to me that is somewhat

16   inconsistent with Rash.  That's all I'm saying.  Not

17   inconsistent with Rash, it's inconsistent with people's

18   interpretation of Rash, like the Ninth Circuit

19   interpretation.

20             MR. KRELLER:  Understood, Your Honor.  I take your

21   point.

22             THE COURT:  Okay.

23             MR. KRELLER:  And I take your point, but I also

24   think that RASH is a little bit off to the side where you

25   have --

1           THE COURT:  I agree with that.  I interrupted you.

2     Why don't you go ahead with your argument.

3           MR. KRELLER:  I will, Your Honor.  So look, it

4     gets even easier because we don't really have an end date.

5     Typically when you're measuring the decrease in value, you

6     would have it start at the petition date, and you would look

7     at what happened over the collateral over time until some

8     other date, typically a plan effective date when the

9     adequate protection stopped.  Here we don't -- we're

10    assuming that all of the collateral has been consumed either

11    through the sale or otherwise by the Debtors.

12          THE COURT:  Right.  Right.

13          MR. KRELLER:  And so the end date is just zero

14    unless and until the Debtors show up with some additional

15    collateral.  That would -- and that collateral our lien is

16    attached to, that would reduce the 507(b) claim.  But for

17    purposes of today, right now that's a zero.  So where you

18    really go is what's the petition date valuation that tells

19    you what's available to the second lien lenders.

20          Your Honor, the exercise really begins, and

21    frankly it almost ends at the petition date and what the

22    circumstances were at the petition date.  What's the

23    collateral, what was it worth at the time, and what in the

24    way of senior obligations at that time, at that snapshot,

25    what were the senior obligations that actually sat in the

Page 71

1    way of the second lien lenders getting to their collateral.

2    And as long as you hang in there with the petition date

3    being an anchor, and I think it has to be, that exercise

4    actually becomes pretty straightforward.

5            The second lien lender experts all take somewhat

6    different approaches to getting to a petition date

7    valuation, but they all at least follow a general road map

8    of you figure out what the collateral is, you value the

9    collateral, you figure out what the senior debt obligations

10   as of the petition date were sitting in front of the second

11   liens, you subtract that, and you arrive at the second lien

12   lenders' interest in the second lien collateral.

13           The Debtors pay lip service to that roadmap.  They

14   repeat a lot that what they did was come up with a fair

15   market value of the collateral at the petition date.  But

16   when you look at what they've done and you listen to Mr.

17   Griffith, you realize they very quickly veer off this path

18   and they start running in several different directions, most

19   notably running as far and as fast away from the petition

20   date as they can.  They don't say they're doing that, they

21   don't try to justify it, they don't point to any law to back

22   it up, they just do it.  And the reason they do it becomes

23   clear.  They've adopted their 85 percent argument, and

24   they're clinging to it.

25           And, Your Honor, they then, hand-in-hand with

Page 72

1   that, stick to the flawed theory that because they chose to

2   pursue a going concern sale, all of the costs associated,

3   virtually all of the costs associated with that process

4   should be surcharged against the second lien collateral

5   notwithstanding the fact that the second lien collateral was

6   just a subset, and frankly a somewhat small subset, of the

7   value of the overall transaction.

8          So the idea that the 85 percent number -- and I'll

9   talk about this in a minute.  But the idea that the 85

10  percent number, because they can impute it in a tortured way

11  from the APA, is somehow a relevant metric, and the notion

12  that the only way to sell the 2L collateral was through the

13  going concern process.  Neither of those hold water.  And

14  it's what their position on this is basically founded in,

15  and it's flawed, and it fails.

16         A couple of other examples of the Debtors ignoring

17  the petition date.  Mr. O'Neal talked about post-petition

18  interest.  Again, Your Honor, I think that the beginning

19  part of this exercise is what exists as of the petition

20  date.

21         THE COURT:  But you're talking about value.  So

22  when you value the inventory and receivables, you do a

23  projection from the petition date, and then that's the

24  value.  You project forward -- Tiger projects forward a

25  little under three months.  Your expert largely does that,

Page 73

1   too.  But you can't get to value without projecting forward.

2   And similarly you can't, I think, get to the debt without

3   looking forward.  I don't see how you could otherwise decide

4   what the debt is. I mean, it's -- if you're going to be

5   using a measure to determine the value of the assets that

6   looks forward 12 weeks, then I don't see how you can't also

7   -- why you can't -- why you must not also look forward on

8   the debt 12 weeks to the extent that it's payable.  And that

9   includes the accruing interest.

10          MR. KRELLER:  I have two responses to that, Your

11  Honor.  One, the inventory exists as of the petition date.

12          THE COURT:  But you value --

13          MR. KRELLER:  The inventory is there.

14          THE COURT:  But you value it looking forward.

15          MR. KRELLER:  But it has -- that value is inherent

16  in that inventory.  It's there.  It exists.  The interest

17  doesn't.

18          THE COURT:  But it's --

19          MR. KRELLER:  If -- I --

20          THE COURT:  The only way to realize is over time.

21  And to me that's just --

22          MR. KRELLER:  I take your point, Your Honor, but

23  that's not a valuation issue; then that becomes a surcharge

24  issue.  That's a cost of selling the inventory.

25          THE COURT:  But the cost is -- all right.  To me

Page 74

1    that's half a dozen of one, six of the other.  I mean, it's

2    the same thing either way.  And frankly there are costs in

3    the calculations.  I mean, that's one of your best arguments

4    on 506(c) is there are already costs in the inventory

5    valuation.

6              MR. KRELLER:  Right.  That's right, Your Honor.

7    And I -- but I think that the difference is -- and you may

8    be right.  If you agree that the $34 million is the right --

9    is a number that is a surchargeable amount, then yes, it

10   comes out on one side of the ledger or the other.  But the

11   one piece that is relevant there is that the burden is very

12   different.  The burden for them, including in a 507(b)

13   calculation where we have the burden versus their having to

14   satisfy their surcharge burden is different.  This is a

15   component --

16             THE COURT:  Well --

17             MR. KRELLER:  This is a component, Your Honor --

18             THE COURT:  I mean, you've got to -- I'm assuming

19   the four-wall aspect of the GOB sale includes paying the

20   rent.  You know, in any event, it doesn't seem like this is

21   a particularly heavy burden for the Debtors to carry.  But

22   to me it's really more calculating the senior debt than the

23   506(c).

24             MR. KRELLER:  All right, Your Honor.  The second

25   point on ignoring the petition date goes back to the LCs.

1    And here's what we know about the LCs.  We know that nothing

2    was drawn as of the petition date and we know that over the

3    life of the case only $9 million were drawn.  We know that

4    as the company went through what was essentially a

5    controlled liquidation in the years leading up to the

6    bankruptcy, they conducted something like 980 going out of

7    business sales.  The LCs weren't drawn.  This wasn't a run

8    on the bank, this wasn't going to be a run on the bank.  Mr.

9    Griffith's speculation about what would happen in a fire

10   sale liquidation is a red herring.  That was never a threat

11   to the company.  That was never an option.  This was always

12   going to go one of two ways; it was going to be a going

13   concern sale or it was going to company-wide GOB sales

14   carefully managed by professionals who do this.

15            THE COURT:  Was the first lien debt accelerated

16   pre-bankruptcy?

17            MR. KRELLER:  It -- I don't -- well, the revolver,

18   the ABL facility was being paid down on a daily basis.

19            THE COURT:  So it wasn't accelerated.  It wasn't

20   cancelled.

21            MR. KRELLER:  It wasn't accelerated, no.

22            THE COURT:  Right.  So it was just the bankruptcy

23   that for purposes of filing a proof of claim accelerated it

24   all.

25            MR. KRELLER:  I believe that's correct, Your

Page 76

1    Honor.  But you wouldn't -- for example, if there were

2    unfunded, undrawn amounts under a revolver, that's not

3    senior debt, that's not funded debt.  That's not money that

4    the company owes anyone.  And the LCs are the same thing.

5    The LCs are just a guarantee, and they're largely a

6    guarantee of performance on ordinary course obligations.

7    It's why Mr. Reicker doesn't include it in his first day

8    declaration and it's why the Debtors didn't include those

9    amounts in their publicly-filed financial statements except

10   as a footnoted item that says this is a -- these LCs exist

11   as contingent obligations.  It's how contingent obligations

12   are accounted for, because they're contingent.  And as of

13   the petition date they sat contingent.  And nothing happened

14   during the course of the case, notwithstanding the very

15   public nature of the potential pivot to a liquidation.

16   Nothing changed the fact that those LCs sat there and

17   remained almost entirely undrawn.

18           So for the petition date snapshot as to what

19   collateral the 2Ls would have had access to on the petition

20   date if the music stopped -- and I don't mean that in terms

21   of there being a one-day liquidation, I just mean as a true,

22   intellectually honest calculation at the petition date, if

23   the music stopped, there were no obligations under those LCs

24   that would have sat ahead of the second liens' ability to

25   take its portion of the collateral after the senior debt was

Page 77

1   paid in full, the amount that was owed under the senior debt

2   that was paid in full.

3          THE COURT:  But if the music stopped, they would

4   either be drawn on or remain outstanding.  They'd still be

5   ahead of the 2Ls.  I mean, they'd be drawn on before they

6   expired, put it that way.

7          MR. KRELLER:  Ahead in the amount of zero though,

8   Your Honor.

9          THE COURT:  No, but if the music stopped, they

10   might not be drawn on until close to their expiry date, but

11   they would certainly be drawn on then.  There's nothing else

12   to back them up.

13          MR. KRELLER:  I don't know that that's -- there is

14   -- they were cash collateralized by ESL and Cyrus cash  to -

15   - about 271 million of them were.

16          THE COURT:  But --

17          MR. KRELLER:  So the scenario of just all of the

18   sudden people hitting those LCs -- and they could --

19          THE COURT:  But if you're a worker's comp board

20   and you know that that LC is going to expire on, you know,

21   whatever, August 20th or August -- you know, whenever the

22   expiry date is, and you know there's no more Sears, you're

23   going to draw on it.

24          MR. KRELLER:  You're going to draw on it if it's

25   not extended.  And guess who, Your Honor, stood behind those

1    LCs?

2              THE COURT:  Right.

3              MR. KRELLER:  It was ESL and Cyrus who would have

4    extended in all likelihood in that scenario.  And this kind

5    of illustrates the problem that we have when we start

6    drifting away from the petition date and thinking about what

7    -- all the different scenarios that could happen.  We know

8    what we know.  They weren't drawn as of the petition date,

9    and only 9 million got drawn during the case.  So to treat

10   them as obligations that stood between the second lien

11   lenders and their inventory and receivables collateral

12   ignores what we do know.

13             And Mr. Griffith can come up with a hypothetical

14   that they would all get drawn in a fire sale situation.  And

15   he can't point to a case or minutes of experience that he

16   has in that realm.

17             THE COURT:  Well, it clearly happens.  I mean, I

18   can take judicial notice from that.  It happened in the A&P

19   case.  I'm handling that litigation right now, where they're

20   trying to get back some money.

21             MR. KRELLER:  Well, Your Honor, and if they're

22   drawn and they're cash collateralized, that is what happens.

23   There's then a fight.  And if the draws turn out to be

24   unnecessary or inappropriate, the money comes back to the

25   estate or that party who put up the cash collateral.  So

Page 79

1   it's not as if it goes away.  That's kind of --

2            THE COURT:  But no one has valued whether the --

3   no one has put a value on whether the LCs are in excess of

4   the liabilities that they -- for the beneficiary.

5            MR. KRELLER:  That's true, Your Honor.  I think

6   Ms. Murray actually comes closest to doing that when she --

7   and I do think that the $9 million of draws over the course

8   of the five month case, six month case, whatever it was by

9   the time the sale closed --

10           THE COURT:  But almost 90 percent are for worker's

11  comp.  Those people just draw off the whole thing and then

12  work it out over, you know, many, many years.

13           MR. KRELLER:  Right, right.  But they didn't.

14  They haven't.

15           THE COURT:  They don't need to.  But if the -- to

16  me that still doesn't mean that it's not an obligation,

17  because they have the right to do it.  And in a net orderly

18  liquidation, you'd think they would.  I mean, that's what

19  they would do.

20           MR. KRELLER:  I don't think they typically do,

21  Your Honor.  I think what -- only if they're expiring.

22           THE COURT:  Well, yeah, but these aren't -- what

23  are the -- these are not 20-year LCs, right?  They're -- you

24  roll them over every year, don't you?

25           MR. KRELLER:  I don't know specifically what the

Page 80

1    terms of these were.

2              THE COURT:  Well --

3              MR. KRELLER:  But they don't simply get drawn

4    because someone -- we know this, Your Honor.  We know this

5    from -- this company has been liquidating for five years and

6    the LCs weren't being drawn.

7              THE COURT:  That's a different scenario.  I'm

8    talking about a scenario where you have a net orderly

9    liquidation of the collateral, which means you're selling

10   all of Sears in a liquidation.  To me -- I mean, do we have

11   the LCs?  Are they in the record?  Are any of them in the

12   record?  It would seem to me that it's likely that they're

13   not 20-year LCs, that they wouldn't just be sitting out

14   there, that they're probably one-year LCs with the rollover

15   feature.  And it's also likely that they'd get drawn on if

16   there's a sale of the whole business.  You know, in

17   liquidation.

18             MR. KRELLER:  But, Your Honor, at the petition

19   date -- first of all, I'm not disputing at all that there

20   are obligations of the company that could turn into senior

21   debt ahead of the second liens.

22             THE COURT:  Okay.

23             There are obligations, no question about it.

24   They're contingent.  They're contingent, and those

25   contingencies were not triggered.  They weren't triggered at

1    the beginning of the case.  They were barely triggered

2    during the case, and those LCs are now gone because they got

3    replaced in the Transform sale.

4              THE COURT:  Well --

5              MR. KRELLER:  And frankly the notion that somehow

6    that amount, the rollover of the LCs gets built into the

7    aggregate purchase price, that's an argument that has no

8    place with respect to second lien lenders other than ESL.

9    And I don't even think it applies to ESL.  The company's

10   calculation of the aggregate purchase price may include

11   that.  I don't know that means that ESL is taking credit for

12   it.  I think the company stood here and sold that to you

13   when they got approval of their sale.

14             THE COURT:  Well, it takes care of an obligation.

15   I mean, look, there's a continuum here.  You can value the

16   LCs at face if valuation is something that you're allowed to

17   do.  But if you're doing a valuation, I don't know why you

18   wouldn't value the bank debt, too.  I mean -- and again,

19   Congress seems to put a valuation of debt only in one place

20   in the bankruptcy code.

21             MR. KRELLER:  Your honor --

22             THE COURT:  If you don't value them, it's either

23   face or no value at all, nothing at all.  Which is odd since

24   it's treated as a pre-petition obligation under the DIP

25   agreement.

1          MR. KRELLER:  But it's also ignored by Mr. Reicker

2     when he talks about how much adequate protection is there

3     for people.

4          THE COURT:  Well, but that's valuation as opposed

5     to just what's -- whether it's debt or not.

6          MR. KRELLER:  Well, Your Honor, I think what you

7     do have from Ms. Murray's testimony, that they are ordinary

8     course LCs that sit there.  They weren't withdrawn, they

9     didn't really get drawn, and they're not a material

10    obligation of the company.  I think that's the testimony you

11    have.  I don't think you have anything to rebut that from

12    the company side except Mr. Griffith's testimony which is

13    without any foundation.

14         THE COURT:  Well, but it's not -- that's not

15    really valuation testimony.  That just says what happened

16    here.  And the bank debt -- I mean the first lien debt

17    didn't really get drawn, either.  It rolled over.

18         MR. KRELLER:  Well, Your Honor, I think the first

19    lien debt is different, right?  It essentially got -- we

20    talked about it getting rolled over.  It essentially was

21    refinanced.

22         THE COURT:  Right.

23         MR. KRELLER:  It essentially got paid off --

24         THE COURT:  Right.

25         MR. KRELLER:  -- with new financing.

1              THE COURT:  Right.

2              MR. KRELLER:  So it was in fact satisfied in

3      whatever amount was outstanding at that time.

4              THE COURT:  So I think --

5              MR. KRELLER:  It didn't get overpaid as a fixed

6      amount.

7              THE COURT:  -- the legal issue is whether a

8      contingent debt should be countered or not.  That's really

9      the issue.

10             MR. KRELLER:  I think that's right, Your Honor.  I

11     think that --

12             THE COURT:  Because knowing that -- I'm sorry to

13     interrupt you.  No one's put a value on it one way or the

14     other.  There's no value on this debt.  It's either all or

15     nothing as far as the testimony is concerned.

16             MR. KRELLER:  You know, I think that yes and yes.

17     But I also would say that there is evidence around -- I do

18     think that there is weight to the fact that as of the

19     petition date, it wasn't debt; it was a contingent

20     obligation in the amount of zero.  And over the life of the

21     case it only came up to about $9 million and then it all

22     went away in the sale.

23             THE COURT:  All right.  Again, that goes to the

24     Rash point where it's hard to -- if you're going to go with

25     Rash in one respect, you should go with Rash in all

Page 84

1    respects.  And you're not arguing that to me, and I don't

2    think that makes sense in the first place.  And when I say

3    Rash, I mean the idea that the programmed outcome of the

4    case as projected on the petition date should govern

5    valuation.  And unless -- you know, for diminution purposes,

6    that program somehow went awry.  And I don't think it went

7    awry here.  No one's contended that the Debtor screwed up in

8    the sale process.

9              MR. KRELLER:  No, Your Honor.  I think the issue

10   is that you're talking about a different -- in retail

11   inventory and receivables you're talking about a different

12   kind of an animal.  This isn't a durable good, it's not

13   property, plant, and equipment.

14             THE COURT:  No, I understand that.  You're looking

15   at net orderly liquidation value.

16             MR. KRELLER:  And those assets turn over --

17             THE COURT:  But if you look at net orderly

18   liquidation value, you're assuming an orderly liquidation of

19   the whole business, which to me means there's reality to

20   those letters of credit.  Because the reason for those

21   letters of credit being there is now really important, which

22   you need to protect the beneficiaries of them, because

23   there's nothing else to protect them with.

24             MR. KRELLER:  Understood, Your Honor.  And at the

25   risk of over-belaboring this, the -- I'll go back to this

Page 85

1   company was effectively in orderly liquidation for five

2   years.

3            THE COURT:  Well, there's still a lot left over

4   though.

5            MR. KRELLER:  If people were --

6            THE COURT:  I mean, I think they were probably

7   paying -- for example, I think they were probably -- the

8   worker's comp claims were probably being paid in the

9   ordinary course because they had the assets to do it.

10           MR. KRELLER:  Right.

11           THE COURT:  There's probably a budget line

12  somewhere on the company's books and records for payment of

13  worker's comp.  And once there's no company, that doesn't

14  happen anymore.  So then the worker's comp board says uh-oh,

15  we'd better draw those LCs.

16           MR. KRELLER:  Once there's no company, then --

17           THE COURT:  But that's the net orderly

18  liquidation.

19           MR. KRELLER:  It's -- Your Honor, I think there's

20  a little bit of a mischaracterization of Ms. Murray's report

21  and how she approached this, and I think it's likely

22  something you'll hear from the debtors and say she used the

23  liquidation value, this wasn't a liquidation -- this case

24  didn't end up liquidating, therefore throw her out.  Your

25  Honor --

1          THE COURT:  I'm not going to accept that argument.

2          MR. KRELLER:  I think though it's an important

3    distinction to realize Ms. Murray did not assume -- she

4    didn't assume that this was going to be a net orderly

5    liquidation value case across the board.  What she said was

6    I am an expert in valuation, I have valuation principles,

7    and my valuation principles tell me that when I'm measuring

8    something as of a date like the petition date, I have to

9    apply what is known or knowable at that point in time.  And

10   she looked at these assets and said here's retail inventory

11   and receivables and proceeds; what was known or knowable at

12   the time?  There was not a going concern bid then in play.

13   There were plenty of statements from the debtors about how

14   they were ready at any given moment to pivot to company-wide

15   GOB sales.  There was a UCC advocating very vigorously to

16   you often through the case that in fact that's the way the

17   case should go.

18          And so what Ms. Murray did was she said my proxy

19   for valuating this inventory is the one outcome that is kind

20   of the backstop here.  It's kind of the contingency plan.

21   And if a going concern transaction doesn't materialize, this

22   is where it ends up.  It's why she calls it a minimum case,

23   it's why we refer to it as setting a floor.  And it was

24   basically her saying this is -- when I think about what

25   these specific asset were worth as of the petition date,

Page 87

1    this is the most reliable thing that I can say about the

2    value.  There's reasons that it could be higher.  There's

3    ineligible inventory that's not in the borrowing base that

4    Tiger doesn't put in there.  There are things that can be

5    added on, and there's reasons why it can increase because

6    the 88.7 percent used by Tiger as an NOLV is actually a much

7    -- a lower number than you see from a number of different

8    constituents in the case, including the debtors, including

9    the UCC, including Mr. Griffith's firm, including Abacus,

10   who -- you know, who has spent years liquidating these

11   stores.

12          So I think what she was doing was saying this is

13   the floor as of the petition date.  It could be subject and

14   maybe should be subject to material upward adjustments like

15   the ones that Mr. Schulte and Mr. Henrich ultimately did.

16   Or even just like the people in the case, the constituents

17   in the case, and looked at this and said -- and stuck NOLV

18   percentages in the nineties on this.

19          So I don't think it's really fair to say that what

20   she did was this -- she assumed all the stores were going

21   out of business and the company was shutting down.  I think

22   she said you asked me to value the inventory and the

23   receivables as of the petition date based on what was known

24   or could have been known at that time, and that's what I

25   did.

Page 88

1          THE COURT:  Okay.

2          MR. KRELLER:  Your Honor, in contrast from the

3    debtor's side, we have Mr. Griffith.  And while the Debtors

4    call this fair market value of the collateral as of the

5    petition date, Mr. Griffith didn't value the collateral.  He

6    couldn't value the collateral; he's not an expert.  He

7    didn't try to value the collateral, and he didn't want to

8    value the collateral.  He wanted to put his arms around 85

9    percent and hang on for dear life.  And in doing that, he

10   ignored the market.  He ignored the market information that

11   he had, and he had a lot of it.  And I shouldn't personalize

12   this; they had a lot of it, the debtors had a lot of this.

13   The market was not -- and certainly not as of the petition

14   date, the market was not, and the ESL transaction that

15   ultimately got negotiated in late January in finality and

16   closed in February.  This -- the market for the -- again,

17   the second lien collateral, the inventory and the

18   receivables.  Not the going -- not all the other stuff, the

19   second lien collateral.  The market was maybe there's a

20   going concern sale in which the inventory will be embedded

21   and sold.  But we've got all sorts of information about the

22   relevant market.  We know that liquidators put bids in.  We

23   knew that Tiger was looking at this.  We know that Abacus

24   had a view on this.  We know that the debtors had a view on

25   a winddown analysis, and we know that the UCC was looking at

Page 89

1    it.

2            So the information that was in the market told you

3    that at a minimum, Tiger at 88.7 was saying this is what

4    this would yield.  You had Mr. Meghji at M-III say -- using

5    a 90 percent NOLV.  You had the UCC giving a presentation

6    that used a 90 percent NOLV.  You had abacus saying --

7    giving a range of 90 to 93 percent.  And in the course of

8    marketing the assets and soliciting liquidator bids, you had

9    four -- you had six different liquidating firms who formed

10   four bidding entities.  And their bids were 89.4 to 91.7

11   percent.  Mr. Griffith didn't look at those.  The debtors

12   didn't think about that in this context.  I don't know how

13   they can hang the words fair market value on something when

14   they affirmatively ignored the market.

15           And I think the other point, Your Honor, on this

16   that's important to keep in mind as it a bit -- has been a

17   bit lost in the shuffle, when you try to apply the APA and

18   impute a valuation to the inventory based upon the APA,

19   you're actually looking at an entirely different set of

20   assets than that that existed as of the petition date.  As

21   of the October 15th petition date, the company is sitting

22   there with almost $3 billion, $2.6, $2.7 billion book value

23   of retail inventory sitting, ready to go on the brink of the

24   holiday selling season.

25           When ESL is negotiating with the company over its

Page 90

1   going concern sale, you're sitting in January.  The holiday

2   season is over.  The inventory has been sold down by a

3   billion dollars.  You've gone from 2.6 or 2.7 to the 1.5 or

4   1.6 that that included in the ESL bid.  The notion that the

5   imputed price that they try to pull out of the APA is

6   somehow a metric of what $3 billion of inventory sitting at

7   the beginning of October was worth based upon a billion

8   dollars less in January after the biggest selling season in

9   the retail year, that just doesn't fly, Your Honor.  That 85

10  percent metric doesn't make any sense, completely separate

11  and apart from the fact that the APA doesn't say that.

12          So I think it's -- I think that the metric is

13  wrong, the timing is wrong.  That analysis and focusing and

14  putting all their eggs in the one basket of we know what

15  happened in the sale to ESL is completely misplaced and it

16  has nothing to do with a valuation determination as of the

17  petition date of the second lien collateral in the hands of

18  the company and available to the second lien lenders.

19          So, Your Honor, ultimately on the debtor's notion

20  of fair market value as of the petition date, which is the

21  necessary starting point for this exercise, they didn't do a

22  valuation, they couldn't do a valuation.  They ignored the

23  market, they ignored the petition date.

24          THE COURT:  Well, the market here that you're

25  referring to are various expressions of interest by

Page 91

1    liquidators, right?

2         MR. KRELLER:  Some of those were, a subset of that

3    was.  The rest of it was views from the UCC and the debtors

4    themselves.

5         THE COURT:  Okay.  But that's not really a market,

6    that's just their --

7         MR. KRELLER:  Well, presumably, Your Honor, their

8    views were informed -- and the other piece of this where

9    that information comes from is the company's historical

10   experience in running GOB sales.  They ran 980 before the

11   case and they ran 260 during the case.  They know how to do

12   this, and they probably have it screwed down pretty tight

13   about how much they make.

14        THE COURT:  But the -- those proposals and those

15   sales didn't take into account all the costs, right?

16        MR. KRELLER:  Your Honor, we believe the Tiger --

17        THE COURT:  Tiger.

18        MR. KRELLER:  -- The Tiger valuation did.

19        THE COURT:  Except -- well --

20        MR. KRELLER:  And I can't speak to the others.

21        THE COURT:  But Tiger didn't take into account

22   legal, it took into account corporate overhead.

23        MR. KRELLER:  Your Honor, there are --

24        THE COURT:  Right?

25        MR. KRELLER:  -- some things in the Tiger -- there

Page 92

1    are some categories in the -- I don't know the direct answer

2    to that question, but there are categories in the Tiger

3    appraisal for things like closing costs and financing costs

4    and other costs.

5              THE COURT:  It's not really laid out.  You don't

6    really know what they take into account as far as their --

7              MR. KRELLER:  I agree with that, Your Honor.  I

8    think that's fair.

