**Hearing Date and Time:**
**November 20, 2019 at 10:00 a.m.**

Edward L. Schnitzer
**Montgomery McCracken Walker & Rhoads LLP**
437 Madison Avenue
New York, NY  10022
(212) 551-7781
ESchnitzer@mmwr.com


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>SEARS HOLDINGS CORPORATION,<br>*et al*.,<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No.: 18-23538 (RDD)<br>Jointly Administered<br><br>Related to ECF No. 5237 |

**BST INTERNATIONAL FASHION LTD.'S RESPONSE TO DEBTORS'**
**TENTH OMNIBUS OBJECTION TO PROOFS OF CLAIM**

**TO THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE**

BST International Fashion Ltd. ("**BST**"), the predecessor holder of Claims Nos. 7960 and 7967,[1] by and through its undersigned counsel, submits this response (the "**Response**") to the *Debtors' Tenth Omnibus Objection to Proofs of Claim (To Reclassify Claims)* (the "**Objection**") and respectfully states as follows:

## PRELIMINARY STATEMENT

1.	In a thorough detailed and well-reasoned opinion, the Third Circuit Court of Appeals held that "receipt as used in 11 U.S.C. § 503(b)(9) requires physical possession by the

---

[1] On or about January 29, 2019, BST sold Claims Nos. 7960 and 7967 (the "**Transferred Claims**") to Hain Capital Investors Master Fund, Ltd. ("**Hain**") pursuant to a certain Assignment of Claim (the "**Assignment**").  *See Notice Of Transfer Of Claim Other Than For Security* [Dkt No. 2216].  BST files this response, as the predecessor holder of the Transferred Claims, pursuant to paragraph 5 of the Assignment which provides BST with the right to defend the Transferred Claims in light of the Objection.  *See* acknowledgement from Hain, attached hereto as **Exhibit 1**. Nothing contained herein is a waiver of BST's rights under the Assignment.

buyer or his agent." *In re World Imports*, 862 F.3d 338, 346 (3d Cir. 2017).  Without any good law in support (as reliance on the bankruptcy and district courts' opinions in *World Imports* that **were reversed** by the Third Circuit do not qualify as good law), the Debtors suggest that the Third Circuit was wrong.

      2.     In making their argument for their self-serving interpretation of "received," the Debtors seek to ignore the ordinary and natural meaning of "received" and instead would like section 503(b)(9) "received" to:

> (a) Be based on transfer of title;
>
> (b) Occur when goods are delivered at port of origin, despite the seller maintaining rights to stop transit until such goods have been physically received by the buyer;
>
> (b) Not mean what "receipt" means in the Uniform Commercial Code (the "**UCC**") despite section 503(b)(9) being derived from reclamation which is a UCC right;
>
> (c) be different from what "receipt" means in the UCC despite the UCC being used to define "goods", the word that precedes "received" in section 503(b)(9); and
>
> (d) Differ from the definition of "received" as used in section 546 of the Bankruptcy Code, thus causing a conflict within the Bankruptcy Code.

Not only can the Debtors not reference a single case in support of their theory that has not been reversed, all courts that have addressed the "received" issue have done so consistently with the Third Circuit's decision in *World Imports*.[2]  As the Third Circuit's reasoning is correct, and "received" in section 503(b)(9) must mean "physical possession," the Objection should be overruled.

---

[2] It is evident that the Debtors' motivation for objecting to the BST Claims is not a tenable legal position, but instead a desperate attempt to avoid having to pay valid administrative expense claims.  Had there been a genuine basis to object to BST's valid 503(b)(9) claims, the Debtors would have objected in the ten months between when the claims were filed and prior to the filing of their plan, not amidst a confirmation battle where one of the main issues is the Debtors' inability to comply with section 1129(a)(9).

## BACKGROUND

3.      On October 15, 2018 (the "**Petition Date**"), Sears Holdings Corporation and several of its affiliates, including Kmart Corporation and Sears, Roebuck and Co. (collectively, the "**Debtors**"), filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (this "**Court**").

4.      BST was a seller of textile goods manufactured in a China that it sold to U.S. retailers including the Debtors.  *See* Declaration of Meyyappan Muthu ("**Muthu Declaration**"), ¶¶ 3-4.

5.      Manufacturing Textiles goods in China and delivering those from China to the Debtors took between 120 to 145 days.  *See* Muthu Declaration, ¶ 5.  That time was comprised of approximately 60 days for manufacturing and 60-85 days for delivery including customs at both ports.  *See* Muthu Declaration, ¶ 5.  For goods being delivered from BST in China to the Debtors in the United States, this 60-85 day process included:

> A.      Following delivery of such goods to common carrier at the Shanghai port, clearing of customs in Shanghai, China and waiting time to depart Shanghai, China on common carrier (7-15 days);
>
> B.      Sailing time from Shanghai, China to United States (10-24 days depending on whether goods are going to east or west coast of the United States);
>
> C.      Delivery from United States port to either PCD (facility located in Pennsylvania for east coast deliveries) or CCD (facility located in California for west coast deliveries) facility to clear customs (8 days)
>
> D.      Clearing customs in the US (10 - 12 days);
>
> E.      Delivery from PCD/CCD facility to Debtors' distribution center (7 - 11 days); and
>
> F.      Delivery from Debtors distribution center to retail stores (2 - 5 days).

