UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SEARS HOLDINGS CORPORATION,<br>*et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No.: 18-23538 (RDD)<br>Jointly Administered |

### DECLARATION OF MEYYAPPAN MUTHU

I, Meyyappan Muthu, declare the following to be true and correct under penalty of perjury.

1. I am over the age of 18 and I have personal knowledge of the statements in this declaration except as specifically set forth herein.

2. I am employed by BST International Fashion, Ltd. ("BST") as Vice President and I have held that position since October 28, 2015.

3. BST is/was a seller of textile goods manufactured in a China.

4. BST sells/sold such goods to U.S. retailers including the Sears and Kmart debtors (the "Debtors").

5. In my experience, manufacturing Textiles goods in China and delivering those from China to a retail store in the United States can take between 120 to 145 days. That 120 to 145 days is comprised of approximately 60 days for manufacturing and 60-85 days for delivery including customs at both ports.

*Process for Delivery of Goods from BST to the Debtors*

6. For goods being delivered from BST in China to the Debtors in the United States, this 60-85 day process includes:

    A. Following delivery of such goods to common carrier at the Shanghai port, clearing of customs in Shanghai, China and waiting time to depart Shanghai, China on common carrier (7-15 days);

    B. Sailing time from Shanghai, China to United States (10-24 days depending on whether goods are going to east or west coast of the United States);

    C. Delivery from United States port to either PCD (located in Pennsylvania for east coast deliveries) or CCD (located in California for west coast deliveries) facility to clear customs (8 days)

    D. Clearing customs in the US (10 - 12 days);

    E. Delivery from PCD/CCD facility to Debtors' distribution center (7 - 11 days); and

    F. Delivery from Debtors distribution center to retail stores (2 - 5 days).

7. "Delivery Date" refers to the date that the goods are delivered to the common carrier in Shanghai, China.

8. "ETD" refers to the estimated time of departure of the goods from the port in Shanghai, China.

9. "Discharge Date" or "ETA" refers to the date the vessel carrying the goods arrives at the United States port.

10. "Destination Date" refers to the date the goods arrive at the PCD or CCD facility.

11. "In DC Date" refers to the date the goods arrive at the Debtors' distribution center.

12. In order for the Debtors to have certain goods in their stores by end of September through October for the Fall/Winter season, the Debtors ordered goods from BST between end of May through mid-June.

*Purchase Orders, Invoices, Distribution Center Delivery, and Proofs of Claim*

13. Attached as **Exhibit A** to this declaration are true and accurate copies of the purchase orders issued by the Debtors for the 2018 Fall/2019 Winter season which relate to the goods that were received by the Debtors within the 20 days prior to the Debtors' October 15, 2018 petition date or after the October 15, 2018 petition date (each a "Purchase Order" and collectively, the "Purchase Orders"). Each Purchase Order provides an "original ship date", a "revised ship date" and an "in-store date." The "in-store date" refers to the date that the Debtors were seeking to have the ordered goods in their particular stores. This "in-store date" aligns with paragraph 6(F) above. The Debtors issued the Purchase Orders as they wanted these goods in its stores by end of September through October for the Fall/Winter season.

14. Attached as **Exhibit B** to this declaration are true and accurate copies of the Invoices issued by BST corresponding to the Purchase Orders (collectively, the "503(b)(9) Invoices"). The 503(b)(9) Invoices relate to goods that were sold by BST to the Debtors and which were received by the Debtors within the 20 days prior to the Debtors' October 15, 2018 petition date.

15. Attached as **Exhibit C** to this declaration is a true and accurate copy of an email with attachment dated January 16, 2019 (the "1/16/19 Email") received from Vinus Soo, Senior Merchandising Manager, Sears Holdings Global Sourcing Ltd. The attachment to the email (the "Vinus Attachment") sets forth the ETD, ETA and In DC Date for each of the invoices between BST and the Debtors, including the invoices that relate to BST Claim 7960 and 7967.

16. Attached as **Exhibit D** to this declaration is a true and accurate copy of proof of claim number 7960 ("**BST Claim 7960**") filed on or about January 23, 2019. BST Claim 7960 contains a spreadsheet that provides, for each and every underlying 503(b)(9) Invoice, the Purchase Order number, the quantity, containers, invoice amount, ETD, Discharge Date, Destination Date, In DC Date and Final Destination (either CCD or PCD port facility) relating to the $1,781.633.92 of goods that were sold to Sears and received in the 20 days prior to the Debtors' October 15, 2018 petition date (collectively, the "**Sears 503(b)(9) Goods**"). The "In DC date" listed in BST Claim 7960 was obtained from the Vinus Attachment.

