HEARING DATE AND TIME: November 20, 201910:00 a.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| SEARS HOLDINGS CORPORATION, et al., | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## REPLY TO OPPOSITION TO DEBTORS' TENTH OMNIBUS OBJECTION TO PROOFS OF CLAIM (TO RECLASSIFY CLAIMS) [DKT. 5237], AS IT RELATES TO PROOFS OF CLAIM FILED BY WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD

Weihai Lianqiao International Coop. Group Co., Ltd. ("WLI") herby files its reply (the "Reply") to the Debtors' Tenth Omnibus Objection to Proofs of Claim (to Reclassify Claims) (the "Objection"), by which the Debtors are seeking to reclassify certain portions of WLI's administrative claims asserted under 11 U.S.C. § 503(b)(9) (each a "§ 503(b)(9) Claim" and, together the "§ 503(b)(9) Claims") by way of (1) Proof of Claim 15587 ("POC 15587") and (2) Proof of Claim 15702 ("POC 15702" and, with POC 15587, the "POCs").

---

[1] The debtors (the "Debtors") in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. ("Sears") (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (2005); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation ("Kmart") (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**I.**

**STATEMENT OF FACTS**

1.      On April 9, 2019, WLI filed (1) POC 15587, pursuant to which WLI asserts a claim against Sears in the total amount of $2,611,888.60, with $646,697.26 designated as a § 503(b)(9) Claim and the balance designated as a general unsecured claim, and (2) POC 15702, pursuant to which WLI asserts a claim against Kmart in the total amount of $890,112.68, with $267,841.10 designated as a § 503(b)(9) Claim and the balance designated as a general unsecured claim.  True and correct copies of POCs 15587 and POC 15702, with notations on the Shipment Lists (as defined below) attached thereto, are attached hereto as **Exhibits "1" and "2," respectively.**

2.      As noted in the paragraphs 4 and 7 of the attachment to each of WLI's POCs, at the time the POCs were filed, (a) the documentation underlying WLI's POCs had been previously submitted with WLI's prior POCs amended by POCs 15578 and 15702 referenced immediately above, (b) such documentation was voluminous and would be provided to the Debtors upon request, and (c) such documentation was available upon request to WLI's designated bankruptcy counsel.  The Debtors never made a request to WLI's designated bankruptcy counsel for such documentation.

3.      WLI re-submitted the then available documentation supporting its § 503(b)(9) Claims asserted by way of the POCs when WLI filed its *Notice Of Motion Of Weihai Lianqiao International Coop. Group Co., Ltd To Allow And Compel Payment Of Administrative Expense Claims Under 11 U.S.C. §§ 503(b)(1) And 503(b)(9)* (the "Administrative Claims Motion"). [Dkt. 4706], which is still pending before the Court and incorporated herein by this reference.

4.      On September 26, 2019, the Debtors filed their Objection to, *inter alia*, WLI's § 503(b)(9) Claims seeking to reclassify $842,132.50 of WLI's § 503(b)(9) Claims in the asserted amount of $914,538.36 into general unsecured claims, which would reduce WLI's § 503(b)(9) Claims to $72,405.86.

**II.**

**REPLY TO OBJECTION**

A.     **WLI'S POCS AND PENDING ADMINISTRATIVE CLAIMS MOTION SUPPORT WLI'S § 503(b)(9) CLAIMS**

5.      Section 503(b)(9) provides administrative priority to claims for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).

6.      Here, the Petition Date was October 15, 2018.  Therefore, the 20 day period under § 503(b)(9) is September 25, 2018 through October 15, 2018 (the "503(b)(9) Window").  In Exhibit "1" to each of WLI's POC's (the "Shipment Lists"), WLI lists (a) all shipments underlying its general unsecured claims and § 503(b) Claims asserted by way of the POCs and (b) for informational purposes, all shipments underlying its § 503(b)(1) Claims ultimately asserted by way of WLI's Administrative Claims Motion.[2]  In the Shipment Lists, (a) the "Load" date indicates the date of delivery to a common carrier at the foreign port in China and (b) the "Destination" date indicates the date when subject goods were received by the Debtors.[3]

7.      Pursuant to the POCs and the Shipment Lists, as well as WLI's pending Administrative Claims Motion, which also includes Shipment Lists, WLI has established that the Debtors received goods with a value of $914,538.36 from WLI during the 503(b)(9) Window.

8.      In the Objection, the Debtors do *not* dispute that WLI delivered the goods underlying its § 503(b)(9) Claims to the Debtors, that the subject goods were sold by WLI to the Debtors in the ordinary course of the Debtors' business, or that the Debtors received value for the subject goods.

---

[2] *See* Exhibits "1" and "2" hereto.

[3] *See* Exhibits "1" and "2" hereto, at Exhibit "1" to each.

9.      The Debtors also provide no basis for the specific amount of WLI's § 503(b)(9) Claims to which the Debtors objected, merely two line items with conclusions.[4]  The *only* argument that the Debtors make is that the goods forming the basis for the portion of WLI's § 503(b)(9) Claims to which the Debtors objected were not "received" by the Debtors during the 503(b)(9) Window.  With that said, a comparison of the Shipment Lists with the Exhibit "1" to the Objection, wherein the Debtors list the amounts of WLI's asserted § 503(b)(9) Claims and the Debtors suggested reduction thereof, indicates that the Debtors have implicitly admitted that the "Load" and "Destination" dates in WLI's Shipment Lists are accurate.  Indeed, using the "Load" date in the Shipment Lists, as the Debtors mistakenly are doing, results in § 503(b)(9) Claims that tie to the penny to the reduced § 503(b)(9) Claims amounts set forth in Exhibit "1" to the Objection.  *Compare* Objection, Exhibit "1" *with* WLI's Shipment Lists attached as Exhibit "1" to WLI's POCs, which are Exhibits 1" and 2" hereto.

10.     The only argument the Debtors make in the Objection is that the Court should not utilize the date the Debtors took physical possession of the goods in the United States (*i.e.*, the "Destination" dates in the Shipping Lists) for the purposes of determining whether goods were "received" during the within 20 days before the Petition Date for the purposes of § 503(b)(9), which date was determined to be the appropriate date to use in *Haining Wansheng Soa Co., Ltd. v. World Imports Ltd. (In re World Imports)*, 862 F.3d 338 (3d Cir. 2017) ("World Imports III") by reference to common usage of the term "receipt" and the definition of "receipt" in the Uniform Commercial Code (the "UCC").

11.     Instead, the Debtors argue that the Court should reply on the reasoning in *In re World Imports, Ltd.*, 511 B.R. 738 (Bankr. E.D. Penn. 2014) ("World Imports I") and *Fujian Zhangzhou Foreign Trade Co. Ltd. v. World Imports Ltd. (In re World Imports)*, 862 F.3d 338 (3d Cir. 2017) ("World Imports II"), which were reversed by World Imports III, and hold that, in the case of foreign vendors, goods are "received" under § 503(b)(9) on the date goods are

---

[4] Objection, Exhibit "1."

delivered to a common carrier at the foreign port (*i.e.*, the "Load" date in the Shipping Lists)
based on purported definitions of "received" in the Convention on Contracts for the International
Sale of Goods (the "CISG") and in commercial terms commonly used in international trade
("Incoterms") such as Free on Board ("FOB").

12.    As more fully discussed below, the Debtors' arguments fail for a number of
reasons.

**B.    UTILIZING THE DATE OF DELIVERY TO A COMMON CARRIER AT A
FOREIGN PORT AS THE DATE THE GOODS WERE RECEIVED DOES NOT
FURTHER THE FUNDAMENTAL PURPOSE OF § 503(b)(9); ON THE OTHER
HAND, UTILIZING PHYSICAL POSSESSION OF SUBJECT GOODS AS THE
DATE THE GOODS WERE RECEIVED DOES ENSURE THAT SIMILARLY
SITUATED CREDITORS WILL RECEIVE THE SAME TREATMENT AND
THAT BANKRUPTCY LAWS WILL BE UNIFORM, AS REQUIRED BY THE
CONSTITUTION.**

13.    In their Objection, the Debtors state that the "fundamental purpose of section
503(b)(9) is to encourage vendors to extend credit to debtors and to continue doing business with
the debtors during the ultra-critical twenty (20) day period leading up to a potential chapter 11
filing."[5]  The Debtors also correctly assert that "courts universally acknowledge that a fundamental
principle of the Bankruptcy Code, more generally, is that similarly-situated creditors should receive
equality of treatment."[6]  The Debtors then inexplicably argue that using the date of delivery to a
common carrier at the foreign port as the date goods are "received" under § 503(b)(9) would
further the foregoing fundamental purpose of § 503(b)(9), as well as equal treatment among
similarly situated creditors.[7]  That is incorrect.

14.    The foregoing fundamental purpose of encouraging vendors to continue extending
credit and doing business with debtors during the critical period immediately preceding a
bankruptcy is not furthered in any way by using the date of delivery to a common carrier at the

---

[5] Objection, ¶ 15 (making statement and citing cases).

[6] Objection, ¶ 16 (making statement and citing cases).

[7] Objection, ¶¶ 19-40.

foreign port as the date goods are "received" under § 503(b)(9), because, even after that date, under both the UCC and the CISG, a seller has the right to recall goods in transit, even after the risk of loss has passed, where "it becomes apparent that the [seller] will not perform a substantial part of his obligations as a result of: (a) a serious deficiency in his ability to perform or in his creditworthiness." CISG, Art. 71; *see also* UCC 2-702.

15.    The scenarios presented by the Debtors purportedly supporting why using the date of delivery to a common carrier at a foreign port as the date goods are "received" will further the primary purpose of § 503(b)(9) suffer from two major flaws.[8] First, the scenarios assume that vendors know the date a debtor/buyer is going to file bankruptcy, which they obviously do not. Second, the scenarios are not in the subjective view of vendors, as they should be. If a typical foreign vendor shipping scenario is analyzed from the perspective of a foreign vendor who does not know if or when a debtor/buyer is going to file bankruptcy, it becomes clear that using the date of delivery to a common carrier at a foreign port as the date goods are "received" does not further the primary purpose of § 503(b)(9).

16.    For example, assume (a) courts are using the date of delivery to a common carrier at a foreign port as the date goods are "received" under § 503(b)(9), (b) a foreign vendor delivers goods to a common carrier at a foreign port on January 1, and (c) on January 5 the foreign vendor gets information indicating that the debtor has credit issues and may soon file bankruptcy. The foreign vendor knows that (a) if the debtor files bankruptcy on or before January 21, the foreign vendor will have a § 503(b)(9) claim, but (b) if the debtor files bankruptcy on or after January 22, the foreign vendor will not have a § 503(b)(9) claim or a § 503(b)(1) claim according to the Debtors' and the Court's position regarding the requirements for § 503(b)(1) claims where the Debtors and the Court have used the date of actual receipt to determine when a § 503(b)(1) claim arises.[9]

---

[8] Objection, ¶ 34.

[9] Objection, p. 14, n.6.

17.    The foregoing result is contrary to the goals of § 503 to "facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services" and to "prevent unjust enrichment of the bankruptcy estate." In re Jefferson Inv. Co., 151 B.R. 920, 922 (Bankr. E.D. Mo. 1993).  Under the foregoing scenario, the foreign vendor's only means of protecting entitlement to an administrative claim under §§ 503(b)(1) and/or (b)(9) is to recall outstanding shipments.  This demonstrates that using the date of delivery to a common carrier at a foreign port as the date goods are "received" does *not* further the primary purpose of § 503(b)(9).  To the contrary, using the date of delivery to a common carrier at a foreign port as the date goods are "received" under § 503(b)(9) and then using the date of actual delivery for the purposes of determining when transactions are completed to create an administrative claim under § 503(b)(1)[10] leads to the absurd result noted above, where a foreign vendor that ships goods more than 21 days before the filing of a bankruptcy case does not receive a § 503(b)(9) administrative claim and is also not rewarded with a § 503(b)(1) administrative claim for continuing to provide credit and shipments to the distressed buyer/potential debtor.  Instead, the foreign vendor facilitating continued operations by a distressed buyer/potential debtor is panelized with no administrative claims.

18.    Additionally, and possibly more importantly, under the Debtors' position, vendors, which are similarly situated in terms of shipping goods to a distressed buyer/potential debtor in advance of a bankruptcy filing, would not receive the same treatment.  More specifically, setting aside for the moment that the CISG and Incoterms do not define when goods are "received" and are not concerned with when title passes, resorting to the CISG and Incoterms for guidance to define when goods are "received" would create at lease three potential methods of determining when goods are "received" for the purposes of § 503(b)(9) – (i) one for goods sold by domestic vendors, which would be when the subject debtor takes physical possession of the goods pursuant to UCC § 2-103(1)(c), since, in this scenario, the CISG and Incoterms would

---

[10] *Id.*

not displace the UCC, together with common usage of the term "received," as the means determining when goods are "received" in domestic vendor/buyer transactions, (ii) one for goods sold by foreign vendors that are signatories to the CISG, which, according to the Debtors, should be based on the date of delivery to a common carrier at the foreign port, but which, under World Imports III, would still be the date of physical possession by the debtor, and (iii) one for goods sold by foreign vendors, such as the United Kingdom, India, and South Africa that are *not* signatories to the CISG,[11] which the Debtors provide no information on as to what would be the date goods are "received," but which, under World Imports III, would likely still be the date of physical possession by the debtor based on the common usage of the term "received" as further construed by the UCC.

