**HEARING DATE: DECEMBER 13, 2019 at 10:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: NOVEMBER 18, 2019 at 4:00 p.m. (Eastern Time)**

Mark Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue, Floor 11
New York, New York 10022
212.593.1100
mfrankel@bfklaw.com

and

Matthew A. Olins (admitted *pro hac vice*)
Vanessa R. Tiradentes (admitted *pro hac vice*)
GOULD & RATNER LLP
222 North LaSalle Street, Suite 800
Chicago, IL 60601
312.236.3003
molins@gouldratner.com
vtiradentes@gouldratner.com

*Attorneys for 233 S. Wacker, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SEARS HOLDING CORPORATION, *et al.*, | ) Case No. 18-23538 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF MOTION OF 233 S. WACKER, LLC FOR**
**ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

PLEASE TAKE NOTICE OF THE FOLLOWING:

A hearing to consider the Motion (the "*Motion*") of 233 S. Wacker, LLC ("*233*") for

Allowance and Payment of Administrative Expense Claim will be held before the Honorable

Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the

Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, on

December 13, 2019 at 10:00 a.m. (Eastern Time).

Objections, if any, to the Motion must be made no later than November 18, 2019 at 4:00

p.m. (Eastern Time) (the "*Objection Deadline*") and be filed and served in accordance with the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, the Amended Order Implementing Certain Notice and Case Management Procedures [Docket No. 405] and General Order M-399 of this Court.

If no objection is timely filed and served in accordance with the Case Management Procedures, then 233 may, on or after the Objection Deadline, submit the proposed order to the Court substantially in the form attached to the Motion, which may be entered without further notice or opportunity to be heard.

Dated:  November 8, 2019

Respectfully submitted,

**233 S. WACKER, LLC**

By: /s/ Mark Frankel
  One of Its Attorneys
Mark Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue, Floor 11
New York, New York 10022
212.593.1100
mfrankel@bfklaw.com

and

By: /s/ Matthew A. Olins
  One of Its Attorneys
Matthew A. Olins (admitted *pro hac vice*)
Vanessa R. Tiradentes (admitted *pro hac vice*)
GOULD & RATNER LLP
222 North LaSalle Street, Suite 800
Chicago, IL 60601
312.236.3003
molins@gouldratner.com
vtiradentes@gouldratner.com

**HEARING DATE: DECEMBER 13, 2019 at 10:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: NOVEMBER 18, 2019 at 4:00 p.m. (Eastern Time)**

Mark Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue, Floor 11
New York, New York 10022
212.593.1100
mfrankel@bfklaw.com

and

Matthew A. Olins (admitted *pro hac vice*)
Vanessa R. Tiradentes (admitted *pro hac vice*)
GOULD & RATNER LLP
222 North LaSalle Street, Suite 800
Chicago, IL 60601
312.236.3003
molins@gouldratner.com
vtiradentes@gouldratner.com

*Attorneys for 233 S. Wacker, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SEARS HOLDING CORPORATION, *et al.*, | ) | Case No. 18-23538 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MOTION OF 233 S. WACKER, LLC FOR ALLOWANCE**
**AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

233 S. Wacker, LLC ("*233*"), by and through its attorneys, Backenroth Frankel &

Krinsky, LLP and Gould & Ratner LLP, moves this Court for allowance and payment of an

administrative expense claim (the "*Administrative Claim*"), pursuant to section 503(b)(1) of title

11 of the United States Code (the "*Bankruptcy Code*") in the bankruptcy cases of the above

captioned debtors and debtors in possession (the "*Debtors*"), and for the Debtors to reserve

sufficient amounts to pay the Administrative Claim pending its adjudication.  In support of this

Motion, 233 respectfully states as follows:

## INTRODUCTION

1.      233 requests allowance and payment of the Administrative Claim for the amounts 233 has and will continue to incur since the Debtors' bankruptcy petition date (the "*Petition Date*") in connection with the sculpture (the "*Sculpture*") that was formerly in the lobby of the Willis Tower located in Chicago, Illinois (and now sits in storage) and in connection with 233's dispute with Debtors Sears Holdings Corporation ("*Sears Holdings*") and Sears, Roebuck and Co. ("*Sears Roebuck,*" and collectively with Sears Holdings, "*Sears*") concerning the Sculpture. Among other things, and as set forth more fully below, these amounts include 233's costs and expenses incurred storing and insuring the Sculpture, 233's costs in connection with reassembly of the Sculpture, 233's attorney's fees, and reimbursement to 233 for any damage or diminishment in value to the Sculpture since the Petition Date.

2.      To the extent the Debtors contemplate contesting 233's right to an Administrative Claim, they must represent to this Court that storage, insurance, and the other costs associated with the Sculpture are unnecessary and that 233 may stop paying them.  Of course, the Debtors cannot make such representations.  Rather, Sears mistakenly believes that it is entitled to buy the Sculpture from 233, and is wrongfully forcing 233 to spend 233's resources preserving and protecting the Sculpture at its current location while the Debtors spend their resources gambling on litigation.

3.      The amount of the Administrative Claim will continue to accrue and will not be fully known until after the resolution of Sears and 233's litigation concerning the Sculpture. However, 233 is filing this Motion at this time based upon the ballot deadline contained in the Debtors' Administrative Expense Claims Consent Program and Section K. of this Court's Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors and (ii) Granting Related Relief (the "*Confirmation Order*") that

provides that motions for allowance and payment of administrative expense claims filed after entry of the Confirmation Order "shall be treated as a proof of an Administrative Expense Claim."   (Confirmation Order, p. 26.)    233 previously put the Debtors on notice of its Administrative Claim, both in its proofs of claim and in communications with counsel to the Debtors.

## JURISDICTION AND VENUE

4.    This court has jurisdiction of the subject matter hereof pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory basis for this Motion is section 503(b)(1) of the Bankruptcy Code.

## FACTUAL BACKGROUND

**The Settlement Agreement**.

5.    On July 1, 2013, 233 and Sears entered into the Settlement Agreement and Mutual Release (the "*Settlement Agreement*," a copy of which is attached hereto as Exhibit A and incorporated herein).   In the Settlement Agreement, 233 and Sears agreed to attempt to effectuate a sale of the Sculpture, which is further described in the Settlement Agreement, to a bona fide third party purchaser (the "*Third Party Sale*") within twenty-four months.

6.    The initial two-year, Third Party Sale period was extended by mutual agreement of 233 and Sears to June 30, 2016.  The Settlement Agreement further provided that Sears was to have "sole control and complete discretion…with respect to any and all efforts to effectuate a third party sale including …(iv) the negotiation and acceptance or rejection of any offers by potential purchasers/bidders/others; (v) the terms and conditions of any potential or actual third party sale; and (vi) any decisions whether to sell the [the Sculpture]."  (Settlement Agreement at § 2(a).)

7.     The Settlement Agreement further provided the manner in which the proceeds of the Third Party Sale were to be distributed (the "*Sale Formula*").  In general, such proceeds were to be applied first to reimbursement of costs incurred by Sears in marketing and selling the Sculpture and by 233 in maintaining and insuring the Sculpture during the Third Party Sale period; second, the sum of $3,625,000.00 for the benefit of 233, third, the next $3,625,000.00 to Sears; fourth, reimbursement of certain additional costs incurred by Sears; fifth, reimbursement of certain additional costs to 233; sixth, the next $3,000,000.00 to be divided equally by Sears and for the benefit of 233; and seventh, any remaining proceeds to be divided 67% to Sears and 33% for the benefit of 233, all as detailed in the Settlement Agreement.  (*See* Settlement Agreement at§ 2(f) for a more complete description of the Sale Formula.)

