UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
: 
In re : Chapter 11 Case No.
:
SEARS HOLDINGS CORPORATION, *et al.*, : 18-23538 (RDD)
Debtors.[1] :
: (Jointly Administered)
:
:
------------------------------------------------------------------ X

## SECOND SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF TRANSFORM HOLDCO LLC'S ADVERSARY COMPLAINT

1. Transform Holdco LLC ("Transform") respectfully submits this second supplemental memorandum of law in support of its *Adversary Complaint*, ECF No. 4033. At the hearing on September 12, 2019 (the "September 12 Hearing"), the Court invited supplemental briefing on the issue of damages arising from Transform's claim that Debtors violated Section 8.6 of the Asset Purchase Agreement (the "APA"), "limited to what's in the record." Hr'g. Tr. 237:16-17, Sept. 12, 2019.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

2. Transform offered substantial reliable evidence that, assuming Debtors violated Section 8.6 of the APA, it suffered significant damages as a result of that breach. That evidence included testimony from the team responsible for handling Debtors' finances that it was the routine practice of Debtors not to pay accounts payable before they were due, documentary evidence with regard to the payments that were planned to be made in the week before Closing to satisfy the accounts payable that were due, the emails with the instruction that accounts payable that were due should not be paid, expert testimony that Debtors failed to pay $89 million of accounts payable due in the week prior to the Closing that Debtors had planned to pay before the instruction was given to suspend the payment of accounts payable that were contractually due, and percipient testimony that—immediately following the Closing—Transform had to pay $150 million in accounts payable that had become due and payable prior to Closing. It also included ample inferences that the Court can draw from the extensive evidence in the record regarding Debtors' cash position in the weeks before Closing, evidence which supports the notion that Debtors would not have paid debts before they became due.

3. At the time of Closing, there was $189 million in accounts payable due on Debtors' books, only $23 million of which Debtors retained. Transform was damaged in the amount of at least the additional $66 million in accounts payable Debtors were obligated to pay before the Close and now refuse to satisfy.[2] $50 million of that was paid by Transform after Debtors repudiated their obligations and takes the form of an administrative claim against Debtors. Transform should likewise be relieved from paying the remaining $16 million of accounts payable that have not been paid and that properly remain the obligation of Debtors.

---

[2] Transform does not include in this amount the significant consequential damages it suffered.

2

## I. Transform Is Entitled to Damages for Debtors' Breach of Contract

4. Transform recognizes that the Court held against Transform with regard to Debtors' liability under Section 8.6 of the APA at the September 12 Hearing. For purposes of this briefing and because that ruling is still subject to appeal, Transform assumes that the Court accepted its argument that Debtors breached Section 8.6. That provision required Debtors, in the disjunctive to (1) "make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement until the Closing Date in all material respects on a timely basis" and (2) "otherwise manage the accounts payable of the business in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business." APA § 8.6. Another section of the APA, Section 2.3(k)(v), provides that Transform will assume other payables outstanding at the time of Closing in an amount not to exceed $166 million. As Transform has argued, the two provisions are complementary: Transform agreed to pay those accounts payable that were outstanding as of the Closing and after Debtors had paid the accounts payable that accrued prior to Closing on a timely basis. It did not agree that Debtors could shift the responsibility for all accounts payable up to $166 million simply by failing to pay their debts as they became due.

5. Transform also submitted evidence that Debtors breached their covenant under Section 8.6 by not paying accounts payable as they became due. That evidence included emails, attaching the Daily Cash Forecasts, that were sent by Debtors' finance team every business day in the week before Closing that instructed and informed that Debtors were delaying payments that were "contractually due" that week.[3] See *Second Supplemental Declaration of Christopher A.*

---

[3] Debtors had access to the Daily Cash Forecasts and several of these documents have been filed on the record. See *Declaration of Robert A. Riecker in Support of Transform Holdco LLC's Adversary Complaint* ("Riecker Decl."), ECF No. 4772, Ex. E (Daily Cash Forecast of February 4, 2019); Id., Ex. G (Daily Cash Forecast of February 8, 2019).

