# EXHIBIT - B

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
In re                                :
                                     :        Chapter 11
SEARS HOLDINGS CORPORATION, et al.,  :
                                     :        Case No. 18-_____ (RDD)
                                     :
                 Debtors.¹           :        (Joint Administration Requested)
-------------------------------------------------------------x
```

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

18-23538-rdd    Doc 14    Filed 10/15/18    Entered 10/15/18 07:49:42    Main Document
Pg 2 of 26

**MOTION OF DEBTORS FOR INTERIM
AND FINAL AUTHORITY TO (I) PAY PREPETITION
CLAIMS OF (A) SHIPPERS, WAREHOUSEMEN, AND OTHER NON-
MERCHANDISE LIEN CLAIMANTS AND (B) HOLDERS OF PACA/PASA CLAIMS,
AND (II) CONFIRM ADMINISTRATIVE EXPENSE PRIORITY FOR
PREPETITION ORDERS DELIVERED TO THE DEBTORS POSTPETITION,
AND SATISFY SUCH OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together

with their non-debtor affiliates, the "**Company**"), respectfully represent in support of this motion

(the "**Motion**"):

## Background

1.      On the date hereof (the "**Commencement Date**"), each of the Debtors

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their

business and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has

been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      Additional information regarding the Debtors' business, capital structure,

and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

*Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for*

2

*Southern District of New York*, sworn to on the date hereof (the "**Riecker Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated herein by reference.

## Jurisdiction

4.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.    By this Motion, the Debtors request, pursuant to sections 105(a), 363, and 503 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, approval of interim and final orders (i) authorizing, but not directing them, to pay (a) Shipping and Warehousing Charges, (b) Non-Merchandise Lien Claims, and (c) PACA/PASA Claims (each as defined herein), and (ii) granting administrative priority status to all undisputed obligations of the Debtors owing to third party vendors and suppliers arising from the postpetition delivery of goods ordered prior to the Commencement Date and authorizing the Debtors to pay such obligations in the ordinary course of business.

6.    A proposed form of order granting the relief requested in the Motion on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

## The Debtors' Supply Chain and the Shippers

7.    The Debtors operate a national network of stores under the "Sears" and "Kmart" banners, which consists of approximately 687 full-line and specialty retail stores

---

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

located throughout the United States (the "**Stores**").  In addition, the Debtors operate a number

of websites under the "sears.com" and "kmart.com" banners, which offer millions of products to

be purchased by customers through cross-channel transactions.  It is essential that the Debtors

ensure their Stores are continuously replenished with a supply of goods and merchandise that

have been advertised for sale and that their customers expect for purchase, including, but not

limited to, consumer electronics, seasonal merchandise, outdoor living, toys, lawn and garden

equipment, food and consumables, apparel, major appliances, tools, automotive products,

fashion, footwear, jewelry, and various other products (the "**Merchandise**").  Without this core

Merchandise, the Debtors' business would suffer greatly.

## A.    Shippers and Warehousemen

8.    The Debtors rely on various third-party services to transport and store

Merchandise (collectively, the "**Shippers and Warehousemen**") to and from the Debtors'

Stores and their various warehouses, distribution centers, and other storage locations

(collectively, the "**Warehouses**").  The Debtors maintain the flow of Merchandise in several

ways:

- *Delivery Carriers.*  The Debtors rely on a myriad of heavy load delivery carriers to pick up Merchandise from the Debtors' various Warehouses and Stores and deliver these goods and products directly to their customers.  These carriers are critical for the Debtors to fulfill their commitments to, and retain the goodwill of, their customers.

- *Domestic Truckload Carriers.* Domestic truckload carriers (sometimes referred to as OTRs) pick up and deliver Merchandise from vendors to the Warehouses and other distribution centers and/or from the Warehouses and distribution centers to their Stores.  As these carriers are directly responsible for delivery of product and Merchandise they are critically necessary for the Debtors to generate sales.

