WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
In re                                       :
                                            :   Chapter 11
SEARS HOLDINGS CORPORATION, et al.,         :
                                            :   Case No. 18-23538 (RDD)
                                            :
                    Debtors. [1]            :   (Jointly Administered)
-------------------------------------------------------x
```

## DEBTORS' OPPOSITION TO TRANSFORM HOLDCO LLC'S SECOND SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF ITS ADVERSARY COMPLAINT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## TABLE OF CONTENTS

I.     Preliminary Statement................................................................................................1

II.    Background ...............................................................................................................3

III.   Argument and Authorities.........................................................................................5

       A.     Under Delaware Law, Transform Bears the Burden of Proof to Prove Its
              Damages With Reasonable Certainty. ...................................................................5

       B.     Transform's Misguided Argument That It Need Only Offer a "Just and
              Reasonable Estimate" of Its Damages Both Misconstrues and Is Belied by
              Delaware Law. ........................................................................................................6

       C.     Transform Has Not Proven the Amount of Its Alleged Damages. ..........................8

       D.     Transform Has Not Proven That It Sustained Damages As A Proximate
              Result of Any Alleged Breach of Section 8.6 of the APA.....................................12

       E.     The Debtors Have Not Waived Any Arguments Opposing Transform's
              Damages Claim.....................................................................................................20

IV.    Conclusion ..............................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Gen. Corp. v. Continental Airlines Corp.*,
  622 A.2d 1 (Del. Ch. 1992)......................................................................6

*Atwell v. RHIS, Inc.*,
  No. CIV.A. 02C-12-003WLW, 2006 WL 2686531 (Del. Super. Ct. July 28,
  2006) ........................................................................................5

*Bd. of Managers of Mason Fisk Condo. v. 72 Berry St.*,
  LLC, 801 F. Supp. 2d 30 (E.D.N.Y. 2011)...........................................21

*Boehm v. Am. Broad. Co., Inc.*,
  929 F.2d 482 (9th Cir. 1991) ............................................................21

*Carteret Bancorp, Inc. v. Home Grp., Inc.*,
  1988 WL 3010 (Del. Ch. Jan. 13, 1988) (unpublished)...........................19

*Duncan v. Theratx, Inc.*,
  775 A.2d 1019 (Del. 2001) ...............................................................12

*In re Elonex Phase II Power Mgmt. Litig.*,
  279 F. Supp. 2d 521 (D. Del. 2003)....................................................21

*Emerald Partners v. Berlin*,
  No. Civ. A. 9700, 2003 WL 21003437 (Del. Ch. Apr. 28, 2003) ..............21

*Grace v. Corbis-Sygma*,
  487 F.3d 113 (2d Cir. 2007)................................................................8

*Gregory v. Frazer*,
  No. CIV.A. 2007-09-492, 2010 WL 4262030 (Del. Com. Pl. Oct. 8, 2010)............5

*Henkel Corp. v. Innovative Brands Holdings, LLC*,
  No. CIV.A. 3663-VCN, 2013 WL 396245 (Del. Ch. Jan. 31, 2013) ...................12

*Patton v. Yancy*,
  No. CV N13A-10-006 JAP, 2014 WL 4674600 (Del. Super. Ct. Sept. 22,
  2014) ........................................................................................7

*Paul v. Deloitte & Touche, LLP*,
  974 A.2d 140 (Del. 2009) ................................................................12

*Raishevich v. Foster*,
   247 F.3d 337 (2d Cir. 2001)..................................................................................................8

*S&R Corp. v. Jiffy Lube Int'l, Inc.*,
   968 F.2d 371 (3d Cir. 1992)...........................................................................................17, 19

*Tamar v. Mind C.T.I., Ltd.*,
   723 F. Supp. 2d 546 (S.D.N.Y. 2010)..................................................................................21

*Thorpe v. CERBCO, Inc.*,
   Civ. A. No. 11713, 1993 WL 443406 (Del. Ch. Oct. 29, 1993).............................................7

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
   763 F.3d 273 (3d Cir. 2014)................................................................................................12

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
   87 F. Supp. 3d 697 (D. Del. 2015).......................................................................................5

*In re Woodbridge Grp. of Cos., LLC*,
   590 B.R. 99 (Bankr. D. Del. 2018) ...........................................................................17, 18, 19

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

## I.    <u>Preliminary Statement and Background</u>[2]

1.    At the September 12, 2019 hearing on Transform's Adversary Complaint and the Debtors' Supplemental Motion to Enforce the APA (the "**September 12 Hearing**"), the Court rejected Transform's argument that the Debtors had breached Section 8.6 of the APA by delaying payments to vendors in the week before Closing.[3]  The Court nevertheless invited the Parties to submit briefing addressing what Transform's damages would have been had the Court found that the Debtors had breached Section 8.6 so that, in the event of an appeal, the appellate court would have the benefit of the Court's ruling on the fact and measure of Transform's damages.[4]  The Court suggested without finally deciding that Transform's damages analysis— which rests entirely upon the Debtors' accounts-payable disbursement forecast for the week ending February 8 (the "**Disbursement Forecast**")—failed to show the measure of Transform's damages because Transform had failed to offer any evidence that the forecasted disbursements were tied to "when" vendor payments were actually "due."[5]  The Court specifically instructed the Parties that they could, "both of [them], point out why [the Court could] rely on the

---

[2] Capitalized terms used in this Opposition but not otherwise defined herein will have the meanings set forth in the *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* (ECF No. 2796) ("**First Motion to Enforce**") or in the APA, as applicable.  The APA is attached as <u>Exhibit B</u> to the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**").

