COZEN O'CONNOR  
*Attorneys for Scents of Worth, Inc.*  
Frederick E. Schmidt, Jr.  
277 Park Avenue  
New York, NY  10172  
(212) 883-4900  
(646) 588-1552 (fax)  
eschmidt@cozen.com  

Hearing Date:.  
Objection Deadline:

**UNITED STATES BANKRUPTCY COURT**  
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**LIMITED OBJECTION OF SCENTS OF WORTH, INC. TO THE DEBTORS' NOTICE REGARDING INITIAL DISTRIBUTION PURSUANT TO ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM**

Scents of Worth, Inc. ("**SOW**") hereby submits this objection to the *Notice Regarding Initial Distribution Pursuant to Administrative Expense Claims Consent Program*, [ECF # 6186],

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LL/C (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

LEGAL\44062541\1

(the "**Notice**"). SOW respectfully requests that the Court find that SOW must be included as an Initial Distribution Participant as defined in the Notice or that the Debtors may not issue any distributions for administrative expense claims until such later date as will permit all opt-in claimants a reasonable opportunity to participate in the Initial Distribution.

## BACKGROUND

1. On July 29, 2019, SOW filed a *Motion to Compel Payment of Proceeds of Sales of Post-Petition Sales of Consigned Goods to Scents of Worth, Inc.* [ECF #4633] (the "**SOW Motion**") which outlines the post-petition claims of SOW in these cases. Although the SOW Motion was consensually adjourned a number of times, no objection to the SOW Motion was ever filed by the Debtors. As set forth below, the SOW Motion was ultimately adjourned without date pursuant to the terms of the Confirmation Order (defined below). Following confirmation, Debtors' counsel advised SOW that the SOW Motion had been adjourned pursuant to the Confirmation Order and that "the debtors are going to prioritize reconciliation of admin claims with parties who opt into the settlement framework announced in connection with confirmation." On November 16, 2019, SOW timely submitted an "Opt In Ballot", opting to become an Initial Distribution Participant.

2. SOW and Kmart Corporation ("**Kmart**") had a longstanding and lengthy business relationship with each other. As part of that relationship, on or about August 31, 2000, SOW and Kmart entered into a *Merchandise Supply Agreement* (as thereafter amended, the "**Prior Contract**") pursuant to which SOW would be the sole supplier to Kmart of certain designer brand name fragrances and perfume products. Paragraph 1(b) of the Prior Contract provided that the products to be supplied by SOW were to be supplied on a consignment basis. Paragraph 2 of the

2

Prior Contract provided that SOW was to supply to begin supplying consigned goods to Kmart beginning on September 11, 2000.

3. Scents of Worth timely filed a UCC-1 financing statement to perfect its interests in the consigned goods to be delivered pursuant to the Prior Contract. A copy of the UCC-3 continuation statement (file # 2008133220-4) filed by SOW with the Michigan Secretary of State on August 25, 2008 was annexed as Exhibit B to the *Declaration of Mike Katz in Support of the Motion to Compel Payment of Proceeds of Post-Petition Sales of Consigned Goods to Scents of Worth, Inc.* (the "**Katz Declaration**") annexed to the SOW Motion as Exhibit B.[2] A copy of the Prior Contract was annexed to the Katz Declaration as Exhibit A.

4. On or about January 1, 2014 following a series of amendments to the Prior Contract, Kmart and SOW entered into a new *Distribution and Supply Agreement* (as thereafter amended, the "**Contract**") pursuant to which SOW would be the exclusive supplier and distributor of certain fragrances and perfume products, on a consignment basis (such goods that were in the Debtors' possession as of the Petition Date (hereafter defined) are hereafter referred to as the "**Consigned Goods**"). A copy of the Contract was annexed as Exhibit C to the Katz Declaration. Pursuant to the terms of the Contract, Kmart was to realize a gross margin on each sale of Consigned Goods of 28% of the selling price of such goods.

---

[2] The UCC-3 references file 2004008749-4 as the initial financing statement filed by SOW. Pursuant to section 440.9515(5) of the Michigan Compiled Laws, the UCC-3 statement continued the effectiveness of the initial 2004 financing statement until 2014, the 5-year anniversary date of the initial financing statement. *See MCL 440.9515(5)* ("…upon timely filing of a continuation statement, the effectiveness of the initial financing statement continues for a period of 5 years commencing on the day on which the financing statement would have become ineffective in the absence of a filing").

