Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4   In the Matter of:

5

6   SEARS HOLDINGS CORPORATION,    Case No. 18-23538-rdd

7

8            Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  SAYVILLE MENLO LLC,

11               Plaintiff,

12        v.                    Adv. Case No. 19-08286-rdd

13  TRANSFORM HOLDCO LLC, ET AL,

14               Defendants.

15  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16

17               U.S. Bankruptcy Court

18               300 Quarropas Street

19               White Plains, NY 10601-4140

20

21               December 13, 2019

22               10:18 AM

23

24

25

Page 2

1    B E F O R E :

2    HON ROBERT D. DRAIN

3    U.S. BANKRUPTCY JUDGE

4

5

6    HEARING Re 1) Motion of Realtor Carl Ireland, Administrator

7    of the Estate of James Garbe, for an Order (I) Determining

8    the Value of Relator's Collateral as of the Sale of such

9    Collateral; (I) Determining the Amount of Any Diminution in

10   the amount of the Sales Proceeds Allocable to such

11   Collateral After the Sale; (II) directing Payment of

12   Relator's Secured and Superpriority Administrative Claims;

13   and (IV) Granting Related Relief (ECF 4931)

14

15   HEARING Re 2) Motion for Payment of Administrative Expenses

16   for Vorys, Sater, Seymour and Pease LLP, Other Professional,

17   period: 10/15/2018 to 10/15/2019, fee: $18,182.50, expenses:

18   $67.98 (ECF 618)

19

20   HEARING Re 3) Motion to Compel: Motion of Debtors to Compel

21   Turnover of Estate Property

22

23   HEARING Re 4) Fourth Plan Supplement in Connection with

24   Modified Second Amended Joint Chapter 11 Plan of Sears

25   Holdings Corporation and Its Affiliated Debtors (ECF 5335)

Page 3

1    HEARING Re 5) Motion of Abel Santiago for Relief from the

2    Automatic Stay (ECF 4640)

3

4    HEARING Re 6) Motion to Kathleen Kime to Deem Proof of Claim

5    as Timely Filed and for Relief from the Automatic Stay (ECF

6    4945)

7

8    HEARING Re 7) Motion of Angela Kelly and Janyce L. Mackenzie

9    For Relief From the Automatic Stay to Permit Them to

10   Continue to Prosecute a Personal Injury Action Against

11   Sears, Roebuck & Co. in King County Superior Court in the

12   State of Washington, and to Liquidate Their Claims in Such

13   Action (ECF 4064)

14

15   HEARING Re 8) Notice of Agenda of Matters Scheduled for

16   Hearing on December 13, 2019 at 10:00 a.m.

17

18   HEARING Re 9) Adversary proceeding: 19-08286-rdd Sayville

19   Menlo LLC v. Transform Holdco LLC et al

20   Stipulation and Scheduling Order signed on 11/5/2019

21   Concerning the Amended Complaint or Motion to Dismiss

22

23

24   Transcribed by:  Tracey Williams, Sherri L. Breach, Pamela

25   Skaw, Nicole Yawn, and Jamie Gallagher

Page 4

1   A P P E A R A N C E S :

2

3   WEIL GOTSHAL & MANGES LLP

4        Attorneys for the Debtors and Debtors-in-Possession

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:  GARRETT A. FAIL, ESQ.

9        JENNIFER CROZIER, ESQ.

10       SUNNY SINGH, ESQ.

11       JARED R. FRIEDMANN, ESQ.

12

13   AKIN GUMP STRAUSS HAUER & FELD LLP

14        Attorneys for the Official Committee of Unsecured

15         Creditors

16        One Bryant Park

17        New York, NY 10036

18

19   BY:  SARA L. BRAUNER, ESQ.

20        PHILIP C. DUBLIN, ESQ.

21

22   FAIR HARBOR CAPITAL LLC

23        Appearing for Fair Harbor Capital LLC

24

25   BY:  FREDERIC GLASS, ESQ.

```
 1   A P P E A R A N C E S : (Contd.)

 2

 3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4        Attorneys for Transform Holdco LLC and Its Affiliates

 5        One Liberty Plaza

 6        New York, NY 10006

 7

 8   BY:  LEWIS J. LIMAN, ESQ.

 9        LUKE A. BAREFOOT, ESQ.

10        KIMBERLY A. BLACK, ESQ.

11

12   DAVIDOFF HUTCHER & CITRON LLP

13        Attorneys for Pearl Global, et al.

14        605 Third Avenue

15        New York, NY 10158

16

17   BY:  DAVID H. WANDER, ESQ.

18        ERIC JAY, ESQ.

19

20   ANSELL GRIMM & AARON PC

21        365 Rifle Camp Road

22        Woodland Park, NJ 07424

23

24   BY:  JOSHUA S. BAUCHNER, ESQ.

25
```

```
 1    A P P E A R A N C E S : (Contd.)

 2

 3    GOODWIN PROCTER LLP

 4         Attorney for Admin Claimants Intralinks, et al.

 5         The New York Times Building

 6         620 Eighth Avenue

 7         New York, NY 10018

 8

 9    BY:  WILLIAM P. WEINTRAUB, ESQ.

10

11    CRAVATH, SWAINE & MOORE LLP

12         Attorney for Admin Claimant Stanley Black & Decker Inc.

13         Worldwide Plaza

14         825 Eighth Avenue

15         New York, NY 10019-7475

16

17    BY:  SALAH M. HAWKINS, ESQ.

18

19    THE SARACHEK LAW FIRM

20         Attorney for Admin Claimants OXO, et al.

21         101 Park Avenue, 27th Floor

22         New York, NY 10178

23

24    BY:  JONATHAN H. MILLER, ESQ.

25
```

1    A P P E A R A N C E S : (Contd.)

2

3    FOLEY & LARDNER LLP

4         Attorney for Ad Hoc 503(b)(9) Creditors Group

5

6    BY:  PAUL LABOV, ESQ. (TELEPHONIC)

7

8    COLE SCHOTZ, P.C.

9         Attorney for Creditor Lifetime Brands

10

11   BY:  DAVID M. BASS, ESQ. (TELEPHONIC)

12

13   KIRBY AISNER & CURLEY LLP

14        Attorney for Admin Creditor

15

16   JULIE C. CURLEY, ESQ. (TELEPHONIC)

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Okay, good morning.  In re Sears

3    Holdings Corp., et al.

4              MR. FAIL:  Good morning, Your Honor.  For the

5    record, Garrett Fail, Weil, Gotshal & Manges for the

6    debtors.

7              There are a number of items on today's agenda,

8    but, with the Court's permission, I'd like to provide the

9    Court with an update on the progress that the debtors have

10   made in connection with the initial distribution that is

11   scheduled to go out this afternoon.

12             THE COURT:  Okay.

13             MR. FAIL:  Thank you, Your Honor.

14             On October 15th, the Court entered the

15   confirmation order approving, among other things, the

16   Administrative Expense Claims Consent Program.  The program

17   provides, as Your Honor will recall, a multi-tiered process

18   for processing and paying administrative claims.

19             After confirmation and after entry of the

20   confirmation order on the 15th, the debtors mailed out

21   notice of the program to 11,352 claimants -- potential

22   claimants -- at 16,614 notice addresses in total, giving

23   them 30 days from receipt of the notice to submit their

24   election.  We sent out on the very next day, on October

25   16th, 13,101 packages, and, one week later, noticed an

1   additional 3513 parties that were not included and gave them

2   30 days to opt in.

3           Your Honor will recall that ballots and creditors

4   were divided into three categories based on their response

5   or lack of response.  The first is opt-in settled admin

6   claims, claimants who affirmatively opt in for the program.

7   That group was eligible to participate in the initial

8   distribution and to receive up to 75 percent of the allowed

9   administrative expense claim.

10          The non-opt-out settled administrative expense

11  claims are parties who did not affirmatively opt in or opt

12  out of the program, or those that were unable to meet the

13  criteria for eligibility in the initial distribution, but

14  who had opted in.  This group is eligible to participate in

15  the second distribution.  And, as a consequence of opting

16  in, they would have their claims reconciled quicker, but as

17  a consequence of not being reconciled in time for the first

18  initial distribution, they would receive 80 percent, an

19  increased amount of their allowed administrative expense

20  claim.

21          And then there's the non-settled administrative

22  expense claims, folks that affirmatively opted out of the

23  program.  That group will be eligible to receive the full

24  value of their allowed claims, if any, but they will not

25  receive any distribution under this program; they are the

Page 10

1    standard administrative expense claims.

2            Your Honor will also recall that the initial

3    distribution is to be made from a cash pool of $21 million

4    that the debtors have been holding in a segregated account

5    and this would be made available on or about December 1.

6    That was an importance piece to the negotiation, Your Honor

7    will remember.

8            The second distribution will be made upon the

9    satisfaction of certain subsequent conditions and minimum

10   funding requirements.  And, for those parties that opted

11   out, they'll receive payment upon the effective date of the

12   plan.

13           Your Honor, in terms of the progress and what has

14   happened subsequent to the mailing, the debtors received

15   1206 affirmative opt-in ballots.  The debtors determined

16   that approximately 258, or 21 percent of that total in

17   number and roughly 28 percent in amount, were duplicative

18   claims, but that took work to ensure, in the debtors'

19   opinion, that roughly 258 or 21 percent of everything that

20   came in could be eliminated as duplicative, leaving --

21           THE COURT:  You mean duplicative of another opt-

22   in?

23           MR. FAIL:  Exactly, Your Honor.  Like --

24           THE COURT:  Okay.

25           MR. FAIL:  -- exact duplicates, because they

1    included perhaps an extra copy and, you know, please return

2    one, or it could have been the case that they filed against

3    multiple debtors.

4                THE COURT:  Okay.

5                MR. FAIL:  That left the debtors with 948 ballots

6    to substantively review, after the review that eliminated

7    258.

8                The debtors determined that 120 of those could be

9    paid outside of the administrative expense program, either

10   because they were professionals that submitted ballots out

11   of an abundance of caution, but those are being paid

12   separately, or they were by utilities that could be paid or

13   may be paid either out of adequate assurance accounts, or

14   possibly by Transform after reconciliation, or they were

15   claims by taxing authorities.  While significant in number,

16   120, Your Honor, it's only less than one percent in the file

17   amount, but, nonetheless, the debtors reviewed those.  That

18   left the debtors with approximately 828 ballots to review

19   and to move forward with.

20               As disclosed in the notice that we filed with the

21   Court earlier this week, the debtors reconciled and were

22   able to allow 285 of the claims or ballots, that's

23   approximately 34 percent of the total that were -- of the

24   828 to be reconciled and allowed.

25               The total allowed amount of those claims was

1    $64,364,904.91, a significant amount, and those parties will

2    all share in the $21 million initial distribution pro rata,

3    and the calculation is approximately 32.63, by my math, Your

4    Honor.

5              The debtors further did determine that they would

6    not be allowing and they would either have to ask the

7    creditors to withdraw or object to 204 of the other ballots.

8    So when we're looking at the 828, we allowed 285, and the

9    debtors determined after an analysis that it wasn't a matter

10   of reconciliation for 204 ballots, approximately 24 of the

11   ballots would need to either be dealt with by the Court as a

12   matter of law or fact, because, for example, ballots were

13   filed for claims that have already been subject to a pending

14   objection; they've been addressed by an objection saying

15   that they're not administrative claims; or, for example, in

16   this significant amount of claims, folks asserted -- filed a

17   ballot, but claims were barred by the bar date.  The bar

18   date included 503(b)(9) claims, parties that didn't assert a

19   claim shouldn't be able to participate.  So that's a bunch

20   that were not allowed, but for reasons that we'll address

21   with the Court subsequently.

22             Another significant ten percent, 89 ballots

23   requested zero dollars.  So the debtors processed those,

24   they're not included in the payment, just as we're walking

25   down the waterfall of what we had to look through.  We'll

Page 13

1   clean that up with the Court to give it one last chance

2   through probably an omnibus objection process, but on the

3   face of it, they've asked for zero dollars and that's

4   another ten percent.

5            So at the end of this math, Your Honor, the

6   debtors determined that there would be approximately 249

7   claims that will be left to reconcile after the initial

8   distribution.  It's only 30 percent of the 828 and only 20

9   percent in number of the initial 1206 claims and ballots

10  that were asserted.  It's still a very significant task, but

11  a relatively small percentage of the overall asserted

12  administrative expense claims.  The ratio of allowed to to-

13  be-reconciled, by my math, is greater than one-to-one.

14  There were more claims allowed than remain to be reconciled.

15           A brief bit about the context for the process that

16  we went through, Your Honor.  The debtors' professionals

17  worked with the UCC's professionals at FTI and Akin.  We

18  also worked and communicated and coordinated with the

19  professionals for the ad hoc group that negotiated the

20  settlement, including the attorneys at Foley.

21           There's consensus for moving forward with the

22  distribution this afternoon.  There is consensus around the

23  claims that were allowed, the timing, and the process that

24  was followed.

25           The Court will also recall that there are no --

1          THE COURT:  When you say consensus, with whom?

2          MR. FAIL:  That group --

3          THE COURT:  Okay.

4          MR. FAIL:  -- the debtors, the UCCs,

5     professionals, and the parties that were the proponents of

6     the lead advocates for the settlement --

7          THE COURT:  Okay.

8          MR. FAIL:  -- including Mr. Wander and the Foley

9     group.

10         The Court will also recall that there are no

11    employees of the debtors.  The Court is aware of the

12    records, detailed records about shipments and payments and

13    timings, and whether there were goods delivered and were

14    they valid and were there credits.  The information is

15    maintained by Transform and the personnel is now Transform.

16    And M3 has been working diligently and hard with the

17    debtors, you know, post-petition retained professionals, to

18    access and to reconcile, but in terms of what is in the

19    world of possible, the Court is aware of those facts.

20         The Court is also aware that, you know, this

21    process was not expected to have major legal issues resolved

22    prior to December 1st.  In recognition of that, that parties

23    would opt in to contribute towards the ultimate consummation

24    of the plan.  For issues that would need to be reconciled

25    beyond December 1, there was an additional five-percent

Page 15

1    incentive added, and the parties would get 80 percent rather

2    than 75 percent recovery on their claims.

3            The debtors are also -- and the Court is also

4    aware because of the public dockets -- and apologies for

5    that -- that the debtors are pursuing preference actions by

6    demand letters out of court and with several hundred

7    preference actions that have been filed.

8            THE COURT:  Well, before -- you're moving on to

9    preference claims now.

10           MR. FAIL:  No, just -- sorry, I apologize, Your

11   Honor.  I'm only bringing that up because, in our

12   reconciliation efforts with creditors with whom we've

13   engaged, and in the debtors' and the committees' and the

14   UCCs' judgment in terms of what could be reconciled and

15   should be, the debtors did factor in whether or not there

16   was potential preference liability into the overall

17   settlement.  Certain creditors have insisted that it be a

18   part of the conversation and the debtors have raised it with

19   parties because --

20           THE COURT:  Okay.

21           MR. FAIL:  -- it is part of the calculus --

22           THE COURT:  Right.

23           MR. FAIL:  -- the money in, money out.

24           THE COURT:  All right, so it relates to -- so what

25   you're talking --

Page 16

1              MR. FAIL:  That's the only --

2              THE COURT:  -- about now relates --

3              MR. FAIL:  -- that's the only reason --

4              THE COURT:  -- to reconciliation?

5              MR. FAIL:  -- I was raising it, Your Honor.

6              THE COURT:  Okay.

7              MR. FAIL:  I don't have an update and don't plan

8    on providing an update on the preferences themselves.

9              THE COURT:  All right.

10             MR. FAIL:  Your Honor, we did file the notice, I

11   don't believe it was required of all of the allowed claims,

12   but, you know, we've seen over the past 24 hours some

13   filings, limited objections, objections.  We've received

14   inquiries, comments, phone calls, and emails from various

15   creditor groups.  I would say that certain parties wanted us

16   to distribute money on December 1st and, you know, wanted it

17   sooner.  Some of them want it now and other parties say,

18   well, I want in and I want to be added.  Some parties are

19   saying, you know, you didn't work hard enough to reconcile

20   my claims and let me in, others are saying they need just a

21   little more time to let them in now.

22             Your Honor, the debtors believe, and have

23   conferred with the professionals from the UCC and the plan

24   proponents, that we followed the process and that the

25   process worked as it was intended to.  Claims that were

Page 17

1   asserted with timely ballots that fell within a range of the

2   debtors' estimates were allowed.  Those parties with whom

3   the debtors were able to and believed reconciliation was

4   possible for the greater good of all parties made it into

5   the distribution.  And the parties that have not been

6   allowed in, in general, have a variance between what was

7   asserted and what was on the debtors' books and records that

8   is greater than the administrative costs to process and

9   reconcile it.  We are being practical in terms of how we're

10  moving forward, both in terms of the administrative cost to

11  reconcile and to bring it, but also in terms of the judicial

12  impact.

13          THE COURT:  So let me ask you --

14          MR. FAIL:  Yes.

15          THE COURT:  -- the following couple questions.

16  First -- and I'm not holding you to this as a specific

17  commitment, but what is the debtors' general sense of the

18  time it will take to reconcile the remaining opt-ins?

19          MR. FAIL:  So we passed the first -- we believe

20  we've passed the first major hurdle and the first major

21  milestone in hopefully getting out the distribution this

22  afternoon.  The checks were cut; the files were locked down

23  several days ago in order to get the distribution out today.

24          Moving forward, we're going to use a funnel

25  approach that we've used in other major cases in the past

1    and that we've started to use with the administrative claims

2    that have been filed and asserted to date.  We're going to

3    first try to filter and group like claims together, and

4    probably proceed with omnibus objections where we think that

5    there are legal issues.  Ones that have been identified to

6    date have reappeared in the balloting process.

7            So world imports, if those claims can't be settled

8    in a manner -- you know, then Your Honor may have to decide

9    what people are calling the world imports issue, what is a

10   503(b)(9) claim.  Another question which may come before the

11   Court is, are drop-shipped claims 503(b)(9) claims if the

12   debtors didn't physically receive goods.

13           So there's buckets which are currently pending

14   objections where the Court might need to decide and our goal

15   would be to combine as many, so they're all before you at

16   the same time.

17           We think that there are others where it's the

18   matter of collecting more information and then processing

19   it.  The debtors' professionals at M3 requested from the

20   parties that submitted ballots additional backup that wasn't

21   submitted with their claims and for many of those we think

22   it's a matter of reconciliation and time.  I don't have the

23   estimate, because I don't have that number yet, but our goal

24   would be to avoid court where possible, certainly for a

25   dollar amount reconciliation.

1           And then there are going to be other major claims

2     where, if the parties can't settle -- the debtors will

3     certainly try -- there may be other issues.  But, you know,

4     our goal would be to filter and to bring before Your Honor

5     in a staged manner for the debtors to control the process,

6     working with the UCC's professionals and with the

7     representative of the administrative expense claim holders,

8     which will be appointed, elected, you know, decided after

9     this first distribution on that process.  We don't think it

10    makes sense for a me-first, do mine now, I'm here.

11          We are all now aware that there are several

12    hundred claims that have to be dealt with and it's up to the

13    debtors, working with the professionals for the UCC and the

14    administrative claimants to figure out how to best and most

15    efficiently work that way forward.  It doesn't make sense

16    for people to say reconcile mine before the Court and bring

17    the process, in our opinion; it may not be necessary.  It

18    may just be we need the data from M3 and we need the data

19    from Transform.

20          THE COURT:  So who -- if an opt-in non-reconciled

21    or ineligible creditor wants to pursue quickly the allowance

22    of their claim, who should they contact?

23          MR. FAIL:  So, Your Honor, in our opinion, they

24    all want them done quickly, as do the debtors.  We share

25    that goal and we're aware of them all.  They've been logged,

Page 20

1    they've been accounted for, and they've just now been

2    disclosed to the Court.  We would respectfully request that

3    the debtors take the next step and make the next affirmative

4    move in reaching out to parties, people who will otherwise

5    be reaching out -- we might have the data, Your Honor, they

6    have already provided --

7             THE COURT:  I get -- can I --

8             MR. FAIL:  Of course.

9             THE COURT:  I understand there are legal

10   categories, there are legal issues that might need to be

11   decided and let's leave those aside for the moment, I gather

12   that the debtors requested additional data, which they may

13   have gotten or may not have gotten --

14            MR. FAIL:  But both categories are true, we

15   requested, and we either did in some --

16            THE COURT:  Right --

17            MR. FAIL:  -- and sometimes we didn't.

18            THE COURT:  -- but those requests may be quite

19   recent.  It seems to me, if it's just a data issue, I'm not

20   sure why there has to be sort of a global process.  It would

21   seem to me people can be focusing on the data, just like

22   they did for the first wave, and deal with it.

23            MR. FAIL:  The debtors are.  We're not waiting for

24   a global process.  The debtors are reconciling the data --

25            THE COURT:  Okay.

1          MR. FAIL:  -- we are.  I thought Your Honor asked

2     how should people that are not being paid this first

3     distribution let us know they want to go quicker --

4          THE COURT:  Well, if it's --

5          MR. FAIL:  -- we know about them.

6          THE COURT:  -- if it's a data issue, then they can

7     follow up right away with the debtor.

8          MR. FAIL:  They've all had access and they've all

9     been in contact.

10          THE COURT:  Okay, all right.  And --

11          MR. FAIL:  There are Listserv set up, there's no

12     lack of direct contact.

13          THE COURT:  And it's clear to know who they should

14     be dealing with?

15          MR. FAIL:  Yes, Your Honor.

16          THE COURT:  Okay.  And then as to legal issues, I

17     can see the benefits of staging them in an organized, global

18     way, thematic way.  It's also conceivable to me, however,

19     that someone may want to settle that issue in advance.

20          MR. FAIL:  We're certainly open to --

21          THE COURT:  They're free to make a proposal on

22     that, if they want to.  Otherwise, if they want to just have

23     a yes-or-no answer, you're going to tee that up in front of

24     me?

25          MR. FAIL:  Yes, Your Honor.  We've been open to

Page 22

1    settlements and we're going to be economically rational --

2              THE COURT:  So if someone --

3              MR. FAIL:  -- actors.

4              THE COURT:  -- wants to make a proposal, they can

5    -- who should they contact on a -- put it differently.  If

6    the reason that they didn't receive their pro rata share of

7    the initial distribution was that they asserted a drop claim

8    or a -- you know, some other right under 503(b) that the

9    debtors are disputing on a legal basis and they want to

10   settle that, they don't want to wait for a yes-or-no answer

11   from the Court, who should they contact?  Counsel or --

12             MR. FAIL:  They can feel free to reach out to

13   either counsel through counsel or the M3 Listserv that

14   they've been in contact with with submitting the ballots.

15   So --

16             THE COURT:  Because they will then -- M3 will then

17   contact you if it's a straight legal issue?

18             MR. FAIL:  We've been in more than daily contact,

19   Your Honor, on this process.

20             THE COURT:  Okay, all right.  And then my -- so

21   the answer is there's not a clear end date to determine

22   these, although one would hope that it would be in the next

23   couple months, right, for a lot of them at least?

24             MR. FAIL:  Your Honor, those are both true

25   statements.  I would also add, just for the context, there's

Page 23

1    no prejudice in this -- there's no immediate prejudice to

2    this.  So parties, I expect, will say we have to agree on

3    schedules with each individual within the next 30 days as

4    the program provides.  The program also allows us to amend

5    it with the consent of the UCC and/or the admin

6    representative.

7              So the debtors are incentivized to move this

8    forward, but there's also no additional -- the second

9    distribution is not scheduled, the money isn't available to

10   go out the door, and so there's no prejudice if someone is

11   not reconciled this week, next week, next month, at this

12   point in time.

13             THE COURT:  Well, that was my next question, which

14   is when is the estimate that the second distribution would

15   be made?  Again, I'm not -- this is just an estimate.

16             MR. FAIL:  Of course.  I don't have that

17   information available at this time.  We can certainly

18   provide additional information, we've been filing monthly

19   operating reports, you know, somewhat regularly, and we can

20   provide an estimate, but I can say now it is not imminent.

21   No one will be prejudiced by several weeks or, you know,

22   short months of having the debtors process and plow through

23   and make progress.

24             THE COURT:  Okay.  So I don't -- this is -- I

25   appreciate your just giving me this report --

Page 24

```
 1              MR. FAIL:  Of course.

 2              THE COURT:  -- on the fly, there's no -- I didn't

 3    pull out the settlement order before this hearing.  Are the

 4    debtors required to give some sort of notice before they

 5    make that second distribution?

 6              MR. FAIL:  One moment, please.

 7         (Pause)

 8              MR. FAIL:  Your Honor, I don't believe there is a

 9    formal notice requirement; however, there are conditions

10    that need to be satisfied.  And, just like we did with this

11    initial distribution, we intend to provide notice in advance

12    of a second distribution.  The debtors will be providing in

13    advance notice of that distribution, there's no question.

14              THE COURT:  All right.

15              MR. FAIL:  Your Honor, I think that there were

16    parties that filed objections, I don't know if -- I think

17    they might be in the courtroom.  They should have -- we have

18    no issue with them being heard.  There might be others on

19    the phone that requested to dial in.  I'm happy to respond

20    to any other questions or kind of reserve --

21              THE COURT:  Well, there are no objections that

22    were scheduled for today --

23              MR. FAIL:  No, Your Honor --

24              THE COURT:  -- and I --

25              MR. FAIL:  -- because there's nothing before the
```

Page 25

1    Court.  It's an automatic, we're supposed to proceed.

2              THE COURT:  Right.  And obviously I authorized the

3    debtors to make the initial distribution to those who had

4    allowed admin expenses who opted in.  So, if you weren't

5    allowed, then that was an issue.

6              MR. FAIL:  And we're not reserving, because the

7    function of -- there were questions that we received

8    overnight, why aren't we reserving in this initial

9    distribution.  The purpose of this initial distribution was

10   not to reserve, it was, if you're allowed, you get it and,

11   if you're not -- you know, I can look back and see if we

12   provided for a reserve in the second round or not, but, you

13   know, that's a different story before the effective date.

14             It's crystal clear that for this initial

15   distribution allowed get the pro rata and those that aren't

16   reconciled and allowed move to stage two.

17             THE COURT:  Which is a pro rata based on a larger

18   denominator?

19             MR. FAIL:  It's a catch-up.  So, in other words,

20   phase one doesn't get anything else, phase two gets up to

21   the 32ish percent that I mentioned before phase one gets

22   anything else, and then collectively they can be satisfied

23   before the confirmation --

24             THE COURT:  And then ultimately --

25             MR. FAIL:  -- and consummation of the plan.

Page 26

1              THE COURT:  -- phase two also has a higher cap,

2       the 80-percent --

3              MR. FAIL:  It does have a higher cap --

4              THE COURT:  -- cap?

5              MR. FAIL:  -- in terms of the percentage of the

6       allowed amounts.

7              THE COURT:  Okay, all right.  So just to summarize

8       then where we are so far.  The debtors will be diligently

9       working to reconcile the remaining opt-ins.  As far as where

10      there are objections based on non-legal issues, they will be

11      interacting with the claimants on the data, mostly through

12      M3.

13             Where there are legal issues, the claimant is

14      always free to make a settlement proposal, but failing that

15      the debtors, with the creditors' committee and the admin

16      group, so designated, will work out a process that's

17      efficient to deal with legal issues on an aggregate basis,

18      so that the briefing won't be done on the claimants' side by

19      just one party, but will be done efficiently, so that people

20      can weigh in on thematic legal issues.

21             MR. FAIL:  Your Honor, I appreciate -- that's all

22      correct.  I appreciate your time this morning; I appreciate

23      the continued access to the Court.  We're trying to make

24      this as efficient for judicial resources, as well as the

25      debtors'.

1           THE COURT:  Okay.  So I know there's some people

2    popping up, but why don't I hear from them --

3           MR. FAIL:  Thank you, Your Honor.

4           THE COURT:  -- briefly.

5           MR. HAWKINS:  Good morning, Your Honor, Salah

6    Hawkins from Cravath, Swaine & Moore on behalf of the

7    administrative claimant Stanley Black & Decker, Inc.

8           And just briefly, Your Honor, I won't resuscitate

9    everything that went through by the debtors, but I just

10   would like to respond to a few points that they made, one

11   being that there's a fundamental fairness issue here with

12   the lack of notice.  Under the terms of the consent --

13   confirmation order, what should have happened is there was a

14   30-day period during which there was a time to reconcile the

15   claims and, prior to that date, we reasonably relied upon

16   the fact that there would not be a distribution made without

17   some form of notice to say, hey, you need to make sure that

18   you give us everything that we need by a certain date in

19   order to be included in the initial distribution.  That's

20   the first issue.

21          The second would be that what the debtors are

22   doing here by filing the notice is making and taking away

23   the bargained-for agreement that is in the confirmation

24   order.  When my client opted in, what they bargained for in

25   that was to get the earliest possible payment that they

Page 28

1      could get under the terms of the order and not to be pushed

2      into the non-opt-out group under which there, as the

3      debtors' counsel conceded, is no foreseeable date under

4      which the second distribution would occur.  That's not what

5      my client bargained for, Your Honor.

6              And, third, as to the prejudice issue, there is a

7      likelihood that there could not be payment at all or it

8      could be a year from now, two years from now.  We don't

9      know, because those minimum conditions have to be satisfied

10     first.

11             So with those three issues being before the Court,

12     we don't feel that it's fair under the terms of the order to

13     allow the initial distribution to go forward without at

14     least including opting claimants like my client who were

15     given no notice that this would be done in this form.

16             THE COURT:  Well, what is the basis for the

17     debtors' view that Black & Decker is not sufficiently -- its

18     claim is not sufficiently reconciled to make the

19     distribution?

20             MR. HAWKINS:  Your Honor --

21             THE COURT:  Is it a legal issue, is it an

22     accounting issue?  What is the basis?

23             MR. HAWKINS:  Respectfully, Your Honor, we have no

24     idea.  There's been no communication.  We submitted the data

25     that they requested after -- after we gave the initial

Page 29

1    ballot opt-in notice, they accessed -- they sent a request

2    for information on December 1st.  We responded and provided

3    that information.  And then there was no follow-up to say,

4    okay, we're disputing your claim as to X amount, we think

5    that there's no legal basis to your claim, we're doing X, Y,

6    and Z.  There was just no information.

7          The first thing that happened after that is that

8    the notice was filed.  And so prior to any reconciliation

9    process being engaged in --

10          THE COURT:  When was the notice actually filed?

11   Again, this is something that --

12          MR. HAWKINS:  It was filed --

13          THE COURT:  -- I'm just basically --

14          MR. HAWKINS:  -- on Wednesday, Your Honor.

15          THE COURT:  -- having a case conference on,

16   because there's really no -- when was the notice filed?

17          MR. HAWKINS:  It was filed on Wednesday, Your

18   Honor, Wednesday of this week.

19          THE COURT:  All right.

20          MR. HAWKINS:  And so -- and a part of that issue

21   is, in looking at when the notice was filed, also you look

22   under the terms of the order, it was supposed to be an

23   initial distribution on or around December 1st.  When that

24   date passed, my client then reasonably relied upon the fact

25   that there would be some notice of like, okay, well, it

Page 30

1    probably won't happen before our 30-day reconciliation

2    period and, if there is, it's reasonable for us to expect

3    notice of when we need to give certain information or when

4    we need to reach a consensual agreement.

5                THE COURT:  Okay.

6                MR. HAWKINS:  And if that doesn't happen, then

7    what's happening here is kind of like the debtors are trying

8    to have their cake and eat it too, right?  Like part of what

9    happened with the confirmation order is the debtors got the

10   benefit of avoiding administrative insolvency that could

11   have happened if they had to pay all the 503(b) claims in

12   full.  In exchange for not having to pay the claims in full,

13   the benefits that were supposed to be given to our clients

14   and opt-in claimants like my client was that they would get

15   an earlier payment of at least a partial payment.  By

16   getting pushed into the non-opt-out group --

17               THE COURT:  Well --

18               MR. HAWKINS:  -- that benefit is no longer being

19   given --

20               THE COURT:  -- to me that depends.  I mean, if

21   there's a fundamental legal issue pertaining to the claim,

22   then I don't think anyone should be surprised that they're

23   not participating in the first distribution.

24               MR. HAWKINS:  I agree, Your Honor.

25               THE COURT:  If it's in a -- you know, if it's a

Page 31

1    numbers issue, then I'm more sympathetic to what you're

2    saying.

3              MR. HAWKINS:  I agree, Your Honor, but we don't

4    know, and that's a part of the issue --

5              THE COURT:  Okay, all right.

6              MR. HAWKINS:  -- is that nothing was said.

7              THE COURT:  Okay.

8              MR. HAWKINS:  And so the debtors' counsel stated

9    that there is, you know, constant communication, but that

10   has not been our experience, and based on the papers that

11   were filed by other additional opt-in claimants, it hasn't

12   been their experience either.  People have reached out and

13   just not been given any information here.  So to allow them

14   to, one, not provide --

15             THE COURT:  After December 1st, you mean, when the

16   notice went out?

17             MR. HAWKINS:  After opting in, Your Honor, and

18   after they requested information, there was just nothing.

19   We got --

20             THE COURT:  But the request for information was on

21   December 1?

22             MR. HAWKINS:  For our -- for my client, yes, Your

23   Honor.

24             THE COURT:  It may have been different for others?

25             MR. HAWKINS:  Yes, Your Honor.

Page 32

1              THE COURT:  Okay.

2              MR. HAWKINS:  With that, respectfully, Your Honor,

3    we request that the Court not allow the initial distribution

4    to happen today without including my client or that the

5    Court set a later date for the initial distribution and

6    request that the debtors provide some notice, at least ten

7    days, of when the period will close to be included in the

8    initial distribution.

9              THE COURT:  Okay.

10             MR. HAWKINS:  Thank you, Your Honor.

11             MR. FAIL:  Your Honor, would you prefer that I

12   respond in turn or --

13             THE COURT:  No, let me just hear all of these.

14             MR. FAIL:  Thank you.

15             MR. WEINTRAUB:  Thank you, Your Honor.  Good

16   morning.  William Weintraub of Goodwin Procter for

17   Intralinks and Urban Edge.  We are in pretty much the same

18   category as counsel.  We were requested to provide

19   information and our clients did it timely, probably back in

20   November, I believe, and then there was radio silence, we

21   heard nothing.  We assumed there was no problem or we would

22   have heard something.  I think it's completely unfair for

23   the debtor and whoever they're working with to just

24   unilaterally decide we'll pay this claim and not that claim,

25   this claim is disputed, this claim we didn't get to, so I

Page 33

1    guess it's disputed.  We don't know what's going on.

2              And the unfairness here, Your Honor, is that this

3    $21 million train is about to leave the station.  My client

4    paid 25 percent of its claim to be on board this train.  No

5    one can tell us when the next train is coming or if another

6    train is coming.

7              THE COURT:  No, I get that, I get that point.

8              MR. WEINTRAUB:  Okay, Your Honor.

9              THE COURT:  Okay.

10             MR. WEINTRAUB:  So, from our perspective, we think

11   a reserve should be established.  What is customary in

12   bankruptcy cases when there's not enough to go around and

13   you've got disputed and undisputed claims, what you do is

14   you put into the denominator the disputed and undisputed

15   claims, you figure out what the pro rata share is, but you

16   only make distributions to the claims that you agree with.

17   We would be okay with that so long as we know there's money

18   left behind for the people who have been unilaterally just

19   kept off the train, Your Honor.

20             THE COURT:  Well, again, I think -- for example,

21   if someone filed a duplicate claim or had, you know, a clear

22   legal issue that is a gatekeeper as to whether it's an admin

23   claim or not, I don't think there needs to be a reserve for

24   that, that wasn't the deal.

25             I understand that --

1                MR. WEINTRAUB:  But we don't know what it is, Your

2       Honor.  When you don't know --

3                THE COURT:  Well, that's fair, that's fair, but

4       I'm looking at these in different -- in terms of what's fair

5       in different -- depending on the nature of the objection.

6       It seems to me --

7                MR. WEINTRAUB:  But we don't know when they --

8                THE COURT:  No, I understand that point, but on

9       the other hand, if the nature of the objection is, you know,

10      this is a duplicate claim or you're asserting a claim under

11      503(b) when the issue has been out there for a long time as

12      to whether you're entitled to it, that's different than

13      favoring some people who have a number that's been

14      reconciled and others who have an accounting issue and that

15      that's not been reconciled yet.

16               MR. WEINTRAUB:  I understand, Your Honor.  Neither

17      of my clients have 503(b) claims, number one.  Number two, I

18      get it, if there's a duplicate claim, you pay on one of

19      them.

20               But with respect to my client, Your Honor, and I'm

21      really pretty much only here because I live a few minutes

22      from the courthouse, my client is owed $50,000, it agreed

23      that it would take the 25-percent haircut.  If somebody had

24      called --

25               THE COURT:  So can I have one --

1           MR. WEINTRAUB:  -- Your Honor, could I just --

2           THE COURT:  -- one other point that hasn't been

3    addressed with either of the two -- with you or that person

4    who spoke before you for Black & Decker, which is the

5    interplay of the preference issue with this.

6           MR. WEINTRAUB:  I'm not aware that we have any

7    preference issues; no one has told us that, Your Honor.

8           THE COURT:  No one has identified a preference

9    issue.  Okay.

10          MR. WEINTRAUB:  But, Your Honor, just to go back

11   to -- because you gave me some hypotheticals, I'm giving you

12   a real world scenario.

13          THE COURT:  All right.

14          MR. WEINTRAUB:  My client is owed $50,000.  If

15   counsel had called and said, you know, we can't reconcile

16   your claim, it only comes out to $49,999, do you know what

17   our answer would have been, Your Honor?

18          THE COURT:  Yeah -- no, I understand --

19          MR. WEINTRAUB:  Okay.

20          THE COURT:  -- I understand that point.

21          MR. WEINTRAUB:  We were not given an opportunity

22   to do that.

23          THE COURT:  Okay.

24          MR. WEINTRAUB:  And what's galling is, we didn't

25   get the request for information on December 1st, we got it a

Page 36

1    long time before that, number one.  And, number two, not to

2    cast aspersions, but I'm pretty sure, Your Honor, that they

3    asked for the exact same information that was attached to

4    our claim.  So we provided it again.  We were given no

5    insight into the request for information as to what the

6    potential problem was, they just asked for basic documents

7    and invoices, which was provided.

8              THE COURT:  Okay.

9              MR. WEINTRAUB:  So our request would be either

10   hold up the distribution, so the rest of the people can

11   catch up, or do a reserve, which we think is customary in

12   circumstances like this.

13             THE COURT:  Okay.

14             MR. WEINTRAUB:  Thank you, Your Honor.

15             MR. MILLER:  Good morning, Your Honor.

16             THE COURT:  Good morning.

17             MR. MILLER:  Jonathan Miller from the Sarachek Law

18   Firm on behalf of OXO, SJ, and Strong Progress.  I really

19   reiterate what the other gentlemen said.  The thing that I

20   would add is attempts to communicate were not successful

21   often.  Calls to the phone number that were provided on the

22   M3 email went to a voicemail that just said voicemail full.

23   Emailing the email address on the M3 email, I don't know if

24   anybody responded to those or not.

25             Reaching out, I've reached out to the debtors as

Page 37

1    well to try and see what was going on, because it kind of

2    became apparent around December 6th, one of our clients in

3    China got an email saying, hey, send us to this address

4    information.

5             It wasn't until I contacted Mr. Griffin, I

6    believe, at M3 that finally I started getting some response,

7    and then the response was basically, too bad, only one of

8    your clients is going to be included of the four that opted

9    in.  And then I sent a further email just saying, okay, was

10   there a date by which they had to have information, what is

11   the process, and I've heard nothing.

12            So it just seems that this is a very arbitrary

13   procedure.  As the other gentlemen said, the bargain these

14   people made by opting in is we're going to give up part of

15   our claim because we're going to negotiate with the debtor.

16   I mean, that's what the program says, you opt in, you

17   negotiate with us over the value of your claim.  I think the

18   reality is -- and there may be some exceptions -- there was

19   no negotiation at all.  The debtor went through claims, made

20   decisions, and then basically it was tough luck for

21   everybody else.

22            As others have said, there was no date given to

23   any of the creditors, suggesting, if you don't opt -- if you

24   don't provide information by this date, then you're out of

25   luck.  They had up until November 25th, the creditor --

Page 38

1    these creditors, to decide whether to opt in or opt out, and

2    that's a very tough decision for them.  These foreign

3    vendors, some of them are really barely scraping by.

4              THE COURT:  All right, so -- I'm sorry.  I thought

5    the date to opt in was earlier than November 25th --

6              MR. MILLER:  As --

7              THE COURT:  -- that was the opt-in date?

8              MR. MILLER:  -- Mr. Fail stated, there was another

9    batch that went out --

10             THE COURT:  Oh, okay, there's a second --

11             MR. MILLER:  -- and these three --

12             THE COURT:  -- a second-month batch, I got it.

13             MR. MILLER:  -- particular clients were in that

14   second batch and had until November 25th.  And --

15             THE COURT:  All right.

16             MR. MILLER:  -- I will say, Weil was kind enough,

17   one of the clients requested an extra two days because they

18   claimed they had never gotten the information, they were

19   kind enough to give until November 27th.

20             MR. FAIL:  So we responded to that email, so we

21   had a dialogue on that one already.

22             THE COURT:  Okay, so -- but that deadline -- but

23   that deadline --

24             MR. MILLER:  Okay, well --

25             THE COURT:  -- but let me --

1          MR. MILLER:  -- but none of the others, Mr. Fail.

2          THE COURT:  -- so that's the second batch?

3          MR. MILLER:  Yes.

4          THE COURT:  Okay.  All right, fine.

5          MR. MILLER:  So the clients complied with what was

6    required --

7          THE COURT:  Well, it's a very tight deadline for

8    the second batch, obviously.

9          MR. MILLER:  I don't dispute that, Your Honor, but

10   there was nothing -- there was nothing that was received

11   saying we need info -- you know, we know you're late --

12         THE COURT:  And remind me, why was there a basis

13   to do a second batch?

14         MR. FAIL:  Your Honor, just a correction.  There

15   was one week delay in notifying certain parts.  We notified

16   whatever it was, 13,000 out of the 16,000 --

17         THE COURT:  right.

18         MR. FAIL:  -- on the first day, we didn't -- they

19   weren't included on the mailing.  We caught the error and we

20   noticed them.

21         THE COURT:  Okay, all right.

22         MR. MILLER:  But, Your Honor, it wasn't --

23         THE COURT:  It was another --

24         MR. MILLER:  -- that deadline wasn't tight.

25         THE COURT:  -- it's another week, though.

1          MR. FAIL:  It's one more week, but it's only tight

2     when parties like with Stanley Black & Decker and maybe your

3     clients waited 30 days to respond.

4          THE COURT:  Well, but --

5          MR. FAIL:  It wasn't tight if they had sent in,

6     like many people did, early on.

7          THE COURT:  Okay --

8          MR. MILLER:  But that was their right.

9          THE COURT:  -- but the actual deadline was the

10    25th.

11         MR. FAIL:  And we included those and we gave the

12    same amount of time for the parties with the late filing.

13    That's why when we delayed the distribution to December 6th,

14    in working with the UCC and the Foley group and checked, you

15    know, with the admin creditors, we gave the same amount of

16    time to reconcile.  To accomplish a distribution on December

17    1st, you cannot cut it off --

18         THE COURT:  I understand.

19         MR. FAIL:  -- November --

20         MR. MILLER:  And just to be clear, Your Honor,

21    nobody is disputing the issues that there's a large amount

22    of opt-in ballots to go through.  I am very sympathetic to

23    the issues that the debtor and the UCC and M3 had to go

24    through, but I am not sympathetic to the idea that no

25    information was communicated about, if you don't have your

Page 41

1   information in by this date, then you're out.  One of our

2   clients got the email from M3 on December 2nd, which I'm

3   guessing might have been too late as a matter of course to

4   even be included.

5           And, again, it's not -- the idea isn't to cast

6   aspersion, it's to say this process was arbitrary, it wasn't

7   consistent with the administrative claims consent program

8   that was approved as part of the confirmation order where

9   clients were led to believe that, if they opt in, they would

10  be getting the right to negotiate with the debtor over their

11  claim.

12          THE COURT:  Well, although there is a -- there was

13  a distribution date there.  So --

14          MR. MILLER:  But --

15          THE COURT:  -- the negotia -- I mean, if you --

16  there is a certain sense that, you know, if you opt in

17  pretty late, you're running the risk that you won't have a

18  lot of time to negotiate.

19          MR. MILLER:  And maybe it should have been --

20  possibly.  I mean, here's the thing, there could have been a

21  thing or some notice that said, if we don't get your

22  information by X date --

23          THE COURT:  But it's kind of common sense, right,

24  that you --

25          MR. MILLER:  Yes and no.  I mean, they also put it

Page 42

1    right up to the deadline.  It could have -- there could have

2    been thing --

3              THE COURT:  Well, that's -- Mr. Fail, when was the

4    last information request?  Not follow-up request, but the

5    last --

6              MR. FAIL:  These are all follow-up.  They're

7    conflating the points, Your Honor.  We asked for information

8    when we received ballots, the fact that his client got an

9    information request on December something means to me and

10   what he's saying is, his client submitted a ballot late

11   November.  When we looked at the ballot late November, at

12   the end of their 30-day window, we saw we didn't have enough

13   information, so we requested it.  And that information may

14   be useful in the next round of reconciliation; it wasn't

15   wasted, it wasn't an admission that we needed -- that the

16   information they gave us is right.  The point was we needed

17   the information; we'll use that information in phase two.

18   He waited and there was a greater variance between the

19   amount asserted and the amount that the debtors' books and

20   records reflect for that claim.  And if --

21             THE COURT:  All right.  Well, let me --

22             MR. FAIL:  -- his claimant is from Asia, I'm

23   guessing also that it's a world import issue.

24             MR. MILLER:  Right, but they -- but the claimants

25   that --

```
 1              THE COURT:  Well, that's a separate issue --

 2              MR. MILLER:  -- opted in --

 3              THE COURT:  -- but let me ask --

 4              MR. FAIL:  I know, but that's his issue.

 5              THE COURT:  -- let me ask --

 6              MR. MILLER:  -- were willing to negotiate that.

 7              MR. FAIL:  That's your issue.

 8              MR. MILLER:  No, no.

 9              THE COURT:  But I'm focusing -- I mean, I've been

10   very clear -- on those legal points, but on the just simple

11   information requests that don't relate to the world import

12   timing points --

13              MR. FAIL:  It was -- they literally were sent out

14   in seriatim based on the receipt when we know who to

15   contact.  We canvassed everybody, said give us your claim

16   and what you owe.  When it matched, we didn't necessarily

17   need information; when it didn't, we'd say we can't figure

18   it out, we don't know who you are.  It's cheaper and easier

19   for you to give us the data --

20              THE COURT:  And when did that --

21              MR. FAIL:  -- than to go to Transform --

22              THE COURT:  -- but when did that step take place

23   in --

24              MR. FAIL:  It's continuing, it's --

25              THE COURT:  No, but in -- I didn't finish -- when
```

Page 44

1    did it take place after the claim came in -- or after the

2    election came in?

3               MR. FAIL:  As soon as the ballots came in, they

4    went out.

5               THE COURT:  The info request?

6               MR. FAIL:  Yeah.

7               THE COURT:  Okay, all right.

8               MR. MILLER:  Can I just very quickly, Your Honor,

9    because I know you want to move on, but as to the world

10   imports issue that was mentioned.  The clients that decided

11   to opt in, right -- because we have clients that didn't opt

12   in, they opted out, because they want to pursue their full

13   claim -- clients that opted in had the reasonable belief

14   under the terms of the program --

15              THE COURT:  That someone would --

16              MR. MILLER:  -- and the confirmation order --

17              THE COURT:  -- that someone would negotiate with

18   them over that point?

19              MR. MILLER:  That they can negotiate that point.

20              THE COURT:  All right, okay.

21              MR. FAIL:  Just the last point in rebuttal, Your

22   Honor, I think it's half the story.  They opted in and they

23   gave up 20 or 25 percent, but they got paid before

24   consummation of the plan.  That wasn't mentioned by Mr.

25   Sarachek's firm, that's the benefit they're not waiting for

Page 45

1     the effective date.

2             THE COURT:  No, I understand that, I understand

3     that.  Okay.

4             MR. GLASS:  Good morning, Your Honor --

5             UNIDENTIFIED SPEAKER:  Your Honor, I --

6             THE COURT:  No, excuse me, ma'am, someone -- you

7     can't see him, but he's -- someone else is speaking in the

8     courtroom.  I'll let the people speak on the phone once the

9     people in the courtroom are done.

10            MR. GLASS:  Thank you, Your Honor.  Good morning.

11    I'm Fred Glass; I'm with Fair Harbor Capital.  We purchased

12    six 503(b)(9), what we believe are 503(b)(9) administrative

13    claims in the case.  We received the ballots, the opt-in

14    ballots, and we filled them out for all six.  That was on

15    November 14th.  On November 19th, five days later, they sent

16    us a correspondence asking for a detailed Excel sheet about

17    all our claims with lists of all our invoices, invoice

18    numbers, purchase order numbers, just a huge list.  We

19    provided it, it looks like that day, everything.

20            When we purchase claims, we try to do due

21    diligence before we do that.  I know that courts aren't

22    always -- look favorably upon claims traders, but we do feel

23    like we do step into the shoes of the claims that we

24    purchase.

25            And so we did provide everything the day they

Page 46

1    asked for it.  Then we didn't hear anything from them,

2    nothing.  We just assumed -- we have clean claims, at least

3    we think we have clean claims, we wouldn't have bought them

4    if we didn't think they were clean, and then they went ahead

5    and didn't -- we heard nothing from them until the next

6    thing we got was on -- it was December 11th from M3 Partners

7    we got a correspondence, it basically looked like asking for

8    the same information, which we provided again, and then

9    asking us and, by the way, send us your mailing information

10   so we know where to send the checks.  So we just expected

11   checks to be on the way.

12           The next thing I get is -- I guess it was

13   Wednesday -- it was yesterday morning actually, I received

14   an email that was sent out at 10:45 p.m. on Wednesday night,

15   and I received it Thursday morning on my phone.  When I woke

16   up in the morning to take a shower, I see that, oh, take a

17   look at this, and I know I have six claims and I see only

18   two of them are listed on the list.

19           So I feel I was completely surprised.  I thought

20   my claims were clean, no one ever gave me any indication

21   they weren't clean.  We don't have -- I didn't believe when

22   we took them that we had any drop-ship legal issues.  I

23   think one claim may have been a duplicative claim, because

24   they sent duplicative ballots, one to the original creditor

25   and one to us.  So we got those ballots and, out of an

Page 47

1    abundance of caution, we filled out those ballots, because

2    that's -- we did that out of a matter of caution, not

3    because we were claiming two claims.  But we didn't receive

4    any correspondence or anything from anyone then.

5              So this was yesterday morning when I got that.

6    Then I'm scrambling, trying to make phone calls, sending

7    emails.  My partner is making phone calls, sending emails to

8    the debtors' counsel, to M3, to Prime Clerk, which was

9    responsive, and I felt like I was stonewalled, basically.

10   Finally, last night I reached debtors' counsel and he was

11   very courteous.  And he said, well, you know, there's

12   nothing I can do, the checks are cut and we're not going to

13   recut checks, you know, for different pro rata amounts, you

14   know, to add you.  And in a nice, very, very courteous, very

15   professional, he did this, but basically said you're out of

16   luck.

17             So I'm here now to say --

18             THE COURT:  Okay.

19             MR. GLASS:  -- I think this process -- I think

20   when the process was put in place it was intended to be

21   fair, I think the implementation of this process is what's

22   unfair, and I just -- I think there's some due process

23   issues -- noticing issues, due processing issues.  I just

24   feel we didn't have a chance to even discuss claims that we

25   thought were crystal clear and were never given an

Page 48

1    indication asking for more information about, ever.

2            THE COURT:  Okay.  I'm --

3            MR. GLASS:  That --

4            THE COURT:  -- I'm going to cut you off there.  I

5    get the point, though.

6            MR. GLASS:  Thank you very much.

7            THE COURT:  Okay.

8            MR. WANDER:  Good morning, Your Honor.

9            THE COURT:  Good morning.

10           MR. WANDER:  David Wander of Davidoff Hutcher &

11   Citron.  I rise on behalf of Pearl Global in support of the

12   debtor and the distribution, Your Honor.

13           No one is more sympathetic than I am to the

14   complaints that people have made about the implementation of

15   the program.  The solution, though, is not to hold up the

16   distribution, because that opens up a Pandora's Box which

17   then in itself really is a collateral attack on the

18   confirmation order, which I've been accused of doing, but

19   I'm not doing; I'm here to support it.

20           We had a bargain, the settling creditors, who I

21   spoke to before today -- and they couldn't be here because

22   of personal reasons, but I joined into the settlement and we

23   settled.  And one of the most important things that the

24   Foley group made clear was the sacrosanct nature of the

25   December 1st distribution.

1            Now, I was upset that checks were not cut on

2    December 1st, but I understood that there was some noticing

3    issues.  And in the big scheme of things I felt that, with

4    respect to that, what the debtor had proposed was the most

5    fair and reasonable way.

6            It's now December 13th.  The bargain that we

7    struck, the settling creditors, the opt-in program, the

8    order by Your Honor, was that under the settlement program,

9    warts and all, there was going to be a cutoff and a

10   distribution on or about December 1st.  Again, I'm

11   sympathetic to all the problems that people have mentioned,

12   but the solution is worse than the problem.  The solution

13   means no one gets money and it can undo the whole

14   confirmation, because it can be months for reconciliation to

15   happen.  I tried pointing that out beforehand.

16           But now that we have a confirmed order by Your

17   Honor and under that confirmed order the distribution was

18   required to go out on or about December 1st, the checks have

19   been cut and I submit, Your Honor, in the context of

20   everything that has happened, the distribution needs to go

21   out, otherwise it can open up the whole confirmation issue.

22   And I support the debtor today in making the initial

23   distribution.  Thank you.

24           THE COURT:  I don't want to hear more back and

25   forth on this.  I'm happy to hear anyone else who wants to

Page 50

1    speak, but I don't need to have rebuttal or anything like

2    that.

3           So I think the people in the courtroom are done.

4    If someone on the phone wants to say something, they should

5    feel free to at this point.

6           MR. LABOV:  Your Honor, this is Paul Labov, Foley

7    & Lardner, on behalf of the Ad Hoc Group.  Can I just make a

8    few points where I think some the objectors were missing?

9           THE COURT:  Okay.

10          MR. LABOV:  So, as Your Honor knows, the admin

11   claims consent program (indiscernible) is really a

12   foundational principal that Mr. Lardner sort of just

13   (indiscernible) me with that, and that's the December 1

14   initial distribution date was actually a fundamental

15   principle of the admin claims consent program.  That's what

16   all of these administrative claim holders bargained for.

17   They said, yes, we'll take a substantial haircut; however,

18   it needs to get paid by December 1.  And that was sort of --

19   that was the whole foundational principle.

20          One of the things that I think Your Honor

21   mentioned and that it's so clear, whether it was the first

22   notice, the second notice, the plan confirmation -- the plan

23   itself, the order in the plan and the attachments thereto,

24   both areas, December 1 was always set forth.  So if you

25   wanted to be in this program and you wanted to receive a

Page 51

1   distribution on or about December 1, you need to be allowed

2   and reconciled by that date.  If you wait and you sat on

3   your hands and you decided, well, I'm going to think about

4   it and take some time, then it was possible you would have

5   gotten pushed past the December 1 and, therefore, not

6   received the distribution.

7          So I guess the whole issue here is, notice went on

8   November -- October 15th, notice went out again the next

9   week -- everybody knew as of October 15th what the program

10  was when Your Honor confirmed the plan -- in both those

11  notices, December was set forth as the sacrosanct date.

12         And in addition, Your Honor may recall -- I don't

13  know, but you may recall, Your Honor, that it was very

14  important at the end of November or (indiscernible) the

15  beginning of December to get an admin claims representative

16  up and ready and running, which we've already now been in

17  the process to do that, and that was going to be decided by

18  anybody who opted in, they would have a say at the table as

19  to who that person may be, so that we could get the bigger

20  legal issues run the appropriate way.

21         So what I heard today was "arbitrary," people were

22  objecting to arbitrary.  In fact, Your Honor, every day, I

23  can attest that in fact it was methodical and deliberate in

24  terms of how the notices went out and how negotiations went.

25  And if you slipped past because you didn't, that was on you.

Page 52

1    It's in the document itself.

2              And so, again, we were the proponents of the plan,

3    and I'm happy to answer any questions the Court may have or

4    anybody may have with respect to how it was done.

5              THE COURT:  Okay.  All right.  Well, I appreciate

6    that given the timing of this settlement program, someone

7    who wanted to opt into the program should realize they could

8    not sit on their hands, but what I'm hearing today is that

9    there were, I believe, a significant number --

10             MS. CURLEY:  Your Honor?

11             THE COURT:  -- of people who didn't sit on their

12   hands --

13             MS. CURLEY:  Hello?

14             THE COURT:  -- and just waiting to hear --

15             MS. CURLEY:  Your Honor?

16             THE COURT:  I'm sorry, I thought we were done.

17             MS. CURLEY:  Oh, I'm sorry, Your Honor.  It's --

18   I'm Julie Curley appearing on behalf of an administrative

19   creditor, Buyer (sic) Corporation.  I --

20             THE COURT:  Ma'am, are you going to be making the

21   same point that several of the other people have already

22   made?

23             MS. CURLEY:  I am not, Your Honor.

24             THE COURT:  Okay.

25             MS. CURLEY:  I just wanted to note for the record

Page 53

1    that on behalf of Buyer Corporation, my client responded to

2    the information request on November 18th and which was

3    nearly a month ago without any response.  So --

4            THE COURT:  So it is the same point.  I got that

5    point.  And in fact I was about to --

6            MS. CURLEY:  Okay.

7            THE COURT:  -- finish saying that I think those

8    people really did not sit on their hands.  They were waiting

9    for a response, having provided information in sufficient

10   time to get a response, to negotiate, to do something.  I

11   think it's fair to say that the debtors and the people

12   working on this were somewhat overwhelmed by the number of

13   people who responded.

14           I also appreciate that timing is important here

15   and it seems to me that, given the number of claims you have

16   here and the categorization that I think has been done based

17   on what Mr. Fail has told me, that you could reasonably set

18   a reserve, so that money could go out promptly to those who

19   are already on the list, but set a reserve for people who

20   are subject to -- who would fall into two categories.

21   Category one is the group of people whose claims did not

22   fall into the list that was submitted yesterday or the day

23   before because of simple accounting issues, where they

24   provided the back-up information at least a week before the

25   extended deadline, which I guess was today, and didn't get a

Page 54

1    response.

2           If you made a timely request and people have not

3    yet responded, you wouldn't have to set a reserve for them,

4    and if they didn't -- you know, if they didn't respond with

5    at least a week to deal with them, then you wouldn't have to

6    set a reserve for them.  So that's just on the numbers side.

7           On the -- if the basis for the omission from the

8    list is that they fall into a legal category, you know, the

9    drop-ship date issue, the world important issue, some other

10   issue that pertains to 503(b) that's in dispute -- not

11   whether they are pre or post generally, but as a disputed

12   legal issue -- you should set a reserve for them, but they

13   should be given notice that they have a limited time to try

14   to settle that issue with you, and I'm thinking maybe ten

15   days.  So you give the notice and before you're in, they

16   settle, and if they don't, you're just going to have to cut

17   another check to the other group.

18           I think -- I think --

19           MR. FAIL:  Your -- yeah --

20           THE COURT:  -- put it differently.  On that issue,

21   I think it really was part of the understanding that, if you

22   opted in, you were opting into a process that could include

23   settling those legal issues.

24           MR. FAIL:  Yeah.  Your Honor, I hear what you're

25   saying and if that's your ruling, that's your ruling.  I

Page 55

1    think the understanding of the debtors, the UCC, the admin

2    creditors that made the proposal is this was designed for

3    the, you know, roughly half, more than half the number that

4    asserted a claim within a variance of roughly, you know, ten

5    to 15 percent of the debtors' estimate, and that we knew and

6    to incentivize parties to do that.  Where there was a

7    discrepancy we knew it was going to take longer, and I think

8    to ask the debtors within the next ten days, you know, or

9    whatever to then reconcile 260 --

10             THE COURT:  No.  I'm not saying --

11             MR. FAIL  -- (indiscernible).

12             THE COURT:  I'm not asking you to do that.  I'm not

13   asking you to do that.  I'm saying set a reserve on the --

14   just on the accounting numbers and on the world import folks

15   who fall into those types of categories, make the

16   distribution to the others.  It will be a lower amount, but

17   it will be made.  The committee can get up and running.  And

18   you may promptly make a second distribution on the world

19   import people if they don't settle within ten days.

20             And the other people, I just think you need to give

21   them at least, again, probably ten days to deal with this.

22   I mean, I just -- there has to be some ability to respond to

23   -- not on an objection basis, but just for this

24   distribution.  If it can't be done, it can't be done.  But I

25   think what they're complaining about is that they didn't

Page 56

1    really get anything back --

2            MR. FAIL:  Okay.

3            THE COURT:  -- once they sent the information in.

4            MR. FAIL:  So we'll provide them -- so what's going

5    to have to happen is the -- no distribution can go out

6    today.  It will take another maybe you know, week to get

7    the initial distribution re-cut.

8            THE COURT:  Well, I'm not sure -- why would it take

9    that long?  I mean, you have these claims categorized,

10   right?

11           MR. FAIL:  No, but the checks were physically ready

12   to be dropped in the mail by 3:30 today.  They can't be re-

13   cut, like --

14           THE COURT:  Well, but --

15           MR. FAIL:  -- they can't --

16           THE COURT:  I know you would have to re-cut it.  I

17   don't know why it would take a week to re-cut them?

18           MR. FAIL:  We have to figure out -- it takes some

19   time to get the money to the bank and the bank to just make

20   the checks up.  But we're -- it takes a couple of days and

21   this is now a new process that I (indiscernible) with Foley

22   and the UCC.

23           THE COURT:  Well --

24           MR. FAIL:  That's okay.  We --

25           THE COURT:  I mean, look --

Page 57

1           MR. FAIL:  We just have to do --

2           THE COURT:  -- alternatively, if you want to just

3    send these people a notice that you have -- you know, that

4    we are going to work in the next ten days, say, to resolve

5    all of this and then the distribution can go out and you

6    don't have to have a reserve, I'm -- that may be

7    appropriate, too.

8           MR. FAIL:  That may -- that probably --

9           MR. LABOB:  Your Honor --

10          MR. FAIL:  -- makes more sense economically.

11          MR. LABOB:  Your Honor, this is Paul Labob from the

12   ad hoc group.  This is a complete re-characterization of the

13   --

14          THE COURT:  I disagree, sir, completely with what

15   you're saying.  I'm sorry.  It just didn't work.  It is not

16   fair to someone that sent in their information --

17          MR. LABOB:  Well --

18          THE COURT:  -- didn't hear back --

19          MR. LABOB:  Yeah.

20          THE COURT:  -- then provided a response timely and

21   didn't hear back, and it's just not right.  And what you're

22   really talking about is not 14 days of not getting the

23   money.  What you're really concerned about is two things,

24   one of which I'm perfectly happy to resolve today, which is

25   that your group can be the group.  I don't have any problem

Page 58

1    with that, and you should start working on --

2            MR. LABOB:  Oh, no.

3            THE COURT:  -- on the process.  The other point is

4    it's quite clear to me that the people that are in this

5    group will be getting a bigger share of the pro rata if this

6    -- if what is proposed before I've intervened happens, and

7    that's just not fair.  It's not right.

8            MR. LABOB:  Well, Your Honor, what I was going to

9    suggest was I don't disagree with you.  But -- well, I don't

10   think we had any idea about the admin representative.  I

11   don't know if that's what you were saying, but that's not

12   where this is going.

13           What I was -- what I was simply going to suggest

14   was, and I think your second point is right.  The idea was

15   the sooner we got in, the better off we were, you know, the

16   more haircut you took from the debtor, the more

17   reconciliation from the debtor.  The idea was behind the

18   entire program was that this is how it would work.

19           So my only suggestion was with respect to the -- I

20   don't know which claims you're referring to when

21   (indiscernible), but whichever ones those are, what I was

22   simply going to suggest was they should have the time that

23   Your Honor is giving them, but let that come in from

24   proceeds that are already at the estate, but not part of the

25   21 million.  So let the 21 million go out to everybody that

Page 59

1   followed the program, and then Your Honor has given

2   everybody a sufficient amount of time to reconcile whatever

3   this -- you know, this issue is Your Honor is discussing.

4          And there is money in the estate from preferences

5   or wherever else, and let them take their pro rata share to

6   be in the same percentage as the initial distribution so

7   that, therefore, nobody is harmed.  It doesn't-- the money

8   is there.  It's not like the money is not there.  That way -

9   -

10          THE COURT:  Well --

11          MR. LABOB:  -- everybody is on the same playing

12   field.

13          THE COURT:  -- that was my suggestion question of

14   the debtors, when can you make the second distribution, and

15   the answer was very vague.  And so hearing that, I'm not

16   prepared to leave these people with that vague answer.  I'm

17   not -- I mean, if there was --

18          MR. LABOB:  (Indiscernible).

19          THE COURT:  -- if there was significant money to

20   make a prompt second distribution I would understand that

21   point.  But that wasn't the answer I got.

22          MR. LABOB:  No.  No.  Your Honor, I'm sorry.

23   That's a different issue.  The second distribution under the

24   admin claims consent program is a defined term and that term

25   defines a situation where there's certain money to pay, you

Page 60

1    know, the holder in reserve for litigation against Mr.

2    (indiscernible) and so on and so forth.  That's not what I

3    was suggesting.

4         I was suggesting that there is money in there now

5    that instead of reserving the 21 million, I don't know what

6    the number is here, but we could make a -- we'll call it a

7    1(a) distribution, not a second, a 1(a) distribution such

8    that the people that are in the courtroom today and have,

9    you know, filed this issue and Your Honor is saying there's

10   an accounting issue and it needs to be responded to

11   immediately, those people, there is money in the estate to

12   pay those people under the program.

13        And so you could make a second distribution in ten

14   days or seven days, assuming that their claims are allowed,

15   you know, worked out between the parties.  There is money to

16   do that.  This is not the "Second Distribution."  That is a

17   much larger distribution that will come in future months and

18   so on and so forth.  This is just a 1(a) distribution, I was

19   suggesting so that we keep (indiscernible) and we allow

20   these people who have apparently not heard from the debtor

21   who did not sit on their hands to --

22        THE COURT:  These people did not sit --

23        MR. LABOB:  -- participate in the --

24        THE COURT:  -- on their hands.  They didn't sit on

25   their hands.

Page 61

1          MR. LABOB:  Right.

2          THE COURT:  They just didn't.  All right.  Again, I

3     want to be clear, the reserve is for someone that promptly

4     provided their information in a way that the debtor could

5     have actually analyzed it and negotiated with them.  I'm

6     assuming that's about another, you know, another week to ten

7     days.  And it's just -- I don't know what else is left over.

8     I don't know who else would be looking to that money.  You

9     know, the deal was $21 million.  It wasn't $25 million or

10    $30 million or, you know, so this is --

11         MR. LABOB:  Right.

12         THE COURT:  -- to me this is not -- the result of

13    sending the checks out today is just not consistent with the

14    program.  If someone didn't provide a response timely to an

15    information request, they did sit on their hands and I

16    understand that.

17         But I think that people should -- if, you know,

18    someone responded on November 19th with their documents and

19    then didn't hear anything, that's not what was contemplated.

20    It just isn't.  And, similarly, if the basis for withholding

21    the money is that there's a legal issue with the drop ship,

22    the world import issue, I think people legitimately expected

23    that someone would reach out to them and tell them that's

24    the basis, and then you have a reason to negotiate.  And

25    that should happen quickly because that's why they say they

Page 62

1    made the election.

2           And I appreciate you're going to get -- you're

3    probably going to get your money about a month late, but

4    it's just -- it's just not right for these other folks.

5    It's not their fault.

6           MR. LABOB:  Well, I agree with that.  I agree that

7    it -- I agree with everything you just said, Your Honor.  My

8    only suggestion was there is money to --

9           THE COURT:  Well, but I don't --

10          MR. LABOB:  -- move things forward.

11          THE COURT:  -- I don't know where that goes, when

12   it goes, but that would also affect the second distribution.

13   So I just -- I don't think we can do that.

14          MR. WANDER:  Judge, if I may, David Wander on

15   behalf of Pearl Global.

16          My concern is that there will end up not being a

17   first distribution and that it's not --

18          THE COURT:  No.

19          MR. WANDER:  -- going to be another month from

20   December 1st.

21          THE COURT:  No.  We're -- again, we're not talking

22   about a reconciliation.  We're talking about a reserve.  I'm

23   hearing from Mr. Fail and I think it may make sense that it

24   may take longer than I thought it would to set up that

25   reserve and make the distribution.

1          MR. WANDER:  Your Honor, I'm --

2          THE COURT:  I'm not saying that the reserve will be

3    fully distributed within a month, although the portion that

4    is attributable to the world import issue will be.  So

5    you're just talking about the portion that's attributable to

6    people that -- where they're just, you know, over ten

7    percent or 15 percent or whatever the cutoff was on the

8    accounting issue.

9          MR. WANDER:  Your Honor, I think that the -- this

10   is not -- again, I fought hard and in the end I settled.

11   And I tried bringing up before Your Honor, before the order

12   was entered, that there might be problems like this, but

13   things went forward.

14         THE COURT:  Right.

15         MR. WANDER:  And so I'm living with the agreement.

16   And my concern, Your Honor, is the agreement that was part

17   of the confirmation order is now being changed --

18         THE COURT:  All right.  So what are your damages --

19         MR. WANDER:  -- and --

20         THE COURT:  -- 30 days of interest, because the pro

21   rata portion is not legitimate damages because these people

22   aren't entitled anymore than the people who I've heard from

23   today to get the money.  So, yeah, you can sue -- you can

24   have an additional admin claim for 30 days of interest.

25         MR. WANDER:  Your Honor, if it turns out to be 30

Page 64

1    days, that's not the problem.

2         THE COURT:  All right.

3         MR. WANDER:  And I have other clients who didn't

4    get into the program the way they should, but their solution

5    -- this is not, in the end, going to --

6         THE COURT:  But this wouldn't apply --

7         MR. WANDER:  -- be a solution.

8         THE COURT:  -- to them.  This only applies, again,

9    to people who got a information request and timely responded

10   and then didn't hear anything.

11        MR. WANDER:  I understand.  I understand.  I'm just

12   saying that if we go forward with what the Court's solution

13   is, it's not going to help those people.  In the end I

14   believe you're going to find out we're not going to have a

15   distribution this year.

16        THE COURT:  Well, I -- I don't understand why not.

17   They're -- it's to set up --

18        MR. WANDER:  Because I --

19        THE COURT:  -- it's to set up a reserve.  It's not

20   to -- your client will have a distribution certainly by year

21   end.  It will just be lower than is on that piece of paper

22   that was filed Wednesday night or Thursday morning.

23        MR. WANDER:  Your Honor, I don't -- Your Honor, I

24   would welcome --

25        THE COURT:  Why would you think that wouldn't be --

Page 65

1    I mean, that's the whole point of a reserve, that the people

2    who are not reserved for, who are already allowed get

3    something.

4           MR. WANDER:  Because I don't believe the

5    implementation of the plan is designed to resolve and

6    negotiate the legal issues.  And that's --

7           THE COURT:  You have -- on the legal issue you have

8    -- I'm contemplating like a week to ten days to negotiate

9    the world imports' types of issues.  And if you can't do it,

10   too bad because the way that the plan actually worked, you

11   would only really have that once you knew that that was the

12   issue.  You would only have about that much time because you

13   had a December 1 drop dead date.

14          But you had to be given some amount of time to

15   respond to the debtors saying you're all set except for the

16   world imports issue.  The spread there is X hundred thousand

17   dollars.  You know, are you prepared to make us a settlement

18   offer on that.  If they don't do that within, you know, a

19   week of getting the debtors' response, then they're not in

20   the reserve anymore.  Then they fall into Group 2.

21          MR. WANDER:  Your Honor, I've expressed my concerns

22   about the timing of the --

23          THE COURT:  But I -- what doesn't work on that?  I

24   don't understand that point.  They have a deadline, you

25   know, and the other people, you know, they -- I can't

Page 66

1    imagine you can't get to the bottom of the information

2    exchange, again, in a prompt time by year end with them --

3               MR. WANDER:  Your Honor, I'm --

4               THE COURT:  -- because that was all the time

5    everyone else had, too, is basically a couple of weeks after

6    you submit your information and then there's a request.

7               MR. WANDER:  Your Honor, I don't want to repeat my

8    points.  I'm just stating based --

9               THE COURT:  Okay.

10              MR. WANDER:  -- upon the knowledge that I have, I

11   just don't think this is --

12              THE COURT:  But what knowledge is -- I mean, I --

13   if it doesn't --

14              MR. WANDER:  Because I --

15              THE COURT:  -- happen, it doesn't happen.

16              MR. WANDER:  Because --

17              THE COURT:  Again, on the world imports, if it

18   doesn't happen, they fall out of the reserve.  On the other

19   point, it just -- I don't even know how many people we're

20   talking about, but they're just in a reserve.

21              MR. WANDER:  I think there are more people than

22   have just been --

23              THE COURT:  On the -- above the 15 percent or

24   whatever that aren't there because of world imports or

25   because of a preference?  I mean, I --

Page 67

1          MR. WANDER:  I think there are more --

2          THE COURT:  Well, I mean, I --

3          MR. WANDER:  I think there are more problems with

4     the implementation and my concern is that --

5          THE COURT:  But what are they?

6          MR. WANDER:  I --

7          MR. LABOB:  May I answer the question, Your Honor?

8     This is Paul Labob, and I hear what you're saying.  So if

9     Your Honor's ruling is, is there a way to say, okay, well,

10    if you got information from the debtor, we're going to look

11    at all pleadings where you've gotten information back at a

12    certain time and we'll reserve for that amount.

13          In other words, we shouldn't allow people now to

14    come in today and say, oh, we want to be part of it now, we

15    want to be part of it.

16          THE COURT:  No, not at all.  Absolutely not.

17    Absolutely not.

18          MR. LABOB:  Okay.

19          THE COURT:  This would only -- the reserve would

20    apply to people where the debtor requested information --

21    I'm told that all of the information was requested like the

22    day after the claim came in or the election form came in.

23    So I'm just focusing on whether there was a prompt response

24    to that information request.

25          And if there was a prompt response, and I'm

Page 68

1   assuming, you know, within a week, then there should be a

2   reserve because where the debtor didn't then say or where

3   the debtor then said nothing.

4           MR. WANDER:  I think, again, I have a lot of

5   disputes as to whether there was a prompt response --

6           THE COURT:  Well, it depends.  I mean, I think you

7   should pick a date, either a week or ten days, whatever it

8   is.

9           MR. WANDER:  I'm just saying, Your Honor, I think

10  that you're going to have not just dozens, maybe hundreds of

11  disputes over --

12          THE COURT:  Why?  I mean, that's --

13          MR. WANDER:  Because I don't --

14          THE COURT:  -- there's a date.  There's an email.

15  There's a -- you know, there's a date that you know -- that

16  each person that stood up today said, we got the request on

17  X date.  We responded either the next day or within a couple

18  of days or a week.  You know, obviously if someone responds

19  outside of what would be a reasonable deadline, they

20  shouldn't fall into this group.

21          But if they responded promptly and then there was

22  no response thereafter, they should be in the group that's

23  reserved for.

24          MR. WANDER:  Your Honor, I'll just leave my

25  comments as they are.  I just --

1        THE COURT:  Well --

2        MR. WANDER:  -- that's what I --

3        THE COURT:  -- I mean, if --

4        MR. WANDER:  I fear it's --

5        THE COURT:  There's an email -- MII -- M3, I'm

6   assuming, put a date when they asked for the information,

7   right?

8        UNIDENTIFIED SPEAKER:  No.

9        UNIDENTIFIED SPEAKER:  No, Your Honor.

10        THE COURT:  They didn't put a date -- no.  No.  Not

11   a date when they wanted it back, but a date when they

12   requested it?

13        MR. FAIL:  Yes, Your Honor.  We have a record of

14   when we made the request.

15        THE COURT:  All right.  So, look, there's a

16   December 1 deadline.  So I'm assuming that if the request

17   was made when the -- I mean, December 1 is when the money

18   goes out.  Everyone assumes that's when the money goes out,

19   right?  There was no correspondence to people saying the

20   money's not going to go out until months -- weeks later,

21   right?

22        MR. FAIL:  In full disclosure, a number of parties

23   with substantial -- a number of parties, not a large number

24   of parties, did ask -- I spoke to one last night.  The

25   amount in dispute with that party is significant and they --

Page 70

1    that party realizes we weren't going to come to a

2    resolution.  I can't say that parties didn't reach out and

3    say, if I wait can I have a little bit more time.

4              THE COURT:  I'm not talking --

5              MR. FAIL:  I'm not making that representation.

6              THE COURT:  Look, I -- everyone realizes that

7    December 1 is the distribution date.

8              MR. FAIL:  Yes.

9              THE COURT:  Okay.  So if the debtor makes an

10   information request, as I'm told it did, promptly after the

11   ballot is submitted, if that information is not provided

12   within at least a week before December 1, they shouldn't be

13   getting in the reserve unless, I guess, they're in this

14   second batch because that -- you have to add another week to

15   that.  So that would be, you know, a week after that

16   deadline.

17             So they had a week.  I mean, I -- they have to -- I

18   guess the one exception is if the debtor actually told them,

19   you have more time, then you would reserve for them, too.

20   But that's a one off because that's part of your

21   negotiations.

22             MR. FAIL:  All right.  Thank you, Your Honor.  I

23   appreciate that.

24             On behalf of the debtors, we appreciate your time.

25   We know this wasn't on the agenda.  It wasn't what the

1    debtors came in asking for.  But --

2              THE COURT:  No, I know that.

3              MR. FAIL:  No, but, Your Honor, the reason the

4    debtors came forward today was for the process and the due

5    process, and in that regard --

6              THE COURT:  Okay.

7              MR. FAIL:  -- it's exactly what we wanted.  We --

8              THE COURT:  All right.  And as far as --

9              MR. FAIL:  -- got the Court's view and we

10   appreciate it.

11             THE COURT:  And as far as the world import, I think

12   you have to build in for them that same week that we're

13   talking about.  You know, whatever you told them, if it's a

14   world import issue, build in a week --

15             MR. FAIL:  We will have to tell them that it's a

16   world --

17             THE COURT:  -- for negotiations, not --

18             MR. FAIL:  -- import issue.

19             THE COURT:  -- for them to respond, for it to be

20   done.  So they need to respond right away.  I'm assuming

21   they've thought about this already to make their response.

22             MR. FAIL:  I appreciate that, Your Honor.

23             THE COURT:  Okay.

24             MR. BASS:  Your Honor, I apologize.  I didn't -- I

25   wanted to just get some clarification.  This is David Bass

Page 72

1    from Cole Schotz.  I represent Lifetime Brand.

2          We did provided information, but we provided it

3    earlier this week.  There was an expectation that certainly

4    that 30 day period where the parties were going to discuss

5    resolution would have governed the (indiscernible) of claim

6    timing on the 18th.  We provided the information.  We had to

7    gather some information.  But we --

8          THE COURT:  right.

9          MR. BASS:  -- provided it earlier this week on the

10   10th.

11         THE COURT:  Well, look --

12         MR. BASS:  I don't think --

13         THE COURT:  -- you may not have heard me because I

14   was talking pretty fast, but the one exception to my week to

15   provide the information was if the debtors said, we're

16   negotiating this first batch still and, you know, we'll give

17   you more time.  I think you need to set a deadline and, you

18   know, that's a separate group where there should be a

19   reserve.

20         But other than those actual commitments by the

21   debtor, if the debtor didn't extend some time, then I'm

22   going by what people should reasonably be held to, which is

23   the -- as far as the first batch, the December 1st deadline

24   and I think as to the second batch the December 7th deadline

25   or December 8th deadline.

1          UNIDENTIFIED SPEAKER:  Your Honor, I don't want to

2     --

3          MR. BASS:  Your Honor, I'm not sure I understand.

4     The expectation was you had a 30 day negotiating window.  We

5     filed a claim on the 18th of December -- I'm sorry -- of

6     November.  We provided the information on December 10th, you

7     know, (indiscernible) holiday week.  The information -- no

8     one responded and said the information is inadequate.  It's

9     --

10         THE COURT:  But --

11         MR. BASS:  -- a numbers issue.  It's --

12         THE COURT:  -- how would you have a --

13         MR. BASS:  -- (indiscernible).  It's not a --

14         THE COURT:  But, sir, how would you have a 30 day

15    negotiating window when the payment is supposed to be made

16    on December 1st?  So, again, unless the debtor --

17         MR. BASS:  (Indiscernible).

18         THE COURT:  -- gave you an extension in respect of

19    the first distribution and you timely complied with that, I

20    don't see how you could reasonably expect that providing

21    information on December 10th would be consistent with a

22    program that assumed that the money would go out to

23    undisputed claims on the first.

24         MR. BASS:  Because there was no mention that on

25    December 1st, if you hadn't reconciled your claim by

1    December 1st you would lose that right --

2         THE COURT:  No.   That's --

3         MR. BASS:  -- (indiscernible).

4         THE COURT:  That's not right.  That's not right.

5    The way the program work -- they weren't going to just make

6    a payment to anyone that asserted a claim.

7         MR. BASS:  But the point -- Your Honor, mine is not

8    a 503(b)(9) claim.  It's not a legal claim.  It's a numbers

9    claim.  It was you submit, you know, payments through the

10   vendor system electronically.  They have all the

11   information.  Then our ballots were consistent with that

12   information.

13        THE COURT:  When did they ask --

14        MR. BASS:  (Indiscernible) --

15        THE COURT:  When did they ask your client for the

16   information that they wanted?

17        MR. BASS:  I believe it was November 19th.

18        THE COURT:  All right.  So there was plenty of time

19   to respond then.  You didn't have to wait till December 10th

20   knowing that the distribution would be made on the 1st.

21        MR. BASS:  We were gathering -- we were gathering

22   information.  I mean, yes, we -- there was nothing in there

23   that says if you don't have the claim reconciled by December

24   1st -- forget about what Your Honor is saying is

25   (indiscernible), it's not in there in the words.  The expect

Page 75

1    -- the documents said the claim would be reconciled within

2    30 days.

3              THE COURT:  That's different than that the money is

4    supposed to go out on the 1st.  So it will be reconciled

5    promptly, but -- that doesn't mean that you're going to get

6    payment in the first group.

7              MR. BASS:  It does, Your Honor.  When you're --

8    when you spend the entire $21 million on -- without getting

9    -- giving people the opportunity to have that 30 day

10   reconciliation period.

11             THE COURT:  You -- what -- I'm sorry.  I don't have

12   it in front of me.  Is there anything that says you have a

13   30 day no matter when?

14             MR. WANDER:  Your Honor, I have it in front of me.

15   What it says is, and this is for the initial recovery.  It

16   says to be -- the reconciliation is to be completed within

17   30 days from the date of receipt of the opt-in ballot.  So

18   the opt-in ballot drives the 30 days.  And in my client's --

19             THE COURT:  Look, you know what?  If people are not

20   going to do something like this, we'll just do it on notice.

21   I'm sorry.  This is just -- I probably shouldn't have taken

22   this up anyway.  I was hoping we could resolve this.  It

23   seems to me totally illogical to assume that you're going to

24   make a December 1 distribution and have 30 days when you

25   submit it on a deadline that's a week before December 1.  It

Page 76

1    doesn't work.

2           So I -- it doesn't work and I -- why don't you give

3    it to me?  I'll take ten minutes and look at it.  All right.

4    Give me the --

5           MR. WANDER:  Okay.  Your Honor, this is my

6    handwritten thing.

7           THE COURT:  No.  I don't want a handwritten thing.

8    I want the docket --

9           UNIDENTIFIED SPEAKER:  Your Honor, we have copies

10   of the order.

11          MR. WANDER:  All right.  Then I --

12          THE COURT:  You know what?  I'm going to take this

13   after lunch.  I'm going to do the rest of the calendar.

14   Everyone else has been very patient on this issue.  We spent

15   two hours on it already.  No one has -- it -- all the people

16   who have spoken to me, this is the first time I've heard of

17   30 days.  All right.

18          UNIDENTIFIED SPEAKER:  It's in the order, Your

19   Honor.  I'm sorry.

20          THE COURT:  Did you mention it?  Did he mention it?

21   No.  What he mentioned was we didn't have enough time to

22   respond to the thing --

23          UNIDENTIFIED SPEAKER:  Well, Your Honor --

24          THE COURT:  -- not 30 days.

25          UNIDENTIFIED SPEAKER:  -- not to -- I'm not looking

Page 77

1    for 30 days.

2              THE COURT:  Look, I'm just -- forget about --

3              UNIDENTIFIED SPEAKER:  Please, Your Honor --

4              THE COURT:  -- forget I said any of that.  We're

5    not going to deal with it now.  I'm going to sit down.

6    Someone is going to give me the full order of the full

7    program and then I will decide this issue.

8              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9              THE COURT:  And meantime someone from M3 should

10   come up with a little bit more information as about who

11   falls into the first group and who falls into the second

12   group and how fast they can decide and negotiate with them.

13   All right.  And they can leave the courtroom to do that or

14   go into the conference room with their personal device.

15             I mean, we have been talking about admin claims for

16   six months now.

17             Okay.  So the actual first matter on the agenda is

18   the turnover motion.

19             MS. CROZIER:  Thank you, Your Honor.  And may it

20   please the Court, Jennifer Crozier, Weil Gotshal & Manges

21   for the debtors on the debtors' motion to compel turnover of

22   estate property.

23             The debtors' motion concerns more than $5.5 million

24   in refunds of property taxes that the debtors' paid to Cook

25   County, Illinois in 2013, 2015 and 2016, years before the

Page 78

1    debtors sold their assets and operations to Transform under

2    the asset purchase agreement.  These Cook County tax refunds

3    belong to the debtors and Transform does not dispute that.

4    They didn't dispute it in the November 11th letter refusing

5    to turn over the refunds to the debtors and they do not

6    dispute it in their objection to the debtors' motion for

7    turnover.

8         Transform doesn't dispute that the Cook County tax

9    refunds belong to the debtors because they can't.  Section

10   2.2(h) of the APA makes unambiguously clear that the debtors

11   interest in or right to any refund, rebate or credit of

12   taxes imposed on the acquired properties for any pre-

13   assignment tax period, for all intents and purposes any pre-

14   closing tax period, are excluded assets not transferred to

15   Transform under the APA.

16        So, in short, such refunds belong to the debtors.

17   Your Honor has examined Section 2.2(h) and agreed.  At the

18   July 11th, 2019 hearing on the debtors' motion to enforce

19   the APA, this Court held that the EDA funds belonged to the

20   debtors pursuant to Section 2.2(h), noting that the parties

21   could not have drafted a more specific --

22        THE COURT:  Can I --

23        MS. CROZIER:  -- provision.

24        THE COURT:  Can I interrupt you?  I don't think

25   there's any -- I agree with you.  There's no dispute that

1    this money is the debtors' money.  I think the issue --

2    which is different than the EDA money -- is that someone

3    this got into the cash management system, or at least that's

4    what's claimed by Transform.  And, therefore, it's wrapped

5    up in the series of disputes about what should be spat out

6    of that system once you reconcile what the debtors owe to

7    Transform and what Transform has of the debtors.  And

8    whereas the EDA money was paid directly to the debtors as

9    opposed to in the cash management system.

10           So what I don't understand is how this money got

11   into the cash management system.  I mean, if it was a check

12   payable to the debtors, how -- it's not like credit card

13   receipts that just run through the daily cash management

14   system or other types of payments like that, or payments

15   made by Transform on account of the debtors, which is all --

16   that's the, in a nutshell the dispute over what comes out of

17   the cash management system.

18           I don't know how this got in there.  I mean, how

19   would -- how did they actually negotiate the check?

20           MS. CROZIER:  Right, Your Honor.  That's -- that is

21   the all important question here today.  And I can refer you

22   to Exhibit B of my declaration, appended to our motion for

23   turnover.  But -- or I can hand you a copy if you don't have

24   one.

25           But the checks were sent with cover letters

Page 80

1    addressed to debtor entities, but they were sent -- they

2    were intended for debtor entities.  It's clear on the face

3    of the check and on the face of the cover letter.  But they

4    wound up --

5              THE COURT:  Well --

6              MS. CROZIER:  -- at --

7              THE COURT:  -- that's the question I have.

8    Transform didn't buy the stock of the entity that was the

9    payee on the check, right?

10             MS. CROZIER:  I don't believe that's the case, Your

11   Honor.

12             THE COURT:  Okay.  So how did Transform cash the

13   check?  I mean, I -- if I move out of my apartment, right --

14   I'm Mr. X.  I move out of my apartment and mail comes to me,

15   a social security check, John Smith.  Bill Jones, who now is

16   in my apartment, can't cash John Smith's check and put it

17   into his bank account.

18             So that's really -- if there's a valid reason for

19   it to be in the cash management system, I think Transform is

20   right.  It's all part of that dispute.  But that's the issue

21   I don't -- I don't know how that happened, what -- I don't

22   know if the money came in and was deposited by Sears.  I

23   don't think so because your affidavits suggest otherwise.

24   You know, Sears, the debtor, not post-acquisition debtor.

25             But it seems from the affidavit that this money

1     came in post-acquisition and was cashed not by the debtor,

2     but by Transform.  But can --

3               Mr. Liman, are you here on this one?

4               MR. LIMAN:  Your Honor, I am.

5               THE COURT:  Do you know the answer to that

6     question?

7               MR. LIMAN:  I'm checking --

8               THE COURT:  Okay.

9               MR. LIMAN:  -- with -- to find out the answer to

10    that.

11              THE COURT:  Okay.

12              MR. LIMAN:  I don't know.

13              THE COURT:  Because I think that's -- I mean, I

14    think if it's -- if Transform just somehow said we're Sears

15    and didn't have a right to say, we're Sears, then, yes, the

16    money should be paid over.  If somehow it was put into the

17    account by Sears or Transform owns the stock, then I think

18    it's all part of the reconciliation that the 706 expert is

19    doing.  Even though this aspect of the reconciliation should

20    be crystal clear, it's all subject to the other adjustments.

21              MS. CROZIER:  So, Your Honor, the debtors' position

22    is that it did not validly wind up in the cash management

23    system, and so for that reason it should be outside the cash

24    reconciliation process and turned over to the debtors.

25              THE COURT:  Okay.  Well, is there anything more to

Page 82

1   say on this?  I mean --

2           MR. LIMAN:  Your Honor, except maybe just to

3   suggest, Your Honor, I think we have your ruling with

4   respect to it.  We can find out the facts --

5           THE COURT:  It's just a factual matter.

6           MR. LIMAN:  We can talk to the debtors and we'll

7   apply Your Honor's ruling.

8           THE COURT:  Okay.  I mean, someone cashed the

9   check.  You know, the old adage, he who takes what isn't his

10  and gives it back or goes to prison.  And I think this not -

11  - I don't think Transform had a right to cash the check.

12          Now maybe -- if you could show me somehow that it

13  did, then that's a different story.

14          MR. LIMAN:  We'll -- Your Honor, we'll find out the

15  answer and we'll discuss it --

16          THE COURT:  All right.  So that should happen --

17          MR. LIMAN:  -- with the debtors.

18          THE COURT:  -- really fast because I have an

19  affidavit that says it didn't, you know, that they didn't

20  have a right to cash the check, that it was sent to the

21  wrong address, to the right person, the debtor, but to the

22  wrong address and that somehow it -- and I think it is -- it

23  has been cashed.  It's not just being held, right?

24          MR. LIMAN:  No.  I believe it has been cashed.

25          THE COURT:  All right.  So I don't think that -- I

1    don't see how anyone had authority to do that.

2           MR. LIMAN:  I -- Your Honor, I'll find out the

3    answer to it.  I've got a -- I could go through lengthy

4    argument, but I --

5           THE COURT:  So can I --

6           MR. LIMAN:  -- I think you've heard lengthy

7    arguments today.

8           THE COURT:  I mean, I went back and I think the

9    objection was correct, that if it is validly in the cash

10   management system, I dealt with this in July on page --

11   well, 194 to 196, and said that, you know, as part of the

12   whole reconciliation, this -- you know, at that point I gave

13   people a deadline.  It's way past the deadline now because

14   you're all trying to work it out.  But it's really covered

15   by the cash management reconciliation, iii of the 706

16   expert's work plan.

17          But if it's -- if it was, you know, improperly

18   cashed or endorsed, then it's not.

19          MR. LIMAN:  We're still exploring the information.

20          THE COURT:  Okay.  So I'm going to set a deadline

21   on this one of next Friday.  And I mean it's either -- I

22   mean, it should be really clear.  I mean, there should be

23   some backup as to if there -- if Transform says, no, we had

24   a right to do it, you should provide the debtors with

25   something.  And if there's still a dispute over that issue,

Page 84

1    then I'll hear it at the next omnibus day.  But I have a

2    feeling that the facts will be clear one way or the other.

3              MR. LIMAN:  Thank you, Your Honor.

4              THE COURT:  Okay.

5              MS. CROZIER:  Thank you, Your Honor.

6              And just for clarification, your ruling is with

7    respect to the three Cook County tax refunds that --

8              THE COURT:  Yeah.

9              MS. CROZIER:  -- are the subject of our --

10             THE COURT:  All the refunds.  I mean, any refund

11   that's made out to a debtor entity where Transform didn't

12   buy the stock and is -- you know, unless Transform can show

13   a right to cash the check, it shouldn't have gone into the

14   cash management system.  So that should be turned over.

15             MS. CROZIER:  Thank you.  Thank you very much.

16             MR. LIMAN:  Your Honor, I can report that we have

17   made progress with respect to the expert.  I think both

18   sides have submitted positions to the expert --

19             THE COURT:  Okay.

20             MR. LIMAN:  -- and submitted the -- Your Honor's

21   transcripts, and I think that process --

22             THE COURT:  Okay.

23             MR. LIMAN:  -- is going smoothly.

24             THE COURT:  I appreciate that.  I have -- sometimes

25   I get letters from people that I don't think are worth

Page 85

1    filing on the docket, but I did want to ask about this

2    issue.

3            I remember from maybe the July hearing, it may have

4    been before then, that it was represented to me that the

5    post-petition severance that was covered by the Transform

6    deal had been paid.  I've gotten correspondence that

7    suggests otherwise.  Could you look into that, both the

8    debtors and Transform?

9            MR. LIMAN:  Yes.

10           THE COURT:  I was -- I think I was told that they

11   did pay it.

12           MR. LIMAN:  That's right, Your Honor.  We believe

13   that it was all paid --

14           THE COURT:  Yeah.

15           MR. LIMAN:  -- already.  But --

16           THE COURT:  And it may be that --

17           MR. LIMAN:  -- if there is --

18           THE COURT:  I mean, sometimes these letters are not

19   clear, like maybe it was prepetition severance --

20           MR. LIMAN:  Correct.  It could -- that's possible.

21           THE COURT:  -- which would be a claim, not a --

22           MR. LIMAN:  Right.

23           THE COURT:  -- not something that -- I don't -- I

24   think not something Transform agreed to pay.  I think it was

25   the post-petition settlement.

Page 86

1          MR. LIMAN:  Certainly, Your Honor.  And we can just

2    coordinate --

3          THE COURT:  But can you --

4          MR. LIMAN:  -- with your chambers --

5          THE COURT:  Could you --

6          MR. LIMAN:  -- and get copies of whatever you got.

7          THE COURT:  Well --

8          MR. LIMAN:  I'm not sure we got them.

9          THE COURT:  -- I don't -- it's just a general --

10         MR. LIMAN:  Got it.  That's fine.

11         THE COURT:  I think -- what I suggest is that

12   someone, either Transform or the debtors, file just a

13   statement on the docket answering my question, which is --

14         MR. LIMAN:  Yes.

15         THE COURT:  -- has the post-petition severance that

16   had been agreed to be paid by Transform been paid, and then,

17   secondly, are there any post-petition severance claims -- I

18   mean, just totally post-petition -- that have not been paid.

19   I think it's a complete overlap under the APA.  And I

20   actually think it's not that big a number, but I would like

21   to break it into those two categories.

22         MR. LIMAN:  And, Your Honor, I'm sure it's clear,

23   but I had not expected the question --

24         THE COURT:  No.  I --

25         MR. LIMAN:  -- and not -- my silence is not --

1            THE COURT:  Neither is Mr. Singh.  I'm just --

2            MR. LIMAN:  -- agreement except that we'll find out

3    the answer.

4            MR. SINGH:  We'll look into it, Judge.

5            THE COURT:  I just want to get -- I just want to

6    have that on the docket so that people can be pointed to it

7    if they think they haven't been paid.

8            MR. SINGH:  Certainly, Your Honor.  We'll --

9            THE COURT:  And it's just post-petition severance.

10            MR. SINGH:  Understood.

11            MR. LIMAN:  Thank you, Your Honor.

12            THE COURT:  And when I'm saying that, what I mean

13    is if someone was severed post-petition, not that they might

14    be owed ongoing payments post-petition.  But if someone was

15    -- their job was terminated post-petition, that's what I

16    mean by post-petition severance.

17            MR. SINGH:  Right.  No, understood.

18            THE COURT:  Okay.

19            MR. SINGH:  And, Your Honor, you said a week for

20    the 20th.  Should we just report back at a status conference

21    on the 20th or --

22            THE COURT:  Well, I think you should just submit an

23    order.

24            MR. SINGH:  I'm hopeful it will just be resolved.

25            THE COURT:  I mean, I would think you would submit

Page 88

1    an order.  If --

2              MR. SINGH:  Right.

3              THE COURT:  -- there's a dispute, just put it on

4    the calendar for the next omnibus date.

5              MR. SINGH:  Okay.  I think the next omnibus, Your

6    Honor, is all the way at the end of January.  I think if

7    there's a way to just -- if there's a dispute --

8              THE COURT:  Well, we'll see what -- I mean, it may

9    be a very simple dispute, factual dispute, so --

10             MR. SINGH:  Right.

11             THE COURT:  -- I'm hoping the facts will be clear.

12             MR. SINGH:  We'll report back on the 20th, Your

13   Honor.

14             THE COURT:  Yeah.  It's not a legal issue.  It's

15   just --

16             MR. SINGH:  Right.

17             MR. LIMAN:  Thank you, Your Honor.

18             MR. SINGH:  Thank you.

19             THE COURT:  Thank you.

20             Okay.  So I think the only other matter is the

21   Sayville Menlo LLC versus Transform.

22             MR. DUBLIN:  There's the -- we have the --

23             THE COURT:  Oh, I'm sorry.  The fourth plan

24   supplement.  Excuse me.

25             MR. DUBLIN:  Yeah.

Page 89

1          THE COURT:  Correct.

2          MR. DUBLIN:  Thank you, Your Honor.  Phil Dublin,

3    Akin Gump for the committee.

4          This issue relates to the compensation for the

5    board members of the litigation trust in their capacity as

6    litigation designees before then.

7          THE COURT:  Right.

8          MR. DUBLIN:  The debtors had filed the fourth

9    supplement setting forth a proposed compensation on October

10   7th. That was during the pendency of the confirmation

11   process, before the confirmation order was entered.  In an

12   order to give people an opportunity to review that proposed

13   compensation, there was a deadline -- an objection deadline

14   made available to parties and we received one objection,

15   some of Mr. Wander's clients.

16         There was also a joinder followed -- that followed

17   that objection about two weeks after the objection deadline

18   that went beyond the scope of the objection.  I don't think

19   anything -- the joinder in and of itself that joins with

20   what Mr. Wander has asserted with respect to the contingent

21   compensation will address that.  With respect to the extra

22   scope and who the board members are, that was all approved

23   in connection with the confirmation order.  We don't believe

24   that is appropriate to be heard.

25         As the Court may recall, these -- the construct for

1    selection of the board members was part of the committee

2    settlement that was embodied in the plan along with the

3    assistance of Doug Chapman with respect to a limited

4    mediation to resolve a number of the committee's objections

5    to the plan in general.

6        Through that process it was agreed that there would

7    be a five-member board, two selected by the debtors, two

8    members selected by the debtors, three selected by the

9    creditors' committee.  The debtors, as previously designated

10    in prior iterations of the plan, determined to designate

11    Alan Carr and Bill Transier to the litigation trust board,

12    two of the -- or the two independent members of the

13    restructuring subcommittee who obviously had intimate

14    familiarity with the claims and causes of action that have

15    been asserted initially in the complaint filed by the

16    restructuring subcommittee and, thereafter, by the

17    litigation designees as amended to include 23 additional

18    causes of action and 26 additional defendants.  And that was

19    put on file on November 25th.

20        The creditors' committee's designees, Ray Wallender

21    (ph), Gene Davis and Patrick Bartels (ph), none of them had

22    any involvement or prior experience with the debtors'

23    Chapter 11 cases prior to being designated by the creditors'

24    committee.  All five of the designees obviously have

25    significant restructuring related experience, have served on

Page 91

1    independent boards and in roles of litigation trust board

2    members or litigation trustees themselves in the past.

3            After determining the composition of the board, the

4    debtors -- by the debtors and the creditors' committee, the

5    creditors' committee itself and its advisors took the lead

6    in negotiating the compensation structure with the board

7    members and with two primary goals in mind.

8            The first was ensuring that there would be a

9    reasonable base compensation for the significant amount of

10   work that would go into the role to be played by the board

11   members, as well as an incentive compensation component to -

12   - which is common, in order to align the interests of the

13   board members with the beneficiaries of those causes of

14   action, the creditors of the debtors' estates.

15           Again, that -- the compensation structure was

16   disclosed on October 7th and provides for an $80,000 per

17   year annual base compensation for each of the board members.

18   That has not been opposed by Mr. Wander's clients or in the

19   joinder.  And then there's the contingent compensation

20   structure which provides that after $150 million in gross

21   proceeds have been recovered, $150 million online with the

22   projected administrative expenses, then there would be

23   incentive compensation that would be shared among the board

24   members.

25           It would be one and a half percent of the gross

Page 92

1    proceeds greater than 150 million up to 250 million; two

2    percent of the gross proceeds greater than 250 million up to

3    350 million; two and a half percent of gross proceeds

4    greater than 350 million to 450 million; and then three

5    percent after $450 million of gross litigation proceeds.

6            Something to note just with respect to the proceeds

7    in and of themselves, there's a bit of a bifurcation with

8    respect to the receipt of the -- or the incentive

9    compensation in that the gross litigation related proceeds,

10   if anything comes in pre-effective date from preference

11   actions, that will not be entitled to any -- will not be

12   accounted for in connection with the incentive compensation

13   because pre-effective date, the mandate for the litigation

14   designees is focused on the defined term, specified causes

15   of action, which is the -- we'll call them the ESL claim.

16   There's obviously a lot more people involved and different

17   entities involved in the litigation.  But the mandate is

18   smaller pre-effective date than post-effective date.  So

19   when preference proceeds come in pre-effective date, there's

20   no -- that doesn't account towards the incentive

21   compensation.

22           And at no point in time does the proceeds that come

23   in from monetization of other assets the debtors have, for

24   example, if money comes in from the Transform disputes and

25   the like, that is not accounted for and is not added to or

1    included in the incentive compensation formula.

2          It's important to note that in connection with the

3    negotiations that were had in leading to the ultimate

4    compensation structure, it was taken into account the

5    extensive or the more expansive role that these board

6    members are going to have than you would typically see in a

7    liquidating trust or litigation trust.  The trust agreement

8    was drafted in a manner by the debtors and the committee to

9    ensure that these board members, given the significance that

10   these causes of action will have to creditor recoveries will

11   have a much more hands on approach.

12          It's not handing over to a litigation trustee the

13   role of stewarding these causes of action.  The board

14   members are doing it themselves.  To the extent that

15   ultimately a trustee is selected to facilitate the operation

16   of the trust, it's going to be an administrative function.

17   It is not going to be a substantive role that you often see

18   in similar circumstances where you have a board that's just

19   rubber stamping or getting a presentation from a trustee and

20   then saying, this works.  These board members are actively

21   involved in the process on a regular basis and obviously

22   signed off on the amended adversary complaint that was filed

23   on the 25th.

24          In fact, the role that these board members are

25   playing is more akin to what you would see of a Chapter 11

Page 94

1    trustee or of a Chapter 7 trustee, but for with respect to a

2    Chapter 7 trustee nowhere near the type of compensation that

3    a

4    Chapter 7 trustee may be able to obtain.

5            As noted in the debtors' disclosure statement, they

6    included projections of what a Chapter 7 trustee would

7    receive in the event the cases were converted and the plan

8    was not confirmed.  The debtors estimated in the disclosure

9    statement $236 million in distributable proceeds from a

10   conversion of the case to Chapter 7, and that would include

11   proceeds with respect to the primary adversary proceeding.

12           While the creditors' committee obviously believes

13   that, and the litigation designees believe now that a

14   substantially greater value will come in, using that

15   disclosure statement analysis as a baseline, in that

16   circumstance a Chapter 7 trustee would have received about

17   $7 million in contingent fees, whereas here because the

18   contingent fee program doesn't kick in until $150 million

19   have been collected, assuming that the 236 minus the 150,

20   the $86 million was all litigation proceeds entitled to

21   compensation, that would only be $1.29 million that would go

22   to the board members here.

23           It's not until there's in excess of $450 million of

24   litigation proceeds that you would get to the three percent

25   threshold.  At that point in time, again, assuming that all

Page 95

1     $450 million in the Chapter 7 context were proceeds akin to

2     what the board members would be entitled to receive, the

3     board members would receive about half, less than half of

4     what -- actually, it's even less.  It's about a third, well,

5     it's about a half of what the Chapter 7 trustee would

6     receive -- oh, I'm sorry.  It's about half of that.

7              So it's clear to us just based on a straight

8     comparison of what would happen in a Chapter 7 case that the

9     board member compensation here is reasonable.  The objection

10    without any support just asserts that the fees are excessive

11    and unwarranted.  We don't -- it's just untenable to believe

12    that based on the analysis contained in the reply or just an

13    assessment of looking at the disclosure statement and the

14    fee structure that's been proposed by the debtors and the

15    committee with respect to the board members.

16             The other issue that was raised in --

17             THE COURT:  Can I interrupt you on that?

18             MR. DUBLIN:  Sure.

19             THE COURT:  What was the -- was the -- did the

20    committee deliberate on this as a whole?  Was there -- how

21    was the decision made?

22             MR. DUBLIN:  As a whole, Your Honor.  We had

23    multiple meetings where this was discussed.  We had Sunday

24    evening conference calls with the committee co-chair in

25    advance of a number of those meetings as the terms were

Page 96

1    being negotiated, and ultimately the entirety of the

2    committee unanimously approved the fee structure.

3            THE COURT:  Okay.

4            MR. DUBLIN:  Just -- the other point I was about to

5    add was that in the joinder there was some insinuation about

6    conflicts between the debtors and the committee on the one

7    hand and the board members on the other.  Obviously, we

8    disagree with that assessment.  But we did include as an

9    exhibit to the reply a 2014 like disclosure from Akin Gump

10   with respect to connections to each of the board members and

11   the current or former connections with respect to all five.

12           I would note that there were three matters that

13   were undisclosed for confidentiality reasons.

14           THE COURT:  Okay.

15           MR. DUBLIN:  And with that I'll -- unless Your

16   Honor has additional questions, I'll turn it over to Mr.

17   Wander.

18           THE COURT:  Okay.

19           MR. WANDER:  Good afternoon, Your Honor.

20           THE COURT:  Good afternoon.

21           MR. WANDER:  David Wander of Davidoff Hutcher &

22   Citron.  I rise on behalf of my clients, Orient Craft, Eric

23   Jay and Stolaas Company.

24           Your Honor, on July 26th, the debtor filed a notice

25   of filing of plan supplement in connection with the modified

Page 97

1    second amended joint plan, and that's Docket Number 4632.

2    At that time there was no trust agreement and no information

3    about the five-member board.

4         THE COURT:  Well, the board itself had been

5    identified on June 28th, and that's in the disclosure

6    statement.

7         MR. WANDER:  Okay.  Going by this document I

8    appreciate what Your Honor just said.

9         On August 2nd, the debtor filed a notice of filing

10   plan supplement in connection with the modified second

11   amended plan.  That's Document 4703.  That included the

12   liquidating trust that had an Annex A that listed the five

13   members.  All it said was for Mr. Bartels, for example,

14   creditors' committee member, for Mr. Carr, debtors' member.

15   That was the full disclosure of those people in that

16   document.

17        Annex B, which is the compensation, had blanks for

18   the base compensation and the incentive compensation.

19        On October 1, which is two days before the

20   confirmation hearing, the debtor filed Docket 5295, notice

21   of filing of revised plan supplement in connection with the

22   modified second amended joint plan.  That had an Annex B on

23   page 58 and it also had the compensation, the base

24   compensation as a blank and the incentive compensation as a

25   blank,

1            There was a footnote, though, actually, a footnote

2     on -- starting on the document filed on August 2nd at Annex

3     B.  Note 5 said, note to draft, the annual base compensation

4     of each member of the liquidating trust board shall be

5     disclosed prior to the confirmation hearing.

6            And Note 6 said, note to draft, each member of the

7     liquidating trust board shall be entitled to incentive

8     compensation on terms to be determined.  Such terms to be

9     disclosed prior to the confirmation hearing.  That was on

10    that August 2nd filing.

11           And the same footnote was included on the August 1

12    filing which said that the compensation for both the base

13    compensation and the incentive would be disclosed prior to

14    the confirmation hearing.

15           Now at the confirmation hearing when I -- well, by

16    the time of the confirmation there was no disclosure with

17    regard to the compensation.  And when I cross-examined the

18    debtors' witnesses, including the people who are going to be

19    the debtors' representatives on the liquidating trust board,

20    they said they had no personal knowledge at all regarding

21    the compensation.

22           It was not until the adjourned hearing on October

23    7th, shortly before that, that Document 5335 was filed with

24    the Court.  And that was the notice of filing of the fourth

25    plan supplement in connection with the modified second

1    amended joint plan that listed the base compensation of

2    $80,000 of each litigation designee who are also the

3    litigation -- liquidating trust board members.  It also then

4    set forth the contingent compensation.

5            I filed an objection to the contingent

6    compensation.  And, by the way, at the time that the October

7    7th filing was made, there was no additional information

8    about the members and any connections that they had.

9            THE COURT:  There's no need to.

10           MR. WANDER:  I -- okay.

11           THE COURT:  They had been disclosed for months.

12   Two of them had been the debtors' independent director since

13   before the case.

14           MR. WANDER:  No.  I'm -- I understand.

15           THE COURT:  I think the --

16           MR. WANDER:  The other --

17           THE COURT:  -- other peoples' names are well

18   recognized in the bankruptcy community and, if they weren't,

19   people could have gone online and figured out who they were.

20           MR. WANDER:  Okay.  So I filed an objection just to

21   the contingency contingent compensation.  And based upon

22   what had been disclosed and what had not been disclosed, I

23   said it appeared to me the compensation was excessive and

24   unwarranted, and there should be full disclosure of the

25   process for determining the criteria and the amount of the

Page 100

1    contingent compensation, the identifies of the people

2    involved in the process, and the role they played.

3            And I pointed out in the objection at paragraph 6,

4    I said, the record before the Court on this issue is bare.

5    At the confirmation hearing there was no testimony or other

6    evidence --

7            THE COURT:  All right.  But there was an objection

8    deadline after that and you filed a timely objection.

9            MR. WANDER:  Right.

10           THE COURT:  So that -- now we're here on it.  So --

11           MR. WANDER:  Right.

12           THE COURT:  -- what is the problem with the

13   compensation?

14           MR. WANDER:  Well, Your Honor -- and, again, I

15   filed the objection on October 25th.  I'm the moving party -

16   -

17           THE COURT:  Right.

18           MR. WANDER:  -- in this matter.

19           THE COURT:  Right.

20           MR. WANDER:  Okay.  I did not get -- we did not get

21   any response --

22           THE COURT:  What -- no.  You said it -- in what

23   sense is the compensation as you described it excessive and

24   unwarranted?  In what sense?

25           MR. WANDER:  I'll tell you, Your Honor.

Page 101

1          So the $80,000 base compensation -- and excuse me

2     for a second just to get to my notes.

3          (Pause)

4          MR. WANDER:  The reason for the incentive

5     compensation is so the board members will be engaged and

6     active, and their interests will be aligned with the

7     beneficiaries.  That's the reason that they're supposed to

8     get the additional compensation.  That term, engaged and

9     active, is peppered throughout the response by the debtors

10    and the committee.

11          Now what I don't understand is what's the

12    difference in their engagement when they're getting base

13    compensation of $80,000 a year and what then is elevated in

14    their engagement if they get contingent compensation because

15    the $80,000 a year, and I believe this liquidating trust may

16    go on for ten years for getting claims objections -- in

17    other liquidating trusts that I've been involved in

18    (indiscernible), it's been more than ten years.  Over ten

19    years if you're getting $80,000 a year, it's $800,000.  And,

20    collectively, the five board members will get $4 million in

21    base compensation.

22          Now some of them, actually all three of the

23    committee's members are on various other boards that the

24    committee represents them, either liquidating trusts or just

25    board members of corporations.  So it doesn't appear that

Page 102

1    this is a full-time or needs to be a full-time job.

2            THE COURT:  Neither is being a Chapter 7 trustee

3    and yet congress saw fit to compensate Chapter 7 trustees in

4    a sliding scale manner.

5            MR. WANDER:  I understand.  But these people are

6    not the Chapter 11 trustees.  And so --

7            THE COURT:  I'm sorry.  That -- I think that's

8    maybe the fundamental disconnect here.  This is not a board

9    that oversees the activities of a litigation trustee.  These

10   are the trustees.  There's no -- they are not a board in the

11   sense of a board of directors where, you know, a much lower

12   amount of compensation would be warranted, and instead of

13   compensation would be a totally different structure.

14           These are the trustees.

15           MR. WANDER:  Right.

16           THE COURT:  And they're being paid the incentive

17   compensation in the aggregate.  So --

18           MR. WANDER:  Right.  So if the -- if there's

19   tremendous success on the ESL litigation, which would be

20   based upon, I submit, the activity of Akin, the counsel, why

21   should these people get $9 million?

22           THE COURT:  Why should a Chapter 7 trustee get

23   compensation when the litigation is based on the activity of

24   his or her counsel?  It's because it's warranted.  Congress

25   has already decided that.

Page 103

1              Do you have any evidence to show that actual

2     litigation, post-litigation trusts -- trustees, excuse me,

3     for a liquidation trustee -- because that's how I view these

4     people, not as the board members, but they are, in effect,

5     the trustees, that this compensation is out of line with

6     what's done in similar cases with similar litigation?

7              MR. WANDER:   Well, Your Honor, I submit you have

8     to take the overall context of this case.

9              THE COURT:   I've just asked you that question.

10    That's why -- in the overall context of this case, where

11    there is a substantial amount of post-confirmation, post-

12    effective date litigation, and so there's a trust set up to

13    pursue it, is this compensation structure out of line with

14    other examples in a similar context, where substantial

15    litigation is pursued?

16             So, for example, Lionel (ph), is it out of line for

17    the liquidation -- for the litigation or the liquidation

18    trustee?

19             MR. WANDER:   Your Honor, I don't know if it's out

20    of line for that case.

21             I believe it's out of line for this case under the

22    facts of this case.

23             THE COURT:   Why.

24             MR. WANDER:   Well, Your Honor, we've already spent

25    in connection with the litigation, okay, I was told that it

Page 104

```
 1    was about $20 million when the committee first did their

 2    investigation and they had a draft complaint attached to

 3    their pleadings.

 4            We were told by, in round numbers, Paul Weisman

 5    approximately $20 million in order to file that complaint

 6    and we now have the additional legal services in millions of

 7    dollars, presumably, that went into the filing of now this

 8    amended complaint.

 9            I just submit at a certain point in time the amount

10    of money that's being expended not for the creditors but for

11    the people who are doing the litigation, one on top of the

12    other.

13            THE COURT:  I'm sorry.  I -- you'd have to explain

14    that to me.  You think that there's no basis to pursue the

15    litigation?

16            MR. WANDER:  No.  I do.  Is it --

17            THE COURT:  So is it really then just for the

18    benefit of the people that are actually pursuing it?

19            MR. WANDER:  But --

20            THE COURT:  As opposed to the lawyers?

21            MR. WANDER:  Your Honor --

22            THE COURT:  Mr. Wander, you've got to be careful

23    in how you phrase these things.  I mean, honestly, that's

24    just --

25            MR. WANDER: Well, I assume Akin Gump is going to be
```

Page 105

1    pursuing the litigation in their best fiduciary duties.

2            THE COURT:   But they're the lawyers.

3            MR. WANDER:   I understand that.

4            THE COURT:   So, I -- again --

5            MR. WANDER:   And these professional trustees --

6            THE COURT:   See --

7            MR. WANDER:   -- if they're getting the base

8    compensation, why isn't that enough?  If we're paying --

9            THE COURT:   I go back to -- I accept that this is

10   market driven.  If you can get competent, capable people to

11   manage the litigation for less, because that's how the

12   market works, I understand the objection.

13           But if you're just saying it's too much because

14   they should be working for less, they don't have to and I

15   don't want to have a trust that's run by the lawyers.

16           MR. WANDER:   No, Your Honor --

17           THE COURT:   I want a trust that's run by a

18   trustee.

19           MR. WANDER:   And I'm saying why are -- what I

20   don't understand is why they need incentive compensation to

21   be active and engaged when the --

22           THE COURT:   I see -- all right.  I know you don't

23   understand that.  But it's incumbent upon you to explain to

24   me why, based on some form of market, if they litigation

25   trustee in Lionel or any number of other cases, is being

Page 106

1    compensated based on an $80,000 a year fixed compensation, I

2    would understand your point.

3          I don't believe that is the case.  But if that is

4    something you can show me, I accept your argument.

5          MR. WANDER:   Your Honor --

6          THE COURT:   But just to say you could work for

7    80,000 and that's fine, I suppose you probably could get

8    someone that would work for 80,000 a year and be the client.

9          The question is whether anyone would want them to

10   be the client and be making the settlement decisions and

11   litigation decisions that would have to be made.

12         MR. WANDER:   Your Honor, when it came out the

13   connections of the firm that is now pursuing these people

14   and the compensation -- I'm just going by what was disclosed

15   two days ago.  Yes, their names may have been out there but

16   it wasn't disclosed the connections between, for example,

17   Mr. Davis and Akin Gump.  There are 21 former matters that

18   they were involved in together and three current matters.

19         Now I'm not sure what a conflict of interest is but

20   we just have had the disclosure because the other joinder

21   winners --

22         THE COURT:   What is the legal --

23         MR. WANDER:   -- said there should be --

24         THE COURT:   What is the legal basis for this

25   argument?

Page 107

1           MR. WANDER:   Well, Your Honor --

2           THE COURT:   What section of the Bankruptcy Code

3    governs this argument?

4           MR. WANDER:  I don't think -- I think it goes to

5    the integrity of the process if we just found out two days

6    ago, okay?

7           THE COURT:   Right.

8           MR. WANDER:   That Mr. Davis has had 21 -- it's the

9    basic disclosure of conflict of interest and connections

10   between the professionals and the other people --

11          THE COURT:   There is a -- just to answer the

12   question you were unable to answer.  I believe the

13   applicable sections of the Bankruptcy Code are 330, 327

14   which apply to the lawyers, not to the board members.  What

15   applies to the board members is 1129(a)(4) and (a)(5).

16          And I don't think what you have alleged here is

17   anything close to running afoul of (a)(4) or (a)(5).

18          As far as 330, that's going to come up on their

19   next fee application.

20          But the fact that someone has served on a lot of

21   boards and liquidation trusts that professionals haven't

22   been involved in is not a conflict of interest.

23          There are not many people that take this work on.

24   It's not risk free.

25          MR. WANDER:   Your Honor, I submit there would be a

Page 108

1    lot of people and professionals in the bankruptcy community

2    who would take this work on.

3          THE COURT:   Well, you're just wrong on that.

4    People are not raising their hands to do this work.   It's

5    hard to find people to do this.

6          Look at the people that resigned from PG&E's board

7    who are restructuring advisors.   You know?

8          MR. WANDER:   You --

9          THE COURT:   Look at the lawsuit against counsel

10   and others in Lionel for what, $350 million.   This is a

11   specialty.

12         MR. WANDER:   Well, Your Honor, the fact that it's

13   a specialty when you have the same people with the same law

14   firm, it creates what I submit is an inherent conflict of

15   interest when it's the same people --

16         THE COURT:   How?  How?  Where's the conflict?

17         MR. WANDER:   Well, let's says Akin makes a mistake

18   in the litigation.   I doubt the liquidating trust board

19   members are going to really raise that issue.   They're

20   serving on several boards together.

21         If the board members -- and I'm just saying this

22   hypothetically, weren't as actively and engaged as they

23   should be because they're on so many boards, I doubt Akin's

24   going to be complaining because they're all serving on the

25   same -- in the same roles together.

1          I mean, it's -- it looks like a boys' club here of

2     the same law firm hires the same people to serve on the

3     boards.  The people on the boards hire the same law firm.

4     And the irony that I found when I was preparing for today is

5     I then pulled out the --

6          THE COURT:  Can I interrupt?  Again, this -- as

7     far as the people on the board are concerned, that was

8     disclosed in June.

9          MR. WANDER:  But not the connections.

10         THE COURT:  But -- there's -- it's -- you -- look,

11    it's an 1129 issue except for the compensation which is

12    subject to subsequent approval by the Court.  This issue has

13    gone by the boards.  The plan was confirmed.  There's an

14    order confirming the plan that includes the identification

15    of these people which includes the conflict issue.

16         MR. WANDER:  It -- what was disclosed two days

17    ago, was not --

18         THE COURT:  You know what?  Too late.  1129(a)(5)

19    says the Court shall confirm a plan only if all of the

20    following requirements are met.  And (a)(5) says the

21    proponent of the plan has disclosed the identity and

22    affiliation of any individual proposed to serve after

23    confirmation of the plan as a director or officer or a

24    voting trustee of the debtor.  An affiliate of the debtor

25    participating in a joint plan with the debtor or a successor

Page 110

1    of the debtor under the plan and the appointment to or

2    continuance in such office and such individual is consistent

3    with the interests of creditors and equity security holders

4    and with public policy.

5              MR. WANDER:   Yes.  But --

6              THE COURT:   Yes.

7              MR. WANDER:   I --

8              THE COURT:   And I've already so found and that

9    order is a final order.

10             MR. WANDER:   Right.  But --

11             THE COURT:   So we're done on this point.

12             MR. WANDER:   Okay, Your Honor.

13             THE COURT:   So you may have a 330 issue that you

14   can raise.  But, frankly, you're going to have to say a lot

15   more than you've said today because, right now, it's empty.

16             MR. WANDER:   Thank you, Your Honor.

17             THE COURT:  Again, I -- it's just not enough to say

18   it's not enough.  I mean -- I'm sorry.  It's not enough to

19   say it's too excessive.  You've got to give me a reason and

20   just saying that there's someone out there who will do it

21   for less, isn't enough.

22             You haven't identified this someone.  You haven't

23   shown me any market information to show what this normally

24   costs.  It's just --

25             MR. WANDER:   Your Honor, the disclosure was

Page 111

1    supposed to -- the compensation was supposed to be --

2          THE COURT:   No.  In fact --

3          MR. WANDER:   -- by the confirmation --

4          THE COURT:   -- under the plan, under the plan

5    itself, to confirm the plan, this is 1129(a)(4).  It helps

6    to actually cite the statute in an objection and be aware of

7    the applicable provisions.  1129(a)(4) says the court shall

8    confirm a plan only if all of the following requirements are

9    met; (a)(4) any payment made or to be made by the proponent,

10   by the debtor or by a person issuing securities requiring

11   property under the plan, for services or for costs and

12   expenses or in connection with the case or in connection

13   with the plan and incident to the case, has been approved by

14   or is subject to the approval of the court as reasonable.

15          So, again, that's why we're here.

16          MR. WANDER:   And my point was that they didn't

17   disclose it prior to the confirmation --

18          THE COURT:   And I've now found it's reasonable.

19          MR. WANDER:   I -- and at the time, when I filed the

20   objection, that's all we knew.

21          THE COURT:   But you have to -- I appreciate it but

22   I would think by now you would have something more than just

23   telling me that $80,000 is enough.

24          MR. WANDER:   Well, Judge, we -- I only got a

25   response two days ago.

Page 112

1          THE COURT:  But you've had the -- you've had the

2     compensation structure since October 7th.  That's plenty of

3     time to go on Pacer and see what the compensation structure

4     is in any number of comparable litigation liquidation

5     trusts.

6          I just -- you know, it's a -- an active committee,

7     made up of sophisticated people who know that their only

8     recovery is going to come from this litigation.

9          I can, I thin, reasonably infer that the reason it

10    took so long to come up with a compensation structure is

11    because it was a difficult issue for them to deal with.

12          They eventually agreed on it based on the full

13    participation of the committee and the committee vote.

14          MR. WANDER:  Well --

15          THE COURT:  That's what I've been told.

16          MR. WANDER:  -- at the confirmation --

17          THE COURT:  By counsel for the committee.

18          MR. WANDER:  At the confirmation hearing --

19          THE COURT:  That's not what -- we're not here on

20    that.  This is not a confirmation issue.

21          MR. WANDER:  I -- no.  I was only talking about

22    the testimony.  I was only talking about the testimony --

23          THE COURT:  Right.

24          MR. WANDER:  -- of the people whose -- who are on

25    the board who said they had no knowledge of anything --

1           THE COURT:  This isn't a board issue.  This was

2    decided by the creditors' committee because that's who these

3    people are going to be working for; the unsecured creditors.

4    They're the ones that set the compensation.

5           It's the creditors' committee.  It's their money.

6           In fact, if it was the debtors' board, I'd be more

7    worried about maybe there might be some, you know -- it's

8    not their money.  So maybe they would lay down and agree to

9    it, an excessive compensation.

10          But the people on the committee themselves are owed

11   substantial amounts of money and they're fiduciaries for

12   people who are owed lots of money.

13          And they are not going to lay down.

14          MR. WANDER:  And I -- well, and, Your Honor, like

15   I said, two days ago we got the disclosure of the

16   connections.

17          THE COURT:  And that's irrelevant.  It's

18   irrelevant in the next fee application because that's the

19   only place it applies under 330.  It -- I've already decided

20   that issue, for better of worse, because it was disclosed in

21   June 28, months before the confirmation hearing.

22          People could have raised the issue then.  They

23   could have asked about it then.  They waited until

24   confirmation was over.

25          But, if anything, as far as the board is concerned,

1    a confirmation issue and it's already embodied in a final

2    order which is the confirmation order.

3        MR. WANDER:   I understand.  And when I saw the

4    base compensation, which I had no objection to, I didn't

5    understand why these professionals, who would have fiduciary

6    duties needed to be incentivized to do what everyone was

7    already doing in pursuing the litigation.

8        THE COURT:   Okay.  Well, it is not a good thing to

9    have a lawyer without a client.  So, yes.  There's great

10   incentive for the lawyers to do a good job.  But you need a

11   client.

12       MR. WANDER:   And they are the client and they were

13   -- they are in place with the $80,000.  And --

14       THE COURT:   All right.  We're plowing over old

15   ground at this point.

16       MR. WANDER: I'll move on, Your Honor.  Thank you.

17       THE COURT:  I conclude, based on this record, that

18   the compensation structure is, in fact, reasonable and

19   consistent with 1129(a)(4).  I approve it.

20       MR. WANDER:   Your Honor, while I'm up one other

21   thing just to -- a scheduling matter that I had raised and

22   this gets to the World Imports and the hearing that we

23   thought we were going to have today.

24       And had we had it, I submit it would be making the

25   consent program and the resolution of a legal issue much

1    easier.

2              It's now adjourned to January 28th.  We've been

3    waiting for the debtor to file its reply papers.

4              I would request that a date be fixed and so that we

5    can prepare for oral argument.  The January --

6              THE COURT:   Well, the issue, I think is we.  I

7    think there needs to be some thought given.  There are a lot

8    of people that have this issue.  It's not just you and your

9    client.

10             MR. WANDER:   And all the people who have filed the

11   papers are -- and those who haven't, like PACO (ph), who I

12   believe is the name, represented by Morris and Foster, even

13   though there was an objection to their claim, which is over

14   $5 million, I believe; they filed supporting papers because

15   their rights are going to be decided even though there

16   wasn't a claim objection.

17             So the people who have the issue, and it's -- and

18   the skin in the game, they want to move forward and get a

19   ruling from --

20             THE COURT:   Well, I want to make sure --

21             MR. WANDER:    -- Your Honor.

22             THE COURT:    -- of that.  I think January 28th is

23   probably a good date.  But I just want to make sure that the

24   people who would be arguing that issue on the claimant's

25   side will be able to do it then.  That's all.

1           MR. WANDER:   And we will be ready.  We just --

2           THE COURT:   I know you will be.

3           MR. WANDER:   No.  The others, too.

4           THE COURT:   Okay.

5           MR. WANDER:   The others, too.

6           THE COURT:   Well --

7           MR. WANDER:   We've spoken.  We've -- they've also

8    submitted, made submissions to Your Honor.

9           We just want the debtor, who has now had about two

10   months, since we filed our briefs, we'd just the debtor to

11   file their papers and we'd just --

12          THE COURT:   Okay.

13          MR. WANDER:   -- like to have a date and not have

14   it adjourned again.

15          THE COURT:   Okay.

16          MR. WANDER:   It's just not fair that they can have

17   two months, three months, to their reply.  Let's get it

18   filed.

19          THE COURT:   Okay.

20          MR. WANDER:   If they could just give us a date.

21          THE COURT:   Do you have something on --

22          MR. MILLER:   I was just going to say we represent

23   quite a few --

24          Jonathan Miller from Sarachek law firm.  We

25   represent about a half a dozen people in -- on this issue.

Page 117

1    And we also filed a supporting document on this.

2             THE COURT:  All right.  So on the claimant side, it

3    does look like people will be ready to argue on the 28th?

4             MR. MILLER:  Yes.

5             THE COURT:  Okay.

6             MR. SINGH:  Well, Your Honor, Sunny Singh.

7             Part of the issue is we just talked about how we're

8    going to try to settle the World Imports issue.

9             THE COURT:  Yeah.

10            MR. SINGH:  We're taking that into account into

11   scheduling.

12            These folks, if they're not going to settle, and

13   they want to get on with the litigation, we'll get on with

14   the litigation.

15            THE COURT:  No.  That's fine.

16            MR. SINGH:  In due course.

17            THE COURT:  I think that --

18            MR. SINGH:  If Your Honor rules --

19            THE COURT:  I think that as far as the settling of

20   this, I think as long as you have your brief in ten days

21   before the hearing; that's fine.

22            MR. SINGH:  Thank you.

23            THE COURT:  That will give you time to settle it.

24            I was thinking of a small window for the opt-ins to

25   settle.

Page 118

1              MR. SINGH:  Yeah.  Your Honor, it's not -- we're

2     holding anything back on the reply.  That's not -- that I

3     think is perfectly fine.

4              THE COURT:  All right.  Okay.

5              MR. SINGH:  The issue was we didn't want a ruling

6     because then there's no settlements to --

7              THE COURT:  No.  But the settlement was just -- the

8     settlement was for the opt-ins.

9              MR. SINGH:  Yeah.  No.  I understand.

10             THE COURT:   And that'll be before the 28th.

11             MR. SINGH:  Yeah.  I think now that we have clarity

12    on timing --

13             THE COURT:  Okay.

14             MR. SINGH:  -- I don't think that --

15             THE COURT:  So pick a day.  Ten days, two weeks?  I

16    don't -- before the hearing?

17             MR. SINGH:  Two weeks for the reply?

18             THE COURT:  Yeah.  Okay?

19             MR. SINGH:  I think that's like eight days more

20    than normal.  That's fine.

21             MR. WANDER:  Well, it's already been two months.

22             MR. SINGH: That's fine.  Right.  But we haven't

23    focused on --

24             MR. WANDER:  Okay.

25             MR. SINGH:  -- that.  We're focusing on the

Page 119

1   reconciliation.

2           MR. WANDER:  Okay.

3           MR. SINGH:  Two weeks before is fine, Your Honor.

4           THE COURT:  Okay.

5           MR. SINGH:  Thank you, Judge.

6           THE COURT:  And then five days for any response.

7           MR. SINGH:  Well, actually that's not.  Can we do

8   one week.  Can we do one week before -- I know there are

9   people that are writing briefs are not available.

10          MR. WANDER:   This is not --

11          MR. SINGH:  They're not going (indiscernible).

12          MR. WANDER:  -- (indiscernible) this would be --

13          MR. SINGH:  Sorry, Your Honor.

14          MR. WANDER:  This would be the last set of papers.

15          THE COURT:  So there's no reply by --

16          MR. SINGH:  No, no.

17          MR. WANDER:  This would be their reply.

18          THE COURT:  Oh, all right.

19          MR. SINGH:  It's a reply because it's always due

20  like two days before --

21          THE COURT:  All right.  So let's --

22          MR. SINGH:  -- the hearing.  I --

23          THE COURT:  No.  So this is just a reply?  This is

24  not the objection to the motion?  Okay.  That will be a

25  week.

1          MR. SINGH:  Yeah.

2          THE COURT:  Okay.  A week before the hearing.

3    That's fine.

4          MR. SINGH:  Right.  Thank you.

5          THE COURT:   A week before the hearing.

6          MR. WANDER:  That's fine.

7          THE COURT:  Yeah.

8          MR. WANDER:  Thank you.

9          THE COURT:  Okay.  For some reason I thought this

10   was the objection.

11         MR. WANDER:  No, no.

12         MR. SINGH:  The objection is on file.  So --

13         THE COURT:  So your motion --

14         MR. SINGH:  -- there were a number of

15   objections --

16         THE COURT:  So you're responding to an objection.

17         MR. WANDER:  No, no.  We've responded to --

18         THE COURT:  To their objection?

19         MR. WANDER:  Right.

20         THE COURT:  All right.

21         MR. WANDER:  And now we're waiting for the reply.

22         THE COURT:  So a week before is fine.

23         MR. SINGH:  And there's also another issue where

24   he's found more clients, him and some others are like

25   finding clients that have already been disallowed.  There's

```
1    those motions --

2              THE COURT:  No.  But this is just the --

3              MR. SINGH:  -- are separate.

4              THE COURT:  -- World Imports point, right?

5              MR. WANDER:  Yes.

6              THE COURT:  Okay.  All right.

7              MR. SINGH:  Thank you.

8              THE COURT:  That's fine.

9              MR. SINGH:  Brian is out until the 14th so like you

10   know --

11             THE COURT:  Okay.

12             MR. SINGH:  -- so that's really not --

13             THE COURT:  So I think we've -- I mean, as far as

14   the joinder is concerned, the joinder (a) was untimely, (b)

15   it's just joinder, which means I let someone speak in

16   support of the underlying objection but there are not rights

17   to appeal, there are no rights to settle and there are no

18   rights to add new issues in respect to a joinder and, beyond

19   that, an untimely joinder.

20             So I dealt with Mr. Wander's arguments and unless

21   the person who joined in has market data to give me, my

22   ruling stands.

23             Okay.  So then the last matter on the calendar I

24   think is the matter I prematurely called which is the --

25             MR. SINGH:  Your Honor, may I be excused, please?
```

Page 122

```
 1              THE COURT:  Yes.

 2              MR. SINGH:  Thank you.

 3              THE COURT:  The Sayville Menlo LLC versus

 4    Transform.

 5              UNIDENTIFIED SPEAKER:  Your Honor, if it's okay

 6    (indiscernible).

 7              THE COURT:  Yes, certainly.

 8              UNIDENTIFIED SPEAKER:  Thank you.

 9              (Pause)

10              UNIDENTIFIED SPEAKER:  Is Your Honor -- I'm sorry.

11    Is Your Honor (indiscernible) first matter that we dealt

12    with?

13              THE COURT:  Some time later, after lunch, I will.

14    Yeah.

15              UNIDENTIFIED SPEAKER:  (Indiscernible) redirect?

16              THE COURT:  Well, this is going to be going for a

17    while.  And then I'm going to go to lunch.  So you may want

18    to come back.  You may want to have lunch.

19              UNIDENTIFIED SPEAKER:  Or I might see you on the

20    court plaza.

21              THE COURT:  That's fine, too.

22              UNIDENTIFIED SPEAKER:  Would that be all right,

23    Your Honor?

24              THE COURT:  Certainly.  Just request permission.

25    That's fine.
```

Page 123

1          (Pause)

2          UNIDENTIFIED SPEAKER:  Your Honor, when do you

3     expect to return from lunch?  Approximately?

4          THE COURT:  I don't know.  This may take an hour.

5     So I may not get back here until two thirty, easily.  Maybe

6     later than that.  Maybe three.

7          (Pause)

8          MR. BAREFOOT:  Good afternoon, Your Honor.  For the

9     record, Luke Barefoot from Cleary Gottleib Steen & Hamilton,

10    LLP for Transform Holco, LLC and its affiliates here on the

11    final agenda item, the Sayville Menlo LLC amended complaint

12    and the motion to dismiss filed by our client.

13         Just at the outset, Your Honor, I'm sure you're

14    pleased to note that I'm not here on a lease assumption and

15    assignment matter and I can report that we have actually

16    completed the very last of the pending motions to assume and

17    assign leases.  And there are less than a dozen remaining

18    live cure disputes.  One of which is the matter we're about

19    to jump into.

20         THE COURT:   Okay.

21         MR. BAREFOOT:   Your Honor, I'll  move right into

22    the merits which have been fully briefed.

23         First off, the core issue is the meaning of this

24    Court's bidding procedures order.  And, as Your Honor knows,

25    that set up a process whereby the debtors in advance of

Page 124

1    making a decision, you assume or assign, would send out a

2    notice that was approved, the form of which was approved by

3    the Court and it would set out the cure amounts necessary to

4    cure any defaults under Section 365(b).

5              There is no dispute here that the landlord was

6    properly served with this assumption and assignment notice;

7    that it required a response by January 26 and that no

8    response was filed or served by the landlord.

9              The only dispute about the cure notice is whether

10   it and the bidding procedures order required a response only

11   as to monetary defaults, which is the post hac reading that

12   the landlord now asserts or whether it required responses to

13   any form of cure.

14             First off, Your Honor, as to the monetary defaults,

15   which even under their reading of the cure notice, would

16   have required a response by January 26th.

17             They do assert in proofs of claim that they filed

18   against the estate in the State Court complaint that they

19   sought to join Transform to and in both the amended and the

20   original complaint monetary defaults.

21             They specifically assert monetary damages through

22   various causes of action in each of Counts I through IV.

23             So, unless as we move on, Your Honor's inclined to

24   hear their excusable neglect arguments, there really is no

25   dispute that that form of relief falls away and is barred

Page 125

1    even under their interpretation of the bidding procedures

2    order.

3          Moving second to the non-monetary default question,

4    Your Honor, I'd point the Court directly to paragraph 33 of

5    the bidding procedures order.

6          Paragraph 33 says the cure costs set forth in the

7    assumption and assignment notice shall be controlling and

8    will be the only amount necessary to cure outstanding

9    defaults under the applicable contract or lease under

10   Bankruptcy Code 363(b); notwithstanding anything to the

11   contrary in the contract or lease, or any other document,

12   and the counterparty shall be forever barred from asserting

13   any additional cure or other amounts with respect to such

14   contract or lease against the debtors, the successful bidder

15   or the property or of any of them.

16         Now, I would like to just highlight a few pieces of

17   that that I think make it very difficult to read this

18   provision of the bidding procedures order in a way that it

19   only touches monetary defaults.

20         First off, it expressly references amounts to cure

21   outstanding defaults under Bankruptcy Code 365(b).  And, as

22   the landlord's own authority has recognized, non-monetary

23   defaults are not exempt from Section 365(b).

24         And, instead, the last clause of Section 365(b)

25   unequivocally requires that for a non-residential real

Page 126

1    property lease, such as this one, if there is a claimed

2    default relating to failure to operate, that default must be

3    cured by performance at and after the time of the

4    assumption.

5         So the landlord's reading of this order, which

6    references and incorporates the requirements of Section

7    365(b), would put the order at odds with the terms of

8    365(b).

9         THE COURT:  Well, except I -- I appreciate that the

10   last clause of paragraph 33 says shall be forever barred

11   from asserting any additional cure or other amounts which

12   suggests that since lower case cure is being used there, and

13   amounts is stated in the disjunctive, that that would

14   include non-monetary cure like performance obligation.

15        MR. BAREFOOT:   Correct, Your Honor.

16        THE COURT:  But, at the same time, the cure costs

17   that the cure notice and -- I'm sorry, the assumption and

18   assignment notice, which is governed by 28 of the order,

19   paragraph 28, and paragraph 31, is really limited by -- in

20   the definition of cure costs to amounts and I don't know

21   how, as a practical matter, you could state a performance

22   obligation when the cure -- when the assignment notice says

23   provide your cure costs, which is amounts.

24        MR. BAREFOOT:   Your Honor, I think  in some cases

25   that might be true.  But, here, the landlord has a cost for

Page 127

1    what it thinks this is going to be required to -- assuming

2    that their allegations are correct, they put it in in their

3    proof of claim.  They put it in the subsequent cure

4    objection they filed.

5             THE COURT:  Well, I understand it's -- but, even

6    that number is still unliquidated, right?  I mean, that's

7    the number that they say but then there's potentially

8    additional costs given that this -- this still hasn't been

9    repaired.  I mean, conceivably, it could be worse because it

10   hasn't been -- the repairs haven't happened.

11            MR. BAREFOOT:  Your Honor, if -- if there are

12   subsequent conditions that develop, such as the septic tank

13   thing that we'll come to in a moment, obviously, you know,

14   that can be dealt with.

15            This was a specific set of issues that there was

16   already a State Court litigation on.  There was already

17   discovery in the State Court on --

18            THE COURT:  No.  I'm saying even with these issues,

19   they stated, when they filed their claim in April, I think

20   it was April, there's a 700+ thousand dollar number.

21            But, even there, you know as we all know, the

22   longer something isn't repaired -- I'm assuming for the sake

23   of this because it's the complaint, the motion to dismiss

24   complaint, that the repairs are warranted.  The longer

25   something isn't repaired it's often the case it's more

Page 128

1    costly to repair it.

2          So I guess I hear you on this point that if the

3    performance obligation is quantifiable, it should be covered

4    by this language --

5          MR. BAREFOOT:  Correct, Your Honor.

6          THE COURT:  -- and barred if you don't -- at least

7    as to the amount of that claim that existed then.

8          MR. BAREFOOT:  And, Your Honor, I just want to

9    note, this was a pre-existing litigation.

10          THE COURT:  No.  I understand that.

11          MR. BAREFOOT:  With a very specific --

12          THE COURT:  But look if you don't repair --

13          MR. BAREFOOT:  -- set of repairs.

14          THE COURT:  -- a pot hole, it gets worse.

15          MR. BAREFOOT:  Understood.  But -- and if the

16    complaint had segregated out and said these are the repairs

17    that were at issue in the State Court litigation, these are

18    things that have arisen prior, we would not be making this

19    argument.

20          THE COURT:  Okay.

21          MR. BAREFOOT:  And we're not making this argument,

22    for example, with respect to the septic tank allegations.

23          THE COURT:  Right.  Okay.

24          MR. BAREFOOT:  But there was a very specific set

25    of repairs and they sought to substitute Transform into the

Page 129

1    State Court complaint.

2              THE COURT:  All right.  I guess I --

3              MR. BAREFOOT:   On that exact set.

4              THE COURT:  Maybe I'm being a little too -- I hate

5    this word, but too granular on this.

6              I had the impression in reading your motion and the

7    reply that you were stating that anything at all related to

8    the asserted repair claim is time barred because of the

9    failure file a timely cure cost statement.

10             It seems to me that that shouldn't apply, at a

11   minimum, to costs that were, at that point, unliquidatable

12   or unliquidated.

13             MR. BAREFOOT:   Fair enough, Your Honor.

14             We used the specific defined term I think roof and

15   parking lot repairs.

16             THE COURT:  Yeah.

17             MR. BAREFOOT:   Which was defined with reference

18   back to the allegations  in the State Court.

19             THE COURT:  To the -- but -- so the specific

20   repairs that were to be done then.

21             MR. BAREFOOT:   Correct.  And that there was a

22   report that was filed that was from a consultant --

23             THE COURT:  Right.

24             MR. BAREFOOT:   -- that detailed the conditions as

25   of that point in time.

Page 130

1          THE COURT:  Okay.

2          MR. BAREFOOT:  And that they certainly could have

3    and did have a monetary estimate for in January 2019.

4          THE COURT:  But, I guess going to bigger point

5    then, because I'm -- maybe I'm wrong but I'm assuming that

6    if there are any additional post-deadline added costs to

7    that same project, because the repairs haven't been done,

8    they probably wouldn't be covered by this paragraph.

9          But the bigger point is the seven hundred and some

10   thousand dollars that's claimed and I guess -- let me

11   paraphrase your argument.

12         I think what you're saying is that if you are able

13   to quantify the costs, which is the definition of cure

14   costs, it's a quantified amount, and you don't put it in

15   your cure response, which is everyone acknowledges it wasn't

16   done here, then not only are you barred from recovering

17   those costs from the tenant, now the assignee, but, in

18   addition, you can't ask the tenant or demand the tenant,

19   under the performance obligations of the lease, to make the

20   repairs because the same amount of money would be spent

21   there.

22         MR. BAREFOOT:  That's exactly correct, Your Honor.

23   And --

24         THE COURT:  Because you knew the amount of money so

25   you --

Page 131

1          MR. BAREFOOT:   Correct.

2          THE COURT:  -- could have said --

3          MR. BAREFOOT:   Correct.  And interpreting it in

4   this sort of overly formalistic way to say that even though

5   references additional cure, which could have been cure in

6   the form of performance, that that is outside of the scope

7   of this notice would have really defeated the purpose of

8   this notice.

9          And would have allowed landlords to -- who didn't

10  timely respond and who we relied on that non-timely response

11  in moving forward, to just recharacterize their obligations

12  and say, okay, fine.  I'll -- I'm not going to demand a

13  check from you.  I'm instead going to require you to expend

14  that same amount to fix the exact same issue.

15          THE COURT:  Okay.

16          MR. BAREFOOT:   I'll also note, Your Honor, just a

17  few more points on this before moving on.

18          This landlord is the only landlord that has taken

19  this interpretation of the cure notice.  And Your Honor has

20  heard a number of other disputes.  You may have remembered

21  the lovely roof in Brighton Colorado or a number of others

22  where landlords did timely respond and asserted what were

23  arguably non-monetary cures.

24          I think another reason for that, Your Honor, is

25  that along with the assumption and assignment notice,

1    Transform did not file but served its adequate assurance

2    information.

3           So if you were relying not on getting a check from

4    Transform but instead on having Transform perform repairs,

5    it would have -- and many other landlords did object to the

6    adequate assurance information because that would be equally

7    if not more relevant to assessing the requirements of cure

8    and assessing, you know, if you were relying on Transform

9    actually performing the repairs itself.

10          One last point, Your Honor, is that the landlord's

11   own behavior and conduct of this litigation and in this

12   proceedings is really contrary to an assertion that they

13   read this and understood that monetary cures would be barred

14   but that somehow non-monetary cures would not be barred.

15          They filed a proof of claim against the debtor for

16   $769,500.  They ultimately filed a subsequent cure notice in

17   April that also asserted monetary cures and they're now

18   continuing to assert monetary cures in both their complaint

19   and their amended complaint.

20          So it's a little at odds and disingenuous to say

21   that we understood by not responding to this order, we would

22   be barred from non -- from monetary cures, we were relying

23   on non-monetary cures.  When, in fact, the record of the

24   litigation shows that they continued to assert and pursue

25   monetary damages as well.

```
 1                THE COURT:   Okay.

 2                MR. BAREFOOT:   Your Honor, I'll then mover to the

 3     alternative point on excusable neglect which would

 4     indisputably apply to monetary cures and, depending on how

 5     Your Honor, reads the --

 6                THE COURT:  Well, there's no motion for --

 7                MR. BAREFOOT:   That's exactly my point, Your

 8     Honor.  They, in their response brief, made general pleas to

 9     bankruptcy courts being courts of equity and giving an

10     equitable time to respond.  They don't cite to the Pioneer

11     factors.  They don't cite  to the standard for adequate

12     assurance.

13                We think that's procedurally inappropriate in this

14     context and, moreover it is their --

15                THE COURT:  You mean, the standard for excusable

16     neglect.

17                MR. BAREFOOT:   For excusable neglect.

18                THE COURT:  Right.

19                MR. BAREFOOT:   Because it is their burden to

20     demonstrate excusable neglect.

21                And, most importantly, Your Honor, to put in

22     evidence on what the reason was that they failed to timely

23     respond, they've mad argument in their brief, unsworn

24     argument, that they read the cure notice in a certain way.

25                As I said, I think their conduct is contrary to
```

1    that assertion.  But in any event there's no declarations.

2    There's no admissible evidence that would really allow the

3    Court to even engage in the Pioneer analysis.

4            So I don't think any claim for excusable neglect is

5    really properly before the Court.

6            THE COURT:  Okay.  Well, you mentioned the

7    landlord's conduct in this litigation.  It's part of your

8    argument in support of the timeliness point.

9            I guess what you're -- I mean, obviously, I should

10   not be considering things that I can't either take judicial

11   notice of or that are incorporated into the complaint.

12           But you're really focusing on the -- things that

13   are actually alleged in the complaint like the proof of

14   claim, the complaint itself.

15           MR. BAREFOOT:   Correct.  And that are before Your

16   Honor.

17           THE COURT:  But they -- the other side points out

18   that Transform actually spent, consistent with the cure

19   provisions of the assignment order as well as the sale

20   order, considerable time trying to work out an agreement on

21   the repairs.

22           MR. BAREFOOT:   Absolutely, Your Honor.  And that's

23   consistent with the provisions in the assumption and

24   assignment order itself --

25           THE COURT:  Right.

Page 135

1             MR. BAREFOOT:    -- which required us -- I mean,

2      we --

3             THE COURT:  But if -- I was -- I mean, if you're

4      saying that they have no cure right, then you wouldn't be

5      required to work out a cure issue.  But --

6             MR. BAREFOOT:   Your Honor, we have a relationship

7      with this landlord.  We're continuing as of now to operate

8      in the store and, you know, it's always our preference to

9      try to resolve these things and avoid the costs and the

10     burden on the Court for all this litigation.

11            I think you're right.  If we had just said to them

12     at the outset, you're barred.  We might have ended up here

13     earlier.  But we did engage in a back and forth in an effort

14     that sort of started with the State Court and a mediation

15     process that went through that to see if there was a way we

16     could come up -- we did make certain repairs.  We talked

17     about those repairs and they were ultimately unsatisfactory

18     to the landlord.

19            But that was really all a part of the process

20     contemplated by the assumption and assignment order that

21     required us to really meet and confer and see if we could

22     resolve this before bringing anything to Your Honor.

23            THE COURT:  So, I mean, to me, that's actually

24     outside of the pleadings.  So I don't think it's appropriate

25     in the response to a motion to dismiss.

Page 136

1          But that, too, might be appropriate in the context

2     of a motion under Pioneer, I'm assuming.  It may or may not.

3     I mean, I think it might be relevant when those discussions

4     happen, et cetera.

5          MR. BAREFOOT:   I would take the opposition

6     position, Your Honor.  But, in any event, for today, there

7     is no Pioneer motion.

8          THE COURT:   Right.

9          MR. BAREFOOT:   And I would think, Your Honor, the

10    Pioneer motion would have had to have been brought before

11    the motion to dismiss was going to be heard if you were a

12    prudent litigant.

13         But let me move on.

14         I think the next question, just in the order it was

15    briefed, is the question of jurisdiction over the septic

16    tank dispute.

17         The septic tank dispute was not part of the

18    original cure allegations.

19         THE COURT:  I have one question on this.

20         MR. BAREFOOT:   Please.

21         THE COURT:  I believe I know the answer to this but

22    is it the case that after the assumption and assignment the

23    debtors bear no obligation for post-assignment breaches of

24    the lease?

25         MR. BAREFOOT:   That is correct, Your Honor.  Not

Page 137

1    only under 365(k) but the assumption and assignment order is

2    crystal clear on that point.

3           THE COURT:  And I knew the answer to that one

4    because of the assumption and assignment order but the issue

5    here is is -- and maybe this is a question for you, sir, the

6    septic tank issue, is that a post-assignment breach?

7           MR. BAREFOOT:   Your Honor, it's alleged to have

8    arisen in I believe August or September, well after the May

9    assignment.

10          THE COURT:  Okay.  Is that right, sir?

11          MR. BAUCHNER:  It's post-assignment.  Yes, Your

12   Honor.

13          THE COURT:  Okay.  All right.  So my preliminary

14   conclusion on this, although it's pretty -- it's a little as

15   preliminary as you could get, is that I do not have related

16   to jurisdiction that I can exercise under 28 U.S.C. Sections

17   157 and 134.  That would be the only available jurisdiction

18   on this issue since it's a post-assignment issue and since

19   there's no conceivable effect on the debtors' estate, that

20   would not be related to jurisdiction under the Pacor v.

21   Higgins test which is the law in the Second Circuit.

22          And as far as supplemental jurisdiction is

23   concerned, I don't think I need to delve into the

24   controversy among the lower courts, which I previously

25   delved into, although one of the district judges here

Page 138

1    disagrees with it, whether bankruptcy courts, as opposed to

2    district courts, have separate supplemental jurisdiction

3    given that it's not specifically recognized in 28 U.S.C. 157

4    in the supplemental jurisdiction statute is a separate

5    jurisdictional basis, 28 U.S.C. Section 1367, which

6    incorporates the -- which -- I'm sorry, which refers only to

7    the district courts' jurisdiction, not bankruptcy courts;

8    157 of the Judicial Code for certain matters gives

9    jurisdiction to bankruptcy courts through the order of

10   reference.

11        There's no order of reference in that section of

12   supplemental jurisdiction.  So I think there is a truly

13   legitimate controversy here.

14        There is a note in passing in In re Lionel Corp.,

15   29 F.3rd 88, 92 (Second Cir. 1994) that bankruptcy courts

16   have supplemental jurisdiction.  I don't think it's

17   necessary to the holding.

18        But I don't believe I really need to get there

19   because here the basis for supplemental jurisdiction, I

20   think even if I did have it, would be lacking in that the

21   septic tank issue is a wholly different issue.  It's a

22   wholly different breach issue that the breaches that were --

23   are asserted to have been pre-assumption and assignment and

24   actually have dealt with septic tank litigation in the A&P

25   case and septic tanks have very little to do with roofs and

1   parking lots.

2            And there's -- it's not the -- it's really a reason

3   to have supplemental jurisdiction here; that there is

4   another dispute under the lease.  It's -- I mean that would

5   mean I would have supplemental jurisdiction on a rent issue

6   in the future.

7            It's -- and courts have made it clear that there's

8   a time when bankruptcy courts jurisdiction ends and I

9   believe it ended here upon the assignment.

10           So that's my -- you can try to persuade me

11  otherwise but I think that's how it comes out here.

12           MR. BAREFOOT:   Completely understood, Your Honor,

13  and I think that's underscored here by the fact that the

14  complaint was originally pled without the septic tank

15  allegations.  It wasn't central of the claims and was added

16  later.

17           But let me move on, Your Honor, then to the handful

18  of individual claims.

19           Your Honor, just to be clear, kind of doctrinally,

20  there would be the same bar on the failure to respond to the

21  bidding procedures order.  Undisputedly for monetary damages

22  for all of these additional  claims.  And then if Your Honor

23  agrees with our interpretation, even to the extent that they

24  seek specific performance.

25           Your Honor, the first one is the -- and I'll also

Page 140

1    note that all of these same causes of action were withdrawn

2    in the State Court action following a conference with the

3    State Court and only the breach claim itself was proceeding

4    in the pre-petition State Court litigation.

5              THE COURT:  But they weren't withdrawn with

6    prejudice?

7              MR. BAREFOOT:   They were not, Your Honor.

8              THE COURT:  Okay.

9              MR. BAREFOOT:   On the good faith and fair dealing,

10   Your Honor, it's black letter law that

11   plaintiffs --

12             THE COURT:  I don't think I need any more on this

13   other than what's in the briefs.  You could try to persuade

14   me otherwise, sir.  But I understand the argument.

15             MR. BAREFOOT:   Fair enough, Your Honor.

16             THE COURT:  I ruled on this issue yesterday.

17   So --

18             MR. BAREFOOT:   I'll reserve for reply then.

19             THE COURT:  Okay.

20             MR. BAREFOOT:   Thank you, Your Honor.

21             MR. BAUCHNER:  Good afternoon, Your Honor.

22             Joshua Bauchner --

23             THE COURT:  Good afternoon.

24             MR. BAUCHNER:  -- with Ansell, Grimm & Aaron.

25             THE COURT:  And by the way I apologize you had to

Page 141

1    sit through an hour and a half of something that I had not

2    scheduled for today's hearing.  So --

3             MR. BAUCHNER:  Thank you for that, Your Honor.  It

4    did have some entertainment value.

5             Your Honor, this is a bait and switch.

6             They knew about the pending State Court action.

7    They -- it's the same people.  The same principals.  In

8    fact, Ms. Carrie Koons (ph), who was involved in the State

9    Court action, as a principal of the debtors, now involved on

10   Transform.

11            Yet they filed a cure amount of zero.  If they're

12   claiming that the State Court action was about a monetary

13   default, why did they file for zero?

14            That was dishonest if that's the case.  We

15   understood --

16            THE COURT:  Well, they --

17            MR. BAUCHNER:  -- it --

18            THE COURT:  -- they had not agreed to the State

19   Court action.  The cure amount was the amount that the

20   debtor had agreed to as a cure amount.  That's what they

21   were supposed to assert.

22            MR. BAUCHNER:  I understand, Your Honor.  But if

23   they understood it to be a monetary amount, how could they

24   have --

25            THE COURT:  No but it's not -- the cure amount,

Page 142

1     just to be clear, when a debtor is directed to file a cure

2     notice, they give notice of the amount that they believe is

3     owing.

4              MR. BAUCHNER:  Right.

5              THE COURT:  It's not an amount that is claimed

6     against them.  It's the amount they believe is owing.  So --

7              MR. BAUCHNER:  I understand they believe it was --

8     that they believe zero was owing.  We don't disagree because

9     we have not, contrary to what counsel said, ever found this

10    to be a liquidated and monetary default.

11             In fact, Your Honor, there were nearly a dozen

12    letters back and forth, each of which demanded specific

13    performance.  We have never, Your Honor, suggested that this

14    was a monetary default.  We've always --

15             THE COURT:  Well, there's an ad damnum clause in

16    the complaint for a specific amount of money plus a proof of

17    claim for a specific amount of money.

18             MR. BAUCHNER:  And, Your Honor, we had to do that

19    because, as you know, if you don't plead it, you lose it.

20             THE COURT:  Right.

21             MR. BAUCHNER:  But the complaint also sought

22    specific performance, an injunction.  We actually filed on

23    an order to show cause and they agreed to remediate.

24             All of the back and forth we had with them was for

25    their -- them to remediate the condition.  I mean, a year's

Page 143

1    worth of letters; two years' worth of letters.

2         Our entire point was that they need to perform

3    under the lease and the reason for that, Your Honor, is we

4    couldn't because it was interrupt their business.

5         THE COURT:  Well, you had the right to.

6         MR. BAUCHNER:  We had the option to.

7         THE COURT:  And they're not -- I don't know, maybe

8    Sears does have a whole repair crew.  But they have to pay

9    money to do that, right?

10        MR. BAUCHNER: Of course they would have to pay

11   money to do that but we don't know how much that's going to

12   cost.

13        They were paying money, claiming all they needed to

14   do was patch the roof.

15        THE COURT:  Right.

16        MR. BAUCHNER:   What this is going to come down to,

17   Your Honor, is simply this.  If they're contention is that

18   as of the date of the assignment, the condition of the roof

19   prior to, they're exempt from remediating, but, as you

20   pointed out, it's a maintenance issue.  As the roof is

21   deteriorating as we speak, anything subsequent

22   deterioration, they're now responsible for, is a fiction

23   because the roof needs to be replaced.

24        THE COURT:  Well, I don't know.  Again, I've had

25   plenty of landlords stand up in front of me and say, this

Page 144

1    roof needs to be replace and lo and behold eventually they

2    reach an agreement on the repairs.

3            MR. BAUCHNER:  Well we have not reached an

4    agreement on the repairs.  We have a property condition

5    report from two years ago that said it needed to be replaced

6    at that time.

7            But, just as a pragmatic issue, Your Honor, how

8    will that work?  How will it work if they say that as of the

9    date of the assignment, the condition of the roof is --

10           THE COURT:  I agree with that point.

11           MR. BAUCHNER:  Right.  And --

12           THE COURT:  I understand that point.  Yeah.

13           MR. BAUCHNER:  -- then the same thing --

14           THE COURT:  And I think that's probably why they

15   were in discussions with you because at some point they

16   don't want the roof to cave in.

17           MR. BAUCHNER:  Neither do we.  And that's why the

18   Court, the State Court next door was so concerned because of

19   the safety issue.

20           THE COURT:  Right.

21           MR. BAUCHNER:  It's the same thing with the parking

22   lot.

23           THE COURT:  But it isn't a -- but there is an

24   allocation of costs and we are talking about amounts and the

25   claim.  So I guess I --

Page 145

1            MR. BAUCHNER:  Your Honor --

2            THE COURT:  I think where you have an obligation,

3    and this is consistent with the Bankruptcy Code's broad

4    definition of claim, which is in Section 105, I'm sorry,

5    101(5).  Let me just get that.

6            A claim is defined very broadly.  A right to

7    payment whether or not such right is reduced to judgment,

8    liquidated, unliquidated, fixed, contingent, matured,

9    unmatured, disputed, undisputed, legal or equitable, secured

10   or unsecured or (b) a right to an equitable remedy for

11   breach of performance if such breach gives rise to a right

12   to payment; whether or not such right to an equitable remedy

13   is reduced to  judgment, fixed, contingent, matured,

14   unmatured, disputed, undisputed, secured or unsecured.

15           So, for example, when a contract for -- in the out

16   of court context upon a breach would have a right to

17   specific performance, as an equitable remedy, if there can

18   be a monetary remedy to, courts will hold that that's the

19   remedy you get in bankruptcy, consistent with the definition

20   of claim.

21           It's hard for me to see here how this obligation --

22   I'm just talking about the pre-assignment obligation, not

23   post-assignment.  The pre-assignment obligation can be

24   barred as far as it seeks payment of money directly but not

25   barred if it requires payment of money to third parties to

Page 146

1   do the same thing; either repair the roof.  To me, that's

2   not what the cure notice was about, to have that

3   distinction.

4          Any point where you're paying money, as opposed to

5   where you can't pay money, I think is covered the cure

6   notice.

7          MR. BAUCHNER:  Your Honor, we understood quite

8   simply that cure costs as defined in the order related to

9   monetary defaults.  That's what the --

10         THE COURT:  It is a monetary default.

11         MR. BAUCHNER:  Your Honor, it's not a monetary

12  default if we were consistently seeking --

13         THE COURT:  No, no.  It actually doesn't really say

14  that.  Again that -- the definition here, and it all tracks

15  back to the motion because that's the footnote in the order

16  and everywhere else, as far as where you get the defined

17  terms that aren't otherwise defined.

18         So the motion, in paragraph 13(a)(v) defines cure

19  costs and it says the debtors' calculation of the amount

20  necessary to cure any defaults thereunder.  So it is an

21  amount.  It does refer to amount.

22         But to cure any defaults.  So, it's a dollar amount

23  that you pay to cure any default.  That may mean that you

24  pay it to the landlord which is what one form of relief in

25  the complaint is or it may mean you pay it to a bunch of

Page 147

1    contractors to cure the default which is the performance

2    default, which, you know, you've cited the paragraphs in the

3    lease that provide for maintenance.

4            But it's money and I think that's what this

5    definition is; the amount necessary to cure any defaults.

6    And you pay the money to cure what's been labelled here as a

7    performance default.  It's that type of default that can

8    actually be performed.

9            MR. BAUCHNER:   It can -- but it can't be

10   quantified, Your Honor, and that's the problem.

11           THE COURT:  Oh, it certainly can be qualified.

12   There's a bill.  I mean, do you pay the money?

13           MR. BAUCHNER:  There isn't a bill.

14           THE COURT:  Well, there will be.  It's an ongoing

15   performance default and, under 365(b)(1)(a), they would have

16   to -- they have to cure it.

17           MR. BAUCHNER:  So, forgive my ignorance, Your

18   Honor.

19           If the roof collapses tomorrow and it needs to be

20   repaired, are they obligated then to repair the roof; to

21   replace the roof?

22           THE COURT:  They -- well, just the repair part?

23           MR. BAUCHNER:  Well, the roof collapsed.  It has to

24   be replaced at this point.

25           THE COURT:  Yeah.  I understand.  I believe that

Page 148

1    they are not obligated for the pre-petition amount that

2    should have been noticed.

3              MR. BAUCHNER:  So, if the --

4              THE COURT:  But they are obligated for whatever

5    else is on top of that.

6              MR. BAUCHNER:  So -- and what is that pre-petition

7    amount because --

8              THE COURT:  Well, you would have to figure that

9    out.

10             MR. BAUCHNER:  -- that's never -- so --

11             THE COURT:  I mean, it's asserted.  It's asserted

12   and in the claim there was actually -- not the pre-petition

13   amount, the pre-assignment amount, excuse me.  I misspoke.

14             I mean the clearest thing to it is the seven

15   hundred and some thousand dollars that asserted in the proof

16   of claim and in the complaint.  That's a quantifiable

17   amount.

18             I think the proof of claim said, you know, reserve

19   some extra language.  That may or may not be quantifiable as

20   of the assignment date.

21             But I think that's the amount that clearly, at this

22   point, is time barred; that amount.

23             MR. BAUCHNER:  So --

24             THE COURT:  There may be lots of other amounts at

25   this point and if the roof falls, it would be much bigger

Page 149

1    because it's not a repair at that point or well maybe they

2    could repair it more cheaply.  I don't know.  Maybe they

3    could repair it for $500,000.  You know?  They're able to

4    get a crack engineering team and repair it for five -- but

5    it -- I think that's the distinction.

6              MR. BAUCHNER:  So are any of the repair costs

7    associated with the parking lot or the roof are offset by

8    that $700,000 figure effectively is Your Honor's ruling.

9              THE COURT:  I think so, yeah.

10             MR. BAUCHNER:  And anything that -- now what about

11   the concern, Your Honor, as you pointed out earlier, these

12   are maintenance obligations?  The longer they wait -- I

13   mean, the longer they wait --

14             THE COURT:  That's true.

15             MR. BAUCHNER:  -- to repair the roof, the more

16   expensive it gets.

17             THE COURT:  They don't want to have pot holes

18   either.

19             MR. BAUCHNER:  And yet they've had them for two

20   years.

21             THE COURT:  But --

22             MR. BAUCHNER:  And Your Honor --

23             THE COURT:  But this is just a question of

24   allocation.  So I'm assuming they're going to get on the

25   stick with you now that you all know how to allocate the

Page 150

1    costs and someone will do the repairs, hopefully you'll be

2    able to agree on that.  And the first seven hundred and -- I

3    forget the exact number, seven hundred and sixty something,

4    will be paid by the landlord and the rest will be paid by

5    the debtors.

6            MR. BAUCHNER:  So had we not filed in April, there

7    would be no 700,000 figure.

8            THE COURT:  No.

9            MR. BAUCHNER:  That comes from our filing.

10           THE COURT:  Well, I know.  That makes it easy to

11   quantify.

12           MR. BAUCHNER:  Right.  But had we not filed it then

13   -- you know, so we tried to do something reserve rights and

14   it's now coming back to bite us in the you know what.

15           THE COURT:  It's not -- no, because --

16           MR. BAUCHNER:  But it was an estimate.

17           THE COURT:  -- you would still have to quantify it.

18   You would have to quantify the pre-assignment cost.

19           MR. BAUCHNER:  Which is impossible because --

20           THE COURT:  No.  You could to it.  You've done it.

21   You did it.  So, it's clearly not impossible.  But it was

22   done.

23           MR. BAUCHNER:  If we had to do it today, we

24   couldn't.  No roofer -- if I may, Your Honor --

25           THE COURT:  No, but it's not today.  It's as of the

Page 151

1    assignment.

2         MR. BAUCHNER:  I understand that.  But no one

3    today, if we had not filed that, no one as of the assignment

4    inspected the roof, took a snapshot of the roof, and said

5    it's going to cost "X" amount to fix it as of the assignment

6    day --

7         THE COURT:  But you've been --

8         MR. BAUCHNER: -- and now, today -- if I may, Your

9    Honor.  Please, if I may --

10        THE COURT:  Okay.

11        MR. BAUCHNER:  -- as of today, December 13th, it

12   costs "X" plus "Y" which is effectively what is the ruling.

13        THE COURT:  Well but there's -- I mean, there's --

14   it was done because there's a number.

15        MR. BAUCHNER:  Right.

16        THE COURT:  And that number isn't the cap on what

17   is the landlord's.  If Transform can show that, you know, in

18   addition these other costs were there, pre-assignment, then

19   that would be the landlord's too.  You know?  Because they

20   weren't asserted.

21        It's just the post-assignment costs that are not

22   the landlord's.

23        MR. BAUCHNER:  And I just would submit, Your Honor,

24   that it's very difficult for a contractor to be able to take

25   that date -- you know, the $700,000 was an estimate.

Page 152

1          THE COURT:  I don't know.  I don't know if that's

2     the case.

3          MR. BAUCHNER:  I do.

4          THE COURT:  I mean, I'm not sure.  I mean, it may

5     be that it was hit by lightening last week.  That would be a

6     difference.

7          MR. BAUCHNER:  That's my point.

8          THE COURT:  That's a big difference.

9          MR. BAUCHNER:  That's my point.  So those costs

10    that are arising from the continuing deterioration.  As of

11    the date of the assignment, no one knows what the cost is.

12         THE COURT:  Well, I think you -- I think it it's

13    just normal wear and tear, you can pretty well tell.  I

14    think you can -- there's probably depreciation that you

15    could do.  There are probably ways you could tell.

16         People budget for repairs over time.  So just --

17    the -- I mean, the assignment was in March; is that when it

18    happened?  I forget.

19         MR. BAUCHNER:  It was May 13th.

20         THE COURT:  May.  It was May.  So, there you go.

21    And so you really -- you're only talking about quantifying

22    the difference between April when the claim was filed and

23    May 13th.  And everything after that is up to Transform.

24         MR. BAUCHNER:  So are we then permitted to sue

25    Transform in State Court for everything after that?

Page 153

1          THE COURT:  But -- yes, after you're credited for

2     the pre-amount.  Yes.

3          MR. BAUCHNER:  Yes.

4          THE COURT:  Yeah.  They took on the ongoing

5     obligations.  Yes.

6          MR. BAUCHNER:  Right.  So, effectively, then are

7     State Court action should include anything from the May 3rd

8     assignment forward for roof and the parking lot --

9          THE COURT:  Yeah.  But that doesn't mean that the

10    whole cost of repairing the roof is post-assignment because

11    no work's being done then.

12         MR. BAUCHNER:  I understand.

13         THE COURT:  Okay.

14         MR. BAUCHNER:  You're saying there's an offset of

15    the $700,000.

16         THE COURT:  And maybe more.  Maybe there's -- you

17    know, if actually more of that was quantifiable then and

18    just wasn't, then --

19         MR. BAUCHNER:  I invite them to show it.  But --

20         THE COURT:  Well, no. That's -- at that point

21    that's going to be their burden.

22         MR. BAUCHNER:  Right.

23         THE COURT:  And you've laid that out.

24         MR. BAUCHNER:  That's a pretty hard thing to do.

25         THE COURT:  Right.

Page 154

1          MR. BAUCHNER:  But I invite them to do it.  So,

2     then, we're litigating next door.

3          THE COURT:  Well, I don't know.  I don't know about

4     that.  Well, yes.  I think that's right.  I mean, I actually

5     did -- yes because I now know conclusively that we're

6     talking about the post-assignment period and the debtor has

7     no stake in this at that point.  So --

8          MR. BAUCHNER:  Right.

9          THE COURT:  -- I don't think the stay applies at

10    that point.

11         MR. BAUCHNER:  So then next door we're litigating

12    the septic tank.  There's now a problem with the fire

13    system.  We're going to litigate that next door.

14         THE COURT:  Anything post-assignment.

15         MR. BAUCHNER:  Right.

16         THE COURT:  Sure.

17         MR. BAUCHNER:  And the roof and the parking lot,

18    post-assignment deterioration, to the extent someone could

19    quantify it, all next door.

20         THE COURT:  Yes.  I think that's right.  I mean,

21    I'm happy to hear the other side but that's how I'm looking

22    at this.

23         MR. BAUCHNER:  Okay.  I mean, it's just -- and then

24    are we continuing to litigate the pre-assignment --

25         THE COURT:  Well, look.  I have a motion to dismiss

Page 155

```
 1    --

 2            MR. BAUCHNER:  -- issue here?

 3            THE COURT:  -- on these other points.

 4            MR. BAUCHNER:  Right.

 5            THE COURT:  And I think I should rule on them

 6    because there's no reason to deal with these other issues,

 7    frankly.  I mean, this is a contract dispute.

 8            MR. BAUCHNER:  Agreed.

 9            THE COURT:  It's not a quantum meriut or unjust

10    enrichment or anything like that.

11            MR. BAUCHNER:  Oh, you mean, the alternative

12    counts?

13            THE COURT:  Yeah.

14            MR. BAUCHNER:  Well, I mean, the law is clear, Your

15    Honor, both under the federal rules and under New York law

16    that we can plead in the alternative.

17            THE COURT:  But you can't plead a cause of action

18    that doesn't exist because the elements of the cause of

19    action aren't plead.

20            It's clear, here, because the contract is

21    incorporated into the pleadings, the lease.  But the parties

22    have a lease.  So that governs.  You can't show unjust

23    enrichment except where there isn't a contract and you can't

24    show breach of the implied covenant of good faith and fair

25    dealing except as in New York an element of your contract
```

Page 156

1    claim.

2            So there's nothing wrong with arguing good --

3    breach of good faith and fair dealing as part of the

4    contract claim.  But it's not a separate cause of action.

5            MR. BAUCHNER:  Your Honor, Rule 8(d)(2)

6    specifically permits us to allege multiple counts even if

7    they're inconsistent.

8            THE COURT:  You can allege them but if the contract

9    that destroys one of the counts is part of the complaint,

10   which it is, the lease, then it destroys part of the counts.

11           Just like what -- I equate to what you're saying

12   here is you can plead in the alternative.  Yes, that's

13   right.  But if one of the causes of action simply doesn't

14   lie because of what's in the complaint, that alternative

15   pleading is --

16           MR. BAUCHNER:  Fine, Your Honor.

17           THE COURT:  -- is denied.

18           MR. BAUCHNER:  I'm less concerned about the

19   alternative counts --

20           THE COURT:  Okay.

21           MR. BAUCHNER:  -- if everyone's going to stipulate

22   to the existence of the contract.

23           THE COURT:  Well, they are.  They --

24           MR. BAUCHNER:  Okay.

25           THE COURT:  I mean, you would win on that basis.

Page 157

1   They acknowledge that there's a lease.

2           MR. BAUCHNER:  And I think it will be curious.

3   We're going to --

4           THE COURT:  Look.  If they somehow say there's no

5   lease --

6           MR. BAUCHNER:  I've had that.  That's my concern,

7   Your Honor.

8           THE COURT:  Well, all right.  If they say there's

9   no lease, then you can come back and I'll vacate my order

10  because --

11          MR. BAUCHNER:  Okay.

12          THE COURT:  -- they're judicially estopped from

13  saying that because I just won -- they just won on the basis

14  that they've said there is a lease.

15          MR. BAUCHNER:  As long as they -- they're saying

16  there's a lease that provides them with this maintenance

17  obligation, and they're not going to challenge that, that's

18  fine.

19          THE COURT:  Well --

20          MR. BAUCHNER:  It's just --

21          THE COURT:  -- there's a lease.

22          MR. BAUCHNER:  -- next door, there was a challenge.

23          THE COURT:  There's a lease and it's governed by

24  its terms.

25          MR. BAUCHNER:  Agreed.

1          THE COURT:  I don't think you're trying to be

2     tricky on this.

3          MR. BAUCHNER:  No. Not at all, Your Honor.

4          THE COURT:  I don't want them -- their silence to

5     be implied later as saying that they agree that they have

6     this specific maintenance obligation that you say they have.

7          It's --

8          MR. BAUCHNER:  It's in the lease.

9          THE COURT:  It's -- whatever's in the lease --

10         MR. BAUCHNER:  Agreed.  Right.

11         THE COURT:  And I think the unjust enrichment claim

12    is based on the same facts as are covered by that provision.

13         MR. BAUCHNER:  So the Court next door has asked for

14    guidance from Your Honor with respect to this issue and I

15    just want to insure that your order --

16         THE COURT:  Which I understand that the Court

17    didn't rule because it felt that there was no jurisdiction

18    because this was till pending here.

19         MR. BAUCHNER:  Yes.

20         THE COURT:  I don't really understand what it was

21    that the Court -- the State Court wanted from me.

22         MR. BAUCHNER:  Well, Mr. Barefoot argues to the

23    Court, to the law secretary, that all these issues were

24    subject to this Court's jurisdiction.

25         THE COURT:  Well, they -- they are until now.

Page 159

1          MR. BAUCHNER:  And -- well, correct.  So my point

2     is I just -- we need -- I just want to make sure that the

3     Court's order is clear; any maintenance issues that arises

4     after May 3rd is subject to the jurisdiction of the State

5     Court, which is what I understand Your Honor is to be saying

6     today.  That case could be resuscitated.  We could

7     substitute in the assignee.  We'll allow in all of the new

8     defaults.

9          THE COURT: Well, you should take out the debtor.

10         MR. BAUCHNER:  Oh, I'm sorry, yes.  We'll replace.

11    Yes.  I didn't mean the word substitute.

12         And then we'll seek specific performance and

13    another order to show cause and everything else next door.

14         THE COURT:  Well, I mean, I --

15         MR. BAUCHNER:  That's my concern is we're going to

16    have two courts.

17         THE COURT:  I -- let me back up.  We haven't really

18    dealt with the motion as far as the specific performance

19    count is concerned.

20         (Pause)

21         THE COURT:  But let's deal with the other ones

22    first.

23         As far as --

24         MR. BAUCHNER:  The other counts, Your Honor?

25         THE COURT:  Yeah.

Page 160

1          MR. BAUCHNER:  Your Honor, if -- like I said, I'm

2    happy to withdraw the non-contract count.

3          THE COURT:  No.  I want to -- no.  I want to go

4    through them in order and starting with the contract count.

5          My view is that first this complaint sets forth two

6    remedies for breach of contract.  The first is for monetary

7    damages.

8          The second is for specific performance which it

9    couches injunctive relief.  But to the extent it's in

10   respect of the contract, it's specific performance.  The

11   injunctive relief might be to avoid a safety hazard or

12   something like that.  That's a separate issue.

13         So, I'm focusing on the contract count and the

14   request for monetary damage and specific performance.

15         Based on my review of the bid procedures order that

16   I entered in November, it's hard to believe, 2018, which

17   among other things directed the notice of assumption and

18   assignment to be sent and provided for a deadline to submit

19   cure costs, a response to the debtor's statement of cure

20   costs that is; and the defined term cure cost, which I've

21   already quoted, that is incorporated from the motion for

22   approval of that bidding procedures order, I conclude that

23   to the extent that money would be required to cure any

24   defaults, pre-assignment defaults, that is, that amount

25   needed to be asserted by the deadline in the notice and it

Page 161

1  was not here.

2          And, given that, I believe that the landlord is now

3  time barred to assert a claim for damages or for specific

4  performance since the specific performance can be quantified

5  for breach of the contract, for anything that could be said

6  to be owing, either as a fixed or unliquidated amount, i.e.,

7  necessary to make the claimed repairs pre-assignment.

8          In other words, the onus was on the landlord to

9  file something to the effect of we object to the zero dollar

10  amount cure costs that in the cure notice from the debtors.

11  We are owed at least seven hundred and whatever it is,

12  seventy-six thousand dollars for repairs plus any amounts

13  thereafter up to the assignment date.

14          That continually was not done and therefore I'm

15  going to grant the motion to dismiss with respect to the

16  contract claim for those pre-assignment amounts that could

17  have been asserted; either as a liquidated amount or an

18  amount that could be described in an unliquidated basis.

19          On the other hand, as far as an ongoing performance

20  obligation is concerned, the repairs need to be made.  It's

21  just a matter of allocating the cost and cost that is

22  attributable to conditions that, for want of a better word,

23  worsened after the assignment date, would be the tenant's

24  obligation.

25          I -- and I'm happy to put -- you should lay that

Page 162

1   out in the order so that it's clear to the State Court Judge

2   what can be before the State Court Judge.

3           I conclude that I -- to the extent I might have

4   supplemental jurisdiction to decide the post-assignment --

5   well, for it to insure a septic tank dispute under 28 U.S.C.

6   1367, I believe on a motion to dismiss basis, I can conclude

7   that for purposes -- this is under 12(b)(1) now, I conclude

8   that for purposes of this matter, the septic tank dispute is

9   not part of the same case or controversy that I've just

10  decided.  It's really -- the only thing that they have in

11  common is that it's under a lease.  But it's a different

12  default.

13          And, most importantly, it's a different default in

14  terms of timing.  It's post-assignment, given the assignment

15  order, I don't have any jurisdiction under 28 U.S.C. 157 and

16  1334 because it doesn't even relate to the bankruptcy case.

17  It's not under the Bankruptcy Code.  It's not a part of a

18  cure dispute.  It's a post-assignment dispute.

19          So that is clearly a matter that can be before the

20  State Court.

21          And I don't need to decide whether bankruptcy

22  courts have this type of jurisdiction or not; although,

23  frankly, I'm skeptical because it's not provided for in

24  either 28 U.S.C. 157 as a matter of reference from the

25  District Court or 28 U.S.C. Section 1367 which only refers

Page 163

1    to the District Courts having supplemental jurisdiction.

2           I conclude that the claim for breach of the implied

3    covenant of good faith and fair dealing should be dismissed

4    here given that it is clear that the claim is based upon a

5    lease that both parties agree is in existence and therefore

6    it is really a contract claim.  It's not a separate cause of

7    action under New York law in that context; although the duty

8    is an implied covenant in the contract.  And so it's part of

9    the contract claim.  It can be asserted.

10          See Harris v. Provident Life & Accident Insurance

11   Company, 310 F.3rd 73, 82 (Second Cir. 2002), Leberman v.

12   Jon Blair & Company, 880 F.2d 1555 (Second Cir. 1989) and In

13   re Adelphia Communications Corp., 2007 Bankr. Lexus, 2851 at

14   pages 29 through 30, Bankr. SDNY August 17, 2007).

15          Similarly, I believe the claim for unjust

16   enrichment must be dismissed under Rule 12(b)(6) given that

17   it is a claim that does not lie where there is a contract

18   that covers the same facts.

19           It is a quasi contract claim and under New York

20   law, therefore, exists only where there is not an express

21   agreement that governs the particular cause of action.  See

22   Clark-Fitzpatrick, Inc. v. Long Island Railroad Company, 7

23   N.Y. 2d 382, 388, 389, 1987 and Beth Israel Medical Center

24   v. Horizon Blue Cross and Blue Shield of New Jersey, 448

25   F.3d 573, 586 through 87, Second Circuit 2006.

Page 164

1           I also believe the negligence cause of action

2      should be dismissed here, in light of the motion, given the

3      absence in the pleading of a duty of care, specifically, to

4      the landlord, it's well-established again, pursuant to

5      Clark-Fitzpatrick v. Long Island Railroad Company, that a

6      simple breach of contract is not a tort, unless there's a

7      legal duty independent of the contract itself.  That's at 70

8      F. N.Y. 2d at 389.  This is essentially a contract cause of

9      action.  There may a duty to other third parties, and that

10     was the case in Scarlet v. Boston Properties, Inc., where

11     the cleaning lady got shocked and had a claim that survived

12     against a tenant of the building.  That's 959 NY F.2d 151

13     152, First Department 2013, but I don't believe that's the

14     case here.

15          As far as the cause of action for injunctive

16     relief, to the extent that this cause of action, again,

17     seeks specific performance of the contract, I will grant the

18     motion to dismiss, based on the same rationale that I gave

19     at the beginning.  To the extent it seeks injunctive relief

20     for health and safety reasons or something like that, under

21     some other provision of law, which I don't really see here

22     yet, but you got an injunction once, I don't think that type

23     of claim is covered by my ruling, you know, because it's to

24     stop an imminent harm.  Now, it may be that it can be dealt

25     with by payment of money, in which case, my initial ruling,

Page 165

1    you know, the ruling on the first cause of action applies,

2    as far as who is responsible pre or post, but to the extent

3    injunctive relief is tied to that to get something done

4    quickly, and the Court concludes that it can't sort out the

5    money immediately, I don't think I should put it different.

6           As it's pled in the complaint, I'm dismissing it.

7    I'm not saying you're not entitled to any sort of injunctive

8    claim, but I think you have to make that distinction and

9    persuade the State Court of the distinction, that it's not

10   violating the ruling that it's time barred, and I'm also --

11   at least based on what I have before me today, this can be

12   dealt with by the payment of money.  So you wouldn't have a

13   right to injunctive relief on this complaint.  I hope that

14   clear and doesn't create, you know, a can of worms, but what

15   I want to be clear is that I am dismissing this claim for

16   injunctive relief, but that doesn't mean that there might be

17   some set of facts and circumstances that might require

18   injunctive relief in the future.

19           MR. BAUCHNER:  So to be clear then, if I may,

20   basically, the only thing we're litigating in this court is

21   what you've been referring to as the allocation issue and

22   next door, we're going to be litigating any defaults,

23   maintenance defaults, arising May 3rd going forward?

24           THE COURT:  Right, and you haven't really made a

25   motion to lift the stay, but I'd be amenable to signing a

Page 166

1    stipulation that would allow that amount on the claim issue,

2    now that I've set the parameters of it, to be decided as

3    part of your overall dispute.  I'm not sure why we have to

4    have two separate courts doing it.  I would just lift the

5    stay and let that happen, if the parties are amenable to

6    that.  Otherwise, I guess I'll have to hear a motion.

7              MR. BAUCHNER:  I'm sorry, Your Honor.  Lift the

8    stay to let the allocation issue, --

9              THE COURT:  Let the --

10             MR. BAUCHNER:  -- the monetary issue, be

11   litigated?

12             THE COURT:  Yeah, I mean, I've decided the

13   parameters of the allocation issue.

14             MR. BAUCHNER:  Right.

15             THE COURT:  It's just applying the facts --

16             MR. BAUCHNER:  A number.

17             THE COURT:  -- to those parameters.  I think you

18   want to make sense for the State Court, not just a legal

19   dispute, to decide that issue.  That's all I'm saying, but I

20   don't have that before me right now.  You could submit a

21   stipulation that lifts the stay to let that happen, or

22   someone could make a motion for relief from the stay so that

23   that now pretty narrow issue could be decided by the State

24   Court.

25             MR. BAUCHNER:  I think it would make the State

Page 167

1    Court's head explode.  That's my concern.

2              THE COURT:  Well, I think the order can lay this

3    out.  I mean, I think --

4              MR. BAREFOOT:  Just two points of clarification.

5              THE COURT:  I think I've been pretty careful on

6    what the parameters of the allocation issue are, which are

7    pretty narrow, and if you lay it out in the order, which I

8    think you're going to want to do so there's no confusion, I

9    think it may well be that the State Court can handle that.

10             MR. BAUCHNER:  The concern, Your Honor is you had

11   referenced the urgency (ph) -- is they've announced they're

12   vacating in February.  I mean, we actually submitted --

13             THE COURT:  Okay.

14             MR. BAUCHNER:  -- an article with our application

15   to that effect.

16             MR. BAREFOOT:  Your Honor, that was outside of the

17   pleadings.

18             MR. BAUCHNER:  Excuse me.

19             THE COURT:  Well, --

20             MR. BAUCHNER:  Excuse me.

21             THE COURT:  No, but we're really talking more

22   about what might be happening in the future, as far as

23   allocation of work between the State Court and me.

24             MR. BAUCHNER:  Right.

25             THE COURT:  I've said enough on this.  If people

Page 168

1    want to agree to let it go to the state court, fine.  If

2    they don't, then someone can make a motion for the stay.

3    Otherwise, I have that issue, and it's a cure issue.

4              MR. BAUCHNER:  And that's, I think, where some of

5    the urgency comes from.  If they vacate and then they just

6    leave us holding the bag for all the maintenance obligations

7    they've deferred for the past five years.

8              THE COURT:  Okay.

9              MR. BAUCHNER:  That seems to be the chief intent

10   here.

11             THE COURT:  Well, I don't know.  I mean, that's

12   maybe for another day.

13             MR. BAREFOOT:  Your Honor, can I just ask two

14   points of clarification?  First off, on the rulings that

15   Your Honor gave, the dismissals with the potential exception

16   of the injunctive relief are with prejudice?

17             THE COURT:  Yes.

18             MR. BAREFOOT:  And second of all, to Your Honor's

19   suggestion of lifting the stay, the debtors aren't a party

20   to this dispute.

21             THE COURT:  No, but it's a cure issue before me.

22             MR. BAREFOOT:  Understood.

23             THE COURT:  So maybe it would be abstention.

24             MR. BAREFOOT:  I wonder whether -- that's what I

25   was going to suggest, Your Honor.

Page 169

1          THE COURT:  You could have an agreed abstention

2     order.  You're right.  It's not a stay issue.  It's

3     abstention.

4          MR. BAUCHNER:  Your Honor?

5          MR. BAREFOOT:  And I think we'll confer with our

6     client and with counsel, but I think next steps we'll

7     propose to not formally settle an order, but discuss with

8     them an order with the goal of submitting an agreed order

9     that memorializes --

10          THE COURT:  Yeah, hopefully, you'll be able to

11     agree on one.  If not, obviously, see the other side when

12     you submit the order.

13          MR. BAREFOOT:  Of course.

14          THE COURT:  And I'll give you some -- you know,

15     let me know.  I mean, we're already talked about it.  So

16     respond promptly to that.

17          MR. BAUCHNER:  Of course.

18          THE COURT:  Like within a day, and say something

19     to the effect that this will confirm we're in agreement with

20     this form, or alternatively, we have some issues.  I've

21     attached a blackline showing our proposed form of order.

22          MR. BAUCHNER:  Okay.

23          THE COURT:  Or give me two days to do, you know, a

24     blackline, something like that.

25          MR. BAUCHNER:  And, Your Honor, we're dismissing

1    with prejudice claims that haven't been adjudicated on the

2    merits, where you had earlier said if we could show --

3            THE COURT:  Well, it's a motion to dismiss.

4            MR. BAUCHNER:  Well, that usually results in a

5    without prejudice dismissal.

6            THE COURT:  Well, but there is no basis for these

7    claims.

8            MR. BAUCHNER:  Well, as you said, if there's

9    something, an issue with the contract, you would permit us

10   to refile.  It's just in my experience, --

11           THE COURT:  Oh, no, but that's -- but no, you rely

12   on judicial estoppel.

13           MR. BAUCHNER:  I Understand, and I don't mean to

14   quibble with the Court, but in my experience, --

15           THE COURT:  Yeah.

16           MR. BAUCHNER:  -- unless I'm on a motion to

17   dismiss, it's a without prejudice dismissal in the absence

18   of adjudication on the merits, but --

19           THE COURT:  Well, I'm not giving you any time to

20   re-plea to make a Rule 15 motion.

21           MR. BAUCHNER:  That's fine.  That's fine.

22           THE COURT:  You know, for a leave to amend.  So --

23           MR. BAUCHNER:  Just changes the dynamics, as you

24   know.

25           THE COURT:  The record's clear, though, that, if

Page 171

1   -- I can't imagine Transform would ever do this.  If they

2   somehow say that there's no lease, there's no lease that's

3   effective between the parties, they would be judicially

4   estopped from doing that, because they weren't on the motion

5   to dismiss.  So you would have a remedy there.  Okay.

6            MR. BAUCHNER:  Thank you, Your Honor.

7            THE COURT:  Okay.

8            MR. BAREFOOT:  Thank you, Your Honor.

9            THE COURT:  Okay.

10           All right, so I'm going to take about a half-hour

11   break or so, come back about 2:20.

12           MR. BAUCHNER:  I'm not sure any of the other

13   parties are still here.

14           THE COURT:  Well, there may be some people on the

15   phone, and you can let the people in the conference room

16   know.

17           THE CLERK:  Yes.

18       (Recessed at 1:42 P.M.; reconvened at 3:04 P.M.)

19           THE COURT:  Please be seated.

20           Is Court Call on also?

21           US:  Yes.

22           THE COURT:  Okay.

23           All right, we're back on the record in in re:

24   Sears Holdings Corporation, et al.  We're going back to the

25   unscheduled case conference in this case that was dealing

Page 172

1    with the administrative expense claims consent program.  I

2    have now had the chance to review those portions of the

3    confirmation order that deal with the program.  So I'm a

4    little more up to speed on how I believe it was intended to

5    operate.

6           So where are we at this point?

7           MR. FAIL:  Thank you, Your Honor.  Garrett Fail,

8    Weil, Gotshal & Manges for the record again.  The debtors,

9    together with the Creditors' Committee's attorneys and the

10   Ad Hoc Group proponents have spent the last several hours

11   and working with M3, going over the numbers to try to

12   address the factual questions Your Honor had, as well as the

13   issues that Your Honor articulated, and we believe that we

14   have a proposal that will address them satisfactorily to the

15   Court, and so, what we've proposed is, with respect to those

16   parties who had timely opted in to the program -- so the

17   universe was the closed universe that we had been speaking

18   about all morning -- and to whom the debtors reached out for

19   information and then that responded to us with respect to,

20   you know, -- so there was a dialogue or emails.  We had

21   reached out.  They have reached back, but we have not

22   communicated back to them.

23          We, the debtors, have not communicated back to

24   those counterparties.  You heard this morning our view that

25   we didn't think we had to, and we spent the time reconciling

Page 173

1   others, but to address the concerns that we had not

2   communicated back and given those parties, you know, a last

3   chance to come back to us.  We propose the following.

4        First, I can identify what the subset is Your

5   Honor asked, you know, "What are we even talking about?"  So

6   when I was going through the walk-down on the waterfall this

7   morning, we had identified a subset of assets -- a subset of

8   ballots that the debtors had said were about 285 that were

9   allowed, and then we talked about 249 that we were putting

10  into the second round.  So there were 249 where the debtors

11  thought there was reconciliation to do, and then there were

12  about 204 that we had determined should be rejected and it

13  wasn't worth pursuing reconciliation.  So there are about

14  453-ish ballots outstanding.

15        With respect to those parties that had timely

16  filed and had responded to us prior to the times that would

17  allow them to have participated in this distribution -- so

18  with respect to the ballots that came back and the

19  information that responded prior to November 23rd, for the

20  folks that were in the first mailing, and by December 1 for

21  the second, there's roughly $40 million of asserted ballots

22  and roughly 153 ballots to look at.

23        So to summarize again, there's about 153 ballots

24  for which information or communications came back to us in

25  time for the debtors to have reconciled prior to this

Page 174

1    distribution, which was on or about December 1.  The debtors

2    propose the following to address the Court's concern.  By

3    this coming Tuesday, December 17th, --

4              THE COURT:  17th, right.

5              MR. FAIL:  -- the debtors will email out to the

6    address that we've received in connection with the balloting

7    process, the email that's submitted, the debtors' view of

8    the amounts that they see being allowable, from zero to

9    whatever the amount is, Your Honor, --

10             THE COURT:  Right.

11             MR. FAIL:  -- with respect to each claim.  It may

12   be zero.  We can express as well the reason for the -- not

13   the -- you know, not all reasons, given the time frame.

14   This is not a claims objection, but we will do our best to

15   communicate the reason.  For example, we think you've been

16   satisfied.

17             We don't believe it's an administrative priority

18   claim.  We don't have any books and records to match it.

19   We'll do our best to advise, and then we will give those

20   parties in the email -- we will make clear that we will work

21   in good faith to try to reconcile those through December

22   23rd.  On that point, Your Honor, I want to just again

23   express that the protocol that was approved and the

24   settlement that was approved does not put a burden on the

25   debtors or change the expectation of creditors that their

Page 175

1    claims should be or must be allowed in that time frame.

2            The debtors are going to exercise their fiduciary

3    duties, work with the Creditors' Committee's professionals

4    and the other ad hoc members to ensure that we're not

5    allowing claims just to have to allow them, but we will do

6    our best to reconcile them.  Any claims that are reconciled

7    by the end of the 23rd will be included in an initial

8    distribution.  The debtors will delay the initial

9    distribution to no later than December 31st to send checks

10   out by December 31.

11           We think that that's -- we don't think that a

12   reserve was required.  We think that this would address,

13   though, the concerns and would cut down on the

14   administrative burden of doing two calculations for a short

15   period of time.  We think the week gives an opportunity for

16   parties to feel, if they want to meet the debtors, if the

17   debtors ask or make another proposal, they can do so.

18           Lastly, I think I just want to say it is the

19   debtors' expectation that not all of these claims will be

20   reconciled.  These claims were categorized as such, because

21   the variance between the asserted amount and the debtors'

22   estimate was significant.  We're optimistic, though, and

23   open-minded, and to the extent claims can be reconciled and

24   allowed in, they will be included in the first distribution.

25           To the extent they can't, because the information

Page 176

1    can't be reconciled and the information can't be gotten from

2    Transform or there are legal issues, then they will be put

3    into the second round.  They will get the benefit of

4    receiving distributions understand the settlement proposal

5    in advance of the effective date of the plan.  They will get

6    80 percent of their allowed amount, rather than 75.

7              One other data set that Your Honor may find useful

8    -- with respect to the claims that were allowed, you know,

9    in our proposal that we filed on the docket, $64 million of

10   allowed claims, the total amount that was asserted in those

11   was roughly $71 million.  So relatively close in number, and

12   that's where we were working.

13             In terms of the claims that we're talking about

14   now, the pool that we had basically shifted all into Zone 2

15   or Batch 2, I think there's roughly $86 million asserted,

16   and the debtors' estimate is that, you know, it'

17   S no more than roughly $23 million.  So there's a much

18   greater discrepancy as it currently exists.  We're open to

19   reconciliation.  The claimants may be right, but the books

20   and records don't reflect that.  So there's a difference

21   between roughly 90 percent match and 27 percent being -- you

22   know, there's a 27 percent -- is what we think these claims

23   will come down to.

24             So, Your Honor, I'm obviously happy to answer any

25   questions, and I hope that this proposal, which took some

Page 177

1    very arms' length negotiation between the debtors and the

2    creditor participants -- and by those, I mean, those

3    represented by the Foley Group.  You know, we think this

4    represents a substantial step forward to address your

5    concerns.

6                THE COURT:  Okay.  I do have a couple questions.

7    First, in terms of the people who would be covered by this

8    program or this change to the program, would it include

9    people who were requested of information, which is -- and

10   provided a response, who the debtors are not paying because

11   of an open issue on a legal basis?

12               MR. FAIL:  It includes all ballots that were

13   received timely that were not included in the allowed, and

14   it does not include the duplicates.  We could provide -- you

15   know, I guess we can attempt --

16               THE COURT:  No, no, I --

17               MR. FAIL:  It doesn't include duplicates.  It

18   doesn't include -- yes is the answer, Your Honor.

19               THE COURT:  The answer is yes?

20               MR. FAIL:  Yes, it is.

21               THE COURT:  So --

22               MR. FAIL:  It includes the legal issues, in other

23   words.

24               THE COURT:  Let me ask it a different way.  The

25   debtors didn't, on their own, conclude that this was a claim

1    that was asserting something that they disagree with on a

2    legal basis and because of that, didn't ask for information?

3    You asked for information of everybody?

4            MR. FAIL:  We asked information of everybody.

5            THE COURT:  Got it.

6            MR. FAIL:  And we will give everybody that timely

7    filed and that has responded to us --

8            THE COURT:  Other than the duplicates?

9            MR. FAIL:  -- other than the duplicates.

10           THE COURT:  Okay.  And the timely response, again,

11   is by the deadline, which would have been either November 23

12   or December 1?

13           MR. FAIL:  Correct, Your Honor.

14           THE COURT:  Depending on whether it was the first

15   mailing or the second?

16           MR. FAIL:  Correct, Your Honor.

17           THE COURT:  Okay.  So I would suggest just one

18   change to that, and I would hope that you would be able to

19   do this and devote the people to it.  Make it the end of the

20   day Monday, the 16th, so that there's a week.

21           MR. FAIL:  They will go out on a rolling basis, to

22   the extent we can, we're fine.  Yep, we will do our very

23   best to get as many out by Monday as possible.

24           THE COURT:  Okay, all right.  Okay.  And I just --

25   you know, you should staff up for that week.  I'm just

1    saying you should -- I mean, I think that's part of this.

2              MR. FAIL:  Understood, Your Honor.

3              THE COURT:  Whether it's on a --

4              MR. FAIL:  And to the extent that --

5              THE COURT:  -- the consultants side or the debtors

6    side.  You should be --

7              MR. FAIL:  To the extent that the resources are

8    those that are constrained by the debtors, but, of course,

9    Your Honor, we've been dedicated to this --

10             THE COURT:  Look, obviously, you cannot -- you are

11   somewhat constrained by the fact that Transform has

12   information, but in terms of being accessible for settlement

13   proposals and the like, I think there should be extra people

14   there.  I mean, even if they're junior people with not much

15   authority.  I don't want the situation where the phone's

16   ringing and then it just goes to an answering machine and

17   then it, you know, just sits there.  So this should be a

18   busy week.

19             MR. FAIL:  Understood, Your Honor.

20             THE COURT:  Okay, all right.

21             I'm happy to hear people on this, but I do want to

22   give you my view on the program.  The program does have the

23   30-day reconciliation in it, but I don't believe that is

24   tied to the initial distribution.  In fact, I think that's

25   made clear by the fact that the 30-day reconciliation also

Page 180

1   applies to people who opted out.  It's just not tied to the

2   distribution.  The distribution's tied to the dates.

3           On the other hand, I think it is important to have

4   additional time and resources devoted to responding to the

5   people who provided the information timely so that there's a

6   chance to cover those people, and it just seems to me that

7   that didn't happen and that it should happen.  It probably

8   didn't happen because there was such a large response, and

9   I'll note that the program is amendable on written consent,

10  not to be unreasonably withheld, and I believe that

11  withholding consent to what's just been proposed would be

12  unreasonable.

13          MR. FAIL:  Appreciate that, Your Honor.  I'll cede

14  the podium.

15          THE COURT:  Okay.

16          Hi, Your Honor.  Salah Hawkins, Cravath, Swaine &

17  Moore, for administrative claimants Stanley Black & Decker.

18  I don't intend to be long, Your Honor, or argue anything.  I

19  think the debtors' proposal addresses many of the concerns

20  that my client had.  Just a clarifying question with regard

21  to the December 1 date.  And so, if counsel can answer it.

22          Is it that the December 1 date is the receipt of

23  the ballot from the second bath?

24          THE COURT:  No, it's the receipt of the response

25  to the information request.

Page 181

1          MR. HAWKINS:  Okay.  And the reason why I raise

2     that question, Your Honor, is because some, like my client,

3     didn't receive the request for information until the 1st.

4     So then --

5          THE COURT:  Well, I --

6          MR. FAIL:  That's the point.

7          THE COURT:  What?

8          MR. FAIL:  He filed his -- he submitted his ballot

9     on what?  The last day, November 25th.

10          But you received your mailing like a month before

11     that, right?

12          THE COURT:  Okay.  Look, I mean, the plan -- I'm

13     sorry.  The consent program says that the distribution will

14     be made on or about December 1, and that date's important.

15     There's some play in it, but I think anyone who sends in the

16     ballot, you know, less than a week before December 1 has to

17     expect, when reading this order, that it's highly unlikely

18     that there will be consensual agreement in those couple of

19     days, and so, you know, that's just -- I think that's just a

20     given.

21          MR. HAWKINS:  I understand that, Your Honor.

22          THE COURT:  Yeah.

23          MR. HAWKINS:  Nevertheless, if the December 1

24     cutoff date for the RFI is the response date and the people

25     that received the second mailing, it doesn't seem feasible

Page 182

1    to me that that's enough time for them to provide a response

2    to the RFI.

3                THE COURT:  Well the second mailing, I think,

4    would be -- you know, the on or about would be basically

5    assumed to be December 7th or 8th, I think.  You know,

6    basically, they gave an extra week, and so, there'd be an

7    extra week.  That's why it's on or about, but once you get

8    beyond that, --

9                MR. HAWKINS:  So the RFI -- so if you were in the

10   second round, then the RFI would need to be responded to by

11   December 7th or 8th?

12               THE COURT:  No, no, no.

13               MR. FAIL:  No, December 1.

14               THE COURT:  No, December 1, because you can't

15   respond on the day that the distribution is assumed to be

16   made and assume that you're going to have a reconciled

17   claim.  It's not possible.

18               MR. HAWKINS:  Agreed, Your Honor.  I think that's

19   part of it, but I think another part of the issue is that

20   the heart of the agreement was that that would be expedited

21   reconciliation.

22               THE COURT:  I disagree with that.  That is an

23   important portion of the agreement.

24               MR. HAWKINS:  Yes.

25               THE COURT:  But it is not tied into making the

Page 183

1    first distribution, because expedited reconciliation applies

2    to the people who opted out, too, and the people who were

3    not agreed to in time.  I mean, it's the same 30 days.

4            MR. HAWKINS:  I agree with that, Your Honor.  The

5    issue, I believe, here just goes back to the fact of not

6    having a response as to knowing whether or not there was an

7    agreement or not.

8            THE COURT:  Well, but it's not reasonable to

9    assume that, if you get your ballot in less than a week

10   before the deadline, you're going to have agreement.  I

11   think that's the parties' risk.  You know?

12           MR. HAWKINS:  Understood, Your Honor.

13           THE COURT:  I mean, I think that reading these

14   procedures, I think people took the risk, that they would

15   not have an agreed allowed claim on or about the December 1

16   date if they sent in their ballot with less time than is

17   need to do that, and it's clearly not going to be given 30

18   days, because that would be beyond the on or about December

19   1 date.

20           MR. HAWKINS:  That makes sense to me, Your Honor.

21   I think that there is just the tension there with the

22   expedited reconciliation versus the receipt of the

23   information, and I understand Your Honor's ruling to be

24   going toward the side of the December 1 date is more

25   important.

Page 184

1                 THE COURT:  Yeah, yeah, I mean, I looked at this

2       carefully.  There is a requirement to try to complete the

3       reconciliation process within 30 days of the receipt of the

4       ballot, but that applies even to people that are not going

5       to be getting the distribution on December 1.

6                 MR. HAWKINS:  Agreed, Your Honor, but the --

7                 THE COURT:  It applies to folks who are getting

8       the second distribution.  So --

9                 MR. HAWKINS:  The way that it reads in the

10      solicitation itself, not only in the conformation order, but

11      in the initial solicitation -- the way it read was the

12      treatment of your claims you had a certain date by which you

13      had to opt in, right?  So that original date was the 18th.

14      And then that date got pushed out to the 25th.

15                THE COURT:  Right.

16                MR. HAWKINS:  So under the terms of the

17      solicitation, the debtors themselves were saying if you get

18      your information in by the 25th, they foresaw that you would

19      still be in that initial distribution.

20                THE COURT:  No.

21                MR. HAWKINS:  I think looking at it --

22                THE COURT:  They didn't.  It's possible that you

23      would be, but if there were reconciliation issues, you would

24      not be.  I mean, again, --

25                MR. HAWKINS:  But, Your Honor, I think honestly

Page 185

1    then that makes the date misleading.

2              THE COURT:  The notice is prefaced by saying

3    consensual reconciliation of the allowed amount to be

4    completed within 30 days from the receipt of the opt-in

5    ballot, but, A, it has to be consensual.  So you can't

6    assume that they're going to agree, and, B, it's physically

7    impractical to do consensual resolution within the 30 days

8    in order to make the December 1, or on or about December 1,

9    payout.  So it's really you have to construe them as two

10   different things.  They're going to speed the resolution,

11   and conceivably, if something is a no-brainer, they'll agree

12   to it so that they can get into the first distribution, but

13   the next clause said holders who do not agree with the

14   debtors shall be deemed to hold a non-opt-out settlement

15   admin. Claim.

16             MR. HAWKINS:  I agree with that, yeah, but I think

17   the tee there is the holders who do not agree with the

18   debtors, and there was no information as to whether or not

19   there was agreement.

20             THE COURT:  All right.

21             MR. HAWKINS:  So if you're looking at --

22             THE COURT:  But that's fine, but again, I don't

23   think people should have had the reasonable expectation

24   that, if they didn't response a week before December 1, if

25   they're in their first mailing, or on December 1, if they

Page 186

1   were in the second mailing, would ever come close to having

2   a right to be in the first one.  It's just not drafted that

3   way.

4           MR. HAWKINS:  Yeah, if I may clarify, Your Honor?

5   So is it that you believe, even though the date was extended

6   to be the 25th, it wasn't reasonable for anyone to rely on

7   that 25th date to be included in the resolution?

8           THE COURT:  No, I --

9           MR. HAWKINS:  It seems to make the date

10  irrelevant.

11          THE COURT:  No, the date of the ballot, but not

12  the -- no one changed the distribution date.  No one's

13  changed the on or about December 1 date.  And so, I don't

14  think they --

15          MR. HAWKINS:  Well, in reality, Your Honor, they

16  did, right?  There wasn't a distribution that went out on

17  the 1st.  There wasn't a distribution that went out a week

18  after the 1st.

19          THE COURT:  That's fine.  We could just be doing

20  that one forever.  We have to base this on reasonable

21  expectations.  I think if someone is supposed to reply on

22  the 25th with their ballot and there's been no change to the

23  date -- I mean, the debtors didn't say we're going to move

24  the date, right?

25          They didn't say it.  So it's still on or about the

Page 187

1    7th, and if you extend this, as you're suggesting, we're

2    going to get into January, and that's way beyond the 7th.  I

3    think this is appropriate.

4              I mean, if you think about it, if you're going to

5    be sending it in that close, you run the risk.  It may work.

6    It may be simple enough so that you can get it, but you run

7    the risk that there won't be agreement, and this is tied to

8    there being agreement.  That's the way it's worded.  The

9    debtors could say we don't agree, period.

10             MR. HAWKINS:  I think that's fair, Your Honor, but

11   I think they do have an obligation prior to the distribution

12   of saying we don't agree.

13             MR. FAIL:  We've said it.

14             THE COURT:  They did.

15             MR. FAIL:  We rejected it.

16             THE COURT:  They did, and I'm making them go over

17   it to make sure.

18             MR. HAWKINS:  Yeah, and I think that's the

19   tension.

20             THE COURT:  There's, basically, another two weeks

21   process.

22             MR. HAWKINS:  Yeah, I think that was the tension

23   was they made the decision, but that decision wasn't

24   communicated.

25             THE COURT:  Well, I think it's evident.  I mean,

Page 188

1    it's evident to me today that this is a fair resolution of

2    that.  I appreciate some creditors either got a head start,

3    or alternatively, had more simple claims, but that's baked

4    into this.  If you have a really difficult claim, it's

5    pretty unlikely that you're going to fit in.

6           So if someone buys a difficult claim or a claim

7    that has some hair on it, you know, that's a risk they take.

8    I'm assuming that, for these, if the claim wasn't difficult,

9    then it was easy for them to respond by the deadlines that

10   are set forth herein, i.e., within a week of filing the

11   ballot and that it could be resolved in a week.  So there

12   you have the two weeks.

13          MR. HAWKINS:  Understood, Your Honor.

14          THE COURT:  So you know, I think this is a proper

15   adjustment.

16          MR. HAWKINS:  Thank you, Your Honor.

17          MR. BASS:  Your Honor, this is David Bass, from

18   Cole Schotz, regarding representing Lifetime Brands.  Your

19   Honor, you're reading seven-day provision -- seven days that

20   don't exist within documents that were mailed out and to

21   which parties were given notice, even when they requested

22   the information, they didn't say provide it within seven

23   days.  There was no deadline.  So you're reading out a

24   provision that deals with a 30-day reconciliation period --

25          THE COURT:  No, look, sir, I'm not going to hear

Page 189

1    15 people make the same argument.  I will say it one more

2    time, and you're not going to persuade me otherwise.  The 30

3    days review is quite clear in these papers it is separate

4    and apart from making the distribution.  It's a separate

5    provision, and that's made abundantly clear on page 28 of

6    the confirmation order, where the 30-day review applies to

7    people who aren't included in the first distribution as

8    well.

9            The distribution is made on or about December 1.

10   So anyone who got this notice and realized that the only

11   claims that would be paid in the first distribution are ones

12   that, A, opted in and, B, that were agreed or allowed, would

13   know that they ran the risk that, if their claim -- which

14   they wouldn't know when they made the ballot -- is going to

15   be allowed or not, they run that risk.  And so, it's fair if

16   the debtors just basically stopped responding and still have

17   responses to make to extend it briefly to let that happen,

18   if people were engaged in that process.  But if people

19   didn't respond or just sat back and thought that they'd have

20   30 days and the December 1 distribution wasn't going to

21   happen, they just didn't read this right.  I'm sorry, and

22   I'm not going to hear this over and over again.

23            I've reviewed it, and I believe that's the way it

24   works.  You know, those --

25            MR. BASS:  We're not in this --

Page 190

1        THE COURT:  -- who consensually agree are the ones

2    who get it, and those who do not agree do not get the

3    distribution, and if the distribution --

4        MR. BASS:  But --

5        THE COURT:  -- is to be on or about December 1.

6    So maybe if you send it --

7        MR. BASS:  Your Honor, --

8        THE COURT:  Excuse me.

9        MR. BASS:  (Indiscernible).

10        THE COURT:  Excuse me.  If you send in your ballot

11    on December 23, you're running a risk that there will be too

12    much hair on the claim for you to fit in here.  It may be

13    that they're comfortable with your claim and you do fit in,

14    but the 30 days is a separate requirement applying to a

15    general reconciliation process.  It doesn't tie into the

16    distribution, because it can't.  The numbers don't fit.

17        MR. BASS:  But that was never expressed.

18        THE COURT:  It's in the order.  I just read it.

19    Anyone could read it.  It's right there.  You read the

20    order.  You read pages 27 and 28.  It's an inescapable

21    conclusion, as it is in the notice, which I've just read,

22    and I'm not going to go over it again.

23        Do you have anything other than that,

24    Mr. Weintraub?

25        MR. WEINTRAUB:  I'm thinking better of it, but I'm

Page 191

1    going to plow ahead --

2              THE COURT:  Okay.

3              MR. WEINTRAUB:  -- anyway, Your Honor.

4              THE COURT:  All right.

5              MR. WEINTRAUB:  I'm in a slightly different

6    bucket, Your Honor.  I'm not going to quibble about the 30

7    days.  What happened with us -- and I know you don't want to

8    hear 5,000 stories, but what happened with us was we filed a

9    request for administrative payment on November 18th.  We

10   were told we needed to file a ballot.  We didn't get the

11   ballot until the 19th.  I think it was Mr. Singh who gave us

12   to the 19th to file the ballot.

13             We filed the ballot.  So the debtor had all of the

14   information.  There was information requested on the 21st.

15   It was provided on the 26th.  So we provided the information

16   well in advance, in the scheme of things, of December 1.

17             We never heard back.  The only thing we saw after

18   that was the schedule, which we were not on when the

19   schedule of scheduled payments was filed with the Court.  We

20   would like the opportunity to agree to agree or disagree.

21   We were never given that opportunity between November 26th

22   and December 1st to say okay, we'll, you know, reduce the

23   claim.  We're okay.  This is why you're wrong.

24             The other thing, Your Honor, is it's my

25   understanding that we filed all of the information that was

Page 192

1    then requested of us again on November 21st back on November

2    19th, with the exception that there was a request for the

3    90-day payments.  We have an administrative claim, Your

4    Honor, and we're a service provider.  So we don't have a

5    503(b)(9) issue under AIMS (ph).  The fact that there may be

6    a preference is not a defense to the administrative claims.

7    So the information they requested on the 21st that we

8    provided on the 26th was really extraneous to whether or not

9    we can have an allowed claim.  So I would just like to not

10   be forced out of the queue --

11           THE COURT:  Well, all right.  Let me back up.  It

12   seems to me that I have been assuming, perhaps incorrectly,

13   that the quest for information was filed the day after the

14   ballot was filed.  I think if there's a response to a

15   request for information within a week of the request having

16   been made, they should fit into this group.  That may not be

17   the 23rd.

18           For Mr. Weintraub's client, it's a day or two

19   after that.

20           MR. WEINTRAUB:  it would be November 19th.

21   November 26th would be exactly when --

22           MR. FAIL:  Your Honor, for a $10,000 with an

23   exceptional circumstance that no one knew of your client,

24   and yet you took more time to respond.

25           MR. WEINTRAUB:  I don't even understand what was

1    just said, Your Honor.  So I --

2              THE COURT:  Well, the ballot --

3              MR. FAIL:  This deal was just cut after several

4    hours of negotiation based on these numbers, and now --

5              THE COURT:  But that -- I think what's being said

6    is that --

7              MR. FAIL:  $10,000 to flip this around.

8              THE COURT:  -- your client was not on the list

9    originally as an administrative expense claim?

10             MR. FAIL:  That's what he's saying.

11             MR. WEINTRAUB:  No, no.

12             MR. FAIL:  We're not here to argue your claim.

13             MR. WEINTRAUB:  That's --

14             MR. FAIL:  We don't have the data.  I don't agree

15   with this.  I don't have any clue or record as to whether --

16             MR. WEINTRAUB:  Your Honor?

17             THE COURT:  No, but --

18             MR. FAIL:  -- his $10,000 was on the list.

19             THE COURT:  But I guess what I'm saying is why is

20   it December 23rd as opposed to 1 week after the information

21   is requested, as long as the ballot was filed timely?

22             MR. SINGH:  I think, Your Honor, --

23             MR. FAIL:  That's working backwards.

24             MR. SINGH:  Well, yeah, we're just working

25   backwards, right?  So just if you ignore for a second the

Page 194

1    second notice, because I think it's complicates it a bit.

2              THE COURT:  Yeah, I'm just focusing on the --

3              MR. SINGH:  Yeah, so if we were to actually make a

4    distribution on December 1st, we would have needed to have

5    really -- that's the Thanksgiving break, but we would have

6    really realistically needed to have a reconciled claim, I

7    think, based upon your comments earlier, a week before.  So

8    when we were in the room back there, when we were sort of

9    coming up with the information, we worked our way back a

10   week before, which gets you to November 23rd.  And so, we

11   said look, if there is somebody that falls into a population

12   where, you know, they're sort of waiting on an answer from

13   us but had responded by the 23rd, they theoretically could

14   have actually been reconciled in time during that week of

15   November 23rd to December 1st to actually participate in the

16   distribution.  And so, that's the reason we picked the 23rd

17   and not, you know, 7 days from a particular issue.  And

18   really, one of the reasons, Your Honor, is part of this

19   process was people were encouraged to sign up early, right?

20             I mean, we literally got emails and ballots.

21   People said I don't even need the ballot the day after the

22   confirmation hearing.  Here's my information.  Here's what

23   I'm ready to do.  And so -- because I think they recognized

24   that December 1st was a real date.  So I don't recall Mr. --

25   I have no reason to --

```
 1              THE COURT:  When did the --

 2              MR. SINGH:  -- believe what Mr. Weintraub's saying

 3     is not true.

 4              THE COURT:  When did the notices go out?

 5              MR. SINGH:  October 18th.  So it's 30 days and

 6     October --

 7              US:  October 16th and October 23rd.

 8              MR. SINGH:  Oh, we added three days for mailing.

 9     Sorry.

10              THE COURT:  All right.

11              MR. SINGH:  So that's why we picked the 23rd and

12     why, for the second distribution, it's December 1st.

13              MR. FAIL:  It's all inclusive.  Some people had

14     much more time, but the whole point is if you waited, you

15     waited.

16              THE COURT:  All right.  That's fine.

17              MR. WEINTRAUB:  Your Honor, I really want to

18     respond to this, please.

19              THE COURT:  Okay.

20              MR. WEINTRAUB:  What I just heard was a back room

21     deal was made in that room, where I was not admitted, where

22     people --

23              THE COURT:  Well, no, I understand that, but I --

24              MR. WEINTRAUB:  Your Honor, where people decided

25     that December 23 was going to be the drop-dead date.
```

Page 196

1            THE COURT:  Right.

2            MR. WEINTRAUB:  What I am saying is that we would

3    have filed our claim timely.  We would have filed it on

4    November 18th, but the debtor didn't give us the ballot.  We

5    filed the ballot on November 19th.  November 19th.  We did

6    not get a request for information until November 21st.  We

7    responded back --

8            THE COURT:  Well, why did you ask for the ballot?

9            MR. WEINTRAUB:  Because we didn't get a ballot.

10           MR. FAIL:  So the first ballot deadline was

11   November 18th.  The debtors were inundated with the

12   thousands that we went -- with the hundreds that we went

13   over with the people that timely responded.  He then asked

14   for a ballot, and it came in later, and the debtors

15   processed it later.  And in processing it later, they

16   realized we have no information and give us more

17   information.

18           THE COURT:  So I mean, I think that explains the

19   difference in the days.

20           MR. WEINTRAUB:  It's one day.

21           THE COURT:  Right, I understand, but --

22           MR. WEINTRAUB:  And the notion that -- we filed an

23   administrative claim on August 14th.  I understand thousands

24   of claims were filed.  Nobody looked at the docket.  I

25   understand that, but the notion that we were asleep --

Page 197

```
 1              THE COURT:  But if they filed a misread claim,

 2    they should have gotten notice, right?

 3              MR. SINGH:  Yes.

 4              THE COURT:  All right.  So they filed it --

 5              MR. WEINTRAUB:  And --

 6              THE COURT:  So there's no reason why it shouldn't

 7    have been in earlier.

 8              MR. WEINTRAUB:  Your Honor, it was in -- it would

 9    have been in by the 18th, but they didn't send us the ballot

10    until the 18th.  So we filed it on the 19th with their

11    consent.  One day.  One day, and I'm willing -- I'm not --

12    please, Your Honor.

13              THE COURT:  I'm not going to change these numbers.

14    Look, if there's some reason that the debtors actually

15    didn't -- a bad reason that they didn't get you the ballot

16    on time, then I imagine they'll consider this.

17              MR. WEINTRAUB:  I'm --

18              THE COURT:  But I --

19              MR. WEINTRAUB:  -- not quibbling with that part of

20    it.

21              THE COURT:  I'm not going to decide those issues

22    now.

23              MR. WEINTRAUB:  Your Honor, I'm not quibbling with

24    that part of it.  What I'm quibbling with is why is November

25    23rd, as opposed to November 26th, the date by which people
```

Page 198

1    are put into the penalty box?

2           THE COURT:  Because people are not going to

3    reconcile 13,000 -- I'm sorry.  They're not going to

4    reconcile 500 claims in 3 days.  It's not going to happen,

5    and that wasn't what was supposed to happen.

6           MR. FAIL:  And the files have to be locked down.

7           MR. WEINTRAUB:  Your Honor?

8           MR. FAIL:  You can't send out checks on the day

9    that you reconcile them.  You need time.

10          THE COURT:  It's just not going to -- I mean,

11   that's not the way it's worded.

12          MR. WEINTRAUB:  Your Honor, if Counsel would stop

13   interrupting and double-teaming.  No one ever said that they

14   needed a week to process checks.

15          THE COURT:  No, but I understand that, but I think

16   that's a risk that people assume.  I mean, --

17          MR. WEINTRAUB:  That's completely --

18          THE COURT:  -- you read this --

19          MR. WEINTRAUB:  It's not a matter of assuming a

20   risk, Your Honor.  It's a matter of basically a shell game.

21          THE COURT:  No, it's not.

22          MR. WEINTRAUB:  We provided the information that

23   they had requested on November 26th.

24          THE COURT:  Yes.

25          MR. WEINTRAUB:  If someone had called and said,

Page 199

1    "Would you reduce your claim by X?" we might have had a

2    consensual deal.  They never tried to even have a consensual

3    deal.

4         What the protocol talks about is people who do not

5    consent.  Well, you have to be talked to, to be able to

6    consent or not consent.  There was no disagreement.  As far

7    as we knew, we sent them the information.  No one followed

8    up.  No one called us.

9         THE COURT:  Look, I'm assuming that if you make a

10   proposal to them that makes sense, you'll fit in.  Okay?

11   But I'm not going to -- I don't -- I'm really not inclined

12   to tinker with this.

13        MR. WEINTRAUB:  I understand.  But how do I make a

14   proposal when nobody has told me that --

15        THE COURT:  No.

16        MR. WEINTRAUB:  -- my claim is not agreeable?

17        THE COURT:  Just make the proposal.

18        MR. WEINTRAUB:  You mean now?

19        THE COURT:  Yes.

20        MR. WEINTRAUB:  I need to know what the dispute

21   is.  I don't think there's a dispute.

22        UNIDENTIFIED SPEAKER:  This is a $10,000 claim.  I

23   think we're spending more time --

24        MR. WEINTRAUB:  It's a $49,000 claim, and it's the

25   principle of the thing.  I was at home with my grandson.  I

1    ended up here all day.

2              THE COURT:  So make a proposal.  But I really

3    don't think -- look, again, if you look at this, there is --

4    yes, there is some obligation of the debtors to proceed with

5    this, and just not to turn everybody down who makes the

6    election.  But I don't think the debtors have done that.

7              What I do think has happened is that there was

8    basically a period where the debtors asked for information.

9    People provided the information within a reasonable time,

10   and the debtors didn't respond within a reasonable time.  I

11   think a week before the payout date is a reasonable time.

12             If for some reason someone didn't get a ballot

13   when they should have or something like that, you can

14   contact them, lay that out with them, make a proposal, and

15   they should review it.  But I don't want to just expand the

16   universe for everybody because I'm assuming that didn't

17   happen to everybody.

18             MR. WEINTRAUB:  Your Honor, we didn't get the

19   ballot when we should have gotten one.

20             THE COURT:  I just said that to you.  I said to

21   you --

22             MR. WEINTRAUB:  Right.

23             THE COURT:  -- if you actually didn't get the

24   ballot when you should have, say that to them.  And I'm

25   telling them right now, if you actually show that that

Page 201

1    didn't happen, then they should look at it.

2            MR. WEINTRAUB:  Okay.  Because --

3            THE COURT:  But that's going to be a distinct

4    minority of people.

5            MR. WEINTRAUB:  I understand that, but we

6    shouldn't discriminate against the minority.

7            THE COURT:  So I'm not going to change the -- I'm

8    not going to change the whole deadline, just assuming that

9    everyone is going to be able to say we didn't get the

10   ballot.

11           MR. WEINTRAUB:  Well, we know we didn't get the

12   ballot, because they conceded that when they gave us the

13   extension.

14           THE COURT:  All right.  I think you're probably

15   the exception.

16           MR. WEINTRAUB:  And we didn't doddle.  We got it

17   in the next day.  And they had the information.  That's my

18   big point, Your Honor, is they have the information.

19           THE COURT:  I don't know that.  I don't know

20   whether they did or not.

21           MR. WEINTRAUB:  Okay.  I'm --

22           THE COURT:  Again, it says if there's a response -

23   -

24           MR. WEINTRAUB:  -- representing to the Court they

25   did.

Page 202

1          THE COURT:  -- then they have it.  If you can say

2     to them, "We already sent this to you," then you have timely

3     responded.

4          MR. WEINTRAUB:  Exactly.  It's dilatory to ask me

5     for the same information.

6          THE COURT:  So you're within it.  So you're within

7     their proposal.

8          MR. WEINTRAUB:  But -- except they're saying the

9     23rd is the cutoff, and we responded on the 26th, but it --

10          THE COURT:  But you say you've already responded.

11     So you -- that's what you say to them.

12          MR. WEINTRAUB:  Okay.

13          THE COURT:  "I already responded.  You didn't have

14     to ask me a second time, because I had already given it to

15     you."  I think there are probably a couple other people who

16     are probably going to be in that boat.

17          MR. WEINTRAUB:  I'm fine with that.  If --

18          THE COURT:  Okay.

19          MR. WEINTRAUB:  -- you'll stipulate that you have

20     the information from --

21          THE COURT:  They don't know that.  They don't know

22     it.

23          MR. FAIL:  We're not stipulating to anything right

24     now.

25          THE COURT:  They don't know that.  There's 250

Page 203

1    people -- 250 claimants.  They don't know which one falls

2    into that boat.

3              MR. WEINTRAUB:  I'll speak with counsel, Your

4    Honor.

5              THE COURT:  The notice will say, "If you didn't

6    respond by November 23rd or December 1, having made a timely

7    election, then" -- well, it's the other way around.  "If you

8    did timely respond, and you've made a timely election, then

9    you have this extra period."  I think it doesn't take much

10   thought to say, "Well, we did respond the first time.  You

11   just asked us for duplicates."

12             MR. FAIL:  And, Your Honor, the way this is going

13   to work, if it's going to work at all mechanically, we're

14   logging the responses that came in.  If -- distributions are

15   going to go out the door based on that.  We'll look into

16   this one circumstance.  We'll either make an arrangement or

17   we won't for a $50,000 claim.  I'm sure we'll be very

18   reasonable.

19             But to now say we have to go back and search

20   histories to see what was done --

21             THE COURT:  No, you don't.

22             MR. FAIL:  -- we cannot do that.

23             THE COURT:  You don't, but I'm assuming if someone

24   gets this and says, "Well, wait a minute.  I gave them all

25   the information the first time, and they just ignored it and

Page 204

1    asked it for me again."  Then they'll send that to you, and

2    you'll look at that, and you'll review it.

3              MR. FAIL:  Of course.

4              THE COURT:  Yeah.  Okay.  So --

5              MR. WEINTRAUB:  I can live with that.

6              THE COURT:  Okay.

7              MR. WEINTRAUB:  Thank you, Your Honor.

8              THE COURT:  Okay.

9              UNIDENTIFIED SPEAKER:  I'm not going to raise any

10   issues.  It seems clear.  I just -- procedurally, the best

11   way to go about if we have some -- so we're supposed to be

12   getting information back on the --

13             THE COURT:  16th or 17th.

14             UNIDENTIFIED SPEAKER:  -- 16th or 17th.  Is there

15   -- do we wait and see if we hear and then reach out?

16             MR. FAIL:  Yeah.  You wait and hear until you --

17   you wait to see if you hear it.  That's --

18             UNIDENTIFIED SPEAKER:  And then if I don't hear --

19             THE COURT:  Wait, on the 16th or 17?

20             UNIDENTIFIED SPEAKER:  And then if we don't hear,

21   reach out to you and try and figure out what's going on?

22             MR. FAIL:  Sure.  That sounds like a wonderful

23   plan.

24             THE COURT:  Okay.

25             UNIDENTIFIED SPEAKER:  You know --

Page 205

1                THE COURT:  But no, no, wait, wait, wait.  No, no,

2    wait.  I --

3                UNIDENTIFIED SPEAKER:  -- Mr. Fail, with all due

4    respect --

5                THE COURT:  No, I think -- this is a -- I'm

6    assuming everyone will hear, except people that filed

7    duplicate claims on the 16th or 17th.  So there shouldn't be

8    much of a reason to reach out.

9                MR. FAIL:  The parties that will hear are those

10   parties that we articulated, with timely ballots --

11               THE COURT:  Yes, all right.

12               MR. FAIL:  I mean --

13               THE COURT:  So if --

14               MR. FAIL:  No one else will hear.

15               THE COURT:  -- you're not in that group, or if

16   maybe you're in Mr. Weintraub's position -- let me finish.

17               UNIDENTIFIED SPEAKER:  Sure.

18               THE COURT:  If you haven't heard on the 16th or

19   17th, hopefully on the 16th, then I guess you need to assume

20   that you didn't fall into this group.  If you think you do,

21   you should get back right away.

22               UNIDENTIFIED SPEAKER:  Right.  That's my question

23   is --

24               THE COURT:  And frankly, if you think you're in

25   Mr. Weintraub's situation, you should get back before then.

Page 206

1           UNIDENTIFIED SPEAKER:  No, I'm not in Mr.

2    Weintraub's situation.

3           THE COURT:  Okay.  All right.  And -- but I think

4    it, at that point, if you've gotten the information, it's

5    really incumbent to get back right away also.  Don't wait

6    until the last day -- don't wait until, you know, the 22nd.

7           UNIDENTIFIED SPEAKER:  I'm not disagreeing, Your

8    Honor.  I'm --

9           THE COURT:  I'm speaking for people on the phone.

10          UNIDENTIFIED SPEAKER:  I'm just saying that I have

11   one client in particular who claimed that they sent in a

12   ballot that would -- or not a ballot, a response that would

13   be timely under these circumstances, and has not heard back.

14   So I'm just --

15          THE COURT:  Well, they may -- they might want to -

16   -

17          UNIDENTIFIED SPEAKER:  Should I wait?

18          THE COURT:  They might want to be proactive.

19          UNIDENTIFIED SPEAKER:  That's all.

20          THE COURT:  I don't know.  Again, if they're in

21   Mr. Weintraub's situation --

22          UNIDENTIFIED SPEAKER:  They're not.

23          THE COURT:  Well, he's -- if they sent it in and

24   they're saying it was ignored, then they are, because he's

25   basically saying when he provided the information the first

Page 207

1    time, it was ignored.

2              UNIDENTIFIED SPEAKER:  Right.  Okay.  I

3    understand.

4              THE COURT:  So I think --

5              UNIDENTIFIED SPEAKER:  And that's what I'm asking

6    is who would we reach out to?

7              THE COURT:  If someone thinks they provided the

8    information the first time, and the request for a response

9    was really a duplicate of what was already -- it doesn't ask

10   for anything new, they should probably be proactive on that

11   point.

12             UNIDENTIFIED SPEAKER:  Well, I just -- they

13   responded to the e-mail from M3.  This is what they are

14   telling me.  I --

15             THE COURT:  Yeah.

16             UNIDENTIFIED SPEAKER:  -- have to verify it.

17             THE COURT:  Right.

18             UNIDENTIFIED SPEAKER:  I'm not -- that they

19   responded to the information from M3 and then have not heard

20   back.

21             THE COURT:  Oh, well that -- no, then I think they

22   should wait until the 16th or 17th.

23             UNIDENTIFIED SPEAKER:  Thank you.  That's all I'm

24   asking.

25             THE COURT:  Yeah, yeah.  Okay.

1          UNIDENTIFIED SPEAKER:  Okay.  Thank you.

2          MR. GLASS:  Your Honor, I'm sorry.  I'm a little

3   confused as to where I fit in.  I think I fit into the

4   group.  We responded -- we gave our opt-in ballot on the

5   14th of November.  On the 19th of November, they asked for

6   information.  On the 19th of November, we provided all of

7   the information.

8          THE COURT:  It sounds like you're in the group.

9          MR. GLASS:  It sounds like I'm in the group.

10          THE COURT:  Right.

11          MR. GLASS:  So now they're going -- I assume, and

12   I'm sorry to make you repeat yourself, after you've done it

13   so many times.

14          THE COURT:  By the 16th or 17th, they're going to

15   tell you what their issues are in shorthand --

16          MR. GLASS:  Yes.

17          THE COURT:  -- with what you provided.  And you'll

18   have a week to -- hopefully it will be done before then, to

19   try to resolve those issues.

20          MR. GLASS:  It seems like almost a truncated

21   claims objection process or in a way --

22          THE COURT:  No, no.  It's not an objection.  This

23   is just to see if you can reach an agreement.  It's just to

24   reach an agreement.  This is not on the merits.  If you

25   don't agree, you fall into the next group.

Page 209

1          MR. GLASS:  And we theoretically get --

2          THE COURT:  Maybe you'll agree on that group, or

3      it will be teed up for a hearing.

4          MR. GLASS:  So we will have the opportunity to

5      request a hearing to resolve it.

6          THE COURT:  If you don't reach an agreement, yeah.

7      If you don't reach an agreement.

8          MR. FAIL:  You don't need to request a hearing.

9      We are aware of all of the ballots.  We have now counted

10     them.  We started with the 1206, and we've worked our way

11     down.  Those that are allowed are going to be paid, starting

12     on the first distribution.  The next round, we'll go

13     forward, and we have to reconcile them.  There's no need for

14     anybody to file additional requests for allowance of claims.

15         THE COURT:  It's only if you --

16         MR. GLASS:  Well, I just don't want to miss the

17     boat.

18         THE COURT:  No, wait.  It's only if you come to a

19     place ever, whether it's in round one or round two, if you

20     ever come to a place where you know you're not going to

21     reach an agreement, then you could ask for a hearing,

22     because -- then it's -- then you're never going to reach an

23     agreement.

24         MR. GLASS:  Okay.  It just seems like -- that

25     we're going to be -- that we're not going to -- that it's in

Page 210

1    their unilateral power not to reach that agreement.

2              THE COURT:  No.  Look, it's written.  It is

3    actually written that way, but that's not what's expected.

4              MR. GLASS:  Okay.  That's not what --

5              THE COURT:  What's expected here is the parties

6    will make --

7              MR. GLASS:  Understood.

8              THE COURT:  -- a good faith effort to reconcile

9    the amounts.

10             MR. GLASS:  Then I have a -- and I know -- I don't

11   know how to say this in an easy way, but I'm going to be out

12   of the country starting tomorrow --

13             THE COURT:  Well --

14             MR. GLASS:  -- until the 21st.

15             THE COURT:  -- it's mostly an accounting issue, I

16   think.

17             MR. GLASS:  Right.  I do have a partner who can

18   reconcile things.

19             THE COURT:  Okay.

20             MR. GLASS:  He's very good with numbers.

21             THE COURT:  And they're they business people.  I

22   mean, if the accounting issue is just, you know, "When was

23   this sent?" or, "My books don't show that," or, "We thought

24   we paid this," you know, then not even a lawyer should be

25   involved.  A lawyer might get involved if the issue is, "Are

1    we going to try to settle one of these legal issues, like

2    drop off, et cetera?"

3              MR. GLASS:  Preference.  And again, I always

4    understand Ames to be that you can't offset preferences from

5    administrative claims.

6              THE COURT:  That's a separate issue.

7              MR. GLASS:  Separate issue?

8              THE COURT:  Separate issue.

9              MR. FAIL:  All these folks, you're assuming that

10   there was a detailed analysis and that we're making

11   conclusions.  We asked for preference exposure as data

12   collection, and it is relevant for some 503(b) claims,

13   maybe.  That's another judicial decision.  It's not before

14   you.

15             We're going to send out the -- you'll know by

16   Monday or Tuesday what we think.

17             THE COURT:  One of the things that was complicated

18   -- contemplated is the potential for a global settlement of

19   claims with the parties.  So people raise preference points

20   not just as a general -- I'm sorry, not just as a focused

21   point on the admin claim, but because people -- there were

22   some people that wanted to resolve everything.  You know,

23   there were some people that had claims that might not even

24   be 503(b)(9) claims or maybe were 503(b)(9)'s but maybe

25   weren't, and then you take into account preference exposure,

Page 212

1   and you wrap it all up.

2          So it's -- this really is intended to try to see

3   if you could reach an agreement.

4          MR. GLASS:  So if we don't reach an agreement,

5   where are we by the 23rd?

6          THE COURT:  Well, that's where we started with.

7   As I read it, the debtors will continue to make an effort to

8   reach an agreement.  It may be that you know on the 23rd

9   you'll never reach an agreement, in which case the amount

10  will have to be fixed by me.  But on the other hand, you may

11  think, "Okay, we're getting close, but we're not there on

12  the 23rd.  I want to be in the next distribution."

13         And so, you know, we'll keep negotiating.

14         MR. GLASS:  The fear is that there will never be a

15  next distribution.

16         THE COURT:  Well, I know that's the fear, but I

17  don't think that's right.  I mean, if that's the case, then

18  the plan will never go effective.

19         MR. FAIL:  What motive could we -- why would we

20  possibly have that motive?  It makes no sense.

21         THE COURT:  Yeah.  They have a great incentive to

22  reach agreement.

23         MR. GLASS:  No, I understand the motive is to go

24  effective.  I'm just thinking about the reality.

25         THE COURT:  Well, that may be true and that's why

1    --

2              MR. GLASS:  Which is a projection.

3              THE COURT:  That's why there's --

4         (Simultaneous speaking)

5              MR. GLASS:  It's a projection.  I understand.

6    Respect with him.

7              THE COURT:  That's why there's incentive to reach

8    an agreement before the 23rd.

9              MR. GLASS:  Understood.

10             MR. FAIL:  The only facts are that we allowed more

11   claims than we didn't allow today.  But --

12             THE COURT:  So I think -- look, I think -- I think

13   that whenever there is a settlement calculation here, and

14   there's a good reason to settle, and part of that is timing,

15   people are going to try to figure out every angle of it.

16             And basically what's happening here is people are

17   getting a little more time to do that.  That's all it is.

18             MR. GLASS:  Understood.  I just have one more

19   question with the duplicate question.  Again, we were sent

20   for one particular claim --

21             THE COURT:  That's fine.

22             MR. GLASS:  -- duplicate ballots.

23             THE COURT:  But unless --

24             MR. GLASS:  And we don't expect to be paid twice.

25             THE COURT:  No, so don't worry about it.

Page 214

```
 1            MR. GLASS:  Got it.

 2            THE COURT:  Okay.

 3            MR. GLASS:  Thank you very much.

 4            THE COURT:  All right.  I guess it's conceivable

 5    that someone may actually have had two different customers

 6    at Sears and --

 7            MR. FAIL:  That did happen.  Sears and Kmart.  So

 8    we're either right or we're wrong.  In this case, we were

 9    wrong.  Another case, we were wrong the other way.

10            THE COURT:  Right.

11            MR. FAIL:  We'll figure it out in the claim's

12    process, Judge.

13            THE COURT:  Right, okay.  I agree.  Okay.  So you

14    have authority to implement this.  I don't know if you have

15    it in writing yet from the people that need to consent, but

16    you've represented that you have their consent.  And I'm

17    saying that if they withheld it at this point, it would

18    actually be unreasonable.  So you can move ahead with this,

19    and should just go ahead and do that.

20            UNIDENTIFIED SPEAKER:  Thank you very much, Your

21    Honor.  We will.

22            THE COURT:  Okay.  I appreciate that a lot of work

23    will be involved in a short period of time, but I really

24    think it needs to be done.  So just staff it up with some

25    junior associates, field calls.
```

1          MR. FAIL:  I'm glad that you ordered that, so it

2     takes the pressure off of me, Your Honor.

3          THE COURT:  M3 exempt.

4          MR. FAIL:  It's -- this is your orders, not mine.

5     So thank you.

6          UNIDENTIFIED SPEAKER:  Your Honor, counsel for

7     (indiscernible).  And we didn't get -- we got an e-mail, but

8     it didn't have a deadline in it.  And we filed our ballots

9     on the 17th.  So there would be -- 30 days has not yet run.

10          THE COURT:  Ma'am, I've already dealt with this 30

11     day issue.  It's a red herring.  It is a red herring under

12     the order.  There is not a 30 day period after which the

13     distribution should happen.  That's not how the order works.

14     The distribution is on or around December 7th.

15          UNIDENTIFIED SPEAKER:  The order -- the ballot

16     said that there would be a 30 day reconciliation period from

17     the date the ballot was submitted.

18          THE COURT:  Yes, but that isn't tied to the

19     distribution.

20          UNIDENTIFIED SPEAKER:  I understand that, Your

21     Honor, but we also had already provided all of the

22     information that was requested in the e-mail that was sent

23     on the 17th.

24          THE COURT:  Well, then you're covered.  Then

25     you're covered by this program, as I said to Mr. Weintraub.

1    This program assumes that there was a timely response.  If

2    there was a timely response, even if it was in the first

3    information you sent, because they just asked for the same

4    information all over again, just make the debtors aware of

5    that fact.

6              UNIDENTIFIED SPEAKER:  Well, it was with our proof

7    of claim.  That's why I'm asking, Your Honor.  With all --

8    all the information they asked for was with our proof of

9    claim.  So we were in the middle of an emergency discovery,

10   which was a shortened discovery period and involved in

11   depositions, and other matters.  So you know, we didn't see

12   a deadline in that e-mail.  We had other things we had to

13   attend to, and they already had all of this information they

14   were requesting.

15             So -- but you're saying that we would be in the

16   first group because of that, if that's --

17             THE COURT:  I'm not saying that.  I'm not saying

18   that.  You didn't tell me that the information you were

19   referring to was in the proof of claim as opposed to the

20   information that you gave them with this election.  So I'm

21   not going to --

22             UNIDENTIFIED SPEAKER:  Well, there wasn't

23   information requested with the election.  And I assume you

24   mean the ballot.  The ballots, if you filed electronically,

25   you could only do what was allowed with the electronic

1    filing (indiscernible) --

2              THE COURT:  It has been represented to me that on

3    the day after, or maybe the day after that, the ballot was

4    filed, the debtors made requests of everyone for additional

5    information.  Are you saying that didn't happen?

6              UNIDENTIFIED SPEAKER:  We received an e-mail on

7    the 17th requesting information, but it was already

8    information that had been submitted --

9              THE COURT:  I'm afraid you're out of luck then,

10   because you didn't respond to that e-mail.  It's that

11   simple.

12             UNIDENTIFIED SPEAKER:  But, Your Honor, I mean,

13   that's just simply not fair.  I mean, attorneys have other

14   (indiscernible) --

15             THE COURT:  I'm done.

16             UNIDENTIFIED SPEAKER:  -- and other things that

17   they're doing --

18             THE COURT:  We're done.  It is fair.  I ruled this

19   three times and we're done.

20             UNIDENTIFIED SPEAKER:  (Indiscernible).  Your

21   Honor, when a deadline is set, then you, as a lawyer,

22   understand that you have until that deadline to file

23   something.  (Indiscernible).

24             THE CLERK:  Call operator, thank you very much.

25   We're done for the day.

1           THE OPERATOR:   Thank you very much.

2        (Whereupon these proceedings were concluded at 3:58 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                                      PAGE

5    Compensation structure is reasonable              114

6    and consistent with 1129(a)(4)

7

8    Motion to Dismiss with respect to the             161

9    contract claim for those pre-assignment

10   amounts that could have been asserted

11

12   Claim for breach of the implied covenant          163

13   of good faith and fair dealing

14   dismissed

15

16   Claim for unjust enrichment dismissed             163

17

18   Motion to dismiss cause of action for             164

19   injunctive relief

20

21

22

23

24

25

Page 220

1                    C E R T I F I C A T I O N

2

3    We, Tracey Williams, Pamela Skaw, and Sherri L. Breach,

4    Nicole Yawn, and Jamie Gallagher certify that the foregoing

5    transcript is a true and accurate record of the proceedings.

6    Tracey Williams
        Digitally signed by Tracey Williams
        DN: cn=Tracey Williams, o, ou,
        email=Digital@veritext.com, c=US
7    _____    Date: 2019.12.17 15:40:26 -05'00'

8    Tracey Williams

9    AAERT Certified Electronic Transcriber CET-914

10   Pamela Skaw
        Digitally signed by Pamela Skaw
        DN: cn=Pamela Skaw, o, ou,
        email=digital@veritext.com, c=US
11   _____    Date: 2019.12.17 15:40:48 -05'00'

12   Pamela Skaw

13   Sherri L. Breach
        Digitally signed by Sherri L. Breach
        DN: cn=Sherri L. Breach, o, ou,
        email=digital@veritext.com, c=US
        Date: 2019.12.17 15:41:05 -05'00'

14   Sherri L. Breach

15   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

     Nicole Yawn
        Digitally signed by Nicole Yawn
        DN: cn=Nicole Yawn, o, ou, email=digital@veritext.com,
        c=US
16   _____    Date: 2019.12.17 15:41:23 -05'00'

17   Nicole Yawn

     Jamie Gallagher
        Digitally signed by Jamie Gallagher
        DN: cn=Jamie Gallagher, o, ou, email=digital@veritext.com,
        c=US
18   _____    Date: 2019.12.17 15:41:48 -05'00'

19   Jamie Gallagher

20   Date:  December 17, 2019

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501

**[& - 23rd]**                                                                    Page 1

## &

**&**   3:11 4:3,13 5:3
5:12,20 6:11,12
7:3,13 8:5 27:6,7
28:17 35:4 40:2
48:10 50:7 77:20
96:21 123:9
140:24 163:10,12
172:8 180:16,17
220:15

## 0

**07424**   5:22

## 1

**1**   2:6 10:5 14:25
31:21 50:13,18,24
51:1,5 60:7,7,18
65:13 69:16,17
70:7,12 75:24,25
97:19 98:11
147:15 162:7
173:20 174:1
178:12 180:21,22
181:14,16,23
182:13,14 183:15
183:19,24 184:5
185:8,8,24,25
186:13 189:9,20
190:5 191:16
193:20 203:6
**1.29**   94:21
**10,000**   192:22
193:7,18 199:22
**10/15/2018**   2:17
**10/15/2019**   2:17
**10006**   5:6
**10018**   6:7
**10019-7475**   6:15
**10036**   4:17
**101**   6:21 145:5
**10153**   4:6
**10158**   5:15

**10178**   6:22
**105**   145:4
**10601-4140**   1:19
**10:00**   3:16
**10:18**   1:22
**10:45**   46:14
**10th**   72:10 73:6
73:21 74:19
**11**   2:24 90:23
93:25 102:6
**11,352**   8:21
**11/5/2019**   3:20
**1129**   107:15
109:11,18 111:5,7
114:19 219:6
**114**   219:5
**11501**   220:25
**11th**   46:6 78:4,18
**12**   162:7 163:16
**120**   11:8,16
**1206**   10:15 13:9
209:10
**13**   1:21 3:16
146:18
**13,000**   39:16
198:3
**13,101**   8:25
**1334**   162:16
**134**   137:17
**1367**   138:5 162:6
162:25
**13th**   49:6 151:11
152:19,23
**14**   57:22
**14th**   45:15 121:9
196:23 208:5
**15**   55:5 63:7 66:23
170:20 189:1
**150**   91:20,21 92:1
94:18,19
**151**   164:12
**152**   164:13

**153**   173:22,23
**1555**   163:12
**157**   137:17 138:3
138:8 162:15,24
**15th**   8:14,20 51:8
51:9
**16,000**   39:16
**16,614**   8:22
**161**   219:8
**163**   219:12,16
**164**   219:18
**16th**   8:25 178:20
195:7 204:13,14
204:19 205:7,18
205:19 207:22
208:14
**17**   163:14 204:19
220:20
**17th**   174:3,4
204:13,14 205:7
205:19 207:22
208:14 215:9,23
217:7
**18,182.50**   2:17
**18-23538**   1:6
**18th**   53:2 72:6
73:5 184:13 191:9
195:5 196:4,11
197:9,10
**19-08286**   1:12
3:18
**194**   83:11
**196**   83:11
**1987**   163:23
**1989**   163:12
**1994**   138:15
**19th**   45:15 61:18
74:17 191:11,12
192:2,20 196:5,5
197:10 208:5,6
**1:42**   171:18
**1st**   14:22 16:16
29:2,23 31:15

35:25 40:17 48:25
49:2,10,18 62:20
72:23 73:16,25
74:1,20,24 75:4
181:3 186:17,18
191:22 194:4,15
194:24 195:12

## 2

**2**   2:15 65:20 156:5
176:14,15
**2.2**   78:10,17,20
**20**   13:8 44:23
104:1,5
**2002**   163:11
**2006**   163:25
**2007**   163:13,14
**2013**   77:25 164:13
**2014**   96:9
**2015**   77:25
**2016**   77:25
**2018**   160:16
**2019**   1:21 3:16
78:18 130:3
220:20
**204**   12:7,10
173:12
**20th**   87:20,21
88:12
**21**   10:3,16,19 12:2
33:3 58:25,25
60:5 61:9 75:8
106:17 107:8
**21st**   191:14 192:1
192:7 196:6
210:14
**22nd**   206:6
**23**   90:17 176:17
178:11 190:11
195:25
**236**   94:9,19
**23rd**   173:19
174:22 175:7
192:17 193:20

194:10,13,15,16
195:7,11 197:25
202:9 203:6 212:5
212:8,12 213:8
**24**   12:10 16:12
**249**   13:6 173:9,10
**25**   33:4 34:23
44:23 61:9
**250**   92:1,2 202:25
203:1
**258**   10:16,19 11:7
**25th**   37:25 38:5
38:14 40:10 90:19
93:23 100:15
181:9 184:14,18
186:6,7,22
**26**   90:18 124:7
**260**   55:9
**26th**   96:24 124:16
191:15,21 192:8
192:21 197:25
198:23 202:9
**27**   176:21,22
190:20
**27th**   6:21 38:19
**28**   10:17 113:21
126:18,19 137:16
138:3,5 162:5,15
162:24,25 189:5
190:20
**285**   11:22 12:8
173:8
**2851**   163:13
**28th**   97:5 115:2
115:22 117:3
118:10
**29**   138:15 163:14
**2:20**   171:11
**2d**   163:23 164:8
**2nd**   41:2 97:9
98:2,10

**3**

**3**   2:20 198:4
**30**   8:23 9:2 13:8
23:3 27:14 30:1
40:3 42:12 61:10
63:20,24,25 72:4
73:4,14 75:2,9,13
75:17,18,24 76:17
76:24 77:1 163:14
179:23,25 183:3
183:17 184:3
185:4,7 188:24
189:2,6,20 190:14
191:6 195:5 215:9
215:10,12,16
**300**   1:18 220:24
**31**   126:19 175:10
**310**   163:11
**31st**   175:9
**32.63**   12:3
**327**   107:13
**32ish**   25:21
**33**   125:4,6 126:10
**330**   107:13,18
110:13 113:19
220:23
**34**   11:23
**350**   92:3,4 108:10
**3513**   9:1
**363**   125:10
**365**   5:21 124:4
125:21,23,24
126:7,8 137:1
147:15
**382**   163:23
**388**   163:23
**389**   163:23 164:8
**397**   220:15
**3:04**   171:18
**3:30**   56:12
**3:58**   218:2
**3rd**   153:7 159:4
165:23

**4**

**4**   2:23 101:20
107:15,17 111:5,7
111:9 114:19
219:6
**40**   173:21
**4064**   3:13
**448**   163:24
**450**   92:4,5 94:23
95:1
**453**   173:14
**4632**   97:1
**4640**   3:2
**4703**   97:11
**49,000**   199:24
**49,999**   35:16
**4931**   2:13
**4945**   3:6

**5**

**5**   3:1 98:3 107:15
107:17 109:18,20
115:14 145:5
**5,000**   191:8
**5.5**   77:23
**50,000**   34:22
35:14 203:17
**500**   198:4
**500,000**   149:3
**503**   7:4 12:18
18:10,11 22:8
30:11 34:11,17
45:12,12 54:10
74:8 192:5 211:12
211:24,24
**5295**   97:20
**5335**   2:25 98:23
**573**   163:25
**58**   97:23
**586**   163:25

**6**

**6**   3:4 98:6 100:3
163:16

**605**   5:14
**618**   2:18
**620**   6:6
**64**   176:9
**64,364,904.91**
12:1
**67.98**   2:18
**6th**   37:2 40:13

**7**

**7**   3:8 94:1,2,4,6,10
94:16,17 95:1,5,8
102:2,3,22 163:22
194:17
**70**   164:7
**700**   127:20
**700,000**   149:8
150:7 151:25
153:15
**706**   81:18 83:15
**71**   176:11
**73**   163:11
**75**   9:8 15:2 176:6
**767**   4:5
**769,500**   132:16
**7th**   72:24 89:10
91:16 98:23 99:7
112:2 182:5,11
187:1,2 215:14

**8**

**8**   3:15 156:5
**80**   9:18 15:1 26:2
176:6
**80,000**   91:16 99:2
101:1,13,15,19
106:1,7,8 111:23
114:13
**800,000**   101:19
**82**   163:11
**825**   6:14
**828**   11:18,24 12:8
13:8
**86**   94:20 176:15

**87** 163:25
**88** 138:15
**880** 163:12
**89** 12:22
**8th** 72:25 182:5
182:11

**9**

**9** 3:18 7:4 12:18
18:10,11 45:12,12
74:8 102:21 192:5
211:24,24
**90** 176:21 192:3
**914** 220:9
**92** 138:15
**948** 11:5
**959** 164:12

**a**

**a&p** 138:24
**a.m.** 3:16
**aaert** 220:9,15
**aaron** 5:20 140:24
**abel** 3:1
**ability** 55:22
**able** 11:22 12:19
17:3 94:4 115:25
130:12 149:3
150:2 151:24
169:10 178:18
199:5 201:9
**absence** 164:3
170:17
**absolutely** 67:16
67:17 134:22
**abstention** 168:23
169:1,3
**abundance** 11:11
47:1
**abundantly** 189:5
**accept** 105:9
106:4
**access** 14:18 21:8
26:23

**accessed** 29:1
**accessible** 179:12
**accident** 163:10
**accomplish** 40:16
**account** 10:4
79:15 80:17 81:17
92:20 93:4 117:10
211:25
**accounted** 20:1
92:12,25
**accounting** 28:22
34:14 53:23 55:14
60:10 63:8 210:15
210:22
**accounts** 11:13
**accurate** 220:5
**accused** 48:18
**acknowledge**
157:1
**acknowledges**
130:15
**acquired** 78:12
**acquisition** 80:24
81:1
**action** 3:10,13
90:14,18 91:14
92:15 93:10,13
124:22 140:1,2
141:6,9,12,19
153:7 155:17,19
156:4,13 163:7,21
164:1,9,15,16
165:1 219:18
**actions** 15:5,7
92:11
**active** 101:6,9
105:21 112:6
**actively** 93:20
108:22
**activities** 102:9
**activity** 102:20,23
**actors** 22:3

**actual** 40:9 72:20
77:17 103:1
**ad** 7:4 13:19 50:7
57:12 142:15
172:10 175:4
**adage** 82:9
**add** 22:25 36:20
47:14 70:14 96:5
121:18
**added** 15:1 16:18
92:25 130:6
139:15 195:8
**addition** 51:12
130:18 151:18
**additional** 9:1
14:25 18:20 20:12
23:8,18 31:11
63:24 90:17,18
96:16 99:7 101:8
104:6 125:13
126:11 127:8
130:6 131:5
139:22 180:4
209:14 217:4
**address** 12:20
36:23 37:3 82:21
82:22 89:21
172:12,14 173:1
174:2,6 175:12
177:4
**addressed** 12:14
35:3 80:1
**addresses** 8:22
180:19
**adelphia** 163:13
**adequate** 11:13
132:1,6 133:11
**adjourned** 98:22
115:2 116:14
**adjudicated** 170:1
**adjudication**
170:18

**adjustment**
188:15
**adjustments**
81:20
**admin** 6:4,12,20
7:14 9:5 23:5 25:4
26:15 33:22 40:15
50:10,15 51:15
55:1 58:10 59:24
63:24 77:15
185:15 211:21
**administrative**
2:12,15 8:16,18
9:9,10,19,21 10:1
11:9 12:15 13:12
17:8,10 18:1 19:7
19:14 27:7 30:10
41:7 45:12 50:16
52:18 91:22 93:16
172:1 174:17
175:14 180:17
191:9 192:3,6
193:9 196:23
211:5
**administrator** 2:6
**admissible** 134:2
**admission** 42:15
**admitted** 195:21
**adv** 1:12
**advance** 21:19
24:11,13 95:25
123:25 176:5
191:16
**adversary** 3:18
93:22 94:11
**advise** 174:19
**advisors** 91:5
108:7
**advocates** 14:6
**affect** 62:12
**affidavit** 80:25
82:19

affidavits 80:23
affiliate 109:24
affiliated 2:25
affiliates 5:4
  123:10
affiliation 109:22
affirmative 10:15
  20:3
affirmatively 9:6
  9:11,22
afoul 107:17
afraid 217:9
afternoon 8:11
  13:22 17:22 96:19
  96:20 123:8
  140:21,23
agenda 3:15 8:7
  70:25 77:17
  123:11
aggregate 26:17
  102:17
ago 17:23 53:3
  106:15 107:6
  109:17 111:25
  113:15 144:5
agree 23:2 30:24
  31:3 33:16 62:6,6
  62:7 78:25 113:8
  144:10 150:2
  158:5 163:5 168:1
  169:11 183:4
  185:6,11,13,16,17
  187:9,12 190:1,2
  191:20,20 193:14
  208:25 209:2
  214:13
agreeable 199:16
agreed 34:22
  78:17 85:24 86:16
  90:6 112:12
  141:18,20 142:23
  155:8 157:25
  158:10 169:1,8

182:18 183:3,15
  184:6 189:12
agreement 27:23
  30:4 63:15,16
  78:2 87:2 93:7
  97:2 134:20 144:2
  144:4 163:21
  169:19 181:18
  182:20,23 183:7
  183:10 185:19
  187:7,8 208:23,24
  209:6,7,21,23
  210:1 212:3,4,8,9
  212:22 213:8
agrees 139:23
ahead 46:4 191:1
  214:18,19
aims 192:5
aisner 7:13
akin 4:13 13:17
  89:3 93:25 95:1
  96:9 102:20
  104:25 106:17
  108:17
akin's 108:23
al 1:13 3:19 5:13
  6:4,20 8:3 171:24
alan 90:11
align 91:12
aligned 101:6
allegations 127:2
  128:22 129:18
  136:18 139:15
allege 156:6,8
alleged 107:16
  134:13 137:7
allocable 2:10
allocate 149:25
allocating 161:21
allocation 144:24
  149:24 165:21
  166:8,13 167:6,23

allow 11:22 28:13
  31:13 32:3 60:19
  67:13 134:2 159:7
  166:1 173:17
  175:5 213:11
allowable 174:8
allowance 19:21
  209:14
allowed 9:8,19,24
  11:24,25 12:8,20
  13:12,14,23 16:11
  17:2,6 25:4,5,10
  25:15,16 26:6
  51:1 60:14 65:2
  131:9 173:9 175:1
  175:24 176:6,8,10
  177:13 183:15
  185:3 189:12,15
  192:9 209:11
  213:10 216:25
allowing 12:6
  175:5
allows 23:4
alternative 133:3
  155:11,16 156:12
  156:14,19
alternatively 57:2
  169:20 188:3
amenable 165:25
  166:5
amend 23:4
  170:22
amendable 180:9
amended 2:24
  3:21 90:17 93:22
  97:1,11,22 99:1
  104:8 123:11
  124:19 132:19
ames 211:4
amount 2:9,10
  9:19 10:17 11:17
  11:25 12:1,16
  18:25 29:4 40:12

40:15,21 42:19,19
  55:16 59:2 65:14
  67:12 69:25 91:9
  99:25 102:12
  103:11 104:9
  125:8 128:7
  130:14,20,24
  131:14 141:11,19
  141:19,20,23,25
  142:2,5,6,16,17
  146:19,21,21,22
  147:5 148:1,7,13
  148:13,17,21,22
  151:5 153:2
  160:24 161:6,10
  161:17,18 166:1
  174:9 175:21
  176:6,10 185:3
  212:9
amounts 26:6
  47:13 113:11
  124:3 125:13,20
  126:11,13,20,23
  144:24 148:24
  161:12,16 174:8
  210:9 219:10
analysis 12:9
  94:15 95:12 134:3
  211:10
analyzed 61:5
angela 3:8
angle 213:15
annex 97:12,17,22
  98:2
announced
  167:11
annual 91:17 98:3
ansell 5:20 140:24
answer 21:23
  22:10,21 35:17
  52:3 59:15,16,21
  67:7 81:5,9 82:15
  83:3 87:3 107:11

107:12 136:21
137:3 176:24
177:18,19 180:21
194:12
**answering** 86:13
179:16
**anybody** 36:24
51:18 52:4 209:14
**anymore** 63:22
65:20
**anyway** 75:22
191:3
**apa** 78:10,15,19
86:19
**apart** 189:4
**apartment** 80:13
80:14,16
**apologies** 15:4
**apologize** 15:10
71:24 140:25
**apparent** 37:2
**apparently** 60:20
**appeal** 121:17
**appear** 101:25
**appeared** 99:23
**appearing** 4:23
52:18
**appended** 79:22
**applicable** 107:13
111:7 125:9
**application**
107:19 113:18
167:14
**applies** 64:8
107:15 113:19
154:9 165:1 180:1
183:1 184:4,7
189:6
**apply** 64:6 67:20
82:7 107:14
129:10 133:4
**applying** 166:15
190:14

**appointed** 19:8
**appointment**
110:1
**appreciate** 23:25
26:21,22,22 52:5
53:14 62:2 70:23
70:24 71:10,22
84:24 97:8 111:21
126:9 180:13
188:2 214:22
**approach** 17:25
93:11
**appropriate**
51:20 57:7 89:24
135:24 136:1
187:3
**approval** 109:12
111:14 160:22
**approve** 114:19
**approved** 41:8
89:22 96:2 111:13
124:2,2 174:23,24
**approving** 8:15
**approximately**
10:16 11:18,23
12:3,10 13:6
104:5 123:3
**april** 127:19,20
132:17 150:6
152:22
**arbitrary** 37:12
41:6 51:21,22
**areas** 50:24
**arguably** 131:23
**argue** 117:3
180:18 193:12
**argues** 158:22
**arguing** 115:24
156:2
**argument** 83:4
106:4,25 107:3
115:5 128:19,21
130:11 133:23,24

134:8 140:14
189:1
**arguments** 83:7
121:20 124:24
**arisen** 128:18
137:8
**arises** 159:3
**arising** 152:10
165:23
**arms** 177:1
**arrangement**
203:16
**article** 167:14
**articulated**
172:13 205:10
**asia** 42:22
**aside** 20:11
**asked** 13:3 21:1
36:3,6 42:7 46:1
69:6 103:9 113:23
158:13 173:5
178:3,4 196:13
200:8 203:11
204:1 208:5
211:11 216:3,8
**asking** 45:16 46:7
46:9 48:1 55:12
55:13 71:1 207:5
207:24 216:7
**asleep** 196:25
**aspect** 81:19
**aspersion** 41:6
**aspersions** 36:2
**assert** 12:18
124:17,21 132:18
132:24 141:21
161:3
**asserted** 12:16
13:10,11 17:1,7
18:2 22:7 42:19
55:4 74:6 89:20
90:15 129:8
131:22 132:17

138:23 148:11,11
148:15 151:20
160:25 161:17
163:9 173:21
175:21 176:10,15
219:10
**asserting** 34:10
125:12 126:11
178:1
**assertion** 132:12
134:1
**asserts** 95:10
124:12
**assessing** 132:7,8
**assessment** 95:13
96:8
**asset** 78:2
**assets** 78:1,14
92:23 173:7
**assign** 123:17
124:1
**assignee** 130:17
159:7
**assignment** 78:13
123:15 124:6
125:7 126:18,22
131:25 134:19,24
135:20 136:22,23
137:1,4,6,9,11,18
138:23 139:9
143:18 144:9
145:22,23,23
148:13,20 150:18
151:1,3,5,18,21
152:11,17 153:8
153:10 154:6,14
154:18,24 160:18
160:24 161:7,13
161:16,23 162:4
162:14,14,18
219:9
**assistance** 90:3

**associated** 149:7
**associates** 214:25
**assume** 75:23
104:25 123:16
124:1 182:16
183:9 185:6
198:16 205:19
208:11 216:23
**assumed** 32:21
46:2 73:22 182:5
182:15
**assumes** 69:18
216:1
**assuming** 60:14
61:6 68:1 69:6,16
71:20 94:19,25
127:1,22 130:5
136:2 149:24
188:8 192:12
198:19 199:9
200:16 201:8
203:23 205:6
211:9
**assumption**
123:14 124:6
125:7 126:4,17
131:25 134:23
135:20 136:22
137:1,4 138:23
160:17
**assurance** 11:13
132:1,6 133:12
**attached** 36:3
104:2 169:21
**attachments**
50:23
**attack** 48:17
**attempt** 177:15
**attempts** 36:20
**attend** 216:13
**attest** 51:23
**attorney** 6:4,12
6:20 7:4,9,14

**attorneys** 4:4,14
5:4,13 13:20
172:9 217:13
**attributable** 63:4
63:5 161:22
**august** 97:9 98:2
98:10,11 137:8
163:14 196:23
**authorities** 11:15
**authority** 83:1
125:22 179:15
214:14
**authorized** 25:2
**automatic** 3:2,5,9
25:1
**available** 10:5
23:9,17 89:14
119:9 137:17
**avenue** 4:5 5:14
6:6,14,21
**avoid** 18:24 135:9
160:11
**avoiding** 30:10
**aware** 14:11,19
14:20 15:4 19:11
19:25 35:6 111:6
209:9 216:4

**b**

**b** 2:1 7:4 12:18
18:10,11 22:8
30:11 34:11,17
45:12,12 54:10
74:8 79:22 97:17
97:22 98:3 121:14
124:4 125:10,21
125:23,24 126:7,8
145:10 147:15
162:7 163:16
185:6 189:12
192:5 211:12,24
211:24
**back** 25:11 32:19
35:10 49:24 53:24

56:1 57:18,21
67:11 69:11 82:10
83:8 87:20 88:12
105:9 118:2
122:18 123:5
129:18 135:13
142:12,24 146:15
150:14 157:9
159:17 171:11,23
171:24 172:21,22
172:23 173:2,3,18
173:24 183:5
189:19 191:17
192:1,11 194:8,9
195:20 196:7
203:19 204:12
205:21,25 206:5
206:13 207:20
**backup** 18:20
83:23
**backwards**
193:23,25
**bad** 37:7 65:10
197:15
**bag** 168:6
**bait** 141:5
**baked** 188:3
**ballot** 12:17 29:1
42:10,11 70:11
75:17,18 180:23
181:8,16 183:9,16
184:4 185:5
186:11,22 188:11
189:14 190:10
191:10,11,12,13
192:14 193:2,21
194:21 196:4,5,8
196:9,10,14 197:9
197:15 200:12,19
200:24 201:10,12
206:12,12 208:4
215:15,17 216:24
217:3

**balloting** 18:6
174:6
**ballots** 9:3 10:15
11:5,10,18,22
12:7,10,11,12,22
13:9 17:1 18:20
22:14 40:22 42:8
44:3 45:13,14
46:24,25 47:1
74:11 173:8,14,18
173:21,22,23
177:12 194:20
205:10 209:9
213:22 215:8
216:24
**bank** 56:19,19
80:17
**bankr** 163:13,14
**bankruptcy** 1:1
1:17 2:3 33:12
99:18 107:2,13
108:1 125:10,21
133:9 138:1,7,9
138:15 139:8
145:3,19 162:16
162:17,21
**bar** 12:17,17
139:20
**bare** 100:4
**barefoot** 5:9
123:8,9,21 126:15
126:24 127:11
128:5,8,11,13,15
128:21,24 129:3
129:13,17,21,24
130:2,22 131:1,3
131:16 133:2,7,17
133:19 134:15,22
135:1,6 136:5,9
136:20,25 137:7
139:12 140:7,9,15
140:18,20 158:22
167:4,16 168:13

168:18,22,24
169:5,13 171:8
**barely** 38:3
**bargain** 37:13
48:20 49:6
**bargained** 27:23
27:24 28:5 50:16
**barred** 12:17
124:25 125:12
126:10 128:6
129:8 130:16
132:13,14,22
135:12 145:24,25
148:22 161:3
165:10
**bartels** 90:21
97:13
**base** 91:9,17
97:18,23 98:3,12
99:1 101:1,12,21
105:7 114:4
186:20
**based** 9:4 25:17
26:10 31:10 43:14
53:16 66:8 95:7
95:12 99:21
102:20,23 105:24
106:1 112:12
114:17 158:12
160:15 163:4
164:18 165:11
193:4 194:7
203:15
**baseline** 94:15
**basic** 36:6 107:9
**basically** 29:13
37:7,20 46:7 47:9
47:15 66:5 165:20
176:14 182:4,6
187:20 189:16
198:20 200:8
206:25 213:16

**basis** 22:9 26:17
28:16,22 29:5
39:12 54:7 55:23
61:20,24 93:21
104:14 106:24
138:5,19 156:25
157:13 161:18
162:6 170:6
177:11 178:2,21
**bass** 7:11 71:24
71:25 72:9,12
73:3,11,13,17,24
74:3,7,14,17,21
75:7 188:17,17
189:25 190:4,7,9
190:17
**batch** 38:9,12,14
39:2,8,13 70:14
72:16,23,24
176:15
**bath** 180:23
**bauchner** 5:24
137:11 140:21,22
140:24 141:3,17
141:22 142:4,7,18
142:21 143:6,10
143:16 144:3,11
144:13,17,21
145:1 146:7,11
147:9,13,17,23
148:3,6,10,23
149:6,10,15,19,22
150:6,9,12,16,19
150:23 151:2,8,11
151:15,23 152:3,7
152:9,19,24 153:3
153:6,12,14,19,22
153:24 154:1,8,11
154:15,17,23
155:2,4,8,11,14
156:5,16,18,21,24
157:2,6,11,15,20
157:22,25 158:3,8

158:10,13,19,22
159:1,10,15,24
160:1 165:19
166:7,10,14,16,25
167:10,14,18,20
167:24 168:4,9
169:4,17,22,25
170:4,8,13,16,21
170:23 171:6,12
**bear** 136:23
**beginning** 51:15
164:19
**behalf** 27:6 36:18
48:11 50:7 52:18
53:1 62:15 70:24
96:22
**behavior** 132:11
**behold** 144:1
**belief** 44:13
**believe** 16:11,22
17:19 24:8 32:20
37:6 41:9 45:12
46:21 52:9 64:14
65:4 74:17 80:10
82:24 85:12 89:23
94:13 95:11
101:15 103:21
106:3 107:12
115:12,14 136:21
137:8 138:18
139:9 142:2,6,7,8
147:25 160:16
161:2 162:6
163:15 164:1,13
172:4,13 174:17
179:23 180:10
183:5 186:5
189:23 195:2
**believed** 17:3
**believes** 94:12
**belong** 78:3,9,16
**belonged** 78:19

**beneficiaries**
91:13 101:7
**benefit** 30:10,18
44:25 104:18
176:3
**benefits** 21:17
30:13
**best** 19:14 105:1
174:14,19 175:6
178:23 204:10
**beth** 163:23
**better** 58:15
113:20 161:22
190:25
**beyond** 14:25
89:18 121:18
182:8 183:18
187:2
**bid** 160:15
**bidder** 125:14
**bidding** 123:24
124:10 125:1,5,18
139:21 160:22
**bifurcation** 92:7
**big** 49:3 86:20
152:8 201:18
**bigger** 51:19 58:5
130:4,9 148:25
**bill** 80:15 90:11
147:12,13
**bit** 13:15 70:3
77:10 92:7 194:1
**bite** 150:14
**black** 5:10 6:12
27:7 28:17 35:4
40:2 140:10
180:17
**blackline** 169:21
169:24
**blair** 163:12
**blank** 97:24,25
**blanks** 97:17

**blue** 163:24,24
**board** 33:4 89:5
  89:22 90:1,7,11
  91:1,3,6,10,13,17
  91:23 93:5,9,13
  93:18,20,24 94:22
  95:2,3,9,15 96:7
  96:10 97:3,4 98:4
  98:7,19 99:3
  101:5,20,25 102:8
  102:10,11 103:4
  107:14,15 108:6
  108:18,21 109:7
  112:25 113:1,6,25
**boards** 91:1
  101:23 107:21
  108:20,23 109:3,3
  109:13
**boat** 202:16 203:2
  209:17
**books** 17:7 42:19
  174:18 176:19
  210:23
**boston** 164:10
**bottom** 66:1
**bought** 46:3
**box** 48:16 198:1
**boys** 109:1
**brainer** 185:11
**brand** 72:1
**brands** 7:9 188:18
**brauner** 4:19
**breach** 3:24 137:6
  138:22 140:3
  145:11,11,16
  155:24 156:3
  160:6 161:5 163:2
  164:6 219:12
  220:3,14
**breaches** 136:23
  138:22
**break** 86:21
  171:11 194:5

**brian** 121:9
**brief** 13:15 117:20
  133:8,23
**briefed** 123:22
  136:15
**briefing** 26:18
**briefly** 27:4,8
  189:17
**briefs** 116:10
  119:9 140:13
**brighton** 131:21
**bring** 17:11 19:4
  19:16
**bringing** 15:11
  63:11 135:22
**broad** 145:3
**broadly** 145:6
**brought** 136:10
**bryant** 4:16
**bucket** 191:6
**buckets** 18:13
**budget** 152:16
**build** 71:12,14
**building** 6:5
  164:12
**bunch** 12:19
  146:25
**burden** 133:19
  135:10 153:21
  174:24 175:14
**business** 143:4
  210:21
**busy** 179:18
**buy** 80:8 84:12
**buyer** 52:19 53:1
**buys** 188:6

**c**

**c** 4:1,20 5:1 6:1
  7:1,16 8:1 220:1,1
**cake** 30:8
**calculation** 12:3
  146:19 213:13

**calculations**
  175:14
**calculus** 15:21
**calendar** 76:13
  88:4 121:23
**call** 60:6 92:15
  171:20 217:24
**called** 34:24 35:15
  121:24 198:25
  199:8
**calling** 18:9
**calls** 16:14 36:21
  47:6,7 95:24
  214:25
**camp** 5:21
**canvassed** 43:15
**cap** 26:1,3,4
  151:16
**capable** 105:10
**capacity** 89:5
**capital** 4:22,23
  45:11
**card** 79:12
**care** 164:3
**careful** 104:22
  167:5
**carefully** 184:2
**carl** 2:6
**carr** 90:11 97:14
**carrie** 141:8
**case** 1:6,12 11:2
  29:15 45:13 80:10
  94:10 95:8 99:13
  103:8,10,20,21,22
  106:3 111:12,13
  126:12 127:25
  136:22 138:25
  141:14 152:2
  159:6 162:9,16
  164:10,14,25
  171:25,25 212:9
  212:17 214:8,9

**cases** 17:25 33:12
  90:23 94:7 103:6
  105:25 126:24
**cash** 10:3 79:3,9
  79:11,13,17 80:12
  80:16,19 81:22,23
  82:11,20 83:9,15
  84:13,14
**cashed** 81:1 82:8
  82:23,24 83:18
**cast** 36:2 41:5
**catch** 25:19 36:11
**categories** 9:4
  20:10,14 53:20
  55:15 86:21
**categorization**
  53:16
**categorized** 56:9
  175:20
**category** 32:18
  53:21 54:8
**caught** 39:19
**cause** 142:23
  155:17,18 156:4
  159:13 163:6,21
  164:1,8,15,16
  165:1 219:18
**causes** 90:14,18
  91:13 92:14 93:10
  93:13 124:22
  140:1 156:13
**caution** 11:11
  47:1,2
**cave** 144:16
**cede** 180:13
**center** 163:23
**central** 139:15
**cert** 220:15
**certain** 10:9 15:17
  16:15 27:18 30:3
  39:15 41:16 59:25
  67:12 104:9
  133:24 135:16

138:8 184:12
**certainly** 18:24
19:3 21:20 23:17
64:20 72:3 86:1
87:8 122:7,24
130:2 147:11
**certified** 220:9,15
**certify** 220:4
**cet** 220:9
**cetera** 136:4
211:2
**chair** 95:24
**challenge** 157:17
157:22
**chambers** 86:4
**chance** 13:1 47:24
172:2 173:3 180:6
**change** 174:25
177:8 178:18
186:22 197:13
201:7,8
**changed** 63:17
186:12,13
**changes** 170:23
**chapman** 90:3
**chapter** 2:24
90:23 93:25 94:1
94:2,4,6,10,16
95:1,5,8 102:2,3,6
102:22
**characterization**
57:12
**cheaper** 43:18
**cheaply** 149:2
**check** 54:17 79:11
79:19 80:3,9,13
80:15,16 82:9,11
82:20 84:13
131:13 132:3
**checked** 40:14
**checking** 81:7
**checks** 17:22
46:10,11 47:12,13

49:1,18 56:11,20
61:13 79:25 175:9
198:8,14
**chief** 168:9
**china** 37:3
**cir** 138:15 163:11
163:12
**circuit** 137:21
163:25
**circumstance**
94:16 192:23
203:16
**circumstances**
36:12 93:18
165:17 206:13
**cite** 111:6 133:10
133:11
**cited** 147:2
**citron** 5:12 48:11
96:22
**claim** 3:4 9:9,20
12:19 18:10 19:7
19:22 22:7 28:18
29:4,5 30:21
32:24,24,25,25
33:4,21,23 34:10
34:10,18 35:16
36:4 37:15,17
41:11 42:20 43:15
44:1,13 46:23,23
50:16 55:4 63:24
67:22 72:5 73:5
73:25 74:6,8,8,9
74:23 75:1 85:21
92:15 115:13,16
124:17 127:3,19
128:7 129:8
132:15 134:4,14
140:3 142:17
144:25 145:4,6,20
148:12,16,18
152:22 156:1,4
158:11 161:3,16

163:2,4,6,9,15,17
163:19 164:11,23
165:8,15 166:1
174:11,18 177:25
182:17 183:15
185:15 188:4,6,6
188:8 189:13
190:12,13 191:23
192:3,9 193:9,12
194:6 196:3,23
197:1 199:1,16,22
199:24 203:17
211:21 213:20
216:7,9,19 219:9
219:12,16
**claim's** 214:11
**claimant** 6:12
26:13 27:7 42:22
117:2
**claimant's** 115:24
**claimants** 6:4,20
8:21,22 9:6 19:14
26:11,18 28:14
30:14 31:11 42:24
176:19 180:17
203:1
**claimed** 38:18
79:4 126:1 130:10
142:5 161:7
206:11
**claiming** 47:3
141:12 143:13
**claims** 2:12 3:12
8:16,18 9:6,11,16
9:22,24 10:1,18
11:15,22,25 12:13
12:15,16,17,18
13:7,9,12,14,23
15:2,9 16:11,20
16:25 18:1,3,7,11
18:11,21 19:1,12
27:15 30:11,12
33:13,15,16 34:17

37:19 41:7 45:13
45:17,20,22,23
46:2,3,17,20 47:3
47:24 50:11,15
51:15 53:15,21
56:9 58:20 59:24
60:14 73:23 77:15
86:17 90:14
101:16 139:15,18
139:22 170:1,7
172:1 174:14
175:1,5,6,19,20
175:23 176:8,10
176:13,22 184:12
188:3 189:11
192:6 196:24
198:4 205:7
208:21 209:14
211:5,12,19,23,24
213:11
**clarification**
71:25 84:6 167:4
168:14
**clarify** 186:4
**clarifying** 180:20
**clarity** 118:11
**clark** 163:22
164:5
**clause** 125:24
126:10 142:15
185:13
**clean** 13:1 46:2,3
46:4,20,21
**cleaning** 164:11
**clear** 21:13 22:21
25:14 33:21 40:20
43:10 47:25 48:24
50:21 58:4 61:3
78:10 80:2 81:20
83:22 84:2 85:19
86:22 88:11 95:7
137:2 139:7,19
142:1 155:14,20

159:3 162:1 163:4
165:14,15,19
170:25 174:20
179:25 189:3,5
204:10
**clearest** 148:14
**clearly** 148:21
150:21 162:19
183:17
**cleary** 5:3 123:9
**clerk** 47:8 171:17
217:24
**client** 27:24 28:5
28:14 29:24 30:14
31:22 32:4 33:3
34:20,22 35:14
42:8,10 53:1
64:20 74:15 106:8
106:10 114:9,11
114:12 115:9
123:12 169:6
180:20 181:2
192:18,23 193:8
206:11
**client's** 75:18
**clients** 30:13
32:19 34:17 37:2
37:8 38:13,17
39:5 40:3 41:2,9
44:10,11,13 64:3
89:15 91:18 96:22
120:24,25
**close** 32:7 107:17
176:11 186:1
187:5 212:11
**closed** 172:17
**closing** 78:14
**club** 109:1
**clue** 193:15
**code** 107:2,13
125:10,21 138:8
162:17

**code's** 145:3
**cole** 7:8 72:1
188:18
**collapsed** 147:23
**collapses** 147:19
**collateral** 2:8,9,11
48:17
**collected** 94:19
**collecting** 18:18
**collection** 211:12
**collectively** 25:22
101:20
**colorado** 131:21
**combine** 18:15
**come** 18:10 58:23
60:17 67:14 70:1
77:10 92:19,22
94:14 107:18
112:8,10 122:18
127:13 135:16
143:16 157:9
171:11 173:3
176:23 186:1
209:18,20
**comes** 35:16
79:16 80:14 92:10
92:24 139:11
150:9 168:5
**comfortable**
190:13
**coming** 33:5,6
150:14 174:3
194:9
**comments** 16:14
68:25 194:7
**commitment**
17:17
**commitments**
72:20
**committee** 4:14
26:15 55:17 89:3
90:1,9,24 91:4,5
93:8 94:12 95:15

95:20,24 96:2,6
97:14 101:10,24
104:1 112:6,13,13
112:17 113:2,5,10
**committee's** 90:4
90:20 101:23
172:9 175:3
**committees** 15:13
**common** 41:23
91:12 162:11
**communicate**
36:20 174:15
**communicated**
13:18 40:25
172:22,23 173:2
187:24
**communication**
28:24 31:9
**communications**
163:13 173:24
**community** 99:18
108:1
**company** 96:23
163:11,12,22
164:5
**comparable** 112:4
**comparison** 95:8
**compel** 2:20,20
77:21
**compensate** 102:3
**compensated**
106:1
**compensation**
89:4,9,13,21 91:6
91:9,11,15,17,19
91:23 92:9,12,21
93:1,4 94:2,21
95:9 97:17,18,18
97:23,24,24 98:3
98:8,12,13,17,21
99:1,4,6,21,23
100:1,13,23 101:1
101:5,8,13,14,21

102:12,13,17,23
103:5,13 105:8,20
106:1,14 109:11
111:1 112:2,3,10
113:4,9 114:4,18
219:5
**competent** 105:10
**complaining**
55:25 108:24
**complaint** 3:21
90:15 93:22 104:2
104:5,8 123:11
124:18,20 127:23
127:24 128:16
129:1 132:18,19
134:11,13,14
139:14 142:16,21
146:25 148:16
156:9,14 160:5
165:6,13
**complaints** 48:14
**complete** 57:12
86:19 184:2
**completed** 75:16
123:16 185:4
**completely** 32:22
46:19 57:14
139:12 198:17
**complicated**
211:17
**complicates** 194:1
**complied** 39:5
73:19
**component** 91:11
**composition** 91:3
**conceded** 28:3
201:12
**conceivable** 21:18
137:19 214:4
**conceivably** 127:9
185:11
**concern** 62:16
63:16 67:4 149:11

157:6 159:15
167:1,10 174:2
**concerned**  57:23
109:7 113:25
121:14 137:23
144:18 156:18
159:19 161:20
**concerning**  3:21
**concerns**  65:21
77:23 173:1
175:13 177:5
180:19
**conclude**  114:17
160:22 162:3,6,7
163:2 177:25
**concluded**  218:2
**concludes**  165:4
**conclusion**  137:14
190:21
**conclusions**
211:11
**conclusively**
154:5
**condition**  142:25
143:18 144:4,9
**conditions**  10:9
24:9 28:9 127:12
129:24 161:22
**conduct**  132:11
133:25 134:7
**confer**  135:21
169:5
**conference**  29:15
77:14 87:20 95:24
140:2 171:15,25
**conferred**  16:23
**confidentiality**
96:13
**confirm**  109:19
111:5,8 169:19
**confirmation**  8:15
8:19,20 25:23
27:13,23 30:9

41:8 44:16 48:18
49:14,21 50:22
63:17 89:10,11,23
97:20 98:5,9,14
98:15,16 100:5
103:11 109:23
111:3,17 112:16
112:18,20 113:21
113:24 114:1,2
172:3 189:6
194:22
**confirmed**  49:16
49:17 51:10 94:8
109:13
**confirming**
109:14
**conflating**  42:7
**conflict**  106:19
107:9,22 108:14
108:16 109:15
**conflicts**  96:6
**conformation**
184:10
**confused**  208:3
**confusion**  167:8
**congress**  102:3,24
**connection**  2:23
8:10 89:23 92:12
93:2 96:25 97:10
97:21 98:25
103:25 111:12,12
174:6
**connections**  96:10
96:11 99:8 106:13
106:16 107:9
109:9 113:16
**consensual**  30:4
181:18 185:3,5,7
199:2,2
**consensually**
190:1
**consensus**  13:21
13:22 14:1

**consent**  8:16 23:5
27:12 41:7 50:11
50:15 59:24
114:25 172:1
180:9,11 181:13
197:11 199:5,6,6
214:15,16
**consequence**  9:15
9:17
**consider**  197:16
**considerable**
134:20
**considering**
134:10
**consistent**  41:7
61:13 73:21 74:11
110:2 114:19
134:18,23 145:3
145:19 219:6
**consistently**
146:12
**constant**  31:9
**constrained**  179:8
179:11
**construct**  89:25
**construe**  185:9
**consultant**  129:22
**consultants**  179:5
**consummation**
14:23 25:25 44:24
**contact**  19:22
21:9,12 22:5,11
22:14,17,18 43:15
200:14
**contacted**  37:5
**contained**  95:12
**contd**  5:1 6:1 7:1
**contemplated**
61:19 135:20
211:18
**contemplating**
65:8

**contention**  143:17
**context**  13:15
22:25 49:19 95:1
103:8,10,14
133:14 136:1
145:16 163:7
**contingency**
99:21
**contingent**  89:20
91:19 94:17,18
99:4,5,21 100:1
101:14 145:8,13
**continually**
161:14
**continuance**
110:2
**continue**  3:10
212:7
**continued**  26:23
132:24
**continuing**  43:24
132:18 135:7
152:10 154:24
**contract**  125:9,11
125:14 145:15
155:7,20,23,25
156:4,8,22 160:2
160:4,6,10,13
161:5,16 163:6,8
163:9,17,19 164:6
164:7,8,17 170:9
219:9
**contractor**  151:24
**contractors**  147:1
**contrary**  125:11
132:12 133:25
142:9
**contribute**  14:23
**control**  19:5
**controlling**  125:7
**controversy**
137:24 138:13
162:9

conversation
  15:18
conversion   94:10
converted   94:7
cook   77:24 78:2,8
  84:7
coordinate   86:2
coordinated
  13:18
copies   76:9 86:6
copy   11:1 79:23
core   123:23
corp   8:3 138:14
  163:13
corporation   1:6
  2:25 52:19 53:1
  171:24
corporations
  101:25
correct   26:22 83:9
  85:20 89:1 126:15
  127:2 128:5
  129:21 130:22
  131:1,3 134:15
  136:25 159:1
  178:13,16
correction   39:14
correspondence
  45:16 46:7 47:4
  69:19 85:6
cost   17:10 126:25
  129:9 143:12
  150:18 151:5
  152:11 153:10
  160:20 161:21,21
costly   128:1
costs   17:8 110:24
  111:11 125:6
  126:16,20,23
  127:8 129:11
  130:6,13,14,17
  135:9 144:24
  146:8,19 149:6

150:1 151:12,18
151:21 152:9
160:19,20 161:10
couches   160:9
counsel   22:11,13
  22:13 28:3 31:8
  32:18 35:15 47:8
  47:10 102:20,24
  108:9 112:17
  142:9 169:6
  180:21 198:12
  203:3 215:6
count   159:19
  160:2,4,13
counted   209:9
counterparties
  172:24
counterparty
  125:12
country   210:12
  220:23
counts   124:22
  155:12 156:6,9,10
  156:19 159:24
county   3:11 77:25
  78:2,8 84:7
couple   17:15
  22:23 56:20 66:5
  68:17 177:6
  181:18 202:15
course   20:8 23:16
  24:1 41:3 117:16
  143:10 169:13,17
  179:8 204:3
court   1:1,17 3:11
  8:2,9,12,14 10:21
  10:24 11:4,21
  12:11,21 13:1,25
  14:1,3,7,10,11,19
  14:20 15:3,6,8,20
  15:22,24 16:2,4,6
  16:9 17:13,15
  18:11,14,24 19:16

19:20 20:2,7,9,16
20:18,25 21:4,6
21:10,13,16,21
22:2,4,11,16,20
23:13,24 24:2,14
24:21,24 25:1,2
25:17,24 26:1,4,7
26:23 27:1,4
28:11,16,21 29:10
29:13,15,19 30:5
30:17,20,25 31:5
31:7,15,20,24
32:1,3,5,9,13 33:7
33:9,20 34:3,8,25
35:2,8,13,18,20
35:23 36:8,13,16
38:4,7,10,12,15
38:22,25 39:2,4,7
39:12,17,21,23,25
40:4,7,9,18 41:12
41:15,23 42:3,21
43:1,3,5,9,20,22
43:25 44:5,7,15
44:17,20 45:2,6
47:18 48:2,4,7,9
49:24 50:9 52:3,5
52:11,14,16,20,24
53:4,7 54:20
55:10,12 56:3,8
56:14,16,23,25
57:2,14,18,20
58:3 59:10,13,19
60:22,24 61:2,12
62:9,11,18,21
63:2,14,18,20
64:2,6,8,16,19,25
65:7,23 66:4,9,12
66:15,17,23 67:2
67:5,16,19 68:6
68:12,14 69:1,3,5
69:10,15 70:4,6,9
71:2,6,8,11,17,19
71:23 72:8,11,13

73:10,12,14,18
74:2,4,13,15,18
75:3,11,19 76:7
76:12,20,24 77:2
77:4,9,20 78:19
78:22,24 80:5,7
80:12 81:5,8,11
81:13,25 82:5,8
82:16,18,25 83:5
83:8,20 84:4,8,10
84:19,22,24 85:10
85:14,16,18,21,23
86:3,5,7,9,11,15
86:24 87:1,5,9,12
87:18,22,25 88:3
88:8,11,14,19,23
89:1,7,25 95:17
95:19 96:3,14,18
96:20 97:4 98:24
99:9,11,15,17
100:4,7,10,12,17
100:19,22 102:2,7
102:16,22 103:9
103:23 104:13,17
104:20,22 105:2,4
105:6,9,17,22
106:6,22,24 107:2
107:7,11 108:3,9
108:16 109:6,10
109:12,18,19
110:6,8,11,13,17
111:2,4,7,14,18
111:21 112:1,15
112:17,19,23
113:1,17 114:8,14
114:17 115:6,20
115:22 116:2,4,6
116:12,15,19,21
117:2,5,9,15,17
117:19,23 118:4,7
118:10,13,15,18
119:4,6,15,18,21
119:23 120:2,5,7

| | | | |
|---|---|---|---|
| 120:9,13,16,18,20 | 158:20,21,21,23 | 203:21,23 204:4,6 | **covers** 163:18 |
| 120:22 121:2,4,6 | 158:25 159:5,9,14 | 204:8,13,19,24 | **crack** 149:4 |
| 121:8,11,13 122:1 | 159:17,21,25 | 205:1,5,11,13,15 | **craft** 96:22 |
| 122:3,7,13,16,20 | 160:3 162:1,2,20 | 205:18,24 206:3,9 | **cravath** 6:11 27:6 |
| 122:21,24 123:4 | 162:25 165:4,9,20 | 206:15,18,20,23 | 180:16 |
| 123:20 124:3,18 | 165:24 166:9,12 | 207:4,7,15,17,21 | **create** 165:14 |
| 125:4 126:9,16 | 166:15,17,18,24 | 207:25 208:8,10 | **creates** 108:14 |
| 127:5,16,17,18 | 167:2,5,9,13,19 | 208:14,17,22 | **credit** 78:11 79:12 |
| 128:6,10,12,14,17 | 167:21,23,25 | 209:2,6,15,18 | **credited** 153:1 |
| 128:20,23 129:1,2 | 168:1,8,11,17,21 | 210:2,5,8,13,15 | **creditor** 7:9,14 |
| 129:4,16,18,19,23 | 168:23 169:1,10 | 210:19,21 211:6,8 | 16:15 19:21 37:25 |
| 130:1,4,24 131:2 | 169:14,18,23 | 211:17 212:6,16 | 46:24 52:19 93:10 |
| 131:15 133:1,6,15 | 170:3,6,11,14,15 | 212:21,25 213:3,7 | 177:2 |
| 133:18 134:3,5,6 | 170:19,22,25 | 213:12,21,23,25 | **creditors** 4:15 7:4 |
| 134:17,25 135:3 | 171:7,9,14,19,20 | 214:2,4,10,13,22 | 9:3 12:7 15:12,17 |
| 135:10,14,23 | 171:22 172:15 | 215:3,10,18,24 | 26:15 37:23 38:1 |
| 136:8,19,21 137:3 | 174:4,10 177:6,16 | 216:17 217:2,9,15 | 40:15 48:20 49:7 |
| 137:10,13 140:2,3 | 177:19,21,24 | 217:18 | 55:2 90:9,20,23 |
| 140:4,5,8,12,16 | 178:5,8,10,14,17 | **court's** 8:8 64:12 | 91:4,5,14 94:12 |
| 140:19,23,25 | 178:24 179:3,5,10 | 71:9 123:24 | 97:14 104:10 |
| 141:6,9,12,16,18 | 179:20 180:15,24 | 158:24 159:3 | 110:3 113:2,3,5 |
| 141:19,25 142:5 | 181:5,7,12,22 | 167:1 174:2 | 172:9 174:25 |
| 142:15,20 143:5,7 | 182:3,12,14,22,25 | **courteous** 47:11 | 175:3 188:2 |
| 143:15,24 144:10 | 183:8,13 184:1,7 | 47:14 | **credits** 14:14 |
| 144:12,14,18,18 | 184:15,20,22 | **courthouse** 34:22 | **crew** 143:8 |
| 144:20,23 145:2 | 185:2,20,22 186:8 | **courtroom** 24:17 | **criteria** 9:13 |
| 145:16 146:10,13 | 186:11,19 187:14 | 45:8,9 50:3 60:8 | 99:25 |
| 147:11,14,22,25 | 187:16,20,25 | 77:13 | **cross** 98:17 |
| 148:4,8,11,24 | 188:14,25 190:1,5 | **courts** 45:21 | 163:24 |
| 149:9,14,17,21,23 | 190:8,10,18 191:2 | 133:9,9 137:24 | **crozier** 4:9 77:19 |
| 150:8,10,15,17,20 | 191:4,19 192:11 | 138:1,2,7,7,9,15 | 77:20 78:23 79:20 |
| 150:25 151:7,10 | 193:2,5,8,17,19 | 139:7,8 145:18 | 80:6,10 81:21 |
| 151:13,16 152:1,4 | 194:2 195:1,4,10 | 159:16 162:22 | 84:5,9,15 |
| 152:8,12,20,25 | 195:16,19,23 | 163:1 166:4 | **crystal** 25:14 |
| 153:1,4,7,9,13,16 | 196:1,8,18,21 | **covenant** 155:24 | 47:25 81:20 137:2 |
| 153:20,23,25 | 197:1,4,6,13,18 | 163:3,8 219:12 | **cure** 123:18 124:3 |
| 154:3,9,14,16,20 | 197:21 198:2,10 | **cover** 79:25 80:3 | 124:4,9,13,15 |
| 154:25 155:3,5,9 | 198:15,18,21,24 | 180:6 | 125:6,8,13,20 |
| 155:13,17 156:8 | 199:9,15,17,19 | **covered** 83:14 | 126:11,12,14,16 |
| 156:17,20,23,25 | 200:2,20,23 201:3 | 85:5 128:3 130:8 | 126:17,20,22,23 |
| 157:4,8,12,19,21 | 201:7,14,19,22,24 | 146:5 158:12 | 127:3 129:9 |
| 157:23 158:1,4,9 | 202:1,6,10,13,18 | 164:23 177:7 | 130:13,15 131:5,5 |
| 158:11,13,16,16 | 202:21,25 203:5 | 215:24,25 | 131:19 132:7,16 |

133:24 134:18
135:4,5 136:18
141:11,19,20,25
142:1 146:2,5,8
146:18,20,22,23
147:1,5,6,16
160:19,19,20,23
161:10,10 162:18
168:3,21
**cured**  126:3
**cures**  131:23
132:13,14,17,18
132:22,23 133:4
**curious**  157:2
**curley**  7:13,16
52:10,13,15,17,18
52:23,25 53:6
**current**  96:11
106:18
**currently**  18:13
176:18
**customary**  33:11
36:11
**customers**  214:5
**cut**  17:22 40:17
47:12 48:4 49:1
49:19 54:16 56:7
56:13,16,17
175:13 193:3
**cutoff**  49:9 63:7
181:24 202:9

**d**

**d**  2:2 8:1 156:5
219:1 220:15
**daily**  22:18 79:13
**damage**  160:14
**damages**  63:18,21
124:21 132:25
139:21 160:7
161:3
**damnum**  142:15
**data**  19:18,18
20:5,12,19,21,24

21:6 26:11 28:24
43:19 121:21
176:7 193:14
211:11
**date**  10:11 12:17
12:18 18:2,6
22:21 25:13 27:15
27:18 28:3 29:24
32:5 37:10,22,24
38:5,7 41:1,13,22
45:1 50:14 51:2
51:11 54:9 65:13
68:7,14,15,17
69:6,10,11,11
70:7 75:17 88:4
92:10,13,18,18,19
103:12 115:4,23
116:13,20 143:18
144:9 148:20
151:25 152:11
161:13,23 176:5
180:21,22 181:24
181:24 183:16,19
183:24 184:12,13
184:14 185:1
186:5,7,9,11,12
186:13,23,24
194:24 195:25
197:25 200:11
215:17 220:20
**date's**  181:14
**dates**  180:2
**david**  5:17 7:11
48:10 62:14 71:25
96:21 188:17
**davidoff**  5:12
48:10 96:21
**davis**  90:21
106:17 107:8
**day**  8:24 27:14
30:1 39:18 42:12
45:19,25 51:22
53:22 67:22 68:17

72:4 73:4,14 75:9
75:13 84:1 118:15
151:6 168:12
169:18 178:20
179:23,25 181:9
182:15 188:19,24
189:6 192:3,13,18
194:21 196:20
197:11,11 198:8
200:1 201:17
206:6 215:11,12
215:16 217:3,3,25
**days**  8:23 9:2
17:23 23:3 32:7
38:17 40:3 45:15
54:15 55:8,19,21
56:20 57:4,22
60:14,14 61:7
63:20,24 64:1
65:8 68:7,18 75:2
75:17,18,24 76:17
76:24 77:1 97:19
106:15 107:5
109:16 111:25
113:15 117:20
118:15,19 119:6
119:20 169:23
181:19 183:3,18
184:3 185:4,7
188:19,23 189:3
189:20 190:14
191:7 194:17
195:5,8 196:19
198:4 215:9
**dead**  65:13 195:25
**deadline**  38:22,23
39:7,24 40:9 42:1
53:25 65:24 68:19
69:16 70:16 72:17
72:23,24,25 75:25
83:13,13,20 89:13
89:13,17 100:8
130:6 160:18,25

178:11 183:10
188:23 196:10
201:8 215:8
216:12 217:21,22
**deadlines**  188:9
**deal**  20:22 26:17
33:24 54:5 55:21
61:9 77:5 85:6
112:11 155:6
159:21 172:3
193:3 195:21
199:2,3
**dealing**  21:14
140:9 155:25
156:3 163:3
171:25 219:13
**deals**  188:24
**dealt**  12:11 19:12
83:10 121:20
122:11 127:14
138:24 159:18
164:24 165:12
215:10
**debtor**  1:8 21:7
32:23 37:15,19
40:23 41:10 48:12
49:4,22 58:16,17
60:20 61:4 67:10
67:20 68:2,3 70:9
70:18 72:21,21
73:16 80:1,2,24
80:24 81:1 82:21
84:11 96:24 97:9
97:20 109:24,24
109:25 110:1
111:10 115:3
116:9,10 132:15
141:20 142:1
154:6 159:9
191:13 196:4
**debtor's**  160:19
**debtors**  2:20,25
4:4,4 8:6,9,20

10:4,14,15,18
11:3,5,8,17,18,21
12:5,9,23 13:6,16
14:4,11,17 15:3,5
15:13,15,18 16:22
17:2,3,7,17 18:12
18:19 19:2,5,13
19:24 20:3,12,23
20:24 22:9 23:7
23:22 24:4,12
25:3 26:8,15,25
27:9,21 28:3,17
30:7,9 31:8 32:6
36:25 42:19 47:8
47:10 53:11 55:1
55:5,8 59:14
65:15,19 70:24
71:1,4 72:15
77:21,21,23,24
78:1,3,5,6,9,10,16
78:18,20 79:1,6,7
79:8,12,15 81:21
81:24 82:6,17
83:24 85:8 86:12
89:8 90:7,8,9,22
91:4,4,14 92:23
93:8 94:5,8 95:14
96:6 97:14 98:18
98:19 99:12 101:9
113:6 123:25
125:14 136:23
137:19 141:9
146:19 150:5
161:10 168:19
172:8,18,23 173:8
173:10,25 174:1,5
174:7,25 175:2,8
175:16,17,19,21
176:16 177:1,10
177:25 179:5,8
180:19 184:17
185:14,18 186:23
187:9 189:16

196:11,14 197:14
200:4,6,8,10
212:7 216:4 217:4
**december** 1:21
3:16 10:5 14:22
14:25 16:16 29:2
29:23 31:15,21
35:25 37:2 40:13
40:16 41:2 42:9
46:6 48:25 49:2,6
49:10,18 50:13,18
50:24 51:1,5,11
51:15 62:20 65:13
69:16,17 70:7,12
72:23,24,25 73:5
73:6,16,21,25
74:1,19,23 75:24
75:25 151:11
173:20 174:1,3,21
175:9,10 178:12
180:21,22 181:14
181:16,23 182:5
182:11,13,14
183:15,18,24
184:5 185:8,24
185:25 186:13
189:9,20 190:5,11
191:16,22 193:20
194:4,15,24
195:12,25 203:6
215:14 220:20
**decide** 18:8,14
32:24 38:1 77:7
77:12 162:4,21
166:19 197:21
**decided** 19:8
20:11 44:10 51:3
51:17 102:25
113:2,19 115:15
162:10 166:2,12
166:23 195:24
**decision** 38:2
95:21 124:1

187:23,23 211:13
**decisions** 37:20
106:10,11
**decker** 6:12 27:7
28:17 35:4 40:2
180:17
**declaration** 79:22
**declarations**
134:1
**dedicated** 179:9
**deem** 3:4
**deemed** 185:14
**default** 125:3
126:2,2 141:13
142:10,14 146:10
146:12,23 147:1,2
147:7,7,15 162:12
162:13
**defaults** 124:4,11
124:14,20 125:9
125:19,21,23
146:9,20,22 147:5
159:8 160:24,24
165:22,23
**defeated** 131:7
**defendants** 1:14
90:18
**defense** 192:6
**deferred** 168:7
**defined** 59:24
92:14 129:14,17
145:6 146:8,16,17
160:20
**defines** 59:25
146:18
**definition** 126:20
130:13 145:4,19
146:14 147:5
**delay** 39:15 175:8
**delayed** 40:13
**deliberate** 51:23
95:20

**delivered** 14:13
**delve** 137:23
**delved** 137:25
**demand** 15:6
130:18 131:12
**demanded** 142:12
**demonstrate**
133:20
**denied** 156:17
**denominator**
25:18 33:14
**department**
164:13
**depending** 34:5
133:4 178:14
**depends** 30:20
68:6
**deposited** 80:22
**depositions**
216:11
**depreciation**
152:14
**described** 100:23
161:18
**designate** 90:10
**designated** 26:16
90:9,23
**designed** 55:2
65:5
**designee** 99:2
**designees** 89:6
90:17,20,24 92:14
94:13
**destroys** 156:9,10
**detailed** 14:12
45:16 129:24
211:10
**deteriorating**
143:21
**deterioration**
143:22 152:10
154:18

determine 12:5
22:21
determined 10:15
11:8 12:9 13:6
90:10 98:8 173:12
determining 2:7,9
91:3 99:25
develop 127:12
device 77:14
devote 178:19
devoted 180:4
dial 24:19
dialogue 38:21
172:20
didn't 68:2
difference 101:12
152:6,8,22 176:20
196:19
different 25:13
31:24 34:4,5,12
47:13 59:23 75:3
79:2 82:13 92:16
102:13 138:21,22
162:11,13 165:5
177:24 185:10
191:5 214:5
differently 22:5
54:20
difficult 112:11
125:17 151:24
188:4,6,8
dilatory 202:4
diligence 45:21
diligently 14:16
26:8
diminution 2:9
direct 21:12
directed 142:1
160:17
directing 2:11
directly 79:8
125:4 145:24

director 99:12
109:23
directors 102:11
disagree 57:14
58:9 96:8 142:8
178:1 182:22
191:20
disagreeing 206:7
disagreement
199:6
disagrees 138:1
disallowed 120:25
disclose 111:17
disclosed 11:20
20:2 91:16 98:5,9
98:13 99:11,22,22
106:14,16 109:8
109:16,21 113:20
disclosure 69:22
94:5,8,15 95:13
96:9 97:5,15
98:16 99:24
106:20 107:9
110:25 113:15
disconnect 102:8
discovery 127:17
216:9,10
discrepancy 55:7
176:18
discriminate
201:6
discuss 47:24 72:4
82:15 169:7
discussed 95:23
discussing 59:3
discussions 136:3
144:15
dishonest 141:14
disingenuous
132:20
disjunctive
126:13

dismiss 3:21
123:12 127:23
135:25 136:11
154:25 161:15
162:6 164:18
170:3,17 171:5
179:8,18
dismissal 170:5
170:17
dismissals 168:15
dismissed 163:3
163:16 164:2
219:14,16
dismissing 165:6
165:15 169:25
dispute 39:9
54:10 69:25 78:3
78:4,6,8,25 79:16
80:20 83:25 88:3
88:7,9,9 124:5,9
124:25 136:16,17
139:4 155:7 162:5
162:8,18,18 166:3
166:19 168:20
199:20,21
disputed 32:25
33:1,13,14 54:11
145:9,14
disputes 68:5,11
79:5 92:24 123:18
131:20
disputing 22:9
29:4 40:21
distinct 201:3
distinction 146:3
149:5 165:8,9
distributable 94:9
distribute 16:16
distributed 63:3
distribution 8:10
9:8,13,15,18,25
10:3,8 12:2 13:8
13:22 17:5,21,23

19:9 21:3 22:7
23:9,14 24:5,11
24:12,13 25:3,9,9
25:15 27:16,19
28:4,13,19 29:23
30:23 32:3,5,8
36:10 40:13,16
41:13 48:12,16,25
49:10,17,20,23
50:14 51:1,6
55:16,18,24 56:5
56:7 57:5 59:6,14
59:20,23 60:7,7
60:13,16,17,18
62:12,17,25 64:15
64:20 70:7 73:18
74:20 75:24
173:17 174:1
175:8,9,24 179:24
180:2 181:13
182:15 183:1
184:5,8,19 185:12
186:12,16,17
187:11 189:4,7,9
189:11,20 190:3,3
190:16 194:4,16
195:12 209:12
212:12,15 215:13
215:14,19
distribution's
180:2
distributions
33:16 176:4
203:14
district 1:2 137:25
138:2,7 162:25
163:1
divided 9:4
docket 76:8 85:1
86:13 87:6 97:1
97:20 176:9
196:24

dockets  15:4
doctrinally
  139:19
document  52:1
  97:7,11,16 98:2
  98:23 117:1
  125:11
documents  36:6
  61:18 75:1 188:20
doddle  201:16
doing  27:22 29:5
  48:18,19 81:19
  93:14 104:11
  114:7 166:4 171:4
  175:14 186:19
  217:17
dollar  18:25
  127:20 146:22
  161:9
dollars  12:23 13:3
  65:17 104:7
  130:10 148:15
  161:12
door  23:10 144:18
  154:2,11,13,19
  157:22 158:13
  159:13 165:22
  203:15
double  198:13
doubt  108:18,23
doug  90:3
dozen  116:25
  123:17 142:11
dozens  68:10
draft  98:3,6 104:2
drafted  78:21
  93:8 186:2
drain  2:2
driven  105:10
drives  75:18
drop  18:11 22:7
  46:22 54:9 61:21
  65:13 195:25

211:2
dropped  56:12
dublin  4:20 88:22
  88:25 89:2,2,8
  95:18,22 96:4,15
due  45:20 47:22
  47:23 71:4 117:16
  119:19 205:3
duplicate  33:21
  34:10,18 205:7
  207:9 213:19,22
duplicates  10:25
  177:14,17 178:8,9
  203:11
duplicative  10:17
  10:20,21 46:23,24
duties  105:1 114:6
  175:3
duty  163:7 164:3
  164:7,9
dynamics  170:23

e

e  2:1,1 4:1,1 5:1,1
  6:1,1 7:1,1 8:1,1
  207:13 215:7,22
  216:12 217:6,10
  219:1 220:1
earlier  11:21
  30:15 38:5 72:3,9
  135:13 149:11
  170:2 194:7 197:7
earliest  27:25
early  40:6 194:19
easier  43:18 115:1
easily  123:5
easy  150:10 188:9
  210:11
eat  30:8
ecf  2:13,18,25 3:2
  3:5,13
economically  22:1
  57:10

eda  78:19 79:2,8
edge  32:17
effect  103:4
  137:19 161:9
  167:15 169:19
effective  10:11
  25:13 45:1 92:10
  92:13,18,18,19
  103:12 171:3
  176:5 212:18,24
effectively  149:8
  151:12 153:6
efficient  26:17,24
efficiently  19:15
  26:19
effort  135:13
  210:8 212:7
efforts  15:12
eight  118:19
eighth  6:6,14
either  11:9,13
  12:6,11 20:15
  22:13 31:12 35:3
  36:9 68:7,17
  83:21 86:12
  101:24 134:10
  146:1 149:18
  161:6,17 162:24
  178:11 188:2
  203:16 214:8
elected  19:8
election  8:24 44:2
  62:1 67:22 200:6
  203:7,8 216:20,23
electronic  216:25
  220:9,15
electronically
  74:10 216:24
element  155:25
elements  155:18
elevated  101:13
eligibility  9:13

eligible  9:7,14,23
eliminated  10:20
  11:6
email  36:22,23,23
  37:3,9 38:20 41:2
  46:14 68:14 69:5
  174:5,7,20
emailing  36:23
emails  16:14 47:7
  47:7 172:20
  194:20
embodied  90:2
  114:1
emergency  216:9
employees  14:11
empty  110:15
encouraged
  194:19
ended  135:12
  139:9 200:1
endorsed  83:18
ends  139:8
enforce  78:18
engage  134:3
  135:13
engaged  15:13
  29:9 101:5,8
  105:21 108:22
  189:18
engagement
  101:12,14
engineering  149:4
enrichment
  155:10,23 158:11
  163:16 219:16
ensure  10:18 93:9
  175:4
ensuring  91:8
entered  8:14
  63:12 89:11
  160:16
entertainment
  141:4

entire 58:18 75:8
143:2
entirety 96:1
entities 80:1,2
92:17
entitled 34:12
63:22 92:11 94:20
95:2 98:7 165:7
entity 80:8 84:11
entry 8:19
equally 132:6
equate 156:11
equitable 133:10
145:9,10,12,17
equity 110:3
133:9
eric 5:18 96:22
error 39:19
esl 92:15 102:19
esq 4:8,9,10,11,19
4:20,25 5:8,9,10
5:17,18,24 6:9,17
6:24 7:6,11,16
essentially 164:8
established 33:11
164:4
estate 2:7,21
58:24 59:4 60:11
77:22 124:18
137:19
estates 91:14
estimate 18:23
23:14,15,20 55:5
130:3 150:16
151:25 175:22
176:16
estimated 94:8
estimates 17:2
estopped 157:12
171:4
estoppel 170:12
et 1:13 3:19 5:13
6:4,20 8:3 136:4

171:24 211:2
evening 95:24
event 94:7 134:1
136:6
eventually 112:12
144:1
everybody 37:21
43:15 51:9 58:25
59:2,11 178:3,4,6
200:5,16,17
everyone's 156:21
evidence 100:6
103:1 133:22
134:2
evident 187:25
188:1
exact 10:25 36:3
129:3 131:14
150:3
exactly 10:23 71:7
130:22 133:7
192:21 202:4
examined 78:17
98:17
example 12:12,15
33:20 92:24 97:13
103:16 106:16
128:22 145:15
174:15
examples 103:14
excel 45:16
exception 70:18
72:14 168:15
192:2 201:15
exceptional
192:23
exceptions 37:18
excess 94:23
excessive 95:10
99:23 100:23
110:19 113:9
exchange 30:12
66:2

excluded 78:14
excusable 124:24
133:3,15,17,20
134:4
excuse 45:6 88:24
101:1 103:2
148:13 167:18,20
190:8,10
excused 121:25
exempt 125:23
143:19 215:3
exercise 137:16
175:2
exhibit 79:22 96:9
exist 155:18
188:20
existed 128:7
existence 156:22
163:5
existing 128:9
exists 163:20
176:18
expand 200:15
expansive 93:5
expect 23:2 30:2
73:20 74:25 123:3
181:17 213:24
expectation 72:3
73:4 174:25
175:19 185:23
expectations
186:21
expected 14:21
46:10 61:22 86:23
210:3,5
expedited 182:20
183:1,22
expend 131:13
expended 104:10
expense 8:16 9:9
9:10,19,22 10:1
11:9 13:12 19:7
172:1 193:9

expenses 2:15,17
25:4 91:22 111:12
expensive 149:16
experience 31:10
31:12 90:22,25
170:10,14
expert 81:18
84:17,18
expert's 83:16
explain 104:13
105:23
explains 196:18
explode 167:1
exploring 83:19
exposure 211:11
211:25
express 163:20
174:12,23
expressed 65:21
190:17
expressly 125:20
extend 72:21
187:1 189:17
extended 53:25
186:5
extension 73:18
201:13
extensive 93:5
extent 93:14
139:23 154:18
160:9,23 162:3
164:16,19 165:2
175:23,25 178:22
179:4,7
extra 11:1 38:17
89:21 148:19
179:13 182:6,7
203:9
extraneous 192:8

**f**

f 2:1 164:8 220:1
f.2d 163:12
164:12

**f.3d** 163:25
**f.3rd** 138:15
 163:11
**face** 13:3 80:2,3
**facilitate** 93:15
**fact** 12:12 27:16
 29:24 42:8 51:22
 51:23 53:5 93:24
 107:20 108:12
 111:2 113:6
 114:18 132:23
 139:13 141:8
 142:11 179:11,24
 179:25 183:5
 192:5 216:5
**factor** 15:15
**factors** 133:11
**facts** 14:19 82:4
 84:2 88:11 103:22
 158:12 163:18
 165:17 166:15
 213:10
**factual** 82:5 88:9
 172:12
**fail** 4:8 8:4,5,13
 10:23,25 11:5
 14:2,4,8 15:10,21
 15:23 16:1,3,5,7
 16:10 17:14,19
 19:23 20:8,14,17
 20:23 21:1,5,8,11
 21:15,20,25 22:3
 22:12,18,24 23:16
 24:1,6,8,15,23,25
 25:6,19,25 26:3,5
 26:21 27:3 32:11
 32:14 38:8,20
 39:1,14,18 40:1,5
 40:11,19 42:3,6
 42:22 43:4,7,13
 43:21,24 44:3,6
 44:21 53:17 54:19
 54:24 55:11 56:2

56:4,11,15,18,24
57:1,8,10 62:23
69:13,22 70:5,8
70:22 71:3,7,9,15
71:18,22 172:7,7
174:5,11 177:12
177:17,20,22
178:4,6,9,13,16
178:21 179:2,4,7
179:19 180:13
181:6,8 182:13
187:13,15 192:22
193:3,7,10,12,14
193:18,23 195:13
196:10 198:6,8
202:23 203:12,22
204:3,16,22 205:3
205:9,12,14 209:8
211:9 212:19
213:10 214:7,11
215:1,4
**failed** 133:22
**failing** 26:14
**failure** 126:2
 129:9 139:20
**fair** 4:22,23 28:12
 34:3,3,4 45:11
 47:21 49:5 53:11
 57:16 58:7 116:16
 129:13 140:9,15
 155:24 156:3
 163:3 187:10
 188:1 189:15
 217:13,18 219:13
**fairness** 27:11
**faith** 140:9 155:24
 156:3 163:3
 174:21 210:8
 219:13
**fall** 53:20,22 54:8
 55:15 65:20 66:18
 68:20 205:20
 208:25

**falls** 77:11,11
 124:25 148:25
 194:11 203:1
**familiarity** 90:14
**far** 26:8,9 71:8,11
 72:23 107:18
 109:7 113:25
 117:19 121:13
 137:22 145:24
 146:16 159:18,23
 161:19 164:15
 165:2 167:22
 199:6
**fast** 72:14 77:12
 82:18
**fault** 62:5
**favorably** 45:22
**favoring** 34:13
**fear** 69:4 212:14
 212:16
**feasible** 181:25
**february** 167:12
**federal** 155:15
**fee** 2:17 94:18
 95:14 96:2 107:19
 113:18
**feel** 22:12 28:12
 45:22 46:19 47:24
 50:5 175:16
**feeling** 84:2
**fees** 94:17 95:10
**feld** 4:13
**fell** 17:1
**felt** 47:9 49:3
 158:17
**fiction** 143:22
**fiduciaries** 113:11
**fiduciary** 105:1
 114:5 175:2
**field** 59:12 214:25
**fifth** 4:5
**figure** 19:14 33:15
 43:17 56:18 148:8

149:8 150:7
204:21 213:15
214:11
**figured** 99:19
**file** 11:16 16:10
 86:12 90:19 104:5
 115:3 116:11
 120:12 129:9
 132:1 141:13
 142:1 161:9
 191:10,12 209:14
 217:22
**filed** 3:5 11:2,20
 12:13,16 15:7
 18:2 24:16 29:8
 29:10,12,16,17,21
 31:11 33:21 60:9
 64:22 73:5 89:8
 90:15 93:22 96:24
 97:9,20 98:2,23
 99:5,20 100:8,15
 111:19 115:10,14
 116:10,18 117:1
 123:12 124:8,17
 127:4,19 129:22
 132:15,16 141:11
 142:22 150:6,12
 151:3 152:22
 173:16 176:9
 178:7 181:8 191:8
 191:13,19,25
 192:13,14 193:21
 196:3,3,5,22,24
 197:1,4,10 205:6
 215:8 216:24
 217:4
**files** 17:22 198:6
**filing** 23:18 27:22
 40:12 85:1 96:25
 97:9,21 98:10,12
 98:24 99:7 104:7
 150:9 188:10
 217:1

**filings** 16:13
**filled** 45:14 47:1
**filter** 18:3 19:4
**final** 110:9 114:1
  123:11
**finally** 37:6 47:10
**find** 64:14 81:9
  82:4,14 83:2 87:2
  108:5 176:7
**finding** 120:25
**fine** 39:4 86:10
  106:7 117:15,21
  118:3,20,22 119:3
  120:3,6,22 121:8
  122:21,25 131:12
  156:16 157:18
  168:1 170:21,21
  178:22 185:22
  186:19 195:16
  202:17 213:21
**finish** 43:25 53:7
  205:16
**fire** 154:12
**firm** 6:19 36:18
  44:25 106:13
  108:14 109:2,3
  116:24
**first** 9:5,17 17:16
  17:19,20,20 18:3
  19:9,10 20:22
  21:2 27:20 28:10
  29:7 30:23 39:18
  50:21 62:17 72:16
  72:23 73:19,23
  75:6 76:16 77:11
  77:17 91:8 104:1
  122:11 123:23
  124:14 125:20
  139:25 150:2
  159:22 160:5,6
  164:13 165:1
  168:14 173:4,20
  175:24 177:7

**178:14 183:1
185:12,25 186:2
189:7,11 196:10
203:10,25 206:25
207:8 209:12
216:2,16
fit** 102:3 188:5
  190:12,13,16
  192:16 199:10
  208:3,3
**fitzpatrick** 163:22
  164:5
**five** 14:25 45:15
  90:7,24 96:11
  97:3,12 101:20
  119:6 149:4 168:7
**fix** 131:14 151:5
**fixed** 106:1 115:4
  145:8,13 161:6
  212:10
**flip** 193:7
**floor** 6:21
**fly** 24:2
**focused** 92:14
  118:23 211:20
**focusing** 20:21
  43:9 67:23 118:25
  134:12 160:13
  194:2
**foley** 7:3 13:20
  14:8 40:14 48:24
  50:6 56:21 177:3
**folks** 9:22 12:16
  55:14 62:4 117:12
  173:20 184:7
  211:9
**follow** 21:7 29:3
  42:4,6
**followed** 13:24
  16:24 59:1 89:16
  89:16 199:7
**following** 17:15
  109:20 111:8

140:2 173:3 174:2
**footnote** 98:1,1,11
  146:15
**forced** 192:10
**foregoing** 220:4
**foreign** 38:2
**foresaw** 184:18
**foreseeable** 28:3
**forever** 125:12
  126:10 186:20
**forget** 74:24 77:2
  77:4 150:3 152:18
**forgive** 147:17
**form** 27:17 28:15
  67:22 105:24
  124:2,13,25 131:6
  146:24 169:20,21
**formal** 24:9
**formalistic** 131:4
**formally** 169:7
**former** 96:11
  106:17
**formula** 93:1
**forth** 49:25 50:24
  51:11 60:2,18
  89:9 99:4 125:6
  135:13 142:12,24
  160:5 188:10
**forward** 11:19
  13:21 17:10,24
  19:15 23:8 28:13
  62:10 63:13 64:12
  71:4 115:18
  131:11 153:8
  165:23 177:4
  209:13
**foster** 115:12
**fought** 63:10
**found** 107:5 109:4
  110:8 111:18
  120:24 142:9
**foundational**
  50:12,19

**four** 37:8
**fourth** 2:23 88:23
  89:8 98:24
**frame** 174:13
  175:1
**frankly** 110:14
  155:7 162:23
  205:24
**fred** 45:11
**frederic** 4:25
**free** 21:21 22:12
  26:14 50:5 107:24
**friday** 83:21
**friedmann** 4:11
**front** 21:23 75:12
  75:14 143:25
**fti** 13:17
**full** 9:23 30:12,12
  36:22 44:12 69:22
  77:6,6 97:15
  99:24 102:1,1
  112:12
**fully** 63:3 123:22
**function** 25:7
  93:16
**fundamental**
  27:11 30:21 50:14
  102:8
**funding** 10:10
**funds** 78:19
**funnel** 17:24
**further** 12:5 37:9
**future** 60:17
  139:6 165:18
  167:22

**g**

**g** 8:1
**gallagher** 3:25
  220:4,19
**galling** 35:24
**game** 115:18
  198:20

garbe 2:7
garrett 4:8 8:5
  172:7
gatekeeper 33:22
gather 20:11 72:7
gathering 74:21
  74:21
gene 90:21
general 17:6,17
  86:9 90:5 133:8
  190:15 211:20
generally 54:11
gentlemen 36:19
  37:13
getting 17:21
  30:16 37:6 41:10
  57:22 58:5 65:19
  70:13 75:8 93:19
  101:12,16,19
  105:7 132:3 184:5
  184:7 204:12
  212:11 213:17
give 13:1 24:4
  27:18 30:3 37:14
  38:19 43:15,19
  54:15 55:20 72:16
  76:2,4 77:6 89:12
  110:19 116:20
  117:23 121:21
  142:2 169:14,23
  174:19 178:6
  179:22 196:4,16
given 28:15 30:13
  30:19 31:13 35:21
  36:4 37:22 47:25
  52:6 53:15 54:13
  59:1 65:14 93:9
  115:7 127:8 138:3
  161:2 162:14
  163:4,16 164:2
  173:2 174:13
  181:20 183:17
  188:21 191:21

202:14
gives 82:10 138:8
  145:11 175:15
giving 8:22 23:25
  35:11 58:23 75:9
  133:9 170:19
glad 215:1
glass 4:25 45:4,10
  45:11 47:19 48:3
  48:6 208:2,9,11
  208:16,20 209:1,4
  209:16,24 210:4,7
  210:10,14,17,20
  211:3,7 212:4,14
  212:23 213:2,5,9
  213:18,22,24
  214:1,3
global 5:13 20:20
  20:24 21:17 48:11
  62:15 211:18
go 8:11 21:3 23:10
  28:13 33:12 35:10
  40:22,23 43:21
  49:18,20 53:18
  56:5 57:5 58:25
  64:12 69:20 73:22
  75:4 77:14 83:3
  91:10 94:21
  101:16 105:9
  112:3 122:17
  152:20 160:3
  168:1 178:21
  187:16 190:22
  195:4 203:15,19
  204:11 209:12
  212:18,23 214:19
goal 18:14,23 19:4
  19:25 169:8
goals 91:7
goes 62:11,12
  69:18,18 82:10
  107:4 179:16
  183:5

going 17:24 18:2
  19:1 21:23 22:1
  33:1 37:1,8,14,15
  47:12 48:4 49:9
  51:3,17 52:20
  54:16 55:7 56:4
  57:4 58:8,12,13
  58:22 62:2,3,19
  64:5,13,14,14
  67:10 68:10 69:20
  70:1 72:4,22 74:5
  75:5,20,23 76:12
  76:13 77:5,5,6
  83:20 84:23 93:6
  93:16,17 97:7
  98:18 104:25
  106:14 107:18
  108:19,24 110:14
  112:8 113:3,13
  114:23 115:15
  116:22 117:8,12
  119:11 122:16,16
  122:17 127:1
  130:4 131:12,13
  136:11 143:11,16
  149:24 151:5
  153:21 154:13
  156:21 157:3,17
  159:15 161:15
  165:22,23 167:8
  168:25 171:10,24
  172:11 173:6
  175:2 182:16
  183:10,17,24
  184:4 185:6,10
  186:23 187:2,4
  188:5,25 189:2,14
  189:20,22 190:22
  191:1,6 195:25
  197:13,21 198:2,3
  198:4,10 199:11
  201:3,7,8,9
  202:16 203:12,13

203:15 204:9,21
  208:11,14 209:11
  209:20,22,25,25
  210:11 211:1,15
  213:15 216:21
good 8:2,4 17:4
  27:5 32:15 36:15
  36:16 45:4,10
  48:8,9 96:19,20
  114:8,10 115:23
  123:8 140:9,21,23
  155:24 156:2,3
  163:3 174:21
  210:8,20 213:14
  219:13
goods 14:13 18:12
goodwin 6:3
  32:16
gotshal 4:3 8:5
  77:20 172:8
gotten 20:13,13
  38:18 51:5 67:11
  85:6 176:1 197:2
  200:19 206:4
gottleib 123:9
gottlieb 5:3
governed 72:5
  126:18 157:23
governs 107:3
  155:22 163:21
grandson 199:25
grant 161:15
  164:17
granting 2:13
granular 129:5
great 114:9
  212:21
greater 13:13
  17:4,8 42:18 92:1
  92:2,4 94:14
  176:18
griffin 37:5

grimm 5:20
  140:24
gross 91:20,25
  92:2,3,5,9
ground 114:15
group 7:4 9:7,14
  9:23 13:19 14:2,9
  18:3 26:16 28:2
  30:16 40:14 48:24
  50:7 53:21 54:17
  57:12,25,25 58:5
  65:20 68:20,22
  72:18 75:6 77:11
  77:12 172:10
  177:3 192:16
  205:15,20 208:4,8
  208:9,25 209:2
  216:16
groups 16:15
guess 33:1 46:12
  51:7 53:25 70:13
  70:18 128:2 129:2
  130:4,10 134:9
  144:25 166:6
  177:15 193:19
  205:19 214:4
guessing 41:3
  42:23
guidance 158:14
gump 4:13 89:3
  96:9 104:25
  106:17

              h

h 5:17 6:24 78:10
  78:17,20
hac 124:11
hair 188:7 190:12
haircut 34:23
  50:17 58:16
half 44:22 55:3,3
  91:25 92:3 95:3,3
  95:5,6 116:25
  141:1 171:10

hamilton 5:3
  123:9
hand 34:9 79:23
  96:7 161:19 180:3
  212:10
handful 139:17
handing 93:12
handle 167:9
hands 51:3 52:8
  52:12 53:8 60:21
  60:24,25 61:15
  93:11 108:4
handwritten 76:6
  76:7
happen 30:1,6
  32:4 49:15 56:5
  61:25 66:15,15,18
  82:16 95:8 136:4
  166:5,21 180:7,7
  180:8 189:17,21
  198:4,5 200:17
  201:1 214:7
  215:13 217:5
happened 10:14
  27:13 29:7 30:9
  30:11 49:20 80:21
  127:10 152:18
  191:7,8 200:7
happening 30:7
  167:22 213:16
happens 58:6
happy 24:19
  49:25 52:3 57:24
  154:21 160:2
  161:25 176:24
  179:21
harbor 4:22,23
  45:11
hard 14:16 16:19
  63:10 108:5
  145:21 153:24
  160:16

harm 164:24
harmed 59:7
harris 163:10
hate 129:4
hauer 4:13
hawkins 6:17 27:5
  27:6 28:20,23
  29:12,14,17,20
  30:6,18,24 31:3,6
  31:8,17,22,25
  32:2,10 180:16
  181:1,21,23 182:9
  182:18,24 183:4
  183:12,20 184:6,9
  184:16,21,25
  185:16,21 186:4,9
  186:15 187:10,18
  187:22 188:13,16
hazard 160:11
head 167:1 188:2
health 164:20
hear 27:2 32:13
  46:1 49:24,25
  52:14 54:24 57:18
  57:21 61:19 64:10
  67:8 84:1 124:24
  128:2 154:21
  166:6 179:21
  188:25 189:22
  191:8 204:15,16
  204:17,18,20
  205:6,9,14
heard 24:18 32:21
  32:22 37:11 46:5
  51:21 60:20 63:22
  72:13 76:16 83:6
  89:24 131:20
  136:11 172:24
  191:17 195:20
  205:18 206:13
  207:19
hearing 2:6,15,20
  2:23 3:1,4,8,15,16

3:18 24:3 52:8
  59:15 62:23 78:18
  85:3 97:20 98:5,9
  98:14,15,22 100:5
  112:18 113:21
  114:22 117:21
  118:16 119:22
  120:2,5 141:2
  194:22 209:3,5,8
  209:21
heart 182:20
held 72:22 78:19
  82:23
hello 52:13
help 64:13
helps 111:5
herring 215:11,11
hey 27:17 37:3
hi 180:16
higgins 137:21
higher 26:1,3
highlight 125:16
highly 181:17
hire 109:3
hires 109:2
histories 203:20
hit 152:5
hoc 7:4 13:19 50:7
  57:12 172:10
  175:4
holco 123:10
hold 36:10 48:15
  145:18 185:14
holdco 1:13 3:19
  5:4
holder 60:1
holders 19:7
  50:16 110:3
  185:13,17
holding 10:4
  17:16 118:2
  138:17 168:6

[holdings - implied]                                                                Page 23

**holdings**  1:6 2:25
  8:3 171:24
**hole**  128:14
**holes**  149:17
**holiday**  73:7
**home**  199:25
**hon**  2:2
**honestly**  104:23
  184:25
**honor**  8:4,13,17
  9:3 10:2,6,13,23
  11:16 12:4 13:5
  13:16 15:11 16:5
  16:10,22 18:8
  19:4,23 20:5 21:1
  21:15,25 22:19,24
  24:8,15,23 26:21
  27:3,5,8 28:5,20
  28:23 29:14,18
  30:24 31:3,17,23
  31:25 32:2,10,11
  32:15 33:2,8,19
  34:2,16,20 35:1,7
  35:10,17 36:2,14
  36:15 39:9,14,22
  40:20 42:7 44:8
  44:22 45:4,5,10
  48:8,12 49:8,17
  49:19 50:6,10,20
  51:10,12,13,22
  52:10,15,17,23
  54:24 57:9,11
  58:8,23 59:1,3,22
  60:9 62:7 63:1,9
  63:11,16,25 64:23
  64:23 65:21 66:3
  66:7 67:7 68:9,24
  69:9,13 70:22
  71:3,22,24 73:1,3
  74:7,24 75:7,14
  76:5,9,19,23 77:3
  77:8,19 78:17
  79:20 80:11 81:4

  81:21 82:2,3,14
  83:2 84:3,5,16
  85:12 86:1,22
  87:8,11,19 88:6
  88:13,17 89:2
  95:22 96:16,19,24
  97:8 100:14,25
  103:7,19,24
  104:21 105:16
  106:5,12 107:1,25
  108:12 110:12,16
  110:25 113:14
  114:16,20 115:21
  116:8 117:6,18
  118:1 119:3,13
  121:25 122:5,10
  122:11,23 123:2,8
  123:13,21,24
  124:14 125:4
  126:15,24 127:11
  128:5,8 129:13
  130:22 131:16,19
  131:24 132:10
  133:2,5,8,21
  134:16,22 135:6
  135:22 136:6,9,25
  137:7,12 139:12
  139:17,19,22,25
  140:7,10,15,20,21
  141:3,5,22 142:11
  142:13,18 143:3
  143:17 144:7
  145:1 146:7,11
  147:10,18 149:11
  149:22 150:24
  151:9,23 155:15
  156:5,16 157:7
  158:3,14 159:5,24
  160:1 166:7
  167:10,16 168:13
  168:15,25 169:4
  169:25 171:6,8
  172:7,12,13 173:5

  174:9,22 176:7,24
  177:18 178:13,16
  179:2,9,19 180:13
  180:16,18 181:2
  181:21 182:18
  183:4,12,20 184:6
  184:25 186:4,15
  187:10 188:13,16
  188:17,19 190:7
  191:3,6,24 192:4
  192:22 193:1,16
  193:22 194:18
  195:17,24 197:8
  197:12,23 198:7
  198:12,20 200:18
  201:18 203:4,12
  204:7 206:8 208:2
  214:21 215:2,6,21
  216:7 217:12,21
**honor's**  67:9 82:7
  84:20 124:23
  149:8 168:18
  183:23
**hope**  22:22 165:13
  176:25 178:18
**hopeful**  87:24
**hopefully**  17:21
  150:1 169:10
  205:19 208:18
**hoping**  75:22
  88:11
**horizon**  163:24
**hour**  123:4 141:1
  171:10
**hours**  16:12 76:15
  172:10 193:4
**huge**  45:18
**hundred**  15:6
  19:12 65:16 130:9
  148:15 150:2,3
  161:11
**hundreds**  68:10
  196:12

**hurdle**  17:20
**hutcher**  5:12
  48:10 96:21
**hypothetically**
  108:22
**hypotheticals**
  35:11

---

**i**

**i.e.**  161:6 188:10
**idea**  28:24 40:24
  41:5 58:10,14,17
**identification**
  109:14
**identified**  18:5
  35:8 97:5 110:22
  173:7
**identifies**  100:1
**identify**  173:4
**identity**  109:21
**ignorance**  147:17
**ignore**  193:25
**ignored**  203:25
  206:24 207:1
**ii**  2:11
**iii**  83:15
**illinois**  77:25
**illogical**  75:23
**imagine**  66:1
  171:1 197:16
**immediate**  23:1
**immediately**
  60:11 165:5
**imminent**  23:20
  164:24
**impact**  17:12
**implement**  214:14
**implementation**
  47:21 48:14 65:5
  67:4
**implied**  155:24
  158:5 163:2,8
  219:12

**import** 42:23
43:11 55:14,19
61:22 63:4 71:11
71:14,18
**importance** 10:6
**important** 48:23
51:14 53:14 54:9
79:21 93:2 180:3
181:14 182:23
183:25
**importantly**
133:21 162:13
**imports** 18:7,9
44:10 65:9,16
66:17,24 114:22
117:8 121:4
**imposed** 78:12
**impossible** 150:19
150:21
**impractical** 185:7
**impression** 129:6
**improperly** 83:17
**inadequate** 73:8
**inappropriate**
133:13
**incentive** 15:1
91:11,23 92:8,12
92:20 93:1 97:18
97:24 98:7,13
101:4 102:16
105:20 114:10
212:21 213:7
**incentivize** 55:6
**incentivized** 23:7
114:6
**incident** 111:13
**inclined** 124:23
199:11
**include** 54:22
90:17 94:10 96:8
126:14 153:7
177:8,14,17,18

**included** 9:1 11:1
12:18,24 27:19
32:7 37:8 39:19
40:11 41:4 93:1
94:6 97:11 98:11
175:7,24 177:13
186:7 189:7
**includes** 109:14
109:15 177:12,22
**including** 13:20
14:8 28:14 32:4
98:18
**inclusive** 195:13
**inconsistent** 156:7
**incorporated**
134:11 155:21
160:21
**incorporates**
126:6 138:6
**incorrectly**
192:12
**increased** 9:19
**incumbent** 105:23
206:5
**independent**
90:12 91:1 99:12
164:7
**indication** 46:20
48:1
**indiscernible**
50:11,13 51:14
55:11 56:21 58:21
59:18 60:2,19
72:5 73:7,13,17
74:3,14,25 101:18
119:11,12 122:6
122:11,15 190:9
215:7 217:1,14,20
217:23
**indisputably**
133:4
**individual** 23:3
109:22 110:2

139:18
**ineligible** 19:21
**inescapable**
190:20
**infer** 112:9
**info** 39:11 44:5
**information** 14:14
18:18 23:17,18
29:2,3,6 30:3
31:13,18,20 32:19
35:25 36:3,5 37:4
37:10,24 38:18
40:25 41:1,22
42:4,7,9,13,13,16
42:17,17 43:11,17
46:8,9 48:1 53:2,9
53:24 56:3 57:16
61:4,15 64:9 66:1
66:6 67:10,11,20
67:21,24 69:6
70:10,11 72:2,6,7
72:15 73:6,7,8,21
74:11,12,16,22
77:10 83:19 97:2
99:7 110:23 132:2
132:6 172:19
173:19,24 175:25
176:1 177:9 178:2
178:3,4 179:12
180:5,25 181:3
183:23 184:18
185:18 188:22
191:14,14,15,25
192:7,13,15
193:20 194:9,22
196:6,16,17
198:22 199:7
200:8,9 201:17,18
202:5,20 203:25
204:12 206:4,25
207:8,19 208:6,7
215:22 216:3,4,8
216:13,18,20,23

217:5,7,8
**inherent** 108:14
**initial** 8:10 9:7,13
9:18 10:2 12:2
13:7,9 22:7 24:11
25:3,8,9,14 27:19
28:13,25 29:23
32:3,5,8 49:22
50:14 56:7 59:6
75:15 164:25
175:7,8 179:24
184:11,19
**initially** 90:15
**injunction** 142:22
164:22
**injunctive** 160:9
160:11 164:15,19
165:3,7,13,16,18
168:16 219:19
**injury** 3:10
**inquiries** 16:14
**ins** 17:18 26:9
117:24 118:8
**insight** 36:5
**insinuation** 96:5
**insisted** 15:17
**insolvency** 30:10
**inspected** 151:4
**insurance** 163:10
**insure** 158:15
162:5
**integrity** 107:5
**intend** 24:11
180:18
**intended** 16:25
47:20 80:2 172:4
212:2
**intent** 168:9
**intents** 78:13
**interacting** 26:11
**interest** 63:20,24
78:11 106:19
107:9,22 108:15

**interests** 91:12
101:6 110:3
**interplay** 35:5
**interpretation**
125:1 131:19
139:23
**interpreting**
131:3
**interrupt** 78:24
95:17 109:6 143:4
**interrupting**
198:13
**intervened** 58:6
**intimate** 90:13
**intralinks** 6:4
32:17
**inundated** 196:11
**investigation**
104:2
**invite** 153:19
154:1
**invoice** 45:17
**invoices** 36:7
45:17
**involved** 92:16,17
93:21 100:2
101:17 106:18
107:22 141:8,9
210:25,25 214:23
216:10
**involvement**
90:22
**ireland** 2:6
**irony** 109:4
**irrelevant** 113:17
113:18 186:10
**ish** 173:14
**island** 163:22
164:5
**isn't** 105:8
**israel** 163:23
**issue** 18:9 20:19
21:6,19 22:17

24:18 25:5 27:11
27:20 28:6,21,22
29:20 30:21 31:1
31:4 32:22 34:11
34:14 35:5,9
42:23 43:1,4,7
44:10 49:21 51:7
54:9,9,10,12,14
54:20 59:3,23
60:9,10 61:21,22
63:4,8 65:7,12,16
71:14,18 73:11
76:14 77:7 79:1
80:20 83:25 85:2
88:14 89:4 95:16
100:4 108:19
109:11,12,15
110:13 112:11,20
113:1,20,22 114:1
114:25 115:6,8,17
115:24 116:25
117:7,8 118:5
120:23 123:23
128:17 131:14
135:5 137:4,6,18
137:18 138:21,21
138:22 139:5
140:16 143:20
144:7,19 155:2
158:14 160:12
165:21 166:1,8,10
166:13,19,23
167:6 168:3,3,21
169:2 170:9
177:11 182:19
183:5 192:5
194:17 210:15,22
210:25 211:6,7,8
215:11
**issues** 14:21,24
18:5 19:3 20:10
21:16 26:10,13,17
26:20 28:11 35:7

40:21,23 46:22
47:23,23,23 49:3
51:20 53:23 54:23
65:6,9 121:18
127:15,18 155:6
158:23 159:3
169:20 172:13
176:2 177:22
184:23 197:21
204:10 208:15,19
211:1
**issuing** 111:10
**item** 123:11
**items** 8:7
**iterations** 90:10
**it's** 59:8
**iv** 2:13 124:22
**i'm** 71:20 76:25

**j**

**j** 5:8
**james** 2:7
**jamie** 3:25 220:4
220:19
**january** 88:6
115:2,5,22 124:7
124:16 130:3
187:2
**janyce** 3:8
**jared** 4:11
**jay** 5:18 96:23
**jennifer** 4:9 77:20
**jersey** 163:24
**job** 87:15 102:1
114:10
**john** 80:15,16
**join** 124:19
**joinder** 89:16,19
91:19 96:5 106:20
121:14,14,15,18
121:19
**joined** 48:22
121:21

**joins** 89:19
**joint** 2:24 97:1,22
99:1 109:25
**jon** 163:12
**jonathan** 6:24
36:17 116:24
**jones** 80:15
**joshua** 5:24
140:22
**judge** 2:3 62:14
87:4 111:24 119:5
162:1,2 214:12
**judges** 137:25
**judgment** 15:14
145:7,13
**judicial** 17:11
26:24 134:10
138:8 170:12
211:13
**judicially** 157:12
171:3
**julie** 7:16 52:18
**july** 78:18 83:10
85:3 96:24
**jump** 123:19
**june** 97:5 109:8
113:21
**junior** 179:14
214:25
**jurisdiction**
136:15 137:16,17
137:20,22 138:2,4
138:7,9,12,16,19
139:3,5,8 158:17
158:24 159:4
162:4,15,22 163:1
**jurisdictional**
138:5

**k**

**k** 137:1
**kathleen** 3:4
**keep** 60:19 212:13

[kelly - legal]                                                      Page 26

kelly  3:8
kept  33:19
kick  94:18
kimberly  5:10
kime  3:4
kind  24:20 30:7
  37:1 38:16,19
  41:23 139:19
king  3:11
kirby  7:13
kmart  214:7
knew  51:9 55:5,7
  65:11 111:20
  130:24 137:3
  141:6 192:23
  199:7
know  11:1 14:17
  14:20 16:12,16,19
  18:8 19:3,8 21:3,5
  21:13 22:8 23:19
  23:21 24:16 25:11
  25:13 27:1 28:9
  30:25 31:4,9 33:1
  33:17,21 34:1,2,7
  34:9 35:15,16
  36:23 39:11,11
  40:15 41:16 43:4
  43:14,18 44:9
  45:21 46:10,17
  47:11,13,14 51:13
  54:4,8 55:3,4,8
  56:6,16,17 57:3
  58:11,15,20 59:3
  60:1,5,9,15 61:6,7
  61:8,9,10,17
  62:11 63:6 65:17
  65:18,25,25 66:19
  68:1,15,15,18
  70:15,25 71:2,13
  72:16,18 73:7
  74:9 75:19 76:12
  79:18 80:21,22,24
  81:5,12 82:9,19

83:11,12,17 84:12
  102:11 103:19
  105:22 108:7
  109:18 112:6,7
  113:7 116:2 119:8
  121:10 123:4
  126:20 127:13,21
  127:21 132:8
  135:8 136:21
  142:19 143:7,11
  143:24 147:2
  148:18 149:2,3,25
  150:10,13,14
  151:17,19,25
  152:1,1 153:17
  154:3,3,5 164:23
  165:1,14 168:11
  169:14,15,23
  170:22,24 171:16
  172:20 173:2,5
  174:13 176:8,16
  176:22 177:3,15
  178:25 179:17
  181:16,19 182:4,5
  183:11 188:7,14
  189:13,14,24
  191:7,22 194:12
  194:17 199:20
  201:11,19,19
  202:21,21,25
  203:1 204:25
  206:6,20 209:20
  210:10,11,22,24
  211:15,22 212:8
  212:13,16 214:14
  216:11
knowing  74:20
  183:6
knowledge  66:10
  66:12 98:20
  112:25
knows  50:10
  123:24 152:11

koons  141:8

l

l  3:8,24 4:19 220:3
  220:14
labelled  147:6
labob  57:9,11,11
  57:17,19 58:2,8
  59:11,18,22 60:23
  61:1,11 62:6,10
  67:7,8,18
labov  7:6 50:6,6
  50:10
lack  9:5 21:12
  27:12
lacking  138:20
lady  164:11
laid  153:23
landlord  124:5,8
  124:12 126:25
  131:18,18 135:7
  135:18 146:24
  150:4 161:2,8
  164:4
landlord's  125:22
  126:5 132:10
  134:7 151:17,19
  151:22
landlords  131:9
  131:22 132:5
  143:25
language  128:4
  148:19
lardner  7:3 50:7
  50:12
large  40:21 69:23
  180:8
larger  25:17
  60:17
lastly  175:18
late  39:11 40:12
  41:3,17 42:10,11
  62:3 109:18

law  6:19 12:12
  36:17 108:13
  109:2,3 116:24
  137:21 140:10
  155:14,15 158:23
  163:7,20 164:21
lawsuit  108:9
lawyer  114:9
  210:24,25 217:21
lawyers  104:20
  105:2,15 107:14
  114:10
lay  113:8,13
  161:25 167:2,7
  200:14
lead  14:6 91:5
leading  93:3
lease  123:14 125:9
  125:11,14 126:1
  130:19 136:24
  139:4 143:3 147:3
  155:21,22 156:10
  157:1,5,9,14,16
  157:21,23 158:8,9
  162:11 163:5
  171:2,2
leases  123:17
leave  20:11 33:3
  59:16 68:24 77:13
  168:6 170:22
leaving  10:20
leberman  163:11
led  41:9
left  11:5,18 13:7
  33:18 61:7
legal  14:21 18:5
  20:9,10 21:16
  22:9,17 26:10,13
  26:17,20 28:21
  29:5 30:21 33:22
  43:10 46:22 51:20
  54:8,12,23 61:21
  65:6,7 74:8 88:14

104:6 106:22,24
114:25 145:9
164:7 166:18
176:2 177:11,22
178:2 211:1
220:22
**legitimate** 63:21
138:13
**legitimately** 61:22
**length** 177:1
**lengthy** 83:3,6
**letter** 78:4 80:3
140:10
**letters** 15:6 79:25
84:25 85:18
142:12 143:1,1
**lewis** 5:8
**lexus** 163:13
**liability** 15:16
**liberty** 5:5
**lie** 156:14 163:17
**life** 163:10
**lifetime** 7:9 72:1
188:18
**lift** 165:25 166:4,7
**lifting** 168:19
**lifts** 166:21
**light** 164:2
**lightening** 152:5
**likelihood** 28:7
**liman** 5:8 81:3,4,7
81:9,12 82:2,6,14
82:17,24 83:2,6
83:19 84:3,16,20
84:23 85:9,12,15
85:17,20,22 86:1
86:4,6,8,10,14,22
86:25 87:2,11
88:17
**limited** 16:13
54:13 90:3 126:19
**line** 103:5,13,16
103:20,21

**lionel** 103:16
105:25 108:10
138:14
**liquidate** 3:12
**liquidated** 142:10
145:8 161:17
**liquidating** 93:7
97:12 98:4,7,19
99:3 101:15,17,24
108:18
**liquidation** 103:3
103:17,17 107:21
112:4
**list** 45:18 46:18
53:19,22 54:8
193:8,18
**listed** 46:18 97:12
99:1
**lists** 45:17
**listserv** 21:11
22:13
**literally** 43:13
194:20
**litigant** 136:12
**litigate** 154:13,24
**litigated** 166:11
**litigating** 154:2,11
165:20,22
**litigation** 60:1
89:5,6 90:11,17
91:1,2 92:5,9,13
92:17 93:7,12
94:13,20,24 99:2
99:3 102:9,19,23
103:2,2,6,12,15
103:17,25 104:11
104:15 105:1,11
105:24 106:11
108:18 112:4,8
114:7 117:13,14
127:16 128:9,17
132:11,24 134:7
135:10 138:24

140:4
**little** 16:21 70:3
77:10 129:4
132:20 137:14
138:25 172:4
208:2 213:17
**live** 34:21 123:18
204:5
**living** 63:15
**llc** 1:10,13 3:19,19
4:22,23 5:4 88:21
122:3 123:10,11
**llp** 2:16 4:3,13 5:3
5:12 6:3,11 7:3,13
123:10
**lo** 144:1
**locked** 17:22
198:6
**logged** 19:25
**logging** 203:14
**long** 33:17 34:11
36:1 56:9 112:10
117:20 157:15
163:22 164:5
180:18 193:21
**longer** 30:18 55:7
62:24 127:22,24
149:12,13
**look** 12:25 25:11
29:21 45:22 46:17
56:25 67:10 69:15
70:6 72:11 75:19
76:3 77:2 85:7
87:4 108:6,9
109:10 117:3
128:12 154:25
157:4 173:22
179:10 181:12
188:25 194:11
197:14 199:9
200:3,3 201:1
203:15 204:2
210:2 213:12

**looked** 42:11 46:7
184:1 196:24
**looking** 12:8
29:21 34:4 61:8
76:25 95:13
154:21 184:21
185:21
**looks** 45:19 109:1
**lose** 74:1 142:19
**lot** 22:23 41:18
68:4 92:16 107:20
108:1 110:14
115:7 129:15
144:22 149:7
153:8 154:17
214:22
**lots** 113:12 139:1
148:24
**lovely** 131:21
**lower** 55:16 64:21
102:11 126:12
137:24
**luck** 37:20,25
47:16 217:9
**luke** 5:9 123:9
**lunch** 76:13
122:13,17,18
123:3

| m |
| --- |

**m** 6:17 7:11
**m3** 14:16 18:19
19:18 22:13,16
26:12 36:22,23
37:6 40:23 41:2
46:6 47:8 69:5
77:9 172:11
207:13,19 215:3
**ma'am** 45:6 52:20
215:10
**machine** 179:16
**mackenzie** 3:8
**mad** 133:23

**mail**  56:12 80:14
  207:13 215:7,22
  216:12 217:6,10
**mailed**  8:20
  188:20
**mailing**  10:14
  39:19 46:9 173:20
  178:15 181:10,25
  182:3 185:25
  186:1 195:8
**maintained**  14:15
**maintenance**
  143:20 147:3
  149:12 157:16
  158:6 159:3
  165:23 168:6
**major**  14:21
  17:20,20,25 19:1
**making**  27:22
  47:7 49:22 52:20
  70:5 106:10
  114:24 124:1
  128:18,21 182:25
  187:16 189:4
  211:10
**manage**  105:11
**management**  79:3
  79:9,11,13,17
  80:19 81:22 83:10
  83:15 84:14
**mandate**  92:13,17
**manges**  4:3 8:5
  77:20 172:8
**manner**  18:8 19:5
  93:8 102:4
**march**  152:17
**market**  105:10,12
  105:24 110:23
  121:21
**match**  174:18
  176:21
**matched**  43:16

**math**  12:3 13:5,13
**matter**  1:4 12:9
  12:12 18:18,22
  41:3 47:2 75:13
  77:17 82:5 88:20
  100:18 114:21
  121:23,24 122:11
  123:15,18 126:21
  161:21 162:8,19
  162:24 198:19,20
**matters**  3:15
  96:12 106:17,18
  138:8 216:11
**matured**  145:8,13
**mean**  10:21 30:20
  31:15 37:16 41:15
  41:20,25 43:9
  55:22 56:9,25
  59:17 65:1 66:12
  66:25 67:2 68:6
  68:12 69:3,17
  70:17 74:22 75:5
  77:15 79:11,18
  80:13 81:13 82:1
  82:8 83:8,21,22
  83:22 84:10 85:18
  86:18 87:12,16,25
  88:8 104:23 109:1
  110:18 121:13
  127:6,9 133:15
  134:9 135:1,3,23
  136:3 139:4,5
  142:25 146:23,25
  147:12 148:11,14
  149:13 151:13
  152:4,4,17 153:9
  154:4,20,23 155:7
  155:11,14 156:25
  159:11,14 165:16
  166:12 167:3,12
  168:11 169:15
  170:13 177:2
  179:1,14 181:12

**183**:3,13 184:1,24
  186:23 187:4,25
  194:20 196:18
  198:10,16 199:18
  205:12 210:22
  212:17 216:24
  217:12,13
**meaning**  123:23
**means**  42:9 49:13
  121:15
**mechanically**
  203:13
**mediation**  90:4
  135:14
**medical**  163:23
**meet**  9:12 135:21
  175:16
**meetings**  95:23,25
**member**  90:7 95:9
  97:3,14,14 98:4,6
**members**  89:5,22
  90:1,8,12 91:2,7
  91:11,13,17,24
  93:6,9,14,20,24
  94:22 95:2,3,15
  96:7,10 97:13
  99:3,8 101:5,20
  101:23,25 103:4
  107:14,15 108:19
  108:21 175:4
**memorializes**
  169:9
**menlo**  1:10 3:19
  88:21 122:3
  123:11
**mention**  73:24
  76:20,20
**mentioned**  25:21
  44:10,24 49:11
  50:21 76:21 134:6
**merits**  123:22
  170:2,18 208:24

**meriut**  155:9
**met**  109:20 111:9
**methodical**  51:23
**middle**  216:9
**mii**  69:5
**milestone**  17:21
**miller**  6:24 36:15
  36:17,17 38:6,8
  38:11,13,16,24
  39:1,3,5,9,22,24
  40:8,20 41:14,19
  41:25 42:24 43:2
  43:6,8 44:8,16,19
  116:22,24 117:4
**million**  10:3 12:2
  33:3 58:25,25
  60:5 61:9,9,10
  75:8 77:23 91:20
  91:21 92:1,1,2,3,4
  92:4,5 94:9,17,18
  94:20,21,23 95:1
  101:20 102:21
  104:1,5 108:10
  115:14 173:21
  176:9,11,15,17
**millions**  104:6
**mind**  91:7
**minded**  175:23
**mine**  19:10,16
  74:7 215:4
**mineola**  220:25
**minimum**  10:9
  28:9 129:11
**minority**  201:4,6
**minus**  94:19
**minute**  203:24
**minutes**  34:21
  76:3
**misleading**  185:1
**misread**  197:1
**missing**  50:8
**misspoke**  148:13

**mistake** 108:17
**modified** 2:24
  96:25 97:10,22
  98:25
**moment** 20:11
  24:6 127:13
**monday** 178:20
  178:23 211:16
**monetary** 124:11
  124:14,20,21
  125:3,19,22
  126:14 130:3
  131:23 132:13,14
  132:17,18,22,23
  132:25 133:4
  139:21 141:12,23
  142:10,14 145:18
  146:9,10,11 160:6
  160:14 166:10
**monetization**
  92:23
**money** 15:23,23
  16:16 23:9 33:17
  49:13 53:18 56:19
  57:23 59:4,7,8,19
  59:25 60:4,11,15
  61:8,21 62:3,8
  63:23 69:17,18
  73:22 75:3 79:1,1
  79:2,8,10 80:22
  80:25 81:16 92:24
  104:10 113:5,8,11
  113:12 130:20,24
  142:16,17 143:9
  143:11,13 145:24
  145:25 146:4,5
  147:4,6,12 160:23
  164:25 165:5,12
**money's** 69:20
**month** 23:11
  38:12 53:3 62:3
  62:19 63:3 181:10

**monthly** 23:18
**months** 22:23
  23:22 49:14 60:17
  69:20 77:16 99:11
  113:21 116:10,17
  116:17 118:21
**moore** 6:11 27:6
  180:17
**morning** 8:2,4
  26:22 27:5 32:16
  36:15,16 45:4,10
  46:13,15,16 47:5
  48:8,9 64:22
  172:18,24 173:7
**morris** 115:12
**motion** 2:6,15,20
  2:20 3:1,4,8,21
  77:18,21,23 78:6
  78:18 79:22
  119:24 120:13
  123:12 127:23
  129:6 133:6
  135:25 136:2,7,10
  136:11 146:15,18
  154:25 159:18
  160:21 161:15
  162:6 164:2,18
  165:25 166:6,22
  168:2 170:3,16,20
  171:4 219:8,18
**motions** 121:1
  123:16
**motive** 212:19,20
  212:23
**move** 11:19 20:4
  23:7 25:16 44:9
  62:10 80:13,14
  114:16 115:18
  123:21 124:23
  136:13 139:17
  186:23 214:18
**mover** 133:2

**moving** 13:21
  15:8 17:10,24
  100:15 125:3
  131:11,17
**multi** 8:17
**multiple** 11:3
  95:23 156:6

## n

**n** 4:1 5:1 6:1 7:1
  8:1 219:1 220:1
**n.y.** 163:23 164:8
**name** 115:12
**names** 99:17
  106:15
**narrow** 166:23
  167:7
**nature** 34:5,9
  48:24
**near** 94:2
**nearly** 53:3
  142:11
**necessarily** 43:16
**necessary** 19:17
  124:3 125:8
  138:17 146:20
  147:5 161:7
**need** 12:11 14:24
  16:20 18:14 19:18
  19:18 20:10 24:10
  27:17,18 30:3,4
  39:11 43:17 50:1
  51:1 55:20 71:20
  72:17 99:9 105:20
  114:10 137:23
  138:18 140:12
  143:2 159:2
  161:20 162:21
  182:10 183:17
  194:21 198:9
  199:20 205:19
  209:8,13 214:15
**needed** 42:15,16
  114:6 143:13

  144:5 160:25
  191:10 194:4,6
  198:14
**needs** 33:23 49:20
  50:18 60:10 102:1
  115:7 143:23
  144:1 147:19
  214:24
**neglect** 124:24
  133:3,16,17,20
  134:4
**negligence** 164:1
**negotia** 41:15
**negotiate** 37:15
  37:17 41:10,18
  43:6 44:17,19
  53:10 61:24 65:6
  65:8 77:12 79:19
**negotiated** 13:19
  61:5 96:1
**negotiating** 72:16
  73:4,15 91:6
  212:13
**negotiation** 10:6
  37:19 177:1 193:4
**negotiations**
  51:24 70:21 71:17
  93:3
**neither** 34:16 87:1
  102:2 144:17
**never** 38:18 47:25
  142:13 148:10
  190:17 191:17,21
  199:2 209:22
  212:9,14,18
**nevertheless**
  181:23
**new** 1:2 4:6,17 5:6
  5:15 6:5,7,15,22
  56:21 121:18
  155:15,25 159:7
  163:7,19,24
  207:10

nice 47:14
nicole 3:25 220:4
220:17
night 46:14 47:10
64:22 69:24
nj 5:22
non 9:10,21 19:20
26:10 28:2 30:16
125:3,22,25
126:14 131:10,23
132:14,22,23
160:2 185:14
normal 118:20
152:13
normally 110:23
note 52:25 92:6
93:2 96:12 98:3,3
98:6,6 123:14
128:9 131:16
138:14 140:1
180:9
noted 94:5
notes 101:2
notice 3:15 8:21
8:22,23 11:20
16:10 24:4,9,11
24:13 27:12,17,22
28:15 29:1,8,10
29:16,21,25 30:3
31:16 32:6 41:21
50:22,22 51:7,8
54:13,15 57:3
75:20 96:24 97:9
97:20 98:24 124:2
124:6,9,15 125:7
126:17,18,22
131:7,8,19,25
132:16 133:24
134:11 142:2,2
146:2,6 160:17,25
161:10 185:2
188:21 189:10
190:21 194:1

197:2 203:5
noticed 8:25
39:20 148:2
notices 51:11,24
195:4
noticing 47:23
49:2
notified 39:15
notifying 39:15
noting 78:20
notion 196:22,25
notwithstanding
125:10
november 32:20
37:25 38:5,14,19
40:19 42:11,11
45:15,15 51:8,14
53:2 61:18 73:6
74:17 78:4 90:19
160:16 173:19
178:11 181:9
191:9,21 192:1,1
192:20,21 194:10
194:15 196:4,5,5
196:6,11 197:24
197:25 198:23
203:6 208:5,5,6
number 8:7 10:17
11:15 13:9 18:23
34:13,17,17 36:1
36:1,21 52:9
53:12,15 55:3
60:6 69:22,23,23
86:20 90:4 95:25
97:1 105:25 112:4
120:14 127:6,7,20
131:20,21 150:3
151:14,16 166:16
176:11
numbers 31:1
45:18,18 54:6
55:14 73:11 74:8
104:4 172:11

190:16 193:4
197:13 210:20
nutshell 79:16
ny 1:19 4:6,17 5:6
5:15 6:7,15,22
164:12 220:25

**o**

o 2:1 8:1 220:1
object 12:7 132:5
161:9
objecting 51:22
objection 12:14
12:14 13:2 34:5,9
55:23 78:6 83:9
89:13,14,17,17,18
95:9 99:5,20
100:3,7,8,15
105:12 111:6,20
114:4 115:13,16
119:24 120:10,12
120:16,18 121:16
127:4 174:14
208:21,22
objections 16:13
16:13 18:4,14
24:16,21 26:10
90:4 101:16
120:15
objectors 50:8
obligated 147:20
148:1,4
obligation 126:14
126:22 128:3
136:23 145:2,21
145:22,23 157:17
158:6 161:20,24
187:11 200:4
obligations
130:19 131:11
149:12 153:5
168:6
obtain 94:4

obviously 25:2
39:8 68:18 90:13
90:24 92:16 93:21
94:12 96:7 127:13
134:9 169:11
176:24 179:10
occur 28:4
october 8:14,24
51:8,9 89:9 91:16
97:19 98:22 99:6
100:15 112:2
195:5,6,7,7
odds 126:7 132:20
offer 65:18
office 110:2
officer 109:23
official 4:14
offset 149:7
153:14 211:4
oh 38:10 46:16
52:17 58:2 67:14
88:23 95:6 119:18
147:11 155:11
159:10 170:11
195:8 207:21
okay 8:2,12 10:24
11:4 14:3,7 15:20
16:6 20:25 21:10
21:16 22:20 23:24
26:7 27:1 29:4,25
30:5 31:5,7 32:1,9
33:8,9,17 35:9,19
35:23 36:8,13
37:9 38:10,22,24
39:4,21 40:7 44:7
44:20 45:3 47:18
48:2,7 50:9 52:5
52:24 53:6 56:2
56:24 66:9 67:9
67:18 70:9 71:6
71:23 76:5 77:17
80:12 81:8,11,25
82:8 83:20 84:4

84:19,22 87:18
88:5,20 96:3,14
96:18 97:7 99:10
99:20 100:20
103:25 107:6
110:12 114:8
116:4,12,15,19
117:5 118:4,13,18
118:24 119:2,4,24
120:2,9 121:6,11
121:23 122:5
123:20 128:20,23
130:1 131:12,15
133:1 134:6
137:10,13 140:8
140:19 151:10
153:13 154:23
156:20,24 157:11
167:13 168:8
169:22 171:5,7,9
171:22 177:6
178:10,17,24,24
179:20 180:15
181:1,12 191:2,22
191:23 195:19
199:10 201:2,21
202:12,18 204:4,6
204:8,24 206:3
207:2,25 208:1
209:24 210:4,19
212:11 214:2,13
214:13,22
**old**  82:9 114:14
220:23
**omission**  54:7
**omnibus**  13:2
18:4 84:1 88:4,5
**once**  45:8 56:3
65:11 79:6 164:22
182:7
**one's**  186:12
**ones**  18:5 58:21
113:4 159:21

189:11 190:1
**ongoing**  87:14
147:14 153:4
161:19
**online**  91:21
99:19
**onus**  161:8
**open**  21:20,25
49:21 175:23
176:18 177:11
**opens**  48:16
**operate**  126:2
135:7 172:5
**operating**  23:19
**operation**  93:15
**operations**  78:1
**operator**  217:24
218:1
**opinion**  10:19
19:17,23
**opportunity**
35:21 75:9 89:12
175:15 191:20,21
209:4
**opposed**  79:9
91:18 104:20
138:1 146:4
193:20 197:25
216:19
**opposition**  136:5
**opt**  9:2,5,6,10,11
9:11 10:15,21
14:23 17:18 19:20
26:9 28:2 29:1
30:14,16 31:11
37:16,23 38:1,1,5
38:7 40:22 41:9
41:16 44:11,11
45:13 49:7 52:7
75:17,18 117:24
118:8 184:13
185:4,14 208:4

**opted**  9:14,22
10:10 25:4 27:24
37:8 43:2 44:12
44:13,22 51:18
54:22 172:16
180:1 183:2
189:12
**optimistic**  175:22
**opting**  9:15 28:14
31:17 37:14 54:22
**option**  143:6
**oral**  115:5
**order**  2:7 3:20
8:15,20 17:23
24:3 27:13,19,24
28:1,12 29:22
30:9 41:8 44:16
45:18 48:18 49:8
49:16,17 50:23
63:11,17 76:10,18
77:6 87:23 88:1
89:11,12,23 91:12
104:5 109:14
110:9,9 114:2,2
123:24 124:10
125:2,5,18 126:5
126:7,18 132:21
134:19,20,24
135:20 136:14
137:1,4 138:9,11
139:21 142:23
146:8,15 157:9
158:15 159:3,13
160:4,15,22 162:1
162:15 167:2,7
169:2,7,8,8,12,21
172:3 181:17
184:10 185:8
189:6 190:18,20
215:12,13,15
**ordered**  215:1
**orders**  215:4

**organized**  21:17
**orient**  96:22
**original**  46:24
124:20 136:18
184:13
**originally**  139:14
193:9
**outset**  123:13
135:12
**outside**  11:9 68:19
81:23 131:6
135:24 167:16
**outstanding**  125:8
125:21 173:14
**overall**  13:11
15:16 103:8,10
166:3
**overlap**  86:19
**overly**  131:4
**overnight**  25:8
**oversees**  102:9
**overwhelmed**
53:12
**owe**  43:16 79:6
**owed**  34:22 35:14
87:14 113:10,12
161:11
**owing**  142:3,6,8
161:6
**owns**  81:17
**oxo**  6:20 36:18

| p |
| --- |

**p**  4:1,1 5:1,1 6:1,1
6:9 7:1,1 8:1
**p.c.**  7:8
**p.m.**  46:14 171:18
171:18
**pacer**  112:3
**packages**  8:25
**paco**  115:11
**pacor**  137:20
**page**  83:10 97:23
189:5 219:4

**pages** 163:14 190:20

**paid** 11:9,11,12 11:13 21:2 33:4 44:23 50:18 77:24 79:8 81:16 85:6 85:13 86:16,16,18 87:7 102:16 150:4 150:4 189:11 209:11 210:24 213:24

**pamela** 3:24 220:3,12

**pandora's** 48:16

**paper** 64:21

**papers** 31:10 115:3,11,14 116:11 119:14 189:3

**paragraph** 100:3 125:4,6 126:10,19 126:19 130:8 146:18

**paragraphs** 147:2

**parameters** 166:2 166:13,17 167:6

**paraphrase** 130:11

**park** 4:16 5:22 6:21

**parking** 129:15 139:1 144:21 149:7 153:8 154:17

**part** 15:18,21 29:20 30:8 31:4 37:14 41:8 54:21 58:24 63:16 67:14 67:15 70:20 80:20 81:18 83:11 90:1 117:7 134:7 135:19 136:17 147:22 156:3,9,10

162:9,17 163:8 166:3 179:1 182:19,19 194:18 197:19,24 213:14

**partial** 30:15

**participants** 177:2

**participate** 9:7,14 12:19 60:23 194:15

**participated** 173:17

**participating** 30:23 109:25

**participation** 112:13

**particular** 38:13 163:21 194:17 206:11 213:20

**parties** 9:1,11 10:10 12:1,18 14:5,22 15:1,19 16:15,17,18 17:2 17:4,5 18:20 19:2 20:4 23:2 24:16 40:2,12 55:6 60:15 69:22,23,24 70:2 72:4 78:20 89:14 145:25 155:21 163:5 164:9 166:5 171:3 171:13 172:16 173:2,15 174:20 175:16 183:11 188:21 205:9,10 210:5 211:19

**partner** 47:7 210:17

**partners** 46:6

**parts** 39:15

**party** 26:19 69:25 70:1 100:15 168:19

**passed** 17:19,20 29:24

**passing** 138:14

**patch** 143:14

**patient** 76:14

**patrick** 90:21

**paul** 7:6 50:6 57:11 67:8 104:4

**pause** 24:7 101:3 122:9 123:1,7 159:20

**pay** 30:11,12 32:24 34:18 59:25 60:12 85:11,24 143:8,10 146:5,23 146:24,25 147:6 147:12

**payable** 79:12

**payee** 80:9

**paying** 8:18 105:8 143:13 146:4 177:10

**payment** 2:11,15 10:11 12:24 27:25 28:7 30:15,15 73:15 74:6 75:6 111:9 145:7,12,24 145:25 164:25 165:12 191:9

**payments** 14:12 74:9 79:14,14 87:14 191:19 192:3

**payout** 185:9 200:11

**pc** 5:20

**pearl** 5:13 48:11 62:15

**pease** 2:16

**penalty** 198:1

**pendency** 89:10

**pending** 12:13 18:13 123:16

141:6 158:18

**people** 18:9 19:16 20:4,21 21:2 26:19 27:1 31:12 33:18 34:13 36:10 37:14 40:6 45:8,9 48:14 49:11 50:3 51:21 52:11,21 53:8,11,13,19,21 54:2 55:19,20 57:3 58:4 59:16 60:8,11,12,20,22 61:17,22 63:6,21 63:22 64:9,13 65:1,25 66:19,21 67:13,20 69:19 72:22 75:9,19 76:15 83:13 84:25 87:6 89:12 92:16 97:15 98:18 99:19 100:1 102:5,21 103:4 104:11,18 105:10 106:13 107:10,23 108:1,4 108:5,6,13,15 109:2,3,7,15 112:7,24 113:3,10 113:12,22 115:8 115:10,17,24 116:25 117:3 119:9 141:7 152:16 167:25 171:14,15 177:7,9 178:19 179:13,14 179:21 180:1,5,6 181:24 183:2,2,14 184:4 185:23 189:1,7,18,18 194:19,21 195:13 195:22,24 196:13 197:25 198:2,16 199:4 200:9 201:4 202:15 203:1

205:6 206:9
210:21 211:19,21
211:22,23 213:15
213:16 214:15
**peoples** 99:17
**peppered** 101:9
**percent** 9:8,18
10:16,17,19 11:16
11:23 12:22 13:4
13:8,9 14:25 15:1
15:2 25:21 26:2
33:4 34:23 44:23
55:5 63:7,7 66:23
91:25 92:2,3,5
94:24 176:6,21,21
176:22
**percentage** 13:11
26:5 59:6
**perfectly** 57:24
118:3
**perform** 132:4
143:2
**performance**
126:3,14,21 128:3
130:19 131:6
139:24 142:13,22
145:11,17 147:1,7
147:15 159:12,18
160:8,10,14 161:4
161:4,19 164:17
**performed** 147:8
**performing** 132:9
**period** 2:17 27:14
30:2 32:7 72:4
75:10 78:13,14
154:6 175:15
187:9 188:24
200:8 203:9
214:23 215:12,16
216:10
**permission** 8:8
122:24

**permit** 3:9 170:9
**permits** 156:6
**permitted** 152:24
**person** 35:3 51:19
68:16 82:21
111:10 121:21
**personal** 3:10
48:22 77:14 98:20
**personnel** 14:15
**perspective** 33:10
**persuade** 139:10
140:13 165:9
189:2
**pertaining** 30:21
**pertains** 54:10
**petition** 14:17
85:5,25 86:15,17
86:18 87:9,13,14
87:15,16 140:4
148:1,6,12
**pg&e's** 108:6
**ph** 90:21,21
103:16 115:11
141:8 167:11
192:5
**phase** 25:20,20,21
26:1 42:17
**phil** 89:2
**philip** 4:20
**phone** 16:14
24:19 36:21 45:8
46:15 47:6,7 50:4
171:15 206:9
**phone's** 179:15
**phrase** 104:23
**physically** 18:12
56:11 185:6
**pick** 68:7 118:15
**picked** 194:16
195:11
**piece** 10:6 64:21
**pieces** 125:16

**pioneer** 133:10
134:3 136:2,7,10
**place** 43:22 44:1
47:20 113:19
114:13 209:19,20
**plains** 1:19
**plaintiff** 1:11
**plaintiffs** 140:11
**plan** 2:23,24
10:12 14:24 16:7
16:23 25:25 44:24
50:22,22,23 51:10
52:2 65:5,10
83:16 88:23 90:2
90:5,10 94:7
96:25 97:1,10,11
97:21,22 98:25
99:1 109:13,14,19
109:21,23,25
110:1 111:4,4,5,8
111:11,13 176:5
181:12 204:23
212:18
**play** 181:15
**played** 91:10
100:2
**playing** 59:11
93:25
**plaza** 5:5 6:13
122:20
**plea** 170:20
**plead** 142:19
155:16,17,19
156:12
**pleading** 156:15
164:3
**pleadings** 67:11
104:3 135:24
155:21 167:17
**pleas** 133:8
**please** 11:1 24:6
77:3,20 121:25
136:20 151:9

171:19 195:18
197:12
**pleased** 123:14
**pled** 139:14 165:6
**plenty** 74:18
112:2 143:25
**plow** 23:22 191:1
**plowing** 114:14
**plus** 142:16
151:12 161:12
**pm** 218:2
**podium** 180:14
**point** 23:12 33:7
34:8 35:2,20
42:16 44:18,19,21
48:5 50:5 52:21
53:4,5 58:3,14
59:21 65:1,24
66:19 74:7 83:12
92:22 94:25 96:4
104:9 106:2
110:11 111:16
114:15 121:4
125:4 128:2
129:11,25 130:4,9
132:10 133:3,7
134:8 137:2 143:2
144:10,12,15
146:4 147:24
148:22,25 149:1
152:7,9 153:20
154:7,10 159:1
172:6 174:22
181:6 195:14
201:18 206:4
207:11 211:21
214:17
**pointed** 87:6
100:3 143:20
149:11
**pointing** 49:15
**points** 27:10 42:7
43:10,12 50:8

66:8 131:17
134:17 155:3
167:4 168:14
211:19
**policy** 110:4
**pool** 10:3 176:14
**popping** 27:2
**population**
194:11
**portion** 63:3,5,21
182:23
**portions** 172:2
**position** 81:21
136:6 205:16
**positions** 84:18
**possession** 4:4
**possible** 14:19
17:4 18:24 27:25
51:4 85:20 178:23
182:17 184:22
**possibly** 11:14
41:20 212:20
**post** 14:17 54:11
80:24 81:1 85:5
85:25 86:15,17,18
87:9,13,14,15,16
92:18 103:2,11,11
124:11 130:6
136:23 137:6,11
137:18 145:23
151:21 153:10
154:6,14,18 162:4
162:14,18 165:2
**pot** 128:14 149:17
**potential** 8:21
15:16 36:6 168:15
211:18
**potentially** 127:7
**power** 210:1
**practical** 17:9
126:21
**pragmatic** 144:7

**pre** 54:11 78:12
78:13 92:10,13,18
92:19 128:9
138:23 140:4
145:22,23 148:1,6
148:12,13 150:18
151:18 153:2
154:24 160:24
161:7,16 165:2
219:9
**prefaced** 185:2
**prefer** 32:11
**preference** 15:5,7
15:9,16 35:5,7,8
66:25 92:10,19
135:8 192:6 211:3
211:11,19,25
**preferences** 16:8
59:4 211:4
**prejudice** 23:1,1
23:10 28:6 140:6
168:16 170:1,5,17
**prejudiced** 23:21
**preliminary**
137:13,15
**prematurely**
121:24
**prepare** 115:5
**prepared** 59:16
65:17
**preparing** 109:4
**prepetition** 85:19
**presentation**
93:19
**pressure** 215:2
**presumably** 104:7
**pretty** 32:17
34:21 36:2 41:17
72:14 137:14
152:13 153:24
166:23 167:5,7
188:5

**previously** 90:9
137:24
**primary** 91:7
94:11
**prime** 47:8
**principal** 50:12
141:9
**principals** 141:7
**principle** 50:15,19
199:25
**prior** 14:22 27:15
29:8 90:10,22,23
98:5,9,13 111:17
128:18 143:19
173:16,19,25
187:11
**priority** 174:17
**prison** 82:10
**pro** 12:2 22:6
25:15,17 33:15
47:13 58:5 59:5
63:20
**proactive** 206:18
207:10
**probably** 13:2
18:4 30:1 32:19
55:21 57:8 62:3
75:21 106:7
115:23 130:8
144:14 152:14,15
180:7 201:14
202:15,16 207:10
**problem** 32:21
36:6 49:12 57:25
64:1 100:12
147:10 154:12
**problems** 49:11
63:12 67:3
**procedurally**
133:13 204:10
**procedure** 37:13
**procedures**
123:24 124:10

125:1,5,18 139:21
160:15,22 183:14
**proceed** 18:4 25:1
200:4
**proceeding** 3:18
94:11 140:3
**proceedings**
132:12 218:2
220:5
**proceeds** 2:10
58:24 91:21 92:1
92:2,3,5,6,9,19,22
94:9,11,20,24
95:1
**process** 8:17 13:2
13:15,23 14:21
16:24,25 17:8
18:6 19:5,9,17
20:20,24 22:19
23:22 26:16 29:9
37:11 41:6 47:19
47:20,21,22 51:17
54:22 56:21 58:3
71:4,5 81:24
84:21 89:11 90:6
93:21 99:25 100:2
107:5 123:25
135:15,19 174:7
184:3 187:21
189:18 190:15
194:19 198:14
208:21 214:12
**processed** 12:23
196:15
**processing** 8:18
18:18 47:23
196:15
**procter** 6:3 32:16
**professional** 2:16
47:15 105:5
**professionals**
11:10 13:16,17,19
14:5,17 16:23

18:19 19:6,13
107:10,21 108:1
114:5 175:3
**program** 8:16,16
8:21 9:6,12,23,25
11:9 23:4,4 37:16
41:7 44:14 48:15
49:7,8 50:11,15
50:25 51:9 52:6,7
58:18 59:1,24
60:12 61:14 64:4
73:22 74:5 77:7
94:18 114:25
172:1,3,16 177:8
177:8 179:22,22
180:9 181:13
215:25 216:1
**progress** 8:9
10:13 23:23 36:18
84:17
**project** 130:7
**projected** 91:22
**projection** 213:2
213:5
**projections** 94:6
**prompt** 59:20
66:2 67:23,25
68:5
**promptly** 53:18
55:18 61:3 68:21
70:10 75:5 169:16
**proof** 3:4 127:3
132:15 134:13
142:16 148:15,18
216:6,8,19
**proofs** 124:17
**proper** 188:14
**properly** 124:6
134:5
**properties** 78:12
164:10
**property** 2:21
77:22,24 111:11

125:15 126:1
144:4
**proponent** 109:21
111:9
**proponents** 14:5
16:24 52:2 172:10
**proposal** 21:21
22:4 26:14 55:2
172:14 175:17
176:4,9,25 180:19
199:10,14,17
200:2,14 202:7
**proposals** 179:13
**propose** 169:7
173:3 174:2
**proposed** 49:4
58:6 89:9,12
95:14 109:22
169:21 172:15
180:11
**prosecute** 3:10
**protocol** 174:23
199:4
**provide** 8:8 23:18
23:20 24:11 31:14
32:6,18 37:24
45:25 56:4 61:14
72:15 83:24
126:23 147:3
177:14 182:1
188:22
**provided** 20:6
25:12 29:2 36:4,7
36:21 45:19 46:8
53:9,24 57:20
61:4 70:11 72:2,2
72:6,9 73:6
160:18 162:23
177:10 180:5
191:15,15 192:8
198:22 200:9
206:25 207:7
208:6,17 215:21

**provident** 163:10
**provider** 192:4
**provides** 8:17
23:4 91:16,20
157:16
**providing** 16:8
24:12 73:20
**provision** 78:23
125:18 158:12
164:21 188:19,24
189:5
**provisions** 111:7
134:19,23
**prudent** 136:12
**public** 15:4 110:4
**pull** 24:3
**pulled** 109:5
**purchase** 45:18
45:20,24 78:2
**purchased** 45:11
**purpose** 25:9
131:7
**purposes** 78:13
162:7,8
**pursuant** 78:20
164:4
**pursue** 19:21
44:12 103:13
104:14 132:24
**pursued** 103:15
**pursuing** 15:5
104:18 105:1
106:13 114:7
173:13
**pushed** 28:1 30:16
51:5 184:14
**put** 22:5 33:14
41:25 47:20 54:20
69:6,10 80:16
81:16 88:3 90:19
126:7 127:2,3
130:14 133:21
161:25 165:5

174:24 176:2
198:1
**putting** 173:9

## q

**qualified** 147:11
**quantifiable**
128:3 148:16,19
153:17
**quantified** 130:14
147:10 161:4
**quantify** 130:13
150:11,17,18
154:19
**quantifying**
152:21
**quantum** 155:9
**quarropas** 1:18
**quasi** 163:19
**quest** 192:13
**question** 18:10
23:13 24:13 59:13
67:7 79:21 80:7
81:6 86:13,23
103:9 106:9
107:12 125:3
136:14,15,19
137:5 149:23
180:20 181:2
205:22 213:19,19
**questions** 17:15
24:20 25:7 52:3
96:16 172:12
176:25 177:6
**queue** 192:10
**quibble** 170:14
191:6
**quibbling** 197:19
197:23,24
**quicker** 9:16 21:3
**quickly** 19:21,24
44:8 61:25 165:4
**quite** 20:18 58:4
116:23 146:7

189:3
**quoted** 160:21

**r**

**r** 2:1 4:1,11 5:1
6:1 7:1 8:1 220:1
**radio** 32:20
**railroad** 163:22
164:5
**raise** 108:19
110:14 181:1
204:9 211:19
**raised** 15:18
95:16 113:22
114:21
**raising** 16:5 108:4
**ran** 189:13
**range** 17:1
**rata** 12:2 22:6
25:15,17 33:15
47:13 58:5 59:5
63:21
**ratio** 13:12
**rational** 22:1
**rationale** 164:18
**ray** 90:20
**rdd** 1:6,12 3:18
**reach** 22:12 30:4
61:23 70:2 144:2
204:15,21 205:8
207:6 208:23,24
209:6,7,21,22
210:1 212:3,4,8,9
212:22 213:7
**reached** 31:12
36:25 47:10 144:3
172:18,21,21
**reaching** 20:4,5
36:25
**read** 125:17
132:13 133:24
184:11 189:21
190:18,19,19,20
190:21 198:18

212:7
**reading** 124:11,15
126:5 129:6
181:17 183:13
188:19,23
**reads** 133:5 184:9
**ready** 51:16 56:11
116:1 117:3
194:23
**real** 35:12 125:25
194:24
**realistically** 194:6
**reality** 37:18
186:15 212:24
**realize** 52:7
**realized** 189:10
196:16
**realizes** 70:1,6
**really** 29:16 34:21
36:18 38:3 48:17
50:11 53:8 54:21
56:1 57:22,23
65:11 80:18 82:18
83:14,22 104:17
108:19 121:12
124:24 126:19
131:7 132:12
134:2,5,12 135:19
135:21 138:18
139:2 146:13
152:21 158:20
159:17 162:10
163:6 164:21
165:24 167:21
185:9 188:4 192:8
194:5,6,18 195:17
199:11 200:2
206:5 207:9 212:2
214:23
**realtor** 2:6
**reappeared** 18:6
**reason** 16:3 22:6
61:24 71:3 80:18

81:23 101:4,7
110:19 112:9
120:9 131:24
133:22 139:2
143:3 155:6
174:12,15 181:1
194:16,25 197:6
197:14,15 200:12
205:8 213:14
**reasonable** 30:2
44:13 49:5 68:19
91:9 95:9 111:14
111:18 114:18
183:8 185:23
186:6,20 200:9,10
200:11 203:18
219:5
**reasonably** 27:15
29:24 53:17 72:22
73:20 112:9
**reasons** 12:20
48:22 96:13
164:20 174:13
194:18
**rebate** 78:11
**rebuttal** 44:21
50:1
**recall** 8:17 9:3
10:2 13:25 14:10
51:12,13 89:25
194:24
**receipt** 8:23 43:14
75:17 92:8 180:22
180:24 183:22
184:3 185:4
**receipts** 79:13
**receive** 9:8,18,23
9:25 10:11 18:12
22:6 47:3 50:25
94:7 95:2,3,6
181:3
**received** 10:14
16:13 25:7 39:10

42:8 45:13 46:13
46:15 51:6 89:14
94:16 174:6
177:13 181:10,25
217:6
**receiving** 176:4
**recessed** 171:18
**recharacterize**
131:11
**recognition** 14:22
**recognized** 99:18
125:22 138:3
194:23
**reconcile** 13:7
14:18 16:19 17:9
17:11,18 19:16
26:9 27:14 35:15
40:16 55:9 59:2
79:6 174:21 175:6
198:3,4,9 209:13
210:8,18
**reconciled** 9:16
9:17 11:21,24
13:13,14 14:24
15:14 19:20 23:11
25:16 28:18 34:14
34:15 51:2 73:25
74:23 75:1,4
173:25 175:6,20
175:23 176:1
182:16 194:6,14
**reconciliation**
11:14 12:10 15:12
16:4 17:3 18:22
18:25 29:8 30:1
42:14 49:14 58:17
62:22 75:10,16
81:18,19,24 83:12
83:15 119:1
173:11,13 176:19
179:23,25 182:21
183:1,22 184:3,23
185:3 188:24

190:15 215:16
reconciling 20:24
172:25
reconvened
171:18
record 8:5 52:25
69:13 100:4
114:17 123:9
132:23 171:23
172:8 193:15
220:5
record's 170:25
records 14:12,12
17:7 42:20 174:18
176:20
recovered 91:21
recoveries 93:10
recovering 130:16
recovery 15:2
75:15 112:8
recut 47:13
red 215:11,11
redirect 122:15
reduce 191:22
199:1
reduced 145:7,13
refer 79:21
146:21
reference 129:17
138:10,11 162:24
referenced 167:11
references 125:20
126:6 131:5
referring 58:20
165:21 216:19
refers 138:6
162:25
refile 170:10
reflect 42:20
176:20
refund 78:11
84:10

refunds 77:24
78:2,5,9,16 84:7
84:10
refusing 78:4
regard 71:5 98:17
180:20
regarding 98:20
188:18
regular 93:21
regularly 23:19
reiterate 36:19
rejected 173:12
187:15
relate 43:11
162:16
related 2:13 90:25
92:9 129:7 137:15
137:20 146:8
relates 15:24 16:2
89:4
relating 126:2
relationship
135:6
relatively 13:11
176:11
relator's 2:8,12
relevant 132:7
136:3 211:12
relied 27:15 29:24
131:10
relief 2:13 3:1,5,9
124:25 146:24
160:9,11 164:16
164:19 165:3,13
165:16,18 166:22
168:16 219:19
rely 170:11 186:6
relying 132:3,8,22
remain 13:14
remaining 17:18
26:9 123:17
remediate 142:23
142:25

remediating
143:19
remedies 160:6
remedy 145:10,12
145:17,18,19
171:5
remember 10:7
85:3
remembered
131:20
remind 39:12
rent 139:5
repair 128:1,12
129:8 143:8 146:1
147:20,22 149:1,2
149:3,4,6,15
repaired 127:9,22
127:25 147:20
repairing 153:10
repairs 127:10,24
128:13,16,25
129:15,20 130:7
130:20 132:4,9
134:21 135:16,17
144:2,4 150:1
152:16 161:7,12
161:20
repeat 66:7
208:12
replace 144:1
147:21 159:10
replaced 143:23
144:5 147:24
reply 95:12 96:9
115:3 116:17
118:2,17 119:15
119:17,19,23
120:21 129:7
140:18 186:21
report 23:25
84:16 87:20 88:12
123:15 129:22
144:5

reporter 220:15
reports 23:19
represent 72:1
116:22,25
representation
70:5
representative
19:7 23:6 51:15
58:10
representatives
98:19
represented 85:4
115:12 177:3
214:16 217:2
representing
188:18 201:24
represents 101:24
177:4
request 20:2 29:1
31:20 32:3,6
35:25 36:5,9 42:4
42:4,9 44:5 53:2
54:2 61:15 64:9
66:6 67:24 68:16
69:14,16 70:10
115:4 122:24
160:14 180:25
181:3 191:9 192:2
192:15,15 196:6
207:8 209:5,8
requested 12:23
18:19 20:12,15
24:19 28:25 31:18
32:18 38:17 42:13
67:20,21 69:12
177:9 188:21
191:14 192:1,7
193:21 198:23
215:22 216:23
requesting 216:14
217:7
requests 20:18
43:11 209:14

217:4
**require** 131:13
165:17
**required** 16:11
24:4 39:6 49:18
124:7,10,12,16
127:1 135:1,5,21
160:23 175:12
**requirement** 24:9
184:2 190:14
**requirements**
10:10 109:20
111:8 126:6 132:7
**requires** 125:25
145:25
**requiring** 111:10
**reserve** 24:20
25:10,12 33:11,23
36:11 53:18,19
54:3,6,12 55:13
57:6 60:1 61:3
62:22,25 63:2
64:19 65:1,20
66:18,20 67:12,19
68:2 70:13,19
72:19 140:18
148:18 150:13
175:12
**reserved** 65:2
68:23
**reserving** 25:6,8
60:5
**residential** 125:25
**resigned** 108:6
**resolution** 70:2
72:5 114:25 185:7
185:10 186:7
188:1
**resolve** 57:4,24
65:5 75:22 90:4
135:9,22 208:19
209:5 211:22

**resolved** 14:21
87:24 188:11
**resources** 26:24
179:7 180:4
**respect** 34:20 49:4
52:4 58:19 73:18
82:4 84:7,17
89:20,21 90:3
92:6,8 94:1,11
95:15 96:10,11
121:18 125:13
128:22 158:14
160:10 161:15
172:15,19 173:15
173:18 174:11
176:8 205:4 213:6
219:8
**respectfully** 20:2
28:23 32:2
**respond** 24:19
27:10 32:12 40:3
54:4 55:22 65:15
71:19,20 74:19
76:22 131:10,22
133:10,23 139:20
169:16 182:15
188:9 189:19
192:24 195:18
200:10 203:6,8,10
217:10
**responded** 29:2
36:24 38:20 53:1
53:13 54:3 60:10
61:18 64:9 68:17
68:21 73:8 120:17
172:19 173:16,19
178:7 182:10
194:13 196:7,13
202:3,9,10,13
207:13,19 208:4
**responding**
120:16 132:21
180:4 189:16

**responds** 68:18
**response** 9:4,5
37:6,7 53:3,9,10
54:1 57:20 61:14
65:19 67:23,25
68:5,22 71:21
100:21 101:9
111:25 119:6
124:7,8,10,16
130:15 131:10
133:8 135:25
160:19 177:10
178:10 180:8,24
181:24 182:1
183:6 185:24
192:14 201:22
206:12 207:8
216:1,2
**responses** 124:12
189:17 203:14
**responsible**
143:22 165:2
**responsive** 47:9
**rest** 36:10 76:13
150:4
**restructuring**
90:13,16,25 108:7
**result** 61:12
**results** 170:4
**resuscitate** 27:8
**resuscitated**
159:6
**retained** 14:17
**return** 11:1 123:3
**review** 11:6,6,18
89:12 160:15
172:2 189:3,6
200:15 204:2
**reviewed** 11:17
189:23
**revised** 97:21
**rfi** 181:24 182:2,9
182:10

**rifle** 5:21
**right** 15:22,24
16:9 20:16 21:7
21:10 22:8,20,23
24:14 25:2 26:7
29:19 30:8 31:5
35:13 38:4,15
39:4,17,21 40:8
41:10,23 42:1,16
42:21,24 44:7,11
44:20 52:5 56:10
57:21 58:7,14
61:1,2,11 62:4
63:14,18 64:2
69:7,15,19,21
70:22 71:8,20
72:8 74:1,4,4,18
76:3,11,17 77:13
78:11 79:20 80:9
80:13,20 81:15
82:11,16,20,21,23
82:25 83:24 84:13
85:12,22 87:17
88:2,10,16 89:7
100:7,9,11,17,19
102:15,18 105:22
107:7 110:10,15
112:23 114:14
117:2 118:4,22
119:18,21 120:4
120:19,20 121:4,6
122:22 123:21
127:6 128:23
129:2,23 133:18
134:25 135:4,11
136:8 137:10,13
142:4,20 143:5,9
143:15 144:11,20
145:6,7,10,11,12
145:16 150:12
151:15 153:6,22
153:25 154:4,8,15
154:20 155:4

156:13 157:8
158:10 165:13,24
166:14,20 167:24
169:2 171:10,23
174:4,10 176:19
178:24 179:20
181:11 184:13,15
185:20 186:2,16
186:24 189:21
190:19 191:4
192:11 193:25
194:19 195:10,16
196:1,21 197:2,4
200:22,25 201:14
202:23 205:11,21
205:22 206:3,5
207:2,17 208:10
210:17 212:17
214:4,8,10,13
**rights**  115:15
121:16,17,18
150:13
**ringing**  179:16
**rise**  48:11 96:22
145:11
**risk**  41:17 107:24
183:11,14 187:5,7
188:7 189:13,15
190:11 198:16,20
**road**  5:21 220:23
**robert**  2:2
**roebuck**  3:11
**role**  91:10 93:5,13
93:17,24 100:2
**roles**  91:1 108:25
**rolling**  178:21
**roof**  129:14
131:21 143:14,18
143:20,23 144:1,9
144:16 146:1
147:19,20,21,23
148:25 149:7,15
151:4,4 153:8,10

154:17
**roofer**  150:24
**roofs**  138:25
**room**  77:14
171:15 194:8
195:20,21
**roughly**  10:17,19
55:3,4 173:21,22
176:11,15,17,21
**round**  25:12
42:14 104:4
173:10 176:3
182:10 209:12,19
209:19
**rubber**  93:19
**rule**  155:5 156:5
158:17 163:16
170:20
**ruled**  140:16
217:18
**rules**  117:18
155:15
**ruling**  54:25,25
67:9 82:3,7 84:6
115:19 118:5
121:22 149:8
151:12 164:23,25
165:1,10 183:23
**rulings**  168:14
219:3
**run**  51:20 79:13
105:15,17 187:5,6
189:15 215:9
**running**  41:17
51:16 55:17
107:17 190:11

**s**

**s**  4:1 5:1,24 6:1
7:1 8:1 176:17
211:24
**sacrosanct**  48:24
51:11

**safety**  144:19
160:11 164:20
**sake**  127:22
**salah**  6:17 27:5
180:16
**sale**  2:8,11 134:19
**sales**  2:10
**santiago**  3:1
**sara**  4:19
**sarachek**  6:19
36:17 116:24
**sarachek's**  44:25
**sat**  51:2 189:19
**sater**  2:16
**satisfaction**  10:9
**satisfactorily**
172:14
**satisfied**  24:10
25:22 28:9 174:16
**saw**  42:12 102:3
114:3 191:17
**saying**  12:14
16:19,20 31:2
37:3,9 39:11
42:10 53:7 54:25
55:10,13 57:15
58:11 60:9 63:2
64:12 65:15 67:8
68:9 69:19 74:24
87:12 93:20
105:13,19 108:21
110:20 127:18
130:12 135:4
153:14 156:11
157:13,15 158:5
159:5 165:7
166:19 179:1
184:17 185:2
187:12 193:10,19
195:2 196:2 202:8
206:10,24,25
214:17 216:15,17
216:17 217:5

**says**  37:16 74:23
75:12,15,16 82:19
83:23 108:17
109:19,20 111:7
125:6 126:10,22
146:19 181:13
201:22 203:24
**sayville**  1:10 3:18
88:21 122:3
123:11
**scale**  102:4
**scarlet**  164:10
**scenario**  35:12
**schedule**  191:18
191:19
**scheduled**  3:15
8:11 23:9 24:22
141:2 191:19
**schedules**  23:3
**scheduling**  3:20
114:21 117:11
**scheme**  49:3
191:16
**schotz**  7:8 72:1
188:18
**scope**  89:18,22
131:6
**scrambling**  47:6
**scraping**  38:3
**sdny**  163:14
**search**  203:19
**sears**  1:6 2:24
3:11 8:2 80:22,24
81:14,15,17 143:8
171:24 214:6,7
**seated**  171:19
**second**  2:24 9:15
10:8 23:8,14 24:5
24:12 25:12 27:21
28:4 38:10,12,14
39:2,8,13 50:22
55:18 58:14 59:14
59:20,23 60:7,13

60:16 62:12 70:14
72:24 77:11 97:1
97:10,22 98:25
101:2 125:3
137:21 138:15
160:8 163:11,12
163:25 168:18
173:10,21 176:3
178:15 180:23
181:25 182:3,10
184:8 186:1
193:25 194:1
195:12 202:14
**secondly** 86:17
**secretary** 158:23
**section** 78:9,17,20
107:2 124:4
125:23,24 126:6
138:5,11 145:4
162:25
**sections** 107:13
137:16
**secured** 2:12
145:9,14
**securities** 111:10
**security** 80:15
110:3
**see** 21:17 25:11
37:1 45:7 46:16
46:17 73:20 83:1
88:8 93:6,17,25
105:6,22 112:3
122:19 135:15,21
145:21 163:10,21
164:21 169:11
174:8 203:20
204:15,17 208:23
212:2 216:11
**seek** 139:24
159:12
**seeking** 146:12
**seeks** 145:24
164:17,19

**seen** 16:12
**segregated** 10:4
128:16
**selected** 90:7,8,8
93:15
**selection** 90:1
**send** 37:3 46:9,10
57:3 124:1 175:9
190:6,10 197:9
198:8 204:1
211:15
**sending** 47:6,7
61:13 187:5
**sends** 181:15
**sense** 17:17 19:10
19:15 41:16,23
57:10 62:23
100:23,24 102:11
166:18 183:20
199:10 212:20
**sent** 8:24 29:1
37:9 40:5 43:13
45:15 46:14,24
56:3 57:16 79:25
80:1 82:20 160:18
183:16 199:7
202:2 206:11,23
210:23 213:19
215:22 216:3
**separate** 43:1
72:18 121:3 138:2
138:4 156:4
160:12 163:6
166:4 189:3,4
190:14 211:6,7,8
**separately** 11:12
**september** 137:8
**septic** 127:12
128:22 136:15,17
137:6 138:21,24
138:25 139:14
154:12 162:5,8

**seriatim** 43:14
**series** 79:5
**serve** 109:2,22
**served** 90:25
107:20 124:6,8
132:1
**service** 192:4
**services** 104:6
111:11
**serving** 108:20,24
**set** 21:11 32:5
50:24 51:11 53:17
53:19 54:3,6,12
55:13 62:24 64:17
64:19 65:15 72:17
83:20 99:4 103:12
113:4 119:14
123:25 124:3
125:6 127:15
128:13,24 129:3
165:17 166:2
176:7 188:10
217:21
**sets** 160:5
**setting** 89:9
**settle** 19:2 21:19
22:10 54:14,16
55:19 117:8,12,23
117:25 121:17
169:7 211:1
213:14
**settled** 9:5,10,21
18:7 48:23 63:10
**settlement** 13:20
14:6 15:17 24:3
26:14 48:22 49:8
52:6 65:17 85:25
90:2 106:10 118:7
118:8 174:24
176:4 179:12
185:14 211:18
213:13

**settlements** 22:1
118:6
**settling** 48:20
49:7 54:23 117:19
**seven** 60:14 130:9
148:14 150:2,3
161:11 188:19,19
188:22
**seventy** 161:12
**severance** 85:5,19
86:15,17 87:9,16
**severed** 87:13
**seymour** 2:16
**share** 12:2 19:24
22:6 33:15 58:5
59:5
**shared** 91:23
**sheet** 45:16
**shell** 198:20
**sherri** 3:24 220:3
220:14
**shield** 163:24
**shifted** 176:14
**ship** 46:22 54:9
61:21
**shipments** 14:12
**shipped** 18:11
**shocked** 164:11
**shoes** 45:23
**short** 23:22 78:16
175:14 214:23
**shortened** 216:10
**shorthand** 208:15
**shortly** 98:23
**shouldn't** 67:13
68:20 70:12 75:21
84:13
**show** 82:12 84:12
103:1 106:4
110:23 142:23
151:17 153:19
155:22,24 159:13
170:2 200:25

210:23
shower  46:16
showing  169:21
shown  110:23
shows  132:24
sic  52:19
side  26:18 54:6
  115:25 117:2
  134:17 154:21
  169:11 179:5,6
  183:24
sides  84:18
sign  194:19
signed  3:20 93:22
significance  93:9
significant  11:15
  12:1,16,22 13:10
  52:9 59:19 69:25
  90:25 91:9 175:22
signing  165:25
silence  32:20
  86:25 158:4
similar  93:18
  103:6,6,14
similarly  61:20
  163:15
simple  43:10
  53:23 88:9 164:6
  187:6 188:3
  217:11
simply  58:13,22
  143:17 146:8
  156:13 217:13
simultaneous
  213:4
singh  4:10 87:1,4
  87:8,10,17,19,24
  88:2,5,10,12,16
  88:18 117:6,6,10
  117:16,18,22
  118:1,5,9,11,14
  118:17,19,22,25
  119:3,5,7,11,13

119:16,19,22
120:1,4,12,14,23
121:3,7,9,12,25
122:2 191:11
193:22,24 194:3
195:2,5,8,11
197:3
sir  57:14 73:14
  137:5,10 140:14
  188:25
sit  52:8,11 53:8
  60:21,22,24 61:15
  77:5 141:1
sits  179:17
situation  59:25
  179:15 205:25
  206:2,21
six  45:12,14 46:17
  77:16 161:12
sixty  150:3
sj  36:18
skaw  3:25 220:3
  220:12
skeptical  162:23
skin  115:18
sliding  102:4
slightly  191:5
slipped  51:25
small  13:11
  117:24
smaller  92:18
smith  80:15
smith's  80:16
smoothly  84:23
snapshot  151:4
social  80:15
sold  78:1
solicitation
  184:10,11,17
solution  48:15
  49:12,12 64:4,7
  64:12

solutions  220:22
somebody  34:23
  194:11
somewhat  23:19
  53:12 179:11
soon  44:3
sooner  16:17
  58:15
sophisticated
  112:7
sorry  15:10 38:4
  52:16,17 57:15
  59:22 73:5 75:11
  75:21 76:19 88:23
  95:6 102:7 104:13
  110:18 119:13
  122:10 126:17
  138:6 145:4
  159:10 166:7
  181:13 189:21
  195:9 198:3 208:2
  208:12 211:20
sort  20:20 24:4
  50:12,18 131:4
  135:14 165:4,7
  194:8,12
sought  124:19
  128:25 142:21
sounds  204:22
  208:8,9
southern  1:2
spat  79:5
speak  45:8 50:1
  121:15 143:21
  203:3
speaker  45:5 69:8
  69:9 73:1 76:9,18
  76:23,25 77:3,8
  122:5,8,10,15,19
  122:22 123:2
  199:22 204:9,14
  204:18,20,25
  205:3,17,22 206:1

206:7,10,17,19,22
207:2,5,12,16,18
207:23 208:1
214:20 215:6,15
215:20 216:6,22
217:6,12,16,20
speaking  45:7
  172:17 206:9
  213:4
specialty  108:11
  108:13
specific  17:16
  78:21 127:15
  128:11,24 129:14
  129:19 139:24
  142:12,16,17,22
  145:17 158:6
  159:12,18 160:8
  160:10,14 161:3,4
  164:17
specifically
  124:21 138:3
  156:6 164:3
specified  92:14
speed  172:4
  185:10
spend  75:8
spending  199:23
spent  76:14
  103:24 130:20
  134:18 172:10,25
spoke  35:4 48:21
  69:24
spoken  76:16
  116:7
spread  65:16
staff  178:25
  214:24
stage  25:16
staged  19:5
staging  21:17
stake  154:7

stamping 93:19
stand 143:25
standard 10:1
  133:11,15
stands 121:22
stanley 6:12 27:7
  40:2 180:17
start 58:1 188:2
started 18:1 37:6
  135:14 209:10
  212:6
starting 98:2
  160:4 209:11
  210:12
state 3:12 124:18
  126:21 127:16,17
  128:17 129:1,18
  135:14 140:2,3,4
  141:6,8,12,18
  144:18 152:25
  153:7 158:21
  159:4 162:1,2,20
  165:9 166:18,23
  166:25 167:9,23
  168:1
stated 31:8 38:8
  126:13 127:19
statement 86:13
  94:5,9,15 95:13
  97:6 129:9 160:19
statements 22:25
states 1:1
stating 66:8 129:7
station 33:3
status 87:20
statute 111:6
  138:4
stay 3:2,5,9 154:9
  165:25 166:5,8,21
  166:22 168:2,19
  169:2
steen 5:3 123:9

step 20:3 43:22
  45:23 177:4
steps 169:6
stewarding 93:13
stick 149:25
stipulate 156:21
  202:19
stipulating 202:23
stipulation 3:20
  166:1,21
stock 80:8 81:17
  84:12
stolaas 96:23
stonewalled 47:9
stood 68:16
stop 164:24
  198:12
stopped 189:16
store 135:8
stories 191:8
story 25:13 44:22
  82:13
straight 22:17
  95:7
strauss 4:13
street 1:18
strong 36:18
struck 49:7
structure 91:6,15
  91:20 93:4 95:14
  96:2 102:13
  103:13 112:2,3,10
  114:18 219:5
subcommittee
  90:13,16
subject 12:13
  53:20 81:20 84:9
  109:12 111:14
  158:24 159:4
submissions 116:8
submit 8:23 49:19
  66:6 74:9 75:25
  87:22,25 102:20

103:7 104:9
  107:25 108:14
  114:24 151:23
  160:18 166:20
  169:12
submitted 11:10
  18:20,21 28:24
  42:10 53:22 70:11
  84:18,20 116:8
  167:12 174:7
  181:8 215:17
  217:8
submitting 22:14
  169:8
subsequent 10:9
  10:14 109:12
  127:3,12 132:16
  143:21
subsequently
  12:21
subset 173:4,7,7
substantial 50:17
  69:23 103:11,14
  113:11 177:4
substantially
  94:14
substantive 93:17
substantively
  11:6
substitute 128:25
  159:7,11
success 102:19
successful 36:20
  125:14
successor 109:25
sue 63:23 152:24
sufficient 53:9
  59:2
sufficiently 28:17
  28:18
suggest 58:9,13
  58:22 80:23 82:3
  86:11 168:25

178:17
suggested 142:13
suggesting 37:23
  60:3,4,19 187:1
suggestion 58:19
  59:13 62:8 168:19
suggests 85:7
  126:12
suite 220:24
summarize 26:7
  173:23
sunday 95:23
sunny 4:10 117:6
superior 3:11
superpriority
  2:12
supplement 2:23
  88:24 89:9 96:25
  97:10,21 98:25
supplemental
  137:22 138:2,4,12
  138:16,19 139:3,5
  162:4 163:1
support 48:11,19
  49:22 95:10
  121:16 134:8
supporting
  115:14 117:1
suppose 106:7
supposed 25:1
  29:22 30:13 73:15
  75:4 101:7 111:1
  111:1 141:21
  186:21 198:5
  204:11
sure 20:20 27:17
  36:2 56:8 73:3
  86:8,22 95:18
  106:19 115:20,23
  123:13 152:4
  154:16 159:2
  166:3 171:12
  187:17 203:17

204:22 205:17
**surprised** 30:22
  46:19
**survived** 164:11
**swaine** 6:11 27:6
  180:16
**switch** 141:5
**sympathetic** 31:1
  40:22,24 48:13
  49:11
**system** 74:10 79:3
  79:6,9,11,14,17
  80:19 81:23 83:10
  84:14 154:13

**t**

**t** 220:1,1
**table** 51:18
**take** 17:18 20:3
  34:23 43:22 44:1
  46:16,16 50:17
  51:4 55:7 56:6,8
  56:17 59:5 62:24
  76:3,12 103:8
  107:23 108:2
  123:4 134:10
  136:5 151:24
  159:9 171:10
  188:7 203:9
  211:25
**taken** 75:21 93:4
  131:18
**takes** 56:18,20
  82:9 215:2
**talk** 82:6
**talked** 117:7
  135:16 169:15
  173:9 199:5
**talking** 15:25
  57:22 62:21,22
  63:5 66:20 70:4
  71:13 72:14 77:15
  112:21,22 144:24
  145:22 152:21

154:6 167:21
  173:5 176:13
**talks** 199:4
**tank** 127:12
  128:22 136:16,17
  137:6 138:21,24
  139:14 154:12
  162:5,8
**tanks** 138:25
**task** 13:10
**tax** 78:2,8,13,14
  84:7
**taxes** 77:24 78:12
**taxing** 11:15
**team** 149:4
**teaming** 198:13
**tear** 152:13
**tee** 21:23 185:17
**teed** 209:3
**telephonic** 7:6,11
  7:16
**tell** 33:5 61:23
  71:15 100:25
  152:13,15 208:15
  216:18
**telling** 111:23
  200:25 207:14
**ten** 12:22 13:4
  32:6 54:14 55:4,8
  55:19,21 57:4
  60:13 61:6 63:6
  65:8 68:7 76:3
  101:16,18,18
  117:20 118:15
**tenant** 130:17,18
  130:18 164:12
**tenant's** 161:23
**tension** 183:21
  187:19,22
**term** 59:24,24
  92:14 101:8
  129:14 160:20

**terminated** 87:15
**terms** 10:13 14:18
  15:14 17:9,10,11
  26:5 27:12 28:1
  28:12 29:22 34:4
  44:14 51:24 95:25
  98:8,8 126:7
  146:17 157:24
  162:14 176:13
  177:7 179:12
  184:16
**test** 137:21
**testimony** 100:5
  112:22,22
**thank** 8:13 27:3
  32:10,14,15 36:14
  45:10 48:6 49:23
  70:22 77:8,19
  84:3,5,15,15
  87:11 88:17,18,19
  89:2 110:16
  114:16 117:22
  119:5 120:4,8
  121:7 122:2,8
  140:20 141:3
  171:6,8 172:7
  188:16 204:7
  207:23 208:1
  214:3,20 215:5
  217:24 218:1
**thanksgiving**
  194:5
**thematic** 21:18
  26:20
**theoretically**
  194:13 209:1
**thereto** 50:23
**thereunder**
  146:20
**thin** 112:9
**thing** 29:7 36:19
  41:20,21 42:2
  46:6,12 76:6,7,22

114:8,21 127:13
  144:13,21 146:1
  148:14 153:24
  162:10 165:20
  191:17,24 199:25
**things** 8:15 48:23
  49:3 50:20 57:23
  62:10 63:13
  104:23 128:18
  134:10,12 135:9
  160:17 185:10
  191:16 210:18
  211:17 216:12
  217:16
**think** 18:4,17,21
  19:9 24:15,16
  29:4 30:22 32:22
  33:10,20,23 36:11
  37:17 44:22 46:3
  46:4,23 47:19,19
  47:21,22 50:3,8
  50:20 51:3 53:7
  53:11,16 54:18,18
  54:21 55:1,7,20
  55:25 58:10,14
  61:17,22 62:13,23
  63:9 64:25 66:11
  66:21 67:1,3 68:4
  68:6,9 71:11
  72:12,17,24 78:24
  79:1 80:19,23
  81:13,14,17 82:3
  82:10,11,22,25
  83:6,8 84:17,21
  84:25 85:10,24,24
  86:11,19,20 87:7
  87:22,25 88:5,6
  88:20 89:18 99:15
  102:7 104:14
  107:4,4,16 111:22
  115:6,7,22 117:17
  117:19,20 118:3
  118:11,14,19

[think - transcripts]                                                    Page 44

| | | | |
|---|---|---|---|
| 121:13,24 125:17 | 212:24 | 67:12 70:3,19,24 | **timings** 14:13 |
| 126:24 127:19 | **thinks** 127:1 | 72:17,21 74:18 | **tinker** 199:12 |
| 129:14 130:12 | 207:7 | 76:16,21 92:22 | **today** 17:23 24:22 |
| 131:24 133:13,25 | **third** 5:14 28:6 | 94:25 97:2 98:16 | 32:4 48:21 49:22 |
| 134:4 135:11,24 | 95:4 145:25 164:9 | 99:6 102:1,1 | 51:21 52:8 53:25 |
| 136:3,9,14 137:23 | **thirty** 123:5 | 104:9 111:19 | 56:6,12 57:24 |
| 138:12,16,20 | **thought** 21:1 38:4 | 112:3 117:23 | 60:8 61:13 63:23 |
| 139:11,13 140:12 | 46:19 47:25 52:16 | 122:13 126:3,16 | 67:14 68:16 71:4 |
| 144:14 145:2 | 62:24 71:21 | 129:8,25 133:10 | 79:21 83:7 109:4 |
| 146:5 147:4 | 114:23 115:7 | 134:20 139:8 | 110:15 114:23 |
| 148:18,21 149:5,9 | 120:9 173:11 | 144:6 148:22 | 136:6 150:23,25 |
| 152:12,12,14 | 189:19 203:10 | 152:16 161:3 | 151:3,8,11 159:6 |
| 154:4,9,20 155:5 | 210:23 | 165:10 170:19 | 165:11 188:1 |
| 157:2 158:1,11 | **thousand** 65:16 | 172:25 173:25 | 213:11 |
| 164:22 165:5,8 | 127:20 130:10 | 174:13 175:1,15 | **today's** 8:7 141:2 |
| 166:17,25 167:2,3 | 148:15 161:12 | 180:4 182:1 183:3 | **told** 35:7 53:17 |
| 167:5,8,9 168:4 | **thousands** 196:12 | 183:16 189:2 | 67:21 70:10,18 |
| 169:5,6 172:25 | 196:23 | 192:24 194:14 | 71:13 85:10 |
| 174:15 175:11,11 | **three** 9:4 28:11 | 195:14 197:16 | 103:25 104:4 |
| 175:12,15,18 | 38:11 84:7 90:8 | 198:9 199:23 | 112:15 191:10 |
| 176:15,22 177:3 | 92:4 94:24 96:12 | 200:9,10,11 | 199:14 |
| 179:1,13,24 180:3 | 101:22 106:18 | 202:14 203:10,25 | **tomorrow** 147:19 |
| 180:19 181:15,19 | 116:17 123:6 | 207:1,8 213:17 | 210:12 |
| 182:3,5,18,19 | 195:8 217:19 | 214:23 | **top** 104:11 148:5 |
| 183:11,13,14,21 | **threshold** 94:25 | **timeliness** 134:8 | **tort** 164:6 |
| 184:21,25 185:16 | **thursday** 46:15 | **timely** 3:5 17:1 | **total** 8:22 10:16 |
| 185:23 186:14,21 | 64:22 | 32:19 54:2 57:20 | 11:23,25 176:10 |
| 187:3,4,10,11,18 | **tie** 190:15 | 61:14 64:9 73:19 | **totally** 75:23 |
| 187:22,25 188:14 | **tied** 165:3 179:24 | 100:8 129:9 | 86:18 102:13 |
| 191:11 192:14 | 180:1,2 182:25 | 131:10,10,22 | **touches** 125:19 |
| 193:5,22 194:1,7 | 187:7 215:18 | 133:22 172:16 | **tough** 37:20 38:2 |
| 194:23 196:18 | **tiered** 8:17 | 173:15 177:13 | **tracey** 3:24 220:3 |
| 198:15 199:21,23 | **tight** 39:7,24 40:1 | 178:6,10 180:5 | 220:8 |
| 200:3,6,7,11 | 40:5 | 193:21 196:3,13 | **tracks** 146:14 |
| 201:14 202:15 | **till** 74:19 158:18 | 202:2 203:6,8,8 | **traders** 45:22 |
| 203:9 205:5,20,24 | **time** 9:17 16:21 | 205:10 206:13 | **train** 33:3,4,5,6 |
| 206:3 207:4,21 | 17:18 18:16,22 | 216:1,2 | 33:19 |
| 208:3 210:16 | 23:12,17 26:22 | **times** 6:5 173:16 | **transcribed** 3:24 |
| 211:16 212:11,17 | 27:14 34:11 36:1 | 208:13 217:19 | **transcriber** 220:9 |
| 213:12,12,12 | 40:12,16 41:18 | **timing** 13:23 | 220:15 |
| 214:24 | 51:4 53:10 54:13 | 43:12 52:6 53:14 | **transcript** 220:5 |
| **thinking** 54:14 | 56:19 58:22 59:2 | 65:22 72:6 118:12 | **transcripts** 84:21 |
| 117:24 190:25 | 65:12,14 66:2,4 | 162:14 213:14 | |

**transferred** 78:14
**transform** 1:13
  3:19 5:4 11:14
  14:15,15 19:19
  43:21 78:1,3,8,15
  79:4,7,7,15 80:8
  80:12,19 81:2,14
  81:17 82:11 83:23
  84:11,12 85:5,8
  85:24 86:12,16
  88:21 92:24 122:4
  123:10 124:19
  128:25 132:1,4,4
  132:8 134:18
  141:10 151:17
  152:23,25 171:1
  176:2 179:11
**transier** 90:11
**treatment** 184:12
**tremendous**
  102:19
**tricky** 158:2
**tried** 49:15 63:11
  150:13 199:2
**true** 20:14 22:24
  126:25 149:14
  195:3 212:25
  220:5
**truly** 138:12
**truncated** 208:20
**trust** 89:5 90:11
  91:1 93:7,7,16
  97:2,12 98:4,7,19
  99:3 101:15
  103:12 105:15,17
  108:18
**trustee** 93:12,15
  93:19 94:1,1,2,4,6
  94:16 95:5 102:2
  102:9,22 103:3,18
  105:18,25 109:24
**trustees** 91:2
  102:3,6,10,14

103:2,5 105:5
**trusts** 101:17,24
  103:2 107:21
  112:5
**try** 18:3 19:3 37:1
  45:20 54:13 117:8
  135:9 139:10
  140:13 172:11
  174:21 184:2
  204:21 208:19
  211:1 212:2
  213:15
**trying** 26:23 30:7
  47:6 83:14 134:20
  158:1
**tuesday** 174:3
  211:16
**turn** 32:12 78:5
  96:16 200:5
**turned** 81:24
  84:14
**turnover** 2:21
  77:18,21 78:7
  79:23
**turns** 63:25
**twice** 213:24
**two** 25:16,20 26:1
  28:8 34:17 35:3
  36:1 38:17 42:17
  46:18 47:3 53:20
  57:23 76:15 86:21
  89:17 90:7,7,12
  90:12 91:7 92:1,3
  97:19 99:12
  106:15 107:5
  109:16 111:25
  113:15 116:9,17
  118:15,17,21
  119:3,20 123:5
  143:1 144:5
  149:19 159:16
  160:5 166:4 167:4
  168:13 169:23

175:14 185:9
  187:20 188:12
  192:18 209:19
  214:5
**type** 94:2 147:7
  162:22 164:22
**types** 55:15 65:9
  79:14
**typically** 93:6

**u**

**u.s.** 1:17 2:3
**u.s.c.** 137:16
  138:3,5 162:5,15
  162:24,25
**ucc** 16:23 19:13
  23:5 40:14,23
  55:1 56:22
**ucc's** 13:17 19:6
**uccs** 14:4 15:14
**ultimate** 14:23
  93:3
**ultimately** 25:24
  93:15 96:1 132:16
  135:17
**unable** 9:12
  107:12
**unambiguously**
  78:10
**unanimously** 96:2
**underlying**
  121:16
**underscored**
  139:13
**understand** 20:9
  33:25 34:8,16
  35:18,20 40:18
  45:2,2 59:20
  61:16 64:11,11,16
  65:24 73:3 79:10
  99:14 101:11
  102:5 105:3,12,20
  105:23 106:2
  114:3,5 118:9

127:5 128:10
  140:14 141:22
  142:7 144:12
  147:25 151:2
  153:12 158:16,20
  159:5 170:13
  176:4 181:21
  183:23 192:25
  195:23 196:21,23
  196:25 198:15
  199:13 201:5
  207:3 211:4
  212:23 213:5
  215:20 217:22
**understanding**
  54:21 55:1 191:25
**understood** 49:2
  87:10,17 128:15
  132:13,21 139:12
  141:15,23 146:7
  168:22 179:2,19
  183:12 188:13
  210:7 213:9,18
**undisclosed** 96:13
**undisputed** 33:13
  33:14 73:23 145:9
  145:14
**undisputedly**
  139:21
**undo** 49:13
**unequivocally**
  125:25
**unfair** 32:22
  47:22
**unfairness** 33:2
**unidentified** 45:5
  69:8,9 73:1 76:9
  76:18,23,25 77:3
  77:8 122:5,8,10
  122:15,19,22
  123:2 199:22
  204:9,14,18,20,25
  205:3,17,22 206:1

206:7,10,17,19,22
207:2,5,12,16,18
207:23 208:1
214:20 215:6,15
215:20 216:6,22
217:6,12,16,20
unilateral 210:1
unilaterally 32:24
33:18
united 1:1
universe 172:17
172:17 200:16
unjust 155:9,22
158:11 163:15
219:16
unliquidatable
129:11
unliquidated
127:6 129:12
145:8 161:6,18
unmatured 145:9
145:14
unreasonable
180:12 214:18
unreasonably
180:10
unsatisfactory
135:17
unscheduled
171:25
unsecured 4:14
113:3 145:10,14
unsworn 133:23
untenable 95:11
untimely 121:14
121:19
unwarranted
95:11 99:24
100:24
update 8:9 16:7,8
upset 49:1
urban 32:17

urgency 167:11
168:5
use 17:24 18:1
42:17
useful 42:14 176:7
usually 170:4
utilities 11:12

**v**

v 1:12 3:19 137:20
146:18 163:10,11
163:22,24 164:5
164:10
vacate 157:9
168:5
vacating 167:12
vague 59:15,16
valid 14:14 80:18
validly 81:22 83:9
value 2:8 9:24
37:17 94:14 141:4
variance 17:6
42:18 55:4 175:21
various 16:14
101:23 124:22
vendor 74:10
vendors 38:3
verify 207:16
veritext 220:22
versus 88:21
122:3 183:22
view 28:17 71:9
103:3 160:5
172:24 174:7
179:22
violating 165:10
voicemail 36:22
36:22
vorys 2:16
vote 112:13
voting 109:24

**w**

wait 22:10 51:2
70:3 74:19 149:12
149:13 203:24
204:15,16,17,19
205:1,1,1,2 206:5
206:6,17 207:22
209:18
waited 40:3 42:18
113:23 195:14,15
waiting 20:23
44:25 52:14 53:8
115:3 120:21
194:12
walk 173:6
walking 12:24
wallender 90:20
wander 5:17 14:8
48:8,10,10 62:14
62:14,19 63:1,9
63:15,19,25 64:3
64:7,11,18,23
65:4,21 66:3,7,10
66:14,16,21 67:1
67:3,6 68:4,9,13
68:24 69:2,4
75:14 76:5,11
89:20 96:17,19,21
96:21 97:7 99:10
99:14,16,20 100:9
100:11,14,18,20
100:25 101:4
102:5,15,18 103:7
103:19,24 104:16
104:19,21,22,25
105:3,5,7,16,19
106:5,12,23 107:1
107:4,8,25 108:8
108:12,17 109:9
109:16 110:5,7,10
110:12,16,25
111:3,16,19,24
112:14,16,18,21

112:24 113:14
114:3,12,16,20
115:10,21 116:1,3
116:5,7,13,16,20
118:21,24 119:2
119:10,12,14,17
120:6,8,11,17,19
120:21 121:5
wander's 89:15
91:18 121:20
want 16:17,18,18
19:24 21:3,19,22
21:22 22:9,10
44:9,12 49:24
57:2 61:3 66:7
67:14,15 73:1
76:7,8 85:1 87:5,5
105:15,17 106:9
115:18,20,23
116:9 117:13
118:5 122:17,18
128:8 144:16
149:17 158:4,15
159:2 160:3,3
161:22 165:15
166:18 167:8
168:1 174:22
175:16,18 179:15
179:21 191:7
195:17 200:15
206:15,18 209:16
212:12
wanted 16:15,16
50:25,25 52:7,25
69:11 71:7,25
74:16 158:21
211:22
wants 19:21 22:4
49:25 50:4
warranted 102:12
102:24 127:24
warts 49:9

**washington** 3:12
**wasted** 42:15
**waterfall** 12:25
173:6
**wave** 20:22
**way** 19:15 21:18
21:18 46:9,11
49:5 51:20 59:8
61:4 64:4 65:10
67:9 74:5 83:13
84:2 88:6,7 99:6
125:18 131:4
133:24 135:15
140:25 177:24
184:9,11 186:3
187:2,8 189:23
194:9 198:11
203:7,12 204:11
208:21 209:10
210:3,11 214:9
**ways** 152:15
**we've** 15:12 16:12
16:13 17:20,25
18:1 21:25 22:18
23:18 51:16
103:24 115:2
116:7,7 120:17
121:13 142:14
172:15 174:6
179:9 187:13
209:10
**wear** 152:13
**wednesday** 29:14
29:17,18 46:13,14
64:22
**week** 8:25 11:21
23:11,11 29:18
39:15,25 40:1
51:9 53:24 54:5
56:6,17 61:6 65:8
65:19 68:1,7,18
70:12,14,15,17
71:12,14 72:3,9

72:14 73:7 75:25
87:19 119:8,8,25
120:2,5,22 152:5
175:15 178:20,25
179:18 181:16
182:6,7 183:9
185:24 186:17
188:10,11 192:15
193:20 194:7,10
194:14 198:14
200:11 208:18
**weeks** 23:21 66:5
69:20 89:17
118:15,17 119:3
187:20 188:12
**weigh** 26:20
**weil** 4:3 8:5 38:16
77:20 172:8
**weintraub** 6:9
32:15,16 33:8,10
34:1,7,16 35:1,6
35:10,14,19,21,24
36:9,14 190:24,25
191:3,5 192:20,25
193:11,13,16
195:17,20,24
196:2,9,20,22
197:5,8,17,19,23
198:7,12,17,19,22
198:25 199:13,16
199:18,20,24
200:18,22 201:2,5
201:11,16,21,24
202:4,8,12,17,19
203:3 204:5,7
215:25
**weintraub's**
192:18 195:2
205:16,25 206:2
206:21
**weisman** 104:4
**welcome** 64:24

**went** 13:16 27:9
31:16 36:22 37:19
38:9 44:4 46:4
51:7,8,24,24
63:13 83:8 89:18
104:7 135:15
186:16,17 196:12
196:12
**whatever's** 158:9
**whichever** 58:21
**white** 1:19
**wholly** 138:21,22
**william** 6:9 32:16
**williams** 3:24
220:3,8
**willing** 43:6
197:11
**win** 156:25
**wind** 81:22
**window** 42:12
73:4,15 117:24
**winners** 106:21
**withdraw** 12:7
160:2
**withdrawn** 140:1
140:5
**withheld** 180:10
214:17
**withholding**
61:20 180:11
**witnesses** 98:18
**woke** 46:15
**won** 157:13,13
**wonder** 168:24
**wonderful** 204:22
**woodland** 5:22
**word** 129:5
159:11 161:22
**worded** 187:8
198:11
**words** 25:19
67:13 74:25 161:8
177:23

**work** 10:18 16:19
19:15 26:16 57:4
57:15 58:18 65:23
74:5 76:1,2 83:14
83:16 91:10 106:6
106:18 107:23
108:2,4 134:20
135:5 144:8,8
167:23 174:20
175:3 187:5
203:13,13 214:22
**work's** 153:11
**worked** 13:17,18
16:25 60:15 65:10
194:9 209:10
**working** 14:16
19:6,13 26:9
32:23 40:14 53:12
58:1 105:14 113:3
172:11 176:12
193:23,24
**works** 93:20
105:12 189:24
215:13
**world** 14:19 18:7
18:9 35:12 42:23
43:11 44:9 54:9
55:14,18 61:22
63:4 65:9,16
66:17,24 71:11,14
71:16 114:22
117:8 121:4
**worldwide** 6:13
**worms** 165:14
**worried** 113:7
**worry** 213:25
**worse** 49:12
113:20 127:9
128:14
**worsened** 161:23
**worth** 84:25 143:1
143:1 173:13

[wound - zone]                                                    Page 48

| | |
|---|---|
| **wound**  80:4 | 143:1 144:5 |
| **wrap**  212:1 | 149:20 168:7 |
| **wrapped**  79:4 | **yep**  178:22 |
| **writing**  119:9 | **yesterday**  46:13 |
| 214:15 | 47:5 53:22 140:16 |
| **written**  180:9 | **york**  1:2 4:6,17 |
| 210:2,3 | 5:6,15 6:5,7,15,22 |
| **wrong**  82:21,22 | 155:15,25 163:7 |
| 108:3 130:5 156:2 | 163:19 |
| 191:23 214:8,9,9 | **z** |

**x**

| | |
|---|---|
| **x**  1:3,9,15 29:4,5 | **z**  29:6 |
| 41:22 65:16 68:17 | **zero**  12:23 13:3 |
| 80:14 151:5,12 | 141:11,13 142:8 |
| 199:1 219:1 | 161:9 174:8,12 |
| | **zone**  176:14 |

**y**

**y**  29:5 151:12
**yawn**  3:25 220:4
220:17
**yeah**  35:18 44:6
54:19,24 57:19
63:23 84:8 85:14
88:14,25 117:9
118:1,9,11,18
120:1,7 122:14
129:16 144:12
147:25 149:9
153:4,9 155:13
159:25 166:12
169:10 170:15
181:22 184:1,1
185:16 186:4
187:18,22 193:24
194:2,3 204:4,16
207:15,25,25
209:6 212:21
**year**  28:8 64:15
64:20 66:2 91:17
101:13,15,19
106:1,8
**year's**  142:25
**years**  28:8 77:25
101:16,18,19