# EXHIBIT I

$b \circ \circ - 0 \, 6 \, l$

## SEARS LEASE

| | | |
|---|---|---|
| Parcel "A" | - | Shopping Center Property |
| Parcel "B" | - | (2.59 cuerdas) Parcel #3 |
| Parcel "C" | - | Sears Main Store |
| Parcel "D" | - | Automotive and Community Center |

## ARTICLE I - PREMISES AND TERM

| | | | |
|---|---|---|---|
| Section | 1.01 | Planning Board Approval........................ | Page 6 |
| " | 1.02 | Conditions Required for Planning Board Approval; Premises "C" and "D".............. | " 6 |
| " | 1.03 | Leasing of Automotive and Community Center to Landlord............................ | " 6 |
| " | 1.04 | Leasing of Premises "C" and "D" to Tenant .... | " 7 |
| " | 1.05 | Commencement Date of Term of Lease........... | " 7 |
| " | 1.06 | Date of Term of Lease........................ | " 9 |
| " | 1.07 | Renewal Options............................. | " 9 |
| " | 1.08 | Lease Year Defined.......................... | " 10 |
| " | 1.09 | Occupancy of Premises Subsequent to Expiration of Extended Term..................... | " 10 |

## ARTICLE II - RENT

| | | | |
|---|---|---|---|
| Section | 2.01 | Fixed Rent................................. | " 11 |
| " | 2.02 | Percentage Rent and Net Sales Defined ........ | " 12 |
| " | 2.03 | Additional Rent: Property Taxes, Utilities, etc.. | " 14 |
| " | 2.04 | Additional Rent: Charges levied during Term of Lease................................... | " 17 |
| " | 2.05 | Additional Rent: Limits ..................... | " 17 |
| " | 2.06 | Fixed Rent and Additional Rent - Premises "C" and "D"................................. | " 17 |

## ARTICLE III - DEMOLITION AND CONSTRUCTION

| | | | |
|---|---|---|---|
| Section | 3.01 | Removal of Equipment, Fixtures, Personal Property, by Landlord ..................... | " 18 |
| " | 3.02 | Commencement of Construction on Premises "C" and/or "D": Specifications ........ | " 18 |
| " | 3.03 | Government Approval of Plans and Specifications and Cost of Construction ......... | " 20 |
| " | 3.04 | Builder's Risk Insurance..................... | " 21 |
| " | 3.05 | Interference by Tenant and Storage of Materials during Construction.............. | " 21 |
| " | 3.06 | Parking Areas .............................. | " 22 |

## ARTICLE IV - MAINTENANCE AND REPAIRS

| | | | |
|---|---|---|---|
| Section | 4.01 | Tenant's Obligations: Fixtures and Utilities .... | " 23 |
| " | 4.02 | Tenant's Obligations: Government Regulations .. | " 23 |
| " | 4.03 | Tenant's Liability........................... | " 24 |

## ARTICLE V - ALTERATIONS AND ADDITIONS

| | | | |
|---|---|---|---|
| Section | 5.01 | Alterations made by Tenant................... | " 24 |
| " | 5.02 | Alterations made by Tenant in excess of $100,000. | " 25 |
| " | 5.03 | Tenant's Liability .......................... | " 25 |

# ARTICLE VI – INSURANCE

| Section 6.01 | Types of Insurance and Amounts................. | Page 26 |
|---|---|---|
| " 6.02 | Tenant's Choice of Insurance Co., Renewal of Policies, etc.................... | " 27 |
| " 6.03 | Indemnification of Tenant and Landlord .......... | " 28 |
| " 6.04 | Repairs Made by Parent Corporation ............ | " 29 |
| " 6.05 | Indemnification of Landlord .................... | " 30 |

# ARTICLE VII – CONDEMNATION

| Section 7.01 | Condemnation of Leased Premises ............... | " 30 |
|---|---|---|
| " 7.02 | Partial Condemnation: Fixed Rent, Percentage Rent | " 31 |
| " 7.03 | Landlord's and Tenant's Damages ............... | " 32 |
| " 7.04 | Repairs Due to Partial Condemnation ........... | " 33 |
| " 7.05 | Indemnification of Landlord Due to Partial Condemnation.............................. | " 34 |

# ARTICLE VIII – CONDUCT OF BUSINESS BY TENANT

| Section 8.01 | Use of Premises.............................. | " 34 |
|---|---|---|

# ARTICLE IX – MORTGAGE, ASSIGNMENT AND SUBLEASE

| Section 9.01 | Assignment of Lease by Tenant .............. | " 34 |
|---|---|---|
| " 9.02 | Consent Required ........................... | " 35 |
| " 9.03 | Written Agreement by Sublessee ............. | " 35 |
| " 9.04 | Abandonment ............................... | " 36 |
| " 9.05 | Right of Tenant to Mortgage Interest ........ | " 36 |
| " 9.06 | Mortgage Lien – Parcel A and/or B .......... | " 37 |

# ARTICLE X – UTILITIES

| Section 10.01 | Utility Charges ........................... | " 37 |
|---|---|---|

# ARTICLE XI – PARKING AND COMMON USE AREAS AND FACILITIES

| Section 11.01 | Control of Common Areas by Landlord............ | " 38 |
|---|---|---|

# ARTICLE XII – COST OF MAINTENANCE OF COMMON AREAS

| Section 12.01 | Tenant to Bear Pro Rata Share of Expense.......... | " 39 |
|---|---|---|

# ARTICLE XIII – MERCHANT'S ASSOCIATION

| Section 13.01 | Tenant's Right as to Membership................. | " 39 |
|---|---|---|

# ARTICLE XIV – DEFAULT

| Section 14.01 | Default by Tenant........................... | " 40 |
|---|---|---|
| " 14.02 | Submittal of Matter to Court by Landlord .......... | " 41 |
| " 14.03 | Default by Landlord ........................ | " 42 |
| " 14.04 | Waiver ................................... | " 43 |

# ARTICLE XV – SURRENDER AT EXPIRATION

| Section 15.01 | Surrender of Premises by Tenant ................ | " 43 |
|---|---|---|

# ARTICLE XVI – EQUIPMENT AND FIXTURES INSTALLED

| Section 16.01 | Installation by Tenant ......................... | " 44 |
|---|---|---|

ARTICLE XVII – COVENANT OF QUIET ENJOYMENT

     Section 17.01  Landlord's Covenant ........................... Page 45

ARTICLE XVIII – ESTOPPEL CERTIFICATES

     Section 18.01  Estoppel Certificates by Tenant .................   "   45
       "   18.02  Estoppel Certificates by Landlord ...............   "   46

ARTICLE XIX – INVALIDITY OF PARTICULAR PROVISIONS

     Section 19.01  Partial Invalidity .............................   "   46

ARTICLE XX – NOTICES

     Section 20.01  Notices Sent by Landlord and Tenant .............   "   47

ARTICLE XXI – RESTRICTION ON NEW BUILDINGS IN SHOPPING CENTER

     Section 21.01  Construction by Landlord .......................   "   47

ARTICLE XXII – ACCESS BY LANDLORD

     Section 22.01  Right of Entry .................................   "   48

ARTICLE XXIII – MISCELLANEOUS

     Section 23.01  "The Term of this Lease" (Definition of) ..........   "   48
       "   23.02  Use of Headings and Numbers as References ......   "   48
       "   23.03  Successors and Assigns .........................   "   49
       "   23.04  Modifications, Alteration, etc., of Lease only in
                 Writing .......................................   "   49
       "   23.05  Counterparts Each Shall be an Original ..........   "   49
       "   23.06  English as the Controlling Language ............   "   49
       "   23.07  Jurisdiction for Determination of Disputes (P. R.)..   "   49
       "   23.08  Recordation of Lease   ........................   "   49


     Signatures of Parties Executing This Lease  ....................   "   50

## LEASE

In the City of San Juan, Commonwealth of Puerto
Rico, this *16TH* day of *SEPTEMBER*, 1965,

### APPEAR:

AS PARTY OF THE FIRST PART:   SANTA ROSA SHOPPING
CENTER, INC., a corporation organized and existing under the
laws of the Commonwealth of Puerto Rico, with offices at the
Santa Rosa Plaza in Bayamon, Puerto Rico, represented herein
by its President, Mr. John P. Birkelund who is of legal age,
an Executive, and resident of South Norwalk, Connecticut, here-
inafter called the "Landlord"; and

AS PARTY OF THE SECOND PART:   BANCO CREDITO Y AHORRO
PONCENO, INC., a banking corporation organized and existing under
the Banking Laws of the Commonwealth of Puerto Rico, with princi-
pal offices in the City of San Juan, Puerto Rico, represented
herein by Mr. *Carlos J. Paw*, its *Vice-president*, who is
of legal age, a banker, and resident of San Juan, Puerto Rico,
hereinafter called "The Trustee"; and

AS PARTY OF THE THIRD PART:   SEARS, ROEBUCK DE PUERTO
RICO, INC., a Delaware corporation, with principal offices in San
Juan, Puerto Rico, located at Munoz Rivera Avenue corner Coll y
Toste Streets, said corporation duly qualified to do business in
Puerto Rico and herein represented by its *President*,
Mr. *L.R. Lauer*, of legal age, an Executive, and resident of
San Juan, Puerto Rico, hereinafter known as the "Tenant".

The authority of all of the appearing parties to act
herein shall be demonstrated whenever and wherever required, and
they state:

A.   The Landlord and the Trustee are owners in fee

simple of the improved real property described according to the
Registry of Property as follows:

> "URBAN: Parcel of land dedicated to a Shopping Center
> Plaza located at Santa Rosa Development in the Ward
> of Juan Sanchez of Bayamon, Puerto Rico, now classi-
> fied and zoned as a C-Four (C-4) district, consisting
> of eighteen and forty-six hundredths "cuerdas" (18.46)
> in area, equivalent to seventy two thousand five hun-
> dred fifty-five and sixty ninth hundredths square
> meters (72,555.69) bounded as follows: At the North,
> by a marginal street and State Highway number Two,
> distance of four hundred twenty-five and six hundredths
> lineal meters (425.06); at the South, by street number
> Two of Santa Rosa Subdivision and lands of Santa Rosa
> Development Corporation in a distance of three hundred
> nine and thirty hundredths lineal meters (309.30); at
> the East by Aguas Buenas Avenue and intersection number
> One Hundred Thirty-One in Santa Rosa sub-division and
> other lands of Santa Rosa Development Corporation, in a
> distance of two hundred forty-nine and forty-nine hun-
> dredths lineal meters (249.49); and at the West, by
> lands owned by the Puerto Rico Housing Authority in a
> distance of two hundred sixteen and twenty-eight hun-
> dredths, lineal meters (216.28)."

The above mentioned property is recorded in the Registry
of Property of Bayamon, Page Sixty-Five (over) property Twelve
Thousand Nine Hundred Fifty-Seven, Third Inscription. This property
shall hereinafter be known as "PARCEL A".

The said property is subject to a mortgage in the principal
amount of ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000.00),
with interest at the rate of six per cent per annum, in favor of
CONNECTICUT GENERAL LIFE INSURANCE COMPANY as appears from deed num-
ber three of June twenty-four, nineteen hundred and sixty before
Notary Public, Jose Gonzalez.

Said property is also subject to utility easements in
favor of the Puerto Rico Water Resources Authority and the Puerto
Rico Acqueduct Authority and to building restrictions appearing
from the corresponding Registry of Property in Bayamon.

There has been erected on this property a complete Shop-
ping Center known as Santa Rosa Shopping Center (hereinafter called
the "Shopping Center") consisting of seven buildings all of steel
frame and masonry construction and an adjacent parking area.

B. The Landlord is also the owner in fee simple of the
following described parcel of property:

"URBAN:   PARCEL OF LAND located at Section Number One
of Santa Rosa Development, in Bayamon, with an area
of TEN THOUSAND ONE HUNDRED EIGHTY-FIVE WITH TWENTY
ONE HUNDREDTHS OF A SQUARE METER (10,185.21 Sq. mts.),
equivalent to TWO CUERDAS AND FIFTY-NINE HUNDREDTHS
OF A CUERDA (2.59), bounded at the NORTH, by Plaza
Comercial Santa Rosa, distance of One Hundred Fifty-
Eight meters and Seventy Three Centimeters (158.73);
at the SOUTH, by Street Number One (1) and Residen-
tial Section Number One (1) of the principal parcel
of Santa Rosa Development, distance of One Hundred
Fifty Two Meters (152.00); at the EAST, by Aguas
Buenas Avenue of Santa Rosa Development with a dis-
tance of Seventy-Five Meters and Twenty Centimeters
(75.20); and at the WEST, by Street Number Five (5)
of the Santa Rosa Development, distance of Forty-Six
Meters and Thirty-Two Centimeters (46.32)."

This property is inscribed in the Registry of Property
in Bayamon at volume two hundred sixty seven of Bayamon, Page One
Hundred Sixty-Five, Property Number Eleven Thousand Six Hundred
Ninety Two, second inscription.

It is understood among the parties that some claim has
been made that there may be a restriction relating to the use of
this land for community purposes, and that the Landlord is under-
taking to resolve this claim so as to permit the use of this par-
cel for a parking area and for the erection of an automotive and
community center.   This property shall hereinafter be known as
"PARCEL B".

