Hearing Date and Time:  Tuesday, January 28, 2020 10:00 a.m. (Eastern Time)
Objection Date and Time:  Friday, January 24, 2020 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                       :

**In re**                    :          **Chapter 11**
                       :

**SEARS HOLDINGS CORPORATION, *et al.*,**    :      **Case No. 18-23538 (RDD)**
                       :

**Debtors.[1]**            :      **(Jointly Administered)**
                       :

-----------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019(a) FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT WITH TRANSFORM HOLDCO LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), by and through their undersigned counsel, filed a motion (the "**Motion**") for entry of an order (the "**Order**") pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for approval of a settlement and compromise among the Debtors and Transform Holdco LLC ("**Transform**").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **Tuesday, January 28, 2020 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Motion (the "**Objections**") shall (i) be in writing; (ii) state the name and address of the objecting party and nature of the claim or interest of such party; (iii) state with particularity the legal and factual bases of such objection; (iv) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in accordance with General Order M-399 (available at www.nysb.uscourts.gov) by registered users of the Court's Electronic Case Filing system, and by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable; and (vi) be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018

(ECF No. 405), so as to be filed and received no later than **Friday, January 24, 2020 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated:     January 10, 2020
           New York, New York

                    ***/s/ Sunny Singh***
                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York  10153
                    Telephone:  (212) 310-8000
                    Facsimile:  (212) 310-8007
                    Ray C. Schrock, P.C.
                    David Lender
                    Paul R. Genender
                    Jared R. Friedmann
                    Sunny Singh

                    *Attorneys for Debtors*
                    *and Debtors in Possession*

Hearing Date and Time:  Tuesday, January 28, 2020 10:00 a.m. (Eastern Time)
Objection Date and Time:  Friday, January 24, 2020 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
                :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019(a) FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT WITH TRANSFORM HOLDCO LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ..................................................................................1

II.     JURISDICTION AND VENUE ...............................................................................3

III.    BACKGROUND ....................................................................................................3

        A.      The Chapter 11 Cases and Creditors' Committee......................................3

        B.      The Asset Purchase Agreement, Sale Order, and Sale Transaction .......................4

        C.      The Cash-Management System Transfer.....................................................5

        D.      The APA Litigation....................................................................................5

                1.      The First Motion to Enforce ...........................................................5

                2.      The Debtors' Supplemental Motion to Enforce the APA and
                        Transform's Adversary Complaint .........................................7

                3.      The Cash Reconciliation Process and Examiner ......................................13

                4.      The Debtors' Motion for Turnover of the Cook County Tax
                        Refunds ...........................................................................14

IV.     THE SETTLEMENT AGREEMENT .......................................................................15

        A.      The Settlement Negotiations..................................................................15

        B.      The Principal Terms of the Settlement Agreement.............................................17

V.      RELIEF REQUESTED SHOULD BE GRANTED ....................................................19

        A.      Basis for Relief ........................................................................................19

        B.      The Settlement Agreement Falls Well Within the Range of
                Reasonableness ........................................................................21

VI.     NOTICE....................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.),*
    156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .........................................19

*Cosoff v. Rodman (In re W.T. Grant Co.),*
    699 F.2d 599 (2d Cir. 1983) .........................................................................................20

*Fla. Trailer & Equip. Co. v. Deal,*
    284 F.2d 567 (5th Cir. 1960) ........................................................................................20

*In re Hibbard Brown & Co.,*
    217 B.R. 41 (Bankr. S.D.N.Y. 1998) ...........................................................................19

*Nellis v. Shugrue,*
    165 B.R. 115 (S.D.N.Y. 1994) ...............................................................................19, 20

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson,*
    390 U.S. 414 (1968) ...............................................................................................19, 20

*In re Purofied Down Prods. Corp.,*
    150 B.R. 519 (S.D.N.Y. 1993) ...............................................................................20, 21

*Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.),*
    134 B.R. 499 (Bankr. S.D.N.Y. 1991) ...................................................................19, 21

**Statutes**

28 U.S.C. §§ 157 and 1334 ...................................................................................................3

28 U.S.C. §§ 157(a)-(b) and 1334(b) ...................................................................................2

28 U.S.C. § 157(b) ............................................................................................................3, 2

28 U.S.C. §§ 1408 and 1409 ............................................................................................3, 2

United States Code title 11 chapter 11 .......................................................................... *passim*

Bankruptcy Code sections 105, 363, and 365 .....................................................................4

Bankruptcy Code sections 1107(a) and 1108 .....................................................................4

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), by and through their undersigned counsel, hereby file this motion (the "**Motion**") pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for approval of a settlement and compromise (the "**Settlement Agreement**," attached hereto as Exhibit 1) between the Debtors and Transform Holdco LLC ("**Transform**") (together, the "**Parties**").[1]

## I.    PRELIMINARY STATEMENT

1.    The Debtors seek the Court's approval to enter into the Settlement Agreement with Transform to resolve, on a global basis, the outstanding APA-related disputes between and among the Parties that will allow for, among other things, an immediate influx of substantial funds to the Debtors' Estates for the benefit of the Estates' creditors. The Settlement Agreement also will eliminate the burdens, expenses, and risks associated with the protracted and contentious APA litigation, including anticipated appeals.

2.    In sum, the Settlement Agreement provides for a payment of approximately $18.3 million by Transform to the Debtors' Estates, comprising a cash payment of approximately $13 million plus the transfer of approximately $5.3 million in utility deposits held by the Debtors that the Court determined belong to Transform under the APA, all within three (3) business days of entry of an order approving the Settlement Agreement. The Settlement Agreement incorporates and ratifies all interim settlements between and among the Parties with respect to the various APA-related disputes and all payments and transfers made as a result of the Court's prior rulings and interim settlements. Further, the Parties will walk away from any

---

[1] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Motion to Enforce (as defined herein).

further litigation associated with outstanding APA-related disputes, such that Transform will not be required to satisfy any further 503(b)(9) (other than cure costs), accounts payable, or severance reimbursement obligations under the APA.  The Debtors will retain over $45 million in previously transferred funds and will now recover an additional $18.3 million under the Settlement Agreement, all without the risk of litigation or appeal.  Moreover, the Debtors will retain the benefit of Transform's payment of almost $160 million in liabilities assumed under the APA (accounts payable plus 503(b)(9) obligations); such payment will be final and no longer subject to offset or appeal.

3.      The Settlement Agreement represents sound business judgment exercised by the Restructuring Committee and brings finality to these long-standing, expensive, and complex disputes.  The Restructuring Committee considered the risks associated with the APA litigation, including potential delays and the ability to collect on any judgment that might be obtained even if the Debtors were successful on their claims.  In light of all of these considerations, the Restructuring Committee has concluded that the Settlement Agreement is in the best interests of the Debtors' Estates and creditors.

4.      As described in this Motion, the Settlement Agreement is the product of extensive negotiations between and among the Parties and their advisors.  The Settlement Agreement has also been independently reviewed and approved by the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), which supports the Debtors' entry into the Settlement Agreement and the relief requested in this Motion.

5.      Accordingly, and for all of the reasons set forth below, the Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Debtors' Estates.  The

Debtors respectfully request that the Court grant the relief requested in this Motion and approve the Settlement Agreement.

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    Further, the Court has jurisdiction to consider this matter pursuant to the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith, and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**"), which provides that the Court

> shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of [the] Sale Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to [the] Sale Order or the Asset Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

Sale Order ¶ 58.

## III.    BACKGROUND

### A.    The Chapter 11 Cases and Creditors' Committee

8.    Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are

authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.    On October 24, 2018, the United States Trustee for Region 2 appointed the Creditors' Committee.  No trustee or examiner has been appointed in these chapter 11 cases.

10.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

**B.    The Asset Purchase Agreement, Sale Order, and Sale Transaction**

11.    On January 17, 2019, the Debtors entered into an Asset Purchase Agreement with Transform—the company that ESL Investments, Inc. ("**ESL**") formed to purchase substantially all of the Debtors' assets and operations.  *See Asset Purchase Agreement dated as of January 17, 2019 by and among Transform Holdco LLC, Sears Holdings Corporation and Its Subsidiaries Party Hereto* (ECF No. 1730) (as amended on February 11, 2019, and as amended, restated, supplemented, or modified from time to time, the "**APA**").

12.    Disputes between Transform and the Debtors regarding the meaning of certain provisions of the APA arose before the ink even dried on the contract—specifically, concerning the meaning of a provision obligating Transform to assume both up to $166 million in respect of the Debtors' accounts payable (as defined in the APA, the "**Other Payables**") as well as all of the Debtors' payment obligations with respect to ordered inventory (as defined in the APA, the "**Ordered Inventory**").  *See* APA § 2.3(k)(v); Feb. 4, 2019 Hr'g Tr. 34:3-36:13; Feb. 7, 2019 Hr'g Tr. 588:8-23, 923:24-925:11.

13.    Despite the existence of this dispute between the Parties, on February 8, 2019, after a hearing on the Debtors' motion for entry of an order pursuant to sections 105, 363, and 365 of the Bankruptcy Code approving the sale of the Debtors' assets (the "**Sale Hearing**"), the Bankruptcy Court entered the Sale Order, which approved the sale of substantially all of the

Debtors' assets and operations to Transform (the "**Sale Transaction**").  The Sale Transaction

closed on February 11, 2019 at 12:01 a.m. Eastern Time (the "**Closing**").  APA § 4.1.

        **C.**        **The Cash-Management System Transfer**

        14.        Before the Closing, Transform advised the Debtors that it had not yet

implemented its own cash-management system or established its own bank accounts.

*Declaration of Brian J. Griffith in Support of the Debtors' Motion Pursuant to Federal Rule of*

*Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with*

*Transform Holdco LLC*, filed concurrently herewith ("**Griffith Decl.**") at ¶ 5.  In order to

alleviate the risk of not being able to close on the timeline contemplated by the APA and to allow

the Parties to proceed to Closing expeditiously in order to satisfy various closing conditions, the

Debtors transferred their cash-management system, including the majority of their bank

accounts, to Transform, effective as of the Closing Date (the "**Cash-Management System**

**Transfer**").  *Id.*  The Parties knew that the Cash-Management System Transfer would give rise

to various cash-reconciliation issues that the Parties would have to work together to resolve in

the days after Closing.  *Id.*

        **D.**        **The APA Litigation**

        **1.**        **The First Motion to Enforce**

        15.        The Parties began litigating disputes related to the APA just one month

after the Sale Transaction closed.  On March 11, 2019, the Debtors filed the *Debtors' (I) Motion*

*to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC*

*and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's*

*Motion to Assign Matter to Mediation* (ECF No. 2796) (the "**First Motion to Enforce**").  In the

First Motion to Enforce, the Debtors sought entry of an order compelling turnover of

approximately $57.5 million in funds being held by Transform in violation, the Debtors alleged,

of the APA and the automatic stay.  First Motion to Enforce ¶ 6.  The Debtors asserted that the

$57.5 million withheld funds comprised:

(i)      approximately $41.3 million in funds owed to the Debtors in connection with the Cash-Management System Transfer ($14.6 million in credit-card proceeds from transactions that occurred prior to Closing (the "**Credit Card Accounts Receivable**") held in reserve accounts by certain credit-card payment processors pursuant to various credit-card processing agreements (the "**Reserve Accounts**"), $18.5 million in cash proceeds from transactions that occurred prior to Closing but that were still in transit from regional banks or stores after Closing (the "**Cash in Transit**"), $4.5 million of cash in transit from the Debtors' Israeli bank accounts prior to Closing, and $3.7 million in GOB Store proceeds); and

(ii)     an approximately $16.2 million rent-proration payment for February 2019 (the "**Rent Proration**").  *Id.* at ¶¶ 16-19.

16.      On or about March 12, 2019, Transform transferred $3,261,487 in respect of Israeli cash and $3,661,721 in respect of GOB Store proceeds to the Debtors.  Griffith Decl. ¶ 7.

17.      On March 18, 2019, Transform filed a response to the First Motion to Enforce, objecting to the relief requested therein (ECF No. 2864) and, on March 20, 2019, the Debtors filed a reply in further support of the First Motion to Enforce (ECF No. 2913).  On the eve of the March 21, 2019 hearing concerning the relief requested in the First Motion to Enforce (the "**March 21 Hearing**"), Transform and the Debtors entered into an interim agreement (the "**Interim Agreement**") that tabled the Cash in Transit and Rent Proration issues in the interest of facilitating (i) the return of the Cash in Transit and Rent Proration and (ii) the production of documents and information that would allow the Debtors and their advisors to confirm Transform's calculations with respect to various reconciliations and setoffs that Transform was asserting against the Cash in Transit and Rent Proration.  Griffith Decl. ¶ 8.

18.      The Interim Agreement provided, among other things, that, on or before March 26, 2019, Transform would (1) pay by wire to the Debtors $3 million in respect of the

Cash in Transit and (2) pay by wire to the Debtors $5 million in respect of the Rent Proration. *Id.* Transform timely remitted these amounts to the Debtors' Estates. *Id.* Accordingly, the only issue to be adjudicated by the Court at the March 21 Hearing was the return of the Credit Card Accounts Receivable.

