WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
In re                                             :
                                                  :      Chapter 11
                                                  :
SEARS HOLDINGS CORPORATION, et al.,               :
                                                  :      Case No. 18-23538 (RDD)
                                                  :
                                                  :
            Debtors.                              :      (Jointly Administered)
------------------------------------------------------------x
```

**DECLARATION OF BRIAN J. GRIFFITH**
**IN SUPPORT OF THE DEBTORS' MOTION PURSUANT TO FEDERAL**
**RULE OF BANKRUPTCY PROCEDURE 9019(a) FOR ENTRY OF AN ORDER**
**APPROVING SETTLEMENT AGREEMENT WITH TRANSFORM HOLDCO LLC**

I, Brian J. Griffith, make this declaration under 28 U.S.C. § 1746:

    1.    I submit this declaration ("**Declaration**") in support of the *Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with Transform Holdco LLC* ("**Motion**"), filed concurrently with this Declaration.[1]

    2.    I have been a Managing Director of M-III Advisory Partners, LP ("**M-III**") for the past five years. As Managing Director at M-III, I am responsible for leading deal teams

---

[1] All capitalized terms not otherwise defined in this Declaration shall have the meanings prescribed to them in the Motion.

**DECLARATION OF BRIAN J. GRIFFITH – Page 1**

where we are retained by either creditors or debtors. Assignments range from operational improvement to distressed situations both in and out of court. Depending on the assignment, deal responsibilities range from short-term profit improvement roles to multi-year turnaround advisory assignments in numerous industries, including: retail, financial services, real estate development, healthcare, energy, consumer products, manufacturing, automotive, and food services. Typical areas of focus on debtor engagements are treasury, cash forecasting, process improvement, cost reductions, development of strategic alternatives, and negotiations with creditors and parties-in-interest. Prior to my current role with M-III, I served in interim management roles, including as a chief financial officer and chief restructuring officer.

3. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors; my discussions with other members of the M-III team and the Debtors' other advisors; my review of relevant documents; and my views based upon my experience. If called to testify, I would testify competently to each of the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of M-III for the Debtors.

4. I have been intimately involved in the APA disputes since their inception shortly after the Closing of the APA in February of 2019. In particular, I have taken a lead role in assessing the Cash Reconciliation, Specified Receivables, Prepaid Inventory, Cook County Tax Refunds, and Section 8.6 Damages disputes on behalf of the Debtors.

5. The sale of substantially all of the Debtors' assets and operations to Transform (the "**Sale Transaction**") closed on February 11, 2019 at 12:01 a.m. Eastern Time (the "**Closing**"). Before the Closing, Transform advised the Debtors that it had not yet implemented its own cash-management system or established its own bank accounts. In order to alleviate the

risk of not being able to close on the timeline contemplated by the APA and to allow the Parties to proceed to Closing expeditiously in order to satisfy various closing conditions, the Debtors transferred their cash-management system, including the majority of its bank accounts, to Transform, effective as of the Closing Date (the "**Cash-Management System Transfer**"). The Parties knew that the Cash-Management System Transfer would give rise to various cash-reconciliation issues that the Parties would have to work together to resolve in the days after Closing. Accordingly, the Parties devised and sought to implement a post-Closing reconciliation process for cash and credit-card proceeds that were the property of the Debtors' Estates. That reconciliation process was outlined in a cash-reconciliation memorandum prepared by Transform's financial advisor Ernst & Young.

6. On March 11, 2019, the Debtors filed the *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* (ECF No. 2796) (the "**First Motion to Enforce**"). In the First Motion to Enforce, the Debtors sought entry of an order compelling turnover of approximately $57.5 million in funds being held by Transform in large measure because of the Cash-Management System Transfer, including but not limited to $14.6 million in credit-card proceeds from transactions that occurred prior to Closing (the "**Credit Card Accounts Receivable**"), $18.5 million in cash proceeds from transactions that occurred prior to Closing but that were still in transit from regional banks or stores after Closing (the "**Cash in Transit**"), $4.5 million of cash in transit from the Debtors' Israeli bank accounts prior to Closing, and $3.7 million in GOB Store proceeds. The Debtors also sought turnover of an approximately $16.2 million rent-proration payment for February 2019 (the "**Rent Proration**").

7. On or about March 12, 2019, Transform transferred $3,261,487 in respect of Israeli cash and $3,661,721 in respect of GOB Store proceeds to the Debtors.

8. On the eve of the March 21, 2019 hearing concerning the relief requested in the First Motion to Enforce (the "**March 21 Hearing**"), Transform and the Debtors entered into an interim agreement (the "**Interim Agreement**") that tabled the Cash in Transit and Rent Proration issues in the interest of facilitating (i) the return of the Cash in Transit and Rent Proration and (ii) the production of documents and information that would allow the Debtors and their advisors to confirm Transform's calculations with respect to various reconciliations and setoffs that Transform was asserting against the Cash in Transit and Rent Proration. The Interim Agreement provided, among other things, that, on or before March 26, 2019, Transform would (1) pay by wire to the Debtors $3 million in respect of the Cash in Transit and (2) pay by wire to the Debtors $5 million in respect of the Rent Proration. Transform timely remitted these amounts to the Debtors' Estates.

9. After the July 11, 2019 hearing (the "**July 11 Hearing**") at which the Court established the Cash Reconciliation Process, the Parties attempted in good faith to resolve the Cash Reconciliation, Specified Receivables, and Prepaid Inventory disputes without resort to an examiner. Over the course of several months, I, along with my team at M-III and the Debtors' other advisors, participated in numerous meetings and teleconferences with Transform and their advisors and exchanged voluminous and detailed correspondence and settlement-related materials to that end.

10. As of late November 2019, however, the Parties remained at an impasse. Resolving the Cash Reconciliation, Specified Receivables, and Prepaid Inventory disputes in a manner consistent with the Court's rulings at the July 11 Hearing was proving to be an immensely

complex, time-consuming, and resource-draining task. For example, determining, in accordance with the Court's July 11 ruling on the Specified Receivables issue, which Accounts Receivable were generated by Sears pre-Closing but not included in the Debtors' $292 million certification at Closing would involve the painstaking review of thousands of lines of ambiguous data and absorb untold hours of the Parties' limited time. Likewise, the Cash Reconciliation Process would involve the reconciliation of several discrete categories of offsets. These categories included, for example: (1) an enterprise wide calculation of telecommunications expenses, (2) a review of all orders made pre-close that were canceled post-close, and (3) an arduous reconciliation of all checks deposited by Transform during at least a five-month period to determine proper ownership. *See id.* Accordingly, on December 9, 2019, the Court appointed an expert, Michael Wyse (the "**Expert**"), to take over these tasks, and the Parties began the process of gathering materials to provide to the Expert and otherwise facilitating the Expert's work.

11. The Court's appointment of the Expert did not forestall settlement negotiations between the Parties. Indeed, on the eve of the December 13, 2019 hearing concerning the relief requested in the Debtors' Motion to Compel Turnover of the Cook County Tax Refunds, Transform contacted the Debtors and their advisors and proposed a global settlement of the outstanding APA-related disputes—i.e., the Cash Reconciliation dispute, Specified Receivables dispute, Prepaid Inventory dispute, Section 8.6 Damages dispute, and any and all appeals of the Bankruptcy Court's APA-related rulings issued at the March 21, July 11, and September 12 Hearings (the "**Outstanding APA Disputes**"). Over the course of the next several days, the Debtors through their advisors, including myself and my team at M-III, worked with Transform to negotiate the terms of such a global settlement. The Parties agreed that any global settlement would address and resolve the dispute over the Cook County Tax Refunds.

12. After several rounds of negotiation, on December 27, 2019, the Parties—again, through their advisors—arrived at an agreement concerning the principal terms of a settlement of the Outstanding APA Disputes. Those terms are accurately reflected in the Settlement Agreement attached to the Motion as Exhibit 1. I, along with the Debtors' other advisors, consulted with and received the reasoned approval of the Restructuring Committee on the principal terms of the Settlement Agreement and, on December 31, 2019, received agreement from the Creditors' Committee on the principal terms of the Settlement Agreement. On December 30, 2019, the Debtors' advisors informed the Expert that he should cease any and all work related to the Cash Reconciliation, Specified Receivables, and Prepaid Inventory disputes pending the Court's adjudication of the Motion and he complied.

13. The Debtors, acting through their independent Restructuring Committee and their advisors and with the support of the Creditors' Committee, have concluded that the Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Debtors' Estates. *First*, under the Settlement Agreement, the Debtors will retain all of the funds Transform has remitted to them in the course of the APA litigation thus far without the risk of appeal or other challenges by Transform—in total, approximately $47 million, including (i) the $3,261,487 million Israeli cash payment; (ii) the $3,661,721 million GOB Store proceeds payment; (iii) the $8 million Interim Agreement payment; (iv) the $14.6 million Credit Card Accounts Receivable (transferred directly by the credit-card payment processors); (v) the $8 million Rent Proration payment; (vi) the Uncashed Checks Escrow (to the extent owed the Debtors under the terms of that agreement); and (vii) with respect to the 2017 EDA Funds (as defined in the *Amended Stipulation and Order by and among the Village of Hoffman Estates, the Debtors, and the Community Unit School District 300 Concerning 2017 EDA Funds Held in the*

*Special Tax Allocation Fund* (ECF No. 5492)), the initial payment of $2,508,660.33 from the Special Tax Allocation Fund and a second payment of $5,153,317 as a result of the settlement with the School District and Village of Hoffman Estates. Moreover, the Debtors will retain the benefit of Transform's payment of almost $160 million in Assumed Liabilities (Other Payables plus Assumed 503(b)(9) Liabilities) (as those terms are defined in the APA); such payment will be final and no longer subject to offset or appeal.

14. **Second**, continued litigation of the Outstanding APA Disputes would be expensive and protracted and would divert the Debtors' and their advisors' resources and attention away from implementing an efficient wind-down of the Debtors' Estates and prosecuting the valuable Preserved Causes of Action for the benefit of the Debtors' creditors. The protracted and contentious course of the APA litigation thus far, with its attendant burdens and expenses, demonstrates the long, time-consuming, and contentious path ahead if the Parties are not able to settle the Outstanding APA Disputes. Those outstanding disputes are complex—so much so that resolving them required the appointment and retention of the Expert, which only compounded the Debtors' litigation-related expenses. Because the Settlement Agreement resolves, fully and finally, the Outstanding APA Disputes, it eliminates the burdens and expenses associated with the APA litigation (including expenses associated with any appeals of the Bankruptcy Court's APA-related rulings) and allows the Debtors and their advisors to redirect their resources and attention to winding down the Debtors' Estates and progressing expeditiously toward the Effective Date.

15. **Third**, given the complexity of the Outstanding APA Disputes, including and especially the Cash Reconciliation Process, the Debtors cannot be certain of the outcome of continued litigation of the Outstanding APA Disputes. Although the Debtors assert that Transform owes the Estates approximately $30.2 million in Cash Reconciliation funds, the Expert may

determine that the $30.2 million total should be reduced by the various setoffs alleged by Transform, including up to $9.6 million in pre-close orders canceled post-close, up to $7 million in unreconciled checks owed to Transform, and up to $1.9 million in telecommunication expenses. Accordingly, and in my view, the Settlement Agreement's approximately $18.3 million value is well within the range of reasonableness. Moreover, given the likelihood of appeal here, as well as the uncertainties inherent in any litigation, the Debtors cannot be certain of their ability to collect (or when they would collect) on any judgment awarded by the Bankruptcy Court against Transform. By fully and finally resolving the Outstanding APA Disputes, the Settlement Agreement eliminates the not inconsiderable risk of loss (or, at the very least, delay) associated with continued litigation of those disputes and guarantees cash for the Debtors' Estates now.

16. The same analysis applies with respect to the Settlement Agreement's provision releasing Transform from any further obligation to satisfy Assumed 503(b)(9) Liabilities and Severance Reimbursement Obligations (as that term is defined in the APA). Transform contends (and the Debtors dispute) that the Specified Receivables and Prepaid Inventory Shortfall Amounts reduce these liabilities to nothing. The Debtors have acknowledged that the amount of Assumed Liabilities has been reduced by at least $55 million as a result of the Prepaid Inventory Shortfall, without accounting for any adjustments in the Specified Receivables Shortfall. While the Debtors could submit to the expensive and time-consuming Cash Reconciliation Process in order to show that the Specified Receivables and Prepaid Inventory Shortfall Amounts are less than what Transform claims, the results of that review are uncertain, particularly against the backdrop that the Bankruptcy Court ruled against the Debtors on both of those issues. Even if the Debtors were to prevail on those issues, however, there exists the risk—again, inherent in any litigation—that Transform would not satisfy the assumed liabilities and that the burden of

satisfying them would fall to the Debtors. The Settlement Agreement, again, eliminates the burden, expense, and risk associated with the Cash Reconciliation Process and guarantees value for the Debtors' Estates.

17. Finally, the same analysis applies with respect to the Settlement Agreement's provision releasing Transform from any further obligation to satisfy Other Payables. Transform has contended throughout the APA litigation that (i) the APA imposes only one obligation (and not two) upon Transform to assume up to $166 million in Other Payables with respect to the Ordered Inventory (as that term is defined in the APA); (ii) the Debtors' Cash in Transit constituted "available cash" within the meaning of the APA that increased the Aggregate DIP Shortfall to more than $19 million and, thus, reduced Transform's obligation to assume Other Payables, if any, by more than $19 million; and (iii) the Debtors' decision to delay payments to certain vendors in the week before Closing, which shifted the obligation to satisfy millions of dollars in accounts payable from the Debtors to Transform, was a breach of various ordinary-course management provisions in the APA, entitling Transform to a substantial reduction ($66 million) in the amount of Other Payables, if any, it assumed under the APA. Although the Debtors prevailed on each of these arguments in the Bankruptcy Court, Transform has signaled its intention to appeal each of these rulings—appeals which would embroil the Debtors in additional protracted and costly litigation. Moreover, as discussed above, the Debtors could not be certain of the outcome of any appeal or their ability to collect on any judgment arising out of appeal. The Settlement Agreement releases Transform from any further obligation to pay approximately $14.5 million in respect of Other Payables and, in return, eliminates the burden, expense, delay, and risk associated with appeal of the Bankruptcy Court's rulings on the Other Payables disputes.

18. **_Fourth_**, the proposed settlement, once effective, will result in the near-immediate (within three (3) business days of Court approval) transfer to the Debtors of more than $18 million and, further, will ensure that all future Cook County Tax Refunds for any Pre-Assignment Tax Period (as that term is defined in the APA) are retained by the Estates. The Debtors anticipate that one such Tax Refund, to be issued in or around the first quarter of 2020, will total more than $4.5 million plus statutory interest. The Settlement Agreement will secure substantial funds for eventual distribution to the Estates' creditors.

19. **_Fifth_**, the proposed settlement is the product of significant effort—over the course, as described above, many months—to reconcile the Debtors' and Transform's outstanding claims against one another. If approved, the Settlement Agreement would, again, fully and finally resolve these claims, permitting the Debtors, the Restructuring Committee, the Creditors' Committee, and their advisors to focus resources and attention on other claims and claimants and move toward final distributions to creditors.

20. **_Sixth_**, the Parties are represented by sophisticated and experienced professionals—highly regarded law firms and financial advisors with significant restructuring, litigation, and other relevant experience. The Debtors' professionals, for their part, fully understand the difficulties of successfully concluding a litigation of this size and complexity and, indeed, have been analyzing, discussing, and litigating these APA-related issues with Transform and its professionals for almost a full year. Accordingly, the Debtors' professionals fully understand the potential consequences to creditors of the Estates if the Settlement Agreement is not consummated and have recommended that the Debtors enter into the Settlement Agreement.

21. **_Seventh_**, in my view, the releases are appropriate and narrowly tailored in scope to the APA disputes. First and foremost, the releases will only be triggered upon receipt of

full payment by Transform. If Transform fails to perform its obligations, the Parties' rights are restored in full as if the Settlement Agreement had never been executed. Second, the release does not affect, and expressly carves out, all other disputes between the Parties, including (i) the 507(b) appeal, (ii) Transform and ESL's appeal of the confirmation order, and (iii) the Estates' adversary proceedings against ESL and certain other parties.

22.  **_Finally_**, the Settlement Agreement is the product of arm's length negotiations between the Debtors, in consultation with the Creditors' Committee, and Transform, as well as the reasoned judgment of the experienced Restructuring Committee, as supported by the Creditors' Committee.

Dated: January 10, 2020  
      New York, New York

By: /s/ *Brian J. Griffith*  
    Brian J. Griffith  
    Managing Director  
    M-III Advisory Partners, LP