**Hearing Date and Time: Wednesday, March 25, 2020 at 10:00 AM (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                 :

**In re**                                          :          **Chapter 11**
                                               :

**SEARS HOLDINGS CORPORATION**, *et al.*,    :          **Case No. 18-23538 (RDD)**
                                               :

            Debtors.[1]                      :          **(Jointly Administered)**
                                               :
------------------------------------------------------------x

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF DEBTORS'**
**TENTH OMNIBUS OBJECTION TO PROOFS OF CLAIM (TO RECLASSIFY CLAIMS)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

        Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in reply to the limited number of responses (collectively, the "**Responses**") filed by certain claimants (collectively, the "**Claimants**")[2] to the *Debtors' Tenth Omnibus Objection to Proofs of Claim (to Reclassify Claims)* (ECF No. 5237) (the "**Objection**")[3].

## Reply

    1.    Nothing in the Responses contradicts the arguments made in the Objection, supported by case law, that statutory priorities must be construed and awarded narrowly, consistent with the intent of the Bankruptcy Code, and in such a manner as to avoid absurd results. There is no question that the intent of section 503(b)(9) of the Bankruptcy Code is to encourage vendors to support companies in the days immediately prior to their filing for bankruptcy protection, and that the intent of the Bankruptcy Code, more generally, is to ensure the equality of treatment of similarly situated creditors. The Debtors' interpretation of section 503(b)(9) is consistent with these goals; Claimants' interpretation is not. The Debtors' interpretation avoids absurd results; Claimants' interpretation leads to them. The Responses fail to address this.

    2.    This Court already recognized that none of the *World Imports* decisions are binding upon this Court, and that this Court is free to adopt or reject the reasoning and holdings of any of the three decisions. *See* May 21, 2019 Hr'g Tr. at 92:13-15, *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (ECF No. 5500). Claimants' elevation of the importance to this Court

---

[2] Infiiloom India Private Limited (ECF No. 5394); Winners Industry Company, Ltd. (ECF No. 5400); Weihai Lianqiao International Coop. Group Co., Ltd. (ECF No. 5488); Orient Craft Limited (ECF No. 5496); and HK Sino-Thai Trading Company Ltd. (ECF Nos. 5990 & 6037).

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection.

2

of *World Imports III* above *World Imports I* and *World Imports II*, without regard to the arguments set forth in the Objection, is without basis.

3.  Claimants' request for this Court to avoid a circuit split in authority likewise is not persuasive. While splits of authority between the circuits should be avoided when possible, this Court need not blindly follow the non-binding holding of one court when a reasonable interpretation adopted by two other courts is readily available and will avoid an absurd and detrimental outcome, both in these chapter 11 cases and for future commercial relationships. *See, e.g.*, *Cobra Nat. Res., LLC v. Fed. Mine Safety & Health Review Comm'n*, 742 F.3d 82, 88 n.11 (4th Cir. 2014) ("Put simply, there is nothing wrong with creating a circuit split when it is justified. At the end of the day, justice is served by reaching the correct result."); *U.S. v. Thomas*, 939 F.3d 1121, 1143 n.22 (10th Cir. 2019) ("Rigid adherence to prudential avoidance of a circuit split would give the first circuit to consider an issue the power to decide it for all circuits.") (Matheson, J., dissenting); *Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1184 (9th Cir. 1999) ("We realize that our decision creates an inter-circuit split of authority. Although we are hesitant to create such a split, and we do so only after the most painstaking inquiry, we must follow the unambiguously expressed intent of Congress."). Greater collateral damage would result if this Court were to follow Claimants' flawed analysis.

4.  As other courts have done with other provisions of the Bankruptcy Code that were added or modified by BAPCPA, this Court should adopt a common sense and pragmatic interpretation of section 503(b)(9). *See, e.g.*, *In re Perfetto*, 361 B.R. 27, 31 (Bankr. D.R.I. 2007) ("[I]ncongruous results appear throughout BAPCPA, creating the potential for many anomalies that were either never considered or completely ignored by the architects of this law. . . . [C]ourts are and will be required to fashion common sense approaches to achieve order out of the confusion

3

unwittingly created by Congress."); *In re Donald*, 343 B.R. 524, 529 (Bankr. E.D.N.C. 2006) ("[T]he BAPCPA amendments do not provide a clear answer.  The amendments are confusing, overlapping, and sometimes self-contradictory.  They introduce new and undefined terms that resemble, but are different from, established terms that are well understood."); *In re Steinhaus*, 349 B.R. 694, 706 (Bankr. D. Idaho 2006) ("[I]t appears unmistakable that Congress drafted, or allowed to be drafted by others and then enacted, provisions with 'loose' and imprecise language.").

5. The Debtors' interpretation of section 503(b)(9) fits logically with section 503(b)(1), while Claimants' interpretation does not.[4]  As set forth in the Objection, this Court already determined, in accordance with longstanding case law, that an administrative expense claim under section 503(b)(1) is not keyed to the physical delivery of goods to the Debtors.  *See Order Denying Vendors' Motions for Allowance and Payment of Administrative Expense Claims* (ECF No. 5371) (the "**503(b)(1) Order**").  The 503(b)(1) Order confirmed that a vendor who completed its contractual obligations prior to the commencement date of these chapter 11 cases, but whose goods were physically received after the commencement date (each, an "**Overlap Vendor**") is not entitled to priority pursuant to section 503(b)(1) solely because the goods arrived after the commencement date.[5]  In this context, what protections are there for Overlap Vendors?

---

[4] Indeed, certain Claimants previously argued that the language of section 503(b)(1) and section 503(b)(9) should be interpreted consistently, even though they appear to have abandoned such position now.  *See Initial Reply to Debtors' Objection to Motion of Winners Industry Co., Ltd. for Allowance and Payment of Administrative Expense Claims* (ECF No. 3229) ("**Winners Reply**"), ¶ 1 ("Given the cardinal canon of statutory construction that subsections of the same section must be interpreted in harmony and not in conflict with each other, sections 503(b)(9) and 503(b)(1)(A) must be interpreted consistently and in a manner that does not yield an absurd result.").

[5] *See* May 21, 2019 Hr'g Tr. at 132:7-14, *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (ECF No. 5500) ("It continues to be the case that a debtor in possession or trustee needs to engage in a post-petition transaction or post-petition conduct that then is in addition beneficial to the estate to give rise to an administrative expense under Section 503(b)(1).  The mere fact of delivery post-petition where the transaction was entered into prepetition is insufficient to give rise to such a claim."); *see also Debtors' Omnibus Objection to Vendors' Motions for Allowance and Payment of Administrative Expense Claims* (ECF No. 3883) (citing to cases holding the same).  *See also* 503(b)(1) Order; *In re A.C.E. Elevator Co.*, 347 B.R. 473, 480 (Bankr. S.D.N.Y. 2006) (holding that a section 503(b)(1) claim must arise

Under the Debtors' interpretation, the vendors that continued to support the Debtors in the days leading up to the chapter 11 filing, completing their obligations to deliver to the agreed FOB port through the 20-day window prior to the commencement date, and supplying the Debtors with goods that arrive for use or sale postpetition, would, appropriately, receive administrative expense priority. Under Claimants' interpretation, Overlap Vendors would have no protection or priority status: foreign vendors that supported the Debtors in the 20-day window prior to the commencement date would have general unsecured claims, while foreign vendors that stopped supporting the Debtors long before that 20-day window and even longer before the commencement date would have priority status simply because their goods were physically received in the United States closer to the commencement date.

6. Claimants' interpretation would lead to an absurd result that is contrary to the agreed objective of section 503(b)(9). Under Claimants' approach, vendors would be incentivized to <u>stop</u> supporting distressed companies <u>sooner</u>, to the detriment of all of the companies' many stakeholders. None of the Responses justify this anomalous result. (Rather, certain of Claimants previously acknowledged that it would be absurd for claims for goods shipped later to receive lower priority than goods shipped earlier. *See* Winners Reply, ¶ 15 ("This is an absurd result and would discourage vendors from continuing business with entities on the verge of bankruptcy.")). "In all events, the Court's charter is to interpret the statute [] 'in a way that avoids absurd results.'" *Del-Orden v. Bonobos, Inc.*, Case No. 17 Civ. 2744 (PAE), 2017 WL 6547902, at *7 (S.D.N.Y. Dec. 20, 2017). *Sorrells v. United States*, 287 U.S. 435, 450 (1932) ("To construe statutes so as to avoid absurd or glaringly unjust results, foreign to the legislative purpose, is . . . a traditional and appropriate function of the courts.").

---

from a post-petition transaction with a debtor).



7.      None of the Responses justify the inequality of treatment among similarly situated creditors that would result from using Claimants' definition of "receive," in spite of "the Bankruptcy Code's strong policy favoring equal treatment of creditors." *See N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 97 (2d Cir. 1997).  Claimants' position would award priority disparately based on external factors outside of the creditors' control, while the Debtors' position avoids this result.  Vendors that deliver goods FOB at the port of origin on the same day will be treated similarly under the Debtors' definition, while they could be treated differently under Claimants' definition based on, among other things: point of destination (including geographic location and ownership of facility); the speed or shipping route used by the common carriers (and selected by a debtor); and any delays, including for severe weather conditions.  Moreover, the date on which a debtor takes physical possession of its own goods relies on the recordkeeping and books of the debtor or a third party, is not easily determined, and likely remains unknown (and otherwise irrelevant) to the shipping vendor, as the vendor's obligations have been completed and the debtor's obligation to pay is triggered by delivery at the port or origin. In these circumstances, it is unlikely that Congress intended to create an entirely new class of

administrative expense priority claimants based on physical possession of goods; rather, it is likely that Congress intended to use a simple, objective metric (the date that title and risk of loss are transferred to a debtor at the mutually agreed FOB port) that the debtor and the shipping vendors have already determined is the key benchmark date for governing their business relationship. The *World Imports I* and *World Imports II* courts recognized the importance that the CISG places on contracting parties abiding by uniform business practices and commercial standards – it is reasonable to believe that Congress expected bankruptcy courts to import these existing contract principles into their interpretation of the Bankruptcy Code. *See World Imports I*, 511 B.R. 738, 744 (Bankr. E.D. Pa. 2014); *World Imports II*, 549 B.R. 820, 823-24 (E.D. Pa. 2016).



8. Certain Claimants argue that the Debtors' definition of "received" is incorrect because Claimants had the right to stop goods in transit even after title and risk of loss had passed to the Debtors. This argument fails upon inspection. There is no evidence that Congress intended to tie entitlement to administrative expense priority to a vendor's ability or inability to stop goods in transit. To the contrary, given Congress' clear intent to protect vendors

7

supporting companies in distress, Congress could have chosen to provide vendors with section 503(b)(9) priority claims even while the vendors' purported rights to stop shipments of goods in transit existed. Indeed, Congress did expressly choose to provide vendors with section 503(b)(9) priority claims even while the vendors' rights to reclamation existed.

9. Whether or not particular Claimants or other creditors could have stopped shipments of goods in transit is not relevant for purposes of interpreting or awarding priority pursuant to section 503(b)(9). But, for the avoidance of doubt, the Debtors do not concede that Claimants could have stopped goods in transit without violating the Bankruptcy Code's automatic stay.[6] Further, the Debtors do not concede that Claimants could have satisfied the underlying requirements to stop any shipped goods in transit.[7] Finally, the Debtors do not waive any

---

[6] *See, e.g.*, *In re A. Marcus Co.*, 64 B.R. 207, 210 (N.D. Ill. 1986) ("Since the risk of loss had shifted to the buyer it is not clear that the seller would have authority to stop the goods in transit."); *Warrior Tombigbee Transp. Co. v. 5,775.674 Net Tons of Coal*, 570 F. Supp. 1405, 1413 (S.D. Ala. 1983) ("The statute gives the right to stop 'delivery.' Obviously, in order to stop 'delivery,' it is imperative that the goods not yet be delivered. . . . [T]he coal was sold 'F.O.B. barge.' . . . [I]t is clear that 'delivery' was made. . . . Thus, it was impossible for 'delivery' to be 'stopped.'"); *In re Darlington Co.*, 163 F. 385, 387 (E.D.N.Y. 1908) ("If a purchaser ships goods at a price f.o.b. at the point of shipment, and the consignee is liable at the point of delivery . . . the exact time at which title passes . . . so that the rights of his creditors may intervene, is susceptible of different opinions."). Certain Claimants attempt to draw an analogy between the instant case and *The Nat'l Sugar Ref. Co. v. C. Czarnikow, Inc. (In re The Nat'l Sugar Ref. Co.)*, 27 B.R. 565 (S.D.N.Y. 1983), which they argue provides Claimants with an unfettered right to interrupt the Debtors' business and stop goods in transit. But *Nat'l Sugar* stands only for the contention that shipping vendors have the right to stop goods in transit if certain requirements are met, and that such a right is not automatically terminated upon the passing of title for such goods. The 35-year old case is not useful for this Court's current analysis. The Debtors note that in that case, as opposed to this case, the vendor did stop goods in transit, and the court there found that the vendor satisfied all of the requirements to do so legally only after live testimony and an evidentiary hearing days after the chapter 11 filing (not in hindsight hypothetically). Further, *Nat'l Sugar* was decided long before Congress enacted section 503(b)(9), making it irrelevant for helping this Court determine what impact, if any, the right to stop goods in transit would have upon an analysis of when a debtor had received such goods for purposes of section 503(b)(9) (the key question here, which was not at issue in *Nat'l Sugar*).

[7] Claimants assert that they had the right to stop goods in transit to the Debtors under both article 71 of the CISG and section 2-705 of the UCC. Such rights are narrow and not unrestricted. *See* U.C.C. § 2-705 (AM. LAW INST. & UNIF. LAW COMM'N 2002); United Nations Convention on Contracts for the International Sale of Goods, art. 71, Apr. 11, 1980, S. TREATY DOC. NO. 98-9 (1983), 19 I.L.M. 668 (1980). *See also In re Nevins Ammunition, Inc.*, 79 B.R. 11, 16 (Bankr. D. Idaho 1987) (finding that a vendor's right to stop goods in transit is subject to the applicable shipment terms because "[t]he choice of shipping terms may alter [] details of performance through to the completion of the contract, i.e. risk of loss, transfer of title, etc."). Each of these legal requirements are highly fact-dependent and may vary from vendor to vendor, making it unlikely that Congress would have wanted the right to stop shipments of goods in transit to be determinative for entitlement to a section 503(b)(9) priority claim.

arguments that even if Claimants could have stopped shipments of goods in transit, their election not to do so was a waiver of their rights.

10. Contrary to Claimants' assertion, the plain meaning of the word "receive" (both in common English and in legal usage) does not necessitate physical possession. The primary legal definition of the word "receive" is "[t]o *acquire* or get something." *Receive*, BLACK'S LAW DICTIONARY (emphasis added). In common English, the primary definition of the word "receive" is "[t]o take or *acquire* (something given or offered); get or be given." *Receive*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (emphasis added). The primary definition of the word "acquire" (as used in both definitions of the word "receive") is "to get something; *to come to own something*; to come to have something." *Acquire*, MERRIAM-WEBSTER DICTIONARY (emphasis added). As set forth in the Objection, the Debtors take ownership of the goods at issue once the shipping vendors deliver the goods to the Debtors' third-party carriers FOB at the port of origin, which is the point in time when title and risk of loss for such goods transfer from the shipping vendors to the Debtors. Thus, even though the Debtors have not yet taken physical possession of such goods at that point in time, they have "received" such goods in accordance with that term's plain meaning.

11. And while Claimants may insist that "received" must have the same meaning in both section 503(b)(9) and section 546(c), established Supreme Court precedent provides otherwise:

> Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent. Where the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to

9

meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed. It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Legislature intended it should have in each instance.

*Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) (internal citations omitted); *see also Dewsnup v. Timm*, 502 U.S. 410, 417 n.3 (1992) ("Accordingly, we express no opinion as to whether the words 'allowed secured claim' have different meaning in other provisions of the Bankruptcy Code."); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1446 (D.C. Cir. 1996) (noting the "judicial presumption that 'identical words used in different parts of the same act are intended to have the same meaning,'" but qualifying that "[t]he Supreme Court in *Atlantic Cleaners*, however, identified . . . situations in which the same-word same-meaning presumption would not apply.").

12. As set forth in the Objection, section 546(c) codifies a preexisting state law right of reclamation for which there is no independent federal entitlement, while section 503(b)(9) is a creature of federal bankruptcy law that does not otherwise exist under state law. The interplay between these sections of the Bankruptcy Code falls squarely into the carve-out espoused by *Atlantic Cleaners* for which the "same-word same-meaning presumption" does not apply.

13. Certain of the Responses wrongly suggest that the Debtors propose a variable standard that depends on whether contracting parties are subject to the CISG or are foreign or domestic businesses. The Debtors' position is that there is only one interpretation for when goods are "received" for purposes of section 503(b)(9) that is applicable to all shipping vendors.[8] The prior existence of the CISG, coupled with the absurdity of any other interpretation of the word

---

[8] Indeed, the CISG does not apply to many of the Debtors' contracts with their shipping vendors, but whether any particular vendor was a party to a contract that applied the CISG is not relevant to this Court determining Congress' intent with respect to section 503(b)(9).

10

"received" for purposes of section 503(b)(9), signifies that Congress intended for the transfer of title and risk of loss for goods shipped to constitute the key date for determining whether claims for such goods are entitled to priority pursuant to section 503(b)(9).  While contracting parties are free to negotiate and agree as to when title and risk of loss may transfer for goods being shipped to buying companies (such as by selecting the date that such goods are delivered to the agreed FOB port), they cannot alter the plain meaning of certain provisions of the Bankruptcy Code or the priority scheme for recoveries set forth therein.  *Cf.* 11 U.S.C. § 365(e)(1) ("Notwithstanding a provision in an executory contract . . ., an executory contract . . . may not be terminated or modified . . . at any time after the commencement of the case solely because of a provision in such contract . . ."); 11 U.S.C. § 365(f)(1) ("[N]otwithstanding a provision in an executory contract . . . that prohibits, restricts, or conditions the assignment of such contract . . ., the trustee may assign such contract . . .").

14. As the Debtors previously argued successfully, Claimants' reference to the Debtors' "first day" comfort order is irrelevant in this context.  By its express terms, this Court's order did not elevate general unsecured claims to administrative claims: "nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party."  *Final Order Authorizing Debtors to (I) Pay Prepetition Claims of (A) Shippers, Warehousemen, and Other Non-Merchandise Lien Claimants and (B) Holders of PACA/PASA Claims, and (II) Confirm Administrative Expense Priority for Prepetition Orders Delivered to the Debtors Postpetition, and Satisfy Such Obligations in the Ordinary Course of Business* (ECF No. 843), ¶ 12.

15. Based on all of the foregoing, the Debtors request that this Court overrule the Responses and sustain the Objection.

16. The Debtors reserve all rights to supplement this reply and to make additional arguments at the hearing scheduled to consider the Objection.

Dated: January 21, 2020
     New York, New York

                          */s/ Garrett A. Fail*
                          Ray C. Schrock, P.C.
                          Jacqueline Marcus
                          Garrett A. Fail
                          Sunny Singh
                          WEIL, GOTSHAL & MANGES LLP
                          767 Fifth Avenue
                          New York, New York 10153
                          Telephone: (212) 310-8000
                          Facsimile: (212) 310-8007

                          *Attorneys for Debtors*
                          *and Debtors in Possession*