**Hearing Date and Time: January 28, 2020 at 10:00 a.m. (Eastern Time)**
**Objection Deadline Date and Time: January 21, 2020 at 4:00 p.m. (Eastern Time)**

FERRAIUOLI LLC
390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Telephone: (407) 982-7310
Facsimile: (787) 766-7001
Email: scolon@ferraiuoli.com
Email: gchico@ferraiuoli.com


Attorneys for *Santa Rosa Mall, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

**MOTION FOR AND AN ORDER FINDING THE AUTOMATIC STAY INAPPLICABLE OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY AND MEMORANDUM IN SUPPORT THEREOF**

TO THE HONORABLE COURT:

COMES NOW Santa Rosa Mall, LLC ("Santa Rosa"), by and through its undersigned counsel, and pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001(d) ("Rule 4001(d)"), Local Rule 4001-1 ("LBR 4001-1"), and the *Amended Case Management Order* (Docket No. 405), hereby moves for an order finding that the automatic stay does not apply and/or should not be extended to protect third-party non-debtors and, in the alternative, relief from the automatic stay for cause as follows:

Preface or Introductory Remarks[1]

As an introductory matter, Santa Rosa does not seek relief to commence an action against the Debtors or any third-parties whose identity or interests are so closely intertwined with those of the Debtors that a suit against such third-parties is essentially a suit against the Debtors.  Rather, it seeks to pursue independent non-bankruptcy causes of action against Lex-London, a Division of AIG Europe Limited, AIG

---

[1] Capitalized terms used but not otherwise defined in these introductory remarks shall have the meanings ascribed to them below.

Europe Limited, Lexington UK, *among others* (collectively, the "Underwriters") [2] and Aon UK Limited, Aon Risk Services Central, Inc. d/b/a/ Aon Risk Insurance Services Central, Inc., and/or Aon Property Risk Consulting, Inc. (collectively "Aon"), on account of its status as an additional named insured and/or loss payee under Policy No. PTNAM1701557. While Santa Rosa has been granted relief from the automatic stay to pursue its claims against Aon[3], it now moves for an order finding the automatic stay inapplicable and does not extend to the Underwriters or, in the alternative, for relief from the stay for cause.

Santa Rosa submits that, the automatic stay does not extend to third-party non-debtors, such as the Underwriters, save "clear and convincing evidence" that "unusual circumstances" exist to warrant such relief. The Debtors have previously objected to the lifting of stay as to the Underwriters relying solely on the existence of a certain *Settlement Agreement*'s indemnity clause which purportedly provides the "unusual circumstance" standard.[4] Santa Rosa submits that the aforementioned indemnity clause is unenforceable because, as hereinafter discussed in detail, (i) "[n]o one should be permitted to take advantage of its own wrong, to [fund] any claim upon his own inequity or to acquire property by his own crime"[5], (ii) Debtors' failed to comply with Fed. R. Bankr. P. 9019, and/or (iii) Debtors cannot justify extending the protections of the stay as no complex litigation involving liability insurance policies nor potential claimants that threaten, burden, or otherwise impede Debtors' reorganization efforts.

Instead, the relief sought by this motion is straightforward and will facilitate the most efficient and equitable result under applicable non-bankruptcy law: the resolution in a single proceeding and forum of an insurance claim that has been adjusted and improperly paid by the Underwriters under Policy No.

---

[2] Pursuant to Article 11.220 of the PR Insurance Code, 26 L.P.R.A. §1122, when, as is in the present case, there is more than one underwriter, they are each regarded as both jointly and severally responsible for the payment of any claim insured in connection with Store No. 1915.

[3] See *Stipulation, Agreeement[sic], and Order Between the Debtors and Santa Rosa Mall, LLC Granting Limited Relief From the Automatic Stay* ("*Stipulation and Order*", Docket No. 5537).

[4] See *Debtors' Objection to Motion for Relief from the Automatic Stay []* ("*Objection to Relief from Stay*", Docket No. 4224).

[5] *Riggs v. Palmer*, 115 N.Y. 506, 506 (1889). See also *Deitrick v. Greaney*, 309 U.S. 190, 196 (1940), citing *United States v. Dunn*, 268 U.S. 121, 133 (1925) and *Independent Coal & Coke Co. v. United States*, 274 U.S. 640, 648 (1927).

PTNAM1701557 disregarding Santa Rosa's rights as additional named insured or loss payee without Santa Rosa's knowledge or consent.

Furthermore, Santa Rosa submits that relief from the automatic stay is appropriate for cause because the Underwriters knew or should have known that Santa Rosa was an additional named insured and/or loss payee under Policy No. PTNAM1701557. Consequently, Santa Rosa has a direct and distinct cause of action against them. In addition, because the insurance funds improperly paid to Debtors for damages caused to a property located in the Commonwealth of Puerto Rico, the action against the Underwriters should be initiated before the United States District Court for the District of Puerto Rico which is **the only forum** where a direct action may be filed under applicable non-bankruptcy law and the appropriate venue for all of Santa Rosa's claims to be adjudicated.

Jurisdiction and Venue

This Honorable Court has jurisdiction over the present controversy pursuant to 28 U. S. C. §157, 1334 and 11 U. S. C. § 362. Venue is proper under 28 U.S.C. §1409.

Factual and Procedural Background

1.      On October 15, 2018, the Debtors filed their voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").

2.      Sears, Roebuck de Puerto Rico, Inc., leased retail space from Santa Rosa Mall in Bayamón, Puerto Rico ("Store No. 1915" or the "Demised Premises") pursuant to a *Lease Agreement* executed on September 22, 1965. See *Lease Agreement*, **Exhibit 1.**

3.      Section 6.01 of the *Lease* required that the Debtors "maintain at [its] sole cost and expense, for the benefit of [Santa Rosa] and [the Lessee], insurance with respect to the Demised Premises" for risks including "windstorm". Id. § 6.01(a), p. 26. Such insurance policy "shall be secured promptly and certificates thereof shall be furnished to [Santa Rosa]" and "shall contain loss payable clause to [Santa Rosa] and [Lessee]". Id., § 6.02(a), pp. 26-27. Renewals of the insurance policies are also subject to the foregoing. Id., § 6.02(b), p. 27.

4.      In the event of damage by windstorm or any other casualty to the Demised Premises, such

as that caused by Hurricanes Irma and Maria, Section 6.03(b) (2) of the *Lease* required that Lessee "proceed with all reasonable expedition to restore or rebuild [] the building so destroyed or rendered untenantable, free from liens of any kind, in substantial accordance with the plans and specifications of the building so destroyed or rendered untenantable []".

5.      Section 6.03(b)(3) of the *Lease Agreement* further mandates as follows:

The net sums recovered by [Santa Rosa] and [Lessee] on account of loss or damage whether under the policies taken out as aforesaid, or under other insurance policies taken out by [Lessee] and indemnifying for physical loss (as distinguished from the loss of use and occupancy. or profits), **shall by deposited in a special account in the name of [Santa Rosa] separate and distinct from all other funds of [Santa Rosa I] in a bank or trust company of the City of San Juan, Puerto Rico, approved by [Santa Rosa] and [Lessee] to be applied on account of the cost of such restoration or rebuilding**, as the case may be, as the work of restoration or rebuilding progresses …

Id., § 6.03(b) (3), pp. 28-29 (emphasis added).

6.      On or about May 30, 2017, the Debtors obtained a *Contract of Insurance* with the Underwriters under Policy No. PTNAM1701557 (the "*Contract of Insurance*") for the period of June 1, 2017 to June 1, 2018. See *Contract of Insurance*, **Exhibit II.**

7.      Pursuant to the *Contract of Insurance*, Santa Rosa is included among the insured.  Id. at p. 3 ("Named Insured" is defined as "Sears Holdings Corporation and any subsidiary, affiliated, associated, or allied company, corporation, firm, organization, partnership, joint venture, joint lease, or joint operating agreement [], as their respective interest may appear; **and any other party for which the Insured has the responsibility for providing insurance, as their respective interest may appear**.") (Emphasis added).

8.      Paragraph 39 of the *Contract of Insurance* further provides:

It is agreed that Aon Risk Services, Inc. are authorized to issue Certificate(s) or Evidence(s) of Insurance… naming Additional Named Insured(s), Loss Payee(s) or Mortgagee(s), and others for their respective rights and interests, subject always to the terms, conditions and limits of endorsements in respect of such additional interests.

Id. at p. 27, ¶ 39.

9.      On September 20, 2017, Store No. 1915 was substantially damaged by the passing of Hurricane Maria.  Thereafter, Store No. 1915 closed its doors.  The Court may take judicial notice of the passing of Hurricane Maria, as well as its trajectory and aftermath under Fed. R. Evid. 201.

10.     On October 2, 2017, the Debtors, via email, "acknowledge[d] its duty to insure and repair the [Demised Premises] for damage caused by Hurricane Maria. See *Email from the Debtors to CCM[6], dated October 2, 2017*, **Exhibit III.**

11.     On or about October 23, 2017, CCM requested by letter to "be kept informed of the status of the insurance claim [and] that any insurance proceeds [be] deposited as required by the Lease Agreement." See *Letter from CCM to the Debtors dated October 23, 2017*, **Exhibit IV.**

12.     On or about October 25, 2017, Aon Risk Services Central, Inc., d/b/a/ Aon Risk Insurance Services Central, Inc., issued a *Certificate of Insurance* No. 570069040317 ("*Certificate of Insurance*") regarding Policy No. PTNAM1701557 which covered "Sears Store No. 1915 Santa Rosa Mall, Bayamon, P.R., for the period of June 1, 2017 to June 1, 2018, in accordance with the policy provisions of the *Contract of Insurance*. See *Certificate of Insurance*, **Exhibit V.**

13.     On even date—that is, after the passing of Hurricane Maria—the *Certificate of Insurance* was emailed to both Santa Rosa and the Debtors by Aon Client Services, a department of Aon Client Services Central, Inc. d/b/a/ Aon Risk insurance Services Central, Inc. See *Email from Aon to CCM and the Debtors dated October 25, 2017*, **Exhibit VI.**

14.     The "Additional Remarks Schedule" of said *Certificate of Insurance* states that,

Santa Rosa Mall, LLC… and Commercial Centers Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

Id. at p. 3.

15.     On October 26, 2017, the Debtors informed CCM that "[w]e [Sears] agree that the Lease Agreement [] requires [Sears] to repair the building for damage or destruction []. Sears has an insurance claim for this loss", referring to Santa Rosa's damages, and that "**[o]nce the insurance payment [is] received arrangements will be made for it to be deposited with an agreed bank**". *Letter from the Debtors to CCM dated October 26, 2017*, **Exhibit VII.**

---

[6] The term "CCM" shall mean Commercial Centers Management S. en C., Santa Rosa's general administrator.

16.     On October 30, 2017, CCM wrote to the Underwriters thru AIG Insurance Company Puerto Rico requesting "to be informed as of the filing of any claim under [Policy No. PTNAM1701557] as well as the processing of the same, and that any insurance proceeds be deposited as required by the Lease Agreement".  *Letter from CCM to AIG dated October 30, 2017*, **Exhibit VIII**.

17.     On June 6, 2018, Dale Menéndez, Director of Claims-Risk Management at Sears Holdings Management Corporation wrote to CCM confirming that "Sears Holding Corporation **will provide all monies** required to restore and rebuild [Store No. 1915] as required by the Lease."[7]  *Letter from the Debtors to CCM dated June 6, 2018*, **Exhibit IX** (emphasis and underline added).  The *June 6, 2018 Letter* further stated that the anticipated "Grand Reopening" date for Store No. 1915 was January 1, 2019.

18.     After the Petition Date, *to wit*, October 15, 2018, Debtors suspended the limited initial reconstruction efforts in the Demised Premises.

19.     On November 19, 2018, the Court entered an *Order Approving Global Bidding Procedures [] (the "Global Bidding Procedures Order"*, Docket No. 816) regarding the sale/disposition of certain assets, scheduling auctions and hearings for approval of proposed sale transactions and approving the procedures for the assumption and assignment of executory contracts and unexpired non-residential leases.

20.     Upon information and belief, on or about January 17, 2019, the Debtor, through Dale Menéndez, in his capacity as Director of Property Claims-Risk Management at Sears Holdings Management Corporation, executed a *Confidential Settlement and Release Agreement* (the "*Settlement Agreement*") with the Underwriters, on account of the Hurricane Irma and Hurricane Maria Loss, as further described therein.  See *Settlement Agreement,* **Exhibit X.**

21.     Paragraph 5 of *Settlement Agreement* reads as follows:

> The Releasor[, i.e., the Debtors,] further warrants that [it] **is the only party of interest with regard to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim under the Policies, including any and all claims that were made, could have been made, or could be made in the future under the Policies for the Hurricane Irma Loss, Hurricane Maria Loss and the Claim** and that it has not assigned or otherwise transferred or attempted to

---

[7] Tellingly, it must be highlighted that Mr. Menéndez is the same officer who about seven months later executed the *Settlement Agreement* on behalf of Debtor and represented that no other parties had claims concerning the insurance proceeds.

transfer, either separately or collectively, any of its legal actions, claims, demands, rights, actions, causes of action and/or damages related to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, including any and all claims that were made, could have been made, or could be made in the future under the Policies in relation to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, all of which are all released in this Agreement. Releasor **further warrants that, to its knowledge, none of its affiliated, subsidiaries, administrators, shareholders, trustees, and creditors are parties of interest with regard to any portion of the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, including any and all claims that were made, could have been made, or could be made in the future under the Policies in relation to the Hurricane Irma Loss, Hurricane Mari Loss and the Claim**.

Id., at ¶ 5 (emphasis added).

22.     In view of the representations made in Paragraph 5 above, and in exchange for certain sums, the Debtors agreed:

to hold harmless, indemnify, and defend the [Underwriters] from any and all actions, demands, and claims under the Policies which Releasor, or any mortgagee, co-owner, coinsured, **additional insured, and/or loss payee**, assignee, or subrogee of Releasor or any other person, including but not limited to **owner(s) and/or landlord(s) of any of** Releasor's **properties**, may assert at a later date arising out of the matters herein released.

Id., at ¶ 6 (emphasis added).

23.     The Debtors neither gave notice of the *Settlement Agreement* nor requested its approval in overt violation of the provisions of Fed. R. Bankr. P. 9019.

24.     On January 23, 2019, Santa Rosa's undersigned counsel informed AIG Europe Limited that "any insurance proceeds recovered for loss or damage be issued jointly to the Debtors and Santa Rosa so that funds can be deposited in a segregated account to be used only for the repairs to Store 1915, in compliance with Section 6.03(b) (3) of the *Lease Agreement*". See *Letter to AIG dated January 23, 2019,* **Exhibit XI.**

25.     On January 26, 2019, Santa Rosa filed a *Standing Objection to Global Asset Sale Transaction* (the "*Standing Objection*", Docket No. 2013), wherein it sustained that insurance proceeds obtained from the global settlement relative to Santa Rosa's claim for damages should be used for the reconstruction of Store No. 1915 or be deposited in escrow with Santa Rosa as the Landlord or Lessor, in accordance with the terms of the *Lease Agreement*. We incorporate by reference the *Standing Objection* (Docket No. 2013) as if fully transcribed herein.

26.     On February 8, 2019, the Court entered an *Order [] Approving the Asset Purchase Agreement []* (the "*Sale Order*", Docket No. 2507). As part of the *Asset Purchase Agreement*, the Debtors allegedly transferred all title to the proceeds obtained from the *Settlement Agreement* to the Buyer, minus a cap of $13,000,000.00.[8] See Docket No. 2507-1, pp. 56-58, § 2.1(q); Docket No. 2507-1, Schedule 2.1(q), p. 1003.

27.     On April 30, 2019, the Debtors filed a *Notice of Rejection of Certain Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* (Docket No. 3449) rejecting the *Lease Agreement* for Store No. 1915, id. at p. 11, and consequently lost any leasehold or proprietary interest in Store No. 1915 as well as any diminished insurable interest it may have had in the insurance proceeds.

28.     On May 1, 2019, Santa Rosa filed a *Motion for Relief from Stay and Memorandum in Support Thereof and/or to Declare that the Insurance Proceeds Are Not Part of the Bankruptcy Estate* (the "*Motion for Relief from Stay*", Docket No. 3475). We incorporate by reference the *Motion for Relief from Stay* as if fully transcribed herein.

29.     On June 13, 2019, Debtors filed an *Objection to Relief from Stay* (Docket No. 4224), wherein they alleged, *inter alia*, that relief from the automatic stay would "harm the Debtors and the estates to the detriment of all creditors in light of the indemnity provision in the Settlement Agreement." Id. at p. 7, ¶19.

30.     A hearing on the *Motion for Relief from Stay* and the *Objection to Relief from Stay* was held on June 20, 2019. Therein, this Honorable Court stated: "I'm not going to deny [the *Motion for Relief from Stay*]. You can keep it on the calendar and put it on for a hearing after a ruling in the adversary proceeding on the merits." *June 20 Hearing Transcript*, 86:4-6. The Adversary Proceeding is no longer pending before this Court.

31.     On July 23, 2019, Courtney E. Murphy, Esq., counsel for Lexington UK, a division for

---

[8] *Declaration of Sunny Sigh* (Docket No. 2344 pp. 236-237, ¶¶ 9-9) ("In addition, the debtors… retain 13 million dollars in hurricane insurance proceeds").

AIG, responded to CCM's *January 23, 2019 Letter*. Therein, AIG stated the following:

> As final payment has been made in connection with all covered loss and damage to covered locations as provided by the subject Policies and the January 17, 2019, Release, no further payments will be made under the subject Policies. Having complied with the terms of the Policies and the Release with the Named Insured –SHC—it is Lexington's position that this matter is fully and finally resolved and no further discussion need be held to discuss any further or additional resolutions.

<u>See</u> *Letter from AIG to CCM dated July 23, 2019*, **Exhibit XII**, p. 3.

32.    On September 11, 2019, Santa Rosa filed a *Supplemental Motion for Relief from Stay or in the Alternative, for an Order Finding the Automatic Stay Inapplicable and Memorandum of Law in Support Thereof* (the "*Supplemental Motion for Relief from Stay*", Docket No. 4124), requesting relief from the automatic stay to pursue its claims against Aon and the Underwriters.

33.    At the October 7, 2019, confirmation hearing, the Court granted the Debtors' *Modified Second Amended Plan* (the "*Plan*") and ordered the Debtors file a letter with the Court clarifying the injunction provision provided in Section 15.8(b). The Debtors complied with the Court's direction and filed a letter on October 11, 2019, clarifying that Section 15.8(b) did not enjoin any actions against non-debtor third-parties.

34.    On October 15, 2019, the Court entered an *Order* (Docket No. 5370) confirming Debtors' *Plan*.

35.    On October 21, 2019, the Debtors and Santa Rosa executed and filed the *Stipulation and Order* (Docket No. 5435), wherein they agreed to modify the automatic stay "to permit Santa Rosa to pursue independent causes of action against Aon". <u>Id</u>. at p. 9, ¶ 2. The *Stipulation and Order* was approved by the Court on October 30, 2019. <u>See</u> Docket No. 5537. Consequently, Santa Rosa withdrew its *Supplemental Motion for Relief from Stay* without prejudice.

36.    Pursuant to Sections 105 and 362(d)(1) of the Bankruptcy Code, and as explained below, Santa Rosa respectfully requests the Court to find that the automatic stay does not extend to the Underwriters or, in the alternative, grant relief from the automatic stay for cause.

Applicable Law and Discussion

**A.    *Extension of the Automatic Stay Does Not Apply Automatically to Third-Party Non-Debtors***

37.    Section 362(a)(1) of the Bankruptcy Code provides that the filing of a bankruptcy petition

operates as a stay of "the commencement or continuation … of a judicial, administrative, or other action or

proceeding **against the debtor** that was or could have been commenced before the commencement of the

case under this title." 11 U.S.C. § 362(a)(1) (emphasis added).

38.    Generally, "the Automatic Stay applies only to the debtor and **does not stay proceedings**

**brought against non-bankrupt co-defendants**." *Millard v. Developmental Disabilities Institute, Inc.,* 266

B.R. 42, 44 (Bankr. E.D.N.Y. 2001) (emphasis added). See *e.g., Franco v. Ideal Mortgage Bankers, Ltd.,*

2017 WL 5195223, 2017 U.S. Dist. LEXIS 186194 (E.D.N.Y. 2017); *Demel v. Group Benefits Plan for*

*Employees of Northern Telecom, Inc.*, 2010 WL 167947, at *1 (S.D.N.Y. 2010) ("Courts normally do not

extend an automatic stay under 11 U.S.C. § 362(a)(1) to non-debtor co-defendants"); *In re McCormick*,

381 B.R. 594, 600 (S.D.N.Y. 2008) ("The Second Circuit has explained that the automatic stay pursuant to

§ 362(a) is generally limited to debtors and does not encompass non-bankrupt codefendants.") (citations

omitted); *Wynn v. AC Rochester General Motors, Corp.*, 155 Fed. App'x 528, 528 (2nd Cir. 2005) ("the stay

[pursuant to Section 362] is not automatically applicable to the non-bankrupt co-defendants"); *Nippon Fire*

*& Marine Ins. Co. v. Skyway Freight Sys., Inc.*, 235 F.3d 53, 58 (2nd Cir. 2000) ("stays pursuant to § 362(a)

are limited to debtors and do not encompass non-bankrupt co-defendants."); *Teachers Ins. & Annuity Ass'n.*

*v. Butler*, 803 F.2d 61, 65 (2nd Cir.1986) ("It is well established that stays pursuant to § 362(a) are limited

to debtors and do not encompass non-bankrupt co-defendants."); *Gray v. Hirsch*, 230 B.R. 239, 241 (Bankr.

S.D.N.Y. 1999) (same); *In re Crazy Eddie Securities Litigation*, 104 B.R. 582, 584 (Bankr. E.D.N.Y. 1989)

(automatic stay did not preclude action against debtor's codefendants that are not so bound by statute or

contract that the liability of the codefendants is automatically imputed to the debtor by operation of law).

39.    The Second Circuit has recognized a limited exception to this general rule and held that

the  automatic stay may be extended to non-debtors in "unusual circumstances" where "a claim against the

non-debtor will have an immediate adverse economic consequence for the debtor's estate," *Queenie, Ltd.*

*v. Nygard Int'l*, 321 F.3d 282, 287 (2nd Cir. 2003), or where removing the stay would pose "a serious threat

to the debtor's reorganization efforts." *Demel*, 2010 WL 167947, at \*1.  However, "extensions of the

Automatic Stay **are the exception rather than the rule and are not favored absent some [un]usual**

**circumstance**."  *Millard*, 266 B.R. at 45 (citing *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31,

32 (S.D.N.Y. 1990)) (emphasis added).

40.      Although the protections of the automatic stay may be extended to third-party non-debtor

entities under certain circumstances, it is an extraordinary exercise of Bankruptcy Court's equitable

discretion.  The circumstances of a case must be sufficiently "unusual" to merit such and expansion.

41.      The debtor or non-debtor movant must make an affirmative act and shall bear the "burden

of both proof and persuasion" that circumstances warrant extending the protections of the automatic stay.

<u>See</u> *In re FPSDA I, LLC*, 2012 WL 6681794, at \*8 (Bankr. E.D.N.Y. 2012) (Slip Copy) ("[T]he movant

must show by 'clear and convincing evidence' that extension of the stay is warranted").

42.      Santa Rosa submits that the automatic stay does not extend to the Underwriters third-party

non-debtor in this case.  The Debtors have not demonstrated by "clear and convincing evidence" that

"unusual circumstances" or "unity of interest" exists to warrant extending the protections of the automatic

stay to the Underwriters.  The only matter to which the Debtors have alluded to in their *Objection to Relief*

*from Stay* (Docket No. 4224) and at the June 20, 2019 hearing is the existence of an indemnity clause in the

*Settlement Agreement* whereby the Debtors represented that no other party of interest had a claim to the

Hurricane Irma and Hurricane Maria Loss, or the insurance proceeds to be derived from Policy No.

PTNAM1701557 despite both the Underwriters and the Debtors having received previous notifications

from Santa Rosa and CCM to the contrary.  Minimal due diligence on the part of the Underwriters would

have confirmed that Santa Rosa had a claim associated with Policy No. PTNAM1701557 on account of its

insurable interest over the property and its right as an additional named insured and/or a loss payee.

43.      Santa Rosa respectfully submits that the *Settlement Agreement*'s indemnity clause is

unenforceable also on account of Debtors' failure to comply with Fed. R. Bankr. P. 9019.  If the

Underwriters seek indemnification from the Debtor under the *Settlement Agreement*, it must be underscored

that said settlement was executed on January 17, 2019—that is, while the Debtors were in bankruptcy—and no notice was ever filed with this Court and no motions were made seeking its approval.[9]

44.    Fed. R. Bankr. P. 9019(a) states that the court *may approve* a settlement *on motion* by the trustee or debtor-in-possession.  See Fed. R. Bankr. P. 9019(a).  In the Second Circuit, "[b]efore pre-plan settlements can take effect, ... they must be approved by the bankruptcy court pursuant to [Fed. R. Bankr. P.] 9019."  *Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 569 B.R. 534, 538–39 (E.D.N.Y. 2017) (quoting *In re Iridium Operating LLC*), 478 F.3d 452, 455 (2nd Cir. 2007).  "The purpose and effect of seeking court approval of a compromise under [Fed. R. Bankr. P.] 9019 is to bind the bankruptcy estate to the terms of any bargain struck by a ... debtor-in-possession that affects the bankruptcy estate."  *Liberty Towers Realty, LLC*, 569 B.R. at 39 (quoting *In re Lexington Jewelers Exch. Inc.*, 2013 WL 2338243, at *5, n. 12 (Bankr. D. Mass. 2013)).

45.    Outside the Second Circuit, the overwhelming majority of courts to interpret Fed. R. Bankr. P. 9019(a) have determined that a compromise or settlement is enforceable **only** if it has been approved by the bankruptcy court.  See *e.g., In re Big Apple Volkswagen*, LLC, 571 B.R. 43, 55 (S.D.N.Y. 2017) ("[R]eading Rule 9019(a) to give effect to all its provisions, the Court concludes that any compromise or settlement must be approved under the Rule to be deemed effective."); *In re Leslie Fay Companies,* 168 B.R. 294, 305 (Bankr. S.D.N.Y. 1994) ("Compromises may not be made in bankruptcy absent notice and a hearing and a court order."); *In re Pugh,* 167 B.R. 251, 253–54 (Bankr. M.D. Fla. 1994) ("[The compromise] could not have become a binding contract unless the Trustee complied with [Fed. R. Bankr. P.] 9019...."); *In re Rothwell,* 159 B.R. 374, 379 (Bankr. D. Mass. 1993) ("A settlement agreement is unenforceable without notice of the settlement to creditors or a court order approving it"); *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988) ("In bankruptcy proceedings… any compromise between the debtor and his creditors must be approved by the court as fair and equitable."); *In re Teknek, LLC,* 563 F.3d 639, 651 (7th Cir. 2009) (recognizing a settlement agreement was null and void

---

[9] While the *Settlement Agreement* is dated as being executed on "January 17, 2018", the Underwriters' counsel has advised us that the correct date is January 17, 2019.

when the bankruptcy court lacked jurisdiction to approve the agreement, "because the trustee is required to get the bankruptcy court's approval before settling claims"); *American Prairie Construction Co. v. Hoich*, 594 F.3d 1015, 1024 (8th Cir. 2010) ("It is a recognized principle of bankruptcy law that a bankruptcy court is required to approve any compromise or settlement proposed in the course of a Chapter 11 reorganization before such compromise or settlement can be deemed effective." "[A] settlement agreement made in bankruptcy has no effect when the parties to the agreement fail to comply with Fed. R. Bank. P. 9019, which requires notice to creditors and court approval."); *In re Blehm Land & Cattle Co.*, 859 F.2d 137, 141 (10th Cir. 1988) ("Under [ Fed. R. Bankr. P.] 9019, a settlement or compromise agreement between the trustee and a party must be approved by the court, after notice and hearing, to be enforceable.").

46.     It is without dispute that none of the requirements of Fed. R. Bankr. P. 9019 were met. Accordingly, to the extent that the *Settlement Agreement* was not executed "in whole or in part" in accordance with Fed. R. Bankr. P. 9019, it and its indemnity clause are unenforceable.

47.     Nonetheless, even if this Honorable Court were to uphold the *Settlement Agreement* and its indemnification clause, while an illustration of "unusual circumstance" warranting extension of the stay *may* arise where there is an entitlement to indemnification between the debtor and a third-party non-debtor, "[i]t is not enough for the movant to show some limited risk or that there is a theoretical threat to the reorganization, because it is always the case that a lawsuit against principals of the Debtor could and have effect on the reorganization. Rather, and in keeping with the principle that extending the stay to non-debtors is <u>extraordinary</u> relief, the party seeking extension of the stay must put forth real evidence demonstrating an actual impact upon, or threat to, the reorganization efforts if the stay is not extended." *In re FPSDA I, LLC*, 2012 WL 6681794, at *8 (citing *Gray v. Hirsch*, 230 B.R. 239, 243-244 (Bankr. S.D.N.Y. 1999)) (emphasis supplied).

48.     In any case, Debtors' mere indemnification obligation to a non-debtor is insufficient to justify extension of the automatic stay to non-debtors. <u>See</u>, *e.g., In re Uni-Marts, LLC*, 399 B.R. 400, 416-17 (Bankr. D. Del. 2009) (held that non-debtor's right to indemnification by debtor was insufficient to extend automatic stay protections to such non-debtor); *Holland v. High Power Energy*, 248 B.R. 53, 59

(Bankr. S.D.W.Va. 2000) ("Notwithstanding the indemnification agreement between the parties, it cannot be said that the interests of [the debtor and non-debtor third-party] are closely intertwined … merely by virtue of the agreement."). Indeed, "because the justification for extending the stay must be consistent with the purpose of the stay itself, [which is] to suspend actions that pose a serious threat to a corporate debtor's reorganization efforts", indemnification obligations alone <u>are not enough</u>. *In re SDNY 19 Mad Park, LLC*, 2014 WL 4473873, at *2 (Bankr. S.D.N.Y. 2014) (quoting *In re FPSDA I, LLC*, 2012 WL 6681794, at *11 and *In re Uni-Marts, LLC*, 399 B.R. at 400)) (quotations omitted).

49.    As such, the Debtors cannot effectively sustain that any indemnification obligation they might have in favor of the Underwriters would pose a serious threat to their reorganization efforts, especially because the Debtors have a confirmed liquidation *Plan*. Thus, there is no justification for extending the protection of the automatic stay to the Underwriters.

50.    Further, while "a suit against a third-party who is entitled to absolute indemnity by the debtor" has been noted as an "unusual circumstances" warranting extension of the stay to non-debtors, *A. H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.1986), that would be the case in "very large complex reorganizations" where "the litigation sought to be stayed presented very formidable discovery and other demands, together with very large numbers of potential claimants," *In re FPSDA I, LLC*, 2012 WL 668794, at *15, such is not the case here. [10]

---

[10] Although in *A. H. Robins, supra*, the U.S. Court of Appeals for the Fourth Circuit found that in "unusual circumstances," the automatic stay could be extended to action against non-debtors, including debtors' insurance company, the circumstances that gave way to that holding are distinguishable from the case at bar. In *A. H. Robins*, thousands of actions were initiated against the debtor and its insurance provider, forcing the debtor to file for bankruptcy. The plaintiffs in various non-bankruptcy actions sought to sever their actions against the debtor in order to proceed against the debtor's co-defendants, which included the debtor's insurer. In affirming the District Court's decision, the U.S. Court of Appeals for the Fourth Circuit affirmed the injunction staying the plaintiffs' suits against debtor's co-defendants because there was such identity between the debtor and the third-party co-defendants that the debtor may be said to be the "real party defendant" and a judgment against such third-party co-defendants would in effect be a judgment or finding against the debtor. The continuation of such litigation threatened the property of *A. H. Robins*' estate, and burdened and impeded the debtor's reorganization efforts.

On the other hand, in *Franco, supra*, the U.S. District Court for the Eastern District of New York held: "A court should not extend the automatic stay where the non-debtor is independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty." *Franco v. Ideal Mortgage Bankers, Ltd.*, 2017 WL 5195223, at *7, 2017 U.S. Dist. LEXIS 186194, at *4-5 (E.D.N.Y. 2017) (citations and internal quotations omitted) (emphasis supplied). In the instant case, Santa Rosa sustains that unlike the liability

51.    Instead, none of the "unusual circumstances" that may justify extending the protections of

the stay to non-debtors like those in *A. H. Robins* are present in this case, *inter alia* because *A. H. Robins*

dealt with liability claims while the claim against the Underwriters in this case relate to a property insurance

claim.  Plainly, this is not the type of bankruptcy case that justifies extending the protections of the

automatic stay to non-debtor third parties, such as the Underwriters.  See*, e.g., In re First Cent. Fin. Corp.,*

238 B.R. 9, 19 (Bankr. E.D.N.Y. 1999) (noting that cases extending protections of automatic stay involve

numerous lawsuits that would have otherwise resulted in a "massive depletion of estate assets and inhibited

key personnel from the important business of getting the corporate debtor back on its feet").  Here, no

reorganization is contemplated for the Debtors' only "going concern" assets have been sold and the

Debtors' liquidation *Plan* has been confirmed.  A large or otherwise complex litigation is not contemplated

and Santa Rosa has a direct and distinct action against the Underwriters.

52.    As stated above, the Debtors must make an affirmative act and shall bear the "burden of

both proof and persuasion" that circumstances warrant extending the protection of the automatic stay. In

the case at bar, Debtors have not met their burden. Furthermore, Santa Rosa has shown that in this particular

case they cannot. For the forgoing reasons, Santa Rosa respectfully asserts that the automatic stay should

not be extended to protect the Underwriters.

**B.    *In the Alternative, Relief from the Automatic Stay is Appropriate for Cause***

53.    Pursuant to 11 U.S.C. § 362(d), the Court may terminate, modify, annul or condition the

automatic stay.  The first ground for obtaining relief from the automatic stay is for "for cause".  11 U.S.C.

§362(d)(1).

54.    The Bankruptcy Code does not define 'cause', nonetheless, generally speaking, 'cause' is

said to exist when the harm that would result from a continuation of the stay would outweigh any harm that

---

insurance policies referred to in *A. H. Robins*, which involved multiple parties, it is the only party of interest and an
action against the Underwriters will not threaten the bankruptcy estate or otherwise burden or impede the Debtors'
reorganization efforts, considering that a liquidation *Plan* has been confirmed by this Honorable Court.

might be suffered by the debtor or the debtor's estate if the stay is lifted.  See *In re Sonnax Industries, Inc.,* 907 F.2d 1280, 1285 (2nd Cir. 1990).

55.    Determining whether 'cause' exists requires a fact intensive inquiry that must be made on a case by case basis.  See *Peerless Ins. Co. v. Rivera*, 208 B.R. 313, 315 (D.R.I. 1997), citing *In re Turner*, 161 B.R. 1, 3 (Bankr. D. Me. 1993); *Assocs. Ltd. v. Aetna Cas. & Sur. Co.*, 30 F.3d 734, 737 (6th Cir. 1994); *In re Balco Equities Ltd.*, 312 B.R. 734, 738 (Bankr. S.D.N.Y. 2004).    Courts make this determination through a balancing test, where they weigh the hardship to the creditor, if he or she is not allowed to proceed with his or her lawsuit, against the potential prejudice to the debtor and debtor's other creditors. See *In re R.J. Groover Constr. LLC*, 411 B.R. 460, 463-64 (Bankr. N.D. Ga. 2008).

56.    Thus the "facts of each request will determine whether relief is appropriate under the circumstances."  *In re Sonnax Industries, Inc.*, 907 F.2d at 1286, quoting H.R.Rep. No. 95–595, at 343–44 (1977), reprinted in 1978 U.S.C.C.A.N. 6300).    "The burden is on the moving party to make an initial showing of 'cause' for relief from the stay."  *In re Mazzeo*, 167 F.3d 139, 142 (2nd Cir. 1999). Only if the movant makes such a showing does any burden shift to the debtor; absent a showing of cause, the court should simply deny relief from the stay.  See *In re Boodrow*, 126 F.3d 43, 48 (2nd Cir. 1997).

57.    In *Sonnax*, the U.S. Court of Appeals for the Second Circuit established a set of twelve factors that have become the standard by which courts in this Circuit consider whether to modify the automatic stay[11].  See *In re Lehman Bros. Holdings, Inc.,* 435 B.R. 122, 138 (S.D.N.Y. 2010) ("Sonnax

---

[11] The Sonnax factors are the following:

(1) whether relief would result in a partial or complete resolution of the issues;  (2) lack of any connection with or interference with the bankruptcy case;  (3) whether the other proceeding involves the debtor as a fiduciary;  (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;  (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties;  (7) whether litigation in another forum would prejudice the interests of other creditors;  (8) whether the judgment claim arising from the other action is subject to equitable subordination;  (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;  (10) the interests of judicial economy and the expeditious and economical resolution of litigation;  (11) whether the parties are ready for trial in the other proceeding; and  (12) impact of the stay on the parties and the balance of harms.

*In re Sonnax Industries, Inc.,* 907 F.2d at 1286.  See *also In re N.Y. Med. Grp., P.C.*, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001).

routinely referenced as the leading relief from stay precedent in this Circuit."). Although the court in Sonnax outlined twelve factors, courts need not consider each factor, but may consider only the factors that are relevant to the particular case. See *In re RCM Global Long Term, Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996) ("A court should…use only the factors that are deemed relevant, assigning to each factor whatever weight the court feels is appropriate."). The *Sonnax* Court itself considered only four of the twelve factors as relevant. See *In re Sonnax Industries, Inc.*, 907 F.2d at 1286.

58.    Assuming *arguendo* that the automatic stay extends to the Underwriters, Santa Rosa respectfully submits that cause exists to modify the stay so as to allow Santa Rosa to pursue claims against them on account of, *inter alia,* willful misrepresentation, loss or damage to an insured property, and breach of contact. Accordingly, Santa Rosa submits that cause exists, as follows:

   (i)    *Factor 1: Relief Would Result in a Partial or Complete Resolution of the Issue*

59.    Puerto Rico Courts are the only forum where the liability of the parties can be completely determined. Allowing Santa Rosa to proceed against the Underwriters provides the only opportunity for *complete or partial relief* against all parties, *to wit,* Aon and the Underwriters, in one forum, thus the first *Sonnax* factor militates granting relief from the stay.

60.    Courts in this District have regularly recognized that relief from the stay may be appropriate where a non-bankruptcy court is the only forum in which the rights of all parties to a dispute can be collectively and properly adjudicated. See *e.g. In re N.Y. Med. Grp., P.C.*, 265 B.R. at 413 (finding that the state court's ability to grant complete relief to all parties, including third parties, weighed in favor of lifting the stay).

61.    Santa Rosa has submitted *Amended Proof of Claim No. 19,755* on account of its *Contingent Claim for Insurance Proceeds*, which is premised on the same underlying facts as its claims against the Underwriters. See *Amended Proof of Claim No. 19,755*. Assuming the Debtors' intend to contest *Amended Proof of Claim No. 19,755*, Santa Rosa's claims will be liquidated in the proof-of-claim adjudication process. By contrast, the liability of the Underwriters is not susceptible to determination by this Court through the proof-of-claim adjudication process or through an adversary proceeding because such liability

vests strictly on Puerto Rico law, specifically the Puerto Rico Civil Code and the Puerto Rico Insurance

Code, as discussed below.

62.     If the stay is not modified with regard to the Underwriters, Santa Rosa will be forced to

litigate essentially identical claims against Aon, then again against the Underwriters upon the "effective

date" of Debtors' confirmed *Plan* (Docket No. 5370), which is not a date certain.  By contrast, if the stay

is modified, the U.S. District Court for the District of Puerto Rico will be able to jointly resolve all claims

as to both the Underwriters and Aon in a single proceeding.  Accordingly, the first *Sonnax* factor weighs

heavily in favor of Santa Rosa.

*(ii)     Factor 2: Relief Would Not Interference with the Debtors' Reorganization*

63.     At this stage in the proceedings, the Debtors' only "going concern" assets have been sold

and the Debtors' *Plan* has been confirmed (Docket No. 5370).  Relief to pursue non-bankruptcy claims

against the Underwriters under applicable non-bankruptcy law would not interfere with the Debtors'

reorganization as no reorganization is contemplated with which to interfere.

64.     It is the Debtors' contention that relief to pursue direct action claims against the

Underwriters under non-bankruptcy law would directly impact and/or harm the Debtor on account of the

*Settlement Agreement's* indemnity clause which purports to hold harmless, indemnify, and defend the

Underwriters from any and all actions, demands and claims arising under Policy No. PTNAM1701557. In

addition to the fact (discussed above) that the Settlement Agreement containing the purported indemnity is

unenforceable, Santa Rosa submits that **it will not pursue claims directly against the Debtors on account**

**of its alleged claim that insurance proceeds were improperly paid.[12]**.  Moreover, the mere fact that the

Debtors *may* or *may not* incur costs in connection with a "potential" litigation initiated by the Underwriter

does not constitute "interference".  By way of example, the Debtors will not incur costs in the Adversary

---

[12] Santa Rosa's *Contingent Claim for Insurance Proceeds* may be withdrawn once Santa Rosa's claims against Aon
and the Underwriters have been fully adjudicated, its remaining claims notwithstanding. See *Amended Proof of Claim
No. 19,755.*

Proceeding no longer pending before this Court, which has been dismissed by stipulation. See Adv. Proc. No. 19-08266, Docket No. 11.

65.    Moreover, as held in *Riggs v. Palmer*, 115 N.Y. 506, 506 (1889), "[n]o one shall be permitted to profit by his own fraud, to take advantage of his own wrong, to [fund] any claim upon his own inequity or to acquire property by his own crime."  For "[i]t is a principle of the widest application that equity will not permit one to rely on his own wrongful act, as against those affected by it but who have not participated in it, to support his own asserted legal title or to defeat a remedy which except for his misconduct would not be available."  *Deitrick v. Greaney*, 309 U.S. 190, 196 (1940), citing *United States v. Dunn*, 268 U.S. 121, 133 (1925) and *Independent Coal & Coke Co. v. United States*, 274 U.S. 640, 648 (1927).

66.    In this instance, no great harm would befall the estate if the stay is not extended and/or lifted as to the Underwriters; the only potential prejudice being an increase in litigation costs which does not rise to the level of great prejudice, only in the event the Underwriters, who lack *clean hands,* should seek recourse against Debtors on the indemnity.  However, in the balance of equities, the harm borne by Santa Rosa would be greater if the stay is extended and/ or remains in place.

67.    Ultimately, as expressly stated in Section 13.4(iii) of the *Plan*, relief to pursue claims directly against the Underwriters is contemplated.  In its pertinent part, Section 13.4(iii) reads:

> [O]n the Effective Date [of the *Plan*] … (iii) **the automatic stay**… and the injunctions set forth in the Plan, if and to the extent applicable, **shall be deemed lifted without further order of this Court**, **solely to permit**: (a) claimants with … direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay … (II) **claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law**, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing…

Docket No. 4704, § 13.4(iii), pp. 77-78 (emphasis added).  For the sake of clarity, "Insurer" is defined as "any company or other entity that issued an Insurance Contract, any third party administrator, and any respective predecessors and/or affiliates thereof." Id. at § 1.82, p. 14.  "Insurance Contract" is defined as "all insurance policies that have been issued at any time to or provide coverage to any of the Debtors

(including, but not limited to, any D&O Policies) and all agreements, documents or instruments relating thereto..." Id. at § 1.81, p. 14.

68.    Further, Santa Rosa highlights Section 13.4(iii)(c) of the confirmed *Plan* (Docket No. 5370) which specifically states that, on the effective date of the *Plan,* "the automatic stay… shall be deemed lifted … to permit … **Insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors** at any time and to hold the proceeds thereof as security for the obligations of the Debtors … **and/or apply such proceeds to the obligations of the Debtors** … **under the applicable Insurance Contracts, in such order as the applicable Insurer may determine** …". Docket No. 5370, § 13.4(iii)(c) (emphasis added).

69.    In summary, the relief requested would not interfere with the Debtors' reorganization as no reorganization is contemplated with which to interfere; any potential litigation costs to be incurred by the Debtors on account of their own misdeeds *post-petition* do not constitute interference; and relief would only expedite what the Debtors' already contemplate in Section 13.4(iii)(c) of the confirmed *Plan* (Docket No. 5370). Consequently, the second *Sonnax* factor weighs heavily in favor of the relief requested.

        *(iii)    Factor 4: A Specialized Tribunal Has Been Established*

70.    It is Santa Rosa's position, as aforestated, that Puerto Rico Courts are the proper forum with the necessary expertise wherein Santa Rosa may adequately pursue all of the causes of action it has at law against the Underwriters. Without exception, the claims to be asserted by Santa Rosa against them hinge exclusively on Puerto Rico law and are premised on uniquely Puerto Rico law causes of action under both the Civil Code of Puerto Rico and the Insurance Code of Puerto Rico.

71.    The fact that the causes of action at issue are governed by foreign law weighs in favor of granting the relief requested. While a close or novel question of law is not presented here, except for the gravity of Hurricanes Irma and María's severity that demanded special legislation and regulations, the cause of action at issue arises under the Insurance Code of Puerto Rico and **may only be exercised in Puerto Rico**, thus, weighing heavily in favor of granting the relief requested.

72.     Furthermore, under Puerto Rico law, an injured party has the right to bring a suit against the insurer in addition to or in place of a suit solely against the insured.  Specifically, Art. 20.030(1) of the PR Insurance Code, commonly referred to as the "direct action statute", provides that:

> **Any individual sustaining damages and losses shall have**, at his option, **a direct action against the insurer under the terms and limitations of the policy**, which action he may exercise against the insurer only or against the insurer and the insured jointly. **<u>The direct action against the insurer may only be exercised in Puerto Rico</u>**.  The liability of the insurer shall not exceed that provided for in the policy, and the court shall determine not only the liability of the insurer, but also the amount of the loss. Any action brought under this section shall be subject to the conditions of the policy or contract and to the defenses that may be pleaded by the insurer to the direct action instituted by the insured.

26 L.P.R.A. § 2003(1) (official translation, emphasis and underline added).  <u>See</u> *Marina Aguila v. Den Caribbean, Inc.,* 490 F. Supp. 2d 244, 245 (D.P.R. 2007). Santa Rosa sustains that it has a distinct, independent and separate cause of action against the Underwriters under Art. 20.030 of the PR Insurance Code, which may only be exercised in Puerto Rico.

73.     Further, because Santa Rosa sustains that since it is an additional named insured and/or a loss payee to the *Contract of Insurance* there is privity of contract between Santa Rosa and the Underwriters, thus, Santa Rosa has a right to bring a direct action against them under Art. 1209 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3374, which states in pertinent part that "[s]hould the contract contain any stipulation in favor of a third [party], he may demand its fulfilment, provided he has given notice of his acceptance to the person bound before it may have been revoked."  31 L.P.R.A. § 3374 (West translation). Accordingly, only Puerto Rico Courts are vested with the necessary expertise for Santa Rosa to pursue <u>all the causes of action it has at law against the Underwriters</u>.  <u>See</u> *e.g. Santiago v. United States Fidelity & Guaranty Co., 183* F. Supp. 676 (D.P.R. 1960) (recognizing action brought against an insurer under Puerto Rico's direct-action statute); *M. R. (Vega Alta), Inc. v. Caribe General Elec. Products, Inc.,* 31 F. Supp. 2d 226, 238 (D.P.R. 1998) (recognizing a cause of action in favor of third-party beneficiaries to a contract under Art. 1209 of the Civil Code of Puerto Rico).

74.    Santa Rosa submits that a Puerto Rico non-bankruptcy tribunal should be considered as the optimal forum to hear causes of action arising under the PR Laws.  Accordingly, the fourth *Sonnax* factor weighs heavily in favor of Santa Rosa's request for relief.

(iv)    *Factor 5: The Underwriters have Assumed Full Responsibility*

75.    Pursuant to the *Contract of Insurance*, Policy No. PTNAM1701557 insures all liability incurred by the Debtors' as tenant or occupant under the Civil code, because of damage to real and personal property by loss or damage.  See *Contact of Insurance*, **Exhibit II**, p. 30, ¶ 50.  Further, in the event the Underwrites fail to pay an amount claimed to be due, the Underwrites agreed to submit to the jurisdiction of any court of competent jurisdiction within the United States and agreed to comply with all requirements necessary to give such jurisdiction.  See id. at p. 25, ¶ 28.  As such, the Underwriters have assumed full responsibility for the Debtors' actions and, as further discussed below, are personally liable under the PR Insurance Code.  Accordingly, the fifth *Sonnax* factor—whether the debtors' insurance carrier has assumed full financial responsibility for defending any litigation in the event the Debtors are sued under the liability coverage—also weighs in favor of Santa Rosa.  Moreover, as stated above, since the present case involves a direct action of Santa Rosa for damages caused to its insurable interest, the present relief does not affect the Debtors' right to seek defense costs against any ensuing litigation filed by third parties, including tenants, occupants and/or visitors to Santa Rosa.

(v)    *Factor 6: Relief Would Allow Santa Rosa to Pursue Claims Exclusively Against Third Party Non-Debtors*

76.    Santa Rosa seeks relief to pursue independent non-bankruptcy causes of action against the Underwriters on account of, *inter alia*, willful misrepresentation, loss or damage to an insured property, and breach of contract.

77.    Upon information and belief, on or about January 17, 2019, the Debtors executed a *Settlement Agreement* with certain insurance Underwriters, on account of the Hurricane Irma and Hurricane Maria Losses.  The *Settlement Agreement* was executed without Santa Rosas' knowledge, authority, consent or input, despite Santa Rosa's multiple requests and communications to that effect.  It must be highlighted

that the *Settlement Agreement* was executed by Dale Menéndez on behalf of the Debtors as Director of

Property Claims-Risk Management at Sears Holdings Management Corporation. Mr. Menéndez also both

received and responded to letters from and to Santa Rosa that confirmed Santa Rosa's rights under the

*Contract of Insurance*, the *Lease Agreement,* and the *Certificate of Insurance*. See **Exhibit IX.** The

Debtors' knowledge that Santa Rosa is an additional insured and/or loss payee and/or has an insurable

interest over the insurance proceeds from Store No. 1915 is therefore unquestionable.

78.    Under Puerto Rico Law, an obligation may be extinguished, *inter alia*, by payment. See

31 L.P.R.A § 3151. "A debt shall not be considered as paid until the full amount of the thing has been

delivered…" 31 L.P.R.A. § 3161. To that effect, "[a]ny person, whether he has an interest or not in the

fulfillment of the obligation... can make the payment." 31 L.P.R.A. § 3162. Notwithstanding, "[p]ayment

must be made to the person in whose favor the obligation is constituted, or to another authorized to receive

it in his name." Art. 1116 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3166. Ergo, while "payment made

in good faith to the person who is in possession of the credit shall release the debtor," 31 L.P.R.A. § 3168,

payment otherwise made to a third person is deemed invalid *unless* "**it may have been beneficial to the**

**creditor**." 31 L.P.R.A. § 3167 (emphasis added). See also *CMI Capital Market Investment, LLC v.*

*Municipality of Bayamon*, 410 F.Supp.2d 61, 74 (D.P.R. 2006) (recognizing the "improper payment"

doctrine of Art. 1116 of the Puerto Rico Civil Code. "[T]he only legal effect of such "improper payment"

would be that the contractual obligation set forth in the [agreement] remains in full force and effect and that

payment remains due."). Santa Rosa submits that payment made under Policy No. PTNAM1701557 was

improper, despite the Underwriters statements to the contrary. See *Letter from AIG to CCM dated July 23,*

*2019,* **Exhibit __,** p. 3.

79.    The Underwriters willfully, knowingly or recklessly participated in the misrepresentations

made by the Debtors regarding Santa Rosa, as they were timely informed by Santa Rosa of its claim

concerning the insurance proceeds. See **Exhibit VIII.** In the alternative, the Underwriters incurred in gross

negligence by executing the *Settlement Agreement* and paying the Debtors*,* blatantly disregarding Santa

Rosa's rights as additional named insured or loss payee.

80.     The Underwriters have a statutory obligation to indemnify Santa Rosa under the Insurance Code of Puerto Rico and under the Civil Code of Puerto Rico on account of the harm and damage caused by the Underwriters for knowingly breaching and/or violating Santa Rosa's subjective rights under both the *Contract of Insurance* and the *Lease Agreement.* Accordingly, the sixth *Sonnax* factor favors granting Santa Rosa relief to pursue independent non-bankruptcy causes of action against the Underwriters.

(vi)    *Factor 7: Relief Would Not Prejudice the Interests of Other Creditors.*

81.     The seventh *Sonnax* factor supports relief as creditors will modestly benefit rather than be harmed.

82.     Santa Rosa's claims against the Underwriters will need to be resolved in one forum or another, with or without the relief sought and the Debtors may incur costs regardless of the forum in which Santa Rosa's claims are pursued and determined. As stated above, the mere fact that the Debtors may or may not incur litigation costs <u>on account of their own misdeeds and misrepresentations</u> does not alone constitute prejudice. Notwithstanding, even if litigation costs were to constitute prejudice, the mere fact that such cost would arise *regardless* confirms that litigation costs alone cannot serve as a basis for prejudice. On the same vein, relief would benefit other creditors by avoiding the costs of duplicative litigation. Wherefore, if relief is granted the litigation costs to be borne by the Debtors will either—*at most*—be lower or—at *minimum*—remain neutral to those already projected.

(vii)    *Factor 8: Relief from the Stay would Not Result in a Subordinated Claim.*

83.     The eighth *Sonnax* factor also weighs in favor of granting relief. Santa Rosa seeks relief solely to pursue independent non-bankruptcy causes of action against third-party non-debtors. No equitable subordination would result from granting the requested relief.

(viii)    *Factor 9: The Puerto Rican Litigation would Not Result in an Avoidable Judicial Lien*

84.     The ninth *Sonnax* factor, if at all relevant, likewise weighs in favor of granting relief as by doing so solely to pursue independent non-bankruptcy causes of action against third-party non-debtors would not result in a judicial lien—avoidable or otherwise—against the Debtors.

       (ix)    *Factor 10: Relief from the Stay will Enhance Judicial Economy and the Expeditious and Economical Resolution of Litigation*

85.    The tenth *Sonnax* factor militates strongly in favor of Santa Rosa in order to avoid costly duplicative litigation.

86.    Judicial economy is best served by allowing Santa Rosa to pursue independent non-bankruptcy causes of action against both the Underwriters and Aon *jointly* in a single forum.  <u>See</u> *In re Cicale*, 2007 WL 1893301, at *4 (Bankr. S.D.N.Y. 2007) (noting that "in the interests of judicial economy, [] allowing [the Movant] to proceed with the Third–Party Action will not result in any unreasonable or unforeseeable delay.  Furthermore, the Court finds that allowing [the Movant to] proceed with the Third–Party Action **will provide the most efficient and economical resolution of the litigation because the Third–Party Action <u>may alleviate the need for any further proceedings in the bankruptcy court</u>**.  Thus, this *Sonnax* factor weighs in favor of [the Movant]."

87.    Absent the relief requested herein, Santa Rosa will be compelled to try the same law and facts twice, first against Aon and again (following the effective date of Debtors' *Plan*) against the Underwriters, a circumstance that should be avoided as issues of whether Santa Rosa would be collaterally estopped could arise.  Declining to grant relief could result in inconsistent judgments concerning the same law applied to the same facts. Thus, the relief requested by Santa Rosa would eliminate that risk and enhance judicial economy.

88.    For the forgoing reasons, the tenth *Sonnax* factor militates strongly in favor of relief from the stay because granting the requested relief is the only viable avenue for avoiding costly duplicative litigation.

       (x)    *Factor 12: The Balance of Harms Weighs in Favor of Santa Rosa*

89.    The relief requested herein will not prejudice the interests of other creditors.  By contrast, continuing the automatic stay will impose substantial hardship on Santa Rosa that outweigh the potential hardships to the Debtors, if any. Any further delay in allowing Santa Rosa to file its claims against the Underwriters only increases Santa Rosa's growing damages.  Consequently, the final *Sonnax* factor

similarly favors granting Santa Rosa's limited relief requested.  It would be a travesty of justice not to allow Santa Rosa relief from the stay to pursue some semblance of justice.

Closing Remarks

In closing, Santa Rosa <u>will not pursue claims directly against the Debtors outside of these proceedings</u>, instead, it seeks only to prosecute independent, non-core, non-bankruptcy causes of action against both the Underwriters and Aon *jointly* in a single forum on account of an insurance claim alleged as improperly paid.  The Debtors' indemnification obligation is insufficient to justify extension of the automatic stay for it cannot be said that the Underwriters' interests are closely intertwined by virtue of an agreement that is unenforceable and/or does not threaten, burden, or otherwise impede Debtors' reorganization efforts.  The Debtors simply cannot effectively justify extending the protection of the automatic stay to the Underwriters.  Absent the relief requested herein, Santa Rosa will be compelled to try the same law and facts twice, first against Aon and again against the Underwriters following the effective date of Debtors' *Plan*, a circumstance that should be avoided as the effective date is not a date certain and issues of whether Santa Rosa would be collaterally estopped could arise and/or result in inconsistent judgments.  Allowing Santa Rosa to proceed against the Underwriters provides the only opportunity for *complete or partial relief* against <u>all parties,</u> *to wit,* Aon and the Underwriters.

Prayer for Relief

WHEREFORE, Santa Rosa respectfully requests that the Court grant the relief requested herein and enter an order finding that the automatic should not be extended or, in the alternative, modify the automatic stay so that Santa Rosa may seek non-bankruptcy relief against the Underwriters.

[Signatures on next page]

Respectfully submitted.
Dated: January 7, 2020.

**Ferraiuoli** LLC

390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Telephone: (407) 982-7310
Facsimile: (787) 766-7001

*/s/ Sonia E. Colón Colón*
Sonia E. Colón Colón
Admitted *Pro Hac Vice*
USDC-PR No. 213809
scolon@ferraiuoli.com

*/s/ Gustavo A. Chico-Barris*
Gustavo A. Chico-Barris
NY State Bar No. 929147
USDC-PR No. 224205
gchico@ferraiuoli.com

-and-

**Ríos Gautier & Cestero C.S.P.**
27 González Giusti Street, Suite 300
Guaynabo, PR 00968-3076
Telephone: (787) 753-7750
Facsimile: (787) 759-6768

/s/Carlos Ríos Gautier
Carlos Ríos Gautier
USDC-PR No. 112606
*Pro Hac Vice*
riosgautierlaw@yahoo.com

Attorneys for
*Santa Rosa Mall, LLC*

# EXHIBIT I

b00-061

**SEARS LEASE**

| | | |
|---|---|---|
| Parcel "A" | – | Shopping Center Property |
| Parcel "B" | | (2.59 cuerdas) Parcel #3 |
| Parcel "C" | | Sears Main Store |
| Parcel "D" | – | Automotive and Community Center |

ARTICLE I– PREMISES AND TERM

Section 1.01   Planning Board Approval........................   Page 6
"      1.02   Conditions Required for Planning Board Approval,
                  Premises "C" and "D"..............   "   6
"      1.03   Leasing of Automotive and Community Center to
                  Landlord..........................   "   6
"      1.04   Leasing of Premises "C" and "D" to Tenant ....   "   7
"      1.05   Commencement Date of Term of Lease..........   "   7
"      1.06   Date of Term of Lease......................   "   9
"      1.07   Renewal Options............................   "   9
"      1.08   Lease Year Defined.........................   "   10
"      1.09   Occupancy of Premises Subsequent to Expiration
                  of Extended Term...................   "   10

ARTICLE II – RENT

Section 2.01   Fixed Rent................................   "   11
"      2.02   Percentage Rent and Net Sales Defined .........   "   12
"      2.03   Additional Rent: Property Taxes, Utilities, etc..   "   14
"      2.04   Additional Rent: Charges levied during Term of
                  Lease.............................   "   17
"      2.05   Additional Rent: Limits.......................   "   17
"      2.06   Fixed Rent and Additional Rent – Premises "C" and
                  "D"..............................   "   17

ARTICLE III – DEMOLITION AND CONSTRUCTION

Section 3.01   Removal of Equipment, Fixtures, Personal Property,
                  by Landlord ......................   "   18
"      3.02   Commencement of Construction on Premises "C"
                  and/or "D": Specifications.......   "   18
"      3.03   Government Approval of Plans and Specifications
                  and Cost of Construction .........   "   20
"      3.04   Builder's Risk Insurance .....................   "   21
"      3.05   Interference by Tenant and Storage of Materials
                  during Construction ..............   "   21
"      3.06   Parking Areas ...............................   "   22

ARTICLE IV – MAINTENANCE AND REPAIRS

Section 4.01   Tenant's Obligations: Fixtures and Utilities ....   "   23
"      4.02   Tenant's Obligations: Government Regulations ..   "   23
"      4.03   Tenant's Liability...........................   "   24

ARTICLE V – ALTERATIONS AND ADDITIONS

Section 5.01   Alterations made by Tenant...................   "   24
"      5.02   Alterations made by Tenant in excess of $100,000.   "   25
"      5.03   Tenant's Liability ..........................   "   25

ARTICLE VI – INSURANCE

Section 6.01    Types of Insurance and Amounts.................    Page 26
"    6.02    Tenant's Choice of Insurance Co., Renewal of
– Policies, etc...................    "    27
"    6.03    Indemnification of Tenant and Landlord ..........    "    28
"    6.04    Repairs Made by Parent Corporation .............    "    29
"    6.05    Indemnification of Landlord ....................    "    30

ARTICLE VII – CONDEMNATION

Section 7.01    Condemnation of Leased Premises...............    "    30
"    7.02    Partial Condemnation: Fixed Rent, Percentage Rent    "    31
"    7.03    Landlord's and Tenant's Damages ................    "    32
"    7.04    Repairs Due to Partial Condemnation ............    "    33
"    7.05    Indemnification of Landlord Due to Partial Condem-
nation........................    "    34

ARTICLE VIII – CONDUCT OF BUSINESS BY TENANT

Section 8.01    Use of Premises................................    "    34

ARTICLE IX – MORTGAGE, ASSIGNMENT AND SUBLEASE

Section 9.01    Assignment of Lease by Tenant ................    "    34
"    9.02    Consent Required .............................    "    35
"    9.03    Written Agreement by Sublessee ................    "    35
"    9.04    Abandonment ..................................    "    36
"    9.05    Right of Tenant to Mortgage Interest............    "    36
"    9.06    Mortgage Lien – Parcel A and/or B .............    "    37

ARTICLE X – UTILITIES

Section 10.01    Utility Charges .............................    "    37

ARTICLE XI – PARKING AND COMMON USE AREAS AND FACILITIES

Section 11.01    Control of Common Areas by Landlord...........    "    38

ARTICLE XII – COST OF MAINTENANCE OF COMMON AREAS

Section 12.01    Tenant to Bear Pro Rata Share of Expense..........    "    39

ARTICLE XIII – MERCHANT'S ASSOCIATION

Section 13.01    Tenant's Right as to Membership................    "    39

ARTICLE XIV – DEFAULT

Section 14.01    Default by Tenant.............................    "    40
"    14.02    Submittal of Matter to Court by Landlord ..........    "    41
"    14.03    Default by Landlord ...........................    "    42
"    14.04    Waiver .......................................    "    43

ARTICLE XV – SURRENDER AT EXPIRATION

Section 15.01    Surrender of Premises by Tenant ................    "    43

ARTICLE XVI – EQUIPMENT AND FIXTURES INSTALLED

Section 16.01    Installation by Tenant ........................    "    44

ARTICLE XVII – COVENANT OF QUIET ENJOYMENT

Section 17.01  Landlord's Covenant ........................ Page 45

ARTICLE XVIII – ESTOPPEL CERTIFICATES

Section 18.01  Estoppel Certificates by Tenant ................  "  45
    "       18.02  Estoppel Certificates by Landlord ...............  "  46

ARTICLE XIX – INVALIDITY OF PARTICULAR PROVISIONS

Section 19.01  Partial Invalidity .............................  "  46

ARTICLE XX – NOTICES

Section 20.01  Notices Sent by Landlord and Tenant ............  "  47

ARTICLE XXI – RESTRICTION ON NEW BUILDINGS IN SHOPPING CENTER

Section 21.01  Construction by Landlord .......................  "  47

ARTICLE XXII – ACCESS BY LANDLORD

Section 22.01  Right of Entry .................................  "  48

ARTICLE XXIII – MISCELLANEOUS

Section 23.01  "The Term of this Lease" (Definition of) .........  "  48
    "       23.02  Use of Headings and Numbers as References ......  "  48
    "       23.03  Successors and Assigns ........................  "  49
    "       23.04  Modifications, Alteration, etc., of Lease only in
                        Writing .........................  "  49
    "       23.05  Counterparts Each Shall be an Original ..........  "  49
    "       23.06  English as the Controlling Language ............  "  49
    "       23.07  Jurisdiction for Determination of Disputes (P. R.)..  "  49
    "       23.08  Recordation of Lease  ........................  "  49

Signatures of Parties Executing This Lease ...................  "  50

LEASE

In the City of San Juan, Commonwealth of Puerto

Rico, this *16TH* day of *SEPTEMBER*, 1965,

APPEAR:

AS PARTY OF THE FIRST PART: SANTA ROSA SHOPPING
CENTER, INC., a corporation organized and existing under the
laws of the Commonwealth of Puerto Rico, with offices at the
Santa Rosa Plaza in Bayamon, Puerto Rico, represented herein
by its President, Mr. John P. Birkelund who is of legal age,
an Executive, and resident of South Norwalk, Connecticut, here-
inafter called the "Landlord"; and

AS PARTY OF THE SECOND PART: BANCO CREDITO Y AHORRO
PONCENO, INC., a banking corporation organized and existing under
the Banking Laws of the Commonwealth of Puerto Rico, with princi-
pal offices in the City of San Juan, Puerto Rico, represented
herein by Mr. *Carlos J. Paui*, , its *Vice-president*, who is
of legal age, a banker, and resident of San Juan, Puerto Rico,
hereinafter called "The Trustee"; and

AS PARTY OF THE THIRD PART: SEARS, ROEBUCK DE PUERTO
RICO, INC., a Delaware corporation, with principal offices in San
Juan, Puerto Rico, located at Munoz Rivera Avenue corner Coll y
Toste Streets, said corporation duly qualified to do business in
Puerto Rico and herein represented by its *President* ,
Mr. *L. R. Lauek* , of legal age, an Executive, and resident of
San Juan, Puerto Rico, hereinafter known as the "Tenant".

The authority of all of the appearing parties to act
herein shall be demonstrated whenever and wherever required, and
they state:

A.   The Landlord and the Trustee are owners in fee

simple of the improved real property described according to the
Registry of Property as follows:

> "URBAN: Parcel of land dedicated to a Shopping Center
> Plaza located at Santa Rosa Development in the Ward
> of Juan Sanchez of Bayamon, Puerto Rico, now classi-
> fied and zoned as a C-Four (C-4) district, consisting
> of eighteen and forty-six hundredths "cuerdas" (18.46)
> in area, equivalent to seventy two thousand five hun-
> dred fifty-five and sixty ninth hundredths square
> meters (72,555.69) bounded as follows:  At the North,
> by a marginal street and State Highway number Two,
> distance of four hundred twenty-five and six hundredths
> lineal meters (425.06); at the South, by street number
> Two of Santa Rosa Subdivision and lands of Santa Rosa
> Development Corporation in a distance of three hundred
> nine and thirty hundredths lineal meters (309.30); at
> the East by Aguas Buenas Avenue and intersection number
> One Hundred Thirty-One in Santa Rosa sub-division and
> other lands of Santa Rosa Development Corporation, in a
> distance of two hundred forty-nine and forty-nine hun-
> dredths lineal meters (249.49); and at the West, by
> lands owned by the Puerto Rico Housing Authority in a
> distance of two hundred sixteen and twenty-eight hun-
> dredths, lineal meters (216.28)."

The above mentioned property is recorded in the Registry
of Property of Bayamon, Page Sixty-Five (over) property Twelve
Thousand Nine Hundred Fifty-Seven, Third Inscription.  This property
shall hereinafter be known as "PARCEL A".

The said property is subject to a mortgage in the principal
amount of ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000.00),
with interest at the rate of six per cent per annum, in favor of
CONNECTICUT GENERAL LIFE INSURANCE COMPANY as appears from deed num-
ber three of June twenty-four, nineteen hundred and sixty before
Notary Public, Jose Gonzalez.

Said property is also subject to utility easements in
favor of the Puerto Rico Water Resources Authority and the Puerto
Rico Acqueduct Authority and to building restrictions appearing
from the corresponding Registry of Property in Bayamon.

There has been erected on this property a complete Shop-
ping Center known as Santa Rosa Shopping Center (hereinafter called
the "Shopping Center") consisting of seven buildings all of steel
frame and masonry construction and an adjacent parking area.

B.  The Landlord is also the owner in fee simple of the
following described parcel of property:

- 2 -

"URBAN:   PARCEL OF LAND located at Section Number One
of Santa Rosa Development, in Bayamon, with an area
of TEN THOUSAND ONE HUNDRED EIGHTY-FIVE WITH TWENTY
ONE HUNDREDTHS OF A SQUARE METER (10,185.21 Sq. mts.),
equivalent to TWO CUERDAS AND FIFTY-NINE HUNDREDTHS
OF A CUERDA (2.59), bounded at the NORTH, by Plaza
Comercial Santa Rosa, distance of One Hundred Fifty-
Eight meters and Seventy Three Centimeters (158.73);
at the SOUTH, by Street Number One (1) and Residen-
tial Section Number One (1) of the principal parcel
of Santa Rosa Development, distance of One Hundred
Fifty Two Meters (152.00); at the EAST, by Aguas
Buenas Avenue of Santa Rosa Development with a dis-
tance of Seventy-Five Meters and Twenty Centimeters
(75.20); and at the WEST, by Street Number Five (5)
of the Santa Rosa Development, distance of Forty-Six
Meters and Thirty-Two Centimeters (46.32)."

This property is inscribed in the Registry of Property

in Bayamon at volume two hundred sixty seven of Bayamon, Page One

Hundred Sixty-Five, Property Number Eleven Thousand Six Hundred

Ninety Two, second inscription.

It is understood among the parties that some claim has

been made that there may be a restriction relating to the use of

this land for community purposes, and that the Landlord is under-

taking to resolve this claim so as to permit the use of this par-

cel for a parking area and for the erection of an automotive and

community center.   This property shall hereinafter be known as

"PARCEL B".

C.   The Landlord, Trustee and Tenant have agreed to the

lease of Premise C hereinafter described and, in the event that the

Planning Board of Puerto Rico permits the use of Premise D herein-

after described as an automotive and community center, and there

is no other legal impediment to such use of Premise D, the Land-

lord, Trustee and Tenant have agreed to the lease of Premise D.

Premise C is shown on the survey of Esteban Gonzalez dated September

11, 1965 (wherein it is referred to as Premise C-1) and Premise D

is shown on the survey of Esteban Gonzalez dated August 12, 1965,

which surveys are annexed hereto initialled by the Landlord and

Tenant and made part of this agreement.   Premise C alone, or in the

event that the use of Premise D is permissible, as aforesaid, then

Premise C and Premise D, and the buildings and improvements hereafter

located thereon (i. e. excepting the buildings now located on

Premise C and to be demolished as provided in this lease), are

hereinafter referred to as the "Demised Premises":

### PREMISE C

Starting at the corner of Aguas Buenas Avenue
and Street No. 1, known as property point No. 46,
move along the inner edge of Aguas Buenas Avenue
sidewalk a distance of 419.394 feet (127.833
meters) at a bearing of N 42° 00' 40" E; thence
move a distance of 57.553 feet (17.542 meters) at
a bearing of N 47° 59' 20" W to the southeast cor-
ner of the parcel.  Thence move a distance of 419.000
feet (127.713 meters) at a bearing of N 13° 18' 50"
E to the northeast corner.  Thence move a distance
of 237.500 feet (72.391 meters) at a bearing of N 76°
41' 10" W to the northwest corner.  Thence move a
distance of 419.000 feet (127.713 meters) at a bear-
ing of S 13° 18' 50" W to the southwest corner, and
finally move a distance of 237.500 feet (72.391
meters) at a bearing of S 76° 41' 10" E to the south-
east corner of the parcel.

The resulting area of the parcel is 99,512.50 square
feet, equal to 9,245.272 square meters.

### PREMISE D

Starting at the corner of Aguas Buenas Avenue and
Street No. 1, move along the inner edge of the side-
walk along Aguas Buenas Avenue a distance of 15.240
meters at a bearing of N 42° 00' 40" E; then move
at right angles to this line a distance of 15.240
meters at a bearing of N 47° 59' 20" W to the south-
east corner of the parcel.  Move then a distance of
56.389 meters at a bearing of N 42° 00' 40" E to the
northeast corner of the parcel.  Then move to 19.203
meters at a bearing of N 47° 59' 20" W to the north-
west corner of the parcel.  From then move a dis-
tance of 56.389 meters at a bearing of S 42° 00' 40"
W to the southwest parcel corner and from there move
a distance of 19.203 meters at a bearing of S 47° 59'
20" E to the south east corner that was our starting
point.

The total area of the parcel is 1,082.838 square meters.

D.  In place of Premise C hereinabove described (i.e.,

Premise C-1 on the aforementioned survey annexed hereto), the Tenant

shall have the option to lease an alternative Premise C which is re-

ferred to as Premise C-2 on the survey of Esteban Gonzalez dated

September 11, 1965 annexed hereto, initialled by the Landlord and

Tenant, and made part of this agreement, and is described as follows:

### PREMISE C-2

Starting at the corner of Aguas Buenas Avenue and Street No. 1

- 4 -

known as property point No. 46, move along the inner
edge of Aguas Buenas Avenue sidewalk a distance of
392.268 feet (119.565 meters) at a bearing of N 42°
00' 40" E; thence move a distance of 52.964 feet
(16.144 meters) at a bearing of N 47° 59' 20" W to
the southeast corner of the parcel. Thence move a
distance of 419.000 feet (127.713 meters) at a bear-
ing of N 13° 18' 50" E to the northeast corner.
Thence move a distance of 228.500 feet (69.648 meters)
at a bearing of N 76° 41' 10" W to the northwest cor-
ner. Thence move a distance of 419.000 feet (127.713
meters) at a bearing of S 13° 18' 50" W to the south-
west corner, and finally move a distance of 228.500
feet (69.648 meters) at a bearing of S 76° 41' 10" E to
the southeast corner of the parcel.

The resulting area of the parcel is 95,741.50 square
feet, equal to 8,894.955 square meters.

The option granted herein to the Tenant is subject to
the approval by the Planning Board of Puerto Rico of the use by
Tenant of said alternative Premise C. If the Planning Board grants
such approval, and the Tenant shall then elect to exercise its op-
tion to lease said alternative Premise C (i. e., Premise C-2), it
shall give written notice thereof to the Landlord. In that event,
said alternative Premise C (i. e., Premise C-2) shall thereupon
constitute part of the Demised Premises in place of the original
Premise C (i. e., Premise C-1) hereinabove described in introduc-
tory paragraph "C" of this lease.

E. The use and occupation by the Tenant of the Premises
herein demised shall include, in addition to Premise C and Premise
D (if permissible), the use in common with others entitled thereto
of the common areas, service roads, loading facilities, sidewalks,
customer car parking areas, and other facilities in Parcel A and Par-
cel B as may be designated by Landlord as areas of common use, sub-
ject, however, to the terms and conditions of this agreement and
to reasonable rules and regulations for the use thereof as prescribed
from time to time by Landlord.

All of the appearing parties of this deed of lease, hav-
ing previously agreed to the lease of Premise C and Premise D (if
permissible as aforesaid,) do hereby do so, under the following
terms and conditions:

## ARTICLE I

### Premises and Term

Section 1.01

Landlord shall, at its expense, obtain from the Plan-
ning Board of Puerto Rico such approval and permits as may be
required for the lease of Premise C to the Tenant for the con-
struction and operation of a retail department store and for the
use of Parcel B as a parking area by the Tenant and the other
tenants of Parcel A.  Landlord shall also use its best efforts
to obtain from said Planning Board such approval and permits as
may be required to allow the lease of Premise D to the Tenant
for the construction of an automotive and community center and
the respective operation thereof as provided for in this lease.

Section 1.02

Landlord shall, at its expense, make and construct such
improvements in the land comprising Premise C and Premise D as the
Planning Board of Puerto Rico may require as a condition to grant-
ing its approval for the lease of such premises for the purposes
provided in Section 1.01 hereof.

Section 1.03

In the event that the required clearances are obtained,
and the Tenant builds the automotive and community center on Premise
D, as hereinafter provided, then Tenant shall lease back to the
Landlord or its designee that portion of Premise D which comprises
the community center for a nominal rental, and Landlord or its
designee shall undertake, at its expense, to operate, maintain
and manage such community center and to obtain and maintain pub-
lic liability insurance adequate to protect Landlord and Tenant
from all claims, demands, and liabilities arising out of the opera-
tion of such community center.  Such insurance shall name both Land-
lord and Tenant as insured and contain limits of liability of $500,000.
per person and $1,000,000. per accident for bodily injury limits and
$100,000. for property damage.  A certificate evidencing such insurance

- 6 -

coverage shall be furnished Tenant.

Section 1.04

Landlord does hereby demise and lease to Tenant and Tenant does hereby take and hire from Landlord (a) the premise described in introductory paragraph "C" of this lease as Premise C and (b) in the event of the approval by the Planning Board of Puerto Rico, and provided further that there is no legal impediment thereto, the premises described in introductory paragraph "C" of this lease as Premise D.

Section 1.05

The term of this lease between Landlord and Tenant shall commence on the first of the month next following the occurrence of all of the following events:

(a) The issuance by the Planning Board of Puerto Rico of whatever approval is required to permit the leasing of Premise C to the Tenant for the construction and use contemplated by this lease.

(b) The vacation of all existing structures contained within Premise C by all tenants thereof, and Landlord's written notification to Tenant that same has been accomplished.

(c) The certification by the Landlord to the Tenant that the Landlord has obtained written consents from all the other tenants of Parcel A (Santa Rosa Shopping Center) to the effectuation of this lease, and Landlord's agreement to indemnify Tenant against any loss that Tenant may incur by reason of any action, claim or demand by any other tenant of the Santa Rosa Shopping Center in connection with or arising out of the execution of this lease.

(d) The receipt by Tenant of a written instrument from each mortgagee holding a mortgage upon the Landlord's fee interest in Parcel A and Parcel B which shall (1) consent to the execution and delivery of this lease and (2) either agree not to disturb the possession of the Tenant, nor to terminate any interest of the

Tenant created hereunder by foreclosure or otherwise so long as
the Tenant shall comply with the terms, covenants and conditions
of this lease, or subordinate the mortgage to this lease.

        (e) The receipt by Tenant of a written confirma-
tion from Landlord that all the above conditions have been satis-
fied and that Tenant may proceed with demolition of the buildings
on Premise C and construction of the new building hereinafter pro-
vided for.

        It is intended that the commencement of this
lease as aforesaid shall be within 15 months from the date of exe-
cution of this instrument. The Landlord shall commence immediately
upon the signing of this lease and shall diligently pursue the con-
struction of the new buildings to be occupied by Banco Credito y
Ahorro Ponceno, Inc. and Belk Lindsey Company and to effect the
removal of the Bank and Belk Lindsey to their new buildings. The
Landlord shall keep the Tenant informed of its progress in complet-
ing the aforesaid conditions. So long as the Landlord acts diligently
and in good faith, Landlord shall not be deemed to be in default un-
der this Section 1.05. However, Landlord agrees, even though not
in default under this Section 1.05, to pay to Tenant the sum of
$500. per day (but in no event exceeding in the aggregate the sum
of $15,000.) for each day required for the completion of the fore-
going conditions in excess of fifteen months from the date of exe-
cution of this instrument, provided that said period of fifteen
months shall, for the purposes of this Section 1.05, be extended
to the extent that the Landlord cannot, by the exercise of reason-
able efforts, complete its performance within such time because of
circumstances over which it has no control including without limita-
tion strikes, lockouts, fire, floods, earthquakes or similar actions
of the elements, acts of God, acts of war or the public enemy.

        The exact date of the commencement of the
term of this lease shall be specified in a written memorandum

- 8 -

signed by both of the parties hereto. In the event that Tenant
shall suffer any delay in proceeding with the demolition of the
existing buildings on Premise C or the construction of the new
building thereon by reason of any legal action brought by any
other tenant of the Santa Rosa Shopping Center, then the date of
commencement of the term of this lease shall be postponed for a
period of time equivalent to the length of such delay.

Section 1.06

The initial term of this lease shall be a term of forty-
two (42) years, beginning on the day specified in Section 1.05 of
this deed of lease and expiring forty-two years thereafter.

Section 1.07

(a)  If Tenant notifies Landlord in writing at any
time after the commencement of this lease but at least eighteen
months prior to the termination of the initial term hereof that it
elects to extend the term of this lease, then this lease shall be
extended for an extended term of fifteen (15) years.

(b)  If this lease is extended for the extended term
hereinabove mentioned, Tenant at its election may extend the term of
this lease for two additional successive extended terms of fifteen (15)
years each, provided Tenant notifies Landlord in writing at least
eighteen (18) months prior to the termination of the then current
extended term that it elects to extend the term of this lease for
the immediately succeeding extended term.

(c)  The right to any extension of this lease shall
be upon the express condition that at the time of the election to
extend the lease, and at the beginning of the extended term, Tenant
shall not be in default under any of the terms, covenants and con-
ditions of this lease.

(d)  In the event Tenant for any reason shall not
exercise its privilege to extend the term of this lease, as here-
in provided, Tenant shall have no further privilege to extend the

term of this lease and said term shall expire and come to an end upon expiration of the then current initial term or extended term. If Tenant' exercises its privilege to extend the term of this lease, as herein provided, then such election, once made, shall be irrevocable.

Section 1.08

The term "lease year" as used herein shall mean a period of twelve (12) consecutive full calendar months. The first lease year shall begin on the date of commencement of the term hereof. Each succeeding lease year shall commence on the anniversary date of the first lease year.

Section 1.09

In the event that Tenant shall have elected to extend the term of this lease for the third extended term as hereinabove provided, then the Tenant shall have the following right of first refusal with regard to occupancy of the Demised Premises subsequent to the expiration of the third extended term.

(a)  During the twelve (12) month period prior to the expiration of the third extended term hereof, upon receiving any acceptable bona fide offer from a third party for the leasing of the Demised Premises, the Landlord shall transmit to the Tenant in writing all the terms and conditions of such offer.

(b)  Tenant shall have thirty (30) days from the receipt of such offer to notify the Landlord in writing of Tenant's intention to enter into a lease of the Demised Premises upon the terms and conditions of such offer.

(c)  Within thirty (30) days (or such extended period as may be agreed upon between the parties) from the giving of Tenant's notice referred to in (b) above, the Tenant shall sign a lease of the Demised Premises upon the terms and conditions of the said offer.

(d)  In the event that the Tenant shall fail to notify the Landlord of its intention to enter into a lease of the

Demised Premises, as provided in (b) above, or in the event that
the Tenant shall fail to execute the lease within the period pro-
vided in (c) above, then the Landlord may enter into a lease of
the Demised Premises upon the terms and conditions of the said
offer with the third party who made such offer, and Tenant shall
have no further rights under this Section 1.09.

     (e)  In the event that the Landlord has not received
an acceptable bona fide offer from a third party but intends to con-
tinue the same type of store operation upon the Demised Premises,
then, if the Tenant so elects, the Landlord and Tenant shall nego-
tiate a new lease of the Demised Premises upon terms substantially
the same as those applicable to the third extended term hereof but
for a period of time mutually acceptable to the Landlord and the
Tenant.

## ARTICLE II

### Rent

Section 2.01

     As fixed rent, Tenant shall pay to Landlord at its
principal office above set forth, or at such other place designated
in writing by Landlord, at the times hereinafter set forth, without
any prior demand therefor and in money of the United States of
America which at the time of payment shall be legal tender for pub-
lic and private debts, the respective amounts hereinafter set forth:

     A.  During the first two lease years of this lease
no fixed rent shall be paid.

     B.  During the third lease year the amount of
$50,000.

     C.  During the fourth lease year the amount of
$75,000.

     D.  During the fifth lease year the amount of
$100,000.

     E.  During the sixth lease year the amount of
$125,000.

F. During the seventh lease year and during each
and every subsequent lease year of the initial term and
of any extended term of this lease the amount of $150,000.

The fixed rent hereinabove provided for shall be payable
in equal monthly instalments in advance on the first business day of
each and every calendar month of each lease year during said initial
term and any extended term.  It is the purpose and intent of Land-
lord and Tenant that this lease shall yield, net to Landlord the
fixed rent specified in this Section 2.01 in each year during the
term of this lease, free of any charges, assessments, or impositions
of any kind charged, assessed or imposed on or against the Demised
Premises except as expressly hereinafter provided in Section 2.03,
and without abatement, deduction or set-off by the Tenant, and Land-
lord shall not be expected or required to pay any such charge, as-
sessment or imposition, or be under any obligation or liability
hereunder except as herein expressly set forth, and that all costs,
expenses and obligations of any kind relating to the demolition of
the structures presently located on the Demised Premises, the con-
struction of the new buildings hereinafter provided for, the main-
tenance, preservation, care, repair and operation of the Demised
Premises, including all replacements, alterations and additions,
as hereinafter provided, which may arise or become due during the
term of this lease shall be paid by Tenant, and the Landlord shall
be indemnified and saved harmless by Tenant from and against such
costs, expenses and obligations.

Section 2.02

In the event that the net sales (as hereinafter defined)
made by Tenant upon the Demised Premises during any lease year of
the initial term or any extended term hereof shall be in excess of
Fifteen Million Dollars ($15,000,000.), then the Tenant shall pay
to Landlord, as additional rental hereunder for said lease year
a sum equal to one per cent (1%) of such excess.  Said additional

- 12 -

rental, if any, shall be paid by Tenant within thirty (30) days after the end of the respective lease year for which the same is payable.

(a) The term "net sales" as used herein is hereby defined to mean the gross sales made upon the Demised Premises by Tenant plus the gross sales, if any, made upon the Demised Premises by Tenant's departmental sublessees, concessionaires and licensees occupying space upon the Demised Premises, but deducting or excluding therefrom, as the case may be, the following:

(1) Sales of departments or divisions not located upon the Demised Premises;

(2) The amount of all sales, use, excise, retailers' occupation or other similar taxes imposed in a specific amount, or percentage upon, or determined by, the amount of retail sales made upon the Demised Premises;

(3) Returns and allowances, as such terms are known and used by Tenant in the preparation of Tenant's profit and loss statements;

(4) Delivery, installation and service charges including any and all service charges for work performed off the Demised Premises;

(5) Amounts in excess of Tenant's (or of its sublessees', concessionaires' and licensees') cash sales price charged on sales made on credit or under a time payment plan;

(6) Sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's catalog order channels, regardless of the place of order, payment or delivery;

(7) Policies of insurance sold on the Demised Premises and premiums collected on policies of insurance;

(8) Sales off the Demised Premises of encyclopedias and other educational books sold in sets;

(9) Sales made through the Commercial and Industrial Sales Department of Tenant.

(b) Within sixty (60) days after the end of each lease year, Tenant shall furnish to Landlord a statement certified by an officer of Tenant showing the net sales (as hereinbefore defined) made by Tenant upon the Demised Premises during such preceding lease year, and the additional rental, if any, payable by Tenant to Landlord for such lease year. In addition, Tenant shall furnish

- 13 -

Landlord with a statement of Tenant's net sales (as above defined)
for Tenant's next preceding fiscal year prepared by Tenant's certi-
fied public accountants.

(c)  Unless Landlord shall, within thirty (30) days
after receipt of any such statement certified by Tenant's officer,
notify Tenant to the contrary, such statement shall be deemed to
have been accepted by the Landlord as correct.  In the event that
Landlord shall notify Tenant of Landlord's dissatisfaction with
such statement within the aforementioned period, then Tenant shall
permit a reputable firm of certified public accountants doing business
in the United States and Puerto Rico, which shall be mutually satis-
factory to, and approved in writing by, Landlord and Tenant, to make
an independent audit of Tenant's net sales (as hereinbefore defined)
for the period covered by said statement.  Such independent audit
shall be at Landlord's expense and the findings of such audit shall
be binding upon both parties and conclusive.

(d)  Tenant makes no representation or warranty as
to the sales which it expects to make upon the Demised Premises
and Landlord agrees to hold in confidence all sales figures and
other information with respect to Tenant's business which Landlord
may obtain from Tenant or from any audit of Tenant's books and
records, except that Landlord may submit all of said information
to the holder or holders of mortgages upon Landlord's interest in
the Demised Premises, who shall also receive same in confidence.

Section 2.03

As additional rent hereunder, Tenant shall be liable
for and pay all property taxes, assessments (ordinary and extra-
ordinary), sewer rents, water rents and charges and other taxes,
duties, charges, fees or payments imposed by any governmental or
public authority, which shall be imposed, assessed, levied or be
or become a charge or lien upon, or arise in connection with the
use, occupancy or possession of the Demised Premises or any part

thereof or appurtenances thereto.  Tenant shall be entitled to
a credit against, and deduction from, the additional rent payable
by it hereunder at the fixed rate of $1,240.69 a year (which figure
represents the proportionate part of all 1964 real estate taxes
upon the land comprising Parcel A which is attributable to the
land included in the Demised Premises and is subject to revision
if the option in introductory paragraph "D" hereof is exercised by
Tenant).

       (a)  Promptly after the execution of this lease,
the Landlord and the Tenant shall join in an application to the
Planning Board or other governmental authority having jurisdiction
thereof, to obtain during the term of this lease the issuance of
tax bills covering only the land and buildings included in Premise
C and Premise D (if the use thereof is permissible as aforesaid)
and the issuance of separate tax bills covering the land and build-
ings in the remainder of the Shopping Center.  The tax bills cover-
ing only the land and buildings included in the Demised Premises
shall determine the Tenant's obligation for additional rental under
this Section 2.03.

       (b)  If for any reason during the term of this lease,
separate tax bills cannot be obtained for only the land and build-
ings included in the Demised Premises, as provided in the preceding
paragraph, then for the purpose of determining the Tenant's obliga-
tion for property taxes under this Section 2.03, the taxes, assess-
ments, etc. attributable to the Demised Premises shall be determined
as follows:  The Landlord and Tenant shall select a reputable, ex-
pert real estate appraiser mutually acceptable to them who shall
prepare and submit to the parties a detailed appraisal of all the
land and buildings in the Shopping Center.  Such appraisal shall
be binding upon both parties and conclusive.  That proportion of
the taxes, assessments, etc. of the entire Shopping Center which
the appraised value of the land and buildings contained in the
Demised Premises bear to the appraised value of the land and build-
ings contained in the entire Shopping Center shall constitute Tenant's

obligation for additional rental (subject to the deduction herein-
above provided for). The said proportion shall be applied in any
year for which the said separate tax bills cannot be obtained. The
said appraisal shall be made and completed in the month of July during
the first year when said separate tax bills are unobtainable and shall
be repeated in the same month during each succeeding year when said
separate tax bills are unobtainable, provided, however, that the cer-
tification by the appraiser (or his mutually acceptable successor)
that there has been no material change in the values of the land
and buildings in the Shopping Center since the date of the last de-
tailed appraisal shall be accepted in lieu of a new appraisal, and
the proportion established by the last detailed appraisal shall con-
tinue to be applicable. The cost of such appraisals shall be borne
equally by Landlord and Tenant.

(c) Tenant shall pay each sum payable pursuant to
this Section 2.03 on or before the date when same becomes due and
payable. In the case of any assessment for public improvements
wherein the cost of the public improvement is permitted to be paid
in installments, the Tenant may pay the same in installments. Any
such installments falling due during the term of this lease shall
be payable by Tenant and any such installments falling due after
the expiration of the term of this lease shall be payable by Land-
lord. Real estate taxes, sewer rents, water rents and charges and
other taxes, duties and charges in said categories (whether or not
the same have become a lien upon the Demised Premises) for the tax
year in which the term of this lease shall end shall be apportioned.

(d) Tenant shall have the right at its own expense,
to contest in good faith any taxes, sewer rents, water rents, charges
or assessments imposed upon, or allocated to, the Demised Premises,
and in case any such taxes, rents, charges or assessments shall, as
a result of any such legal proceedings, be reduced, cancelled, set
aside or otherwise discharged, Tenant shall be entitled to receive
its proportion of such taxes, rents, charges or assessments, with
interest thereon, if any, which may be recovered; provided, however,
that any such contest by Tenant of any taxes, assessments or other

charges shall not endanger Landlord's fee interest in the property
demised, and Tenant shall furnish any requisite bond and shall take
such other steps as reasonably may be required to protect Landlord's
interest.'

Section 2.04

As additional rent hereunder, Tenant shall pay to Landlord
expenses and charges other than those referred to in Section 2.03
hereof, which during the term of this lease shall be levied, assessed
or imposed by any governmental authority upon or with respect to, or
incurred in connection with, the ownership, possession, occupation,
operation, alteration, maintenance, repair and use of the Demised
Premises, or the making of any additions thereto.  If at any time
during the term of this lease under the laws of the Commonwealth or
any political subdivision thereof in which the Demised Premises are
situated a tax or excise on rents or other tax, however described,
is levied or assessed by said commonwealth or political subdivision
against the Landlord or the fixed rent expressly reserved hereunder,
Tenant covenants to pay and discharge such tax or excise on rents or
other tax but only to the extent of the amount thereof which is law-
fully assessed or imposed upon Landlord and which was so assessed
or imposed as a direct result of Landlord's ownership of the Demised
Premises, or of this lease or of the rentals accruing under this
lease, it being the intention of the parties hereto that the fixed
rent to be paid hereunder shall be paid to Landlord absolutely net
without deduction of any nature whatsoever except as in this lease
otherwise expressly provided.

Section 2.05

Nothing in this lease contained shall be construed to re-
quire Tenant to pay any franchise, estate, inheritance, succession,
capital levy, or transfer tax of Landlord, or any income, excess
profits or revenue tax or any other tax or impost charged or levied
upon the rentals payable by Tenant under this lease, except as pro-
vided in Section 2.04 hereof.

Section 2.06

The fixed rent and additional rent specified in this
Article II is intended to cover both Premise C and Premise D in

the event that the Planning Board of Puerto Rico permits the use
of Premise D as an automotive and community center. If the
Planning Board does not permit the use of Premise D as an auto-
motive center, or if there is other legal impediment to the use
of Premise D as an automotive center, then Premise D will be
excluded from this lease so long as such lack of permission or
other legal impediment exists, the Tenant will locate its auto-
motive center on Premise C, and the fixed rent and additional
rent specified in this Article II shall not be reduced, abated
or otherwise affected in any way whatsoever.

ARTICLE III

Section 3.01

Promptly upon the commencement of the term of this
lease, Tenant shall, at its own cost and expense, demolish and
remove the buildings or improvements now on Premise C, except for
such portion thereof, if any, as the Tenant may be able to in-
tegrate into the new building to be placed on Premise C. Land-
lord reserves the right to remove, free of charge but at its own
expense, from any building on Premise C prior to its demolition
any personal property, fixtures or equipment which either belong
to the present lessee of said building or could be used by the
Landlord in the new building being provided for such lessee, pro-
vided, however, that the Tenant shall be entitled to retain the
air conditioning unit now serving the Belk-Lindsey store if Tenant
is able to use such unit in Tenant's new building, and such unit
shall not be removed by Landlord without Tenant's prior written
consent.

Section 3.02

(a) As soon as Premise C is cleared as herein-
above provided, Tenant shall, at its own cost and expense, commence
the construction on Premise C of a modern department store building
of a quality, design and construction at least equal to that of the
other department store building owned and operated by Tenant in

- 18 -

San Juan, Puerto Rico. Such building shall be designed so as to harmonize esthetically with the rest of the Shopping Center and shall have the following specifications: approximately 416 feet in the north-south direction and approximately 234 feet in the east-west direction, containing approximately 97,400 square feet of covered parking in a partial basement, 97,400 square feet of ground floor, 48,700 square feet on the second floor and 24,300 square feet of future second floor area.

(b) In the event that the Planning Board of Puerto Rico approves the use of Premise D as an automotive and community center, promptly thereafter Tenant shall, at its own cost and expense, commence the construction on Premise D of an automotive and community center of a quality, design and construction in keeping with the aforesaid building on Premise C, which building on Premise D shall have the following specifications: approximately 60 feet in the northwest-southeast direction and approximately 182 feet in the northeast-southwest direction, containing approximately 12,000 square feet of ground floor, 5,720 square feet of mezzanine floor and 12,000 square feet of second floor area.

(c) Construction of the building on Premise C and the building on Premise D (if permissible) shall be made in accordance with duplicate sets of working plans, sketches and specifications prepared by duly licensed architects and engineers theretofore submitted to Landlord, whose approval as to the general appearance of the buildings shall be required. Such approval shall not unreasonably be withheld.

(d) Fee simple title to the said buildings (but not the land upon which they are placed) shall be vested in Tenant free and clear of all existing liens and encumbrances. Upon the expiration of the term of this lease (initial or extended) or other sooner termination thereof, the title to the said buildings shall vest in the Landlord and possession of the said buildings

shall be surrendered and delivered to the Landlord in good order,
condition and repair, reasonable wear and tear excepted, and free
and clear of all liens and encumbrances. Tenant shall execute
such instruments and perform such other acts as may be required
to transfer fee title in said buildings to Landlord, and Tenant
shall not be entitled to any compensation whatsoever in connection
with such vesting and transfer of title. Tenant shall have the
right to remove from said buildings free of cost all personal
property and trade fixtures, provided, however, that Tenant shall
promptly repair any damage caused to the building by such removal.

(e) The aforesaid buildings shall have, for Regis-
try of Property purposes only, a value of $2,000,000.

(f) Landlord and Tenant and Trustee shall appear
in and execute the appropriate Act of Edification (Acta de Edifica-
cion) notarial deed in order that title to the buildings to be built
by Tenant may be inscribed in Tenant's name in the corresponding
section of the Registry of Property of Puerto Rico, and, if neces-
sary, Landlord will cause the mortgagees of said premises to appear
in and execute the said Act of Edification.

Section 3.03

(a) Before commencing the construction of the new
building or buildings on the Demised Premises, Tenant shall, at
its own cost and expense, obtain from all Boards, Departments and
governmental offices having jurisdiction, approval of plans, sketches
and specifications for the buildings together with all permits re-
quired by law for the construction of the buildings. After the said
approvals and permits shall have been granted, Tenant shall, at its
own cost and expense, keep the same in force and effect until the
improvements shall have been completed.

(b) After commencing such construction, Tenant shall,
at its own cost and expense, thereafter diligently proceed with,
complete and pay for the construction of the new building or buildings

- 20 -

in conformity with the said plans, sketches and specifications
filed and approved as above, in good and workmanlike manner,
free from mechanics' liens and in accordance with the laws, or-
dinances and lawful requirements of the Commonwealth of Puerto Rico
and the various departments and bureaus having jurisdiction thereof.
Upon completion of any building, Tenant shall furnish Landlord with
a duly issued Certificate of Occupancy, or if local procedure makes
no provision therefor, then Tenant shall furnish Landlord with the
architect's certification that the building has been completed ac-
cording to the plans and specifications.

Section 3.04

In connection with said demolition and construction,
Tenant shall obtain, or cause contractors to obtain and maintain,
without cost or expense to Landlord, Builder's Risk (fire, wind-
storm, hail, explosion, riot, riot attending a strike, civil com-
motion, aircraft, vehicle, smoke, vandalism, malicious mischief,
sprinkler leakage, and earthquake) insurance with limits commen-
surate with the completed portion of the buildings under construction,
Public Liability insurance, with limits of $500,000. per person and
$1,000,000. per accident for bodily injury limits and $100,000. for
property damage, and Workmen's Compensation and Employer's Liability
insurance with a limit of at least $100,000. under the Employer's
Liability portion.  Such insurance shall be in forms sufficient to
protect Landlord and Tenant from liability claims arising out of
said demolition and construction.  Tenant shall furnish Landlord
with certificates evidencing such coverages; provided, however,
that Tenant may elect to self-insure any or all of these require-
ments in accordance with Section 6.02.

Section 3.05

The said demolition and construction shall be carried
out in such a way as to interfere as little as is reasonably possi-
ble with the operation of the Shopping Center or the rights of other

tenants thereof. All materials to be stored at the site of con-
struction shall be stored on Parcel B free of charge by the Land-
lord. Except for the said use of Parcel B, the Tenant shall confine
its activities as closely as possible to the area of the Demised
Premises. Tenant shall erect such fence or other enclosures as are
required to carry out the intent of this Section 3.05.

Section 3.06

(a) Either simultaneously with, or immediately sub-
sequent to, the construction of the said new building or buildings,
Tenant shall, at its own cost and expense, construct upon Parcel B
a parking area which shall be of quality, design and construction
at least equal to that of the existing parking areas in the Shopping
Center. Such parking area shall be for the general use, in common,
of all the customers of the Shopping Center, as more fully provided
in Article XI hereof. In addition, Tenant shall, at its own cost
and expense, also construct a comparable parking area on that por-
tion of the land occupied by buildings to be demolished by Tenant
which is outside the boundaries of Premise C.

(b) Tenant shall have the right at any time and from
time to time during the term of this lease to improve the presently
existing parking areas in the Shopping Center so that they will con-
form to the Tenant's reasonable standards, provided, however, that
Tenant shall first obtain Landlord's written consent to any such
improvement, which consent Landlord shall not unreasonably withhold.
The cost of any such improvement shall be divided between Tenant and
Landlord. Tenant shall pay that proportion of the total cost which
the total floor area of Tenant's new building or buildings (exclud-
ing the floor area of the community center on Premise D, if the
same should be built) shall bear to the total floor area of all
the buildings in the Shopping Center upon the completion of Tenant's
new building or buildings.

ARTICLE IV

Maintenance and Repair

Section 4.01

Tenant shall, at its own cost and expense, keep the Demised Premises and the buildings and improvements hereafter erected and maintained upon the Demised Premises in good order and repair and in such condition as may be required by law and by the terms of any insurance policies covering the Demised Premises, whether or not such repairs shall be interior or exterior, extraordinary as well as ordinary, and whether or not such repairs shall be of a structural nature, and Tenant's obligation for maintenance and repair shall apply to the fixtures and facilities upon the Demised Premises or forming part thereof, including without limitation, all water, drainage, electric lighting, heating, air conditioning, gas, elevator, sewer, plumbing and other fixtures and facilities thereon.

Section 4.02

Tenant shall, at its own cost and expense, promptly comply with and conform to the requirements of every applicable statute, law, ordinance, lawful regulation and order, with respect to the condition, equipment, maintenance, use or occupation of the Demised Premises and any buildings and improvements thereafter erected and maintained thereon, and appurtenances, franchises and privileges connected therewith, whether or not such statute, law, ordinance, regulation or order be of a kind now within the contemplation of the parties hereto.

Section 4.03

Tenant shall pay and discharge, and indemnify and save harmless Landlord against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon or incurred by or asserted against Landlord by reason of any of the following

- 23 -

occurring during the term of this lease unless caused by the sole
negligence of the Landlord:

    (a)  Any work or thing done in, on or about
the Demised Premises or any part thereof;

    (b)  Any use, nonuse, possession, occupation,
condition, operation, maintenance, repair or
management of the Demised Premises or any part
thereof or any fixtures or facilities therein
contained;

    (c)  Any negligence on the part of Tenant or
any of its agents, contractors, servants, employees,
licensees, concessionaires or invitees;

    (d)  Any injury or damage to any person or
property occurring in or on the Demised Premises
or any part thereof;

    (e)  Any failure on the part of Tenant to per-
form or comply with any of the covenants, agreements,
terms or conditions contained in this lease on its
part to be performed or complied with.

In case any action or proceeding is brought against Landlord by
reason of any such claim, Tenant will at Tenant's expense resist
or defend such action or proceeding.

## ARTICLE V

### Alterations and Additions

Section 5.01

    Subject to the conditions hereafter set forth in this
Article V, Tenant shall have the right from time to time at its
own cost and expense to make any alterations, additions or improve-
ments within the Demised Premises, including necessary demolition,
incidental to the convenient conduct of Tenant's business, pro-
vided that such alterations, additions or improvements, when
completed, do not diminish the value of the Demised Premises.
Tenant shall have the right hereunder to increase the cubic con-
tents of the new building on Premise C without incurring any
liability for an increase in the fixed rent provided for in
Section 2.01 hereof, provided, however, that any such increase in
the cubic contents shall be dependent upon compliance by the
Tenant with the parking requirements of the governmental authority
having jurisdiction thereof.

Section 5.02

All alterations and additions by Tenant within the
Demised Premises shall be subject to the following:

(a) Before commencing any alteration or addi-
tion whose estimated cost is in excess of $100,000., Tenant
shall furnish to Landlord a duplicate set of the working plans,
sketches and specifications for the proposed work prepared by a
duly licensed architect or engineer.

(b) All alterations and additions shall be made
in accordance with all governmental statutes, ordinances and
regulations as specified in Section 3.03 hereof.

(c) In connection with any alteration or addi-
tion, Tenant shall at its cost and expense obtain or cause to be
obtained all the insurance coverage specified in Section 3.04
hereof.

(d) Any alteration or addition shall be carried
out in such a way as to interfere as little as is reasonably
possible with the operation of the Shopping Center or the rights
of any other tenants thereof.

Section 5.03

Tenant shall have no power to do any act or make any
contract which may create or be the foundation for any lien, charge
or other encumbrance upon the reversion or fee estate of Landlord
in the Demised Premises. Should Tenant cause any alterations, re-
placements, changes, additions, improvements or repairs to be made
in the Demised Premises, or labor to be performed or material to
be furnished therein, neither Landlord nor the Demised Premises
shall under any circumstances be liable for the payment of any
expenses incurred or for the value of any work done or material
furnished, but all such work, labor and material shall be made,
furnished and performed at Tenant's expense and Tenant shall be
solely and wholly responsible to all persons furnishing and per-
forming such labor and material. If, because of any act of Tenant,
any mechanic's, laborer's or materialman's lien shall be filed

against the Demised Premises or against Landlord, Tenant shall, at its own cost and expense, within 20 days after the filing thereof, commence and diligently pursue proceedings to have the same cancelled and discharged of record.

## ARTICLE VI

### Insurance

Section 6.01

Tenant shall maintain at Tenant's sole cost and expense, for the benefit of Landlord and Tenant, insurance with respect to the Demised Premises, of the following types and in the following amounts:

(a) Fire and extended coverage insurance (losses due to windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, smoke), vandalism, malicious mischief, sprinkler leakage and earthquake insurance and insurance against such other events as shall from time to time be added to the extended coverage insurance carried by Tenant's Parent Corporation in an amount not less than 100% of the replacement cost (excluding excavation and foundation values) as the same is determined at five (5) year intervals by an architect or engineer designated by Tenant and satisfactory to Landlord.

(b) Public Liability insurance covering liability claims occurring on the Demised Premises and arising out of the operation of the Tenant within the Demised Premises or any interest of the Landlord in the Demised Premises. The limits of liability of such insurance shall be at least $500,000. per person, $1,000,000. per accident for bodily injury and $100,000. per accident for property damage.

(c) Plate glass insurance on the Demised Premises.

Section 6.02

Tenant shall have the option of effecting such insurance through an insurance company of recognized standing satisfactory to the Landlord and the holder of any mortgage on the fee of the Demised Premises or through Tenant's Parent Corporation

(Sears, Roebuck and Company, a New York corporation) which would
act as a self-insurer.

       (a)  If Tenant elects to effect such insurance
through an insurance company, such policies shall be secured
promptly and certificates thereof shall be furnished to Landlord.
Such policies shall provide that they will not be cancelled with-
out at least twenty (20) days  prior written notice to the Landlord
and Tenant.  Such policies shall contain loss payable clauses to
Landlord and Tenant as hereinbelow provided in Section 6.03.

       (b)  Tenant shall procure renewals of all such
insurance policies at least twenty (20) days before the expira-
tion thereof.  In default of the delivery or renewal of any such
insurance policy required hereunder, the Landlord may procure any
such insurance and the Tenant shall, on demand, reimburse the
Landlord for the cost thereof with interest thereon at the rate
of 6% per annum.

       (c)  If Tenant elects to effect all or any portion
of such insurance through its Parent Corporation, then Tenant
promptly shall advise Landlord of such election and shall furnish
Landlord with a duly executed certificate from its Parent Corpora-
tion specifying the exact insurance coverage which the Parent Cor-
poration will be responsible for.  Such certificate shall be
accompanied by the Parent Corporation's most recent published
annual report evidencing sufficient assets to cover the self-
insured risks.

       (d)  So long as the said Parent Corporation is
acting as insurer, the Tenant shall furnish to Landlord annually
on the anniversary of the certificate referred to in the preceding
paragraph, (1) a duly executed certificate of its Parent Corpora-
tion that the insurance coverage being provided by the Parent
Corporation is in full force and effect as of the date of said
certificate, and (2) the Parent Corporation's most recent pub-
lished annual financial report.

- 27 -

Section 6.03

In the event that during the term of this lease the building or buildings referred to in Section 3.02 hereof or any additions thereto at any time erected on the Demised Premises shall be damaged by fire or other insured casualty, then:

(a)  In case such damage shall amount to $100,000. or less, the loss shall be settled with Tenant and the insurance proceeds shall be paid to Tenant, and Tenant shall, at its own cost and expense, promptly proceed to repair the damage so caused.

(b)  In case such damage shall amount to over $100,000:

(1)  If such damage shall not be so serious as to render the said building untenantable or as to amount to a total destruction of said building, Tenant shall, at its own cost and expense, promptly proceed to repair the damage so caused;

(2)  If such damage shall be so serious as to render the said building untenantable, or shall amount to a total destruction of the building, then Tenant shall proceed with all reasonable expedition to restore or rebuild, as the case may be, the building so destroyed or rendered untenantable, free from liens of every kind, in substantial accordance with the plans and specifications of the building so destroyed or rendered untenantable (the building so to be rebuilt or restored in respect of its general exterior design, and the mechanical, heating, lighting and sanitary systems therein, to be substantially in accord with the building so destroyed or rendered untenantable), or in accordance with such other plans and specifications as may be agreed upon by the parties hereto; and in connection with such rebuilding or restoration Tenant shall comply with all the rules and requirements of all Boards, Departments and governmental offices having jurisdiction of such reconstruction or restoration and shall also comply with the requirements specified in Section 5.02 hereof.

(3)  The net sums recovered by Landlord and Tenant on account of loss or damage, whether under the policies taken out as aforesaid, or under other insurance policies taken out by Tenant and indemnifying for physical loss (as distinguished from the loss of use and occupancy or profits), shall be deposited in a special account in the name of Landlord, separate and distinct from all other funds of Landlord in a bank or trust company of the City of San Juan, Puerto Rico approved by Landlord and Tenant, to be applied on account of the cost of such restoration or rebuilding, as the case may be, as the work of restoration or rebuilding progresses, and Tenant shall pay any and all additional moneys required in such restoration or rebuilding in excess of said net sums recovered, and shall be entitled to receive any surplus, if any, remaining of said deposit after such restoration or rebuilding has been completed as aforesaid, provided, however, that should the aforesaid damage by fire or other casualty occur within the last three years of the initial term or any extended term

surrender the proceeds of any insurance to Land-
lord and vacate the premises.

(c)  There shall be no abatement or reduction of
any fixed or additional rental payable by the Tenant by reason of
any such damage or destruction or during any period of repair or
restoration, nor shall the Tenant be entitled to surrender posses-
sion of the Demised Premises or to terminate this lease by reason
of such damage or destruction, except as provided in subdivision
(3) of Section 6.03 (b) above.

(d)  If Tenant does not commence promptly to repair
or restore the injury or destruction, or if, having commenced the
repair or restoration, Tenant does not proceed diligently to com-
plete the same, Landlord shall be entitled (but shall be under no
obligation) at any time thereafter to enter the Demised Premises
and repair or restore the injury or destruction and to apply any
insurance proceeds in the said special account to the payment of
the cost thereof; but if the insurance proceeds are insufficient
for the cost of the repair, restoration or reconstruction, Tenant
shall pay to Landlord, upon demand and as additional rent as the
work progresses, such amounts as shall be necessary to complete
the repair, restoration or reconstruction.

Section 6.04

If the Tenant's Parent Corporation is the insurer of
the buildings on the Demised Premises against loss from fire or
other casualty, then upon the damage or destruction of such build-
ings, Tenant shall promptly proceed to repair the damage or to
restore or rebuild, as the case may be, in accordance with the
applicable provisions of Section 6.03, Subsection (a) and Subsec-
tion (b), paragraphs (1) and (2) hereof, and Tenant shall promptly
furnish to Landlord the written undertaking of its Parent Corpora-
tion to provide all monies which shall be required to complete the
repair or reconstruction work which the Tenant is obligated to
perform.

Section 6.05

Notwithstanding the insurance required under this Article

- 29 -

VI, Tenant agrees to indemnify Landlord against all damage, loss
or liability resulting from any insured risks referred to in this
Article VI or arising out of Tenant's occupancy and operation of
the Demised Premises except for damages, losses or liabilities
resulting from the sole negligence of the Landlord, whether or
not Tenant has placed and maintained such insurance.

## ARTICLE VII

### Condemnation

Section 7.01

(a) If at any time during the term of this lease,
a fee simple interest in the whole or at least sixty per cent (60%)
of the actual ground area of the Demised Premises shall be taken for
any public or quasi-public purposes by any lawful power or authority
by the exercise of the right of condemnation or eminent domain, then
this lease and the term hereof shall terminate and expire as of the
date of such taking, the fixed rent, additional rent and any other
sum or sums of money and other charges herein reserved and provided
to be paid by Tenant shall be apportioned and paid to date of such
taking, and the Tenant shall thereupon be released from any further
liability hereunder.

(b) If a fee simple interest in less than ten per
cent (10%) of the actual ground area of the Demised Premises shall
be taken as aforesaid, then this lease and the term hereof shall
continue, but the rent payable hereunder shall be reduced as pro-
vided in Section 7.02 hereof, and Tenant shall have the duty to re-
pair and restore the Demised Premises as provided in Section 7.04
hereof.

(c) If a fee simple interest of at least ten per
cent (10%), but less than sixty per cent (60%) of the actual ground
area of the Demised Premises shall be taken as aforesaid, then Tenant
shall have the right to cancel and terminate this lease effective as
of the date of such taking or to continue in possession of the

- 30 -

remainder of the Demised Premises for the term hereof, and Tenant
shall give to Landlord, within thirty (30) days after the date of
such taking, notice of Tenant's election to terminate or to con-
tinue this lease. Upon termination, rents and other charges shall
be apportioned as in Subsection (a) above, and upon continuation
the rent shall be reduced as provided in Section 7.02 hereof and
the Tenant shall have the duty to repair and restore as provided
in Section 7.04 hereof.

    (d) Upon termination of this lease as provided in
Subsections (a) and (c) above, title to the building or buildings
on the Demised Premises shall vest in the Landlord without any
compensation whatsoever by the Landlord to the Tenant, and neither
Landlord nor Tenant shall, except for obligations incurred before
the occurrence of such event, have any further obligation or
liability to the other.

Section 7.02

    In the event that this lease shall continue pursuant to
Subsection (b) of Section 7.01 hereof, or in the event that Tenant
shall elect to continue this lease, as provided in Subsection (c)
of Section 7.01 hereof, then all the terms, conditions and provi-
sions of this lease shall continue in full force and effect, pro-
vided, however, that:

    (a) The fixed rent then payable shall abate during
the period of repair and restoration in the proportion that the
floor area of the buildings referred to in Section 3.02 hereof so
taken plus the floor area of such buildings which cannot be used by
Tenant during said period of repair and restoration bears to the
floor area of the entire buildings referred to in Section 3.02
hereof before such taking; and

    (b) After the repair and restoration of the buildings
has been completed:

        (1) The fixed rent payable thereafter under
this lease shall be equal to that proportion of the
fixed rent specified in Section 2.01 hereof which the

floor area of the entire buildings after repair and
restoration bears to the floor area of the entire
buildings referred to in Section 3.02 hereof before
such taking.

(2)  In computing percentage rent under Section
2.02 hereof, the figure of Fifteen Million Dollars
($15,000,000.) shall be replaced by a figure derived
by applying the proportion set forth in the preceding
paragraph to the said figure of Fifteen Million Dollars
($15,000,000.).

(c)  The term "floor area" as used herein shall mean
the actual number of square feet of space within the outside lines
of the exterior walls of all floors of full-story height of the
building on the Demised Premises, without any deduction for space
used or occupied for elevators, escalators, stairs, columns, or
other equipment of interior construction; excluding, however, any
area outside the building line or above the roof line and excluding
the area of the community center on Premise D (in the event that the
Planning Board permits construction of the automotive and community
center on Premise D).

Section 7.03

In the event of any condemnation proceeding involving
either the whole or any portion of the Demised Premises, both the
Landlord and the Tenant shall participate in such proceeding and
each shall be represented by its own counsel at its own cost and
expense.  Both parties shall cooperate in the prosecution and col-
lection of any award upon any taking in such condemnation proceeding
and shall request that the Court allocate the award between the fee
estate (Landlord) and the leasehold estate (Tenant) in accordance
with the following:

(a)  In the event of any such taking, partial,
whole or substantially all, as the case may be, Land-
lord shall be entitled to receive such portion of the
award therefor, with the interest thereon, as shall
represent compensation for the value of the Demised

- 32 -

Premises or the part thereof so taken considered as vacant and unimproved land free and clear of leases as of the date of taking.

(b)  In the event of any such taking, partial, whole or substantially all, as the case may be, that portion of the award therefor, with the interest thereon, as shall represent compensation for the value of the new building on the Demised Premises, or the part thereof which is taken, shall be allocated so that the Landlord shall receive such proportionate part as the number of full calendar years then elapsed since the commencement date of this lease bears to 64 years.  The remainder of said portion of the award shall be allocated to the Tenant.

(c)  In the event of any such taking, partial, whole or substantially all, as the case may be, Landlord shall be entitled to receive such portion of the award therefor, with the interest thereon, as shall represent compensation, if any, for consequential damages to lands, buildings and improvements adjoining or adjacent to the Demised Premises.

(d)  In the event of any taking, partial, whole or substantially all, as the case may be, Tenant shall be entitled to such portion of the award, if any, which represents compensation for the leasehold estate.

(e)  In the event of any taking of less than sixty per cent (60%) of the actual ground area of the Demised Premises and the continuation of this lease as provided in Section 7.01, Subsection (b) or Subsection (c) hereof, that portion of the award which is allocated to the Tenant shall be deposited in a special escrow account in the name of Landlord, separate and distinct from all other funds of Landlord in a bank or trust company of the City of San Juan, Puerto Rico approved by Landlord and Tenant, to be applied on account of the repair or restoration of, or addition to, the building on the Demised Premises, as the work of repair or restoration progresses in accordance with Section 7.04 hereof.

Section 7.04

In the event of any taking of less than sixty per cent (60%) of the actual ground area of the Demised Premises, and the continuation of this lease as provided in Section 7.01, Subsection (b) or Subsection (c) hereof, the Tenant shall proceed with all reasonable expedition to repair or restore the remaining part of the buildings, or to build any addition thereto, in substantial accordance with the plans and specifications of the new buildings prior to such taking, so far as applicable, or in accordance with such other plans and specifications as may be agreed upon by the parties hereto.  The Tenant shall comply with all the rules and requirements of all Boards, Departments and governmental offices having jurisdiction of such repair, restoration or addition and shall also comply with all the conditions specified in Section 5.02 hereof.

The deposit made pursuant to Section 7.03, Subsection (e) hereof shall be applied on account of the cost of any such repair, restoration and addition as the work progresses, and Tenant shall pay any and all additional moneys required for any such repair restoration or addition in excess of the amount of said deposit, and shall be entitled to receive any surplus of the said deposit remaining after all the required work has been completed as aforesaid.

Section 7.05

If during the term of this lease less than a fee title to all or any portion of the Demised Premises shall be taken in condemnation proceedings by any lawful power or governmental authority for temporary use or occupancy, the foregoing provisions of this Article shall be inapplicable to such taking; this lease shall continue in full force and effect but the rent shall abate in the proportion that the floor area so taken bears to the floor area of all of Tenant's buildings referred to in Section 3.02 hereof before such taking. In such event, Landlord shall be entitled to claim for, recover and retain any award in respect of such taking.

## ARTICLE VIII

### Conduct of Business by Tenant

Section 8.01

Tenant shall use the leased premises for the purpose of conducting the business of a Sears Roebuck "Class A" department store in a manner substantially similar to the operation now carried on in the existing "Class A" Sears Roebuck department stores in Puerto Rico and the United States, except as otherwise provided for herein. Promptly after completion of the new building, as aforesaid, Tenant shall commence such operation.

## ARTICLE IX

### Mortgage, Assignment and Sublease

Section 9.01

The Tenant at any time hereafter may assign this lease

- 34 -

and the leasehold estate hereby created, or sublet the whole of
the Demised Premises to any wholly owned subsidiary of Tenant
or to any corporation wholly owned by Tenant's Parent Corporation
or in which Tenant's Parent Corporation owns at least two-thirds
of the outstanding voting stock, subject, however, to the terms
and conditions of this lease.

Section 9.02

Except as provided in Section 9.01 hereof, Tenant
shall not assign this lease in whole or in part nor sublet the
entire Demised Premises without the prior written consent of
Landlord. It is the intent of the parties that during the term
of this lease the Demised Premises shall not without the Landlord's
prior written consent, be used for the conduct of any business
other than that specified in Section 8.01 hereof, and it is under-
stood that the Landlord shall not consent to any assignment or
subletting unless the Landlord is reasonably satisfied that the
prospective assignee or sublessee has the standing and experience
to conduct a department store business substantially equivalent
to that specified in Section 8.01 hereof, or such other business
as is commensurate with the objectives of the Shopping Center and
does not conflict with contractual obligations of the Landlord to
other tenants in the Center.

Notwithstanding the foregoing, Tenant shall have the
right to sublease or sublicense parts of the Demised Premises to
such departmental sublessees, concessionaires and licensees as
normally occupy space in a Sears Roebuck "Class A" department
store.

Section 9.03

In the event of an assignment of this lease, or a sub-
lease of the entire Demised Premises, as permitted in Section
9.01 or Section 9.02 hereof, the assignee or sublessee shall
execute and deliver to the Landlord an agreement in writing

- 35 -

assuming all the terms, covenants and conditions on the part of
the Tenant to be kept and performed under this lease. No assign-
ment or subletting, nor the acceptance of rents or other payments
from, nor any other dealing by the Landlord with any assignee, under-
tenant, occupant or other person shall release the Tenant from its
obligation to pay the Landlord a monthly rental equivalent to the
average monthly rental paid by Tenant to Landlord during the
twelve months' period last preceding such assignment or subletting,
but, in no event shall such liability be less than the fixed
rentals hereinabove provided to be paid from time to time during
the existing term of the lease and any renewal thereof.

Section 9.04

In the event that the Tenant abandons the Demised
Premises, then this lease shall terminate and title to the build-
ing or buildings on the Demised Premises shall vest in Landlord
in accordance with the provisions of Section 14.01, Subsection (b)
hereof. Upon such termination Tenant shall pay to Landlord, as
and for liquidated and agreed damages, the amounts set forth in
Section 14.01, Subsections (c) and (d) hereof.

Section 9.05

Tenant may mortgage its interest under this lease, but
any such mortgage shall be subject and subordinate to the provi-
sions of Sections 3.02(d),7.01(d), 9.04 and 14.01 hereof as well as
to the other provisions of this lease, and no such mortgage shall
impair any of the rights, remedies or interest of Landlord under
this lease. Landlord agrees to give notice of any default here-
under to any mortgagee of this lease who shall have given Landlord
written notice of such mortgage and furnished Landlord with a
certified copy thereof, and further agrees to accept perform-
ance by such mortgagee of the terms, covenants and conditions

- 36 -

of this lease in the manner and within the time provided for here-
under as if such performance were by Tenant, provided, however,
that such mortgagee shall be subject to the business restrictions
referred to in Section 9.02 hereof. No mortgage of Tenant's
interest under this lease or the enforcement thereof, shall be
deemed to release or discharge Tenant from any obligation or
liability hereunder.

Section 9.06

The provisions of subdivision (d)(2) of Section 1.05
shall be complied with by any mortgagee holding a mortgage upon
Landlord's fee interest in Parcel A and/or Parcel B, and shall
be superior to the lien of any such mortgage upon Landlord's
said fee interest.

### ARTICLE X

### Utilities

Section 10.01

Tenant shall be solely responsible for and promptly
pay all charges for heat, water, gas, electricity, telephone,
sewerage or any other utility rendered to, used or consumed in
the leased premises. In no event shall Landlord be liable for an
interruption or failure in the supply of any such utilities to the
leased premises, provided, however, that in the event that Land-
lord fails to maintain in good working condition any utility
equipment such as a sewage pipe or utility conduit located
within the Shopping Center but utilized by the Tenant, which
utility equipment was installed by and is under Landlord's effec-
tive control, and if within ten (10) days after receiving written
notice thereof from Tenant, Landlord does not proceed promptly
to cure such condition, Tenant shall have the same right as
Landlord to cure such condition and deduct the cost thereof
from rental payments due hereunder.

- 37 -

ARTICLE XI

Parking and Common Use Areas and Facilities

Section 11.01

All automobile parking areas, driveways, entrances
and exits thereto, and other facilities furnished by Landlord
in or near the Shopping Center, for the general use, in common,
of tenants, their officers, agents, employees and customers, shall
at all times be subject to the exclusive control and management of
Landlord and Landlord shall have the right from time to time to
establish, modify and enforce reasonable rules and regulations
with respect to all facilities and areas mentioned in this Article.
Landlord shall have the right to construct, maintain and operate
lighting facilities on all said areas and improvements; to police
the same; from time to time to change the level, location and ar-
rangement of parking areas and other facilities hereinabove referred
to; to restrict parking by tenants, their officers, agents and em-
ployees to employee parking areas; to close all or any portion of
said areas or facilities to such extent as may, in the opinion of
Landlord's counsel, be legally sufficient to prevent a dedication
thereof or the accrual of any rights to any person or the public
therein; to close temporarily all or any portion of the parking
areas or facilities; to discourage noncustomer parking; and to do
and perform such other acts in and to said areas and improvements
as, in the use of good business judgment, the Landlord shall de-
termine to be advisable with a view to the improvement of the con-
venience and use thereof by tenants, their officers, agents, employees
and customers. Landlord will operate and maintain the common facili-
ties referred to above in such manner as Landlord in its sole discre-
tion, shall determine from time to time. Without limiting the scope
of such discretion, Landlord shall have the full right and authority
to employ all personnel and to make all rules and regulations pertain-
ing to and necessary for the proper operation and maintenance of the

- 38 -

common areas and facilities. Landlord shall obtain and maintain

a public liability policy of insurance with Landlord and all tenants

of the Shopping Center as insured covering liability claims arising

out of the common use and facilities areas. The coverage shall be

$500,000. and $1,000,000. for personal damages and $100,000. for

property damages. Certificates of insurance shall be issued to

the tenants.

## ARTICLE XII

### Cost of Maintenance of Common Areas

Section 12.01

Tenant shall pay to Landlord as an agreed service charge

that proportion of the cost of insuring, repaving or otherwise main-

taining, policing, landscaping and lighting the parking areas, road-

ways, service areas and sidewalks in the Shopping Center, which the

floor area of the new building or buildings on the Demised Premises

(excluding the floor area of the community center on Premise D, if

the same should be built) shall bear to the aggregate floor area of

all of the structures in the Shopping Center. Such service charge

shall be payable monthly as billed by the Landlord. Sixty (60)

days after Landlord's fiscal year, Landlord shall furnish to Tenant

a detailed statement of the aforesaid cost and the payments there-

tofore made by Tenant will be adjusted in accordance therewith. In

the event that the Landlord fails to maintain the said common areas

in a manner reasonably satisfactory to Tenant, then Tenant shall be

entitled to proceed in accordance with the provisions of Section

14.03 hereof.

## ARTICLE XIII

### Merchants' Association

Section 13.01

Tenant shall cooperate on a fair and equitable basis with

the Merchants' Association of the Shopping Center in furthering the

objects and purposes of the Merchants' Association. Tenant reserves

the right in its sole discretion, to decide whether or not to be-
come a member of said Association.

## ARTICLE XIV

### Default

Section 14.01

(a)  If default shall be made by the Tenant in the
due and punctual payment of any fixed rent or additional rent pay-
able under this lease when and as the same shall become due and
payable, and such default shall continue without correction for a
period of thirty (30) days after notice from Landlord to Tenant,
then and in such event Landlord shall have the right to terminate
this lease by giving written notice thereof to Tenant and five (5)
days after the giving of such notice this lease and the term hereby
demised and all rights of Tenant hereunder shall, subject to the
provisions of this Section 14.01, expire and terminate; provided,
however, that the non-payment of any disputed additional rent under
Section 2.02 hereof prior to the binding determination provided in
subsection (c) of Section 2.02 hereof, or the non-payment of any
taxes which Tenant is contesting in accordance with the provisions
of subsection (d) of Section 2.03 hereof, shall not be deemed to be
a default under this Section 14.01.

(b)  Upon any such termination of this lease, title
to the building or buildings erected by the Tenant on the Demised
Premises shall vest in the Landlord without any compensation whatso-
ever to the Tenant by way of payment, offset or otherwise, and Tenant
shall execute such instruments as may be required to effectuate the
transfer of title to the Landlord.  Upon any such termination of
this lease, Tenant shall quit and peacefully surrender the Demised
Premises to Landlord, and Landlord, upon or at any time after any
such termination, may without further notice, enter upon the Demised
Premises and possess itself thereof, by summary proceedings, eject-
ment or otherwise, and may dispossess Tenant and remove Tenant and
may have, hold and enjoy the Demised Premises.

(c) In the event of any such termination Tenant shall pay to Landlord for the remainder of the then existing term of the lease, as and for liquidated and agreed damages, the equivalent of the fixed rent hereinabove provided, less the net proceeds of any reletting (after deducting all Landlord's expenses in connection with such reletting). Tenant shall pay such damages to Landlord monthly on the days on which the fixed rent would have been payable under this lease if it were still in effect, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same shall arise.

(d) In the event of any such termination, Landlord shall make reasonable efforts to relet the Demised Premises for such term or terms upon such conditions as Landlord, in its sole discretion, may determine and Landlord shall collect and receive the rent therefor and apply the same on a monthly basis against the liquidated damages obligations of the Tenant hereinabove provided. So long as the Landlord acts in good faith, the Landlord shall not be responsible or liable for any failure to relet the Demised Premises or for any failure to collect any rent due upon any such reletting.

Section 14.02

If default shall be made by Tenant in the performance of or compliance with any of the covenants, agreements, terms or conditions contained in this lease other than those referred to in Section 14.01 hereof, and such default shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant, (provided, however, that Tenant's time to cure any such default shall be extended for such additional time as shall be reasonably required for the purpose if Tenant shall proceed with due diligence during such thirty (30) day period to cure such default and is unable to cure the same within the said thirty (30) days) then Landlord shall have the right, at its

election, to submit the matter to an appropriate court. The
final determination of any such court shall be binding upon the
parties hereto. Any award of damages to the Landlord shall be
added to the payment of fixed rent next falling due under this
lease, and Tenant's default in paying such damages shall be
deemed to be a default in the payment of fixed rent under
Section 14.01 hereof.

Section 14.03

If default shall be made by Landlord in the perform-
ance of or compliance with any of the covenants, agreements or
conditions on its part to be performed hereunder, then the Tenant
shall be entitled to proceed as follows:

(a) If Landlord's default shall be in the perform-
ance of work which the Tenant is able and willing to perform, then
Tenant shall give the Landlord written notice specifying in detail
the work which Tenant requires and which Tenant proposes to per-
form upon Landlord's failure to do so. Within thirty (30) days
after such written notice the Landlord shall either commence the
performance of the requested work and shall diligently proceed
therewith until the work is completed or the Landlord shall sub-
mit the matter to an appropriate court. In the event that the
Landlord does not either proceed with the performance of the re-
quested work or submit the matter for adjudication within the
said thirty (30) day period, the Tenant shall have the right to
perform the work specified in its notice and to deduct the monies
actually expended therefor from the rental payment or payments
next falling due under this lease.

(b) If Landlord's default shall be in some per-
formance which Tenant is either unable or unwilling to perform,
then Tenant shall give the Landlord written notice of the perform-
ance required and if within thirty (30) days after such written
notice the Landlord does not commence and diligently proceed with
the requested performance then Tenant shall have the right, at
its election, to submit the matter to an appropriate court.

(c)  The final determination by the court of any matter submitted pursuant to paragraphs (a) or (b) of this Section 14.03 shall be binding upon the parties hereto. Any award of damages to the Tenant shall be deducted from the rental payment or payments next falling due under this lease and the Tenant shall also have the right to deduct therefrom the monies actually expended by Tenant for work performed by Tenant pursuant to such determination.

(d)  In the event of Landlord's default which shall be held by a court of competent jurisdiction to have constituted an eviction of Tenant of a permanent nature, then Tenant's failure to pay rent subsequent to such finding shall not constitute a technical default under Section 14.01 hereof and Tenant shall be entitled to such damages as the court deems proper.

Section 14.04

Notwithstanding the foregoing provisions of this Article XIV, in the event of the breach by either party of the covenants, agreements or conditions of this lease, the other party shall, in addition to any and all other rights, be entitled to such injunctive and other remedies as may be allowed at law, in equity, by statute or otherwise for such breach.  No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this lease or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition.  No waiver of any breach shall affect or alter this lease, but each and every covenant, agreement, term and condition of this lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

### ARTICLE XV

### Surrender At Expiration

Section 15.01

Tenant shall on the expiration of the term of this lease

or other sooner termination hereof, surrender and deliver up the Demised Premises with the buildings and improvements then erected and maintained thereon into the possession of Landlord in good order, condition and repair, free and clear of all liens, tenancies and encumbrances other than those, if any, created by Landlord, and title to such buildings and improvements shall vest in the Landlord without any payment or allowance whatever by Landlord on account of or for any buildings and improvements on the Demised Premises at the time of the surrender, or for the contents thereof or appurtenances thereto.  Tenant shall execute such instruments as may be required to effectuate the transfer of title to Landlord.

The aforesaid surrender shall include all fixtures and facilities in the buildings on the Demised Premises, or forming part thereof, which are customarily regarded as real estate and as part of the buildings.  Any fixtures, trade fixtures, personal property or belongings of Tenant left upon the Demised Premises at the time of such surrender shall be deemed to have been abandoned by Tenant.

## ARTICLE XVI

### Equipment and Fixtures Installed

Section 16.01

Tenant from time to time during the initial term or any extended term may install equipment and fixtures of various kinds and descriptions for use in connection with its business, and upon the installation or placing of, any such equipment and fixtures in or on the Demised Premises by Tenant, the same shall remain at all times the property of Tenant, and, at any time during the initial term or any extended term and at the termination of the lease, Tenant shall be entitled to remove any and all of such equipment and fixtures.  If any equipment or fixtures are so attached to the building as not to be readily removable without damage to the building, then, if Tenant shall remove the same, Tenant shall promptly repair and replace any damage caused to the building by such removal.

Upon the expiration or other termination of this lease, Landlord may require Tenant to remove any and all of such equipment and fixtures at the expense of the Tenant and Tenant shall promptly repair any damage caused to the building by such removal.

Nothing herein contained shall be deemed to confer upon Tenant any right to remove any equipment or fixtures used in the operation of the Demised Premises (Article XV) as distinguished from fixtures used in carrying on Tenant's business.

## ARTICLE XVII

### Covenant of Quiet Enjoyment

Section 17.01

Landlord covenants and agrees that so long as Tenant pays the fixed rent, additional rent and other charges reserved and agreed to be paid by Tenant under this lease, and faithfully observes all covenants, conditions and agreements herein contained, Tenant shall quietly have and enjoy the Demised Premises and every part thereof during the term of this lease without hindrance, ejection or molestation by Landlord or any person or persons claiming by, through or under Landlord. In the event that Landlord shall hereafter convey, or in any manner be divested of title to, the Demised Premises, Landlord shall be and hereby is entirely freed and relieved of the performance of all covenants and obligations of Landlord hereunder from and after such conveyance or divestiture of title to the extent that Landlord's successor in title shall become obligated, expressly or by implication of law, to perform the covenants and obligations of Landlord hereunder, and to such extent Tenant shall thenceforth look solely to Landlord's successor in title for the performance of the covenants and obligations of Landlord hereunder.

## ARTICLE XVIII

### Estoppel Certificates

Section 18.01

Tenant agrees at any time and from time to time during

the term of this lease upon not less than ten (10) days prior
notice by Landlord to execute, acknowledge and deliver to Land-
lord a statement in writing certifying that this lease is unmodi-
fied and in full force and effect (or if there have been modifica-
tions, that the same is in full force and effect as modified and
stating the modifications), and the dates to which the fixed rent
and other charges have been paid, and stating whether or not to
the best knowledge of the signer of such certificate Landlord
is in default in performance of any covenant, agreement or condi-
tion contained in this lease and, if so, specifying each such
default of which the signer may have knowledge, it being intended
that any such statement delivered pursuant to this Section 18.01
may be relied upon by any prospective purchaser of the fee or any
mortgagee thereof.

Section 18.02

Landlord agrees at any time and from time to time during
the term of this lease upon not less than ten (10) days prior no-
tice by Tenant to execute, acknowledge and deliver to Tenant a
statement in writing certifying that this lease is unmodified and
in full force and effect (or if there shall have been modifications
that the same is in full force and effect as modified and stating
the modifications) and the dates to which the fixed rent and other
charges have been paid, and stating whether or not to the best
knowledge of the signer of such certificate Tenant is in default
in performance of any covenant, agreement or condition contained
in this lease and, if so, specifying each such default of which
the signer may have knowledge, it being intended that any such
statement delivered pursuant to this Section 18.02 may be relied
upon by any prospective mortgagee of the Tenant's interest in this
lease.

## ARTICLE XIX

### Invalidity of Particular Provisions

Section 19.01

If any term or provision of this lease or the application

thereof to any person or circumstance shall, to any extent, be
invalid or unenforceable, the remaining terms and provisions of
this lease, or the application of such term or provision to per-
sons or circumstances other than those as to which it is held
invalid or unenforceable, shall not be affected thereby, and
each term and provision of this lease shall be valid and be en-
forced to the fullest extent permitted by law.

## ARTICLE XX

### Notices

Section 20.01

     All notices, demands and requests required or permitted
to be given hereunder by either party to the other shall be in
writing and given by registered mail return receipt requested. All
notices, demands and requests by Landlord to Tenant shall be deemed
to have been properly given if and when the original notice, de-
mand or request has been mailed by registered mail addressed to
Tenant at Office of the President, 106 Coll y Toste Streets, Hato
Rey, Puerto Rico, or at such other place as Tenant may from time
to time designate in a written notice to Landlord. All notices,
demands and requests by Tenant to Landlord shall be deemed to
have been properly given if and when mailed by registered mail
addressed to Landlord at Office of the President, Suite 2600, 70
Pine Street, New York 5, New York, or at such other place as Land-
lord may from time to time designate in a written notice to Tenant.

## ARTICLE XXI

### Restriction on New Buildings in Shopping Center

Section 21.01

     During the term of this lease Landlord shall not, with-
out the prior written consent of the Tenant, undertake or permit
the construction of new buildings upon the premises of the Shopping
Center which will (1) substantially reduce the parking area of the
Shopping Center which is then available or (2) substantially alter

the character of the Shopping Center.  Nothing contained herein
shall be construed to restrict in any way whatever Landlord's
right to make normal repairs or alterations to existing buildings
or to repair, restore or rebuild any buildings which may be damaged
or destroyed by fire or other casualty or to repair or restore
buildings which may be affected by condemnation.

### ARTICLE XXII
### Access By Landlord

Section 22.01

The Landlord or its agents shall have the right at all
reasonable hours and upon reasonable notice, to inspect the Demised
Premises.  In the event the Tenant has not elected to extend the
term of this lease as provided in Section 1.07 hereof, then during
the one year period prior to the expiration of the initial term or
the first extended term or the second extended term, as the case
may be, the Landlord shall have the right to exhibit the premises
to prospective tenants at reasonable hours and upon reasonable
notice.  The Landlord shall have the right to exhibit the premises
to prospective tenants during the one year period prior to the
expiration of the third extended term without any prejudice to
Tenant's rights under Section 1.09 hereof.

### ARTICLE XXIII
### Miscellaneous

Section 23.01

As used herein, the expression "the term of this lease",
or any variation thereof, shall be deemed to include the initial
term and any and all extended terms provided for in Section 1.07
hereof.

Section 23.02

All the headings and the numbering of the Sections in
this lease are for convenience of reference only and shall not
affect the construction of this lease.

Section 23.03

Subject to the provisions of Article IX hereof, and without in any way enlarging Tenant's right to assign as therein set forth, this lease shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

Section 23.04

This lease may not be modified, altered, terminated or discharged orally but only by an agreement in writing signed by the parties hereto.

Section 23.05

This lease may be executed in any number of counterparts, each of which shall be an original and the counterparts shall constitute but one and the same instrument.

Section 23.06

The controlling language of this instrument shall be English.

Section 23.07

The appropriate jurisdiction for the determination of disputes arising under this lease shall be Puerto Rico.

Section 23.08

Any party hereto may, at its sole expense, elect to make this lease a public deed. In such event, the other parties hereto shall join in the execution of such instruments as may be required to effectuate such election, but the other parties shall not be responsible for any taxes, fees, costs or other expenses whatsoever incurred in connection therewith.

IN WITNESS WHEREOF, the parties hereto have caused this lease to be executed in their respective corporate names and

their respective corporate seals to be hereunto affixed by their
respective officers thereunto duly authorized, as of the day and
year first above written.

SANTA ROSA SHOPPING CENTER, INC.

By _____
PRESIDENT

SEARS, ROEBUCK de PUERTO RICO, INC.

By _____

BANCO CREDITO Y AHORRO PONCENO, INC.

By _____

STATE OF NEW YORK )
                  : ss.:
COUNTY OF NEW YORK)

Before me, a Notary Public, in and for the County and State of New York, there came JOHN P. BIRKELUND, the President of SANTA ROSA SHOPPING CENTER, INC., to me personally known, who acknowledged that he is the one who executed on behalf of the above named corporation the above instrument of lease.

WHEREFORE, I have hereunto set my hand and seal of office this 16th day of September, 1965.

_BENJAMIN BLONDER_
NOTARY PUBLIC, State of New York
No. 31-5390125
Qualified in New York County
Commission Expires March 30, 19 66

CITY OF _Hinsdale_)
              : ss.:
STATE OF _Illinois_)

Before me, a Notary Public, in and for the City of _Hinsdale_ and State of _Illinois_, there came _____, the _____ of SEARS, ROEBUCK de PUERTO RICO, INC., to me personally known, who acknowledged that he is the one who executed on behalf of the above named corporation the above instrument of lease.

WHEREFORE, I have hereunto set my hand and seal of office this _____ day of September, 1965.

CITY OF _San Juan_ )
                   : ss.:
STATE OF _Puerto Rico_ )

Affidavit # 4245

Before me, a Notary Public, in and for the City of _San Juan_ and State of _Puerto Rico_, there came _____, the Vice President of BANCO CREDITO Y AHORRO PONCENO, INC., to me personally known, who acknowledged that he is the one who executed on behalf of the above named corporation the above instrument of lease.

WHEREFORE, I have hereunto set my hand and seal of office this 9th day of September, 1965.
(October)

C-600-061Am

AMENDMENT TO THE LEASE BETWEEN SANTA ROSA SHOPPING CENTER, INC. AND
SEARS, ROEBUCK DE PUERTO RICO, INC., DATED SEPTEMBER 6, 1965

Agreement made this 3 day of    June        , 1983, in San Juan,
Puerto Rico, between Plaza Las Cumbres, Inc., a corporation organized
and existing under the laws of the Commonwealth of Puerto Rico, as
Party of the First Part, represented herein by its president, Andre
Nikitine, of legal age, married, and a resident of Puerto Rico, who
is duly authorized therefore, hereinafter called the "Landlord", and

Sears, Roebuck de Puerto Rico, Inc., a Delaware corporation with
principal offices in San Juan, Puerto Rico, as Party of the Second
Part, represented herein by its president, Donald S. Jones, of legal
age, married, and a resident of San Juan, Puerto Rico, who is duly
authorized therefore, hereinafter called the "Tenant".

Whereas, Santa Rosa Shopping Center, Inc. and Sears, Roebuck
de Puerto Rico, Inc. signed a lease agreement on September 6, 1965
(hereinafter referred to as the "Lease Agreement"), and

Whereas, subsequent to the signing of the Lease Agreement, Santa
Rosa Shopping Center, Inc. was purchased by Landlord, and

Whereas, Landlord is the successor in interest of Santa Rosa
Shopping Center, Inc. to the Lease Agreement, and

Whereas, Landlord wishes to make additions and improvements to
the mall of Santa Rosa Shopping Center (hereinafter referred to as
the "Shopping Center"), and

Whereas, the proposed addition and improvement to the mall will
affect the Demised Premises, including Tenant's department store
(hereinafter referred to as "Tenant's store") and said Shopping Center,

Now, therefore, the Parties agree as follows:

1. Prior to beginning the construction of any addition or improvement
   to the Shopping Center, Landlord shall:

   (a) submit to Tenant for Tenant's approval the proposed design
       and specifications for the mall, which design and specifi-
       cations: (i) shall be similar to those for the existing
       mall building, (ii) shall not provide for any alteration in
       the precast concrete fascia panels or the structural slab

of the roof overhang at the mall entrance to Tenant's
store, and (iii) shall include roof plans illustrating
the location of roof drains and rain leaders.  Tenant's
exterior canopy may be used as the roof of the building
to be attached to the demised premises or as the roof of
the enclosed mall; provided, however, that said overhang
shall be used only as a roof, and provided further that
no equipment or materials; with the exception of a suspended
ceiling and lighting, shall be hung from said canopy or
installed on or over it.

Landlord shall further present to Tenant for its approval
all designs and specifications for the alteration of the
Demised Premises.  Said plans and specifications shall include,
inter alia:

(i)  the proposed plans for the doorway between Tenant's
store and the mall, the size of the mall configuration
at the entrance to Tenant's store, and the form in which
the mall building is to be attached to Tenant's store.
In the event that an exterior wall of Tenant's store is
used as a common wall for an adjoining building, said plans
shall include plans for the construction of an exterior
stud wall;

(ii)  the layout of parking spaces on and adjacent to the
demised premises.  Landlord shall paint any lines drawn
in the parking lot in a way that parked cars  will not
interfere with loading and unloading operations for the
demised premises, and in no event shall there be fewer
than 25 feet between the loading and unloading entrance
of Tenant's store and the parking areas for cars.

Once Tenant has approved said design and specifications,
Landlord shall prepare the site plan in accordance therewith
and shall submit said plan for Tenant's approval.  After
Tenant has approved the site plan, Landlord shall attach
said plan hereto as Exhibit II.  Landlord shall make no
modification or alterations to said plan without Tenant's
written authorization.

(b) obtain and make available for inspection by Tenant all
necessary approvals and permits of the Permit and Regulation
Administration (ARPE) and the Puerto Rico Planning Board
for additions and improvements to the Shopping Center and
to the Demised Premises.  Landlord shall not commence or
cause to commence any work on additions or improvements to
the Shopping Center or to the Demised Premises until Tenant
has reviewed and approved said approvals and permits.  Any
changes to the proposed plans will be notified to Tenant
for Tenant's approval.  If public hearings are necessary,
Landlord will notify Tenant of the time, date and place
they will take place.

(c) obtain and present to Tenant the authorization of any
mortgagors or creditors of Landlord that may be required
to permit Landlord to perform the modifications and altera-
tions referred to herein.

2. Landlord warrants and represents that it shall:

(a) commence construction within      days of approval of the site
plan by Tenant and shall finish construction within      days
of commencement.

(b) construct all additions and improvements to the Shopping
Center so that the entire area of the Shopping Center shall
be covered by a sprinkler system.

(c) place all building rain leaders designed to drain water from
the roof in a location that does not cause rain water run
off to flow down the entrance ramp to Tenant's lower level
parking.

(d) not disturb the precast concrete fascia panels or the structural
slab of the roof overhang at the mall entrance to Tenant's
store.

(e) bear all costs of additions or improvements to the Shopping
Center as well as all costs of additions or improvements to
the Demised Premises required because of additions or im-
provements to the Shopping Center; Landlord shall pay

the cost of the construction or remodeling of the doorway
between Tenant's store and the mall, up to a maximum of
$12,500.  Landlord will seek and obtain Sears' approval
on any and all exterior signs bearing Sears name to be put on the mall.

(f)  at Landlord's expense, cause GT Sylvania to survey Tenant's
rear parking lot after completion of the additions and
improvements to the Shopping Center.  Landlord shall provide
Tenant with a certificate from GT Sylvania stating that the
lighting of Tenant's rear parking lot is equal the current
lighting level of Tenant's front parking lot.

(g)  Building 17 on the plot plan attached hereto as Exhibit I,
to be constructed in the central part of the parking lot
of the Shopping Center fronting on Highway Number 2, and shall
construct any sign related to Building 17 in such a way that
neither the building nor the sign will be higher than the
ground level of Tenant's store, which is twenty-two feet.
Landlord further warrants and represents that it shall not
build any building or structure directly fronting on the
Demised Premises, or on or around the corner of Highway
Number 2, and Aguas Buenas Avenue.

(h)  in connection with the remodeling work to be done on the
Demised Premises, obtain, pay for, and maintain at all times
during the performance of work under this contract, through
companies and agencies approved by Tenant and pursuant to
contracts containing provisions satisfactory to Tenant,
the following Insurance:

(i)  Worker's Compensation and Employer's Liability Insurance
with statutory benefits under Worker's Compensation,
and limits of liability under the Employer's Liability
portion of not less than $500,000 containing a waiver
of subrogation in favor of Tenant executed by Landlord's
insurance company or companies,

(ii)   Comprehensive General Liability Insurance including
Contractor's Protective Liability in Contractor's
name, with bodily injury and property damage limits
of not less than $1,000,000 per occurrence,

(iii)   Contractual Liability Insurance in Landlord's name
specifically endorsed to cover the indemnity agreement
in this contract.  Limits of liability shall be not
less than $1,000,000 per occurrence for bodily injury
and property damage,

(iv)   Owner's Protective Liability Insurance with Tenant as
the named insured, covering Landlord's operations and
the work performed for Landlord on the job site.  Such
policy shall have a combined single limit of not less
than $1,000,000 per occurrence for bodily injury and
property damage, and

(v)   Automobile Liability Insurance with an Employer's Non-
Ownership Liability Endorsement in Landlord's name.
Limits of liability shall not be less than $1,000,000
per occurrence for bodily injury and property damage.

Landlord shall cause waivers of subrogation to be executed
by Landlord's insurance company or companies in favor of
Tenant with respect to the foregoing policies as well as with
respect to any real and personal property insurance policy
maintained by Landlord covering the Shopping Center.

(i)   To the fullest extent permitted by law, defend, indemnify
and hold harmless Tenant and its agents and employees from
and against all claims, actions, liabilities, losses, costs
and expenses, including but not limited to attorneys'
fees, arising out of any actual or alleged (i) bodily
injury, sickness, disease or death, or to injury to or
destruction of tangible property (other than the work itself)
including the loss of use resulting therefrom, or any other
damage or loss arising out of or resulting or claimed to

have resulted in whole or in part from any actual or
alleged act or omission of the Landlord, or any con-
tractor, any subcontractor, anyone directly or indirectly
employed by any of them or anyone for whose acts any of them
may be liable in the performance of the work hereunder
(for purposes of this Section 2(i), hereinafter collectively
called "Contractor"), whether or not lawful or within the
scope of their employment, and regardless of whether or not
it is caused in part by a party indemnified hereunder; or
(ii) violation by Contractor, in the performance of the work,
of any law, statute or ordinance or any governmental
administrative order, rule or regulation, on whatever amount
a Court of Justice may award on any incident alleged to
result or resulting from the Santa Rosa Shopping Center
remodeling.

In any and all claims against Tenant, or any of its agents
or employees, by any employee of the Contractor, the indemni-
fication obligation hereunder shall not be limited in any
way by (i) any limitation on the amount or type of damages,
compensation or benefits payable by or for the Contractor
under workers' compensation acts, disability benefit acts
or other employee benefit acts; or (ii) by any statutory
bar or limitaiton in any worker's compensation or other
similar type of statute.

(j)   carry out all remodeling work in such a way as to interfere
as little as reasonably possible with the operation of Tenant
on the Demised Premises.

3.   Landlord warrants and represents that Tenant shall maintain its
rights to the future expansion area previously approved by the
Planning Board, including the existing parking spaces allocated for
Tenant's future expansion.

4.   Landlord warrants and represents that the mall shall be no greater
than 28 linear feet wide at the entrance of the mall to Tenant's
Premises.

5.   For the period of June 1, 1983 to May 31, 1988, the first paragraph
of Section 2.02 shall be amended to read as follows:

-7-

"a.   In the event that the net sales (as hereinafter defined)
      made by Tenant upon the Demised Premises during any lease
      year shall be in excess of Fifteen Million Dollars
      ($15,000,000), then Tenant shall pay to Landlord, as
      additional rental hereunder for said lease year, a sum
      equal to one (1) per cent of such excess (said amount referred
      to hereinafter as "additional rental").

"b.   Tenant shall pay as an advance to Landlord the sum of $2,000
      per month, which amount shall be credited against the amount
      due hereunder as additional rental, if any.  Said advances
      shall be paid prior to the first business day of each month
      during the aforesaid period.  In the event that at the end
      of any lease year that begins or ends during the period
      between June 1, 1983 to May 31, 1988, the sum of the monthly
      advances paid during said year as additional rental exceeds
      the total amount due as additional rental in accordance
      with 2.02 (a) above,  Landlord shall promptly refund such
      excess to Tenant, together with the interest thereon,
      calculated at the average prime rate established by
      Citibank, N. A. during the last month of the year in question.

"c.   The term 'net sales' as used herein is hereby defined to
      mean the gross sales made upon the Demised Premises by
      Tenant plus the gross sales, if any, made upon the Demised
      Premises by Tenant's departmental sublessees, concessionaires
      and licensees occupying space upon the Demised Premises, but
      deducting or excluding therefrom, as the case may be, the
      following:

         (1)  Sales of departments or divisions not located upon
         the Demised Premises;

(2)  The amount of all sales, use, excise retailers'
occupation or other similar taxes imposed in a specific
amount, or percentage upon, or determined by, the amount
of retail sales made upon the Demised Premises;

(3)  Returns and allowances, as such terms are known
and used by Tenant in the preparation of Tenant's profit
and loss statements;

(4)  Delivery, installation and service charges including
any and all service charges for work performed off the
Demised Premises;

(5)  Amounts in excess of Tenant's (or of its sublessees',
concessionaires' and licensees') cash sales price charged on
sales made on credit or under a time payment plan;

(6)  Sales of merchandise ordered through the use of
Tenant's mail order catalogs or filled through Tenant's
catalog order channels, regardless of the place of order,
payment or delivery;

(7)  Policies of insurance sold on the Demised Premises
and premiums collected on policies of insurance;

(8)  Sales off the Demised Premises of encyclopedias
and other educational books sold in sets;

(9)  Sales made through the Commercial and Industrial
Sales Department of Tenant.

"d. Within sixty (60) days after the end of each lease year,
Tenant shall furnish to Landlord a statement certified by
an officer of Tenant showing the net sales (as hereinbefore
defined) made by Tenant upon the Demised Premises during
such preceding lease year, and the additional rental, if
any, payable by Tenant to Landlord for such lease year.
In addition, Tenant shall furnish Landlord with a statement
of Tenant's net sales (as above defined) for Tenant's next
preceding fiscal year prepared by Tenant's certified public
accountants.

"e.  Unless Landlord shall, within thirty (30) days after receipt
of any such statement certified by Tenant's officer, notify
Tenant to the contrary, such statement shall be deemed to
have been accepted by the Landlord as correct.  In the
event that Landlord shall notify Tenant of Landlord's dis-
satisfaction with such statement within the aforementioned
period, then Tenant shall permit a reputable firm of certified
public accountants doing business in the United States and
Puerto Rico, which shall be mutually satisfactory to, and
approved in writing by, Landlord and Tenant, to make and
independent audit of Tenant's net sales (as hereinbefore
defined) for the period covered by said statement.  Such
independent audit shall be at Landlord's expense and the
findings of such audit shall be binding upon both parties
and conclusive.

"f.  Tenant makes no representation or warranty as to the sales
which it expects to make upon the Demised Premises and
Landlord agrees to hold in confidence all sales figures
and other information with respect to Tenant's business
which Landlord may obtain from Tenant or from any audit
of Tenant's books and records, except that Landlord may
submit all of said information to the holder or holders
of mortgages upon Landlord's interest in the Demised
Premises, who shall also receive same in confidence."

On June 1, 1988, the aforesaid modification shall cease to have
any force and effect and the first paragraph of Section 2.02 shall
read as originally drafted.

6.  Section 5.01 of the Lease Agreement shall be modified by the
addition of paragraph (e), as follows:

"(e)  Any section herein to the contrary notwithstanding, Tenant
      shall have the right to remodel and add such additional
      offices on the second level of Tenant's store as Tenant
      may deem necessary, for its own use.  In the event that
      such offices are added, Tenant's office employees will
      use only the parking located at the rear of the Tenant's
      store."

7.  Section 12.01 of the Lease Agreement, as modified be amendment
    dated July 30, 1971, shall be modified to read as follows:

"A.  Tenant shall pay to Landlord as the exterior maintenance
     charge a percentage of the exterior maintenance cost
     (as defined below), which percentage shall be calculated
     using the following formula:  Tenant's gross floor area
     less basement parking area, divided by the gross leasable
     area (including Tenant's gross area) of the Shopping Center.
     The term 'exterior maintenance cost' shall include only:
     cost of insuring, repaving or otherwise maintaining, policing,
     securing, landscaping and lighting the exterior common areas
     plus overhead limited to 6% of such costs.  The term 'exterior
     common areas' shall mean only the parking areas, landscaped
     areas, roadways, service areas, sidewalks and entrances
     in the exterior of the Shopping Center.
     Tenant's gross floor area, less basement parking area,
     is 193,500 square feet and the gross leasable area of
     the Shopping Center is 329,327 square feet, on the date
     hereof, before expansion.

"B.  In addition to the payment of the aforesaid exterior
     maintenance charge, Tenant shall also pay as a mall
     operating charge a percentage of the operating costs
     of the mall, which percentage shall be calculated in
     accordance with the following formula:  The frontage
     of Tenant's store onto the mall, measured in linear
     feet, divided by total frontage of all leasable areas

onto the mall; provided, however, that in no event shall
Tenant be required to pay as a mall operating charge an
amount that exceeds 4% of the operating costs of the mall;
and provided, further, that in no event shall Tenant be
required to pay as a mall operating charge (including any
management or administrative expenses) an amount in excess
of $5,000 per year, such limit adjusted every five years
according to the CPI as published by the Department of
Labor of the Commonwealth of Puerto Rico.  The term 'operating
costs of the mall' shall include only the following expenses:
insurance, electricity, water, air conditioning repairs,
labor and materials used in cleaning, maintaining and making
repairs to the enclosed mall, and such management and administra-
tive costs as do not exceed 6% of the total amount of the
operating costs of the mall.  The term 'operating costs of
the mall' shall also include depreciation of ventilation equipment
installed or used in the mall area only.  For purposes
of cleaning, maintenance, and repairs, the term 'mall'
shall include:  mall flooring, ceiling, benches, planters,
plants, illumination (including emergency lights) and
ventilation equipment.

"C.   The aforesaid exterior maintenance and mall operating charge
shall be payable monthly as billed by the Landlord.  Within
sixty (60) days of the end of each lease year, Landlord
shall furnish Tenant a certified statement showing the
mall operating costs and exterior maintenance costs, as
defined above, for said lease year.  Payments made by
Tenant during said years shall be adjusted in accordance
with said statement and Tenant may credit any amounts due
to it as a result of said adjustment against any other
payments that it may owe to Landlord.  Tenant may notify
Landlord of Tenant's dissatisfaction with such statement,
in which case Landlord shall allow a certified public

accountant mutually acceptable to Tenant and Landlord to
make an independent audit of the aforesaid costs, at
Tenant's expense.  The findings of such audit shall be
binding upon both parties.  In the event that the Landlord
fails to maintain the exterior common areas in a manner
reasonably satisfactory to Tenant, then Tenant shall be
entitled to proceed in accordance with the provisions
established in Section 14.03 of the Lease Agreement dated
September 6, 1965."

8.   Section 12.02 of the Lease Agreement, as modified by amendment
dated July 30, 1971, shall be modified to read as follows:
"In the event that Tenant expands its store or that Landlord
enlarges the Shopping Center, Tenant's portion of the exterior
maintenance charge and the mall operating charge shall be
recalculated using the formulas set forth in Section 12.01 (A)
and (B) above.  Any change in Tenant's percentage of the afore-
said charges resulting from said recalculation shall be applied
only to that portion of the lease year during which said expansion
or enlargement was completed."

Tenant's final approval of Landlord's Santa Rosa Shopping Center
remodeling is subject to Landlord submitting to Tenant the final
detailed architechtural drawings for Tenant's approval.  Tenant
reserves the right of refusal of this contract until the final
detailed architechtural drawings are given to Tenant for Tenant's
approval.

All other terms and conditions of the Lease Agreement not specifically
modified herein shall remain in full force and effect.

PLAZA LAS CUMBRES, INC.          SEARS, ROEBUCK DE PUERTO RICO, INC.



André V. Nikitine                    Donald S. Jones

# EXHIBIT II

# Contract of Insurance

**Insured:**    SEARS HOLDINGS CORPORATION

**Policy Number:**    PTNAM1701557

**Period:**    1st June 2017 to 1st June 2018

**Type:**    All Risk Of Direct Physical Loss Or Damage
Including Flood, Earthquake and Boiler &
Machinery Insurance.

**Limit:**    USD440,000,000 (Excess of USD10,000,000
Non Stock Deductible)



Aon UK Limited
Registered Office  |  The Aon Centre  |  The Leadenhall Building  |  122 Leadenhall Street  |  London  |  EC3V 4AN
Registered in England & Wales No. 210725  |  VAT Registration No. 480 8401 48
Aon UK Limited is authorised and regulated by the Financial Conduct Authority



# Information for Aon Clients

This document is the Insurer agreed Contract of Insurance which provides evidence of cover in accordance with the heading "Insurer Contract Documentation" in the Risk Details section.

The Contract Administration and Advisory Sections facilitate the administration of the placement between the Insurer and Broker.

**To ensure that the insurance coverage we have placed for you meets your needs, please review this document carefully (including but not limited to applicable limits, sub-limits, deductibles, terms and conditions). In the event that this document contains errors or otherwise does not meet your needs, please advise us immediately as this will reduce the chance that you later sustain uninsured losses. This also applies to any queries you may have about the document. Unless we hear from you to the contrary within 30 days, we and you will deem the document provided to you fully conforms with your needs and instructions.**

## Remuneration

Aon may act as a Managing General Agent (MGA) on behalf of an Insurer for a single product, product line or their participation. In addition to any commission earned by the Global Broking Centre (GBC), the MGA is remunerated for the work undertaken on behalf of the Insurer and this may include profit or contingent commission.

Any participation placed via such an arrangement can be clearly identified as Aon Underwriting Managers (AUM) or Maven Underwriters on behalf of the applicable Insurer within the Security Details Section.

Aon may earn other remuneration from Insurers in respect of administration and management activities it undertakes at the time of placement, or during the period of the Insurance, in relation to specific products and facilities which facilitate the Insurers' own activities. Insurers may also ask the GBC to place facultative reinsurance, and may independently remunerate the GBC for these services through the payment of commission.

Further details will be provided by Aon on request.

## Taxes

Over the course of the placement of your Insurance Aon collect information relating to the underlying risks and the location of such risks. This information can assist in identifying premium allocations by country/territory and to produce tax schedules for inclusion in contract documentation. It is your obligation to ensure the accuracy of such information.

Where applicable, Aon will collect the tax amounts due and pass them to the Insurer(s) to settle with the relevant tax authorities. Insurers will be responsible for confirming that the taxes identified for collection in the tax schedule are correct. In certain circumstances, taxes may be payable by the Insured . Whilst we endeavour to identify such taxes, please note that Aon is not a tax adviser and it is your responsibility to ensure that such taxes are correctly identified and remitted. If you require independent advice on your tax liabilities, you should consult with your tax adviser.

It is important to note that where a tax schedule is completed this merely represents a proposed apportionment of premium calculated on a pro rata basis, and utilises rates that Aon has taken from tax calculation systems, as at the date the tax schedule was produced. The purpose of tax schedules is to provide information to Insurers which they may, if they wish, use in establishing an apportionment of premium for taxation and legislative reporting purposes.

This procedure in no way changes Insurers' responsibilities for making this calculation and/or ensuring that the correct tax rates are applied.

Policy Number:PTNAM1701557

# RISK DETAILS

**UNIQUE MARKET**      B1526PTNAM1701557
**REFERENCE**

**NAMED INSURED**      The Sears Holdings Corporation and any subsidiary, affiliated,
associated, or allied company, corporation, firm, organization,
partnership, joint venture, joint lease, or joint operating agreement as
now or hereafter constituted or acquired, as their respective interest
may appear; and any other party for which the Insured has the
responsibility for providing insurance, as their respective interest may
appear.

but in no event shall this include the following entities or their
subsidiaries:

Sears Canada Inc.
Sears Technology Services, Inc.
ST Holdings, Inc.

Whose mailing address is:

Sears Holdings Corporation
Risk Management Department
3333 Beverly Road E3-237A
Hoffman Estates, Illinois 60179

**all hereafter referred to as the "Insured."**

**POLICY TERM**      This policy attaches and insures from June 1, 2017 to June 1, 2018
beginning and ending at 12:01AM Local Standard Time at the location
of the property involved.

**TERRITORY**      This policy insures worldwide; except as respects the following
countries      Afghanistan, Angola, Bosnia-Herzegovina, Burma
(Myanmar), Congo (The Democratic Republic Of Congo or formally
known as Zaire), Croatia, Cuba, El Salvador, Guam, Haiti, Iran, Iraq,
Laos, Lebanon, Liberia, Libya, Nicaragua, North Korea,
Serbia-Montenegro, Slovenia, Sudan, Syria, Zimbabwe, Yugoslavia
and/orterritories formerly known as Yugoslavia;, or any country where
trade relations are unlawful as determined by the Government of the
United States of America or it's agencies, unless the Insured has been
granted a U.S. Treasury Department Foreign Assets Control license to
do business in that country and then coverage is provided only to the
extent legally permitted as a result of the issuance of the license,
subject to all other terms and conditions found in this policy.

**PERILS INSURED**      All Risk of direct physical loss or damage including flood earthquake,
**(LOSS OR DAMAGE**      Boiler and Machinery Insurance as defined in Contract Wording and
**INSURED)**      Endorsements.

**LOSS OR DAMAGE**      As fully detailed in Contract Wording and Endorsements.
**EXCLUDED**

**PROPERTY AND**      As fully detailed in Contract Wording and Endorsements.
**INTERESTS**
**INSURED**

Policy Number:PTNAM1701557

| | |
|---|---|
| **SPECIAL CONDITIONS** | As fully detailed in Contract Wording and Endorsements. |
| **PROPERTY EXCLUDED** | As fully detailed in Contract Wording and Endorsements. |
| **VALUATION** | As fully detailed in Contract Wording and Endorsements. |
| **LIMITS OF LIABILITY** | USD 440,000,000 per occurrence |
| | In excess of: |
| | USD 10,000,000 per occurrence Non-Stock Deductible |
| | Which in turn to pay excess of Deductibles and limited by Program Sublimits as detailed below. |
| | When a Program Sublimit is shown as applying in the Aggregate During Any Policy Year, the Limit of Liability detailed above shall also be applied in the Aggregate During Any Policy Year separately for each applicable Program Sublimit and shall not exceed such Program Sublimit during any policy year. |

| **PROGRAM SUBLIMITS** | | |
|---|---|---|
| | USD100,000,000 | per **Occurrence** and in the aggregate for the period in full as respects the peril of Earthquake |
| | USD100,000,000 | per **Occurrence** and in the aggregate for the period in full as respects the peril of **Flood** |
| | USD100,000,000 | per **Occurrence** as respects the peril of **Named Windstorm for the entire States of; Florida, Hawaii and Tier 1 counties** |
| | USD200,000,000 | per **Occurrence** as respects Demolition and Increased Cost of Construction |
| | USD200,000,000 | per **Occurrence** as respects Extra Expense |
| | USD100,000,000 | per **Occurrence** as respects Automatic Coverage (120 Days), except: |
| | USD100,000,000 | per **Occurrence** as respects Service Interruption / Off Premises Power |
| | USD100,000,000 | per **Occurrence** as respects Errors and Omissions |
| | USD50,000,000 | or 25% of the actual physical damage loss whichever is lesser, for Debris Removal |
| | USD5,000,000 | per **Occurrence** as respects Fine Arts |
| | USD100,000,000 | per **Occurrence** as respects **Miscellaneous Unnamed** Locations including Exhibition, Fair or Tradeshow; |
| | USD3,000,000 | per **Occurrence** as respects Professional Fees; |

Policy Number:PTNAM1701557

| | |
|---|---|
| USD2,500,000 | per **Occurrence** and in the aggregate for the period in full as respects Decontamination and Clean-up |
| USD50,000,000 | per **Occurrence** as respects Leasehold Interest |
| USD50,000,000 | per **Occurrence** as respects Rental Income and Rental Value |
| USD200,000,000 | per **Occurrence** as respects Transit |
| USD100,000,000 | per **Occurrence** as respects Property in the Course of Construction |
| USD100,000,000 | or 90 days, whichever is less, as respects Ingress/Egress — within 10 statute miles of an insured location. |
| USD100,000,000 | or 90 days, whichever is less, as respects Interruption by Civil or Military Authority — within 10 statute miles of an insured location. |
| USD5,000,000 | per **Occurrence** as respects Extended Increased Cost of Construction |

**BELOW SUBLIMITS ONLY APPLY TO HOFFMAN ESTATES, IL LOCATIONS:**

| | |
|---|---|
| USD5,300,000 | per **Occurrence** as respects Gross Earnings as respects Hoffman Estates, IL |
| USD1,000,000 | per Occurrence as respects Gross Earnings as respects 7615 Golden Triangle Drive, Eden Prairie, MN 55344 |
| USD10,000,000 | per **Occurrence** as respects Contingent Time Element |

**TIME LIMITS (Applicable to All Coverages):**

| | |
|---|---|
| Ninety (90) consecutive days | as respects Civil or Military Authority. |
| Ninety (90) consecutive days | as respects Ingress/Egress. |
| One Hundred Twenty (120) | as respects the Automatic Coverage provision. |
| 180 days | per occurrence as respects Extended Period of Indemnity |

**DISTANCE LIMITS (Applicable to All Coverages):**

| | |
|---|---|
| 10 statute miles | as respects Civil or Military Authority |
| 10 statute miles | as respects Ingress/Egress. |

The total amount to be indemnified under this policy and/or any

Policy Number:PTNAM1701557

admitted version of this policy issued by the insurer shall not exceed the overall limit or applicable sublimits stated in this policy

**PROGRAM DEDUCTIBLES**

In each case of loss covered by this policy, the Company will be liable only if the Insured sustains a loss in a single **Occurrence** greater than the applicable deductible(s) specified below, and only for its share of that greater amount.

Unless otherwise stated below, when this policy insures more than one location, the deductible will apply against the total loss covered by this policy in any one **Occurrence**.

All losses or damages arising out of any one **Occurrence** shall be adjusted as one loss, and from the amount of such adjusted loss shall be deducted the sum USD5,000,000 per **Occurrence**, except:

The following shall apply for losses arising from the specific critical catastrophic perils below:

A.    Five percent (5%) of the value per unit of insurance at the time when such loss occurs for insured property situated in a **Flood** zone A and V for **Flood**, subject to a minimum of USD5,000,000 in total for all units of insurance per **Occurrence**. This deductible shall apply only to those units of insurance suffering a loss in the **Occurrence**. However, this deductible shall not apply to insured property located outside of the above designated **Flood** zone.

B.    Five percent (5%) of the value per unit of insurance at the time when such loss occurs at locations within the state of California for the peril of Earthquake subject to a minimum of USD5,000,000 in total for all units of insurance per **Occurrence**. This deductible shall apply only to those units of insurance suffering a loss in the **Occurrence**.

C.    Five percent (5%) of the value per unit of insurance at the time when such loss occurs at locations within the entire state of Florida and Tier 1 counties as more fully defined in the policy for the peril of **Named Windstorm** subject to a minimum of USD5,000,000 in total for all units of insurance per **Occurrence**. This deductible shall apply only to those units of insurance suffering a loss in the **Occurrence**.

D.    Three percent (3%) of the value per unit of insurance at the time when such loss occurs at locations within the entire state of Hawaii for the peril of **Named Windstorm** subject to a minimum of USD5,000,000 in total for all units of insurance per **Occurrence**. This deductible shall apply only to those units of insurance suffering a loss in the **Occurrence**.

The amount of the deductibles above shall be determined by applying the above percentages, separately to each of the following units of insurance:

(1)    Each building or structure, not including the value of its foundations, which has sustained loss or damage;

(2)    Personal property within each building or structure if that personal property sustains loss or damage;

(3)    Personal property in the open that sustains loss or damage;

As to the calculation of deductibles under Paragraphs 4A, 4B, 4C and
4D, above, the insured shall have the option to determine what unit(s)
of insurance shall be included in its loss.  Additionally, stock and/or
inventory is not to be considered one of the units of insurance in
Paragraphs 4A, 4B, 4C and 4D above, unless the underlying Stock
Throughput limits have been exhausted.

**WAITING PERIOD**

Service Interruption                    ( 24 ) hours

**Deductible Clarifications:**

(1) If two or more deductible amounts in this policy apply to a single
**Occurrence**, the total to be deducted shall not exceed the largest
deductible.

(2) The deductible amounts specified above shall not apply to general
average contributions and salvage charges.

(3) If other insurance applies to the same property as insured
hereunder, and to the extent recovery is made from such other
insurance, the deductible under this policy shall be reduced by
such recovery, but in no event shall the deductible under this policy
be less than shown in the policy. If recovery from such other
insurance is greater than the deductible in this policy, then the
deductible under this policy shall not apply.

(4) Whenever mortgage or lease conditions require insurance
protection without deductibles, or with deductibles less than are
provided herein, **Insurers** agree to make payment without
consideration of the applicable deductible.   The Insured agrees to
reimburse the **Insurers** for any payments so made within 30 days
of such payment.

(5) This Policy recognises there are separate Stock Throughput
Policies, with coverage no greater than this Policy, in effect    for
the Policy Term with a USD50,000,000 per Location, per
Occurrence policy limit subject to annual aggregates for Flood,
Earthquake and Named Windstorm.
  a) In the event of a loss occurrence insured under both this Policy
     and the Stock Throughput Policy, the USD5,000,000
     deductible within this Policy only applies, in the event the stock
     / inventory loss is less than USD5,000,000. The amount then
     applied is only for the difference between USD5,000,000 and
     the amount of the stock / inventory damage.

  b) Deductibles 4A, 4B, 4C and 4D still apply but only for the
     difference between USD5,000,000 (or the amount of the
     stock/inventory loss if less than USD5,000,000) and the
     applicable percentage deductibles.

This clause will not apply, in the event the Stock Throughput Policies
are completely exhausted.

**NON-STOCK**
**DEDUCTIBLE**          This policy also recognises that the insured shall retain an additional
                        non-stock deductible in the amount of USD10,000,000 per occurrence
                        excess of the deductibles listed in the Deductibles section of the policy

  
above. This non-stock deductible applies on the non-stock portion of the loss and shall also be aggregated annually and separately, as respects the perils of Earthquake and Flood.

**LOSS ADJUSTORS**   Each and every loss expected to exceed the standard deductible will be adjusted by Vericlaim located at 1833 Centre Pointe Circle, Suite 139, Naperville, IL 60563-1484; unless otherwise agreed by the Insured and the Insurer.

**CONDITIONS**   Contract Wording and Endorsements as agreed by Lex-London a Division of AIG Europe Limited on Aon Policy Number PTNAM1701557, which contains the following endorsements:

Endorsement No.1 - Earthquake and Wind Zones
Endorsement No.2 - Participation Endorsement
Endorsement No.3 - Biological or Chemical Materials Exclusion – NMA 2962
Endorsement No.4 - Asbestos Endorsement – LMA 5019 (Modified) – Listed Perils: Fire; Explosion; Lightning; Windstorm; Hail; Flood; Collapse; Direct Impact of Vehicle; Aircraft or Vessel; Riot or Civil Commotion; Vandalism or Malicious Mischief; or Accidental Discharge of Fire Protective Equipment
Endorsement No.5 - Electronic Data Endorsement A- NMA 2914 (Modified): Sublimit: USD25,000,000 Listed Perils: Fire, Explosion, Lightning, Earthquake, Falling Aircraft, Flood, Smoke, Impact Damage, Windstorm or Tempest, Sprinkler Leakage, Collapse, Theft.
Endorsement No.6 - Mold, Mildew and Fungus Clause – Sublimit: USD2,500,000 per occurrence and in the aggregate for the period.
Endorsement No.7 - Application of Sublimits – LMA 5130 (Modified)
Endorsement No.8 - Extended Increased Cost Of Construction

**SUPPLEMENTAL CLAUSES**   The following endorsements are detailed in Supplemental Clauses:

Sanction Limitation and Exclusion Clause - LMA3100
Service of Suit Clause (USA) - NMA1998
Terrorism Exclusion Endorsement - NMA2920
U.S. Terrorism Risk Insurance Act of 2002 as amended – Not Purchased Clause - LMA5219
Illinois Surplus Lines Notice - LMA9046

Premium Payment Condition (Time on Risk basis) - PPC5 4/86.
Date for the   payment of premium: 30 Jul 2017

**CHOICE OF LAW AND JURISDICTION**   Choice of jurisdiction to be determined in court of competent jurisdiction as stated in the Service of Suit Clause in Supplemental Clauses.   Choice of law to be determined by same court.

**PREMIUM**   USD 5,900,000   (100%) Annual in respect of All Risks.

Split as follows:

USD 5,737,750   (100%) Annual In respect of USA Exposure
USD 141,010   (100%) Annual In respect of Puerto Rico Exposure

Policy Number:PTNAMI701557

|   |   |
|---|---|
| USD 13,570 | (100%) Annual In respect of US Virgin Islands Exposure |
| USD 7,670 | (100%) Annual In respect of Guam Exposure |

**PAYMENT TERMS**

Premium payment to underwriters to be effected by Aon Limited on behalf of the (Re)Insured in line with terms of trade as defined herein in respect of Lloyd's or XIS Underwriters or as per accounting procedures in operation with underwriters hereon.

**TAXES PAYABLE BY (RE)INSURED AND ADMINISTERED BY UNDERWRITERS**

Nil.

**RECORDING, TRANSMITTING & STORING INFORMATION**

All documentation and information to be recorded and/or transmitted electronically and stored electronically in Aon Limited repositories.

**INSURER CONTRACT DOCUMENTATION**

This document details the contract terms entered into by the (Re)Insurers and constitutes the contract document.

**NOTICES**

It is your Broker's responsibility to advise you of the full terms and conditions of your contract with the Underwriters and if any terms, clauses or conditions are unclear you are advised to contact your Broker immediately.

Policy Number PTNAM1701557

## RISK DETAILS - WORDING

### Named Insured

The Sears Holdings Corporation and as more fully detailed in Risk Details.

1.    **Policy Term**

As fully detailed in Risk Details.

2.    **Territory**

As fully detailed in Risk Details.

3.    **Limits of Liability**

In the event of direct physical loss or damage insured under this policy, this **Insurer** shall be liable for its proportional share of Limits of Liability as detailed in Risk Details, excess of the policy deductibles, except as respects the following:

**Program Sub-Limits:**  As fully detailed in Risk Details.

**Time Limits Applicable to All Coverages**: As fully detailed in Risk Details.

**Distance Limits Applicable to All Coverages**: As fully detailed in Risk Details.

The total amount to be indemnified under this policy and/or any admitted version of this policy issued by the **Insurer** shall not exceed the overall limit or applicable sublimits stated in this policy.

4.    **Deductibles:**

As fully detailed in Risk Details.

5.    **Loss or Damage Insured**

This policy insures against all risk of direct physical loss or damage to property insured by this policy including General Average, salvage, and all other charges on shipments insured hereunder except as hereinafter excluded.

6.    **Loss or Damage Excluded**

This policy does not insure the following:

A.    1.    Loss or damage caused by hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual, impending, or expected attack:

(a)    by any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces;
(b)    or by military, naval, or air forces;

(c)    or by an agent of such government, power, authority, or forces;

2.    Indirect or remote loss or damage

3.    Mysterious disappearance, or loss or shortage disclosed on taking inventory or any unexplained loss.

Policy Number PTNAM1701557

4.    Loss or damage caused by any weapon employing atomic fission or fusion;

5.    Loss or damage caused by rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such Occurrence;

6.    Loss or damage caused by seizure or destruction by order of public authority, except destruction by order of public authority to prevent spread of, or to otherwise contain, control or minimize loss, damage, or destruction which occurs due to loss or damage insured under this policy;

7.    Risks of contraband or illegal trade.

8.    Any act of terrorism. For the purpose of this policy an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, (including the intention to influence any government and/or to put the public or any section of the public in fear), committed for political purposes by any person or group(s) of persons whether acting alone or on behalf of or in connection with any organization(s) or government(s). This policy also excludes loss, damage, cost or expense of whatsoever nature directly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism.

If the Company alleges that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Insured.

In the event any portion of this exclusion 8. is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

B.    Loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, attributed to, or aggravated by loss or damage insured herein except:

1.    The Insurer shall be liable for loss or damage caused by sudden or accidental radioactive contamination, including resultant radiation damage for each Occurrence from material used or stored or from processes conducted on insured premises, provided at the time of loss there is neither a nuclear reactor capable of sustaining nuclear fission in a self-supporting chain reaction nor any new or used nuclear fuel on the insured premises;

2.    If an insured loss ensues, liability is specifically assumed by the Insurer for such ensuing direct loss or damage insured hereunder but not including any loss due to nuclear reaction, nuclear radiation or radioactive contamination.

C.    Loss or damage caused by fraudulent or dishonest act or acts committed by the Insured or any of the Insured's employees.    This exclusion does not apply to physical loss or damage resulting from the Insured voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense, nor shall this exclusion apply to willful acts of destruction committed by the Insured's employees.

D.    Wear and tear, or deterioration, defect, depletion, rust, corrosion, inherent vice or latent defect unless physical loss or damage not excluded in this policy ensues, and then this policy shall insure only the ensuing loss or damage.    This exclusion shall not apply if the ensuing loss or damage constitutes an Accident to an Object.

Policy Number PTNAM1701557

E.  The cost of making good defective design, faulty material, or faulty workmanship, except, if physical loss or damage not excluded in this policy ensues, then this policy shall insure only the ensuing physical loss or damage. This exclusion shall not apply if the ensuing loss or damage constitutes an Accident to an Object.

F.  Except as provided in Clause 16, Land and Water Decontamination and Clean Up Expense, loss or damage arising out of the dispersal, release or escape of contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but not excluding resultant loss or damage from contaminants or pollutants to insured property caused by or resulting from loss or damage not otherwise excluded.

If loss or damage not excluded in this policy causes the dispersal, release or escape of contaminants or pollutants, then the entire loss or damage is insured by this policy.

G.  Delay or loss of market.

H.  Settling, cracking, shrinking, bulging, or expansion of foundations, floors, walls or pavements.

I.  Insect or vermin damage

7.  **Coverage**

This policy insures the interest of the Insured in the following:

A.  **Real and Personal Property**

Real and personal property while such property is located anywhere within the territorial limits of this policy in which the Insured has an insurable interest, including while in due course of transit which is owned, used, or contracted for use by the Insured, or acquired by the Insured, and property of others in the Insured's care, custody and control including the Insured's liability for such property and including the costs to defend any allegations of liability for loss or damage to such property, and any allegations under a lease as a result of such loss or damage; including the following:

1.  Improvements and betterments. The **Insurer** agrees to accept and consider the Insured as sole and unconditional owner of the improvements and betterments, notwithstanding any contract or lease to the contrary.

2.  At the option of the Insured, personal property of the Insured's officials and employees, while in the Insured's care, custody or control, or while on the Insured's premises.

3.  Contractor's and/or subcontractor's (of any tier) and vendor's interests in property insured to the extent of the Insured's liability imposed by law or assumed by contract, whether written or oral.

4.  At the option of the Insured, the interest of the Insured's customers in property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan including property which is leased to customers under a lease/purchase agreement.

5.  Real and/or Personal Property of others, including that which the Insured leases or has agreed to insure prior to loss or damage whilst within the Insured's care, custody or control and at the Insured's option the interest of the owner of such property.

6.      Property while in the course of construction and/or during erection, assembly and/or installation.

7.      This policy also insures, in accordance with the Automatic Coverage clause of this policy, property (including Time Element coverage as provided by this policy) at any location rented, leased, used, purchased, constructed, or acquired by the Insured after the inception date of this policy.

8.      All real and personal property at a Miscellaneous Unnamed Location. A miscellaneous unnamed location as used herein shall be defined as a location at which the Insured has property of the type insured hereunder which has not been reported to the Company. Upon report to the Company of said location, the Policy Limit shall apply.

B.      **Business Interruption - Gross Earnings (as respects Hoffman Estates, IL and 7615 Golden Triangle Drive, Eden Prairie, MN 55344)**

1.      Loss due to the necessary interruption of business conducted by the Insured, whether total or partial, including all interdependencies between or among companies owned or operated by the Insured resulting from physical loss or damage insured herein and occurring during the term of this policy to real and/or personal property described in Clause 7.A, Real and Personal Property.

2.      Such loss shall be adjusted on the basis of the actual loss sustained by the Insured, consisting of the net profit which is prevented from being earned including **ordinary payroll** and payroll;

**and**

all charges and other expenses (including **soft costs**) to the extent that these must necessarily continue during the interruption of business, but only to the extent to which such charges and expenses would have been incurred had no loss occurred.

3.      In determining the amount of net profit, charges, and expenses insured hereunder for the purposes of ascertaining the amount of the actual loss sustained, due consideration shall be given to the experience of the business before the date of the loss or damage and to the probable experience thereafter had no loss occurred.

4.      In the event of insured physical loss or damage to property as described in Clause 7.A. which results in an interruption of research and development activities, which in themselves would not have produced income during the recovery period, this policy shall insure the actual loss sustained of the continuing charges and expenses, including **ordinary payroll**, and payroll, directly attributable to such research and development activities.

5.      As respects coverage provided under Clause Business Interruption – Gross Earnings, the **Insurer** shall not be liable for any loss resulting from loss or damage to **finished stock or stock in process** nor for the time required to reproduce said **finished stock or stock in process.**

C.      **Extra Expense**

1.      Extra Expense incurred by the Insured in order to temporarily continue as nearly as practicable the normal operation of the Insured's business following loss or damage insured herein and occurring during the term of this policy to real and/or personal property as described in Clause 7.A, Real and Personal Property.

Policy Number PTNAM1701557

2.    The term Extra Expense, as used herein, is defined as the excess (if any) of the total cost chargeable to the operation of the Insured's business, over and above the total cost that would normally have been incurred to conduct the business had no loss or damage occurred, including soft costs.

3.    Notwithstanding any provision to the contrary, the term Extra Expense, as used herein, will include the expense incurred for no longer than 90 days from the date of loss for the payroll of salaried and hourly employees to retain the Insured's work force after a covered event.

4.    The term Extra Expense, as used herein, shall include the reasonable and necessary extra costs of temporarily using property or facilities of others.

5.    The term Extra Expense, as used herein, shall include the reasonable and necessary extra costs of temporary repair of physical damage to property insured by this Policy and the extra costs of expediting the permanent repair or replacement of such damaged property including in-house hourly labor for clean-up, restocking, redisplaying merchandise and fixtures, and the Insured's construction project management personnel.

D.    **Accounts Receivable**

In the event of insured physical loss or damage to records or accounts receivable from customers caused by loss or damage insured herein, this **Insurer** will indemnify the Insured as follows:

1.    All sums due the Insured (from customers), provided the Insured is unable to effect collection thereof as a result of loss or damage to records of accounts receivable by loss or damage insured by this policy.

2.    All sums due the Insured from factoring transactions, when the property of the debtor has been lost or damaged by loss or damage insured by this policy and the Insured has been unable to effect collection thereof.

3.    Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage.

4.    Collection expenses in excess of normal collection cost and made necessary because of such loss or damage.

5.    Other expenses, when reasonably incurred by the Insured in reestablishing records of accounts receivable following such loss or damage.

For purpose of this insurance, charges under a credit card company and maintained on **EDP Media** shall be deemed to represent sums due the Insured from customers.

When there is proof that a loss of records of accounts receivable has occurred by the Insured and the Insured cannot more accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be computed as follows:

1.    The monthly average of accounts receivable during the last available twelve (12) months shall be adjusted in accordance with the percentage increased or decreased in the twelve (12) months average of monthly gross revenues which may have occurred in the interim;

2.    The monthly amount of accounts receivable thus established shall be further adjusted in accordance with any demonstrable variance from the average for the particular month in which the loss occurred, due consideration also being

given to the normal fluctuations in the amount of accounts receivable within the
fiscal month involved.

There shall be deducted from the total amount of accounts receivable,
however established, the amount of such accounts evidenced by records, not
lost or damaged, or otherwise established or collected by the Insured and an
amount to allow for probable bad debts which would normally have been
uncollectible by the Insured.

E.    **Leasehold Interest**

    1.    This policy provides coverage for the leasehold interest of the Insured.

        (a)    Pro rata proportion from the date of loss to expiration date of the lease (to
be paid without discount) on the Insured's interest in:

            i.    The amount of bonus paid by the Insured for the acquisition of
the lease not recoverable under the terms of the lease;

            ii.    Improvements and betterments to real property which are not
covered under any other section of this policy;

            iii.    The amount of advance rental paid by the Insured and not
recoverable under the terms of the lease;

        when property is rendered wholly or partially untenantable by any
covered loss during the term of this policy and the lease is canceled by
the party not the Named Insured under this policy in accordance with
the conditions of the lease or by statutory requirements of the
appropriate jurisdiction in which the damaged or destroyed property is
located; and

    2.

        (a)    "The Interest of the Insured as Lessee or Lessor" when property is
rendered wholly or partially untenantable by any covered loss during the
term of this policy and the lease is cancelled by the party not the Named
Insured by this policy in accordance with the conditions of the lease or by
statutory requirements of the appropriate jurisdiction in which the
damaged or destroyed property is located.

        (b)    "The Interest of the Insured as Lessee or Lessor" as referred to herein
shall be paid for the first three months succeeding the date of the loss
and the "Net Lease Interest" shall be paid for the remaining months of
the unexpired lease.

    3.    Definitions:

The following terms, wherever used in this section shall mean::

        (a)    "The Interest of the Insured as Lessee" is defined as:

            i.    the excess of the rental value of similar premises over the actual
rental payable by the lessee (including any maintenance or
operating charges paid by the lessee) during the unexpired term
of the lease; and

            ii.    the rental income earned by the Insured from sublease
agreements, to the extent not covered under any other section of
this policy, over and above the rental expenses specified in the
lease between the Insured and the lessor.

Policy Number PTNAM1701557

(b) "The Interest of the Insured as Lessor" is defined as the difference between the rents payable to the lessor under the terms of the lease in effect at the time of loss and the actual rent collectible by the lessor during the unexpired term of the lease provided the lease is canceled by the lessee, to the extent not covered under any other section of this policy.

(c) "Net Lease Interest" is defined as that sum, which placed at 6% interest compounded annually will be equivalent to the "The Interest of the Insured as Lessee or Lessor."

4. It is understood and agreed that in the event that an insured physical loss or damage results in both loss of Rental Income and/or Rental Value and loss of The Interest of the Insured as Lessor, the provisions and limit of liability of the Rental Income and Rental Value coverage will be applied first in accordance with the applicable period of recovery. The coverage provided by the Leasehold Interest provisions and limit of liability shall be applied and commence at the cessation of the Rental Income and Rental Value coverage and continue until the expiration of the lease.

This Company shall not be liable for any increase of loss which may be occasioned by the suspension, lapse or cancellation of any license or by the Named Insured exercising any option to cancel the lease. Furthermore, the Named Insured shall use due diligence including all things reasonably practicable to diminish loss under this clause and under the Rental Value and Rental Income clause.

## F.    Rental Value and Rental Income

1.    This policy provides coverage for Loss of Rental Income and/or Loss of Rental Value of the Insured caused by physical loss or damage insured herein occurring during the term of this policy to property and/or premises rented, leased or occupied by the Insured and/or rented or leased by the Insured to others, including loss of use.

2.    Rental Income:

(a)    Rental Income shall mean the total anticipated gross rental income from tenant(s) of the Insured's building(s) and structure(s), and

(b)    The amount of all charges assumed by tenant(s) except those charges which do not continue, which would otherwise be obligations of the Insured, and

(c)    The fair rental reasonably expected from unrented portions of such property.

Rental Income Insurance also applies in those situations where the Insured is required under a lease or rental agreement to maintain such insurance on behalf of any landlord.

Furthermore, if the Insured leases premises and the premises becomes wholly or partially untenantable or unusable and the lease agreement requires continuation of the rent, this Policy shall indemnify the Insured for the actual rent payable for the unexpired term of the lease.

Rental Income Insurance shall include expenses incurred by the Insured in excess of the expenses which would have been incurred had a leased or rented premises not been damaged or destroyed by loss or damage insured herein.

Policy Number PTNAM1701557

Such coverage will apply for all additional expenses incurred during the period of untenantability or if the lease cannot be terminated until its expiration.

3.    Rental Value:

Rental Value shall mean the fair rental for that portion of the Insured Location occupied by the Insured, including the loss of use, without deduction for non-continuing expenses.

4.    Experience of the Business:

In determining the amount of Rental Income covered hereunder, due consideration shall be given to the rental experience before the date of damage or destruction and to the probable experience thereafter had no loss occurred to above said property.

5.    (Applicable to both Rental Income and Rental Value)

With respect to alterations, additions, and property while in the course of construction, erection, installation, or assembly, due consideration shall be given to the available rental experience of the business after completion of the construction, erection, installation, or assembly.

6.    (Applicable to both Rental Income and Rental Value)

Period of Recovery: the length of time for which a loss may be claimed under this provision shall be in accordance with the loss provisions applicable under the Period of Recovery clause 9.A of this policy.

G.    **Royalties**

1.    Loss of Royalties, Fees and Commissions which would have been earned under Royalties, Fees or Commission Agreements between the Insured and any concern(s), as a result of physical loss or damage to the property of a type not excluded in this Policy of such concern(s) caused by loss or damage insured herein occurring during the term of this policy.

2.    Such loss shall be adjusted on the basis of actual loss sustained of such income which would have been earned had no loss occurred.

H.    **Transit**

This insurance is extended to insure physical loss or damage to insured property in transit including resulting loss as afforded under the Business Interruption – Gross Earnings; Business Interruption – ; Extra Expense; Rental Value and Rental Income; and Royalties clauses of this policy.

1.    This insurance is also extended to insure physical loss or damage to property:

(a)    sold and shipped by the Insured under terms of F.O.B. point of origin or other terms usually regarded as terminating the shipper's responsibility short of points of delivery;

(b)    at the Insured's option, which is incoming to the Insured.

2.    This policy also insures loss or damage:

(a)    arising out of any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for    shipment    or    to accept goods for delivery;

18-23538-shl   Doc 7326-1   Filed 02/21/20   Entered 02/21/20 16:20:01   Exhibit A-
Unredacted Relief from Stay Motion   Pg 113 of 217

Policy Number PTNAM1701557

      (b)    occasioned by the acceptance by the Insured, by its agents, or by its customers of fraudulent bills of lading, shipping and delivery orders, or similar documents;

**I.**    **Automatic Coverage**

This Policy covers insured property at any location rented, leased, purchased, by the Insured after the inception date of this Policy. This coverage applies from the date of rental, lease, purchase.

This coverage will apply until whichever of the following occurs first:

1. The location is reported to the Insurer; upon which the Policy Limit shall apply;

2. Agreement is reached that the Location will not be insured under this Policy;

3. The Time Limit shown in the LIMITS OF LIABILITY clause of this Policy has been reached.

**8.**    **Extensions of Coverage**

THIS CLAUSE EXTENDS THE FOLLOWING COVERAGES AS DESCRIBED ABOVE: Business Interruption and Extra Expense

A.    This policy insures loss resulting from or caused by physical loss or damage insured herein to the following:

    1.    **Contingent Business Interruption (applicable to Hoffman Estates and 7615 Golden Triangle Drive, Eden Prairie, MN 55344 locations, only):**

    Property of a type not excluded in this Policy, that directly prevents and/or hinders a direct supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that prevents and/or hinders direct customers of goods and/or services from the Insured from accepting the Insured's goods and/or services.

    There is no liability for any loss or damage as insured under the Service Interruption/Off Premises Power clause herein.

    2.    **Contingent Extra Expense** (applicable to all Locations)

    Property of a type not excluded in this Policy, that directly prevents and/or hinders a direct supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that prevents and/or hinders direct customers of goods and/or services from the Insured from accepting the Insured's goods and/or services.

    3.    **Service Interruption/Off Premises Power:** Any property of the following providers of services, including, but not limited to, electricity, water, gas, sewerage, steam, telephone, telecommunications or their respective transmission and distribution lines within 5 mile of the affected insured location or utility plants which directly provide incoming or outgoing services to the Insured situated on or outside of the Insured's premises.

    4.    **Impounded Water:** Dams, reservoirs or equipment connected therewith when water used as a raw material or used for power or for other manufacturing purpose stored behind such dams or reservoirs is released from storage and causes an interruption of business as a result of lack of adequate water supply from such sources for up to    30 days.

Policy Number PTNAM1701557

B.    **Interruption by Civil or Military Authority**

This policy is extended to cover, starting from the time of physical damage, for up to the number of consecutive days as stated in the Limits of Liability clause of this policy, the Business Interruption or Extra Expense loss sustained during the period of time when access to covered real or personal property of the Insured is impaired by order or action of civil or military authority issued as a direct result of physical damage of the type insured against to property of the type not excluded which is within the number of statute miles as stated in the Limits of Liability clause of this policy.

C.    **Ingress/Egress**

This policy is extended to cover, starting from the time of physical damage, for up to the number of consecutive days as stated in the Limits of Liability clause of this policy, the Business Interruption or Extra Expense loss sustained during the period of time when, as a direct result of physical damage of the type insured against to property of the type not excluded is within the number of statute miles as stated in the Limits of Liability clause, ingress to or egress from real or personal property is impaired.

The provisions of this paragraph shall also extend to include the extensions of coverage described under the Service Interruption, Contingent Business Interruption, Contingent Extra Expense and Attraction Properties provisions described above.

9.    **Loss Provisions Applicable to Clauses 7.B, 7.C, 7.E, 7.F, 7.G, 7.H. and 8.**

A.    Period of Recovery

The length of time for which loss may be claimed is referred to as the period of recovery and:

1.    shall commence with the date of such loss or damage and shall not be limited by the date of expiration of this policy;

2.    shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace the property that has been destroyed or damaged;

**and**

3.    such additional length of time to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

(a)    the date on which the liability of the **Insurer** for loss or damage would otherwise terminate; or

(b)    the date on which repair, replacement or rebuilding of the property that has been damaged is actually completed and the Insured has resumed normal operations.

but in no event for more than one hundred eighty (180) consecutive days as stated in the Limits of Liability clause of this policy thereafter from said later commencement date;

4.    with respect to alterations, additions, or property while in the course of construction, erection, installation, or assembly, due consideration shall be given to the level of production or level of business operations that would

Policy Number PTNAM1701557

reasonably have been achieved after construction and start up would have been completed had no loss or damage occurred.

B.    Expense to Reduce Loss but not applicable to Extra Expense coverage

This policy also insures such expenses as are necessarily incurred for the purpose of reducing any loss under this policy. Such expenses may not exceed the amount by which the loss under this policy is thereby reduced.

C.    Experience of the Business

In determining the amount of loss insured hereunder due consideration shall be given to the experience of the business before the date of loss or damage and to the probable experience thereafter had no loss or damage occurred.

10.    **Property Excluded**

This policy does not insure loss or damage to:

A.    Watercraft over forty (40) feet only while waterborne, aircraft and motor vehicles licensed for highway use when not on the Insured's premises, except this exclusion shall not apply to contractor's equipment, nor to such property which constitutes stock or which is on exhibit or being repaired.

B.    Land, except as insured under Clause 16, Land and Water Decontamination and Clean Up Expense. This exclusion shall not apply to the cost of reclaiming, restoring or repairing land improvements. Land improvements as described hereunder include, but are not limited to, any alteration to the natural condition of the land by grading, excavating, landscaping, earthen dikes or dams, as well as additions to land such as pavements, roadways, ponds, golf courses, or similar works;

C.    Currency, money, gold bullion, evidence of debt, except accounts receivable as defined in the policy, notes or securities.

D.    Growing crops, standing timber to be used for industrial processes, and live animals not used for research.

E.    Water, except as insured under Clause 8.A.4. Impounded Water, Clause 16. Land and Water Decontamination and Clean Up Expense, or when contained in any form of piping system, processing system or holding tank or used in the manufacturing process.

F.    Export and import shipments after loading on board the oceangoing watercraft and during ocean transit, but coverage will attach after unloading at the destination port. However, this exclusion will not apply to:

1.    ferry shipments to, from and between countries in Continental Europe, the United Kingdom and Ireland; and
2.    air or inland waterway shipments to, from and between countries in Continental Europe.

G.    Waterborne shipments via the Panama Canal.

H.    Waterborne shipments to and from Alaska, to and from Hawaii, and to and from Puerto Rico, Guam and the Virgin Islands.

I.    Bridges, roadways, dams and dikes other than coverage as provided in 10.B

11.    **Valuation**

Unless otherwise endorsed hereon, adjustment of property loss under this policy shall be:

(a)    on stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges;

(b)    on finished goods manufactured by the Assured, the regular selling price prior to all discounts and charges to which the merchandise would have been subject had no loss occurred;

(c)    on other merchandise not manufactured by the Assured, the regular selling price prior to all discounts and charges to which the merchandise would have been subject had no loss occurred;

(d)    on exposed film, records, manuscripts, and drawings, the value blank plus the cost of transcription, if copies are available, otherwise the full replacement value;

(e)    on media, data, and programs for electronic and elctromechanical data processing and production equipment, the cost of reproducing such media, data and programs;

(f)    on real property including machinery and equipment permanently installed and affixed thereto, and the Assured's improvements and betterments to real property of others not otherwise covered herein, the cost to repair or replace new with materials of like kind and quality However, as respects the Assured's improvements and betterments not replaced, the actual cash value;

(g)    on furniture, fixtures and equipment (including tools and dies) except such equipment as included under (f) above, the cost to repair or replace new with materials of like kind and quality ;

(h)    Fine arts owned by the Assured at the cost of reasonably restoring the property to its condition immediately prior to the loss, or in the event that the property cannot be restored at the appraised value prior to the loss. In absence of such appraisal, at the market value at the time of loss, plus the Assured's costs.

Fine Arts, which is the property of others, at the Assured's option, either at the cost of reasonably restoring the property to its condition immediately prior to loss, or the Assured's contractual or legal liability.

(i)    property of others at the amount agreed to prior to loss or for which the Assured is contractually or legally liable, not to exceed the cost to repair or replace new with materials of like kind and quality ;

(j)    All other property, not otherwise mentioned above, at the cost to repair or replacement cost new whichever is less; if not repaired or replaced within three years, then at the actual cash value

all to be computed at the time and place of loss

It is understood and agreed that as respects replacement cost new, the Insured shall have the option of replacing equipment having technological advantages and/or representing an improvement in function and/or forming part of a program of system enhancement provided that such replacement can be accomplished without increasing the Insurer's liability.

The Insured, using reasonable discretion, shall be the sole judge as to whether electrical and mechanical equipment are damaged and unusable. This Insurer shall be allowed to dispose of, as salvage, any non-proprietary property deemed unusable by the Insured.

As respects 11.F., 11.G. and 11J., the Insured may elect not to replace the real and/or personal property lost, damaged, or destroyed and obtain loss settlement on a replacement cost basis if the proceeds of such loss settlement are expended in any other capital expenditures related to

Policy Number PTNAM1701557

the Insured's operations, provided such capital expenditure is unplanned prior to the occurrence.

Permission is granted for the Insured to replace the property with similar property at the same or another site within the territorial limits of the policy, but recovery is limited to no more than what it would cost to replace on same site.

12.   **Demolition and Increased Cost of Construction**

In the event of physical loss or damage insured under this policy that causes, at the time , the enforcement of any law, ordinance and/or governmental directive in force at time of such physical loss or damage regulating the construction, repair or use of the property, the **Insurer** shall be liable for:

A.   The cost of demolishing the undamaged property including the cost of clearing the site;

B.   The proportion that the value of the undamaged part of the property bore to the value of the entire property prior to loss;

C.   The increased cost of repair or reconstruction of the damaged and undamaged property on the same site and limited to the costs that would have been incurred in order to comply with the minimum requirements of such law, ordinance and/or governmental directive regulating the repair or reconstruction or use of the damaged property on the same site or another site.   However, the **Insurer** shall not be liable for any increased cost of construction loss unless the damaged property is actually rebuilt or replaced;

D.   The increase in loss, including, but not limited to, Business Interruption, Extra Expense, Rental Value, Leasehold Interest or Royalties or extensions thereof arising out of the additional time required to comply with said law, ordinance and/or governmental directive.

13.   **Contingent Exposures**

It is agreed that this Policy is extended to cover to the limit of the Insured's interest in personal property and inventory at dealer stores. When a claim of loss or damage as covered under this Policy results from the non-existence, inadequacy, or uncollectiblity, except for insolvency or failure of dealers insurance, in whole or in part ( by the Insured) of dealers' insurance, whether or not the loss or damage was required to be insured under the dealer agreement. In no event is coverage provided by this Clause deemed to be greater than otherwise recoverable under this Policy less any recoveries from other insurance.

14.   **Fire Brigade Charges and Extinguishing Expenses**

This policy insures the following expenses resulting from:

A.   fire brigade charges and other extinguishing expenses for which the Insured may be assessed;

B.   loss of fire extinguishing materials expended.

15.   **Debris Removal**

(1)   In the event of physical loss or damage to the property insured hereunder, this policy (subject otherwise to its terms, conditions and limitations, including but not limited to any applicable deductible) also insures:

(a)   expenses reasonably incurred in removal of debris of the property insured hereunder destroyed or damaged from an insured location;

(b)    expenses reasonably incurred in removal of debris of the property insured hereunder which is destroyed or damaged while in transit;

(c)    expenses reasonably incurred in removal of debris of property not insured under this policy blown onto the insured location by wind or deposited onto the insured location by **Flood;**

(d)    cost of cleanup at an insured location made necessary as a result of such physical loss or damage;

provided that this policy does not insure against the costs of decontamination or removal of land or water or the contaminant on or in land or water except as provided in the Land and Water Decontamination and Clean Up Expense clause of this policy.

(2)    It is a condition precedent to recovery under this extension that the Company shall have paid or agreed to pay for direct physical loss or damage to the property insured hereunder unless such payment is precluded solely by the operation of any deductible and that the Insured shall give notice to the Company of the intent to claim for the cost of removal of debris or cost of cleanup NO LATER THAN 12 MONTHS AFTER THE DATE OF SUCH PHYSICAL LOSS OR DAMAGE.

16.    **Land and Water Decontamination and Clean Up Expense**

This policy insures any cost or expense of decontamination or removal or disposal of water, soil or any similar substance on or under the premises of the Insured incurred during emergency measures undertaken in order to mitigate any circumstances pertaining to seepage, pollution and/or contamination, whether or not at the instruction of any government agency or other authority.

It is the condition precedent to recovery under this clause that the **Insurer** shall have paid, or agreed to pay for, loss or damage to the property insured hereunder unless such payment is precluded solely by the operation of any deductible.

It is also a condition precedent to recovery under this clause that the insured shall give written notice to the insurer of intent to claim for decontamination and cleanup expense not later than 180 days after the date of such loss or damage.

17.    **Notice of Loss**

The Insured shall report to the **Insurer** any loss or damage which may become a claim under this insurance policy as soon as may be practicable after it becomes known to the Director of the Risk Management Department (or the individual acting in a similar capacity) of the Insured.

18.    **Knowledge of Occurrence**

It is agreed that knowledge of an **Occurrence** by an agent, servant or employee of the Insured shall not in itself constitute knowledge by the Insured. Knowledge is understood to occur only when the Director of the Risk Management Department (or the individual acting in a similar capacity) of the Insured shall have received notice from its agent, servant or employee.

19.    **Proof and Payment of Loss**

A detailed Proof of Loss shall be filed with the **Insurer** as soon as practicable. Loss shall be adjusted with the Risk Management Department of the Insured or assigned representatives, and all adjusted claims, including partial claims, shall be paid to the Insured or its order within Thirty (30) days after reaching agreement on the value of the claim or any part thereof.

20.    **Non-Reduction of Limits of Liability**

Any loss hereunder shall not reduce the limit(s) of liability under this policy except for aggregate limits as described in the Limits clause of the policy.

21.    **Subrogation and Subrogation Waiver**

A.    It is agreed that upon payment of any loss, this **Insurer** is subrogated to all the rights of the Insured to the extent of such payment.

Any release or waiver of liability entered into by the Insured in the course of their business prior to loss (including but not limited to bills of lading and/or receipts from carriers, bailees, warehouseman, lighterman, processors, limiting or releasing their liability) hereunder shall not prejudice the Insured's rights of recovery under this policy.

B.    The right of subrogation against the Insured's subsidiary, affiliated, or associated corporations or companies, joint ventures, partnerships or individuals, or any other party required to be insured, or any other corporations or companies associated with the Insured through ownership or management is waived, and at the option of the Insured, subrogation is waived against any tenant or landlord of the Insured.

C.    In the event of any payment under this policy, except where subrogation rights have been waived, the **Insurer** shall be subrogated to the extent of such payment to all the Insured's rights of recovery therefore.    The Insured shall execute all papers required and shall take reasonable and necessary action to secure such subrogation rights. The **Insurer** will act in concert with all other interests concerned, i.e., the Insured and any other company(ies) participating in the payment of any loss as primary or excess insurers, in the exercise of such rights of recovery.    The Insured and the Insurer shall mutually agree upon subrogation counsel for the pursuit of their mutual subrogation interests.    Further, the Insured shall have the right to pursue any uninsured interest independently of the mutual subrogation interests.    If any amount is recovered, after deducting the costs of recovery, payment will first be made to the Insured to the full extent of the deductible applied to the loss.

22.    **Protection and Preservation of Property**

In case of actual or imminent physical loss or damage of the type insured against by this policy, the expenses incurred by the insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder shall be added to the total physical loss or damage, if any, otherwise recoverable under the policy and be subject to the applicable deductible and without increase in the limit provisions contained in this Policy.

23.    **Appraisal**

In case the Insured and this **Insurer** shall fail to agree as to the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within Twenty (20) days of such demand.    The appraisers shall select a competent and disinterested umpire; and, failing for Fifteen (15) days to agree upon such umpire, then on request of the Insured or the **Insurer**, such umpire shall be selected by a judge of a district court of a judicial district in accordance with the Jurisdiction and Suit clause of this policy. The appraisers shall then appraise the loss, separating the loss to each item; and, failing to agree, shall submit their differences only to the umpire.    An award in writing, so itemized of any two when filed with the **Insurer**, shall determine the amount of loss. Each appraiser shall be paid by the party selecting each respective appraiser and the expenses of appraisal and umpire shall be paid by the parties equally.

24.    **Brands and Labels**

In case of insured physical loss or damage to property bearing a brand or trademark or which in any way carries or implies the guarantee or the responsibility of the manufacturer or the Insured, the salvage value of such damaged property shall be determined after removal in the

customary manner, at the expense of the Insurer, of all such brands or trademarks or other identifying characteristics.

**25.    Control of Damaged Merchandise**

The Insured shall have full right to the possession of all merchandise manufactured, sold or distributed by the Insured involved in any loss under this policy and shall retain control of all damaged merchandise. The Insured, exercising reasonable discretion, shall be the sole judge as to whether the merchandise involved in any loss under this policy are fit for consumption, sale or use and any merchandise so deemed by the Insured to be unfit for consumption, sale or use shall not be sold or otherwise disposed of except by the Insured or with the Insured's consent, but the Insured shall allow this Insurer any salvage proceeds obtained by the Insured on any sale or other disposition of such merchandise.

**26.    Salvage and Recoveries**

Except as described in Clause 23, after expenses incurred in salvage or recovery are deducted, any salvage or other recovery, except recovery through subrogation proceedings and/or from underlying and/or excess insurance as described herein, shall accrue entirely to the benefit of this Insurer until the sum paid by the Insurer has been recovered.

**27.    Expediting Expense**

This policy insures the reasonable extra cost of temporary repair or replacement and of expediting the repair or replacement of damaged property insured hereunder, including overtime and express freight or other rapid means of transportation.

**28.    Jurisdiction and Suit**

It is hereby understood and agreed that:

A.    In the event of the failure of the Insurer to pay an amount claimed to be due hereunder, at the direction of the Insured, the Insurer will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such jurisdiction. All matters arising hereunder shall be determined in accordance with the law and practice of such court.

B.    In any suit instituted against it under this policy, the Insurer will abide by the final decision of such court or any appellate court in the event of an appeal.

**29.    Pair and Set/Consequential Reduction in Value**

In the event of insured loss or damage to personal property, this policy shall insure the resulting reduction in value of the remaining undamaged components or parts of products customarily sold as individual units or sold as pairs, sets or lots or ranges of sizes or colors.

**30.    Consequential/Sequential Damage**

This policy insures consequential/sequential loss or damage caused by or resulting from the change in temperature or humidity caused by, but not limited to, interruption of power, heat, light, air conditioning, refrigeration, telephone or telegraphs, supply water or telecommunications to property/equipment or plants used to provide refrigeration, cooling, humidifying, dehumidifying, air conditioning, heating, generating, converting power, or telephone or telegraphs, or telecommunications, including all connections and supply from transmission lines and pipes within one mile, power generating equipment, utility plants or sources, whether or not such equipment is on or off the premises of the Insured.

**31.    Permits**

Permission is hereby granted for any building(s) to be and remain vacant and unoccupied without limit of time and without prejudice to the Insured's right of recovery for claim under this policy.

32.    **Contributing Insurance**

Permission is granted for other policies written upon the same terms, conditions, and provisions irrespective of limit or attachment point as those contained in this policy.    This policy shall contribute to the total of each loss otherwise payable herein to the extent of the participation of this policy in the total limit of liability stated herein.

33.    **Excess Insurance**

Permission is granted for the Insured to have excess insurance over the limit of liability in this policy without prejudice to this policy and the existence of such insurance, if any, shall not reduce any liability under this policy.

34.    **Underlying Insurance**

Permission is granted for the Insured to purchase insurance on all or any part of the deductible and against all or any of the coverage provided by this policy.    The existence of such underlying insurance shall not prejudice or affect any recovery otherwise payable under this policy.    This includes all Stock Throughput Policies, which cover stock and/or inventory.

Notwithstanding the above, it is a condition precedent that the Policy and Limit(s) of the Stock Throughput Policies shall be maintained in full force and effect, except for any reduction or exhaustion of the separate annual aggregates for Flood, Earthquake and Named Windstorm solely by the amount of loss(es) paid or admitted during the Policy Term.

35.    **Other Insurance**

Except as referred to in Clauses 32, 33 and 34, if any property included in the terms of this policy shall, at the time of any loss, be insured with other valid and collectible insurance, the Insured shall have the option of choosing which policy to utilise to respond first to loss or damage, unless otherwise agreed.    If the Insured elects for such other insurance to be applied first, then this insurance shall be excess of and/or supplementary to such other insurance.

Notwithstanding the above, the insurance provided by this Policy shall always be excess of USD50,000,000 (reduced only by reduction of the separate annual aggregates for Flood, Earthquake and Named Windstorm) regardless of the uncollectibility (in whole or in part) under the Stock Throughput Policy for any reason, including but not limited to the financial impairment or insolvency of the Stock Throughput Insurer.

36.    **Coinsurance Waiver**

This policy is not subject to Coinsurance or Average Clause.

37.    **Errors & Omissions**

No inadvertent error, omission or failure in making reports or other data hereunder shall prejudice the Insured's right of recovery, but shall be corrected when discovered.    It is further understood and agreed that any error in description of locations, or values of projects insured or to be insured by this policy shall not invalidate or reduce the policy limit of liability, or otherwise prejudice any recovery under this policy.

38.    **Titles of Paragraphs**

The several titles of the various paragraphs of this policy (and of Endorsements and Supplemental Policies, if any, which are attached to this policy) are inserted solely for

convenience or reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

**39.   Certificates of Insurance**

It is agreed that Aon Risk Services, Inc. are authorized to issue Certificate(s) or Evidence(s) of Insurance being the Acord Certificate of Property Insurance 24 (1/95), naming Additional Named Insured(s), Loss Payee(s) or Mortgagee(s), and others for their respective rights and interests, subject always to the terms, conditions and limits of endorsements in respect of such additional interests. The Certificate(s) or Evidence(s) of Insurance may show a deductible amount less that the policy deductible, but the Insured agrees to reimburse The Company immediately after The Company has mad a loss payment to the extent this agreement results in a larger loss payment or a payment with the policy deductible.

**40.   Partial Payment of Loss**

It is understood and agreed that this Insurer will make partial payments of claims subject to the policy provisions and the normal policy adjustment provisions.

**41.   Mortgage Interests and Obligations**

If loss hereunder is made payable in whole or in part, to a designated mortgagee not named herein as the Insured, such interest in this Policy may be cancelled by giving to such mortgagee ten (10) days written notice of cancellation.

If the Insured fails to render proof of loss, such mortgagee, upon notice, shall render proof of loss in the form herein specified within sixty (60) days thereafter and shall be subject to the provisions hereof relating to appraisal and time of payment and of bringing suit. If The Company shall claim that no liability existed as to the mortgagor or owner, it shall, to the extent of payment of loss to the mortgagee, be subrogated to all the mortgagee's right to sue, or it may pay off the mortgage debt and require as assignment thereof and of the mortgage. Other provisions relating to the interests and obligations of such mortgagee may be added hereto by agreement in writing.

**42.   Special Mortgage Clause**

The following mortgage clause applies in favor of any mortgagee named in the Certificate or Evidence of Insurance to the location under which the mortgagee is named:

Loss, if any, under this Policy to Real Property only, unless otherwise indicated, shall be payable to the indicated Mortgagee [or Trustee] (hereafter referred to as Mortgagee) as its interest may appear under all present or future mortgages upon the described property in which the aforesaid may have an interest as Mortgagee, in order of precedence of said mortgages; and this insurance, as to the interest of the Mortgagee therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to said property, nor by any change in the title or ownership of said property, nor by the occupation of the location for the purposes more hazardous than are permitted by this Policy; provided, that in case the mortgagor or owner shall neglect to pay any premium due under this Policy, the Mortgagee shall, on demand, pay the same.

Provided, also that the Mortgagee shall notify The Company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of the Mortgagee and, unless permitted by this Policy, it shall be noted hereon and the Mortgagee shall, on demand, pay the premium for such increase hazard for the term of the use thereof; otherwise this agreement shall be null, and void.

The Company reserves the right to cancel this Policy at any time as provided by its terms, but in such case this Policy shall continue in force for the benefit only of the Mortgagee for ten (10)

days after written notice to the Mortgagee of such cancellation and shall then cease, and The
Company shall have the right, on like notice, to cancel this agreement.

43.    **Cancellation**

A.    This policy may be cancelled at any time at the request of the first named Insured, or it
may be cancelled by the **Insurer** by mailing via registered or certified mail to

Sears Holdings Corporation
Risk Management Department
3333 Beverly Road E3-237A
Hoffman Estates, Illinois 60179

and with copies provided to

Aon Risk Services
200 E Randolph St
Chicago, Illinois 60601

during the term of this policy, written notice stating when no less than Ninety    (90) days
thereafter,    such cancellation shall be effective.

This insurance may be canceled at any time by the Insured by surrender of this policy
to the **Insurer** or by mailing or delivery to the **Insurer** written notice stating when
thereafter such cancellation shall take effect.    Return premium shall be allowed the
Insured on a pro rata basis if the **Insurer** or Insured cancels.

Payments or tender of any unearned premium by the **Insurer** shall not be a condition
precedent to the effectiveness of cancellation, but such payment shall be made as
soon as practicable.

B.    The mailing of notice as described in A. above shall be sufficient proof of notice and the
effective date and hour of cancellation stated in the notice shall become the end of the
policy period.    Delivery of such written notice either by the Insured or by this **Insurer**
shall be equivalent to mailing.

C.    Cancellation shall not affect coverage on any shipment in transit on the date of
cancellation.    Coverage will continue in full force until such property is safely delivered
and accepted at place of final destination.

44.    **Inspection and Audit**

This **Insurer** shall be permitted, but not obligated, to inspect the Insured's property at any
reasonable time.    Neither the **Insurer's** right to make inspections, nor the making thereof, nor
any report thereon, shall constitute an undertaking, on behalf of or for the benefit of the Insured
or others, to determine or warrant that such property is safe.

45.    **Loss Adjustment Expenses**

This policy is extended to insure the expenses incurred by the Insured, or by the Insured's
representatives for assessing, preparing and/or certifying details of a claim resulting from a loss
which would be payable under this policy.    However, this policy does not insure the expenses
of Public Adjustors.

46.    **Currency**

Policy Number PTNAM1701557

It is hereby understood and agreed that all amounts used herein are in United States currency and that premiums shall be paid and all losses shall be adjusted and paid in United States currency. In the event of a loss adjustment involving foreign currency, conversion into the currency of the United States of America shall be calculated as follows:

A.    As respects real and personal property, the cost of repair, replacement or reconditioning shall be converted, at the option of the Insured, based on any of the following:

    1.    date of loss;

    2.    date of repair, replacement or reconditioning;

    3.    date of acceptance or proof of loss or settlement.

Options A.1. - A.3. shall be based on the rate of exchange quoted in the Wall Street Journal.

If the property is not replaced or repaired, the conversion into the currency of the United States of America shall be at the rate of exchange quoted in the Wall Street Journal as of the date of loss.

B.    As respects all other coverages, currency shall be converted at the rate of exchange quoted in the Wall Street Journal and such rate of exchange shall be based on the average of the daily rate of exchange quoted in the Wall Street Journal for the period of loss.

47.    **Tax Liability**

A.    In the event that a loss insured hereunder cannot be paid in the country where the loss insured under this policy has occurred, this **Insurer** shall be liable for an additional loss payment in accordance with the following formula:

Loss payment due under this section =    $[a(1 - c) / (1-b)] -a$

Where:

a    =    Loss otherwise payable under this Policy except for operation of this coverage, after due consideration for any applicable deductible(s).

b    =    The net effective rate of the sum of: any taxation (a positive number) plus tax any relief/credit (a negative number) that accrues in the country where loss payments are received.

c    =    The net effective rate of the sum of: any taxation (a positive number) plus tax any relief/credit (a negative number) that accrues in the country where the loss occurred.

2.    The formula herein will not apply if the calculation of additional payment results in an amount less than zero.  The rates referred to herein will be the respective corporate income tax rates in effect on the date of the loss.

3.    The Insured will cooperate with the Insurer in making every reasonable effort to pay the loss or portion thereof locally in the country in which the loss occurred.

4.    Any payment under this coverage will be made only after completion and acceptance by the Insurer of audited tax returns for the period in question for both the country where a payment hereunder is made and the country where the loss occurred.  The actual payment under this coverage will be adjusted and reduced by all appropriate tax credits and/or tax relief entitled and/or received by the Insured and/or the local entity where the loss occurred provided that an income tax liability is incurred.

48.    **Difference in Conditions**

Subject to all other terms and conditions set forth herein, coverage under this policy is to apply only when coverage and/or definitions and/or conditions set forth herein are broader in meaning or scope than those of specific underlying or primary policies except for Stock Throughput Policies. The insurance provided by this policy will apply as contributing or excess insurance as respects loss arising from loss or damage insured under such other policies. In the absence of any other valid and collectible insurance, this policy shall become primary, subject to the terms and conditions of this policy.

49. **Tax Treatment of Profits**

This policy is extended to insure the additional loss sustained by the Insured resulting from loss or damage insured by this policy in the event the tax treatment of:

A. the profit portion of a loss recovery involving finished stock manufactured or purchased by the Insured; and/or

B. the profit portion of business interruption loss proceeds;

differs from the tax treatment of profits that would have been incurred had no loss occurred.

50. **Tenants and Neighbors Liability**

This policy insures:

A. 1. The liability, which the Insured incurs as tenant or occupant under the articles of any civil or commercial code, because of damage to real and personal property by loss or damage insured by this policy;

   2. The liability, which the Insured incurs under articles of any civil or commercial code, for damage to real or personal property from loss or damage spreading from the Insured's premises to the premises of neighbors, cotenants and other third parties;

   3. The liability, which the Insured as landlord incurs under articles of any civil or commercial code, for loss or damage to the personal property of tenants insured by this policy as a result of constructional defects or lack of maintenance;

B. This extension applies only to liability incurred in those countries or jurisdictions in which a Napoleonic or other civil or commercial code applies due to loss or damage as defined by such code and as insured hereunder.

51. **Severability of Interest**

Each of the Insureds insured by this policy will have the same protection and obligations as if the policy has been issued individually to each of them, except as respects the obligations associated with the **Cancellation** clause. However, the inclusion of more than one Insured will not operate to increase the limit of liability of the **Insurer** beyond the limit of liability stated in this policy.

52. **Loss Adjustors**

As fully detailed in Risk Details.

53. **Loss Payable**

Loss, if any, shall be adjusted with and payable to Sears Holdings Corporation or as directed by it.

Policy Number PTNAM1701557

54.    **Priority of Payments (applicable to primary or underlying policy(ies) only)**

Any recoveries made under this policy shall first apply to loss or damage not insured by the excess policy(ies). Upon exhauston of this policy's limit, the excess policy(ies) shall step down and be liable for the loss in excess of the amount attributed to this policy as respects loss or damage insured thereunder subject to the excess policy(ies) limits.

It is further herby understood and agreed that this policy provides secondary and excess coverage to that provided by the Named Insured's stock throughput policies for physical loss or damage covered under this policy to any and all stock and/or inventory values. The Named Insured's stock throughput policies are deemed primary and more specific for purposes of payment of physical loss or damage to any and all stock and/or inventory values. This policy will pay to the full extent of coverage afforded hereunder for the physical loss or damage to any and all stock and/or inventory values in excess of the limits of liability provided by the Named Insured's stock throughput policies.

55.    **Step Down / Drop Down (applicable to excess policies only)**

In determining the amount of any loss or damage for which this policy is excess, the total loss caused by any combination of loss or damage, all of which are insured against under the primary policy or **underlying policy**, shall be used even though such loss or damage is not insured against under this excess policy.

A.    Any recoveries made under the primary or **underlying policy** shall first apply to loss or damage not insured against by this policy. Upon exhaustion of the primary or **underlying policy** limits, this policy shall apply in excess of the  amount attributed to the primary or **underlying policy** as respects loss or damage insured hereunder subject to the limit of this policy.

B.    If there is any other excess insurance insuring the property insured hereunder for loss or damage insured against in the primary or **underlying policy** but not insured by this policy, this policy shall then allocate any loss recoveries made under the primary or **underlying policy** in the same proportion as the amount of loss or damage insured against by this policy bears to the combined total loss.

Upon exhaustion of the primary or **underlying policy** limits, this policy shall apply in excess of the amount attributed to the primary or **underlying policy** as respects loss or damage insured hereunder subject to the limit of this policy.

C.    Sub-Paragraph B. above shall not apply, however, when the amount of loss attributed to loss or damage insured under the primary or **underlying policy**, but not insured under this policy, exceed the total amount of insurance provided by the primary and excess coverages with respect to said loss or damage. In this situation, any recoveries made under the primary or **underlying policy** shall first apply to loss or damage not insured by this policy. Upon exhaustion of the primary or **underlying policy** limits, this policy shall apply in excess of the amount attributed to the primary or **underlying policy** as respects loss or damage insured hereunder subject to the limit of this policy.

D.    It is further agreed, in the event the **Flood** and/or **Earthquake** annual aggregate limits of any primary or **underlying policy** and/or the **Named Windstorm** aggregate limit of the stock throughput policy are diminished or exhausted in any one policy year, any loss or damage insured under this policy for **Flood** and/or **Earthquake** and/or **Named Windstorm** as respects stock and/or inventory, shall apply as excess of any undiminished or unexhausted limits subject to the policy deductibles herein.

56.    **Statement of Values**

The Statement of Values is for informational purposes only and does not bear on the coverages provided by this Policy.

Policy Number PTNAM1701557

57.    **Definitions**

The following terms whenever used in this policy shall mean:

**A.  Accident to an Object (Boiler and Machinery Coverage)**

The term "Accident to an Object", if used herein, is defined solely for the determination of the limits of liability and/or deductible(s) and application of the        suspension    section    only. The term "accident" shall not limit or define the perils or  coverages provided elsewhere in this policy.

The term "accident to an object" shall mean: Any condition or **Occurrence** within boilers or fired or unfired vessels owned by, operated by, or under the control of the Insured and subject to pressure or vacuum including piping or apparatus attached to and forming a part thereof, except that the words "any condition or **Occurrence**" shall not include explosion, other than explosion of the parts of a steam boiler containing steam or water, steam pi ping, steam turbines, or steam engines;

(1)    mechanical breakdown of any machine or apparatus arising out of any condition or **Occurrence** within such machine or apparatus;

(2)    electrical injury or disturbance to electrical appliances, devices, fixtures, wiring, or other electrical or electronic equipment caused by electrical currents artificially generated.

However,  the term "accident" does not include:

(1)    loss or damage from fire or from the use of water or other means to extinguish fire; and

(2)    the normal operation of any safety or protective device;

The term "accident" shall not apply to the following property:

(1)    property in transit;

(2)    property while in the course of construction, erection, installation, or assembly;

(3)    electronic data processing systems used for administrative, statistical, or accounting purposes;

(4)    any sewer piping, any piping forming a part of a fire protective system, or any water piping other than:

(a)    boiler feed water piping;

(b)    boiler condensate return piping;

(c)    water piping used in a heat transfer system for cooling, humidifying, or space heating purposes;

(5)    any vehicle, aircraft, or self-propelled equipment or floating vessel;

(6)    any elevator, crane, ladle or bucket, hoist, power shovel, drag line, excavator, scale, or conveyor, but not excluding any pressure vessel, gears, engines or electrical equipment used with a machine.

**B.    Architect Fees and Engineering Fees**

Any cost associated with the preparation of plans for the repair or reconstruction of the damaged property.

C.   **Earthquake**

Quaking, vibratory or undulating movement of a portion of the earth's crust, produced by underground volcanic forces or by breaking and shifting of rock beneath the earth's crust.

It is understood and agreed that, wherever used in this policy, the term "loss caused by" or "loss arising from" Earthquake shall be restricted exclusively to the actual, specific cracking, rupturing, shifting or toppling of property and shall not include ensuing loss or damage, not otherwise excluded, resulting from other loss or damage insured. However, Earthquake shall include loss arising from tsunami, tide or tidal water, that result from an Earthquake.

D.   **EDP Systems**

Electronic Data Processing Systems shall include, but not be limited to, transferring equipment, computer systems, telecommunications systems or electronic control equipment and component parts.

E.   **EDP Media**

All forms of data, converted data, electronically converted data and/or programs and/or applications and/or instructions and/or media vehicles employed.

F.   **Fine Arts**

Fine Arts shall include, but not be limited to, bona fide works of art, works of rarity, works of historical value, works of artistic merit, photographs, (positives and negatives) lithographs, illustrations, galley proofs, original records.

G.   **Finished Stock**

Stock manufactured by the Insured which, in the ordinary course of the Insured's business, is ready for packing, shipment or sale.

H.   **Fire Brigade Charges/Fire Extinguishing Materials and Expenses**

Fire fighting and/or containment charges and/or fire department service charges and other extinguishing expenses.

I.   **Flood**

Waves, tide or tidal water, rapid accumulation of surface waters, or the rising (including overflowing or breaking of boundaries) of lakes, reservoirs, rivers, streams or other bodies of water. It is understood and agreed that, whenever used in this policy, the term "loss caused by" or "loss arising from" flood shall not include ensuing loss or damage, not otherwise excluded, resulting from other loss or damage insured.

J.   **Fraudulent or Dishonest Acts**

Fraudulent or dishonest acts committed by the Insured or the Insured's employees with the manifest intent to:

1.   cause the Insured to sustain such loss; and

2.   obtain financial benefit for the Insured, Insured's employee, or for any other person or organization intended by the Insured or the employee to receive such benefit for such fraudulent or dishonest act or acts.

K.   **Miscellaneous Unnamed Location**

A Miscellaneous Unnamed Location as used herein shall be defined as a location at
which the Insured has property of the type insured hereunder which has not been
reported to the Company. Upon report to the Company of said location, the Policy Limit
shall apply.

L.    **Named Windstorm**

A Named Windstorm is a storm cell and/or weather condition that is declared by the
National Weather Bureau and/or National Hurricane Center and/or any other similar
weather center in foreign countries as a Named Hurricane or Storm.

It is understood and agreed that, whenever used in this policy, the term "loss caused
by" or "loss arising from" Named Windstorm shall not include ensuing loss or damage,
not otherwise excluded, resulting from other loss or damage insured. However, such
Named Windstorm shall include loss arising from rain, flood, storm surge or any other
water damage that results from the Named Windstorm.

M.    **Object**

Means any boiler, fired or unfired vessel subject to pressure or vacuum, including
piping or apparatus attached thereto and forming a part thereof, and any mechanical or
electrical machine or apparatus used for the generation, transmission or utilization of
mechanical or electrical power.

N.    **Occurrence**

Loss, or a series of losses or several losses, which are attributable directly to one cause or
disaster or to one series of causes or disasters arising from a single event.   All such losses
shall be added together and the total amount of such losses shall be treated as one
**Occurrence** irrespective of the period of time or area over which such losses occur.

When the term applies to windstorms, it shall be defined as the sum total of all losses
arising directly out of or caused by the same atmospheric disturbance during any period of
72 consecutive hours.   The Insured shall have the right to elect the moment from which the
72 hour period shall be deemed to have commenced, provided always that no elected
period of 72 hours shall commence within the period of any previous **Occurrence.**

When the term applies to **earthquake** , it shall be defined as the sum total of all the
Insured's losses arising directly out of or caused by **earthquake** during any period of 168
consecutive hours by reason of one **earthquake** or a series of **earthquake shocks.**   The
Insured may elect the moment from which the 168 hour period shall be deemed to have
commenced, provided always that no elected period of 168 hours shall commence within
the period of any previous **Occurrence.**

When the term applies to **flood,** it shall be defined as the sum total of all losses arising
directly out of or caused by reason of one **flood** or a series of **floods.**

O.    **Ordinary Payroll**

Ordinary Payroll is the entire payroll expense for all employees of the Insured except
officers, executives, employees under contract, and other critical employees.

P.    **Soft Costs**

Expenses related to the delay of completion of a project over and above those costs
which would have been incurred, including, but not limited to, attorneys fees, fines,
interest payments on financing under loan agreements and real estate taxes accruing
during the period of delay.

Policy Number PTNAM1701557

Q.    **Transit**

Shipments within and between the territorial limits of this policy, including the coastal waters thereof, by any means of conveyance, from the time the property is moved for purpose of loading and continuously thereafter while awaiting and during loading and unloading and in temporary storage including temporary storage on any conveyance intended for use for any outbound or used for inbound shipment, including during deviation and delay, until safely delivered and accepted at place of final destination.

R.    **Underlying Policy**

An insurance policy issued to the Insured which is similar as respects the terms and conditions of this policy and issued for limits below the attachment point or deductible of this policy.

S.    **Valuable Papers & Records**

Written, printed or otherwise inscribed documents, and records including but not limited to books, maps, films, drawings, abstracts, deeds, mortgages, mortgage files, manuscripts and micro or electronically/magnetically inscribed documents, but not including the monetary value of monies and/or securities.

Policy Number PTNAM1701557

## ENDORSEMENT 1

### EARTHQUAKE AND WIND ZONES

**TIER 1 WIND COUNTIES**

Tier One counties are outlined below and include any county bordering the Gulf of Mexico and/or Atlantic Ocean.

Virginia  –  Accomack, Northhampton, Gloucester, Isle of Wright, James City, Lancaster, Mathews, Middlesex, Newport News Northumberland, Suffold, Surry, Westmoreland York.
Independent Cities: Chesapeake, Norfolk, Virginia Beach.

North Carolina –  Beaufort, Bertie, Bladen, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Duplin, Hyde, Jones, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrell, Washington.

South Carolina –  Beaufort, Berkley, Charleston, Colleton, Dorchester, Florence, Georgetown, Hampton, Horry, Jasper, Marion, Williamsburg Georgia – Brantley, Bryan, Chatham, Camden, Effingham, Glynn, Liberty, Long, McIntosh

Florida –  The entire state

Alabama –  Baldwin, Mobile

Mississippi –  George, Hancock, Harrison, Jackson, Pearl River

Louisiana –  Assumption, Calcasieu, Cameron, Jefferson Davis, Vermilion, Iberia, St. Mary, Terrebonne, La Fourch, Plaque Mines, St. Martin, St. Bernard, St. Tammany, Jefferson, Orleans

Texas –  Jefferson, Chambers, Harris, Bazoria, Galveston, Matagorda, Jackson, Calhoun, Refugio, Nueces, Aransas, Liberty, Orange, San Patricio, Kenedy, Kleberg, Wilacy, Cameron

Guam

Puerto Rico

U.S. Virgin Islands

Policy Number PTNAM1701557

## NEW MADRID EARTHQUAKE COUNTIES

| ARKANSAS | Arkansas | Ashley | Chicot | Desha |
|---|---|---|---|---|
| | Drew | Fulton | Grant | Izard |
| | Jefferson | Lincoln | Lonoke | Monroe |
| | Prairie | Pulaski | Saline | White |
| | Woodruff | | | |

| ILLINOIS | Bond | Calhoun | Christian | Clark |
|---|---|---|---|---|
| | Clay | Clinton | Coles | Crawford |
| | Cumberland | Edwards | Effingham | Fayette |
| | Greene | Jasper | Jersey | Lawrence |
| | Macoupin | Madison | Marion | Monroe |
| | Montgomery | Morgan | Pike | Randolph |
| | Richland | Sangamon | Scott | Shelby |
| | St. Clair | Wabash | Washington | Wayne |

| INDIANA | Crawford | Daviess | Dubois | Gibson |
|---|---|---|---|---|
| | Greene | Knox | Lawrence | Martin |
| | Orange | Perry | Pike | Posey |
| | Spencer | Sullivan | Vanderburgh | Warrick |

| KENTUCKY | Breckinridge | Butler | Christian | Daviess |
|---|---|---|---|---|
| | Hancock | Logan | Ohio | Simpson |
| | Todd | Trigg | Warren | |

| MISSISSIPPI | Alcorn | Benton | Bolivar | Calhoun |
|---|---|---|---|---|
| | Carroll | Chickasaw | Choctaw | Clay |
| | Grenada | Holmes | Humphreys | Issaquena |
| | Itawamba | Lafayette | Lee | Leflore |
| | Lowndes | Marshall | Monroe | Montgomery |
| | Oktibbeha | Pontotoc | Prentiss | Sharkey |
| | Sunflower | Tippah | Tishomingo | Union |
| | Warren | Washington | Webster | Yalobusha |
| | Yazoo | | | |

| MISSOURI | Audrain | Callaway | Cole | Crawford |
|---|---|---|---|---|
| | Dent | Franklin | Gasconade | Howell |
| | Iron | Jefferson | Lincoln | Maries |
| | Marion | Miller | Montgomery | Oregon |
| | Osage | Phelps | Pike | Pulaski |
| | Ralls | Reynolds | Shannon | St. Charles |
| | St. Francois | St. Louis | St. Louis City | |
| | Ste. Genevieve | Texas | Warren | Washington |

| TENNESSEE | Cheatham | Decatur | Dickson | Hardin |
|---|---|---|---|---|
| | Hickman | Houston | Lawrence | Lewis |
| | McNairy | Montgomery | Perry | Robertson |
| | Stewart | Wayne | | |

Policy Number PTNAM1701557

## PACIFIC NORTHWEST EARTHQUAKE COUNTIES

| WASHINGTON | Clallam | Clark | Cowlitz |
|---|---|---|---|
| | Grays Harbor | Island | Jefferson |
| | King | Kitsap | Lewis |
| | Mason | Pacific | Pierce |
| | San Juan | Skagit | Thurston |
| | Wahkiakum | | |

| OREGON | Benton | Clackamas | Clatsop |
|---|---|---|---|
| | Columba | Lane | Lincoln |
| | Marion | Multnomah | Polk |
| | Tillamook | Washington | Yamhill |

Policy Number PTNAM1701557

## ENDORSEMENT 2

### PARTICIPATION ENDORSEMENT

Notwithstanding anything contained in the policy to the contrary the total amount to be indemnified under this policy shall not exceed USD450,000,000 in respect of any limits of liability shown in Clause 3 of the policy – Limits of Liability nor USD450,000,000 of the recoverable loss in any one Occurrence.

### INSURER PARTICIPATION

Subject to the terms and conditions contained herein and in consideration of the Insured, named herein or named in endorsements or amendments attached hereto, having paid or agreed to pay an annual Net premium, in the amount indicated in the table below, to the Insurer who has hereto subscribed it's name, the Insurer agrees to pay the Insured or the Insured's successors and assigns for loss or damage, all as more fully set forth herein, during   the period of this insurance stated herein for an amount not to   exceed the Limits stated herein and limited to the Insurer's participation as described below.

Policy Number PTNAM1701557

## ENDORSEMENT 3

It is hereby understood and agreed that with effect from inception, the following Clause is included in this insurance:

### Biological or Chemical Materials Exclusion

It is agreed that this Insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto.

Malicious use of chemical materials does not include Arson or any materials used in connection with same.

**NMA2962 (Modified)**
**06/02/03**

All other terms, conditions and limitations of this policy remain unaltered.

Policy Number PTNAM1701557

## ENDORSEMENT 4

It is hereby understood and agreed that with effect from inception, the following endorsement is included in this insurance:

### ASBESTOS ENDORSEMENT

A.  This Policy only insures asbestos physically incorporated in an insured building or structure, and then only that part of the asbestos which has been physically damaged during the period of insurance by one of these Listed Perils:

As defined in Part I – Risk Details

This coverage is subject to each of the following specific limitations:

1.  The said building or structure must be insured under this Policy for damage by that Listed Peril.

2.  The Listed Peril must be the immediate, sole cause of the damage of the asbestos.

3.  The Assured must report to Underwriters the existence and cost of the damage as soon as practicable after the Listed Peril first damaged the asbestos. However, this Policy does not insure any such damage first reported to the Underwriters more than 12 (twelve) months after the expiration, or termination, of the period of insurance.

4.  Insurance under this Policy in respect of asbestos shall not include any sum relating to:

    (i)  any faults in the design, manufacture or installation of the asbestos;

    (ii)  asbestos not physically damaged by the Listed Peril including any governmental or regulatory authority direction or request of whatsoever nature relating to undamaged asbestos.

B.  Except as set forth in the foregoing Section A, this Policy does not insure asbestos or any sum relating thereto.

**LMA5019 (Modified)**
**14/09/2005**
All other terms, conditions and limitations of this policy remain unaltered.

Policy Number PTNAM1701557

## ENDORSEMENT 5

It is hereby understood and agreed that with effect from inception, the following endorsement is included in this insurance:

### ELECTRONIC DATA ENDORSEMENT A

1. **Electronic Data Exclusion**

   Notwithstanding any provision to the contrary within the Policy or any endorsement thereto, it is understood and agreed as follows:

   (a) This Policy does not insure loss, damage, destruction, distortion, erasure, corruption or alteration of ELECTRONIC DATA from any cause whatsoever (including but not limited to COMPUTER VIRUS) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting therefrom, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

   ELECTRONIC DATA means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programmes, software and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

   COMPUTER VIRUS means a set of corrupting, harmful or otherwise unauthorised instructions or code including a set of maliciously introduced unauthorised instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. COMPUTER VIRUS includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

   (b) However, in the event that a peril listed below results from any of the matters described in paragraph (a) above, this Policy, subject to all its terms, conditions and exclusions, will cover physical damage occurring during the Policy period to property insured by this Policy directly caused by such listed peril.

   Listed Perils – As detailed in Risk Details.

Policy Number PTNAMt701557

2.  **Electronic Data Processing Media Valuation**

Notwithstanding any provision to the contrary within the Policy or any endorsement thereto, it is understood and agreed as follows:

Should electronic data processing media insured by this Policy suffer physical loss or damage insured by this Policy, then the basis of valuation shall be the cost to repair, replace or restore such media to the condition that existed immediately prior to such loss or damage, including the cost of reproducing any ELECTRONIC DATA contained thereon, providing such media is repaired, replaced or restored. Such cost of reproduction shall include all reasonable and necessary amounts, not to exceed sublimit as detailed in Risk Details any one loss, incurred by the assured in recreating, gathering and assembling such ELECTRONIC DATA. If the media is not repaired, replaced or restored the basis of valuation shall be the cost of the blank media. However this Policy does not insure any amount pertaining to the value of such ELECTRONIC DATA to the Assured or any other party, even if such ELECTRONIC DATA cannot be recreated, gathered or assembled.

25/01/01
NMA2914

All other terms, conditions and limitations of this policy remain unaltered.

Policy Number PTNAM1701557

## ENDORSEMENT 6

It is hereby understood and agreed that the following clause is added hereon:

**MOLD, MILDEW AND FUNGUS CLAUSE**

It is understood and agreed that:-

A.    This policy only insures physical loss or damage to insured property by mold, mildew or fungus that directly results from physical loss or damage to property insured by this policy during the policy period by one of the following listed perils:

    Fire; Explosion; Lightning; Windstorm; Hail; Direct Impact of Vehicle; Aircraft or Vessel; Riot or Civil Commotion; Vandalism or Malicious Mischief; Accidental Discharge of Fire Protection Equipment; Water Damage or Flood.

This coverage is subject to all limitations in the policy to which this endorsement is attached and, in addition, to each of the following specific limitations:

    1.    The said property must otherwise be insured under this policy for physical loss or damage by that Listed Peril.

    2.    The Insured must report to the Insurers the existence and cost of the physical loss or damage by mold, mildew or fungus as soon as practicable, but no later than six (6) months after the Listed Peril first caused any physical loss or damage to insured property during the policy period. This policy does not insure any physical loss or damage by mold, mildew or fungus first reported to underwriters after that six (6) month period.

    3.    Regardless of circumstances or other policy provisions, the maximum amount insured and payable under this policy for all mold, mildew or fungus caused by or resulting from any Listed Peril is as detailed in Risk Details.

B.    Except as set forth in the foregoing Section A., this policy does not insure any loss, damage, claim, cost, expense, or other sum directly or indirectly arising out of or relating to mold, mildew or fungus of any type, nature or description.


All other terms, conditions and limitations of this Policy remain unaltered.

Policy Number PTNAM1701557

## ENDORSEMENT 7

## APPLICATION OF SUBLIMITS ENDORSEMENT

It is hereby understood and agreed that the Application of Sublimits Endorsement is deleted and replaced with the following:

1.  **Application To Insured Interests**.    Each sublimit stated in this policy applies as part of, and not in addition to, the overall policy limit for an occurrence insured hereunder. Each sublimit is the maximum amount potentially recoverable from all insurance layers combined for all insured loss, damage, expense, time element or other insured interest arising from or relating to that aspect of the occurrence, including but not limited to type of property, construction, geographic area, zone, location, or peril.

2.  **Application Within Perils**.    If insured under this policy, any sublimit for earthquake, earth movement, flood, named storm, or named windstorm is the maximum amount potentially recoverable from all insurance layers combined for all insured loss, damage, expense, time element or other insured interest arising from or relating to such an occurrence.    If flood occurs in conjunction with a named storm, named windstorm, earthquake or earth movement, the flood sublimit applies within and erodes the sublimit for that named storm, named windstorm, earthquake or earth movement.

    This endorsement takes precedence over and, if in conflict with any other wording in the contract bearing on the application of sublimits, replaces that wording.

All other terms, conditions and limitations of this Policy remain unaltered.

**LMA5130 (Modified)**

Policy Number PTNAM1701557

## ENDORSEMENT 8

## EXTENDED  INCREASED  COST OF CONSTRUCTION

This policy also provides coverage for increased cost of construction due to the enforcement of any law, ordinance and/or governmental directive regulating the construction, repair or use of property that comes into force and effect within 12 months after the date of loss.

All other terms, conditions and limitations of this Policy remain unaltered

Policy Number PTNAM1701557

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or
provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or
provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under
United Nations resolutions or the trade or economic sanctions, laws or regulations of the European
Union, United Kingdom or United States of America.

15/09/10
LMA3100

# SERVICE OF SUIT CLAUSE (U.S.A.)

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be
due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the
jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause
constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an
action in any Court of competent jurisdiction in the United States, to remove an action to a United States
District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United
States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon Messrs Mendes & Mount, 750
Seventh Avenue, New York, New York 10019-6829, U.S.A. and that in any suit instituted against any
one of them upon this contract, Underwriters will abide by the final decision of such Court or of any
Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in
any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the
Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event
such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes
provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or
Director of Insurance or other officer specified for that purpose in the statute, or his successor or
successors in office, as their true and lawful attorney upon whom may be served any lawful process in
any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary
hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the
above-named as the person to whom the said officer is authorized to mail such process or a true copy
thereof.

24/4/86
NMA1998

## TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is
agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or

Policy Number PTNAM1701557

indirectly caused by, resulting from or in connection with any act of terrorism regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2920

### U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
### Not Purchased Clause

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5219
12 January 2015

### ILLINOIS SURPLUS LINES NOTICE

**Notice to Policyholder:   This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.**

Policy Number PTNAM1701557

01/09/13
LMA9046

## PREMIUM PAYMENT CONDITION (TIME ON RISK)

It is a condition of this contract of Insurance that the premium due at inception must be paid to and received by Insurers on or before midnight on the date specified under Risk Details.

If this condition is not complied with, then this contract of Insurance shall terminate on the above date with the Insured hereby agreeing to pay premium calculated at not less than pro rata temporis.

**PPC5 (TOR) 4/86**

Policy Number PTNAM1701557

# INFORMATION

Total Insured Values:

USD 22,765,315,021

Submissions provided to (Re)insurer(s) and, for those markets that use EbixExchange, added to the Data Pack

Policy Number PTNAM1701557

---

## CONTRACT ADMINISTRATION AND ADVISORY SECTIONS

### SUBSCRIPTION AGREEMENT

**SLIP LEADER**

The Slip Leader is Lex-London a Division of AIG Europe Limited

In respect of electronic lines, the Slip Leader is as defined in Security Details herein.

**BUREAU(X) LEADER(S)**

The Bureau(x) Leader(s) (where applicable) is Lex-London a Division of AIG Europe Limited

**BASIS OF AGREEMENT TO CONTRACT CHANGES**

General Underwriting Agreement (February 2014) with:

Non-Marine Schedule (October 2001) except as below:

- Agree extend for up to one calendar month at pro rata additional premium as agreed by Slip Leader only;

- Extensions to any Premium Payment Warranty (PPW), Premium Payment Condition (PPC), Prompt Payment Discount (PPD) or Settlement Due Date (SDD) are to be agreed by the Slip Leader only;

- When details of agreed endorsements are required to be provided to following (re)insurer(s), email and/or other electronic means may be used by Aon UK Limited.

Wherever practicable, between the broker and each (re)insurer which have at any time the ability to send and receive ACORD messages:

1. the broker agrees that any proposed contract change will be requested via an 'ACORD message' or using an ACORD enabled electronic trading platform;

2. whilst the parties may negotiate and agree any contract change in any legally effective manner, each relevant (re)insurer agrees to respond via an appropriate 'ACORD message' or using an ACORD enabled electronic trading platform;

3. where a (re)insurer has requested to receive notification of any contract change the broker agrees to send the notification via an 'ACORD message' or using an ACORD enabled electronic trading platform.

**OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR PART TWO GUA CHANGES ONLY**

Where no Other Agreement Parties for contract changes are stated herein, the Agreement Parties will be the Slip Leader only.

**AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR THEIR PROPORTION ONLY**

None.

**BASIS OF CLAIMS AGREEMENT**

Claims to be managed in accordance with:

- The Lloyd's Claims Scheme (Combined), or as amended or any successor thereto. The applicable Scheme/part will be determined by the rules and scope of the Scheme(s);

- IUA claims agreement practices;

- The practices of any (re)insurer(s) electing to agree claims in respect of their own participation.

Unless otherwise detailed in the Risk Details, the Slip Leader may instruct any third party expert to investigate and adjust any claim or circumstance notified to the contract.

**CLAIMS AGREEMENT PARTIES**

The Lead Claims Agreement Party is deemed to be the Slip Leader unless otherwise specified here.

For Lloyd's syndicates, the leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate. The second Lloyd's syndicate is ACT 9536.

For company (re)insurers, all IUA subscribing companies agree to follow the IUA claims agreement practices

All other subscribing (re)insurers, each in respect of their own participation, that are not party to the Lloyd's or IUA claims agreement practices, agree to follow the decisions of the Lloyd's and IUA claims agreement parties or the lead Claims Agreement Party where such is not otherwise the Lloyd's or IUA lead, excepting those that may have opted out below.

**CLAIMS ADMINISTRATION**

Aon UK Limited will notify claims agreement parties, and where applicable following (re)insurer(s) that do not participate in the Lloyd's and IUA claims schemes, of claims submitted to the contract, and provide material updates. Wherever possible such notifications and updates will be given and administered via ECF or other electronic platform at Aon UK Limited's election.

**RULES AND EXTENT OF ANY OTHER DELEGATED CLAIMS AUTHORITY**

None, unless otherwise specified here by any of the claim agreement parties shown above.

**EXPERT(S) FEES COLLECTION**

Aon UK Limited will not undertake the collection of any fee invoices rendered by third parties unless the fees form part of the (re)insured's claim or the work is for the exclusive benefit of the (re)insured.

In the event of Aon UK Limited not collecting third party fees the following applies:

Xchanging Claims Services Limited to collect fees for all slip security, including overseas (re)insurers unless the leading claims agreement party elects an alternate on a case by case basis.

**SETTLEMENT DUE DATE**

30th July 2017
Unless otherwise stated by (re)insurer(s), the Settlement Due Date is 90 days from inception in respect of direct business and 120 days from inception in respect of reinsurance business.

In respect of electronic lines, please refer to the Settlement Information shown under Security Details herein which is deemed to supersede the above.

**NOTICE OF CANCELLATION DELIVERY PROVISIONS**

Where the terms and conditions of this Contract allow for notice of cancellation to be issued, such notice of cancellation shall be provided to Aon UK Limited by email to aon.qbc.noc@aon.co.uk.

Failure to comply with this delivery requirement will make the notice null and void.

Delivery of the notice in accordance with this requirement will
cause it to be effective irrespective of whether Aon UK Limited
has acknowledged receipt.

**BUREAUX
ARRANGEMENTS**

Aon UK Limited will submit de-linked accounts to Xchanging
Ins-Sure Services Ltd (XIS) where possible.

In respect of any PPW, PPC, PPD or SDD the following apply:

- Premium payment requirements are deemed met by
  presentation of premium/accounts to XIS on or before the
  SDD and will not be recorded as a late signing or payment;

- The SDD is deemed in all instances to be the same as the
  PPW, PPC or PPD due date;

- Where the PPW, PPC or PPD has been updated then the
  SDD shall be deemed to be updated in parallel, unless
  otherwise stated to the contrary;

- The PPW, PPC, PPD or SDD shall not be deemed to be
  breached if the original presentation of the electronic
  submission to XIS is in time, but subsequently amendments to
  the electronic submission are notified as being required to
  enable the premium signing to be completed.   In such event
  Aon UK Limited shall have an additional period of seven days
  from such notification to complete the amendments and
  resubmit the electronic submission to XIS;

- Where a PPW, PPC, PPD or SDD falls on a weekend or public
  holiday, presentation to XIS on the next working day will be
  deemed in compliance with the PPW, PPC, PPD or SDD.

(Re)insurer(s) hereby agree that any premium payable in
instalments under this contract will be processed as delinked
Additional Premium entries other than when submitted under the
Deferred Account Scheme. However any annual instalments to
be allocated to respective year of account.

(Re)insurer(s) authorise XIS to issue separate signing numbers
and dates for their participations only and issue a single claims
FDO signing where applicable.

Where payments are received by Aon UK Limited in convertible
currencies, (re)insurer(s) agree to accept/settle accounts at
rate(s) of exchange obtained by Aon UK Limited.

In respect of convertible currencies, (re)insurer(s) instruct XIS to
accept settlement in any valid settlement currency as determined
by Aon UK Limited.

In the event of this contract stating multiple insurance and/or
reinsurance premiums (each to be paid from a different source);
and/or separate entries/sections for taxation/regulation reporting
purposes, XIS are instructed to leave the premium advice notes
ungrouped so that each can be released separately once paid by
the respective client.

In the event of partial premium received by Aon UK Limited,
(re)insurer(s) agree to accept premium as paid to and endorsed
by Aon UK Limited.

XIS are authorised to sign premium from individual Insureds /
territories / sections separately as and when received by Aon UK
Limited.

(Re)insurers agree that Aon UK Limited may settle premiums for

this contract/release de-linked premium for this contract into settlement at different times.

**NON BUREAUX ARRANGEMENTS**

Where a PPW, PPC, PPD or SDD falls on a weekend or public holiday, presentation to (re)insurer(s) hereon as applicable on the next working day will be deemed in compliance with the PPW, PPC, PPD or SDD.

Where payments are received by Aon UK Limited in convertible currencies, (re)insurer(s) agree to accept/settle accounts at rate(s) of exchange obtained by Aon UK Limited.

In respect of convertible currencies, (re)insurer(s) agree to accept settlement in any valid settlement currency as determined by Aon UK Limited.

In the event of partial premium received by Aon UK Limited, (re)insurer(s) agree to accept premium as paid to and endorsed by Aon UK Limited.

Policy Number PTNAM1701557

# FISCAL AND REGULATORY

**TAX PAYABLE BY (RE)INSURER(S):**  5.00% Premium Tax in respect of US Virgin Islands

**COUNTRY OF ORIGIN:**  United States of America

**OVERSEAS BROKER:**  Aon Risk Services Central Inc (Formerly Known As Aon Risk Services Inc Of Illinois)
Aon Center
200 East Randolph Street
Chicago
Illinois 60601
United States of America

**SURPLUS LINE BROKER:**  Aon Center
200 East Randolph Street
Chicago
Illinois
United States of America
60601Licence Number:- 2122152

**STATE OF FILING**  Illinois

**US CLASSIFICATION:**  **Surplus Lines**

| USClassification | | 100.0000% |
|---|---|---|
| | Total: | 100.0000% |

**In respect of International Premium only:**

| Puerto Rico | | 86.81% |
|---|---|---|
| US Virgin Islands | | 8.44% |
| Guam | | 4.75% |
| | Total: | 100.0000% |

**NAIC CODES:**  Not applicable

**ALLOCATION OF PREMIUM TO CODING:**  P2 for 100%

In respect of electronic lines, please refer to the Settlement Information shown under Security Details herein.

**REGULATORY CLIENT CLASSIFICATION:**  Large Risk

| State of Exposure | Licensee | Location | License |
|---|---|---|---|
| IL | William M Murphy | Chicago, IL | 2122152 |

Policy Number PTNAM1701557

## BROKER REMUNERATION AND DEDUCTIONS

**TOTAL BROKERAGE:**          10.00%

**OTHER DEDUCTIONS
FROM PREMIUM:**          Nil.

Policy Number PTNAM1701557

## SECURITY DETAILS

**(RE)INSURER'S LIABILITY:**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333 (amended)

Policy Number PTNAM1701557

**ORDER HEREON:**      As per total signed lines as detailed in Security Details

**BASIS OF WRITTEN LINES:**

- ☒ Percentage of Whole
- ☐ Percentage of Order
- ☐ Part of Whole
- ☐ Part of Order

**BASIS OF SIGNED LINES:**

- ☒ Percentage of Whole
- ☐ Percentage of Order
- ☐ Part of Whole
- ☐ Part of Order

**SIGNING PROVISIONS:**

In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (re)insurers.

However:

a) in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b) the (re)insured may elect for the disproportionate signing of (re)insurers' lines, without further specific agreement of (re)insurers, providing that any such variation is made prior to the commencement date of the period of insurance, and that lines written "to stand" may not be varied without the documented agreement of those (re)insurers.

The signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

**WRITTEN LINES:**      As per attached

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the lead (re)insurer.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

Policy Number: (UMR) B1526PTNAM1701557

# SECURITY DETAILS

## REFERENCES

Policy No: PTNAM1701557
Market Submission Version: 30/5/2017 2
EbixExchange Version: 1.0
Date contract published to EbixExchange Marketplace: 12:00PM 30 May 2017 (GMT)
UMR (Unique Market Reference): B1526PTNAM1701557

# SIGNED UNDERWRITERS

**Lex-London a Division of AIG Europe Limited**

Jonathan McCombie

| | | | |
|---|---|---|---|
| **Written Line** | 8.50 % | **Signed Line** | 8.50 % |
| **Agreed on** | 11:42AM 31 May 2017 Greenwich Mean Time | **Effective from** | Inception |

| For and on behalf of: | % of Written Line | Written Line | Signed Line |
|---|---|---|---|
| **Lex-London a Division of AIG Europe Limited** | 100.00 % | 8.50 % | 8.50 % |

Bound as Slip Leader

*Reference:*    87076781_2017

**Line Conditions**

Line to Stand
All contract amendments to be agreed.

# EXHIBIT III

**Jose Aguilu**

| | |
|---|---|
| **From:** | Betsy Alvarez |
| **Sent:** | Tuesday, October 03, 2017 10:40 AM |
| **To:** | Vadim Nikitine; Harold Fournier; tshymansky@ccmgroupllc.com |
| **Cc:** | Jorge Fournier; Jose Aguilu; Cindya Denis |
| **Subject:** | FW: Sears 1915 Bayamon, PR DOL 9-21-2017  /  Hurricane Maria |
| | |
| **Importance:** | High |

Mr. Elliot Feliciano, Operations Manager, informed Jose Aguilu that they are doing a new roof. Process of damage assessment started. Still in process is environmental and risk management to visit the location to have a full scope of work. At that time they will be able to provide timing.
They have contracted North Star for the moisture assessment testing.
Betsy Alvarez, CPA, MBA
Senior VP Operations & Finance
Commercial Centers Management
CCM is green. Please do not print. Help protect our planet for future generations. Thank you.

**From:** Jose Aguilu
**Sent:** Monday, October 2, 2017 2:04 PM
**To:** Betsy Alvarez <balvarez@ccmpr.com>
**Cc:** Alan Muñoz <amunoz@ccmpr.com>
**Subject:** FW: Sears 1915 Bayamon, PR DOL 9-21-2017 / Hurricane Maria
FYI

**From:** Lodi, Michael [mailto:Michael.Lodi@searshc.com]
**Sent:** Monday, October 02, 2017 1:28 PM
**To:** Jose Aguilu
**Cc:** Menendez, Dale
**Subject:** Sears 1915 Bayamon, PR DOL 9-21-2017 / Hurricane Maria
Jose,
Per our conversation Sears acknowledges its duty to insure and repair the building for damage caused by Hurricane Maria. As discussed, Sears District Facility Manager, Luis Almanza, is your primary contact for questions about Sears scheduling to complete building repair.
His cell phone # is (305) 725-0523. Please contact me should you have any questions.
Michael Lodi
Property Analyst-Risk Management
3333 Beverly Road, E3-272A
Hoffman Estates, IL 60179
Phone: 847-286-2603
Fax: 847-747-1119
EMAIL: Michael.Lodi@searshc.com

**SEARS HOLDINGS**

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

# EXHIBIT IV



**CCM**
**PUERTO RICO**
*A CCM Group Company*

PO Box 362983, San Juan, PR 00936-2983
Tel. 787-622-9600 Fax 787-277-9601

October 23, 2017

**Via email** Cary.Coonce@searshc.com
**And Certified mail** #: 7016 2140 0000 5009 1684

Sears Holdings Management Corporation
Director of Real Estate Strategy
Real Estate Department
3333 Beverly Road, BC-097B
Hoffman Estates, Il 60179

Attn. Ms. Cary Coonce, CCIM

**Re: Sears #1915 at Santa Rosa Mall, Bayamón, Puerto Rico**

Dear Ms. Coonce:

A month has transpired after Hurricane Maria made landfall in Puerto Rico, and Commercial Centers Management Realty, S en C ("CCM") has yet to receive formal communication from Sears Holdings Management Corp. ("Sears") as to its plans for the restoration, rebuilding and reopening of the above referenced store. Local store management has informally discussed with our shopping center manager that Sears intends to close the store for approximately six months for repairs.

Please be advised that under the terms of the Lease Agreement dated September 6th, 1965, upon the destruction, partial destruction or occurrence of significant damage to the premises, Sears is required to promptly and expeditiously repair the damage caused and/or rebuild the premises.

Moreover, under, Section 6.03 of the Lease Agreement all net sums recovered for loss or damage under any applicable insurance policy must be deposited in a special account in the name of Landlord to be applied to the cost of rebuilding the premises. Notwithstanding as of this date, Sears has not informed CCM about the status of the insurance claims nor of any proceeds thereunder.

Sears Holdings Management Corporation
October 23, 2017
Page 2


Also please bear in mind, that under subsection 6.03(c) of
the Lease Agreement, no abatement of rent is forthcoming due to
damages or destruction to the premises, nor during the repair and
rebuilding period.

We request that Sears provide a specific and detailed schedule of
restoration work at the premises and expect that rebuilding of the
store is expeditiously undertaken. Also, we request that we be
kept informed of the status of the insurance claim and that any
insurance proceeds are deposited as required by the Lease
Agreement.

Please contact the undersigned to discuss necessary arrangements
regarding the foregoing.

Cordially,

Betsy Alvarez
Senior Vice President
Operations and Finance

# EXHIBIT V

ACORD®   **CERTIFICATE OF PROPERTY INSURANCE**

| DATE (MM/DD/YYYY) |
| --- |
| 10/25/2017 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | | |
| --- | --- | --- | --- |
| Aon Risk Services Central, Inc.<br>Chicago IL Office<br>200 East Randolph<br>Chicago IL 60601 USA | PHONE (A/C. No. Ext): (866) 283-7122 | | FAX (A/C. No.): (800) 363-0105 |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: 570000034159 | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| INSURED | INSURER A: AIG Europe Limited | | AA112084 |
| Sears Holdings Corporation<br>dba Sears, Roebuck and Co.<br>Attn: Risk Management E3-219A<br>3333 Beverly Road<br>Hoffman Estates IL 60179 USA | INSURER B: | | |
| | INSURER C: | | |
| | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

**COVERAGES**   **CERTIFICATE NUMBER:** 570069040317   **REVISION NUMBER:**

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE: Sears Store No. 1915 - Santa Rosa Mall, Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | | LIMITS |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| A | X **PROPERTY** | | PTNAM1701557 | 06/01/2017 | 06/01/2018 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | CONTENTS | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggrega | $50,000,000 |
| | Blkt B&PP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | **INLAND MARINE** | TYPE OF POLICY | | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | POLICY NUMBER | | | | | | |
| | **CRIME** | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | **BOILER & MACHINERY / EQUIPMENT BREAKDOWN** | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
| --- | --- |
| CCM Puerto Rico, A CCM Group Company<br>Santa Rosa Mall, LLC, 3 Pals Caribe, LLC<br>Commercial Centers Management Realty<br>S. en C.<br>Carr. #2, Km. 7.1<br>Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE   *Aon Risk Services Central, Inc.* |

Holder Identifier : 1915

CERTIFICATE NUMBER: 570069040317

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)        The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: 570000034159

**ACORD®**

# ADDITIONAL  REMARKS SCHEDULE

LOC #:

Page _ of _

| | |
|---|---|
| **AGENCY**<br>Aon Risk Services Central, Inc. | **NAMED INSURED**<br>Sears Holdings Corporation |
| **POLICY NUMBER**<br>See Certificate Number:  570069040317 | |
| **CARRIER**<br>See Certificate Number:  570069040317 | **NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES**   If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | PTNAM1701557 | 06/01/2017 | 06/01/2018 | Boiler & Machinery | Included |

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

**ACORD**®

AGENCY CUSTOMER ID: 570000034159
LOC #:

## ADDITIONAL  REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

**POLICY NUMBER**
See Certificate Number:  570069040317

| CARRIER | | NAIC CODE | |
|---|---|---|---|
| See Certificate Number:  570069040317 | | | EFFECTIVE DATE: |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance

**LOCATION OF PREMISES / DESCRIPTION OF PROPERTY**

**SPECIAL CONDITIONS / OTHER COVERAGES**

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's
further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers
Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy
with respect to the property located at the above referenced Location.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

**AGENCY CUSTOMER ID:** 570000034159
**LOC #:**

# ADDITIONAL REMARKS SCHEDULE

Page __ of __

| | |
|---|---|
| **AGENCY**<br>Aon Risk Services Central, Inc. | **NAMED INSURED**<br>Sears Holdings Corporation |
| **POLICY NUMBER**<br>See Certificate Number: 570069040317 | |
| **CARRIER**<br>See Certificate Number: 570069040317 | **NAIC CODE** |
| | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

**FORM NUMBER:** ACORD 24   **FORM TITLE:** Certificate of Property Insurance

Property Program 6/1/17 - 6/1/18

$50,000,000 All Risk Policy Numbers:

Primary Property
ACE American Insurance Company - GPAD3739824A010 - 12% of $50M
Zurich American Insurance Company - XPP926068010 - 10% of $50M
Lloyds of London - Syndi 3000 MKL (Slip Leader) - PTNAM1701122 - 3% of $50M
*Novae Bermuda Underwriting Ltd - XR04017ADFRT - 3%of $50M
*Allied World Assurance Company, Ltd. - P003839014 - 18.33% of $50M
Lloyds of London - Synd 318 MSP (Slip Leader) - PTNAM1701562 - 7.5% of $50M
Aspen Specialty Insurance Company - PXAA52817 - 1.67% of $50M
Westport Insurance Corporation - NAP045210505 - 8% of $50M
HDI Global Insurance Company - XPD1488600 - 2.5% of $50M

Starr Companies - 5% of $50M
Starr Surplus Lines Insurance Company - SLSTPTY10966117
Chubb Custom Insurance Company - 4468121406
General Security Indemnity Company of Arizona (GSINDA) - T0234451703681
Executive Risk Specialty Insurance Company - 4468121506


Excess Property
Endurance worldwide Insurance Ltd. (Slip Leader) - PTNAM1701564 - 2% of $50M
Lloyds of London - Synd 1414 ASC (Slip Leader) - PTNAM1701559 - 8% of $50M
Tokio Marine America Insurance Company - LCP648016706 - 4% of $50M
Liberty Mutual Fire Insurance Company - MJ2L9L426774037 - 4% of $50M
Ironshore Specialty Insurance Company - 000423108 - 2.5% of $50M
AIG Europe Ltd. - PTNAM1701557 - 8.5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an
administrative capacity as evidence of insurance where required by clients of the Insured."

ACORD 101 (2008/01)                    © 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# EXHIBIT VI

| | |
|---|---|
| **From:** | ACS Chicago |
| **To:** | Juan C. Cintron; Martha.Cooper@searshc.com |
| **Subject:** | Sears Holdings Corporation - CCM Puerto Rico, A CCM Group Company [17102510773022] |
| **Date:** | Wednesday, October 25, 2017 5:01:21 PM |
| **Attachments:** | Sears Holdings Corporation_CCM Puerto Rico, A CCM Group Company_17102510773022.pdf |

Attached, please find the Certificate(s) of Insurance that you have requested. Should you have any
questions, please call 866-283-7122.

*(See attached file: Sears Holdings Corporation_CCM Puerto Rico, A CCM Group
Company_17102510773022.pdf)*

Aon Client Services
Aon Risk Services Central, Inc.
dba Aon Risk Insurance Services Central, Inc.
CA License 0D04043
4 Overlook Point | Lincolnshire, IL | 60069
t: 866.283.7122 | f: 800.363.0105 w: aon.com

# ACORD® CERTIFICATE OF PROPERTY INSURANCE

**DATE (MM/DD/YYYY)**
10/25/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Aon Risk Services Central, Inc.<br>Chicago IL Office<br>200 East Randolph<br>Chicago IL 60601 USA | PHONE (A/C. No. Ext): (866) 283-7122 | | FAX (A/C. No.): (800) 363-0105 |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: 570000034159 | | |

Holder Identifier : 1915

| INSURED | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| Sears Holdings Corporation<br><br>dba Sears, Roebuck and Co.<br>Attn: Risk Management E3-219A<br>3333 Beverly Road<br>Hoffman Estates IL 60179 USA | INSURER A: AIG Europe Limited | AA112084 |
| | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

## COVERAGES          CERTIFICATE NUMBER: 570069040317          REVISION NUMBER:

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE:  Sears Store No. 1915 - Santa Rosa Mall, Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

CERTIFICATE NUMBER: 570069040317

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X PROPERTY | | PTNAM1701557 | 06/01/2017 | 06/01/2018 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | CONTENTS | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggrega | $50,000,000 |
| | Blkt B&PP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | INLAND MARINE | TYPE OF POLICY | | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | POLICY NUMBER | | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company<br>Santa Rosa Mall, LLC, 3 Pals Caribe, LLC<br>Commercial Centers Management Realty<br>S. en C.<br>Carr. #2, Km. 7.1<br>Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Aon Risk Services Central, Inc.* |

© 1995-2015 ACORD CORPORATION. All rights reserved.

**ACORD 24 (2016/03)**          The ACORD name and logo are registered marks of ACORD

**ACORD**®

# ADDITIONAL  REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

**POLICY NUMBER**
See Certificate Number:  570069040317

| CARRIER | | NAIC CODE | |
|---|---|---|---|
| See Certificate Number:  570069040317 | | | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**
**FORM NUMBER:**  ACORD 24   **FORM TITLE:**  Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES**   If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | PTNAM1701557 | 06/01/2017 | 06/01/2018 | Boiler & Machinery | Included |

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

ACORD®

AGENCY CUSTOMER ID: 570000034159
LOC #:

# ADDITIONAL  REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

**POLICY NUMBER**
See Certificate Number:   570069040317

| CARRIER | NAIC CODE | |
|---|---|---|
| See Certificate Number:   570069040317 | | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:**   ACORD 24   **FORM TITLE:**   Certificate of Property Insurance

**LOCATION OF PREMISES / DESCRIPTION OF PROPERTY**

**SPECIAL CONDITIONS / OTHER COVERAGES**

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's
further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers
Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy
with respect to the property located at the above referenced Location.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD



**ADDITIONAL REMARKS SCHEDULE**

AGENCY CUSTOMER ID: 570000034159
LOC #:

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |
| POLICY NUMBER | |
| See Certificate Number:  570069040317 | |
| CARRIER | NAIC CODE |
| See Certificate Number:  570069040317 | |
| | EFFECTIVE DATE: |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  ACORD 24    FORM TITLE:  Certificate of Property Insurance

```
                      Property Program 6/1/17 - 6/1/18


$50,000,000 All Risk Policy Numbers:

Primary Property
ACE American Insurance Company - GPAD3739824A010 - 12% of $50M
Zurich American Insurance Company - XPP926068010 - 10% of $50M
Lloyds of London - Syndi 3000 MKL (Slip Leader) - PTNAM1701122 - 3% of $50M
*Novae Bermuda Underwriting Ltd - XR04017ADFRT - 3%of $50M
*Allied World Assurance Company, Ltd. - P003839014 - 18.33% of $50M
Lloyds of London - Synd 318 MSP (Slip Leader) - PTNAM1701562 - 7.5% of $50M
Aspen Specialty Insurance Company - PXAA52817 - 1.67% of $50M
Westport Insurance Corporation - NAP045210505 - 8% of $50M
HDI Global Insurance Company - XPD1488600 - 2.5% of $50M

Starr Companies - 5% of $50M
Starr Surplus Lines Insurance Company - SLSTPTY10966117
Chubb Custom Insurance Company - 4468121406
General Security Indemnity Company of Arizona (GSINDA) - T0234451703681
Executive Risk Specialty Insurance Company - 4468121506


Excess Property
Endurance worldwide Insurance Ltd. (Slip Leader) - PTNAM1701564 - 2% of $50M
Lloyds of London - Synd 1414 ASC (Slip Leader) - PTNAM1701559 - 8% of $50M
Tokio Marine America Insurance Company - LCP648016706 - 4% of $50M
Liberty Mutual Fire Insurance Company - MJ2L9L426774037 - 4% of $50M
Ironshore Specialty Insurance Company - 000423108 - 2.5% of $50M
AIG Europe Ltd. - PTNAM1701557 - 8.5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an
administrative capacity as evidence of insurance where required by clients of the Insured."
```

ACORD 101 (2008/01)                    © 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# EXHIBIT VII

# SEARS HOLDINGS CORPORATION

October 26, 2017

**CERTIFIED MAIL/
RETURN RECEIPT REQUESTED**
# 7016 2070 0000 0797 8220

Commercial Centers Management
PO Box 362983
San Juan, PR 00936

Via Email: balvarez@ccmpr.com

Re:    Sears 1915
       Location: Bayamon, PR
       Date of Loss: 9/21/2017
       Type of Loss: Hurricane Maria / Wind

Dear Ms. Alvarez,

This letter is in response to your letter dated October 23, 2017 (copy enclosed).

As you are aware, the Sears building sustained extensive damage from Hurricane Maria. Northstar Recovery Services was contacted for emergency cleanup and dry-out to mitigate building damages and protect the building from further damage. Sears is currently in the process of obtaining permanent building repair proposals. Sears intends to repair the building on an expedited basis as material and labor are available. Nevertheless, it may take months for repairs to be completed and the store to open.

We agree the Lease Agreement dated September 6th, 1965, requires the Tenant to repair the building for damage or destruction by fire or other insured casualty. Sears has an insurance claim for this loss but it will take some time for insurance proceeds to be received to this loss. Please let us know what account the Landlord would like the insurance proceeds to be deposited to for building repair. Once the insurance payment is received arrangements will be made for it to be deposited with an agreed bank.

Sears District Facility Manager, Luis Almanza, is the point of contact to discuss on-site permanent building repairs, inspection and provide access to the premises. His cell phone number is (305) 725-0523

Please let us know if there is anything further at this time. As information on the cost of repairs becomes available we will advise further.

Sincerely,

Michael Lodi
Property Analyst – Risk Management
Sears Holdings Corporation
3333 Beverly Road E3-272A; Hoffman Estates, Il. 60179
Office: 847-286-2603 Email:Michael.Lodi@searshc.com

| STORE # | TYPE | LOCATION | Project MGR | Status |
|---|---|---|---|---|
| | | | | 5/4/2018 |
| 1915 | FLS | BAYAMON, PR | BARRY BRUNSON 817 689 3108 847 254 1915 | No Change Permit Plans have been processed. District supplied, Sales Support and Office plan, complete and transmitted waiting on Planning for revised Merchandise and Sales Support Plans. Store Hazardous Materials Abatement starts 4/16/2018. Store will be abated in Quadrants per floor starting on the 2nd Floor Stock Area. Please be aware of Hazardous Materials Warning signs that will be posted in the building in the areas work is being completed. Exterior Design for Building upper level Design and Repairs request have been sent to Architect for Research and Implementation into the Permit Drawings. Sandra Pechan sent a Request for Information to the District Team for Licensed Business, Cash wrap Placement and Sale Support information. This information is needed to send correct plans to the Architect. |

| Status | Status |
|--------|--------|
| 5/11/2018 | 5/18/2018 |

No Change.

No Change Permit Plans have been processed. District supplied, Sales Support and Office plan, complete and transmitted waiting on Planning for revised Merchandise and Sales Support Plans. Store Hazardous Materials Abatement starts 4/16/2018. Store will be abated in Quadrants per floor starting on the 2nd Floor Stock Area. Please be aware of Hazardous Materials Warning signs that will be posted in the building in the areas work is being completed. Exterior Design for Building upper level Design and Repairs request have been sent to Architect for Research and implementation into the Permit Drawings. Sandra Pechan sent a Request for Information to the District Team for Licensed Business, Cash wrap Placement and Sale Support information. This information is needed to send correct plans to the Architect.

# EXHIBIT VIII

## CCM
## PUERTO RICO

*A CCM Group Company*

PO Box 362983, San Juan, PR 00936-2983
Tel. 787-622-9600 Fax 787-277-9601

October 30, 2017

**Via email rolando.ortega@aig.com**

AIG Insurance Company Puerto Rico
Atn. Mr. Rolando Ortega
250 Muñoz Rivera, suite 500
San Juan, PR 00918

   **Re: Insurance policy number PTNAM1701557 for the Sears store located at
   Santa Rosa Mall, Bayamón, Puerto Rico**

Dear Mr. Ortega:

   The above referenced property insurance policy covers the Sears store located at
Santa Rosa Mall, and both Santa Rosa Mall, LLC and Commercial Centers Management
Realty, S en C ("CCM") are Additional Insureds under the policy. For ease of reference,
I enclose a copy of the Certificate of Property Insurance.

   Please be advised that under Section 6.03 of the Lease Agreement, all net sums
recovered for loss or damage under any applicable insurance policy must be deposited
in a special account in the name of Landlord to be applied to the cost of rebuilding the
premises. Under the existing Lease Agreement, Sears Holding Management Corporation
("Sears") is required to promptly and expeditiously repair the damage caused and/or
rebuild the premises. Sears is aware and has agreed to fully comply with the provisions
of the Lease herein discussed.

   CCM formally requests to be informed as to the filing of any claim under the policy
as well as the processing of the same, and that any insurance proceeds be deposited as
required by the Lease Agreement.

   Please contact the undersigned at balvarez@ccmpr.com to further discuss this
matter and coordinate necessary arrangements regarding the foregoing.

Cordially,

Betsy Alvarez
Senior VP of Operations and Finance

c: claims.pr@aig.com

# EXHIBIT IX

# SEARS HOLDINGS CORPORATION

June 6, 2018

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
# 7016 2070 0000 0797 8848

Commercial Centers Management
PO Box 362983
San Juan, PR 00936

Via Email: ymelendez@ccmpr.com
          balvarez@ccmpr.com

Re:    Sears 1915
       Location: Bayamon, PR
       Date of Loss: 9/21/2017
       Type of Loss: Hurricane Maria / Wind

Dear Ms. Melendez,

This letter is intended to provide a brief recap of our telephone conversation on June 5, 2018.

As discussed, in Section 6.4 of the Lease the Tenant's Parent Corporation, Sears Holdings Corporation, is not required to place insurance money into a special account for building repairs as a result of fire or other casualty. Our letter of June 1st explains in detail. The Certificate of Insurance confirms Sears Holdings Corporation is the insured. Please let me know if there are any further questions.

As to the progress of the building repairs, we believe we have been proceeding in a diligent fashion. In order to assure Landlord of our intent and diligence, and as promised in our call attached you will find a Construction Schedule from the Sears Construction Team. The Construction Schedule provides the approximate dates Sears expects to have specific repair items completed. As you can see, Sears anticipates having a Grand Reopening on January 1, 2019. As stated in our prior letter, Sears Holdings Corporation will provide all monies required to restore and rebuild as required by the Lease. Should you or others at your company have any Construction specific questions please feel free to contact the Sears Project Manager, Barry Brunson. His cell phone number # is (817) 689-3108, and he has working knowledge of the construction progress.

Please contact me should you have any questions. At this juncture, if Tenant does not hear from Landlord to the contrary within 5 days from the date of this letter, Tenant will consider any default alluded to in Landlord's letter dated June 1, 2018, cured and rescinded.

Sincerely,

Dale Menendez, CPCU, MBA
Director, Property Claims - Risk Mgmt
Sears Holdings Management Corporation
3333 Beverly Road, E3-240B
Hoffman Estates, IL 60179

1915 Sears Bayamon, PR

Hurricane Repair and Build Back

Sears Holdings Corporation have undertaken significant steps in restoring the Bayamon property to original condition. See below for reference on the timeline and milestones for the build-back:

- Mold Remediation  - 11/2017 start, now Complete

- Interior Building Demo – 1/2018 start, now Complete

- Roof Replacement: Upper Level – 1/2018 start, now Complete

- ACM Environmental Abatement –3/2018 start, now Complete 6/15

- Architectural and Mechanical Permit Plans – Complete 6/29/2018

- Submit for Permits – 7/2 Start

- Pre-Bid Meeting – 7/06

- Material Orders Released – 7/09 Start

- Major Construction – 7/27 Start

- Roof Replacement: Lower Level – 8/3 Start

- Exterior Building Repairs – 8/6 Start

- Exterior Signs – 8/24 Start

- Merchandise Receipt: 10/15 Start

Planned date for Certificate of Occupancy to be complete is end of Calendar Year 2018

# EXHIBIT X

# UNREDACTED

## CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement") is entered into between Sears
Holdings Corporation ("Releasor" or "Sears") and Certain Interested Insurers of Releasor,
including Certain Underwriters at Lloyd's, London, Subscribing to Policy No. PTNAM1701559,
PTNAM1701562 and PTNAM1701122, Allied World Assurance Company, Ltd and Allied
World Assurance Company, Ltd Subscribing to Policy P003839/014, Chubb, Zurich North
America ("Zurich"), Lexington UK ("Lexington"), Westport Insurance Company ("Westport"),
Liberty Mutual Insurance Company ("Liberty Mutual"), Tokio Marine America ("Tokio"),
Certain Underwriters At Lloyd's, Novae Syndicates Limited ("Novae"), HDI, Ironshore, Sompo
Endurance Insurance ("Sompo"), Starr Surplus Lines Insurance Company ("Starr"), Chubb
Custom Insurance Company, Executive Risk Specialty Insurance Company, General Security
Indemnity Company of Arizona ("GSINDA") and Aspen Insurance ("Aspen") (collectively,
"Releasees" or "Underwriters"). Releasor and Releasees may sometimes be referred to as the
"Parties."

WHEREAS, Releasees provided certain insurance coverage for Sears' properties for the policy
period June 1, 2017 to June 1, 2018 (the "Policy Period") under various all-risk manuscript
policies, including policy nos. PTNAM1701559, PTNAM1701562, PTNAM1701122, Allied
World Assurance Company, Ltd policy no. P003839/014, Chubb policy no. GPAD3739824A010,
Zurich policy no. XXP9260680-10, Lexington policy no. PTNAM1701557, Westport policy no.
NAP0452105-05, Starr policy no. SLSTPTY10966117, Chubb Custom Insurance Company
policy no. 44681214-06, Executive Risk Specialty Insurance Company policy no. 44681215-06
and GSINDA policy no. T0234451703681, Liberty Mutual policy no. MJ2-L9L-426774-037,
Tokio Marine policy no. LCP6480167-06, Novae policy no. XR04017ADFRT, HDI policy no.
XPD14886-00, Ironshore policy no. 000423108, Sompo policy no. PTNAM1701564, and Aspen
policy no. PXAA52817 (the "Policies"), subject to the Policies' terms, conditions, limitations, and
exclusions;

WHEREAS, certain of Sears' property was damaged by Hurricane Irma which occurred
on or about September 7, 2017 (the "Hurricane Irma Loss");

WHEREAS, certain of Sears' property was damaged by Hurricane Maria which occurred on or
about September 16, 2017 (the "Hurricane Maria Loss");

WHEREAS, Sears submitted claim(s) to Underwriters seeking recovery for its Hurricane
Irma and Hurricane Maria Loss and damage (the "Claim");

WHEREAS, Underwriters previously made, will make and agreed to make payments to Sears
totaling $46,332,916 with regard to its Claim. To the extent that any money is still owed by any
insurer for their pro rata share of the agreed upon $46,332,916 prior payment, such amount shall
be promptly paid by such insurer and not later than 10 business days after the execution of this
Agreement.

467818.1

WHEREAS, certain disputes arose between Sears and Underwriters regarding the nature, scope, extent and amount of Loss and damage that was caused by, and/or was attributable to, Hurricane Irma and Hurricane Maria that may be covered under the Policies, if any;

WHEREAS, Releasor and Releasees have, through negotiation and compromise and without acknowledgment of liability, reached an agreement as the Hurricane Irma Loss, Hurricane Maria Loss and the Claim under the Policies; and

WHEREAS, for the avoidance of doubt, the resolution of the Hurricane Irma Loss, Hurricane Maria Loss and Claim includes *any and all* claims that were made, could have been made, or could be made in the future under the Policies for the Policy Period June 1, 2017 to June 1, 2018 in any way relating to or arising out of the Hurricane Irma Loss, Hurricane Maria Loss and the Claim.

ACCORDINGLY, Releasor and Releasees agree as follows:

1.      Releasees severally and not jointly will pay Releasor Thirteen Million Two Hundred Sixty Thousand One Hundred Twenty Two Dollars and Zero Cents (USD $13,260,122.00) in exchange for a full and final release of the Hurricane Irma Loss, Hurricane Maria Loss and the Claim under the Policies, including any and all claims that Releasor or any other party made, could have made, or could make in the future under the Policies for the Hurricane Irma Loss, Hurricane Maria Loss and the Claim. No further or additional consideration has been promised by Releasees. Releasor explicitly acknowledges that Releasees have no duty to pay Releasor or any other party any further amounts under the Policies for the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, including any and all claims that were made, could have been made, or could be made in the future under the Policies for the Hurricane Irma Loss, Hurricane Maria Loss and the Claim.

2.      Subject to Releasor's execution of this Agreement and delivery thereof to Releasees, Releasees will pay the above-described amount by wire transfer or check to Releasor within 10 business days from the date of execution of this Agreement by Releasor. Payment by any of Releasees of its share of the settlement shall satisfy the terms of this Agreement and be binding as between Releasor and the entity making payment, notwithstanding the failure to comply of any other of the Releasees.

3.      In consideration of the Settlement, Releasor does, hereby, for itself and its predecessors, heirs, executors, successors, assigns, affiliates, subsidiaries, administrators, shareholders, trustees, creditors, mortgage holders, landlords, and agents, remise, release, and forever discharge *in their entirety,* Releasees, their agents, servants, employees, officers, insurers, reinsurers, adjusters, managing agencies, coverholders, third-party administrators, attorneys, independent contractors, successors, assigns, affiliates, subsidiaries and all other persons, firms, corporations, and entities, and each and every one of them from all obligations under the Policies in relation to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, including any and all claims that were made, could have been made, or could be made in the future under the Policies in relation to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim. Except as otherwise set forth herein, this shall include *all* legal actions, appraisals, claims,

467818.1

CONFIDENTIAL

demands, equitable relief, rights, actions, causes of action, bad faith, extra-contractual damages, punitive damages, and/or any other damages known or unknown, anticipated or unanticipated, which Releasor has now or claims to have now or which may hereafter accrue against Releasees under the Policies, which are in anyway related to and/or arising out of the Hurricane Irma Loss, Hurricane Maria Loss and the Claim.

4.       Releasor expressly acknowledges that this Agreement resolves all claims for the Policy Period June 1, 2017 to June 1, 2018 for the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, including any and all claims that Releasor or any other party made, could have made, or could make in the future under the Policies for the Hurricane Irma Loss, Hurricane Maria Loss and the Claim.. Releasor expressly waives its right to assert any further claims under the Policies for the Policy Period at issue in relation to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim and acknowledges that the consideration supporting this Agreement fully and completely satisfies the obligations of all Releasees under the Policies for all claims, whether or not submitted, in relation to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim. Releasor assumes all risk of mistake of law and/or fact, including but not limited to what rights may exist and/or waiving rights as to unknown and/or unanticipated claims.

5.       Releasor further warrants that Releasor is the only party of interest with regard to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim under the Policies , including any and all claims that were made, could have been made, or could be made in the future under the Policies for the Hurricane Irma Loss, Hurricane Maria Loss and the Claim and that it has not assigned or otherwise transferred or attempted to transfer, either separately or collectively, any of its legal actions, claims, demands, rights, actions, causes of action and/or damages related to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, including any and all claims that were made, could have been made, or could be made in the future under the Policies in relation to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, all of which are all released in this Agreement. Releasor further warrants that, to its knowledge, none of its affiliates, subsidiaries, administrators, shareholders, trustees, and creditors are parties of interest with regard to any portion of the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, including any and all claims that were made, could have been made, or could be made in the future under the Policies in relation to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim.

6.       Releasor agrees to hold harmless, indemnify, and defend the Releasees from any and all actions, demands, and claims under the Policies which Releasor, or any mortgagee, co-owner, coinsured, additional insured, and/or loss payee, assignee, or subrogee of Releasor or any other person, including but not limited to owner(s) and/or landlord(s) of any of Releasor's properties, may assert at a later date arising out of the matters herein released.

7.       Releasor acknowledges that this Agreement shall not be construed as an admission of liability or coverage by Releasees as to Hurricane Irma Loss, Hurricane Maria Loss and the Claim, or any portion thereof, including any and all claims that were made, could have been made, or could be made in the future under the Policies for the Hurricane Irma Loss, Hurricane Maria Loss and the Claim. Releasor recognizes that this settlement is being paid without waiver of any of the Releasees' rights under the Policies, and is subject to the Policies' terms, conditions, exclusions and limitations.

467818.1

CONFIDENTIAL                                              SEARS_SantaRosaMall 00000077

8.      Releasor further acknowledges that this Agreement constitutes the entire
agreement between the Releasor and Releasees as respects the Hurricane Irma Loss, Hurricane
Maria Loss and the Claim and any and all claims that were made, could have been made, or
could be made in the future under the Policies related to the Hurricane Irma Loss, Hurricane
Maria Loss and the Claim, and that in executing this Agreement, Releasor has not relied upon
any representation or statement not set forth herein, and that the representations contained in this
Agreement are the complete and full representations to which they have agreed.

9.      Except as set forth herein, the terms of this Agreement, including but not limited
to the amount of the settlement payment for the Hurricane Irma Loss, Hurricane Maria Loss and
the Claim, shall remain confidential and shall not be disclosed without the written consent of
Releasees to any person except as by court order, by law, to enforce the terms of the Agreement,
or as necessary for the bankruptcy or to apply for or obtain insurance. Should any court order the
disclosure of the terms of this Agreement to any other entity or person, the parties shall attempt
to maintain its terms under seal. If any third party seeks disclosure of this Agreement from
Releasor except as provided above, Releasor will inform Releasees within forty-eight (48) hours
of such effort and will forward any writings evidencing any such request to Releasees. Notice
shall be marked priority and sent via U.S. mail and electronic mail to: Courtney Murphy,
Clausen Miller PC, 28 Liberty Street, New York, New York 10005, and cmurphy@clausen.com.
Notwithstanding the foregoing, Releasor may disclose the terms of this Agreement to its legal,
accounting, tax and/or financial advisors, in any required securities filings, and to the extent that
Releasor's legal counsel and/or its independent accountants advise that such disclosure is
required.

10.      A facsimile and/or electronically transmitted (.pdf) signature upon this Agreement
shall constitute an original signature for all purposes.

11.      The purpose of this Agreement is to fully, finally, and completely resolve all
portion of the Hurricane Irma Loss, Hurricane Maria Loss and the Claim, including any and all
claims that were made, could have been made, or could be made in the future under the Policies
in relation to the Hurricane Irma Loss, Hurricane Maria Loss and the Claim.

12.      The provisions of this Agreement are severable, and if any part of it is found to be
unenforceable, the other paragraphs, or parts thereof, shall remain full, valid, and enforceable.
This Agreement shall survive termination of any arrangements contained herein.

13.      Having had the opportunity to confer with counsel, Releasor hereby declares that
the terms of this Agreement have been completely read, fully understood, and voluntarily
accepted for the purposes of making a final settlement and release of the Hurricane Irma,
Hurricane Maria and the Claim that were made, could have been made, or could be made in the
future under the Policies. For purposes of construing this Agreement, no party shall be
considered the drafter, and this Agreement shall be considered fully integrated.

462818.1

14.    The undersigned warrants and verifies that he/she has full authority to execute this Agreement and bind all parties releasing claims herein.

15.    It is understood and agreed by and between the Parties that any and all claims for subrogation and/or all recovery rights of claims for the Hurricane Irma Loss, Hurricane Maria Loss and/or the Claim shall be, and will remain, governed by the **Subrogation and Subrogation Waiver** provision (¶21 thereof) within the subject Policies of insurance. Notwithstanding this Policies of insurance requirement, it is further agreed by and between the Parties that this Agreement does not, in any way, waive, limit, estop and/ or release any liability, recovery, claim and damages against any responsible or potentially responsible party – not otherwise released by the terms of this Agreement – to the full extent of the law, and at the discretion of the Releasor. Releasees shall not be responsible for payment of any cost or expense incurred by Releasor in any future claims for recovery against third parties which are in any way related to the Hurricane Irma, Hurricane Maria and/or the Claim.

**Sears Holding Corporation:**

By: Name: _(signature)_

Print Name: DALE MENENDEZ

Position: DIRECTOR, PROPERTY CLAIMS

Sworn and subscribed before me this 17 day of January 2018

_(signature)_
Notary Public

JULY 13, 2020
My Commission Expires
Notary Public, State of Illinois
OFFICIAL SEAL
EILEEN TEMPLEMAN

467818 1

CONFIDENTIAL

SEARS_SantaRosaMall 00000079

**Certain Underwriters At Lloyd's Subscribing to Policy PTNAM1701559:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this ____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL

SEARS_SantaRosaMall 00000080

**Certain Underwriters At Lloyd's Subscribing to Policy PTNAM1701562:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL                                    SEARS_SantaRosaMall 00000081

**Certain Underwriters At Lloyd's Subscribing to Policy PTNAM1701122:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this ____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL                                              SEARS_SantaRosaMall 00000082

**Allied World Assurance Company, Ltd and Allied World Assurance Company, Ltd
Subscribing to Policy P003839/014:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL

SEARS_SantaRosaMall 00000083

**Chubb Subscribing to Policy GPAD3739824A010:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this ____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL                                    SEARS_SantaRosaMall 00000084

**Zurich Subscribing to Policy XXP9260680-10:**

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL                                    SEARS_SantaRosaMall 00000085

**Lexington Subscribing to Policy PTNAM1701557:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL

SEARS_SantaRosaMall 00000086

**Westport Subscribing to Policy NAP0452105-05:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this ____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL                                        SEARS_SantaRosaMall 00000087

**Starr Surplus Lines Insurance Company Subscribing to Policy SLSTPTY10966117**
**Chubb Custom Insurance Company Subscribing to Policy 44681214-06**
**Executive Risk Specialty Insurance Company Subscribing to Policy 44681205-06**
**General Security Indemnity Company of Arizona Subscribing to T0234451703681**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018

Notary Public _____

467818 |

**Liberty Mutual Subscribing to Policy MJ2-L9L-426774-037:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL    SEARS_SantaRosaMall 00000089

**Tokio Marine Subscribing to Policy LCP6480167-06:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018

_____

Notary Public

467818.1

CONFIDENTIAL

**Novae Subscribing to Policy XR04017ADFRT:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this ____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL

**HDI Subscribing to Policy XPD14886-00:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018


_____

Notary Public

467818.1

CONFIDENTIAL

SEARS_SantaRosaMall 00000092

**Ironshore Subscribing to Policy 000423108:**

By: Name: _____

Position: _____

Sworn and subscribed before me this ____ day of _____, 2018

_____
Notary Public

467813.1

CONFIDENTIAL                    SEARS_SantaRosaMall 00000093

**Sompo Subscribing to Policy PTNAM1701564:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this _____ day of _____, 2018

_____
Notary Public

467818.1

CONFIDENTIAL

SEARS_SantaRosaMall 00000094

**Aspen Subscribing to Policy PXAA52817:**

By: Name: _____

Print Name: _____

Position: _____

Sworn and subscribed before me this ____ day of _____, 2018

_____

Notary Public

467818.1

CONFIDENTIAL

SEARS_SantaRosaMall 00000095

# EXHIBIT XI

**Ferraiuoli** LLC

*Looking Forward*  **15**
                    ANNIVERSARY

T. 787-766-7000
F. 787.766.7001

January 23, 2019

**FedEx Intl.**
**#812063306452**

**AIG EUROPE**
**LIMITED** The AIG
Building
58 Fenchurch Street
London EC3M 4AB

| This is not an attempt to collect a debt. This letter is sent for informational purposes only. We acknowledge your bankruptcy filing. |
| --- |

RE:    **Insurance Policy No. PTNAM1701557, effective from 06/01/2017-06/01/2018**
       **Insurance Policy No. PTNAM1802875, effective from 06/01/2018-06/01/2019**

To Whom It May Concern:

Our firm represents Santa Rosa Mall, LLC ("Santa Rosa Mall"), a loss payee to the above referenced property insurance policies, which cover Sears Store No. 1915 ("Store 1915") located at Santa Rosa Mall, Bayamón, PR 00959. The purpose of this letter is to request information regarding the status of a claim under either policy, as set forth in our client's October 30th letter attached hereto as **Exhibit I**. This is not a collection letter or a demand for payment.

Store 1915 has remained closed since September 2017, due to damages suffered during Hurricane Maria. Pursuant to Michael Lodi, Property Analyst at Sears Holdings Corporation, "Sears has an insurance claim for this loss". At such time, Sears was insured by AIG Europe Limited ("AIG") under Policy No. PTNAM1701557. I am including a copy of the *Certificate of Property Insurance* as **Exhibit II**. Under the "Additional Remarks Schedule" of such *Certificate*, "Santa Rosa Mall LLC [] [is] included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced location", referring to Store 1915. Id. Thus, upon information and belief, Sears is currently insured by AIG under Policy No. PTNAM1802875.

As a Loss Payee, Santa Rosa Mall affirming it has an interest in any negotiation conducted by and between AIG and Sears, as well as any proceeds thereto. As such, we provide notice, and hereby copy Debtor's counsel, that any insurance proceeds recovered for loss or damage be issued jointly to Debtor and Santa Rosa so that funds can be deposited in a segregated account to be used only for the repairs to Store 1915, in compliance with Section 6.03(b)(3) of the *Lease Agreement* executed by Santa Rosa Mall and Sears on September 22, 1965.

As it relates to AIG Europe Limited, this letter is being sent in conjunction with the Debtor for notification purposes. This notice is for informational purposes only and does not constitute a demand for payment.

AIG Europe Limited
Insurance Policy No. PTNAM1701557 and PTNAM1802875
January 23, 2019

---

Should you wish to discuss the foregoing, please do not hesitate to contact us at your earliest convenience. We are available to meet with you to try to reach an amicable resolution.

Your anticipated cooperation in this matter is greatly appreciated.

Cordially,

FERRAIUOLI, LLC

*/s/Sonia E. Colón*
Sonia E. Colón Colón, Esq.
scolon@ferraiuoli.com


cc:    **Ms. Candace M. Arthur**
       **Weil, Gotshal & Manges LLP**
       767 Fifth Avenue
       New York, NY 10153
       FedEx Intl. #812063306441



**CCM**
**PUERTO RICO**
*A CCM Group Company*
PO Box 362983, San Juan, PR 00936-2983
Tel. 787-622-9600 Fax 787-277-9601

**Exhibit I**

October 30, 2017

**Via email rolando.ortega@aig.com**

AIG Insurance Company Puerto Rico
Atn. Mr. Rolando Ortega
250 Muñoz Rivera, suite 500
San Juan, PR 00918

**Re: Insurance policy number PTNAM1701557 for the Sears store located at
Santa Rosa Mall, Bayamón, Puerto Rico**

Dear Mr. Ortega:

The above referenced property insurance policy covers the Sears store located at Santa Rosa Mall, and both Santa Rosa Mall, LLC and Commercial Centers Management Realty, S en C ("CCM") are Additional Insureds under the policy. For ease of reference, I enclose a copy of the Certificate of Property Insurance.

Please be advised that under Section 6.03 of the Lease Agreement, all net sums recovered for loss or damage under any applicable insurance policy must be deposited in a special account in the name of Landlord to be applied to the cost of rebuilding the premises. Under the existing Lease Agreement, Sears Holding Management Corporation ("Sears") is required to promptly and expeditiously repair the damage caused and/or rebuild the premises. Sears is aware and has agreed to fully comply with the provisions of the Lease herein discussed.

CCM formally requests to be informed as to the filing of any claim under the policy as well as the processing of the same, and that any insurance proceeds be deposited as required by the Lease Agreement.

Please contact the undersigned at balvarez@ccmpr.com to further discuss this matter and coordinate necessary arrangements regarding the foregoing.

Cordially,

Betsy Alvarez
Senior VP of Operations and Finance

c: claims.pr@aig.com

# CERTIFICATE OF PROPERTY INSURANCE

**ACORD®**

DATE (MM/DD/YYYY): 10/25/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Aon Risk Services Central, Inc.<br>Chicago IL Office<br>200 East Randolph<br>Chicago IL 60601 USA | PHONE (A/C, No, Ext): (866) 283-7122 | FAX (A/C, No): (800) 363-0105 |
| | E-MAIL ADDRESS: | |
| | PRODUCER CUSTOMER ID #: 570000034159 | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED<br>Sears Holdings Corporation<br>dba Sears, Roebuck and Co.<br>Attn: Risk Management E3-219A<br>3333 Beverly Road<br>Hoffman Estates IL 60179 USA | INSURER A: AIG Europe Limited | AA112084 |
| | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

**COVERAGES** CERTIFICATE NUMBER: 570069032839 REVISION NUMBER:

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE: Sears Store No. 1915 - Santa Rosa Mall, Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X PROPERTY | | PTNA41701557 | 06/01/2017 | 06/01/2018 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | CONTENTS | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggrega | $50,000,000 |
| | B14 B&PP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | INLAND MARINE | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | | POLICY NUMBER | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| CCM Puerto Rico, A CCM Group Company<br>Santa Rosa Mall, LLC, 3 Pais Caribe, LLC<br>Commercial Centers Management Realty<br>S. en C.<br>Carr. #2, Km. 7.1<br>Bayamón PR 00960 USA | AUTHORIZED REPRESENTATIVE<br>*Aon Risk Services Central, Inc.* |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03) The ACORD name and logo are registered marks of ACORD

Holder Identifier : 1915

CERTIFICATE NUMBER: 570069032839

LOC #:

# ADORD®
# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |
| **POLICY NUMBER** See Certificate Number: 570069032839 | |
| **CARRIER** See Certificate Number: 570069032839 | **NAIC CODE** |
| | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER:  ACORD 24    FORM TITLE:   Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES**  If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | PTNAM1701557 | 06/01/2017 | 06/01/2018 | Boiler & Machinery | Included |

ACORD 101 (2008/01)

The ACORD name and logo are registered marks of ACORD          © 2008 ACORD CORPORATION. All rights reserved.

# ACORD®

## ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER | |
|---|---|
| See Certificate Number:   570069032839 | |

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number:   570069032839 | | |

**AGENCY CUSTOM!**   570d00034159
**LOC #:**

### ADDITIONAL REMARKS

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ACORD 24   **FORM TITLE:** Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

SPECIAL CONDITIONS / OTHER COVERAGES

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

ACORD®

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

POLICY NUMBER
See Certificate Number:  570069032839

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number:  570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  ACORD 24   FORM TITLE:  Certificate of Property Insurance

Property Program 6/1/17 - 6/1/18

$50,000,000 All Risk Policy Numbers:

Primary Property
ACE American Insurance Company - GPAD3739824A010 - 12% of $50M
Zurich American Insurance Company - XPP926068010 - 10% of $50M
Lloyds of London - Syndi 3000 MKL (Slip Leader) - PTNAM1701122 - 3% of $50M
*Novae Bermuda Underwriting Ltd - XR04017ADFRT - 3%of $50M
*Allied World Assurance Company, Ltd. - P003839014 - 18.33% of $50M
Lloyds of London - Synd 318 MSP (Slip Leader) - PTNAM1701562 - 7.5% of $50M
Aspen Specialty Insurance Company - PXAAS2817 - 1.67% of $50M
Westport Insurance Corporation - NAP045210505 - 8% of $50M
HDI Global Insurance Company - XPD1488600 - 2.5% of $50M

Starr Companies - 5% of $50M
Starr Surplus Lines Insurance Company - SLSTPTY10966117
Chubb Custom Insurance Company - 4468121406
General Security Indemnity Company of Arizona (GSINDA) - T0234451703681
Executive Risk Specialty Insurance Company - 4468121506

Excess Property
Endurance Worldwide Insurance Ltd. (Slip Leader) - PTNAM1701564 - 2% of $50M
Lloyds of London - Synd 1414 ASC (Slip Leader) - PTNAM1701559 - 8% of $50M
Tokio Marine America Insurance Company - LCP648016706 - 4% of $50M
Liberty Mutual Fire Insurance Company - MJ2L9L426774037 - 4% of $50M
Ironshore Specialty Insurance Company - 000423108 - 2.5% of $50M
AIG Europe Ltd. - PTNAM1701557 - 8.5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an administrative capacity as evidence of insurance where required by clients of the Insured."

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# EXHIBIT II

## ACORD® — CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY): 10/25/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

**PRODUCER**
Aon Risk Services Central, Inc.
Chicago IL office
200 East Randolph
Chicago IL 60601 USA

CONTACT NAME:
PHONE (A/C, No. Ext): (866) 283-7122
FAX (A/C, No.): (800) 363-0105
EMAIL ADDRESS:
PRODUCER CUSTOMER ID #: 570000034158

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: AIG Europe Limited | AA112084 |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |
| INSURER F: | |

**INSURED**
Sears Holdings Corporation
dba Sears, Roebuck and Co.
Attn: Risk Management E3-219A
3333 Beverly Road
Hoffman Estates IL 60179 USA

**COVERAGES**   CERTIFICATE NUMBER: 570069032839   REVISION NUMBER:

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE: Sears Store No. 1915 ~ Santa Rosa Mall, Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X PROPERTY | | PTNAM1701557 | 06/01/2017 | 06/01/2018 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | CONTENTS | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggreg | $50,000,000 |
| | BM B&PP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | INLAND MARINE | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | POLICY NUMBER | | | | | |
| | NAMED PERILS | | | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

**CERTIFICATE HOLDER**
CCM Puerto Rico, A CCM Group Company
Santa Rosa Mall, LLC; 3 Pais Caribe, LLC
Commercial Centers Management Realty
S. en C.
Carr. #2, Km. 7.1
Bayamon PR 00960 USA

**CANCELLATION**
SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE
*Aon Risk Services Central, Inc.*

Holder Identifier : 1915

CERTIFICATE NUMBER: 570069032839

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)     The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID:  570000034159
LOC #:

**ACORD**

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc, | Sears Holdings Corporation |

| POLICY NUMBER | | |
|---|---|---|
| See Certificate Number:  570069032839 | | |

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number:  570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER:  ACORD 24    FORM TITLE:  Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES**    If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | PTNAN1701557 | 06/01/2017 | 06/01/2018 | Boiler & Machinery | Included |

ACORD 101 (2008/01)    The ACORD name and logo are registered marks of ACORD    © 2008 ACORD CORPORATION. All rights reserved.

# ACORD®

## ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |
| **POLICY NUMBER** | | |
| See Certificate Number:   570069032839 | | |
| **CARRIER** | **NAIC CODE** | **EFFECTIVE DATE:** |
| See Certificate Number:   570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  ACORD 24     FORM TITLE:  Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

SPECIAL CONDITIONS / OTHER COVERAGES

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

**ACORD**

# ADDITIONAL REMARKS SCHEDULE

Page __ of __

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |
| **POLICY NUMBER** | | |
| See Certificate Number:    570069032839 | | |
| **CARRIER** | NAIC CODE | **EFFECTIVE DATE:** |
| See Certificate Number:    570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER:  ACORD 24    FORM TITLE:  Certificate of Property Insurance

Property Program 6/1/17 - 6/1/18

$50,000,000 All Risk Policy Numbers:

Primary Property
ACE American Insurance Company - GPAD3739824A010 - 12% of $50M
Zurich American Insurance Company - XPP926068010 - 10% of $50M
Lloyds of London - Syndi 3000 MKL (Slip Leader) - PTNAM1701122 - 3% of $50M
*Novae Bermuda Underwriting Ltd - XR04017ADFRT - 3%of $50M
*Allied World Assurance Company, Ltd. - P003839014 - 18.33% of $50M
Lloyds of London - Synd 318 MSP (Slip Leader) - PTNAM1701562 - 7.5% of $50M
Aspen Specialty Insurance Company - PXAA52817 - 1.67% of $50M
Westport Insurance Corporation - NAP045210505 - 8% of $50M
HDI Global Insurance Company - XPD1488600 - 2.5% of $50M

Starr Companies - 5% of $50M
Starr Surplus Lines Insurance Company - SLSTPTY10966117
Chubb Custom Insurance Company - 4468121406
General Security Indemnity Company of Arizona (GSINDA) - T0234451703681
Executive Risk Specialty Insurance Company - 4468121506

Excess Property
Endurance Worldwide Insurance Ltd. (Slip Leader) - PTNAM1701564 - 2% of $50M
Lloyds of London - Synd 1414 ASC (Slip Leader) - PTNAM1701559 - 8% of $50M
Tokio Marine America Insurance Company - LCP648016706 - 4% of $50M
Liberty Mutual Fire Insurance Company - M32L9L426774037 - 4% of $50M
Ironshore Specialty Insurance Company - 000423108 - 2.5% of $50M
AIG Europe Ltd. - PTNAM1701557 - 8.5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an administrative capacity as evidence of insurance where required by clients of the Insured."

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# EXHIBIT XII

*Clausen*
*Miller*<sub>PC</sub>

CLAUSEN MILLER P.C.
CHICAGO, IL
FLORHAM PARK, NJ
IRVINE, CA
NEW YORK, NY

**CMI** CLAUSEN MILLER INTERNATIONAL

Clausen Miller LLP, LONDON
Clausen Miller P.C.
Grenier Avocats, PARIS
Studio Legale Corapi, ROME
van Cutsem-Wittamer-Marnef & Partners, BRUSSELS
Wilhelm Partnerschaft von Rechtsanwälten mbB, DÜSSELDORF

CLAUSEN MILLER LLP
LONDON, ENGLAND

*Attorneys at Law*                    28 Liberty Street, 39th Floor  •  New York, NY  10005  •  www.clausen.com
Tel: 212.805.3900  •  Fax: 212.805.3939

**Courtney E. Murphy, Esq.**
**Direct:  212-805-3908**
cmurphy@clausen.com

July 23, 2019

***VIA EMAIL***
Sonia E. Colon, Esq.
Frances C. Brunet Uriarte, Esq.
221 Ponce de León Avenue - Suite 500
San Juan, PR 00917

RE:    Insurance Policy No.  PTNAM1701557 (06/01/2017 – 06/01/2018)
       Insurance Policy No.  PTNAM1802875 (06/01/2017 – 06/01/2018)

Dear Attorney Colon and Attorney Uriarte:

As you know from our prior exchanges relative to the Sears Holding Corporation ("SHC") bankruptcy proceeding, this firm represents Lexington UK ("Lexington"), a division of AIG Europe Limited, in connection with the referenced matter.  Please direct all future communications directly to my attention.  Additionally, this communication has been approved by, and authorized for issuance on behalf of, Lexington.

Lexington is in receipt of your communication dated January 23, 2019, which appears to have been re-issued on May 23, 2019, and received by Lexington on or about May 30, 2019.  The communication issued appears to serve as both notice "*for informational purposes only*" of Santa Rosa Mall, LLC's assertion that it is a Loss Payee under the referenced Policies of insurance and, a demand for information as to the status of the claim relative to Sears Store No. 1915.

As you know from our prior communications and your involvement with SHC's counsel – Weil Gotshal – Sears' Hurricane Irma and Maria claims were fully and finally resolved on ▮▮▮▮▮, well before the issuance or receipt of your January 23, 2019, communication. Nevertheless and pursuant to subpoenas served by your office, we understand that the information requested relative to Store 1915 was disclosed to your offices by Weil Gotshal after consultation with this firm, with such production having been made subject and pursuant to the standing Protective Order issued by the bankruptcy Court.  As such, the information request portion of your communication has been fully satisfied.



Sonia E. Colon, Esq.
Frances C. Brunet Uriarte, Esq.
July 23, 2019
2 | Page

While your communication makes clear that the notice "*does not constitute a demand for payment*", we write to advise you that the subject Policies contain clear and unambiguous provisions relative to the manner in which payment should be made in the event of covered loss or damage to covered locations under the Policies.

Preliminarily, we have reviewed the Certificate of Property Insurance enclosed with your communication of January 23, 2019, which we note – with interest – was dated October 25, 2017, well after Hurricane Irma and Hurricane Maria occurred. Setting aside the post loss issuance of the Certificate for the sake of discussion, while the Policies permit Aon to issue Certificates of Insurance, that provision (§39) makes clear that any Certificates issued are nevertheless subject always to the terms, conditions and limits of endorsements in respect of such additional interests.

Specifically, the Policy states in pertinent part as follows:

**19.    Proof and Payment of Loss**

A detailed Proof of Loss shall be filed with the Insurer as soon as practicable. Loss shall be adjusted with the Risk Management Department of the Insured or assigned representatives, and all adjusted claims, including partial claims, shall be paid to the Insured or its order within Thirty (30) days after reaching agreement on the value of the claim or any part thereof.

\* \* \*

**53.    Loss Payable**

Loss, if any, shall be adjusted with and payable to Sears Holdings Corporation or as directed by it.

Upon the conclusion of Lexington's investigation into the Hurricane Irma and Hurricane Maria losses, SHC – pursuant to the above Policy terms and conditions – expressly directed Lexington to make payment to SHC and to no other order. Accordingly, Lexington made payment consistent with SHC's directives as well as the Policies' terms and conditions. To the extent you take exception to the manner or direction of payment, we respectfully recommend that you continue to assert your position and interests with SHC.

Separately, we understand that SHC takes issue with Santa Rosa Mall, LLC's claims relative to being an Additional Insured or Loss Payee under the Policies based upon certain language within the controlling Lease, which provides for the parties' respective obligations


*Clausen*
*Miller.*

Sonia E. Colon, Esq.
Frances C. Brunet Uriarte, Esq.
July 23, 2019
**3** | P a g e

thereunder.  Although we are not privy to SHC's specific contentions, that issues exist relative to Santa Rosa Mall, LLC's status as an Additional Insured or Loss Payee – a status purportedly created by a post loss Certificate of Insurance - further supports Lexington's payment to SHC directly.

As final payment has been made in connection with all covered loss and damage to covered locations as provided for by the subject Policies and the ▮▮▮▮▮▮ Release, no further payments will be made under the subject Policies.  Having complied with the terms of the Policies and the Release with the Named Insured – SHC - it is Lexington's position that this matter is fully and finally resolved and no further discussions need be held to discuss any further or additional resolutions.

Should you have any questions in connection with the foregoing, please feel free to call me directly.

Very truly yours,

*Courtney Murphy*

Courtney E. Murphy

CEM/lr