**Hearing Date:**     TBD
                                        **Response Deadline:** TBD

BERNSTEIN BURKLEY, P.C.
Salene R.M. Kraemer, Esquire
NY ID No. 5228580
707 Grant Street, Suite 2200
Pittsburgh, PA 15219
Phone: (412) 427-7075
skraemer@bernsteinlaw.com
*Counsel to VIR Ventures, Inc. and*
*AMI Ventures, Inc.*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| In re: SEARS HOLDING CORPORATION, et al., Debtors. | Bankruptcy No. 18-23538 (RDD) |
|---|---|
| VIR VENTURES, INC. AND AMI VENTURES, INC., Movants, <br><br> v. <br><br> SEARS HOLDING CORPORATION, Respondents. | Document No. ___ |

**EXPEDITED JOINT MOTION OF E-MARKET PLACE SELLERS
VIR VENTURES, INC. AND AMI VENTURES, INC. TO SET-ASIDE A $885,896
RESERVE FROM THE SECOND DISTRIBUTION UNDER THE
<u>ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM</u>**

1

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

VIR Ventures, Inc. ("VIR") and AMI Ventures, Inc. ("AMI" and, together with VIR, the "Claimants") hereby move (the "Motion") for an order directing the Debtors to set-aside $885,896 – equal to the Claimants' alleged administrative claims -- from the "Second Distribution" to holders of allowed administrative expense claims under the "Administrative Expense Claims Consent Program." In support of this Motion, the Claimants respectfully state:

## SUMMARY OF ARGUMENT

In connection with their chapter 11 plan, the Debtors devised the "Administrative Expense Claims Consent Program" (the "Admin Claims Program") to resolve and make distributions in respect of allowed administrative claims. The Debtors have not followed the procedures under the Admin Claims Program they proposed and that this Court approved. They have delayed, and continue to delay, adjudication of the Claimants' administrative expense claims. The Debtors have made, and are making, low-ball offers to the Claimants that are neither reasonable nor fair. The Debtors appear intent upon "running out the clock" so that the Claimants will recover nothing under the Admin Claims Program. If so, then this is contrary to the spirit of achieving a "consensual resolution" that underpins that program.

After months of the Claimants' attempts to settle, the Debtors and the Claimants have not been able to reach a mutually acceptable solution. Meanwhile, the Debtors are attempting to lock the courtroom door to the Claimants, by staying any proceedings under which this Court could adjudicate their administrative claims. The Claimants are entitled to a fair negotiating process or to their day in court.

Until the parties can reach agreement on, or the Court can determine, the Allowed amount of the Claimants' administrative claims, this Court can and should direct the Debtors to set-aside

2

and reserve from the proposed "Second Distribution" the sum of $885,896 (which is the asserted amount of the Claimants' administrative expense claims). Unless this relief is granted, the Claimants may be left with no recovery at all on their Allowed claims.

## FACTUAL BACKGROUND

1. AMI and VIR were likely among the Debtors' top third-party online e-marketplace sellers. They provided the largest selection and number of different products, consisting of at least 1 million unique SKU's, representing products available to be purchased by the Debtors' customers via the www.sears.com website.

2. AMI filed 5 claims (designated as Claim Nos. 8514, 8540, 8644, 8513, and 8556). VIR filed 1 claim (designated as Claim No. 8539). In those proofs of claims, the Claimants asserted section 503(b)(9) administrative priority for goods purchased on behalf of the Debtors' customers that were delivered to the Debtors' customers within 20 days before the Debtors commenced their chapter 11 bankruptcy cases. Collectively, those claims total $790,534.35 (collectively, the "503(b)(9) Claims").

3. For each of the transactions with AMI and VIR, the Debtors collected payment from the Debtors' customers for the goods that AMI and VIR supplied, including applicable sales taxes. The Debtors never paid AMI or VIR for those goods. The Debtors also never remitted the sales taxes they collected to the appropriate governmental taxing authorities. Instead, the Debtors kept that tax money and "stuck" AMI and VIR with the sales tax bills.

4. In their Second Omnibus Objection [Docket No. 4776], the Debtors objected to AMI's and VIR's claim for section 503(b)(9) administrative expense treatment on the basis that AMI and VIR delivered the goods directly to the customers, and not to the Debtors. Both

Claimants responded on September 3, 2019 [Docket No. 5056], which is incorporated in its entirety (the "Joint Response").

5. On September 26, 2019, the Claimants also filed a motion (the "503(b)(1) Motion") seeking allowance and payment under section 503(b)(1) of $95,362.30 for benefits they conferred upon the Debtors post-petition [Docket No. 5242] (the "503(b)(1) Claim") (The 503(b)(9) Claims and 503(b)(1) Claim are referred to below collectively as the "Claims").

6. The Debtors never formally responded to the 503(b)(1) Motion.

7. Then, in the *Order (I) Confirming Modified Joint Chapter 11 Plan . . ."* [Docket No. 5370] (the "Confirmation Order"), the Court approved the Debtors' Admin Claims Program. Under the Admin Claims Program, holders of administrative expense claims (including claims under section 503(b)(9)) who "opted-in" by the deadline (November 18, 2019) are entitled to treatment (summarized) as follows:

(a) Such holder shares in a 75% initial recovery payable in an "Initial Distribution" if it "consensually agree[s] with the Debtors and Creditors' Committee to the Allowed amount" of [its] claims", and "consensual resolution of the Allowed amount . . . ***to be completed within 30 days from the date of the [holder's] Opt-In Ballot***". If the holder, the Debtor, and Committee do not agree within that time, then

(b) that holder "shall then receive" a pro rata share of a "Second Distribution" equal to 80% of the Allowed amount and "consensual resolution of the Allowed amount of [that] Claim . . . ***to be completed within 30 days from [November 18, 2019]***. For the holder to share in the Second Distribution, though, "such resolution [of the Allowed amount] shall be subject to reconciliation ***on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder*** . . ." of that claim. If the holder, the Debtor, and Committee still do not agree, then

(c) allowance and payment of the claim, if at all, are addressed via later proceedings under the Plan.

4

*See* Confirmation Order at ¶ 52(a) (emphasis added). To function as "advertised" as truthful and not misleading, this Admin Claims Program depends upon at least two things – <u>First</u>, that the Debtors will adhere studiously to the timeline they proposed (and that the Court ordered); <u>second</u>, that the Debtors will negotiate timely and in good faith to achieve "consensual resolution" with each such holder. With respect to AMI and VIR, however, the Debtors have failed on both counts.

### I. The Debtors did not adhere to the timeline the Court ordered.

8. Problems began for AMI and VIR on August 19, 2019 – long before the Court approved the Admin Claims Program in the Confirmation Order. Since August 19, the Claimants reached out repeatedly to the Debtors to try and settle their Claims, but to no avail.

9. Over several months, the Claimants corresponded with at least 6 of the Debtors' professionals about their Claims. Despite the Claimants' diligent efforts, they have been unable to achieve any meaningful progress towards a resolution. Instead, the Claimants received inconsistent responses from those professionals, hindering their efforts to resolve the Claims.

10. At the same time the Debtors sent mixed, inconsistent messages in reply to the Claimants' inquiries, the Debtors deprived the Claimants of the only other mechanism to resolve their Claims – a hearing before this Court. At the Debtors' unilateral request, all hearings on their Second Omnibus Objection to the 503(b)(9) Claims and on the Claimants' 503(b)(1) Motions were adjourned repeatedly and, ultimately, indefinitely. To date, those hearings have never occurred.

11. After additional facts became known, on November 12, 2019, the Claimants initiated an adversary proceeding (No. 19-ap-8700) in an effort to protect and enforce their rights and interests.[1]

---

[1] In the Complaint, the Claimants assert five counts: Count I (breach of express trust); Count III [sic] (Unjust Enrichment/Implied Contract); Count IV (Obtain the Imposition of a Constructive Trust Pursuant to Fed. R. Bankr. P. 7001(7) and 11 U.S.C. § 105(a)); Count V (Conversion); Count VI (Fraudulent or Negligent Misrepresentation) (the "<u>Adversary Proceeding</u>"), and pray for (1) an order for the recovery of money from the Debtors aggregating

5

12. On November 18, 2019, the Claimants cast timely Opt-In Ballots under the Admin Claims Program. Naturally, they expected that the Debtors would follow the timeline the Court had ordered, and that their Claims would be "reconciled" and the subject of a "consensual resolution" within 30 days from November 18. But that did not happen.

13. On November 19, 2019, the Claimants received an email from M-III Partners, financial advisors to the Debtors ("M-III"), asking the Claimants to provide supporting documentation in an excel spreadsheet. But the Claimants already had provided most, if not all, of that support, by attaching those documents to their Joint Response to the Second Omnibus Objection and their 503(b)(1) Motion. After that, M-III and the Debtors fell silent.

14. Under their Admin Claims Program, the Debtors were supposed to "complete" a consensual resolution of the Claims within 30 days from the date of the Claimants' November 18 Opt-In Ballots – i.e., by December 18. That would have enabled the Claimants to share in the First Distribution. As of December 18, however, the Debtors had not even made any offer in response to AVI's and VIR's filed Claims. Nor had the Debtors otherwise sought to "resolve" anything with the Claimants.

15. Instead, on December 11, 2019, the Debtors filed a *Notice Regarding the Initial Distribution Pursuant to Administrative Expense Claims Consent Program* [Docket No. 6186] (the "Notice"). In that Notice, the Debtors identified by name those holders who had "timely allowed and reconciled Opt-In Settled Admin Claims" and who would share in the Initial Distribution. That list did not include AVI or VIR.

---

$885,896.65 ($95,362.30 + $790,534.35), plus attorneys' fees, and/or (2) the imposition of a constructive trust regarding same; or (3) such other and further relief as is just.

6

16. In other words, within 3 weeks after the deadline for submitting Opt-In Ballots, the Debtors had allowed and reconciled various other holders' claims. But during those same 3 weeks, and for another month thereafter, the Debtors did not negotiate with the Claimants. As a result, the Debtors "ran out the clock" on AVI and VIR, denying them any opportunity to participate in that Initial Distribution.

17. It appears that the Debtors may be trying to "run out the clock" for AVI and VIR to share in the Second Distribution as well. First, the Debtors are still failing to comply with their own Admin Claim Process. For any holder who timely Opted-In but whose claim was not resolved during the 30-day window(s) (such as AVI and VIR), the Admin Claims Program provides that claim allowance is ". . . subject to reconciliation ***on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder*** . . ." of that claim. Confirmation Order at ¶ 52(a) (emphasis added). Yet, the Debtors and the Creditors' Committee have never even ***proposed***, let alone "reasonably agreed to," any "agreed-upon schedule" with AVI and VIR to resolve their Claims. Instead, the Debtors (and the Creditors' Committee) are requiring AVI and VIR to "twist in the wind."

18. Thus, the Debtors have not complied, and are still not complying, with the timeline they proposed in the Admin Claims Program and that the Court mandated in the Confirmation Order. The Debtors' dismissive behavior late last year precluded the Claimants from sharing in the Initial Distribution during December. Now, as explained below, the Debtors are not negotiating in good faith – thereby jeopardizing the Claimants' chance to resolve their Claims and participate in the Second Distribution, which is looming.

**II. The Debtors are not negotiating in good faith.**

19.     After their December 11 Notice, almost an entire month elapsed with no further word from the Debtors. At last, on January 7, 2020, the Claimants and Debtors were able to engage in substantive discussions about the Claims. The discussions were unsuccessful. No movement towards a mutual resolution occurred. The Debtors made a "take-it-or-leave-it" low-ball offer that they were told the Claimants could not, and would not, accept. The offer was so low that, from the Claimants' viewpoint, it did not merit a substantive counterproposal beyond what they already had set forth in their proofs of claim and in their Joint Response.

20.     Meanwhile, the Debtors have now turned their attention to a different front as part of their concerted their effort to induce the Claimants to accept an objectively bad deal. The Debtors have filed a Motion to adjourn (stay) the Adversary Proceeding [Adversary Proceeding No. 19-ap-8700, Docket No. 5] in an effort to prevent the Claimants from obtaining a judicial determination of their claims against the estates. The Claimants filed an Opposition [*Id*. at Docket No. 6, filed January 21, 2020]. That Motion is set for hearing on February 24, 2020.

21.     Next, on February 6, 2020, M-III sent an email that purported to recite that same offer the Debtors made verbally on January 7, and that the Claimants rejected. See Email from Christopher Casamassima to Claimants' counsel, dated February 6, 2020)[Intentionally omitted due to Fed.R. Evid. 408). The email, however, contained the wrong dollar amounts.

22.     Therefore, on February 10, 2020, M-III sent a second, corrected email to the Claimants, containing the same low-ball January 6 proposal that the Claimants had rejected. The Claimants have until February 25, 2020, to respond.

23. It is reasonable to infer from the Debtors' tactics that they want the Claimants to face a "Hobson's choice" – AVI and VIR can either (a) accept an offer in which they basically "capitulate" that the Debtors' arguments are correct (and receive a correspondingly tiny distribution), or (b) be denied any share of the Second Distribution, and risk receiving nothing (even though the Debtors concede that some of their Claims should be allowed and paid).

24. A recent email from one of the Debtors' attorneys all but concedes this. In that February 13, 2020 email, that attorney threatened that "[s]hould the parties end up litigating a motion to dismiss Plaintiff's adversary complaint (which as you. know can take two and a half to three months), it is very likely Plaintiffs [AVI and VIR] will not be included in the next [Second D]istribution." See Exhibit A (Email from Jennifer Crozier to Claimants' counsel, dated February 13, 2020). If the Debtors have their way, AVI and VIR will receive much less than they deserve – or, if AVI and VIR do not "knuckle under," maybe nothing at all.

## RELIEF REQUESTED

25. The ostensible purpose of the Admin Claims Program is to create a fair, even-handed process whereby the Debtors, the Committee, and the holder of an administrative expense claim can negotiate and "consensually resolve" the holder's claims, so that the holder then can recover a large percentage of its allowed claim from one of two pools of funds – by means of the Initial Distribution or the Second Distribution. AVI and VIR timely opted-in to that process. For that process to work properly, however, the Debtors must adhere to their self-imposed deadlines and they must negotiate in good faith.

26. With respect to AVI and VIR, the Debtors have not done either. Rather, the Debtors have abused that process to those two Claimants' detriment. Before the Court approved the Admin Claim Program, the Claimants' efforts to negotiate resulted in confused, inconsistent responses

9

from the Debtors and no meaningful progress. During the first critical weeks after the Confirmation Order, the Debtors ignored the timeline they established as it relates to AVI and VIR. The Debtors did not make any offers to them and did not negotiate. Meanwhile, the Debtors evidently negotiated with other administrative claimants. By the time the Debtors finally engaged in (unproductive) discussions with the Claimants, weeks later, it was too late for them to receive a share of the Initial Distribution. The Debtors had run out that clock.

27. Early this year, the Debtors began to negotiate with AVI and VIR under the Admin Claims Program, but have not done so in good faith. Since January 6, the only offer the Debtors have made is woefully insufficient. The Debtors have made their position plain: "It's their way or the highway." They have turned a negotiating process into a mechanism to arm-twist two administrative creditors into accepting far less than they deserve, under threat of being excluded from the Second Distribution and, potentially, being denied any recovery.

28. At the same time the Debtors are low-balling AVI and VIR, the Debtors are seeking to deny them any day in court, evidently in the hope that AVI and VIR will have no alternative but to accede to the Debtors' low-ball "resolution." First, the Debtors obtained an indefinite postponement of their Second Omnibus Objection. Thus, the Claimants may not be able to obtain a judicial determination of their Claims via that contested matter. Second, the Debtors are seeking to adjourn or stay the Claimants' Adversary Proceeding. If the Debtors succeed, the Claimants may not be able to obtain any judicial determination of their claims there, either. In the meantime, the clock continues to tick – and the Debtors have indicated that the Second Distribution is imminent.

29. The Debtors ran out the clock on the Initial Distribution, from which they excluded AVI and VIR. The Debtors should not be permitted to run out the clock a second time. If the

Debtors have their way, though, that is what will happen. As their lawyer cautioned a few days ago, unless AVI and VIR knuckle under, "it is very likely [AVI and VIR] will not be included in the next distribution." See Ex. A.

30. Before making distributions on allowed claims, it is customary (and confirmed plans typically provide) for a reorganized debtor or any disbursing agent to reserve funds with which to make future, equalizing distributions to holders of disputed claims once those claims are allowed at some later date. The Claimants submit that the same procedure is appropriate here. They therefore request that the Debtors (or any other entity responsible for making distributions under the Admin Claims Program) be directed to set aside $885,896 – an amount equal to the Claimants' Claims – as a reserve from which to pay an appropriate distribution to AVI and VIR for whatever portion of their Claims ultimately are Allowed.

31. By setting aside the requested funds, the estates will not be harmed. If the Claimants are not successful in the adjudication of their Claims or in the Adversary Proceeding, or if their Claims are Allowed for less than the amounts filed, then any excess funds can be distributed among the other holders of Allowed administrative claims. On the other hand, if the requested funds are not reserved and the Second Distribution occurs before AVI's and VIR's Claims are "consensually resolved" or judicially determined, the money will be gone forever – and AVI and VIR necessarily will suffer prejudice a second time at the Debtor's hands.

32. Accordingly, the Court can and should direct the Debtors to set aside sufficient funds (i.e., $885,896) to ensure that money will be available to make proper distributions on whatever amounts of their Claims are Allowed (whether by agreement with the Debtors and the Committee or order of this Court).

## NOTICE

33.   Notice of this Motion will be served upon (i) the Debtors, (ii) the Debtors' counsel, (iii) the United States Trustee, (iv) all parties requesting service of notices pursuant to Fed. R. Bankr. P. 2002.

## CERTIFICATE OF NECESSITY

34.   The undersigned submits that this matter is an emergency because the Debtors' Second Distribution will be made shortly, without the Claimants having been able to reconcile their Claims.  If an expedited hearing in not granted, there may no funds in the Debtors' estate to pay the Claimants what is right and just on Allowed claims

35.   The undersigned further certifies that the necessity of this emergency hearing has not been caused by any lack of due diligence on my part, but has been brought about only by circumstances beyond my control or that of my clients.

## NO PREVIOUS REQUEST

36.   Except as set forth above, no previous application for the relief requested herein has been made to this or any other Court by the Claimants.

WHEREFORE, the Claimants respectfully request the entry of an Order (I) directing that, before the Second Distribution (or any other distribution) is made under the Administrative Expense Claims Consent Program, the Debtors shall cause to be set aside and reserved (in a segregated, federally-insured account), for the benefit of the Claimants, the sum of $$885,896 (equal to the Claimants' alleged administrative claims), which sum the Debtors shall retain until further order of this Court (entered after notice to the Claimants and the Debtors and opportunity for a hearing) and (II) granting such other relief as is just and proper.

    Respectfully submitted,

    **BERNSTEIN BURKLEY P.C.**

    By: */s/ Salene R.M. Kraemer*

    Salene R.M. Kraemer, Esquire
    NY ID No. 5228580
    707 Grant Street, Suite 2200
    Pittsburgh, PA 15219
    Phone: (412) 427-7075
    skraemer@bernsteinlaw.com
    *Counsel to VIR Ventures, Inc. and AMI Ventures, Inc.*

*February 24, 2020*

*EXHIBIT LIST*

Exhibit A (Email from Jennifer Crozier to Claimants' counsel, dated February 13, 2020).
Exhibit B (Proposed Order Granting Motion)