Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 1 of 43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: SEARS HOLDINGS CORPORATION, et al.,

Debtors.

MOAC MALL HOLDINGS LLC,

Appellant,

-against-

TRANSFORM HOLDCO LLC and SEARS HOLDINGS CORPORATION, et al.

Appellees.

No. 19 Civ. 09140 (CM)

**DECISION ON APPEAL**

McMahon, C.J.:

Sears (f/k/a Sears, Roebuck and Co., collectively with Sears Holdings Corporation and its affiliated debtors, the "Debtors"), the iconic American retailer, is once again bankrupt.

The instant appeal is taken from an order issued by The Hon. Robert Drain, U.S.B.J., approving the assignment and assumption of Sears' lease at the equally iconic (if considerably newer) Minneapolis shopping mall *cum* amusement and entertainment venue known as the Mall of America.

The approved assignor is not a business establishment – not a retail store, not a restaurant, not a hotel, not an amusement venue, not a waterpark (reputed to be the latest addition to the Mall of America's ever-lengthening list of very un-shopping-mall-like tenants). Rather, it is an entity known as Transform Leaseco LLC ("Transform Leaseco"), an affiliate and wholly owned

subsidiary of Transform Holdco LLC (collectively, "Transform"). Transform was formed and is headed by Sears' final CEO, Eddie Lampert, and several other former Sears executives.

Transform's goal is to gain control of substantially all of Sears' assets, including Sears' many real estate holdings, through Sears' bankruptcy proceedings. In this it has been largely successful; Transform provisionally acquired 660 Sears leases in a sale order entered by the Bankruptcy Court, 659 of which the court has approved for assignment to Transform. Transform plans to continue to operate approximately 400 of these 660 leases (i.e., Transform will continue to operate Sears stores at those locations) and to market the remaining 260 in order to find new tenants to occupy those premises.

Mall of America is not interested in seeing Sears' three-story building leased out by Transform. Mall of America's owner, MOAC Mall Holdings LLC ("MOAC"), wants the lease to revert to it, the landlord, so that it can control who gets to occupy that very prestigious space. MOAC insists that, under certain provisions in the Bankruptcy Code that were passed to protect the owners and tenants of "shopping centers," the lease may not be assigned to Transform and must revert to the landlord.

The learned bankruptcy judge disagreed with MOAC's argument that 11 U.S.C. §§ 365(b)(3)(A) and/or (b)(3)(D) prohibited the assignment of the Mall of America lease (the "Lease") to Transform. He approved the assignment and assumption as proposed by Sears. But Judge Drain admitted that, at least insofar as his ruling addressed § 365(b)(3)(A), his ruling was one of first impression.

MOAC has appealed from the Bankruptcy Court's order.

I agree with the bankruptcy judge that nothing in § 365(b)(3)(D) of the Code prohibits the transfer of the Lease to Transform.

However, I am constrained to disagree with his conclusion that § 365(b)(3)(A) does not bar the proposed assignment. In § 365(b)(3)(A), Congress provided a rigorous standard that an assignee of a bankrupt's shopping center lease must meet in order to give the landlord adequate assurance that the new tenant will not shortly end up in bankruptcy. In this case, the Bankruptcy Court found that the tenant did not meet that standard. The judge's decision that an alternative provision in Sears' Lease could be substituted for the statutory standard effectively read the congressionally-mandated standard out of the Bankruptcy Code. I do not believe that result can be justified.

The proposed assignment is, therefore, disallowed.

**Statement of Relevant Facts**

Although Judge Drain held a hearing at which evidence was presented and witnesses were cross-examined, the facts salient to this appeal do not appear to be in dispute.

*Relevant Terms of the Lease*

Sears was one of the original anchor tenants at Mall of America. Its Lease – which, with extensions, runs for 100 years, or until 2091[1] – contains many terms that are most unusual, especially in a shopping center lease. Equally unusual are many of the terms of the Amended and Restated Reciprocal Easement and Operating Agreement ("REA") between Sears, MOAC, and the other two original anchor retail tenants at the mall, Macy's and Nordstrom, which are incorporated into and made a part of the Lease. The terms are highly favorable to Sears; the reasons for that, I am advised, are that (1) Sears constructed the demised premises at its own expense, while (2) MOAC bent over backward to get Sears into the shopping center as an anchor tenant.

[1] One wonders whether there will be big box retailing in 2091. Unimaginable things can happen when leases last for a century. Just ask the people of Hong Kong.

Under the Lease, Sears owes only $10 per year in rent, which it prepaid through 2021 at the time the Lease was signed. (APX2231).[2] However, with taxes, common area payments, and insurance, Sears' annual financial obligation to the mall amounted to approximately $1.1 million. (Transcript of August 23, 2019 Hearing ("Tr.") at 53:21-25, 54:1-5, APX2048-49).[3] Unlike most tenants at shopping centers and malls, Sears is not responsible for paying any "percentage rent," which is an extraordinarily tenant-favorable term in any commercial lease.

The REA, as incorporated into the Lease, required Sears to operate as a retail department store in its space for a term of 15 years, or until 2007. That 15-year term, the Major Operating Period of Sears ("Major Operating Period"), expired over a decade ago.

In another unusual provision, per the REA, once the Major Operating Period expired, Sears had the right – without needing the approval of MOAC or the other parties to the REA – to vacate all or any part of the building, or to lease or sublease all or any portion of the building, or to assign the REA. (APX2438). In most shopping center leases, the landlord retains veto power over the assignment of tenant leases. *See Retail Lease: Key Provisions*, Practical Law Practice Note 4-507-0793 (Westlaw 2020) ("Retail leases usually contain explicit restrictions on a tenant's ability to assign its lease or sublease its premises to third parties. These provisions typically provide that the landlord's consent is required before an assignment or sublease.")

The only constraint on Sears in this regard was found in Article XXII of the REA, the relevant portion of which – Article XXII(c)(1), which is applicable *only* to Sears and not to Macy's or Nordstrom – provides that any Sears sublessee or assignee, for the remainder of the term of the Lease, was forbidden to use the leased premises, "for any use or purpose other than retail purposes

2 References to the record on appeal, which can be found at Docket Entry #17, are designated with the prefix APX.

3 The transcript for this hearing can also be found in the Bankruptcy Court docket, *In re Sears Holdings Corporation, et al.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y.), at Docket Entry #5393.

customarily found in an enclosed mall shopping center and non-retail activities customarily incidental thereto *or such other uses and purposes that are compatible and consistent with (and are not detrimental, injurious or inimical to) the operation of a first-class regional shopping center*." (APX2420-21) (emphasis added).

Thus, Sears and its successors and assigns were not limited to running a retail establishment in the demised premises from and after 2007. No one – not MOAC and not any of its other tenants, even co-anchor tenants Macy's and Nordstrom – could possibly have entertained any justifiable expectation that the Sears space would be used for retail purposes beyond the Major Operating Period. Rather, Sears could use the space for retail activities, or for non-retail activities that one might find in a mall, or even for non-retail activities that were "compatible . . . with [] and . . . not detrimental . . . to" a first-class mall – which Mall of America considers itself to be.[4]

The very broad "use restriction" applicable to Sears in Article XXII of the REA is, of course, virtually meaningless at Mall of America, since the phrase "compatible with and not detrimental to" a mall at that location includes practically any legal and non-industrial operation that might bring people into Mall of America, for any purpose. The "mall" currently houses hotels, a miniature golf course, an amusement park, a comedy club, an aquarium, a 2,500-square-foot Amazing Mirror Maze, and something called the "Crayola Experience," which occupies an area larger than an NFL football field and boasts 25 hands-on attractions. Most recently, the Bloomington City Council approved the development of a waterpark that will be fully integrated into Mall of America. (*See* Ghermezian Decl. ¶ 3, APX1837).

---

4 The REA does prohibit public or private nuisances, warehouses, or establishments that are noisy (a standard that does not seem to mean what most of us think it means, since I have never been to a quiet amusement park) or hazardous. (REA, Art. IX(D), APX2350-52).

None of these establishments would have been thought "compatible" with a "shopping mall" when enclosed malls containing multiple retail shops and restaurants or fast food establishments were first invented. But all of them are by definition "compatible with and not detrimental to" *this particular* mall in Minneapolis, and to its tenants. Indeed, aside from a house of prostitution or other criminal enterprise, this court has had great difficulty imaging any non-industrial use that would not be "compatible with and not detrimental to" the multi-faceted operations at Mall of America.

This includes use for commercial offices. Contrary to an assertion in MOAC's brief on appeal (Appellant's Br. at 7, Dkt. No. 16), use of a portion of the Sears Building for "office and service establishments" is not only not forbidden, it is expressly permitted. The only restriction is that, as long as any of the anchor tenants is operating a department store at Mall of America, "office use" in Mall of America may not include "a Building used *primarily* for general office purposes." (APX2350) (emphasis added). Use of the word "primarily" would appear to permit as much as 49% of the Sears Building to be rented out for general office purposes; and the employees who worked in those offices would undoubtedly provide considerable custom to the stores and restaurants in the mall.

Neither the Sears Lease nor the REA contains any sort of "tenant mix" restriction with respect to the Sears space following the expiration of the Major Operating Period.[5] According to the testimony of Raphael Ghermezian, the CEO of MOAC and a Senior Executive Vice-President of MOAC's parent company, certain tenants in the mall have in their leases "co-tenancy" or "anchor" provisions that allow them to break their leases if there are fewer than three "department

---

[5]    The REA includes an exclusive use provision – the quintessential tenant mix restriction – such that Sears must operate "a retail Department Store in the Sears Building"; but this provision only applies during the Major Operating Period, which has long since expired. (APX2418-19).

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 7 of 43

stores" in Mall of America. (*See* Ghermezian Decl. ¶ 9, APX1840; Tr. at 77:18-25, 80:1-3, APX2072, 2075). However, none of those leases has been made part of the record. Moreover, had Sears not gone bankrupt, it could have "gone dark" or leased out its premises for a variety of non-retail uses – thereby depriving Mall of America of one of its "department stores" – and MOAC could not have stopped it from doing so, regardless of what was in some other tenant's lease.

But while Sears was able to obtain a virtually unfettered right to use the premises for myriad purposes after 2007 – or not to use it at all, but to keep it dark – a few provisions were added to the Lease to protect MOAC's interests.

Per Article 6.3(a) of the Lease, from and after the end of the Major Operating Period in 2007 and until the expiration of the Lease, if Sears decided to cease operating a store in the building, or to transfer its interest in the leased premises, it was required to give MOAC the right to match any bona fide offer for the space – or, if there were no such offer, to give MOAC the right the buy out the leasehold estate at fair market value. (APX2218).

Also, per Article 4.4 of the Lease, after 2007 if Sears ceased to operate at least 20,000 square feet on the third floor, an MOAC affiliate, Minntertainment Company, had the exclusive and irrevocable first right and option to lease the third floor, subject to the terms of an option agreement. (APX2214).

Finally, per Article XXV(D)(4)(a) of the REA, if, after 2007, Sears ceased operating, subleased its premises, or assigned the REA, Sears would nonetheless remain liable under the REA "unless its assignee has a net worth or shareholder equity, determined in accordance with generally accepted accounting principles, of at least $50,000,000.00 and executes a written undertaking in recordable form, stating at least that it is made for the benefit of Developer in which said assignee

expressly assumes and covenants . . . to perform and be bound by . . . this REA . . . (including the provisions of this Article XXII . . . ), which Sears shall deliver to Developer." (APX2438).

*The Proposed Assignment*

The Debtors filed for chapter 11 bankruptcy in October of 2018. Transform purchased substantially all of the Debtors' assets through a § 363 sale, including the right to designate certain leases for assignment if approved for assumption and assignment by the Bankruptcy Court. The sale order approved Transform's purchase of approximately 660 leases the Debtors would assume and then assign to Transform or its designee. Of the 660 leases assigned to Transform or its designee, the Mall of America Lease is the only lease still embroiled in litigation.

Sears wishes to assign the Lease, and have the Lease assumed by, a newly-formed entity, Transform Leaseco. As might be inferred from its name, Transform Leaseco plans to market the Sears space to as yet unidentified subtenants who are willing to pay the highest price in order to maximize the value of the real estate.

The Bankruptcy Code, specifically 11 U.S.C. § 365(f)(2)(B), permits such assignment "only if . . . adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." Were Mall of America not a "shopping center,"[6] the proposed assignment would be in every way favorable under § 365(f)(2)(B), which deals with the assignment of leases in bankruptcy. As the Bankruptcy Court found (and no one disputes), the proposed assignment to Transform meets that statutory standard: (1) Transform has agreed to put one year's rent and consideration due under the Lease ($1.1

[6] The parties stipulated that Mall of America is a "shopping center" under the Code – an assertion that is at the very least questionable, given the makeup of its tenants. (APX1782). The Code does not define the term; it is supposed to be "strictly construed," *In re Ames*, 121 B.R. 160, 164 (Bankr. S.D.N.Y. 1990); and while the mall shares some of the commonly understood characteristics of a shopping center, *see In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1087–88 (3d Cir. 1990), Mall of America does not look much like most "shopping centers." I take the case as I find it, however, so for our purposes Mall of America is a "shopping center" for purposes of 11 U.S.C. § 365(b)(3).

million) into escrow; (2) its senior management has extensive experience in marketing and selling Sears' vacated retail property; (3) Transform has obtained substantial financing with respect to its operating portfolio and real estate portfolio, and "likely" has the equity of at least $50 million required by Article XXV(D)(4)(a) of the REA (more on that later); (4) Transform committed to lease portions of the property within two years (provided MOAC does not interfere with its marketing efforts); and (5) most important, Transform agreed to be bound by all relevant provisions of the Lease and the REA – including specifically the modest "use restriction" in Article XXII and the "right of first refusal/buyout" provisions of Article 6.3(a) – which means that MOAC retains the right to buy out the lease or match any "unsuitable" tenant's offer for the space.

However, the Bankruptcy Code imposes additional restrictions on the assignment of a "shopping center" lease in bankruptcy. In particular, § 365(b)(3) adds gloss to § 365(f)(2)(B) by explaining exactly what is needed in order to give a shopping center landlord "adequate assurance of future performance by the assignee of such contract or lease." That term, in the shopping center context, is deemed to include four elements, two of which are relevant for purposes of this appeal:

> (A) The financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease (which is our case is 1991); and
>
> (D) That assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

This court reads the word "include" to mean, at a minimum,[7] that these provisions (as well as the other two subsections of § 365(b)(3), which are not at issue in this case) must be satisfied in order for a shopping center landlord to have "adequate assurance of future performance" of the terms of a lease.

[7] This reading is not inconsistent with Transform's definition of "includes" as "not limiting." (*See* Appellee's Br. at 15, Dkt. No. 20).

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 10 of 43

MOAC argues that the assignment to Transform would contravene both of these statutory provisions.[8]

*The Bankruptcy Judge's Opinion*

The Bankruptcy Court (Drain, B.J.) conducted a hearing on MOAC's objections on August 23, 2019. The parties agreed to a set of stipulated facts and to the admission of a number of exhibits into evidence. Each side also provided declarations in support of its position, which constituted the declarant's direct testimony; the declarants were available for cross-examination at the hearing.

In an oral opinion delivered at the conclusion of the hearing on August 23, 2019, Judge Drain determined that MOAC's objections should be denied, and approved Sears' assumption of the Lease and its assignment to Transform. (Tr. at 134:12-20, APX 2129).

The Bankruptcy Court first found that Transform had provided adequate assurance of future performance of the Lease as required by § 365(f)(2)(B). (Tr. at 115:15-18, APX2110). But of course, where a shopping center is concerned, that section is simply a starting point. As Congress made clear in the legislative history of the of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), "section 365(f) does not override any part of section 365(b)." H.R. Rep. 109-31(I), 87, 2005 U.S.C.C.A.N. 88, 153. The requirements set out in § 365(b)(3) give specific meaning to, and are more onerous than, what is meant by "adequate assurance" under § 365(f)(2)(B).

So the Bankruptcy Court turned to the requirements of § 365(b)(3). Insofar as is relevant to this appeal, Judge Drain found that Transform had satisfied the requirements of subsections (A) and (D) of that provision of the Code.

---

8 MOAC originally argued that the proposed assignment would also contravene 11 U.S.C. § 365(b)(3)(C), but that issue is no longer in the case.

    Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 11 of 43

With regard to § 365(b)(3)(D): Judge Drain concluded that, because the Lease (including the REA incorporated therein) included no "tenant mix" requirement – and, indeed, neither required Sears to operate a retail store in its building nor substantially limited the type of entity to which Sears could sublease following the expiration of the Major Operating Period in 2007 – the assignment to Transform would not violate § 365(b)(3)(D)'s requirement that the "tenant mix" of the shopping center be preserved. (Tr. at 130:5-18, APX2125).

Judge Drain reasoned that § 365(b)(3)(D) had to be read in conformity with the Lease – the contract whose performance was being "adequately assured" – so as not to confer on MOAC more rights than it enjoyed under the Lease. Because the Lease neither contains any restriction on the tenant mix of the shopping mall nor guarantees that the Sears space will be operated as a retail department store – and, indeed, barely restricts the use of the Sears Building in any way (aside from proscribing nuisances, too much noise, industrial uses, or "primarily" as an office building) – Judge Drain found that the tenant mix would not be disrupted as long as Transform agreed to abide by the restrictions in Article XXII(c) of the REA – which it did.

Judge Drain rested this decision on the decision of Bankruptcy Judge Buschman in *In re Ames Department Stores, Inc.*, 127 B.R. 744 (Bankr. S.D.N.Y. 1991) [hereinafter, "*Thatcher Woods*"]. The *In re Ames (Thatcher Woods)* opinion draws heavily from a prior opinion – also by Bankruptcy Judge Buschman and also involving the Ames bankruptcy – *In re Ames Department Stores, Inc.*, 121 B.R. 160, 162 (Bankr. S.D.N.Y. 1990) [hereinafter, "*Westmont*"]. *Thatcher Woods* has been cited with approval a number of times subsequently.[9]

---

9 *In re Ames*'s logic was followed in *In re Great Atlantic & Pacific Tea Company, Inc.*, 472 B.R. 666, 678 (S.D.N.Y. 2012), a case in which Judge Seibel affirmed Judge Drain's finding that § 365(b)(3)(D) did not apply where the debtor was permitted under the lease to go dark – and did in fact go dark – prior to bankruptcy; and *In re Toys "R" Us Property Company I, LLC*, No. 18-31429, 2019 WL 548643, at *6 (Bankr. E.D. Va. Feb. 11, 2019), which expressly noted, "In order to invoke the protection of § 365(b)(3)(D), a lessor must establish that there was an intended tenant mix and that the mix was part of the bargained-for-exchange of the debtor's and other tenants'

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 12 of 43

With regard to § 365(b)(3)(A): Transform contended that its current financial condition and operating performance could be "derived from inspection of a confidential letter, dated April 26, 2019 (the "Transform Financials") (12-MOAC), and from the Buyer's reply (the "Buyer's Reply") (16-MOAC)." (APX1783). It argued that the Transform Financials revealed that the proposed assignee had $250 million in equity.

But MOAC's counsel cast doubt on the Transform Financials in at least two ways. (*See generally* Tr. at 17-35 (cross-examination of Michael Jerbich), APX2012-30). First, the balance sheet on which Transform relied was marked as a "draft" and indicated that it was subject to adjustment. (Tr. at 26:9-25, APX2021; 12-MOAC at 10, APX4245). Second, an "Adequate Insurance Information" table in the same document expressly notes that the document "is not intended to provide the basis for any decision on any transaction." (Tr. at 31:10-16, APX2026; 12-MOAC at 7, APX4242).

As a result, the bankruptcy judge found himself unable to conclude that Appellee had in excess of $250 million in of equity, as Transform contended. Specifically he refused to accept the dollar amounts in the declaration of Roger Puerto, one of Transform's witnesses and the Head of Real Estate Transactions at Transform, "as the value of the portfolio, but simply as evidence that Transform believes that it has a valuable portfolio and that it's seeking to realize it." (Tr. at 45:7-11, APX2040). Judge Drain concluded that Transform *hoped* that its portfolio would turn out to

leases." *See also In re Toys "R" Us Prop. Co. I, LLC*, 598 B.R. 233, 241–42 (Bankr. E.D. Va. 2019) (citing *Westmont*); *In re Toys "R" Us, Inc.*, 587 B.R. 304, 310 (Bankr. E.D. Va. 2018) (citing *Westmont*); *In re Ames Dep't Stores, Inc.*, No. 01-42217, 2005 WL 1000263, at *5 n.46 (Bankr. S.D.N.Y. Apr. 29, 2005) (citing *Thatcher Woods*); *In re Serv. Merch. Co., Inc.*, 297 B.R. 675, 689–690 (Bankr. M.D. Tenn. 2002), *aff'd sub nom. Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*, 293 B.R. 169 (M.D. Tenn. 2003) (citing *Thatcher Woods*); *In re Trak Auto Corp.*, 277 B.R. 655, 672 (Bankr. E.D. Va. 2002) (citing *Thatcher Woods*), *aff'd sub nom. LaSalle Nat'l Tr., N.A. v. Trak Auto Corp.*, 288 B.R. 114, 125–26 (E.D. Va. 2003) (citing *Westmont*), *rev'd on other grounds sub nom. In re Trak Auto Corp.*, 367 F.3d 237 (4th Cir. 2004) (citing *Westmont*); *In re J. Peterman Co.*, 232 B.R. 366, 369–70 (Bankr. E.D. Ky. 1999) (citing *Thatcher Woods*).

be worth $250 million – a proposition that had yet to be tested in the marketplace. (Tr. at 117:24-25, 118:1-3, APX2112-13).

That said, the Bankruptcy Court found that "it's highly likely that that [Transform's] equity exceeds $50 million." (Tr. at 118:4-5, APX2113). He focused on that number because, if Sears were to have assigned the Lease outside of bankruptcy to an entity with at least $50 million in net worth or shareholder equity, it would be relieved of liability under the Lease. (*See* REA, Article XXV(D)(4)(a)).[10] The bankruptcy judge reached his factual finding, not on the basis of Transform's financial statements, but because, "I cannot believe that third-party lenders would provide the level of financing that they have to Transform without at least that level of solvency." (Tr. at 118:5-8, APX2113). No testimony from the third party lenders appears in the record.

Having found it "highly likely" that Transform satisfied the $50 million standard, the bankruptcy judge then decided that assignment to an entity that had at least $50 million in equity/net worth was sufficient under § 365(b)(3)(A) – even though that provision as drafted requires that the assignee of a shopping center lease have "financial condition and operating performance" that was "similar" to that of Sears back when the Lease was signed.

The bankruptcy judge concluded that § 365(b)(3)(A), like § 365(b)(3)(D), had to be read in conformity with anything in the lease to be assigned that guaranteed future performance under the lease. Noting that there were not many cases interpreting § 365(b)(3)(A) (he found only three), he observed that each of those three case "makes it clear that [§ 365(b)(3)(A)] is to be construed not in a mechanical way, but rather consistent with the underlying charge as set forth in the preface to it, the general language in Section 365(b)(3), which again refers to adequate assurance of future

10 Article XXV of the REA relieved Sears of any future obligations under the Lease as long as it subleased or assigned its space to an "assignee [that] has a net worth or shareholder equity . . . of at least $50,000,000.00." (APX2438).

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 14 of 43

performance of the lease itself." (Tr. at 121:12-17, APX2116). He determined that § 365(b)(3)(A), like § 365(b)(3)(D), ". . . requires reference back to the part[ies]' actual agreement, and that Congress did not create independent requirements that would not go to actual assurance of future performance, but rather wanted to focus the Court on, obviously still subject to Section 365(e), taking into account the landlord's rights under the lease, as implicated by these four subsections." (Tr. at 125:10-17, APX2120).

Judge Drain noted that Sears and MOAC had bargained for the level of financial security that it would take before MOAC would release Sears from its lease obligations in the event of an assignment (which was something that MOAC could not veto). MOAC agreed to relieve Sears from liability as long as it assigned the Lease to a tenant with at least $50 million in equity/net worth. It did not require Sears to replace itself with a tenant whose financial standing was comparable to that of Sears in 1991 in order to be relieved of liability for performance of the Lease. Applying the reasoning of *In re Ames* to § 365(b)(3)(A), Judge Drain concluded that Transform had provided MOAC with all the assurance required by that provision of the Bankruptcy Code. (*See* Tr. at 129:9-15, APX2124).

That said, the learned bankruptcy judge recognized that he was plowing new ground. He thus made a second pronouncement: "[I]f that legal determination is incorrect, and that the case law [I] cited and follow on the grounds of *stare decisis* is incorrect, then *the financial condition and operating performance of Transform is not similar to Sears in 1991.* Transform has not carried its burden to show, for example, that the ratio as far as its financial health, is the same, notwithstanding that it has shown that it's sufficiently financially healthy, when coupled with the favorable nature of the lease and deposit of an amount equal to the annual projected monetary

payment under the lease, that it is sufficiently healthy." (Tr. at 129:16-25, 130:1-2, APX2124-25) (emphasis added).[11]

In other words, the Bankruptcy Court concluded that, if Article XXV(D)(4)(a)'s $50-million-in-equity provision for relieving Sears of liability did not supersede the similar-to-Sears-in-1991 statutory standard in § 365(b)(3)(A), the assignment could not be approved, because Transform failed to carry its burden of demonstrating financial similarity.

*The Order Appealed From*

After delivering his oral opinion, Judge Drain entered a final order authorizing, *inter alia*[12] the assumption and assignment of the Lease to Transform, from which MOAC appeals. ("A&A Order," APX1947). This order provides that MOAC's rights under Article 6.3 of the Lease shall remain fully enforceable against Transform and any assignee, Transform will operate in compliance with the Lease, including the "Uses" section of the Lease and the REA, and Transform must initially sublet a portion of the premises within two years, "on the condition that the counterparty to the [Lease] does not improperly interfere with the Buyer's attempt to sublet the premises . . . ." (*Id.* at ¶¶ 16–17, APX1962-64).

MOAC appealed.

**Conclusions of Law**

On appeal, MOAC argues that the Bankruptcy Court erred in holding that the Lease terms define the protections of §§ 365(b)(3)(A) and (D). Thus, MOAC asserts, the Bankruptcy Court's determinations that the assignment to Transform satisfied (A) – even though it does not have

[11] The reference to the "ratio" between Transform's and Sears' financial health referred to a standard announced in *In re Casual Male Corporation*, 120 B.R. 256, 265 (Bankr. D. Mass. 1990) – a case in which, as here, the proposed assignor was a newly-formed entity that did not have an operating history. That case is discussed *infra* at pp. 35–37.

[12] The order appealed from grants additional relief.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 16 of 43

similar financial condition or operating performance as Sears in 1991 – and (D) – even though Transform did not propose a certain tenant or use – were erroneous.

This court reviews the Bankruptcy Court's findings of fact under the clearly erroneous standard and its conclusions of law *de novo*. *In re Republic Airways Holdings Inc.*, 582 B.R. 278, 281–82 (S.D.N.Y. 2018), (citing *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018); *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000); *In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 699 (S.D.N.Y. 2012)). "Mixed questions of law and fact are generally subject to *de novo* review," *id.*, though "the standard of review for a mixed question all depends[]on whether answering it entails primarily legal or factual work," *U.S. Bank*, 138 S. Ct. at 967.

Following the bankruptcy judge's lead, I will begin with a discussion § 365(b)(3)(D) and *In re Ames*'s reliance on lease terms to provide substance to the Code's "undefined notions of tenant mix." *In re Ames (Thatcher Woods)*, 127 B.R. at 753. I will then turn to Section § 365(b)(3)(A), which I find to be a very different provision.[13]

**<u>365(b)(3)(D)</u>**

I agree with Judge Drain's conclusion that § 365(b)(3)(D) – which requires that the assignment of a shopping center lease in bankruptcy "will not disrupt any tenant mix" of the shopping center – is not violated by Sears' assignment of the Lease to Transform. In fact, given the terms of the Lease and the REA, and in light of Transform's promise to abide by the few restrictions on subletting contained therein, I conclude that the proposed assignment does not alter

---

[13] Because I conclude that the Bankruptcy Court's order must be overturned under subsection (A), some might think it inappropriate to begin with what is, essentially, dictum. However, because the bankruptcy judge's decision on subsection (A) depends on his conclusion that subsection (A) should be treated exactly as subsection (D) was treated in the case of *In re Ames*, I think it makes more sense to discuss subsection (D) first.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 17 of 43

the tenant mix that was in existence at Mall of America at the time Sears filed for bankruptcy protection.

Let me begin by recapping the relevant findings of fact:

*First*, there is no provision in the Lease or the REA limiting tenant mix, other than Article XXII(c)'s restriction of the Sears space to uses "compatible with and not detrimental to" a mall and the restrictions that prohibit nuisances and industrial uses.

*Second*, Sears has had the right under the Lease, since 2007, to "go dark" or to sublease to a user who was not obligated to run a department store; and MOAC had no right to veto such a sublease – on "tenant mix" or any other ground – aside from the few proscriptions mentioned above.

*Third*, under Article 6.3 of the Lease, MOAC does have a "right of first refusal" that allows it to pay the assignor the amount to be paid under a proposed sublease if it does not wish to see any particular new subtenant take over all or part of the Sears space – and Judge Drain "so ordered" Transform's representation that it would abide by Article 6.3 of the Lease.

*Fourth*, Transform also agreed that it would sublet at least a portion of the leased premises within two years (on the condition that MOAC did not interfere with its marketing efforts) and would be bound by all other provisions of the Lease – including specifically Article XXII of the REA, which contains all that exists in the Sears Lease with respect to use restrictions and tenant mix.

*Fifth*, as the parties stipulated, Transform does not intend to operate any store, such as a Sears or a K-Mart, in the leased premises. Rather, Transform intends to sublease the premises to as-yet unidentified any potential tenant for any portion of the premises.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 18 of 43

MOAC does not challenge any of those findings of fact as erroneous. As is clear from the description of the relevant lease provisions above, they are not erroneous.

So with these facts in mind, we turn to a discussion of the law.

MOAC argues that (1) the plain language of § 365(b)(3)(D) prohibits any assignment of the Sears Lease that would affect the "tenant mix" at Mall of America, (2) the Bankruptcy Court could not make a determination about whether the proposed assignment to Transform would affect "tenant mix," because there is no proposed tenant.

Like Judge Drain, I conclude that MOAC's argument fails at the first step. I do not believe that the assignment, taken together with the restrictions imposed by the Bankruptcy Court and accepted by Transform, affects the "tenant mix" at the mall.

MOAC's argument relies for its force on a determination that *In re Ames (Thatcher Woods)* – the decision on which the bankruptcy judge relied – was decided wrongly, and that, under the literal language of § 365(b)(3)(D), any assignment that would result (or, in this case, that could result) in the Sears space's being used for any purpose other than a retail department store is prohibited – notwithstanding the language in the Lease that permits change-of-use assignment.

The courts that have considered this question, starting with the bankruptcy court of this district in the *In re Ames* cases, have repeatedly rejected this argument.

In the first two *Ames* cases, the debtor, Ames, sought to assign leases for premises located in Westmont, Illinois and at the Thatcher Woods Shopping Center in River Grove, Illinois. Both stores had been occupied by an Ames subsidiary, Zayre, which had been operating Ames Department Stores at these locations. Ames proposed to assign its leases to Schottenstein, which planned to operate a furniture store in part of each store and sublet the remainder of the space.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 19 of 43

In the first case, *Westmont*, the landlord objected to the assignment on the ground that the proposed assignment would disrupt the "tenant mix" in what landlord deemed to be a "shopping center," in violation of § 365(b)(3)(D). In the second case, *Thatcher Woods*, Ames/Zayre was one of four anchor tenants in the shopping center, and Pioneer, the landlord, objected to the assignment, on *inter alia*, the same ground.[14] In each case, the landlord argued that the phrase "will not disrupt any tenant mix" as used in the statute meant the assignment had to preserve a particular array of stores, or at least types of stores, in the shopping center.

Bankruptcy Judge Buschman disagreed with the landlord in both of the *Ames* cases. He concluded that bankruptcy courts had to rely on lease terms to define the Code's otherwise "undefined notions of tenant mix" in order to ensure that they were enforcing legal constraints cognizable under non-bankruptcy laws, and preserving the benefit of the bargain between landlord and tenant. *In re Ames (Thatcher Woods)*, 127 B.R. at 753; *In re Ames (Westmont)*, 121 B.R. at 165. Put otherwise, the *Ames* cases stand for the proposition that "tenant mix" at a shopping center – a term that is neither defined nor placed in time in the Code – is a function of the terms of the shopping center's space leases, rather than a separate criterion set by the legislature.

In *Westmont*, this "holding" was pure dictum. The principal issue in *Westmont* was whether the Ames Department Store was in fact part of a "shopping center." Judge Buschman held that it was not. That being so, any discussion of the requirements of § 365(b)(3)(D) – which applies only to leases in "shopping centers" – was entirely unnecessary.

However, Judge Buschman did discuss § 365(b)(3)(D) in the *Westmont* decision, and his discussion formed the basis for his subsequent ruling in the *Thatcher Woods* decision, where the

[14] Pioneer objected on other grounds as well, but those are not relevant to the discussion of § 365(b)(3)(D).

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 20 of 43

store was indeed part of a "shopping center." What the *Westmont* decision said about § 365(b)(3)(D) thus bears scrutiny.

Having observed that the "general notions of tenant mix" in § 365(b)(3)(D) were "undefined," Judge Buschman looked to Congress' stated purpose in passing § 365(b), which was to protect the landlord's contract rights. *In re Ames (Westmont)*, 121 B.R. at 165. Specifically, he noted, with regard to § 365(b)(3), that the statute was passed "to assure a landlord of his bargained for exchange." *Id.* (quoting H.R. Rep. No. 95-595, at 348–39 (1997)). He noted that both §§ 363(f)(2)(B) and 365(b)(3), which supplemented it, were designed to give the landlord "adequate assurance" that an assignee in bankruptcy would continue to perform *the terms of the debtor's lease*. He observed that, if § 365(b)(3)(D) were read without the prefatory language in § 365(b)(3), it would not specifically refer to the terms of the lease. But he went on to say that subsection (D) should be read in light of the Code section's prefatory language, which does refer to the terms of the underlying lease. He held that the Code "defines such 'adequate assurance of future performance *of a lease of real property in a shopping center*' to include non-disruption of tenant mix. The statute itself thus directs tenant mix inquiry to contractual provisions [of the lease] rather than general notions of tenant mix[15] argued by the Landlord here." *Id.* (emphasis added).

In *Westmont* (as in this case), the Zayre lease did not contain any restrictive use clause. Moreover, in *Westmont* (as in this case), Zayre had an absolute right to assign its lease or sublease the premises without the landlord's approval. *See id.* at 164–65. Thus, the lease whose performance had to be adequately assured gave the landlord neither the right to control how the debtor's space could be used, nor any comfort that it would be used in any particular way, including as a

[15] The "general notion[] of tenant mix argued by the Landlord" in *Westmont* was that assignment would be to an entity that was not the same "type" or entity – a furniture store rather than a department store – that had previously occupied the space.

department store (which is how Ames was using the space). That being so, the court concluded that Zayre's assignment to Schottenstein – a furniture store, rather than a department store – was not barred by § 365(b)(3)(D). *Id.* at 165.

Judge Buschman's analysis of § 365(b)(3)(D) in the subsequent *In re Ames (Thatcher Woods)* case relied extensively on this discussion (dictum or not) in the *Westmont* case.

As was true in the *Westmont* case, Ames's lease at Thatcher Woods "does not expressly restrict use of the premises in any fashion; nor do any of the leases of existing tenants restrict in any fashion the use of the Zayre of Illinois premises."[16] *In re Ames (Thatcher Woods)*, 127 B.R. at 746. Nonetheless, the landlord (Pioneer) argued that, for purposes of § 365(b)(3)(D), the court was required to look beyond the terms of the lease, and could only determine the "tenant mix" at the shopping center by looking at the actual types of stores that were resident in the shopping center at the time of the bankruptcy. *Id.* at 752. Since Ames/Zayre was trying to assign the lease to a furniture store, rather than a department store, Pioneer argued that the assignment would alter the tenant mix.

Judge Buschman once again refused to read § 365(b)(3)(D) outside of the context provided by the prefatory language in the statute. He observed that this subsection was concerned solely with providing "adequate assurance of future performance . . . *of the contract or lease*" that was being assigned. *Id.* (emphasis added). Where preservation of the "tenant mix" (which Pioneer, like the landlord in *Westmont*, defined as the same type or store that had previously occupied the space) was not something to which the landlord was entitled to under the "contract or lease" at issue, Pioneer's interpretation of the "tenant mix" requirement in § 365(b)(3)(D) would effectively rewrite the lease. Because in *Thatcher Woods* the landlord had not bargained for the right to

[16] Unlike in this case, those leases were in the record; Judge Buschman described various provisions in those leases.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 22 of 43

preserve tenant mix outside of bankruptcy, "no reason exists why it should have such a right now that [the debtor-tenant] has filed for bankruptcy." *Id.* at 754.

It is important to note that the term "tenant mix" as used in § 365(b)(3)(D) is both undefined and unfixed in time. It is not at all clear whether the phrase "tenant mix" in § 365(b)(3)(D) refers to the precise stores that were tenants at the time the lease in question was signed; or to a snapshot of the stores that were open when the bankruptcy was filed; or to types of stores as opposed to precise tenants. There can be no question that a snapshot of the tenants at Mall of America has varied over time, and that tenants undreamed of at the time the Sears Lease was signed (Crayola Experience? Waterparks?) now or soon will occupy space in or as part of the mall. Judge Buschman's description of the term "tenant mix" as "undefined" was, in short, apt.

Unfortunately, the legislative history of the statute sheds little light on the meaning of "tenant mix." The Conference Report for the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act") – pursuant to which § 365(b)(3) passed into law – says nothing at all about § 365(b)(3).

But Senator Orrin G. Hatch discussed "the provisions improving bankruptcy procedures with regard to shopping centers" during debate on the bill. *See* H.R. Rep. 98-882 (1984) (Conf. Rep.) *as reprinted in* 1984 U.S.C.C.A.N. 576, 598. He noted that changes to § 365 sought to remedy several problems, including that "shopping center leases are assumed or assigned and then used in ways *which violate the use clause of the lease and disrupt the tenant mix*." *See id.* at 598–600 (emphasis added). Having linked the disruption of tenant mix to violation of a lease's "use clause," Senator Hatch made it quite clear that the amendments were designed to prevent courts from effectively rewriting essential terms out of leases in order to effectuate assignments in bankruptcy:

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 23 of 43

> It is especially important that any use clause in the lease be strictly adhered to and that the tenant mix not be disrupted. . . . This amendment is intended to stop courts from creating new leases by changing essential lease terms to facilitate assignments.

*Id.* at 600.

I have no quarrel (nor did Judge Drain) with MOAC's argument that the provisions of § 365(b)(3), including subsection (D), supplement and give special meaning to the "adequate assurance" rule of § 365(f)(2)(B) in the context of shopping centers. Section 365(f)(2)(B) is not specific about what "adequate assurance" would require; § 365(b)(3) fills in that blank when the debtor has a lease for space in a shopping center; and § 365(b)(3)(D) prohibits assignments that would disrupt the tenant mix.

But given the lack of any statutory definition for the words "tenant mix," and the several possibilities for what it might mean, it makes perfect sense to interpret the phrase "tenant mix" for purposes of § 365(b)(3)(D) in light of the lease whose performance is being assured – because the tenancy governed by that lease is part of the "tenant mix" at the shopping center.

As was true in both *In re Ames* cases and in the cases that have cited them subsequently, (*see* n.9, *supra*), the Sears Lease and the REA (a master agreement incorporated therein) contain virtually no restrictions on what kinds of tenants could occupy the Sears building once the Major Operating Period expired in 2007. There is certainly no "use clause" in the Lease or in the REA that will be violated by assigning the lease to someone who does not plan to operate a retail store on the premises. Those documents permit virtually unfettered assignment of the Lease for a host of uses. They do not restrict the use of the space to a retail department store, and Sears itself has not been required to operate a retail store in the premises since 2007.

It is, therefore, fair to say that the "tenant mix" at Mall of America since 2007, when the Major Operating Period expired, included a space that was free to cease operating as a department

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 24 of 43

store and that could be subleased for a variety of uses other than a department store, *without the approval of the landlord, and without regard to objections by any of the mall's other tenants*. No one had a right – not MOAC and not any of its tenants – to assume or expect that the Sears space would be occupied by a department store until 2091. Other than by matching a proposed assignee's offer or buying Sears out (discussed further below), neither MOAC nor any of its other tenants could stop Sears from changing the way in which its space was being used. That uncertainty was part of the "tenant mix" of the mall, from the mall's very beginning. It was embedded in the terms of Lease and woven into Mall of America's "master agreement," the REA. And it remained part of the "tenant mix" at Mall of America when Sears declared bankruptcy.

To rule that Sears cannot now assign the Lease to an entity that is not a department store because that would somehow alter the "tenant mix" at Mall of America is to ignore the reality of the "tenant mix" that was created by the (admittedly) most unusual lease between MOAC and Sears. Such a ruling would not protect the rights of the landlord, MOAC; it would radically expand them.

While recognizing that nothing in the Lease restricts assignment of the space to an entity other than a department store, MOAC argues that the loss of Sears as a retailer will leave Mall of America with only two "department stores," which will in turn allow several of its other tenants to break their leases. MOAC represents that these unidentified tenants have the right to leave the mall if the number of department stores at Mall of America falls below three. (Tr. 80:1-4, APX2075). It argues that, in *Thatcher Woods*, Judge Buschman considered it significant (though not dispositive) that no tenants at the Thatcher Woods Shopping Center could cancel their leases if the premises occupied by Zayre of Illinois were to be subleased to an entity other than a department store. In this case, by contrast, MOAC insists that some of its tenants could so cancel.

However, there are two problems with MOAC's argument on this appeal.

First, as noted above, none of these purported leases is found in the record on appeal, nor is there any testimony in the record from tenants indicating that they will leave Mall of America if the proposed assignment is approved, as was the case in *Matter of Federated Department Stores*, 135 B.R. 941, 944 (Bankr. S.D. Ohio 1991) – an opinion whose strained judicial definition of "tenant mix and balance" this court finds less than persuasive. In fact, MOAC's witness Mr. Ghermezian testified to the contrary – although tenants in Mall of America *may* leave without a third department store, "today, they may not leave that fast." (Tr. at 74:7, APX2069).

Second, if, as Mr. Ghermezian testified, other leases "require that a department store be operated in the Sears space," then those leases were entered into in contravention of the REA as incorporated into the Lease, which expressly permits Sears not to use the space for a department store from and after 2007 – whether or not that would have placed MOAC in violation of some other tenant's lease. And if (as I suspect, but cannot prove is the case) other tenant leases require that department stores be operated in three of the four anchor-tenant locations in the mall, (*compare* Tr. at 77:18-25, APX2072 *with* Tr. at 79:20-25, 80:1-4, APX2074-75), then it was particularly important that *MOAC* make sure that all the anchor spaces other than the Sears space contained department stores – because once the Major Operating Period expired, MOAC had no contractual ability to make sure that the Sears space was operated as a department store.

At some point, MOAC did hedge against Sears' absolute right to convert the Sears Building to something other than a department store. It leased a fourth "anchor" space in Mall of America to Bloomingdale's, a retail department store. That gave the mall four department stores (Sears, Bloomingdale's, Macy's and Nordstrom), and gave MOAC a cushion against Sears exercising its rights under its Lease.

But in 2012, MOAC permitted Bloomingdale's to vacate its space. After it remained dark for three years,[17] MOAC finally leased the premises, not to another department store, but to Binney & Smith, which installed a "Crayola Experience" children's entertainment center in part of what used to be a department store.

The fact that Sears was having financial difficulty was hardly a secret during the period 2012-2017, when MOAC allowed the Bloomingdale's space first to go dark and then be converted to a non-department store use.[18] If MOAC had obligations to other tenants concerning the number of department stores, then, knowing the terms of the Sears Lease and the REA, it could and should have protected itself when Bloomingdale's closed, by leasing that space to a department store tenant. By not doing so, MOAC, not Sears, created any problem it faces today.

MOAC next argues that the assignment should be disallowed because it is impossible to know whether Transform will lease the Sears space to a tenant or tenants that MOAC and its other tenants do not find objectionable. But what Sears proposes to do is not unprecedented. *See e.g.*, *Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*, 293 B.R. 169, 172–73 (M.D. Tenn. 2003)

---

[17] This long period of disuse, despite the obvious attractions of Mall of America as a place to do business, is less surprising than it might seem; retail stores like Bloomingdale's and Sears are not exactly a growth industry these days.

[18] *See, e.g.*, Lauren Thomas, *Sears is Shuttering 20 More Stores*, CNBC, June 22, 2017, https://www.cnbc.com/2017/06/22/sears-is-shuttering-20-more-stores.html ("Sears . . . is headed down what many believe is a path toward filing for bankruptcy, as the retailer struggles to grow its sales."); Brian Sozzi, *As Sears Goes From Bad to Worse, Bankruptcy Looms, Fitch Says*, THE STREET, Dec. 8, 2016, https://www.thestreet.com/investing/stocks/retail-zombie-sears-is-running-out-of-money-13918802; *Sears and Kmart struggle to survive in the era of Walmart and Amazon*, THE GUARDIAN, Dec. 4, 2014, https://www.theguardian.com/business/2014/dec/04/sears-closes-more-stores-shoppers-walmart; David Gelles, *For Once-Mighty Sears, Pictures of Decay*, N.Y. TIMES DEALBOOK, Oct. 29, 2013, https://dealbook.nytimes.com/2013/10/29/sears-considers-split-of-lands-end-and-auto-centers/; Ronald Thomas, *Are We Recession-Bound? Results From Wal-Mart and Low-End Retailers Suggest 'Maybe'*, 2013 WLNR 21398411 (Aug. 23, 2013) ("In that area it is widely known that JC Penney (NYSE:JCP) and Sears/Kmart . . . could well be in bankruptcy within one to two years . . . ."); Brigid Sweeney, WHERE AMERICA SHOPPED, 2012 WLNR 8830213 (Apr. 23, 2012) ("After the second-worst year in the companys [*sic*] history, and with its annual shareholders meeting two weeks away, there is open discussion of a once-unthinkable proposition: Will this 126-year-old company, which helped define modern America, continue to exist?"); Paul R. La Monica, *Tears for Sears: American icon in trouble*, CNN MONEY, Jan. 12, 2012, https://money.cnn.com/2012/01/12/markets/thebuzz/index.htm ("The future is looking increasingly bleak for the former king of retail, Sears Holdings.").

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 27 of 43

(debtor sold designation rights to third party, third party proposed assignment to new entity that would in turn sublease to a tenant); *In re Sun TV & Appliances, Inc.*, 234 B.R. 356, 359 (Bankr. D. Del. 1999) (assignee intended to shop the lease). And Transform has agreed to be bound by the relatively minimal restrictions in the Lease and REA on how the space can be used, an agreement incorporated into Judge Drain's order.

Moreover, MOAC is not without recourse if Transform tries to bring a tenant into Mall of America that MOAC would rather not have in the mall. Article 6.3 of the Lease provides that Sears must offer MOAC the right to purchase the Lease at the same price and on the same terms offered to Sears by any prospective tenant. Additionally, Article 6.3 also provides that, if no unrelated arms-length offer were made for the space, Sears must offer MOAC the right to purchase the Lease for the fair market value of the leasehold estate. Transform had to agree to abide by that provision in the Lease as a condition of the assignment; and Judge Drain incorporated that promise into his order. (Tr. at 132:13-17; *see* A&A Order at ¶¶ 16-17, APX1962-63). MOAC is as protected against incursion by a tenant deemed "undesirable" as it was prior to Sears' bankruptcy – thereby preserving the "tenant mix" that was in place prior to the bankruptcy.

Thus, in terms of "tenant mix," the Bankruptcy Court's order leaves MOAC in exactly the position that it would have occupied had Sears assigned the Lease outside of a bankruptcy, as was its absolute right. Under Judge Drain's order, MOAC is getting the full benefit of what it bargained for back in 1991 insofar as "tenant mix" is concerned. The Bankruptcy Code cannot be read to place the Landlord in a better position than it would have occupied absent the bankruptcy. *See In re Great Atl. & Pac. Tea Co., Inc.*, 472 B.R. 666, 675 (S.D.N.Y. 2012) ("Section 365 . . . does not give a landlord the right to improve its position upon the bankruptcy of a tenant. The statute affords

no relief to a landlord simply because it might seek to escape the bargain it made.") (quoting *In re Rock 49th Rest. Corp.*, No. 09-14557, 2010 WL 1418863, at *7 (Bankr. S.D.N.Y. Apr. 7, 2010)).

In support of its argument that the words "will not disrupt any tenant mix" in § 365(b)(3)(D) must be read to guarantee the preservation of the very businesses, or at least the same type and number of businesses, that were resident in the mall just before Sears declared bankruptcy, MOAC relies principally on *Matter of Federated Department Stores, Inc.*, 135 B.R. 941 (Bankr. S.D. Ohio, 1991). But *Federated* is not particularly helpful to its cause.

For one thing, the facts of *Federated* were radically different from the facts of this case.

In *Federated*, the debtors sought to assign the lease for a three-story Jordan Marsh store to Mervyn's. The store was located in a shopping mall in Miami, Florida called Dadeland, which was owned and managed by the Equitable Life Assurance Society of the United States ("Equitable"). Whereas Jordan Marsh was a full-line, fashion-oriented retail department store that offered moderately priced to expensive merchandise – similar to Macy's or Nordstrom – Mervyn's sells casual wear for cost-conscious consumers. *See Federated*, 135 B.R. at 941.

As part of a first bankruptcy plan hammered out by the bankruptcy court, Federated assumed a modified lease for the Jordan Marsh store at Dadeland, in exchange for Equitable's payment of $700,000. That deal was designed to give Equitable "security to plan for the future." *Id.* at 941–42, 945.

The original plan did not come to fruition, for reasons not explained in the opinion. One year later, the debtor closed the Jordan Marsh store and proposed a new plan, pursuant to which Mervyn's would take over the Jordan Marsh space at Dadeland.

Equitable objected to the assignment of the Jordan Marsh space to Mervyn's, on the ground that placing the store next to Saks Fifth Avenue – a decidedly upscale store – would disrupt the

"tenant mix or balance" at Dadeland (specifically the "balance," which the court defined as the placement of stores relative to one another).[19] *See id.* at 943. After a hearing at which a witness from Saks testified that it would vacate the premises rather than allow the store next door to become a Mervyn's – something Saks had done at two prior malls, and apparently something that Saks had a right to do under its lease – the bankruptcy court concluded that the proposed assignment would violate § 365(b)(3)(D), because it would alter the "tenant balance" at Dadeland.

In so holding, however, the bankruptcy court focused on the fact that the new bankruptcy plan "took [] away" the security that Equitable had purchased during the first round of negotiations in the bankruptcy court. *See id.* at 941–42, 945. The bankruptcy judge concluded that Equitable had a "bargained for" right to control how the former Jordan Marsh space was to be used once it paid the $700,000 under the original, abandoned plan of reorganization:

> Must we not ignore the reasonable expectations of security and control over the character of future development that Equitable once bargained for with the Debtor under court supervision. The concept of the "benefit of a bargain" is not a static concept constrained by the four corners of a lease—especially in a case such as this involving continuous, fluid negotiations. This bankruptcy proceeding first provided Equitable with security to plan for the future, then took it away. Based on the reasonable expectations of the parties under all the circumstances, it is fair and just to give a measure of that lost security back to Equitable.

*Id.* at 945.

So contrary to MOAC's argument, the *Federated* court did not simply rely on some literal reading of the phrase "tenant mix" as used in § 365(b)(3)(D) in order to reach its result. In fact, and significantly, the *Federated* court cited *In re Ames (Thatcher Woods)* with approval for the proposition that a court "may not imply non-bargained for terms in leases." *Federated*, *supra*, 135 B.R. at 945. The *Federated* court reached its conclusion that the assignment would violate

---

[19] Equitable was willing to lease space at Dadeland to Mervyn's – just not the three-story space next door to Saks Fifth Avenue.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 30 of 43

§ 365(b)(3)(D) in order to give Equitable the benefit of its bargain (a bargain not contained in the original lease, but reached in the bankruptcy court).[20]

This court has found only one case has cited *Federated* in the 19-plus years since it was decided – *In re Montgomery Ward, LLC*, 307 B.R. 782, 787 (D. Del. 2004).[21] *Montgomery Ward* cited to *Federated* – in an alternative holding – for the proposition that "consideration of whether an assignment disrupts the balance of the tenant mix necessarily requires the court to determine the balance of the rights between the parties." 307 B.R. at 787. In other words, the Delaware court, relying on *Federated*, held that the phrase "tenant mix" could not be parsed without looking to the parties' underlying agreement, which is, of course, where the "balance of the rights between the parties" is laid out.

And that is precisely what Judge Drain did when applying *In re Ames* to the tenant mix question. He balanced the rights between the parties, as set forth in the Lease and the REA. He applied those rights rigorously to decide whether the requirement of "tenant mix preservation" at Mall of America had been met. As MOAC had and has only the most limited right to control who occupies the Sears premises under the Lease – and as Transform is now bound by all of the relevant restrictions in Article XXII of the REA, as well as MOAC's right of first refusal Article 6.3 of the Lease – Judge Drain correctly concluded that the proposed assignment of the Lease to Transform does not violate § 365(b)(3)(D).

It is not really necessary to address step two of MOAC's argument, which is that Judge Drain was not capable of deciding whether the proposed assignment would alter the mall's tenant

[20] There is no suggestion in *Federated* that Equitable had the right, under Jordan Marsh's original lease, to control who could occupy the Jordan Marsh space if Jordan Marsh vacated that space. There is mention of some unspecified modification of the lease in exchange for the $700,000 payment; it may be that this lease modification gave Equitable explicit control over the identity of any subsequent assignee – a right that MOAC conspicuously lacks here.

[21] Given the unusual facts of *Federated*, this is hardly surprising.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 31 of 43

mix since he had no idea who or what the actual new tenant(s) might be. However, MOAC fails to convince on this prong of its argument as well.

MOAC relies on *In re Sun TV & Appliances, Inc.*, 234 B.R. 356, 359 (Bankr. D. Del. 1999), where the court denied a motion for approval of the assumption and assignment of a lease in a shopping center. At the auction of two of the debtor's leases, the winning bid was contingent on a finding that one of the leases was not subject to § 365(b)(3), because the winning bidder sought unbridled designation rights. In other words, the debtor would assign its rights to assign the lease to the bidder, under which the bidder would shop the lease to third parties and then direct the debtor to assign to lease to the bidder's chosen assignee. *See id.*

The lease in that case, unlike Sears' Lease in this case, contained significant restrictive use conditions: the store had to be an electronics store for 15 years and thereafter it could not be a store that competed directly with certain other tenants in the mall (including Lowe's, which foreclosed the premises' use as a department store, bookstore, jewelry store, or music/multimedia store). *See id.* at 366, 370. The debtor urged the court to strike those conditions as an unlawful restraint on assignment.

This the court declined to do. While the court found that § 365(b)(3) permitted "insubstantial deviations"[22] from the lease provisions, it denied the debtor's motion, reasoning as follows:

> Even if we were inclined to permit an insubstantial deviation from the provision, we would not make that decision here. At this time, neither [the assignee] nor the Debtor are able to tell the Landlord or this Court what use will ultimately be made of the Demised Premises. By the mere nature of the Motion, it is clear that [the assignee] does not intend to use the Premises itself. Absent knowledge of the ultimate intended use, we cannot determine that such use (if it does vary from the

[22] The *In re Sun* court relied on an outdated version § 365(b)(3) that required only "that assumption or assignment of such lease will not disrupt *substantially* any tenant mix or balance in such shopping center." Congress has since removed "substantially" from the statute and reiterated that use provisions must be "strictly adhered to."

> use provision of the Lease) would have an insubstantial impact on the Landlord and its other tenants.

*Id.*

As should be obvious, *In re Sun* has very little precedential value here; its facts turn the facts of this case on their head. In *In re Sun*, the lease restricted the use of the demised premises; in our case, by contrast, Sears has a virtually unrestricted right to assign the Lease to any type of legal and non-nuisance user – miniature golf course, spa, travel agency, comedy club, children's playground, or pharmacy – or to go dark and simply leave the premises vacant. Additionally, the assignee in *In re Sun* sought to get out from under these use restrictions, whereas Transform has agreed to abide by the use terms in the Lease.

Moreover, *In re Sun* did not hold, as MOAC argues, that a bankruptcy court may not approve a lease assignment in bankruptcy under § 365(b)(3)(D) before a new tenant has been identified. The issue in *In re Sun* was whether the court could ascertain if a proposed tenancy qualified as an "insubstantial deviation" from the explicit use restrictions in the debtor's lease before a proposed tenant had been identified. The issue of "insubstantial deviation" as a matter of statute is not before this court, because the statute has since been amended. Furthermore, in this case, the Sears Lease authorizes quite "substantial deviations" from the original "tenant mix" in the Sears space from and after 2007 – and authorizes them through 2091.

What *is* illuminating about *In re Sun* for our purposes is that the bankruptcy court in Delaware did not read the "literal" (as defined by MOAC) language of § 365(b)(3)(D) as precluding a use other than one of the uses that was specified as permissible in the lease. So *In re Sun* also does not stand for the proposition that § 365(b)(3)(D) embodies some literal meaning of "tenant mix" that is divorced from the provisions of the lease sought to be assigned.

MOAC also cites to yet another *In re Ames* case, *In re Ames Department Stores, Inc.*, 348 B.R. 91, 93–94 (Bankr. S.D.N.Y. 2006) [hereinafter, "*Parkway*"], in which Ames sought to assign its lease in the Ames/Parkway Building. The building housed only two tenants: an Ames department store and a medical facility. Bankruptcy Judge Gerber concluded that this two-tenant building did not qualify as a "shopping center," so § 365(b)(3)(D) was inapplicable to the assignment. Judge Gerber did note, in dicta, that he was "initially concerned because [the proposed assignee] had not definitively stated what kind of business would be taking over the Ames store, that the proposed assignment . . . would disrupt the tenant mix or balance in the Ames/Parkway Building." *Id.* at 98. However, his concern dissipated because the assignee did in fact identify the sublessee prior to Judge Gerber's ruling, and the sublessee – a furniture store – would not disrupt any tenant mix or balance. But ultimately, this case is meaningless as precedent here because the "tenant mix" statute was inapplicable to a non-shopping center tenant. The fact that the assignee identified a proposed tenant was interesting, but irrelevant to the ultimate determination, which was that §365(b)(3)(D) did not apply in the circumstances of the case. *Id.* at 97.

In our case, Transform has promised that it would abide by the provisions of Articles IX and XXII of the REA, which forbid the use of the Sears Building for things like a warehouse, a veterinary hospital, or a mortuary. The Bankruptcy Court incorporated that restriction into the order appealed from, so Transform is indeed bound to the Lease. Under the Bankruptcy Court's order, no tenant can be introduced into the space by Transform if Sears would have been precluded from leasing to that tenant. Having imposed that requirement, Judge Drain was free to conclude that MOAC had "adequate assurance" that the allowable "tenant mix" at Mall of America would not be disturbed by the assignment of the Lease to Transform.

Put more generally, where there are few or no use restrictions on a demised premises, and the assignee agrees to be bound by whatever restrictions do exist, as Transform has, a court may deem the adequate assurances under § 365(b)(3)(D) to have been given – even if the no ultimate occupant for the space has been identified.

**365(b)(3)(A)**

The Bankruptcy Court also concluded that Transform had given MOAC "adequate assurance of future performance of [the] lease" as required by § 365(b)(3)(A) of the Code. Subsection (A) provides that "adequate assurance of future performance" of a shopping center lease requires proof that "the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease." 11 U.S.C. § 365(b)(3)(A). Congress adopted this provision to "insure that the assignee itself will not soon go into bankruptcy." H.R. Rep. 98-882 (1984) (Conf. Rep.) *as reprinted in* 1984 U.S.C.C.A.N. 576, 600.

It would, of course, be impossible to locate a tenant of any sort that boasted the precise "financial condition and operating performance" of Sears Roebuck back in 1991. At that point, Sears had been in business for nearly 100 years. It virtually created "big box" retailing, and its massive catalogues were the progenitor of Amazon's internet omni-market. It has few equals in the history of American business.

But by using the word "similar" rather than "identical," Congress indicated that identity of financial condition and operating performance is not required. The few courts that have considered what the statutory phrase "similar to the financial condition and operating performance of the debtor" means have concluded that it requires at the very least that there be proportionally

comparable financial health between the assignee and/or its guarantors and the debtor as of the lease's inception. Alternatively, if the assignee is a newly-formed entity, like Transform, courts have looked to whether the strength of business experience of the assignee's owner and operator is comparable to that of the debtor at the time the lease was signed. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 2003 WL 749172, at *2 (S.D.N.Y. Mar. 5, 2003) (comparing Form 10-Ks and per-store sales and profit); *Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*, 293 B.R. 169, 177–78 (M.D. Tenn. 2003) (considering cashflow analysis for store; guaranty from assignee's parent company; and financial statements for the debtors, the proposed subtenant, and assignee's parent companies where assignee was a new entity with no operating history or financial record); *In re Casual Male Corp.*, 120 B.R. 256, 265 (Bankr. D. Mass. 1990) (comparing ratios of current assets to current liabilities and noting owner and CEO's business experience where assignee was recently incorporated).

Unfortunately for the Debtors, Transform did not manage to demonstrate that its financial condition and operating performance were "similar" to those of Sears in 1991 – even under the rather creative "proportionality" standard used to measure similarity by the courts in *In re Ames*, 2003 WL 749172, at *2, and *In re Casual Male Corp.*, 120 B.R. at 265. On the contrary: After declining to credit Transform's "draft" balance sheet (which showed equity in excess of $250 million), the learned bankruptcy judge found that the financial condition and operating performance of Transform was *not similar* to the financial condition and operating performance of Sears in 1991, under any standard of similarity – including proportional ratios, which the bankruptcy judge expressly mentioned. (*See* Tr. 129:16-25, 130:1-2, APX2124-25).

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 36 of 43

As far as MOAC is concerned, that is the end of the story. The statutory language requires similarity of financial condition and operating performance; the Bankruptcy Court found no such similarity; game over.

However, the learned bankruptcy judge rejected MOAC's argument. He decided that Transform's failure to demonstrate financial and operating "similarity" to Sears was of no moment, because it was "highly likely" that Transform satisfied an entirely different standard – one based, not on financial similarity, but on Transform's putative net worth or shareholder equity.

As the reader will recall, the Lease/REA provides that Sears could relieve itself of its obligations under the Lease as long as it assigned its Lease to an entity with a net worth or shareholder equity of $50 million or more. The bankruptcy judge concluded that if this level of assurance about an assignee's financial stability was sufficient assurance for MOAC outside the bankruptcy context, then it provided "adequate assurance of future performance" under the Bankruptcy Code – even though it bore no resemblance to the standard set out in subsection (A). The Bankruptcy Court said that Congress had not imposed any "independent requirements" when passing the special shopping center protections under the Code (Tr. 125:10-17, APX2120), and ruled that § 365(b)(3)(A), like § 365(b)(3)(D), had to be interpreted in light of the terms of the lease. As MOAC had agreed to relieve Sears of liability under the Lease outside of bankruptcy as long as its proposed assignee was worth $50 million or more, Judge Drain held that § 365(b)(3)(A) entitled it to no greater level of assurance in the context of a bankruptcy.

As the Bankruptcy Court recognized, this was a holding of first impression. No court has ever applied *In re Ames* to the financial assurance requirements in § 365(b)(3)(A). As he himself noted, the cases on which Judge Drain relied as precedential support for *In re Ames*'s logic[23] are

---

[23] *In re Great Atl. & Pac. Tea Co., Inc.*, 472 B.R. 666, 678–79 (S.D.N.Y. 2012); *Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*, 293 B.R. 169 (M.D. Tenn. 2003); *In re Toys "R" Us Prop. Co. I, LLC*, No. 18-31429, 2019

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 37 of 43

all cases discussing whether a proposed assignment satisfied the "tenant mix" requirement of § 365(b)(3)(D) in light of use clauses (or lack of use clauses) in the underlying lease. The few cases that have analyzed whether an assignment comports with § 365(b)(3)(A) – there are apparently just three of them – do not rely on *In re Ames.* Neither do they look to the terms of the lease to see whether the assignee has given "adequate assurance of future performance of [the] lease" under that subsection of § 365(b)(3). Instead, the courts in those cases analyzed balance sheets, Form 10-Ks and other financial records. *See In re Ames*, 2003 WL 749172, at *2 (Form 10-Ks); *Ramco-Gershenson*, 293 B.R. at 177–78 (cash flow analysis, Form 10-Ks, and annual reports); and *In re Casual Male Corp.*, 120 B.R. at 265 (balance sheets and Form 10-Qs). Where, as here, the proposed assignment is to a start-up with no operating history of its own, they consider whether it is appropriate to compare the financial record and operating performance of the people who are running the new enterprise with the financial condition and operating performance of the debtor. *See, e.g.*, *Ramco-Gershenson*, 293 B.R. at 177–78 (assessing the financial strength of the newly formed assignee's guarantors); *In re Casual Male Corp.*, 120 B.R. at 265 (assessing the business experience of the recently incorporated assignee's sole owner and CEO). All three of those cases in some manner compare the financial strength of the assignee or its guarantors with the financial strength of the debtor in the year the lease was signed.

Nonetheless, the learned bankruptcy judge concluded, without much discussion, that *In re Ames (Thatcher Woods)* was controlling precedent "for purposes of this section [(A)], as well as the other three subsections of 365(b)(3) that each requires reference back to the party's actual

---

WL 548643, at *6 (Bankr. E.D. Va. Feb. 11, 2019) (also discussing § 365(b)(3)(C) under Fourth Circuit precedent that relies on *In re Ames (Westmont)*); *In re Ames (Thatcher Woods)*, 127 B.R. 744 (Bankr. S.D.N.Y. 1991); *In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299, 308 (Bankr. S.D.N.Y. 1983).

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 38 of 43

agreement, and that Congress did not create independent requirements that would not go to actual assurance of future performance . . . ." (Tr. at 125:10-14, APX2120).

I am not persuaded by the learned bankruptcy judge's reasoning. For one thing, I disagree with his premise. Congress did indeed create "independent requirements" for actual assurance of future performance when it passed § 365(b)(3) – four separate independent requirements, over and above those set out in § 365(f) – each of which needs to be met before a bankruptcy court can approve the assignment of a shopping center lease. *In re Ames* does not authorize a bankruptcy court to dispense with any congressionally-mandated "independent requirement" for adequate assurance of performance. Rather, it comes up with a logical way to interpret one of those requirements (subsection (D)'s non-disruption of tenant mix) because Congress left that term undefined. Courts do that all the time; it is our proper role.

That is precisely what the learned bankruptcy judge did in this case when discussing subsection (D). He did not discard the statutory "tenant mix" standard when he followed *In re Ames* in that context; he, like many courts before him, used the Lease to give meaning to that undefined phrase. And like many courts before him, he concluded that assigning the Lease to an entity that agreed to abide by the few use restrictions imposed on Sears, while preserving the limited right MOAC had to control the use of the premises (by matching a proposed lessee's offer or buying Sears out of the Lease), would not disturb the "tenant mix or balance" at Mall of America. As Sears' ability to cease using the space for a department store, whether by assigning the Lease (which it could do without MOAC's consent) or by going dark, had been part of the "tenant mix" at Mall of America for over a decade, I see no reason to disturb that eminently logical conclusion.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 39 of 43

But when it turned to subsection (A), the Bankruptcy Court did not simply come up with a way to interpret the phrase "similar . . . financial condition and operating performance" as between the Debtors and the assignee.[24] Instead, the court adopted an alternative standard for determining adequacy of assurance after concluding that the statutory standard was not met. Put otherwise, the Bankruptcy Court, stretching *In re Ames* past its breaking point, read § 365(b)(3)(A) out of the statute, effectively rewriting it and overriding the express wishes of the legislature. And as the Supreme Court reminded us only this week, legislating is not our proper role. *See Rodriguez v. FDIC*, 589 U.S. ___, No. 18-1269, slip op. at 4, 6 (Feb. 25, 2020).

Subsection (A), unlike subsection (D), does not use a phrase that requires resort to the lease to give it definition and context. In adopting subsection (A), Congress wanted to assure the landlord that it would not have to endure a second bankruptcy any time soon. H.R. Rep. 98-882 (1984) (Conf. Rep.) *as reprinted in* 1984 U.S.C.C.A.N. 576, 600; *see also*, *Ramco-Gershenson*, 293 B.R. at 177 n.5 (quoting the goal). To accomplish that goal, Congress insisted on something more than the general and undefined "adequate assurance of future performance" ordinarily required when a lease is assigned in bankruptcy (i.e., the standard found in § 365(f)(2)(B)). Instead it devised a more specific standard. Congress concluded that if a shopping center landlord were dragged into bankruptcy court, it should not have a new tenant imposed on it unless the proposed assignee "looked," in terms of its financial condition and operating performance, like the party that was vacating the premises. Moreover, Congress selected a particular moment in time for making the comparison between the wherewithal of debtor and assignee: the assignee today versus the debtor as it was at the commencement of the lease, when its financial condition and operating

---

[24] In cases like *In re Ames*, 2003 WL 749172, at *2, and *In re Service Merchandise Co., Inc.*, 297 B.R. 675, 682–86 (Bankr. M.D. Tenn. 2002*), aff'd sub nom. Ramco-Gershenson*, 293 B.R. 169 (M.D. Tenn. 2003), that is exactly what the courts did: figured out a reason why the financial data with which they were presented demonstrated financial similarity between the assignee and the debtor at the time the lease was signed.

performance were such as to make it an attractive tenant to the landlord.[25] Congress in its wisdom decided that only an assignee with a financial condition and operating performance that resembled the debtor's *ab initio* would provide a shopping center landlord with "adequate assurance" that the bargain originally struck would be performed by the lease's assignee. Congress may have been wrong to think so, but that was for Congress to decide.

In this case, we know that the congressionally-mandated requirement was not satisfied. The Bankruptcy Court held that Transform, the proposed assignee, failed to prove financial and operating similarity between Sears in 1991 and Transform today, under any standard – including the standard of proportionality that was developed in cases like *In re Ames*, 2003 WL 749172, at *2 and *Ramco-Gershenson*, 293 B.R. at 177–78. Transform's financial condition and operating performance were expressly found not to be "similar" to that of Sears in 1991.

Nonetheless, the Bankruptcy Court determined that the provision allowing Sears to escape liability under the Lease if it assigned to an entity with equity of $50 million gave MOAC protection that was effectively equivalent to what Congress had mandated. But that is simply not the case. Article XXV(D)(4)(a) of the REA, the provision that the Bankruptcy Court substituted for § 365(b)(3)(A), addresses only what it would take to absolve Sears of liability for an assignment outside of bankruptcy. In bankruptcy, which is where we are, Sears will be absolved of liability under the Lease whether the Lease is assigned to an entity with $50 million in net worth

---

25 The landlord certainly does not want to replace Sears with a tenant similar Sears as it has been in recent years According to MOAC, Sears had become a liability to the mall in the years immediately preceding its bankruptcy: "In the past several years, Sears has become a liability to the Mall, has ceased being able to drive traffic, has ceased being able to operate in a high manner, and has ceased in its ability to contribute to the Mall or add positively to its brand and tenant mix or image throughout the country and the world." (Ghermezian Decl. ¶ 10, APX 1840).

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 41 of 43

or not. Nothing in the Lease or the REA suggests that the provision cited by the bankruptcy judge would or should apply in the context of a bankruptcy proceeding.

There is good reason why this is so. As Judge Drain found, having $50 million in equity is not the same thing as having a financial condition and operating performance similar to that of Sears in 1991. It might be enough to give adequate assurance of future performance under the lesser standard of § 365(f)(2)(B) that applies outside the shopping center context; indeed, I would argue that that is precisely where the $50 million in equity provision of the REA would come into play were Sears located anywhere but a mall. But it does not satisfy the more stringent requirements of § 365(b)(3)(A). That differs substantially from how a "use clause" or restriction on assignment addresses the landlord's ability to control the look and feel of its property – or why the absence of such clauses (as is the case here) might preclude the landlord's ability to control the re-letting of a debtor's premises in bankruptcy under the "tenant mix" standard articulated in *In re Ames*.[26]

In relying on *Ames* to hold that the $50 million in equity standard could be substituted for the "similar . . . financial condition and operating performance" standard of subsection (A) went far beyond what any court identified above as "controlling precedent" has ever done. With all respect to the learned bankruptcy judge, I do not see how his conclusion can possibly be correct. *In re Ames* does not offer a way around the congressionally-mandated standard for providing adequate financial assurance of future lease performance.

Like Judge Drain, I freely admit that I might be wrong. This is a difficult question, and making a decision has not been helped by knowing that Congress could not possibly have had an

---

26 The other condition in the "get out from under" clause in the REA – that the assignee sign an undertaking agreeing to be bound by all the terms of the REA – was satisfied by Transform and meets yet another of the requirements of § 365(b)(3), this one found in subsection (C) of that statute. That section is not implicated by this appeal.

extraordinary lease like the Sears Lease in mind when it passed § 365(b)(3). I admit to having gone back and forth several times.

But if I am wrong, and the learned bankruptcy judge was right in concluding that the $50 million "get out from under" clause in the REA satisfies the mandate of § 365(b)(3)(A), then the order of the Bankruptcy Court would still need to be vacated, and the case must be remanded to the Bankruptcy Court for further findings.

Judge Drain found that it was "highly likely" that Transform had in excess of $50 million in equity. But "highly likely" doesn't cut it. Either Transform meets the standard in the Lease/REA or it does not. There has to be a finding, one way or the other, and that finding has to be supported by substantial evidence.

Unfortunately, the bankruptcy judge does not cite in his opinion to any evidence that supports his conclusion. His "finding" rests on his expressed belief that Transform would not have been able to obtain financing if it did not have at least $50 million in equity. The learned bankruptcy judge has seen far more of these situations than I have, and I do not question his expertise. But in an era when venture capitalists throw untold amounts of money at ideas that are not backed by anything like $50 million (or even $1 million) in equity, I perceive no justification for this wholly conclusory supposition. Had Judge Drain pointed to anything in Transform's financials that proved this point, it would be another matter entirely – but he did not.

Case 7:19-cv-09140-CM Document 26 Filed 02/27/20 Page 43 of 43

**Conclusion**

For the reasons stated, the order of the Bankruptcy Court (*In re Sears Holdings Corporation, et al.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Sept. 5, 2019), Dkt. No. 5074) is VACATED to the extent it approved the assumption and assignment of the Sears Lease (the "Designated Lease") to Transform and REMANDED to the Bankruptcy Court for further proceedings not inconsistent with this opinion.[27]

This constitutes the decision and order of the court. It is a written opinion. The Clerk of Court is respectfully directed to close this matter on the court's docket.

Dated: February 27, 2020
New York, New York

Chief Judge

BY ECF TO ALL PARTIES

[27] The order appealed from grants additional relief, not all of which appears to be related to the now-overturned assignment, but which may be – hence the remand.