**MORRISON & FOERSTER LLP**
Jennifer L. Marines, Esq.
Benjamin W. Butterfield, Esq.
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jmarines@mofo.com
bbutterfield@mofo.com

*Counsel to Icon Health & Fitness, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION**, *et al.*,[1] | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

----------------------------------------------------------------x

**RESPONSE OF ICON HEALTH & FITNESS, INC. TO DEBTORS'**
**ELEVENTH OMNIBUS OBJECTION TO PROOFS OF CLAIM**
**(TO RECLASSIFY OR DISALLOW CERTAIN CLAIMS)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR-Rover De Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## TABLE OF CONTENTS

Introduction ................................................................................................................. 1

The Icon Claims ........................................................................................................... 3

Relevant Statutory Context ......................................................................................... 4

    A.    The Uniform Commercial Code. ........................................................... 4

    B.    Section 546(c) As Enacted in 1978. ..................................................... 5

    C.    Problems with Section 546(c) Before BAPCPA. .................................. 7

    D.    BAPCPA Amends Section 546(c) and Enacts Section 503(b)(9). ......... 8

    E.    Sections 546(c) and 503(b)(9) as Presently Enacted. ........................... 9

Response to Objection ............................................................................................... 10

I.    Under Well-Established Principles of Statutory Interpretation, the Term "Received" Requires Physical Possession. ........................................................................... 10

    A.    The Definition of "Received" in Black's Law Dictionary Requires Physical Possession by the Debtor. ..................................................... 10

    B.    In Light of its Well-Known Meaning, Congress is Presumed to Have Intended "Received" to Require Physical Possession. ........................... 11

    C.    The Statutory and Historical Context of Section 503(b)(9) Confirms that "Received" is Predicated on Physical Possession. ................................. 12

    D.    The Debtors' Contrary Statutory Interpretation Arguments Are Without Merit. . 13

        1.    The *Howard* Principle Does Not Support the Debtors' Interpretation. .... 13

        2.    The Debtors' Reliance on the CISG is Misplaced. ................................. 15

II.    Precedent Strongly Supports Icon's Interpretation. ........................................... 17

    A.    Virtually Every Court to Have Addressed The Issue Agrees with Icon ............... 17

    B.    The Reversed Lower Court Decisions in *World Imports I* and *World Imports II* Are Unpersuasive and Should Be Rejected ........................................ 19

III.    Using Date of Physical Possession by the Debtor as the Date of Receipt Is the Only Interpretation that Preserves the Protections and Purposes of Section 503(b)(9). ............ 23

Reservation of Rights ................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ADI Liquidation, Inc*.,
    572 B.R. 543 (Bankr. D. Del. 2017) ....................................................................14

*In re ADI Liquidation, Inc*.,
    No. BR 14-12092 (KJC), 2019 WL 211528 (D. Del. Jan. 16, 2019) .....................18

*In re Arlco, Inc*.,
    239 B.R. 261 (Bankr. S.D.N.Y. 1999) ...................................................................4

*Matter of Brio Petrol., Inc*.,
    800 F.2d 469 (5th Cir. 1986) ................................................................................5

*Cargill, Inc. v. Trico Steel Co. LLC* (*In re Trico Steel Co. LLC*),
    282 B.R. 318 (Bankr. D. Del. 2002), *affirmed by Trico Steel Co. v. Cargill*
    *Inc. (In re Trico Steel Co. LLC*), 302 B.R. 489 (D. Del. 2003) .............................24

*In re Circuit City Stores, Inc.*,
    432 B.R. 225 (Bankr. E.D. Va. 2010)................................................12, 19, 20, 21

*In re Contract Interiors, Inc.*,
    14 B.R. 670 (Bankr. E.D. Mich. 1981) ..................................................................8

*In re Dana Corp*.,
    367 B.R. 409 (Bankr. S.D.N.Y. 2007)..................................................................12

*In re Erving Indus., Inc.*,
    432 B.R. 354 (Bankr. D. Mass. 2010) ..................................................................14

*In re Fabric Buys*,
    34 B.R. 471 (Bankr. S.D.N.Y. 1983).....................................................................5

*Matter of Flagstaff Foodservice Corp*.,
    14 B.R. 462 (Bankr. S.D.N.Y. 1981).....................................................................13

*In re Flagstaff Foodservice Corp.*,
    56 B.R. 910 (Bankr. S.D.N.Y. 1986)................................................................7, 11

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co*.,
    547 U.S. 651 (2006)..............................................................................................2

*In re L.T.S., Inc.*,
    32 B.R. 907 (Bankr. D. Idaho 1983).......................................................................8

*In re Maloney Enters., Inc.*,
    37 B.R. 290 (Bankr. E.D. Ky. 1983)................................................................6

*Matter of Marin Motor Oil, Inc.*,
    740 F.2d 220 (3d Cir. 1984).................................................5, 6, 7, 13

*McCullen v. Coakley*,
    573 U.S. 464 (2014).......................................................................10

*In re Momenta, Inc.*,
    455 B.R. 353 (Bankr. D.N.H. 2011) ...............................................18

*In re Nat'l Sugar Ref. Co.*,
    27 B.R. 565 (S.D.N.Y. 1983).......................................................21, 24

*Ningbo Chenglu Paper Prod. Mfg. Co. v. Momenta, Inc.*,
    No. 11-CV-479-SM, 2012 WL 3765171 (D.N.H. Aug. 29, 2012)....................14, 18

*In re O.W. Bunker Holding N. Am. Inc.*,
    607 B.R. 32 (Bankr. D. Conn. 2019) ...............................................14, 18

*Perrin v. United States*,
    444 U.S. 37 (1979).......................................................................10

*Price v. Marathon Oil, Inc.*,
    1986 WL 808 (Ohio App.1986) *rev'd in part on other grounds*, 32 Ohio St.3d
    397, 513 N.E.2d 776 (1987).......................................................21

*In re Pridgen*,
    No. 007-04531-8-RDD, 2008 WL 1836950 (Bankr. E.D.N.C. Apr. 22, 2008) .....................19

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997).......................................................................12, 23

*Smith v. United States*,
    508 U.S. 223 (1993).......................................................................10

*In re SRC Liquidation, LLC*,
    573 B.R. 537 (Bankr. D. Del. 2017) ...............................................5, 14, 18

*St. Pierre v. North East Ins. Co.*,
    471 A.2d 1049 (Me. 1984)...............................................................21

*Standard Oil Co. of N.J. v. United States*,
    221 U.S. 1 (1911)...........................................................................11

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988).......................................................................13

iii

*In re VPH Pharmacy, Inc.*,
    578 B.R. 776 (Bankr. E.D. Mich. 2017) ...................................................................18

*In re Wezbra Dairy, LLC*,
    493 B.R. 768 (Bankr. N.D. Ind. 2013) ...............................................................18, 21

*In re World Imports, Ltd.*,
    511 B.R. 738 (Bankr. E.D. Pa. 2014) , *aff'd In re World Imports, Ltd.*, 549
    B.R. 820 (E.D. Pa. 2016), *rev'd and remanded In re World Imports, Ltd.*, 862
    F.3d 338 (3d Cir. 2017) ............................................................................... *passim*

*In re World Imports, Ltd.*,
    549 B.R. 820 (E.D. Pa. 2016), *rev'd and remanded In re World Imports, Ltd.*,
    862 F.3d 338 (3d Cir. 2017) ........................................................................ *passim*

*In re World Imports, Ltd.*,
    862 F.3d 338 (3d Cir. 2017) ........................................................................ *passim*

*Zarda v. Altitude Express, Inc.*,
    883 F.3d 100 (2d Cir. 2018) ...............................................................................15

**Statutes**

11 U.S.C. § 546(c) (as of Nov. 6, 1978) ......................................................... *passim*

11 U.S.C. § 546(c)(1) (as of Oct. 22, 1994) .................................................... 6, 7, 8

11 U.S.C. § 546(c)(2) (as of Nov. 6, 1978) ....................................................... 6, 12

11 U.S.C. § 546(c)(2)(A) (as of Nov. 6, 1978) .......................................................7

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005
    ("BAPCPA") ..................................................................................... *passim*

Bankruptcy Code section 503(b)(9) .............................................................. *passim*

Bankruptcy Reform Act of 1978 .............................................................................6

Bankruptcy Reform Act of 1994 .............................................................................8

UCC § 2-702 ....................................................................................................4, 23

UCC § 2-705 .........................................................................................4, 5, 23, 24

UCC § 2-103 ....................................................................................................4, 11

**Other Authorities**

Black's Law Dictionary (8th ed. 2004) ...................................................................11

George V. Philippopoulos, *Awareness of the CISG Among American Attorneys*, 40 No. 3 UCC L. J. ART 4 (Winter 2008)..............................................................................16

William C. Hillman, *Unpaid Seller's Rights in the United States: A Parallel to Germany's Eigentumsvorbehalt* 1 Int'l Bus. Law. 43 (1973)................................................4, 5

Weil Bankruptcy Blog, *A Spoonful of Sugar Helps the [UCC] Remedy Go Down: Recognition of Stoppage Rights in the Early Years of the Bankruptcy Code* ...................25 n.6

v

**TO THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE:**

Icon Health & Fitness, Inc. ("Icon"), by its undersigned counsel, hereby submits this

response (the "Response") to the *Debtors' Eleventh Omnibus Objection to Proofs of Claim (To*

*Reclassify or Disallow Certain Claims)* (the "Objection")[2] [Docket No. 7213] dated as of

February 11, 2020.  In support of this Response, Icon respectfully states as follows:

### Introduction

1.        Icon is owed no less than $10,258,878.08 as an administrative expense under

section 503(b)(9) of the Bankruptcy Code for the value of premium fitness equipment received

by the Debtors in the ordinary course during the 20 days prior to the commencement of their

chapter 11 cases.  Of that amount, the Debtors assert that $8,489,831.08 should be reclassified as

a general unsecured claim and should not be afforded administrative expense priority under the

Bankruptcy Code.

2.        The dispute centers on the meaning of the phrase "received by the debtor" as it is

used in section 503(b)(9) of the Bankruptcy Code.  For the reasons set forth herein, Icon asserts

that "receipt" does not occur until after the seller's ability to stop delivery ends—namely, upon

the buyer's physical possession." *In re World Imports, Ltd*., 862 F.3d 338, 345 (3d Cir. 2017)

("*World Imports III*").  This interpretation is not only consistent with the ordinary meaning of

"received" and the definition of "receipt" in the Uniform Commercial Code (the "UCC"), but it

is also supported by the statutory context in which Congress enacted section 503(b)(9).  With the

exception of the lower court decisions reversed by the Third Circuit in *World Imports III*, every

---

[2]  Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to such terms in the Objection.

ny-1873648

court that has interpreted "received" in the context of section 503(b)(9) has reached the same conclusion.

3.    The Debtors, on the other hand, argue that the Court should interpret "received" by reference to international commercial terms (the "Incoterms") published by the International Commerce Commission and updated periodically in response to changing trade practices.[3]  The Incoterms do not actually define "received," but the Debtors insist that the term "received" "is equivalent" to the term "delivery," which is used (but also not defined) in the Incoterm definition of "free on board."  The Debtors ascribe to the Incoterms the force of federal law, although the Incoterms are not expressly referenced in the Convention on Contracts for the Sale of International Goods (the "CISG"), the federal treaty on which the Debtors rely.  Ultimately, the Debtors incorrectly conclude that Icon's goods were received by the Debtors when Icon delivered them "free on board"—*i.e.*, when title and risk of loss passed.

4.    In addition to the "plain meaning" of the statute, Icon's position that "received" means physical possession for the purposes of section 503(b)(9) is also supported by the explicit statutory rights of vendors under the UCC and CISG.  Both the UCC and the CISG permit a seller of goods to stop a shipment of goods to an insolvent buyer, unless the buyer is able to provide adequate assurance of payment for those goods.  This right survives the filing of a chapter 11 petition—*i.e.*, notwithstanding the automatic stay, a vendor may recall goods so long as the debtor is not in physical receipt of them.

5.    The Debtors' suggestion that a vendor's section 503(b)(9) priority should be tied to a point in time before the Debtor takes physical possession of goods dilutes the protections

---

[3]  The Incoterms were amended in 1936, 1953, 1967, 1974, 1980, 1990, 2000, 2010, and 2019.  *See* www.iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-history/.

ny-1873648

and purpose of section 503(b)(9).  From the point of "free on board" shipment until the time of physical possession, a vendor is protected against the credit risk of an insolvent buyer by the stoppage rights afforded it under the UCC and CISG, regardless of whether or not a bankruptcy filing has occurred.  For 503(b)(9) priority protections to be triggered at the point of shipment would render those protections redundant.  It is at the point of physical possession—when a vendor's non-bankruptcy remedies are exhausted—that a vendor most requires assurance of payment under the Bankruptcy Code to induce performance.

6.      For these reasons, and for the other reasons set forth herein, Icon's claims should be accorded administrative expense status under section 503(b)(9), and the Objection should be denied.

## The Icon Claims

7.      Icon is a leading manufacturer of premium fitness equipment, including brands such as NordicTrack and ProForm.  Before the Petition Date, the Claimant supplied treadmills, stationary bicycles, and ellipticals, among other things, to the Debtors in the ordinary course of the Debtors' business.

8.      On March 22, 2019, Icon timely filed two proofs of claim against the Debtors pursuant to section 503(b)(9) of the Bankruptcy Code:  Claim No. 11857 against Sears, Roebuck and Co. in the amount of $10,225,919.10 and Claim No. 11860 against Kmart Corporation in the amount of $32,958.98 (together, the "Icon Claims").  The Icon Claims are for the value of goods sold in the ordinary course and received into the possession of the Debtors during the 20 days before the commencement of their chapter 11 cases.

9.      On February 11, 2020, the Debtors filed the Objection seeking to reclassify as general unsecured claims $8,489,831.08 of the Icon Claims, which is the portion of the Icon

Claims that the Debtors assert relates to goods delivered by Icon "free on board" more than

20 days before the Debtors' petition date.

**Relevant Statutory Context**

**A.      The Uniform Commercial Code.**

10.      The UCC is a codification and modernization of commercial law promulgated by

the National Conference of Commissioners on Uniform State Laws.  The UCC was adopted by

all of the states in the United States, except Louisiana, before the enactment of the Bankruptcy

Code.  *See* William C. Hillman, *Unpaid Seller's Rights in the United States: A Parallel to*

*Germany's Eigentumsvorbehalt*, 1 Int'l Bus. Law. 43 (1973).  Despite its local variations, the

UCC is the commercial law of the United States.  *See id*.

**1.      Definition of "Receipt" Under the UCC.**

11.      The UCC defines "receipt" with respect to goods as "taking physical possession

of them."  UCC § 2-103(1)(c).

**2.      Stoppage and Reclamation Rights Under the UCC.**

12.      Article 2 of the UCC provides an unpaid seller with two different methods for

recovering its goods from an insolvent buyer.  Under Section 2-702, a seller may reclaim goods

from a buyer if (a) the seller discovers that the goods were received by the buyer while insolvent,

and (b) a demand for return is made within ten days after receipt.  *See* UCC § 2-702(2).  The

ten day requirement is waived if the buyer misstated its solvency to the seller within three

months before delivery.  *See id*.  A seller's reclamation rights are subject to the rights of a buyer

in the ordinary course or other good faith purchaser, including a secured party.  *See* UCC § 2-

702(3); *see also In re Arlco, Inc*., 239 B.R. 261, 268 (Bankr. S.D.N.Y. 1999).

13.      Under Section 2-705, a seller may stop delivery of goods in the possession of a

common carrier or other bailee when the seller discovers that the buyer is insolvent.  *See* UCC

4

§ 2-705(1).  The right of stoppage is restricted to goods *en route* to, but not yet in the physical

possession of, the buyer.  *See Hillman* at 43.  To stop delivery, the seller must notify the bailee

so as to enable it, by reasonable diligence, to prevent delivery of the goods.  *See* UCC

§ 2-705(3)(a).  After such notification, the bailee must hold and deliver the goods according to

the directions of the seller, but the seller is liable to the bailee for any ensuing charges or

damages.  *See* UCC § 2-705(3)(b).

14.    Critically, the UCC remedies of reclamation and stoppage are tied to physical

possession, not transfer of title or risk of loss.  *See In re SRC Liquidation, LLC*, 573 B.R. 537,

542 (Bankr. D. Del. 2017) ("[T]he U.C.C. does not rely on the concept of title[;] . . . possession

is the key.").  Under the UCC, a seller has the right to stop delivery of goods until a buyer takes

physical possession of them.  *See Matter of Brio Petrol., Inc*., 800 F.2d 469, 472 (5th Cir. 1986)

("[A] seller's right to stop goods in transit may continue after delivery and until the buyer is in

actual, physical or constructive possession of them.").

15.    It is only after the goods are in the physical possession of the buyer that a seller

must rely on its right to reclamation.  *See Matter of Marin Motor Oil, Inc*., 740 F.2d 220, 225 (3d

Cir. 1984) ("This right to stop delivery applies regardless of which party bears the risk of loss,

and regardless of which party is deemed to have 'title' to the goods while they are in the carrier's

possession.  Moreover, under the U.C.C., the right of reclamation—a different right than the

right to stop goods in transit—takes effect when the buyer 'receives' the goods."); *In re Fabric

Buys*, 34 B.R. 471, 475 (Bankr. S.D.N.Y. 1983) ("stoppage in transit is essentially the

reclamation right exercised at an earlier stage").

**B.    Section 546(c) as Enacted in 1978.**

16.    Congress enacted the original version of Section 546(c) as part of the  Bankruptcy

Reform Act of 1978 in order to resolve the question of whether reclamation under UCC

5

Section 2-702(2) is available after a debtor files for bankruptcy. *See Matter of Marin Motor Oil, Inc.*, 740 F.2d at 223. Although the UCC is preempted by any contrary federal statute, the problem was that the predecessor to the Bankruptcy Code did not mention an unpaid seller's state law statutory right to reclamation, and it was therefore unclear whether, and to what extent, the right to reclamation was preempted. *See id*. The drafters of the Bankruptcy Code solved the issue by enacting section 546(c), which essentially adopted section 2-702(2) of the UCC, albeit with significantly more restrictive demand requirements discussed immediately below. *See id*; *In re Maloney Enters., Inc*., 37 B.R. 290, 292 (Bankr. E.D. Ky. 1983) ("Congress, in enacting the Bankruptcy Reform Act of 1978 and, specifically, section 546(c) thereof, intended to incorporate the Uniform Commercial Code reclamation provision into the Bankruptcy Code.").

17.    Specifically, the original version of section 546(c) permitted sellers to reclaim their goods under any existing state law that would otherwise apply "if the debtor has received such goods while insolvent." 11 U.S.C. § 546(c) (as of Nov. 6, 1978). This right to reclamation took precedence over the strong arm powers granted to a trustee under the Bankruptcy Code. *See id*. The original version of section 546(c) also required a seller to make a written demand within ten days "after receipt of such goods by the debtor," before seeking to exercise its state law reclamation rights. *See id*. at § 546(c)(1). Although a demand requirement already existed in the UCC, the original version of section 546(c) specified that the demand had to be in writing (an oral demand was sufficient under the UCC) and eliminated the UCC's waiver of demand where the buyer misstated its solvency to the seller. Finally, the statute required a court to honor a state law reclamation demand unless the court granted the seller's claim priority as an administrative expense or provided a lien on the debtor's property. *See id*. at § 546(c)(2).

6

18.     Like its parallel remedy in the UCC, the remedy of reclamation provided in

section 546(c), and the obligation to provide prior notice to the debtor, was tied to physical

possession by the debtor, not transfer of title or risk of loss.  "Receipt" within the meaning of

section 546(c) did not occur until the debtor took actual physical possession of the goods.  *See*

*Matter of Marin Motor Oil, Inc.*, 740 F.2d at 222.  And the "date that the debtor receives the

goods in its physical possession" was "the starting point" for the running of the ten-day written

demand period.  *See In re Flagstaff Foodservice Corp.*, 56 B.R. 910, 914 (Bankr. S.D.N.Y.

1986).

## C.     Problems with Section 546(c) Before BAPCPA.

19.     As noted above, the original version of section 546(c) permitted a court to deny a

seller's timely demand for reclamation "only if" the court granted "the claim of such a seller

priority as an administrative expense" or secured "such claim by lien."  *See* 11 U.S.C.

§ 546(c)(2)(A) (as of Nov. 6, 1978).  The problem was that, in order to become eligible for

priority or a lien, the seller had to comply strictly with section 546(c)(1), which required the

seller make a written demand for reclamation within ten days "after receipt of such goods by the

debtor."  *See id*. at 546(c)(1) (as of Nov. 6, 1978).

20.     Virtually every court to consider the issue held that "in the determination of

whether or not a written demand is timely, the date that the debtor receives the goods in its

physical possession is the starting point for the running of the ten-day time limit mandated by

§ 546(c)."  *In re Flagstaff Foodservice Corp*., 56 B.R. at 914; *see also Matter of Marin Motor

Oil, Inc*., 740 F.2d at 222 ("The practical significance of this dispute is that the date of 'receipt'

is established by section 546(c) as the day from which to begin counting the ten-day period

within which the seller must make a written demand for reclamation.").  A seller who failed to

make the requisite demand within statutory period was not entitled to a lien or priority, and the

7

well-established exceptions to the UCC's written notice requirement (specifically, the existence

of an oral demand or a misrepresentation of solvency by the debtor) did not apply.  *In re L.T.S.,*

*Inc.*, 32 B.R. 907, 908 (Bankr. D. Idaho 1983) ("[V]irtually every court considering the question

has concluded that . . . a written demand under [section 546(c)] is mandatory.").

21.      The result was that section 546(c) provided unpaid sellers with little to no

practical protection.  As one court observed:

> [T]o limit the right of [an unpaid] seller to recover property only if
> he complies with the conditions set forth in section 546(c), for all
> practical purposes, makes the right meaningless.  The event that
> generally triggers demand for reclamation is the filing of a petition
> in bankruptcy.  Unless the filing of the petition is preceded by
> extensive publicity, a seller will ordinarily not be able to comply
> with the conditions set forth in section 546(c).  A court, however,
> does not have the power to legislate; it must merely accept what
> the legislature has written.  It is "not at liberty to revise while
> professing to construe."

*In re Contract Interiors, Inc.*, 14 B.R. 670, 676 (Bankr. E.D. Mich. 1981).

22.      In 1994, Congress took notice and enacted the Bankruptcy Reform Act (the "1994

Reform Act").  Among other things, the 1994 Reform Act amended section 546(c) to provide

that, if the ten day period expired after a debtor's petition date, then the vendor would have an

additional ten days (for a total of twenty days following receipt of the goods by the debtor) to

make the requisite written demand upon the debtor.  *See* 11 U.S.C. § 546(c)(1) (as of Oct. 22,

1994).

**D.      BAPCPA Amends Section 546(c) and Enacts Section 503(b)(9).**

23.      Thus, as things stood at the beginning of 2005, the meaning of the term "received

by the debtor" could not have been more important.  Not only did the date of receipt start the

clock for section 546(c)'s twenty-day notice period, but the consequences of failure to make a

timely demand were draconian: no reclamation, no priority, and no lien.  This is the context in

8

ny-1873648

which Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of

2005 ("BAPCPA"), which included section 503(b)(9).

24.    With Section 1227 of BAPCPA, entitled "Reclamation," Congress appears to

have employed a three-part strategy to streamline the Bankruptcy Code's reclamation

procedures. *First*, it amended section 546(c) to expand significantly the statutory period during

which an unpaid seller could make its written demand (up to 45 days prepetition, and up to

20 days postpetition). *Second*, it eliminated the court's role in granting statutory priority or liens,

and instead enacted section 503(b)(9), which gave vendors the ability to assert administrative

claims against the estate for goods they might otherwise seek to reclaim. *Third*, it did away with

the draconian penalty (and made bankruptcy practice significantly more efficient) by permitting

sellers to assert claims for administrative priority even if they failed to make a timely demand for

reclamation.

**E.    Sections 546(c) and 503(b)(9) as Presently Enacted.**

25.    The text of sections 546(c) and 503(b)(9) have not been amended since the

enactment of BAPCPA. Section 546(c) provides as follows:

> (c)(1) Except as provided in subsection (d) of this section and in
> section 507(c), and subject to the prior rights of a holder of a
> security interest in such goods or the proceeds thereof, the rights
> and powers of the trustee under sections 544(a), 545, 547, and 549
> are subject to the right of a seller of goods that has sold goods to
> the debtor, in the ordinary course of such seller's business, to
> reclaim such goods if the debtor has received such goods while
> insolvent, within 45 days before the date of the commencement of
> a case under this title, but such seller may not reclaim such goods
> unless such seller demands in writing reclamation of such goods—
>
>> (A) not later than 45 days after the date of receipt of such
>> goods by the debtor; or
>>
>> (B) not later than 20 days after the date of commencement
>> of the case, if the 45-day period expires after the
>> commencement of the case.

(2) If a seller of goods fails to provide notice in the manner
described in paragraph (1), the seller still may assert the rights
contained in section 503(b)(9).

11 U.S.C. § 546(c).

26.    Section 503(b)(9) provides as follows:

(b) After notice and a hearing, there shall be allowed,
administrative expenses, other than claims allowed under section
502(f) of this title, including— . . . (9) the value of any goods
received by the debtor within 20 days before the date of
commencement of a case under this title in which the goods have
been sold to the debtor in the ordinary course of such debtor's
business.

11 U.S.C. § 503(b)(9).

## **Response to Objection**

### I.    **Under Well-Established Principles of Statutory Interpretation, the Term "Received" Requires Physical Possession.**

27.    Section 503(b)(9) of the Bankruptcy Code grants administrative expense priority treatment to claims for "the value of any goods **received by the debtor** within 20 days before the date of commencement of a case." 11 U.S.C. § 503(b)(9) (emphasis added). The Bankruptcy Code does not define the term "received." However, as discussed below, under well-established principles of statutory interpretation, it is clear that the term "received" requires physical possession by the debtor.

### A.    **The Definition of "Received" in Black's Law Dictionary Requires Physical Possession by the Debtor.**

28.    "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). When determining the ordinary or natural meaning of a word, a court should start with the dictionary definition. *See, e.g., McCullen v. Coakley*, 573 U.S. 464 (2014). The relevant dictionary is the one in existence "at the time Congress enacted the statute." *See Perrin v. United States*, 444 U.S.

10

37, 42 (1979).  In 2005, when Congress enacted BAPCPA, Black's Law Dictionary defined

"receipt of goods" as "[t]aking physical possession of goods."  *See* Black's Law Dictionary

(8th ed. 2004).  There was no secondary definition.  Thus, Icon's proposed interpretation of

"received," which requires physical possession, is the ordinary and natural meaning of the word.

**B.**      **In Light of its Well-Known Meaning, Congress is Presumed to Have Intended "Received" to Require Physical Possession.**

29.      Icon's proposed interpretation is also consistent with the definition of "received"

and "receipt" in the Bankruptcy Code and in Article 2 of the UCC, respectively.  The Supreme

Court has held that "where words are employed in a statute which had at the time a well-known

meaning at common law or in the law of this country, they are presumed to have been used in

that sense."  *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911); *see also* UCC

§ 2-103(1)(a) ("'Receipt' of goods means taking physical possession of them.").

30.      As discussed above, immediately before the enactment of BAPCPA in 2005, the

meaning of the term "received by the debtor" was well known and important.  The date of receipt

started the clock for the twenty-day notice period, and an unpaid seller that failed to make a

timely demand forfeited its priority and security under section 546(c)(2)(A).  Moreover, virtually

every court to consider the meaning of "receipt" for the purposes of section 546(c) found that the

term referred to "the date that the debtor receives the goods in its physical possession."  *In re

Flagstaff Foodservice Corp.*, 56 B.R. at 914.  Thus, when Congress decided to amend section

546(c) and enact section 503(b)(9) in the same provision of BAPCPA, it is presumed have

intended for the term "received" to have the same meaning.

31.      Likewise, at the time Congress enacted BAPCPA, the UCC governed sales of

goods in 49 states.  *See In re World Imports, Ltd.*, 862 F.3d 338, 342 (3d Cir. 2017) (citations

omitted).  Because the UCC defined "receipt" of goods as "taking physical possession of them,"

11

Congress is presumed to have used those words in that sense.  *See In re Circuit City Stores, Inc.*, 432 B.R. 225, 230 (Bankr. E.D. Va. 2010) (finding near-unanimous adoption of the UCC may have informed Congress's intended definition of the term "received").

32.    Thus, Icon's proposed interpretation of "received" is consistent with the well-established meaning of the word in the Bankruptcy Code and the UCC, and is therefore presumed to be what Congress intended.

### C.    The Statutory and Historical Context of Section 503(b)(9) Confirms that "Received" is Predicated on Physical Possession.

33.    The statutory and historical context of section 503(b)(9) provides further evidence that the phrase "received by the debtor" refers to when the debtor obtains physical possession of the goods.  The Supreme Court has observed that, if the ordinary or well-known meaning of statutory language is not determinative, then the "plainness or ambiguity" of that language is determined by reference to "the specific context in which that language is used, and the broader context of the statute as a whole."  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Moreover, in the bankruptcy context, Congress "does not write 'on a clean slate,'" and courts are "reluctant to accept arguments that would interpret the [Bankruptcy] Code . . . to effect a major change in . . . practice that is not the subject of at least some discussion in the legislative history."  *In re Dana Corp.*, 367 B.R. 409, 417 (Bankr. S.D.N.Y. 2007) (citations and quotation marks omitted).

34.    Here, the statutory and historical context shows that section 503(b)(9) continues the Bankruptcy Code's long-standing practice of granting priority to unpaid sellers for the value of goods that come into the debtor's physical possession in the run up to bankruptcy.  The initial version of section 546(c) allowed courts to deny an unpaid seller's reclamation demand, so long as the court provided the seller with priority or security.  *See* 11 U.S.C. § 546(c)(2) (as of Nov. 6,

12

1978).  Courts determined the amount of the priority by reference to goods in the debtor's

physical possession, since only goods in a debtor's physical possession are subject to reclamation

by an unpaid seller.  *See, e.g., Matter of Flagstaff Foodservice Corp.*, 14 B.R. 462, 469 (Bankr.

S.D.N.Y. 1981) ("Judgment is rendered for the plaintiff to the extent its goods were in the

debtor's possession on the filing date."); *Matter of Marin Motor Oil, Inc.*, 740 F.2d at 225

("[T]he right of reclamation—a different right than the right to stop goods in transit—takes effect

when the buyer 'receives' the goods.").

35.     Simply put, under both the old section 546(c)(2) and the new section 503(b)(9),

the amount of a vendor's priority claim is linked to the value of goods in the debtor's physical

possession.  "A provision that may seem ambiguous in isolation is often clarified by the

remainder of the statutory scheme-because the same terminology is used elsewhere in a context

that makes its meaning clear . . . ."  *United Sav. Ass'n of Texas v. Timbers of Inwood Forest*

*Assocs., Ltd.*, 484 U.S. 365, 371 (1988).  Accordingly, it is only logical that the meaning of the

phrase "received by the debtor" should be consistent in both statutes.

> **D.    The Debtors' Contrary Statutory Interpretation Arguments Are Without Merit.**

> **1.    The *Howard* Principle Does Not Support the Debtors' Interpretation.**

36.     Rather than address the ordinary meaning of "received," the Debtors argue that

"received" must be interpreted to mean the date when risk of loss is transferred under the canon

of construction that the priorities afforded in the Bankruptcy Code should be construed narrowly.

*See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651 (2006).  That is wrong for

two independent reasons.

37.     First, the *Howard* canon only applies when a statutory term is truly ambiguous.

A "[c]ourt should not find an ambiguity where there is none or make policy decisions to limit the

application of Bankruptcy Code provisions [under the *Howard* principle] when the language of the statute is otherwise clear." *See, e.g., In re Erving Indus., Inc.*, 432 B.R. 354, 374 (Bankr. D. Mass. 2010). Here, because the term "received" unambiguously refers to physical possession, the *Howard* canon does not apply.

38.    Second, the *Howard* cannon also does not support the Debtors' interpretation because that interpretation is not "narrower" than Icon's. Under the *Howard* cannon, when two interpretations of an ambiguous statutory term governing priorities are equally plausible, the narrower interpretation is preferred. But the Debtor's interpretation of "received" as when risk of loss is transferred is not narrower than Icon's interpretation of "received" as when physical possession is obtained; the two interpretation are just different.

39.    In fact, in a number of recent decisions involving the interpretation of "receipt," the *debtor* (or its successor) successfully argued for a possession requirement because it would prevent claims for "drop ship" goods from obtaining priority, and was therefore the *narrower interpretation* of section 503(b)(9):

- *In re O.W. Bunker Holding N. Am. Inc.*, 607 B.R. 32, 38-39 (Bankr. D. Conn. 2019) ("The phrase 'received by the debtor' as used in Section 503(b)(9) means: possessed by the debtor, either actually or constructively.");

- *In re SRC Liquidation, LLC*, 573 B.R. at 542 ("The Debtor never physically possessed the goods. Only [the common carrier] possessed the goods, and [the common carrier] does not qualify as an agent. The goods were never received by the Debtor from IIMAK within the meaning of section 503(b)(9).");

- *In re ADI Liquidation, Inc.*, 572 B.R. 543, 550-51 (Bankr. D. Del. 2017) ("In its Objection, [the debtor] argues that BBU's Administrative Priority Claim must be denied, *inter alia*, because [the debtor] never received . . . the goods sent by BBU to [the debtor's] Customers."); and

- *Ningbo Chenglu Paper Prod. Mfg. Co. v. Momenta, Inc.*, No. 11-CV-479-SM, 2012 WL 3765171, at *6 (D.N.H. Aug. 29, 2012) ("The phrase 'received by the debtor' as used in Section 503(b)(9) means: possessed by the debtor, either actually or constructively.").

14

40.    Notably, the Debtors make this very argument (and cite to these exact same cases) in a separate omnibus objection to section 503(b)(9) claims asserted by their own "drop ship" and "marketplace" vendors.  *See Debtors' Thirteenth Omnibus Objection to Proofs of Claim (Reclassify or Disallow Claims)* ¶ 17 ("[C]laims of "drop ship" vendors . . . are not entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code because . . . . [a "drop ship"] vendor delivers goods directly to a customer without any physical or constructive possession by a debtor or its bailees."); *see also id.* at ¶¶ 17-19 (expressly citing to and relying on *O.W. Bunker*, *SRC Liquidation*, *ADI Liquidation*, and *Momenta*).

41.    Thus, even if the meaning of "received" were ambiguous (which Icon disputes), the *Howard* principle of statutory construction has no application here.

### 2.    The Debtors' Reliance on the CISG is Misplaced.

42.    The Debtors next argue that the meaning of the term "received" is ambiguous, and that the Court should therefore look to the CISG, a federal treaty, to determine its meaning.  That argument fails.

43.    To begin, the plain meaning of the term "received" in section 503(b)(9) is not ambiguous.  As described above, well-established principles of statutory interpretation all confirm that "received" refers to physical possession.  There is thus no reason for the Court to look to a separate federal treaty to resolve any ambiguity.

44.    Even if ambiguity existed, Debtors fail to explain why the Court should rely on the CISG to interpret the term "received" in section 503(b)(9) of the Bankruptcy Code.  "The presumptions that terms are used consistently and that differences in terminology denote differences in meaning have the greatest force when the terms are used in 'the same act.'"  *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 130 (2d Cir. 2018).  "By contrast, when drafting separate statutes, Congress is far less likely to use terms consistently . . . and these presumptions are

15

entitled to less force where" a party "points to terms used in different statutes passed by different Congresses in different decades." *Id.* The U.S. Senate ratified the CISG in 1986, while a different Congress enacted section 503(b)(9) almost two decades later in 2005. The Bankruptcy Code does not refer to or expressly incorporate the CISG. In short, there is no reason to believe that Congress intended the term "received" in section 503(b)(9) to be defined by anything in the CISG.

45.     It is especially unlikely that Congress intended the CISG to control the meaning of "received" in the Bankruptcy Code given that treaty's relative obscurity. The CISG is rarely used by practitioners in the United States. In fact, in a survey published by the Uniform Commercial Code Law Journal just three years after the enactment of BACPA (and more than 20 years after the enactment of the CISG), the "majority of the participants" said their practices "felt minimal to zero effect from the CISG" and most participants followed their response "with the caveat that they always choose to opt out of the CISG." *See* George V. Philippopoulos, *Awareness of the CISG Among American Attorneys*, 40 No. 3 UCC L. J. ART 4 (Winter 2008). Although it is certainly a well-intentioned experiment in international commercial law, the "CISG has not been readily accepted by United States lawyers" and "continues to suffer" from "decades" of "neglect." *See id*.

46.     What's more, the CISG does not even define the term "received." The Debtors point to two rules of construction and interpretation that are contained in the CISG, which the Debtors argue "incorporate" the Incoterms. But, even if that is true, the Incoterms also do not actually define the term "received." Undeterred, the Debtors direct the Court's attention to the Incoterm "FOB," which provides that risk of loss or damage passes to the buyer once goods are "delivered" by the seller to a common carrier.

16

47.    The Debtors' argument ultimately rests on the idea that the term "received" is equivalent to "delivery" and transfer of risk of loss.  Unfortunately, nothing in the text of the CISG or the Incoterms actually says that, so the Debtors must look elsewhere.  At the end of the day, the Debtors are forced to rely on the lower court decisions in *World Imports I*[4] and *World Imports II*[5] (discussed in further detail below), which were reversed on appeal to the Third Circuit in *World Imports III*.  And when those decisions—which provide this critical linchpin for the Debtors' entire legal argument—are examined in closer detail, the Debtors' position unravels.

## II.    Precedent Strongly Supports Icon's Interpretation.

### A.    Virtually Every Court to Have Addressed The Issue Agrees with Icon.

48.    Virtually every court to decide the meaning of "received by the debtor" for the purposes of section 503(b)(9) has concluded that "received by the debtor" requires physical possession.

49.    The leading case is the Third Circuit's decision in *World Imports III*, which is the only circuit-level decision to address the issue.  In *World Imports III*, the Third Circuit considered whether goods were "received" by the debtor under section 503(b)(9) when placed on the common carrier or when physically received by the debtor.  The Third Circuit overruled the lower court decisions in *World Imports I* and *World Imports II* and relied on ordinary meaning and the statutory context to conclude that the definition of "received" in section 503(b)(9) has the same meaning as "receipt" in the UCC and, therefore, requires physical possession by the debtor.

---

[4]  As used herein, "*World Imports I*" refers to *In re World Imports, Ltd.*, 511 B.R. 738 (Bankr. E.D. Pa. 2014), aff'd *In re World Imports, Ltd.*, 549 B.R. 820 (E.D. Pa. 2016), rev'd and remanded *In re World Imports, Ltd.*, 862 F.3d 338 (3d Cir. 2017).

[5]  As used herein, "*World Imports II*" refers to *In re World Imports, Ltd.*, 549 B.R. 820 (E.D. Pa. 2016), rev'd and remanded *In re World Imports, Ltd.*, 862 F.3d 338 (3d Cir. 2017).

ny-1873648

*See World Imports III* at 342-45 ("receipt does not occur until after the seller's ability to stop

delivery ends—namely, upon the buyer's physical possession").

50.     Every other court to consider the question has reached the same conclusion,

including the U.S. Bankruptcy Court for the District of Connecticut—the first court in the

Second Circuit to squarely address the issue. *See In re O.W. Bunker Holding N. Am. Inc.*, 607

B.R. 32 (Bankr. D. Conn. 2019) ("Possession may be actual or constructive, and occurs when the

seller can no longer stop delivery and is left only with the remedy of reclamation."); *see also In*

*re ADI Liquidation, Inc.*, No. BR 14-12092 (KJC), 2019 WL 211528, at *3 (D. Del. Jan. 16,

2019) ("receipt as used in 11 U.S.C. § 503(b)(9) requires physical possession by the buyer or his

agent") (citations omitted); *Ningbo Chenglu Paper Prod. Mfg. Co. v. Momenta, Inc.*, 2012 WL

3765171, at *6 (D.N.H. Aug. 29, 2012) ("The phrase 'received by the debtor' as used in Section

503(b)(9) means: possessed by the debtor, either actually or constructively."); *In re SRC*

*Liquidation, LLC*, 573 B.R. 537, 542 (Bankr. D. Del. 2017) ("[T]his Court finds physical

possession by the buyer or its agent, as interpreted in U.C.C. § 2-705(2), not the passing of title,

the appropriate indicator as to when the Debtor 'received' goods for purposes of section

503(b)(9)."); *In re VPH Pharmacy, Inc.*, 578 B.R. 776, 780-81 (Bankr. E.D. Mich. 2017) ("A

seller must be entitled to an administrative expense claim where a debtor received goods, by

having either physical possession or constructive possession as specified in UCC § 2-705(2),

within twenty days of the commencement of the bankruptcy case.") (citations omitted); *In re*

*Wezbra Dairy, LLC*, 493 B.R. 768, 771 (Bankr. N.D. Ind. 2013) ("Thus, the key to determining

when goods are received is possession—whether actual or constructive—not title."); *In re*

*Momenta, Inc.*, 455 B.R. 353, 360 (Bankr. D.N.H. 2011) ("A seller must be entitled to an

administrative expense claim where a debtor received goods, by having either physical

possession or constructive possession as specified in UCC § 2–705(2), within twenty days of the commencement of the bankruptcy case."); *In re Circuit City Stores, Inc.*, 432 B.R. at 230  ("The Court holds that the definition of 'received' means 'having taken into physical possession,' and that this definition should be applied as the federal definition of the term 'received' for purposes of interpreting § 503(b)(9) of the Bankruptcy Code."); *In re Pridgen*, No. 007-04531-8-RDD, 2008 WL 1836950, at *4 (Bankr. E.D.N.C. Apr. 22, 2008) ("Such facts do not support a finding that the debtors took physical possession of the gas or 'received' the gas sold within 20 days before the commencement of the case.  Therefore, [the seller] is not entitled to an administrative claim pursuant to 11 U.S.C. § 503(b)(9).").

**B.    The Reversed Lower Court Decisions in *World Imports I* and *World Imports II* Are Unpersuasive and Should Be Rejected.**

51.      The Debtors' reliance on the lower court decisions in *World Imports I* and *World Imports II* is misplaced.  Conveniently, the legal conclusion reached by those courts (and since reversed by the Third Circuit in *World Imports III*) bridges a *critical* gap in the Debtor's Objection; namely, that the term "received" (in the CISG) is equivalent to "delivery" and transfer of risk of loss (in the Incoterm FOB).  Although the Debtors urge the Court to "adopt the same logic as the bankruptcy court and the district court did in *World Imports I* and *World Imports II*, respectively," s*ee* Objection ¶ 31, those pleas should be rejected.

52.      As discussed above, the Third Circuit reversed *World Imports I* and *World Imports II* almost three years ago, and its decision in *World Imports III* aligns with all other courts to decide the issue.  Nevertheless, in light of the importance that the Debtors attribute to *World Imports I* and *World Imports II* and their admonition to this Court to "adopt the same logic," it is worth examining those now-reversed decisions in closer detail.

### 1. *World Imports I* **(Bankr. E.D. Pa 2014).**

53.    The relevant portion of *World Imports I* is quoted here in its entirety:

*Delivery and Receipt*

> While the Incoterm definition of FOB does not contain either the word "receive" or "receipt," the definition of FOB that is given aids in interpretation.  According to the definition of FOB, once the seller delivers the goods, the risk of loss or damage passes to the buyer.  **Once delivered, the goods are perforce constructively received by the Debtor**.  *See Price v. Marathon Oil, Inc.,* 1986 WL 808, at *13 (Ohio App.1986) rev'd in part on other grounds, 32 Ohio St. 3d 397, 513 N.E. 2d 776 (1987) (observing that the word deliver ordinarily connotes transfer of possession and is accomplished by any act by which the deliverer irrevocably relinquishes possession and control in such a fashion that receipt of possession by the transferee is assured); *St. Pierre v. North East Ins. Co.*, 471 A.2d 1049, 1052 (Me. 1984) (holding that corn was "received" when delivered to debtor's siloes and not upon sale to debtor's customers). *See also In re Wezbra Dairy, LLC*, 493 B.R. 768, 771 (Bkrtcy. N.D. Ind. 2013); *and see also In re Circuit City Stores, Inc.*, 432 B.R. 225, 229-230 (Bkrtcy. E.D. Va.2010) (holding that "receipt" of consigned goods occurred when goods were delivered to debtor's warehouses and not when goods were sold to debtor's customers).

*World Imports I* at 745 (emphasis supplied).

54.    *World Imports I* acknowledges the fact that the terms "receive" or "receipt" are not defined in Incoterm FOB, and that the concept of "delivery" in Incoterm FOB refers to the transfer of risk of loss, but does not provide any logical justification for why "receive" or "receipt" have the same meaning as "deliver."  As discussed below, the legal authority relied upon by *World Imports I*—two state court decision and two bankruptcy court decisions—arrive at exactly the opposite conclusion.  Therefore, the *World Imports I* decision is unpersuasive and should be rejected in its entirety.

55.    Specifically, *World Imports I* cites first to two state law decisions, both of which stand for the proposition that "delivery" is "accomplished by any act by which the deliverer

20

irrevocably relinquishes possession." *See id*. (citing to *Price v. Marathon Oil, Inc*., 1986 WL

808 (Ohio App. 1986) and *St. Pierre v. North East Ins. Co.*, 471 A.2d 1049 (Me. 1984)).  But,

this proposition cuts squarely in Icon's favor.  As discussed herein, an unpaid seller of goods can

exercise its stoppage rights (even after the buyer has filed for bankruptcy), and therefore does not

"irrevocably relinquish possession" of goods until they are in the buyer's physical possession.

*See In re Nat'l Sugar Ref. Co.*, 27 B.R. 565, 572 (S.D.N.Y. 1983).  Thus, these state court

decisions do little to support the conclusion reached by *World Imports I*—that delivery "free on

board" is equivalent to receipt.

56.    The *World Imports I* court cites next to two bankruptcy court decisions, and both

of those decisions expressly define "receipt" as physical possession, which is the exact position

taken by Icon.  *See In re Wezbra Dairy, LLC*, 493 B.R. at 771 ("Both the UCC and Ohio's

version of [the UCC] define receipt as taking physical possession of the goods.  This possession

may be actual or constructive, and occurs when the seller can no longer stop delivery and is left

only with the remedy of reclamation.  Thus, the key to determining when goods are received is

possession—whether actual or constructive—not title.") (citations and internal quotations

omitted); *In re Circuit City Stores, Inc*., 432 B.R. at 229  ("As receipt in Article 2 of the UCC

and § 546(c) is defined as taking physical possession, the Court holds that received for the

purposes of § 503(b)(9) means having taken into physical possession.") (internal quotations

omitted).

57.    To be clear, *World Imports I* relies on four court decisions—all of which either

suggest or expressly state that "receipt" means "physical possession"—to reach exactly the

contrary conclusion.  It is abundantly clear that the reasoning in *World Imports I* lacks persuasive

authority.

2.    *World Imports II* (E.D. Pa. 2016).

58.    The relevant analysis in *World Imports II* is similar to the analysis in *World Imports I* and is quoted here in its entirety:

> Though ICC's Incoterms do not explicitly define the word "receive," the definition of "FOB" or "free on board" aids in interpretation.  The term "free on board" is defined in the Incoterms as:
>
> [m]ean[ing] that the seller delivers the goods on board the vessel nominated by the buyer at the named port of shipment or procured the goods already so delivered. The risk of loss of or damage to the goods passes when the goods are on board the vessel, and the buyer bears all costs from that moment onwards.
>
> Incoterms ® 2010, 87.
>
> **In short, once the seller delivers the goods, the risk of loss or damage passes to the buyer and the goods are constructively received by the debtor**.  Therefore, the relevant date for purposes of determining whether claims are eligible for administrative expense priority is the date on which the goods were shipped.

*World Imports II* at 824 (emphasis supplied).

59.    Although the Debtors urge the Court to adopt the "logic and reasoning" of the court in *World Imports II*, there is nothing to adopt.  Without citing to any legal authority, *World Imports II* simply asserts that "constructive" receipt means delivery because that is when the risk of loss "passes to the buyer." *Id.*  The conclusion does not logically follow.  And adding the word "constructive" does not somehow transform the meaning of "received" into "delivered."

60.    Ultimately, the Debtors are unable to bridge the gap between the word "received" in the CISG and the use of the word "delivery" in Incoterm FOB.  The CISG and the Incoterms *do not say* these terms are equivalent.  And the caselaw on which the Debtors rely for this critical proposition is unpersuasive.

22

III.    **Using Date of Physical Possession by the Debtor as the Date of Receipt Is the Only Interpretation that Preserves the Protections and Purposes of Section 503(b)(9).**

61.    As set forth above, the definition of "received" proposed by Icon is the ordinary and natural use of the term, comports with the understanding of Congress at the time it enacted BAPCPA, and fits squarely within the overall statutory scheme.  Thus, under well-established Supreme Court precedent, the inquiry into statutory interpretation must cease.  *See Robinson v. Shell Oil Co*., 519 U.S. at 340 (citations omitted) (the inquiry into statutory interpretation "must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.") (internal quotation marks omitted).  That being said, the express statutory rights of unpaid sellers under the UCC and CISG, as well as the intent and purpose of section 503(b)(9) to encourage parties to continue to do business with prepetition debtors, also support the conclusion that "receipt" means physical possession of goods by the debtor.

62.    Both the UCC and the CISG permit a seller of goods to stop a shipment of goods to an insolvent (real or perceived) buyer, unless the buyer is able to provide adequate assurance of payment for those goods.  *See* U.C.C. § 2-702(1) ("Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this Article (Section 2-705)."); U.C.C. § 2-705(1) ("The seller may stop delivery of goods in the possession of a carrier . . . when he discovers the buyer to be insolvent."); *see also CISG*, Art. 71 ("If the seller has already dispatched the goods before [the buyer's insolvency becomes] evident, he may prevent the handing over of the goods to the buyer even though the buyer holds a document which entitles him to obtain them.").

63.    Notably, the United States District Court for the Southern District of New York held in *In re National Sugar Refining Company* that this right of stoppage survives the filing of a

chapter 11 petition—*i.e.*, notwithstanding the automatic stay, a vendor may recall goods so long

as the debtor is not in physical receipt of them. *See, e.g., In re Nat'l Sugar Ref. Co.*, 27 B.R. at

572 ("We are of the opinion, however, that [the vendor] was not required under Code § 362(a) to

seek relief from the stay prior to exercising its right of stoppage."); *see also Cargill, Inc. v. Trico

Steel Co. LLC* (*In re Trico Steel Co. LLC*), 282 B.R. 318, 325 (Bankr. D. Del. 2002), *affirmed by

Trico Steel Co. v. Cargill Inc. (In re Trico Steel Co. LLC*), 302 B.R. 489 (D. Del. 2003) (holding

that a vendor's exercise of its stoppage rights was appropriate even though exercised

postpetition).

64.    The Debtors' suggestion that a vendor's section 503(b)(9) protections should be

tied to a point in time before a debtor takes physical possession of goods dilutes the protections

and purpose of section 503(b)(9).  From the point of FOB shipment until the time of physical

possession, a vendor's stoppage rights protect against an insolvent buyer, regardless of whether

or not a bankruptcy filing has occurred.  For section 503(b)(9) priority protections to be triggered

at the point of shipment would render those protections redundant.

65.    It is at the point when physical possession by an insolvent buyer occurs—whether

in or out of bankruptcy—that a vendor loses its stoppage rights under the UCC and the CISG.

*See* U.C.C. § 2-705(2)(b) (The right to stop delivery of goods is cut off by "receipt of the goods

by the buyer"); CISG, Art. 71 (the right to stop delivery is cut off by "the handing over of the

goods to the buyer").  It is also at the point of physical possession that an all-asset lien of a

secured lender will attach to the goods, making a vendor's right under section 546(c) to demand

reclamation largely meaningless.  Thus, it is at the point of physical possession—when a

vendor's self-help remedies are effectively exhausted—that a vendor most requires assurance of

payment under the Bankruptcy Code to induce performance.

66.    The Debtors' argument that a vendor makes its credit decision at the point of FOB shipment is therefore incorrect, or at least incomplete.  A vendor's decision to *initiate* the shipment of goods to an insolvent customer is informed both by the customer's creditworthiness and also by the vendor's explicit right to recall those goods at any time before physical delivery.  A vendor's decision to *permit* physical delivery of those goods is informed by the customer's creditworthiness at the time of delivery and also by the priority status afforded upon physical delivery under section 503(b)(9) of the Bankruptcy Code.

67.    While the Debtors believe it would be absurd for a vendor who ships ten days before the petition date to receive an unsecured claim for goods delivered 15 days after the petition date, the reality is that such vendor could have recalled those goods at any time prior to physical delivery—in which case, the vendor could have negotiated assurance of payment with the debtor in possession.[6]  And, it does not seem absurd that a vendor who ships goods 30 days before the petition date—when a restructuring does not seem imminent—should receive a priority claims for goods that the vendor allows to be delivered (*i.e.*, did not stop under the UCC or CISG) five days prior to the petition date, when the potential for a bankruptcy becomes significantly more evident.

68.    The Debtors are not incorrect that two vendors can ship the same day and, due to differences in means of transportation, may receive different priority based on when their goods are physically received by a debtor.  But again, both vendors are protected by self-help stoppage

---

[6]  Icon agrees with this Court's ruling that "the mere fact of delivery post-petition . . . is insufficient" to give rise to administrative expense status.  However, as observed by Debtors' counsel on its bankruptcy practice blog, debtors regularly induce postpetition delivery by granting administrative expense status to critical vendors.  *See* Weil Bankruptcy Blog, *A Spoonful of Sugar Helps the [UCC] Remedy Go Down: Recognition of Stoppage Rights in the Early Years of the Bankruptcy Code* ("The practice of entering a first day order assuring vendors that payments for goods delivered postpetition will be treated as administrative expenses is consistent with the principles of *National Sugar*.").

25

rights until the point of physical possession—they are equally responsible for monitoring

customer credit risk and implementing non-bankruptcy protections when the need arises,

including by waiting until the debtor has obtained entry of a first day "critical vendor" order

before releasing "stopped" goods.

## **<u>Reservation of Rights</u>**

69.      Icon reserves its rights with respect to the following issues:  (a) whether Icon and

the Debtors reached a postpetition agreement that caused Icon to permit delivery (or refrain from

exercising its stoppage rights), and (b) whether Icon was induced by the Debtors to take or

refrain from taking any action with respect to goods received by the Debtors, whether before or

after the Debtors' petition date.

*[Continued on Next Page]*

26

**WHEREFORE**, Icon respectfully requests that this Court enter an order

(i) denying the Debtors' Objection, (ii) allowing the Icon Claims as administrative expenses

pursuant to Bankruptcy Code section 503(b)(9), and (iii) granting other relief this Court deems

appropriate.

Dated: March 3, 2020                    Respectfully submitted,
        New York, New York

                                        **MORRISON & FOERSTER LLP**

                                        By: /s/ *Jennifer L. Marines*
                                        Jennifer L. Marines, Esq.
                                        Benjamin W. Butterfield, Esq.
                                        250 West 55th Street
                                        New York, New York 10019-9601
                                        Telephone:  (212) 468-8000
                                        Facsimile:  (212) 468-7900
                                        Email:  jmarines@mofo.com
                                                bbutterfield@mofo.com

                                        *Counsel to Icon Health & Fitness, Inc.*

27