## SCAN-BASED TRADING AND CONSIGNMENT AGREEMENT

This Scan-Based Trading and Consignment Agreement (the "Agreement") is entered into by and between Kmart Corporation (together with its subsidiaries "Kmart"), Sears, Roebuck and Co. (together with its subsidiaries "Sears") by their agent Sears Holdings Management Corporation, 3333 Beverly Road, Hoffman Estates, IL 60179 (jointly, "Company") and [iStar Jewelry LLC dba SGG, Inc (1000994639)] ("Vendor") signing this Agreement as Vendor below. In consideration of and reliance on the mutual promises and representations contained in this Agreement, Vendor and Company agree as follows:

1.    Vendor and Company desire to enter into a scan-based trading and consignment arrangement for the supply of certain merchandise by Vendor to Company for resale to retail customers pursuant to the terms set forth in this Agreement. As used in this Agreement, scan-based trading ("SBT") refers to an arrangement in which: (i) Company payments to Vendor are based on Company's point of sale ("POS") data, (ii) Vendor delivers merchandise to Company's stores as defined in related Agreements between Company and Vendor in the absence of a purchase order relative to such merchandise, (iii) Vendor retains title and ownership of such merchandise until the merchandise is scanned by Company at the register, at which time Company purchases the merchandise and instantaneously resells it to the retail customer, (iv) Company only pays Vendor for merchandise that is scanned by Company at the register, (v) Company will pay vendor net 15 days from the date the merchandise is scanned by Company at register, (vi) Company's EDI system automatically generates sales reports which will be forwarded to Vendor as they become available, and (vii) As sales reports are available, Company and Vendor will discuss replenishment options. Company at its sole discretion may accept or decline replenishment options desired by Vendor.

2.    Vendor will deliver to Company on a consignment basis such merchandise as identified in one or more SBT inventory form(s) executed by Vendor and Company (the "SBT Merchandise"), a representative form of which is attached and incorporated by reference. The parties intend by this Agreement to enter into a "consignment" arrangement agreement as defined in § 9-102(20) of the Uniform Commercial Code and agree that all SBT Merchandise delivered by Vendor and received by Company is consigned merchandise. Title to the SBT Merchandise will remain with Vendor until (i) the SBT Merchandise is scanned by Company at the register, at which point title will pass to Company and the SBT Merchandise will be resold to the retail customer or (ii) purchased by Company as may subsequently be agreed by the parties. Company will establish appropriate initial inventory levels of SBT Merchandise in Company's retail stores and distribution centers along with levels for replenishing such merchandise based on reported sales (as reflected in Company's POS data).

3.    Company and Vendor will mutually agree upon the purchase price of the SBT Merchandise as between Company and Vendor. Company will have the sole discretion to determine the retail price of the SBT Merchandise for sales to retail customers. For each unit of SBT Merchandise sold (as determined by Company POS data, which is subject to audit by Vendor as provided below), Company will pay Vendor the current system cost for the unit as updated per the existing gold lock agreement between Company and Vendor pursuant to the agreed upon payment terms. Any SBT Merchandise that (i) is sold and returned by a retail customer in accordance with Company's return policy, or (ii) is defective will not be counted as a sale for purposes of calculating payments to Vendor. Company may take deductions from payments due to Vendor for any and all returned or defective SBT Merchandise for which Vendor has previously received payment.

4.    All transactions between Company and Vendor concerning this Agreement (e.g., remittance advises, payments, etc.) will be conducted via electronic data interchange ("EDI") pursuant to the Electronic Data Interchange Trading Partner Agreement in place between Company and Vendor. Company will provide Vendor with EDI transaction set No. 852 "Product Activity Data" (also known as POS) via EDI (which reflects unit sales of SBT Merchandise) at no charge within 48 hours of the end of each business day. In the event of any conflict between the terms of the Electronic Data Interchange Trading Partner Agreement and this Agreement, the terms of this Agreement will control.

5.    Risk of loss or damage to the SBT Merchandise caused by fire, flood, wind or other natural disaster will remain with Vendor until title passes to Company as provided in paragraph 1. Risk of loss or damage to the SBT Merchandise caused by theft or physical destruction other than by natural causes will

remain with Vendor until delivery to Company. Using Company's annual inventory data, the parties agree to periodically, but no less frequently than annually, reconcile their respective balances to book. Company and Vendor will agree upon the verified shrink discrepancy between the physical inventory and the book inventory ("SBT Shrink").

6.    Vendor will maintain true and correct books and records concerning the delivery of SBT Merchandise to Company's distribution centers which specify the quantity of SBT Merchandise received by Company from Vendor and which is subject to audit as provided below. Company will maintain a record of the perpetual inventory of the SBT Merchandise. If physical inventories of the SBT Merchandise are performed, the company that performs Company's annual physical cycle inventories at the retail stores will perform the physical inventories of the SBT Merchandise at Company's cost; provided, however, Vendor may at its own cost conduct its own periodic physical inventories or observe physical inventories conducted by Company. Company may audit Vendor's books and records concerning the delivery of SBT Merchandise to Company (i) once per calendar year on 15 days written notice to Vendor and (ii) thereafter, at any other time upon 15 days written notice to Vendor subject to Vendor's written consent with such consent not to be unreasonably withheld or delayed. If Company chooses to conduct such an audit, Company or its auditors will sign a commercially reasonable confidentiality agreement.

7.    Company is responsible for collecting, paying, and reporting all sales, use, excise, gross receipts and other federal, state or local taxes or other assessments (other than any tax based on the income of Vendor or the value of the consigned SBT Merchandise) arising from the sale of the SBT Merchandise to the retail customer. Vendor is responsible for reporting and paying any personal property, inventory, and ad valorum taxes assessed by any taxing authority on the consigned SBT Merchandise located at the Company retail stores and distribution centers. At Company's request, Vendor will furnish Company evidence of paying such taxes. Company represents that the SBT Merchandise will not be identified or treated as Company-owned inventory for the Company's accounting, financial reporting or any other purpose.

8.    The consigned SBT Merchandise, even if conforming and non-defective, may be returned to Vendor under the existing non-conforming merchandise agreement between Company and Vendor. Specialty seasonal or merchandise for holidays and special promotional days including but not necessarily limited to Valentine's Day, Mothers' Day, Hanukkah and Christmas may be returned at Company's option, freight prepaid.

9.    Company consents to Vendor filing financing statements, any amendments and other appropriate Uniform Commercial Code forms and other documents reflecting Vendor's consigning the SBT Merchandise (and proceeds) and forwarding notices to other secured parties, if any, as contemplated by § 9-324 of the Uniform Commercial Code, in order for Vendor to have and maintain a first priority, perfected consignment interest. Company will cooperate with Vendor to protect and secure Vendor's interest in the SBT Merchandise (and proceeds), including without limitation executing such other security documents and notices as Vendor may deem reasonably necessary in order to maintain a perfected interest in the SBT Merchandise (and proceeds).

10.    This Agreement is a Vendor Agreement as the term is defined in the Universal Terms and Conditions signed by, and governing the relationship between Vendor and Company. The UTC including the Vendor Information Guide and any other Vendor Agreements currently or which may in the future be entered between Vendor and Company are incorporated by reference in this Agreement. In the event there is a conflict between this Agreement and the UTC and any other Vendor Agreement this Agreement will supersede and control. In all other respects, the UTC and any other Vendor Agreement will remain in full force and effect.

11.    Notwithstanding anything to the contrary herein, the parties agree that (i) this Agreement will only control transactions, terms and conditions relating directly to SBT Merchandise, as defined herein, and (ii) all other agreements between the parties remain effective upon their own terms.

12.    This Agreement will commence and be effective on the signature date and continue in effect until terminated as provided in this document. Company may terminate this Agreement on 30 days written notice without cause. Breaching, expiring or terminating this Agreement will have no impact on Vendor's ownership interest and consignment interest or security interest in the SBT Merchandise.

@BCL@C814C0B1.doc

13.  This agreement will be governed by the laws of the State of Illinois, without regard to its conflicts of law principles.

**COMPANY**

By: _____
Its: _____
Date: _____

**VENDOR**

By:  **Tony Cheng**
Its:  *Tony Cheng*
Date:  **8/27/18**