**HALPERIN BATTAGLIA BENZIJA, LLP**
Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Email: ahalperin@halperinlaw.net
Email: dlieberman@halperinlaw.net

*Counsel to Relator Carl Ireland,*
*Administrator of the Estate of James Garbe*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
**In re**                                                    :
                                                             :    **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,                    :
                                                             :    **Case No. 18-23538 (RDD)**
    **Debtors.[1]**                                          :
                                                             :    **(Jointly Administered)**
------------------------------------------------------------ x

**REPLY OF RELATOR CARL IRELAND, ADMINISTRATOR OF THE
ESTATE OF JAMES GARBE, TO DEBTORS' OBJECTION TO MOTION OF
RELATOR FOR AN ORDER (I) DETERMINING THE VALUE OF RELATOR'S
COLLATERAL AS OF THE SALE OF SUCH COLLATERAL; (II) DETERMINING
THE AMOUNT OF ANY DIMINUTION IN THE AMOUNT OF THE SALES
PROCEEDS ALLOCABLE TO SUCH COLLATERAL AFTER THE SALE; (III)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (19870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC ,Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None): SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

{00310460.6 / 1274-001 }

1

**DIRECTING PAYMENT OF RELATOR'S SECURED AND SUPERPRIORITY ADMINISTRATIVE CLAIMS; AND (IV) GRANTING RELATED RELIEF**

Relator Carl Ireland, Administrator of the Estate of James Garbe ("Relator") by and through his undersigned counsel, submits this reply (the "Reply") to the Debtors' Objection (the "Debtors' Objection") to Relator's Motion for an Order (I) Determining the Value of Relator's Collateral as of the Sale of Such Collateral; (II) Determining the Amount of Any Diminution In the Amount of the Sales Proceeds Allocable to Such Collateral After the Sale; (III) Directing Payment of Relator's Secured and Superpriority Administrative Claims; and (IV) Granting Related Relief (the "Motion") pursuant to sections 105(a), 361, 363(e), 506(a) and 507(b) of the Bankruptcy Code, Rule 3012 of the Bankruptcy Rules and certain Orders of this Court in these cases.[2] In response to the Debtors' Objection and in further support of his Motion, Relator respectfully represents:

**PRELIMINARY STATEMENT**

1.      This is an exceptionally challenging time for all parties and for the Court, as the world faces a health crisis and attendant economic crisis of a scope that none of us have previously experienced. Relator has no wish to create an emergency where there is not one, and will work with the Debtors and the United States to address the issues raised here in a cooperative manner. But Relator respectfully submits that circumstances have changed since the Confirmation Order was entered, and as a result of those changed circumstances, the Mortgagees are not adequately protected. As set forth in greater detail below, Relator believes that its position is eroding and is, in fact, at significant risk.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion, which appears at D.N. 4931. The Debtors' Objection appears at D.N. 7471.

{00310460.6 / 1274-001 }

2

2.   Relator Carl Ireland filed the Motion on August 23, 2019, seeking, among other things, a determination of the value of the Mortgagees' secured claim, and prompt payment of that claim. Prior to the scheduled hearing to consider the Motion, the Debtors' Plan (defined below) was confirmed. The Plan provided for payment of allowed secured claims (and allowed superpriority administrative claims) upon the effective date of the Plan. The Debtors conceded in their Plan-related filings and at the confirmation hearing that they did not have sufficient funds for the Plan to become effective and did not know when they would have such funds.

3.   Relator raised the issue of adequate protection at the confirmation hearing and requested, as he had at the sale hearing, that funds be segregated for the Mortgagees' secured claim. The Court denied that request, but granted the Mortgagees additional adequate protection in the Confirmation Order, in the form of a replacement lien on Total Assets, and reserved the Mortgagees' right to re-visit the issue of segregating funds in the event that there was a change in circumstances after Plan confirmation. Confirmation Order, D.N. 5370, ¶ 65.

4.   Since that time, Relator has adjourned the hearing on his Motion several times at the Debtors' request, and most recently, at the request of Relator's co-mortgagee, the United States. The United States proposed a brief adjournment in the hopes of obtaining current information about the Debtors' assets and liabilities, including the total amount of administrative claims asserted against the Debtors. (Because of the absence of an administrative claims bar date and the unusual administrative settlement procedures implemented in these cases, information about administrative claims that would normally be publicly available is somewhat opaque.[3])

---

[3] The Mortgagees were interested in knowing the total asserted dollar amount of administrative claims entitled to distributions of 80% (which group can receive distributions prior to the Effective Date) and the total asserted dollar amount of administrative claims entitled to distributions of 100% (upon the Effective Date), as well as the Debtors' estimates as to the amounts that would likely be allowed in each of these categories. Additionally, the Mortgagees asked for information about preference recoveries to date, and the estimated value of what the Debtors' described as

The Debtors have provided the Mortgagees with their rough estimates of certain, but not all, of the requested information, although it is unclear whether the Debtors view that information as confidential.

5. Based upon the limited information available to Relator, it is clear that at least two things have changed since the entry of the Confirmation Order on October 15, 2019. First, Transform did not pay the $90 million or more that the Debtors represented Transform would pay in satisfaction of the estimated $90 to $155 million in 503(b)(9) claims against the Debtors. Transform paid $7 million and has no further liability for such claims under its January 2020 settlement with the Debtors. Second, as discussed below, recoveries from preference claims are likely to be materially lower than estimated by the Debtors at the time of the confirmation hearing, as a result of recent world and national events. *See* section (b)(ii) hereof.

## DISCUSSION

**(a) Background**

6. As set forth in the Motion, as of the dates of the Debtors' bankruptcy filings, Relator and the United States of America together held a perfected first lien on real property owned by the Debtors, as well as the proceeds of that property. The value of the secured claim was approximately $18.2 million as of the deadline for filing pre-petition claims in these cases.

7. Both the rights of the Mortgagees and the priority of their secured claim were preserved in the DIP financing orders entered by this Court. *See* Senior DIP Order, D.N. 955, ¶ 65; Junior DIP Order, D.N. 1436, ¶ 64. In addition, at the hearing to consider the sale of the

---

their "*de minimis* assets" - certain non-cash, non-litigation assets - in the Debtors' Confirmation Brief. [D.N. 5144, PDF]. The non-cash assets had been given an estimated value of $33.4 million at the time of confirmation, but upon information and belief, a portion of the $18.3 million which the Debtors received in connection with the January 2020 settlement with Transform reduced the amount of the non-cash assets.

{00310460.6 / 1274-001 }

Debtors' operating business, the Court considered Relator's objection to the sale of the mortgaged collateral, and granted the Mortgagees a lien against the sale proceeds of the property, and a superpriority administrative expense claim against the Debtors as adequate protection to satisfy any diminution of the value of the replacement lien post-closing. Sale Order, D.N. 2507, ¶ 71.

8.  Relator's Motion was filed on August 23, 2019. After the filing of the Motion, the Debtors sought to and in fact did confirm a Modified Second Amended Joint Chapter 11 Plan (the "Plan"), although the Debtors conceded in numerous documents filed with the Court and at the confirmation hearing that they did not know when there would be sufficient funds for the Plan to become effective. Confirmation Hearing Transcript, D.N. 5395, page 74, lines 15-25, page 75, lines 1-6, page 79, lines 5-25, page 80, lines 1-9.The Debtors represented to the Court that (i) recoveries from the sale of some remaining assets, (ii) payment obligations of Transform and (iii) recoveries from preference litigations would make it possible for the Plan to become effective.[4] See Debtors' memorandum of law in support of Plan confirmation (the "Debtors' Confirmation Brief"), D.N. 5144, PDF pages 21-22; Declaration of Brian J. Griffith (the "Griffith Declaration"), D.N. 5148, ¶ 61; Confirmation Hearing Transcript, D.N. 5395, pages 66-68. This was, of course, of concern to Relator because the Plan provides for the payment of the Mortgagees' secured claim upon the effective date of the Plan (the "Effective Date") and not before.

9.  The Debtors' Confirmation Brief provided charts of "sources and uses" that indicated that 503(b)(9) administrative claims would total between $90 and $155 million, and

---

[4] While the litigation that the Creditors' Committee had commenced against ESL was identified as an asset, the testimony at the confirmation hearing was that recoveries from such action would not be needed in order for the Plan to become effective. Confirmation Hearing Transcript, pages 62, 164 [D.N. 5395].

{00310460.6 / 1274-001 }

5

"other administrative claims" would total approximately $50 million, for total administrative claims in the range of $140 to $205 million. D.N. 5144, PDF pages 21-22. Upon information and belief, the Debtors still believe that allowed administrative claims will fall within this range. But the Debtors' Confirmation Brief also represented that the "sources" side of the ledger includes $90 million from Transform in payment of 503(b)(9) claims, D.N. 5144, PDF page 22, while the Griffith Declaration indicated that the Debtors' assets included $97 million from Transform in satisfaction of 503(b)(9) claims. D.N. 5148, ¶ 56. The Griffith Declaration also estimated preference recoveries at $100-150 million, while Mr. Griffith reduced that estimate to $100 million in his hearing testimony, predicting that recoveries would likely be $20 million in 2019, $60 million in 2020, and $20 million in 2021. See D.N. 5148, ¶ 67; Confirmation Hearing Transcript, D.N. 5395, page 69, lines 16-25, page 70, lines 1-25, and page 71, line 1.

      10.    At the confirmation hearing, Relator raised doubts about the value of the Mortgagees' replacement lien and adequate protection, given the Debtors' lack of sufficient cash and the uncertain nature of other assets, and the fact that the estates would be continuing to spend money and even making distributions to other creditors (junior in priority to Relator's claims) in advance of the Plan Effective Date. Under the administrative settlement procedures that were finalized at the confirmation hearing, holders of administrative claims that did not "opt-out" of the administrative settlement procedures could begin to get partial distributions on account of their allowed administrative claims as early as December of 2019. In effect, distributions would be (and have been) made from the Mortgagees' sale proceeds, not to the Mortgagees, but to holders of administrative claims that hold no liens on assets or superpriority administrative claims.

11.     The Court ultimately determined that the Plan was feasible, but granted the Mortgagees additional adequate protection, in the form of liens on Total Assets in the event of diminution in the value of the Mortgagees' replacement lien. And as noted above, the Court also authorized the Mortgagees to re-visit the issue of segregating funds in the event of a change in circumstances.  See Confirmation Order, D.N. 5370, ¶ 65.

**(b) The Debtors' Objection to the Motion**

12.     The Debtors' Objection makes two primary points.  The Debtors assert that there is no reason for the Court to determine the value of the Mortgagees' secured claim right now, as the appraisals obtained by the parties are not worlds' apart, and the parties are likely to be able to reach agreement about a number.  In addition, the Debtors contend that at the confirmation hearing, the Court found that the Mortgagees were adequately protected, and that nothing has changed since mid-October, when the confirmation hearing took place.

**(i)     The Valuation Issue**

13.     Relator agrees with the first of the Debtors' assertions.  The secured claim was $18.2 million immediately prior to the bar date in these cases.  The appraisal which Relator obtained within a few weeks after the closing of the sale valued the Property at $ 22.1 million, while the appraisal that the Debtors' obtained nine months after the sale closed valued the Property at approximately $16.9 million,  Moreover, as noted in the Motion, approximately three months after the sale closed, the Debtors and Transform jointly submitted notarized deeds of transfer to the Puerto Rico Real Property Registrar, in which the sellers and the buyer stated that the Property had been sold for $20,770,000.  Relator, like the Debtors, is therefore hopeful that the parties will be able to reach agreement about the value of the Property.

**(ii)    Changes in Circumstances/Adequate Protection**

14.     Relator sharply disagrees, however, with the Debtors' assertion that since the October confirmation hearing, there has been no change in circumstances that would warrant current payments against the secured claim or the creation of a cash reserve for the Mortgagees. There have been at least two very material changes—the first in the amount of funds that the Debtors have on the "sources" side of their ledger, and the second in the amount of funds that the Debtors are likely to recover from preference actions.

15.     There is no administrative bar date in these cases, but the Debtors' Confirmation Brief estimated 503(b)(9) claims at $90 to $155 million, and other administrative expense claims at $50 million, making the range for total administrative claims $140 to $205 million. D.N. 5144, PDF pages 21-22.[5]  The dollar amount of administrative claims and the Debtors' ability to satisfy those claims is important to Relator for the customary reason in chapter 11 cases -- the Effective Date will not occur unless and until the Debtors have sufficient cash to satisfy allowed administrative claims, and the Mortgagees will not be paid until the Effective Date.  That is even more critical here as the Plan was confirmed with the understanding that the Effective Date was not expected to occur for nearly a year, while estate monies would continue to be spent on ongoing costs and on payment towards claims junior to Relator's claim.

---

[5] As noted earlier in this Reply, the Mortgagees are seeking information from the Debtors on an informal basis about the asserted amounts of administrative claims, the Debtors' estimates of what dollar amounts will be allowed, and which treatment buckets those claims are in (75% or 80% distribution, with payments commencing pre-Effective Date, 100% distribution on the Effective Date), and may, if necessary, seek discovery on these points. The Amended Notice of Distribution that was filed by the Debtors on December 24, 2019 indicates that the amount of allowed administrative claims for creditors that opted-in to the administrative claims settlement process, **and** whose claims had been reconciled and allowed by the Debtors as of the date of the amended notice, totaled $73,174,490.44.  D.N. 6280.  That number does not include the administrative claims of creditors that (i) opted-in but whose claims were not reconciled or not allowed by December 24th, (ii) did not return ballots, or (iii) opted-out of the administrative claims settlement process.

{00310460.6 / 1274-001 }

16. Relator has been unable to determine the total dollar amount of administrative claims asserted against the Debtors from a review of publicly available information, but upon information and belief, the Debtors continue to believe that the total dollar amount of administrative claims that will ultimately be allowed in these cases will be within the $140 to $205 million range estimated at the time of confirmation.

17. The Debtors also represented in the Debtors' Confirmation Brief and the Griffith Declaration that Transform would be paying $90 to $97 million in satisfaction of 503(b)(9) claims against the Debtors. D.N. 5144, PDF pages 21-22; D.N. 5148, ¶ 61, and at the confirmation hearing, Mr. Griffith testified to that. D.N. 5395, page 66. Yet the subsequently agreed to settlement agreement between the Debtors and Transform that was filed with this Court on January 10, 2020 states that Transform paid $7 million in connection with 503(b)(9) claims, and pursuant to the terms of the settlement, Transform has no further obligations with respect to such claims. D.N. 6327, PDF pages 43 and 47.

18. The Debtors have therefore apparently received $7 million where they expected to (and relied upon) receiving either $90 or $97 million to satisfy their administrative claims. This deficiency means that the Debtors must realize at least an additional $83 million (and likely more) in preference recoveries if the Debtors are to have sufficient cash for the Plan to become effective.[6]

19. This change in circumstances alone raises the specter that the Mortgagees are not adequately protected. Unfortunately, at present, the difference between the Debtors' estimate about administrative claims and the reality of administrative claims pales next to the issue of

---

[6] The Debtors represented at the confirmation hearing that they are not relying on any recovery from the lawsuit that the Committee filed against ESL and that the Plan will become effective without reference to that action. Confirmation Hearing Transcript, D.N. 5395, pages 62 and 164.

{00310460.6 / 1274-001 }

9

what amounts the Debtors are likely to recover from the preference actions which are supposed to provide the cash needed for the Effective Date to occur.

20.   At the confirmation hearing, the testimony of the Debtors' witness was that the Debtors expected to realize $100 million in preference recoveries-- $20 million in 2019, $60 million in 2020, and $20 million in 2021. Transcript, D.N. 5395, page 69, lines 16-25, page 70, lines 1-25, and page 71, line 1.

21.   The total amount of preference proceeds realized by the Debtors in 2019 cannot be readily ascertained.[7] But since early 2020, our country and the world have found themselves facing a global pandemic. Supply chains have been severely disrupted, entire industries have shut down, and individuals and businesses have been adversely impacted by the pandemic, and the related social isolation and "shelter in place" orders. The businesses and individuals that are the targets of the Debtors' preference actions are not somehow insulated from these circumstances.

22.   These events are impacting us all, and it is a given that they will impact the ability of preference defendants to settle the actions against them or pay judgments. Relator respectfully submits that circumstances that none of us did or could have anticipated in October of 2019 will impact the Debtors' ability to fund their Plan and will delay and may well jeopardize the Debtors' ability to reach an Effective Date.

23.   Relator does not believe that the Debtors' assertions in the Debtors' Objection-- that nothing has changed since the confirmation hearing and that the Mortgagees are adequately protected – are accurate ones. A representation that the Debtors made prior to and at the

---

[7] Filings by Acumen Recovery and the Katten law firm indicate that **gross** preference proceeds collected by those firms in 2019 totaled $5,554,651.92. However, the filings of ASK, the third firm pursuing preferences on behalf of the Debtors, do not indicate the amount of gross proceeds.

{00310460.6 / 1274-001 }

10

confirmation hearing concerning the amount of cash that the Debtors would receive from Transform for payment of administrative claims has proven inaccurate by $83 to $90 million, and there is no suggestion in any publicly available information that the Debtors have obtained those funds from another source. In addition, the projections that the Debtors offered for preference recoveries were calculated prior to a global pandemic and economic catastrophe, and must be re-evaluated in light of those dramatically changed circumstances.

24. Nonetheless, the Debtors continue to spend significant amounts of money to administer these cases and to make distributions to other creditors. Some of the funds that the Debtors are spending are the proceeds from the sale of the Mortgagees' collateral, and Relator respectfully submits that funds should be escrowed for or paid to the Mortgagees, to ensure that they are adequately protected.

Dated: New York, New York
April 17, 2020

Respectfully submitted,

HALPERIN BATTAGLIA BENZIJA, LLP

By: /s/Alan D. Halperin
Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
ahalperin@halperinlaw.net
dlieberman@halperinlaw.net

*Counsel to Relator Carl Ireland, Administrator for the Estate of James Garbe*