

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

April 20, 2020

**By ECF**
The Honorable Robert D. Drain
United States Bankruptcy Judge
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

    Re: *In re Sears Holding Corporation, et al.,* No. 18-23538 (RDD)

Dear Judge Drain:

  We write respectfully on behalf of the United States of America (the "Government") to join in the motion filed by Relator Carl Ireland ("Relator") to the extent he seeks adequate protection for the Relator and the Government (together, the "Mortgagees").[1]  A request for adequate protection may be made at any time, and Debtors have the burden of demonstrating that adequate protection has been provided once the creditor demonstrates a valid interest.[2]  The Government is concerned that although it and the Relator have a lien against all assets of the Estate, as well as a super-priority administrative claim that places them in the front of the line for payment of administrative claims,[3] circumstances have changed sufficiently since the confirmation hearing to warrant additional adequate protection.  Specifically, the cash over which the Mortgagees have a lien is leaving the Estate in the form of payments to more junior administrative creditors, while

---

[1] The history of the Government's and the Relator's claims against Debtors, and the security provided by the Court to ensure the payment of these debts, is set forth in the Relator's motion (Docket Number ("D.N.") 4931) and not repeated herein.  Capitalized terms and abbreviations not defined herein are defined in the Relator's motion.

[2] *See* 11 U.S.C. § 363(e) ("Notwithstanding any other provision of this section, *at any time*, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.") (emphasis added); *In re AMR Corp.*, 490 B.R. 470, 477 (S.D.N.Y. 2013) ("[W]hen a secured creditor moves for adequate protection pursuant to § 363(e), it need only establish the validity of its interest in the collateral, while 'the Debtor bears the initial burden of proof as to the issue of adequate protection.'") (citation and internal quotation marks omitted).

[3] Sale Order, D.N. 2507, ¶ 71 (granting replacement lien and superpriority administrative claim); Confirmation Order, D.N. 5370, ¶ 65 (providing replacement lien on Total Assets as additional adequate protection); *see also* Senior DIP Order, D.N. 955, ¶ 65; Junior DIP Order, D.N. 1436, ¶ 64.

the Mortgagees' more senior superpriority administrative claims remain unpaid. And Debtors now have fewer assets than contemplated at the time of the confirmation hearing due to their January 2020 settlement with Transform, leaving the Mortgagees in a tenuous position that warrants additional adequate protection.

A review of Sears's current assets and liabilities renders it entirely possible that the Effective Date of its plan will not occur, and that the cash subject to the Mortgagees' lien will be dissipated to more junior administrative creditors. We estimate that Sears currently has less than $156 million in assets based on the following: On information and belief based on a conversation with Debtors, as of November 2, 2019 (the closing date of the last filed operating report), Debtors had $53 million in cash, approximately half of which was restricted; available non-restricted cash assets are thus estimated by the Debtors to currently be $26 million or less. Debtors also estimated that they initially had $35 million in non-cash assets, but have confirmed that some of those assets have been liquidated and paid out to administrative creditors. Debtors have not provided us with a current estimate of the remaining non-cash assets in the Estate. The Estate's other assets include preference actions, which Debtors value at approximately $100 million after fees.[4] As Relator notes in his reply brief (D.N. 7828), it is not clear if this estimate remains valid in light of the current public health crisis. Indeed, although Debtors guessed that they would recover $15-20 million on such claims in 2019, and an additional $60 million in 2020,[5] we understand that the Debtors have recovered only approximately $5 million to date in preference actions, suggesting that their initial estimate was overly optimistic. Debtors have further not provided us an estimate of the value of the ESL litigation, on which they told the Court they are not relying to satisfy the requirements for their plan to become effective.[6] But even assuming that Debtors can recover an additional $95 million (net) in preference actions, their current assets are only $156 million less the value of non-cash assets they have already liquidated and either distributed to creditors or currently hold in cash.

As for their liabilities, Debtors face an as-yet-undetermined amount of administrative claims, since there is no bar date for administrative claims and it is not clear what the total value of allowed administrative claims will be. Debtors estimate that the administrative claims will be between $140 million and $205 million.[7] Thus, it is entirely conceivable that the Estate will become administratively insolvent, with administrative claims alone exceeding the assets of the Estate. Since the Plan includes provisions permitting Debtors to make payments prior to the Effective Date to administrative creditors who have agreed to cap their claims at 80% or 75% of the value of their clams, the cash over which the Mortgagees hold a lien may well be fully

---

[4] Debtors initially estimated "gross" recoveries from "a low of $53.8 million to a high of $200 million." Declaration of Brian J. Griffith ("Griffith Decl.") (D.N. 5148), ¶ 66. That number was refined to a then-current "estimated recovery range of $100 million to $150 million." *Id.* ¶ 67. Debtors' declarant concluded that "net of fees," "more than approximately $100 million is reasonable." *Id.*

[5] Transcript, D.N. 5395, at 69:16-25, 70:1-25.

[6] *Id.* at 62; 164 ("we're not counting on ESL litigation proceeds, you know, to go effective").

[7] Debtors' brief supporting plan confirmation, D.N. 5144, at ¶5 (brief at pp. 4-5; PDF at 21-22).

disbursed before they receive any of it. Indeed, Debtors have already paid $21 million to administrative creditors pursuant to this early payment authority.[8]

While Debtors argue nothing has changed since plan confirmation, when the Court approved early payment to administrative creditors, there has been a material change in the Debtors' financial picture since that time. Specifically, Debtors' settlement with Transform has significantly reduced the assets Debtors said would be available to pay administrative claims. In support of confirmation, Debtors indicated that Transform would pay $90 million or $97 million of their administrative claims under 11 U.S.C. § 503(b)(9).[9] But now it appears that Transform has paid only $7 million of such claims, and that its remaining obligations have been eliminated through settlement.[10] Accordingly, Debtors' assets that can be used to pay administrative claims have decreased by at least $83 million since the confirmation hearing. Parties are expressly permitted to seek additional adequate protection when circumstances change, as they have here. *In re AMR Corp.*, 490 B.R. at 476 (finding that bankruptcy court's statement that a party can seek adequate protection if circumstances change was redundant of the statute, "because the statute itself provides that adequate protection is available whenever the circumstances dictate a need for it.").

For these reasons, the Government respectfully joins in the Relator's request for additional adequate protection. The Government is open to creative solutions and working with Debtors to ensure that it and Relator are provided adequate protection. The Government also expressly requests permission to take discovery in the absence of a negotiated resolution.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: /s/Lawrence H. Fogelman
PETER ARONOFF
LAWRENCE H. FOGELMAN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor

---

[8] Amended Notice Regarding Initial Distribution Pursuant to Administrative Expense Claims Consent Program, D.N. 6280.

[9] Debtors' brief supporting confirmation, D.N. 5144 at ¶5 (brief at pp. 4-5; PDF at 21-22) (estimating $90 million paid by Transform towards administrative Section 503(b)(9) claims); Griffith Decl. ¶ 56 (estimating $97 million payment by Transform towards administrative Section 503(b)(9) claims).

[10] Settlement Agreement, D.N. 6327, at Whereas Clauses on p.5 (pdf page 43) (indicating that $7 million had been paid towards Section 503(b)(9) administrative claims); *id.* § 1(e) (pdf page 47) (stating that "Transform will have no further obligations to make any payments relating to the . . . Assumed 503(b)(9) Liabilities (except to the extent any such 503(b)(9) Liabilities also constitute Cure Costs related to any Assigned Agreements)").

        New York, New York 10007
        Tel.:   (212) 637-2697/2719
        Fax:   (212) 637-2686

Cc: All parties (By ECF)