# EXHIBIT III

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 18-23538-rdd

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

SEARS HOLDINGS CORPORATION,

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

United States Bankruptcy Court

300 Quarropas Street, Room 248

White Plains, NY 10601

April 23, 2020

10:00 AM

B E F O R E :

HON ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

ECRO: UNKNOWN

Hearing re: Notice of Agenda of Matters Scheduled for Telephonic Hearing on April 23, 2020 at 10:00 a.m.

Amended motion for Reconsideration and Request for an Enlargement of Time to File an Appeal Pending this Motion (related document(s)51) filed by Brian Coke Ng (document #52)

Motion for Reconsideration (document #51)

Objection to Motion/Objection of PDX, Inc. and National Health Information Network, Inc., to the Motion of Brian Coke Ng Pursuant to Rule 60(b) for Relief from Order and Request for an Enlargement of Time to File an Appeal Pending this Motion (related document(s)52)

Affidavit/Reply Affidavit and Further Memorandum in Support (related document(s)52) filed by Brian Coke Ng (document #55)

Debtors' Motion for Entry of an Order Approving Settlement Agreement Among Sears Holdings Corporation and the Canadian Plaintiffs (ECF #7518)

Application to Appoint to Retain and Employ Moritt Hock & Hamroff LLP as Special Conflicts Counsel, Effective Nunc Pro Tunc to January 2, 2020 filed by Ted A. Berkowitz on behalf of Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al. (ECF #7798)

Debtors Second Omnibus Objection to Proofs of Claim (Reclassification as General Unsecured Claims) (ECF #4776)

Claimant's Response to Omnibus Objection Re: Claim no. 5472 (related document(s)4776) filed by Georgia Watersports, LLC (ECF No. 4814)

Response of VM Innovations to Second Omnibus Objection to Proofs of Claim (ECF No. 4986)

Objection to Suzanne Jewelers (ECF No. 4994)

Response of ShopChimney.com to Second Omnibus Objection to Proofs of Claim (ECF No. 5003)

Response of VIR Ventures, Inc. to Second Omnibus Objection to Proofs of Claim (ECF No. 5056)

Response of Sky Billiards, Inc., d/b/a Best Choice Products in Opposition to Debtors' Second Omnibus Objection (ECF No. 5421)

Response of Stolaas Company in Opposition to Debtors' Second Omnibus Objection to Proofs of Claim (ECF No. 5524)

Motion to Extend Time to Respond filed by Myrna Ruiz-Olmo on behalf of Puerto Rico Supplies Group, Inc. (ECF #7788)

Motion of Relator Carl Ireland, Administrator of the Estate of James Garbe, for an Order (I) Determining the Value of Relator's Collateral as of the Sale of Such Collateral; (II) Determining the Amount of Any Diminution in the Amount of the Sales Proceeds Allocable to Such Collateral After the Sale; (III) Directing Payment of Relator's Secured and Superpriority Administrative Claims; and (IV) Granting Related Relief filed by Alan D. Halperin on behalf of Relator Carl Ireland, Administrator of the Estate of James Garbe (ECF #4931)

Debtors' Objection (ECF #7471)

Letter on behalf of the United States of America to join in the motion (ECF #7836)

Administrative Claim Status Conference

Debtors' Tenth Omnibus Objection to Proofs of Claim (To Reclassify Claims) (ECF #5237)

Debtors' Eleventh Omnibus Objection to Proofs of Claim (To Reclassify or Disallow Certain Claims) (ECF #7213)

Motion for Relief from Stay filed by Sonia E. Colo on behalf of Santa Rosa Mall, LLC (ECF #6317)

Debtors' Objection (ECF #7211)

Reply to Debtors' Objection filed by Sonia E. Colon on behalf of Santa Rosa Mall, LLC. (ECF #7311)

Statement Certifying Compliance (related document(s)6316, 6317) filed by Sonia E. Colon on behalf of Santa Rosa Mall, LLC. (ECF #7326)

Memorandum of Law on Puerto Rico's Insurance Law in Compliance with Court Order (related document(s)6317, 7311, 7211) filed by Sonia E. Colon on behalf of Santa Rosa Mall, LLC. (ECF 7531)

Transcribed by: Sonya Ledanski Hyde

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES
Attorney for the Debtors
767 Fifth Avenue
New York, NY 10153

BY: GARRETT FAIL
JACQUELINE MARCUS

KIRBY AISNER & CURLEY, LLP
Attorney for PDX, Inc.
700 Post Rd Suite 237
Scarsdale, NY 10583

BY: JULIE CURLEY

HALPERIN BATTAGLIA BENZIJA
Attorney for Relator, Carl Ireland
40 Wall Street
New York, NY 10005

BY: ALAN HALPERIN

U.S. DEPARTMENT OF JUSTICE

Attorney for the United States Trustee

U.S. Federal Office Building

201 Varick Street, Suite 1006

New York, NY 10014

BY: LAWRENCE FOGELMAN

DAVIDOFF HUTCHER & CITRON

Attorney for Orient Craft Limited and HK Sino-Thai Trading Company Limited.

605 3rd Avenue

New York, NY 10158

BY: DAVID WANDER

BERNSTEIN-BURKLEY

Attorney for Vir Ventures and AMI Ventures

707 Grant Street, #2200

Pittsburgh, PA 15219

BY: SALENE MAZUR KRAEMER

MORRISON & FOERSTER

Attorney for Icon Health and Fitness

250 W 55th Street

New York, NY 10019

BY: BEN BUTTERFIELD

ARENT FOX LLP

Attorney for Sky Billiards

1301 Avenue of the Americas, 42nd Floor

New York, NY 10019

BY: DOUG FLAHAUT

FOLEY & LARDNER LLP

Attorney for Hain Capital Investors Master Fund, Ltd

90 Park Avenue

New York, NY 10016-1314

BY: PAUL J. LABOV

RÍOS GAUTIER & CESTERO C.S.P.
Attorney for Santa Rosa Mall, LLC
27 González Giusti Street, Suite 300
Guaynabo, PR 00968-3076

BY: CARLOS RIOS

FERRAIUOLI LLC
Attorneys for Santa Rosa Mall
221 Avenida de la Constitución
San Juan, 00917, Puerto Rico

BY: SONIA COLON
CARLOS RIOS
GUSTAVO CHICO

BRIAN COKE NG

P R O C E E D I N G S

THE COURT: Hello, good morning. This is Judge Drain, and this is the omnibus hearing date for matters in Sears Holdings Corporation, et al. This is a completely telephonic hearing, so not only will I ask you to identify yourself and your client when you first speak, I may also ask you later while you're speaking to do the same thing again if I think that the court reporter taking down the official recording from Court Solutions may not be able to identify you.

One last point, there is one recording permitted of this set of hearings; that's the official recording being undertaking by Court Solutions. No one should separately be recording this hearing.

With that introduction, I'm happy then to proceed on the agenda, the amended version of which was filed yesterday.

MR. FAIL: Good morning, Your Honor. For the record, Garrett Fail, Weil, Gotshal & Manges for the Debtors. That's right, the agenda was filed at Docket #7857. Before beginning, we hope the Court and its staff are well and appreciate the Court's time and thank the Court for the time this morning.

Unless the Court prefers to proceed in a different fashion, we could proceed in the order in which items appear

on the agenda, which would begin with the adversary proceeding first, the Brian Coke Ng v. Sears Holding Corporation, et al; it's Item #1 on the agenda.

THE COURT: Right, that's fine. Let's do that. And that matter is a motion by Mr. Ng -- that's spelled N-G for the court reporter's benefit -- for reconsideration of an order that I entered on April 9, 2020 in which I did two things: I relieved PDX, Inc. and National Health Information, which I'll refer to as PDX/NHIN or PDX, of a default in this adversary proceeding under Federal Rule of Bankruptcy Procedure 7055, and also granted PDX/NHIN's motion to dismiss the claims against it in the adversary proceeding brought by Mr. Ng.

The hearing on that matter was conducted by me telephonically. And during the hearing I asked a number of times whether Mr. Ng was present. He had expressed a serious interest in participating in that hearing. And I am aware of email correspondence with the Clerk's Office -- or I was aware at the time of email correspondence with the Clerk's Office instructing him how to sign on to Court Solutions. Notwithstanding that, he was not present at the hearing, and I proceeded just with counsel for the movant, PDX/NHIN.

Mr. Ng filed his motion almost immediately after the order was entered, stating that he attempted to be

present at the hearing and was not and sought reconsideration on that basis.

I see from the dashboard, Mr. Ng, that you are present today.

MR. NG: Yes, Your Honor. Good morning. Thanks for having me. I finally got here. I was present. I did call in at the last hearing, but I was placed on mute, and I did not have all of the protocols with me at the time to know everything that is required of me to properly enter through the dashboard. I was signed up by the defense counsel.

I felt somewhat disappointed because no one called me to advise me when the Court already sent me an email, which I received later in the day, that there would be a waiver. And so, I felt very not much -- not happy because I have a complaint that I had filed and I wanted to address the complaint, along with some procedural issues on the part of the PDX defendants. So I'm --

THE COURT: Okay. But before we go further, Mr. Ng, let me take the other appearances on this particular matter.

MR. NG: Yes. Yes, Your Honor.

MS. CURLEY: Thank you, Judge. Julie Curley of Kirby Aisner & Curley, LLP for defendants, PDX, Inc. and National Health Information Network, Inc.

THE COURT: Okay, very well. I don't think anyone else is appearing on this particular motion. So, Mr. Ng, let me go back to you. We received an email well after the Sears hearing ended -- and it was an omnibus hearing; there were more matters on the calendar than just this one -- that you were still on the phone and were wondering what was going on. Did you hear my ruling at the hearing and the discussion?

MR. NG: No, Your Honor. I heard nothing.

THE COURT: Okay.

MR. NG: I heard nothing other than from the beginning when I first call in, I got a good morning message, a good morning greeting, and that greeting shortly thereafter placed me on mute. I was there waiting until sometime after midday or so that same day and I became curious. I thought then perhaps the Court was busy with other cases and so I continued to wait.

THE COURT: Okay.

MR. NG: And I finally sent an email.

THE COURT: Okay, and I got that email. I do want to note two things, Mr. Ng. I get the dashboard that shows each person that's on the call --

MR. NG: Yes, Your Honor.

THE COURT: -- and also the clerk's office does too. And that dashboard showed you on the call at the very

beginning briefly before the hearing started and then did not show you thereafter, including at the end. And I now have your icon and you are -- you're obviously showing up now, and the fact that someone is muted doesn't take them out of the dashboard. So I'm not sure what happened, but I don't think there's anything particularly nefarious that went on here. It's just that you weren't able to participate in the hearing; that's clear. And in light of that, I decided to schedule a hearing on your motion.

I know you're representing yourself and you're not a lawyer, but under the local rules and the bankruptcy rules, the court does not need to schedule a hearing on a motion under Bankruptcy Rules 9023 and 7024, which incorporate the Federal Rules 59 and 60, if it believes there's really no purpose to be served by a hearing. But I felt that since you had not participated in the earlier hearing, that there would be a purpose served, so that's why I scheduled this hearing.

So I have one more question for you, and then I'm going to ask you just to briefly address your opposition to the motion that was made by PDX/NHIN to dismiss. And that question is, have you been able to get the transcript of my ruling, because I gave quite a lengthy ruling at the end of the prior hearing.

MR. NG: Well, I request it, Your Honor.

THE COURT: Right.

MR. NG: And I was promised in an email that somehow that request was somehow end up in a spam box, and that I will be -- they will respond to my request within a day, and that was earlier on several days ago. And I have not heard anything back from anyone pertaining to the transcript, so I do not have a copy, Your Honor.

THE COURT: You haven't reviewed the transcript.

MR. NG: I haven't seen it.

THE COURT: Okay. And unless one asks for an emergency transcript, it usually takes them a while to prepare it, so I'm not surprised that you haven't seen it, but I just really wanted to know as to the state of your knowledge of my ruling.

MR. NG: No, I have no knowledge of --

THE COURT: Okay.

MR. NG: It just here and I heard that there was a transcript and I requested and I have not gotten it whatsoever.

THE COURT: Okay, very well. So given that, I want to let you know I did read your objection to PDX's motion to dismiss carefully, including the exhibits, as well as the underlying Complaint that they sought to dismiss.

MR. NG: Yes.

THE COURT: So I'm familiar with all of those

documents, as well as, of course, PDX's motion. But if you want to say anything more on top of those documents in opposition to the motion, now is your chance.

MR. NG: Yes, Your Honor. I'm happy to say something on it.

So the complaint was filed, and it is my belief -- I'm not an attorney and only pro se, and I'm not someone who can artfully plead like an attorney. But what I do understand, Your Honor, is that what I would like to say, that my complaint is well pled under the Rule 8 -- Rule 8(a), with the accompanying factual allegations I'm showing of the harm. It relates to negligence. That's the primary complaint that I have.

But the PDX defendants is simply ignoring the portion of the complaint that they do not like. Like I said, it's negligence. I understand that long ago that a complaint must specify who, what, when, where and how, but it went -- my complaint went further than that.

For example, I had alleged four elements of the negligence that I pled, and I had declared those elements of the negligence and applied them to the PDX defendants, but I had -- I did not stop there. I put forward a factual basis of the claim establishing, including how the PDX negligence occurred and how the damages occurred.

I must point out also, Your Honor, that -- and I

would like to point you to the complaint itself. At Paragraph 118, I expressed everything concerning the standard of care that was owed to me. I also expressed and explained in Paragraph 118 also that PDX owed me a duty.

The factual allegation actually showing the standard of care that is owed in Paragraphs 16, 17, 19 and 118. And so, I believe that was just covered in the -- that covered the first element of the negligence, Your Honor.

I had also alleged specifically in the complaint at Paragraph 4, 41, 42, 43, 44 and 45, also 115 and 118, 119 and 120, that the PDX defendants had breached that duty of care. And so, with that, I didn't stop there. I went on with the other paragraph -- Paragraphs 2, 41, 47, 48, 68, 69, 70, 86, 87, 91, 116 and 117 to show and to explain the injury that I had -- that I had -- that came about and developed as a result of the negligence.

And then to sum it up and to finalize the negligence, I had also alleged in Paragraphs 2, 41, 48, 69, 85, 86, 87, 91, 115, 116, 117 and 124, the injuries that result from the PDX breach of duty, Your Honor.

But one other thing with related which I would like to touch on. The issues about the -- I'm sorry -- the issues about the product liability, all of that was just part of the negligence complaint that I have. My main complaint, Your Honor, is about negligence and the injuries

related to emotional distress and the asthma attacks that I have been suffering until this moment, Your Honor, all of that is a part of the injuries that I had sustained.

So I tried to be artful as possible to make the case for the negligence because I know very well that it has -- there are four elements to it, which I detailed to you just a short while ago in the paragraph as I had placed them, and I didn't stop there. I also showed the factual basis for bringing those elements to the forefront of the Court.

THE COURT: Okay, all right. I think at this point, you're repeating what you told me earlier, so you don't need to do it again.

MR. NG: Okay. Okay, Your Honor.

THE COURT: Okay.

MR. NG: So one other thing I would like to touch on is that there seems to be a matter related to the procedural efforts that the PDX defendants had made. In July of 2019, they made their first motion to dismiss, Your Honor. And with respect to that notice of motion, they did raise that Rule 12(b)(6) motion; in fact, they said that they were making the motion for an order to dismiss under the (b)(12) -- I mean, under the Rule 12 -- Rule 12(b)(6).

However, they made just few, just very little address of what the claims were at that time, but they

didn't go forward with it. Instead, they stick to what they were intended to do, I believe, that was for the jurisdiction, dismissing the complaint for personal jurisdiction. I'm sorry.

And because that had been raised, I believe that at that time when they raised that first motion, they could have include the other defense as well and consolidate them under the Rule 12 -- under the rules of those defense that they have. They could have consolidated them, but they did not, they choose not. However, the Court made a decision which denied that personal jurisdiction request -- motion that they had set forth.

And I believe when that decision was handed out and filed with the Court in December 2nd, I believe from the rules that they have only 14 days to either plead or to answer the Complaint. They had not made any request or move the Court to seek an extension of time to either plead or answer the Complaint and so, the time expired.

They were supposed to answer 14 days; they end up answered January 16. And I believe, Your Honor, that I should be protected -- I should be protected by that under the Rule 12 -- Rule 12 for -- let me see what I have here -- under that rule that actually gives them -- granted them that time to respond or to plead, if you understand what I'm trying to say here.

THE COURT: Yes. No, I do. I do, and you made that point clearly in your objection to their motion.

MR. NG: Yes, Your Honor. So for me not to be able to protect it -- and, in fact, that's why I seek the Court to enter default. And that was just one day later, they quickly went, and they filed a motion to dismiss, which they never even respond to the motion -- to the clerk's default entry. They didn't make any response. They just figured then, well, the time was not -- the motion was not untimely. Nobody says that, but them not making any response, I don't feel comfortable yet, Your Honor, because I believe that I was protected by the Rule 12(a) -- (a)(4)(a).

THE COURT: Mr. Ng, following the date after the 14 days ran, did you take any action in reliance on the default?

MR. NG: Well, the action related to the default, I understand that I have a time to -- after the Court make that decision to enter the default, I understand that I have a specific time. I don't remember the exact timeframe as to move for an order for default judgment. So I believe I'm still within that time, Your Honor, but, again, I don't remember the exact time because I tried to seek as much help as to get proper information as well. But I don't have that time that is allowed for making that judgment -- for that

motion for a default judgment.

THE COURT: Okay.

MR. NG: So I'm not satisfied, Your Honor, that I'm not protected by that Rule 12, because with everything else within the Court, respectfully, the Court ruled by rules and strict rules. And so, you know, I feel that that should be considered, Your Honor, with all respect due.

THE COURT: All right.

MR. NG: I believe that with all respect due. And I'm not trying to make a big deal out of anything other than I believe I have been so mistreated by all the defendants actually because I'm the person actually suffering. I have bills piled up on me over the same issues, and it's not like I'm not suffering. I'm suffering very deeply. And so, with this case, it's hard to digest that something could have gone so, you know, in such a direction that nobody cares to find a way to resolve it, and I have to be fighting over pretty much my civil rights and my private rights over simple medical records.

THE COURT: Okay.

MR. NG: And so, at this stage that, you know, I don't -- I don't know really.

THE COURT: All right. So let me ask, Miss Curley, do you want to respond or do you want to stand on your prior pleadings?

MS. CURLEY: Your Honor, I'll stand on my prior pleadings, as well as what I had said in a prior hearing that, because there is a legitimate defense -- grounds exist for the motion to dismiss the complaint, that there is cause to vacate the default, and then hear the motion to dismiss, which the Court had granted at the last hearing.

THE COURT: Okay, very well.

MS. CURLEY: Thank you.

THE COURT: All right. I have before me the plaintiff's motion in this adversary proceeding to reconsider and vacate my April 9th, 2020 order, which, as I said, introducing this matter did two things. First, it vacated the entry of default by the clerk's office under Bankruptcy Rule 7055 against the remaining defendant, PDX/NHIN; and secondly, it granted PDX/NHIN's motion to dismiss all of the claims in the complaint against it.

As I noted at the beginning of this hearing, that was a -- the hearing that resulted in that order was a telephonic hearing and Mr. Ng was not able or did not speak at that hearing. I don't believe it was through any intentional fault on his own or on any other one's part. But given that he is pro se and given the fact that he did not get his chance to speak, in addition to the extensive objection that he filed, I believed it was warranted to schedule this hearing on his motion today to hear him.

Normally, motions under Bankruptcy Rules 9023 and 9024, to vacate a prior order of the court, are viewed as seeking an extraordinary remedy to be employed sparingly in the interest of finality and the conservation of judicial resources. Motions for reconsideration under Bankruptcy Rule 9023, which incorporates Federal Rule of Civil Procedure 59, are not normally granted unless the moving party can point to controlling decisions or facts that the court overlooked; matters, in other words, that might reasonably expect to alter the conclusion reached by the court. Zuma Press, Inc. v. Getty Images (USA), Inc., 2019 US Dist. LEXIS 12415 at Page 2 (S.D.N.Y. January 24, 2019), citing, among other cases, Key Mechanical Inc. v. BDC 56 LLC., 330 F.3d 111, 123 (2nd Cir. 2003).

In addition, I've treated this as a potential request under Bankruptcy Rule 9024, which incorporates Federal Rules of Civil Procedure 60(b). That rule provides that a party can obtain relief from judgment on the following grounds: mistake, inadvertent surprise or excusable neglect; two, newly discovered evidence; three, fraud, misrepresentation or misconduct by an opposing party; four, the judgment is void; five, the judgment has been satisfied, released or discharged; or, six, any other reason that justifies relief.

Rule 60(b), "strikes a balance between serving the

ends of justice and preserving the finality of judgments". Nemaizer v. Baker, 793 F.2d 58, 61 (2nd Cir. 1986). Courts should not lightly reopen final judgments under Rule 60(b), Id. See also In re Lehman Brothers Holdings, Inc., 445 B.R. 143, 168 (Bank. S.D.N.Y. 2011). And it should not be used as a substitute for a timely appeal, and it is invoked only upon a showing of exceptional circumstances, Id. See also United States v. International Brotherhood of Teamsters, 247 F.3d 373, 391 (2nd Cir. 2001), although ultimately, the decision whether to grant such relief lies with the sound discretion of the court.

Here, potentially categories one, that is mistake, inadvertent surprise or excusable neglect; two, newly discovered evidence; three, fraud, misrepresentation or misconduct by an opposing party; or, six, any other reason that justifies relief have been asserted as potential grounds. Here, there is, as stated, no newly discovered evidence; in fact, Mr. Ng was quite clear in laying out in summary form the basis for his objection, which he had filed previously in more voluminous form and that I considered in connection with my original ruling.

The response to the objection to this motion alleges misconduct by PDX in setting up the phone call. But it appears to me that such an allegation, i.e., fraud, misrepresentation or misconduct, sets forth a high burden.

As stated in the case law, the movant has the burden to establish, by clear and convincing evidence, that the adverse party obtained the judgment through fraud, misrepresentation or other misconduct. See In re Old Carco, LLC, 423 B.R. 50-51 (Bankr. S.D.N.Y. 2010) and the cases cited therein. And it does not appear to me, based on my own recollection of the Dashboard and the correspondence with chambers that there was misconduct that has been shown by clear and convincing evidence here.

In any event, I have given Mr. Ng the chance to participate in what in essence would have been or is a replay of the hearing that I previously had, which would be the only other reason that might justify relief under 60(b)(6), given that this catch-all provision cannot apply if one or more of the specific clauses of Rule 60(b) will not justify relief under that provision. Again, see United States v. International Brotherhood of Teamsters, 247 F.3d 370, 390-92 (2nd Cir. 2011), citing Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 863 (1988).

In addition, I have not heard any new evidence that was not raised before or could have been raised before. And that leaves me with whether any exercise of my discretion I believe I made a mistake in my ruling based on my review of the pleadings, including the underlying complaint. Mistakes can include both legal and factual

mistakes by the Court.

Here, given that this was a motion to dismiss, it would only be a potential legal mistake. And I considered, after having heard Mr. Ng, whether that might apply here. Again, for the interpretation of Rule 60(b)(1), see In re Old Carco, LLC, 423 B.R. 45-46 and the cases cited therein. I thought carefully about that, but I conclude that the order was properly entered.

Let me deal with the motion to dismiss first. I carefully reviewed the complaint and went through the elements of the underlying causes of action and then applied the factual allegations in the complaint to those elements and I believe laid out in some detail in my bench ruling why here I believe the complaint did not state a cause of action that was plausible, including under negligence.

The basic proposition on the negligence point was that the allegedly negligent action by PDX was to have provided Mr. Ng with certain records that it had regarding prescriptions filled for him that were (a) not originally provided and then were later provided and when later provided that conflicted with, i.e., were different from information he had previously received regarding the prescriptions.

I concluded that as far as the negligence cause of action was concerned, the facts alleged did not establish a

duty of care with respect to those facts nor approximate cause, given that the primary conflict was in the nature of the warnings with respect to prescriptions that were prescribed medically, and that one would not reasonably expect or plausibly expect that to have caused the psychological reactions that Mr. Ng's complaint details.

The other causes of action, which Mr. Ng has not dealt with at today's hearing but did in his objection, I separately addressed, and I believe was not mistaken in addressing in my bench ruling denying those causes of action.

Finally, the second part of my ruling was that PDX should be relieved of the default that the clerk's office entered here. The default was entered correctly, as Mr. Ng noted both in his objection and at oral argument. After PDX lost its initial motion to dismiss, which was solely on the grounds of lack of personal jurisdiction, it had a specified time under the bankruptcy rules to answer the complaint or otherwise move. It was late in that by approximately a month and the notice of default was properly entered under Bankruptcy Rule 7055. However, this rule is only the first step in a default, unless the complaint is for a sum certain, which was not the case here.

In addition, the plaintiff needs to move for a default judgment, which had not yet been done, and I don't

fault Mr. Ng for doing that. He's correct in saying that his time to make such a motion had not expired by the time that the defendant had made its second motion to dismiss. But that fact is relevant to the proper analysis of a request to be relieved of a default under Federal Rule of Civil Procedure 55.

The courts generally act or approach a request to be relieved of a default with the following factors: whether the default was willful or culpable; whether granting relief from the default would prejudice the opposing party, in this case, Mr. Ng; and whether defaulting party has a meritorious defense. Those factors guide the court in the exercise of its discretion, although courts are generally well advised by the proposition that the courts prefer matters to be decided on their merits.

Here, I concluded that the default was not willful or culpable, which is related to the second point, which is that there was no prejudice to Mr. Ng in that he had not yet moved for entry of a default judgment, nor had any other step in the adversary proceeding taken place. And further, there was sufficient time for addressing all of the issues on the merits in the motion to dismiss. And there, it was clear to me that, in fact, the defendant did have a meritorious defense to each of the causes of action in the complaint.

So in light of that, I was prepared to grant the request by PDX for relief from the default, and I don't believe on today's record that that should be changed. Of course, Mr. Ng has his right to appeal and by saying that I didn't make a mistake I'm not concluding that there wasn't a mistake, but as far as a motion under Rule 9023 or 9024 is concerned, that is dispositive.

So I will ask counsel for PDX to submit an order denying the motion for the reasons stated in my bench ruling on the record. I will also ask or work with my clerk's Office, Miss Li work with counsel for PDX and Mr. Ng to get a copy of the transcript of my earlier bench ruling so that the parties can have that promptly.

MS. CURLEY: Thank you, Judge. I've been taking notes and I'll start to get an order over this afternoon.

THE COURT: Okay, very well. Thank you both.

MS. CURLEY: And I'll copy Mr. Ng on the submission of the order.

THE COURT: That's fine. Okay. So we should proceed then to the next item on the agenda.

MR. FAIL: Thank you, Your Honor, for the record, again, Garret Fail, Weil, Gotshal & Manges.

The second item on the agenda is the first of two status conferences that are on for today. The first relates to a motion filed by the Relator Carl Ireland, relating to a

secured claim that was asserted in these cases.

Your Honor will recall, this motion was filed eight months ago prior to the sale, prior to confirmation. It's been carried from time to time. The motion originally sought to have the claim value determined, to have proceeds allocated, and to be paid and satisfied.

Subsequently to the motion being filed, Your Honor will recall several instances where this issue was discussed in Court, including at the confirmation hearing where, through the confirmation order, this creditor was granted adequate protection for its secured claim with a lien on all assets of the Debtors, which included --

THE COURT: I'm sorry, I have the paragraph here, and it's a lien against the sale proceeds of the property and a superpriority administrative expense against all the Debtors that was adequate protection.

MR. FAIL: That was at the sale, Your Honor, right?

THE COURT: No, that's, I believe, the confirmation order, paragraph 65, if I'm not mistaken. But in any event, there's the superpriority administrative expense claim as well as adequate protection arising from the sale of the property, which was where there had been an earlier lien granted in connection with the sale, to satisfy the diminution in value of the replacement lien post-

closing.

MR. FAIL: Right, Your Honor. We cite, in paragraph 65, that they got a lien in our reply that we filed at Docket 7471, confirmation order, paragraph 65, which gave them a replacement lien against total assets defined in the plan as additional adequate assurance, which is senior to other liens against total assets, and doesn't supersede or otherwise modify the sale order grant for the Debtors.

THE COURT: I'm not sure about that. My notes have it as just a lien on the property plus the superpriority claim, but it may not matter based on what you --

MR. FAIL: I think that was an issue -- that was an issue that was, you know, that was an argument that they were concerned that the proceeds weren't sufficient. And I think to address the issue, we gave the additional liens, Your Honor.

THE COURT: Okay, all right.

MR. FAIL: It's in total assets. So, you know, from the Debtors' perspective, when we attempted to make the initial distribution pursuant to the confirmation orders approval of the administrative consent program whereby creditors that opted to reduce their administrative expense recoveries by 25 or 20 percent, would receive payments in

advance of the effective date of confirmation, the Relator objected and, again, sought to have payment made on the secured claim. And the Court determined that they were adequately protected, noting, among other things, that to be adequately protected, the Debtors only had to have roughly $18-, $20-, $22 million worth of assets to cover the alleged claim.

The Court noted that the litigation, the substantive litigations that the Debtors were pursuing, including preference actions, of which the record is clear that the Debtors have pursued and filed hundreds of causes of action, including the Debtors' claims against D&O proceeds, and including the Debtors' litigation against ESL, you know, were valuable assets of the Debtors'.

From the Debtors' position, nothing has changed with respect to that, and the fact that the Relator and the government are now looking at other items that were part of calculations dealt with and addressed at confirmation, you know, we shouldn't be retrying things. This estate is limited. We're trying to move forward. And this Court has already ruled that, from the adequate protection perspective, the estate had long-term assets that provided them this claim with adequate protection.

We don't think there's anything else to do or to schedule with respect to this motion. We noted in our reply

that, you know, there's a dispute as to the quantum of the claim. I think that the real sticking point to settlement of that is the Relator's and the government's continued desire to be paid in full in cash, immediately and prior to the effective date and from the Debtors' perspective, this issue has been addressed and we don't have to do that.

We also note that, you know, the Debtors reserve all rights to dispute the claim, obviously, if the need be, including examination as to whether any of the claims should be actually subordinated, because it's a penalty or a punitive damage claim.

But we're hopeful that we don't have to spend a substantial amount of money disputing it. I think that the real issue is that they continue to want payment. Nothing has changed since the confirmation order, it's law of the case. There are no facts and circumstances that change with respect to the pending litigation that's outstanding.

That litigation won't be compromised, abandoned or settled or monetized without orders of this Court. Even if it were, then distributions from those proceeds eventually will not go out to creditors unless and until we provide notice to the Court, which hasn't happened, obviously, of course. And so, if circumstances change based on those two factors, perhaps we can revisit. But at this point, we don't think that it's beneficial to the estate or necessary

to protect adequately this secured claim for $20 million, approximately, to spend any more resources or judicial resources on it. I'm happy to answer any questions and I'm sure that the Relator and the government will want so speak.

THE COURT: Okay. Well, I just want to focus on what's -- this is a status conference, but it's a status conference not really on the matter that's pending before the Court. The matter that's pending before the Court is a motion for an order determining the value of the Relator's collateral as of the sale; determining the amount of any diminution in the amount allocable thereafter and directing payments. And on that score, I gather that the parties not only have exchanged their appraisals, where there seems to be a spread between about $17 million and $22 million, at least without going into any detail as to the valuation issue. And I've had some discussions about resolving those issues.

But the real subject of today's conference, at least as highlighted by Mr. Fogelman's letter, is about adequate protection. And there isn't really an adequate protection motion in front of me. So, I'm reluctant to get into great detail about whether the Relator is adequately protected or not, because I don't really have a forum in which to do that.

MR. FAIL: Thank you, Your Honor, that's fine.

The Debtors would agree with that and further with respect to the eight-month-old motion to determine the value. A lot has happened since then, including the imposition of the administrative expense program. I'll be providing an update on that next, Your Honor. But the Debtors are focused on reconciling claims that are entitled to be paid first, and we've been efficient and, the Court has deferred and adjourned all requests to have individual claims addressed at the request of individual creditors. And so, I really don't think that we need a status conference on that or that the Court will be scheduling that portion.

THE COURT: Well, let me just -- part of the Relator's collateral is cash. And the issue, I guess, that Mr. Fogelman raises, is an adequate protection issue. But to the extent that the Debtors would be paying out or using cash, I don't think there's a cash collateral agreement. There didn't need to be given the earlier findings of adequate protection. But I suppose the issue could be raised there. But I gather from what you've stated, that the Debtors don't intend to be making distributions or payments to administrative expense creditors going forward without notice, which I'm assuming would include notice to the Relator's counsel and the government. Am I right about that?

MR. FAIL: You are, Your Honor. But I want to be

clear, we will be providing notice. But I don't think that -- you know, I hope to defer this issue beyond that notice because the Court's confirmation order gave them a lien on total assets, as I said. It says, "In addition to the sale order grants, mortgagee shall have a replacement lien against total assets as adequate protection. It shall be subject to the carve out...," blah, blah, blah. So, it basically has a lien on everything else and it was expected that cash coming in would then go out. So, it's not new. So, we do have cash now. We will announce -- it's not a today issue.

THE COURT: I don't think it is a today issue, but I also think that that finding of adequate protection is subject to materially changed circumstances. So, it would seem to me that if there are materially changed circumstances that would, arguably, render the Relator and the government not adequately protected upon the Debtors making material cash distributions, then they should either consent or -- you know, it should be on notice to them that this is the proposed use with a showing which could be as much as you want, including what you've just said, that they are adequately protected. I think that would be, other than a motion for relief from the stay or to enforce an administrative expense under the applicable order, the confirmation order. Those would be the two ways I think

this issue could come up. And I don't think it's really more than that can be said today about it, other than I would encourage you to sit down with counsel for the Relator, and to the extent Mr. Fogelman wants to be involved, the government to potentially head off unnecessary litigation over this issue so that they can report back to their clients whether they think, based on what you've gone through, that they are still adequately protected.

MR. FAIL: Thank you, Your Honor. We have had conversations. We've attempted to cut off litigation costs. The litigation remains outstanding as significant. The Unsecured Creditors Committee is pursuing it. They're on the line. I would hope that we don't see a motion and that they don't request and that the Court doesn't require additional costs for trials to prove what's already been proven as law of the case; that the Debtor has significant short-term assets, long-term assets, and that the long-term assets are remaining with value that exceeds the estimated $20 million, even if all cash, you know, current cash, were to go out, all current available cash were to go out pursuant to the admin expense motion. I'm just afraid that, you know, we're going to face another motion from the same parties for the same issue. The Debtors were looking to cut that off with the status conference.

THE COURT: All right.

MR. HALPERIN: Your Honor, it's Alan Halperin.

THE COURT: Yeah, go ahead.

MR. HALPERIN: My apologies. I would like to be heard on this if I may.

THE COURT: Sure.

MR. HALPERIN: First and foremost, just because it bears saying at the beginning, I genuinely appreciate the Court and the parties getting together today and allowing us to be heard. These are some interesting and surreal times that we're all living in right now, and I do hope that everybody is okay. There are a couple of --

THE COURT: Could you -- I'm sorry -- just for the record, could you just state who you're appearing on behalf of?

MR. HALPERIN: My apologies, Your Honor. Alan Halperin, Halperin Battaglia Benzija, on behalf of the Relator, Carl Ireland.

THE COURT: Okay.

MR. HALPERIN: There are definitely a couple of points that I felt was important to at least note, and I do know that this is a status conference, it wasn't a motion. But we've kind of, sort of blurred the line a little bit.

A couple of things: first, we filed our motion back in August of 2019, seeking a determination of value of the secured claim, and seeking adequate protection. It was

noted in there, because we do continue to have concerns and there were some things at the time that were concerning us. And that was before confirmation. Actually, I think it might have even been before the sale, but I'm not 100 percent sure, before the sale closing.

I don't need to get into everything. It's a status conference and we've already gone through quite a bit. But suffice it to say, I guess, in short, as part of the sale order and as part of the confirmation order, the right of the Relator and its co-mortgagee, the United States, to come in and request a change in terms of the adequate protection, in terms of requesting some monies to be escrowed or paid, was reserved. And it was clear all along that that was a preserved right.

So, I understand that lawyers will have positions, and clients do too, but it's certainly not law of the case. It was a procedure that was set up, and it can evolve, just like the case can evolve. In terms of the --

THE COURT: Well, that's always the case with adequate protection. So, I don't think we need to worry about that. On the other hand, it's really not a good idea to make a motion on, essentially, the same facts or not materially change facts for your particular client. I don't know the answer to that. Maybe you're at that point.

MR. HALPERIN: Clearly understood, Your Honor. By

way of going along those lines, let's be very clear, we made or motion back in August of last year and it's been adjourned from time to time at the request of the Debtor. And, frankly, we did it because we wanted to queue up the process and start to deal with our claim, but it wasn't urgent, and we didn't --

THE COURT: Right, but I did deal with it in confirmation, you know, because that was --

MR. HALPERIN: Absolutely.

THE COURT: -- it was teed up at confirmation. So, we're really focusing on what's changed since the third week of October last year. A lot may have changed as far as your collateral. I don't know.

MR. HALPERIN: And that is correct, and that is something that has been causing us concern. I don't need to belabor the point per se, because this is a status conference, Your Honor, but we do note in our reply some of those changed circumstances. And they're material. Everybody's operating on a little bit of a difficult basis given the stay-at-home orders and the impact it's having on everybody. But it does go to proceeds realized versus proceeds that were projected.

THE COURT: Well, the issue, though, is whether they're material as to your client's claim, not the case generally.

MR. HALPERIN: We believe they are.

THE COURT: And I understand that you get that too. So, I don't know if there's anything more to say at this point. It's not really going to help me to hear more on that without the right context. So, I would urge you, again, to focus on that. It seems to be so far -- maybe I'm wrong -- the discussions have been more about how to resolve the claim as opposed to the interim step of adequate protection. If you haven't had that latter set of discussions, you should before making a motion. There are a whole host of ways to assure a secured creditor that there is adequate protection and/or a court. And I would just want that exercise to have happened before any request for adequate protection is teed up before me.

MR. HALPERIN: Your Honor, I think that's okay, I guess, to the extent I heard what I thought I heard. I just want to make sure we're on the same page. I thought I heard Your Honor say that additional monies to any administrative creditors wouldn't go out without notice. We have --

THE COURT: Well, material payments. I mean, obviously, if they're paying the light bill, that's one thing. But material payments, yeah.

MR. HALPERIN: But that would go, I would expect, to the admin procedures motion, so, to the extent we're talking about millions of dollars out the door. That said,

we have recently started discussions asking for additional information, so that we could better understand the current asset picture; some of which we were able to glean from the public record, some of which really isn't in the public record and we still don't have. And we will follow up with the Debtors and their counsel, and hopefully be able to get that information. And if not, if we need to tee this up by another -- we still believe that we're in trouble and we need to -- or concerned or at risk -- and need to tee this up by another motion -- we can.

We kept it kind of light, although we did at least address the requests in this motion, but we can tee it up differently with more specifics if we need to. But we'd be happy, and would prefer, to first be able to get the information we need and come to some kind of an amicable resolution of this. Because I think we and the Debtors, at least via the positions in Court today, have a different perspective on what was put before the Court in terms of what could be, what should be relied on, and what confirmation was based on versus what wasn't, in terms of assets and what would be there.

All of that being said, as Your Honor stated -- and I agree with you -- it's better not to turn this into a contested matter if we can all come to some kind of an accord on issues that concern both sides. And I will

continue to try to do that.

THE COURT: Okay. And that agreement can an interim one just on adequate protection or it can be a comprehensive one, which includes all the issues regarding this claim that are before me. So, it can be either one.

And then as far as major outflows of cash are concerned, if that cash is the Relator's cash collateral, then I think that you all are entitled to notice before it goes out the door.

MR. FAIL: That's fine. Your Honor, we've already agreed. Your Honor, the Debtors already have agreed that we're going to provide notice of a distribution. There's nothing new or that's contemplated by a distribution. The Court entered the confirmation order and directed us to give out the cash that was liquidated from short-term assets to administrative creditors, knowing that there were long-term assets. And the long-term assets remain. The Committee counsel is on the phone, who is prosecuting it. I mean, the Relator wants detailed information and I just hope that they don't continue to ask us to engage in another trial on what's been done. The Court considered long-term and short-term assets. We'll deal with it if they file something, Judge.

THE COURT: Very well. Okay --

MR. HALPERIN: The only thing I would ask, which

is where I was going with this -- I apologize, Judge, but I want to make sure this is clear -- is that we'll get, what I'll say is adequate notice so that if we do have a concern about what's going out the door, we have an opportunity to first talk with Weil and second, if we can't come to some accord, that we have an opportunity to ask Your Honor for some help. Judge, I want to make this very clear. I'm not --

THE COURT: That's clear, you don't have to -- that's what I have in mind.

MR. FOGELMAN: Good morning, Your Honor, this is Larry Fogelman, if I may be heard briefly?

THE COURT: Sure.

MR. FOGELMAN: Just for the record, I'm here on behalf of the United States.

Your Honor, first, just as an initial matter, AUSA Peter Aronoff is lead counsel for the government on this case. He is recently returned from parental leave, and I've been filling in, in his absence. So, I appreciate the Court's hearing me this morning.

I think everything has already been said. I just want to raise the concern that -- the Court's asked about conversations about adequate protection. And at least to date, and it's been said today in Court, the Debtor's position has been that the Court's already ruled on this,

it's law of the case and nothing has changed.

We disagree with that, respectfully. I think, just to give the Court one key example, at the time of the confirmation hearing, it was estimated that Transform would pay $90 million of the administrative claims in this case. And the recent settlement in January 2020 reduced that amount of their contribution to $7 million. So, right off the bat, there's an $83 million swing that has potentially harmed the government and the Relator here.

We've been attempting to have conversations with Debtors' counsel to evaluate how much cash is on hand, what's the value of non-cash assets, what's the amount of liability just to be able to compare that asset and liability picture and have a more detailed -- get more detailed information to present to the Court. And we'd simply ask that the Debtors be flexible in providing that information to us. There is still outstanding information that we've attempted to learn that we have not yet been given and we looked forward to working with Debtors in an effort to resolve this.

THE COURT: Okay, very well.

MR. FOGELMAN: Thank you, Your Honor.

THE COURT: Why don't we move then to the next agenda item; which I would like to actually have -- not the next one. And I think, Mr. Fail, you alluded to it earlier,

which is just a brief status conference on the administrative expense claim liquidation process.

MR. FAIL: Thank you, Your Honor. You're saying you would like me to present that or you would not like me to present that?

THE COURT: Yes. No, I would. I would like you to.

MR. FAIL: Thank you.

THE COURT: It's not next on the agenda, but I think it's related to this matter.

MR. FAIL: I do as well. I just wanted to clarify. Thank you, Judge.

At the February 24th hearing, I presented an updated on the Debtors' efforts to reconcile administrative claims and administrative motions invalid. We disclosed at the time that we had reconciled and allowed 359 opt invalid for an allowed total of $73.2 million that shared in $21 million and received initial distribution of 28.7 percent already.

We disclosed at that time that we had reconciled 992 non-opt-out settled admin claims as well. We disclosed that we had resolved various claims without the need for objections, that we had filed ten omnibus objections to more n 1,400 claims; that we had resolved all but approximately 48 of those claims for less than 30 creditors with a

settlement or with a court order, but without a contested hearing.

At that time, we had filed the Debtors' eleventh, twelfth and thirteenth omnibus objections to another approximately 280 claims that were pending at the time. At that time there were approximately 668 other claims that remained to be reconciled or put on an objection.

Since that last status update, Debtors have continued to resolve claims through the administrative claims process without objections. Since the last status update, the objection deadlines for the eleventh, twelfth and thirteenth omnibus objections have passed, and the Court has already entered multiple orders granting the relief requested.

The Debtors also filed their fourteenth, fifteenth, sixteenth, seventeenth and eighteenth omnibus objections. The Court entered an order for the fourteenth omnibus objection already. The objection deadline remains outstanding for the remaining. We're going forward to address the remaining claims on the Debtor's second omnibus objection later today.

While we have adjourned disputes from time to time, the Debtors have been efficient and productive in the interim. Out of all of the hundreds of claims subject to the first 13 omnibus objections, there are only a very few

claims for which the hearings remain adjourned. The numbers are quite impressive. A total of only six non-World Import claims remain adjourned. And a total of only 11 World Import-related claims remain adjourned.

I'll note two things of further relevance with respect to the already incredibly small population of claims. First, the Debtors have reached a settlement in principle, and are documenting settlements with three of those 11 World Imports-related claims. So, a more accurate count of those claims is really 25 percent lower than the 11.

Second, certain of the remaining World Imports creditors have opted out of the administrative claims settlement. In other words, they will not participate in distributions ahead of the plan effective date, even if their claims are eventually allowed through litigation in advance of the effective date. Notably, these include some of the most vocal objectors. And of course, the Debtors were required to prioritize settlements of all other claims ahead of their claim.

In summary and in total, since the last update, the Debtors have reduced the number of claims that have not been settled or subject to an objection, from 668 to 127; a reduction of 541 or 80 percent of the claims population. Obviously, a lot of work went into this. The results speak

for themselves.

The Debtors have been efficient with their use of judicial resources and we hope to continue that efficiency while continuing to make progress. We ask that the Court allow us to be able to continue in this fashion. While we have made significant progress, there remains significant work to do. The goal of the Debtors continues to be to reduce the number and amount of disputed claims in advance of the next distribution, in order to reduce the need for reserves, and to maximize the amount that is distributable.

The Debtors and the UCC advisors, and now the administrative claims representative, have the best visibility into the pools of claims, and the best way to meet that goal. Individual creditors do not. They only see and argue for their particular claim. In addition, as we have disclosed before, while the Debtors have reconciled the amounts that they owe, they have also sent demand letters and commenced hundreds of preference actions.

There is overlap between the claimants and the preference defendants, including significant overlap amongst a small group of remaining disputed World Import creditors. The Debtors do not intend to make any distribution to these prepetition claims while preference exposure is outstanding.

The Debtors have consulted with the UCC and the administrative claims representative in developing and

executing their strategies. Both the UCC and the administrative claims representative supported the debtors' decision to continue to adjourn the hearings that have been adjourned, and to reduce the time and expense of litigation on the World Import issues.

Judge, I'm happy to answer any questions you have, but that's our update on the significant progress that's been made with respect to the program.

THE COURT: Okay. The one question I have at this point is, what is going on with regard to payment of these claims to the extent allowed?

MR. FAIL: Judge, under the program the debtors are required to fund certain reserves and excess available cash above those reserves are to be distributed to the next round of these creditors that I'm talking about, that have been allowed since the initial distribution, pro rata, up to the 28 percent recovery that initial distribution received, but that's after we provide notice.

THE COURT: Okay.

MR. FAIL: The significant 80 percent reduction in number has led to a significant reduction in what would otherwise need to be reserved for the claims. But our goal will be, and must be, because the confirmation order requires us, to expeditiously move to distribute the cash that we have amassed, and anything that comes in, to those

creditors.

THE COURT: So, who does that notice go to?

MR. FAIL: We'll file it publicly on the docket. I suggest that nothing further need to be required. Parties that are interested receive information from the docket. And there wasn't -- we don't need to continue to do mailings or anything like that. We'll file notice on the docket. People can --

THE COURT: At this point, you have claims that have been filed, right? There's no one out there who hasn't filed a claim? I mean, that didn't have to file a claim?

MR. FAIL: Judge, to be clear, we're talking about administrative priority claims. We looked at those that were filed by the bar date. We filed motions based on everything in our books and records. We sent out notices asking anybody in connection with the ballots. I think at the last hearing I talked about the -- I forget if it was between 10- and 20,000 parties that we noticed. We think we've covered the universe, and now we've gone through everything that's come through.

THE COURT: I mean, at this point, you have defined the universe because of the bar date. So --

MR. FAIL: For pre-petition claims, that's right. And honestly, we haven't operated as Debtor -- we haven't operated a business in close to a year, so, we're over a

year. We think we know of everybody that's out there.

THE COURT: Okay. I see at least Mr. Wander on the Dashboard. I don't know if other parties -- he had asked for this conference. I don't know if other parties want to be heard as well.

MR. WANDER: Good morning, Judge, this is David Wander, of Davidoff Hutcher & Citron, on behalf of Orient Craft Limited and HK Sino-Thai, that's S-I-N-O hyphen T-H-A-I, Trading Company Limited. After I give you my comments, Your Honor, Benjamin Butterfield of the Morrison Foster firm, counsel for Icon, would like to give his comments, if that is okay with Your Honor.

THE COURT: Okay.

MR. WANDER: Your Honor, I want to focus on the matter that I asked you to have this status conference. There were additional matters that were just mentioned with regard to the payment of a second distribution. And while I have comments on that, I am not going to say it on this call, because that was not the purpose of my request, Your Honor. I would only note that there has been no administrative claims bar date in the case. But I want to focus on my matter, Your Honor.

THE COURT: But I'm sorry, just on that point, it is the case that it's highly unlikely that there are any parties who care about administrative expenses at this

point, that have not surfaced, given that the Debtors' sale happened so long ago.

MR. WANDER: Your Honor, I don't think that's correct, because I saw on the docket in the past two days, I believe, an administrative claim of $1 million that was recently filed. And I've been following the docket and each week I see additional motions for allowance of administrative claim. So, I believe there are other administrative claims out there, but again, that is not what I asked to be heard on today.

THE COURT: Okay, all right.

MR. WANDER: Your Honor, I look at this very differently than the Debtors' position. From my viewpoint, if the Court rendered or renders a decision on the World Imports issue, it would save a lot of legal fees. Claimants want to know the position in the Southern District on 503(b)(9). It's a pressing issue. I imagine, based on --

THE COURT: I'm sorry, in this case?

MR. WANDER: No.

THE COURT: It doesn't sound like the numbers bear that out.

MR. WANDER: Well, Your Honor, I've had many discussions with other administrative claimants, and many of them, frankly, have been worn down and they can't, some of them, their clients can't continue to pay the legal fees.

Others are being told there's another distribution coming and if you don't settle, you're going to miss the boat. So, I just look at things differently from the Debtors' point of view, because I've been vocal in my viewpoints on the administrative claims process, and certain defects, but I haven't put it before Your Honor because it hasn't been appropriate for my clients.

There are no negotiation going on right now on my client's 503(b)(9) claims. And I believe that it's important for my clients. It's important for the bankruptcy bar, particularly with the deluge of retail bankruptcy filings that we're expecting. Now, I wrote to Your Honor --

THE COURT: No, but Mr. Wander, that's not this case. People write law review articles and that's why people like you advise their clients. But courts just don't go out and write opinions because they want to write an opinion that will affect the law in other cases. So, to me, that's not warranted. Can go back, though, to one of your other points? I just want to make sure I understand a couple of things here.

First, is your client a defendant or has it been given notice that it could be a defendant in a preference action?

MR. WANDER: Orient Craft I'm not aware of any preference claim. I believe for HK Sino-Thai, I think my

client got a letter four months ago and nothing else has happened. We did not opt out, so we're in the administrative claims program. So, if that answers Your Honor's questions?

THE COURT: Okay. And then the other question I had is, I appreciate that the World Imports issue would, at some level, affect negotiations. But it appears to me that in this case, there are many other factors that probably have a more significant effect on negotiation. Those include potential preference liability and, most importantly, simply the Debtors' ability to pay. And I don't get the impression, but you can feel free to correct me, that the thing that is driving all of these settlements it the World Imports issue and parties trying to figure out whether it applies or not, and/or whether they have given up on it because they don't have the money to spend.

Normally, if people need an answer on something like that, and want an answer as opposed to want the uncertainty in an negotiation, which could help both sides, they leave it open, or they, you know, if they need an answer they go and get one. But to say that people don't want to spend the money on it, may well mean, simply, they don't want to spend anymore money on the case because they see their best-case scenario even if they win, being a certain percentage recovery as opposed to a full recovery.

MR. WANDER: I appreciate that, Your Honor. The way I look at this right now, from a procedural posture, I wrote to Your Honor on this issue in January, on January 21. And at that time, I said I will not object to one more adjournment of the hearing on the tenth omnibus claims motion if the Debtors would file their reply papers. And Your Honor forced the Debtor to file their reply papers, I believe, in January. And so, we had agreed that the matter would get adjourned. And I did say in my email at the end, "This issue is too important for the can to just be kicked further down the road."

Now, that was in January, and here we are in April. And myself and others were prepared for oral argument today, and then we heard that the Debtor was going to adjourn things. And I'm okay with that, Your Honor. Because of what's going on right now, I'm not going to rant and rave like I might otherwise have done.

But there's no reason, Your Honor, respectfully, that this matter can't and shouldn't be addressed at the next omnibus on May 14. Your Honor, I believe, I submit, Your Honor is going to have to render a decision on this, because there are certain parties that do not feel that the type of settlement that's been proposed comes close to what would be acceptable to my clients. So, we would --

THE COURT: How many of those parties are there at

this point? That was one of the reasons to adjourn back in January. If it wasn't clear who was going to be involved in the dispute --

MR. WANDER: I think there was --

THE COURT: Has that been narrowed down? There are three parties.

MR. WANDER: I think it's -- well, three law firms. So, Your Honor, I have two clients; Mr. Butterfield, he has Icon, which is, I think the largest one, it's about a $10 million claim, I believe. And then there's Jeffrey Schwartz, who has the Winners. So, we want to go forward --

MS. MAZUR KRAEMER: Your Honor, if I may, this is Salene Mazur Kraemer on behalf of Vir Ventures and AMI Ventures. We are in this boat as well. They had a claim for about $800,000, Your Honor. It's a World Imports issue also. And I represent another creditor, New Acme, their claim is about $100,000. Again, it's a World Imports issue. I echo the sentiments of counsel regarding this issue.

THE COURT: Have you briefed it like the other three firms?

MS. MAZUR KRAEMER: Yes, I have, Your Honor. It's a joint response to the second omnibus objection.

MR. FAIL: Judge, it's Garrett Fail, just a quick check of reality here. Since January, we've resolved a large number of the ones that were remaining, as we said we

were going to. Since January, Your Honor gave us the discretion to continue to adjourn it where we thought it would be productive for the Debtors. Not necessarily -- not productive for the parties that have insisted that it goes forward.

We checked with the Creditors Committee, we've checked with the administrative claims representative, who have agreed with us and whose counsels are on the line today. We've demonstrated that there has been progress with respect to this subgroup of claimants.

We've further demonstrated that we've not focused solely on these creditors, but to address 80 percent of the other creditors that are out there.

THE COURT: Mr. Fail, I heard you earlier.

MR. FAIL: Okay, and then the last --

THE COURT: I'm just trying to figure out how many people are involved here --

MR. FAIL: Very few.

THE COURT: -- it sounds like there are like eight or ten.

MR. FAIL: There's eight of them at most. Our records indicate, and we're checking, that -- and now I've just gotten confirmation -- Orient Craft, Mr. Wander's client, opted out. The administrative claim motions that are being filed recently are related to real estate and

landlord claims where Transform is liable. So, I don't think there's anything wrong with any of the statements, actually, that I made. The new motions don't demonstrate that there's people that have valid claims against us and I don't think it's relevant at all to whether or not we continue to adjourn. At most, there's more work for us to do -- nothing that helps Mr. Wander's client.

THE COURT: So, I guess the one other point --

MR. WANDER: Your Honor, if I may --

THE COURT: No, no, let me just ask this question first. I wanted the Debtors to file their brief so that --

MR. FAIL: We did.

THE COURT: -- the lawyers involved here -- I know, I know, and I wanted the lawyers involved here to actually see both sides of the question, and their clients could see both sides of the question and could analyze it in the context of settlement negotiation.

Mr. Wander is right, there is a time, at some point, when settlement negotiations stop because one side or the other doesn't want to continue. But at the same time, if, in the meantime, people are not being prejudiced, and the Debtors are actually using their time more efficiently, I'm not sure why we should put this issue on the front burner.

So, I guess the thing I'm most interested in at

this point is how, if at all, other than wanting to have an answer conclusively, which could hurt or help, there's prejudice of this being adjourned -- not only today, which it was, but say, from the May hearing, if the Debtors are at a point there where, in consultation with various parties, they think it should be adjourned. We're at the prejudice, that's really the issue I'm asking Mr. Wander.

MR. WANDER: Yes, Your Honor, if I may defer just now to counsel, Mr. Butterfield. I know he wanted to address you.

THE COURT: Okay.

MR. WANDER: And if he doesn't address this point, which I think he will, then I will do that after he speaks.

THE COURT: Okay.

MR. BUTTERFIELD: Good morning, Your Honor. For the record, it's Ben Butterfield from Morrison & Foerster for Icon Health and Fitness. Your Honor, I just wanted to address that point and also add a little bit to the comments from Mr. Wander.

We understand that adjournments can be helpful, that they can facilitate settlements, and we support that. But what we don't think should be allowed is for a Debtor to use adjournments defensively, right, defensively to pressure creditors to settle.

And look, you know, I know that some creditors

will complain about any delay, any adjournment. And we tried not to complain in this case. But I think the Debtors are starting to cross the line here. They filed their tenth omnibus objection last September. They filed their eleventh several months ago now. The issue is fully briefed. They've already filed a reply for the tenth; maybe they'll file a reply for the eleventh, I don't know. But otherwise, it's fully briefed.

This is a discreet legal issue. Like they said, there's not that may admin creditors out there with this issue that remain at this point; there's just a few of us. And you know, the Debtors have given us a preliminary settlement range and we are nowhere close. We are nowhere close. And the Debtors don't disagree.

We gave them our estimate of it, they gave us theirs and they said, look, I don't even think we can have a settlement here. We've never seen a settlement where the divide is so great. So, we think we have very strong arguments. There are dozens of cases on our side. There's not a single case on the Debtors' side that's going to win on the merits --

THE COURT: Can I interrupt you?

MR. BUTTERFIELD: Yes, Your Honor, please.

THE COURT: Are your clients preference targets?

MR. BUTTERFIELD: They are. So, we have an $8.5

million disputed 503(b)(9) World Imports claim. That's like the disputed portion on World Imports. Our preference liability, you know, we've talked to the Debtors about it. We think it's about $3 million. And one of the concerns here is that, like we have a reserve issue. Like, we're not sure -- I know that people are talking about there's going to be a reserve, there's going to be a reserve, but where is that in the confirmation order?

MR. FAIL: This is not on for the agenda today. What is this relevant for? This is ---

THE COURT: I'm just focusing on -- and this goes to the prejudice point -- again, the Debtors have represented that they're giving notice, and they've discussed reserves. I understand that the Debtors' decision to adjourn today's hearing, which had been noticed on the World Imports issue, came late. What I want to focus on is that I want to make sure that if they do the same thing -- I forget when the next omnibus day is. It's May …

MR. BUTTERFIELD: May 14, Your Honor.

THE COURT: May 14, well, that's not that far away. But if they do it before then, on, say, May 13, that it's the right thing to do. And to me, I'm not sure it really matters unless there's real prejudice in terms of money going out the door that would otherwise be spread among parties. And I'm not hearing that yet.

MR. WANDER: Judge, this is David Wander. I'd like to address the prejudice.

THE COURT: Okay.

MR. WANDER: The prejudice is to everyone because, let's assume Your Honor rules against my client, then maybe there shouldn't be a reserve, and there will be more money to distribute. Now, say Your Honor rules for my client, then those funds aren't going to (indiscernible), they're going to be distributed.

MR. FAIL: No, they won't, in either case. That's not true, right? We will not distribute after the final order, number one and number two -- is Mr. Wander now giving up his appellate rights if he loses? That would be great if he is. But it doesn't seem to be the history of the case that he has. So, I just -- these arguments fall flat.

MR. WANDER: Please don't interrupt me, because I wasn't finished. In addition, I'll address what Mr. Fail brought up. And this is another reason that goes to the prejudice. If Your Honor rules against my client and others, we will appeal. We may do a direct appeal to the Second Circuit, whatever procedure is appropriate. And this is an issue that then will still have to be resolved with millions of dollars in reserve if Your Honor rules for my clients, and supports the World Imports decision. It's doubtful there would be an appeal. And I'm just saying

that. I'm sure Mr. Fail will disagree, but as a practical matter, a decision by Your Honor, together with the Third Circuit, I think the Debtor would probably determine they would then be wasting a state's resources. So, there's the prejudice, Your Honor.

To my other client, Pearl Global, that wants to have more money distributed, it doesn't want to have a reserve. And to the other claimant, they don't want to have a reserve. That's the prejudice, Your Honor.

MR. FAIL: Judge, one more time, now that Mr. Wander is finished, I'm looking at the Orient Craft ballot. They're both opt out. So, there's no reserve whatsoever for his clients' claims that will clog up anything and there's no prejudice for his clients because they're not receiving anything until the effective date of the plan. So that's that.

MR. BUTTERFIELD: Your Honor, Ben Butterfield from Morrison & Foerster. Mr. Fail, are you representing that -- so, our client, Icon, opted in. And our claim is -- the disputed portion of our claim is $8.5 million and the full amount is close to $10. Are you representing that you will be reserving for our client's claim, even though our client is the subject of a preference demand, or a preference complaint?

MR. FAIL: I'm not making any representations

because it's not on the agenda, and we haven't announced the distribution. So, the relevant parties haven't said anything. But disputed claims are acknowledged, they're before the Court. We'll address them.

There's no prejudice whatsoever. We deal with the Icon, and I haven't figured -- we haven't addressed the preference setoff and we can and we will. But you're subject to a preference, so you won't receive a distribution on a prepetition claim. That may be litigable issue, but it's another one that could be tied up for some time, that doesn't result in a distribution going out the door.

MR. BUTTERFIELD: Your Honor, Ben Butterfield from MoFo. So, look, I really think there's two issues here. So, the first is, we're going to get jammed. You know, we filed our papers, we've been paying attention to the docket. But what's going to happen is there's going to be a notice of distribution and then we're going to get jammed because our claim is not allowed yet. But they're not going to reserve for it. They're not going to reserve for it. And the second thing is, every time --

MR. FAIL: Not true.

MR. BUTTERFIELD: -- we have these hearings, they get put on the agenda and then they get adjourned two days before the hearing. And we spend time, we spend or clients' money, we spend resources, we get distracted from our

settlement negotiations, because we're trying to prepare for a hearing and then it just disappears. So, the start-stop nature of this has become really burdensome.

MR. FAIL: We'd love to kick it off indefinitely, but what we've done is follow the Court's orders and waited 'til we see if it was still necessary and productive. And as we've settled with 25 percent of the remaining ones that are relevant, and we're working to document it, we, the Creditors Committee and the administrative claims representative thought, in this circumstance, it did make sense.

THE COURT: Okay, I think -- you should adjourn this to the June omnibus day and you should provide notice if you intend to further adjourn it at least two weeks before that date, and we'll have a discussion then as to whether I'll grant that adjournment or not.

MR. FAIL: Thank you, Your Honor.

MS. MAZUR KRAEMER: Your Honor, if I may --

THE COURT: They are very capable, counsel, here. You've just highlighted about ten reasons why my ruling is not going to be the driving factor in resolving these claims, and you all know it, so you should deal with that. If you don't, that's fine, I will decide it. But it shouldn't be driving the bus.

MR. HALPERIN: Your Honor, it's Alan Halperin, if

I could ask one thing just relating back to the very beginning of this topic. Mr. Fail indicated that in terms of notice on distributions, it was going to be ECF, as we have been sort of dubbed as someone a little bit more elevated in terms of priority and I don't want to see this get lost in the mail, so to speak. If we could get direct notice email to our folks, I would be grateful.

THE COURT: That's fine, as long as only one attorney checks the ECF. Yes, I will note there were three people on this call, so, that's fine. But you can take off the number of people that are checking the ECF.

MS. MAZUR KRAEMER: Your Honor, if I may. Selene Mazur Kraemer with Vir Ventures and AMI Ventures. Just for the purposes of the record, I did file a motion back in February, in ECF 7331, for the other e-marketplace seller counsel that are on the phone here, that did set forth all of the things that they just said about a need to set aside a reserve. My client's claim was $885,000. So, I just wanted to note that for the record.

You did ask me to withdraw that motion, Your Honor, which we did. But again, the prejudice to my client is they basically have run out of money to pay my counsel fee and I think that's the same with all these other e-marketplace sellers who have smaller claims, they've just kind of given up because this issue has gone on for so long

and so many months.

MR. FAIL: Your Honor, if we're ready to move onto the next item, I think the only thing to say with respect to that last comment is I don't think that Ms. Kraemer's clients have a World Imports issue. I think they are the marketplace issue, which is coming up right now; we believe totally unrelated, but Your Honor will make that decision.

THE COURT: Okay.

MR. FAIL: The fourth item on the agenda is the Debtors' second omnibus objection to proofs of claim. The Debtors filed this objection with respect to a number of claims that were asserted as entitled to priority. There are six claimants that are contesting the objection, and that we're moving forward with today. Each assets claim entitled to 503(b)(9) priority.

As we said in our objection, the Debtors did not receive goods, which is a prima facie element to entitlement to 503(b)(9). Each of these parties, as set forth in our response, which is filed on our reply at 7829, so I won't belabor it, Your Honor. Each of these parties sold goods to non-debtors. They marketed their goods through a Sears marketplace website.

We're not contesting in this objection that Sears may have owed them money as pass-through, but these aren't even drop-ship cases. These parties sold goods to other

people. The Debtors never purchased them like a drop ship case where the Debtors buy goods and they're delivered someplace else.

This is, as we cited in our reply, a step removed from that. The Debtors aren't these vendors' customers. The Debtors didn't buy any goods from the vendors. The Debtors didn't receive any goods from these Debtors. And so, it's not a matter of does Sears owe these people money, it's, are they entitled to priority.

We think the law is clear, priorities have to be awarded strictly and narrowly. And there's nothing in the claim or the responses to the objection that entitled them to priority. There are other bases for entitlement to money asserted in the replies.

At most, they're duplicative tort claims, which would be duplicative to get money damages. Those are unsecured claim issues. None of the allegations in the responses elevate general unsecured claims to priority. There's no overlap with World Imports, there's no overlap with anything substantive with respect to 503(b)(9) disputes. This is plain, clear cut. We didn't buy anything. We didn't get anything. Full stop. Happy to answer any questions or address any responses.

THE COURT: Okay. I'm happy to hear from the objectors now.

MS. MAZUR KRAEMER: I'm sorry, Your Honor, did you give us the floor there?

THE COURT: Yes.

MS. MAZUR KRAEMER: Okay, thank you.

THE COURT: Each of the objectors should feel free to...

MS. MAZUR KRAEMER: Your Honor, we set forth our response --

THE COURT: I think I know who you are, but you should just state it again for the record so we could be absolutely sure.

MS. MAZUR KRAEMER: Selene Mazur Kraemer on behalf of Vir Ventures and AMI Ventures. We pleaded, we briefed this in our response that we filed back in, I think, September. We believe that -- and I apologize for the -- when they say World Imports issue -- we rely on World Imports in our response, Your Honor, arguing that there was constructive possession on behalf of the Debtor.

Our client is, again, an e-marketplace seller. The customer buys, let's say, a treadmill online through the Sears portal. And my client fulfills that order. Sears tells us what to buy, Sears tells us where to ship it, and we ship it. We get paid only after we provide a proof of delivery to Sears customers to Sears. And we did all those things, Your Honor, to the tune of $885,000 of goods that

Sears then did not transfer to us, the customer funds which, according to the agreement as we set forth in our papers, was to be held as an agent for the purposes of returning those customer funds, minus Sears' commission.

Your Honor, we would argue that, again, constructive possession as a result of delivery to one of the buyers of Sears agents, which would have been UPS or FedEx, which was a shipper, Your Honor, or directly to Sears customers. That's our position, Your Honor, and I know with respect to the definition of control -- I'm sorry, the definition of constructive possession, relates to the amount of control that Sears would have had in that kind of a transaction. And as we've set forth in our papers, that sufficient control would have existed here and that, therefore, my client should be allowed an administrative claim for these 503(b)(9) claims. That's it, Your Honor. The rest of it we rest on it with our papers.

MR. FLAHAUT: Your Honor, this is Doug Flahaut from Arent Fox LLP on behalf of Sky Billiards. I don't know if the Court, sort of, wants to go down and take each of the individual claims in order or whether now is the appropriate time for me to weigh in on behalf of my client, Sky Billiards.

THE COURT: No, go ahead. That's fine.

MR. FLAHAUT: Thank you, Your Honor. Again, Doug

Flahaut from Arent Fox LLP on behalf of Sky Billiards.

Sky Billiards' claim here, and argument is particularly unique, and I believe is different from the other arguments made at this hearing. I would note that this second omnibus objection was filed in August of 2019 and has been continued unilaterally by the Debtor about seven months, a number of times. It is only now, during a global pandemic when we can't get into the courthouse physically that the debtor now decides to go forward with this objection. But, in any case, we are prepared to make our arguments and proceed.

The first thing I want to put on the record and raise before Your Honor is the fact that I don't see any evidence in the record before Your Honor that Sears didn't receive these goods. If you look at the second omnibus objection, you don't see any declaration in support of --

THE COURT: Where is there evidence that you delivered them?

MR. FLAHAUT: Well, I'll get to that, Your Honor, and I think it is in the record of that. What there's evidence of is we filed a proof of claim, which is prima facie validity in amount of our claim, and in response to the objection, we attached an email from a Sears account executive stating that Sears received the goods and that we should check the 503(b)(9) box. And that moves to my

estoppel argument, Your Honor, in the sense that we believe that potentially it's a live issue as to whether Sears received the goods or not. I think you heard counsel before me argue about that and there are going to be some disputes about that. I understand there has been, in the past, a lot of disputes on the facts on these sorts of things as to what constitutes receipt and what doesn't and that will be litigated in due course, if need be.

But right now, you don't have any evidence in the record that says Sears didn't receive the goods and I think Sears bears the burden on objecting to our claim of overcoming the prima facie evidence of the claim. And so, I just wanted to call into question the lack of evidence in the Objection itself.

I believe we're here on what's known as, pursuant to the objection proceedings, as a sufficiency hearing. So, we're looking to see whether there's enough evidence, it's the same standard as a motion to dismiss for failure to state a claim. So, if my client has any plausible claim, then this Objection needs to be overruled at this stage. And I think -- what's that?

THE COURT: Go ahead, I'm sorry.

MR. FLAHAUT: Okay. Well, I want to address the Court's concerns, obviously. Those are the most important concerns, so if you have a particular question, I do want to

address that.

THE COURT: I'm trying to pull up your pleading to look at the exhibit.

MR. FLAHAUT: Sure.

THE COURT: The client, again, is?

MR. FLAHAUT: My client is Sky Billiards.

MR. FAIL: It's Document 5421, Judge.

MR. FLAHAUT: Yes, it's ECF Document 5421 and this, again, was filed -- I apologize to the Court on the shortness of these opposition papers, but we were trying to resolve this consensually up until, sort of, the day before it was due and then no further extension of the deadline was granted. So, we rushed to file at least a written opposition.

MR. FAIL: Judge, it's Garrett Fail from Weil Gotshal for the Debtors. 5421-1 is the exhibit that counsel seems to be referring to. It doesn't say what counsel suggests. This is a generic email that says -- it doesn't say that the Debtors received goods. It says, claims for amount -- it's an instruction on how to file the form electronically.

THE COURT: This is from --

MR. FLAHAUT: If I may, Mr. Fail, I haven't completed my argument.

THE COURT: No, I'm just trying to locate it.

This is from Shawn Zavsza, is that the email we're referring to?

MR. FAIL: That's what I'm (indiscernible), Your Honor.

THE COURT: Okay. All right. You can go ahead, I just was trying --

MR. FLAHAUT: Sure, and I'm sure Mr. Fail will have an opportunity to state his position, but I'd like to finish stating mine.

The email -- I think you've got it up now, this is from Shawn Zavsza, the account executive. And he understands the relationship between the parties well and this is post-petition, so this is after the filing of the petition. And so, he sends an email to my client, including instructions for filing a claim and also says there that you want to use "yes" for question 13 and include that as well.

Now, if you look at question 13 on the proof of claim form, it spells out specifically. It says, this is the amount of goods received by the Debtor within 20 days of the Petition. So, I believe that Mr. Zavsza here is telling my client, or acknowledging to my client, that he has received these goods. Now, he may be, in hindsight, incorrect, whether there's going to be litigation about this. But --

THE COURT: But do you have -- I'm sorry -- do you

have any evidence that they were actually -- the issue here is whether they were physically delivered to Sears or Bailey or agent for Sears. Do you have any evidence of that?

MR. FLAHAUT: I do not on the record, Your Honor, and I don't know if I do outside of the record.

THE COURT: Okay. So, it appears to me that the argument you're making, based on this email, is simply that an employee of Sears acknowledged that you had a claim for goods delivered. Not that they actually were delivered, right? So it's more of an estoppel argument or a waiver or a contract argument than a proof that they were actually delivered.

MR. FLAHAUT: It is certainly an estoppel argument, Your Honor. I think the initial point I was making at the beginning about the lack of evidence in opposition was just highlighting -- and I don't -- I'm admitted pro hac vice here, so I don't practice in front of your Court, Your Honor, very often. But I was somewhat surprised that the objection of this magnitude did not have any evidence, any declaration, anybody from Sears saying, I never received the goods, for example, which would presumably be necessary to overcome the prima facie validity and amount of my client's claim. But yes, Your Honor --

THE COURT: Each one says they have not been received. I'm looking at the omnibus objection now.

MR. FLAHAUT: Yes. They say it in the pleading, Your Honor. The lawyers say it, but I don't see a declaration from anybody that would put that into evidence and perhaps that's an offer of proof that's sufficient to Your Honor. But yes, the crux of my client's argument -- I think the strongest argument for my client, and what makes my client unique and different from the other parties in this same boat here, is the estoppel argument.

Your Honor hit it on the head, I think that we relied -- my client relied on the account executive stating that they did receive the goods. Whether they did or not, we relied on that and on the prospect that we would be paid a priority on that claim and in reliance, what we didn't do is, we didn't aggressively pursue, perhaps, constructive trust arguments, other arguments that can be made in these sorts of situations, chasing the money or aggressively pursue the kind of critical vendor preferential treatment that sometimes you can get in these sorts of situations. Because my client was lulled, I suppose, into believing that he would be -- have a valid 503(b)(9) claim. And it's only now, way after the fact, that the Debtor, the same entity that essentially, in my view, acknowledged receipt of these goods for purposes of 503(b)(9) back in November, now objects to it. And I think that's the issue where they can't really blow hot or cold on these facts.

MS. KRAEMER: Your Honor, if I may, Salene Mazur Kraemer. We are in that same exact boat and now that counsel --

THE COURT: Ma'am, I've already ruled on your constructive trust claim.

MS. KRAEMER: Yeah. I just wanted to say we're in the same boat with respect to the representations by the Debtor right at the filing of the case. And we did submit those emails in the adversary proceeding where the Debtor directed our client to go ahead and check that box.

THE COURT: Are they part of your opposition -- are they part of your opposition to the claim objection?

MS. KRAEMER: Yes, I believe they are, Your Honor. I'll have to double check that. I believe we did put that -- actually, I'm not -- I believe we did. I can double check. I know for sure we put it in our Complaint and the adversary proceeding. I need to pull that up, Your Honor.

THE COURT: No, don't pull up the adversary proceeding. That's not --

MR. FLAHAUT: Just to complete it and then I'll cede the floor, Your Honor, if I may. This is Doug Flahaut again from Arent Fox LLP. I -- So, Your Honor has focused on the estoppel argument, I think, correctly. I would note again that the opposition was not the kind of detailed points and authorities that I typically would like to give a

Court on the estoppel issue because it was hastily put together on the last day after I realized no further extension was going to be granted.

Looking at the reply, I have reviewed the Debtors' discussion of the estoppel argument and I think there are some issues with it. The first is that I'm not sure the Debtor really has the correct estoppel standard in the sense that, I think there's federal estoppel and also estoppel under state law and I believe the standards are different. In my review of the Debtors' reply, I think, reading those cases, are that some of them were applying state law estoppel -- the state law estoppel standard whereas, I believe, this would be a federal estoppel standard applied in this case. And the Second Circuit case of Kosakow v. New Rochelle Radiology, that's 274 F.3d 706 (2d Cir. 2001), states the federal law standard, which has three factors, not four like the Debtor put in their reply. It says, under federal law -- this is a quote, "Under federal law, a party may be estopped from pursuing a claim or defense where (1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe the other party will rely on it, (2) the other party reasonably relies upon it, (3) to her detriment." And I think we --

THE COURT: But the reasonable reliance issue is the real issue here. I mean, the goods had already been

shipped, right?

MR. FLAHAUT: The goods had been shipped. The reliance aspect of it, Your Honor, is that we relied on it by not seeking to recover our money through other mechanisms, which we believe would, potentially, have been --

THE COURT: But, there's no segregation of the money, right?

MR. FLAHAUT: We don't know. Certainly not now.

THE COURT: No, no. I mean, under the parties' agreement.

MR. FLAHAUT: I do not know, Your Honor. I do not have the Agreement in front of me. I don't believe it was put in the record in connection with the objection to this claim.

THE COURT: No, but you're the one arguing estoppel.

MR. FLAHAUT: Right. Well, and I can tell you that we would -- that my client has informed me, and I believe they are correct on this, that they would have pursued recovery of these monies differently and more aggressively if they had not been lulled into believing that they had a 503(b)(9) claim for the goods with it shipped within 20 days.

THE COURT: Well, that could just have meant,

though, that they would have spun their wheels. Just as VMI did in making a constructive trust argument, which I ruled on, they had no basis for, and it wasn't just based on the inability to trade.

And then secondly, as far as the critical vendor point is concerned, it's not based on pressure from the other party, it's based on an analysis of a number of factors that -- I just -- I'm quite skeptical that if one's talking about burden here, that somehow, you've carried your burden on estoppel.

MR. FLAHAUT: Well remember, Your Honor, it's the Debtor carrying the burden. We've got burdens of proof here. Only --

THE COURT: I'm sorry, sir. If you cannot, in good faith, tell me that the goods were physically delivered, then they have rebutted that issue.

MR. FLAHAUT: Okay.

THE COURT: I mean, come on, this email doesn't say anything acknowledging physical delivery of goods.

MR. FLAHAUT: Correct, Your Honor. It only says that the goods had been delivered sufficiently for 503(b)(9) under the proof of claim --

THE COURT: No, it doesn't say that either. But it certainly doesn't talk about physical delivery or delivery to an agent or a bailee. And that's what the basis

for the objection is and, you know what, I could adjourn this, but you're going to have to amend your claim or actually show me that there was physically delivered before we even think about convening another hearing.

MR. FLAHAUT: Well, Your Honor, obviously we've been -- we're trying to work out a consensual deal with this Debtor for months now and if a continued hearing would allow us time to discuss the matter, I would certainly take that from the Court.

THE COURT: Okay. I'm fine with that. I really don't think you've carried your burden on estoppel, which really is your burden here, such as not part of the claim and -- I mean, it's not alleged anywhere.

MR. FAIL: Your Honor, even if it was alleged, it doesn't give priority. We're not saying, again, we're not challenging --

THE COURT: Look, I'm going to give you all my ruling, which, just as a preference is that physical delivery or delivery to a bailee or an agent for delivery, at least has to be shown here. So, they know that, (a) and (b), as far as whether they can show physical delivery or not, they also know that they're going to be wasting their time if they can't do that.

And as far as estoppel is concerned, I think you can tell that I think it's a very slim reed. So, I don't

see any reason not to adjourn it so that you can try to resolve this without further litigation. I mean, the estoppel point here is one where, under either standard, reliance is key, and the notion that they would have pursued some other avenue in the case given their rights, I think is highly questionable. But we don't have their agreement and let's just leave it at that.

So, going back to Ms. Kraemer's matter, your pleading did not include any emails on it.

MS. KRAEMER: Your Honor, no, it was in the Constructive Trust Complaint, Your Honor.

THE COURT: Right, okay. Which I dismissed. So, are any of the other objections, counsel, wanting to go forward and speak?

MR. WANDER: Yes, Your Honor. This is David Wander of Davidoff Hutcher & Citron, counsel for Stolaas Company, if I may be heard.

THE COURT: Sure.

MR. WANDER: Your Honor, first, in a nutshell, my client has an equitable estoppel argument. Stolaas provided goods for the Debtors for approximately seven years through the Sears Marketplace beginning in about 2011.

Historically, the Debtors paid Stolaas daily -- this is a very important point -- with direct payments to Stolaas' bank account with a 14-day lag, which represented

the credit terms. Several months prior to the Debtors' bankruptcy filing, these payments stopped, but Sears kept reporting the goods delivered by Stolaas as having been paid, meaning Sears collected the money.

Numerous emails sent by Sears to Stolaas claimed that Sears deposited funds into Stolaas' account as payment for the goods delivered when, in fact, those deposits were never made. Attached to the response by Stolaas are numerous emails showing the fraud that was perpetrated.

Now because my client was told that these were computer errors, my client kept delivering the goods. Now it's important here -- if Sears generated falsified remittance reports showing non-existent deposits into Stolaas' account with fictious EFT numbers, while no payments were made after the Sears EFT date of September 11, 2018, remittance reports continued populating on the Sears website stating that the deposits were being regularly made on September 12th, 13th, 14th, 17th, 19th, etc., all the way through October 9th, less than one week before the bankruptcy filing. The total amount of the fictitious deposits reflected on the Sears remittance reports is $104,605.00.

Now, in various emails during this period, Sears claimed that the delays in payment were due to computer problems. In addition, during this time, there were some

payments that were received by my client which induced my client to continue shipping goods. It was not until after Sears filed for bankruptcy that Stolaas realized that a fraudulent scheme had been in place to induce Stolaas to continue shipping goods to Sears, including during the 20 days leading up to the bankruptcy filing.

Had Sears not induced Stolaas to continue shipping goods that were sold in the Sears Marketplace with falsified remittance reports and fraudulent emails, Stolaas would have stopped delivering goods. Based on the facts and equitable principles, the goods sold by Stolaas should be considered to have been delivered by the Debtors. Now, Judge --

THE COURT: Why? Why? I don't understand. Why? You mean delivered to the Debtors?

MR. WANDER: Correct. What we're saying is --

THE COURT: But on what grounds? They weren't.

MR. WANDER: So, it's the estoppel defense. It's the equitable estoppel should bar the Debtors from raising the defense that the goods were not delivered to the Debtors or received by the Debtors. Because, Your Honor, the Estate received a windfall through the fraudulent conduct of the Debtors' pre-petition. Had they not fraudulently induced my client to continue shipping goods, the Estate would not have had that cash on hand when they filed for bankruptcy. Now --

THE COURT: But Mr. Wander, that -- I mean, let's just assume that instead of -- I'm assuming, for purposes of this hearing, that your allegations of fraud are accurate, okay? For purposes of this hearing, because the focus of this hearing is just on the administrative expense under 503(b)(9). So, let's say, instead of keeping the money, it actually -- one of its agents went to your client's office and robbed the money. As far as Sears is concerned, that would just be a pre-petition claim.

MR. WANDER: Your Honor, so, had an employee of Sears robbed my client, the estate would not have gotten those funds and I would agree, my client would --

THE COURT: All right. Let's say he gave the money to Sears. It has nothing to do with 503(b)(9). It's just a pre-petition forge claim.

MR. WANDER: Yes, I'll tell you why it does, Your Honor. Because this was not a robbery, this was a fraudulent scheme to induce my client to ship goods so the debtor could load up on inventory and load up on cash going into the bankruptcy. Now, Your Honor, the same thing happened after the Transform sale. Now, this is --

THE COURT: Mr. Wander, do you have any caselaw even remotely on point on this issue?

MR. WANDER: The caselaw on equitable estoppel, which counsel for Sky Billiards mentioned before and which

was the discussion, okay --

THE COURT: So, the answer is no. This objection is granted. This is a pre-petition tort that is alleged in the objection. Pre-petition torts to the extent it's proven, and that's not the issue for today, are pre-petition claims. There's absolutely no basis for estoppel here. There was no delivery and I'm sorry, Mr. Wander, there's a point where creative law just has to stop, and you've reached that point here. There is no estoppel here. There is no estoppel alleged in the claim, there are no cases cited, and there's a good reason for that. None could be.

MR. WANDER: Well, Your Honor --

THE COURT: 503(b)(9) is a specific provision and the elements of that provision are not shown here, there's no representation that even ties into rights under 503(b)(9) that were somehow not asserted and consequently, there was reliance on something where those rights were not asserted. Moreover, the failure to assert those rights in light of the misrepresentations that you've alleged, would not have been replaced by any post-petition rights that your client would have had, such as the billiard company asserted, oh, we would have, instead, asserted a constructive trust or, oh, you would have asserted a critical vendor point. Just not the case here.

Your client, as you said, became aware of this

pre-petition. So, enough.

MR. WANDER: No, that's not --

THE COURT: This objection is granted. This objection is granted. This is not a priority claim.

MR. WANDER: Your Honor, could I just address the comment?

THE COURT: Very briefly.

MR. WANDER: In paragraph 12 of Stolaas' response, it says, Stolaas reserves its right to amend its response to include additional arguments in support of its administrative claim. Additionally, Stolaas reserves its right to file a response to any reply filed by the debtors. Because the debtors' claim objection fails to include any facts or law, Stolaas can only guess what grounds underlies the debtors' claim objection.

The reason there was no caselaw in this, is because there was no caselaw or even mention of the Sears Marketplace in the debtors' initial objection. All it said in the debtors' objection was that, according to the debtors' books and records or review of the debtors' records, reveals that the goods were not delivered within 20 days. Period. Nothing about Sears --

THE COURT: But that's not disputed, right? You don't dispute that, do you?

MR. WANDER: Well, in the reply by the debtors,

Your Honor, in the reply, where I believe they mischaracterize Stolaas' claim as a fraudulent inducement claim instead of that is supporting the 503(b)(9) claim, the debtors said in paragraph 20, courts generally do not consider arguments that are raised for the first time --

THE COURT: No, I'm not relying on that. I'm relying on what you just told me. I'm relying on what you just told me and what you just told me doesn't hold water. I'm sorry. It's undisputed that the debtors' assertion that the goods were not physically delivered or delivered to a bailee or an agent for receipt of the goods, that's undisputed. And what the claim is based on is a series of alleged fraudulent representations to your client pre-petition. And the two don't -- that may give rise to a claim, but it doesn’t give rise to a claim under 503(b)(9), which is what the claim is for.

So, I don't care whether you didn't raise it or did raise it, it's just not going to fly. So, I’m granting this objection without prejudice to any claim that you've asserted on a pre-petition basis or in a timely manner.

MR. FAIL: Thanks, Your Honor. For the record, again, Garrett Fail from Weil for the Debtors. So, does that cover -- hopefully that covers every claim that's going forward today based on --

THE COURT: Well, I don't know. There were -- I

think there were --

MR. FAIL: We could hear from others. I would just also, for the record --

THE COURT: There were some responses from companies that I have not yet heard from.

MR. FAIL: That's fine. We can -- and we should consider to make -- we should go forward to make sure everyone's heard. I would just, again, point the Court to Section 503(b)(9), which requires that value of goods received by the Debtor for goods that have been sold to the Debtor in the ordinary course.

Our argument, and it's undisputed thus far, is not only was there no receipt, but goods under this Marketplace Agreement were not sold to the Debtors, they were sold to third party customers. Nothing, so far, has contested that fact and nothing in 503(b)(9), as Your Honor said, gives priority for other tort causes of action. So, even if they're right, as Your Honor is accepting for purposes today and as we did, but not for any other reason, there's no 503(b)(9) priority. We're happy to continue to look into other -- the other parties and make sure that we could go forward and get rid of all these claims.

THE COURT: Is there anyone else on the phone who wants to address or speak on behalf of any of the objections?

MS. KRAEMER: Your Honor, Salene Kraemer again. Can you just -- for purposes of me being able to explain to my client, so, how is the comity carrier not an agent of the Debtor --

THE COURT: I will give you a ruling, ma'am, but your own paper says that Sears was the agent for the plaintiff, so, I think you should point that out to them.

But, is there anyone else on the phone on this matter? All right.

I have before me the debtors' second omnibus objection to asserted claims under Section 503(b)(9) of the Bankruptcy Code, which creates a statutory priority notwithstanding, unlike all of the other statutory priorities -- well, maybe a couple of exceptions in 503(b) of the Bankruptcy Code -- creates an administrative expense with respect to pre-petition obligations as with any administrative expense as stated by the court in the Howard Delivery Service case. Administrative expenses, including under 503(b)(9), take away from the normal priority scheme of the Bankruptcy Code and unless there is any other strong policy arguing to the contrary, should be read narrowly.

503(b)(9) of the Bankruptcy Code says that there shall be an allowed administrative expense for, "the value of any goods received by the debtor within 20 days before the date of commencement of the case under this title in

which the goods have been sold to the debtor in the ordinary course of such debtor's business.."

The objectors here, including those who have had counsel speaking at today's hearing, are participants or were participants in the Sears Marketplace selling activity whereby, on the Sears internet site, they sold goods to customers with payment to Sears. The goods were delivered to the customers and were never delivered to the debtor or sold to the debtor.

By the plain terms of Section 503(b)(9), therefore, they would not be entitled to a statutory priority. This argument has never been directly made in the context of a Marketplace Agreement like this, although it has been closely addressed before in ADI Liquidation, Inc. 572 B.R. 543-544 (Bankr. D. Del. 2017) and generally speaking, the requirement for physical delivery or, at a minimum, constructive possession through an agent or bailee, in numerous cases, including In re O.W. Bunker Holding North America, Inc. 607 B.R. 32, 43-44 (Bankr. D. Conn 2019) and, In re SRC Liquidation, Inc. from the District Court of Delaware 573 B.R. 537, 542 (Bankr. D. Del. 2017).

The objection did not dispute that there was not physical delivery of the goods to the debtor or sale of the goods to the debtor, but rather have raised arguments to the effect that the debtor nevertheless should be charged with

having received the goods on various theories, one of which comport with the statutes, including, as asserted by VIR, AMI that Sears was the agent for the claimants, not having any agency relationship where its agent received the goods.

Although it has also been argued by the same creditor that the shipping service, whether it was UPS, FedEx or some other service, was Sears' agent, notwithstanding the lack of any proof or assertion that such shipper had a relationship with Sears as opposed to the claimant. In any event, the statute's plain language simply hasn't been satisfied and the statutory priority therefor should not lie.

As far as the arguments regarding estoppel are concerned, that the debtor may have engaged in some form of tort or misconduct pre-petition that induced a claimant to ship goods pre-petition, does not give rise to a post-petition claim for estoppel and clearly does not do so under Section 503(b)(9). The representations alleged by Stolaas do not affect the 503(b)(9) nature of the claim.

As far as Sky Billiards is concerned, there was a post-petition communication that arguably could give rise to an estoppel argument on a post-petition basis. However, when one examines the email, it is not an acknowledgment of a claim that could reasonably be relied on as to the nature of the claim, although it may have misled or caused the

claimant to rely on the assertion of the claim holding up.

But whether that reliance was the cause of any harm remains to be seen and, as I said during oral argument, I'm skeptical that it could be shown. It would be need to be based upon some theory that some right had been lost to a priority or to a specific 100 percent payment, both of which I'm quite skeptical about, but I'm prepared to adjourn based on my review, if it comes, of a supplement to the claim that would credibly make such an argument.

As far as the other objections are concerned, the delivery argument is key and has not been addressed sufficiently to overcome the debtors' objection. So, I will grant the objection as to all claims except Sky Billiards and I will adjourn the hearing on that provided that Sky Billiards sufficiently amends its claim at least 14 days before the hearing. So that probably means the hearing would be adjourned to June. But if you can get it in before then, then I'll hear it in May.

MR. FLAHAUT: Your Honor, this is Doug Flahaut from Arent Fox on behalf of Sky Billiards. I would probably prefer the June date just to allow --

THE COURT: That's fine. It's up to you. I'm just saying I'm giving you the choice. But I'll look for an order from the debtors otherwise granting the claim objection, which, again, is solely as to the priority nature

of these claims pursuant to 503(b)(9) of the Bankruptcy Code. And you can, obviously, from the schedule, leave out Sky Billiards and reference the adjourn date in the order.

MR. FAIL: Thank you, Your Honor. This is Garrett Fail from Weil Gotshal on behalf of the Debtors. We'll submit an order in accordance with the Court's direction. We appreciate your time this morning on these claims matters.

The next item on the agenda -- oh, go ahead -- will be handled by my colleague and partner, Jackie Marcus.

MS. MARCUS: Hi. Good afternoon, Your Honor, Jacqueline Marcus on behalf of Sears Holdings Corporation.

This is the motion of Santa Rosa Mall and as you'll recall, Your Honor, at the February 24th hearing, you had granted Santa Rosa Mall additional time to file a supplemental briefing. I don't know how you'd like to move forward this afternoon.

THE COURT: Well, I've reviewed those briefs and so you all should assume that, which are Santa Rosa's briefs, the debtors' reply and Santa Rosa's response to that. I guess I'm happy to hear from Santa Rosa's counsel at this point.

MR. RIOS: Thank you, Your Honor. My name is Carlos Rios. I'm one of the attorneys for Santa Rosa Mall and with me are attorney Sonia Colon and Gustavo Chico. I

will address the issues concerning the memorandum of insurance. If it relates to other matters, then either Sonia Colon or Gustavo Chico will address those issues.

THE COURT: Okay.

MR. RIOS: The first thing that I'd like to say, Your Honor, is that the classic example of first party insurance is property insurance. That's what this case is all about and that's what we discussed in our memorandum of insurance. The right to be insured in the Sears policy arises from the lease contract.

We cited Section 601, we called for Sears to provide insurance for the benefit of landlord and tenant with respect to the demised premise, which works as the respective interest may appear, which is the standard language used.

Accordingly, the insurance contract included Santa Rosa as an additional named insured and that appears, Your Honor, in the first page of the insurance contract where the insured is defined. And it's defined as follows, it mentions Sears and its affiliates, without mentioning the name of Santa Rosa, yet its name was clearly implied when it said, any other party for which the insured has the responsibility for providing insurance and as their respective interest may appear. I covered that in our memorandum at pages 3, 6, 4, 19 and 28, with cases, and

juris prudence and authorities.

The objective of first party indemnity is to fulfill the insured reasonable expectations. That objective comports with the classic function of the contract theory and contract remedies to fulfill the reasonable expectations of the contracted parties. The underwriters know this and also were aware of Santa Rosa insurable interest in the property because Santa Rosa was implied in the policy.

Furthermore, the damages occurred in September 2017. The case was settled in January 2018. That's 16 months after. The underwriters had plenty of time before paying Sears to find out who the other insureds were, but they did not. An insurance company cannot ignore a party insured because another party insured tells them otherwise. We cited cases. You end up paying twice when you do that. We also mentioned that in the Memorandum. Furthermore --

THE COURT: I'm sorry. Could I interrupt you?

MR. RIOS: Of course.

THE COURT: The only cases I see -- really, the only case I see is the Farmers case from Texas.

MR. RIOS: Yes.

THE COURT: And it is not clear to me that that stands for the proposition that the insurer paid twice. What support do you have for that? Maybe I missed it. Because let me back up for a second, and maybe I should have

done this at the start of the hearing, and I apologize for not having done it. The reason I asked Santa Rosa to brief whether it has a direct right against the insurer was whether that right was somehow separate from the policies. And the reason for that is that under the settlement and release agreement between Sears and the underwriters, Sears represented that, in paragraph 4, this agreement resolves all claims for the applicable policy period, including any and all claims that Releasor or any other party made, could have made or could make in the future under the policies for the hurricane loss. And then paragraph 5 states release of further warrant that Releasor is the only party of interest with regard to the hurricane loss.

So, the Debtors have argued that this has already been dealt with and any attempt by Santa Rosa to go against the underwriters at this point would immediately give rise to liability under paragraphs 4 and 5 and then, of course, 6 is the hold harmless provision for paragraph 4 and 5. And T the prior hearing that we had, I said that I understand or I thought that Santa Rosa was making an argument that it had a direct right against the insurers not grounded on the policies. And you put it quite clearly just now. It would in essence mean that the insureds would have to pay twice because they have a separate, an independent duty. Not just a right under -- not just that the policy gave the mall the

right to be paid the money based on the policy itself. And frankly, that's how I read the Farmers case, the latter scenario.

So, do you have any authorities for the proposition that the insurers have to pay twice, separate and apart from the policy, they have an obligation not to have paid the money out to Sears?

MR. RIOS: We cited a case. It's a Puerto Rico case, I don't have the case right in front of me, but it's a Puerto Rico case that involved a flood damage and they paid the wrong person. So, the issue was resolved against the claimant because there was no insurance. There had been a misrepresentation that had been made in the policy and as a consequence of that the claimant could not collect.

In our case, Your Honor, the underwriters cannot claim that they didn't know that Santa Rosa was an additional insured because they appointed, they authorized Aon to issue the certificates, they authorized Aon, as their agent, to keep all the documents, all the records. So, the underwriters knew or should have known --

THE COURT: But that case is distinguishable because the insurer paid someone that wasn't a named insured whereas Sears was a named insured.

MS. MARCUS: And Your Honor, if I may interject. This is Jacqueline Marcus.

MR. RIOS: The decision not to pay -- are you talking about the Texas case, Your Honor?

THE COURT: No, no. I'm talking about the one you just summarized for me.

MR. RIOS: Yes, the one I summarized, the claimant's claim was denied because of the -- because the insured made -- represented some facts that under the federal law -- under the Flawed Insurance Act, they were -- the policy was null and void. But allow me, sir, to go back to the original issue here. My client has a separate and distinct action against the underwriter, which does not depend on the -- upon the -- Sears or Debtors. Debtors --

THE COURT: I'm sorry. Let me -- this is the key point. How does that action not depend upon the policy itself?

MR. RIOS: Well, it depends upon the policy, of course, because if you don't have an insurable interest, you cannot claim on the policy. Both parties here, Sears and Santa Rosa, had an insurable interest on the insurance policy. So, consequently, they are both first party insured and they have a direct action against the insured -- I mean, insurance company.

THE COURT: Except the insurance company's already paid to the other insured.

MR. RIOS: Well, the insurance company should have

paid the amount that Sears was entitled to receive as its interest may appear. Now, if they went beyond that and they paid in excess of the interest that Sears had, well, they have to pay twice. But, I'm --

MS. MARCUS: Your Honor --

THE COURT: Hold on Ms. Marcus for a second. But aren't you just assuming that? I mean, I don't -- I don't --

MR. RIOS: I don't have any other way to know, Your Honor, because we --

THE COURT: No, but how would it be in excess, as their interest may appear? That's where I'm having a hard time --

MR. RIOS: Of course. Of course. The policy itself describes what -- how is the payment distributed in the case of a lessor, in the case of a mortgagor. I mean, this insurance policy was made to protect Sears. That's why they have this blanket named insured.

THE COURT: I'm sorry. Where does it say that?

MR. RIOS: In the policy.

THE COURT: But, I mean, I don't -- I guess --

MR. RIOS: I didn't mention that in the Memorandum, Your Honor, but the policy --

THE COURT: I know.

MR. RIOS: -- makes reference to mortgagors and

makes reference to lessors and lessees.

THE COURT: First of all, I guess I have two points, two questions. The Memorandum says, citing the one case, I think, the Farmers case, Farmers Insurance Exchange v. Nelson 479 S.W.2d 717, 721 and there are some other cases in that case that are cited, (Tex.Civ.App. 1972), for the proposition that once the insurer becomes aware of an agreement to include a loss payee under the terms of insurance policy, the duty rests upon the insurer to treat the proceeds of the policy as though such a provision was written into the policy. And the argument is made that there was sufficient disclosure in the policy, along with the certificate, so that the underwriters would know that it would include, although not specifically identified, Santa Rosa as a landlord.

MR. RIOS: Yes.

THE COURT: But Sears also is the beneficiary of the policy and I don't see anything to show that the insurer is liable for having paid Sears as opposed to Santa Rosa. And I don't see how there's a direct action against the landlord having already paid Sears.

MR. RIOS: Your Honor, the issue here is clearly stated in the definition of the additional insured. When it says, as their respective interest may appear. Let's say that a landlord is included in the policy, its name and

everything in the policy. The landlord sells the property to another person. The landlord that is included in the policy has no insurable interest in the property, so he cannot collect. Regardless of the fact that his name was on the policy.

THE COURT: Okay, go ahead.

MR. RIOS: Yes. And that's why -- I mean, you have a --

THE COURT: So, when was the payment here? And what was Sears' interest at the time?

MR. RIOS: As a lessor? As a lessee? I'm sorry, Your Honor, as a lessee.

THE COURT: Okay. All right. The property hadn't been sold and it is still the lessee.

MR. RIOS: Yes. So, I'm entitled to participate in the proceeds of the insured -- in the insurance.

THE COURT: But what is missing here is whether -- you may be entitled, somehow, to participate in the proceeds of the insurance.

MR. RIOS: The underwriter.

THE COURT: The question is whether you have a separate cause of action, separate and apart from the policies, against the underwriters for paying the money over to Sears.

MR. RIOS: Your Honor, our case depends upon the

contract of insurance. That's the whole basis of our Memorandum. But we have a separate and the distinct right from that of Sears. I mean, the two could work together. There's cases on that. I mean, there's stateside cases referring to how the monies are distributed. But what is consistent in all the juris prudence that I have reviewed, Your Honor, I have been in practice -- I've been practicing law for 55 years.

I was Insurance Commissioner of Puerto Rico for two years and I've been involved in contracts of insurance. There's some basic principles of insurance, like I said, if you don't have insurance, you can't collect. So --

THE COURT: But Sears had an insurable and insured interest.

MR. RIOS: I beg your pardon, sir.

THE COURT: But Sears had an insured interest.

MR. RIOS: I don't understand. What?

THE COURT: Sears had an insured interest.

MR. RIOS: Of course, it had, but it's separate and apart from the one that my client. That's why I believe that the indemnity has no purpose. Because if the underwriters paid Sears what Sears was entitled to receive, they have no recourse against Sears. If, on the other hand, if the underwriters paid in excess and obtained or made payments through Sears that belonged to my client, to the

landlord, then we will have a case against the underwriters. The underwriters will have to decide -- that's an issue to be decided in Puerto Rico and --

THE COURT: Do you have any cases to support that proposition?

MR. RIOS: Well, Your Honor, I mean, we cited the case of -- let me see, I have it right here -- the case of Capital Markets vs. Municipality of Bayamon. It says ergo while payment might be made in good faith for the person who is in possession of the credit shall release the debtor. But payment otherwise made to a third person is deemed invalid unless it may have been beneficial to the creditor. I mean, what the underwriters --

THE COURT: But that was a third person who didn't have the insurable interest.

MS. MARCUS: Your Honor, I know you asked me to wait, but --

MR. RIOS: I'm referring to the principle, Your Honor. I'm referring to the principle because the Civil Code has a series of sections that talk about this third party and the rights of a beneficiary. So, you have to integrate the whole law, the whole system, civil law system which is statutory and contains all the provisions regarding the obligations that they go beyond the Insurance Code because the Civil Code supplements what the Insurance Code

does not cover.

So, I believe that Sears will be able to defend itself if they receive what they should have received. And if the underwriters didn't pay what they had to pay to Santa Rosa, they have to pay Santa Rosa because Santa Rosa was disregarded without any legal authority or any present. They had no right to do that. The underwriters knew letters were written to the underwriters before they entered the settlement. And of course, Sears knew about it when they misrepresented the fact that that there was nobody else involved or had any rights to the insurance proceeds. So, we have a situation here that, I believe that we covered aptly in our Memorandum and it was not notified.

THE COURT: Do you have cases for the proposition that if the underwriters knew someone was asserting an interest as a loss payee. No, let me finish. That they should withhold payment to the other insured party until that party's interests are taken into account?

MR. RIOS: Yes, Your Honor. You're paying the wrong party. Of course, there's mostly cases of that, but I mean, they're paying someone that's not entitled to receive the monies. The monies did not benefit my client because had Sears repaired and restored the store, then we wouldn't be complaining.

THE COURT: I'm just asking if you have any cases.

I'm asking if you have any cases here.

MR. RIOS: We could cite some cases, Your Honor, yes.

THE COURT: I thought that was the purpose of this Memo.

MR. MARCUS: Your Honor, this is Jacqueline Marcus. Before we go too much further, I wanted to respond to a couple of points.

I know that Santa Rosa's arguing that they are an insured under the policy, and I think you know, based on our papers, that we dispute that. But I think we can all agree that if Santa Rosa were considered an insured under the policy, that they would be bound by the terms of the policy. In Section 53 of the policy, which is entitled, "Loss Payable", says, and I quote, "Loss, if any, shall be adjusted with and payable to Sears Holding Corporation or as directed by it." And Paragraph 19 has similar language talking about how a claim is asserted and how it's adjusted. So, even if Santa Rosa were correct that it's an insured covered by the policy, I fail to see how there would be any argument that the underwriters paid the wrong party. They did exactly as they were required to do under Section 53 of the policy.

MR. RIOS: Could I address that issue, Your Honor?

THE COURT: Sure.

MR. RIOS: We covered that in the memorandum. We covered it in the memorandum. We said you have to read Paragraph 53 with Paragraph 51 that says that each of the insureds insured by this policy will have the same protection and obligations as if the policy had been issued individually to each of them. The intent of an insurance policy is to provide insurance to the insured, to provide and protect, that's the intention. If there's any doubt in interpreting these conflicting paragraphs, it would favor the insured. We covered that extensively by referring to how to interpret an insurance policy and --

THE COURT: Well, you -- I'm actually at that section and it is at pages 27, 28 and 29 and there's literally no authority, other than a general provision in the Puerto Rico Civil Code that states the following, If the terms of a contract are clear and leave no doubt as to the intentions of the contracting party, the literal sense of its stipulations shall be observed. If the words appear to be contrary to the evident intention of the contracting parties, the intent shall prevail.

So, I really don't see the support for what you've just said to me, that this is somehow embodied in the insurance law.

MR. RIOS: Well, it's in the Civil Code, Your Honor, and when you interpret --

THE COURT: No, I just read the provision, but paragraph 53 is specific and paragraph 601 is general and 602.

MR. RIOS: Well, but --

THE COURT: Doesn't paragraph 53 deal with the issue of payment and adjustment whereas the issue covered by 601 and 602 is as far as the parties covered by the policy?

MR. RIOS: Well, yes, Your Honor. It does authorize Sears to adjust and collect the payment. What it doesn't do is authorize the underwriters to pay the total amount due Sears disregarding Santa Rosa's rights as an additional insured. That is the issue here.

THE COURT: Well, all right. Is there any support for that proposition, other than Puerto Rico's version of the plain meaning rule?

MR. RIOS: The plain meaning rule? The plain meaning rule -- there is some ambiguity here. Here are two clauses. The entire contract refers to the definition of the insured, the entire contract. It goes back and forth. They authorize the agent, the broker who's performing a dual role or broker and agent to issue the certificates. The certificates evidence the existence of the rights of Santa Rosa. They cannot be disregarded. There's no provision in the insurance contract or anywhere that you could disregard one insured's rights versus another. They're both named

insureds. So, it's --

THE COURT: The contract itself specifies, I think, how it's supposed to be adjusted, through Sears.

MR. RIOS: Of course, and I agreed with you, Your Honor.

MR. MARCUS: And Your Honor, there's a very (indiscernible) reason for that because the insured, the underwriters don't want to get involved in dealing with various landlords or other parties that might have an interest in the insurance proceeds. Their view is, Sears is the insured party. They pay Sears and then Sears deals with it.

MR. RIOS: Your Honor, that's the case of Nickels that we cited -- that we included -- a cite in the memorandum and the standard practice is, before the insurance company pays, they find out if there's any other additional insureds involved and they make sure, they issue the check, the check in the names of the two parties.

In this case, in the case of Nickels, a check was written in the name of the two parties and the insured falsified the endorsement and the Court said, look, I mean, you have to be more careful, insurance company. You have to watch out, you have to make sure that you're paying the right party and you're delivering the check to both. Which is what the lease contract provides, the monies to be

deposited in a joint account. But --

THE COURT: I'm sorry -- Nickels. I don't see Nickels in your list of cases.

MR. RIOS: Let me see, Your Honor.

MS. MARCUS: It's there, Your Honor. It's Blackburn-Nickels & Smith.

MR. RIOS: I'm looking for it, sir.

THE COURT: Oh, Blackburn. I see. But that's -- It was not cited for that proposition, so I'm going to look it up.

MR. RIOS: Sir, the case is Bank of Nichols Hills versus Bank of Oklahoma. It's cited at page --

THE COURT: I'm sorry, not Blackburn-Nickels & Smith? What page --

MR. RIOS: Page 24, sir.

THE COURT: Okay.

MR. RIOS: It said, Bank of Nichols Hills versus Bank of Oklahoma. It held that the insured did not act in a commercially reasonable manner or in accordance with reasonable commercial standards. And I insist, Your Honor, the underwriters knew that before they made the payment, that Santa Rosa had an interest in the policy. I know this is going to be an issue of fact, but it's an issue that we will be able to prove in court in due form.

THE COURT: I'm sorry. You say this appears in

what case?

MR. RIOS: I'm citing think Bank of Nichols Hills versus Bank of Oklahoma. It's cited at page 24.

THE COURT: It's actually 27 through 28. Let me go to that. It's not there either. Well, it doesn't appear on the page that the table of authorities say it appears and it's not on page 24 either.

MS. MARCUS: It looks to me like it's on, maybe, page 23, Your Honor.

THE COURT: Oh, I see.

MS. MARCUS: Yeah. It's page 28 of the .pdf.

MR. RIOS: Oh yes. Because I'm referring to the memorandum itself, Your Honor. I'm sorry.

THE COURT: Right. Okay, okay. I got it. All right. So is Santa Rosa prepared in any way to protect the Debtor against this?

MR. RIOS: I beg your pardon, sir. I missed something there.

THE COURT: A number of times during this argument you've said that if the insurers in fact paid the debtor properly under the policy, the debtor has nothing to worry about and if they didn't, they have an independent obligation.

MR. RIOS: Yes.

THE COURT: But they will be going after the

debtor no matter what under this indemnification provision. Is Santa Rosa able to protect the Debtor against the adverse consequences of that?

MR. RIOS: Well --

THE COURT: Assume it doesn't win against the insurers, that the insurers acted properly but the insurers run up a million-dollar legal bill in determining that which then they assert against the Debtors. How are the Debtors protected against that from happening?

MR. RIOS: Well, it's a self-inflicted harm, Your Honor. They could have avoided it in the first place when they signed the settlement agreement. That's number one. Number two, I think you have to balance the interest and this is -- I mean, we're now addressing an issue which is -- it doesn't fall within my realm of knowledge. I believe that's a bankruptcy issue. Right, Your Honor?

MS. COLON: Your Honor, if I may, there's -- this is Sonia Colon on behalf of Santa Rosa. In the motion we specifically stated that we will withdraw our part of the claim against Santa Rosa, against the debtor, when we are released of the stay and our claim against the (indiscernible) is adjudicated.

THE COURT: No. I understand that portion. What I'm addressing is a different point, which is the debtors liability to the insurers understand the settlement

agreement, if it turns out that the insurers are right and Santa Rosa is wrong as far as Santa Rosa having a separate claim against the insurers.

MS. COLON: Santa Rosa has the claim -- well, these facts cannot be taken in a vacuum. We had asserted our claims, Your Honor, and after we had asserted our claims they negotiated and they included language therein that they're the only ones with a right to receive this funds. Both parties knew of our right of -- under the policy because we had sent communications to both parties, Your Honor, in the balance of equities between -- which is one of the Sonnax Factors in the balance of equities. Once this is adjudicated we'll withdraw our claim or that portion of the claim against Santa Rosa.

Nonetheless, right now, if there's any fees that they're incurring -- they raise that there are going to be incurring fees -- in defending themselves. They're already incurring fees in Puerto Rico with regards to the same mall in a cause of action that they have against a roofing company. So they're already incurring fees in this regard. Thus --

THE COURT: I'm sorry. Can you say that -- I'm sorry. I'm sure I followed that. What about the litigation in Puerto Rico at this point? Can you just repeat that?

MS. COLON: They already have a cause of action in

Puerto Rico which they're actively litigating. I don't know --

THE COURT: I'm sorry. Who do you mean by -- the insurer?

MS. MARCUS: Your Honor, I can help with that. I think I can help with that.

MS. COLON: They have a cause of action against the roof -- against the roofing company that did work in the roof of the building, of the Santa Rosa Mall, and all the profits of that litigation and those litigation costs, everything is being borne by the debtor and the benefits of those, even though it affects Santa Rosa, it was the roof. Santa Rosa doesn't have any rights with those. Everything is being kept by the debtors. So, those allegations that they are going to incur expenses if this is litigated in Puerto Rico which is the exclusive forum of --

THE COURT: No, no. I'm sorry. You're going way off where I wanted an answer.

MS. MARCUS: Your Honor, can I just --

THE COURT: Let me just summarize what --

MR. RIOS: May I address that issue, Your Honor, briefly?

THE COURT: No. Let me -- please. I'm trying to focus this and the last five minutes got it completely off track so I'm trying to get it back to where it should be.

Your response as to whether the debtor should be protected in any way from Santa Rosa being wrong on this issue, I believe, is as follows; the debtors took the risk in entering into that settlement agreement knowing of Santa Rosa's interest in being paid directly by the insurers. Is that a fair summary?

MR. RIOS: Well, not directly, jointly, Your Honor.

THE COURT: Well, with the insurers.

MR. RIOS: Yes.

THE COURT: Fine, jointly. But I have one document before me that I think may support that or is being asserted to support that proposition, which was the December 14th, 2018 motion by Santa Rosa Mall in this case to compel disclosure of the status of insurance claims and to compel the deposit of any proceeds into escrow exclusively for repair. Right? Is that what we're talking about here? Okay.

MS. COLON: Yes, Your Honor. We filed a motion in December.

THE COURT: But again, that's assuming, I think, that the money is going to go to Sears.

MR. RIOS: Well, like I said, Your Honor, it is going to go to Sears and Santa Rosa. That's our position.

THE COURT: But, I think that motion assumes that

any settlement proceeds goes to Sears and then is put into escrow. It's not a motion to compel the insurer to pay the money separately into escrow, right? It's dealing with the money coming into Sears, as I read it.

MS. COLON: Your Honor, that motion is pre-dated by numerous letters which I don't have in front of me, but numerous letters requesting that Santa Rosa comply to the terms of the lease agreement -- that Sears complies with terms of lease agreement.

THE COURT: All right. That's fine but those are --

MS. COLON: They hadn't had our --

THE COURT: But those are to Sears. Again, the focus here is on whether an agreement whereby Sears gets paid the money -- we shouldn't even be dealing at this point with that issue as far as the insurers are concerned.

MR. RIOS: Can I address this, Your Honor?

MS. COLON: There were letters to both the insurers and to Sears and in numerous efforts prior to that motion, Your Honor.

MS. MARCUS: Your Honor, this is --

THE COURT: Are they in the record in connection with the motion before me? They aren't, right?

MS. COLON: I assume they are just --

THE COURT: Well, I have the motion before me and

I don't see them.

MR. RIOS: In this particular motion I don't believe there's -- in this particular --

THE COURT: Right. And all the other motions have been withdrawn.

MR. RIOS: Your Honor, can I respond to your previous question and then I'll allow Sonia to talk about the previous letters, Your Honor, please?

THE COURT: Okay.

MR. RIOS: The fact that Sears as the primary insurer gets paid and does the adjustment, that is the normal practice, Your Honor. But the normal practice also is when the monies are paid, they're paid to the insured and the landlord and that's what went wrong here. That's what went wrong, and in this case, the underwriters relied extremely -- they took a big risk when they accepted the misrepresentation of a Debtor in possession.

I mean, they knew beforehand when they signed that indemnity that Sears was under the protection of the bankruptcy court. So they took a chance. In spite of that, they issued the check and -- knowing that Santa Rosa had written letters to the underwriters, to AIG specifically and to AIG specifically in Puerto Rico and in London. There were two of them. So we have an issue here which is an issue of unfairness and it's an issue of breach of contract,

an issue of reasonable expectations which is a principle of insurance law, an issue of bad faith which is also a principle of insurance law, but expressed good faith -- no bad faith.

I mean, insurers have to observe good faith and they can expect that the insured, in this case Santa Rosa, would be treated by the underwriter as the underwriter would treat itself and this is not what happened here. And one last comment, Your Honor. It's not going to cost the underwriters a million dollars in Puerto Rico. There are plenty of good lawyers that work for AIG and they're not going to charge a million dollars for this case.

If sister counsel, Jacqueline Marcus, was right, this issue could go out with a motion to dismiss. I don't think that's going to happen but it could be very brief. If Attorney Marcus is right it could only require a motion to dismiss. But that's not going to happen and it's never going to cost a million dollars, but it's costing my client Santa Rosa a lot of money because they've had to go forward and restore the building without the benefit of the insurer's proceeds. I would ask sister counsel Sonia Colon to add anything with regards to the notices, Your Honor.

MS. COLON: Your Honor, with regards to your question, the letters that I'm referring to are in docket 6317, the release of stay, docket 6317, docket 7, 8, and 9.

That's the release of January the 7th.

THE COURT: I'm sorry. I have the motion, which is 6317. The only exhibit that I have is the -- Oh, so there are other exhibits. Okay. So, Ms. Marcus, what is your response to this?

MS. COLON: Yeah. I wanted to -- well, okay. I wanted to speak regarding the bankruptcy perspective but I'll speak then after Ms. Marcus.

MS. MARCUS: Okay. Your Honor, first, I'd like to go back to the case that Santa Rosa relies on for this question about who's the appropriate person to pay, Bank of Nichols Hills versus Bank of Oklahoma. In the second paragraph it says -- it was about insurance over a mobile home -- excuse me -- and I'm quoting. In paragraph two it says, "The insurance policy provided that in case of loss Farm Bureau will pay you unless another payee is named on the declarations page, that loss shall be payable to any mortgagee named in the declarations, and that one of Farm Bureau's duties was to protect the mortgagee's interest in the insured building."

The declarations page of the policy listed Conseco Finance as the mortgagee. Conseco has a mortgage security interest in the home, and that's the end of the quote from paragraph 2.

So unlike the situation here where -- paragraph 53

says, insurance company you pay Sears -- in that case, the policy said that the obligation was to protect the mortgagee and that's why that case came out the way it did. That's a very different situation.

But I also don't want us to lose sight of the fact that the Debtors have taken the position Santa Rosa is not an insured under the policy under that language and I think Your Honor mentioned it at the last hearing on February 24th. There's an obligation in the lease for the Debtors to obtain insurance but we don't believe that that language puts Santa Rosa within the insured language that they're relying on.

I can't take issue with the letters that Ms. Colon refers to because there is a letter there to AIG of Puerto Rico that mentions an obligation ostensibly for the monies to be put in a separate account which we also take issue with. But the bottom line here is that the policy is very, very clear and the underwriters complied with the policy and that Santa Rosa really doesn't fall within the language that they're relying on.

MR. RIOS: Briefly, we covered that in our response but I'll allow Sonia Colon to respond to the other issues.

MS. COLON: Your Honor, at the last hearing -- the February 24th hearing -- you requested us to brief on three

gatekeeping issues. A, that the lease agreement grants Santa Rosa right in under the contract of insurance, Two, that the certificate of insurance modified or changed the terms of the contracts, and three, Santa Rosa statutorily direct actions status.

In a motion that we filed, and in the discussion that Carlos Rios, who was commissioner of insurance of Puerto Rico did a few minutes ago, it's my proposition that we have complied with the three gatekeeping issues that is set forth in the February 24th hearing.

So the only pending issues that we raised in the motion for release of stay and that is whether the settlement's indemnity clause, which was not subject to Rule 1919, is enforceable and serves as justification to extend the automatic stay to non-debtor third parties, namely the underwriters, Your Honor.

Okay. Although we agree that Section 362 of the Bankruptcy Code may be extended according to some case law to non-debtors in certain unique circumstances, that's not the case that we have before us, Your Honor. The case --

THE COURT: Ma'am, I'm going to interrupt you on that point. You're not going to win on that point because the issue here is specifically far more -- the stay doesn't even need to be extended at this point because the immediate effect of any litigation against the underwriters asserting

that they paid improperly here given the terms of the agreement is going to result in a claim under the settlement agreement. So this is not your indemnification claim that is the type of claim that's covered in your brief as something that has an immediate effect on the Debtors. So you should focus on --

MS. COLON: The claim was --

THE COURT: -- ma'am, I'm sorry. You're just going to lose on this point. You're not going to persuade me. Your brief did as good as you could ever do it and it's not going to carry the day. So you should focus on the second point which is whether the settlement agreement on the payment of the proceeds required notice in a hearing.

MS. MARCUS: Your Honor, I thought you ruled on that in the last hearing.

THE COURT: I thought I did, too, but --

MS. MARCUS: We weren't going to argue that --

THE COURT: Is there something we missed on that point? Yeah. So I think the real issue here is the one that I did ask you all to brief and, frankly, to me, the rights that you're asserting here are at best rights that give Santa Rosa a claim to the insurance policies and perhaps that claim should have been dealt with when those policies were in hand and of course the litigation history here is tortured.

I don't recall whether we ever got to the point where I was given a case that asserted as the Texas case that I previously cited asserts that somehow there's a lien right as to those proceeds, but I'm having a hard time seeing a claim here of the type that I thought might give Santa Rosa a right to stay relief, namely a claim that would not be based on the policies and its rights under the policies, but a separate claim to the insurers under which they would have to pay twice.

And I appreciate the length of the brief and the experience of the brief writer, but I don't see, except in very distinguishable circumstances, authority that under these circumstances would require the insurer to pay twice, particularly in light of the terms of the policy itself which have the money coming to Sears.

MR. RIOS: Well, Your Honor, will the fact the underwriters were notified -- that they knew about it which they did. We have --

THE COURT: But that --

MR. RIOS: May I finish, Your Honor?

THE COURT: Well, okay. That's fine. Sure.

MR. RIOS: Yes. Very briefly, they had constructive notice through their agent, Aon. They had it in their files with the name and everything of Santa Rosa.

THE COURT: I accept that. I accept that they had

notice. I accept that Santa Rosa said the money should be paid into a separate escrow, but the policy itself doesn't say that, and the case law that you've cited, to me, doesn't say that they paid improperly. What it says is that in an action where they are an actual insured or named insured which at least under the law of certain states would arguably include Santa Rosa here --

MR. RIOS: Certainly the laws of Puerto Rico does.

THE COURT: Well, I didn't see any Puerto Rico case on point on that in the brief. The case that you cited, I believe, is a case where the other party just wasn't entitled to the money. And here, at best, again, there's going to be an argument as to who -- whose interests were the proper interests and --

MR RIOS: That is true.

THE COURT: -- to me, that's not the type of right that would let the stay be lifted here.

MR. RIOS: Your Honor, I'm missing something here because when this case started there was a discussion with regards to a direct action statute which applies to liability cases, to accident cases. And I am lost if the Court at that time believed that there was a direct action statute, the case would be -- the stay would be relifted or not extended. Why --

THE COURT: Well --

MR. RIOS: Why would an insured be deprived of a right as a contract act is a party to the contrary?

THE COURT: Because in the direct action cases where the stay is lifted to let the personal injury claimant go against the insurer, the Debtor hasn't already been paid the insurance and hasn't signed an indemnity agreement saying, I was the proper one to get it.

My recollection of the last hearing was that I basically threw you guys a lifeline saying, if you can show that the insurers had some separate duty to Santa Rosa Mall and that duty is not one flowing from the policy itself that would give rise to an immediate claim under the settlement agreement, then I might say that the stay doesn't apply as I've said it that it wouldn't apply -- shouldn't apply and you all agreed on this -- to Aon, but that doesn't seem to me to be the case here.

I mean, again, I started this whole argument by asking about cases that say the insurer might have to pay twice and so far what I'm getting is that when the insurer might have to pay twice is where the payment was clearly made to the wrong party.

MR. RIOS: That is correct, Your Honor.

THE COURT: And I don't think that's the case here. I mean, Sears is a party too, and you have the paragraph 53 and 19 of the agreement which contemplates

payment and -- look, I understand that the interest was made known to AIG. I see that letter now. And clearly, among the theories that Santa Rosa raised in December of 2018 was that these funds should be dedicated to repairing the mall, but I don't believe that I was ever shown that that interest was something other than a contract interest, and I think that's where we are at this point.

MR. RIOS: Well, Your Honor, it's a matter of proof.

THE COURT: Can I tell -- I'm sorry to interrupt, sir, but I wanted to get out one other thought. If there is some way to protect Sears on that point -- because I understand your point, which is that, you know, under certain circumstances as a factual matter it may be shown that the insurers acted improperly, so if there's some way to protect the debtor against that not being the case and the insurers coming back and having a legitimate claim against the debtor under the settlement agreement, then I think under Sonnax the stay could be lifted. But I'm not hearing that.

Now you said the cost should be minimal, et cetera. I don't know, but I think Santa Rosa should think about that.

MS. COLON: Your Honor --

THE COURT: Because --

MS. COLON: -- if I may --

THE COURT: -- I can't -- let me just -- I'm sorry. I was just pausing. My kids complain that my pauses are too long but --

MS. COLON: I'm sorry.

THE COURT: -- but that's what happens when you're on the phone. I do, again, recognize that there might be a scenario, at least under a couple of the cases that are cited in the brief, where, you know, you might be able to establish that the insurance carriers were on sufficient notice that they shouldn't have made the payment, but that's far from a given here and so that's why I'm focusing on protecting the debtor because I think the stay is in place at this point given the payment and given the settlement agreement.

MR. RIOS: Well, but the --

THE COURT: So that's where we are. I mean, if the payments haven't been made, then that's a different issue, but I think at this point --

MR. RIOS: But there won't be an indemnity then, Your Honor.

THE COURT: Well, but I don't know -- indemnity by whom?

MR. RIOS: Well, if monies had not been paid, Sears would have not have to issue the indemnity.

THE COURT: Oh, I understand, but the money has been paid. That's the difference.

MR. RIOS: Well, but -- I mean, why should we be penalized for the wrongdoings of Sears? Sears should have never signed that indemnity, should have never agreed.

THE COURT: Well, I've already ruled on that point. I've already ruled on that point so that's a different issue.

MS. COLON: Your Honor --

THE COURT: Go ahead. Yeah. Go ahead.

MS. COLON: It's not --

CLERK: Good afternoon, Your Honor.

MS. COLON: Oh.

CLERK: I do apologize. This is Ry, the court clerk.

THE COURT: Well I -- can I interrupt you? This is important. Yeah. Go ahead.

MS. COLON: Okay.

THE COURT: There's a feature -- no, no, ma'am, this is important. There's a feature of this Court Solutions that is tied, I think, to other people's technology. The hearing can only go on for four minutes on a recorded -- four hours -- on a recorded basis and then it stops so we're going to be cut off in about 20 minutes. Right, Ry?

CLERK: That is -- Your Honor, that's correct.

THE COURT: Okay. So unless we're going to go past 2:00 we can wrap this up, but if we're going to go past 2:00 I'm going ask everyone to hang up at about, you know, five of two, three of two and then sign back in again.

MS. COLON: Your Honor --

THE COURT: That's just how the technology works. So go ahead, ma'am.

MS. COLON: Two issues. Again, I sustain that there are conflict of actions that can be established directly against Sears, but I leave that to Carlos Rios. There were even amendments after Hurricane Maria and those were briefed that gives those rights and those were briefed in our motion.

Nonetheless, with regards to the underwriter's claim, we included case law in our brief where we say that an indemnity gives rise to the -- it's crystalized or the claim is crystalized when the indemnity is executed. So if the underwriters had a claim or have a claim against Sears, they show as a result of this indemnity. They should have filed a proof of claim and there's nothing in the record regarding the proof of claim.

THE COURT: There's no administrative expense bar date in this case. Correct, Ms. Marcus?

MS. MARCUS: That's correct, Your Honor.

THE COURT: All right. So they don't have to have filed a proof of claim.

MS. COLON: We included language also in our brief as to how we see that this is an unsecured claim and not necessarily an administrative claim as Sears has represented.

THE COURT: It's a post-petition agreement, ma'am.

MS. COLON: But they are not defined as the release parties and we included all this discussion regarding as to how the plan reads and how the --

THE COURT: No. that's a separate -- I'm sorry. Maybe I misunderstood you. I understand that they are released under the plan, but there's a separate agreement -- post-petition agreement, the settlement agreement -- to which they are a party and Sears is a party and if Sears breaches that agreement it gives rise to administrative expense.

MS. COLON: An agreement that a clause can be easily (indiscernible) because it's really not enforceable. They did not comply with the bankruptcy requirements or the application requirements before issuing that indemnity clause in that agreement. I think that we can -- in all due respect, Your Honor -- I consider that we can (indiscernible) that clause and leave the agreement and that way Santa Rosa can assert its right in Puerto Rico law

against the underwriters and Aon.

MS. MARCUS: Your Honor, we're going over things that we've gone over multiple times over the course of the past year.

THE COURT: Right. I agree with that. I agree with that. I mean, I dealt with that at our last hearing. I was assuming the enforceability of that agreement which was why I accept if there was some separate cause of action and we've been through that for the last hour or so. So I think we're at the point of diminishing returns at this point.

MS. COLON: Your Honor, if there's going to be -- if your position has to do that there's been a stay which we disagree, we request, Your Honor, that it be retroactive to extend it and any applicable statute of limitations be told while we appeal then any decision.

MS. MARCUS: I'm not sure I understand that.

THE COURT: I'm not sure I understand that either. You could separately brief that if you want to. I don't understand what you're focusing on there.

MS. COLON: Oh, you see, I can have a second, Your Honor. It's under 108(c) so we can resolve this matter instead of delaying the issue. Just give me a -- just give me a second to speak with co-counsel.

MR. CHICO: Your Honor, am I unmuted? Can you

hear me?

THE COURT: You can go ahead. Yes, is this Ry from the clerk's office?

MR. CHICO: No. This is Gustavo Chico, Your Honor. Good afternoon. Thank you for your time. I think what Ms. Sonia Colon was trying to address is that since we can -- if your ruling is not to grant the relief from stay, then to preserve our rights on appeal, we would like to have the -- any tolling period -- any applicable tolling period, if any -- extended so that we can preserve our right to appeal. But we can do that by way of motion, Your Honor.

THE COURT: Okay. I mean, I'm looking at 108. I'm not quite sure what -- yes. Unless that period is about to expire, in which case you should argue it now -- but if there's sufficient time so you could brief it you should brief that issue.

So this hearing is not only a lengthy hearing today, but covers a prior hearing, which was also lengthy where I gave other rulings. I'm not going to go through those rulings again, but I will state based on today's record, as well as the briefing, that I'm not prepared either to declare the stay inapplicable to the pursuit of claims against the underwriters given that they derive from the debtors' insurance policies and immediately and adversely implicate the debtors with liability under the

insurance settlement agreement and therefore, the primary factor under the Sonnax test, which is the adverse effect on the estate, argues to keep the stay in place.

The adverse effect here would be in hundred-cent dollars given the post-petition nature of the agreement and the risk the debtors face. If Santa Rosa were prepared to ameliorate that effect with some particular form of undertaking or protection to the debtors, I would view the matter differently but, that is not the case today.

That agreement, to the extent that the lift of the stay would directly affect it, and therefore it would be covered under 362(a), would also be a basis for protecting the underwriters separately under Queenie v Nygard, International 321 F.3d 282, 287 (2d Cir. 2003), where the court through then Judge Sotomayor stated that where there's an immediate adverse impact on the estate third parties will be protected.

That's not necessarily extending the stay. It's just interpreting the stay to apply in that type of situation which I believe is the case here. So I will deny the motion and ask the debtors to prepare an order to that affect. You don't need to formally settle it on counsel for Santa Rosa Mall, but you should provide it to them a day or so before submitting it to the Court.

If Santa Rosa wants to seek extension or tolling

of a limitations period, it's free to do so on motion to the Court. And you should cc not only the Debtors but the party that would be asserting the statute of limitations, if in fact it was not told, which I'm assuming would be the insurers here.

MS. MARCUS: Thank you, Your Honor. We will submit an order as you suggested.

THE COURT: Okay. I think that is the last matter on today's agenda and just would like either Ms. Marcus and Ms. Fail to confirm -- Mr. Fail -- to confirm that and otherwise I think this call can be concluded.

MS. MARCUS: That's correct, Your Honor. That was the last matter. The rest have been addressed. Thank you very much for your time.

THE COURT: Okay. Very well.

MR. FAIL: Thank you very much, Your Honor.

THE COURT: Who was trying to address me?

Mr. BERKOWITZ: Good afternoon, Judge Drain, it's Ted Berkowitz from Moritt, Hock & Hamroff. We were advised that our -- the application of the creditor's committee for whom we are proposed counsel might be considered on today's hearing. We did file a certification of no objection.

THE COURT: No. That will just be granted. I reviewed it and given that there were no objections and then based on my review, you could email the proposed order to

chambers.

MR. BERKOWITZ: Thank you, Judge.

THE COURT: You should just send the application itself along with it just so I can reference it in the order in case you haven't.

MR. BERKOWITZ: Very good. Thank you, sir.

THE COURT: Okay. Thank you.

MS. MARCUS: Thank you, Your Honor.

MR. FAIL: Thank you, Judge.

THE COURT: Okay.

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: April 27, 2020

**&**

**&** 3:1 6:3,9 7:9 8:1,15 9:1 10:19 12:24 29:22 52:7 60:16 64:18 83:16 111:6,13 135:19

**0**

**00917** 9:11
**00968-3076** 9:4

**1**

**1** 11:3 26:5 53:5 79:19
**1,400** 46:24
**10** 51:18 57:10 64:21
**100** 39:4 94:6
**100,000** 57:17
**10005** 6:18
**10014** 7:5
**10016-1314** 8:18
**10019** 8:4,11
**1006** 7:4
**10153** 6:5
**10158** 7:13
**104,605.00.** 84:22
**10583** 6:12
**10601** 1:15
**108** 132:22 133:12
**10:00** 1:18 2:2
**11** 48:3,9,11 84:15
**111** 23:14
**115** 17:10,19
**11501** 137:23
**116** 17:14,19
**117** 17:14,19
**118** 17:2,4,7,10
**119** 17:10
**12** 18:21,23,23,23 19:8,22,22 20:12 21:4 88:8
**120** 17:11
**123** 23:14
**124** 17:19
**12415** 23:12
**127** 48:23
**12th** 84:18
**13** 47:25 62:21 75:16,17
**1301** 8:10
**13th** 84:18
**14** 19:15,19 20:15 56:20 62:19,20 83:25 94:15
**143** 24:5
**14th** 84:18 116:14
**15219** 7:20
**16** 17:6 19:20 97:10
**168** 24:5
**17** 17:6 34:14
**17th** 84:18
**18** 32:6
**18-23538** 1:3
**19** 17:6 96:25 107:17 126:25
**1919** 122:14
**1972** 102:6
**1986** 24:2
**1988** 25:19
**19th** 84:18

**2**

**2** 3:3 17:13,18 23:12 79:22 120:24
**20** 31:25 32:6 34:1 37:19 75:19 80:24 85:5 88:21 89:4 91:24 129:24
**20,000** 51:18
**2001** 24:9 79:15
**2003** 23:14 134:14
**201** 7:4
**2010** 25:5
**2011** 24:5 25:18 83:22
**2017** 92:15,21 97:10
**2018** 84:16 97:10 116:14 127:3
**2019** 18:19 23:11 23:12 38:24 72:5 92:19
**2020** 1:17 2:2 3:3 11:7 22:11 45:6 137:25
**21** 46:17 56:3
**22** 32:6 34:14
**2200** 7:19
**221** 9:10
**23** 1:17 2:2 112:9
**237** 6:11
**24** 23:12 111:15 112:3,7
**247** 24:8 25:17
**248** 1:14
**24th** 46:13 95:14 121:9,25 122:10
**25** 31:25 48:10 66:7
**250** 8:3
**27** 9:3 108:13 112:4 137:25
**274** 79:15
**28** 50:17 96:25 108:13 112:4,11
**28.7** 46:18
**280** 47:5
**282** 134:14
**287** 134:14
**29** 108:13
**2:00** 130:3,4
**2d** 79:15 134:14
**2nd** 19:14 23:14 24:2,9 25:18

**3**

**3** 62:4 79:23 96:25
**30** 46:25
**300** 1:14 9:3 137:22
**32** 92:19
**321** 134:14
**330** 23:14 137:21
**359** 46:16
**362** 122:17 134:12
**370** 25:18
**373** 24:9
**390-92** 25:18
**391** 24:9
**3rd** 7:12

**4**

**4** 17:10 20:13 96:25 98:7,17,18
**40** 6:17
**41** 17:10,13,18
**42** 17:10
**423** 25:5 26:6
**42nd** 8:10
**43** 17:10
**43-44** 92:19
**44** 17:10
**445** 24:4
**45** 17:10
**45-46** 26:6
**47** 17:13
**4776** 3:8,11
**479** 102:5
**48** 17:13,18 46:25
**4814** 3:12
**486** 25:19
**4931** 4:20
**4986** 3:15
**4994** 3:17

**5**

**5** 98:11,17,18
**50-51** 25:5

**5003** 3:20
**503** 53:17 54:9 62:1 68:15,18 69:20 71:16 72:25 77:20,23 80:23 81:21 86:6,14 87:13,15 89:3,15 90:9,16,20 91:11 91:14,19,22 92:10 93:18,19 95:1
**5056** 3:23
**51** 2:6,9 108:3
**52** 2:7,15,18
**5237** 5:4
**53** 107:14,22 108:3 109:2,5 120:25 126:25
**537** 92:21
**541** 48:24
**542** 92:21
**5421** 4:3 74:7,8
**5421-1** 74:16
**543-544** 92:15
**5472** 3:10
**55** 2:19 28:6 104:8
**5524** 4:6
**55th** 8:3
**56** 23:13
**572** 92:15
**573** 92:21
**58** 24:2
**59** 14:14 23:7

**6**

**6** 18:21,23 25:14 96:25 98:17
**60** 2:13 14:14 23:17,25 24:3 25:14,15 26:5
**601** 96:11 109:2,7
**602** 109:3,7
**605** 7:12
**607** 92:19
**61** 24:2
**6316** 5:17
**6317** 5:10,18,22 119:25,25 120:3
**65** 30:20 31:3,4
**668** 47:6 48:23
**68** 17:13
**69** 17:14,18

**7**

**7** 45:7 119:25
**70** 17:14
**700** 6:11
**7024** 14:13
**7055** 11:11 22:14 27:21
**706** 79:15
**707** 7:19
**717** 102:5
**721** 102:5
**7211** 5:12,23
**7213** 5:7
**73.2** 46:17
**7311** 5:15,22
**7326** 5:19
**7331** 67:15
**7471** 4:22 31:4
**7518** 2:23
**7531** 5:24
**767** 6:4
**7788** 4:9
**7798** 3:5
**7829** 68:19
**7836** 4:25
**7857** 10:21
**793** 24:2
**7th** 120:1

**8**

**8** 16:10,11 119:25
**8.5** 61:25 64:20
**80** 48:24 50:20 58:12
**800,000** 57:15
**83** 45:8
**847** 25:19
**85** 17:19
**86** 17:14,19
**863** 25:19
**87** 17:14,19
**885,000** 67:18 70:25

**9**

**9** 11:7 53:17 54:9 62:1 68:15,18 69:20 71:16 72:25 77:20,23 80:23 81:21 86:6,14 87:13,15 89:3,15 90:9,16,20 91:11 91:19,22 92:10 93:18,19 95:1 119:25
**90** 8:17 45:5
**9023** 14:13 23:1,6 29:6
**9024** 23:2,16 29:6
**91** 17:14,19
**992** 46:21
**9th** 22:11 84:19

**a**

**a.m.** 2:2
**abandoned** 33:18
**ability** 55:11
**able** 10:9 14:7,22 20:4 22:19 42:3,6 42:14 45:13 49:5 91:2 106:2 111:24 113:2 128:9
**absence** 44:19
**absolutely** 40:9 70:11 87:6
**accept** 124:25,25 125:1 132:8
**acceptable** 56:24
**accepted** 118:16
**accepting** 90:18
**accident** 125:21
**accompanying** 16:11
**accord** 42:25 44:6
**account** 72:23 75:11 77:10 83:25 84:6,14 106:18 111:1 121:16
**accurate** 48:9 86:3 137:4
**acknowledged** 65:3 76:8 77:22
**acknowledging** 75:21 81:19
**acknowledgment** 93:23
**acme** 57:16
**acquisition** 25:19
**act** 28:7 100:8 111:18 126:2
**acted** 113:6 127:15
**action** 20:15,17 26:11,14,17,25 27:7,11 28:24 32:12 54:23 90:17 100:11,14,21 102:20 103:22 114:19,25 115:7 125:5,20,22 126:3 132:8
**actions** 32:10 49:18 122:5 130:10
**actively** 115:1
**activity** 92:5
**actual** 125:5
**add** 60:18 119:22
**addition** 22:23 23:15 25:20 27:24 36:4 49:15 63:17 84:25

**additional** 31:6,17
37:15 41:18 42:1
52:16 53:7 88:10
95:15 96:17 99:17
102:23 109:12
110:17
**additionally**
88:11
**address** 12:16
14:20 18:25 31:17
42:12 47:20 58:12
60:10,12,18 63:2
63:17 65:4 69:23
73:23 74:1 88:5
90:24 96:1,3
107:24 115:21
117:17 133:6
135:17
**addressed** 27:9
32:18 33:6 35:8
56:19 65:6 92:14
94:11 135:13
**addressing** 27:10
28:21 113:14,24
**adequate** 30:11
30:16,22 31:6
32:21,23 34:20,20
35:14,18 36:6,13
38:25 39:12,20
41:8,12,14 43:3
44:3,23
**adequately** 32:4,5
34:1,22 36:17,22
37:8
**adi** 92:14
**adjourn** 50:3
56:15 57:1 58:2
59:6 62:15 66:12
66:14 82:1 83:1
94:7,14 95:3
**adjourned** 35:8
40:3 47:22 48:1,3
48:4 50:4 56:9

60:3,6 65:23
94:17
**adjournment** 56:5
61:1 66:16
**adjournments**
60:20,23
**adjudicated**
113:22 114:13
**adjust** 109:9
**adjusted** 107:16
107:18 110:3
**adjustment** 109:6
118:11
**admin** 37:21
41:24 46:21 61:10
**administrative**
4:17 5:1 30:15,21
31:23,24 35:4,21
36:24 41:18 43:16
45:5 46:2,14,15
47:9 48:13 49:12
49:25 50:2 51:13
52:21,25 53:5,8,9
53:23 54:5 55:3
58:7,24 66:9
71:15 86:5 88:11
91:15,17,18,23
130:23 131:5,16
**administrator**
4:11,19
**admitted** 76:17
**advance** 32:1
48:17 49:8
**adversary** 11:1,10
11:12 22:10 28:20
78:9,17,18
**adverse** 25:3
113:2 134:2,4,16
**adversely** 133:25
**advise** 12:13
54:15
**advised** 28:13
135:19

**advisors** 49:11
**affect** 54:17 55:7
93:19 134:11,22
**affidavit** 2:17,17
**affiliates** 96:20
**afraid** 37:21
**afternoon** 29:15
95:11,17 129:12
133:5 135:18
**agency** 93:4
**agenda** 2:1 10:16
10:20 11:1,3
29:20,23 45:24
46:9 62:9 65:1,23
68:9 95:9 135:9
**agent** 71:3 76:3
81:25 82:19 89:11
91:3,6 92:17 93:3
93:4,7 99:19
109:20,21 124:23
**agents** 71:7 86:7
**aggressively**
77:14,16 80:22
**ago** 15:5 16:16
18:7 30:3 53:2
55:1 61:5 122:8
**agree** 35:1 42:23
86:12 107:11
122:17 132:5,5
**agreed** 43:11,11
56:8 58:8 110:4
126:15 129:5
**agreement** 2:22
35:16 43:2 71:2
80:11,13 83:6
90:14 92:13 98:6
98:7 102:8 113:12
114:1 116:4 117:8
117:9,14 122:1
123:2,3,12 126:6
126:13,25 127:18
128:15 131:7,13
131:14,14,16,18

131:22,24 132:7
134:1,5,10
**ahead** 38:2 48:15
48:20 71:24 73:22
75:5 78:10 95:9
103:6 129:10,10
129:17 130:8
133:2
**aig** 118:22,23
119:11 121:14
127:2
**aisner** 6:9 12:24
**al** 3:5 10:4 11:3
**alan** 4:18 6:19
38:1,15 66:25
**allegation** 17:5
24:24
**allegations** 16:11
26:12 69:17 86:3
115:14
**alleged** 16:19 17:9
17:18 26:25 32:6
82:13,14 87:3,10
87:19 89:13 93:18
**allegedly** 26:17
**alleges** 24:23
**allocable** 4:15
34:11
**allocated** 30:6
**allow** 49:5 82:7
94:21 100:9 118:7
121:22
**allowance** 53:7
**allowed** 20:25
46:16,17 48:16
50:11,16 60:22
65:18 71:15 91:23
**allowing** 38:8
**alluded** 45:25
**alter** 23:10
**amassed** 50:25
**ambiguity** 109:17

**ameliorate** 134:7
**amend** 82:2 88:9
**amended** 2:4 10:16
**amendments** 130:12
**amends** 94:15
**america** 4:24 92:19
**americas** 8:10
**ami** 7:18 57:13 67:13 70:13 93:3
**amicable** 42:15
**amount** 4:14,14 33:13 34:10,11 45:7,12 49:8,10 64:21 71:11 72:22 74:20 75:19 76:23 84:20 101:1 109:11
**amounts** 49:17
**analysis** 28:4 81:7
**analyze** 59:16
**announce** 36:10
**announced** 65:1
**answer** 19:16,18 19:19 27:18 34:3 39:24 50:6 55:17 55:18,21 60:2 69:23 87:2 115:18
**answered** 19:20
**answers** 55:3
**anybody** 51:16 76:20 77:3
**anymore** 55:23
**aon** 99:18,18 124:23 126:15 132:1
**apart** 99:6 103:22 104:20
**apologies** 38:3,15
**apologize** 44:1 70:15 74:9 98:1
129:14
**appeal** 2:5,14 24:6 29:4 63:20 63:20,25 132:16 133:8,11
**appear** 10:25 25:6 96:14,24 101:2,12 102:24 108:18 112:5
**appearances** 12:20
**appearing** 13:2 38:13
**appears** 24:24 55:7 76:6 96:17 111:25 112:6
**appellate** 63:13
**applicable** 36:24 98:8 132:15 133:9
**application** 3:1 131:21 135:20 136:3
**applied** 16:21 26:11 79:13
**applies** 55:15 125:20
**apply** 25:14 26:4 126:13,14,14 134:19
**applying** 79:11
**appoint** 3:1
**appointed** 99:17
**appraisals** 34:13
**appreciate** 10:22 38:7 44:19 55:6 56:1 95:7 124:10
**approach** 28:7
**appropriate** 54:7 63:21 71:21 120:11
**approval** 31:23
**approving** 2:21
**approximate** 27:1
**approximately** 27:19 34:2 46:24 47:5,6 83:21
**april** 1:17 2:2 11:7 22:11 56:13 137:25
**aptly** 106:13
**arguably** 36:16 93:21 125:7
**argue** 49:15 71:5 73:4 123:17 133:14
**argued** 93:5 98:14
**argues** 134:3
**arguing** 70:17 80:16 91:21 107:9
**argument** 27:15 31:15 56:14 72:2 73:1 74:24 76:7 76:10,11,14 77:5 77:6,8 78:23 79:5 81:2 83:20 90:12 92:12 93:22 94:3 94:9,11 98:20 102:11 107:21 112:19 125:13 126:17
**arguments** 61:19 63:15 72:4,11 77:15,15 88:10 89:5 92:24 93:13
**arises** 96:10
**arising** 30:22
**aronoff** 44:17
**artful** 18:4
**artfully** 16:8
**articles** 54:14
**aside** 67:17
**asked** 11:15 44:22 52:4,15 53:10 98:2 105:16
**asking** 42:1 51:16 60:7 106:25 107:1 126:18
**asks** 15:10
**aspect** 80:3
**assert** 87:18 113:8 131:25
**asserted** 24:16 30:1 68:12 69:14 87:16,17,21,22,23 89:20 91:11 93:2 107:18 114:5,6 116:13 124:2
**asserting** 106:15 122:25 123:21 135:3
**assertion** 89:9 93:8 94:1
**asserts** 124:3
**asset** 42:3 45:13
**assets** 30:12 31:5 31:7,20 32:6,14 32:22 36:4,6 37:17,17,18 42:21 43:15,17,17,22 45:12 68:14
**assume** 63:5 86:2 95:19 113:5 117:24
**assumes** 116:25
**assuming** 35:22 86:2 101:7 116:21 132:7 135:4
**assurance** 31:6
**assure** 41:11
**asthma** 18:1
**attached** 72:23 84:8
**attacks** 18:1
**attempt** 98:15
**attempted** 11:25 31:21 37:10 45:18

**attempting** 45:10
**attention** 65:15
**attorney** 6:3,10
  6:16 7:2,10,18 8:2
  8:9,16 9:2 16:7,8
  67:9 95:25 119:16
**attorneys** 9:9
  95:24
**august** 38:24 40:2
  72:5
**ausa** 44:16
**authorities** 78:25
  97:1 99:4 112:6
**authority** 106:6
  108:14 124:12
**authorize** 109:9
  109:10,20
**authorized** 99:17
  99:18
**automatic** 122:15
**available** 37:20
  50:13
**avenida** 9:10
**avenue** 6:4 7:12
  8:10,17 83:5
**avoided** 113:11
**awarded** 69:11
**aware** 11:18,19
  54:24 87:25 97:7
  102:7

**b**

**b** 1:21 2:13 4:1
  18:21,23,23 23:17
  23:25 24:3 25:14
  25:15 26:5 53:17
  54:9 62:1 68:15
  68:18 69:20 71:16
  72:25 77:20,23
  80:23 81:21 82:21
  86:6,14 87:13,15
  89:3,15 90:9,16
  90:20 91:11,14,19
  91:22 92:10 93:18

93:19 95:1
**b.r.** 24:4 25:5 26:6
  92:15,19,21
**back** 13:3 15:6
  37:6 38:24 40:2
  54:18 57:1 67:1
  67:14 70:14 77:23
  83:8 97:25 100:9
  109:19 115:25
  120:10 127:17
  130:5
**bad** 119:2,4
**bailee** 81:25 82:19
  89:11 92:17
**bailey** 76:2
**baker** 24:2
**balance** 23:25
  113:13 114:11,12
**ballot** 64:11
**ballots** 51:16
**bank** 24:5 83:25
  111:11,12,17,18
  112:2,3 120:11,12
**bankr** 25:5 92:15
  92:19,21
**bankruptcy** 1:1
  1:13,23 11:11
  14:11,13 22:14
  23:1,5,16 27:18
  27:21 54:10,11
  84:2,20 85:3,6,24
  86:20 91:12,15,20
  91:22 95:1 113:16
  118:20 120:7
  122:18 131:20
**bar** 51:14,22
  52:21 54:11 85:18
  130:23
**based** 25:6,23
  31:12 33:23 37:7
  42:20 51:14 53:17
  76:7 81:3,6,7
  85:10 89:12,24

94:5,7 99:1
  107:10 124:7
  133:20 135:25
**bases** 69:13
**basic** 26:16
  104:11
**basically** 36:8
  67:22 126:9
**basis** 12:2 16:22
  18:9 24:19 40:19
  81:3,25 87:6
  89:20 93:22 104:1
  129:23 134:12
**bat** 45:8
**battaglia** 6:15
  38:16
**bayamon** 105:8
**bdc** 23:13
**bear** 53:20
**bears** 38:7 73:11
**beg** 104:15 112:17
**beginning** 10:21
  13:12 14:1 22:17
  38:7 67:2 76:15
  83:22
**behalf** 3:3 4:9,18
  4:24 5:9,15,18,23
  38:13,16 44:15
  52:7 57:13 70:12
  70:18 71:19,22
  72:1 90:24 94:20
  95:5,12 113:18
**belabor** 40:16
  68:20
**belief** 16:6
**believe** 17:7 19:2
  19:5,13,14,20
  20:12,21 21:9,11
  22:20 25:23 26:13
  26:14 27:9 29:3
  30:19 41:1 42:8
  53:5,8 54:9,25
  56:8,20 57:10

68:6 70:15 72:3
  73:1,15 75:20
  78:13,14,15 79:9
  79:13,21 80:5,13
  80:20 89:1 104:20
  106:2,12 113:15
  116:3 118:3
  121:10 125:11
  127:5 134:20
**believed** 22:24
  125:22
**believes** 14:14
**believing** 77:19
  80:22
**belonged** 104:25
**ben** 8:6 60:16
  64:17 65:12
**bench** 26:13 27:10
  29:9,12
**beneficial** 33:25
  105:12
**beneficiary**
  102:17 105:21
**benefit** 11:6 96:12
  106:22 119:20
**benefits** 115:11
**benjamin** 52:10
**benzija** 6:15
  38:16
**berkowitz** 3:3
  135:18,19 136:2,6
**bernstein** 7:17
**best** 4:1 49:12,13
  55:24 123:21
  125:12
**better** 42:2,23
**beyond** 36:2
  101:2 105:24
**big** 21:10 118:16
**bill** 41:21 113:7
**billiard** 87:21
**billiards** 4:1 8:9
  71:19,23 72:1,2

74:6 86:25 93:20
94:13,15,20 95:3
**bills** 21:13
**bit** 38:22 39:8
40:19 60:18 67:4
**blackburn** 111:6
111:8,13
**blah** 36:7,7,7
**blanket** 101:18
**blow** 77:25
**blurred** 38:22
**boat** 54:2 57:14
77:8 78:2,7
**books** 51:15 88:20
**borne** 115:11
**bottom** 121:17
**bound** 107:13
**box** 15:3 72:25
78:10
**breach** 17:20
118:25
**breached** 17:11
**breaches** 131:16
**brian** 2:6,12,18
9:17 11:2
**brief** 46:1 59:11
98:2 119:15
121:25 123:4,10
123:20 124:10,11
125:10 128:9
130:16 131:3
132:19 133:15,16
**briefed** 57:19 61:5
61:8 70:13 130:13
130:13
**briefing** 95:16
133:21
**briefly** 14:1,20
44:12 88:7 115:22
121:21 124:22
**briefs** 95:18,20
**bringing** 18:9

**broker** 109:20,21
**brotherhood** 24:8
25:17
**brothers** 24:4
**brought** 11:13
63:18
**building** 7:3 115:9
119:20 120:20
**bunker** 92:18
**burden** 24:25
25:1 73:11 81:9
81:10,12 82:11,12
**burdens** 81:12
**burdensome** 66:3
**bureau** 120:16
**bureau's** 120:19
**burkley** 7:17
**burner** 59:24
**bus** 66:24
**business** 51:25
92:2
**busy** 13:16
**butterfield** 8:6
52:10 57:8 60:9
60:15,16 61:23,25
62:19 64:17,17
65:12,12,22
**buy** 69:2,6,21
70:22
**buyers** 71:7
**buys** 70:20

**c**

**c** 6:1 10:1 132:22
137:1,1
**c.s.p.** 9:1
**calculations** 32:18
**calendar** 13:5
**call** 12:7 13:12,22
13:25 24:23 52:19
67:10 73:13
135:11
**called** 12:12 96:11

**canadian** 2:22
**capable** 66:19
**capital** 8:16 105:8
**carco** 25:4 26:6
**care** 17:3,6,12
27:1 52:25 89:17
**careful** 110:22
**carefully** 15:22
26:7,10
**cares** 21:16
**carl** 4:11,19 6:16
29:25 38:17
**carlos** 9:6,14
95:24 122:7
130:11
**carried** 30:4 81:9
82:11
**carrier** 91:3
**carriers** 128:10
**carry** 123:11
**carrying** 81:12
**carve** 36:7
**case** 1:3 18:5
21:15 25:1 27:23
28:11 33:16 37:16
39:16,18,19 40:24
44:18 45:1,5
52:21,24 53:18
54:14 55:8,23,24
61:2,20 63:10,14
69:2 72:10 78:8
79:14,14 83:5
87:24 91:18,25
96:7 97:10,20,20
99:2,8,9,9,10,15
99:21 100:2
101:16,16 102:4,4
102:6 103:25
105:1,7,7 110:13
110:19,19 111:11
112:1 116:14
118:15 119:6,12
120:10,15 121:1,3

122:18,20,20
124:2,2 125:3,10
125:10,11,19,23
126:16,23 127:16
130:16,24 133:14
134:9,20 136:5
**caselaw** 86:22,24
88:16,17
**cases** 13:17 23:13
25:5 26:6 30:1
54:17 61:19 68:25
79:11 87:10 92:18
96:25 97:15,19
102:5 104:4,4
105:4 106:14,20
106:25 107:1,2
111:3 125:21,21
126:3,18 128:8
**cash** 33:4 35:13
35:16,16 36:9,10
36:18 37:19,19,20
43:6,7,7,15 45:11
45:12 50:14,24
85:24 86:19
**catch** 25:14
**categories** 24:12
**cause** 22:4 26:14
26:24 27:2 94:2
103:22 114:19,25
115:7 132:8
**caused** 27:5 93:25
**causes** 26:11 27:7
27:10 28:24 32:11
90:17
**causing** 40:15
**cc** 135:2
**cede** 78:21
**cent** 134:4
**certain** 5:7 26:18
27:23 48:12 50:13
54:5 55:25 56:22
122:19 125:6
127:14

**certainly** 39:16 76:13 80:9 81:24 82:8 125:8
**certificate** 102:13 122:3
**certificates** 99:18 109:21,22
**certification** 135:22
**certified** 137:3
**certifying** 5:17
**cestero** 9:1
**cetera** 127:22
**challenging** 82:16
**chambers** 25:8 136:1
**chance** 16:3 22:23 25:10 118:20
**change** 33:16,23 39:11,23
**changed** 29:3 32:15 33:15 36:14 36:15 40:11,12,18 45:1 122:3
**charge** 119:12
**charged** 92:25
**chasing** 77:16
**check** 57:24 72:25 78:10,14,16 110:18,18,19,24 118:21
**checked** 58:6,7
**checking** 58:22 67:11
**checks** 67:9
**chico** 9:15 95:25 96:3 132:25 133:4 133:4
**choice** 4:1 94:23
**choose** 19:10
**cir** 23:14 24:2,9 25:18 79:15 134:14
**circuit** 63:21 64:3 79:14
**circumstance** 66:10
**circumstances** 24:7 33:16,23 36:14,16 40:18 122:19 124:12,13 127:14
**cite** 31:2 107:2 110:14
**cited** 25:6 26:6 69:4 87:11 96:11 97:15 99:8 102:6 105:6 110:14 111:9,12 112:3 124:3 125:3,11 128:9
**citing** 23:13 25:18 102:3 112:2
**citron** 7:9 52:7 83:16
**civil** 21:18 23:6,17 28:6 105:19,22,25 108:15,24
**claim** 3:7,10,15,20 3:23 4:6 5:1,3,6 16:23 30:1,5,11 30:22 31:12 32:3 32:7,23 33:2,8,11 34:1 38:25 40:5 40:24 41:8 43:5 46:2 48:20 49:15 51:11,11 53:5,8 54:25 57:10,14,17 58:24 62:1 64:19 64:20,22 65:9,18 67:18 68:10,14 69:12,17 71:16 72:2,21,22 73:11 73:12,19,19 75:15 75:18 76:8,23 77:13,20 78:5,12 79:19 80:15,23 81:22 82:2,12 86:9,15 87:10 88:4,11,13,15 89:2,3,3,12,15,15 89:16,19,23 93:17 93:19,24,25 94:1 94:8,15,24 99:16 100:6,18 107:18 113:20,21 114:3,4 114:13,14 123:2,3 123:4,7,22,23 124:5,6,8 126:12 127:17 130:16,18 130:19,19,21,22 131:2,4,5
**claimant** 64:8 93:10,15 94:1 99:12,14 126:4
**claimant's** 3:10 100:6
**claimants** 49:19 53:15,23 58:10 68:13 93:3
**claimed** 84:5,24
**claims** 3:8 4:17 5:4,7 11:12 18:25 22:16 32:12 33:9 35:6,8 45:5 46:15 46:21,22,24,25 47:5,6,9,10,20,24 48:1,3,4,7,9,10,13 48:16,19,22,24 49:8,12,13,23,25 50:2,11,22 51:9 51:13,23 52:21 53:9 54:5,9 55:3 56:5 58:7 59:1,4 64:13 65:3 66:9 66:22 67:24 68:12 69:15,18 71:16,21 74:19 87:6 90:22 91:11 94:13 95:1 95:7 98:8,9 114:6 114:6 116:15 133:23
**clarify** 46:12
**classic** 96:6 97:4
**clause** 122:13 131:18,22,24
**clauses** 25:15 109:18
**clear** 14:8 24:18 25:2,9 28:23 32:10 36:1 39:13 40:1 44:2,7,9 51:12 57:2 69:10 69:21 97:22 108:16 121:18
**clearly** 20:2 39:25 93:17 96:21 98:22 102:22 126:20 127:2
**clerk** 129:12,14 129:15 130:1
**clerk's** 11:18,20 13:24 20:7 22:13 27:13 29:10 133:3
**client** 10:6 39:23 54:21 55:1 58:24 59:7 63:5,7,19 64:6,19,22 67:21 70:19,21 71:15,22 73:19 74:5,6 75:14,21,21 77:6 77:7,10,19 78:10 80:19 83:20 84:10 84:11 85:1,2,23 86:11,12,18 87:20 87:25 89:13 91:3 100:10 104:20,25 106:22 119:18
**client's** 40:24 54:9 64:22 67:18 76:23 77:5 86:7

**clients** 37:7 39:16 53:25 54:7,10,15 56:24 57:8 59:15 61:24 63:24 64:13 64:14 65:24 68:5
**clog** 64:13
**close** 51:25 56:23 61:13,14 64:21
**closely** 92:14
**closing** 31:1 39:5
**code** 91:12,15,20 91:22 95:2 105:20 105:24,25,25 108:15,24 122:18
**coke** 2:6,13,18 9:17 11:2
**cold** 77:25
**collateral** 4:13,13 4:15 34:10 35:13 35:16 40:13 43:7
**colleague** 95:10
**collect** 99:14 103:4 104:12 109:9
**collected** 84:4
**colo** 5:9
**colon** 5:14,18,23 9:13 95:25 96:3 113:17,18 114:4 114:25 115:7 116:19 117:5,12 117:18,24 119:21 119:23 120:6 121:13,22,24 123:7 127:24 128:1,5 129:9,11 129:13,18 130:6,9 131:3,8,18 132:12 132:21 133:6
**come** 37:1 39:11 42:15,24 44:5 51:20 81:18
**comes** 50:25 56:23 94:8
**comfortable** 20:11
**coming** 36:9 54:1 68:6 117:4 124:15 127:17
**comity** 91:3
**commenced** 49:18
**commencement** 91:25
**comment** 68:4 88:6 119:9
**comments** 52:9,11 52:18 60:18
**commercial** 111:20
**commercially** 111:19
**commission** 71:4
**commissioner** 104:9 122:7
**committee** 3:4 37:12 43:17 58:6 66:9 135:20
**communication** 93:21
**communications** 114:10
**companies** 90:5
**company** 4:5 7:11 52:9 83:17 87:21 97:13 100:22,25 110:16,22 114:20 115:8 121:1
**company's** 100:23
**compare** 45:13
**compel** 116:14,15 117:2
**complain** 61:1,2 128:3
**complaining** 106:24
**complaint** 12:16 12:17 15:23 16:6 16:10,13,15,17,18 17:1,9,24,25 19:3 19:16,18 22:4,16 25:25 26:10,12,14 27:6,18,22 28:25 64:24 78:16 83:11
**complete** 78:20
**completed** 74:24
**completely** 10:4 115:24
**compliance** 5:17 5:22
**complied** 121:18 122:9
**complies** 117:8
**comply** 117:7 131:20
**comport** 93:2
**comports** 97:4
**comprehensive** 43:4
**compromised** 33:18
**computer** 84:11 84:24
**concern** 40:15 42:25 44:3,22
**concerned** 26:25 29:7 31:16 42:9 43:7 81:6 82:24 86:8 93:14,20 94:10 117:16
**concerning** 17:2 39:2 96:1
**concerns** 39:1 62:4 73:24,25
**conclude** 26:7
**concluded** 26:24 28:16 135:11
**concluding** 29:5
**conclusion** 23:10
**conclusively** 60:2
**conduct** 85:21
**conducted** 11:14
**conference** 5:1 34:6,7,18 35:10 37:24 38:21 39:7 40:17 46:1 52:4 52:15
**conferences** 29:24
**confirm** 135:10 135:10
**confirmation** 30:3 30:9,10,20 31:4 31:22 32:1,18 33:15 36:3,25 39:3,9 40:8,10 42:20 43:14 45:4 50:23 58:23 62:8
**conflict** 27:2 130:10
**conflicted** 26:21
**conflicting** 108:9
**conflicts** 3:2
**conn** 92:19
**connection** 24:21 30:24 51:16 80:14 117:22
**conseco** 120:21,22
**consensual** 82:6
**consensually** 74:11
**consent** 31:23 36:19
**consequence** 99:14
**consequences** 113:3
**consequently** 87:16 100:20
**conservation** 23:4
**consider** 89:5 90:7 131:23

**considered** 21:7 24:20 26:3 43:21 85:11 107:12 135:21
**consistent** 104:6
**consolidate** 19:7
**consolidated** 19:9
**constitución** 9:10
**constitutes** 73:7
**constructive** 70:18 71:6,11 77:14 78:5 81:2 83:11 87:22 92:17 124:23
**consultation** 60:5
**consulted** 49:24
**contains** 105:23
**contemplated** 43:13
**contemplates** 126:25
**contested** 42:24 47:1 90:15
**contesting** 68:13 68:23
**context** 41:5 59:17 92:13
**continue** 33:14 39:1 43:1,20 49:3 49:5 50:3 51:6 53:25 58:2 59:6 59:20 85:2,5,7,23 90:20
**continued** 13:17 33:3 47:9 72:6 82:7 84:16
**continues** 49:7
**continuing** 49:4
**contract** 76:11 96:10,16,18 97:4 97:5 104:1 108:16 109:18,19,24 110:2,25 118:25 122:2 126:2 127:6
**contracted** 97:6
**contracting** 108:17,19
**contracts** 104:10 122:4
**contrary** 91:21 108:19 126:2
**contribution** 45:7
**control** 71:10,12 71:14
**controlling** 23:8
**convening** 82:4
**conversations** 37:10 44:23 45:10
**convincing** 25:2,9
**copy** 15:7 29:12 29:17
**corp** 25:19
**corporation** 1:7 2:22 3:5 10:4 11:3 95:12 107:16
**correct** 28:1 40:14 53:4 55:12 79:7 80:20 81:20 85:15 107:19 126:22 130:1,24,25 135:12
**correctly** 27:14 78:23
**correspondence** 11:18,19 25:7
**cost** 119:9,18 127:21
**costing** 119:18
**costs** 37:10,15 115:10
**counsel** 3:2 11:22 12:11 29:8,11 35:23 37:3 42:6 43:18 44:17 45:11 52:11 57:18 60:9 66:19 67:16,22 73:3 74:16,17 78:3 83:13,16 86:25 92:4 95:21 119:13,21 132:24 134:22 135:21
**counsels** 58:8
**count** 48:10
**country** 137:21
**couple** 38:11,19 38:23 54:20 91:14 107:8 128:8
**course** 16:1 29:4 33:23 48:18 73:8 90:11 92:2 97:18 98:17 100:17 101:14,14 104:19 106:9,20 110:4 123:24 132:3
**court** 1:1,13 5:22 10:2,8,9,13,21,22 10:24 11:4,6,20 12:13,19 13:1,10 13:16,18,20,24 14:12 15:1,8,10 15:16,20,25 18:10 18:11,15 19:10,14 19:17 20:1,5,14 20:18 21:2,5,5,8 21:20,23 22:6,7,9 23:2,9,11 24:11 26:1 28:12 29:16 29:19 30:9,13,19 31:10,19 32:3,8 32:20 33:19,22 34:5,8,8 35:7,11 35:12 36:12 37:14 37:25 38:2,5,8,12 38:18 39:19 40:7 40:10,23 41:2,12 41:20 42:17,18 43:2,14,21,24 44:9,13,24 45:3 45:15,21,23 46:6 46:9 47:1,12,17 49:4 50:9,19 51:2 51:9,21 52:2,13 52:23 53:11,14,18 53:20 54:13 55:5 56:25 57:5,19 58:14,16,19 59:8 59:10,13 60:11,14 61:22,24 62:11,20 63:3 65:4 66:12 66:19 67:8 68:8 69:24 70:3,5,9 71:20,24 72:17 73:22 74:2,5,9,22 74:25 75:5,25 76:6,18,24 78:4 78:11,18 79:1,24 80:7,10,16,25 81:14,18,23 82:9 82:10,17 83:12,18 85:13,16 86:1,13 86:22 87:2,13 88:3,7,23 89:6,25 90:4,8,23 91:5,17 92:20 94:22 95:18 96:4 97:17,19,22 99:21 100:3,13,23 101:6,11,19,21,24 102:2,17 103:6,9 103:13,17,21 104:13,16,18 105:4,14 106:14 106:25 107:4,25 108:12 109:1,5,13 110:2,21 111:2,8 111:13,16,24,25 112:4,10,14,19,25 113:5,23 114:22 115:3,17,20,23 116:9,11,21,25 117:10,13,22,25 118:4,9,20 120:2 122:21 123:8,16

123:18 124:19,21
124:25 125:9,16
125:22,25 126:3
126:23 127:10,25
128:2,6,17,22
129:1,6,10,14,16
129:19,20 130:2,7
130:23 131:1,7,11
132:5,18 133:2,12
134:15,24 135:2,8
135:15,17,23
136:3,7,10
**court's** 10:22 36:3
44:20,22,25 66:5
73:24 95:6
**courthouse** 72:8
**courts** 24:2 28:7
28:13,14 54:15
89:4
**cover** 32:6 89:23
106:1
**covered** 17:7,8
51:19 96:24
106:12 107:20
108:1,2,10 109:6
109:7 121:21
123:4 134:12
**covers** 89:23
133:18
**craft** 7:10 52:8
54:24 58:23 64:11
**creates** 91:12,15
**creative** 87:8
**credibly** 94:9
**credit** 84:1 105:10
**creditor** 30:10
41:11 57:16 93:6
105:12
**creditor's** 135:20
**creditors** 3:4
31:24 33:21 35:9
35:21 37:12 41:19
43:16 46:25 48:13

49:14,21 50:15
51:1 58:6,12,13
60:24,25 61:10
66:9
**critical** 77:17 81:5
87:23
**cross** 61:3
**crux** 77:5
**crystalized**
130:17,18
**culpable** 28:9,17
**curious** 13:16
**curley** 6:9,13
12:23,23,24 21:24
22:1,8 29:14,17
**current** 37:19,20
42:2
**customer** 70:20
71:1,4
**customers** 69:5
70:24 71:9 90:15
92:7,8
**cut** 37:10,23
69:21 129:24

**d**

**d** 1:22 4:1,18 10:1
92:15,19,21
**d&o** 32:12
**daily** 83:23
**damage** 33:11
99:10
**damages** 16:24
69:16 97:9
**dashboard** 12:3
12:10 13:21,25
14:5 25:7 52:3
**date** 10:3 20:14
32:1 33:5 44:24
48:15,17 51:14,22
52:21 64:15 66:15
84:15 91:25 94:21
95:3 130:24
137:25

**dated** 117:5
**david** 7:15 52:6
63:1 83:15
**davidoff** 7:9 52:7
83:16
**day** 12:14 13:15
15:5 20:5 62:18
66:13 74:11 79:2
83:25 123:11
134:23
**days** 15:5 19:15
19:19 20:15 53:4
65:23 75:19 80:24
85:6 88:22 91:24
94:15
**de** 9:10
**deadline** 47:18
74:12
**deadlines** 47:11
**deal** 21:10 26:9
40:5,7 43:22 65:5
66:22 82:6 109:5
**dealing** 110:8
117:3,15
**deals** 110:11
**dealt** 27:8 32:18
98:15 123:23
132:6
**debtor** 1:9 37:16
40:3 51:24 56:7
56:14 60:22 64:3
70:18 72:6,9
75:19 77:21 78:8
78:9 79:7,17
81:12 82:7 86:19
90:10,11 91:4,24
92:1,8,9,23,24,25
93:14 105:10
112:16,20,21
113:1,2,20 115:11
116:1 118:17
122:15 126:5
127:16,18 128:13

**debtor's** 44:24
47:20 92:2
**debtors** 2:21 3:7
4:2,5,22 5:3,6,12
5:14 6:3 10:20
30:12,16 31:9,21
32:5,9,11,12,13
32:14,15 33:5,7
35:1,5,15,20
36:17 37:23 42:6
42:16 43:11 45:11
45:16,19 46:14
47:3,8,15,23 48:7
48:18,22 49:2,7
49:11,16,22,24
50:2,12 53:1,13
54:3 55:11 56:6
58:3 59:11,22
60:4 61:2,12,14
61:20 62:3,12,14
68:10,11,16,21
69:1,2,5,6,7,7
74:16,19 79:4,10
83:21,23 84:1
85:12,14,18,19,20
85:22 88:12,13,15
88:18,19,20,20,25
89:4,9,22 90:14
91:10 94:12,24
95:5,20 98:14
100:12,12 113:8,8
113:24 115:14
116:3 121:6,9
122:19 123:5
133:24,25 134:6,8
134:21 135:2
**december** 19:14
116:13,20 127:3
**decide** 66:23
105:2
**decided** 14:9
28:15 105:3

**decides** 72:9
**decision** 19:10,13 20:19 24:10 50:3 53:14 56:21 62:14 63:24 64:2 68:7 100:1 132:16
**decisions** 23:8
**declaration** 72:16 76:20 77:3
**declarations** 120:17,18,21
**declare** 133:22
**declared** 16:20
**dedicated** 127:4
**deemed** 105:11
**deeply** 21:14
**default** 11:10 20:5 20:8,16,17,19,21 21:1 22:5,13 27:13,14,20,22,25 28:5,8,9,10,16,19 29:2
**defaulting** 28:11
**defects** 54:5
**defend** 106:2
**defendant** 22:14 28:3,23 54:21,22
**defendants** 12:18 12:24 16:14,21 17:11 18:18 21:11 49:20
**defending** 114:17
**defense** 12:10 19:7,8 22:3 28:12 28:24 79:19 85:17 85:19
**defensively** 60:23 60:23
**defer** 36:2 60:8
**deferred** 35:7
**defined** 31:6 51:22 96:19,19 131:8
**definitely** 38:19
**definition** 71:10 71:11 102:23 109:18
**del** 92:15,21
**delaware** 92:21
**delay** 61:1
**delaying** 132:23
**delays** 84:24
**delivered** 69:2 72:18 76:2,9,9,12 81:16,21 82:3 84:3,7 85:12,14 85:19 88:21 89:10 89:10 92:7,8
**delivering** 84:11 85:10 110:24
**delivery** 70:24 71:6 81:19,24,25 82:19,19,19,21 87:7 91:18 92:16 92:23 94:11
**deluge** 54:11
**demand** 49:17 64:23
**demised** 96:13
**demonstrate** 59:3
**demonstrated** 58:9,11
**denied** 19:11 100:6
**deny** 134:20
**denying** 27:10 29:9
**department** 7:1
**depend** 100:12,14
**depends** 100:16 103:25
**deposit** 116:16
**deposited** 84:6 111:1
**deposits** 84:7,13 84:17,21
**deprived** 126:1
**derive** 133:23
**describes** 101:15
**desire** 33:4
**detail** 26:13 34:15 34:22
**detailed** 18:6 43:19 45:14,15 78:24
**details** 27:6
**determination** 38:24
**determine** 35:2 64:3
**determined** 30:5 32:3
**determining** 4:12 4:14 34:9,10 113:7
**detriment** 79:23
**developed** 17:16
**developing** 49:25
**difference** 129:2
**different** 10:24 26:21 42:17 72:3 77:7 79:9 113:24 121:4 128:18 129:8
**differently** 42:13 53:13 54:3 80:21 134:9
**difficult** 40:19
**digest** 21:15
**diminishing** 132:10
**diminution** 4:14 30:25 34:11
**direct** 63:20 67:6 83:24 98:3,21 100:21 102:20 122:5 125:20,22 126:3
**directed** 43:14 78:10 107:17
**directing** 4:16 34:11
**direction** 21:16 95:6
**directly** 71:8 92:12 116:5,7 130:11 134:11
**disagree** 45:2 61:14 64:1 132:14
**disallow** 5:7
**disappears** 66:2
**disappointed** 12:12
**discharged** 23:23
**disclosed** 46:15,20 46:21 49:16
**disclosure** 102:12 116:15
**discovered** 23:20 24:14,17
**discreet** 61:9
**discretion** 24:11 25:23 28:13 58:2
**discuss** 82:8
**discussed** 30:8 62:14 96:8
**discussion** 13:8 66:15 79:5 87:1 122:6 125:19 131:9
**discussions** 34:16 41:7,10 42:1 53:23
**dismiss** 11:12 14:21 15:22,23 18:19,22 20:6 22:4,5,16 26:2,9 27:16 28:3,22 73:18 119:14,17
**dismissed** 83:12

**dismissing** 19:3
**dispositive** 29:7
**dispute** 33:1,8 57:3 88:24 92:22 107:11
**disputed** 49:8,21 62:1,2 64:20 65:3 88:23
**disputes** 47:22 69:21 73:4,6
**disputing** 33:13
**disregard** 109:24
**disregarded** 106:6 109:23
**disregarding** 109:11
**dist** 23:12
**distinct** 100:11 104:2
**distinguishable** 99:21 124:12
**distracted** 65:25
**distress** 18:1
**distributable** 49:10
**distribute** 50:24 63:7,11
**distributed** 50:14 63:9 64:7 101:15 104:5
**distribution** 31:22 43:12,13 46:18 49:9,22 50:16,17 52:17 54:1 65:2,8 65:11,17
**distributions** 33:20 35:20 36:18 48:15 67:3
**district** 1:2 53:16 92:20
**divide** 61:18
**docket** 10:20 31:4 51:3,5,7 53:4,6 65:15 119:24,25 119:25
**document** 2:6,6,9 2:15,18,18 3:11 5:17,22 66:8 74:7 74:8 116:12
**documenting** 48:8
**documents** 16:1,2 99:19
**doesn't** 89:15
**doing** 28:1
**dollar** 113:7
**dollars** 41:25 63:23 119:10,12 119:18 134:5
**door** 41:25 43:9 44:4 62:24 65:11
**double** 78:14,15
**doubt** 108:8,16
**doubtful** 63:25
**doug** 8:13 71:18 71:25 78:21 94:19
**dozens** 61:19
**drain** 1:22 10:3 135:18
**driving** 55:13 66:21,24
**drop** 68:25 69:1
**dual** 109:20
**dubbed** 67:4
**due** 21:7,9 73:8 74:12 84:24 109:11 111:24 131:22
**duplicative** 69:15 69:16
**duties** 120:19
**duty** 17:4,11,20 27:1 98:24 102:9 126:10,11

**e**

**e** 1:21,21 5:9,14 5:18,23 6:1,1 10:1 10:1 67:15,23 70:19 137:1
**earlier** 14:16 15:5 18:12 29:12 30:24 35:17 45:25 58:14
**easily** 131:19
**ecf** 2:23 3:5,8,12 3:15,17,20,23 4:2 4:6,9,20,22,25 5:4 5:7,10,12,15,19 5:24 67:3,9,11,15 74:8
**echo** 57:18
**ecro** 1:25
**effect** 55:9 92:25 122:25 123:5 134:2,4,7
**effective** 3:2 32:1 33:5 48:15,17 64:15
**efficiency** 49:3
**efficient** 35:7 47:23 49:2
**efficiently** 59:22
**effort** 45:20
**efforts** 18:18 46:14 117:19
**eft** 84:14,15
**eight** 30:3 35:2 58:19,21
**eighteenth** 47:16
**either** 19:15,17 36:18 43:5 63:10 81:23 83:3 96:2 112:5,7 132:18 133:22 135:9
**electronically** 74:21
**element** 17:8 68:17
**elements** 16:19,20 18:6,9 26:11,12 87:14
**elevate** 69:18
**elevated** 67:5
**eleventh** 5:6 47:3 47:11 61:4,7
**email** 11:18,19 12:13 13:3,19,20 15:2 56:9 67:7 72:23 74:18 75:1 75:10,14 76:7 81:18 93:23 135:25
**emails** 78:9 83:9 84:5,9,23 85:9
**embodied** 108:22
**emergency** 15:11
**emotional** 18:1
**employ** 3:1
**employed** 23:3
**employee** 76:8 86:10
**encourage** 37:3
**ended** 13:4
**endorsement** 110:21
**ends** 24:1
**enforce** 36:23
**enforceability** 132:7
**enforceable** 122:14 131:19
**engage** 43:20
**engaged** 93:14
**enlargement** 2:5 2:14
**enter** 12:9 20:5,19
**entered** 11:7,25 26:8 27:14,14,20 43:14 47:13,17 106:8

**entering** 116:4
**entire** 109:18,19
**entitled** 35:6 43:8 68:12,15 69:9,12 92:11 101:1 103:15,18 104:22 106:21 107:14 125:12
**entitlement** 68:17 69:13
**entity** 77:21
**entry** 2:21 20:8 22:13 28:19
**equitable** 83:20 85:10,18 86:24
**equities** 114:11,12
**ergo** 105:8
**errors** 84:11
**escrow** 116:16 117:2,3 125:2
**escrowed** 39:13
**esl** 32:13
**essence** 25:11 98:23
**essentially** 39:22 77:22
**establish** 25:2 26:25 128:10
**established** 130:10
**establishing** 16:23
**estate** 4:11,19 32:19,22 33:25 58:25 85:20,23 86:11 134:3,16
**estimate** 61:15
**estimated** 37:18 45:4
**estopped** 79:19,20
**estoppel** 73:1 76:10,13 77:8 78:23 79:1,5,7,8,8 79:12,12,13 80:17 81:10 82:11,24 83:3,20 85:17,18 86:24 87:6,9,10 93:13,17,22
**et** 3:5 10:4 11:3 127:21
**evaluate** 45:11
**event** 25:10 30:21 93:10
**eventually** 33:20 48:16
**everybody** 38:11 40:21 52:1
**everybody's** 40:19
**everyone's** 90:8
**evidence** 23:20 24:14,18 25:2,9 25:20 72:14,17,21 73:9,12,13,17 76:1,3,15,20 77:3 109:22
**evident** 108:19
**evolve** 39:17,18
**exact** 20:20,23 78:2
**exactly** 107:22
**examination** 33:9
**examines** 93:23
**example** 16:19 45:3 76:21 96:6
**exceeds** 37:18
**exceptional** 24:7
**exceptions** 91:14
**excess** 50:13 101:3,11 104:24
**exchange** 102:4
**exchanged** 34:13
**exclusive** 115:16
**exclusively** 116:16
**excusable** 23:20 24:13
**excuse** 120:14
**executed** 130:18
**executing** 50:1
**executive** 72:24 75:11 77:10
**exercise** 25:22 28:12 41:13
**exhibit** 74:3,16 120:3
**exhibits** 15:22 120:4
**exist** 22:3
**existed** 71:14
**existence** 109:22
**existent** 84:13
**expect** 23:10 27:5 27:5 41:23 119:6
**expectations** 97:3 97:5 119:1
**expected** 36:8
**expecting** 54:12
**expeditiously** 50:24
**expense** 30:15,22 31:24 35:4,21 36:24 37:21 46:2 50:4 86:5 91:15 91:17,23 130:23 131:17
**expenses** 52:25 91:18 115:15
**experience** 124:11
**expire** 133:14
**expired** 19:18 28:2
**explain** 17:14 91:2
**explained** 17:4
**exposure** 49:23
**expressed** 11:16 17:2,3 119:3
**extend** 4:8 122:14 132:15
**extended** 122:18 122:24 125:24 133:10
**extending** 134:18
**extension** 19:17 74:12 79:3 134:25
**extensive** 22:23
**extensively** 108:10
**extent** 35:15 37:4 41:16,24 50:11 87:4 134:10
**extraordinary** 23:3
**extremely** 118:16

**f**

**f** 1:21 137:1
**f.2d** 24:2
**f.3d** 23:14 24:9 25:17 79:15 134:14
**face** 37:22 134:6
**facie** 68:17 72:22 73:12 76:22
**facilitate** 60:21
**fact** 14:4 18:21 20:4 22:22 24:18 28:4,23 32:16 72:13 77:21 79:20 84:7 90:16 103:4 106:10 111:23 112:20 118:10 121:5 124:16 135:4
**factor** 66:21 134:2
**factors** 28:8,12 33:24 55:8 79:16 81:8 114:12
**facts** 23:8 26:25 27:1 33:16 39:22 39:23 73:6 77:25 85:10 88:14 100:7 114:5

**factual** 16:11,22
17:5 18:8 25:25
26:12 127:14
**fail** 6:7 10:18,19
29:21,22 30:17
31:2,14,20 34:25
35:25 37:9 43:10
45:25 46:3,8,11
50:12,20 51:3,12
51:23 57:23,23
58:14,15,18,21
59:12 62:9 63:10
63:17 64:1,10,18
64:25 65:21 66:4
66:17 67:2 68:2,9
74:7,15,15,23
75:3,7 82:14
89:21,22 90:2,6
95:4,5 107:20
135:10,10,16
136:9
**fails** 88:13
**failure** 73:18
87:18
**fair** 116:6
**faith** 81:15 105:9
119:2,3,4,5
**fall** 63:15 113:15
121:19
**falsified** 84:12
85:8 110:21
**familiar** 15:25
**far** 26:24 29:6
40:12 41:6 43:6
62:20 81:5 82:21
82:24 86:8 90:12
90:15 93:13,20
94:10 109:7 114:2
117:16 122:23
126:19 128:12
**farm** 120:16,18
**farmers** 97:20
99:2 102:4,4

**fashion** 10:25
49:5
**fault** 22:21 28:1
**favor** 108:9
**feature** 129:19,20
**february** 46:13
67:15 95:14 121:8
121:25 122:10
**federal** 7:3 11:10
14:14 23:6,17
28:5 79:8,13,16
79:18,18 100:8
**fedex** 71:8 93:7
**fee** 67:23
**feel** 20:11 21:6
55:12 56:22 70:5
**fees** 53:15,25
114:15,17,18,20
**felt** 12:12,15
14:16 38:20
**ferraiuoli** 9:8
**fictious** 84:14
**fictitious** 84:20
**fifteenth** 47:16
**fifth** 6:4
**fighting** 21:17
**figure** 55:14 58:16
**figured** 20:9 65:6
**file** 2:5,14 43:22
51:3,7,11 56:6,7
59:11 61:7 67:14
74:13,20 88:12
95:15 135:22
**filed** 2:6,18 3:3,11
4:8,18 5:9,14,18
5:23 10:16,20
11:24 12:16 16:6
19:14 20:6 22:24
24:19 29:25 30:2
30:7 31:4 32:11
38:23 46:23 47:3
47:15 51:10,11,14
51:14 53:6 58:25

61:3,4,6 65:15
68:11,19 70:14
72:5,21 74:9 85:3
85:24 88:12
116:19 122:6
130:21 131:2
**files** 124:24
**filing** 75:13,15
78:8 84:2,20 85:6
**filings** 54:12
**filled** 26:19
**filling** 44:19
**final** 24:3 63:11
**finality** 23:4 24:1
**finalize** 17:17
**finally** 12:6 13:19
27:12
**finance** 120:22
**find** 21:17 97:12
110:16
**finding** 36:13
**findings** 35:17
**fine** 11:4 29:19
34:25 43:10 66:23
67:8,10 71:24
82:10 90:6 94:22
116:11 117:10
124:21
**finish** 75:9 106:16
124:20
**finished** 63:17
64:11
**firm** 52:11
**firms** 57:8,20
**first** 10:6 11:2
13:12 17:8 18:19
19:6 22:12 26:9
27:21 29:23,24
35:6 38:6,23
42:14 44:5,16
47:25 48:7 54:21
59:11 65:14 72:12
79:6 83:19 89:5

96:5,6,18 97:2
100:20 102:2
113:11 120:9
**fitness** 8:2 60:17
**five** 23:22 115:24
130:5
**flahaut** 8:13 71:18
71:18,25 72:1,19
73:23 74:4,6,8,23
75:7 76:4,13 77:1
78:20,21 80:2,9
80:12,18 81:11,17
81:20 82:5 94:19
94:19
**flat** 63:15
**flawed** 100:8
**flexible** 45:16
**flood** 99:10
**floor** 8:10 70:2
78:21
**flowing** 126:11
**fly** 89:18
**focus** 34:5 41:6
52:14,22 62:16
86:4 115:24
117:14 123:6,11
**focused** 35:5
58:11 78:22
**focusing** 40:11
62:11 128:12
132:20
**foerster** 8:1 60:16
64:18
**fogelman** 7:7
35:14 37:4 44:11
44:12,14 45:22
**fogelman's** 34:19
**foley** 8:15
**folks** 67:7
**follow** 42:5 66:5
**followed** 114:23
**following** 20:14
23:19 28:8 53:6

108:15
**follows** 96:19
116:3
**forced** 56:7
**forefront** 18:9
**foregoing** 137:3
**foremost** 38:6
**forge** 86:15
**forget** 51:17 62:18
**form** 24:19,20
74:20 75:18 93:14
111:24 134:7
**formally** 134:22
**forth** 19:12 24:25
67:16 68:18 70:7
71:2,13 109:19
122:10
**forum** 34:23
115:16
**forward** 16:22
19:1 32:20 35:21
45:19 47:19 57:11
58:5 68:14 72:9
83:14 89:24 90:7
90:22 95:17
119:19
**foster** 52:10
**four** 16:19 18:6
23:22 55:1 79:17
129:22,23
**fourteenth** 47:15
47:17
**fourth** 68:9
**fox** 8:8 71:19 72:1
78:22 94:20
**frankly** 40:4
53:24 99:2 123:20
**fraud** 23:21 24:14
24:24 25:3 84:9
86:3
**fraudulent** 85:4,9
85:21 86:18 89:2
89:13

**fraudulently**
85:22
**free** 55:12 70:5
135:1
**front** 34:21 59:23
76:17 80:13 99:9
117:6
**fulfill** 97:3,5
**fulfills** 70:21
**full** 33:4 55:25
64:20 69:22
**fully** 61:5,8
**function** 97:4
**fund** 8:16 50:13
**funds** 63:8 71:1,4
84:6 86:12 114:8
127:4
**further** 2:17
12:19 16:18 28:20
35:1 48:5 51:4
56:11 58:11 66:14
74:12 79:2 83:2
98:12 107:7
**furthermore** 97:9
97:16
**future** 98:10

**g**

**g** 10:1 11:5
**garbe** 4:12,20
**garret** 29:22
**garrett** 6:7 10:19
57:23 74:15 89:22
95:4
**gatekeeping**
122:1,9
**gather** 34:12
35:19
**gautier** 9:1
**general** 3:8 69:18
108:14 109:2
**generally** 28:7,13
40:25 89:4 92:15

**generated** 84:12
**generic** 74:18
**genuinely** 38:7
**georgia** 3:11
**getting** 38:8
126:19
**getty** 23:11
**giusti** 9:3
**give** 43:14 45:3
52:9,11 70:2
78:25 82:15,17
89:14,15 91:5
93:16,21 98:16
123:22 124:5
126:12 132:23,23
**given** 15:20 22:22
22:22 25:10,14
26:2 27:2 35:17
40:20 45:19 53:1
54:22 55:15 61:12
67:25 83:5 123:1
124:2 128:12,14
128:14 133:23
134:5 135:24
**gives** 19:23 90:16
130:13,17 131:16
**giving** 62:13
63:12 94:23
**glean** 42:3
**global** 64:6 72:8
**go** 12:19 13:3 19:1
33:21 36:9 37:20
37:20 38:2 40:21
41:19,23 51:2
54:16,18 55:21
57:11 71:20,24
72:9 73:22 75:5
78:10 83:13 90:7
90:21 95:9 98:15
100:9 103:6
105:24 107:7
112:5 116:22,24
119:14,19 120:10

126:5 129:10,10
129:17,22 130:2,3
130:8 133:2,19
**goal** 49:7,14 50:22
**goes** 43:9 58:4
62:11 63:18
109:19 117:1
**going** 13:7 14:20
34:15 35:21 37:22
40:1 41:4 43:12
44:1,4 47:19
50:10 52:18 54:2
54:8 56:14,16,16
56:21 57:2 58:1
61:20 62:6,7,24
63:8,9 65:11,14
65:16,16,17,18,19
66:21 67:3 73:4
75:23 79:3 82:2
82:17,22 83:8
86:19 89:18,23
111:9,23 112:25
114:16 115:15,17
116:22,24 119:9
119:12,15,17,18
122:21,22 123:2,9
123:9,11,17
125:13 129:24
130:2,3,4 132:2
132:12 133:19
**gonzález** 9:3
**good** 10:2,18 12:5
13:12,13 39:21
44:11 52:6 60:15
81:15 87:11 95:11
105:9 119:3,5,11
123:10 129:12
133:5 135:18
136:6
**goods** 68:17,20,21
68:25 69:2,6,7
70:25 72:15,24
73:3,10 74:19

75:19,22 76:9,21 77:11,23 79:25 80:2,23 81:15,19 81:21 83:21 84:3 84:7,11 85:2,5,8 85:10,11,19,23 86:18 88:21 89:10 89:11 90:9,10,13 91:24 92:1,6,7,23 92:24 93:1,4,16
**gotshal** 6:3 10:19 29:22 74:16 95:5
**gotten** 15:18 58:23 86:11
**government** 32:17 34:4 35:23 36:17 37:5 44:17 45:9
**government's** 33:3
**grant** 7:19 24:10 29:1 31:8 66:16 94:13 133:7
**granted** 11:11 19:23 22:6,15 23:7 30:10,24 74:13 79:3 87:3 88:3,4 95:15 135:23
**granting** 4:17 28:9 47:13 89:18 94:24
**grants** 36:5 122:1
**grateful** 67:7
**great** 34:22 61:18 63:13
**greeting** 13:13,13
**grounded** 98:21
**grounds** 22:3 23:19 24:17 27:17 85:16 88:14
**group** 4:9 49:21
**guaynabo** 9:4
**guess** 35:13 39:8 41:16 59:8,25 88:14 95:21 101:21 102:2
**guide** 28:12
**gustavo** 9:15 95:25 96:3 133:4
**guys** 126:9

**h**

**h** 52:8
**hac** 76:17
**hain** 8:16
**halperin** 4:18 6:15,19 38:1,1,3,6 38:15,16,16,19 39:25 40:9,14 41:1,15,23 43:25 66:25,25
**hamroff** 3:2 135:19
**hand** 39:21 45:11 85:24 104:23 123:24
**handed** 19:13
**handled** 95:10
**hang** 130:4
**happen** 65:16 119:15,17
**happened** 14:5 33:22 35:3 41:13 53:2 55:2 86:21 119:8
**happening** 113:9
**happens** 128:6
**happy** 10:15 12:15 16:4 34:3 42:14 50:6 69:22 69:24 90:20 95:21
**hard** 21:15 101:12 124:4
**harm** 16:12 94:3 113:10
**harmed** 45:9
**harmless** 98:18
**hastily** 79:1
**head** 37:5 77:9
**health** 2:12 8:2 11:8 12:25 25:18 60:17
**hear** 13:7 22:5,25 41:4 69:24 90:2 94:18 95:21 133:1
**heard** 13:9,11 15:6,17 25:20 26:4 38:4,9 41:16 41:16,17 44:12 52:5 53:10 56:14 58:14 73:3 83:17 90:5,8
**hearing** 2:1,2 10:3 10:5,14 11:14,15 11:17,22 12:1,7 13:4,4,7 14:1,8,9 14:12,15,17,18,24 22:2,6,17,18,19 22:20,25 25:12 27:8 30:9 44:20 45:4 46:13 47:2 51:17 56:5 60:4 62:15,25 65:24 66:2 72:4 73:16 82:4,7 86:3,4,5 92:4 94:14,16,16 95:14 98:1,19 121:8,24,25 122:10 123:13,15 126:8 127:20 129:22 132:6 133:17,17,18 135:22
**hearings** 10:12 48:1 50:3 65:22
**held** 71:3 111:18
**hello** 10:2
**help** 20:23 41:4 44:7 55:19 60:2 115:5,6
**helpful** 60:20
**helps** 59:7
**hi** 95:11
**high** 24:25
**highlighted** 34:19 66:20
**highlighting** 76:16
**highly** 52:24 83:6
**hills** 111:11,17 112:2 120:12
**hindsight** 75:22
**historically** 83:23
**history** 63:14 123:24
**hit** 77:9
**hk** 7:10 52:8 54:25
**hock** 3:1 135:19
**hold** 89:8 98:18 101:6
**holding** 11:2 92:18 94:1 107:16
**holdings** 1:7 2:22 3:5 10:4 24:4 95:12
**home** 40:20 120:14,23
**hon** 1:22
**honestly** 51:24
**honor** 10:18 12:5 12:22 13:9,23 14:25 15:7 16:4,9 16:25 17:8,20,25 18:2,14,20 19:20 20:3,11,22 21:3,7 22:1 29:21 30:2,7 30:17 31:2,18 34:25 35:5,25 37:9 38:1,15

39:25 40:17 41:15
41:18 42:22 43:10
43:11 44:6,11,16
45:22 46:3 52:10
52:12,14,20,22
53:3,12,22 54:6
54:12 56:1,3,7,15
56:18,20,21 57:8
57:12,15,21 58:1
59:9 60:8,15,17
61:23 62:19 63:5
63:7,19,23 64:2,5
64:9,17 65:12
66:17,18,25 67:12
67:21 68:2,7,20
70:1,7,17,25 71:5
71:8,9,16,18,25
72:13,14,19 73:1
75:4 76:4,14,18
76:23 77:2,5,9
78:1,13,17,21,22
80:3,12 81:11,20
82:5,14 83:10,11
83:15,19 85:20
86:10,17,20 87:12
88:5 89:1,21
90:16,18 91:1
94:19 95:4,11,14
95:23 96:6,18
99:15,24 100:2
101:5,10,23
102:22 103:12,25
104:7 105:6,16,19
106:19 107:2,6,24
108:25 109:8
110:5,6,13 111:4
111:5,20 112:9,13
113:11,16,17
114:6,11 115:5,19
115:21 116:8,19
116:23 117:5,17
117:20,21 118:6,8
118:12 119:9,22

119:23 120:9
121:8,24 122:16
122:20 123:14
124:16,20 125:18
126:22 127:8,24
128:21 129:9,12
130:1,6,25 131:23
132:2,12,14,22,25
133:5,11 135:6,12
135:16 136:8
**honor's** 55:4
**hope** 10:21 36:2
37:13 38:10 43:19
49:3
**hopeful** 33:12
**hopefully** 42:6
89:23
**host** 41:11
**hot** 77:25
**hour** 132:9
**hours** 129:23
**howard** 91:17
**hundred** 134:4
**hundreds** 32:11
47:24 49:18
**hurricane** 98:11
98:13 130:12
**hurt** 60:2
**hutcher** 7:9 52:7
83:16
**hyde** 5:25 137:3,8
**hyphen** 52:8

**i**

**i.e.** 24:24 26:21
**icon** 8:2 14:3
52:11 57:9 60:17
64:19 65:6
**idea** 39:21
**identified** 102:14
**identify** 10:5,10
**ignore** 97:13
**ignoring** 16:14

**ii** 4:13
**iii** 4:16
**images** 23:11
**imagine** 53:17
**immediate** 122:24
123:5 126:12
134:16
**immediately**
11:24 33:4 98:16
133:24
**impact** 40:20
134:16
**implicate** 133:25
**implied** 96:21
97:8
**import** 48:2,4
49:21 50:5
**important** 38:20
54:10,10 56:10
73:24 83:24 84:12
129:17,20
**importantly**
55:11
**imports** 48:9,12
53:15 55:6,14
57:15,17 62:1,2
62:16 63:24 68:5
69:19 70:16,17
**imposition** 35:3
**impression** 55:12
**impressive** 48:2
**improperly** 123:1
125:4 127:15
**inability** 81:4
**inadvertent** 23:19
24:13
**inapplicable**
133:22
**include** 19:7
25:25 35:22 48:17
55:10 75:16 83:9
88:10,13 102:8,14
125:7

**included** 30:12
96:16 102:25
103:2 110:14
114:7 130:16
131:3,9
**includes** 43:4
**including** 14:2
15:22 16:23 25:24
26:15 30:9 32:10
32:12,13 33:9
35:3 36:21 49:20
75:14 85:5 91:18
92:3,18 93:2 98:8
**incorporate** 14:14
**incorporates** 23:6
23:16
**incorrect** 75:23
**incredibly** 48:6
**incur** 115:15
**incurring** 114:16
114:17,18,20
**indefinitely** 66:4
**indemnification**
113:1 123:3
**indemnity** 97:2
104:21 118:19
122:13 126:6
128:20,22,25
129:5 130:17,18
130:20 131:21
**independent**
98:24 112:22
**indicate** 58:22
**indicated** 67:2
**indiscernible** 63:8
75:3 110:7 113:22
131:19,24
**individual** 35:8,9
49:14 71:21
**individually**
108:6
**induce** 85:4 86:18

**induced** 85:1,7,22 93:15
**inducement** 89:2
**inflicted** 113:10
**information** 2:12 11:9 12:25 20:24 26:22 42:2,7,15 43:19 45:15,17,17 51:5
**informed** 80:19
**initial** 27:16 31:22 44:16 46:18 50:16 50:17 76:14 88:18
**injuries** 17:19,25 18:3
**injury** 17:15 126:4
**innovations** 3:14
**insist** 111:20
**insisted** 58:4
**instances** 30:8
**instructing** 11:20
**instruction** 74:20
**instructions** 75:15
**insurable** 97:7 100:17,19 103:3 104:13 105:15
**insurance** 5:21 96:2,7,7,9,12,16 96:18,23 97:13 99:12 100:8,19,22 100:23,25 101:17 102:4,9 103:16,19 104:1,9,10,11,12 105:24,25 106:11 108:6,7,11,23 109:24 110:10,16 110:22 116:15 119:2,3 120:13,15 121:1,10 122:2,3 122:7 123:22 126:6 128:10 133:24 134:1
**insured** 96:9,17 96:19,22 97:3,14 97:14 99:17,22,23 100:7,20,21,24 101:18 102:23 103:16 104:13,16 104:18 106:17 107:10,12,19 108:4,7,10 109:12 109:19 110:7,11 110:20 111:18 118:13 119:6 120:20 121:7,11 125:5,5 126:1
**insured's** 109:25
**insureds** 97:12 98:23 108:4 110:1 110:17
**insurer** 97:23 98:3 99:22 102:7 102:9,18 115:4 117:2 118:11 124:13 126:5,18 126:19
**insurer's** 119:21
**insurers** 98:21 99:5 112:20 113:6 113:6,6,25 114:1 114:3 116:5,9 117:16,19 119:5 124:8 126:10 127:15,17 135:5
**integrate** 105:22
**intend** 35:20 49:22 66:14
**intended** 19:2
**intent** 108:6,20
**intention** 108:8,19
**intentional** 22:21
**intentions** 108:17
**interest** 11:17 23:4 96:14,24 97:7 98:12 100:17 100:19 101:2,3,12 102:24 103:3,10 104:14,16,18 105:15 106:16 110:10 111:22 113:13 116:5 120:19,23 127:1,5 127:6
**interested** 51:5 59:25
**interesting** 38:9
**interests** 106:18 125:13,14
**interim** 41:8 43:3 47:24
**interject** 99:24
**international** 24:8 25:17 134:14
**internet** 92:6
**interpret** 108:11 108:25
**interpretation** 26:5
**interpreting** 108:9 134:19
**interrupt** 61:22 63:16 97:17 122:21 127:10 129:16
**introducing** 22:12
**introduction** 10:15
**invalid** 46:15,16 105:12
**inventory** 86:19
**investors** 8:16
**invoked** 24:6
**involved** 37:5 57:2 58:17 59:13 59:14 99:10 104:10 106:11 110:8,17
**ireland** 4:11,19 6:16 29:25 38:17
**issue** 30:8 31:14 31:15,17 33:6,14 34:16 35:13,14,18 36:2,11,12 37:1,6 37:23 40:23 53:15 53:17 55:6,14 56:3,10 57:15,17 57:18 59:23 60:7 61:5,9,11 62:5,16 63:22 65:9 67:25 68:5,6 70:16 73:2 76:1 77:24 79:1 79:24,25 81:16 86:23 87:5 99:11 99:18 100:10 102:22 105:2 107:24 109:6,6,12 109:21 110:17 111:23,23 113:14 113:16 115:21 116:3 117:16 118:24,25,25 119:1,2,14 121:13 121:16 122:23 123:19 128:19,25 129:8 132:23 133:16
**issued** 108:5 118:21
**issues** 12:17 17:22 17:23 21:13 28:21 34:17 42:25 43:4 50:5 65:13 69:17 79:6 96:1,3 121:23 122:1,9,11 130:9
**issuing** 131:21
**item** 11:3 29:20 29:23 45:24 68:3 68:9 95:9

**items** 10:25 32:17
**iv** 4:17
**i'm** 89:18

**j**

**j** 8:20
**jackie** 95:10
**jacqueline** 6:8 95:12 99:25 107:6 119:13
**james** 4:12,19
**jammed** 65:14,17
**january** 3:3 19:20 23:12 45:6 56:3,3 56:8,12 57:2,24 58:1 97:10 120:1
**jeffrey** 57:10
**jewelers** 3:17
**join** 4:24
**joint** 57:22 111:1
**jointly** 116:7,11
**juan** 9:11
**judge** 1:23 10:2 12:23 29:14 43:23 44:1,7 46:12 50:6 50:12 51:12 52:6 57:23 63:1 64:10 74:7,15 85:12 134:15 135:18 136:2,9
**judgment** 20:21 20:25 21:1 23:18 23:22,22 25:3 27:25 28:19
**judgments** 24:1,3
**judicial** 23:4 34:2 49:3
**julie** 6:13 12:23
**july** 18:19
**june** 66:13 94:17 94:21
**juris** 97:1 104:6
**jurisdiction** 19:3 19:4,11 27:17
**justice** 7:1 24:1
**justification** 122:14
**justifies** 23:24 24:16
**justify** 25:13,16

**k**

**keep** 99:19 134:3
**keeping** 86:6
**kept** 42:11 84:2 84:11 115:14
**key** 23:13 45:3 83:4 94:11 100:13
**kick** 66:4
**kicked** 56:10
**kids** 128:3
**kind** 38:22 42:11 42:15,24 67:25 71:12 77:17 78:24
**kirby** 6:9 12:24
**knew** 99:20 106:7 106:9,15 111:21 114:9 118:18 124:17
**know** 12:9 14:10 15:13,21 18:5 21:6,16,21,22 31:15,20 32:14,19 33:1,7 36:2,19 37:19,22 38:21 39:24 40:8,13 41:3 52:1,3,4 53:16 55:20 59:14 59:14 60:9,25,25 61:7,12 62:3,6 65:14 66:22 70:9 71:9,19 76:5 78:16 80:9,12 82:1,20,22 89:25 95:16 97:6 99:16 101:9,24 102:13 105:16 107:9,10 111:22 115:1 127:13,22 128:9 128:22 130:4
**knowing** 43:16 116:4 118:21
**knowledge** 15:14 15:15 113:15
**known** 73:15 99:20 127:2
**kosakow** 79:14
**kraemer** 7:22 57:12,13,21 66:18 67:12,13 70:1,4,7 70:12,12 78:1,2,6 78:13 83:10 91:1 91:1
**kraemer's** 68:4 83:8

**l**

**la** 9:10
**labov** 8:20
**lack** 27:17 73:13 76:15 93:8
**lag** 83:25
**laid** 26:13
**landlord** 59:1 96:12 102:15,21 102:25 103:1,2 105:1 118:14
**landlords** 110:9
**language** 93:10 96:15 107:17 114:7 121:7,10,11 121:19 131:3
**lardner** 8:15
**large** 57:25
**largest** 57:9
**larry** 44:12
**late** 27:19 62:16
**law** 5:21,21 25:1 33:15 37:16 39:16 45:1 54:14,17 57:7 69:10 79:9 79:11,12,16,18,18 87:8 88:14 100:8 104:8 105:22,22 108:23 119:2,3 122:18 125:3,6 130:16 131:25
**lawrence** 7:7
**laws** 125:8
**lawyer** 14:11
**lawyers** 39:15 59:13,14 77:2 119:11
**laying** 24:18
**lead** 44:17
**leading** 85:6
**learn** 45:18
**lease** 96:10 110:25 117:8,9 121:9 122:1
**leave** 44:18 55:20 83:7 95:2 108:16 130:11 131:24
**leaves** 25:22
**led** 50:21
**ledanski** 5:25 137:3,8
**legal** 25:25 26:3 53:15,25 61:9 106:6 113:7 137:20
**legitimate** 22:3 127:17
**lehman** 24:4
**length** 124:10
**lengthy** 14:23 133:17,18
**lessee** 103:11,12 103:14
**lessees** 102:1
**lessor** 101:16 103:11
**lessors** 102:1
**letter** 4:24 34:19 55:1 121:14 127:2

**letters** 49:17
106:7 117:6,7,18
118:8,22 119:24
121:13
**level** 55:7
**lexis** 23:12
**li** 29:11
**liability** 17:23
45:13,14 55:10
62:3 98:17 113:25
125:21 133:25
**liable** 59:1 102:19
**lie** 93:12
**lien** 30:11,14,24
30:25 31:3,5,11
36:3,5,8 124:3
**liens** 31:7,17
**lies** 24:10
**lifeline** 126:9
**lift** 134:10
**lifted** 125:17
126:4 127:19
**light** 14:8 29:1
41:21 42:11 87:18
124:14
**lightly** 24:3
**liljeberg** 25:18
**limitations** 132:15
135:1,3
**limited** 7:10,11
32:20 52:8,9
**line** 37:13 38:22
58:8 61:3 121:17
**lines** 40:1
**liquidated** 43:15
**liquidation** 46:2
92:14,20
**list** 111:3
**listed** 120:21
**literal** 108:17
**literally** 108:14
**litigable** 65:9

**litigated** 73:8
115:15
**litigating** 115:1
**litigation** 32:8,13
33:17,18 37:6,10
37:11 48:16 50:4
75:23 83:2 114:23
115:10,10 122:25
123:24
**litigations** 32:9
**little** 18:24 38:22
40:19 60:18 67:4
**live** 73:2
**living** 38:10
**llc** 3:11 5:10,15,19
5:24 9:2,8 23:14
25:5 26:6
**llp** 3:2 6:9 8:8,15
12:24 71:19 72:1
78:22
**load** 86:19,19
**local** 14:11
**locate** 74:25
**london** 118:23
**long** 16:16 32:22
37:17,17 43:16,17
43:21 53:2 67:8
67:25 128:4
**look** 53:12 54:3
56:2 60:25 61:16
65:13 72:15 74:3
75:17 82:17 90:20
94:23 110:21
111:9 127:1
**looked** 45:19
51:13
**looking** 32:17
37:23 64:11 73:17
76:25 79:4 111:7
133:12
**looks** 112:8
**lose** 121:5 123:9

**loses** 63:13
**loss** 98:11,13
102:8 106:16
107:14,15 120:15
120:17
**lost** 27:16 67:6
94:5 125:21
**lot** 35:2 40:12
48:25 53:15 73:5
119:19
**love** 66:4
**lower** 48:10
**lulled** 77:19 80:22

**m**

**ma'am** 78:4 91:5
122:21 123:8
129:19 130:8
131:7
**magnitude** 76:19
**mail** 67:6
**mailings** 51:6
**main** 17:24
**major** 43:6
**making** 18:22
20:10,25 35:20
36:18 41:10 64:25
76:7,15 81:2
98:20
**mall** 5:10,15,18
5:23 9:2,9 95:13
95:15,24 98:25
114:18 115:9
116:14 126:10
127:4 134:23
**manges** 6:3 10:19
29:22
**manner** 89:20
111:19
**marcus** 6:8 95:10
95:11,12 99:24,25
101:5,6 105:16
107:6,7 110:6
111:5 112:8,11

115:5,19 117:21
119:13,16 120:4,8
120:9 123:14,17
130:24,25 132:2
132:17 135:6,9,12
136:8
**maria** 130:12
**marketed** 68:21
**marketplace**
67:15,24 68:6,22
70:19 83:22 85:8
88:18 90:13 92:5
92:13
**markets** 105:8
**master** 8:16
**material** 36:18
40:18,24 41:20,22
**materially** 36:14
36:15 39:23
**matter** 11:5,14
12:21 18:17 22:12
31:12 34:7,8
42:24 44:16 46:10
52:15,22 56:8,19
64:2 69:8 82:8
83:8 91:9 113:1
127:8,14 132:22
134:9 135:8,13
**matters** 2:1 10:3
13:5 23:9 28:14
52:16 62:23 95:8
96:2
**maximize** 49:10
**mazur** 7:22 57:12
57:13,21 66:18
67:12,13 70:1,4,7
70:12,12 78:1
**mean** 18:23 41:20
43:18 51:11,21
55:22 79:25 80:10
81:18 82:13 83:2
85:14 86:1 98:23
100:21 101:7,16

101:21 103:7
104:3,4 105:6,13
106:21 110:21
113:14 115:3
118:18 119:5
126:17,24 128:17
129:3 132:6
133:12
**meaning** 84:4
109:15,16,17
**means** 94:16
**meant** 80:25
**mechanical** 23:13
**mechanisms** 80:5
**medical** 21:19
**medically** 27:4
**meet** 49:14
**memo** 107:5
**memorandum**
2:17 5:21 96:1,8
96:25 97:16
101:23 102:3
104:2 106:13
108:1,2 110:15
112:13
**mention** 88:17
101:22
**mentioned** 52:16
86:25 97:16 121:8
**mentioning** 96:20
**mentions** 96:20
121:15
**meritorious** 28:11
28:24
**merits** 28:15,22
61:21
**message** 13:13
**midday** 13:15
**million** 32:6 34:1
34:14,14 37:19
45:5,7,8 46:17,18
53:5 57:10 62:1,4
64:20 113:7

119:10,12,18
**millions** 41:25
63:23
**mind** 44:10
**mine** 75:9
**mineola** 137:23
**minimal** 127:21
**minimum** 92:17
**minus** 71:4
**minutes** 115:24
122:8 129:22,24
**mischaracterize**
89:2
**misconduct** 23:21
24:15,23,25 25:4
25:8 93:15
**misled** 93:25
**misrepresentation**
23:21 24:14,25
25:4 79:20 99:13
118:17
**misrepresentati...**
87:19
**misrepresented**
106:10
**missed** 97:24
112:17 123:18
**missing** 103:17
125:18
**mistake** 23:19
24:12 25:23 26:3
29:5,6
**mistaken** 27:9
30:20
**mistakes** 25:25
26:1
**mistreated** 21:11
**misunderstood**
131:12
**mobile** 120:13
**modified** 122:3
**modify** 31:8

**mofo** 65:13
**moment** 18:2
**monetized** 33:19
**money** 33:13
55:16,22,23 62:24
63:6 64:7 65:25
67:22 68:24 69:8
69:13,16 77:16
80:4,8 84:4 86:6,8
86:14 99:1,7
103:23 116:22
117:3,4,15 119:19
124:15 125:1,12
129:1
**monies** 39:12
41:18 80:21 104:5
106:22,22 110:25
118:13 121:15
128:24
**month** 27:20 35:2
**months** 30:3 55:1
61:5 68:1 72:7
82:7 84:1 97:11
**moritt** 3:1 135:19
**morning** 10:2,18
10:23 12:5 13:12
13:13 44:11,20
52:6 60:15 95:7
**morrison** 8:1
52:10 60:16 64:18
**mortgage** 120:22
**mortgagee** 36:5
39:10 120:18,22
121:2
**mortgagee's**
120:19
**mortgagor** 101:16
**mortgagors**
101:25
**motion** 2:4,5,9,11
2:12,15,21 4:8,11
4:25 5:9 11:5,12
11:24 13:2 14:9

14:13,21 15:22
16:1,3 18:19,20
18:21,22 19:6,11
20:2,6,7,9 21:1
22:4,5,10,15,25
24:22 26:2,9
27:16 28:2,3,22
29:6,9,25 30:2,4,7
32:25 34:9,21
35:2 36:23 37:13
37:21,22 38:21,23
39:22 40:2 41:10
41:24 42:10,12
56:6 67:14,20
73:18 95:13
113:18 116:14,19
116:25 117:2,5,20
117:23,25 118:2
119:14,16 120:2
122:6,12 130:14
133:11 134:21
135:1
**motions** 23:1,5
46:15 51:14 53:7
58:24 59:3 118:4
**movant** 11:22
25:1
**move** 19:16 20:21
27:19,24 32:20
45:23 50:24 68:2
95:16
**moved** 28:19
**moves** 72:25
**moving** 23:7
68:14
**multiple** 47:13
132:3
**municipality**
105:8
**mute** 12:7 13:14
**muted** 14:4
**myrna** 4:8

**n**

**n** 6:1 10:1 11:5 46:24 52:8 137:1
**name** 95:23 96:21 96:21 102:25 103:4 110:20 124:24
**named** 96:17 99:22,23 101:18 109:25 120:16,18 125:5
**names** 110:18
**narrowed** 57:5
**narrowly** 69:11 91:21
**national** 2:11 11:8 12:25
**nature** 27:2 66:3 93:19,24 94:25 134:5
**necessarily** 58:3 131:5 134:18
**necessary** 33:25 66:6 76:22
**need** 14:12 18:13 33:8 35:10,17 39:6,20 40:15 42:7,9,9,13,15 46:22 49:9 50:22 51:4,6 55:17,20 67:17 73:8 78:17 94:4 122:24 134:22
**needs** 27:24 73:20
**nefarious** 14:6
**neglect** 23:20 24:13
**negligence** 16:12 16:16,20,21,23 17:8,16,18,24,25 18:5 26:15,16,24
**negligent** 26:17
**negotiated** 114:7
**negotiation** 54:8 55:9,19 59:17
**negotiations** 55:7 59:19 66:1
**nelson** 102:5
**nemaizer** 24:2
**network** 2:12 12:25
**never** 20:7 61:17 69:1 76:21 84:8 92:8,12 119:17 129:5,5
**nevertheless** 92:25
**new** 1:2 6:5,18 7:5 7:13 8:4,11,18 25:20 36:9 43:13 57:16 59:3 79:14
**newly** 23:20 24:13 24:17
**ng** 2:6,13,18 9:17 11:2,5,13,16,24 12:3,5,20,22 13:2 13:9,11,19,21,23 14:25 15:2,9,15 15:17,24 16:4 18:14,16 20:3,14 20:17 21:3,9,21 22:19 24:18 25:10 26:4,18 27:7,14 28:1,11,18 29:4 29:11,17
**ng's** 27:6
**nhin** 11:9,23 14:21 22:15
**nhin's** 11:11 22:15
**nichols** 111:11,17 112:2 120:12
**nickels** 110:13,19 111:2,3,6,13
**non** 45:12 46:21 48:2 68:21 84:13 122:15,19
**normal** 91:19 118:12,12
**normally** 23:1,7 55:17
**north** 92:18
**notably** 48:17
**note** 13:21 33:7 38:20 40:17 48:5 52:20 67:9,19 72:4 78:23
**noted** 22:17 27:15 32:8,25 39:1
**notes** 29:15 31:10
**notice** 2:1 18:20 27:20 33:22 35:22 35:22 36:1,2,19 41:19 43:8,12 44:3 50:18 51:2,7 54:22 62:13 65:16 66:13 67:3,7 123:13 124:23 125:1 128:11
**noticed** 51:18 62:15
**notices** 51:15 119:22
**notified** 106:13 124:17
**noting** 32:4
**notion** 83:4
**notwithstanding** 11:21 91:13 93:8
**november** 77:23
**null** 100:9
**number** 11:15 48:22 49:8 50:21 57:25 63:12,12 67:11 68:11 72:7 81:7 112:19 113:12,13
**numbers** 48:1 53:20 84:14
**numerous** 84:5,9 92:18 117:6,7,19
**nunc** 3:2
**nutshell** 83:19
**ny** 1:15 6:5,12,18 7:5,13 8:4,11,18 137:23
**nygard** 134:13

**o**

**o** 1:21 10:1 52:8 137:1
**o.w.** 92:18
**object** 56:4
**objected** 32:2
**objecting** 73:11
**objection** 2:11,11 3:7,10,14,17,19 3:22 4:2,6,22 5:3 5:6,12,14 15:21 20:2 22:24 24:19 24:22 27:8,15 47:7,11,18,18,21 48:23 57:22 61:4 68:10,11,13,16,23 69:12 72:5,10,16 72:23 73:14,16,20 76:19,25 78:12 80:14 82:1 87:2,4 88:3,4,13,15,18 88:19 89:19 91:11 92:22 94:12,13,25 135:22
**objections** 46:23 46:23 47:4,10,12 47:17,25 83:13 90:25 94:10 135:24
**objective** 97:2,3
**objectors** 48:18 69:25 70:5 92:3

**objects** 77:24
**obligation** 99:6 112:23 121:2,9,15
**obligations** 91:16 105:24 108:5
**observe** 119:5
**observed** 108:18
**obtain** 23:18 121:10
**obtained** 25:3 104:24
**obviously** 14:3 33:8,22 41:21 48:25 73:24 82:5 95:2
**occurred** 16:24,24 97:9
**october** 40:12 84:19
**offer** 77:4
**office** 7:3 11:18 11:20 13:24 22:13 27:13 29:11 86:7 133:3
**official** 3:4 10:9 10:12
**oh** 87:21,22 95:9 111:8 112:10,12 120:3 129:1,13 132:21
**okay** 12:19 13:1 13:10,18,20 15:10 15:16,20 18:11,14 18:14,15 21:2,20 22:7 29:16,19 31:19 34:5 38:11 38:18 41:15 43:2 43:24 45:21 50:9 50:19 52:2,12,13 53:11 55:5 56:15 58:15 60:11,14 63:3 66:12 68:8 69:24 70:4 73:23 75:5 76:6 81:17 82:10 83:12 86:4 87:1 96:4 103:6 103:13 111:16 112:14,14 116:18 118:9 120:4,6,9 122:17 124:21 129:18 130:2 133:12 135:8,15 136:7,10
**oklahoma** 111:12 111:18 112:3 120:12
**old** 25:4 26:6 35:2 137:21
**olmo** 4:8
**omnibus** 3:7,10 3:14,19,22 4:2,6 5:3,6 10:3 13:4 46:23 47:4,12,16 47:18,20,25 56:5 56:20 57:22 61:4 62:18 66:13 68:10 72:5,15 76:25 91:10
**once** 102:7 114:12
**one's** 22:21 81:8
**ones** 57:25 66:7 114:8
**online** 70:20
**open** 55:20
**operated** 51:24,25
**operating** 40:19
**opinion** 54:17
**opinions** 54:16
**opportunity** 44:4 44:6 75:8
**opposed** 41:8 55:18,25 93:9 102:19
**opposing** 23:21 24:15 28:10
**opposition** 4:2,5 14:20 16:3 74:10 74:14 76:16 78:11 78:12,24
**opt** 46:16,21 55:2 64:12
**opted** 31:24 48:13 58:24 64:19
**oral** 27:15 56:13 94:3
**order** 2:13,21 4:12 5:22 10:25 11:7,25 18:22 20:21 22:11,18 23:2 26:8 29:8,15 29:18 30:10,20 31:4,8 33:15 34:9 36:3,5,24,25 39:9 39:9 43:14 47:1 47:17 49:9 50:23 62:8 63:12 70:21 71:21 94:24 95:3 95:6 134:21 135:7 135:25 136:4
**orders** 31:22 33:19 40:20 47:13 66:5
**ordinary** 90:11 92:1
**orient** 7:10 52:7 54:24 58:23 64:11
**original** 24:21 100:10
**originally** 26:19 30:4
**ostensibly** 121:15
**outflows** 43:6
**outside** 76:5
**outstanding** 33:17 37:11 45:17 47:19 49:23
**overcome** 76:22 94:12
**overcoming** 73:12
**overlap** 49:19,20 69:19,19
**overlooked** 23:9
**overruled** 73:20
**owe** 49:17 69:8
**owed** 17:3,4,6 68:24

**p**

**p** 6:1,1 10:1
**pa** 7:20
**page** 23:12 41:17 96:18 111:12,14 111:15 112:3,6,7 112:9,11 120:17 120:21
**pages** 96:25 108:13
**paid** 30:6 33:4 35:6 39:13 70:23 77:12 83:23 84:4 97:23 99:1,7,10 99:22 100:24 101:1,3 102:19,21 104:22,24 107:21 112:20 116:5 117:15 118:11,13 118:13 123:1 125:2,4 126:5 128:24 129:2
**pandemic** 72:8
**paper** 91:6
**papers** 56:6,7 65:15 71:2,13,17 74:10 107:11
**paragraph** 17:2,4 17:10,13 18:7 30:13,20 31:3,4 88:8 89:4 98:7,11 98:18 107:17 108:3,3 109:2,2,5 120:13,14,24,25 126:25

**paragraphs** 17:6
  17:13,18 98:17
  108:9
**pardon** 104:15
  112:17
**parental** 44:18
**park** 8:17
**part** 12:17 17:24
  18:3 22:21 27:12
  32:17 35:12 39:8
  39:9 78:11,12
  82:12 113:19
**participants** 92:4
  92:5
**participate** 14:8
  25:11 48:14
  103:15,18
**participated**
  14:16
**participating**
  11:17
**particular** 12:20
  13:2 39:23 49:15
  73:25 118:2,3
  134:7
**particularly** 14:6
  54:11 72:3 124:14
**parties** 29:13
  34:12 37:23 38:8
  51:4,18 52:3,4,25
  55:14 56:22,25
  57:6 58:4 60:5
  62:25 65:2 68:18
  68:20,25 75:12
  77:7 80:10 90:21
  97:6 100:18
  108:20 109:7
  110:9,18,20 114:9
  114:10 122:15
  131:9 134:16
**partner** 95:10
**party** 23:8,18,21
  24:15 25:3 28:10

28:11 79:18,20,21
  79:21,22 81:7
  90:15 96:6,22
  97:2,13,14 98:9
  98:12 100:20
  105:21 106:17,20
  107:21 108:17
  110:11,24 125:11
  126:2,21,24
  131:15,15 135:2
**party's** 106:18
**pass** 68:24
**passed** 47:12
**paul** 8:20
**pauses** 128:3
**pausing** 128:3
**pay** 45:5 53:25
  55:11 67:22 98:23
  99:5 100:1 101:4
  106:4,4,5 109:10
  110:11 117:2
  120:11,16 121:1
  124:9,13 126:18
  126:20
**payable** 107:15,16
  120:17
**payee** 102:8
  106:16 120:16
**paying** 35:15
  41:21 65:15 97:12
  97:15 103:23
  106:19,21 110:23
**payment** 4:16
  32:2 33:14 50:10
  52:17 84:6,24
  92:7 94:6 101:15
  103:9 105:9,11
  106:17 109:6,9
  111:21 123:13
  126:20 127:1
  128:11,14
**payments** 31:25
  34:12 35:21 41:20

41:22 83:24 84:2
  84:15 85:1 104:25
  128:18
**pays** 110:16
**pdf** 112:11
**pdx** 2:11 6:10
  11:8,9,9,11,23
  12:18,24 14:21
  16:14,21,23 17:4
  17:11,20 18:18
  22:15,15 24:23
  26:17 27:12,15
  29:2,8,11
**pdx's** 15:21 16:1
**pearl** 64:6
**penalized** 129:4
**penalty** 33:10
**pending** 2:5,14
  33:17 34:7,8 47:5
  122:11
**people** 51:8 54:14
  54:15 55:17,21
  58:17 59:4,21
  62:6 67:10,11
  69:1,8
**people's** 129:21
**percent** 31:25
  39:5 46:18 48:10
  48:24 50:17,20
  58:12 66:7 94:6
**percentage** 55:25
**performing**
  109:20
**period** 84:23
  88:22 98:8 133:9
  133:9,13 135:1
**permitted** 10:11
**perpetrated** 84:9
**person** 13:22
  21:12 99:11 103:2
  105:9,11,14
  120:11

**personal** 19:3,11
  27:17 126:4
**perspective** 31:21
  32:22 33:5 42:18
  120:7
**persuade** 123:9
**pertaining** 15:6
**peter** 44:17
**petition** 51:23
  75:13,14,20 85:22
  86:9,15 87:3,4,5
  87:20 88:1 89:14
  89:20 91:16 93:15
  93:16,17,21,22
  131:7,14 134:5
**phone** 13:6 24:23
  43:18 67:16 90:23
  91:8 128:7
**physical** 81:19,24
  82:18,21 92:16,23
**physically** 72:9
  76:2 81:15 82:3
  89:10
**picture** 42:3 45:14
**piled** 21:13
**pittsburgh** 7:20
**place** 28:20 85:4
  113:11 128:13
  134:3
**placed** 12:7 13:14
  18:7
**plain** 69:21 92:10
  93:10 109:15,16
  109:16
**plains** 1:15
**plaintiff** 27:24
  91:7
**plaintiff's** 22:10
**plaintiffs** 2:23
**plan** 31:6 48:15
  64:15 131:10,13
**plausible** 26:15
  73:19

**plausibly** 27:5
**plead** 16:8 19:15
  19:17,24
**pleaded** 70:13
**pleading** 74:2
  77:1 83:9
**pleadings** 21:25
  22:2 25:24
**please** 61:23
  63:16 115:23
  118:8
**pled** 16:10,20
**plenty** 97:11
  119:11
**plus** 31:11
**point** 10:11 16:25
  17:1 18:12 20:2
  23:8 26:16 28:17
  33:2,24 39:24
  40:16 41:4 50:10
  51:9,21 52:23
  53:1 54:3 57:1
  59:8,19 60:1,5,12
  60:18 61:11 62:12
  76:14 81:6 83:3
  83:24 86:23 87:8
  87:9,23 90:8 91:7
  95:22 98:16
  100:14 113:24
  114:24 117:15
  122:22,22,24
  123:9,12,19 124:1
  125:10 127:7,12
  127:13 128:14,19
  129:7,7 132:10,11
**points** 38:20
  54:19 78:25 102:3
  107:8
**policies** 98:4,10
  98:22 103:23
  123:22,24 124:7,8
  133:24

**policy** 91:21 96:9
  97:8 98:8,25 99:1
  99:6,13 100:9,14
  100:16,18,20
  101:14,17,20,23
  102:9,10,11,12,18
  102:25 103:1,3,5
  107:10,13,13,14
  107:20,23 108:4,5
  108:7,11 109:7
  111:22 112:21
  114:9 120:15,21
  121:2,7,17,18
  124:14 125:2
  126:11
**pools** 49:13
**populating** 84:16
**population** 48:6
  48:24
**portal** 70:21
**portion** 16:15
  35:11 62:2 64:20
  113:23 114:13
**position** 32:15
  44:25 53:13,16
  71:9 75:8 116:24
  121:6 132:13
**positions** 39:15
  42:17
**possession** 70:18
  71:6,11 92:17
  105:10 118:17
**possible** 18:4
**post** 6:11 30:25
  75:13 87:20 93:16
  93:21,22 131:7,14
  134:5
**posture** 56:2
**potential** 23:15
  24:16 26:3 55:10
**potentially** 24:12
  37:5 45:8 73:2
  80:5

**pr** 9:4
**practical** 64:1
**practice** 76:17
  104:7 110:15
  118:12,12
**practicing** 104:7
**pre** 51:23 85:22
  86:9,15 87:3,4,5
  88:1 89:13,20
  91:16 93:15,16
  117:5
**prefer** 28:14
  42:14 94:21
**preference** 32:10
  49:18,20,23 54:22
  54:25 55:10 61:24
  62:2 64:23,23
  65:7,8 82:18
**preferential** 77:17
**prefers** 10:24
**prejudice** 28:10
  28:18 60:3,6
  62:12,23 63:2,4
  63:19 64:5,9,14
  65:5 67:21 89:19
**prejudiced** 59:21
**preliminary**
  61:12
**premise** 96:13
**prepare** 15:12
  66:1 134:21
**prepared** 29:1
  56:13 72:10 94:7
  112:15 133:21
  134:6
**prepetition** 49:23
  65:9
**prescribed** 27:4
**prescriptions**
  26:19,23 27:3
**present** 11:16,21
  12:1,4,6 45:15
  46:4,5 106:6

**presented** 46:13
**preserve** 133:8,10
**preserved** 39:14
**preserving** 24:1
**press** 23:11
**pressing** 53:17
**pressure** 60:23
  81:6
**presumably** 76:22
**pretty** 21:18
**prevail** 108:20
**previous** 118:7,8
**previously** 24:20
  25:12 26:22 124:3
**prima** 68:17
  72:21 73:12 76:22
**primary** 16:12
  27:2 118:10 134:1
**principle** 48:8
  105:18,19 119:1,3
**principles** 85:11
  104:11
**prior** 14:24 21:25
  22:1,2 23:2 30:3,3
  33:4 84:1 98:19
  117:19 133:18
**priorities** 69:10
  91:14
**prioritize** 48:19
**priority** 51:13
  67:5 68:12,15
  69:9,13,18 77:13
  82:15 88:4 90:17
  90:20 91:12,19
  92:12 93:11 94:6
  94:25
**private** 21:18
**pro** 3:2 16:7 22:22
  50:16 76:17
**probably** 55:8
  64:3 94:16,20
**problems** 84:25

**procedural** 12:17
 18:18 56:2
**procedure** 11:11
 23:7,17 28:6
 39:17 63:21
**procedures** 41:24
**proceed** 10:15,24
 10:25 29:20 72:11
**proceeded** 11:22
**proceeding** 11:2
 11:10,13 22:10
 28:20 78:9,17,19
**proceedings**
 73:16 137:4
**proceeds** 4:15
 30:5,14 31:16
 32:13 33:20 40:21
 40:22 102:10
 103:16,18 106:11
 110:10 116:16
 117:1 119:21
 123:13 124:4
**process** 40:5 46:2
 47:10 54:5
**product** 17:23
**productive** 47:23
 58:3,4 66:6
**products** 4:1
**profits** 115:10
**program** 31:23
 35:4 50:8,12 55:3
**progress** 49:4,6
 50:7 58:9
**projected** 40:22
**promised** 15:2
**promptly** 29:13
**proof** 70:23 72:21
 75:17 76:11 77:4
 81:12,22 93:8
 127:9 130:21,22
 131:2
**proofs** 3:7,15,20
 3:23 4:6 5:3,6

68:10
**proper** 20:24 28:4
 125:14 126:7
**properly** 12:9
 26:8 27:20 112:21
 113:6
**property** 30:14,23
 31:11 96:7 97:8
 103:1,3,13
**proposed** 36:20
 56:23 135:21,25
**proposition** 26:16
 28:14 97:23 99:5
 102:7 105:5
 106:14 109:14
 111:9 116:13
 122:8
**prosecuting** 43:18
**prospect** 77:12
**protect** 20:4 34:1
 101:17 108:8
 112:15 113:2
 120:19 121:2
 127:12,16
**protected** 19:21
 19:21 20:12 21:4
 32:4,5 34:23
 36:17,22 37:8
 113:9 116:2
 134:17
**protecting** 128:13
 134:12
**protection** 30:11
 30:16,22 32:21,23
 34:20,21 35:14,18
 36:6,13 38:25
 39:12,20 41:9,12
 41:14 43:3 44:23
 108:5 118:19
 134:8
**protocols** 12:8
**prove** 37:15
 111:24

**proven** 37:16 87:5
**provide** 33:21
 43:12 50:18 66:13
 70:23 96:12 108:7
 108:7 134:23
**provided** 26:18,20
 26:20,21 32:22
 83:20 94:14
 120:15
**provides** 23:17
 110:25
**providing** 35:4
 36:1 45:16 96:23
**provision** 25:14
 25:16 87:13,14
 98:18 102:10
 108:14 109:1,23
 113:1
**provisions** 105:23
**prudence** 97:1
 104:6
**psychological**
 27:6
**public** 42:4,4
**publicly** 51:3
**puerto** 4:9 5:21
 9:11 99:8,10
 104:9 105:3
 108:15 109:14
 114:18,24 115:1
 115:16 118:23
 119:10 121:14
 122:8 125:8,9
 131:25
**pull** 74:2 78:17,18
**punitive** 33:11
**purchased** 69:1
**purpose** 14:15,17
 52:19 104:21
 107:4
**purposes** 67:14
 71:3 77:23 86:2,4
 90:18 91:2

**pursuant** 2:13
 31:22 37:21 73:15
 95:1
**pursue** 77:14,17
**pursued** 32:11
 80:21 83:4
**pursuing** 32:9
 37:12 79:19
**pursuit** 133:22
**put** 16:22 42:18
 47:7 54:6 59:23
 65:23 72:12 77:3
 78:14,16 79:1,17
 80:14 98:22 117:1
 121:16
**puts** 121:11

**q**

**quantum** 33:1
**quarropas** 1:14
**queenie** 134:13
**question** 14:19,22
 50:9 55:5 59:10
 59:15,16 73:13,25
 75:16,17 103:21
 118:7 119:24
 120:11
**questionable** 83:6
**questions** 34:3
 50:6 55:4 69:23
 102:3
**queue** 40:4
**quick** 57:23
**quickly** 20:6
**quite** 14:23 24:18
 39:7 48:2 81:8
 94:7 98:22 133:13
**quote** 79:18
 107:15 120:23
**quoting** 120:14

**r**

**r** 1:21 6:1 10:1
 137:1

**radiology** 79:15
**raise** 18:21 44:22
  72:13 89:17,18
  114:16
**raised** 19:5,6
  25:21,21 35:19
  89:5 92:24 122:11
  127:3
**raises** 35:14
**raising** 85:18
**ran** 20:15
**range** 61:13
**rant** 56:16
**rata** 50:16
**rave** 56:17
**rd** 6:11
**rdd** 1:3
**reached** 23:10
  48:7 87:9
**reactions** 27:6
**read** 15:21 91:21
  99:2 108:2 109:1
  117:4
**reading** 79:10
**reads** 131:10
**ready** 68:2
**real** 33:2,14 34:18
  58:25 62:23 79:25
  123:19
**reality** 57:24
**realized** 40:21
  79:2 85:3
**really** 14:15 15:13
  21:22 34:7,20,23
  35:9 37:1 39:21
  40:11 41:4 42:4
  48:10 60:7 62:23
  65:13 66:3 77:25
  79:7 82:10,12
  97:19 108:21
  121:19 131:19
**realm** 113:15

**reason** 23:23
  24:15 25:13 56:18
  63:18 79:21 83:1
  87:11 88:16 90:19
  98:2,5 110:7
**reasonable** 79:24
  97:3,5 111:19,20
  119:1
**reasonably** 23:10
  27:4 79:22 93:24
**reasons** 29:9 57:1
  66:20
**rebutted** 81:16
**recall** 30:2,8
  95:14 124:1
**receipt** 73:7 77:22
  89:11 90:13
**receive** 31:25 51:5
  65:8 68:17 69:7
  72:15 73:10 77:11
  101:1 104:22
  106:3,21 114:8
**received** 12:14
  13:3 26:22 46:18
  50:17 72:24 73:3
  74:19 75:19,22
  76:21,25 85:1,20
  85:21 90:10 91:24
  93:1,4 106:3
**receiving** 64:14
**reclassification**
  3:8
**reclassify** 5:4,7
**recognize** 128:7
**recollection** 25:7
  126:8
**reconcile** 46:14
**reconciled** 46:16
  46:20 47:7 49:16
**reconciling** 35:6
**reconsider** 22:11
**reconsideration**
  2:4,9 11:6 12:2

23:5
**record** 10:19 29:3
  29:10,21 32:10
  38:13 42:4,5
  44:14 60:16 67:14
  67:19 70:10 72:12
  72:14,20 73:10
  76:4,5 80:14
  89:21 90:3 117:22
  130:21 133:21
  137:4
**recorded** 129:23
  129:23
**recording** 10:9,11
  10:12,14
**records** 21:19
  26:18 51:15 58:22
  88:20,21 99:19
**recourse** 104:23
**recover** 80:4
**recoveries** 31:25
**recovery** 50:17
  55:25,25 80:21
**reduce** 31:24 49:8
  49:9 50:4
**reduced** 45:6
  48:22
**reduction** 48:24
  50:20,21
**reed** 82:25
**refer** 11:9
**reference** 95:3
  101:25 102:1
  136:4
**referring** 74:17
  75:1 104:5 105:18
  105:19 108:10
  112:12 119:24
**refers** 109:18
  121:14
**reflected** 84:21
**regard** 50:10
  52:17 98:13

114:20
**regarding** 26:18
  26:22 43:4 57:18
  93:13 105:23
  120:7 130:22
  131:10
**regardless** 103:4
**regards** 114:18
  119:22,23 125:20
  130:15
**regularly** 84:17
**related** 2:6,15,18
  3:11 4:18 5:17,22
  17:21 18:1,17
  20:17 28:17 46:10
  48:4,9 58:25
**relates** 16:12
  29:24 71:11 96:2
**relating** 29:25
  67:1
**relationship**
  75:12 93:4,9
**relator** 4:11,19
  6:16 29:25 32:1
  32:16 34:4,22
  36:16 37:4 38:17
  39:10 43:19 45:9
**relator's** 4:13,16
  33:3 34:9 35:13
  35:23 43:7
**release** 98:6,11
  105:10 119:25
  120:1 122:12
  131:9
**released** 23:23
  113:21 131:13
**releasor** 98:9,12
**relevance** 48:5
**relevant** 28:4 59:5
  62:10 65:2 66:8
**reliance** 20:15
  77:13 79:24 80:3
  83:4 87:17 94:2

**relied** 42:19 77:10
77:10,12 80:3
93:24 118:15
**relief** 2:13 4:18
5:9 23:18,24
24:10,16 25:13,16
28:9 29:2 36:23
47:13 124:6 133:7
**relies** 79:22
120:10
**relieved** 11:8
27:13 28:5,8
**relifted** 125:23
**reluctant** 34:21
**rely** 70:16 79:22
94:1
**relying** 89:6,7,7
121:12,20
**remain** 43:17 48:1
48:3,4 61:11
**remained** 47:7
**remaining** 22:14
37:18 47:19,20
48:12 49:21 57:25
66:7
**remains** 37:11
47:18 49:6 94:3
**remedies** 97:5
**remedy** 23:3
**remember** 20:20
20:23 81:11
**remittance** 84:13
84:16,21 85:9
**remotely** 86:23
**removed** 69:4
**render** 36:16
56:21
**rendered** 53:14
**renders** 53:14
**reopen** 24:3
**repair** 116:17
**repaired** 106:23

**repairing** 127:4
**repeat** 114:24
**repeating** 18:12
**replaced** 87:20
**replacement**
30:25 31:5 36:5
**replay** 25:12
**replies** 69:14
**reply** 2:17 5:14
31:3 32:25 40:17
56:6,7 61:6,7
68:19 69:4 79:4
79:10,17 88:12,25
89:1 95:20
**report** 37:6
**reporter** 10:8
**reporter's** 11:6
**reporting** 84:3
**reports** 84:13,16
84:21 85:9
**represent** 57:16
**representation**
87:15
**representations**
64:25 78:7 89:13
93:18
**representative**
49:12,25 50:2
58:7 66:10
**represented** 62:13
83:25 98:7 100:7
131:6
**representing**
14:10 64:18,21
**request** 2:4,14
14:25 15:3,4
19:11,16 23:16
28:5,7 29:2 35:9
37:14 39:11 40:3
41:13 52:19
132:14
**requested** 15:18
47:14 121:25

**requesting** 39:12
117:7
**requests** 35:8
42:12
**require** 37:14
119:16 124:13
**required** 12:9
48:19 50:13 51:4
107:22 123:13
**requirement**
92:16
**requirements**
131:20,21
**requires** 50:24
90:9
**reserve** 33:7 62:5
62:7,7 63:6,23
64:8,9,12 65:19
65:19 67:18
**reserved** 39:13
50:22
**reserves** 49:10
50:13,14 62:14
88:9,11
**reserving** 64:22
**resolution** 42:16
**resolve** 21:17 41:7
45:20 47:9 74:11
83:2 132:22
**resolved** 46:22,24
57:24 63:22 99:11
**resolves** 98:7
**resolving** 34:16
66:21
**resources** 23:5
34:2,3 49:3 64:4
65:25
**respect** 18:20 21:7
21:9 27:1,3 32:16
32:25 33:17 35:1
48:6 50:8 58:10
68:3,11 69:20
71:10 78:7 91:16

96:13 131:23
**respectfully** 21:5
45:2 56:18
**respective** 96:14
96:24 102:24
**respond** 4:8 15:4
19:24 20:7 21:24
107:7 118:6
121:22
**response** 3:10,14
3:19,22 4:1,5 20:8
20:11 24:22 57:22
68:19 70:8,14,17
72:22 84:8 88:8,9
88:12 95:20 116:1
120:5 121:22
**responses** 69:12
69:18,23 90:4
**responsibility**
96:23
**rest** 71:17,17
135:13
**restore** 119:20
**restored** 106:23
**rests** 102:9
**result** 17:16,20
65:11 71:6 123:2
130:20
**resulted** 22:18
**results** 48:25
**retail** 54:11
**retain** 3:1
**retroactive**
132:14
**retrying** 32:19
**returned** 44:18
**returning** 71:3
**returns** 132:10
**reveals** 88:21
**review** 25:24
54:14 79:10 88:20
94:8 135:25

**reviewed** 15:8
26:10 79:4 95:18
104:6 135:24
**revisit** 33:24
**rico** 4:9 9:11 99:8
99:10 104:9 105:3
108:15 114:18,24
115:1,16 118:23
119:10 121:15
122:8 125:8,9
131:25
**rico's** 5:21 109:14
**rid** 90:22
**right** 10:20 11:4
15:1 18:11 21:8
21:23 22:9 29:4
30:18 31:2,19
35:23 37:25 38:10
39:10,14 40:7
41:5 45:7 51:10
51:23 53:11 54:8
56:2,16 59:18
60:23 62:22 63:11
68:6 73:9 75:5
76:10 78:8 80:1,8
80:18 83:12 86:13
88:9,12,23 90:18
91:9 94:5 96:9
98:3,4,21,25 99:1
99:9 103:13 104:2
105:7 106:7
109:13 110:24
112:14,15 113:16
114:1,8,9,15
116:17 117:3,10
117:23 118:4
119:13,16 122:2
124:4,6 125:16
126:2 129:25
131:1,25 132:5
133:10
**rights** 21:18,18
33:8 63:13 83:5

87:15,17,18,20
105:21 106:11
109:11,22,25
115:13 123:21,21
124:7 130:13
133:8
**rios** 9:6,14 95:23
95:24 96:5 97:18
97:21 99:8 100:1
100:5,16,25 101:9
101:14,20,22,25
102:16,22 103:7
103:11,15,20,25
104:15,17,19
105:6,18 106:19
107:2,24 108:1,24
109:4,8,16 110:4
110:13 111:4,7,11
111:15,17 112:2
112:12,17,24
113:4,10 115:21
116:7,10,23
117:17 118:2,6,10
121:21 122:7
124:16,20,22
125:8,15,18 126:1
126:22 127:8
128:16,20,24
129:3 130:11
**rise** 89:14,15
93:16,21 98:16
126:12 130:17
131:16
**risk** 42:9 116:3
118:16 134:6
**road** 56:11 137:21
**robbed** 86:8,11
**robbery** 86:17
**robert** 1:22
**rochelle** 79:15
**role** 109:21
**roof** 115:8,9,12

**roofing** 114:19
115:8
**room** 1:14
**rosa** 5:10,15,18,23
9:2,9 95:13,15,24
96:17,21 97:7,8
98:2,15,20 99:16
100:19 102:15,19
106:5,5,5 107:12
107:19 109:23
111:22 112:15
113:2,18,20 114:2
114:2,4,14 115:9
115:12,13 116:2
116:14,24 117:7
118:21 119:6,19
120:10 121:6,11
121:19 122:2,4
123:22 124:6,24
125:1,7 126:10
127:3,22 131:25
134:6,23,25
**rosa's** 95:19,20,21
107:9 109:11
116:5
**roughly** 32:5
**round** 50:15
**ruiz** 4:8
**rule** 2:13 11:10
16:10,10 18:21,23
18:23 19:8,22,22
19:23 20:12 21:4
22:14 23:6,6,16
23:17,25 24:3
25:15 26:5 27:21
27:21 28:5 29:6
109:15,16,17
122:13
**ruled** 21:5 32:21
44:25 78:4 81:2
123:14 129:6,7
**rules** 14:11,12,13
14:14 19:8,15

21:6,6 23:1,17
27:18 63:5,7,19
63:23
**ruling** 13:7 14:23
14:23 15:14 24:21
25:23 26:13 27:10
27:12 29:9,12
66:20 82:18 91:5
133:7
**rulings** 133:19,20
**run** 67:22 113:7
**rushed** 74:13
**ry** 129:14,25
133:2
**ríos** 9:1

**s**

**s** 2:6,15,18 3:11
5:17,22 6:1 10:1
52:8
**s.d.n.y.** 23:12 24:5
25:5
**s.w.2d** 102:5
**sale** 4:13,16 30:3
30:14,17,23,24
31:8 34:10 36:4
39:4,5,9 53:1
86:21 92:23
**salene** 7:22 57:13
78:1 91:1
**sales** 4:15
**san** 9:11
**santa** 5:10,15,18
5:23 9:2,9 95:13
95:15,19,20,21,24
96:16,21 97:7,8
98:2,15,20 99:16
100:19 102:14,19
106:4,5,5 107:9
107:12,19 109:11
109:22 111:22
112:15 113:2,18
113:20 114:2,2,4
114:14 115:9,12

115:13 116:2,4,14
116:24 117:7
118:21 119:6,19
120:10 121:6,11
121:19 122:2,4
123:22 124:6,24
125:1,7 126:10
127:3,22 131:25
134:6,23,25
**satisfied** 21:3
23:23 30:6 93:11
**satisfy** 30:24
**save** 53:15
**saw** 53:4
**saying** 28:1 29:4
38:7 46:3 63:25
76:20 82:15 85:15
94:23 126:7,9
**says** 20:10 36:4
73:10 74:18,19
75:15,18 76:24
79:17 81:20 88:9
91:6,22 102:3,24
105:8 107:15
108:3 120:13,15
121:1 125:4
**scarsdale** 6:12
**scenario** 55:24
99:3 128:8
**schedule** 14:9,12
22:25 32:25 95:2
**scheduled** 2:1
14:18
**scheduling** 35:11
**scheme** 85:4
86:18 91:19
**schwartz** 57:11
**score** 34:12
**se** 16:7 22:22
40:16
**sears** 1:7 2:22 3:4
10:4 11:2 13:4
68:21,23 69:8

70:21,21,22,24,24
71:1,4,7,8,12
72:14,23,24 73:2
73:10,11 76:2,3,8
76:20 83:22 84:2
84:4,5,6,12,15,16
84:21,23 85:3,5,7
85:8 86:8,11,14
88:17,22 91:6
92:5,6,7 93:3,7,9
95:12 96:9,11,20
97:12 98:6,6 99:7
99:23 100:12,18
101:1,3,17 102:17
102:19,21 103:10
103:24 104:3,13
104:16,18,22,22
104:23,25 106:2,9
106:23 107:16
109:9,11 110:3,10
110:11,11 116:22
116:24 117:1,4,8
117:13,14,19
118:10,19 121:1
124:15 126:24
127:12 128:25
129:4,4 130:11,19
131:5,15,15
**second** 3:7,14,19
3:22 4:2,5 27:12
28:3,17 29:23
44:5 47:20 48:12
52:17 57:22 63:21
65:20 68:10 72:5
72:15 79:14 91:10
97:25 101:6
120:12 123:12
132:21,24
**secondly** 22:15
81:5
**section** 90:9 91:11
92:10 93:18 96:11
107:14,22 108:13

122:17
**sections** 105:20
**secured** 4:16 30:1
30:11 32:3 34:1
38:25 41:11
**security** 120:22
**see** 12:3 19:22
24:4,7 25:4,16
26:5 37:13 49:14
52:2 53:7 55:24
59:15,16 66:6
67:5 72:13,16
73:17 77:2 83:1
97:19,20 102:18
102:20 105:7
107:20 108:21
111:2,4,8 112:10
118:1 124:11
125:9 127:2 131:4
132:21
**seeing** 124:5
**seek** 19:17 20:4
20:23 134:25
**seeking** 23:3
38:24,25 80:4
**seen** 15:9,12
61:17 94:3
**segregation** 80:7
**selene** 67:12 70:12
**self** 113:10
**seller** 67:15 70:19
**sellers** 67:24
**selling** 92:5
**sells** 103:1
**send** 136:3
**sends** 75:14
**senior** 31:7
**sense** 66:11 73:1
79:7 108:17
**sent** 12:13 13:19
49:17 51:15 84:5
114:10

**sentiments** 57:18
**separate** 98:4,24
99:5 100:10
103:22,22 104:2
104:19 114:2
121:16 124:8
125:2 126:10
131:11,13 132:8
**separately** 10:13
27:9 117:3 132:19
134:13
**september** 61:4
70:15 84:15,18
97:9
**series** 89:12
105:20
**serious** 11:17
**served** 14:15,17
**serves** 122:14
**service** 91:18 93:6
93:7
**services** 25:19
**serving** 23:25
**set** 10:12 19:12
39:17 41:9 67:16
67:17 68:18 70:7
71:2,13 122:10
**setoff** 65:7
**sets** 24:25
**setting** 24:23
**settle** 54:2 60:24
134:22
**settled** 33:19
46:21 48:23 66:7
97:10
**settlement** 2:21
33:2 45:6 47:1
48:7,14 56:23
59:17,19 61:13,17
61:17 66:1 98:5
106:9 113:12,25
116:4 117:1 123:2
123:12 126:12

127:18 128:14
131:14 134:1
**settlement's**
122:13
**settlements** 48:8
48:19 55:13 60:21
**seven** 72:7 83:21
**seventeenth** 47:16
**shared** 46:17
**shawn** 75:1,11
**ship** 68:25 69:1
70:22,23 86:18
93:16
**shipped** 80:1,2,23
**shipper** 71:8 93:9
**shipping** 85:2,5,7
85:23 93:6
**shopchimney.com**
3:19
**short** 18:7 37:17
39:8 43:15,21
**shortly** 13:13
**shortness** 74:10
**show** 14:2 17:14
82:3,21 102:18
126:9 130:20
**showed** 13:25
18:8
**showing** 14:3
16:11 17:5 24:7
36:20 84:9,13
**shown** 25:8 82:20
87:14 94:4 127:5
127:14
**shows** 13:21
**side** 59:19 61:19
61:20
**sides** 42:25 55:19
59:15,16
**sight** 121:5
**sign** 11:20 130:5
**signed** 12:10
113:12 118:18

126:6 129:5
**significant** 37:11
37:16 49:6,6,20
50:7,20,21 55:9
**similar** 107:17
**simple** 21:19
**simply** 16:14
45:16 55:11,22
76:7 93:10
**single** 61:20
**sino** 7:10 52:8
54:25
**sir** 81:14 100:9
104:15 111:7,11
111:15 112:17
127:11 136:6
**sister** 119:13,21
**sit** 37:3
**site** 92:6
**situation** 106:12
120:25 121:4
134:20
**situations** 77:16
77:18
**six** 23:23 24:15
48:2 68:13
**sixteenth** 47:16
**skeptical** 81:8
94:4,7
**sky** 4:1 8:9 71:19
71:22 72:1,2 74:6
86:25 93:20 94:13
94:14,20 95:3
**slim** 82:25
**small** 48:6 49:21
**smaller** 67:24
**smith** 111:6,14
**sold** 68:20,25 85:8
85:11 90:10,14,14
92:1,6,9 103:14
**solely** 27:16 58:12
94:25

**solutions** 10:9,13
11:21 129:21
137:20
**someplace** 69:3
**somewhat** 12:12
76:18
**sonia** 5:9,14,18,23
9:13 95:25 96:3
113:18 118:7
119:21 121:22
133:6
**sonnax** 114:12
127:19 134:2
**sonya** 5:25 137:3
137:8
**sorry** 17:22 19:4
30:13 38:12 52:23
53:18 70:1 71:10
73:22 75:25 81:14
87:7 89:9 97:17
100:13 101:19
103:11 111:2,13
111:25 112:13
114:22,23 115:3
115:17 120:2
123:8 127:10
128:3,5 131:11
**sort** 38:22 67:4
71:20 74:11
**sorts** 73:6 77:16
77:18
**sotomayor** 134:15
**sought** 12:1 15:23
30:5 32:2
**sound** 24:10 53:20
**sounds** 58:19
**southern** 1:2
53:16
**spam** 15:3
**sparingly** 23:3
**speak** 10:6 22:19
22:23 34:4 48:25
67:6 83:14 90:24

120:7,8 132:24
**speaking** 10:7
92:4,16
**speaks** 60:13
**special** 3:2
**specific** 20:20
25:15 87:13 94:6
109:2
**specifically** 17:9
75:18 102:14
113:19 118:22,23
122:23
**specifics** 42:13
**specified** 27:17
**specifies** 110:2
**specify** 16:17
**spelled** 11:5
**spells** 75:18
**spend** 33:12 34:2
55:16,22,23 65:24
65:24,25
**spite** 118:20
**spread** 34:14
62:24
**spun** 81:1
**src** 92:20
**staff** 10:21
**stage** 21:21 73:20
**stand** 21:24 22:1
**standard** 17:3,6
73:18 79:7,12,13
79:16 83:3 96:14
110:15
**standards** 79:9
111:20
**stands** 97:23
**start** 29:15 40:5
66:2 98:1
**started** 14:1 42:1
125:19 126:17
**starting** 61:3
**state** 15:13 26:14
38:13 70:10 73:19

75:8 79:9,11,12 133:20
**state's** 64:4
**stated** 24:17 25:1 29:9 35:19 42:22 91:17 102:23 113:19 134:15
**statement** 5:17
**statements** 59:2
**states** 1:1,13 4:24 7:2 24:8 25:17 39:11 44:15 79:16 98:11 108:15 125:6
**stateside** 104:4
**stating** 11:25 72:24 75:9 77:10 84:17
**status** 5:1 29:24 34:6,6 35:10 37:24 38:21 39:7 40:16 46:1 47:8 47:10 52:15 116:15 122:5
**statute** 125:20,23 132:15 135:3
**statute's** 93:10
**statutes** 93:2
**statutorily** 122:4
**statutory** 91:12 91:13 92:11 93:11 105:23
**stay** 5:9 36:23 40:20 113:21 119:25 122:12,15 122:23 124:6 125:17,23 126:4 126:13 127:19 128:13 132:13 133:7,22 134:3,11 134:18,19
**step** 27:22 28:20 41:8 69:4
**stick** 19:1
**sticking** 33:2
**stipulations** 108:18
**stolaas** 4:5 83:16 83:20,23,25 84:3 84:5,6,8,14 85:3,4 85:7,9,11 88:8,9 88:11,14 89:2 93:18
**stop** 16:22 17:12 18:8 59:19 66:2 69:22 87:8
**stopped** 84:2 85:10
**stops** 129:24
**store** 106:23
**strategies** 50:1
**street** 1:14 6:17 7:4,19 8:3 9:3
**strict** 21:6
**strictly** 69:11
**strikes** 23:25
**strong** 61:18 91:20
**strongest** 77:6
**subgroup** 58:10
**subject** 34:18 36:7 36:14 47:24 48:23 64:23 65:8 122:13
**submission** 29:18
**submit** 29:8 56:20 78:8 95:6 135:7
**submitting** 134:24
**subordinated** 33:10
**subsequently** 30:7
**substantial** 33:13
**substantive** 32:9 69:20
**substitute** 24:6
**suffering** 18:2 21:12,14,14
**suffice** 39:8
**sufficiency** 73:16
**sufficient** 28:21 31:16 71:14 77:4 102:12 128:10 133:15
**sufficiently** 81:21 94:12,15
**suggest** 51:4
**suggested** 135:7
**suggests** 74:18
**suite** 6:11 7:4 9:3 137:22
**sum** 17:17 27:22
**summarize** 115:20
**summarized** 100:4,5
**summary** 24:19 48:21 116:6
**superpriority** 4:17 30:15,21 31:12
**supersede** 31:8
**supplement** 94:8
**supplemental** 95:16
**supplements** 105:25
**supplies** 4:9
**support** 2:17 60:21 72:16 88:10 97:24 105:4 108:21 109:13 116:12,13
**supported** 50:2
**supporting** 89:3
**supports** 63:24
**suppose** 35:18 77:19
**supposed** 19:19 110:3
**sure** 14:5 31:10 34:4 38:5 39:5 41:17 44:2,13 54:19 59:23 62:6 62:17,22 64:1 70:11 74:4 75:7,7 78:16 79:6 83:18 90:7,21 107:25 110:17,23 114:23 124:21 132:17,18 133:13
**surfaced** 53:1
**surprise** 23:19 24:13
**surprised** 15:12 76:19
**surreal** 38:9
**sustain** 130:9
**sustained** 18:3
**suzanne** 3:17
**swing** 45:8
**system** 105:22,22

**t**

**t** 52:8 98:18 137:1 137:1
**table** 112:6
**take** 12:20 14:4 20:15 67:10 71:20 82:8 91:19 121:13 121:16
**taken** 28:20 106:18 114:5 121:6
**takes** 15:11
**talk** 44:5 81:24 105:20 118:7
**talked** 51:17 62:3
**talking** 41:25 50:15 51:12 62:6 81:9 100:2,3 107:18 116:17
**targets** 61:24

**teamsters** 24:8
25:17
**technology**
129:22 130:7
**ted** 3:3 135:19
**tee** 42:7,9,12
**teed** 40:10 41:14
**telephonic** 2:2
10:5 22:19
**telephonically**
11:15
**tell** 80:18 81:15
82:25 86:16
127:10
**telling** 75:20
**tells** 70:22,22
97:14
**ten** 46:23 58:20
66:20
**tenant** 96:12
**tenth** 5:3 56:5
61:3,6
**term** 32:22 37:17
37:17,17 43:15,16
43:17,21,22
**terms** 39:11,12,18
42:18,20 62:23
67:2,5 84:1 92:10
102:8 107:13
108:16 117:8,9
122:4 123:1
124:14
**test** 134:2
**tex.civ.app.** 102:6
**texas** 97:20 100:2
124:2
**thai** 7:10 52:8
54:25
**thank** 10:22 12:23
22:8 29:14,16,21
34:25 37:9 45:22
46:3,8,12 66:17
70:4 71:25 95:4

95:23 133:5 135:6
135:13,16 136:2,6
136:7,8,9
**thanks** 12:5 89:21
**theirs** 61:16
**theories** 93:1
127:3
**theory** 94:5 97:4
**therefor** 93:11
**thing** 10:7 17:21
18:16 41:22 43:25
55:13 59:25 62:17
62:22 65:20 67:1
68:3 72:12 86:20
96:5
**things** 11:8 13:21
22:12 32:4,19
38:23 39:2 48:5
54:3,20 56:15
67:17 70:25 73:6
132:2
**think** 10:8 13:1
14:6 18:11 31:14
31:17 32:24 33:2
33:13,25 35:10,16
36:1,12,13,22,25
37:1,7 39:3,20
41:15 42:16 43:8
44:21 45:2,25
46:10 51:16,18
52:1 53:3 54:25
57:4,7,9 59:2,5
60:6,13,22 61:2
61:16,18 62:4
64:3 65:13 66:12
67:23 68:3,4,5
69:10 70:9,14
72:20 73:3,10,21
75:10 76:14 77:6
77:9,24 78:23
79:5,8,10,23 82:4
82:11,24,25 83:5
90:1 91:7 102:4

107:10,11 110:3
112:2 113:13
115:6 116:12,21
116:25 119:15
121:7 123:19
126:23 127:6,19
127:22,22 128:13
128:19 129:21
131:22 132:10
133:5 135:8,11
**third** 40:11 64:2
90:15 105:11,14
105:20 122:15
134:16
**thirteenth** 47:4,12
**thought** 13:16
26:7 41:16,17
58:2 66:10 98:20
107:4 123:14,16
124:5 127:11
**three** 23:20 24:14
48:8 57:6,7,20
67:9 79:16 121:25
122:4,9 130:5
**threw** 126:9
**tied** 65:10 129:21
**ties** 87:15
**time** 2:5,14 4:8
10:22,23 11:19
12:8 18:25 19:6
19:17,18,24 20:9
20:18,20,22,23,25
27:18 28:2,2,21
30:4,4 39:2 40:3,3
45:3 46:16,20
47:3,5,6,22,23
50:4 56:4 59:18
59:20,22 64:10
65:10,20,24 71:22
82:8,23 84:25
89:5 95:7,15
97:11 101:13
103:10 124:4

125:22 133:5,15
135:14
**timeframe** 20:20
**timely** 24:6 89:20
**times** 11:16 38:9
72:7 112:19 132:3
**title** 91:25
**today** 12:4 22:25
29:24 36:11,12
37:2 38:8 42:17
44:24 47:21 53:10
56:14 58:9 60:3
62:9 68:14 87:5
89:24 90:18
133:18 134:9
**today's** 27:8 29:3
34:18 62:15 92:4
133:20 135:9,21
**told** 18:12 54:1
84:10 89:7,8,8
132:15 135:4
**tolling** 133:9,9
134:25
**top** 16:2
**topic** 67:2
**tort** 69:15 87:3
90:17 93:15
**torts** 87:4
**tortured** 123:25
**total** 31:5,7,20
36:4,6 46:17 48:2
48:3,21 84:20
109:10
**totally** 68:7
**touch** 17:22 18:16
**track** 115:25
**trade** 81:4
**trading** 7:11 52:9
**transaction** 71:13
**transcribed** 5:25
**transcript** 14:22
15:7,8,11,18
29:12 137:4

**transfer** 71:1
**transform** 45:4
  59:1 86:21
**treadmill** 70:20
**treat** 102:9 119:8
**treated** 23:15
  119:7
**treatment** 77:17
**trial** 43:20
**trials** 37:15
**tried** 18:4 20:23
  61:2
**trouble** 42:8
**true** 63:11 65:21
  125:15 137:4
**trust** 77:15 78:5
  81:2 83:11 87:22
**trustee** 7:2
**try** 43:1 83:1
**trying** 19:25
  21:10 32:20 55:14
  58:16 66:1 74:2
  74:10,25 75:6
  82:6 115:23,25
  133:6 135:17
**tunc** 3:3
**tune** 70:25
**turn** 42:23
**turns** 114:1
**twelfth** 47:4,11
**twice** 97:15,23
  98:23 99:5 101:4
  124:9,13 126:19
  126:20
**two** 11:7 13:21
  22:12 23:20 24:13
  29:23 33:23 36:25
  48:5 53:4 57:8
  63:12 65:13,23
  66:14 89:14 102:2
  102:3 104:3,10
  109:17 110:18,20
  113:13 118:24

120:14 122:2
  130:5,5,9
**type** 56:23 123:4
  124:5 125:16
  134:19
**typically** 78:25

**u**

**u.s.** 1:23 7:1,3
  25:19
**ucc** 49:11,24 50:1
**ultimately** 24:9
**uncertainty** 55:19
**underlies** 88:14
**underlying** 15:23
  25:24 26:11
**understand** 16:9
  16:16 19:24 20:18
  20:19 39:15 41:2
  42:2 54:19 60:20
  62:14 73:5 85:13
  98:19 104:17
  113:23,25 127:1
  127:13 129:1
  131:12 132:17,18
  132:20
**understands** 75:12
**understood** 39:25
**undertaking** 10:13 134:8
**underwriter** 100:11 103:20
  119:7,7
**underwriter's** 130:15
**underwriters** 97:6,11 98:6,16
  99:15,20 102:13
  103:23 104:22,24
  105:1,2,13 106:4
  106:7,8,15 107:21
  109:10 110:8
  111:21 118:15,22

119:10 121:18
  122:16,25 124:17
  130:19 132:1
  133:23 134:13
**undisputed** 89:9
  89:12 90:12
**unfairness** 118:25
**unilaterally** 72:6
**unique** 72:3 77:7
  122:19
**united** 1:1,13 4:24
  7:2 24:8 25:16
  39:10 44:15
**universe** 51:19,22
**unknown** 1:25
**unmuted** 132:25
**unnecessary** 37:5
**unrelated** 68:7
**unsecured** 3:4,8
  37:12 69:17,18
  131:4
**untimely** 20:10
**update** 35:4 47:8
  47:11 48:21 50:7
**updated** 46:14
**ups** 71:7 93:6
**urge** 41:5
**urgent** 40:6
**usa** 23:11
**use** 36:20 49:2
  60:23 75:16
**usually** 15:11

**v**

**v** 11:2 23:11,13
  24:2,8 25:17,18
  79:14 102:5
  134:13
**vacate** 22:5,11
  23:2
**vacated** 22:13
**vacuum** 114:5
**valid** 59:4 77:20

**validity** 72:22
  76:22
**valuable** 32:14
**valuation** 34:15
**value** 4:12 30:5,25
  34:9 35:2 37:18
  38:24 45:12 90:9
  91:23
**varick** 7:4
**various** 46:22
  60:5 84:23 93:1
  110:9
**vendor** 77:17 81:5
  87:23
**vendors** 69:5,6
**ventures** 3:22
  7:18,18 57:13,14
  67:13,13 70:13,13
**veritext** 137:20
**version** 10:16
  109:14
**versus** 40:21
  42:20 109:25
  111:12,17 112:3
  120:12
**vice** 76:17
**view** 54:4 77:22
  110:10 134:8
**viewed** 23:2
**viewpoint** 53:13
**viewpoints** 54:4
**vir** 3:22 7:18
  57:13 67:13 70:13
  93:2
**visibility** 49:13
**vm** 3:14
**vmi** 81:1
**vocal** 48:18 54:4
**void** 23:22 100:9
**voluminous** 24:20
**vs** 105:8

**w**

**w** 8:3
**wait** 13:17 105:17
**waited** 66:5
**waiting** 13:14
**waiver** 12:15 76:10
**wall** 6:17
**wander** 7:15 52:2 52:6,7,14 53:3,12 53:19,22 54:13,24 56:1 57:4,7 59:9 59:18 60:7,8,12 60:19 63:1,1,4,12 63:16 64:11 83:15 83:16,19 85:15,17 86:1,10,16,22,24 87:7,12 88:2,5,8 88:25
**wander's** 58:23 59:7
**want** 13:20 15:21 16:2 21:24,24 33:14 34:4,5 35:25 36:21 41:13 41:17 44:2,7,22 52:5,14,21 53:16 54:16,19 55:18,18 55:22,23 57:11 59:20 62:16,17 64:7,8 67:5 72:12 73:23,25 75:16 110:8 121:5 132:19
**wanted** 12:16 15:13 40:4 46:11 59:11,14 60:9,17 67:19 73:13 78:6 107:7 115:18 120:6,7 127:11
**wanting** 60:1 83:13
**wants** 37:4 43:19 64:6 71:20 90:24 134:25
**warnings** 27:3
**warrant** 98:12
**warranted** 22:24 54:18
**wasting** 64:4 82:22
**watch** 110:23
**water** 89:8
**watersports** 3:11
**way** 21:17 40:1 49:13 56:2 77:21 84:18 101:9 112:15 115:17 116:2 121:3 127:12,15 131:25 133:11
**ways** 36:25 41:11
**we've** 35:7 37:10 38:22 39:7 43:10 45:10,18 51:19,19 57:24 58:6,9,11 58:11 61:17 62:3 65:15 66:5,7 71:13 81:12 82:5 132:3,9
**website** 68:22 84:17
**week** 40:12 53:7 84:19
**weeks** 66:14
**weigh** 71:22
**weil** 6:3 10:19 29:22 44:5 74:15 89:22 95:5
**went** 14:7 16:18 16:18 17:12 20:6 26:10 48:25 86:7 101:2 118:14,15
**whatsoever** 15:19 64:12 65:5
**wheels** 81:1
**white** 1:15
**willful** 28:9,16
**win** 55:24 61:20 113:5 122:22
**windfall** 85:21
**winners** 57:11
**withdraw** 67:20 113:19 114:13
**withdrawn** 118:5
**withhold** 106:17
**wondering** 13:6
**words** 23:9 48:14 108:18
**work** 29:10,11 48:25 49:7 59:6 82:6 104:3 115:8 119:11
**working** 45:19 66:8
**works** 96:13 130:7
**world** 48:2,3,9,12 49:21 50:5 53:14 55:6,14 57:15,17 62:1,2,16 63:24 68:5 69:19 70:16 70:16
**worn** 53:24
**worry** 39:20 112:21
**worth** 32:6
**wrap** 130:3
**write** 54:14,16,16
**writer** 124:11
**written** 74:13 102:11 106:8 110:20 118:22
**wrong** 41:7 59:2 99:11 106:20 107:21 114:2 116:2 118:14,15 126:21
**wrongdoings** 129:4
**wrote** 54:12 56:3

**x**

**x** 1:4,10

**y**

**yeah** 38:2 41:22 78:6 112:11 120:6 123:19 129:10,17
**year** 40:2,12 51:25 52:1 132:4
**years** 83:21 104:8 104:10
**yesterday** 10:17
**york** 1:2 6:5,18 7:5,13 8:4,11,18

**z**

**zavsza** 75:1,11,20
**zuma** 23:11