UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
IN RE:                                          :
                                                :
SEARS HOLDINGS CORPORATION, et al.,             :
                              Debtors.          :        **OPINION AND ORDER**
-------------------------------------------------------------x
ESL INVESTMENTS, INC., et al.,                  :        19 CV 7660 (VB)
                              Appellants,        :
                                                :
v.                                              :
                                                :
SEARS HOLDINGS CORPORATION, et al.,             :
                              Appellees.         :
-------------------------------------------------------------x

Briccetti, J.:

Appellants ESL Investments, Inc., and certain of its affiliated entities (including JPP, LLC, JPP II, LLC) (together, "ESL"), Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent, and Cyrus Capital Partners, L.P. (collectively, "Appellants" or "Second Lien-Creditors"), appeal from a July 31, 2019, bench ruling and an August 5, 2019, Order (together, the "Orders") of the U.S. Bankruptcy Court for the Southern District of New York (Hon. Robert D. Drain, Judge) finding no diminution in value of the Second Lien-Creditors' collateral following August 15, 2018 (the "Petition Date"), and thus, that the Second Lien-Creditors are not entitled to superpriority claims pursuant to 11 U.S.C. § 507(b). (Case No. 18-23538, Doc. #4740).

Appellants argue the bankruptcy court erred in its valuation of the Second-Lien Creditors' collateral (the "Second-Lien Collateral") after Sears Holdings Corporation ("Sears Holdings") and its affiliates (together, "Debtors") filed a voluntary petition for Chapter 11 bankruptcy protection. Specifically, Appellants argue the bankruptcy court errantly determined

there was no net diminution in value of the Second-Lien Collateral from the Petition Date through February 19, 2019 (the "Sale Date"), when Sears Holdings was sold.

For the following reasons, the bankruptcy court's Orders are AFFIRMED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 158(a).

## BACKGROUND

Founded in 1893, Sears, Roebuck and Co. ("Sears"), has a storied 125-year history. Long a staple of American shopping malls, Sears led all retailers in the tool, appliance, lawn and garden, and automotive repair and maintenance retail sectors.

Sears was purchased in 2005 and merged into Sears Holdings. Between 2005 and 2018, Sears struggled. Due to declining revenues, poor brick-and-mortar market conditions, and cash flow and liquidity issues, on October 15, 2018, Sears Holdings filed for Chapter 11 bankruptcy protection.

I.    Bankruptcy Proceedings and Sale to ESL

As of the Petition Date, all of Sears Holdings's assets were encumbered. (See A-38).[1] Sears Holdings's secured debt totaled approximately $2.68 billion, comprising approximately $1.53 billion in first-lien debt, and approximately $1.15 billion in second-lien debt secured on a junior basis by certain assets including the Second-Lien Collateral.

Sears Holdings's largest secured creditor was ESL, a hedge fund owned by Edward Lampert, Sears Holdings's CEO and Chairman of its Board of Directors. (A-5–6).

---

[1]    "A-__" refers to the common appendices submitted by the parties pursuant to Federal Rules of Bankruptcy Procedure 8015 and 8018. (See Docs. ##45-1 to 45-18; 51-1). Appellants' common appendix spans A-1 through A-4875. Appellees' common appendix spans A-4876 through A-5009.

The Chapter 11 filing triggered the automatic stay, which prevented the Second-Lien

Creditors from foreclosing on the Second-Lien Collateral without the bankruptcy court's

permission.  The Second-Lien Creditors, as pre-petition lenders, received a protection package

following the bankruptcy filing as part of the debtor-in-possession ("DIP") financing process,

which allowed Debtors to continue to use, post-petition, the Second-Lien Collateral.  (A-460–

61).[2]  To provide adequate protection, in the Final DIP Order, the Second-Lien Creditors were

given Section 507(b) superpriority claims to the extent there was any net diminution in value of

the Second-Lien Collateral after the Petition Date.  (See A-464–65).

As of the Petition Date, neither Debtors nor their creditors knew whether Sears Holdings

would be sold or liquidated.  Accordingly, Sears Holdings continued to sell its inventory at Go-

Forward Stores, going-out-business ("GOB") stores, and to collect accounts receivable.

In December 2018, ESL submitted a going-concern bid to purchase substantially all of

Debtors' assets, but the proposal was deemed deficient by Debtors and thus, Debtors pivoted to

liquidation.  (A-4885–86).  ESL requested more time to improve its bid, which Debtors allowed,

and in January 2019, ESL submitted a second going-concern bid.  (A-4886–89).  According to

Debtors, this bid too failed to address the deficiencies Debtors had identified in the initial

proposal.  ESL once again requested additional time to provide a better offer.  It was that third

offer that Debtors accepted, agreeing that ESL's proposal was the highest and best-provided

alternative to liquidation.  (A-4889–93).

---

[2]    An adequate protection package is the standard package given to creditors in exchange for their consent for debtors to retain the collateral securing their debt obligations so that debtors can use the collateral to continue to operate their business and engage in restructuring activities. See 11 U.S.C. § 363(e).

On February 8, 2019, the bankruptcy court approved the transaction—over the objection

of some creditors—and entered an order to that effect (the "Sale Order").  Three days later, on

February 11, 2019, the sale closed pursuant to an asset purchase agreement ("APA") between

Sears Holdings and Transform Holdco LLC ("Transform"), the ESL entity.  Accordingly, Sears

Holdings's assets were transferred to Transform.

ESL purchased substantially all of Debtors' assets for approximately $5.2 billion in cash

and non-cash consideration.  (A-1831).  Included in the purchase price was a $433.45 million

credit bid (the "Credit Bid") pursuant to Section 363(k) of the Bankruptcy Code, which in effect

forgave some of the $1.15 billion debt owed by Debtors to the Second-Lien Creditors.  (A-1012–

14).[3]  Included in the purchase price was $885 million in cash paid by ESL for Sears Holdings's

inventory and receivables, some of which comprised the Second-Lien Collateral.  (A-1249).

## II.    Section 507(b) Claims

Following the sale, the Second Lien-Creditors asserted Section 507(b) claims pursuant to

the Final DIP Order.  The Second-Lien Creditors insisted they were still owed approximately

$718 million in outstanding debt, accounting for $1.15 billion less the $433.45 million Credit

Bid.

On May 26, 2019, Debtors filed a motion to estimate the Second-Lien Creditors' claims.

By stipulation between the parties, the motion was converted into a proceeding under Federal

Rule of Bankruptcy Procedure 3012 to:  (i) determine the amount of the Second Lien-Creditors'

secured claims and Section 507(b) claims; and (ii) adjudicate Debtors' request, pursuant to

---

[3]    Although neither Cyrus Capital Partners nor Wilmington Trust were purchasers pursuant
to the APA, they did participate in the Credit Bid and therefore had the amount of their debts
reduced accordingly.  (See A-1584).

Section 506(c), to surcharge the Second-Lien Collateral with substantially all the costs of the bankruptcy proceedings.  The court so ordered the stipulation.

Accordingly, the bankruptcy court held a two-day evidentiary hearing on July 23 and July 31, 2019.  At the hearing, the Second-Lien Creditors presented expert testimony respecting the value of the Second-Lien Collateral as of the Petition Date, in order to assess the value of the Section 507(b) claims.

David M. Schulte, expert for ESL, testified that the value of the collateral on the Petition Date was $2.928 billion, which was $245 million more than the debt owed the first-lien creditors and Second-Lien Creditors, and nearly $600 million more than the maximum amount of any Section 507(b) claim in light of the Credit Bid.  (A-2892).  Schulte calculated this amount by using the inventory's book value for Go-Forward stores and net retail value for GOB stores, which was slightly lower than book value.  (A-2888–92).  And for the non-inventory collateral of cash, credit card receivables, pharmacy receivables, pharmacy prescriptions (or "Scripts"), Schulte used the book value provided by the Debtors.  (See A-2887–88).[4]  Accordingly, Schulte testified that the diminution in value from the Petition Date for the 507(b) claims was $962.7 million, or $250 million more than the $718 million the Second-Lien Creditors were entitled to recover in light of the Credit Bid.  (See A-4285).

William Heinrich, expert for Wilmington Trust, opined that the collateral on the Petition Date was worth $3.28 billion, which was nearly $600 million more than the debt owed the first-lien creditors and Second-Lien Creditors, and nearly $950 million more than the maximum

---

[4]    Appellants and Debtors disagree about whether certain assets should be included in the assessment pursuant to the Second-Lien security agreement.  Specifically, Debtors argue the Second-Lien Creditors' experts improperly considered "pharmacy receivables," "pharmacy scripts," and "cash and cash equivalents," in their valuations.  (Doc. #51 ("Debtors' Br.") at 16).

amount of any Section 507(b) claim in light of the Credit Bid.  (See A-3126).  Heinrich

calculated this amount by assuming the inventory would be sold at retail price at both the Go-

Forward and GOB stores.  (See A-3074–81).  He too factored in accounts receivable, Scripts,

and certain inventory that was deemed "ineligible" by the first-lien creditors.  (See A-3074–81).

Accordingly, Heinrich testified at the evidentiary hearing that that the diminution in value from

the Petition Date for the 507(b) claims was $1.314 billion, or $200 million more than the total

outstanding debt and nearly $600 million more than the $718 million the Second-Lien Creditors

were entitled to recover in light of the Credit Bid.  (See A-4321).

Marti P. Murray, expert for Cyrus Capital Partners, opined that the value of the collateral

on the Petition Date was $2.46 billion, which was over $200 million more than the maximum

amount of any Section 507(b) claim in light of the Credit Bid.  (See A-2003).  Murray calculated

this amount by assuming the Second-Lien Collateral would be sold through an "orderly

liquidation of its business," a company-wide GOB sale.  (A-1971).  Murray relied on appraisals

performed by Tiger Capital Group ("Tiger"), an independent third-party appraiser hired by the

first-lien creditors.  (A-1971).  Tiger ascribed an overall net orderly liquidation value ("NOLV")

of 88.7 percent to the Second-Lien Collateral—the value expected to be realized from the

inventory, net of all costs necessary to sell the inventory in an orderly liquidation.  (A-1971).

Accordingly, Murray testified that the Second-Lien Creditors' interest in the collateral on the

Petition Date totaled between $925 million and $1.469 billion.  (A-2002–04).

The Debtors' fact witness, Brian Griffith, offered his opinion that all of the inventory was

worth, on the Petition Date, only eighty-five percent of its book value.  (A-4221).  Griffith

opined that the valuation was based on the APA and the sale value to Transform.  (A-4221).

Following the two-day hearing, Judge Drain ruled that the Second-Lien Creditors had not met their burden of proof to establish there was a diminution in the value of the Second-Lien Collateral after the Petition Date, and therefore that the Second-Lien Creditors were not entitled to Section 507(b) superpriority claims.  (A-4798, A-4805).  Specifically, the bankruptcy court gave "next to no weight to Mr. Schulte's purported expert report" and similarly discounted Heinrich's report, which proposed an even higher valuation.  (A-4790–92).

Finding neither the Second-Lien Creditors' experts' valuations nor Debtors' fact witness's valuation credible, Judge Drain undertook his own valuation of the Second-Lien Collateral as of the Petition Date and determined that the collateral was worth $2.147 billion, and that following payments to the first-lien creditors, and other necessary reductions, the Second-Lien Creditors' remaining value on their collateral was $186 million.

Specifically, Judge Drain figured that the appropriate measure should be going-concern value, but noted that "[t]he concept of going concern versus liquidation is not a binary, either or situation.  Instead, a company's status appears on a spectrum between the sale of a true, financially healthy going concern business, and a forced liquidation.  With an orderly liquidation somewhere in between."  (A-4787–88) (citing In re Aerogroup Int'l, Inc., 601 B.R. 571, 593 (Bankr. D. Del. 2019), motion to certify appeal denied, 2020 WL 757892 (D. Del. Feb. 14, 2020)).  The bankruptcy court determined that a NOLV analysis was appropriate because, like in Aerogroup, there ultimately was a going-concern sale but "that sale was in the context of a failed standalone plan process, and the distinct possibility of veering or pivoting to a liquidation."  (A-4788).

In order to undertake a NOLV-based approach, Judge Drain used Murray's expert opinion as a starting point, finding it was "tethered to reality or the reality that faced these second

lien Creditors at the start of this case with respect to their interest and the Debtor's interest in their collateral, as well as the reality of asset-based lending." (A-4794). Accordingly, the court applied Tiger's methodology of applying an 88.7 percent face value for <u>eligible</u> inventory and receivables.[5] But he deducted 1.3 percent for corporate overhead and thus found a resulting 87.4 percent inventory recovery rate for eligible inventory. (A-3208).

Next, Judge Drain added collateral to the discounted inventory total, $46.6 million in credit card receivables—Debtors' proffered amount—and $10.5 million in pharmacy receivables, Murray's proffered amount. (A-4799). The bankruptcy court rejected the Second-Lien Creditors' arguments that Scripts and cash should be included in the valuation. (A-4800).

Then the bankruptcy court accounted for senior first-lien debt, including post-petition interest, and deducted those amounts from the total figure. (A-4802). The court also deducted undisputed debt: (i) a revolving credit facility of $836 million, (ii) a first-lien loan of $570.8 million, and (iii) a FILO (first-in, last-out) term loan of $125 million. (A-4801–02).

Finding the Second-Lien Creditors did not meet their evidentiary burden respecting whether the face amounts of the letters of credit exceeded the underlying obligations, the bankruptcy court deducted two senior letters of credit, determining that these letters of credit should be counted as debt senior to the Second-Lien Creditors' debt. (<u>See</u> A-4803–05).

---

[5]    Appellants contend the Bankruptcy Court actually discounted the collateral 77 percent because "[t]he combination of the bankruptcy court's valuations—0% for ineligible inventory and 88.7% for eligible inventory—resulted in the court's blended average for all of the inventory of only 77% of book value, markedly less than even the Debtors' claim that the inventory was worth 85% of book value." (Doc. #45 ("Apps. Br.") at 34).

The bankruptcy court also deducted the Credit Bid and determined that there was no net diminution in value of the Second-Lien Collateral from the Petition Date and thus, the Second-Lien Creditors were not entitled to superpriority for their Section 507(b) claims.

Indeed, as reflected in the below chart from the bankruptcy court's August 5 Order, the Second Lien-Collateral was valued at approximately $2.147 billion, and approximately $1.96 billion comprised senior first-lien debt.  Thus, the remaining value of the Second-Lien Collateral was approximately $186.57 million.  (A-3208–09).  However, because the Credit Bid provided for recovery of $433.5 million, Judge Drain determined that the Second-Lien Creditors' interest in the collateral was actually negative, and thus that there was no diminution in value for the Second-Lien Collateral after the Petition Date; therefore, the Second-Lien Creditors were not entitled to Section 507(b) superpriority claims.  (A-3208–09).

| ($ in millions) | |
| --- | --- |
| **Collateral** | |
| Net Eligible Inventory as of Petition Date | 2,391.5 |
| Inventory Value Recovery Rate | 87.40% |
| **Inventory Value** | 2,090.17 |
| Credit Card Receivables | 46.6 |
| Cash | - |
| Scripts | - |
| Pharmacy Receivables | 10.5 |
| **Total Collateral** | 2,147.27[4] |
| | |
| **First Lien / Senior Debt** | |
| Revolving Credit Facility | 836.0 |
| First Lien Letters of Credit | 123.8 |
| First Lien Term Loan B | 570.8 |
| FILO Term Loan | 125.0 |
| Stand-Alone L/C Facility | 271.1[5] |
| Post-petition First Lien Interest | 34.0 |
| Total First Lien Debt | 1,960.7 |
| | |
| 2L Debt Remaining Value | 186.57 |
| Credit Bid | (433.5) |
| Credit Bid Adjusted 2L Debt Collateral Value | (246.93) |
| Less: Value of 2L Adequate Protection | (0.3) |
| Total | (246.63) |

(A-3208, A-3209).

On August 15, 2019, the Second-Lien Creditors filed notices of appeal of the Orders (the

"507(b) Appeals").[6]

## DISCUSSION

I.    Legal Standard

The Court has jurisdiction to hear these appeals pursuant to 28 U.S.C. § 158(a).  A

district court reviews a bankruptcy court's conclusions of law de novo and its findings of fact

---

[6]    On August 27, 2019, Debtors appealed the 506(c) Orders, which comprised the July 31, 2019, bench ruling and the August 8, 2019, Order on the 506(c) motion (the "506(c) Appeals"). On October 30, 2019, this Court granted Debtors' motion to stay the 506(c) Appeals pending the outcome of the 507(b) Appeals.  (See 19 Civ. 8002 Doc. #25).

under a clearly erroneous standard.  See In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d

Cir. 2009) (citing Momentum Mfg. Corp. v. Emp. Creditors Comm., 25 F.3d 1132, 1136 (2d Cir.

1994)).[7]

     With respect to a bankruptcy court's factual findings, clear error exists only when a

reviewing court is "left with the definite and firm conviction that a mistake has been committed."

In re Manville Forest Prods. Corp., 896 F.2d 1384, 1388 (2d Cir. 1990).  "[T]he standard of

review for a mixed question depends on whether answering it entails primarily legal or factual

work."  U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC, 138 S. Ct. 960, 962, (2018).

II.    Second-Lien Creditors' Burden of Proof

     "The burden of proving valuation falls on different parties at different times."  In re

Residential Capital, LLC, 501 B.R. 549, 590 (Bankr. S.D.N.Y. 2013).  "In establishing its claim,

a secured creditor generally bears the burden under section 506(a) of proving the amount and

extent of its lien."  Id.  "Once the amount and extent of the secured claim has been set, the

burden shifts to a debtor seeking to use, sell, lease, or otherwise encumber the lender's collateral

under sections 363 or 364 of the Code to prove that the secured creditor's interest will be

adequately protected."  Id.  "But in all cases, the creditor bears the burden in the first instance of

establishing the amount and extent of its lien under section 506(a)."  Id.

     Section 507(b) of the Bankruptcy Code governs whether the Second-Lien Creditors are

entitled to superpriority.  It provides:

> If the trustee, under section 362, 363, or 364 of this title, provides adequate
> protection of the interest of a holder of a claim secured by a lien on property of the
> debtor and if, notwithstanding such protection, such creditor has a claim allowable
> under subsection (a)(2) of this section arising from the stay of action against such
> property under section 362 of this title, from the use, sale, or lease of such property

---

[7]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b).

Here, the Second-Lien Creditors had the burden of proving: (i) they were previously provided adequate protection under Bankruptcy Code Sections 362, 363, or 364; (ii) notwithstanding such adequate protection, they held an allowable claim under 11 U.S.C. 507(a)(2); and (iii) their claim arose from Debtors' use, sale, or lease of the Second-Lien Collateral under Section 363. (A-4781–82). Superpriority status, what the Second-Lien Creditors seek, arose only if there was a diminution of value of the Second-Lien Collateral after the Petition Date.

The bankruptcy court concluded that the first two requirements of the Section 507(b) analysis—that the Second-Lien Creditors received adequate protection and that they had an allowable claim under Section 507(a)(2)—were satisfied. (A-4781). Thus, the bankruptcy court analyzed the third requirement: whether the Second-Lien Creditors were entitled to superpriority for such claims.

Ultimately, the bankruptcy court determined the Second-Lien Creditors did not meet their burden respecting whether there was a diminution in value of the Second-Lien Collateral from the Petition Date, and thus, they were not entitled to superpriority. (See A-4798). In reaching that conclusion, for the reasons discussed above, the bankruptcy court rejected the valuations of the Second-Lien Creditors' three experts.

On appeal, the Court agrees with the bankruptcy court that the Second-Lien Creditors did not meet their burden of proof to establish superpriority for their Section 507(b) claims. See In re Residential Capital, LLC, 501 B.R. at 590. Moreover, the Court is aligned with Judge Drain

that the Second-Lien Creditors' failure to meet that burden alone ends the inquiry. (A-4798)

("Courts have denied 507(b) requests in toto for a failure of proof of the amount of diminution.")

(collecting cases). Nevertheless, the bankruptcy court went further and performed its own

valuation for the Second-Lien Collateral, and determined that there was no net diminution from

the Petition Date. Thus, said the bankruptcy court, the Second-Lien Creditors were not entitled

to Section 507(b) superpriority claims.

The Court sees no reason to upset the bankruptcy court's holding given that it was well-

reasoned, and the bankruptcy court applied the law to the facts. Although it may appear the

inquiry ends here—given that the Second Lien Creditors did not meet their burden—because the

bankruptcy court reached its conclusion by performing its own valuation, and because

Appellants now challenge that valuation, the Court will address such arguments in turn.

II.    Valuation of Second-Lien Inventory

Appellants argue the bankruptcy court erred by failing to follow Supreme Court

precedent when it applied its own formula for valuing the inventory which comprised the

Second-Lien Collateral. Appellants argue the court should have relied on replacement value,

what Appellants contend was the inventory's book or retail value.

The Court disagrees.

As discussed above, the Bankruptcy Code requires a debtor to provide a secured lender

with adequate protection against a diminution in value of the secured lender's collateral resulting

from the post-petition use, sale, or lease of the property under Section 363 of the Bankruptcy

Code. See In re Residential Capital, LLC, 501 B.R. at 589 (citing 11 U.S.C. § 361(1)).

To determine whether there was a diminution in value, courts apply the valuation set

forth in Section 506(a)(1) of the Bankruptcy Code, which provides in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has
> an interest, . . . is a secured claim to the extent of the value of such creditor's interest
> in the estate's interest in such property, . . . and is an unsecured claim to the extent
> that the value of such creditor's interest . . . is less than the amount of such allowed
> claim.  Such value shall be determined in light of the purpose of the valuation and
> of the proposed disposition or use of such property.

11 U.S.C. § 506(a)(1).

In Associates Commercial Corporation v. Rash, 520 U.S. 953 (1997), the Supreme Court

held that the value of collateral retained by the debtor is the cost the debtor would incur to obtain

a like asset for the same proposed use.  In reaching this holding, the Supreme Court rejected the

foreclosure-value standard for retained collateral in a Chapter 13 bankruptcy proceeding.

Specifically, in Rash, the debtor retained his truck—collateral for which Associates Commercial

Corporation held a lien—in order to use the truck in the debtor's business to generate income

after the Chapter 13 plan was confirmed.  Id.  Here, by contrast, Debtors retained the Second-

Lien Collateral, namely, Debtors' inventory, in order to sell the inventory in a going-concern sale

or liquidation.  Such distinctions matter.

Appellants argue the bankruptcy court was required, pursuant to Rash, to apply the

valuations proffered by their experts, Schulte and Heinrich, and that in rejecting those experts'

opinions, the bankruptcy court failed to follow controlling precedent.  But as the Supreme Court

observed in Rash, "[o]f prime significance, the replacement-value standard accurately gauges the

debtor's 'use' of the property."  Assocs. Comm. Corp. v. Rash, 520 U.S. 953 at 963.  The

Supreme Court did not mandate the replacement-value standard in every context, but rather

determined that the replacement-value standard in the context of Rash "renders meaningful the

key words 'disposition or use.'"  Id. at 962.  Indeed, the bankruptcy court addressed this

distinction, reasoning, "the Supreme Court has made it clear in Associates Commercial Corp. v.

Rash, that the court should look to the purpose of the proposed use of the value, and if it is to be

14

a reorganization, that use would be in the hands of the Debtor and would normally call for

replacement value."  (A-4785).

The bankruptcy court was not required to use the retail or book value of the inventory,

like Schulte and Heinrich did, in making its valuation under Rash because Debtors' purpose for

retaining the collateral was to sell it, either through a going-concern sale or liquidation, or worst-

case scenario, a forced liquidation.[8]  The bankruptcy court considered each of these scenarios

and determined the valuations put forward by Schulte and Heinrich did not account for the range

of outcomes as of the Petition Date.  (See A-4627, A-4688–89, A-4790).

Moreover, the formula the bankruptcy court did apply—NOLV—was not the

foreclosure-value standard, but rather a valuation that discounted the inventory and sought to

calculate what Debtors would have obtained had they sold the Second-Lien Collateral in an

orderly liquidation.  Such valuation, which relied on the testimony of one of Appellants' experts,

Murray, was not clear error.  See Anderson v. Bessemer City, N.C., 470 U.S. 564, 575 (1985)

("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or

more witnesses, each of whom has told a coherent and facially plausible story that is not

contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never

be clear error.").  Nor were Judge Drain's departures from Murray's analysis clear error.  See In

re Motors Liquidation Co., 576 B.R. 325, 425 (Bankr. S.D.N.Y. 2017) ("[T]he Court need not

choose any party's proffered appraisal wholesale, but may instead pick and choose to determine

'the best way' to value the collateral.").

---

[8]    As Debtors point out, the "collateral here was inventory and so, not surprisingly, all
parties agreed the proposed use was to sell it.  The question was how it would be sold."
(Debtors' Br. at 40).

Accordingly, the Court concludes the bankruptcy court did not overlook or misapply controlling Supreme Court precedent in rejecting certain Second-Lien Creditors' experts' opinions, or by applying the NOLV calculation advanced by one of the Second-Lien Creditors' experts.

III.    Excluded Collateral and Other Reductions

Next Appellants advance a number of claims that the bankruptcy court erred by excluding or reducing the value of certain assets from the overall valuation of the Second-Lien Collateral.

The Court finds each of these claims unpersuasive.

A.    Letters of Credit

Appellants argue the bankruptcy court erred by deducting the total face value of the stand-by letters of credit from the overall valuation of the Second-Lien Collateral as of the Petition Date, even though the letters had not been drawn as of that date.

The Court disagrees.

As of the Petition Date, Debtors had $395 million in stand-by letters of credit. These letters included: (i) two first-lien letter of credit facilities, which comprised outstanding stand-by letters of credit that secured principally Debtors' potential worker's compensation obligations (A-19–23); and (ii) a stand-alone letter of credit facility. (A-23–25, A-4491, A-4635–42).

The bankruptcy court determined that even though these obligations remained undrawn as of the Petition Date, they were still "real obligations" that stood ahead of the Second-Lien Creditors, and that in the event of an orderly liquidation, these stand-by letters may have been drawn. (A-4803). Appellants argue Judge Drain erred because the letters of credit had not been drawn as of the Petition Date, and only $9 million was drawn during the bankruptcy proceedings.

16

Moreover, Appellants insist it is common for such obligations either to never be drawn, or, in the event of a going-concern sale, to be "cancelled, reissued or assumed by the buyer." (Apps. Br. at 62). But that was the best-case scenario and, importantly, the bankruptcy court held that the Second-Lien Creditors did not meet their burden in providing a valuation of the letters of credit based on their contingency. (A-4805) ("Given the 2L Creditors' burden of proof here, I believe they were required to do more, and that I should count the letters of credit in their face amount, rather than do my own attempt to value such obligations, which again, according to the DIP agreement, are senior obligations.").

The Court agrees with the bankruptcy court's determination because, as discussed above, the Second-Lien Creditors had the burden of establishing their Section 507(b) claims and the proper valuations to assert diminution in value. The Second-Lien Creditors having failed to offer an alternative valuation for the stand-by letters of credit besides zero, the bankruptcy court applied the face value of these "real obligations," seeing no reason not to. The Court finds that decision was not clear error.

B.    Post-Petition Interest

Appellants argue the bankruptcy court erred in deducting the post-petition interest to be paid to the first-lien creditors.

The Court disagrees.

The bankruptcy court reasoned that because the first-lien creditors were over-secured, in the event of an orderly liquidation—the bankruptcy court's chosen framework— first-lien creditors were entitled to $34 million in interest on the collateral at issue. Judge Drain reached this conclusion because his Petition Date valuation assumed an orderly liquidation, which would have occurred over the course of three months; he relied on Murray's assessment that three

months was how long an orderly liquidation would take.  (A-1997–98, A-4802–03).  Thus, in the

event of an orderly liquidation, and given that the first-lien creditors were over-secured, their

post-petition interest would be senior to the Second-Lien Creditors' claims.  (A-4614).

Appellants' invocation of Matter of Rupprect, 161 B.R. 48 (Bankr. D. Neb. 1993), is

unpersuasive.  Although there, the court held "on the facts of this case, the [junior creditor] is

entitled to be adequately protected from interest accrual," id. at 49, here, the Second-Lien

Creditors neither sought nor received adequate protection to protect against post-petition interest.

Accordingly, the Court concludes the bankruptcy court did not err in assessing post-petition

interest on the collateral.

C.    Costs

Appellants argue the bankruptcy court's 1.3 percent deduction for overhead and

professional costs was a backdoor to asserting Debtors' 506(c) claims and therefore, in error.  In

other words, the court erred in deducting costs because such deductions were actually surcharge

claims against the collateral, which the bankruptcy court previously denied.

The Court disagrees.

Although the Second Circuit has said that a bankruptcy court cannot "direct that interim

fees and disbursements of attorneys and accountants be paid from the encumbered collateral" it

has allowed "fees payable from [the creditor's] collateral . . . for services which were for the

benefit of [the creditor] rather than the debtor or other creditors."  In re Flagstaff Foodservice

Corp., 739 F.2d 73, 75 (2d Cir. 1984).

Here, the bankruptcy court reasoned that a 1.3 percent cost deduction on the inventory

was appropriate because, in order to effectuate an orderly liquidation, there would be certain

costs borne through the sale of the inventory.  These costs are appropriately deducted from the

encumbered collateral because such costs would inure to the benefit of the Second-Lien

Creditors.  See In re Flagstaff Foodservice Corp., 739 F.2d at 75.  Thus, it was appropriate for

the bankruptcy court to deduct costs from the total valuation if such costs were anticipated in

furtherance of an orderly liquidation.

Appellants argue that such claims for costs are really a "backdoor 506(c) surcharge."

(Apps. Br. at 66).  But this argument strains credulity.  In the Section 506(c) Appeals, which are

stayed pending the outcome of the 507(b) Appeals, Debtors are seeking review of the bankruptcy

court's determination that Debtors did not meet their burden of proof with respect to their request

to surcharge the Second-Lien Collateral with substantially all the costs of the bankruptcy

proceedings.  Debtors seek $1.4 billion in Section 506(c) claims.  However, the bankruptcy court

deducted a modest $31 million in costs.  (A-3208).  Given the delta between what Debtors seek

for their 506(c) claims—$1.4 billion—and what Appellants argue the bankruptcy court

erroneously provided in the 507(b) claims—$31 million—the Court declines to upset the

bankruptcy court's eminently reasonable assessment of costs for overheard and professional

services.

D.    Credit Card Receivables

Appellants argue the bankruptcy court erred in using the Debtors' valuation for credit

card receivables.

The Court disagrees.

The bankruptcy court was not persuaded by any of the Second-Lien Creditors' experts

respecting their valuation for the credit card receivables.  The bankruptcy court rejected Schulte

and Heinrich's valuations of $64.2 million and $64.3 million, respectively, finding that those

experts had merely taken the face value of the credit card receivables rather than some

discounted formula.  (A-4798).  The court also rejected Murray's valuation of $54.8 million for credit card receivables, finding "[t]here seems to be no real analysis behind Ms. Murray other than her desire . . . to comport with what was on the Debtor's books of the discounted value." (A-4798–99).  Instead, the court applied Debtors' $46.6 valuation for credit card receivables. (A-4799).  Seeing no basis for finding the bankruptcy court's determination was clear error, the Court declines to disturb the valuation for credit card receivables.

E.   Ineligible Inventory

Appellants argue the bankruptcy court erred by declining to attribute any value to so-called ineligible inventory.[9]

The Court disagrees.

The bankruptcy court applied an 88.7 percent NOLV on the inventory (and a 1.3 percent deduction for overhead and professional fees), but only on the eligible inventory.  Indeed, the court determined "the Second-Lien Holders [had] not met their burden to include ineligible inventory or inventory-in-transit as Collateral on the Petition Date."  (A-3208).

The gravamen of Appellants' argument on this point is that because neither Debtors nor the APA distinguished between eligible and ineligible inventory, it was clear error to exclude this category of inventory from the overall valuation of the Second-Lien Collateral.  In short, Appellants argue that the distinction between eligible and ineligible inventory was "strictly for purposes of assessing the willingness of the First-Lien Lenders to lend against certain collateral.

---

[9]   Under the bankruptcy court's assessment, ineligible inventory comprised inventory marked as ineligible on the borrowing base as well as in-transit inventory.  (A-3208, A-4796–97).  The court's assessment was based on Murray's report which noted, "Tiger also ascribed a value of 51.6%-55.8% to in-transit inventory in its appraisal dated February 4, 2019, which was considered ineligible for purposes of calculating the borrowing base, but which still had value." (A-1971).

It had nothing to do with whether the Debtors could sell that inventory—they did." (Apps. Br. at 72).

The bankruptcy court concluded the Second-Lien Creditors did not meet their burden of establishing the value of such collateral. Moreover, even if the bankruptcy court assigned the ineligible inventory some value greater than zero, it would not have changed the outcome, because as Debtors point out, "[a]t most, the 2Ls would only be entitled the $74.6 million for in-transit inventory that Ms. Murray calculated," which is "not sufficient to overcome the negative $246 million diminution." (Debtors' Br. at 58 n.17; see also A-2030).

Accordingly, the Court concludes the bankruptcy court did not err in excluding ineligible inventory from the valuation.

F.    Pharmacy Prescriptions

Appellants argue the bankruptcy court erred by failing to include Scripts in the valuation. The Court disagrees.

The bankruptcy court held that "the right to fill a prescription . . . clearly is not inventory." (A-4800). The bankruptcy court went on to note that "[t]he lien on books and records as set forth in a 2L security agreement, has a qualifying clause, which states that their books and records pertaining to the collateral." (A-4800). The bankruptcy court concluded that the "right to sell un-presented prescriptions" is not "an item of collateral." (A-4800).

The Court finds such assessment was not clear error. The first-lien creditors' security agreement explicitly includes "all Prescription Lists," but the Second-Lien Creditors' security agreement contains no such language. (Compare A-4908–09 with A-3431). This supports the bankruptcy court's finding that Scripts were not part of the Second-Lien Collateral.

Accordingly, the Court concludes the bankruptcy court did not commit clear error when it excluded pharmacy prescriptions from its valuation.

G.    Cash

Appellants argue the bankruptcy court erred by failing to include any of the cash Debtors held on the Petition Date in its valuation of the Second-Lien Collateral.

The Court disagrees.

The bankruptcy court excluded cash from the valuation of the Second-Lien Collateral, finding the Second-Lien Creditors did not meet their burden of establishing the cash was proceeds of such collateral. (A-4799–800). Indeed, the bankruptcy court determined "cash should not be included here given the lack of tracing and the other problems with the proof as established – to establish this is an element of collateral or this should be part of the collateral determination." (A-4800). Moreover, like the pharmacy prescriptions, the first-lien creditors' security agreement included "all cash and cash equivalents," but such language was not included in the Second-Lien Creditors' security agreement. (Compare A-4908–09 with A-3431). Even still, the Appellants argue the "proceeds," under New York law, includes "[w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." (Apps. Br. at 77 n.19 (citing A-3431; N.Y. U.C.C. Law § 9-102(a)(64)(A)). Appellants assert Debtors' witness, Brian Griffith, indicated at his deposition that the cash was the proceeds of the collateral. (A-4213–14). However, the Second-Lien Creditors' expert, Murray, acknowledged that cash may be generated from sources other than inventory. (A-4347–48).

Given the various rationales asserted by the parties and their witnesses respecting whether cash should be included in the valuation of the Second-Lien Collateral, it was not clear

error for the bankruptcy court to exclude cash from such calculation having found the Second-Lien Creditors did not met their burden of establishing its necessary inclusion.[10]

IV.    Cap on ESL's Section 507(b) Recovery

Finally, ESL argues the bankruptcy court erred in capping at $50 million the recovery available to ESL for its Section 507(b) claims.[11]

The Court disagrees.

Delaware law governs interpretation of the contract.  (A-1641–43) (APA § 13.8(a)). Under Delaware law, the plain text of the APA controls.  See Salamone v. Gorman, 106 A.3d 354, 367–68 (Del. 2014).

"Delaware law adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party." Salamone v. Gorman, 106 A.3d at 367–68.  "When interpreting a contract, this Court will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." Id. at 368.  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." Id. "Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract." Id.

_____

[10]    The parties also offer competing views on whether the cash should have been used by Debtors to help pay off the first-lien debt, thereby reducing the senior debt ahead of the Second-Lien Creditors. (See Apps. Br. at 78–79; Debtors' Br. at 63).  The parties further dispute whether such issue is properly on appeal. (See Debtors' Br. at 63; Doc. #54 ("Apps. Reply") at 37–38).  Because the bankruptcy court ultimately determined the Second Lien-Creditors had not met their burden to show that the cash was traceable to the proceeds of the Second-Lien Collateral, the Court declines to address whether such arguments are properly before it on appeal.

[11]    The other appellants take no position respecting this argument.

Here, the provision which addresses the amount of any Section 507(b) claim by ESL is

Section 9.13(c), which provides:

> After giving effect to the credit bid set forth in Section 3.1(b), ESL shall be entitled
> to assert any . . . Claims arising under Section 507(b) of the Bankruptcy Code, . . .
> provided that (i) no Claims or causes of action of ESL shall have recourse to, or
> any other right of recovery from, . . . any Claim or cause of action involving any
> intentional misconduct by ESL, or the proceeds of any of the foregoing, <u>(ii) any
> ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled
> to distributions of not more than $50 million from the proceeds of any Claims or
> causes of action of the Debtors or their estates other than the Claims and causes of
> action described in the preceding clause (c)(i)</u>; provided that, in the event that, in
> the absence of this clause (c)(ii), any such proceeds to the Debtors or their estates
> would have resulted in distributions in respect of such ESL Claims in excess of $50
> million, the right to receive such distributions in excess of $50 million shall be
> treated as an unsecured claim and receive pro rata recoveries with general
> unsecured claims other than the Claims and causes of action described in the
> preceding clause (c)(i), and (iii) notwithstanding any order of the Bankruptcy Court
> to the contrary or section 1129 of the Bankruptcy Code, it shall not be a condition
> to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL
> Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in
> part.

(A-1628–29) (emphasis added).

The bankruptcy court read this provision and determined that Section 9.13(c)(ii) capped

at $50 million ESL's recovery for its <u>Section 507(b) claims</u>.  (A-4806) ("I also have determined

that the proper interpretation of Paragraph 9.13 of the asset purchase agreement is that to the

extent there is a 507(b) claim for ESL, that claim is capped at -- recovered on that claim is

capped at $50 million, again, based on the definition of claim, uppercase Claim in the APA.")

The APA defines "Claims" broadly to include:

> [A]ll rights to payment, whether or not such right is reduced to judgment,
> liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
> undisputed, legal, equitable, secured, or unsecured; or rights to an equitable remedy
> for breach of performance if such breach gives rise to a right to payment, whether
> or not such right to an equitable remedy is reduced to judgment, fixed, contingent,
> matured, unmatured, disputed, undisputed, secured, or unsecured, in each case, of
> whatever kind or description against any Person.

(A-1540).

ESL now argues Judge Drain erred because a plain reading of Section 9.13(c) limits

ESL's recovery in only two respects:  first, ESL cannot recover the proceeds of any distributions

to the estates from specific causes of action, including for claims of ESL's intentional

misconduct; and second, ESL can only recover $50 million for any of the other causes of

action—namely, other "litigation claims" or legal proceedings.  (A-4617).  Thus, ESL argues

recovery for its Section 507(b) claims is not capped at $50 million.

Moreover, ESL insists that any other reading of clause (ii) of Section 9.13(c) of the APA

would render superfluous the second half of the provision—"from the proceeds of any Claims or

causes of action of the Debtors or their estates other than the Claims and causes of action

described in the preceding clause."  (Apps. Br. at 82).  ESL argues that the bankruptcy court's

reading of the provision violates Delaware rules of contract construction.  See Kuhn Const., Inc.

v. Diamond State Port Corp., 990 A.2d 393, 396–97 (Del. 2010) (noting "give each provision

and term effect, so as not to render any part of the contract mere surplusage").

Debtors counter that a plain reading of Section 9.13(c) expressly limits to $50 million

recovery for Section 507(b) claims.  In support of this view, Debtors note that the definition of

"Claims" in the APA is derived from the Bankruptcy Code, and courts have concluded the

Bankruptcy Code definition of "the term 'claim' is sufficiently broad to encompass any possible

right to payment."  Conway Hosp., Inc. v. Lehman Bros. Holdings Inc., 531 B.R. 339, 342

(S.D.N.Y. 2015) (citing In re Mazzeo, 131 F.3d 295, 302 (2d Cir. 1997)).  Moreover, Debtors

argue any other reading would make "Claims" coextensive with "causes of action," thereby

violating the other rule of contract construction ESL cites, the rule against surplusage.  Further,

Debtors contend the phrase "from the proceeds" is not rendered superfluous by the $50 million

cap on recovery for Section 507(b) claims because the APA limits any claims ESL has, in excess of $50 million, including the Section 507(b) claims, and that any such claims in excess "shall be treated as an unsecured claim and receive pro rata recoveries with general unsecured claims other than the Claims" excluded in Section 9.13(c)(i).  (A-1629).

The Court agrees with Debtors and thus concludes the bankruptcy court did not clearly err when it concluded that ESL's Section 507(b) claims were capped at $50 million pursuant to the APA.  The plain text of the APA supports the bankruptcy court's finding that the limitation on recovery was not limited to legal proceedings, as ESL insists, but rather encompasses a broader set of claims, including Section 507(b) claims.

## CONCLUSION

The bankruptcy court's Orders of July 31, 2019, and August 5, 2019, are AFFIRMED.

The Clerk is instructed to terminate the pending appeals and close these cases.  (19 Civ. 7660; 19 Civ. 7697; and 19 Civ. 7782).

By September 15, 2020, Debtors shall advise the Court on how they wish to proceed with respect to the 506(c) Appeals.  (See 19 Civ. 8002, 19 Civ. 8237).

Dated: September 1, 2020
     White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge