UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :       Chapter 11
In re:                                          :
                                                :
SEARS HOLDING CORPORATION, *et al.*,            :       Case No. 18-23538 (RD)
                                                :
          Debtors.                              :       (Jointly Administered)
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**NON-PARTY PNC FINANCIAL SERVICES, INC.'S RESPONSE
IN OPPOSITION TO MOTION TO COMPEL**

PETRILLO KLEIN & BOXER LLP
Nelson A. Boxer
655 Third Avenue
New York, NY 10017
Telephone: (212) 370-0330
nboxer@pkbllp.com
*Attorneys for PNC Financial Services, Inc.*

## INTRODUCTION

1.      Non-party PNC Financial Services, Inc. ("PNC"), cooperated with Creditors' Committee counsel, devoted internal resources and produced responsive data for nearly 250 transactions with respect to the April 7, 2014 and June 11, 2015 issuance of securities that were the subject of a subpoena issued to PNC. At the time of PNC's compliance, counsel added new requests that fall outside the scope of the subpoena: first, for PNC to search for all customer records "within a week" of the two transaction dates; and now, in the instant motion, for PNC to search for all customer records as of a week after the transaction dates, that is, "for Lands' End spin off shares as of April 14, 2014 and Seritage Rights offerings as of June 18, 2020." Because PNC has already complied with the subpoena as written, because the Creditors' Committee has not carried its burden of establishing that dates a week after the transaction dates are likely to lead to admissible evidence, and because compliance with this additional request would cause an undue burden on PNC, the motion to compel should be denied.

## FACTS

2.      PNC is large, diverse financial services institution comprised of many entities, including an investment advisor, a broker dealer, and an institutional asset and wealth management group. *See*, *e.g.*, https://thepncfinancialservicesgroupinc.gcs-web.com/.

3.      In July 2020, "acting on behalf of the Debtors' estates," the Official Committee of Unsecured Creditors of Sears Holding Corporation, *et al.* (the "CUC"), issued and served a Subpoena to Produce Documents directed to PNC Bank, N.A. ("Subpoena 1"). *See* September 28, 2020 Declaration of Nelson A. Boxer ("Boxer Decl."), ¶2(a), Exh. A. Subpoena 1 informed that it was the CUC's "understanding that you either (1) received Lands' End shares in connection with the Lands' End Spin-off in April 2014, and/or (2) received subscription rights to

purchase shares of Seritage Growth Properties, Inc. in connection with the Seritage Rights Offering in June 2015," and provided CUSIP numbers for Sears, Lands' End, Seritage Rights, and Seritage securities. *Id*. Subpoena 1 requested, *inter alia*, documents "sufficient to identify (a) all shares of Lands' End that You received at the time of the Lands' End Spin-off, and (b) the capacity in which You received such a Transfer," and documents "sufficient to identify (a) all Seritage Rights that You received at the time of the Seritage Rights Offering, and (b) the capacity in which You received such a Transfer."[1]  *See Id*.

    4.      On August 6, 2020, counsel for PNC spoke with CUC Counsel, Danielle J. Marlow, of Moritt Hock & Hamroff LLP, who stated that the CUC was interested in receiving a spreadsheet that listed the account holders who received the initial distribution of Lands' End stock on April 7, 2014, and the Seritage rights offering on June 11, 2015.  *See* Boxer Decl., ¶3. In a follow-up e mail later that day, CUC counsel advised that "[a]s discussed, in particular, we are looking for:  The account holder name, the date of the distribution, the number of shares distributed, and the share values for Lands' End shares distributed to account holders at PNC on or about April 7, 2014 … [and the] Seritage rights distributed to account holders at PNC on or about June 11, 2015."  *See* September 14, 2020, Motion of the Official Committee of Unsecured Creditors to Compel, Dkt. 8438 ("Motion"), Exh. G.  Counsel added that "we are looking for distributions in connection with the following transactions," and provided links to press releases announcing the specific transactions. *Id*.  These press releases identified (i) the pro-rata spin-off of Lands' End, Inc. on April 4, 2014; (ii) the June 9, 2015 filing of a Registration Statement, stating that "Sears Holding is distributing to its stockholders, at no charge, one transferable

---

[1] "You," "whether capitalized or not, mean[t] the named entity on the accompanying subpoena." "Transfer" was defined in Subpoena 1 as "any transaction that falls within the meaning of 11 U.S.C. § 101(54), as well as any transaction in which the receiving institution acts a conduit or the ultimate beneficial Owner."  *See* Boxer Decl., ¶2(a), Exh. A, Definitions, ¶¶ 14 and 15.

subscription right for every share of Sears Holding common stock held of record as of 5:00 p.m., New York City time, on June 11, 2015, the previously announced record date"; and (iii) that the Seritage Rights would begin to trade on July 6, 2015, and would be distributed on July 7, 2015. *See* Motion, Exh. G. On August 12, 2020, counsel added, by e-mail, that "[w]e are requesting the name of the individual beneficial owners, as if a preference or fraudulent conveyance action was brought, it would be against the individual account holders rather than the bank." Boxer Decl., ¶2(c).

5. Several employees of PNC worked on the response to the subpoena. Boxer Decl., ¶4. On September 8, 2020, counsel for PNC informed CUC Counsel that the CUC would need to issue an additional subpoena directed to the entity that possessed the requested information – PNC Financial Services, Inc. (Boxer Decl., ¶2(c), Exh. C) – and, in an e-mail on September 9, 2020, further confirmed as follows:

> I should have PNC's subpoena production to you tomorrow. It will be in the form of excels. Yes, please issue and serve on me a new subpoena, addressed to PNC Financial Services Group, Inc. Following your instruction, PNC searched for (and you may want the subpoena to so specify) any accounts that on the below dates held the indicated CUSIPs:
>
> April 7, 2014
> - Sears CUSIP 812350106
> - Lands' End CUSIP 51509F105
>
> June 11, 2015
> - Sears CUSIP 812350106
> - Seritage Subscription Rights CUSIP 81752R118
> - Seritage CUSIP 81752R100

Boxer Decl., ¶2(c), Exh. C. CUC Counsel replied, "to be clear, the securities at issue may not have been issued on those exact dates; to be safe, we would request accounts that were issued those securities within a week of April 7, 2014 (Lands' End) and June 11, 2015 (Seritage)," to which PNC counsel responded, "It was time-consuming and somewhat complicated to navigate

3

the entire institution to get you what you wanted, which you described in an Aug. 6 e mail to me. I can't re-do that work for the 'within a week' parameter, and I don't see how it would matter. Send me the new subpoena, I'll make the production (it may be PDF instead of excel), and I suspect you'll be satisfied but if not we can litigate then." *Id*.

6. On September 10, PNC counsel confirmed the appropriate addressee for the subpoena (Boxer Decl., ¶2(c), Exh. C), after which CUC Counsel served a new subpoena, directed to PNC Financial Services, Inc. ("Subpoena 2"), that was otherwise identical to Subpoena 1 which, again, did not identify any dates other than April 7, 2014 and June 11, 2015, nor did it state that CUC was seeking information for the identified dates <u>and</u> additional dates to be specified at a later point in time.[2] Boxer Decl., ¶2(d), Exh. D. Later on September 10, in response to Subpoena 2, counsel for PNC produced, on behalf of PNC, PDF copies of two spreadsheets, a total of six pages, that contained 244 rows of responsive data as of April 7, 2014 or June 11, 2015.[3] Motion, Exh. H.

7. The following day, September 11, CUC Counsel described PNC's production as "helpful and the format is perfect," and asked if PNC would be willing to conduct another search of PNC records, using the same CUSIPs, for transactions "as of one week after the dates in question (April 14, 2014 and June 18, 2015)," and noted that such a search "would be sufficient and we could avoid motion practice." Motion, Exh. H. On September 14, PNC counsel responded as follows:

> My client is unwilling to devote further resources with respect to your client's Subpoena. PNC searched as previously instructed in our correspondence regarding the particular transaction dates referenced in the

---

[2] CUC Counsel wrote, "Please see attached [subpoena]. We did not change Exhibit A, but as per our e-mail communications, without waiver, and without any agreement that such production is sufficient, we understand that your production, at least in the first instance, will be limited as per below."
[3] The documents were labelled "Highly Confidential" pursuant to the parties' December 7, 2018 Amended Stipulated Protective Order.

4

> Subpoena. Any additional work, after PNC complied with the requests and the Subpoena, is unreasonable, unfairly burdensome and appears unnecessary.

Motion, Exh. H. Later that same day, counsel served and filed the instant motion to compel, directed against six entities, each of whom, except PNC, had allegedly not produced any documents and/or "completely ignored" (Motion, ¶16) CUC subpoenas or produced documents but "without account holder names" (Motion, ¶21). The motion referenced a parallel contempt motion against two additional entities and the "flout[ing]" of this Court's Rule 2004 Order (Motion, ¶3); a copy of the Order has never been provided to PNC.

## THE MOTION

8. Counsel argues that PNC's "position is absurd in that the e-mail correspondence clearly is intended to provide information regarding the subject transactions, not limit the scope of the Subpoena to two specific dates" (Motion, ¶24), and that PNC's claim of undue burden "is simply not credible." (Motion, ¶26). Counsel also contends that in order to get an "accurate picture of the account holders at PNC receiving Lands' End and Seritage securities," PNC should be compelled to search its records and databases "for Lands' End spin off shares as of April 14, 2014 and Seritage Rights offerings as of June 18, 2020." (Motion, ¶26).

## GOVERNING LAW

9. "Rule 45 [of the] F. R. Civ. P. applies in cases under the Code." *See* Fed. R. Bankr. P. 9016. Fed. R. Civ. P. 45(d)(1) requires that a "party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."

## ARGUMENT

10. By counsel's own admission, the CUC's purpose in serving Subpoena 2 was "to obtain information necessary to file a separate action asserting fraudulent transfer claims against the non-insider shareholders … [if] it will be beneficial to the Debtors' estates to do so." *See* Motion, ¶1; *see also* Motion, ¶9 (same) and ¶10 ("The subpoenas sought documentation sufficient to identify the underlying beneficial owners of the Sears shares held by each subpoena recipient in street name."). PNC's response to the Subpoena accomplished that purpose by providing the requested information for each customer who received the April 7, 2014 and June 11, 2015 securities "at the time of" their distribution. *See* Subpoena 2, Documents Requested 1 and 4 (Boxer Decl., ¶2(d), Exh. D). Such data permits the CUC and/or the Debtors to pursue "fraudulent transfer claims against the non-insider shareholders."[4]

11. Unexplained in the motion to compel is why shares potentially subject to a claim of fraudulent conveyance would have been distributed to, or received by, a PNC account not on, but instead a week subsequent to, the "as of" date for issuance of those shares.[5] A search of PNC entities for customer shareholders a week after the issuance date could potentially reveal customers who bought the relevant securities <u>from</u> a person or entity who received the initial distribution – that is, in the after-market – a shareholder who presumably could not be a defendant in a fraudulent conveyance claim.

---

[4] Of the 244 lines of account data provided, the large majority of PNC customers received a market value of between $25 and $5,000 in those securities. The possibility that the CUC will sue these customers for fraudulent conveyances (from over five years ago) seems remote.

[5] CUC counsel initially asked that PNC search for shareholders within a week of April 7, 2014 and June 11, 2015 (Boxer Decl., ¶2(b), Exh. B); in the contempt motion, it asks the Court to order PNC to search for shareholders "as of one week after the dates in question (April 14, 2014 and June 18, 2015)." Motion ¶26.

12.     Moreover, to the extent Subpoena 1 and Subpoena 2's use of "on or about" April 7, 2014 and "on or about" June 11, 2015 was intended to cover additional specific dates, that intention was so vague and ambiguous as to prevent PNC from reasonably complying.[6]  Because the Subpoenas offered no additional guidance other than the stated dates, it is unclear whether PNC is obligated – or even authorized – to disclose customer information for additional dates that CUC counsel seemingly arbitrarily selected after-the-fact.  Coupled with counsel's links (on August 6) to the press releases that informed that the particular transaction dates were April 7, 2014 (Lands' End "spin-off" date) and June 11, 2015 ("as of" date for receiving subscription rights), as well as the stated purpose of Subpoena 2 to pursue potential claims for fraudulent conveyance, PNC complied with the requests in Subpoena 2 fairly read.

13.     Canvassing non-party PNC's various constituent parts and searching for responsive information was time-consuming and involved the work of several (at least four) different PNC employees.  Boxer Decl., ¶4.  PNC has provided responsive material in a "perfect" format; asking it to do further work and expend further resources for an additional set of dates that was not specifically requested or identified in either Subpoena 1 or 2 and may not lead to admissible evidence is unreasonable and would impose an <u>undue</u> burden.

## CONCLUSION

14.     PNC cooperated with CUC counsel; expended resources in order to make a diligent search of its records; volunteered to CUC counsel the name of the entity that would possess information responsive to Subpoena 2; and produced detailed records reflecting accounts

---

[6] PNC did not object to Subpoena 2 on the basis of burdensomeness or relevance because it was unclear that it asked for transaction dates apart from the ones expressly stated, and CUC counsel's attempt to interject additional dates occurred after PNC had already gathered responsive information.  *See* Boxer Decl., ¶2(c), Exh. C.

7

that received the securities on the dates of issue, which counsel described as in "perfect" format. Further work as sought by the instant motion is unreasonable and would result in an undue burden on PNC. Accordingly, the CUC's motion to compel should be denied.

Dated: September 28, 2020
      New York, New York

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By: _____
Nelson A. Boxer
655 Third Avenue
New York, NY 10017
*Attorneys for PNC Financial Services, Inc.*

8