# TRI-PARTY SUPPLEMENTAL AGREEMENT

THIS TRI-PARTY SUPPLEMENTAL AGREEMENT (this "**Agreement**") is made as of December 21, 2017, by and between CRICKM LAFAYETTE TRUST, a Delaware business trust ("**Lessor**"), KMART CORPORATION, a Michigan corporation ("**Assignor**"), and AT HOME STORES LLC, a Delaware limited liability company ("**Assignee**").

## RECITALS:

A.    Lessor and Assignor entered into that certain lease dated October 15, 1997 (the "**Original Lease**") whereby Lessor leased to Assignor a certain parcel of land ("**Land**"), all buildings and improvement existing on said Land and building fixtures, building machinery and building equipment thereto (collectively, the "**Improvements**"), and all easements, rights and appurtenances thereto (collectively with the Land and the Improvements, the "**Leased Property**"). The Improvements include an approximately 113,442 square foot building (the "**Building**").

B.    The Land is legally described on **Exhibit A** attached hereto, and the Leased Property is depicted on **Exhibit B** attached hereto (the "**Site Plan**").

C.    Contemporaneously herewith, Assignor and Assignee have entered into that certain Assignment of Lease (the "**Assignment Agreement**") pursuant to which Assignor assigned all of its right, title and interest under the Original Lease to Assignee, and Assignee assumed all of Assignor's future obligations under the Original Lease. The Original Lease and the Assignment Agreement are collectively referred to as the "**Existing Lease**" and the Existing Lease and this Agreement are collectively referred to as the "**Lease**." Capitalized terms not otherwise defined herein shall have the meanings given to them in the Existing Lease.

D.    The parties desire to enter into this Agreement to set forth and confirm the respective rights, responsibilities, and obligations of the parties under the Existing Lease from and after the Assignment Effective Date.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Consent by Lessor; Assignor Not Released; Purchase Right Retained**. Lessor consents to the assignment and assumption of the Original Lease as documented by the Assignment Agreement, and Lessor waives the requirements set forth in Section 18(c) of the Original Lease with respect to such assignment and assumption. Notwithstanding the foregoing, until the expiration of the Basic Term (October 31, 2022) or such earlier date that Lessor, Assignor and Lessor's Mortgagee may agree upon in writing, Assignor shall remain liable for the full performance of all obligations of the "Lessee" under the Lease. Upon the expiration of the Basic Term, Lessor agrees that the Lease shall terminate as to Assignor and Assignor shall be fully released from any of its liabilities and obligations under the Lease. Notwithstanding the assignment and assumption of the Original Lease as documented by the Assignment Agreement, the parties agree and acknowledge that Assignor is not assigning, and expressly retains, any

rights that Assignor may have under the Lease pursuant to Section 23 of the Original Lease (the "**Section 23 Rights**"); provided, however, such Section 23 Rights shall automatically terminate as to Assignor upon the expiration of the Basic Term. The parties further agree and acknowledge that in the event that Assignor exercises its Section 23 Rights, (a) such automatic termination shall apply only to Assignor's Section 23 Rights and Assignee's rights under Section 23 of the Original Lease shall continue, or (b) if Assignor purchases the Leased Property pursuant to Section 23 of the Original Lease, such purchase shall be subject to the Lease (as may be amended or supplemented) and, upon the closing of such purchase, the Lease (as may be amended or supplemented) shall continue in full force and effect as a direct lease between Assignor as Lessor and Assignee as Lessee and Assignee's occupancy of the Leased Property shall not be disturbed.

2. **Term**. Assignor hereby waives its right pursuant to Section 2(b) of the Original Lease to extend the Term beyond the Basic Term.

3. **Rent**.

   a. Notwithstanding Section 3(a) of the Original Lease, Lessor and Assignee agree that commencing on the Rent Commencement Date and thereafter during the Term, Assignee shall be responsible for paying Basic Rent to Lessor (or to such other third party as designated by Lessor), in equal monthly installments in the amounts listed on **Schedule A** attached hereto, on or before the first (1st) day of each calendar month included in the Term. Basic Rent shall be payable in advance and shall be prorated on a daily basis for any partial calendar months falling within the Term. Basic Rent, Additional Rent and any other sums due under the Lease may be paid by Assignee by electronic wire or funds transfer. The "**Rent Commencement Date**" shall mean the date that is the earlier of (x) the date Assignee opens for business to the public and (y) one hundred fifty (150) days after the Assignment Effective Date. Notwithstanding anything contained in the Lease to the contrary, Assignee shall not be required to pay Basic Rent from and after the Assignment Effective Date until the Rent Commencement Date.

   b. For the avoidance of doubt, Assignor shall continue to pay Basic Rent as set forth in the Original Lease for the remainder of the Basic Term; provided, however, that for any month or partial month during the Basic Term that Assignee pays Basic Rent pursuant to Section 2(a) of this Agreement, Assignor's Basic Rent obligation for such month or partial month shall be reduced by the Basic Rent amount paid by Assignee for such month or partial month. For the avoidance of doubt, Assignor's failure to pay Basic Rent as and when due or to otherwise comply with the terms of the Original Lease shall not constitute an Event of Default by Assignee under the Lease. Further, notwithstanding any default or Event of Default by Assignor under the Lease, Assignee's rights and obligations under the Lease shall continue in full force and effect, and so long as no Event of Default by Assignee under the Lease then exists, Lessor shall have no right to terminate the Lease or otherwise disturb Assignee's occupancy of the Leased Property pursuant to the Lease.

4. **Assignee's Work.**

  a. Lessor and Assignee agree and acknowledge the following: (i) that as part of Assignee's initial leasehold improvements ("**Assignee's Work**"), Assignee will complete certain repair work to the roof of the Building, as more particularly described on **Exhibit C** (the "**Roof Work**"); (ii) Lessor shall reimburse Assignee for the first One Hundred Forty Five Thousand and No/100 Dollars ($145,000.00) of out-of-pocket costs incurred by Assignee in connection with the completion of the Roof Work (the "**Roof Allowance**"); and (iii) Assignee shall be responsible for the amount by which the total out-of-pocket costs incurred by Assignee in connection with completion of the Roof Work exceeds the Roof Allowance.  Lessor shall pay the Roof Allowance to Assignee within fifteen (15) days following Lessor's receipt of written notice from Assignee requesting the Roof Allowance, which written notice shall include: (a) a written draw request with a sworn statement from Assignee's contractor showing that the total out of pocket costs incurred by Assignee for the Roof Work; and (b) final or conditional (with the only condition being payment of the particular amount owed) lien waivers from all contractors and subcontractors that performed the Roof Work.

  b. Assignor agrees to reimburse Lessor in the amount of the Roof Allowance.  Commencing on the Rent Commencement Date and continuing until the amount of the Roof Allowance has been reimbursed to Lessor in full ("**Repayment Period**") Assignor shall be responsible for paying to Lessor monthly installments of Ten Thousand Seven Hundred Twenty Nine and 17/100 Dollars ($10,729.17) ("**Monthly Repayment Amount**") on or before the first (1st) day of each calendar month during the Repayment Period.  Such monthly installments shall be prorated on a daily basis for any partial calendar months falling within the Repayment Period.  If the Rent Commencement Date is not the first (1st) day of a calendar month, the first prorated Monthly Repayment Amount shall be paid together with the second payment of the Monthly Repayment Amount.

5. **Brokerage Indemnities**.  Lessor and Assignee acknowledge that CBRE and Excess Space Retail Services, Inc. (collectively, the "**Brokers**") have been retained in connection with the Leased Property and the Lease, and Assignor hereby agrees that Assignor shall pay to the Brokers the total brokerage commission due and payable to the Brokers pursuant to a separate agreement by and between Assignor and Brokers.  Except as described in the preceding sentence, Lessor, Assignor and Assignee hereby represent and warrant, each to the others, that they have not disclosed the Lease or the subject matter hereof to, and have not otherwise dealt with, any broker, finder or any other person, firm, corporation or other legal entity so as to create any legal right or claim of whatsoever kind or nature for a commission or similar fee or compensation with respect to the Leased Property or this Agreement.  Lessor, Assignor and Assignee hereby indemnify each other against, and agree to defend and hold each other harmless from, any liability or claim (and all expenses, including attorneys' fees, incurred in defending any such claim or in enforcing this indemnity) for a real estate brokerage commission or similar fee or compensation arising out of or in any way connected with any claimed dealings with the indemnitor and relating to the Leased Property or this Agreement.  The provisions of this Section shall survive the expiration or sooner termination of the Lease.

6. **No Modifications**.  Except as expressly set forth in this Agreement, the Lease is not modified, and remains in full force and effect, in accordance with its terms.

7.      **Authority**.  Each party represents and warrants to the others that it has full power and lawful authority to enter into and perform its obligations under this Agreement, that the person or persons signing on its behalf has been duly authorized to do so, and that the execution, delivery and performance by such party will not be in violation of any material agreement or restriction by which such party is bound or affected.

8.      **Counterparts**.  This Agreement may be executed in any number of counterparts. All counterparts so executed shall constitute one contract, binding on all parties, even though all parties are not signatory to the same counterpart.

[Signatures Follow]

*Tri Party Supplemental Agreement*

EXECUTED as of the date first above written.

**LESSOR**:

**CRICKM LAFAYETTE TRUST**,
a Delaware business trust

By: _[signature]_
Name: John Catsimatidis
Title: Successor Administrative Trustee and Successor Beneficiary

**ASSIGNOR:**

**KMART CORPORATION**,
a Michigan corporation

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

**AT HOME STORES LLC**,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

EXECUTED as of the date first above written.

**LESSOR**:

**CRICKM LAFAYETTE TRUST**,
a Delaware business trust

By: _____
Name: _____
Title: _____

**ASSIGNOR:**

**KMART CORPORATION**,
a Michigan corporation

By: _*JoAnn Catanese*_____
Name: __JoAnn Catanese_____
Title: __Divisional Vice President, Real Estate__

[Stamp: REAL ESTATE / CAB / LEGAL / JL]

**ASSIGNEE:**

**AT HOME STORES LLC**,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

AUS-6454690-1    5

EXECUTED as of the date first above written.

**LESSOR:**

**CRICKM LAFAYETTE TRUST,**
a Delaware business trust

By: _____
Name: _____
Title: _____

**ASSIGNOR:**

**KMART CORPORATION,**
a Michigan corporation

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

**AT HOME STORES LLC,**
a Delaware limited liability company

By: /s/ Judd T. Nystrom
Name: Judd T. Nystrom
Title: Chief Financial Officer

# EXHIBIT A

# LEGAL DESCRIPTION

Legal Description

The land referred to in this policy is situated in the County of Tippecanoe, State of Indiana, and is described as follows:

PARCEL I:
Lot 9 in the Lafayette Market Place Subdivision as per the plat thereof dated October 11, 1995, recorded October 26, 1995, in Plat Cabinet E, Slide E-86, as Document Number 9518515. Located in the northeast quarter of Section 34, Township 23 North, Range 4 West, in Fairfield Township, City of Lafayette, Tippecanoe County, Indiana, more particularly described as follows: Commencing at the northeastern corner of the northeast quarter of said Section 34; thence South 89°-21'-29" West along the northern line of the said northeast quarter, which corresponds to the centerline of McCarty Lane for 883.31 feet; thence South 01°-15'-35" East for 35.00 feet to the Point of Beginning; thence South 01°-15'-35" East for 135.00 feet; thence South 16°-20'-18" West for 347.28 feet; thence South 01°-15'-35" East for 237.00 feet; thence North 89°-24'-20" East for 329.56 feet; thence South 01°-16'-09" East for 445.94 feet; thence North 47°-04'-00" West for 158.05 feet; thence South 42°-56'-00" West for 285.60 feet; thence South 47°-04'-00" East for 91.71 feet, thence South 42°-56'-00" West for 376.25 feet; thence North 47°-04'-00" West for 270.57 feet; thence South 42°-56'-00" West for 366.12 feet to the northeastern right of way line of State Road 38; thence North 47°-04'-00" West along said northeastern right of way line for 63.06 feet; thence North 42°-56'[-00"East for 261.36 feet; thence North 47°-04'-00" West for 175.37 feet; thence North 42°-56'-00" East for 408.27 feet; thence North 00°-45'-10" West for 357.82 feet; thence North 88°-50'-52" East for 295.53 feet; thence North 01°-15'-35" West for 190.64 feet; thence North 16°-20'-18" East for 312.48 feet; thence North 00°-45'-42" West for 128.39 feet; thence South 89°-21'-29" West for 20.00 feet; thence North 00°-45'-42" West for 35.00 feet to the southern right of way line of McCarty Lane; thence North 89°-21'-29" East along the southern right of way line of McCarty Lane for 63.10 feet to the point of beginning, containing 12.399 acres, more or less. LESS AND EXCEPT A part of the northeast quarter of Section 34, Township 23 North, Range 4 West in Fairfield Township, City of Lafayette, Tippecanoe County, Indiana, described as follows: Beginning at the southeastern corner of Lot 3 in the Lafayette Market Place Subdivision as recorded in Plat Cabinet E-86 in the Office of Recorder for Tippecanoe County, Indiana, as Document No. 9518515 on October 26, 1995; thence North 42°-56'-00" East along the eastern line of Lot 3 for 10.00 feet; thence South 47°-04'-00" East for 63.06 feet to the western line of Lot 2 in the said Lafayette Market Place Subdivision; thence South 42°-56'-00" West along the western line of said Lot 2 for 10.00 feet to the northeastern right of way line of State Road 38; thence North 47°-04'-00" West along the said right of way line for 63.06 feet to the point of beginning. Said tract being a part of Lot 9 in the Lafayette Market Place Subdivision as recorded in Plat Cabinet E-86 in the Office of Recorder for Tippecanoe County Indiana as Document No. 9518515 on October 26, 1995, and containing 630 square feet, more or less, containing in total a net area of 12.384 acres, more or less.

PARCEL II:

Driveway Easement Agreement dated May 22, 1995, recorded June 2, 1995, as Document Number 95-08260, by and between Tippecanoe II, L.L.C. and Dan F. Dexter, L. Jane Kenny, and Twyla Irene Dexter.

PARCEL III:

Declaration of Reciprocal Easements and Covenants dated May 25, 1995, recorded June 2, 1995, as Document Number 95-08263, from Tippecanoe II, L.L.C., as Declarant. First Modification to Declaration of Reciprocal Easements and Covenants dated September 16, 1996, recorded January 15, 1997, as Document Number 9700748, from Tippecanoe II, L.L.C., as Declarant.

# EXHIBIT B

# SITE PLAN



**EXHIBIT C**

**ROOF WORK**

**[Attached]**

# WINCON SERVICES, INC.

126 Park Avenue
P.O. Box 232
Kiel, WI 53042-0232
Cell 920-980-9173
Fax (920) 894-4002

## Kmart 7775
## 3530 State Rd
## Lafayette, IN 47905
### Scope of work to Re Roof Ballasted EPDM all levels including canopies

1, Remove all rock, EPDM and copings and dispose of per OSHA. Copings to low to put slip or term bar on.

2, Include 1,000 SF of insulation replacement if EPS is wet or crushed.

3, Leave gutter in place and figure repairing joints only and provide add cost for new.

4, Install a single layer of 3/8 inch fan fold product or equal to over existing EPS at all levels.

5, Mechanically attach in 10 foot sheets .045 TPO per Manufacturers 1-90 pattern. Figure GAF or JM sheet

6, Flash all penetrations and curbs using extruded term bar for final terminations on curbs.

7, TPO flashings fully adhered up and over outside edge and provide a pre finished edge ES-1 Detail required.

7, Figure in typical SHC contract terms and 60 day pay schedule.

8, No painting of equipment required and follow manufactures specifications for 1-90 for fastening.

9, Wincon and PM will conduct a pre con and final inspection at end of project to insure quality control.

10, Include all taxes, permits, dumpsters, outside portal, rentals, and all items include in a typical SHC project.

11, Include 2 year contractor and 10 year manufacturer warranty minimum.

End of Brief Scope of Work by Wincon 7-20-17

Contractor Name: **Guy Roofing, Inc.**     Signature _____     DATE **July 20, 2017**

Contractor Email: **clint@guyroofing.com**     GAF or JM figured **GAF**

Start Time: **August 9, 2017**     End Date **August 31, 2017**

Total cost per scope above and drawings sent: $ **289,970.00**

Total add cost for new gutters and downspouts pre-finished: $ **13,100.00**

1,000 SF of allowance figured wet insulation in bid: $ **2,000.00**     $ **2.00**     SF

Email back by tomorrow 2:00 PM or earlier preferred to Wincon and John Valenti this form filled out.

We appreciate your expeditious time in this proposal that if accepted your held to the costs.

## SCHEDULE A

### At Home Basic Rent

| Period | Monthly Installment of Basic Rent | Annual Basic Rent |
| --- | --- | --- |
| Assignment Effective Date – Day Before the Rent Commencement Date | $0 | $0 |
| Rent Commencement Date – Half-Rent End Date | $21,458.33 | $257,499.96 |
| Day after the Half-Rent End Date – 10/31/2022 | $42,916.67 | $515,000.00 |

"**Half-Rent End Date**" means the last day of the sixteenth (16th) full calendar month after the Rent Commencement Date.