## UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| ☒ Sears Holdings Corporation (18-23538) | ☐ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☐ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22031) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | |

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

| | | |
|---|---|---|
| 1. Who is the current creditor? | **Elm Creek Real Estate LLC** | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| 2. Has this claim been acquired from someone else? | ☒ No ☐ Yes. From whom? | |
| 3. Where should notices and payments to the creditor be sent? Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** c/o Melissa Hayward Hayward & Associates PLLC 10501 N. Central Expy., Ste. 106 Dallas, TX 75231 Contact phone 972-755-7100 Contact email mhayward@haywardfirm.com | **Where should payments to the creditor be sent?** (if different) Contact phone Contact email |
| 4. Does this claim amend one already filed? | ☐ No ☒ Yes.   Claim number on court claims registry (if known) 16737 | Filed on 04/11/2019 MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No ☐ Yes. Who made the earlier filing? | |

**Claim Number: 20307**

Proof of Claim                                        page 1

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ See attached Exhibit A

**Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached Exhibit A

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**            $_____

**Amount of the claim that is secured:**            $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**            $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.** $ See attached Ex. A

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(     ) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☐ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**  $_____

---

**Part 3:** Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** *Michael Montgomery*
Michael Montgomery (Sep 13, 2019)

**Email:** mhayward@haywardfirm.com

_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Michael Montgomery |
| | First name          Middle name          Last name |
| Title | Manager |
| Company | Elm Creek Real Estate LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 4641 Nall Road |
| | Number          Street |
| | Dallas                    TX          75244 |
| | City                      State        ZIP Code |
| Contact phone | 214-695-7472          Email |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ have supporting documentation.
    (attach below)

☐ do <u>not</u> have supporting documentation.

Attachment

**PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.**

**IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.**

**A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.**

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                                    12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

---

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** 18 U.S.C. §§ 152, 157 and 3571.

---

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://restructuring.primeclerk.com/sears.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101(10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101(13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Sears Holdings Corporation Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

**Do not file these instructions with your form**

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Sears Holdings Corporation et al. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of New York |
| Case number | 18-23538 (RDD) |

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Elm Creek Real Estate LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

c/o Melissa Hayward
Name

10501 N. Central Expy., Ste. 106
Number     Street

Dallas             TX        75231
City               State      ZIP Code

Contact phone 972-755-7100

Contact email mhayward@haywardfirm.com

Where should payments to the creditor be sent? (if different)

Name

Number     Street

City               State      ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.  Claim number on court claims registry (if known) 16737

Filed on 04/11/2019
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**

$ ___See attached Exhibit A___ . Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

___See attached Exhibit A___

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                          $_____

Amount of the claim that is secured:        $_____

Amount of the claim that is unsecured:     $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:     $_____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.**   $ ___See attached Exhibit A___

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*                                                                    Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).                        $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).        $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).                        $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).        $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).        $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.        $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   9/12/19
                   MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

Name        Michael Montgomery
            First name            Middle name            Last name

Title       Manager

Company     Elm Creek Real Estate LLC
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     4641 Nall Road
            Number        Street

            Dallas                            TX        75244
            City                              State     ZIP Code

Contact phone   24.695.7472            Email

## EXHIBIT A TO ELM CREEK REAL ESTATE LLC'S
## AMENDED PROOF OF CLAIM

1.     <u>Claimant</u>

Elm Creek Real Estate LLC ("<u>Elm Creek</u>") asserts a claim, as described below (the "<u>Claim</u>"), against Sears, Roebuck and Co. and its bankruptcy estate (the "<u>Debtor</u>") arising in connection with the lease described below or related thereto.

2.     <u>Amount of Claim</u>

At least $854,749.44, as set forth herein.

3.     <u>Claim Description</u>

On or about April 18, 2018, Elm Creek and the Debtor entered into that certain lease (the "<u>Lease</u>") whereby Elm Creek leased certain real property located at 1501 Kings Road and 3 Kings Road in Garland, Texas, (the "<u>Leased Premises</u>") to the Debtor. A true and correct copy of the Lease is attached hereto as <u>Exhibit 1</u> and incorporated herein. The Lease provides for an initial term of five years beginning on April 18, 2018 (the "<u>Effective Date</u>") and expiring on April 30, 2023. Pursuant to the terms of the Lease, the Debtor is obligated to pay $71,229.12 per month in rent (the "<u>Base Rent</u>").[1] In addition to the Base Rent, the Debtor is also obligated to pay taxes relating to the ownership, leasing, and operation of the Leased Premises when they become due (all collectively with the Base Rent, the "<u>Rent</u>").[2]

On October 15, 2018 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>").

On October 15, 2018, the Debtor filed its *Motion for Entry of an Order Establishing Procedures for Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* [Dkt. No. 24]. On November 16, 2018, the Bankruptcy Court entered the *Order Authorizing Debtors to Establish Procedures for Rejection of Unexpired Leases of Nonresidential Real Property and Abandon Property in Connection Therewith* [Dkt. No. 800].

On August 14, 2019, the Bankruptcy Court entered the *Supplemental Order Approving Rejection of Unexpired Lease of Nonresidential Real Property (Store #8907)* [Dkt. No.4838] authorizing the Debtor to reject the Lease pursuant to Section 365 of the Bankruptcy Code, which rejection became effective on April 30, 2019.

Pursuant to section 502(b)(6) of the Bankruptcy Code, Elm Creek's total allowed claim arising from the Debtor's rejection of the Lease is capped at an amount equal to: (i) any pre-petition

---

[1] <u>See</u> Lease, ¶ 4(k).

[2] <u>See</u> Lease, ¶ 4(l).

unpaid rent due under the Lease, without acceleration; plus (ii) the greater of either (a) one year's rent or (b) 15% of the remaining rent, not to exceed three years.[3]  The start date for the damages calculation is the earlier of either: (i) the date the bankruptcy petition was filed; or (ii) the date that the landlord repossessed, or the tenant surrendered the leased property.[4]

Based upon the application of section 502(b)(6), Elm Creek is entitled to a claim resulting from the Debtor's rejection of the Lease in an amount equal to: (i) unpaid Rent through the Petition Date, plus (ii) one year's Rent calculated from May 1, 2019 to April 30, 2020.

The Debtor does not owe any unpaid Rent through the Petition Date.[5]  Additionally, the amount of one year's Base Rent from May 1, 2019 to April 30, 2020 totals **$854,750.00**. Accordingly, pursuant to Section 502(b)(6), Elm Creek is entitled to a claim against the Debtor under section 506(b)(6) of the Bankruptcy Code based upon the rejection of the Lease in the amount of **$854,750.00**. A calculation of Elm Creek's claim under section 502(b)(6) is attached hereto as <u>Exhibit 3</u>.

4.    <u>Other Rights</u>

In addition to the foregoing, Elm Creek reserves the right in the future to amend this Claim, if necessary, and assert any and all claims that Elm Creek may have against the Debtor for the imposition of constructive trust, earmarking of funds, equitable lien, security interest, subrogation, marshalling, or other legal and equitable remedies to which Elm Creek may be entitled. Elm Creek also reserves the right to assert additional claims that may arise from the Debtor's conduct, including, but not limited to, any claim arising under applicable state or federal law as well as any equitable claims.

This Claim is filed under compulsion of the Court's deadline for filing proofs of claim. In executing and filing this Claim, Elm Creek does not waive, reduce, impair, or limit: (i) Elm Creek's rights against (a) the Debtor, (b) any non-debtor obligor, any other entity or person liable for all or part of any claim described herein or any collateral securing the obligations, or any part thereof, or (c) any obligor that may be a debtor in any bankruptcy case not jointly administered with this bankruptcy case, and Elm Creek reserves all rights against all such persons and collateral; (ii) any obligation owed to Elm Creek, or any right to any security that may be determined to be held by the Debtor or any insiders of the Debtor for Elm Creek's benefit; (iii) any past, present, or future defaults or events of default; (iv) the right to trial by jury, to move to withdraw the reference, or

---

[3] <u>See</u> 11 U.S.C. § 502(b)(6).

[4] <u>See</u> 11 U.S.C. § 502(b)(6)(A).

[5] The Debtor has not paid 2018 *ad valorum* real estate taxes in the amount of **$198,795.58**, which, pursuant to the Lease, came due post-petition. A copy of the tax invoices are attached hereto as <u>Exhibit 2</u>. Elm Creek will be filing an application for an administrative expense claim for this amount; however, to the extent such amount is not allowed as an administrative expense claim, then Elm Creek hereby includes the $198,795.58 owed for *ad valorem* real estate taxes in this Claim.

otherwise challenge the jurisdiction of this Court, with respect to the subject matter of this Claim, any objection hereto, or any other proceeding commenced in this case against or otherwise involving Elm Creek, or to assert that the reference has already been withdrawn with respect to the subject matter of this Claim, any objection hereto, or any other proceeding commenced in this case against or otherwise involving Elm Creek; or (v) any other rights, claims, actions, set-offs, or recoupments to which Elm Creek or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, set-offs, and recoupments Anders expressly reserves.

Elm Creek additionally claims the benefit of: (a) all renewals, extension, ratification, supplements, amendments, corrections, and other, prior, or subsequent documentation evidencing or relating to the claims of Elm Creek; (b) all rights under 11 U.S.C. § 506(b); and (c) any other filed or recorded documents. The filing of this Proof of Claim is not and should not be construed as an election of remedies.

    5.    <u>Credits</u>

 Elm Creek has offset all payments made in making this proof of claim.

    6.    <u>Notices</u>

All notices to Elm Creek should be sent to:

    Michael Montgomery
    Elm Creek Real Estate LLC
    4641 Nall Road
    Dallas, TX 75244

with a copy to counsel for Elm Creek as follows:

    Hayward & Associates PLLC
    c/o Melissa Hayward
    10501 N. Central Expy., Ste. 106
    Dallas, TX 75231

    7.    <u>Payments</u>

All payments and distributions to Elm Creek with respect to this Proof of Claim should be made directly to Elm Creek as follows:

    Michael Montgomery
    Elm Creek Real Estate LLC

4641 Nall Road
Dallas, TX 75244

8.    <u>Exhibits</u>

The following exhibits are attached hereto and are incorporated herein by reference.

- Exhibit 1 - *Lease*
- Exhibit 2 - *Tax Invoices*
- Exhibit 3 - *502(b)(6) Calculation*

# LEASE

## BY AND BETWEEN

### SEARS, ROEBUCK AND CO., as tenant

## AND

### ELM CREEK REAL ESTATE, LLC, as landlord

Dated as of April 16, 2018

Property: The following two (2) parcels of land all in the City of Garland, Dallas County, Texas 75042:

(i)      Parcel 1 = 1501 Kings Road (Sears #8907); and

(ii)     Parcel 3 = 3 Kings Road (which also has an address of 1617 Kings Road), (Sears #8157).

### Sears #8157 and Sears #8907

## LEASE

THIS LEASE (this "**Lease**") is made as of the 18 day of April, 2018 ("**Effective Date**"), between **ELM CREEK REAL ESTATE, LLC**, a Texas limited liability company having an office at 4641 Nall Rd, Dallas, Texas 75244 ("**Landlord**") and **SEARS, ROEBUCK AND CO.,** a New York corporation, having an office at 3333 Beverly Road, Dept. 824RE, Hoffman Estates, Illinois 60179 ("**Tenant**").

### W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Real Estate Sale Contract dated as of April 6, 2018, between Tenant, as seller, and Landlord, as buyer (the "**PSA**"), Tenant agreed to sell to Landlord, and Landlord agreed to purchase from Tenant the land more particularly described on **Exhibit A-1** attached hereto (the "**1501 Kings Road Property**") and the land more particularly described on **Exhibit A-2** attached hereto (the "**3 Kings Road Property**") (the 1501 Kings Road Property and 3 Kings Road Property are collectively, the "**Property**");

**WHEREAS**, as a condition to the closing pursuant to the PSA, immediately following the sale of the Property by Tenant to Landlord, Landlord is required to lease to Tenant, and Tenant is required to lease from Landlord, the Premises (as defined below) pursuant to the terms and conditions of this Lease; and

**WHEREAS**, the closing under the PSA occurred on the Effective Date and Tenant and Landlord wish to enter into this Lease to complete the transaction.

**NOW, THEREFORE,** Tenant and Landlord agree as follows:

1.    **Demise**.  (a) Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, all existing parking located on the Property and all additional parking and all easements and appurtenances for the benefit of the Property, except that the use of the existing parking areas by Tenant shall be non-exclusive to the extent other parties have parking rights with regard to such areas on the Effective Date) for the Term.  The "**Premises**" shall be defined as the premises described on **Exhibit B-1** attached hereto (the "**1501 Kings Road Premises**") and described on **Exhibit B-2** attached hereto (the "**3 Kings Road Property Premises**").  The leasing of the Premises under this Lease shall also include Tenant's right to use all parking, access and common areas useful in connection with the Property in a manner substantially similar to the manner in which same have been used prior to the date hereof, to the extent Landlord possesses or has the right to such rights.  All leases together with any license agreements and/or subleases of portions of the Premises (collectively, the "**Tenant Leases**") shall continue to inure to the sole benefit of Tenant through the Termination Date.  For the avoidance of doubt, Tenant expressly retains all rights, remedies and privileges in and to the Tenant Leases for the duration of the Term, including all rents payable under the Tenant Leases. Landlord and Tenant acknowledge and agree that this Lease relates to the 1501 Kings Road Property and the 3 Kings Road Property, but the demise hereunder relates to each such Property separately and individually.  Except as otherwise expressly provided herein, each reference to the Property or the Premises shall be interpreted as a separate reference to the 1501 Kings Road Property or the 3 Kings Road Property, as applicable.

(b)     At any time after the Effective Date, Landlord shall have the right to cause any portion of the Property to be released from the Lease (the "**Landlord Released Parcel**"), without a reduction in rent, provided that (i) Landlord gives written notice to Tenant of the proposed release no less than sixty (60) days prior to the date of the proposed release, (ii) the Landlord Released Parcel is vacant and is not currently being utilized by Tenant in connection with its operations at the Property, (iii) Landlord submits a site plan, subject to Tenant's prior approval, which approval shall not be unreasonably withheld, of Tenant's remaining property (the "**Tenant's Remaining Property**") showing that Tenant's access to, parking on, or utilities at Tenant's Remaining Property are not changed by the proposed release, (iv) the zoning and use at Tenant's Remaining Property shall remain unaffected by the proposed release; (v) Landlord shall present to Tenant a metes and bounds legal description of the Landlord Released Parcel for Tenant's review and approval (if such metes and bounds legal description does not already exist) prior to the release of the Landlord Released Property (vi) Landlord and Tenant shall enter into an amendment of this Lease which shall document the release of the Landlord Released Parcel and (vii) all costs and expenses incurred by Tenant in connection with the release of the Landlord Released Property shall be borne by Landlord. If necessary, simultaneously with the release of Tenant's property, Landlord and Tenant shall enter into a mutual access easement agreement providing free and uninterrupted pedestrian and vehicular ingress to and egress from the Tenant's Remaining Property to and from Kings Road.

2.     **Term**.

(k)     The initial term of this Lease (the "**Initial Term**") shall commence on the Effective Date and shall expire at midnight on the last day of the fifth (5th) Lease Year, unless (x) sooner terminated as provided in this Lease or (y) extended as provided herein. The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "**Term**".

(l)     Unless this Lease has expired or has been sooner terminated, or a default has occurred and is continuing at the time the Extension Option is exercised, Tenant shall have the right and option (an "**Extension Option**") to extend the Initial Term for one additional successive period of five (5) years (the "**Extension Term**").  Tenant may only exercise the Extension Option by giving written notice thereof to Landlord of its election to do so no later than one hundred eighty (180) days prior to the then existing expiration date of the Term.  It is the intention of the parties hereto to avoid forfeiture of Tenant's rights to exercise the Extension Option through inadvertent failure to give notice of the exercise thereof within the time limits prescribed above.  It is also the intention of the parties to allow Landlord sufficient time if Tenant decides not to exercise the Extension Option to find a substitute tenant.  Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to exercise the Extension Option at least one hundred eighty (180)  days prior to the then existing expiration date of the Term, then Tenant's right to exercise its Extension Option shall continue thereafter until the earlier to occur of (i) Landlord shall have served (not more than forty-five (45)) days prior to the expiration date of the then current Term) upon Tenant a notice directing Tenant to make a decision within thirty (30) days to exercise or decline to exercise the Extension Option and such thirty (30) day period shall have expired with Tenant having failed to exercise or having declined to exercise during such period the Extension Option or (ii) Tenant shall have served upon Landlord a written notice of its election to exercise or not to exercise the Extension Option.

Tenant's written notice of its election not to exercise the Extension Option shall cause the Lease to terminate at the expiration of the last day of the then current Term. Without modification of the foregoing, if Tenant does not exercise the Extension Option within the Term or Landlord does not direct Tenant to make a decision to elect within the Term and a holdover results into the next Extension Term period and thereafter Tenant exercises its Extension Option in accordance herewith, then the Term shall nonetheless expire at the end of what would normally have been the next succeeding Extension Term period (it being the intention of the parties that the then-current Term expire on the last day of the next Extension Term period). Notwithstanding such holdover, Tenant may notify Landlord of its intention to not exercise the next Extension Option, thereby terminating this Lease as of the one hundred twentieth (120th) day following delivery of such notification. Tenant shall not be subject to the provisions of <u>Section 24</u> if any holding over is pursuant to the provisions of this <u>Section 2(b)</u>. Upon the request of Tenant or Landlord, the parties hereto will, at the expense of Landlord, execute and exchange an instrument in recordable form setting forth the extension of the Term.

(m)    If the date otherwise scheduled for termination or expiration of this Lease is not a Business Day, the Termination Date shall be on the first Business Day thereafter. A "**Business Day**" means any day other than a Saturday, Sunday or other day on which banks are authorized or required by law to be closed in the jurisdiction in which the Property is located. A "**Lease Year**" means each successive twelve (12) calendar month period commencing on the first day of a calendar month. The first Lease Year shall be the twelve (12) month period commencing on the first day of the calendar month immediately succeeding the month in which the Term of this Lease commences plus any partial calendar month during the calendar month in which the Term of this Lease commences.

3.    <u>**Surrender of Possession; Early Termination By Tenant**</u>.

(a)    <u>**Early Termination by Tenant**</u>.  In addition to any early termination of this Lease that may arise under any other section of this Lease, Tenant may elect to terminate this Lease as to (i) all of the Premises, or (ii) either or both of the 1501 Kings Road Premises or the 3 Kings Road Property Premises currently being used by Tenant at the time of the execution of this Lease (in which case the Rent shall be adjusted as to reflect the terminated portion of the Premises); provided, that as a condition precedent to such termination, Tenant shall provide not less than ninety (90) days' prior written notice of termination ("**Tenant Termination Notice**") to Landlord. Notwithstanding any provision in this Lease to the contrary, Tenant shall not have the right to terminate the Lease and receive a reduction in Rent on (i) the portion of the Landlord's Released Parcel, or (ii) on a portion of the buildings and parking lot located on 1501 Kings Road Premises or 3 Kings Road Property Premises.

(b)    <u>**Surrender of Possession**</u>.  Upon the first to occur of (i) the expiration of the Term, or (ii) any sooner termination of this Lease pursuant to any other section of this Lease, or (iii) any earlier date as noted in a validly delivered Tenant Termination Notice (the first of such dates being the "**Termination Date**"), Tenant shall surrender possession of the Premises in its "AS-IS," "WHERE-IS" and "WITH ALL FAULTS" condition, free of all subtenants, licensees, leases, subleases, concessionaires and other occupants claiming by, through or under Tenant, including the Tenant Leases, if any, and without any obligation by Tenant to remove any fixtures, furnishings or equipment or other personal property. Other than heating, ventilating and

air conditioning systems and equipment (other than racking equipment), plumbing systems and equipment, electrical systems and equipment, on or prior to the Termination Date, Tenant may remove any or all of Tenant's fixtures, furnishings, equipment, merchandise, inventory and other personal property (collectively, "**Tenant's Property**"), and any of the same remaining after the Termination Date shall be deemed abandoned by Tenant and Landlord shall have no liability with respect thereto and Landlord may, at Landlord's expense, dispose of and/or demolish any such personal property without compensation to Tenant.

4.    Rent.

(k)    As consideration for this Lease, Tenant shall pay to Landlord annual fixed rent ("**Annual Fixed Rent**") during each Lease Year in the aggregate amounts set forth on **Schedule 1** attached hereto.  The Annual Fixed Rent then in effect shall be payable in equal monthly installments ("**Monthly Fixed Rent**") in advance on or prior to the fifth (5th) day of each month.  Monthly Fixed Rent shall be prorated on a per diem basis for any portion of a month.

(l)    As "**Additional Rent**" Tenant shall also pay directly to the relevant authority as and when due, Taxes and, upon request by Landlord, shall provide Landlord with reasonable evidence that the same have been paid.  For purposes hereof, "**Taxes**" shall mean all taxes and impositions relating to the ownership, leasing and operation of the Property, or any portion thereof, including the land, but excluding any excess profits taxes, franchise taxes, gift taxes, inheritance and succession taxes, estate taxes, documentary transfer taxes, federal or state income taxes, corporate, capital stock or capital gains taxes, penalties incurred as a result of Landlord's failure to pay taxes or to file any tax or informational returns and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Property). Notwithstanding the foregoing, Landlord shall be responsible for all increases in real estate taxes based on or triggered by a change of ownership or the sale of the Property, including pursuant to the PSA, and/or a reassessment of the Property by reason thereof.  All real estate taxes for the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available real estate tax bill and will be adjusted in cash once the actual taxes are known.  Landlord shall give prompt notice to Tenant of all real estate taxes payable by Tenant hereunder of which Landlord at any time has knowledge and shall send copies of all bills and notices received by Landlord in respect of the Premises to Tenant.

(m)    If the Termination Date occurs on any day other than the last day of a calendar month, Tenant will be entitled to a refund in an amount equal to Monthly Fixed Rent and Additional Rent theretofore paid with respect to the Premises allocable on a per-diem basis to the remainder of the month.

(n)    The parties acknowledge and agree that Tenant shall pay for all of its own ordinary operating costs and expenses (such as, but not limited to, utility costs and phone service) in connection with Tenant's use and occupancy of the Premises prior to and during the Term, in accordance with its customary practices, subject to Section 4 and Section 8, and except (i) for costs, expenses and damages resulting from the negligence or willful misconduct by

Landlord or its agents, employees or contractors, (ii) with respect to all pre-existing conditions at or affecting the Property, and (iii) as otherwise expressly set forth herein.

(o)    Annual Fixed Rent, Monthly Fixed Rent and Additional Rent shall be collectively referred to herein as "**Rent**".

(p)    Subject to Section 4, all Taxes applicable to the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available tax bill and adjusted in cash once actual taxes are known. Landlord shall give prompt notice to Tenant of all Taxes payable by Tenant hereunder of which Landlord at any time has knowledge. Landlord shall use its reasonable efforts to obtain the cooperation of all taxing authorities to send all bills and notices in respect of the Property directly to Tenant.

(q)    Tenant may, at its own expense, contest or cause to be contested, by appropriate legal proceedings conducted in good faith and with due diligence, any tax (including penalties and interest), assessment, tax lien, forfeiture or other imposition or charge upon or against the Property or any part thereof, including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; and (ii) no default under this Lease has occurred and is continuing. Landlord shall, at the request of Tenant, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Landlord shall incur no cost or obligation thereby.

(r)    In light of the fact that Tenant is continuing (i) in occupancy following the Closing Date, and (ii) to control the Tenant Leases and service contracts, except as set forth in the PSA, Tenant and, if applicable, Landlord have not prorated common area maintenance reimbursements or payments under any Ancillary Rights and Agreements (as hereinafter defined), expenses under service contracts, utilities and other customary real property prorations and adjustments as of the Closing.

(s)    In the event Landlord obtains a release of the Property as set forth in Section 1(a), then Tenant shall pay Taxes on the land and improvements situated on the Tenant's Remaining Property and Landlord shall pay Taxes on the released property.

5.    **Alterations; "Going out of Business Sale"; Signage**.

(k)    Except as otherwise provided herein, without first obtaining Landlord's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), Tenant shall not make or cause to be made any alterations to the building structure or building systems or any other material alterations or install any additional permanent fixtures to the Premises. Notwithstanding the preceding sentence, Tenant (and any of its subtenants, licensees or other occupants) shall not be required to obtain any consent from Landlord for: (1) any minor or non-structural alterations to the Premises, (2) placing temporary signs on the Property in connection with its store-closing operations or (3) any non-structural alterations to the Premises in connection with any Necessary Curtailments, or any reduction in business operations or reduction in utilizing space within the Premises. "**Necessary Curtailments**" means repairs,

alterations, Ordinary Repairs and any Major Repair/Capital Improvement, Casualty, customary acts or events of force majeure, and events beyond the reasonable control of Tenant. Notwithstanding the foregoing, Tenant, at its expense, may at any time and from time to time make alterations and/or additions to the Premises provided that: (A) the market value of the Premises shall not be reduced or its usefulness impaired, (B) the work shall be done expeditiously and in a good and workmanlike manner, (C) Tenant shall comply with all legal requirements applicable to the work and (D) Tenant shall promptly pay all costs and expenses and discharge any and all liens arising in connection with the work in accordance with the terms hereof. Notwithstanding the foregoing, Tenant, at its expense, may install or assemble or place on the Premises, and remove and substitute, any items of machinery, equipment, furniture, furnishings, trade fixtures or other Tenant's personal property, including, but not limited to, all conveyer and material handling systems and related equipment, used or useful in Tenant's business.

(l)     Notwithstanding any provision herein to the contrary, but subject to the provisions hereof, Tenant shall have the right to conduct a "going out of business sale" to be completed during the one hundred twenty (120) day period prior to the expiration of the Term or earlier termination of this Lease as provided herein and to cease store operations and to remove Tenant's personal property and prepare for the turnover of possession of the Premises to Landlord pursuant to the provisions of this Lease. Tenant shall have the option to erect and maintain, subject to applicable legal requirements and matters of title to which this Lease is subordinate, at its sole cost and expense, upon any portion of the Property or improvements, signs of such height and other dimensions bearing such legend or inscription as Tenant shall determine.

6.    **Use; Operation**.

(k)     Tenant shall not have any obligation to operate or use or conduct business in or on any of the Premises or be subject to any restrictions on any operation or on the use of or conduct of business on the Premises, and Tenant may use the Premises, if it operates at all, for any lawful use and may downsize its operations and/or cease operations at any time in its sole discretion.

(l)     Without limiting the foregoing, Tenant will continue to enjoy the benefit of all existing easements, parking agreements, rights of access and ingress, and all other rights and benefits as it currently enjoys (including under all applicable REAs and supplemental agreements, if any) with respect to the Property (all of the foregoing, collectively, "**Ancillary Rights and Agreements**"), and in furtherance thereof, Landlord agrees to enforce (and cause its affiliates to enforce) all such Ancillary Rights and Agreements (excluding operating covenants) for the benefit of Tenant. Tenant agrees to continue to comply with the non-monetary provisions (if any) of the Ancillary Rights and Agreements that are applicable to the Premises in accordance with its past practices in the ordinary course of business. Landlord shall not terminate, amend or modify the Ancillary Rights and Agreements without Tenant's consent.

7.    **Access and Cooperation**.    Upon not less than five (5) Business Days' prior notice to Tenant, Landlord and its representatives shall have access to the Premises for purposes of a visual inspection during normal business hours; provided, however, that in emergency

circumstances Landlord and its representatives may have immediate access to the Premises at any time after making all reasonable attempts to contact Tenant, but otherwise without the necessity of prior notice. In connection with any such access or entry, Landlord and its representatives shall (a) not unreasonably interfere with Tenant's or any subtenant's, licensee's or other occupant's business operations at the Premises (including the business operations pursuant to any Tenant Leases), (b) not conduct any physical testing or invasive studies, and (c) promptly restore or repair any damage occasioned by such access or entry.

8.    **Services and Repairs; Utilities**.

(a)    Tenant shall accept the Premises in its existing condition as of the Effective Date, "as is," "where is," and "with all faults" and without any written or verbal representations or warranties whatsoever, whether express or implied, other than representations and warranties expressly set forth in this Lease, and except for any surviving provisions of the PSA and any ancillary documents executed in connection therewith.

(b)    Subject to the foregoing and the following provisions of this Section 8 and the other terms and conditions of this Lease, Landlord shall have no obligation to supply any services or make any ordinary repairs to the Premises or Property, the parties expressly intending that subject to the further provisions of this Section 8 and the other terms and conditions of this Lease, Tenant's current arrangements for all other services and general maintenance and ordinary repairs shall continue at Tenant's election unaffected during the Term (and Landlord shall not interfere with same).

(c)    Subject to the provisions hereinafter set forth and Section 5, Tenant and not Landlord shall be responsible for the ordinary repair and maintenance of the Premises (including the parking lot and other common areas), subject to the provisions hereinafter set forth, (i) Tenant shall not be responsible for funding any Major Repair/Capital Improvement to the Premises (including the parking lot and other common areas), and (ii) Tenant shall be responsible for funding any repair which is not a Major Repair/Capital Improvement and which is not covered by net proceeds received by Tenant with respect to applicable insurance, if any ("**Ordinary Repairs**"), subject to an aggregate cap of $150,000 for such Ordinary Repairs in any consecutive twelve (12) month period (the "**Repair/Capital Threshold**"). Any Ordinary Repairs reasonably necessary above such cap will be considered to be a Major Repair/Capital Improvement.

(i)    A "**Major Repair/ Capital Improvement**" shall mean (with respect to one event or one item, or a series of directly related events or items, and not an aggregate of separate unrelated events or separate unrelated items) a repair (to the extent not covered by the net proceeds received by Tenant with respect to applicable insurance, if any) or a capital improvement costing (or which is reasonably estimated to cost) in any case in excess of $300,000. In the event Tenant acting in good faith determines that a Major Repair/Capital Improvement is appropriate, Tenant may elect not to fund the Major Repair/Capital Improvement and terminate this Lease upon not less than ninety (90) days' prior written notice to Landlord, but, prior to exercising such termination right, Tenant must notify Landlord of the necessity for any such Major Repair/Capital Improvement and the cost (or reasonably estimated cost) of such Major Repair/Capital Improvement. Landlord shall have the opportunity for a

period of ten (10) days after receipt of such notice from Tenant to notify Tenant that Landlord irrevocably commits to fund at Landlord's sole cost and expense the amount of such Major Repair/Capital Improvement in excess of $300,000 (with Tenant funding the first $300,000). If Landlord timely elects to fund and actually funds such excess within ten (10) days after it provides its election to fund notice to Tenant, then Tenant shall not have a termination right as it relates to such Major Repair/Capital Improvement and shall be obligated to make any such Major Repair/Capital Improvement (subject to the terms and provisions of this Lease and subject to reimbursement by Landlord as set forth above).

(ii)     As set forth above, Tenant's responsibility for funding Ordinary Repairs is subject to the Repair/Capital Threshold. The Repair/Capital Threshold shall be implemented as provided in this Section 8(c)(ii). In the event that Tenant has expended, or is reasonably expected to expend, funds (in a consecutive twelve (12) month period) on Ordinary Repairs in excess of the Repair/Capital Threshold, Tenant may elect not to fund any further Ordinary Repairs for the balance of the twelve (12) consecutive month period at issue and terminate this Lease upon not less than ninety (90) days' prior written notice to Landlord. However, prior to exercising such termination right, Tenant must notify Landlord of the necessity (as reasonably determined by Tenant) for any such Ordinary Repairs and the cost (or reasonably estimated cost) of such Ordinary Repairs. Landlord shall have the opportunity for a period of ten (10) days after receipt of such notice from Tenant to notify Tenant that Landlord irrevocably commits to fund at Landlord's sole cost and expense the amount of such Ordinary Repairs in excess of the Repair/Capital Threshold for the balance of the twelve (12) consecutive month period at issue. If Landlord timely elects to fund and actually funds such excess within ten (10) days after Landlord provides its election to fund notice to Tenant, then Tenant shall not have a termination right as it relates to such Ordinary Repairs for that twelve (12) consecutive month period and shall be obligated to make any such Ordinary Repairs (subject to the terms and provisions of this Lease and subject to reimbursement by Landlord as set forth herein).

(iii)     Except as expressly set forth above and elsewhere in this Lease, Tenant shall have no obligation to make any repairs or replacements or capital expenditures of whatever nature during the Term, but Tenant may do so at any time at its election. Tenant may continue to exercise and enforce exclusively any and all rights of the owner or landlord under the Tenant Leases and the service contracts (including, without limitation, with respect to maintenance and upkeep of the Premises), and Landlord agrees to reasonably cooperate with Tenant at no cost to Landlord in connection therewith.

(d)     Tenant shall pay directly to the utility company(ies), the cost of all utilities consumed by Tenant during the Term.

9.     **Insurance; Casualty**.

(k)     Tenant shall maintain all personal property and liability insurance programs presently in effect or as replaced by Tenant from time to time in accordance with its general corporate policies throughout the Term. Tenant shall maintain commercial general public liability insurance for the common area of the Premises and all-risk property damage insurance covering the Premises and other building improvements on the Premises.

(l)     This Lease shall terminate at the election of Tenant upon the occurrence of a fire or other casualty ("**Casualty**") which results in material damage to the Premises (the portion of the Premises that is destroyed or damaged is twenty-five percent (25%) or more of the floor area or the floor area of the Premises that is destroyed or damaged materially affects the use and occupancy of the Premises)  with an appropriate prorated refund to Tenant on a per-diem basis of all prepaid Monthly Fixed Rent and Additional Rent.  If Tenant elects not to terminate this Lease in the event of a Casualty which results in material damage to the Premises, all Monthly Fixed Rent and Additional Rent with respect to the portion of the Premises which is damaged shall be abated on a per-square-foot basis.  If this Lease is terminated as provided herein, Tenant, at Tenant's election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Tenant), for the purpose of winding down its business operations and removing any or all of Tenant's personal property at its election from the Property without payment of any Rent.  In no event shall Tenant or Landlord be obligated to make any repairs or restorations in the event of damage to the Premises resulting from a Casualty.

(m)     If Landlord shall be advised by a condemning authority or otherwise has knowledge of a proposed condemnation or other taking of the Property (or a portion thereof), then Landlord shall promptly give notice thereof to Tenant.  Upon any actual exercise by any governmental power (by legal proceedings or otherwise), by any public or quasi-public authority or by any other Person having the right of eminent domain or a voluntary sale or transfer by Landlord to any of the foregoing either under the threat of exercise of eminent domain or while legal proceedings for condemnation are pending with respect to a material portion of the Premises (i.e., twenty-five percent (25%) or more of the floor area of the Premises or the portion of Property taken materially affects the use and occupancy of the Premises) (collectively, a "**Condemnation Action**", this Lease shall automatically terminate, except as provided below, as of the date on which title to the property subject to the Condemnation Action is vested in the condemnor.  Tenant, at Tenant's election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Tenant) after Tenant receives notice a Condemnation Action (but in no event later than the date of the actual Condemnation Action) during which to wind down its business operations and remove any or all of Tenant's Property at its election from the Premises without payment of any Rent.  Upon the payment of any award or compensation to Landlord arising from any Condemnation Action, there shall be such division of the proceeds and such other adjustments as the parties may agree upon as being just and equitable under all circumstances regardless of any technical rule of law.

10.    **Default**.

(k)     **By Tenant**.

(i)     Defaults by Tenant are: (A) failing to timely pay Monthly Fixed Rent or Additional Rent, if such Monthly Fixed Rent and/or Additional Rent is not paid within seven (7) Business Days after receipt of written notice from Landlord of nonpayment; or (B) failing to observe or perform any other material obligations of Tenant hereunder for a period of thirty (30) days after receipt of written notice from Landlord of such failure (or such longer period as may be reasonably required to cure such failure, provided that Tenant is diligently prosecuting such cure to completion).  As Landlord's sole remedy for a default by Tenant, Landlord may give Tenant written notice of Landlord's intention to terminate this Lease (the

"**Default Termination Notice**") at the end of the expiration of thirty (30) days from the date of the giving of such Default Termination Notice, and, in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term.  No default shall be deemed to exist under clause (B) during any time the curing thereof is prevented by Necessary Curtailments provided that upon the cessation of such Necessary Curtailments (subject to Section 9) Tenant shall prosecute such cure without further delay.

(ii)    If (A) Tenant becomes bankrupt, makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver for Tenant or for the major part of its property; (B) a trustee or receiver is appointed for Tenant or for the major part of its property; or (C) any voluntary or involuntary proceedings are filed by or against Tenant under any bankruptcy, insolvency or similar laws, Landlord may give Tenant written notice of intention to terminate this Lease (the "**Bankruptcy Termination Notice**") at the end of the expiration of thirty (30) days from the date of giving such Bankruptcy Termination Notice, and in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term.

(iii)    Subject to the provisions of Section 10(k)(iv) below, upon the termination of this Lease in accordance with the provisions of this Section 10(k), Tenant shall remain liable to Landlord for any portion of the Monthly Fixed Rent and Additional Rent due through the end of the Term (less the net proceeds, if any, of any reletting of the Premises or any part thereof and the avails of any continuing Leases), but in no event shall Tenant be liable for any consequential, special, punitive or other damages, or any other costs, fees or expenses.  In any event, Landlord shall make reasonable efforts to mitigate damages.

(iv)    In no event shall Tenant be liable in damages of any kind for any default under this Lease by Tenant and Landlord acknowledges that Landlord's sole and exclusive remedy for any default or breach of this Lease by Tenant shall be Landlord's right to terminate this Lease as set forth in this Section 10.  Neither Tenant nor any member, partner (general or limited), manager, officer, director, shareholder or principal of Tenant shall have any personal liability whatsoever for the payment or collection of any judgment requiring the payment of money by Tenant in the event of a default by Tenant with respect to the terms, covenants and conditions of this Lease to be observed and/or performed by Tenant.

(l)    **By Landlord.**  Defaults by Landlord are (i) failing to timely pay any amount to be paid by Landlord hereunder, if such amount is not paid within seven (7) Business Days after receipt of written notice from Tenant of nonpayment; or (ii) failing to observe or perform any other material obligations of Landlord hereunder for a period of thirty (30) days after receipt of written notice from Tenant of such failure (or such longer period as may be reasonably required to cure such failure, provided that Landlord is diligently prosecuting such cure to completion).  In the event of any default by Landlord, Tenant may give Landlord written notice ("**Tenant Notice**") of Tenant's intention to (A) cure any or all non-monetary defaults of Landlord, in which event Landlord shall pay to Tenant the reasonable cost of curing the same upon demand, and/or (B) set off against the Rent and all other sums due or becoming due from Tenant to Landlord hereunder, the amount of all sums as to which Landlord is in default,

together with the reasonable cost of curing all non-monetary defaults of Landlord in the event Tenant elects to cure the same, at the end of (I) with respect to (A), the expiration of ten (10) Business Days from the date of the giving of such Tenant Notice and (II) with respect to (B), the expiration of five (5) Business Days from the date of giving of such Tenant Notice. Tenant shall also have the option, in the Tenant Notice, to terminate this Lease at the end of the expiration of thirty (30) days from the date of giving such Tenant Notice, and in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term. The provisions of this Section 10(l) shall survive the expiration or sooner termination of this Lease.

11.    **Assignment/Subleasing**.

(k)    Tenant shall have the right to assign or sublet (and grant licenses and concessions, department arrangements and other rights) all or any portion of its leasehold interest during the Term without Landlord's approval so long as Tenant (or any successor) remains liable to Landlord for all Rent.

(l)    Tenant shall also have the right, without Landlord's approval, to (i) assign this Lease to Parent or any Subsidiary of Tenant; (ii) assign or transfer all of Tenant's rights and obligations under this Lease (either directly or indirectly, by operation of law or through a merger or other corporate transaction) to any other Person that (1) acquires all or substantially all of the assets of Tenant Holdings Corporation ("**Parent**"), (2) is the surviving entity of a merger with Parent, or (3) results from a consolidation, reorganization or recapitalization of Parent with a solvent corporation, partnership or other legal entity; or (iii) assign or transfer all of Tenant's rights and obligations under this Lease to any Person that concurrently acquires not less than ten (10) Tenant's stores (including the Premises) by purchase, consolidation, merger or spin-off; provided, that in each case the successor tenant (if not the named tenant herein, the "**Unrelated Successor Tenant**") assumes all of Tenant's obligations under this Lease (except that any such Unrelated Successor Tenant shall not be required to comply with any operating covenant provided for herein). In the case of an assignment or transfer in connection with clause (iii) above, Tenant shall not be released from all liability under this Lease unless the assignee has a net worth of not less than $50,000,000 as of the effective date of such assignment or transfer and the assignee assumes in writing the obligations of Tenant under this Lease which arise on and after the date upon which the assignment becomes effective. As used in this Lease, (x) "**Subsidiary**" means, as to any Person, (i) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time of determination owned by such Person and/or one or more Subsidiaries of such Person, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person and/or one or more Subsidiaries of such person has more than a fifty percent (50%) equity interest at the time of determination and (y) "**Person**" or "**person**" means any natural person, partnership, limited partnership, limited liability company, corporation, trust, estate, association, unincorporated association or other entity.

(m)    Landlord shall enter into a non-disturbance agreement with any permitted subtenant in form and substance reasonably satisfactory to the parties thereto whereby Landlord agrees to recognize such subtenant's rights under its sublease so long as such subtenant observes and performs all of its obligations under such sublease and such subtenant agrees to attorn to Landlord. With respect to any sublease, such non-disturbance agreement shall provide that, upon termination of this Lease, (1) subtenant shall pay to Landlord the rent provided for in the sublease and (2) the sublease shall become a direct lease between Landlord and subtenant (except that (a) Landlord shall not be subject to any prior offsets or defenses which subtenant might have against Tenant (but subject to Landlord's continuing obligations as landlord); (b) Landlord shall not be bound by any rent or additional rent which subtenant might have paid more than one (1) month in advance to Tenant; (c) Landlord shall not be bound by any escrow deposit for taxes, insurance, maintenance, single or payment made under the sublease (including, without limitation, any security deposit) unless Landlord shall have taken actual possession of such sums; (d) Landlord shall not be bound by any prior obligation under the sublease to make any payment to subtenant; (e) Landlord shall not be bound by any surrender or termination or any amendment or modification of the sublease which is made in violation of the terms of this Lease; and (f) Landlord shall not be obligated to commence, complete or perform any construction or make any contributions toward construction or installation of any improvements upon the subleased premises required under the sublease or any expansion or rehabilitation of existing improvements thereon) and the parties will execute and deliver any further reasonable documents as are necessary or desirable to more fully effectuate the foregoing. In the event a subtenant enters into a direct lease with Landlord, Landlord shall obtain from each of the Ground Lessors and Landlord's Mortgagees an SNDA for the benefit of such subtenant containing provisions substantially similar to those set forth in this Section 11(m).

(n)    In the event of a sale or conveyance by Landlord of the Property (or any portion thereof), the same shall be made subject to this Lease (and any Tenant Leases) and Landlord shall only be released from any liability under this Lease accruing after the date of any such conveyance, provided the assignee shall assume and agree to keep and perform all of the terms of this Lease on the part of Landlord to perform from and after the date of any such conveyance and a copy of the assignment and assumption agreement executed by Landlord and assignee shall be delivered to Tenant.

12.    **Governing Law.**  This Lease shall be governed by and construed in accordance with the laws of the state in which the Property is located applicable to agreements made, and to be wholly performed, in such state.

13.    **Waiver of Trial by Jury.**  LANDLORD AND TENANT EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE OR THE LANDLORD-TENANT RELATIONSHIP, WHETHER ARISING IN CONTRACT, IN TORT OR OTHERWISE.

14.    **Binding Effect.**  Subject to Section 11 above, this Lease shall bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

15.    **Complete Agreement; No Oral Modification.**  This Lease may not be altered or terminated, nor may its provisions be waived, except in a writing signed by Tenant and Landlord. This Lease, together with the PSA and the documents referred to in the PSA or executed in connection with the Closing thereunder, represents the entire agreement and understanding of the parties with respect to the subject matter hereof, and completely supersedes and integrates any and all other promises, understandings and agreements between the parties (including all of the same by and between any of the parties' agents and representatives on behalf of the parties), both oral and written.

16.    **Counterparts.**  This Lease may be executed in two or more counterparts and by facsimile or electronic signatures which taken together shall constitute collectively one agreement.  In making proof of this Lease it shall not be necessary to produce or account for more than one such counterpart with each party's original, facsimile or electronic signature.

17.    **Invalidity.**  If any term or provision of this Lease shall to any extent or for any reason be held invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease, but this Lease shall be valid and enforceable to the fullest extent permitted by law, subject to such modification hereof as may be necessitated by such invalidity, illegality or unenforceability provided that the purpose and intent hereof is not in any way abrogated.

18.    **Notices.**

(a)    Notices shall be either (i) personally delivered, (ii) sent by a nationally recognized overnight courier delivery service, or (iii) mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office.  If personally delivered, then such notices shall be effective when received as evidenced by affidavit of the Person making such delivery; if sent by overnight courier delivery service then such notices shall be deemed to have been received by the addressee on the next Business Day following the date so sent; if mailed, then such notices or other communication shall be deemed to have been received by the addressee on the fifth (5th) Business Day following the date deposited with the United States mail.  The inability to make delivery because of changed address of which no notice was given or by reason of rejection or refusal to accept delivery of any notice shall be deemed to be receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept.  All notices, demands or requests made pursuant to, under or by virtue of this Lease must be in writing and addressed as follows:

If to Tenant:

Sears, Roebuck and Co.
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention:  President, Real Estate


With copies to:

Sears, Roebuck and Co.

3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL  60179
Attention:  Associate General Counsel, Real Estate


If to Landlord:

Elm Creek Real Estate, LLC
4641 Nall Rd.
Dallas, TX 75244
Attn:  Michael Montgomery

With a copy to:

Zane B. Butler
Attorney at Law
522 Colgate Dr.
Allen, Texas 75013


(b)    All notices (i) shall be deemed to have been given on the date that the same shall have been delivered in accordance with the provisions of this Section and (ii) may be given either by a party or by such party's attorneys.  Any party may, from time to time, specify as its address for purposes of this Lease any other address upon the giving of five (5) days' prior notice thereof to the other parties.

19.    **Subject to Existing Agreements**.

(k)    This Lease is subject to all Ancillary Rights and Agreements in effect on the Effective Date with respect to the Premises.

(l)    Upon Landlord's prior written approval, which approval shall be at Landlord's sole discretion, Tenant may, from time to time, upon thirty (30) days' prior written notice to Landlord (at Tenant's cost and expense): (a) grant easements and other rights in the nature of easements, (b) release existing easements or other rights in the nature of easements which are for the benefit of the Property, (c) subdivide or parcelize all or a portion of the Property, (d) dedicate or transfer unimproved portions of the Property for road, highway or other public purposes, (e) execute petitions to have the Property annexed to any municipal corporation or utility district, (f) execute amendments to any covenants and restrictions affecting the Property, and Landlord shall execute and deliver to any person any instrument appropriate to confirm or effect such grants, releases, subdivisions, parcelizations, dedications and transfers to the extent of its interest in the Property (or execute such instrument in its own name); provided, however, that the rights granted to Tenant pursuant to the provisions of this Subsection (and the obligation of Landlord to execute such instrument) are subject to thirty (30) days' prior written notice to Landlord which notice shall include (x) a certificate of an authorized person of Tenant (A) describing such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment, (B) stating that such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment is not detrimental to the proper conduct of the business of Tenant on the

Property and does not materially impair the usefulness of the Property for the purposes contemplated and permitted hereby, or materially reduce the fair market value of the Property, or materially impair Landlord's interest in the Property, and (C) stating the consideration, if any, being paid for such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment and (y) duly authorized and binding unconditional undertakings of Tenant that it will remain obligated hereunder to the same extent as if such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment had not been made (including, without limitation, the obligation to pay all Rent in accordance with the terms hereof), and that Tenant will perform all obligations of Landlord under such instrument during the Term.

   20.    **Mechanic's Liens.**    Tenant shall not permit any mechanic's, laborer's or materialman's lien to be filed at any time against the Premises or any part thereof by reason of work performed with prior authorization by or on behalf of Tenant or any agent or contractor claiming by, through or under Tenant, which are not bonded or discharged within the later of sixty (60) days (a) of filing or (b) Tenant's actual notice thereof.

   21.    **Estoppels.**    At any time and from time to time, upon not less than ten (10) Business Days' prior request, either party (the "**Requesting Party**") may request that the other party (the "**Certifying Party**") furnish to the Requesting Party (and its lenders or purchasers) a certificate (signed by a person duly authorized to sign on behalf of the Certifying Party) certifying as follows: (a) that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect and modified and setting forth the modifications), (b) the dates to which the Monthly Fixed Rent and any Additional Rent have been paid and the amount thereof then payable, (c) that the Certifying Party does not know of any default in the performance of any provisions of this Lease or specifying any default of which the Certifying Party may have knowledge and stating what action the defaulting party is taking or proposes to take with respect thereto and (d) any other information reasonably requested by the Requesting Party.

   22.    **Indemnification; Waiver of Subrogation**.

        (a)    Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, actions, damages, liability and expense, including reasonable attorneys' fees ("**Loss**"), in connection with bodily injury, the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises to the extent caused by any act or omission of Tenant and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of Landlord, its agents, contractors, employees, servants or licensees (as to all of which Loss Landlord shall indemnify, defend and hold harmless Tenant).

        (b)    Landlord shall indemnify, defend and hold Tenant harmless from and against any Loss, in connection with bodily injury, the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Property (exclusive of the Premises) to the extent caused by any act or omission of Landlord and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of Tenant, its agents, contractors, employees, servants or licensees (as to all of which Loss Tenant shall indemnify, defend and hold harmless Landlord).

(c)    Each party releases and waives any and every claim and right of recovery against the other which arises or may arise in its favor and against the other party during the Term for any and all loss of or damage to any of its property located within or upon or constituting a part of its respective premises, which loss or damage is customarily covered by the property insurance carried by each party under this Lease, or would have been covered if each party had carried the insurance that such party is required to carry under this Lease. This mutual waiver shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties. Landlord and Tenant agree to furnish to each insurance company which has or will issue property damage policies on its premises, notice of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

(d)    The provisions of this Section shall survive the Termination Date.

**23.    Hold Over**. No holding over by Tenant nor acceptance of Monthly Fixed Rent, Additional Rent or other charges by Landlord shall operate as a renewal or extension of this Lease without the written consent of Landlord. Should Tenant hold over after the Termination Date without the consent of Landlord (excluding the possible extensions in **Section 9** or elsewhere in this Lease), this Lease shall continue in force from month to month, subject to all of the provisions hereof.

**24.    No Restrictions On Tenant Financing**. Tenant may continue to finance all receivables, inventory and other personal property and enter into financing leases of property and equipment, in the ordinary course of business.

**25.    Subordination; Quiet Enjoyment**.

(a)    Subject to and expressly conditioned upon the provisions of **Section 25(b)**, including receipt of an SNDA from each Landlord's Mortgagee and each Ground Lessor in accordance with **Section 25(b)** below, this Lease and all rights of Tenant hereunder hereby are made and shall be subject and subordinate in all respects to the lien of all present and future ground leases (collectively, "**Ground Leases**") and mortgages (collectively, "**Landlord's Mortgages**") which may now or hereafter encumber Landlord's interest in the Property, provided that no such Ground Leases or Landlord's Mortgages shall increase any liabilities or obligations nor decrease any rights or remedies of Tenant under or with respect to this Lease.

(b)    Notwithstanding the foregoing or any such subordination, or any other provision contained in this Lease to the contrary, so long as Tenant shall not be in default of the express provisions of this Lease (without reference to any such Ground Leases or Landlord's Mortgages) beyond any applicable grace, notice or cure period, Landlord covenants and agrees that Tenant shall peacefully and quietly possess and enjoy the Premises and all rights of Tenant under this Lease in accordance with all terms and conditions hereof (without reference to **Section 25(a)** hereof), without let, hindrance or disturbance and free from all rights and claims of Landlord and all of all Persons claiming by or through Landlord, including under any such Ground Leases and Landlord's Mortgages. As a condition precedent to the subordination of this Lease to the interest of the holders of any such Landlord's Mortgages (collectively, the "**Landlord's Mortgagees**") and the ground lessors under any such Ground Leases (collectively,

the "**Ground Lessors**"), Landlord must obtain from each of any such Landlord's Mortgagees and Ground Lessors (each an "**SNDA Party**"), an SNDA which shall (x) provide, among other things, that such SNDA Party, as well as any person who acquires any portion of the Premises in a foreclosure or similar proceeding or in a transfer in lieu of any such foreclosure or a successor owner of the Property (each, a "**Foreclosure Purchaser**"), will not disturb either Tenant's leasehold interest or possession of the Premises in accordance with the terms hereof, nor any of Tenant's rights, privileges and options, and shall give effect to this Lease as if such SNDA Party or Foreclosure Purchaser were the landlord under this Lease so long as there is not then any outstanding and continuing default by Tenant under this Lease which has remained uncured beyond the time periods specified in Section 10 (except that (a) such SNDA Party or Foreclosure Purchaser shall not be subject to any prior offsets or defenses which Tenant might have against Landlord except related to a Landlord default under Section 10(b)(ii) (but subject to such SNDA Party's or Foreclosure Purchaser's continuing obligations as landlord); (b) such SNDA Party or Foreclosure Purchaser shall not be bound by any rent or additional rent which Tenant might have paid more than one (1) month in advance to Landlord; (c) such SNDA Party or Foreclosure Purchaser shall not be bound by any escrow deposit for taxes, insurance, maintenance, single or payment made under this Lease (including, without limitation, any security deposit) unless such SNDA Party or Foreclosure Purchaser shall have taken actual possession of such sums; (d) such SNDA Party or Foreclosure Purchaser shall not be bound by any prior obligation under this Lease to make any payment to Tenant; (e) such SNDA Party or Foreclosure Purchaser shall not be bound by any surrender or termination or any amendment or modification of this Lease which is made without such SNDA Party's or Foreclosure Purchaser's consent; and (f) such SNDA Party or Foreclosure Purchaser shall be obligated to commence, complete and perform any construction and make any contributions and allowances toward construction or installation of any improvements upon the Property required under this Lease and any expansion or rehabilitation of existing improvements thereon), and (y) also be in form and substance reasonably satisfactory to Tenant.

26.    **Attorneys' Fees**.  In the event of litigation between the parties to enforce this Lease or if any legal action is instituted as a result of a default by either party under this Lease that is not cured within the applicable cure period, the prevailing party in such action shall be entitled to recover from, or be reimbursed by the other party for, its reasonable and actual attorneys' fees and costs, including but not limited to expert witness fees and court costs, through all levels of proceedings.

27.    **Tenant Rights**.  Without limiting the provisions of Section 10(b), nothing herein contained shall constitute a limitation on the right of Tenant, and Tenant shall have the express right to:  (1) seek and secure injunctive relief for any violation by Landlord of any of the terms of this Lease, or (2) offset and make a deduction from Rent or any other sums due Landlord for any violation by Landlord of any of the terms of this Lease and/or to cure any such violation by Landlord.

28.    **Lease Not to Be Recorded; Memorandum of Lease**.  The parties agree that this Lease shall not be recorded, but the parties shall record the Lease Memorandum concurrently with the execution hereof.

29.    **Discretion**.  Except as otherwise expressly provided herein, any agreement, approval, consent or other determination shall not be effective unless it is in writing and shall be in the sole and absolute discretion of such party.

30.    **Section Headings**.  The headings of the various sections of this Lease have been inserted only for purposes of convenience, are not part of this Lease and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Lease.

31.    **General Definitional Provisions.**  Unless the context of this Lease otherwise requires, (i) words of any gender are deemed to include each other gender, (ii) words using the singular or plural number also include the plural or singular number respectively, (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Lease, (iv) the terms "Article," "Section," "Subsection," "Paragraph" or "clause" refer to the specified Article, Section, Subsection, Paragraph or clause of this Lease, and (v) all references to "dollars" or "$" refer to currency of the United States of America.  The term "including" as used herein shall in all instances mean "including, but not limited to."

32.    **Joint Drafting**.  Each of Tenant and Landlord has been represented by counsel in the negotiation and execution of this Lease, and each of Tenant and Landlord had input in the drafting of this Lease.  For all purposes, this Lease shall be considered to have been jointly drafted by Tenant and Landlord.

33.    **Other Documents.**  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

34.    **Environmental.**  (a)  If Tenant becomes aware of a spill or discharge of a Hazardous Material (as such term is defined in the PSA) in concentrations above those allowed under applicable environmental laws (a "**Spill**"), which occurs on or from the Premises during the term of this Lease, Tenant shall give Landlord prompt oral and written notice of such Spill, setting forth in reasonable detail all relevant facts, including, without limitation, a copy of (i) any notice of a violation, or a potential or alleged violation, of any environmental law received by Tenant or any subtenant or other occupant of the Premises; (ii) any inquiry, investigation, enforcement, cleanup, removal, or other action instituted or threatened against Tenant or any subtenant or other occupant of the Premises; and (iii) any claim instituted or threatened against Tenant or any subtenant or other occupant of the Premises.  If a Spill arises out of or relates to Tenant's use and occupancy of the Premises, or if a Spill is caused by the act, negligence or omission of Tenant or Tenant's employees, agents or visitors, then Tenant shall pay all costs and expenses relating to compliance with applicable environmental laws (including, without limitation, the costs and expenses of site investigations and the removal and remediation of such Hazardous Material).  Without relieving Tenant of its obligations under this Lease and without waiving any default by Tenant under this Lease, if Tenant fails or neglects to diligently proceed with addressing a Spill for which it is responsible, Landlord will have the right, but not the obligation, to take such action as Landlord deems necessary or advisable to cleanup, remove, resolve or minimize the impact of or otherwise deal with any Spill on or from the Premises and Tenant shall, on demand, pay to Landlord all costs and expenses incurred by Landlord in connection with any action taken in connection therewith by Landlord. Notwithstanding the

foregoing, Tenant shall not be liable for any Spills which are caused by the acts or omissions of the Landlord or its employees, agents or visitors.

(b) Tenant shall permit the Landlord to cause the Premises to be tested and inspected in connection with the preparation of a Phase II environmental report provided that (i) Landlord provides Tenant two (2) days' notice prior to any testing, (ii) the testing shall not interfere with Tenant's use of the Premises, (iii) Landlord shall cause the investigating party to execute a Phase II Access Agreement (as defined in the Non-Invasive Inspection Agreement) and (iv) the scope of tests to be performed shall be subject to Tenant's prior approval, as set forth in the Phase II Access Agreement. In the event that the Phase II environmental report identifies an issue which requires remediation, then Landlord, at its sole cost and expense, shall cause such issue to be remediated, provided that such remediation work shall not be performed by Landlord prior to the Termination Date (other than in the case of an emergency situation or as required by law, in either case Landlord shall work with Tenant as to the scope of work so as not to interrupt Tenant's business operations), provided further that in the event that such environmental issue (as identified in the Phase II environmental report) affects an adjacent property, then Tenant shall bear the cost of remediating such issues as permitted by applicable environmental laws. Fifty percent (50%) of the Tenant costs to make such remediation on the adjacent property shall be applied to the Repair/Capital Threshold in the year the work is completed and paid for.

(c)    During the Term of this Lease, Tenant shall remain responsible for all maintenance, repair or abatement required, including replacement, or any other action or expense related to existing asbestos in the Premises, to the extent such maintenance, repair or abatement is required due to the actions or inactions of Tenant. Tenant shall indemnify Landlord against all asbestos related claims during the Term of the Lease pursuant to the indemnifications provisions in Section 22(a). Notwithstanding the foregoing, Tenant shall not be responsible for removal or abatement of existing asbestos at the expiration or earlier termination of this Lease.

**35.    Side Letter.**    Pursuant to the PSA, Tenant, as seller, and Landlord, as buyer, entered into a Side Letter agreement pertaining to drainage and utilities relative to Parcels 1, 3, 4 and 5 and the Side Letter survived the closing and terminates upon certain conditions contained therein.

**[Signatures appear on the following pages]**

**IN WITNESS WHEREOF,** Landlord and Tenant have executed and delivered this Lease to each other as of the Effective Date.

TENANT:

**SEARS, ROEBUCK AND CO.,** a New York corporation

By: _____

Name: Robert A. Riecker
Title: Chief Financial Officer

[Signature page to Garland, TX Lease (Parcel 1 = 1501 Kings Road (#8907); and Parcel 3 = 3 Kings Road (which also has an address of 1617 Kings Road), (#8157))]

**LANDLORD:**

**ELM CREEK REAL ESTATE, LLC,**
a Texas limited liability company

By: _____
     Michael Montgomery, Manager

## EXHIBIT A-1

## Legal Description

Tract 1: (1501 Kings)

Being Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland, Dallas County, Texas, according to the plat recorded in Volumes 78041, Page 409, Map Records, Dallas County, Texas.

WEIL:\98522389\2\73219.0007

## EXHIBIT A-2

## Legal Description

Tract 3: (3 Kings)

Being Lot 3, Block 1, Sears-Miller Replat an addition to the City of Garland, Dallas County, Texas, according to the plat recorded under Clerk's File No. 201300020593, Real Property Records, Dallas County, Texas.

WEIL:\96522389\2\73219.0007

## EXHIBIT B-1

### Premises

The "**Premises**" means the entirety of the Property together with all improvements located thereon.

WEIL:\96522389\2\73219.0007

## EXHIBIT B-2

### Premises

The "**Premises**" means the entirety of the Property together with all improvements located thereon.

WEIL:\96522389\2\73219.0007

## SCHEDULE 1

### Annual Fixed Rent

| Lease Year | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1 | $854,750.00 | $71,229.12 |
| 2 | $854,750.00 | $71,229.12 |
| 3 | $854,750.00 | $71,229.12 |
| 4 | $854,750.00 | $71,229.12 |
| 5 | $854,750.00 | $71,229.12 |
| **If Exercised, Extension Term:** | | |
| 6 | $986,250.00 | $82,187.50 |
| 7 | $986,250.00 | $82,187.50 |
| 8 | $986,250.00 | $82,187.50 |
| 9 | $986,250.00 | $82,187.50 |
| 10 | $986,250.00 | $82,187.50 |

WEIL:\96522389\2\73219.0007

**Stream Realty Partners - DFW, L.P.**
14901 Quorum Dr.
Dallas, TX 75254
469-298-3301

| Invoice #: | SEARS12319 |
|---|---|
| Date: | 01/21/19 |

**Bill to:**

Sears, Roebuck and Co.
3333 Beverly Rd. Dept. 824RE
Hoffman Estates, Illinois 60179

**_Payment payable to:_**

Garland Kings, LLC c/o Stream Realty Partners

**_Payment due upon receipt_**

** Taxes due January 31st, 2019

**Send to:**

Garland Kings c/o Stream Realty Partners
14901 Quorum Dr. #
Dallas, TX 75254

| Description | Amount |
|---|---|
| Reimbursement for 2018 Real Estate Taxes for the following parcels: | |
| | |
| 3 Kings Road | |
|     Dallas County Tax Office | $7,186.38 |
|     Garland ISD | $15,981.89 |
|     City of Garland | $7,712.90 |
| 1501 Kings Road | |
|     Dallas County Tax Office | $39,075.47 |
|     Garland ISD | $86,900.51 |
|     City of Garland | $41,938.43 |
| 1602 Kings Road | |
|     Dallas County Tax Office | $13,410.07 |
|     Garland ISD | $29,822.84 |
|     City of Garland | $14,392.58 |
| **TOTAL** | **$256,421.07** |



# DALLAS COUNTY TAX OFFICE
### JOHN R. AMES, CTA
TAX ASSESSOR/COLLECTOR

1201 Elm Street, Suite 2600
Dallas, Texas 75270
www.dallascounty.org/tax | 214-653-7811
email: propertytax@dallascounty.org

## 2018 TAX STATEMENT

ELM CREEK REAL ESTATE LLC
4641 NALL RD
DALLAS, TX 75244-4618

**Account:** 26512600010010000

Property Description:

1501 KINGS RD, CG

SEARS INDUSTRIAL DISTRICT 2
BLK 1 LT 1 ACS 13.2709
INT201800104350 DD04182018 CO-DC
5126000100100      2CG51260001

Statement Date:   December 05, 2018

| | |
|---|---|
| Land Value: | 1,734,240 |
| Improvement Value: | 4,217,850 |
| Agriculture Value: | 0 |
| Market Value: | 5,952,090 |

| Jurisdiction | Taxable Value | Tax Rate | Tax Due |
|---|---|---|---|
| DAL CNTY | 5,952,090 | .243100 | $14,469.53 |
| HOSP DIST | 5,952,090 | .279400 | $16,630.14 |
| COLL DIST | 5,952,090 | .124000 | $7,380.59 |
| SCH EQUAL | 5,952,090 | .010000 | $595.21 |

| | | | |
|---|---|---|---|
| Total taxes for account: | $39,075.47 | Pay taxes online at: | **Total Due If Paid By January 31, 2019** |
| Previous payment on account: | $39,075.47 | www.dallascounty.org/tax | **$0.00** |

### *Your check may be converted to electronic funds transfer*
## Return This Portion With Your Payment

**Account:** 26512600010010000

2

020605010206000000010000010000000011800000000006

| IF PAID IN | P&I | TOTAL DUE |
|---|---|---|
| Feb | | $0.00 |
| Mar | | $0.00 |

**Total Due If Paid By January 31, 2019**
**$0.00**
Amount Paid: $ _____

Remit To:
**John R. Ames, CTA**
**P O Box 139066**
**Dallas, Texas 75313-9066**

ELM CREEK REAL ESTATE LLC
4641 NALL RD
DALLAS, TX 75244-4618

v15.1.65



# DALLAS COUNTY TAX OFFICE
**JOHN R. AMES, CTA**
TAX ASSESSOR/COLLECTOR

1201 Elm Street, Suite 2600
Dallas, Texas 75270
www.dallascounty.org/tax | 214-653-7811
email: propertytax@dallascounty.org

## 2018 TAX STATEMENT

ELM CREEK REAL ESTATE LLC
4641 NALL RD
DALLAS, TX 75244-4618

**Account:** 26512610010030000

Property Description:

3 KINGS RD, CG

SEARS-MILLER
BLK 1 LT 3 ACS 7.978
INT201800104350 DD04182018 CO-DC
5126100100300     2CG51261001

Statement Date:   December 05, 2018

| Land Value: | 1,042,560 |
|---|---|
| Improvement Value: | 52,090 |
| Agriculture Value: | 0 |
| Market Value: | 1,094,650 |

| Jurisdiction | Taxable Value | Tax Rate | Tax Due |
|---|---|---|---|
| DAL CNTY | 1,094,650 | .243100 | $2,661.09 |
| HOSP DIST | 1,094,650 | .279400 | $3,058.45 |
| COLL DIST | 1,094,650 | .124000 | $1,357.37 |
| SCH EQUAL | 1,094,650 | .010000 | $109.47 |

| | | | |
|---|---|---|---|
| Total taxes for account: | $7,186.38 | Pay taxes online at: | **Total Due If Paid By January 31, 2019** |
| Previous payment on account: | $7,186.38 | www.dallascounty.org/tax | **$0.00** |

*Your check may be converted to electronic funds transfer*
## Return This Portion With Your Payment

**Account:** 26512610010030000

2   020605010206010000100003000000011800000000003

| IF PAID IN | P&I | TOTAL DUE |
|---|---|---|
| Feb | | $0.00 |
| Mar | | $0.00 |

**Total Due If Paid By January 31, 2019**
**$0.00**
Amount Paid: $

Remit To:
**John R. Ames, CTA**
**P O Box 139066**
**Dallas, Texas 75313-9066**

ELM CREEK REAL ESTATE LLC
4641 NALL RD
DALLAS, TX 75244-4618

v15.1.65

GDS - NetTAX

http://taxserv.garlandisd.net/newtax_receipt.aspx

RECEIPT FOR TAX PAYMENT
DATE: 11/26/2018                JES - 181127B
GARLAND INDEPENDENT SCHOOL DISTRICT

901 W. STATE STREET
P.O. BOX 461407

```
                                    0000355512
                                    PROPERTY DESCRIPTION
                                    26512610010030000
                                    SEARS-MILLER
                                    BLK 1 LT 3 ACS 7.978
                                    INT201800104350 DD04182018 CO-
ENTITY      TAX RATE    NET VALUE   AMT PAID
909         1.460000    1,094,650   15,981.89


            ELM CREEK REAL ESTATE LLC      YEAR PAID : 2018
                                           TAXES PAID:15,981.89
            4641 NALL RD                   INTEREST  :   0.00
            DALLAS, TX 75244-4618          PENALTY   :   0.00
                                           ATTY FEES :   0.00
                                           OTHER:        0.00
                                           --------------------------
                                           AMT PAID :15,981.89
                                           --------------------------
```

CHECK NO: 100223946        PAYER: REPUBLIC TITLE OF TEXAS INC

11/26/2018, 1:31 PM

DUPLICATE RECEIPT FOR TAX PAYMENT

DATE:   11/26/2018                          JES  181127B

GARLAND INDEPENDENT SCHOOL DISTRICT
901 W. STATE STREET                    0000140859
P.O. BOX 461407                        PROPERTY DESCRIPTION
GARLAND, TEXAS  75046-1407             26512600010010000
(972)494-8570                          KINGS RD                        1501
                                       SEARS INDUSTRIAL DISTRICT 2
ENTITY   TAX RATE   NET VALUE   AMT PAID   BLK 1 LT 1 ACS 13.2709
 909     1.460000   5,952,090   86,900.51

                                       INT201800104350 DD04182018 CO-
                                       ACRES:       0.0000

                                       YEAR PAID : 2018
                                       TAXES PAID:        86,900.51
        ELM CREEK REAL ESTATE LLC      INTEREST  :             0.00
                                       PENALTY   :             0.00
        4641 NALL RD                   ATTY FEES :             0.00
        DALLAS, TX  75244-4618         OTHER FEES:             0.00
                                       ─────────────────────────────
                                       AMT PAID  :        86,900.51

CHECK NO:  100223945         PAYER:  REPUBLIC TITLE OF TEXAS INC

City of Garland Tax Office

P.O. Box 462010

Garland, TX  75046-2010
(972)205-2410
ADDRESS CORRECTION REQUESTED

**ACCOUNT**          CAD NUMBER
**0000163827**        26512600010010000
Property Owner
    ELM CREEK REAL ESTATE LLC

    4641 NALL RD
    DALLAS, TX 75244-4618

2018 ONLINE TAX STATEMENT
12/04/2018
RETAIN THIS PORTION FOR YOUR RECORDS

**TO PAY ONLINE, SIGN UP FOR EMAIL STATEMENTS,
PRINT A DUPLICATE RECEIPT, OR TO VIEW PAYMENT
HISTORY, GO TO http://www.texaspayments.com**
PROPERTY DESCRIPTION
    1501 KINGS RD
SEARS INDUSTRIAL DISTRICT 2
BLK 1 LT 1 ACS 13.2709

INT201800104350 DD04182018 CO-

| LAND VALUE | IMPROVEMENT VALUE | MINERAL VALUE | PERSONAL PROPERTY | TOTAL APPRAISED/ASSESSED |
|---|---|---|---|---|
| 1,734,240 | 4,217,850 | | | 5,952,090 |

| TAXING ENTITY | HOMESTEAD EXEMPTION | OVER 65/ DISABLED | DISABLED VETERAN | CAP ADJ/AG DEFERRAL/OTHER | TAXABLE VALUE | TAX RATE | TAX AMOUNT DUE |
|---|---|---|---|---|---|---|---|
| CITY OF GARLA | | | | | 5,952,090 | 0.704600 | 0.00 |

TAXPAYERS WITH AN OVER 65 EXEMPTION, A
DISABILITY EXEMPTION, OR A DISABLED VETERANS
EXEMPTION ON YOUR HOMESTEAD QUALIFY FOR AN
INSTALLMENT PLAN ON THEIR RESIDENCE HOMESTEAD.
PLEASE CALL FOR DETAILS (972)205-2410.

| TOTAL DUE | $ | 0.00 |
|---|---|---|
| AMOUNT DUE IF PAID IN: | | |
| FEBRUARY ( 7%) | $ | 0.00 |
| MARCH ( 9%) | $ | 0.00 |
| APRIL (11%) | $ | 0.00 |
| MAY (13%) | $ | 0.00 |
| JUNE (15%) | $ | 0.00 |

TAXES ARE DUE UPON RECEIPT AND BECOME DELINQUENT FEBRUARY 1, 2019
MAKE CHECKS PAYABLE TO:
City of Garland Tax Office
P.O. Box 462010

Garland, TX  75046-2010
(972)205-2410
PROPERTY DESCRIPTION
    1501 KINGS RD
SEARS INDUSTRIAL DISTRICT 2
BLK 1 LT 1 ACS 13.2709

INT201800104350 DD04182018 CO-
    ELM CREEK REAL ESTATE LLC

    4641 NALL RD
    DALLAS, TX 75244-4618

RETURN THIS PORTION WITH YOUR PAYMENT

2018 ONLINE TAX STATEMENT   12/04/2018

CAD NUMBER:  26512600010010000
**ACCT NO   :   0000163827**
MTG CODE  :

| **TOTAL DUE**   :   **$** | | **0.00** |
|---|---|---|
| **DELINQUENCY DATE:** | **02/01/2019** | |
| AMOUNT DUE IF PAID IN: | | |
| FEBRUARY ( 7%) | $ | 0.00 |
| MARCH ( 9%) | $ | 0.00 |
| APRIL (11%) | $ | 0.00 |
| MAY (13%) | $ | 0.00 |
| JUNE (15%) | $ | 0.00 |

City of Garland Tax Office

P.O. Box 462010

Garland, TX  75046-2010
(972)205-2410
ADDRESS CORRECTION REQUESTED

2018 ONLINE TAX STATEMENT
12/04/2018

RETAIN THIS PORTION FOR YOUR RECORDS



**TO PAY ONLINE, SIGN UP FOR EMAIL STATEMENTS,
PRINT A DUPLICATE RECEIPT, OR TO VIEW PAYMENT
HISTORY, GO TO http://www.texaspayments.com**

| ACCOUNT | CAD NUMBER |
|---|---|
| **0000271791** | 26512610010030000 |

Property Owner
ELM CREEK REAL ESTATE LLC

4641 NALL RD
DALLAS, TX 75244-4618

PROPERTY DESCRIPTION
    3  KINGS RD
SEARS-MILLER
BLK 1 LT 3 ACS 7.978

INT201800104350 DD04182018 CO-

| LAND VALUE | IMPROVEMENT VALUE | MINERAL VALUE | PERSONAL PROPERTY | TOTAL APPRAISED/ASSESSED |
|---|---|---|---|---|
| 1,042,560 | 52,090 | | | 1,094,650 |

| TAXING ENTITY | HOMESTEAD EXEMPTION | OVER 65/ DISABLED | DISABLED VETERAN | CAP ADJ/AG DEFERRAL/OTHER | TAXABLE VALUE | TAX RATE | TAX AMOUNT DUE |
|---|---|---|---|---|---|---|---|
| CITY OF GARLA | | | | | 1,094,650 | 0.704600 | 0.00 |

TAXPAYERS WITH AN OVER 65 EXEMPTION, A
DISABILITY EXEMPTION, OR A DISABLED VETERANS
EXEMPTION ON YOUR HOMESTEAD QUALIFY FOR AN
INSTALLMENT PLAN ON THEIR RESIDENCE HOMESTEAD.
PLEASE CALL FOR DETAILS (972)205-2410.

| TOTAL DUE | | $ | 0.00 |
|---|---|---|---|
| AMOUNT DUE IF PAID IN: | | | |
| FEBRUARY | ( 7%) | $ | 0.00 |
| MARCH | ( 9%) | $ | 0.00 |
| APRIL | (11%) | $ | 0.00 |
| MAY | (13%) | $ | 0.00 |
| JUNE | (15%) | $ | 0.00 |

TAXES ARE DUE UPON RECEIPT AND BECOME DELINQUENT FEBRUARY  1, 2019

MAKE CHECKS PAYABLE TO:
City of Garland Tax Office
P.O. Box 462010

Garland, TX  75046-2010
(972)205-2410
PROPERTY DESCRIPTION
    3  KINGS RD
SEARS-MILLER
BLK 1 LT 3 ACS 7.978

INT201800104350 DD04182018 CO-
    **ELM CREEK REAL ESTATE LLC**

    **4641 NALL RD**
    **DALLAS, TX 75244-4618**

RETURN THIS PORTION WITH YOUR PAYMENT

2018 ONLINE TAX STATEMENT   12/04/2018

CAD NUMBER:  26512610010030000
**ACCT NO  :  0000271791**
MTG CODE  :

| **TOTAL DUE** | **:** | **$** | **0.00** |
|---|---|---|---|
| **DELINQUENCY DATE:** | | **02/01/2019** | |
| AMOUNT DUE IF PAID IN: | | | |
| FEBRUARY | ( 7%) | $ | 0.00 |
| MARCH | ( 9%) | $ | 0.00 |
| APRIL | (11%) | $ | 0.00 |
| MAY | (13%) | $ | 0.00 |
| JUNE | (15%) | $ | 0.00 |

### **Exhibit 3: Calculation of 502(B)(6) Claim**

Property: 1501 Kings Road and 3 Kings Road in Garland, Texas

| MONTHS | BASE RENT | MONTHLY TOTAL | TOTAL |
|---|---|---|---|
| 5/19-4/20 | $71,229.12 | $71,229.12 | $854,749.44 |

*502(B)(6) Calculation*

1. Unpaid Rent as of Petition Date

    $0[1]

2. Plus the greater of:

    **One Year's Rent:**                                        $854,749.44
    5/19-4/20 at $71,229.12/month

    -or-

    **15% of Remaining Rent:**
    5/19-4/22 at $71,229.12/month:          $2,564,248.32
    Total Remaining Rent:                          $2,564,248.32
                                                          X          0.15
    15% of Total Remaining Rent:             $384,637.25

---

[1] The Debtor owes $198,795.58 for the 2018 *ad valorem* real property taxes, which amount came due post-petition. Elm Creek will be filing an application for an administrative expense claim for this amount; however, to the extent such amount is not allowed as an administrative expense claim, then Elm Creek hereby includes the $198,795.58 owed for *ad valorem* real estate taxes in this Claim.

# Electronic Proof of Claim_OWEGZ27384

Final Audit Report                                                    2019-09-13

| | |
|---|---|
| Created: | 2019-09-13 |
| By: | Sears Claims (searsclaims@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAdJWfceWtFolfQ0_NS_6AGZSKAn_JNe3R |

## "Electronic Proof of Claim_OWEGZ27384" History

Web Form created by Sears Claims (searsclaims@primeclerk.com)
2019-09-13 - 9:12:26 PM GMT

Michael Montgomery (mhayward@haywardfirm.com) uploaded the following supporting documents:
  Attachment
2019-09-13 - 9:18:59 PM GMT

Web Form filled in by Michael Montgomery (mhayward@haywardfirm.com)
2019-09-13 - 9:18:59 PM GMT- IP address: 75.51.220.81

(User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/76.0.3809.132 Safari/537.36)
2019-09-13 - 9:19:03 PM GMT- IP address: 75.51.220.81

Signed document emailed to Sears Claims (searsclaims@primeclerk.com) and Michael Montgomery (mhayward@haywardfirm.com)
2019-09-13 - 9:19:03 PM GMT