# EXHIBIT C

# CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE

DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

———

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1036

WRITER'S EMAIL ADDRESS
pzumbro@cravath.com

KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
MARGARET SEGALL D'AMICO
RORY A. LERARIS
KARA L. MUNGOVAN

NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG

———

SPECIAL COUNSEL
SAMUEL C. BUTLER

———

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

February 19, 2020

Re: Notice of Intended Litigation and Settlement Offer
In re: Sears Holding Corporation, *et. al.*, Bankr. Case No. 18-23538 (RDD)
Chapter 11, Filed October 15, 2018

Dear Mr. Reisman:

I write on behalf of my client Stanley Black & Decker, Inc. (together with its subsidiaries, "**SBD**"), which is in receipt of your letter dated January 27, 2020 (the "**Letter**") regarding the *Notice of Intended Litigation and Settlement Offer* related to certain alleged preference claims arising from the Sears chapter 11 cases (the debtors in such cases, the "**Debtors**"). As discussed in more detail below, the assertion of a preference demand against SBD is contrary to the terms of the Confirmation Order (as defined below) entered by the bankruptcy court overseeing the chapter 11 cases (the "**Court**"), and SBD has strong defenses to the alleged preference claims asserted in the Letter. Accordingly, SBD rejects the proposed settlement offer and demands that the Debtors drop the alleged preference claims.

   A.   **Background**

In order to address the Debtors' apparent administrative insolvency, the Debtors solicited their administrative claim holders, including SBD, to accept less than full payment for their administrative expense claims, as the Debtors would not otherwise be able to confirm a plan under confirmation provisions of title 11 of the United States Code (the "**Bankruptcy Code**"). To induce the administrative creditors to agree to this unusual request, the Debtors made certain promises, including "Expedited Reconciliation" of the claims of those creditors who agreed to "opt in" to the Consent Program (as defined below). Importantly, the "Expedited Reconciliation" promised under the Debtors' Court-approved solicitation materials [Docket No. 5370-3] expressly includes reconciliation of not only administrative expense claims but also "**any exposure on account of preference actions**". *See* Confirmation Order ¶ 52(a)(3). Relying on this promise, SBD agreed to the Debtors' request and opted into the Consent Program.

For the Debtors to have accepted the benefits of SBD's agreement to participate the Consent Program and SBD's agreement to further reduce the amount of its asserted administrative expense claims as part of the "Expedited Reconciliation" component of the Consent Program, and then to turn around and make an approximately $5 million preference demand upon SBD is outrageous. SBD demands that you immediately withdraw the claims asserted in the Letter because the claims violate the terms of the Confirmation Order and SBD possesses viable defenses against the total asserted amounts.

> B. **The Preference Claims Demand Violates the Terms of the Confirmation Order**

The Debtors' asserted preference claims violate the terms of the Confirmation Order, under which administrative expense claims and preference claims of claimants who, like SBD, accommodated the Debtors by "opting-in" to the Consent Program, were to be resolved together.

On October 15, 2019, the Court entered the *Order (i) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors and (ii) Granting Related Relief* [Docket No. 5370] (the "**Confirmation Order**"). The Confirmation Order incorporates the terms of the Debtors' Administrative Expense Claims Consent Program (the "**Consent Program**"), which was designed to address the Debtors' apparent administrative insolvency. The Consent Program expressly provides that the consensual reconciliation of the administrative claims amounts contemplated by the Consent Program includes "**any exposure on account of preference actions**". *See* Confirmation Order ¶ 52(a)(3).[1]

SBD timely opted-in to the Consent Program on November 25, 2019. On December 1, the Debtors sent SBD a request for information supporting SBD's asserted administrative expense claims. The Debtors requested both a list of unpaid invoices supporting SBD's claims, and a list of payments received from the Debtors during the preference period, which information SBD understood based on the language of the Confirmation Order would be used to reach a definitive settlement of both the administrative expense claims and any potential preference claims. SBD duly compiled the requested information and included in its December 11 response a complete list of payments it had received.

At the December 13, 2019 Omnibus Hearing (the "**Hearing**"), the Debtors confirmed that administrative expense claims and preference claims would be resolved concurrently when the Debtors' counsel represented to the Court that the Debtors would "factor in whether or not there

---

[1] "Each holder of an Allowed Administrative Expense Claim against the Debtors that does not opt-out . . . shall . . . receive . . . consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the Opt-In/Opt-Out Deadline . . . ". Although SBD duly opted in to the Consent Program, pursuant to the *Notice Regarding Initial Distribution Pursuant to Administrative Expense Claims Consent Program* [Docket No. 6186], the Debtors unilaterally (and improperly) deemed SBD to be a holder of Non Opt-Out Settled Admin Claims. Accordingly, the non-opt out provisions of the Confirmation Order are cited.

was potential preference liability into the overall settlement" amount of administrative expense claims asserted by parties who like SBD, had opted into the Consent Program. *See* Dec. 13, 2019 Hr'g Tr. at 15:15–17.

Following the Hearing, on December 16, 2019, SBD began settlement discussions with the Debtors regarding the reconciliation of SBD's administrative expense claims. On December 22, the Debtors sent SBD proposed settlement amounts. On January 7, 2020, SBD sent an email to the Debtors accepting the Debtors' proposed amounts (which were lower than those shown in SBD's records), stating that although SBD did not agree with the Debtors' numbers, SBD was willing to accept the lower amounts as a full settlement in order to avoid spending any further time or expense on reconciliation. On January 9, the Debtors confirmed with SBD that the agreed upon claim amounts constituted "full and final satisfaction of all administrative and priority claims" held by SBD and such claims would be considered "Non-Opt Out Settled Admin Claims" (as defined in the Confirmation Order). In reaching this "full and final satisfaction", the Debtors specifically referenced the Confirmation Order and the provisions of the Consent Program relating to settling administrative claims; the same section which states that "consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (includ[es] . . . 503(b)(9) and 503(b)(1) issues . . . and any exposure on account of preference actions)". During the course of the settlement discussions with SBD, after requesting detailed information as to prepetition transfers— which SBD provided—and stating in open court that preference claims would be a part of the administrative claims settlements, the Debtors asserted no preference claims against SBD either directly or as an asserted amount to be netted or offset against the consensually agreed administrative claim amount pursuant to the claims reconciliation process contemplated by the Confirmation Order.

Under the terms of the Consent Program, the Debtors had a duty to raise any preference claims during these settlement discussions to allow SBD to consider the resolution of such potential claims during the negotiations over the resolution of SBD's administrative expense claims. Combining the Debtors' failure to raise any preference claims issues with the Debtors' counsel's representations that the Debtors "did factor in whether or not there was potential preference liability into the overall settlement" amount of the administrative expense claims, SBD reasonably relied on the Debtors' lack of assertion of preference claims exposure during the course of the overall claims reconciliation process in agreeing to the Debtors' proposed reductions to administrative expense claims asserted by SBD. SBD would not have agreed to the settlement if SBD believed the Debtors would later assert preference claims. For the Debtors to now make a settlement demand upon SBD for approximately $5 million of alleged preference exposure— significantly more than the entire $3.15 million agreed amount of SBD's administrative claim—is not only unfair dealing, but is also a violation of the letter and spirit of the Confirmation Order.

### C.    SBD's Defenses Against the Alleged Preference Claims

Putting aside the fact that the preference demand violates the Confirmation Order, SBD has strong defenses to the asserted preferences under applicable law, including based on the doctrines of ordinary course and subsequent new value.

As a threshold matter, two payments—$1,203,127.67 dated August 24, 2018 and $393,178.00 dated September 17, 2018 (collectively, the "**PSA Payments**")—are erroneously

scheduled as payments by and on account of the antecedent indebtedness of Kmart Corporation ("**Kmart**"). Under section 547(b) of the Bankruptcy Code, a preference must be a transfer made to a creditor for an "antecedent debt **owed by the debtor**". Each of the PSA Payments arose from the sale of the Craftsman business to SBD pursuant to a series of contracts to which Kmart was not a party. The $1,203,127.67 payment was a working capital adjustment made pursuant to the Craftsman Purchase and Sale Agreement dated January 5, 2017 (the "**Craftsman PSA**"). The $393,178.00 payment was a Quarterly Warranty True-up Payment (as defined in the Craftsman PSA) stemming from the sale of Craftsman products by Sears, Roebuck and Company ("**Sears**"). Kmart was not the obligor in respect of any of these payments. Accordingly, for the purposes of its affirmative defenses and in accordance with section 547, SBD has analyzed the PSA Payments as having been made by Sears, not Kmart as incorrectly indicated in the Letter.

Ordinary Course of Business

Under section 547(c)(2) of the Bankruptcy Code, the Debtors may not avoid transfers made to SBD to the extent such transfers were made in the ordinary course of business or according to ordinary business terms. 11 U.S.C. § 547(c)(2). For the first prong, the Second Circuit applies a subjective test that focuses on the prior dealings between the debtor and the transfer recipient. *In re Carrozzella & Richardson*, 247 B.R. 595, 603 (B.A.P. 2d Cir. 2000). The test is satisfied if the transfer was initiated as payment for a service or delivery of goods that the transfer recipient has repeatedly performed in the past, and according to terms customary to the relationship between the parties. *In re Enron Creditors Recovery Corp.,* 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007). The second prong requires an objective test that looks to the customs of similarly situated parties in the same industry. *In re Roblin Indus., Inc.*, 78 F.3d 30, 41 (2d Cir. 1996). In order to establish a successful preference defense the creditor needs to satisfy either one of the two prongs. *In re M. Fabrikant & Sons, Inc.,* No. 06-12737 SMB, 2010 WL 4622449, at *3 (Bankr. S.D.N.Y. Nov. 4, 2010).

The Debtors' preference period transfers to SBD were consistent with the prepetition ordinary course dealings between the parties. The transfers made by Kmart and Sears described in the Letter were each payments made in the ordinary course consistent with that respective Debtor's long-standing payment practices with SBD. In the 12 months prior to the preference period, SBD offered two payment terms to Kmart and Sears: one term requiring payment within 50 days, and the other (offered starting April 2018) requiring payment within 52 days but offering a discount for payment within 35 days. In the pre-preference period from July 2017 to July 2018, the average number of days between invoice and payment date was: (1) 41.9 days for Kmart and 38.9 days for Sears under for the 52-day payment term; and (2) 62.5 days for Kmart and 64.2 days for Sears under for the 50-day payment term. Comparing the average payment window for each payment term in the historical period with the average payment period in the preference period, the alleged preference transfers fall squarely in line with the "baseline of dealings" required to be ordinary course payments. *In re M. Fabrikant & Sons, Inc.,* at *3 (quoting *Ellenberg v. Tulip Prod. Polymerics, Inc. (In re T.B. Home Sewing Enters., Inc.)*, 173 B.R. 782, 788 (Bankr. N.D. Ga. 1993)).

With respect to Kmart, the Debtors identified 21 transfers made during the preference period. SBD's records reflect that 19 transfers totaling $341,630.66 are tied to SBD invoices, while 2 transfers totaling $1,596,305.67 are in fact related to the Craftsman PSA and for which

Kmart was not an obligor as explained above. All 19 transfers tied to invoices were made under the 52-day payment term. For these 19 transfers, the average payment window (between invoice date and payment date) was 43.6 days. As noted above, the average payment window under the 52-day payment term was 41.9 days. The difference between the average in the pre-preference period and the preference period is less than 2 days. As such, the 19 identified transfers were clearly ordinary course transfers and zero dollars are subject to avoidance under section 547(c)(2).

Regarding Sears, the Debtors identified 66 transfers made during the preference period totaling $3,551,172.06. Sixty-five of the 66 payments were made under the 52-day payment term and one payment was made under the 50-day term. For the 65 preference period transfers under the 52-day payment term, the average payment window was 38.5 days. The average payment window under the 52-day payment term in the pre-preference period was 38.9 days. The average payment windows in the pre-preference period and in the preference period are almost identical. Under the 50-day payment term, Sears made one payment in the amount of $170.70 in the preference period. Sears made the $170.70 payment 36 days after receiving SBD's invoice. The 36-day payment window differs widely from the average pre-preference period payment window of 64.2 days for 50-day payment term. Putting aside the Confirmation Order and SBD's other affirmative defenses, this $170.70 payment would be the sole payment potentially subject to avoidance under the ordinary course of business timeliness analysis. As explained below, however, this payment is offset by the subsequent new value SBD provided to Sears.[2]

The PSA Payments are also unavoidable under the ordinary course defense. Both Sears and SBD engaged in the distribution and sale of products in the consumer goods industry. Sears made the PSA Payments pursuant to the Craftsman PSA, which the parties executed over a year and a half prior to the petition date. During this time, Sears paid SBD a working capital adjustment and a series of warranty true-ups under the terms of the Craftsman PSA, as had been expected and planned for by the parties. Under the objective element, the payments made in connection with the Craftsman transaction are ordinary in the consumer goods industry. It is a common, if not constant, feature of asset sale agreements particularly involving consumer goods inventory, to include provisions for a working capital adjustments and other forms of price true-ups. Even assuming, arguendo, that the $1,203,127.67 working capital adjustment payment is not an ordinary course payment, it is in any event fully covered by the subsequent new value defense described below.

With respect to the warranty true-up payment specifically, the $393,178.00 payment also qualifies as ordinary course as part of a regularly scheduled and administered agreement that had been in place for over a year and remained substantively unchanged throughout that time. The warranty true-up payments were based on a comparison between warranty claims projected at the

---

[2] In addition to the timing element weighing strongly in SBD's favor for the invoice payments, the other factors courts consider also indicate that the transfers are ordinary course. For instance, SBD did not begin using any collection methods, such as letters or telephone calls, that it did not employ before; nor did the payments occur under any unusual circumstances. *Cf. In re Cyberrebate.com, Inc.*, 296 B.R. 639 (Bankr. E.D.N.Y. 2003) (circumstances and collection practices were unusual because the creditor started using persistent phone calls to pressure the debtor into paying).

time the parties executed the Craftsman PSA, and actual warranty claims incurred based on Sears' net sales each quarter. Starting in Q2 2017, Sears calculated the amounts due to SBD for each quarter and confirmed such amounts through letters to SBD, following which confirmation the warranty true-up payment for each quarter was made by Sears to SBD. The last of these quarterly letters arrived in August 2018 and Sears confirmed the $393,178.00 payment due for Q2 2018. Sears delivered that payment in September 2018. There was no change in the timing or system for calculating and delivering these payments, and even the payment amounts remained similar (hovering around $400,000.00 throughout) before and during the preference period.

Therefore, as whole, under section 547(c)(2), all of the payments scheduled in the Letter, save for one transfer for $170.70 (and potentially the $1,203,127.67 working capital adjustment payment), fall within the ordinary course and cannot be avoided as preferences independent of other defenses. But as explained below, this entire amount is unavoidable because of subsequent new value SBD provided to the Debtors.

Subsequent New Value

Independent of and in addition to the foregoing defenses, under section 547(c)(4) of the Bankruptcy Code, the Debtors may not avoid transfers made to SBD to the extent SBD gave new value after such transfer. 11 U.S.C. § 547(c)(4). Courts in the Second Circuit apply the "subsequent advance rule", which "contemplates carrying forward the net balance of prior preferences in determining the effect of subsequent value on the total preference claimed". *See Baumgold Bros. v. O.Censor & Co. (In re Baumgold Bros.)*, 103 B.R. 436, 440 (Bankr. S.D.N.Y. 1989). The new value can still be credited against the payments in the preference period even if it has already been paid. *Van Dyck/Columbia Printing v. Katz*, 289 B.R. 304, 315 (D. Conn. 2003). Therefore, any subsequent shipment of goods on credit to the Debtors—even if paid—can be netted against the alleged preferences.

SBD provided new value to the Debtors that effectively eliminates any potential preference exposure. SBD continued to provide goods on credit to the Debtors following the first payments described in the Letter.

The Debtors identified 19 payments made by Kmart beginning on July 18, 2018 in the aggregate amount of $341,630.66 (excluding the PSA Payments). Beginning on July 18, 2018, SBD shipped goods to Kmart with an aggregate value of $418,126.86. Under the subsequent advance rule, SBD may only apply the value of goods shipped against payments made prior to that shipment. Thus, while the aggregate value of the goods shipped after the first identified preference period payment is greater than the aggregate amount of preference period payments, SBD acknowledges that due to the application of the subsequent advance rule $4,386.85 of the identified payments are not protected by a subsequent new value defense. However, this small amount is fully covered by an ordinary course defense as described above.

Regarding the 68 payments made by Sears beginning on July 17, 2018 in the aggregate amount of $5,147,477.73 (including the PSA Payments), beginning on July 17, 2018 SBD shipped goods to Sears with the aggregate value of $9,230,039.12, which under application of the subsequent advance rule leaves zero dollars of payments not protected by a subsequent new value defense.

Thus, under section 547(c)(4), only $4,386.85 of the $5,489,108.39 from payments scheduled in the Letter are potentially avoidable preferences, independent of SBD's section 547(c)(2) defenses. Combining SBD's section 547(c)(2) and 547(c)(4) defenses, none of the alleged $5,489,108.39 preference payments are subject to avoidance.

***

In sum, under the terms of the Confirmation Order the resolution of SBD's administrative expense claim also resolved any and all preference claims held by the Debtors against SBD. As a result, the Debtors' assertion of preference claims at this point directly violates the Confirmation Order. Moreover, even if those potential preference claims had not been fully resolved (and they were), those claims are subject to full and complete defenses for the reasons discussed above.

We assume the Debtors and their estates would prefer to avoid the costs associated with yet another fight with their creditors over a confirmation issue, especially given that the Court has already had to address issues related to the Debtors' practices under the Consent Program. Accordingly, we expect the Debtors to promptly confirm in writing that they are abandoning any and all preference claims against SBD, including those asserted in the Letter. Absent the Debtors withdrawing these alleged preference claims, SBD is prepared to take any and all necessary actions to protect its rights, including but not limited to filing a motion for relief with the Court to find the Debtors in contempt of the Confirmation Order and to compel the Debtors to comply with the Confirmation Order, vigorously opposing any and all attempts by Debtors to pursue their preference claims against it, and potentially seeking attorneys' fees and costs that SBD incurs in connection with the Debtors' meritless claims.

We look forward to receiving a response on or before March 4, 2020. In the meantime, we are available to meet and confer if you have any questions about the matters discussed in this letter.

Very truly yours,

Paul H. Zumbro

Steven J. Reisman, Esq.
Karen Dine, Esq.
   Katten Muchin Rosenman LLP
      575 Madison Ave, New York NY 10022
      (via email)

Copies (via email) to:

Robin Z. Weyand, Esq.
Theodore C. Morris, Esq.
    Stanley Black & Decker, Inc.
        701 E. Joppa Road, MS TW230, Towson, Maryland 21286

Ray C. Schrock, P.C.
Jacqueline Marcus, Esq.
Garrett A. Fail, Esq.
Sunny Singh, Esq.
    Weil, Gotshal & Manges LLP
        767 5th Avenue, New York NY 10153