**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| SEARS HOLDINGS CORPORATION, | ) Case No. 18-23538 (RDD) |
| *et al.*, | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |
| | ) |
| SEARS HOLDINGS CORPORATION; SEARS, | ) Adversary Proceeding |
| ROEBUCK AND CO.; AND THE OFFICIAL | ) Case No. **Refer to Summons** |
| COMMITTEE OF UNSECURED CREDITORS OF | ) |
| SEARS HOLDINGS CORPORATION, *ET AL.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| DEFENDANTS LISTED ON **EXHIBIT A,** | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

The Official Committee of Unsecured Creditors of Sears Holdings Corporation, *et al.* (the "Creditors' Committee"), acting, pursuant to the *Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors and (II) Granting Related Relief*, dated October 15, 2019 [ECF No. 5370] (the "Confirmation Order"), on behalf of Sears Holdings Corporation ("Sears Holdings") and Sears, Roebuck and Co. ("Sears Roebuck" and, collectively with Sears Holdings, the "Debtor Plaintiffs," and the Debtor Plaintiffs together with the Creditors' Committee, the "Plaintiffs"),[1] files this Complaint against the Defendants listed on **Exhibit A** to this Complaint (the "Shareholder Defendants").

---

[1] Each of the Debtor Plaintiffs was a debtor that filed for bankruptcy under chapter 11 of the U.S. Bankruptcy Code on October 15, 2018. This Complaint refers to the overall business enterprise of the Debtor Plaintiffs together with certain non-Debtor affiliates as "Sears."

## Introduction

1.      This adversary proceeding stems from the bankruptcy of Sears, Roebuck and Co. and Kmart Corporation, once American institutions and retail pioneers.

2.      By the time of their bankruptcy filings in October 2018, the Debtors[2] were woefully insolvent by billions of dollars.  This level of insolvency did not occur overnight. Instead, the Debtors' insolvency and the inevitable bankruptcy filings were the result of a years-long effort by Sear's Chief Executive Officer ("CEO") Edward "Eddie" S. Lampert ("Lampert"),[3] members of the Sears Holdings Corporation Board of Directors (the "Directors"), insider shareholders, and other culpable parties to systematically loot Sears of assets to benefit themselves and other shareholders.

3.      As a result of Lambert's and the other culpable parties' actions the Shareholder Defendants in this case received millions of dollars in benefits in the forms of stock that they received for grossly inadequate consideration or no consideration at all.

---

[2]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, LLC (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), LLC (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, LLC (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[3]Any capitalized terms not defined herein shall have those meanings ascribed to them in the First Amended Complaint filed in *Sears Holdings Corp. v. Lampert*, Adv. Proc. No. 19-08250 (RDD) (Bankr. S.D.N.Y.) [ECF No. 52] or in the Confirmation Order, as applicable.

4.      The actions and omissions of Lampert and these certain insider shareholders, directors, officers, and other culpable parties are the subject of a thirty-five count amended complaint in an adversary proceeding styled *Sears Holdings Corp. v. Lampert*, Adv. Proc. No. 19-08250 (RDD) (Bankr. S.D.N.Y.) currently pending before the Court. Four of those counts involving actual and constructively fraudulent transfers were pleaded against certain John and Jane Doe shareholders who benefitted from the actions of the culpable parties. This adversary proceeding is a companion case to the adversary proceeding commenced against Lampert and others, identifying certain John and Jane Does who received fraudulent transfers.

5.      The Shareholder Defendants profited through two transactions that are the focus of this adversary complaint: first, the spinoff of Lands' End Inc. ("Lands' End"), and second the share offering of Seritage, a real estate investment trust ("REIT"). Through these two transactions, Lampert and other culpable parties converted potentially valuable estate assets into cash and transferring these assets to them and the Shareholder Defendants at a time the Debtors were in need of these assets to operate their businesses.

6.      In April 2014, Sears Holdings spun off Lands' End to Sears Holdings's shareholders for no consideration and left Sears Holdings and Sears, Roebuck and Co. ("Sears Roebuck"), Lands' End's parent company, with unreasonably small capital and incapable of paying their existing and intended future debts.  Prior to the spin-off, Lands' End operated one of Sears's few remaining profitable businesses, having been described by *The Wall Street Journal* as one of Sears's "crown jewels." In transferring Lands' End to Sears Holdings's shareholders, Lampert, the Directors, and other culpable parties refused to consider an unsolicited third-party indication of interest that valued Lands' End at $1.6 billion (inclusive of net debt), failed even to consider a sale to an unaffiliated third party or to undertake a meaningful marketing process and refused to

increase Lands' End's borrowing to support a larger "pre-spin" dividend from Lands' End to Sears Holdings (as recommended by the lead banker). As a consequence of the transaction, Sears Holdings's shareholders including the Shareholder Defendants herein received Lands' End shares worth at least $800 million.

7.    In June and July 2015, Lampert, the Directors, and other culpable parties caused Sears Holdings to undertake a rights offering (the "Seritage Rights Offering") permitting Sears Holdings's shareholders including Shareholder Defendants herein to invest in Seritage, a newly created REIT, and a sale-and-lease-back agreement allowing Seritage to take ownership of 266 of Sears's premier retail stores for a grossly understated purchase price and to lease them back to Sears pursuant to prejudicial master-leases laden with off-market and one-sided terms (the "Seritage Real Estate Transfers," and, together with the Seritage Rights Offering, the "Seritage Transaction").

8.    The Seritage Rights Offering gave Sears Holdings's shareholders including the Shareholder Defendants herein the ability to purchase Seritage's common stock at an artificially deflated price for no consideration to Sears. The Culpable Parties intended for the subscription rights to transfer value away from Sears and to Sears Holdings's shareholders. The Sears Holdings Board achieved that goal: hundreds of millions of dollars of value were transferred from Sears Holdings to its shareholders through the distribution of the rights for no consideration.

9.    Meanwhile, despite fraudulent projections that papered over billions of dollars and losses, Sears and its related companies careened headlong into insolvency and bankruptcy. While shareholders like the Shareholder Defendants made off with millions of dollars, an American institution was left unable to survive. While it is too late to undo the complete torching of Sears,

the Shareholder Defendants must return these gains that were fraudulently obtained at the expense of the Debtors' creditors.

## **Jurisdiction**

10.     This Court has subject-matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Each of the Plaintiffs consents to the entry of a final order or judgment by the Bankruptcy Court on the causes of action asserted herein.

11.     This Court has personal jurisdiction over each of the Shareholder Defendants under Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

12.     This Court also has personal jurisdiction over each of the Shareholder Defendants under N.Y. C.P.L.R. §§ 301 and 302 because Plaintiffs' claims arise from acts by Shareholder Defendants, in person or through agents, transacting business within New York, committing tortious acts within New York and/or committing tortious acts causing injury to persons or property within New York.  At the relevant times, Sears Holdings (ticker symbol:  SHLD) was traded on the NASDAQ Stock Market ("NASDAQ"), a securities exchange located in New York.  The shares of Lands' End (ticker symbol:  LE) traded on NASDAQ and the shares of Seritage (ticker symbol: SRG) and the Seritage subscription rights traded on the New York Stock Exchange ("NYSE"), another securities exchange located in New York.  The Lands' End and Seritage Transactions both involved property owned, directly or indirectly, by Debtor Sears Roebuck, a New York corporation, including (in the case of Lands' End and Seritage) substantial interests in real property located in New York.  Each of these transactions also was accomplished through the use of lawyers, financial advisors and/or financial institutions located in New York.

13.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1409(a) and (c).

## The Parties

14.     Plaintiff Creditors' Committee is the Official Committee of Unsecured Creditors of the Debtors appointed in the chapter 11 cases by the Office of the United States Trustee and granted joint standing with the Debtors to pursue the claims and causes of action contained herein pursuant to the terms of the Confirmation Order.

15.     Debtor Plaintiffs are Debtors in the chapter 11 cases filed on the Petition Date.

16.     Plaintiff Sears Holdings is and was the direct or indirect parent of the other Debtor Plaintiff.  Sears Holdings is a borrower or guarantor of certain debt outstanding as of the Petition Date.  At all relevant times, Sears Holdings was incorporated in Delaware.

17.     Plaintiff Sears Roebuck is and was a direct subsidiary of Sears Holdings and was the parent of Lands' End until 2014.  Sears Roebuck also held title, directly or indirectly, to much of the real estate transferred in the Seritage Transaction.  At all relevant times, Sears Roebuck was incorporated in New York.

18.     Each of the Shareholder Defendants listed on **Exhibit A**[4] were shareholders of Sears Holdings or its related companies who received benefits from either the spin-off of Lands' End, the Seritage transaction, or both.

19.     Defendants ANDREW H. TISCH and the Trustee of the Andrew H. Tisch 10/10/2014 Annuity Trust (the "AHT Defendants") received benefits from either the spin-off of

---

[4]On December 7, 2018, the Court entered an *Amended Stipulated Protective Order* [ECF No. 1084] ("the Amended Protective Order"). Pursuant to the Amended Protective Order, certain entities who agreed to be bound by the order could designate discovery material produced as confidential or highly confidential. The Amended Protective Order limits the distribution of material produced as confidential or highly confidential to certain entities. Certain non-party entities that responded to subpoenas concerning the number of shares each Shareholder Defendant received designated the information as confidential or highly confidential. Accordingly, Plaintiffs are filing Exhibit A with the number of shares redacted. An unredacted version will be available to the Court, as well as to each invidual Shareholder Defendant concerning their invidual shares. Additionally, upon service of the complaint, Plainitff will inquire whether any Shareholder Defendant continues to stand on the confidentiality designation, and will file an unredacted version as Shareholder Deefendants respond.

Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

20.      Defendants AQR DELTA FUND, LP; AQR DELTA MASTER ACCOUNT, L.P.; AQR DELTA SAPPHIRE FUND, LP; and AQR DELTA XN FUND, LP (the "AQR Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

21.      Defendants BARCLAYS CAPITAL INC., BARCLAYS CAPITAL SECURITIES LIMITED, and Barclays Capital Derivative Funding (the "Barclays Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

22.      Defendants BLACKROCK ASSET MANAGEMENT IRELAND LIMITED; The Bank of New York Mellon (International) Limited, as Trustee of the iShares UK Equity Index Fund (UK) ; and BlackRock Inc. (the "BlackRock Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

23.      Defendants GSO AIGUILLE DES GRANDS MONTETS FUND I LP; GSO AIGUILLE DES GRANDS MONTETS FUND II LP; GSO AIGUILLE DES GRANDS MONTETS FUND III LP; GSO CACTUS CREDIT OPPORTUNITIES FUND LP; GSO COASTLINE CREDIT PARTNERS LP; GSO CREDIT ALPHA TRADING (CAYMAN) LP; GSO CREDIT-A PARTNERS LP; GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS LP; GSO SPECIAL SITUATIONS FUND LP; GSO SPECIAL SITUATIONS MASTER FUND LP; GSO SPECIAL SITUATIONS OVERSEAS FUND LTD; and STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP (the "Blackstone Defendants")

received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

24.     Defendants Credit Suisse Funds AG; CREDIT SUISSE (MONACO) S.A.M. ; and Credit Suisse First Boston Corp/NY (the "Credit Suisse Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

25.     Defendants D.E. SHAW ALL COUNTRY GLOBAL ALPHA EXTENSION PORTFOLIOS, L.L.C.; D.E. SHAW ALL COUNTRY GLOBAL ALPHA PLUS SPECIAL FUND, L.P.; D.E. SHAW KALON PORTFOLIOS, L.L.C.; D.E. SHAW OCULUS PORTFOLIOS, L.L.C.; D.E. SHAW U.S. BROAD MARKET CORE ALPHA EXTENSION PORTFOLIOS LLC; D.E. SHAW U.S. BROAD MARKET CORE ALPHA EXTENSION SPECIAL PORTFOLIOS II (MA), L.L.C.; D.E. SHAW U.S. BROAD MARKET CORE ALPHA PLUS SPECIAL FUND, L.P.; D.E. SHAW U.S. LARGE CAP CORE ALPHA EXTENSION PORTFOLIOS LLC; D.E. SHAW VALENCE PORTFOLIOS LLC; and D.E. SHAW WORLD ALPHA EXTENSION PORTFOLIOS LLC (the "D.E. Shaw Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

26.     Defendants DIMENSIONAL FUNDS PLC- GLOBAL TARGETED VALUE FUND; QIT2 IE DFA CORE MANDATE; and DFA Investment Dimensions Group, Inc. (the "DFA Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

27.     Defendants DANIEL R. TISCH, the Trustee of the DRT 1/14/14 ANNUITY TRUST; and the Trustee of the DRT 12/5/13 ANNUITY TRUST (the "DRT Defendants") received

benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

28.    Defendants Fiam LLC, and Jonathan Chiel, as Trustee of the Fidelity Concord Street Trust (the "<u>Fideltiy Defendants</u>") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

29.    Defendants DEKEL PARTNERS, L.P.; FINE OFFSHORE PARTNERS, L.P.; FINE PARTNERS I, L.P.; NOGA PARTNERS, L.P.; and TAPUZ PARTNERS, L.P. (the "<u>Fine Capital Defendants</u>") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

30.    Defendants FORCE CAPITAL II LLC; FORCE CAPITAL II LTD; FORCE CAPITAL LTD; and FORCE SELECT LTD (the "<u>Force Capital Defendants</u>") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

31.    Defendants GOLDMAN SACHS - 3NET, GOLDMAN SACHS – CSSPXS, GOLDMAN SACHS - DELTA HEDGE DHQRST, GOLDMAN SACHS - DISTRESSED EQUITY – GSCO, GOLDMAN SACHS - ENCAII – 4, GOLDMAN SACHS - ENCAII – 5, GOLDMAN SACHS - HSG 2 - HSG2, GOLDMAN SACHS - RELATIVE VALUE 3, GOLDMAN SACHS – SPXSDB, GOLDMAN SACHS & Co. LLC, and GOLDMAN SACHS PROFIT SHARING MASTER TRUST (the "<u>Goldman Sachs Defendants</u>") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

32.    Defendants HORIZON CORE VALUE COLLECTIVE TRUST FUND; HORIZON SPIN-OFF & CORP. RESTRUCTURING FD.; and KINETICS PORTFOLIO TRUST (the "Horizon Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

33.    Defendants MAVERICK FUND II LIMITED; MAVERICK FUND LDC; MAVERICK FUND USA, LTD.; MAVERICK LONG ENHANCED FUND LIMITED; and MAVERICK NEUTRAL LEVERED FUND LIMITED (the "Maverick Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

34.    Defendants OMEGA ADVISORS INC.; OMEGA CAPITAL INVESTORS, L.P.; OMEGA CAPITAL PARTNERS, L.P.; OMEGA CHARITABLE PARTNERSHIP, L.P.; OMEGA EQUITY INVESTORS, L.P.; and OMEGA OVERSEAS PARTNERS, Ltd. (the "Omega Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

35.    Defendants PRESCOTT ASSOCIATES LP; PRESCOTT GENERAL PARTNERS LL; PRESCOTT INTERNATIONAL PARTNERS LP; and PRESCOTT INVESTORS INC. (the "Prescott Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

36.    Defendants GF RADING LLC; RIEF RMP LLC; and RIEF TRADING LLC (the "Renaissance Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

37.    Defendant SAC CAPITAL ASSOCIATES LLC received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

38.    Defendants SCULPTOR DOMESTIC PARTNERS II LP; SCULPTOR DOMESTIC PARTNERS, LP; Sculptor Captial Investments, LLC, aka SCULPTOR GROUP, fdba OCH-ZIFF CAPITAL MANAGEMENT GROUP, L.L.C.; and Scultpor Capital Management, Inc. fdba OCH-ZIFF CAPITAL MANAGEMENT GROUP INC. aka Oz Group (the "Sculptor Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

39.    Defendants SICAV STATE STREET BANQ, PARIS; STATE STREET BANK & TRUST COMPANY; STATE STREET GLOBAL ADVISORS - FTSE RAFI DEV1000 INDX NL CTF; STATE STREET GLOBAL ADVISORS - SSCSIL SSGA EUT GBL DEV INX EQ; and STATE STREET GLOBAL ADVISORS (the "State Street Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

40.    Defendants MOST DIVERSIFIED PORTFOLIO SICAV - TOBAM ANTI-BENCHMARK GLOBAL EQUITY FUND; MOST DIVERSIFIED PORTFOLIO SICAV - TOBAM ANTI-BENCHMARK US EQUITY FUND; and MOST DIVERSIFIED PORTFOLIO SICAV - TOBAM ANTI-BENCHMARK WORLD EQUITY FUND (the "TOBAM Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

41.    Defendants THE VANGUARD GROUP, INC., AS AGENT; VANGUARD BALANCED INDEX FUND; VANGUARD CONSUMER DISCRETIONARY INDEX FUND;

VANGUARD EXTENDED MARKET INDEX FUND; VANGUARD GROWTH AND INCOME FUND; VANGUARD INSTITUTIONAL TOTAL STOCK MARKET INDEX FUND; VANGUARD LARGE-CAP INDEX FUND; VANGUARD MID-CAP INDEX FUND; VANGUARD MID-CAP INDEX PORTFOLIO; VANGUARD MID-CAP VALUE INDEX FUND; VANGUARD SMALL-CAP INDEX FUND; VANGUARD SMALL-CAP VALUE INDEX FUND; VANGUARD TAX-MANAGED CAPITAL APPRECIATION FUND; VANGUARD TOTAL STOCK MARKET INDEX FUND; VANGUARD TOTAL STOCK MARKET INDEX TRUST; and VANGUARD VALUE INDEX FUND (the "Vanguard Defendants") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

42.    Defendant BANK OF BERMUDA received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

43.    Defendant EMPLOYEES RETIREMENT SYSTEM OF TEXAS received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

44.    Defendant FIRST TRUST CONSUMER DISCRETIONARY ALPHADEX® FUND received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

45.    Defendant GOTHIC HSP CORPORATION received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

46.     Defendant GUGGENHEIM SPIN OFF ETF received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

47.     Defendant HAP TRADING LLC received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

48.     Defendant HBOS FINAL SALARY PENSION SCHEME received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

49.     Defendant JHT 12/5/13 ANNUITY TRUST received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

50.     Defendant KARLIN HOLDINGS LIMITED PARTNERSHIP received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

51.     Defendant KENDEN ALFOND, C/O DEXTER ENTERPRISES, INC. received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

52.     Defendant LOCKHEED MARTIN CORPORATION MASTER RETIREMENT (the "Lockheed Defendant") received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

53.     Defendant LUMA CAPITAL S.A.-SPF received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

54.     Defendant M.S. SERVICES received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

55.     Defendant MASON CAPITAL MGMT LLC received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

56.     Defendant MPAMG SECURITY PROCESSING OMNI received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

57.     Defendant MUFG UNION BANK NA received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

58.     Defendant NORGES BANK INVESTMENT MANAGEMENT received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

59.     Defendant ORI UZIEL received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

60.     Defendant PERCEVAL PRN-FAIRHOLME CUST received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

61.     Defendant SFM CAPITAL MARKETS, L.P. received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

62.     Defendant T. ROWE PRICE ASSOCIATES, INC. received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

63.     Defendant Trustee of the THOMAS J. TISCH 1994 ISSUE TRUST received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

64.     Defendant TIMOTHY F PALMER received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

65.     Defendant X-ENTITY 0302 P / received benefits from either the spin-off of Lands', the Seritage transaction, or both, as more fully described on **Exhibit A** and incorporated herein by reference.

### **Factual Background**

**A.     Plaintiffs' Businesses**

66.     Prior to the Petition Date, Sears Holdings was the ultimate holding company for the other Debtor Plaintiffs that operated under two nationwide retail brands, "Sears" and "Kmart." Until the late 1980s, Sears Roebuck and Kmart were the largest and second largest retailers in the United States by sales.

67.     Sears Roebuck's department stores averaged 150,000 square feet and often served as anchor tenants in shopping malls.  Sears Roebuck sold a wide variety of products, including appliances, apparel, consumer electronics, outdoor furniture and automotive tires and batteries.

68.     Kmart's stores averaged 100,000 square feet and were located primarily in strip malls.  Kmart also sold a variety of products, including apparel, consumer electronics, children's toys, lawn items and groceries.

69.     According to Sears Holdings's SEC filings, Sears's key competitors included, depending on the products, big-box stores like Target and Walmart; department stores like J.C. Penney, Kohl's and Macy's; home improvement stores like Home Depot and Lowe's; consumer electronics stores like Best Buy and online retailers like Amazon.

**B.     Sears's Financial Results and Condition**

70.     After peaking in 2006 by every relevant measure, Sears began an unrelenting decline.  Beginning in 2006, Sears's revenue declined every year; its operating income and net income fell to *de minimis* levels in Fys 2009–2010 and went negative thereafter.

71.     At the same time, in a vicious cycle, Sears was forced to close stores and reduce capital expenditures, which undercut its ability to generate revenue.  Sears was facing increased competition—both from more successful brick-and-mortar stores and online market places—and losing market share.  And Sears's Shop Your Way ("SYW") loyalty program—which Lampert claimed as his key initiative and proselytized as the savior of Sears's future and an essential source of potential future profitability—consistently failed to deliver results.

72.     As a result, key third parties raised serious concerns about Sears's solvency.  Sears's suppliers demanded shorter trade terms, resulting in an effective loss of hundreds of millions of dollars of trade credit.  The Pension Benefit Guaranty Corporation ("PBGC") raised concerns about Sears's ability to honor its billions of dollars of liabilities to its unfunded, defined-benefit

pension plans and threatened to terminate the plans, ultimately forcing Sears to "ring fence" collateral to protect the interests of the plans and PBGC.

### 1.    Sears's Deteriorating Financial Performance

73.    Prior to the Lands' End Spin-off and the Seritage Transaction, multiple financial metrics clearly showed that Sears's performance was in a steep, multi-year freefall.  Between FY 2006 and FY 2014, Sears's revenue declined steadily from approximately $53 billion to $31 billion—approximately 41%.  Sears had operating losses (i.e., losses before interest and taxes) in each year beginning in FY 2011 of between $838 million and $1.5 billion.  Between FY 2011 and FY 2014, Sears had incurred cumulative net losses of more than $4.8 billion.[5]

74.    Irrespective of the measure of financial health used, Sears' performance at the time of the Land's End and Seritage transactions was abysmal. Whether in term of gross revenue, operating losses, or EBITDA, Sears's financial performance was in precipitous decline as Lampert and Sears's Directors schemed to strip assets for the benefit of shareholders.

### 2.    Sears's Deteriorating Operating Performance

75.    Sears's looming insolvency was not just to be found in financial metrics. Sears's deteriorating condition also was reflected in several troubling operational trends: store closures, same-store sales declines, reduced investment in stores (capital expenditures), increased competition, decreased market share and the failure of the SYW loyalty/membership program to drive increased sales.  In view of these operating trends, it was abundantly clear that Sears had no viable path to service and discharge its debt when due, let alone return to profitability.

---

[5]    Sears used a retail fiscal year that ran approximately from February 1 to January 31.  Following this retail convention, Sears refers to a fiscal year by the calendar year in which it began.  For example, FY 2012 began January 29, 2012 and ended February 2, 2013.  Sears filed with the SEC its results for FY 2013 in March 2014 (just prior to the Lands' End Spin-off) and the results for FY 2014 in March 2015 (a couple months prior to the Seritage Transaction).

76.    *Store closures*.  At the end of 2006, Sears operated more than 3,433 stores in the United States, including 935 Sears-branded "broadline" (later referred to as "full-line") stores, 1,388 Kmart-branded stores and 1,110 specialty stores (including 1,075 Orchard Supply Hardware Stores Corp. ("Orchard"), Sears Hometown and Outlet Stores, Inc. ("SHO") and Lands' End stores).  Lampert publicly denied at the time that he planned to close "tens of dozens" or even "hundreds" of stores, stating that only a few of the poorest performing stores would be closed.

77.    To the contrary, over the next decade, Sears in fact closed more and more stores. Even after controlling for the significant number of stores that were spun off in the Orchard, SHO, Sears Canada transactions and the Lands' End Spin-off (by omitting those stores from the prior period numbers), Sears reduced its store count between 2006 and 2017 by 1,356 stores, or 58%.

78.    As Sears's losses began to mount, Lampert began to talk about a supposed strategy of closing Sears's worst stores to "right-size" Sears, decreasing its operating expenses and increasing its profitability.  But Sears's problems were the result of a prolonged lack of innovation, intense competition, failed management strategies and under-investment at the corporate level, of which the store-level problems were only a symptom.  At the time, the strategy of closing money-losing stores—which had been tried unsuccessfully by peers like Toys "R" Us and Sports Authority—could not return Sears to profitability.  Instead, it would result in a "death spiral."

79.    Closing stores created the temporary illusion of boosting Sears's balance sheet with revenue from the liquidation of inventory and/or the sale of real estate and with reduced operating expenses, but store closures also eroded Sears's long-term revenue base.  Despite Lampert's professed emphasis on online channels, in-store sales remained responsible for 97% or more of Sears's revenue at all relevant times.

80.    In addition to undercutting Sears's revenue base, store closures undercut the value of Sears's affiliated brands (such as Craftsman, DieHard and Kenmore), whose reputations were linked to that of Sears and which relied upon Sears's in-store sales for much of their market share.

81.    ***Reduced Capital Expenditures***.  Under Lampert's leadership, Sears's capital expenditures in maintaining and upgrading its stores declined drasticallySears's same-store sales had declined every year since the Sears/Kmart merger, demonstrating that Sears's supposed effort to "right-size" its business by removing unprofitable stores was a failure.  Those same-store sales continued to decline during the period that Lampert was engaging in the wrongful conduct alleged herein, amounting to a cumulative decline in same-store sales of more than 33% from 2012 to 2017.

82.    ***The failure of Shop Your Way***.   Since the Kmart/Sears merger, Lampert has promised to "transform" Sears.  That transformation never materialized. Lampert claimed that the centerpiece of the promised transformation was SYW, a no-cost (to customers) membership rewards program created in 2009 that was supposed to provide Sears with data about its customers that it could leverage to drive results.  Specifically, the information obtained from SYW was supposed to enable Sears to increase margins with personalized pricing while also reducing expenditures on traditional marketing.  In exchange for their personal information, SYW members receive coupons, free shipping and "points" that can be converted into cash.  As explained by Director Ann Reese, the goal of SYW was to have SYW members direct "more share of wallet" to Sears.

83.    While many customers signed up for SYW, Sears has never succeeded in its goal of causing members to increase materially their purchases from Sears and in any case, SYW membership has declined steadily since 2015.

84.    SYW did not offer Sears a material competitive advantage. Indeed, many of Sears's competitors already had launched similar (and superior) programs prior to SYW. Amazon, for example, launched "Amazon Prime"—a paid membership program that offers members, among other benefits, two-day free shipping on eligible purchases—in 2005. Best Buy launched "Reward Zone," a customer loyalty program, in 2004. Macy's launched "Star Rewards," another customer loyalty program, in 2005. And J.C. Penney introduced a rewards program in 2008.

85.    Beginning as early as 2012, Sears Holdings's directors began to request metrics from management that would indicate the transformation's progress. However, Sears management did not track data that would support the notion that the transformation—which depended solely on the success of SYW—was working. Had they tracked such metrics, they would have learned that the transformation was not working. Indeed, based on actual and estimated data, from 2013 to 2017, there was a 33% decline both in active SYW memberships and in spending by SYW members. By 2014, it was impossible for Sears's directors and officers to have believed that SYW was going to help return Sears to profitability.

### 3.    Third Parties Express Concerns About Sears's Solvency

86.    In light of the Sears's declining financial and operating performance, Sears's solvency was increasingly called into doubt by third parties, including rating agencies (which downgraded Sears's credit ratings), suppliers (which reduced their trade credit to Sears) and PBGC (which demanded protection and threatened to terminate the Sears pension plans).

87.    ***Rating agencies***. In the years leading up to the Lands' End Spin-off and Seritage Transaction, all three major rating agencies took notice of Sears's deteriorating financial and operating performance and repeatedly downgraded Sears's credit ratings.

88.    Moody's Investors Service downgraded Sears's issuer rating, corporate family rating and probability of default rating from Ba2 (which it had held since 2009) to Ba3 in July

2011. Moody's further downgraded Sears to B1 in December 2011 and then again to B3 in January 2012. In January 2014, Moody's again downgraded Sears to Caa1.[6]  In November 2014, Moody's revised its rating outlook to negative.

89.    S&P downgraded Sears from BB- (which it had held since 2009) to B+ in May 2011. S&P further downgraded Sears to B in November 2011 and CCC+ in January 2012.[7] S&P issued a negative outlook in August 2012, presaging further downgrade.

90.    Fitch Ratings downgraded Sears's issuer rating to B in June 2011. Fitch further downgraded Sears to CCC in December 2011.[8] Fitch similarly downgraded Sears's senior secured debt rating to BB in June 2011, to B+ in December 2011, to B in September 2012, to B- in September 2013 and then CCC in September 2014.

91.    As Sears's CFO Rob Schriesheim conceded in a January 2012 email to other Sears executives following the initial downgrades: "The rating agencies actually do have their facts correct on our balance sheet and liquidity."   Schriesheim noted that Sears's year-end debt-to-EBITDA ratio was at least 8x (even without counting billions of dollars of unfunded pension obligations, which, Schriesheim admitted, "is debt" too).

92.    ***Suppliers***.  As a result of the increasing costs of factoring and credit insurance, as well as independent suppliers' concerns about Sears's solvency, Sears's suppliers contracted their trade credit to Sears.  Since FY 2009, Sears's Days Payable Outstanding ("DPO") an aggregate measure of the average number of days Sears was able to defer vendor payments—had been significantly below that of Sears's peer group and generally declining.  The decline in Sears's DPO

---

[6]    According to Moody's, "Obligations rated Caa are judged to be speculative of poor standing and are subject to very high credit risk."

[7]    According to S&P, "In the event of adverse business, financial, or economic conditions, the obligor [of a CCC obligation] is not likely to have the capacity to meet its financial commitments on the obligation."

[8]    According to Fitch, "[d]efault is a real possibility" on CCC obligations.

from FY 2010 to FY 2014 represented a loss of more than $200 million of trade credit from suppliers of goods. The decline in DPO was due to demands from suppliers for more favorable payment terms. Other suppliers ceased taking orders from Sears, forcing Sears to find replacements or to discontinue certain product lines.

93.     In the words of former Sears Vice President of Profit Improvement, Lynn Walsh: "The suppliers wanted to shorten payment terms as our credit and financial standing became less stable. It got to the point of being absurd. It was like, wink, nod. Oh yeah, we're going to grow 2% next year. Ha. Given last year we decreased double digits. I ended up leaving because I had no integrity anymore. I was trying to negotiate on the promise that we've got a plan to grow the business, knowing that was never going to happen."

94.     ***PBGC***. Prior to the Lands' End Spin-off and Seritage Transaction, PBGC—a federally chartered corporation that insures private defined-benefit pension plans—had serious concerns about Sears's solvency and ability to pay its underfunded pension obligations. As of August 13, 2014, PBGC asserted that Sears Holdings's pension was underfunded by $3.2 billion.

95.     Based on these concerns, by no later than March 2014, PBGC sent Sears a set of detailed information requests for non-public information. Among other things, PBGC asked about Sears's "long-term business plan," the "spin-offs" and "dispositions" "currently under consideration" (specifically including Lands' End) and the value of Sears's real estate. PBGC requested that Sears provide this information by April 2, 2014—which was prior to the closing date of the Lands' End Spin-off.

96.     By no later than July 30, 2014—well before the Seritage Transaction—PBGC had communicated to Sears its view that "the risk of loss to PBGC is ***great and increasing***" (emphasis added). PBGC explained that its view was based on "a number of factors, including [Sears's]

operating losses, the significant uncertainty around the Company's business plan, and accelerating cash-burn rates, which could result in a near-term liquidity issue." As a result, PBGC said, "we believe we must act now."

97.     Under the Employee Retirement Income Security Act of 1974 (ERISA), PBGC is authorized to file litigation to terminate a pension plan if it expects to incur unreasonable losses with respect to the plan, i.e., because the plan sponsor is or becomes insolvent and unable to meet its obligations. By no later than August 2014, PBGC had threatened Sears with litigation unless Sears agreed to begin negotiating the provision of additional security to its pension plans. Sears initially asked PBGC to detail its views in a letter, but then reversed course and asked PBGC *not* to put its position in writing.

98.     If PBGC had sued, its concerns about Sears's solvency would have been made public. Instead, while PBGC and Sears negotiated, PBGC's concerns were kept secret. In September 2015—after the closing of the Seritage Transaction—Sears disclosed that it had signed a term sheet with PBGC and, in March 2016, PBGC and Sears announced a settlement that granted the pension plans rights with respect to certain of Sears's real estate, with an appraised value of approximately $890 million, as well as the subsidiary holding Sears's primary intellectual property assets (such as Kenmore, Craftsman and DieHard).

C.     **Sears's Unrealistic, Bad-Faith Projections of Future Performance**

99.     Despite Sears's declining financial performance and worsening financial condition, Sears continued to produce financial projections assuming an immediate and dramatic turnaround in its performance. These bogus projections were prepared and adjusted at Lampert's insistence and adopted in bad faith. After years of missed projections and by the time of the Lands' End Spin-off and Seritage Transaction, Lampert and Sears's management knew there was no chance

that the projections upon which all analyses of the appropriateness of the transactions were based could be achieved.

100.    Instead, Lampert and Sears's management came up with elaborate, and largely fictional, projections and plans that would have Sears attain financial stability over the long term. None of these projections came to fruition—instead, Sears's decline continued unabated.

101.    Instead of pursuing options that would have materially benefitted Sears, Lampert and other members of Sears's management and leadership continued to strip assets for the benefit of shareholders while leaving Sears and its related businesses unable to survive in an increasingly difficult retail environment.

102.    Sears did not descend into insolvency merely because of a difficult retail environment, competitors like Amazon and Target, or increasing costs. The downfall of Sears was management more interested in lining their own pockets and benefitting shareholders, including the Shareholder Defendants, than making Sears a success.

## The Basis for the Causes of Action in this Complaint

A.    **The April 2014 Lands' End Spin-off Wrongfully Transferred More Than $1 Billion of Value from Sears to Its Shareholders**

103.    Lands' End is a multi-channel retailer of casual clothing, accessories and home products.  Sears acquired Lands' End in June 2002 for $1.9 billion.  Sears Holdings owned Lands' End indirectly through Sears Roebuck, its wholly owned subsidiary.  Because of its strong cash flow and profitability (particularly in comparison to Sears's other business units), Lands' End was one of Sears's crown jewels. In 2012, for example, Lands' End had revenue of $1.6 billion and gross margin of $704.1 million.

104.    The April 2014 Lands' End Spin-off constitutes a fraudulent transfer and an illegal dividend.  The Lands' End Spin-off transferred the Lands' End business (worth at least $1.3 billion

at the time) from Sears to Sears Holdings's shareholders, the largest of whom were the Controlling Insider Shareholders. The shareholders, including Shareholder Defendants herein, paid no consideration for shares in Lands' End. The transaction occurred at a time when Sears Holdings and Sears Roebuck intended to incur or reasonably should have believed they would incur debts beyond their ability to pay and had unreasonably small capital, or left Sears Holdings and Sears Roebuck in such a financial condition.

### 1. Lampert Insists on a Spin-off to Benefit Shareholders, Rather than Alternatives that Would Have Generated More Proceeds for Sears

105.    Sears began planning a potential spin-off of Lands' End in 2012. Despite planning the Lands' End Spin-off for at least two years, Sears never seriously considered or pursued any alternatives, including a third-party sale of Lands' End, which would have maximized the proceeds to Sears and left such proceeds available to creditors, nor did Sears engage an investment banker to conduct a sale process or obtain an independent valuation. As Lampert has conceded, there was speculation "that [Sears was] shopping around Lands' End, which was never true."

106.    As Lampert and other insiders knew, prospective buyers existed. On January 9, 2014, Sears received an unsolicited indication of interest from Leonard Green & Partners and the Tommy Hilfiger investment group (the "Tommy Hilfiger Group") regarding Lands' End. This investment group stated that they were "highly interested" in investing in Lands' End, which they valued at $1.6 billion (including net debt). The Tommy Hilfiger Group proposed a "sponsored spin" transaction that would give the Tommy Hilfiger Group a 25% stake in Lands' End (alongside Sears Holdings's shareholders) and deliver proceeds of either $850 million or $1 billion (depending on the transaction structure) to Sears.

107.    Lampert summarily rejected this opportunity. Just six days later, Lampert personally told the Tommy Hilfiger Group that the proposed transaction was a "non-starter"—not

because it failed to maximize proceeds to Sears, but because it would have diluted his and ESL's

stake in Lands' End relative to a non-sponsored spin.

108.    Ultimately, Lands' End was distributed to Lampert, ESL shareholders[9] and Sears

Holdings's other shareholders, including Shareholder Defendants herein, for no consideration

following a pre-spin dividend from Lands' End of $500 million.  The transfer of Lands' End shares

was approved by and made by Sears Holdings, which initially received the shares from Sears

Roebuck.  Market multiple analyses based on Lands' End's historical revenue and EBITDAR

confirm that the standalone company had an enterprise value of at least $1.3 billion.

109.    The spin-off itself involved a dividend paid to Sears Holdings's shareholders,

according to resolutions of the Sears Holdings Board.  In recognition of the massive value that was

being stripped from Sears Roebuck and passed along to Sears Holdings's shareholders, the Sears

Holdings Board authorized cash dividends, called "make whole awards," to holders of unvested

shares of Sears Holdings stock.  These cash dividends were paid to a total of 48 holders of unvested

Sears Holdings shares.

110.    When asked why alternatives that would have resulted in greater proceeds to Sears

were not pursued, Lampert conceded that the spin-off was "just a way of separating the two

companies" (which, of course, also would have been accomplished by a third-party sale).  When

pressed on the alternative of a sale, Lampert said Lands' End was spun off rather than sold because

it was valuable, and he wanted shareholders—of which, of course, he and ESL were by far the

largest—and not creditors to enjoy that value.  In Lampert's own words, he "didn't think hard

about the creditors in the Lands' End deal."

---

[9] ESL Investment, Inc. is an investment manager under the sole control of Lampert. Lampert is the sole founder, owner, member, and CEO of ESL.

## 2.    Lampert Limits the Pre-Spin Dividend to Benefit the New Shareholders of Lands' End, Including ESL and Himself, at the Expense of Sears

111.    Lampert also rejected suggestions to increase Lands' End's new borrowings in order to support a larger pre-spin dividend, despite knowing Lands' End's value far exceeded the anticipated $500 million pre-spin dividend.[10]

112.    Lands' End's 2013 EBITDA (according to the Duff & Phelps solvency analysis) was $141 million. Lands' End could have paid Sears a pre-spin dividend of approximately $635 million.  Indeed, once Lands' End's strong results for full year 2013 became known, Bank of America suggested that Lands' End could in fact borrow an amount equal to 5.3x its 2013 EBITDA, which would have resulted in a pre-spin dividend to Sears of approximately $747 million.  Instead, at Lampert's direction, Lands' End borrowed only $515 million and paid a pre-spin dividend of only $500 million.

## 3.    The Lands' End Spin-off Left Sears Holdings and Sears Roebuck With Unreasonably Small Cash Flow To Pay Debts As They Came Due

113.    After the Land's End transaction Sears Holdings and Sears Roebuck were left with unreasonably small capital and unable to pay their debts as they were expected to come due after the Lands' End Spin-off.  At the time of the Lands' End Spin-off, Sears Holdings had funded debt obligations with an aggregate principal amount of more than $4.2 billion, and Sears Roebuck was liable on substantially all of that debt.  Together with interest, these Debtors required more than $4.7 billion (and more than $4.3 billion by 3Q 2018 alone) to pay off their debts.

114.    Sears's total cash and cash equivalents immediately after the Lands' End Spin-off (including the pre-spin dividend) were approximately $842 million.  Even **_assuming_** that Sears

---

[10]    A November 30, 2013 Ernst & Young impairment analysis and an April 3, 2014 International Strategy & Investment Group valuation report echoed the Tommy Hilfiger Group indication of interest valuation, concluding that Lands' End's enterprise value was between $1.4 billion and $1.5 billion.

Holdings and Sears Roebuck were able to use *all* of these funds for principal and interest payments (rather than to fund continued operating losses, as actually occurred), these Debtors *still* would have required more than $3.4 billion of *additional* free cash flow by 3Q 2018 to satisfy its obligations

115.    Sears had no basis to expect to earn anything close to what it needed.  After the Lands' End Spin-off, it could not reasonably have expected to earn $841 million in free cash flow by 1Q 2016 (when the asset-based loan ["ABL"] came due).  In reality, Sears ultimately saw free cash flow of approximately *negative* $1.7 billion in FY 2014, *negative* $2.4 billion in FY 2015 and *negative* $1.5 billion in FY 2016.  After Lands' End, the only way the existing ABL principal payment due in 1Q 2016 could be made, was by selling core assets.  And that is what ultimately happened as the ABL was paid down with a portion of the proceeds of the Seritage Transaction (discussed in more detail below).

116.    But even with non-ordinary-course sales of core assets, after the Lands' End Spin-off, Sears Holdings and Sears Roebuck could not reasonably have funded the cumulative $4.3 billion in principal and interest payments by 3Q 2018 (when the Second Lien Notes would come due) in addition to ongoing operating losses.  Not coincidentally, 3Q 2018 is when these Debtors ultimately filed for bankruptcy, with $304 million of the Second Lien Notes or notes exchanged for Second Lien Notes in March 2018 outstanding.

117.    In light of Sears's declining financial performance over the preceding years and the numerous adverse qualitative trends, as detailed above, it was not reasonable to assume that Sears could achieve the level of cash flow necessary for timely debt principal and interest payment.  In the three immediately prior fiscal years to the Lands' End Spin-off, Sears had failed to generate *any* cash flow from operations.  Nor did it generate *any* earnings to cover interest expenses in the

fiscal year immediately prior to the Lands' End Spin-off. In that year, Sears also had **negative** free cash flow of $1.4 billion and **negative** Adjusted EBITDA of $337 million. In the four immediately prior fiscal years, FYs 2010–2013, Sears had suffered a cumulative net loss of $5.3 billion.

4.    **The Lands' End Spin-off Left Sears Holdings and Sears Roebuck with Unreasonably Small Capital**

118.    Sears Holdings and Sears Roebuck also had unreasonably small capital after the Lands' End Spin-off.

119.    As detailed above, Sears's multi-year performance leading up to the Lands' End Spin-off demonstrated that it was unable to generate sufficient profits to sustain operations or adequately address existing liabilities. Indeed, Sears could not generate **any** profits and could only temporarily sustain its operations by selling off core assets and falling further into debt.

120.    After the Lands' End Spin-off, Sears had insufficient capital or reserves to account for its normal business operations and to repay its existing debt load, much less sustain operations through any difficulties likely to arise in its lines of business, including a general or deepening industry-wide economic downturn. It certainly did not help that, under Lampert's leadership, Sears's capital expenditures had declined drastically, reflecting lower investment in maintaining and upgrading its stores and well below those of its key competitors

B.    **The July 2015 Seritage Transaction Fraudulently Transferred Hundreds of Millions of Dollars of Value to Seritage and Other Sears Holdings Shareholders**

121.    The Seritage Transaction constituted a fraudulent transfer and an illegal dividend and gives rise to a variety of common law claims. The sale-and-lease-back agreement and related agreements between a number of Sears entities and Seritage (the "Sale-and-Lease-Back")[11]

---

[11]    The Sale-and-Lease-Back comprises several related contracts (and amendments thereto), including: (i) the Subscription, Distribution and Purchase and Sale Agreement by and between Sears Holdings and Seritage, dated June 8, 2015; (ii) the Contribution and Sale Agreement between Kmart Corporation, Marin Access LLC, Kmart of Washington, LLC, Plaza Guaynabo Limited Partnership, S.E., Sears Roebuck, Sears, Roebuck de Puerto Rico, Inc., Sears Development Co., Seritage KMT Finance LLC and Seritage SRC Finance LLC, dated July 7, 2015 and (iii) the

undervalued the transferred real estate by hundreds of millions of dollars and saddled Sears with grossly one-sided and costly lease terms. The Seritage Rights Offering transferred highly valuable subscription rights to Sears Holdings's shareholders (principally to the Controlling Insider Shareholders) as well as Shareholder Defendants herein for no consideration to any Sears entity.

122.    The Seritage Transaction consisted of two primary steps.  ***First***, Sears Holdings transferred subscription rights to purchase shares of Seritage common stock to Sears Holdings shareholders for no consideration.  The exercise price of these rights was derived from artificially low appraisals of the real estate to be transferred, and, as a result, the Seritage Rights Offering conveyed several hundred millions of dollars of value to Sears Holdings's shareholders for no consideration to Sears.[12]

123.    ***Second***, Sears sold to Seritage  the title (or joint venture interests) for the land relating to 266 stores expected to have positive operating results—235 stores that Sears owned in full and 31 stores in which Sears owned 50% as part of a joint venture—for a purchase price of approximately $2.58 billion[13] while simultaneously agreeing to lease those spaces back from Seritage.  The purchase price for the 235 Sears-owned stores was based upon appraisals of the properties performed by Cushman & Wakefield, Inc. ("C&W").  But, as C&W and other culpable parties knew, those appraisals were fundamentally flawed, and, as a result, those properties were undervalued by at least hundreds of millions of dollars.  The 31 joint venture properties also were

Master Lease by and among Seritage SRC Finance LLC, Seritage KMT Finance LLC, Kmart Operations LLC and Sears Operations LLC, dated July 7, 2015.

[12]      In connection with the Seritage Transaction, the Sears Holdings Board provided a cash dividend to holders of unvested stock who were unable to participate in the Seritage Rights Offering, as they had in the Lands' End Spin-off.  Payment of these cash amounts is an implicit acknowledgement that each of the Lands' End Spin-off and the Seritage Transaction constituted a transfer of value from Sears to Sears Holdings's shareholders.

[13]      Sears received cash consideration of $2,582,572,012.35.  Certain public disclosures inaccurately referred to a purchase price of approximately $2.7 billion.  The higher figure was calculated by improperly counting the fees paid to the third-party professionals who worked on the transaction and other amounts that were, in reality, paid to Seritage rather than Sears.

undervalued in the sale to Seritage as evidenced by subsequent transaction history. Sears leased back each of the properties conveyed to Seritage under burdensome "Master Leases" (the "Master Leases") agreements, which provided Seritage the right to "recapture" or "redevelop"—i.e., evict Sears from up to 50% of the space at most of the stores, and up to 100% of the space at 21 of the stores—while requiring that Sears pay a penalty of one year's rent if Sears wished to terminate any lease prematurely.

124.    When the Seritage Transaction closed in July 2015, Sears's financial condition was even worse than it had been fifteen months earlier when Lands' End was spun off. That was due in part to Sears's continuing losses (it recorded a net loss of $1.68 billion in FY 2014) and, in part, to the Lands' End Spin-off itself, which divested Sears of one of its few profitable subsidiaries. As a result, Sears was insolvent on a balance-sheet basis prior to closing the Seritage Transaction and certainly as a consequence of the Seritage Transaction, in addition to lacking adequate capital to operate Sears's businesses and pay their debts as they came due in the near future.

125.    The terms of the Seritage Transaction—including the price Seritage paid Sears for the properties, the rent and other terms of the leases between Sears and Seritage and the terms of the rights offering—were established unilaterally by Lampert and others who reported to him and without any negotiation. Lampert, however, was grossly conflicted because, once the transaction went through, he and ESL would be by far the largest shareholders of Seritage. No consideration was given to the interests of Sears or its creditors.

126.    Lampert was only able to obtain approval of the Seritage Transaction from the Sears Holdings Board with the assistance of Duff & Phelps, LLC and C&W (the "Advisor Entities"). The Advisor Entities acted as gatekeepers to key information—namely, C&W was responsible for determining the purchase price of the properties and Duff & Phelps was responsible for opining

on the fairness of the sale and Sears Holdings's solvency—and knowingly provided false or misleading information to the Sears Holdings Board. These Advisor Defendants occupied positions of trust, and they knew that the Sears Holdings Board would only approve the Seritage Transaction based upon satisfactory assurances from them that Lampert and other culpable parties could later attempt to invoke as a shield when inevitably sued for their misconduct. But rather than provide truthful appraisals and opinions, both C&W and Duff & Phelps provided fundamentally flawed analyses that facilitated the deeply unfair terms of the Seritage Transaction and failed to capture Sears's insolvency.

    **1.**     **With Sears Facing a Liquidity Crisis, Lampert Proposes a Sale-and-Lease-Back Transaction without Adequate Consideration of Alternatives**

127.     The Seritage Transaction was developed and approved in the face of an approaching liquidity and operational crisis for Sears. In mid-2014, shortly after the Lands' End Spin-off, Sears management began to predict a liquidity shortfall the following year.

128.     Then, in the fall of 2014, Sears's auditor, Deloitte & Touche ("Deloitte"), raised concerns about Sears's ability to continue as a going concern, highlighting Sears's negative operating cash flows, recurring losses from operations, consecutive years of declining margins, dependence on revolving credit arrangements with limited availability and small cushions on debt covenant ratios. Given Sears's worsening financial situation, Deloitte ultimately concluded that Sears could not remain a going concern, ***through FY 2015***, unless it took meaningful, significant action. [14]

129.     To address these liquidity concerns, Lampert first presented the potential real estate Sale-and-Lease-Back transaction to the Sears Holdings Board on September 9, 2014. From the

---

[14]     Notably, in light of Sears's prolonged history of failing to meet forecasts, Deloitte did not accept management's forecasts in performing its going concern analysis. Instead, Deloitte assumed Sears would lose up to $500 million in EBITDA in FY 2015.

outset, the Sale-and-Lease-Back transaction was conceived as a related-party transaction, under which Sears's assets would be sold for the benefit of Sears Holdings's shareholders. The Sale-and-Lease-Back transaction to insiders was presented alongside alternatives such as a real estate loan, a real estate mortgage investment conduit loan and borrowing against treasury shares, none of which, notably, would have transferred value from Sears to Sears Holdings's shareholders.

130.    Other alternatives—such as selling the real estate at arm's length to third parties, entering into the Sale-and-Lease-Back transaction with a third party or creating a business unit or subsidiary of Sears Holdings that could lease the real estate to other tenants while allowing Sears to retain the upside benefit of the real estate—were not presented or seriously considered.

131.    Critically, no outside advisor was hired to evaluate or market the properties for sale to a third party, and in fact, no process was run to test what the market might pay.

**2.    The Seritage Subscription Rights Were Valuable Securities Transferred from Sears Holdings to Sears Holdings's Shareholders for No Consideration**

132.    The Seritage Transaction involved two distinct steps: the Seritage Rights Offering issued in June 2015 followed by the Sale-and-Lease-Back of real estate assets in July 2015.

133.    With respect to the Seritage Rights Offering, the newly created REIT (Seritage) issued and delivered to Sears Holdings 106,597,798 unitized subscription rights ("Seritage Rights") pursuant to a "Subscription, Distribution and Purchase and Sale Agreement" between Sears Holdings and Seritage dated June 8, 2015. The Seritage Rights gave their ultimate holders the option to purchase new shares of common stock of Seritage at an exercise price payable to Seritage of $29.58 per share.[15]  At that point, Sears Holdings possessed all of the value inherent in the subscription rights, i.e., the value of Seritage above $29.58 per share.

---

[15]    The balance of Seritage's capital structure consisted of third-party financing secured by the real estate to be acquired from Sears.

134.    That same day, Sears Holdings distributed all of the Seritage Rights to its shareholders, more than 75% of whom were the Controlling Insider Shareholders. The shareholders, including Shareholder Defendants herein, did not pay Sears Holdings any consideration in exchange for the Seritage Rights.

135.    The Seritage Rights were valuable securities. Between June 9 and June 26, 2015, the Seritage Rights traded on the NYSE. During the trading period, the volume-weighted average trading price of the Seritage Rights was $3.75, meaning the market was willing to pay a significant premium over the $29.58 exercise price set by Sears. The Seritage Rights, which were transferred for no consideration, were worth hundreds of millions of dollars.

136.    Sears's senior management, including Schriesheim, Riecker and Huckins, all of whom were Sears Holdings's shareholders who stood to make significant profits in the Seritage Rights Offering, monitored the trading price of the rights on a daily basis. During this time, Schriesheim, Sears's then-CFO, specifically observed in an email to Kamlani (then a member of the Sears Holdings Board, and shortly thereafter, ESL's President), which he forwarded to Riecker and Huckins, that "to the degree that a right trades in the 'positive' the market perceives there is value." Schriesheim laid out the logic even more precisely in a subsequent email exchange with Riecker, noting that "one might also expect the shares of [Sears] to trade flat with where they were before all this began since SHLD is getting cash in an amount of $2.6B in consideration for selling assets valued at $2.6B . . . *unless investors believe that the assets being sold are worth more than the cash received* . . . if rights trade in positive territory, investors perceive there to be value in excess of the cost to exercise the right." (emphasis added). Huckins calculated the implied value of Seritage as the rights offering price plus twice the trading price of the Seritage Rights. And just weeks before the transaction closed, Schriesheim wrote in an email to Sears management,

including Riecker and Huckins, that "the market thinks [Sears] is selling something for about $600M less than it is worth."[16] Around that same time, Schriesheim and Huckins exchanged emails confirming they were participating in the Seritage Rights Offering.

137.    Once the rights were issued, Schriesheim, Riecker, Huckins and other members of Sears's management were all monitoring and aware of the trading price of the Seritage Rights at the same time they were taking the necessary corporate steps, including the transfer of the underlying properties, to consummate the overall transaction in advance of the July 7 closing.

138.    ESL and Lampert similarly were aware that the trading price for the rights implied a significantly higher valuation for the real estate to be sold to Seritage and the accompanying lease back than the $2.58 billion purchase price Seritage was to pay. For example, Lampert, while working with an employee of ESL on June 17, 2015, valued ESL's anticipated investment in Seritage using a $36.48 share price. The next day, on June 18, 2015, he received an analysis from CRT Capital concluding that Seritage had a total enterprise value of $3.262 billion, implying a $38.34 share price.

139.    As reflected in Lampert's contemporaneous comments to the Sears Holdings Board, the Seritage Rights were intended to have a substantial positive trading price. Specifically, the minutes reflect that Lampert told the Sears Holdings Board that he wanted the Seritage Rights to "be attractive to investors" and to provide "value to Sears's shareholders who chose to sell their rights." In their mediation statement submitted in connection with the Seritage Derivative Litigation (as defined herein), counsel for Sears Holdings, the Directors, Lampert and ESL described the Seritage Rights as "akin to a dividend." Perhaps most tellingly, during a meeting of the Sears Holdings Board, Lampert expressed an interest in ESL *over-subscribing* for the Seritage

---

[16]    The market valued Seritage at significantly more than the subscription price *despite* incomplete and often misleading information, which, if disclosed in full, would have increased the perceived value of Seritage.

Rights to the extent other Sears Holdings shareholders failed to participate in the Seritage Rights Offering.

140.    That the Seritage Rights were intended to have positive value is further reflected in the efforts of Lampert, the ESL Shareholders and Fairholme Capital to guarantee they would maintain the same pro rata ownership of Seritage as they had in Sears Holdings. Had the Seritage Rights been properly valued, the upside of investing in Seritage would have been limited for Lampert, the ESL Shareholders and Fairholme Capital, and Lampert, the ESL Shareholders and Fairholme Capital would not have gone through the tortured process they engineered in order to maintain the same pro rata ownership. Moreover, the value conveyed to Lampert, ESL Shareholders and Fairholme Capital was materially greater than the value conveyed to other Sears Holdings shareholders because the securities Lampert, the ESL Shareholders and Fairholme Capital were able to obtain by "exchanging" their Seritage Rights gave Lampert, the ESL Shareholders and Fairholme Capital the special ability to block a change of control.

141.    It is critical to note that the exercise price of the Seritage Rights was derived directly from the valuation of the real estate performed by C&W (as discussed herein). Specifically, the exercise price equaled the purchase price of the real estate, less associated costs, less total debt raised by Seritage of approximately $1.16 billion, divided by the total number of shares to be issued. Had the real estate been properly valued (rather than low-balled), the exercise price of the Seritage Rights would have been higher, providing little to no incremental value to Sears Holdings's shareholders who would have been indifferent to participating in the transaction. But, because the Culpable Insiders intended to provide Sears Holdings's shareholders with value for participating in the Seritage Rights Offering, the real estate valuations necessarily had to undervalue the real estate that was the subject of the transaction. Thus, the transaction was

designed to undervalue the real estate conveyed in order to provide financial benefits to Sears Holdings's shareholders, including the Shareholder Defendants herein, at the expense of Sears.

142.    Two years after the Seritage Transaction, Schriesheim reflected on his investment in Seritage in an email to Riecker, noting that he had sold his shares at about $45 per share after purchasing them at the $29.58 offering price (a 52% gain).  Schriesheim went on to describe the tremendous upside in the Seritage Transaction, commenting that he "[knew] the math pretty well" and that he had "always felt like [Seritage] was positioned well in [the] market."

**3.    In Connection with the Sale-and-Lease-Back Transaction, Sears's Real Estate and Joint Venture Interests Were Transferred to KMT Mezz, SRC Mezz and SPS Portfolio Holdings LLC**

143.    The second step in the Seritage Transaction was the transfer of certain of Sears's real estate assets to Seritage for hundreds of millions of dollars less than the true market value of those assets.  Given the complexity of Sears's corporate structure, this required a number of intermediate transactions.

144.    *First*, various Kmart subsidiaries (including the entities listed in footnote 2) (i) contributed properties to Seritage KMT Finance LLC (an entity formed for the purpose of the Seritage Transaction) for no consideration or (ii) distributed the properties to Kmart for no consideration so that Kmart could contribute them to Seritage KMT Finance LLC also for no consideration.  Certain other subsidiaries of Kmart (including Kmart of Washington) sold properties to Seritage KMT Finance LLC for inadequate consideration (based on the appraisals described below).

145.    *Second*, Sears Roebuck and various Sears Roebuck subsidiaries contributed properties to Seritage SRC Finance LLC (an entity formed for the purpose of the Seritage Transaction) for no consideration.  Certain other subsidiaries of Sears Roebuck (including Sears

Development and Sears Roebuck de Puerto Rico) also sold properties to Seritage SRC Finance LLC for inadequate consideration (based on the appraisals described below).

146.    **Third**, Sears Roebuck contributed its joint venture interests in GS Portfolio Holdings LLC and MS Portfolio LLC (each of which owned significant real estate assets) for no consideration to Seritage GS Holdings LLC and Seritage MS Holdings LLC (two more entities formed for the purpose of the Seritage Transaction), respectively.

147.    **Fourth**, Kmart contributed Seritage KMT Finance LLC to KMT Mezz (another entity formed for the purpose of the Seritage Transaction) for no consideration.

148.    **Fifth**, Sears Roebuck contributed Seritage SRC Finance LLC, Seritage GS Holdings LLC and Seritage MS Holdings LLC to SRC Mezz (another entity formed for the purpose of the Seritage Transaction) for no consideration.

149.    In connection with the foregoing, Kmart acted at the direction of its three directors, Schriesheim, Riecker and Huckins (collectively, the "Kmart Directors").  The Kmart Directors directed that Kmart take all actions in furtherance of the Seritage Transaction, including the sale of 64 of the properties transferred to Seritage, in a Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Kmart on June 26, 2015.

150.    Following Kmart's approval of the sale of 64 properties transferred to Seritage, Meerschaert, in his capacity as Vice President, Tax, Assistant Treasurer and Secretary of Kmart Holding, caused Kmart Holding to adopt and approve the Contribution and Sale Agreement pursuant to which the Real Estate Transferors—Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart and Kmart of Washington—conveyed those 64 properties to Seritage, in an Action by Written Consent of Sole Member of Kmart Corporation, dated June 26, 2015.  Subsequently, on July 7, 2015, Meerschaert, in his capacity as Vice President, Tax, Assistant

Treasurer and Secretary, caused Kmart to transfer an additional six properties to Seritage by executing a Bill of Sale.

151.    Likewise, in connection with the foregoing, Sears Roebuck acted at the direction of its sole director, Riecker.  Riecker directed that Sears Roebuck take all actions in furtherance of the Seritage Transaction, including the sale of 162 separate properties to Seritage, in a Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Sears Roebuck on June 30, 2015.  Subsequently, on July 7, 2015, Meerschaert, in his capacity as Vice President, Tax, Assistant Treasurer and Secretary, caused Sears Roebuck to transfer an additional six properties to Seritage by executing a Bill of Sale.

152.    Sears Development also acted at the direction of its sole director, Riecker.  Riecker directed that Sears Development take all actions in furtherance of the Seritage Transaction, including the sale of a property to Seritage SRC Finance LLC in a Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Sears Development on July 1, 2015.

153.    Continuing the trend, Sears Roebuck de Puerto Rico acted at the direction of its directors, Munjal and Rodney.  Munjal and Rodney directed that Sears Roebuck de Puerto Rico take all actions in furtherance of the Seritage Transaction, including the sale of two properties to Seritage SRC Finance LLC in a Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Sears Roebuck de Puerto Rico on July 1, 2015.

### 4.    The Sale-and-Lease-Back Undervalued the Transferred Real Estate Assets and Joint Venture Interests by At Least Hundreds of Millions of Dollars

154.    On or about July 7, 2015, Sears and Seritage closed on the Sale-and-Lease-Back of 266 Sears stores, including 235 properties that Sears owned in full and 31 properties that Sears owned 50% of as part of a joint venture.

155.    Seritage paid Sears a total of $2.58 billion, net of costs, for the real estate assets and joint venture interests, a purchase price that was based (as to the 235 wholly owned properties) on appraisals performed by C&W.  It was not the result of any negotiation between Sears and Seritage, and in fact not a single person or entity sought to increase the purchase price on Sears's behalf or considered the validity or fairness to Sears of the C&W appraisals.  This purchase included:  (i) the purchase of KMT Mezz from Kmart; (ii) the purchase of SRC Mezz and SPS Portfolio Holdings LLC from Sears Roebuck and (iii) the purchase of certain other real estate assets from Kmart (and one of its subsidiaries) and Sears Roebuck.

156.    C&W's appraisals, each of which was addressed to Riecker, were fundamentally flawed and undervalued the 235 properties that Sears owned in full by hundreds of millions of dollars, which, in turn, meant Seritage underpaid at least that much for the properties.  The appraisals were flawed in multiple respects.  All of the Defendants included in the Seritage Transaction knew or were reckless in not knowing that Sears's properties were being sold for less than fair market value.

157.    *First*, as dictated by the terms of C&W's engagement agreement with Sears Holdings, in valuing the properties, C&W considered only the "income capitalization" approach, i.e., the present value of the future rental payments that Sears would make to Seritage.  At the very least, C&W also should have applied the "sales comparison" approach by looking at comparable sales to assess value.  Failing to include the sales comparison approach was highly atypical for a real estate appraisal process, especially when the highest and best use of many of these properties was not as leased to Sears (which lease could be terminated unilaterally by Seritage).  Each of the C&W appraisals contained the same, factually false boilerplate language stating that insufficient sales existed to make the comparison approach useful.  This was not correct on a national or a

regional market basis; moreover, it was not correct even at some county and municipality market levels. Not only had there, in fact, been a substantial number of market transactions around large anchor tenant stores in recent years, not one of which was utilized in any of the appraisals, but Sears *itself* had sold approximately $1.5 billion worth of real estate in the two years preceding the Seritage Transaction.

158.    ***Second***, C&W improperly and systematically utilized lower than average "market rents" in its income capitalization methodology. Determining the appropriate "market rent" was a critical first step in the income capitalization approach. Overall, the "market rents" calculated by C&W for each of the 235 properties transferred to Seritage were, on a portfolio-wide basis, ***30.2% below*** average comparable market rents (and that is prior to taking into consideration the additional reduction C&W took to account for the unusual terms of the Master Leases described below). Since the $2.58 billion purchase price was determined based on the income capitalization method (i.e., treating the rental income streams from these properties as perpetuities and dividing the net operating income by a capitalization rate), the use of artificially low rents had the direct effect of substantially lowering the price that Seritage paid Sears for the properties. C&W employed different rationales to lower the rents for different properties, but the overall result was a substantially below-market average rent, often below the low end of ***all*** other rental comparables considered.

159.    ***Third***, C&W further reduced the rent streams it used to value the properties by between 20% and 30%. This reduction in rent payable by Sears purportedly was intended to offset the benefit to Seritage of the recapture and redevelopment rights and the other unusual features of the planned Master Leases. In other words, the parties recognized the leases had very unfavorable terms for Sears and intentionally set the rent substantially below otherwise market rents. But by

using this under-market rent as the basis for its appraisals, C&W materially undervalued the properties by a significant multiple of the amount by which the rent was discounted. For example, if C&W understated the annual rent at a given property by $1 million on account of the lease terms, the purchase price would be lowered by $12.5 million at an 8% capitalization rate ($1 million divided by .08). The recapture and redevelopment provisions thus resulted in a *lower* overall valuation even though those same provisions were a recognized *benefit* to Seritage. A feature of the deal that should have caused Seritage to pay more actually caused it to pay less.

160.    As some of the C&W appraisals acknowledged, because C&W valued the property using the rental rate that Sears would pay Seritage, C&W should have adjusted the capitalization rate downward (thereby increasing its valuations) to adjust for the effect of the below-market rent. However, instead of applying *lower* capitalization rates, C&W routinely applied rates at the *high* end of its calculated range (thereby again lowering the value). Indeed, C&W's average capitalization rate of 8.16% was higher than the averages in both datasets that C&W consulted. As C&W has acknowledged, it is a matter of simple arithmetic that applying a *higher* capitalization rate to the same expected cash flow results in *lowering* the resulting appraised value. This was in addition to using lower than market rents, to which the further value-lowering, higher-capitalization rate was applied.

161.    *Fourth*, the C&W appraisal process failed to value the properties based on their highest and best use. The valuation technique employed by C&W assumed that Sears would continue renting the properties at below-market rents, even though the premise of the Seritage Transaction—as provided for in the Master Leases—was that Seritage would recapture and redevelop the properties from Sears and re-let them to other tenants at higher rents. C&W's failure to consider the properties' highest and best use was a violation of the professional appraisal

standards that C&W is required to follow and precludes these appraisals, even if all of the other errors did not exist, from being fair market valuations of the real estate.

162.    By contrast, the proper, industry-standard approach would consider the highest and best use for each property and, when it indicated a value higher than assuming perpetual occupancy at a discounted rental rate, would use a combination of (i) a residual development value analysis based on a discounted cash-flow method to determine the developable value of the properties in question and (ii) a comparable sales approach for development properties.    C&W never did anything of the sort, nor did any other advisor, even though it is obvious that an appraiser looking to obtain the highest price for the benefit of Sears (or determine the fair market value) would have done so.

163.    *Fifth*, the C&W appraisals were riddled with errors and inconsistencies.[17]  The quality control process at C&W was decentralized and had limited ability to confirm that individual appraisers across different offices and geographies adequately documented their appraisals and applied consistent analyses and assumptions where appropriate.  To that end, Duff & Phelps observed "internal inconsistencies" in C&W's analysis and reported that Riecker, who was running the process from Sears's perspective, had "not been too pleased with the quality of C&W's work" and "blasted Cushman for their ineptitude."  An independent review of a sample of the C&W appraisals confirms numerous errors and inconsistencies, all of which were apparent at the time.

164.    Subsequent events confirm that C&W's rents were systematically too low, and, thus, that the $2.58 billion purchase price was too low.  *First*, cognizant that leasing to Sears does not represent the highest and best use of many of the newly acquired properties, Seritage has redeveloped and re-tenanted (or begun the process of redeveloping) Sears stores at a rapid pace,

with such activity increasing 34% quarter-over-quarter since the fourth quarter of 2015. On January 17, 2017, Seritage announced that it had signed new leases totaling 2.2 million square feet, increasing third-party rental income by 94% since Seritage's formation. As of September 2018, Seritage had already redeveloped or was in the process of redeveloping 79 stores (i.e., approximately 26 per year).

165.    Seritage's recapture and redevelopment strategy has been a success as evidenced by Seritage's ability to achieve a staggering *3.5x to 4.5x* "rental uplift" upon re-leasing space formerly occupied by Sears, thereby validating the underlying premise of the Seritage Transaction and demonstrating that the "highest and best use" should have been a key consideration in the appraisal process.

166.    Seritage has passed its success along to its owners (i.e., the Sears Holdings shareholders who participated in the Seritage Rights Offering). Following the July closing of the Seritage Transaction, Seritage began paying quarterly dividends. In fact, Seritage paid quarterly dividends from December 2015 to June 2019, totaling approximately $220 million. On information and belief, the Controlling Insider Shareholders have received at least $131 million in dividends from Seritage.

167.    *Second*, the undervaluing of all the properties C&W appraised also is apparent from C&W's valuation of 17 of the 31 joint venture properties (i.e., properties owned 50% by Sears and 50% by its joint venture partners).[18] The total value of the 31 joint venture properties was $858 million, based on the $429 million paid by the joint venture partners to Sears for 50% ownership in the properties. Although C&W appraised 17 of the 31 properties at a total value of $364 million as part of its process for the Seritage Transaction, those same properties were valued at a total of

$520 million in connection with the sale of the joint venture partners' 50% interest in them to Seritage—a number reached through what Sears's Head of Real Estate, Jeff Stollenwerck, described as a "true" third-party and arm's length negotiation with the joint venture partners. This negotiated sales price was, on average, 43% higher than C&W's appraisals for Sears's 50% interest in the same joint ventures, demonstrating that the appraisals were woefully beneath fair market purchase prices that would have been negotiated had a true marketing and valuation process been employed (and presumably below what Sears would have received for its 50% joint venture interest had it just negotiated at arm's length with Seritage as did its joint venture partners).

168.    **Third**, Sears has sold to buyers other than Seritage many other stores valued by C&W for well above the C&W appraisal price, suggesting that C&W generally undervalued Sears's stores. Beginning in 2016 and continuing into 2018, Sears sold 36 properties that had been appraised by C&W. Collectively, those stores had been valued at $565 million by C&W, but Sears was able to sell them (unlike the Seritage Transaction) at arm's length, even in a generally anemic retail sales market, for $793 million, more than 40% above appraised value.

169.    After correcting for these and other errors, a fair valuation would have resulted in a purchase price of at least hundreds of millions of dollars more than Seritage paid.

170.    Finally, it is important to note that Fairholme Capital—who performed extensive analyses of Sears's real estate portfolio—also concluded that C&W's valuations were woefully low. In a letter to Fairholme Capital's shareholders sent April 9, 2015, Berkowitz noted that Fairholme Capital's "initial analyses of [the Seritage] portfolio shows an estimated gross value of $5 billion," which was approximately twice the C&W valuation. Berkowitz understood the windfall Fairholme Capital could expect to receive in light of this undervaluation. He continued in the letter: "If [Sertiage's] total purchase price equals $2.5 billion and is fully funded with equity,

then each dollar of value will only cost us 50 cents.  Any use of leverage by [Seritage] would further improve our economics."

171.    In a document drafted in December 2016, Fairholme Capital reflected on why its valuation was so much greater than C&W's appraisals.  As Fairholme Capital explained, "Cushman and Wakefield has to stick with the standard appraisal methodology and does not value based on development potential."  Fairholme Capital does not mention that the "standard appraisal methodology" C&W had to use is not what is standard in the industry (or standard to reach a fair market value) but rather is the non-market "standard" which C&W was instructed by Sears fiduciaries to use and which was actually *built in* to C&W's engagement letter with Sears.  This, of course, was one of the primary reasons that C&W's appraisals of the Seritage properties were woefully below fair value:  C&W failed to take into consideration the properties' highest and best use.  Fairholme Capital itself valued 84 of the 235 properties contributed to Seritage and found that those properties alone were worth between $1.3 billion and $3.3 billion, proportionately much greater than the approximately $2.2 billion at which C&W valued *all* 235 properties taken together.[19]

172.    Remarkably, instead of taking steps to correct C&W's clear undervaluation of the Seritage properties, Fairholme Capital seized the windfall offered by the undervaluation *despite* owing fiduciary duties to Sears Holdings because of its status as a Controlling Insider Shareholder.

**5.    Onerous Master Lease Terms Further Benefited Seritage at Sears's Expense**

173.    The Sale-and-Lease-Back contained one-sided, off-market terms that benefited Seritage and harmed Sears.  Two terms in particular were unfair to Sears:  (i) Seritage's right to "recapture" up to 50% of the space at 214 of the properties it purchased and 100% of the space at

the remaining 21 properties (plus auto care centers) and (ii) Sears's obligation to pay a punitive termination fee calculated as one year's rent if Sears elected to terminate the lease with respect to individual stores.

174.    Seritage's recapture rights harmed Sears because it left Sears's most profitable stores vulnerable to eviction or having their footprint materially reduced.  Indeed, the insiders, on behalf of Sears and Seritage, made preliminary plans for the space to be recaptured even before the completion of the Seritage Transaction, a fact that was never disclosed to investors in public filings which reference only mere "rights" to recapture space in the future.  Notably, the Master Leases imposed no limitation on Seritage's right to lease the space to anyone, including competitors of Sears.  Sears received no benefit from the higher rents to be received by Seritage nor the redevelopment profits which accrued on account of its former real estate sold to Seritage at a bargain price.

175.    Sears's liability to pay a punitive termination fee harmed Sears because it increased the cost of Sears's stated strategy of closing unprofitable stores.  The day before the Seritage Transaction, Sears could close a store without paying any fee to anyone (and could sell the property for market value); the day after closing the Seritage Transaction, Sears could only close its stores upon paying one year's rent plus reimbursing Seritage for all carrying costs and receive nothing from the sale of the property.  These termination fees would become a material expense for Sears as its business declined and store closures increased.  According to Jeffrey Stollenwerck, Sears's head of real estate, even as the Seritage Transaction was being negotiated, Sears's performance continued to decline, such that certain stores included in the Seritage Transaction that had been EBITDA-positive when the transaction was first contemplated were EBITDA-negative by the time the transaction closed.  In the months and years after the Seritage Transaction, Sears closed many

of these EBITDA-negative stores, and paid a termination fee to do so—a termination fee Sears would not have been required to pay prior to the Seritage Transaction.

176.    Moreover, Sears was prohibited from exercising the termination right to reduce aggregate rent under the Sale-and-Lease-Back by more than 20% per year.  In other words, to the extent Sears wanted to exit stores faster than 20% per year, it had to keep paying rent and then, when it could contractually exit, pay an additional one-year rental penalty.

177.    Taken together, the Sale-and-Lease-Back terms ensured a lose/lose for Sears.  With respect to Sears's unprofitable stores, Sears would continue to pay Seritage rent, while also paying Seritage for the "privilege" of closing those stores.  With respect to Sears's profitable stores, Seritage had the one-way option to evict Sears from half of all of the space in the stores and relet or redevelop the site at a multiple of the rents that Sears was paying, and Sears would share none of the upside of re-letting the stores at higher rents.  Duff & Phelps, Sears's advisor on the transaction, estimated the value to Seritage (and the detriment to Sears) of these unusual lease terms at between $214 and $488 million.

178.    The Sale-and-Lease-Back was not the product of an arm's length negotiation process.  Because Seritage did not exist prior to the transaction, all decisions about Seritage were made by Sears personnel and—as Schriesheim, former CFO of Sears, explained to counsel for the Subcommittee—mainly by Lampert himself.  Jeffrey Stollenwerck similarly stated that he was not aware of any "negotiation" of the Sale-and-Lease-Back or of any person tasked with protecting Sears's interests, as opposed to someone focused solely on maximizing the benefits of the transaction to Seritage.  Indeed, Lampert dictated the terms to his attorneys who drew up the leases.

179.    Nor did Sears Holdings allow a disinterested committee of the Sears Holdings Board (such as the RPT Committee) to negotiate the terms.  The RPT Committee, in evaluating

the transaction, did not have an independent real estate appraisal firm or an independent solvency firm and never considered hiring either. The RPT Committee never evaluated or weighed in on the C&W appraisals, the Solvency Analysis or Fairness Opinion issued by Duff & Phelps, the terms of the Master Leases or the overall fairness of the transaction from Sears's perspective. Rather, the RPT Committee's sole focus in reviewing the transaction was whether Lampert and ESL were getting a better deal than other Sears Holdings *shareholders*. The RPT Committee was not tasked with considering and did not consider any of the other key aspects of the transaction, including the price of the rights offering, the value of the properties themselves, the one-sided lease terms or Sears's solvency (or insolvency). The RPT Committee did not consider Sears's creditors and whether the transaction would harm them. And of course, the RPT Committee approved management's bad-faith projections year after year, despite knowing Sears's historical performance and its history of missing its projections by hundreds of millions, if not billions, of dollars. It also bears noting that Kamlani, one of the four members of the RPT Committee at the time, joined ESL as its President in March 2016, less than one year after the Seritage Transaction closed.

180. The transaction's one-sided terms and transfer of value from Sears to Sears Holdings's shareholders are the predictable result of this flawed process.

**6. Sears Holdings, Kmart Holding and the Real Estate Transferors[20] Were Insolvent Under the Balance-Sheet Test at the Time of the Seritage Transaction**

181. At the time of the Seritage Transaction, Sears Holdings had a negative net asset value and its liabilities exceeded its assets at fair value and, thus, was insolvent under the balance-

---

[20] Collectively, Plaintiff Sears Roebuck and Debtors Sears Development Co., Sears Roebuck de Puerto Rico, Inc., Kmart Holding Corporation, Kmart Corporation and Kmart of Washington LLC are referred to herein as the "Real Estate Transferors."

sheet test.

182.    In connection with the Seritage Transaction, Sears Holdings retained Duff & Phelps to provide a solvency opinion.  That solvency opinion concluded that Sears Holdings was solvent on a balance-sheet basis, but that opinion was based on host of assumptions that were either deeply flawed or outright erroneous.

183.    For example, in its solvency opinion, Duff & Phelps opined that Sears Roebuck had a net asset value of $3.959 billion as of April 4, 2015, but Duff & Phelps's valuation relied upon a $6.59 billion intercompany receivable due to Sears Roebuck largely from Sears Holdings. Because Sears Holdings was insolvent, that intercompany receivable was impaired.  Correcting even that single error reveals that Sears Roebuck was insolvent on a balance-sheet basis.

### 7.    Sears Holdings, Kmart Holding and the Real Estate Transferors Were Insolvent under the Cash-Flow Test at the Time of the Seritage Transaction

184.    Sears Holdings, Kmart Holding and the Real Estate Transferors also were insolvent under the cash-flow test, both before and after the Seritage Transaction.

185.    At the time of the Seritage Transaction, Sears Holdings had existing debt obligations with an aggregate principal amount of more than $3.7 billion, and Kmart Holding and the Real Estate Transferors were liable on substantially all of that debt.  Together with interest, these Debtors required a total of more than $4.7 billion in cash (and more than $4.2 billion in cash by 4Q 2019) to pay off that debt.

186.    Sears's cash and cash equivalents immediately after the Seritage Transaction (including the $2.58 billion purchase price) totaled approximately $3 billion.  By quarter end, after paying down the ABL due in 1Q 2016, Sears Holdings had just more than $1.8 billion in cash and cash equivalents remaining.  Even *assuming* that Sears Holdings, Kmart Holding and the Real Estate Transferors were to use *all* of these funds for debt principal and interest payments (rather

than continued operating losses, as actually occurred), these Debtors still would have required more than $1.2 billion of *additional* free cash flow by 4Q 2019 and more than $460 million of that by 3Q 2018 in order to satisfy its debts.

187.    After the Seritage Transaction, Sears could not reasonably have been expected to have $460 million in free cash flow by 3Q 2018 (when the Second Lien Notes, among other debts, came due).  Indeed, assuming that Sears's cash flow from operations merely stayed flat after the transaction, rather than continuing to decline as they had over the preceding five years, Sears would have a cash balance of negative $1.1 billion—i.e., it would be out of cash—by the end of FY 2016, less than 18 months later.

188.    In actuality, Sears ultimately experienced free cash flow of approximately *negative* $2.4 billion in FY 2015, *negative* $1.5 billion in FY 2016 and *negative* $1.9 billion in FY 2017. Even with non-ordinary-course sales of Sears's core assets, after the Seritage Transaction, Sears could not reasonably have funded these debt principal and interest payments.  Not coincidentally, 3Q 2018 is when the Debtors ultimately filed for bankruptcy, with liabilities exceeding $11.34 billion as of August 4, 2018.

189.    In light of Sears's declining financial performance over the preceding years and the numerous adverse qualitative trends, as detailed above, there was no good-faith basis to assume that Sears could achieve the required levels of liquidity and cash flow to remain in business and pay its debts as they came due following Seritage.  In the four immediately prior fiscal years, 2011-2014, Sears had failed to generate any cash flow from operations or any earnings to cover interest expenses.  In the immediately prior year, FY 2014, Sears had negative free cash flow of $1.7 billion and negative EBITDAP of approximately $750 million.  And in the four immediately prior fiscal years, 2011-2014, Sears had suffered a cumulative net loss of approximately $7 billion.

8. **Sears Holdings, Kmart Holding and the Real Estate Transferors Had Unreasonably Small Capital at the Time of the Seritage Transaction**

190.    In addition, Sears Holdings, Kmart Holding and the Real Estate Transferors had unreasonably small capital—and, in fact, negative capital—after the Seritage Transaction.

191.    Lampert himself acknowledged Sears's near-insolvent state by telling the Sears Holdings Board that, without the Seritage Transaction, "management would be operated more in 'liquidation mode' than 'operating mode.'"

192.    As detailed above, Sears's multi-year performance history leading up to the Seritage Transaction demonstrated that it was unable to generate sufficient profits to sustain operations.  Indeed, Sears could not generate *any* profits and could only temporarily stave off complete collapse by selling core assets and incurring further secured debt that it would be unable to generate sufficient cash flow to repay.

### Sears Files for Bankruptcy

193.    On October 15, 2018, Sears Holdings and most of its direct and indirect subsidiaries filed for bankruptcy protection under chapter 11 of the Bankruptcy Code.

194.    On October 15, 2019, the Court entered the Confirmation Order confirming *the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5293] (the "Plan").  The Confirmation Order granted joint standing between the Debtors and the Creditors' Committee to pursue the claims and causes of action set forth in this Complaint with the oversight of designees selected by the Debtors and Creditors' Committee, each of whom will become the initial board members of the liquidating trust to be established under the Plan upon the effective date (the "Effective Date").  Upon the occurrence of the Effective Date, the liquidating trust will succeed the Debtor Plaintiffs and the Creditors' Committee as the

plaintiff in this Adversary Proceeding under the administration and oversight of the liquidating trust board.

### Count 1
### Avoidance of the Lands' End Spin-off as an Actual Fraudulent Transfer
### (11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); 13 L.P.R.A. §§ 30621 and 33006; 28 U.S.C. § 3304(a)–(b); NY DCL § 276; 6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))

195.    Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this Complaint as though fully set forth herein.

196.    The Lands' End Spin-off resulted in transfers of interests in the property of Sears Holdings and Sears Roebuck.  Specifically, 100% of the stock of Lands' End was transferred from Sears Roebuck to Sears Holdings and then from Sears Holdings to Sears Holdings's shareholders, including the Shareholder Defendants as listed in Exhibit A to this Complaint (the "Lands' End Transfers").  The transferred property was worth at least $1 billion, with the Shareholder Defendants receiving hundreds of millions of this value.

197.    Sears Holdings and Sears Roebuck made the Lands' End Transfers to and for the benefit of Sears Holdings's shareholders, including the Shareholder Defendants.

198.    The Lands' End Transfers were made with an actual intent to hinder, delay and/or defraud Sears Holdings's and Sears Roebuck's creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the Lands' End Transfers, specifically including but not limited to:

a)    Many of the Lands' End Transfers were to insiders, including Lampert and other officers and directors.

b)    Lampert and the other culpable parties created substantially false financial projections to paper over the numerous problems with the Lands' End Transfers.

c)  At the time of the Lands' End Spin-Off, Sears had substantial obligations to numerous creditors, including but not limited to the PBGC and the Department of Treasury of Puerto Rico.

d)  Sears was cash flow insolvent before or became cash flow insolvent as a result of the Lands' End Spin-Off.

199.    As a result of the Lands' End Transfers, Sears Holdings, Sears Roebuck and the creditors of Sears Holdings and Sears Roebuck have been harmed.

200.    Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings and Sears Roebuck in property, including each Lands' End Transfer to the Shareholder Defendants, that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. One or more creditors of Sears Holdings and Sears Roebuck, including but not limited to PBGC and Department of Treasury of Puerto Rico, hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Lands' End Transfersunder applicable non-bankruptcy law.

201.    The Lands' End Transfers should be avoided as actual fraudulent transfers under sections 544 and 550 of the Bankruptcy Code, section 1117 of the Internal Revenue Code for a New Puerto Rico, section 3304 of the Fair Debt Collection Practices Act, and applicable state law.

202.    By virtue of the foregoing, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee are entitled to a judgment against each of the Shareholder Defendants in the amount of the value of the Lands' End Transfer(s) they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with, among other things, the Lands' End Spin-off.

**Count 2**
**Avoidance of the Lands' End Spin-off as a Constructive Fraudulent Transfer**
**(11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); 13 L.P.R.A. §§ 30621 and 33006;**
**28 U.S.C. § 3304(a)–(b); NY DCL §§ 273, 274 and 275;**
**6 Del. C. §§ 1304(a)(2) and 1305(a); 740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a))**

203.    Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this Complaint as though fully set forth herein.

204.    The Lands' End Transfers were transfers of interests in the property of Sears Holdings and Sears Roebuck—namely, 100% of the stock of Lands' End that was transferred from Sears Roebuck to Sears Holdings and then to Sears Holdings's shareholders—made to and for the benefit of Sears Holdings's shareholders, including the Shareholder Defendants.

205.    The Lands' End Transfers to the Shareholder Defendants were made for no consideration, without fair consideration or for less than reasonably equivalent value.

206.    The Lands' End Transfers were made at a time when Sears Holdings and Sears Roebuck had unreasonably small capital and/or at a time when Sears Holdings and Sears Roebuck intended to incur or believed they would incur debts beyond their ability to pay as such debts matured.

207.    Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings and Sears Roebuck in property, including each Lands' End Transfer to the Shareholder Defendants, that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings and Sears Roebuck, including but not limited to PBGC and Department of Treasury of Puerto Rico, hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Lands' End Transfers under applicable non-bankruptcy law.

55

208.    The Lands' End Transfers should be avoided as constructive fraudulent transfers under sections 544 and 550 of the Bankruptcy Code, section 30621 of the Internal Revenue Code for a New Puerto Rico, as codified, section 3304 of the Fair Debt Collection Practices Act and applicable state law.,

209.    By virtue of the foregoing, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee are entitled to a judgment against each of the Shareholder Defendant in the amount of the value of the Lands' End Transfer(s) they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with the Lands' End Spin-off.

### Count 3
### Avoidance of the Seritage Rights Transfers as Actual Fraudulent Transfers
### (11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); NY DCL § 276; 6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))

210.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this Complaint as though fully set forth herein.

211.    The Seritage Rights Offering resulted in transfers of interests in the property of Sears Holdings—namely, the Seritage Rights—to Sears Holdings's shareholders, including the Defendant Shareholders (the "Seritage Transfers").  The transferred rights were worth at least several hundred million dollars, with the Shareholder Defendants millions of this value.

212.    Sears Holdings transferred the Seritage Rights to and for the benefit of Sears Holdings's shareholders, including the Shareholder Defendants.

213.    The Seritage Transfers were made with an actual intent to hinder, delay and/or defraud Sears Holdings's creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the Seritage Rights Offering and from the intent of the transferees, specifically including but not limited to:

a)    Many of the Seritage Transfers were to insiders, including Lampert and other officers and directors.

b)    Lampert and the other culpable parties created substantially false financial projections to paper over the numerous problems with the Seritage Rights Offering.

c)    At the time of the Seritage Rights Offering, Sears had substantial obligations to numerous creditors, including but not limited to the PBGC and the Department of Treasury of Puerto Rico.

d)    Sears was insolvent before or became insolvent as a result of the Seritage Rights Offering.

214.    Lampert's intent to hinder, delay and/or defraud the creditors of Sears Holdings can be imputed to Sears Holdings.  Lampert and the ESL Defendants were the largest transferees of the Seritage Rights Offering.  As CEO, Chairman of the Sears Holdings Board and controlling shareholder of Sears Holdings with the ability to remove other board members, Lampert was able to exercise an inordinate amount of influence over other members of the Sears Holdings Board.  Lampert expressed his desire that the board members approve the Seritage Transaction and warned that the failure to close the transaction would lead to "liquidation mode" and require management to close and sell additional stores.

215.    As a result of the Seritage Rights Offering, Sears Holdings and its creditors have been harmed.

216.    Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings in property, including each Seritage Transfer to the Shareholder Defendants, that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Seritage Rights Offering under applicable non-bankruptcy law.

217.    The Seritage Transfers should be avoided as an actual fraudulent transfer under sections 544 and 550 of the Bankruptcy Code and applicable state law.

218.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Shareholder Defendants in the amount of the value of the Seritage Transfers they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with the Seritage Transaction.

## Count 4
**Avoidance of the Seritage Rights Transfers as Constructive Fraudulent Transfers**
**(11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); NY DCL §§ 273, 274 and 275;**
**6 Del. C. §§ 1304(a)(2) and 1305(a); 740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a))**

219.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this Complaint as though fully set forth herein.

220.    The Seritage Rights Offering resulted in transfers of interests in the property of Sears Holdings made to and for the benefit of Sears Holdings's shareholders, including the Shareholder Defendants.

221.    The Seritage Transfers were made for no consideration, without fair consideration or for less than reasonably equivalent value.

222.    The Seritage Rights were transferred (a) when Sears Holdings was insolvent, (b) when Sears Holdings had unreasonably small capital and/or (c) when Sears Holdings intended to incur or believed it would incur debts beyond its ability to pay as they matured.

223.    Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings in property including each Seritage Transfer to the Shareholder Defendants, that is voidable under

applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. One or more creditors of Sears Holdings hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Seritage Rights Transfers under applicable non-bankruptcy law.

224. The Seritage Rights Offering should be avoided as a constructive fraudulent transfer under sections 544 and 550 of the Bankruptcy Code and applicable state law.

225. By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Defendant Shareholders in the amount of the value of the Seritage Rights they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with the Seritage Transaction.

### **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment and grant the following relief to the extent consistent with the Plan:

a. a judgment against the Defendant Shareholders listed on Exhibit A finding and declaring that the Lands' End Transfers and the Seritage Rights Transfers constitute actual and constructive fraudulent transfers;

b. a judgment avoiding the transfer of shares to the Defendant Shareholders;

c. a judgment permitting the recovery of the value of the transfer of shares to the Defendant Shareholders;

d. pre-and post-judgment interest to the maximum extent permitted by law;

e. reasonable attorneys' fees, costs, and expenses incurred in this action; and

f. any further relief as the Court deems just, proper, or equitable under the circumstances.

Dated: October 15, 2020          **ASK LLP**

By: _/s/ Joseph L. Steinfeld, Jr._
Joseph L. Steinfeld, Jr., Esq., MN SBN 0266292
Brigette G. McGrath, Esq., NY SBN 4962379
Kara E. Casteel, Esq. MN SBN 0389115
Richard J. Reding, Esq. MN SBN 0389945
ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN  55121
Telephone: (651) 406-9665
Fax: (651) 406-9676
Email: jsteinfeld@askllp.com
          bmcgrath@askllp.com
          kcasteel@askllp.com
          rreding@askllp.com

*-and-*

Edward E. Neiger, Esq.
Marianna Udem, Esq.
151 West 46th Street, 4th Fl.
New York, NY  10036
Telephone: (212) 267-7342
     Fax: (212) 918-3427

*Counsel to the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al., acting on behalf of the Debtors' Estates*