# <u>EXHIBIT D</u>

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☐ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☒ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22031) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | |

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1. | Who is the current creditor? | Armande Mock, Individually and as Personal Representative of the Estate of Roy Mock |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| 2. | Has this claim been acquired from someone else? | ☒ No<br>☐ Yes. From whom? |
|---|---|---|

| 3. | Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Sharon J. Zinns<br>Zinns Law, LLC<br>2082 Westwood Rd SE<br>Smyrna, GA 30080<br><br>Contact phone  404-882-9002<br>Contact email  sharon@zinnslaw.com | **Where should payments to the creditor be sent?** (if different)<br><br>same<br><br><br>Contact phone<br>Contact email |
|---|---|---|---|

| 4. | Does this claim amend one already filed? | ☒ No<br>☐ Yes.   Claim number on court claims registry (if known)_____   Filed on _____<br>                                                                                                 MM  / DD  / YYYY |
|---|---|---|

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☒ No<br>☐ Yes. Who made the earlier filing? _____ |
|---|---|---|

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?** $ 1,000,000 . **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

wrongful death of Roy Mock from mesothelioma; pathology report, death certificate, and relevant deposition pages attached

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)( ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** *Sharon J. Zinns*
Sharon J. Zinns (Oct 29, 2020 12:57 EDT)

**Email:**    sharon@zinnslaw.com

_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name of the person who is completing and signing this claim:

| Name | Sharon  J. Zinns |
|---|---|
| | First name        Middle name        Last name |
| Title | Attorney |
| Company | Zinns Law, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 2082 Westwood Rd SE |
| | Number        Street |
| | Smyrna        GA        30080 |
| | City        State        ZIP Code |
| Contact phone | (404) 882-9002        Email    sharon@zinnslaw.com |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ **I have supporting documentation.**
    **(attach below)**

☐ **do not have supporting documentation.**

🖇 **Attachment**

**PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.**

**IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.**

**A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.**

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                                   12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else,** then state the identity of the last party who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://restructuring.primeclerk.com/sears.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Sears Holdings Corporation Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

**Do not file these instructions with your form**


## MAYO CLINIC
**Mayo Medical Laboratories**

**1-800-533-1710**
# PATHC
Pathology Consultation

| Patient ID | Patient Name | | Birth Date | Gender | Age |
|---|---|---|---|---|---|
| M000449060 | MOCK, ROY E | | 1943-01-22 | M | 74 |

| Order Number | Client Order Number | Ordering Physician | Report Notes |
|---|---|---|---|
| SA00365049 | S17-2782 | HEJKA, ANTHONY | |

| Account Information | Collected |
|---|---|
| C7012680   Candler Hospital | 05 Sep 2017 13:38 |

## Pathology Consult

Case Number CR-17-51656

**Interpretation** MCR

**FINAL DIAGNOSIS**

Pleura, left, biopsy (S17-2782, 9/5/2017): Malignant mesothelioma, biphasic type (see Comment).

**COMMENT**

This 74-year-old gentleman presented with pleural effusion and was found to have pleural based lesions on the left anterior chest wall. I had the pleasure to review this case because of my special interest in pulmonary pathology and also shared it with my colleague, Dr. Joanne E. Yi, who shares my interest and we completely agree with your assessment.

The submitted slides from the left pleura reveal a biphasic neoplasm. This neoplasm is predominantly comprised of atypical spindle cells. However, there are also foci of more round to oval cells with open chromatin, prominent nucleoli, and ample cytoplasm. The atypical cells are growing in a fibrotic background and a tumefactive growth pattern. Overall, in my opinion, this a malignant neoplasm and I considered a biphasic malignant mesothelioma, a sarcomatoid carcinoma, metastatic melanoma, and sarcoma. Submitted immunostains show that the neoplastic cells at least focally are positive for MCK, CK7, CK5, calretinin, p63, vimentin, and WT1, and are negative for TTF-1, MOC31, BerEp4, B72.3, S-100, CK20, and CD15. Desmin and SMA stain the sarcomatoid component. These morphological and immunophenotypical features are suggestive of a biphasic malignant mesothelioma. Given the strong expression of desmin and SMA in the sarcomatoid component, heterologous leiomyosarcoma-elements might also be a possibility.

Thank you for sharing this case with me. Your submitted material is enclosed. If you have any questions, please do not hesitate to reach me at 507-284-1798. I would appreciate any further follow-up information that you may received on this case.

---

**Participated in the Interpretation** MCR

Raghavendra Pillappa, M.B.B.S.-Pathology Fellow

**Report electronically signed by** MCR

**Anja C. Roden, M.D.**
8-2179

I verify that I have examined all relevant slides/materials for the specimen(s) and rendered or confirmed the diagnosis.

Seen in consultation with:
Joanne E. Yi, M.D. 8-9973

---

**Material Received** MCR

A. S17-2782: Left pleura
18 stained slides, 1 block

**Received:** 16 Sep 2017 06:17

**Reported:** 18 Sep 2017 16:55

---

**Performing Site Legend**

| Code | Laboratory | Address |
|---|---|---|
| MCR | Mayo Clinic Laboratories - Rochester Main Campus | 200 First Street SW, Rochester, MN 55905 |

Printed 19 Sep 2017

**Report Status: Final**
Received and reported dates and times are reported in US Central Time.

CR-17-51656 Page 1 of 1

## GEORGIA DEATH CERTIFICATE

State File Number **2019GA000016800**

| 1, DECEDENT'S LEGAL FULL NAME (First, Middle, Last)<br>ROY EDWARD MOCK | 1a, IF FEMALE, ENTER LAST NAME AT BIRTH | 2, SEX<br>MALE | 2a, DATE OF DEATH (Mo., Day, Year)<br>ACTUAL DATE OF DEATH 03/19/2019 |
|---|---|---|---|

| 3, SOCIAL SECURITY NUMBER<br>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 | 4a, AGE  (Years)<br>76 | 4b, UNDER 1 YEAR<br>Mos. / Days | 4c, UNDER 1 DAY<br>Hours / Mins. | 5, DATE OF BIRTH (Mo., Day, Year)<br>01/22/1943 |
|---|---|---|---|---|

| 6, BIRTHPLACE<br>GEORGIA | 7a, RESIDENCE - STATE<br>GEORGIA | 7b, COUNTY<br>CHATHAM | 7c, CITY, TOWN<br>SAVANNAH |
|---|---|---|---|

| 7d, STREET AND NUMBER<br>201 RUSS CIRCLE | 7e, ZIP CODE<br>31406 | 7f, INSIDE CITY LIMITS?<br>YES | 8, ARMED FORCES?<br>YES |
|---|---|---|---|

| 8a USUAL OCCUPATION<br>FLOOR CONTRACTOR | 8b, KIND OF INDUSTRY OR BUSINESS<br>CONSTRUCTION |
|---|---|

| 9, MARITIAL STATUS<br>MARRIED | 10, SPOUSE NAME<br>ARMANDE F. SWEENEY | 11, FATHER'S FULL NAME (First, Middle, Last)<br>JOHNNY MOCK |
|---|---|---|

| 12, MOTHER'S MAIDEN NAME (First, Middle, Last)<br>MOURICE TOOTLE | 13a, INFORMANT'S NAME (First, Middle, Last)<br>ARMANDE MOCK | 13b, RELATIONSHIP TO DECEDENT<br>WIFE |
|---|---|---|

| 13c, MAILING ADDRESS<br>201 RUSS CIRCLE SAVANNAH GEORGIA 31406 | 14, DECEDENT'S EDUCATION<br>HIGH SCHOOL GRADUATE OR GED COMPLETED |
|---|---|

| 15, ORIGIN OF DECEDENT (Italian, Mex.,French, English, etc.)<br>NO, NOT SPANISH/HISPANIC/LATINO | 16, DECEDENT'S RACE (White, Black, American Indian, etc.) (Specify)<br>WHITE |
|---|---|

| 17, IF DEATH OCCURRED IN HOSPITAL | 17b, IF DEATH OCCURRED OTHER THAN HOSPITAL (Specify)<br>DECEDENT'S HOME |
|---|---|

| 18, HOSPITAL OR OTHER INSTITUTION NAME (If not in either give street and no.)<br>201 RUSS CIRCLE | 19, CITY, TOWN or LOCATION OF DEATH<br>SAVANNAH | 20, COUNTY OF DEATH<br>CHATHAM |
|---|---|---|

| 21, METHOD OF DISPOSITION (specify)<br>BURIAL | 22, PLACE OF DISPOSITION<br>DANIEL BAPTIST CEMETERY HWY 17 RICHMOND HILL GEORGIA 31324 | 23, DISPOSITION DATE (Mo., Day, Year)<br>03/23/2019 |
|---|---|---|

| 24a, EMBALMER'S NAME<br>SANFORD L CARTER JR | 24b, EMBALMER LICENSE NO.<br>3512 | 25, FUNERAL HOME NAME<br>CARTER FUNERAL HOME - RICHMOND HILL |
|---|---|---|

| 25a, FUNERAL HOME ADDRESS<br>10512 FORD AVE RICHMOND HILL GEORGIA 31324 |
|---|

| 26a, SIGNATURE OF FUNERAL DIRECTOR<br>SANFORD CARTER | 26b, FUN. DIR. LICENSE NO<br>3938 | AMENDMENTS |
|---|---|---|

| 27, DATE PRONOUNCED DEAD (Mo., Day, Year)<br>03/19/2019 | 28, HOUR PRONOUNCED DEAD<br>15:20 MILITARY |
|---|---|

| 29a, PRONOUNCER'S NAME<br>Marlene  ALICE Kears | 29b, LICENSE NUMBER<br>RN200599 | 29c, DATE SIGNED<br>03/19/2019 |
|---|---|---|

| 30, TIME OF DEATH<br>15:20 MILITARY | 31, WAS CASE REFERRED TO MEDICAL EXAMINER<br>NO |
|---|---|

| 32, Part I. Enter the chain of events–diseases, injuries, or complications that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, Or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | Approximate interval between onset and death |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | A.  MESOTHELIOMA–DID METASTASIZED | YEARS |
| | Due to, or as a consequence of | |
| | B. | |
| | Due to, or as a consequence of | |
| | C. | |
| | Due to, or as a consequence of | |
| | D. | |

| Part II. Enter significant conditions contributing to death but not related to cause given in Part 1A. If female, indicate if pregnant or birth occurred within 90 days of death. | 33, WAS AUTOPSY PERFORMED?<br>NO | 34, WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |
|---|---|---|

| 35, TOBACCO USE CONTRIBUTED TO DEATH<br>UNKNOWN | 36, IF FEMALE (range 10-54) PREGNANT<br>NOT APPLICABLE | 37, ACCIDENT, SUICIDE, HOMICIDE, UNDETERMINED (Specify)<br>NATURAL |
|---|---|---|

| 38, DATE OF INJURY (Mo., Day, Year) | 39, TIME OF INJURY | 40, PLACE OF INJURY (Home, Farm, Street, Factory, Office, Etc.) (Specify) | 41, INJURY AT WORK? (Yes or No) |
|---|---|---|---|

| 42, LOCATION OF INJURY (Street, Apartment Number, City or Town, State, Zip, County) |
|---|

| 43, DESCRIBE HOW INJURY OCCURRED | 44, IF TRANSPORTATION INJURY |
|---|---|

| 45, To the best of my knowledge death occurred at the time, date and place and due to the cause(s) stated, Medical Certifier (Name, Title, License No.)<br>CYNTHIA L CARTER, MD, 056534 | 46, On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) stated, Medical Examiner/Coroner (Name, Title, License No.) |
|---|---|

| 45a, DATE SIGNED (Mo., Day, Year)<br>03/22/2019 | 45b, HOUR OF DEATH<br>15:20 MILITARY | 46a, DATE SIGNED (Mo., Day, Year) | 46b, HOUR OF DEATH |
|---|---|---|---|

| 47, NAME, ADDRESS, AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH<br>CYNTHIA L CARTER 1352  EISENHOWER DRIVE DRIVE SAVANNAH GEORGIA 31416 |
|---|

| 48, REGISTRAR (Signature)  /S/ GWENDOLYN DUFFIN | 49, DATE FILED - REGISTRAR (Mo., Day, Year)<br>03/26/2019 |
|---|---|

THIS IS TO CERTIFY THAT THIS IS A TRUE REPRODUCTION OF THE ORIGINAL RECORD ON FILE WITH THE STATE
OFFICE OF VITAL RECORDS, GEORGIA DEPARTMENT OF PUBLIC HEALTH. THIS CERTIFIED COPY IS ISSUED UNDER
THE AUTHORITY OF CHAPTER 31-10, CODE OF GEORGIA AND 511-1-3 DPH RULES AND REGULATIONS.

Gwendolyn Duffin

DEPUTY STATE REGISTRAR AND CUSTODIAN
GEORGIA STATE OFFICE OF VITAL RECORDS

COUNTY CUSTODIAN: _____

ISSUED BY: _K. M. Bradley_

DATE ISSUED: _3 - 28 - 2019_

Any reproduction of this document is prohibited by statute. Do not accept unless embossed with a raised seal.
**VOID IF ALTERED OR COPIED**

SOME RELEVANT PAGES OF THE DEPOSITIONS OF ROY MOCK ARE ATTACHED AS SUPPORTING PROOF. GIVEN THE LENGTH OF THE DEPOSITIONS, ALL PAGES CANNOT BE ATTACHED PER INSTRUCTIONS THAT SUBMISSION BE FEWER THAN 100 PAGES. A FULL AND COMPLETE COPY OF THE DEPOSITIONS WILL BE PRODUCED UPON REQUEST.

IN THE STATE COURT OF CHATHAM COUNTY
STATE OF GEORGIA

ROY MOCK and ARMANDE MOCK,      )
                                )
            Plaintiffs,         )      CIVIL ACTION FILE
                                )
vs.                             )      NO.:  STCV1701890
                                )
AMERICAN BILTRITE, INC.,        )
et al.,                         )
                                )
            Defendants.         )      Volume I of III
_____)      (Pages 1-193)


              Deposition of ROY E. MOCK, taken on

        behalf of the Defendants, pursuant to the

        stipulations contained herein, reading and

        signing of the deposition being reserved, in

        accordance with the Georgia Civil Practice Act,

        before Daniel M. Gershwin, Certified Court

        Reporter and Notary Public, at the Embassy

        Suites, 145 West Mulberry Boulevard, Savannah,

        Georgia, on the 9th day of January, 2018,

        commencing at the hour of 10:08 a.m.


_____
                  REGENCY-BRENTANO, INC.
                CERTIFIED COURT REPORTERS
                   13 Corporate Square
                       Suite 140
                  Atlanta, Georgia 30329
                     (404) 321-3333

```
 1   of the residential homes, do you know who made that?

 2       A        Different companies.

 3       Q        Do you recall any that Coastal used while

 4   we're sitting here today?

 5       A        Sir?

 6       Q        Do you know any of the companies that

 7   made carpet that Coastal Flooring installed while you

 8   were there?

 9       A        Let's see.  Mohawk, Columbus Mills,

10   Burlington Industries, and I know there's several

11   others.

12       Q        Did you install any vinyl tile at any of

13   the residential homes while at Coastal?

14       A        No.

15       Q        So then we're looking around '76 you left

16   Coastal, and where did you go?

17       A        Well, in the early '77s, several of the

18   Sears salesmen would come to the houses that I was

19   working in and they would watch me.  And they talked

20   me into signing a contract with Sears to install their

21   merchandise.

22       Q        So you kind of went out on your own and

23   worked as a contractor for Sears?

24       A        Yes.

25       Q        And how long did you maintain that
```

```
 1   relationship with Sears?

 2        A          Probably close to 30 years.

 3        Q          Did you have to sign some sort of

 4   contract to work for them?

 5        A          Yes.

 6        Q          And how long did the contract last?

 7        A          One year.  But I don't think I've ever

 8   signed but one.

 9        Q          Okay.  So you signed that first year and

10   then just kept working for them?

11        A          Yeah.

12        Q          Do you recall the names of any of these

13   Sears employees that came and talked to you?

14        A          Lloyd Lein.

15                   MR. BEDINGER:  I'm sorry.  What was that?

16                   THE WITNESS:  Lloyd Lein.

17                   MR. BEDINGER:  Lloyd?

18                   THE WITNESS:  Lein, L-E-I-N.  He passed

19        away in 1989.

20   BY MR. HAWKINS:

21        Q          Do you know what he passed away from?

22        A          Cancer.

23        Q          Do you know what type of cancer?

24        A          No, not exactly.

25        Q          Is there anyone else other than Lloyd
```

1    that made this initial pitch to you to start working

2    for Sears?

3         A        He was the main one.

4         Q        Okay.  And where was Lloyd based out of?

5         A        Savannah, Georgia.

6         Q        Where was the Sears store in Savannah

7    located?

8         A        Oglethorpe Mall.

9         Q        So then after signing this contract with

10   Sears, how did your relationship work with them in

11   terms of getting work?

12        A        Real good.

13        Q        It was good?

14                 So would they just call you up and say we

15   got somebody that needs flooring installed?

16        A        Well, the salesman would go out and sell

17   the merchandise to the homeowner, and then they would

18   give me a contract that was signed by the homeowner

19   for me to go install it in their house.

20        Q        Did you ever install any products other

21   than flooring?

22        A        One time we did some remote-controlled

23   ceiling fans for just like two or three weeks, and

24   then we quit doing it.

25        Q        Okay.  Now, when you did this work for

```
 1   Sears, did your company have a name or did you just

 2   work by yourself?

 3       A        Mock's Floor Covering Service.

 4       Q        And is Mock's incorporated?

 5       A        No.

 6       Q        Do you have a business license with the

 7   city or county?

 8       A        With the contract with Sears I wasn't

 9   required to have no license because I did --

10   90-something percent of what I did was residential

11   work, and I didn't change the condition of the house

12   as far as size or anything.

13       Q        And how long did you run Mock's Floor

14   Covering?

15       A        From '77 to 2006.

16       Q        Did you have any employees?

17       A        Yes.

18       Q        How many employees did you have?

19       A        Most of the time it was just me and one

20   other guy, and he was like a subcontractor.  He wasn't

21   actually an employee.

22       Q        Just somebody you'd hire to help you with

23   a specific job?

24       A        Yeah.

25       Q        Do you recall the names of any of those
```

```
 1   people that you hired?

 2        A          Oh, Lord.  Yeah, my son-in-law, Bobby

 3   Sauls.  He was with me longer than anybody else.

 4        Q          When did Bobby start working with you?

 5        A          In 2002, I believe.

 6        Q          Did Mock's Floor Company advertise in any

 7   newspapers or --

 8        A          No.

 9        Q          Did you get customers any other way other

10   than through Sears?

11        A          Yes.

12        Q          How did you get those other customers?

13        A          Just from name and all.

14        Q          Like word of mouth?

15        A          Yeah.

16        Q          And what percentage of your work came

17   from Sears versus word of mouth?

18        A          With Sears when I was doing Sears work

19   I'd say about 90 percent.

20        Q          And you said 90 percent of that was

21   residential?

22        A          Yes.

23        Q          And the remaining 10 percent, where did

24   you work at for that time?

25        A          Maybe a church every now and then or
```

IN THE STATE COURT OF CHATHAM COUNTY
STATE OF GEORGIA

ROY MOCK and ARMANDE MOCK,       )
                                 )
            Plaintiffs,          )       CIVIL ACTION FILE
                                 )
vs.                              )       NO.:  STCV1701890
                                 )
AMERICAN BILTRITE, INC.,         )
et al.,                          )
                                 )
            Defendants.          )       Volume II of III
_____ )       (Pages 194-399)


                Deposition of ROY E. MOCK, taken on

        behalf of the Defendants, pursuant to the

        stipulations contained herein, reading and

        signing of the deposition being reserved, in

        accordance with the Georgia Civil Practice Act,

        before Daniel M. Gershwin, Certified Court

        Reporter and Notary Public, at the Embassy

        Suites, 145 West Mulberry Boulevard, Savannah,

        Georgia, on the 10th day of January, 2018,

        commencing at the hour of 9:00 a.m.


_____

                    REGENCY-BRENTANO, INC.
                  CERTIFIED COURT REPORTERS
                     13 Corporate Square
                          Suite 140
                     Atlanta, Georgia 30329
                       (404) 321-3333

1        A        That'd be almost impossible.

2        Q        Okay.

3        A        Because I used some of all of them.

4        Q        All right.  Is there one or two that you

5    used more of?

6        A        No, sir, I used some of all of them.

7        Q        Okay.  And after you spent seven or nine

8    months at Coastal, the Sears people persuaded you to

9    sign a contract with Sears to do their installing?

10       A        Yes, sir.

11       Q        When you worked as a Sears installer, did

12   you use the same brands of sheet vinyl flooring or

13   were there different brands?

14       A        There was all different brands.

15       Q        Okay.

16       A        But a lot of the same brands I used at

17   Coastal.

18       Q        All right.  I'm going to ask you the same

19   question now.  We're stretching over 30 years, and I

20   know that's a long time.  But is there a way for you

21   to give us percentages of what manufacturer you used

22   on your floor jobs installing for Sears?

23       A        No, sir.

24       Q        You told us yesterday that you estimated

25   that 95 percent of the work you did as a Sears

1    Q        Okay.   When you first got it?

2    A        Yeah.   Very seldom we ever used it in a

3  customer's home.

4    Q        After that.   It just wasn't needed I take

5  it?

6    A        No.

7    Q        If you needed it, you'd go get it?

8    A        We used it inside the Sears store to take

9  up floor tiles inside the store.

10    Q        That's the square 12 by 12?

11    A        Yes, sir.

12    Q        Okay.   Do you know what kind of floor

13  tile that was that you took up?

14    A        I think Sears used a Tarkett.

15    Q        I wasn't fishing for a brand name, but

16  thank you.

17             Do you know what kind of tile it was,

18  what it was made of?

19    A        I always called it an asbestos vinyl

20  tile.

21    Q        All right.   Is that the only time you

22  ever removed what you call asbestos vinyl tile?

23    A        That was the majority of the onliest

24  time, yes.

25    Q        All right.   How big of a surface area was

```
 1   that Sears floor that you used that electric machine
 2   on back in the late '80s?
 3        A       God, I don't remember how big the store
 4   was.  It was two stories.
 5        Q       And did you have that tile to remove on
 6   both stories?
 7        A       Yes.
 8        Q       So you did the upstairs and the
 9   downstairs?
10        A       Yes, sir.
11        Q       From the north side to the south side?
12        A       Yes, sir.
13        Q       So the entire floor was removed and then
14   you installed something new on the new surface?
15        A       Yes, sir.
16        Q       Okay.  How long did that job take?
17        A       Probably a couple of months.
18        Q       Working --
19        A       At nighttime.
20        Q       At nighttime.  I was going to ask you
21   because it sounds like that took up your full
22   calendar, but you did it after you finished other
23   jobs?
24        A       Yes.
25        Q       So you would -- how would that work?  Did
```

1   you set aside part of the store to get to on a Tuesday

2   night?

3        A        Yes.   They would move merchandise out of

4   certain areas.

5        Q        And that was your target area?

6        A        Yes.

7        Q        So you'd come in after your normal

8   workday and go to work removing the old floor in the

9   Sears --

10       A        Yes.

11       Q        -- area?

12                Okay.   When you used that machine on that

13  tile, what happened to the tile?

14       A        We scraped it up and put it in a dumpster

15  to be hauled away.

16       Q        All right.   I'm with you there.   I'm

17  asking a more particular question.

18                That 12-inch by 12-inch tile and you put

19  the machine on it, what happens to that tile?   Does it

20  pop up like just free and clear (indicating) or does

21  it break?

22       A        It breaks all to pieces.

23       Q        Okay.   How old was that floor in the

24  Sears building, if you know, before you took it up?

25       A        I think it was installed when the Sears

**Roy Mock**                    Mock v. American Biltrite, et al.                    *January 10, 2018*
**Volume II**

```
 1   store was built, and I don't know when the Sears store
 2   was built, but I know it was there for quite a while.
 3         Q        All right.  You believe it was the
 4   original floor --
 5         A        Yes.
 6         Q        -- for that building?
 7                  So if I find out when that Sears store
 8   opened, we might know when the floor was installed?
 9         A        That's right.
10         Q        Okay.  And Sears will tell us if they
11   know.
12                  Now, when you worked with that floor tile
13   and that machine and the tiles broke up, did each and
14   every one break up like that or did some of them come
15   up free and clear?
16         A        I'd say 99 percent of them broke all to
17   pieces.
18         Q        All to pieces?
19         A        (Nods head affirmatively.)
20         Q        So help me with the biggest piece that's
21   left from a 12-by-12 tile after you use that machine
22   on it in the Sears store.
23         A        Maybe a 2 by 4 inch.
24         Q        Section?
25         A        Yes.
```

**Mock v. American Biltrite, et al.**                    **January 10, 2018**

```
 1        Q          That would be the biggest piece that

 2   survived?

 3        A          Most likely, yes.

 4        Q          And the rest of it would be smaller?

 5        A          Yes.

 6        Q          How dusty was that work?

 7        A          If I remember, it wasn't real dusty, no.

 8        Q          Did you wear a mask?

 9        A          No, I didn't.

10        Q          You did not?

11        A          No.  I was mostly supervising.

12        Q          All right.  Who was operating the

13   machine?

14        A          There was a friend of mine that was a

15   carpet cleaner, a black guy.

16        Q          Yeah.

17        A          And you couldn't stop him.  He'd grab

18   ahold of that machine and go all night.

19        Q          It'd be like cutting grass?

20        A          Yeah.

21        Q          He'd just go row by row --

22        A          Yeah.

23        Q          -- until he got the job done?

24        A          Yes, sir.

25        Q          How close were you to him when he's
```

```
1    operating that machine?

2         A        Sometimes right next to him.

3         Q        Okay.  Did he wear a mask?

4         A        No.

5         Q        Okay.  So there wasn't enough dust from

6    this job to make you think that somebody needed to

7    wear a mask like another removal job that you've

8    talked about this morning?

9         A        At the time, no, I didn't think so.

10        Q        Okay.  And 99 percent of it broke up.  Is

11   that the whole Sears building upstairs --

12        A        Yes.

13        Q        -- and down?

14        A        Yes.

15        Q        Okay.  Did you see the machine -- strike

16   that.

17                 Were you present for the whole time when

18   the job was done?

19        A        Yes.

20        Q        Okay.  And it took the better part of

21   three months?

22        A        Two or three months, yes.

23        Q        Okay.

24                 MR. BEDINGER:  (Indicating.)

25                 MS. ZINNS:  No, no, no, we're okay,
```

```
 1        unless -- unless you're turning to --

 2                MR. BEDINGER:  No.

 3                MS. ZINNS:  -- a completely different

 4        topic.

 5                MR. BEDINGER:  No, not yet.

 6                MS. ZINNS:  Okay.

 7                MR. BEDINGER:  So thank you.  I just saw

 8        you looking at your watch.

 9                MS. ZINNS:  I'm just checking out how

10        long we've been doing this.

11                MR. BEDINGER:  Right.

12    BY MR. BEDINGER:

13        Q       And you don't know who made this vinyl

14    asbestos tile that you took up from Sears; do you?

15        A       I want to say it was Tarkett, but I'm not

16    a hundred percent sure.

17        Q       I'll let someone else ask you about that.

18                Did you ever operate that electric floor

19    tile remover?

20        A       If I could get out of it, no.

21        Q       I understand that, but did you ever?

22        A       Yes.

23        Q       Okay.  Other than this Sears job, did you

24    ever operate it?

25        A       Maybe a couple of times but not many.
```

```
 1        Q        Okay.  And you didn't use it much after

 2   that job --

 3        A        No.

 4        Q        -- if I heard your testimony earlier?

 5        A        Right.  We kind of retired it.

 6        Q        And truth is, you didn't have a job that

 7   needed it like the Sears store did?

 8        A        No.

 9                 MR. BEDINGER:  This is probably a good

10        time to take a break.

11                 MS. ZINNS:  Yeah.  It's been almost an

12        hour so --

13                 MR. BEDINGER:  Yeah.

14                 MS. ZINNS:  -- why don't we take a

15        five-minute break.

16                 THE VIDEOGRAPHER:  Going off video at

17        9:55 a.m.

18                      (VIDEO CAMERA OFF.)

19                 (Thereupon, a recess was taken.)

20                      (VIDEO CAMERA ON.)

21                 THE VIDEOGRAPHER:  Back on video at

22        10:06 a.m., start of File 6.

23   BY MR. BEDINGER:

24        Q        Mr. Mock --

25        A        Yes, sir.
```

**Roy Mock**                    *Mock v. American Biltrite, et al.*                    **January 10, 2018**
**Volume II**

```
 1        Q        -- we talked about -- or you talked about

 2   yesterday some other catalog Sears stores, but the one

 3   you did the tile job on, removing and putting down new

 4   flooring, that was not a catalog office; was it?

 5        A        No, sir.

 6        Q        That was the main store at Oglethorpe

 7   Mall?

 8        A        Yes, sir.  It's a Sears retail store.

 9        Q        So it's got everything in there?

10        A        Yes, sir.

11        Q        Blue jeans and lawn --

12        A        Right.

13        Q        -- mowers and washing machines and the

14   whole --

15        A        Yes.

16        Q        -- the whole gamut?

17                 Okay.  Talking about that electric

18   machine that you used on the -- that was used on the

19   removal job at Sears, did you ever have to use that

20   machine on vinyl sheet flooring to get up some

21   section?

22        A        We tried it on it before, but it really

23   didn't work good on sheet vinyl.

24        Q        Okay.  Why was that?

25        A        Because it would slip up on the vinyl and
```

```
 1              And how were you paid for that work?

 2      A       Sears paid me.

 3      Q       Okay.  Do you remember the -- and Frank

 4  may have asked you this, and pardon me if I'm

 5  repeating it.  Did you also reinstall the floor, some

 6  floor product, after you'd taken the old floor up?

 7      A       Yes, sir.

 8      Q       And what product did you use for that?

 9  What type of product did you use to replace it?

10      A       Like I said, if I remember right, I'm

11  pretty sure the boxes said Tarkett on it.

12      Q       That you replaced it with?

13      A       Yes.

14      Q       Oh, okay.  I don't remember that.  I

15  thought you were talking about the material you took

16  up.

17      A       No.

18      Q       Okay.  I wrote that down wrong then.

19              Could you identify -- now, strike that.

20              Going back to this Sears job at the

21  Oglethorpe Mall, the Sears store of tile removal, that

22  was floor tile that you were taking up?

23      A       Yes, sir.

24      Q       12-by-12 squares?

25      A       Yes, sir.
```

```
 1        Q          Do you remember the color?

 2        A          Sort of an off-white color.

 3        Q          Okay.  Do you remember anything about the

 4   texture of the tile that you were taking up?

 5        A          Well, the top had a -- it didn't have no

 6   indented pattern in it or nothing.  It was a smooth

 7   surface.

 8        Q          Smooth surface?

 9        A          And the bottom of the tiles was a little

10   rough.

11        Q          Okay.  But the bottom was all part of the

12   same tile, though, it wasn't a different material?

13        A          Yeah.  It had the same color all the way

14   through.

15        Q          Okay.  The off-white kind of color?

16        A          Yes, sir.

17        Q          Did the top of the tile have any kind of

18   pattern that you recall or was it just solid off

19   white?

20        A          Well, it had like little pieces of

21   colored stones and stuff in it, not a lot, but the

22   majority of the tile was white.

23        Q          And you don't recall when that tile you

24   were taking up was originally installed; right?

25        A          As far as I know, it was when the store
```

Mock v. American Biltrite, et al.    January 10, 2018

```
 1   was built.
 2        Q        Okay.  And had that -- do you have a
 3   judgment as to when the store was built?
 4        A        I think it was in the '70s.
 5        Q        Okay.  Now, the tile that you were taking
 6   up, did it have any writing on it?
 7        A        If it did, I didn't see any.
 8        Q        The tile that you were taking up, did it
 9   have the name Tarkett anywhere on it?
10        A        The one I was taking up?
11        Q        Yeah.
12        A        As far as I can tell, no.
13        Q        Okay.  Why do you think it was Tarkett
14   tile that you were taking up?
15        A        I didn't say it was Tarkett tile that was
16   taken up.
17        Q        Okay.
18        A        I said I thought it was Tarkett that we
19   was putting down.
20        Q        I gotcha you.  Okay.  I had that all
21   confused, and I appreciate -- so you can't identify
22   who made the tile you were taking up?
23        A        No, sir.
24        Q        Okay.  Now, the tile that you were
25   putting down you think was Tarkett?
```

REGENCY-BRENTANO, INC.

```
 1        A         Yes, sir.

 2        Q         Okay.  And why do you say that?

 3        A         I believe the name Tarkett was written on

 4   the boxes.

 5        Q         Can you describe the boxes?

 6        A         It was just a brown cardboard box.

 7        Q         And this is floor tile you were putting

 8   down?

 9        A         Yes, sir.

10        Q         Okay.  Was the name Tarkett on the box

11   itself?

12        A         I believe it was, yes.

13        Q         Was anything -- any other writing on the

14   box itself?

15        A         Just the style number and all.

16        Q         Do you remember the style number?

17        A         No, sir.

18        Q         Did it have a product name, brand name,

19   on the box?

20        A         I don't remember nothing.  The onliest

21   thing I remember I think -- I think it was Tarkett

22   tile is all I --

23        Q         You just think you remember Tarkett --

24        A         Yes.

25        Q         -- on the box?
```

1          And that -- that one word is the only

2    word you remember here today being on those boxes?

3        A        Yes.

4        Q        Do you know how many boxes you had to use

5    to do the retiling?

6        A        Probably two or three hundred.

7        Q        And what would you -- do you recall how

8    many tiles were in each box?

9        A        45.

10       Q        Okay.  And what was the color of the new

11   tiles you were putting down?  Was that the off white,

12   too --

13       A        It was -- yeah.

14       Q        -- or was that a different color?

15       A        It was off white.

16       Q        It was the same color as what you were

17   taking up?

18       A        Pretty close.

19       Q        Was there anything inside the boxes of

20   tiles other than the tiles themselves?

21       A        No.

22       Q        There were no instructions or any kind of

23   paperwork inside the boxes themselves?

24       A        Not in them boxes, no.

25       Q        Okay.  And what was the name of your

```
 1   friend that was helping you on this job?

 2        A         The what?

 3        Q         You said you had a friend that was

 4   helping you doing the tile removal.  Did he also help

 5   you put the new tile down?

 6        A         Well, there was several guys that helped

 7   put it down.

 8        Q         Okay.  Were they working for you or for

 9   Sears?

10        A         For me.

11        Q         Okay.  Do you remember any of their

12   names?

13        A         Well, of course, my son-in-law Bobby and

14   a guy by the name of Archie.  He also worked for

15   Sears.

16        Q         Do you remember Archie's last name?

17        A         Sir?

18        Q         Do you remember Archie's last name?

19        A         Fisher.

20        Q         Anybody else that you recall other than

21   your son-in-law and Archie helping on this job?

22        A         Yeah, I can see most of them, but I can't

23   remember their names.

24        Q         Okay.

25        A         That was a long time ago.
```

```
 1        Q         I understand.
 2                  Was there any writing on the tiles, the
 3   new tiles, that you were putting down themselves?
 4        A         I don't think so, no.
 5        Q         So there was nothing on the boxes of
 6   these new tiles that said the tiles contained
 7   asbestos; is that correct?
 8        A         No, sir.
 9        Q         And there was nothing on the tiles
10   themselves that said they contained asbestos?
11        A         No, sir.
12        Q         Okay.  You don't have any personal
13   knowledge of whether they contained asbestos or not;
14   do you?
15        A         No, sir.
16        Q         Okay.  Were the guys working with you
17   doing the lion's share of the installation of these
18   new tiles?
19        A         Were they doing what?
20        Q         Were they doing most of the work doing
21   this installation work or were you actually -- were
22   you mostly supervising, in other words, and they were
23   doing the labor?
24        A         Yeah.  I was telling them where to put it
25   and how to put it, and they were actually putting the
```

```
 1   tile down.

 2        Q        Okay.  So the actual installation work

 3   was being done by other people; is that right?

 4        A        Yes.

 5        Q        And any tile work or any cutting that had

 6   to be done or anything was really being done by them,

 7   and you --

 8        A        Yes.

 9        Q        -- were just supervising?

10        A        Yes.

11        Q        Okay.  And when on occasion I take it

12   most of the work you would actually be able to use the

13   full square of tiles laying them down; is that

14   correct?

15        A        Yes.

16        Q        Okay.  On the occasion where you'd have

17   to cut the tile, you use a razor knife or some other

18   type of instrument?

19        A        Well, we'd use a tile cutter when we

20   could, and other times we used a heat gun and a knife.

21        Q        Okay.  Did any -- did those methods

22   create dust when you were cutting the tile?

23        A        No.

24        Q        Okay.  And I take it you didn't wear --

25   you or the people working with you doing this
```

**Roy Mock**                    Mock v. American Biltrite, et al.                    *January 10, 2018*
**Volume II**

```
 1   installation didn't wear a mask during the job?

 2        A        No.  I wish we had have but we didn't.

 3        Q        Okay.  And that was because as far as you

 4   could tell there was no dust being created by doing

 5   this installation; is that correct?

 6        A        Not a lot, no.

 7        Q        What dust was created?  I thought you

 8   said when you cut it there was no dust created.

 9        A        Not when we were putting it down.  When

10   you're taking it up, there was --

11        Q        Okay.

12        A        -- very little.

13        Q        Okay.

14        A        Sweeping up the floor.

15        Q        Okay.  But that was all debris left over

16   from --

17        A        Yes.

18        Q        -- the old tile that you were taking up

19   that you can't identify; correct?

20        A        Yes, sir.

21        Q        As far as putting down the new tile, that

22   didn't create any dust?

23        A        No.

24        Q        Okay.  Let me move on to some Tarkett-

25   specific types of products, Tarkett USA in particular.
```

```
 1   for yourself and for Sears, what did you do with

 2   scraps of flooring?

 3       A       Well, Sears had a compressed dumpster at

 4   the back of their store, and they let me throw all the

 5   old stuff in it.

 6       Q       Okay.  Before you threw the scraps of

 7   flooring into the compressed dumpster at Sears, did

 8   you have to do anything special to it, bag it up, wet

 9   it down, anything like that?

10       A       No.

11       Q       Okay.  And if I understand your testimony

12   correctly from yesterday, in about 1977, maybe late

13   '76, that's when you opened Mock Flooring; correct?

14       A       Yeah, in '77.

15       Q       '77.  Okay.

16               You felt pretty good after your six to

17   nine months on the job with Coastal to open your own

18   business?

19       A       Well, I pretty much watched my cousin

20   what he did, and I said I don't figure I can -- there

21   ain't no reason I can't do that.

22       Q       All right.

23       A       And the salesman at Sears thought I could

24   do it.

25       Q       That's right.  You said some folks from
```

```
 1   Sears had seen you working and --

 2       A       Yes.

 3       Q       -- offered you the contract?

 4       A       Yes, sir.

 5       Q       All right.  This contract that you had

 6   with Sears, I think you said maybe you had an initial

 7   one-year contract that you might not have even signed

 8   and then you just kept working for them; right?

 9       A       Yes.  I signed -- I think the only one I

10   ever signed was the first one.

11       Q       All right.  Do you remember anything

12   about the terms of that contract?

13       A       I don't think I ever read it.  I just

14   signed it.

15       Q       Got a whole lot of people in this room

16   that would advise against doing that again.

17       A       I know, I know.  You should read

18   everything you sign.

19       Q       That's right.

20               Okay.  But despite that, Sears treated

21   you fairly over the years?

22       A       Yes.

23       Q       Okay.  Do you recall whether it was in a

24   contract or in any sort of training or instruction you

25   may have gotten from Sears, did they require you to
```

```
 1  follow any specific safety guidelines?

 2       A        No.  They just informed me to take care

 3  of people's personal property.

 4       Q        Did you have any sort of training or

 5  receive any sort of information, either from Sears or

 6  on your own, about OSHA?

 7       A        No.

 8       Q        Do you know what OSHA is?

 9       A        Yes.

10       Q        Okay.  You also said that when you did a

11  job there was a contract entered into with the

12  homeowner; correct?

13       A        Yes.

14       Q        And I think as you described today that

15  it was actually the salesperson that did that contract

16  with the owner and then scheduled the installation

17  which you did?

18       A        Yes, sir.

19       Q        So you didn't have any involvement in

20  that contract with the owner?

21       A        No.

22       Q        Okay.  Would there sometimes be in the

23  contract some sort of special provisions that an owner

24  might have about furniture or about where the flooring

25  was going to be or anything like that?
```

Roy Mock                     Mock v. American Biltrite, et al.                January 11, 2018
Volume III

```
              IN THE STATE COURT OF CHATHAM COUNTY
                      STATE OF GEORGIA


ROY MOCK and ARMANDE MOCK,     )
                               )
             Plaintiffs,       )     CIVIL ACTION FILE
                               )
vs.                            )     NO.:  STCV1701890
                               )
AMERICAN BILTRITE, INC.,       )
et al.,                        )
                               )
             Defendants.       )     Volume III of III
_____)     (Pages 400-452)



             Deposition of ROY E. MOCK, taken on

       behalf of the Defendants, pursuant to the

       stipulations contained herein, reading and

       signing of the deposition being reserved, in

       accordance with the Georgia Civil Practice Act,

       before Daniel M. Gershwin, Certified Court

       Reporter and Notary Public, at the Embassy

       Suites, 145 West Mulberry Boulevard, Savannah,

       Georgia, on the 11th day of January, 2018,

       commencing at the hour of 9:15 a.m.



_____

                 REGENCY-BRENTANO, INC.
               CERTIFIED COURT REPORTERS
                  13 Corporate Square
                       Suite 140
                 Atlanta, Georgia 30329
                    (404) 321-3333
```

Page 417

1    can't remember his name.

2         Q        Do you know if he's still living?

3         A        No, he's not.

4         Q        You talked about the contract that you

5    signed with Sears to start the flooring work --

6    installation work with Sears, and I think there was

7    some back and forth.  Did you actually sign that

8    contract?

9         A        The first one I did.

10        Q        And I believe you said that was a

11   contract that went for a period of a year?

12        A        I believe that's what Ms. Lingerfelt told

13   me.

14        Q        I'm sorry.  What was the name you just

15   used?

16        A        Ms. Lingerfelt.  She was an employee at

17   Sears.  She was like an assistant manager of the

18   store.

19        Q        And what was -- what was her first name?

20        A        Ms.

21        Q        Okay.

22        A        She was a little bit older than me, so I

23   called her Ms. Lingerfelt.

24        Q        Okay.  Do you -- how do you spell that?

25   Is that L-I-N-G-E-R-F-E-L-T?

Roy Mock                    Mock v. American Biltrite, et al.              January 11, 2018
Volume III

Page 418

1      A        L-I-N-G-E-R-F-E-L-T, I believe.

2      Q        And when you say that she was the

3  assistant manager of the store, are we talking about

4  the Oglethorpe location?

5      A        Yes, ma'am.

6      Q        The two-story --

7      A        Yes, ma'am.

8      Q        -- retail center?  Okay.

9               And I believe you mentioned yesterday you

10 don't recall the terms of the contract; correct?

11     A        I really don't even remember seeing it,

12 but I think I signed one.

13     Q        But in terms of what you talked -- you

14 talked with Mr. Lein about what they expected you to

15 do on these different jobs; is that correct?

16     A        Yes, ma'am.

17              MS. ZINNS:  Object to form.

18 BY MR. BENJAMIN:

19     Q        And what was the discussion that you had

20 with -- with Mr. Lein?

21     A        Well, he came out on some of the jobs

22 that I was doing with Coastal Floors and kept bugging

23 me to come and do Sears' work.  And after a while I

24 just decided to go sign this contract with them and do

25 their work.

Page 419

1      Q        But did you talk about specifically what

2  you would be expected to do?  You talked about -- let

3  me take a step back.

4             Yesterday you mentioned in terms of

5  getting paid it depended on what you did.  So when you

6  initially talked with Mr. Lein, what did you talk

7  about in terms of what you would be expected to do on

8  these different jobs?

9      A        Well, he said I still would be doing the

10  same kind of work that I was doing and I didn't have

11  to worry about trying to collect money from customers,

12  that Sears would do that, and Sears would pay me for

13  all the installation.

14      Q        And how were you paid?  Was it check,

15  cash?  How did that work?

16      A        No.  They -- they wrote -- wrote out a

17  check to me once a week.

18      Q        And again, that would be based on the

19  work that you did for that particular week?

20      A        Yes, ma'am.

21      Q        And what was the process?  Would you --

22  you talked about having those contracts for each

23  particular job.  Would you take those contracts in to

24  Ms. Lingerfelt so that you could then receive payment,

25  or how did that process work?

Page 424

1      Q        Okay.  But in terms of specifically

2  talking about the asbestos in some of the -- in some

3  of the products, you were talking with a divisional

4  manager you said?

5      A        His name was Jimmy DeLoach.

6      Q        Jimmy DeLoach?

7      A        (Nods head affirmatively.)

8      Q        And how did that discussion come about

9  with Jimmy DeLoach in the late '90s or in the '90s?

10     A        Well, if -- if the salesman went out and

11 sold the job and they talked to a customer about

12 removing vinyl that's glued down and they told us that

13 we had to check with the customer before we took it

14 up.  And if we didn't know whether it had asbestos in

15 it or not that they had to be tested before we could

16 remove it.

17     Q        Now, I want to turn your attention to the

18 work that you did at the Oglethorpe -- the Sears

19 retail center at Oglethorpe Mall.  You talked about

20 using the electric machine to remove the flooring

21 material at that location on both levels.  Do you

22 recall that testimony?

23     A        Yes, ma'am.

24     Q        I want to take a step back and just ask

25 you:  How did -- how did you come about becoming

Page 425

1  involved in that actual work?  I mean, was that

2  something that Sears approached you about to come in

3  and handle that work?

4      A       Yes, the store manager.  At that time his

5  name was John Monroe.  He was the best manager that

6  store ever had.

7      Q       Was there some contract involved with

8  this work?

9      A       Just a verbal contract between me and

10  him, and he told me how much he would pay me to take

11  it up and put it down.

12      Q       And that machine, did -- did they -- did

13  you actually receive that electric -- electric machine

14  just for this particular job?  Is that how that

15  exchange came about?

16      A       Sears purchased it for this job.  The

17  machine actually belonged to them, but after we

18  finished the job they just give it to me.

19      Q       You also talked about at some point

20  yesterday that you had installed some parquet flooring

21  for Sears at one point?

22      A       Yes, just some small displays.

23      Q       And was that still at the retail store at

24  Oglethorpe Mall?

25      A       Yes, ma'am.

Roy Mock                    Mock v. American Biltrite, et al.                    January 11, 2018
Volume III

Page 426

1      Q        Okay.  Do you know who manufactured that

2  parquet flooring?

3      A        No, I don't remember the name of it.

4      Q        You also mentioned on yesterday that one

5  of the particular brands of tile cutters that you used

6  was made by Crane?

7      A        Yes, ma'am.

8      Q        Do you recall that testimony?

9               Do you know of any other brands of tile

10  cutters that you would have used?

11     A        The what?

12     Q        Other brands of tile cutters that you

13  would have used?

14     A        I only used one kind.

15     Q        Okay.

16     A        And I believe it was a Crane.

17     Q        Mr. Mock, I also wanted to direct your

18  attention back to the work that you did at the airport

19  tower in Savannah, and I believe it was around the

20  '80s that you testified about?

21     A        I believe it was, yes.

22     Q        Okay.  And do you know, what's the name

23  of the airport?

24     A        Savannah/Hilton Head International.  It's

25  right across the highway over here.

Roy Mock                    Mock v. American Biltrite, et al.              January 11, 2018
Volume III

Page 441

1  were working on the building silos you were, quote,

2  quite a ways away from the actual mine.  Do you know

3  how far away you were from the mine?

4      A      I'd say they were probably a mile or more

5  away from where we was actually building the silos.

6      Q      Did you ever see any of the actual work

7  of the mine taking place?

8      A      No, I didn't care to go there.

9      Q      Okay.  Can you tell us what material you

10 were working with when you were building the silos at

11 the mine?

12     A      Wood.

13     Q      Okay.  Were you around anyone doing work

14 with material aside from wood at the silos?

15            MS. PAYNE:  Object to form.

16     A      No, just with other guys was using

17 Number 9 wire or steel rebar.

18 BY MS. ZINNS:

19     Q      Were you ever at the silos after they

20 were built when material was actually being pumped

21 into them?

22     A      No, ma'am.

23     Q      You were asked a lot of questions about

24 your work at the Oglethorpe Mall Sears store --

25     A      Yes.

Page 442

```
 1      Q        -- when you were removing and installing

 2 vinyl floor; correct?

 3      A        Yeah.  It was 12-inch square tile, yeah.

 4      Q        Okay.  You told us yesterday that you

 5 were mostly supervising and other people were doing

 6 the actual cutting of the tile.  Do you remember that?

 7      A        Yes.

 8      Q        Were you nearby them when they were doing

 9 that cutting?

10      A        Yes.

11      Q        How close would you say you were to them

12 when they were doing that work?

13      A        Sometime right beside of them.

14      Q        Were you showing them how to do the work?

15 Were you ever showing them how to --

16      A        Some of them.

17      Q        -- do the work?

18      A        Some of them, yeah.

19      Q        Okay.  I want to go back to your time in

20 the Navy for just a moment.  When Mr. Kennaday was

21 asking you questions yesterday about, quote-unquote,

22 renovation on the ship, can you tell us what you

23 were -- what you were talking about?  Was that the

24 helicopter hangar that was being installed?

25      A        The first time, just the helicopter
```

IN THE STATE COURT OF CHATHAM COUNTY
STATE OF GEORGIA

ROY MOCK and ARMANDE MOCK,           )
                                     )
              Plaintiffs,            )      CIVIL ACTION FILE
                                     )
vs.                                  )      NO.:  STCV1701890
                                     )
AMERICAN BILTRITE, INC.,             )
et al.,                              )
                                     )
              Defendants.            )
_____)


              Videotaped deposition of ROY E. MOCK,

      taken on behalf of the Plaintiffs, pursuant to

      the stipulations contained herein, reading and

      signing of the deposition being reserved, in

      accordance with the Georgia Civil Practice Act,

      before Daniel M. Gershwin, Certified Court

      Reporter and Notary Public, at the Courtyard

      Marriott, 6703 Abercorn Street, Savannah,

      Georgia, on the 30th day of January, 2018,

      commencing at the hour of 10:03 a.m.


_____

                REGENCY-BRENTANO, INC.
              CERTIFIED COURT REPORTERS
                 13 Corporate Square
                      Suite 140
                Atlanta, Georgia 30329
                    (404) 321-3333

```
 1       Q        And what was the name of that business?

 2       A        Mock's Floor Covering Service.

 3       Q        Okay.  Did Mock's have a relationship

 4  with any particular store where you got your business

 5  from?

 6       A        Yes.  I had a contract with Sears for

 7  almost 30 years.

 8       Q        Would you tell us how you began working

 9  for Sears?

10       A        Well, I was working with my cousins,

11  which was Coastal Floor Covering, and the salesman

12  from Sears would come out on two or three of the jobs

13  that I was doing and tried to get me to come to

14  install for them, and finally I gave up and agreed to

15  it.

16       Q        Do you remember about what year that was?

17       A        1977.

18       Q        When did you retire from Mock's Floor

19  Covering?

20       A        2006.

21       Q        Okay.  From that time that you first

22  began your company and began working as a contractor

23  for Sears, how did you know what job to go to every

24  day?

25       A        It was a contract with Sears and their
```

```
 1   customer, and they would give me a work order to go

 2   and install their merchandise in the customer's home.

 3        Q       Did that work order provide which product

 4   you would install in the customer's home?

 5        A       Well, it had the name of the merchandise

 6   and the color number and stuff like that on the work

 7   order.

 8        Q       You did not parti -- excuse me.  Did you

 9   participate in picking out any of the merchandise for

10   these customers?

11        A       No, ma'am.

12        Q       Okay.  When you went to a job and you got

13   that purchase order, did it tell you whether to remove

14   old flooring in the home?

15        A       Yes, it did.

16        Q       At any time -- strike that.

17                Did you ever actually work inside of a

18   Sears store doing floor covering?

19        A       Yes.

20        Q       What year was that?

21        A       I don't know the -- remember the exact

22   year, but it was in the '80s.  I think it was the

23   early '80s.

24        Q       Can you tell us what store you worked at?

25        A       At Oglethorpe Mall in Savannah, Georgia.
```

Roy Mock                          Mock v. American Biltrite, et al.                          *January 30, 2018*

```
 1       Q          What was the project that you performed
 2  at that Sears location?
 3       A          Vinyl tile.
 4       Q          When you say "vinyl tile," did you remove
 5  the old vinyl tile that was already in place?
 6       A          Yes, I did.
 7       Q          Okay.  Did you have to install new vinyl
 8  tile?
 9       A          Yes, ma'am.
10       Q          Okay.  Do you remember how many boxes of
11  tile you installed in that Sears location?
12       A          Not exactly.  It was somewhere between
13  two and four hundred.
14       Q          Do you remember how many square feet of
15  tile you had to remove and install?
16       A          I don't remember.
17       Q          Was it the entire store?  Was it the
18  entire Sears store that you were doing?
19       A          Yes.  At the time there was two levels.
20       Q          Did you have anything to do with picking
21  out the new tile that would be installed in that Sears
22  store at Oglethorpe Mall?
23       A          No, ma'am.
24       Q          Were you given any tools by Sears to
25  remove the old tile?
```

**REGENCY-BRENTANO, INC.**

1       A       Yes.  They purchased a floor-stripper

2   machine for me to use to remove the tile.

3       Q       And what happened to that floor-stripper

4   machine after you left that project?

5       A       They gave it to me.

6       Q       Okay.  We've talked a little bit so far

7   about your diagnosis with mesothelioma.  Can you tell

8   us, did something happen that made you think you might

9   be sick or cause you to go to the doctor?

10      A       Yes.  It happened in February of 2016.

11      Q       What happened?  Tell us about that.

12      A       All of a sudden I would start belching

13  and I couldn't stop.  So I went to the doctor, and for

14  the next year and a half to two years they run all

15  kind of tests on me, different doctors, stomach

16  doctor, lung doctors, and everything else.

17              And finally in July -- I think it was

18  July of 2017 -- my lung doctor, I had them do a biopsy

19  of a place they saw on my lungs.

20      Q       Okay.

21      A       And it said it come out to be cancer.

22  But at that time they didn't really know the type of

23  cancer.

24              So in September they did a biopsy through

25  my back so they could get more of the cancer and do a