WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jared R. Friedmann
Jacqueline Marcus
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
**In re**                                                  :
                                                           :     **Chapter 11**
**SEARS HOLDINGS CORPORATION, *et al*.,**                  :
                                                           :     **Case No. 18-23538 (RDD)**
                                                           :
**Debtors.** [1]                                           :     **(Jointly Administered)**
-------------------------------------------------------------x

**DECLARATION OF JARED R. FRIEDMANN IN SUPPORT OF THE DEBTORS'
OPPOSITION TO THE MOTION OF COMMUNITY UNIT SCHOOL DISTRICT 300
TO DEEM THE ECONOMIC DEVELOPMENT AGREEMENT REJECTED OR,
IN THE ALTERNATIVE, TO COMPEL DEBTORS TO REJECT THE AGREEMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is c/o M-III Partners, LP, 130 W 42nd St. 17th Floor, New York, NY 10036.

Pursuant to 28 U.S.C. § 1746, I, Jared R. Friedmann, hereby declare as follows:

1.    I am a partner of the law firm of Weil, Gotshal & Manges, LLP, representing the Debtors in the above captioned proceeding.  I submit this Reply Declaration in Support of the Debtors' *Opposition to the Motion of Community Unit School District 300 to Deem the Economic Development Agreement Rejected or, in the Alternative, to Compel Debtors to Reject the Agreement*.

2.    Unless otherwise indicated, all statements in this Declaration are based on my personal knowledge.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge.

3.    Attached as **Exhibit 1** is a true and correct copy of the *Fourth Amended Verified Complaint for Declaratory, Injunctive and Other Relief*, filed in *Community Unit School District 300, et al. v. Village of Hoffman Estates, et al.*, No. 2018-CH-12683 (Ill. Cir. Ct.) (the "**Illinois Action**") on July 8, 2020 (the "**Complaint**").  A copy of the 1990 Economic Development Agreement by and between the Village of Hoffman Estates and Sears, Roebuck and Co. was attached as Exhibit 2 to the Complaint, which appears beginning at page 43 of the PDF file.

4.    Attached as **Exhibit 2** is a true and correct copy of the Settlement Agreement between Community Unit School District 300 (the "**School District**") and Transform Holdco LLC, Transform SR Holding Management LLC, TF Hoffman Estates IL LLC, Transform SR LLC, and their subsidiaries successors and assigns that was provided to me by counsel for the School District on October 28, 2020.

5.    Attached as **Exhibit 3** is a true and correct copy of the transcript of the August 15, 2019 hearing before the Hon. Celia G. Gamrath in the Illinois Action.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: November 11, 2020
      New York, New York

By: */s/ Jared R. Friedmann*         
     Jared R. Friedmann

**<u>EXHIBIT 1</u>**

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
7/8/2020 5:03 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH12683

9706743

# IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| COMMUNITY UNIT SCHOOL DISTRICT 300, an Illinois school district, BARRINGTON LIBRARY DISTRICT, an Illinois public library, ELGIN COMMUNITY COLLEGE, an Illinois community college district, BARRINGTON TOWNSHIP, an Illinois township, METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, an Illinois special purpose district, and SCHOOL DISTRICT U-46, an Illinois public school district, | ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) ) |  |
| VILLAGE OF HOFFMAN ESTATES, an Illinois municipal corporation; and SEARS HOLDINGS CORPORATION, a Delaware corporation, SEARS, ROEBUCK & CO., a New York Corporation. KMART HOLDING CORPORATION, a Delaware corporation, SEARS HOLDINGS MANAGEMENT CORPORATION, a Delaware corporation, TRANSFORM HOLDCO LLC, a Delaware Limited Liability company, TRANSFORM SR HOLDING MANAGEMENT, LLC, a Delaware Limited liability Company, and TF HOFFMAN ESTATES IL, LLC, a Delaware limited liability company, HOFFMAN ESTATES PARK DISTRICT, an Illinois park district, NORTHWEST MOSQUITO ABATEMENT DISTRICT, an Illinois mosquito abatement district, COOK COUNTY FOREST PRESERVE, an Illinois forest preserve, COOK COUNTY, an Illinois county, and POPLAR CREEK LIBRARY DISTRICT, an Illinois public library district. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 2018 CH 12683 |
| Defendants. | ) ) ) |  |

## FOURTH AMENDED VERIFIED COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

NOW COME the Plaintiffs, Community Unit School District 300 ("District"), Barrington Library District, Elgin Community College, Barrington Township, School District U-46, and Metropolitan Water Reclamation District of Greater Chicago (collectively the "Taxing District Plaintiffs"), by and through their attorneys, the Law Office of Kory Atkinson and Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., Matuszewich & Kelly, LLP, Klein, Thorpe, & Jenkins, Ltd., Susan T. Morakalis, Jorge T. Mihalopoulos, Angad S. Nagra, and Respicio F. Vazquez, and for the Taxing District Plaintiffs' Fourth Amended Verified Complaint for Declaratory, Injunctive and Other Relief, hereby allege as follows:

## PARTIES

1.      The Village of Hoffman Estates ("Village") is an Illinois municipal corporation located primarily in Cook County, Illinois. The Village's principal address is 1900 Hassell Road, Hoffman Estates, Illinois. The Village has a mayor and a six-member board of trustees that is elected at large.

2.      Defendant Sears Holdings Corporation is incorporated in Delaware. Its headquarters was located in the Village at 3333 Beverly Road, Hoffman Estates, Illinois until Sears' bankruptcy.

3.      Defendant Sears Roebuck & Co., a New York corporation, is the predecessor of Sears Holdings Corporation. Sears Holdings Corporation owns 100% of Sears Roebuck & Co. *See* Ownership Statement, attached hereto as <u>Exhibit 1</u>.

4.      Defendant Kmart Holding Corporation is a Delaware corporation and is 100% owned by Sears Holdings Corporation. *See* <u>Exhibit 1</u>.

2

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

5.      Defendant Sears Holdings Management Corporation is a Delaware corporation, and is owned 80% by Kmart Holding Corporation and 20% by Sears Roebuck & Co. *See* Exhibit 1. Unless otherwise noted, Sears Holdings Corporation, its predecessor Sears, Roebuck & Co., Kmart Holding Corporation, and Sears Holdings Management Corporation are collectively referred to as "Sears."

6.      Defendant Transform Holdco, LLC ("Transform"), is registered in Delaware. Its headquarters is located in the Village. Transform entered into an asset purchase agreement with Sears on or about January 18, 2019, which included acquiring the real estate at issue in this case.

7.      Defendant, Transform SR Holding Management, LLC ("Transform SR"), is a corporation registered in Delaware.

8.      Defendant, TF Hoffman Estates IL, LLC ("TF Hoffman Estates") is a corporation registered in Delaware (collectively, with Transform Holdco, LLC and Transform SR Holding Management, LLC, herein after referred to as the "Transform Entities").

9.      Community Unit School District 300 ("District") is an Illinois school district with its administrative offices located at 2550 Harnish Drive, Algonquin, Illinois.  The District has an enrollment of over 21,000 students at nineteen elementary schools, seven middle schools and five high schools.  The headquarters of Sears is located entirely within the boundaries of District 300. The District is a taxing body which levies and receives tax monies within the Economic Development Area.

10.     Barrington Public Library is a public library located at 505 N. Northwest Highway, Barrington, Illinois. Barrington Public Library is a taxing body which levies and receives tax monies within the Economic Development Area.

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

11.    Hoffman Estates Park District is an Illinois park district with its administrative offices located at 1685 W. Higgins Road, Hoffman Estates, Illinois. Hoffman Estates Park District is a taxing body levies and receives tax monies within the Economic Development Area.

12.    Elgin Community College District 509 is an Illinois community college district with its administrative offices located at 1700 Spartan Drive, Elgin, Illinois. Elgin Community College District 509 is a taxing body which levies and receives tax monies within the Economic Development Area.

13.    Northwest Mosquito Abatement District is an Illinois mosquito abatement district with its administrative offices located at 147 W. Hintz Road, Wheeling, Illinois. Northwest Mosquito Abatement District is a taxing body which levies and receives tax monies within the Economic Development Area.

14.    The Metropolitan Water Reclamation District of Chicago is a unit of Illinois local government and a body corporate and politic with its administrative offices located at 100 E. Erie Street, Chicago, Illinois 60611. The Metropolitan Water Reclamation District of Chicago is a taxing body which levies and receives tax monies within the Economic Development Area.

15.    Barrington Township is an Illinois township with its administrative offices located at 602 S. Hough Street, Barrington, Illinois. Barrington Township is a taxing body which levies and receives tax monies within the Economic Development Area.

16.    The Cook County Forest Preserve District is an Illinois forest preserve district with its administrative offices located at 536 N. Harlem Avenue, River Forest, Illinois. The Cook County Forest Preserve District is a taxing body which levies and receives tax monies within the Economic Development Area.

4

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

17.    Cook County is an Illinois county with its administrative offices located at 118 N. Clark Street, Chicago, Illinois. Cook County is a taxing body which levies and receives tax monies within the Economic Development Area.

18.    School District U-46 is an Illinois school district with its administrative offices located at 355 E. Chicago Street, Elgin, Illinois. School District U-46 is a taxing body which levies and receives tax monies within the Economic Development Area.

19.    Poplar Creek Library District is an Illinois public library district with its administrative offices located at 1405 S. Park Avenue, Streamwood, Illinois. Poplar Creek Library District is a taxing body which levies and receives tax monies within the Economic Development Area (collectively, with Barrington Public Library, Hoffman Estates Park District, Elgin Community College District 509, Northwest Mosquito Abatement District, the Metropolitan Water Reclamation District of Chicago, Barrington Township, Cook County Forest Preserve District, Cook County, and School District U-46, herein after referred to as the "Taxing Bodies").

## BACKGROUND

20.    In 1989, as part of generous efforts to keep Sears from moving out of the State of Illinois as Sears was threatening to do, a law was passed known as the Economic Development Area and Tax Increment Allocation Act, 20 ILCS 620/1 et seq. (the "Sears EDA Act"), which was designed to specifically incentivize Sears to relocate its headquarters from downtown Chicago to undeveloped farmland in the Village ("the EDA Act District").

21.    In 1990, the Village created the EDA Act District and entered into an Economic Development Agreement pursuant to the Sears EDA Act (the "1990 Agreement") with Sears. Among other things, the 1990 Agreement provided considerable financial assistance and subsidies

5

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

for Sears to develop its corporate campus in the Village.  The 1990 Agreement enabled Sears to recapture a large portion of the property taxes paid on its corporate campus to cover the cost incurred for development of its corporate campus.  A copy of the 1990 Agreement is attached hereto and incorporated herein as <u>Exhibit 2</u>.

22.    The term of the 1990 Agreement was structured to last for a 23-year period, the maximum length of time such an agreement could be under the Sears EDA Act.

23.    Under the 1990 Agreement, the definition of "Developer" was "Sears, Roebuck and Co., a New York corporation."

24.    The 1990 Agreement is authorized and solely based upon the Sears EDA Act.

25.    Under the 1990 Agreement, millions of taxpayer dollars, much of which would have gone to the Taxing Bodies, were instead diverted to Sears.

26.    In exchange, Sears agreed, among other things, to create or maintain a minimum number of jobs and cause a specific amount of private investment to occur in the designated project area.

27.    The creation and retention of jobs is and always has been the critical purpose of the Sears EDA Act.  So critical, in fact, that in passing the Sears EDA Act, the General Assembly found that:

- that the loss of job opportunities for the residents of [Illinois] is a serious menace to the health, safety, morals and general welfare of the people of the entire State;

- that a vigorous, growing economy is the basic source of job opportunities;

- that protection against the economic burdens associated with the loss of job opportunities, the consequent spread of economic stagnation and the resulting harm

6

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

to the tax base of the State can best be provided by promoting, attracting, stimulating, retaining and revitalizing industry, manufacturing, and commerce within the State;

- that the State has a responsibility to help create a favorable climate for new and improved job opportunities for its citizens…by…the retention of existing commercial businesses and industrial and manufacturing facilities within the State;

- that loss of job opportunities within the State has persisted despite efforts of State and local authorities and private organizations to attract new commercial businesses and industrial and manufacturing facilities to the State and to retain existing commercial businesses and industrial and manufacturing facilities within the State;

- that persistent loss of job opportunities in the State may continue and worsen if the State and its political subdivisions are not able to provide additional incentives to commercial businesses and industrial and manufacturing facilities to locate or to remain in the State; and

- that the provision of such additional incentives by the State and its political subdivisions will relieve conditions of unemployment, maintain existing levels of employment, create new job opportunities, retain jobs within the State, increase industry and commerce within the State, thereby creating job opportunities for the residents of the State and reducing the evils attendant upon unemployment, and increase the tax base of the State and its political subdivisions. See 20 ILCS 620/2.

28.    For two decades following the 1990 Agreement, the District and the other Taxing Bodies saw millions of tax dollars diverted to Sears, while Sears and the Village assured the

7

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

District that when the 1990 Agreement under the Sears EDA Act expired in 2012, the District would experience substantial benefits with Sears' property in the Village fully back on the tax rolls. Those assurances never materialized.

29.     In 2011, when the Sears EDA Act was about to expire, Sears again started scaring lawmakers with the possibility of largescale job losses in the area by threatening to move its headquarters out of Illinois.

30.     At this same time, Sears sought a new package of subsidies in exchange for remaining in the Village.

31.     In 2012, faced with the threats by Sears to move out of state and the loss of thousands of jobs and economic activity that would entail, Illinois legislators passed an amendment to the Sears EDA Act that effectively extended the 1990 Agreement, but included certain conditions and provisions about the amount of subsidies for Sears and the manner in which subsidies would be distributed (the "EDA Amendment").

32.     Also included in the 2012 Amendments to the Sears EDA Act was a specific requirement that Sears maintain not less than 4,250 full-time equivalent jobs at its headquarters in the Village, and provisions providing for recapture of subsidies received by Sears in the event Sears fails to comply with the jobs requirement.

33.     In the event that Sears fails to comply with the requirement that it maintain 4,250 jobs, the 2012 Amendments provide a formula for recapture of the subsidies based on the amount of time that Sears failed to comply with the jobs requirement.

34.     On December 12, 2011, the Illinois House of Representatives debated the Sears EDA Act.

8

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

35.     The sponsors of the Sears EDA Act, which included Representative Bradley, did not intend to allow Sears to count anyone beyond its own employees in the full-time equivalent job requirement.

36.     Representatives Tryon and Bradley discussed this in the following exchange:

Tryon: "Okay. What happens if Sears leaves Illinois and keeps not zero jobs but let's say 100 jobs are skeletal staff…"
Bradley: "I…I think that would've…"
Tryon: "…just to maintain the building."
Bradley: "…I think that would effectively end the EDA."
Tryon: "So, your intention here is that if that were to happen, if Sears were to leave and there was only a minimal workforce left here, that the EDA would…would cease…"
Bradley: "Yeah."
Tryon: "…to exist and Hoffman would then have one more year."
Bradley: "Sears…Sears would be forfeiting all their benefits and EDA would wind up."

37.     Representatives Sullivan and Bradley also had the following exchange during the debate:

Sullivan: "Also, on page 45 of the Bill, it refers to developer or any of its success[or] entities. By success[or] entities are we referring to success[or] or Sears operating companies and not to an entity simply occupying the Sears premises in Hoffman Estates?"
Bradley: "Yes."

38.     In addition to receiving subsidies under the Sears EDA Act, part of the package Illinois put together in the 2011-2012 timeframe to keep Sears in state included incentives under an Act titled the Economic Development for a Growing Economy Tax Credit Act (the "EDGE Act"), 35 ILCS 10/5-1.

39.     The EDGE Act is administered by the State of Illinois Department of Commerce and Economic Opportunity ("Department of Commerce").

9

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

40.    Pursuant to the EDGE Act, Sears and the Department of Commerce entered into an

agreement on October 26, 2012 called the EDGE Tax Credit Agreement (the "EDGE Agreement").

41.    The EDGE Agreement required Sears to, among other things, create and/or

maintain at least 4,250 jobs at its locations in the Village and in downtown Chicago, and the EDGE

Agreement required Sears to submit documentation showing compliance with the jobs

requirement.

42.    The Illinois House of Representatives also debated the EDGE Act on November

29, 2011, and discussed its connection to the Sears EDA Act:

> Franks: If you look at how this is written, right now, the amount of employees in
> Hoffman Estates is approximately 6100, correct? About 6100 employees at
> Hoffman Estates?"
> Bradley: "I think that's right."
> Franks: "Okay. But under this legislation, what we're saying is … We will pay you
> $150 million as long as you don't fire more than 1850 employees. So basically,
> we're going to be paying them $150 million to fire 1,850 employees because in
> order to retain this incentive they must only keep 4,250 people."
> Bradley: "Well, the…and I…and you weren't a party to the negotiations, and I
> wasn't a direct party to the negotiations but my understanding was that there's about
> 1800 employees out there that are not technically classified as employees. They
> work for other people. And so if we were to put the 6100 employee requirement on
> them, ***there's only about 4200 (sic) employees out there that they actually have
> control over.*** And so that would create a situation where this would not be a
> tenable…a tenable program." (Emphasis added).

43.    On or about October 15, 2018, Sears filed for voluntary Chapter 11 Bankruptcy.

This case was captioned *In re Sears Holdings Corporation, et al.* Case No. 18-23528 (Jointly

Administrated) and was filed in the Southern District of New York (the "Bankruptcy Case").

44.    On or about January 17, 2019, as part of an Asset Purchase Agreement, the

Transform Entities acquired, from Sears, among other things, all or substantially all of the real

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

estate owned by Sears in the Project Area, as defined by the 1990 Agreement and EDA Amendment.

45.     In the bankruptcy case:

a.  Sears has filed various "Notices of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases," including the Sixth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transactions (the "Sixth Supplement") on April 11, 2019. *See* Exhibit 3.

b.  In the Sixth Supplement, Sears stated that it was filed "in accordance with the Assumption and Assignment Procedures and the Global Bidding Procedures Order," and that pursuant to the notice, Sears "**may**, in connection with the Global Asset Sale Transaction, seek to assume and assign to the Buyer (or its designated assignee, if applicable) certain Contracts and Leases of [Sears], including the what we think they were referring to as the EDA Agreement."

c.  On May 2, 2019, Sears filed its "Notice of Assumption and Assignment of Additional Executory Contracts" pursuant to which Sears notes that Transform Holdco, LLC "has designated for assumption and assignment certain Additional Contracts," which contracts the Plaintiff believe include the EDA Agreement. *See* Exhibit 4.

d.  Plaintiffs have filed timely objections to the Notices referenced above, which have yet to be scheduled for a hearing.

46.     When Sears and the Transform Entities entered into the Asset Purchase Agreement, Sears ceased being the developer as defined in the 1990 Agreement and EDA Amendment.

47.     As of the date of the Asset Purchase Agreement, the Developer (Sears, Roebuck & Co.) ceased employing a single employee in Hoffman Estates or anywhere else, and Transform instead hired many of the former Sears employees. The Asset Purchase Agreement and Order Approving the Sale in the Bankruptcy Case states that the Buyer, in this case, the Transform Entities, "(i) is not, and shall not be considered or deemed a mere continuation of, or successor to, the Debtors in any respect; (ii) has not, de facto or otherwise, merged with or into the Debtors; and (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors and there is no continuity of enterprise between the Debtors and the Buyer."

48.     When Sears ceased being the developer, there was no longer any developer, as defined by the 1990 Agreement, EDA Amendment, and the Sears EDA Act.

49.     The Transform Entities are the owners of real property within the Economic Development Area.

50.     The Transform Entities pay property taxes on the property that they own within the Economic Development Area.

51.     The Transform Entities are interested parties to this action because they own the property in question.

**SEARS FAILURE TO COMPLY WITH JOBS REQUIREMENTS**

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

52.    In March of 2017, Sears submitted requests to the Department of Commerce for Sears' 2016 tax subsidies. However, because Sears announced plans to lay off over 100 corporate employees, the Department of Commerce began questioning whether Sears was in compliance with the jobs requirement under the EDGE Agreement.

53.    The Department of Commerce asked Sears to demonstrate that it complied with the jobs requirement in the EDGE Agreement.  Sears responded telling the Department of Commerce that Sears had satisfied the jobs requirement.

54.    Nevertheless, shortly after Sears' assurances that it satisfied the jobs requirement in the EDGE Agreement, media reports surfaced in which Sears acknowledged that, in fact, it did not satisfy the jobs requirement of the EDGE Agreement.  For a June 12, 2017 *Crain's Chicago Business* article entitled "With layoffs, Sears loses state tax credits," Sears spokesman Howard Riefs wrote that "For the first time since our agreement was enacted in 2011, we recently dropped below the required retained job figure for the Edge credit…"  A copy of the article is attached hereto as Exhibit 5.

55.    In June 2017 the Department of Commerce told Sears that the EDGE Agreement was suspended, and Sears thereafter threatened legal action.

56.    With litigation a real possibility, Sears and the Department of Commerce entered into an agreement titled "Settlement Agreement Regarding EDGE Tax Credit Agreement" (the "Settlement Agreement"), a copy of which is attached hereto as Exhibit 6.

57.    In the Settlement Agreement, Sears admits failing to comply with the jobs requirement at least as of May 31, 2017, and admits that it continued to fail to comply with the jobs requirement at least through December 15, 2017, the date of the Settlement Agreement.

13

58.    Around the same time that Sears was admitting to the Department of Commerce that it failed to comply with the jobs requirement in the EDGE Agreement, Sears was telling a totally different story to the Village.

59.    In a November 27, 2017 letter to the Village Manager from Jonathan Bredemeier, Sears' Senior Director of Real Estate and Corporate Services, Sears told the Village that "as of the date of this letter, over 4,250 jobs exist at the Sears Holdings' campus in Hoffman Estates."  Mr. Bredemeier continued stating that "at no time in 2017 did the number of jobs dip below the requisite 4250 jobs."  A copy of the November 27, 2017 correspondence is attached hereto as Exhibit 7.

60.    Notably, the November 27, 2017 letter came from Sears Holdings Management Corporation, and not from Sears Holdings Corporation.

61.    The Village had an  obligation under the EDA Act and under the EDA Amendment to certify that Sears complied with the EDA Act and EDA Amendment prior to making payments to Sears under the EDA Act and EDA Amendment.  The Village failed to comply with these obligations  and wrongfully made payments to Sears. Sears was not entitled under the EDA Act and EDA Amendment to receive the payments made.

62.    All proceeds generated by the EDA are deposited in the special tax allocation fund of the Village. 220 ILCS 620/4(e)(2). The special tax allocation fund is under the sole control and authority of the Village.

63.    The Village has a statutory and contractual obligation to administer the special tax allocation fund in strict conformity with the EDA Act and the EDA Agreement.

14

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

64.    The Village can only make distributions from the special tax allocation fund as expressly provided for in the EDA Act. One essential condition on the distribution of funds from the special tax allocation fund is that the Developer maintains 4,250 jobs.

65.    Copied on the November 27, 2017 correspondence was the Corporation Counsel and Assistant Corporation Counsel for Sears.

66.    The November 27, 2017 correspondence provided no documentation or other evidence to corroborate the unverified claims that "over 4250 jobs exist at the Sears Holdings' campus" and that "at no time in 2017 did the number of jobs dip below the requisite 4250 jobs."

67.    Based on information and belief, at no time prior to November 2017 did the Village request any verification from Sears as to its jobs count. Furthermore, other than the November 2017 letter to the Village and one subsequent letter in January 2018, Sears provided no information to the Village demonstrating that it satisfied the jobs requirement in the Sears EDA Act.

68.    Despite the claims of Mr. Bredemeier, media reports from 2017 and early 2018 indicate that Sears was cutting and/or losing hundreds of jobs at its corporate headquarters in the Village.

69.    Media reports on January 31, 2018 indicated that Sears laid off 220 employees at its corporate headquarters in the Village.  See CNBC article attached hereto as Exhibit 8.

70.    Thus, Sears currently fails to maintain 4,250 jobs as required by the Sears EDA Act and has failed to maintain the requisite number of jobs since at least, and upon information and belief, before, January 31, 2017.

71.    Given the millions of dollars that the District and the other Taxing Bodies have had to forgo in order to subsidize Sears and keep Sears from taking thousands of corporate jobs out of

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

state, the District was justifiably alarmed by reports that Sears was cutting hundreds of jobs and failing to comply with Sears' obligations with the State of Illinois under the EDGE Agreement.

72.     On July 30, 2018, the District wrote to Jonathan Bredemeier at Sears.  The District stated that it was concerned about the proper administration of the Sears EDA Act given that millions of property tax dollars are diverted from schools and other local governments based on the promise that Sears will maintain 4,250 jobs at its headquarters.  A copy of the July 30, 2018 correspondence from the District is attached hereto as <u>Exhibit 9</u>.

73.     The District's correspondence requested, quite reasonably, that Sears provide corroborating evidence to support its assertion that it maintained 4,250 jobs during calendar year 2017.

74.     Additionally, the District asked for a commitment from Sears to provide corroborating evidence in support of any assertion as to the number of jobs maintained during 2018 prior to any distribution of funds under the Sears EDA Act for 2018.

75.     In closing, the District emphasized that it welcomed open communication with Sears about the administration of the Sears EDA Act.

76.     Before this lawsuit was filed, the District never received a response from Mr. Bredemeier or from anyone else at Sears.  Sears never engaged with the District on the important issues raised and certainly never took up the District's request for open communication.  Instead, on August 24, 2018, the District received a response from one of Sears' outside property tax attorneys, David Martin.

77.     Concerning the District's request for corroborating evidence from Sears and to engage in open and constructive communication with Sears, Mr. Martin's terse letter states that

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

"Sears has no obligation to provide School District 300 with any information regarding 'jobs' within the EDA.  Sears has not provided this information to School District 300 in the past and sees no reason to begin doing so now."  A copy of the August 24, 2018 correspondence is attached hereto as <u>Exhibit 10</u>.

78.     Sears and the District entered into a settlement stipulation agreement documented by a Stipulation Order in the Bankruptcy Case (the "Stipulation") pertaining to property taxes levied for tax year 2017 that were extended and collected in calendar year 2018, as well as for other years, a copy of which is attached hereto as <u>Exhibit 11</u>. The District is only seeking relief from Sears as provided in the Stipulation.

79.     In the Bankruptcy Case, the Transform Entities gave notice of their intent to assume the EDA Amendment and the extension of such agreement and therefore are necessary parties to this lawsuit.

## COUNT I – DECLARATORY JUDGMENT
### Plaintiffs v. All Defendants

80.     The Plaintiffs restate all paragraphs *supra* for Count I as though fully set forth in this paragraph.

81.     For almost three decades, Sears' headquarters in the Village has been located in an economic development project area and has been the subject of an economic development plan pursuant to the Sears EDA Act.

82.     The Sears EDA Act, as amended in 2012 by Public Act 97-636, requires Sears to maintain not less than 4,250 full-time equivalent jobs at its corporate headquarters in the Village.

83.     Pursuant to the Sears EDA Act, Sears receives subsidies in the form of millions of dollars in property tax rebates.  Property taxes that Sears receives are diverted from the District

17

and other taxing districts that levy taxes on the Sears property. The loss of the property tax revenue has and continues to negatively impact the District's ability to educate the students in the District including but not limited to hiring sufficient staff, adequately funding student programs and properly maintaining District facilities.

84.     Beginning at least January 31, 2017 and continuing to date, Sears has failed to maintain the requisite 4,250 jobs at its corporate campus in the Village.

85.     The jobs requirement in the Sears EDA Act was absolutely critical to passage of the Sears EDA Act.

86.     The jobs requirement was so critical that, when the Sears EDA Act was amended in 2012, and in an effort to keep Sears from leaving Illinois, the Illinois General Assembly added a new section 4.5, 20 ILCS 620/4.5 titled "Recapture" and subsection b of section 4.5 specifically provides what happens in the event Sears maintains some but not all of the required jobs.

87.     Section 4.5(b) of the Sears EDA Act specifically provides as follows:

(b) In the event the developer fails to maintain 4,250 jobs at any time before the termination of the economic development project area….the developer shall forfeit an amount of its allocations from the special tax allocation fund for that time period in which the developer failed to maintain 4,250 jobs. The amount forfeited shall equal the percentage of the year that the developer failed to maintain 4,250 jobs multiplied by the amount the developer would have received if they maintained 4,250 jobs for the entire year. Any funds that are forfeited shall be distributed to the taxing districts in the same manner and proportion as the most recent distribution by the county collector to those taxing districts (inclusive of the municipality) in the economic development project area.

88.     Thus, the District has a legal tangible interest in this matter because a forfeiture of Sears per Section 4.5(b) results in a distribution of the forfeited amount to the taxing districts, including the District.

18

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

89.     Upon information and belief, Sears failed to maintain or retain the requisite number of jobs per the Sears EDA Act in calendar year 2013.

90.     Upon information and belief, Sears failed to maintain or retain the requisite number of jobs per the Sears EDA Act in calendar year 2014.

91.     Upon information and belief, Sears failed to maintain or retain the requisite number of jobs per the Sears EDA Act in calendar year 2015.

92.     Upon information and belief, Sears failed to maintain or retain the requisite number of jobs per the Sears EDA Act in calendar year 2016.

93.     Sears failed to maintain or retain the requisite number of jobs per the Sears EDA Act in calendar year 2017.

94.     Per Section 4.5(b) of the Sears EDA Act, whatever percentage of the calendar year Sears had less than the required number of jobs is the percentage of the amount of receipts that Sears must forfeit.  That forfeited amount is distributed to the taxing districts in the same manner and proportion as the most recent distribution of the Cook County Treasurer, except for the taxes levied in 2017 and collected in 2018, which is the subject of a settlement stipulation order.

95.     In calendar years 2018 and 2019, Sears failed to maintain the requisite number of jobs required by the Sears EDA Act for the entire year.  In other words, for 100% of calendar years 2018 and 2019, Sears has failed to maintain the requisite number of jobs per the Sears EDA Act.

96.     Accordingly, this Honorable Court should declare that the Village acted contrary to the EDA Act by incorrectly paying to Sears the amount of property tax revenue levied by the Taxing Bodies in 2012, 2013, 2014, 2015, 2016 and 2018 and extended in the respective subsequent year, that Sears would have received if Sears had maintained 4,250 jobs for the entire

19

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

calendar year of 2013, 2014, 2015, 2016, 2017 and 2019. Sears failed to maintain or retain the requisite number of jobs per the Sears EDA Act in 2018, but the taxes levied in 2017 and extended in 2018 are the subject of the Settlement Stipulation Order.

97.     The Village receives and is responsible for maintaining tax monies in a special fund under the Sears EDA Act called the "special tax allocation fund" every year that the Sears EDA Act is active.  Subsidies to Sears under the Sears EDA Act are paid from the special tax allocation fund in the amounts pursuant to 20 ILCS 620/4(g).

98.     Among the relief sought by the Taxing Body Plaintiffs is injunctive relief preventing any further distributions by the Village from the Village's special tax allocation fund until the rights of the parties are declared by this court.

99.     Any orders entered concerning forfeiture of amounts by Sears or the Transform Entities and changed distributions will necessarily affect the Village's administration of the special tax allocation fund and the Village is therefore named as a defendant.

100.    Any orders entered concerning forfeiture of amounts by Sears or the Transform Entities will necessarily affect the other Taxing Bodies.

WHEREFORE, the Taxing Body Plaintiffs pray that this Court enter an order:

A.     Declaring that Sears has failed to maintain the number of jobs required of it under the Sears EDA Act for calendar years 2013 through 2019:

B.     Declaring that under the 1990 Agreement, EDA Amendment, and the Sears EDA Act, Sears is the only eligible Developer;

C.     Declare the specific amounts forfeited by Sears and the specific amounts payable to the District and to the Taxing Bodies;

D.     Declaring that because Sears has sold and relinquished its interest in the Sears Headquarters Property and property tax rebates under the EDA Act, the Sears EDA Act District should be dissolved and an Order entered directing the Village to

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

terminate the EDA Act District and distribute all the funds in the special tax allocation fund;

E.    Not entering any changes nor any additional orders which are contradictory to the Stipulation nor the Agreed Order entered on October 31, 2019;

F.    Retaining jurisdiction over this matter for the purpose of enforcing the provisions of its judgment or decree; and

G.    Granting any other relief that this Court deems appropriate.

## COUNT II – STATUTORY VIOLATION OF THE EDA ACT
### The Plaintiffs v. the Village of Hoffman Estates

101.    The Plaintiffs restate all paragraphs *supra* for Count II as though fully set forth in this paragraph.

102.    The EDA Act states, in relevant part,

"a municipality shall submit in an electronic format all of the following information for each economic development project area…to all taxing district overlapping the economic development project area no later than 180 days after the close of each municipal fiscal year or as soon thereafter as the audited financial statements become available:…

(3) Certification of the Chief Executive Officer of the municipality that the municipality has complied with all of the requirements of this Act during the preceding fiscal year;…

(4) An opinion of legal counsel that the municipality is in compliance with this Act.

(7) a statement setting forth all activities undertaken in furtherance of the objectives of the economic development plan, including:

(A) any project implemented in the preceding fiscal year;

(B) a description of the economic development activities undertaken;

(C) a description of any agreements entered into by the municipality with regard to the disposition or redevelopment of any property within the economic development project area;

(D) additional information on the use of all funds received under this Act and steps taken by the municipality to achieve the objectives of the economic development plan;

(E) information regarding contracts that the municipality's tax increment advisors or consultants have entered into with entities or

21

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

persons that have received, or are receiving, payments financed by tax increment revenues produced by the same economic development project area; and

(F) a review of public and, to the extent possible, private investment actually undertaken on or after the effective date of this amendatory Act of the 97th General Assembly and prior to the date of the report and estimated to be undertaken during the following fiscal year; this review shall, on a project by project basis, set forth the estimated amounts of public and private investment incurred after the effective date of this amendatory Act of the 97th General Assembly and provide the ratio of private investment to public investment to the date of the report and as estimated to the completion of the economic development project." 20 ILCS 620/4.7.

103.     Section 4.5 of the EDA Act states, in relevant part,

"(b) In the event the developer fails to maintain 4,250 jobs at any time before the termination of the economic development project area, except as provided in subsection (c), the developer shall forfeit an amount of its allocations from the special tax allocation fund for that time period in which the developer failed to maintain 4,250 jobs. The amount forfeited shall equal the percentage of the year that the developer failed to maintain 4,250 jobs multiplied by the amount the developer would have received if they maintained 4,250 jobs for the entire year. Any funds that are forfeited shall be distributed to the taxing districts in the same manner and proportion as the most recent distribution by the county collector to those taxing districts (inclusive of the municipality) in the economic development project area."

104.     By maintaining less than 4,250 full-time jobs in Hoffman Estates, the developer, Sears, failed to comply with the terms of the EDA Act.

105.     If Sears fails to maintain 4,250 jobs, 20 ILCS 620/4.5 provides for a recapture of the special tax allocations. Sears has not provided statutory recapture allocation to the District.

106.     The Village's annual municipal reports, required by 20 ILCS 620/4.7, are not in compliance with the Village's obligation to verify and certify Sears' maintenance of a job count exceeding 4,250.  As a result, these reports are statutorily deficient in that they do not adequately certify compliance with the EDA Act, as required by 20 ILCS 620/4.7.

22

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

107.    The Village had sole control and authority over the special tax allocation fund and had a statutory obligation to distribute those funds in strict conformity with the EDA Act. Contrary to its clear statutory obligations, the Village illegally distributed funds from the special tax allocation fund to Sears.

108.    The Village's distribution of funds to Sears was not permitted under and is a violation of the Sears EDA Act because the Village failed to satisfy the EDA Act statutory duties before distributing EDA Act Funds to Sears, knew or should have known that Sears failed to maintain the jobs necessary to qualify for EDA distributions, and wrongfully distributed EDA Act Funds to Sears.

109.    Alternatively, the Village's distribution of funds to Sears was not permitted under and is a violation of the Sears EDA Act because the Village willfully and knowingly failed to obtain information from Sears that would have enabled the Village to make an independent determination as to the number of jobs maintained by Sears as required under the Sears EDA Act.

110.    Plaintiffs and the other Taxing Bodies, except the Village, have been injured by the Village's violation because the funds that were improperly distributed to Sears should have been properly distributed to Plaintiff and the other Taxing Bodies.

111.    The Illinois General Assembly enacted Section 4.5 of the Sears EDA Act, to prevent this type of injury to Plaintiff

WHEREFORE, the Taxing Body Plaintiffs pray that this Court enter an order:

A.    Declaring that Sears has failed to maintain the number of jobs required of it under the Sears EDA Act;

B.    Declaring that the Village of Hoffman Estates violated the Sears EDA Act;

23

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

C.      Declaring that whatever percentage of each calendar year, 2013 through 2019, excluding property taxes levied in 2017 and extended and collected in 2018, that Sears was not compliant with the jobs requirement of the Sears EDA Act, should be declared forfeited and paid by the Village of Hoffman Estates to the Plaintiffs and the other remaining Taxing Bodies in the same manner and proportion as the distribution of the Cook County Treasurer for each applicable year;

D.      Declaring the specific amounts forfeited and the specific amounts payable to the Plaintiffs and to the remaining Taxing Bodies by the Village;

E.      Entering an injunction as to the Village of Hoffman Estates preventing any further distributions by the Village from the Village's special tax allocation fund until the status of the EDA District is declared by this court;

F.      Declaring the Sears EDA District dissolved and enter an Order directing the Village to terminate the EDA and distribute all the funds in the special tax allocation fund;

G.      Not entering any changes nor any additional orders which are contradictory to the Stipulation nor the Agreed Order entered on October 31, 2019;

H.      Retaining jurisdiction over this matter for the purpose of enforcing the provisions of its judgment or decree; and

I.      Granting any other relief that this Court deems appropriate.

## COUNT III – UNJUST ENRICHMENT
### The Plaintiffs v. Village of Hoffman Estates

112.    The Plaintiffs restate all paragraphs *supra* for Count III as though fully set forth in this paragraph.

113.    Pursuant to 20 ILCS 620/4(g), the Village has received a benefit of $5,000,000 annually every year that the Sears EDA Act District was active.

114.    This benefit of $5,000,000 was to the Taxing Bodies' detriment because that money comes out of the total property taxes levied by the Taxing Bodies and paid by Sears each year.

115.    By not meeting the jobs requirement of the Sears EDA Act, the Defendants have unjustly retained EDA Act and EDA Amendment revenues to the detriment of the District.

24

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

116.    The Village had an obligation to verify and certify whether Sears was in compliance with the jobs requirement of the Sears EDA Act.  However, for the Village it is more lucrative under the Sears EDA Act for Sears to be in compliance with the jobs requirement than not in compliance, so the Village failed to meaningfully perform its verification and certification functions mandated by the Sears EDA Act.

117.    The Village's failure to perform its verification and certification functions mandated by the Sears EDA Act directly resulted in the Village getting more money under the Sears EDA Act District's existence at the expense and to the detriment of the District and other Taxing Bodies.

118.    The Defendants' retention of the tax benefits to the detriment of the District violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, the Taxing Body Plaintiffs pray that this Court enter an order:

A.    Declaring that Sears has failed to maintain the number of jobs required of it under the Sears EDA Act;

B.    Declaring that the Village of Hoffman Estates has been unjustly enriched;

C.    Declaring that whatever percentage of each calendar year, 2013 through 2019, excluding property taxes levied in 2017 and extended and collected in 2018, that Sears was not compliant with the jobs requirement of the Sears EDA Act, should be deemed forfeited and distributed to the Plaintiffs and the remaining Taxing Bodies in the same manner and proportion as the distribution of the Cook County Treasurer for each applicable year and that the Village of Hoffman Estates shall pay to the taxing districts those amounts incorrectly paid to Sears by the Village;

D.    Declaring the specific amounts forfeited and the specific amounts payable to the Plaintiffs and to the remaining Taxing Bodies by the Village;

E.    Entering an injunction as to the Village of Hoffman Estates preventing any further distributions by the Village from the Village's special tax allocation fund until the rights of the parties are declared by this court;

25

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

F.    Declaring the Sears EDA Act District dissolved and enter an Order directing the Village to terminate the EDA and distribute all the funds in the special tax allocation fund;

G.    Not entering any changes nor any additional orders which are contradictory to the Stipulation nor the Agreed Order entered on October 31, 2019;

H.    Retaining jurisdiction over this matter for the purpose of enforcing the provisions of its judgment or decree; and

I.    Granting any other relief that this Court deems appropriate.

Respectfully submitted,

COMMUNITY UNIT SCHOOL DISTRICT 300, BARRINGTON PUBLIC LIBRARY DISTRICT, BARRINGTON TOWNSHIP, METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, AND SCHOOL DISTRICT U-46

By:    _____
                    One of their Attorneys

Kory Atkinson
**Law Office of Kory Atkinson**
236 West Lake Street, Suite 100
Bloomingdale, IL 60108
630-980-9100 (ph)
kaa@koryatkinson.com
Cook County No. 44788

Kenneth M. Florey
M. Neal Smith
Katie Zumalt-Rogers
**Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.**
55 W. Monroe, Suite 800
Chicago, IL 600603
312-332-7760
kflorey@robbins-schwartz.com
nsmith@robbins-schwartz.com
kzumalt-rogers@robbins-schwartz.com
Cook County No. 91219

26

ELGIN COMMUNITY COLLEGE

By: _____

    One of Its Attorneys

Respicio F. Vazquez
Legal General Counsel for the College
1700 Spartan Drive
Elgin, IL 60123
rvazquez@elgin.edu

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

STATE OF ILLINOIS        )
                         ) SS.
COUNTY OF COOK           )

## VERIFICATION

Susan Harkin, being first duly sworn on oath, hereby deposes and states that she is the Chief Operating Officer for Community Unit School District 300, that she has read the foregoing Verified Complaint for Declaratory, Injunctive and Other Relief, and that the facts contained therein are true and accurate to the best of her knowledge and belief.

Susan  Harkin
Chief Operating Officer

SUBSCRIBED AND SWORN TO BEFORE
ME THIS ___!!_DAY OF JULY, 2020

Notary Public

OFFICIAL  SEAL
CHRISTINE  C IATHROP
NOTARY PUBLIC. STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/11'24

28

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| **SEARS, ROEBUCK AND CO.,** | : | Case No. 18-_____ (RDD) |
| | : | |
| Debtor. | : | |
| | : | |
| **Fed. Tax Id. No. 36-1750680** | : | |

---------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| **SEARS HOLDINGS CORPORATION,** | : | Case No. 18-_____ (RDD) |
| | : | |
| Debtor. | : | |
| | : | |
| **Fed. Tax Id. No. 20-1920798** | : | |

---------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| **KMART HOLDING CORPORATION,** | : | Case No. 18-_____ (RDD) |
| | : | |
| Debtor. | : | |
| | : | |
| **Fed. Tax Id. No. 32-0073116** | : | |

---------------------------------------------------------x

**EXHIBIT
1**

FILED DATE: 7/8/2020 5:03 PM 2018CH12683

```
------------------------------------------------------------x
In re                                    :      Chapter 11
                                         :
KMART OPERATIONS LLC,                    :      Case No. 18-_____ (RDD)
                                         :
                        Debtor.          :
                                         :
Fed. Tax Id. No. 32-0456546              :
------------------------------------------------------------x
In re                                    :      Chapter 11
                                         :
SEARS OPERATIONS LLC,                    :      Case No. 18-_____ (RDD)
                                         :
                        Debtor.          :
                                         :
Fed. Tax Id. No. 35-2524331              :
------------------------------------------------------------x
In re                                    :      Chapter 11
                                         :
SERVICELIVE, INC.,                       :      Case No. 18-_____ (RDD)
                                         :
                        Debtor.          :
                                         :
Fed. Tax Id. No. 36-4616774              :
------------------------------------------------------------x
In re                                    :      Chapter 11
                                         :
A&E FACTORY SERVICE, LLC,                :      Case No. 18-_____ (RDD)
                                         :
                        Debtor.          :
                                         :
Fed. Tax Id. No. 36-4486695              :
------------------------------------------------------------x
In re                                    :      Chapter 11
                                         :
A&E HOME DELIVERY, LLC,                  :      Case No. 18-_____ (RDD)
                                         :
                        Debtor.          :
                                         :
Fed. Tax Id. No. 37-1500205              :
------------------------------------------------------------x
```

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

```
------------------------------------------------x
In re                                  :    Chapter 11
                                       :
A&E LAWN & GARDEN, LLC,                 :    Case No. 18-_____ (RDD)
                                       :
                        Debtor.        :
                                       :
Fed. Tax Id. No. 13-4275028            :
------------------------------------------------x
In re                                  :    Chapter 11
                                       :
A&E SIGNATURE SERVICE, LLC,            :    Case No. 18-_____ (RDD)
                                       :
                        Debtor.        :
                                       :
Fed. Tax Id. No. 37-1500204            :
------------------------------------------------x
In re                                  :    Chapter 11
                                       :
FBA HOLDINGS INC.,                     :    Case No. 18-_____ (RDD)
                                       :
                        Debtor.        :
                                       :
Fed. Tax Id. No. 36-4186537            :
------------------------------------------------x
In re                                  :    Chapter 11
                                       :
INNOVEL SOLUTIONS, INC.,               :    Case No. 18-_____ (RDD)
                                       :
                        Debtor.        :
                                       :
Fed. Tax Id. No. 36-1857180            :
------------------------------------------------x
In re                                  :    Chapter 11
                                       :
KMART CORPORATION,                     :    Case No. 18-_____ (RDD)
                                       :
                        Debtor.        :
                                       :
Fed. Tax Id. No. 38-0729500            :
------------------------------------------------x
```

3

```
----------------------------------------------------------x
In re                                  :      Chapter 11
                                       :
MAXSERV, INC.,                         :      Case No. 18-_____ (RDD)
                                       :
                    Debtor.            :
                                       :
Fed. Tax Id. No. 74-2707626            :
----------------------------------------------------------x
In re                                  :      Chapter 11
                                       :
PRIVATE BRANDS, LTD.,                  :      Case No. 18-_____ (RDD)
                                       :
                    Debtor.            :
                                       :
Fed. Tax Id. No. 55-0544022            :
----------------------------------------------------------x
In re                                  :      Chapter 11
                                       :
SEARS DEVELOPMENT CO.,                 :      Case No. 18-_____ (RDD)
                                       :
                    Debtor.            :
                                       :
Fed. Tax Id. No. 36-2476028            :
----------------------------------------------------------x
In re                                  :      Chapter 11
                                       :
SEARS HOLDINGS                         :      Case No. 18-_____ (RDD)
MANAGEMENT CORPORATION,                :
                                       :
                    Debtor.            :
                                       :
Fed. Tax Id. No. 20-3592148            :
----------------------------------------------------------x
In re                                  :      Chapter 11
                                       :
SEARS HOME & BUSINESS                  :      Case No. 18-_____ (RDD)
FRANCHISES, INC.,                      :
                                       :
                    Debtor.            :
                                       :
Fed. Tax Id. No. 98-0126742            :
----------------------------------------------------------x
```

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

4

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

```
--------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SEARS HOME IMPROVEMENT                    :        Case No. 18-_____ (RDD)
PRODUCTS, INC.,                          :
                                         :
                Debtor.                  :
                                         :
Fed. Tax Id. No. 25-1698591              :
--------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SEARS INSURANCE                           :        Case No. 18-_____ (RDD)
SERVICES, L.L.C.,                        :
                                         :
                Debtor.                  :
                                         :
Fed. Tax Id. No. 36-4287182              :
--------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SEARS PROCUREMENT                         :        Case No. 18-_____ (RDD)
SERVICES, INC.,                          :
                                         :
                Debtor.                  :
                                         :
Fed. Tax Id. No. 30-0092859              :
--------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SEARS PROTECTION COMPANY,                 :        Case No. 18-_____ (RDD)
                                         :
                Debtor.                  :
                                         :
Fed. Tax Id. No. 36-4471250              :
--------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SEARS PROTECTION                          :        Case No. 18-_____ (RDD)
COMPANY (PR) INC.,                       :
                                         :
                Debtor.                  :
                                         :
Fed. Tax Id. No. 66-0704861              :
--------------------------------------------------x
```

5

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

```
---------------------------------------------------------x
In re                                    :       Chapter 11
                                         :
SEARS ROEBUCK ACCEPTANCE CORP.,          :       Case No. 18-_____ (RDD)
                                         :
                        Debtor.          :
                                         :
Fed. Tax Id. No. 51-0080535              :
---------------------------------------------------------x
In re                                    :       Chapter 11
                                         :
SEARS, ROEBUCK DE                        :       Case No. 18-_____ (RDD)
PUERTO RICO, INC.                        :
                                         :
                        Debtor.          :
                                         :
Fed. Tax Id. No. 66-0233626              :
---------------------------------------------------------x
In re                                    :       Chapter 11
                                         :
SYW RELAY LLC,                           :       Case No. 18-_____ (RDD)
                                         :
                        Debtor.          :
                                         :
Fed. Tax Id. No. 35-2561870              :
---------------------------------------------------------x
In re                                    :       Chapter 11
                                         :
WALLY LABS LLC,                          :       Case No. 18-_____ (RDD)
                                         :
                        Debtor.          :
                                         :
No Fed. Tax Id.                          :
---------------------------------------------------------x
In re                                    :       Chapter 11
                                         :
BIG BEAVER OF FLORIDA                    :       Case No. 18-_____ (RDD)
DEVELOPMENT, LLC,                        :
                                         :
                        Debtor.          :
                                         :
No Fed. Tax Id.                          :
---------------------------------------------------------x
```

6

```
------------------------------------------------x
In re                                           :    Chapter 11
                                                :
CALIFORNIA BUILDER APPLIANCES, INC., :               Case No. 18-_____ (RDD)
                                                :
                        Debtor.                 :
                                                :
Fed. Tax Id. No. 68-0406327                     :
------------------------------------------------x
In re                                           :    Chapter 11
                                                :
FLORIDA BUILDER APPLIANCES, INC.,               :    Case No. 18-_____ (RDD)
                                                :
                        Debtor.                 :
                                                :
Fed. Tax Id. No. 36-3619133                     :
------------------------------------------------x
In re                                           :    Chapter 11
                                                :
KBL HOLDING INC.,                               :    Case No. 18-_____ (RDD)
                                                :
                        Debtor.                 :
                                                :
Fed. Tax Id. No. 26-0031295                     :
------------------------------------------------x
In re                                           :    Chapter 11
                                                :
KLC, INC.,                                      :    Case No. 18-_____ (RDD)
                                                :
                        Debtor.                 :
                                                :
Fed. Tax Id. No. 75-2490839                     :
------------------------------------------------x
In re                                           :    Chapter 11
                                                :
KMART OF MICHIGAN, INC.,                        :    Case No. 18-_____ (RDD)
                                                :
                        Debtor.                 :
                                                :
Fed. Tax Id. No. 38-3551696                     :
------------------------------------------------x
```

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

```
--------------------------------------------------------x
In re                                :    Chapter 11
                                     :
KMART OF WASHINGTON LLC,             :    Case No. 18-_____ (RDD)
                                     :
                    Debtor.          :
                                     :
Fed. Tax Id. No. 61-1448898          :
--------------------------------------------------------x
In re                                :    Chapter 11
                                     :
KMART STORES OF ILLINOIS LLC,        :    Case No. 18-_____ (RDD)
                                     :
                    Debtor.          :
                                     :
Fed. Tax Id. No. 61-1448897          :
--------------------------------------------------------x
In re                                :    Chapter 11
                                     :
KMART STORES OF TEXAS LLC,           :    Case No. 18-_____ (RDD)
                                     :
                    Debtor.          :
                                     :
Fed. Tax Id. No. 61-1448915          :
--------------------------------------------------------x
In re                                :    Chapter 11
                                     :
MYGOFER LLC,                         :    Case No. 18-_____ (RDD)
                                     :
                    Debtor.          :
                                     :
Fed. Tax Id. No. 26-4005531          :
--------------------------------------------------------x
In re                                :    Chapter 11
                                     :
SEARS BRANDS BUSINESS                :    Case No. 18-_____ (RDD)
UNIT CORPORATION,                    :
                                     :
                    Debtor.          :
                                     :
Fed. Tax Id. No. 42-1564658          :
--------------------------------------------------------x
```

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

8

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

```
------------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
SEARS HOLDINGS PUBLISHING                :    Case No. 18-_____ (RDD)
COMPANY, LLC,                            :
                                         :
                      Debtor.            :
                                         :
Fed. Tax Id. No. 26-0075554              :
------------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
SEARS PROTECTION COMPANY                 :    Case No. 18-_____ (RDD)
(FLORIDA), L.L.C.,                       :
                                         :
                      Debtor.            :
                                         :
Fed. Tax Id. No. 20-0224239             :
------------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
SHC DESERT SPRINGS, LLC,                 :    Case No. 18-_____ (RDD)
                                         :
                      Debtor.            :
                                         :
No Fed. Tax Id.                          :
------------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
SOE, INC.,                               :    Case No. 18-_____ (RDD)
                                         :
                      Debtor.            :
                                         :
Fed. Tax Id. No. 83-0399616             :
------------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
STARWEST, LLC,                           :    Case No. 18-_____ (RDD)
                                         :
                      Debtor.            :
                                         :
Fed. Tax Id. No. 37-1495379             :
------------------------------------------------------------x
```

9

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

```
---------------------------------------------------x
In re                                     :    Chapter 11
                                          :
STI MERCHANDISING, INC.,                  :    Case No. 18-_____ (RDD)
                                          :
                      Debtor.             :
                                          :
Fed. Tax Id. No. 38-2760188              :
---------------------------------------------------x
In re                                     :    Chapter 11
                                          :
TROY COOLIDGE NO. 13, LLC,                :    Case No. 18-_____ (RDD)
                                          :
                      Debtor.             :
                                          :
No Fed. Tax Id.                           :
---------------------------------------------------x
In re                                     :    Chapter 11
                                          :
BLUELIGHT.COM, INC.,                      :    Case No. 18-_____ (RDD)
                                          :
                      Debtor.             :
                                          :
Fed. Tax Id. No. 77-0527034              :
---------------------------------------------------x
In re                                     :    Chapter 11
                                          :
SEARS BRANDS, L.L.C.,                     :    Case No. 18-_____ (RDD)
                                          :
                      Debtor.             :
                                          :
Fed. Tax Id. No. 42-1564664              :
---------------------------------------------------x
In re                                     :    Chapter 11
                                          :
SEARS BUYING SERVICES, INC.,              :    Case No. 18-_____ (RDD)
                                          :
                      Debtor.             :
                                          :
Fed. Tax Id. No. 36-3256533              :
---------------------------------------------------x
```

```
-----------------------------------------------------------x
In re                                   :      Chapter 11
                                        :
KMART.COM LLC,                          :      Case No. 18-_____ (RDD)
                                        :
                    Debtor.             :
                                        :
Fed. Tax Id. No. 77-0529022             :
-----------------------------------------------------------x
In re                                   :      Chapter 11
                                        :
SEARS BRANDS                            :      Case No. 18-_____ (RDD)
MANAGEMENT CORPORATION,                 :
                                        :
                    Debtor.             :
                                        :
Fed. Tax Id. No. 36-2555365             :
-----------------------------------------------------------x
```

## DEBTORS' CONSOLIDATED CORPORATE OWNERSHIP STATEMENT

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure and Rule 1007-3 of the Local Bankruptcy Rules for the Southern District of New York, Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**") respectfully represent:

1.     Sears Holdings is a publicly traded corporation.  The only corporations, as defined in section 101 of title 11 of the United States Code, that own greater than 10% of Sears Holdings' equity interests are affiliates of Edward S. Lampert, including ESL Investments, Inc. ("**ESL**"), which on an aggregate basis own approximately 49% of Sears Holdings' equity interests.  ESL is not a Debtor in these chapter 11 cases.

2.     Sears Holdings owns 100% of the membership or equity interests (whichever is applicable) in the following Debtors: Kmart Holding Corporation ("**Kmart**

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

11

Holding"), Kmart Operations LLC, Sears Operations LLC, ServiceLive, Inc., and Sears, Roebuck and Co. ("**Roebuck**").

3.      Kmart Holding owns 100% of the equity interests in Kmart Corporation ("**Kmart Corp.**"), and 20% of the equity interests in Sears Holdings Management Corporation ("**SHMC**").  Roebuck owns the remaining 80% of the equity interests in SHMC.

4.      Kmart Corp. owns 100% of the membership or equity interests (whichever is applicable) in the following Debtors: Kmart of Michigan, Inc., Big Beaver of Florida Development, LLC, KLC, Inc., Kmart of Washington LLC, Kmart Stores of Illinois LLC, Kmart Stores of Texas LLC, SHC Desert Springs LLC, Troy Coolidge No. 13 LLC, STI Merchandising, Inc., and MyGofer LLC.  Kmart Corp. also owns 100% of the equity interests in Debtor KBL Holding Inc., which owns 100% of the equity interests in BlueLight.com, Inc., also a Debtor in these chapter 11 cases.  BlueLight.com, Inc. owns 100% of the membership interests in Debtor Kmart.com LLC.

5.      SHMC owns 100% of the equity interests in Debtor Sears Brands Business Unit Corporation ("**SBBU**").  SBBU owns 100% of the equity interests in Debtor Sears Buying Services, Inc., which owns 100% of the equity interests in Sears Brands Management Corporation. SBBU also owns 100% of the membership interests in Sears Brands, L.L.C., which owns 100% of the membership interests in non-Debtor KCD IP, LLC.

6.      Roebuck owns 100% of the membership or equity interests (whichever is applicable) in the following Debtors: A&E Factory Service, LLC, A&E Signature Service, LLC, A&E Lawn & Garden, LLC, Innovel Solutions, Inc., MaxServ, Inc., A&E Home Delivery, LLC, Sears Home Improvement Products, Inc., Sears Development Co., Private Brands, Ltd., Sears Roebuck Acceptance Corp., Sears, Roebuck de Puerto Rico, Inc., Sears Home & Business

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

Franchises, Inc., Sears Home & Business Franchises, Inc., Sears Insurance Services, L.L.C., Sears Protection Company, SYW Relay LLC, Wally Labs LLC, and Sears Protection Company. Sears Protection Company owns 100% of the membership interests in Sears Protection Company (Florida), L.L.C.

7.      Roebuck also owns 100% of the equity interests in Debtor FBA Holdings Inc., which owns 100% of the membership or equity interests (whichever is applicable) in the following Debtors: California Builder Appliances, Inc., Florida Builder Appliances, Inc., SOE, Inc., and StarWest, LLC.

8.      Sears Procurement Services, Inc. owns a 100% membership interest in Debtor Sears Holdings Publishing Company, LLC.

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

**Fill in this information to identify the case:**

Debtor name: <u>Sears Holdings Corporation, et al.</u>

United States Bankruptcy Court  for the:  <u>Southern</u>   District of  <u>New York</u>
<span style="font-size:small">(State)</span>

Case number (*If known*):  _____

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

WARNING – Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

**Declaration and signature**

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐    Schedule A/B: Assets–Real and Personal Property (Official Form 206A/B)

☐    Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)

☐    Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)

☐    Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)

☐    Schedule H: Codebtors (Official Form 206H)

☐    Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)

☐    Amended Schedule _____

☐    Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)

☑    Other document that requires a declaration <u>Corporate Ownership Statement</u>

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  <u>October 15, 2018</u>           **X**   <u>/s/ Robert A. Riecker</u>
            MM / DD / YYYY                      Signature of individual signing on behalf of debtor

                                <u>Robert A. Riecker</u>
                                Printed name

                                <u>Chief Financial Officer</u>
                                Position or relationship to debtor

14

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

FILED DATE: 11/12/2019 4:33 PM   2018CH12683

**ECONOMIC DEVELOPMENT AGREEMENT**

**BY AND BETWEEN**

**THE VILLAGE OF HOFFMAN ESTATES**

**AND**

**SEARS, ROEBUCK AND CO.**

EXHIBIT

**2**

## TABLE OF CONTENTS

**ARTICLE**                                                                    **PAGE**

DEFINITIONS................................................    1

RECITALS..................................................   15

ARTICLE 1.    INCORPORATION OF RECITALS....................   17

ARTICLE 2.    GOALS, MUTUAL ASSISTANCE AND COOPERATION......   17

              2.1. Goals and Mutual Assistance.............   17

              2.2. Cooperation in Seeking Financial Aid
                   and Assistance..........................   18

ARTICLE 3.    DEVELOPMENT OF THE SUBJECT PROPERTY...........   19

              3.1. Phase I Development.....................   19
                   (a)  General............................   19
                   (b)  Permits............................   20
                   (c)  Preliminary Grading.................   21
                   (d)  Submission of Development
                        Documentation......................   22
                   (e)  Construction of Phase I Develop-
                        ment Public Site Improvements.......   26
                   (f)  SMG Occupancy Date.................   29

              3.2. Phase II Development....................   29
                   (a)  General............................   29
                   (b)  Construction of Phase II Develop-
                        ment Public Site Improvements.......   30

              3.3. Construction of Public Works and
                   Improvements............................   32

              3.4. Covenant to Run With Land Regarding Uses
                   of the Subject Property.................   32

              3.5. Insurance...............................   33

              3.6. Compliance of Plats, Plans and Construc-
                   tion Activities with Village Ordinance....   34

ARTICLE 4.    COSTS  OF  THE  DEVELOPMENT  CONSTITUTING  "PROJECT
              COSTS" WHICH ARE TO BE PAID OR FINANCED PURSUANT TO
              THE PROVISIONS OF THIS AGREEMENT..............   35

              4.1. General.................................   35

02/27/90-H.E.                          i

**PAGE**

4.2. Project Costs Agreed Upon as the Date of this Agreement............................. 35

4.3. Project Costs Incurred in Connection With the Construction of Public Site Improvements Identified by the Village After the Date of this Agreement............................. 38

4.4. Determining "Reasonable or Necessary" Costs.................................... 42

ARTICLE 5.   SPECIAL TAX ALLOCATION FUND................... 42

5.1. Deposit of Monies into Fund............... 42

5.2. Accounting of Monies Deposited in Fund.... 42

5.3. Investment of Monies Deposited in the Fund.................................... 43

ARTICLE 6.   PAYMENT AND FINANCING OF PROJECT COSTS......... 43

6.1. Project Costs Other Than Village Project Costs.................................... 43

6.2. Payment and Financing of Village Project Costs.................................... 44

6.3. Issuance of Bonds/Execution and Delivery of Notes................................. 45

6.4. Limited Liability of the Village......... 47

6.5. Developer Advances....................... 47

6.6. Procedure for Payment and Reimbursement to the Developer of Project Costs............ 48

ARTICLE 7.   UTILIZATION OF TAX INCREMENT REVENUES.......... 50

7.1. Tax Increment Revenues Received Prior to the Phase I Tax Increment Revenue Commencement Date....................... 50

7.2. Tax Increment Revenues Received On and Subsequent to Phase I Tax Increment Revenue Commencement Date....... 50

**PAGE**

7.3. The Village's Distribution of The Phase
I Allocated Tax Increment
Revenue Amounts............................ 52

ARTICLE 8.    BONDS AND NOTES................................ 54

8.1. Issuance, Execution and Delivery......... 54

8.2. Interest Payment, Maturity, Priorities and
Credit Enhancements.................·..... 55

8.3. Tax-Exempt Issues........................ 56

8.4. SMG Completion Guaranty Note............. 56

ARTICLE 9.    TAX PROTESTS AND APPEALS/PAYMENT OF REAL ESTATE
TAXES......................................... 57

9.1. Tax Protests and Appeals................. 57

9.2. Miscellaneous............................ 58

ARTICLE 10.   SPECIFIC DEVELOPER ADVANCES AND DONATIONS...... 58

10.1. Developer Advance for Costs of Administer-
ing the Economic Development Plan......... 58

10.2. Developer Advance for Police and Fire
Personnel................................ 59

10.3. Donation of Village Municipal Site........ 60

10.4. Donations Relating to Redevelopment of
PCMT Property............................ 61
      (a)  Loss of Contracted Service Income.... 61
      (b)  Reductions in Equalized
           Assessed Value....................... 62
      (c)  Municipal Entertainment Tax.......... 63

10.5. Developer Advance for Miscellaneous
Village Project Costs.................... 63

10.6. No Other Donations....................... 64

ARTICLE 11.   NOTICES....................................... 65

ARTICLE 12.   MEMORANDUM OF AGREEMENT....................... 66

ARTICLE 13.   PERMITTED DELAYS.............................. 67

02/27/90-H.E.                iii

FILED DATE: 1/7/8/2020 8:03 PM   2018CH12683

**PAGE**

ARTICLE 14.   MORTGAGE HOLDERS............................... 67

14.1. Rights and Obligations................... 67

14.2. Notice/Assumption of Obligations......... 68

14.3. Village Right to Cure Defaults........... 70

ARTICLE 15.   NO DISCRIMINATION-CONSTRUCTION................ 71

ARTICLE 16.   NO DISCRIMINATION-USE.......................... 71

ARTICLE 17.   REMEDIES-LIABILITY............................ 72

17.1. Developer Remedies....................... 72

17.2. Village Remedies......................... 73

17.3. Defaults-Rights to Cure.................. 74

17.4. Acts and Omissions of Default............ 75

17.5. Dispute Resolution....................... 75

17.6. Right to Continue Construction
      Activities............................... 77

ARTICLE 18.   ASSIGNMENT   OF   DEVELOPER   RIGHTS   AND
              OBLIGATIONS/CONVEYANCES OF THE SUBJECT
              PROPERTY..................................... 78

18.1. Assignment of Developer Rights and
      Obligations.............................. 78

18.2. Conveyances of the Subject Property....... 82

18.3. ...................................... 85

ARTICLE 19.   DEDICATIONS AND EASEMENTS..................... 85

ARTICLE 20.   DEVELOPER INDEMNIFICATION..................... 85

ARTICLE 21.   AMENDMENT/INTEGRATION......................... 87

ARTICLE 22.   DUPLICATE ORIGINALS........................... 88

ARTICLE 23.   TIME IS OF THE ESSENCE........................ 88

ARTICLE 24.   TERM.......................................... 88

02/27/90-H.E.                    iv

FILED DATE: 1/28/2020 5:03 PM    2018CH12683

|  |  | PAGE |
|---|---|---|
| ARTICLE 25. | INTERPRETATION | 88 |
| ARTICLE 26. | SEVERABILITY | 88 |
| ARTICLE 27. | CAPTIONS AND PRONOUNS | 88 |
| LIST OF EXHIBITS | | 91 |

02/27/90-H.E.                          v

1                 **ECONOMIC DEVELOPMENT AGREEMENT**

2

3

4          **THIS ECONOMIC DEVELOPMENT AGREEMENT** is made by and entered

5    into on the _____ day of _____, 1990, by and between the

6    **VILLAGE OF HOFFMAN ESTATES,** an Illinois home rule municipal

7    corporation located in Cook and Kane Counties, Illinois, and **SEARS,**

8    **ROEBUCK AND CO.,** a New York corporation.

9                      **DEFINITIONS**

10      The following words and terms used in this Agreement shall

11    have the following meanings unless the context or use indicates

12    another or different meaning:

| | |
|---|---|
| 13 **ACQUISITION** | The sale/purchase contracts which have been |
| 14 **CONTRACTS** | executed by Developer, or Developer's nominee, |
| 15 | that provide for the Developer's acquisition |
| 16 | of the Subject Property.  A summary of the |
| 17 | Acquisition Contracts is attached hereto as |
| 18 | Exhibit "A". |
| 19 | |
| 20 **ACT** | The Economic Development Area Tax Increment |
| 21 | Allocation Act, Ill.Rev.Stat. (1989) Ch.67 |
| 22 | 1/2,SS1001 et seq., as amended from time to |
| 23 | time. |
| 24 | |
| 25 **AGREEMENT** | This Economic Development Agreement and all |
| 26 | exhibits attached hereto, as the same may be |
| 27 | amended from time to time by the Parties in |
| 28 | accordance with the terms hereof. |
| 29 | |
| 30 **ALLOCATED** | The amounts of Tax Increment Revenues which |
| 31 **TAX INCREMENT** | are to be paid to the Village and the other |
| 32 **REVENUE** | Taxing Districts, consisting of the "Phase I |
| 33 **AMOUNTS** | Allocated Tax Increment Revenue Amounts" set |
| 34 | forth on Exhibit "B" attached hereto, and the |
| 35 | "Phase II Allocated Tax Increment Revenue |
| 36 | Amounts," as determined by using the |
| 37 | percentages set forth on Exhibit "C" attached |
| 38 | hereto. |
| 39 | |
| 40 **AMENDMENT TO** | Such amendment to the Beverly Annexation |
| 41 **THE ANNEXATION** | Agreement and the Nederlander Annexation |
| 42 **AGREEMENTS** | Agreement as the Parties may execute in order |
| 43 | to further the development of the Subject |

02/27/90-H.E.                  1

|  |  |
|---|---|
|  | Property.   The Amendment to the Annexation Agreements may also constitute the annexation agreement for the portion of the Subject Property that is commonly described as the "Studz Parcel". |
| **BEVERLY ANNEXATION AGREEMENT** | That certain annexation agreement dated January 19, 1981 and approved by the Village by Village Ordinance No. 1248-1981, as amended. |
| **BOARD OF TRUSTEES** | The Board of Trustees of the Village holding office from time to time. |
| **BONDS** | The Revenue Bonds and the General Obligation Bonds. |
| **CORPORATE AUTHORITIES** | The President and Board of Trustees of the Village holding office from time to time. |
| **DEPARTMENT** | The State's Department of Commerce and Community Affairs. |
| **DESIGNATED OFFICER** | The Village Manager of the Village holding office from time to time. |
| **DEVELOPER** | Sears, Roebuck and Co., a New York corporation. |
| **DEVELOPER ADVANCES** | The advances made to or on behalf of the Village by the Developer in order to pay Project Costs, which advances shall be reimbursed to the Developer by the Village, in accordance with the provisions of this Agreement and the Act. |
| **DEVELOPMENT** | The Phase I Development and Phase II Development. |
| **ECONOMIC DEVELOPMENT PLAN** | The economic development plan dated August 4, 1989, entitled "Hoffman Estates Economic Development Project Area Plan and Project" which constitutes the comprehensive program of the Village for the Project Area, as approved by the Corporate Authorities by Village Ordinance No. 2106-1989, adopted on September 11, 1989, together with any amendments thereto. |
| **ECONOMIC DEVELOPMENT PROJECT** | The economic development project approved by the Corporate Authorities by Village Ordinance No. 2106-1989, adopted on September 11, 1989, |

02/27/90-H.E.                              2

| | | |
|---|---|---|
| 96 | | in furtherance of the objectives of the |
| 97 | | Economic Development Plan. |
| 98 | | |
| 99 | **FUND** | The Special Tax Allocation Fund. |
| 100 | | |
| 101 | **GENERAL** | Those general obligation bonds which the |
| 102 | **OBLIGATION** | Village may issue pursuant to the terms of |
| 103 | **BONDS** | this Agreement. |
| 104 | | |
| 105 | **NEDERLANDER** | That certain annexation and development |
| 106 | **ANNEXATION** | agreement dated August 22, 1978 and approved |
| 107 | **AGREEMENT** | by the Village by Village Ordinance No. 1039- |
| 108 | | 1978, as amended. |
| 109 | | |
| 110 | **NOTE(S)** | The economic development project tax increment |
| 111 | | revenue note(s) authorized to be issued by the |
| 112 | | Village pursuant to the terms of this |
| 113 | | Agreement, including Notes to evidence |
| 114 | | Developer Advances, Notes to evidence |
| 115 | | obligations to reimburse private financing |
| 116 | | costs and Notes evidencing obligations to any |
| 117 | | credit enhancers. |
| 118 | | |
| 119 | **OBLIGATIONS** | The Bonds, the Notes, special service area |
| 120 | | bonds and any other instrument evidencing the |
| 121 | | obligation of the Village to pay money in |
| 122 | | furtherance of the Economic Development Plan |
| 123 | | and the development of the Subject Property |
| 124 | | (including, without limitation, bonds, notes, |
| 125 | | installment or financing contracts, |
| 126 | | certificates, tax anticipation warrants or |
| 127 | | notes, vouchers, and any other evidence of |
| 128 | | indebtedness). |
| 129 | | |
| 130 | **PCMT PROPERTY** | The real estate upon which the Poplar Creek |
| 131 | | Music Theater is situated. The PCMT Property |
| 132 | | is legally described on Exhibit "C" to the |
| 133 | | Nederlander Annexation Agreement. |
| 134 | | |
| 135 | **PARTIES** | The Village and the Developer. |
| 136 | | |
| 137 | **PHASE I** | That development occurring during the life of |
| 138 | **DEVELOPMENT** | the Economic Development Project either within |
| 139 | | or outside the boundaries of the Project Area |
| 140 | | (including, without limitation, site |
| 141 | | preparation, the construction of buildings, |
| 142 | | structures, utility installations, roadways |
| 143 | | and other improvements) which is undertaken |
| 144 | | on, in connection with, or in furtherance of |
| 145 | | the use, occupancy and development of the |
| 146 | | Phase I Site. |
| 147 | | |

02/27/90-H.E.                           3

| | | |
|---|---|---|
| 148<br>149<br>150<br>151<br>152<br>153<br>154<br>155<br>156<br>157<br>158 | **PHASE II<br>DEVELOPMENT** | That development occurring during the life of the Economic Development Project either within or outside the boundaries of the Project Area (including, without limitation, site preparation, the construction of buildings, structures, utility installations, roadways and other improvements) which is undertaken on, in connection with, or in furtherance of the use, occupancy and development of the Phase II Site. |
| 159<br>160<br>161<br>162<br>163<br>164<br>165 | **PHASE I SITE** | That portion of the Subject Property, consisting of approximately two hundred (200) acres, which is located in the northwest corner of the Subject Property. The Phase I Site is legally described on Exhibit "D" attached hereto. |
| 166<br>167<br>168<br>169<br>170<br>171<br>172 | **PHASE II SITE** | The Subject Property, exclusive of the Phase I Site. The Phase II Site consists of approximately five hundred eighty-eight (588) acres and includes the PCMT Property. The Phase II Site is legally described on Exhibit "E" attached hereto. |
| 173<br>174<br>175<br>176<br>177<br>178<br>179<br>180<br>181<br>182<br>183<br>184 | **PHASE I TAX<br>INCREMENT<br>REVENUES** | The ad valorem taxes levied upon taxable real property within the Phase I Site by any and all Taxing Districts having the power to tax real property in the Phase I Site, which taxes are attributable to the increase in the then current equalized assessed valuation of each taxable lot, block, tract, or parcel of real property in the Phase I Site over and above the initial equalized assessed value of each such lot, block, tract or parcel of real property. |
| 185<br>186<br>187<br>188<br>189<br>190 | **PHASE I TAX<br>INCREMENT<br>REVENUE<br>COMMENCEMENT<br>DATE** | The date on which the Phase I Tax Increment Revenues received and deposited in the Fund reflect a full year's assessment of the SMG Home Office Complex. |
| 191<br>192<br>193<br>194<br>195<br>196<br>197<br>198<br>199 | **PHASE II TAX<br>INCREMENT<br>REVENUES** | The ad valorem taxes levied upon taxable real property within the Phase II Site by any and all Taxing Districts having the power to tax real property in the Phase II Site, which taxes are attributable to the increase in the then current equalized assessed valuation of each taxable lot, block, tract or parcel of real property in the Phase II Site over and above the initial equalized assessed value of |

02/27/90-H.E.                                    4

200  each such lot, block, tract or parcel of real
201  property.
202

203  **PROJECT AREA**  The Hoffman Estates Economic Development
204  Project Area, which is legally and commonly
205  described on Exhibit "F" attached hereto, and
206  pictorially depicted on Exhibit "G" attached
207  hereto, as heretofore established by the
208  Corporate Authorities by Village Ordinance No.
209  2107-1989, adopted September 11, 1989, and as
210  certified by the Department on October 6,
211  1989.
212

213  **PROJECT COSTS**  The reasonable or necessary costs incurred by
214  the Village incidental to the Economic
215  Development Project.  Project Costs shall
216  include, without limitation, "economic
217  development project costs", as defined in the
218  Act as of the date of this Agreement, and the
219  following:
220

221  (a)  Costs of studies, surveys,
222  development of plans and
223  specifications, implementation and
224  administration of the Economic
225  Development Plan, including, but not
226  limited to, personnel and
227  professional service costs for
228  architectural, engineering, legal,
229  marketing, financial, planning,
230  police, fire, public works or other
231  services, provided, however, that no
232  charges for professional services
233  may be based on a percentage of the
234  incremental tax revenues;
235

236  (b)  Property assembly costs within the
237  Project Area, including, but not
238  limited to, acquisition of land and
239  other real or personal property, or
240  rights or interests therein, and
241  specifically including payments to
242  the Developer and other
243  nongovernmental parties as
244  reimbursement for, respectively,
245  Property Assembly Costs and the
246  property assembly costs incurred by
247  such other nongovernmental parties;
248

249  (c)  Site preparation costs,
250  including, but not limited to,
251  clearance of any area within the

02/27/90-H.E.                              5

Project Area by demolition or removal of existing buildings, structures, fixtures, utilities and improvements, and clearing and grading; and including installation, repair, construction, reconstruction, or relocation of public streets, public utilities, and other public site improvements (and the acquisition of necessary rights-of-way and easements therefor) within or outside the boundaries of the Project Area which are essential to the preparation of the Project Area for use in accordance with the Economic Development Plan; and specifically including payments to the Developer and other nongovernmental parties as reimbursement for site preparation costs incurred by the Developer or such other nongovernmental parties;

(d)    Costs of renovation, rehabilitation, reconstruction, relocation, repair or remodeling of any existing public or private buildings, improvements and fixtures within the Project Area, and specifically including payments to the Developer or other nongovernmental parties as reimbursement for such costs incurred by the Developer or such other nongovernmental parties;

(e)    Costs of construction within the Project Area of public works or improvements, including but not limited to, buildings, structures, works, utilities or fixtures;

(f)    Financing costs, including, but not limited to, all necessary and incidental expenses related to the issuance of any Obligations, payment of any interest on any Obligations issued hereunder which accrues during the estimated period of construction of the part of the Economic Development Project for which such Obligations are issued and for not exceeding thirty-six

FILED DATE: 1/18/2020 5:33 PM   2018CH12683

304
305
306
307
308
309
310
311
312
313
314
315
316
317
318
319
320
321
322
323
324
325
326
327
328
329
330
331
332
333
334
335
336
337
338
339
340
341
342
343
344
345
346
347
348
349
350
351
352
353
354
355

(36) months thereafter, and any reasonable reserves related to the issuance of such Obligations;

(g)    All or a portion of a Taxing District's capital costs resulting from the Economic Development Project necessarily incurred or estimated to be incurred by a Taxing District in the furtherance of the objectives of the Economic Development Plan and Economic Development Project, to the extent the Village, by written agreement, accepts and approves such costs;

(h)    Relocation costs to the extent that the Village determines that relocation costs shall be paid or is required to make payment of relocation costs by federal or State law;

(i)    The estimated tax revenues from real property in the Project Area acquired by the Village which, according to the Economic Development Plan, is to be used for a private use and which any Taxing District would have received had the Village not adopted tax increment allocation financing for the Project Area and which would result from such Taxing District's levies made after the time of the adoption by the Village of tax increment allocation financing to the time the current equalized assessed value of real property in the Project Area exceeds the Total Initial Equalized Assessed Value of real property in said area;

(j)    Costs of job training, advanced vocational or career education, including, but not limited to, courses in occupational, semi-technical or technical fields leading directly to employment, incurred by one or more Taxing Districts, provided that such costs are related to the establishment and

02/27/90-H.E.                    7

356
357
358
359
360
361
362
363
364
365
366
367
368
369
370
371
372
373
374
375
376
377
378
379
380
381
382
383
384
385
386
387
388
389
390
391
392
393
394
395
396
397
398
399
400
401
402
403
404
405
406
407

maintenance of additional job
training, advanced vocational
education or career education
programs for persons employed or to
be employed by employers located in
the Project Area and further
provided that when such costs are
incurred by a Taxing District or
Taxing Districts other than the
Village they shall be set forth in a
written agreement by or among the
Village and the Taxing District or
Taxing Districts, which agreement
describes the program to be
undertaken, including, but not
limited to, the number of employees
to be trained, a description of the
training and services to be
provided, the number and type of
positions available or to be
available, itemized costs of the
program and sources of funds to pay
the same, and the term of the
agreement. Such costs include,
specifically, the payment by
community college districts of costs
pursuant to SS3-37,3-38, 3-40 and 3-
40.1 of the Public Community College
Act (Ill.Rev.Stat.Ch.103, S103
et.seq.) and by school districts of
costs pursuant to SS10-22.20a and
10-23.3a of The School Code
(Ill.Rev.Stat.Ch. 122);

(k) Private financing costs incurred by
the Developer or other
nongovernmental parties in
connection with the Economic
Development Project, and
specifically including payments to
the Developer or other
nongovernmental parties as
reimbursement for such costs
incurred by the Developer or such
other nongovernmental parties,
provided that:

(i) private financing costs shall
be paid or reimbursed by the
Village only pursuant to the
prior official action of the
Village evidencing an intent to

02/27/90-H.E.                    8

pay or reimburse such private financing costs;

(ii) except as provided in subparagraph (iv), the aggregate amount of such costs paid or reimbursed by the Village in any one year shall not exceed 30% of such costs paid or incurred by the Developer or such other nongovernmental parties in that year;

(iii) private financing costs shall be paid or reimbursed by the Village solely from the Special Tax Allocation Fund established pursuant to the Act and shall not be paid or reimbursed from the proceeds of any Obligations issued by the Village;

(iv) if there are not sufficient funds available in the Special Tax Allocation Fund in any year to make such payment or reimbursement in full, any amount of such interest cost remaining to be paid or reimbursed by the Village shall accrue and be payable when funds are available in the Special Tax Allocation Fund to make such payment; and

(v) in connection with its approval and certification of the Economic Development Project pursuant to Section 5 of the Act, the Village shall forward a copy of this Agreement to the Department;

(l) Other eligible expenses, as permitted by the Act; and

(m) Developer Advances made to satisfy or pay any of the foregoing Project Costs (other than those identified in paragraph (k) above).

02/27/90-H.E.                                9

| | |
|---|---|
| 460 **PROPERTY** | The purchase price that is to be paid for the |
| 461 **ASSEMBLY COSTS** | Subject Property pursuant to the Acquisition |
| 462 | Contracts, and all reasonable title and survey |
| 463 | charges; reasonable brokerage fees; reasonable |
| 464 | attorneys fees; reasonable escrow charges; and |
| 465 | all reasonable costs of soil, engineering and |
| 466 | other "due diligence" tests and studies |
| 467 | incurred in connection with the acquisition of |
| 468 | the Subject Property. |
| 469 | |
| 470 **PUBLIC** | The Public Site Improvements and the Public |
| 471 **IMPROVEMENTS** | Works and Improvements. |
| 472 | |
| 473 **PUBLIC** | The public streets, public utilities and other |
| 474 **SITE** | public site improvements consisting of the |
| 475 **IMPROVEMENTS** | Phase I Development Public Site Improvements, |
| 476 | all of which are set forth on Exhibit "H" |
| 477 | attached hereto and the Phase II Development |
| 478 | Public Site Improvements, all of which are set |
| 479 | forth on Exhibit "I" attached hereto, which |
| 480 | are constructed, or to be constructed, by the |
| 481 | Village or the Developer, and all reasonable |
| 482 | or necessary activities which are undertaken |
| 483 | in connection with such construction, within |
| 484 | the Project Area (or outside the boundaries of |
| 485 | the Project Area but essential to the |
| 486 | preparation of the Project Area for use in |
| 487 | accordance with the Economic Development |
| 488 | Plan), which result in the Village's incurring |
| 489 | "site preparation costs", as defined by |
| 490 | Section 3(e)(3) of the Act. Exhibits "H" and |
| 491 | "I" may be amended by the Parties, from time |
| 492 | to time, pursuant to the provisions of this |
| 493 | Agreement. Natural gas, electric and |
| 494 | telephone service shall not be included within |
| 495 | the definition of "public utilities", as used |
| 496 | above and as used in Section 4.3 of this |
| 497 | Agreement, except to the extent that they |
| 498 | relate to natural gas, electric and telephone |
| 499 | service improvements which are to be dedicated |
| 500 | to, and owned by, the Village (e.g. public |
| 501 | street lights). |
| 502 | |
| 503 **PUBLIC WORKS** | Those public improvements (including, but not |
| 504 **AND** | limited to, buildings, structures, works, |
| 505 **IMPROVEMENTS** | utilities or fixtures) identified on Exhibit |
| 506 | "J" attached hereto which are constructed, or |
| 507 | to be constructed, by the Village, and all |
| 508 | activities which are undertaken in connection |
| 509 | with such construction, which are authorized |
| 510 | by this Agreement and the Economic Development |
| 511 | Plan which result in the Village's incurring |

02/27/90-H.E.                    10

| | |
|---|---|
| | "costs of construction", as defined by Section 3(e)(5) of the Act. Exhibit "J" may be amended by the Parties, from time to time, pursuant to the provisions of this Agreement. |
| **REVENUE BONDS** | The economic development project tax increment revenue bonds authorized to be issued by the Village pursuant to the terms of Section 6.3(b) and Article 8 of this Agreement. |
| **SANITARY SEWER IMPROVEMENTS** | The sanitary sewer interceptor and related facilities which, pursuant to the terms of this Agreement, are to be constructed by the Village in order to provide sanitary sewer service to the Project Area. |
| **SMG** | Sears Merchandise Group, a group of Sears, Roebuck and Co., a New York corporation. |
| **SMG HOME OFFICE COMPLEX** | The mixed use complex of no less than 1,600,000 square feet of low to mid-rise development which is to be constructed on a portion of the Phase I Site for purposes of housing Developer's Merchandise Group home office and related uses. The location of such portion of the Phase I Site is generally depicted on Exhibit "K" attached hereto. |
| **SMG OCCUPANCY DATE** | The date the Developer substantially completes the SMG Home Office Complex and applies to the Village, in accordance with Village ordinances, for issuance of a temporary or permanent certificate of occupancy for the SMG Home Office Complex. |
| **SMG OCCUPANCY DATE NOTICE** | The written notice which the Developer is to deliver to the Village confirming that the Developer has received the last governmental permit or approval necessary to the Developer's commencement of construction of the SMG Home Office Complex. The SMG Occupancy Date Notice shall be substantially in the form of Exhibit "L" attached hereto. |
| **SPECIAL TAX ALLOCATION FUND (OR FUND)** | The 1989 Hoffman Estates Economic Development Project Area Special Tax Allocation Fund, which is a special fund established pursuant to the provisions of the Act and created by Village Ordinance No. 2108-1989, adopted by the Corporate Authorities on September 11, 1989, which shall be the repository for: (i) the Tax Increment Revenues; (ii) the other |

02/27/90-H.E.                                     11

FILED DATE: 1/8/2026 8:03 PM   2018CH12683

564                  monies which are to be deposited in the Fund
565                  pursuant to the Act or this Agreement; and
566                  (iii) the income earned on the investment of
567                  the monies deposited in the Fund.

568

569 **SUBJECT**       That certain parcel of real estate under the
570 **PROPERTY**      ownership or control of the Developer
571                  consisting of approximately 788 acres, bounded
572                  generally on the north by Higgins Road, on the
573                  east by Route 59, on the south by I-90 and on
574                  the west by Beverly Road (excluding the
575                  approximately 44 acres located east of Old
576                  Sutton Road and north of the corporate limits
577                  of the Village). The Subject Property is
578                  legally described on Exhibit "M" attached
579                  hereto.

580

581 **TAX INCREMENT**    The sum of the Phase I Tax Increment Revenues
582 **REVENUES**      and the Phase II Tax Increment Revenues.

583

584 **TAXING DISTRICTS**    Counties, townships, municipalities, and
585                  school, road, park, library, sanitary,
586                  mosquito abatement, forest preserve, public
587                  health, fire protection, river conservancy,
588                  tuberculosis sanitarium and any other
589                  municipal corporations or districts with the
590                  power to levy taxes on real property located
591                  in the Project Area.

592

593 **TOTAL INITIAL**    The total initial equalized assessed value of
594 **EQUALIZED**      the taxable real property within the Project
595 **ASSESSED VALUE**    Area, as determined by the County Clerk of
596                  Cook County in accordance with the provisions
597                  of the Act.

598

599 **TOTAL MINIMUM**    That amount of the assessed valuation of the
600 **ASSESSED**      Subject Property for a given levy year which,
601 **VALUATION**      when taken together with the applicable tax
602                  rate and state equalization factor for such
603                  levy year, will be required to produce Tax
604                  Increment Revenues sufficient: (i) to satisfy
605                  the debt service requirements, including
606                  additions to required reserves, on outstanding
607                  Revenue Bonds for the next succeeding year, as
608                  required by then outstanding Village
609                  ordinances authorizing issuance of such
610                  Revenue Bonds; and (ii) to pay the
611                  appropriate Allocated Tax Increment Revenue
612                  Amounts for the next succeeding year, as set
613                  forth on Exhibits "B" and "C" attached hereto.

614

615

| VILLAGE | The Village of Hoffman Estates, an Illinois home rule municipal corporation. |

**VILLAGE MUNICIPAL FACILITY**   The municipal service facility which is to be constructed on the Village Municipal Site which may include offices, a Village fire station, a Village police station and an interior public works area. A "Village Green" may adjoin the Village Municipal Facility and be located on the Village Municipal Site.

**VILLAGE MUNICIPAL SITE**   That certain fifteen (15) acre portion of the Subject Property which is to be agreed upon and identified by the Parties on the conceptual land use plan submitted pursuant to Section 3.1(d)(1)(iv) of this Agreement.

**VILLAGE PROJECT COSTS**   Those Project Costs incurred at any time by the Village which shall include, and be limited to, the following (to the extent permitted under the Act):

    (a)   Costs of studies, surveys, development of plans and specifications, and administration, personnel and professional service costs related to the Village's implementation and administration of the Economic Development Plan and Economic Development Project, (including, but not limited to, personnel and professional costs for administrative, engineering, legal, marketing, financial, planning, public works or other services);

    (b)   Costs of providing police and fire protection to the Development and the Project Area;

    (c)   Costs of development, construction, maintenance, repair and replacement of the Public Works and Improvements (including, without limitation, the Village Municipal Facility and the Village Water Tank);

    (d)   Costs of: (i) maintenance and repair of the Public Site Improvements after their conveyance to, and acceptance by, the Village; and Village-owned water lines and sewer

02/27/90-H.E.                    13

668          lines existing as of the date of
669          this Agreement either within or
670          outside the boundaries of the
671          Project area; and (ii) replacement
672          of Public Site Improvements after
673          their conveyance to, and acceptance
674          by, the Village in accordance with
675          Village ordinance; and
676
677    (e)  All financing costs related to the
678          costs identified in (a) through (d)
679          above, including, but not limited
680          to, all necessary and incidental
681          expenses related to the issuance of
682          those Village Obligations (including
683          the General Obligation Bonds) which
684          are issued to pay the costs
685          identified in (a) through (d) above;
686          payment of any interest on any such
687          Village Obligations which accrue
688          during the estimated period of
689          construction of the part of the
690          Economic Development Project for
691          which such Village Obligations are
692          issued and for not exceeding thirty-
693          six (36) months thereafter; and any
694          reasonable reserves related to the
695          issuance of such Village
696          Obligations.
697

**VILLAGE WATER TANK**  698  The water storage tank which is to be
699  constructed by the Village within the Project
700  Area or within the vicinity of the Project
701  Area for purposes of furthering the use of the
702  Project Area in accordance with the Economic
703  Development Plan.  The Village Water Tank is
704  to provide storage for not less than seven
705  hundred fifty thousand (750,000) gallons of
706  water.
707
708
709
710
711
712

## RECITALS

713    A.    Pursuant to the Act and to the terms of the Economic
714    Development Plan, the Village proposed the Economic Development
715    Project for economic development of certain designated areas either
716    within its municipal limits or pending annexation to the Village.
717    The site proposed for the Economic Development Project is the
718    Project Area.  The Project Area includes the Subject Property.  The
719    Economic Development Plan sets forth a mixture of land use
720    activities within the Project Area.

714    B.    On September 11, 1989, the Village adopted Ordinance No.
715    2108-1989 adopting tax increment allocation financing for the
716    Project Area.  Such ordinance provides that the Tax Increment
717    Revenues which are realized within the Project Area are to be paid
718    to the Village for deposit in the Special Tax Allocation Fund in
719    order to pay Project Costs and principal and interest obligations
720    coming due on the Obligations.

714    C.    The Corporate Authorities, after due and careful
715    consideration, have concluded that the development of the Project
716    Area, as provided in this Agreement and in the Economic Development
717    Plan, will: (i) create or retain not less than 2,000 full-time
718    equivalent jobs; (ii) cause private investment in an amount of not
719    less than $100,000,000 to occur in the Project Area; (iii)
720    encourage the increase of commerce and industry within the State of
721    Illinois, thereby reducing the evils attendant upon unemployment
722    and increasing opportunities for personal income; (iv) increase or
723    maintain the property, sales and income tax bases of the Village

02/27/90-H.E.                    15

739    and of the State of Illinois and enable the Village to control the
740    development of the Subject Property; and (v) otherwise be in the
741    best interests of the Village.

742    D.    Subject to the terms and provisions of the Act and this
743    Agreement: (i) the Developer intends to acquire, or to cause its
744    nominee to acquire, the Subject Property, and the Village intends
745    to reimburse the Developer for the Property Assembly Costs the
746    Developer incurs, or to pay the Developer's Property Assembly
747    Costs, out of Tax Increment Revenues (other than the Allocated Tax
748    Increment Revenue Amounts), or other monies deposited in the Fund,
749    the proceeds of Revenue Bonds, and the proceeds of Developer
750    Advances; (ii) the Developer intends to develop the Phase I Site
751    with at least the SMG Home Office Complex; (iii) the Developer may
752    hereafter develop the Phase II Site with the uses specified in the
753    Economic Development Plan; and (iv) the Village intends to
754    reimburse the Developer for the Project Costs the Developer pays,
755    incurs or advances to, or on behalf of, the Village out of Tax
756    Increment Revenues (other than the Allocated Tax Increment Revenue
757    Amounts), other monies deposited in the Fund, or from the proceeds
758    of Revenue Bonds.

759    E.    The Parties acknowledge that the purchase price
760    established by the Acquisition Contracts for the Subject Property
761    is reasonable.

762    F.    The development of the Subject Property, and the
763    fulfillment generally of the terms and provisions of this
764    Agreement, are in the vital and best interest of the Village and

02/27/90-H.E.                    16

765    the health, safety, and welfare of its residents and taxpayers.

766    G.    The Parties intend to enter into this Agreement under the
767    authority of the Act and pursuant to the Village's home-rule
768    authority.

769    **NOW, THEREFORE,** in consideration of the foregoing Recitals,
770    and the mutual agreements set forth below, it is hereby agreed by
771    and between the Parties as follows:

772    **ARTICLE 1.      INCORPORATION OF RECITALS**

773    The representations set forth in the foregoing Recitals are
774    material to this Agreement and are hereby incorporated into and
775    made a part of this Agreement as though they were fully set forth
776    in this Article 1.

777    **ARTICLE 2.      GOALS, MUTUAL ASSISTANCE AND COOPERATION**

778    **2.1. Goals and Mutual Assistance**

779    The Parties acknowledge that it is their mutual goal and
780    desire to further the objectives of the Economic Development Plan
781    and Economic Development Project, to further the improvement and
782    development of the Project Area, and to finance all costs of the
783    Development as Project Costs (to the fullest extent permitted by
784    law and in the most economically efficient manner) pursuant to the
785    provisions of this Agreement.  Accordingly, the Parties shall do
786    all things necessary or appropriate to carry out the terms and
787    provisions of this Agreement and to aid and assist each other in
788    furthering the objectives of this Agreement and the intentions of
789    the Parties as reflected by said terms.  Specifically, if it shall
790    become necessary, the Village: (i) shall assist the Developer in

02/27/90-H.E.                    17

791  acquiring portions of the Subject Property (whether or not such

792  portions are the subject of the Acquisition Contracts); and (ii) at

793  the request of the Developer, shall attempt to acquire properties,

794  rights-of-way and easements necessary to the development of the

795  Project Area by the use of its power of eminent domain (provided,

796  however, that the Village makes no representation or warranty

797  regarding its ability to acquire any such portions of the Subject

798  Property, or any of such properties, rights-of-way or easements by

799  use of its power of eminent domain, and provided further that the

800  Developer shall pay and satisfy all purchase prices, settlements,

801  judgments, orders or other costs and expenses incurred by the

802  Village in the exercise of such powers by making a Developer

803  Advance in the amount of such costs and expenses).  In the event

804  the Village acquires all or any portion of the Subject Property

805  through the use of its power of eminent domain as set forth above,

806  it shall convey the same to the Developer immediately thereafter

807  for one dollar ($1.00).

808  **2.2. <u>Cooperation in Seeking Financial Aid and Assistance</u>**

809  The Parties shall cooperate with each other in seeking

810  financial or other aid and assistance required for or useful to the

811  construction of roadway, highway and utility improvements

812  (including a two million three hundred thousand dollar

813  ($2,300,000.00) "Build Illinois" infra-structure grant for the

814  construction of the Sanitary Sewer Improvements) within the Project

815  Area or outside the boundaries of the Project Area (but essential

816  to the preparation of the Project Area for use in accordance with

02/27/90-H.E.                    18

817   the Economic Development Plan) from all appropriate governmental
818   bodies (whether Federal, State, County or local).  In addition, in
819   order to gain the Department's certification of the Village's
820   designation of the Project Area as an "Enterprise Zone" for the
821   maximum statutory term pursuant to the Illinois Enterprise Zone Act
822   (Ill.Rev.Stat.  Ch.  67  1/2,SS601 et  seq.),  the  Village,  in
823   accordance with the provisions of said statute and within sixty
824   (60) days of the date of this Agreement, shall: (i) pass an
825   ordinance designating the Project Area as an "Enterprise Zone";
826   (ii) submit a complete written application to the Department
827   seeking the Department's certification of the Village's designation
828   of the Project Area as an "Enterprise Zone"; and (iii) take such
829   other actions as may be necessary or appropriate under the
830   provisions of said statute to gain certification by the Department
831   of the Project Area as an "Enterprise Zone".  The Village, pursuant
832   to said statute or other applicable state statutes or local
833   ordinances, shall also consent to local sales tax exemption for
834   construction  materials  purchased  in  connection  with  the
835   Development.

836   **ARTICLE 3.        DEVELOPMENT OF THE SUBJECT PROPERTY**

837   **3.1. Phase I Development**

838   **(a)    General.**

839           The Phase I Development shall be the first priority of
840           the Parties.  The first stage of that development shall
841           encompass the construction of the SMG Home Office
842           Complex.    The  SMG  Home  Office  Complex  shall  be

02/27/90-H.E.                    19

843    constructed in a manner consistent with the goals and

844    objectives of the Economic Development Plan and shall be

845    of a quality that is consistent with other first-class

846    office facilities located in the Greater Chicagoland

847    Metropolitan Area.

848    **(b)**    **Permits.**

849    Before commencement of construction of any portion of the

850    SMG Home Office Complex, the Developer, at its expense,

851    shall secure, or cause to be secured, all permits or

852    approvals which may be required by the Village and other

853    governmental agencies having jurisdiction over such

854    construction, in whole or in part, including, without

855    limitation, all permits required, if any, from the U.S.

856    and Illinois Environmental Protection Agencies, the

857    Metropolitan Water Reclamation District, the U.S. Army

858    Corps of Engineers, the Illinois Department of

859    Transportation and all other local, Federal and State

860    agencies having or exercising any jurisdiction over such

861    construction or over the portion of the Project Area that

862    is affected by such construction.   The Village shall

863    provide all proper assistance to the Developer in

864    securing such permits and shall promptly execute all

865    permits and permit applications which require or benefit

866    from such execution provided such permits and permit

867    applications (and the plans relating thereto) are in

868    proper form and comply with all lawful requirements.   The

02/27/90-H.E.                    20

869         Village shall promptly issue all permits required to be
870         issued by the Village provided such permits (and the
871         permit applications and plans relating thereto) are in
872         proper form and comply with all lawful requirements.

873    (c)  **Preliminary Grading.**

874         Notwithstanding the provisions of the foregoing paragraph
875         (b), and provided the public hearings described in
876         Section 3.1(d) have commenced, the Board of Trustees
877         shall authorize issuance to the Developer of a site
878         development permit for mass grading and storm water
879         management installation and other similar excavation-
880         related tasks on the Subject Property prior to receipt of
881         all of the foregoing permits, prior to final Village
882         approval of the Amendment to the Annexation Agreements
883         and prior to approval of final engineering plans for the
884         Phase I Development provided that:

885         (1)  The Developer satisfies the Village staff and Board
886              of Trustees that the Developer is providing the
887              necessary   erosion   and   sedimentation   control
888              measures to satisfy the principles set forth in
889              Sub-Section A of Section 10-8-6 of the Village's
890              Municipal Code (Erosion and Sedimentation Control);
891              and

892         (2)  The Board of Trustees receives a tree survey from
893              the Developer showing all trees having a four inch
894              (4") caliper or more and the Board approves a tree

02/27/90-H.E.                    21

895       preservation plan satisfying the principles set

896       forth in Sub-section D in Section 10-8-11 of the

897       Hoffman Estates Municipal Code and issues or

898       directs the Village staff to issue any necessary

899       tree removal permits; and

900   (3)  That such grading and other work shall be

901       undertaken at the Developer's sole cost and risk

902       and the Developer, pursuant to Article 20 of this

903       Agreement, shall indemnify the Village against,

904       and hold the Village harmless from, all costs,

905       expenses, reasonable attorney fees, losses,

906       liabilities and damages that may be suffered or

907       sustained by the Village as a result of Developer's

908       undertaking such grading and other work.

909   (4)  That the President and Board of Trustees shall find

910       that provisions C - (1), (2) and (3) above are

911       satisfied and grant approval for such preliminary

912       grading.

913   **(d)   Submission of Development Documentation**

914   (1)  On or before March 1, 1990, the Developer shall

915       submit the following to the Village for the

916       Village's review and approval:

917       (i)   A Community Impact Statement for the Subject

918           Property submitted pursuant to Village

919           Ordinance No. 914-1977;

920       (ii)  An application for approval by the Corporate

02/27/90-H.E.                    22

921                  Authorities of the Amendment to the Annexation

922                  Agreements;

923       (iii)    An application for the granting of the relief

924                  provided   for   in   the   Amendment   to   the

925                  Annexation Agreements;

926       (iv)    A conceptual land use plan for the Subject

927                  Property (which plan identifies, among other

928                  things, estimates of square footage, proposed

929                  land   uses,   internal   roadway   plans   and   the

930                  proposed location of the Village Municipal

931                  Site); and

932       (v)     A preliminary site plan, preliminary plat of

933                  subdivision,   preliminary   engineering   plans,

934                  preliminary   landscaping   plans   and   other

935                  appropriate preliminary documentation for the

936                  Phase I Development.

937          Within thirty (30) days of the Village's receipt of

938       the last of the foregoing submittals (provided such

939       submittals are complete and in a form acceptable to the

940       Village), the Village shall schedule, and give all

941       notices required to be given for, all public hearings

942       required to be conducted by the Corporate Authorities,

943       the Board of Trustees, the Plan Commission, the Zoning

944       Board of Appeals and all other commissions and committees

945       of   the   Village   for   purposes   of   considering   the

946       Developer's applications, plats and plans.   Such public

02/27/90-H.E.             23

947    hearings shall be conducted by the Village in an
948    expeditious manner and, to the extent practicable, but in
949    the sole discretion of the Village, such public hearings
950    shall be conducted concurrently before the aforesaid
951    entities, commissions and committees. The Developer, at
952    any of such public hearings, shall have the right, at the
953    Developer's option, to present preliminary and final
954    plats and plans concurrently or to bypass the submittal
955    of preliminary plats and plans entirely in favor of
956    proceeding directly with the review and approval of final
957    plats and plans.

958    (2)    Not later than sixty (60) days after the Village's
959        adoption of the ordinances and resolutions
960        authorizing the execution of the Amendment to the
961        Annexation Agreements and granting the relief
962        provided for in the Amendment to the Annexation
963        Agreements, the Developer shall submit the
964        following to the Village for the Village's review
965        and approval:

966        (i)    A final plat of subdivision for the Phase I
967            Development;

968        (ii)    Final grading, utility and roadway plans for
969            the construction of the SMG Home Office
970            Complex;

971        (iii)    Final engineering plans for the Public Site
972            Improvements which are to be constructed as

02/27/90-H.E.                    24

973              part of the Phase I Development (as identified
974              on Exhibit "H" to this Agreement), which
975              improvements shall include all Public Site
976              Improvements necessary to the construction,
977              use and occupancy of the SMG Home Office
978              Complex; and

979      (iv)    Such other documentation as the Village may
980              reasonably request as a condition precedent to
981              the issuance of a building permit for the SMG
982              Home Office Complex.

983          The Village's staff and representatives, during the
984      time the Developer is preparing all such final plats and
985      plans, shall meet with the Developer, and its
986      representatives, to coordinate the preparation of such
987      plats and plans and their submission to, and review by,
988      the Village.    The Village and the Developer shall
989      communicate and consult informally with each other as
990      frequently as is necessary to insure that the review,
991      processing and approval of all such plats and plans
992      receives prompt consideration by the Village.

993          The Board of Trustees shall approve or disapprove
994      all such final plats and plans within thirty (30) days of
995      their submission to the Village provided: (i) such plats
996      and plans are complete, have been reviewed by the Plan
997      Commission upon an expedited schedule that shall be
998      provided for in the Amendment to the Annexation

02/27/90-H.E.                    25

999          Agreements, and are in a form acceptable to the Village;

1000         (ii) the Amendment to the Annexation Agreements has then

1001         been approved by the Corporate Authorities and executed

1002         by the Parties; (iii) all annexation and zoning

1003         ordinances provided for in the Amendment to the

1004         Annexation Agreements have been adopted by the Village;

1005         and (iv) such plats and plans substantially conform to

1006         the preliminary plats and plans. If such plats or plans

1007         are disapproved, as soon as reasonably possible

1008         thereafter, the Developer shall submit revised plats and

1009         plans to the Village.

1010    (e)  **Construction of Phase I Development Public Site**
1011         **Improvements.**

1012         (1)  The Developer is hereby appointed as the Village's

1013              sole and exclusive agent for purposes of managing

1014              and overseeing the engineering, design and

1015              construction of those Public Site Improvements

1016              which are to be constructed as part of the Phase I

1017              Development (as identified on Exhibit "H" to this

1018              Agreement), provided, however, that: (i) before

1019              either the Village or the Developer enters into any

1020              contract for construction or construction services

1021              relating to the construction of such Public Site

1022              Improvements, the Developer shall select a

1023              contractor and the Village shall approve such

1024              contractor provided the conditions of this Section

1025              3.1(e) are met and further provided the contractor

02/27/90-H.E.                    26

1026  can complete the improvements in such a manner and

1027  in accordance with such a timetable as may be

1028  agreed to by the Parties; and (ii) all such

1029  contracts shall be executed by the Village to the

1030  extent necessary to further the goals of this

1031  Agreement.  The Developer shall not be required to

1032  advertise for bids or to submit multiple bids to

1033  the Village prior to entering into such contracts.

1034  (2)  The Board of Trustees shall receipt all contracts

1035  submitted to it by the Developer in order to

1036  review:  (i) that the contractors which are to

1037  perform work pursuant to such contracts are

1038  sufficiently experienced in doing the size and type

1039  of work required for the construction of the

1040  improvements to be constructed; (ii) that all such

1041  contracts accurately reflect the cost of completing

1042  such improvements; and (iii) that no purpose would

1043  be served in the Village's obtaining further bids

1044  for the construction of such improvements.  The

1045  Board of Trustees shall have twenty-one (21) days

1046  to review and approve or disapprove the contracts

1047  submitted to it by the Developer.  If disapproved,

1048  the Village Manager shall give reasons, in writing,

1049  to the Developer for such disapproval.  All

1050  construction contracts shall provide for payment in

1051  accordance with the provisions of this Agreement.

02/27/90-H.E.                    27

FILED DATE: 1/7/8/2026 6:33 PM   2018CH12683

1052                  With respect to such construction contracts, and

1053                  where the provisions of this Section 3.1(e) are

1054                  satisfied, the Board of Trustees, in accordance

1055                  with Ill.Rev.Stat. Ch. 24, S8-9-1 (1987), shall

1056                  hereafter waive any advertising for bids by the

1057                  Village.

1058                   Notwithstanding the foregoing, the Village hereby

1059 approves those contracts which have been entered into as

1060 of the date of this Agreement or which are to be entered

1061 into, by or on behalf of the Developer, with the parties

1062 and for the services identified on Exhibit "N" to this

1063 Agreement; waives advertising for bids for the services

1064 to be provided by such contracts; and acknowledges that

1065 all costs incurred pursuant to those contracts shall be

1066 considered Project Costs that relate directly to Public

1067 Improvements or Public Site Improvements or Property

1068 Assembly Costs as Project Costs and both the Village and

1069 Sears agree that Chapman & Cutler as Bond Counsel for the

1070 Village will determine what costs in Exhibit "N" qualify

1071 as Project Costs under the Act.   The provisions of

1072 Section 17.5 of this Agreement, Dispute Resolution shall

1073 not apply to the determination made by Chapman & Cutler

1074 relating to Exhibit "N" which are to be paid or

1075 reimbursed pursuant to the terms of this Agreement.

1076 (3) Notwithstanding the provisions of the foregoing

1077                  paragraphs (1) and (2), the Village retains the

02/27/90-H.E.                 28

FILED DATE: 1/7/2020 6:03 PM   2018CH12683

| 1078 | | right and the obligation to undertake the |
| 1079 | | engineering, design and construction of the |
| 1080 | | Sanitary Sewer Improvements and agrees to |
| 1081 | | substantially complete, or cause the substantial |
| 1082 | | completion of, the construction of the Sanitary |
| 1083 | | Sewer Improvements by the SMG Occupancy Date. |
| 1084 | **(f)** | **SMG Occupancy Date.** |
| 1085 | | The Developer shall deliver the SMG Occupancy Date |
| 1086 | | Notice to the Village not more than sixty (60) days after |
| 1087 | | the date of the Amendment to the Annexation Agreements, |
| 1088 | | and the Developer shall substantially complete, or cause |
| 1089 | | the substantial completion of, the SMG Home Office |
| 1090 | | Complex, and cause the SMG Occupancy Date to occur, not |
| 1091 | | later than thirty (30) months after the date the |
| 1092 | | Developer delivers the SMG Occupancy Date Notice to the |
| 1093 | | Village provided the Village has completed construction |
| 1094 | | of the Village Water Tank and the Sanitary Sewer |
| 1095 | | Improvements. |
| 1096 | **3.2.** | **Phase II Development** |
| 1097 | **(a)** | **General.** |
| 1098 | | The Phase II Development shall be constructed in |
| 1099 | | accordance with the terms and provisions of the Economic |
| 1100 | | Development Plan and shall include amenities, facilities |
| 1101 | | and landscaping that are of a similar quality to other |
| 1102 | | first-class office and mixed use developments located in |
| 1103 | | the Greater Chicagoland Metropolitan Area. The Phase II |

02/27/90-H.E.                   29

1104    Development may occur in stages or phases.  The Developer
1105    shall not be obligated to commence construction of the
1106    Phase II Development, or any portion thereof, at any
1107    time.

1108    (b)    **Construction of Phase II Development Public Site**
1109           **Improvements.**

1110    (1)    The Village retains the right to manage and oversee
1111           the engineering, design and construction of those
1112           Public Site Improvements which are to be
1113           constructed as part of the Phase II Development
1114           (except those Phase II Development Public Site
1115           Improvements identified on Exhibit "I" which are to
1116           be constructed upon the Subject Property), provided
1117           that the Village shall coordinate such engineering,
1118           design and construction with the Developer.  The
1119           Developer shall act as the Village's agent for
1120           purposes of managing and overseeing the
1121           engineering, design and construction of the Phase
1122           II Development Public Site Improvements identified
1123           on Exhibit "I" to this Agreement which are to be
1124           constructed on the Subject Property provided,
1125           however, that: (i) before either the Village or the
1126           Developer enters into any contract for construction
1127           or construction services relating to the
1128           construction of such Phase II Development Public
1129           Site Improvements, the Developer shall select a
1130           contractor and the Village shall approve such

02/27/90-H.E.                      30

1131           contractor provided the conditions of this Section

1132           3.2(b) are met and further provided the contractor

1133           can complete the improvements in such a manner and

1134           in accordance with such a timetable as may be

1135           agreed to by the Parties; and (ii) all such

1136           contracts shall be executed by the Village to the

1137           extent necessary to further the goals of this

1138           Agreement.  The Developer shall not be required to

1139           advertise for bids or to submit multiple bids to

1140           the Village.

1141     (2)    The Board of Trustees shall receipt all contracts

1142           submitted to it by the Developer in connection with

1143           the construction of the Phase II Development Public

1144           Site Improvements identified on Exhibit "I" to this

1145           Agreement in order to review: (i) that the

1146           contractors which are to perform work pursuant to

1147           such contracts are sufficiently experienced in

1148           doing the size and type of work required for the

1149           construction of the improvements to be constructed;

1150           (ii) that all contracts accurately reflect the cost

1151           of completing such improvements; and (iii) that no

1152           purpose would be served in the Village's obtaining

1153           bids for the construction of such improvements.

1154           The Board of Trustees shall have twenty-one (21)

1155           days to review and approve or disapprove the

1156           contracts submitted to it by the Developer.  If

FILED DATE: 1/7/2020 8:33 PM   2018CH12683

1157   disapproved, the Village Manager shall give
1158   reasons, in writing, to the Developer for such
1159   disapproval.   All construction contracts shall
1160   provide for payment in accordance with the
1161   provisions of this Agreement.  With respect to such
1162   construction contracts and where the provisions of
1163   this Section 3.2(b) are satisfied, the Board of
1164   Trustees, in accordance with Ill.Rev.Stat.
1165   Ch.24,S8-9-1(1987), shall hereafter waive any
1166   advertising for bids by the Village.

1167   ### 3.3. Construction of Public Works and Improvements

1168   The Village retains the right to manage and oversee the
1169   engineering, design and construction of the Public Works and
1170   Improvements.  The design and location of the Village Water Tank
1171   and the parameters for the design and construction of the Village
1172   Municipal Facility and the Village Water Tank shall be provided for
1173   in the Amendment to the Annexation Agreements.

1174   ### 3.4. Covenant to Run With Land Regarding Uses of the Subject
1175   Property.

1176   The Developer hereby covenants that, for the term of the
1177   Economic Development Plan, the Subject Property shall be devoted
1178   only to the uses specified in the Economic Development Plan. Such
1179   covenant shall constitute a covenant running with the land which
1180   shall terminate upon expiration of the Economic Development Plan.
1181   At the request of the Village, the Developer shall execute, and
1182   record in the Cook County Recorder of Deeds Office, a Declaration
1183   of Covenants that confirms such covenant and that subjects the

02/27/90-H.E.                    32

1184   Subject Property to the terms of this Agreement and the Economic
1185   Development Plan.

1186       3.5. <u>Insurance</u>

1187       Prior to the commencement of construction of any portion of
1188   the Development, the Developer shall furnish, or cause to be
1189   furnished, to the Village certificates of insurance evidencing the
1190   procurement of comprehensive bodily injury and property damage
1191   liability insurance policies in the amount of at least two million
1192   dollars ($2,000,000.00) for any injury or death to persons, five
1193   million dollars ($5,000,000.00) for any injury or death to any
1194   number of persons arising out of any aggregate occurrence and five
1195   hundred thousand dollars ($500,000.00) for property damage, which
1196   certificates confirm the naming of the Village, its officials,
1197   agents and employees as "additional insureds" under all such
1198   policies.  The Developer shall have the option to provide the
1199   required insurance in a combined single limit form of not less than
1200   $5,000,000.00. All such policies shall provide for at least thirty
1201   (30) days' notice to the Village of the cancellation or termination
1202   of such policies.  Liability under the Illinois Structural Work Act
1203   and contractual liability for indemnification of the Village, its
1204   officials, agents and employees, shall be fully insured under these
1205   policies for the limits set forth above.  The Developer shall cause
1206   such insurance to be maintained in force for so long as the
1207   Developer is undertaking the construction of any improvements on
1208   the Subject Property.  Provided the Developer delivers to the
1209   Village documents that provide assurances to the Village equivalent

02/27/90-H.E.              33

1210    to the assurances provided by the certificates of insurance as

1211    required above, the Developer shall have the right to self-insure

1212    for any or all of the losses described above.

1213    **3.6. <u>Compliance of Plats, Plans and Construction Activities</u>**
1214    **<u>with Village Ordinances.</u>**

1215    (a)   All plats and plans submitted to the Village for the

1216    Village's review and approval shall comply with the codes

1217    and ordinances of the Village that are in effect at the

1218    time of such submittal except to the extent such codes or

1219    ordinances conflict with, or are made inapplicable to the

1220    Subject Property by, the Beverly Annexation Agreement,

1221    the Nederlander Annexation Agreement or the Amendment to

1222    the Annexation Agreements.

1223    (b)   All construction activities undertaken on the Subject

1224    Property by, or under the direction of, the Developer

1225    shall be undertaken in compliance with the codes and

1226    ordinances of the Village that are in effect at the time

1227    of such construction except to the extent such codes or

1228    ordinances conflict with, or are made inapplicable to the

1229    Subject Property by, the Beverly Annexation Agreement,

1230    the Nederlander Annexation Agreement, the Amendment to

1231    the Annexation Agreements or this Agreement.

1232

1233

02/27/90-H.E.          34

1234  **ARTICLE 4.**  **COSTS OF THE DEVELOPMENT CONSTITUTING "PROJECT**
1235  **COSTS" WHICH ARE TO BE PAID OR FINANCED**
1236  **PURSUANT TO THE PROVISIONS OF THIS AGREEMENT**

1237  **4.1. General**

1238  To the fullest extent permitted by law, but subject to the

1239  provisions of Section 4.3 of this Article 4, all costs incurred by

1240  the Parties in furtherance of the Economic Development Plan and the

1241  Economic Development Project and the Development shall be deemed

1242  Project Costs and such costs shall be paid for or financed pursuant

1243  to the provisions of Article 6 of this Agreement.

1244  **4.2. Project Costs Agreed Upon as of the Date of this**
1245  **Agreement.**

1246  As of the date of this Agreement, the Parties acknowledge the

1247  following costs to be Project Costs which are to be paid for or

1248  financed pursuant to the provisions of this Agreement:

1249  (a)  All reasonable or necessary Property Assembly Costs

1250  (including, without limitation, those costs identified on

1251  Exhibit "O" attached hereto) and both the Village and

1252  Sears agree that Chapman & Cutler as Bond Counsel for the

1253  Village will determine what costs in Exhibit "O" qualify

1254  as Project Costs under the Act.  The provisions of

1255  Section 17.5 of this Agreement, Dispute Resolution shall

1256  not apply to the determination made by Chapman & Cutler

1257  relating to Exhibit "O";

1258  (b)  All reasonable or necessary costs of construction of the

1259  Public Improvements (including, without limitation, those

1260  costs identified on Exhibit "P" attached hereto) and both

1261  the Village and Sears agree that Chapman & Cutler as Bond

FILED DATE: 1/7/8/2020 6:03 PM   2018CH12683

1262    Counsel for the Village will determine what costs in

1263    Exhibit "P" qualify as Project Costs under the Act.  The

1264    provisions of Section 17.5 of this Agreement, Dispute

1265    Resolution shall not apply to the determination made by

1266    Chapman & Cutler relating to Exhibit "P";

1267    (c)    All reasonable or necessary costs of preparation of

1268    surveys, development of plans and specifications,

1269    implementation and administration of the Economic

1270    Development Plan, and retention of personnel and

1271    professionals for architectural, engineering, legal,

1272    marketing, financial, planning, police, fire, public

1273    works and other services;

1274    (d)    All reasonable or necessary financing costs (including,

1275    without limitation, all necessary and incidental expenses

1276    related to the issuance of the Obligations, payment of

1277    any interest on any such Obligations which accrues during

1278    the estimated period of construction of the Economic

1279    Development Project for which such Obligations are issued

1280    and for not exceeding thirty-six (36) months thereafter,

1281    and any reasonable reserves related to the issuance of

1282    such Obligations);

1283    (e)    All reasonable or necessary Village Project Costs; and

1284    (f)    All reasonable or necessary private financing costs

1285    incurred by the Developer in furtherance of the Economic

1286    Development Plan, the Economic Development Project and

1287    the Development, and specifically including payments to

02/27/90-H.E.                    36

the Developer as reimbursement for such costs incurred by
the Developer, provided that:

    (1)   Such private financing costs shall be paid or
reimbursed by the Village only pursuant to the
prior official action of the Village evidencing an
intent to pay or reimburse the Developer for such
private financing costs (which action shall be
deemed to have been taken by the Corporate
Authorities' adoption of an ordinance authorizing
the Village's execution of this Agreement);

    (2)   Except as provided in subparagraph (4) hereof, the
aggregate amount of such costs paid or reimbursed
by the Village to the Developer in any one year
shall not exceed thirty percent (30%) of such costs
paid or incurred by the Developer in that year;

    (3)   Private financing costs shall be paid or reimbursed
by the Village solely from the Special Tax
Allocation Fund and shall not be paid or reimbursed
from the proceeds of Obligations issued by the
Village;

    (4)   If there are not sufficient funds available in the
Special Tax Allocation Fund in any year to make
such payment or reimbursement in full, any amount
of such interest cost remaining to be paid or
reimbursed by the Village shall accrue, and, at
Developer's request, be evidenced by the execution

02/27/90-H.E.                    37

1314            and delivery of a Note, and be payable when funds

1315            are available in the Fund to make such payment (and

1316            any such payment shall be made without regard to

1317            the limitations contained in subparagraph (2)

1318            hereof); and

1319      (5)   In connection with the Department's approval and

1320            certification of the Economic Development Project

1321            pursuant to Section 5 of the Act, the Village shall

1322            forward a copy of this Agreement to the Department.

1323   4.3.  **Project Costs Incurred in Connection With the**
1324        **Construction of Public Site Improvements Identified by**
1325        **the Village After the Date of this Agreement.**

1326   (a)   If:

1327      (1)   After the date of this Agreement, the Village

1328            determines that a public street, public utility or

1329            other public improvement that is not identified on

1330            either Exhibit "H" or Exhibit "I" to this Agreement

1331            must be constructed in order to further the

1332            Economic Development Project and the Development;

1333            and

1334      (2)   The Developer accepts and agrees with such

1335            determination;

1336            then such public street, public utility or public

1337            improvement shall be deemed a "Public Site Improvement"

1338            and the entire cost of constructing such Public Site

1339            Improvement shall be deemed a Project Cost which is to be

1340            paid for or financed pursuant to the provisions of

Article 6 of this Agreement.

2      (b)  If:

1343        (1)  After the date of this Agreement, the Village
1344             determines that a public street, public utility or
1345             other public improvement that is not identified on
1346             either Exhibit "H" or Exhibit "I" to this Agreement
1347             must be constructed in order to further the
1348             Economic Development Project and the Development;
1349             and

1350        (2)  The Developer believes that such public street,
1351             public utility or other public improvement
1352             provides a material benefit to areas outside the
1353             boundaries of the Project Area;

1354        then, subject to the provisions of paragraph (d) of this
1355        Section 4.3, such public street, public utility or public
1356        improvement shall be deemed a "Public Site Improvement"
1357        and that portion, and only that portion, of the cost of
1358        constructing such Public Site Improvement which is
1359        specifically and uniquely attributable to the Development
1360        shall be deemed a Project Cost which is to be paid for or
1361        financed pursuant to the provisions of Article 6 of this
1362        Agreement.

1363   (c)  Not less than 30 days after the Village makes a
1364        determination pursuant to the foregoing paragraph (a) or
1365        paragraph (b) that a public street, public utility or
1366        public improvement must be constructed in order to

02/27/90-H.E.                39

FILED DATE: 1/7/8/2020 8:03 PM    2018CH12683

1367 further the Economic Development Project and the
1368 Development, the Village shall deliver notice to the
1369 Developer identifying:

1370    (1)    The public street, public utility or public
1371           improvement and the basis for the Village's
1372           determination that such public street, public
1373           utility or public improvement must be constructed
1374           in order to further the Economic Development
1375           Project and the Development;

1376    (2)    The Village's determination of the anticipated cost
1377           of constructing such public street, public utility
1378           or public improvement;

1379    (3)    The Village's determination as to whether or not
1380           such public street, public utility or public
1381           improvement provides a material benefit to areas
1382           outside the boundaries of the Project Area; and

1383    (4)    The Village's determination as to the portion of
1384           the cost of constructing such public street, public
1385           utility or public improvement which is specifically
1386           and uniquely attributable to the Development.

1387 (d)    If the Developer agrees with the Village's determinations
1388        made pursuant to the foregoing paragraph (c), then the
1389        portion of the cost of constructing such public street,
1390        public utility or public improvement which is
1391        specifically and uniquely attributable to the Development
1392        shall be deemed a Project Cost.    If the Developer

02/27/90-H.E.                        40

FILED DATE: 7/8/2020 5:33 PM   2018CH12683

1393      disagrees with any determination made by the Village
1394      pursuant to the provisions of this Section 4.3, then the
1395      following process shall occur:

1396      (1)   The Developer shall deliver notice to the Village
1397          identifying the specific Village determination with
1398          which the Developer disagrees;

1399      (2)   The Village, at the Village's cost, shall retain a
1400          consultant to provide evidence which supports the
1401          Village's determination and shall submit that
1402          evidence, with a report that summarizes the
1403          consultant's methodologies and conclusions, to the
1404          Developer;

1405      (3)   If the Developer disagrees with such consultant's
1406          evidence, methodologies or conclusions, then the
1407          Developer, at the Developer's cost, shall retain a
1408          consultant to provide evidence which supports the
1409          Developer's conclusions relative to the Village's
1410          determination and shall submit that evidence, with
1411          a report that summarizes such consultant's
1412          methodologies and conclusions, to the Village; and

1413      (4)   If the Parties are thereafter unable to resolve
1414          their difference of opinion, then the Village's
1415          consultant and the Developer's consultant shall
1416          jointly choose a third consultant, at a cost to be
1417          shared equally by the Village and the Developer,
1418          who shall make a final determination as to the

02/27/90-H.E.          41

1419    matter in dispute, and such determination shall be

1420    final and binding on the Parties.

1421    **4.4. Determining "Reasonable or Necessary" Costs**

1422    Determinations of the Parties as to what costs are "reasonable

1423    or necessary" costs that are incidental to the Economic Development

1424    Project, as such terms are used in the Act and this Agreement,

1425    shall be consistent with the provisions of Sections 2.1 and 4.1 of

1426    this Agreement.

1427    **ARTICLE 5.     SPECIAL TAX ALLOCATION FUND**

1428    **5.1. Deposit of Monies into Fund**

1429    In accordance with the Act, the Village Treasurer shall

1430    promptly deposit in the Special Tax Allocation Fund, upon receipt,

1431    all Tax Increment Revenues, all other monies required by the Act or

1432    this Agreement to be deposited in the Fund, and all earnings

1433    realized upon the investment of such monies. Monies deposited in

1434    the Fund shall be used only for the purposes, and in the manner,

1435    specified in this Agreement and the Act.

1436    **5.2. Accounting of Monies Deposited in Fund**

1437    The Village shall establish such accounts and keep such books

1438    and records as are necessary to implement the provisions of this

1439    Agreement, the Act and the ordinances adopted in connection with

1440    each issue of Bonds. From and after the date of this Agreement,

1441    the Village shall provide the Developer with its annual financial

1442    report which shall include a statement of monies deposited into and

1443    disbursed from the Fund. Such report shall be undertaken in

1444    accordance with generally accepted auditing standards by a

02/27/90-H.E.                    42

1445   certified public accounting firm designated by the Village.  The

1446   Developer shall have the right to review the books and records of

1447   the Village which relate to the Fund and any fund or account

1448   holding proceeds of Revenue Bonds and Notes.  At the request of the

1449   Developer, a separate compliance audit shall be performed to

1450   provide sufficient detail to enable the Parties to determine

1451   whether or not there has been compliance with the provisions of

1452   this Agreement and the Act.  Both the accounting records and all

1453   financial audits of the Fund shall separately identify Phase I Tax

1454   Increment Revenues and Phase II Tax Increment Revenues.  If the

1455   Developer requests a separate compliance audit of the Fund, the

1456   cost of such compliance audit shall not be a Village Project Cost

1457   unless the compliance audit indicates material non-compliance; in

1458   that event, the cost shall be a Village Project Cost.

1459         **5.3. <u>Investment of Monies Deposited in the Fund</u>**

1460         The Village shall invest monies in the Fund from  time to time

1461   only in those investment vehicles as are identified, as of the date

1462   of this Agreement, in Section 2 of "An Act Relating to Certain

1463   Investments  of  Public  Funds  by  Public  Agencies"

1464   (Ill.Rev.Stat.Ch.85,SS902).  All income earned on the investment of

1465   such monies shall be deposited in the Fund pursuant to Section 5.1

1466   of this Article 5.  The Village shall not transfer or loan monies

1467   deposited in the Fund to other Village funds.

1468         **ARTICLE 6.**       **<u>PAYMENT AND FINANCING OF PROJECT COSTS</u>**

1469         **6.1. <u>Project Costs Other Than Village Project Costs</u>**

1470         The  Village  shall  pay  and  finance  those  Project  Costs

FILED DATE: 1/28/2020 6:33 PM   2018CH12683

1471  identified in Article 4 of this Agreement other than Village

1472  Project Costs solely from Tax Increment Revenues, the proceeds of

1473  Obligations, the proceeds of Developer Advances, grants from the

1474  State of Illinois or other monies made available for such purposes

1475  pursuant to the Act or the provisions of this Agreement. The

1476  Village shall reimburse the Developer for the Project Costs

1477  identified in Article 4 of this Agreement which the Developer has

1478  paid or incurred out of Tax Increment Revenues or other monies

1479  deposited in the Fund, the proceeds of Revenue Bonds, or other

1480  monies made available for such purposes pursuant to the Act or the

1481  provisions of this Agreement. The foregoing provision shall not

1482  preclude the Parties, as provided in Article 2 of this Agreement,

1483  from seeking and securing other funding sources for the

1484  construction of public improvements which are deemed reasonable or

1485  necessary to the implementation of the Economic Development Plan

1486  and the furtherance of the Economic Development Project.

1487       **6.2. Payment and Financing of Village Project Costs**

1488       All Village Project Costs shall be paid out of, or financed

1489  by, the Village's portion of the Phase I Allocated Tax Increment

1490  Revenue Amounts (as identified in Column 2 of Exhibit "B" attached

1491  hereto); those Developer Advances and donations specified in

1492  Sections 10.1, 10.2 and 10.5 of this Agreement, or the proceeds of

1493  General Obligation Bonds or Village Obligations secured solely by

1494  the Village's portion of the Phase I Allocated Tax Increment

1495  Revenue Amounts.  Debt service on Village Obligations which are

1496  issued to pay Village Project Costs shall be paid solely out of the

02/27/90-H.E.                44

1497    Village's portion of the Phase I Allocated Tax Increment Revenue

1498    Amounts and such other monies as may be available to the Village

1499    for such purposes.  Any portion of the Village's portion of the

1500    Phase I Allocated Tax Increment Revenue Amounts (as identified in

1501    Column 2 of Exhibit "B" attached hereto) which is not used or

1502    encumbered to pay or finance Village Project Costs or to pay such

1503    debt service shall be paid by the Village to the Cook County

1504    Collector for distribution to the Village and the affected Taxing

1505    Districts in accordance with the surplus distribution provisions of

1506    the Act.  The portion of the Phase II Allocated Tax Increment

1507    Revenue Amounts which are distributed to the Village pursuant to

1508    Article 7 of this Agreement need not be used by the Village to pay

1509    or finance Village Project Costs.  Notwithstanding any other

1510    provisions of this Agreement, the estimated three million dollar

1511    ($3,000,000.00) cost for constructing the Sanitary Sewer

1512    Improvements shall not be considered a Village Project Cost

1513    although the Parties acknowledge the Village's intention to secure

1514    the "Build Illinois" grant referenced in Section 2.2 of this

1515    Agreement and the Village's agreement to apply the proceeds of such

1516    grant, if and when received, to the construction of the Sanitary

1517    Sewer Improvements.  The Developer shall have no obligation to pay

1518    Village Project Costs, or to make Developer Advances for the

1519    purpose of paying Village Project Costs, except to the extent

1520    provided for in Sections 10.1, 10.2 and 10.5 of this Agreement.

1521        6.3. __Issuance of Bonds/Execution and Delivery of Notes__

1522        The Village shall issue Bonds and execute and deliver Notes,

02/27/90-H.E.                    45

1523   as necessary to fulfill its obligations under the terms of this

1524   Agreement, as follows:

1525        (a)   From time to time, the Village, in its sole discretion,

1526              may issue its General Obligation Bonds, and tax increment

1527              revenue bonds secured solely by the Village's portion of

1528              the Phase I Allocated Tax Increment Revenue Amounts, in

1529              amounts sufficient to satisfy and pay for Project Costs,

1530              including without limitation Village Project Costs.

1531              Notwithstanding the foregoing, the Village shall not

1532              issue any General Obligation Bonds until it has received

1533              the SMG Occupancy Date Notice from the Developer;

1534        (b)   From time to time, the Village pursuant to the terms of

1535              this Agreement and after it has received the SMG

1536              Occupancy Date Notice from the Developer, shall issue

1537              economic development project tax increment revenue bonds

1538              in amounts sufficient to satisfy and pay for the Project

1539              .Costs described in Article 4 of this Agreement other than

1540              Village Project Costs (but in no event shall private

1541              financing costs incurred by the Developer in connection

1542              with the Economic Development Project be paid or

1543              reimbursed from the proceeds of Revenue Bonds);

1544        (c)   To the extent:

1545              (1)   The proceeds of Revenue Bonds are not sufficient to

1546                    satisfy, or cannot be used to satisfy, the Project

1547                    Costs described in Article 4 of this Agreement; and

1548              (2)   The Tax Increment Revenues (other than the

02/27/90-H.E.                    46

1549            Allocated Tax Increment Revenue Amounts) then

1550            deposited in the Fund, are not, and will not be,

1551            sufficient or available to satisfy such Project

1552            Costs; and

1553          (3)   Such Project Costs do not constitute Village

1554            Project Costs;

1555 the Developer, to the extent permitted by the Act, shall make a

1556 Developer Advance to satisfy such Project Costs and the Village

1557 shall execute and deliver its Note to evidence such Developer

1558 Advance. Notwithstanding the foregoing, the Developer shall not

1559 advance, or be required to advance, monies needed to satisfy debt

1560 service requirements on the Obligations, to establish reserves for

1561 the debt service requirements of the Obligations or to retire or

1562 redeem any Obligations and no Developer Advance shall be used for

1563 such purpose.

1564      **6.4.** <u>**Limited Liability of the Village**</u>

1565      The Village shall not be required to pay and finance any of

1566 those Project Costs identified in Article 4 of this Agreement

1567 (other than Village Project Costs) unless funds for such purposes

1568 are available from Tax Increment Revenues (other than Allocated Tax

1569 Increment Revenue Amounts), the proceeds of Obligations, the

1570 proceeds of Revenue Bonds, the proceeds of Developer Advances,

1571 grants from the State of Illinois or other monies made available

1572 for such purposes pursuant to the Act or the provisions of this

1573 Agreement. The Village shall not be required to reimburse the

1574 Developer for such Project Costs unless funds for such purposes are

02/27/90-H.E.                47

FILED DATE: 1/7/2020 5:03 PM   2018CH12683

1575  available from Tax Increment Revenues (other than Allocated Tax

1576  Increment Revenue Amounts), or other monies deposited from time to

1577  time in the Fund, the proceeds of Revenue Bonds or other monies

1578  made available for such purposes pursuant to the Act or the

1579  provisions of this Agreement.

1580  **6.5. Developer Advances**

1581  All monies paid to the Village by the Developer in furtherance

1582  of the Economic Development Project and pursuant to the provisions

1583  of this Agreement shall be accounted for separately within the Fund

1584  and all such advances shall be deemed Developer Advances, unless

1585  provided otherwise in this Agreement. All Developer Advances made

1586  in connection with the incurring of various Project Costs may be

1587  paid to the Village prior to or subsequent to the incurring of such

1588  Project Costs. All Developer Advances shall be evidenced by the

1589  Village's execution and delivery of a Note in accordance with the

1590  provisions of Article 8 of this Agreement. The Developer shall

1591  advance the funds necessary to pay any such Project Costs within

1592  fourteen (14) days of its receipt of a written request therefor

1593  from the Village Manager. Notwithstanding the foregoing, the

1594  Developer shall not be required to make any Developer Advance until

1595  the terms and conditions and the form of the Note which is to be

1596  executed and delivered to evidence such Developer Advance have been

1597  agreed upon by the Parties, which terms, conditions and form shall

1598  be consistent with the terms of this Agreement.

1599  **6.6. Procedure for Payment and Reimbursement to the Developer**
1600  **of Project Costs**

1601  All payment and reimbursement requests of the Developer in the

02/27/90-H.E.                              48

1602   amount of four thousand dollars ($4,000.00) or less, and all

1603   payment or reimbursement requests of the Developer of more than

1604   four thousand dollars ($4,000.00) made pursuant to contracts which

1605   have been previously approved by the Board of Trustees (whether

1606   pursuant to this Agreement or otherwise) shall be undertaken

1607   pursuant to the authorization of the Village Manager.  In order to

1608   effect such payment or reimbursement (whether being made to the

1609   Developer or others), the Developer shall submit to the Village

1610   Manager, for his review and approval (which approval shall not be

1611   unreasonably withheld or delayed), all affidavits, lien waivers and

1612   other documentation as may be necessary to effect such payment or

1613   reimbursement.  The Village Manager shall inform the appropriate

1614   Village financial officer of such approval within ten (10) working

1615   days of receipt of such documentation or, within said period, shall

1616   provide the Developer with a specific written explanation of his

1617   reasons for disapproving such request.  Such Village financial

1618   officer shall effect payment or reimbursement within five (5)

1619   working days of receipt of the Village Manager's approval of any

1620   request for payment or reimbursement. All payment or reimbursement

1621   requests of the Developer of more than four thousand dollars

1622   ($4,000.00) which are not being made pursuant to a contract which

1623   has been previously approved by the Board of Trustees shall be

1624   submitted to the Board of Trustees for its review and approval

1625   (which approval shall not be unreasonably withheld or delayed).

1626

1627

02/27/90-H.E.                    49

1628    **ARTICLE 7.     <u>UTILIZATION OF TAX INCREMENT REVENUES</u>**

1629    **7.1. <u>Tax Increment Revenues Received Prior to the</u>**
1630    **<u>Phase I Tax Increment Revenue Commencement Date.</u>**

1631    Prior to the Phase I Tax Increment Revenue Commencement Date,

1632    the Village from time to time shall disburse or allocate Tax

1633    Increment Revenues as they are received and deposited in the Fund,

1634    subject to the provisions of any ordinance authorizing the issuance

1635    of Revenue Bonds, as follows:

1636    (1)   First, the Village shall pay, or allocate amounts

1637    sufficient to satisfy, debt service requirements

1638    (and any increases in required reserves) due in the

1639    current year and coming due in the following year

1640    on all outstanding Revenue Bonds; and

1641    (2)   The balance, if any, shall be reserved by the

1642    Village to pay Project Costs (other than Village

1643    Project Costs) to be incurred within the next three

1644    (3) years and to provide reserves needed to secure

1645    outstanding Revenue Bonds and Notes.

1646    **7.2. <u>Tax Increment Revenues Received On and Subsequent to</u>**
1647    **<u>Phase I Tax Increment Revenue Commencement Date.</u>**

1648    Commencing with the Phase I Tax Increment Revenue Commencement

1649    Date and continuing thereafter as Tax Increment Revenues are

1650    received and deposited in the Fund, the Village from time to time

1651    shall disburse or allocate Tax Increment Revenues, subject to the

1652    provisions of any ordinance authorizing the issuance of Revenue

1653    Bonds, as follows:

1654    (1)   First, subject to the last sentence of Section 8.2

02/27/90-H.E.                    50

1655           of this Agreement, the Village shall: (i) disburse

1656           or allocate Phase I Allocated Tax Increment Revenue

1657           Amounts to the Village up to the maximum amounts

1658           set forth in Column 1 of Exhibit "B" to this

1659           Agreement; and (ii) disburse or allocate the Phase

1660           II Allocated Tax Increment Revenue Amounts to the

1661           Village and the affected Taxing Districts in an

1662           aggregate amount that is determined by multiplying

1663           the percentages set forth on Exhibit "C" to this

1664           Agreement times the amount of Phase II Tax

1665           Increment Revenues received and deposited in the

1666           Fund, which Phase II Allocated Tax Increment

1667           Revenue Amounts shall be distributed to the Village

1668           and the affected Taxing Districts in accordance

1669           with the surplus distribution provisions of the

1670           Act;

1671      (2)  Next, the Village shall pay, or allocate amounts

1672           sufficient to satisfy, debt service requirements

1673           due in the current year and coming due in the

1674           following year on all outstanding Revenue Bonds,

1675           and to provide reserves needed to secure

1676           outstanding Revenue Bonds;

1677      (3)  Next, the Village shall pay, or allocate amounts

1678           sufficient to satisfy, debt service requirements

1679           due in the current year and coming due in the

1680           following year on all outstanding Notes (unless the

02/27/90-H.E.           51

FILED DATE: 7/8/2020 6:33 PM   2018CH12683

1681                 holder of such Notes agrees, in writing, to defer

1682                 such payment);

1683      (4)   Next, the Village shall pay, or allocate amounts

1684                 sufficient to pay, outstanding Project Costs (other

1685                 than Village Project Costs); and

1686      (5)   Next, the Village shall pay, or allocate amounts

1687                 sufficient to pay Project Costs (other than Village

1688                 Project Costs) to be incurred within three (3)

1689                 years, or to purchase or redeem all or a portion of

1690                 the outstanding Notes or Revenue Bonds, as the

1691                 Parties by mutual agreement shall annually

1692                 determine.

1693      (6)   The balance, if any, shall be paid to the Cook

1694                 County Collector for distribution to the Village

1695                 and the affected Taxing Districts, for deposit in

1696                 their appropriate accounts, in accordance with the

1697                 surplus distribution provisions of the Act.

1698    **7.3.**   **The Village's Distribution of The Phase I Allocated Tax**
1699          **Increment Revenue Amounts**

1700      Upon receipt, the Village, subject to the provisions of any

1701 ordinance authorizing the issuance of General Obligation Bonds, and

1702 from time to time shall disburse or allocate the Phase I Allocated

1703 Tax Increment Revenue Amounts as follows:

1704      (1)   First, the Village may pay, or allocate an amount

1705                 sufficient to satisfy, debt service requirements

1706                 due in the current year and coming due in the

1707                 following year on any outstanding Village

02/27/90-H.E.                52

1708        Obligations;

1709     (2)   Next, the Village shall pay, or allocate an amount

1710           sufficient to satisfy, outstanding Village Project

1711           Costs;

1712     (3)   Next, the Village shall pay, or allocate an amount

1713           sufficient to reimburse the Village for, Village

1714           Project Costs which have been theretofore paid or

1715           incurred by the Village;

1716     (4)   The balance, if any, shall be paid to the Cook

1717           County Collector for distribution to the Village

1718           and the affected Taxing Districts, for deposit in

1719           their appropriate accounts, in accordance with the

1720           surplus distribution provisions of the Act,

1721 provided, however, that the amount of Phase I Tax Increment Revenue

1722 Amounts paid to, or allocated by, the Village annually pursuant to

1723 paragraphs (1), (2), and (3) above shall not exceed the amounts

1724 specified in Column 2 of Exhibit "B" to this Agreement.

1725

1726

1727

1728

02/27/90-H.E.           53

1729   **ARTICLE 8.      BONDS AND NOTES**

1730      **8.1. Issuance, Execution and Delivery**

1731      The Parties acknowledge that the acquisition of the Subject

1732   Property and the Development, and the construction of the Public

1733   Improvements, as provided in the Economic Development Plan and this

1734   Agreement, necessitate the use of proceeds from one or more issues

1735   or series of Revenue Bonds and from the execution and delivery of

1736   one or more Notes to pay Project Costs as provided in the Economic

1737   Development Plan and in this Agreement.  Accordingly, the Village

1738   shall issue Revenue Bonds and execute and deliver Notes to finance

1739   Project Costs pursuant to the Act and the terms of this Agreement.

1740   Such  Revenue  Bonds  shall  be  in  the  aggregate  amounts  which

1741   reasonably  can  be  sold  based  upon  the  security  which  can  be

1742   provided  to  the  purchasers  of  such  Revenue  Bonds  under  the

1743   provisions of this Agreement.  Such Revenue Bonds and Notes shall

1744   not be secured by the full faith and credit of the Village.  One or

1745   more issues or series of Revenue Bonds to pay for Project Costs

1746   (other than Village Project Costs) may be sold at one or more times

1747   in  order  to  implement  the  Economic  Development  Plan  and  the

1748   Economic Development Project, provided that the Village shall not

1749   be required to issue such Revenue Bonds until necessary credit

1750   enhancements and security, as may reasonably be deemed necessary by

1751   the Village, have been established.  The amount of each series of

1752   Revenue Bonds to be issued by the Village shall be supported by a

1753   feasibility  report  prepared  by,  or  at  the  direction  of,  the

1754   Developer,  which  shall  reasonably  determine  the  amount  of  each

02/27/90-H.E.                      54

1755    series of such Revenue Bonds which can be issued and which shall be

1756    satisfactory to the Village.   Such report shall analyze the

1757    projected cash flows (from Tax Increment Revenues and other

1758    sources), credit enhancements and other security provisions related

1759    to the issuance of such series of such Revenue Bonds, all then

1760    outstanding Revenue Bonds and all Revenue Bonds expected to be

1761    issued thereafter.

1762          **8.2.** <u>**Interest Payment, Maturity, Priorities and Credit**</u>
1763               <u>**Enhancements**</u>

1764        All Bonds issued pursuant to this Agreement shall bear

1765    interest at prevailing market rates for similar instruments and

1766    shall be subject to such other terms and conditions as are agreed

1767    to by the Village and the Developer, subject to the Village

1768    ordinances authorizing issuance of such Bonds and the provisions

1769    of this Agreement applicable at the time of issuance of the Bonds.

1770    All taxable Notes executed and delivered pursuant to this Agreement

1771    shall bear interest at the rate of interest announced from time to

1772    time by Continental Bank N.A. at Chicago, Illinois, as its "prime

1773    rate".   If, for any reason, Continental Bank N.A. shall cease to

1774    announce a "prime rate" then such taxable Notes shall bear interest

1775    at the rate of interest announced from time to time by The First

1776    National Bank of Chicago at Chicago, Illinois, as its "prime rate"

1777    or "base rate".   The Parties shall agree upon the interest rate to

1778    apply to any tax-exempt Notes executed and delivered pursuant to

1779    this Agreement and prior to their execution and delivery.   All

1780    Bonds and Notes shall mature on or before September 11, 2012 and in

1781    any event within 20 years of the date of issuance or execution and

    02/27/90-H.E.            55

1782   delivery thereof.  All Revenue Bonds issued, and all Notes executed

1783   and delivered, pursuant to this Agreement shall be limited

1784   obligations of the Village payable solely from Tax Increment

1785   Revenues (subject to the last sentence of this Section 8.2) and the

1786   other monies deposited from time to time in the Fund as a result of

1787   the investment of such Tax Increment Revenues, as and to the extent

1788   available for such purposes, and by such capitalized interest, debt

1789   service reserves and sinking funds or other available credit

1790   enhancements as may be provided by the ordinances adopted by the

1791   Village from time to time in conjunction with each issue of Revenue

1792   Bonds and each delivery of Notes.   Revenue Bonds issued and

1793   outstanding pursuant to this Agreement shall be secured by a first

1794   priority pledge of amounts in the Fund subsequent and subordinate

1795   only to the obligation to make the payments due under Section

1796   7.2(1) (unless the Village shall have agreed upon an alternative

1797   mechanism to provide for the payments which are otherwise to be

1798   made under Section 7.2(1).)

1799       **8.3.  <u>Tax-Exempt Issues</u>**

1800       The Village, as issuer of the Obligations, and the Developer

1801   shall cooperate with each other in an attempt to ensure that

1802   interest paid on the Obligations is exempt from Federal income

1803   taxes, provided that the Village shall not be required to take any

1804   action that is inconsistent with the provisions of this Agreement

1805   or the Village's rights herein.

1806       **8.4.  <u>SMG Completion Guaranty Note.</u>**

1807       Upon the Village's issuance of any General Obligation Bonds

02/27/90-H.E.                      56

1808    pursuant to Section 6.3(a) of this Agreement, the Developer shall

1809    execute and deliver to the Village a note guaranteeing substantial

1810    completion of the SMG Home Office Complex by the end of the

1811    calendar year in which the SMG Occupancy Date is to occur (as

1812    established by the SMG Occupancy Date Notice) and providing for the

1813    payment to the Village when due of liquidated damages to be agreed

1814    upon by the Parties.    Notwithstanding the foregoing, the Village

1815    shall not issue any General Obligation Bonds until the Village has

1816    received the SMG Occupancy Date Notice from the Developer.

1817    **ARTICLE 9.**    **TAX PROTESTS AND APPEALS/PAYMENT OF REAL ESTATE**
1818                   **TAXES**

1819    **9.1. Tax Protests and Appeals**

1820    The Parties acknowledge that certain assumptions will be made

1821    relative to the future assessed valuations of the Subject Property

1822    as and when the Development occurs and as and when Bonds are issued

1823    by the Village in connection with the Development.    The Parties

1824    further acknowledge that attaining and maintaining said assessed

1825    valuations will have a material effect on the revenue available to

1826    pay debt service on such Bonds. Accordingly, for so long as such

1827    Bonds are outstanding, neither the Developer nor its agents,

1828    representatives, successors, assigns, tenants or transferees of any

1829    portion of the Subject Property shall initiate, take or perform any

1830    acts attempting to reduce the assessed valuation of any portion of

1831    the Subject Property if such reduction will cause the then-current

1832    total assessed valuation of the Subject Property to be less than

1833    the Total Minimum Assessed Valuation.    The Total Minimum Assessed

1834    Valuation of the Subject Property shall be established, in writing,

02/27/90-H.E.                    57

1835   by the Parties from time to time as Bonds are issued in connection

1836   with the development of the Subject Property.  The foregoing shall

1837   not preclude or prohibit the Developer from protesting the assessed

1838   value of the SMG Home Office Complex for the limited purpose of

1839   establishing a partial year assessment of the building assessment

1840   for the year in which the SMG Occupancy Date occurs.

1841      **9.2. <u>Miscellaneous</u>**

1842      Except as otherwise expressly set forth in this Article 9, the

1843   Developer shall have the same right to challenge real estate taxes

1844   as is offered to the taxpayers and owners of other real property

1845   situated within Cook County, Illinois, but no such challenge shall

1846   be made without notice to the Village.   The Developer further

1847   agrees, that to the extent it is obligated to pay any portion of

1848   the real estate tax bills for the Subject Property, it shall pay

1849   such taxes promptly before the date of delinquency of such tax

1850   bills.   The Developer shall file necessary documentation with the

1851   appropriate governmental authorities in order to cause the Phase I

1852   Site, the Phase II Site and the PCMT Property to be identified by

1853   separate permanent tax index numbers so that the provisions of this

1854   Agreement can be given effect.

1855      **ARTICLE 10.     <u>SPECIFIC DEVELOPER ADVANCES AND DONATIONS</u>**
1856
1857      **10.1.     <u>Developer Advance for Costs of Administering the</u>**
1858      **<u>Economic Development Plan</u>**

1859      The Developer shall advance to the Village the sum of two

1860   hundred ten thousand dollars ($210,000) to be used by the Village

1861   to pay for one (1) new employee and for clerical support to be

1862   hired   specifically   for   the   purpose   of   implementing   and

02/27/90-H.E.                    58

1863    administering    the    Economic    Development    Plan    and . Economic
1864    Development Project during the period commencing with the date of
1865    this Agreement and terminating on September 30, 1992.    This sum
1866    shall be advanced to the Village in three (3) equal installments of
1867    seventy    thousand    dollars    ($70,000.00)    each,    with    the    first
1868    installment being advanced upon execution of this Agreement; the
1869    second installment being advanced on November 1, 1990; and the
1870    third installment being advanced on November 1, 1991.    Funds
1871    advanced to the Village pursuant to this Section 10.1 shall be
1872    considered Developer Advances.    Principal and interest obligations
1873    coming due on the Notes executed by the Village to evidence such
1874    Developer Advances shall not be paid out of the Village's portion
1875    of    the    Phase    I    Allocated    Tax    Increment    Revenue    Amounts    (as
1876    identified in Column 2 of Exhibit "B" attached hereto).

1877    **10.2.    Developer Advance for Police and Fire Personnel**

1878    The  Developer shall advance to the Village the sum of one
1879    million, two hundred twenty-five thousand dollars ($1,225,000)
1880    which the Developer agrees shall be used by the Village to pay the
1881    cost    of    hiring    and    training    sufficient    police    officers    and
1882    firefighters in the sole discretion of the Village, to serve the
1883    Development upon the Developer's occupancy of the SMG Home Office
1884    Complex.  This sum shall be advanced to the Village as follows:  an
1885    initial installment of five hundred twenty-five thousand dollars
1886    ($525,000.00) shall be advanced to the Village on January 1, 1991;
1887    and the balance of seven hundred thousand dollars ($700,000.00)
1888    shall be advanced to the Village on January 1, 1992.  In addition,

02/27/90-H.E.                    59

1889  commencing January 1, 1993 and continuing on the first day of each

1890  month thereafter through and including April 1 of the calendar year

1891  in which the Phase I Tax Increment Revenue Commencement Date is to

1892  occur, the Developer shall advance an amount which is not more than

1893  sixty-three thousand eight hundred dollars ($63,800.00), which

1894  amount shall be increased by 10% on January 1, 1994 and by 10% on

1895  each January 1 thereafter, in order to reimburse the Village for

1896  police and fire personnel costs incurred by the Village for that

1897  period of time subsequent to the SMG Occupancy Date established by

1898  the SMG Occupancy Date Notice through and including April 30 of the

1899  calendar year in which the Phase I Tax Increment Revenue

1900  Commencement Date occurs.  Notwithstanding the above, the Developer

1901  shall not be obligated to make monthly payments after January 1,

1902  1993 for any months wherein the delay of the Phase I Tax Increment

1903  Revenue Commencement Date is due to breach by the Village as

1904  provided in Article 17 of this Agreement. Funds advanced to the

1905  Village pursuant to this Section 10.2 shall be considered Developer

1906  Advances.  Principal and interest obligations coming due on the

1907  Notes executed by the Village to evidence such Developer Advances

1908  shall not be paid out of the Village's portion of the Phase I

1909  Allocated Tax Increment Revenue Amounts (as identified in Column 2

1910  of Exhibit "B" attached hereto).

1911      **10.3.      Donation of Village Municipal Site**

1912      The Developer shall donate and convey the Village Municipal

1913  Site to the Village, or cause such donation and conveyance to be

1914  made to the Village.  Such donation and conveyance shall occur not

02/27/90-H.E.                     60

1915   more than thirty (30) days after the date the Developer, or the

1916   Developer's nominee, acquires title to the portion of the Subject

1917   Property which contains the Village Municipal Site, and, in any

1918   event, such donation and conveyance shall occur prior to issuance

1919   of the first building permit for a structure which is to be

1920   constructed on the Subject Property.  The donation of the Village

1921   Municipal Site shall constitute the donation of land required to be

1922   made to the Village for municipal purposes pursuant to the Beverly

1923   Annexation Agreement.

1924   **10.4.**          **Donations Relating to Redevelopment of PCMT**
1925                        **Property**

1926   (a)  **Loss of Contracted Service Income.**

1927   If, during the Term of this Agreement, the Poplar Creek

1928   Music Theater is permanently closed due to the

1929   redevelopment of the PCMT Property (hereafter referred to

1930   as "closure"), and provided such redevelopment occurs at

1931   the request of the Developer, the Developer shall make a

1932   one-time donation to the Village of the sum of four

1933   hundred fifty thousand dollars ($450,000.00) for deposit

1934   in its general fund to compensate for loss of income to

1935   the Village for contracted services. Such donation shall

1936   be made on June 1 of the first year following the date of

1937   the Poplar Creek Music Theater closure as aforesaid.

1938   Funds donated to the Village pursuant to this Section

1939   10.4(a) shall not be considered Developer Advances and

1940   such sums shall not be paid out of Tax Increment Revenues

1941   or out of the proceeds of Revenue Bonds.

02/27/90-H.E.                    61

1942    **(b)    <u>Reductions in Equalized Assessed Value.</u>**

1943    If, as a result of the Poplar Creek Music Theater closure

1944    and the redevelopment of the PCMT Property, provided such

1945    redevelopment occurs at the request of the Developer, the

1946    equalized assessed value of that property, during the

1947    period of redevelopment, falls below the portion of the

1948    Total Initial Equalized Assessed Value which was

1949    attributable to the property, the Developer shall pay to

1950    the Village an amount equal to the Village's loss in real

1951    property tax revenue occasioned by said closure.   Such

1952    loss in real property tax revenue shall be computed by

1953    multiplying: (i) the difference between that portion of

1954    the Total Initial Equalized Assessed Value which was

1955    attributable to the property and the then equalized

1956    assessed value of such property; by (ii) the Village's

1957    real estate tax rate for the applicable tax year.   This

1958    donation shall be recomputed every year and shall

1959    continue for so long as the Village realizes a loss in

1960    real property tax revenue as a result of the closure of

1961    the Poplar Creek Music Theater (as computed above) or

1962    until this Agreement terminates, whichever first occurs.

1963    Funds paid to the Village pursuant to this Section

1964    10.4(b) may be used by the Village for any legal

1965    purposes.   Such funds shall not be considered Developer

1966    Advances and such funds shall not be paid out of Tax

1967    Increment Revenues or out of the proceeds of Revenue

02/27/90-H.E.                    62

1968      Bonds.   Notwithstanding the foregoing, no such funds

1969      shall be paid to the Village unless the Village shall

1970      first have obtained the opinion of a nationally

1971      recognized bond counsel that such payment will not affect

1972      the tax-exempt status of any outstanding Bonds.

1973   **(c)   Municipal Entertainment Tax.**

1974      If, as a result of the closure of the Poplar Creek Music

1975      Theater and the redevelopment of the PCMT Property,

1976      provided such redevelopment occurs at the request of the

1977      Developer, then the Developer shall pay to the Village an

1978      amount equal to the amount of municipal entertainment tax

1979      revenue which was realized by the Village in the year

1980      immediately preceding such closure provided, however,

1981      that the Developer shall only be required to pay such

1982      sums to the Village for so long as the Village shall be

1983      entitled to receive funds under Section 10.4(b).  Funds

1984      paid to the Village pursuant to this Section 10.4(c) may

1985      be used by the Village for any legal purposes.   Such

1986      funds shall not be considered Developer Advances and such

1987      funds shall not be paid out of Tax Increment Revenues or

1988      out of the proceeds of Revenue Bonds.

1989   **10.5.      Developer Advance for Miscellaneous Village Project**
1990   **Costs**

1991   The Developer shall advance to the Village, within thirty (30)

1992   days of the date of this Agreement, the sum of fifty-eight thousand

1993   three hundred dollars ($58,300.00) in order to reimburse the

1994   Village for the fees of Chapman & Cutler (in the amount of

02/27/90-H.E.                   63

1995    $40,000.00) and the fees of Teska & Associates, Inc. (in the amount

1996    of $18,300.00), which fees were incurred by the Village in

1997    establishing the Economic Development Project and preparing the

1998    Economic Development Plan.  Funds advanced to the Village pursuant

1999    to this Section 10.5 shall be considered a Developer Advance.

2000    Principal and interest obligations coming due on the Note executed

2001    by the Village to evidence such Developer Advance shall not be paid

2002    out of the Village's portion of the Phase I Allocated Tax Increment

2003    Revenue Amounts (as identified in Column 2 of Exhibit "B" attached

2004    hereto).

2005        **10.6.**    <u>**No Other Donations**</u>

2006        In consideration of the donations which the Developer has

2007    agreed to make in accordance with the provisions of this Article

2008    10, and in further consideration of the fact that the Parties

2009    contemplate satisfying and financing all public costs of developing

2010    the Subject Property pursuant to the provisions of this Agreement,

2011    the Developer shall not be required by the Village, directly or

2012    indirectly, to make any other donations of land or cash to the

2013    Village or any other public body as a result of the Development of

2014    the Subject Property or in furtherance of the Economic Development

2015    Project.  Specifically, but without limitation, the Developer shall

2016    not be required by the Village: (i) to pay any impact fees for

2017    Village Project Costs, or for improvements which are to be financed

2018    pursuant to this Agreement (other than customarily and uniformly

2019    imposed sewer and water connection and user charges, building and

2020    occupancy permit fees and engineering inspection and plan review

02/27/90-H.E.                    64

2021 fees); or (ii) to make any donations of land or cash to the Village

2022 for school, park, library or other public purposes (whether

2023 pursuant to the Beverly Annexation Agreement, the Nederlander

2024 Annexation Agreement, or otherwise).

2025     **ARTICLE 11.    <u>NOTICES</u>**

2026     All notices required or permitted to be given pursuant to the

2027 provisions of this Agreement shall be in writing and shall be

2028 served on the Parties, either personally, with evidence of receipt,

2029 or by certified or registered mail, return receipt requested, as

2030 follows:

2031     **if to the Village:**      Village of Hoffman Estates
2032                               1200 North Gannon Drive
2033                               Hoffman Estates, Illinois 60196
2034                               Attn:  Village Manager
2035
2036     **with copies to:**         Village of Hoffman Estates
2037                               1200 North Gannon Drive
2038                               Hoffman Estates, Illinois 60196
2039                               Attn:  Corporation Counsel
2040
2041                               Burke & Ryan
2042                               33 North Dearborn Street
2043                               Suite 402
2044                               Chicago, Illinois 60602
2045                               Attn:  William E. Ryan, Esq.
2046
2047     **if to the Developer:**    Sears, Roebuck and Co.
2048                               Sears Tower
2049                               Chicago, Illinois 60684
2050                               Attn:  Senior Vice President
2051                                      Resources and Administration,
2052                                      Department 707
2053
2054     **with copies to:**         Sears, Roebuck and Co.
2055                               Sears Tower
2056                               Chicago, Illinois 60684
2057                               Attn:    General Counsel
2058                                        Merchandise Group
2059                                        Department 766
2060
2061
2062

02/27/90-H.E.                    65

FILED DATE: 1/16/2020 5:03 PM    2018CH12683

```
2063                          Tully & Weinstein
2064                          77 West Washington Street
2065                          Suite 1500
2066                          Chicago, Illinois 60602
2067                          Attn:  Thomas Tully, Esq.
2068
2069                                     and
2070
2071                          Rudnick & Wolfe
2072                          203 North LaSalle Street
2073                          Suite 1800
2074                          Chicago, Illinois 60601
2075                          Attn:    J. Kevin Garvey, Esq.
2076                                   Harold W. Francke, Esq.
2077
```

2078    Either party's address may be changed from time to time by such

2079    party giving notice, as provided above, to the other party.

2080    Notices delivered personally shall be deemed given on receipt.

2081    Notices delivered by certified or registered mail shall be deemed

2082    given two (2) business days after the date of post-marking.

2083    **ARTICLE 12.    <u>MEMORANDUM OF AGREEMENT</u>**

2084    Neither of the Parties shall record this Agreement, but each

2085    party agrees to execute and to deliver to the other party, when

2086    this Agreement is executed and delivered, multiple copies of a

2087    Memorandum of this Agreement in a form acceptable to their

2088    respective counsel.  Either of the Parties, at its sole expense,

2089    may record such Memorandum in the Office of the Recorder of Deeds

2090    of Cook County, Illinois.  Such Memorandum shall recite the

2091    covenants contained in Article 9 of this Agreement and such

2092    covenants shall run with the land and be binding upon the Developer

2093    and its agents, representatives, successors, assigns, tenants and

2094    transferees for so long as any Bonds are issued and outstanding.

2095    If and when the Bonds have been paid in full and redeemed (other

2096    than by a refunding), the covenants contained in Article 9 of this

02/27/90-H.E.                     66

2097   Agreement shall become null and void and the Village shall issue a

2098   release of such covenants in recordable form and deliver such

2099   release to the Developer for recording in the Office of the Cook

2100   County Recorder of Deeds.

2101        **ARTICLE 13.    PERMITTED DELAYS**

2102        Neither of the Parties shall be deemed to be in default

2103   hereunder in the performance of any obligation where delays or

2104   defaults in such performance are due to war, insurrection, strikes,

2105   lockouts, riots, floods, earthquakes, fires, casualties, acts of

2106   God, acts of the public enemy, epidemics, quarantine restrictions,

2107   freight embargoes and lack of transportation, or the inability to

2108   secure, or the revocation or suspension of, necessary governmental

2109   licenses, permits, authorizations and approvals or the failure of

2110   the other party to this Agreement to keep and perform the covenants

2111   and obligations on its part to be kept and performed.  An extension

2112   of time for any such cause shall be for the period of the delay,

2113   which period shall commence to run from the time of the

2114   commencement of the cause, provided that written notice by the

2115   party claiming such extension is sent to the other party not more

2116   than twenty (20) days after the commencement of such cause.

2117        **ARTICLE 14.    MORTGAGE HOLDERS**

2118        **14.1.    Rights and Obligations**

2119        The holder of any mortgage, deed of trust or other security

2120   interest, the lessor under any ground lease, and the grantee under

2121   any other conveyance for financing, shall not be obligated by the

2122   provisions of this Agreement to construct or complete the

02/27/90-H.E.                    67

2123   improvements which are contemplated by this Agreement or the
2124   Economic Development Plan or to guarantee such construction or
2125   completion, notwithstanding the collateral assignment of this
2126   Agreement to such party by the Developer.   Nothing in this
2127   Agreement shall be deemed to permit or authorize any such holder,
2128   lessor or grantee to devote the Subject Property to any uses, or
2129   to construct any improvements thereon, other than those uses or
2130   improvements provided for or authorized by this Agreement or the
2131   Amendment to the Annexation Agreements, any such unauthorized use
2132   or improvements being expressly prohibited.

2133        **14.2.**     **Notice/Assumption of Obligations**

2134        Whenever the Village shall deliver any notice or demand to the
2135   Developer with respect to any alleged breach or default by the
2136   Developer hereunder, the Village, at the same time, shall deliver
2137   to each holder of record of any mortgage, deed of trust or other
2138   security interest, and to the lessor of any ground lease and to the
2139   grantee under any other conveyance for financing, a copy of such
2140   notice or demand, provided the Village has been advised in writing
2141   by the Developer, or such holder, lessor, or grantee, of the name
2142   and address of any such holder, lessor or grantee.   Each such
2143   holder, lessee or grantee (insofar as the rights of the Village are
2144   concerned) shall have the same right to cure or remedy, or to
2145   commence to cure or remedy, any such default, provided, however,
2146   that in the event of a default by the Developer hereunder which is
2147   not curable by such holder, lessor or grantee (e.g., insolvency or
2148   bankruptcy of the Developer), such holder, lessor or grantee shall

02/27/90-H.E.                    68

2149  be deemed to have cured such noncurable defaults by its execution

2150  of the assumption agreement contemplated in the later portions of

2151  this Section 14.2.   Nothing contained in this Agreement shall be

2152  deemed to permit or authorize such holder, lessor or grantee to

2153  undertake  or  continue  the  construction  or  completion  of  the

2154  improvements contemplated by this Agreement (beyond the extent

2155  necessary to conserve or protect the improvements or construction

2156  already   made)   without   first   having   expressly   assumed   the

2157  Developer's obligations (with respect to the portion of the Subject

2158  Property on which the holder, lessor or grantee has a security

2159  interest) to the Village by written agreement satisfactory to the

2160  Village.   In such event, the holder, lessor or grantee shall agree

2161  to  complete,  in  the  manner  provided  in  this  Agreement,  the

2162  improvements to which the security interest of such holder, lessor

2163  or grantee relates, and submit evidence satisfactory to the Village

2164  that  it  has  the  qualifications  and  financial  responsibility

2165  necessary to perform such obligations.   The assumption agreement

2166  shall provide that such holder, lessor or grantee shall only be

2167  deemed to have assumed the Developer's obligations for as long as

2168  they have a security interest in the Subject Property, and that the

2169  Village's sole and exclusive remedy for a breach of the assumption

2170  agreement is forfeiture of the equity interest of such holder,

2171  lessor or grantee in the Subject Property.   No such assumption

2172  agreement shall relieve the Developer of any of its obligations

2173  under this Agreement.   Any such holder, lessor or grantee properly

2174  completing such improvement shall be entitled, upon written request

02/27/90-H.E.                           69

2175    made to the Village, to a certificate of occupancy from the Village

2176    with respect to such improvements.    To the extent of a conflict,

2177    ambiguity or inconsistency between the provisions of this Section

2178    14.2 and the provisions of any underlying agreement between the

2179    Developer and a holder, lessor or grantee of any security interest

2180    in the Subject Property, the former shall control.

2181        **14.3.    <u>Village Right to Cure Defaults</u>**

2182        In the event the Developer, or any entity acquiring title to

2183    the Subject Property, or any portion thereof, defaults in the

2184    construction or completion of construction of the improvements

2185    contemplated by the provisions of this Agreement, and such default

2186    is also a default under any mortgage, deed of trust, other security

2187    instrument or lease-back or obligation to the grantee under any

2188    other conveyance for financing, and the holder, lessor or grantee,

2189    as the case may be, elects not to exercise its option to cure such

2190    default, the Village may cure such default, or cause the same to be

2191    cured, prior to completion of any foreclosure, termination of lease

2192    or other remedial proceeding as a result of such default.    In such

2193    event,    the    Village,    or    its    nominee,    shall    be    entitled    to

2194    reimbursement from the Developer, or such other entity, of all

2195    reasonable costs and expenses incurred by the Village in curing the

2196    default (including reasonable attorney's fees).    The Village shall

2197    also be entitled to a lien upon the Subject Property to the extent

2198    of    such    reasonable    costs    and    expenses    (including    reasonable

2199    attorneys' fees).    Any such lien shall be subject to the lien of

2200    the mortgages, deeds of trust and other security instruments, and

02/27/90-H.E.                    70

2201    to the prior interests of a lessor under any lease-back or ground

2202    lease, executed for the purpose of obtaining funds to purchase or

2203    develop the Subject Property, to construct the improvements

2204    contemplated by this Agreement, to finance the costs of such

2205    construction or to pay the costs reasonably related to the

2206    Developer's performing its obligations under this Agreement.

2207    **ARTICLE 15.**   **NO DISCRIMINATION-CONSTRUCTION**

2208    The Developer, in connection with the development of the

2209    Subject Property, shall not discriminate against any employee or

2210    applicant for employment because of race, color, religion, sex or

2211    national origin.  The Developer shall take affirmative action to

2212    require that applicants are employed, and that employees are

2213    treated during employment, without regard to their race, color,

2214    religion, sex or national origin.  Such action shall include, but

2215    not be limited to, the following:  employment upgrading, demotion,

2216    or transfer; recruitment or recruitment advertising, solicitations

2217    or advertisements for employees; layoff or termination; rates of

2218    pay or other forms of compensation; and selection for training,

2219    including apprenticeship.  The Developer agrees to post in

2220    conspicuous places, available to employees and applicants for

2221    employment, notices which may be provided by the Village setting

2222    forth the provisions of this non-discrimination clause.

2223    **ARTICLE 16.**   **NO DISCRIMINATION-USE**

2224    The Developer shall not discriminate against any person, or

2225    group of persons, on account of sex, race, color, religion or

2226    national origin in the sale, lease, sublease, transfer, use,

02/27/90-H.E.          71

FILED DATE: 1/7/2020 8:03 PM   2018CH12683

2227   occupancy, tenure or enjoyment of the Subject Property, nor shall

2228   the Developer establish or permit, or knowingly allow any person

2229   claiming under or through the Developer to establish or permit, any

2230   such practice or practices of discrimination with reference to the

2231   selection, location, number, use, or occupancy of tenants, lessees,

2232   subtenants, sublessees, or vendees of any portion of the Subject

2233   Property.

2234   **ARTICLE 17.   <u>REMEDIES-LIABILITY</u>**

2235   **17.1.   <u>Developer Remedies</u>**

2236   The sole remedies of the Developer in the event of a breach by

2237   the Village in any of the terms of this Agreement shall be: (i) to

2238   institute legal action for specific performance, mandamus or

2239   mandatory injunction against the Village (including the right to

2240   require the Village to make any payment required to be made by this

2241   Agreement and to issue Revenue Bonds); and (ii) to maintain an

2242   action at law for the Developer's actual (but not consequential or

2243   punitive) damages, provided, however, that such right to maintain

2244   an action for actual damages shall be limited to a Village default

2245   in the performance of one or more of the following Village

2246   obligations, which default results in a breach of the terms of this

2247   Agreement:

2248   (a)   The obligation to issue Revenue Bonds, to the extent and

2249   when provided for by the provisions of this Agreement;

2250   (b)   The obligation to make payments to the Developer or

2251   others on construction contracts which have been approved

2252   by the Board of Trustees pursuant to the provisions of

02/27/90-H.E.                    72

2253          this Agreement; and

2254     (c)  The obligation to reimburse the Developer for Project

2255          Costs which the Developer has paid or incurred, to the

2256          extent and when provided for by the provisions of this

2257          Agreement.

2258  In the event the Developer obtains a final non-appealable judgment

2259  against the Village for either legal or equitable relief as

2260  provided above, as a result of a breach of this Agreement by the

2261  Village, the Developer shall be entitled to recover the reasonable

2262  attorneys fees and court costs it has incurred in securing such

2263  judgment.

2264       Notwithstanding the foregoing, the Developer shall have the

2265  right to terminate this Agreement at any time before it occupies

2266  any part of the SMG Home Office Complex upon paying the Village all

2267  costs, expenses, claims, liabilities and all fees including

2268  attorneys fees that the Village has incurred that relate directly

2269  to the creation of the Economic Development Project, the

2270  preparation and adoption of the Economic Development Plan and this

2271  Agreement, as more fully set forth in Article 20.

2272     **17.2.   Village Remedies**

2273       The Village shall have all remedies at law or equity against

2274  the Developer for any breach by the Developer in any of the terms

2275  of this Agreement including the right to reasonable attorneys fees

2276  and court costs, subject to the Developer's right to terminate this

2277  Agreement as set forth in Section 17.1.  Notwithstanding the

2278  foregoing, the Village shall not have the right to maintain an

02/27/90-H.E.                73

FILED DATE: 1/18/2020 5:03 PM    2018CH12683

2279    action against the Developer for consequential or punitive damages.

2280    **17.3.    Defaults-Rights to Cure**

2281    Subject to the extensions of time set forth in Article 13 of

2282    this Agreement, failure or delay by either party to perform any

2283    term or provision of this Agreement shall constitute a default

2284    under this Agreement.  The party who so fails or delays must, upon

2285    receipt of written notice of the existence of such default,

2286    immediately commence to cure, correct or remedy such default and

2287    thereafter proceed with diligence to cure such default.  The party

2288    claiming such default shall give written notice of the alleged

2289    default to the party alleged to be in default specifying the

2290    default complained of by the injured party.  Except as required to

2291    protect against further damages, and except as otherwise expressly

2292    provided in this Agreement, the injured party may not institute

2293    proceedings against the party in default until thirty (30) days

2294    after giving such notice.  If such default is cured within such

2295    thirty (30) day period, the default shall not be deemed to

2296    constitute a breach of this Agreement.  If the default is one which

2297    cannot reasonably be cured within thirty (30) days, and if the

2298    defaulting party shall commence to cure the same within such thirty

2299    (30) day period, said thirty (30) day period shall be extended for

2300    such time as is reasonably necessary for the curing of the same, so

2301    long as the defaulting party diligently proceeds to cure such

2302    default.  If such default is cured within such extended period, the

2303    default shall not be deemed to constitute a breach of this

2304    Agreement.  However, a default not cured as provided above shall

02/27/90-H.E.                        74

2305    constitute a breach of this Agreement. Except as otherwise
2306    expressly provided in this Agreement, any failure or delay by
2307    either party in asserting any of its rights or remedies as to any
2308    default or alleged default or breach shall not operate as a waiver
2309    of any such default or breach or any rights or remedies it may have
2310    as a result of such default or breach.

2311    **17.4.**    **Acts and Omissions of Default**

2312    At the option of the Village, each of the following acts or
2313    omissions of the Developer shall constitute a default under this
2314    Agreement:

2315    (a)    The Developer transfers, or suffers any involuntary
2316    transfer of, the Subject Property in violation of the
2317    terms of Article 18 of this Agreement;

2318    (b)    The Developer files a petition seeking any debtor relief
2319    or executes any instrument for the purpose of effecting
2320    a composition of creditors;

2321    (c)    The Developer makes an assignment for the benefit of
2322    creditors; or

2323    (d)    The Developer is adjudicated as bankrupt.

2324    **17.5.**    **Dispute Resolution**

2325    (a)    If, at any time during the Term of this Agreement, the
2326    Parties do not agree on any of the following three
2327    issues:

2328    (i)    Whether or not a given Project Cost which is
2329    to be paid or financed pursuant to the terms
2330    of this Agreement is "reasonable or necessary"

02/27/90-H.E.            75

2331        to the Economic Development Project;

2332        (ii)    Whether a given Project Cost constitutes a

2333        Village Project Cost; or

2334        (iii)   Whether the Parties have fulfilled their

2335        respective obligations under this Agreement

2336        relative to the issuance of Revenue Bonds;

2337    then, at the option of either the Village or the

2338    Developer, the Parties shall attempt to resolve such

2339    disagreement pursuant to the provisions of this Section

2340    17.5.  If either the Village or the Developer seeks to

2341    exercise such option, notice of such election shall be

2342    given to the other party within thirty (30) days of the

2343    date it first becomes apparent to the Parties that such

2344    disagreement exists.

2345    (b)    If, pursuant to the provisions of the foregoing paragraph

2346    (a), either of the Parties shall seek to resolve a

2347    disagreement that pertains to one of the issues described

2348    in said paragraph (a), such party shall select an expert,

2349    at such party's cost, who shall have the responsibility

2350    to consider the issue in dispute and render an opinion,

2351    within twenty-one (21) days, relative to the resolution

2352    of such disagreement.  If, following the receipt of such

2353    opinion, the other party wishes to retain its own expert,

2354    such other party shall have the right to do so, at such

2355    party's cost, and, in such event, such expert shall also

2356    proceed to consider the issue in dispute and render an

02/27/90-H.E.                    76

2357           opinion, within twenty-one (21) days, relative to the

2358           resolution of such disagreement.  If, after receipt of

2359           the foregoing opinions, the Parties are still unable to

2360           resolve their disagreement, the Parties' respective

2361           experts shall jointly designate a third expert, at a cost

2362           to be shared equally by the Parties, who shall have the

2363           responsibility to consider the issue in dispute and

2364           render such expert's opinion, within twenty-one (21)

2365           days, relative to the resolution of such disagreement.

2366           None of the opinions rendered by any of the foregoing

2367           experts shall be binding on the Parties unless both

2368           Parties agree otherwise.

2369   (c)   Either of the Parties shall have the right, after

2370           completing the procedure provided for in paragraph (b)

2371           above, to seek the resolution of a disagreement in a

2372           trial de novo before the Circuit Court of Cook County.

2373           No damages (actual, consequential or punitive) shall be

2374           claimed by either of the Parties during the period the

2375           Parties are attempting to resolve, or as a result of the

2376           Parties' attempt to resolve, a disagreement pursuant to

2377           the  provisions of the foregoing paragraph (b).

2378   **17.6.**    **Right to Continue Construction Activities**

2379     The Parties acknowledge that one of the primary objectives of

2380 this Agreement is the Developer's timely completion of the SMG Home

2381 Office Complex.  Accordingly, the Village shall not take any action

2382 to delay, hinder or prevent the construction of the SMG Home Office

02/27/90-H.E.             77

2383   Complex, or the construction of any of the Public Site
2384   Improvements, notwithstanding any actual or alleged breach or
2385   default by the Developer in any of the obligations imposed on the
2386   Developer by the terms of this Agreement that relate to the payment
2387   or financing of Project Costs, and notwithstanding the pendency of
2388   any dispute resolution or court proceeding under Section 17.5
2389   hereof.  The foregoing shall not preclude the Village from taking
2390   any action against the Developer in the event of a violation of any
2391   law, ordinance or regulation or the exercise of the Village's
2392   police powers in the public interest.

2393   **ARTICLE 18.   ASSIGNMENT OF DEVELOPER RIGHTS AND**
2394   **OBLIGATIONS/CONVEYANCES OF THE SUBJECT PROPERTY**

2395   **18.1.   Assignment of Developer Rights and Obligations**

2396   The rights and obligations of the Developer under this
2397   Agreement shall not be assigned except as provided by this Section
2398   18.1.

2399   (a)   The term "Developer", as used in this Section 18.1, shall
2400   mean only:

2401   (i)   Sears, Roebuck and Co., a New York
2402   corporation;

2403   (ii)   Any entity which is a parent, controlling
2404   shareholder (i.e. owning fifty-one percent
2405   (51%) or more of the capital stock), or fifty-
2406   one percent (51%) or more owned subsidiary of
2407   Sears, Roebuck and Co.;

2408   (iii)   Any entity which is owned, to the extent of at
2409   least a fifty-one percent (51%) controlling

02/27/90-H.E.                    78

2410                 interest, by Sears, Roebuck and Co. or an

2411                 entity described in the foregoing paragraph

2412                 (ii); and

2413       (iv)    Any entity to whom the Developer has conveyed

2414                 a portion of the Subject Property consisting

2415                 of one hundred (100) acres or more and

2416                 assigned its rights under this Agreement

2417                 pursuant to Section 18.2.

2418   (b)    Except as provided in paragraph (c) of this Section 18.1,

2419         all rights of the Developer established by the terms of

2420         this Agreement shall inure solely to the benefit of the

2421         Developer and shall not be subject to assignment by the

2422         Developer and, specifically but without limitation, the

2423         Village shall not be required to issue Revenue Bonds in

2424         order to satisfy and pay for Project Costs except for the

2425         Developer.

2426   (c)    The following rights established by the terms of this

2427         Agreement shall inure to the benefit of: (i) the

2428         Developer; and (ii) any assignee of such rights acquiring

2429         an ownership interest in the Subject Property pursuant to

2430         a sale or conveyance of a portion of the Subject Property

2431         (or pursuant to an assignment of an interest in a

2432         corporation, partnership or land trust) that does not

2433         violate Section 18.2 of this Agreement:

2434       (i)    The right to have costs incurred in

2435                 furtherance of the Economic Development Plan

02/27/90-H.E.          79

and the Development deemed Project Costs (to the fullest extent permitted by law) and, subject to the rights of holders of any Obligations and subject to the provisions of paragraph (b) above, to have such Project Costs paid for, financed or reimbursed pursuant to Article 6 of this Agreement;

(ii)   The right to challenge real estate taxes (as provided in Section 9.2 of this Agreement);

(iii)   The right to develop the Subject Property without regard to then existing Village donation requirements (as provided in Section 10.6 of this Agreement);

(iv)   The right to maintain an action against the Village and to only recover reasonable attorneys fees and court costs from the Village in the event of a Village default under the provisions of this Agreement (as provided in Section 17.1 of this Agreement); and

(v)   The right to sell, convey, mortgage, lease and otherwise transfer interests in and to the Subject Property (subject to the limitations of, and as provided for in, Section 18.2 of this Agreement).

(d)   Except as provided in paragraph (e) of this Section 18.1,

02/27/90-H.E.                    80

all obligations, including Developer's indemnification obligations under Article 20 of this Agreement, of the Developer established by the terms of this Agreement shall be solely the obligations of the Developer.

(e)   With respect to the development of the various portions of the Subject Property, the following obligations shall be the obligations of the party or entity undertaking such development or causing such development to be undertaken:

 (i)   The obligation to devote such portion of the Subject Property as is being developed to only the uses specified in the Economic Development Plan (as provided in Section 3.4 of this Agreement);

 (ii)   The obligation to procure and maintain insurance covering construction on such portion of the Subject Property (as provided in Section 3.5 of this Agreement);

 (iii)   The obligation to submit plats and plans, and to undertake construction, in accordance with the codes and ordinances of the Village (as provided in Section 3.6 of this Agreement);

 (iv)   The obligation to refrain from protesting real estate taxes or assessed valuations of the Subject Property (as provided in Section 9.1 of this Agreement);

02/27/90-H.E.                    81

2488         (v)    The obligation to grant and provide

2489                  dedications, easements and rights of way

2490                  necessary to the development of such portion

2491                  of the Subject Property (as provided in

2492                  Article 19 of this Agreement); and

2493         (vi)   The obligation to indemnify the Village

2494                  against costs and expenses incurred by the

2495                  Village as a result of construction activities

2496                  on such portion of the Subject Property and as

2497                  a result of the negligence of general

2498                  contractors, subcontractors and their

2499                  respective employees (as provided in Article

2500                  20 of this Agreement).

2501    **18.2.**   <u>**Conveyances of the Subject Property**</u>

2502      The Developer shall have the right to sell, convey, mortgage,

2503 lease and otherwise transfer interests in and to the Subject

2504 Property without limitation and without the approval of the Village

2505 provided, however, that:

2506      (a)   The Developer shall not sell or transfer any interest in

2507               and to that portion of the Phase I Site on which the SMG

2508               Home Office Complex is to be constructed until issuance

2509               by the Village of the first occupancy permit for the SMG

2510               Home Office Complex and until after the Developer's

2511               Merchandise Group, or another entity, division or group

2512               controlled or owned by Developer, shall have occupied the

2513               SMG Home Office Complex for at least ten (10) years

2514          following the SMG Occupancy Date; and

2515    (b)   If:

2516          (1)   The Developer seeks to sell, transfer or convey any

2517                portion of the Subject Property consisting of one

2518                hundred (100) acres or more; and

2519          (2)   The Developer seeks to be relieved of liability

2520                under this Agreement with respect to such portion

2521                of the Subject Property; and

2522          (3)   Bonds are outstanding;

2523          then the Village shall have the right to require that any

2524          purchaser/grantee of such portion of the Subject Property

2525          satisfy the following conditions and meet the following

2526          standards:

2527                (i)   Any such purchaser/grantee shall have the

2528                      experience and financial responsibility

2529                      necessary to fulfill the Developer's

2530                      obligations under this Agreement (to the

2531                      extent applicable to such portion of the

2532                      Subject Property);

2533                (ii)  Any such purchaser/grantee shall have expressly

2534                      assumed, in writing, the Developer's

2535                      obligations under this Agreement (to the

2536                      extent applicable to such portion of the

2537                      Subject Property);

2538                (iii) All instruments confirming the matters

2539                      specified in the foregoing paragraphs (i) and

02/27/90-H.E.                    83

2540    (ii) Shall be submitted to the Village for

2541    review and approval (which approval shall not

2542    be unreasonably withheld or delayed).

2543    Upon the occurrence of a sale or conveyance that satisfies the

2544    foregoing conditions and meets the foregoing standards, the

2545    Developer shall be relieved of all liability under this Agreement

2546    (to the extent applicable to such portion of the Subject Property).

2547    No conveyance of a portion of the Subject Property consisting of

2548    one hundred (100) acres or more that fails to satisfy the foregoing

2549    conditions or meet the foregoing conditions, shall be deemed to

2550    relieve the Developer of any of its obligations under this

2551    Agreement with respect to such portion of the Subject Property.

2552    The provisions of this Section 18.2 are intended to be

2553    applicable to a sale and assignment of a beneficial interest in a

2554    land trust, a sale and assignment of partnership interests, a sale

2555    and transfer of capital stock in a corporation, and other

2556    comparable transactions which would effectively frustrate the

2557    spirit and intent of these provisions. However, the provisions of

2558    this Section 18.2 are not intended to preclude or be applicable to,

2559    and such provisions shall not preclude or be applicable to, the

2560    financing, refinancing, sale-leaseback or leasing of any portion of

2561    the Subject Property by the Developer; the sale or transfer of any

2562    interest in and to the Subject Property to an entity controlled or

2563    owned by the Developer; or an assignment of a beneficial interest

2564    in a land trust to, the assignment of partnership interests to, or

2565    the transfer of capital stock in a corporation to an entity

02/27/90-H.E.                    84

2566    controlled or owned by the Developer. Any entity in which the

2567    Developer holds more than a fifty percent (50%) interest shall be

2568    considered to be controlled or owned by the Developer for purposes

2569    of this Section 18.2.

2570    **18.3.**    The terms and provisions of this Agreement shall be

2571    binding upon and inure to the benefit of the Corporate Authorities

2572    (including successor Corporate Authorities).

2573    **ARTICLE 19.**    **DEDICATIONS AND EASEMENTS**

2574    The Developer, at no cost to the Village, shall grant and

2575    provide all reasonable street dedications and permanent and

2576    temporary easements and rights-of-way reasonably requested by the

2577    Village in connection with the Development, including, but not

2578    limited to, easements and rights-of-way for vehicular access,

2579    pedestrian access, parking facilities, sanitary sewers, storm

2580    drains, water lines, street lighting, and electrical power,

2581    telephone, cable TV and natural gas lines.

2582    **ARTICLE 20.**    **DEVELOPER INDEMNIFICATION**

2583    (a)    The Developer shall indemnify and hold harmless the

2584        Village, its agents, officers and employees, against all

2585        injuries, deaths, losses, damages, claims, suits,

2586        liabilities (including any liability under the Illinois

2587        Structural Work Act, known as the Scaffolding Act),

2588        judgments, costs and any reasonable expenses of

2589        consultants, lawyers and other reasonable expenses of any

2590        type, except Village Project Costs, that are directly or

2591        indirectly related to the creation of the Economic

02/27/90-H.E.            85

2592    Development Project, the preparation or adoption of the

2593    Economic Development Plan and this Agreement, including,

2594    but not limited to any breach of the terms of this

2595    Agreement by the Developer; the sale and use of any Bonds

2596    pursuant to this Agreement (other than General Obligation

2597    Bonds and other Village Obligations secured solely by the

2598    Village's portion of the Allocated Tax Increment Revenue

2599    Amounts); the Developer's improvement of the Subject

2600    Property and construction of the Development, and from

2601    any negligence or reckless misconduct of the Developer,

2602    its general contractor or its employees and agents, or of

2603    a subcontractor of the general contractor or his

2604    employees, if any, in connection therewith, and the

2605    Developer shall, at its own expense, appear, defend and

2606    pay all charges of attorneys and costs and other expenses

2607    arising therefrom or incurred in connection with any

2608    claim for which the Developer is responsible hereunder,

2609    and, if any judgment shall be rendered against the

2610    Village, its agents, officials or employees in any such

2611    action involving any claim for which the Developer is

2612    responsible hereunder, the Developer shall, at its own

2613    expense, satisfy and discharge the same. The Developer

2614    expressly understands and agrees that the insurance

2615    protection required by Section 3.5 of this Agreement

2616    shall in no way limit the responsibility to indemnify,

2617    hold harmless and defend as herein provided in this

02/27/90-H.E.                    86

FILED DATE: 1/7/8/2020 8:03 PM    2018CH12683

2618    Article 20, but to the extent a particular claim, action

2619    or liability is covered by such insurance, the Developer

2620    shall be released of liability hereunder.

2621    (b)    The indemnification obligations of the Developer

2622    contained in the foregoing paragraph (a) shall not extend

2623    to injuries, deaths, losses, damages, claims, suits,

2624    liabilities, judgments, costs and expenses incurred as a

2625    result of or arising out of: (i) the negligence or

2626    reckless misconduct of the Village, its officers, agents,

2627    employees and contractors; (ii) obligations which the

2628    Village has agreed to pay or incur pursuant to the

2629    provisions of this Agreement; (iii) the Village's breach

2630    in any of the terms of this Agreement; (iv) the Village's

2631    construction of the Public Works and Improvements and the

2632    Sanitary Sewer Improvements; and (iv) the Village's

2633    improvement and use of the Village Municipal Site.

2634    **ARTICLE 21.    AMENDMENT/INTEGRATION**

2635    This Agreement, and any exhibits attached hereto, may be

2636    amended only by the mutual consent of the Parties with, on the part

2637    of the Village, the adoption of an ordinance or resolution of the

2638    Board of Trustees approving said amendment, as provided by law, and

2639    by the execution of said amendment by the Parties or their

2640    successors in interest.  The Amendment to the Annexation Agreements

2641    and this Agreement, when both are fully executed by the Parties,

2642    shall constitute the entire understanding and agreement of the

2643    Parties relative to the subject matter hereof superseding all prior

02/27/90-H.E.                    87

2644   agreements, negotiations and discussions relative to such subject

2645   matter.  All exhibits to this Agreement are expressly incorporated

2646   herein by this reference thereto.

2647        **ARTICLE 22.**   **DUPLICATE ORIGINALS**

2648       This Agreement is executed in four (4) duplicate originals,

2649   each of which is deemed to be an original.

2650        **ARTICLE 23.**   **TIME IS OF THE ESSENCE**

2651       Time is of the essence of this Agreement.

2652        **ARTICLE 24.**   **TERM**

2653       This Agreement shall remain in full force and effect until

2654   termination of the Project Area and the Economic Development Plan

2655   or until otherwise terminated pursuant to the terms hereof.

2656        **ARTICLE 25.**   **INTERPRETATION**

2657       The  laws  of  the  State  of  Illinois  shall  govern  the

2658   interpretation and enforcement of the terms and provisions of this

2659   Agreement.

2660        **ARTICLE 26.**   **SEVERABILITY.**

2661       In the event any phrase, paragraph, article or portion of this

2662   Agreement is found to be invalid, illegal or unenforceable by any

2663   court  of  competent  jurisdiction,  such  finding  of  invalidity,

2664   illegality  or  unenforceability  as  to  that  phrase,  paragraph,

2665   article  or  portion  shall  not  affect  the  validity,  legality  or

2666   enforceability of the remaining portions  of this Agreement.

2667        **ARTICLE 27.**   **CAPTIONS AND PRONOUNS.**

2668       The captions and headings of the various articles and sections

2669   of this Agreement are for convenience only, and are not to be

02/27/90-H.E.             88

2670   construed as confining, defining, expanding or limiting in any way

2671   the scope or intent of the provisions hereof.  Whenever the context

2672   requires or permits, the singular shall include the plural, the

2673   plural shall include the singular, and the masculine, feminine and

2674   neuter shall be freely interchangeable.

2675

02/27/90-H.E.                    89

2676    **IN WITNESS WHEREOF** this Agreement has been duly authorized and

2677    approved by the President and Board of Trustees of the Village of

2678    Hoffman Estates, Cook and Kane Counties, Illinois, and executed by

2679    the Parties as of the day and year first above set forth.

2680
2681                                        **VILLAGE:**
2682
2683                                        **VILLAGE OF HOFFMAN ESTATES,** an
2684                                        Illinois home rule municipal
2685                                        corporation
2686
2687
2688                                        By: _____
2689                                            Its:   Village President
2690
2691    **ATTEST:**
2692
2693
2694    By: _____
2695        Its:  Village Clerk
2696        (Seal)
2697
2698                                        **DEVELOPER:**
2699
2700                                        **SEARS, ROEBUCK AND CO.,** A New
2701                                        York corporation
2702
2703
2704                                        By: _____
2705                                            Its:  Chairman and Chief
2706                                                  Executive Officer
2707                                                  Merchandise Group
2708
2709                                                      APPROVED
2710    **ATTEST:**
2711
2712
2713    By: _____
2714        Its:  Assistant Secretary
2715        (Seal)
2716
2717
2718
2719
2720
2721
2722
2723

02/27/90-H.E.                           90

## LIST OF EXHIBITS

EXHIBIT A          Summary of Acquisition Contracts

EXHIBIT B          Phase I – Allocated Tax Increment Revenue Amounts

EXHIBIT C          Phase II – Allocated Tax Increment Revenue Amounts

EXHIBIT D          Legal Description of the Phase I Site

EXHIBIT E          Legal Description of the Phase II Site

EXHIBIT F          Legal Description of the Hoffman Estates Economic
                   Development Project Area

EXHIBIT G          Depiction   of   the   Hoffman   Estates   Economic
                   Development Project Area

EXHIBIT H          Phase I Development Public Site Improvements

EXHIBIT I          Phase II Development Public Site Improvements

EXHIBIT J          Public Works and Improvements

EXHIBIT K          General Depiction of Portion of Phase I Site to
                   Contain SMG Home Office Complex

EXHIBIT L          SMG Occupancy Date Notice

EXHIBIT M          Legal Description of Subject Property

EXHIBIT N          Contracts   in   Existence   or   To   Be   Let   by   the
                   Developer

EXHIBIT O          Property Assembly Costs Paid, Incurred, or Known by
                   the Developer as of the Date of this Agreement

EXHIBIT P          Project Costs Paid or Incurred by the Developer as
                   of the Date of this Agreement in Connection with
                   Construction of the Public Site Improvements

02/27/90-H.E.                      91

## EXHIBIT A

## SUMMARY OF ACQUISITION CONTRACTS

1. **Origer Property** – Two (2) Contracts – Approximately 520 acres

   I.   Date of Contracts:  June 23, 1989

   II.  Owners:

       1.   Approximately 360 acres are owned by two (2) land trusts having as beneficiary The Thomas J. Origer Inter-Vivos Trust;

       2.   Approximately 160 acres are owned by two (2) land trusts with beneficial owners being the children of Thomas J. Origer (seven individuals).

   III. Purchase Price:

       1.   $ *  per square foot;

       2.   $  *  (in the aggregate)

   IV.  Closing Date:  The thirtieth (30th) day following the earlier to occur of: (i) satisfaction of zoning contingency; and (ii) June 23, 1990.  If extended the Closing Date shall be no later than October 24, 1990.

B. **Nederlander Property** – Two (2) Contracts – Approximately 221 acres

   I.   Date of Contracts:  June 24, 1989.

   II.  Owner:  LaSalle National Bank Trust No. 54757 having as beneficiary Ned-Prop, an Illinois joint venture.

   III. Purchase Price:

       1.   $  *  per square foot;

       2.   $  *  (in the aggregate)

   IV.  Closing Date:  The thirtieth (30th) day following the earlier to occur of: (i) satisfaction of zoning contingency; and (ii) June 25, 1990.  If extended the Closing Date shall be no later than September 24, 1990.

   V.   Leaseback:  Poplar Creek Music Theatre is to be leased to the Seller at closing for an initial period (with renewal rights provided it does not interfere with Sears' development) for a rent of $1.00 per year.


*   Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

FILED DATE: 1/28/2020 6:03 PM   2018CH12683

C.   **Studz Property** – Approximately 40 acres

   I.   Date of Contract:  June 25, 1989

   II.   Owner:  Charter Bank and Trust Company Trust No. 769 having as beneficiary Ruth Studz

   III.   Purchase Price:

      1.   $___*___ per square foot (based on 40 acres);

      2.   $_____*_____ (in the aggregate)

   IV.   Closing Date:  the thirtieth (30th) day following the earlier to occur of: (i) satisfaction of zoning and annexation contingency; and (ii) June 25, 1990. If extended the Closing Date shall be no later than October 24, 1990.

D.   **"Watson" Property** – Approximately 7 acres

   I.   Date of Contract:  June 26, 1989

   II.   Owner:  Sutton Road Partnership, an Illinois general partnership (Contract Buyer)

   III.   Purchase Price:

      1.   $___*___ per square foot

      2.   $_____*_____ in the aggregate

   IV.   Closing Date:  Property was acquired on September 7, 1989.

E.   **Totals**:

Acreage:  Approximately 788 acres

Purchase Price: Approximately $_____*_____ or $___*___ per square foot

---

\*   Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

## EXHIBIT B

## PHASE I
## ALLOCATED TAX INCREMENT REVENUE AMOUNTS

| YEAR | COLUMN 1<br>Total Amount of Phase I<br>Tax Increment Revenues<br>which are to be Received<br>and Deposited in Fund<br>for Benefit of Village<br>and Other Taxing Districts | COLUMN 2<br><br>Portions of<br>Column 1 Amounts<br>which are Subject<br>to Disbursement<br>to the Village |
|---|---|---|
| 1st Year of Payment | $2,000,000 | $1,500,000 |
| 2nd | 2,100,000 | 1,575,000 |
| 3rd | 2,205,000 | 1,653,750 |
| 4th | 2,315,250 | 1,736,438 |
| 5th | 2,431,013 | 1,823,260 |
| 6th | 3,000,000 | 2,250,000 |
| 7th | 3,150,000 | 2,362,500 |
| 8th | 3,307,500 | 2,480,625 |
| 9th | 3,472,875 | 2,604,656 |
| 10th | 3,646,519 | 2,734,889 |
| 11th | 3,828,845 | 2,871,634 |
| 12th | 4,020,287 | 3,015,215 |
| 13th | 4,221,301 | 3,165,976 |
| 14th | 4,432,366 | 3,324,275 |
| 15th | 4,653,985 | 3,490,488 |
| 16th | 4,886,684 | 3,665,013 |
| 17th | 5,131,018 | 3,848,264 |
| 18th | 5,387,569 | 4,040,677 |
| 19th | 5,656,947 | 4,242,711 |
| 20th | 5,939,795 | 4,454,846 |

FILED DATE: 1/7/2020 8:03 PM   2018CH12683

## EXHIBIT C

### PHASE II
### ALLOCATED TAX INCREMENT REVENUE AMOUNTS

| YEAR | PERCENTAGE OF PHASE II TAX INCREMENT REVENUES WHICH ARE TO BE PAID TO TAXING DISTRICTS |
|------|------|
| 1st year of payment | 15 |
| 2nd | 15 |
| 3rd | 15 |
| 4th | 15 |
| 5th | 15 |
| 6th | 20 |
| 7th | 20 |
| 8th | 20 |
| 9th | 20 |
| 10th | 20 |
| 11th | 25 |
| 12th | 25 |
| 13th | 25 |
| 14th | 25 |
| 15th | 25 |
| 16th | 30 |
| 17th | 30 |
| 18th | 30 |
| 19th | 30 |
| 20th | 30 |

FILED DATE: 1/7/2020 6:03 PM   2018CH12683

## EXHIBIT D

## LEGAL DESCRIPTION OF THE PHASE I SITE

That part of the Northeast 1/4 of Section 31, and that part of the Northwest 1/4 of Section 32, all in Township 42 North, Range 9 East of the Third Principal Meridian, more particularly described as follows:

Commencing at the Southwest corner of the Northwest 1/4 of said Section 32, thence Westerly along the Southline of the Northeast 1/4 of said Section 31, North 89 degrees 42 minutes 57 seconds West, a distance of 1,320.70 feet to a point on the West line of the East 1/2 of the Northeast 1/4 of said Section 31, said point being the point of beginning; thence Northerly along said West line, North 00 degrees 25 minutes 04 seconds East, a distance of 2,432.03 feet to a point on the Southwesterly line of Higgins Road (Route 72) as recorded per documents: No. 12079013, recorded November 8, 1937, No. 12284905, recorded March 20, 1939, No. 12309896, recorded May 10, 1939, and No. 12647599, recorded March 27, 1941, the following three courses:

(1)    A distance of 189.90 feet along an arc of a circle, convex to the Southwest, having a radius of 10,257.06 feet, and whose chord of 189.90 feet bears South 82 degrees 59 minutes 46 seconds East;

(2)    South 83 degrees 31 minutes 35 seconds East, a distance of 2,317.28 feet;

(3)    A distance of 1,239.98 feet along an arc of a circle, convex to the Northeast, having a radius of 9,965.07 feet, and whose chord of 1,239.18 feet bears South 79 degrees 57 minutes 42 seconds East;

Thence South 13 degrees 53 minutes 26 seconds West, 29.15 feet; thence Southerly along a curve tangent to the last described course, concave Easterly having a radius of 1,550.00 feet, an arc distance of 582.50 feet, and whose chord bears South 03 degrees 07 minutes 28 seconds West, a distance of 579.08 feet; thence South 07 degrees 38 minutes 30 seconds East, tangent to the last described course, a distance of 150.00 feet; thence Southwesterly along a curve concave Northwesterly having a radius of 1,350.00 feet, an arc distance of 2,402.00 feet, and whose chord bears South 43 degrees 19 minutes 50 seconds West, a distance of 2,097.46 feet; thence North 85 degrees 41 minutes 51 seconds West, tangent to the last described course, a distance of 150.00 feet; thence Northwesterly along a curve concave Northeasterly having a radius of 3,450.00 feet, an arc distance of 539.63 feet, and whose chord bears North 81 degrees 12 minutes 59 seconds West, a distance of 539.08 feet; thence North 76 degrees 44 minutes 08 seconds West, tangent to the last described course, a distance of 170.49 feet; thence Northwesterly along a curve concave Southwesterly having a radius of 3,550.00 feet, an arc distance of 789.05 feet and whose chord bears North 83 degrees 06 minutes 11 seconds West, a distance of 787.43 feet; thence North 89 degrees 28 minutes 15 seconds West, a distance of 642.09 feet to a point on the West line of the East 1/2 of the Northeast 1/4 of aforementioned Section 31; thence Northerly along said West line, North 00 degrees 31 minutes 45 seconds East a distance of 116.16 feet to the point of beginning all in Cook County, Illinois. Containing 8,762,404 square feet (201.157 acres) of land, more or less.

## EXHIBIT E

### LEGAL DESCRIPTION OF THE PHASE II SITE

The Phase II Site is legally described as that certain real property legally described on Exhibit M as the Subject Property excepting therefrom that certain real property legally described on Exhibit D as the Phase I Site.

## EXHIBIT F

### LEGAL DESCRIPTION OF THE HOFFMAN ESTATES
### ECONOMIC DEVELOPMENT PROJECT AREA

That part of the East 1/2 of the East 1/2 of Section 31, lying South of the Northerly line of Higgins Road (S.R. 72) and North of the Southerly line of Section 31, and excluding property owned by the Northwest Tollroad; also that part of Section 32, lying South of the Northerly line of Higgins Road; North of the Southerly line of the Section 32 and excepting those portions of right-of-way (100' wide) belonging to E. J. & E. Railway (except the southerly 300' within the Northeast 1/4 of Section 32); and excluding property owned by the Northwest Tollway; also that part of the Southwest 1/4 of the Northwest 1/4 and the West 1/2 of the Southwest 1/4 of Section 33 lying south of the Northerly line of Higgins Road and North of the Southerly line of Section 33 except that portion of property owned by the Northwest Tollway; also the entire right-of-way of Beverly Road from the Northerly Line of Higgins Road to the Southerly Line of Section 31; also, that part of the east 1/2 of the Southwest 1/4 of Section 33 along with the Southeast 1/4 of the Northwest 1/4 of Section 33 lying south of the southerly line of Higgins Road right-of-way, except that portion of property owned by the Northwest Tollway, all of the above being in Township 42 North, Range 9, West of the Third Principal Meridian, in Cook County, Illinois. Also, that part of Section 4 lying Easterly of the Easterly right of way line of the Elgin, Joliet and Eastern Railroad Company and North of the Northerly Line of the Northern Illinois State Toll Highway Commission right of way, and that part of the West half of the West Half of Section 3, Township 41, North, Range 9, East of the Third Principal Meridian, lying North of the. Northerly line of the Northern Illinois State Toll Highway Commission right of way, in Cook County, Illinois, and that part of the East half of the West half of fractional Section 3, lying North of the Northerly right of way line of the Northern Illinois State Toll Highway, excepting therefrom that part thereof conveyed to the Northern Illinois State Toll Highway Commission by instrument recorded May 13, 1957, as document 16902251 in Township 41 North, Range 9, East of the Third Principal Meridian, in Cook County, Illinois, and also except the following described parcels located in Township 42 North, Range 9, West of the Third Principal Meridian in Cook County, Illinois.

That part of the South 20.04 chains of the East 1/2 of the Southwest 1/4 of Section 33 lying South and East of the Northwesterly line of property owned by the Northwest Tollroad (Interstate 90) and lying south and East of New Sutton Road (S.R. 59);

Also that part of the Northeast 1/4 of the Southwest 1/4 of Section 33 lying West of the Westerly line of the New Sutton Road (S.R. 59) Right of Way;

Also that part of the Southeast 1/4 of the Northwest 1/4 of Section 33 lying South of the Southerly line of the Higgins Road (S.R. 72) Right of Way.

# ECONOMIC DEVELOPMENT PROJECT BOUNDARY
## HOFFMAN ESTATES
## ECONOMIC DEVELOPMENT AREA

VILLAGE OF HOFFMAN ESTATES

TESKA
ASSOCIATES
INC.




**EXHIBIT G**

**DEPICTION OF THE HOFFMAN ESTATES ECONOMIC DEVELOPMENT PROJECT AREA**

## EXHIBIT H

## PHASE I DEVELOPMENT PUBLIC SITE IMPROVEMENTS

The following is a description of the Phase I Development Public Site Improvements, as that term is used in the Agreement. The Phase I Development Public Site Improvements consist of those public streets, public utilities and other public site improvements which are constructed, or to be constructed, by, or under the direction of, the Developer, and all activities which are undertaken in connection with such construction: (i) within the Phase I Site; or (ii) outside the boundaries of the Phase I Site but within the Project Area and in connection with, or in furtherance of, the use, occupancy, and development of the Phase I Site; or (iii) outside the boundaries of the Project Area (to the extent such public streets, public utilities and public improvements are essential to the preparation of the Project Area in accordance with the Economic Development Plan). Natural gas, electric and telephone service shall not be included within the definition of "public utilities", as used above, except to the extent that they relate to natural gas, electric and telephone service improvements which are to be dedicated to, and owned by, the Village (e.g. public street lights).

The Phase I Site encompasses that portion of the Subject Property consisting of approximately two hundred (200) acres, which is located in the northwest corner of the Subject Property.

Specifically, the Phase I Development Public Site Improvements consist of the following:

A.    **DEMOLITION**

Demolition and removal of existing structures within the Phase I Site and removal of all waste piles, underground storage tanks, if any, and similar conditions.

B.    **EARTHWORK**

Earth-moving and grading within the Project Area to prepare for the construction and installation of the Phase I Development Public Site Improvements and construction of necessary storm water management improvements.

C.    **WETLANDS MITIGATION**

Processing of necessary wetlands regulatory applications, satisfaction of all wetlands regulatory requirements, wetlands protection, and engineering and implementation of wetlands mitigation plans for the Subject Property.

D.    **SANITARY SEWER**

Construction of necessary sanitary sewer mains and lines; lifts station and appurtenances; and acquisition of the easements and rights-of-way necessary to such construction. These improvements include, without limitation, essential trunk sewer mains from existing Metropolitan Water

Reclamation District lines to the Project Area; sewer mains and lines through the Phase II Site and to the Phase I Site; and arterial sewer lines, and feeder lines from arterial sewer lines to structures, as required throughout the Phase I Site.

E.    **WATER MAINS**

Construction of necessary potable water mains and lines and appurtenant facilities, and acquisition of the easements and rights-of-way necessary to such construction. This includes the construction of trunk mains located outside the Project Area that connect the Project Area to existing Village or Joint Area Water Association (JAWA) water mains; and the construction of arterial water lines through the Phase II Site, as necessary to connect the Subject Property to the existing municipal water system.

F.    **ROADWAYS**

Construction of necessary roadways and ancillary roadway improvements and acquisition of the easements and right-of-ways necessary to such construction. These roadways and ancillary roadway improvements shall include the following (or their equivalents):

(a)    *

(b)    *

(c)    *

(d)    *

Construction of each of the foregoing roadway improvements may include, but shall not be limited to: (i) levelling and grading of earth; (ii) preparation of roadbed; (iii) paving; (iv) construction of curbs, sidewalks and gutters; (v) landscaping of medians and shoulders; (vi) installation of storm sewers; (vii) installation of street lighting; and (viii) installation of traffic signals.

G.    **PIPELINE RELOCATION**

Relocation of existing pipeline(s) so as to permit construction of infrastructure and structures.

H.    **INDIRECT COSTS**

Permit costs and fees related to the construction of all Phase I Development Public Site Improvements.

---

*   Document on file. Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

**EXHIBIT I**

## PHASE II DEVELOPMENT PUBLIC SITE IMPROVEMENTS

The following is a description of the Phase II Development Public Site Improvements, as that term is used in the Agreement. The Phase II Development Public Site Improvements consist of those public streets, public utilities and other public site improvements which are constructed, or to be constructed, by, or under the direction of, either the Village or the Developer, and all activities which are undertaken in connection with such construction: (i) within the Phase II Site; or (ii) outside the boundaries of the Phase II Site but within the Project Area and in connection with, or in furtherance of, the use, occupancy, and development of the Phase II Site; or (iii) outside the boundaries of the Project Area (to the extent such public streets, public utilities and public improvements are essential to the preparation of the Project Area for use in accordance with the Economic Development Plan). Natural gas, electric and telephone service shall not be included within the definition of "public utilities", as used above, except to the extent that they relate to natural gas, electric and telephone service improvements which are to be dedicated to, and owned by, the Village (e.g. public street lights).

The Phase II Site consists of the Subject Property, exclusive of the Phase I Site. The Phase II Site consists of approximately five hundred eighty-eight (588) acres and includes the PCMT Property.

Specifically, the Phase II Development Public Site Improvements consist of the following:

A.    **DEMOLITION**

Demolition and removal of the remaining structures within the Project Area.

B.    **EARTHWORK**

Earth-moving and grading within the Project Area to prepare for the construction and installation of the Phase II Development Public Site Improvements and construction of necessary storm water management improvements.

C.    **SANITARY SEWER**

Construction of necessary sanitary sewer mains and lines, lift station and appurtenances, and acquisition of the easements and right-of-ways necessary to such construction. This includes, without limitation, construction of sanitary sewer mains and lines throughout the Phase II Site; construction of arterial lines from sanitary sewer trunk mains to structures located within the Phase II Site; and construction of all other sanitary sewer mains and lines, lift station and appurtenances that are essential to the preparation of the Project Area in accordance with the Economic Development Plan (except for those sewer mains and lines, lift stations and appurtenances constructed as Phase I Development Public Site Improvements).

D.  **WATER MAINS**

Construction of necessary potable water mains and lines and appurtenant facilities, and acquisition of the easements and rights-of-way necessary to such construction.  This includes, without limitation, construction of feeder lines from arterial lines to structures located within the Phase II Site; and all other water mains and lines and other appurtenant facilities essential to the preparation of the Project Area in accordance with the Economic Development Plan (except for those water mains and lines and appurtenant facilities constructed as Phase I Development Public Site Improvements).

E.  **ROADWAYS**

Construction of necessary roadways and ancillary roadway improvements and acquisition of the easements and rights-of-way necessary to such construction.  These roadways and ancillary roadway improvements shall include the following (or their equivalents):

(a)   *

(b)   *

(c)   *

(d)   *

(e)   *

(f)   *

(g)   *

(h)   *

(i)   *

(j)   *

Construction of each of the foregoing roadway improvements may include, but shall not be limited to: (i) levelling and grading of earth; (ii) preparation of roadbed; (iii) paving; (iv) construction of curbs, sidewalks and gutters; (v) landscaping of medians and shoulders; (vi) installation of storm sewers; (vii) installation of street lighting; and (viii) installation of traffic signals.

F.  **INDIRECT COSTS**

Permit costs and fees related to the construction of all Phase II Development Public Site Improvements.

---

*  Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

Exhibit "J"
1 of 1

## PUBLIC WORKS AND IMPROVEMENTS

The following is a list of Public Works and Improvements which are to be constructed, by or on behalf of the Village and all activities which are undertaken in connection with such construction, which are authorized by this Agreement and the Economic Development Plan which the Parties agree are reasonable or necessary.  This Exhibit may be amended by the parties, from time to time, pursuant to the provisions of this Agreement.

1.   VILLAGE MUNICIPAL FACILITY

2.   VILLAGE WATER TANK

3.   INDIRECT COSTS

   Fees related to the construction of Public Works and Improvements listed herein or as otherwise allowed by the provisions of this Agreement.

Exhibit J

FILED DATE: 1/7/2020 6:03 PM    2018CH12683



## SMG OCCUPANCY DATE NOTICE

Village of Hoffman Estates
1200 North Gannon Drive
Hoffman Estates, IL  60196
Attn:  Village Manager

Village of Hoffman Estates
1200 North Gannon Drive
Hoffman Estates, IL  60196
Attn:  Corporation Counsel

Re:    SMG Occupancy Date Notice Given Pursuant to
Economic Development Agreement Dated By and Between
the Village of Hoffman Estates and Sears, Roebuck
and Co., ("Agreement")

Date: _____

Ladies and Gentlemen:

This will confirm that Sears, Roebuck and Co., as Developer under the Agreement, has received the last governmental permit or approval necessary to its commencement of construction of the SMG Home Office Complex.

All terms not otherwise defined herein shall have the meanings given them in the Agreement.

SEARS, ROEBUCK AND CO., a
New York Corporation

By: _____
Its: _____

CC:    Senior Vice President - Sears/Resources and Administration
General Counsel - Sears Merchandise Group
Thomas Tully, Esq.
J. Kevin Garvey, Esq.
Harold W. Francke, Esq.

Exhibit L

## EXHIBIT M

## LEGAL DESCRIPTION OF SUBJECT PROPERTY

THAT PART OF THE EAST ½ OF SECTION 31, AND THAT PART OF SECTION 32, AND THAT PART OF THE WEST ½ OF SECTION 33, ALL IN TOWNSHIP 42 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, AND ALSO THAT PART OF FRACTIONAL SECTION 3, AND FRACTIONAL SECTION 4, BOTH IN TOWNSHIP 41 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST ¼ OF SAID SECTION 32;

THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST ¼ OF SAID SECTION 32, NORTH 89°41'27" WEST, A DISTANCE OF 1343.48 FEET;

THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF TOLLWAY I-90 AS CONVEYED TO THE ILLINOIS STATE TOLL HIGHWAY COMMISSION, PER DOCUMENT NO. 17 400 695, RECORDED DECEMBER 10, 1958, THE FOLLOWING FIVE COURSES:

(1)     NORTH 73°44'44" WEST, A DISTANCE OF 291.20 FEET;
(2)     NORTH 53°26'13" WEST, A DISTANCE OF 372.02 FEET;
(3)     NORTH 89°41'27" WEST, A DISTANCE OF 550.00 FEET;
(4)     SOUTH 54°08'29" WEST, A DISTANCE OF 461.68 FEET;
(5)     SOUTH 87°54'36" WEST, A DISTANCE OF 612.13 FEET;

THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼ OF SAID SECTION 31, NORTH 89°33'24" WEST, A DISTANCE OF 350.18 FEET;

THENCE ALONG THE EASTERLY RIGHT-OF-WAY LINE OF BEVERLY ROAD, AS RECORDED DECEMBER 18, 1956, PER DOCUMENT NO. 16 783 799, THE FOLLOWING FOUR COURSES:

(1)     NORTH 19°28'22" WEST, A DISTANCE OF 93.54 FEET;
(2)     A DISTANCE OF 379.80 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHWEST, HAVING A RADIUS OF 1087.92 FEET, AND WHOSE CHORD OF 377.87 FEET BEARS NORTH 9°28'19" WEST;
(3)     NORTH 7°32'23" WEST, A DISTANCE OF 178.10 FEET;
(4)     NORTH 89°28'14" WEST, A DISTANCE OF 33.00 FEET;

THENCE ALONG THE WEST LINE OF THE EAST ½ OF THE SOUTHEAST ¼ OF SAID SECTION 31, NORTH 0°31'46" EAST, A DISTANCE OF 1997.96 FEET;

THENCE ALONG THE WEST LINE OF THE EAST ½ OF THE NORTHEAST ¼ OF SAID SECTION 31, NORTH 0°25'04" EAST, A DISTANCE OF 2432.02 FEET;

THENCE ALONG THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD (ROUTE 72), AS PER DOCUMENTS: NO. 12 079 013, RECORDED NOVEMBER 8, 1937, NO. 12 284 905, RECORDED MARCH 20, 1939, NO. 12 309 896, RECORDED MAY 10, 1939, NO. 12 647 599, RECORDED MARCH 27, 1941, AND NO. 12 288, RECORDED FEBRUARY 20, 1939, THE FOLLOWING FOUR COURSES:

(1)     A DISTANCE OF 189.90 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHWEST, HAVING A RADIUS OF 10,257.06 FEET, AND WHOSE CHORD OF 189.90 FEET BEARS SOUTH 82°59'46" EAST;
(2)     SOUTH 83°31'35" EAST, A DISTANCE OF 2317.28 FEET;
(3)     A DISTANCE OF 2532.01 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE NORTHEAST, HAVING A RADIUS OF 9965.06 FEET, AND WHOSE CHORD OF 2525.20 FEET BEARS SOUTH 76°14'50" EAST;
(4)     SOUTH 68°58'05" EAST, A DISTANCE OF 1233.00 FEET;

FILED DATE: 1/7/2020 5:03 PM   2018CH12683

THENCE ALONG THE NORTHWESTERLY RIGHT-OF-WAY LINE OF ELGIN, JOLIET AND EASTERN RAILROAD, AS RECORDED JULY 1, 1889, PER DOCUMENT NO. 1 123 185, SOUTH 11°12'47" WEST, A DISTANCE OF 3844.25 FEET;

THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼, OF SAID SECTION 32, NORTH 89°42'33" WEST, A DISTANCE OF 1425.69 FEET TO THE POINT OF BEGINNING;

AND ALSO:
COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 32;
THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼ OF SAID SECTION 32, NORTH 89°42'33" WEST, A DISTANCE OF 1111.55 FEET TO THE POINT OF BEGINNING;

THENCE ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID ELGIN, JOLIET AND EASTERN RAILROAD, NORTH 11°12'47" EAST, A DISTANCE OF 3807.64 FEET;
THENCE ALONG THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD (ROUTE 72), SOUTH 68°58'05" EAST, A DISTANCE OF 1336.48 FEET;
THENCE SOUTH 0°07'09" WEST, A DISTANCE OF 178.58 FEET;
THENCE SOUTH 89°52'51" EAST, A DISTANCE OF 185.00 FEET;
THENCE NORTH 0°07'09" EAST, A DISTANCE OF 12.00 FEET;
THENCE SOUTH 89°52'51" EAST, A DISTANCE OF 141.20 FEET;
THENCE NORTH 01°07'09" EAST, A DISTANCE OF 41.94 FEET;
THENCE ALONG SAID SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD, SOUTH 68°58'05" EAST, A DISTANCE OF 135.51 FEET;
THENCE AS MONUMENTED AND OCCUPIED, SOUTH 0°07'09" WEST, A DISTANCE OF 1769.21 FEET;
THENCE ALONG A LINE PARALLEL WITH, AND 1323.61 FEET NORTH OF THE SOUTH LINE, OF THE SOUTHWEST ¼ OF SAID SECTION 33, SOUTH 89°44'52" EAST, A DISTANCE OF 1210.76 FEET;

THENCE ALONG THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 59 (NEW SUTTON ROAD), AS RECORDED AUGUST 30, 1934, PER DOCUMENT NO. 11 451 859, A DISTANCE OF 83.94 FEET ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHEAST, HAVING A RADIUS OF 1458.06 FEET, AND WHOSE CHORD OF 83.93 FEET BEARS SOUTH 18°01'24" WEST;
THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF TOLLWAY I-90, RECORDED MAY 13, 1957 PER DOCUMENT NO. 16 902 251, AS MONUMENTED AND OCCUPIED, THE FOLLOWING TEN COURSES:
(1)     SOUTH 32°03'22" WEST, A DISTANCE OF 312.00 FEET;
(2)     SOUTH 40°38'44" WEST, A DISTANCE OF 517.39 FEET;
(3)     NORTH 49°12'41" WEST, A DISTANCE OF 70.00 FEET;
(4)     NORTH 89°52'22" WEST, A DISTANCE OF 635.00 FEET;
(5)     SOUTH 0°28'49" WEST, A DISTANCE OF 237.60 FEET;
(6)     SOUTH 50°39'29" WEST, A DISTANCE OF 501.20 FEET;
(7)     SOUTH 74°15'09" WEST, A DISTANCE OF 472.21 FEET;
(8)     NORTH 89°44'13" WEST, A DISTANCE OF 1513.85 FEET;
(9)     NORTH 0°23'47" EAST, A DISTANCE OF 15.00 FEET;
(10)    NORTH 89°44'13" WEST, A DISTANCE OF 81.60 FEET;
THENCE ALONG SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF ELGIN, JOLIET AND EASTERN RAILROAD, NORTH 11°12'47" EAST, A DISTANCE OF 44.75 FEET, TO THE POINT OF BEGINNING, ALL IN COOK COUNTY, ILLINOIS.

## EXHIBIT N

## CONTRACTS IN EXISTENCE OR TO BE LET BY THE DEVELOPER[1]

| CONSULTANT | SCOPE OF WORK |
|---|---|
| Barton-Aschman | Traffic Analysis and Consultation |
| Ludlow & Associates | Surveying |
| Tornrose Campbell | Civil Engineering (including civil engineering on Phase II Site which supports Phase I Development) |
| STS Consultants | Geotechnical Analysis |
| Hey & Associates | Environmental Studies |
| Schal Associates | Value Engineering |
| Donohue Associates[2] | Civil Engineering/Planning/Landscape (including civil engineering, planning and landscape on Phase II Site which supports Phase I Development) |
| Perkins & Will | Master Planning[3] 788 Acres |
| Homart Development Co. | Project Coordinator |

1   The Village reserves the right to confirm that dollar amounts expended under contracts relate to property assembly costs, site preparation costs, and costs of construction of the Public Improvements, all as defined in the Act.

2   Includes subcontract to Johnson, Johnson & Roy.

3   Does not include costs for master planning of Phase I Site (200 acre), which costs are not deemed to be a "Project Cost".

## EXHIBIT O

## PROPERTY ASSEMBLY COSTS PAID, INCURRED
## OR KNOWN AS OF THE DATE OF THIS AGREEMENT

I.    **CONSULTANT COSTS**

| CONSULTANT | SCOPE OF WORK[1] | EDA COSTS[2] |
|---|---|---|
| Ludlow | ALTA Survey[3] | |
| Coldwell Banker Commercial | Brokerage | |
| Tornrose Campbell | Preliminary Civil | |
| STS Consultants | Preliminary Soils | * |
| Rudnick & Wolfe | Property Assemblage, Zoning, Environmental, Economic Development | |

| | | |
|---|---|---|
| **Subtotal** | | **$1,550,000.00** |

II.    **PURCHASE PRICE**

|  |  | EDA COSTS |
|---|---|---|
| (1) | Origer Estate | * |
| (2) | Origer Children | |
| (3) | Studz | |
| (4) | Nederlander: | |
| | 73 acre parcel[4] | |
| | 148 acre parcel[4] | |
| (5) | Watson[5] | |
| | **Subtotal** | **$87,368,618.00** |

III.    **TITLE AND SEARCHES**[3]

|  |  |  | EDA COSTS[2] |
|---|---|---|---|
| (1) | Origer Estate: | | |
| | (a) | Title[6] | * |
| | (b) | Searches | |
| (2) | Origer Children: | | |
| | (a) | Title[6] | * |
| | (b) | Searches | |
| (3) | Studz: Purchaser to receive a credit for: | | |
| | (a) | Title[6] | * |
| | (b) | Searches | |

*    Document on file.  Confidentiality protected by Chapter 24, Section 207(s) of the Illinois Revised Statutes.

FILED DATE: 1/7/2020 6:03 PM    2018CH12683

FILED DATE: 1/7/2020 6:03 PM    2018CH12683

| | | | |
|---|---|---|---|
| (4) | Nederlander: For both parcels: | | |
| | (a) Title[6] | | * |
| | (b) Searches | | |
| (5) | Watson:[5] | | |
| | (a) Title | | * |
| | (b) Searches | | |
| | **Subtotal** | | **$40,000.00** |

## IV.  ESCROW CHARGES[3]

EDA COSTS[2]

| | | |
|---|---|---|
| (1) | Origer Estate and Origer Children | * |
| (2) | Nederlander | |
| (3) | Studz | |
| | **Subtotal** | **$5,000.00** |

---

[1]  Contracts are subject to execution of change orders.

[2]  Costs are estimated and are not intended to be final.

[3]  Subject to credits pursuant to Acquisition Contracts.

[4]  Provided the initial closing date is not extended.  If the initial closing date is extended beyond June 29, 1990, Sears must deliver into the strict joint order escrow at Ticor Title Insurance Company an additional $_____ per parcel, of which $_____ per parcel will not be credited against the purchase price for each parcel.

[5]  Acquisition closed on September 7, 1989.  All charges related to such closing have been paid in full.

[6]  This quote from Ticor Title Insurance Company is based on a title insurance premium of $.40 per $1,000.00 and a zoning 3.0 endorsement fee of $.05 per $1,000.00.  No other endorsements are included in the quote, nor is the cost of reinsurance included.

*  Document on file.  Confidentiality protected by Chapter 24, Section 207(s) of the Illinois Revised Statutes.

## EXHIBIT P

### PROJECT COSTS PAID OR INCURRED BY THE DEVELOPER
### AS OF THE DATE OF THIS AGREEMENT IN CONNECTION WITH
### THE CONSTRUCTION OF THE PUBLIC SITE IMPROVEMENTS

I.   **PROJECT COSTS PAID OR INCURRED BY THE DEVELOPER**

| CONSULTANT | EDA COSTS[1] | DESCRIPTION OF WORK |
|---|---|---|
| **Planning** | | |
| Barton-Aschman | $278,332 | Traffic impact analysis; roadway design |
| Perkins & Will | 244,152 | Site and master planning |
| Subtotal | $522,484 | |
| | | |
| **Engineering** | | |
| Ludlow & Associates | $173,000 | Surveying; topographic studies |
| STS Consultants | 97,742 | Geotechnical studies |
| Tornrose Campbell | 65,328 | Utility design |
| Hey & Associates | 152,080 | Environmental studies |
| Chicago Area Transport- ation Study | 2,248 | Traffic data |
| Subtotal | $490,398 | |

1   Costs are not intended to be final; additional Project Costs are expected to be incurred.

Mayor
**MICHAEL J. O'MALLEY**

Village Clerk
**VIRGINIA M. HAYTER**

Village Manager
**PETER T. BURCHARD**

**Board of Trustees**
**BRUCE C. LIND**
**WILLIAM D. McLEOD**
**SUSAN H. KENLEY**
**MICHAEL D. FRIESEN**
**RICHARD A. COCHRAN**
**LOUIS G. DESRUISSEAUX**

**HOFFMAN ESTATES**

March 19, 1990

Mr. Michael Bozic
Chairman and Chief Executive Officer
Sears Merchandise Group
Sears Tower
Chicago, IL  60684

> **Re:  Letter of Clarification of Intent of Village Board Amendment of February 26, 1990 Prior to Approval of Economic Development Agreement By and Between The Village of Hoffman Estates and Sears, Roebuck and Co.**

Dear Mr. Bozic:

On February 26, 1990, the Village Board of the Village of Hoffman Estates approved, by Ordinance No. 2161-1990, the above referenced Economic Development Agreement.  Prior to such approval, amendments to Sections 3.1-(e)-(2), 4.2(a) and 4.2(b) were made which stated that in regard to service contracts (Exhibit "N"), property assembly costs (Exhibit "O") and costs of construction activities (Exhibit "P"), that "both the Village and Sears agree that Chapman and Cutler as Bond Counsel for the Village, will determine what costs. . .qualify as Project costs under the Act".

In order to clarify the scope of such determination, please be advised that, after discussion with Corporation Counsel and the Board of Trustees, I can represent that the intent of such amendment was not to have Chapman and Cutler determine specific dollar amounts of expenditures or the reasonableness or necessity of any given expenditure.  Rather, the Village's intent is to make Chapman and Cutler the party responsible for determining if the amounts payable under such service contracts, as well as the amount payable as "property

assembly costs", as "site preparation costs", and as costs of construction of the Public Improvements (as defined in the Agreement), qualify as "economic development project costs" under the State Statute referenced as the "Act" in the Agreement.

Specifically, with respect to Exhibit "N", it is understood that, to the extent service contracts relate to construction activities which do not constitute "site preparation costs" as that term is defined in the Act, or costs of construction of Public Improvements as that term is defined in the Agreement, then to such extent the costs incurred under such service contracts shall not be deemed to qualify under the Act and under the Agreement as a "Project Cost".

However, it remains the Village's intention to have the prorated share of the "qualified" portions of service contracts, property assembly costs, site preparation costs and costs of construction of the Public Improvements and to have the reasonableness or necessity of the "qualified" portions of service contracts, property assembly costs, site preparation costs and cost of construction of the Public Improvements determined under the provisions of Sections 4.3, 4.4 and 17.5 of the Agreement.

If this is your understanding and agreement, please sign one copy and return.

Sincerely,

Michael J. O'Malley
Village President

MJO/ds

Understood and Agreed to:

Michael   Bozic
Chairman and Chief Executive Officer
Sears Merchandise Group

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

In re                                                    :
                                                         :        **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,                :
                                                         :        **Case No. 18-23538 (RDD)**
                                                         :
Debtors.[1]                                              :        **(Jointly Administered)**

--------------------------------------------------------- x

### SIXTH SUPPLEMENTAL NOTICE OF CURE COSTS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH GLOBAL SALE TRANSACTION

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On November 19, 2018, the Bankruptcy Court entered the *Order Approving Global Bidding Procedures and Granting Related Relief* (the "**Global Bidding Procedures Order**") (ECF No. 816),[2] approving global bidding and sale procedures (the "**Global Bidding Procedures**"), substantially in the form attached to the Global Bidding Procedures Order as Exhibit 1, in connection with the sale or disposition of substantially all of the Debtors' assets (the "**Assets**"), among other relief.

2.      On November 21, 2018, the Debtors filed the *Notice of Filing of Global Bidding Procedures Process Letter* (ECF No. 862) (the "**Global Process Letter**") soliciting bids on the Assets, including the Debtors' retail stores or groups of stores (the "**Retail Stores**") on a going

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Global Bidding Procedures Order, the Asset Purchase Agreement or the Sale Order (each as defined herein), as applicable.

**EXHIBIT 3**

concern or liquidation basis and individual target businesses, including Sears Home Services, the business unit PartsDirect, Sears Auto Centers, and Innovel (the "**Target Businesses**") (the Retail Stores together with the Target Businesses, the "**Global Assets**").

3.    On January 14, 2019, the Debtors commenced an auction for the sale of the Global Assets (the "**Auction**"). As announced on the record of the Auction, the Debtors, as directed by the Restructuring Committee, determined that the offer submitted by Transform Holdco, LLC (the "**Buyer**"), established by ESL Investments, Inc. to acquire substantially all of the Global Assets, was the highest or best offer for the Global Assets (the "**Successful Bid**"). The Debtors executed an asset purchase agreement with the Buyer for purchase of the Acquired Assets (as defined in the Asset Purchase Agreement), dated January 17, 2019 (the "**Asset Purchase Agreement,**" and the transaction effected thereby, the "**Global Asset Sale Transaction**")).  A copy of the Asset Purchase Agreement and description of the material terms thereof are provided in the *Notice of Successful Bidder and Sale Hearing*, filed on January 18, 2019 (ECF No. 1730).

4.    On January 18, 2019, the Debtors filed and served on the applicable Sale Notice Parties the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 1731) (the "**Initial Notice**"). On January 23, 2019, the Debtors filed and served on the applicable counterparties the *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 1774) (the "**Supplemental Notice**"). On January 31, 2019, the Debtors filed and served on the applicable counterparties the *Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 2314) (the "**Second Supplemental Notice**").  On March 5, 2019, the Debtors filed and served on the applicable counterparties the *Third Supplemental Notice of Cure Costs and Potential Assumption & Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 2753) (the "**Third Supplemental Notice**"). On March 29, 2019, the Debtors filed and served on the applicable counterparties the *Fourth Supplemental Notice of Cure Costs and Potential Assumption & Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 2995) (the "**Fourth Supplemental Notice**").  On April 9, 2019, the Debtors filed and served on the applicable counterparties the *Fifth Supplemental Notice of Cure Costs and Potential Assumption & Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 3097) (the "**Fifth Supplemental Notice**" and, collectively with the Initial Notice, the Supplemental Notice, the Second Supplemental Notice, the Third Supplemental Notice, and the Fourth Supplemental Notice, the "**Cure Notices**").

5.    On February 8, 2019, the Bankruptcy Court entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith, and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**"), approving the Global Asset Sale Transaction. On February 11, 2019, the Debtors closed the Global Asset Sale Transaction with the Buyer (the "**Closing Date**").

6.    In accordance with the Assumption and Assignment Procedures and the Global

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Bidding Procedures Order, the Debtors may, in connection with the Global Asset Sale Transaction, seek to assume and assign to the Buyer (or its designated assignee, if applicable) certain Contracts and Leases of the Debtors.

7.      You are receiving this Sixth Supplemental Notice because you may be a Counterparty to a Contract or Lease of the Debtors that potentially could be assumed and assigned to the Buyer in connection with the Global Asset Sale Transaction.

## Cure Costs

8.      In accordance with the terms of the Sale Order, Buyer may designate Additional Contracts and Designatable Leases (collectively, the "**Additional Assigned Agreements**") for assumption and assignment for up to sixty (60) days after the Closing Date.

9.      Each of the Contracts that may be assumed and assigned in connection with the Global Asset Sale Transaction that were not included in the prior Cure Notices (the "**Contracts**"), and the Debtors' calculation of the Cure Costs with respect thereto are set forth on Exhibit A hereto. Each of the Leases that may be assumed and assigned in connection with the Global Asset Sale Transaction that were not included in the prior Cure Notices (the "**Leases**"), and the Debtors' calculation of the Cure Costs with respect thereto are set forth on Exhibit B hereto.

10.      The inclusion of any Contract or Lease on Exhibit A or Exhibit B does not constitute an admission that a particular Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Contract or Lease ultimately will be assumed or assigned. Assumption or assignment of a Contract or Lease is subject to Court approval.  All rights of the Debtors and other parties in interest with respect thereto are reserved.

11.      The Debtors' proposed Cure Amounts may not reflect negotiated settlements or payments made pursuant to first-day orders that would reduce the proposed Cure Amounts.  The Debtors are in the process of reconciling these numbers and reserve the right to amend the proposed cure amounts at any time, before or after the Objection Deadline.  If the Debtors determine that the proposed Cure Amounts set forth in Exhibit A or Exhibit B hereto include any amounts previously paid, the proposed Cure Amounts will be adjusted to eliminate such amounts and the Debtors will serve a further revised notice setting forth updated proposed Cure Amounts to the applicable Counterparties as soon as reasonably practicable following the determination that an adjustment is required. In the event that the proposed Cure Amounts in Exhibit A or Exhibit B are amended, the notice filed later in time shall govern and supersede the earlier notice with respect to such modified amounts.

## Buyer's Adequate Assurance Information

12.      Adequate Assurance Information for the Buyer (or Buyer's assignee, if applicable) will be distributed to the applicable Counterparties.  The Adequate Assurance Information of the Buyer (or Buyer's assignee, if applicable) is intended to provide the Counterparties to the Contracts and Leases with adequate assurance of future performance and to support the ability of the Buyer (or Buyer's assignee, if applicable) to comply with the

WEIL:\96994788\1\73217.0004

requirements of adequate assurance of future performance, including the financial wherewithal and willingness to perform under the Contracts and Leases of the Buyer (or Buyer's assignee, if applicable).

<u>**Assumption and Assignment Procedures**</u>

13.      On February 1, 2019, the Debtors filed the Notice of Filing Initial Assigned Agreements in Connection with Global Sale Transaction, as amended on February 3, 2019, February 7, 2019 (ECF Nos. 2349, 2377, 2452) (the "**Initial Assigned Agreements**"). In accordance with the Sale Order, the Initial Assigned Agreements were assumed and assigned to the Buyer as of the Closing Date.  On March 19, 2019, the Debtors filed the Notice of Filing of Further Revised List of Initial Assigned Agreements in Connection with the Sale Transaction [ECF No. 2910].

14.      The Asset Purchase Agreement also provides for certain rights for the Buyer to acquire additional contracts and leases that were not on the Initial Assigned Agreements list after the Closing Date (each, an "**Additional Contract**"). At any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019, the Buyer may elect that certain contracts and agreements related to the Business (but that were not on the Initial Assigned Agreements list) be assumed by the Sellers and assigned to the Buyer or an applicable Assignee of the Buyer.

15.      The Asset Purchase Agreement also includes the purchase of the exclusive right to irrevocably select, identify and designate certain Leases for assumption and assignment (the "**Designation Rights**") after the Closing Date. The Designation Rights terminate upon the expiration of the period commencing on the Closing Date and ending on the earliest of (i) five (5) Business Days after delivery of the applicable Buyer Rejection Notice, (ii) the date on which an applicable agreement is assumed and assigned to an Assignee, (iii) the date which is sixty (60) days after the Closing Date and (iv) May 3, 2019.

16.      You will receive an additional notice informing you if your Contract or Lease is designated for assumption and assignment to the Buyer.

<u>**Objections**</u>

**A.  Cure Objections**

17.      Any objection to the proposed assumption, assignment, or potential designation of a Contract or Lease identified on <u>Exhibit A</u> or <u>Exhibit B</u>, the subject of which objection are the Debtors' proposed Cure Costs (a "**Cure Objection**") must be (i) filed in accordance with the Global Bidding Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Recipients (as identified in the Global Bidding Procedures) by **April 19, 2019 at 4:00 p.m. (Eastern Time)** (the "**Cure Objection Deadline**").

18.      If a Cure Objection cannot otherwise be resolved by the parties, the Debtors may adjourn their request to assume the Contract or Lease pending resolution of the Cure Objection (an "**Adjourned Cure Objection**") subject to the Global Bidding Procedures Order; provided further that, to the extent the Adjourned Cure Objection is resolved or determined unfavorably to the Debtors, the Debtors may withdraw the proposed assumption of the applicable Contract or Lease

4

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

after such determination by filing a notice of withdrawal, which, in the case of a Lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code. An Adjourned Cure Objection may be resolved in the Debtors' discretion.

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION RECIPIENTS A TIMELY CURE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE AMOUNT TO CURE ANY DEFAULT UNDER THE APPLICABLE CONTRACT OR LEASE. THE CURE COSTS SET FORTH ON EXHIBIT A AND EXHIBIT B HERETO SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE APPLICABLE CONTRACT OR LEASE UNDER BANKRUPTCY CODE SECTION 365(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR LEASE, OR ANY OTHER DOCUMENT, AND THE APPLICABLE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH CONTRACT OR LEASE AGAINST THE DEBTORS, THE BUYER, OR THE PROPERTY OF ANY OF THEM.**

### B. Adequate Assurance Objections

19.     Any counterparty to the Additional Contracts and Designatable Leases who wishes to object to the proposed assumption, assignment, or potential designation of its Additional Contract or Designatable Lease, the subject of which objection is the Buyer's (or the Buyer's assignee's) (a) ability to provide adequate assurance of future performance or (b) the proposed form of adequate assurance of future performance with respect to such Contract or Lease (an "**Adequate Assurance Objection**"), must (i) file such objection with the Bankruptcy Court in accordance with the Global Bidding Procedures Order and (ii) serve such objection on the Objection Recipients (as identified in the Global Bidding Procedures) by **April 19, 2019 at 4:00 p.m. (Eastern Time)** (the "**Adequate Assurance Objection Deadline**").

20.     If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties, such objection and all issues of adequate assurance of future performance shall be determined by the Court at a hearing on a date to be scheduled by the Debtors in their discretion.

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION RECIPIENTS A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF THE APPLICABLE CONTRACT OR LEASE. THE BUYER (OR ITS DESIGNATED ASSIGNEE, IF APPLICABLE) SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE APPLICABLE CONTRACT OR LEASE IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 365(F)(2)(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR LEASE, OR ANY OTHER DOCUMENT.**

WEIL:\96994788\1\73217.0004

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

## **Additional Information**

21.    Copies of the Global Bidding Procedures Order, the Cure Notices, the Sale Order, the Asset Purchase Agreement, the Initial Assigned Agreements and the Assumption and Assignment Order may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC, located at https://restructuring.primeclerk.com/Sears.

Dated: April 11, 2019

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile: (212) 310 8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

6

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

**Exhibit A**

**Cure Costs Schedule – Executory Contracts**

1

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Supplemental Cure Noticing
Executory Contracts

| No | Debtor Counterparty(s) | Counterparty Name | Contract Title | Contract Expiration Date | Cure Amount |
|----|------------------------|-------------------|----------------|--------------------------|-------------|
| 1 | SEARS. ROEBUCK AND CO | TIMETRADE SYSTEMS, INC. | N/A | N/A | $    - |
| 2 | SEARS HOME IMPROVEMENT PRODUCTS, INC | NEST LABS, INC. | RESELLER AGREEMENT (WHOLESALE DISTRIBUTION) | 12/31/2017 | $    - |
| 3 | SEARS HOLDINGS MANAGEMENT CORPORATION KMART CORPORATION SEARS, ROEBUCK AND CO. | KONICA MINOLTA/COPYTRONICS, INC. | "SHOP YOUR WAY" AMENDMENT TO MASTER KONICA MINOLTA/COPYTRONICS, INC PREMIER LEASE AGREEMENT | N/A | $    - |
| 4 | SEARS HOME IMPROVEMENT PRODUCTS, INC | KONICA MINOLTA/COPYTRONICS, INC. | AMENDMENT TO MASTER PREMIER LEASE AGREEMENT | N/A | $    - |
| 5 | SEARS HOME IMPROVEMENT PRODUCTS, INC | NEST LABS, INC. | AMENDMENT NO. 1 TO RESELLER AGREEMENT (WHOLESALE DISTRIBUTION) | 12/31/2018 | $    - |
| 6 | SEARS HOME IMPROVEMENT PRODUCTS, INC | OWENS CORNING SALES, LLC | FIRST AMENDMENT TO PROMOTIONAL INCENTIVE AGREEMENT | 12/31/2017 | $    - |
| 7 | SEARS HOME IMPROVEMENT PRODUCTS, INC | OWENS CORNING SALES, LLC | PROGRAM LETTER - UPDATE TO PROMOTIONAL INCENTIVE AGREEMENT | 12/31/2018 | $    - |
| 8 | SEARS HOME IMPROVEMENT PRODUCTS, INC | COMPUTER POWER SYSTEMS, INC. | STANDARD SERVICE AGREEMENT - MITSUBISHI | 3/29/2019 | $    - |
| 9 | SEARS HOME IMPROVEMENT PRODUCTS, INC | COMPUTER POWER SYSTEMS, INC. | STANDARD SERVICE AGREEMENT - POWERWARE | 3/29/2019 | $    - |
| 10 | SEARS, ROEBUCK AND CO. | THE VILLAGE OF HOFFMAN ESTATES | ECONOMIC DEVELOPMENT AGREEMENT BY AND BETWEEN THE VILLAGE OF HOFFMAN ESTATES AND SEARS, ROEBUCK AND CO. | N/A | $    - |
| 11 | SEARS, ROEBUCK AND CO. | THE VILLAGE OF HOFFMAN ESTATES | FOURTH AMENDMENT TO THE ECONOMIC DEVELOPMENT AGREEMENT | N/A | $    - |
| 12 | SEARS HOLDINGS MANAGEMENT CORPORATION | NOVELL INC. | ADDENDUM TO SUSE LINUX ENTERPRISE SERVER ("SLES") 1 SP2 NOVEL SOFTWARE LICENSE AGREEMENT | 1/28/2014 | $    - |
| 13 | SEARS HOLDINGS MANAGEMENT CORPORATION | NOVELL INC. | SUSE LINUX ENTERPRISE SERVER ("SLES") 1 SP2 NOVEL SOFTWARE LICENSE AGREEMENT | 1/28/2014 | $    - |
| 14 | KMART CORPORATION | T LEX, INC. | SERVICES AGREEMENT | PERPETUAL | $    8,925.00 |
| 15 | SEARS HOLDINGS MANAGEMENT CORPORATION | RED HAT INC. | RED HAT ENTERPRISE AGREEMENT | 2/7/2009 | $    - |
| 16 | SEARS HOLDINGS MANAGEMENT CORPORATION | RED HAT INC. | RED HAT ENTERPRISE AGREEMENT - APPENDIX #3 | 2/7/2009 | $    - |
| 17 | SEARS HOLDINGS MANAGEMENT CORPORATION | RED HAT INC. | RED HAT ENTERPRISE LINUX SERVER WITH SMART MANAGEMENT, STANDARD (PHYSICAL OR VIRTUAL NODES)- | 2/7/2009 | $    - |
| 18 | SEARS HOME IMPROVEMENT PRODUCTS, INC | REMODELING.COM, LLC | SOW #1 LEAD GENERATION SERVICES FOR SEARS HOME IMPROVEMENT PRODUCTS | 7/31/2021 | $    - |
| 19 | SEARS HOME IMPROVEMENT PRODUCTS, INC | REMODELING.COM, LLC | REVISION TO EXHIBIT OF SOW #1 LEAD GENERATION SERVICES FOR SEARS HOME IMPROVEMENT PRODUCTS | 7/31/2021 | $    - |

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

**Exhibit B**

**Cure Costs Schedule – Leases**

1

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

**Sears Holdings Corporation**
**Supplemental Cure Noticing**
**Real Estate Leases**

| No. | Store Number | Store Name | State | Debtor Counterparty(s) | Counterparty Name | Contract Title | Contract Expiration Date | Debtor's Interest | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 490 | HOFFMAN ESTATES | IL | SEARS HOLDINGS MANAGEMENT CORPORATION | ARAMARK SERVICES (C3) | FOOD SERVICE TENANCY | 12/31/14 (MTM) | LESSOR | $        - |
| 2 | 490 | HOFFMAN ESTATES | IL | SEARS HOLDINGS MANAGEMENT CORPORATION | ARAMARK SERVICES (JAVA CITY) | FOOD SERVICE TENANCY | 12/31/14 (MTM) | LESSOR | $        - |
| 3 | 490 | HOFFMAN ESTATES | IL | SEARS HOLDINGS MANAGEMENT CORPORATION | AXA ADVISORS, LLC | ATRIUM LICENSE AGREEMENT | 9/30/15 (MTM) | LESSOR | $        - |
| 4 | 490 | HOFFMAN ESTATES | IL | SEARS HOLDINGS MANAGEMENT CORPORATION | THE SALVATION ARMY | PARKING LOT ARRANGEMENT | 6/30/2099 | LESSOR | $        - |
| 5 | 3544 | SALEM | VA | KMART CORPORATION | NAIL TIPS | TENANCY | N/A | LESSOR | $        - |
| 6 | 26734 | SANFORD | FL | SEARS ROEBUCK AND CO. | FIELDS CHRYSLER-JEEP-DODGE SANFORD | TENANCY | 11/30/2027 | LESSOR | $        - |
| 7 | 30934 | NORTH MEMPHIS | TN | KMART CORPORATION | C&T ENTREPRENEURS INC | TENANCY | N/A | LESSOR | $        - |
| 8 | 31900 | STERLING | IL | KMART STORES OF ILLINOIS, LLC | MY NAILS | TENANCY | N/A | LESSOR | $        - |

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re                                     :
                                          :        **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,  :
                                          :        **Case No. 18-23538 (RDD)**
                                          :
      Debtors.[1]                          :        **(Jointly Administered)**

---------------------------------------------------------- x

## NOTICE OF ASSUMPTION AND ASSIGNMENT
## OF ADDITIONAL EXECUTORY CONTRACTS

1.      Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed a motion,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

**EXHIBIT**
**4**

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

dated November 1, 2018 (ECF No. 429) (the "**Sale Motion**") seeking, among other things, the entry of an order pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1, 6005-1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"), authorizing and approving the sale of the Acquired Assets and the assumption and assignment of certain executory contracts and unexpired leases of the Debtors in connection therewith.

2.      On January 18, 2019, the Debtors filed and served on the applicable counterparties the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 1731) (the "**Initial Notice**").

3.      On January 23, 2019, the Debtors filed and served on the applicable counterparties the *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 1774) (the "**Supplemental Notice**").

4.      On January 31, 2019, the Debtors filed and served on the applicable counterparties the *Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 2314) (the "**Second Supplemental Notice**").

5.      On March 5, 2019, the Debtors filed and served on the applicable counterparties the *Third Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 2753) (the "**Third Supplemental Notice**").

6.      On March 29, 2019, the Debtors filed and served on the applicable counterparties the *Fourth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 2995) (the "**Fourth Supplemental Notice**)

7.      On April 9, 2019, the Debtors filed and served on the applicable counterparties the *Fifth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 3097) (the "**Fifth Supplemental Notice**").

8.      On April 11, 2019, the Debtors filed and served on the applicable counterparties the *Sixth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 3152) (the "**Sixth Supplemental Notice**").

9.      On April 23, 2019, the Debtors filed and served on the applicable counterparties the *Seventh Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 3330) (the "**Seventh Supplemental Notice**").

WEIL:\97001918\2\73217.0004

10.    On April 30, 2019, the Debtors filed and served on the applicable counterparties the *Eighth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 3453) (the "**Eighth Supplemental Notice**" and together with the Initial Notice, the Supplemental Notice, the Second Supplemental Notice, the Third Supplemental Notice, the Fourth Supplemental Notice, the Fifth Supplemental Notice, the Sixth Supplemental Notice and the Seventh Supplemental Notice, the "**Assumption and Assignment Notices**").

11.    On February 8, 2019, the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith, and (IV) Granting Related Relief* (the "**Sale Order**") (ECF No. 2507)[2] was entered by the Court.

12.    In accordance with the terms of the Sale Order, Buyer may designate Additional Contracts and Designatable Leases (collectively, the "**Additional Assigned Agreements**") for assumption and assignment for up to sixty (60) days after the Closing Date (the "**Designation Rights Period**"), which occurred on February 11, 2019.  The Debtors and Buyer agreed to an extension of the Designation Rights Period and, on April 12, 2019, the Debtors filed the *Notice of Amendment to Asset Purchase Agreement Extending Certain Deadlines* (ECF No. 3171), which extended the Designation Rights Period to May 3, 2019 for certain Designatable Leases and to May 13, 2019 for certain Additional Contracts.

13.    On April 2, 2019, the Court entered the *Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* (the "**Assumption and Assignment Order**") (ECF No. 3008).

14.    Paragraphs 26 and 27 of the Assumption and Assignment Order establish a noticing procedure for assumption and assignment of Additional Assigned Agreements.

15.    In accordance with the Sale Order and the Assumption and Assignment Order, Buyer has designated for assumption and assignment certain Additional Contracts, which are listed on **Exhibit 1** hereto.

16.    Each of the Additional Contracts listed on Exhibit 1 was listed on an Assumption and Assignment Notice that was previously filed with the Bankruptcy Court and served on the applicable Counterparty, and all objection periods related to such Assumption and Assignment Notice, other than the Eighth Supplemental Notice, have expired.  All Additional Contracts listed in Exhibit 1 shall be deemed to include any and all applicable supplements, amendments, and/or addenda.

17.    To the extent a counterparty to an Additional Contract properly filed and served a Cure Objection, and to the extent such counterparty is entitled to assert a Cure Objection under the Eighth Supplemental Notice, or an additional objection to cure costs or assumption and assignment that could not have been raised in its prior objection, in accordance with paragraph 34 of the Sale

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Sale Order.

WEIL:\97001918\2\73217.0004

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Order and paragraph 26 of the Assumption and Assignment Order, such counterparty shall file and serve such objection (a "**Supplemental Objection**") in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) so as to be filed and received no later than May 10, 2019 at 4:00 p.m. (Eastern Time) (the "**Supplemental Objection Deadline**").

18.     If a Cure Objection or a Supplemental Objection is timely filed and served with respect to an Additional Contract listed on <u>Exhibit 1</u>, the contract that is the subject of the Cure Objection or Supplemental Cure Objection may be removed from the list of Additional Contracts listed on <u>Exhibit 1</u> at any time prior to the Assumption Effective Date for such Additional Contract, as determined in accordance with paragraph 27 of the Assumption and Assignment Order, or, to the extent it remains unresolved, such Cure Objection or Supplemental Objection shall be set for a hearing (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on a date to be scheduled.

19.     If a timely Cure Objection is not filed (or any such objection has been withdrawn or resolved) and the Supplemental Objection Deadline is not applicable to an Additional Contract, the Assumption Effective Date for any such Additional Contract shall be the date that this notice is filed with the Court.

Dated:  May 2, 2019
       New York, New York

                                     /s/ Jacqueline Marcus
                                     WEIL, GOTSHAL & MANGES LLP
                                     767 Fifth Avenue
                                     New York, New York  10153
                                     Telephone:  (212) 310-8000
                                     Facsimile:  (212) 310-8007
                                     Ray C. Schrock, P.C.
                                     Jacqueline Marcus
                                     Garrett A. Fail
                                     Sunny Singh

                                     *Attorneys for Debtors*
                                     *and Debtors in Possession*

18-23538-rdd    Doc 9999    Filed 09/02/19    Entered 09/02/19 20:33:11    Main Document
Pg 5 of 36

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

## Exhibit 1

**Additional Contracts**

WEIL:\97001918\2\73217.0004

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | 1-800 REMODEL, INC | N/A | SHCLCW1670 | N/A | 04/15/2021 | N/A | N/A | N/A | Cure amount resolved |
| 2 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | 1-800 REMODEL, INC | N/A | CW2321864 | N/A | 04/15/2021 | - | - | - | |
| 3 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | 1-800 REMODEL, INC | MASTER LEAD AGGREGATION SERVICES AGREEMENT - 2012 | SHC-112308 | N/A | 11/01/2019 | - | - | - | |
| 4 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO. | A & GS CONTRACTOR INC | FAC - AGS CONTRACTOR INC - MSA 2018 | CW2338384 | N/A | 06/11/2019 | - | - | - | |
| 5 | N/A | SEARS, ROEBUCK AND CO. | AADVANTAGE NORTHAMERICAN | SUPPLY CHAIN- AADVANTAGE NORTH AMERICAN- SEARS MSA 2015 | CW2299401 | N/A | 01/02/2021 | N/A | N/A | N/A | Cure amount resolved |
| 6 | N/A | SEARS, ROEBUCK AND CO. | AADVANTAGE NORTHAMERICAN | SUPPLY CHAIN- AADVANTAGE NORTH AMERICAN- WAREHOUSE MSA 2016 | CW2309873 | N/A | 01/02/2021 | - | - | - | |
| 7 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | ONLINE ACCERTIFY SOW 6 THREATMATREX | CW2256736 | N/A | 02/28/2019 | N/A | N/A | N/A | Cure amount resolved |
| 8 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | IT - ACCERTIFY - MSAASMSA - 2012 | CW2211067 | N/A | 09/04/2020 | - | - | - | |
| 9 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | CUST DIR - ACCERTIFY INC - STATEMENT OF WORK 1 TO MASTER SOFTWARE SERVICES AGREEMENT - 2012 | SHCLCW5184 | N/A | 02/28/2019 | - | - | - | |
| 10 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | RETAIL SERVICES - ACCERTIFY - SOW 8 CREDIT CARD CHARGEBACK MANAGEMENT 20140519 | CW2278410 | N/A | 09/04/2020 | - | - | - | |
| 11 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | RETAIL SERVICES - ACCERTIFY - SOW 9 GRADIENT BOOSTING MACHINE MODEL - 20151005 | CW2306457 | N/A | 02/28/2019 | - | - | - | |
| 12 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | AMENDMENT #1 TO STATEMENT OF WORK #6(EXTEND TERM) | N/A | N/A | 2/28/2019 | - | - | - | |
| 13 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | AMENDMENT #1TO STATEMENT OF WORK #1(EXTEND TERM)DATED: OCTOBER 5, 2015 | N/A | N/A | 02/28/2019 | - | - | - | |
| 14 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | SOW #15ETHOCADATED: JANUARY 15, 2018 | N/A | N/A | 2/28/2019 | - | - | - | |
| 15 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | SOW #9MACHINE LEARNING GRADIENT BOOSTING MACHINE MODEL | N/A | N/A | 2/28/2019 | - | - | - | |
| 16 | 1846 | SEARS HOLDINGS MANAGEMENT CORPORATION | ACCERTIFY INC | AMENDMENT #1 TO SOW #8 | N/A | N/A | 09/04/2020 | - | - | - | |
| 17 | N/A | SEARS ROEBUCK AND CO. ; SEARS OPERATIONS LLC ; KMART CORPORATION ; KMART OPERATIONS LLC | ACE ROOF COATINGS, INC | MAJOR MAINTENANCE AGREEMENT | N/A | N/A | 11/12/2018 | - | - | - | |
| 18 | N/A | SEARS, ROEBUCK AND CO. | ACME PLATING, INC | LICENSE AGREEMENT MERRITT ISLAND, FL STORE 1175 | N/A | N/A | 03/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 19 | N/A | SHC LICENSED BUSINESS LLC | ACME PLATING, INC | B2B LICENSE AGREEMENT MERRITT ISLAND, FL STORE 1175 | N/A | N/A | 03/31/2019 | - | - | - | |
| 20 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | ACTION TIME, INC., | FIFTH AMENDMENT (FIFTH AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OF APRIL 1,2015 | N/A | N/A | 4/30/2020 | N/A | N/A | N/A | Cure amount resolved |

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | N/A | KMART CORPORATION | ACTION TIME, INC., | FIFTH AMENDMENT (FIFTH AMENDMENT) TO THE LICENSE AGREEMENTIS MADE AS OF APRIL 1,2015 | N/A | N/A | 4/30/2020 | - | - | - | |
| 22 | N/A | KMART CORPORATION; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SHC LICENSED BUSINESS LLC | ACTION TIME, INC., | SEVENTH AMENDMENT TO THE LICENSE AGREEMENT IS MADE AS OFJULY 26, 2016 | N/A | N/A | 4/30/2020 | - | - | - | |
| 23 | N/A | SHC LICENSED BUSINESS LLC | ACTION TIME, INC., | EIGHTH AMENDMENT TO THE LICENSE AGREEMENTI MADE AS OFMARCH 28, 2018 | N/A | N/A | 04/30/2020 | - | - | - | |
| 24 | N/A | KMART CORPORATION; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | ACTION TIME, INC., | EIGHTH AMENDMENT TO THE LICENSE AGREEMENTIS MADE AS OFMARCH 28, 2018 | N/A | N/A | 04/30/2020 | - | - | - | |
| 25 | N/A | SEARS, ROEBUCK AND CO. | ACTION TIME, INC., | THIRD AMENDMENT  TO THE LICENSE AGREEMENT IS MADE AS OF DECEMBER 10,2013 | N/A | N/A | 4/30/2020 | - | - | - | |
| 26 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ACTION TIME, INC., | THIRD AMENDMENT TO THE LICENSE AGREEMENT IS MADE AS OF DECEMBER 10, 2013 | N/A | N/A | 4/30/2020 | - | - | - | |
| 27 | N/A | KMART CORPORATION; SEARS BRANDS MANAGEMENT CORP.; SEARS, ROEBUCK AND CO. | ADH GUARDIAN USA LLC | SUPPLY AGREEMENT FOR GARAGE DOOR OPENERS | N/A | N/A | Expired | N/A | N/A | N/A | Cure amount resolved |
| 28 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ADOBE SYSTEMS INCORPORATED | MKTG - ONLINE - ADOBE - OMNITURE SO - 2017 | CW2331543 | N/A | 04/30/2020 | N/A | N/A | N/A | Cure amount resolved |
| 29 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ADOBE SYSTEMS INCORPORATED | HS - ADOBE - SO WORKBENCH - 2018 | CW2336125 | N/A | 06/30/2019 | - | - | - | |
| 30 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ADOBE SYSTEMS INCORPORATED | MKTG - ADOBE - GENERAL TERMS (MASTER ENTERPRISE LICENSING TERMS) - 2016 | CW2316531 | N/A | 07/19/2020 | N/A | N/A | N/A | Cure amount resolved |
| 31 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ADOBE SYSTEMS INCORPORATED | CUST EXP - ADOBE - SO FOR TEST AND TARGET_2018 | CW2338793 | N/A | 04/30/2020 | - | - | - | |
| 32 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ADOBE SYSTEMS INCORPORATED | HS - ADOBE - SO FOR HS ANALYTICS - 2017 | CW2333692 | N/A | 12/31/2018 | - | - | - | |
| 33 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ADOBE SYSTEMS INCORPORATED | HS - ADOBE - PARTS DIRECT SO - 2018 | CW2339895 | N/A | 07/31/2019 | - | - | - | |
| 34 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ADOBE SYSTEMS INCORPORATED | ADOBE SALES ORDER | N/A | N/A | 09/30/2108 | - | - | - | |
| 35 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | AIRES | AIRES RELOCATION SERVICES SOW | CW2331639 | N/A | 08/30/2020 | N/A | N/A | N/A | Cure amount resolved |
| 36 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | AIRES | AIRES RELOCATION SERVICES MASTER SERVICES AGREEMENT | CW2331637 | N/A | 08/30/2020 | - | - | - | |
| 37 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | AJB SOFTWARE DESIGN INC | IT-AJB SOFTWARE DESIGN- MSSA AND AMENDMENT NO.1 TO MSSA-11 | SHCLCW1 | N/A | 10/06/2019 | - | - | - | |
| 38 | N/A | SEARS HOLDINGS CORPORATION | ALLIED WORLD ASSURANCE CO. LTD | EXCESS LIABILITY | C018491/006 | N/A | 08/01/2019 | - | - | - | |
| 39 | N/A | SEARS HOLDINGS CORPORATION | AON CORPORATION | FINANCE - AON CORPORATION - MASTER SERVICES AGREEMENT (INSURANCE RELATED SERVICES) - 2011 | CW2315266 | N/A | 10/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 40 | N/A | SEARS HOLDINGS CORPORATION | AON CORPORATION | FINANCE_AON RISK_SOW 4_2017 | CW2332798 | N/A | 10/30/2019 | - | - | - | |

Sears Holdings Corporation
Executory Contracts for Assignment

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO. | AON CORPORATION | APP- AON GLOBAL RISK- RISK PROPERTY SURVEY- 2017 | CW2330470 | N/A | 06/30/2020 | - | - | | |
| 42 | N/A | INNOVEL SOLUTIONS, INC. | APOGEE DELIVERY AND INSTALLATION INC | SUPPLY CHAIN - APOGEE DELIVERY AND INSTALLATION, INC. - MSA 2018 | CW2339487 | N/A | 06/10/2023 | N/A | N/A | N/A | Cure amount resolved |
| 43 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | APPLAUSE | SOW 04 | CW2340081 | N/A | 9/23/2019 | - | - | - | |
| 44 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | APPLAUSE APP QUALITY, INC. | ONLINE - APPLAUSE - MASTER SERVICES AGREEMENT - 2014 | CW2288942 | N/A | 09/23/2021 | N/A | N/A | N/A | Cure amount resolved |
| 45 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | APPLAUSE APP QUALITY, INC. | ONLINE - APPLAUSE - SOW 4 - 2018 FUNTIONAL TESTING SERVICES - OCT 2018 | CW2340081 | N/A | 09/23/2019 | - | - | - | |
| 46 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | APPLAUSE APP QUALITY, INC. | AMENDMENT #2 TO MASTER SERVICES AGREEMENT(APPLAUSE APP QUALITY, INC.  EXTEND TERM) DATED: SEPTEMBER 21, 2018 | N/A | N/A | 09/23/2021 | - | - | - | |
| 47 | N/A | SEARS BRANDS MANAGEMENT CORP. | APPLAUSE APP QUALITY, INC. | APPLAUSE STATEMENT OF WORK | N/A | N/A | 11/18/2018 | - | - | - | |
| 48 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | APPLAUSE APP QUALITY, INC. | N/A | CW2288942 | N/A | 9/23/2021 | - | - | - | |
| 49 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | APPLAUSE APP QUALITY, INC. | ONLINE - APPLAUSE - SOW 4 - 2018 FUNTIONAL TESTING SERVICES - OCT 2018 | CW2340081 | N/A | 9/23/2019 | - | - | - | |
| 50 | N/A | KMART CORPORATION | APPRISS INC | RS - APPRISS, INC- MASTER SOFTWARE AND SERVICES AGREEMENT - 2010 | SHCLCW5424 | N/A | 12/12/2020 | N/A | N/A | N/A | Cure amount resolved |
| 51 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPECT SOFTWARE INC | MSO - ASPECT SOFTWARE - MSA - 2003 | CW2308212 | N/A | 01/17/2020 | - | - | - | |
| 52 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPECT SOFTWARE INC | N/A | CW2308212 | N/A | 1/17/2020 | - | - | - | |
| 53 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPECT SOFTWARE INC | N/A | CW2340831 | N/A | 12/31/2018 | - | - | - | |
| 54 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPECT SOFTWARE INC | N/A | CW2340831 | N/A | 12/31/2018 | - | - | - | |
| 55 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPECT SOFTWARE INC | MSO-ASPECT SOFTWARE-SOW-WFM UPGRADE-NOV 2018 | CW2340831 | N/A | 12/31/2018 | - | - | - | |
| 56 | 2406 1919 | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPEN REFRIGERANTS, INC | HS-AIRGAS REFRIGERANTS-REFRIGERANT AND RECLAMATION SERVICES AGREEMENT-2013 | SHCLCW4031 | N/A | 10/31/2021 | N/A | N/A | N/A | Cure amount resolved |
| 57 | 2406 1919 | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPEN REFRIGERANTS, INC | N/A | 31 INTERNAL ID C | N/A | 10/31/2021 | - | - | - | |
| 58 | 2406 1919 | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPEN REFRIGERANTS, INC | N/A | N/A | N/A | 10/31/2021 | - | - | - | |
| 59 | 2406 1919 | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPEN REFRIGERANTS, INC | MASTER AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 60 | 2406 1919 | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPEN REFRIGERANTS, INC | AMENDMENT 1 | N/A | N/A | N/A | - | - | - | |
| 61 | 2406 1919 | SEARS HOLDINGS CORPORATION | ASPEN REFRIGERANTS, INC | VTER FORM | SHCLCW4031 | N/A | 10/31/2021 | - | - | - | |
| 62 | 2406 1919 | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPEN REFRIGERANTS, INC | AMENDMENT 1 | SHCLCW4031 | N/A | 10/31/2021 | - | - | - | |
| 63 | 2406 1919 | SEARS HOLDINGS MANAGEMENT CORPORATION | ASPEN REFRIGERANTS, INC | HS-AIRGAS REFRIGERANTS-REFRIGERANT AND RECLAMATION SERVICES AGREEMENT-2013 | SHCLCW4031 | N/A | 10/31/2021 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64 | N/A | KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | ATC GROUP SERVICES INC | FAC - ATC GROUP SERVICES - MESA 2018 | CW2334694 | N/A | 01/14/2020 | N/A | N/A | N/A | Cure amount resolved |
| 65 | N/A | SEARS, ROEBUCK AND CO. | ATEQ CORP | FACILITIES-AUTOMOTIVE-ATEQ TPMS TOOLS LLC- MSA-2017 | CW2332784 | N/A | 10/09/2020 | - | - | - | |
| 66 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | AUDITEC SOLUTIONS | FIN - AUDITEC SOLUTIONS - MASTER SERVICES AGREEMENT - 2012 | SHCLCW5815 | N/A | 07/31/2020 | N/A | N/A | N/A | Cure amount resolved |
| 67 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | AUDITEC SOLUTIONS | FIN - AUDITEC SOLUTIONS - STATEMENT OF WORK 1 TO MSA - 2012 | SHCLCW5816 | N/A | 12/31/2018 | - | - | - | |
| 68 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | AUDITEC SOLUTIONS | FINANCE_AUDITEC SOLUTIONS_SOW 2_2016 | CW2316286 | N/A | 07/31/2020 | - | - | - | |
| 69 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | AVIS BUDGET CAR RENTAL, LLC | FIN-MSA-AVIS CAR RENTAL-2015 | CW2294932 | N/A | 02/14/2021 | N/A | N/A | N/A | Cure amount resolved |
| 70 | N/A | SEARS HOLDINGS CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | AVIS BUDGET CAR RENTAL, LLC | FIFTH AMENDMENT TO THE AFFILIATION AGREEMENT DATED OCT 10 2012 | N/A | N/A | N/A | - | - | - | |
| 71 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO,; SHC LICENSED BUSINESS LLC | AVIS BUDGET CAR RENTAL, LLC | AFFILIATION AGREEMENT ENTERED INTO AS OF 11/29/2016 | N/A | N/A | 01/31/2022 | - | - | - | |
| 72 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | AVIS BUDGET CAR RENTAL, LLC | EIGHTH AMENDMENT -6/12/2014- TO THE AFFILIATION AGREEMENT(101/2002) | N/A | N/A | 1/31/2022 | - | - | - | |
| 73 | N/A | SHC LICENSED BUSINESS LLC | AVIS BUDGET CAR RENTAL, LLC | LETTER AGREEMENT 3/8/2018 TO AFFILIATION AGREEMENT DATED 11/29/16 | N/A | N/A | N/A | - | - | - | |
| 74 | N/A | SEARS HOLDINGS CORPORATION; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | AVIS BUDGET CAR RENTAL, LLC | AMENDMENT TO CAR RENTAL FINITE #195-005 DATED  OCTOBER 09, 2012 TO AN AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 75 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO,; SHC LICENSED BUSINESS LLC | AVIS BUDGET CAR RENTAL, LLC | AFFILIATION AGREEMENT ENTERED INTO AS OF 11/29/2016 | N/A | N/A | 01/31/2022 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 76 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | AVIS BUDGET CAR RENTAL, LLC | EIGHTH AMENDMENT -6/12/2014- TO THE AFFILIATION AGREEMENT(101/2002) | N/A | N/A | 1/31/2022 | - | - | - | |
| 77 | N/A | SEARS HOLDINGS CORPORATION; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | AVIS BUDGET CAR RENTAL, LLC | AMENDMENT TO CAR RENTAL FINITE #195-005 DATED  OCTOBER 09, 2012 TO AN AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 78 | N/A | SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | AVIS RENT A CAR SYSTEM LLC | AMENDMENTCAR RENTAL MADE AND ENTERED INTO ON _____, 2003, TO AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 79 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | AVIS RENT A CAR SYSTEM LLC | THIS AMENDMENT (AMENDMENT) IS MADE AND ENTERED INTO ON JUNE 6, 2005AN AFFILIATION AGREEMENT DATED JUNE 30, 2004 | N/A | N/A | N/A | - | - | - | |
| 80 | N/A | SEARS ROEBUCK ACCEPTANCE CORP.; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL APRIL 30, 2010 TO  AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 81 | N/A | SEARS ROEBUCK ACCEPTANCE CORP.; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL FEBRUARY 10, 2006 TO  AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 82 | N/A | SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTALJUNE 6, 2008 TO  AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 83 | N/A | SEARS ROEBUCK ACCEPTANCE CORP. | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL JUNE 6, 2008 TO  AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 84 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL SEPTEMBER 29, 2010 TO  AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 85 | N/A | SEARS, ROEBUCK AND CO. | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL SEPTEMBER 29, 2010TO  AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 86 | N/A | SEARS ROEBUCK ACCEPTANCE CORP. | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTALSEPTEMBER 29, 2010TO  AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 87 | N/A | SEARS ROEBUCK ACCEPTANCE CORP.; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL DECEMBER 17, 2003 TO  AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 88 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL DECEMBER 17, 2003 TO AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 (WITH SEARS NATIONAL BANK) | N/A | N/A | N/A | - | - | - | - |
| 89 | N/A | SEARS ROEBUCK ACCEPTANCE CORP.; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL JUNE 9 2009, TO AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | - |
| 90 | N/A | SEARS ROEBUCK ACCEPTANCE CORP.; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | AVIS RENT A CAR SYSTEM LLC | AMENDMENT CAR RENTAL JUNE 9 2009, TO AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | - |
| 91 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BALANCE INNOVATIONS | SEARS RETAIL SERVICES - BALANCE INNOVATIONS - MHSSA - SEP 2016 | CW2318075 | N/A | 09/11/2019 | N/A | N/A | N/A | Cure amount resolved |
| 92 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BALANCE INNOVATIONS | RETAIL SERVICES - BALANCE INNOVATIONS - SOW 1 - AUTOMATED CASH MGT SOLUTION - SEPT 2016 | CW2318091 | N/A | 09/11/2019 | - | - | - | - |
| 93 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BCI ACRYLIC BATH SYSTEMS, INC | SECOND AMENDMENT TOSUPPLY AGREEMENTFOR BATHROOM REMODELING PRODUCTS | N/A | N/A | 12/31/2019 | - | - | - | - |
| 94 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BCI ACRYLIC BATH SYSTEMS, INC | SUPPLY AGREEMENT | SHC-113003 | N/A | 01/05/2021 | - | - | - | - |
| 95 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | Berch Cabinent Manufacturing, Inc. | Supply Agreement for Cabinetry | N/A | N/A | 1/0/1900 | - | - | - | - |
| 96 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BERTCH CABINET MFG.,INC | 3RD AMENDMENT TO THE AMENDED AND RESTATEDSUPPLY AGREEMENT FOR BATH CABINETRY PRODUCTS | CW2277664 | N/A | 12/31/2019 | - | - | - | - |
| 97 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BESTMARK INC | RS - BESTMARK INC - MASTER SERVICES AGREEMENT - 2013 | SHCLCW6224 | N/A | 11/19/2019 | N/A | N/A | N/A | Cure amount resolved |
| 98 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BESTMARK INC | CORPORATE SERVICES - BESTMARK, INC. - MYSTERY SHOPPER PROJECT - SOW 3 - 2017 | CW2323974 | N/A | 12/31/2018 | - | - | - | - |
| 99 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BLUE TRIANGLE TECHNOLOGIES, INC | MASTER SOFTWARE AS A SERVICE MANAGED SERVICES AGREEMENT | N/A | N/A | 2/13/2019 | N/A | N/A | N/A | Cure amount resolved |
| 100 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | BMJ FOOD PUERTO RICO, INC | BMJ FOOD PR INC TENANT LEASE | N/A | N/A | 12/31/2028 | N/A | N/A | N/A | Cure amount resolved |
| 101 | N/A | INNOVEL SOLUTIONS, INC. | BORDER TRANSFER INC | SUPPLY CHAIN- BORDER TRANSFER, INC- MSA 2017 | CW2321874 | N/A | 12/31/2022 | N/A | N/A | N/A | Cure amount resolved |
| 102 | N/A | INNOVEL SOLUTIONS, INC. | BORDER TRANSFER INC | SUPPLY CHAIN- BORDER TRANSFER OF MA- MSA 2017 | CW2321878 | N/A | 12/31/2022 | - | - | - | - |
| 103 | N/A | INNOVEL SOLUTIONS, INC. | BORDER TRANSFER INC | SUPPLY CHAIN- BORDER TRANSFER OF MA- EXHIBIT (WESTWOOD) | CW2321880 | N/A | 09/28/2019 | - | - | - | - |
| 104 | N/A | INNOVEL SOLUTIONS, INC. | BORDER TRANSFER INC | SUPPLY CHAIN- BORDER TRANSFER, INC- EXHIBIT (MILPITAS) | CW2321882 | N/A | 09/28/2019 | - | - | - | - |
| 105 | N/A | INNOVEL SOLUTIONS, INC. | BORDER TRANSFER INC | SUPPLY CHAIN- BORDER TRANSFER, INC- EXHIBIT (FRESNO,CA) 2017 | CW2330846 | N/A | 06/27/2020 | - | - | - | - |

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 106 | N/A | KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | BRADBURNE BRILLER & JOHNSON LLC | FAC-ENVIRONMENTAL CONSULTANTS-BBJ GROUP-MESA | CW2333459 | N/A | 11/09/2020 | N/A | N/A | N/A | Cure amount resolved |
| 107 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BRIDGELINE DIGITAL, INC. | MKTG - HOME SERVICES - BRIDGELINE - MSA - 2017 | CW2331241 | N/A | 08/07/2020 | N/A | N/A | N/A | Cure amount resolved |
| 108 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BRIDGELINE DIGITAL, INC. | MKTG - HOME SERVICES - BRIDGELINE - MSSA - 2017 | CW2331239 | N/A | 08/07/2022 | - | - | - | |
| 109 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BRIDGELINE DIGITAL, INC. | IAPPS MANAGED HOSTING AGREEMENT | | N/A | 8/8/2022 | - | - | - | |
| 110 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | BRIGHTCLAIM, LLC(S-GS2895) | MASTER SERVICES AGREEMENT | CW2318516 | N/A | N/A | N/A | N/A | N/A | Cure amount resolved |
| 111 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BRIGHTEDGE TECHNOLOGIES INC | HS - BRIGHTEDGE - ORDER FORM - 2017 | CW2334113 | N/A | 12/31/2018 | N/A | N/A | N/A | Cure amount resolved |
| 112 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BRIGHTEDGE TECHNOLOGIES INC | CUST DIR - BRIGHTEDGE - MASTER SOFTWARE AS A SERVICES MANAGED SERVICES AGREEMENT - 2012 | SHCLCW5916 | N/A | 03/31/2021 | - | - | - | |
| 113 | N/A | SEARS HOLDINGS CORPORATION | BRIGHTEDGE TECHNOLOGIES INC | ORDER FORM | CW2341079 | N/A | 12/31/2019 | - | - | - | |
| 114 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BRINQA LLC. | IT - BRINQA LLC - SERVICE AGREEMENT(BRINQA THREAT AND VULNERABILITY) | CW2332253 | N/A | 9/19/2019 | - | - | - | |
| 115 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BRINQA LLC. | IT - BRINQA LLC - EVALUATION AGREEMENT(BRINQA THREAT AND VULNERABILITY) - 2016 | CW2320768 | N/A | 09/12/2019 | N/A | N/A | N/A | Cure amount resolved |
| 116 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | BROOKFIELD EQUINOX LLC-701289 | MEMBER TECH - BROOKFIELD EQUINOX - SOW 2 - P2PE VALIDATION SERVICES - JUNE 2017 | CW2330055 | N/A | 06/13/2019 | N/A | N/A | N/A | Cure amount resolved |
| 117 | N/A | KMART CORPORATION; SEARS, ROEBUCK DE PUERTO RICO, | BUD HILLS SECURITY & SERVICES-986062 | FIN-BUD HILLS SECURITY AND SERVICES-ARMORED CAR SERVICES AGREEMENT-2012 | SHCLCW4146 | N/A | 04/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 118 | N/A | SEARS HOLDINGS CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | BUDGET RENT A CARSYSTEM, INC | AMENDMENT CAR RENTAL 10/9/2012 TO AN AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 119 | N/A | SEARS HOLDINGS CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | BUDGET RENT A CARSYSTEM, INC | AMENDMENT CAR RENTAL 10/9/2012 TO AN AFFILIATION AGREEMENT DATED OCTOBER 1, 2002 | N/A | N/A | N/A | - | - | - | |
| 120 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | BUDGET TRUCK RENTAL LLC | BUDGET TRUCK RENTAL ADDENDUM 3/9/2010 | N/A | N/A | 01/31/2022 | - | - | - | |
| 121 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | BUDGET TRUCK RENTAL LLC | THIRD AMENDMENT EFFECTIVE AS OF MAY 1, 2010 TO AFFILIATION AGREEMENT DATED OCTOBER 1,2002. | N/A | N/A | N/A | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 122 | N/A | SEARS HOLDINGS CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | BUDGET TRUCK RENTAL LLC | FOURTH AMENDMENT TO AFFILIATION AGREREMENT - 2/9/2012. | N/A | N/A | N/A | - | - | - | |
| 123 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | BUDGET TRUCK RENTAL LLC | THIRD AMENDMENT EFFECTIVE AS OF MAY 1, 2010 TO AFFILIATION AGREEMENT DATED OCTOBER 1,2002. | N/A | N/A | N/A | - | - | - | |
| 124 | N/A | SEARS HOLDINGS CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | BUDGET TRUCK RENTAL LLC | FOURTH AMENDMENT TO AFFILIATION AGREREMENT - 2/9/2012. | N/A | N/A | N/A | - | - | - | |
| 125 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | CALIFORNIA COMMERCIAL ROOFING SYSTEMS | SOAR (RETAIL SERVICES) CALIFORNIA COMMERCIAL ROOFING _ SEARS 2451 GREELEY, CO _ ROOF REPLACEMENT 2018 _ RISK | CW2339854 | N/A | 12/14/2018 | N/A | N/A | N/A | Cure amount resolved |
| 126 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION | CARBONITE INC- 194946757 | PHARMACY CARBONITE ENTERPRISE AGREEMENT 2018 | CW2338812 | N/A | 07/16/2019 | N/A | N/A | N/A | Cure amount resolved |
| 127 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CAREERBUILDER, LLC | CAREERBUILDER MASTER SERVICES AGREEMENT | CW2319809 | N/A | 11/08/2019 | N/A | N/A | N/A | Cure amount resolved |
| 128 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CAREERBUILDER, LLC | CAREERBUILDER SOW AND ORDER FORM 2017 | CW2332500 | N/A | 11/08/2018 | - | - | - | |
| 129 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CAREERBUILDER, LLC | N/A | CW2319809 | N/A | 11/8/2019 | - | - | - | |
| 130 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CAREERBUILDER, LLC | N/A | CW2340591 | N/A | 11/8/2019 | - | - | - | |
| 131 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CAREERBUILDER, LLC | N/A | CW2340591 | N/A | 11/8/2019 | - | - | - | |
| 132 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CAREERBUILDER, LLC | MASTER AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 133 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CAREERBUILDER, LLC | AMENDMENT 1 | N/A | N/A | N/A | - | - | - | |
| 134 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CAREERBUILDER, LLC | ORDER FORM | N/A | N/A | N/A | - | - | - | |
| 135 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CARFAX INC | IT - CARFAX INC - DATA TRANSFER FACILITATION AGREEMENT - 2016 | CW2319311 | N/A | 09/28/2030 | N/A | N/A | N/A | Cure amount resolved |
| 136 | 1818 | INNOVEL SOLUTIONS, INC.; KMART CORPORATION; SEARS HOME IMPROVEMENT PRODUCT; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | CASCADE WATER SERVICES | FAC - CASCADE WATER SERVICES INC - MASTER SERVICES AGREEMENT - 2012 | SHCLCW7063 | N/A | 02/28/2020 | N/A | N/A | N/A | Cure amount resolved |
| 137 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CCH INC | FIN - CCH INC - STRATEGIC ACCOUNT AGREEMENT - 2012 | SHCLCW5483 | N/A | 07/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 138 | N/A | SEARS HOLDINGS CORPORATION | CENTRICITY | HOME SERVICES CENTRICITY MSA AND SOW 2017 | CW2334174 | N/A | 12/28/2020 | N/A | N/A | N/A | Cure amount resolved |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 139 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CENTRICITY | HOME SERVICES CENTRICITY SOW 2 | CW2335791 | N/A | 02/21/2020 | - | - | - | |
| 140 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK DE PUERTO RICO | CENTRO TECHNICO DE REPARACION DE RELOJES, INC. | LIC AGMT B2B CENTRO TECNICO | N/A | N/A | 07/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 141 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CERTONA CORPORATION | IR - CERTONA - MSAASMSA - 20160614 | CW2315490 | N/A | 06/19/2020 | N/A | N/A | N/A | Cure amount resolved |
| 142 | N/A | INNOVEL SOLUTIONS, INC. | CEVA FREIGHT, LLC | LARGE PARCEL TRANSPORTATION AGREEMENT | N/A | N/A | 08/03/2019 | N/A | N/A | N/A | Cure amount resolved |
| 143 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CHAR-BROIL LLC | RIDER TO DIRECT TO CUSTOMER TERMS AND CONDITIONS | N/A | N/A | Recurring | N/A | N/A | N/A | Cure amount resolved |
| 144 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CLARABRIDGE INC-695085 | MEMBER TECHNOLOGY - CLARABRIDGE - SOW 15 - 2018 | CW2336591 | N/A | 03/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 145 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CLARABRIDGE INC-695085 | MEMBER TECH - CLARABRIDGE - MSSA 2018 | CW2339334 | N/A | 08/16/2019 | - | - | - | |
| 146 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CLARABRIDGE INC-695085 | MEMBER TECH - CLARABRIDGE - SOCIAL SOW1 - 2018 | CW2339343 | N/A | 08/16/2019 | - | - | - | |
| 147 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CLICKSOFTWARE INC. | HS - CLICKSOFTWARE - MSAASA - 2016 | CW2318916 | N/A | 09/30/2021 | - | - | - | |
| 148 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CLICKSOFTWARE INC. | HOME SERVICES - CLICK SOFTWARE - SOW - DEC 2018 | CW2341195 | N/A | 2/28/2019 | - | - | - | |
| 149 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CLICKSOFTWARE INC. | HS - CLICKSOFTWARE - CHANGE REQUEST - 2018 | CW2335582 | N/A | 09/30/2021 | N/A | N/A | N/A | Cure amount resolved |
| 150 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CLICKTALE INC | AMENDMENT 1 TO MASTER SOFTWARE AS A SERVICE MANAGED SERVICES AGREEMENT(EXTEND TERM | N/A | N/A | 04/29/2020 | - | - | - | |
| 151 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | CORPORATE SERVICES - CALL CENTER SERVICES - ATENTO - MOSA 2017 | CW2332515 | N/A | 10/19/2022 | N/A | N/A | N/A | Cure amount resolved |
| 152 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | CORPORATE SERVICES - MSO - REPAIR SPANISH CALLS - ATENTO - SOW 1 - 2018 | CW2334567 | N/A | 01/31/2021 | - | - | - | |
| 153 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | CORPORATE SERVICES - MSO - DELIVERY SPANISH CALLS - ATENTO - SOW 5 - 2018 | CW2334581 | N/A | 01/31/2021 | - | - | - | |
| 154 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | CORPORATE SERVICES - MSO - ONLINE SPANISH CALLS - ATENTO - SOW 2 - 2018 | CW2334571 | N/A | 01/31/2021 | - | - | - | |
| 155 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | CORPORATE SERVICES - MSO - SYW SPANISH CALLS - ATENTO - SOW 6 - 2018 | CW2334583 | N/A | 01/31/2021 | - | - | - | |
| 156 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | CORPORATE SERVICES - MSO - PARTS SPANISH CALLS - ATENTO - SOW 3 - 2018 | CW2334573 | N/A | 01/31/2021 | - | - | - | |
| 157 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | CORPORATE SERVICES - MSO - CUSTOMER SOLUTIONS SPANISH CALLS - ATENTO - SOW 4 - 2018 | CW2334578 | N/A | 01/31/2022 | - | - | - | |
| 158 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | N/A | CW2337460 | N/A | 1/31/2022 | - | - | - | |
| 159 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | CONTACT US TELESERVICES, INC | N/A | CW2337464 | N/A | 1/31/2022 | - | - | - | |
| 160 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DATA PARTNERS INC-63271668 | MT DATA PARTNERS, INC. MSA | CW2338257 | N/A | 06/12/2021 | N/A | N/A | N/A | Cure amount resolved |

Sears Holdings Corporation
Executory Contracts for Assignment

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 161 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | DDP ROOFING SERVICES INC | SOAR (RETAIL SERVICES) DDP ROOFING SERVICES INC - SEARS 6875-1365 MIAMI, FL _ ROOF REPLACEMENT_2018 RISK | CW2339038 | N/A | 11/15/2018 | N/A | N/A | N/A | Cure amount resolved |
| 162 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | Decore-active Specialities, Inc. | Supply Agreement for Cabinetry | N/A | N/A | 1/0/1900 | - | - | - | |
| 163 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | DECORE-ATIVE SPECIALTIES(S-G52919) | FOURTH AMENDMENT TOSUPPLY AGREEMENT FOR CABINETRY PRODUCTS | SHCLCW4138 | N/A | N/A | - | - | - | |
| 164 | N/A | SEARS, ROEBUCK AND CO. | DENTALCARE PARTNERS, INC. | LICENSE AGREEMENT , JULY 5,2009 | N/A | N/A | 07/04/2020 | N/A | N/A | N/A | Cure amount resolved |
| 165 | N/A | SEARS, ROEBUCK AND CO. | DENTALCARE PARTNERS, INC. | AMENDMENT  DENTAL FINITE #195-050 11/12/07 TO LICENSE AGREEMENT DATED 6/19/95 | N/A | N/A | 7/4/2020 | - | - | - | |
| 166 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DESCARTES SYSTEMS USA LLC | SC-DESCARTES SYSTEMS-MASTER SOFTWARE AND SERVICES AGREEMENT-2013 | SHCLCW1587 | N/A | 08/28/2019 | N/A | N/A | N/A | Cure amount resolved |
| 167 | N/A | SEARS, ROEBUCK AND CO. | DIAKON LOGISTICS | SUPPLY CHAIN- DIAKON LOGISTICS-EXHIBITS (CAPE GIRARDEAU,COLUMBIA) 2017 | CW2339861 | N/A | 11/23/2019 | N/A | N/A | N/A | Cure amount resolved |
| 168 | N/A | SEARS, ROEBUCK AND CO. | DIAKON LOGISTICS | SUPPLY CHAIN- DIAKON LOGISTICS-SEARS MSA 2015 | CW2308840 | N/A | 11/24/2019 | - | - | - | |
| 169 | N/A | INNOVEL SOLUTIONS, INC. | DIAKON LOGISTICS | SUPPLY CHAIN- DIAKON LOGISTICS-WAREHOUSE MSA 2015 | CW2308820 | N/A | 08/15/2020 | - | - | - | |
| 170 | N/A | INNOVEL SOLUTIONS, INC. | DIAKON LOGISTICS | SUPPLY CHAIN- DIAKON LOGISTICS-MSA 2015 | CW2308822 | N/A | 08/15/2020 | - | - | - | |
| 171 | N/A | INNOVEL SOLUTIONS, INC. | DIAKON LOGISTICS | SUPPLY CHAIN- DIAKON LOGISTICS-EXHIBITS (GRANITE CITY, RIVERSIDE) | CW2321884 | N/A | 09/28/2019 | - | - | - | |
| 172 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DIALOGTECH INC | HS - DIALOGTECH - SO - HOME IMPROVEMENT - 2018 | CW2338060 | N/A | 06/30/2020 | - | - | - | |
| 173 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DIALOGTECH INC | MASTER SOFTWAREAS A SERVICEMANAGED SERVICES AGREEMENT | CW2253910 | N/A | N/A | - | - | - | |
| 174 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DIALOGTECH INC | HS - DIALOGTECH - PARTS DIRECT - SO - 2018 | CW2338127 | N/A | 06/30/2020 | N/A | N/A | N/A | Cure amount resolved |
| 175 | 2235 | KMART CORPORATION | DIRECT ENERGY BUSINESS LLC | SHC SEARS CA 2018 - DIRECT ENERGY - SOUTHERN CALIFORNIA EDISON | CW2336258 | N/A | 11/30/2018 | N/A | N/A | N/A | Cure amount resolved |
| 176 | 2235 | SEARS, ROEBUCK AND CO. | DIRECT ENERGY BUSINESS LLC | SHC SEARS CA 2018 - DIRECT ENERGY - PACIFIC GAS AND ELECTRIC CO | CW2334070 | N/A | 11/30/2018 | N/A | N/A | N/A | Cure amount resolved |
| 177 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DOCUSIGN INC | FINANCE  - DOCUSIGN INC - CORPORATE EDITION TERMS AND CONDITIONS - 04152013 | CW2257443 | N/A | 04/12/2019 | N/A | N/A | N/A | Cure amount resolved |
| 178 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DOCUSIGN INC | FINANCE -  DOCUSIGN PROCUREMENT RENEWAL FOR 2018  - APRIL 2018 | CW2271504 | N/A | 04/12/2019 | - | - | - | |
| 179 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DOMO INC. | AUTO DOMO SOW 10 | CW2337634 | N/A | 05/14/2019 | - | - | - | |
| 180 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DOMO INC. | HS - DOMO INC. - MSA AND SOW 1 (PILOT) - 2015 | CW2303302 | N/A | 07/13/2019 | - | - | - | |

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 181 | N/A | SHC LICENSED BUSINESS, LLC | DORIBEL E. PLEITEZ MENJIVAR | LICENSE AGREEMENT | N/A | N/A | 7/1/2019 | N/A | N/A | N/A | Cure amount resolved |
| 182 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DRIVERS ALERT | FAC-HOME SERVICES-DRIVERS ALERT-MSA-2018 | CW2335073 | N/A | 01/31/2021 | N/A | N/A | N/A | Cure amount resolved |
| 183 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | DUN & BRADSTREET | CORPORATE SERVICES - D AND B SUPPLIER RISK MANAGER - ACCOUNTING 2018 | CW2303002 | N/A | 07/31/2021 | - | - | - | |
| 184 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO.; SEARS ROEBUCK DE PUERTO RICO | DUNBAR ARMORED INC | FIN-DUNBAR ARMORED, INC-ARMORED CAR SERVICES AGREEMENT-2012 | SHCLCW4064 | N/A | 04/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 185 | N/A | N/A | DUNBAR ARMORED INC | KMART INVOICING - DUNBAR | CW2324442 | N/A | 12/31/2018 | - | - | - | |
| 186 | N/A | N/A | DUNBAR ARMORED INC | SEARS INVOICING - DUNBAR | CW2324439 | N/A | 12/31/2018 | - | - | - | |
| 187 | N/A | N/A | DUNBAR ARMORED INC | SAC INVOICING - HOFFMAN | CW2324451 | N/A | 12/31/2018 | - | - | - | |
| 188 | N/A | N/A | DUNBAR ARMORED INC | HOME SERVICES INVOICING - CHILDERS - DUNBAR | CW2324457 | N/A | 12/31/2018 | - | - | - | |
| 189 | N/A | KMART CORPORATION; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | DURO BAG MFG CO | SUPPLIES - DURO HILEX POLY, LLC - PTC - 2015 | CW2302532 | N/A | 07/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 190 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTORS INC _ KMART 7783 SAN JUAN, PR _ RTU REPLACEMENT 2018 _ RISK | CW2339619 | N/A | 12/10/2018 | N/A | N/A | N/A | Cure amount resolved |
| 191 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTORS _ KMART 3882 MAYAGUEZ, PR _ RTU REPLACEMENT 2018 _ RISK | CW2339598 | N/A | 12/10/2018 | - | - | - | |
| 192 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTORS INC _ KMART 7768 GUAYNABO, PR _ RTU REPLACEMENT 2018 _ RISK | CW2339610 | N/A | 12/10/2018 | - | - | - | |
| 193 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTOR INC _ KMART 7419 CAGUAS, PR _ RTU REPLACEMENT 2018 _ RISK | CW2339607 | N/A | 12/10/2018 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 194 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTORS INC _ KMART 7741 PONCE, PR _ RTU REPLACEMENT 2018 _ RISK | CW2339621 | N/A | 12/10/2018 | - | - | - | |
| 195 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTORS INC _ KMART 7788 BAYAMON, PR _ RTU REPLACEMENT 2018 _ RISK | CW2339624 | N/A | 12/10/2018 | - | - | - | |
| 196 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTORS INC _ SEARS 1915 BAYAMON, PR _ HVAC COOLING TOWER REPAIR 2018 _ RISK | CW2339728 | N/A | 12/05/2018 | - | - | - | |
| 197 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTORS INC_KMART 4494 TRUJILLO ALTO. PR_RTU REPLACEMENT 2018_RISK | CW2339747 | N/A | 12/17/2018 | - | - | - | |
| 198 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | E V MECHANICAL CONTRACTORS INC | SOAR (RETAIL SERVICES) EV MECHANICAL CONTRACTORS INC _ KMART 7784 VEGA ALTA, PR _ RTU REPLACMENT 2018 _ RISK | CW2339822 | N/A | 12/28/2018 | - | - | - | |
| 199 | N/A | SEARS, ROEBUCK AND CO. | ECHO MEDIA CORPORATION | PROMOTIONAL_MARKETING SERVICES FORM AGREEMENT | -51294_0_20090 | N/A | Not Applicable | N/A | N/A | N/A | Cure amount resolved |
| 200 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ECS GLOBAL INC | IT - ECS GLOBAL INC - AMENDMENT 04 TO SECOND AMENDED AND RESTATED SCHEDULE 1 TO THE SOFTWARE LICENSE AGREEMENT - 2016 | CW2309520 | N/A | 02/28/2019 | N/A | N/A | N/A | Cure amount resolved |
| 201 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ECS GLOBAL INC | MEMBER TECH - ECS GLOBAL INC. MASTER CONSULTING AGREEMENT - NOVEMBER 1998 | CW2332418 | N/A | 11/25/2018 | - | - | - | |
| 202 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ECS GLOBAL INC | MEMBER TECHNOLOGY - ECS GLOBAL - SOW 20 - ECS PROJECT - OCTOBER 2017 | CW2332386 | N/A | 10/16/2020 | - | - | - | |

Sears Holdings Corporation
Executory Contracts for Assignment

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 203 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ECS GLOBAL INC | MT - ECS - MSAAS MANAGED SERVICES AGREEMENT - APRIL 2018 | CW2336949 | N/A | 04/23/2023 | - | - | - | |
| 204 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ECS GLOBAL INC | MT - ECS GLOBAL - SOW 1 -HOSTING OF ECS - APRIL 2018 | CW2336991 | N/A | 04/30/2019 | - | - | - | |
| 205 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ELEVATE LIMITED | CORPORATE SERVICES - GLOBAL COMPLIANCE 3RD PARTY AUDITS AGREEMENT - 2016 | CW2319036 | N/A | 07/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 206 | N/A | SEARS, ROEBUCK AND CO. | EMC CORPORATION | SOW #16 | N/A | N/A | 6/11/2019 | N/A | N/A | N/A | Cure amount resolved |
| 207 | N/A | SEARS, ROEBUCK AND CO. | ENCOMPASS SUPPLY CHAIN SOLUTIONS, INC. | PURCHASE AGREEMENT | N/A | N/A | Recurring | N/A | N/A | N/A | Cure amount resolved |
| 208 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | FAC-AVISTA ADVANTAGE INC-FACILITY IQ CLIENT SERVICE AGREEMENT-2002 | SHCLCW1676 | N/A | 01/31/2019 | - | - | - | |
| 209 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | FAC - ECOVA - SEARS ENERGY MANAGEMENT - 2016 | CW2310915 | N/A | 01/31/2019 | - | - | - | |
| 210 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | FAC - ECOVA - KMART ENERGY MGMT - 2016 | CW2310918 | N/A | 01/31/2019 | - | - | - | |
| 211 | N/A | N/A | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | ECOVA - KMART INVOICE | CW2310771 | N/A | 01/31/2019 | - | - | - | |
| 212 | N/A | N/A | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | ECOVA - SEARS INVOICE | CW2310769 | N/A | 01/31/2019 | - | - | - | |
| 213 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | N/A | SHCLCW1676 | N/A | 1/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 214 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | N/A | CW2310915 | N/A | 1/31/2019 | - | - | - | |
| 215 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | MASTER AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 216 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 1 | N/A | N/A | N/A | - | - | - | |
| 217 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 2 | N/A | N/A | N/A | - | - | - | |
| 218 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 3 | N/A | N/A | N/A | - | - | - | |
| 219 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 4 | N/A | N/A | N/A | - | - | - | |
| 220 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 5 | N/A | N/A | N/A | - | - | - | |
| 221 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 6 | N/A | N/A | N/A | - | - | - | |
| 222 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 7 | N/A | N/A | N/A | - | - | - | |
| 223 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 8 | N/A | N/A | N/A | - | - | - | |
| 224 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 9 | N/A | N/A | N/A | - | - | - | |
| 225 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ENGIE INSIGHT SERVICES INC. F/K/A ECOVA, INC | AMENDMENT 10 | N/A | N/A | N/A | - | - | - | |
| 226 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | EPSILON DATA MANAGEMENT LLC | SYW - EPSILON - AMENDMENT 1 - 2018 | CW2334784 | N/A | 01/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 227 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | EPSILON DATA MANAGEMENT LLC | IT-EPSILON DATA MANAGEMENT, LLC-MSSA-10 | SHCLCW23 | N/A | 04/12/2020 | - | - | - | |
| 228 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | EPSILON DATA MANAGEMENT LLC | MASTER SOFTWARE AND SERVICES AGREEMENT (DATED: APRIL 13, 2010) | SHC-75879 | N/A | 12/17/2018 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 229 | N/A | INNOVEL SOLUTIONS, INC. | ESTES FORWARDING WORLDWIDE, LLC | WAREHOUSE SERVICE AGREEMENT | N/A | N/A | 11/13/2019 | N/A | N/A | N/A | Cure amount resolved |
| 230 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | FAR EAST WATCHCASES (U.S.A.) LTD | LICENSE AGREEMENT FAR EAST WATCHCASES (U.S.A.) LTD | N/A | N/A | 12/31/2018 | N/A | N/A | N/A | Cure amount resolved |
| 231 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | FEEDVISOR, INC | MKTG - HOME SERVICES - FEEDVISOR - SOW 2 - 2018 | CW2340474 | N/A | 10/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 232 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | FEEDVISOR, INC | N/A | CW2340474 | N/A | 10/31/2019 | - | - | - | |
| 233 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | FEEDVISOR, INC | N/A | CW2340474 | N/A | 10/31/2019 | - | - | - | |
| 234 | N/A | SHC LICENSED BUSINESS, LLC | FORMAL HEADQUARTERS INTERNATIONAL, LLC | LICENSE AGREEMENT | N/A | N/A | 3/31/2018 | - | - | - | |
| 235 | N/A | SHC LICENSED BUSINESS, LLC | FORMAL HEADQUARTERS INTERNATIONAL, LLC | FIRST AMENDMENT TO LICENSE AGREEMENT | N/A | N/A | 3/31/2020 | - | - | - | |
| 236 | N/A | SEARS, ROEBUCK AND CO. | G4S (GUAM) | FIN-G4S (GUAM) ARMORED SERVICES-ARMORED CAR SERVICES AGREEMENT 2016 | CW2317048 | N/A | 04/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 237 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | GENESYS TELECOMMUNICATIONS LABORATORIES, INC. | AMENDMENT #2 | CW2317854 | N/A | 09/03/2022 | N/A | N/A | N/A | Cure amount resolved |
| 238 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | GENESYS TELECOMMUNICATIONS LABORATORIES, INC. | N/A | CW2311522 | N/A | 9/30/2022 | - | - | - | |
| 239 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | GITLAB INC | IT-GITLAB-MSSA-SEPT 2016 | CW2318561 | N/A | 09/13/2021 | N/A | N/A | N/A | Cure amount resolved |
| 240 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | GLOBAL DIRECT LOGISTICS | SUPPLY CHAIN- GDX LOGISTICS- 2017 | CW2329690 | N/A | 04/30/2020 | N/A | N/A | N/A | Cure amount resolved |
| 241 | N/A | SEARS HOLDINGS MANAGEMENT CORP | GORSKI-OSTERHOLDT INC | MASTER SOFTWARE AND SERVICES AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 242 | N/A | SEARS HOLDINGS MANAGEMENT CORP | GORSKI-OSTERHOLDT INC | SOFTWARE AND SERVICES SOW | N/A | N/A | N/A | - | - | - | |
| 243 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | GORSKI-OSTERHOLDT INC | MASTER SOFTWARE AND SERVICES AGREEMENT | N/A | N/A | Not Applicable | N/A | N/A | N/A | Cure amount resolved |
| 244 | N/A | INNOVEL SOLUTIONS, INC. | GREEN MOUNTAIN TECHNOLOGY, LLC | SECOND AMENDMENT TO THE AUDIT SERVICES AGREEMENT | CW2303192 | N/A | 01/31/2021 | N/A | N/A | N/A | Cure amount resolved |
| 245 | N/A | SEARS ROEBUCK AND CO. ; SEARS OPERATIONS LLC ; KMART CORPORATION ; KMART OPERATIONS LLC | GREENWOOD INDUSTRIES, INC | MAJOR MAINTENANCE AGREEMENT | N/A | N/A | 3/31/2018 | - | - | - | |
| 246 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | GROUP O, INC | SAC-GROUP O-PREPAID CARDS-2016 | CW2319782 | N/A | 10/01/2019 | N/A | N/A | N/A | |
| 247 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | GROUP O, INC | AUTOMOTIVE-GROUP O, INC.-STATEMENT OF WORK #1 | CW2319782 | N/A | 10/01/2019 | - | - | - | |
| 248 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | GROUP O, INC | AUTOMOTIVE-GROUP O, INC.-AMENDMENT #1 | N/A | N/A | 10/01/2019 | - | - | - | |
| 249 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | GXS INC-693469 | IT OPS-GXS-INOVIS-SOW 2009-01-2009 | SHCLCW3347 | N/A | 12/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 250 | N/A | SEARS, ROEBUCK AND CO. | GXS INC-693469 | IT OPS-GXS-INOVIS-MASTER SERVICES AGREEMENT-2000 | SHCLCW3345 | N/A | 12/31/2019 | - | - | - | |
| 251 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | GXS INC-693469 | IT OPS-GXS-INOVIS-SOW 2008-01-2008 | SHCLCW3346 | N/A | 12/31/2019 | - | - | - | |
| 252 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | GXS INC-693469 | IT GXS EDI VAN (VALUE ADDED NETWORK) SERVICES 2016 | CW2320370 | N/A | 01/17/2019 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 253 | N/A | SEARS, ROEBUCK AND CO. | HAIRSTYLISTS MANAGEMENT SYSTEMS, INC | THIS FIFTEENTH AMENDMENT (FIFTEENTH AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OF MARCH 27, 2018 BY HAIRSTYLISTS MANAGEMENT SYSTEMS, INC., A MINNESOTA CORPORATION, (LICENSEE) AND SHC LICENSED BUSINESS LLC., A DELAWARE LIMITED | N/A | N/A | 04/30/2020 | N/A | N/A | N/A | Cure amount resolved |
| 254 | N/A | SEARS, ROEBUCK AND CO. | HAIRSTYLISTS MANAGEMENT SYSTEMS, INC | THIS FIFTEENTH AMENDMENT (FIFTEENTH AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OF MARCH 27, 2018 BY HAIRSTYLISTS MANAGEMENT SYSTEMS, INC., A MINNESOTA CORPORATION, (LICENSEE) AND SHC LICENSED BUSINESS LLC., A DELAWARE LIMITED | N/A | N/A | 04/30/2020 | - | - | - | |
| 255 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO. | HAWTHORNE PACIFIC CORP | FAC - HAWTHORNE PACIFIC CORP - MSA - 2018 | CW2337586 | N/A | 05/14/2019 | N/A | N/A | N/A | Cure amount resolved |
| 256 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | HEARING ASSCOCIATES, INC | THIS FOURTH AMENDMENT (AMENDMENT) IS MADE AND ENTERED INTO ON MAY 22, 2015 BY AND BETWEEN SEARS ROEBUCK DE PEURTO RICO, INC. A DELAWARE CORPORATION ("SEARS"), AND HEARING ASSOCIATES, INC., A PUERTO RICO CORPORATION, DOING BUSINESS UNDER THE NAME MIR | N/A | N/A | 08/31/2020 | N/A | N/A | N/A | Cure amount resolved |
| 257 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | HEARING ASSCOCIATES, INC | THIS AMENDMENT (AMENDMENT) IS MADE AND ENTERED INTO ON NOVEMBER 7, 2007, BY AND BETWEEN SEARS ROEBUCK DE PUERTO RICO, INC. , A DELAWARE CORPORATION (SEARS), AND HEARING ASSOCIATES, INC.., A PUERTO RICO CORPORATION, DOING BUSINESS UNDER THE N | N/A | N/A | 8/31/2020 | - | - | - | |
| 258 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | HEARING ASSCOCIATES, INC | THIS LICENSE AGREEMENT ('AGREEMENT') IS MADE AND ENTERED INTO ON JANUARY 1, 2005 (THE 'EFFECTIVE DATE') BY SEARS ROEBUCK DE PUERTO RICO, INC. , A DELAWARE CORPORATION (SEARS), AND HEARING ASSOCIATES, INC.., A PUERTO RICO CORPORATION, DOING BUSINE | N/A | N/A | 8/31/2020 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 259 | N/A | SEARS, ROEBUCK DE PUERTO RICO, INC. | HEARING ASSCOCIATES, INC | THIS FOURTH AMENDMENT (AMENDMENT) IS MADE AND ENTERED INTO ON MAY 22, 2015 BY AND BETWEEN SEARS ROEBUCK DE PEURTO RICO, INC. A DELAWARE CORPORATION ("SEARS"), AND HEARING ASSOCIATES, INC., A PUERTO RICO CORPORATION, DOING BUSINESS UNDER THE NAME MIR | N/A | N/A | 08/31/2020 | - | - | - | |
| 260 | N/A | SHC LICENSED BUSINESS LLC | HEAVENLY JEWELRY ON EARTH, LLC | THIS SECOND AMENDMENT (SECOND AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OF AUGUST 1, 2018 BY HEAVENLY JEWELRY ON EARTH, LLC, A FLORIDA LIMITED LIABILITY COMPANY (LICENSEE) AND SHC LICENSED BUSINESS LLC, A DELAWARE LIMITED LIABILITY COMPA... | N/A | N/A | 08/25/2020 | N/A | N/A | N/A | Cure amount resolved |
| 261 | N/A | SHC LICENSED BUSINESS LLC | HEAVENLY JEWELRY ON EARTH, LLC | THIS SECOND AMENDMENT (SECOND AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OF AUGUST 1, 2018 BY HEAVENLY JEWELRY ON EARTH, LLC, A FLORIDA LIMITED LIABILITY COMPANY (LICENSEE) AND SHC LICENSED BUSINESS LLC, A DELAWARE LIMITED LIABILITY COMPA... | N/A | N/A | 08/25/2020 | - | - | - | |
| 262 | N/A | SEARS, ROEBUCK AND CO. | HELEN ZAROU AND JOSEPH ZAROU | JOHNS WATCH & JEWELRY REPAIR-AMEND-EXP 08 31 19 | N/A | N/A | 08/31/2019 | - | - | - | |
| 263 | N/A | SEARS, ROEBUCK AND CO. | HENNESSY INDUSTRIES INC-5549159 | SHC-FACILITIES-AUTOMOTIVE-HENNESSY-LIFTS 2018 | CW2336206 | N/A | 05/11/2019 | N/A | N/A | N/A | Cure amount resolved |
| 264 | N/A | SEARS, ROEBUCK AND CO. | HENNESSY INDUSTRIES INC-5549159 | RO-HENNESSY INDUSTRIES-MASTER PURCHASE AGREEMENT-2018 | SHCLCW3158 | N/A | 04/30/2021 | - | - | - | |
| 265 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | HEWLETT PACKARD FINANCIAL SERVICES-90754292 | MEMBER TECH - HPFS - 3 PAR LEASE - FEBRUARY 2016 | CW2309165 | N/A | 01/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 266 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | HIGHJUMP SOFTWARE INC | SC PUR PRO-HIGHJUMP SOFTWARE INC-MASTER SOFTWARE AND SERVICES AGREEMENT-2013 | SHCLCW2066 | N/A | 12/31/2018 | N/A | N/A | N/A | Cure amount resolved |
| 267 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | HORCHER CONSTRUCTION INC | REAL ESTATE AND LICENSED BUSINESSES - HORCHER - MSA - 2013 | CW2253946 | N/A | 09/30/2021 | N/A | N/A | N/A | Cure amount resolved |
| 268 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | HORCHER CONSTRUCTION INC | N/A | CW2253946 | N/A | 9/30/2021 | - | - | - | |
| 269 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | HUEN ELECTRIC INC | TRANSITION TO MONTH TO MONTH | SHCLCW1632 | N/A | mo-to-mo | - | - | - | Cure amount resolved |
| 270 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | HUEN ELECTRIC INC | FIRST AMENDMENT TO MSA | CW2258334 | N/A | 7/31/2023 | - | - | - | |
| 271 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | HUEN ELECTRIC INC | FIRST AMENDMENT TO MSA | CW2258334 | N/A | 7/31/2023 | - | - | - | |
| 272 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | IDENTIFIX INC-181073107 | FAC - IDENTIFIX INC - SUBSCRIPTION AGREEMENT - 2013 | CW2326493 | N/A | 02/28/2019 | N/A | N/A | N/A | Cure amount resolved |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 273 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ILLINOIS DEPARTMENT OF COMMERCE AND ECONOMIC OPPORTUNITY | ECOM - ILLINOIS DEPARTMENT OF COMMERCE AND ECONOMIC OPPORTUNITY - EDGE TAX CREDIT AGREEMENT - 2012 | SHCLCW6432 | N/A | 10/25/2022 | - | - | - | |
| 274 | N/A | SEARS HOLDINGS CORPORATION | INDEED, INC. | INDEED RESUME SUBSCRIPTION INSERTION ORDER - ANNUAL 2018 | N/A | N/A | None | - | - | - | |
| 275 | N/A | SEARS HOLDINGS CORPORATION | INDEED, INC. | INDEED TARGETED ADS (APPLY) INSERTION ORDER | N/A | N/A | None | - | - | - | |
| 276 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | INFOBLOX, INC | IT OPS-INFOBLOX INC-MASTER SERVICES AGREEMENT-2012 | SHCLCW1478 | N/A | 12/21/2020 | N/A | N/A | N/A | Cure amount resolved |
| 277 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | INTELEX TECHNOLOGIES INC | COMPLIANCE-INTELEX-SAAS AGREEMENT - DEC 2017 | CW2334011 | N/A | 12/31/2018 | N/A | N/A | N/A | Cure amount resolved |
| 278 | N/A | SEARS, ROEBUCK AND CO.; SHC LICENSED BUSINESS LLC | INTENATIONAL CRUISE & EXCURSIONS | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Cure amount resolved |
| 279 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | INTERNATIONAL PACKAGING GROUP | N/A | CW2333490 | N/A | PERPETUAL | N/A | N/A | N/A | Cure amount resolved |
| 280 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | INTERNATIONAL PACKAGING GROUP | N/A | CW2333490 | N/A | PERPETUAL | - | - | - | |
| 281 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | INTERNATIONAL PACKAGING GROUP | AMENDMENT #3 TO IPS FOR PREPETITION RELEASE OF DEBT | CW2333490 | N/A | 1/31/2021 | - | - | - | |
| 282 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ION INTERACTIVE INC | HS - I-ON INTERACTIVE - MASTER SOFTWARE MANAGED SERVICES AGREEMENT - 2012 | SHCLCW5262 | N/A | 07/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 283 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ION INTERACTIVE INC | HOME SERVICES - ION INTERACTIVE - SOW 2 - 2016 | CW2318409 | N/A | 08/31/2019 | - | - | - | |
| 284 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | IRON MOUNTAIN INFORMATION MANAGEMENT INC. | CORPORATE SERVICES - IRON MOUNTAIN MASTER SERVICES AGREEMENT 2017 | CW2323595 | N/A | 02/26/2020 | N/A | N/A | N/A | Cure amount resolved |
| 285 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | IRON MOUNTAIN INFORMATION MANAGEMENT INC. | CORPORATE SERVICES - IRON MOUNTAIN INFORMATION MANAGEMENT LLC - SOW 2 - 2017 | CW2323754 | N/A | 02/29/2020 | - | - | - | |
| 286 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | IRON MOUNTAIN INFORMATION MANAGEMENT INC. | CORPORATE SERVICES - IRON MOUNTAIN INFORMATION MANAGEMENT LLC - SOW 3 - 2017 | CW2323757 | N/A | 02/29/2020 | - | - | - | |
| 287 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | IRON MOUNTAIN INFORMATION MANAGEMENT INC. | CORPORATE SERVICES - IRON MOUNTAIN INFORMATION MANAGEMENT - SOW 1 - 2017 | CW2323746 | N/A | 02/29/2020 | - | - | - | |
| 288 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | IRON MOUNTAIN INFORMATION MANAGEMENT INC. | MASTER SOFTWARE AND SERVICES AGREEMENT | N/A | N/A | 2/26/2020 | - | - | - | |
| 289 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | IRON MOUNTAIN INFORMATION MANAGEMENT INC. | STATEMENT OF WORK | N/A | N/A | N/A | - | - | - | |
| 290 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | IRWPR (INTERNATIONAL ROOFING & WATERPROOFING | SOAR (RETAIL SERVICES) IRWPR _ KMART 7419 CAGUAS, PR _ ROOF REPLACEMENT 2018 _ RISK | CW2339974 | N/A | 12/03/2018 | N/A | N/A | N/A | Cure amount resolved |
| 291 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO. | JEFFCOAT MECHANICAL SERVICE INC | MASTER AGREEMENT | N/A | N/A | 7/11/2018 | N/A | N/A | N/A | Cure amount resolved |

Sears Holdings Corporation
Executory Contracts for Assignment

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 292 | N/A | SHC LICENSED BUSINESS LLC | JOHN'S WATCH & JEWELRY REPAIR, INC. | THIRD AMENDMENT TO LICENSE AGREEMENT. STORE LOCATIONS 1285, 1355, 1456 | N/A | N/A | 8/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 293 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | KAIROS PARTNERS LLC | MT-KARIOS PARTNERS-LETTER OF ENGAGEMENT - FEB 2018 | CW2335848 | N/A | 02/25/2020 | N/A | N/A | N/A | Cure amount resolved |
| 294 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | KENSHOO, INC. | LICENSE AGREEMENT | N/A | N/A | 9/14/2011 | N/A | N/A | N/A | Cure amount resolved |
| 295 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | KENSHOO, INC. | SEVENTH AMENDMENT TO SERVICES AGREEMENT | N/A | N/A | 2/28/2018 | - | - | - | |
| 296 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | KEYMETRIC, INC. | AUTOMOTIVE-KEYMETRIC, INC.-MSA (004) | CW2331003 | N/A | 7/1/2019 | - | - | - | |
| 297 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | KEYMETRIC, INC. | AUTOMOTIVE-KEYMETRIC, INC.-MSA | CW2331003 | N/A | 7/1/2019 | - | - | - | |
| 298 | N/A | SEARS ROEBUCK AND CO. | KHANH C. PHAM | LICENSE AGREEMENT WITH KHANH C. PHAM | N/A | N/A | 6/30/2015 | N/A | N/A | N/A | Cure amount resolved |
| 299 | N/A | SHC LICENSED BUSINESS, LLC | KHANH C. PHAM | SECOND AMENEDMENT TO LICENSE AGREEMENT | N/A | N/A | 6/30/2019 | - | - | - | |
| 300 | N/A | SEARS BRANDS MANAGEMENT CORP. | KPITARGET | MASTER SERVICES AGREEMENT | N/A | N/A | 01/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 301 | 2001 | SEARS, ROEBUCK AND CO. | LAKIN TIRE WEST INC. | AUTO-LAKIN TIRE WEST-TIRE REMOVAL AND DISPOSAL-MSA-2016 | CW2320625 | N/A | 12/31/2020 | N/A | N/A | N/A | Cure amount resolved |
| 302 | N/A | KMART CORPORATION | LANGUAGE LINE | N/A | N/A | N/A | REOCCURING | N/A | N/A | N/A | Cure amount resolved |
| 303 | N/A | KMART CORPORATION | LANGUAGE LINE | LANGUAGE LINE | N/A | N/A | Not Applicable | - | - | - | |
| 304 | N/A | INNOVEL SOLUTIONS, INC.; KMART CORPORATION; SEARS HOME IMPROVEMENT PRODUCT; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | LERCH BATES INC | FAC - LERCH BATES INC - MASTER SERVICES AGREEMENT (VERTICAL TRANSPORTATION INSPECTION SERVICES) - 2013 | SHCLCW7053 | N/A | 12/31/2021 | N/A | N/A | N/A | Cure amount resolved |
| 305 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO. | LERCH BATES INC | FAC - LEARCH BATES INC - MSA - 2018 | CW2337590 | N/A | 04/03/2019 | - | - | - | |
| 306 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | LERCH BATES INC | FAC - LERCH BATES - THIRD AMENDMENT TO MSA | CW2335061 | N/A | 02/01/2020 | - | - | - | |
| 307 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LEVELWING MEDIA, LLC | AUTOMOTIVE-LEVELWING MEDIA, LLC-SOW #2 | N/A | N/A | 8/31/2019 | - | - | - | |
| 308 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LEVELWING MEDIA, LLC | AUTOMOTIVE-LEVELWING MEDIA, LLC-MSA | CW2301569 | N/A | 8/31/2019 | - | - | - | |
| 309 | N/A | SEARS HOLDINGS CORPORATION | LEXISNEXIS RISK SOLUTIONS | LN NON-FCRA APPLICATION AND AGREEEMENT | N/A | N/A | 9/1/2019 | N/A | N/A | N/A | Cure amount resolved |
| 310 | N/A | SEARS HOLDINGS CORPORATION | LEXISNEXIS RISK SOLUTIONS | LN NON-FCRA APPLICATION AND AGREEEMENTAMENDMENT SCHEDULE A | N/A | N/A | 9/1/2019 | - | - | - | |
| 311 | N/A | SEARS HOLDINGS CORPORATION | LEXISNEXIS RISK SOLUTIONS | SCHEDULE A AMENDMENTRISK MANAGEMENT SOLUTIONS | N/A | N/A | 10/1/2012 | - | - | - | |
| 312 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LEXISNEXIS RISK SOLUTIONS | APPLICATION SERVICE PROVIDER&INFORMATION TECHNOLOGY SERVICES AGREEMENT | N/A | N/A | N/A | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 313 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LEXISNEXIS RISK SOLUTIONS | APPLICATION SERVICE PROVIDER&INFORMATION TECHNOLOGY SERVICES AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 314 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LEXISNEXIS RISK SOLUTIONS | LEXIS ADVANCE SUBSCRIPTION AMENDMENT FOR CORPORATE LEGAL | N/A | N/A | 6/30/2019 | - | - | | |
| 315 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LEXISNEXIS RISK SOLUTIONS | FIXED PRICE AMENDMENT | N/A | N/A | 5/31/2018 | - | - | - | |
| 316 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LEXISNEXIS RISK SOLUTIONS | LEXIS FOR MICROSOFT OFFICE ADDENDUM | N/A | N/A | 12/7/2012 | - | - | - | |
| 317 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LIAISON TECHNOLOGIES | IT - LIAISON - MSA - 2010 | CW2279520 | N/A | 11/10/2019 | N/A | N/A | N/A | Cure amount resolved |
| 318 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LIAISON TECHNOLOGIES | KCD LIAISON SOW EDI 2014 | CW2279523 | N/A | 05/31/2020 | - | - | - | |
| 319 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LIAISON TECHNOLOGIES | SUPPLY CHAIN LIAISON SOW 2 2015 | CW2302779 | N/A | 11/10/2019 | - | - | - | |
| 320 | N/A | SEARS BRANDS MANAGEMENT CORP. | LIAISON TECHNOLOGIES | KCD LIAISON SOW EDI 2014 | N/A | N/A | 05/31/2020 | - | - | - | |
| 321 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LIAISON TECHNOLOGIES | N/A | CW2302779 | N/A | 8/31/2021 | - | - | - | |
| 322 | N/A | SEARS HOLDINGS CORPORATION; SEARS, ROEBUCK AND CO. | LIBERTY TIRE RECYCLING | AUTO-LIBERTY TIRE RECYCLING-TIRE REMOVAL AND DISPOSAL SERVICES-MSA-2016 | CW2320599 | N/A | 12/31/2020 | N/A | N/A | N/A | Cure amount resolved |
| 323 | 1865 | KMART CORPORATION | LITTLE CAESAR ENTERPRISES, INC | N/A | N/A | N/A | 9/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 324 | 1865 | KMART CORPORATION | LITTLE CAESAR ENTERPRISES, INC | SECOND ADDENDUM TO FRANCHISE AGREEMENT | N/A | N/A | 09/30/2021 | - | - | - | |
| 325 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | LL D INC  RESPOND NEW MEXICO | FIN-LL D AND D, INC-ARMORED CAR SERVICES AGREEMENT-2012 | SHCLCW4067 | N/A | 04/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 326 | N/A | N/A | LL D INC  RESPOND NEW MEXICO | SEARS MONTHLY BILLING - LL D, INC | CW2314128 | N/A | 04/30/2019 | - | - | - | |
| 327 | N/A | N/A | LL D INC  RESPOND NEW MEXICO | KMART MONTHLY BILLING - LL D, INC | CW2314178 | N/A | 04/30/2019 | - | - | - | |
| 328 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LOGICBROKER, INC | HOME SERVICES LOGIC BROKER SAAS AND SOW | CW2331038 | N/A | 07/27/2021 | N/A | N/A | N/A | Cure amount resolved |
| 329 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LOGICBROKER, INC | ONLINE LOGICBROKER SOW 2018 | CW2334618 | N/A | 01/11/2021 | - | - | - | |
| 330 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LOGICBROKER, INC | VENDOR DIRECT MANAGED SERVICES SOW | N/A | N/A | 7/28/2020 | - | - | - | |
| 331 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO. | LOOMIS ARMORED US LLC | FIN-LOOMIS ARMORED US, LLC-ARMORED CAR SERVICES AGREEMENT-2012 | SHCLCW4029 | N/A | 04/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 332 | N/A | N/A | LOOMIS ARMORED US LLC | LOOMIS - SEARS AUTO CENTER - GEORGE HOFFMAN | CW2317124 | N/A | 04/30/2019 | - | - | - | |
| 333 | N/A | N/A | LOOMIS ARMORED US LLC | LOOMIS - SEARS FULL LINE STORES - MICHELE RADLOFF | CW2317145 | N/A | 04/30/2019 | - | - | - | |
| 334 | N/A | N/A | LOOMIS ARMORED US LLC | LOOMIS - CALL CENTER - MATTHEW PENNIES | CW2317143 | N/A | 04/30/2019 | - | - | - | |
| 335 | N/A | N/A | LOOMIS ARMORED US LLC | LOOMIS - HOME SERVICES - WILLIAM CHILDERS | CW2317150 | N/A | 04/30/2019 | - | - | - | |
| 336 | N/A | N/A | LOOMIS ARMORED US LLC | LOOMIS - KMART - BOB EASTERBROOK | CW2317148 | N/A | 04/30/2019 | - | - | - | |
| 337 | N/A | N/A | LOOMIS ARMORED US LLC | LOOMIS - IN HOME - ALLEN NG | CW2317112 | N/A | 04/30/2019 | - | - | - | |

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 338 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LOOMIS ARMORED US LLC | N/A | CR41033-V13 | N/A | 4/30/2019 | - | - | - | |
| 339 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | LOOMIS ARMORED US LLC | N/A | CR41033-V13 | N/A | 4/30/2019 | - | - | - | |
| 340 | N/A | SEARS, ROEBUCK AND CO. | MARR BROS INC | HOME SERVICES - MARR BROS - MPA 2018 | CW2336051 | N/A | 02/07/2022 | N/A | N/A | N/A | Cure amount resolved |
| 341 | N/A | SEARS, ROEBUCK AND CO. | MARYLAND WHOLESALE AUTOMOTIVE, LLC, DBA THE KEYLESS SHOP AT SEARS | MARYLAND WHOLESALE DBA KEYLESS SHOP AT SEARS - AGREEMENT FEX | N/A | N/A | 12/31/2019 | - | - | - | |
| 342 | 1913 | INNOVEL SOLUTIONS, INC.; KMART CORPORATION; KMART HOLDING CORPORATION; PRIVATE BRANDS, LTD.; SEARS BUYING SERVICES, INC.; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO, | MATSON NAVIGATION COMPANY, INC. | SERVICE CONTRACT | C3077 | N/A | 04/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 343 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | MAYAGUEZ OPTICAL LABORARTORIES | THIS AMENDMENT ("AMENDMENT") IS MADE AS OF JANUARY 1, 2017  BY AND BETWEEN  SEARS ROEBUCK DE PUERTO RICO INC A DELAWARE CORPORATION ("SEARS").,  AND MAYAGUEZ OPTICAL LABORARTORIES, A PUERTO RICO CORPORATION ("LICENSE") | N/A | N/A | 12/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 344 | N/A | KMART CORPORATION | MEDLINE INDUSTRIES INC | MER - MEDLINE INDUSTRIES INC - MERCHANDISE SUPPLY AGREEMENT - 2017 | CW2323616 | N/A | 01/31/2020 | N/A | N/A | N/A | Cure amount resolved |
| 345 | N/A | KMART CORPORATION | MEDLINE INDUSTRIES INC | MEDLINE CURAD BRANDED MERCHANDISE SUPPLY AGREEMENT | N/A | N/A | 2/1/2020 | - | - | - | |
| 346 | N/A | KMART HOLDING CORPORATION | MEDTURN (INMAR) | RM-MEDTURN-MSA-2009 | SHCLCW1873 | N/A | 12/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 347 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | MERKLE INC. | SOW#18 - SEARCH ENGINEOPTIMIZATION SERVICES FOR SEARS PARTS DIRECT AND HOME SERVICES | N/A | N/A | 7/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 348 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO.; SHC LICENSED BUSINESS LLC | MICHAEL E BUTLER | LIC AGMT B2B MICHAEL E BUTLER | N/A | N/A | 10/31/2018 | N/A | N/A | N/A | Cure amount resolved |
| 349 | N/A | SEARS, ROEBUCK AND CO. | MIDTRONICS INC | AUTOMOTIVE-BATTERY TESTER-MIDTRONICS-SUPPLY AGREEMENT-2016 | CW2311127 | N/A | 03/08/2019 | N/A | N/A | N/A | Cure amount resolved |
| 350 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | MOOD MEDIA-1000504217 | MKTG - MOOD MEDIA - MASTER AGREEMENT - 2004 | CW2331903 | N/A | 09/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 351 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | MOTIONPOINT CORPORATION | MASTER SERVICES AGREEMENT | N/A | N/A | - | N/A | N/A | N/A | Cure amount resolved |
| 352 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | MOTIONPOINT CORPORATION | SERVICES SOW SOW #1(SPANISH LANGUAGE WEB SITE- SEARS.CORN) | N/A | N/A | - | - | - | - | Cure amount resolved |
| 353 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | MR. ANDY K. MELWANI | LIC AGRMT STORE 1304 SILVER SPRING MD | N/A | N/A | 06/30/2019 | N/A | N/A | N/A | Cure amount resolved |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 354 | N/A | SEARS, ROEBUCK AND CO. | MUSIC CITY METALS CO. INC. | HS - PARTS PURCHASE AGREEMENT - MUSIC CITY METALS - 2018 | CW2334937 | N/A | 01/17/2021 | N/A | N/A | N/A | Cure amount resolved |
| 355 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | MUZAK LLC D/B/A MOOD MEDIA | N/A | CW2331903 | N/A | 9/30/2019 | - | - | - | |
| 356 | N/A | SEARS, ROEBUCK AND CO. | MUZAK LLC D/B/A MOOD MEDIA | N/A | CW2331903 | N/A | 9/30/2019 | - | - | - | |
| 357 | 1910 | SEARS HOLDINGS MANAGEMENT CORPORATION | NATIONAL HEALTH INFORM NETWORK INC/ABSOLUTE AR | HEALTH WELLNESS ABSOLUTE MASTER AND EXHIBITS | CW2333616 | N/A | 11/29/2020 | N/A | N/A | N/A | Cure amount resolved |
| 358 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | NEW RELIC INC | HOME SERVICES - NEW RELIC - MSA - SEPT 2018 | CW2339882 | N/A | 09/18/2021 | N/A | N/A | N/A | Cure amount resolved |
| 359 | N/A | KMART CORPORATION | OPEN TEXT CORPORATION | ADDENDUM | N/A | N/A | 6/30/2019 | - | - | - | |
| 360 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | ORACLE ELEVATOR | SC - ORACLE ELEVATOR COMPANY - MASTER SERVICE AGREEMENT - 2012 | SHCLCW6881 | N/A | 02/20/2022 | N/A | N/A | N/A | Cure amount resolved |
| 361 | N/A | SEARS, ROEBUCK AND CO. | OUTSIDE KEYSHOP, LLC | THIS LICENSE AGREEMENT (THE AGREEMENT) IS ENTERED INTO AS OF (THE 8/6/2014 EFFECTIVE DATE), BY OUTSIDE KEYSHOP, LLC, A TEXAS LIMITED LIABILITY COMPANY (LICENSEE), AND SEARS HOLDINGS MANAGEMENT CORP., A DELAWARE CORPORATION, AS AGENT FOR | N/A | N/A | 08/06/2021 | N/A | N/A | N/A | Cure amount resolved |
| 362 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | OUTSIDE KEYSHOP, LLC | THIS LICENSE AGREEMENT (THE AGREEMENT) IS ENTERED INTO AS OF (THE 8/6/2014 EFFECTIVE DATE), BY OUTSIDE KEYSHOP, LLC, A TEXAS LIMITED LIABILITY COMPANY (LICENSEE), AND SEARS HOLDINGS MANAGEMENT CORP., A DELAWARE CORPORATION, AS AGENT FOR | N/A | N/A | 08/06/2021 | - | - | - | |
| 363 | 2242 1910 | KMART CORPORATION; KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION | PDX INC-361857 | HEALTH WELLNESS NHS (PDX) HIPPA AGREEMENT 2015 | CW2304689 | N/A | 08/20/2022 | N/A | N/A | N/A | Cure amount resolved |
| 364 | 2242 1910 | KMART CORPORATION | PDX INC-361857 | LICENSE AGREEMENT | N/A | N/A | 6/14/2019 | N/A | N/A | N/A | Cure amount resolved |
| 365 | N/A | INNOVEL SOLUTIONS, INC. | PENSKE TRUCK LEASING-362702664 | SC - INNOVEL - DENVER DDC INVOICING | CW2324868 | N/A | 11/21/2023 | N/A | N/A | N/A | Cure amount resolved |
| 366 | N/A | INNOVEL SOLUTIONS, INC. | PENSKE TRUCK LEASING-362702664 | SC - INNOVEL - STOCKTON DDC INVOICING | CW2324861 | N/A | 11/21/2023 | - | - | - | |
| 367 | N/A | INNOVEL SOLUTIONS, INC. | PENSKE TRUCK LEASING-362702664 | SC - INNOVEL - MIDDLETOWN TDC INVOICING | CW2324871 | N/A | 11/21/2023 | - | - | - | |
| 368 | N/A | INNOVEL SOLUTIONS, INC. | PENSKE TRUCK LEASING-362702664 | SC - INNOVEL - CHAMBERSBURG RSC INVOICING | CW2324878 | N/A | 11/21/2023 | - | - | - | |
| 369 | N/A | INNOVEL SOLUTIONS, INC. | PENSKE TRUCK LEASING-362702664 | SC - INNOVEL - MIRA LOMA RDC INVOICING | CW2324878 | N/A | 11/21/2023 | - | - | - | |
| 370 | N/A | INNOVEL SOLUTIONS, INC. | PENSKE TRUCK LEASING-362702664 | SC - INNOVEL - ONTARIO RDC INVOICING | CW2324881 | N/A | 11/21/2023 | - | - | - | |
| 371 | N/A | INNOVEL SOLUTIONS, INC. | PENSKE TRUCK LEASING-362702664 | SC - INNOVEL - LAWRENCE RDC INVOICING | CW2324886 | N/A | 11/21/2023 | - | - | - | |
| 372 | N/A | INNOVEL SOLUTIONS, INC. | PENSKE TRUCK LEASING-362702664 | SC - INNOVEL - MORRISVILLE RDC INVOICING | CW2324884 | N/A | 11/21/2023 | - | - | - | |
| 373 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PENSKE TRUCK LEASING-362702664 | SUPPLY CHAIN - INNOVEL - YARD HOSTLING LEASE - 2016 | CW2320822 | N/A | 11/22/2023 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|-------|--------|--------|-------------|---------------|-------------|------------|-------------|------------|------------|------------|----------|
| 374 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PERSADO, INC | MKTG - PERSADO - MSA - 2015 | CW2294339 | N/A | 01/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 375 | N/A | KMART CORPORATION | PHARMACY QUALITY SOLUTIONS, INC. | IT - PHARMACY QUALITY SOLUTIONS - INVOICING | CW2331944 | N/A | 12/31/2020 | N/A | N/A | N/A | Cure amount resolved |
| 376 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PHOENIX ENERGY TECHNOLOGIES INC | SC - PHOENIX ENERGY TECHNOLOGIES - MASTER SERVICES AGREEMENT - 2013 | SHCLCW5597 | N/A | 08/31/2020 | N/A | N/A | N/A | Cure amount resolved |
| 377 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PHOENIX ENERGY TECHNOLOGIES INC | N/A | SHCLCW5597 | N/A | 8/31/2020 | - | - | - | |
| 378 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PHOENIX ENERGY TECHNOLOGIES INC | MASTER AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 379 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PHOENIX ENERGY TECHNOLOGIES INC | AMENDMENT 1 | N/A | N/A | N/A | - | - | - | |
| 380 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PHOENIX ENERGY TECHNOLOGIES INC | AMENDMENT 2 | N/A | N/A | N/A | - | - | - | |
| 381 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PHOENIX ENERGY TECHNOLOGIES INC | AMENDMENT 3 | N/A | N/A | N/A | - | - | - | |
| 382 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PHOENIX ENERGY TECHNOLOGIES INC | AMENDMENT 4 | N/A | N/A | N/A | - | - | - | |
| 383 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PLUSONE SOLUTIONS | NS-PLUSONE SOLUTIONS, INC.-MASTER SERVICES AGREEMENT-2007 | SHCLCW3984 | N/A | 09/30/2021 | N/A | N/A | N/A | Cure amount resolved |
| 384 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PLUSONE SOLUTIONS | CORPORATE SERVICES - PLUSONE SOLUTIONS - SOW 1 | CW2287361 | N/A | 09/30/2021 | - | - | - | |
| 385 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PLUSONE SOLUTIONS | N/A | SHCLCW3984 | N/A | 9/30/2021 | - | - | - | |
| 386 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PLUSONE SOLUTIONS | AMENDMENT 03 | SHCLCW3984 | N/A | 9/30/2021 | - | - | - | |
| 387 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PRECISION CONTROL SYSTEMS OF CHICAGO | RE - PRECISION CONTROL SYSTEMS OF CHICAGO, INC - MASTER SERVICES AGREEMENT - 2011 | SHCLCW5186 | N/A | 06/30/2020 | N/A | N/A | N/A | Cure amount resolved |
| 388 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PRECISION CONTROL SYSTEMS OF CHICAGO | N/A | SHCLCW5186 | N/A | 6/30/2020 | - | - | - | |
| 389 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PRGX USA, INC. | FINANCE - PRG-SCHULTZ USA INC - AUDIT AND RECOVERY SERVICES AGREEMENT - 2004 | SHCLCW6147 | N/A | 07/31/2021 | N/A | N/A | N/A | Cure amount resolved |
| 390 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PRGX USA, INC. | FINANCE_PRGX_SECONDARY POST AUDIT WORK ORDER  2016 | CW2316252 | N/A | 07/31/2021 | - | - | - | |
| 391 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PTC-695103 | KA - PTC - MASTER SERVICES AGREEMENT - 2011 | SHCLCW6111 | N/A | 06/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 392 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PTC-695103 | KA - PTC - MASTER SERVICES AGREEMENT - 2011 | HC 99396 MASTER | N/A | 06/30/2019 | - | - | - | |
| 393 | N/A | KMART CORPORATION; KMART OPERATIONS LLC | PUERTO RICO TELEPHONE COMPANY, INC | THIS FOURTH AMENDMENT (FOURTH AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OFNOVEMBER 16, 2017 BY PUERTO RICO TELEPHONE COMPANY, INC., A COMPANY ORGANIZED UNDER THELAWS OF THE COMMONWEALTH OF PUERTO RICO (COMPANY),AND KMART CORPORATION... | N/A | N/A | 09/30/2019 | N/A | N/A | N/A | Cure amount resolved |

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 394 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | PUERTO RICO TELEPHONE COMPANY, INC | THIS FOURTEENTH AMENDMENT (FOURTEENTH AMENDMENT) TO THE LICENSE AGREEMENT IS MADE ASOF NOVEMBER 16, 2017 BY PUERTO RICO TELEPHONE COMPANY, INC., A COMPANYORGANIZED UNDER THE LAWS OF THE COMMONWEALTH OF PUERTO RICO (LICENSEE), AND SEARS,R | N/A | N/A | 09/30/2019 | - | - | - | |
| 395 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | PUERTO RICO TELEPHONE COMPANY, INC | THIS TWELFTH AMENDMENT TO LICENSE AGREEMENT (TENTH AMENDMENT) ISMADE AS OF JANUARY 1, 2015 BETWEEN PUERTO RICO TELEPHONE COMPANY, INC., A COMPANYORGANIZED UNDER THE LAWS OF THE COMMONWEALTH OF PUERTO RICO (LICENSEE), AND SEARS, ROEBUCK DE | N/A | N/A | 9/30/2019 | - | - | - | |
| 396 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | PUERTO RICO TELEPHONE COMPANY, INC | THIS THIRTEENTH AMENDMENT (THIRTEENTH AMENDMENT) TO THE LICENSE AGREEMENT IS MADE ASOF MARCH 2, 2017 BY PUERTO RICO TELEPHONE COMPANY, INC., A COMPANYORGANIZED UNDER THE LAWS OF THE COMMONWEALTH OF PUERTO RICO (LICENSEE), AND | N/A | N/A | 9/30/2019 | - | - | - | |
| 397 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | PUERTO RICO TELEPHONE COMPANY, INC | THIS FIFTH AMENDMENT TO LICENSE AGREEMENT (THIS FIFTH AMENDMENT) IS BETWEEN PUERTO RICOTELEPHONE COMPANY, INC., A COMPANY ORGANIZED UNDER THE LAWS OF THE COMMONWEALTH OFPUERTO RICO (LICENSEE), AND SEARS, ROEBUCK DE PUERTO RICO, | N/A | N/A | 9/30/2019 | - | - | - | |
| 398 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | PUERTO RICO TELEPHONE COMPANY, INC | THIS SIXTH AMENDMENT TO LICENSE AGREEMENT (THIS SIXTH AMENDMENT) IS BETWEEN PUERTORICO TELEPHONE COMPANY, INC., A COMPANY ORGANIZED UNDER THE LAWS OF THE COMMONWEALTH OFPUERTO RICO (LICENSEE), AND SEARS, ROEBUCK DE PUERTO RICO, | N/A | N/A | 9/30/2019 | - | - | - | |
| 399 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | PUERTO RICO TELEPHONE COMPANY, INC | THIS NINTH AMENDMENT TO LICENSE AGREEMENT (THIS NINTH AMENDMENT) IS BETWEEN PUERTORICO TELEPHONE COMPANY, INC., A COMPANY ORGANIZED UNDER THE LAWS OF THE COMMONWEALTH OFPUERTO RICO (LICENSEE), AND SEARS, ROEBUCK DE PUERTO RICO, | N/A | N/A | 9/30/2019 | - | - | - | |

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 | N/A | SEARS, ROEBUCK AND CO. | PUERTO RICO TELEPHONE COMPANY, INC | EXTENDED ZONE BUNDLE SERVICE AGREEMENT | N/A | N/A | Expired | - | - | - | |
| 401 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | PULSELEARNING LTD | THCS - MSA - PULSELEARNING - 2015 | CW2301891 | N/A | 06/10/2019 | N/A | N/A | N/A | Cure amount resolved |
| 402 | N/A | SEARS HOLDINGS PUBLISHING COMP. | QUAD GRAPHICS INC-55302756 | SC PP-QUAD-GRAPHICS-PRINT AGREEMENT-2007 | SHCLCW3426 | N/A | 12/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 403 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | QUINSTREET | HS - QUIN STREET INC - MASTER SERVICES AGREEMENT - 2013 | SHCLCW6664 | N/A | 4/15/2018 | N/A | N/A | N/A | Cure amount resolved |
| 404 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | QUINSTREET | FIRST AMENDMENT TO MASTER SERVICES AGREEMENT | N/A | N/A | 04/15/2021 | - | - | - | |
| 405 | N/A | KMART CORPORATION | RAND MCNALLY | N/A | N/A | N/A | 12/30/2018 | N/A | N/A | N/A | Cure amount resolved |
| 406 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | RANGER AMERICAN ARMORED SERVICES, INC | FIN-RANGER AMERICAN ARMORED SERVICES-ARMORED CAR SERVICES AGREEMENT-12 | SHCLCW4069 | N/A | 04/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 407 | N/A | N/A | RANGER AMERICAN ARMORED SERVICES, INC | RANGER - SEARS PR - ACC RECORD - 2017 | CW2323652 | N/A | 04/30/2019 | - | - | - | |
| 408 | N/A | N/A | RANGER AMERICAN ARMORED SERVICES, INC | RANGER - KMART PR - ACC - 2017 | CW2323656 | N/A | 04/30/2019 | - | - | - | |
| 409 | N/A | N/A | RANGER AMERICAN ARMORED SERVICES, INC | RANGER - KMART VI - ACC - 2017 | CW2323669 | N/A | 04/29/2019 | - | - | - | |
| 410 | N/A | SEARS HOLDINGS CORPORATION | RANGER AMERICAN ARMORED SERVICES, INC | VENDOR AGREEMENT | SHCLCW4069 | N/A | 10/15/2021 | - | - | - | |
| 411 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | REED GROUP MANAGEMENT LLC | REED GROUP MASTER SERVICE AGREEMENT | CW2315427 | N/A | 10/31/2023 | N/A | N/A | N/A | Cure amount resolved |
| 412 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | REED GROUP MANAGEMENT LLC | REED GROUP CENTRALIZED LEAVE MANAGEMENT SOW | CW2315837 | N/A | 08/31/2021 | - | - | - | |
| 413 | N/A | SEARS, ROEBUCK AND CO. | RELIABLE PARTS, INC. | PARTS SUPPLIER AGREEMENT | N/A | N/A | Recurring | N/A | N/A | N/A | Cure amount resolved |
| 414 | N/A | SEARS, ROEBUCK AND CO.; SHC LICENSED BUSINESS LLC | REPAIR AND WEAR INC | THIS FIRST AMENDMENT "FIRST AMENDMENT" TO THE LICENSE AGREEMENT IS MADE AS OF FEBRUARY 4, 2016 BY REPAIR AND WEAR INC.; AN OHIO CORPORATION "LICENSE"AND SHC LICENSED BUSINESS LLC A DELAWARE LIMITED LIABILITY COMPANY "COMPANY" UNDER GRANT | N/A | N/A | 1/31/2021 | N/A | N/A | N/A | Cure amount resolved |
| 415 | N/A | SEARS, ROEBUCK AND CO.; SHC LICENSED BUSINESS LLC | REPAIR AND WEAR INC | THIS SECOND AMENDMENT "SECOND AMENDMENT" TO THE LICENSE AGREEMENT IS MADE AS OF SEPTEMBER 28, 2017 BY REPAIR AND WEAR INC.; AN OHIO CORPORATION "LICENSE"AND SHC LICENSED BUSINESS LLC A DELAWARE LIMITED LIABILITY COMPANY "COMPANY" UNDER GRANT | N/A | N/A | 1/31/2021 | - | - | - | |

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 416 | N/A | SEARS, ROEBUCK AND CO.; SHC LICENSED BUSINESS LLC | REPAIR AND WEAR INC | THIS LICENSE AGREEMENT (THE AGREEMENT) IS ENTERED INTO AS OF JANUARY 31, 2016 (THE EFFECTIVE DATE), BY REPAIR AND WEAR, INC., AN OHIO CORPORATION (LICENSEE), AND SHC LICENSED BUSINESS LLC, A DELAWARE LIMITED LIABILITY COMPANY (COMPANY | N/A | N/A | 01/31/2021 | - | - | - | |
| 417 | N/A | SHC LICENSED BUSINESS LLC | REPAIR AND WEAR INC | THIS LICENSE AGREEMENT (THE AGREEMENT) IS ENTERED INTO AS OF JANUARY 31, 2016 (THE EFFECTIVE DATE), BY REPAIR AND WEAR, INC., A OHIO CORORAITN (LICENSEE), AND SHC LICENSED BUSINESS LLC., A DELAWARE LIMITED LIABILITY COMPANY (COMPANY) | N/A | N/A | 01/31/2021 | - | - | - | |
| 418 | N/A | SHC LICENSED BUSINESS LLC | REPAIR AND WEAR INC | THIS SECOND AMENDMENT ( SECOND AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OF SEPTEMBER 28, 2017 (THE EFFECTIVE DATE), BY REPAIR AND WEAR, INC., A OHIO CORPORATION (LICENSEE), AND SHC LICENSED BUSINESS LLC., A DELAWARE LIMITED LIABIL | N/A | N/A | 1/31/2021 | - | - | - | |
| 419 | N/A | SHC LICENSED BUSINESS LLC | REPAIR AND WEAR INC | THIS FIRST AMENDMENT ( FIRST AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OF FEBRUARY 4, 2016 (THE EFFECTIVE DATE), BY REPAIR AND WEAR, INC., A OHIO CORPORATION (LICENSEE), AND SHC LICENSED BUSINESS LLC., A DELAWARE LIMITED LIABIL | N/A | N/A | 1/31/2021 | - | - | - | |
| 420 | 3077 3259 | Sears Holdings Management Corporation | Retail Contractors of Puerto Rico Inc. | MAJOR MAINTENANCE OWNER CONTRACTOR AGREEMENT - ESCALATOR REPLACEMENT (Store #1905 - San Juan, PR) | CW2338834 | N/A | 1/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 421 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | RETAIL MANAGEMENT PARTNERS, INC | THIS AMENDED AND RESTATED LICENSE AGREEMENT (THE AGREEMENT) IS ENTERED INTO AS OF _____, 2014 (THE EFFECTIVE DATE), BY RETAIL MANAGEMENT PARTNERS, INC., A TEXAS CORPORATION (LICENSEE), AND SEARS HOLDINGS MANAGEMENT CORP., A DELAWARE LIMITED LIABILITY | N/A | N/A | 06/11/2019 | N/A | N/A | N/A | Cure amount resolved |

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 422 | N/A | SEARS, ROEBUCK AND CO. | RETAIL MANAGEMENT PARTNERS, INC | THE MASTER ADDENDUM ("ADDENDUM") IS ENTERED INTO ON 1/9/2015 (THE "EFFECTIVE DATE"), BETWEEN SEARS ROEBUCK AND CO., A NEW YORK CORPORATION ("SEARS") AND RETAIL MANAGEMENT PARTNERS, INC., A TEXAS CORPORATION ("LICENSEE") | N/A | N/A | 06/11/2019 | - | - | - | |
| 423 | 2552 1959 | SEARS HOLDINGS MANAGEMENT CORPORATION | RISKONNECT, INC | RISK MGMT RISKONNECT MASTER AND ADDENDUM 23 | CW2332858 | N/A | 10/16/2023 | N/A | N/A | N/A | Cure amount resolved |
| 424 | 1959 2552 | SEARS HOLDINGS MANAGEMENT CORPORATION | RISKONNECT, INC | N/A | CW2332858 | N/A | 10/16/2023 | - | - | - | |
| 425 | N/A | KMART CORPORATION; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | ROCHESTER ARMORED CAR | FIN-ROCHESTER ARMORED CAR-ARMORED CAR SERVICES AGREEMENT-2012 | SHCLCW4070 | N/A | 04/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 426 | N/A | N/A | ROCHESTER ARMORED CAR | KMART- INVOICING | CW2320962 | N/A | 04/30/2019 | - | - | - | |
| 427 | N/A | N/A | ROCHESTER ARMORED CAR | SEARS- INVOICING | CW2320964 | N/A | 04/30/2019 | - | - | - | |
| 428 | 2252 1981 | SEARS HOLDINGS MANAGEMENT CORPORATION | SALESFORCE.COM | INVOICE NUMBER 12515781 | N/A | N/A | 1/0/1900 | N/A | N/A | N/A | Cure amount resolved |
| 429 | 2252 1981 | SEARS HOLDINGS MANAGEMENT CORPORATION | SALESFORCE.COM | MASTER SUBSCRIPTION AGREEMENT - 2010 | SHC-68113 | N/A | 1/0/1900 | - | - | - | |
| 430 | N/A | SEARS, ROEBUCK AND CO.; SHC LICENSED BUSINESS LLC | SANDRA GOFF BURGER | THIS FIRST AMENDMENT ("AMENDMENT") TO THE LICENSE AGREEMENT IS MADE AS OF MAY 17, 2017 BY SANDRA GOFF BURGER, A SOLE PROPRIETOR ("LICENSEE"), AND SHC LICENSED BUSINESS LLC., A DELAWARE LIMITED LIABILITY COMPANY ("COMPANY") AS ASSIGNEE OF SEARS, ROEBUCK AND... | N/A | N/A | 06/26/2019 | N/A | N/A | N/A | Cure amount resolved |
| 431 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | Sertifi, Inc. | Master "Software as a Service" Managed Service Agreement | N/A | N/A | 1/0/1900 | N/A | N/A | N/A | Cure amount resolved |
| 432 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SERVICE EXPRESS INC | OBU-SERVICE EXPRESS-MASTER SERVICE AGREEMENT (2015) | CW2301126 | N/A | 05/18/2025 | N/A | N/A | N/A | Cure amount resolved |
| 433 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SERVICE EXPRESS INC | MEMBER TECH - SERVICE EXPRESS INC - SOW 2 - AUGUST 2018 | CW2340477 | N/A | 09/30/2019 | - | - | - | |
| 434 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SERVICE EXPRESS INC | N/A | CW2340477 | N/A | 9/30/2019 | - | - | - | |
| 435 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SERVICE EXPRESS INC | N/A | CW2340477 | N/A | 9/30/2019 | - | - | - | |
| 436 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SERVICE EXPRESS INC | SOW 2 | N/A | N/A | N/A | - | - | - | |
| 437 | N/A | SEARS, ROEBUCK AND CO. | SERVICEBENCH INC | HS-SERVICEBENCH INC.-MSA-03 | SHCLCW103 | N/A | 04/01/2021 | N/A | N/A | N/A | Cure amount resolved |
| 438 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SHARE A SALE | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Cure amount resolved |
| 439 | N/A | KMART CORPORATION; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS, ROEBUCK AND CO. | SPECIALTY STORE SERVICES-707779 | FAC - SPECIALTY STORE SERVICES - PTC 2018 | CW2338753 | N/A | 06/30/2021 | N/A | N/A | N/A | Cure amount resolved |

Sears Holdings Corporation
Executory Contracts for Assignment

Sears Holdings Corporation
Executory Contracts for Assignment

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 440 | N/A | SHC LICENSED BUSINESS LLC | SUMMIT PORTRAITS, LLC | THIS LICENSE AGREEMENT (THE AGREEMENT) IS ENTERED INTO AS OF _____ (THE 7/11/2018 EFFECTIVE DATE), BY SUMMIT PORTRAITS, LLC, A LIMITED LIABILITY CORPORATION (LICENSEE), AND SHC LICENSED BUSINESS LLC, A DELAWARE LIMITED LIABILITY CO. | N/A | N/A | 07/10/2023 | - | - | - | |
| 441 | 1979 | KMART CORPORATION | SUPPLYLOGIX LLC | RM - SUPPLYLOGIX INC - MASTER SERVICES AGREEMENT - 2011 | SHCLCW5616 | N/A | 11/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 442 | 1979 | KMART CORPORATION | SUPPLYLOGIX LLC | RM - SUPPLYLOGIX INC - STATEMENT OF WORK 2 TO MSA - 2012 | SHCLCW5617 | N/A | 11/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 443 | 1979 | KMART CORPORATION | SUPPLYLOGIX LLC | RM - SUPPLYLOGIX LLC - STATEMENT OF WORK 3 TO MSA - 2012 | SHCLCW5903 | N/A | 11/30/2019 | - | - | - | |
| 444 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES | CORPORATE SERVICES - SUTHERLAND GLOBAL SERVICES - MASTER OUTSOURCED SERVICES AGREEMENT - 2016 | CW2318003 | N/A | 08/31/2021 | - | - | - | |
| 445 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES | CORPORATE SERVICES - SUTHERLAND GLOBAL SERVICES PHILIPPINES, INC. - MASTER OUTSOURCED SERVICES AGREEMENT - 2016 | CW2318007 | N/A | 08/31/2021 | - | - | - | |
| 446 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES | CORPORATE SERVICES - SUTHERLAND GLOBAL SERVICES PHILIPPINES, INC. SOW 2 - 2016 | CW2318009 | N/A | 10/06/2019 | - | - | - | |
| 447 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES | CORPORATE SERVICES - SUTHERLAND GLOBAL SERVICES PRIVATE LIMITED - SOW 1 - 2016 | CW2318005 | N/A | 10/06/2019 | - | - | - | |
| 448 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES | CS - SUTHERLAND GLOBAL - SOW 3 - 2017 | CW2327026 | N/A | 08/31/2021 | - | - | - | |
| 449 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES INDIA PVT LTD. | CS - SUTHERLAND GLOBAL - SOW 2 - 2016 | CW2321517 | N/A | 10/06/2019 | - | - | - | |
| 450 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES INDIA PVT LTD. | CS - SUTHERLAND GLOBAL - SOW 1 - 2016 | CW2321520 | N/A | 10/06/2019 | - | - | - | |
| 451 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES INDIA PVT LTD. | HS - SUTHERLAND - SOW 3 | CW2329570 | N/A | 10/06/2019 | - | - | - | |
| 452 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES INDIA PVT LTD. | CORPORATE SERVICES - PARTS SALES AND CARE CHATS - SUTHERLAND GLOBAL SERVICES - SOW 3 - 2017 | CW2325437 | N/A | 10/06/2019 | - | - | - | |
| 453 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES PHILIPPINES, INC. | CS - SUTHERLAND GLOBAL SVCS - SOW 1 - 2016 | CW2329857 | N/A | 10/06/2019 | N/A | N/A | N/A | Cure amount resolved |
| 454 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES PHILIPPINES, INC. | CS - SUTHERLAND - SOW 2 - 2016 | CW2321515 | N/A | 10/06/2019 | - | - | - | |
| 455 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | SUTHERLAND GLOBAL SERVICES PHILIPPINES, INC. | CS - SUTHERLAND GLOBAL - SOW 3 - 2017 | CW2327709 | N/A | 08/31/2021 | - | - | - | |
| 456 | N/A | INNOVEL SOLUTIONS, INC. | TCI LEASING | INNOVEL - TCI INVOICING - 2017 | CW2333068 | N/A | 10/31/2022 | N/A | N/A | N/A | Cure amount resolved |
| 457 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | TCI LEASING | SUPPLY CHAIN - INNOVEL  TCI YARD HOSTLING LEASE - 2017 | CW2332767 | N/A | 10/18/2022 | - | - | - | |
| 458 | N/A | SEARS HOLDINGS CORPORATION | TCI LEASING | N/A | CW2332767 | N/A | 10/18/2022 | - | - | - | |

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 459 | N/A | SEARS HOLDINGS CORPORATION | TCI LEASING | N/A | CW2332767 | N/A | 10/18/2022 | - | - | - | |
| 460 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO. | TECHNICON INC | FAC - TECHNICON INC - MASTER SERVICE AGREEMENT 2017 | CW2333386 | N/A | 11/09/2018 | N/A | N/A | N/A | Cure amount resolved |
| 461 | N/A | KMART CORPORATION; KMART OPERATIONS LLC; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO. | TECHNICON INC | FACILITIES UPTO $40K MSA | N/A | N/A | 11/09/2018 | - | - | - | |
| 462 | N/A | SHC LICENSED BUSINESS LLC | TELEFLORA LLC | THIS SIXTH AMENDMENT (SIXTH AMENDMENT) TO THE LICENSE AGREEMENT IS MADE AS OF APRIL 28, 2018  BY TELEFLORA, LLC, A DELAWARE LIMITED LIABILITY COMPANY (LICENSEE) AND SHC LICENSED BUSINESS LLC, A DELAWARE LIMITED LIABILITY COMPANY | N/A | N/A | 05/31/2020 | N/A | N/A | N/A | Cure amount resolved |
| 463 | N/A | SEARS IT & MANAGEMENT SERVICES INDIA PRIVATE LIMITED | TELEFLORA LLC | SYW PARTNERSHIP AGREEMENT | N/A | N/A | 12/12/2018 | - | - | - | |
| 464 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | TELESOFT CORP. | ITG - TELESOFT - MSSA - 2014 | CW2281898 | N/A | 06/29/2019 | N/A | N/A | N/A | Cure amount resolved |
| 465 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | TELESOFT CORP. | IT TELESOFT SOW 2017 | CW2332078 | N/A | 11/30/2018 | - | - | - | |
| 466 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | TEMPUS TECHNOLOGIES | HOME SERVICES - TEMPUS - SAAS AGREEMENT - SEPT 2017 | CW2217455 | N/A | 10/01/2020 | N/A | N/A | N/A | Cure amount resolved |
| 467 | 1925 | INNOVEL SOLUTIONS, INC. | THE J.M. SMUCKER COMPANY | WAREHOUSE SERVICE AGREEMENT | N/A | N/A | 05/01/2021 | N/A | N/A | N/A | Cure amount resolved |
| 468 | N/A | SEARS HOME & BUSINESS FRANCHIS | THE MEDIA CAPTAIN, LLC | SEARCH ENGINE OPTIMIZATION SERVICES AGREEMENT FOR SEARS CARPET CLEANING & SEARS GARAGE DOORS | N/A | N/A | Recurring | N/A | N/A | N/A | Cure amount resolved |
| 469 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | THE SHERWIN-WILLIAMS CO | Supply Agreement for Roofing Products | N/A | N/A | 1/0/1900 | N/A | N/A | N/A | Cure amount resolved |
| 470 | N/A | KMART CORPORATION; SEARS HOLDINGS CORPORATION; SEARS, ROEBUCK AND CO. | TJ&H CHILLUNS, LTD. | THIS SCAN-BASED TRADING AND CONSIGNMENT AGREEMENT (THE "AGREEMENT") IS ENTERED INTO BY AND BETWEEN KMART CORPORATION (TOGETHER WITH ITS SUBSIDIARIES "KMART", SEARS, ROEBUCK AND CO., (TOGETHER WITH ITS SUBSIDIAIRIES "SEARS" AND ALL OTHER SUBSIDIARIES | N/A | N/A | N/A | N/A | N/A | N/A | Cure amount resolved |
| 471 | N/A | SEARS, ROEBUCK AND CO.; SHC LICENSED BUSINESS LLC | TJ&H CHILLUNS, LTD. | THIS EIGHTH AMENDMENT ("EIGHTH AMENDMENT") TO THE LICENSE AGREEMENT IS MADE AS OF JANUARY 17, 2018 BY TJ&H CHILLUNS, LTD., AN INDIANA CORPORATION ("LICENSEE") AND SHC LICENSED BUSINESS LLC,  A DELAWARE LIMITED LIABILITY COMPANY ("COMPANY") AS ASSIGNEE OF | N/A | N/A | 01/31/2020 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 472 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | TMAXSOFT | IT TMAXSOFT MSSA SOW IMS REHOSTING 2017 | CW2332824 | N/A | 10/24/2020 | N/A | N/A | N/A | Cure amount resolved |
| 473 | N/A | INNOVEL SOLUTIONS, INC. | TOTE MARITIME ALASKA, INC. | NINETEENTH AMENDMENT TO TRANSPORTATION AGREEMENT DATED MAY 2, 2006 | N/A | N/A | 12/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 474 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | TOUCHSTORM, LLC | KENMORE YOUTUBE CHANNEL MANAGEMENT & AUDIENCE DEVELOPMENT | N/A | N/A | 06/30/2019 | N/A | N/A | N/A | Cure amount resolved |
| 475 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | TRAVEL CONCEPTS | WE ACKNOWLEDGE RECEIPT OF YOUR LETTER DATED JULY 16, 2013. | N/A | N/A | 2/28/2018 | N/A | N/A | N/A | Cure amount resolved |
| 476 | N/A | SEARS, ROEBUCK DE PUERTO RICO, | TRAVEL CONCEPTS | THIS AMENDMENT ("AMENDMENT") IS MADE AND ENTERED INTO ON AUGUST 1, 2013, BY AND BETWEEN SEARS, ROEBUCK DE PUERTO RICO,INC, A DELAWARE CORPORATION ("SEARS"), AND TRAVEL CONCEPTS, INC, A PUERTO RICO CORPORATION ("LICENSEE") | N/A | N/A | 2/28/2018 | - | - | - | |
| 477 | N/A | SEARS, ROEBUCK AND CO, KMART CORPORATION, SEARS BRANDS MANAGEMENT CORPORATION | TRICO PRODUCTS CORPORATION | SUPPLY AGREEMENT FOR WIPER BLADES | N/A | N/A | 3/2/2021 | - | - | - | |
| 478 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | VERIFONE | IT-AJB SOFTWARE DESIGN- MSSA AND AMENDMENT NO.1 TO MSSA-11 | SHCLCW1 | N/A | 10/06/2019 | N/A | N/A | N/A | Cure amount resolved |
| 479 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | VERIFONE | MT-VERIFONE-SOW 61-WINDOWS STORE SET UP CHANGES-OCT 2018 | CW2340203 | N/A | 12/11/2018 | - | - | - | |
| 480 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | VERIFONE | N/A | CW2340203 | N/A | 12/11/2018 | - | - | - | |
| 481 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | VERIFONE | SOW 61 | CW2340203 | N/A | 12/11/2018 | - | - | - | |
| 482 | N/A | KMART OPERATIONS LLC; SEARS HOLDINGS MANAGEMENT CORPORATION; SEARS OPERATIONS LLC; SEARS, ROEBUCK AND CO.; SEARS, ROEBUCK DE PUERTO RICO | VERTEX | FAC-ENVIRONMENTAL CONSULTANTS-VERTEX-MESA | CW2333465 | N/A | 11/09/2020 | N/A | N/A | N/A | Cure amount resolved |
| 483 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | VERTIV SERVICES INC. | N/A | N/A | N/A | 8/22/2018 | N/A | N/A | N/A | Cure amount resolved |
| 484 | N/A | SEARS, ROEBUCK AND CO. | VILLAGE OF HOFFMAN ESTATES | FIN - VILLAGE OF HOFFMAN ESTATES - 2016 SEARS CENTRE NAMING RIGHTS AGREEMENT | CW2314101 | N/A | 04/26/2019 | - | - | - | |
| 485 | N/A | SEARS, ROEBUCK AND CO. | VILLAGE OF HOFFMAN ESTATES | 2016 SEARS NAMING RIGHTS AGREEMENT | N/A | N/A | 8/31/2019 | - | - | - | |
| 486 | N/A | SEARS ROEBUCK AND CO. ; SEARS OPERATIONS LLC ; KMART CORPORATION ; KMART OPERATIONS LLC | WEATHERVANE SERVICE, INC | MAJOR MAINTENANCE AGREEMENT | N/A | N/A | 10/25/2018 | - | - | - | |
| 487 | N/A | SEARS ROEBUCK AND CO. ; SEARS OPERATIONS LLC ; KMART CORPORATION ; KMART OPERATIONS LLC | WINCON SERVICES, INC | MASTER GENERAL CONSULTING SERVICES AGREEMENT | N/A | N/A | 6/21/2018 | N/A | N/A | N/A | Cure amount resolved |

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 488 | N/A | SEARS ROEBUCK AND CO. ; SEARS OPERATIONS LLC ; KMART CORPORATION ; KMART OPERATIONS LLC | WINCON SERVICES, INC | MASTER GENERAL CONSULTING SERVICES AGREEMENT | N/A | N/A | 6/21/2019 | - | - | - | |
| 489 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION;SEARS HOME IMPROVEMENT PRODUCTS, INC. | WINCORE WINDOW COMPANY, LLC, | SECOND AMENDMENT TO SUPPLY AGREEMENT | N/A | N/A | 08/31/2021 | - | - | | |
| 490 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WINDSTREAM PROFESSIONAL SERVICES(S-G53033) | IT OPS - WINDSTREAM COMMUNICATIONS - CUSTOMER SERVICE AGREEMENT - 2012 | SHCLCW5824 | N/A | 07/09/2019 | N/A | N/A | N/A | Cure amount resolved |
| 491 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WINNSCAPES INC | INNOVEL-WINNSCAPES INC-SNOW REMOVAL-45432 COLUMBUS OH-2018 | CW2340004 | N/A | 09/30/2020 | N/A | N/A | N/A | Cure amount resolved |
| 492 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIPRO LIMITED | FINANCE - WIPRO LIMITED - MASTER AGREEMENT - 20 | CW2212745 | N/A | 12/02/2022 | N/A | N/A | N/A | Cure amount resolved |
| 493 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIPRO LIMITED | HR OPS- WIPRO LIMITED MASTER OUTSOURCED SERVICES AGREEMENT 2007 | SHCLCW1657 | N/A | 12/31/2021 | - | - | - | |
| 494 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIPRO LIMITED | HOME SERVICES AND OTHER WIPRO LIMITED- SOW FA PHASE I TO MOSA 2008 | SHCLCW4124 | N/A | 12/31/2021 | - | - | - | |
| 495 | N/A | SEARS IT & MANAGEMENT SERVICES INDIA PRIVATE LIMITED | WIPRO LIMITED | HOME SERVICES - WIPRO FINANCE - PHASE 1 SHIP - 2012 | CW2256110 | N/A | 12/31/2021 | - | - | - | |
| 496 | N/A | N/A | WIPRO LIMITED | FINANCE - WIPRO - ACC PHASE I SOW - PLANO - 2012 | CW2259119 | N/A | 12/31/2021 | - | - | - | |
| 497 | N/A | N/A | WIPRO LIMITED | FINANCE - WIPRO - SOW DCC ACCOUNT 08413 - 2012 | CW2259110 | N/A | 12/31/2021 | - | - | - | |
| 498 | N/A | N/A | WIPRO LIMITED | FINANCE - WIPRO - SOW NCC - 2012 | CW2259115 | N/A | 12/31/2021 | - | - | - | |
| 499 | N/A | N/A | WIPRO LIMITED | FINANCE - WIPRO - SOW FINANCIAL SERVICES ACCOUNT 35013 - 2015 | CW2303066 | N/A | 12/31/2021 | - | - | - | |
| 500 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIPRO LIMITED | HOME SERVICES-WIPRO-SOW 2 CR067-2014 | CW2276384 | N/A | 12/31/2021 | - | - | - | |
| 501 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIPRO LIMITED | SYW - WIPRO - SOW FOR ANALYTICS - 2018 | CW2335068 | N/A | 01/31/2019 | - | - | - | |
| 502 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIS INTERNATIONAL | HS - WIS INTERNATIONAL - INVENTORY MASTER SERVICES AGREEMENT - 2011 | SHCLCW5478 | N/A | 01/31/2019 | N/A | N/A | N/A | Cure amount resolved |
| 503 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIS INTERNATIONAL | CORPORATE SERVICES - TRUCK INVENTORY SERVICES SOW 6- WIS INTERNATIONAL - 2016 | CW2309861 | N/A | 01/31/2019 | - | - | - | |
| 504 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIS INTERNATIONAL | N/A | CW2340929 | N/A | 1/31/2022 | - | - | - | |
| 505 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIS INTERNATIONAL | N/A | CW2340929 | N/A | 1/31/2022 | - | - | - | |
| 506 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIS INTERNATIONAL | HS - WIS INTERNATIONAL - INVENTORY MASTER SERVICES AGREEMENT - 2011 | SHCLCW5478 | N/A | 1/31/2022 | - | - | - | |
| 507 | N/A | SEARS HOLDINGS MANAGEMENT CORPORATION | WIS INTERNATIONAL | INVETORY SERVICES | CW2340929 | N/A | 1/31/2022 | - | - | - | |

FILED DATE: 7/8/2020 5:03 PM 2018CH12683

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

Sears Holdings Corporation
Executory Contracts for Assignment

| Ref # | ECF No. (Cure objection asserted by counterparty) | Debtor | Counterparty | Contract Title | Contract No. | Contract Executed Date | Contract Expiration Date | Debtors' Asserted Cure Amount | Counterparty's Asserted Cure Amount | Disputed Cure Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 508 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | DANOSA CARIBBEAN, INC. | SUPPLY AGREEMENT FOR ROOFING | N/A | N/A | N/A | - | - | - | |
| 509 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | AMERICAN BUILDERS & CONTRACTORS SUPPLY CO.INC.(S-G52885) | SUPPLY AGREEMENT FOR ROOFING | N/A | N/A | N/A | - | - | - | |
| 510 | N/A | SEARS, ROEBUCK AND CO. | VILLAGE OF HOFFMAN ESTATES | ECONOMIC DEVELOPMENT AGREEMENT BY AND BETWEEN THE VILLAGE OF HOFFMAN ESTATES AND SEARS, ROEBUCK AND CO. | N/A | N/A | N/A | - | - | - | |
| 511 | N/A | SEARS, ROEBUCK AND CO. | VILLAGE OF HOFFMAN ESTATES | AMENDMENTS 1-4 TO THE ECONOMIC DEVELOPMENT AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 512 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | DAL-TILE DISTRIBUTION, INC. | SUPPLY AGREEMENT FOR FLOORING /BACKSPLASH | N/A | N/A | N/A | 33,426 | - | N/A | Cure Amount Resolved |
| 513 | N/A | SEARS, ROEBUCK AND CO. | SEALED UNIT PARTS CO., INC. | HS - PARTS SERVICE AGREEMENT - SUPCO - 2018 | CW2334836 | N/A | 01/21/2021 | - | - | - | |
| 514 | N/A | A&E FACTORY SERVICE, LLC | A.O. SMITH CORPORATION | N/A | CW2340675 | N/A | 6/15/2019 | - | - | - | |
| 515 | N/A | A&E FACTORY SERVICE, LLC | A.O. SMITH CORPORATION | SERVICE AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 516 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | AIR-CONDITIONING, HEATING AND REFRIGERATION INSTITUTE(S-G53005) | LICENSING AGREEMENT | N/A | N/A | N/A | - | - | - | |
| 517 | N/A | SEARS HOME IMPROVEMENT PRODUCTS, INC. | OWENS CORNING SALES, LLC | PROGRAM LETTER - UPDATE TO PROMOTIONAL INCENTIVE AGREEMENT | N/A | N/A | 12/31/2018 | - | - | - | |
| 518 | 2540, 1920 | SEARS HOLDINGS MANAGEMENT CORPORATION | INFOSYS TECHNOLOGIES LIMITED | IT OPS-INFOSYS TECHNOLOGIES LIMITED-OUTSOURCING AGREEMENT-2004 | SHCLCW3458 | N/A | 7/31/2019 | N/A | N/A | N/A | Cure amount resolved |

FILED DATE: 7/8/2020 5:03 PM  2018CH12683
FILED DATE: 11/12/2019 4:33 PM  2018CH12683

# CRAIN'S CHICAGO BUSINESS

June 12, 2017 07:00 PM

## With layoffs, Sears loses state tax credits

BRIGID SWEENEY  



Bloomberg

Sears' Hoffman Estates headquarters.

The 400 jobs being cut put the retailer below the employment threshold required for tax breaks—but Sears gets to keep the millions it has already received.

The announcement this morning that Sears Holdings has cut about 400 jobs, mostly at its Hoffman Estates headquarters, puts the company under the employment threshold required to receive the annual tax breaks it brokered in a 2011 deal with the state.

The deal, struck under the Edge program (short for Economic Development for a Growing Economy), provided Sears with state income tax credits worth $15 million a year for 10 years. In order to keep the deal, Sears agreed to stop shopping for a new

EXHIBIT
5

headquarters location out of state and to keep at least 4,250 local corporate jobs in Hoffman Estates.

"For the first time since our agreement was enacted in 2011, we recently dropped below the required retained job figure for the Edge credit," Sears spokesman Howard Riefs wrote in an email to Crain's. He said the company was allowed to count only certain types of jobs under the agreement.

A separate property tax agreement, reached at the same time, extended existing tax credits for 15 years, or until the company recovered $125 million. That agreement also includes a 4,250 job requirement, but the definition of jobs that count is broader than the one within the Edge agreement. Sears remains in compliance with the property tax deal and will continue to receive those credits, according to spokesman Chris Brathwaite.

The retailer had a property tax break dating back to 1992, when it first moved to Hoffman Estates from the formerly namesake Loop skyscraper now named Willis Tower. That agreement was intended to reimburse Sears for the $200 million it spent to build its suburban campus. Only about $75 million was recaptured in property tax credits through 2011, according to Brathwaite. The extension was intended to pay back the remainder of Sears' investment.

At the time of the Edge and property tax deals in December 2011, Sears employed about 6,100 people at its headquarters, including full-time and contract workers. Brathwaite declines to provide the number currently employed at Sears headquarters. Though the number of Edge-qualifying employees is now below 4,250, that number does not include contractors, he said. Neither the Edge nor property tax deals count store-level Sears and Kmart employees in Illinois.

***Read more:***

• Special Report: Sears—where America shopped

• With Sears' future in doubt, vendors begin pulling back

• Sears' media-shy CEO lashes out at suppliers

Under the Edge deal, Sears was required to spend $60 million in infrastructure investment by 2015 and $100 million before 2018 to begin collecting credits. The credits are paid two years in arrears. Sears met those requirements and first collected about $20 million in tax credits in 2016 for the 2014 calendar year. It is currently collecting credits for meeting conditions in 2015. Sears also met conditions in 2016, he said, which means it would be paid out next year.

In the last five years, Brathwaite said, Sears has paid more than $680 million in taxes, invested more than $260 million in its headquarters campus and worked with thousands of vendors across the state.

The state's Department of Commerce & Economic Opportunity, which oversees the Edge agreement, confirmed that Sears will fall below the minimum number of employees required to receive the credits.

"The department is planning a books and records examination to ensure taxpayers are not on the hook for an out-of-compliance Edge agreement," spokeswoman Jacquelyn Reineke wrote in an email.

Sears is one of eight companies that received so-called "special" Edge agreements through a program amendment filed in 2011. CME Group also received one around the same time as Sears. Mitsubishi, which closed its plant in Normal in 2015 and no longer operates in Illinois, received another.

Unlike regular Edge agreements, tax credits already issued under special Edge deals cannot be clawed back if a company falls out of compliance, Reineke said.

Gov. Bruce Rauner has worked to add taxpayer protections to the Edge program, she added.

---

**Source URL:** *https://www.chicagobusiness.com/article/20170613/NEWS07/170619964/with-layoffs-sears-loses-edge-tax-credits*

FILED DATE: 7/8/2020 5:03 PM    2018CH12683
FILED DATE: 11/12/2019 4:33 PM    2018CH12683

## SETTLEMENT AGREEMENT REGARDING EDGE TAX CREDIT AGREEMENT

**THIS SETTLEMENT AGREEMENT REGARDING EDGE TAX CREDIT AGREEMENT** (the "Settlement Agreement") is entered into as of this 15th day of December, 2017 by and between the State of Illinois, acting by and through its Department of Commerce and Economic Opportunity (the "Department") and Sears Holdings Management Corporation ("Sears Holdings"), together with its other direct and indirect subsidiaries that now or hereafter exist (collectively, the "Company"), and together with the Department, the "Parties."

### RECITALS

A. The Department and the Company entered into the EDGE Tax Credit Agreement dated October 26, 2012 (the "Original Agreement") and the First Amendment to the EDGE Tax Credit Agreement dated June 14, 2017 (the "First Amendment"; the Original Agreement and the First Amendment are hereafter referred to as the "Agreement"), wherein the Department agreed to award an EDGE tax credit to the Company pursuant to Public Act 91-476, titled the Economic Development for a Growing Economy ("EDGE") Tax Credit Act, 35 ILCS 10/5-1, *et seq.*, subject to the terms and conditions set forth therein.

B. The Agreement required the Company to, among other things, retain a minimum of 4,250 Full-Time Employees at certain specified locations as set forth in the Agreement.

C. On March 15, 2017, the Company submitted its request for the Certificate of Verification for Taxable Year 2016.

D. On May 31, 2017, the number of Retained Employees fell below 4,250, and as of the date of this Settlement Agreement the number of Retained Employees remains below 4,250.

E. To resolve and settle certain disputes that arose between the Parties regarding issuance of the Certificates of Verification for Taxable Year 2016 and Fiscal Year 2017, the Department and the Company desire to enter into this Settlement Agreement.

F. As used herein, the below terms have the following meanings:

a. "Settlement Agreement" refers to the agreement herein entered into by the Parties on this 15th day of December, 2017.

b. "Fiscal Year 2017" means the Company's fiscal year ending January 31, 2018.

c. "Certified" refers to issuance by the Department of a Certificate of Verification for a given Taxable Year.

d. Capitalized terms used herein but not defined shall have the respective meanings ascribed to them in the Agreement.

**EXHIBIT**

**6**

NOW, THEREFORE, in consideration of the mutual covenants, obligations, and stipulations set forth herein, the receipt and sufficiency of which are hereby acknowledged and agreed to, the Parties hereto agree as follows:

1. <u>Recitals</u>. The Recitals set forth above are hereby incorporated into and made a part of this Settlement Agreement.

2. <u>Issuance of Certificate of Verification for Taxable Year 2016; Use of Credits</u>. Concurrently with the execution of this Settlement Agreement, the Department shall issue the Certificate of Verification for Taxable Year 2016 to the Company. Notwithstanding the provisions of Section 2E of the Agreement, the Company may use the Credits issued and carryforward any Unused Credits Certified and unused as of the date of this Settlement Agreement even though the number of Retained Employees remains below 4,250, so long as the Company uses any such Unused Credits by September 30, 2019. After October 1, 2019, the Company may not claim any Unused Credits against its obligation to pay over withholding under Section 704A of the Illinois Income Tax Act unless, and until, the Company comes back into compliance with the terms and conditions of the Agreement as set forth in Section 2E.

3. <u>Certificate of Verification for Fiscal Year 2017</u>. The Department shall have no obligation to issue any Certificate of Verification for Fiscal Year 2017. The Company expressly waives and agrees to not seek any Certificate of Verification or other Credit for Fiscal Year 2017.

4. <u>Release of Claims for Taxable Year 2016 and Fiscal Year 2017</u>. As the purpose of this Settlement Agreement is to resolve certain disputes that arose between the Parties regarding issuance of the Certificates of Verification and use of Credits for Taxable Year 2016 and Fiscal Year 2017, the Company hereby releases the Department from all causes of action, claims or demands, whether known or unknown, with respect to issuance of the Certificates of Verification and use of Credits for Taxable Year 2016 and Fiscal Year 2017.

5. <u>Authority to Bind</u>.    The Company hereby represents and warrants as of the date hereof: (a) this Settlement Agreement has been duly authorized, executed and delivered by the Company and is the legal, valid and binding obligation of the Company enforceable in accordance with its terms; (b) the Company has full power and authority to execute, deliver and perform the Agreement, as agreed to hereby, and any ancillary documents and to perform its obligations thereunder, and to consummate the transactions contemplated hereby; and (c) the execution and delivery of this Settlement Agreement and any ancillary documents, the performance by the Company of its obligations under the Agreement, as agreed to hereby, and the consummation by the Company of the transactions contemplated by the Agreement, as agreed to hereby, will not: (i) contravene any provision of the articles of incorporation of bylaws of the Company; (ii) violate or conflict with any law, statute, ordinance, rule, regulation, decree, writ, injunction, judgment or court order of any governmental body or of any arbitration award which is either applicable to, binding upon or enforceable against the Company; (iii) conflict with, result in any breach of, or constitute a default (or an event which would, with the passage

of time or the giving of notice or both, constitute a default) under any other agreement which is applicable to, binding upon or enforceable against the Company; or (iv) require the consent, approval, authorization or permit of, or filing with or notification to, any governmental body, any court or tribunal or any other Person. The signatory for the Company represents that he or she has been duly authorized to execute this Settlement Agreement on behalf of the Company.

6. No Other Amendment; Conflicts. Except as otherwise expressly agreed to hereby, the Agreement shall remain unmodified and in full force and effect. In the event of any conflicts between the Agreement and this Settlement Agreement, this Settlement Agreement shall control.

7. No Construction Bias. Each of the Parties hereto cooperated in the drafting and preparation of this Settlement Agreement. Hence, this Settlement Agreement shall not be construed as an admission of liability, wrongdoing or responsibility by any party.

8. Binding Upon Successors and Assigns. This Settlement Agreement, and all representations, agreements, covenants and releases set forth herein, shall be binding upon, and shall inure to the benefit of, the Parties and their respective predecessors, successors, heirs and assigns.

9. Partial Invalidity. In the event that any provisions of this Settlement Agreement should be held to be void or unenforceable, the remaining portions hereof shall remain in full force and effect.

10. Governing Law. This Settlement Agreement shall be construed in accordance with and governed by the laws of the State of Illinois, notwithstanding its choice of law rules to the contrary or any other state's choice of law rules and suit, if any, must be brought in the State of Illinois.

11. Counterparts. This Settlement Agreement may be executed in counterparts, it being understood that all such counterparts, taken together, shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Settlement Agreement on the date set forth above.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

EAST\148594379.1

[Signature Page to Settlement Agreement to EDGE Tax Credit Agreement]

**SEARS HOLDINGS MANAGEMENT CORPORATION, a Delaware corporation**

By: _____

Its: _General Counsel_

Date: __12/15/17__

**THE STATE OF ILLINOIS, ACTING BY AND THROUGH ITS DEPARTMENT OF COMMERCE AND ECONOMIC OPPORTUNITY**

By: _____

Its:  Director

Date: __12/15/17_____

FILED DATE: 7/8/2020 5:03 PM   2018CH12683
FILED DATE: 11/12/2019 4:33 PM   2018CH12683

# SEARS HOLDINGS

Jonathan Bredemeier
Sr. Director, Real Estate and Corporate
Services

Sears Holdings Management Corporation
3333 Beverly Road BC-154A
Hoffman Estates, IL  60179
(847) 286-8358
Fax (847) 286-3470
Email Jon.Bredemeier@searshc.com

November 27, 2017


James H. Norris
Village Manager
Village of Hoffman Estates
1900 Hassell Road
Hoffman Estates, IL  60169


Re:  EDA Distribution

Dear Mr. Norris:

Thank you for your letter dated November 7, 2017 regarding the EDA distribution for 2017. Please be advised that, pursuant to Public Act 097-0636, as of the date of this letter, over 4250 jobs exist at the Sears Holdings' campus in Hoffman Estates.  Please be further advised that at no time in 2017 did the number of jobs dip below the requisite 4250 jobs.

Sears Holdings appreciates the ongoing relationship we enjoy with the Village of Hoffman Estates and the surrounding community.  As one of the State's largest employers and taxpayers, we are proud of the positive impact we have had on the area for more than two decades: hundreds of millions in infrastructure development dollars have been invested plus thousands of direct jobs (thousands more ancillary jobs) have been created and maintained.

Should you have any further questions, please do not hesitate to ask.


Sincerely,

Jonathan Bredemeier
Sr. Director, Real Estate
and Corporate Services


cc:    Jason Pollak, Assistant General Counsel
       Arthur Janura, Corporation Counsel

**EXHIBIT
7**

FILED DATE: 7/8/2020 5:03 PM   2018CH12683
FILED DATE: 11/12/2019 4:33 PM   2018CH12683

## RETAIL

APPAREL | DISCOUNTERS | DEPARTMENT STORES | E-COMMERCE | FOOD AND BEVERAGE | RESTAURANTS | HOUSEHOLD PRODUCTS

# Sears lays off 220 employees at corporate offices

- Sears is laying off 220 employees primarily at the company's corporate headquarters.

   

MARKETS                      BUSINESS NEWS                      CNBC TV                      MENU

- •The moves are part of the department store chain's ongoing restructuring plan.

**BREAKING NEWS**

Lauren Thomas | Lauren Hirsch

Published 2:56 PM ET Wed, 31 Jan 2018 | Updr  8 PM ET Wed, 31 Jan 2018





 **Sears lays off 220 employees at corporate offices**

6:14 PM ET Wed, 31 Jan 2018 | 00:42

Sears Holdings on Wednesday laid off 220 employees primarily at the company's corporate headquarters in Hoffman Estates, Illinois, effective immediately.

The job cuts impacted various business units and roles across the retail organization, a spokesman told CNBC. The moves are part of the department store chain's ongoing restructuring plan, announced earlier this month, to streamline operations and get back to profitability.

"The company continues to achieve significant progress in our restructuring program, with actions taken in fiscal year 2017 to

FROM THE WEB                    Sponsored Links by Taboola

**Top Surgeon: How To Properly Flush Out Your Bowels**
Gundry MD

**Reclusive Millionaire Warns: "Get Out Of Cash Now"**
Investing Outlook

**3 Ways Your Cat Asks For Help**
Dr. Marty

**U.S. Cardiologist: It's Like a Insides**
Health Headlines

EXHIBIT
8

realize $1.25 billion in annualized cost savings," the spokesman said.

Earlier this month, the retailer also outlined its plans to shutter more than 100 locations under the Sears and Kmart banners, impacting hundreds of other part-time positions as those stores go dark.

The company has said it will offer severance and transition assistance to those employees who are eligible. It wasn't immediately clear how many people still work at Sears' corporate headquarters, and the company declined to comment.

Coming off a disappointing holiday season, Sears is looking for ways to drive sales and is considering further monetizing some of its other assets, including the Kenmore and DieHard brands, and Sears Home Services.

by Taboola

Why you should buy a used car—and pay a lot less money than you think

The Kavanaugh decision might have cost businesses $9 billion — so far

Elon Musk asks this tricky interview question that most people can't answer

You should feel dumb if you're not getting this interest rate on your savings account, expert says

If you're married and near retirement, consider this tax-saving strategy

Mattress Firm is the latest retailer to go bankrupt. Here are others that went bust this year.

MARKETS

BUSINESS NEWS

MENU

**BREAKING NEWS**

consider 'all options' if refinancing efforts fail



### Sears warns it will consider 'all options' if efforts to refinance $1 billion fail

11:05 AM ET Wed, 10 Jan 2018 | 01:06





**Lauren Thomas**
Retail Reporter

**Lauren Hirsch**
Retail Reporter for CNBC.com

**TRENDING NOW**



**1.** Once you hit this credit score, going higher is a 'waste of time,' expert says



**2.** Stocks making the biggest move premarket: IP, AMZN, TRV, NIO, PG & more



**3.** Elon Musk asks this tricky interview question that most people can't answer



**4.** Voter registrations skyrocket after Taylor Swift's get-out-the-vote push

Listen to the IMF's new warning,

### RELATED SECURITIES

| Symbol | Price | Change | %Change |
|--------|-------|--------|---------|
| SHLD | 0.5851 ▼ | -0.0373 | -5.99% |

FILED DATE: 7/8/2020 5:03 PM   2018CH12683
FILED DATE: 11/22/2019 4:33 PM   2018CH12683



**LAW OFFICE OF Kory Atkinson**

236 West Lake Street, Suite 100    P: 630.980.9100    kaa@koryatkinson.com
Bloomingdale, IL 60108    F: 630.980.9120    www.koryatkinson.com

July 30, 2018

Jonathan Bredemeier
Senior Director, Real Estate and Corporate Services
Sears Holdings Management Corporation
3333 Beverly Road, BC-154A
Hoffman Estates, IL 60179

   RE: **Economic Development Area**
      **Sears Headquarters Campus Job Count**

Dear Mr. Bredemeier:

  I am an attorney for Community Unit School District 300. Pursuant to the Illinois Economic Development Area Tax Increment Allocation Act (20 ILCS 620/1 *et seq.*) (the "Act"), Sears Holdings Management Corporation (Sears) annually informs the Village of Hoffman Estates as to the number of jobs maintained at the Sears headquarters campus in Hoffman Estates. Under the Act, Sears is required to maintain at least 4.250 jobs at the campus in order to qualify to receive millions of dollars in property tax proceeds generated by the Economic Development Area ("EDA").

  Media reports over the past year have raised legitimate concern as to the number of jobs maintained in the EDA. Such reports suggest that Sears may no longer qualify for Economic Development for a Growing Economic (EDGE) tax credits because it no longer has 4.250 employees at the headquarters campus. Media reports following Sears' most recent announcement that it is again cutting hundreds of jobs at its headquarters indicated that a Sears' spokesperson declined to say how may jobs at now at the Sears headquarters campus.

  School District 300 is understandably concerned about the proper administration of the EDA. Millions of property tax dollars are diverted from the school district and other local governments based on the promise that Sears will maintain 4.250 jobs at its headquarters. In light of the ongoing media coverage, School District 300 requests that Sears provide corroborating evidence to support its assertion that it maintained 4,250 jobs during calendar year 2017. In addition, the school district asks for a commitment from Sears that it will provide corroborating evidence in support of any assertion as to the number of jobs maintained during 2018 prior to any distribution of funds under the EDA for 2018.

  School District 300 welcomes open communication with Sears about the administration of the EDA. Clarification and corroboration on whether and how Sears is maintaining the requisite 4,250 jobs in the face of continuing layoffs is a critical concern for the school district.

**EXHIBIT**
**9**



236 West Lake Street, Suite 100     P: 630.980.9100     kaa@koryatkinson.com
Bloomingdale, IL 60108     F: 630.980.9120     www.koryatkinson.com

Jonathan Bredemeier
Sears Holdings Management Corporation
July 30, 2018
Page 2

I appreciate your prompt attention and response to this letter.

Sincerely,

Kory A. Atkinson

cc:    Jason Pollak, Assistant General Counsel, Sears Holdings Management Corporation
Arthur Janura, Corporation Counsel, Village of Hoffman Estates
Fred Heid, Superintendent, Community Unit School District 300
Susan Harkin, Chief Operating Officer/CSBO, Community Unit School District 300

FILED DATE: 7/8/2020 5:03 PM   2018CH12683
FILED DATE: 11/12/2019 4:33 PM   2018CH12683

 **NEAL GERBER EISENBERG**

August 24, 2018

David S. Martin
Attorney at Law

Tel 312.269.8011
Fax 312.578.1544
dmartin@nge.com

Via Email and US Mail

Mr. Kory Atkinson
236 West Lake Street, Suite 100
Bloomingdale, Illinois 60108

     Re:    Sears Property Tax

Dear Kory:

    Thank you for your email that attached your letter to Jonathan Bredemeier. Regarding whether Sears would reconsider and accept notes in lieu of a tax refund the answer is no. I assume School District 300 is aware that its appraisal and expert opinion supports a refund of about $4,600,000 for each of the pending PTAB appeals 2013 through 2015. Sears expert opines a value that would generate a refund of about $8,400,000 for each of the 3 years. Sears is open to a set off for property tax deemed illegal by a settlement, which it has previously received pursuant to an annual increment allocation. Sears is also open to discussing refunds being paid incrementally. However, if settlement is not reached refunds would be paid in full at one time and it is presumed that based on the parties expert opinions the refund amount would be between $4,600,000 and $8,400,000 for each year.

    Regarding the letter to Jonathan Bredemeier that was attached to your email, I offer the following observations.

- First, any issue relating to the number of jobs maintained within the EDA are unrelated to the property tax appeals pending at the PTAB. These 2 matters are wholly independent of each other and will be treated as such by Sears.

- Secondly, Sears has no obligation to provide School District 300 with any information regarding "jobs" within the EDA. Sears has not provided this information to School District 300 in the past and sees no reason to begin doing so now.

I look forward to further discussions relating to the pending PTAB appeals.

Very truly yours,

David S. Martin

DSM:kb
014311.0002:28253491.2

**EXHIBIT
10**

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
In re                                                   :
                                                        :        **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*               :
                                                        :        **Case No. 18-23538 (RDD)**
                                                        :
Debtors. [1]                                            :        **(Jointly Administered)**
-----------------------------------------------------------------x

### AMENDED STIPULATION AND ORDER
### BY AND AMONG THE VILLAGE OF HOFFMAN ESTATES, THE DEBTORS,
### AND THE COMMUNITY UNIT SCHOOL DISTRICT 300 CONCERNING
### 2017 EDA FUNDS HELD IN THE SPECIAL TAX ALLOCATION FUND

WHEREAS, on October 10, 2018, Community Unit School District 300 (the "**School**

**District**") brought suit against the Village of Hoffman Estates (the "**Village**") and Sears

Holdings Corporation ("**SHC**," and together with certain of its affiliates, as debtors and debtors

in possession in the above-captioned chapter 11 cases, collectively, the "**Debtors**") (each a

"**Party**" and collectively, the "**Parties**") in the Circuit Court of Cook County, State of Illinois

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1

EXHIBIT
11

**EXHIBIT A**

(the "**Circuit Court**"), in a matter styled *Community Unit School District 300 v. Village of Hoffman Estates, et al.*, Case No. 2018 CH 12683 (the "**Illinois Action**"), seeking declaratory, injunctive and other relief arising from SHC's alleged failure to comply with certain terms and conditions of the Economic Development Area and Tax Increment Allocation Act, 20 ILCS 620/1 *et seq.* (the "**EDA Act**") and an economic development agreement entered into by and between the Village and Sears, Roebuck and Co., as the developer ("**Sears**") (the "**EDA Agreement**") under to the EDA Act, pursuant to which the developer (as set forth in the EDA Act) receives annual distributions from the Village's special tax allocation fund maintained under the EDA Act (the "**Special Tax Allocation Fund**" and the funds therein, the "**EDA Funds**").

WHEREAS, at the time the School District filed the Illinois Action, the Village was holding EDA Funds consisting of property taxes levied for tax year 2017 that were extended and collected in calendar year 2018 in the Special Tax Allocation Fund (the "**2017 EDA Funds**"), which 2017 EDA Funds — if Sears was compliant with the relevant terms and conditions of the EDA Act and EDA Agreement — were projected to be distributed fifty-five percent (55%) to Sears (the "**55% Portion**"), and forty-five percent (45%) to various taxing districts within the State of Illinois (the "**45% Portion**") pursuant to the EDA Act and EDA Agreement.

WHEREAS, on October 15, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), staying the Illinois Action pursuant to section 362 of the Bankruptcy Code.

2

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

WHEREAS, on November 12, 2018, the School District filed its *Motion of Community Unit School District 300 for Relief From the Automatic Stay or, in the Alternative, for Abstention* (ECF No. 652) (the "**Abstention Motion**"), pursuant to which the School District sought the entry of an order granting relief from the automatic stay or the Bankruptcy Court abstaining from hearing matters relating to the Illinois Action.

WHEREAS, on December 17, 2018, the Debtors filed their Objection to the Abstention Motion (ECF No. 1280).

WHEREAS, on January 11, 2019, the Bankruptcy Court entered a stipulation and order (the "**Stipulated Order**") that, among other things, authorized and directed the Village to (i) distribute the 45% Portion of the 2017 EDA Funds and (ii) continue to hold in the Special Tax Allocation Fund the remaining 55% Portion pending further order of the Bankruptcy Court or an agreement among the Parties (ECF No. 1548).

WHEREAS, following the distribution of the 45% Portion in accordance with the Stipulated Order, on February 28, 2019, the Debtors filed their *Motion to Compel Turnover of Estate Property* (ECF No. 2715) (the "**Turnover Motion**"), seeking turnover of the remaining 55% Portion, or approximately $9.7 million, which the Village continued to hold in the Special Tax Allocation Fund pursuant to the Stipulated Order.

WHEREAS, the School District objected to the Turnover Motion (ECF No. 2996) and, in the alternative, requested the Bankruptcy Court to abstain from the issues raised therein and allow those issues to be litigated in the Circuit Court in connection with the Illinois Action.

WHEREAS, following a hearing on the Turnover Motion and the Abstention Motion on April 18, 2019, the Bankruptcy Court issued (i) the *Order Granting Community Unit School*

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

*District 300's Motion for Abstention* (ECF No. 3362) (the "**Abstention Order**") allowing the Circuit Court to adjudicate the issues raised in the Turnover Motion; and (ii) the *Order Directing Partial Turnover of EDA Funds to Debtors and Reserving the Balance Pending Court Order* (ECF No. 3666) ordering and directing the Village (a) to disburse to Debtor Sears $2,508,660.33 of the 2017 EDA Funds held in the Special Tax Allocation Fund  and (b) to continue to hold in the Special Tax Allocation Fund the balance of the 2017 EDA Funds in the amount of $7,153,317.

WHEREAS, following entry of the Abstention Order, the Parties filed in the Circuit Court their respective summary judgment cross-motions as to the issues raised in the Turnover Motion.

WHEREAS, the Debtors and the School District have reached an agreement to resolve all of the outstanding litigation concerning the Turnover Motion, the balance of the 2017 EDA Funds held in the Special Tax Allocation Fund by the Village pursuant to the Stipulated Order, and the School District's remaining claims and objections to confirmation of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4476) (as the same may be amended or modified, the "**Plan**").

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by and among the Debtors, the Village (solely in respect of paragraphs 3, 5, 6, and 16 through 24 hereof) and the School District, and upon Bankruptcy Court approval it shall hereby be **ORDERED** that:

1.      Subject to the terms and conditions of this Stipulation and Order, the School District agrees to:

WEIL:\97240374\2\73217.0004

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

i.   Release all claims with respect to the 2017 EDA Funds, in whole or in part, whether asserted or not, known or unknown;

ii.   Withdraw with prejudice any complaint, claim, motion, pleading, or other litigation seeking to prevent Sears from receiving the 2017 EDA Funds;

iii.   Dismiss with prejudice all claims seeking a monetary recovery asserted against the Debtors in the Illinois Action and waive its right to recover from the Debtors, their bankruptcy estates, or any Liquidating Trust or Liquidating Trustee, monetary claims with respect to EDA Funds consisting of property taxes levied prior to 2017, provided however, that notwithstanding anything to the contrary in this paragraph 1.iii., the School District shall be entitled to: (a) seek recovery from parties other than the Debtors, their bankruptcy estates, and any Liquidating Trust and Liquidating Trustee, for property taxes levied prior to 2017 and EDA Funds other than the 2017 EDA Funds, notwithstanding whether such third parties may have, as a result, contribution or other claims against the Debtors; (b) seek declaratory relief against the Debtors with respect to their past compliance with the terms and conditions of the EDA Act and the EDA Agreement to the extent necessary in connection with pursuing claims against parties other than the Debtors, their bankruptcy estates, and any Liquidating Trust and Liquidating Trustee so long as any such action is not inconsistent with this Stipulation and Order and does not seek monetary relief including costs against the Debtors; and (c) to the extent necessary to preserve and recover cure claims with respect to property taxes levied prior to 2017, and EDA Funds previously rebated to the Debtors, other than the 2017 EDA Funds, or to the extent necessary to object to any effort to assume, or assume and assign the EDA Agreement, pursuant to section 365 of the Bankruptcy Code;

iv.   Withdraw with prejudice the *Objection of Community Unit School District 300 to Confirmation of the Plan* (ECF No. 4713) and *Supplemental Objection of Community Unit School District 300 to Confirmation of the Plan* (ECF No. 5005) (together with ECF No. 4713, the "**School District's Plan Objections**");

v.   Withdraw with prejudice all of its voting ballots submitted as to the Plan, provided that the School District shall be deemed to have opted out of the third party releases set forth in Section 15.9(b) of the Plan;

vi.   Withdraw with prejudice all proofs of claim filed against Sears, SHC, or any other Debtor, except that such withdrawal shall not prejudice or be deemed to constitute a waiver of any claims or rights of the School District to: (a) seek declaratory relief against the Debtors with respect to

5

WEIL:\97240374\2\73217.0004

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

their past compliance with the terms and conditions of the EDA Act and the EDA Agreement in connection with pursuing claims against parties other than the Debtors, their bankruptcy estates, and any Liquidating Trust and Liquidating Trustee so long as any such action is not inconsistent with this Stipulation and Order and does not seek monetary relief including costs against the Debtors; and (b) preserve and recover cure claims with respect to property taxes levied prior to 2017, and EDA Funds previously rebated to the Debtors, other than the 2017 EDA Funds, or to object to any effort to assume, or assume and assign the EDA Agreement, pursuant to section 365 of the Bankruptcy Code; and

vii.    Release all rights to recovery against Debtors or their bankruptcy estates, including through a constructive trust, _provided however_, that notwithstanding anything to the contrary in this paragraph 1.vii., the School District shall be entitled to: (a) seek recovery from parties other than the Debtors, their bankruptcy estates, and any Liquidating Trust and Liquidating Trustee for property taxes levied prior to 2017 and EDA Funds other than the 2017 EDA Funds, notwithstanding whether such third parties may have, as a result, contribution or other claims against the Debtors; (b) maintain to the extent necessary claims against the Debtors seeking declaratory relief with respect to the Debtors' compliance with the terms and conditions of the EDA Act and the EDA Agreement in connection with pursuing claims against parties other than the Debtors, their bankruptcy estates, and any Liquidating Trust and Liquidating Trustee so long as any such action is not inconsistent with this Stipulation and Order and does not seek monetary relief including costs against the Debtors; and (c) retain claims with respect to property taxes levied prior to 2017, and EDA Funds previously rebated to the Debtors, other than those related to 2017 EDA Funds, to the extent necessary to preserve and recover cure claims, or to object to any effort to assume, or assume and assign the EDA Agreement, pursuant to section 365 of the Bankruptcy Code.

2.    In consideration of the mutual covenants and agreements contained herein and subject to the terms and conditions of this Stipulation and Order, Debtors agree to relinquish any right they may have, in whole or in part, whether asserted or not, known or unknown, with respect to EDA Funds consisting of property taxes levied for tax year 2018 that were extended and collected in calendar year 2019 in the Special Tax Allocation Fund (the "**2018 EDA**

WEIL:\97240374\2\73217.0004

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

**Funds**") and otherwise, if applicable, relinquish any rights, claims or interests to any subsequent years' EDA Funds.

     3.     As a result of this Stipulation and Order, and there being no further claims or objections to the distribution of the balance of the 2017 EDA Funds residing in the Special Tax Allocation Fund, the Village is hereby ordered and directed to take all necessary steps to distribute such remaining 2017 EDA Funds in the manner described below:

        a.   The Village is ordered and directed to disburse to Sears, as the developer, 2017 EDA Funds in the amount of $5,153,317.00 currently held in the Special Tax Allocation Fund; and

        b.   Simultaneously with the disbursement to Sears, the Village is ordered and directed to disburse to the School District 2017 EDA Funds in the amount of $2,000,000.00 currently held in the Special Tax Allocation Fund that were otherwise to be disbursed to Sears as the developer pursuant to the EDA Act.

     4.     The School District is hereby deemed to have withdrawn with prejudice its objection to the Turnover Motion (ECF No. 2996).

     5.     The Parties hereby acknowledge that this Stipulation and Order fully settles those issues involving the disbursement and the recipients of the 2017 EDA Funds raised in the Turnover Motion (but not any EDA Funds related to other years), and that the payments to Sears and the School District referenced in paragraph 2 above shall fully and completely satisfy the Village's obligations to disburse the 2017 EDA Funds.

     6.     Sears, the Village, and the School District shall request withdrawal of their respective motions and cross-motions for summary judgment with respect to the 2017 EDA Funds, which motions are currently pending before the Circuit Court in connection with the Illinois Action, as moot.

7

7.      In light of (i) the Debtors' and the School District's settlement as to distribution of the 2017 EDA Funds; (ii) the School District's release of all monetary claims asserted against the Debtors in the Illinois Action and waiver of its right to recover from the Debtors, their bankruptcy estates, and any Liquidating Trust and Liquidating Trustee claims with respect to EDA Funds consisting of property taxes levied prior to 2017; and (iii) the Debtors' relinquishment of any rights, claims, or interests they may have, in whole or in part, whether asserted or not, known or unknown, with respect to the 2018 EDA Funds or any subsequent years' EDA Funds, Debtors stipulate that they have no further interest in the Illinois Action. Accordingly, upon entry of this Stipulation and Order, the Illinois Action and any other issues or disputes arising from or related to the Debtors' compliance with the terms and conditions of the EDA Act and/or the EDA Agreement shall no longer be subject to the automatic stay under section 362 of the Bankruptcy Code, and shall not be subject to any discharge injunction imposed by the Bankruptcy Code, or any injunction imposed pursuant to any plan of liquidation or reorganization filed by the Debtors or other parties in interest, solely to permit the School District to take actions so long as they are consistent with this Stipulation and Order; provided that, for the avoidance of doubt, the School District shall not seek or enforce any judgment against the Debtors. Further, because any claims by the School District with respect to EDA Funds consisting of property taxes levied prior to 2017 as well as EDA Funds consisting of property taxes levied in 2018 now will proceed as part of the Illinois Action, in the interest of efficiency, until such claims are adjudicated in the Illinois Action, the Court shall defer ruling on the issue of whether the Debtors, or any Liquidating Trust or Liquidating Trustee may assume, or

8

assume or assign the EDA Agreement pursuant to section 365 of the Bankruptcy Code, and any disputes involving cure claims associated with the EDA Agreement.

8.      The School District shall dismiss with prejudice all monetary claims to the extent provided in paragraph 1.iii. of this Stipulation and Order.

9.      The School District is hereby deemed to have withdrawn with prejudice the School District's Plan Objections.

10.     The School District is hereby deemed to have (i) withdrawn with prejudice all of its voting ballots submitted as to the Plan; and (ii) opted out of the third party releases set forth in Section 15.9(b) of the Plan.

11.     The School District is hereby deemed to have withdrawn with prejudice all of the School District's Cure Objections, with the exception of its objections to assumption and assignment of the EDA Agreement (asserted in the School District's Cure Objections, as well as in the *Objection and Reservation of Rights of Community Unit School District 300 to Debtors' Notice of Assumption and Assignment of Executory Contracts* (ECF No. 3783)).

12.     The School District is hereby deemed to have withdrawn with prejudice all proofs of claim filed against Sears, SHC, or any other Debtor.

13.     The School District is hereby deemed to have released with prejudice all rights to recovery against Debtors or their bankruptcy estates, including through a constructive trust.

14.     The Debtors are hereby deemed to have relinquished any right, claim or interest they may have, in whole or in part, whether asserted or not, known or unknown, with respect to the 2018 EDA Funds and any subsequent years' EDA Funds.

9

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

15.     The School District and the Debtors, on behalf of themselves and their past,
present, and future officers, directors, board members, employees, agents, advisors, accountants,
attorneys, assignees, and representatives or other entities acting on their behalf or through which
they claim a beneficial interest (the "**Releasing Parties**"), hereby mutually release and
absolutely and forever discharge each other, as well as their past, present, and future companies,
subsidiaries, and affiliates, and their respective present and former officers, directors,
shareholders, employees, agents, advisors, accountants, attorneys, assignees, and representatives,
of and from any and all claims, demands, damages, debts, liabilities, judgments, accounts,
obligations, costs, expenses, actions, and causes of action of every kind and nature whatsoever,
whether now known or unknown, asserted or which could have been asserted, suspected or
unsuspected, choate or inchoate, which the Releasing Parties now have, own, or hold, or at any
time heretofore ever had, owned, or held against any of them from the beginning of the world to
the date hereof, which arise out of, relate to, or are based upon Sears' entitlement to receive 2017
EDA Funds either in whole or in part, including any claims arising under section 362 of the
Bankruptcy Code.  The language of this paragraph shall apply only as consistent with this
Stipulation and Order.

16.     Notwithstanding anything herein to the contrary, the Village, and its officers,
directors, committee members, employees, agents, advisors, representatives, attorneys and other
professionals are hereby exculpated and shall have no liability to the limited extent of any and all
claims (as defined in Section 101(5) of the Bankruptcy Code), causes of actions, demands, suits,
liabilities, obligations, losses, damages, offsets and/or judgments of any kind or nature, whether
known or unknown, contingent or non-contingent, statutory or non-statutory, solely arising from,

10

WEIL:\97240374\2\73217.0004

out of or in any way related to the Village's compliance with this Stipulation and Order. Notwithstanding anything herein to the contrary, nothing in this Stipulation and Order is intended to waive or release any claims, causes of actions, demands, suits, liabilities, obligations, losses, damages, offsets, arguments, defenses, facts, objections, counterclaims or other rights and positions that the School District, the Village or any other party (other than the Debtors) may have related to the distribution and receipt of the EDA Funds and/or the compliance and/or non-compliance with the EDA Act or EDA Agreement in any year other than as expressly provided herein in respect of the 2017 EDA Funds.

17.    For avoidance of doubt, nothing herein, including the distributions of the 2017 EDA Funds, is intended or shall be construed to be (a) an admission as to the merits of the Turnover Motion or the School District's objection to the Turnover Motion, (b) an admission as to the merits of the Parties' respective motions and cross-motions for summary judgment pending before the Circuit Court in connection with the Illinois Action, or (c) a waiver of any Party's right to assert any facts or contentions relating to compliance and/or non-compliance with the EDA Act or the EDA Agreement.

18.    Notwithstanding anything to the contrary, nothing in this Stipulation and Order, including, without limitation, the School District's withdrawal with prejudice of any complaint, claim, motion, pleading, or other litigation seeking to prevent Sears from receiving the 2017 EDA Funds, is intended or shall be construed to (i) waive or release any claims, causes of actions, demands, suits, liabilities, obligations, losses, damages, offsets, arguments, defenses, facts, objections, counterclaims or other rights and positions that the School District, the Village, Transform Holdco LLC, Transform SR Holding Management, LLC, TF Hoffman Estates IL,

11

FILED DATE: 7/8/2020 5:03 PM    2018CH12683

LLC, or any other third party may have with respect to the Debtors' compliance with the EDA Act and/or EDA Agreement, disbursements of the 2018 EDA Funds or any subsequent years' EDA Funds, as well as any cure claims that might be asserted arising under, or the Debtors' ability to assume, or assume and assign the EDA Agreement pursuant to section 365 of the Bankruptcy Code, or (ii) constitute any finding or determination as to whether any defaults exist under the EDA Agreement with respect to property taxes levied in tax years prior to 2017. Further, nothing in this Stipulation and Order is intended to or shall be construed to waive or release any claims, causes of actions, demands, suits, liabilities, obligations, losses, damages, offsets, arguments, defenses, facts, objections, counterclaims or other rights and positions of any third-parties, including the Debtors' assignee to the EDA Agreement, as to the impact of the releases negotiated by and among the parties herein.  Further, nothing in this Stipulation and Order shall waive, extinguish, or otherwise release the rights, if any, of Debtors' assignee to the EDA Agreement, as applicable, to EDA Funds levied for tax year 2018 or for any subsequent years.

19.    In withdrawing with prejudice any complaint, claim, motion, or other litigation seeking to prevent Sears from receiving the 2017 EDA Funds, in dismissing with prejudice all claims against SHC asserted in the Illinois Action, and in releasing all claims to EDA Funds consisting of property taxes levied prior to 2017 to the extent provided herein, the School District will not be deemed to have admitted that, nor will the Court be deemed to have made a finding with respect to: (i) the issue of whether the Village, SHC, or any other Debtor, to the extent relevant, have complied with the terms and conditions of the EDA Act and/or the EDA Agreement; (ii) the issue of whether the School District or other parties have valid cure claims

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

under section 365 of the Bankruptcy Code; or (iii) whether the Debtors are entitled to assume, or assume and assign the EDA Agreement pursuant to section 365 of the Bankruptcy Code.

20.  Each of the undersigned counsel represents that he/she is authorized to execute this Stipulation and Order on behalf of his/her respective clients.

21.  This Stipulation and Order may be executed in multiple counterparts, any of which may be transmitted by facsimile, and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

22.  Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, the terms and conditions of this Stipulation and Order shall be immediately effective and enforceable upon approval of the Bankruptcy Court.

23.  To the extent there is any inconsistency with the Plan, this Stipulation and Order shall supersede and govern.

24.  The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Stipulation and Order.

(Signature page follows)

13

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

**CONSENTED AND AGREED TO:**

VILLAGE OF HOFFMAN ESTATES                    DEBTORS AND DEBTORS IN POSSESSION


By:_/s/_Michael Schein_____                    By:_/s/ _Sunny Singh_____
One of its Attorneys                           One of Their Attorneys

Michael Schein                                 Ray C. Schrock, P.C.
Joshua Dunn                                     Jared R. Friedmann
Vedder Price P.C.                               Sunny Singh
1633 Broadway, 31st Floor                       Jessie B. Mishkin
New York, New York  10019                       Weil, Gotshal & Manges LLP
(212) 407-7700 (telephone)                      767 Fifth Avenue
(212) 407-7799 (facsimile)                      New York, New York  10153
                                                (212) 310-8000 (telephone)
                                                (212) 310-8007 (facsimile)


COMMUNITY UNIT SCHOOL DISTRICT 300

By:_/s/ _Kenneth Florey_____
One of its Attorneys

Kenneth Florey
Neal Smith
Robbins Schwartz, Nicholas, Lifton & Taylor, Ltd.
631 E. Boughton Road, Suite 200
Bolingbrook, Illinois 60440
(630) 929-3639 (telephone)
(630) 783-3231 (facsimile)


**SO ORDERED THIS**
23rd day of October, 2019
White Plains, New York


                                    /s/ Robert D. Drain
                                    THE HONORABLE ROBERT D. DRAIN
                                    UNITED STATES BANKRUPTCY JUDGE

FILED DATE: 7/8/2020 5:03 PM   2018CH12683

WEIL:\97240374\2\73217.0004

**EXHIBIT 2**

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| COMMUNITY UNIT SCHOOL DISTRICT 300, an Illinois school district, BARRINGTON PUBLIC LIBRARY DISTRICT, an Illinois public library, ELGIN COMMUNITY COLLEGE, an Illinois community college district, BARRINGTON TOWNSHIP, an Illinois township, METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, an Illinois special purpose district, and SCHOOL DISTRICT U-46, an Illinois public school district, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| VILLAGE OF HOFFMAN ESTATES, an Illinois municipal corporation; and SEARS HOLDINGS CORPORATION, a Delaware corporation, SEARS, ROEBUCK & CO., a New York Corporation. KMART HOLDING CORPORATION, a Delaware corporation, SEARS HOLDINGS MANAGEMENT CORPORATION, a Delaware corporation, TRANSFORM HOLDCO LLC, a Delaware Limited Liability company, TRANSFORM SR HOLDING MANAGEMENT, LLC, a Delaware Limited liability Company, and TF HOFFMAN ESTATES IL, LLC, a Delaware limited liability company, HOFFMAN ESTATES PARK DISTRICT, an Illinois park district, NORTHWEST MOSQUITO ABATEMENT DISTRICT, an Illinois mosquito abatement district, COOK COUNTY FOREST PRESERVE, an Illinois forest preserve, COOK COUNTY, an Illinois county, and POPLAR CREEK LIBRARY DISTRICT, an Illinois public library district. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 2018 CH 12683 |
| Defendants. | ) ) ) | |

**<u>SETTLEMENT AGREEMENT</u>**

This Settlement Agreement ("**Settlement Agreement**") is made by and among the following parties:

    a.       Community Unit School District 300, an Illinois school district ("**District 300**");

    b.       Transform Holdco LLC, a Delaware limited liability company; Transform SR Holding Management, LLC, a Delaware limited liability company; TF Hoffman Estates IL, LLC, a Delaware limited liability company; Transform SR LLC, a Delaware limited liability company, and all subsidiaries, successors, and assigns (collectively, "**Transform**");

    c.       Elgin Community College District 509, an Illinois community college district;

    d.       Metropolitan Water Reclamation District of Greater Chicago, an Illinois water reclamation district;

    e.       Barrington Township, an Illinois Township;

    f.       School District U-46, and Illinois school district;

    g.       Barrington Public Library District, an Illinois public library district;

as of the date fully executed by all parties, and is as follows:

    **WHEREAS**, on October 10, 2018, plaintiff District 300 filed this action (the "**Illinois Action**") against the Village of Hoffman Estates, Illinois, an Illinois municipal corporation (the "**Village**") and Sears Holdings Corporation, a Delaware corporation, Sears, Roebuck and Co., a New York corporation; Kmart Holding Corporation, a Delaware corporation; and Sears Holdings Management Corporation, a Delaware corporation (collectively, "**Sears**"), seeking declaratory, injunctive and other relief arising from Sears' alleged failure to comply with certain terms and conditions of the Economic Development Area and Tax Increment Allocation Act, 20 ILCS 620/1 *et seq.* (the "**EDA Act**") and an Economic Development Agreement entered into by and between the Village and Sears, Roebuck and Co., as the developer pursuant to the EDA Act (the "**EDA**

- 2 -

**Agreement**"), pursuant to which Sears receives annual distributions from the Village's special tax allocation fund maintained under the EDA Act (the "**Special Tax Allocation Fund**" and the funds therein, the "**EDA Funds**"); and

**WHEREAS**, at the time District 300 filed this action, the Village was holding EDA Funds consisting of property taxes levied for tax year 2017 that were extended and collected in calendar year 2018 in the Special Tax Allocation Fund (the "**2017 EDA Funds**"), which 2017 EDA Funds – if Sears was compliant with the relevant terms and conditions of the EDA Act and EDA Agreement – were projected to be distributed fifty-five percent (55%) to the developer (the "**55% Portion**"), and forty-five percent (45%) to various taxing districts within the State of Illinois (the "**45% Portion**") pursuant to the EDA Act and EDA Agreement.

**WHEREAS**, on October 15, 2018, Sears and certain other debtors (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); staying the Illinois Action pursuant to section 362 of the Bankruptcy Code; and

**WHEREAS**, on November 12, 2018, District 300 filed its *Motion of Community Unit School District 300 for Relief From the Automatic Stay or, in the Alternative, for Abstention* (ECF No. 652) (the "**Abstention Motion**"), pursuant to which District 300 sought the entry of an order granting relief from the automatic stay or the Bankruptcy Court abstaining from hearing matters relating to this action; and on December 17, 2018, the Debtors filed their Objection to the Abstention Motion (ECF No. 1280); and

**WHEREAS**, on January 11, 2019, the Bankruptcy Court entered a stipulation and order (the "**Stipulated Order**") that, among other things, authorized and directed the Village to (i)

- 3 -

distribute the 45% Portion of the 2017 EDA Funds and (ii) continue to hold in the Special Tax Allocation Fund the remaining 55% Portion pending further order of the Bankruptcy Court or an agreement among the Parties (ECF No. 1548); and

**WHEREAS**, following the distribution of the 45% Portion in accordance with the Stipulated Order, on February 28, 2019, the Debtors filed their *Motion to Compel Turnover of Estate Property* (ECF No. 2715) (the "**Turnover Motion**"), seeking turnover of the remaining 55% Portion, which the Village continued to hold in the Special Tax Allocation Fund pursuant to the Stipulated Order; and District 300 objected to the Turnover Motion (ECF No. 2996) and, in the alternative, requested the Bankruptcy Court to abstain from the issues raised therein and allow those issues to be litigated in the Circuit Court in connection with this action; and

**WHEREAS**, following a hearing on the Turnover Motion and the Abstention Motion on April 18, 2019, the Bankruptcy Court issued (i) the *Order Granting Community Unit School District 300's Motion for Abstention* (ECF No. 3362) (the "**Abstention Order**") allowing the Circuit Court to adjudicate the issues raised in the Turnover Motion; and (ii) the *Order Directing Partial Turnover of EDA Funds to Debtors and Reserving the Balance Pending Court Order* (ECF No. 3666) ordering and directing the Village (a) to disburse to Debtor Sears a portion of the 2017 EDA Funds held in the Special Tax Allocation Fund and (b) to continue to hold in the Special Tax Allocation Fund the balance of the 2017 EDA Funds; and

**WHEREAS**, following entry of the Abstention Order, the Parties filed in the Circuit Court their respective summary judgment cross-motions as to the issues raised in the Turnover Motion; and

**WHEREAS**, Transform has asserted an interest in the EDA Agreement and the funds associated with the EDA Act due to its affiliate relationship with Transform SR LLC, to whom

- 4 -

certain assets of Sears, Roebuck and Co. were assigned by order of the Bankruptcy Court through the Asset Purchase Agreement ("APA"), pursuant to which the APA, among other matters, granted Transform the authority to designate for assignment and assumption, subject to further order of the Bankruptcy Court in the event of an unresolved objection, the Debtors' interests in certain executory contracts and unexpired leases; and

**WHEREAS,** pursuant to the APA and Section 365 of the Bankruptcy Code, Transform designated the EDA Agreement for assumption and assignment; and

**WHEREAS,** District 300 filed objections to said assignment and assumption of the EDA Agreement which are pending resolution in the Bankruptcy Court, as a result of which the assumption and assignment has not become effective; and

**WHEREAS**, Transform acquired its interest in the former Sears Headquarters Complex ("Sears Headquarters") located within the EDA District via the APA from Sears by which, among many other rights and duties and the Bankruptcy Code, Transform may withdraw its designation to assume the EDA Agreement, and the time in which it may withdraw its designation of such interests has not expired; and

**WHEREAS,** on August 16, 2019, District 300 filed its First Amended Complaint in this action, adding the Transform entities as party defendants; and

**WHEREAS**, the Parties including Transform re-filed their responsive pleadings and respective summary judgment cross-motions as to the issues raised in the Turnover Motion; and

**WHEREAS**, on October 23, 2019, the Bankruptcy Court entered an amended stipulation and order in which Sears and District 300 reached an agreement, related to the balance of the 2017 EDA Funds held in the Special Tax Allocation Fund by the Village pursuant to the Stipulated Order, and the School District's remaining claims and objections to confirmation of the *Modified*

- 5 -

*Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*

(ECF No. 4476) (the "**Plan**"); and

**WHEREAS**, on November 12, 2019, District 300 filed its Second Amended Complaint in this action which, among other things, named the remaining taxing districts projected to receive distributions of the 45% Portion of the EDA Funds, including Barrington Public Library, Hoffman Estates Park District, Elgin Community College District 509, Northwest Mosquito Abatement District, Metropolitan Water Reclamation District of Chicago, Barrington Township, Cook County Forest Preserve, County of Cook, School District U-46 and Poplar Creek Library District (collectively, the "**Remaining Taxing Districts**"); Transform, the Village and Sears thereafter filed motions to dismiss the Second Amended Complaint; and

**WHEREAS**, on January 24, 2020, District 300 moved for leave to file a Third Amended Complaint; and

**WHEREAS**, on February 2, 2020, the Circuit Court entered an order re-aligning some but not all of the Remaining Taxing Districts from defendants to plaintiffs in this action; and

**WHEREAS**, the plaintiffs and the non-private defendants are hereafter referred to as the "**Taxing Districts**"; and

**WHEREAS**, on February 20, 2020, an Agreed Order was entered in this action distributing the 45% Portion of the 2018 EDA Funds, but holding the 55% Portion of the 2018 EDA Funds pending further order of this Court; and

**WHEREAS**, on March 12, 2020, in lieu of filing a Third Amended Complaint, District 300 and the re-aligned plaintiffs moved for leave to file a Fourth Amended Complaint; and

**WHEREAS**, on July 8, 2020, with leave of court, District 300 and the re-aligned plaintiffs filed their Fourth Amended Complaint; to which certain defendants have answered and which

- 6 -

Sears and the Village have moved to dismiss; and

**WHEREAS**, EDA Funds presently held in the Special Tax Allocation Fund, subject to this action, consist of:

a.       a remaining portion of property taxes levied for the tax year 2018 and scheduled to be paid to the Taxing Districts in calendar year 2019 (the "**2018 EDA Funds**"), and

b.       property taxes levied for the tax year 2019 and scheduled to be paid to the Taxing Districts in calendar year 2020 (the "**2019 EDA Funds**"); and

**WHEREAS**, on September 8, 2020, Sears admitted in its Motion to Dismiss Fourth Amended Complaint in this action:

> 1.       Sears has no legal interest in this case.  All monetary claims asserted against or by Sears for EDA Funds for any year have been released, dismissed with prejudice, or forever relinquished.

.       .       .

> 9.       . . . Sears has relinquished any right it may have to 2018 EDA Funds and any subsequent years' EDA Funds as part of the Stipulation and Order [in the Bankruptcy Court].

and

**WHEREAS**, to avoid the uncertainties, costs and expenses of further litigation, the parties to this Settlement Agreement (the "**Parties**") have reached an agreement on the terms set forth herein, *inter alia* (a) to resolve Transform's position in this action; (b) to allow the distribution of the 55% Portion of the 2018 taxes collected in 2019; (c) to withdraw Transform's designation for assumption and assignment of, and disclaim any and all interests in, the EDA Agreement, provided that Sears agrees to thereafter reject the EDA Agreement, each before the Bankruptcy Court; (d) to terminate the EDA Agreement; and (e) to resolve certain remaining issues in this action;

**NOW THEREFORE**, in consideration of the foregoing and the mutual promises and

- 7 -

covenants contained herein, it is hereby stipulated and agreed to by and among the Parties, and

upon Bankruptcy Court approval it shall hereby be ordered that:

1.    The above recitals are incorporated and included in the terms of this Agreement.

### *Actions to Implement Agreement*

2.    Transform and the Plaintiffs agree that the following actions will be taken to

implement the terms of this Settlement Agreement:

(a)    Upon execution by Sears and District 300 of an Order and Stipulation in the form attached to and included in this Agreement as Exhibit A (the "**EDA Stipulation**"), stipulating to (i) Transform's irrevocable withdrawal of its designation of the EDA Agreement as an executory contract to be assumed and assigned to Transform pursuant to the terms of the APA; and (ii) Sears' irrevocable rejection of the EDA Agreement pursuant to Section 365 of the Bankruptcy Code and the terms of the Plan, as the same has been modified and amended; then within 1 business day after Sears executes the EDA Stipulation, Transform shall execute and Transform and District 300 shall file the EDA Stipulation with and for approval by the Bankruptcy Court;

(b)    In the event that Sears does not execute the EDA Stipulation by October 30, 2020, District 300 shall, no later than November 3, 2020, file a motion in the Bankruptcy Court, in form and substance reasonably satisfactory to each of District 300 and Transform, to compel Sears to immediately reject the EDA Agreement upon Transform's withdrawal of its designation of the EDA Agreement as an executory contract to be assumed and assigned to Transform pursuant to the terms of the APA, and Transform shall, concurrently with the filing of said motion, file a notice in the Bankruptcy Court that it shall withdraw said designation contingent on Sears' rejection;

(c)    Within 1 business day after either (i) the Bankruptcy Court approves the EDA Stipulation, or (ii) the Bankruptcy Court grants District's 300's motion to compel and orders the rejection by Sears of the EDA Agreement, Plaintiffs as applicable and Transform shall request the Court in the Illinois Action to enter, and Plaintiffs as applicable and Transform shall diligently pursue, an Order that is final and appealable per Rule 304(a) for the Village to release the 55% Portion of the 2018 EDA Funds to the Taxing Districts.

3.    Subject to the occurrence of those events described in  paragraph 2 above, and

the Village's release of the 55% portion of the 2018 EDA Funds to the Taxing Districts, either

with Village's consent or pursuant to a final and non-appealable order per Rule 304(a), Plaintiffs

- 8 -

shall (a) within 5 business days pay Transform the sum of $900,000 (Nine Hundred Thousand Dollars), and (b) dismiss Transform from the Illinois Action with prejudice.

4.      Subject to the occurrence of those events described in paragraph 2 above, in the event of the Village's release of the 55% portion of the 2019 EDA Funds to the Taxing Districts, either with Village's consent or pursuant to a final and non-appealable order per Rule 304(a), before or upon termination of the EDA Agreement, plaintiffs shall within 5 business days pay Transform the additional sum of $300,000 (Three Hundred Thousand Dollars).

5.      Upon termination of the EDA Agreement, whether in accordance with its terms, through a final and non-appealable order per Rule 304(a) in the Illinois Action, or by agreement with the Village and Sears (if required by law),  Plaintiffs shall within 5 business days pay Transform the remaining sum of $1,700,000 (One Million Seven Hundred Thousand Dollars).

6.      Provided that Transform is paid the total sum of $2,900,000 (Two Million Nine Hundred Thousand Dollars) by Plaintiffs, Transform shall not seek any portion of the EDA Funds or any other funds related to the EDA District and EDA Agreement.

7.      The Parties have declared their intent that the EDA Agreement shall be deemed terminated.

8.      If either (i) the Bankruptcy Court does not approve the EDA Stipulation, or (ii) the Bankruptcy Court does not grant District's 300's motion to compel, ordering the rejection by Sears of the EDA Agreement, by November 16, 2020, Transform may terminate this Agreement by providing written notice to the School District provided that Transform may not terminate this Agreement after the Bankruptcy Court has either approved the EDA Stipulation or granted District 300's motion to compel and ordered Sears rejection of the EDA Agreement.

- 9 -

. In the event of such termination, this Agreement shall be null and void and of no further force or effect whatsoever, returning the parties to the status quo ante.

### *Mutual Releases*

9.      District 300, the Plaintiff Taxing Districts, and Transform, on behalf of themselves and their past, present and future officers, directors, shareholders, board members, employees, agents, advisors, accountants, attorneys, assignees, and representatives or other entities acting on their behalf or through which they claim a beneficial interest (the "**Releasing Parties**"), hereby mutually release and absolutely and forever discharge each other (subject solely to termination pursuant to Paragraph 8, the conditions set forth in Paragraph 3 above, and the Bankruptcy Court either (i) approving the EDA Stipulation, or (ii) granting District 300's motion to compel and order rejection by Sears of the EDA Agreement), as well as their past, present and future companies, subsidiaries and affiliates, and their present and former officers, directors, shareholders, employees, agents, advisors, accountants, attorneys, assignees, and representatives, of and from any and all claims, demands, damages, debts, liabilities, judgments, accounts, obligations, costs, expenses, actions and causes of action of every kind and nature whatsoever, whether now known or unknown, asserted or which could have been asserted, suspected or unsuspected, choate or inchoate, which the Releasing Parties now have, own, hold, or at any time heretofore ever had, owned or held against any of them from the beginning of the world to the date of this agreement, which arise out of, or relate to, or are based upon the EDA Act, the EDA Agreements, or the EDA Funds whether in whole or in part except for the rights conferred by and each Party's performance under this Agreement.   The language of this paragraph shall apply only as consistent with this Agreement and shall not apply to each Party's obligation to perform under this Agreement.

- 10 -

10.     For avoidance of doubt, nothing herein, including the distribution of the 2018 EDA Funds, is intended or shall be construed to be (a) an admission as to the merits of the Turnover Motion or District 300's objection to the Turnover Motion, (b) an admission as to the merits of the Parties' respective motions and cross-motions of summary judgment in this action, (c) a waiver of any Party's right to assert any facts or contentions relating to compliance and/or non-compliance with the EDA Act or the EDA Agreement, (d) any release or waiver of Plaintiffs' claims against the Village asserted in the Illinois Action, or (e) a release or waiver of District 300's cure claims or any objection to Sears entitlement to assign the EDA Agreement, pursuant to section 365 of the Bankruptcy Code.

11.     In withdrawing with prejudice any complaint, claim, motion or other litigation seeking to prevent Transform from receiving the any EDA Funds, in dismissing with prejudice all claims against Transform in this action, to the extent provided herein, District 300 and the Remaining Taxing Districts will not be deemed to have admitted, nor will the Court nor the Bankruptcy Court be deemed to have made a finding with respect to: (i) the issue of whether the Village, Sears or Transform, to the extent relevant, have complied with the terms and conditions of the EDA Act and/or the EDA Agreement; (ii) the issue of whether District 300 or other parties have valid cure claims under Section 365 of the Bankruptcy Code; or (iii) whether Sears is entitled to assign that EDA Agreement pursuant to Section 365 of the Bankruptcy Code. Furthermore, District 300 and the Remaining Taxing Districts will not be deemed to have waived any claims against the Village regarding compliance with the terms of the EDA Act and/or the EDA Agreement.

### ***Representations***

- 11 -

12.     Transform represents that it maintains full authority to withdraw its designation of the EDA Agreement in its entirety. Transform represents that it currently holds title to the real property and tangible assets previously held by Debtors within the EDA District as of the date on which the transactions contemplated by the APA were consummated.

13.     Transform represents that it alone may withdraw its designation of its interests in the EDA Agreement. Transform represents that no successor, assignee, subsidiary, or other affiliated entity maintains any actual or potential interest in the EDA Agreement, other than any lenders to Transform that hold a collateral interest in Transform's potential rights under the EDA Agreement, which will be automatically released upon the effectiveness of Transform's withdrawal of its designation of the EDA Agreement as an executory contract to be assumed and assigned to Transform. Transform represents that it has not and will not assign, sell, or otherwise transfer its designation rights in the EDA Agreement or its real property interest in the Sears Headquarters, including building and improvements, prior to (a) withdrawing its designation of the EDA Agreement as an executory contract to be assumed and assigned to Transform, and (b) the Bankruptcy Court either (i) approving the EDA Stipulation, or (ii) granting District 300's motion to compel and ordering rejection by Sears of the EDA Agreement.

14.     Plaintiffs represent that they have not and will not assign, sell or otherwise transfer their interest in this Agreement.

### *General*

15.     Neither this Settlement Agreement, nor any terms contained herein, shall be offered or received as evidence or in any way referred to in any legal action or administrative proceeding among or between the Parties hereto, other than in the instant Bankruptcy Action or

- 12 -

any appeal thereto, the related Illinois Action or any appeal thereto, or as may be necessary to obtain approval for and to enforce this Settlement Agreement, obtain the release of the EDA Funds referenced in Paragraph 2(c) of this Settlement Agreement, including to obtain a declaration that the EDA Agreement and EDA District is terminated.  Unless inconsistent with the terms of this Settlement Agreement, nothing herein is intended or shall be construed to waive any defenses, objections, counterclaims or other positions that any of the Parties may have in this action or before the Bankruptcy Court.

16.    Transform, the School District and Remaining Taxing Districts and their officers, directors, committee members, employees, agents, advisors, representatives, attorneys and other professionals are hereby exculpated and shall have no liability with respect to claims, causes of actions, demands, suits, liabilities, obligations, losses, damages, offsets and/or judgments of any kind or nature, whether known or unknown, contingent or non-contingent, statutory or non-statutory, solely arising from, out of, or in any way related to compliance with and approval of this Settlement Agreement.

17.    Each person or undersigned counsel represents that he/she is authorized to execute this Settlement Agreement on behalf of his or her respective client.

18.    This Settlement Agreement may be executed in multiple counterparts, any of which may be transmitted by facsimile, and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

- 13 -

**CONSENTED AND AGREED TO:**

| | |
|---|---|
| COMMUNITY UNIT SCHOOL DIST. 300 BARRINGTON PUBLIC LIBRARY DISTRICT ELGIN COMMUNITY COLLEGE DISTRICT 509 SCHOOL DISTRICT U-46 BARRINGTON TOWNSHIP METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO<br><br>By:_____<br>　　Kory Atkinson<br>　　Law Office of Kory Atkinson<br>　　236 West Lake Street, Suite 100<br>　　Bloomingdale, IL 60108<br>　　630-980-9100<br>　　kaa@koryatkinson.com<br>　　Cook County No. 44788<br><br>　　Kenneth M. Florey<br>　　M. Neal Smith<br>　　Katie Zumalt-Rogers<br>　　Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.<br>　　631 E. Boughton Road, Suite 200<br>　　Bolingbrook, IL 60440<br>　　630-929-3639<br>　　kflorey@robbins-schwartz.com<br>　　nsmith@robbins-schwartz.com<br>　　mmacnair@robbins-schwartz.com<br>　　Cook County No. 91219 | TRANSFORM HOLDCO LLC, TRANSFORM SR HOLDING MGMT, LLC, TF HOFFMAN ESTATES IL, LLC, TRANSFORM SR LLC<br><br>By: _Thomas F. Geselbracht_ (signature)<br>　　Thomas F. Geselbracht<br>　　DLA Piper LLP (US)<br>　　444 West Lake Street<br>　　Suite 900<br>　　Chicago, Illinois 60606<br>　　Thomas.Geselbracht@us.dlapiper.com |

- 14 -

<u>EXHIBIT A</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
**In re**                                               :
                                                        :        **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,               :
                                                        :        **Case No. 18-23538 (RDD)**
                                                        :
**Debtors.**[1]                                         :        **(Jointly Administered)**
------------------------------------------------------------x

**STIPULATION AND ORDER**
**BY AND AMONG THE DEBTORS, TRANSFORM, AND COMMUNITY UNIT**
**SCHOOL DISTRICT 300 CONCERNING ECONOMIC DEVELOPMENT**
**AGREEMENT**

**WHEREAS**, Debtors, Transform Holdco LLC, Transform SR Holding Management,

LLC, TF Hoffman Estates IL, LLC, and Transform SR, LLC (collectively, "**Transform**");

Community Unit School District 300 ("**District 300**"); Elgin Community College District 509;

Metropolitan Water Reclamation District of Greater Chicago; Barrington Township; School

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

- 15 -

District U-46; and Barrington Public Library District have reached an agreement to resolve outstanding litigation as memorialized in the attached Settlement Agreement; and

**WHEREAS**, the parties to the Settlement Agreement hereby incorporate the Settlement Agreement and its recitals in their entirety;

**NOW THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained in the Settlement Agreement, it is hereby stipulated and agreed to by and among the parties, and upon Bankruptcy Court approval it shall hereby be ordered that:

Subject to the terms and conditions of the Settlement Agreement:

i.    Transform hereby irrevocably withdraws its designation of the EDA Agreement as an executory contract to be assumed and assigned to Transform pursuant to the terms of the APA;

ii.    Transform represents that it maintains full authority to withdraw its designation of the EDA Agreement in its entirety. Transform represents that it currently holds title to the real property and tangible assets previously held by Debtors within the EDA District as of the date on which the transactions contemplated by the APA were consummated.

iii.    Transform represents that it alone may withdraw its designation of its interests in the EDA Agreement. Transform represents that no successor, assignee, subsidiary, or other affiliated entity maintains any actual or potential interest in the EDA Agreement, other than any lenders to Transform that hold a collateral interest in Transform's potential rights under the EDA Agreement, which will be automatically released upon the effectiveness of Transform's withdrawal of its designation of the EDA Agreement as an executory contract to be assumed and assigned to Transform. Transform represents that it has not and will not assign, sell, or otherwise transfer its designation rights in the EDA Agreement or its real property interest in the Sears Headquarters, including building and improvements, prior to (a) withdrawing its designation of the EDA Agreement as an executory contract to be assumed and assigned to Transform, and (b) the Bankruptcy Court either (i) approving the EDA Stipulation, or (ii) granting District 300's motion to compel and ordering rejection by Sears of the EDA Agreement.

- 16 -

iv.    Plaintiffs represent that they have not and will not assign, sell or otherwise transfer their interest in this Agreement; and

v.    Debtors' irrevocably rejects the EDA Agreement pursuant to Section 365(a) of the Bankruptcy Code and the terms of Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors, as the same has been modified and amended, with prejudice.

(Signature page follows)

- 17 -

**CONSENTED AND AGREED TO:**

| | |
|---|---|
| COMMUNITY UNIT SCHOOL DIST. 300 BARRINGTON PUBLIC LIBRARY DISTRICT ELGIN COMMUNITY COLLEGE DISTRICT 509 SCHOOL DISTRICT U-46 BARRINGTON TOWNSHIP METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO<br><br><br>By:_____<br>Kory Atkinson<br>Law Office of Kory Atkinson<br>236 West Lake Street, Suite 100<br>Bloomingdale, IL 60108<br>630-980-9100<br>kaa@koryatkinson.com<br>Cook County No. 44788<br><br>Kenneth M. Florey<br>M. Neal Smith<br>Katie Zumalt-Rogers<br>Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.<br>631 E. Boughton Road, Suite 200<br>Bolingbrook, IL 60440<br>630-929-3639<br>kflorey@robbins-schwartz.com<br>nsmith@robbins-schwartz.com<br>mmacnair@robbins-schwartz.com<br>Cook County No. 91219 | TRANSFORM HOLDCO LLC, TRANSFORM SR HOLDING MGMT, LLC, TF HOFFMAN ESTATES IL, LLC, TRANSFORM SR LLC<br><br><br>By:_____<br>Thomas F. Geselbracht<br>DLA Piper LLP (US)<br>444 West Lake Street<br>Suite 900<br>Chicago, Illinois 60606<br>Thomas.Geselbracht@us.dlapiper.com<br><br>SEARS HOLDINGS CORPORATION, SEARS, ROEBUCK & CO., KMART HOLDING CORPORATION, SEARS HOLDINGS MANAGEMENT CORPORATION,<br><br><br>By:_____ |

**SO ORDERED THIS**
_____ day of _____, 2020
White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

- 18 -

**EXHIBIT 3**

Page 1

1   STATE OF ILLINOIS   )
                        )   SS:
2   COUNTY OF C O O K   )

3          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT - CHANCERY DIVISION

4

5   COMMUNITY CONSOLIDATED UNIT        )
    SCHOOL DISTRICT 300, an            )
6   Illinois school district,          )
                                       )
7              Plaintiff,              )
                                       )
8       -vs-                           )   No. 18 CH 12683
                                       )
9   VILLAGE OF HOFFMAN ESTATES,        )
    an Illinois municipal             )
10  corporation; and SEARS            )
    HOLDINGS CORPORATION, a           )
11  Delaware corporation,             )
                                       )
12             Defendants.             )

13

14          REPORT OF PROCEEDINGS before the HONORABLE

15  CELIA G. GAMRATH, Judge of the Circuit Court of Lake

16  County, Illinois, commencing at 9:15 a.m. on the 15th

17  day of August, 2019, upon the hearing of the above

18  entitled case.

19

20

21

22

23

24

Page 2

1 PRESENT:
2    ROBBINS SCHWARTZ NICHOLAS
     By MR. KENNETH M. FLOREY
3    55 West Monroe Street, Suite 800
     Chicago, Illinois  60603
4    (312) 332-7760
     kflorey@robbins-schwartz.com
5
       appeared on behalf of plaintiff,
6
     VEDDER PRICE, PC
7    By MS. JEANAH PARK
     222 North LaSalle Street
8    Chicago, Illinois  60601
     (312) 609-7532
9    jpark@vedderprice.com
10     and
11   MR. ARTHUR L. JANURA, JR.
     Village of Hoffman Estates
12   1900 Hassell Road
     Hoffman Estates, Illinois  60169
13   (847) 781-2603
     Arthur.janura@hoffmanestates.org
14     and
15
     EUGENE L. GRIFFIN & ASSOCIATES
16   By MR. MICHAEL B. ANDRE
     29 North Wacker Drive, Suite 650
17   Chicago, Illinois  60606
     (312) 855-5013
18   mandre@griffinlaw.com
19     appeared on behalf of defendant Village of
       Hoffman Estates,
20
21
22
23
24

Page 3

1 PRESENT: (Cont'd)
2    NEAL GERBER & EISENBERG, LLP
     By MR. DAVID S. MARTIN
3    Two North LaSalle Street, Suite 1700
     Chicago, Illinois  60602
4    (312) 269-8011
     dmartin@nge.com
5
       appeared on behalf of defendant Sears Holding
6      Corporation,
7
  ALSO PRESENT:
8
     DLA PIPER, LLP
9    By MR. THOMAS GESELBRACHT
     444 West Lake Street, Suite 900
10   Chicago, Illinois  60606
     (312) 368-4094
11   thomasgeselbracht@dlapiper.com
12     appeared on behalf of Transform Holdco.
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1    MR. MARTIN:  Your Honor, I'm David Martin from
2 Neal Gerber Eisenberg.  I represent Sears.
3    MR. FLOREY:  Good morning, Judge.  Ken Florey on
4 behalf of School District 300.
5    THE COURT:  Do you think we're waiting for
6 somebody else?
7    MR. MARTIN:  Well, I was told that counsel for
8 Transform --
9    MR. FLOREY:  Was supposed to be here.
10   MR. MARTIN:  -- was going to be here.  I don't --
11   MR. GESELBRACHT:  Yes, your Honor.  Tom
12 Geselbracht, DLA Piper.  We would be representing
13 Transform assuming that this motion is granted and we
14 are named as a defendant.
15   THE COURT:  All right.  May I have a courtesy
16 copy of the motion?
17   MR. MARTIN:  Counsel?
18   THE COURT:  One was not delivered to us.
19   MR. FLOREY:  It was not?  And my associate is,
20 she's --
21   MS. PARK:  Your Honor, Jeanah Park on behalf of
22 the Village of Hoffman Estates.  I think I have an
23 extra copy.
24   MR. FLOREY:  Thank you.

Page 5

1    MR. ANDRE:  And Judge, I'm Mike Andre, also on
2 behalf of the Village, from Griffin and Associates.
3    MR. JANURA:  My name is Arthur Janura.  I'm
4 corporation counsel for the Village of Hoffman
5 Estates.
6    THE COURT:  Thank you.
7    MS. PARK:  Your Honor, I've written on my copy.
8 I probably shouldn't tender it to the Court.
9    MR. MARTIN:  Your Honor --
10   THE COURT:  I'm just going to say as a courtesy
11 to all, I allowed you to get on my call on an
12 expedited basis.  The only reason why I'm privy to
13 what the motion is is because you had an assistant
14 call my law clerk.  I expect courtesy copies of
15 motions at each meeting.
16   MR. FLOREY:  I apologize, Judge.
17   THE COURT:  Particularly when I'm squeezing you
18 in as I am.  Does anybody have something for me to
19 look at?
20   MR. MARTIN:  Your Honor, it's not my motion, but
21 I have a clean copy.
22   THE COURT:  Thank you.  I appreciate that.
23   MR. MARTIN:  Yes, this is clean, yes.
24   THE COURT:  Is there an objection to this motion?

2 (Pages 2 - 5)

1    MR. FLOREY: Judge, the motion is adding the
2  Transform Holdco companies, there's three companies,
3  actually two that would be added. And they are the
4  asset purchasers of Sears. And through the
5  bankruptcy proceedings they have asserted an interest
6  in the EDA funds that are at issue.
7      I've spoken with counsel. They are agreeing
8  to join in the, I don't want to speak for counsel,
9  but they're not going to disrupt the hearing that's
10  set for next week or seek additional briefing,
11  joining in the motion of Sears Holding Corporation.
12    MR. GESELBRACHT: Yes, your Honor. On behalf of
13  Transform, the two Transform entities that are
14  proposed to be named in the amended complaint, I've
15  told counsel that we would accept service and we
16  would not anticipate objecting to you holding the
17  argument on the pending motions. We would anticipate
18  that we would join with Sears Holding Company's
19  positions in response to the school district's motion
20  and the Sears, I guess I would call it a cross
21  motion.
22    THE COURT: When you say you'll anticipate doing
23  that, tell me where we stand.
24    MR. GESELBRACHT: We have discussed -- the

1  proposed amended complaint would also name an
2  additional defendant, ESL Investments, Inc. I've
3  asked them not to do that.
4    MR. FLOREY: And we agreed to take that name off
5  of it.
6    MR. GESELBRACHT: So I've got to get the amended
7  complaint, I've got to file an appearance and I
8  assume that we're going to file an answer at some
9  point. The only reason I say I anticipate, Judge, is
10  because as my grandfather used to say, there's many a
11  slip twixt cup and lip and I just need to work my way
12  through these things. But we do not anticipate
13  objecting to your holding the oral argument next
14  week.
15    THE COURT: Because it's set for --
16    MR. MARTIN: 21st.
17    MR. FLOREY: Wednesday.
18    THE COURT: So what I've been hearing there's
19  no objection to allowing the granting of the amended
20  complaint to add Transform but not ESL. Plaintiff is
21  going to withdraw ESL.
22    MR. FLOREY: Correct. And there is one third
23  party that is the grantee on a quitclaim deed for the
24  property that we also --

1    MR. GESELBRACHT: Counsel raised that issue to me
2  and I just don't know the answer to that.
3    THE COURT: So is that Transform Holdco or
4  Transform SR or are we talking about somebody totally
5  separate?
6    MR. FLOREY: It is called TF Hoffman Estates,
7  Illinois LLC. It's the deed from Sears, the
8  quitclaim deed from Sears to this entity holds title
9  to the property. So it's title holder which is owned
10  apparently by --
11    MR. GESELBRACHT: Presumably. I've asked counsel
12  for a copy of the deed. I just need to confirm that.
13    MR. FLOREY: -- by Transform.
14    THE COURT: I don't see them on this amended
15  complaint.
16    MR. GESELBRACHT: They're not.
17    MR. FLORNEY: Correct, Judge. We received the
18  deed after we filed the amended complaint.
19    THE COURT: So you're saying you might at some
20  point deem it necessary to file a second amended
21  complaint adding this party?
22    MR. FLOREY: We'd like leave to add them by
23  agreement.
24    THE COURT: Today?

1    MR. FLOREY: To add them as a party, correct.
2    THE COURT: So I'm hearing a request to add
3  Transform Holdco, Transform SR Holding Management and
4  TF Hoffman --
5    MR. FLOREY: Estates IL.
6    THE COURT: And to strike ESL Investments.
7    MR. FLOREY: Correct.
8    THE COURT: Counsel for Transform, what's your
9  position on that? Who would, I mean, I will not
10  allow you to add TF Hoffman Estates without agreement
11  because I don't have that motion in front of me.
12    MR. FLOREY: Fine.
13    MR. GESELBRACHT: I don't have an objection to
14  that, your Honor.
15    THE COURT: So that would be acceptable.
16    MR. GESELBRACHT: And I'm not even sure I have
17  standing to have an objection until we're actually
18  named and appear, but I understand what you suggest.
19    THE COURT: I mean, technically I could easily
20  deny it.
21    MR. GESELBRACHT: I understand.
22    THE COURT: But if you're agreeing, is it true,
23  counsel, you would step in to represent TF Hoffman
24  Estates?

3 (Pages 6 - 9)

**Page 10**

1    MR. GESELBRACHT: Yes, your Honor.

2    THE COURT: Then based on that, if you want to

3  mark the order agreed granting leave to file unless

4  you have an objection.

5    MR. MARTIN: We have an objection, your Honor.

6    THE COURT: Okay.

7    MR. MARTIN: Thank you. David Martin on behalf

8  of defendant Sears Holdings Corporation. This

9  motion, your Honor, is unusually tardy. Counsel has

10  known about the transfer of these assets to Transform

11  since January of this year. He's also known that

12  Transform has made a claim to these assets since May.

13  And here we are, less than a week or maybe one week

14  from our hearing and he's filing a motion to add

15  these parties which we don't think are necessary.

16    The issue as to -- between Sears and

17  Transform entitled to the funds that are the subject

18  of the motions before your Honor is not before your

19  Honor. That issue is before the bankruptcy judge in

20  New York. And Judge Drain has already preliminarily

21  ruled that those funds belong to either Sears or the

22  district depending on -- the taxing districts

23  depending on the outcome of the motions before your

24  Honor. So we think it's highly prejudicial to Sears

**Page 11**

1  for this Court to allow Transform into the case, into

2  your case, the issue before you when counsel has

3  known that they purchased assets of Sears since

4  January and they brought this on the eave of oral

5  argument after the issue has been totally agreed.

6  Now they're before you this morning saying, well, no,

7  we want to eliminate one of the three parties but we

8  want to add a party. That motion is not before the

9  Court and we think it's highly prejudicial to Sears

10  given the fact that the confirmation of bankruptcy is

11  going to most likely happen in September, next month.

12    And all parties, I think, would like a ruling

13  on the limited issue that's before this Court, which

14  is how the 2017 funds that remain in the Village's

15  account are to be distributed. There's no other

16  issue, no other issue than that and Transform does

17  not need to be a party to this case for this Court to

18  decide that issue.

19    MR. FLOREY: Judge, a couple -- thank you for

20  reading my mind, counsel, but first of all, we did

21  not receive an objection from the main counsel

22  representing Sears, Jared Friedman, so I'm a little

23  surprised at your position, but we were told by Jared

24  Friedman, the main counsel, that they had the sole

**Page 12**

1  interest, there was no dispute with EDA between who

2  owed -- or asset purchase agreement about who was

3  entitled to those funds.

4    There were some bankruptcy filings among the

5  hundreds of thousands of documents filed in this

6  case. As soon as we became aware of this claim and

7  the dispute to the funds, we added them as soon as we

8  were reasonably aware of it.

9    THE COURT: Counsel is saying that you knew it

10  since May. It's now mid August.

11    MR. FLOREY: We did not know since May. We made

12  our way through all the documents and discovered it

13  about ten days ago.

14    MR. MARTIN: Your Honor, we find that highly

15  unlikely. The deed, the deed to this property was

16  recorded in January. Counsel has been intimately

17  involved in the bankruptcy proceeding. I find it

18  highly unlikely that he was not aware of what was

19  going on with respect to this property. There's a

20  recorded deed, a public document. There's an asset

21  purchase agreement, a public document. They were

22  intimately involved. They've been to New York

23  several times and have been present at these hearings

24  involving this issue. It's highly unlikely that they

**Page 13**

1  did not have knowledge.

2    MR. FLOREY: Again, we relied on the

3  representation of counsel repeatedly that they solely

4  are entitled and have a claim and a right to EDA

5  funds at issue before you for these years. Shame on

6  us for trusting representation of counsel, the New

7  York counsel, the main attorney in the case and now

8  I'm hearing something different from local counsel.

9  I'm a bit shocked.

10    I'm not sure what he's proposing. I'm not

11  sure if he's objecting to the hearing next week.

12  I don't know what the point is when we've got an

13  agreement to add the defendants. They clearly have

14  an interest in, if not this batch of funds, future

15  EDA funds.

16    THE COURT: But the question before me is with

17  respect to how this EDA fund should be distributed.

18    MR. FLOREY: Correct.

19    THE COURT: The issue in front of me then is

20  going to be, right now as it stands, between

21  plaintiffs and Sears and the Village.

22    MR. FLOREY: Correct.

23    THE COURT: Now am I to decide if these new

24  parties get a piece of the action?

4 (Pages 10 - 13)

Page 14

1    MR. FLOREY: No, no. That's between --
2    THE COURT: Then why are they necessary parties
3  in my case?
4    MR. FLOREY: That's between the bankruptcy --
5  first of all, they're a necessary party in the case
6  because your rulings could affect future
7  distributions of the funds. The legal issues in our
8  motion --
9    THE COURT: But let's say that I find that, you
10  know, the school district ought to get them. What's
11  the consequence to these soon to be named new
12  parties?
13    MR. FLOREY: To make that ruling, which we
14  believe would be the correct ruling, you would
15  determine that, among other issues, you can't count
16  non-Sears employees. You only have to count Sears
17  employees to come up with the 4250 magic number.
18  That would be an issue that affects the current funds
19  before you as well as future funds and potentially
20  funds from the past.
21    So that's, as Sears is the owner of the new
22  property in seeking to -- they've made a motion to
23  assume the contract, so they're now the new
24  recipients of these EDA funds going forward, they

Page 15

1  would have an interest --
2    THE COURT: Which party is? Transform?
3    MR. FLOREY: Transform Holdco, correct. The new
4  Sears, let's call them.
5    THE COURT: So now let's say that I think that
6  Sears ought to get these funds.
7    MR. FLOREY: Yes.
8    THE COURT: What's it --
9    MR. MARTIN: The issue is only for 2017, your
10  Honor. '18 is a separate issue. That is not before
11  this Court. Transform does not have an issue with
12  respect to 2017. If another claim for '18 wants to
13  be made and they want to make that claim for those
14  funds, that's a separate issue. But that issue right
15  now rests with the bankruptcy court in New York.
16  That is not before this Court. This Court's
17  jurisdiction is limited to 2017.
18    THE COURT: What's your position on that? It
19  sounds like you disagree.
20    MR. FLOREY: I completely disagree because to
21  make a decision one way or another, you have to
22  decide some legal issues about the intent of the
23  statute. That's going to affect the '17 funds as
24  well as it will be an issue of conclusion for, that

Page 16

1  same issue for the '18 funds, '19, '20, '21.
2    THE COURT: But I'm hearing from counsel that
3  there's already issues teed up in front of the
4  bankruptcy judge with respect to Sears and Transform
5  and --
6    MR. FLOREY: Who gets the money.
7    THE COURT: And the bankruptcy judge is dealing
8  with those other issues.
9    MR. FLOREY: He's made a ruling and that's on
10  appeal, is my understanding.
11    MR. GESELBRACHT: No, it's a preliminary ruling.
12  I'm sorry. I concur with Mr. Martin. It is a
13  preliminary ruling that the judge announced. There
14  was oral argument scheduled on that. It was deferred
15  because of the press of other business. I believe it
16  is now set for sometime in September, but I can't
17  tell you the exact date. But that issue is between
18  Transform and old, I guess I'll call them old Sears,
19  no disrespect.
20    THE COURT: And is that with respect to which
21  funds? Is that 2017, 2018, future funds, back funds?
22    MR. MARTIN: 2017, your Honor.
23    THE COURT: Okay.
24    MR. FLOREY: The fund here.

Page 17

1    THE COURT: So then if the bankruptcy judge is
2  going to determine that issue, why would -- in other
3  words, it seems to me that the first step would have
4  to be Sears getting ahold of these funds and then the
5  bankruptcy court kind of then taking it from there
6  and saying Sears, you get to keep them or do they go
7  to Transform.
8    MR. GESELBRACHT: I agree.
9    MR. FLOREY: So Judge, you decide school district
10  gets the money for '17. The appellate court or the
11  judge reverses himself and says you know what, under
12  the asset purchase agreement that should have gone to
13  Transform Holdco. Without them having a say on the
14  ability to participate in your hearing on our cross
15  motions, they could come in and say hey, we weren't a
16  party to that lawsuit even though we've known about
17  it since it's been filed, we've been before the
18  bankruptcy court, they haven't intervened.
19    If they had an interest, we would expect them
20  to intervene, we preemptively said we're going to
21  bring you in because, in theory because of your claim
22  in the bankruptcy court to this money. If you don't
23  participate in these state court proceedings, you
24  could come then in after the fact of your decision

5 (Pages 14 - 17)

Page 18

1 and say I now want to participate because I wasn't in
2 the case, the state court case, I have an interest in
3 these funds, I haven't weighed in on the legal
4 arguments and factual arguments before the Court and
5 they could effectively throw out your whole decision.
6    THE COURT: Except Transform presumably wants me
7 to rule that Sears gets the funds, correct?
8    MR. GESELBRACHT: I think that's fair. We're
9 aligned in that regard, your Honor.
10    THE COURT: So let's say that I made that ruling
11 because that's what's in front of me.
12    MR. MARTIN: Right.
13    THE COURT: And Transform is in this case. Does
14 that box out Transform in the bankruptcy court from
15 then saying they want the funds? In other words, now
16 they become a party to my case. My only real dispute
17 is between Sears and Community Unit School District.
18    MR. GESELBRACHT: Right.
19    THE COURT: In which case I'm not even like
20 putting you in this realm. It's not even on my
21 radar. So I do not anticipate by any means giving
22 these funds to Transform. Will that prejudice
23 Transform at that moment in time?
24    MR. GESELBRACHT: And that's one of the reasons

Page 19

1 I said that I anticipate what I'm going to do. I,
2 quite frankly, have not looked at the issue of, given
3 that you have a limited jurisdiction in light of the
4 bankruptcy court's remand, I guess I would call it.
5    MR. MARTIN: Abstention.
6    MR. GESELBRACHT: Abstention, that's better,
7 would that bind Transform under the circumstances
8 that counsel suggested? I don't know the answer to
9 that, Judge. I just haven't looked at that.
10    MR. FLOREY: And Judge, the --
11    MR. MARTIN: Your Honor, I would say --
12    MR. FLOREY: Wait, counsel. Let me --
13    THE COURT: I'll let you speak.
14    MR. MARTIN: As I've said earlier, that issue
15 arose after the abstention in this case was removed
16 to your court for the limited purpose. The
17 bankruptcy judge still has that issue between
18 Transform and Sears. And for this Court to entertain
19 that is, in my view, beyond the jurisdiction that has
20 been granted to this Court because that issue remains
21 in New York.
22    MR. FLOREY: Judge, despite the status of the
23 2017 funds, which are the funds that are currently
24 before you for the hearing next week, this case, the

Page 20

1 global case is going to affect future funds, the
2 status of the asset -- of the EDA act agreement of
3 which Transform is now, has told the world they're
4 going to assume and they'll be the new party and
5 they'll be seeking EDA funds. So in the case in
6 general, they need to be in it for the going forward
7 regardless of what happens in 2017.
8    THE COURT: The irony is that you specifically
9 asked the bankruptcy court to let Cook County,
10 Illinois decide this issue. Your transcript from
11 those hearings reflects that plaintiff's counsel, I
12 believe it is plaintiff's counsel, said don't worry,
13 Judge Drain in New York, Cook County is going to
14 decide this in a month, completely unrealistic. You
15 are experienced counsel in this venue. That notion
16 to lead Judge Drain believing that is so far afield.
17 And had I known that then, I would have kicked it
18 right back to Judge Drain.
19    We are now dealing with two fronts and it
20 looks like forum shopping to me, quite frankly.
21 Judge Drain is ultimately going to be looking at
22 these other funds and issues and now I'm looking at
23 it for this finite year in time. I'm not sure that
24 that's the right result. He has invited the Court to

Page 21

1 send it back, indicating that Judge Drain reserves
2 the right to reconsider its conclusion, that the
3 matters raised can be timely adjudicated if they're
4 not promptly resolved by the circuit court and any
5 Illinois appellate court. Again, I have given you an
6 expedited hearing date and we know it's been months.
7 I do not anticipate ruling next week. You know that.
8    MR. FLOREY: Yes.
9    THE COURT: We know, not only in the circuit
10 court of Cook County but down the street in federal
11 court, that limited motions like this may take months
12 on end. You have the right to appeal. Our appellate
13 process is, on a conservative basis, 18 months. The
14 notion that you go to Judge Drain and make that
15 representation that you're going to wrap this up in
16 four weeks is just --
17    MR. FLOREY: Judge, the context, if you read the
18 complete transcript, I told the judge there are
19 cases, election cases in Illinois which are handled
20 on, by agreement of the parties, on an expedited
21 basis where you have hearing schedules within five
22 days' briefing. I said if the Court accepts --
23    THE COURT: A totally different analogy. We're
24 not dealing with an election case.

6 (Pages 18 - 21)

Page 22

1    MR. FLOREY: There is precedent for expediting
2  cases in Cook County if the need --
3    THE COURT: Of course, there is. I do TRO's all
4  the time. But this kind of case, these kind of
5  motions, I think everybody in this room knows better.
6  And so now is a real opportune time to hear you to
7  say -- Judge Drain has already made some preliminary
8  rulings on this particular issue and notion. He is
9  contemplating where these EDA funds ought to go,
10  correct? He's made a preliminary ruling and he's got
11  an argument set.
12    MR. FLOREY: Just among Sears and Transformco.
13  He has not made any ruling about whether the school
14  district is entitled to the funds or not. And the
15  abstention --
16    THE COURT: But he is willing to.
17    MR. FLOREY: The abstention, even though Judge
18  Drain described that he has the ability to take it
19  back, that would be in dispute because he accepted
20  our argument under mandatory abstention where the
21  Court cannot hear the case because of the issues. So
22  I'm not going to second guess Judge Drain right now
23  and his --
24    THE COURT: His abstention motion was granted to

Page 23

1  the limited extent set forth herein and he set forth,
2  in his order of April 25, 2019, the parameters. So
3  while you may have argued this motion, it was granted
4  to a limited extent. It was not granted in totality
5  for blanket ruling.
6    MR. FLOREY: I think all the parties want, would
7  like, we agree we would like a hearing by this Court
8  next week, unless I'm hearing different from any
9  other counsel today. The confirmation, it was
10  supposed to be in June, it was supposed to be in
11  July, it was supposed to be in August, it's supposed
12  to be in September. We don't know if it's going to
13  continue onward.
14    The judge understood that if an appeal was
15  granted from your decision, that's a different --
16  that's going to also continue it. He also understood
17  that he would make a decision, we would appeal that
18  to the district court and that would be in the same
19  process. Either way you face this issue, it's going
20  to -- there's going to be multiple, many months, if
21  not years when you add on appeals to the process. So
22  that's -- the judge understood that.
23    THE COURT: Did he really understand that? Did
24  he get a clear picture about what the Illinois system

Page 24

1  is like in terms of the time gap as opposed to the
2  more expedited situation in White Plains, New York
3  and particularly on the bankruptcy call versus --
4    MR. MARTIN: My understanding, your Honor, is
5  that counsel or someone for the school district
6  represented to the judge that this would take
7  60 days, including appeals.
8    MR. FLOREY: That's not true, not true at all.
9    MR. MARTIN: That's what I was told by New York
10  counsel.
11    MS. PARK: We were told the same thing by our
12  bankruptcy counsel on behalf of the Village.
13    THE COURT: And so --
14    MR. FLOREY: That's absolutely untrue.
15    THE COURT: To the extent Judge Drain would like
16  the Court's impression of this, clearly 60 days were
17  come and gone. If the Court entertains argument next
18  week, there will not be a ruling next week. There
19  will not be a ruling for quite some time. Our
20  appellate process ordinarily takes 18 months and on
21  a complex case, that is hopeful. That would be
22  considered a fast track.
23    And so I do not know Judge Drain. I am sure
24  that he is a very fine and well informed jurist.

Page 25

1  But I do fear that counsel has given him false
2  impressions and false expectations of what the
3  capabilities of our Cook County court system is. And
4  it is certainly not for lack of diligence by this
5  Court. It is just because of the sheer volume and
6  the magnitude of our cases in this chancery division
7  which, for those who don't practice here, we have 14
8  judges who are general chancery judges, we have
9  several hundred cases on our dockets. We are the
10  judge, we are the jury, we deal with class action
11  lawsuits all the time, we deal with temporary
12  restraining orders. We deal with preliminary
13  injunctions, we deal with true emergencies on a
14  regular basis. Our cases are national, huge cases.
15  We have insurance coverage cases with 35 different
16  parties on a regular basis.
17    This is a very important case and a very
18  important issue, just like every single case on my
19  docket is. So while I would love to be in a position
20  to do that five day turnaround that counsel just
21  spoke of, this case does not rise to that level.
22  It's not warranted and it's not feasible. So I do
23  want everybody to understand that clearly, that it is
24  certainly not because we're taking long holidays

7 (Pages 22 - 25)

Page 26

1  here. We work overtime, weekends, nights and then
2  some.
3       So I just want that to be clear because if
4  our judicial system on a national level believes that
5  this issue could be teed up and resolved in a more
6  efficient expedited manner being kept within the
7  control of the bankruptcy court, then this Court
8  would have no objection to relinquishing jurisdiction
9  over this limited issue. Because I do believe that
10 Judge Drain gave it to this Court thinking this would
11 be the more efficient process and it just has not
12 turned into that, certainly not because of Judge
13 Drain's doing, but I think because not everybody
14 speaking in New York was quite familiar with our
15 protocol here and the magnitude of our case load.
16      With respect -- yes.
17      MS. PARK: Your Honor, there is one other issue
18 that, on behalf of the Village, we feel compelled
19 that we need to raise to the Court just because
20 counsel for the school district has brought up this
21 necessary party issue. We did file our answer and
22 affirmative defenses to the original complaint back
23 in May, and one of the affirmative defenses that the
24 Village raised was that the plaintiff's claims have

Page 27

1  failed because of failure to add necessary parties.
2  Now, the necessary parties that the Village was
3  contemplating, if the Court is familiar with the
4  papers, which I know the Court is, is that to the
5  extent that the recapture provision in the EDA act is
6  triggered if the Court so rules, there are other
7  taxing districts that may have standing to assert,
8  you know, entitlement to those funds. That is
9  something that the school district referenced in the
10 complaint.
11      You know, the case has been filed since
12 October of '18 and nobody's moved to intervene in
13 this case. But to the extent that the Court is
14 considering other necessary parties, we wanted to
15 raise the fact that there might be other taxing
16 districts that could be entitled to recapture of the
17 funds.
18      MR. JANURA: Pardon me, Judge. Arthur Janura on
19 behalf of the Village of Hoffman Estates. The
20 developer in this case that, pursuant to statute, is
21 entitled to funds is Sears Roebuck and Company.
22 Sears Roebuck and Company is an entity that's in
23 bankruptcy. They are a separate corporate entity and
24 that's who the Village deals with and writes the

Page 28

1  checks to. I don't believe Sears Roebuck Company has
2  been named in this case and that is who receives
3  these funds on behalf of the developer. And there
4  are 11 units of government and three school districts
5  that also receive funds out of this increment. This
6  was raised earlier and other than what was put forth
7  in the prior pleadings, the Village has no position
8  other than what was previously stated.
9      THE COURT: So to your point, is it -- so to your
10 point, basically because Community School District
11 300 is the one who came and sued, if they prevail,
12 would get the entire bucket of the $7 million.
13      MR. GESELBRACHT: I don't think that's right.
14      MR. FLOREY: Judge Drain already took the other
15 taxing bodies' money and since they didn't intervene
16 in the bankruptcy court, he ordered it turned over
17 from the Village to Sears.
18      MS. PARK: I don't know that, I'm not necessarily
19 taking the position that the school district would be
20 entitled to all the funds.
21      THE COURT: But you're saying there are other
22 taxing districts that theoretically could be?
23      MS. PARK: Correct.
24      THE COURT: And they're not here, so --

Page 29

1      MR. MARTIN: But this issue was raised in the
2  bankruptcy proceeding. All districts have been on
3  notice of this issue and no one responded.
4      MS. PARK: That's true, your Honor. The
5  bankruptcy court ordered the Village to give notice
6  of class to potential claimants. The Village did
7  give notice and nobody filed a claim in the
8  bankruptcy case.
9      MR. FLOREY: And they turned over, they ordered
10 turnover of the money then to Sears for 2017.
11      MR. MARTIN: It's not their money.
12      MR. FLOREY: Pardon?
13      MR. MARTIN: Sears'.
14      MR. FLOREY: Their portion of the whole. It's
15 about 10.9 school districts. It's about 5.9. Those
16 numbers are --
17      MR. MARTIN: You're characterizing it
18 incorrectly, Sears' money.
19      MR. FLOREY: And so the balance of the other
20 taxing districts' money has been ordered by Judge
21 Drain to be turned over to Sears.
22      THE COURT: So then to your point about your
23 affirmative matters that you raised about the
24 necessary parties and these other taxing districts,

8 (Pages 26 - 29)

Page 30

1 are these necessary parties in light of the fact that
2 Judge Drain has already ordered the turnover?
3     MR. JANURA:  Judge, it depends on what is being
4 done here today.  I've heard two different arguments
5 coming from the school district and Sears.  Sears has
6 maintained, from what my understanding of what was
7 said today, that this matter only involves 2017
8 funds.  The school district has indicated that your
9 ruling will affect future payments of EDA funds.
10 Conservatively speaking, future EDA funds go well
11 beyond $100 million.  And if your ruling is going to
12 affect the future of those funds being disbursed, the
13 districts, I believe pursuant to statute, are
14 entitled to some of those moneys.
15     And I believe that because of that, if it's
16 interpreted that your ruling has future effects, then
17 the school district -- then the taxing districts not
18 appearing in the bankruptcy court, which supposedly
19 was limited to 2017 funds, doesn't mean they might
20 not be interested in the $100 million plus in the
21 future for which they weren't notified was being
22 involved.  All they would receive notice of was the
23 bankruptcy which, according to Sears, only involves
24 2017 funds.

Page 31

1     MR. MARTIN:  Well, your Honor, if I might, I
2 would go back to the jurisdiction of the Court which
3 is 2017.  Who's entitled to the funds for '18 and
4 subsequent years is at this point totally, 100
5 percent speculative.  It's based on facts and the
6 law.  And this Court has been charged with ruling
7 with respect to these 2017 funds and --
8     MR. FLOREY:  I agree with counsel on that point.
9     THE COURT:  You do?  Because earlier I thought I
10 heard you say that my ruling would affect not only
11 2017 but future funds and potentially back funds.
12     MR. FLOREY:  We could argue that, but certainly
13 the only issue before you is 2017 funds.  We could
14 argue, try to argue at a later date that that ruling
15 has an effect on future funds.
16     THE COURT:  But if you do, then to their point,
17 who else needs to be a party to that case, to this
18 case?  In other words, I think you need to posture it
19 to say we're all on the same page, this is 2017, in
20 which case the parties who stand before me, I think
21 that's okay.  If this is going to go beyond that, I
22 would be concerned about knocking other taxing
23 districts out of the box for future years.  I don't
24 think that that's fair or just because if you

Page 32

1 prevail, you are being one taxing body in front of
2 me, which is sort of winner take all.
3     MR. FLOREY:  Well, we don't get their money, so
4 obviously we are just litigating over our money.  But
5 in all due respect to counsel, the money, the EDA
6 funds at issue before the bankruptcy court, we've
7 gone back from day one with our pleading to the
8 future.  So those local governments have been on
9 notice that all the EDA funds potentially at issue,
10 past, present and future, are before the bankruptcy
11 court.  The judge took our massive claim, past,
12 present and future, and sent a piece back to you for
13 2017 to say we'd like a ruling by the Illinois court.
14     Effectively it's Illinois statute, the
15 Illinois court's interpretation of the statute.
16 That, I believe, was, I'm not going to speak for the
17 judge, but that's what we argued was the appropriate
18 way for not just in Illinois but every state in the
19 country in every bankruptcy proceeding.  Bankruptcy
20 courts can interpret other states' statutes, but the
21 state courts are in better position to make that
22 interpretation.  I think that might have been a
23 factor that influenced sending this back as well.
24     We still believe that's the position up until

Page 33

1 this proceeding.  I walked in with everyone wanted to
2 have the hearing next week.  Is anyone here pulling
3 back, saying you don't want the hearing next week?
4 Because that's not the position I heard from every
5 counsel I spoke to.
6     MS. PARK:  The Village would like to proceed with
7 the hearing next week, your Honor.  We're not
8 interested in the ongoing proceeding.  I want to be
9 very clear about that.  We just wanted to raise this
10 issue because it was raised in our affirmative
11 defense.  Even if the Court's decision next week or
12 whenever the Court renders its opinion is limited to
13 the 2017 funds, we just wanted to raise the issue.
14 We don't take the position that there might be other
15 taxing districts who might have standing to have
16 access to those funds to the extent the Court rules
17 that their recapture provision should apply.
18     MR. JANURA:  Judge, the Village's position is we
19 just want to make sure the Court is aware of these
20 matters.  But we do not take any position regarding
21 the hearing.  But of course, this Court is well aware
22 of the fact that orders made without necessary
23 parties are void orders that can be challenged at any
24 time, even on appeal.  And so we feel it's important

9 (Pages 30 - 33)

Page 34

1 that the Court, when making orders, is aware of that.
2    MR. MARTIN:  Again, your Honor, Sears would like
3 to proceed next week as well, as I indicated earlier
4 on.
5    THE COURT:  You had indicated that Judge Drain
6 made a preliminary ruling in plaintiff's oral
7 argument in September, is that correct?  He made a
8 preliminary ruling?
9    MR. MARTIN:  Yes, he did.  I don't think it was
10 in September, though.
11    THE COURT:  He's going to --
12    MR. FLOREY:  I'm not sure which you're talking
13 about.
14    THE COURT:  I thought you said he was going to
15 hold argument in September.
16    MR. GESELBRACHT:  Judge, a little bit more
17 context.  Transform and old Sears have a dispute on
18 not just this issue as to who gets this money but a
19 number of different things.
20    MR. MARTIN:  Right.
21    MR. GESELBRACHT:  If I said a dozen, I might be
22 understating it and it's a lot of dough.  The judge
23 preliminarily announced that he was leaning towards
24 awarding these funds to old Sears.  They were going

Page 35

1 to argue it but couldn't.  I don't know what the new
2 date is.  I think it's in September, but I can't tell
3 you for sure.
4    THE COURT:  But that's only as between Transform
5 and old Sears.
6    MR. GESELBRACHT:  Correct.
7    MR. MARTIN:  Correct.
8    THE COURT:  Which again, I guess I look at this
9 and say if I bring you in, even though you're not
10 objecting, is that problematic?
11    MR. GESELBRACHT:  Judge, the question of issue
12 preclusion, which is I think what is raised here, not
13 so much the facts because the facts are going to
14 change from year to year, but for example, if you
15 rule on one issue, whether non-Sears employees count,
16 it's conceivable that that could -- that issue
17 preclusion could arise that ruling.  I don't know
18 what the answer is given a limited jurisdiction.
19 Normally the circuit court has unlimited
20 jurisdiction.  This is kind of an unusual situation.
21 So I just don't know.  Transform does not object to
22 holding a hearing next week.
23    THE COURT:  Just to be clear, what we had started
24 with plaintiff's counsel was a real easy motion.

Page 36

1    MR. FLOREY:  I didn't see this train coming
2 around the corner.
3    THE COURT:  But are we back full circle to say
4 Transform has no objection to be added as a party,
5 and that would include Transform --
6    MR. FLOREY:  Transform Holdco LLC, Transform SR
7 Holding Management LLC and TF --
8    THE COURT:  Now TF Hoffman Estates and we're
9 striking ESL Investments.
10    MR. FLOREY:  Correct.
11    THE COURT:  Sears, you had indicated that you
12 would be, as you said, highly prejudiced by allowing
13 them to come in.  They plan to join in your motion.
14    MR. MARTIN:  Yes, only from the standpoint,
15 Judge, that we're prejudiced if there is delay.  So
16 we agree with counsel, we want --
17    THE COURT:  But there will not --
18    MR. MARTIN:  But we don't want to have Transform
19 come in and file, you know, we think they're aligned
20 with us.  They should be.
21    MR. GESELBRACHT:  Yes.
22    MR. MARTIN:  We all have the same interest.
23    MR. GESELBRACHT:  And that's our intention,
24 Judge.

Page 37

1    THE COURT:  Okay.
2    MR. MARTIN:  And so only from the standpoint we
3 don't want there to be delay because of them being
4 added as parties.
5    THE COURT:  All right.  Then in light of all of
6 this, mark the order agreed, agreed order granting
7 leave to file, not this amended complaint.
8    MR. FLOREY:  Right.  Revised amended complaint.
9    THE COURT:  A new first amended complaint that
10 would include these parties, TF Hoffman Estates and
11 striking ESL Investments.
12    MR. MARTIN:  Your Honor, I just wanted to make
13 one other point.  The amended complaint includes
14 claims for 2018 and possibly subsequent years.
15    THE COURT:  Does this, I'm sorry, does this
16 amended complaint do anything more than add parties?
17    MR. FLOREY:  No.
18    THE COURT:  I didn't think it did, but are you
19 saying that it does?
20    MR. MARTIN:  Well, I just want to --
21    THE COURT:  Because if it does --
22    MR. FLOREY:  It does nothing.
23    MR. MARTIN:  It doesn't change -- excuse me.  It
24 doesn't change the original pleading other than to

10 (Pages 34 - 37)

Page 38

1 add Transform, but I do want to reiterate that the
2 issue before the Court is to have the '17 -- this
3 complaint has claims for other years other than 2017,
4 which of course the Court doesn't have jurisdiction
5 over.
6    MR. FLOREY:  Just because that's what was in the
7 original complaint.
8    MR. MARTIN:  It was in the original complaint,
9 your Honor.
10    THE COURT:  The summary judgment, though, these
11 motions that are in front of me --
12    MR. FLOREY:  Relate to 2017.
13    THE COURT:  So I guess if we have a new -- I
14 mean, it's summary judgment on your complaint.
15    MR. FLOREY:  Partial, yes.
16    THE COURT:  Are we now doing summary judgment on
17 this amended -- like just procedurally, aside from
18 adding new parties, if there are substantive, and
19 again having just seen this, if there are paragraphs
20 that are changed in this --
21    MR. FLOREY:  Judge, we're representing the only
22 paragraphs that were changed were adding the parties,
23 the three parties, the Transformco and the ESL.
24 There's no other change that I know.

Page 39

1    MR. GESELBRACHT:  Your Honor, I concur with that
2 almost word for word.
3    MR. MARTIN:  I'm not suggesting -- I'm just
4 stating that there are claims in there that were in
5 the original complaint that relate to years other
6 than '17 and that this Court is going to be deciding
7 2017.  That's --
8    THE COURT:  And then to be clear, also in today's
9 order indicate that my hearing the cross motions
10 would be directed at this amended complaint.  Is that
11 a fair statement?
12    MR. FLOREY:  Yes.
13    THE COURT:  And I'm not going on an old one.
14    MS. PARK:  That's fine, your Honor.
15    THE COURT:  No new briefing needs to be done.
16    MR. MARTIN:  Correct.
17    THE COURT:  Let's just make that clear
18 procedurally so that we can wrap this up.  And then
19 the hearing on Wednesday, I think it's 1:30, shall
20 stand.
21    MR. FLOREY:  Thank you, Judge.
22    THE COURT:  You're welcome.
23    MR. MARTIN:  Thank you.
24    MS. PARK:  Thank you, your Honor.

Page 40

1    MR. JANURA:  Do we have leave to answer or
2 otherwise plead the amended --
3    MS. PARK:  The Village would be prepared to file
4 a response to the pleading before next week's
5 hearing.
6    THE COURT:  Is it going to look different?
7    MS. PARK:  No.  Other than responding to the
8 allegations regarding the new parties, no, it will
9 not be different.
10    THE COURT:  Here is what I actually think.  Yes,
11 you should do that, but I am concerned that we're
12 kind of putting the cart before the horse and that
13 maybe we allow this to get filed, we get the answer
14 or otherwise plead and I kick next week.  I am
15 inclined to do that.  This changes the dynamic, it
16 does.  And I just don't want to rush into this and
17 have all these procedural inconsistencies.  That's
18 not going to do any good.
19    This case is going to live, as you indicated,
20 for years.  There's a lot of other potential
21 claimants, there's years to consider, there's
22 possible other taxing districts.  The worst thing
23 that we could do is rush into this and people not
24 make heads or tails.  I may not be here by the time

Page 41

1 that this goes through the full system.  The
2 attorneys may change, the judges may change.  We all
3 could be on the same page, but there does need to be
4 a coordinated effort so that somebody looking at this
5 court docket cold could understand it.
6    MR. FLOREY:  And I think we can do that among
7 ourselves.  Everyone here wants the hearing next --
8    THE COURT:  I'm striking next week.  I'm going to
9 look at my book and give you a date after you decide
10 about -- how many days do you need to file this?
11 Probably 24 hours?
12    MR. FLOREY:  We'll file it this afternoon.
13    THE COURT:  How many days do you need to respond
14 or otherwise plead?  Let's look at those motions for
15 summary judgment.  If we even just need to change the
16 caption, I want it done, I want a cross motion on the
17 amended complaint.  I don't care if you just simply
18 rip off the front page, put a new caption on it.
19 That is how it needs to proceed.  Figure out how many
20 days you want to do that and I'll give you a date in
21 my book.
22    MR. MARTIN:  Thank you, Judge.
23    MS. PARK:  Very good, your Honor.
24    THE COURT:  And you're going to want some time to

11 (Pages 38 - 41)

Page 42

1  respond or otherwise plead?
2      MR. GESELBRACHT:  Yes.
3      THE COURT:  You're in it.
4      MR. GESELBRACHT:  I'm in it now.  So if the
5  hearing --
6      THE COURT:  The hearing is getting kicked.  Why
7  don't I do this.  As you can see, I have other cases
8  that have been waiting really patiently which, my
9  apologies, I appreciate.  I'm going to ask you all
10  to step outside, coordinate the briefing schedule
11  between yourselves and then based on when that last
12  brief is due, I will try to give you the soonest date
13  in my book, all right?
14      MS. PARK:  Thank you, your Honor.
15      MR. FLOREY:  Are we talking about the soonest
16  date is two weeks, three weeks?  Do you have --
17      THE COURT:  It depends.  Figure out what your
18  schedule is.
19      MR. GESELBRACHT:  Thank you, Judge.
20      MS. PARK:  Thank you, your Honor.
21      (Which were all the proceedings had or
22  offered at the hearing of said cause.)
23
24

Page 43

1  STATE OF ILLINOIS )
           ) SS.
2  COUNTY OF C O O K )
3
4      I, LYDIA B. PINKAWA, CSR, do hereby certify
5  that I reported in shorthand the proceedings had at
6  the hearing aforesaid, and that the foregoing is a
7  true, complete and accurate transcript of the
8  proceedings at said hearing as appears from my
9  stenographic notes so taken and transcribed under my
10  personal direction this 16th day of August, 2019.
11
12
13      _Lydia B. Pinkawa_
14      Certified Shorthand Reporter
15
16  CSR No. 84-002342
17
18
19
20
21
22
23
24

12 (Pages 42 - 43)