COZEN O'CONNOR
*Attorneys for Scents of Worth, Inc.*
Frederick E. Schmidt, Jr.
277 Park Avenue
New York, NY  10172
(212) 883-4900
(646) 588-1552 (fax)
eschmidt@cozen.com

**Hearing Date: December 10, 2020 at 10:00 a.m.**
**Objection Deadline: December 3, 2020 at 4:00 p.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## MOTION TO COMPEL COMPLIANCE WITH ORDERS

Scents of Worth, Inc. f/k/a Model Imperial, Inc. ("**SOW**"), as and for its motion (the

"**Motion**") seeking entry of an order compelling compliance by the above-captioned debtors and

debtors in possession (collectively, the "**Debtors**") with this Court's *Interim Order Approving*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LL/C (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

*(i) Procedures for Store Closing Sales and (ii) Assumption of Liquidation Consulting Agreement* [ECF # 337] (the "**Interim Store Closing Order**") and *Final Order Approving (i) Procedures for Store Closing Sales and (ii) Assumption of Liquidation Consulting Agreement* [ECF # 823] (the "**Final Store Closing Order**" or, together with the Interim Store Closing Order, the "**Store Closing Orders**"), respectfully represents as follows.

1.    As more fully set forth below, the Store Closing Orders each direct the Debtors to pay consignment vendors in the ordinary course of business for post-petition sales of consigned goods, and to segregate proceeds from the sale of consigned goods and hold such proceeds in trust for the benefit of consignment vendors.  SOW is a bona fide consignment vendor, having supplied goods under a consignment agreement with Kmart Corporation, and having perfected its consignment interests by filing UCC-1 financing statements and provided notification to the then-existing secured lender.  Nevertheless, after a year and a half since the Debtors sold the last of the inventory consigned by SOW, the Debtors have not made any payment to SOW for post-petition sales.  By this Motion, SOW seeks entry of an order compelling the Debtors to comply with the Store Closing Orders and pay to SOW approximately $2.4 million, representing the proceeds from post-petition sales of Consigned Goods (the "**Consignment Proceeds**").[2]  SOW further seeks an accounting by the Debtors of all inventory consigned by SOW and all post-petition sales of such inventory.

---

[2] In addition to SOW's rights and protections as a consignment vendor under the Store Closing Orders, SOW also holds a purchase money security interest in the Consigned Goods, which interests attached to the Consignment Proceeds.  SOW also is entitled to, and has timely asserted, an administrative expense claim arising out of the Debtors' post-petition sale of the Consigned Goods.  SOW was hopeful that its claim (insofar as it is entitled to administrative expense priority status) would be resolved and paid as part of the opt-in administrative claim process established by the Debtors, but its claim has languished.  The Debtors have characterized the claim as disputed, even though they have not provided SOW with the basis of the purported dispute.  Accordingly, SOW has not shared in any distribution to administrative claimants.

LEGAL\45391793\2

## BACKGROUND

### A.  Kmart and SOW Enter Into An Initial Consignment Agreement in August of 2000

2.      SOW and Kmart Corporation ("**Kmart**") have had a longstanding business relationship with each other.  As part of that relationship, the parties entered into at least two consignment agreements.  On or about August 31, 2000, SOW and Kmart entered into the first of the two consignment agreements, the *Merchandise Supply Agreement* (as thereafter amended, the "**Prior Contract**") pursuant to which SOW was the sole supplier to Kmart of certain designer brand name fragrances and perfume products.  A copy of the Prior Contract is annexed to the accompanying declaration of Michael Katz (the "**Katz Declaration**") as Exhibit "A".  Paragraph 1(b) of the Prior Contract provided that SOW was to supply products on a consignment basis and paragraph 2 provided that SOW was to begin supplying such consigned goods beginning on September 11, 2000.[3]

### B.  SOW Perfects Its Consignment Interests Under the Prior Contract

3.      SOW timely filed UCC-1 financing statements in all required state and county levels to perfect its interests in the consigned goods to be delivered pursuant to the Prior Contract. In 2004, following the 2001 amendments to the UCC, which, among other things, altered the required location for the filing of financing statements, SOW filed an initial financing statement with the Michigan Secretary of State.[4]  That financing statement was thereafter continued.  A copy

---

[3] The Prior Contract was assumed by Kmart in its earlier 2002 chapter 11 bankruptcy.

[4] When the Prior Contract was entered into, the Uniform Commercial Code (the "**UCC**") required that financing statements be filed where the collateral was located.  SOW, then known as Model Imperial, Inc. filed UCC financing statements in all required state and county levels.  In 2001, substantial revisions were made to the UCC and were adopted in all 50 states.  Those revisions changed the location that most financing statements would need to be filed to the state of registration for corporations, rather than the place where the collateral was located.  The revisions to Article 9 of the UCC did not invalidate previously properly filed financing statements.  Instead, those financing statements would lapse on the earlier of (i) the time which the financing statement would lapse under the former rule (typically 5 years after filing); or (ii) June 30, 2006.  SOW relied on its initial UCC filings under the pre-2001

of the UCC-3 continuation statement (File # 2008133220-4), filed by SOW with the Michigan Secretary of State on August 25, 2008, extending the 2004 financing statement, is annexed as Exhibit "B" to the Katz Declaration.[5]

### C. SOW and Kmart Enter into a New Consignment Agreement

4.      On or about January 1, 2014, following a series of amendments to the Prior Contract, Kmart and SOW entered into a new *Distribution and Supply Agreement* (as thereafter amended, the "**Contract**") pursuant to which SOW would be the exclusive supplier and distributor of certain fragrances and perfume products, again on a consignment basis.  The consigned goods that were in the Debtors' possession as of the Petition Date (hereafter defined) are hereafter referred to as the "**Consigned Goods**".  A copy of the Contract (together with the amendments thereto) is annexed as Exhibit "C" to the Katz Declaration.

5.      The Contract provides that the goods supplied thereunder were to be supplied on a consignment basis.  Specifically, paragraph 3 of the Contract provides as follows:

> **3. Consignment.**  The Products will be supplied on a Consignment Basis.  Supplier and Kmart have been parties to similar consignment arrangements on an ongoing basis beginning August 31, 2000. Subject to adjustments as may be provided in this Agreement, the parties agree the value of Supplier Products currently in Kmart possession to be eight million dollars ($8,000,00.00) (the 'Consignment Amount').  The Consignment Amount may be adjusted during the Term of this Agreement by mutual agreement of the parties based on changes in the Kmart Store count and amount of Products necessary to maintain a level of inventory to conform with the requirements of this Agreement.  Any adjustment

---

amendments until 2004, when it filed an initial financing statement in Michigan, as required by revised UCC Section 9-706.

[5]  The UCC-3 attached to the Katz Declaration references File No. 2004008749-4 as the initial financing statement filed by SOW in Michigan.  Pursuant to section 440.9515(5) of the Michigan Compiled Laws, the UCC-3 statement continued the effectiveness of the initial 2004 financing statement until 2014, the 5-year anniversary date of the would-be expiration of the initial financing statement.  *See* MCL 440.9515(5) ("…upon timely filing of a continuation statement, the effectiveness of the initial financing statement continues for a period of 5 years commencing on the day on which the financing statement would have become ineffective in the absence of a filing").

4

> downward in the Consignment amount in excess of $200,000 will make the entire adjustment due and payable to the vendor within 30 days of the agreed upon adjustment. The Consignment Amount will be due and payable upon the expiration of this Agreement. This Agreement is intended to create a true consignment of the Products and not to evidence a purchase and sale of merchandise. The Products delivered to Kmart will at all times remain the property of Supplier until sold to Kmart customers. This Agreement constitutes a Security Agreement as defined in Article 9 of the Uniform Commercial Code. In addition, Supplier shall have the ability to notify Kmart secured lenders who hold a security interest in Kmart's inventory, which secured lenders are identified in Exhibit C.

Contract ¶ 3.

### D. __SOW Perfects Its Consignment Interests Under the Contract__

6.      SOW properly perfected its consignment interests by filing a new UCC financing statement with the Michigan Department of State (Document Number 2013179478-4)[6] on December 20, 2013. SOW further provided written notice of the consignment and of the UCC filing to Wells Fargo Bank, NA ("**Wells**"), which Kmart identified in the Contract as the only creditor having a security interest in any of its inventory at the time. Copies of the financing statement and the notification to Wells Fargo Bank, NA are annexed to the Katz Declaration as Exhibit "D" and Exhibit "E" respectively.

7.      Over the next several years, the Contract was amended five times to reduce the level of the Consignment Amount, as had been contemplated in paragraph 3 of the Contract.[7] Importantly, none of the amendments changed any part of paragraph 3 except for the third sentence

---

[6]   Although the Contract provides that Illinois law governs the construction, interpretation, and enforcement of the Contract, the UCC financing statement was filed in Michigan because Kmart is a Michigan corporation *See* Uniform Commercial Code § 9-307 made relevant here by § 440.9307 of the Michigan Compiled Laws (the "**MCL**").

[7]   The First Amendment, dated July 1, 2016, reduced the Consignment Amount to $5.5 million; the Second Amendment, dated January 1, 2017, reduced the Consignment Amount to $4.4 million; the Third Amendment, dated July 1, 2017, reduced the Consignment Amount to $3.5 million; the Fourth Amendment, dated December 1, 2017, reduced the Consignment Amount to $2.5 million; and the Fifth Amendment, dated July 23, 2018, reduced the Consignment Amount to $2.2 million.

LEGAL\45391793\2

therein, which set forth the required level of the Consignment Amount. All other parts of

paragraph 3 of the Contract have remained intact at all times.

### E. Kmart Commences Chapter 11 Proceedings While In Possession of Goods Consigned by SOW

8.      On October 15, 2018 (the "**Petition Date**"), nearly all of the Debtors, including

Kmart, filed voluntary petitions under chapter 11 of Title 11 of the United States Code (the

"**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New

York (the "**Court**"). The remaining three Debtors filed voluntary petitions under chapter 11 of

the Bankruptcy Code in the Court on October 18, 2018, October 22, 2018, and January 7, 2019.

9.      According to Kmart's internal purchasing/accounting system (the "**Workbench

System**"), approximately $2,384,237.00 in Consigned Goods was in the Debtors' possession on

October 13, 2018 – two days prior to the Petition Date.[8]

### F. The Court Enters Orders Directing the Debtors to Pay Consignment Vendors for Consigned Goods Sold Post-Petition, and to Hold Proceeds Thereof in Segregated Account for the Benefit of Consignment Vendors

10.     On October 26, 2018, the Court entered the Interim Store Closing Order, and on

November 19, 2018, the Court entered the Final Store Closing Order. The Store Closing Orders

were the product of discussions between the Debtors and various consignment vendors and

resolved various objections filed by consignment vendors, including one filed by SOW [ECF

# 224].

11.     The Store Closing Orders each provide, *inter alia*, that consignment vendors, like

SOW, are to be paid in the ordinary course of business from the proceeds of post-petition sales of

consigned goods, regardless of whether the goods are sold pursuant to store closings or any other

---

[8] The precise amount of Consigned Goods in the Debtors' possession on the Petition Date is not presently known to SOW, though it is believed that the amount does not materially differ from the amount of Consigned Goods in the Debtors' possession on October 13, 2018.

LEGAL\45391793\2

sale.  Further, the Store Closing Orders directed the Debtors to establish a separate segregated

account in which proceeds of the sales of consigned goods were to be placed and held in trust for

the benefit of consignment vendors, such as SOW.  Specifically, paragraphs 36 and 37 of the Final

Store Closing Order[9] provide:

> 36.    The Debtors are authorized to sell goods and merchandise
> shipped to the Debtors pursuant to a consignment agreement with a
> consignment vendor, whether delivered to the Debtors prepetition
> or postpetition (the "**Consignment Merchandise**"), in connection
> with the Store Closings *or any other sale by the Debtors of
> Consigned Merchandise* and notwithstanding any other provision of
> the Order, consignment vendors shall be paid in the ordinary course
> of business from the allocable proceeds solely from the postpetition
> sale of such Consignment Merchandise in accordance with the terms
> of the applicable consignment agreements (the "**Vendor
> Proceeds**"), whether such goods were delivered to the Debtors
> prepetition or postpetition.  The Debtors are directed to establish a
> separate, segregated account which shall be funded with the reported
> amount of Vendor Proceeds and all payments made to consignment
> vendors shall be made from such account (the "**Reserve Account**"),
> with the Vendor Proceeds therein to be held in trust for the benefit
> of the Consignment Vendors.
>
> 37.    For the avoidance of doubt, notwithstanding anything to the
> contrary in the Interim DIP Order or the Final DIP Order, any
> properly perfected, noticed and valid consignment interest (as
> defined under the Uniform Commercial Code (the "**UCC**")) in and
> to the Consignment Merchandise or Consignment Merchandise
> shipped postpetition pursuant to this Order the Vendor Proceeds and
> the Reserve Account shall not be subject to any DIP Liens or
> Adequate Protection Liens (each as defined in the Interim DIP
> Order) granted under the Interim DIP Order or the Final DIP Order.

Final Store Closing Order ¶¶ 36 and 37.

---

[9]   Paragraphs 34 and 35 of the Interim Store Closing Order contain substantially the same language as paragraphs 36
and 37 of the Final Store Closing Order.

LEGAL\45391793\2

**G. The Debtors Sell All of the SOW Consigned Goods But Fail to Pay Any of the Proceeds to SOW**

12.      According to the Workbench System, as of February 9, 2019, the total value of Consigned Goods with the Debtors was approximately $1,049,303.00.  The Debtors, therefore, sold approximately $1,334,934.00 in Consigned Goods between October 13, 2018 and February 9, 2019.  Substantially all of those sales appear to have been post-petition sales of Consigned Goods to the Debtors' customers.  Pursuant to the terms of the Store Closing Orders, the Debtors were required to segregate the proceeds from those sales and to hold them in trust for the benefit of SOW.

13.      On February 8, 2019, the Court entered an *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* [ECF # 2507] pursuant to which the Debtors thereafter sold substantially all of their assets to Transform Holdco LLC ("**Transform Holdco**").  Upon information and belief, the sale of the Debtors' assets to Transform Holdco closed on February 11, 2019.

14.      It appears that all Consigned Goods then remaining in the Debtors' possession (the "**Remaining Consigned Goods**") were included in the assets that were sold by the Debtors to Transform Holdco.  According to the Workbench System, as of February 9, 2019 – two days prior to the closing on the sale of the Debtors' assets to Transform Holdco – the total amount of Consigned Goods in the Debtor's possession was $1,049,303.00.  Like the proceeds from post-petition sales of Consigned Goods to the Debtors' customers, the proceeds from the Debtors' sale of Remaining Consigned Goods to the Buyer were required to be segregated and placed in a

separate account to be held in trust for the benefit of SOW pursuant to the terms of the Store Closing Orders.

### H. **SOW Files a Motion to Compel Payment Which Is Thereafter Adjourned In Accordance With the Court's Plan Confirmation Order**

15.    On July 29, 2019, SOW filed a *Motion to Compel Payment of Proceeds of Post-Petition Sales of Consigned Goods to Scents of Worth, Inc.* [ECF # 4633] (the "**Motion to Compel Payment**").  The Motion to Compel Payment was originally scheduled to be heard on August 22, 2019, but was thereafter adjourned at the request of the Debtors and on consent of SOW.

16.    On October 15, 2019, the Court entered an order confirming the Debtors' second amended joint chapter 11 plan [ECF # 5370] (the "**Confirmation Order**").  Paragraph 51 of the Confirmation Order provided that any motion seeking payment of an administrative expense claim "shall be adjourned until a date as determined by the Debtors."  SOW's Motion to Compel Payment was treated as a motion to compel the payment of an administrative expense and was adjourned without having been adjudicated and without the Debtors having submitted a response thereto.

17.    Although this Motion is similar to SOW's original Motion to Compel Payment, this motion solely seeks to compel the Debtors' compliance with the Store Closing Orders, rather than seeking the payment of an administrative expense.  As such, SOW respectfully submits that the matter is ripe for adjudication and that the Motion is not impacted by paragraph 51 of the Confirmation Order.

### JURISDICTION

18.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

LEGAL\45391793\2

19.     This Court also has jurisdiction over all matters arising from or related to the implementation or interpretation of the Store Closing Orders.

## ARGUMENT

20.     The Court can and should compel the Debtors to comply with the Store Closing Orders.  Those orders each unambiguously direct the Debtors to pay post-petition Vendor Proceeds to consignment vendors in the ordinary course of business.  They further direct the Debtors to segregate such proceeds and to hold them in trust for the benefit of Consignment Vendors.  *See* Final Store Order ¶ 36.

21.     The Debtors have not paid SOW on account of any post-petition sales of consigned goods.  SOW is not aware of whether the Debtors have segregated the proceeds from the sales of SOW's consigned goods to be held in trust for SOW's benefit, as required by the Store Closing Orders.

### A. **SOW IS A BONA FIDE CONSIGNMENT VENDOR WHOSE CONSIGNMENT INTERESTS WERE PROPERLY PERFECTED PREPETITION**

22.     SOW is a bona fide consignment vendor entitled to the protections of such under the Store Closing Orders.

#### a. **SOW Provided Goods to the Debtors Under a Consignment Agreement**

23.     The term "consignment" is defined under MCL § 440.9102 as follows:

"Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and that meets all of the following:

(i) The merchant deals in goods of that kind under a name other than the name of the person making delivery, is not an auctioneer, and is not generally known by its creditors to be substantially engaged in selling the goods of others.

(ii) With respect to each delivery, the aggregate value of the goods is $1,000.00 or more at the time of delivery.

10

(iii) The goods are not consumer goods immediately before delivery.

(iv) The transaction does not create a security interest that secures an obligation.

MCL § 440.9102(t).

24.     The transactions between Kmart and SOW satisfy all of the requirements of MCL § 440.9102 and therefore constitute a "consignment".

25.     As set forth above, both the Prior Contract and the Contract provide for SOW to deliver goods, in the form of certain fragrances and perfume products, to Kmart.

26.     Kmart was indisputably a "merchant" that engaged in longstanding retail sales of fragrances and perfume products to the public.  A "merchant" under the UCC is defined as "a person that deals in goods of the kind or otherwise by the person's occupation holds itself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to which that knowledge or skill may be attributed by the person's employment of an agent or broker or other intermediary who by the person's occupation holds itself out as having that knowledge or skill."  MCL § 440.2104.  Kmart engaged in retail sales of, among other things, perfume and fragrance products and was, therefore, a merchant.  Moreover, the goods delivered under the Contract were delivered to Kmart for purposes of sale to the public.  *See, e.g.* Contract ¶ 7 (providing that Kmart was solely responsible for collecting sales taxes "from customers on retail sales of the Products").  Kmart sold fragrances and perfume products at retail locations under its own name (rather than in the name of SOW), is not an auctioneer, and is/was not generally known by its creditors to be substantially engaged in selling the goods of others.[10]

---

[10] An arrangement is not a "consignment" if the consignee's creditors generally knew it was substantially engaged in selling consigned goods in which case a consignee's creditors cannot obtain a lien or other interest in the consigned goods.  *See In re Valley Media, Inc.*, 279 B.R. 105, 123-24 (Bankr. D. Del. 2002).

11

27.     The consigned fragrances and perfume products were well in excess of the $1,000.00 requirement set forth in MCL § 440.9102(ii), with an initial consigned amount under the Contract of $8 million, which was thereafter replenished from time to time in amounts which exceeded $1,000.00.

28.     The inventory was sold by a wholesale vendor (SOW) to a retailer (Kmart) and was not, therefore, consumer goods prior to delivery.

29.     Lastly, the consignment transaction did not create a security interest that secured an obligation.

30.     The Consigned Goods were, therefore, provided pursuant to a valid consignment arrangement.[11]

### b. <u>SOW Properly Perfected Its Interests in the Consigned Goods Prepetition</u>

31.     SOW properly perfected its consignment interests in the Consigned Goods and its rights in the Consigned Goods are therefore superior to those of any other party.  As set forth above, SOW both timely and properly filed a UCC financing statement with the Michigan Secretary of State *and* provided written notice of its perfected consignment interest to Wells, Kmart's secured lender with a lien against its inventory at the time the Contract was entered into.

32.     Section 440.9319 of the MCL (UCC § 9-319) provides that "for purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while

---

[11] The Debtors have informally raised the question of whether the various prepetition amendments to the Contract altered the arrangement between the parties such that it would no longer constitute a consignment arrangement.  The Debtors have not explained the basis for that question, but it is clear that none of the various amendments affected the character of the Contract as a consignment agreement.  As set forth above, the only substantive change accomplished by each of the amendments to the Contract was to reduce the level of the consigned inventory that was required to be carried by Kmart (*i.e.* the Consignment Amount).  No other revision was made to paragraph 3 of the Contract (which provides for the goods to be supplied on a consignment basis).  Indeed, the following portions of paragraph 3 remained completely untouched:  "The Products will be supplied on a Consignment Basis . . . . This Agreement is intended to create a true consignment of the Products and not to evidence a purchase and sale of merchandise.  The Products delivered to Kmart will at all times remain the property of Supplier until sold to Kmart customers."

the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer." MCL § 440.9313(1). Accordingly, unless perfected by a consignor, consigned goods are subject to the claims of a consignee's creditors. *See In re Pettit Oil Company*, 575 B.R. 905, 910 (9th Cir. BAP, 2017) ("[A] debtor is deemed to hold rights and title to the [consigned] goods such that its creditors can attach the consigned goods as if the debtor actually had title and priority over a consignor who fails to perfect its PMSI in the goods."). As set forth above, SOW timely filed a UCC-1 financing statement with the Michigan Department of State (Document Number 2013179478-4) on December 20, 2013 (*see* Exhibit D to Katz Declaration).

33.    Section 544(a) of the Bankruptcy Code provides debtors with the status of a secured creditor. That section provides, in relevant part, as follows:

> (a)  The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by-
>
> > (1) A creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
> >
> > (2) A creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists…

11 U.S.C. § 544(a)(1) & (2).

34.     In addition to Kmart's status as a secured creditor under section 544 of the Bankruptcy Code, at least at the time that the parties entered into the Contract, Kmart had a lender, Wells, with a pre-existing lien on Kmart's inventory.

35.     Section 440.9322(1)(a) of the MCL (UCC § 9-322(a)(1)) provides that as between competing security interests, the party that files or perfects its security interests first has priority. MCL § 440.9322(1)(a).   As between SOW and Kmart, SOW's UCC-1 filing occurred on December 20, 2013, well before the time Kmart's chapter 11 case was commenced.   SOW's perfected security interest in the Consigned Goods, therefore, is entitled to priority and may not be avoided by Kmart.   *See In re TSAWD Holdings Inc.*, 601 B.R. 599, 608 (Bankr. D. Del. 2019) ("Under section 9-322(a), conflicting perfected security interests rank according to priority in time of UCC-1 filings").

36.     Additionally, SOW's consignment interests enjoyed priority as purchase-money security interests because SOW provided the required notification of its perfected consignment interests to Wells, Kmart's pre-existing secured lender with a lien on Kmart's inventory.   *See In re TSAWD Holdings, Inc.*, 601 B.R. at 608 (noting that a consignor who complies with section 9-324(b) of the UCC by providing notice to a pre-existing lender with a security interest in inventory has first priority status as the holder of a purchase-money security interest in the consigned goods).

37.     MCL § 440.9103(4) (UCC § 9-103(d)) provides that "[t]he security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory."   MCL § 440.9103(4).   Section 440.9324(2) of the MCL (UCC § 9-324(b)) provides that a perfected purchase-money security interest has priority over conflicting security interests in the same inventory.   That section, in relevant part, provides as follows:

a perfected purchase-money security interest in inventory has priority over a conflicting securing interest in the same inventory … if all of the following are met:

(a) The purchase-money security interest is perfected when the debtor receives possession of the inventory.

(b) The purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest.

(c) The holder of the conflicting security interest receives the notification within 5 years before the debtor receives possession of the inventory.

(d) The notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

MCL § 440.9324(2).

38.     All of the foregoing criteria have been met.  SOW's security interest, having been continuously perfected since the Prior Contract, was perfected when Kmart received the inventory. As set forth above, SOW timely sent an authenticated notification of its perfected consignment interest to Wells (*see* Katz Declaration, Exhibit E).  Wells received the notification within 5 years before the debtor received possession of the inventory, and the notification (and accompanying copy of the UCC-1 filing) stated that SOW had or expected to acquire a purchase-money security interest in the inventory of Kmart and described the inventory.  Thus, to the extent that Wells, or any successor-in-interest to Wells, maintains a competing secured interest in the Consigned Goods, SOW's has priority.  SOW's consignment interest in the Consigned Goods is thus fully-perfected and superior in priority to all competing security interests.[12]  SOW is therefore entitled to the protections given to consignment vendors pursuant to the Store Closing Orders.

---

[12]  Such priority was not affected by the post-petition lapse of SOW's financing statement.  It has been long established in the Second Circuit and elsewhere that valid liens existing as of the petition date do not lose validity post-petition. *See, Lockhart v. Garden City Bank & Trust Co.*, 116 F.2d 658, 661 (2d Cir. 1940) ("[I]n general no creditors' liens

### B. **AS A CONSIGNMENT VENDOR, SOW IS ENTITLED TO THE PROTECTIONS OF THE STORE CLOSING ORDERS**

39.    SOW is entitled to the protections and benefits of the Store Closing Orders granted to consignment vendors.  Indeed, it was in part because of SOW's objection to the Debtors' store closing motion that the protections to consignment vendors in paragraphs 36 and 37 of the Final Store Closing Order (and paragraphs 34 and 35 of the Interim Store Closing Order) were added.  The Store Closing Orders provide the following protections to consignment vendors:

> 36.    The Debtors are authorized to sell goods and merchandise shipped to the Debtors pursuant to a consignment agreement with a consignment vendor, whether delivered to the Debtors prepetition or postpetition (the "**Consignment Merchandise**"), in connection with the Store Closings or any other sale by the Debtors of Consigned Merchandise and notwithstanding any other provision of the Order, consignment vendors shall be paid in the ordinary course of business from the allocable proceeds solely from the postpetition sale of such Consignment Merchandise in accordance with the terms of the applicable consignment agreements (the "**Vendor Proceeds**"), whether such goods were delivered to the Debtors prepetition or postpetition.  The Debtors are directed to establish a separate, segregated account which shall be funded with the reported amount of Vendor Proceeds and all payments made to consignment vendors shall be made from such account (the "**Reserve Account**"), with the Vendor Proceeds therein to be held in trust for the benefit of the Consignment Vendors.

> 37.    For the avoidance of doubt, notwithstanding anything to the contrary in the Interim DIP Order or the Final DIP Order, any properly perfected, noticed and valid consignment interest (as

---

acquire validity after the filing of the petition . . . .  It should equally follow, we believe, that liens good at this time do not lose their validity as against the trustee, unless the statute so expressly provides[.]"); *In re Halmar Distributors, Inc.*, 968 F.2d 121, 126-27 (1st Cir. 1992) (applying freeze rule and noting that in bankruptcy proceedings, "the trustee and existing creditors gain knowledge of the perfected security interest on the date the bankruptcy petition is filed . . . Consequently, filing a continuation statement served no purpose . . . ."); *Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 144 (2d Cir. 1988) ("The rationale for eliminating the requirement for filing continuation statements during insolvency proceedings is that such a filing is not needed to protect potential creditors when the funds have been placed openly in the possession and control of the court."); *In re Chaseley's Foods, Inc.*, 726 F.2d 303, 308 (7th Cir. 1983) (". . . a refiling of a security interest after the filing of a bankruptcy petition would serve no useful purpose since the rights of prepetition creditors and the trustee in bankruptcy were fixed at the time of the filing of the petition. . . . A bankruptcy proceeding eliminated the need for further refiling; both before and after the amendment of § 9-403(2)"); *In re Essex Construction , LLC*, 591 B.R. 630, 635 (Bankr. D. Md. 2018) ("This principle, which many courts refer to as the "freeze rule," dictates that security interests are determined as of the petition date").

16

defined under the Uniform Commercial Code (the "**UCC**")) in and to the Consignment Merchandise or Consignment Merchandise shipped postpetition pursuant to this Order the Vendor Proceeds and the Reserve Account shall not be subject to any DIP Liens or Adequate Protection Liens (each as defined in the Interim DIP Order) granted under the Interim DIP Order or the Final DIP Order.

Final Store Closing Order ¶¶ 36 and 37.

### a. **SOW is a "Consignment Vendor" as Defined Under the Store Closing Orders**

40.     The term "Consignment Vendors" is not defined in the Store Closing Orders.  From the context thereof, however, it is clear that such term refers to vendors that deliver to the Debtors "Consignment Merchandise."

41.     SOW delivered Consignment Merchandise to the Debtors.  The Store Closing Orders define "Consignment Merchandise" as "goods and merchandise shipped to the Debtors pursuant to a consignment agreement with a consignment vendor, whether delivered to the Debtors prepetition or postpetition."  *See* Final Store Closing Order ⁋ 36.  As set forth above, the Contract was a valid consignment agreement and the Consigned Goods were shipped pursuant to the Contract.  SOW is, therefore, a "Consignment Vendor" under the Store Closing Orders.

### b. **The Consignment Proceeds Constitute "Vendor Proceeds" as Defined Under the Store Closing Orders**

42.     The Consignment Proceeds owed to SOW constitute "Vendor Proceeds" as that term is defined by the terms of the Store Closing Orders.  The term "Vendor Proceeds" is defined as "allocable proceeds solely from the postpetition sale of such Consignment Merchandise in accordance with the terms of the applicable consignment agreements".  *See* Final Store Closing Order ⁋ 36.

43.     All of the Consignment Proceeds resulted from post-petition sales by the Debtors of SOW's Consigned Goods.  Moreover, as set forth above, the Consigned Goods qualify as

17

"Consignment Merchandise" under the Store Closing Orders.  Lastly, the sale of Consigned Goods by the Debtors is pursuant to the terms of the Contract.  The Consignment Proceeds sought by SOW, therefore, constitute "Vendor Proceeds" which must be held in trust for the benefit of SOW pursuant to the terms of the Store Closing Orders.

c.  **The Debtors Were Required to Establish a Segregated Reserve Account and Place the Consignment Proceeds Therein**

44.    The Store Closing Orders further required the Debtors to open up a "Reserve Account," defined as a "separate, segregated account which shall be funded with the reported amount[13] of Vendor Proceeds."  *See* Final Store Closing Order ⁋ 36.  Presumably, the Debtors have complied with their obligations and have segregated the Consignment Proceeds and placed them into the Reserve Account, although SOW has no knowledge as to whether that actually occurred.

d.  **The Consigned Proceeds Are Not Property of the Estate**

45.    The Consigned Proceeds are not property of the Debtors' estates because such proceeds were ordered by this Court to be held in trust for the benefit of SOW. *See e.g. Bergier v. I.R.S.*, 496 U.S. 53, 59, 110 S.Ct. 2258, 110 L.E.D.2d 46 (1990) (acknowledging that a debtor "does not own an equitable interest in property he holds in trust for another, [so] that interest is not 'property of the estate'"); *Grede v. FCStone, LLC*, 867 F.3d 767, 779 (7th Cir. 2017) ("Under the Bankruptcy Code, property held in trust by the debtor for a third party is not property of the debtor's bankruptcy estate."); *In re Peregrine Financial Group, Inc.*, 487 B.R. 498, 512-13 (Bankr.

---

[13] Paragraph 36 of the Store Closing Order does not contain any other reference to "reported" Vendor Proceeds. Paragraph 40 thereof, however, provides that "[t]he Debtors and the DIP lenders shall agree on appropriate reporting on the inventory from consignment vendors who have been identified to the DIP Lenders (the "**Designated Consignment Vendors**"). SOW, having filed a limited objection [ECF # 224] to the Debtors' motion seeking entry of the Store Closing Orders, would have necessarily been known to the DIP Lenders and would thus be one of the "Designated Consignment Vendors". Counsel to various objecting consignment vendors, together with Debtors' counsel and counsel to the DIP Lenders, negotiated and crafted the language in the Store Closing Orders regarding consignments.

LEGAL\45391793\2

N.D. Ill. 2013) (noting that Section 541(d) of the Bankruptcy Code "describes the classic express trust situation in which a trustee holds bare legal title to property for the benefit of another who holds equitable title to the trust property"); *In re Ward*, 300 B.R. 692, 698 (Bankr. S.D. Ohio 2003) ("An express trust, from its inception, excludes a beneficiary's ownership interest from being a part of the property which constitutes a debtor's estate in a bankruptcy case").

46.     Because the Debtors were required to hold the Consignment Proceeds in trust for the benefit of SOW, the Debtors have no interest in such funds.

### C. <u>THE COURT CAN AND SHOULD COMPEL THE DEBTORS TO COMPLY WITH THE STORE CLOSING ORDERS</u>

47.     Compelling compliance by the Debtors with the Store Closing Orders is warranted and appropriate.  Bankruptcy Code section 105(a) authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate."

48.     The Court unquestionably has the power to enforce its own orders and, if necessary, to impose civil contempt sanctions to ensure such compliance.  *See, e.g., In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 97 (2d Cir. 2005) ("Bankruptcy Courts retain jurisdiction to enforce and interpret their own orders."); *In re Velo Holdings Inc.*, 500 B.R. 693, 700 (Bankr. S.D.N.Y. 2013) ("A bankruptcy court may hold a party in contempt and award sanctions after that party has willfully violated a court order"); *In re Texaco Inc.*, 182 B.R. 937, 944 (Bankr. S.D.N.Y. 1995) ("In short, the express language of the Bankruptcy Code, the decided cases (other than the Ninth Circuit decision in *Sequoia Auto Brokers*), the express provisions of the Texaco Plan and sound considerations of public policy compel the conclusion that a bankruptcy court has subject matter jurisdiction to enforce and interpret its own orders."); *In re McLean Indus., Inc.*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("All courts, whether created pursuant to Article I or Article III, have inherent contempt power to enforce compliance with their lawful orders.").

19

49.     A party seeking civil contempt based on a court order need only establish that: (i) the order is clear and unambiguous; (ii) proof of noncompliance is clear and convincing; and (iii) the party has not been reasonably diligent in attempting to accomplish what was ordered.  *See, e.g. New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989); *cert. denied*, 495 U.S. 947 (1990); *In re Stockbridge Funding Corp.*, 158 B.R. 914, 917 (S.D.N.Y. 1993).  This Court need not find that the Debtors acted with a specific intent in contempt of the Store Closing Orders.  *See*, *In re Patterson*, 111 B.R. 395, 397 (Bankr. N.D.N.Y. 1989); *In re Stockbridge Funding Corp.*, 145 B.R. at 805 ("willfulness is not required"); *Gen. Motors Corp. v. Gibson Chem. & Oil Corp*., 627 F. Supp. 678, 681-82 (E.D.N.Y. 1986) (holding that knowledge of a party in contempt is knowledge of the existence of the order, not knowledge of the particulars of the order).

50.     There should be no question that the Store Closing Orders are clear and unambiguous.  Indeed, they were submitted *by the Debtors* as proposed orders to the Court (with the input of various consignment vendors, including SOW).  Moreover, it is indisputable that SOW has not been paid anything in connection with the Debtors' post-petition sales of its consigned inventory.  Thus, proof of non-compliance with the terms of the Store Closing Orders is clear and convincing.  Lastly, SOW has alerted the Debtors on numerous times that it was in violation of the Store Closing Orders and that it had not been paid on account of post-petition sales of consigned inventory.  Indeed, SOW filed the Motion to Compel Payment in July of 2019.  The Debtors, therefore, have not been reasonably diligent in attempting to accomplish what was ordered by way of the Store Closing Orders.  All requirements for sanctions therefore are therefore present.

LEGAL\45391793\2

51.    Although the civil contempt factors are present, SOW merely seeks the *enforcement* of the Store Closing Orders by this Motion.[14]

## **CONCLUSION**

52.    For all of the foregoing reasons, SOW respectfully requests that the Court order the Debtors to comply with the Store Closing Orders; that it direct the Debtors to account for all Consigned Goods in their possession as of the Petition Date that were sold post-petition; and that it further direct the Debtors to remit the full amount of the Consignment Proceeds to SOW.  SOW further requests such other and further relief as the Court deems just and proper.

Dated: New York, New York
           November 12, 2020

                                        COZEN O'CONNOR
                                        *Attorneys for Scents of Worth, Inc.*

                                        By: */s/ Frederick E. Schmidt, Jr.*
                                        Frederick E. Schmidt, Jr.
                                        277 Park Avenue
                                        New York, NY 10172
                                        Phone: 212-883-4948
                                        Facsimile: 646-588-1552
                                        Email:  eschmidt@cozen.com

---

[14] If enforcement of the Store Closing Orders is, for whatever reason, insufficient to result in full payment to SOW, SOW reserves the right to seek a finding of civil contempt and for sanctions.

LEGAL\45391793\2