# EXHIBIT "A"

## MERCHANDISE SUPPLY AGREEMENT

**THIS MERCHANDISE SUPPLY AGREEMENT** (the "Agreement") is made and entered into as of the 31st day of August, 2000 by and between **Model Imperial, Inc.,** a Florida Corporation with its principal offices at 1061 S.W. 30th Avenue, Deerfield Beach, FL 33442 ("Vendor") and **KMART CORPORATION,** a Michigan Corporation with its principal offices at 3100 West Big Beaver Road, Troy, Michigan 48084 including its subsidiaries and affiliates ("Kmart").

1.    **Product Supply**.

(a) Subject to the terms and conditions of this Agreement, Kmart hereby agrees that Vendor will be the sole supplier to Kmart of the designer brand name fragrances and perfume products identified on the merchandise list attached to this Agreement as Exhibit A and incorporated herein by reference (the "Merchandise"). The Merchandise listed on Exhibit A can only be changed by mutual agreement of the parties, which agreement shall not be unreasonably withheld by either party.  Vendor will supply the Merchandise for all Kmart stores (Big Kmart and Super Kmart stores) operated by Kmart during the term of this Agreement that currently sell designer brand name fragrances and perfume products, except for those stores identified by Kmart to Vendor that currently contain a designer fragrance licensed department. All Kmart stores that currently contain a designer fragrance licensed department or do not currently sell the Merchandise are excluded from this Agreement.  Contained in Exhibit B, attached hereto and incorporated herein by reference is a list of Kmart stores to which this Agreement is applicable and Kmart will update the store list from time to time to reflect new store openings and store closings.  During the term of this Agreement, Kmart will not purchase the Merchandise supplied by Vendor as identified on Exhibit A from any other party or permit any other vendor to sell the Merchandise in the Kmart stores covered by this Agreement. Notwithstanding the foregoing or anything in this Agreement to the contrary, Kmart may obtain fragrances and perfumes not listed on Exhibit A from any other supplier and offer such products for sale in the Kmart stores without restriction.

(b) Vendor will supply the Merchandise to Kmart on a consignment basis. Vendor will ship an initial quantity of the Merchandise to the Kmart stores to fully stock the stores with Merchandise (the "Consigned Inventory").  Vendor will invoice Kmart for the total purchase price of the Consigned Inventory based on the prices set forth below.  Kmart will place a hold on the Vendor's account in an amount equaling the total purchase price to Kmart of the Consigned Inventory (the "Consignment Amount"). Vendor will also supply an initial quantity of Merchandise to each new store opened by Kmart during the term of this Agreement and the value of such Merchandise will be added to the Consignment Amount and will be part of the Consigned Inventory.  The Consignment Amount will not be due and payable by Kmart to Vendor during the term of this Agreement.  Title to the Consigned Inventory shall remain with Vendor as owner until the Consigned Inventory is replenished with more recently delivered Merchandise up to the Consignment Amount.  Kmart acknowledges that Vendor always retains title to and in any event grants Vendor a security interest in Merchandise located in the stores equal to the Consignment Amount.

(c)  Kmart agrees that Vendor will have the right to file UCC-1 consignment notices/financing statements and otherwise  record a security interest in the Consigned Inventory up to the Consignment Amount.  Kmart agrees to reasonably cooperate with Vendor in securing its security interest in the Consigned Inventory by executing the appropriate consignment

notices/financing statements.  The filing of any consignment notices/financing statements will be at Vendor's sole cost and Vendor will promptly file appropriate termination statements at the expiration or termination of this Agreement, upon the return of the Consigned Inventory supplied by the Vendor to the Vendor or the purchase of and payment for the Consigned Inventory by Kmart as provided for in this Agreement.

(d)  Vendor shall determine the initial stock level, quantity and mix of Merchandise to be supplied in each store. Vendor will also be responsible for changing the Merchandise mix to remove slow selling, out of date or discontinued Merchandise.  All Merchandise supplied to Kmart from Vendor pursuant to this Agreement is supplied subject to the purchase order terms and conditions contained in Exhibit C, attached hereto and incorporated herein by this reference (the "Purchase Order").

2.    **Term.**   Subject to early termination as provided below, the term of this Agreement will be effective as of the date first written above and continue for a term of three (3) years from October 1, 2000 (the "Term").  Vendor will supply the Consigned Inventory to the Kmart stores beginning on September 11, 2000 and all stores will receive Consigned Inventory by September 30, 2000.

3.    **Price, Payment, and Other Terms.**

(a)  Vendor will determine the retail price of the Merchandise to the customer. Vendor will promptly notify Kmart of any change in the retail price of the Merchandise to allow Kmart sufficient time to enter the new price into its system and the appropriate adjustment will be made by Vendor in the cost of the Merchandise to Kmart.   Each individual bottle of Merchandise supplied by Vendor will be shrink wrapped, source tagged with a security tag, labeled with the manufacturer's list price ("comp store price"), Kmart sale price to customers and UPC code.  Vendor will ship the Merchandise FOB destination to the particular store being supplied, freight prepaid.  Vendor will be responsible for loss or damage to the Merchandise in transit until the received at the designated store.

(b) The net purchase price to Kmart of the Merchandise from Vendor will be maintained at twenty-five percent (25%) below the customer retail sales price,  excluding applicable taxes and after giving effect to other discounts as provided in subsection 3 (c) below.  It is the intention of the parties that Kmart will realize a gross margin on each sale of Merchandise equal to twenty-five percent (25%) of the selling price of the Merchandise regardless of the retail price set by Vendor.

(c) Vendor will be responsible for managing the inventory level of the Merchandise in the stores.  Vendor will provide recommended orders for the stores to Kmart via electronic data interchange for Kmart's review and approval.   Kmart will issue orders to Vendor for replenishment Merchandise based on the information provided by Vendor.  Kmart will provide point of sale (POS) data to Vendor on an ongoing basis during the Term of this Agreement. The parties agree to use reasonable efforts to maintain at least a four-week supply of the Merchandise in each store based on historical and projected sales.  Kmart will remit payment to Vendor for all replenishment orders delivered to the stores above the Consignment Amount on a net ten (10) day basis after receipt of a correct invoice from Vendor following the delivery of the replenished Merchandise to the designated stores.  The invoice from Vendor will be for eighty percent (80%) of the retail selling price of the Merchandise replenished and Vendor will rebate to Kmart each calendar quarter beginning with the calendar quarter October 1, 2000 to

2

December 31, 2000 an additional 5% of the selling price of Merchandise replenished and paid for by Kmart each calendar quarter.  In the event Vendor subsequently lowers the retail price of the Merchandise, Vendor will issue an appropriate credit to Kmart to maintain Kmart's agreed upon margin.

(d)    Kmart is solely responsible for the collection from customers and the payment to the applicable government authorities of any and all sales taxes due on the sale of the Merchandise to the general public. Vendor is solely responsible for the payment of any and all personal property and similar taxes on the Consigned Inventory.  At the request of Kmart, Vendor will furnish to Kmart evidence of payment of such taxes.

(e)    Notwithstanding anything in this Agreement to the contrary, provided Kmart is in compliance with the terms of this Agreement, Vendor hereby guarantees that Kmart will receive a minimum margin revenue during each year of this Agreement from the sale of the Merchandise in an amount detailed and adjusted if appropriate as provided in Exhibit D attached hereto and incorporated herein by reference.  In any year during the term of this Agreement that Kmart's total margin revenue from the sale of the Merchandise is below the minimum margin revenue guarantee amount, Vendor will pay to Kmart the difference between the amount actually received by Kmart for the sale of the Merchandise and the minimum margin revenue guarantee within thirty (30) days after the end of each Agreement year.

4.    **Purchase of Existing Inventory.**  Vendor will purchase Kmart's existing inventory of designer fragrances and perfumes at Kmart's documented costs prior to the effective date of the consignment arrangement.  Vendor will be permitted to sell Kmart's existing inventory in the stores until September 30, 2000 and the proceeds of all such sales will be retained by Kmart to be applied against the purchase price of the inventory by Vendor.  In the event such existing inventory is not sold by September 30, 2000 the remaining inventory will be removed from the stores by Kmart and shipped to GENCO Distribution System for return to Vendor. Vendor will pay to Kmart an amount equal to the cost of the returned inventory in four equal monthly installments on January 15, 2001, February 28, 2001, March 28, 2001 and May 2, 2001.   Vendor is responsible of the cost of the return freight of the remaining inventory from GENCO to Vendor.  GENCO will bill Vendor for the cost of the return freight charges.

5.    **Termination.**

(a)    Termination With Cause.  This Agreement may be terminated by either party with thirty (30) days prior written notice to the other in the event of 1) a material breach hereof by the other party, 2) a material failure of any covenant, representation, or warranty of the other party set forth herein, 3) a material failure of the other party to be in compliance with all applicable federal, state, and local laws and regulations relating to the performance of this Agreement, 4) the insolvency of, or the institution of proceedings by or against, the other party under any federal or state bankruptcy or insolvency law, 5) an assignment by the other party for the benefit of all or substantially all of its creditors or the appointment of a receiver for all or a substantial part of the party's assets, or 6) a cessation of operations by the other party; provided, however, termination is subject to the right of the breaching party to cure within thirty (30) days of receiving prior written notice and provide evidence thereof to the non-breaching party prior to the otherwise effective date of termination.

(b)    Termination Without Cause.   Kmart may terminate this Agreement during the Term with sixty (60) days prior written notice to Vendor at any time and for any reason. If Kmart terminates this Agreement in accordance with this subsection (b), Kmart will purchase the

3

Consigned Inventory from Vendor for the Consignment Amount within thirty days after the effective date of termination.  In addition, if Kmart terminates this Agreement pursuant to this subsection during the first year of this Agreement commencing October 1, 2000, Kmart will also reimburse Vendor for the amount Vendor actually paid to Kmart pursuant to Section 4 for the amount of the Kmart inventory returned to Vendor.

(c)     Expiration.   This Agreement, if not earlier terminated in accordance with subsection (a) or (b) above, automatically terminates upon expiration of the Term.  Upon expiration of the Agreement, Kmart will, at its sole election, either: (i) return the Consigned Inventory to Vendor for a full credit at 75% of the retail selling price of the Merchandise returned in saleable condition against the Consignment Amount for the value of the inventory actually returned, or (ii) purchase the Consigned Inventory from Vendor for the Consignment Amount.  If Kmart elects to return the Consigned Inventory to Vendor, Kmart will be required to pay for  any Consigned Inventory that is not returned up to the Consignment Amount.

(d)   Store Closings.  The Agreement will automatically terminate with respect to any Kmart store that is permanently closed to the public by Kmart and in such event Kmart will purchase from Vendor the Consigned Inventory located at the closed store and adjust the minimum margin revenue guarantee amount in accordance with Exhibit D, if appropriate.

(e)     Survival of Certain Terms.   Upon termination, there is nothing due from Kmart to Vendor beyond any monies due as provided for in this Agreement or amounts which may become due as a result of termination, and both parties are relieved of any further obligations contained in this Agreement except for those that by their nature survive or may require performance after termination (e.g., indemnity).

6.     **Services.**

(a)  The Vendor's Merchandise will be displayed in the space currently used to display Kmart's existing fragrance and perfume inventory in each store. The display space for the Merchandise in any new stores will be based on Kmart's standard store layout for the type of new store opened.  Kmart will not reduce the size of the space allocated to display Vendor's Merchandise during the Term without the Vendor's consent.  Provided, however, Kmart reserves the right to relocate the display space for the Merchandise in any store to a different location in the store at any time. Any new fixtures and / or signage required for the stores will be mutually agreed upon by the parties and will be paid for by Vendor. Any new fixtures supplied by Vendor will be supplied pursuant to a separate fixture agreement.

(b) Kmart will be responsible for stocking the Merchandise in the display space and for maintaining the displays.  Kmart will also be solely responsible for any shortage or shrinkage of the Merchandise.

(c) Kmart will provide to Vendor minimum advertising space in Kmart's weekly roto of four (4) ten (10) inch cuts per year during the Term.  At least two (2) of the advertisements will be made available in Kmart's fourth quarter 2000, and at least one of the advertisements will be made available during the Christmas season each ensuing year during the Term.  Vendor will pay to Kmart the amount of $90,000 for each ten (10) inch cut roto advertisement.

(d)  At least once per year during the Term, the parties will perform a reconciliation of the Consigned Inventory to confirm the amount of Consigned Inventory in the stores.  The

4

reconciliation will be performed at the same time that Kmart performs its annual financial inventory by the same service that Kmart retains to perform the inventory. Any Consigned Inventory that is not on hand or otherwise not accounted for, shall be treated for purposes hereof as Merchandise sold by Kmart and Kmart shall pay to Vendor the Consignment Amount for the unaccounted for Consigned Inventory. The cost of the reconciliation for Vendor' Merchandise will be the responsibility of Vendor.  Vendor may elect to do a second inventory reconciliation each Agreement year.  The second reconciliation will be  performed by an inventory service provider acceptable to both parties and at Vendor's sole expense.

(e) Vendor and Kmart agree to maintain true and correct books and records in accordance with generally accepted accounting principals to enable the parties to perform a reconciliation of the Consigned Inventory.

7.   **Vendor Information Manual Compliance.**   Vendor represents and warrants that it has received and reviewed all documents contained in Kmart's Vendor Information Manual (and any successor thereto) including, without limitation, the Purchase Order (collectively, the "Related Documents") and currently is in full compliance with same.  Vendor's execution of this Agreement constitutes Vendor's acceptance of and agreement to the terms and conditions contained in all of the Related Documents.  In the event of any conflict between the terms of this Agreement and terms contained in any of the Related Documents (including the Kmart Merchant Workbench Agreement signed by Vendor), the terms of this Agreement shall govern and control.

8.   **Limitation of Liability.**   Except with respect to the obligations of confidentiality and indemnity under the Purchase Order, in no event is either party or its officers, agents, or employees liable to the other for indirect, special, punitive, exemplary, incidental, or consequential damages arising out of or related to the performance, omission of performance, or termination of this Agreement, even if advised of the possibility of such damages and without regard to the nature of the claim or the underlying theory or cause of action (whether in contract, tort, or otherwise).

9.   **Independent Contractors.**   Vendor and Kmart are independent contractors in the performance of this Agreement, and nothing contained in this Agreement may be construed to create or constitute a joint venture, partnership, agency, franchise, lease, license or any other arrangement other than as expressly granted in this Agreement.  Vendor and Kmart are responsible for their own operations.  Vendor and Kmart shall each exercise control over their employees, agents, representatives, subcontractors and suppliers and are each solely responsible for the verification of identity and employment eligibility, for the payment of any wages, salaries, or other remuneration of its employees, agents, representatives, subcontractors and suppliers, and for the payment of any payroll taxes, contributions for unemployment or workers compensation, social security, pensions or annuities that are imposed as a result of the employment of its employees, agents, representatives, subcontractors, and suppliers.  Vendor must not pledge credit, incur any obligation or liability, hire any employee, nor purchase any Merchandise or services in the name of Kmart or any subsidiary or affiliate thereof.

10.   **No Assignment.**   The provisions of this Agreement are binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns; provided, however, neither the rights and/or duties under this Agreement are to be assigned by either party, without prior written consent of the other party, given or not at the other party's sole

5

option, provided, either party may assign this Agreement to a subsidiary or affiliate upon notice to the other party.  Any prohibited assignment is void.

11.    **Costs, Charges, and Expenses.**    All costs, charges, and expenses incurred in connection with Vendor's performance of this Agreement must be borne by Vendor.

12.    **Vendor Representations.**    Vendor represents, covenants, and warrants that (a) it is duly organized, validly existing, operating in good standing in each jurisdiction where necessary to perform this Agreement, and has the full legal right, power and authority to execute, deliver, and perform this Agreement; (b) no litigation or governmental, regulatory, or administrative agency investigation or proceeding is pending or threatened against Vendor which might adversely affect Vendor's ability to perform this Agreement; (c) it will comply with all federal, state, and local laws, rules, and regulations applicable to this Agreement or the performance thereof, (d) the signing and delivery of this Agreement by the party signing for Vendor and the performance of this and any agreement relating to this Agreement have been duly authorized by all necessary action of its board of directors and do not conflict with (i) any law, order, writ, injunction, decree, rule, or regulation of any court, administrative agency, or any other governmental authority, (ii) any agreement to which Vendor is a party or by which Vendor is otherwise bound, or (iii) any provision of Vendor's certificate of incorporation or any by-laws, and does not result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest, or other encumbrance upon the Merchandise; and no approval, consent, or withholding of objection is required from any governmental authority or any other party with respect to Vendor's entering into or performing this Agreement; (e) at the time of the sale of the Merchandise to the customer by Kmart there are no liens or other encumbrances on the Merchandise; and (f) this Agreement has been authorized, executed, and delivered by Vendor and constitutes a legal, valid, and binding obligation of Vendor, enforceable in accordance with its terms, unless enforcement may be limited by bankruptcy, reorganization, insolvency, or other laws affecting creditors' rights generally.

13.    **Authority to Sign.**    Each person signing below warrants and represents that he/she has full power and authority to execute this Agreement on behalf of the party he/she represents.  Each party represents and warrants that it is free to enter into this Agreement without violating the rights of any person or entity.  Upon request, each party must provide a Certified Resolution or Certificate of Authority authorizing the undersigned to enter into and sign this Agreement.

14.    **Applicable Law.** THIS AGREEMENT, AND ALL OTHER ASPECTS OF THE BUSINESS RELATIONSHIP BETWEEN THE PARTIES, IS CONSTRUED, INTERPRETED AND ENFORCED UNDER AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN WITHOUT REGARD TO CHOICE OF LAW PROVISIONS. VENDOR AGREES, WITH RESPECT TO ANY LITIGATION ARISING DIRECTLY OR INDIRECTLY OUT OF, OR THAT IN ANY WAY RELATES TO, THIS AGREEMENT, THE BUSINESS RELATIONSHIP OR ANY OTHER TRANSACTION, MATTER OR ISSUE BETWEEN THE PARTIES, TO COMMENCE IT (I) EXCLUSIVELY IN THE STATE OF MICHIGAN COURTS OF OAKLAND COUNTY, MICHIGAN OR THE UNITED STATES DISTRICT COURT AT DETROIT, MICHIGAN, AND VENDOR BY THIS AGREEMENT CONSENTS TO THE JURISDICTION OF THESE COURTS AND (II) WITHIN 18 MONTHS FROM THE DATE OF KMART'S LAST ORDER FOR THE PURCHASE OF MERCHANDISE HEREUNDER OR THE PERIOD

PRESCRIBED BY THE APPLICABLE STATUTE OF LIMITATIONS, WHICHEVER IS SOONER.

15.   **No Implied Covenants / Reliance.**  Vendor and Kmart each expressly represent and warrant to the other that each has relied solely and exclusively on its own judgment and the advice of its own attorneys in entering into this Agreement, and that no representative or agent of the other has made any statement or representation to it beyond those in this Agreement that have induced signing of this Agreement.   There exist no implied or otherwise unstated covenants, rights, or obligations by, of, or against either party.  The parties expressly disclaim the existence of any implied covenant of good faith and/or fair dealing.

16.   **General**

(a)    **Section Headings.**  The section and paragraph headings, titles and captions in this Agreement are used solely for the convenience of the parties and are not relevant in any construction of this Agreement nor be interpreted to define, expand, or limit the provisions of this Agreement.

(b)    **Severability.**  If any provision of this Agreement is held to be void or unenforceable by any judicial or administrative authority, or is unlawful or unenforceable under any applicable law, the remaining provisions are severable and their enforceability is not to be affected or impaired in any way by reason of such law or holding; provided, however, that in the event such law or holding materially and substantially affects the actual performance hereof or a basic consideration given hereunder, either party will have the right to renegotiate the affected provision(s) upon thirty (30) days notice to the other party in order to achieve the original intent of the parties.

(c)    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which is an original and all of which taken together will constitute one single agreement between the parties hereto.

(d)    **Waivers.**  No waiver of any breach or default is a waiver of any subsequent breach or default.

(e)    **Notices.**   All notices under this Agreement must be in writing and must be given by either party by prepaid mail or by cable, telefax, telegram, telex or hand delivery to the other party as follows:

If to Kmart:                                If to Vendor:
Kmart Corporation                 Model Imperial, Inc.
3100 West Big Beaver Road     1061 S. W. 30th Avenue
Troy, Michigan  48084           Deerfield Beach, FL 33442
Attn: Vice President, Drugstore   Attn: Mr. Michael W. Katz
     Business

With a copy to:

                                      Dennis M. Apfel, Esq.
Attn: General Counsel         2070 Deer Park Avenue
  (at the above address)        Deer Park, NY 11792

7

Either party may change its address and/or addressee for notices at any time with fifteen (15) days prior notice to the other party in accordance with the foregoing.

17.    **Incorporation and Integration.**  This Agreement, together with Exhibits A, B, C and D, is the final and complete agreement between Kmart and Vendor with respect to the subject matter hereof.  No representations, inducements, promises, or understandings in relation to the subject matter hereof, whether oral or written, exist unless expressly set forth in this Agreement, and this Agreement supersedes all prior understandings, agreements, contracts, or arrangements between the parties, whether oral or written, unless otherwise expressly incorporated in this Agreement.  No agreement or other understanding purporting to add to or to modify the terms and conditions hereof is binding unless agreed to by the parties in writing.  Any terms or conditions in any forms of the parties used in the performance of this Agreement that are in conflict with the terms and conditions hereof are void.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year set forth below.

**MODEL IMPERIAL, INC.**          **KMART CORPORATION**
(Vendor)

_Michael W. Katz_               _[signature]_
Signature                       Signature

MICHAEL W. KATZ                 A. Gianciani III.
Name                            Name

Office of The President         PRESIDENT , COO
Title                           Title

8.31.2000                       9/7/00
Date                            Date

8