# EXHIBIT "C"

# DISTRIBUTION AND SUPPLY AGREEMENT

THIS DISTRIBUTION AND SUPPLY AGREEMENT (the "Agreement") is made and entered into as of January __1__, 2014 (the "Effective Date") by and between Scents of Worth, Inc. with its principal offices at 35 Sawgrass Drive, Bellport, New York 11713 ("Supplier" or "Scents") and Kmart Corporation including its subsidiaries and affiliates with its principal offices at 3333 Beverly Road, Hoffman Estates, Illinois 60179 ("Kmart").

1.   **Products Supply**. Subject to the terms and conditions of this Agreement, Supplier will be the exclusive supplier and distributor of the prestige designer and celebrity brand name fragrances and perfume products identified on the merchandise list attached to this Agreement as Exhibit A and such other products as may be mutually agreed to by the parties from time to time (the "Products") to all existing Kmart stores and any new stores opened by Kmart during the term of this Agreement (the "Stores").

The terms and conditions set forth on invoices and other forms issued by Supplier or Kmart are not a part of, nor modify or supplement this Agreement, even if Kmart or Supplier acknowledges and/or approves the invoices or other forms. Except where inconsistent with this Agreement, the Uniform Terms and Conditions between Kmart and Supplier will apply to transactions under this Agreement

During the term of this Agreement, Kmart will not purchase Products from any other source, or permit any vendor or licensee to sell Products in the Stores except for the Coty Beauty direct distributed Prestige Fragrances previously launched in department stores which can be purchased directly in one-half (1/2) and one (1) ounce sizes if Supplier cannot provide. If Kmart is offered other prestige or celebrity brand fragrance from a vendor that Supplier is not then presently providing, Kmart will refer the offer and vendor to the Supplier. Supplier may purchase this offered product directly from the vendor and provide it for the Kmart planogram if, in the sole judgment of the Supplier, such transaction is financially viable. Nothing in this Agreement prevents Kmart from sourcing or selling merchandise which are not prestige designer or celebrity brand fragrances.

Subject to Kmart approval, Supplier will determine stock levels, quantity and mix of Products supplied to each store as well as updating Products mix and removing slow selling, out of date and discontinued Products.

2.   **Term and Termination**. The term of this Agreement (the "Term") is two (2) years and, six (6) months, starting on the Effective Date unless terminated by either party as follows:

   (a)   Termination With Cause. Either party may provide the other party with a notice of intent to terminate this Agreement in the event of (1) a material breach of this Agreement by the other party, (2) a material failure of any covenant, representation, or warranty of the other party provided in this Agreement, (3) a material failure of the other party to be in compliance

1

with applicable federal, state, and local laws and regulations relating to the performance of this Agreement, (4) the insolvency of, or failing to appropriately oppose the institution of proceedings by or against, the other party under any federal or state bankruptcy or insolvency law, (5) an assignment by the other party for the benefit of all or substantially all of its creditors or the appointment of a receiver for all or a substantial part of the party's assets, or (6) a cessation of all or substantially all operations by the other party (a "Notice of Intent to Terminate"). In the event the breaching party fails to cure or to provide evidence of cure to the non-breaching party within thirty (30) days of receipt of the Notice of Intent to Terminate or, in the event giving rise to the right to terminate is not reasonably capable of being cured within thirty (30) days, and the breaching party fails to promptly and diligently commence to cure such event, within thirty (30) days, the non-breaching party may provide the breaching party with notice of termination effective as of the date specified in said notice of termination; provided, however, that the non-breaching party in the case of a breach that cannot reasonably be cured within thirty (30) days may in any event provide the breaching party with notice of termination effective as of the date specified in said notice of termination if the breaching party fails to cure its breach or to provide evidence of cure to the non-breaching party within ninety (90) days of receipt of the Notice of Intent to Terminate.

(b)    <u>Termination Without Cause</u>. Kmart may terminate this Agreement on sixty (60) days prior written notice to Supplier at any time and for any reason or for no reason. Supplier may terminate this Agreement on sixty (60) days prior written notice to Kmart at any time and for any reason or for no reason.

(c)    <u>Survival of Certain Terms</u>. Upon termination, both parties are relieved of any further obligations contained in this Agreement except for those that by their nature survive or may require performance after termination (e.g., indemnity) and resolution of Consignment obligations as provided in Section 3. Upon notice of termination under this Agreement for whatever reason (i.e. with or without cause), Supplier will work with Kmart in good faith to develop an orderly transition plan.

(d)    <u>Store Closings</u>. In the event Kmart permanently closes a store to its customers, Kmart will purchase all Products currently in the store at eighty percent (80%) of the Products current retail sales price before any discounting for closeout. Kmart at its sole option may offer Products purchased pursuant to Section 2(d) at discount as part of a going out of business sale in the store being closed, transfer the Products to other Kmart stores for resale to Kmart customers, or sell the Products wholesale to other retailers, liquidators or aggregators.

(e)    <u>Multiple Store Closings</u>. In the event Kmart closes 10 or more stores during the term of this Agreement the Parties agree in good faith to review and renegotiate the Consignment Amount consistent with the total number of stores then available to stock Products.

3.    <u>Consignment</u>. The Products will be supplied on a Consignment Basis. Supplier and Kmart have been parties to similar consignment arrangements on an ongoing basis beginning August 31, 2000. Subject to adjustments as may be provided in this Agreement, the parties agree the value of Supplier Products currently in Kmart possession to be eight million dollars ($8,000,000.00) (the 'Consignment Amount'). The Consignment Amount may be adjusted

during the Term of this Agreement by mutual agreement of the parties based on changes in the Kmart Store count and amount of Products necessary to maintain a level of inventory to conform with the requirements of this Agreement. Any adjustment downward in the Consignment amount in excess of $200,000 will make the entire adjustment due and payable to the vendor within 30 days of the agreed upon adjustment. The Consignment Amount will be due and payable upon the expiration of the Term of this Agreement. This Agreement is intended to create a true consignment of the Products and not to evidence a purchase and sale of merchandise. The Products delivered to Kmart will at all times remain the property of Supplier until sold to Kmart customers. This Agreement constitutes a Security Agreement as defined in Article 9 of the Uniform Commercial Code. In addition, Supplier shall have the ability to notify Kmart secured lenders who hold a security interest in Kmart's inventory, which secured lenders are identified on Exhibit C.

Upon expiration of this Agreement, or if this Agreement is terminated for any reason as provided in Section 2, Kmart may, at its sole election: (i) return Products to Supplier for a full credit at eighty (80%) of the Products current retail sales price returned in merchantable condition against the total Consignment Amount for the value of Products returned; or, (ii) purchase the Products from Supplier for the Consignment Amount.

Kmart has an agreement subject to possible amendment, revision or replacement in the future, with lenders pursuant to which Kmart borrows against its assets. Kmart grants these senior lenders a security interest in its inventory, including all goods, merchandise, and other tangible personal property now owned or subsequently acquired and held for sale or use or consumed in Kmart's business. Supplier agrees and acknowledges that it will only have an interest as a consignor in the Products and will not have any interest in any property of Kmart, including without limitation, Kmart's portion of the proceeds received by Kmart upon the sale or other disposition of any of the Products. Approval of this Agreement by Kmart's finance facility may be necessary. Kmart agrees, subject to the approval of its finance facility, to execute and deliver, at the sole cost and expense of Supplier, such Uniform Commercial Code financing statements as are necessary to evidence of public record Supplier's interest as a Supplier in the Products. Supplier will, upon the request of Kmart and at Supplier's expense, execute and deliver to Kmart such amendments to, or partial releases of, any financing statement or other public notice filed by Supplier with respect to the Consigned Merchandise, which financing statement or other notice incorrectly describes the Products or Supplier's interest in the Products.

Kmart will be solely responsible for any shortage or Products shrink while in Kmart stores.

4.    **Price and Payment**. Supplier will set the retail price of the Products based on current Manufacturers Suggested Retail Price ("MSRP"). Supplier will notify Kmart of any changes to the retail price and Kmart will enter price changes into the point of sale and any other necessary Products management data bases and computer programs twice a year to coordinate with resets. Since all items are prepriced, any cost changes will require Kmart stores to resticker each item at store level. This will be funded by Scents of Worth and included as part of reset fees (see Section 8 (d). Supplier will also make all necessary cost adjustments to assure Kmart margin support as provided in the following paragraph. Products will be packaged, source tagged, provided a security code, labeled with the manufacturer list price, Kmart sale price, and UPC

3

code. Products will ship FOB destination to Kmart stores. Supplier will be responsible for any loss to Products incurred during transit to the Kmart stores.

The net purchase price of Products to Kmart will be maintained at least twenty percent (20%) below the retail sales price, excluding tax and before providing for other discounts as provided in this Agreement. The parties intend Kmart to realize a gross margin on each sale of Products of at least twenty-eight percent (28%) of the selling price regardless of the retail price. Should supplier lower Products retail price, Supplier will issue Kmart a twenty percent (20%) credit which is sufficient to maintain the agreed upon twenty-eight percent (28%) gross margin.

Kmart will submit payment to vendor for replenishment orders delivered to the store that increase the value above the Consignment Amount on a net 15 day basis following receipt of a correct invoice from Supplier. The invoice will be for eighty percent (80%) of the retail sales price of replenished Products. Supplier will rebate Kmart an additional eight (8%) of the sales price monthly. In the event Supplier lowers the price of the Products, Supplier will issue an appropriate credit to Kmart.

Supplier will pay Kmart at least three hundred sixty thousand dollars ($360,000.00) advertising co-op fees every year for the term of this Agreement. Advertising co-op payments will be made in quarterly ninety-thousand ($90,000.00) installments, to be collected in advance of each quarter. Kmart may offset the co-op fees against amounts due Supplier in the ordinary course of business. Kmart will use the co-op fees to fund a minimum of ten (10) ROTO promotion events and four (4) Savings Guide Passouts per year as reasonably agreed to by the parties. Supplier will not otherwise be required to fund any fixtures or signage used by Kmart in connection with the Products.

5.  **Discontinued and Gift Set Mark Downs.** Supplier may from time to time discontinue basic merchandise Products. In the event Supplier does so, effected Products will have two exit options at the Supplier's discretion: 1) Products will be marked down 50% on TPR below the regular retail price for at least four (4) weeks with any extension subject to agreement by the parties. After the agreed markdown period, effected Products not sold will be returned to Supplier. A VAT will track markdown funding. 2) Products will be marked down in a 4 week sequence 25%, 50%, 75% then 90% with no returns. Kmart will earn a credit based on 80% of the original retail price of all discontinued general merchandise Products returned to Supplier.

Holiday gift sets will be marked down to a maximum 90% below the original retail price as agreed by the parties at the close of the applicable sales period. Supplier will maintain Kmart margin of 20% on all marked down gift set sales to a 90% mark down. In the event the parties agree to mark down gift sets more than 90% below the original retail price, Supplier will not be required to maintain Kmart's 20% margin. On the first day any gift set mark down price is set, Kmart will issue a VAT against Supplier account to maintain Kmart's 20% margin.

6.  **Supplier Managed Inventory.** Supplier will manage inventory levels of the Merchandise in the stores. Supplier will provide recommended inventory levels to Kmart via Supplier's Inforum system at all times subject to Kmart review and approval. Kmart will allow

4

Supplier to access point of sale data throughout the Term of this Agreement. Within reason, Products inventory levels will be maintained at approximately the Consignment Amount.

7.   **Sales and other Taxes on Products.** Kmart is solely responsible for collecting any and all sales taxes from customers on retail sales of the Products and paying same to applicable government body. Supplier is solely responsible for paying any personal property and other similar tax on the Products. At Kmart's request, Supplier will provide proof of paying such taxes.

8.   **Products Management.** Products will be displayed and managed as follows:

(a)   Fixture displays. The Products will be displayed in the space used during the pendency of the most recent distribution agreement between Supplier and Kmart. Products display space in any new stores opened by Kmart will be placed in a manner consistent with the new store format. Kmart reserves the right to make reasonable changes to the amount of space allocated to Products during the term of this agreement without Supplier's consent. If the space is lost to another vendor then Kmart will absorb the cost of any markdowns on Products being displaced from the lost space. If space is lost to department downsizing, Kmart will provide a reasonable time for Supplier to sell off the displaced Product. If an aggregate of more than 20% of the space Product is displayed in is lost, then the advertising co-op fee will be adjusted downward proportionately. Kmart reserves the right to relocate display space in any Store or all stores of a particular format at any time. Kmart will be responsible for stocking Products in the planogram and for cleaning and maintaining the displays.

(b)   Packaging. Products will be supplied in a clamshell container incorporating appropriate security features. Supplier will make commercially reasonable efforts to ensure packaging and other security features as appropriate to reduce shrink. For any Products that do not fit in clamshell containers, Supplier will submit alternate packaging designs for Kmart review and sole approval.

(c)   Fragrance Set. Supplier will offer Products to Kmart assorted in sets for fragrances based on Kmart's standard planogram for the fragrance sales area subject to reasonable agreement by the parties. The Set will be based on maintaining an assortment that at minimum results in sales equivalent to Kmart's prior year total sales of designer fragrances. If total sales of Products should fall below comparable prior year sales, Kmart may reduce Sets allocated for Products on a pro rata basis equivalent to the reduction of sales.

(d)   Planogram and Reset. At most two times per year, Kmart may at its sole discretion engage Supplier to provide planogram support, including without limitation, providing Products samples, imaging, outlining suggested placement, layout, and Products presentation. In the alternative, Supplier will reimburse Kmart for all reasonable costs and expenses it incurred developing planogram support. These reasonable costs must be supported by present time study results and will not exceed $90,000 per planogram support event. Kmart will issue a VAT against Supplier's account for its costs related to planogram resets.

(e) <u>Pallet Displays</u>. In addition to the Products, Supplier and Kmart will mutually agree on provisioning Pallet Displays for use during the Christmas sales period. Any Pallet Sales program will include at least 500 Store locations at one hundred (100) Products pieces per Pallet. The Pallet Displays will contain agreed Products assortments as appropriate for the sales period. The Pallet Display merchandise will be consigned merchandise, subject to the terms of Section 3 of this Agreement. The parties will reasonably agree as to the disposition of any Pallet Display merchandise remaining in the Stores at the end of the sales period. Kmart will pay for the Pallet Display merchandise at 50% of its agreed value net 30 days following delivery to the Stores. Payment for the remaining 50% will follow final disposition of the Products as provided in Section 3 of this Agreement.

(f) <u>Pro Space</u>. Kmart shall be responsible for all costs related to any Pro Space activity.

9. **Confidentiality**. Supplier agrees that all information (including the provisions of this Agreement) of or relating to Kmart, regardless of the manner or medium in which it is furnished to or otherwise obtained by Supplier or any Supplier representative, is provided to and received by Supplier in confidence. Supplier must at all times preserve and protect the confidentiality of this information and any other proprietary and non-public Kmart information that Supplier or any Supplier representative becomes aware of or acquires during the performance of this Agreement (collectively, the "Confidential Information"). Without limiting the generality of the foregoing, Supplier must not divulge to or discuss with third parties any trade secret; system, program, or any other matter on which Supplier is working hereunder; other program, system, or work product belonging to Kmart which are disclosed on Supplier; or information regarding Kmart and any agreements or contracts which Kmart has with other companies or firms. Supplier must take all necessary steps to ensure that the Confidential Information is not disclosed to, or used by any person, firm, or entity, except Supplier's own employees and agents, and then only to the extent necessary to permit Supplier to perform this Agreement. The confidentiality obligations set forth above do not apply to information (i) available to the public through no fault of Supplier; (ii) released by Kmart to any third party on a non-confidential basis without restrictions on disclosure; and (iii) to the extent disclosure of the information is required under any valid court or governmental order and Supplier provides Kmart immediate notice thereof so that Kmart will have an opportunity to contest disclosure or seek an appropriate protective order. The confidentiality and non-disclosure obligations contained in this Agreement survive and continue after termination of this Agreement for any reason and bind Supplier's legal representatives, successors, and assigns.

10. **Indemnity/Insurance/"Pass-Throughs"**. Supplier is a distributor of products manufactured by others. Supplier passes through, assigns and transfers to Kmart all representations, warranties and indemnifications received by Supplier from Supplier's vendors with respect to all Products provided to Kmart. Supplier further agrees to assist Kmart in enforcing all vendor representations, warranties and indemnifications covering Products supplied to Kmart to the extent required by Kmart.

11. **Limitation of Liability**. Except with respect to obligations of confidentiality and indemnity under the Agreement, in no event is either party, its officers, agents or employees

6

liable to the other for indirect, special, punitive, exemplary, incidental, or consequential damages arising out or related to the performance, omission of performance or termination of this Agreement, even if advised of the possibility of such damages and without regard to the nature of claim or underlying theory or cause of action.

12. **Independent Contractor.** Supplier is an independent contractor in the performance of this Agreement, and nothing contained in this Agreement may be construed to create or constitute a joint venture, partnership, agency, franchise, lease o any other arrangement other than as expressly granted in this Agreement. Each party is responsible for its own operation. Supplier must exercise control over its employees, agents, representatives, subcontractors and vendors and is solely responsible for the verification of identity and employment eligibility, for the payment of any wages, salaries, or other remuneration of its employees, agents, representatives, subcontractors and vendors, and for the payment of any payroll taxes, contributions for unemployment or workers compensation, social security, pensions or annuities that are imposed as a result of the employment of its employees, agents, representatives, subcontractors, and vendors. Supplier may not pledge credit, incur any obligation or liability, hire any employee, nor purchase any products or services in the name of Kmart or any subsidiary or affiliate of Kmart.

13. **No Assignment/Subcontracting.** The provisions of this Agreement are binding upon and inure to the benefit of the parties and their respective permitted successors and assigns; provided, however, except as otherwise set forth in this Section 13, neither the rights and/or duties under this Agreement are to be assigned by either party, without prior written consent of the other party, given or not at the other party's sole option. Any prohibited assignment is void. Notwithstanding anything to the contrary, Kmart has the right without any requirement to obtain Supplier consent, to assign this Agreement to a parent, subsidiary or affiliate or to a successor by merger, acquisition or consolidation of Kmart, its parent, subsidiary or affiliate. The parties agree that Supplier may subcontract the task of delivering the Products to the Stores to third party carriers. With respect to any permitted assignment or subcontracting, the assigning/subcontracting party remains fully responsible for performance and for all acts and omissions of its assignees and subcontractors.

14. **Costs, Charges, and Expenses.** Except as otherwise provided, all costs, charges and expenses incurred in connection with Supplier's performance of this Agreement will be Supplier's sole responsibility.

15. **Representations.** Each party represents, covenants, and warrants to the other party that (a) it is duly organized, validly existing, operating in good standing in each jurisdiction where necessary to perform this Agreement, and has the full legal right, power and authority to execute, deliver, and perform this Agreement; (b) no litigation or governmental, regulatory, or administrative agency investigation or proceeding is pending or threatened against it which might adversely affect its ability to perform this Agreement; (c) the signing and delivery of this Agreement by the person signing for each party and the performance of this and any agreement relating to this Agreement have been duly authorized by all necessary action of its board of directors and do not conflict with (i) any law, order, writ, injunction, decree, rule, or regulation of any court, administrative agency, or any other governmental authority, (i) any agreement to

7

which it is a party or by which it is otherwise bound, or (iii) any provision of its certificate of incorporation or any by-laws, and does not result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest, or other encumbrance upon the Products; and no approval, consent, or withholding of objection is required from any governmental authority or any other party with respect to the entering into or performing this Agreement; (d) this Agreement has been authorized, executed and delivered by each party and constitutes a legal, valid, and binding obligation of each party, enforceable in accordance with its terms unless enforcement may be limited by bankruptcy, reorganization, insolvency, or other laws affecting creditors' rights generally

Additionally, Supplier represents, covenants and warrants that (i) it will comply with all federal, state and local laws, rules and regulations applicable to this Agreement or the performance thereof, and (ii) there are no liens or other encumbrances on the Products as of the date of the delivery to the Stores.

16. **Authority to Sign**. Each person signing below warrants and represents that he/she has full power and authority to execute this Agreement on behalf of the party he/she represents. Each party represents and warrants that it is free to enter into this Agreement without violating the rights of any person or entity.

17. **Applicable Law**. This Agreement, and all other aspects of the relationship between the parties, is construed, interpreted and enforced under and in accord with the laws of the State of Illinois without regard to the choice of law provisions. Supplier agrees any litigation arising directly or indirectly out of this Agreement or the business relationship will commence exclusively in the State of Illinois courts of Cook County or the United States District court for the Northern District of Illinois in Chicago, IL. By this Agreement Supplier consents to the jurisdiction of these courts.

18. **No Implied Covenants/Reliance**. Supplier and Kmart each expressly represent and warrant to the other that each has relied solely and exclusively on its own judgment and the advice of its own attorneys in entering into this Agreement, and that no representative or agent of the other has made any statement or representation to it beyond those in this Agreement that have induced signing of this Agreement. There exist no implied or otherwise unstated covenants, rights, or obligations by, of, or against either party. The parties expressly disclaim the existence of any implied covenant of good faith and/or fair dealing.

19. **General**.

(a) **Section Headings**. Article, section and paragraph headings, titles and captions in this Agreement are used solely for the convenience of the parties and are not relevant in any construction of this Agreement nor will they be used to define, expand, or limit the provisions of this Agreement.

(b) **Severability**. If any provision of this Agreement is held to be void or unenforceable by any judicial or administrative authority, or is unlawful or unenforceable under any applicable law, the remaining provisions are severable and their enforceability is not to be

affected or impaired in any way by reason of such law or holding; provided, however, that in the event such law or holding materially and substantially affects the actual performance hereof or a basic consideration given hereunder, either party will have the right to renegotiate the affected provision(s) upon thirty (30) days notice to the other party in order to achieve the original intent of the parties.

(c)   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which is an original and all of which taken together will constitute one single agreement between the parties hereto.

(d)   **Waivers.**  No waiver of any breach or default is a waiver of any subsequent breach or default.

(e)   **Notices.**  All notices under this Agreement must be in writing and must be given by either party by prepaid mail or by cable, telefax, telegram, telex or hand delivery to the other party as follows:

| If to Kmart: | If to Supplier: |
|---|---|
| Kmart Corporation | Scents of Worth, Inc. |
| 3333 Beverly Road | 35 Sawgrass Drive |
| Hoffman Estates, IL 60179 | Bellport, NY 11713 |
| Attn: Vice President, General Merchandise Manager, Drug Stores | Attn: President |
| FAX: (847) 286-3700 | FAX: (631) 866-4231 |
| | |
| With a copy to: | With a copy to: |
| Attn: General Counsel | Alfred Paliani |
| (at the above address) | General Counsel |
| FAX (847) 286-0266 | (at the above address) |
| | FAX: (631) 439-2262 |

Either party may change its address and/or addressee for notices at any time with fifteen (15) days prior notice to the other party in accordance with the foregoing.

(f)   Supplier acknowledges Sears Brands, L.L.P. ("Sears Brands") claims the exclusive right, title, and interest in and to all trademarks, trade names, service marks, logos, assignees, program and event names, identifications, and other proprietary rights and privileges that it licenses to Kmart with the right to sublicense (the "Sears Brands Marks"). This Agreement and its various provisions are not a license or assignment of any right, title, or interest, in the Sears Brands Marks by Sears Brands or Kmart to Supplier. Supplier must not, in any manner, represent that it has any ownership in the Sears Brands Marks. Supplier must not do or cause to be done anything that impairs Kmart's exclusive license in the Sears Brands Marks.

Supplier must not use, print or duplicate the Sears Brands Marks unless Supplier has obtained prior written approval from Kmart and Sears Brands. Any permitted use by Supplier of

9

the Sears Brands Marks is limited to the term of this Agreement. Upon termination, Supplier must immediately cease all use of the Sears Brands Marks. Supplier must not assign or attempt to assign any rights with regard to the Sears Brands Marks that arise under this Agreement and any such attempted assignment is void.

(g)     **Publicity.** Neither Supplier nor Kmart nor any affiliate of Kmart or Supplier will issue or make, or cause to have issued or made, any media release or announcement concerning this Agreement or the transactions contemplated hereby without the prior written approval of the other party.

(h)     **Force Majeure.** Neither party will be liable to the other party for any failure or delay in performance of its obligations under this Agreement (other than obligations to pay money when due) because of circumstances beyond its control including, but not limited to, acts of God, flood, fire, riot, embargo, inability to obtain phone lines, government action (including enactment of any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Agreement) and other causes beyond its control whether or not of the same class or kind as specifically named above. If either party is unable to perform its obligations hereunder (other than obligations to pay money when due) for any of the reasons described in this Section 19(h), the obligations of such party will be suspended for the duration, and only to the extent of, such force majeure event, provided that the affected party will notify the other party of its inability to so perform within five (5) business days of the occurrence of the force majeure event, the steps it plans to take to rectify or mitigate such inability and the anticipated length of such inability. Notwithstanding anything contained herein to the contrary, if a force majeure event occurs at only specific Supplier distribution centers and does not effect the other Supplier distribution centers, Supplier will use commercially reasonable efforts to arrange for the delivery of Products to the Stores serviced by the effected distribution center from another Supplier distribution center (subject to Product availability) unless prevented from doing so by the force majeure event or applicable law.

**20.     Incorporation and Integration.** This Agreement, including any Exhibits, is the final and complete agreement between Kmart and Supplier with respect to the subject matter. No representations, inducements, promises, or understandings in relation to the subject matter, whether oral or written, exist unless expressly provided in this Agreement, and this Agreement supersedes all prior understandings, agreements, contracts, or arrangements between the parties, whether oral or written, unless otherwise expressly incorporated in this Agreement. No agreement or other understanding purporting to add to or to modify the terms and conditions hereof is binding unless agreed to by the parties in writing. Any terms or conditions in any invoices, statements or other forms of the parties used in the performance of this Agreement that are in addition to or conflict with the terms and conditions hereof are void.

The parties agreed to and executed this Agreement the day and year indicated below.

Scents of Worth, Inc.  
(Supplier)

Kmart Corporation

_____  
Signature

_____  
Signature

MICHAEL W. KATZ  
Name

David Acchione  
Name

President & CEO  
Title

VP/GMM  
Title

January 2, 2014  
Date

January 1, 2014  
Date

11