Allen G. Kadish
ARCHER & GREINER, P.C.
1211 Avenue of the Americas, Suite 2750
New York, New York 10036
Tel: (212) 682-4940
Email: akadish@archerlaw.com

  and

Kenneth M. Florey
M. Neal Smith
ROBBINS, SCHWARTZ, NICHOLAS,
LIFTON & TAYLOR, LTD.
631 E. Boughton Road, Suite 200
Bolingbrook, Illinois 60440
Tel: (630) 929-3639
Email: kflorey@robbins-schwartz.com
   nsmith@robbins-schwartz.com

  and

Matthew T. Gensburg
GENSBURG CALANDRIELLO & KANTER, P.C.
200 West Adams Street, Suite 2425
Chicago, Illinois 60606
Tel: (312) 263-2200
Email: mgensburg@gcklegal.com

*Attorneys for Community Unit School District 300*

Hearing Date and Time: November 18, 2020 at 10:00 A.M.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.,* | Case No. 18-23538 (RDD) |
|  | (Jointly Administered) |
| Debtors. |  |

**REPLY OF COMMUNITY UNIT SCHOOL DISTRICT 300 TO OBJECTIONS TO MOTION TO DEEM ECONOMIC DEVELOPMENT AGREEMENT REJECTED PURSUANT TO THE DEBTORS' CONFIRMED CHAPTER 11 PLAN, OR, IN THE <u>ALTERNATIVE, TO COMPEL THE DEBTORS TO REJECT THE AGREEMENT</u>**

   COMMUNITY UNIT SCHOOL DISTRICT 300 (the "School District"), an Illinois school district existing and operating pursuant to the Illinois School Code, 105 ILCS 5/1-1, *et seq.*, by and through its attorneys, in support of its *Motion of Community Unit School District 300 to Deem*

*Economic Development Agreement Rejected Pursuant to the Debtors' Confirmed Chapter 11 Plan, or, in the Alternative, to Compel the Debtors to Reject the Agreement* (the "Motion") [ECF No. 9061] and Supplement [ECF No. 9071], and in reply to the following responses:

(i) *Objection of the Village of Hoffman Estates to Motion of Community Unit School District 300 to Deem Economic Development Agreement Rejected Pursuant to the Debtors' Confirmed Chapter 11 Plan, or, in the Alternative, to Compel the Debtors to Reject the Agreement* [ECF No. 9079],

(ii) (a) *Debtors' Opposition to Motion of Community Unit School District 300 to Deem Economic Development Agreement Rejected Pursuant to the Debtors' Confirmed Chapter 11 Plan, or, in the Alternative, to Compel the Debtors to Reject the Agreement* [ECF No. 9082], and (b) *Declaration of Jared R. Friedmann in Support of the Debtors' Opposition to the Motion of Community Unit School District 300 to Deem the Economic Development Agreement Rejected or, in the Alternative, to Compel Debtors to Reject the Agreement* [ECF No. 9084], and

(iii) *Notice of Withdrawal of Proposed Assumption of Additional Assigned Agreement* [ECF No. 9083],

respectfully sets forth as follows.[1]

**A.   The School District Has Standing Under Section 365(d)(2).**

1.   Noting that section 365(d)(2) of the Bankruptcy Code provides that "the court, *on the request of a party to such contract or lease*, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease," the Village and Sears argue that the School District has no standing to seek relief under section 365(d)(2). Their premise is that the School District is not a party to the EDA Agreement.

2.   The Village and Sears are wrong. Contrary to their assertions, the School District and the other taxing districts (the "Taxing Districts") are parties to the EDA Agreement and, therefore, have standing to request that the Court either compel Sears to reject the EDA Agreement,

---

[1] Capitalized terms not otherwise defined in this Response shall have the meanings ascribed to them in the Motion.

or specify a shortened period of time during which Sears must either assume or reject the EDA Agreement. The original EDA Agreement was entered into between the Village and Sears pursuant to the Economic Development Area Tax Increment Allocation Act, 20 ILCS 620/1, *et seq.* (the "EDA Act"). When the Village and Sears entered into the EDA Agreement in 1989, the EDA Act then in effect limited the duration of the agreement to twenty three years. *See* Ill. Rev. Stat. 1989, ch. 67½ ¶ 1008; Pub. Act 86-38 (eff. July 12, 1989) ("obligations shall bear such date or dates, mature at such time or times not exceeding 20 years from their respective dates, but in no event exceeding 23 years from the date of establishment of the economic development project area") ("the last maturity of the refunding obligations shall not be expressed to mature later than 23 years from the date of the ordinance establishing the economic development project area"). Absent legislative intervention, the EDA Agreement would have terminated by operation of law in the fall of 2012. *Id.*; *see also* EDA Agreement Art. 24 ("This Agreement shall remain in full force and effect until termination of the Project Area and the Economic Development Plan or until otherwise terminated pursuant to the terms hereof"). The termination of the EDA Agreement would have resulted in Sears paying approximately $25.7 million annually to the Taxing Districts, of which 60%, or $15.4 million, would be paid to the School District.

3.   The Illinois General Assembly's amendment to the EDA Act in 2011 legislatively recrafted the EDA Agreement by grafting onto the agreement (i) a 15-year extension, (ii) additional parties, and (iii) new conditions. The EDA Act Amendment extended the EDA Agreement for an additional fifteen years. *See* P.A. 97-636; 20 ILCS 620/4(g)(1) ("the duration of any existing economic development plan created pursuant to this Act is extended to the duration permitted under this subsection, up to a maximum duration of 15 years"). *Id.*

3

4. Pursuant to the amendment, the Taxing Districts, now for the first time, directly shared in property taxes generated by the EDA District. 20 ILCS 620/4(g)(2)(D) ("45% of the remaining receipts shall be allocated to the Taxing Districts located within the economic development project area"); 20 ILCS 620/4(g)(4) ("If the amount of current year taxes paid is greater than the base amount, then 75% of the increase in real estate tax receipts shall be payable to the developer and the remaining 25% of the increase in real estate tax receipts shall be distributed to the taxing districts"). *Id.* Also for the first time, the Village became obligated to prepare annual reports to the Taxing Districts on the performance of the EDA District. 20 ILCS 620/4.7 (the "municipality shall submit in an electronic format * * * information for each economic development project area * * * to all taxing districts overlapping the economic development project area"). *Id.* The Amendment further required all the Taxing Districts to meet annually "to review the effectiveness and status of the economic development project area[.]" 20 ILCS 620/4(h).

5. The amendment for the first time also required Sears (as developer) to maintain 4,250 jobs for the duration of the extension period. 20 ILCS 620/4(e) ("Any ordinance adopted which approves an economic development plan shall contain findings that the developer or any of its successor entities and its subsidiaries shall create or retain not less than 4,250 full-time equivalent jobs"); 20 ILCS 620/4.5(b) ("In the event the developer fails to maintain 4,250 jobs at any time before the termination of the economic development project area * * * the developer shall forfeit an amount of its allocations from the special tax allocation fund for that time period in which the developer failed to maintain 4,250 jobs"); 20 ILCS 620/5(a) (The municipality shall submit * * * an analysis, and any supporting documents and statistics, demonstrating that the developer * * * shall create or retain not less than 4,250 full-time equivalent jobs"). *Id.* The

4

amendment further provided that in the event Sears did not maintain 4,250 jobs, Sears would forfeit *to the Taxing Districts* its property tax rebates under the EDA Agreement. 20 ILCS 620/4.5(b) ("Any funds that are forfeited shall be distributed to the taxing districts"). *Id.* And, there was a provision for early termination of the development incentive altogether. *See* 20 ILCS 620/4.5(c) ("In the event that the developer maintains no jobs at any time before the termination of the economic development project area, the municipality shall adopt an ordinance dissolving the special tax allocation fund for the economic development project area and terminating the economic development project area"). *Id.*

6. The EDA Agreement itself was never actually amended to reflect these modifications. Rather, the amendment was achieved through the above referenced legislation, the same legislation which incorporated the Taxing Districts into the EDA Agreement. Thus, following the amendment, the Taxing Districts became integral parties to the EDA Agreement by operation of law.

7. In the alternative, even if the Taxing Districts, including the School District, are not direct parties to the EDA Agreement by law, they are clearly intended third-party beneficiaries to the EDA Agreement. A third-party beneficiary may recover under a contract if the benefit is direct, rather than incidental. *Gothberg v. Nemerovski,* 58 Ill.App.2d 372, 385, 208 N.E.2d 12, 19 (1st Dist. 1965). Where the benefit is direct, as it is in the instant case, the third-party beneficiary has standing to sue. *See Id.* This third party right rests on the liability of the promisor, which liability must affirmatively appear in the language of the agreement when properly interpreted and construed. *Id.*

8. The Illinois Supreme Court has held in various instances that there may be third-party beneficiaries to public contracts. *See, i.e., People ex rel. Resnick v. Curtis & Davis,*

5

*Architects & Planners, Inc.* 78 Ill.2d 381, 400 N.E.2d 918, 36 Ill.Dec. 338 (1980) (holding that the State of Illinois was a third-party beneficiary of a contract between the Illinois Building Authority and multiple architects and contractors and had standing to sue because the circumstances showed an intention of the parties to benefit the State); *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 441 N.E.2d 324, 65 Ill.Dec. 411 (1982) (holding that homeowner was a direct and intended third-party beneficiary of a contract between city and builder when identification of the homeowner as a direct beneficiary was clear per the unmistakable intent in the agreement); and *Bates & Rogers Const. Corp. v. Greeley & Hansen,* 109 Ill.2d 225, 486 N.E.2d 902, 93 Ill.Dec. (1985) (holding that engineer was a third-party beneficiary of a contract between construction contractor and sanitary district). Additionally, the contract may identify the third party by description of an intended class, rather than explicitly by name. *Altevogt v. Brinkoetter*, 85 Ill.2d 44, 421 N.E.2d 182, 51 Ill.Dec. 674 (1981).

9. The original EDA Agreement explicitly references intent to benefit the Taxing Districts. This is evident in the definition of "Allocated Tax Increment Revenue Amounts" as "[t]he amounts of Tax Increment Revenues which are to be paid to the Village and the other Taxing Districts, consisting of the "Phase I Allocated Tax Increment Revenue Amounts" set forth on Exhibit "B" attached hereto * * *." The EDA Agreement then outlines "total amount of phase I Tax Increment Revenues which are to be Received and Deposited in Fund *for Benefit of Village and Other Taxing Districts*." EDA Agreement, p. 100 (emphasis added). The definition of "taxing districts" includes the School District. EDA Agreement, p. 12. The EDA Agreement and EDA Act language cited in paragraphs 4, 5 and 6 above are incorporated by reference to support the School District's alternative third-party beneficiary argument.

10. In *City of Peru v. Illinois Power Co.*, the court reiterated the long-held rule that a party is a third-party beneficiary of a contract when intent to benefit that third party affirmatively appears from the language of the agreement. 258 Ill.App.3d 309, 630 N.E.2d 454, 196 Ill.Dec. 519 (1994). The court explained that the City of Peru, as a member of the Illinois Municipal Electrical Agency, was a third-party beneficiary of the agreement between Illinois Power Co. (a power company) and the municipal electrical agency because the agreement stated that the electrical agency entered into agreement on its own behalf and for the benefit of its members located within the Illinois Power Co. control area. *Id.* The same analysis, transposed onto the facts here, indicate that the Taxing Districts, as entities within the economic development project area, are third-party beneficiaries of the EDA Agreement between Sears and the Village because the EDA Agreement explicitly indicates multiple instances in which remaining receipts shall be allocated to the Taxing Districts, as discussed above. See 20 ILCS 620/4(g)(2)(D); 620/4(g)(4); and 620/4.5. These tax distributions, conferred by contract to the Taxing Districts, indicate a clear intent to benefit the Taxing Districts - if not as parties, then at minimum, as third party beneficiaries.

B.  **Section 365(d)(2) Relief is Available Post-Confirmation and the School District's Request Does Not Violate Section 1127(b).**

11. The Village and Sears argue that section 365(d)(2) of the Bankruptcy Code is inapplicable because Sears has confirmed its Plan and, therefore, it is the Plan which should dictate when Sears needs to assume or reject the EDA Agreement. They also argue that deeming the EDA Agreement rejected would result in an improper modification of the Plan under section 1127(b) of the Bankruptcy Code. They are wrong on both points.

12. The Plan [ECF No. 4476] was confirmed on October 15, 2019. However, as the Village and Sears acknowledge, the Plan has not gone "effective." There is significance to this basic fact.

7

13.     The phrase "Effective Date" is not defined in the Bankruptcy Code, and while the Plan defines the term "Effective Date," it does so only in terms of when it occurs.[2] When a term is undefined, as this term is, courts look to its ordinary meaning, often consulting dictionaries for this particular purpose. *See Gillespie v. Equifax Information Services, L.L.C.*, 484 F.3d 938 (7th Cir. 2007); *see also In re Constructive Supervision Services, Inc.*, 753 F.3d 124 (4th Cir. 2014) (to construe an undefined statutory term, court looks first to the plain statutory language, and may use dictionaries to get at its plain or common meaning). In *In re Dawes,* 423 B.R. 550, 554 (Bankr. D. Kan. 2010), the court noted that "effective" in common parlance means "ready for service or action; to effect." "Effect" in turn means "a quality or state of being operative." WEBSTER'S NEW COLLEGIATE DICTIONARY (1975). Based on these definitions, *Dawes* explained that the "Effective Date" of a plan is the date the plan is "ready for action" or "operative." Similarly, in *In re Potomac Iron Works, Inc.*, 217 B.R. 170, 172 (Bankr. D. Md. 1997), the court quoted Benjamin Weintraub and Michael J. Crames who noted that the "[e]ffective date is the date which a confirmed plan becomes operative and distribution of cash or property is commenced. In essence, it is the point in time when the plan can and should be susceptible to implementation and commencement of the operation of its provisions."[3]

14.     Paragraph 14.1 of Article XIV of the Plan states that the Plan will not become "effective" until certain "conditions precedent" first occur. A "condition precedent" under a contract is an act that must be performed or an event that must occur before a contract becomes effective or before one party is obligated to perform. *See Credit Union 1 v. Carrasco*, 107 N.E.3d

---

[2] See Paragraph 1.57 of the Plan which states that: "***'Effective Date'*** means the date on which all conditions to the effectiveness of the Plan set forth in Article XIV hereof have been satisfied or waived in accordance with the terms of the Plan."

[3] See, Weintraub & Crames, *Defining Consummation, Effective Date of Plan of Reorganization and Retention of Postconfirmation Jurisdiction: Suggested Amendments to Bankruptcy Code and Bankruptcy Rules*, 64 AM. BANKR. L. J. 245, 276 (1990).

1021 (Ill.App.1 Dist. 2018). *See also, Rom Terminals, Ltd. v. Scallop Corp.*, 529 N.Y.S.2d 304, 306 (1988) (a condition precedent, as defined in Section 224 of the Restatement, 2d, Contracts, is "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due"). Those conditions precedent have not yet occurred. More explicitly, the *Order (i) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors and (ii) Granting Related Relief* (the "Confirmation Order") [ECF No. 5370-4], recognizes that until the Effective Date, the Plan is not binding. Paragraph 4 of the Confirmation Order provides, in part that, "[t]he terms of the Plan, the Plan Supplement, the Liquidating Trust Agreement, all exhibits thereto, and all other relevant and necessary documents *shall be effective and binding* as of the Effective Date" (emphasis added). It is self-evident, therefore, that absent the occurrence of the Effective Date, the Plan has not become *effective and binding*, *i.e.,* "susceptible to implementation and commencement" including Article XIII, relating to assumption and rejection of executory contracts and unexpired leases.

15.  The Village cites to *In re Worldcom, Inc.*, 2006 WL 898029 (Bankr. S.D.N.Y. March 9, 2006), for the proposition that section 365(d)(2) is not applicable where a plan has been confirmed. *Worldcom* is distinguishable. In *Worldcom* the debtor's plan was confirmed on October 21, 2003, and went effective on April 20, 2004. *See Notice of Occurrence of Effective Date of Chapter 11 Plan of Reorganization* [Ch. 11 Case No. 02-13533 (AJG), ECF No. 11479]. The dispute resolved in the opinion occurred on August 5, 2005, over a year and a half after the plan's "effective date." The *Worldcom* plan was determinative.

16.  Sears's plan has not gone effective, now over a year after it was confirmed. In the absence of a binding plan, the applicable provisions of the Bankruptcy Code, including section

9

365(d)(2), necessarily govern debtor-creditor relationships and obligations. Any other outcome would create an authoritative void.

17. But even if the confirmation date, rather than the effective date, controlled, section 365(d)(2) would still be applicable. Section 1123(b)(2) of the Bankruptcy Code provides the mechanism by which executory contracts are assumed or rejected through a plan, stating that a plan may "*subject to section 365 of this title*, provide for the assumption, rejection, or assignment of any executory contract * * * not previously rejected under such section." Therefore, Sears's ability to assume the EDA Agreement remains "subject to" broadly, section 365. "Subject to" means "governed by" or "subordinate to." *See Teague v. Healthcare Development Partners, LLC*, 2019 WL 3973372 (N.D. Ill.) *See also In re ASPC Corp.*, 601 B.R. 766 (Bankr. S.D. Ohio 2019) (The natural sense of the term "subject to" is to be conditioned, affected, or modified in some indicated way: having a contingent relation to something and usually dependent on such relation for final form, validity, or significance). Thus, Sears's ability to assume or reject the EDA Agreement through the Plan remains subject to section 365, which naturally incorporates subsection 365(d)(2), which in turn authorizes the court to accelerate the decision date if a valid reason exists.

18. Under the specific facts of this case, where the Plan provides for an indefinite "Effective Date," the Court retaining the equitable authority to set a definitive assumption/rejection date where necessary to protect non-debtor parties to the executory contract is especially relevant.[4]

---

[4] Even if the Plan had gone "effective," the Court would have had the jurisdiction to consider this issue pursuant to Article XVI, Paragraph 16.1(d) of the Plan which provides that:

> On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:
>
> * * * *

10

19. Further, the EDA Agreement was offered to Transform to designate for assignment. Transform designated the EDA Agreement for assignment on May 2, 2019, a year and a half ago. Transform has reversed its decision (again, prior to the "Effective Date" of the Plan). The Debtors' only choice (whether under the Plan or section 365), is to reject, as set forth below.

C. **Sears Retains No Meaningful Economic Interest in the EDA Agreement.**

(i) **Sears is Unable to Assign the EDA Agreement**

20. Both the Village and Sears assert that once Transform withdraws its designation of the EDA Agreement for assumption and assignment, Sears will retain a legal and economic interest in the EDA Agreement which will have value for its bankruptcy estate. While the School District does not contest that upon Transform's withdrawal of its designation, Sears will remain a nominal party to the EDA Agreement, that contract will have no value to Sears or any prospective third-party assignee.

21. Sears may only assign the EDA Agreement by conveying 100 acres of real estate in the EDA District to the same third party. Since Sears has already conveyed all of its real property in the EDA District to Transform, Transform is the only entity to which Sears could assign its interest under the EDA Agreement.[5]

22. The EDA Agreement provides that the "rights and obligations of the Developer under this Agreement shall not be assigned except as provided in * * * section 18.1." EDA

---

(d) to resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any claims arising therefrom, including cure amounts pursuant to section 365 of the Bankruptcy Code, (2) any potential contractual obligation under any executory contract or unexpired lease that is assumed or assumed and assigned, and (3) any dispute regarding whether a contract or lease is or was executory or expired.

[5] The School District's objection to cure [ECF No. 2087] is still pending.

Agreement, § 18.1. The Agreement defines the "Developer" to "mean only [ ] Sears Roebuck & Co." or "[a]ny entity to whom the Developer has conveyed a portion of the Subject Property consisting of one hundred (100) acres or more and assigned its rights under this Agreement[.]" EDA Agreement, § 18.1(a)(i)-(iv). The EDA Agreement further provides that the "rights established by the terms of this Agreement shall inure to the benefit of: (i) the Developer; and (ii) any assignee of such rights acquiring an ownership interest in the Subject Property pursuant to a sale or conveyance of a portion of the Subject Property." EDA Agreement, § 18.1(c).

23.     Under the plain terms of the EDA Agreement, Sears can *only* assign its interests to a party to whom it has conveyed 100 acres of its real property with a situs in the EDA District. Sears conveyed its corporate campus to Transform and has no real property left to sell or convey. Transform has decided to decline assignment of the EDA Agreement. In other words, the *only* entity to whom Sears could assign its interests has elected not to accept the assignment. As there is no other entity eligible to receive the assignment, the EDA Agreement has no economic value.

24.     Moreover, the EDA Act sunsets the EDA Agreement when Sears has no more employees in the district. 20 ILCS 620/4.5(c). It is upon information and belief that no Sears employees remain in the district. As of October 1, 2020, all remnant Sears Hoffman Estates employees have been transitioned to and employed by Transform. To the extent that is so, the EDA Agreement and the EDA District will be terminated and the EDA Agreement will have no value to anyone. The EDA Agreement will have served its purpose and now that Sears no longer has a presence in the economic development zone, it will be terminated. The EDA Agreement should be deemed rejected, or the Debtors immediately should be compelled to reject it.

    **(ii)     Sears Has Waived Its Interests in Future EDA Funds**

25.     While Sears acknowledges in the Amended Stipulation that it waived any entitlement to 2018 and subsequent years EDA Funds, referencing paragraph 18 of the Amended

Stipulation, Sears states that it never waived its right to assign the EDA Agreement to another party, nor the right of that prospective assignee to receive future EDA Funds. Other than with respect to Transform, the School District disagrees.

26. Paragraph 2 of the Amended Stipulation explicitly provides that in consideration of the mutual covenants and agreements contained in the Amended Stipulation:

> Debtors agree to relinquish any right they may have, in whole or in part, whether asserted or not, known or unknown, with respect to EDA Funds consisting of property taxes levied for tax year 2018 that were extended and collected in calendar year 2019 in the Special Tax Allocation Fund (the "**2018 EDA Funds**") and otherwise, if applicable, relinquish any rights, claims or interests to any subsequent years' EDA Funds.

27. This waiver to 2018 and subsequent years EDA Funds is significant, as it is black letter law that an assignee merely steps into the shoes of its assignor. *In re Boyajian,* 367 B.R. 138, 145 (9th Cir. BAP 2007). *See also* 29 WILLISTON ON CONTRACTS §74.74 (4th ed. 2003) ("It has been held repeatedly that the assignee 'stands in the shoes' of the assignor...."); RESTATEMENT (SECOND) OF CONTRACTS §336(1) ("By an assignment the assignee acquires a right against the obligor only to the extent that the obligor is under a duty to the assignor; and if the right of the assignor would be voidable by the obligor or unenforceable against him if no assignment had been made, the right of the assignee is subject to the infirmity").

28. Yet it is also black letter law that a settlement under Rule 9019 cannot impair the rights of others who are not parties to the settlement agreement. *See In re Devon Capital Management, Inc.*, 261 B.R. 619 (Bankr. W.D. Pa. 2001) (Even where proposed settlement is fair and equitable to parties thereto, court may not approve settlement if rights of others who are not parties to settlement will be unduly prejudiced; rather, court must determine that no one has been set apart for unfair treatment).

29.  At the time the Amended Stipulation was entered, Transform had already acquired the assets of Sears and had designated the EDA Agreement for assumption and assignment (subject to the School District's objections).  Transform was also not a party to the Amended Stipulation.  Thus, nothing in the Amended Stipulation could otherwise impact the asserted claims and rights of Transform arising out of the Asset Purchase Agreement.  It was this situation, and this situation alone which lead to the insertion of the sentence in Paragraph 18 of the Amended Stipulation that "nothing in this Stipulation and Order shall waive, extinguish, or otherwise release the rights, if any, of Debtors' assignee to the EDA Agreement, as applicable, to EDA Funds levied for tax year 2018 or for any subsequent years."

30.  While perhaps not a model of clarity, the phrase "Debtors' assignee" is in the present tense, not the future tense.  It is meant to protect Transform's interests, and Transform's alone (subject to the School District's objections).  It would be nonsensical to interpret the Amended Stipulation to provide that, without saying so, Sears was waiving claims to future EDA Funds, but preserving those claims for the benefit unidentified future assignees.  *See, e.g., In re DPH Holdings Corp.*, 553 B.R. 20, 27 (Bankr. S.D.N.Y. 2016) (Drain J.) (a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties; a contract should not be construed "disregarding common sense in favor of formalistic literalism" that defies logic) (citations omitted).  With respect to Transform, as noted, it was simply unavoidable.  However, once Transform withdraws its designation of the EDA Agreement, the Amended Stipulation cannot be said to be the source for Sears, which relinquished its claim to 2018 or subsequent years EDA Funds, to claim the right to assign those rights to some other, yet unidentified, prospective assignee.

# **CONCLUSION**

**WHEREFORE**, the School District respectfully requests that the Court (i) enter an order, substantially in the form submitted with the Motion, granting the relief requested therein, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York  
November 15, 2020

ARCHER & GREINER, P.C.

By:   s/ Allen G. Kadish  
    Allen G. Kadish  
1211 Avenue of the Americas, Suite 2750  
New York, New York 10036  
Tel: (212) 682-4940  
Email: akadish@archerlaw.com

and

Kenneth M. Florey  
M. Neal Smith  
ROBBINS, SCHWARTZ, NICHOLAS,  
LIFTON & TAYLOR, LTD.  
631 E. Boughton Road, Suite 200  
Bolingbrook, Illinois 60440  
Tel: (630) 929-3639  
Email: kflorey@robbins-schwartz.com  
nsmith@robbins-schwartz.com

and

Matthew T. Gensburg  
GENSBURG CALANDRIELLO & KANTER, P.C.  
200 West Adams Street, Suite 2425  
Chicago, Illinois 60606  
Tel: (312) 263-2200  
Email: mgensburg@gcklegal.com

*Attorneys for Community Unit School District 300*

219748303v1