**Hearing Date and Time:  December 10, 2020 at 10:00 am (Eastern Time)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
:
In re                                                                                       :                    **Chapter 11**
:
**SEARS HOLDINGS CORPORATION, *et al.*,**        :
:                    **Case No. 18-23538 (RDD)**
Debtors.[1]                                                  :
:                    **(Jointly Administered)**
:
---------------------------------------------------------------X

## TRANSFORM HOLDCO LLC'S BRIEF IN OPPOSITION TO THE DEBTORS' MOTION TO COMPEL TURNOVER OF ESTATE PROPERTY

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 130 W. 44nd St., 17th Fl., New York, NY 10036.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT ........................................................................................................................... 5

    A.    The Debtors Are Not Entitled to Turnover Because Transform Is Not in Possession of Estate Property ...................................................................................................................... 5

        a)    Transform Has No Contractual Obligation to Make Any Cash Payment for the Closed Claims ............................................................................................................................ 6

        b)    The Debtors' Attempts to Rewrite the Second APA Settlement Agreement Fail........................ 10

        c)    Transform's Obligations (If Any) Are Reduced by Amounts Expended on the Debtors' Behalf................................................................................................................ 15

        d)    Transform Did Not Violate the Automatic Stay ....................................................... 16

    B.    The Debtors Improperly Failed to Deliver the Indian Acquired Foreign Assets Based on Transform's Purported "Breach" of the Second APA Settlement Agreement ........................... 17

CONCLUSION ...................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Aramony v. United Way of America,
254 F.3d 403 (2d Cir. 2001)................................................................. 12, 13

Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.),
543 B.R. 78 (Bankr. S.D.N.Y. 2016)...................................................... 6, 17

Brown v. Miguens,
No. 02 Civ. 5278 (JSM), 2003 WL 1090304 (S.D.N.Y. March 11, 2003)........................ 12

District of Columbia v. Heller,
554 U.S. 570 (2008)............................................................................ 13

In re Ore Cargo, Inc.,
544 F.2d 80 (2d Cir. 1976)................................................................... 7

In re Seatrain Lines, Inc.,
198 B.R. 45 (S.D.N.Y. 1996)................................................................ 17

In re Weiss-Wolf, Inc.,
60 B.R. 969 (Bankr. S.D.N.Y. 1986)...................................................... 6

Manley v. AmBase Corp.,
337 F.3d 237 (2d Cir. 2003)................................................................. 11

Mountaineer Coal Co. v. Liberty Mut. Ins. Co. (In re Mountaineer Coal Co.),
247 B.R. 633 (Bankr. W.D. Va. 2000) .................................................. 17

Process America, Inc. v. Cynergy Holdings, LLC,
839 F.3d 125 (2d Cir. 2016)................................................................. 18, 19

Realtime Data, LLC v. Melone,
104 A.D.3d 748, 961 N.Y.S.2d 275 (2013) ........................................... 7

Reyes v. Metromedia Software, Inc.,
840 F. Supp. 2d 752 (S.D.N.Y. 2012)................................................... 13

**Rules and Statutes**

11 U.S.C. § 542(a) ............................................................................................................... 6

**Other Authorities**

Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> (1st
ed. 2012) ............................................................................................................................... 12, 13

## PRELIMINARY STATEMENT

1.      This dispute turns on a simple question of contract interpretation.  The Debtors and Transform Holdco LLC ("Transform") agreed in the Second APA Settlement Agreement[2] that "neither Party shall be required to make any cash payment to the other Party pursuant to this Agreement."  Second APA Settlement Agreement § 17(b).  Nonetheless, shortly thereafter, the Debtors demanded that Transform make a cash payment for certain Closed Claims (as defined below).  Transform plainly has no such obligation under the Agreement.  Nor can the Debtors assert a separate basis for this payment (*i.e.* under the Asset Purchase Agreement between the parties) given the broad mutual release in the Agreement that covers "any and all past, present, and future claims" related to the Closed Claims "whether based in contract, tort or otherwise, whether in law or equity, and whether direct or indirect, fixed or contingent."  Second APA Settlement Agreement § 18(a).

2.      In their Motion,[3] the Debtors twist the plain contractual language in the Second APA Settlement Agreement to try to extract an additional, unbargained-for payment from Transform.  These efforts fail.  The Debtors' incorrect interpretation of the Agreement would render key terms superfluous, and neither the prefatory language of the Agreement nor its purported purpose can alter its unambiguous operative terms.

3.      Simply put, the Debtors are not entitled to turnover because Transform does not hold any estate property.  But even if the Court were to grant the Debtors' motion, the Debtors have already recovered $169,287.66 from the TBK Account (as defined below), and would be

---

[2]      The Settlement Agreement between the Debtors and Transform dated as of September 17, 2020 (the "Second APA Settlement Agreement" or the "Agreement"), filed with the Debtors' motion for entry of any order pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure approving the Second APA Settlement Agreement, Docket No. 8445, which was granted by the Bankruptcy Court on October 16, 2020, Docket No. 9025.

[3]      *Motion of Debtors to Compel Turnover of Estate Property*, Docket No. 9106 (the "Motion").

entitled only to the net proceeds, not the gross proceeds, of the Closed Claims. Therefore, while the Debtors claim damages of $676,688.73, the actual amount at stake here is no more than $406,505.07.

## BACKGROUND

4.     On October 15, 2018, each of the Debtors filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York, commencing a process to sell all or substantially all of the Debtors' businesses and assets. On February 8, 2019, the Bankruptcy Court entered an order approving the sale of substantially all of the Debtors' assets to Transform pursuant to a certain Asset Purchase Agreement, dated as of January 17, 2019 (as it has and may be amended, restated, modified, or supplemented, the "APA").[4]

5.     Following the Closing of the APA, Transform and the Debtors entered into a settlement agreement on January 10, 2020 to resolve a number of disputes that had arisen under the APA (the "First APA Settlement Agreement"). Not long after the entry into the First APA Settlement Agreement, it became clear that there were additional unresolved disputes. Among other things, there were disputes concerning the ownership of various litigation and insurance claims (the "Litigation and Insurance Claims"). As part of confidential settlement discussions, Transform made a settlement proposal to the Debtors pursuant to which ten closed claims and fifteen pending claims would belong to the Debtors, with the remainder belonging to Transform.

---

[4]     The APA refers to the Asset Purchase Agreement filed as Ex. B to the *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief*, Docket No. 2507 (the "Sale Order"), as amended by the Amendment No. 1 to Asset Purchase Agreement filed as Ex. E to the *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement*, Docket No. 2599 (the "Notice of Filing of Amendment No. 1 to the APA"). All capitalized terms used but not defined herein shall have the meaning ascribed to them in the APA.

*Declaration of Jennifer Brooks Crozier in Support of Debtors' Motion to Compel Turnover of Estate Property*, Docket No. 9107, Ex. A (the "Barefoot Letter").  Transform stated that it was "prepared to transfer these claims, or the proceeds thereof, to the Debtors, subject to overall agreement on the outstanding APA disputes that we have been discussing."[5]  Id.  Transform indicated that $146,480.22 of the total recovery of $614,018.94 for the ten closed claims was deposited in a client trust account for the Debtors with Thompson Brody & Kaplan, LLP (the "TBK Account").  Id.  The Debtors, however, did not accept the package of proposals described in Transform's settlement offer.

6.    Eventually, following months of negotiations to resolve all of the outstanding APA disputes, the parties executed the Second APA Settlement Agreement, which resolved numerous disputes, including those concerning the Litigation and Insurance Claims, Vornado Claims, Altaquip Claims, India Gains Tax, Indian Acquired Foreign Assets, Indian Interest Amount, Mexican Gains Tax, Mexican Acquired Foreign Assets, Mexico Dividend, Seritage Environmental Receivables, Seritage Reimbursement Funds, Vernon Warehouse Subtenant Rent, Tax Clearance Fee, Buyer Transition Services, Remaining KCD Intellectual Property, Sedgwick Fees, SHC-Israel Employee Costs, 2019 BPP Taxes, and Transition Vendor Services Amounts.   In connection therewith, the Debtors and Transform engaged in negotiations about the ownership of the Litigation and Insurance Claims, ultimately reaching an agreement about the allocation of these claims without conceding the merits of either side's legal arguments or agreeing as to liability.  See Second APA Settlement Agreement § 21 ("[N]othing contained in this Agreement shall be construed to be an admission of fault or liability on the part of any Party . . . .").   Notably, as

---

[5]    The Debtors suggest that they were misled because Transform "represented to the Debtors that the Closed Claims had 'Actual Recover[ies]' when, in fact, Transform had actually recovered the proceeds of those Claims." Motion at 9.  But the Barefoot Letter makes clear that Transform was "prepared to transfer" these proceeds – *i.e.*, that Transform was in possession of the proceeds as of May 2020.  Barefoot Letter at 1.

relevant to the present dispute, the parties agreed on an allocation of the Litigation and Insurance Claims, with 32 claims belonging to the Debtors (14 closed claims (the "Closed Claims") and 18 open claims) and 88 claims belonging to Transform.  Second APA Settlement Agreement § 10, Schedule 1.

7.      However, the Parties also agreed that they would not exchange cash payments for each element of the APA disputes according to this allocation.  Rather, the Parties agreed that it was crucial to have a net-zero payment settlement, which would require neither party to make a cash payment pursuant to the settlement agreement.  The correspondence between the Parties makes clear the centrality of this point in the negotiations.  For example, on July 7, 2020, Jared Friedmann of Weil, Gotshal & Manges LLP, counsel to the Debtors, stated in a letter to Transform conveying a settlement offer:  "Our proposal, which hopefully will get this done, eliminates the need for either party to come out of pocket."  *Declaration of Sean O'Neal in Support of Transform Holdco LLC's Brief in Opposition to the Debtors' Motion to Compel Turnover of Estate Property* ("O'Neal Decl."), Ex. A (the "Friedmann Email").

8.      The Second APA Settlement Agreement by its plain terms enacted this net-zero payment construct, allocating the ownership of disputed assets and liabilities in Sections 2-16, and then providing in Section 17(b) that "neither Party shall be required to make any cash payment to the other Party pursuant to this Agreement," with four specific exceptions for the Vornado Claims, the Altaquip Claims, the Bayamon/Panama City Claims, and post-Execution Date Buyer Transition Services (the "Four Exceptions").[6]  Section 10(a) provides that the 32 Litigation and Insurance Claims in Category 1 of Schedule 1 belong to the Debtors.  Section 17(b) expressly

---

[6]      All four of these exceptions contemplated a potential cash payment from the Debtors to Transform; the Second APA Settlement Agreement therefore provided a payment method for any amounts due from the Debtors to Transform, but did not include a reciprocal provision for amounts due from Transform to the Debtors.  Second APA Settlement Agreement, Section 18(c).

relieves the Parties from any obligation to make cash payments to each other pursuant to the Agreement; the only Litigation and Insurance Claims excepted from this provision are the Bayamon/Panama City Claims, which are pending, unresolved claims. There is no exception for the 14 Closed Claims.

9.     Nonetheless, soon after the Court entered an order approving the Second APA Settlement Agreement on October 16, 2020, *Order Approving the Second APA Settlement Agreement*, Docket No. 9025, the Debtors demanded that Transform make a cash payment for $676,668.73, the asserted aggregate amount of the proceeds of the Debtors' Closed Claims. See Crozier Decl. Ex. C (Nov. 6, 2020 Email from Jennifer Crozier to Sean O'Neal).

10.    The Debtors further demanded that if Transform did not make such a cash payment, it would "treat Transform's refusal as a material breach of the Second APA Settlement Agreement that relieves/excuses the Debtors from further performance, including of the obligation to transfer the Indian Acquired Foreign Assets to Transform." O'Neal Decl. Ex. B (Nov. 11, 2020 Email from Jennifer Crozier to Samuel Levander).

11.    Transform explained that it had no obligation to make any cash payment to the Debtors pursuant to the Second APA Settlement Agreement, including for the Closed Claims, Crozier Decl. Ex. C (Nov. 10, 2020 Email from Samuel Levander to Jennifer Crozier (the "Levander Email")), and the Debtors filed the instant motion for turnover on November 19, 2020.

## ARGUMENT

### A. The Debtors Are Not Entitled to Turnover Because Transform Is Not in Possession of Estate Property

12.    The Debtors' Motion should be denied because Transform is not in possession of estate property. As the moving party, the Debtors must establish that: (1) the property is in the possession, custody or control of a third party; (2) the property constitutes property of the estate;

(3) the property is a type that the trustee could use, sell, or lease pursuant to section 363 or that the debtor could exempt under section 522; and (4) the property is not of inconsequential value or benefit to the estate.  See 11 U.S.C. § 542(a); Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.), 543 B.R. 78, 96 (Bankr. S.D.N.Y. 2016).  The Debtors bear the burden of proof in a turnover action to show that Transform is in possession of estate property.  See, e.g., In re Weiss-Wolf, Inc., 60 B.R. 969, 975 (Bankr. S.D.N.Y. 1986) ("The burden of proof in a turnover proceeding under Code § 542 is at all times on the party seeking turnover.").

### a) Transform Has No Contractual Obligation to Make Any Cash Payment for the Closed Claims

13.    Transform has no obligation to make any cash payment pursuant to the Second APA Settlement Agreement, including with regard to the Closed Claims.  The plain language of section 17(b) of the Agreement clearly provides that "neither Party shall be required to make any cash payment to the other Party pursuant to this Agreement" (the "Zero Cash Payment Provision").  Second APA Settlement Agreement § 17(b).  To further clarify this point, Section 17(b) carves out only the Four Exceptions from the Zero Cash Payment Provision, and the Closed Claims are not among them.  Id.  Because Transform has no contractual obligation to make the cash payment sought by the Debtors in their Motion, Transform is not in possession of estate property, and the Motion should be denied.

14.    Taken as a whole, the Second APA Settlement Agreement resolves a variety of disputes between Transform and the Debtors in two steps:  First, it apportions the assets and liabilities that were in dispute between the Parties.  Second APA Settlement Agreement §§ 2-16.  Second, it provides that neither Party is required to make any cash payment to the other Party for the disputes resolved in Sections 2 through 16 of the Agreement, subject to the Four Exceptions.  Second APA Settlement Agreement § 17(b).

6

15.     As to the Litigation and Insurance Claims, the Agreement first lists 32 claims that belong to the Debtors and 88 claims that belong to Transform. Second APA Settlement Agreement § 10, Schedule 1. Section 17(b), as applied to the Litigation and Insurance Claims, then provides that neither Party shall be required to make any cash payment to the other Party for any such Claims, with the sole exception of the Bayamon/Panama City Claims. Id. § 17(b). The Agreement contains no exception for a cash payment with respect to the Closed Claims.[7]

16.     This silence is determinative, since the only permitted cash payments under the Agreement are for the Four Exceptions explicitly identified in Section 17(b). For example, Sections 10(c) and (d) specify the circumstances under which cash payments will be made to Transform for the Bayamon/Panama City Claims, and Section 17(b) carves out an exception for the Bayamon/Panama City Claims. By contrast, neither section makes any reference to a cash payment for the Closed Claims. See, e.g., In re Ore Cargo, Inc., 544 F.2d 80, 82 (2d Cir. 1976) (holding that the omission of a specific reference by a sophisticated commercial lender precludes the court from divining such a right based on the general language of a contract); Realtime Data, LLC v. Melone, 104 A.D.3d 748, 751, 961 N.Y.S.2d 275, 278 (2013) (explaining that under the doctrine of *expressio unius est exclusio alterius*, the expression of one thing is the exclusion of the other).

17.     Because the Four Exceptions in Section 17(b) all involve potential payments from the Debtors to Transform, Section 17(c) of the Agreement provides for a payment mechanism from the Debtors to Transform, but not from Transform to Debtors. Section 17(c) thus demonstrates that neither party contemplated that Transform would have to make any payment to

---

[7]     This structure clearly distinguishes the instant dispute from the tax refund dispute referred to by the Debtors in their preliminary statement. See Motion at 1-2. The issue here is not whether the Litigation and Insurance Claims in Category 1 of Schedule 1 belong to the Debtors (they plainly do), but whether the Agreement requires Transform to make a cash payment to the Debtors related to those Claims (it plainly does not).

the Debtors pursuant to the Agreement.  By contrast, the First APA Settlement Agreement, which called for a cash payment from Transform to Debtors, included a mechanism and wire transfer information to effectuate such a payment.  <u>Compare</u> First APA Settlement Agreement § 1(g) (providing wire transfer transformation and instructions for Transform to pay the Settlement Amount to the Debtors), <u>with</u> Second APA Settlement Agreement § 17(c), Schedule 4 (providing wire transformation and instructions for the Debtors to make payments for the Four Exceptions to Transform).

18.    The Debtors are also barred from bringing this turnover motion based on the broad mutual release in Section 18(a) of the Agreement, which resolved all claims related to the Litigation and Insurance Claims (including the Closed Claims) with finality. [8]  Under this provision, the Debtors released any potential claims related to the "Additional APA Disputes," which includes the "Litigation and Insurance Claims Dispute," which in turn is defined to include "any other matters involving the Litigation and Insurance Claims that could have been asserted by

---

[8]    The complete text of Section 18(a) states:

Upon the Effective Date, Transform and each of the Debtors, on behalf of itself, its controlled affiliates, and each and all of its and its affiliates' respective past and present successors and assigns or any entity asserting a claim released hereunder either through or on behalf of any such parties (all such releasing persons and entities collectively, the "<u>Releasing Parties</u>"), does hereby fully, unconditionally and irrevocably release, relieve, waive, relinquish, remise, acquit and forever discharge the other Party and such other Party's respective past, present and future agents, heirs, executors, administrators, conservators, successors, assigns, noteholders, participants, co-participants, direct and indirect parents, principals, subsidiaries, affiliates, related companies, shareholders, interest holders, investors, members, partners (including, without limitation, general and limited partners), managers, directors, representatives, contractors, service providers, receivers, attorneys and beneficiaries, and the past, present, and future officers, directors, and employees (all such released persons and entities, collectively, the "<u>Released Parties</u>") from, against, and in respect of any and all past, present, and future claims, cross-claims, counterclaims, third-party claims, demands, liabilities, obligations, debts, liens, damages, losses, costs, expenses, controversies, actions, rights, suits, assessments, penalties, charges, indemnities, guaranties, promises, commitments, appeals, or causes of action of whatsoever nature, whether based in contract, tort or otherwise, whether in law or equity and whether direct or indirect, fixed or contingent, that any of the Parties have or may have against any of the other Parties since the beginning of time, under, arising out of or in connection with the Additional APA Disputes (all of the foregoing, the "<u>Released Claims</u>"), which Released Claims shall include for the avoidance of doubt any right to claim an award of attorneys' fees or other costs and expenses incurred in, or in connection with, any of the foregoing.

a Party as of the date hereof." See Second APA Settlement Agreement at 4, 5, § 18(a). To obtain the relief requested by this Motion, the Debtors would have needed to have sought turnover of these funds *before* they signed the Second APA Settlement and released these claims, including any claim that the funds should be turned over as estate property.

19.      Transform submits that the Agreement on its face unambiguously and expressly relieves Transform from the obligation to make any cash payment to the Debtors for the Closed Claims. However, if it were applied, the parol evidence would also confirm Transform's position. The net-zero payment settlement structure, as memorialized in Section 17(b), was a crucial feature of the Parties' Agreement. In fact, the Debtors themselves repeatedly stressed the importance of this aspect of the Agreement in communications with Transform and this Court. In proposing this structure, counsel for the Debtors stated to Transform in a July 7, 2020 email: "Our proposal, which hopefully will get this done, eliminates the need for either party to come out of pocket." O'Neal Decl., Ex. A (Friedmann Email). Moreover, and importantly, the *Debtors' Motion Pursuant to Federal Rules of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Second APA Settlement Agreement with Transform Holdco LLC* (the "Motion to Approve"), Docket No. 8445, did not suggest that the Debtors were entitled to receive any cash payment (for the Closed Claims or otherwise), but rather pointed to "the *possibility* of significant recoveries to the Debtors' estates for the benefit of the estates' creditors." Motion to Approve at 1 (emphasis added). Finally, the Motion to Approve provided that the intent of the settlement was to resolve the specified outstanding issues "on a global basis" through "the full and final resolution" of the issues and "the release of any claims arising out of or related to those disputes." See Motion to Approve at 1.

      **b)  The Debtors' Attempts to Rewrite the Second APA Settlement Agreement
Fail**

20.    The Debtors assert several meritless counterarguments in an attempt to rewrite the

Second APA Settlement Agreement and seek a cash payment for the Closed Claims from

Transform.

21.    ***The Closed Claims Belong to the Debtors under the Second APA Settlement
Agreement.***  The Debtors argue that any cash payment for the Closed Claims would be exempted

from Section 17(b) because any such payment would be "under the APA" rather than "pursuant to

[the Second APA Settlement Agreement]."  Motion at 12.  That argument fails on the face of the

Agreement:  The Debtors seek a cash payment that corresponds to the Closed Claims allotted to

them in Category 1 of Schedule 1 to the Second APA Settlement Agreement.  *Compare* Second

APA Settlement Agreement, Schedule 1, *with,* Crozier Decl., Ex. C (Nov. 6, 2020 Email from

Jennifer Crozier to Sean O'Neal) (listing the 14 Closed Claims from Category 1 of Schedule 1).

The specific Litigation and Insurance Claims at issue here were allocated between the Debtors and

Transform under the Second APA Settlement Agreement, not the APA.  Indeed, the Debtors

recognize as much, noting that "the instant dispute (concerning the right to recover on the Debtors'

Closed Claims . . . ***is the very dispute that the Second APA Settlement Agreement resolved***."

Motion at 15 n.5 (emphasis in original).

22.    Moreover, the Debtors waived their right to enforce the APA as to the Closed

Claims in Section 18(c) of the Second APA Settlement Agreement, which provides "<u>except with

respect to the Released Claims as provided in Section 18(a)</u>, nothing herein shall prejudice the

rights of any Party to enforce its rights under the APA."  Second APA Settlement Agreement

§ 18(c) (emphasis added).  In turn, the definition of Released Claims in Section 18(a) includes all

claims "under, arising out of or in connection with the Additional APA Disputes," which includes

the Litigation and Insurance Claims and "*any other matters involving the Litigation and Insurance Claims that could have been asserted by a Party as of the date hereof*." Id. at 4, 5, § 18(a) (emphasis added).  To the extent the Debtors seek a cash payment for the Closed Claims under the APA, they waived their right to do so upon entering into the Second APA Settlement Agreement.

23.    The Debtors' proffered exception for the Closed Claims from Section 17(b)'s Zero Cash Payment Provision because the Closed Claims "belong to the Debtors under the APA" would render Section 17(b) meaningless.  Motion at 12; see, e.g., Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003) (instructing that courts must avoid "interpretations that render contract provisions meaningless or superfluous").  The Second APA Settlement Agreement describes that the Vornado Claims, Altaquip Claims, Indian Gains Tax, Indian Acquired Foreign Assets, Indian Interest Amount, Mexican Gains Tax, Mexican Acquired Foreign Assets, Mexico Dividend, Seritage Environmental Receivables, Seritage Reimbursement Funds, Vernon Warehouse Subtenant Rent, Sedgwick Fees, SHC-Israel Employee Costs, and 2019 BPP Taxes were all disputed "under the APA."  Second APA Settlement Agreement at 1-5; see also Motion to Approve at 6 (describing every issue addressed by the Second APA Settlement Agreement as "disputed . . . under the APA").  The Debtors' argument, taken to its logical conclusion, would render Section 17(b) a nullity as to every dispute resolved by the Second APA Agreement.

24.    That is not the case.  The Parties enumerated only the Four Exceptions from Section 17(b)'s Zero Cash Payment Provision.  They did not create a fifth exception *sub silentio* for the Closed Claims in Section 17(b) by using this "under the APA" language in Section 10(a).  Rather, where the Parties intended to create exceptions, they did so explicitly.  See supra ¶ 16 (the difference in contractual language between the silence as to the Closed Claims and the specific

carve out for the Bayamon/Panama City Claims in Sections 10(c), 10(d), and 17(b) should be given meaning).

25.    ***Section 17(b)'s Prefatory Clause Does Not Limit Its Operative Clause.***    The Debtors also argue that because the Closed Claims are not explicitly mentioned in Section 17(b), they were not subject to the Zero Cash Payment Provision.  But by its plain language, 17(b) is not limited to the issues described in 17(b)(i)-(iii), but applies to "any cash payment to the other Party pursuant to this Agreement," subject only to the Four Exceptions.

26.    Grammatically, Section 17(b) is split into two parts.  The first part begins with the phrase "Because, for purposes of this Agreement" and ends with "(reducing the amount owed by the Debtors to Transform to $723,000 in the aggregate)."  This a prefatory clause, which creates no independent obligation between the Parties.  <u>See, e.g.</u>, Antonin Scalia & Bryan A. Garner, <u>Reading Law:  The Interpretation of Legal Texts</u> 217 (1st ed. 2012) (defining prefatory material as "a passage that precedes the text's operative terms").  The second part begins with "neither Party shall be required to make any cash payment to the other Party," and consists of the Zero Cash Payment Provision and the Four Exceptions.  This is the operative clause – it describes the Parties' obligations under the Agreement.

27.    The Debtors would read the prefatory clause to modify and limit the plain, unambiguous language of the operative clause.  This argument fails for three reasons.  First, prefatory language cannot independently expand or limit the operative terms of an agreement. <u>Aramony v. United Way of America</u>, 254 F.3d 403, 413 (2d Cir. 2001) (contractual language describing the purpose of a pension plan "cannot create any right beyond those arising from the operative terms of the document"); <u>Brown v. Miguens</u>, No. 02 Civ. 5278 (JSM), 2003 WL 1090304 at *3 (S.D.N.Y. March 11, 2003) (holding that the introductory section of a contractual

provision "cannot remove or limit rights that are plainly given by the terms of an agreement"); see also Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal Texts 219 (1st ed. 2012) ("[A]n expression of specific purpose in the prologue will not limit a more general disposition that the operative text contains.").  Here, the operative clause – "neither party shall be required to make any cash payment to the other Party pursuant to this Agreement" – is not limited by the introductory language of Section 17(b).  While prefatory language may be useful in interpreting an ambiguous operative clause, the operative language of Section 17(b) is plainly unambiguous.  See Aramony, 254 F.3d at 413; see also District of Columbia v. Heller, 554 U.S. 570, 577-78 (2008) (noting that a prefatory clause may "resolve an ambiguity in the operative clause . . . [b]ut apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause.").

28.    Second, "it is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'"  Aramony, 254 F.3d at 413 (quoting Restatement (Second) of Contracts § 203(c)).  Thus, general introductory language yields to the specific operative language of a contractual provision. Id. at 414.  Here, the general description of certain terms of the Parties' agreement in the prefatory clause is superseded by the specific operative language of the Zero Cash Payment Provision subject to the Four Exceptions.

29.    Third, the Debtors' interpretation of Section 17(b) would carve out exceptions from the Zero Cash Payment Provision for any payment not specifically identified in the prefatory clause.  This interpretation would dramatically depart from the contractual text, which explicitly spells out only the Four Exceptions, and would render the contractual language describing those exceptions mere surplusage.  See Reyes v. Metromedia Software, Inc., 840 F. Supp. 2d 752, 755 (S.D.N.Y. 2012) (a court must evaluate the disputed contractual language "in the context of the

entire agreement .... [to] safeguard against adopting an interpretation that would render any individual provision superfluous.") (citing Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)).

30.     ***The Purpose of Section 17(b) Was to Effectuate a Net-Zero Payment Settlement.*** The purpose of Section 17(b) does not support the Debtors' position.  The plain language of the Agreement provides that neither Party shall make a cash payment to the other Party pursuant to the Agreement, effectuating the purpose of enacting a net-zero payment settlement.  The title of Section 17(b), "Netting of Payments," is consistent with this purpose.  That is, the Parties intended for all payments under the Second APA Settlement Agreement to net out such that there would be no cash payment between them.  And to the extent that there is any ambiguity in the text of the Agreement, the parol evidence unmistakably demonstrates that the purpose of the Agreement was to resolve the pending disputes without the Parties "ever having to draw upon their own bank accounts," "eliminat[ing] the need for either party to come out of pocket."  Motion to Approve at 14; O'Neal Decl., Ex. A (Friedmann Email).  The only exceptions to that rule were (i) if the Debtors recovered amounts from one or more third parties *in the future* (*i.e.* in connection with the Vornado Claims, the Altaquip Claims, and/or the Bayamon/Panama City Claims), and (ii) for services rendered by Transform to the Debtors pursuant to the TSA *after* the Invoiced Date.  No other cash payments are required by the Agreement.

31.     ***The "Rights, Title, and Interest" to the Litigation and Insurance Claims Hold Value***.  The Debtors incorrectly posit that their "rights, title, or interest in, to, or under the Litigation and Insurance Claims listed in Category 1 of Schedule 1" would be rendered meaningless if they are not entitled to a cash payment for the proceeds of the Closed Claims.  See Motion at 15 (quoting Second APA Settlement Agreement § 10(a)).  This argument ignores several

14

valuable rights conveyed to the Debtors related to the Litigation and Insurance Claims.  *First*, the

Debtors may prosecute all of the pending Litigation and Insurance Claims, and are entitled to any

settlement or judgment arising from those claims.  *Second*, the Debtors have already taken control

of the TBK Account, which had $169,287.66 as of the time of transfer.[9]  *Third*, they have the right

to any residual or contingent (*i.e.* future) value from the Closed Claims, as well as the right to

enforce the various settlement agreements relating to the Closed Claims.

32.    ***The Right to Enforce the Second APA Settlement Agreement Does Not Change
the Operative Terms of the Agreement.***  The Debtors point to the fact that Section 18(b) gives

them the right to enforce the Second APA Settlement Agreement, but this provision neither

expands nor takes away either Party's rights under the Agreement.  Given that the Second APA

Settlement Agreement affirmatively relieves Transform from any obligation to make a cash

payment to the Debtors for the Closed Claims, Section 18(b) cannot independently create such an

obligation.

c)    **Transform's Obligations (If Any) Are Reduced by Amounts Expended on the
Debtors' Behalf**

33.    Even if the Debtors were correct that the Second APA Settlement Agreement

entitled them to a cash payment for the Closed Claims (and they are not), their requested

$676,668.73[10] in funds must be reduced by (i) amounts deposited in the TBK Account which have

been released to the Debtors, and (ii) amounts spent on the Debtors' behalf for legal fees and

expenses, expert fees, and other similar costs.  Because Transform has already relinquished any

---

[9]    As of May 20, 2020, Transform informed the Debtors that $146,480.22 had been deposited in the TBK
Account from the proceeds of the Closed Claims.  Barefoot Letter at 4.  The amount in the TBK Account subsequently
increased to $169,287.66 by the time the Debtors took control of the Account.

[10]    Exhibit E to the Crozier Declaration and the November 6, 2020 email from Crozier demand a cash payment
of $676,6**6**8.73.  The Debtors' Motion and proposed order, which are purportedly based off of Exhibit E to the Crozier
Declaration, demand $676,6**8**8.73.

rights it had to the TBK Account (which held $169,287.66 when control was transferred to the Debtors), the total cash component of the proceeds of the Closed Claims sought by the Debtors cannot exceed $507,381.07.

34.    Moreover, the Debtors cannot recover more than the *net* proceeds of the Closed Claims after taking into account funds spent on the prosecution of Debtor claims, further reducing the maximum available potential damages to $406,505.07.  The Debtors overstate the amounts that could be owed to the Debtors even if their contractual interpretation were correct.  By the Debtors' own calculations, Thompson Brody Kaplan LLP spent $100,876 from the TBK Account on "Debtor Claim Uses."  See *Declaration of Dale Menendez in Support of Transform Holdco LLC's Brief in Opposition to the Debtors' Motion to Compel Turnover of Estate Property* ("Menendez Decl."), Ex. A (Oct. 30, 2020 Email from William Gallagher to Dale Menendez).[11]  The Debtors are not entitled to double recovery of these amounts already expended on their behalf for claims that belong to them.

### d)  Transform Did Not Violate the Automatic Stay

35.    There is no merit to the Debtors' argument that Transform violated the automatic stay.  It is well settled that a matter of contract dispute cannot be converted by the Debtors into a purported violation of the automatic stay.  See In re Soundview Elite Ltd., 543 B.R. at 97 ("[T]he turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable."); In re Seatrain Lines, Inc., 198 B.R. 45, 50 n.7 (S.D.N.Y. 1996) (Sotomayor, J.) (quoting United States v. Inslaw, 932 F.2d 1467, 1472 (D.C. Cir.

---

[11]    The Parties are engaged in further discussions concerning whether any portion of an additional $82,000 is properly attributable to Debtor Claim Uses.

1991)) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."); Mountaineer Coal Co. v. Liberty Mut. Ins. Co. (In re Mountaineer Coal Co.), 247 B.R. 633, 644 (Bankr. W.D. Va. 2000) (Congress did not intend "to convert a matter of contract dispute into a violation of the automatic stay.").

36.    The Parties here dispute whether the Debtors are entitled to a cash payment for the Closed Claims pursuant to the Second APA Settlement Agreement.  The Debtors argue that Transform is in "material breach of the Second APA Settlement Agreement" and demand a $676,668.73 cash payment.  O'Neal Decl. Ex. B (Nov. 11, 2020 email from Jennifer Crozier to Samuel Levander); Motion at 16.  Transform responds that this demand is prohibited by Section 17(b) of the Second APA Settlement Agreement.  Crozier Decl. Ex. C (the Levander Email); supra at 6-15.  That is, there is a genuine contract dispute between the Parties, which the Debtors may not use as the basis to recover attorneys' fees as a willful violation of the automatic stay.

37.    In addition, the Debtors' request for attorneys' fees is foreclosed by Section 18(a) of the Second APA Settlement Agreement, which defines the Parties' "Released Claims" to include "any right to claim an award of attorneys' fees or other costs and expenses."  Second APA Settlement § 18(a).

## B.  The Debtors Improperly Failed to Deliver the Indian Acquired Foreign Assets Based on Transform's Purported "Breach" of the Second APA Settlement Agreement

38.    In their Motion, the Debtors fail to mention that they have refused to transfer the Indian Acquired Foreign Assets to Transform until this dispute over the Closed Claims has been resolved.  Under the Second APA Settlement Agreement, the Debtors must "use commercially reasonable efforts to transfer to Transform one-hundred percent (100%) of the equity in the Indian Acquired Foreign Assets within thirty (30) days following the Effective Date," i.e., by November 15, 2020.  Second APA Settlement Agreement § 3.  Rather than comply with their contractual

obligations, the Debtors have declared that they have been "relieve[d]/excuse[d] . . . of the obligation to transfer the Indian Acquired Foreign Assets to Transform," and will not finalize the India transfer until the Litigation and Insurance Claims issue is resolved.  O'Neal Decl., Ex. B (Nov. 11, 2020 Email from Jennifer Crozier to Samuel Levander).

39.    While, as demonstrated above, Transform has not breached the Second APA Settlement Agreement, the Debtors must perform their obligations to transfer the Indian Acquired Foreign Assets even if the Court accepts the Debtors' arguments in the present dispute.   Under New York law, a party is excused from performance only where its contractual counterparty has committed a breach that is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract."  Process America, Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 136 (2d Cir. 2016) (quoting Callanan v. Powers, 199 N.Y. 268, 284 (1910)).   "A partial breach by one party . . . does not justify the other party's subsequent failure to perform; both parties may be guilty of breaches, each having a right to damages."  Process America, 839 F.3d at 137 (quoting New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117-18 (2d Cir. 2006)).

40.    Moreover, the Debtors' willful failure to comply with their obligations to deliver the Indian Acquired Foreign Assets is forbidden by two separate terms of the Second APA Settlement Agreement.  First, under Section 30 of the Second APA Settlement Agreement, the observance of any term may be waived only with the written consent of both Parties.  Transform has not consented to waive its rights as to the Indian Acquired Foreign Assets, and the Debtors may not amend this provision unilaterally.

41.    Second, Section 28, on "Severability," provides:

If any provision in this Agreement is determined to be invalid, inoperative, or unenforceable, the remaining provisions of this Agreement remain in effect if both

the economic and legal substance of the transactions contemplated hereby are not materially affected in any manner adverse to any Party. Otherwise, the Parties shall negotiate in good faith to rewrite any such provision so as to, as nearly and fairly as possible, approach the economic and legal substance originally intended.

That is, the Severability provision provides for two options:  either the other provisions of the Agreement remain in effect, or the Parties negotiate in good faith to rewrite the provision in question.  The Agreement does not contemplate that one Party can unilaterally cease to perform its duties related to one provision because it asserts that the other Party is in breach of another provision.

42.    Thus, the Debtors must immediately consummate the transfer of the Indian Acquired Foreign Assets to Transform, and any damages awarded to the Debtors for breach of the Litigation and Insurance Claims provision should be offset by damages incurred by Transform for breach of the Indian Acquired Foreign Assets provision.[12]

## CONCLUSION

43.    For the reasons stated above, Transform requests that the Court deny the Debtors' Motion to Compel Turnover of Estate Property and order the Debtors to immediately consummate the transfer of the Indian Acquired Foreign Assets to Transform.

---

[12]    In addition, Transform reserves the right to pursue damages for the Debtors' filing and service of confidential settlement materials, which included sensitive and potentially damaging information about various Litigation and Insurance Claims beyond the Closed Claims which were the subject of the Motion.  This sensitive and potentially damaging information related to claims owned by Transform and the Debtors pursuant to the Second APA Settlement.

Dated:  December 3, 2020
        New York, New York

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**

*/s/ Sean A. O'Neal*
Sean A. O'Neal
Samuel Levander
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Counsel for Transform Holdco LLC*