9              THE COURT:  So that's an element of the --

10             MR. KRELLER:  I think that's fair, Your Honor.

11   But I also think that it's a little hard to think that the

12   debtors, when they were making recommendations to their

13   board when they were in a hotly-contentious battle with the

14   UCC about what was the right alternative here in an auction

15   scenario and they used a 90 percent number, they just got it

16   wrong.  They didn't think about the other costs.  And the

17   UCC adopted the 90 percent, too.  I'm not --

18             THE COURT:  We'll -- I'll ask them about that.

19   But, look, I didn't have any testimony on it.  I have a

20   document that clearly says what it says, but the context is

21   pretty opaque to me.

22             MR. KRELLER:  It is, Your Honor.  But I think if

23   they can explain to you that the less-than-complete

24   information was being given to their board, I would be

25   surprised if that's what you hear from them.

1              THE COURT:  I mean, I know that part of their

2     argument against the transform sale is that they would have

3     very large 503(c) -- the estate would have very large 506(c)

4     claims.  So I guess the -- but I'll ask them about the 90

5     percent.

6              MR. KRELLER:  And, Your Honor, I'm not suggesting

7     that those numbers are definitive valuations.  What I'm

8     telling you is there's a lot of data out there that Mr.

9     Griffith didn't bother to look to and the debtors ignore

10    when they say 85 percent is the fair market value because we

11    say it is.

12             THE COURT:  That's fair.

13             MR. KRELLER:  That's a gross oversimplification

14    and ignores facts in the record that you don't have to

15    accept as valuations --

16             THE COURT:  Right.

17             MR. KRELLER:  -- to know that the data is out

18    there.

19             Your Honor, you raised a question or made a

20    comment I guess at the outset of last week's hearing about

21    the expert's reliance on other outside sources like Tiger.

22    I don't -- I can certainly address that with you if that's

23    still an open question in your mind.

24             THE COURT:  Well, I think -- I distinguish Tiger

25    from some of these other ones that are really not

Page 94

1   appraisals.  And there is testimony from multiple parties

2   that Tiger was relied on, et cetera.  So I'm not sure how

3   much vetting -- it certainly -- put it this way; given other

4   parties' reliance on Tiger, including the lender group

5   through the debtor's borrowing base certificates, it

6   wouldn't be a basis for excluding Ms. Murray's testimony

7   that she heavily relied on Tiger, put it that way.

8          MR. KRELLER:  Your Honor, then let me go a little

9   bit further with it, because I'm -- that's not entirely

10  satisfying.

11         THE COURT:  Okay.

12         MR. KRELLER:  Federal Rule of Evidence 703 says an

13  expert may base an opinion on facts or data in the case that

14  the expert has been made aware of and not just facts that

15  the expert has personally observed.

16         THE COURT:  Right.  That's fine.  Facts are data.

17  But what she's relying -- if an expert is relying on another

18  expert's opinion, it may not be facts or data.  So that's

19  the only point.  But I'm saying this is enough.  People

20  relied on this.

21         MR. KRELLER:  That's fine, Your Honor.  I'll move

22  on.

23         THE COURT:  It's not clear to me why she relies on

24  one and not the other when she takes the February percentage

25  or something as opposed to the October percentage for

Page 95

1    something, but that's another story.

2            MR. KRELLER:  Well, I think the answer to that,

3    Your Honor, is -- without going into the report, I think

4    Tiger actually explains what they did in their report as to

5    how they recalibrated that calculation, if you will.

6            THE COURT:  Can you also address -- and it's a

7    relatively small point.  It's only about $8 million, which

8    is I guess fairly small.  Ms. Murray has a discounted number

9    for credit card receivables of $54.8 million, Mr. Griffith

10   has $46.6.  Can you explain the difference and why you think

11   Ms. Murray is correct?

12           MR. KRELLER:  Your Honor, I think -- frankly I

13   think it's just kind of a matter of sourcing.  The experts

14   were obviously working on an expedited timeline to try and

15   accommodate the debtor's confirmation desires.  And I think

16   that those issues were just taken -- I think that the

17   numbers were just taken from different sources.  And I can

18   see if I can -- I'm not sure I can pinpoint that one for you

19   as I stand here.

20           THE COURT:  Okay.

21           MR. KRELLER:  But I believe it may be the case --

22   that may be one where Ms. Murray was sourcing from the

23   debtor's schedules.

24           THE COURT:  Okay.

25           MR. KRELLER:  Your Honor, I think -- I guess the

Page 96

1     one other point I'll make, and then I think in keeping with

2     the guidance you gave Mr. O'Neal is that I'll stop before I

3     flip the page into my 506(c) notes.  But let me make one

4     other point, because I think it's relative to the discussion

5     that we've had about the notion that the company could be

6     very well justified in pursuing its going concern

7     transaction and its desire to find a comprehensive solution

8     here but have that not be the best thing for the second lien

9     lenders.  Because a lot has been made about and there's a

10    lot in the papers about the support for the going concern

11    sale.

12          Clearly ESL was advocating for a going concern

13    sale.  I don't think they were doing that as a second lien

14    lender, I think they were doing that as a buyer, as a

15    hopeful buyer and then ultimately a prevailing buyer.  And I

16    think there's a meaningful distinction there.

17          With respect to Cyrus, Your Honor, because we drew

18    some fire on this, we're grouped as someone who was a

19    forceful advocate for the going concern sale and making

20    strong statements in support of the going concern sale.

21    Your Honor, there's nothing in the record to support those

22    statements.  There's not a court filing, there's not a

23    hearing transcript, there are no letters from Cyrus to the

24    board as you've seen with ESL.  You've got testimony from

25    Brendon Aebersold where he basically testifies I think I

Page 97

1    remember -- and we've designated this testimony for you, but

2    I think I remember having calls with Cyrus at different

3    points in time during the case, I don't really know who they

4    were with and I'm not really clear on what they were about.

5    He was a skilled witness.  There's not much to glean there.

6    But it falls well short of being a forceful advocate.

7            What you see from the debtors and what you see

8    from the UCC on this point, Your Honor, is a letter from

9    Cleary to the company on behalf of ESL.  Cyrus was not a

10   party to that letter, Milbank was not a party to that

11   letter.  Cyrus was not copied on that letter, Milbank was

12   not copied on that letter.  And Cleary doesn't purport to

13   speak for Cyrus in that letter.  That's what they have.

14           The other thing they have is that Cyrus came in

15   and did the junior DIP.  And they say that Cyrus did the

16   junior DIP in order to bridge to a going concern sale.  And

17   yet --

18           THE COURT:  Right.  And you say it was a

19   protective DIP.

20           MR. KRELLER:  Well, Your Honor two -- three things

21   actually.  It was a protective DIP.  We didn't want to get

22   primed, but we didn't even want to get our adequate

23   protection liens primed, which would have been the case with

24   the Great American DIP that was -- they were trying to put

25   in ahead of us.  That's point one.

1              Point two, Your Honor, the DIP wasn't solely for

2        the purpose of getting to a going concern sale.  Mr. Reicker

3        testified in his declaration in support of the junior DIP --

4        and I believe it's Paragraph 14 of that declaration.  He

5        says, "We will need the $250 million of liquidity even if we

6        end up pivoting to a liquidation because an orderly

7        liquidation will take time, and we need liquidity to do it."

8        So the debtors weren't even trying to sell this as a bridge

9        to a going concern.

10             And the third --

11             THE COURT:  Well, that does take you beyond the

12        peak selling season.

13             MR. KRELLER:  It does, Your Honor.

14             THE COURT:  I mean, there are cases -- they're

15        early ones, but there are cases that actually apply

16        equitable considerations to 507(b) as opposed to 506(c).

17             MR. KRELLER:  Well, Your Honor, I'd be interested

18        to know what equitable considerations there might be for

19        putting in a junior DIP.  But my point is this, it wasn't

20        for the purpose of supporting an ESL transaction.  In fact,

21        Mr. Aebersold's other -- in another portion of his

22        deposition, he acknowledged that when he negotiated and was

23        soliciting Cyrus's involvement in the junior DIP, he was

24        actually advocating to Cyrus that if they were going to step

25        in, he needed and wanted them to step in without being tied

1    to ESL because they didn't want ESL as a DIP lender.

2              THE COURT:  Right.

3              MR. KRELLER:  And so Cyrus made a credit decision

4    to make that DIP.  It was protective, and it was agnostic as

5    to going concern sale versus orderly liquidation process.

6              That's what you have, Your Honor.  That's what

7    they back up their allegations that Cyrus was somehow a

8    forceful advocate and somehow took positions.  You won't

9    find anything in the docket, you won't find me standing at

10   hearings talking to you about how we want to see a going

11   concern sale happen.  Those things didn't happen, they don't

12   have any proof, and their papers essentially demonstrate

13   that to you.

14             THE COURT:  Okay.  Am I right though that the

15   junior DIP contemplated taking the debtor's sale process,

16   whether it's going concern or orderly liquidation, beyond

17   the first 12 weeks of the case?

18             MR. KRELLER:  It was -- well, I think the junior

19   DIP came in -- I think it got approved in late November.  So

20   you're a month-and-a-half almost into the case.

21             THE COURT:  Right.

22             MR. KRELLER:  But yes, I think it was -- I think

23   the intention was to provide enough liquidity to see through

24   to a decision on whether there was going to be a going

25   concern sale or to pivot to the liquidation.  But it wasn't

Page 100

1    hard-wired into either of those alternatives, but it would

2    have provided the funding for the debtors to do that, and I

3    think that was their intention.

4              THE COURT:  Okay.

5              MR. KRELLER:  And, Your Honor, and then the last

6    part on that.  Yes, the junior DIP rolled as part of the

7    ultimate transaction.  That was a last-minute concession

8    that Cyrus made to the debtors at the auction and Cyrus's

9    decision was I can either roll this over and have my $350

10   million junior DIP become a piece of financing on Transform

11   Co. on essentially the same collateral, or this transaction

12   can fail and I can sit here with a $350 million junior DIP

13   in a messy bankruptcy in the wake of a failed ESL

14   transaction and wait it out and see what happens.

15             And so, Your Honor, that was just a standalone

16   decision.  That wasn't advocacy for ESL or going concern or

17   anything else.  Again, it was a credit decision that Cyrus

18   made because they were better with that loan being on the

19   outside of this bankruptcy case than they were leaving it

20   inside and whatever the aftermath would have been of the

21   failed auction.

22             THE COURT:  Okay.

23             MR. KRELLER:  Your Honor, the only other -- my

24   other points are on 506(c).  So with that I'll sit down and

25   speak to you later.

Page 101

1                    THE COURT:  Okay.

2                    MR. FOX:  Your Honor, Edward Fox with Seyfarth

3        Shaw on behalf of Wilmington Trust, indenture trustee and

4        collateral agent.

5                    We have a binder, if we could hand it up, Your

6        Honor, that has some documents that are in evidence and

7        testimony that's been designated that I'll be referring to.

8                    THE COURT:  Okay.  Thanks.

9                    MR. FOX:  Your Honor, at the outset I'd just like

10       to note -- and there's been I think some misconceptions

11       earlier in the case among certain parties.  Wilmington Trust

12       is both the collateral agent for the entire second lien as

13       well as the indenture trustee for the 6-5/8th percent senior

14       secured notes due 2018, which are generally referred to as

15       the 2010 notes.  Those are the cash pay notes.  And they

16       were issued in 2010 and were secured at that time.

17                   There's been some suggestion from time to time, I

18       think mostly earlier in the case, that ESL and Cyrus owned

19       those notes.  And that's not the case.  ESL does not own any

20       of those notes.  I think that's clear from the exhibit to

21       the asset purchase agreement.  And it's our understanding

22       that Cyrus does not own any of those, either.  But there are

23       $90 million worth of outstanding notes on that 2010 position

24       which are owned by note holders who are not here today, but

25       who, some of them at least, do check in from time to time

Page 102

1    with us.  And we're here to speak for them in particular

2    since Cyrus and ESL are speaking largely for themselves.

3              THE COURT:  And those notes are subordinated under

4    the -- in their creditor agreement as far as collateral?

5              MR. FOX:  Under the security agreement, Your

6    Honor, the waterfall is that the collateral agents' fees and

7    expenses are paid first.  The indenture trustees and loan

8    admin agents' fees and expenses are paid second.  What are

9    called senior second lien obligations, which is everything

10   except the 2010 notes, are paid third.  And then the 2010

11   notes are paid fourth with respect to collateral.  If

12   there's no collateral and they're unsecured, then they're

13   all pari passu for whatever that's worth.

14             THE COURT:  Okay.  This is an issue no one has

15   addressed.  But if it's meaningful here that ESL's -- if

16   ESL's $50 million cap is meaningful, does that cut off the

17   2010 notes' recovery?

18             MR. FOX:  I think to the contrary, Your Honor,

19   that would help them.  I think we've not gotten into it or

20   briefed it, as I think you recognize, in terms of the issue

21   of how a super-priority claim as opposed to a lien would be

22   treated under the -- if at all under the terms of the

23   security agreement --

24             THE COURT:  Of the waterfall.

25             MR. FOX:  Yes.

Page 103

1              THE COURT:  Okay.  Anyway, it's an issue for

2     another day perhaps.

3              MR. FOX:  Yes, yes.

4              THE COURT:  All right.

5              MR. FOX:  Your Honor, the primary issue here goes

6     to valuation at the petition date, and there's been a lot of

7     discussion about that.  We have I think in some sense a

8     slightly different take, although not necessarily so, from

9     the other parties and the other experts.  And that goes to -

10    - you know, the debtor argues that the issue is the fair

11    market value.  The question is what's the market.  And it's

12    also a question of when, but it's also what.

13             On October 15th -- and if you look at the first

14    point -- the first page of the binder, is an answer to a

15    question that I asked Mr. Griffith during his deposition.

16    And I asked him, between October 15th 2018 and the closing

17    of the sale on February 11th, 2019, what were the debtors

18    doing at their going concern stores?  Were they open for

19    business to sell at retail?  And he answered yes.  And

20    there's no secret about that.

21             And I think it's important to remember, Your

22    Honor, that what we see within the courtroom and what goes

23    on in here is something very different than what was going

24    on two blocks away at the Sears store down the street where

25    they were selling inventory at retail starting on the

Page 104

1    petition date and continuing until the sale occurred.

2    Selling Craftsman tools to Ms. Smith and washing machines to

3    Mr. Jones and whatever products, DieHard batteries, et

4    cetera, Kenmore appliances that Sears sells.

5           And on the first day of the case when Sears issued

6    a press release, it said, "As we look towards the holiday

7    season," and this is at Tab 1, "Sears and Kmart stores

8    remain open for business, and our dedicated associates look

9    forward to serving our members and customers."  And that's

10   what was going on.

11          And so when it comes to valuing the collateral, we

12   believe, and Mr. Henrich valued the collateral as if it was

13   being sold at retail, which is exactly what the debtors were

14   doing with the collateral.

15          And if you look at Tab 2, it's a segment from Mr.

16   Reicker's declaration, the first day declaration, describing

17   the company's current operations, operating 687 retail

18   stores, being a market leader in appliances, tools, lawn and

19   garden, fitness equipment, automotive repair, and other

20   products, and talking about Kmart and the products that

21   Kmart sold.  All of which was being sold at retail to retail

22   customers.

23          And so in our view -- and we look at Rash, too.

24   Our view.  Our view is that the Debtors -- the use the

25   debtors are making of our collateral, which was inventory,

1   not durable goods or capital goods, but inventory -- was to

2   sell it at retail on a daily basis to customers who walked

3   in the door and paid retail.

4          And if you turn to Tab 3, Your Honor, which is

5   Joint Exhibit 10, you can see how the debtor in its stock

6   ledger detail listed both the cost of its outstanding

7   inventory as well as the selling value of the inventory.

8   And the cost was at $2.6 billion and the selling value by

9   the debtor's calculation was in excess of $5 billion.

10          So when one considers how to value the inventory

11   at the petition date given that the debtors were in a going

12   concern sale, what Mr. Henrich did and what we believe is

13   the appropriate methodology is to value that inventory as if

14   it's being sold at retail, which is exactly what was

15   happening here.  That doesn't mean that there aren't other

16   methods that could have been applied, and others did.  But

17   that's what Mr. Henrich did, and we believe that was

18   appropriate.

19          And in the context of a valuation, expert

20   testimony is appropriate.  And I don't think, there's been

21   any question that Mr. Henrich is an expert and that his

22   testimony should be accepted here, although we are mindful

23   of the Court's concerns at the beginning of the hearing the

24   other day.  But because the inventory was being sold at

25   retail at the petition date, Henrich valued the inventory at

Page 106

1    retail value on the petition date.  And we submit, Your

2    Honor, that that is the appropriate fair market value that

3    should be applied here.  For that purpose, for that

4    valuation.  And as I said, expert testimony is appropriate

5    to address that valuation issue.

6              Now, just to point out before I get to Mr.

7    Henrich's particular views and conclusions, at Tab 20 we

8    included -- or actually I think it's Tabs 19 and 20, we

9    included the weekly reporting that the debtors provided at

10   Tab 19 from January 30th that took us through January 26th.

11   And then at Tab 20 was the last two weeks that had been

12   omitted when the weekly reporting stopped with that January

13   30th report before the sale, and picked up those last couple

14   of weeks.

15             And what those show when you total the columns

16   across is that during that period of time from the petition

17   date through the sale date on February 11th to ESL as a

18   going concern, the debtors had revenues of $3,366,000,000.

19   They had net operating cashflow of $548 million, and they

20   had net cashflow before financing of $364 million.  And

21   those are the results from largely the going concern store

22   sales as well as the going out of business sales which were

23   also going on, starting with the first wave of 142 stores at

24   or around the petition date, and then the additional two

25   waves after that.

Page 107

1           So when Mr. Henrich looked at the inventory and

2      the other collateral to value it, he started with the

3      debtor's total inventory at cost of $2,576,000,000.  He

4      deducted from that the going out of business inventory at

5      cost, which was available, and that's why he calculated it

6      this way, because that's the most readily available number,

7      leaving a going concern inventory at cost of $1,959,000,000.

8           Now, let me just stop for a minute, because I know

9      you asked the question about the going out of business

10     inventory and the various schedules that have floated

11     around.  The going out of business inventory information was

12     provided by ESL in a spreadsheet.  And as Mr. Henrich

13     explained, that spreadsheet contained a calculation error,

14     which is -- which one can see in the live spreadsheet but

15     not on paper.  As a result of that, additional amounts of

16     either Kmart or Sears inventory were added in the columns

17     that should not have been added to those columns.

18          Despite that, the total percentage of GOB recovery

19     remained the same using the formula that Mr. Henrich applied

20     of 96.4 percent.  He then corrected and attached to his

21     declaration the corrected schedule, taking out those

22     improperly added in amounts of Sears and Kmart to get to the

23     $617 million going out of business number.

24          Now, the effect of that actually was to increase

25     the overall value of the collateral.  Because by reducing --

Page 108

1    that reduced the amount of going out of business collateral,

2    thereby increasing the amount of going concern inventory at

3    the same time.

4              THE COURT:  So where did this information come

5    from?

6              MR. FOX:  It came from a spreadsheet that was

7    provided by ESL.

8              THE COURT:  And how does -- how do they have

9    access to this?

10             ESL, as we understood it from ESL's counsel, had

11   all this information because they bought the -- through

12   Transform, bought the company.

13             THE COURT:  Okay.

14             MR. FOX:  It would have been nice to get it from

15   the debtors, but we got it from ESL.  There's been no

16   dispute about the $617 million.  There's been an issue of

17   the previous number which has been resolved.

18             There's not been a dispute about the $617.  And

19   then there's been the difference between, as you raised with

20   Mr. O'Neal, between the 95.6 percent that Mr. Schulte

21   calculated, as the percentage, and the 96.4 percent that Mr.

22   Henrich calculated.  That goes to how they did their

23   calculation of those numbers.  They, I guess, differed in

24   their view of that.  That percentage number has minimal

25   difference in terms of this.

1          THE COURT:  And we don't know what that inventory

2     was comprised of, right?  We don't know whether it included

3     eligible inventory only or all inventory.

4          MR. FOX:  That was all the inventory, as we

5     understand it, that was sold at the going out of business

6     stores.  Now, there --

7          THE COURT:  But we don't know what that was,

8     though, right?  What categories that fell into?

9          MR. FOX:  You mean, eligible versus ineligible?

10          THE COURT:  Right.

11          MR. FOX:  No.  I don't think there's a way to

12     know.

13          THE COURT:  Or whether it included pharmacy assets

14     or anything like that?

15          MR. FOX:  Well, as far as we know, to the extent

16     there was a pharmacy in a going out of business store.

17          THE COURT:  But we don't know whether that was the

18     case?

19          MR. FOX:  We do not.

20          THE COURT:  Okay.

21          MR. FOX:  I mean, I'm not sure that they would

22     have a going out of business sale for control substances.

23     I'm just speculating about that.

24          THE COURT:  Well, sometimes you have GOBs where

25     you sell the pharmacy assets as part of the sale, although

Page 110

1    separately.  Not to just someone who walked in, obviously.

2            MR. FOX:  Right.

3            THE COURT:  Okay.

4            MR. FOX:  But then getting back to the numbers.

5    So, taking the going concern inventory at cost, which is the

6    million-959--billion-959, Mr. Henrich then treated it as a

7    retailer does, and he applied a gross margin to that book

8    value of inventory to reach a selling cost of 2 billion, 759

9    million dollars.  He then deducted from that store expenses

10   of 457 million, leaving a total inventory at going concern

11   value of $2.3 billion.

12           Now, he had added to that credit depart...  I'm

13   sorry.  Credit card deposits and transit, which are up above

14   in Exhibit 4.  He also included the pharmacy accounts

15   receivable.  And he included total cash, largely as a proxy,

16   on the theory that even if it was not considered proceeds of

17   our inventory, which would be our collateral, it would be

18   applied by the first lien lenders ahead of the application

19   of other collateral, since it's liquid and available to

20   them.

21           He then added to his 2.3 billion of total going

22   concern inventory the 617 million of GOB inventory, which

23   was reduced by unrecovered value at the liquidation sale of

24   22.4 million.  So, that takes account, I think, the concern

25   that maybe not everything sells.  Some of it gets disposed

Page 111

1    of, thrown away, and sort of left in the stores as they

2    vacate, with the resulting total inventory for liquidation

3    value of 594 million.

4            THE COURT:  So, that would -- I'm sorry.  So, the

5    96 percent is before that reduction?

6            MR. FOX:  The 96 percent...  Well, no, the 617

7    million is the actual number.  What that established,

8    though, was that when they sold that -- when they took

9    inventory at cost and sold it in the Debtor's going out of

10   business sales, the net result was that you got back 96.4

11   percent of the cost of that inventory.

12           THE COURT:  All right.  All of that inventory or

13   the inventory before you reduced it by 22.4 million?

14           MR. FOX:  Well, of the inventory, and then you

15   reduce it by the 22.4 to take account of what didn't sell.

16           THE COURT:  Well, let me phrase it differently.

17   It's been argued to me that the value of the inventory has a

18   market marker equal to the result of the GOP sales, which is

19   either 95 percent or 96 percent.  But my question is, is

20   that really accurate or is the GOB sales percentage then

21   need to be further reduced because of the category that I'm

22   assuming wasn't sold or shrank, or whatever?  That I guess

23   there's some number...  I don't know if this is in a -- also

24   something ESL provided or just Mr. Henrich's own calculation

25   equals 22.4 million.

Page 112

1           You know, I don't remember the answer to that

2       question.  I think I did know it at the time.  Well, you can

3       see why it might be meaningful.

4           MR. FOX:  Yeah.

5           THE COURT:  I mean, I go by what people pay for

6       something and if they actually pay 96 percent or 95 percent,

7       that's meaningful.  But if really they're not paying

8       anything for a big chunk of it, then I would reduce it.

9           MR. FOX:  Well, the 22 --

10          THE COURT:  In other words, you wouldn't apply --

11      not for what they paid for, but I take into account what

12      disappeared or what they didn't pay for in coming up with an

13      overall percentage on everything else.

14          MR. FOX:  Well, that 22.4 is a little bit -- it's

15      around 3 percent of the 617 million.

16          THE COURT:  Right.  Well, I understand.  But it's

17      a zero, right?  There's no value to that, so...

18          MR. FOX:  Right.  So, in other words, if that were

19      not included in the 617 and you were starting at 96.4

20      percent, you'd be talking around 93.4 percent.

21          THE COURT:  Right.  Before -- before the cost

22      component?

23          MR. FOX:  Well, no --

24          THE COURT:  Where does the 22.4 come from?

25          MR. FOX:  I became it came from ESL, if I'm not

Page 113

1    mistaken.

2              THE COURT:  Is that in the record anywhere?

3              MR. FOX:  If it's in that -- if it's in that

4    schedule, then it is.  But I don't remember...

5              THE COURT:  I mean, I guess -- in other words, you

6    can see -- I don't know the answer to this question but you

7    can certainly see a calculation of the GOB sales results as

8    being just of what was sold.

9              MR. FOX:  Oh, I'm sorry, Your Honor.  I've just

10   been told the 617 million times the 96.4 percent is 590...

11   That's the 594.8.  The difference is the 22.4.  So, it's

12   included already in the 96.4 percent.  It's not an

13   additional deduction.

14             THE COURT:  Okay.

15             MR. FOX:  And the going out of business sale

16   numbers included the four-wall costs, selling costs for

17   those?  So, those are also included in here.  It's not --

18   those would not be an additional deduction.

19             Mr. Henrich then -- he had not included the home

20   services inventory of 114 million when he started with total

21   inventory of cost, unlike the other -- Mr. Schulte and Mr.

22   Griffith, who started with the 26.90, I think it was.  He

23   was not comfortable initially about included that because he

24   wasn't sure where -- who it belonged to.  When he got to

25   that point where he was comfortable that it belonged here,

Page 114

1    he then included it but he did not include it in the

2    inventory that's grossed up by the gross margin of 29

3    percent.

4           So, he includes it at the book value of 114 with

5    no gross up because that was sold through Home Services

6    rather than directly in the stores.  That resulted in total

7    inventory, by his calculation, of -- you know, cumulative

8    total inventory of $3.2 billion.

9           He then added to it the 72.8 million of pharmacy

10   scripts, and then deducted from the $3.279 billion total

11   collateral value; corporate expenses on a going concern

12   basis of 138 million, which is about 6 percent of cost;

13   corporate expenses on a liquidation of 19.1 million, which

14   is the 3.1 percent, which Tiger used.  That's the only place

15   where Mr. Henrich relied on anything from an outside source

16   -- an outside expert like Tiger.  And I think we can all

17   agree now that that -- the Tiger numbers were reliable.

18          And then he took a $51 million professional fee

19   charged for 506(c) costs with the expectation that that

20   would be the outside numbers.  The Debtor put it -- it was

21   not clear at the time and we'll argue later that that's

22   excessive.

23          As a result of those adjustments, he leaves a

24   total collateral value of over $3 billion, which is more

25   than sufficient after paying down the first lien loan to

1   leave the second lien loans fully collateralized as to the

2   petition date.  And, again, Your Honor, that's based on the

3   retail selling value, which is what the Debtor was doing on

4   a daily basis.

5            Now, the Debtors through Griffith make some

6   criticisms of Henrich.  In the first instance, Griffith is a

7   fact witness so he's not really qualified to criticize

8   Henrich's valuation.  He doesn't provide his own valuation

9   that the petition did.  In the second supplemental

10  declaration, for instance, Page 9, Paragraph 13, he asserts

11  that Henrich applies too high of a margin to the going

12  concern inventory.  That's the 29 percent.

13           But when he was asked about Henrich's use of the

14  29 percent gross margin in his deposition, the question was:

15  "Well, the question is do you believe Henrich was wrong to

16  use a 29 percent gross margin, which is the same gross

17  margin that M3 used?" Mr. Genender objected.  Mr. Griffith

18  then answered:  "I said I disagree with his methodology.  I

19  don't have a problem with the 29 percent margin."

20           And when the Debtors prepared their weekly

21  reporting and they forecasted what their results were going

22  to be on a weekly basis for both the lenders, as required

23  under the final DIP order, of what they used the 29 percent

24  gross margin to forecast.  And we've included that in here

25  for you to look at.  That's at Tab 6.  That's Joint Exhibit

1    015-4.  And you can see in the gross margin numbers under

2    the forecast, the Debtors themselves use the 29 percent.

3              So, they really don't have a basis now to be

4    challenging that.  And to the extent Griffith wants to talk

5    about methodology, he's not qualified to do that.

6              Griffith next in the supplement -- second

7    supplemental declaration on Page 9, Paragraph 13 -- claimed

8    that Henrich's calculation of GOB liquidation inventory cost

9    is overstated by 37.9 million.  We've just discussed that

10   and Henrich's declaration in Paragraph 50, he not only

11   explained it but explained that this actually then increases

12   the go-forward inventory by that same amount, which

13   increases the total value of the inventory rather than

14   decreasing it.

15             Griffith next in his second supplemental

16   declaration at Pages 9 and 10 at Paragraph 13 complained

17   that Henrich does not consider additional expenses required

18   to sell the inventory.  But Henrich did include the expenses

19   of 20 percent of sales for store expenses -- it was the 457

20   million of store expenses; the 5 percent corporate overhead,

21   which resulted in 138 million for going concern stores; the

22   19.1 million for GOB stores for overhead.  And if you can --

23   and that totaled 157 million of overhead for just four

24   months, which on an annual basis would result in a $471

25   million corporate overhead.

Page 117

1          Now, two things are interesting here:  First, the

2    Debtors themselves, and actually M3 -- and this is at Tab 8

3    -- projected and told the committee in November of 2018,

4    that Sears Holdings could return to profitability and that

5    they anticipated their expectation was that the SG&A, which

6    Griffith thought Henrich wasn't using enough of, could be

7    reduced to 365 million as the estimate for 2019, and to 296

8    million for 2020.

9          So, that was their expectation, M3's expectation

10   and the Debtor's expectation of what the reasonable numbers

11   could and should be ultimately.  And the number that Henrich

12   used on an annual basis is even higher than those numbers.

13         The other point that's particularly relevant is

14   that Griffith himself, although he criticizes Henrich and

15   says Henrich didn't use enough overhead, Griffith didn't

16   know how much overhead to use.  When he was asked about it

17   in his deposition, he said -- and this is at...okay...  He

18   was asked on Page 266 -- the question is "What was the

19   recovery as a percentage of book value on inventory in going

20   out of business stores?" Answer:  "Without any allocations I

21   can't tell you." Question:  "You have no idea?" Answer:

22   "There are certain allocations that are made that are

23   sometimes used in certain reports.  Internally developed

24   ones by the Sears team, and Tiger takes a certain view as

25   well, but they're not based on actual total overhead."

Page 118

1          Question:  "I'm asking what the Debtor's actual

2     experience was.  Not about Tiger's estimates.  Do you know

3     what the Debtor's actual experience was?" Answer:  "It would

4     depend on how much corporate allocations you were putting on

5     the stores." Question:  "If you allocated no corporate

6     overhead, what would the result be?"  Answer:  "I can't

7     answer that.  I don't know."

8          Question:  "You don't know?  How much overhead do

9     you believe should be allocated to the going out of business

10    store sales?" Mr. Genender objected.  Answer:  "It's hard to

11    say," said Mr. Griffith.  Question:  "So, you don't know how

12    much corporate overhead should be allocated to the going out

13    of business sale stores' results?" Answer:  "It would depend

14    on the situation." Question:  "Well, we're talking about the

15    Debtor's situation, the 242 going out of business stores."

16    Mr. Genender:  "262." Mr. Fox:  "262.  Thank you." Answer:

17    "There should be more allocation than what they currently

18    have in the model." Question:  "How much?" Answer:  "I don't

19    have that quantified."

20          He criticizes Mr. Henrich but he has no idea what

21    he thinks the number should be other than it should be

22    higher.  And that's just no basis for that kind of a

23    criticism.

24          With respect to -- or Griffith then says in his

25    declaration, Paragraph 13, that Henrich overstates the

Page 119

1   inventory by using total inventory at cost of 2 billion, 576

2   million.  That's the stock ledger inventory, except for the

3   114.6 million of Sears Home Services inventory.  And

4   Griffith argues that Henrich should have started with net-

5   eligible inventory of 2 billion, 391 million.

6          But in the Griffith second supplemental

7   declaration at Page 7, Paragraph 11, Griffith himself uses

8   the stock ledger inventory of 2 billion, 690 million, which

9   includes the Sears Home Services, and he does not start with

10  net-eligible inventory.  So, again, there's just no basis

11  for the criticism when he does the same thing.

12         He also, you know, argues about cash and what the

13  -- what the security agreement provides for, but he admitted

14  he can't -- he's not a lawyer, he can't make a legal

15  conclusion.  And I think we've all agreed at this point that

16  that's a decision the Court will make.

17         With respect to the letters of credit, you've had

18  a significant amount of discussion about that.  I'm not sure

19  that there's more than I can add to what Mr. Kreller

20  offered.  I do believe the fact that there are contingent

21  applications and that there's, in fact, no obligation unless

22  the payment's not made in the ordinary course and there's

23  actually a claim back against the -- or to draw on ELC, does

24  matter and should have an impact here.

25         However -- and I'll -- and I'll come to this -- to

Page 120

1    the extent that Griffith is asserting here that the Court

2    finds that the 271 million should come ahead of the second

3    lien claims in the collateral on the theory that that was

4    outstanding, it was a claim against the collateral -- then

5    the Griffith...  And, again, we don't believe the 85 percent

6    is an appropriate valuation number.  Certainly not as the

7    petition date and not as the sale date either.  But if that

8    number is to be used, the 271 million has to be added to the

9    value, because that was an additional component of

10    consideration directly related to the sale cost of the

11    collateral and required under the asset purchase agreement.

12            And when that happens, that increases the amount

13    of the sale price from 85 percent to 101 percent.  And I'll

14    come to it in a little bit, but that results in more than a

15    $300 million 507(b) claim when that's -- if that's properly

16    calculated that way.

17            Now, as we've discussed and as others have

18    discussed, Griffith claims --

19            THE COURT:  Can you walk through that?  I'm not

20    sure I follow that.

21            MR. FOX:  Let me find the tab for you.

22            THE COURT:  Yeah, okay.

23            MR. FOX:  If you turn to Tab 16, and you're also

24    going to need to look at Tab 11 -- but if you turn to 16,

25    what Griffith says is he believed there were certain

Page 121

1      components of the purchase price that, based on his view,

2      should be allocated, if you will, specifically to the

3      inventory and the second lien collateral.  And that's a

4      billion-408, which he then divides by the 1.67 billion of

5      receivables and inventory that are required under I think

6      it's section 10.9 of the asset purchase agreement to be

7      delivered.  And that's how he gets to his 85 percent number.

8              But what he leaves out of that is the obligation

9      of the purchaser under section 3.1F of the asset purchase

10     agreement to provide the letter of credit facility

11     consideration.  And that letter of credit facility

12     consideration is defined to mean the obligation of the buyer

13     to basically cause those letters of credit to no longer be

14     outstanding as an obligation of the Debtor.

15             So, if the letters of credit are a charge against

16     the collateral ahead of the -- against the inventory, ahead

17     of the second lien, then by rights, if you follow or accept

18     Griffith's argument that he should apply the cost that he

19     chooses to allocate to the purchase of the remaining

20     inventory, what he leaves out of that is the additional cost

21     to have the buyer take care of that 271 million of

22     outstanding letters of credit and make those no longer be in

23     charge against the collateral.

24             THE COURT:  But the buyer's replacing the first

25     lien debt too.  I mean, there's a new first lien facility,

Page 122

1    so that would be a charge too under that theory.

2            MR. FOX:  Well, that's effectively what Griffith

3    argues.

4            THE COURT:  No, but --

5            MR. FOX:  No, no, no.  Griffith argues -- he says

6    exactly that.  He said -- first, he said it's the billion-

7    408 of cash under 3.1A.  And if you divide a billion-408 by

8    the billion-676 and 10.9, you get 85 percent.

9            THE COURT:  Oh, I see.

10           MR. FOX:  Then he said -- when that wasn't working

11   as well, he said, well, the billion-408, we get to that by

12   the cost of paying off the 850 million of first lien debt --

13           THE COURT:  I follow you now.

14           MR. FOX:  -- the 433 and the 125 --

15           THE COURT:  I understand now.

16           MR. FOX:  But it's -- but what he never includes

17   in that calculation is the additional 271 million of LCs

18   that also have to be --

19           THE COURT:  But you're criticizing his sort of

20   backing into the 85 percent.  That's what you're doing.

21           MR. FOX:  Well, if you're going to follow his

22   methodology to get to 85, he left out a part.

23           THE COURT:  Okay.

24           MR. FOX:  And the part he left out --

25           THE COURT:  I follow you, I follow you.

Page 123

1          MR. FOX:  -- was the 271.  And when you add that

2     back, now all of a sudden it's not paying 85 percent, it's

3     paying 101 percent.

4          THE COURT:  Okay.

5          MR. FOX:  So, they just can't have it both ways.

6          THE COURT:  Well...

7          MR. FOX:  They can't have it as a charge against

8     the collateral but not a cost of buying the collateral when

9     it's bought.  That's just cherry-picking in an unfair way.

10         THE COURT:  Well, you can certainly have something

11    as a charge ahead of the second line debt.  That's...  I

12    understand your point that the 85 percent, one of the

13    rationales for picking that is to walk through the million -

14    - billion-4 of first lien debt.  I understand that point.

15    And you're basically saying that was -- that's contrived

16    because you're basically taking one aspect of the

17    consideration that Transform provided under the APA in tying

18    it to a value for the inventory.  But I don't really see

19    that -- beyond that.  But maybe that's all you're saying.

20         MR. FOX:  Well, it's certainly contrived.  And

21    when Mr. Griffith was here last week on the witness stand,

22    he was asked about that.  His answer was, well, that's in a

23    different part of the agreement.  Well, it's in 3.1F instead

24    of 3.1A or B but it's part of the consideration for the...

25    And so if you're going to equate particular parts of the

Page 124

1    consideration to the collateral and you're doing that based

2    on what's the charge --

3            THE COURT:  That's the part I understand.  Okay.

4            MR. FOX:  Now, to go back to it, you know, like we

5    said -- and I don't want to beat a dead horse, so just tell

6    me if you've heard enough on this point.  But on the 85

7    percent, you know, the Debtors admitted on February 7th at

8    the sale hearing that they waived the allocation.  And Your

9    Honor specifically questioned Mr. Schrock about it.  The

10   testimony starts at Joint Exhibit 072-56.

11           THE COURT:  Right.  I don't need more on that.

12           MR. FOX:  Right.  And further, Your Honor, at that

13   hearing -- and I think this is important -- Your Honor asked

14   about the amount of consideration in addition to the credit

15   bid, and to do it briefly, Your Honor asked:  "Just to cut

16   through it to do the math, you're saying basically that the

17   total value of the ESL deal is 5.2 billion, if you subtract

18   a billion-3 from that, which was the amount of the four

19   credit bids that are specifically allowed under 3.1B?" Mr.

20   Schrock said, "That's right." The Court:  "There's 3.9

21   billion of value provided for the unencumbered assets."  Mr.

22   Schrock:  "That's right." The Court:  "Has anyone placed a

23   value on unencumbered assets anywhere close to 3.9 billion?"

24   Mr. Schrock:  "No, Your Honor."

25           So, at that point, the view was that of the 5.2

Page 125

1    billion, only the credit bids of the various assets of the

2    various liens totaling 1.3 billion, which included the

3    various real estate loans as well as the loan on the

4    inventory and receivables -- the lien on the inventory and

5    receivables -- was -- everything else was going towards

6    unencumbered assets.  So, it kind of undercuts the argument

7    today that we should look at 85 percent, based on Mr.

8    Griffith's view, because somehow he adds up to a billion-4,

9    when the statement by Debtor's counsel -- the concession by

10    Debtor's counsel on February 7th sale hearing was that that

11    additional 3.9 went to unencumbered assets, not to the

12    encumbered assets.  You just -- they can't have it -- they

13    can't be saying one thing then and something else now.

14            The -- and just so it's clear, those were the

15    credit bids under 3.1B of the asset purchase agreement for

16    the IP Ground lease's term loan facility of 152 million, the

17    outstanding FILO facility obligations held by the buyer, 70

18    million, the obligations by the buyer and its affiliates

19    under the real estate loan 2020 of 544 million, and then the

20    $433 million credit bid for the inventory.  And those

21    numbers added up to slightly more, by math, of a billion-2.

22    That's the billion-3 of credit bids that was being discussed

23    in Your Honor's questioning at that point.

24            And, as I said at the outset, even if Mr. Griffith

25    could allocate the purchase price, that does not determine

Page 126

1    the value of the second lien collateral at the petition

2    date.  And what Mr. Griffith says about this is instructive.

3    Because, according to him, this -- the 85 percent was just

4    an assumption.  He says, starting at Page 262 of his

5    deposition -- I say, "When it says..." Question: "And it

6    says in Paragraph 14, as shown on the Debtor's valuation, M3

7    valued the collateral at 85 percent.  Do you see that?" "I

8    do." Question:  "Okay.  When you say M3 valued, who at M3?"

9    Answer:  "It's the assumption we were using so it would be

10   myself and the team that we -- that was working with me."

11          Question:  "You say that's the assumption you were

12   using.  IS that your opinion?" Answer:  "It's the assumption

13   we were using was the 85 percent." Question:  "So, it's not

14   your opinion?" Mr. Genender:  "Objection to form.  Asked and

15   answered.  Answer:  "It's one of the assumptions we made in

16   this document, yes.  So, it's my declaration.  So, if you

17   want to call it my opinion, but it's the 85 percent."

18   Question:  "It's not what I want to call it; it's what you

19   are calling it." Answer:  "I'm calling it an assumption."

20          Now, he can't offer value at the petition date

21   anyway, but he's admitting here that he just assumed that

22   that should be the same number.  And there's no basis.

23   That's the only thing the Debtors have, and there's no basis

24   for it given that he's calling it, you know, an assumption.

25          Now, it goes further than that because he also

Page 127

1    called it a proxy for value.  But as I pointed out in the

2    very first slide that we used, that he admitted that the

3    Debtors were open for business to sell at retail at the

4    petition date.  It was not the going concern sale to ESL.

5    And he admitted that there's a very large difference between

6    selling at retail and selling at business in bulk.

7           This is at 258 of his -- of his deposition, which

8    is designated.  Question:  "Do you know the difference

9    between selling in stores to retail customers and selling an

10   entire business in bulk to a buyer?  Do you think there's a

11   difference between those two things?" Answer:  "A very large

12   difference."

13          THE COURT:  And what the Debtors were doing was

14   selling it in bulk to a buyer?

15          MR. FOX:  At -- in February -- that's correct but

16   --

17          THE COURT:  From the start.  Or in bulk as part of

18   a liquidation sale?

19          MR. FOX:  No, Your Honor.  What they were doing

20   was selling their inventory to retail customers who walked

21   in the door --

22          THE COURT:  No, but we know that that was not how

23   your clients were going to realize any value.  They were

24   never going to get value that way.  The Debtor's use of this

25   collateral was to get to -- a way to realize value, which is

Page 128

1    either the sale as a going concern in the context of also

2    taking offers for overall liquidation.  That's the only way

3    they were going to get any money.

4            MR. FOX:  Well, two things:  One, the Debtors had

5    given indications of the possibility of doing a standalone

6    without a sale.  And that -- the presentation they made to

7    the Creditors Committee in, I believe it was November, which

8    was attached to the Transier declaration, and a portion of

9    which I showed you in one of the slides shows exactly how

10   they thought they could get there.

11           The other, though, is even if what they were

12   ultimately getting to was a sale, in the meantime, our

13   collateral, as it existed at the petition date, was being

14   sold at retail.  And, in fact, the numbers would suggest

15   that it was virtually all sold.  As I indicated, the total -

16   - the revenues were in excess of 3.3 billion.  The Debtors -

17   -

18           THE COURT:  Okay, I've heard enough on this.

19           MR. FOX:  Okay.

20           THE COURT:  Thank you.

21           MR. FOX:  We talked about the standalone credit

22   facility, 271.  I think Mr. Kreller covered the 34 million

23   of the interest on the post-petition obligations.

24           THE COURT:  Right.

25           MR. FOX:  I think, just to briefly --

Page 129

1          THE COURT:  A creditor truly expects to have a day

2     one going concern retail recovery here.  I get it.

3          MR. FOX:  No, Your Honor, I think the --

4          THE COURT:  Yeah, the answer is no, that's not a

5     reasonable expectation.  That's complete fantasy.

6          MR. FOX:  I'm not suggesting otherwise, Your

7     Honor.

8          THE COURT:  Well, then why give me a $3 billion

9     value?  It's just -- it's just a fantasy.  That's not a

10    potential recovery here under any scenario that's at all

11    realistic.

12         MR. FOX:  No, Your Honor, the 3.3 billion was

13    revenue that was actually generated in the stores during

14    that period of time.  That's -- you know, that's what

15    actually happened.

16         THE COURT:  If that's what Congress wanted, then

17    the Code would be written completely differently.

18         MR. FOX:  Your Honor, let me just -- I'll leave

19    aside the 506(c) points until later, as you suggested.  Let

20    me just make sure -- I think there are...  Your Honor, I

21    think you indicated on the professional fee carve-out

22    account that you don't believe there's an issue there now.

23         THE COURT:  Right.

24         MR. FOX:  Okay.  If the Debtors have a different

25    view, we'll come and address it.

Page 130

```
 1              THE COURT:  That's fine.

 2              MR. FOX:  We did include the solvency tracker at

 3    Tab 23, which shows the funds that are put in the

 4    professional fee carve-out account, the amounts that have

 5    been paid.  And I'll also not talk about post-closing

 6    diminution.

 7              Just one last point -- a couple last things.  With

 8    respect to Aebersold.  You know, he was put in -- there was

 9    no need to cross-examine him but we did take his deposition,

10    you know, about his indication that he had been hearing from

11    second lien parties pushing for a sale.  It's clear from

12    what's been designated, he wasn't hearing from Wilmington

13    Trust about that.  He didn't know who -- anybody who was

14    with Wilmington Trust.  He couldn't identify them.  He

15    clearly, you know, wasn't talking about that.  So, I don't

16    think there's any indication that Wilmington Trust was the

17    party that was, you know, doing anything one way or another

18    to push for or to object to a sale.

19              I am a little bit surprised that the Committee

20    seems to be suggesting that, I guess, they would've been --

21    they were pushing for a liquidation because it would've bene

22    better for us, even though it wouldn't have been as good for

23    the estate otherwise.  But that's a separate issue.  So, I

24    think on that, point, Your Honor, I'll rest at this time.

25    Thank you.
```

1              THE COURT:  Okay.  All right.

2              MR. SCHROCK:  Your Honor, would it be all right if

3     I take like five minutes before we get started?

4              THE COURT:  Yeah, that's fine.  I'll come back at

5     1:30.

6              MR. SCHROCK:  Okay, thank you.

7              (Recess)

8              THE COURT:  Okay, we're back on the record in In

9     re Sears Holding Corp.

10             MR. SCHROCK:  Good afternoon, Your Honor.  Ray

11    Schrock, Weil Gotshal, for the Debtors.  Your Honor, I took

12    the liberty of approaching and setting a shorter handout for

13    you --

14             THE COURT:  Okay.

15             MR. SCHROCK:  -- as well as for your law clerk.

16    It'll guide some of the comments that I have here in closing

17    argument.

18             THE COURT:  All right.

19             MR. SCHROCK:  But I'll try and answer the

20    questions that you at least previewed during the course of

21    my presentation.

22             Your Honor is very well aware of the key issues

23    and the legal standards.  And on Page 3 I would just note

24    that -- that we do think that the value of -- the correct

25    valuation to use, as of the petition date, is, you know, the

Page 132

1   value in proposed -- in light of the proposed valuation and

2   the proposed disposition or use of such property as of the

3   moment they begin using the collateral.

4          Now, we came into these cases pursuing a going

5   concern sale but having the option for a liquidation.  We

6   did believe that -- and we believe the record speaks for

7   itself as to the value that was actually paid for those

8   assets.  But I think before we get into what we disagree

9   about I think it's helpful to look at what's really

10  undisputed.  And I'll start with Page 4.

11         I don't think the parties dispute the book value

12  of the collateral.  I don't think that the parties dispute

13  the second lien security agreement, terms of it, and that it

14  does not include any specific language regarding pharmacy

15  receivables, scripts, and cash.  There's no tracing

16  analysis.

17         Then onto the second lien holders' experts --

18  performed independent valuations of the collateral.  And I

19  do think that's meaningful.  It is their burden.  Every

20  single one of their experts simply assumes valuation.  But

21  the whole purpose is for them to actually do a valuation

22  analysis if they're going to try and argue for a 507(b)

23  claim.  None of the experts vetted or independently tested

24  the Tiger appraisal work.  None of the experts performed

25  valuations of the collaterals of the sale closing.

Page 133

1           The second lien holders are subject to an inter-

2     creditor agreement subordinate to all senior and first lien

3     debt.  Now, Your Honor talked about and had questions around

4     how were letters of credit treated as debt for purposes of,

5     you know, the sale and otherwise in this 507(b) analysis?

6     And I think that it's instructive to look at the inter-

7     creditor agreement to which the parties are bound as of the

8     petition date that's incorporated into the DIP order.  And

9     let's just look and see what the inter-creditor says.

10          It says that "The discharge of ABL obligations

11    means, among other things, one, amounts available to be

12    drawn under outstanding letters of credit issued thereunder

13    or indemnities or other undertakings issued pursuant thereto

14    in respective outstanding letters of credit..." and it goes

15    on.

16          Your Honor, there could be no doubt that when a

17    second lien creditor -- and under the terms of this very

18    inter-creditor agreement, those obligations have to be paid

19    in full or cash collateralized before the second lien

20    lenders can recover anything.  I think it's also -- we can

21    take judicial notice of the fact that ESL and Cyrus had to

22    cash collateralize the one LC facility.  Okay, other parties

23    are saying that you have to put up that cash as an

24    obligation.  They obviously -- they counted it for purposes

25    of the APA.  It is an obligation that had to be assumed.

Page 134

1           The fact that it wasn't drawn, I don't believe

2     that really matters, Your Honor, because under the terms of

3     the inter-creditor that they've agreed to be bound by, it

4     had to be paid or taken out before they could recover

5     anything.  That's the starting point and that's the ending

6     point when considering that 507(b) analysis.

7           Your Honor, the adequate protection on Page 5, the

8     package is also undisputed that, you know, they are provided

9     with a form of replacement lien super-priority claims,

10    Wilmington Trust fees, among other things to protect against

11    diminution in value.  They consented to the use of cash

12    collateral.  There is no 506(c) waiver for ESL in any

13    capacity or for the second lien lenders under the terms of

14    the DIP order.

15          The going concern sale, all of the assets were

16    sold.  You know, two of the largest second lien lenders are

17    purchasers of the assets and participated in the sale.  The

18    second lien lenders, the record is undisputed that they

19    advocated for the sale at all times.  And, Your Honor, we do

20    think --

21          THE COURT:  Well, what do you mean by advocated?

22    I mean, I don't recall either counsel for Cyrus or counsel

23    for the indentured trustee collateral agent affirmatively

24    advocating for the sale, as opposed to not advocating for

25    some other alternative.

1              MR. SCHROCK:  So stipulated, Your Honor.  Okay,

2    that's -- you're right.  That's probably too far to say that

3    they were in court publicly advocating it.  There's not

4    evidence in the record as to what the statements were,

5    certainly behind closed doors.  I believe that's the truth

6    but that's, you know, what the record shows is not in

7    dispute.

8              THE COURT:  Okay.

9              MR. SCHROCK:  Your Honor, their -- they fought to

10   keep this out.  But Your Honor did admit, for purposes of at

11   least for how people were thinking about the value of, you

12   know, the collateral, the value of the inventory and

13   receivables, that ESL repeatedly -- okay, they told the

14   Debtors, and Mr. Griffith said in his testimony, you know,

15   before the Court:  "Do you recall references to the 85 cents

16   during the meetings?" "Yes." "By whom?" "Moelis and ESL."

17             Throughout the entire negotiations up through the

18   closing, Your Honor, it was -- 85 cents was the value that

19   they were assuming.  That was the number that we were all

20   using and that all parties were using in terms of evaluating

21   the bid at the auction.

22             THE COURT:  Why can't the results of the GOB sales

23   be as good a proxy for the collateral value?

24             MR. SCHROCK:  Well, Your Honor, I think that some

25   of the GOBs -- there were some stores -- I think it's fair

Page 136

1    to say that there were some stores that were actually set

2    for GOB at the beginning of the case.  But what actually

3    happened here was we actually sold the inventory and

4    receivables, we would submit, for 85 cents.  So, to look at

5    just the GOBs in some hypothetical that didn't occur with

6    respect to all of the inventory, I don't think that's as

7    good of evidence.

8              THE COURT:  No, I understand the "all of the

9    inventory" point.  But in the stores that went through GOB

10   sales, they sold inventory, right?  I mean, they sold --

11             MR. SCHROCK:  Yes.

12             THE COURT:  So, I'm being told that the results of

13   those sales resulted in a -- after four-wall costs, you

14   know, 95 percent of the book value.

15             MR. SCHROCK:  I think it was -- yeah.  When

16   considering only eligible inventory, the NLV would be --

17   yeah, around 95 percent.

18             THE COURT:  Well, it's unclear to me what is in

19   those sales.  Whether it's eligible inventory, whether it's

20   all inventory and what percentage, etc.  But --

21             MR. SCHROCK:  And, Your Honor, we --

22             THE COURT:  -- do you have something to show that

23   the 95 is just of eligible?

24             MR. SCHROCK:  Your Honor, I think that the

25   relevant inquiry is whether or not the second liens have

Page 137

1    submitted evidence that the 95 percent includes only

2    eligible inventory or what specifically is a component part

3    of that.  They just have a gross number that includes the

4    results of the GOB sales.  They had an opportunity to

5    present evidence to show what exactly those numbers were.

6    But all their -- their so-called experts did was assume that

7    number.

8            And so, Your Honor, I don't think that, you know,

9    I'm prepared to sit here and say one way or the other

10   around...  I know the 95 percent did not include all of the

11   costs associated with the GOB sales.  I know that when we

12   evaluated the Tiger bids in connection with comparing the

13   ESL sale to liquidation that we had to back out all of --

14   you know, Tiger was going to use the company's employees.

15   They were going to use -- these were going to be company-run

16   GOBs.  These were not guaranteed results.  These are just

17   something that they could forecast.  And we had to back out

18   all of the costs associated with running the business and

19   operating it to arrive at a net-realizable amount.

20           Now, those amounts are not in the record and

21   they're not in the record, Your Honor, because, frankly, we

22   didn't believe that was the right method to go down to

23   actually value the inventory when we, in fact, had a going

24   concern sale.  But, Your Honor, they certainly -- the second

25   liens never put that evidence into the record.

Page 138

1              The second liens don't dispute that they received

2       100 percent recovery on 433,450,000 of the credit bid.

3       That's part of the record.  That's what they received.  And

4       they don't dispute that the first lien letter of credit

5       facilities were refinanced at the sale, and that was

6       certainly an assumed liability.

7              The -- we've talked a little bit about the -- what

8       ESL side during the course of the negotiations.  I think

9       that that evidence is uncontroverted.  It certainly is

10      instructive.  We have the second lien lenders saying there

11      is no -- there's no allocation.  Well, if there's no

12      allocation, they don't have any evidence of what was

13      actually paid for for the inventory.  All they have is a

14      hypothetical that they point to about what NOLV was.  That's

15      not the law, that's not what the purpose and the proposed

16      use of the inventory was as of the petition date.  We'll let

17      those exhibits speak for themselves.

18              THE COURT:  Well, are you saying that the going

19      concern sale was for a lesser amount than orderly

20      liquidation value?

21              MR. SCHROCK:  Your Honor, it was -- the NOLV and

22      the book value and the 85 percent, it's a little bit apples

23      and oranges because the NOLV only counts eligible inventory.

24      So, for instance, when you do the math around Ms. Murray's

25      calculation -- you know, if you use our numbers on the book

Page 139

1    value or, sorry, on the NOLV, we would be at 95.6 percent

2    under Mr. Griffith's calculations.  That's the rough justice

3    on the equivalent math that we outlined on the record.  We

4    would be at 95.6 percent.  Ms. Murray would be at 88.7

5    percent.

6              I think that whether or not, you know, we would

7    actually -- we believe that by running the sale process, we

8    did increase the value of the assets.  I think that nobody

9    really took into account the fact that this was going to be

10   an unprecedented liquidation.  We didn't know -- the truth

11   is we didn't know what was going to happen if we put the

12   entire Sears chain up through liquidation through, you know,

13   over several months.  And you put -- and you flooded the

14   market.  And all of -- everybody we contacted about a

15   liquidation certainly said that.  That we're not certain

16   what's going to be recovered on account of -- on account of

17   the inventory if you put it all out there at the same time

18   and run it on an expedited basis.

19             I think that, you know, by actually running the

20   sale process, if you'd have went through the NOLV, we do

21   think that the value actually -- you obtained a higher value

22   by going through the process and running the sale process,

23   but that's what was always contemplated from the moment that

24   we started.

25             At the first -- at the petition date, there was no

Page 140

1    right to credit bid.  There was only a process that we had

2    to go through that included the subcommittee investigation,

3    a lengthy process to get through the case.  And only by

4    going through this process and incurring the actual cost

5    were we able to get to a point where the second lien lenders

6    could have the right to credit bid through an order that

7    Your Honor -- or a ruling that Your Honor made in January.

8    Without it, the second line lenders, we believe, would've,

9    in fact, covered substantially less.  And they certainly

10   wouldn't have had the right to credit bid, you know, going

11   straight into a liquidation and we believe under those facts

12   and circumstances.

13            Now, Your Honor did -- you know, you approved the

14   bid procedures.  You had a process to follow.  That's what

15   really happened in this case.  But what's strange is nobody

16   talks about what the real costs were involved in the case

17   other than the Debtors.  There's a hypothetical cost

18   structure and an NOLV to try and arrive at, I think, at a

19   relatively inflated number for a 507(b) claim.  But nobody

20   goes through and actually details what happened during the

21   case in terms of the costs that were incurred and what

22   should be broken out, other than the Debtors.

23            Mr. Griffith goes through that in detail.  I

24   haven't seen or heard any testimony, you know, really

25   criticizing -- they criticize that he didn't do a careful

Page 141

1    enough job but there's nothing that actually goes through

2    and outlines and details what they believe the right 506(c)

3    charge -- you know, should be, other than on a hypothetical

4    basis, not really on an actual cost basis as to what was

5    incurred in this case.

6              We think that if Your Honor looks at -- I believe

7    it's Slide 11, which is just our chart that we had come back

8    to time and time again.  We really do believe it's this

9    simple.  That if you looked at the petition date what they

10   would've recovered -- and, listen, this was, frankly, being

11   generous at the 85 cents that they could ever get there --

12   and then look at what they did recover, they recovered more.

13   There is no 507(b) claim in this case.  And we certainly

14   don't think that the second lien lenders have carried their

15   burden to prove to this Court that there is a 507(b) claim.

16             The second lien lenders did obtain substantial

17   benefits during the course of this case, including, you

18   know, the credit bid, the allowance of their claims, they

19   got a credit bid release, they got a Cyrus release in

20   exchange for pursuing this sale.  And, Your Honor, I don't

21   think that those items should really be discounted when

22   you're looking at the equities as to whether or not there

23   should be a 507(b) claim that's allowed by the Court in this

24   case.

25             Your Honor, none of the second lien experts valued

Page 142

1    the collateral in accordance with the case law using a fair

2    market value approach, as was used -- and what was actually

3    paid for during the course of the sale.  Instead, they go

4    through and assumed valuation without testing it, without

5    questioning it, without doing anything else other than just

6    taking it and plugging it into a model for what would've

7    happened if the company were to move into an NOLV, with

8    regard to two of the experts.  Mr. Henrich's valuation

9    methodology -- you know, we're not going to spend a lot of

10   time on that.  We don't believe that that's very credible.

11          Now, the second lien's experts, you know, do take

12   -- they do -- all of them do include the inventory and the

13   credit cards -- or, sorry, the pharmacy accounts receivable.

14   And I think it's noteworthy, Your Honor, that -- you know, I

15   didn't hear any explanation around why the second lien

16   security agreement wouldn't go through the trouble of

17   actually outlining what their collateral package would be

18   here.  I don't understand how, you know, a script is

19   included within books and records.  It's a right to -- you

20   know, for a customer list.  And they are sold, as Your Honor

21   is very well-aware, you know, in this case and other cases -

22   - you sell scripts and you sell those script lists to other

23   authorized providers of prescriptions when you sell them to

24   a strategic buyer.  So, CVS, you know, Walgreen's, other

25   parties that come in here.

Page 143

```
 1              But you don't have anything in the record that

 2     says why would you have a security agreement that would fail

 3     to enumerate cash, would fail to enumerate the pharmacy

 4     scripts?

 5              THE COURT:  Well, I understand the cash point, but

 6     as far as the -- except as far as proceeds go -- but as far

 7     as scripts, why wouldn't it be included in books and

 8     records?  It's a record of your customers that have

 9     prescriptions that have been written.

10              MR. SCHROCK:  Your Honor, I don't think it's a

11     book and -- to me it's not a -- it's a right to issue a --

12     it's a right to issue a prescription to a customer.  I don't

13     believe it's -- technically, it doesn't appear to be like a

14     book -- you know, a ledger or anything that I would consider

15     like a book and record.

16              The books and records also refers back to, I

17     believe, the underlying collateral package.  So, it's the

18     books and records related to the other items that are

19     enumerated as part of the collateral package.  And that

20     would be relatively circular if you just included books and

21     records that, you know, were allowed to, you know, pertain

22     to something that's not even enumerated.

23              THE COURT:  This is a question for everyone.  Are

24     there -- the parties (indiscernible) find any cases that

25     treat customer lists as being covered by books and records?
```

1                    MR. SCHROCK:  We're not aware of any, Your Honor.

2                    THE COURT:  No?  No?  Everyone's shaking their

3      head no.

4                    MR. SCHROCK:  And, Your Honor, I mean, the fact

5      that you have one security agreement that lists pharmacy

6      receivables, prescription lists, cash and cash equivalents,

7      and you have another that doesn't, you know, that's

8      certainly -- and it's -- you know, it's not like we're

9      talking about parties that are not...  The same parties were

10     in both agreements.

11                   THE COURT:  But it doesn't --

12                   MR. SCHROCK:  In the case of ESL.

13                   THE COURT:  But to me, that just -- that doesn't

14     necessarily mean that it's not covered if it's within an

15     accepted definition.  I mean, going to the pharmacy

16     receivables, for example...

17                   MR. SCHROCK:  Mm hmm?

18                   THE COURT:  It just has the word pharmacy in front

19     of it.  I mean, it's still a receivable.  So, to me that's--

20                   MR. SCHROCK:  Yes, but --

21                   THE COURT:  I don't see why that wouldn't be --

22     wouldn't be collateral, if you have a right to inventory and

23     the proceeds thereof.  And that the pharmacy assets are just

24     like any other assets except they're connected with the

25     pharmacy and there are regulatory issues related to them.

Page 145

1    But you sell them and then you collect on them.

2              MR. SCHROCK:  Yeah, fair enough, Your Honor.  I

3    mean, they do have a right -- and if you look at -- we put a

4    side-by-side for you on page -- on Slide 15.

5              THE COURT:  Right.

6              MR. SCHROCK:  Just to, you know -- they do have a

7    lien on inventory.  You know, they have a lien on documents

8    related to inventory.  I suppose if you were -- if you're

9    going to try and say that somehow it was a document related

10   to an inventory.  But that books and records refers back to

11   the collateral package itself.  And, again, I think it's

12   very circular to try and argue that well, it's included as

13   part of the collateral package.

14             THE COURT:  No, I understand that argument on the

15   scripts.  I'm more focused on pharmacy receivables because

16   that's a different -- it's anywhere from 10-1/2 to 14-1/2 in

17   the three 2L experts' reports, and it's given zero value by

18   the Debtors.  But, I mean, a receivable is a receivable,

19   whether it has pharmacy in front of it or not, it seems to

20   me.

21             MR. SCHROCK:  Yeah.  And, Your Honor, they -- I

22   mean, when I'm looking -- I'm just looking at the collateral

23   package here.  They have credit card accounts receivable,

24   inventory...

25             THE COURT:  Yeah.

1              MR. SCHROCK:  But they don't have --

2              THE COURT:  But it extends to proceeds of the

3     foregoing.

4              MR. SCHROCK:  It does.

5              THE COURT:  Right.

6              MR. SCHROCK:  It does.  But it doesn't -- they

7     don't have a general lien on all -- on all accounts...  The

8     accounts receivable is limited to credit cards.

9              THE COURT:  No, I understand.  But you would have

10    proceeds of inventory.

11             MR. SCHROCK:  Yes.  Yes, you would.

12             THE COURT:  And once you collect on the AR, that's

13    proceeds.

14             MR. SCHROCK:  Although I would say generally on

15    the AR, you know, that's -- you know, again, I mean, I

16    guess, to the extent it's from a credit card, that's right.

17    To the extent that I would agree with it -- to the extent

18    it's related --

19             THE COURT:  Well, the thing is, the credit card

20    receivable isn't necessary a proceed of inventory.

21             MR. SCHROCK:  Correct.

22             THE COURT:  Because of the credit card

23    relationship.  So, I could see why that would be separately

24    listed.  Because you can't get there from just having a lien

25    on inventory and the proceeds thereof.

Page 147

```
 1              MR. SCHROCK:  Right.

 2              THE COURT:  Because you go through the credit card

 3    issuer.

 4              MR. SCHROCK:  Right.

 5              THE COURT:  Anyway...so...

 6              MR. SCHROCK:  But, Your Honor, I think --

 7              THE COURT:  So, maybe you win one out of two on

 8    those.

 9              MR. SCHROCK:  But -- but, Your Honor, I mean,

10    again, I do think it's noteworthy that -- you certainly can

11    take judicial notice of the fact that there's -- the same

12    lenders are parties to each of these --

13              THE COURT:  Maybe they have different lawyers, I

14    don't know.  I mean, I don't --

15              MR. SCHROCK:  They certainly did not.

16              THE COURT:  But that doesn't really matter if you

17    can get a perfected lien on the description in the 2L

18    security agreement, right?

19              MR. SCHROCK:  Mm hmm.

20              THE COURT:  I mean, just because other people --

21    you know, other people draft it differently...  I've not

22    been -- put it differently.  I've not been given any law

23    that says that you've waived your right to certain proceeds

24    if you don't -- if you enter into another agreement that

25    specifies the right to those proceeds.
```

Page 148

1          MR. SCHROCK:  Yeah, I agree, Your Honor.  I do

2    think that the DIP order did certainly note that there's a

3    category of collateral that the second liens don't have.

4    When they kind of go through the recitals, they talk about

5    it being specified, you know -- certain specified collateral

6    of the ABL lenders that's not party to -- or that the second

7    liens don't have.

8          THE COURT:  Right.

9          MR. SCHROCK:  I think that certainly every

10   analysis that the Debtors have ever done, we never thought

11   that they did -- and I certainly, you know, up until this

12   507(b) argument, I'd never really heard about the pharmacy

13   receivables, and script lists, and cash and cash equivalents

14   --

15          THE COURT:  Well, they don't have a lien on cash

16   except for traceable proceeds, and they don't have a lien on

17   --

18          MR. SCHROCK:  And they haven't done any tracing.

19          THE COURT:  Right.  And they don't have a lien on

20   scripts, I don't think.

21          MR. SCHROCK:  They have credit card account -- I

22   mean, to the extent...  I mean, when you think about it,

23   what are we really talking about?  So, pharmacy receivables

24   versus prescription lists.  I think that the scripts, those

25   are meaningful, right?  You sell those in a GOB.  A pharmacy

Page 149

1    receivable, as opposed to a credit card accounts receivable

2    -- I would think that's a pretty narrow universe of items.

3    But we don't -- you know, unfortunately, we don't have

4    anything in the record kind of enumerating what that would

5    even be.  But, you know, when we looked through this I said,

6    well, it's hard to -- when you look at what's a pharmacy

7    receivable, it seemed to be they were just drafting

8    carefully.

9          But a list -- there's not a prescription, there's

10   nothing in the grant of collateral that's around a

11   prescription list for -- and no one certainly argued it.

12         THE COURT:  Right.  Well, the experts have a value

13   between 10-1/2 and 14-1/2 million for pharmacy receivables.

14   They're getting it from somewhere, I'm assuming.  Because

15   they haven't independently valued them -- they're getting it

16   from the Debtor's books and records.

17         MR. SCHROCK:  Right.

18         THE COURT:  Just the face value, right?  Although

19   someone's discounted it.

20         MR. SCHROCK:  Right.  But, Your Honor, I'm not

21   aware of anybody ever, you know, speaking of that -- just

22   kind of prosecuting a 507(b) claim where they don't actually

23   do a valuation.  There's no valuation that comes from the

24   parties that are asserting a 507(b) claim in this case.  All

25   they do is rely on one -- a part of one for -- from Abacus.

Page 150

1                    There's nothing in the record that they even did.

2         They didn't vet it.  They didn't test it.  They didn't try

3         and get the rest of the -- they could've brought Abacus in

4         here.  They could've asked a lot of questions around it.  We

5         weren't going to do that because it wasn't our burden, but I

6         don't know how someone satisfies their burden to prove that

7         there's a 507(b) claim when you don't even do a valuation.

8                    They didn't even perform one in any regard.  They

9         did a math and there was a methodology, I think a flawed

10        one, about what would happen if there was a liquidation of

11        the business, but that wasn't our plan, that's not what

12        happened.  And then you look at what's the end test result.

13        We don't know.  We don't know what the end test result is.

14        There's no...  you know, "Mr. Schrock said there's no --

15        there's nothing in the record about that so we can't tell

16        you." Those two things together don't add up of proof of

17        anything.

18                    The -- every one of these experts understate the

19        first lien debt.  To me, it would just turn everything on

20        its head if you say that you signed an inter-creditor

21        agreement and you can't get paid anything until the

22        discharge of the ABL obligations, in which you sign a

23        contract that include the LC obligations and including cash

24        collateralization up to 105 percent -- you then get -- those

25        agreements are then...  But you can't get paid anything

Page 151

1    until those things occur.  Your liens are subordinated.  But

2    somehow now, because we've refinanced them as part of the

3    sale in which the second lien lenders, the largest ones

4    participated in, that now there's -- they -- you know, you

5    don't even count that, count that amount.

6            And if you're going to use an NOLV, Your Honor,

7    and, honestly, I don't know where you were headed on this,

8    but how can you not include the LCs that would have to be

9    paid in a liquidation?  A liquidation, by definition, you

10   have to pay off all of the ABL obligations including...

11   Now, that's what the inter-creditor really does.  It talks

12   about what happens if the music stops.  And if the music

13   stops, those amounts have to be paid.  That's what the

14   record is in these cases.

15           Your Honor's already hit that the sale process --

16   nobody really questions what happened in the cases as far as

17   the Debtors running a fair sale process.  They don't say

18   that that was, you know, an unfair way to conduct the cases.

19   They don't talk about that, you know -- there was no

20   criticism, and those statements are in the record

21   uncontroverted.  And we think that's meaningful because,

22   again, when you look at the equities and you also, when you

23   look at what would actually occur to yield a fair market

24   value sale of the collateral in these cases.

25           I'm going to let the Unsecured Creditors Committee

Page 152

1    hit a lot of the equities in determining whether or not

2    there should be a 507(b) claim here.  But I'll just

3    emphasize, Your Honor, that when you really look at what

4    happened in these cases, and it was not -- as Your Honor is

5    well-aware, it wasn't for certain by any stretch that we

6    were going to be able to save the company, that we were

7    going to be able to sell these assets on a going concern

8    basis.  And it was by far the largest second lien lender

9    that was the purchaser of that -- those assets.

10          The second lien lender that also, you know, helped

11   finance those assets and is, you know, an owner to some

12   degree, I presume, in Transform Co -- that those parties are

13   now able to come back after there was such a heavy fight

14   around liquidation to say we want a large 507(b) claim in

15   these cases in addition to this.  Especially when you

16   consider the language that was agreed to as part of the APA

17   sale order.

18          THE COURT:  Well, but doesn't that cut the other

19   way?  I mean, ESL reserved the right, although capped, to

20   make or file a 507(b) claim.  So, it's kind of hard to argue

21   that they waived it when they reserved it.

22          MR. SCHROCK:  They didn't waive it, Judge.  I

23   think that's, you know, one of the reasons that -- and, you

24   know, listen, the law we point to is 503(c)(3).  That, you

25   know, Your Honor is certainly allowed to take into account

Page 153

1    the facts and circumstances of the case to determine whether

2    or not that there should be, you know, a claim granted in

3    these cases.

4              THE COURT:  Well, I'm sorry, 503(c)(3)?

5              MR. SCHROCK:  Yes.

6              THE COURT:  Why would that be applicable?

7              MR. SCHROCK:  Because I think that other transfers

8    or obligations are outside the ordinary course of business

9    and not justified by the facts and circumstances of the

10   cases -- that's within the gambit of 503.  And there's

11   nothing in the DIP order that says that that provision is

12   waived or that Your Honor would not be taking that into

13   account.

14             THE COURT:  So, you're saying that the 507 claim,

15   as far as insiders, which would be ESL --

16             MR. SCHROCK:  Yes.

17             THE COURT:  -- is concerned, is actually governed

18   by 503(c)...?

19             MR. SCHROCK:  I think it's relevant, Your Honor,

20   just according to the text.  I admit, I have not seen any

21   cases to this effect but we will...  I don't think that we

22   need to get there in order for the Debtors to prevail.

23             THE COURT:  Because this really applies to

24   inducing the person to stay.

25             MR. SCHROCK:  Well, that's certainly the

Page 154

1    subsection, yes, Your Honor.  But that's not to what -- by

2    its plain terms, that's what it would apply to.  It applies

3    to insiders.

4              THE COURT:  I mean, there are a few cases that

5    apply equitable principles to a 507(b) claim.  They're

6    fairly old.  They predate Flagstaff.  And they actually stem

7    from a case that Flagstaff disagreed with, although that was

8    in a 506(c) context.

9              MR. SCHROCK:  Your Honor, I do think that the

10   equities in this particular case, and especially when you

11   hear from the Unsecured Creditors Committee, that they

12   certainly -- they oppose the sale.  That's not the way this

13   case worked out.  But to say that those parties that

14   actually purchased the assets, who agreed to a cap, as in

15   large part, as part of their -- you know, the APA, are now

16   allowed to basically take everything from the unsecured

17   creditors in these cases.

18             That's not, I would submit, you know, as a

19   restructuring professional, as somebody who lived this, that

20   doesn't seem like the right outcome here in light of all the

21   facts and circumstances.  But, Your Honor, I'll let them --

22   I'll let the Creditors Committee discuss more of the

23   equities.

24             THE COURT:  Okay.

25             MR. SCHROCK:  On 506(c), Your Honor, only the

Page 155

1    Debtors put forth evidence of the actual cost in these

2    cases.

3              THE COURT:  But the 2Ls put holes in that.

4              MR. SCHROCK:  They talked about certain things

5    that they would do differently in the context of the

6    liquidation but, you know, Mr. Griffith's testimony -- and

7    we go through the categories on Page 26 -- his testimony

8    around the actual cost, it's uncontroverted.  This is a

9    retailer.  The stores exist so we can sell the inventory and

10   collect on the credit card receivables.  The employee

11   payroll, the rent, the logistics, the professional fees, all

12   of these expenses, Your Honor, by line item -- and this is

13   somebody from M3.  I mean, Mr. Griffith has been on the

14   ground with the Debtors for a couple of years.  He's very

15   familiar with the business and he's the only person that

16   spoke to "here's what I believe and we think is fair to

17   allocate to the second lien collateral."

18              And when you think about it, for a retailer, if

19   you're not allocating it to this, you know, what else are

20   you -- you know, there may be some other costs.  And he

21   didn't allocate everything, but anybody who --

22              THE COURT:  I mean, the case law refers to there

23   needing to be a reasonable relation between the cost and the

24   collateral.

25              MR. SCHROCK:  Mm hmm.

Page 156

1          THE COURT:  This seems to be way out of whack from

2     that.

3          MR. SCHROCK:  Well, Your Honor --

4          THE COURT:  And, secondly, I can certainly think

5     of other beneficiaries of the case -- landlords...

6          MR. SCHROCK:  Yes.

7          THE COURT:  ...503(b)(9) claimants whose

8     obligations were assumed...

9          MR. SCHROCK:  Yes.

10         THE COURT:  ...employees, PBGC.  I mean, it may be

11    that these are legitimate quantifications of expenses.

12         MR. SCHROCK:  Yes.

13         THE COURT:  But I don't see how this shows that

14    they were primarily for the benefit of the 2L creditors.

15         MR. SCHROCK:  Well, Your Honor --

16         THE COURT:  Except, you know, in a much smaller

17    subset that may be included in -- already in valuations of

18    the inventory and receivables, or largely already included

19    in.  I mean, legal is clearly not included in this.

20         MR. SCHROCK:  Legal is not included.  But if Your

21    Honor is going to use -- if you were to use NOVL to start,

22    which I will say again, that's not what happened here -- you

23    know, we had a fair market sale of the assets.  When you

24    look at the employees, the company exists to run a retail

25    operation to sell the inventory.  There may be some indirect

Page 157

1   overhead that Your Honor can choose to exclude but certainly

2   all of the employees in the stores.

3           THE COURT:  Well, that's if you assume the

4   inventory is the retail value.  I understand -- I mean, I

5   think -- I understand that point if you go with the legal

6   analysis that would lead to Mr. Henrich's valuation.

7           MR. SCHROCK:  Mm hmm.

8           THE COURT:  But I think you can just as easily say

9   that the real value of the collateral is something much more

10  narrow than that, which is the value of the 2L lenders'

11  interest and the Debtors' interest in that collateral, which

12  I think is much more reduced to what they would be able

13  likely to achieve.

14          And then you may have equities that go into the

15  fact that they didn't insist on doing that at the beginning,

16  although they did consent to let the process go on.

17          MR. SCHROCK:  They consented to (indiscernible) so

18  they're flat --

19          THE COURT:  And one of them very actively

20  participated in that process.  And one of them knew that by

21  lending to the process, it was going to go on two months

22  longer than --

23          MR. SCHROCK:  Yeah.

24          THE COURT:  -- in a net orderly liquidation value.

25  But leaving that aside, I mean, I think that counsel for

Page 158

1    Cyrus made what I thought was a pretty good point, which was

2    that although she used net orderly liquidation value, that's

3    basically a way to value the collateral, even in the hands

4    of the Debtor because, again, it's their interest in the

5    collateral.

6            But that would assume that except for narrow

7    categories that specifically relate to that collateral, the

8    idea that the business operates for their benefit doesn't

9    really fly.  The whole business.

10           MR. SCHROCK:  Yeah, I thought it was interesting,

11   Your Honor, when you actually use the math -- NOLV again is

12   only eligible inventory.  You know, I believe that would

13   bring Ms. Murray's value around 88.7 percent.  We actually

14   used a higher value.

15           THE COURT:  I understand.  This --

16           MR. SCHROCK:  Ours was 95.6.

17           THE COURT:  Well, I understand.  But she's -- it's

18   a different analysis because it looks at not the GOB sales

19   but the value in place.

20           MR. SCHROCK:  But, again, Your Honor, I mean, we

21   ran a sale process and we sold the inventory.  Your Honor,

22   we sold the inventory for 85 cents.  We incurred all of

23   these costs to get there, to run the case.  And it's not --

24   you don't --  you know, you have to allocate, you know --

25   I've seen, you know, ResCap -- certainly Judge Glenn on

Page 159

1    ResCap, he actually -- because there was -- in part, I

2    think, because there was a 506(c) waiver there, he actually

3    includes the cost for the starting delta of the 507(b)

4    claim.

5              But where there is no 506(c) waiver, we incurred

6    1.4 -- you know, a billion and a half dollars' worth of cost

7    to get to the sale, okay?  And then, you know, to say that

8    there's -- that they get to use a hypothetical NOVL, which

9    didn't occur, as a way to value --

10             THE COURT:  Well, it's two different -- I think

11   we're talking about two different points.

12             MR. SCHROCK:  Okay.

13             THE COURT:  You don't really have a valuation to

14   support the 85 percent either.  It was just --

15             MR. SCHROCK:  No, we just have what happened in

16   the case.

17             THE COURT:  Well, except as reflected in the

18   record, that's -- that consists of deal proposals...

19             MR. SCHROCK:  Yes.

20             THE COURT:  ...which were not the final proposal,

21   where parties were talking around 85 percent...

22             MR. SCHROCK:  Mm hmm.

23             THE COURT:  ...testimony that parties were talking

24   about 85 percent, which is consistent with those deal

25   proposals, and a final agreement that doesn't have an actual

Page 160

1    allocation where it says 85 -- it doesn't really say 85

2    percent.  You get there by doing math, including some of the

3    debt.

4            MR. SCHROCK:  Right.  But, Your Honor, what did

5    the second liens put up for the value, the sale value?

6            THE COURT:  Well, I'm just --

7            MR. SCHROCK:  I don't think they put up anything

8    but, you know...

9            THE COURT:  Well, they -- there is, in essence,

10   two of the experts basically look at book value and do no

11   valuation on that other than valuing the Debtors -- a retail

12   -- Mr. Henrich valued the Debtors a retail enterprise and

13   basically said that's our value.

14           MR. SCHROCK:  Mm hmm.

15           THE COURT:  And then Ms. Murray, I think, applied

16   a fairly traditional approach to valuing inventory and

17   receivables.

18           MR. SCHROCK:  Right, but not what actually

19   happened in the case.  I don't know how someone can argue,

20   Your Honor, that we are submitting there is no proof of what

21   was actually paid for the assets but yet -- but they have to

22   make their case.

23           THE COURT:  Well, their only proof is in the

24   actual GOB sales, and that doesn't reflect all the cost.

25           MR. SCHROCK:  It does not reflect all the cost.

Page 161

1     Abacus is, you know --

2               THE COURT:  So, why doesn't Ms. Murray's analysis

3     actually kind of dovetail that when you actually factor in

4     the cost?

5               MR. SCHROCK:  Your Honor, I believe that if you're

6     going to use anyone's, okay, you know, I would stipulate on

7     their side that Ms. Murray's would be -- holds together the

8     most --

9               THE COURT:  I mean, I'm not asking you to agree

10    that she should include the cash, the scripts, or the full

11    value of the inventory in transit.  But other than that, it

12    does seem to be a valuation.  I appreciate she relies

13    heavily on Tiger, but she also doesn't say Tiger -- I mean,

14    she does say that she has experience valuing these types of

15    assets and she sees nothing to criticize at Tiger's number.

16              MR. SCHROCK:  Yeah, but, Your Honor, I think what

17    Ms. Murray and all the experts do -- not one of them

18    actually performs a valuation of what occurred.  All they do

19    is run, you know, some calculations based upon relying on

20    the work of another party, who's not in front of the Court,

21    and their complete analysis is not in front of the Court,

22    and run from what actually happened in these cases.  That

23    they bought the collateral for 85 cents.

24              THE COURT:  All right.  Although I don't really

25    have that in the record either.  I have indications that

Page 162

1    people were talking around that number.

2            MR. SCHROCK:  Your Honor, we don't have a final

3    agreement that denotes the 85 cents.  What we do have is the

4    value of the first lien debt, we have the book value of the

5    inventory and a starting point, and we have a credit bid

6    where they actually received 100 cents on the dollar.  And,

7    you know, other than the parties who were subordinated, you

8    know, it's by the two parties that purchased and were in

9    involved in the purchase of the assets of the company.

10           THE COURT:  Right.  So, what is your response to

11   the citations to Abacus and indicative proposals by other

12   liquidators, and the creditors' committees, and Debtor's

13   statements, all of which sort of revolve somewhere between

14   89 and 92 percent?  Is it that we don't know what that's a

15   percent of?

16           MR. SCHROCK:  We don't.  You know, there -- these

17   are -- you know, these are -- first of all, the Abacus, you

18   know, bid, when you look at it, doesn't have all of the

19   costs, and the second liens never put in or even attempted

20   to try and put in a complete notion of what -- you know,

21   what all of those included.  There's a number of costs that

22   would have to come off of the Abacus.

23           You know, Abacus, again, they're not buying the

24   inventory.  They're using all of the company's employees.

25           THE COURT:  To sell the inventory.

Page 163

1           MR. SCHROCK:  And to get a net realizable value,

2     which was substantially below, in our estimates, you know,

3     below the 85 cents that, you know, I guess, that we actually

4     compared it to when we, as a board, you know, agreed to sell

5     the assets of the company.

6           But my response to that, Your Honor, is just,

7     again, that is not -- that's not what happened in these

8     cases.  It's a data point, just like the data point that ESL

9     was trying to talk the Debtors into taking their bid by

10    buying the collateral for 85 cents.  They were pleading with

11    us, they were writing letters to everyone that would listen

12    -- we're paying you more than you're going to get on a

13    liquidation basis -- we're giving you 85 cents.

14          And when you actually subtract it out, you know,

15    those are -- coupled with the risk associated with actually

16    undertaking an unprecedented liquidation of an iconic

17    retailer, that what was going to happen by dumping all of

18    this inventory onto the street and trying to sell it over

19    the course of six months during the first six months of the

20    year, we believed you're going to get a higher value by

21    actually pursuing the sale.  But if you look --

22          THE COURT:  So you're saying, in essence, that's

23    inequitable -- it's inequitable for them at that point to

24    then say they actually lost value?

25          MR. SCHROCK:  Yes.  Yes.  I mean, it is certainly

Page 164

1    inequitable --

2            THE COURT:  Although that's just ESL.  That's no

3    one else.

4            MR. SCHROCK:  I submit it's also Cyrus, Your

5    Honor, but -- and then there's the parties who are

6    subordinated and they're out of the money under all

7    circumstances.  Your Honor, we do think the 506(c)

8    surcharges were necessary and reasonable and a direct

9    benefit to their...  I think that Mr. Griffith's testimony,

10   again, he was the only one that talked about the actual

11   costs incurred in the case.  That, you know, he's broken

12   them out, and we go through this on Slide 27, around, you

13   know, what actually was -- what was actually borne by the

14   estate.  These are real costs that were actually incurred by

15   the company.  And you can't controvert that by just pointing

16   to a hypothetical and submitting that that's a better record

17   on which the Court should rely.

18           And I know Your Honor's familiar with this, but

19   the purpose behind 506(c) is to prevent unjust enrichment, a

20   windfall to a secured creditor at the expense of the estate.

21   They didn't have a 506(c) waiver.  We know this.  If you

22   would buy their argument, Your Honor, they're saying that

23   we're not going to devaluate any of the actual cost in these

24   cases.  We're going to use a net -- NOLV and we're going to

25   insist that none of the cost -- actually, there's a zero

Page 165

1    506(c) surcharge.

2            Now, Ms. Murray does, you know, say that there is

3    some amount here, but this amount, the 506(c) surcharge, we

4    believe dwarfs any legitimate 507(b) claim that's in these

5    cases.  And we go through the actual cost and, Mr. Griffith

6    does, what happens after, you know, post-sale as well.

7            That, listen, there was some inventory that

8    actually existed that, you know, has been -- that has been

9    spent.  But when you look at the 506(c) surcharges that are

10   allocable to that inventory from the petition date through

11   these cases, there's certainly nothing that we believe that

12   would entitle them to any recovery on account of a 507(b)

13   claim.

14           So, Your Honor, I'm not sure if I answered all of

15   your questions but I'm -- I'll reserve the right to stand

16   back up if parties are going to retort on the 506(c) issues

17   and I'll let the Creditors Committee get up at this time.

18           THE COURT:  Okay.

19           MR. SCHROCK:  Thanks.

20           MR. SORKIN:  Good afternoon, Your Honor.  Joseph

21   Sorkin, Akin Gump, on behalf of the Official Committee of

22   Unsecured Creditors.  Your Honor, I think we've covered most

23   of what there is to talk about and what I would cover.  So,

24   I think I will be brief.  I think it's important, though, to

25   bring it altogether -- excuse me -- and focus just for a

Page 166

1    minute on the equities.  But those equities also play into

2    the proposed theories of recoveries that each of the

3    Claimants have put forth here and why the equities, both

4    with respect to equitable arguments and why the fundamental

5    premise of those theories fails.

6          Your Honor, the Committee approaches this dispute

7    or comes to this dispute having lived the realities of this

8    case.  The second lien parties are effectively in their

9    request for 507(b) claim attempting to ignore those

10   realities.

11         We heard this morning ESL talk about the policy

12   behind adequate protection legislation and what was meant.

13   What we didn't hear talked about and there is no case law

14   that says you look at a second lien lender or any secured

15   lender independent of every other action they take in the

16   case.  In this case, you have to look at ESL as ESL not from

17   the petition date but as ESL throughout the entirety of the

18   process and the advocacy and the forcefulness with which

19   they pursued a going concern sale, which is exactly what

20   happened from the time of filing.

21         So, again, I don't think there's really any

22   dispute here.  I think the level of aggressiveness

23   culminated with what is Joint Exhibit 25, excuse me, the

24   January 7th letter threatening litigation if the debtors did

25   not pursue the going concern sale.  And in just a minute

Page 167

1    we'll talk about each individually -- ESL, Cyrus, and

2    Wilmington Trust -- with respect to the experts they've put

3    forth.

4              Now, Cyrus has understandably attempted to

5    distance itself from ESL and look at each decision in a

6    vacuum.  But the Committee argues that you can't do that.

7    You have to look at what Cyrus has done and how it's

8    approached its actions in the entire case because it was

9    those actions that allowed for financing first of the junior

10   DIP and then a rollover in connection with the sale of that

11   DIP.

12             In addition, none of the second-lien parties

13   advocated for anything other than going concern sale or the

14   sale to ESL.  So, again, all of that taken together

15   establishes that the second-lien parties without their

16   actions, or inactions in some case, there would not have

17   been a going concern sale.  Absent those second-lien

18   parties, no going concern sale would have happened.  And,

19   again, the Court cannot, and there's no authority that's

20   been cited nor that we found that says the Court looks at

21   and ignores the actions taken by the second-lien parties

22   separate from their status as second-lien parties.

23             And that is why, and especially for the Committee

24   given the history of this case, the arguments in support of

25   the second-lien parties' 507(b) claim and against the

Page 168

1  surcharge are so jarring and so -- such a difficult pill to

2  swallow.  So if we look at them individually, first ESL,

3  Your Honor.

4          So ESL has put forth an expert that says the

5  appropriate value look at -- again, not a valuation.  We

6  agree one hundred percent with the Debtors that the second-

7  lien parties have not met their burden.  They have put forth

8  an expert who takes book value, and I think the discount

9  amounted to less than one percent that was applied to come

10  to the value.  Now, if you were to ask ESL how ESL viewed

11  the value of that inventory, well, there's been a lot of

12  talk about the 85 cents.  What the 85 cents shows, setting

13  aside whether or not it shows the value of the assets -- we

14  believe it does -- set that aside, what it clearly shows is

15  that ESL believed that the value of the inventory was far

16  less than a small one percent discount.

17          So, again, it is that argument, the fact that ESL

18  now comes to this Court --

19          THE COURT:  I'm sorry.  Why is that?  Why should I

20  assume ESL thought that?

21          MR. SORKIN:  Because ESL in its own documents in

22  connection with presenting its bids -- understandably, this

23  is not what was in the APA.  What it clearly shows is that

24  ESL's assumptions and what it was assuming would be part of

25  the entire package it was putting together in its bid, value

Page 169

1    the inventory as far less than a hundred cents.

2            THE COURT:  Okay.

3            MR. SORKIN:  That document is in evidence.  It's

4    an exception to hearsay because it's an admission by a party

5    opponent.  So I don't think there's any question that that

6    was -- again, whether or not it is the actual value, no

7    question that that was an indication of what they believe

8    value was.

9            So to now come and suggest that the Court should

10   ignore that and look at an expert that is decreasing the

11   value or diminishing the -- you know, has a small decrease

12   of one percent, we think is again just evidence of why it is

13   inequitable to come to this Court now.  Again, all of this

14   is secondary to the primary argument that the 507(b)

15   claimants here have not carried their burden.  They have not

16   put forth evidence of fair market value of the inventory for

17   its intended purpose.  And that leads to Cyrus.

18           So, Cyrus has put forth a valuation for a net

19   orderly liquidation value, and Mr. Schrock talked about why

20   that is not appropriate here.  But, again, to suggest that

21   you just ignore everything that happened and every action

22   that Cyrus took after the petition date where it funded and

23   without that funding, there would not have been a going

24   concern sale, it wasn't necessarily pre-ordained.  We argued

25   against it.  But Cyrus knew that what was actually going to

Page 170

1        happen was just as likely to be a going concern sale.

2              And, again, as Mr. Schrock said, the idea that

3        you're now going to argue that the fair market value is not

4        what actually happened runs counter to everything that they

5        understood and the actions they took that allowed that going

6        concern sale to happen.

7              THE COURT:  Well, all right.  I understand your

8        point about ESL.  I think it's basically you're saying that

9        at some point -- well, let me back up.  The purpose of

10       507(b) is to protect a lender against the diminution of the

11       value of its collateral.  There's a subsidiary purpose or a

12       purpose within that purpose which is to encourage lenders

13       and other parties in interest to give debtors more time to

14       see whether one course such as a going concern sale or a

15       reorganization will actually achieve more value and to

16       discourage prompt liquidations.

17             Your point in ESL is, well, ESL was pushing for

18       sale here no matter what.  There was no choice here.  ESL

19       didn't really have a choice ever, ever express a choice.  It

20       was all for the going concern approach.  Cyrus, I'm not sure

21       your argument really fits into the construct for 507(b)

22       because while they're funding it, one of the reasons they're

23       funding it is they know they have the 507(b) protections.

24             I mean I understand it's somewhat meaningful to me

25       that they were funding beyond 12 weeks, and the liquidation

Page 171

1    scenario assumed 12 weeks.  But maybe that just goes to

2    things like post-petition interest being part of the

3    calculation, not just for the 12 weeks but for the whole --

4    you know, through the sale.  But, to me, it's a different --

5    I mean to say that a lender that has various options,

6    doesn't really know which is the best should have 507(b)

7    narrowed because they tried to keep options open is -- it

8    doesn't sound like it's the same analysis.

9              MR. SORKIN:  Well, two points.

10             THE COURT:  The application would be different on

11   the same analysis, in other words.

12             MR. SORKIN:  Understood, Your Honor.  And I guess

13   two points, and one is with respect to the equitable

14   arguments, we are certainly not arguing that they all stand

15   or fall together.  Certainly, ESL is in its own category,

16   and any claim by ESL could be denied in and of itself.

17             With respect to Cyrus, I would go back to the

18   point I made earlier which is if you were looking only at

19   the junior DIP and at the decision with respect to whether

20   or not to fund the junior DIP, I think Your Honor's points

21   would be correct.  But when looking at, as a whole, the

22   participation of Cyrus in the junior DIP and then the

23   decision to fund, again, if those are viewed as an act or

24   independently making separate decisions, then, you know, I

25   think it's a harder argument to make.  But here, what you

Page 172

1  have is the same actor agreeing to both fund the process

2  which went beyond what would be necessary for a liquidation

3  which was what was necessary for and contemplated a going

4  concern sale process and then participate and roll that

5  over.  So I think it's the combination here of those two

6  actions that make this different.

7            THE COURT:  Although you could say that they're

8  making the best of a bad deal, you know, at that point.  I'm

9  not sure that's right, but I'm reluctant to adopt a

10  principle that would preclude people from making the best of

11  a bad deal.  Anyway --

12            MR. SORKIN:  Understood, Your Honor.  And as Mr.

13  Schrock said, there isn't -- unlike ESL, and we have not put

14  before the Court evidence of counsel for Cyrus making

15  statements on the record, so we agree with Mr. Schrock on

16  that.

17            THE COURT:  Okay.

18            MR. SORKIN:  And, finally, Your Honor, I guess I

19  would move to Wilmington Trust, and I think that situation's

20  a little bit different because I think the idea that anyone

21  viewed or approached this process beginning as of the

22  petition date as an ongoing retail operation, it's just not

23  consistent with the facts.  And I would point out that to

24  the extent there was ever a discussion of having lived it,

25  the possibility of certain retail operations continuing,

Page 173

1    that was on a much smaller footprint and was never anything

2    that really materialized.

3              THE COURT:  Okay.

4              MR. SORKIN:  So, with that, Your Honor, unless the

5    Court has any further questions, I think that is all the

6    Committee had.

7              THE COURT:  Okay.  All right.

8              MR. O'NEAL:  Just a brief rebuttal?  Thank you,

9    Your Honor, for your patience.  I know this has been a long

10   day.

11             So let me just start with the equities of the

12   case.  I don't know where Your Honor is on this.  But I do

13   feel compelled to say a few things because I'm happy to

14   embrace the equities of the case.

15             THE COURT:  Well, you know, the equities of the

16   case is a loaded term.  I would prefer to look at the --

17   although cases from the '80s use it.  I would prefer to look

18   at this as how it ties into valuation.  At some point, it

19   does seem strange to me that a company that not only is

20   trying to keep its options open but is actually threatening

21   the board for going with a liquidation alternative as

22   opposed to a going concern sale, can say that the value of

23   its collateral is actually higher in a liquidation.

24             MR. O'NEAL:  Right.  Your Honor, all our

25   liquidation analysis in Schulte's report is just a rebuttal

Page 174

1    to the arguments that the Debtors had made with respect to

2    the equities in the case.  So I'd like to address that.

3              THE COURT:  Okay.

4              MR. O'NEAL:  I mean let's -- it's kind of

5    astounding to hear us described as some kind of villains in

6    this process.

7              THE COURT:  I'm just -- again, I'm trying to keep

8    this on the level of valuation.

9              MR. O'NEAL:  Certainly, okay.  So let's --

10             THE COURT:  I mean I think ESL knew as much about

11   these companies as the people running the companies.  And

12   they had a substantial investment in the debt.  They knew

13   the equity was worthless.  And they contend that

14   notwithstanding that, the going concern sale that they

15   pushed very hard for somehow reduced the overall value of

16   the company on the petition date by, you know, a factor too.

17             MR. O'NEAL:  Well --

18             THE COURT:  Some of that just doesn't concern me.

19             MR. O'NEAL:  Certainly.

20             THE COURT:  I mean why would -- that's like saying

21   you're just hitting yourself on the head.

22             MR. O'NEAL:  I think this goes to the point that

23   you made when you were speaking with Mr. Schrock, which is

24   that when we did the big, we preserved our --

25             THE COURT:  I'm not talking about the 85 percent.

Page 175

```
 1                MR. O'NEAL:  No.  And I'm not either.

 2                THE COURT:  Okay.

 3                MR. O'NEAL:  I'm talking about when we actually --

 4      when we bought these assets --

 5                THE COURT:  Right.

 6                MR. O'NEAL:  -- we preserved our rights to pursue

 7      507(b) claims.  We preserved our rights at every turn in

 8      this process.

 9                THE COURT:  So, I guess all that that means is

10      that -- to me, at least, is that when you're negotiating for

11      the sale, the sale itself isn't really fair market value for

12      these assets?

13                MR. O'NEAL:  No.  I don't -- we're not saying that

14      at all.  I mean I think what we're saying is that when we

15      agreed to purchase the assets after a substantial

16      negotiation after a lot of give and take, ESL has a lot of

17      different capacities in this situation, not only as a

18      second-lien creditor, but also as a first-lien creditor,

19      also as an unsecured creditor, also we have Eddie Lampert

20      who was chairman of the board for some time.  We have the

21      fact that ESL had invested billions of dollars in this

22      company and had not just an economic interest but other

23      interest as well and very much wanted to continue the

24      business and to continue the employment or at least to stop

25      the immediate termination of 45,000 employees.
```

Page 176

1            There were a lot of things that were motivating

2    ESL beyond its second-lien position.  And I don't think that

3    ESL should be penalized for buying the assets and actually

4    creating value for everybody in this room.  There would be

5    no --

6            THE COURT:  Well, I guess that's the point.  If

7    it's creating value, how can it argue that it actually has

8    lost value on the collateral?

9            MR. O'NEAL:  It is -- we created value through the

10   assumption of liabilities, for example, correct.  And we

11   created value through the, as you mentioned, the assumption

12   of leases and the assumption of contracts.

13           THE COURT:  But does that mean that --

14           MR. O'NEAL:  It doesn't mean we waived our 507(b)

15   -- I mean --

16           THE COURT:  No, I know you never waived -- there's

17   no waiver.

18           MR. O'NEAL:  Yeah.

19           THE COURT:  This is not a waiver argument.  It's a

20   valuation argument.  It's hard for me to see that there

21   would be such a disconnect between the sale proposal and the

22   value of the 2L collateral --

23           MR. O'NEAL:  Well, there's --

24           THE COURT:  -- since it was inventory and

25   receivables.

Page 177

1           MR. O'NEAL:  Yeah, I mean we're just looking to

2      the collateral, the second-lien collateral.  We're applying

3      Rash.  We believe that the replacement value is the book

4      value.  And then we do the math from there, and then we

5      deduct the applicable first-lien debt.  We're just following

6      what standard case law says in terms of --

7           THE COURT:  You know, of course, the standard case

8      law that you cite doesn't say anything like that.  In fact,

9      it says just the opposite.  I'll turn to it.

10          MR. O'NEAL:  Are you referring to Rash or --

11          THE COURT:  No, I'm referring to Judge Glenn's

12     interpretation of Rash where he says --

13          (Pause)

14          THE COURT:  -- "The Court remains favorable to the

15     dictates of section 506(a) by valuing the creditor's

16     interest in the collateral" -- it's the creditor's interest,

17     not the debtor's interest -- "the creditor's interest in the

18     collateral in light of the proposed post-bankruptcy

19     reality."  And when he described the post-bankruptcy

20     reality, he says in criticizing Houlihan, who was the

21     creditor expert's valuation, "it assumes that the collateral

22     could have been sold on the petition date by the debtors.

23     This assumption ignores reality.  You need to look at sales

24     conducted by other distressed entities on the brink of

25     insolvency."

Page 178

```
 1                    I mean --

 2                    MR. O'NEAL:  Your Honor, I think --

 3                    THE COURT:  -- so to say that you used book value

 4      is to me is divorced from reality is saying that you used

 5      retail value.

 6                    MR. O'NEAL:  Right.  Allow --

 7                    THE COURT:  It doesn't compute.  That's not how

 8      there's a realizable value here.

 9                    MR. O'NEAL:  Allow me to explain our position.

10                    THE COURT:  Okay.

11                    MR. O'NEAL:  On this particular point, ResCap's

12      very different, right?  ResCap dealt with hard-to-value

13      assets.  It dealt with --

14                    THE COURT:  It deal with reality and realizing the

15      value of the collateral.

16                    MR. O'NEAL:  That's true, part of --

17                    THE COURT:  Not of the circulation of what, you

18      know, Mr. or Ms. Smith buy a washing machine for when you

19      know that there's a good chance you're going to have a

20      liquidation sale and at best, you're going to have a sale to

21      one party bidding on a going concern basis.

22                    MR. O'NEAL:  Right.  Well, my point here is that -

23      -

24                    THE COURT:  And that party is your own client who

25      should know the difference --
```

Page 179

1          MR. O'NEAL:  Yeah, my --

2          THE COURT:  -- because he's assessing the

3     competition.

4          MR. O'NEAL:  Right.  Well, actually, we didn't

5     assess the competition while we were bidding, right.  We

6     very much hope that we wanted a robust option process,

7     right, just like with the --

8          THE COURT:  He knows the liquidation alternative

9     --

10         MR. O'NEAL:  We --

11         THE COURT:  -- because he got the reports until he

12    got off the board.  He knows the liquidation alternative,

13    and he knows what he's bidding against.  And he's not

14    bidding against book value or retail value.  It's that

15    simple, right?  How is he bidding against something other

16    than that?  If he knew he was bidding against retail value,

17    he would have had to have bid more and he just didn't

18    because that --

19         MR. O'NEAL:  Well, we bid --

20         THE COURT:  -- would have been a fantasy.

21         MR. O'NEAL:  Your Honor, at the end what we did

22    was we bid against a hypothetical liquidation.  But we were

23    hopeful that there would be other bidders, that there would

24    be other bidders.

25         THE COURT:  Right.  No, I agree.  He bid against a

1    hypothetical liquidation.  That's what he bid against.  He

2    did not bid against book value or retail value --

3              MR. O'NEAL:  But during the process --

4              THE COURT:  -- what Mr. and Ms. Smith paid for a

5    washing machine.

6              MR. O'NEAL:  But during the process, we're talking

7    now at the end of the process, right.  What the Debtor's

8    restructuring subcommittee looked at, they looked at a

9    hypothetical versus ESL.  We would have been more than happy

10   for a third party to come in and outbid us.  That would have

11   been wonderful.

12             THE COURT:  I don't think you're getting my point

13   which is that this ties into valuation.  ESL knows this

14   company inside and out.  It knows what it has to make to

15   acquire the company.  And to say that what it would really

16   have to make is book value is just -- it's just -- it's

17   nonsense.  So whether you call that equities or nonsense, I

18   prefer calling it nonsense.  It just doesn't make any sense,

19   period.

20             And I guess to the extent nonsense is inequitable,

21   I agree it's inequitable.  You know, and it's just --

22             MR. O'NEAL:  Right.  Well, then your argument is

23   about the valuation.

24             THE COURT:  Yeah.

25             MR. O'NEAL:  Then your argument is not about

Page 181

1    whether or not we actually -- you know, whether the fact

2    that we wanted a sale to happen means that we don't have

3    507(b) claims.

4              THE COURT:  Well, I think it is -- it's kind of --

5    I think in this sense, it's inequitable to argue now that

6    realizing value out of this company in respect of the

7    collateral is something other than what the parties went

8    through, which is a process on a very expedited time frame

9    to determine whether there would be a going concern sale or

10   a liquidation sale.

11             MR. O'NEAL:  Understood, Your Honor.  All I'm

12   saying is that you've got an issue with our valuation.  You

13   don't have an issue with the fact that because we put forth

14   the bid -- I mean the --

15             THE COURT:  Okay, that's fine.

16             MR. O'NEAL:  -- the UCC, you know --

17             THE COURT:  That's fine.

18             MR. O'NEAL:  -- highlighted one again the letter

19   that you said should be put in a drawer and it had no impact

20   on the proceedings, right.  I think you were very clear

21   about that in the sale hearing.  If there's any equities

22   involved here, I think they should -- I mean the fact is is

23   that it is the restructuring subcommittee that approved this

24   transaction because it was better, because it maximized the

25   values to the estate.  And we shouldn't be penalized because

Page 182

1   of that.

2          THE COURT:  Okay.

3          MR. O'NEAL:  So if we could talk a little bit

4   about the 506(c) surcharge, though.  I'm not sure if I need

5   to.  I'm sensitive to your time and I think I've got your

6   views on it.  But I do believe that just a few words could

7   be helpful.

8          You know, I think when I mentioned that they

9   applied a stick of dynamite to our 506(b) claims, I was

10  referring to their 506(c) surcharge.  We've never before

11  seen anything remotely closely to 1.4 billion.  I think on

12  Slide 27 of the presentation I gave you this morning, we

13  laid out the relevant factors, and it's Flagstaff.

14         THE COURT:  Well, it's not necessarily all or

15  nothing, though.  I mean it is true that the GOB sales as

16  well as the credit bid sale was premised on specific

17  corporate overhead that went to this collateral because that

18  is what they were selling, not everything.  But it's hard to

19  believe that the 2L lenders would get a free ride.

20         MR. O'NEAL:  Your Honor, I don't think we --

21         THE COURT:  And in essence, that's what's being

22  suggested because your expert says that this is basically 99

23  percent of book --

24         MR. O'NEAL:  Yeah, but I don't think we're --

25         THE COURT:  -- with no 506(c).

Page 183

1         MR. O'NEAL:  We're not suggesting a free ride

2    because we've actually in our valuation, right, the book

3    value deducts from it the (indiscernible) cost, the direct

4    cost of the sale.  So it's not -- we're not doing --

5         THE COURT:  It doesn't deduct the legal cost of

6    actually getting approval for the sale, dealing with the

7    landlords, or paying the employees, right?  It doesn't deal

8    with any of that.

9         MR. O'NEAL:  It would cover the employees.  It

10   would cover employees at the stores.

11        THE COURT:  We covered the corporate overhead for

12   paying the employees?

13        MR. O'NEAL:  The corporate overhead we've got --

14        THE COURT:  HR?

15        MR. O'NEAL:  Our materials, and I went through

16   this this morning, do provide that there's a lot of areas of

17   value.  You can't assign all of the sale prices.

18        THE COURT:  I'm not deciding all of it, but I'm

19   assuming that some of the HR function included dealing with

20   these employees.

21        MR. O'NEAL:  That may be, but the -- to some

22   extent, there could be some overhead and I think it's clear

23   that it's not everything, as you've said.  And there's

24   certainly other businesses that could not ever --

25        THE COURT:  Should pay all of it?

Page 184

1           MR. O'NEAL:  -- take a surcharge.

2           THE COURT:  But not pay all of it?  But, again,

3    I'm talking about a reasonable relation --

4           MR. O'NEAL:  Yeah.  Understood.  But --

5           THE COURT:  -- as the case law says.

6           MR. O'NEAL:  -- the Debtors have the burden on

7    this particular point, and they haven't created anything

8    along the lines of what you've said.  When you look at the

9    case law and you, you know, you look at Slide 28 and I think

10   we go through the kinds of things that you normally see, you

11   know, storage fees and utilities and the like, we're not --

12   this is just $1.4 billion.  And they basically just took all

13   of the costs and they deducted three minor buckets.

14          THE COURT:  So does the four walls include

15   advertising expenses?

16          MR. O'NEAL:  Yes, it does, Your Honor.  And that

17   was in the testimony.

18          THE COURT:  How do we know that?

19          MR. O'NEAL:  That was in the testimony.

20          THE COURT:  Okay.

21          MR. O'NEAL:  Griffith.

22          THE COURT:  Whose testimony?

23          MR. O'NEAL:  Griffith, Mr. Moloney crossed

24   Griffith on this particular point.

25          THE COURT:  Okay.  I'll double check that.

Page 185

 1                MR. O'NEAL:  And, you know, and I think also

 2    Griffith admitted during his testimony that the 506(c)

 3    charges that the Debtors had proposed covered a lot of other

 4    businesses, Sears Auto Center, Shop Your Way.

 5                THE COURT:  No doubt.  No doubt.  A million -- a

 6    billion-450, it's just not realistic.

 7                MR. O'NEAL:  Yes.  We agree with that, Your Honor.

 8                And I think, you know, just at bottom, you know, I

 9    think we started out this morning saying that this was not

10    done for the benefit of us.  If Brandon Aebersold had come

11    into this court and said -- and Allan Carr, the independent

12    director had said we're going to do this transaction because

13    it's good for ESL, that never would have been approved.

14    This is not -- this was a decision by the restructuring

15    subcommittee that that was the best deal.

16                I think, also, I would just note that -- I do want

17    to respond to just a few things that came up at other parts

18    of the debate today.

19                THE COURT:  Okay.

20                MR. O'NEAL:  I'll be quick.  In terms of the

21    borrowing base, I think you were focusing that we should

22    perhaps suggesting that we should exclude ineligible

23    inventory.  We don't think that's the right way to go.

24    There's some pretty important buckets of value in that.  And

25    if you actually look at the --

Page 186

```
 1              THE COURT:  Your expert ascribes 100 percent value

 2    to it.  That's just not credible.

 3              MR. O'NEAL:  If --

 4              THE COURT:  It's not credible.  And he does no

 5    valuation.  He just blindly says it's all book value.

 6              MR. O'NEAL:  Well, I think that's because we view

 7    that as replacement value.

 8              THE COURT:  And that's not credible.  That's not a

 9    valuation.  That's just a wish.

10              MR. O'NEAL:  Right.  Well, let's focus

11    specifically on the issue, which is whether or not

12    ineligible receivables should be included.

13              THE COURT:  There is some value to it.  I

14    understand that.

15              MR. O'NEAL:  Okay.  And --

16              THE COURT:  But no one except this Ms. Murray does

17    that.

18              MR. O'NEAL:  Right.

19              THE COURT:  Your expert doesn't do it.

20              MR. O'NEAL:  And if you look at -- you know, for

21    example, if you look at I guess it was Slide 13 in Mr.

22    Schrock's presentation, you can get a sense, you know,

23    there's some pretty significant stuff in there, store

24    closing sale inventory that's GOB.

25              THE COURT:  You have the burden of proof on this.
```

Page 187

1    I'll cite you three cases where the courts denied a 507(b)

2    motion simply because the numbers were not articulated in

3    any way other than a gross estimation, which is what this

4    is.

5          MR. O'NEAL:  Right.  Well, we -- obviously we

6    disagree.  We think book value is --

7          THE COURT:  I should just pull it out.  Where do I

8    get it?  Where do I get it from?  Where do I get the value

9    of the ineligible inventory from?  What source other than

10   book value which doesn't apply?

11         MR. O'NEAL:  I mean, well, actually, if you look

12   at the borrowing base certificate, there's value ascribed

13   there.  It's just ineligible for borrowing.  It's not value-

14   based.

15         THE COURT:  But it's not a valuation.  And you

16   have issue with the borrowing base.

17         MR. O'NEAL:  Well, we used the beginning ledger

18   number for --

19         THE COURT:  Oh, yeah, sure.  The beginning number.

20         MR. O'NEAL:  -- the book value.

21         THE COURT:  Great.  That was expert testimony, not

22   really.

23         MR. O'NEAL:  Well, I would say that Mr. Schulte

24   did -- I mean he didn't just -- I mean he looked at book

25   value and he testified that he looked at other options and

Page 188

1    he determined that book value was the best approximation.

2                THE COURT:  Right.

3                MR. O'NEAL:  And, actually, it ended up being

4    lower than the other inventory value.

5                THE COURT:  Than retail value.

6                MR. O'NEAL:  That's correct.

7                THE COURT:  Yep.

8                MR. O'NEAL:  And to net retail.

9                THE COURT:  Right.

10               MR. O'NEAL:  I think in terms of the LCs, I know

11   Your Honor has heard a lot on this today, and I think the

12   main focus is, you know, your concern that we didn't include

13   these contingent and liabilities.  We continue to believe

14   that that is the correct way to look at it.

15               I guess conceivable you could, per your

16   questioning whether, you know, it -- conceivably, you could

17   value that at some amount, based on the draws that actually

18   occurred, which is the $9 million.

19               MR. O'NEAL:  I think the other thing that --

20               THE COURT:  No one has actually done that, right?

21   No expert has done that?

22               MR. O'NEAL:  Well, I think, Your Honor, that would

23   be a relatively simple math exercise of --

24               THE COURT:  No, but it's not a valuation exercise.

25               MR. O'NEAL:  Valuing...  That's correct, Your

1    Honor.

2                    THE COURT:  Put it differently, I doubt that the

3    beneficiaries of those LCs would say that they would walk

4    away from them for $9 million.

5                    MR. O'NEAL:  That may be, but there's nothing for

6    them to walk away from.  There's no liabilities that have

7    actually come to roost as of the petition date.

8                    THE COURT:  Right.

9                    MR. O'NEAL:  In terms of the scripts, I think

10   there was some question about whether scripts actually have

11   a value.  And I think they do have value.  I mean, it is --

12                   THE COURT:  But they seem to be excluded, based on

13   the books and records being only in relation to the

14   collateral.

15                   MR. O'NEAL:  Well, the collateral here is the

16   inventory.  So, in the same way that the pharmacy

17   receivables relate to inventory, the scripts relate to

18   inventory, which is the controlled substances and the

19   medication and the like.  So, it's books and records related

20   to the inventory, which would include the pharmaceuticals.

21   So, we don't believe -- we believe that actually is actually

22   included.

23                   And I would say that even stores that are

24   operating, they could sell the scripts.  They could -- there

25   is intrinsic value to the scripts.  You know, for example --

Page 190

1             THE COURT:  Am I right that all three of the

2    experts give them just face book value, they don't do any

3    valuation analysis of it?

4             MR. O'NEAL:  That's my understanding, that we used

5    the Debtors' books and records on it.

6             THE COURT:  Well, the book value.

7             MR. O'NEAL:  I think I do -- another point I would

8    like to do is I would like to just turn your attention again

9    to the 507(b) cap.  And I think if you were to -- and that's

10   on Slide 37 -- I think if you were to read it the way that

11   the people were suggesting earlier today, you're reading out

12   everything after $50 million.  It's just basically you would

13   read out from the proceeds of claims, blah, blah, blah.  It

14   would really -- it would not give any meaning to those words

15   if you were to read it as you described.

16            THE COURT:  I'm sorry, this is...?

17            MR. O'NEAL:  This is on Page -- if you look at our

18   deck Slide 37.

19            THE COURT:  I don't understand your point.

20            MR. O'NEAL:  Yeah, so if you were to say that it's

21   just a $50 million cap, that's all it -- it's just a $50

22   million cap, you would not need the words "from the

23   proceeds" and all of those words following in that

24   particular clause.

25            THE COURT:  Well, remember this is Clause 2.

```
 1              MR. O'NEAL:  That's correct.

 2              THE COURT:  Clause 1 says there's no right out of

 3    the specific litigation claims.

 4              MR. O'NEAL:  That's correct.

 5              THE COURT:  Clause 2 says $50 million and then it

 6    says from where else?

 7              MR. O'NEAL:  Yeah, so --

 8              THE COURT:  So, I agree with you, you could say --

 9              MR. O'NEAL:  Yeah.

10              THE COURT:  -- any ESL claims arising under 507(b)

11    of the Bankruptcy Code from any other source shall be

12    entitled to distributions of no more than --

13              MR. O'NEAL:  Or you wouldn't even need "from any

14    other source" because the first rule is just that you're not

15    getting any recovery from these designated litigations,

16    right?  That's just -- there's no recoveries from the Clause

17    1.  And then Clause 2, if it were intended to apply to

18    everything, it would just stop right at $50 million.

19              THE COURT:  I don't view that as required by this

20    language.

21              MR. O'NEAL:  Well, I think we have to give meaning

22    to all of the words on the page and --

23              THE COURT:  And I am.

24              MR. O'NEAL:  -- if we're not giving meaning to the

25    words --
```

Page 192

1          MR. O'NEAL  It says from the proceeds of any

2     claims or causes of action.

3          MR. O'NEAL:  It would just say, shall not be

4     entitled to distributions of --

5          THE COURT:  But you already have Clause 1, so

6     you've got to say more than that, because Clause 1 --

7          MR. O'NEAL:  No, because in Clause 1 we've said

8     there's no recoveries there.

9          THE COURT:  And then Clause 2, you want to say

10    there is recovery?  You've got to have more than that.

11         MR. O'NEAL: There's recovery -- yes, there is

12    recovery.  That's correct.  Except as provided in Clause 1.

13         THE COURT:  It doesn't say that.  Doesn't say

14    except as provided in Clause 1.  I agree with you.  You

15    could do it that way also, but to have written it a

16    different way serves that function.

17         MR. O'NEAL:  Well, I don't even think you need the

18    "except as provided by Clause 1."  I mean, and certainly, if

19    you look at the auction --

20         THE COURT:  You're not going to win on this one.

21         MR. O'NEAL:  And if you --

22         THE COURT:  Defined term claims includes the -- I

23    mean it's the def -- it's as defined.  It's how it's

24    written.

25         MR. O'NEAL:  I think that we're kind of reading

1    out some language.  And if you look at Slide --

2              THE COURT:  You're the one reading out the

3    language.  Let's move on from this.  This is just not going

4    to work.

5              MR. O'NEAL:  Okay.  And I think -- I'm sensing

6    that I don't need to say anything more on the 85 cent issue,

7    but I'm happy to.

8              THE COURT:  No, you don't.

9              MR. O'NEAL:  Okay.  And I think, Your Honor,

10   that's all I have.  Thank you.

11             THE COURT:  Okay.  Thank you.

12             MR. KRELLER:  Your Honor, Thomas Kreller again,

13   with Milbank, for Cyrus Capital.  I'll try and limit this,

14   Your Honor, to a couple of points.

15             Beginning with 506(c), I think what we have here

16   is really best illustrated by what Mr. Schrock stood here

17   and told you, and it's really consistent with what Mr.

18   Griffiths told you in his supplemental declaration at Docket

19   4439, filed on July 3rd.

20             Mr. Schrock stood here and said, "You have to look

21   at what happened in these cases.  We sold the inventory at

22   85 cents, and we incurred all of these costs, the $1.45

23   billion, and we incurred all of these costs to get to the

24   sale."

25             Mr. Griffith said something similar in his

Page 194

1    declaration.  He basically said that the number, the $1.4

2    billion that he put in his declaration, reflects the

3    rigorous sale process and efforts to sell the company as a

4    going concern.

5            There's a conflation here, Your Honor, and it's

6    exactly the issue that I pointed out when I first stood up

7    earlier today, which is there is a going concern sale that

8    happened in this case.  There is a sale of receivables and

9    inventory that was a portion of that sale that became

10   embedded when ultimately the company chose that path.  It

11   became embedded.

12           But the inventory and receivables, Your Honor,

13   were not the train.  They were one car on the train.  And

14   the Debtors' notion that they had to conduct the going

15   concern sale in order to dispose of the inventory and

16   receivables simply isn't the case.

17           THE COURT:  Okay.

18           MR. KRELLER:  And Your Honor, we know that isn't

19   the case.  Mr. Aebersold testified as much, Mr. Griffith

20   testified as much --

21           THE COURT:  No, you don't need to go on on this.

22   I mean, you're basically talking about Flagstaff.

23           MR. KRELLER:  I am, Your Honor.  And so, I think

24   the idea that -- I think this really goes to the component

25   in 506(c) where the costs have to be not just reasonable --

Page 195

1    and I've heard your views on reasonable, and I agree with

2    them in terms of the magnitude of the costs they're seeking

3    to load on to the second lien collateral.

4            But there's also in 506(c) requires that the costs

5    be necessary.  So, I'm going to focus on necessary.

6            THE COURT:  No, you don't need -- your briefs have

7    covered all this.  You don't need to do anymore on this

8    point.

9            MR. KRELLER:  Okay, Your Honor.  I will move on.

10   Your Honor, let me be very specific then in response to a

11   couple of the points that the Debtors made and that the UCC

12   made.

13           The notion that the second lien parties did not

14   object to the going concern process or the sale process,

15   Your Honor, that's really not evidence of anything other

16   than we bargained for adequate protection that we thought

17   would be there at the end of the day.  And so, we were

18   pulled along in that process.  And yes, ESL was active in

19   trying to put a bid forward.

20           But the fact that we didn't object was because at

21   the outset of the case, is we bargained for adequate

22   protection.  And that's all we're seeking here.  We're not

23   seeking to take things away from the unsecured creditors.

24   We're seeking the benefit of the bargain that we got in the

25   DIP order when we were given the adequate protection rights

Page 196

1    that we had to protect our interest in the collateral.

2              THE COURT:  Right.

3              MR. KRELLER:  The other thing I would note, Your

4    Honor, on 506(c), I think the Debtors have done here exactly

5    what you're not supposed to do.  They've taken it from the

6    top down rather than from bottom up.  And what they've

7    basically said is they've laid a pile of costs in front of

8    you.  And then in the supplemental iterations of Mr.

9    Griffith's declaration, he kind of starts to take some of

10   those things off the pile.  And it's as if they're standing

11   here looking at you saying, okay, is that enough?  Did we

12   take off enough now?  And that's not what 506(c) is about,

13   Your Honor.

14              They're supposed to build that pile brick by

15   brick, and they're supposed to carry the burden that

16   substantiates to you how those costs related directly to the

17   preservation or disposition of the second lien collateral,

18   not all of the other stuff, not the real estate, not the IP,

19   not everything else going on in this business.  Not all of

20   the assumed liabilities they were trying to put to ESL --

21              THE COURT:  Well, it's primarily, as opposed to

22   exclusively.  But other than that, I agree with you.

23              MR. KRELLER:  I think that's right, Your Honor.

24   And to the primary point, let's cut to that, to the primary

25   point.  You had a sale transaction that the Debtors proudly

Page 197

1    stood here and said, we got $5.2 billion of value in this

2    transaction; this is a great result for the estate.

3           When you look at the second lien collateral as a

4    subset of the assets that were sold, the benefit that they

5    can point to as being realized by the second lien lenders is

6    the $433 million credit that we got for the credit bid.

7    Four hundred and thirty-three million dollars as a

8    percentage of a $5.2 billion transaction is 8.3 percent.

9    So, the benefit that inured to second liens through the

10   credit bid was 8.3 percent of the aggregate value that was

11   delivered in this transaction by the Debtors' own math.

12          The case that the Debtor cites on this point, Your

13   Honor, there's a case -- and I apologize, I don't have that

14   brief at my fingertips -- but there's a case that they cite

15   that cites to a case where there's a secured creditor who

16   received 59.5 percent of the benefit of the subject

17   transaction in that case.  8.3 percent is a far cry from

18   59.5 percent, Your Honor.  And I don't know how you get --

19   how you could ever characterize 8.3 percent of the aggregate

20   purchase price as the primary benefit provided in the sale.

21   And that's all they have.  That's what they point to.

22          Your Honor, a couple of very quick, discrete

23   points that I'll finish with.  You asked about scripts.

24   There actually is a valuation in the Tiger appraisals.

25   There's two different valuations that Tiger did of the

Page 198

1    scripts.  They value it in I believe a September report at

2    $28 million.  And then they later, in February I believe,

3    they reassessed their methodology for valuing scripts and

4    the moved that up to $54 million.  So, you do at least have

5    in the record an attempt by at least one of the experts.

6              THE COURT:  And there's been no analysis of that

7    by anybody, right?

8              MR. KRELLER:  Your Honor, I believe that Ms.

9    Murray studied --

10             THE COURT:  She just adopted the higher number.

11   She didn't say why.  She doesn't even reference the earlier

12   number.  I checked.

13             MR. KRELLER:  That may be the case, Your Honor.  I

14   know that she took into account those appraisals and I know

15   that she did in fact look at them.

16             THE COURT:  But she --

17             MR. KRELLER:  And --

18             THE COURT:  It's one thing to say, I know a lot

19   about accounts receivable and inventory financing.  She

20   doesn't really say she knows anything about pharmacy

21   receivables.

22             MR. KRELLER:  True enough, Your Honor.  I just

23   point it out because it sounded like you thought there was a

24   dearth of anything in the record, and I do point out --

25             THE COURT:  There is.

Page 199

1          MR. KRELLER:  -- it is identified in the --

2          THE COURT:  I mean, that's fact, or expert

3     testimony.  I mean, I would think, given that they made two

4     valuations within three months apart, that someone would

5     need to cross-examine Tiger on that issue.

6          MR. KRELLER:  Understood, Your Honor.  So, Your

7     Honor, quickly, on the LCs, when you think about how this

8     actually works in the real world, one, on the petition date,

9     there was nothing drawn.  But these were cash collateralized

10    at -- at least $271 million of the LCs were cash

11    collateralized by ESL and Cyrus.

12          If those were ultimately drawn -- and we know they

13    weren't drawn at the petition date and we know they weren't

14    drawn during the case -- but had they been drawn, the

15    issuing bank, I believe it was Citibank, would have honored

16    the draws and they would have hit the cash collateral.  And

17    they would have taken the cash collateral that was the ESL

18    and Cyrus cash, and that amount -- that essentially would

19    become first lien debt.  That would essentially become first

20    lien -- the senior obligations at that point in time would

21    no longer be contingent.

22          THE COURT:  Right.

23          MR. KRELLER:  And then what would happen -- and I

24    think this is what's happening and what you referred to in

25    terms of AM, PM -- it's happening in Linen 'n Things -- what

Page 200

1    happens then is that after those draws get made and all for

2    the processing and time goes on, money comes back.  Because

3    the LCs --

4              THE COURT:  No one has given me any testimony on

5    that either.

6              MR. KRELLER:  Well, Your Honor, the --

7              THE COURT:  I realize that one could, but I don't

8    have that.

9              MR. SCHROCK:  Your Honor, I think there is a

10   discussion in the Murray report, but I agree with you, it's

11   not about the cash collateral.  But if we're --

12             THE COURT:  No, but no --

13             MR. KRELLER:  If we're talking about --

14             THE COURT:  Leave aside the cash collateral,

15   because as you just said, there's a subrogation claim,

16   right?

17             MR. KRELLER:  Right.

18             THE COURT:  So --

19             MR. KRELLER:  And that subrogation claim is

20   initially --

21             THE COURT:  It's first, right?  It's ahead of the

22   2Ls?

23             MR. KRELLER:  It's ahead of the 2Ls --

24             THE COURT:  Right.

25             MR. KRELLER:  -- and it's initially in the amount

Page 201

1    of the draw.

2              THE COURT:  Right.

3              MR. KRELLER:  And over time, if money comes back

4    because the draw was in essence an overdraw --

5              THE COURT:  Right.

6              MR. KRELLER:  -- that reduces that first lien

7    debt.

8              THE COURT:  I understand that, but --

9              MR. KRELLER:  So --

10             THE COURT:  -- I have no testimony as to what is a

11   fair value of what that money would be.  It assumes, without

12   evidence, that the 271 and I think it's 123 at the other LC

13   facility, are actually substantially in excess of the

14   obligations of the LC beneficiaries that they were issued

15   for.  I don't have any evidence to say one way or another

16   about that.

17             MR. KRELLER:  No, Your Honor --

18             THE COURT:  But I do know from my own experience

19   that it's like pulling teeth to get money back.  And you

20   know, it's nowhere close to the face value.  I mean, it's

21   peanuts.

22             MR. KRELLER:  I don't know that that's the case,

23   Your Honor, but --

24             THE COURT:  Well --

25             MR. KRELLER:  -- I'll move on.

Page 202

1           THE COURT:  I'm just basing it on a couple of

2    cases.  But that's not expert testimony either.  I don't

3    have any testimony on that issue.

4           MR. KRELLER:  No, no, that's true.  The evidence

5    you have on this point was that there were zero drawn under

6    the letters of credit at the petition date.

7           THE COURT:  Right.

8           MR. KRELLER:  And if you refuse to be unmoored

9    from the petition date, that has meaning.

10          THE COURT:  Right.

11          MR. KRELLER:  And there is evidence on that.

12          THE COURT:  Right.

13          MR. KRELLER:  Your Honor, you had asked me earlier

14   if the legal fees were taken out of the Tiger report.  I

15   don't believe they were.  But I do think it's worth noting

16   that the legal fees are paid through the carveout, so they

17   already effectively run out and get paid, and push us junior

18   in any event.

19          So, I think those costs -- you don't need to layer

20   on an additional amount of those costs through a 506(c)

21   surcharge.  They're already effectively coming out of our

22   collateral via the carveout, or via the subordination that

23   the carveout effects.

24          THE COURT:  But you're saying that your claim is

25   still increased by that amount, right?

Page 203

1          MR. KRELLER:  We are entitled to adequate

2     protection for that, yes.

3          THE COURT:  So...

4          MR. KRELLER:  But it's not a -- it's not a

5     component of the valuation, the (indiscernible).

6          THE COURT:  Well, but if you -- you're saying you

7     agreed to the carveout, but then aren't you taking it back

8     by saying that the 507(b) is increased by it?

9          MR. KRELLER:  No.  What I'm saying is we agreed to

10    the carveout in exchange for 507(b) rights, in exchange for

11    adequate protection --

12         THE COURT:  Right.

13         MR. KRELLER:  -- for the effect of the carveout.

14         THE COURT:  Right.  But it's --

15         MR. KRELLER:  So, it's --

16         THE COURT:  I still don't understand.  If you're

17    valuing the collateral and comparing it to 507(b), it

18    proposes a 507(b) analysis.  I don't see why the carveout is

19    relevant, because you're still valuing the collateral in the

20    first place.

21         And Ms. Murray, I think is, as appropriate,

22    discounts the value for various costs related to it.  And

23    direct legal fees -- not necessarily all the legal fees in

24    the case, by any means, I would think would be part of that

25    analysis.  Tiger didn't do that.  She didn't do it.  But I

Page 204

1    don't know why you wouldn't do it.

2              As far as the value of the collateral.  I

3    understand there's a carveout.  But as far as the value of

4    the collateral, since the carveout isn't a credit against

5    the 507(b) claim, it doesn't seem to affect the 507(b)

6    analysis.

7              MR. KRELLER:  Your Honor, I agree with that.  I

8    don't think it affects the 507(b) analysis --

9              THE COURT:  Okay.

10             MR. KRELLER:  -- which is the valuation analysis.

11             THE COURT:  Okay.  All right.

12             MR. KRELLER:  Your Honor, I guess -- two more

13   points, just on this, on cash.  I know you've looked --

14   you're thinking about tracing.  I think Mr. Schrock has

15   tried to suggest that there might be other things in the

16   cash from other places.

17             I would submit at least this, Your Honor.  There

18   was an ABL, essentially cash dominion mechanism in place at

19   the time -- at all relevant times we're talking about.  I

20   think that it is highly unlikely that there would be

21   proceeds from other non-ABL collateral that would find its

22   way into that cash management system.

23             And so, I think the assumption that the experts

24   made in terms of the reasonableness -- the reasonable belief

25   that that cash represented proceeds, I think is consistent

Page 205

1    with the common sense of how an ABL facility works, and the

2    facts that these Debtors, I don't imagine, would be all that

3    keen on dumping other unencumbered cash into a cash

4    management system encumbered to the benefit of their ABL

5    lenders.

6            THE COURT:  Well, is this cash just in the -- is

7    there anything other than the cash management system?

8            MR. KRELLER:  I don't know the answer to that,

9    Your Honor.  We certainly -- in the cash collateral -- in

10   the cash collateral motion and the Riecker declaration,

11   first day declaration, are in the record and discuss the

12   scope and the magnitude of the cash management system.  And

13   they talk about how the standard cash management system in a

14   retailer would work, and the volume of cash that runs

15   through that system.

16           And I believe the magnitude is something like $168

17   million runs through the account is the average balance

18   through those accounts.  And we're looking at cash on the

19   petition date of about $123 million or $115 million.  So,

20   the numbers are roughly consistent with what Mr. Riecker

21   testified to back when he was talking about the cash

22   management motion.

23           I acknowledge that's not a precise tracing

24   analysis.  But I think it's persuasive evidence --

25           THE COURT:  Well, my question was -- I mean, it

Page 206

1    sounds like the Debtors only had the cash management system,

2    like they really didn't have a choice to put cash elsewhere.

3            MR. KRELLER:  I don't know the answer to that,

4    Your Honor.

5            THE COURT:  Okay.

6            MR. KRELLER:  But having represented debtors, I

7    would be loath to put proceeds from non-collateral assets

8    into my controlled accounts with my other secured lenders.

9            THE COURT:  Well, but this cash isn't...  For

10   example, does this cash include cash in like payroll

11   accounts?

12           MR. KRELLER:  Your Honor, my understanding from

13   the cash management motion is that there aren't payroll

14   account -- it's a zero balance -- the disbursement accounts

15   are zero a balance account where cash doesn't sit.

16           THE COURT:  Well, this is all based on the cash

17   management motion?

18           MR. KRELLER:  And the Riecker declaration in

19   support, Your Honor.  That's in the record.

20           THE COURT:  Okay.

21           MR. KRELLER:  Your Honor, the last point I'll make

22   -- and I'll set aside Mr. Schrock's suggestion that he

23   somehow has some inside information about what Cyrus was

24   doing behind closed doors, because there's certainly nothing

25   in the record on that.

Page 207

1                    Beyond that, Your Honor --

2                    THE COURT:  Well, we've got something in the

3       record.  We have a bid -- the rejected bids.  And we have

4       some testimony about what Cyrus was talking about, although

5       nothing from Mr. Schrock.

6                    MR. KRELLER:  Yeah, I don't --

7                    THE COURT:  He was testifying, and I'm not

8       counting it as testimony.

9                    MR. KRELLER:  Thank you, Your Honor.  And I think

10      there was testimony in there too about how they didn't

11      really know what -- and the liquidators told them in their

12      bids they didn't really know what costs were built into

13      those analyses.  A lot of --

14                   THE COURT:  Well, I don't know.  I mean, I don't

15      have that information.  Ms. Murray doesn't discuss that.

16                   MR. KRELLER:  No, I understand that, Your Honor.

17      But for Mr. Schrock to stand here and tell you what the

18      liquidators told them when they submitted their bids --

19                   THE COURT:  No, I agree with that.

20                   MR. KRELLER:  That's not --

21                   THE COURT:  I'm not taking that as fact.

22                   MR. KRELLER:  And the more significant point on

23      that, Your Honor, is Mr. Schrock stood here and then you

24      asked him the direct question -- he answered a slightly

25      different question -- but your question was, you know, what

Page 208

1    were all of the costs loaded into the 90 percent, or the 90

2    percentish numbers that people had out there, that the

3    Debtors had out there, that M-III had out there, that the

4    UCC had out there.  And he sidestepped you a bit.

5              But what he said was, we don't really know what

6    was in there.  We don't really know --

7              THE COURT:  That's true.

8              MR. KRELLER:  -- what was in there.  Your Honor,

9    the materials that are in the record on this point with the

10   90 percent in there are the materials that were presented to

11   the board of directors to make the biggest decision in these

12   cases, the decision whether to pursue the ESL going concern

13   bid, or to proceed to an orderly winddown of the company

14   across the board.

15             And today you hear, we don't know what was in

16   there.  I don't think that's credible, Your Honor.

17             THE COURT:  Well, but I don't know.

18             MR. KRELLER:  I --

19             THE COURT:  I don't know what was in there.  I

20   don't know whether there was a -- what they assumed would be

21   the cost to get to that 90 percent.

22             MR. KRELLER:  I understand that, Your Honor.  My

23   point is not what's in the 90 percent.  My point is for the

24   Debtors to disavow that now in a litigation position that's

25   --

1              THE COURT:  They're not disavowing the 90 percent.

2      They're just disavowing what it's 90 percent of.

3              MR. KRELLER:  That may be the case, Your Honor.

4      But the notion that that's the advice that the board was

5      given in making this decision with the UCC breathing down

6      their necks, I think, Your Honor, that 90 percent had to be

7      pretty solid.  And I think people had to be pretty

8      comfortable with it, because they were relying on it to make

9      a pretty big decision.

10             THE COURT:  Well, again, 90 percent of what?  They

11     might have been very comfortable with it and then factored

12     in the costs.  I don't know.

13             MR. SCHROCK:  Your Honor, I'm sorry.  Just to

14     clarify.  The board obviously made an informed decision.

15     What I should have said -- standing here now, I don't know

16     what the 90 percent was of.  I know that the board was

17     provided with an analysis that took out -- that took off

18     costs.  But that's not part of the record.  And we didn't

19     put it in there because it wasn't our burden.

20             MR. KRELLER:  Your Honor, I'll close with this.

21     Mr. Schrock will stand here and say you have to look at what

22     happened in this case.  And I'll counter that with you have

23     to actually look -- and this is what I started with -- you

24     actually have to look at what happened to the 2L collateral

25     from the petition date over the life of the case.

Page 210

1          You actually don't have to look at the rest of

2    what happened in the case.  What you need to do is focus on

3    what was the collateral position at the petition date, and

4    it's zero now.  Those are the things you have to look at.

5    The going concern sale, the bigger efforts to preserve

6    everything else, and the $5.2 billion less the 433 credit

7    bid, those actually don't have much of anything to do at all

8    here.

9          But until they can satisfy their burden under

10   506(c) to show you, with specificity and substantiation and

11   convince you that they're reasonable, I don't think they've

12   satisfied their burden to put all those costs on the 2L

13   collateral.  And I don't think doing so would be consistent

14   with the case law in this circuit, certainly.

15          THE COURT:  Okay.

16          MR. KRELLER:  Thank you, Your Honor.

17          MR. FOX:  Edward Fox, Your Honor, from Seyfarth

18   Shaw, on behalf of Wilmington Trust.  I'll be brief, Your

19   Honor.

20          On the 506(c) points, the fundamental problem is

21   that what the Debtors put forth as the justification for the

22   506(c) surcharge basically consists of a single page with

23   categories (indiscernible).

24          And when we asked Mr. Griffith about that in his

25   deposition, what the supporting documentation was for it,

Page 211

1    all he could point to, and the only thing he pointed to, was

2    the chart in Paragraph 20 of his May 25th declaration, and

3    nothing else.  And when we asked for the output, we either

4    were told you can have the entire books and records of the

5    company, which was produced, some number of 145,000 pages-

6    plus, or the single page.  There's nothing in between that

7    shows the subset of the costs which are allocated to 506(c).

8           And that's the fundamental problem, that there's

9    ability either for the creditors or for the Court to be able

10   to ascertain whether these numbers are appropriate or not,

11   because there's no backup documentation.

12          In addition, Your Honor, to the extent that this

13   one page or so constitutes the documentation that supports

14   it, you'll note that the categories in large part do not

15   even follow the same categories in the weekly reporting that

16   the Debtors were providing.  And if they do, the numbers

17   don't match.

18          One example that we noticed quickly is there's

19   occupancy costs in the weekly reporting and GOB rent.  Those

20   two numbers for the entire period from October 15 through

21   the sale date of February 9th constituted $149 million,

22   according to the Debtors' weekly reporting.

23          Mr. Griffith and the Debtors now for 506(c) have a

24   category that they call rent occupancy expense, property

25   taxes and property maintenance, and that total in Mr.

Page 212

1   Griffith's May 26th declaration was $228 million, as opposed

2   to the $149 million of occupancy cost that they listed in

3   their weekly reporting.  And even here in Mr. Schrock's

4   slide for that amount they total $152 million.  You just

5   can't figure out --

6           THE COURT:  When you say to me that the $149

7   million is for the total, not just for a week?

8           MR. FOX:  Correct --

9           THE COURT:  Right, okay.

10          MR. FOX:  -- $149 million, according to the weekly

11  reporting for the two categories of occupancy, and then

12  separate category of GOB rent.

13          THE COURT:  Okay.

14          MR. FOX:  Now, Mr. Griffith tried to explain that

15  he thought, you know, some of this cost like property taxes

16  were included in SG&A.  But there is no way to know that or

17  see that or to go hunting for it.  And then there are

18  additional categories that, again, just don't fit or don't

19  match the categories of the reporting.  So, it becomes

20  impossible to understand what, if anything, should be

21  included.

22          With respect to the professional fees, you'll

23  recall last week we raised the issue of Mr. Griffith's

24  ability to testify at all, and you declined to strike

25  Paragraph 33 and 32 of his declaration, even though he had

Page 213

1    testified at his deposition that he had nothing to do with

2    selecting the professional fees, or the $51,000,000 and that

3    counsel did that.  He comes back and sort of suggests that

4    he oversaw the process, I believe is what he said in his

5    declaration.

6            But if you look at what he's asking for in those

7    Paragraphs 32 and 33, the most that we could come up with,

8    based on what's in the record itself, including the fee

9    requests which were included in the exhibits, is about $33

10   million.

11           And when we went through them, if you include all

12   of Weil Gotshal's asset disposition costs through their

13   February fee application, that's about $13.4 million.  If

14   you include all their hearing and court matters, that's

15   another $1.4 million.  That gets you to the $14,927,627 that

16   Griffith uses.

17           After that -- and he had testified that they used

18   the M&A line item to pull out these costs from the various

19   professionals -- for FTI Consulting, the asset sale number

20   $248,197; for Paul Weiss, the for sale transactions, the

21   number was $2,027,029.

22           He testified that for professional fees that were

23   based -- where there was a fixed fee, they based it on hours

24   recorded.  And he said that, therefore, $400,000 of a

25   million for Evercore should be included.  But the Evercore

Page 214

1   fee application, which is a Joint Exhibit 059-1, showed they

2   billed 245 of their 1,528 hours, or 16 percent of their

3   million, to assets sales, which is about $160,000, not

4   $400,000.

5          Houlihan has no asset sale category in their

6   application.  And then Lazard has the sale transaction of

7   $453,000, and the total restructuring fee of $15,000,004.

8   And all that together totals to $33,288,143.  So, to the

9   extent you can try to tease it out of what is available, at

10  least on that, it doesn't add to the amount that they're

11  asking for.

12         I think Mr. Kreller covered the carveout point, I

13  would just say this.  The purpose of it is it allows the

14  professionals to be paid and not have the funds clawed back

15  from them, because it's taken off the top of the collateral.

16         But the creditors, the secured creditors, are

17  given the replacement lien and the replacement claim, the

18  superpriority claim, to then recover it back from the

19  estate.  So, the professionals don't get hung out if there

20  is a shortfall, but the estate does cover it.  And because

21  they're taken off the top, they're paid before the

22  collateral reaches us.

23         THE COURT:  That works when there is a 506(c)

24  waiver, there's not a waiver here.

25         MR. FOX:  Well, but --

1          THE COURT:  I've dealt with this already.

2          MR. FOX:  Okay, Your Honor.  Two other things.

3    With respect to eligible inventory you asked about, the in-

4    transit inventory and the cash in advance inventory were the

5    two largest categories of ineligible inventory.  But in

6    fact, all of that inventory actually showed up.  So,

7    although it's not considered eligible, to the extent you're

8    looking at that number as a guidepost, it in fact does show

9    up out of those categories.

10         THE COURT:  Where?  When?

11         MR. FOX:  It was delivered.

12         THE COURT:  No, but on the petition date?  No,

13   right?

14         MR. FOX:  No, but it was ultimately delivered to

15   the --

16         THE COURT:  But it's... People are including it

17   on the petition date as part of their valuation.

18         MR. FOX:  Well, I think they include it because

19   there few that it does in fact show up and doesn't --

20         THE COURT:  But they're not including post-

21   petition interest, which also, in fact, shows up?

22         MR. FOX:  Because it's been paid for.  But I

23   understand.  That was the conclusion that reached with

24   respect to those categories.

25         THE COURT:  By whom?

Page 216

1             MR. FOX:  By I think our expert and by the others.

2             THE COURT:  Your expert didn't place any value on

3    inventory in transit.

4             MR. FOX:  No, no, no.  But he started with the

5    stock ledger inventory, not the eligible inventory.  And

6    that's the difference.  And that's why he felt comfortable

7    doing that because he concluded that it was out there, and

8    it would be paid for.

9             I mean, look, the thing about eligible inventory,

10   it's like if you go out and buy a house, the lender will

11   lend you 90 percent against the house, but that doesn't mean

12   the house isn't worth the 100 percent you for it or that you

13   can sell it for.  And this is just a way for the -- you

14   know, the eligible inventory, it's a way for the lender to

15   protect itself.  It doesn't mean that the additional

16   inventory or items don't have value.

17            Lastly, Your Honor, and I don't --

18            THE COURT:  But they don't have 100 percent value.

19   That's the issue.  Tiger values it at between 10 and 30

20   percent.  Although for some reason, Ms. Murray valued it at

21   51 percent, without explaining why.

22            MR. FOX:  Well, that was on a liquidation basis.

23   It was (indiscernible) an orderly liquidation sale.

24            THE COURT:  Right.  Well, we've been through that.

25            MR. FOX:  Right.  Lastly, Your Honor, I would just

Page 217

1    point out that with respect to the extent the Court is going

2    to look to the sale price, notwithstanding what was said in

3    February, there was $5.2 billion of consideration paid for

4    the assets.  And to the extent that $3.9 billion of that was

5    attributable to non-encumbered assets, I don't know what

6    assets this Debtor had that were not encumbered.  They were

7    liened to the gills.

8            So, yet, it's not unheard of for a buyer to agree

9    that part of the consideration will be attributed to other

10   factors, which is maybe what went on here.

11           THE COURT:  Well, there's no allocation.

12           MR. KRELLER:  That's right.  But at the end of the

13   day, there's $5.2 billion that's paid, and there are only

14   credit bids of $1.3 billion.  So, there's additional value

15   there.  How it gets allocated or divided towards particular

16   collateral becomes an open issue, that in the context of

17   this, I think needs to be considered.

18           Thank you, Your Honor.

19           THE COURT:  Okay.

20

21           THE COURT:  Okay.  All right.  I appreciate this

22   isn't a normal lunchtime, but I have to eat something

23   because I'm getting a little cranky.  So, I'll be back at --

24   what is it, quarter to 4:00?  I'll be back at 4:15.

25           MAN:  Okay.  Thanks, Judge.

1         (Recess)

2              THE COURT:  Okay.  We're back on the record in In

3    re Sears Holdings, et al.  Does anyone else have anything

4    further to say before I give you my ruling?  No.  Okay.

5              No one should draw anything from the fact that

6    since I got off the bench a few minutes ago, it turned pitch

7    dark and we had a thunderstorm.

8              In any event, I'm going to give you an oral ruling

9    on what is a set of fairly complicated issues.  I'm doing

10   that because I understand that the parties in this case

11   would benefit considerably from getting the result promptly.

12   And obviously giving it to you this afternoon is more prompt

13   than sitting down and writing a written opinion.

14              As is the case when I give an oral ruling, often I

15   may review the transcript and in addition to correcting any

16   typos or mis-citations, supplement it, correct my grammar,

17   et cetera.  If I do that, I'll file it as an amended bench

18   ruling.  It won't be a transcript.  And obviously it won't

19   have the weight of a fully written opinion, but it will read

20   better.  But my rulings won't change.

21              I have before me two motions, both involving the

22   so-called second lien, or 2L creditors, which comprise ESL,

23   Cyrus and those parties to the so-called 2010 Notes, whose

24   trustee, or indenture trustee, is Wilmington Trust.

25   Wilmington Trust also serves as the collateral agent for all

Page 219

1    the 2L parties.

2            The two motions, two contested matters, before me

3    pertain to the following overall issues.  First, whether the

4    2L creditors have a claim under Paragraphs 17 and 18, (d) in

5    each case, of the final Debtor in Possession Financing Order

6    in this case, and section 507(b) of the Bankruptcy Code,

7    which provides, "If the trustee" -- in this case the debtor

8    in possession -- "under section 362, 363 or 364 of this

9    title provides adequate protection of the interest of a

10   holder of a claim secured by a lien on property of the

11   debtor, and if, notwithstanding such protection, such

12   creditor has a claim allowable under subsection (a)(2) of

13   this section arising from the stay of action against such

14   property under section 362 of this title from the use, sale

15   or lease of such property under section 363 of this title,

16   or the granting of a lien under section 364(d) of this

17   title, then such creditor's claim under such subsection

18   shall have priority over every other claim allowable under

19   such subsection,"  that is, subsection 507(a)(2) of the

20   Bankruptcy Code.  The parties refer to this as the "section

21   507(b) dispute."

22           In addition, I have a contested matter before me

23   pertaining to an assertion by the debtors in possession in

24   this case under section 506(c) of the Bankruptcy Code.  That

25   provision states that the "trustee" -- in this case, the

Page 220

1   debtor in possession – "may recover from property securing

2   an allowed secured claim the reasonable necessary costs and

3   expenses of preserving or disposing of such property to the

4   extent of any benefit to the holder of such claim, including

5   the payment of all ad valorem property taxes with respect to

6   the property."

7          It is often the case that in debtor in possession

8   financing/cash collateral orders on a final basis 506(c)

9   rights or claims against the secured creditor and/or its

10  collateral are waived.  But that is not a case in this case

11  with respect to the second lien lenders' collateral.

12  Therefore, it's a live issue.

13         I will address the section 507(b) contested matter

14  first.  That is a matter in which the second lien creditors

15  bear the burden of proof in showing their entitlement to the

16  superpriority claim set forth in section 507(b).  See

17  Official Committee of Unsecured Creditors v. UMB Bank NA,

18  501 B.R. 549 -- oh, I'm sorry, it's the wrong -- no, I'm

19  sorry -- 501 B.R. 549 at 590 (Bankr. S.D.N.Y. 2013), and the

20  cases cited therein.

21         I should note that while section 507(b) gives, to

22  the extent the statute's  requirements are satisfied, the 2L

23  creditors a superpriority administrative expense claim, that

24  claim has been limited in this case by two orders of the

25  Court, which set up certain reserves and then deal with the

Page 221

1    reserves, the so-called "windown reserves."  But the claim

2    itself, except in one respect, has not otherwise been

3    limited by contract.

4         As is clear from the plain language of section

5    507(b), Congress set forth several criteria that have to be

6    satisfied for there to be such a claim.  First, the creditor

7    has to have a claim allowable under subsection 507(a)(2) of

8    the Bankruptcy Code, which defines allowed administrative

9    expenses as the "actual necessary costs and expenses of

10   preserving the estate."

11        The vast majority of cases, as well as the leading

12   commentator, Collier on Bankruptcy, view this requirement as

13   relatively easy to meet, as long as the creditors'

14   collateral was used in a necessary way to preserve the

15   estate.  And I conclude here that that element of the test

16   is satisfied, at least through the date of the sale to

17   Transform in this case.

18        Then the creditor must establish, first, that

19   adequate protection was provided and, later, proved to be

20   inadequate.  And there's no question here that adequate

21   protection was in fact provided in the form of a replacement

22   lien.

23        Second, as I said, the creditor must have an

24   administrative expense claim under section 507(a)(2).  And

25   finally, the claim must have arisen from either the

1   automatic stay of section 362, or the use, sale or lease of

2   property under section 363, or the granting of a lien under

3   section 364.

4            Here, the claim for diminution, if such a claim

5   exists, arose from the use, sale or lease of property under

6   section 363 of the Bankruptcy Code, given the alleged

7   diminution in the value of the collateral from the grant of

8   adequate protection through the sale to Transform.

9            It is clear, however, that the mere use of a

10  secured creditors' collateral is insufficient to establish a

11  507(b) claim.  Instead, the use of the collateral here has

12  to be shown to have resulted in a diminution in the value of

13  the collateral, and it is the amount of that diminution,

14  i.e. comparing the value at time 1, and value at time 2,

15  that leads to an allowed 507(b) claim.

16           For all of the foregoing points, see In re

17  Construction Supervision Services, 2015 Bankr. LEXIS 2700 at

18  pages 17-19 (Bankr. E.D.N.C., August 13, 2015).

19           Consequently, 507(b) claims -- and the claims at

20  issue before me are no exception -- fundamentally raise

21  issues concerning value, the valuation of collateral, a

22  topic, for probably obvious reasons, that has led to much

23  case law and development of the law over the years, with

24  still an ultimate realization that valuation exercises are

25  exercises of judgment and not an exact science and are

Page 223

1    driven heavily by the facts of a particular case.

2             Congress itself recognized this point in the

3    legislative history of the Bankruptcy Code, to section

4    506(a) of the Code.  As stated in the Congressional

5    Reporter, "Value does not necessarily contemplate forced

6    sale or liquidation value of collateral, nor does it always

7    imply a going concern value.  Courts will have to determine

8    the value on a case-by-case basis, taking into account the

9    facts of each case and the competing interests in the case."

10   H.R. Rep. No. 95-595, 95th Congress, 1st Sess., 365 (1977).

11            The legislative history of section 361 of the

12   Bankruptcy Code provides the same concept:  "The section

13   does not specify how value is to be determined for purposes

14   of adequate protection," that is.  "Nor does it specify when

15   it is to be determined.  These matters are left to case-by-

16   case interpretation and development.  This flexibility is

17   important to permit the courts to adapt to varying

18   circumstances and changing modes of financing.  Neither is

19   it expected that the courts will construe the term 'value'

20   to mean in every case forced sale liquidation value or a

21   full going concern value.  There is wide latitude between

22   those two extremes, although forced sale liquidation value

23   will be a minimum." And then Congress went on to say, "In

24   any particular case, especially of a reorganization case,

25   the determination of which entity should be entitled to the

Page 224

1    difference between the going concern value and the

2    liquidation value must be based on equitable considerations

3    arising from the facts of the case."  S.Rep. No. 95-989 95th

4    Congress 2d Sess., 54 (1978).  See also H.R. Rep. No. 95-595

5    95th Congress, 1st Sess., 338 -- excuse me -- 340.

6              As noted by In re Craddock-Terry Shoe Corp., 98

7    B.R. 250 at 253-54 (Bankr. W.D.Va. 1988), the courts have

8    applied this flexibility in attempting to determine the most

9    commercially reasonable disposition practical under the

10   circumstances.  The court there also noted that in order to

11   determine the most commercially reasonable disposition

12   practical, the court must follow the directive of section

13   506 and consider the purpose of the valuation.  That is in

14   reference to section 506(a) of the Bankruptcy Code, which

15   states in (a)(1) that with respect to valuing the collateral

16   for determining the amount of an allowed secured claim,

17   "such value shall be determined in light of the purpose of

18   the valuation and of the proposed disposition or use of such

19   property and in conjunction with any hearing on such

20   disposition or use, or in a plan affecting such creditors'

21   interests."

22             Craddock-Terry Shoe Corp. went on to state, "The

23   purpose of adequate protection, as stated in the legislative

24   history of section 361 of the Bankruptcy Code, is to ensure

25   that the secured creditor receives in value essentially what

Page 225

1    he bargained for."  Of course, that concept leaves a lot up

2    to the discretion of the court.  Many courts have held that

3    what a creditor bargains for is what it would get outside of

4    the bankruptcy case, since the statute measures the

5    creditor's interest in the debtor's interest in the

6    collateral, and normally the creditor would bargain for its

7    right outside of the bankruptcy case.

8            However, at least in terms of exit value, the

9    Supreme Court has made it clear in Associates Commercial

10   Corp. v. Rash, 520 U.S. 953 (1997), that the court should

11   look to the purpose of the proposed use of the asset, and if

12   it is to be for a reorganization, that use would be in the

13   hands of the debtor and would normally call for replacement

14   value.

15           I have not been asked for the Court to determine

16   valuation in the context of a sale allocation or a Chapter

17   11 plan of collateral, but, rather, under section 507(b).

18   The courts in this District have properly applied the Rash

19   case's approach to 507(b) questions. Again See The Official

20   Committee of Unsecured Creditors v UMB Bank 501 B.R. 549,

21   593 - 97, and In re Sabine Oil and Gas Corp. 537 B.R. 503,

22   506 -- I'm sorry, 576 - 577 (Bankr. S.D.N.Y. 2016).

23           As is perhaps to be expected, as I said, that

24   general case law has not led to agreement among the parties

25   here as to the starting and ending -- well, at least the

Page 226

1    starting values, and perhaps the ending values for the

2    507(b) analysis, or even how to, as a matter of law, go

3    about that analysis.

4            The 2L creditors have largely taken the view that

5    because their collateral, which is primarily inventory and

6    accounts receivable, is -- well, was used in the Debtors'

7    retail business, that I should apply a retail value to it in

8    the first instance, subject to discounts or a 506(c) claim,

9    the retail value being derived almost entirely, if not

10   entirely from how those assets were listed at cost on the

11   Debtor's books and records.  That's the contention by the

12   experts for two of the three 2L movants here, Messrs.

13   Schulte and Henrich.

14           The third expert, Ms. Murray, contends that these

15   types of assets are reasonably and traditionally valued

16   based on customary borrowing base formula -- formulas, with

17   respect to eligible assets, at least, and at least to set a

18   floor value for those assets.

19           The Debtors, on the other hand, contend that the

20   ultimate -- they contend allocation of the sale value to

21   Transform under the ultimate section 363(b) sale in this

22   case should set the value of the collateral, both at the

23   beginning of the case, and, of course, at the end case --

24   end of the case.

25           They contend that that value is 85 percent of book

Page 227

1    value for all of the collateral, both eligible for the

2    borrowing base and not eligible.  All four parties use the

3    concept of going concern value but in different ways, even

4    though they all recognize that because of the nature of the

5    disposition of the collateral here, i.e. in a going concern

6    sale, some form of going concern value should be used under

7    the Rash case and the two SDNY cases that I've cited.

8         That, too, begs the question, however, as amply

9    stated, or as aptly stated, that is, by Bankruptcy Judge

10   Carey in In re Aero Group International, A-e-r-o G-r-o-u-p,

11   2019 Bankr. LEXIS 904 (Bankr. D Del., March 26, 2019), at

12   Page 38, the concept of going -- this is a quote, "The

13   concept of going concern versus liquidation is not a binary,

14   either/or situation.  Instead, a company's status appears on

15   a spectrum between the sale of a true, financially healthy

16   going concern business, and a forced liquidation, with an

17   orderly liquidation somewhere in between."

18        Judge Carey noted that in that case there was a

19   going concern sale ultimately, but that that sale was in the

20   context of a failed standalone plan process and the distinct

21   possibility of veering or pivoting to a liquidation. Those

22   facts are also the case here.  Thus, although the collateral

23   was used in the Debtors' retail business, the reality of

24   this case was quite clear: the Debtors would need a

25   financial reorganization that was premised upon, under all

Page 228

1    realistic scenarios, either a going concern sale in the

2    context of competing liquidation bids, or no going concern

3    bid acceptable and pivoting to a liquidation.  It is in that

4    context that I consider the valuation evidence put before

5    me.

6            I believe that that approach is also entirely

7    consistent with Judge Glenn's approach in Official Committee

8    of Unsecured Creditors v UMB Bank, 501 B.R. 549, starting at

9    page 594, and continuing through 597.  As Judge Glenn there

10   states, "The Court remains faithful to the dictates of

11   506(a) by valuing the creditors' interest in the collateral

12   in light of the proposed post-bankruptcy reality."  That's

13   at page 595. He goes on to criticize the valuation

14   assumption of the secured creditors in that case that was

15   ostensibly at fair market value, since there was a fair

16   market disposition ultimately in the case, as quote,

17   "assuming that the JSN Collateral could have been sold on

18   the petition date by the Debtors. This assumption ignores

19   reality." As Judge Glenn stated, that did not take into

20   account the costs associated with obtaining requisite

21   consents or other costs and timing concerns that pertain to

22   the real facts facing the secured creditors at the

23   commencement of the case.

24            Moreover, Judge Glenn faulted the secured

25   creditors' expert's assumption in not looking to sales

Page 229

1    conducted by other distressed entities on the brink of

2    insolvency and, instead, considering only a solvent company

3    able to capture fair value for its assets.

4         To the contrary, Judge Glenn held that the debtor

5    was very substantially, and the collateral was -- and the

6    collateral was very substantially impaired by reason of

7    existing defaults that prevented the debtors from disposing

8    of most of their collateral at that time.

9         Any assessment, I believe, of the 2L creditors'

10   collateral at the commencement of the case in order to

11   determine its -- whether it has diminished in value,

12   therefore needs to take those concerns into account.

13        It may well be that some lesser form of value than

14   retail value, in a retail customer's hands, or full book

15   value, therefore, is appropriate, and that some form of

16   orderly liquidation value, instead, would be more

17   appropriate under these facts.  See, for example, In re

18   T.H.B. Corp. 85 B.R. 192 (Bank. D. Mass. 1988).

19        In conducting such an analysis, one would expect

20   an expert to look at different types of collateral and to

21   make adjustments for their reasonably realizable value,

22   which is what the experts did in the Aero Group case, with

23   respect to accounts receivable and inventory, for example,

24   deducting off the face value or book value of accounts

25   receivable for old or potentially uncollectable receivables,

1   and making similar deductions based on the ability to

2   realize on inventory in the context of the case itself.

3           Accordingly, I have given next to no weight to Mr.

4   Schulte's purported expert report, where he simply took the

5   companies' book value inventory for "go-forward stores," and

6   discounted it by less than one percent.  That includes not

7   only eligible receivables, which I believe are properly

8   discounted as the borrowing base does, but also ineligible

9   receivables and inventory and other assets that the record

10  reflects should be in fact steeply discounted.

11          Such discounting is normal and customary and

12  expected of a valuation of collateral, as was done in the

13  Aero Group case that I just cited, as well as the In re MD

14  Moody and Sons Inc. case, 2010 Bankr. LEXIS 5220 (Bankr.

15  M.D. Fla., March 5, 2010), where Judge Funk quite rightly

16  distinguished between the fair market value of eligible and

17  ineligible receivables, albeit in the context of an adequate

18  protection decision as opposed to a 507(b) decision.

19          It appears to me this really wasn't particularly

20  Mr. Schulte's fault, but was based on the direction he was

21  given, which I believe is based on a misguided

22  interpretation of the effect of the Rash case as applied to

23  determining initial adequate protection value and as was

24  properly construed in Official Committee of Unsecured v UMB

25  Bank, to the contrary to the legal approach applied by Mr.

Page 231

1    Schulte apparently at the direction of counsel.  That

2    valuation is simply not tied to reality, i.e. the normal

3    realizable value of this collateral in the context at the

4    start of this case.

5            That reasonable expectation of the 2L creditors

6    was not based on a pure book value analysis without taking

7    into account reasonable projections that would inform actual

8    valuation upon which a person would actually exercise some

9    judgment to determine the value of the collateral.

10           Rather, it assumed in essence an immediate sale of

11   the collateral to realize value on day one of the case at

12   retail value, as if anyone that would buy all the collateral

13   in that context where the Debtor was in severe financial

14   distress would in fact buy it for the same price that it was

15   marked on the Debtor's books, or, in the case of Mr.

16   Henrich's valuation, at retail value, i.e., as Mr. and Mrs.

17   Smith would buy an item of inventory, a washing machine, at

18   retail value.

19           It's clear to me that this is -- this should have

20   come as no surprise to any of the 2L creditors.  Certainly

21   it should not have come as a surprise to ESL, the largest 2L

22   creditor, which had an intimate familiarity with the

23   Debtors' operations and analyses of the collateral for its

24   2L debt that were conducted over the years.  But frankly, it

25   would -- should have come as no surprise to any

Page 232

1    sophisticated lender.

2         I believe that Cyrus' expert, Ms. Murray, does

3    attempt to take realistic realizable value into account in

4    applying a borrowing base type of analysis to the

5    collateral.  She does so, however, frankly based on another

6    entity's analysis who has not served as an expert in this

7    case, a company called Tiger Asset Intelligence, which --

8    Intelligent, excuse me, which provided a net orderly

9    liquidation value analysis of the collateral as of September

10   -- on September 28th, 2018, covering that value as of the

11   start of October, which is the closest valuation that one

12   has to the commencement of this case in mid-October of 2018.

13        Ms. Murray makes no effort to vet Tiger's

14   analysis, but assumes, based on her knowledge generally of

15   inventory and accounts receivable asset based facilities

16   that Tiger's conclusions as to a net orderly liquidation

17   value are reasonable.

18        She then applies that percentage to the "go-

19   forward store" inventory and then slightly different

20   percentages or somewhat different percentages to other types

21   of collateral, including inventory in transit and other

22   assets.

23        There are problems with this analysis that aren't

24   limited just to the fact that the Tiger analysis is almost

25   exclusively relied on without any real vetting.  Ms.

Page 233

1    Murray's analysis includes, for example, valuations for

2    inventory in transit, credit card receivables, pharmacy

3    scripts, and pharmacy receivables that differ considerably

4    from Tiger's own analyses as of the start of October of

5    2018.

6              For example, Tiger put a value on inventory in

7    transit of between 10 and 30 percent, which would lead to a

8    range between $19.8 million and $58 million.  Ms. Murray put

9    a value on it of $74.6 million.  Ms. Murray also appears to

10   have valued pharmacy scripts at face or near face, $72.8

11   million, when Tiger put a 38.1 percent value on such

12   scripts, and caveated its analysis by noting that the sale

13   of scripts on a liquidation basis is a delicate and

14   difficult task, given that other pharmacies know that the

15   debtor is going out of business.

16             Nevertheless, it appears to me that Ms. Murray's

17   general approach is at least somewhat, probably more than

18   somewhat, tethered to reality or the reality that faced

19   these second lien creditors at the start of this case with

20   respect to their interest in the Debtors' interest in their

21   collateral, as well as the reality of asset-based lending,

22   which is well established and reflected not only in the DIP

23   Order for the treatment of the ABL lenders and their rights

24   under the borrowing base calculations, but in numerous DIP

25   orders over the years. See, for example, In re RadioShack

Page 234

1    Corp., 2015 Bankr. LEXIS, 4541 (Bankr. D Del., March 12,

2    2015), and in re Visteon Corp. 2010 Bankr. LEXIS 5516

3    (Bankr. D. Del. March 16, 2010).

4           Tiger, in adopting an 87.7 percent value against

5    face for eligible inventory and receivables stated that it

6    took certain costs into account, both direct and indirect.

7    It of course has not testified or been deposed, and we don't

8    know how it did that or what costs it considered.  And Ms.

9    Murray does not evaluate that analysis in any way.

10          It's clear to me that certain costs were not

11   included, such as legal costs directly related to selling

12   the inventory, however.  And as I noted, while there is some

13   value in the other inventory and assets, Tiger has heavily

14   discounted it.

15          The Debtors have a totally different approach. As

16   I stated, they contend that there is sufficient evidence to

17   show that the ultimate transaction here reflected both the

18   starting and ending value of the collateral, which should be

19   measured at 85 percent of book.  There is a problem with

20   this evidence, however, as well, in that there's no binding

21   agreement to show that the parties intended that 85 percent

22   discounted number to be the allocable value for the

23   collateral.

24          To the contrary, the parties waived any allocation

25   of value among the forms of consideration in the Asset

Page 235

1    Purchase Agreement with Transform, and the specific

2    references to 85 percent of book value, which are in

3    evidence, are in evidence in connection with prior and lower

4    bids made by Transform for the Debtors' assets or

5    substantially all the Debtors' assets as a going concern.

6           So, at best, that 85 percent discounted figure

7    serves as a "data point," for what it's worth.  On the other

8    end of the scale, Ms. Murray refers to data points, as well,

9    that have similar evidentiary problems, namely, proposals,

10   that were not accepted, to use the Debtors' resources to

11   sell in going concern -- I'm sorry, in orderly liquidation

12   sales, going-out-of-business sales, the collateral by a

13   company called Abacus and bids by consortiums of

14   liquidators, which on their face show, in discount to book,

15   a net realizable value of between 89 and slightly under 94

16   percent of face value.

17          In addition, the 2L lenders point to analyses of

18   the collateral by the Debtors or the Creditor's Committee

19   that place a 90 percent discount to face value on it.

20          The problem with all of those data points is

21   similar to the problem with the 85 percent data point

22   related to the APA. There's no detail in the record as to

23   what collateral was covered and what costs were netted out

24   from the proposals.  Moreover, they were just that,

25   proposals.  They were not accepted, and, therefore, not

Page 236

1    binding on anyone.

2          Finally, the Court has another data point, which

3    is the adjusted going-out-of-business-sale net recovery

4    which is in evidence in two different forms, one measuring

5    the actual going-out-of-business-sale net recoveries in this

6    case -- and that is with respect to many stores that were

7    sold and did not form the consideration sold to Transform --

8    where essentially some combination of inventory and other

9    assets were sold.

10         The two statements purporting to be accurate

11   statements of the results of those inventory sales state

12   that the discount on a net basis to face was either 95.6

13   percent or 96.4 percent.  There is a similar problem with

14   these data points beyond the difference between the two

15   numbers. The first is that at least Mr. Henrich's

16   calculation came from ESL, and we don't know how ESL derived

17   its numbers, except that it is stated that ESL derived it

18   from succeeding to the Debtors' books and records.

19   Secondly, and more importantly, we don't know the makeup of

20   the inventory that was actually sold. Was it primarily

21   eligible inventory?  Did it include ineligible inventory?

22   Did it include other assets referenced in the Tiger report

23   from September 28, 2018? It clearly did not include

24   inventory in transit.  So although, again, it is a data

25   point, what makes up the figure that I'm being told to use

Page 237

1    as an absolute marker is unknown.  Finally, it is

2    acknowledged that the only adjustment off of the purchase

3    price for the net costs of the sales are the "four-wall

4    costs" related to the individual GOB sales, as opposed to

5    any on-top corporate costs, such as maintaining HR services

6    related to the employees who were selling the inventory and

7    the like.

8         I began this discussion of section 507(b) by

9    noting that the 2L creditors have the burden of proof here.

10   That's an important burden.  Courts have denied 507(b)

11   requests in toto for a failure of proof of the amount of

12   diminution. See, for example, In re Bailey Tool Mfg. Co.,

13   2018 Bank. LEXIS 154 at 20 (Bankr. N.D. Tex. Jan. 23, 2018),

14   and In re Modern Warehouse Inc., 74 B.R. 773 (Bankr. W.D.

15   MO. 1987).

16        Simply based upon the information before me with

17   respect to the starting value of inventory, I conclude that

18   a proper measure of value for 507(b) purposes is with regard

19   to eligible inventory, exclusive of inventory in transit, of

20   86.5 percent of face.

21        There were certain other elements of the

22   collateral that have some value, which the 2L experts place

23   a value on, namely credit card receivables, pharmacy

24   scripts, and pharmacy receivables.  The valuation of credit

25   card receivables by Messers. Schulte and Henrich are $64.2

Page 238

1    and $64.3 million, apparently, also at face. Ms. Murray

2    values them at 64.3 percent -- I'm sorry, $64.3 million,

3    excuse me, while the Debtor -- I'm sorry -- Ms. Murray

4    values them at $54.8 million, while the Debtor puts a value

5    at $46.6 million.  There seems to be no real analysis behind

6    Ms. Murray's value other than her desire, at least from what

7    I took away from statements made in oral argument, to

8    comport with what was on the Debtors' books of the

9    discounted value.  I will go with the Debtors' book value,

10   $46.6, given that fact, $46.6 million.

11           As far as pharmacy scripts are concerned, all

12   three of the 2L experts value those scripts at $72.8

13   million, again apparently at face.  However, as noted,

14   Tiger, the one whom Ms. Murray relied on for everything

15   else, puts a value of 38.1 percent as against face.

16           If I concluded that the scripts were in fact

17   collateral, I would discount them by that same 38.1 percent

18   number.

19           As far as pharmacy receivables are concerned, I

20   will take Ms. Murray's number of $10.5 million.

21           All three experts count cash as part of the 2L

22   lenders' collateral at the starting point of the case.  They

23   do that notwithstanding the fact that they do not have a

24   lien specifically on all cash, but instead only have a lien

25   on the proceeds of their collateral.

Page 239

1              They acknowledge that they have not done any sort

2     of tracing exercise to determine what cash was actually

3     proceeds of their collateral as existed on the books of the

4     company at the start of the case, although they urge me

5     simply to infer that most of the cash should be viewed as

6     their proceeds.

7              They also argue that the first lien debt that

8     comes ahead of them would apply the cash to reduce the first

9     lien debt, notwithstanding that there's no evidence if that

10    happened, specifically, or -- and, excuse me, the waiver of

11    marshaling in the Debtor in Possession Financing Order.

12             I agree with the Debtors that cash should not be

13    included here given the lack of tracing and the other

14    problems with the proof as established -- to establish this

15    is an element of collateral or this should be part of the

16    collateral determination.

17             There's also an underlying problem as to whether

18    the pharmacy scripts constitute the Debtors' -- I'm sorry --

19    constitute the 2L creditors' collateral.  The 2L creditors

20    contend that the scripts, which are the right to fill a

21    prescription that has not yet been presented, are either

22    inventory or "books and records,"  and that if one sold the

23    books and records, i.e. the scripts, there would be value

24    attributable to it.

25             The right to fill a prescription, to my mind,

Page 240

1    clearly is not inventory.  The lien on "books and records"

2    as set forth in the 2L security agreement, has a qualifying

3    clause which states that they are books and records

4    pertaining to the collateral. I do not believe that a right

5    to sell un-presented prescriptions is in fact such an item

6    of collateral.  In that sense, it's not like a creditor list

7    -- I'm sorry -- a customer list, which would be a separate

8    item of collateral and clearly has value just as scripts

9    have some value.  So I believe it is also properly excluded

10   from the collateral calculation, even as to its heavily

11   discounted value as I previously found.

12          As I've noted, the diminution-in-collateral

13   analysis requires a starting point valuation, which I've

14   just conducted.  One has to then determine what the

15   diminution was as of an end date.  The parties agree that

16   the only end date value was the designated 2L credit bid

17   under the APA of $433.5 million.

18          So it would appear that the calculation of

19   diminution is relatively easy, i.e. subtract the collateral

20   value -- I'm sorry -- subtract from the starting collateral

21   value, which I've previously determined, the amount of

22   $433.5 million.  It is complicated, however, by the fact

23   that this was second lien collateral.  There is first lien

24   debt ahead of it.

25          Clearly, the 2L creditors' interest in the

1    collateral -- interest in the collateral as of the starting

2    date, has to take into account that senior debt, i.e., that

3    senior debt needs to be deducted from the collateral value

4    that I had previously found, in addition to subtracting the

5    $433.5 million credit bid.

6           The parties agree that the revolving credit

7    facility of $836 million and the first lien term loan of

8    $570.8 million and the FILO term loan of $125 million should

9    all be subtracted from the starting collateral value.  They

10   disagree, however, about three other deductions that the

11   Debtors contend need to be made on account of the first lien

12   debt.

13          First, they disagree that postpetition interest

14   for the assumed 11 to 12 weeks of orderly liquidation sales

15   would have to be deducted.  The Debtors calculate that

16   number at $34 million and no one has challenged that.  The

17   2L creditors say that I must look at the petition date,

18   when, of course, that postpetition interest had not accrued,

19   and, therefore, I should not count it.

20          I conclude, to the contrary, that I must count it,

21   consistent with Judge Glenn's opinion in Official Committee

22   of Unsecured Creditors v UMB Bank, which I believe entirely

23   correctly says that one must apply projected "post-

24   bankruptcy reality," that's a quote, to the calculation.

25          It is completely unreal to assume a realizable

Page 242

1    value on the collateral without a period to realize that

2    value in.  The Debtors have assumed, I believe, the minimal

3    period for that realization in coming up with the $34

4    million of postpetition interest.

5           Clearly, the first lien creditors are -- would be,

6    entitled to that interest, given that they were oversecured,

7    and therefore have a right to it under section 506(b) of the

8    Bankruptcy Code.  One might argue that postpetition interest

9    should continue to accrue through the sale, since that was

10   the real reality here.  But the Debtors have not done so,

11   and I won't do so here.

12          In part I'm not doing so because of the pay downs

13   to the first lien creditors from the GOB sales, which would

14   have reduced the number against which postpetition interest

15   would be calculated.  So the $34 million is a fair number.

16          That leaves what I believe to be the most

17   difficult issue with respect to the 507(b) determination.

18   Namely, the Debtors contend that two first lien letter of

19   credit facilities need to be counted in the first lien debt

20   and accordingly subtracted from the collateral value before

21   the 2L creditors would be entitled to any collateral value

22   on the petition date.

23          One facility is for $123.8 million of issued

24   letters of credit.  Another one is for $271.1 million.

25   Neither of those facilities was drawn on the petition date.

Page 243

1    Namely, they were therefore contingent obligations, although

2    they were collateralized.

3              Nevertheless, they were real obligations.  They

4    were denominated in the Debtor in Possession Financing Order

5    as "senior debt."  They clearly stood ahead of the 2L

6    creditors and had a claim, albeit contingent, to the 2L

7    collateral senior to the 2L creditors'.

8              Again, the realistic context of this case is not a

9    long-term going concern, but a short-term sale process, with

10   the very real backdrop of a potential liquidation in which

11   the Sears Debtors would go out of business.

12             Under that scenario, it appears clear to me that

13   the letters of credit would be drawn, either immediately or

14   upon their expiration date.  The beneficiaries of the

15   letters of credit would not simply let their collateral in

16   the form of a letter of credit go away.

17             Ms. Murray calculates that almost 90 percent of

18   the letters of credit are in respect of worker's

19   compensation contingent obligations, obligations that, as a

20   going concern, the Debtors would be funding, but in a

21   liquidation scenario, would not fund.

22             One could conceivably do a valuation of those

23   letter of credit facilities and not simply take the value at

24   face.  Congress does recognize in one context, namely

25   determining whether an entity is insolvent or not, that debt

Page 244

1    as well as assets can be subject to a fair valuation and

2    section 101(32)(A) of the Bankruptcy Code. See for example

3    Traveler's International AG v TWA, 134 F.3d 183 (3d Cir.

4    1998). But it doesn't -- but Congress doesn't require a

5    valuation of debt in other contexts in the Code, and this

6    issue does not appear to have arisen in a 507(b) context.

7              One also could conceivably value the letters of

8    credit, not just on -- in terms of valuing the contingency

9    as to whether they would be drawn, but also as to whether

10   their face amounts exceed the underlying obligations that

11   they in essence secure, namely the worker's compensation

12   claims and other claims that they cover.

13             Neither of those valuation exercises was

14   undertaken here by the 2L creditors.  They simply contend

15   that I should ignore the letters of credit because they were

16   not drawn on the petition date.  As a backup, they say that

17   I should simply value them at roughly $9 million, the amount

18   that was drawn between the petition date and the sale.

19             Given the 2L creditors' burden of proof here, I

20   believe they were required to do more, and that I should

21   count the letters of credit in their face amount, rather

22   than do my own attempt to value such obligations, which,

23   again, according to the DIP Agreement, are senior

24   obligations.

25             I do so, again, in the context of this case, where

Page 245

1    an orderly liquidation going out of business was clearly a

2    very available option against which ESL was bidding.

3              I believe that this resolves all of the open

4    disputes as far as determining the value of the collateral,

5    which subsumes in it what constitutes the collateral and the

6    diminution of the collateral between the petition date and

7    today.

8              I also have determined that the proper

9    interpretation of Paragraph 9.13 of the Asset Purchase

10   Agreement is that to the extent there is a 507(b) claim for

11   ESL, that claim is capped at -- recovery on that claim is

12   capped at $50 million, again based on the definition of

13   "Claim," uppercase Claim in the APA.

14             That definition, which is very broad and includes

15   a right to payment, I believe would mean that it would

16   include claims based on accounts receivable derived from

17   inventory.  I'll note a similar argument, which I accepted,

18   was made by the 2L creditors for my including pharmacy

19   receivables in their collateral, even though it wasn't

20   specifically a defined term but can be viewed as based on a

21   right to inventory and the proceeds thereof.

22             So I don't know what that adds up to, but I think

23   the parties can do the math.  And if there's a dispute, you

24   could explain the dispute to me as to what the diminution

25   claim will be.

Page 246

1                    Let me turn then to the second issue.  And before

2        doing that, though, there is one issue that somewhat bleeds

3        over into the second issue.

4                    The second issue, of course, is the 506(c) rights

5        of the debtor in possession.  The Creditors Committee and

6        the Debtors have argued that I should take equitable

7        considerations into account in determining those 506(c)

8        rights.  And I'll address that when I address the 506(c)

9        issues.

10                   I will note, however, that at least a couple of

11       cases have taken equitable considerations into account when

12       doing a 507(b) calculation.  They're relatively old cases. I

13       think the leading one is probably In re McFarland's Inc. 33

14       B.R. 788 (Bankr. W.D.N.Y. 1983).  See also In re Cheatham,

15       C-h-e-a-t-h-a-m, 91 B.R. 982 (Bankr. E.D.N.C. 1988).

16                   I recognize that in the 1980s bankruptcy courts,

17       (perhaps because it was an accepted fact of bankruptcy

18       jurisprudence then) that bankruptcy courts as "courts of

19       equity" -- and that seemed to mean what it said -- were more

20       willing to apply equitable principles to determinations. And

21       clearly Congress in drafting section 506(a) and section 361,

22       as reflected in the legislative history that I've just read,

23       also contemplated applying equitable principles in a

24       valuation.

25                   The Supreme Court has severely narrowed the equity

Page 247

1    jurisdiction of the bankruptcy courts over the years,

2    culminating in Law v Siegel, 134 S.Ct. 1188 (2014).  And I

3    actually now view these cases through that lens.

4            I also view them as entirely consistent with my

5    holding on the valuation of the collateral for the 2L

6    creditors at the start of the case, in that I believe when

7    applying the equities in McFarland's and Cheatham and in

8    citing In re Callaster in doing so, those courts were

9    actually talking about what would be an appropriate

10   valuation in light of the facts of the case, namely, what

11   were the reasonable expectations as to the value of the

12   collateral given the nature of the case.

13           And again, as I've heavily relied on Judge's Glenn

14   and Carey's opinions, it seems to me the nature of this case

15   at the start was one where everyone knew -- none more than

16   ESL -- but everyone knew, that the Debtors were going to

17   dispose of substantially all of their assets in a very short

18   time, and that that was the only way that the secured

19   creditors would realize any value.

20           Applying mere book or retail value in those

21   circumstances, one could say would be inequitable, but it's

22   really just unrealistic.  So I equate "equity" here as

23   really meaning what's realistic.

24           All right, turning to section 506(c), unlike the

25   507(b) issue, the Debtors here have the burden of proof.

1   See In re Flagstaff Food Service Corp., 739 F.2d 73, 77 (2d

2   Cir. 1984), and First Services Group Inc. v O'Connell (In re

3   Ceron), C-e-r-o-n, 412 B.R. 41, 48 (Bankr. E.D.N.Y. 2009).

4           Under the law of the Second Circuit, the statute's

5   plain language, which is requiring -- which requires, that

6   the expenses incurred by the debtor in possession were

7   necessary and the amounts expended were reasonable and

8   benefited the secured creditor -- require three different

9   things, including a gloss, namely that the benefit be

10  "direct" or "primary." See General Electric Credit Corp v

11  Peltz (In re Flagstaff Food Service Corp.), 762 F.2d 10, 12

12  (2d Cir. 1985).  This does not mean that the creditor be the

13  only beneficiary of the expenses, but that the benefit be

14  not only direct, but primary.

15          The valuation of the collateral that I have given

16  already takes into account costs of realizing on the

17  collateral, not only the so-called "four-wall" costs and the

18  assumed, apparently, although, again, this has not been

19  vetted, 3.1 percent discount applied by Tiger, but also my

20  belief as to proper costs applied for corporate overhead

21  attributable to the collateral and legal fees and

22  professional fees directly attributable to the collateral.

23          Where do I come up with that extra discount?  In

24  part from, largely from, Mr. Henrich's analysis of 506(c)

25  claims, as well as Judge Stong's analysis in the Ceron case,

Page 249

1    in which she makes the clearly correct point that whether

2    expenses incurred were "reasonable," requires an assessment

3    that shows that there's some sensible proportion to the

4    value of the benefit to be received.

5            The relatively modest adjustment I've made to the

6    Tiger/Murray analysis takes that into account I believe

7    already.  This is important because I think to do the

8    analysis again would be double counting in the 506(c)

9    context.  Moreover, the 506(c) evidence provided to me by

10   the Debtors, which consists primarily of a one-page breakout

11   of alleged costs that would fit 506(c) itemized simply by

12   category adding up to over $1,400,000,000 does not break out

13   in sufficient detail any costs beyond what I've included in

14   the value of the collateral that I believe would properly be

15   charged under section 506(c).

16           I think without that level of detail, in other

17   words, I cannot make the "reasonable" and "necessary," let

18   alone "primary and direct benefit" analysis that the Second

19   Circuit case law requires.  Consequently, I will deny the

20   Debtors' motion under section 506(c).

21           So I will ask counsel for Cyrus to prepare the

22   order denying the 506(c) motion, and counsel for the Debtors

23   to prepare the order on the 507(b) matter.  You don't need

24   to formally settle those orders on the docket, but you

25   should clearly run them by the parties involved in this

Page 250

1   litigation, including the Creditors Committee, before you

2   submit them to chambers.

3           And, again, if there's some dispute as to how my

4   rulings total up to a 507(b) claim, I would ask the parties

5   to give me their dueling orders with an explanation, emailed

6   obviously to each other as well as to chambers, of the basis

7   for their contention.  Anything else?

8           MR. SCHROCK:  Ray Schrock, for the Debtors.  That

9   said, Your Honor, thank you very much for taking all this

10  time today.

11          THE COURT:  Okay.

12          MR. SCHROCK:  And we'll move to settle the orders

13  ASAP.

14          THE COURT:  Okay.

15          MR. SCHROCK:  Or not settle the orders, but

16  prepare them.

17          THE COURT:  All right.  I have to say also, I

18  greatly appreciate the efficient way that the parties set

19  this litigation up.

20          MR. SCHROCK:  Thank you.

21          THE COURT:  Thank you.

22          (Whereupon these proceedings were concluded at

23  5:49 PM)

24

25

1

2

3

4                          I N D E X

5

6                          RULINGS

7                                                    Page        Line

8

9    Debtor's Motion Denied Under section 506(c)   250          12

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 252

1                       C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya Ledanski     Digitally signed by Sonya Ledanski
                         Hyde
7     Hyde               DN: cn=Sonya Ledanski Hyde, o, ou,
                         email=digital@veritext.com, c=US
                         Date: 2019.10.11 13:26:10 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  August 12, 2019