*See* Muthu Declaration, ¶ 6.

6.      Terms used during the delivery process (collectively, the "**Delivery Process Terms**") include:

> A.      "Delivery Date" refers to the date that the goods are delivered to the common carrier in Shanghai, China.
>
> B.      "ETD" refers to the estimated time of departure of the goods from the port in Shanghai, China.
>
> C.      "Discharge Date" or "ETA" refers to the date the vessel carrying the goods arrives at the United States port.
>
> D.      "Destination Date" refers to the date the goods arrive at the PCD or CCD facility.
>
> E.      "In DC Date" refers to the date the goods arrive at the Debtors' distribution center.

*See* Muthu Declaration, ¶¶ 7-11.

7.      In order for the Debtors to have certain goods in their stores by end of September through October for the 2018 Fall/2019 Winter season, the Debtors ordered goods from BST between end of May and mid-June.  *See* Muthu Declaration, ¶ 12.

8.      On January 23, 2019, BST timely filed claim number 7960 ("**BST Claim 7960**"). BST Claim 7960 contains a spreadsheet that provides, for each and every underlying 503(b)(9) Invoice, the Purchase Order number, the quantity, containers, invoice amount, and the Delivery Process Terms relating to the $1,781.633.92 of goods that were sold to Sears and received in the 20 days prior to the Debtors' October 15, 2018 petition date (collectively, the "**Sears 503(b)(9) Goods**").  *See* Muthu Declaration, ¶¶ 7-11, 15-16.

9.      The "In DC date" for the Sears 503(b)(9) Goods was provided by Vinus Soo, Senior Merchandising Manager, Sears Holdings Global Sourcing Ltd.  *See* Muthu Declaration, ¶ 16.  All In DC dates identified in BST Claim 7960 are on or later than September 25, 2018, the start of the 503(b)(9) 20-day period.

10.     On January 23, 2019, BST timely filed claim number 7967 ("**BST Claim 7967**", and together with BST Claim 7960, the "**BST 503(b)(9) Claims**").  BST Claim 7967 contains a

spreadsheet that provides, for each and every underlying 503(b)(9) Invoice, the Purchase Order number, the quantity, containers, invoice amount, and the Delivery Process Terms relating to the $342,783.60 of goods that were sold to Kmart and received in the 20 days prior to the Debtors' October 15, 2018 petition date (collectively, the "**Kmart 503(b)(9) Goods**," and together with the Sears 503(b)(9) Goods, the "**BST 503(b)(9) Goods**").  *See* Muthu Declaration, ¶¶ 7-11, 15-17.

11.     The "In DC date" for the Kmart 503(b)(9) Goods was provided by Vinus Soo, Senior Merchandising Manager, Sears Holdings Global Sourcing Ltd.  *See* Muthu Declaration, ¶ 17.  All In DC dates identified in BST Claim 7967 are on or later than September 25, 2018, the start of the 503(b)(9) 20 day period.

## RESPONSE TO OBJECTION

### A.  *The Objection is Deemed Withdrawn*

12.     As an initial procedural matter, based upon the Notice of Allowed Administrative Expense Claims (the "**Notice**") [Dkt No. 5298], the Objection should be overruled as the Debtors agreed to withdraw such objection as it pertains to the BST 503(b)(9) Claims.  The Notice provides in relevant part:

> The Allowed Administrative Expense Claims resolve any and all motions for allowance of payment of the Administrative Expense Claims listed in Exhibit A and all motions and/or objections filed with respect thereto are deemed withdrawn upon entry of an order by the Bankruptcy Court (a) confirming the Plan and (b) approving the Administrative Expense Claims Consent Program, filed contemporaneously herewith.

Notice, ¶ 2.  As the BST 503(b)(9) Claims were set forth in Exhibit A to the Notice, this Court entered an order confirming the Plan and approving the Administrative Expense Claims Consent Program, the Objection is "deemed withdrawn."

13.      The Notice states that the objection is "deemed withdrawn."  Even if this Court were to allow the Debtors to claim that the objection is "deemed withdrawn" really means "the Debtors may revise the objection," then the Debtors should have done so.  It is inappropriate for the Debtors to continue to prosecute a claim objection to claims totaling over $2.1 million if, in fact, the Debtors are only objecting to less than half that amount.  By doing so, the Debtors are misleading this Court and all parties in interest, and have unnecessarily increased the litigation costs by doing so.

**B.  This Court Should Follow The Third Circuit's Decision in *World Imports* Because It Is Correct and It Is Persuasive Authority**

14.      While the *World Imports* decision from Third Circuit is not binding on this Court, it is persuasive, and this Court should follow the decision.

15.      The Second Circuit has made clear that "where a question has been decided after careful and exhaustive examination by the Court of Appeals of one circuit, another court of co-ordinate jurisdiction should not reach a different conclusion unless persuaded that the first decision is clearly wrong." *Calculagraph Co. v Automatic Time Stamp Co.*, 187 F.2d 276, 277 (2d Cir. 1911); *see also Ferguson v. FBI*, 957 F.2d 1059, 1067 (2d Cir. 1992) ("Given the ambiguity within our circuit, we consider the reasoning of other circuits . . . .").

16.      Furthermore, other courts, not bound by the Third Circuit, found the Third Circuit's reasoning in *World Imports* to be persuasive and adopted its holding.  *See, e.g., In re O.W. Bunker Holding N.A. Inc.*, Case No. 14-51720 (Bankr. D. Conn. Aug. 26, 2019) (describing Third Circuit's reasoning and holding defining "received" as physical possession); *In re VPH Pharmacy, Inc.*, 578 B.R. 776 (Bankr. E.D. Mich. 2017) (citing to *World Imports* to define "received" under 503(b)(9)).

17.    In addition, other courts have looked to the UCC to determine the definition of received, and if this Court were to not look to the UCC, it would be one of the only courts to do so. *See, e.g., In re Momenta, Inc.*, 455 B.R. 353, 358 (Bankr. D.N.H. 2011) ("Since Congress borrowed from the UCC when enacting § 546(c), courts have found the UCC relevant when interpreting that section.  In turn, the same UCC provisions are relevant when interpreting the requirements of § 503(b)(9)."), *aff'd, Ningbo Chenglu Paper Prods. Mfg. Co. v. Momenta, Inc.*, 2012 WL 3765171 (D.N.H. Aug. 29, 2012).

### C. The Ordinary and Natural Meaning of "Received"

18.    Section 503(b)(9) of the Bankruptcy Code provides a creditor with an administrative expense priority claim for the "value of any goods received by the debtor within 20 days before the date of commence of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  As the Bankruptcy Code does not define "received", it should be "normally construe[d] in accord with its ordinary or natural meaning."  *Smith v. United States*, 508 U.S. 223, 228 (1993); *see also World Imports*, 862 F.3d at 342.

19.    The Supreme Court also instructs courts that "where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense."  *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911); *see also In re Circuit City Stores, Inc.*, 432 B.R. 225, 228 (Bankr. E.D. Va. 2010).  The Supreme Court's guidance does not support changing the word "received" to "transfer of title" or "received at port of origin" as the Debtors would suggest.  It means looking to the dictionary definition of "received."

20.    What is the ordinary and natural meaning of "received"?  **To take into physical possession.**  "[T]he key to determining when goods are received is possession — whether actual or constructive — not title."  *In re Wezbra Dairy, LLC*, 493 B.R. 768, 771 (Bankr. N.D. Ind. 2013).  As explained by the Third Circuit Court of Appeals:

> The most recent edition of Black's Law Dictionary defines "receive" as "[t]o take...; to come into possession of or get from some outside source." Black's Law Dictionary (10th ed. 2014). The 1990 edition of Black's defined "receive" as "[t]o take into possession and control; [to] accept custody of." Black's Law Dictionary 1433 (6th ed. 1990). The Oxford English Dictionary defines "receive," with respect to physical goods, as "[t]o take into one's hands or one's possession (something offered or given by another); to take delivery of (something) from another, either for oneself or for a third party." Oxford English Dictionary (3d ed. 2009). Although these definitions are not identical, they all require physical possession. Applying these definitions to § 503(b)(9), a debtor must "take" goods into its "possession," "custody," or "hands" in order to receive them.

*World Imports*, 862 F.3d at 342.

21.    The Virginia Bankruptcy Court stated similarly:

> This definition of "received" is consistent with Black's Law Dictionary, which defines "receipt" as the "[a]ct of receiving; also, the fact of receiving or being received," and "receive" as "[t]o take into possession and control; to accept custody of." BLACK'S LAW DICTIONARY 1433 (4th ed. 1968). This definition is also consistent with the term's ordinary and common usage. For example, Webster's Ninth New Collegiate Dictionary defines "receive[d]," in the first instance, as "[having] come into possession of." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 982 (9th ed. 1986).

*Circuit City Stores*, 432 B.R. at 229.

22.    Noticeably, the Debtors have failed to allege, let alone establish, that "delivery to port of origin" is the ordinary and natural meaning of the term "received."  The absence of such an argument is not surprising given that it would be impossible for the Debtors to do so.  Instead, the Debtors just ask this Court to ignore the well-reasoned decisions in many other courts and to

instead blindly follow a bankruptcy court and district court decision that was reversed by the Third Circuit and not followed by any other court.

### D. The UCC Definition of Receipt Should be Utilized

23.     Defining receipt as "take into physical possession" is also consistent with the definition of receipt/received used in Article 2 of the UCC and the Third Circuit's holding in *World Imports*.[3]

24.     Receipt of goods is defined under the UCC as "taking physical possession of them."  UCC § 2-103(1)(c).  "Courts interpreting 'receipt' in § 546(c) have consistently adopted a definition of 'receipt' based on the definition in Article 2 of the UCC and held that 'receipt' in § 546(c) means taking 'physical possession.'"  *Circuit City Stores*, 432 B.R. at 228-29; *see also World Imports*, 862 F.3d at 342 ("The legal and dictionary definitions comport with the definition found in the UCC. Section 2-103(1)(c) defines 'receipt' of goods as 'taking physical possession of them.'").

25.     As explained by the Third Circuit in *World Imports*, the UCC should be looked to because "Article 2 of the UCC governed sales of goods in 49 states when 11 U.S.C. § 503(b)(9) was adopted [and courts should] infer that Congress meant to adopt this "well-known meaning" of the term …."  *World Imports*, 862 F.3d at 342.  "In fact, there is ample evidence from the statutory context that Congress relied on the UCC definition of the word."  *World Imports*, 862 F.3d at 342; *see also Momenta*, 455 B.R. at 358 ("Since Article 2 of the Uniform Commercial

---

[3] BST submits that even if this Court were to look to the CISG to define "received," it would come to the same conclusion that physical possession is required.  Article 71 of the CISG provides that a seller may stop goods in transit prior to "the handing over of the goods to the buyer even though the buyer holds a document which entitles him to obtain them."  CISG Article 71 (https://www.cisg.law.pace.edu/cisg/text/e-text-71.html); *cf.* UCC § 2-705 (a seller "may stop delivery of goods in the possession of a carrier … until the receipt of the goods by the buyer").  As "receipt does not occur until after the seller's ability to stop delivery ends" (*World Imports*, 862 F.3d at 345), receipt cannot occur under the CISG and the UCC until physical receipt.

Code's ("UCC") right to reclamation lead to the enactment of § 546(c), it also proffers guidance in interpreting § 503(b)(9).").

### E. As Section 503(b)(9) is Related to Reclamation, the UCC Definition of Receipt Must be Utilized

26.     As section 503(b)(9) was enacted to address reclamation issues, and because reclamation derives from UCC § 2-207, this Court should look to Article 2 of the UCC to define "received" in 503(b)(9).[4]

27.     The Bankruptcy Code itself demonstrates that 503(b)(9) is a reclamation issue. "Section 546(c)(1) addresses a seller's right of reclamation and § 546(c)(2) states that "[i]f a seller of goods fails to provide notice in the manner described in paragraph (1), the seller may still assert the rights contained in section 503(b)(9)." *Momenta*, 455 B.R. at 357.  As the Third Circuit explained in *World Imports*:

> The interrelationship between § 546(c) and § 503(b)(9) is explicit in the Bankruptcy Code. Section 546(c)(2) states: "If a seller of goods fails to provide notice ... the seller still may assert the rights contained in section 503(b)(9)." Because § 503(b)(9) provides "an alternative remedy to reclamation," In re Momenta, Inc., 455 B.R. 353, 357 (Bankr. D.N.H. 2011), it should be read and interpreted consistent with § 546(c).

*World Imports*, 862 F.3d at 342.

28.     In fact, the "section of BAPCPA that created § 503(b)(9) was titled 'Reclamation' and was the same section that amended § 546(c)." *Momenta*, 455 B.R. at 357; *see also Circuit City Stores*, 432 B.R. at 229 ("Both § 503(b)(9) and the amendments to §546(c) were enacted as part of § 1227 of the [BAPCPA] to enhance certain types of reclamation claims."); *In re Brown & Cole Stores, LLC*, 375 B.R. 873, 875 n.3 (9th Cir. BAP 2007) ("[t]he legislative history of

---

[4] The Debtors incorrectly argue that unlike section 546(c) which codifies a preexisting state law right of reclamation, 503(b)(9)'s administrative expense claims are derived from federal bankruptcy law. Objection, ¶¶ 19-23.

§ 503(b)(9) suggests that it was aimed at providing relief to sellers of goods who fail to give the required notice under the reclamation provision of section 546(c).”); *In re The Great Atlantic & Pacific Tea Co., Inc.*, Case No. 12-2449 (Bankr. S.D.N.Y. Oct. 25, 2012) (“The statute [section 503(b)(9)] was enacted along with and in the context of modifications to the Bankruptcy Code’s reclamation provisions, at Section 546(c) of the Code.”).  As the Third Circuit explained:

> Section 503(b)(9) was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (2005). Section 1227 of BAPCPA, entitled “Reclamation,” did two things: (1) it amended § 546(c) to clarify the conditions placed on trustees and sellers that seek to reclaim goods sold to a debtor; and (2) it created § 503(b)(9) to add an administrative expense claim as an exemption from § 546(c)’s reclamation conditions. See BAPCPA § 1227.

*World Imports*, 862 F.3d at 342-43.  The placement of section 503(b)(9) under the heading “Reclamation” cannot be minimized.  See *Fla. Dep’t of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (noting importance of subchapter location for word’s meaning).  “Based upon the placement of §§ 503(b)(9) and 546(c)(2) in § 1227 of BAPCPA under the heading “Reclamation,” Congress appears to have intended for the UCC definition of goods applicable to reclamation to apply in both sections.”  *In re Circuit City Stores, Inc.*, 416 B.R. 531, 537 (Bankr. E.D. Va. 2009).

29.    “The Bankruptcy Code … must be read and function as a whole ….”  *In re Mirant Corp.*, 440 F.3d 238, 252 (5th Cir. 2006); *In re Jamo*, 283 F.3d 392, 399 (1st Cir. 2002) (“[T]he Bankruptcy Code should be read as a whole, with a view toward effectuating Congress’s discerned intent.”).  As sections 503(b)(9) and 546(c) were both added to the Bankruptcy Code under the “Reclamation” section, the term “received” must be given the same definition.  By defining “received” as physical possession in both 503(b)(9) and 546(c), the court is reading the Bankruptcy Code as a whole and allowing it function as a whole by not having inconsistent

terms in the same section. *See World Imports*, 862 F.3d at 343 ("Given the interrelationship between these two provisions and our holding that Congress meant for terms used in § 546(c) to bear the definition used in the UCC at the time of BAPCPA's enactment, it follows that the UCC definitions also apply to the § 503(b)(9) exception."); *Momenta*, 455 B.R. at 358-59 ("Because §§ 546(c) and 503(b)(9) were enacted or amended together as part of the BAPCPA and because both sections concern remedies for sellers of goods with reclamation rights, . . . the words should be interpreted identically in both sections.").

### F. As Courts Look to the UCC To Define "Goods" in 503(b)(9), the UCC Definition of "Receipt" Should also be Used

30.    Section 503(b)(9) grants allowed administrative expenses for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). As Bankruptcy Courts have already turned to the UCC in order to define "goods" under 503(b)(9), Bankruptcy Courts should also to look to the UCC to define "received," the word immediately following "goods."

31.    "Every bankruptcy court to consider the issue, including the court below, has applied the Uniform Commercial Code definition of goods, found in UCC [Section] 2-105." *GFI Wisconsin, Inc. v. Reedsburg Utility Commission*, 440 B.R. 791, 797 (W.D. Wis. 2010); *see also In re Great Atlantic & Pacific Tea Co., Inc.*, 498 B.R. 19, 25 (S.D.N.Y. 2013) ("The Bankruptcy Court - as well as the numerous other court that have reached the same conclusion on this issue - did not err in holding that UCC Section 2-105(1) should provide the definition of 'goods' for the purpose of interpreting Section 503(b)(9)."); *In re Erving*, 432 B.R. 354, 365 (Bankr. D. Mass. 2010) ("[T]his Court concludes (as have most, if not all, court addressing the issue), that the meaning of goods under § 503(b)(9) is primarily informed by the meaning of

goods under Article 2 of the UCC.").  As the Delaware Bankruptcy Judge Sontchi explained in

*In re Goody's Family Clothing, Inc.*, 401 B.R. 131, 134 (Bankr. D. Del. 2009):

> Use of the UCC Article 2's definition of "goods" in interpreting
> section 503(b)(9) is suggested in a leading treatise and has been
> adopted by bankruptcy courts examining this issue.  Given the near
> unanimous nationwide adoption of Article 2 of the UCC, the Court
> concludes that the term "goods" in section 503(b)(9) conforms
> with the meaning given in U.C.C. § 2-105(1); "goods" are
> something that is "moveable."  This approach is supported by the
> perhaps surprising fact that the definition of "goods" set forth in
> the UCC is consistent with the ordinary, "non legal" meaning of
> the word: "property or possessions; esp. moveable property."

*Goody's Family Clothing*, 401 B.R. at 134.

32.    In an attempt to convince this Court that the Third Circuit was wrong in *World

Imports* (despite citing such decision in paragraphs 20 and 38 in, and in support of, the

Objection), the Debtors cite to *In re Escalera Resources Co.*, 563 B.R. 336 (Bankr. D. Colo.

2017).  In doing so, the Debtors failed to portray that case accurately.

33.    The Debtors failed to note that the court in *Escalera Resources* stated that the

"UCC is a very important analog [to determine the meaning of "goods" in section 503(b)(9)]."

*Escalera Resources*, 563 B.R. at 350.  The Court explained:

> First, the UCC does contain a definition of "goods" that was in
> place prior to the enactment of Section 503(b)(9). Second, the
> priority claim dispute between PacifiCorp and the Debtor is, in
> essence, a commercial dispute between corporations relating to a
> transaction (i.e., the purchase and sale of electrical energy). The
> UCC generally governs commercial "transactions in goods."
> COLO. REV. STAT. § 4-2-102(1); WYO. STAT. ANN. § 34.1-2-
> 102(1).[6] Third, the UCC purports to be a uniform law in the
> United States and has been adopted (in one form or another) in 49
> States. Fourth, the UCC definition of "goods" is widely accepted
> and used. Erving Indus., 432 B.R. at 365.

*Escalera Resources*, 563 B.R. at 350.  As the above four points apply heavily to the facts at

hand, it is not surprising that the Debtors chose to ignore them.

34.     Perhaps even more egregious is the Debtors failing to inform this Court that the *Escalera Resources* Court's conclusion was to "adopt[] the UCC definition of 'goods' as the principal legal definition to be used for purposes of Section 503(b)(9)" (*Escalera*, 563 B.R. at 350).  BST submits that this Court should similarly "adopt" the UCC definition of "received".

### G.  Definition of Received in 503(b)(9) Must be the Same as Receipt in 546(c)(1)(A)

35.     To take into physical possession is also consistent with the definition of receipt/received used in section 546(c) of the Bankruptcy Code as "Courts interpreting 'receipt' in § 546(c) have consistently adopted a definition of 'receipt' based on the definition in Article 2 of the UCC and held that 'receipt' in § 546(c) means taking 'physical possession.'" *Circuit City Stores*, 432 B.R. at 228-29; *see also Momenta*, 455 B.R. at 358-59 ("Because §§ 546(c) and 503(b)(9) were enacted or amended together as part of the BAPCPA and because both sections concern remedies for sellers of goods with reclamation rights, … the words should be interpreted identically in both sections.").

36.     Courts "interpreting § 503(b)(9) have examined its history and its relationship to § 546(c), which governs reclamation.  Having done so, they conclude that the terms used in § 503(b)(9) — including 'received' — should be given the same meaning they have in § 546(c), and, since § 546(c) is derived from the reclamation provisions of the Uniform Commercial Code, the court may look to the UCC for guidance." *Wezbra Dairy*, 493 B.R. at 770.

37.     As was argued, successfully, to the Third Circuit in *World Imports*:

> Congress elected to use "received" in Section 503(b)(9) and "receipt" in Section 546(c). 11 U.S.C. §§ 503(b)(9), 546(c)(1)(A). It is unlikely that Congress envisioned a disparate application of the term "received" in Section 503(b)(9) and "receipt" in Section 546. If Congress had intended for disparate application or room for creative interpretation in Section 503(b)(9), it could have easily drafted Section 503(b)(9) to provide administrative claim status for "the value of any goods transferred to the Debtor..." Instead,

> Congress likely contemplated a consistent, uniform interpretation
> for the similar terms by using "received" and "receipt."

Brief of Appellants at 17-18, *World Imports*, 862 F.3d 338.

38.    Despite the explicit reference to section 503(b)(9) in section 546 and the reference to both in the Reclamation section of the BAPCPA amendments, the Debtors argue that the Third Circuit was wrong to determine that the meaning of receipt/received should have the same meaning in both sections of the code.  Instead, the Debtors suggest that receipt and received shall refer to "physical possession" in section 546, but refer to transfer of title in section 503(b)(9).  Such a notion, albeit convenient when attempting to get out from under millions of dollars of valid administrative expense claims, is absurd in application.

39.    The New Hampshire District Court effectively rejected this argument in the Momenta bankruptcy holding:

> The bankruptcy court correctly concluded that Sections 503(b)(9)
> and 546 are related statutory provisions enacted for the benefit of
> reclamation sellers. It also properly determined that the word
> "received" should be given the same meaning in both sections. See
> generally United States v. Delgado–Garcia, 374 F.3d 1337, 1347
> (D.C. Cir. 2004) (courts should "construe related statutory
> provisions in similar fashion.").

*Ningbo Chenglu Paper Prods. Mfg. Co.*, 2012 WL 3765171, at *6.

### H.  There is No Basis to Use CISG or Incoterms To Define Any Term in Section 503(b)(9)

40.    The Debtors seek to use a definition of "received" that fits their desired end result – millions less of administrative expense claims so that they can claim administrative insolvency.  The Debtors have no statutory basis for their definition.  In order to get to their FOB origin definition, they must look to the *Convention on Contracts for the International Sale of Goods* (the "**CISG**"), then the International Commerce Commissions' definitions of commercial terms commonly used in international trade ("**Incoterms**"), and then argue that delivery and receipt are

synonymous.[5]  While they note there must be an "explicit connector" between two statutes in order to look to one another (Objection, ¶ 38), they provide none.

41.      As the Supreme Court has held, the "absence of any explicit connector between [a section of the Bankruptcy Code and another federal statute" is crucial where a party seeks to connect the two.  *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 219-20 (1996).  This Court should not look to the CISG and Incoterms because as the Third Circuit noted, it cannot be "necessarily assum[ed] that Congress intended to adopt a definition from another source of federal law in the 'absence of any specific connecter' between the Bankruptcy Code and a definition contained in another statute."  *World Imports*, 862 F.3d at 345 n.4 (*quoting United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 US 213, 219-20 (1996); *cf. Circuit City Stores*, 432 B.R. at 230 ("Nor has Panasonic presented anything to suggest that Congress meant to deviate from the common and well known meaning of the word 'received' in drafting § 503(b)(9).").

### I.    *Receipt Cannot Occur Until Seller's Ability to Stop Delivery Ends*

42.      "[R]eceipt does not occur until after the seller's ability to stop delivery ends …."  *World Imports*, 862 F.3d at 345.  That reasoning was also adopted by the Connecticut Bankruptcy Court in *O.W. Bunker* where the court correctly explained that "possession may be actual or constructive, and occurs when the seller can no longer stop delivery and is left only with the remedy of reclamation."  *In re O.W. Bunker Holding N.A. Inc.,* Case No. 14-51720 (Bankr. D. Conn. Aug. 19, 2019) (internal quotations omitted).  BST's ability to stop delivery did not end until the BST Goods were received at the Debtors' Distribution Center.

---

[5] The Debtors assert, without any support except to the reversed Bankruptcy and District Courts decisions in *World Imports*, that "received" is equivalent to "delivered."  Objection, ¶ 28.  As the Third Circuit noted, "This Court in Marin explicitly stated that delivery and receipt of goods can occur at different times.  See 740 F.2d at 225."  *World Imports*, 862 F.3d at 345.

43.     While the Debtors reference Article 7 of the CISG (see Objection, ¶ 26), they fail to reference Article 71.  Under Article 71, a seller "may prevent the handing over of the goods to the buyer even though the buyer holds a document which entitles him to obtain them."  CISG Article 71(2).[6]  The Debtors are well aware of this right, as it was the Debtors that stated in their first-day motions that vendors could "recall shipments" of goods that were ordered prepetition. *Motion of Debtors for Interim and Final Authority to (I) Pay Prepetition Claims of (A) Shippers, Warehousemen, and Other Nonmerchandise Lien Claimants and (B) Holders of Paca/Pasa Claims, and (II) Confirm Administrative Expense Priority for Prepetition Orders Delivered to the Debtors Postpetition, and Satisfy Such Obligations in the Ordinary Course of Business* [Dkt No. 14], ¶ 19.[7]

44.     The Debtors' current position is contradicted by their statements to the Court in that first-day motion.  If the Debtors had received all such goods upon them being placed in transit at the point of origin as they allege in the Objection, there would have been no need for the Debtors to seek and obtain an order from this Court setting forth that "[a]ll undisputed obligations of the Debtors arising from the postpetition delivery or shipment by of goods under the Prepetition Orders are granted administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code …."  *Final Order Authorizing Debtors To (I) Pay Prepetition Claims Of (A) Shippers, Warehousemen, And Other Non-Merchandise Lien*

---

[6] https://www.cisg.law.pace.edu/cisg/text/e-text-71.html

[7] "Prior to the Commencement Date, and in the ordinary course of business, the Debtors ordered approximately $162 million in Merchandise from suppliers and vendors that will not be delivered until on or after the Commencement Date (the "Prepetition Orders").  These suppliers and vendors may be concerned that, because the Debtors' obligations under the Prepetition Orders arose prior to the Commencement Date, such obligations will be treated as general unsecured claims in these Chapter 11 Cases.  Accordingly, certain vendors may refuse to provide goods to the Debtors (**or may recall shipments thereof**) purchased pursuant to the Prepetition Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court providing that all undisputed obligations of the Debtors arising from the postpetition delivery of goods subject to Prepetition Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code." (**Emphasis added**).  This Court entered an order approving the Debtors' motion.  *See Final Order Authorizing Debtors To (I) Pay Prepetition Claims Of (A) Shippers, Warehousemen, And Other Non-Merchandise Lien Claimants And (B) Holders Of Paca/Pasa Claims, And (II) Confirm Administrative Expense Priority For Prepetition Orders Delivered To The Debtors Postpetition, And Satisfy Such Obligations In The Ordinary Course Of Business* [Dkt No. 843], ¶ 18.

*Claimants And (B) Holders Of Paca/Pasa Claims, And (II) Confirm Administrative Expense*
*Priority For Prepetition Orders Delivered To The Debtors Postpetition, And Satisfy Such*
*Obligations In The Ordinary Course Of Business* (the "**Postpetition Delivery Admin Order**")
[Dkt No. 843], ¶ 18.

45.    Notably, Article 71 of the CISG provides sellers of goods with similar rights as
provided under Section 2-705 of the UCC.  UCC § 2-705 provides that a seller of goods "may
stop delivery of carload, truckload, planeload or larger shipments of express or freight when the
buyer repudiates or fails to make a payment due before delivery or if for any other reason the
seller has a right to withhold or reclaim the goods … until (a) receipt of the goods by the
buyer…."  Both rights (CISG Article 71 and UCC § 2-705) cease to exist once the buyer has
physically received the goods.  As rights to stop goods in transit under both CISG and the UCC
are limited once the goods are in the actual possession of the buyer, the Debtors contention that
receipt of goods under CISG is akin to transfer of title or risk of loss and different from receipt
under the UCC is simply wrong.  Under both the CISG and the UCC, sellers of goods have the
right to stop goods in transit prior to receipt by the buyer.

46.    To hold otherwise would suggest that the right to stop goods in transit is
meaningless if title/risk of loss was transferred prior to such goods being put in transit.  That
cannot be the case as Article 71 specifically states title is irrelevant to the stoppage right.

### J.  All Debtors' Arguments to the Contrary Should be Rejected

47.    Debtors' claimed concern about creditor equality is misplaced.[8]  Overall Creditor
equality is not a goal of section 503(b)(9).  In fact, the opposite is true as claims based on goods
received on the 21st day before the petition date are treated vastly different than claims based on

---

[8]  BST also submits that such claim is also suspect in light of the Debtors' refusal to pay administrative expense
creditors 100% upon the effective date.

goods received just one day later on the 20th.  In fact, in this case, that difference could amount to a 98% difference in distribution.

48.     What must be treated equally are all creditors whose goods are received by the Debtors within 20 days of the petition date.  The only way to treat those creditors equally is to analyze "received" based on a simple-to-determine objective measure of receipt date - when the goods were in the physical possession of the debtors - not some subjective determination based on title and risk of loss which completely ignores sellers' statutory rights to stop goods in transit.

49.     This Court should consider the timing of the Objection.  It was filed nearly three months after the disclosure statement was filed.  Nowhere in the Debtors' disclosure statement did the Debtors inform 503(b)(9) claimants, or this Court, that the Debtors did not intend to pay such claims.  Nowhere in that disclosure statement did the Debtors inform such creditors or this Court that the Debtors intended to object to such just prior to the confirmation hearing, argue that the accepted and well-thought Third Circuit decision in *World Imports* was wrong, and that such claims would be only general unsecured claims.

50.     By objecting post-solicitation, the Debtors purposefully disenfranchised BST.  If the Debtors objection is sustained, the BST Claims will become general unsecured claims and BST should have had a right to vote on the plan as a holder of two general unsecured claims.  Instead, by their deliberate and purposeful actions, the Debtors seek to both deprive BST of valid administrative expense claims and BST's right to vote as a general unsecured creditor.  BST submits that this Court should not sanction the Debtors' actions.

51.     Lastly, this Court should be scared by the Debtors' floodgate-type claims.  The Debtors suggest that if this Court were to follow the well-reasoned decision of the Third Circuit in *World Imports* and the same logic that has been applied in every court that has considered the

issue, including courts in Virginia, New Hampshire and Connecticut, it would "enlarge the 503(b)(9) by 300% for goods arriving by ship from Asian ports or origin. *See* Objection, ¶ 32. That claim should be rejected by this Court as it is made without a scintilla of evidence. Furthermore, even if it were true, that is not a valid reason for this Court to not correctly decide that "received" in 503(b)(9) requires physical possession, not a mere transfer of title.

### K. The Notice Contradicts the Debtors' Asserted Position

52.    The Debtors' actions in continuing to prosecute this Objection as it relates to the BST Claims are also disingenuous in light of the Notice.

53.    By the Notice, the Debtors granted Hain, as assignee from BST, allowed administrative expense claims in the aggregate amount of $1,133,278.05 despite those claims and amounts relating to goods which were delivered to the port of origin (Shanghai, China) more than 20 days prior to the Petition Date.  By the Objection, the Debtors assert that only goods delivered to the port of origin within 20 days prior to the Petition Date are entitled to an administrative expense priority claim under section 503(b)(9).  Instead, what the $1,133,278.05 represents is the aggregative amount of goods from the BST 503(b)(9) Claims that arrived at the port of destination (United States), not the port of origin, within the 503(b)(9) 20-day period.

54.    By way of example, Invoice 201821460092 in the amount of $101,337.70 is one of the invoices being allowed as an administrative expense claim under the Notice.  The goods invoiced in Invoice 201821460092 left the Chinese port of origin on or about September 5, 2018 (prior to the 503(b)(9) 20-day period) and arrived at the U.S. port of destination on September 27, 2018 (within the 503(b)(9) 20-day period).  To allow such a claim and yet to continue to insist that such a result is "absurd" (Objection, ¶ 34) demonstrates that even the Debtors do not believe their own position.

**L. Any Good Received At The Debtors' Distribution Center After The Petition Date Should be Afforded Administrative Expense Status Pursuant to Section 503(b)(1) and the Postpetition Delivery Admin Order**

55.    To the extent that some of the goods set forth in the BST Claims were received at the Debtors' Distribution Center after the Petition Date, they should be afforded administrative expense status pursuant to 503(b)(1) of the Bankruptcy Code and the Postpetition Delivery Admin Order.

56.    As set forth in the Muthu Declaration, BST abstained from asserting its rights under CISG Article 71 to "prevent the handing over of the goods to the buyer …."  BST's abstention was based on the Debtors' representatives' statements, orally at the San Fran Meeting and in writing in the various emails attached to the Muthu Declaration, and the Debtors' motion seeking to award administrative expense status for all goods that were ordered prepetition but received post-petition.  BST relied upon the pre and post-petition statements of the Debtors and their representatives and it would be inequitable to deprive BST of administrative expense claims under these circumstances.

## RESERVATION OF RIGHTS

57.    BST reserves the right to supplement or amend this Response and make additional arguments at the hearing to consider the Motion.

## JOINDER

58.    BST joins in other responses filed by holders of administrative expense claims in response to the Objection, to the extent that such objections are not inconsistent with the arguments set forth herein.

## CONCLUSION

59.     For the foregoing reasons, BST submits that the Objection should be denied as it relates to the BST 503(b)(9) Claims.

**WHEREFORE**, BST respectfully requests that this Court sustain this Objection and granting such other and further relief as this Court deems equitable and proper.

Dated: October 23, 2019
        New York, New York

                              **MONTGOMERY MCCRACKEN WALKER &
                              RHOADS LLP**

                              By: _  /s/ Edward L. Schnitzer_____
                                    Edward L. Schnitzer

                              437 Madison Avenue
                              New York, NY 10022
                              Telephone:  (212) 551-7781
                              Facsimile:  (212) 599-5085
                              Email:  eschnitzer@mmwr.com

                              *Counsel for BST International Fashion Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2019, I electronically filed the foregoing with the Clerk of the Bankruptcy Court which sent notification of such filing to all CM/ECF system participants.  I also caused true and correct copies of the foregoing to be served by overnight delivery upon (i) Weil, Gotshal, & Manges LLP, 767 Fifth Avenue, New York 10153 (Attn: Ray C. Schrock, Esa., Jacqueline Marcus, Esq., Garrett A. Fail, Esq., and Sunny Singh, Esq.), and (ii) Akin Gump Struass Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Philip C. Dublin, Esq., Ira Dizengoff, Esq., and Sara Lynne Brauner, Esq.)

*/s/    Edward L. Schnitzer*