17. Attached as **Exhibit E** to this declaration is a true and accurate copy of proof of claim number 7967 ("**BST Claim 7967**", and together with BST Claim 7960, the "**BST 503(b)(9) Claims**") filed on or about January 23, 2019. BST Claim 7967 contains a spreadsheet that provides, for each and every underlying 503(b)(9) Invoice, the Purchase Order number, the quantity, containers, invoice amount, ETD, Discharge Date, Destination Date, In DC Date and Final Destination (either CCD or PCD port facility) relating to the $342,783.60 of goods that were sold to Kmart and received in the 20 days prior to the Debtors' October 15, 2018 petition date (collectively, the "**Kmart 503(b)(9) Goods**", and together with the Sears 503(b)(9) Goods, the "**BST 503(b)(9) Goods**"). The "In DC date" listed in BST Claim 7967 was obtained from the Vinus Attachment.

*Convention on Contracts for the International Sale of Goods Article 71*

18. In the Debtors' objection to the BST 503(b)(9) Claims, the Debtors state that the United Nations Convention on Contracts for the International Sale of Goods ("CISG") governs the Purchase Orders and 503(b)(9) Invoices between BST and the Debtors. Article 71 of the United Nations Convention on Contracts for the International Sale of Goods ("CISG") states:

(1) A party may suspend the performance of his obligations if, after the conclusion of the contract, it becomes apparent that the other party will not perform a substantial part of his obligations as a result of:

 (a) a serious deficiency in his ability to perform or in his creditworthiness; or

 (b) his conduct in preparing to perform or in performing the contract.

(2) If the seller has already dispatched the goods before the grounds described in the preceding paragraph become evident, he may prevent the handing over of the goods to the buyer even though the buyer holds a document which entitles him to obtain them.

***San Francisco In-Person Meeting***

 19. Representatives of BST attended a meeting with the Debtors in San Francisco August 31, 2018 through September 5, 2018 (the "**San Francisco Meeting**"). At the time of the San Francisco meeting, the Debtors had already placed their orders with BST for the next Fall/Winter season (2018 Fall/2018-19 Winter), and the majority of the BST 503(b)(9) Goods were manufactured and were in transit. None of the BST 503(b)(9) Goods had been discharged from the US port, or been delivered to the Debtors' Distribution Center, and over 85% of the BST 503(b)(9) Goods had not even departed from Shanghai, China. At that meeting, the Debtors assured BST that the Debtors were financially sound and that BST would be paid for the BST 503(b)(9) Goods.

 20. At the time of the San Francisco Meeting, BST, pursuant to Article 71 of CISG, could have prevented the handing over of the BST 503(b)(9) Goods to the Debtors as such goods were at the Shanghai port, on a common carrier or at the United States port, but none were in the actual possession of the Debtors. Had the Debtors been truthful about their creditworthiness at the San Francisco Meeting or the fact that they did not intend to pay BST for any of the BST 503(b)(9) Goods, BST would have exercised its rights under CISG Article 71 and prevented the

5

BST 503(b)(9) Goods from being turned over to the Debtors. Instead BST took no action based, in part, on the San Francisco Meeting which induced BST to continue shipping goods to the Debtors and not take any action to prevent delivery of them.

***Emails Assuring Payment***

21. On September 18, 2018, Ms. Soo, Senior Merchandising Manager for Sears Holdings Global Sourcing Ltd., informed BST via e-mail that "US finance forecast the payment to be released as below" showing payments to BST of $2,75,043.40 from October 2, 2018 through December 10, 2018 (the "**September 18 Email**"). A true and accurate copy of the September 18 Email is attached as **Exhibit F**.

22. At the time of the September 18 Email, none of the BST 503(b)(9) Goods were at either the PCD or CCD facility, let alone the Debtors' distribution center. Instead, over 80% of the BST 503(b)(9) Goods were still in transit on-board the vessel from China, and the remaining 20% had just recently arrived at the US port. At the date of the September 18 Email, BST, pursuant to Article 71 of CISG, could have prevented the handing over of the BST 503(b)(9) Goods to the Debtors as such goods were on a common carrier and not in the actual possession of the Debtors.

23. Had the Debtors been truthful about their creditworthiness in the September 18th Email or the fact that they did not intend to pay BST for any of the BST 503(b)(9) Goods, BST would have exercised its rights under CISG Article 71 and prevented the BST 503(b)(9) Goods from being turned over to the Debtors. Instead BST took no action based, in part, on the September 18th Email which induced BST to continue shipping goods to the Debtors and not take any action to prevent delivery of them.

24. On September 19, 2018, Ms. Soo informed BST via e-mail "please convince factory to ship the balance qtys on time by 9/19 & 9/26 as US team is now working to the release the payment to you this week" (the "**September 19th Email**"). A true and accurate copy of the September 19th Email is attached as **Exhibit G**.

25. At the time of the September 19th Email, none of the BST 503(b)(9) Goods were at the Debtors' distribution center. Instead, over 80% of the BST 503(b)(9) Goods were still in transit on-board the vessel from China, approximately 13% had just recently arrived at the US port, and only approximately 7% had made it to the PCD or CCD facility. At the date of the September 19th Email, BST, pursuant to Article 71 of CISG, could have prevented the handing over of the BST 503(b)(9) Goods to the Debtors as such goods were on a common carrier and not in possession of the Debtors.

26. Had the Debtors been truthful about their creditworthiness in the September 19th Email or the fact that they did not intend to pay BST for any of the BST 503(b)(9) Goods, BST would have exercised its rights under CISG Article 71 and prevented the BST 503(b)(9) Goods from being turned over to the Debtors. Instead BST took no action based, in part, on the September 19th Email which induced BST to continue shipping goods to the Debtors and not take any action to prevent delivery of them.

27. On October 5, 2018, Ms. Sherri Kwan of the Debtors informed BST "the payment will arrive your bank on next working date" and provided a schedule indicating payments of at least $75,000 on October 10, 2018 and $77,000 on October 15, 2018 (the "**October 5 Email**"). A true and accurate copy of the October 5 Email is attached as **Exhibit H**.

28. At the time of the October 5 Email, the vast majority of the BST 503(b)(9) Goods were not yet at the Debtors' distribution center. Instead, they were still in transit on-board the

7

vessel from China, had just recently arrived at the US port, or were at either the PCD or CCD facility. At the date of the October 5 Email, BST, pursuant to Article 71 of CISG, could have prevented the handing over of the vast majority of the BST 503(b)(9) Goods to the Debtors as such goods were not in possession of the Debtors.

29.   Had the Debtors been truthful about their creditworthiness in the October 5th Email or their intention to not pay BST for any of the BST 503(b)(9) Goods, BST would have exercised its rights under CISG Article 71 and prevented the not-yet delivered BST 503(b)(9) Goods from being turned over to the Debtors. Instead BST took no action based, in part, on the October 5th Email which induced BST to continue shipping goods to the Debtors and not take any action to prevent delivery of them.

***Motion to Confirm Administrative Expense Priority for Prepetition Orders Delivered to the Debtors Postpetition***

30.   On October 15, 2018, the petition date, Debtors filed a motion (the "**Pre-Order/Post-Delivery Admin Motion**") seeking protection for creditors who received prepetition orders for merchandize that would not be delivered until on or after the petition date. In the Pre-Order/Post-Delivery Admin Motion, the Debtors sought an order setting forth that "obligations owed under the Prepetition Orders relating to goods delivered postpetition should be explicitly granted administrative expense status." In support of the Pre-Order/Post-Delivery Admin Motion, the Debtors stated:

> Prior to the Commencement Date, and in the ordinary course of business, the Debtors ordered approximately $162 million in Merchandise from suppliers and vendors that will not be delivered until on or after the Commencement Date (the "Prepetition Orders"). These suppliers and vendors may be concerned that, because the Debtors' obligations under the Prepetition Orders arose prior to the Commencement Date, such obligations will be treated as general unsecured claims in these Chapter 11 Cases. Accordingly, certain vendors may refuse to provide goods to the Debtors (**or may recall shipments thereof**) purchased pursuant to

8

the Prepetition Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court providing that all undisputed obligations of the Debtors arising from the postpetition delivery of goods subject to Prepetition Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code. (**emphasis added**)

Pre-Order/Post-Delivery Admin Motion, ¶19.

31. At the time Pre-Order/Post-Delivery Admin Motion was filed, a large portion of the BST 503(b)(9) Goods had not yet been delivered to the Debtors' distribution center, exactly the situation set forth by the Debtors in the Pre-Order/Post-Delivery Admin Motion. Based on the Debtors' motion, BST did not seek to exercise its rights under CISG Article 71 to prevent the handing of the BST 503(b)(9) Goods that had not yet been delivered to the Debtors' distribution. Had BST been informed that the Debtors were going to treat the postpetition delivery of such goods as general unsecured claims, not administrative expense priority claims pursuant to the Debtors' motion, BST would have sought to exercise its rights under Article 71 of the CISG, exactly as the Debtors stated in their motion.

32. On October 16, 2018, the Bankruptcy Court entered an order (the "**Pre-Order/Post-Delivery Admin Order**") which provided that "All undisputed obligations of the Debtors arising from the postpetition delivery or shipment by of goods under the Prepetition Orders are granted administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code ...."

33. On October 16, 2018, when the Pre-Order/Post-Delivery Admin Order was entered, a significant amount of the BST 503(b)(9) Goods had not yet been received by the Debtors at their distribution center. Had BST been informed that the Debtors were going to treat the postpetition delivery of such goods as general unsecured claims, not administrative expense priority claims pursuant to the Pre-Order/Post-Delivery Admin Order, BST would have sought to

9

exercise its rights under Article 71 of the CISG. Instead BST took no action based, in part, on the Pre-Order/Post-Delivery Admin Motion which induced BST to not take any action to prevent delivery of them because its claim would receive administrative expense status.

Executed on this _____23rd_____ of October 2019.

_____
Meyyappan Muthu