19.    Having three methods of establishing the date goods are "received" for the purposes of § 503(b)(9) would violate the requirement under United States Constitution that bankruptcy law must be uniform.  U.S. Const., Art. 1, § 8, Cl. 4.  ("The Congress shall have power to *...* establish … uniform laws on the subject of bankruptcies throughout the United States.").  On the other hand, using the date of physical receipt of goods by a debtor as the date goods are "received" under § 503(b)(9) for all vendors would satisfy the uniformity requirement of the United States Constitution and result in equal treatment for similarly situated creditors (*i.e.*, vendors, which are similarly situated in terms of shipping goods to a distressed buyer/potential debtor in advance of a bankruptcy filing), which is an overarching goal of the Bankruptcy Code.

20.    Having three methods of defining when goods are received under § 503(b)(9) would also be impractical.  *See, e.g., In re Circuit City Stores, Inc.*, 432 B.R. 225, 228–30 (Bankr. E.D. Va. 2010) (In deterring when goods are "received" under § 503(b)(9), "[i]t would be inefficient to look at each transaction that occurred in every state or territory that has an interest in the transaction, decide which state law may apply to the transaction, determine how

---

[11] See (1) https://www.cisg.law.pace.edu/cisg/countries/notables.html and
(2) https://www.cisg.law.pace.edu/cisg/cisgintro.html.

the law of each applicable state or territory would individually construe the term 'received,' and then apply that definition to the individual claim at hand. This approach could lead to inconsistent treatment for otherwise similar claims. The Court does not believe that Congress intended a disparate application of the term 'received,' but rather contemplated a consistent, uniform approach to its interpretation.")

**C.    UNDER FEDERAL LAW, GOODS ARE RECEIVED FOR THE PURPOSES OF §503(b)(9) WHEN A DEBTOR TAKES PHYSICAL POSSESSION OF THE GOODS.**

21.    Contrary to the Debtors' assertions, the court in World Imports III and courts in other cases discussed herein have not used the UCC to displace federal law governing when goods are "received" for the purposes of applying the Bankruptcy Code.  Instead, bankruptcy and other federal courts have created a federal law regarding when goods are "received" for the purposes of applying the Bankruptcy Code based on the common usage of the term "received" and reference to the UCC's definition of the term.

22.    For example, courts have noted that §§ 503(b)(9) and 546(c) are closely related, and a number of courts have construed 546(c)'s use of the terms "goods" and "received" by reference to the UCC.  As stated in *In re Circuit City,* 432 B.R. at 228–30 (Bankr. E.D. Va. 2010):

> The Supreme Court has recognized that when two words are similar and concern related issues they may be treated as "functional equivalent[s]" and interpreted identically. *See Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) (recognizing that the Court previously "interpreted 'involving commerce' ... as the functional equivalent of the more familiar term 'affecting commerce'..."). Although the word "receipt" does not appear in § 503(b)(9), both "receipt" and 'received' appear in the same sentence in § 546(c). Both § 503(b)(9) and the amendments to § 546(c) were enacted as part of § 1227 of the of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") to "enhance certain types of reclamation claims." *Circuit City Stores,* 416 B.R. 531, 536 (Bankr. E.D. Va. 2009); *see also Brown & Cole Stores, LLC v. Associated Grocers, Inc. (In re Brown & Cole Stores, LLC),* 375 B.R. 873 (9th Cir. BAP 2007) ("The legislative history of §

> 503(b)(9) suggests that it was aimed at providing relief to sellers of goods who fail to give the required notice under the reclamation provision of section 546(c).”). The Court concludes that 'receipt' and "received" are similar words and concern related issues. Therefore, they should be treated as functional equivalents and interpreted identically. … As "receipt" in Article 2 of the UCC and § 546(c) is defined as taking "physical possession," the Court holds that "received" for the purposes of § 503(b)(9) means having taken into "physical possession."

*Id.; see also Matter of Marin Motor Oil, Inc.*, 740 F.2d 220, 224–25 (3d Cir. 1984) ("There is no definition of 'receipt' in the Bankruptcy Code, but U.C.C. § 2–103(1)(c) defines receipt of goods as 'taking physical possession of them.' Marin argues that it should be deemed to have taken possession of the goods at the time the gas was loaded onto the common carrier because at that point, under the terms of the sales contract, 'title' and risk of loss passed to Marin. The first problem with this argument is that it ignores the plain language of U.C.C. § 2–103(1)(c)— '*physical* possession'—and it ignores the fact that the U.C.C. does not rely on the concept of "title" for purposes of establishing the rights of buyers and sellers under the Code. *See* Note, *Disengaging Sales Law from the Sale Contract,* 96 Harv.L.Rev. 470 (1982); *In re O.W. Bunker Holding N. Am. Inc.*, No. 14-51720 (JAM), 2019 WL 3933615, at *11 (Bankr. D. Conn. Aug. 19, 2019) ("Furthermore, post-BAPCPA courts have looked to *Marin* to conclude that "receipt" means the same thing in both sections 503(b)(9) and 546(c)"); In re Wezbra Dairy, LLC, 493 B.R. 768, 770–71 (Bankr. N.D. Ind. 2013) ("The term 'received' is not defined in the Bankruptcy Code. Other courts interpreting § 503(b)(9) have examined its history and its relationship to § 546(c), which governs reclamation. Having done so, they conclude that the terms used in § 503(b)(9)—including 'received'—should be given the same meaning they have in § 546(c), and, since § 546(c) is derived from the reclamation provisions of the Uniform Commercial Code, the court may look to the UCC for guidance. Although 'receive' is not defined by the UCC, the term 'receipt' is, and it has been used in interpreting 'received' in § 546(c) and § 503(b)(9). Both the UCC and Ohio's version of it define 'receipt' as 'taking physical possession' of the goods. This possession may be actual or constructive … and occurs

when the seller "can no longer stop delivery and is left only with the remedy of reclamation." (internal cites and footnotes omitted); In re ADI Liquidation, Inc., 572 B.R. 543, 548 (Bankr. D. Del. 2017), aff'd, No. BR 14-12092 (KJC), 2019 WL 211528 (D. Del. Jan. 16, 2019) ("

Id.; see also Matter of Marin Motor Oil, Inc., 740 F.2d 220, 224–25 (3d Cir. 1984) ("There is no definition of 'receipt' in the Bankruptcy Code, but U.C.C. § 2–103(1)(c) defines receipt of goods as 'taking physical possession of them.' Marin argues that it should be deemed to have taken possession of the goods at the time the gas was loaded onto the common carrier because at that point, under the terms of the sales contract, 'title' and risk of loss passed to Marin. The first problem with this argument is that it ignores the plain language of U.C.C. § 2–103(1)(c)— 'physical possession'—and it ignores the fact that the U.C.C. does not rely on the concept of "title" for purposes of establishing the rights of buyers and sellers under the Code. See Note, Disengaging Sales Law from the Sale Contract, 96 Harv.L.Rev. 470 (1982); In re Wezbra Dairy, LLC, 493 B.R. 768, 770–71 (Bankr. N.D. Ind. 2013) ("The term 'received' is not defined in the Bankruptcy Code. Other courts interpreting § 503(b)(9) have examined its history and its relationship to § 546(c), which governs reclamation. Having done so, they conclude that the terms used in § 503(b)(9)—including 'received'—should be given the same meaning they have in § 546(c), and, since § 546(c) is derived from the reclamation provisions of the Uniform Commercial Code, the court may look to the UCC for guidance. Although 'receive' is not defined by the UCC, the term 'receipt' is, and it has been used in interpreting 'received' in § 546(c) and § 503(b)(9). Both the UCC and Ohio's version of it define 'receipt' as 'taking physical possession' of the goods. This possession may be actual or constructive … and occurs when the seller "can no longer stop delivery and is left only with the remedy of reclamation." (internal cites and footnotes omitted)

23.    Reference to the UCC makes sense, because the UCC is nearly uniformly adopted in the U.S. and its definitions of "goods" and "received" generally conform with common usage of such terms.  Indeed, this Court referred to the UCC in determining what constitutes "goods" under § 503(b)(9) and noted that it was appropriate to do so. See In re Great Atlantic & Pacific

*Tea Co. Inc.*, Case No. 10-2459-rdd at Dkt. 4017, a true and correct copy of which is attached hereto as **Exhibit "3,"** at (1) p. 4:22-25 ("The courts uniformly agree that they can be guided in their interpretation of what is a 'good' or what are 'goods' for purposes of Section 503(b)(9) by the definition set forth in Section 2.105 of the Uniform Commercial Code" and (2) p. 5:8-15 ("The basis for looking to the UCC definition of 'goods" is well summarized in the *Goody's* case in light of the near unanimous nationwide adoption of Article 2 of the UCC and, as Judge Sontchi says in that opinion, the fact that the definition of goods set forth in the UCC is consistent with the ordinary non-legal meaning of the word, which he takes from the dictionary: property or possessions, especially movable property."); *see also In re Great Atlantic & Pacific Tea Co. Inc.*, 498 B.R. 19, 25-26 (S.D.N.Y. 2013) (remanding for this Court's decision in *Great Atlantic* for further factual determinations, but nevertheless agreeing with this Court and confirming that "goods" under § 503(b)(9) should be determined by reference to the UCC).[12]

---

[12] As stated in by the District Court in *Great Atlantic:*

> As a threshold matter, Hudson argues that the Bankruptcy Court erred in looking to the UCC definition of goods to interpret Section 503(b)(9), asserting that the Court should have considered the general common law definition of "goods," which Hudson proposes could be found in *Black's Law Dictionary*. (*See* Hudson Mem. 13–15.) I am persuaded, however, that "it is hardly plausible that Congress expected [ ] judges to roll up their sleeves and set to work reinventing the proverbial wheel and divining a more amorphous 'common understanding' of the term [goods]"—given the "wide usage and acceptance of the definition of goods found in the UCC at [Section] 2–105(1)." *In re Erving Indus.*, 432 B.R. at 365 (emphasis omitted). The Bankruptcy Court—as well as the numerous other courts that have reached the same conclusion on this issue—did not err in holding that UCC Section 2–105(1) should provide the definition of "goods" for the purpose of interpreting Section 503(b)(9). *See In re Grede Foundries*, 440 B.R. at 797 ("Every bankruptcy court to consider the issue, including the court below, has applied the Uniform Commercial Code definition of goods, found in UCC [Section] 2–105."); *In re Erving Indus.*, 432 B.R. at 365 ("[T]his Court concludes (as have most, if not all, courts addressing the issue), that the meaning of goods under [Section] 503(b)(9) is primarily informed by the meaning of goods under Article 2 of the UCC.") (emphasis omitted); *In re Circuit City Stores*, 416 B.R. at 537 ("[T]he Court will adopt the UCC definition of 'goods' as the federal definition of goods for the purpose of interpreting [Section] 503(b)(9) of the Bankruptcy Code. This ruling is consistent with the approach that has been taken by a number of other bankruptcy courts faced with the same question of interpreting the meaning of 'goods' under [Section] 503(b)(9)."); *In re Pilgrim's Pride Corp.*, 421 B.R. at 237 *26 ("The court concludes that the appropriate definition of goods for the purpose of Code [Section] 503(b)(9) is that found in the 'model' UCC."); *In re Goody's Family Clothing*, 401 B.R. at 134 ("Use of the UCC Article 2's definition of 'goods' in interpreting [S]ection 503(b) (9) is suggested in a leading treatise and has been adopted by bankruptcy courts examining this issue. Given the near unanimous nationwide adoption of Article 2 of the UCC, the Court concludes that the term 'goods' in [S]ection 503(b)(9) conforms with the meaning given in U.C.C. [Section] 2–105(1).") (footnotes omitted).

In re Great Atl. & Pac. Tea Co., Inc., 498 B.R. 19, 25–26 (S.D.N.Y. 2013) (footnote omitted) (emphasis added).

24.     Based on the foregoing, it would be reasonable for this Court, the District Court, and the Second Circuit to also refer to the UCC to construe what "received" means for the purposes of § 503(b)(9).   This would aid in producing a uniform consistent definition of "received" for purposes of §§ 503(b)(9) and § 546(c), which is required under the Constitution. *See* World Imports III, 862 F.3d at 340 (concluding that "receipt" under § 546(c) and "received under § 503(b)(9) both occur when the debtor takes physical possession of the subject goods).

25.     Like this Court and the District Court in *Great Atlantic*, in World Imports III, the Third Circuit did not use the UCC to displace federal law governing when goods are "received" for the purposes of applying the Bankruptcy Code.   The Third Circuit merely referred the common usage of the term "received," as further construed by the UCC, to guide in the interpretation and stating federal law as to when goods are "received" under § 503(b)(9).

26.     More specifically, in World Imports III, the court started by acknowledging, as have other courts, that the term "received" in § 503(b)(9) is not defined in the Bankruptcy Code. World Imports III, 862 F.3d at 342.   As a result, the court found that it was appropriate to "'construe the [the term 'received'] in accordance with its ordinary or natural meaning.'" *Id.* (citing and quoting *Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)); *see also In re ADI Liquidation, Inc.*, 572 B.R. 543, 548 (Bankr. D. Del. 2017), aff'd, No. BR 14-12092 (KJC), 2019 WL 211528 (D. Del. Jan. 16, 2019) ("The term 'received' is not defined in the Bankruptcy Code.   In analyzing the meaning of the term 'received' in section 503(b)(9), decisional law and legislative history suggest that it have the same meaning as 'received' in section 546(c), which governs reclamation. Courts have also looked to the Uniform Commercial Code ('UCC') for guidance in defining the term 'receipt.'"); In re O.W. Bunker Holding N. Am. Inc., No. 14-51720 (JAM), 2019 WL 3933615, at *7 (Bankr. D. Conn. Aug. 19, 2019) (same).

27.     The World Imports III court then discussed the definitions of "receive" in Black's Law Dictionary and the Oxford English Dictionary and concluded that the definitions require physical possession.   World Imports III, 862 F.3d at 342.

28.    Next, the World Imports III court referred to the UCC definition and found the definition of "receipt" in the UCC comported with the legal and dictionary definitions of "receipt" and that Congress meant to adopt the foregoing well-known meaning of the term "receipt" into the Bankruptcy Code. *Id.* at 343-44. The Fourth Circuit has also resorted to the UCC to instruct in the meaning to be applied to terms that are not defined in the Bankruptcy Code. *See In re Price,* 562 F.3d 618, 624–25 (4th Cir. 2009).

29.    Finally, the World Imports III court considered and rejected the argument offered by the Debtor in this case - that FOB delivery at a foreign port to a common carrier somehow changes the definition of "receipt" from actual physical possession to the date when goods are delivered to a common carrier, which are not agents of a debtor/buyer, at a foreign port.  Id. at 344-46.  As stated in World Imports III:

> World Imports argues that despite the foregoing reasons, the goods in this case were constructively received upon delivery because they were delivered "FOB" to a common carrier. While it is true that a buyer may be deemed to have received goods when his agent takes physical possession of them, common carriers are not agents. Constructive receipt thus does not include "FOB delivery" to a common carrier, as the Bankruptcy Court and District Court assumed.
>
> Delivery, or transfer of title or risk of loss, has been treated as distinct from actual receipt of goods by the buyer.
>
> …
>
> This Court in *Marin* explicitly stated that delivery and receipt of goods can occur at different times. *See* 740 F.2d at 225. We found that "the U.C.C. does not rely on the concept of 'title' for purposes of establishing the rights of buyers and sellers under the Code." *Id.* After finding that "receipt" in 11 U.S.C. § 546(c) is defined the same way as in the UCC (requiring physical possession), *id.* at 224–25 & n.9, we noted that the UCC "views goods given by a seller to a common carrier for delivery to a buyer as being in the possession of the common carrier not the buyer," *id.* at 225. Under this framework, the seller has "the right to stop delivery of the goods" while the common carrier remains in possession. *Id.* And "[t]his right to stop delivery applies regardless of which party bears the risk of loss, and regardless of which party is deemed to have 'title' to the goods while they are in the carrier's possession." *Id.* Only upon the buyer's physical possession does the seller's remedy convert to the

"different right" of reclamation (governed in bankruptcy cases by § 546(c)). *Id.*

In other words, regardless of FOB status, under the UCC and Chapter 11, receipt does not occur until after the seller's ability to stop delivery ends—namely, upon the buyer's physical possession. *See id.* The upshot of all this is that the transfer of risk is not the same thing as receipt. *See, e.g.*, *Trico Steel*, 282 B.R. at 324 ("Although title may have passed to [the buyer] pursuant to the terms of the contract, those terms did not transfer actual physical possession of the [goods].").

Rather than look to this precedent, the Bankruptcy Court and District Court asserted that "goods are perforce constructively received" when delivered to the common carrier FOB. *World Imports I*, 511 B.R. at 745; *accord World Imports II*, 549 B.R. at 824. In our view, that assertion misapplies the concept of constructive receipt.[4] While actual possession by an agent on behalf of a buyer constitutes constructive receipt, our caselaw is clear that common carriers do not qualify as agents. When a buyer "arrange[s] for a commercial barge operated by a common carrier to pick up the" goods from the seller, *Marin*, 740 F.2d at 222, the carrier does not act as an agent for purposes of receipt. *See id.* at 226 & n.13; *see also Trico Steel*, 282 B.R. at 323 (finding that "mere intermediaries in the transport" of goods do not qualify as agents). Bankruptcy courts in the Third Circuit have recognized this distinction since *Marin*. *See, e.g.*, *Mayer Pollock Steel Corp.*, 157 B.R. 952, 960 (Bankr. E.D. Pa. 1993) ("It is true that *346 a constructive receipt will satisfy the requirements for reclamation if ... the buyer's bailee receives possession of the goods.... However, receipt of the goods by a common carrier is not deemed constructive possession by a buyer, but rather is deemed to be possession by the common carrier." (citing *Marin*, 740 F.2d at 225)). Thus, the common carrier in this case did not act as an agent for World Imports.

In sum, there is no support for the idea that a buyer constructively receives goods when they are delivered to a common carrier, even if title and risk of loss pass at that time.

4. The lower courts looked to the CISG and Incoterms because they assumed the lack of definition for "received" in the Bankruptcy Code created a gap in the statute that could only be filled by reference to other federal law as the "rule of decision." *See World Imports I*, 511 B.R. at 741; *accord World Imports II*, 549 B.R. at 823. However, the Bankruptcy Code itself provides the relevant substantive law in this case, and in interpreting Code terms, we do not necessarily assume that Congress intended to adopt a definition from another source of federal law in the "absence of any explicit connector" between the Bankruptcy Code and a definition contained in another statute. *United States v.*

> *Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 219–20, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). In addition, while the CISG and the Incoterm definition of FOB would certainly be relevant in a contract dispute between these parties, the relevant inquiry for this appeal is meaning of the Bankruptcy Code, not the intent of the parties. *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005); *see* Appellants' Br. 15. Finally, while we sometimes presume that federal statutes are to be interpreted consistent with treaties joined by the United States, *INS v. Cardoza–Fonseca*, 480 U.S. 421, 437–39, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), we perceive no potential conflict between our holding here and the CISG. *See* Appellants' Br. 21–23.

<u>In re World Imports, Ltd.</u>, 862 F.3d 338, 345–46 (3d Cir. 2017)

30.    In summary, World Imports III is directly on point, and this Court should adopt the holding of the court in World Imports III as to when goods are "received" for the purposes of § 503(b)(9), as well as its well reasoned basis for rejecting the same arguments advanced by the Debtors based on World Imports I and II, which were reversed by World Imports III, regarding the use of a different definition of when goods are "received" under § 503(b)(9) when a foreign vendor ships FOB from a foreign port.[13]

---

[13] For the reasons discussed above, the CISG and Incoterms should not be used to define when goods are "received" under § 503(b)(9). With that said, in Transitional Notes, *Receipt of Goods under the CISG: a Threshold Question When an American Buyer is Going Bankrupt*, A. Hublet (2015), a true and correct copy of which is attached hereto as **Exhibit "4,"** the author convincingly discuss why, even if the CISG is applied to define when goods are "received" under § 503(b)(9), goods should still be considered to be "received" when a debtor takes physical possession of the subject goods. *See also Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F. Supp. 2d 702, 708-09, 711-14 (N.D. Ill. 2004), aff'd, 408 F.3d 894 (7th Cir. 2005) (Discussing application of the CISG in a contract dispute between a U.S. vendor and a foreign vendor (not in the context of construing the Bankruptcy Code) and (1) holding that "[t]he [CISG] Convention directs that its interpretation be informed by its 'international character and ... the need to promote uniformity in its application and the observance of good faith in international trade.' *Delchi Carrier SpA*, 71 F.3d at 1028 (quoting CISG, Art. 7(1)). ***Case law interpreting analogous provisions of Article 2 of the Uniform Commercial Code ('UCC') may also inform the court where the language of the relevant CISG provisions tracks that of the UCC***. *Id.* However, UCC caselaw "is not per se applicable." *Id.* (quoting *Orbisphere Corp. v. United States*, 726 F.Supp. 1344, 1355 (C.I.T.1989))" and (2) discussing that receipt under the CISG should generally be when the buyer takes physical possession of goods, because that is when the buyer's inspection obligations and related rights to return non-conforming goods is triggered.)

## III.

## CONCLUSION

WHEREFORE, based on the foregoing, WLI respectfully requests that the Court enter an order (1) overruling the Objection insofar as it relates to WLI's § 503(b)(9) Claims, (2) holding that WLI's § 503(b)(9) Claims are allowed in the amount of 914,538.36 and entitled to priority under § 503(b)(9), and (3) affording such further and other relief as the Court deems appropriate under the circumstances.

Dated: Los Angeles, California
     October 23, 2019

          LEVENE, NEALE, BENDER, YOO
            & BRILL

          By: */s/ Todd M. Arnold*
          Todd M. Arnold
          Cal. Bar No. 221868
          (*pro hac vice* approved) [Dkt. 4790]
          10250 Constellation Blvd.
          Suite 1700
          Los Angeles, CA 90067
          T: 310-229-1234
          E: tma@LNBYB.com
          *Attorneys for Weihai Lianqiao International*
          *Coop. Group Co., Ltd.*

## DECLARATION OF TODD M. ARNOLD

I, TODD M. ARNOLD, hereby declare as follows:

1.      I am over 18 years of age.  Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I make this declaration in support of the Reply to which this declaration is attached.  Unless otherwise state, all capitalized terms herein have the same meanings as in the Reply.

3.      I serve as WLI's lead attorney in regard to the Debtors' bankruptcy cases.

4.      On April 9, 2019, WLI filed POC 15587 and (2) POC 15702.  True and correct copies of POCs 15587 and POC 15702, with notations on the Shipment Lists (as defined below) attached thereto, are attached hereto as **Exhibits "1" and "2," respectively.**

5.      As noted in the paragraphs 4 and 7 of the attachment to each of WLI's POCs, at the time the POCs were filed, (a) the documentation underlying WLI's POCs had been previously submitted with WLI's prior POCs amended by POCs 15578 and 15702 referenced immediately above, (b) such documentation was voluminous and would be provided to the Debtors upon request, and (c) such documentation was available upon request to WLI's designated bankruptcy counsel.  The Debtors never made a request to me for such documentation.

6.      WLI re-submitted the then available documentation supporting its § 503(b)(9) Claims asserted by way of the POCs when WLI filed its *Notice Of Motion Of Weihai Lianqiao International Coop. Group Co., Ltd To Allow And Compel Payment Of Administrative Expense Claims Under 11 U.S.C. §§ 503(b)(1) And 503(b)(9)* (the "Administrative Claims Motion"). [Dkt. 4706], which is still pending before the Court and incorporated herein by this reference.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 23rd day of October 2019, at Los Angeles, California.

*/s/ Todd M. Arnold*
TODD M. ARNOLD

**EXHIBIT "1"**

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☐ Kmart Corporation (18-23561) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☒ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22301) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc (18-23584) | |

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers **must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | WEIHAI LIANQIAO INTL COOP GP CO LTD |

| | |
|---|---|
| 2. **Has this claim been acquired from someone else?** | ☒ No ☐ Yes. From whom? _____ |

| | | |
|---|---|---|
| 3. **Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** Todd M. Arnold Levene, Neale, Bender, Yoo & Brill L.L.P. 10250 Constellation Blvd. Suite 1700 Los Angeles, CA 90067 | **Where should payments to the creditor be sent?** (if different) Weihai Lianqiao International Coop Group Co. Ltd. Attn: Helen Zhu No. 269, West Wenhua Rd. Hi-Tech Deve Zone China, CN26420 |
| | Contact phone 310-229-1234 Contact email tma@lnbyb.com | Contact phone 0086 18663132616 Contact email helen_zhu@lianqiao.net |

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☐ No ☒ Yes. Claim number on court claims registry (if known) 818 and 5213     Filed on 10/26/2018 (MM / DD / YYYY) |

| | |
|---|---|
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No ☐ Yes. Who made the earlier filing? _____ |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

7. **How much is the claim?**    $ 2,611,888.60 _____ . Does this amount include interest or other charges?
☒ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

## Goods Sold
_____

9. **Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

   **Nature of property:**

   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
   ☐ Motor vehicle
   ☐ Other. Describe: _____

   **Basis for perfection:** _____
   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**                    $_____

   **Amount of the claim that is secured:**        $_____

   **Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**    $_____

   **Annual Interest Rate** (when case was filed)_____%
   ☐ Fixed
   ☐ Variable

10. **Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☐ No<br>☑ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $ 646,697.26 |

---

**Part 3:    Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** *Helen Zhu*
Helen Zhu (Apr 9, 2019)

**Email:** tma@lnbyb.com

Signature
**Print the name of the person who is completing and signing this claim:**
**Name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | HELEN ZHU | | |
| | First name | Middle name | Last name |
| Title | DEPARTMENT MANAGER | | |
| Company | WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | NO.269, WEST WENHUA ROAD, HI-TECH DEVE ZONE | | |
| | Number        Street | | |
| | WEIHAI, SHANDONG, CHINA | CN | 26420 |
| | City | State | ZIP Code |
| Contact phone | 0086 18663132616 | Email | helen_zhu@lianqiao.net |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ **have supporting documentation.**    ☐ **do not have supporting documentation.**
   (attach below)

*C* Attachment

**PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.**

**IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.**

**A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.**

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                              12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.** Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://restructuring.primeclerk.com/sears.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Sears Holdings Corporation Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

**Do not file these instructions with your form**

**In re Sears Holdings Corporation et al.**
**Chapter 11 Case No. Case No. (18-23538)**
**(Jointly Administered)**

## ATTACHMENT TO WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD. PROOF OF CLAIM

1.    Weihai Lianqiao International Coop. Group Co., Ltd. ("WLI") provided goods to Sears, Roebuk and Co. ("Sears") and/or certain affiliated debtors in the above-referenced jointly administered bankruptcy cases (the "Debtors") for resale in the Debtors' retail business.

2.    The Proof of Claim (the "POC") to which this Attachment is attached amends Proof of Claim 818 filed by WLI against Sears on October 19, 2018 and Proof of Claim 5213 filed by WLI against Sears on October 26, 2018 (together, the "Prior POCs")

3.    WLI asserts a pre-petition claim in the amount of $2,611,888.60 (the "Claim"), which amount includes a claim in the amount of $646,697.26 for goods received by Sears within 20 days of the petition date that were sold to Sears in the ordinary course of Sears' business, which is entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9) (the "503(b)(9) Claim"). A summary of the invoices underlying the Claim and identifying the invoices underlying the 503(b)(9) Claim is attached hereto as **Exhibit "1."**

4.    The documentation underlying the Claim (including the 503(b)(9) Claim) (a) was previously submitted with the Prior POCs and is incorporated herein by this reference and (b) is voluminous and will be provided to the Debtors upon request.

5.    In addition to the foregoing Claim, WLI also asserts a post-petition claim against Sears in the approximate amount of $357,041.71, which is entitled to administrative priority pursuant to 11 U.S.C. §§ 503(b) and 507(a)(2) (the "Administrative Claim"). WLI is not asserting the Administrative Claim pursuant to this POC. WLI will file a motion for the allowance and payment of its Administrative Claim.

6.    WLI reserves the right to amend this POC, including, but not limited to, in the event (a) WLI discovers further unpaid amounts for pre-petition invoices, (b) Sears asserts that any portion of the 503(b)(9) Claim and/or Administrative Claim are misclassified for any reason,

1

including by reason of the date the underlying goods were loaded for shipment, in transit, delivered to port, or actually received by the Debtors, and/or (c) Sears asserts that the Claim (including the 503(b)(9) Claim) should have been asserted against one of the other Debtors.

7.    Any **objection to this proof of claim** must be served on:

>       Todd M. Arnold
>       Levene, Neale, Bender, Yoo & Brill L.L.P.
>       10250 Constellation Boulevard, Suite 1700
>       Los Angeles, California 90067
>       tma@lnbyb.com
>
>       and
>
>       Weihai Lianqiao International
>       Coop Group Co. Ltd.
>       Attn: Helen Zhu
>       No. 269, West Wenhua Rd.
>       Hi-Tech Deve Zone
>       China, CN26420

8.    Any other communications about this proof of claim should be directed to:

>       Todd M. Arnold
>       Levene, Neale, Bender, Yoo & Brill L.L.P.
>       10250 Constellation Boulevard, Suite 1700
>       Los Angeles, California 90067
>       tma@lnbyb.com
>       310-229-1234

2

**WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD**

**WEIHAI LIANQIAO INTL COOP GP CO LTD**

TO:SEARS(2642)

| Commercial Invoice | Amount | Payment Due | LOAD | DISCHARGE | DESTINATION | Pre-BK | 503(b)(9) | Post-BK [1] |
|---|---|---|---|---|---|---|---|---|
| 201820075682 | $74,954.16 | 2018/9/14 | 2018/7/2 | 2018/8/2 | 2018/8/10 | X | | |
| 201820076137 | $83,052.80 | 2018/9/14 | 2018/7/2 | 2018/8/2 | 2018/8/10 | X | | |
| 201820453134 | $35,141.44 | 2018/9/14 | 2018/7/2 | 2018/8/2 | 2018/8/10 | X | | |
| 201820076750 | $10,727.28 | 2018/9/19 | 2018/7/7 | 2018/7/25 | 2018/8/2 | X | | |
| 201820076460 | $1,797.12 | 2018/9/14 | 2018/7/2 | 2018/8/2 | 2018/8/10 | X | | |
| 201820058650 | $91,580.40 | 2018/9/19 | 2018/7/7 | 2018/7/25 | 2018/8/2 | X | | |
| 201820060481 | $101,620.72 | 2018/9/19 | 2018/7/7 | 2018/7/25 | 2018/8/2 | X | | |
| 201820452976 | $42,970.88 | 2018/9/19 | 2018/7/7 | 2018/7/25 | 2018/8/2 | X | | |
| 201820075469 | $12,847.92 | 2018/9/19 | 2018/7/7 | 2018/7/25 | 2018/8/2 | X | | |
| 201820075091 | $2,257.92 | 2018/9/19 | 2018/7/7 | 2018/7/25 | 2018/8/2 | X | | |
| 201820252031 | $8,375.68 | 2018/9/26 | 2018/7/14 | 2018/8/2 | 2018/8/10 | X | | |
| 201820250725 | $5,199.60 | 2018/9/26 | 2018/7/14 | 2018/8/2 | 2018/8/10 | X | | |
| 201820251761 | $44,017.60 | 2018/9/26 | 2018/7/14 | 2018/8/2 | 2018/8/10 | X | | |
| 201820254204 | $6,828.00 | 2018/9/28 | 2018/7/16 | 2018/8/9 | 2018/8/17 | X | | |
| 201820252274 | $4,308.24 | 2018/9/28 | 2018/7/16 | 2018/8/9 | 2018/8/17 | X | | |
| 201820252432 | $35,973.40 | 2018/9/28 | 2018/7/16 | 2018/8/9 | 2018/8/17 | X | | |
| 201820353438 | $23,689.80 | 2018/10/1 | 2018/7/19 | 2018/8/10 | 2018/8/18 | X | | |
| 201820353778 | $19,384.80 | 2018/9/27 | 2018/7/15 | 2018/8/26 | 2018/9/3 | X | | |
| 201820544099 | $43,768.78 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820545431 | $4,003.68 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820546556 | $30,881.35 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820545098 | $32,190.37 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820542385 | $33,705.25 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820549414 | $15,187.20 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820545721 | $32,015.84 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820545835 | $14,535.00 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820544888 | $36,070.93 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820545580 | $3,336.40 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820562305 | $25,130.23 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820545900 | $26,221.90 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820544551 | $27,615.25 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820556761 | $12,422.40 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820545808 | $26,084.96 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |

| Commercial Invoice | Amount | Payment Due | LOAD | DISCHARGE | DESTINATION | Pre-BK | 503(b)(9) | Post-BK [1] |
|---|---|---|---|---|---|---|---|---|
| 201820545869 | $12,055.50 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820732914 | $12,642.00 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820844733 | $68,976.36 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820725521 | $14,592.60 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820845039 | $32,080.90 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820733141 | $10,290.00 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820843579 | $56,600.82 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820726553 | $11,939.40 | 2018/10/13 | 2018/7/31 | 2018/8/30 | 2018/9/7 | X | | |
| 201820844107 | $26,326.14 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820941067 | $109,258.20 | 2018/10/24 | 2018/8/11 | 2018/8/31 | 2018/9/8 | X | | |
| 201820849050 | $71,414.20 | 2018/10/24 | 2018/8/11 | 2018/8/31 | 2018/9/8 | X | | |
| 201820929030 | $100,133.32 | 2018/11/6 | 2018/8/24 | 2018/9/10 | 2018/9/18 | X | | |
| 201820962598 | $3,550.56 | 2018/10/24 | 2018/8/11 | 2018/8/31 | 2018/9/8 | X | | |
| 201820955709 | $105,906.31 | 2018/10/19 | 2018/8/6 | 2018/9/6 | 2018/9/14 | X | | |
| 201820963681 | $18,379.52 | 2018/10/19 | 2018/8/6 | 2018/9/6 | 2018/9/14 | X | | |
| 201820954683 | $107,707.43 | 2018/10/19 | 2018/8/6 | 2018/9/6 | 2018/9/14 | X | | |
| 201820988215 | $1,186.38 | 2018/10/15 | 2018/8/2 | 2018/8/6 | 2018/8/8 | X | | |
| 201820985675 | $34,459.80 | 2018/11/6 | 2018/8/24 | 2018/9/10 | 2018/9/18 | X | | |
| 201821065486 | $94,530.80 | 2018/11/6 | 2018/8/24 | 2018/9/10 | 2018/9/18 | X | | |
| 201821018228 | $18,324.40 | 2018/10/25 | 2018/8/12 | 2018/9/13 | 2018/9/21 | X | | |
| 201821066407 | $86,939.40 | 2018/10/25 | 2018/8/12 | 2018/9/13 | 2018/9/21 | X | | |
| 201821100819 | $108,942.88 | 2018/11/10 | 2018/8/28 | 2018/9/27 | 2018/10/5 | X | X | |
| 201821239612 | $14,543.36 | 2018/11/10 | 2018/8/28 | 2018/9/27 | 2018/10/5 | X | X | |
| 201821153169 | $66,726.03 | 2018/11/10 | 2018/8/28 | 2018/9/27 | 2018/10/5 | X | X | |
| 201821119601 | $143,497.73 | 2018/11/3 | 2018/8/21 | 2018/9/20 | 2018/9/28 | X | X | |
| 201821240030 | $11,801.28 | 2018/11/3 | 2018/8/21 | 2018/9/20 | 2018/9/28 | X | X | |
| 201821246306 | $24,889.91 | 2018/11/10 | 2018/8/28 | 2018/9/27 | 2018/10/5 | X | X | |
| 201821245823 | $30,612.49 | 2018/11/15 | 2018/9/2 | 2018/9/24 | 2018/10/2 | X | X | |
| 201821413426 | $1,625.44 | 2018/11/20 | 2018/9/7 | 2018/9/28 | 2018/10/6 | X | X | |
| 201821412444 | $13,476.72 | 2018/11/20 | 2018/9/7 | 2018/9/28 | 2018/10/6 | X | X | |
| 201821413747 | $5,270.88 | 2018/11/20 | 2018/9/7 | 2018/9/28 | 2018/10/6 | X | X | |
| 201821413879 | $17,926.48 | 2018/11/20 | 2018/9/7 | 2018/9/28 | 2018/10/6 | X | X | |
| 201821412826 | $18,876.38 | 2018/11/20 | 2018/9/7 | 2018/9/28 | 2018/10/6 | X | X | |
| 201821430175 | $78,127.33 | 2018/11/20 | 2018/9/7 | 2018/9/28 | 2018/10/6 | X | X | |
| 201821431011 | $69,397.41 | 2018/11/17 | 2018/9/4 | 2018/10/4 | 2018/10/12 | X | X | |
| 201821414125 | $14,548.76 | 2018/11/17 | 2018/9/4 | 2018/10/4 | 2018/10/12 | X | X | |
| 201821414017 | $15,347.68 | 2018/11/17 | 2018/9/4 | 2018/10/4 | 2018/10/12 | X | X | |

| Commercial Invoice | Amount | Payment Due | LOAD | DISCHARGE | DESTINATION | Pre-BK | 503(b)(9) | Post-BK [1] |
|---|---|---|---|---|---|---|---|---|
| 201821413941 | $11,086.50 | 2018/11/17 | 2018/9/4 | 2018/10/4 | 2018/10/12 | X | X | |
| 201821540762 | $72,917.73 | 2018/11/28 | 2018/9/15 | 2018/10/8 | 2018/10/16 | | | X |
| 201821739794 | $13,064.00 | 2018/11/28 | 2018/9/15 | 2018/10/8 | 2018/10/16 | | | X |
| 201821540641 | $70,453.54 | 2018/11/23 | 2018/9/10 | 2018/10/11 | 2018/10/19 | | | X |
| 201821784669 | $19,902.65 | 2018/11/28 | 2018/9/15 | 2018/10/8 | 2018/10/16 | | | X |
| 201821783023 | $15,958.10 | 2018/11/28 | 2018/9/15 | 2018/10/8 | 2018/10/16 | | | X |
| 201821778959 | $46,691.26 | 2018/11/28 | 2018/9/15 | 2018/10/8 | 2018/10/16 | | | X |
| 201821782595 | $13,146.10 | 2018/11/29 | 2018/9/16 | 2018/10/18 | 2018/10/26 | | | X |
| 201821781297 | $16,026.02 | 2018/11/29 | 2018/9/16 | 2018/10/18 | 2018/10/26 | | | X |
| 201821778231 | $37,727.95 | 2018/11/29 | 2018/9/16 | 2018/10/18 | 2018/10/26 | | | X |
| 201822122594 | $23,004.72 | 2018/12/14 | 2018/10/1 | 2018/11/1 | 2018/11/9 | | | X |
| 201822122859 | $28,149.64 | 2018/12/19 | 2018/10/6 | 2018/10/29 | 2018/11/6 | | | X |
| TOTAL GENERAL PRE-PETITION UNSECURED NON-503(b)(9) CLAIM | | | | | | $ 1,965,191.34 | | |
| TOTAL PRE-PETITION 503(b)(9) CLAIM | | | | | | $ 646,697.26 | | |
| TOTAL PRE-PETITION CLAIM | | | | | | $ 2,611,888.60 | | |

TOTAL POST-PETITION ADMINISTRATIVE CLAIM TO BA ASSERTED BY
SEPARATE REQUEST FOR TE ALLOWANCE AND PAYMENT OF
ADMINISTRATIVE CLAIM                                                    $     357,041.71

[1] To be asserted by separate request for the allowance and payment of administrative claim

Based on "Load" date, ties to the penny to the asserted reduced § 503(b)(9) claim amount in Exhibit "1" to the Debtors' Objection.

# Electronic Proof of Claim

Final Audit Report                                                                    2019-04-09

| | |
|---|---|
| Created: | 2019-04-09 |
| By: | Sears Claims (searsclaims@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAASmz7Ui3DvY58Qzed5xetabjslpVHeyAp |

## "Electronic Proof of Claim" History

📄 Widget created by Sears Claims (searsclaims@primeclerk.com)
2019-04-09 - 5:48:53 PM GMT

🖉 Helen Zhu (tma@lnbyb.com) uploaded the following supporting documents:
🖉 Attachment
2019-04-09 - 5:57:27 PM GMT

📄 Widget filled in by Helen Zhu (tma@lnbyb.com)
2019-04-09 - 5:57:27 PM GMT- IP address: 38.88.223.171

🔏 (User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64; rv:66.0) Gecko/20100101 Firefox/66.0)
2019-04-09 - 5:57:29 PM GMT- IP address: 38.88.223.171

✅ Signed document emailed to Sears Claims (searsclaims@primeclerk.com) and Helen Zhu (tma@lnbyb.com)
2019-04-09 - 5:57:29 PM GMT

**Prime Clerk** 🔵  POWERED BY
Adobe Sign

**EXHIBIT "2"**

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☒ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☐ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22301) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | |

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD <br><br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor    WEIHAI LIANQIAO INTL COOP GP CO LTD |
| 2. **Has this claim been acquired from someone else?** | ☒ No <br> ☐ Yes. From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Todd M. Arnold <br> Levene, Neale, Bender, Yoo & Brill L.L.P. <br> 10250 Constellation Blvd. <br> Suite 1700 <br> Los Angeles, CA 90067 <br><br> Contact phone 310-229-1234 <br> Contact email tma@lnbyb.com | **Where should payments to the creditor be sent?** (if different) <br><br> Weihai Lianqiao International Coop Group Co. Ltd. <br> Attn: Helen Zhu <br> No. 269, West Wenhua Rd. <br> Hi-Tech Deve Zone <br> China, CN26420 <br><br> Contact phone 0086 18663132616 <br> Contact email helen_zhu@lianqiao.net |
| 4. **Does this claim amend one already filed?** | ☐ No <br> ☒ Yes.   Claim number on court claims registry (if known) 519 and 2340        Filed on 10/26/2018 <br> MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No <br> ☐ Yes. Who made the earlier filing? _____ |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 890,112.68 _____. Does this amount include interest or other charges?

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Goods Sold

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                     $ _____

Amount of the claim that is secured:      $ _____

Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:      $ _____

Annual Interest Rate (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.      $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No ☐ Yes. *Check one:* | Amount entitled to priority |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☐ No ☑ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $ 267,841.10 |

## Part 3:  Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b). If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:* |
|---|---|

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Signature: *Helen Zhu*
Helen Zhu (Apr 9, 2019)

**Email:** tma@lnbyb.com

Signature

**Print the name of the person who is completing and signing this claim:**
**Name of the person who is completing and signing this claim:**

| Name | HELEN ZHU | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | DEPARTMENT MANAGER | | |
| Company | WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | NO.269, WEST WENHUA ROAD, HI-TECH DEVE ZONE | | |
| | Number        Street | | |
| | WEIHAI, SHANDONG, CHINA | CN | 26420 |
| | City | State | ZIP Code |
| Contact phone | 0086 18663132616 | Email | helen_zhu@lianqiao.net |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ have supporting documentation.        ☐ do not have supporting documentation.
    (attach below)

Attachment

**PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.**

**IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.**

**A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.**

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                    12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else,** then state the identity of the last party who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.** Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://restructuring.primeclerk.com/sears.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Sears Holdings Corporation Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

**Do not file these instructions with your form**

**In re Sears Holdings Corporation et al.**
**Chapter 11 Case No. Case No. (18-23538)**
**(Jointly Administered)**

## ATTACHMENT TO WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD. PROOF OF CLAIM

1.      Weihai Lianqiao International Coop. Group Co., Ltd. ("WLI") provided goods to Kmart Corporation ("Kmart") and/or certain affiliated debtors in the above-referenced jointly administered bankruptcy cases (the "Debtors") for resale in the Debtors' retail business.

2.      The Proof of Claim (the "POC") to which this Attachment is attached amends Proof of Claim 519 filed by WLI against Kmart on October 19, 2018 and Proof of Claim 2340 filed by WLI against Kmart on October 26, 2018 (together, the "Prior POCs")

3.      WLI asserts a pre-petition claim in the amount of $622,271.58 (the "Claim"), which amount includes a claim in the amount of $267,841.10 for goods received by Kmart within 20 days of the petition date that were sold to Kmart in the ordinary course of Kmart's business, which is entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9) (the "503(b)(9) Claim").    A summary of the invoices underlying the Claim and identifying the invoices underlying the 503(b)(9) Claim is attached hereto as **Exhibit "1."**

4.      The documentation underlying the Claim (including the 503(b)(9) Claim) (a) was previously submitted with the Prior POCs and is incorporated herein by this reference and (b) is voluminous and will be provided to the Debtors upon request.

5.      In addition to the foregoing Claim, WLI also asserts a post-petition claim against Kmart in the approximate amount of $113,489.03, which is entitled to administrative priority pursuant to 11 U.S.C. §§ 503(b) and 507(a)(2) (the "Administrative Claim").    WLI is not asserting the Administrative Claim pursuant to this POC.    WLI will file a motion for the allowance and payment of its Administrative Claim.

6.      WLI reserves the right to amend this POC, including, but not limited to, in the event (a) WLI discovers further unpaid amounts for pre-petition invoices, (b) Kmart asserts that any portion of the 503(b)(9) Claim and/or Administrative Claim are misclassified for any reason,

1

including by reason of the date the underlying goods were loaded for shipment, in transit, delivered to port, or actually received by the Debtors, and/or (c) Kmart asserts that the Claim (including the 503(b)(9) Claim) should have been asserted against one of the other Debtors.

7.    Any **objection to this proof of claim** must be served on:

> Todd M. Arnold
> Levene, Neale, Bender, Yoo & Brill L.L.P.
> 10250 Constellation Boulevard, Suite 1700
> Los Angeles, California 90067
> tma@lnbyb.com
>
> and
>
> Weihai Lianqiao International
> Coop Group Co. Ltd.
> Attn: Helen Zhu
> No. 269, West Wenhua Rd.
> Hi-Tech Deve Zone
> China, CN26420

8.    Any other communications about this proof of claim should be directed to:

> Todd M. Arnold
> Levene, Neale, Bender, Yoo & Brill L.L.P.
> 10250 Constellation Boulevard, Suite 1700
> Los Angeles, California 90067
> tma@lnbyb.com
> 310-229-1234

**WEIHAI LIANQIAO INTERNATIONAL COOP. GROUP CO., LTD**

**WEIHAI LIANQIAO INTL COOP GP CO LTD**

TO:KMART(2641)

| Commercial Invoice | Amount | Payment Due | LOAD | DISCHARGE | DESTINATION | Pre-BK | 503(b)(9) | Post-BK [1] |
|---|---|---|---|---|---|---|---|---|
| 201820279309 | $128.70 | 2018/9/14 | 2018/7/2 | 2018/8/2 | 2018/8/10 | X | | |
| 201820060111 | $30,952.28 | 2018/9/14 | 2018/7/2 | 2018/8/2 | 2018/8/10 | X | | |
| 201820059688 | $25,244.32 | 2018/9/19 | 2018/7/7 | 2018/7/25 | 2018/8/2 | X | | |
| 201820350161 | $8,729.83 | 2018/10/1 | 2018/7/19 | 2018/8/10 | 2018/8/18 | X | | |
| 201820350637 | $11,058.25 | 1902/8/21 | 1902/6/8 | 2018/8/16 | 2018/8/24 | X | | |
| 201820533679 | $3,573.76 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820533619 | $4,349.76 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820498950 | $6,642.84 | 2018/10/9 | 2018/7/27 | 2018/8/17 | 2018/8/25 | X | | |
| 201820534197 | $3,671.48 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820536141 | $4,728.00 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820535811 | $6,784.68 | 2018/10/5 | 2018/7/23 | 2018/8/23 | 2018/8/31 | X | | |
| 201820870567 | $10,052.55 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820915593 | $15,606.58 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820914831 | $38,394.78 | 2018/10/18 | 2018/8/5 | 2018/8/24 | 2018/9/1 | X | | |
| 201820817108 | $24,316.88 | 2018/10/13 | 2018/7/31 | 2018/8/30 | 2018/9/7 | X | | |
| 201820871312 | $7,511.00 | 2018/10/13 | 2018/7/31 | 2018/8/30 | 2018/9/7 | X | | |
| 201820916917 | $12,856.05 | 2018/10/13 | 2018/7/31 | 2018/8/30 | 2018/9/7 | X | | |
| 201820916811 | $19,874.04 | 2018/10/13 | 2018/7/31 | 2018/8/30 | 2018/9/7 | X | | |
| 201820915831 | $48,827.70 | 2018/10/13 | 2018/7/31 | 2018/8/30 | 2018/9/7 | X | | |
| 201820817638 | $30,932.40 | 2018/10/13 | 2018/7/31 | 2018/8/30 | 2018/9/7 | X | | |
| 201820871443 | $7,917.00 | 2018/10/13 | 2018/7/31 | 2018/8/30 | 2018/9/7 | X | | |
| 201820846941 | $15,059.35 | 2018/10/24 | 2018/8/11 | 2018/8/31 | 2018/9/8 | X | | |
| 201820847600 | $11,281.00 | 2018/10/24 | 2018/8/11 | 2018/8/31 | 2018/9/8 | X | | |
| 201820904879 | $85,240.85 | 2018/10/24 | 2018/8/11 | 2018/8/31 | 2018/9/8 | X | | |
| 201820848478 | $11,843.60 | 2018/10/19 | 2018/8/6 | 2018/9/6 | 2018/9/14 | X | | |

| Commercial Invoice | Amount | Payment Due | LOAD | DISCHARGE | DESTINATION | Pre-BK | 503(b)(9) | Post-BK [1] |
|---|---|---|---|---|---|---|---|---|
| 201820904608 | $98,477.00 | 2018/10/19 | 2018/8/6 | 2018/9/6 | 2018/9/14 | X | | |
| 201820848289 | $19,192.76 | 2018/10/19 | 2018/8/6 | 2018/9/6 | 2018/9/14 | X | | |
| 201820877481 | $925.38 | 2018/10/15 | 2018/8/2 | 2018/8/6 | 2018/8/8 | X | | |
| 201821014937 | $25,454.37 | 2018/11/6 | 2018/8/24 | 2018/9/10 | 2018/9/18 | X | | |
| 201821014259 | $32,321.53 | 2018/10/29 | 2018/8/12 | 2018/9/13 | 2018/9/21 | X | | |
| 201820989279 | $322.86 | 2018/10/26 | 2018/8/13 | 2018/8/16 | 2018/8/18 | X | | |
| 201821334395 | $70,057.68 | 2018/11/10 | 2018/8/28 | 2018/9/27 | 2018/10/5 | X | X | |
| 201821335154 | $5,620.23 | 2018/11/10 | 2018/8/28 | 2018/9/27 | 2018/10/5 | X | X | |
| 201821390361 | $138.80 | 2018/11/10 | 2018/8/28 | 2018/9/27 | 2018/10/5 | X | X | |
| 201821451501 | $639.00 | 2018/11/10 | 2018/8/28 | 2018/9/27 | 2018/10/5 | X | X | |
| 201821335449 | $66,256.48 | 2018/11/15 | 2018/9/2 | 2018/9/24 | 2018/10/2 | X | X | |
| 201821390456 | $69.40 | 2018/11/15 | 2018/9/2 | 2018/9/24 | 2018/10/2 | X | X | |
| 201821451519 | $575.10 | 2018/11/15 | 2018/9/2 | 2018/9/24 | 2018/10/2 | X | X | |
| 201821410610 | $55,181.11 | 2018/11/20 | 2018/9/7 | 2018/9/28 | 2018/10/6 | X | X | |
| 201821412033 | $69,303.30 | 2018/11/17 | 2018/9/4 | 2018/10/4 | 2018/10/12 | X | X | |
| 201821745965 | $9,319.01 | 2018/11/28 | 2018/9/15 | 2018/10/8 | 2018/10/16 | | | X |
| 201821745754 | $33,205.13 | 2018/11/28 | 2018/9/15 | 2018/10/8 | 2018/10/16 | | | X |
| 201821743157 | $37,902.56 | 2018/11/29 | 2018/9/16 | 2018/10/18 | 2018/10/26 | | | X |
| 201821744696 | $11,820.83 | 2018/11/29 | 2018/9/16 | 2018/10/18 | 2018/10/26 | | | X |
| 201822099995 | $11,900.00 | 2018/12/14 | 2018/10/1 | 2018/11/1 | 2018/11/9 | | | X |
| 201822099866 | $9,341.50 | 2018/12/19 | 2018/10/6 | 2018/10/29 | 2018/11/6 | | | X |
| **TOTAL GENERAL PRE-PETITION UNSECURED NON-503(b)(9) CLAIM** | | | | | | $ 622,271.58 | | |
| **TOTAL PRE-PETITION 503(b)(9) CLAIM** | | | | | | $ 267,841.10 | | |
| **TOTAL PRE-PETITION CLAIM** | | | | | | $ 890,112.68 | | |

**TOTAL POST-PETITION ADMINISTRATIVE CLAIM TO BA ASSERTED BY SEPARATE REQUEST FOR TE ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM**          $    113,489.03

[1] To be asserted by separate request for the allowance and payment of administrative claim

Based on "Load" date, ties to the penny to the asserted reduced § 503(b)(9) claim amount in Exhibit "1" to the Debtors' Objection.

# Electronic Proof of Claim

Final Audit Report                                               2019-04-09

| | |
|---|---|
| Created: | 2019-04-09 |
| By: | Sears Claims (searsclaims@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAQOOx9bBTwpuqKlgJIuBVCWyDx8r2lDH2 |

## "Electronic Proof of Claim" History

🗒 Widget created by Sears Claims (searsclaims@primeclerk.com)
2019-04-09 - 6:03:40 PM GMT

📎 Helen Zhu (tma@lnbyb.com) uploaded the following supporting documents:
   📎 Attachment
2019-04-09 - 6:10:10 PM GMT

🗒 Widget filled in by Helen Zhu (tma@lnbyb.com)
2019-04-09 - 6:10:10 PM GMT- IP address: 38.88.223.171

🔏 (User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64; rv:66.0) Gecko/20100101 Firefox/66.0)
2019-04-09 - 6:10:13 PM GMT- IP address: 38.88.223.171

✅ Signed document emailed to Sears Claims (searsclaims@primeclerk.com) and Helen Zhu (tma@lnbyb.com)
2019-04-09 - 6:10:13 PM GMT

**EXHIBIT "3"**

1                    **UNITED STATES BANKRUPTCY COURT**
                    **SOUTHERN DISTRICT OF NEW YORK**

2

3       Case No. 10-24549-rdd

4       - - - - - - - - - - - - - - - - - - - - - - - - - - x

5       In the Matter of:

6       THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,

7                             Debtors.

8       - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10      <u>MODIFIED BENCH RULING ON THE MOTION OF HUDSON ENERGY
        SERVICES, L.L.C. FOR ALLOWANCE OF AN ADMINISTRATIVE CLAIM</u>

11

12      **APPEARANCES:**

13      KIRKLAND & ELLIS, LLP

14          Attorneys for the Reorganized Debtors

15          BY: ANDREW M. GENSER, ESQ.

16          and HUNTER MURDOCK, ESQ.

17

18      ANDREWS & KURTH, LLP

19          Attorneys for Hudson Energy Services, L.L.C.

20          BY: DAVID A. KDUNKEWICZ, ESQ.

21

22      APPEARING TELEPHONICALLY:

23          DOUGLAS GOULD

24          JOSHUA SIEGEL

25

1    **HON. ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE:**

2        I have before me a motion by Hudson Energy

3    Services, LLC, which I'll refer to as "Hudson," for the

4    allowance of an administrative claim under Section 503(b)(9)

5    of the Bankruptcy Code.  Because this Court established a

6    bar date that included Section 503(b)(9) claims,

7    procedurally this is couched as an objection to Hudson's

8    claim.

9        But because it is an administrative claim, I

10    believe that the burden is on Hudson to establish its right

11    to the administrative expense.  And that's what's at issue

12    here, as opposed to the amount of the claim.

13        Section 503(b)(9) of the Bankruptcy Code was

14    enacted in 2005 as part of BAPCPA.  It states that "After

15    notice and a hearing, there shall be allowed administrative

16    expenses, including the value of any goods received by the

17    debtor within 20 days before the date of commencement of a

18    case under this title in which the goods have been sold to

19    the debtor in the ordinary course of such debtor's

20    business."

21        Hudson sold electricity to the debtor pursuant to

22    a contract that's attached as Exhibits A, B, and C (Exhibits

23    B and C referring to agreements incorporated in the contract

24    attached as Exhibit A) to the declaration of Hunter Murdock

25    in support of the debtor's opposition to the administrative

1    claim.  The debtor does not dispute that the electricity was

2    sold to the debtor in the ordinary course of the debtor's

3    business or that the electricity at issue here, for which

4    Hudson seeks an administrative claim of $875,943.90, was

5    supplied to the debtor within 20 days before the start of

6    the debtor's bankruptcy case.

7            What the debtor disputes is whether the

8    electricity provided under the contract by Hudson was, in

9    fact, "goods" within the meaning of Section 503(b)(9).  (I

10    don't believe the debtor disputes the value of the

11    electricity, either.  The amount claimed is apparently the

12    amount that was actually billed for the electricity provided

13    within 20 days of the petition date.)

14            As noted by Collier: "Section 503(b)(9)

15    fundamentally shifts the order and nature of payment to

16    creditors.  Prepetition venders eligible under Section

17    503(b)(9) now have a priority ahead of wages, taxes, and all

18    other priorities that rank below administrative expenses

19    under Section 507.  Section 503(b)(9) results in disparate

20    treatment of otherwise similarly situated creditors that

21    provided value to the debtor during the 20 day period

22    preceding the filing of the case but will not receive an

23    administrative expense priority if their prepetition claim

24    is not for the delivery of goods." 4-503 Collier Bankruptcy,

25    Paragraph 503.16 (16th Ed. 2012).

1        That fundamental shift highlights even more than

2   normally that provisions allowing administrative claims

3   "must be tightly construed."  Howard Delivery Serv. v.

4   Zurich Am. Ins. Co., 547 U.S. 651, 667, 669 (2006).  That is

5   because administrative expenses that have priority under

6   Section 507(a)(2) must be paid in full before non-priority

7   claims are paid.  Thus, each creditor holding an unsecured

8   claim pays a part of the administrative claim unless, as is

9   clearly not the case here, the debtor is financially able to

10  pay all unsecured claims in full.  Id.; see also In re

11  Bethlehem Steel Corp., 479 F.3d 167, 172 (2d. Cir. 2007),

12  and In re Texaco, Inc., 2011 U.S Dist. Lexis 111533, at *21

13  (S.D.N.Y. Sept. 28, 2011).

14       Thus, a party claiming an administrative priority

15  "must fit clearly" within the priority provision of the Code

16  in order to be entitled to such a claim.  Howard Delivery,

17  547 U.S. at 677.

18       Unfortunately, at the edges -- and, clearly, the

19  provision of electricity is at the edges -- Section

20  503(b)(9) is neither clear nor has it been clearly applied

21  by the courts.

22       The courts uniformly agree that they can be guided

23  in their interpretation of what is a "good" or what are

24  "goods" for purposes of Section 503(b)(9) by the definition

25  set forth in Section 2.105 of the Uniform Commercial Code.

1    See In re Circuit City Stores, Inc., 416 B.R. 531, 537

2    (Bankr. E.D. Va. Sept. 22, 2009), as well as In re Grede

3    Foundries, Inc, 440 B.R. 791, 797 (W.D. Wisc. 2010), and In

4    re Goody's Family Clothing, Inc., 401 B.R. 131, 134 (Bankr.

5    D. Del. 2009).  See also In re Samaritan Alliance, LLC, 2008

6    Bankr. Lexis 1830, at *6-7 (Bankr. E.D. Ky. June 20, 2008),

7    and 4-503 Collier on Bankruptcy, Paragraph 503.16[1].

8              The basis for looking to the UCC definition of

9    "goods" is well summarized in the Goody's case in light of

10   the near unanimous nationwide adoption of Article 2 of the

11   UCC and, as Judge Sontchi says in that opinion, the fact

12   that the definition of goods set forth in the UCC is

13   consistent with the ordinary non-legal meaning of the word,

14   which he takes from the dictionary: property or possessions,

15   especially movable property.

16             As Judge Sontchi also notes in Goody's, the

17   statute, as enacted in 2005, in referring only to goods

18   leads the Court to distinguish the concept from "services,"

19   which the Bankruptcy Code uses in conjunction with goods in

20   several other contexts. 401 B.R. at 135.

21             Unfortunately, however, as noted by Collier and

22   the courts that have had to deal with this issue, the term

23   "goods" as interpreted for purposes of Article 2 of the UCC

24   has not been interpreted uniformly throughout the country,

25   even though the courts applying it are interpreting a

1    uniform law.  This has contributed to the fact that the case

2    law on the more narrow issue of the applicability of Section

3    503(b)(9) to electricity is, for my purposes, evenly divided

4    on whether electricity constitutes goods or not for purposes

5    of that provision of the Bankruptcy Code.

6         Two courts addressing the issue directly and

7    applying a UCC analysis, among others, have held that for

8    purposes of Section 503(b)(9) electricity is not a good.  In

9    re Pilgrim's Pride Corp., 421 B.R. 231 (Bankr. N.D. Tex.

10   2009), and In re Samaritan Alliance, LLC, 2008 Bankr. Lexis

11   1830 (Bankr. E.D. Ky. June 20, 2008).

12        On the other hand, two courts have concluded --

13   again, looking by analogy to Article 2 UCC case law, that

14   for purposes of Section 503(b)(9) of the Bankruptcy Code

15   electricity is a good for the purposes of that section.  In

16   re Erving Industries, Inc., 432 B.R. 354 (Bankr. D. Mass

17   2010), and GFI Wis., Inc. v. Reedsburg Util. Comm'n (In re

18   Grede Foundries, Inc.), 440 B.R. 791 (W.D. Wis. 2010).

19        In large measure, the conflict between those

20   decisions is driven by a conflict in the underlying UCC case

21   law.  It's probably fair to say that a majority of courts

22   interpreting Section 2.105(1) of the UCC, which defines

23   "goods," have held that electricity is a good for purposes

24   of Article 2.  However, there is a strong minority position,

25   and as the debtors' point out, the leading cases in support

1    of that minority position are from the New York Court of

2    Appeals and the Second Circuit and the District Court for

3    the Southern District of New York.

4        The case law is noted in the parties' briefs and

5    is also well summarized in two law review articles:  William

6    R. O'Connor:  "Are You Positive Electricity is a Good?  Why

7    Electricity Should Be Considered a Service Under Section

8    503(b)(9) of the Bankruptcy Code," 42 University of Memphis

9    Law Review 187 (2011), and Colby Bailey:  "Energy 'Goods':

10   Should Article 2 of the Uniform Commercial Code Apply to

11   Energy Sales in a Deregulated Environment," 37 John Marshall

12   Law Review 281 (2003).

13       The debtors contend that given all of the

14   bankruptcy courts' deference or willingness to take guidance

15   from the UCC definition of goods for purposes of the

16   503(b)(9) analysis, I should defer to the interpretation of

17   New York's UCC, which is the same, both in terms of the

18   statute and the comments, as the Uniform Act, which, as I've

19   noted, has repeatedly held, in various contexts, that

20   electricity is not a good.

21       The debtors contend that that should be end of the

22   story, particularly in light of the fact that this contract

23   is one that is wholly governed by New York law.  The

24   electricity provided here is provided only to New York

25   locations, Hudson is a New York corporation and therefore

1    would reasonably expect that New York law would govern the

2    parties' rights under the contract.

3         The debtors cite to a number of cases that apply

4    the law of a particular state in connection with various

5    bankruptcy issues.  Most of those cases, however, deal with

6    situations where there is a property interest at stake or a

7    particular right to payment based on a claim governed by a

8    particular state law is at issue.

9         Here, the underlying right to payment is a claim

10   for $800,000+; but what is at issue before me is a priority,

11   which is governed by federal law, the Bankruptcy Code.

12   Again, see In re Texaco, Inc., 2011 U.S Dist. Lexis 111533,

13   at *11-13 (S.D.N.Y. Sept. 28, 2011).

14        There are cases, however, where courts have looked

15   to applicable state law when determining a bankruptcy law

16   right, such as in the area of non-dischargeability.  So

17   there is some logic to the debtors' argument that New York

18   law should, in fact, govern this dispute over what is a good

19   and that the Court would be uniformly applying or

20   interpreting the Bankruptcy Code as required by the

21   Constitution by adopting a uniform rule that where the

22   parties' reasonable expectations are governed by an

23   applicable state's law, that principle can be applied

24   uniformly throughout the country.  So that, for example, a

25   503(b)(9) claim where the underlying contract would clearly

1   call for the applicability of Indiana law would lead to

2   electricity being defined as a good and, therefore, an

3   administrative claim, since the Indiana courts have

4   interpreted the UCC to include electricity as a good.  See

5   In re Wabash Valley Power Ass'n, 1991 Bankr. Lexis 2213

6   (Bankr. S.D. Ind. Aug. 7, 1991), Helvy v. Wabash County

7   REMC, 278 N.E.2d 608 (Ind. App. 1972).

8            I have considered that argument carefully and have

9   decided that the Court here should not apply such a refined

10  analysis.  It is certainly conceivable to me that there

11  would be situations where sellers of electricity would have

12  a contract that would not clearly be covered by any

13  particular state's law or might provide for delivery in

14  various states, and it appears to me that it would be

15  better, therefore, to apply a uniform-throughout-the-country

16  analysis to the issue, as opposed to simply applying the New

17  York UCC's definitions to Section 503(b)(9).

18            In that sense, I agree with the analysis of this

19  issue by Judge Boroff in Erving Industries, 432 B.R. at 366,

20  note 23, in which he concludes that the definition for

21  purposes of Section 503(b)(9) is ultimately a matter of

22  federal and not state interpretation.

23            Part of that federal interpretation, I believe, is

24  the fundamental interpretive principle that I stated at the

25  beginning of this ruling, which is that administrative

1    expense claims need to be construed narrowly rather than

2    broadly, and that a claim should clearly fit within the

3    statute's provisions or definition before it is accorded

4    administrative expense treatment.

5           I conclude that this claim for the sale of

6    electricity does not clearly fall within the definition of

7    the sale of a good or goods for purposes of Section

8    503(b)(9) and, therefore, I conclude that the request for

9    the allowance of an administrative expense here should be

10   denied.

11          I do so not only because of the clear number of

12   cases that disagree, both in the narrow sense under Section

13   503(b)(9) and in the larger sense under Article 2, applying

14   the inquiry or making the inquiry as to whether electricity

15   is a good throughout the country, but I also do it because I

16   conclude that the term as used in Section 503(b)(9) does not

17   clearly apply to electricity as sold here to the debtor by

18   Hudson; that it is an ambiguous term and that the

19   legislative history and context do not support the extension

20   of the definition to include the provision of electricity,

21   whether sold by a utility or, here, by an independent non-

22   utility marketer, Hudson.

23          I am guided in large measure by the definition in

24   Section 2.105(1) of the UCC, although I do find generally

25   that it is consistent with the non-statutory definitions of

 1     the term.  Again, as set forth in Section 2.105(1) of the

 2     UCC, "goods" means "all things, including specially

 3     manufactured goods, which are movable at the time of

 4     identification to the contract for sale other than money in

 5     which the price is to be paid, investment securities

 6     (Article 8), and things in action.  'Goods' also includes

 7     the unborn young of animals and growing crops and other

 8     identifiable things attached to reality as described in the

 9     section on goods to be severed from reality (Section

10     2.107)."

11            Also relevant is Subparagraph (4) of that

12     definition, which states that, "An undivided share in an

13     identified bulk of fungible goods is sufficiently identified

14     to be sold although the quantity of the bulk is not

15     determined.  Any agreed proportion of such bulk or any

16     quantity thereof agreed upon by number, weight or other

17     measure may to the extent of the seller's interest in the

18     bulk be sold to the buyer who then becomes an owner in

19     common."

20            Official Uniform Comment number one to Section

21     2.105, which appears both in the New York UCC and the

22     uniform statute, states, among other things, "The definition

23     of goods is based on the concept of movability and the term

24     'chattels personal' is not used.  It is not intended to deal

25     with things which are not fairly identifiable as movables

1    before the contract is performed."

2         The one distinction between the UCC definition and

3    the dictionary definition, albeit definition number 2 that

4    appears in the Court's American Heritage Dictionary, is the

5    notion that it goes beyond personal property.   The

6    dictionary definition defines "goods" as:   "(1) Merchandise;

7    wares; and (2) Portable personal property."

8         Black's Law Dictionary defines goods as "tangible

9    or movable personal property other than money, especially

10   articles of trade or items of merchandise, goods and

11   services," and then "things that have value" is the second

12   definition: "things that have value, whether tangible or

13   not."

14        The problem with the definition as applied to

15   electricity is that in some sense, clearly, electricity is

16   bought and sold, and, in a deregulated world, which applies

17   to this transaction, bought and sold separate and apart from

18   the seller's being a utility.   It is, therefore, commonly

19   recognized to be a commodity, including for purposes of

20   Section 761(8)(n)(1) of the Bankruptcy Code.   See In re NBS

21   Management Services, Inc., 430 B.R. 750 (Bankr. E.D. La.

22   2010), in which the court states, citing numerous cases,

23   "Thus, no serious debate exists on the issue of

24   electricity's status as a commodity."

25        Anything that is bought and sold, as electricity

1   clearly is, must be also measurable; otherwise, it cannot be

2   such that the parties would be able to form a purchase

3   price.  Electricity also falls into that category and it is

4   measured at a meter, both in terms of hours used and amount

5   of use or BTU.

6         Broadly construed, it is also a thing.  It

7   certainly can be felt, as anyone who has had a shock knows.

8   And it is movable.  It's delivered from one place to

9   another.

10         All of these things have led the courts who have

11   found that electricity is a good, either for purposes of

12   Article 2 or for Section 503(b)(9), to conclude that it is,

13   in fact, a good.  The best analysis of this view is Judge

14   Boroff's in the Erving Industries case.  He was, in

15   particular, moved by the fact that in that case the movant,

16   the seller, was, in his view, only a seller.  It was not a

17   utility.  It had bought the electricity from the generating

18   utility and it was responsible for delivering it to the

19   debtor.

20         I am less moved by the distinction between a

21   seller like Hudson, or the claimant in Erving Industries,

22   than that opinion was, however.  It appears to me that the

23   distinction simply highlights the current marketability of

24   electricity separate and apart from the creation or

25   distribution of it.

1      But a number of courts, including courts who have

2   taken a contrary view, do not view transactions involving

3   electricity as transactions that are pure sale transactions.

4   Rather, they involve an analysis of whether the transaction

5   is fundamentally a service.  I'm not particularly moved by

6   that distinction either, although clearly there is a

7   distinction between a service and a good.  (Obviously, as

8   set forth in Goody's, it is critical that there be a seller

9   with title to the goods for purposes of 503(b)(9), but

10  that's undisputed here.).

11      My analysis really comes down to the ambiguity as

12  to whether a thing of this nature is, in fact, a "good" as

13  intended by Congress.  Even under the UCC definition, one

14  can make a very good case, as have the New York courts

15  relied upon by the debtor as well as the two bankruptcy

16  court cases that I've cited, that electricity does not fall

17  within the UCC definition.  It is not identifiable until the

18  moment it reaches the meter, and at that point it is used.

19  So it is hard to see that it is actually movable at the time

20  of identification.  It, in essence, disappears into use at

21  that moment.

22      It also is not, I believe, an identifiable bulk of

23  fungible goods.  It is simply a stream of electrical energy.

24  It is only identified, again, at the point of delivery.  And

25  consistent with the concept set forth in the Official

1    Comment that I quoted, it is not "fairly identifiable before

2    the contract is performed."  It's only identifiable at the

3    moment the contract is performed.

4         Obviously, other courts with well-reasoned

5    arguments have taken a different view, in essence delving

6    into, although they say they needn't, physics.  I believe

7    they are largely moved by the notion, which I think is

8    distinguishable, that electricity is a commodity, which I do

9    not believe clearly makes it a good, particularly for

10   purposes of Section 503(b)(9).

11        Again, the fact that something can be bought and

12   sold does not necessarily mean that it fits the definitions

13   that I've quoted.

14        In this regard, it would seem clear to me,

15   notwithstanding the directive that the Court must apply the

16   plain meaning of a statute first and foremost and never

17   inquire of the legislative history unless the statute is

18   ambiguous, that this statute, although it uses a simple

19   word, "goods," is ambiguous when applied to electricity.

20        Therefore, I believe it is incumbent to look at

21   the context of the statute when it was enacted.

22        Here, as I've noted, Congress in 2005 did

23   something unprecedented in preferring venders of goods over

24   other prepetition creditors, including taxing authorities

25   and employees, who have a more junior priority, and

 1    certainly over other prepetition creditors who supply value

 2    to a debtor within 20 days before the bankruptcy case.

 3         The statute was enacted along with and in the

 4    context of modifications to the Bankruptcy Code's

 5    reclamation provisions, at Section 546(c) of the Code.  They

 6    do not cross-reference each other and, clearly, Section

 7    503(b)(9) provides a separate and independent right to the

 8    right set forth in Section 546(c).  However, they were

 9    considered together, as noted at pages 22 and 23 of the

10    debtors' memorandum in opposition.  Clearly, one cannot

11    reclaim electricity, just as one cannot often reclaim goods

12    that have been spoiled and are not easily identifiable.  But

13    the concept of reclamation generally applies to more

14    tangible things than electricity.

15         The rationale behind granting this form of

16    preference has also been recognized, as set forth in the

17    Samaritan case, to discourage stockpiling by a debtor or an

18    entity in financial trouble prepetition, which would further

19    skew its supply relationships and its management of its

20    cash.  2008 W.L. 2520107, pages 3-4.  Obviously, electricity

21    is not something that a debtor can stockpile.  This

22    highlights, again, the other notion that I've stated, which

23    is that it is only identified at the very moment of delivery

24    because it is then used.

25         In light of all that, it would appear to me that

1   it is more likely than not that Congress intended Section

2   503(b)(9) not to apply to something like electricity, but,

3   rather, to the more colloquial definition of "goods," which

4   is a tangible thing and not a tangible thing that is

5   evanescent like electricity, but a thing that can be

6   identified before the contract is performed in a movable

7   quantity, a movable and measurable quantity.

8       But even if it's not more likely than not, it's at

9   least as likely that this was the case.  And given that, and

10  given, again, the directive to construe the statute narrowly

11  because of the preference it gives and the money it takes

12  out of other creditors' pockets, I conclude that it should

13  not be construed here broadly to equate a sale of

14  electricity with a "good."

15      I recognize that this will, in some respects,

16  inject a third element into the analysis that has already

17  taken place in the courts, which I'm reluctant to do since

18  clear guidance is the most important thing that the parties

19  need to receive from the courts in general.  But it appears

20  to me that, again, the courts have dealt with that issue in

21  Howard, Bethlehem and in other cases, i.e. where there is

22  not clear guidance with respect to an administrative expense

23  being allowable, the courts should clearly err on not

24  granting the administrative expense.  And I believe that's

25  undoubtedly the case here.

```
 1              So for those reasons I'll grant the debtor's

 2   objection and deny the request for payment of administrative

 3   expense to Hudson.

 4

 5   Dated: White Plains, New York
            October 25, 2012

 6

 7                                 /s/Robert D. Drain_____ __
                                   UNITED STATES BANKRUPTCY JUDGE
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT "4"**

# Transnational Notes



## Receipt of goods under the CISG: a threshold question when an American buyer is going bankrupt

**FEBRUARY 5, 2015**

### I. Introduction

In 2005, the U.S. Congress adopted the Bankruptcy Abuse Prevention and Consumer Protection Act, which, among other things, incorporated an effective protection for sellers of goods when a bankrupt buyer received them without paying[1]. Less than 10 years after, two recent decisions of the United States Bankruptcy Court for the Eastern District of Pennsylvania made this protection less effective when the sale is governed by the UN Convention on the International Sale of Goods (hereafter the « CISG »)[2].

In the present paper, we will first expose the general context of the litigation (I), then discuss the interpretation of this protection in US case law (II). We will after explain why the CISG applies in the cases at hand (III). Finally, we will expose why the Court went wrong in its interpretation of the CISG (IV).

### II. Legal and factual framework

The effective protection incorporated under section 503(b)(9) of the Bankruptcy Code states that the unpaid seller of a bankrupt buyer should be allowed administrative expenses[3] amounting the value of the goods. The Bankruptcy Code provides two conditions for this provision to apply. On the one hand, the transaction must occur within the ordinary course of debtor's business. On the other hand, there is a strict time limit: the debtor shall have received the goods less than 20 days before going bankrupt.

The facts under which the discussed decisions arose are common

The Center for Transnational Litigation and Commercial Law aims at the advancement of the study and practice of international business transactions and the way to solve related disputes either through litigation or arbitration. As commercial transactions become increasingly international, it is vital to the legal and business communities to understand and analyze the practices and legal principles that govern relationships between firms and between firms and consumers in the international arena

search here ...    Go

## Categories

Conflict of Laws (8)
Events (49)
Faculty News (32)
International Arbitration (47)
Miscellanea (101)
Scholarship (14)
Uniform Law (5)

## Meta

Subscribe to this blog
Get updates by email

Log in

and straightforward. Chinese sellers sent goods to an American buyer[4]. The goods were shipped FOB from different Chinese harbors more than 20 days before the bankruptcy proceeding began but arrived in the United States less than 20 days before. The core issue was to determine when the goods where received in the meaning of section 503(b)(9), in order to determine the starting point of the 20 days period.

### III. The interpretation of « *received*» under article 2 of the U.C.C.

The term « *received* » is not defined in section 503(b)(9) neither in the US Bankruptcy Code itself[5], and courts agree that the definition must be found in article 2 of the Uniform Code of Commerce (the « UCC »)[6]. This statute defines the « *receipt of goods* » as « *taking physical possession of them* »[7]. Despite the express reference to physical possession in the UCC, courts stated that possession could also be constructive[8].

It is worth noting that this definition is a uniform federal interpretation. Indeed, referring to a state interpretation of section 503(b)(9) would be impracticable in the context of large bankruptcies, given that the bankruptcy judge would have to look to the conflict of law rules of each interested state to determine the law applicable to the claim, then would define the word « *received* » in that law and finally apply this definition to the claim at hand[9].

### IV. A different definition when the CISG governs the sale of goods: two decisions of the United States Bankruptcy Court for the Eastern District of Pennsylvania

Despite this uniform interpretation, the US Bankruptcy Court for the Eastern District of Pennsylvania decided that the CISG shall provide the definition of the word « *received* » when this Convention governs the sale of goods[10]. Even if the Court went fast on this point, we will present the exhaustive analysis of the application criteria of the CISG.

In fact, five conditions have to be met for the CISG to apply. First, the contract shall be a sale of goods. Even if the CISG itself does not define what a sale of goods is, case law has defined this notion by interpreting articles 30 and 53: « *a sales contract is a contract by which the seller is obliged to deliver goods, transfer the property in the goods and eventually hand over all the documents relating to the goods, while the buyer is obliged to pay the price and take delivery of the goods[11].* » Secondly, the

object of the contract shall be tangible and movable goods[12]. Thirdly, the contract shall be international, which means, under article 1(1) of the CISG, that the parties have their places of business in different states. Fourthly, an additional applicability criteria requires that the states in which the parties have their places of business are signatories of the CISG[13] or that the international private law rules of the forum lead to the application of the law of a contracting state of the CISG[14]. Finally, the parties shall not have agreed to exclude the CISG[15].

In the cases at hand, no doubt exists on the application of the CISG. There are sales of goods between parties having their places of business in different countries. Both China and the US are signatories to the CISG, and the parties did not exclude it.

## V. The definition of the « *receipt of goods*» shall be based on the CISG, but not following the reasoning adopted by the Court

As the CISG applies, the Court was correct when stating that this Convention displaces the traditional definition found in the UCC (a), but erred in its interpretation of the CISG, mixing the interpretation of the Convention itself with the interpretation of parties' intention (b). And since the parties did not modify the CISG provisions on the receipt of goods, the general principles of the CISG provide the definition of « *receipt of goods* » (c).

### a. Interpretation of receipt of goods under the CISG: a case of first impression

As the CISG is the applicable law, the Court noted that it displaces the UCC[16]. Therefore, it displaces the interpretation of the « *receipt of goods* » as stated under article 2 of the UCC, only if this concept falls within the scope of the Convention. As article 4 of the CISG does not exclude the « *receipt of goods* » from the scope of the Convention, the above-mentioned case law based on article 2 of the UCC shall be disregarded. The interpretation of « *receipt of goods* » under the CISG is a case of first impression[17].

### b. The Court baldy interpreted the CISG

This word « *receipt* » is not defined in the CISG[18], so that the Court shall interpret this Convention to determine the meaning of this concept. The reasoning of the Court on how to interpret the CISG is unfortunately very short and confusing. The Court decided first to rely on the gap-filling analysis under article 7(2), which requires interpreting the text of the CISG in accordance

with the general principles on which it is based. Then, without any explanation of the relationship between both articles, the Court referred to article 9(2) of the Convention, which deals with the implicit application of international trade practice. On such basis, the Court held that the parties have impliedly made the Incoterms FOB applicable and that, under the Incoterms provisions on transfer of risks, the receipt was concomitant to the delivery by the seller, which occurred when the risks were transferred[19].

This reasoning mixes the interpretation of the CISG itself, governed by article 7, with the interpretation of parties' agreement, provided in articles 8 and 9. The interpretation of the CISG itself, as opposed to the interpretation of the contractual framework, is convincing when the parties did not agree to derogate from CISG's default provisions. On the contrary, when, under article 6 of the CISG, the parties derogated from the Convention, their intention shall be interpreted. Seeing the inconsistent provisions invoked by the Court, the question is whether the Incoterms provide a definition of « *receipt of the goods* », so that the court wrongly referred to article 7(2), or whether the Incoterms are not dealing with the receipt of the goods, so that the court correctly referred to article 7(2) but should have analyzed the general principles surrounding the CISG. In our opinion, the answer is the latter.

*c. The parties did not modify the CISG provisions on the receipt of the goods*

In the present case, the Court considered that the FOB term provided a contractual definition of the « *receipt of goods* ». The Court, in the decisions at hand, did not explain why its reasoning is limited to the transfer of risks. In the decision of 10 September 2014, plaintiffs were challenging the use, in the first decision, of the Incoterms as an interpretation tool to define the « *receipt of the goods* ». The Court refused to revise its position, stating first that there is « *no reason to look outside the Incoterms for a definition of « receipt[20] » »*, given that the seller delivers the goods when they are placed on board of the vessel, and that this event is concomitant to the receipt of the goods by the buyer. Secondly, it refused to consider that the Incoterms make a distinction between delivery and receipt of goods[21].

This focus on transfer of risk is absolutely not convincing. Indeed, the definition of « *receipt of goods* » is not univocal, but can revert to different moments: when the risk of loss passes, when the title passes or when a party takes possession of the goods[22].

Therefore, the Court shall first determine the definition of « *receipt of goods* » under the CISG. Then, if this definition reverts to a provision superseded by the Incoterms, such as article 67(1) of the CISG on the transfer of risks[23], the Court shall apply trade terms.

*d. General principles of the CISG concerning the receipt of goods*

Article 7(2) helps to fulfill internal gaps, by referring to general principles and, in absence of such principles, by referring to the rules of private international law of the applicable law[24]. Concerning the « *receipt of goods* », a general principle can be deducted from different provisions of the CISG, which distinguishes this concept from the transfer of risks and reverts to possession by the buyer.

First, article 38 deals with the examination of the goods by the buyer. The receipt of goods is very important in this context, as it fixes the point in time from which the « *short period* » to examine the goods runs[25]. For contracts involving the carriage of goods, article 38 states that the examination can only occur when the goods arrive at destination. When trade terms such as FOB are used, delivery occurs when the goods are transferred to the first carrier. At this time, it is impossible, or at least unreasonable, that the buyer examines the goods. Therefore, article 38(2) provides that such examination can only be performed when the goods are at destination[26]. Thus, the CISG makes a distinction between the delivery by the seller, which occurs when the goods are handled over to the first carrier, and the reception by the buyer, which occurs when the goods are at destination. In the present cases, the former reverts to transfer of risks, governed by the Incoterms. The latter concerns receipt of goods, which occurs when the buyer takes possession of them.

In the same way, article 58 states that, unless otherwise agreed, the buyer must pay the price when the seller places the goods, or documents controlling their disposition, « *at the disposal* » of the buyer[27]. The threshold question to determine disposal of the goods is « *the right to possession of the goods[28]* ». When a sale of goods involves a carriage, the disposal takes place when the goods are at the place of destination, *i.e.* when the carrier passes the goods to the buyer[29]. This reverts to the possession of the goods by the buyer. This focus on possession has been confirmed by the CISG Advisory Council in its opinion no. 11, which stated, in analyzing which documents constitute a constructive possession, that the buyer may not be left in the position of having to pay for goods when the right to possession can still be

transferred[30].

Hence, it arises out of these articles that the CISG distinguishes the transfer of risk from the receipt of goods by the buyer. And definition of « *receipt of goods* » reverts to the possession of the goods by the buyer. As the Incoterms deal with transfer of risks, the agreement of the parties does not change this definition in the present case. Concretely, this means that the American buyer received the goods when they arrived in the US harbor, and the Chinese sellers are entitled to an administrative expense.

## VI. Conclusion

Two principles govern the interpretation of article 503(b)(9) of the US Bankruptcy Code in the context of an international sale of goods under the CISG. First, the CISG provides the definition of the word « *received* », dismissing the uniform federal interpretation found in article 2 of the UCC. Secondly, the general principles surrounding the CISG distinguish the receipt from the transfer of risks, and state that the receipt occurs when the buyer takes possession of the goods.

Concerning the first principle, one may regret that this conclusion sounds the death knell of uniform federal interpretation of section 503(b)(9). However, from a practical perspective, the unmanageable burden of various states' definitions, which was the rationale for uniformity, is not relevant, as every case governed by the CISG will use the same interpretation, unless the parties otherwise agree.

On the second one, the proposed solution reconciliates the CISG with US law. Indeed, shortly after the issue of the commented decisions, some law firms advised, among other tools, to exclude the CISG when contracting with a US buyer, in order to enjoy the broader protection of article 503(b)(b) interpreted under article 2 of the UCC[31]. If US courts adopt the interpretation proposed in this paper, the CISG will continue to be an interesting legal framework for international sales of goods when the buyer is American.

**Alexandre Hublet**

The author is a Class of 2015 LL.M student in the International Business Regulation, Litigation and Arbitration program at the New York University School of Law. He obtained his law degree at the *Université libre de Bruxelles (ULB)* in 2012, after which he

took the oath at the Brussels' bar and worked for two years in a major Belgian law firm. In the mean time, he collaborated with the Perelman Center for Legal Philosophy at the ULB, focusing his research on global justice.

_____

[1] See section 503(b)(9) of the US Bankruptcy Code; *In re Momenta, Inc.,* 455 B.R. 353 (2011)

[2] *In re World Imps., Ltd.*, 511 B.R. 738 (18 June 2014) and *In re World Imps.,* 2014 Bankr. LEXIS 3858 (10 September 2014)

[3] An administrative claim is « *a first priority claim that is much more likely than a general unsecured claim to be paid in full or substantially in full upon any distribution to creditors.* » See Michael A. Tessitore, *The U.N. Convention on International Sales and the Seller's Ineffective Right of Reclamation Under the U.S. Bankruptcy Code,* 35 Willamette L. Rev. 367 (1999), p. 383

[4] In fact each case concerns two Chinese exporters. In the June 18's case, one exporter sent all the goods to the buyer, the second one sent a part directly to the buyer's consumers, the other to the buyer. As the Court dismissed the case because of the 20 days limitation, it made no distinction between the goods sent to the buyer and the goods sent to the consumers. In the September 10's case, one of the exporter sent all the goods directly to the buyer's consumers. The other exporter sent a part of the goods directly to the buyer's consumers, the other to the buyer. The Court dismissed the claim of the first corporation because the buyer never *received* the goods. The goods sent directly to the buyer were shipped less than 20 days before the bankruptcy, so that there was no time issue. However, the Chinese exporters contested the reasoning of the June 18's case, but the court affirmed its position. See *In re World Imps., Ltd.*, op. cit. (18 June 2014) and *In re World Imps.,* op. cit. (10 September 2014)

[5] *In re Wezbra*, 455 B.R. 493 (2013), p. 770; *In re Momenta, Inc.,* 455 B.R. 353 (2011), at 358

[6] *In re Circuit City Stores, Inc.,* 432 B.R. 225, 228 (Bankr.E.D.Va.2010), at 228 ; *In re Momenta, Inc.,* op. cit.. ; *In re Wezbra*, op. cit., p. 770-771

[7] Even if both statutes do not use the same wording, Courts consider both expressions as functional equivalent (see *In re Circuit City Stores Inc.*, op. cit., at 229)

[8] The detailed reasoning can be found in *In Re Momenta*, op.

cit., at 361; see also *In re Wezbra*, op. cit., p. 771

[9] *In re Circuit City Stores Inc.*, op. cit., at 228

[10] *In re World Imps., Ltd.*, op. cit. (18 June 2014), p.6

[11] Tribunale di Forli, 11 December 2008 at 2.2, available at
http://cisgw3.law.pace.edu/cases/081211i3.html

[12] Tribunale di Forli, op. cit., at 2.3. The present cases do not
mention the type of goods involved. As the issue is not raised, we
will assume these are tangible and movable goods.

[13] Art. 1(1)(a) of the CISG

[14] Art. 1(1)(b) of the CISG; please note that both United States
and China made a reservation under article 95 of the CISG not to
be bound by article 1(1)(b)

[15] Art. 6 of the CISG

[16] *In re World Imps.,* op. cit. (18 June 2014), p. 6

[17] *In re World Imps.,* op. cit. (18 June 2014), p. 6

[18] *In re World Imps.,* op. cit. (18 June 2014), p. 6

[19] *In re World Imps.,* op. cit. (18 June 2014), pp. 6-8

[20] *In re World Imps.,* op. cit. (10 September 2014), pp. 6

[21] *In re World Imps.,* op. cit. (10 September 2014), pp. 5-7

[22] *In re momenta*, op. cit., at. 358

[23] J. CUOTZEE, *The interplay between Incoterms © and the
CISG*, Journal of Law & Commerce, Vol 23, No. 1 (2013), p. 12

[24] H. MATHER,*Choice of Law for International Sales Issues
not Resolved by the CISG*, 20 Journal of Law and Commerce 155
(2001), pp 156-158

[25] P. SCHLECHTRIEM & I. SCHWENZER, *Commentary on
the UN Convention on the International Sale of Goods (CISG)*,
third edition, Oxford, 2010, pp. 607 et s.

[26] Id., p. 618

[27] See art. 58 of the CISG

[28] CISG Advisory Council Opinion, no. 11, at 5.3, available at
http://www.cisg.law.pace.edu/cisg/CISG-AC-op11.html

[29] P. SCHLECHTRIEM & I. SCHWENZER, op. cit., pp. 847-848

[30] CISG Advisory Council Opinion, no. 11, op. cit., at 5.3

[31] See Gibson Dunn, International Shipments Deemed "Received" by Debtor When Delivered to Common Carrier "FOB Port of Origin" – Rather Than Physically Received – for Purposes of Granting an Administrative Expense Claim Under Section 503(B)(9) of the Bankruptcy Code, Aug. 18 2014 available at http://www.gibsondunn.com/publications/pages /International-Shipments-Deemed-Received-by-Debtor-When-Delivered-to-Common%20Carrier-FOB-Port-of-Origin.aspx; Montgomery McCracken, Bankruptcy and Commercial Transactions with Foreign Entities: What Law Governs?, July 8, 2014, available at http://www.mmwr.com/home/news-and-publications/alerts-and-resources/default.aspx?d=5826

© 2019 Transnational Notes | Accessibility