8.     It was the mutual intent and reasonable expectation of 233 and that the Sculpture would be sold to the highest bona fide third party bidder so that the distribution of proceeds as provided in the Settlement Agreement would be maximized for the mutual benefit of 233 and Sears.

9.     On or about June 23, 2016, Sears received an offer to purchase the Sculpture for the lump sum of $13,600,000.00 (the "*June 2016 Offer*"), payable in immediately available funds at closing to occur on or before June 30, 2016.

**<u>Sears's Breach of the Settlement Agreement</u>.**

10.     Sears did not accept or respond to the June 2016 Offer.  Instead, just seven days later, on June 30, 2016, Sears served notice to 233 "as a courtesy" that Sears "will purchase" the Sculpture for $3,860,625.00, which if such sale occurred would deprive 233 the benefit of its share of the $13.6 million June 2016 Offer that Sears refused.

11.     Sears's exercise of its authority over the sale of the Sculpture pursuant to the Settlement Agreement was done unreasonably, with improper motive, arbitrarily, capriciously

and/or in a manner inconsistent with the reasonable expectations of the parties under the Settlement Agreement, and violated Sears's good faith and fair dealing obligations under Illinois law (which governs the Settlement Agreement). Further, on information and belief, Sears has not used reasonable and good faith efforts to market and sell the Sculpture to a bona fide third party purchaser. Sears has materially breached the Settlement Agreement, and Sears is jointly and severally liable for the damages incurred by 233 as a result. 233 has performed all obligations required of it under the Settlement Agreement and that were not excused as a consequence of Sears' material breach.

**The State Court Litigation and 233's Prepetition Claim.**

12.     On August 4, 2016, Sears filed an action against 233 in the Circuit Court of Cook County, Illinois, County Department, Chancery Division (Case No. 2016-CH-10308) (the "*State Court Litigation*") requesting specific performance of the sale of the Sculpture from 233 to Sears. 233 asserted a counterclaim in the State Court Litigation against Sears for Sears's breach of its duty of good faith and fair dealing in connection with its obligations to market the Sculpture and share the proceeds of a sale with 233.

13.     As a direct and proximate consequence of Sears's breaches of the Settlement Agreement, 233 has been damaged in an amount not fully known at present but potentially in excess of $6,000,000.00 as of the Petition Date (the "*Prepetition Claim*"). These damages are currently being decided in the State Court Litigation and are based on the terms of the Settlement Agreement and incidental costs 233 has incurred and include, but are not limited to, a combination of certain of the following as of the Petition Date:

(i)     Amounts 233 would have received from a sale of the Sculpture pursuant to the June 2016 Offer under the terms of the Settlement Agreement, including but not limited to, interest due from Sears under the terms of the Settlement Agreement.

The precise amount is unknown, but is currently being litigated and liquidated in the State Court Litigation. Pursuant to the Sale Formula, it is $6,230,500.00 (minus certain costs incurred by Sears in marketing and selling the Sculpture and reimbursement of certain additional costs incurred by Sears) (plus certain costs incurred by 233 in maintaining and insuring the Sculpture, reimbursement of certain additional costs incurred by 233, and interest) as adjusted by 233's retention or subsequent sale of the Sculpture accounting for any decrease in resale value below the $13,600,000 amount contained in the June 2016 Offer or decrease in value of the Sculpture while it is being stored in a storage facility.

(ii)     Amounts paid to BRE 312 Owner LLC ("*BRE*"), the current owner of the Willis Tower, for storage, removal, and insurance costs that were to be borne by Sears under the Settlement Agreement but have been paid by 233. This amount totals $600,000, some of which is attributable to the post-petition period and is included in the Administrative Claim.

(iii)    Costs incurred to insure the Sculpture in the storage facility and paid by 233. As of the Petition Date, those amounts were $39,432.60. Insurance costs have and continue to accrue since the Petition Date and are included in the Administrative Claim.

(iv)    Costs incurred in connection with re-assembly of the Sculpture. This amount is unknown at this time but is at issue in the State Court Litigation.

(v)     Attorneys' fees and expenses incurred as a result of Sears's breach of the Settlement Agreement pursuant to Section 23 of the Settlement Agreement. This amount is unknown at this time but is at issue in the State Court Litigation.

14.     233 has filed Proof of Claim #14102 in Sears Holdings case, and Proof of Claim

#13878 in Sears Roebuck's case, reflecting the Prepetition Claim.

**233's Post-Petition, Administrative Claim**

15.      Since the Petition Date, 233 has been required to continue to pay for storage of the Sculpture.  As of November 8, 2019, storage costs during the post-petition period has totaled approximately $37,566.04.   Approximately $29,516.26 of this amount was originally paid by BRE, which has since been reimbursed by 233 as part of a larger settlement.  This amount has and will continue to accrue until the resolution of the State Court Litigation.

16.      Since the Petition Date, 233 has been required to continue to pay for insurance for the Sculpture.  As of November 8, 2019, insurance costs during the post-petition period have totaled approximately $31,695.60, of which $18,678.60 was paid by 233 to Driesassur USA, LLC, and approximately $13,017.00 was paid by BRE to Willis of NY, and BRE has since been reimbursed by 233 as part of a larger settlement.    This amount has and will continue to accrue until the resolution of the State Court Litigation.

17.      233 will also incur costs in costs incurred in connection with re-assembly of the Sculpture and has and will continue to incur attorney's fees since the Petition Date.

18.      233 is also entitled to reimbursement to the extent there has been damage to the Sculpture, and to the extent that the Sculpture has diminished in value since the Petition Date.

19.      Separate from the amounts listed above, if Sears wins the State Court Proceeding, it will, among other things, be required to pay 233 $3,860,625.00, which represents the forced sale price of the Sculpture.  One of the requirements of the specific performance remedy that Sears seeks in the State Court proceeding is Sears's ability to perform under the Settlement Agreement.  Therefore, even if Sears does prevail, it will also be required to pay 233 the full amount of the $3,860,625.00 forced sales price before the forced sale may occur.

## RELIEF REQUESTED AND BASIS THEREFOR

20.    233 requests that this Court grant 233 allowance and payment of its Administrative Claim, pursuant to section 503(b)(1) of the Bankruptcy Code, and for the Debtors to reserve sufficient amounts to pay it prior its final adjudication.  Section 503(b)(1)(A) of the Bankruptcy Code provides for an administrative expense claim for "the actual necessary costs and expense of preserving the state…."  11 U.S.C. § 503(b)(1)(A).  For the reasons discussed below, 233 is entitled to allowance and payment of its Administrative Claim for amounts 233 has and will continue to incur since the Debtors' Petition Date in connection with the Sculpture and in connection with 233's dispute with Sears concerning the Sculpture.

**233 Is Entitled To Its Administrative Claim If Sears Wins The State Court Proceeding.**

21.    If Sears wins the State Court Proceeding, and 233 is compelled to sell the Sculpture to Sears, then 233 will be entitled to an administrative expense claim for the amounts it has spent storing, insuring, and otherwise preserving and protecting the Sculpture.  Storing, insuring, and otherwise preserving and protecting what would become an estate asset (if Sears wins the State Court Proceeding) that Sears believes it can sell for the benefit of creditors clearly falls into the plain language of section 503(b)(1)(A) of the Bankruptcy Code.  *See e.g. In re Jarriel*, 518 B.R. 140 (Bankr. S.D. Ga. 2014) (bank's forced-place insurance payments on debtor's equipment was administrative expense); *In re Aerospace Tech., Inc.*, 199 B.R. 331, 340-41 ("It is well established that providing storage for property of the estate constitutes 'preserving the estate' within the meaning of § 503(b)(1)(A)") (citing *In re Great Northern Forest Products, Inc.*, 135 B.R. 46, 59 (Bankr.W.D.Mich.1991)).

22.    As discussed above, even if Sears wins the State Court Proceeding, it will, among other things, also be required to pay 233 $3,860,625.00, which represents the forced sale price of the Sculpture, before the forced sale may occur.

**233 Is Entitled To An Administrative Claim If 233 Wins The State Court Proceeding.**

23.    If 233 wins the State Court Proceeding, the Debtors will also be liable for 233's costs and expenses incurred storing, and insuring the Sculpture, and also 233's costs in connection with reassembly of the Sculpture, 233's attorney's fees, and reimbursement for any damage or diminishment in value to sculpture since the Petition Date.

24.    In *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), the Supreme Court, construed the provision for payment of administrative expenses set out in the Bankruptcy Act of 1898, the Bankruptcy Code's predecessor. The Court held that administrative expenses included compensation for torts committed in the operation of a debtor's business in bankruptcy, even though the tortious conduct itself did not "preserve" the bankruptcy estate. According to the Court, "decisions in analogous cases suggest that 'actual and necessary costs' should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *Id.* at 483, 88 S.Ct. 1759.

25.    Based upon *Reading*, courts have concluded that post-petition breach of contact claims fall within the Bankruptcy Code's definition of administrative expense. *See In re Eagle–Picher Indus., Inc.*, 447 F.3d 461, 464 (6th Cir. 2006) (citing *Nostas Assocs. v. Costich (In re Klein Sleep Prods.*), 78 F.3d 18, 26 (2d Cir.1996); *United Trucking Serv. v. Trailer Rental Co. (In re United Trucking Serv.)*, 851 F.2d 159, 162–63 (6th Cir.1988)).

26.    If 233 wins the State Court Litigation, 233 will have incurred the costs of storing and insuring the Sculpture, costs in connection with reassembly of the Sculpture, and attorney's fees. Additionally, the Sculpture may have diminished in value as a result of any damage to and as a result of the State Court Litigation. All of these damages are a direct result of Sears's breach of duty of good faith and fair dealing under the Settlement Agreement and its insistence on continuing that breach post-petition through the State Court Litigation in its gamble that it will

win the Sculpture.  Sears must pay the cost of its bet if it loses.

27.    To the extent that Sears disagrees that the costs resulting from its State Court Litigation gamble, whether Sears wins or loses, benefit the estate, then surely Sears would have no objection to 233 ceasing to make storage, insurance, and other payments in connection with the Sculpture.  But of course it would object, because such action would result in irreparable harm to the Sculpture, which is being kept in limbo as a result of Sears's actions.

**Reservation of Rights.**

28.    The amount of the Administrative Claim continues to accrue, and certain components of the Administrative Claim are being litigated and liquidated in the State Court Litigation.   233 files this Motion at this time to assert its contingent and unliquidated Administrative Claim, prior to the deadline under the Administrative Expense Claims Consent Program, so that it may exercise its rights.  Give that the Administrative Claim continues to grow and could also include new items in addition to accruing amounts, 233 reserves its right to amend and update its request for an administrative expense claim as well as file other requests for administrative expense claims.

## NOTICE

29.    Notice of this Motion will be provided in accordance with the procedures set forth in the Amended Order Implementing Certain Notice and Case Management Procedures [Docket No. 405].  233 respectfully submits that no further notice is required.

## NO PRIOR REQUEST

30.    No previous request for the relief sought herein has been made by 233 to this or any other Court.

WHEREFORE, 233 respectfully requests that this Court grant this Motion and enter an order in the proposed form attached hereto (i) granting 233 allowance and payment of the

Administrative Claim for amounts 233 has and will continue to incur since the Debtors' Petition Date in connection with the Sculpture and in connection with 233's dispute with Sears concerning the Sculpture in an amount to be determined at a later date, (ii) requiring the Debtors to reserve an appropriate amount to pay the Administrative Claim, and (iii) granting 233 such other and further relief as this Court deems just.

Dated:  November 8, 2019

Respectfully submitted,
**233 S. WACKER, LLC**


By:/s/ Mark Frankel
       One of Its Attorneys
Mark Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue, Floor 11
New York, New York 10022
212.593.1100
mfrankel@bfklaw.com

and

By:/s/ Matthew A. Olins
       One of Its Attorneys
Matthew A. Olins (admitted *pro hac vice*)
Vanessa R. Tiradentes (admitted *pro hac vice*)
GOULD & RATNER LLP
222 North LaSalle Street, Suite 800
Chicago, IL 60601
312.236.3003
molins@gouldratner.com
vtiradentes@gouldratner.com

# EXHIBIT A

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

**THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE** ("Agreement") is entered into and made effective as of the 1st day of July, 2013 ("Effective Date"), at Chicago, Illinois, by and among SEARS, ROEBUCK AND CO. ("SEARS"), SEARS HOLDINGS CORPORATION ("SEARS HOLDINGS"), and 233 S. WACKER LLC ("233 S. WACKER") (each, individually, a "Party," and collectively, the "Parties").

### R E C I T A L S:

**WHEREAS**, SEARS, SEARS HOLDINGS, and 233 S. WACKER are presently parties to a lawsuit (the "Action") pending in the Circuit Court of Cook County, County Department, Chancery Division, entitled <u>233 S. Wacker LLC v. Sears, Roebuck and Co. and Sears Holdings Corp.</u>, 10 CH 42462, concerning Sears' right to purchase the Alexander Calder sculpture (the "Calder") presently located in the lobby of the building located at 233 S. Wacker Drive in Chicago, Illinois (the "Building") pursuant to that certain Option Agreement (Calder Sculpture) (the "Option Agreement"), dated November 7, 1994, and attached to SEARS' Amended Counterclaims in the Action as Exhibit 2;

**WHEREAS**, U.S. Bank National Association, as successor Trustee to Wells Fargo Bank, N.A. (as successor Trustee to LaSalle Bank National Association), as Trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C2, Commercial Mortgage Pass-Through Certificates, Series 2007-C2, having an address c/o Wells Fargo Bank, N.A., 550 South Tryon Street, 14th Floor, Charlotte, North Carolina 28202 MAC D1086-120 (together with its successors and assigns, "Mortgagee"), as Mortgagee of the Building, the personal property contained therein, and the land on which it sits (the Building, the personal property, and the land, collectively, the "Property"), has a security interest in the Calder ("Lien");

3913525_11

**WHEREAS**, the Parties have determined that it is in their best interests to settle all pending claims now existing between them; and

**WHEREAS**, the Parties have expressly agreed that this settlement is not, and shall not be construed as, an admission as to their actual rights or liabilities.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    **Recitals**.  The above Recitals are fully incorporated into this Agreement.

2.    **Third-Party Sale of The Calder**.  The Parties agree to attempt to effectuate a sale of the Calder to a bona fide third party purchaser ("Third Party Sale") within 24 months from the Effective Date of this Agreement.  The period of time between the Effective Date of the Agreement and the earlier of (i) the closing of a Third Party Sale or (ii) 24 months from the Effective Date of this Agreement shall be referred to herein as the "Third Party Sale Period," which may be extended pursuant to Section 4 hereof.  SEARS and/or SEARS HOLDINGS shall promptly deliver to 233 S. WACKER a true and correct copy of any sale contract entered into with a bona fide purchaser.  In the event SEARS and SEARS HOLDINGS agree to finance the sale price in connection with a Third Party Sale, SEARS and SEARS HOLDINGS shall remain liable to pay 233 S. WACKER in full its share of the Total Proceeds as described in Section 2(f) as if there was no financing and it were a cash sale.

a.    SEARS shall have sole control and complete discretion during the Third-Party Sale Period (including any Extension Period, pursuant to Section 4 hereof) with respect to any and all efforts to effectuate a Third Party Sale, including but not limited to, the following:

2

3913525 11

(i)     The retention of, and the terms and conditions of any agreements with, any art advisors, consultants, conservators, auction houses, title insurers, and/or brokerage agents;

(ii)    The marketing of the Calder;

(iii)   The purchase, and the negotiation of the terms of, any title insurance on the Calder;

(iv)    The negotiation and acceptance or rejection of any offers by potential purchasers/bidders/others;

(v)     The terms and conditions of any potential or actual Third Party Sale; and

(vi)    Any decisions whether to sell the Calder.

All costs and expenses paid to independent third parties and associated with these and any other efforts, activities, and decisions with respect to a Third Party Sale ("Pre-Third Party Sale Costs") will be advanced by SEARS and reimbursed per Section 2.f hereof. Notwithstanding the foregoing, SEARS will work with 233 S. WACKER to develop a marketing strategy to sell the Calder. 233 S. WACKER shall have the right to approve all marketing materials, which consent shall not be unreasonably withheld or delayed. In addition, SEARS shall cause its representative to be available to 233 S. WACKER on a monthly basis to discuss status of any potential buyers and written offers, and SEARS will cause its representative to promptly forward to 233 S. WACKER copies of any offers that SEARS is willing to accept. Notwithstanding Sections 2(a)(iv) and (v) hereof, SEARS shall not accept any offer for Third Party Sale that would result in net proceeds less than an amount sufficient to make the Payment B referenced in Section 2(f)(ii) hereof.

3

3913525 11

b.    Within seven (7) business days after the Effective Date of this Agreement, 233 S. WACKER will request a registration number (which may or may not already have been assigned) for the Calder from the Calder Foundation, and, thereafter, will diligently pursue obtaining such a number. SEARS and/or SEARS HOLDINGS will cooperate and assist 233 S. Wacker to apply for same.

c.    233 S. WACKER will provide any and all information and documents in its possession or control requested by any title insurer(s) selected by SEARS and will execute all applications, forms and other documentation reasonably requested by such title insurer(s).

d.    233 S. WACKER shall fully cooperate with SEARS in (i) obtaining information relating to the Calder, including, but not limited to, requesting information and access (including direct access by SEARS and/or SEARS HOLDINGS, their counsel, and/or their agents, if requested) to information from the Calder Foundation; (ii) marketing the Calder for sale, including, but not limited to, providing access to the Calder during business hours with not less than two (2) business days advance written notice; and (iii) removing and relocating the Calder after a sale is consummated, which may include obtaining any necessary permits. The reimbursement of costs incurred by 233 S. WACKER with respect to the removal and relocation of the Calder after a sale is consummated as set forth in this Section shall be governed by Section 2(f)(iv) hereof. All inspections of the Calder and all removal work shall be done at times designated by 233 S. WACKER in its reasonable discretion.

e.    233 S. WACKER shall repair or cause to be repaired any damage to the Building caused by the removal of the Calder, including the restoration and repair of all surfaces from which the Calder is removed, using new materials which match as closely as is reasonably

4

3913525 11

practicable to the then existing finishes.  The reimbursement of costs incurred by 233 S. WACKER for such repairs and restoration shall be governed by Section 2(f)(iv) hereof.

        f.    If the Calder is sold to a third party during the Third Party Sale Period (including any Extension Period, pursuant to Section 4 hereof), the proceeds from the Third Party Sale ("Total Proceeds") shall be distributed as follows, in the following order until the Total Proceeds fully are distributed:

        (i)    First, reimbursement to SEARS and SEARS HOLDINGS ("Payment A-1") for any Pre-Third Party Sale Costs, which may include, but shall not be limited to, costs incurred and/or payments made to independent third parties with respect to the following:

    (A)    Art advisors/consultants;

    (B)    Appraisals done after the Effective Date of this Agreement;

    (C)    Marketing costs;

    (D)    Conservators and/or condition reports;

    (E)    The Calder Foundation; and

    (F)    Title Insurance;

AND

reimbursement to 233 S. WACKER ("Payment A-2") for any costs incurred and/or payments made to independent third parties with respect to the following:

    (A)    Maintenance during the Third Party Sale Period (including any Extension Period, pursuant to Section 4 hereof);

    (B)    Insurance during the Insurance Period pursuant to Section 7 hereof; and

    (C)    The Calder Foundation.

3913525_11

To qualify for reimbursement, all Payment A-1 and Payment A-2 costs must be documented by invoices or other reasonable documentation identifying the amount(s) charged or paid.

(ii)    Second, the sum of Three Million Six Hundred Twenty-Five Thousand Dollars ($3,625,000.00) to 233 S. WACKER ("Payment B"). In no event shall Payment A-1 and A-2 reduce Payment B, and SEARS and SEARS HOLDINGS will be responsible for the shortfall if any to ensure that Mortgagee in all events receives not less than $3,625,000. Payment B shall be made to Mortgagee as directed by 233 S. WACKER.

(iii)   Third, the next Three Million Six Hundred Twenty-Five Thousand Dollars ($3,625,000.00) to SEARS ("Payment C").

(iv)    Fourth, reimbursement to SEARS, SEARS HOLDINGS, and/or 233 S. WACKER ("Payment D") for any costs or expenses which were incurred following the Third Party Sale and were necessary to effectuate the Third Party Sale (the "Post-Third Party Sale Costs"), which may include, but shall not be limited to, costs incurred and/or payments made to independent third parties with respect to the following:

(A)    Title insurance;

(B)    Brokerage fees;

(C)    Sales, transfer, or other taxes (excluding any federal or state income tax);

(D)    Removal of the Calder from the Building;

6

3913525.11

(E)  Repairs of any damage to the Building caused by the removal of the Calder as set forth in Section 2.e of this Agreement;

(F)  Transportation costs and/or storage fees of the Calder.

To qualify for reimbursement, all Payment D costs must be documented by invoices or other reasonable documentation identifying the amount(s) charged or paid.

(v)  Fifth, reimbursement to 233 S. WACKER ("Payment E") for all costs and fees, including attorneys' fees, payable to the Mortgagee incurred by 233 S. WACKER to procure the Mortgagee's consent to this Agreement and the Lien Releases (as hereinafter defined). In no event shall Payment E exceed Fifteen Thousand Dollars ($15,000.00).

(vi)  Sixth, SEARS and 233 S. WACKER shall divide equally up to Three Million Dollars ($3,000,000.00) of the remaining proceeds ("Payment F"), provided in no event shall the allocation of proceeds under this subparagraph (v) cause the total amount distributed under subparagraphs (i) through (v) of this Section 2.f to exceed Eleven Million Dollars ($11,000,000.00).  233 S. WACKER's share of Payment F shall be paid to Mortgagee as directed by 233 S. WACKER.

(vii)  Seventh, the remaining proceeds (the "Secondary Remaining Proceeds") shall be distributed 67% to SEARS and 33% to 233 S.

7

3913525 11

WACKER ("Payment G"). 233 S. WACKER's share of Payment G shall be paid to Mortgagee as directed by 233 S. WACKER.

g.     In the event of a Third Party Sale, as between the Parties hereto, removal of the Calder from the Building will be at the sole risk and expense of SEARS and SEARS HOLDINGS, except with respect to any negligence of 233 S. WACKER. 233 S. WACKER shall reasonably cooperate with any third party removal companies employed to remove the Calder from the Building, provided, however, such removal shall be made in accordance with any reasonable requirements imposed by 233 S. WACKER's property manager. In the event of a Third Party Sale, SEARS and SEARS HOLDINGS will ensure that the Calder is removed from the Building within a commercially reasonable time after the closing of the Third-Party Sale, or as otherwise agreed to by 233 S. WACKER and the third party purchaser of the Calder (the "Third Party Sale Removal Period"). During the Third Party Sale Removal Period, the third party purchaser shall secure and maintain insurance on the Calder, and shall fully reimburse 233 S. WACKER for any and all costs incurred and/or payments made to independent third parties with respect to maintaining the Calder in good and safe condition and any repairs made to the Building necessitated by the removal of the Calder from the Building. To qualify for reimbursement, any and all such maintenance costs must be documented by invoices or other reasonable documentation identifying the amount(s) charged or paid.

3.     Custody and Maintenance During the Third Party Sale Period.

a.     233 S. WACKER agrees to keep the Calder in its present location in the Building during the Third Party Sale Period (including any Extension Period, pursuant to Section 4 hereof).

8

b.    233 S. WACKER covenants that it will take all actions reasonably necessary to maintain the Calder in a good and safe condition throughout the later of (i) the end of a Third Party Sale, (ii) the Third Party Sale Period (including any Extension Period, pursuant to Section 4 hereof), or (iii) the physical transfer of the Calder to SEARS pursuant to Section 5 of this Agreement.

4.    **Option to Extend the Third Party Sale Period.** The Parties may mutually agree to extend the initial 2-year Third Party Sale Period for one (1) additional year (the "Extension Period") by written agreement on or before March 31, 2015. If the Parties exercise their option to extend the Third Party Sale Period, no interest shall accrue on the Purchase Price referenced in Section 5 hereof throughout the term of the Extension Period.

5.    **Purchase by SEARS at the End of the Third Party Sale Period.**

a.    If the Calder is not sold to a third party during the Third Party Sale Period (including any Extension Period, pursuant to Section 4 hereof), SEARS shall, within thirty (30) days after the end of the Third Party Sale Period (including any Extension Period, pursuant to Section 4 hereof), purchase the Calder from 233 S. WACKER for Three Million Six Hundred Twenty Five Thousand Dollars ($3,625,000.00), plus interest calculated at Wall Street Journal Prime Rate from the Effective Date of this Agreement to the date that the Third Party Sale Period (excluding any Extension Period, pursuant to Section 4 hereof) expires (the "Purchase Price"). The Purchase Price shall be paid to Mortgagee as directed by 233 S. WACKER;

b.    In exchange for the payment of the Purchase Price, 233 S. WACKER will execute and deliver a Bill of Sale for the Calder to SEARS, free and clear of all liens or security interests, in the form attached hereto as Exhibit "A" (the "Bill of Sale") and provide the Lien

9

3013525_11

releases (the "Lien Releases") of the Lien for the Calder, in the forms attached hereto as <u>Exhibit</u>
"<u>B</u>" (the "SEARS Closing");

        c.      Within sixty (60) days after the SEARS Closing, SEARS shall remove the
Calder from the Building (the "Removal Period").

        d.      During the Removal Period, SEARS shall secure and maintain insurance
on the Calder, and shall fully reimburse 233 S. WACKER for any and all costs incurred and/or
payments made to independent third parties with respect to maintaining the Calder in good and
safe condition and any repairs made to the Building necessitated by the removal of the Calder
from the Building.  To qualify for reimbursement, any and all such maintenance costs must be
documented by invoices or other reasonable documentation identifying the amount(s) charged or
paid.

        e.      Removal of the Calder from the Building will be at the sole risk and
expense of SEARS and SEARS HOLDINGS, except with respect to any negligence of 233 S.
WACKER.  233 S. WACKER shall reasonably cooperate with any third party removal
companies employed by SEARS or SEARS HOLDINGS to remove the Calder from the
Building, provided, however, such removal shall be made in accordance with any reasonable
requirements imposed by 233 S. WACKER's property manager.

      6.     **Party Representations and Covenants.**

        a.      233 S. WACKER represents and warrants that it has taken all actions
reasonably necessary to maintain the Calder in a good and safe condition pursuant to its
obligations under Section 5 of the Option Agreement.

        b.      233 S. WACKER represents and warrants that, as of the Effective Date of
this Agreement, except for the Lien, there are no other liens or encumbrances on the Calder.  233

10

3913525_11

S. WACKER further covenants that it will not at any time on or after the Effective Date sell or transfer the Calder, pledge or encumber the Calder, grant any security interest in the Calder, or enter into any agreement to pledge, transfer, encumber or grant a security interest in the Calder, or perform any actions detrimental to the title or value of the Calder.

       c.    The Parties hereby represent to one another that they have full power and authority to enter into this Agreement and carry out all of their obligations hereunder. The Parties further represent that (i) all necessary corporate action has been duly taken to authorize the execution and delivery of this Agreement and (ii) that this Agreement has been duly executed and delivered.

7.    **Insurance.**

       a.    233 S. WACKER agrees to continue to maintain fine arts insurance coverage, which insurance limit shall be in an amount of not less than Seven Million Two Hundred Fifty Thousand Dollars ($7,250,000.00) ("Coverage Limit"). 233 S. WACKER shall deliver to SEARS a copy of a certificate of insurance evidencing the coverage. It is the intent of the parties that the Coverage Limit for the Calder shall be paid out first in the event of a loss impacting the acquired coverage such that the loss of the Calder due to an insured event shall always be paid for by said insurance. Upon execution of this Agreement, 233 S. WACKER shall deliver to SEARS a certificate of insurance naming SEARS and SEARS HOLDINGS as the certificate holder. All required insurance on the Calder as set forth in this Section shall be effective from the Effective Date of this Agreement through the later of (i) a Third Party Sale, (ii) the end of the Third Party Sale Period (including any Extension Period, pursuant to Section 4 hereof), or (iii) the SEARS Closing (the "Insurance Period"). In the event of a loss of the Calder due to an insured event during the Insurance Period, 233 S. WACKER agrees to promptly file an

insurance claim and reasonably cooperate with the insurance carrier in order to settle the claim in a timely manner, provided, however, the insurance claim shall be settled in 233 S. WACKER's sole discretion. Upon receipt of the insurance proceeds, Mortgagee shall be entitled to receive the sum of Three Million Six Hundred Twenty Five Thousand Dollars ($3,625,000.00), and SEARS and SEARS HOLDINGS shall be paid the next Three Million Six Hundred Twenty Five Thousand Dollars ($3,625,000.00). Notwithstanding the above, in no event shall SEARS and SEARS HOLDINGS receive less than Three Million Six Hundred Twenty Five Thousand Dollars ($3,625,000.00) and 233 S. WACKER will be responsible for the shortfall to SEARS and SEARS HOLDING, if any, in connection with the loss of the Calder, to ensure that SEARS and SEARS HOLDINGS in all events receive not less than $3,625,000.00.

8.      **Indemnity.**   233 S. WACKER agrees to indemnify SEARS and SEARS HOLDINGS against any and all third party claims and/or expenses related in any way to the Lien or any other pledge of, or lien or encumbrance placed on, the Calder by 233 S. WACKER, including any claims asserted by the Mortgagee or any other lender to 233 S. WACKER, or by the Mortgagee's and/or such lender(s)' successors and assigns, with the exception of any claims or expenses arising solely out of SEARS' and/or SEARS HOLDINGS' actions.

9.      **Release of Lien.** 233 S. WACKER shall be obligated to procure the Releases, in the forms attached hereto as Exhibit "B", upon a Third Party Sale or the sale of the Calder to SEARS pursuant to this Agreement. 233 S WACKER agrees to bear any costs or other consideration to be paid to Mortgagee in consideration of such Releases. In, and only in, the event of a Third Party Sale, shall 233 S. Wacker be entitled to reimbursement of the Mortgagee's costs and attorneys' fees as set forth in Section 2(f)(v) above.. Simultaneous with its entry into this Agreement, 233 S. WACKER shall deliver to SEARS a side letter from the Mortgagee

12

consenting to the terms and provisions of this Agreement including its agreement to a Third Party Sale in accordance with the terms and provisions hereof ("Mortgagee's Consent").

10.    **Dismissal.** Within fourteen (14) days after the Parties execute this Agreement, the Parties shall cause the Action to be dismissed with prejudice, each party to bear its own attorneys' fees and costs, with the Court retaining jurisdiction to enforce this Agreement.

11.    **Mutual Releases**. The following Mutual Releases shall become effective on the later of the date that the Calder is removed from the Building by SEARS pursuant to Section 5.c of this Agreement or the payments referenced in Section 2.f of this Agreement are made.

a.    233 S. WACKER for itself and on behalf of its past, current and future agents, employees, representatives, contractors, officers, directors, members, owners, partners, shareholders, subsidiary companies, parent companies, affiliates, related entities, successors and assigns in interest, hereby releases SEARS and SEARS HOLDINGS, including their past, current and future agents, employees, representatives, contractors, officers, directors, members, owners, partners, shareholders, subsidiary companies, parent companies, affiliates, related entities, successors and assigns in interest from all claims, demands, judgments, and causes of action, whether in law or in equity (collectively "Claims") that 233 S. WACKER now or could in the future have against SEARS or SEARS HOLDINGS arising out of any matter relating to the Claims that were or could have been asserted in the Action or are in any way related to the Calder. This release, however, does not include Claims arising out of a failure of a Party to perform in conformity with the terms of this Agreement.

b.    SEARS and SEARS HOLDINGS and their past, current and future agents, employees, representatives, contractors, officers, directors, members, owners, partners, shareholders, subsidiary companies, parent companies, affiliates, related entities, successors and

13

3913525 11

assigns in interest, hereby release 233 S. WACKER, including its past, current and future agents, employees, representatives, contractors, officers, directors, members, owners, partners, shareholders, subsidiary companies, parent companies, affiliates; related entities, successors and assigns in interest from all Claims that SEARS or SEARS HOLDINGS now or could in the future have against 233 S. WACKER arising out of any matter relating to the Claims that were or could have been asserted in the Action or are in any way related to the Calder. This release, however, does not include Claims arising out of a failure of a Party to perform in conformity with the terms of this Agreement.

        c.     The Parties represent to one another that they are the current owners of the Claims they purport to release in this Agreement. In the event that an action is maintained by some other party to enforce any such Claim, the Party who purported to release the Claim shall indemnify the remaining Parties for (i) all attorneys' fees, disbursements, and expenses incurred by them in defending the Claim and (ii) all payments made or losses sustained by them in the event judgment is entered or a settlement reached.

     12.    **Confidentiality**.  The Parties agree that they will not disclose to anyone, other than their legal counsel, their prospective purchasers, the Mortgagee, tax advisers or taxing bodies, or cause to be disclosed to anyone else through another, except to the extent required by State or Federal laws or to facilitate a Third Party Sale, the terms of this Agreement. All inquiries relating to the Agreement or any Third Party Sale shall be directed to Sears' public relations department.

     13.    **Recording**.  SEARS may record in the public record a memorandum of this Agreement in the form attached hereto as Exhibit "C" and made a part hereof.

14

14.    <u>Voluntary Agreement</u>.    The Parties acknowledge and agree that they have reviewed this Agreement with counsel, fully understand its terms, and enter into it voluntarily.

15.    <u>No Reliance</u>.  The Parties acknowledge and agree that they have relied upon their own judgment and on the advice of their own attorneys and not on any advice, statement, or representation of any other Party or Party's counsel.

16.    <u>No Modification</u>.  This Agreement cannot be modified or amended except in writing signed by all Parties.

17.    <u>Drafting and Interpretation.</u>  No Party or that Party's respective attorney is to be deemed the drafter of this Agreement for any purpose, including but not limited to the construction of its provisions.

18.    <u>Severability</u>.  Whenever possible, each provision of this Agreement is to be interpreted in such a manner as to be valid and enforceable. If, however, one or more provisions are held not to be valid or enforceable, such invalidity or unenforceability will not affect the validity or enforceability of the remainder of this Agreement.

19.    <u>Successors and Assigns</u>.  This Agreement inures to the benefit of and is binding upon the Parties and their respective successors, successors-in-interest, and assigns. Notwithstanding the foregoing sentence, neither SEARS nor SEARS HOLDINGS shall assign, transfer or pledge its rights, title or interest hereunder except to a corporate affiliate or in a merger or purchase of substantially all of the assets of SEARS or SEARS HOLDINGS, and 233 S. WACKER shall not assign its rights, title or interest hereunder except to a purchaser of the Building.

3913525_11

20.    **Further Assurances**. The Parties agree to cooperate fully and to take all actions which are consistent with and which may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

21.    **Entire Agreement**. This Agreement embodies the entire understanding of the Parties. All prior representations and agreements, whether oral or in writing, have been merged into and replaced by this Agreement.

22.    **Counterparts**. This Agreement may be executed by each of the Parties in counterparts with the same effect as if the Parties had signed the same copy.

23.    **Attorneys' Fees**. Except in the case of enforcement or a breach of this Agreement, each Party will bear its own attorneys' fees with respect to the Calder, the Option Agreement, the Action, and their entry into this Agreement. In no event will Mortgagee's attorneys' fees or costs, if any, be the responsibility of SEARS or SEARS HOLDINGS, all of which shall be the responsibility of 233 S. WACKER. In, and only in, the event of a Third Party Sale, shall 233 S. Wacker be entitled to reimbursement of the Mortgagee's costs and attorneys' fees as set forth in Section 2(f)(v) above.. If a Party breaches this Agreement, the breaching Party shall reimburse the non-breaching Parties for all reasonable attorneys' fees and expenses incurred by them as a result of the breach.

24.    **Governing Law**. This Agreement shall be governed in accordance with the laws of the State of Illinois. The Parties mutually agree that the Circuit Court for Cook County, County Department, Chancery Division, and to the extent possible, Judge Mary Anne Mason presiding, shall maintain jurisdiction over this matter in order to enforce and effectuate this Agreement, and the Parties agree to personal jurisdiction and venue in said Court in any proceeding to enforce the terms of this Agreement.

25.    **Single Points of Contact**.

a.    For SEARS and SEARS HOLDINGS, James Terrell (3333 Beverly Road, Hoffman Estates, Illinois 60179; email: james.terrell@searshc.com) will be the single point of contact for communications regarding the Third Party Sale.

b.    For 233 S. WACKER, Yisroel Gluck (8114 North Lawndale Street, Skokie, Illinois 60076; 847-568-0808; email: y.gluck@americanlandmark.com) will be the single point of contact for communications regarding the Third Party Sale. Courtesy copies of all correspondence shall be sent to the Building manager, Gary Michon, 233 South Wacker Drive, Suite 3500, Chicago, Illinois 60606, 312-875-3679; email: gmichon@willistower.com.

26.    **Signature Page**. Signatures appear on the following page.

17

SEARS HOLDINGS CORPORATION

By: _Will K. Phel_

Its: _SVP - Finance_

Date: _06/28/2013_


SEARS, ROEBUCK AND CO.

By: _[signature]_

Its: ~~James B. Terrell~~
Vice President Real Estate

Date: _____


233 S. WACKER LLC

By: _____

Its: _____

Date: _____


RE MANAGER
LEGAL

18

3913525_11

**SEARS HOLDINGS CORPORATION**

By: _____

Its: _____

Date: _____

**233 S. WACKER LLC**

By: _____

Its: President

Date: July 1, 2013

**SEARS, ROEBUCK AND CO.**

By: _____

Its: _____

Date: _____

18

3913525_11

EXHIBIT "A"

## BILL OF SALE

**233 S. WACKER LLC**, a Delaware limited liability company ("**Seller**"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby grant, sell, assign, convey, and transfer to **SEARS, ROEBUCK and CO.**, a New York corporation ("**Buyer**"), its successors and assigns, all right, title and interest in and to the mechanical three dimensional sculptural work of art commonly known as The Universe created by Alexander Calder (American, 1898-1976) (the "**Work**," a description and copy of which is attached hereto as Exhibit A), including without limitation Seller's rights, if any, to (i) sue any third parties for claims relating to the Work, and (ii) any contracts, intellectual property and intangible rights relating to the Work, to have and to hold the same, its successors and assigns, for its use, benefit and behalf forever, with full title warranty and guarantee, and all other warranties and guarantees as follows:

(a) Seller has owned the Work since March 11, 2004. Prior thereto, the provenance of the Work is as follows:

    (i) The Work is an original Alexander Calder sculpture, as more particularly described on Exhibit A attached hereto.

    (ii) From the time of its completion and installation the Work has resided in the lobby of 233 S. Wacker Dr., Chicago, Illinois.

    (iii) The Work does not violate or infringe any copyrights, moral rights or other intellectual property rights of any third party or contain material which may cause harm or injury or which is contrary to law. There is no assertion or claim of any violation or infringement of any copyright of others whether statutory or common law or of any claim of libel.

(b) The Work is sold and subject to all of the terms, conditions, representations and warranties contained in the Settlement Agreement and Mutual Release dated May____, 2013 between Seller and Buyer (the "Agreement"), and all such terms, conditions, representations and warranties of the parties thereunder are incorporated herein by this reference as if fully set forth herein in their entirety. All capitalized terms not defined in this Bill of Sale shall have the same meaning as set forth in the Agreement.

(c) Seller represents and warrants that upon delivery by Seller to Buyer of the Work and full payment of the Purchase Price by Buyer as defined in Section 5 of the Agreement, good and marketable title and exclusive and unrestricted right to possession of the Work, free and clear of all Claims (as defined below), will pass from Seller to Buyer.

BILL OF SALE

(d) Seller represents and warrants to Buyer that (i) the Work is authentic, that is, the Work is an original Alexander Calder sculpture, as more particularly described on Exhibit A attached hereto; (ii) the Seller has full right and legal authority to execute and deliver this Bill of Sale and to make these representations and warranties; (iii) the Seller is able in accordance with this Bill of Sale to transfer the Work to Buyer, free and clear of any and all rights or interests of others, claims, liens, pledges, title defects, security interests or other encumbrances held or claimed by any person or entity and relating to the Work (the "Claims"); (iv) the Seller has no knowledge of any Claims threatened or pending, nor knowledge of any facts or circumstances likely to give rise to any Claims; (v) the Seller has provided Buyer with all information, documents, and materials available to Seller or of which Seller is aware concerning the Work, including its authenticity, provenance, and description; (vi) the Seller has not restored or repaired any part of the Work.

(e) The representations and warranties contained in this Bill of Sale and all other terms hereof, shall survive the delivery of this Bill of Sale and transfer of the Work.

(f) Seller represents and warrants that there are and have been no material disputes between Seller and any other party concerning the Work. There are no actions, suits or proceedings to which Seller is a party, or which are pending, or to the knowledge of Seller threatened against Seller, which affect the Work, before any court, governmental department, commission, foundation, board, agency or instrumentality, and Seller is not subject to any order, injunction or decree of any court, governmental department, commission, foundation, board, agency or instrumentality relating to or affecting the Work. There are no judgments against Seller relating to the Work. There are no UCC encumbrances relating to the Work

(g) Seller covenants and agrees that Buyer retains its right to enter the premises of 233 S. Wacker Dr., Chicago, Illinois within sixty (60) days of the date hereof to disassemble and remove, or cause to be disassembled and removed, the Work from said premises, all in accordance with the provisions of the Agreement.

(h) Seller agrees to indemnify, defend and hold Buyer harmless from and against all demands, suits, judgments, damages, losses or other liability, including all attorney or other professional fees and expenses resulting from any breach or alleged breach of or falsity or inaccuracy of any of Seller's representations or warranties (express or implied) or other terms set forth in this Bill of Sale.

(i) The terms and conditions of this Bill of Sale shall be binding upon Seller, and its successors, successors-in-interest, and assigns and shall inure to the benefit of Buyer and its successors, successors-in-interest, and assigns.

Seller covenants and agrees that it will at any time, and from time to time, after the date of this Bill of Sale, upon the request of Buyer, execute, acknowledge, deliver and perform, or cause to be executed, delivered, or performed, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be required of Seller for complete

BILL OF SALE

vesting and confirming unto Buyer of the title to and possession of the Work and all of the assets, properties and rights of the Work acquired by Buyer from Seller hereunder.

*[Remainder of page intentionally left blank; signature page follows.]*

BILL OF SALE

IN WITNESS THEREOF, Seller has executed this Bill of Sale as of the _____ day of _____, 201___

**SELLER:**

**233 S. WACKER LLC,**
a Delaware limited liability company

By: _____
Name: _____
Its: _____

STATE OF _____ )
                                                  ) ss.
COUNTY OF _____ )

On _____ before me, _____, a Notary Public in and for the State of Illinois, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged to me that he freely executed the within instrument and that, by his signature on the within instrument, he intended to be bound by its terms.

WITNESS my hand and official seal.

_____
Signature

## EXHIBIT A

### Description of The Universe, 1974

1) Medium: Painted metal; motors

2) Measurements: (overall) 33 feet H x 55 feet L; weighs over 16,000 pounds; (spine) 33 feet high; (pendulum) 9 foot diameter x 22 foot arm; (sun) 7 1/2 foot diameter; (helix) 25 feet long x 7 feet high

3) Signature and Inscriptions: signed Calder

4) Provenance:
   a) Commissioned from the artist via Galerie Lelong, Paris, France by Sears, Roebuck, and Company via Mr. Bruce Graham of Skidmore Owings & Merrill, architect of Sears Tower.
   b) Dedicated on October 25, 1974

5) Fabricated at: foundry in Tours, France

6) General Contractor (Installation): Diesel Construction, Chicago, Illinois

7) Visual Description: Motorized sculpture comprised of five separate parts - floor to ceiling spine with ten pennant-shaped extensions colored red, yellow, blue, and black; against the wall is three amoebic shapes colored red, blue, and black representing flowers; also against the wall is a 9 foot diameter black pendulum suspended from a 22 foot long arm; suspended from the ceiling are two 7 1/2 foot diameter discs which intersect, representing the sun, painted red, orange, and black; on the floor is mounted a 25 foot long x 7 foot high black helix.

BILL OF SALE



Alexander Calder (1898 - 1976) - The Universe, 1974

EXHIBIT "B"
LIEN RELEASES

*Attached*

UCC FINANCING STATEMENT AMENDMENT

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

File Number: 20070231113   Filed on: 03-01-2007  Delaware SOS

The sculpture known as "The Universe," by Alexander Calder, which sculpture is currently installed on the ground level of the office building known as the "Willis Tower" (f/k/a the "Sears Tower").

To be recorded with the Delaware SOS

U.S. Bank National Association, as Successor Trustee to Wells Fargo Bank, N.A. as successor successor to LaSalle Bank National Association (See Schedule 1.1, column)

55183-00004A

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

UCC FINANCING STATEMENT AMENDMENT ADDENDUM

2007 9423435, Filed on 02/01/2007. Delaware SOS

U.S. Bank National Association. (See Section 13, below, for full organization name):

Print     Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

Debtor: 233 S. Wacker LLC

Secured Party: U.S. Bank National Association, as successor
Trustee to Wells Fargo Bank, N.A. (as successor trustee to LaSalle Bank
National Association), as Trustee for the registered holders of LB-UBS
Commercial Mortgage Trust 2007-C2, Commercial Mortgage Pass-Through
Certificates, Series 2007-C2.

Delaware SOS

Premises:  The sculpture known at "The Universe," by Alexander Calder,
which sculpture is currently installed on the ground level of the office
building known as the "Willis Tower" (f/k/a the "Sears Tower"), located
at 233 South Wacker Drive, Chicago, Illinois 60606.

EXHIBIT "C"

MEMORANDUM OF AGREEMENT

*Attached*

**PREPARED BY
AND ATER RECORDING
RETURN TO:**

Greenberg Traurig, LLP
Attention: Jason Toon
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601

(For Recorder's Use Only)

## MEMORANDUM OF AGREEMENT

This MEMORANDUM OF AGREEMENT ("Memorandum") is entered into and made effective as of the ___ day of June, 2013 (the "Effective Date"), by and among SEARS, ROEBUCK AND CO. ("SEARS"), SEARS HOLDINGS CORPORATION ("SEARS HOLDINGS"), and 233 S. WACKER LLC ("233 S. WACKER") (each, individually, a "Party," and collectively, the "Parties")

### RECITALS:

A.    SEARS, SEARS HOLDINGS, and 233 S. WACKER are presently parties to a lawsuit (the "Action") pending in the Circuit Court of Cook County, County Department, Chancery Division, entitled 233 S. Wacker LLC v. Sears, Roebuck and Co. and Sears Holdings Corp., 10 CH 42462, concerning Sears' right to purchase the Alexander Calder sculpture (the "Calder") presently located in the lobby of the building located at 233 S. Wacker Drive in Chicago, Illinois (the "Property") pursuant to that certain Option Agreement (Calder Sculpture) (the "Option Agreement"), dated November 7, 1994, and attached to SEARS' Amended Counterclaims in the Action as Exhibit 2.

B.    On June _____, 2013, 233 S. WACKER and SEARS entered into that certain Settlement Agreement and Mutual Release (the "Agreement") pursuant to which they established the terms and conditions under which the Parties have resolved the pending claims now existing between them in the Action.

NOW, THEREFORE, in consideration of the covenants and agreements contained in the Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties' agree as follows:

1.    Record Notice. This Memorandum is prepared for the purposes of providing record notice of the Agreement and to protect the rights and interests of the Parties as to third parties.

All capitalized terms not specifically defined herein shall have the meaning given to such terms in the Agreement.

    2.  <u>Conflict.</u>  In the event of any conflict or any inconsistency between the terms and provisions of the Agreement and the terms and provisions of this Memorandum, the terms and provisions of the Agreement shall control.  Nothing contained in this Memorandum shall alter, modify or amend the provisions of the Agreement (or the exhibits thereto), which remain in full force and effect according to all of the terms and provisions thereof.

    3.  <u>Successors and Assigns</u>. The Agreement inures to the benefit of and is binding upon the Parties and their permitted respective successors, successors-in-interest, and assigns.  This Memorandum also shall be binding upon and inure to the benefit of the Parties and their permitted respective successors, successors-in-interest, and assigns.

*(Signatures appear on the following page.)*

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum as of the Effective Date.

**233 S. WACKER LLC,**

By:_____.

Subscribed and Sworn to this ____
day of _____, 2013.

_____

Notary Public

**SEARS, ROEBUCK AND CO.**

By: _____

Subscribed and Sworn to this ____
day of _____, 2013.

_____

Notary Public

**SEARS HOLDINGS CORPORATION**

By:_____

Subscribed and Sworn to this ____
day of _____, 2013.

_____

Notary Public

## SCHEDULE I

## LEGAL DESCRIPTION

# PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDING CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

**ORDER GRANTING MOTION OF 233 S. WACKER, LLC FOR**
**ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

Upon the Motion (the "*Motion*") of 233 S. Wacker, LLC ("*233*") for Allowance and

Payment of Administrative Expense Claim, the Court having jurisdiction to consider the Motion

and the relief requested therein; consideration of the Motion and the relief requested therein

being a core proceeding; venue being proper before this Court; due and proper notice of the

Motion having been provided, and no other or further notice need be provided; the Court having

reviewed the Motion and having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; upon all of the proceedings had before

the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS ORDERED THAT**:

1.      The Motion is granted.

2.      233 is granted an allowed administrative expense claim (the "*Administrative*

*Claim*") pursuant to section 503(b)(1) of title 11 of the United States Code in an amount to be

determined by this Court at later date upon request of 233 or the Debtors.

3.      The Debtors shall reserve $_____ for payment of the Administrative

Claim.

4.        The matter is continued to _____ __, ____ for further status.


_____, New York


_____
UNITED STATES BANKRUPTCY JUDGE