3

*Good in Support of the Debtors' Supplemental Memorandum of Law in Support of the Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Second Supp. Good Decl."), ECF No. 4977, Ex. D at 1 (Daily Cash Forecast of February 4, 2019) ("In order to manage 1L outstanding on Feb 8th, we are delaying certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days."); id., Ex. E at 1 (Daily Cash Forecast of February 5, 2019) (same); id., Ex. F at 1 (Daily Cash Forecast of February 6, 2019) (same); id., Ex. G at 1 (Daily Cash Forecast of February 7, 2019) ("In order to manage 1L outstanding on Feb 7th, we are delaying certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days."); id., Ex. H at 1 (Daily Cash Forecast of February 8, 2019) ("In order to maintain $850 1L outstanding balance, certain payments contractually due this week have been delayed until next week."); *Declaration of Robert A. Riecker in Support of Transform Holdco LLC's Adversary Complaint* ("Riecker Decl.") ¶¶ 13-14, ECF No. 4772 ("On Monday, February 4, 2019, Debtors, in consultation with M-III, directed that payments should not be made on accounts payable that would become due the following day. . . . Debtors made the same decision to delay payments each day after February 5 up until the Close.").

6. Following the Closing, Transform has paid over $150 million in accounts payable. *Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Brief in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement and in Support of the Adversary Complaint* ¶ 15, ECF No. 4458.

### A.   Delaware Law Does Not Require Damages to Be Proven with Certainty

7. Under Delaware law, which governs the interpretation and application of the APA, see APA § 13.8, once a party has established a breach of contract it is entitled to expectation

4

damages.  "[E]xpectation damages [are] measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." Duncan v. Theratx, Inc., 775 A.2d 1019, 1022 (Del. 2001).  "Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost."  Id.  Courts applying Delaware law "do[] not 'require certainty in the award of damages where a wrong has been proven and injury established.'"  Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC, Civ. A. No. 3718-VCP, 2010 WL 338219, at *23 (Del. Ch. Jan. 29, 2010) (citation omitted).  Importantly, "once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."  Thorpe v. CERBCO, Inc., Civ. A. No. 11713, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993) (citing Donovan v. Bierwirth, 754 F.2d 1049, 1056 (3d Cir. 1985)).

8.    While the plaintiff has the burden of establishing damages, "[e]vidence [of damages] that is unrebutted when presented by one side . . . should . . . be considered conclusive." Patton v. Yancy, No. CV N13A-10-006 JAP, 2014 WL 4674600, at *2 (Del. Super. Ct. Sept. 22, 2014) (quoting Amalfitano v. Baker, 794 A.2d 575, 578 (Del. 2001)) (internal quotations omitted). Moreover, a plaintiff need not offer "a mathematically precise formula as to the amount of damages"—a factfinder may make a damages calculation based on a "'just and reasonable estimate' of the damages caused."  Grace v. Corbis-Sygma, 487 F.3d 113, 119 (2d Cir. 2007) (quoting Raishevich v. Foster, 247 F.3d 337, 342 n.2 (2d Cir. 2001)); see also Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946) (damages may be established "as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business" and a factfinder is "allowed to act on probable and inferential as well as (upon) direct and positive proof") (internal quotations and citations omitted).

5

### B. Transform Has Provided a Just and Reasonable Estimate of the Damages Caused

9. There is ample evidence in the record from which the Court can reach a just and reasonable estimate of the damages caused. Those damages stem from the $89 million of accounts payable that were due prior to Closing but that Debtors failed to pay. As a result of Debtors' failure to pay those debts when they became due and repudiation of their obligation to pay them after the Closing, Transform was forced to pay an additional $50 million after Closing that it would not have had to pay had Debtors honored their contract. In addition, it is faced with an additional $16 million of claims that Debtors have refused to pay and for which Debtors have argued Transform is liable.[4]

10. Specifically, there is evidence that on Monday, February 1, 2019, one week before the Closing, Debtors estimated that they would make $158 million in payments before week end for accounts payable and CIA orders. *Second Supplemental Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Adversary Complaint* ("Second Supp. Hede Decl."), ECF No. 4769, Ex. A at 2. That evidence is uncontradicted in the record. There also is evidence, that is uncontradicted, that Debtors paid over $100 million less than they planned to pay that week. The February 8, 2019 Daily Cash Forecast reflects that the company only made $57 million in actual cash disbursements that week, $101 million less than forecasted. Id. at 2-3 n.3; Riecker Decl., Ex. G (Daily Cash Forecast of February 8, 2019).

11. That $101 million should be reduced for CIA payments planned but not made in the week before Closing. Those planned but not made CIA payments are not accounts payable. The APA provides a separate mechanism for Debtors' failure to make planned CIA payments; it

---

[4] It is undisputed that Debtors are liable for the $23 million in delayed payments of accounts payable above the $166 million threshold established by APA § 2.3(k)(v).

6

provides that Transform's responsibility for the Assumed Liabilities is reduced by the amount by which the CIA inventory is below $147 million. APA § 2.3(k)(ix). Ernst & Young's ("EY") analysis reflected that the $158 million of planned disbursements for the week of February 1 included $26 million of disbursements for CIA orders. It also reflected that of that $26 million, Debtors disbursed $14 million in CIA orders, meaning that $12 million of the $101 million in disbursements planned for the week of February 1 but not made were for CIA and not for accounts payable. Second Supp. Hede Decl., Ex. A at 2 n.2; Riecker Decl., Ex. G. Accounting for that $12 million amount, Debtors had $89 million in payments that they planned to make the week of February 1 for contractually due accounts payable but failed to make, resulting in the impermissible transfer of $66 million of liabilities to Transform. Second Supp. Hede Decl., Ex. A, at 2-3.

12. There also is evidence that the full $89 million was contractually due the week of February 1. For one, the cover emails circulated with the Daily Cash Forecasts explicitly noted that the payments the company was delaying were "contractually due" that week. See Second Supp. Good Decl., Ex. D at 1 (Daily Cash Forecast of February 4, 2019) ("In order to manage 1L outstanding on Feb 8th, we are delaying certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days."); id., Ex. E at 1 (Daily Cash Forecast of February 5, 2019) (same); id., Ex. F at 1 (Daily Cash Forecast of February 6, 2019) (same); id., Ex. G at 1 (Daily Cash Forecast of February 7, 2019) ("In order to manage 1L outstanding on Feb 7th, we are delaying certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days."); id., Ex. H at 1 (Daily Cash Forecast of February 8, 2019) ("In order to maintain $850 1L outstanding balance, certain payments contractually due this week have been delayed until next week."). Nowhere does the record suggest that the company forecasted and delayed payments on accounts payable before

7

such payments became due. These emails prove the opposite—the delayed payments on accounts payable were contractually due that week.

13. The documents and testimony regarding Debtors' plan to satisfy the closing metrics further demonstrate that Debtors did not—and would not—plan to make payments before they were contractually due and that the full $89 million that Debtors deferred paying were contractually due the week earlier. Specifically, the Court received evidence—which was uncontradicted—that "on or around January 25, 2019, representatives of M-III first began discussing with the Finance Team increasing cash held by Debtors by withholding and not making timely payments of accounts payable that would ordinarily be due and payable." Riecker Decl. ¶ 8. Mr. Riecker testified "[t]his increase [in payables] would result from delaying until after the Close disbursements on accounts payable as they became due." Id. ¶ 9. See also *Declaration of Abena A. Mainoo in Support of Transform Holdco LLC's Reply Memorandum of Law in Further Support of the Adversary Complaint* ("Mainoo Decl."), Ex. V, 105:15-20 ("Q:. . . When it says, 'Increase payable to offset the DIP,' does that mean that if you pay fewer payables, the impact will be that you will have more money available to bridge the gap for the DIP? A: Yes").

14. The unrebutted declaration of Robert Riecker makes clear that the Daily Cash Forecasts projected payments on accounts payable as they became due. Mr. Riecker testified:

> On February 3, 2019, Brian Griffith sent an email attaching a cash forecast presentation, and wrote, "If we want to hit the $850M on Thursday with no outside help (cash in stores, cash in transit, AR monetization, etc.), we will have to carefully manage disbursements for the next four days.["] . . . The attached presentation set out expected expenditures between February 4 and February 7 and noted that M-III "assumes all merch and non-merch spending is discretionary." . . . In other words, Debtors would not make payments on accounts payable as they became due but would delay them until after the Close in order to generate cash to satisfy the obligation under the APA with respect to the DIP.

Riecker Decl. ¶ 11. Exhibit C of Mr. Riecker's Declaration includes a PowerPoint presentation entitled "Project Blue – Cash Forecast – 2/4/19 – 2/7/19." The figures in the first table of this

8

presentation, "Daily Cash Performance Through 2/7/19," are derived from the same Daily Cash Forecast of February 1, 2019 that EY relied on in its projections. Mr. Riecker's testimony makes clear that the Company's plan to "carefully manage disbursements" was to delay payments on accounts payable as they became due. Had the forecasts projected payments prior to their due date, Mr. Riecker's conclusion—which the Debtors did not contest or question—would not follow.

15. Mr. Prakash, who circulated the above Daily Cash Forecasts and had an intimate familiarity with these documents,[5] confirmed that the company's practice was to make payments on accounts payable as they became due. See *Declaration of Jessie B. Mishkin in Support of Debtors' Supplemental Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Mishkin Decl."), ECF No. 4975, Ex. F, 13:6-10 ("Q: Do you know when AP is paid? . . . A: I mean, whenever payments are due, the company generally tries to pay them. We have some payment due almost every day."). The Daily Cash Forecasts were the primary means for the company to track its cash availability and project upcoming disbursements and therefore tracked the company's practices. As confirmed by Mr. Prakash, the Daily Cash Forecasts needed to project disbursements for accounts payable on the day when they were due because the company's practice was to pay accounts payable when they were due—not prior to the due date.

16. The Debtors have never suggested that the Daily Cash Forecasts—the basis for Transform's damages calculation—project disbursements on accounts payable prior to being due, nor could they credibly do so. In fact, the Debtors have consistently assumed that the Daily Cash Forecasts reflected delays on payments that were "otherwise contractually due." See, e.g., Mishkin

---

[5] See *Declaration of Jessie B. Mishkin in Support of Debtors' Supplemental Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Mishkin Decl."), ECF No. 4975, Ex. F, 15:9-12 ("Q: . . . [I]s it your responsibility to send these daily cash flow forecasts? A: Our team sends it out, yeah, and I spend most of my time on this.").

9

Pg 10 of 15

Decl., Ex. B, 21:22-22:3 ("After this February 4th, 2019 email that . . . was sent out by Mr. Prakash, do you recall any pushback . . . from Mr. Lampert regarding the decision to institute this three business day delay in payments that were otherwise contractually due?").

17. Debtors could have deposed Mr. Hede or cross-examined him at the September 12 Hearing. They chose not to do so. They could have presented their own analysis on damages, but again chose not to do so. Given the abundance of evidence in the record supporting Transform's position and the lack of any evidence to the contrary, Transform has established that the Daily Cash Forecasts projected disbursements on accounts payable as they became due. See Patton, 2014 WL 4674600, at *2 ("evidence [of damages] that is unrebutted when presented by one side . . . should . . . be considered conclusive") (quoting Amalfitano v. Baker, 794 A.2d 575, 578 (Del. 2001)); cf. Inline Connection Corp. v. AOL Time Warner Inc., 347 F. Supp. 2d 56, 80 (D. Del. 2004) ("In light of plaintiff's deafening silence in response to defendants' specific argument . . . the court can only assume it had no viable argument to make.").

18. "The Court may make reasonable inferences from the facts in evidence in its damage computation." Rodriguez v. United States, No. 81 Civ. 7628, 1986 WL 15718, at *6 (S.D.N.Y. June 20, 1986). As the Court recognized at the September 12 Hearing, Debtors' cash position was such that they would not make or plan to make payments on debts before they became due. See Hr'g. Tr. 211:5-8, Sept. 12, 2019; id. at 228:4-12; id. at 237:22-25 ("I understand Mr. Liman's point that it's highly unlikely that a Debtor in this position would have accelerated vendor payments, and so forecasted vendor payments might well be forecasted as when they're due."). Debtors were concerned about their ability to meet Transform's proposed closing condition and in fact faced a significant strain in the weeks leading up to the Close to meet the APA's closing condition to bring the company's aggregate DIP obligations below $850 million. See, e.g., Mainoo

10

Decl., Ex. V, 108:2-22 (Deposition of Christopher Good, dated August 28, 2019) ("[W]e had serious concerns about being able to hit the level that Eddie and Kunal and ESL were pushing us towards. . . . [W]e were concerned about our ability to close, and we worked very closely with ESL to make sure we could meet them there on the closing conditions."). Given that concern, which Debtors had at least as early as December, id. at 107:20, it is inconceivable that the forecasts the parties consulted over, see id. at 108:7-9, would have reflected disbursements for payments prior to when those payments were due; such projections would have unnecessarily increased the projected DIP balance at a time when the parties were attempting to come to an agreement on the correct projected balance to contract around.

19. The Court can and should draw the same inference from the company's stated goal of maximizing availability under its revolver. See Mishkin Decl., Ex. A, 35:17-36:17 ("[T]o the extent you can keep your revolver balance low, you incur less interest expense. Knowing how much availability we had on the revolver at any point in time was important to decisions that management would make with respect to buying inventory, procuring services. . . . [C]ash and available liquidity is the lifeline of the company. . . . [W]e always . . . had an interest of making sure that the revolver was paid down as low as it possibly could be paid down."). See also *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* ¶ 68, ECF No. 3 ("The Cash Management System provides significant benefits to the Debtors, including, among other things, the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information."). Occam's Razor applies; it makes no sense (nor have Debtors offered evidence to suggest) that Debtors would project to make payments that they were

11

not contractually obligated to pay if the ultimate objective was to determine how much availability they would have on the revolver. See United States v. Shyne, No. S405CR1067KMK, 2007 WL 1075035, at *24 (S.D.N.Y. Apr. 5, 2007) ("Occam's razor, a principle that is often paraphrased in English as 'all things being equal, the simplest solution tends to be the best one,' is apt here.").

20. There is a reason Debtors have never challenged Transform's calculation of damages. The evidence before the Court and Debtors' own admission that they delayed payments on tens of millions of accounts payable[6] amply demonstrates that Transform was damaged in the amount of tens of millions of dollars. Bigelow, 327 U.S. at 264; see Thorpe v. CERBCO, Inc., 1993 WL 443406, at *12 (uncertain quanta of damages are to be determined against the breaching party).

**II. Debtors Have Waived Arguments Opposing Transform's Claim of Damages**

21. The Court should reject any counterargument that Debtors now attempt to raise in opposition to Transform's claim of damages. Bd. of Managers of Mason Fisk Condo. v. 72 Berry St., LLC, 801 F. Supp. 2d 30, 39 (E.D.N.Y. 2011) (citing Tamar v. Mind C.T.I, Ltd., 723 F. Supp. 2d 546, 555 (S.D.N.Y. 2010)) ("Arguments raised for the first time at oral argument are generally deemed waived."); see also Emerald Partners v. Berlin, No. Civ. A. 9700, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."). Debtors had their opportunity to provide the Court with arguments challenging Transform's entitlement to damages. They chose not to do so. See *Supplemental Memorandum of Law in Support of Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the*

---

[6]  Hr'g. Tr. 186:16-20, Sept. 12, 2019 ("Transform kicks off its ordinary course section in [its] reply brief with the statement that Debtors do not deny that they unilaterally decided to delay paying tens of millions of dollars in trade liabilities. And that's, of course, true.").

*Asset Purchase Agreement* ¶¶ 22-43, ECF No. 4973.  They should not now, after the record has already been closed, be given a second bite at the apple.  Accord In re Elonex Phase II Power Mgmt. Litig., 279 F. Supp. 2d 521, 525 (D. Del. 2003) (finding that "[w]hile [defendant] plainly disagrees with [plaintiff]'s damages calculation, the time to voice that concern and offer evidence in support thereof" had passed and that, as defendant "decided not to act in a timely fashion, the judgment was appropriately based on the unrebutted record evidence available to the court").

22.     Even if not waived, the arguments that Debtors attempted to raise at the September 12 Hearing are unavailing.  Transform anticipates Debtors will argue again—as they did at the hearing—that Transform was not damaged because, but for Debtors' breach, Debtors would not have satisfied its obligations to deliver an $850 million DIP balance and the transaction would not have been able to close.  Hr'g. Tr. 190:14-21, Sept. 12, 2019.  But, as the Court quickly and correctly recognized, that is not how the law of contracts works.  Debtors had to satisfy both closing conditions—paying accounts payable as they came due and ensuring that the DIP balance was below $850 million—and, if they failed to do so, Transform had an option.  It could decide not to close (based, for example, on the failure to make timely payments) or it had "the right under Delaware law to close and then sue for damages."  Hr'g. Tr. 220:16-17, Sept. 12, 2019.  See also In re Woodbridge Grp. of Cos., LLC, 590 B.R. 99, 105 (Bankr. D. Del. 2018) (quoting S&R Corp. v. Jiffy Lube Int'l Inc., 968 F.2d 371, 376 (3d Cir. 1992)) ("Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages.").  Debtors did not have the unilateral right to strip Transform of that option and to deprive it of the right to seek damages by satisfying one condition while breaching the other.

23. Indeed, Debtors' argument assumes a false choice. Debtors were not limited to breaching the covenant to deliver an outstanding DIP balance of $850 million or breaching the covenant to make timely payments on accounts payable. They had other options, ones that they in fact exercised to some extent. As Transform suggested at the September 12 Hearing, Debtors could have mitigated Transform's damages by ordering even less Prepaid Inventory. Hr'g. Tr. 216:21-217:19, Sept. 12, 2019. They did so prior to Closing but only by approximately $70 million. They could also have attempted to collect additional receivables, delivering fewer to Transform. Neither of those actions would breach a covenant. Of course, Debtors' choice to reduce Prepaid Inventory or Specified Receivables would not have been free. The reduction of those amounts would have resulted in a dollar-for-dollar reduction of Transform's assumed liabilities. APA § 2.3(k)(vii), (ix). But that is the point. The one option that Debtors did not have was the one that they elected—to reduce the payment of accounts payable as they became due while at the same time attempting to stick Transform with the full $166 amount of accounts payable.

24. Alternatively, as Mr. Meghji and Debtors' counsel acknowledged, Debtors could have sought to renegotiate the terms of the contract, offering some concession to Transform, such that they could then modify and satisfy the closing conditions. See Mainoo Decl., Ex. W (Deposition of Mohsin Meghji, dated August 29, 2019), 70:23-71:2 ("[T]here was significant risk that either ESL would demand concessions that we would have to give or we would be unable to close."); Hr'g. Tr. 199:2-3, Sept. 12, 2019 ("There could have been options where they could have tried to renegotiate aspects of [the APA]"). Rather than resolve its dilemma through any of the above means, Debtors instead chose to breach their obligations under Section 8.6. They cannot now deny Transform its right to recover damages from that breach.

14

25. For similar reasons, Debtors' argument at the September 12 Hearing that there are no damages because had they made payments on time, they "would have bought more CIA orders on inventory to get up to the 166," is also unavailing. Hr'g. Tr. 221:9-12, Sept. 12, 2019. The flaws in this logic are transparent. Cash-in-advance orders are orders for inventory that the company pays upfront, prior to delivery. See APA § 1.1 ("Prepaid Inventory shall mean all Inventory that has been paid for by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery as of the Closing Date."). They do not generate accounts payable. And if the company instead chose to place more orders for inventory and to generate additional payables for inventory to be delivered after the Close, Transform would have received the benefit of that additional inventory. See APA § 2.1(x) (providing that Transform acquired inventory ordered but not delivered prior to the Closing Date).

## CONCLUSION

26. For the reasons stated above, Transform requests that the Court enter a declaratory judgment that the record establishes Transform's calculation of damages.

Dated:  November 8, 2019
       New York, New York

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

*/s/ Lewis J. Liman*
Lewis J. Liman
Sean A. O'Neal
Luke A. Barefoot
Abena A. Mainoo
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Counsel for Transform Holdco LLC*

15