- *Domestic Intermodals.*  The Debtors rely on railroads and other intermodal freight transportation providers to transport Merchandise from vendors or port locations to the Debtors' Merchandise Warehouses.

4

- *Ocean Shippers.* The Debtors rely on various ocean shippers to carry Merchandise from overseas vendors and suppliers to various port locations where they are then transported by other means of shipment on to Stores and Warehouses.

9. In the event that the Debtors fail to reimburse the Shippers and Warehousemen for charges incurred in connection with the transport and storage of the Merchandise, various state laws may permit the Shippers and Warehousemen to assert statutory liens against Merchandise in their possession that is the subject of any delinquent charges, securing such charges and potentially blocking the Debtors' access to the transported Merchandise.[3] To date, shipments have been halted for over 200 vendors, which has had an estimated $100 million impact on the Debtors' available liquidity. In addition, the Debtors have received multiple termination letters from carrier and demands for payments with threats to discontinue services if payment is not made. Certain vendors have attempted to retrieve merchandise already delivered to the Warehouses, while other vendors have ceased performing services completely.

10. Thus, to maintain access to Merchandise that is essential to the continued viability of the Debtors' retail operations and preserve the value of the Merchandise, the Debtors seek authority to honor outstanding invoices related to shipping services provided by the Shippers and Warehousemen to the Debtors prior to the Commencement Date (collectively, the "**Shipping and Warehousing Charges**"). The Debtors estimate that, as of the Commencement Date, there are approximately $16.7 million of Shipping and Warehousing Charges outstanding,

---

[3] For example, Michigan's Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges or subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." Mich. Comp. Laws § 440.7307.

WEIL:\96759237\1\73217.0003

approximately $15.8 million of which will come due and owing within the first thirty (30) days of the chapter 11 cases.

### Non-Merchandise Lien Claimants

11.     The Debtors regularly make improvements and repairs to their property (including their Stores and Warehouses) and the equipment that the Debtors use in the operation of their business, including electrical systems, plumbing, elevator and escalator systems, Merchandise sorting machines, computer equipment, refrigeration equipment, and various other types of equipment.  To do so, the Debtors contract with a number of third party service providers (collectively, the "**Non-Merchandise Lien Claimants**" and, together with the Shippers and Warehousemen, the "**Lien Claimants**" or "**Contractors**").

12.     Absent payment of their prepetition claims, the Non-Merchandise Lien Claimants could potentially assert liens under applicable state law, including mechanic's liens, artisan's liens, and materialman's liens against the Debtors' property for amounts the Debtors owe to these third parties (collectively, the "**Non-Merchandise Lien Claims**" and, together with the Shipping and Warehousing Charges, the "**Lien Claims**").[4]  If the Debtors are unable to pay the Non-Merchandise Lien Claims, the Debtors risk losing access to equipment and other property that is critical to the continued operation of their business.  For example, the Debtors spend an average of approximately $271,000 per month on costs relating to forklift repairs and rentals, all of which is subject to mechanics liens in the event of non-payment by the Debtors.  In total, the Debtors pay approximately $2.3 million in Non-Merchandise Lien Claims per month.  Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such a lien, to the

---

[4] For example, Illinois' Uniform Commercial Code provides, in pertinent part, for a possessory lien "(1) which secures payment or performance of an obligation for services or materials furnished with respect to goods by a person in the ordinary course of the person's business; (2) which is created by statute or rule of law in favor of the person; and (3) whose effectiveness depends on the person's possession of the goods." Ill. Comm. Code 5/9-333.

WEIL:\96759237\1\73217.0003

extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[5]

13.     Accordingly, the Debtors seek authority to pay and discharge, on a case-by-case basis, Non-Merchandise Lien Claims that the Debtors believe have created, or could give rise to, a lien against the Debtors' property or equipment, regardless of whether such Non-Merchandise Lien Claimants have already perfected their interests.   The relief request herein includes authority to remit such payments to the Contractors for their services as well as to Contractors on behalf of any of their subcontractors' work, and to pay the Contractor's administrative fees, if applicable.   The Debtors will include a summary of any Non-Merchandise Lien Claims paid pursuant to the relief requested herein in the Critical Vendor Matrix (as defined in the Critical Vendors Motion).

14.     The Debtors request authorization to pay any Non-Merchandise Lien Claims that come due and payable within thirty (30) days after the Commencement Date and throughout these chapter 11 cases in the ordinary course of business.

**PACA/PASA Claims**

15.     Many of the Kmart Stores carry groceries. To maintain the goodwill of the Debtors' customer base, which benefits from access to fresh fruits, produce, meats, and poultry in such Stores, it is critical that the Debtors preserve the ability to source such Merchandise.

16.     The Debtors believe that a certain portion of the Merchandise sold in the Stores may qualify as "perishable agricultural commodit[ies]" under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq.* ("**PACA**").   PACA's definition of "perishable agricultural commodity" generally includes "fresh fruits and fresh vegetables of

---

[5] Under section 546(b), a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection . . . ."  11 U.S.C. § 546(b)(1)(A).

7

every kind and character [whether or not frozen or packed in ice]." 7 U.S.C § 499a(b)(4). Under PACA, eligible produce suppliers and their agents (the "**PACA Claimants**") are the beneficiaries of a statutory trust (the "**PACA Trust**") in all of the buyer's perishable agricultural commodity inventory or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "**PACA Trust Assets**"). *See* 7 U.S.C. § 499e(c)(2). PACA Trust Assets are preserved as a non-segregated floating trust and may be commingled with non-trust assets. PACA Trust Assets are not property of a debtor's estate. *In re Kornblum & Co.*, 81 F.3d 280, 284 (2d Cir. 1995).

17.      Similarly, certain of the Debtors' suppliers (the "**PASA Claimants**" and, together with the PACA Claimants, the "**PACA/PASA Claimants**") may be eligible to assert claims under the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 *et seq.* ("**PASA**"), which prescribes the conditions of operations for businesses dealing in livestock and poultry. PASA creates a statutory trust (the "**PASA Trust**" and, together with the PACA Trust, the "**Statutory Trusts**") scheme which is virtually identical to PACA in respect of delivery of livestock, meat products and related products, products derived therefrom, and the proceeds related to the sale of such commodities or products (collectively, the "**PASA Trust Assets**" and, together with the PACA Trust Assets, the "**Trust Assets**"). *See In re W.L. Bradley Co.*, 75 B.R. 505, 509 (Bankr. E.D. Pa. 1987) ("The Legislative history expressly notes that the [PACA Trust] was modeled on the trust amendment to the Packers and Stockyards Act.").

18.      The PACA/PASA Claimants may be eligible to assert potential claims under the respective statutes for outstanding payments owed on account of applicable Merchandise (collectively, the "**PACA/PASA Claims**"). The Debtors estimate that

8

PACA/PASA Claimants hold approximately $1 million in unpaid claims as of the Commencement Date.[6] Because the PACA/PASA Claimants may impose a Statutory Trust on certain of the Merchandise and thereby obtain priority ahead of all other secured and unsecured creditors of the Debtors' estates, payment of valid PACA/PASA Claims will not prejudice or affect the amount available for distributions to the Debtors' other creditors. Accordingly, the Debtors seek authority to pay PACA/PASA Claims in the ordinary course of business, pursuant to the terms of any contracts under which such claims arose. The Debtors will include a summary of any PACA/PASA Claims paid pursuant to the relief requested herein in the Critical Vendor Matrix (as defined in the Critical Vendors Motion).

## **Prepetition Orders**

19.     Prior to the Commencement Date, and in the ordinary course of business, the Debtors ordered approximately $162 million in Merchandise from suppliers and vendors that will not be delivered until on or after the Commencement Date (the "**Prepetition Orders**"). These suppliers and vendors may be concerned that, because the Debtors' obligations under the Prepetition Orders arose prior to the Commencement Date, such obligations will be treated as general unsecured claims in these Chapter 11 Cases. Accordingly, certain vendors may refuse to provide goods to the Debtors (or may recall shipments thereof) purchased pursuant to the Prepetition Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court providing that all undisputed obligations of the Debtors arising from the postpetition delivery of goods subject to Prepetition Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code.

---

[6] Nothing contained herein is intended or shall be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim against the Debtors is a PACA/PASA Claim; or (v) the assumption of any contract.

9

20.     To prevent any disruption to the Debtors' retail operations, and given that Merchandise delivered on, within 20 days prior to, and after the Commencement Date is afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order confirming administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed Prepetition Orders and authorizing the Debtors to satisfy such obligations in the ordinary course of business.

<u>**The Relief Requested Should Be Granted**</u>

**A.      Payment of Prepetition Lien Claims Is in the Best Interest of the Debtors' Estates and Warranted Under the Doctrine of Necessity**

21.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purpose exists for doing so.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims of suppliers).

22.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "'protect and preserve the estate, including an

10

operating business' going-concern value,'" on behalf of the debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee."). Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a); *see Ionosphere Clubs*, 98 B.R. at 175 (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to debtor's employees); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims).

23.    In a long line of well-established cases, courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g., Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugy Corp. (In re Chateaugy Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

11

24. This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.,* 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims . . . [for] goods or services indispensably necessary" to debtors' continued operation); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) ("[A] *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."). The rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.

25. This flexible approach is particularly critical where prepetition creditors—here, the Shippers, Warehousemen, and Non-Merchandise Lien Claimants—provide vital services to a debtor that would be unavailable if the debtor did not satisfy its prepetition obligations. Paying the Lien Claimants will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. The Lien Claimants may be unwilling to release the Merchandise or other property in their possession, because releasing possession of those items may convert their claims against the Debtors from secured to unsecured. As set forth above, in the two weeks leading up to the Commencement Date, more than 200 vendors refused to ship Merchandise to the Debtors, which had a negative impact on the Debtors' liquidity of approximately $100 million. Therefore, unless the Court authorizes the Debtors to pay the Lien Claimants, it is unlikely the Debtors will continue to have access to the Merchandise in the possession of the Lien Claimants. If the Lien Claimants possess lien rights

12

or have the ability to exercise "self-help" remedies to secure payment of their claims, failure to

satisfy the Lien Claimants' claims could have a material adverse effect on the Debtors' retail

business operations to the detriment of the Debtors' creditors.

26.    Further, the Debtors propose to take steps to ensure that (i) any payments

to Lien Claimants under the authority requested herein actually result in continued supply of vital

Merchandise and result in the Debtors' continued use and possession of critical property and

equipment, and that (ii) any such payments are minimized.  The Debtors propose, in their sole

discretion, to negotiate new credit terms with any Lien Claimant as a condition to payment of

any such claim.  Likewise, the Debtors, in their sole discretion, propose to condition payment of

Lien Claims on the agreement of such Lien Claimants to continue supplying goods and services

to the Debtors on the same credit terms given to them prior to the Commencement Date or upon

new credit terms (to the extent agreed to by the Debtors and the applicable Lien Claimant, the

"**Agreed Terms**").  Further, the Debtors propose to undertake appropriate efforts to cause the

Lien Claimants to acknowledge in writing that payment of their respective claims is so

conditioned.

27.    To the extent a Lien Claimant fails to comply with the Agreed Terms, the

Debtors propose, in their sole discretion, to (i) cause any payment made to such Lien Claimant

on account of its asserted lien claim to be deemed to have been in payment of then outstanding

postpetition obligations owed to the Lien Claimant, and to (ii) require the Lien Claimant to

immediately repay to the Debtors any payment made to it on account of its asserted lien claim to

the extent the aggregate amount of such payment exceeds the postpetition obligations then

outstanding, without the right of any setoffs, claims, provision for payment of reclamation or

trust fund claims, or otherwise.

28.     Accordingly, the Debtors submit that the proposed relief with respect to the Lien Claims is warranted in these chapter 11 cases.

**B.     The Payment of PACA/PASA Claims is in the Best Interests of the Debtors' Businesses and their Estates and Does Not Adversely Affect Any Parties in Interest**

29.     The prompt and full payment of PACA/PASA Claims should be authorized by the Court.  The disposition of Trust Assets is subject to the jurisdiction of the bankruptcy court.  *See Monterey Mushrooms, Inc. v. Carolina Produce Distribs., Inc.*, 110 B.R. 207, 209 (W.D.N.C. 1990); *Allied Growers Co-Op, Inc. v. United Fruit and Produce Co.*, 86 B.R. 14, 16 (Bankr. D. Conn. 1988).  Assets governed by PACA or PASA, however, do not constitute property of the Debtors' estates.  *See In re Kornblum & Co.*, 81 F.3d 280, 284 (2nd Cir. 1995); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993).  As a result, the distribution of assets to the PACA/PASA Claimants falls outside the priority scheme of the Bankruptcy Code, and the PACA/PASA Claimants holding PACA/PASA Claims are, thus, entitled to payment from the respective Statutory Trust ahead of the Debtors' other creditors.  *See, e.g., In re Magic Rests., Inc.*, 205 F.3d 108, 110 (3d Cir. 2000); *Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1377-78 (3d Cir. 1994).  Accordingly, the requested relief does not prejudice the Debtors' creditors.  In fact, payment made to PACA/PASA Claimants on account of PACA/PASA Claims is consistent with the intent of PACA and PASA and, moreover, will inure to the benefit of the Debtors and all parties in interest by (i) facilitating the continued purchase and receipt of fresh produce and other products and (ii) avoiding potential disruption to the Debtors' business operations.

30.     Notably, in certain circumstances, shareholders, officers, or directors of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA or PASA, as applicable.  *See*

14

*Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997); *see also Goldman-Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000).  Thus, to the extent that any valid obligations arising under PACA or PASA remain unsatisfied by the Debtors, the Debtors' officers and directors may be subject to lawsuits during the pendency of these chapter 11 cases.  Any such lawsuit (and the ensuing potential liability) would distract the Debtors and their officers and directors from administering the Debtors' estates and, moreover, could lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements, and applicable laws.

31.    Finally, payment of PACA/PASA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and certain of the vendors of fresh produce and meat and poultry products.  Without the relief requested herein, the Debtors could be subject to numerous claims, adversary proceedings, and motions, including motions by PACA/PASA Claimants for relief from the automatic stay and/or complaints for injunctive relief, which would result in the unnecessary expenditure of time, effort, and money by the Debtors.

**C.    The Obligations Owed Under the Prepetition Purchase Orders for Postpetition Goods and Services Are Administrative Expense Claims Under Section 503(b) of the Bankruptcy Code**

32.    Pursuant to section 503(b) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of necessary goods and services are afforded administrative expense priority because they benefit the estate postpetition. 11 U.S.C. § 503(b)(1)(A); *see In re Chateaugay Corp.*, 10 F.3d 944, 956 (2d. Cir. 1993) (holding that an obligation arising from the postpetition performance relating to a prepetition transaction is entitled to administrative expense priority) *In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 481 (Bankr. S.D.N.Y. 2006) (holding that to receive a claim under section 503 a claimant must

15

provide a postpetition benefit to the estate).  Additionally, under section 363 of the Bankruptcy Code, the Debtors can continue to operate in the ordinary course of business including honoring postpetition obligations under Prepetition Orders without prior court approval.

33.    Accordingly, granting the relief sought herein with respect to the Prepetition Orders will not provide the Vendors with any greater priority than they would otherwise be entitled to, and will not prejudice any part in interest.  Absent such relief, the Debtors may be required to expend substantial time and effort reissuing the Prepetition Orders to provide their vendors with assurance of administrative priority.  This disruption to the continuous flow of goods and services to the Debtors would seriously impact the Debtors' ability to operate their business.  Without the support of their vendors, the Debtors will incur significant costs and lose valuable business relationships to the detriment of all parties in interest. Therefore, the obligations owed under the Prepetition Orders relating to goods delivered postpetition should be explicitly granted administrative expense status.

## **Reservation of Rights**

34.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or, validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

16

## The Debtors Have Satisfied Bankruptcy Rule 6003(b)

35.      Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. Fed. R. Bankr. P. 6003(b). As described above, payment of the Lien Claims, Prepetition Orders, and PACA/PASA Claims is integral to the Debtors' operations and is necessary to maintain the Debtors' operations, as well as the confidence and goodwill of the Debtors' customer base. Failure to implement the relief with respect to the Lien Claimants, Prepetition Orders, and PACA/PASA Claimants during the first 21 days of these chapter 11 cases will jeopardize value for the Debtors' estates and creditors. Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the Lien Claimants and PACA/PASA Claimants is imperative to their continued operations. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003(b) is satisfied.

## Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

36.      To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Riecker Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

17

## Notice

37.    Notice of this Motion will be provided to (i) the Office of the United
States Trustee for Region 2; (ii) the holders of the twenty (20) largest unsecured claims against
the Debtors (on a consolidated basis); (iii) counsel for Bank of America, N.A., as administrative
agent under the First Lien Credit Facility and the DIP ABL Agent; (iv) counsel for Citibank,
N.A., as administrative agent under the Stand-Alone L/C Facility; (v) counsel for JPP, LLC, as
administrative agent under the Second Lien Credit Facility, the IP/Ground Lease Term Loan, and
the Consolidated Secured Loan Facility; (vi) counsel for Computershare Trust Company N.A., as
indenture trustee for the Second Lien PIK Notes, the Holdings Unsecured PIK Notes, and the
Holdings Unsecured Notes; (vii) counsel for Wilmington Trust, National Association, as
indenture trustee for the Second Lien Notes; (viii) counsel for The Bank of New York Mellon
Trust Company, N.A., as successor trustee for the SRAC Unsecured PIK Notes, the SRAC
Unsecured Notes, and the SRAC Medium Term Notes; (ix) the Pension Benefit Guaranty
Corporation; (x) the Unions; (xi) the Securities and Exchange Commission; (xii) the Internal
Revenue Service; and (xiii) the United States Attorney's Office for the Southern District of New
York.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient
and no other or further notice need be provided.

WEIL:\96759237\1\73217.0003

38.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of interim and final orders

granting the relief requested herein and such other and further relief as is just.

Dated: October 15, 2018
       New York, New York

/s/ Ray C. Schrock P.C.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                                          :
                                                               :     **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,                      :
                                                               :     **Case No. 18-_____ (RDD)**
                                                               :
Debtors.[1]                                                    :     **(Jointly Administered)**
---------------------------------------------------------------x

**INTERIM ORDER AUTHORIZING DEBTORS TO (I) PAY PREPETITION CLAIMS
OF (A) SHIPPERS, WAREHOUSEMEN, AND OTHER NON-MERCHANDISE
LIEN CLAIMANTS AND (B) HOLDERS OF PACA/PASA CLAIMS, AND (II)
CONFIRM ADMINISTRATIVE EXPENSE PRIORITY FOR PREPETITION ORDERS
DELIVERED TO THE DEBTORS POSTPETITION, AND SATISFY SUCH
OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS**

Upon the motion (the "**Motion**") of Sears Holdings Corporation and its debtor

affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), pursuant to sections 105(a), 363, and 503 of title 11 of the United

States Code (the "**Bankruptcy Code**"), for entry of interim and final orders (i) authorizing but

not directing them to pay (a) Shipping and Warehousing Charges, (b) Non-Merchandise Lien

Claims, and (c) PACA/PASA Claims, and (ii) granting administrative priority status to all

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

undisputed obligations of the Debtors owing to third party vendors and suppliers arising from the

postpetition delivery of goods ordered prior to the Commencement Date and authorizing the

Debtors to pay such obligations in the ordinary course of business, all as more fully set forth in

the Motion; and the Court having jurisdiction to decide the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b) and the Amended Standing Order of

Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the

requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper

before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

interim relief requested in the Motion having been given as provided in the Motion; such notice

having been adequate and appropriate under the circumstances, and it appearing that no other or

further notice need be provided; and the Court having held a hearing to consider the relief

requested in the Motion on an interim basis on October 15, 2018 (the "**Interim Hearing**"); and

upon the Riecker Declaration, filed contemporaneously with the Motion, and the record of the

Interim Hearing, and upon all of the proceedings had before the Court; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and it appearing that the interim relief requested in the Motion is necessary

to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by

Bankruptcy Rule 6003, provides a net benefit to the Debtors and their estates after taking into

account the Bankruptcy Code's priority scheme, and is in the best interests of the Debtors, their

estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause

appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The Debtors are authorized, but not directed, to pay the prepetition Lien Claims; *provided that*, the Debtors are authorized, but not directed, to pay only amounts due and payable as of the Commencement Date and amounts that are or become due and payable between the Commencement Date and the date that a final order on the Motion is entered, unless otherwise ordered by the Court.

3.      The Debtors, in their sole discretion, shall undertake appropriate efforts to cause the Lien Claimants to acknowledge in writing that payment of their respective Lien Claims is conditioned upon such Lien Claimant continuing to supply services to the Debtors on terms that, at a minimum, such Lien Claimant provided to the Debtors on a historical basis prior to the Commencement Date, or such other trade practices and programs that are at least as favorable to the Debtors as those in effect during such time, and the Debtors reserve the right to negotiate new trade terms with any Lien Claimant as a condition to payment of any such claim.

4.      The Debtors may condition, in their sole discretion, payment of Lien Claims on the agreement of such Lien Claimants to continue supplying goods and services to the Debtors on the same trade terms given to them prior to the Commencement Date or upon new trade terms (to the extent agreed to by the Debtors and the applicable Lien Claimant, the "**Agreed Terms**").

5.      To the extent a Lien Claimant fails to comply with the Agreed Terms, the Debtors may, in their sole discretion, (i) cause (a) any payment made to such Lien Claimant on account of its asserted lien claim to be deemed to have been in payment of then outstanding postpetition obligations owed to the Lien Claimant and (b) the Lien Claimant shall be required to immediately repay to the Debtors any payment made to it on account of its asserted lien claim to the extent the aggregate amount of such payments exceeds the postpetition obligations then

3

outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

6.      Neither the Debtors nor any other party in interest concedes that any liens (contractual, common law, statutory or otherwise) satisfied pursuant to this Interim Order are valid, and the Debtors expressly reserve the right to contest the extent, validity or perfection or seek the avoidance of all such liens.

7.      The Debtors are hereby directed to pay PACA/PASA Claims in the ordinary course of business consistent with the parties' customary practices in effect prior to the Commencement Date.

8.      All undisputed obligations of the Debtors arising from the postpetition delivery or shipment by of goods under the Prepetition Orders are granted administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code, and the Debtors are authorized, but not directed, to pay such obligations in the ordinary course of business consistent with the parties' customary practices in effect prior to the Commencement Date.

9.      Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

10.      Notwithstanding anything in the Motion or this Interim Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable:  (i) the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities

4

(collectively, the "**DIP Orders**"); (ii) the other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; and (iii) the Approved Budget (as defined in the DIP Orders).

11.     To the extent there is any inconsistency between the terms of any of the DIP Orders and this Interim Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

12.     Nothing contained in the Motion or this Interim Order nor any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

13.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

14.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

15.     Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

16.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

5

17.     This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; *provided that*, the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

18.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order.

19.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

20.     The Final Hearing on the Motion shall be held on _____, **2018, at _____ (Prevailing Eastern Time)**, and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn: Ray C. Schrock, P.C., Jacqueline Marcus, Esq., Garrett A. Fail, Esq., and Sunny Singh, Esq.); (ii) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Paul Schwartzberg, Esq. and Richard Morrissey, Esq.); and (iii)  counsel for the DIP ABL Agent, with a copy to the Court's chambers, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on _____, 2018**.


Dated: _____, 2018
              White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

WEIL:\96759237\1\73217.0003