[3] *Transform Holdco LLC v. Sears Holdings Corp., et al.* Sept. 12, 2019 Hr'g Tr. (Adv. Case No. 19-08262 ECF No. 9) ("**Sept. 12, 2019 Hr'g Tr.**") at 229:18-234:25, 238:13-16.

[4] *See id.* at 237:18-238:9, 245:3-246:14.

[5] *See id.* at 209:18-20 ("THE COURT: . . . Does this forecast show them paying it when due, or just forecast when they make the payment?"), 210:10-11 ("THE COURT: I mean, he never says anything about when due.  These are just forecasts."), 227:4-5 ("THE COURT: . . . I can't assume it's accurate because it just says forecast.").

forecasting, or not rely on the forecasting."[6]  The Court cannot rely on the forecasting, and

nothing in Transform's *Second Supplemental Memorandum of Law in Support of Transform

Holdco LLC's Adversary Complaint* (ECF No. 5796) ("**Second Supplemental Memorandum,**"

or "**Transform Br.**") warrants a different conclusion.

2.      First, Section 8.6 of the APA does not obligate the Debtors to make ***forecasted***

payments to vendors.  Rather, Section 8.6 requires the Debtors to, in all material respects and in

accordance with their pre-petition cash-management policies and practices, make ***timely***

payments to vendors—and the Disbursement Forecast says nothing about how much the Debtors

had to pay (or when) in order to ensure their payments were timely.  Although Transform had all

of the vendor contracts, invoices, and records of ***actual*** accounts payable at its fingertips—not to

mention Robert Riecker, who served as the Debtors' Chief Financial Officer ("**CFO**") before the

Sale Transaction, and Rajat Prakash, who tracked this very issue—Transform elected not to put

any of that information in the record.  Instead, it relied solely upon Andrew Hede's "expert

analysis" of a forecast rather than ***actual*** vendor contracts and invoices.  As a result, Transform

plainly failed to meet its burden to demonstrate the amount of damages, if any, it supposedly

suffered as a result of the alleged breach.

3.      Second, Transform's damages analysis puts Transform in a better position than it

would have been absent any breach of Section 8.6.  As Mohsin Meghji, the Debtors' Chief

Restructuring Officer ("**CRO**"), and Mr. Riecker both testified, every dollar used to pay down

accounts payable increased the DIP balance by a dollar.  Accordingly, had the Debtors diverted

available cash to pay the accounts-payable balance down to $100 million before Closing (as

Transform asserts the Debtors should have done), the DIP balance would necessarily have

---

[6] *Id.* at 245:8-10.

increased by that same amount, and the Debtors would not have been able to satisfy the closing condition set forth in Section 10.10 of the APA—that is, to pay down the outstanding indebtedness under the DIP Credit Agreement to $850 million. It was a zero-sum game. Under no circumstances would Transform have emerged from the Sale Transaction with a company that had both only $100 million outstanding accounts payable and an $850 million DIP balance (what Transform now seeks for itself through litigation). Transform's damages analysis thus seeks to give Transform a windfall in direct contravention of Delaware law.

4.    For these reasons, the Debtors respectfully request that the Court find that, even if the Debtors had breached Section 8.6 of the APA by delaying payments to certain vendors in the week before Closing, Transform would nevertheless not be entitled to an award of damages for the breach.

5.    Finally, the Court should reject out of hand Transform's disingenuous assertion that the Debtors have waived their argument that Transform has failed to satisfy its burden to prove damages. The Court specifically "invite[d] briefing on the damages point."[7] Moreover, any inadequacies in the record manifest Transform's own failure to carry its burden of proof and, thus, cannot be charged against the Debtors.

## II.    **Background**

6.    The APA obligates Transform to assume, among other things, up to $166 million Other Payables as well as all payment obligations with respect to the Ordered Inventory.[8] The APA obligates the Debtors to "make all payments in respect of payables of the Business . . . arising from the date of this Agreement until the Closing Date in all material respects on a timely

---

[7] *Id.* at 237:18-19.

[8] *Asset Purchase Agreement Dated as of January 17, 2019 by and among Transform Holdco LLC, Sears Holdings Corporation and Its Subsidiaries Party Hereto* (ECF No. 2507-1) ("**APA**") § 2.3 (k)(v); *Transform Holdco LLC v. Sears Holdings Corp., et al.* July 11, 2019 Hr'g Tr. (ECF No. 4800) at 266:1-269:15.

basis and [to] otherwise manage the accounts payable of the business in accordance with the [Debtors'] cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business." APA § 8.6.

7.    On May 25, 2019, Transform filed an adversary complaint against the Debtors asserting a claim for breach of the APA based upon allegations, among others, that the Debtors had failed to act in the ordinary course of business by delaying certain payments to vendors in the week before Closing.[9]  Transform ultimately argued that these delays in vendor payments were a breach of Section 8.6 of the APA and that, accordingly, it was entitled to damages for the breach in the amount of $66 million—the difference, it claimed, between the amount of the accounts payable it assumed ($166 million) and the amount it would have assumed had the Debtors complied with the covenants set forth in Section 8.6 ($100 million).[10]

8.    The Court heard oral argument on the issue at the September 12 Hearing and, having considered the Parties' submissions, the jointly submitted evidence, including deposition designations and the testimony given at the hearing, and the Parties' arguments, concluded that Section 8.6 is "an ordinary course management provision" and that the evidence clearly showed that the Debtors' "early February decision to delay accounts payable by three days was in the ordinary course," "consistent with the Debtors' prior practices, and . . . at least as consistent with Transform's own practices."[11]  As discussed above, the Court nevertheless ordered the Parties to brief the issue of what Transform's damages would have been had the Court found that the Debtors had breached the covenants set forth in Section 8.6.[12]  The Court specifically instructed

---

[9] Adversary Complaint dated May 25, 2019 (ECF No. 4033).

[10] Transform Holdco LLC's Supplemental Memorandum of Law in Support of Its Adversary Complaint dated August 6, 2019 (ECF No. 4767).

[11] Sept. 12, 2019 Hr'g Tr. at 233:1-14, 234:17-25.

[12] *See id.* at 237:18-238:9, 245:3-246:14.

the Parties to limit their arguments to evidence already in the record.[13]   Transform filed its Second Supplemental Memorandum on November 8, 2019; the Debtors address the evidence and arguments raised in that brief herein.

## III.   Argument and Authorities

9.     In its Second Supplemental Memorandum, Transform argues, broadly speaking, that (1) it need not prove its expectation damages with certainty; rather, it need only offer a "just and reasonable estimate" of its damages; (2) it has satisfied its burden to prove its expectation damages; and (3) the Debtors have waived any argument that Transform failed to satisfy that burden of proof.   As discussed below, each of these arguments is without merit and unsupported by Delaware law: (1) contrary to Transform's assertion, Delaware law requires Transform to prove its damages with reasonable certainty; (2) Transform has failed to satisfy (and cannot satisfy) that burden of proof; and (3) the Debtors have not waived their argument that Transform failed to meet its burden of proof.

### A.     Under Delaware Law, Transform Bears the Burden of Proof to Prove Its Damages With Reasonable Certainty.

10.     The plaintiff in a breach of contract action bears the burden of proving (1) that it sustained damages, (2) that the defendant's breach proximately caused those damages, and (3) the amount of those damages.   *See Gregory v. Frazer*, No. CIV.A. 2007-09-492, 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010) ("Plaintiff must prove . . . by a preponderance of the evidence . . . [that] damages resulted from Defendant's breach."); *Atwell v. RHIS, Inc.*, No. CIV.A. 02C-12-003WLW, 2006 WL 2686531, at *1 (Del. Super. Ct. July 28, 2006) ("Damages in both a breach of contract or negligence action are also limited to those which were proximately caused by the offending party."); *VICI Racing, LLC v. T-Mobile USA, Inc.*, 87 F.

---

[13] *Id.* at 237:18-19.

Supp. 3d 697, 699 (D. Del. 2015) (requiring plaintiffs to "lay a basis for a reasonable estimate" of the amount of damages) (quoting *Emmett S. Hickman Co. v. Emilio Capaldi Developer, Inc.*, 251 A.2d 571, 573 (Del.Super.1969)).

11.    Under Delaware law, damages for breach of contract must be proven with reasonable certainty. *Dill v. Dill*, K15L-02-003-JJC, 2016 LEXIS 385, \*3 (Del. Super. Ct. Aug. 2, 2016). "An award of damages may not be based upon 'speculation or guesswork.'" *Am. Gen. Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 12 (Del. Ch. 1992) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)); *see also Dill*, 2016 LEXIS at \*3 ("Recovery is not available to the extent that the alleged damages are uncertain, contingent, conjectural, or speculative.").

**B.    Transform's Misguided Argument That It Need Only Offer a "Just and Reasonable Estimate" of Its Damages Both Misconstrues and Is Belied by Delaware Law.**

12.    Transform's argument that "Delaware Law Does Not Require Damages to Be Proven with Certainty" demands correction. *See* Transform Br. at 4. Specifically, Transform relies on *Great American Opportunities, Inc. v. Cherrydale Fundraising, LLC* to claim that Delaware law "does not 'require certainty in the award of damages where a wrong has been proven and injury established.'" No. Civ. A. No. 3718-VCP, 2010 WL 338219, at \*23 (Del. Ch. Jan. 29, 2010) (citation omitted). This "lesser degree of certainty" is only triggered as to the ***amount*** of damages once "reasonable certainty" has been proven as to the ***fact*** of damages. *See SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015), as corrected (Dec. 28, 2015), 131 A.3d at 1131 ("Where the injured party has proven the fact of damages—meaning that there would have been some profits from the contract—less certainty is required of the proof establishing the amount of damages. In other words, the injured party need not establish the amount of damages with precise certainty 'where the wrong has been proven and injury

6

established.'").    In this exercise, the Parties assume *arguendo* that that there was a breach of the APA, not that injury or damages resulted from that breach.  Thus, Delaware law still requires Transform to prove, with "reasonable certainty," the fact of its expectation damages.  *Id.*

13.    Transform also misstates Delaware law by claiming, out of context, that "once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."  Transform Br. ¶ 7 (citing *Thorpe v. CERBCO, Inc.*, No. Civ. A. No. 11713, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993) (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (3d Cir. 1985))).  This so-called "wrongdoer rule" only applies "where the wrongdoer caused [the] uncertainty" about the damages.  *SIGA Techs.*, 132 A.3d at 1131 ("Where uncertainty could not be traced to SIGA's breach, the Court of Chancery did not resolve the uncertainty against SIGA.").  Since Transform makes no argument (and indeed there is none) as to how the Debtors' alleged breach caused any purported uncertainty about damages, the wrongdoer rule is irrelevant.

14.    Likewise irrelevant is Transform's assertion that "[e]vidence [of damages] that is unrebutted when presented by one side . . . should be considered conclusive."  Transform Br. ¶ 8 (citing *Patton v. Yancy*, No. CV N13A-10-006 JAP, 2014 WL 4674600, at *2 (Del. Super. Ct. Sept. 22, 2014) (quoting *Amalfitano v. Baker*, 794 A.2d 575, 578 (Del. 2001)) (internal quotations omitted)).  *Patton* is an intentional tort case where the plaintiff, despite having "introduced little evidence to show compensable injuries," was still entitled to "minimal damages" because he had "conclusively established an injury, in the form of a laceration" to his head.  2014 WL 4674600, at *1-2.  As discussed below, Transform has not and cannot establish injury here.  And, regardless, its damages claim is not "unrebutted;" the Debtors have offered substantial evidence and argument to that end.

15.     Finally, Transform premises its entire damages claim on the notion that its damages analysis is sufficient because it is a "just and reasonable estimate of the damages caused."  Transform Br. ¶ 8 (citing *Grace v. Corbis-Sygma*, 487 F.3d 113, 119 (2d Cir. 2007) (quoting *Raishevich v. Foster*, 247 F.3d 337, 342 n.2 (2d Cir. 2001))).  Transform, however, opportunely omits a material piece of the standard: "in cases such as this, ***in which the defendant's wrongdoing prevented the plaintiff from demonstrating the exact measure of the damages suffered***, the factfinder may make a just and reasonable estimate of the damages caused."  *Grace*, 487 F.3d at 119 (internal quotations omitted) (emphasis added); *Raischevich*, 247 F.3d at 343 (allowing for a just and reasonable estimate of damages "[i]f the plaintiff's inability to prove an exact amount of damages arises from actions of the defendant.").  Transform has failed to allege any causal link between the Debtors' actions and Transform's inability to give a precise damages figure.  In fact, the truth of the matter is quite the opposite.

16.     The Debtors literally conveyed every single shred of information that Transform might have used to calculate its damages to Transform in connection with the Sale Transaction—all of the Debtors' corporate books and records (including, presumably, the Debtors' contracts with and invoices from their vendors).  The Debtors handed Transform the keys to the castle, and Transform employed the men who could most deftly wield those keys—the Debtors' former CFO Robert Riecker and former Assistant Treasurer Rajat Prakash.  Accordingly, any failure to offer a precise measure of its damages falls squarely upon Transform's shoulders.  In short, the "just and reasonable" standard has not been triggered, and Transform has based its entire argument on the wrong standard.  *See generally* Transform Br. ¶¶ 7- 8.

**C.     Transform Has Not Proven the Amount of Its Alleged Damages.**

17.     Transform's damages analysis is set forth in the *Second Supplemental Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Adversary Complaint*

(ECF No. 4769) (the "**Hede Declaration**"). In the Hede Declaration, Mr. Hede purports to show that, for the week ending February 8, 2019, the Debtors *forecasted* that they would disburse $158 million in merchandise, non-merchandise, and CARPACH-related payments but ***actually*** disbursed $57 million in such payments, for a $101 million variance between forecasted and actual disbursements.[14] Mr. Hede then adjusts for CIA payments not made that week ($12 million) to arrive at an adjusted $89 million variance between forecasted and actual disbursements.[15]

18.      Transform subtracts that $89 million from the $189 million accounts payable outstanding at Closing to arrive at the amount of accounts payable it claims would have been outstanding at Closing had the Debtors acted in the ordinary course ($100 million).[16] Transform thus argues that it is entitled to recover $66 million in damages, comprising a $50 million administrative claim against the Debtors' Estate (because Transform claims that it has already paid $150 million in respect of accounts payable) and a release of its obligation to pay another $16 million outstanding accounts payable (the delta between the $150 million it allegedly has already paid and the $166 million cap specified in the APA).[17]

19.      The Hede Declaration, however, fails to show that Transform's damages are based upon more than just speculation or guesswork. Transform contends that it was injured because the Debtors failed to pay what they had *forecasted* they would pay. But a forecast is nothing more than a projection, a prediction, an estimate—an ***educated guess***. The Debtors might have paid more than they projected they would pay; they might have paid less. Nothing in

---

[14] *See* Hede Declaration at Ex. A p. 2. Notably, Mr. Hede draws this number from a February 1, 2019 daily cash-flow file that is ***not*** in evidence.

[15] *Id.*

[16] Transform Br. ¶¶ 10-11.

[17] *See id.*; *see also* APA § 2.3(k)(v); Sept. 12, 2019 Hr'g Tr. at 206:3-208:3.

the record—no document, no declaration, no hearing or deposition testimony—shows that the Disbursement Forecast was tied to anything more concrete than the Debtors' own projections. Nothing, for example, shows that the Disbursement Forecast was directly tied to the applicable provisions in the Debtors' contracts with or invoices from their vendors, such that the Court could rely upon the Disbursement Forecast as a proxy for what was due or, more importantly, *timely*.

20.    As discussed above, Section 8.6 of the APA required the Debtors to make timely payments—not payments when due.    The Court itself has recognized this distinction.[18] Transform has failed to offer evidence that the Debtors' forecasted disbursements were tied to when vendor payments were due.    And Transform also has failed to offer any evidence that would allow the Court to assess whether delaying a payment when contractually due necessarily rendered that payment untimely within the meaning of Section 8.6, such that the Debtors would be liable for damages in the amount of the payment.

21.    Transform dedicates a substantial portion of its Second Supplemental Memorandum to evidence purporting to show that the Debtors, themselves, have admitted that, in the week before Closing, they delayed certain "contractually due" payments.  *See* Transform Br. ¶¶ 12-16 (citing, *inter alia*, Second Supp. Good Decl. Ex. D (Feb. 4, 2019 Email from R. Prakash to E. Lampert, et al. Re: Daily Cash Flow Forecast 2.4.2019) at 1 ("In order to manage 1L outstanding on Feb 8th, we are delaying certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days."); Riecker Decl. ¶ 11 ("In other words, Debtors would not make payments on accounts payable as they became due but would delay them until after the Close in order to generate cash to satisfy the obligation under the APA with respect to the

---

[18] *See* Sept. 12, 2019 Hr'g Tr. at 211:3-6 ("THE COURT: Generally speaking, having looked at a lot of invoices over the years, [']when due['] is usually within a range.  I mean, it's usually within like a 10-day range or a 15-day range . . . .").

DIP."); Riecker Aug. 20, 2019 Dep. 21:22-22:3 ("Q. After this February 4th, 2019 email . . . was

sent out by Mr. Prakash, do you recall any pushback . . . from Mr. Lampert regarding the

decision to institute this three business day delay in payments that were otherwise contractually

due?")).[19]  Transform argues that this evidence demonstrates that the Disbursement Forecast was

tied to contractual due dates.[20]  Not so.  Just because Mr. Prakash said on February 4, 2019 that

the Debtors would "delay[] certain payments contractually due on February 5th, February 6th,

February 7th, by three business days," does not without further evidence prove that the February

1, 2019 disbursement forecast upon which Transform has predicated its damages analysis was

tied to contractual due dates.  And it certainly does not demonstrate that payments made after the

contractual due date would have become not timely within the meaning of Section 8.6 of the

APA.

22.    Transform's failure to adduce any proof that the Debtors' disbursement forecasts

were based upon or arose out of the applicable provisions in the Debtors' contracts or invoices

with their vendors is all the more stark when considered in light of the fact that Transform has

(and has had) unfettered access to the Debtors' books, records, and cash-management system

since mid-February 2019.   Indeed, Transform even has had the Debtors' former CFO and

Assistant Treasurer at its disposal.   Notwithstanding, Transform has not directed this Court to

even a single sentence—in an exhibit, declaration, transcript, or otherwise—that suggests that the

Court may rely upon the Disbursement Forecast as a proxy for what was due or timely.  This

resounding failure of proof dooms Transform's damages claim; accordingly, the Court should

find that, had the Debtors breached Section 8.6 of the APA, Transform would nevertheless not be

---

[19]  The Debtors do not concede that counsel's deposition question constitutes evidence that could support Transform's damages claim; the Debtors include Transform's reference here merely to illustrate the species of "evidence" Transform points to in an effort to prop up its unsalvageable damages claim.

[20] *See, e.g.*, Transform Br. ¶ 12.

entitled to an award of damages.

**D.     Transform Has Not Proven That It Sustained Damages As A Proximate Result of Any Alleged Breach of Section 8.6 of the APA.**

23.     Even if Transform had offered some evidence of untimely payment amounts (and it has not), Transform would nevertheless not be entitled to an award of damages for the separate and independent reason that it has failed to show that it sustained expectation damages as a proximate result of the Debtors' alleged breach of Section 8.6 of the APA.

24.     In Delaware, the standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*. *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001). Expectation damages are measured by the amount of money that would put the promisee in ***the same position as if the promisor had performed the contract***. *Id.*; *see also Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146-47 (Del. 2009) ("Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed . . . .'") (internal citations omitted); *see also VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 294 (3d Cir. 2014) (applying Delaware law) (same). Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract and, hence, what the promisee lost. *Duncan*, 775 A.2d at 1022. Moreover, "damages for breach of contract 'should not act as a windfall' for the non-breaching party." *Henkel Corp. v. Innovative Brands Holdings, LLC*, No. CIV.A. 3663-VCN, 2013 WL 396245, at *5 (Del. Ch. Jan. 31, 2013) (quoting *Paul*, 974 A.2d at 146).

25.     Assuming *arguendo* that the Debtors breached Section 8.6 when, in the week before Closing, it delayed making certain payments in respect of payables by three business days, the record demonstrates that ***Transform would nevertheless not have suffered any***

*expectation damages*.  The record is clear that, had the Debtors "performed the contract" as Transform purports to read it, they would not have been able to satisfy the Section 10.10 closing condition.  Stated differently, had the Debtors made all payments in respect of payables of the Business arising from the date of the APA until the Closing Date on their contractual due dates (again, assuming that is what the APA required), the Debtors would not also have been able to pay down the outstanding indebtedness under the DIP Credit Agreement to $850 million.

26.    For example, the evidence shows that, in the weeks before the Closing Date, the Debtors "did everything in their power to move as much cash as possible as quickly as possible into the concentration account so that [they] could minimize the DIP balance, with the focus being on the 850."[21, 22]  Days before the Closing Date, however, it became clear that the Debtors would have to do more.[23]  On February 3, 2019, Brian Griffith, the Debtors' financial advisor, cautioned the Debtors, including Mr. Meghji and Mr. Riecker, that "[i]f we want to hit the 850 on [the Closing Date] . . . , we will have to carefully manage disbursements for the next four days."[24]  The next day, Mr. Prakash informed ESL that the Debtors would delay certain disbursements by three business days in order to ensure that the DIP balance was no more than $850 million on the Closing Date.[25]

---

[21] When referencing any deposition transcript, the Debtors cite to those deposition page-and-line designations offered into evidence before and in connection with the September 12, 2019 hearing.

[22] Meghji Aug. 30, 2019 Dep. at 42:16-43:6; *see also* Sept. 12, 2019 Hr'g Tr. at 74:24-75:4 ("Q. In fact, the reason that you were expediting the process is that there was a concern that by the closing date you might not have gotten enough money into that concentration account in order to pay the DIP down to the 850 closing condition, correct? [MR. RIECKER:] That is correct."), 76:15-19 ("Q. And during that last week before the close, you were still going through that process of trying to expedite the process to get as much into the concentration account as possible, correct?  [MR. RIECKER:] I believe that was still the process in that last week.").

[23] *See* Sept. 12, 2019 Hr'g Tr. at 76:15-19.

[24] Riecker Aug. 6, 2019 Decl. (ECF No. 4772) ("**Riecker Decl.**") at Ex. C.

[25] *See* Sept. 12, 2019 Hr'g Joint Ex. 013 (Feb. 4, 2019 Email from R. Prakash to E. Lampert, et al. Re: Daily Cash Flow Forecast 2.4.2019) at 1; *see also* Sept. 12, 2019 Hr'g Tr. at 98:16-23 ("Q. And did you have an understanding of what Mr. Prakash meant when he said 'in order to manage 1L outstanding on February 8th?'  [MR. RIECKER:]

27.    Mr. Meghji and Mr. Riecker, now Transform's CFO, both testified concerning the direct and inverse relationship between the DIP balance and accounts-payable disbursements in the week before Closing.  Mr. Meghji explained:

> in a period as tight as this was, the DIP balance is affected by what you pay in terms of payables.  . . .  Anything you pay hits the DIP balance.  If you pay a dollar in accounts payable, it increases the DIP balance by a dollar. . . .  [I]f your payables are higher, DIP is lower.  If you make a payment, then it reduces accounts payable and increases your DIP balance, and vice versa.[26]

And Mr. Riecker admitted that every dollar in the Debtors' concentration accounts was swept to pay down the DIP balance and that, if the Debtors wanted to pay for anything else (including accounts payable), they would draw down on the DIP in order to do so.[27]  Mr. Riecker further admitted that the Debtors delayed disbursements in the week before the Closing Date to ensure that the DIP balance was no more than $850 million on the Closing Date.[28]

28.    Because every dollar used to pay down accounts payable increased the DIP balance by a dollar, if the Debtors had "performed the contract" by further paying down the

---

Yes. . . .  Those were the first lien debt that the company was – that was a closing condition of the company to meet as part of the – or the Debtor was to meet as part of the APA.").

[26] Meghji Aug. 30, 2019 Dep. at 60:14-61:9, 61:11-25; *see also id.* at 40:2-25 ("The only mechanisms that existed [to ensure that the DIP shortfall provision would not be triggered] were around managing payables and purchasing of inventory[.]"), 41:14-23 ("Kunal specifically told me, you know how this is done.  As long as you hit the minimum borrowing base requirements, which is minimum inventory, along with receivables, so that it hits the specified amount of the borrowing base – minimum borrowing base that they needed, and then we were expected to manage payables and inventory buying to get to the 850.  That was the only mechanism left."), 42:16-43:6 ("[T]he Debtors, between January 16 and the closing date, did everything in their power to move as much cash as possible as quickly as possible into the concentration account so that we could get – we could minimize the DIP balance, with the focus being on the 850."), 68:16-69:16 ("My big focus, as CRO of the company, was first and foremost to hit the two main closing conditions . . . .  One was the DIP balance needs to be below 850 and as close to 850 as possible without triggering anything else.  And the second one was hitting the . . . $1.553 billion was the inventory number, and there was receivables on top of that.  Those were the two critical closing conditions.  The buyers were as focused on ensuring that we were focused on that as we were, because, at that point, they were really interested in ensuring that we worked together to get the APA done, consummated and the transaction closed."), and 70:20-71:2 ("[T]here was a significant risk that either ESL would demand concessions that we would have to give or we would be unable to close . . . .").

[27] Sept. 12, 2019 Hr'g Tr. at 118:16-119:6.

[28] *See id.* at 99:3-6, 113:16-114:19; Riecker Decl. ¶ 13 ("Debtors . . . directed that payments should not be made on accounts payable that would become due the following day . . . in order to ensure that Debtors would have sufficient cash to be able to satisfy the DIP obligations under the APA . . . .").

accounts-payable balance before Closing, the only two possible outcomes on the day of Closing would have been: (1) Transform could have waived the Section 10.10 closing condition (which required the Debtors to pay down the outstanding indebtedness under the DIP Credit Agreement to $850 million) and closed on the Sale Transaction with outstanding accounts payable below $166 million (for example, $100 million) but an outstanding DIP indebtedness above $850 million (for example, $939 million) or (2) Transform could have invoked the Section 10.10 closing condition and refused to close on the Sale Transaction.[29]   Under no circumstances, however, would the company have emerged from the transaction with outstanding accounts payable of only $100 million and outstanding DIP indebtedness of only $850 million.[30]   To suggest otherwise is to, as defense counsel put it at the September 12, 2019 hearing, "operat[e] in make-believe land"[31]—or to say that one can add weight to one side of a balance scale while the other side remains static.

29.    The possible outcomes of the anticipated Sale Transaction as of February 4, 2019 can be depicted as follows:

---

[29] APA Article X ("Buyer's obligation to consummate the Transactions is subject to the satisfaction or waiver, as of the Closing, of each of the following conditions . . . ."); APA § 10.10 ("The aggregate amount required to be paid to fully satisfy the existing indebtedness of Sellers under (a) the DIP Credit Agreement shall be no greater than $850,000,000 and (b) the Junior DIP Term Loan shall be no greater than $350,000,000 . . . .").

[30] *See id.*

[31] Sept. 12, 2019 Hr'g Tr. at 220:7-8.

|  | **1** | **2** |
|---|---|---|
|  | **No "Breach"** (i.e., vendor payments **not** delayed during the week before Closing) | **"Breach"** (i.e., vendor payments **delayed** to pay down the DIP balance to $850M) |
| **Outstanding A/P** | $100 million[32] | $189 million |
| **Outstanding DIP Indebtedness** | $939 million | $850 million |

Table 1[33]

30.    Compare those two possible outcomes with the outcome upon which Transform

predicates its alleged expectation damages:

|  | **1** | **2** | **3** |
|---|---|---|---|
|  | **No "Breach"** | **"Breach"** | **Make-Believe Land** |
| **Outstanding A/P** | $100 million | $189 million | $100 million |
| **Outstanding DIP Indebtedness** | $939 million | $850 million | $850 million |

Table 2

In Transform's scenario—column 3, above—Transform reduces the outstanding accounts-

payable balance by the $89 million it argues the Debtors should have paid to get the balance

down to $100 million, but it does so without at all impacting the DIP balance from which the

Debtors would have had to make those payments.  The money to reduce the accounts-payable

balance appears as if out of thin air, like manna from heaven.

31.    It is within that impossible framework that Transform asserts that it is entitled to

---

[32] The numbers included in Tables 1 and 2 are for illustrative purposes only and in no way operate as a concession that the numbers advanced in Transform's damages analysis are accurate or supported by the evidence.  The critical point is that, if the Debtors were going to pay down the DIP to $850 million, the outstanding accounts-payable balance was going to be higher than $100 million, and if the Debtors were going to make all payments in respect of the Business between Execution and Closing on their contractual due dates, the outstanding DIP balance was going to be higher than $850 million.  *See supra* notes 29-37 and accompanying text.

[33] *See* APA § 10.10 and *supra* notes 29-37 and accompanying text.

recover $66 million in damages: the difference between the $100 million it claims the Debtors should have reduced the accounts-payable balance to before the Closing and the $166 million cap on its assumption of such payables per Section 2.3(k)(v) of the APA.    Under no circumstances, however, could Transform have purchased a company with both only $100 million outstanding accounts payable and only $850 million outstanding DIP indebtedness. Transform could either have assumed an additional $66 million accounts payable (as in column 2), come up with enough cash to pay down the DIP to $850 million in order to satisfy the terms of its lender financing agreement (as in column 1), or walked away from the deal entirely.[34]  But it could not, under any scenario, get the deal it seeks through litigation.  Transform thus seeks to put itself in a far better position—$66 million better—than it possibly could have been absent the alleged breach.  Such a windfall is in direct contravention of Delaware law.

32.    Transform argues that, once it "learned" of the Debtors' purported breach, Delaware law supplied it with two choices: it could "'either stop performance and assume the contract [was] avoided, or continue its performance and sue for damages.'"  *See* Transform's Br. ¶ 22 (quoting *In re Woodbridge Grp. of Cos., LLC*, 590 B.R. 99, 105 (Bankr. D. Del. 2018); *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992)).  But neither *Woodbridge* nor *Jiffy Lube* supports Transform's argument that it would necessarily be entitled to some amount of expectation damages if the Debtors had breached Section 8.6 of the APA.

33.    In *Woodbridge*, a debtor defaulted on its payments to the holders of a promissory note.  *Woodbridge*, 590 B.R. at 101.  The noteholders then assigned the note to an assignee in

---

[34] *See* APA § 10.10 and *supra* note 36; *see also* Meghji Aug. 30, 2019 Dep. at 37:19-38:4 ("The understanding was that your client and the debtors negotiated an agreement which required managing to a particular level of a DIP balance and a particular amount of a borrowing base that they dictated and asked us to do specifically because of their financing constraints.  So that's essentially what was required to be done.  And we did our best to do that."); Sept. 12, 2019 Hr'g Tr. at 87:21-23 ("Q. But if the $850 million DIP target was not met, that meant that the deal may be off, correct?  [MR. RIECKER:] My understanding, yes.").

violation of the note's anti-assignment clause. *Id.* at 102. The assignee, in turn, filed a proof of claim with the bankruptcy court, asserting a secured claim against the debtor in the amount of the note. *Id.* The debtor objected to the proof of claim on the grounds that the assignment was void because it violated the note's anti-assignment clause. *Id.* at 101, 102, 105-06. The assignee argued that the debtor's prior breach had rendered the anti-assignment clause unenforceable. *Id.* at 105-06. The bankruptcy court rejected the assignee's argument on the grounds that "[u]nder no circumstances may [a] non-breaching party stop performance *and* continue to take advantage of the contract's benefits." *Id.* at 105. The court further stated that "[i]t is axiomatic that a non-breaching party may not emerge post-breach with more rights than it had pre-breach." *Id.*

34. *Woodbridge*, then, stands for the simple proposition that one party's breach of a contractual provision does not necessarily render other provisions of the contract unenforceable, especially where that would give the non-breaching party more rights than it had pre-breach. *Id.* at 105-06. *Woodbridge* thus supports the Debtors' position. Again, had the Debtors made all payments in respect of payables of the Business arising between Execution and Closing on their contractual due dates so as not to "breach" Section 8.6 of the APA, the Debtors could not have met the Section 10.10 closing condition and the transaction would never have closed (unless Transform had waived the closing condition and agreed to move forward despite the DIP balance being greater than $850 million). Stated differently, under no circumstances would Transform have emerged from the transaction with a company that had both $100 million outstanding accounts payable and an $850 million DIP balance. By exploiting the Debtors' purported breach as a justification to sue the Debtors for $66 million in damages, Transform seeks for itself more rights than it had pre-"breach"—that is, a better position than it would have been in had the Debtors not delayed vendor payments in the week before Closing—in clear contravention of

Delaware law and fundamental damages principles.

35.     In *Jiffy Lube*, a franchisee, "[f]eeling that [the franchisor] had violated its duty to him, . . . stopped making royalty payments, but [nevertheless] continued to operate the service centers under the [trademark] name." *Jiffy Lube*, 968 F.2d at 377.  The Third Circuit held that "a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor," thus "[the franchisee] may ***still*** have [had] a legitimate claim for damages, but he [did] ***not*** have the right to continue using the trademark as an infringer." *Id.* (emphasis added).  The court underscored that "[u]nder no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits." *Id.* at 376.

36.     *Jiffy Lube*, therefore, stands for the proposition that one cannot terminate their performance under a contract and then continue to benefit from the contract's terms, *id.* at 376-77, a principle that is relevant here only to the extent it buttresses the Debtors' argument that Transform cannot emerge from the Debtors' purported breach with a better bargain than it could ever have had absent the breach.

37.     Significantly, neither *Woodbridge* nor *Jiffy Lube* supports Transform's position that it is entitled to an award of expectation damages.  Transform might have treated Mr. Prakash's February 4 email as an anticipatory breach, immediately ceased performance of its obligations under the APA, and sued for damages for total breach under the doctrine of anticipatory repudiation.[35]  *Carteret Bancorp, Inc. v. Home Grp., Inc.*, 1988 WL 3010, at *5 (Del. Ch. Jan. 13, 1988) (unpublished) (citing Farnsworth, *Contracts* § 8.20 (1982)).  But it didn't.  Transform instead chose to close on the Sale Transaction and sue for actual breach.

---

[35] The Debtors do not concede or suggest that Mr. Prakash's February 4, 2019 email amounts to the sort of "unequivocal statement by a promisor that he will not perform" that would give rise to a claim for anticipatory repudiation, *see Carteret*, 1988 WL 3010, at *5, but rather merely suggest a possible course of action open to Transform.

Accordingly, under Delaware law, its damages are measured by the amount of money that would put it in the same position as if the Debtors had not "breached" the APA. As discussed at length above, that amount is $0.

38.    If Transform did not want to assume the obligation to make the payments that the Debtors delayed in order to meet the Section 10.10 closing condition, Transform, again, might have ceased performance and immediately asserted a claim for anticipatory repudiation. Or it might have immediately directed the Debtors to refrain from delaying vendor payments, whatever the consequences to the Debtors' efforts to pay down the DIP. Transform did neither. It wanted the impossible. It wanted its windfall. It wanted a company with an $850 million outstanding DIP balance and a $66 million damages claim (based on Debtors' alleged failure to pay the accounts payable balance down to $100 million). But that is not—and could not be—the position that Transform would have been in absent the theoretical breach by the Debtors. The law doesn't give it that, and neither should this Court.

### E.    The Debtors Have Not Waived Any Arguments Opposing Transform's Damages Claim.

39.    As discussed above, because Transform failed, in its first bite at the apple, to show that the Debtors' forecasted disbursements were tied to when vendor payments were due or timely, the Court "invite[d] briefing on the damages point, limited to what's in the record" and, further, specifically instructed the Parties that they could, "both of [them], point out why [the Court could] rely on the forecasting, or not rely on the forecasting."[36] Astoundingly, Transform now argues, in its second bite at the apple, that the Debtors have waived any argument that Transform failed to carry its burden of proof with respect to its damages claim.

40.    Transform's waiver argument is unsupported by law or common sense. First, it is

---

[36] Sept. 12, 2019 Hr'g Tr. at 245:8-10.

nonsensical to say that the Debtors have waived an argument that the Court specifically invited them to make. And, in any event, the Court invited such briefing because it was uncomfortable with Transform's damages analysis.[37] Thus, if any party is guilty of inadequately addressing damages, it is Transform. *See Boehm v. Am. Broad. Co., Inc.*, 929 F.2d 482, 487 (9th Cir. 1991) (rejecting the defendant-employer's argument that the plaintiff-employee had waived its argument that the employer had failed to carry its burden of proof where "[a]ny inadequacies in [the] record . . . manifest[ed the employer's] own failure to carry its burden of proof").

41.    Second, Transform cites to a series of cases that simply do not reflect the circumstances here. *See Bd. of Managers of Mason Fisk Condo. v. 72 Berry St.*, LLC, 801 F. Supp. 2d 30, 39 (E.D.N.Y. 2011) (waiving an argument on the merits where plaintiff omitted it from the complaint and opposition brief to a motion to dismiss); *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 555 (S.D.N.Y. 2010) (same); *Emerald Partners v. Berlin*, No. Civ. A. 9700, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) (waiving an argument on the merits where plaintiff failed to raise it for fifteen years, despite "many hundreds of pages of pre-trial and post-trial briefing"); *In re Elonex Phase II Power Mgmt. Litig.*, 279 F. Supp. 2d 521, 525 (D. Del. 2003) (waiving an argument where defendant failed to answer plaintiff's complaint and then lost on a default judgment). The Debtors are neither a party carrying the burden of proof, *see Boehm*, 929 F.2d at 487, nor one making an argument "a day late and a dollar short," *Elonex*, 279 F. Supp. 2d at 525 (failing to raise an argument until after a default judgment hearing). Instead, the Debtors are briefing the very topic raised by the Court—whether Transform has satisfied its burden to prove breach-of-contract damages had it won on liability, which it did not. Transform's waiver argument is therefore meritless and should be dismissed as such.

---

[37] *Id.* at 246:6-14.

## IV.    Conclusion

42.    For all of the foregoing reasons, the Debtors respectfully request that the Court find that, even if the Debtors had breached Section 8.6 of the APA by delaying certain payments contractually due on February 5, 6, and 7 by three business days, Transform would not have been entitled to an award of damages because Transform has neither proven that it sustained damages nor the measure of those damages.

Dated: November 22, 2019
       New York, New York

/s/ *Sunny Singh*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*