5. SOW properly perfected its consignment interests by filing a new UCC financing statement with the Michigan Department of State (Document Number 2013179478-4)[3] on December 20, 2013. SOW further provided written notice of the consignment and of the UCC filing to Wells Fargo Bank, NA, which Kmart identified in the Contract as the only creditor having a security interest in any of its inventory at the time. Copies of the financing statement and the notification to Wells Fargo Bank, NA were annexed to the Katz Declaration as Exhibits D and E respectively.

6. On October 15, 2018 (the "**Petition Date**"), the Debtors each filed voluntary petitions under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). According to Kmart's internal purchasing/accounting system (the "**Workbench System**"), approximately $2,384,237.00 in Consigned Goods was in the Debtors' possession on October 13, 2018 – two days prior to the Petition Date. The precise amount of Consigned Goods in the Debtors' possession on the Petition Date is not presently known to SOW, though it is believed that the amount does not materially differ from the amount of Consigned Goods in the Debtors' possession on October 13, 2018.

7. On October 26, 2018, the Court entered an *Interim Order Approving (i) Procedures for Store Closing Sales and (ii) Assumption of Liquidation Consulting Agreement* [ECF # 337] (the "**Interim Store Closing Order**") and on November 19, 2018, the Court entered a *Final Order Approving (i) Procedures for Store Closing Sales and (ii) Assumption of Liquidation Consulting Agreement* [ECF # 823] (the "**Final Store Closing Order**" or, together with the Interim Store

---

[3] Although the Contract provides that Illinois law governs the construction, interpretation, and enforcement of the Contract, the UCC financing statement was filed in Michigan because Kmart is a Michigan corporation *See Uniform Commercial Code* § 9-307 made relevant here by § 440.9307 of the *Michigan Compiled Laws* (the "**MCL**").

4

Closing Order, the "**Store Closing Orders**"). The Interim Store Closing Order that was agreed upon by the Debtors and various consignment vendors resolved various objections filed by consignment vendors, including an objection filed by SOW [ECF # 224].

8. The Store Closing Orders each provide, *inter alia*, that consignment vendors, like SOW, are to be paid in the ordinary course of business from the proceeds of post-petition sales of consigned goods, regardless of whether the goods are sold pursuant to store closings or any other sale. Further, the Store Closing Orders directed the Debtors to establish a separate segregated account in which proceeds of the sale of consigned goods were to be placed and held in trust for the benefit of consignment vendors, such as SOW. Specifically, and paragraphs 36 and 37 of the Final Store Closing Order[4] provide:

> 36. The Debtors are authorized to sell goods and merchandise shipped to the Debtors pursuant to a consignment agreement with a consignment vendor, whether delivered to the Debtors prepetition or postpetition (the "**Consignment Merchandise**"), in connection with the Store Closings *or any other sale by the Debtors of Consigned Merchandise* and notwithstanding any other provision of the Order, consignment vendors shall be paid in the ordinary course of business from the allocable proceeds solely from the postpetition sale of such Consignment Merchandise in accordance with the terms of the applicable consignment agreements (the "**Vendor Proceeds**"), whether such goods were delivered to the Debtors prepetition or postpetition. *The Debtors are directed to establish a separate, segregated account which shall be funded with the reported amount of Vendor Proceeds and all payments made to consignment vendors shall be made from such account* (the "**Reserve Account**"), *with the Vendor Proceeds therein to be held in trust for the benefit of the Consignment Vendors*.
>
> 37. For the avoidance of doubt, notwithstanding anything to the contrary in the Interim DIP Order or the Final DIP Order, any properly perfected, noticed and valid consignment interest (as defined under the Uniform Commercial Code (the "**UCC**")) in and to the Consignment Merchandise or Consignment Merchandise shipped postpetition pursuant to this Order the Vendor Proceeds and

---

[4] Paragraphs 34 and 35 of the Interim Store Closing Order contains substantially the same language as paragraphs 36 and 37 of the Final Store Closing Order.

> the Reserve Account shall not be subject to any DIP Liens or Adequate Protection Liens (each as defined in the Interim DIP Order) granted under the Interim DIP Order or the Final DIP Order.

*Final Store Closing Order*, ¶¶ 36 and 37 (italicized emphasis added).

9. According to the Workbench System, as of February 9, 2019, the total value of Consigned Goods with the Debtors was approximately $1,049,303. The Debtors, therefore, sold approximately $1,334,934.00 in Consigned Goods between October 13, 2018 and February 9, 2019. Substantially all of those sales appear to have been post-petition sales of Consigned Goods to the Debtors' customers. Pursuant to the terms of the Store Closing Orders, the Debtors were required to segregate the proceeds from those sales and to hold them in trust for the benefit of SOW.

10. On February 8, 2019, the Court entered an *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* [ECF # 2507] pursuant to which the Debtors thereafter sold substantially all of their assets to Transform Holdco LLC ("**Transform Holdco**"). Upon information and belief, the sale of the Debtors' assets to Transform Holdco closed on February 11, 2019.

11. It appears that all Consigned Goods then remaining in the Debtors' possession (the "**Remaining Consigned Goods**") were included in the assets that were sold by the Debtors to Transform Holdco. According to the Workbench System, as of February 9, 2019 – two days prior to the closing on the sale of the Debtors' assets to Transform Holdco – the total amount of Consigned Goods in the Debtor's possession was $1,049,303. Like the proceeds from post-petition sales of Consigned Goods to the Debtors' customers, the proceeds from the Debtors' sale of Remaining Consigned Goods to the Buyer were required to be segregated and placed in a

6

separate account to be held in trust for the benefit of SOW pursuant to the terms of the Store Closing Orders.

12. Unless the claimholders otherwise agree, section 503(b) claims must be paid in full for a debtor to emerge from a Chapter 11 proceeding. During the pendency of these Chapter 11 cases, the Debtors came to realize that it may be difficult for them to emerge from these Chapter 11 cases without a consensual resolution of the various claims that entities and individuals asserted under section 503(b). The Debtors therefore proposed the Administrative Expense Claims Consent Program (the "**Consent Program**") under which individuals and entities asserting section 503(b) claims could opt-in and have their claims paid prior to the effective date of the Debtor's plan of reorganization, but the payments would be less than one-hundred cents on the dollar.

13. On October 15, 2019, this Court entered an Order (i) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors and (ii) Granting Related Relief, [ECF #5370], (the "**Confirmation Order**"). The Confirmation Order approved, among other things, the Consent Program. It also provided for the adjournment without date of all motions seeking payment of an administrative expense. The SOW Motion was so adjourned pursuant to the terms of the Confirmation Order.

14. As relevant here, the Consent Program provides:

> each holder of an Allowed Administrative Expense Claim against the Debtors that *affirmatively opts-in* (the "**Opt-In Settled Admin Claims**") to the Administrative Expense Claims Consent Program shall receive: (i) its pro rata share of the Initial Distribution capped at 75% of the Allowed Administrative Expense Claim (the percentage recovery, the "**Initial Recovery**"); provided, that, the Initial Distribution shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors and the Creditors' Committee to the Allowed amount of the Opt-In Settled Admin Claims; provided, further, that, holders who do not agree with the Debtors and the Creditors' Committee on the Allowed amount of the Opt-In Settled Admin

7

        Claim shall be deemed to hold a Non Opt-Out Settled Admin Claim; and (ii) consensual reconciliation of the Allowed amount of Opt-In Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of receipt of the Opt-In Ballot; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Opt-In Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of an Opt-In Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

    15.    As defined in the Consent Program, "Initial Distribution shall mean Distributions made from a cash pool of $21 million inclusive of the Carve-Out Contribution ('**Initial Cash Pool**') to be held in the Segregated Account and made available on or about December 1, 2019 (the '**Initial Distribution Date**') for holders of Opt-In Settled Admin Claims". (Id. at 27 n.6.) SOW timely opted into the Consent Program on November 16, 2019. One of the inducements promised in the Debtors' solicitation of opt-in ballots was "Expedited Reconciliation" of claims of administrative expense claimholders who affirmatively opt-in (to be completed within 30 days from the date of the Debtors' receipt of the opt-in ballot). (Ex. A at 3.).

    16.    Notwithstanding the promise of an "Expedited Reconciliation", SOW has not been contacted since the date of its opt-in election regarding its claim. Indeed, SOW only learned that it would not be able to participate in the Initial Distribution was its electronic receipt of the Notice. No additional information has been requested by the Debtors or the Committee and no specific explanation of any disagreement with SOW's claim has ever been provided to SOW.

## ARGUMENT

    17.    SOW opted in to the Consent Program to: (i) maximize its likelihood of recovery of a substantial amount of the Administrative Expense Claims; and (ii) receive payment

for a substantial amount of the Administrative Expense Claims as quickly as possible, in light of the Debtors' apparent difficulties in avoiding "administrative insolvency." The Debtors' premature Notice not only attempts to rob SOW of the benefits it expected to receive from opting in, but also attempts to push SOW into a group where there is no clear indication of how long SOW will have to wait before receiving a distribution. SOW respectfully submits that such mistreatment is wrong.

18. As noted above, the Consent Program provides that entities who opt in are entitled to receive their pro rata share of the Initial Distribution as long as the parties come to agreement on the Allowed amount of the asserted Opt-In Settled Admin Claims. After having filed its opt-in ballot with the Debtors' claims agent, SOW reasonably believed that either (i) they would be contacted by the Debtors or the Committee to reconcile any disagreement on SOW's claim; or (ii) SOW's claim would be agreed to and SOW would receive its pro rata share from the Initial Distribution pool. This expectation on the part of SOW was reasonable and justified, in light of the promise of "Expedited Reconciliation" as one of the benefits touted by the Debtors in their opt-in solicitation materials (in the same bullet point list as the promise of participation in the Initial Distribution for those claimants who affirmatively opt-in). SOW did not foresee a scenario where the Debtors would file the Notice without at least contacting it to reconcile any disagreement over its claim. Nevertheless, that is exactly what occurred.

19. The Debtors intend to commence the Initial Distribution on December 13, 2019. If the Court allows the Initial Distribution specified in the Notice to go forward, SOW will be pushed into the Non Opt-Out group with no reasonable expectation of when (or if) to expect a payment for the Administrative Expense Claims.

20. Administrative expense claims are entitled to full payment under the Bankruptcy Code, unless the claimholder otherwise agrees (in which case it goes without saying that the Debtor must abide by the terms of such agreement). A debtor cannot emerge from a Chapter 11 case without paying such claims in full. The Debtors created the Consent Program to enable themselves to settle administrative claims for amounts that are less than the full amount and emerge from these Chapter 11 cases. The Confirmation Order, authorized and approved that program, thus providing the benefits that the Debtors expected. After careful consideration, having not received *any* payment on account of the post-petition sales of its consigned inventory, SOW elected to file an opt-in ballot in order to receive at least some payment on its administrative claim at the earliest possible date. By pushing SOW and similarly situated administrative claimholders into the Non Opt-Out group, the Debtors receive the benefits of settling those administrative claims for less than the full amounts and also relieving them of their promised obligation to issue expeditious payments to the many claimants who opted into the Consent Program. The Court cannot allow the Debtors to both receive their benefits under the Consent Program and take away the benefits claimholders such as SOW expected to receive under that program.

21. Accordingly, SOW respectfully requests that the Court rule that SOW must be included in the Initial Distribution specified in the Notice. In the alternative, SOW respectfully requests that the Court rule that: (i) the Debtors may not commence the Initial Distribution on December 13, 2019, (ii) a new date will be set for the Initial Distribution, and (iii) the Debtors are required to provide at least 10 days' notice to all opt-in claimants as to the deadline for reaching consensual agreement on the Allowed amounts of the claimants' Opt-In Settled Admin Claims so as to enable all opt-in claimants a reasonable opportunity to participate in the Initial Distribution.

## CONCLUSION

For the foregoing reasons, SOW respectfully requests that the Court order the relief requested above and order further relief as the Court may deem just and appropriate.

Dated: New York, New York
December 13, 2019

>                         COZEN O'CONNOR
>                         *Attorneys for Scents of Worth, Inc.*
>
>                         By: */s/ Frederick E. Schmidt, Jr.*
>                         Frederick E. Schmidt, Jr.
>                         277 Park Avenue
>                         New York, NY 10172
>                         Phone: 212-883-4948
>                         Facsimile: 646-588-1552
>                         Email:  eschmidt@cozen.com