C.   The Landlord, Trustee and Tenant have agreed to the
lease of Premise C hereinafter described and, in the event that the
Planning Board of Puerto Rico permits the use of Premise D herein-
after described as an automotive and community center, and there
is no other legal impediment to such use of Premise D, the Land-
lord, Trustee and Tenant have agreed to the lease of Premise D.
Premise C is shown on the survey of Esteban Gonzalez dated September
11, 1965 (wherein it is referred to as Premise C-1) and Premise D
is shown on the survey of Esteban Gonzalez dated August 12, 1965,
which surveys are annexed hereto initialled by the Landlord and
Tenant and made part of this agreement.   Premise C alone, or in the
event that the use of Premise D is permissible, as aforesaid, then
Premise C and Premise D, and the buildings and improvements hereafter

- 3 -

located thereon (i. e. excepting the buildings now located on
Premise C and to be demolished as provided in this lease), are
hereinafter referred to as the "Demised Premises":

## PREMISE C

Starting at the corner of Aguas Buenas Avenue
and Street No. 1, known as property point No. 46,
move along the inner edge of Aguas Buenas Avenue
sidewalk a distance of 419.394 feet (127.833
meters) at a bearing of N 42° 00' 40" E; thence
move a distance of 57.553 feet (17.542 meters) at
a bearing of N 47° 59' 20" W to the southeast cor-
ner of the parcel. Thence move a distance of 419.000
feet (127.713 meters) at a bearing of N 13° 18' 50"
E to the northeast corner. Thence move a distance
of 237.500 feet (72.391 meters) at a bearing of N 76°
41' 10" W to the northwest corner. Thence move a
distance of 419.000 feet (127.713 meters) at a bear-
ing of S 13° 18' 50" W to the southwest corner, and
finally move a distance of 237.500 feet (72.391
meters) at a bearing of S 76° 41' 10" E to the south-
east corner of the parcel.

The resulting area of the parcel is 99,512.50 square
feet, equal to 9,245.272 square meters.

## PREMISE D

Starting at the corner of Aguas Buenas Avenue and
Street No. 1, move along the inner edge of the side-
walk along Aguas Buenas Avenue a distance of 15.240
meters at a bearing of N 42° 00' 40" E; then move
at right angles to this line a distance of 15.240
meters at a bearing of N 47° 59' 20" W to the south-
east corner of the parcel. Move then a distance of
56.389 meters at a bearing of N 42° 00' 40" E to the
northeast corner of the parcel. Then move to 19.203
meters at a bearing of N 47° 59' 20" W to the north-
west corner of the parcel. From then move a dis-
tance of 56.389 meters at a bearing of S 42° 00' 40"
W to the southwest parcel corner and from there move
a distance of 19.203 meters at a bearing of S 47° 59'
20" E to the south east corner that was our starting
point.

The total area of the parcel is 1,082.838 square meters.

D.   In place of Premise C hereinabove described (i.e.,
Premise C-1 on the aforementioned survey annexed hereto), the Tenant
shall have the option to lease an alternative Pr_ .se C which is re-
ferred to as Premise C-2 on the survey of Esteban Gonzalez dated
September 11, 1965 annexed hereto, initialled by the Landlord and
Tenant, and made part of this agreement, and is described as follows:

## PREMISE C-2

Starting at the corner of Aguas Buenas Avenue and Street No. 1

known as property point No. 46, move along the inner
edge of Aguas Buenas Avenue sidewalk a distance of
392.268 feet (119.565 meters) at a bearing of N 42°
00' 40" E; thence move a distance of 52.964 feet
(16.144 meters) at a bearing of N 47° 59' 20" W to
the southeast corner of the parcel. Thence move a
distance of 419.000 feet (127.713 meters) at a bear-
ing of N 13° 18' 50" E to the northeast corner.
Thence move a distance of 228.500 feet (69.648 meters)
at a bearing of N 76° 41' 10" W to the northwest cor-
ner. Thence move a distance of 419.000 feet (127.713
meters) at a bearing of S 13° 18' 50" W to the south-
west corner, and finally move a distance of 228.500
feet (69.648 meters) at a bearing of S 76° 41' 10" E to
the southeast corner of the parcel.

The resulting area of the parcel is 95,741.50 square
feet, equal to 8,894.955 square meters.

The option granted herein to the Tenant is subject to
the approval by the Planning Board of Puerto Rico of the use by
Tenant of said alternative Premise C. If the Planning Board grants
such approval, and the Tenant shall then elect to exercise its op-
tion to lease said alternative Premise C (i. e., Premise C-2), it
shall give written notice thereof to the Landlord. In that event,
said alternative Premise C (i. e., Premise C-2) shall thereupon
constitute part of the Demised Premises in place of the original
Premise C (i. e., Premise C-1) hereinabove described in introduc-
tory paragraph "C" of this lease.

E. The use and occupation by the Tenant of the Premises
herein demised shall include, in addition to Premise C and Premise
D (if permissible), the use in common with others entitled thereto
of the common areas, service roads, loading facilities, sidewalks,
customer car parking areas, and other facilities in Parcel A and Par-
cel B as may be designated by Landlord as areas of common use, sub-
ject, however, to the terms and conditions of this agreement and
to reasonable rules and regulations for the use thereof as prescribed
from time to time by Landlord.

All of the appearing parties of this deed of lease, hav-
ing previously agreed to the lease of Premise C and Premise D (if
permissible as aforesaid,) do hereby do so, under the following
terms and conditions:

ARTICLE I

Premises and Term

Section 1.01

Landlord shall, at its expense, obtain from the Planning Board of Puerto Rico such approval and permits as may be required for the lease of Premise C to the Tenant for the construction and operation of a retail department store and for the use of Parcel B as a parking area by the Tenant and the other tenants of Parcel A. Landlord shall also use its best efforts to obtain from said Planning Board such approval and permits as may be required to allow the lease of Premise D to the Tenant for the construction of an automotive and community center and the respective operation thereof as provided for in this lease.

Section 1.02

Landlord shall, at its expense, make and construct such improvements in the land comprising Premise C and Premise D as the Planning Board of Puerto Rico may require as a condition to granting its approval for the lease of such premises for the purposes provided in Section 1.01 hereof.

Section 1.03

In the event that the required clearances are obtained, and the Tenant builds the automotive and community center on Premise D, as hereinafter provided, then Tenant shall lease back to the Landlord or its designee that portion of Premise D which comprises the community center for a nominal rental, and Landlord or its designee shall undertake, at its expense, to operate, maintain and manage such community center and to obtain and maintain public liability insurance adequate to protect Landlord and Tenant from all claims, demands, and liabilities arising out of the operation of such community center. Such insurance shall name both Landlord and Tenant as insured and contain limits of liability of $500,000. per person and $1,000,000. per accident for bodily injury limits and $100,000. for property damage. A certificate evidencing such insurance

coverage shall be furnished Tenant.

Section 1.04

Landlord does hereby demise and lease to Tenant and Tenant does hereby take and hire from Landlord (a) the premise described in introductory paragraph "C" of this lease as Premise C and (b) in the event of the approval by the Planning Board of Puerto Rico, and provided further that there is no legal impediment thereto, the premises described in introductory paragraph "C" of this lease as Premise D.

Section 1.05

The term of this lease between Landlord and Tenant shall commence on the first of the month next following the occurrence of all of the following events:

(a)   The issuance by the Planning Board of Puerto Rico of whatever approval is required to permit the leasing of Premise C to the Tenant for the construction and use contemplated by this lease.

(b)   The vacation of all existing structures contained within Premise C by all tenants thereof, and Landlord's written notification to Tenant that same has been accomplished.

(c)   The certification by the Landlord to the Tenant that the Landlord has obtained written consents from all the other tenants of Parcel A (Santa Rosa Shopping Center) to the effectuation of this lease, and Landlord's agreement to indemnify Tenant against any loss that Tenant may incur by reason of any action, claim or demand by any other tenant of the Santa Rosa Shopping Center in connection with or arising out of the execution of this lease.

(d)   The receipt by Tenant of a written instrument from each mortgagee holding a mortgage upon the Landlord's fee interest in Parcel A and Parcel B which shall (1) consent to the execution and delivery of this lease and (2) either agree not to disturb the possession of the Tenant, nor to terminate any interest of the

Tenant created hereunder by foreclosure or otherwise so long as
the Tenant shall comply with the terms, covenants and conditions
of this lease, or subordinate the mortgage to this lease.

(e). The receipt by Tenant of a written confirma-
tion from Landlord that all the above conditions have been satis-
fied and that Tenant may proceed with demolition of the buildings
on Premise C and construction of the new building hereinafter pro-
vided for.

It is intended that the commencement of this
lease as aforesaid shall be within 15 months from the date of exe-
cution of this instrument. The Landlord shall commence immediately
upon the signing of this lease and shall diligently pursue the con-
struction of the new buildings to be occupied by Banco Credito y
Ahorro Ponceno, Inc. and Belk Lindsey Company and to effect the
removal of the Bank and Belk Lindsey to their new buildings. The
Landlord shall keep the Tenant informed of its progress in complet-
ing the aforesaid conditions. So long as the Landlord acts diligently
and in good faith, Landlord shall not be deemed to be in default un-
der this Section 1.05. However, Landlord agrees, even though not
in default under this Section 1.05, to pay to Tenant the sum of
$500. per day (but in no event exceeding in the aggregate the sum
of $15,000.) for each day required for the completion of the fore-
going conditions in excess of fifteen months from the date of exe-
cution of this instrument, provided that said period of fifteen
months shall, for the purposes of this Section 1.05, be extended
to the extent that the Landlord cannot, by the exercise of reason-
able efforts, complete its performance within such time because of
circumstances over which it has no control including without limita-
tion strikes, lockouts, fire, floods, earthquakes or similar actions
of the elements, acts of God, acts of war or the public enemy.

The exact date of the commencement of the
term of this lease shall be specified in a written memorandum

signed by both of the parties hereto. In the event that Tenant
shall suffer any delay in proceeding with the demolition of the
existing buildings on Premise C or the construction of the new
building thereon by reason of any legal action brought by any
other tenant of the Santa Rosa Shopping Center, then the date of
commencement of the term of this lease shall be postponed for a
period of time equivalent to the length of such delay.

Section 1.06

The initial term of this lease shall be a term of forty-
two (42) years, beginning on the day specified in Section 1.05 of
this deed of lease and expiring forty-two years thereafter.

Section 1.07

(a) If Tenant notifies Landlord in writing at any
time after the commencement of this lease but at least eighteen
months prior to the termination of the initial term hereof that it
elects to extend the term of this lease, then this lease shall be
extended for an extended term of fifteen (15) years.

(b) If this lease is extended for the extended term
hereinabove mentioned, Tenant at its election may extend the term of
this lease for two additional successive extended terms of fifteen (15)
years each, provided Tenant notifies Landlord in writing at least
eighteen (18) months prior to the termination of the then current
extended term that it elects to extend the term of this lease for
the immediately succeeding extended term.

(c) The right to any extension of this lease shall
be upon the express condition that at the time of the election to
extend the lease, and at the beginning of the extended term, Tenant
shall not be in default under any of the terms, covenants and con-
ditions of this lease.

(d) In the event Tenant for any reason shall not
exercise its privilege to extend the term of this lease, as here-
in provided, Tenant shall have no further privilege to extend the

term of this lease and said term shall expire and come to an end upon expiration of the then current initial term or extended term. If Tenant exercises its privilege to extend the term of this lease, as herein provided, then such election, once made, shall be irrevocable.

Section 1.08

The term "lease year" as used herein shall mean a period of twelve (12) consecutive full calendar months. The first lease year shall begin on the date of commencement of the term hereof. Each succeeding lease year shall commence on the anniversary date of the first lease year.

Section 1.09

In the event that Tenant shall have elected to extend the term of this lease for the third extended term as hereinabove provided, then the Tenant shall have the following right of first refusal with regard to occupancy of the Demised Premises subsequent to the expiration of the third extended term.

(a)  During the twelve (12) month period prior to the expiration of the third extended term hereof, upon receiving any acceptable bona fide offer from a third party for the leasing of the Demised Premises, the Landlord shall transmit to the Tenant in writing all the terms and conditions of such offer.

(b)  Tenant shall have thirty (30) days from the receipt of such offer to notify the Landlord in writing of Tenant's intention to enter into a lease of the Demised Premises upon the terms and conditions of such offer.

(c)  Within thirty (30) days (or such extended period as may be agreed upon between the parties) from the giving of Tenant's notice referred to in (b) above, the Tenant shall sign a lease of the Demised Premises upon the terms and conditions of the said offer.

(d)  In the event that the Tenant shall fail to notify the Landlord of its intention to enter into a lease of the

Demised Premises, as provided in (b) above, or in the event that
the Tenant shall fail to execute the lease within the period pro-
vided in (c) above, then the Landlord may enter into a lease of
the Demised Premises upon the terms and conditions of the said
offer with the third party who made such offer, and Tenant shall
have no further rights under this Section 1.09.

(e)  In the event that the Landlord has not received
an acceptable bona fide offer from a third party but intends to con-
tinue the same type of store operation upon the Demised Premises,
then, if the Tenant so elects, the Landlord and Tenant shall nego-
tiate a new lease of the Demised Premises upon terms substantially
the same as those applicable to the third extended term hereof but
for a period of time mutually acceptable to the Landlord and the
Tenant.

## ARTICLE II

### Rent

Section 2.01

As fixed rent, Tenant shall pay to Landlord at its
principal office above set forth, or at such other place designated
in writing by Landlord, at the times hereinafter set forth, without
any prior demand therefor and in money of the United States of
America which at the time of payment shall be legal tender for pub-
lic and private debts, the respective amounts hereinafter set forth:

A.  During the first two lease years of this lease
no fixed rent shall be paid.

B.  During the third lease year the amount of
$50,000.

C.  During the fourth lease year the amount of
$75,000.

D.  During the fifth lease year the amount of
$100,000.

E.  During the sixth lease year the amount of
$125,000.

F. .During the seventh lease year and during each
and every subsequent lease year of the initial term and
of any extended term of this lease the amount of $150,000.

The fixed rent hereinabove provided for shall be payable
in equal monthly instalments in advance on the first business day of
each and every calendar month of each lease year during said initial
term and any extended term. It is the purpose and intent of Land-
lord and Tenant that this lease shall yield, net to Landlord the
fixed rent specified in this Section 2.01 in each year during the
term of this lease, free of any charges, assessments, or impositions
of any kind charged, assessed or imposed on or against the Demised
Premises except as expressly hereinafter provided in Section 2.03,
and without abatement, deduction or set-off by the Tenant, and Land-
lord shall not be expected or required to pay any such charge, as-
sessment or imposition, or be under any obligation or liability
hereunder except as herein expressly set forth, and that all costs,
expenses and obligations of any kind relating to the demolition of
the structures presently located on the Demised Premises, the con-
struction of the new buildings hereinafter provided for, the main-
tenance, preservation, care, repair and operation of the Demised
Premises, including all replacements, alterations and additions,
as hereinafter provided, which may arise or become due during the
term of this lease shall be paid by Tenant, and the Landlord shall
be indemnified and saved harmless by Tenant from and against such
costs, expenses and obligations.

Section 2.02

In the event that the net sales (as hereinafter defined)
made by Tenant upon the Demised Premises during any lease year of
the initial term or any extended term hereof shall be in excess of
Fifteen Million Dollars ($15,000,000.), then the Tenant shall pay
to Landlord, as additional rental hereunder for said lease year
a sum equal to one per cent (1%) of such excess. Said additional

rental, if any, shall be paid by Tenant within thirty (30) days

after the end of the respective lease year for which the same is

payable.

(a) The term "net sales" as used herein is hereby

defined to mean the gross sales made upon the Demised Premises by

Tenant plus the gross sales, if any, made upon the Demised Premises

by Tenant's departmental sublessees, concessionaires and licensees

occupying space upon the Demised Premises, but deducting or exclud-

ing therefrom, as the case may be, the following:

(1) Sales of departments or divisions not
located upon the Demised Premises;

(2) The amount of all sales, use, excise,
retailers' occupation or other similar taxes imposed
in a specific amount, or percentage upon, or determined
by, the amount of retail sales made upon the Demised
Premises;

(3) Returns and allowances, as such terms
are known and used by Tenant in the preparation of
Tenant's profit and loss statements;

(4) Delivery, installation and service
charges including any and all service charges for
work performed off the Demised Premises;

(5) Amounts in excess of Tenant's (or of
its sublessees', concessionaires' and licensees')
cash sales price charged on sales made on credit or
under a time payment plan;

(6) Sales of merchandise ordered through
the use of Tenant's mail order catalogs or filled
through Tenant's catalog order channels, regardless
of the place of order, payment or delivery;

(7) Policies of insurance sold on the De-
mised Premises and premiums collected on policies of
insurance;

(8) Sales off the Demised Premises of en-
cyclopedias and other educational books sold in sets;

(9) Sales made through the Commercial and
Industrial Sales Department of Tenant.

(b) Within sixty (60) days after the end of each

lease year, Tenant shall furnish to Landlord a statement certified

by an officer of Tenant showing the net sales (as hereinbefore de-

fined) made by Tenant upon the Demised Premises during such preced-

ing lease year, and the additional rental, if any, payable by Tenant

to Landlord for such lease year. In addition, Tenant shall furnish

Landlord with a statement of Tenant's net sales (as above defined) for Tenant's next preceding fiscal year prepared by Tenant's certified public accountants.

(c)  Unless Landlord shall, within thirty (30) days after receipt of any such statement certified by Tenant's officer, notify Tenant to the contrary, such statement shall be deemed to have been accepted by the Landlord as correct. In the event that Landlord shall notify Tenant of Landlord's dissatisfaction with such statement within the aforementioned period, then Tenant shall permit a reputable firm of certified public accountants doing business in the United States and Puerto Rico, which shall be mutually satisfactory to, and approved in writing by, Landlord and Tenant, to make an independent audit of Tenant's net sales (as hereinbefore defined) for the period covered by said statement. Such independent audit shall be at Landlord's expense and the findings of such audit shall be binding upon both parties and conclusive.

(d)  Tenant makes no representation or warranty as to the sales which it expects to make upon the Demised Premises and Landlord agrees to hold in confidence all sales figures and other information with respect to Tenant's business which Landlord may obtain from Tenant or from any audit of Tenant's books and records, except that Landlord may submit all of said information to the holder or holders of mortgages upon Landlord's interest in the Demised Premises, who shall also receive same in confidence.

Section 2.03

As additional rent hereunder, Tenant shall be liable for and pay all property taxes, assessments (ordinary and extra-ordinary), sewer rents, water rents and charges and other taxes, duties, charges, fees or payments imposed by any governmental or public authority, which shall be imposed, assessed, levied or be or become a charge or lien upon, or arise in connection with the use, occupancy or possession of the Demised Premises or any part

- 14 -

thereof or appurtenances thereto. Tenant shall be entitled to
a credit against, and deduction from, the additional rent payable
by it hereunder at the fixed rate of $1,240.69 a year (which figure
represents the proportionate part of all 1964 real estate taxes
upon the land comprising Parcel A which is attributable to the
land included in the Demised Premises and is subject to revision
if the option in introductory paragraph "D" hereof is exercised by
Tenant).

    (a) Promptly after the execution of this lease,
the Landlord and the Tenant shall join in an application to the
Planning Board or other governmental authority having jurisdiction
thereof, to obtain during the term of this lease the issuance of
tax bills covering only the land and buildings included in Premise
C and Premise D (if the use thereof is permissible as aforesaid)
and the issuance of separate tax bills covering the land and build-
ings in the remainder of the Shopping Center. The tax bills cover-
ing only the land and buildings included in the Demised Premises
shall determine the Tenant's obligation for additional rental under
this Section 2.03.

    (b) If for any reason during the term of this lease,
separate tax bills cannot be obtained for only the land and build-
ings included in the Demised Premises, as provided in the preceding
paragraph, then for the purpose of determining the Tenant's obliga-
tion for property taxes under this Section 2.03, the taxes, assess-
ments, etc. attributable to the Demised Premises shall be determined
as follows: The Landlord and Tenant shall select a reputable, ex-
pert real estate appraiser mutually acceptable to them who shall
prepare and submit to the parties a detailed appraisal of all the
land and buildings in the Shopping Center. Such appraisal shall
be binding upon both parties and conclusive. That proportion of
the taxes, assessments, etc. of the entire Shopping Center which
the appraised value of the land and buildings contained in the
Demised Premises bear to the appraised value of the land and build-
ings contained in the entire Shopping Center shall constitute Tenant's

obligation for additional rental (subject to the deduction herein-
above provided for). The said proportion shall be applied in any
year for which the said separate tax bills cannot be obtained. The
said appraisal shall be made and completed in the month of July during
the first year when said separate tax bills are unobtainable and shall
be repeated in the same month during each succeeding year when said
separate tax bills are unobtainable, provided, however, that the cer-
tification by the appraiser (or his mutually acceptable successor)
that there has been no material change in the values of the land
and buildings in the Shopping Center since the date of the last de-
tailed appraisal shall be accepted in lieu of a new appraisal, and
the proportion established by the last detailed appraisal shall con-
tinue to be applicable. The cost of such appraisals shall be borne
equally by Landlord and Tenant.

(c)  Tenant shall pay each sum payable pursuant to
this Section 2.03 on or before the date when same becomes due and
payable. In the case of any assessment for public improvements
wherein the cost of the public improvement is permitted to be paid
in installments, the Tenant may pay the same in installments. Any
such installments falling due during the term of this lease shall
be payable by Tenant and any such installments falling due after
the expiration of the term of this lease shall be payable by Land-
lord. Real estate taxes, sewer rents, water rents and charges and
other taxes, duties and charges in said categories (whether or not
the same have become a lien upon the Demised Premises) for the tax
year in which the term of this lease shall end shall be apportioned.

(d)  Tenant shall have the right at its own expense,
to contest in good faith any taxes, sewer rents, water rents, charges
or assessments imposed upon, or allocated to, the Demised Premises,
and in case any such taxes, rents, charges or assessments shall, as
a result of any such legal proceedings, be reduced, cancelled, set
aside or otherwise discharged, Tenant shall be entitled to receive
its proportion of such taxes, rents, charges or assessments, with
interest thereon, if any, which may be recovered; provided, however,
that any such contest by Tenant of any taxes, assessments or other

charges shall not endanger Landlord's fee interest in the property demised, and Tenant shall furnish any requisite bond and shall take such other steps as reasonably may be required to protect Landlord's interest.'

Section 2.04

As additional rent hereunder, Tenant shall pay to Landlord expenses and charges other than those referred to in Section 2.03 hereof, which during the term of this lease shall be levied, assessed or imposed by any governmental authority upon or with respect to, or incurred in connection with, the ownership, possession, occupation, operation, alteration, maintenance, repair and use of the Demised Premises, or the making of any additions thereto. If at any time during the term of this lease under the laws of the Commonwealth or any political subdivision thereof in which the Demised Premises are situated a tax or excise on rents or other tax, however described, is levied or assessed by said commonwealth or political subdivision against the Landlord or the fixed rent expressly reserved hereunder, Tenant covenants to pay and discharge such tax or excise on rents or other tax but only to the extent of the amount thereof which is lawfully assessed or imposed upon Landlord and which was so assessed or imposed as a direct result of Landlord's ownership of the Demised Premises, or of this lease or of the rentals accruing under this lease, it being the intention of the parties hereto that the fixed rent to be paid hereunder shall be paid to Landlord absolutely net without deduction of any nature whatsoever except as in this lease otherwise expressly provided.

Section 2.05

Nothing in this lease contained shall be construed to require Tenant to pay any franchise, estate, inheritance, succession, capital levy, or transfer tax of Landlord, or any income, excess profits or revenue tax or any other tax or impost charged or levied upon the rentals payable by Tenant under this lease, except as provided in Section 2.04 hereof.

Section 2.06

The fixed rent and additional rent specified in this Article II is intended to cover both Premise C and Premise D in

the event that the Planning Board of Puerto Rico permits the use
of Premise D as an automotive and community center.  If the
Planning Board does not permit the use of Premise D as an auto-
motive center, or if there is other legal impediment to the use
of Premise D as an automotive center, then Premise D will be
excluded from this lease so long as such lack of permission or
other legal impediment exists, the Tenant will locate its auto-
motive center on Premise C, and the fixed rent and additional
rent specified in this Article II shall not be reduced, abated
or otherwise affected in any way whatsoever.

ARTICLE III

Section 3.01

     Promptly upon the commencement of the term of this
lease, Tenant shall, at its own cost and expense, demolish and
remove the buildings or improvements now on Premise C, except for
such portion thereof, if any, as the Tenant may be able to in-
tegrate into the new building to be placed on Premise C.  Land-
lord reserves the right to remove, free of charge but at its own
expense, from any building on Premise C prior to its demolition
any personal property, fixtures or equipment which either belong
to the present lessee of said building or could be used by the
Landlord in the new building being provided for such lessee, pro-
vided, however, that the Tenant shall be entitled to retain the
air conditioning unit now serving the Belk-Lindsey store if Tenant
is able to use such unit in Tenant's new building, and such unit
shall not be removed by Landlord without Tenant's prior written
consent.

Section 3.02

     (a)  As soon as Premise C is cleared as herein-
above provided, Tenant shall, at its own cost and expense, commence
the construction on Premise C of a modern department store building
of a quality, design and construction at least equal to that of the
other department store building owned and operated by Tenant in

- 18 -

San Juan, Puerto Rico.  Such building shall be designed so as to harmonize esthetically with the rest of the Shopping Center and shall have the following specifications:  approximately 416 feet in the north-south direction and approximately 234 feet in the east-west direction, containing approximately 97,400 square feet of covered parking in a partial basement, 97,400 square feet of ground floor, 48,700 square feet on the second floor and 24,300 square feet of future second floor area.

(b)  In the event that the Planning Board of Puerto Rico approves the use of Premise D as an automotive and community center, promptly thereafter Tenant shall, at its own cost and expense, commence the construction on Premise D of an automotive and community center of a quality, design and construction in keeping with the aforesaid building on Premise C, which building on Premise D shall have the following specifications:  approximately 60 feet in the northwest-southeast direction and approximately 182 feet in the northeast-southwest direction, containing approximately 12,000 square feet of ground floor, 5,720 square feet of mezzanine floor and 12,000 square feet of second floor area.

(c)  Construction of the building on Premise C and the building on Premise D (if permissible) shall be made in accordance with duplicate sets of working plans, sketches and specifications prepared by duly licensed architects and engineers theretofore submitted to Landlord, whose approval as to the general appearance of the buildings shall be required.  Such approval shall not unreasonably be withheld.

(d)  Fee simple title to the said buildings (but not the land upon which they are placed) shall be vested in Tenant free and clear of all existing liens and encumbrances.  Upon the expiration of the term of this lease (initial or extended) or other sooner termination thereof, the title to the said buildings shall vest in the Landlord and possession of the said buildings

shall be surrendered and delivered to the Landlord in good order,
condition and repair, reasonable wear and tear excepted, and free
and clear,of all liens and encumbrances. Tenant shall execute
such instruments and perform such other acts as may be required
to transfer fee title in said buildings to Landlord, and Tenant
shall not be entitled to any compensation whatsoever in connection
with such vesting and transfer of title. Tenant shall have the
right to remove from said buildings free of cost all personal
property and trade fixtures, provided, however, that Tenant shall
promptly repair any damage caused to the building by such removal.

(e) The aforesaid buildings shall have, for Regis-
try of Property purposes only, a value of $2,000,000.

(f) Landlord and Tenant and Trustee shall appear
in and execute the appropriate Act of Edification (Acta de Edifica-
cion) notarial deed in order that title to the buildings to be built
by Tenant may be inscribed in Tenant's name in the corresponding
section of the Registry of Property of Puerto Rico, and, if neces-
sary, Landlord will cause the mortgagees of said premises to appear
in and execute the said Act of Edification.

Section 3.03

(a) Before commencing the construction of the new
building or buildings on the Demised Premises, Tenant shall, at
its own cost and expense, obtain from all Boards, Departments and
governmental offices having jurisdiction, approval of plans, sketches
and specifications for the buildings together with all permits re-
quired by law for the construction of the buildings. After the said
approvals and permits shall have been granted, Tenant shall, at its
own cost and expense, keep the same in force and effect until the
improvements shall have been completed.

(b) After commencing such construction, Tenant shall,
at its own cost and expense, thereafter diligently proceed with,
complete and pay for the construction of the new building or buildings

- 20 -

in conformity with the said plans, sketches and specifications
filed and approved as above, in good and workmanlike manner,
free from mechanics' liens and in accordance with the laws, or-
dinances and lawful requirements of the Commonwealth of Puerto Rico
and the various departments and bureaus having jurisdiction thereof.
Upon completion of any building, Tenant shall furnish Landlord with
a duly issued Certificate of Occupancy, or if local procedure makes
no provision therefor, then Tenant shall furnish Landlord with the
architect's certification that the building has been completed ac-
cording to the plans and specifications.

Section 3.04

In connection with said demolition and construction,
Tenant shall obtain, or cause contractors to obtain and maintain,
without cost or expense to Landlord, Builder's Risk (fire, wind-
storm, hail, explosion, riot, riot attending a strike, civil com-
motion, aircraft, vehicle, smoke, vandalism, malicious mischief,
sprinkler leakage, and earthquake) insurance with limits commen-
surate with the completed portion of the buildings under construction,
Public Liability insurance, with limits of $500,000. per person and
$1,000,000. per accident for bodily injury limits and $100,000. for
property damage, and Workmen's Compensation and Employer's Liability
insurance with a limit of at least $100,000. under the Employer's
Liability portion.  Such insurance shall be in forms sufficient to
protect Landlord and Tenant from liability claims arising out of
said demolition and construction.  Tenant shall furnish Landlord
with certificates evidencing such coverages; provided, however,
that Tenant may elect to self-insure any or all of these require-
ments in accordance with Section 6.02.

Section 3.05

The said demolition and construction shall be carried
out in such a way as to interfere as little as is reasonably possi-
ble with the operation of the Shopping Center or the rights of other

- 21 -

tenants thereof. All materials to be stored at the site of construction shall be stored on Parcel B free of charge by the Landlord. Except for the said use of Parcel B, the Tenant shall confine its activities as closely as possible to the area of the Demised Premises. Tenant shall erect such fence or other enclosures as are required to carry out the intent of this Section 3.05.

Section 3.06

(a) Either simultaneously with, or immediately subsequent to, the construction of the said new building or buildings, Tenant shall, at its own cost and expense, construct upon Parcel B a parking area which shall be of quality, design and construction at least equal to that of the existing parking areas in the Shopping Center. Such parking area shall be for the general use, in common, of all the customers of the Shopping Center, as more fully provided in Article XI hereof. In addition, Tenant shall, at its own cost and expense, also construct a comparable parking area on that portion of the land occupied by buildings to be demolished by Tenant which is outside the boundaries of Premise C.

(b) Tenant shall have the right at any time and from time to time during the term of this lease to improve the presently existing parking areas in the Shopping Center so that they will conform to the Tenant's reasonable standards, provided, however, that Tenant shall first obtain Landlord's written consent to any such improvement, which consent Landlord shall not unreasonably withhold. The cost of any such improvement shall be divided between Tenant and Landlord. Tenant shall pay that proportion of the total cost which the total floor area of Tenant's new building or buildings (excluding the floor area of the community center on Premise D, if the same should be built) shall bear to the total floor area of all the buildings in the Shopping Center upon the completion of Tenant's new building or buildings.

- 22 -

## ARTICLE IV

### Maintenance and Repair

Section 4.01

Tenant shall, at its own cost and expense, keep the Demised Premises and the buildings and improvements hereafter erected and maintained upon the Demised Premises in good order and repair and in such condition as may be required by law and by the terms of any insurance policies covering the Demised Premises, whether or not such repairs shall be interior or exterior, extraordinary as well as ordinary, and whether or not such repairs shall be of a structural nature, and Tenant's obligation for maintenance and repair shall apply to the fixtures and facilities upon the Demised Premises or forming part thereof, including without limitation, all water, drainage, electric lighting, heating, air conditioning, gas, elevator, sewer, plumbing and other fixtures and facilities thereon.

Section 4.02

Tenant shall, at its own cost and expense, promptly comply with and conform to the requirements of every applicable statute, law, ordinance, lawful regulation and order, with respect to the condition, equipment, maintenance, use or occupation of the Demised Premises and any buildings and improvements thereafter erected and maintained thereon, and appurtenances, franchises and privileges connected therewith, whether or not such statute, law, ordinance, regulation or order be of a kind now within the contemplation of the parties hereto.

Section 4.03

Tenant shall pay and discharge, and indemnify and save harmless Landlord against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon or incurred by or asserted against Landlord by reason of any of the following

- 23 -

occurring during the term of this lease unless caused by the sole
negligence of the Landlord:

    (a)  Any work or thing done in, on or about
the Demised Premises or any part thereof;

    (b)  Any use, nonuse, possession, occupation,
condition, operation, maintenance, repair or
management of the Demised Premises or any part
thereof or any fixtures or facilities therein
contained;

    (c)  Any negligence on the part of Tenant or
any of its agents, contractors, servants, employees,
licensees, concessionaires or invitees;

    (d)  Any injury or damage to any person or
property occurring in or on the Demised Premises
or any part thereof;

    (e)  Any failure on the part of Tenant to per-
form or comply with any of the covenants, agreements,
terms or conditions contained in this lease on its
part to be performed or complied with.

In case any action or proceeding is brought against Landlord by
reason of any such claim, Tenant will at Tenant's expense resist
or defend such action or proceeding.

## ARTICLE V

### Alterations and Additions

Section 5.01

    Subject to the conditions hereafter set forth in this
Article V, Tenant shall have the right from time to time at its
own cost and expense to make any alterations, additions or improve-
ments within the Demised Premises, including necessary demolition,
incidental to the convenient conduct of Tenant's business, pro-
vided that such alterations, additions or improvements, when
completed, do not diminish the value of the Demised Premises.
Tenant shall have the right hereunder to increase the cubic con-
tents of the new building on Premise C without incurring any
liability for an increase in the fixed rent provided for in
Section 2.01 hereof, provided, however, that any such increase in
the cubic contents shall be dependent upon compliance by the
Tenant with the parking requirements of the governmental authority
having jurisdiction thereof.

- 24 -

Section 5.02

All alterations and additions by Tenant within the Demised Premises shall be subject to the following:

(a)  Before commencing any alteration or addition whose estimated cost is in excess of $100,000., Tenant shall furnish to Landlord a duplicate set of the working plans, sketches and specifications for the proposed work prepared by a duly licensed architect or engineer.

(b)  All alterations and additions shall be made in accordance with all governmental statutes, ordinances and regulations as specified in Section 3.03 hereof.

(c)  In connection with any alteration or addition, Tenant shall at its cost and expense obtain or cause to be obtained all the insurance coverage specified in Section 3.04 hereof.

(d)  Any alteration or addition shall be carried out in such a way as to interfere as little as is reasonably possible with the operation of the Shopping Center or the rights of any other tenants thereof.

Section 5.03

Tenant shall have no power to do any act or make any contract which may create or be the foundation for any lien, charge or other encumbrance upon the reversion or fee estate of Landlord in the Demised Premises. Should Tenant cause any alterations, replacements, changes, additions, improvements or repairs to be made in the Demised Premises, or labor to be performed or material to be furnished therein, neither Landlord nor the Demised Premises shall under any circumstances be liable for the payment of any expenses incurred or for the value of any work done or material furnished, but all such work, labor and material shall be made, furnished and performed at Tenant's expense and Tenant shall be solely and wholly responsible to all persons furnishing and performing such labor and material. If, because of any act of Tenant, any mechanic's, laborer's or materialman's lien shall be filed

against the Demised Premises or against Landlord, Tenant shall,
at its own cost and expense, within 20 days after the filing
thereof, commence and diligently pursue proceedings to have the
same cancelled and discharged of record.

## ARTICLE VI

### Insurance

Section 6.01

Tenant shall maintain at Tenant's sole cost and expense,
for the benefit of Landlord and Tenant, insurance with respect to
the Demised Premises, of the following types and in the following
amounts:

(a)  Fire and extended coverage insurance (losses
due to windstorm, hail, explosion, riot, riot attending a strike,
civil commotion, aircraft, vehicles, smoke), vandalism, malicious
mischief, sprinkler leakage and earthquake insurance and insurance
against such other events as shall from time to time be added to
the extended coverage insurance carried by Tenant's Parent Corpora-
tion in an amount not less than 100% of the replacement cost
(excluding excavation and foundation values) as the same is deter-
mined at five (5) year intervals by an architect or engineer desig-
nated by Tenant and satisfactory to Landlord.

(b)  Public Liability insurance covering liability
claims occurring on the Demised Premises and arising out of the
operation of the Tenant within the Demised Premises or any interest
of the Landlord in the Demised Premises.  The limits of liability
of such insurance shall be at least $500,000. per person,
$1,000,000. per accident for bodily injury and $100,000. per
accident for property damage.

(c)  Plate glass insurance on the Demised Premises.

Section 6.02

Tenant shall have the option of effecting such insur-
ance through an insurance company of recognized standing satis-
factory to the Landlord and the holder of any mortgage on the fee
of the Demised Premises or through Tenant's Parent Corporation

(Sears, Roebuck and Company, a New York corporation) which would
act as a self-insurer.

(a) If Tenant elects to effect such insurance
through an insurance company, such policies shall be secured
promptly and certificates thereof shall be furnished to Landlord.
Such policies shall provide that they will not be cancelled with-
out at least twenty (20) days prior written notice to the Landlord
and Tenant. Such policies shall contain loss payable clauses to
Landlord and Tenant as hereinbelow provided in Section 6.03.

(b) Tenant shall procure renewals of all such
insurance policies at least twenty (20) days before the expira-
tion thereof. In default of the delivery or renewal of any such
insurance policy required hereunder, the Landlord may procure any
such insurance and the Tenant shall, on demand, reimburse the
Landlord for the cost thereof with interest thereon at the rate
of 6% per annum.

(c) If Tenant elects to effect all or any portion
of such insurance through its Parent Corporation, then Tenant
promptly shall advise Landlord of such election and shall furnish
Landlord with a duly executed certificate from its Parent Corpora-
tion specifying the exact insurance coverage which the Parent Cor-
poration will be responsible for. Such certificate shall be
accompanied by the Parent Corporation's most recent published
annual report evidencing sufficient assets to cover the self-
insured risks.

(d) So long as the said Parent Corporation is
acting as insurer, the Tenant shall furnish to Landlord annually
on the anniversary of the certificate referred to in the preceding
paragraph, (1) a duly executed certificate of its Parent Corpora-
tion that the insurance coverage being provided by the Parent
Corporation is in full force and effect as of the date of said
certificate, and (2) the Parent Corporation's most recent pub-
lished annual financial report.

- 27 -

Section 6.03

In the event that during the term of this lease the
building or buildings referred to in Section 3.02 hereof or any
additions thereto at any time erected on the Demised Premises shall
be damaged by fire or other insured casualty, then:

(a) In case such damage shall amount to $100,000.
or less, the loss shall be settled with Tenant and the insurance
proceeds shall be paid to Tenant, and Tenant shall, at its own
cost and expense, promptly proceed to repair the damage so caused.

(b) In case such damage shall amount to over $100,000:

(1) If such damage shall not be so serious
as to render the said building untenantable or as to
amount to a total destruction of said building,
Tenant shall, at its own cost and expense, promptly
proceed to repair the damage so caused;

(2) If such damage shall be so serious as
to render the said building untenantable, or shall
amount to a total destruction of the building, then
Tenant shall proceed with all reasonable expedition
to restore or rebuild, as the case may be, the building
ing so destroyed or rendered untenantable, free from
liens of every kind, in substantial accordance with
the plans and specifications of the building so de-
stroyed or rendered untenantable (the building so to
be rebuilt or restored in respect of its general ex-
terior design, and the mechanical, heating, lighting
and sanitary systems therein, to be substantially
in accord with the building so destroyed or rendered
untenantable), or in accordance with such other plans
and specifications as may be agreed upon by the
parties hereto; and in connection with such rebuild-
ing or restoration Tenant shall comply with all the
rules and requirements of all Boards, Departments and
governmental offices having jurisdiction of such re-
construction or restoration and shall also comply
with the requirements specified in Section 5.02 hereof.

(3) The net sums recovered by Landlord and
Tenant on account of loss or damage, whether under
the policies taken out as aforesaid, or under other
insurance policies taken out by Tenant and indem-
nifying for physical loss (as distinguished from the
loss of use and occupancy or profits), shall be de-
posited in a special account in the name of Landlord,
separate and distinct from all other funds of Land-
lord in a bank or trust company of the City of San
Juan, Puerto Rico approved by Landlord and Tenant,
to be applied on account of the cost of such restora-
tion or rebuilding, as the case may be, as the work
of restoration or rebuilding progresses, and Tenant
shall pay any and all additional moneys required in
such restoration or rebuilding in excess of said net
sums recovered, and shall be entitled to receive any
surplus, if any, remaining of said deposit after such
restoration or rebuilding has been completed as afore-
said, provided, however, that should the aforesaid
damage by fire or other casualty occur within the last
three years of the initial term or any extended term

- 28 -

of this lease, Tenant shall have the option to
surrender the proceeds of any insurance to Land-
lord and vacate the premises.

(c)   There shall be no abatement or reduction of
any fixed or additional rental payable by the Tenant by reason of
any such damage or destruction or during any period of repair or
restoration, nor shall the Tenant be entitled to surrender posses-
sion of the Demised Premises or to terminate this lease by reason
of such damage or destruction, except as provided in subdivision
(3) of Section 6.03 (b) above.

(d)   If Tenant does not commence promptly to repair
or restore the injury or destruction, or if, having commenced the
repair or restoration, Tenant does not proceed diligently to com-
plete the same, Landlord shall be entitled (but shall be under no
obligation) at any time thereafter to enter the Demised Premises
and repair or restore the injury or destruction and to apply any
insurance proceeds in the said special account to the payment of
the cost thereof; but if the insurance proceeds are insufficient
for the cost of the repair, restoration or reconstruction, Tenant
shall pay to Landlord, upon demand and as additional rent as the
work progresses, such amounts as shall be necessary to complete
the repair, restoration or reconstruction.

Section 6.04

If the Tenant's Parent Corporation is the insurer of
the buildings on the Demised Premises against loss from fire or
other casualty, then upon the damage or destruction of such build-
ings, Tenant shall promptly proceed to repair the damage or to
restore or rebuild, as the case may be, in accordance with the
applicable provisions of Section 6.03, Subsection (a) and Subsec-
tion (b), paragraphs (1) and (2) hereof, and Tenant shall promptly
furnish to Landlord the written undertaking of its Parent Corpora-
tion to provide all monies which shall be required to complete the
repair or reconstruction work which the Tenant is obligated to
perform.

Section 6.05

Notwithstanding the insurance required under this Article

- 29 -

VI, Tenant agrees to indemnify Landlord against all damage, loss
or liability resulting from any insured risks referred to in this
Article VI or arising out of Tenant's occupancy and operation of
the Demised Premises except for damages, losses or liabilities
resulting from the sole negligence of the Landlord, whether or
not Tenant has placed and maintained such insurance.

## ARTICLE VII

### Condemnation

Section 7.01

(a). If at any time during the term of this lease,
a fee simple interest in the whole or at least sixty per cent (60%)
of the actual ground area of the Demised Premises shall be taken for
any public or quasi-public purposes by any lawful power or authority
by the exercise of the right of condemnation or eminent domain, then
this lease and the term hereof shall terminate and expire as of the
date of such taking, the fixed rent, additional rent and any other
sum or sums of money and other charges herein reserved and provided
to be paid by Tenant shall be apportioned and paid to date of such
taking, and the Tenant shall thereupon be released from any further
liability hereunder.

(b)  If a fee simple interest in less than ten per
cent (10%) of the actual ground area of the Demised Premises shall
be taken as aforesaid, then this lease and the term hereof shall
continue, but the rent payable hereunder shall be reduced as pro-
vided in Section 7.02 hereof, and Tenant shall have the duty to re-
pair and restore the Demised Premises as provided in Section 7.04
hereof.

(c) If a fee simple interest of at least ten per
cent (10%), but less than sixty per cent (60%) of the actual ground
area of the Demised Premises shall be taken as aforesaid, then Tenant
shall have the right to cancel and terminate this lease effective as
of the date of such taking or to continue in possession of the

remainder of the Demised Premises for the term hereof, and Tenant

shall give to Landlord, within thirty (30) days after the date of

such taking, notice of Tenant's election to terminate or to con-

tinue this lease. Upon termination, rents and other charges shall

be apportioned as in Subsection (a) above, and upon continuation

the rent shall be reduced as provided in Section 7.02 hereof and

the Tenant shall have the duty to repair and restore as provided

in Section 7.04 hereof.

(d)  Upon termination of this lease as provided in

Subsections (a) and (c) above, title to the building or buildings

on the Demised Premises shall vest in the Landlord without any

compensation whatsoever by the Landlord to the Tenant, and neither

Landlord nor Tenant shall, except for obligations incurred before

the occurrence of such event, have any further obligation or

liability to the other.

Section 7.02

In the event that this lease shall continue pursuant to

Subsection (b) of Section 7.01 hereof, or in the event that Tenant

shall elect to continue this lease, as provided in Subsection (c)

of Section 7.01 hereof, then all the terms, conditions and provi-

sions of this lease shall continue in full force and effect, pro-

vided, however, that:

(a)  The fixed rent then payable shall abate during

the period of repair and restoration in the proportion that the

floor area of the buildings referred to in Section 3.02 hereof so

taken plus the floor area of such buildings which cannot be used by

Tenant during said period of repair and restoration bears to the

floor area of the entire buildings referred to in Section 3.02

hereof before such taking; and

(b)  After the repair and restoration of the buildings

has been completed:

(1)  The fixed rent payable thereafter under

this lease shall be equal to that proportion of the

fixed rent specified in Section 2.01 hereof which the

floor area of the entire buildings after repair and

restoration bears to the floor area of the entire

buildings referred to in Section 3.02 hereof before

such taking.

      (2)  In computing percentage rent under Section

2.02 hereof, the figure of Fifteen Million Dollars

($15,000,000.) shall be replaced by a figure derived

by applying the proportion set forth in the preceding

paragraph to the said figure of Fifteen Million Dollars

($15,000,000.).

      (c)  The term "floor area" as used herein shall mean

the actual number of square feet of space within the outside lines

of the exterior walls of all floors of full-story height of the

building on the Demised Premises, without any deduction for space

used or occupied for elevators, escalators, stairs, columns, or

other equipment of interior construction; excluding, however, any

area outside the building line or above the roof line and excluding

the area of the community center on Premise D (in the event that the

Planning Board permits construction of the automotive and community

center on Premise D).

Section 7.03

      In the event of any condemnation proceeding involving

either the whole or any portion of the Demised Premises, both the

Landlord and the Tenant shall participate in such proceeding and

each shall be represented by its own counsel at its own cost and

expense.  Both parties shall cooperate in the prosecution and col-

lection of any award upon any taking in such condemnation proceeding

and shall request that the Court allocate the award between the fee

estate (Landlord) and the leasehold estate (Tenant) in accordance

with the following:

      (a)  In the event of any such taking, partial,
    whole or substantially all, as the case may be, Land-
    lord shall be entitled to receive such portion of the
    award therefor, with the interest thereon, as shall
    represent compensation for the value of the Demised

Premises or the part thereof so taken considered as
vacant and unimproved land free and clear of leases
as of the date of taking.

(b)   In the event of any such taking, partial, whole
or substantially all, as the case may be, that portion
of the award therefor, with the interest thereon, as shall
represent compensation for the value of the new building
on the Demised Premises, or the part thereof which is taken,
shall be allocated so that the Landlord shall receive such
proportionate part as the number of full calendar years
then elapsed since the commencement date of this lease bears
to 64 years.  The remainder of said portion of the award
shall be allocated to the Tenant.

(c)   In the event of any such taking, partial, whole
or substantially all, as the case may be, Landlord shall
be entitled to receive such portion of the award there-
for, with the interest thereon, as shall represent com-
pensation, if any, for consequential damages to lands,
buildings and improvements adjoining or adjacent to the
Demised Premises.

(d)   In the event of any taking, partial, whole or
substantially all, as the case may be, Tenant shall be
entitled to such portion of the award, if any, which
represents compensation for the leasehold estate.

(e)   In the event of any taking of less than sixty
per cent (60%) of the actual ground area of the Demised
Premises and the continuation of this lease as provided
in Section 7.01, Subsection (b) or Subsection (c) here-
of, that portion of the award which is allocated to the
Tenant shall be deposited in a special escrow account
in the name of Landlord, separate and distinct from all
other funds of Landlord in a bank or trust company of
the City of San Juan, Puerto Rico approved by Landlord
and Tenant, to be applied on account of the repair or
restoration of, or addition to, the building on the
Demised Premises, as the work of repair or restoration
progresses in accordance with Section 7.04 hereof.

Section 7.04

In the event of any taking of less than sixty per cent

(60%) of the actual ground area of the Demised Premises, and the

continuation of this lease as provided in Section 7.01, Sub-

section (b) or Subsection (c) hereof, the Tenant shall proceed

with all reasonable expedition to repair or restore the remaining

part of the buildings, or to build any addition thereto, in sub-

stantial accordance with the plans and specifications of the new

buildings prior to such taking, so far as applicable, or in accord-

ance with such other plans and specifications as may be agreed upon

by the parties hereto.  The Tenant shall comply with all the rules

and requirements of all Boards, Departments and governmental offices

having jurisdiction of such repair, restoration or addition and shall

also comply with all the conditions specified in Section 5.02 hereof.

The deposit made pursuant to Section 7.03, Subsection (e) hereof

shall be applied on account of the cost of any such repair, resto-

ration and addition as the work progresses, and Tenant shall pay

any and all additional moneys required for any such repair resto-

ration or addition in excess of the amount of said deposit, and

shall be entitled to receive any surplus of the said deposit

remaining after all the required work has been completed as afore-

said.

Section 7.05

If during the term of this lease less than a fee title

to all or any portion of the Demised Premises shall be taken in

condemnation proceedings by any lawful power or governmental

authority for temporary use or occupancy, the foregoing provisions

of this Article shall be inapplicable to such taking; this lease

shall continue in full force and effect but the rent shall abate

in the proportion that the floor area so taken bears to the floor

area of all of Tenant's buildings referred to in Section 3.02 here-

of before such taking. In such event, Landlord shall be entitled

to claim for, recover and retain any award in respect of such

taking.

## ARTICLE VIII

### Conduct of Business by Tenant

Section 8.01

Tenant shall use the leased premises for the purpose

of conducting the business of a Sears Roebuck "Class A" depart-

ment store in a manner substantially similar to the operation now

carried on in the existing "Class A" Sears Roebuck department

stores in Puerto Rico and the United States, except as otherwise

provided for herein. Promptly after completion of the new building,

as aforesaid, Tenant shall commence such operation.

## ARTICLE IX

### Mortgage, Assignment and Sublease

Section 9.01

The Tenant at any time hereafter may assign this lease

and the leasehold estate hereby created, or sublet the whole of
the Demised Premises to any wholly owned subsidiary of Tenant
or to any corporation wholly owned by Tenant's Parent Corporation
or in which Tenant's Parent Corporation owns at least two-thirds
of the outstanding voting stock, subject, however, to the terms
and conditions of this lease.

Section 9.02

Except as provided in Section 9.01 hereof, Tenant
shall not assign this lease in whole or in part nor sublet the
entire Demised Premises without the prior written consent of
Landlord.  It is the intent of the parties that during the term
of this lease the Demised Premises shall not without the Landlord's
prior written consent, be used for the conduct of any business
other than that specified in Section 8.01 hereof, and it is under-
stood that the Landlord shall not consent to any assignment or
subletting unless the Landlord is reasonably satisfied that the
prospective assignee or sublessee has the standing and experience
to conduct a department store business substantially equivalent
to that specified in Section 8.01 hereof, or such other business
as is commensurate with the objectives of the Shopping Center and
does not conflict with contractual obligations of the Landlord to
other tenants in the Center.

Notwithstanding the foregoing, Tenant shall have the
right to sublease or sublicense parts of the Demised Premises to
such departmental sublessees, concessionaires and licensees as
normally occupy space in a Sears Roebuck "Class A" department
store.

Section 9.03

In the event of an assignment of this lease, or a sub-
lease of the entire Demised Premises, as permitted in Section
9.01 or Section 9.02 hereof, the assignee or sublessee shall
execute and deliver to the Landlord an agreement in writing

assuming all the terms, covenants and conditions on the part of
the Tenant to be kept and performed under this lease. No assign-
ment or subletting, nor the acceptance of rents or other payments
from, nor any other dealing by the Landlord with any assignee, under-
tenant, occupant or other person shall release the Tenant from its
obligation to pay the Landlord a monthly rental equivalent to the
average monthly rental paid by Tenant to Landlord during the
twelve months' period last preceding such assignment or subletting,
but, in no event shall such liability be less than the fixed
rentals hereinabove provided to be paid from time to time during
the existing term of the lease and any renewal thereof.

Section 9.04

In the event that the Tenant abandons the Demised
Premises, then this lease shall terminate and title to the build-
ing or buildings on the Demised Premises shall vest in Landlord
in accordance with the provisions of Section 14.01, Subsection (b)
hereof. Upon such termination Tenant shall pay to Landlord, as
and for liquidated and agreed damages, the amounts set forth in
Section 14.01, Subsections (c) and (d) hereof.

Section 9.05

Tenant may mortgage its interest under this lease, but
any such mortgage shall be subject and subordinate to the provi-
sions of Sections 3.02(d),7.01(d), 9.04 and 14.01 hereof as well as
to the other provisions of this lease, and no such mortgage shall
impair any of the rights, remedies or interest of Landlord under
this lease. Landlord agrees to give notice of any default here-
under to any mortgagee of this lease who shall have given Landlord
written notice of such mortgage and furnished Landlord with a
certified copy thereof, and further agrees to accept perform-
ance by such mortgagee of the terms, covenants and conditions

of this lease in the manner and within the time provided for here-
under as if such performance were by Tenant, provided, however,
that such mortgagee shall be subject to the business restrictions
referred to in Section 9.02 hereof. No mortgage of Tenant's
interest under this lease or the enforcement thereof, shall be
deemed to release or discharge Tenant from any obligation or
liability hereunder.

Section 9.06

The provisions of subdivision (d)(2) of Section 1.05
shall be complied with by any mortgagee holding a mortgage upon
Landlord's fee interest in Parcel A and/or Parcel B, and shall
be superior to the lien of any such mortgage upon Landlord's
said fee interest.

ARTICLE X

Utilities

Section 10.01

Tenant shall be solely responsible for and promptly
pay all charges for heat, water, gas, electricity, telephone,
sewerage or any other utility rendered to, used or consumed in
the leased premises. In no event shall Landlord be liable for an
interruption or failure in the supply of any such utilities to the
leased premises, provided, however, that in the event that Land-
lord fails to maintain in good working condition any utility
equipment such as a sewage pipe or utility conduit located
within the Shopping Center but utilized by the Tenant, which
utility equipment was installed by and is under Landlord's effec-
tive control, and if within ten (10) days after receiving written
notice thereof from Tenant, Landlord does not proceed promptly
to cure such condition, Tenant shall have the same right as
Landlord to cure such condition and deduct the cost thereof
from rental payments due hereunder.

## ARTICLE XI

## Parking and Common Use Areas and Facilities

Section 11.01:

All automobile parking areas, driveways, entrances
and exits thereto, and other facilities furnished by Landlord
in or near the Shopping Center, for the general use, in common,
of tenants, their officers, agents, employees and customers, shall
at all times be subject to the exclusive control and management of
Landlord and Landlord shall have the right from time to time to
establish, modify and enforce reasonable rules and regulations
with respect to all facilities and areas mentioned in this Article.
Landlord shall have the right to construct, maintain and operate
lighting facilities on all said areas and improvements; to police
the same; from time to time to change the level, location and ar-
rangement of parking areas and other facilities hereinabove referred
to; to restrict parking by tenants, their officers, agents and em-
ployees to employee parking areas; to close all or any portion of
said areas or facilities to such extent as may, in the opinion of
Landlord's counsel, be legally sufficient to prevent a dedication
thereof or the accrual of any rights to any person or the public
therein; to close temporarily all or any portion of the parking
areas or facilities; to discourage noncustomer parking; and to do
and perform such other acts in and to said areas and improvements
as, in the use of good business judgment, the Landlord shall de-
termine to be advisable with a view to the improvement of the con-
venience and use thereof by tenants, their officers, agents, employees
and customers. Landlord will operate and maintain the common facili-
ties referred to above in such manner as Landlord in its sole discre-
tion, shall determine from time to time. Without limiting the scope
of such discretion, Landlord shall have the full right and authority
to employ all personnel and to make all rules and regulations pertain-
ing to and necessary for the proper operation and maintenance of the

common areas and facilities.  Landlord shall obtain and maintain

a public liability policy of insurance with Landlord and all tenants

of the Shopping Center as insured covering liability claims arising

out of the common use and facilities areas.  The coverage shall be

$500,000. and $1,000,000. for personal damages and $100,000. for

property damages.  Certificates of insurance shall be issued to

the tenants.

## ARTICLE XII

### Cost of Maintenance of Common Areas

Section 12.01

Tenant shall pay to Landlord as an agreed service charge

that proportion of the cost of insuring, repaving or otherwise main-

taining, policing, landscaping and lighting the parking areas, road-

ways, service areas and sidewalks in the Shopping Center, which the

floor area of the new building or buildings on the Demised Premises

(excluding the floor area of the community center on Premise D, if

the same should be built) shall bear to the aggregate floor area of

all of the structures in the Shopping Center.  Such service charge

shall be payable monthly as billed by the Landlord.  Sixty (60)

days after Landlord's fiscal year, Landlord shall furnish to Tenant

a detailed statement of the aforesaid cost and the payments there-

tofore made by Tenant will be adjusted in accordance therewith.  In

the event that the Landlord fails to maintain the said common areas

in a manner reasonably satisfactory to Tenant, then Tenant shall be

entitled to proceed in accordance with the provisions of Section

14.03 hereof.

## ARTICLE XIII

### Merchants' Association

Section 13.01

Tenant shall cooperate on a fair and equitable basis with

the Merchants' Association of the Shopping Center in furthering the

objects and purposes of the Merchants' Association.  Tenant reserves

- 39 -

the right in its sole discretion, to decide whether or not to be-
come a member of said Association.

## ARTICLE XIV

### Default

Section 14.01

(a)  If default shall be made by the Tenant in the
due and punctual payment of any fixed rent or additional rent pay-
able under this lease when and as the same shall become due and
payable, and such default shall continue without correction for a
period of thirty (30) days after notice from Landlord to Tenant,
then and in such event Landlord shall have the right to terminate
this lease by giving written notice thereof to Tenant and five (5)
days after the giving of such notice this lease and the term hereby
demised and all rights of Tenant hereunder shall, subject to the
provisions of this Section 14.01, expire and terminate; provided,
however, that the non-payment of any disputed additional rent under
Section 2.02 hereof prior to the binding determination provided in
subsection (c) of Section 2.02 hereof, or the non-payment of any
taxes which Tenant is contesting in accordance with the provisions
of subsection (d) of Section 2.03 hereof, shall not be deemed to be
a default under this Section 14.01.

(b)  Upon any such termination of this lease, title
to the building or buildings erected by the Tenant on the Demised
Premises shall vest in the Landlord without any compensation whatso-
ever to the Tenant by way of payment, offset or otherwise, and Tenant
shall execute such instruments as may be required to effectuate the
transfer of title to the Landlord.  Upon any such termination of
this lease, Tenant shall quit and peacefully surrender the Demised
Premises to Landlord, and Landlord, upon or at any time after any
such termination, may without further notice, enter upon the Demised
Premises and possess itself thereof, by summary proceedings, eject-
ment or otherwise, and may dispossess Tenant and remove Tenant and
may have, hold and enjoy the Demised Premises.

(c) In the event of any such termination Tenant
shall pay to Landlord for the remainder of the then existing
term of the lease, as and for liquidated and agreed damages, the
equivalent of the fixed rent hereinabove provided, less the net
proceeds of any reletting (after deducting all Landlord's expenses
in connection with such reletting). Tenant shall pay such damages
to Landlord monthly on the days on which the fixed rent would have
been payable under this lease if it were still in effect, and
Landlord shall be entitled to recover from Tenant each monthly
deficiency as the same shall arise.

(d) In the event of any such termination, Land-
lord shall make reasonable efforts to relet the Demised Premises
for such term or terms upon such conditions as Landlord, in its
sole discretion, may determine and Landlord shall collect and
receive the rent therefor and apply the same on a monthly basis
against the liquidated damages obligations of the Tenant herein-
above provided. So long as the Landlord acts in good faith,
the Landlord shall not be responsible or liable for any failure
to relet the Demised Premises or for any failure to collect any
rent due upon any such reletting.

Section 14.02

If default shall be made by Tenant in the performance
of or compliance with any of the covenants, agreements, terms
or conditions contained in this lease other than those referred
to in Section 14.01 hereof, and such default shall continue for
a period of thirty (30) days after written notice thereof from
Landlord to Tenant, (provided, however, that Tenant's time to cure
any such default shall be extended for such additional time as
shall be reasonably required for the purpose if Tenant shall
proceed with due diligence during such thirty (30) day period to
cure such default and is unable to cure the same within the said
thirty (30) days) then Landlord shall have the right, at its

- 41 -

election, to submit the matter to an appropriate court. The final determination of any such court shall be binding upon the parties hereto. Any award of damages to the Landlord shall be added to the payment of fixed rent next falling due under this lease, and Tenant's default in paying such damages shall be deemed to be a default in the payment of fixed rent under Section 14.01 hereof.

Section 14.03

If default shall be made by Landlord in the performance of or compliance with any of the covenants, agreements or conditions on its part to be performed hereunder, then the Tenant shall be entitled to proceed as follows:

(a) If Landlord's default shall be in the performance of work which the Tenant is able and willing to perform, then Tenant shall give the Landlord written notice specifying in detail the work which Tenant requires and which Tenant proposes to perform upon Landlord's failure to do so. Within thirty (30) days after such written notice the Landlord shall either commence the performance of the requested work and shall diligently proceed therewith until the work is completed or the Landlord shall submit the matter to an appropriate court. In the event that the Landlord does not either proceed with the performance of the requested work or submit the matter for adjudication within the said thirty (30) day period, the Tenant shall have the right to perform the work specified in its notice and to deduct the monies actually expended therefor from the rental payment or payments next falling due under this lease.

(b) If Landlord's default shall be in some performance which Tenant is either unable or unwilling to perform, then Tenant shall give the Landlord written notice of the performance required and if within thirty (30) days after such written notice the Landlord does not commence and diligently proceed with the requested performance then Tenant shall have the right, at its election, to submit the matter to an appropriate court.

(c)   The final determination by the court of any
matter submitted pursuant to paragraphs (a) or (b) of this Section
14.03 shall be binding upon the parties hereto. Any award of damages
to the Tenant shall be deducted from the rental payment or payments
next falling due under this lease and the Tenant shall also have
the right to deduct therefrom the monies actually expended by Tenant
for work performed by Tenant pursuant to such determination.

(d)   In the event of Landlord's default which shall
be held by a court of competent jurisdiction to have constituted an
eviction of Tenant of a permanent nature, then Tenant's failure to
pay rent subsequent to such finding shall not constitute a technical
default under Section 14.01 hereof and Tenant shall be entitled to
such damages as the court deems proper.

Section 14.04

Notwithstanding the foregoing provisions of this Article
XIV, in the event of the breach by either party of the covenants,
agreements or conditions of this lease, the other party shall, in
addition to any and all other rights, be entitled to such injunctive
and other remedies as may be allowed at law, in equity, by statute
or otherwise for such breach. No failure by either party to insist
upon the strict performance of any covenant, agreement, term or
condition of this lease or to exercise any right or remedy conse-
quent upon a breach thereof, shall constitute a waiver of any such
breach or of such covenant, agreement, term or condition. No waiver
of any breach shall affect or alter this lease, but each and every
covenant, agreement, term and condition of this lease shall con-
tinue in full force and effect with respect to any other then exist-
ing or subsequent breach thereof.

ARTICLE XV

Surrender At Expiration

Section 15.01

Tenant shall on the expiration of the term of this lease

- 43 -

or other sooner termination hereof, surrender and deliver up the
Demised Premises with the buildings and improvements then erected
and maintained thereon into the possession of Landlord in good order,
condition and repair, free and clear of all liens, tenancies and en-
cumbrances other than those, if any, created by Landlord, and title
to such buildings and improvements shall vest in the Landlord with-
out any payment or allowance whatever by Landlord on account of or
for any buildings and improvements on the Demised Premises at the
time of the surrender, or for the contents thereof or appurtenances
thereto.  Tenant shall execute such instruments as may be required
to effectuate the transfer of title to Landlord.

        The aforesaid surrender shall include all fixtures and
facilities in the buildings on the Demised Premises, or forming part
thereof, which are customarily regarded as real estate and as part
of the buildings.  Any fixtures, trade fixtures, personal property
or belongings of Tenant left upon the Demised Premises at the time
of such surrender shall be deemed to have been abandoned by Tenant.

## ARTICLE XVI

### Equipment and Fixtures Installed

Section 16.01

        Tenant from time to time during the initial term or any
extended term may install equipment and fixtures of various kinds and
descriptions for use in connection with its business, and upon the
installation or placing of, any such equipment and fixtures in or
on the Demised Premises by Tenant, the same shall remain at all
times the property of Tenant, and, at any time during the initial
term or any extended term and at the termination of the lease,
Tenant shall be entitled to remove any and all of such equipment
and fixtures.  If any equipment or fixtures are so attached to the
building as not to be readily removable without damage to the build-
ing, then, if Tenant shall remove the same, Tenant shall promptly
repair and replace any damage caused to the building by such removal.

- 44 -

Upon the expiration or other termination of this lease, Landlord may require Tenant to remove any and all of such equipment and fixtures at the expense of the Tenant and Tenant shall promptly repair any damage caused to the building by such removal.

Nothing herein contained shall be deemed to confer upon Tenant any right to remove any equipment or fixtures used in the operation of the Demised Premises (Article XV) as distinguished from fixtures used in carrying on Tenant's business.

## ARTICLE XVII

### Covenant of Quiet Enjoyment

Section 17.01

Landlord covenants and agrees that so long as Tenant pays the fixed rent, additional rent and other charges reserved and agreed to be paid by Tenant under this lease, and faithfully observes all covenants, conditions and agreements herein contained, Tenant shall quietly have and enjoy the Demised Premises and every part thereof during the term of this lease without hindrance, ejection or molestation by Landlord or any person or persons claiming by, through or under Landlord. In the event that Landlord shall hereafter convey, or in any manner be divested of title to, the Demised Premises, Landlord shall be and hereby is entirely freed and relieved of the performance of all covenants and obligations of Landlord hereunder from and after such conveyance or divestiture of title to the extent that Landlord's successor in title shall become obligated, expressly or by implication of law, to perform the covenants and obligations of Landlord hereunder, and to such extent Tenant shall thenceforth look solely to Landlord's successor in title for the performance of the covenants and obligations of Landlord hereunder.

## ARTICLE XVIII

### Estoppel Certificates

Section 18.01

Tenant agrees at any time and from time to time during

- 45 -

the term of this lease upon not less than ten (10) days prior

notice by Landlord to execute, acknowledge and deliver to Land-

lord a statement in writing certifying that this lease is unmodi-

fied and in full force and effect (or if there have been modifica-

tions, that the same is in full force and effect as modified and

stating the modifications), and the dates to which the fixed rent

and other charges have been paid, and stating whether or not to

the best knowledge of the signer of such certificate Landlord

is in default in performance of any covenant, agreement or condi-

tion contained in this lease and, if so, specifying each such

default of which the signer may have knowledge, it being intended

that any such statement delivered pursuant to this Section 18.01

may be relied upon by any prospective purchaser of the fee or any

mortgagee thereof.

Section 18.02

Landlord agrees at any time and from time to time during

the term of this lease upon not less than ten (10) days prior no-

tice by Tenant to execute, acknowledge and deliver to Tenant a

statement in writing certifying that this lease is unmodified and

in full force and effect (or if there shall have been modifications

that the same is in full force and effect as modified and stating

the modifications) and the dates to which the fixed rent and other

charges have been paid, and stating whether or not to the best

knowledge of the signer of such certificate Tenant is in default

in performance of any covenant, agreement or condition contained

in this lease and, if so, specifying each such default of which

the signer may have knowledge, it being intended that any such

statement delivered pursuant to this Section 18.02 may be relied

upon by any prospective mortgagee of the Tenant's interest in this

lease.

## ARTICLE XIX

### Invalidity of Particular Provisions

Section 19.01

If any term or provision of this lease or the application

thereof to any person or circumstance shall, to any extent, be
invalid or unenforceable, the remaining terms and provisions of
this lease, or the application of such term or provision to per-
sons or circumstances other than those as to which it is held
invalid or unenforceable, shall not be affected thereby, and
each term and provision of this lease shall be valid and be en-
forced to the fullest extent permitted by law.

## ARTICLE XX

### Notices

Section 20.01

All notices, demands and requests required or permitted
to be given hereunder by either party to the other shall be in
writing and given by registered mail return receipt requested. All
notices, demands and requests by Landlord to Tenant shall be deemed
to have been properly given if and when the original notice, de-
mand or request has been mailed by registered mail addressed to
Tenant at Office of the President, 106 Coll y Toste Streets, Hato
Rey, Puerto Rico, or at such other place as Tenant may from time
to time designate in a written notice to Landlord. All notices,
demands and requests by Tenant to Landlord shall be deemed to
have been properly given if and when mailed by registered mail
addressed to Landlord at Office of the President, Suite 2600, 70
Pine Street, New York 5, New York, or at such other place as Land-
lord may from time to time designate in a written notice to Tenant.

## ARTICLE XXI

### Restriction on New Buildings in Shopping Center

Section 21.01

During the term of this lease Landlord shall not, with-
out the prior written consent of the Tenant, undertake or permit
the construction of new buildings upon the premises of the Shopping
Center which will (1) substantially reduce the parking area of the
Shopping Center which is then available or (2) substantially alter

the character of the Shopping Center. Nothing contained herein

shall be construed to restrict in any way whatever Landlord's

right to make normal repairs or alterations to existing buildings

or to repair, restore or rebuild any buildings which may be damaged

or destroyed by fire or other casualty or to repair or restore

buildings which may be affected by condemnation.

### ARTICLE XXII

### Access By Landlord

Section 22.01

The Landlord or its agents shall have the right at all

reasonable hours and upon reasonable notice, to inspect the Demised

Premises. In the event the Tenant has not elected to extend the

term of this lease as provided in Section 1.07 hereof, then during

the one year period prior to the expiration of the initial term or

the first extended term or the second extended term, as the case

may be, the Landlord shall have the right to exhibit the premises

to prospective tenants at reasonable hours and upon reasonable

notice. The Landlord shall have the right to exhibit the premises

to prospective tenants during the one year period prior to the

expiration of the third extended term without any prejudice to

Tenant's rights under Section 1.09 hereof.

### ARTICLE XXIII

### Miscellaneous

Section 23.01

As used herein, the expression "the term of this lease",

or any variation thereof, shall be deemed to include the initial

term and any and all extended terms provided for in Section 1.07

hereof.

Section 23.02

All the headings and the numbering of the Sections in

this lease are for convenience of reference only and shall not

affect the construction of this lease.

## Section 23.03

Subject to the provisions of Article IX hereof, and without in any way enlarging Tenant's right to assign as therein set forth, this lease shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

## Section 23.04

This lease may not be modified, altered, terminated or discharged orally but only by an agreement in writing signed by the parties hereto.

## Section 23.05

This lease may be executed in any number of counterparts, each of which shall be an original and the counterparts shall constitute but one and the same instrument.

## Section 23.06

The controlling language of this instrument shall be English.

## Section 23.07

The appropriate jurisdiction for the determination of disputes arising under this lease shall be Puerto Rico.

## Section 23.08

Any party hereto may, at its sole expense, elect to make this lease a public deed. In such event, the other parties hereto shall join in the execution of such instruments as may be required to effectuate such election, but the other parties shall not be responsible for any taxes, fees, costs or other expenses whatsoever incurred in connection therewith.

IN WITNESS WHEREOF, the parties hereto have caused this lease to be executed in their respective corporate names and

their respective corporate seals to be hereunto affixed by their

respective officers thereunto duly authorized, as of the day and

year first above written.

SANTA ROSA SHOPPING CENTER, INC.

By _____
                PRESIDENT

SEARS, ROEBUCK de PUERTO RICO, INC.

By _____

BANCO CREDITO Y AHORRO PONCENO, INC.

By _____

- 50 -

STATE OF NEW YORK )
               : ss.:
COUNTY OF NEW YORK)

        Before me, a Notary Public, in and for the County and
State of New York, there came JOHN P. BIRKELUND, the President of
SANTA ROSA SHOPPING CENTER, INC., to me personally known, who
acknowledged that he is the one who executed on behalf of the above
named corporation the above instrument of lease.

        WHEREFORE, I have hereunto set my hand and seal of
office this _16th_ day of September, 1965.

                               *[signature]*

                              BENJAMIN BLONDER
               NOTARY PUBLIC, State of New York
               No. 31-5350125
               Qualified in New York County
               Commission Expires March 30, 19_66_

CITY OF _Hinsdale_ )
            : ss.:
STATE OF _Illinois_ )

        Before me, a Notary Public, in and for the City of
_Hinsdale_ and State of _Illinois_ , there came
_T. V. Learson_ , the _Vice President_ of SEARS, ROEBUCK de PUERTO
RICO, INC., to me personally known, who acknowledged that he is
the one who executed on behalf of the above named corporation the
above instrument of lease.

        WHEREFORE, I have hereunto set my hand and seal of
office this _23rd_ day of September, 1965.

                            *[signature] Mary Catherine ____*

CITY OF _San Juan_ )
            : ss.:      *Affidavit # 4245*
STATE OF _Puerto Rico_ )

        Before me, a Notary Public, in and for the City of
_San Juan_ and State of _Puerto Rico_ , there came _Mr._
_Carlos J. Paú_ , the _Vice President_ of BANCO CREDITO
Y AHORRO PONCEÑO, INC., to me personally known, who acknowledged
that he is the one who executed on behalf of the above named
corporation the above instrument of lease.

        WHEREFORE, I have hereunto set my hand and seal of
office this _9th_ day of September, 1965.
                        *October*

                                *[signature]*

*C-600-061Am*

AMENDMENT TO THE LEASE BETWEEN SANTA ROSA SHOPPING CENTER, INC. AND
SEARS, ROEBUCK DE PUERTO RICO, INC., DATED SEPTEMBER 6, 1965

Agreement made this 3 day of     June     , 1983, in San Juan, Puerto Rico, between Plaza Las Cumbres, Inc., a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, as Party of the First Part, represented herein by its president, Andre Nikitine, of legal age, married, and a resident of Puerto Rico, who is duly authorized therefore, hereinafter called the "Landlord", and

Sears, Roebuck de Puerto Rico, Inc., a Delaware corporation with principal offices in San Juan, Puerto Rico, as Party of the Second Part, represented herein by its president, Donald S. Jones, of legal age, married, and a resident of San Juan, Puerto Rico, who is duly authorized therefore, hereinafter called the "Tenant".

Whereas, Santa Rosa Shopping Center, Inc. and Sears, Roebuck de Puerto Rico, Inc. signed a lease agreement on September 6, 1965 (hereinafter referred to as the "Lease Agreement"), and

Whereas, subsequent to the signing of the Lease Agreement, Santa Rosa Shopping Center, Inc. was purchased by Landlord, and

Whereas, Landlord is the successor in interest of Santa Rosa Shopping Center, Inc. to the Lease Agreement, and

Whereas, Landlord wishes to make additions and improvements to the mall of Santa Rosa Shopping Center (hereinafter referred to as the "Shopping Center"), and

Whereas, the proposed addition and improvement to the mall will affect the Demised Premises, including Tenant's department store (hereinafter referred to as "Tenant's store") and said Shopping Center,

Now, therefore, the Parties agree as follows:

1.  Prior to beginning the construction of any addition or improvement to the Shopping Center, Landlord shall:

    (a) submit to Tenant for Tenant's approval the proposed design and specifications for the mall, which design and specifications:  (i) shall be similar to those for the existing mall building, (ii) shall not provide for any alteration in the precast concrete fascia panels or the structural slab

of the roof overhang at the mall entrance to Tenant's
store, and (iii) shall include roof plans illustrating
the location of roof drains and rain leaders.  Tenant's
exterior canopy may be used as the roof of the building
to be attached to the demised premises or as the roof of
the enclosed mall; provided, however, that said overhang
shall be used only as a roof, and provided further that
no equipment or materials, with the exception of a suspended
ceiling and lighting, shall be hung from said canopy or
installed on or over it.

Landlord shall further present to Tenant for its approval
all designs and specifications for the alteration of the
Demised Premises.  Said plans and specifications shall include,
inter alia:

(i)  the proposed plans for the doorway between Tenant's
store and the mall, the size of the mall configuration
at the entrance to Tenant's store, and the form in which
the mall building is to be attached to Tenant's store.
In the event that an exterior wall of Tenant's store is
used as a common wall for an adjoining building, said plans
shall include plans for the construction of an exterior
stud wall;

(ii)  the layout of parking spaces on and adjacent to the
demised premises.  Landlord shall paint any lines drawn
in the parking lot in a way that parked cars  will not
interfere with loading and unloading operations for the
demised premises, and in no event shall there be fewer
than 25 feet between the loading and unloading entrance
of Tenant's store and the parking areas for cars.

Once Tenant has approved said design and specifications,
Landlord shall prepare the site plan in accordance therewith
and shall submit said plan for Tenant's approval.  After
Tenant has approved the site plan, Landlord shall attach
said plan hereto as Exhibit II.  Landlord shall make no
modification or alterations to said plan without Tenant's
written authorization.

(b)   obtain and make available for inspection by Tenant all
      necessary approvals and permits of the Permit and Regulation
      Administration (ARPE) and the Puerto Rico Planning Board
      for additions and improvements to the Shopping Center and
      to the Demised Premises.  Landlord shall not commence or
      cause to commence any work on additions or improvements to
      the Shopping Center or to the Demised Premises until Tenant
      has reviewed and approved said approvals and permits.  Any
      changes to the proposed plans will be notified to Tenant
      for Tenant's approval.  If public hearings are necessary,
      Landlord will notify Tenant of the time, date and place
      they will take place.

(c)   obtain and present to Tenant the authorization of any
      mortgagors or creditors of Landlord that may be required
      to permit Landlord to perform the modifications and altera-
      tions referred to herein.

2.  Landlord warrants and represents that it shall:

(a)   commence construction within      days of approval of the site
      plan by Tenant and shall finish construction within        days
      of commencement.

(b)   construct all additions and improvements to the Shopping
      Center so that the entire area of the Shopping Center shall
      be covered by a sprinkler system.

(c)   place all building rain leaders designed to drain water from
      the roof in a location that does not cause rain water run
      off to flow down the entrance ramp to Tenant's lower level
      parking.

(d)   not disturb the precast concrete fascia panels or the structural
      slab of the roof overhang at the mall entrance to Tenant's
      store.

(e)   bear all costs of additions or improvements to the Shopping
      Center as well as all costs of additions or improvements to
      the Demised Premises required because of additions or im-
      provements to the Shopping Center; Landlord shall pay

the cost of the construction or remodeling of the doorway
between Tenant's store and the mall, up to a maximum of
$12,500.  Landlord will seek and obtain Sears' approval
on any and all exterior signs bearing Sears name to be put on the mall.

(f)   at Landlord's expense, cause GT Sylvania to survey Tenant's
rear parking lot after completion of the additions and
improvements to the Shopping Center.  Landlord shall provide
Tenant with a certificate from GT Sylvania stating that the
lighting of Tenant's rear parking lot is equal the current
lighting level of Tenant's front parking lot.

(g)   Building 17 on the plot plan attached hereto as Exhibit I,
to be constructed in the central part of the parking lot
of the Shopping Center fronting on Highway Number 2, and shall
construct any sign related to Building 17 in such a way that
neither the building nor the sign will be higher than the
ground level of Tenant's store, which is twenty-two feet.
Landlord further warrants and represents that it shall not
build any building or structure directly fronting on the
Demised Premises, or on or around the corner of Highway
Number 2, and Aguas Buenas Avenue.

(h)   in connection with the remodeling work to be done on the
Demised Premises, obtain, pay for, and maintain at all times
during the performance of work under this contract, through
companies and agencies approved by Tenant and pursuant to
contracts containing provisions satisfactory to Tenant,
the following insurance:

(i)   Worker's Compensation and Employer's Liability Insurance
with statutory benefits under Worker's Compensation,
and limits of liability under the Employer's Liability
portion of not less than $500,000 containing a waiver
of subrogation in favor of Tenant executed by Landlord's
insurance company or companies,

(ii)   Comprehensive General Liability Insurance including
Contractor's Protective Liability in Contractor's
name, with bodily injury and property damage limits
of not less than $1,000,000 per occurrence,

(iii)  Contractual Liability Insurance in Landlord's name
specifically endorsed to cover the indemnity agreement
in this contract.  Limits of liability shall be not
less than $1,000,000 per occurrence for bodily injury
and property damage,

(iv)   Owner's Protective Liability Insurance with Tenant as
the named insured, covering Landlord's operations and
the work performed for Landlord on the job site.  Such
policy shall have a combined single limit of not less
than $1,000,000 per occurrence for bodily injury and
property damage, and

(v)    Automobile Liability Insurance with an Employer's Non-
Ownership Liability Endorsement in Landlord's name.
Limits of liability shall not be less than $1,000,000
per occurrence for bodily injury and property damage.

Landlord shall cause waivers of subrogation to be executed
by Landlord's insurance company or companies in favor of
Tenant with respect to the foregoing policies as well as with
respect to any real and personal property insurance policy
maintained by Landlord covering the Shopping Center.

(i)   To the fullest extent permitted by law, defend, indemnify
and hold harmless Tenant and its agents and employees from
and against all claims, actions, liabilities, losses, costs
and expenses, including but not limited to attorneys'
fees, arising out of any actual or alleged (i) bodily
injury, sickness, disease or death, or to injury to or
destruction of tangible property (other than the work itself)
including the loss of use resulting therefrom, or any other
damage or loss arising out of or resulting or claimed to

have resulted in whole or in part from any actual or
alleged act or omission of the Landlord, or any con-
tractor, any subcontractor, anyone directly or indirectly
employed by any of them or anyone for whose acts any of them
may be liable in the performance of the work hereunder
(for purposes of this Section 2(i), hereinafter collectively
called "Contractor"), whether or not lawful or within the
scope of their employment, and regardless of whether or not
it is caused in part by a party indemnified hereunder; or
(ii) violation by Contractor, in the performance of the work,
of any law, statute or ordinance or any governmental
administrative order, rule or regulation, on whatever amount
a Court of Justice may award on any incident alleged to
result or resulting from the Santa Rosa Shopping Center
remodeling.

In any and all claims against Tenant, or any of its agents
or employees, by any employee of the Contractor, the indemni-
fication obligation hereunder shall not be limited in any
way by (i) any limitation on the amount or type of damages,
compensation or benefits payable by or for the Contractor
under workers' compensation acts, disability benefit acts
or other employee benefit acts; or (ii) by any statutory
bar or limitaiton in any worker's compensation or other
similar type of statute.

(j)  carry out all remodeling work in such a way as to interfere
as little as reasonably possible with the operation of Tenant
on the Demised Premises.

3.  Landlord warrants and represents that Tenant shall maintain its
rights to the future expansion area previously approved by the
Planning Board, including the existing parking spaces allocated for
Tenant's future expansion.

4.  Landlord warrants and represents that the mall shall be no greater
than 28 linear feet wide at the entrance of the mall to Tenant's
Premises.

5.  For the period of June 1, 1983 to May 31, 1988, the first paragraph
of Section 2.02 shall be amended to read as follows:

-7-

"a.   In the event that the net sales (as hereinafter defined)
made by Tenant upon the Demised Premises during any lease
year shall be in excess of Fifteen Million Dollars
($15,000,000), then Tenant shall pay to Landlord, as
additional rental hereunder for said lease year, a sum
equal to one (1) per cent of such excess (said amount referred
to hereinafter as "additional rental").

"b.   Tenant shall pay as an advance to Landlord the sum of $2,000
per month, which amount shall be credited against the amount
due hereunder as additional rental, if any.   Said advances
shall be paid prior to the first business day of each month
during the aforesaid period.   In the event that at the end
of any lease year that begins or ends during the period
between June 1, 1983 to May 31, 1988, the sum of the monthly
advances paid during said year as additional rental exceeds
the total amount due as additional rental in accordance
with 2.02 (a) above,  Landlord shall promptly refund such
excess to Tenant, together with the interest thereon,
calculated at the average prime rate established by
Citibank, N. A. during the last month of the year in question.

"c.   The term 'net sales' as used herein is hereby defined to
mean the gross sales made upon the Demised Premises by
Tenant plus the gross sales, if any, made upon the Demised
Premises by Tenant's departmental sublessees, concessionaires
and licensees occupying space upon the Demised Premises, but
deducting or excluding therefrom, as the case may be, the
following:

        (1)  Sales of departments or divisions not located upon
        the Demised Premises;

(2)   The amount of all sales, use, excise retailers' occupation or other similar taxes imposed in a specific amount, or percentage upon, or determined by, the amount of retail sales made upon the Demised Premises;

(3)   Returns and allowances, as such terms are known and used by Tenant in the preparation of Tenant's profit and loss statements;

(4)   Delivery, installation and service charges including any and all service charges for work performed off the Demised Premises;

(5)   Amounts in excess of Tenant's (or of its sublessees', concessionaires' and licensees') cash sales price charged on sales made on credit or under a time payment plan;

(6)   Sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's catalog order channels, regardless of the place of order, payment or delivery;

(7)   Policies of insurance sold on the Demised Premises and premiums collected on policies of insurance;

(8)   Sales off the Demised Premises of encyclopedias and other educational books sold in sets;

(9)   Sales made through the Commercial and Industrial Sales Department of Tenant.

"d. Within sixty (60) days after the end of each lease year, Tenant shall furnish to Landlord a statement certified by an officer of Tenant showing the net sales (as hereinbefore defined) made by Tenant upon the Demised Premises during such preceding lease year, and the additional rental, if any, payable by Tenant to Landlord for such lease year. In addition, Tenant shall furnish Landlord with a statement of Tenant's net sales (as above defined) for Tenant's next preceding fiscal year prepared by Tenant's certified public accountants.

"e.   Unless Landlord shall, within thirty (30) days after receipt
of any such statement certified by Tenant's officer, notify
Tenant to the contrary, such statement shall be deemed to
have been accepted by the Landlord as correct.   In the
event that Landlord shall notify Tenant of Landlord's dis-
satisfaction with such statement within the aforementioned
period, then Tenant shall permit a reputable firm of certified
public accountants doing business in the United States and
Puerto Rico, which shall be mutually satisfactory to, and
approved in writing by, Landlord and Tenant, to make and
independent audit of Tenant's net sales (as hereinbefore
defined) for the period covered by said statement.   Such
independent audit shall be at Landlord's expense and the
findings of such audit shall be binding upon both parties
and conclusive.

"f.   Tenant makes no representation or warranty as to the sales
which it expects to make upon the Demised Premises and
Landlord agrees to hold in confidence all sales figures
and other information with respect to Tenant's business
which Landlord may obtain from Tenant or from any audit
of Tenant's books and records, except that Landlord may
submit all of said information to the holder or holders
of mortgages upon Landlord's interest in the Demised
Premises, who shall also receive same in confidence."

On June 1, 1988, the aforesaid modification shall cease to have
any force and effect and the first paragraph of Section 2.02 shall
read as originally drafted.

6.   Section 5.01 of the Lease Agreement shall be modified by the
addition of paragraph (e), as follows:

"(e)   Any section herein to the contrary notwithstanding, Tenant

shall have the right to remodel and add such additional

offices on the second level of Tenant's store as Tenant

may deem necessary, for its own use.   In the event that

such offices are added, Tenant's office employees will

use only the parking located at the rear of the Tenant's

store."

7.   Section 12.01 of the Lease Agreement, as modified be amendment

dated July 30, 1971, shall be modified to read as follows:

"A.   Tenant shall pay to Landlord as the exterior maintenance

charge a percentage of the exterior maintenance cost

(as defined below), which percentage shall be calculated

using the following formula:   Tenant's gross floor area

less basement parking area, divided by the gross leasable

area (including Tenant's gross area) of the Shopping Center.

The term 'exterior maintenance cost' shall include only:

cost of insuring, repaving or otherwise maintaining, policing,

securing, landscaping and lighting the exterior common areas

plus overhead limited to 6% of such costs.   The term 'exterior

common areas' shall mean only the parking areas, landscaped

areas, roadways, service areas, sidewalks and entrances

in the exterior of the Shopping Center.

Tenant's gross floor area, less basement parking area,

is 193,500 square feet and the gross leasable area of

the Shopping Center is 329,327 square feet, on the date

hereof, before expansion.

"B.   In addition to the payment of the aforesaid exterior

maintenance charge, Tenant shall also pay as a mall

operating charge a percentage of the operating costs

of the mall, which percentage shall be calculated in

accordance with the following formula:   The frontage

of Tenant's store onto the mall, measured in linear

feet, divided by total frontage of all leasable areas

onto the mall; provided, however, that in no event shall
Tenant be required to pay as a mall operating charge an
amount that exceeds 4% of the operating costs of the mall;
and provided, further, that in no event shall Tenant be
required to pay as a mall operating charge (including any
management or administrative expenses) an amount in excess
of $5,000 per year, such limit adjusted every five years
according to the CPI as published by the Department of
Labor of the Commonwealth of Puerto Rico.  The term 'operating
costs of the mall' shall include only the following expenses:
insurance, electricity, water, air conditioning repairs,
labor and materials used in cleaning, maintaining and making
repairs to the enclosed mall, and such management and administra-
tive costs as do not exceed 6% of the total amount of the
operating costs of the mall.  The term 'operating costs of
the mall' shall also include depreciation of ventilation equipment
installed or used in the mall area only.  For purposes
of cleaning, maintenance, and repairs, the term 'mall'
shall include:  mall flooring, ceiling, benches, planters,
plants, illumination (including emergency lights) and
ventilation equipment.

"C.   The aforesaid exterior maintenance and mall operating charge
shall be payable monthly as billed by the Landlord.  Within
sixty (60) days of the end of each lease year, Landlord
shall furnish Tenant a certified statement showing the
mall operating costs and exterior maintenance costs, as
defined above, for said lease year.  Payments made by
Tenant during said years shall be adjusted in accordance
with said statement and Tenant may credit any amounts due
to it as a result of said adjustment against any other
payments that it may owe to Landlord.  Tenant may notify
Landlord of Tenant's dissatisfaction with such statement,
in which case Landlord shall allow a certified public

·accountant mutually acceptable to Tenant and Landlord to make an independent audit of the aforesaid costs, at Tenant's expense. The findings of such audit shall be binding upon both parties. In the event that the Landlord fails to maintain the exterior common areas in a manner reasonably satisfactory to Tenant, then Tenant shall be entitled to proceed in accordance with the provisions established in Section 14.03 of the Lease Agreement dated September 6, 1965."

8.   Section 12.02 of the Lease Agreement, as modified by amendment dated July 30, 1971, shall be modified to read as follows: "In the event that Tenant expands its store or that Landlord enlarges the Shopping Center, Tenant's portion of the exterior maintenance charge and the mall operating charge shall be recalculated using the formulas set forth in Section 12.01 (A) and (B) above. Any change in Tenant's percentage of the aforesaid charges resulting from said recalculation shall be applied only to that portion of the lease year during which said expansion or enlargement was completed."

Tenant's final approval of Landlord's Santa Rosa Shopping Center remodeling is subject to Landlord submitting to Tenant the final detailed architechtural drawings for Tenant's approval. Tenant reserves the right of refusal of this contract until the final detailed architechtural drawings are given to Tenant for Tenant's approval.

All other terms and conditions of the Lease Agreement not specifically modified herein shall remain in full force and effect.

PLAZA LAS CUMBRES, INC.              SEARS, ROEBUCK DE PUERTO RICO, INC.



André V. Nikitine                    Donald S. Jones