19.     The Court ultimately held that (i) the Reserve Accounts were Credit Card Accounts Receivable under the APA; (ii) the Debtors were entitled to, and did, deliver the Reserve Accounts to Transform at Closing to satisfy their obligation under Section 10.9 of the APA to deliver at least $1.657 billion, in the aggregate, of Acquired Inventory (excluding any Pending Inventory), Credit Card Accounts Receivable, and Pharmacy Receivables; (iii) the Debtors delivered an aggregate threshold excess of approximately $14.6 million to Transform as of the Closing Date, less any amounts drawn from the Reserve Accounts held by the credit-card payment processors to satisfy liabilities owed by the Debtors to the credit-card payment processors as of the Closing Date (the "**Reserve Draw**"); and (iv) the Debtors were entitled to take the steps necessary to effectuate a transfer of the $14.6 million held in Reserve Accounts by certain of the credit-card payment processors less any Reserve Draw. *See Order Enforcing Asset Purchase Agreement Against Transform Holdco LLC* dated May 8, 2019 (ECF No. 3742) ¶¶ 2-3. On May 8, 2019, the Bankruptcy Court entered an order consistent with its oral ruling (the "**CCAR Order**"). *See generally id.*

### 2.     The Debtors' Supplemental Motion to Enforce the APA and Transform's Adversary Complaint

20.     In the months following the March 21 Hearing, the Parties attempted to resolve the outstanding APA-related disputes. The Parties' attempts, however, were unavailing and, in fact, the number of APA-related disputes between the Parties increased.

21.     On May 24, 2019, the Debtors filed the *Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* (ECF No. 4029) (the "**Supplemental Motion to Enforce**").  In the Supplemental Motion to Enforce, the Debtors sought entry of an order (i) compelling Transform to assume up to $166 million in Other Payables as well as all payment obligations with respect to Ordered Inventory pursuant to Section 2.3(k)(v) of the APA; (ii) compelling Transform to assume approximately $83 million in 503(b)(9) claims in accordance with the APA; (iii) compelling Transform to turn over $35.1 million to the Debtors, representing the total amount of cash owed to the Debtors as a result of the Cash-Management System Transfer and Rent Proration amounts due under the APA; and (iv) enjoining Transform from (a) taking any actions to exercise control over thirteen subdivided lots in the Village of Hoffman Estates, Illinois (the "**Hoffman Estates Development**") or (b) interfering with the Debtors' use, enjoyment, or right to dispose of those thirteen lots.

22.     On May 25, 2019, Transform filed an Adversary Complaint (ECF No. 4033) (Adversary Proceeding No. 19-08262) (the "**Adversary Complaint**") against the Debtors, asserting causes of action for breach of contract, declaratory judgment, and specific performance based upon allegations, among others, that (i) the Debtors failed to deliver the amount of Prepaid Inventory required by the APA; (ii) the Debtors failed to deliver the amount of Specified Receivables required by the APA; (iii) Transform acquired the security deposit (the "**Adequate Assurance Deposit**") established pursuant to the Bankruptcy Court's order to ensure the continued service of utilities during the Chapter 11 Cases (ECF No. 431); (iv) Transform acquired the Debtors' claims to rebates of property taxes levied on the Debtors' Hoffman Estates properties and collected from the Debtors for the 2017 tax year held by the Village of Hoffman Estates (the "**EDA Funds**"); (v) Transform only assumed liability for mechanics' liens included

in Section 2 of Schedule 6.5 of the APA and did not assume liability for any other pre-Closing mechanics' liens on Acquired Assets; (vi) the Debtors caused Transform to assume accounts payable beyond those it agreed to assume including by acting outside the ordinary course of business in the week before Closing; and (vii) the Debtors held approximately $19.6 million "available cash," within the meaning of the APA, at Closing that reduced Transform's obligation, if any, to assume up to $166 million in Other Payables under Section 2.3(k)(v) of the APA.

23.     On July 3, 2019, after extensive discovery taken by both Parties, the Debtors filed their *Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* (ECF No. 4430).[2]  And, on July 8, 2019, Transform filed its *Brief in Support of the Adversary Complaint and in Opposition to the Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* (the "**Brief in Support**") (ECF No. 4464).

24.     A hearing to adjudicate the issues raised in the Supplemental Motion to Enforce and Adversary Complaint (and supporting memoranda and declarations) was to be held before the Bankruptcy Court on July 11, 2019 (the "**July 11 Hearing**").  After Transform filed its Brief in Support but before the July 11 Hearing, the Parties reached a settlement with respect to the Rent Proration issue (the "**Rent Proration Settlement**").  July 11, 2019 Hr'g Tr. 32:4-6. Pursuant to the Rent Proration Settlement, Transform would wire an additional $8 million to the Debtors on July 15, 2019 for prorated rent for February 2019 without any condition on how the Debtors could use the money or into what account it would be placed.  *Id.* at 32:8-12.  The

---

[2] Also on July 3, 2019, the Creditors' Committee filed the *Joinder of the Official Committee of Unsecured Creditors to (I) Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement and (II) Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* (ECF No. 4436).

Parties also resolved part of the cash reconciliation dispute by agreeing that Transform would escrow $2.4 million for uncashed checks written by the Debtors pre-Closing to satisfy the Debtors' pre-Closing obligations, to be released to Transform upon cashing and to the Debtors after an applicable escheat period elapsed (the "**Uncashed Checks Escrow**"). *Id.* at 32:12-15.[3]

      25.    The Rent Proration Settlement left ten APA-related disputes between the Parties to be adjudicated by the Court.  At the July 11 Hearing, the Court, having considered the Parties' submissions and all evidence attached thereto, the testimony given, and the Parties' arguments, resolved the disputes as follows:

    (i)    **The $166 Million Other Payables Dispute.**  The Court ruled that the APA obligated Transform to assume, effective as of the Closing Date, liability for both (a) up to $166 million in respect of Other Payables (i.e., the accounts payable set forth on Schedule 1.1(g) of the APA) and (b) all payment obligations with respect to the Ordered Inventory. *Id.* at 264:17-269:15.

    (ii)    **The Adequate Assurance Deposit Dispute.**  The Court issued a preliminary ruling that the Adequate Assurance Deposit was a utility deposit and was acquired by Transform on the Closing Date, but only to the extent the Deposit related to assets acquired by Transform under the APA. *Id.* at 297:15-20.  The Parties subsequently agreed to accept the Court's preliminary ruling as final.  Sept. 12, 2019 Hr'g Tr. (Adv. Case No. 19-08262-RDD ECF No. 9) 14:11-16.

    (iii)    **The EDA Funds Dispute.**  The Court issued a preliminary ruling that the EDA Funds were Excluded Assets that the Debtors did not sell, transfer, or convey to Transform under the APA.  July 11, 2019 Hr'g Tr. 297:21-298:1.  The Parties subsequently agreed to accept the Court's preliminary ruling as final.  Sept. 12, 2019 Hr'g Tr. 14:11-16.

    (iv)    **The Hoffman Estates Real Property Dispute.**  The Court ruled that "Store Number 490, Hoffman Estates, Illinois" in Schedule 1.1(p) of the APA referred to all sixteen parcels of land in Hoffman Estates, including the thirteen disputed parcels referred to in the Supplemental Motion to Enforce as the "Estates' Lots."  The Court further held that Sections 1.1 and 2.1(c) of the APA obligated the Debtors to sell, transfer, and convey to Transform the "Operating Owned Properties" described in Schedule

---

[3] The Debtors have not yet received any funds from the Uncashed Checks Escrow, but their right to receive such funds will not be affected by the Settlement Agreement. *See infra* at Part IV.B.

1.1(p) of the APA; therefore, Transform acquired all sixteen parcels of land in the Hoffman Estates Development on the Closing Date. July 11, 2019 Hr'g Tr. 129:22-133:4. The Debtors subsequently transferred the underlying deeds to Transform on September 16, 2019.

(v)    **The Mechanics' Liens Dispute.** The Court issued a preliminary ruling that Transform only assumed liability for the mechanics' liens included in Section 2 of Schedule 6.5 of the APA and did not assume liability for any other pre-Closing mechanics' liens on Acquired Assets. *Id.* at 298:2-5.

(vi)    **The Specified Receivables Dispute.** The Court ruled that, for purposes of calculating the Specified Receivables Shortfall Amount (as defined in Section 1.1 of the APA), the Debtors were required to deliver to Transform at Closing an aggregate $255,200,000 of actual accounts receivable—i.e., accounts reflecting balances owed to the Debtors that had not been paid as of the Closing Date ("**Accounts Receivable**")—as opposed to those accounts listed as receivable in the Debtors' financial reporting. The Court further ruled that any accounts that were satisfied before the Closing Date, or were not Accounts Receivable as of the Closing Date, would not count in the calculation of the Specified Receivables Shortfall Amount. Intercompany receivables, however, would be treated as Specified Receivables for purposes of the calculation of the Specified Receivables Shortfall Amount. *Id.* at 174:5-177:21. Finally, the Court ruled that, in the event the Parties were unable to agree on the calculation of the Specified Receivables Shortfall Amount within ten (10) days, the Court would appoint an examiner, with the costs split evenly between the Parties, to determine the Specified Receivables Shortfall Amount. *See id.* at 194:16-195:14.

(vii)    **The Prepaid Inventory Dispute.** The Court ruled that the Prepaid Inventory Shortfall Amount (as defined in Section 1.1 of the APA) calculation required an actual valuation of the Prepaid Inventory that the Debtors delivered to Transform at Closing, rather than a valuation based upon the methodology used by the Debtors in their financial reporting. *Id.* at 218:23-221:22. The Court further ruled that, in the event the Parties were unable to agree on the calculation of the Prepaid Inventory Shortfall Amount within ten (10) days, the Court would appoint an examiner, with the costs split evenly between the Parties, to determine the Prepaid Inventory Shortfall Amount. *See id.* at 194:16-195:14.

(viii)    **The Cash Reconciliation Dispute.** The Court allowed the Parties ten (10) days from the date of the July 11 Hearing to reach an agreement concerning the net cash reconciliation amounts owing from one Party to the other Party as a result of the Cash-Management System Transfer. *Id.* at 194:16-195:14. The Court further ruled that, in the event the Parties were unable to agree on the net cash reconciliation amounts owing from one Party to the other Party as a result of the Cash-Management System

Transfer within ten (10) days, the Court would appoint an examiner, with the costs split evenly between the Parties, to determine those net cash reconciliation amounts. *See id.* at 194:16-195:14.

26.    The Court postponed ruling on Transform's ordinary course and available cash arguments, stating that, at a subsequent hearing, it would consider parol evidence concerning the meaning of "available cash" under the APA. *Id.* at 296:18-19.    The Court permitted the Parties to file supplemental briefing (i) on the ordinary-course dispute and (ii) addressing the significance of any parol evidence concerning the meaning of the term available cash. *Id.*

27.    On August 6, 2019, after further discovery taken by both Parties, Transform filed a *Supplemental Memorandum of Law in Support of Transform Holdco LLC's Adversary Complaint* (ECF No. 4767).    The Debtors responded on August 23, 2019 with a *Supplemental Memorandum of Law in Support of Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* (ECF No. 4973).    On September 6, 2019, Transform filed a *Reply Memorandum of Law in Further Support of Transform Holdco LLC's Adversary Complaint* (ECF No. 5085).

28.    On September 12, 2019, the Bankruptcy Court held a hearing (the "**September 12 Hearing**") to address, among other things, the meaning of the term available cash under the APA, whether the Debtors' delays in vendor payments in the week before Closing were, in fact, a breach of Section 8.6 of the APA, and whether Transform was entitled to damages as a result of any breach by the Debtors of Section 8.6.    The Court, having considered the Parties' submissions and all evidence attached thereto, the testimony given, and the Parties' arguments, resolved the disputes between the Parties as follows:

(i)    **The Available Cash Dispute.**  The Court ruled that the term "available cash" as used in the APA's definition of Aggregate DIP Shortfall Amount was ambiguous and, further, that, based upon consideration of the relevant parol evidence, the Parties intended that the phrase "net of available cash" would not include the Debtors' Cash in Transit and, thus, that the Aggregate DIP Shortfall Amount at Closing was $243,249 (as opposed to approximately $19.2 million, as Transform claimed).  Sept. 12, 2019 Hr'g Tr. 173:1-185:1; *see also* Oct. 3, 2019 Hr'g Tr. 163:25-167:16.

(ii)    **The Ordinary Course Dispute.**  The Court ruled that the phrase "in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business" in Section 8.6 of the APA modified both the Debtors' obligation to "manage accounts payable of the business" and the Debtors' obligation to "make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement until the Closing Date in all material respects on a timely basis."  The Court further ruled that the Debtors' delay of payments to certain vendors in the week before the Closing Date was therefore not a violation of Section 8.6 because such delays were consistent with the Debtors' prior practices and at least as consistent with Transform's own practices.  Sept. 12, 2019 Hr'g Tr. 229:18-238:9.

(iii)    **The Mechanics' Liens Dispute.**  The Court issued a final ruling consistent with the preliminary ruling it delivered at the July 11 Hearing.  *Id.* at 244:1-22.[4]

29.    The Court, for the benefit of any appeal, invited the Parties to submit briefing on the issue of what amount of damages, if any, Transform proved that it had incurred and would have been entitled to had the Bankruptcy Court found that the Debtors had breached Section 8.6, so that it could provide a ruling on that issue as well.  *Id.* at 237:18-238:9.  The Parties submitted supplemental briefing concerning that issue in accordance with the Court's instructions (ECF Nos. 5796, 6079).

### 3.    The Cash Reconciliation Process and Examiner

30.    As discussed above, at the July 11 Hearing, the Court ordered that, in the event the Parties were unable to agree on the calculation of the Cash Reconciliation Amounts,

---

[4] A table summarizing the Court's rulings with respect to the various APA-related disputes and their statuses is included herein as Appendix 1.

the Specified Receivables Shortfall Amount, or the Prepaid Inventory Shortfall Amount within ten (10) days, the Court would appoint an examiner, with the costs split evenly between the Parties, to determine the Cash Reconciliation Amounts, the Specified Receivables Shortfall Amount, and the Prepaid Inventory Shortfall Amount (the "**Cash Reconciliation Process**"). *See* July 11, 2019 Hr'g Tr. 194:16-195:14.

31.    The Parties continued to have multiple discussions to resolve the disputes relating to the Cash Reconciliation and consequently agreed to extend the timeline for the appointment of an examiner.  However, they were unable to agree on the calculation of the Cash Reconciliation Amounts, the Specified Receivables Shortfall Amount, or the Prepaid Inventory Shortfall Amount and ultimately requested that the Court appoint an expert to assist in the process.  Accordingly, the Court appointed an expert, Michael Wyse (the "**Expert**"), to determine such amounts.  *Order Directing the Appointment of an Expert Pursuant to Federal Rule of Evidence 706* dated Dec. 9, 2019 (ECF No. 6166) (the "**Expert Order**").  The Cash Reconciliation Amounts owed by each Party, if any, would accrue interest at nine percent (9%) annually from April 15, 2019 until the Cash Reconciliation Amounts were reconciled and paid. *See* July 11, 2019 Hr'g Tr. 194:16-195:14.  In light of the discussions concerning a global settlement, the Parties agreed on December 29, 2019 to halt their work with the Expert pending negotiation and documentation of the Settlement Agreement.  *See* Griffith Decl. ¶ 12.

**4.    The Debtors' Motion for Turnover of the Cook County Tax Refunds**

32.    On November 22, 2019, the Debtors filed the *Motion of Debtors to Compel Turnover of Estate Property* (ECF No. 6084) (the "**Motion for Turnover**"), seeking entry of an order compelling Transform to turn over more than $5.5 million in refunds of property taxes that the Debtors paid to Cook County, Illinois during pre-Closing periods (the "**Cook County Tax Refunds**" or "**Tax Refunds**").  The Debtors asserted that Transform had

deposited checks for the Cook County Tax Refunds paid specifically to the order of Debtors' entities (the "**Cook County Tax Refund Checks**") into its own bank accounts and, subsequently, refused to return the funds to the Debtors.

33.     Transform filed an opposition to the Debtors' Motion for Turnover on December 6, 2019 (ECF No. 6150), arguing that the Tax Refunds were not properly the subject of a turnover motion because they should be reconciled in the context of the Cash Reconciliation Process established by the Court at the July 11 Hearing.

34.     On December 13, 2019, the Bankruptcy Court held a hearing to address the relief requested in the Motion for Turnover (the "**December 13 Hearing**").  The Court directed Transform to show within seven (7) days whether Transform was authorized to or had a right to deposit the Cook County Tax Refund Checks into its own bank accounts.  Dec. 13, 2019 Hr'g Tr. 81:14-20; 82:9-13; 83:17-18; 83:20-25.

35.     In the days following the December 13 Hearing, the Parties agreed that any global APA settlement would address and resolve the dispute over the Cook County Tax Refunds.  Griffith Decl. ¶ 11.

## IV.     THE SETTLEMENT AGREEMENT

### A.     The Settlement Negotiations

36.     As discussed above, the Parties first began negotiating a settlement of the APA-related disputes between them in March 2019, shortly after the Debtors filed the First Motion to Enforce.  *See supra* at ¶¶ 17-18.  Those negotiations continued in the months following the Israeli cash and GOB Store proceeds payments ($3.3 million and $3.7 million, respectively) and Interim Agreement payment ($8 million) and culminated in the July 2019 Rent Proration Settlement, which provided for an additional $8 million payment from Transform to the Debtors and the establishment of the Uncashed Checks Escrow.  *See supra* at ¶ 24.

37.     After the July 11 Hearing at which the Court established the Cash Reconciliation Process, the Parties attempted in good faith to resolve the Cash Reconciliation, Specified Receivables, and Prepaid Inventory disputes without resort to an examiner.  *See Griffith Decl. ¶ 9.*  Over the course of several months, the Parties and their advisors participated in numerous meetings and teleconferences and exchanged voluminous and detailed correspondence and settlement-related materials to that end.  *Id.*  As of late November 2019, however, the Parties remained at an impasse.  *Id.* at ¶ 10.  Resolving the Cash Reconciliation, Specified Receivables, and Prepaid Inventory disputes in a manner consistent with the Court's rulings at the July 11 Hearing was proving to be an immensely complex, time-consuming, and resource-draining task.  *Id.*  For example, determining, in accordance with the Court's July 11 ruling on the Specified Receivables issue, which Accounts Receivable were generated by Sears pre-Closing but not included in the Debtors' $292 million certification at Closing would involve the painstaking review of thousands of lines of ambiguous data and absorb untold hours of the Parties' limited time.  *Id.*  Likewise, the Cash Reconciliation Process would involve the reconciliation of several discrete categories of offsets.  *Id.*  These categories included, for example: (1) an enterprise wide calculation of telecommunication expenses, (2) a review of all orders made pre-close that were canceled post-close, and (3) an arduous reconciliation of all checks deposited by Transform during at least a five-month period to determine proper ownership.  *Id.*  Accordingly, on December 9, 2019, the Court appointed the Expert to take over these tasks, *see supra* at ¶ 31, and the Parties began the process of gathering materials to provide to the Expert and otherwise facilitating the Expert's work, Griffith Decl. ¶ 10.

38.     The Court's appointment of the Expert did not forestall settlement negotiations between the Parties.  *Id.* at ¶ 11.  Indeed, on the eve of the December 13 Hearing

concerning the relief requested in the Debtors' Motion for Turnover, Transform contacted the Debtors and their advisors and proposed a global settlement of the outstanding APA-related disputes—i.e., the Cash Reconciliation dispute, Specified Receivables dispute, Prepaid Inventory dispute, Cook County Tax Refunds dispute, Section 8.6 Damages dispute, and any and all appeals of the Bankruptcy Court's prior orders and APA-related rulings issued at the March 21, July 11, and September 12 Hearings (the "**Outstanding APA Disputes**"). *Id.* Over the course of the next several days, the Parties through their advisors worked diligently to negotiate the terms of such a global settlement. *See id.*

39.    After several rounds of negotiation, and in consultation with the Creditors' Committee, on December 27, 2019, the Parties arrived at an agreement concerning the principal terms of a settlement of the Outstanding APA Disputes. *Id.* at ¶ 12. Those terms, described below, are reflected in the Settlement Agreement attached hereto as Exhibit 1. *Id.* The Debtors and their advisors had received the reasoned approval of the Restructuring Committee of the principal terms of the Settlement Agreement, and, on December 31, 2019, received agreement from the Creditors' Committee on the principal terms of the Settlement Agreement. *Id.*[5]

## B.    The Principal Terms of the Settlement Agreement

40.    The principal terms of the Settlement Agreement are:

- On or before 6:00 p.m. Eastern time on the third (3rd) business day after the Bankruptcy Court enters an order approving the Settlement Agreement (the "**Outside Payment Date**"), Transform will pay cash to the Debtors in an amount equal to $12 million (the "**Cash Payment**"). Settlement Agreement § 1(c).

- No later than the Outside Payment Date, Transform will pay cash to the Debtors in an amount equal to $992,985—fees the Debtors have incurred through September 30, 2019 in furtherance of their obligations under

---

[5] In an effort to limit administrative expenses, on December 30, 2019, the Debtors' advisors informed the Expert that he should cease any and all work related to the Cash Reconciliation, Specified Receivables, and Prepaid Inventory disputes pending the Court's adjudication of this Motion. *Id.* He complied. *Id.*

Section 9.2(a) of the APA (the "**Deloitte Tax Fees**," together with the Cash Payment, the "**Settlement Amount**"). *Id.* at § 1(d).

- Transform's obligation to pay the Deloitte Tax Fees is conditioned upon the Debtors' agreement to transfer to Transform a series of real property interests or related joint venture interests described in Schedule 1 attached to the Settlement Agreement, with such transfer to occur no later than five (5) business days after the Debtors have received the Settlement Amount. *Id.* at § 4.

- The Settlement Agreement will fully and finally resolve the Outstanding APA Disputes and, upon payment of the Settlement Amount and release of the Adequate Assurance Deposit, Transform will have no further obligations to make any payments relating to the Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities (other than Cure Costs), Other Payables, Ordered Inventory, or, with the exception of any Uncashed Checks Escrow owed to the Debtors, the Cash Reconciliation Amounts (as defined in the Expert Order). *Id.* at § 1(e).

- The Parties will exchange a release of claims in full upon the Debtors' receipt of the Settlement Amount and Transform's release of the Adequate Assurance Deposit. The releases are narrowly tailored and address only APA-related disputes. The 507(b) appeal, confirmation order appeal, and the Estates' adversary proceeding against ESL and certain other parties will remain open. *Id.* at §§ 2(a) – (b).

- The Parties' other obligations under the APA, including for tax reimbursements and indemnification, will remain unaffected. *Id.* at §§ 2(b) – (c).

- The Parties agree that any future tax refunds, rebates, or credits that are Excluded Assets (as that term is defined in the APA) under Section 2.2(h) of the APA (the "**Debtors' Tax Refunds**") will, to the extent received by Transform, be promptly turned over to the Debtors and that any future tax refunds, rebates, or credits of Transform that are the property of Transform (the "**Transform Tax Refunds**," together with the Debtors' Tax Refunds, the "**Future Tax Refunds**") will, to the extent received by the Debtors, be promptly turned over to Transform. *Id.* at § 1(h).

- If Transform fails to pay the Settlement Amount or release the Adequate Assurance Deposit for any reason whatsoever, the Parties' rights will be restored in full as if the Settlement Agreement had never been executed. *Id.* at § 8.

- All interim settlements by and among the Parties with respect to the APA-related disputes and all payments and transfers made to date as a result of the Court's prior rulings will be unaffected by this Settlement Agreement,

and the Parties agree not to appeal any of the Court's prior APA-related rulings. *Id.* at §§ 1(i) – (j).

## V.   RELIEF REQUESTED SHOULD BE GRANTED

41.   The Debtors have determined, in consultation with the Restructuring Committee, their advisors, and the Creditors' Committee, that the Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Debtors' Estates.  By this Motion, the Debtors request approval of the Settlement Agreement pursuant to Rule 9019(a).

### A.   Basis for Relief

42.   Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."   Bankruptcy Rule 9019(a) "empowers the Bankruptcy Court to approve compromises and settlements if they are in the best interests of the Estates."  *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).   Accordingly, the Court is authorized to approve the proposed settlement between the Parties on the terms set forth in the Settlement Agreement.

43.   In determining whether to approve a proposed settlement pursuant to Bankruptcy Rule 9019(a), a court must find that the proposed settlement is fair and equitable, reasonable, and in the best interests of the debtor's estates and creditors.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).   A decision to approve a particular compromise or settlement is within the sound discretion of the bankruptcy court. *Drexel Burnham*, 134 B.R. at 505.  It is appropriate for the court to consider the opinions of the debtor in possession that a settlement is fair and equitable. *Nellis v. Shugrue*, 165 B.R. 115, 122

(S.D.N.Y. 1994). In addition, the bankruptcy court should exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Shugrue*, 165 B.R. at 123 ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above.").

44.    In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvas the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits). "All that [the proponent of the settlement] must do is establish [that] it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).

45.    Relying on the guiding language of *TMT Trailer Ferry*, courts in this Circuit have set forth the following factors to be considered in evaluating the reasonableness of settlement:

  a. the probability of success in litigation, with due consideration for the uncertainty in fact and law;

  b. the difficulties of collecting any litigated judgment;

  c. the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay;

  d. the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement;

e.    the competence and experience of counsel who support the settlement;

f.    the relative benefits to be received by members of any affected class;

g.    the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and

h.    the debtor's informed judgment that the settlement is fair and reasonable.

*See Purofied Down Prods.*, 150 B.R. at 522; *Drexel Burnham*, 134 B.R. at 506.

**B.    The Settlement Agreement Falls Well Within the Range of Reasonableness**

46.    In this case, weighing the reasonableness factors for purposes of Bankruptcy Rule 9019, the Debtors, acting through their independent Restructuring Committee and their advisors and with the support of the Creditors' Committee, have concluded that the Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Debtors' Estates and, thus, should be approved.  *See* Griffith Decl. ¶ 13.

47.    ***First***, under the Settlement Agreement, the Debtors will retain all of the funds Transform has remitted to them in the course of the APA litigation thus far without the risk of appeal or other challenges by Transform—in total, approximately $47 million, including (i) the $3,261,487 million Israeli cash payment; (ii) the $3,661,721 million GOB Store proceeds payment; (iii) the $8 million Interim Agreement payment; (iv) the $14.6 million Credit Card Accounts Receivable (transferred directly by the credit-card payment processors); (v) the $8 million Rent Proration payment; (vi) the Uncashed Checks Escrow (to the extent owed the Debtors under the terms of that agreement); and (vii) with respect to the 2017 EDA Funds (as defined in the *Amended Stipulation and Order by and among the Village of Hoffman Estates, the Debtors, and the Community Unit School District 300 Concerning 2017 EDA Funds Held in the Special Tax Allocation Fund* (ECF No. 5492)), the initial payment of $2,508,660.33 from the Special Tax Allocation Fund and a second payment of $5,153,317 as a result of the settlement

with the School District and Village of Hoffman Estates. *Id.* Moreover, the Debtors will retain the benefit of Transform's payment of almost $160 million in Assumed Liabilities (Other Payables plus Assumed 503(b)(9) Liabilities); such payment will be final and no longer subject to offset or appeal. *Id.*

48.     ***Second***, continued litigation of the Outstanding APA Disputes would be expensive and protracted and would divert the Debtors' and their advisors' resources and attention away from implementing an efficient wind-down of the Debtors' Estates and prosecuting the valuable Preserved Causes of Action for the benefit of the Debtors' creditors. *Id.* at ¶ 14. The protracted and contentious course of the APA litigation thus far, *see supra* ¶¶ 15-35, with its attendant burdens and expenses, demonstrates the long, time-consuming, and contentious path ahead if the Parties are not able to settle the Outstanding APA Disputes. Griffith Decl. ¶ 14. Those outstanding disputes are complex—so much so that resolving them required the appointment and retention of the Expert, which only compounded the Debtors' litigation-related expenses. *Id.* Because the Settlement Agreement resolves, fully and finally, the Outstanding APA Disputes, it eliminates the burdens and expenses associated with the APA litigation (including expenses associated with any appeals of the Bankruptcy Court's APA-related rulings) and allows the Debtors and their advisors to redirect their resources and attention to winding down the Debtors' Estates and progressing expeditiously toward the Effective Date. *Id.*

49.     ***Third***, given the complexity of the Outstanding APA Disputes, including and especially the Cash Reconciliation Process, the Debtors cannot be certain of the outcome of continued litigation of the Outstanding APA Disputes. *Id.* at ¶ 15. Although the Debtors assert that Transform owes the Estates approximately $30.2 million in Cash Reconciliation funds, the Expert may determine that the $30.2 million total should be reduced by the various setoffs

alleged by Transform, including up to $9.6 million in pre-close orders canceled post-close, up to $7 million in unreconciled checks owed to Transform, and up to $1.9 million in telecommunications expenses. *Id.* Accordingly, the Settlement Agreement's approximately $18.3 million value is well within the range of reasonableness. *Id.* Moreover, given the likelihood of appeal here, as well as the uncertainties inherent in any litigation, the Debtors cannot be certain of their ability to collect (or when they would collect) on any judgment awarded by the Bankruptcy Court against Transform. *Id.* By fully and finally resolving the Outstanding APA Disputes, the Settlement Agreement eliminates the not inconsiderable risk of loss (or, at the very least, delay) associated with continued litigation of those disputes and guarantees cash for the Debtors' Estates now. *Id.*

50.    The same analysis applies with respect to the Settlement Agreement's provision releasing Transform from any further obligation to satisfy Assumed 503(b)(9) Liabilities (other than Cure Costs) and Severance Reimbursement Obligations. *Id.* at ¶ 16; Settlement Agreement § 1(e). Transform contends (and the Debtors dispute) that the Specified Receivables and Prepaid Inventory Shortfall Amounts reduce these liabilities to nothing. Griffith Decl. ¶ 16. The Debtors have acknowledged that the amount of Assumed Liabilities has been reduced by at least $55 million as a result of the Prepaid Inventory Shortfall, without accounting for any adjustments in the Specified Receivables Shortfall. *Id.* While the Debtors could submit to the expensive and time-consuming Cash Reconciliation Process in order to show that the Specified Receivables and Prepaid Inventory Shortfall Amounts are less than what Transform claims, the results of that review are uncertain, particularly against the backdrop that the Bankruptcy Court ruled against the Debtors on both of those issues. *Id.* Even if the Debtors were to prevail on those issues, however, there exists the risk—again, inherent in any litigation—

that Transform would not satisfy the assumed liabilities and that the burden of satisfying them would fall to the Debtors. *Id.* The Settlement Agreement eliminates the burden, expense, and risk associated with the Cash Reconciliation Process and guarantees value for the Debtors' Estates. *Id.*

51.    Finally, the same analysis applies with respect to the Settlement Agreement's provision releasing Transform from any further obligation to satisfy Other Payables. *Id.* at ¶ 17; Settlement Agreement § 1(e). Transform has contended throughout the APA litigation that (i) the APA imposes only one obligation (and not two) upon Transform to assume up to $166 million in Other Payables with respect to the Ordered Inventory; (ii) the Debtors' Cash in Transit constituted "available cash" within the meaning of the APA that increased the Aggregate DIP Shortfall to more than $19 million and, thus, reduced Transform's obligation to assume Other Payables, if any, by more than $19 million; and (iii) the Debtors' decision to delay payments to certain vendors in the week before Closing, which shifted the obligation to satisfy millions of dollars in accounts payable from the Debtors to Transform, was a breach of various ordinary-course management provisions in the APA, entitling Transform to a substantial reduction ($66 million) in the amount of Other Payables, if any, it assumed under the APA. Griffith Decl. ¶ 17. Although the Debtors prevailed on each of these arguments in the Bankruptcy Court, Transform has signaled its intention to appeal each of these rulings—appeals which would embroil the Debtors in additional protracted and costly litigation. *Id.* Moreover, as discussed above, the Debtors could not be certain of the outcome of any appeal or their ability to collect on any judgment arising out of appeal. *Id.* The Settlement Agreement releases Transform from any further obligation to pay approximately $14.5 million in respect of Other

Payables and, in return, eliminates the burden, expense, delay, and risk associated with appeal of the Bankruptcy Court's rulings on the Other Payables disputes.  *Id.*

52.     ***Fourth***, the proposed settlement, once effective, will result in the near-immediate (within three (3) business days of Court approval) transfer to the Debtors of more than $18 million and, further, will ensure that all future Cook County Tax Refunds for any Pre-Assignment Tax Period (as that term is defined in the APA) are retained by the Estates.  *Id.* at ¶ 18.  The Debtors anticipate that one such Tax Refund, to be issued in or around the first quarter of 2020, will total more than $4.5 million plus statutory interest.  *Id.*  The Settlement Agreement will secure substantial funds for eventual distribution to the Estates' creditors.  *Id.*

53.     ***Fifth***, the proposed settlement is the product of significant effort—over the course, as described above, of many months—to reconcile the Debtors' and Transform's outstanding claims against one another.  *Id.* at ¶ 19; *see also supra* at ¶¶ 36-39.  If approved, the Settlement Agreement would, again, fully and finally resolve these claims, permitting the Debtors, the Restructuring Committee, the Creditors' Committee, and their advisors to focus resources and attention on other claims and claimants and move toward final distributions to creditors.  Griffith Decl. ¶ 19.

54.     ***Sixth***, the Parties are represented by sophisticated and experienced professionals—highly regarded law firms and financial advisors with significant restructuring, litigation, and other relevant experience.  *Id.* at ¶ 20.  The Debtors' professionals, for their part, fully understand the difficulties of successfully concluding a litigation of this size and complexity and, indeed, have been analyzing, discussing, and litigating these APA-related issues with Transform and its professionals for almost a full year.  *Id.*  Accordingly, the Debtors' professionals fully understand the potential consequences to creditors of the Estates if the

Settlement Agreement is not consummated and have recommended that the Debtors enter into the Settlement Agreement. *Id.*

55.    ***Seventh***, the releases are appropriate and narrowly tailored in scope to the APA disputes. *Id.* at ¶ 21. First and foremost, the releases will only be triggered upon receipt of full payment by Transform. *Id.* If Transform fails to perform its obligations, the Parties' rights are restored in full as if the Settlement Agreement had never been executed. *Id.* Second, the release does not affect, and expressly carves out, all other disputes between the Parties, including (i) the 507(b) appeal, (ii) Transform and ESL's appeal of the confirmation order, and (iii) the Estates' adversary proceeding against ESL and certain other parties (Adv. Pro. No. 19-08250-rdd). *Id.*

56.    ***Finally***, the Settlement Agreement is the product of arm's length negotiations between the Debtors, in consultation with the Creditors' Committee, and Transform, as well as the reasoned judgment of the experienced Restructuring Committee, as supported by the Creditors' Committee. *Id.* at ¶ 22.

57.    Accordingly, the Debtors submit that the settlement and compromise embodied in the Settlement Agreement is appropriate in light of the relevant factors, is fair and equitable, and should be approved.

## VI.    NOTICE

58.    Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) (the "**Amended Case Management Order**"). Notice has been provided to Transform. The Debtors respectfully submit that no further notice is required.

59.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order attached hereto as Exhibit 2, approving the Settlement Agreement and granting such additional and further relief as the Court deems just and appropriate.

Dated: January 10, 2020
         New York, New York

                                        */s/ Sunny Singh*_____
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York  10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007
                                        Ray C. Schrock, P.C.
                                        David Lender
                                        Paul R. Genender
                                        Jared R. Friedmann
                                        Sunny Singh

                                        *Attorneys for Debtors*
                                        *and Debtors in Possession*

**Appendix 1**

**Table Summarizing:**
**(i) the Bankruptcy Court's Rulings on the APA-Related Disputes and**
**(ii) the Status of Those Disputes Pending Potential Appeals**

| | Dispute | Issue | Outcome | Status |
|---|---|---|---|---|
| 1. | **Credit Card Accounts Receivable** | Whether (i) $14.6 million in pre-Closing credit-card transaction proceeds held in the Reserve Accounts were "Credit Card Accounts Receivable" under the APA; (ii) the Debtors were entitled to deliver the Reserve Accounts to Transform at Closing to satisfy their obligations under Section 10.9 of the APA; and (iii) the Debtors were entitled to retain as an Excluded Asset the oldest Credit Card Accounts Receivable in an amount of approximately $14.6 million. | Court ruled in favor of the Debtors at April 18, 2019 hearing; Debtors entitled to retain as an Excluded Asset the oldest Credit Card Accounts Receivable in an amount of approximately $14.6 million. | Closed: Court order. |
| 2. | **Israeli Cash** | Whether $4.5 million of cash in transit from the Debtors' Israeli bank accounts that flowed into Transform's bank accounts as a result of the Cash-Management System Transfer should be turned over to the Debtors immediately. | Transform paid approximately $3.3 million in respect of the Israeli cash. | Closed: settled. |
| 3. | **GOB Store Proceeds** | Whether $3.7 million in GOB Store proceeds that flowed into Transform's bank accounts as a result of the Cash-Management System Transfer should be turned over to the Debtors immediately. | Transform paid approximately $3.7 million in respect of the GOB Store proceeds. | Closed: settled. |

| | Dispute | Issue | Outcome | Status |
|---|---|---|---|---|
| 4. | **Cash in Transit** | Whether several million dollars in cash proceeds from transactions that occurred before Closing but flowed into Transform's bank accounts as a result of the Cash-Management System Transfer should be turned over to the Debtors immediately. | Transform paid $3 million in respect of the Cash in Transit in connection with the Interim Agreement and established the $2.4 million Uncashed Checks Escrow.  Court established Cash Reconciliation Process at July 11 Hearing which provides for the Expert to determine—given various setoffs alleged by Transform—how much, if any, Cash in Transit should be turned over to the Debtors. | Open. |
| 5. | **Rent Proration** | Whether an approximately $16.2 million rent-proration payment for February 2019 should be turned over to the Debtors immediately. | Transform paid $5 million in respect of the Rent Proration in connection with the Interim Agreement and $8 million in connection with Rent Proration Settlement; Transform still owes the Estates approximately $3.2 million, potentially subject to approximately $3.2 million in alleged setoffs (to be confirmed by the Expert in the context of the Cash Reconciliation Process). | Open. |
| 6. | **$166 Million Other Payables** | Whether Section 2.3(k)(v) of the APA obligates Transform to assume both (i) up to $166 million Other Payables and (ii) all payment obligations with respect to Ordered Inventory. | Court ruled in favor of the Debtors at July 11 Hearing; Section 2.3(k) of the APA obligates Transform to assume both (i) up to $166 million Other Payables and (ii) all payment obligations with respect to Ordered Inventory. | Closed: Court ruling. |
| 7. | **Adequate Assurance Deposit** | Whether the Adequate Assurance Deposit is a "utility deposit" acquired by Transform under the APA to the extent related to assets acquired by Transform. | Court issued preliminary ruling in favor of Transform at July 11 Hearing, subsequently accepted by the Parties as final; the Adequate Assurance Deposit is a "utility deposit" acquired by Transform under the APA to the extent related to assets acquired by Transform. | Closed: Court ruling. |

| | Dispute | Issue | Outcome | Status |
|---|---|---|---|---|
| 8. | **EDA Funds** | Whether the EDA Funds, tax rebates held by the Village of Hoffman Estates from property taxes levied and collected for the 2017 tax year on the Hoffman Estates properties, are Excluded Assets retained by the Debtors under the APA. | Court issued preliminary ruling in favor of the Debtors at July 11 Hearing, subsequently accepted by the Parties as final; the EDA Funds are Excluded Assets retained by the Debtors under the APA. | Closed: Court ruling and settlement of related amounts. |
| 9. | **Hoffman Estates Real Property** | Whether Transform acquired all sixteen subdivided parcels of land in the Hoffman Estates Development under the APA. | Court ruled in favor of Transform at July 11 Hearing; Transform acquired all sixteen subdivided parcels of land in the Hoffman Estates Development under the APA. | Closed: Court ruling. |
| 10. | **Mechanics' Liens** | Whether Transform assumed liability for all pre-Closing mechanics' liens on Acquired Assets. | Court issued preliminary ruling in favor of Transform at July 11 Hearing and issued final ruling consistent with preliminary ruling at September 11 Hearing; Transform only assumed liability for the mechanics' liens included in Section 2 of Schedule 6.5 of the APA. | Closed: Court ruling. |
| 11. | **Specified Receivables** | Whether a Specified Receivables Shortfall Amount (as defined in the APA) existed at Closing (such that Transform's obligation to satisfy the Assumed Liabilities was reduced) and, if so, what the amount of that Shortfall was. | Court appointed the Expert to determine, in a manner consistent with its ruling at the July 11 Hearing, whether a Specified Receivables Shortfall Amount existed at Closing and, if so, what the amount of that Shortfall was. | Open. |
| 12. | **Prepaid Inventory** | Whether a Prepaid Inventory Shortfall Amount (as defined in the APA) existed at Closing (such that Transform's obligation to satisfy the Assumed Liabilities was reduced) and, if so, what the amount of that Shortfall was. | Court appointed the Expert to determine, in a manner consistent with its ruling at the July 11 Hearing, the amount of the Prepaid Inventory Shortfall Amount that existed at Closing. | Open. |

|     | Dispute | Issue | Outcome | Status |
|-----|---------|-------|---------|--------|
| 13. | **Available Cash** | Whether the Debtors' Cash in Transit (i) constituted "available cash" within the meaning of the APA, (ii) increased the Aggregate DIP Shortfall Amount, and (iii) correspondingly reduced Transform's obligation to satisfy Assumed Liabilities under the APA. | Court ruled in favor of the Debtors at September 12 Hearing; the Debtors' Cash in Transit was not "available cash" within the meaning of the APA and thus neither increased the Aggregate DIP Shortfall Amount nor reduced Transform's obligation to satisfy the Assumed Liabilities under the APA. | Closed: Court ruling. |
| 14. | **Ordinary Course: Liability** | Whether (i) Section 8.6 of the APA required the Debtors to make all payments in respect of payables of the Business, from Execution to Closing, unqualifiedly on a timely basis (or, rather, was an ordinary-course management provision) and (ii) the Debtors acted in the ordinary course of business in delaying payments to certain vendors in the week before Closing. | Court ruled in favor of the Debtors at September 12 Hearing; Section 8.6 is an ordinary-course management provision and the Debtors acted in the ordinary course of business in delaying payments to certain vendors in the week before Closing. | Closed: Court ruling. |
| 15. | **Ordinary Course: Damages** | Whether Transform proved, had the Court held that the Debtors had breached Section 8.6 of the APA by delaying payments to certain vendors in the week before Closing, that it suffered any damages as a result of the purported breach and, if so, the amount of those damages. | Court ordered supplemental briefing to address the ordinary-course damages issue at the September 12 Hearing; the Parties submitted such briefing in accordance with the Court's instructions. | Open. |
| 16. | **Cook County Tax Refunds** | Whether (i) refunds of property taxes paid by the Debtors in pre-Closing taxable periods belonged to the Debtors under Section 2.2(h) of the APA and, if so, (ii) checks for those refunds paid specifically to the order of Debtor entities but mistakenly sent to Transform should be turned over to the Debtors immediately. | At December 13 Hearing, Court directed Transform to show, within seven (7) days, that it was authorized to deposit the property-tax refunds paid specifically to the order of Debtor entities; should Transform fail to make such a showing, the funds would have to be turned over to the Debtors immediately. | Open. |

**Exhibit 1**

**Settlement Agreement**

EXECUTION VERSION

## SETTLEMENT AGREEMENT

Transform Holdco LLC ("Transform"), Sears Holdings Corporation ("Sears Holdings") and each of the undersigned direct and indirect subsidiaries of Sears Holdings (collectively, with Sears Holdings, the "Debtors") hereby enter into this Settlement Agreement (the "Agreement") on January 10, 2020 (the "Execution Date"). In this Agreement, the term "Parties" refers to Transform, on the one hand, and Debtors, on the other hand.

WHEREAS, on October 15, 2018, each of the Debtors[1] filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), commencing a process to sell all or substantially all of Debtors' businesses and assets;

WHEREAS, on February 8, 2019, the Bankruptcy Court entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 2507] (the "Sale Order"), approving the sale of substantially all of the assets of Debtors to Transform pursuant to that certain Asset Purchase Agreement, dated as of January 17, 2019, by and among Transform and the Debtors party thereto (as it has and may be amended, modified or otherwise waived, the "APA") (the "Sale Transaction");

WHEREAS, the Sale Transaction closed on February 11, 2019 at 12:01 a.m. Eastern Time (the "Closing");

WHEREAS, to facilitate the Closing, Debtors transferred their cash-management system, including the majority of their bank accounts, to Transform, effective as of the Closing (the "Cash-Management System Transfer");

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

1

**EXECUTION VERSION**

WHEREAS, on March 11, 2019, Debtors filed *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* [Docket No. 2796] (the "First Motion to Enforce"), seeking entry of an order compelling turnover of approximately $57.5 million in funds being held by Transform, comprising (i) approximately $41.3 million in funds owed to Debtors in connection with the Cash-Management System Transfer ($14.6 million in credit-card proceeds from transactions that occurred prior to Closing (the "Credit Card Accounts Receivable") held in reserve accounts by certain credit-card payment processors pursuant to various credit-card processing agreements (the "Reserve Accounts"), $18.5 million in cash proceeds from transactions that occurred prior to Closing but that were still in transit from regional banks or stores after Closing (the "Cash in Transit"), $4.5 million of cash in transit from Debtors' Israeli bank accounts prior to Closing, and $3.7 million in GOB Store proceeds); and (ii) an approximately $16.2 million rent-proration payment for February 2019 (the "Rent Proration");

WHEREAS, on or about March 12, 2019, Transform paid $3,261,487 in respect of cash in transit from Debtors' Israeli bank accounts (the "Israeli Cash Payment") and $3,661,721 in respect of GOB Store proceeds owed to Debtors (the "GOB Store Proceeds Payment");

WHEREAS, on March 18, 2019, Transform filed a response to the First Motion to Enforce [Docket No. 2864] and, on March 20, 2019, Debtors filed a reply in further support of the First Motion to Enforce [Docket No. 2913];

WHEREAS, on March 20, 2019, Transform and Debtors entered into an interim agreement that provided, among other things, that, on or before March 26, 2019, Transform would (i) pay by wire to Debtors $3 million in respect of the Cash in Transit and (ii) pay by wire to Debtors $5 million in respect of the Rent Proration (the "Interim Agreement");

WHEREAS, Transform timely remitted $8 million to Debtors' Estates in satisfaction of the Interim Agreement;

WHEREAS, on April 8, 2019, Debtors filed *Debtors' Supplemental Memorandum of Law in Further Support of Their Motion to Enforce the Automatic Stay* [Docket No. 3079] and, on April 11, 2019, Transform filed *Transform Holdco LLC's Supplemental Reply Brief and Supporting Documents in Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement Against Transform Holdco LLC and (B) Compel Turnover of Estate Property* [Docket No. 3156];

WHEREAS, at a hearing before the Bankruptcy Court on April 18, 2019, the Court considered the evidence and arguments presented by the Parties and ruled that the Reserve Accounts were Credit Card Accounts Receivable under the APA (the "April 18 Bench Ruling");

WHEREAS, on May 8, 2019, the Court entered an order consistent with the April 18 Bench Ruling which, among other things, (i) ordered that Debtors were entitled to, and did, deliver the Reserve Accounts to Transform at Closing to satisfy their obligation under Section 10.9 of the APA to deliver at least $1.657 billion, in the aggregate, of Acquired Inventory

**EXECUTION VERSION**

(excluding any Pending Inventory), Credit Card Accounts Receivable, and Pharmacy Receivables; (ii) ordered that Debtors delivered an aggregate threshold excess of approximately $14.6 million to Transform as of the Closing, less any amounts drawn from the Reserve Accounts held by the credit-card payment processors to satisfy liabilities owed by Debtors to the credit-card payment processors as of the Closing (the "Reserve Draw"); (iii) entitled Debtors to retain as an Excluded Asset the oldest Credit Card Accounts Receivable in an amount of approximately $14.6 million held in Reserve Accounts by certain of the credit-card payment processors less any Reserve Draw (the "Adjusted Excess Amounts"); and (iv) authorized Debtors to take the steps necessary to effectuate a transfer of the Adjusted Excess Amounts from the credit-card payment processors [Docket No. 3742] (the "CCAR Order");

WHEREAS, Transform has satisfied all of its obligations under the CCAR Order;

WHEREAS, on May 24, 2019, Debtors filed the *Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4029] (the "Supplemental Motion to Enforce"), seeking entry of an order (i) compelling Transform to assume up to $166 million in Other Payables as well as all payment obligations with respect to Ordered Inventory pursuant to Section 2.3(k)(v) of the APA; (ii) compelling Transform to assume approximately $83 million in 503(b)(9) claims in accordance with the APA; (iii) compelling Transform to turn over $35.1 million to Debtors, representing the total amount of cash owed to Debtors as a result of the Cash-Management System Transfer and Rent Proration amounts due under the APA; and (iv) enjoining Transform from (a) taking any actions to exercise control over thirteen subdivided lots in the Village of Hoffman Estates, Illinois (the "Hoffman Estates Development") or (b) interfering with Debtors' use, enjoyment, or right to dispose of those thirteen lots;

WHEREAS, on May 25, 2019, Transform filed the *Adversary Complaint* [Docket No. 4033] (the "Adversary Complaint"), asserting causes of action for breach of contract, declaratory judgment, and specific performance based upon allegations, among others, that (i) Debtors failed to deliver the amount of Prepaid Inventory required by the APA; (ii) Debtors failed to deliver the amount of Specified Receivables required by the APA; (iii) Transform acquired the security deposit (the "Adequate Assurance Deposit") established pursuant to the *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service* [Docket No. 431] (the "Adequate Assurance Order"); (iv) Transform acquired Debtors' claims to funds related to property taxes levied on Debtors' Hoffman Estates properties and collected from Debtors for the 2017 tax year held by the Village of Hoffman Estates (the "EDA Funds"); (v) Transform only assumed liability for mechanics' liens included in Section 2 of Schedule 6.5 of the APA and did not assume liability for any other pre-Closing mechanics' liens on Acquired Assets; (vi) Debtors caused Transform to assume accounts payable beyond those it agreed to assume including by acting outside the ordinary course of business in the week before Closing; and (vii) Debtors held approximately $19.6 million "available cash," within the meaning of the APA, at Closing that reduced Transform's obligation, if any, to assume up to $166 million Other Payables under Section 2.3(k)(v) of the APA;

3

**EXECUTION VERSION**

WHEREAS the Parties respectively submitted additional briefing and declarations in support of and in opposition to the Supplemental Motion to Enforce and Adversary Complaint, including *Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4464], *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4430], *Transform Holdco LLC's Reply Brief in Further Support of the Adversary Complaint* [Docket No. 4480], *Supplemental Memorandum of Law in Support of Transform Holdco LLC's Adversary Complaint* [Docket No. 4767], *Supplemental Memorandum of Law in Support of Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4973], *Reply Memorandum of Law in Further Support of Transform Holdco LLC's Adversary Complaint* [Docket No. 5085], *Second Supplemental Memorandum of Law in Support of Transform Holdco LLC's Adversary Complaint* [Docket No. 5796], and *Debtors' Opposition to Transform Holdco LLC's Second Supplemental Memorandum of Law in Support of Its Adversary Complaint* [Docket No. 6079] (collectively, the "Supplemental Briefing");

WHEREAS, on or about July 11, 2019, Transform and Debtors entered into a settlement that provided that Transform would wire an additional $8 million to Debtors on July 15, 2019 for prorated rent for February 2019 without any condition on how Debtors could use the funds or into which account those funds would be deposited (the "Rent Proration Settlement");

WHEREAS, Transform timely remitted $8 million to Debtors' Estates in satisfaction of the Rent Proration Settlement;

WHEREAS, on or about July 11, 2019, Transform and Debtors entered into an agreement that provided that Transform would escrow approximately $2.4 million for uncashed checks written by Debtors pre-Closing to satisfy Debtors' pre-Closing obligations, to be released to Transform upon cashing and to Debtors after an applicable escheat period elapsed (the "Uncashed Checks Escrow");

WHEREAS, on or about July 16, 2019, Transform established and continues to hold funds in the Uncashed Checks Escrow;

WHEREAS, as of the Execution Date, the amount held in the Uncashed Checks Escrow (after payment of incoming checks) is approximately $1,799,271;WHEREAS, at a hearing before the Bankruptcy Court on July 11, 2019 (the "July 11 Hearing"), the Court considered the evidence and arguments presented by the Parties and ruled that the APA obligated Transform to assume, effective as of the Closing, liability for both (a) up to $166 million in respect of Other Payables (i.e., the accounts payable set forth on Schedule 1.1(g) of the APA) and (b) all payment obligations with respect to the Ordered Inventory (the "$166 Million Other Payables Ruling");

WHEREAS, Transform alleges that the combined Specified Receivables Shortfall Amount and Prepaid Inventory Shortfall Amount (each as defined in the APA) would eliminate

4

EXECUTION VERSION

completely any obligations of Transform to make payments relating to the Assumed 503(b)(9) Liabilities and the Severance Reimbursement Obligations (each as defined in the APA);

WHEREAS, Debtors allege that the combined Prepaid Inventory Shortfall Amount and Warranty Receivables Shortfall Amount (as defined in the APA) would reduce Transform's obligations to make payments relating to the Assumed 503(b)(9) Liabilities and the Severance Reimbursement Obligations by approximately $55 million, without accounting for any reduction as a result of any Specified Receivables Shortfall Amount (which would be the subject of review by the Expert (as defined below));

WHEREAS, Transform has represented that it has paid approximately $151.5 million in liabilities related to Other Payables notwithstanding its position that no such amounts are payable by Transform under the APA and Debtors have reasonably relied upon that representation in agreeing to enter into this Agreement;

WHEREAS, Transform has represented that it has paid approximately $7 million in respect of Assumed 503(b)(9) Liabilities and Debtors have reasonably relied upon that representation in agreeing to enter into this Agreement;

WHEREAS, at the July 11 Hearing, the Court considered the evidence and arguments presented by the Parties and issued a preliminary ruling, which the Parties subsequently agreed to accept as final, that the Adequate Assurance Deposit was a utility deposit and was acquired by Transform at the Closing, but only to the extent the Adequate Assurance Deposit related to assets acquired by Transform under the APA (the "Adequate Assurance Deposit Ruling");

WHEREAS, the Parties estimate that the amount of the Adequate Assurance Deposit representing deposits related to assets acquired by Transform pursuant to the Adequate Assurance Ruling is approximately $5.3 million;

WHEREAS, at the July 11 Hearing, the Court considered the evidence and arguments presented by the Parties and issued a preliminary ruling, which the Parties subsequently agreed to accept as final, that the EDA Funds were Excluded Assets that Debtors did not sell, transfer, or convey to Transform under the APA (the "EDA Funds Ruling");

WHEREAS, at the July 11 Hearing, the Court considered the evidence and arguments presented by the Parties and ruled that Transform acquired all sixteen parcels of land in the Hoffman Estates Development at the Closing (the "Hoffman Estates Real Property Ruling");

WHEREAS, on September 16, 2019, in accordance with the Hoffman Estates Real Property Ruling, Debtors transferred to Transform the remaining parcels of the Hoffman Estates Development;

WHEREAS, at the July 11 Hearing, the Court considered the evidence and arguments presented by the Parties and issued a preliminary ruling that Transform only assumed liability for the mechanics' liens included in Section 2 of Schedule 6.5 of the APA and did not assume liability for any other pre-Closing mechanics' liens on Acquired Assets;

**EXECUTION VERSION**

WHEREAS, at the July 11 Hearing, the Court considered the evidence and arguments presented by the Parties and ruled that, for purposes of calculating the Specified Receivables Shortfall Amount referenced in Sections 1.1 and 2.3(k) of the APA, Debtors were required to deliver to Transform at Closing an aggregate $255,200,000 of actual accounts receivable—i.e., accounts reflecting balances owed to Debtors that had not been paid as of the Closing(the "Accounts Receivable")—as opposed to those accounts listed as receivable in Debtors' financial reporting, and, further, that any accounts that were satisfied before the Closing, or were not Accounts Receivable as of the Closing, would not count in the calculation of the Specified Receivables Shortfall Amount, and, further that, intercompany receivables would be treated as Specified Receivables for purposes of the calculation of the Specified Receivables Shortfall Amount, and, finally, that in the event the Parties were unable to agree on the calculation of the Specified Receivables Shortfall Amount within ten (10) days, the Court would appoint an examiner, with the costs split evenly between the Parties, to determine the Specified Receivables Shortfall Amount (the "Specified Receivables Ruling");

WHEREAS, at the July 11 Hearing, the Court considered the evidence and arguments presented by the Parties and ruled that the Prepaid Inventory Shortfall Amount calculation required an actual valuation of the Prepaid Inventory that Debtors delivered to Transform at Closing, rather than a valuation based upon the methodology used by Debtors in their financial reporting, and, further, that, in the event the Parties were unable to agree on the calculation of the Prepaid Inventory Shortfall Amount within ten (10) days, the Court would appoint an examiner, with the costs split evenly between the Parties, to determine the Prepaid Inventory Shortfall Amount (the "Prepaid Inventory Ruling");

WHEREAS, at the July 11 Hearing, the Court considered the evidence and arguments presented by the Parties and allowed the Parties ten (10) days from the date of the July 11 Hearing to reach an agreement concerning the reconciliation of amounts of cash held in Debtors' legacy cash-management system and that might be allocated, as applicable, to Debtors or Transform (the "Cash Reconciliation Amounts"), and, further, that, in the event the Parties were unable to agree on the Cash Reconciliation Amounts within ten (10) days, the Court would appoint an examiner, with the costs split evenly between the Parties, to determine the Cash Reconciliation Amounts (the "Cash Reconciliation Ruling") (the $166 Million Other Payables Ruling, the Adequate Assurance Deposit Ruling, the EDA Funds Ruling, the Hoffman Estates Real Property Ruling, the Specified Receivables Ruling, the Prepaid Inventory Ruling, and the Cash Reconciliation Ruling, collectively, the "July 11 Bench Rulings");

WHEREAS, in light of ongoing discussions and efforts by the Parties to reach a consensual resolution of the APA Claims, the Parties agreed, and informed the Court of such agreement, to extend the deadlines previously established for the appointment of an examiner as contemplated by the Specified Receivables Ruling, the Prepaid Inventory Ruling, and the Cash Reconciliation Ruling;

WHEREAS, at a hearing before the Bankruptcy Court on September 12, 2019 (the "September 12 Hearing"), the Court considered the evidence and arguments presented by the Parties and ruled that the term "available cash" as used in the APA's definition of Aggregate DIP Shortfall Amount was ambiguous and, further, that, based upon consideration of the relevant parol evidence, the Parties intended that the phrase "net of available cash" would not include

**EXECUTION VERSION**

Debtors' Cash in Transit, and, thus, that the Aggregate DIP Shortfall Amount at Closing was $243,249 (the "Available Cash Ruling");

WHEREAS, at the September 12 Hearing, the Court considered the evidence and arguments presented by the Parties and ruled that the phrase "in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business" in Section 8.6 of the APA modified both Debtors' obligation to "manage accounts payable of the business" and Debtors' obligation to "make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement until the Closing in all material respects on a timely basis," and, further, that Debtors' delay of payments to certain vendors in the week before the Closing was therefore not a violation of Section 8.6 because such delays were consistent with Debtors' prior practices (the "Ordinary Course Ruling");

WHEREAS, at the September 12 Hearing, the Court considered the evidence and arguments presented by the Parties and issued a final ruling with respect to the Parties' dispute concerning Transform's assumption of mechanics' liens that was consistent with the preliminary ruling it delivered at the July 11 Hearing (the "Mechanics' Liens Ruling") (the Available Cash Ruling, Ordinary Course Ruling, and Mechanics' Lien Ruling, collectively, the "September 12 Bench Rulings");

WHEREAS, at the September 12 Hearing, the Court, for the benefit of any appeal, invited the Parties to submit briefing addressing what amount of damages, if any, Transform proved that it had incurred and would have been entitled to had the Bankruptcy Court found that Debtors had breached Section 8.6 of the APA by delaying payments to certain vendors in the week before Closing (the "Section 8.6 Damages Instruction");

WHEREAS, in accordance with the Section 8.6 Damages Instruction, on November 8, 2019, Transform filed the *Second Supplemental Memorandum of Law in Support of Transform Holdco LLC's Adversary Complaint* [Docket No. 5796], and, on November 22, 2019, Debtors filed the *Debtors' Opposition to Transform Holdco LLC's Second Supplemental Memorandum of Law in Support of Its Adversary Complaint* [Docket No. 6079] (the "Section 8.6 Damages Briefing");

WHEREAS, on October 23, 2019, the Bankruptcy Court entered the *Amended Stipulation and Order by and among the Village of Hoffman Estates, the Debtors, and the Community Unit School District 300 Concerning 2017 EDA Funds Held in the Special Tax Allocation Fund* [Docket No. 5492] (the "EDA Stipulation") pursuant to which Debtors relinquished any right they may have, in whole or in part, with respect to EDA Funds consisting of property taxes levied for tax year 2018 that were extended and collected in calendar year 2019 in the Special Tax Allocation Fund and as well as any rights, claims or interests to any subsequent years' EDA Funds (the "Future EDA Funds");

WHEREAS, on November 22, 2019, Debtors filed the *Motion of Debtors to Compel Turnover of Estate Property* [Docket No. 6084] (the "Turnover Motion"), seeking entry of an order compelling Transform to turn over more than $5.5 million in refunds of property

**EXECUTION VERSION**

taxes that Debtors had paid to Cook County, Illinois during pre-Closing periods (the "Cook County Tax Refunds");

WHEREAS, on December 6, 2019, Transform filed the *Objection of Transform Holdco LLC to Motion of Debtors to Compel Turnover of Estate Property* [Docket No. 6150] (the "Turnover Objection");

WHEREAS, on December 13, 2019, the Court held an initial hearing concerning the Cook County Tax Refunds and ruled that the Cook County Tax Refunds should be turned over to Debtors pursuant to Section 2.2(h) of the APA subject to the submission of additional information concerning the circumstances of Transform's deposit of such funds into its bank accounts (the "December 13 Bench Ruling," together with the July 11 Bench Rulings and the September 12 Bench Rulings, the "Bench Rulings");

WHEREAS, Debtors have retained Deloitte Tax LLP ("Deloitte") to perform various tax services in furtherance of Debtors' obligations under Section 9.2(a) of the APA and have incurred and may continue to incur liabilities in connection with those services (the "Deloitte Tax Fees") which are Assumed Liabilities under Section 2.3(i) of the APA;

WHEREAS, as of September 30, 2019, the total amount of Deloitte Tax Fees is $992,985.00;

WHEREAS, following the Closing, the Parties disputed whether certain real property interests and related joint venture interests were required to be transferred to Transform under the APA;

WHEREAS, the Parties agree that the property interests and related joint venture interests described on Schedule 1 attached hereto constitute Acquired Properties to be transferred to Transform pursuant to the APA;

WHEREAS, in the First Motion to Enforce, the Supplemental Motion to Enforce, the Adversary Complaint, the Supplemental Briefing, the Section 8.6 Damages Briefing, the Turnover Motion, and the Turnover Objection (collectively, the "APA Allegations"), the Parties asserted multiple Claims (as defined in the APA) arising out of various disputes related to the APA (including, without limitation, any Claims arising out of the same facts and circumstances specified in the APA Allegations, the "APA Claims");

WHEREAS, Transform has stated its intention to appeal certain of the Bench Rulings absent a consensual resolution of the issues addressed in this Agreement;

WHEREAS, the Bankruptcy Court issued an order on December 9, 2019 appointing an expert to assist in the resolution of certain of the APA Claims [Docket No. 6166] (the "Expert Order");

WHEREAS, in light of the productive discussions concerning this Agreement, on or about December 29, 2019, the Parties ceased all work with respect to the Expert's review of various APA Claims and instructed the Expert to cease its work pending the Bankruptcy Court's consideration of this Agreement;

**EXECUTION VERSION**

NOW, THEREFORE, for and in consideration of the covenants, representations, obligations and releases set forth in this Agreement and other good and valuable consideration, the sufficiency of which is hereby acknowledged, and notwithstanding the Bench Rulings and the Expert Order, each of the Parties, intending to be bound, agrees as follows:

1.    <u>Obligations of the Parties</u>.

(a)  No later than two (2) business days following the Execution Date, Debtors shall file a motion in form and substance reasonably acceptable to the Parties seeking approval of this Agreement.

(b)  Pending the Bankruptcy Court's consideration of the Approval Order, the Parties shall cease all work related to the Expert's review of various APA Claims and shall instruct the Expert to cease all such work.  Transform, on the one hand, and Debtors, on the other hand, will each be responsible for fifty percent (50.0%) of the costs of the Expert and its counsel, which amounts shall be paid to the Expert or its designee no later than ten (10) business days following submission of an invoice by the Expert.

(c)  On or before 6:00 p.m. (prevailing Eastern time) on the third (3rd) business day following entry of the Approval Order (as defined below) (the "<u>Outside Payment Date</u>"), Transform shall pay, without offset, hold back, or deduction, cash to Debtors in an amount equal to $12,000,000 (twelve million dollars) (the "<u>Cash Payment</u>").

(d)  No later than the Outside Payment Date, provided that the Deloitte Tax Fees Condition (as defined in <u>Section 4</u> hereof) is satisfied, Transform shall pay cash to Debtors in an amount equal to $992,985[2] (together with the Cash Payment, the "<u>Settlement Amount</u>," and the date and time that such Settlement Amount shall have been received by Debtors, the "<u>Release Time</u>"), as full and final payment of the Deloitte Tax Fees through September 30, 2019.

(e)  Upon payment of the Settlement Amount and transfer of the Adequate Assurance Deposit (as provided in <u>Section 1(f)</u> below), Transform will have no further obligations to make any payments relating to the Severance Reimbursement Obligations, the Assumed 503(b)(9) Liabilities (except to the extent any such 503(b)(9) Liabilities also constitute Cure Costs related to any Assigned Agreements), the Other Payables, the Ordered Inventory (each as defined in the APA), or, with the exception of the Uncashed Checks Escrow, the Cash Reconciliation Amounts (as defined in the Expert Order).  For the avoidance of doubt, the Agreement does not vitiate Transform's obligation to (i) release, upon expiration of the applicable escheat period, any Uncashed Checks Escrow owed to Debtors or (ii) satisfy Cure Costs related to any Assigned Agreements, including any Cure Costs that may also constitute Assumed 503(b)(9) Liabilities, in accordance with the APA.

(f)  As of the Release Time, Transform shall hereby and without any further action by Transform irrevocably release any interest it may have in the Adequate

---

[2] Reflects a $25,000 reduction to invoiced amounts for entries not applicable to Transform.

**EXECUTION VERSION**

Assurance Deposit, which shall be deemed transferred to and become property of Debtors' Estates.  Transform acknowledges and agrees that, as of the Closing, Debtors have no liabilities or obligations for payment of utilities with respect to the Owned Real Property or the Acquired Leases and all such liabilities or obligations shall exclusively be Transform's responsibility without access to or availability of the Adequate Assurance Deposit.

(g) Unless otherwise indicated in a writing from Debtors to Transform, the (i) Settlement Amount and (ii) any amounts from the Uncashed Checks Escrow owed to Debtors upon expiration of the applicable escheat period shall be transferred by wire transfer of immediately available funds in accordance with the following wire transfer instructions:

| | |
|---|---|
| **Account Number:** | 4451327244 |
| **Active ACH Blocks/Filters on File:** | NO |
| **Routing Number ACH/EFT:** | 111000012 |
| **Routing Number DOM WIRES:** | 026009593 |
| **SWIFT Code INTL WIRES:** | BOFAUS3N |
| **Account Name:** | Sears Roebuck and Co. |

(h) Transform agrees that any future tax refunds, rebates, or credits that are Excluded Assets (as that term is defined in the APA) under Section 2.2(h) of the APA (the "Debtors' Tax Refunds") shall, to the extent they are received by Transform, be held in trust for the benefit of Debtors, in the same form as so received, and delivered to Debtors as soon as reasonably practicable, but in no event later than five (5) business days after receipt thereof, consistent with Section 2.2(h) of the APA.  Likewise, Debtors agree that any tax refunds, rebates, or credits that are the property of Transform (the "Transform Tax Refunds," together with the Debtors' Tax Refunds, the "Future Tax Refunds") shall, to the extent they are received by Debtors, be held in trust for the benefit of Transform, in the same form as so received, and delivered to Transform as soon as reasonably practicable, but in no event later than five (5) business days after receipt thereof.  Except as provided in this Section 1(h), Transform shall have no obligation to review, analyze, or turn over to Debtors any checks, cash, or cash equivalents received by Transform prior to the date hereof in connection with the Cash-Management System Transfer and the Cash Reconciliation Amounts.  No later than the fifteenth (15th) business day following the end of each calendar quarter (beginning with the first quarter of 2020 and ending with the last quarter of 2024, unless the Parties subsequently agree otherwise) in which any Future Tax Refund remains outstanding, each Party agrees to provide each other Party with a schedule of (i) all Future Tax Refunds received, (ii) the amount of such Future Tax Refunds, and (iii) the date(s) on which such Future Tax Refunds were received.  Further, to the extent each Party (the "Disclosing Party") receives a request or requests from each other Party (the "Requesting Party"), whether formal or informal, to produce documents or information substantiating the (i) receipt of Future Tax Refunds,

**EXECUTION VERSION**

(ii) the amount of such Future Tax Refunds, and/or (iii) the date(s) upon which such Future Tax Refunds were received, the Disclosing Party shall promptly (within three (3) business days) respond to such request, including by producing to the Requesting Party copies of documents or information sufficient to substantiate (i) the receipt of Future Tax Refunds, (ii) the amount of such Future Tax Refunds, and/or (iii) the date(s) upon which such Future Tax Refunds were received.  For the avoidance of doubt, Transform shall have no obligation under this Section 1(h) to either hold in trust or deliver to Debtors any Future EDA Funds.

(i)  The Parties agree not to appeal the CCAR Order or the Bench Rulings (collectively, the "Prior Rulings").  For the avoidance of doubt, any amounts previously paid by or paid to or received by the Parties as a result of the Prior Rulings or otherwise, including any Severance Reimbursement Obligations, Other Payables, and/or Assumed 503(b)(9) Liabilities, are unaffected by this Settlement Agreement and shall be final and binding on the Parties and not subject to or available for any offset or reimbursement for any purpose whatsoever.

(j)  The Parties accept and continue to be bound by their obligations under any and all interim agreements between and among the Parties, including, for the avoidance of doubt, the Israeli Cash Payment, the GOB Store Proceeds Payment, the Interim Agreement, the Rent Proration Settlement, and the Uncashed Checks Escrow (collectively, the "Interim Settlements").  The Parties acknowledge that Transform has satisfied all of its obligations under the Israeli Cash Payment, the GOB Store Proceeds Payment, the Interim Agreement, and the Rent Proration Settlement.  For the avoidance of doubt, any amounts previously paid to, escrowed by, or received by the Parties as a result of the Interim Settlements are unaffected by this Settlement Agreement and shall be final and binding on the Parties and not subject to or available for any offset or reimbursement for any purpose whatsoever.

2.    Mutual Release.

(a)  Upon the occurrence of the Release Time, except as provided in Sections 2(c) or 2(d) hereof, Transform and each of Debtors, on behalf of itself, its controlled affiliates, and each and all of its and its affiliates' respective past and present successors and assigns or any entity asserting a claim released hereunder either through or on behalf of any such parties (all such releasing persons and entities collectively, the "Releasing Parties"), does hereby fully, unconditionally and irrevocably release, relieve, waive, relinquish, remise, acquit and forever discharge the other Party and such other Party's respective past, present and future agents, heirs, executors, administrators, conservators, successors, assigns, noteholders, participants, co-participants, direct and indirect parents, principals, subsidiaries, affiliates, related companies, shareholders, interest holders, investors, members, partners (including, without limitation, general and limited partners), managers, directors, representatives, contractors, service providers, receivers, attorneys and beneficiaries, and the past, present and future officers, directors, and employees (all such released persons and entities collectively, the "Released Parties") from, against, and in respect of any and all past, present and future claims, cross-claims, counterclaims, third-party claims, demands, liabilities, obligations, debts, liens, damages, losses, costs,

EXECUTION VERSION

expenses, controversies, actions, rights, suits, assessments, penalties, charges, indemnities, guaranties, promises, commitments, appeals, or causes of action of whatsoever nature, whether based in contract, tort or otherwise, whether in law or equity and whether direct or indirect, fixed or contingent, that any of the Parties have or may have against any of the other Parties since the beginning of time, under, arising out of or in connection with the APA Claims (all of the foregoing, the "Released Claims"), which Released Claims shall include for the avoidance of doubt any right to claim an award of attorneys' fees or other costs and expenses incurred in, or in connection with, any of the foregoing.

(b) For the avoidance of doubt, nothing in this Agreement (including, without limitation, Section 2(a)) releases, waives or prejudices the rights of any Party or Released Party to (i) enforce this Agreement, (ii) prosecute or defend against that certain appeal of the Bankruptcy Court's (A) *Order Determining the Amount of Second-Lien Holders' Section 507(b) Administrative Claims Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure* [Docket No. 4740] currently pending in the United States District Court for the Southern District of New York, Case No. 19-cv-07660 (VB) or (B) *Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors and (II) Granting Related Relief* [Docket No. 5370] (the "Confirmation Order") currently pending in the United States District Court for the Southern District of New York, Case No. 19-cv-09703 (NSR), (iii) prosecute or defend against that certain adversary proceeding commenced with Debtors' filing, on April 17, 2019, of a complaint (as amended or may be amended from time to time, including but not limited to the First Amended Complaint filed on November 25, 2019) in the Bankruptcy Court against, *inter alia*, Edward Scott "Eddie" Lampert, ESL Investments, Inc.; RBS Partners LP; and CRK Partners LLC (Adv. Case No. 19-08250-rdd), other than Released Claims, (iv) prosecute or defend against Preserved Causes of Action as defined in section 1.127 of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [Docket No. 5370-1] and not otherwise Released Claims, or (v) prosecute or defend against Claims related to obligations under the APA that are not otherwise Released Claims, including but not limited to Claims related to Transform's obligation, if any, to (a) assume Cure Costs under the APA, (b) reimburse Debtors for Deloitte Tax Fees under Sections 2.3 and 9.2(a) of the APA to the extent such fees arise after September 30, 2019; (c) indemnify Debtors for Taxes that are Assumed Liabilities under Sections 2.3 and 9.2(e) of the APA; or (d) satisfy the requirements of Section 9.5 of the APA.

(c) For the avoidance of doubt, except with respect to the Released Claims as provided in Section 2(a), nothing herein shall prejudice the rights of any Party to enforce its rights under the APA, the CCAR Order, the EDA Stipulation, and the Interim Settlements, and all such rights are fully and completely reserved.

(d) For the avoidance of doubt, pending the occurrence of the Release Time, the Parties shall retain all of their rights and claims with respect to the APA Claims, provided that the Parties agree that unless the Agreement terminates as provided in Section 8 hereof, each Party will not pursue such rights or claims or prosecute the APA Claims against each other Party.

**EXECUTION VERSION**

3.        Conditions Precedent to Agreement.  This Agreement shall become fully effective and binding on each Party upon the satisfaction of each of the following conditions precedent:

(a) Debtors shall have filed a Motion (in form and substance satisfactory to each of the Parties) seeking approval of this Agreement by no later than January 10, 2020;

(b) the Bankruptcy Court shall have entered an order approving this Agreement substantially in form and substance as the proposed order attached as Exhibit A hereto (the "Approval Order");

(c) each of the Debtors shall have executed and delivered signature pages to this Agreement; and

(d) there is no order, or any stay entered or having taken effect, prohibiting or otherwise delaying the transactions contemplated herein.

4.        Deloitte Tax Fees Condition.  Transform's obligation to make the payment described in Section 1(d) hereof shall be subject to the satisfaction of the following condition precedent: Debtors shall have agreed to transfer to Transform each of the real property interests, or related joint venture interests, described in Schedule 1 attached hereto, with such transfer to occur no later than five (5) business days after the Release Time subject to payment of the Settlement Amount (the "Deloitte Tax Fees Condition").

5.        Mutual Representations and Warranties of All Parties.  Each Party represents and warrants to each other Party as of the Execution Date and the Release Time that:

(a) it is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation;

(b) subject to the Approval Order with respect to Debtors, it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(c) subject to the Approval Order with respect to Debtors, this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms;

(d) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(e) the execution, delivery, and performance by it of this Agreement does not violate any provision of law, rule or regulation applicable to it or any of its affiliates or its certificate of incorporation, bylaws or other organizational documents or those of any of its affiliates;

13

(f)  before executing this Agreement, (i) it has been fully informed of its terms, contents, conditions and effects, (ii) it has had a full and complete opportunity to discuss this settlement with its attorney or attorneys, (iii) it is not relying in any respect on any statement or representation made by any other Party and (iv) no promise or representation of any kind has been made to such Party separate and apart from what is expressly contained in this Agreement.

6.    Further Assurances.  On and after the Release Time, the Parties shall use their reasonable best efforts to take, or cause to be taken, all appropriate action to do or cause to be done all things necessary under applicable law, and to execute and deliver such documents and other papers, in each case, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby.  Without limiting the foregoing, no later than three (3) business days after the Release Time, (i) Transform shall withdraw, with prejudice, the Adversary Complaint, and (ii) Debtors shall withdraw, with prejudice, the First Motion to Enforce (to the extent not disposed of by the CCAR Order), the Supplemental Motion to Enforce, and the Turnover Motion.

7.    No Admission of Fault or Liability. This Agreement is a compromise of disputed claims, and nothing contained in this Agreement shall be construed to be an admission of fault or liability on the part of any Party, all such fault or liability being expressly denied by each Party.

8.    Termination.  This Agreement shall terminate automatically, and shall be null and void without any further action, if the Release Time does not occur for any reason whatsoever on or before 6:00 p.m. (prevailing Eastern time) on the third (3rd) business day following entry of the Approval Order (or such other time mutually agreed by the Parties), and the rights of the Parties shall be fully restored as if this Settlement Agreement had never been executed.  For the avoidance of doubt, if this Agreement terminates, or if the Settlement Amount, the Adequate Assurance Deposit, or any amounts paid pursuant to the APA, the Prior Rulings, or the Interim Settlements are clawed back or avoided or the Parties or any successor in interest or authorized representative seek to claw back or avoid, each Party acknowledges and agrees that each other Party shall retain (and may assert and prosecute) all of its APA Claims for the full amounts as if this Agreement had not been executed.

9.    Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York (excluding any conflicts-of-law rule or principle that might refer same to the laws of another jurisdiction).

10.    Consent to Jurisdiction.  This Agreement shall be deemed to be made in New York.  Each Party irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of the Bankruptcy Court for any action, suit or proceeding arising out of or based upon this Agreement, and waives any objection that it may have to the laying of venue in any such court or that any such court is an inconvenient forum or does not have personal jurisdiction over it.  Each Party waives any right to a trial by jury in any lawsuit, action or proceeding to enforce or defend any right under this Agreement or any amendment, instrument, document or agreement delivered or to be delivered in connection with this Agreement and agrees that any lawsuit, action or proceeding will be tried before a court and not before a jury.

**EXECUTION VERSION**

11.     <u>Trial by Jury Waived</u>.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER IN CONTRACT OR IN TORT, IN LAW OR IN EQUITY OR GRANTED BY STATUTE).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND EACH OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11</u>.

12.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Agreement by electronic mail transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

13.     <u>Execution.</u>  Debtors' Chief Restructuring Officer, by and on behalf of Sears Holdings Corporation, shall execute this Agreement in the first instance and, in so doing, bind Sears Holdings Corporation to the terms of the Agreement.  No later than three (3) business days following the Execution Date, Debtors will cause to be filed in the Bankruptcy Court a motion for entry of an order authorizing principals, employees, or independent contractors of M-III Advisory Partners, LP ("<u>M-III</u>") to sign and bind all Debtors to the terms of this Agreement. When the Bankruptcy Court enters such order, M-III shall execute this Agreement on behalf of all Debtors and the Debtors shall cause such updated and fully executed Agreement to be delivered to Transform.

14.     <u>Successors and Assigns; Third Party Beneficiaries</u>.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  Each of the Released Parties who is not a party to this Agreement is intended to be, and shall be, a third-party beneficiary but only as pertaining to the Released Claims in <u>Section 2</u> of this Agreement entitled to enforce the terms thereof.  Except to the extent provided in the immediately preceding sentence, there are no third-party beneficiaries with respect to this Agreement.

15.     <u>Notices</u>.  All notices, requests, demands and other communications to any Party hereto given under this Agreement shall be in writing, hand delivered or sent by overnight courier or electronic transmission (with confirmation received) to such Party at the address or electronic mail address specified for such Party on <u>Exhibit B</u> hereto, or at such other address or electronic mail address as such Party may subsequently request in writing.  All notices, requests, demands and other communications will be deemed delivered when actually received.

16.     <u>Severability</u>.  If any provision in this Agreement is determined to be invalid, inoperative or unenforceable, the remaining provisions of this Agreement remain in effect if both the economic and legal substance of the transactions contemplated hereby are not materially affected in any manner adverse to any Party.  Otherwise, the Parties shall negotiate in

**EXECUTION VERSION**

good faith to rewrite any such provision so as to, as nearly and fairly as possible, approach the economic and legal substance originally intended.

17.    <u>Entire Agreement; Amendment and Waiver</u>.  This Agreement constitutes the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior understandings among the Parties with respect to such subject matter.  This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of each Party.  Nothing in this Agreement shall amend, modify or waive any provisions of the EDA Stipulation.

[*The remainder of this page is intentionally left blank.*]

IN WITNESS WHEREOF, this Agreement has been executed by each of the Parties, effective as of the Execution Date.

**TRANSFORM HOLDCO LLC**

By: _____

     Name: Robert Riecker
     Title:   Chief Financial Officer

**SEARS HOLDINGS CORPORATION**

By: _____

     Name:
     Title:

IN WITNESS WHEREOF, this Agreement has been executed by each of the Parties, effective as of the Execution Date.

**TRANSFORM HOLDCO LLC**

By: _____
    Name: Robert Riecker
    Title:   Chief Financial Officer

**SEARS HOLDINGS CORPORATION**

By: _____
    Name: Mohsin Y. Meghji
    Title: Chief Restructuring Officer

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Kmart Holding Corporation**


By: _____

Name:

Title:

**EXECUTION VERSION**

**Kmart Operations LLC**

By: _____

Name:

Title:

**EXECUTION VERSION**

**Sears Operations LLC**

By: _____

Name:

Title:

**EXECUTION VERSION**

**Sears, Roebuck and Co.**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**ServiceLive, Inc.**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**SHC Licensed Business LLC**

By: _____

Name:

Title:

**EXECUTION VERSION**

**A&E Factory Service, LLC**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**A&E Home Delivery, LLC**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**A&E Lawn & Garden, LLC**

By:     _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**A&E Signature Service, LLC**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**FBA Holdings Inc.**


By:                          _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Innovel Solutions, Inc.**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Kmart Corporation**

By: _____

Name:

Title:

EXECUTION VERSION

**MaxServ, Inc.**

By: _____

Name:

Title:

**EXECUTION VERSION**

**Private Brands, Ltd.**

By: _____

Name:

Title:

**EXECUTION VERSION**

**Sears Development Co.**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Holdings Management Corporation**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Home & Business Franchises, Inc.**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**Sears Home Improvement Products, Inc.**


By: _____

Name:

Title:

**EXECUTION VERSION**

**Sears Insurance Services, L.L.C.**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Procurement Services, Inc.**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Protection Company**


By: _____

Name:

Title:

**EXECUTION VERSION**

**Sears Protection Company (PR), Inc.**

By:    _____

Name:

Title:

**EXECUTION VERSION**

**Sears Roebuck Acceptance Corp.**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears, Roebuck de Puerto Rico, Inc.**


By: _____

Name:

Title:

**EXECUTION VERSION**

**SYW Relay LLC**


By: _____

Name:

Title:

**EXECUTION VERSION**

**Wally Labs LLC**

By:    _____

Name:

Title:

**EXECUTION VERSION**

**SHC Promotions LLC**


By:    _____

Name:

Title:

**EXECUTION VERSION**

**Big Beaver of Florida Development, LLC**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**California Builder Appliances, Inc.**


By:    _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Florida Builder Appliances, Inc.**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

EXECUTION VERSION

**KBL Holding Inc.**


By: _____

Name:

Title:

**EXECUTION VERSION**

**Kmart of Michigan, Inc.**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Kmart of Washington LLC**

By: _____

Name:

Title:

**EXECUTION VERSION**

**Kmart Stores of Illinois LLC**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**Kmart Stores of Texas LLC**


By: _____

Name:

Title:

**EXECUTION VERSION**

**MyGofer LLC**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Brands Business Unit Corporation**

By:  _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Holdings Publishing Company, LLC**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Protection Company (Florida), L.L.C.**

By: _____

Name:

Title:

**EXECUTION VERSION**

**SHC Desert Springs, LLC**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**SOE, Inc.**

By:    _____

Name:

Title:

**EXECUTION VERSION**

**StarWest, LLC**

By: _____

Name:

Title:

**EXECUTION VERSION**

**STI Merchandising, Inc.**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Troy Coolidge No. 13, LLC**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**BlueLight.com, Inc. .**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Brands, L.L.C.**

By:        _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Buying Services, Inc.**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Kmart.com LLC**

By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**Sears Brands Management Corporation**


By: _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**KLC, Inc.**


By:    _____

Name:

Title:

*[Signature Page to Settlement Agreement]*

**EXECUTION VERSION**

**SRe Holding Corporation**

By: _____

Name:

Title:

**Exhibit A**
**[Draft Approval Order]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                 :

In re                          :        **Chapter 11**

SEARS HOLDINGS CORPORATION, *et al.*,  :        **Case No. 18-23538 (RDD)**
                                   :

Debtors.[1]                :        **(Jointly Administered)**
                                   :

---------------------------------------------------------------x

### ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN
### THE DEBTORS AND TRANSFORM HOLDCO LLC

Upon the motion, dated [____] (ECF No. [____]) (the "Motion")[2] of Sears Holdings

Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "Debtors"), for entry of an order pursuant to Rule 9019(a) of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the settlement

and compromise (the "Settlement Agreement") entered into by the Debtors and Transform

Holdco LLC ("Transform"); and the Court having jurisdiction to decide the Motion and the relief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing

Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the

Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the relief sought in the Motion and the opportunity for a hearing thereon having

been provided in accordance with the Amended Case Management Order; such notice having

been adequate and appropriate under the circumstances, and it appearing that no other or further

notice need be provided; and the Court having held a hearing to consider the relief requested in

the Motion on January 28, 2020 (the "Hearing"); and upon the record of the Hearing, and upon

all of the proceedings had before the Court; and the Court having determined that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein and that

such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in

interest; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.      The relief requested in the Motion is granted.

2.      Pursuant to Bankruptcy Rule 9019(a), the Settlement Agreement is

approved and the Debtors are authorized to enter into the Settlement Agreement.

3.      The Parties are authorized to take any action as may be necessary or

appropriate to implement, effectuate, and fully perform under the Settlement Agreement in

accordance with this Order, including without limitation to execute and deliver all instruments

and documents, and take such other action as may be necessary or appropriate to implement,

effectuate, and fully perform under the Settlement Agreement in accordance with this Order.

4.      Upon the occurrence of the Release Time (as defined in the Settlement Agreement), the Adequate Assurance Deposit shall be (i) deemed transferred to the Debtors without further action; (ii) available to be used in the ordinary course of the Debtors' business; and (iii) no longer required to be treated as segregated funds under the *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service* (ECF No. 431).

5.      Upon the occurrence of the Release Time, the Expert is relieved of his duties pursuant to the Order of this Court, signed on December 9, 2019 (ECF No. 6166).

6.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2020
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**EXECUTION VERSION**

# Exhibit B
## Notice Addresses

**Transform Holdco LLC**

Transform Holdco LLC
3333 Beverly Road
Hoffman Estates, IL 60179
Attention: Luke Valentino, Esq.
Tel: (847) 286-9551

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention: Sean A. O'Neal, Esq.
Tel: (212) 225-2000

**Debtors** (including any Debtor affiliate)

Weil, Gotshal & Manges
767 Fifth Ave.
New York, NY 10153-0119
Attention: Sunny Singh, Esq.
Tel: (212) 310-8000

M-III Partners, LLC
130 W 42nd St. 17th Floor
New York, NY 10036
Attention: Brian Griffith
Tel: (212) 716-1491

**EXECUTION VERSION**

**Schedule 1:**
**Lurking Fee Parcels**

|  | Site Number | City or County | State | Assessor Parcel Number, Property Index Number and/or Block and Lot Information |
|---|---|---|---|---|
| 1. | 1570 | Schaumburg/Woodfield | IL | 07-13-200-009-0000 |
| 2. | 9153 | South Lake Tahoe | CA | 032-291-023-000 |
| 3. | 7329 | Loveland | CO | 95103-76-002 |
| 4. | 3433 | Holyoke | MA | 000114-0015-3; and 000115-0015-3[1] |
| 5. | 7756 | Bishop | CA | 008-360-11; 008-360-12; 008-360-13; and 008-360-14 |
| 6. | 1094 (AKA 6854) | Hackensack | NJ | 0223-404, 2; 0223-405, 14; 0223-406, 1.02; and 0223-406, 1.03 |
| 7. | 66768 (AKA 1068) | Lancaster / Palmdale | CA | 3132-017-002 |
| 8. | 31930[2] | Hialeah | FL | N/A – See footnote 2 below |
| 9. | 30934 | Memphis | TN | 085-028-00013; and 085-028-00014 |

---

[1] For the avoidance of doubt, the Parties agree that the assessor parcel numbers 000114-0015-3 and 000115-0015-3 refer to and correspond to Parcels 2 and 3, as described on Chicago Title Commitment No. CCHI1906244NT dated November 18, 2019.

[2] Big Beaver Development Corporation, a Michigan Corporation, wholly owned by Kmart Corporation, has an interest in Red Road Joint Venture, which is identified by the title company as holding fee simple title.

**Exhibit 2**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
In re                                                   :        **Chapter 11**
:
**SEARS HOLDINGS CORPORATION,** *et al.*,               :        **Case No. 18-23538 (RDD)**
:
Debtors.[1]                                             :        **(Jointly Administered)**
:
-------------------------------------------------------------x

## ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN
## THE DEBTORS AND TRANSFORM HOLDCO LLC

Upon the motion, dated [___] (ECF No. [___]) (the "Motion")[2] of Sears Holdings

Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "Debtors"), for entry of an order pursuant to Rule 9019(a) of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the settlement

and compromise (the "Settlement Agreement") entered into by the Debtors and Transform

Holdco LLC ("Transform"); and the Court having jurisdiction to decide the Motion and the relief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing

Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the

Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the relief sought in the Motion and the opportunity for a hearing thereon having

been provided in accordance with the Amended Case Management Order; such notice having

been adequate and appropriate under the circumstances, and it appearing that no other or further

notice need be provided; and the Court having held a hearing to consider the relief requested in

the Motion on January 28, 2020 (the "Hearing"); and upon the record of the Hearing, and upon

all of the proceedings had before the Court; and the Court having determined that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein and that

such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in

interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion is granted.

2.      Pursuant to Bankruptcy Rule 9019(a), the Settlement Agreement is

approved and the Debtors are authorized to enter into the Settlement Agreement.

3.      The Parties are authorized to take any action as may be necessary or

appropriate to implement, effectuate, and fully perform under the Settlement Agreement in

accordance with this Order, including without limitation to execute and deliver all instruments

and documents, and take such other action as may be necessary or appropriate to implement,

effectuate, and fully perform under the Settlement Agreement in accordance with this Order.

4.      Upon the occurrence of the Release Time (as defined in the Settlement Agreement), the Adequate Assurance Deposit shall be (i) deemed transferred to the Debtors without further action; (ii) available to be used in the ordinary course of the Debtors' business; and (iii) no longer required to be treated as segregated funds under the *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service* (ECF No. 431).

5.      Upon the occurrence of the Release Time, the Expert is relieved of his duties pursuant to the Order of this Court, signed on December 9, 2019 (ECF No. 6166).

6.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2020
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE