## Exhibit A

**New Escrow Agreement**

*Execution Version*

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "Escrow Agreement") is entered into and effective this December 7, 2020, by and among Jeffrey R. Abbott, Esquire, a Pennsylvania resident (the "Escrow Agent"), William D. Staffieri, a Florida resident ("Buyer") and Innovel Solutions, Inc. (a/k/a Sears Logistics Services, Inc.) (the "Company)" and together with the Buyer and the Escrow Agent, the "Parties";

BACKGROUND

Buyer, the Company and Congress Abstract Corporation entered into an Escrow Agreement on or about December 20, 1994 (the "1994 Escrow Agreement").  A copy of that Agreement is attached as Exhibit "A".

Buyer, the Company and Chicago Title Insurance Company (successor in interest to Congress Abstract Corporation) have agreed to terminate the 1994 Escrow Agreement in accordance with the Stipulation, Agreement And Order Resolving Motion For Relief From The Automatic Stay, dated December 7, 2020, attached here as Exhibit "B".

Upon the termination of the 1994 Escrow Agreement, $114,827.47 has been paid outright to the Company and $5,617.00 has been paid to Buyer. Buyer and the Company have agreed that $103,383.00 is to be held in escrow in accordance with this Escrow Agreement (the "Escrow Funds").

WHEREAS,

The Parties desire for the Escrow Agent to open an account (the "Escrow Account") into which  the Escrow Funds, shall be held, disbursed and invested by the Escrow Agent in accordance with this Escrow Agreement.

The Parties desire for the Escrow Account to be used exclusively to fund certain costs pertaining to environmental remediation limited to an 11,000 +/- square foot parcel known as Parcel 3 and located at 3820 North 2nd Street, Philadelphia, PA, 19140, currently owned by the Company (the "Property").

NOW, THEREFORE, in consideration of the premises herein, the Parties agree as follows:

**I**.    **Terms and Conditions**

1.1.   Buyer and the Company hereby appoint the Escrow Agent as their escrow agent, and the Escrow Agent hereby accepts its duties as provided herein. The initial escrow deposit will be the Escrow Funds totaling $103,383.00.  The Escrow Funds shall be initially allocated as follows:

| | |
|---|---|
| Vertex estimate | $57,000.00 |
| GAC proposal | $15,000.00 |
| Vertex reserve (wells) | $15,000.00 |
| GAC reserve (wells) | $2,000.00 |
| Reserve | $14,383.00 |
| **TOTAL:** | **$103,383.00** |

1.2    In connection with the remediation of the Property, the Company shall remit to the Escrow Agent the Escrow Funds, using the wire instructions set forth below, to be held by the Escrow Agent and disbursed and invested as provided in this Escrow Agreement.:

> Citizens Bank
> ABA:  036076150
> Acct.#:  6101554000
> Acct. Name:  Jeffrey R. Abbott, IOLTA

1.3.    Within two business days (except as provided in Paragraphs 1.4, 1.5 and 1.6) of receipt of written instructions ("Joint Instructions"), signed by an authorized representative of both Buyer and the Company, the Escrow Agent shall disburse funds held in the Escrow Account as provided in such Joint Instructions and this Section 1.3, but only to the extent that funds are collected and available. Furthermore, if Buyer requests instruction from the Company and the Company does not respond within 15 calendar days, the Escrow Agent can release funds to Buyer for purposes of funding the remediation.  The Joint Instructions shall include the amount to be disbursed and shall identify the party to whom the disbursement shall be made. The Escrow Agent shall have no responsibility for, and is hereby relieved of all liability to Buyer, the Company and all other persons and entities with respect to, the manner in which funds are applied or disbursed from the Escrow Account.

1.4    Immediately upon receipt of the Escrow Funds set forth in Paragraph 1.1 above, the Escrow Agent shall disburse $2,525.00 to GAC, which amount shall reduce the Escrow Funds allocated to the GAC proposal.

1.5    Upon the completion of the remediation of the Property, (i) as evidenced by either a "No Further Action  Letter" or similar determination communicated in writing by the Pennsylvania Department of Environmental Protection or (ii) compliance by the Company to the reasonable satisfaction of the Buyer with Paragraph 18 of the Agreement for Purchase and Sale of Property between SLS, Inc. and Buyer dated May 31, 1994 attached as Exhibit "C",  any remaining Escrow Funds, shall be delivered to the Company.

1.6    Notwithstanding the above, if remediation of the Property has not been completed in compliance with Paragraph 1.5 above on or before November 1, 2021 the remaining Escrow Funds shall be paid to the Buyer and the Property shall be conveyed by the Company to the Buyer.

## II.    Provisions as to the Escrow Agent

2.1.    This Escrow Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Escrow Agreement against the Escrow Agent. In performing its duties under this Escrow Agreement, or upon the claimed failure to perform its duties, the Escrow Agent shall have no liability except for the Escrow Agent's willful misconduct or gross negligence. In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds effected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Escrow Agreement. Any wire transfers of funds made by the Escrow Agent pursuant to this Escrow Agreement will be made subject to and in accordance with the Escrow Agent's usual and ordinary wire transfer procedures in effect from time to time. No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur

any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with this Escrow Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

2.2.    The Parties acknowledge and agree that the Escrow Agent acts hereunder as a depository only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof, or of any person executing or depositing such subject matter.

2.3.    This Escrow Agreement, together with all exhibits hereto, constitutes the entire agreement among the Parties in connection with the subject matter of this Escrow Agreement, and no other agreement entered into between Buyer and the Company, or either of them, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof.

2.4.    The Escrow Agent shall be protected in acting upon any written instruction, notice, request or instrument which the Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items directing investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the Escrow Funds and items amending the terms of this Escrow Agreement.

2.5.    The Escrow Agent may consult with legal counsel in the event of any dispute or question as to the construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected in acting in accordance with the advice of such counsel.  Any legal fees incurred by the Escrow Agent shall be paid from the Escrow Funds.

2.6.    In the event of any disagreement between Buyer and the Company, or between either of them and any other party, resulting in adverse claims or demands being made in connection with the matters covered by this Escrow Agreement, or in the event that the Escrow Agent, in good faith, is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to refrain from acting until (i) the rights of Buyer and the Company and all other interested parties shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjudged and all doubt resolved by agreement among Buyer and the Company and all other interested parties, and the Escrow Agent shall have been notified thereof in writing signed by Buyer and the Company. Notwithstanding the preceding, the Escrow Agent may in its discretion obey the order, judgment, decree or levy of any court, whether with or without jurisdiction, or of an agency of the United States or any political subdivision thereof, or of any agency of any State of the United States or of any political subdivision thereof, and the Escrow Agent is hereby authorized in its sole discretion, to comply with and obey any such orders, judgments, decrees or levies. The rights of the Escrow Agent under this sub-paragraph are cumulative of all other rights which it may have by law or otherwise.

The Parties acknowledge that Escrow Agent acts as legal counsel for Buyer and may continue to do so notwithstanding this Agreement. In the event of any disagreement or doubt, as described above, the Escrow Agent shall have the right, in addition to the rights described above and at the election of the Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all funds

and property held under this Escrow Agreement, and the Escrow Agent shall have the right to take such other legal action as may be appropriate or necessary, in the sole discretion of the Escrow Agent. Upon such tender, Buyer and the Company agree that the Escrow Agent shall be discharged from all further duties under this Escrow Agreement and, thereafter, Escrow Agent shall not be prohibited from representing Buyer in any action.

2.7.    Buyer and the Company jointly and severally agree to defend, indemnify and hold harmless the Escrow Agent and his successors or assigns (the "Indemnified Parties") from and against any and all losses, liabilities, claims made by any Party or any other person or entity, damages, expenses and costs (including, without limitation, attorneys' fees and expenses) of every nature whatsoever (collectively, "Losses") which any such Indemnified Party may incur and which arise directly or indirectly from this Escrow Agreement or which arise directly or indirectly by virtue of the Escrow Agent's undertaking to serve as the Escrow Agent hereunder; *provided*, *however*, that no Indemnified Party shall be entitled to indemnity with respect to Losses that have been finally adjudicated by a court of competent jurisdiction to have been directly caused by such Indemnified Party's gross negligence or willful misconduct and, *provided further*, that the Company's indemnity obligations are limited to the Escrow Funds. The provisions of this section shall survive the termination of this Escrow Agreement and any resignation or removal of the Escrow Agent.

2.8    If the Escrow Agent resigns or dies, James R. Abbott, Esquire, in his individual capacity, shall be Successor Escrow Agent ("Successor") under this Escrow Agreement without further act.

2.9.    The Escrow Agent or Successor may resign at any time from its obligations under this Escrow Agreement by providing written notice to Buyer and the Company. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) calendar days after such written notice has been furnished. If the Successor resigns Buyer and the Company shall promptly appoint a second successor escrow agent. In the event no second successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Successor shall be entitled to tender into the custody of any court of competent jurisdiction all funds and other property then held by the Successor hereunder and the Successor shall thereupon be relieved of all further duties and obligations under this Escrow Agreement. The Successor shall have no responsibility for the appointment of a second successor escrow agent hereunder.

## III.  Compensation of the Escrow Agent

3.1.    The Escrow Agent and Successor shall be entitled to reasonable compensation to be paid from the Escrow Funds.  The Escrow Agent and Successor shall not charge fees to Buyer and the Company for the services provided by it hereunder; *provided*, *however*, that the terms of this paragraph shall in no way limit the rights of the Escrow Agent and Successor to indemnification as set forth in this Escrow Agreement.

## IV.  Miscellaneous

4.1    The Parties agree that, subject to the terms and conditions of this Escrow Agreement, at least one of the owners of the funds held in escrow is an individual and the Escrow Funds shall be held in the Escrow Agent's IOLTA account.  No interest on the Escrow Funds shall accrue to Buyer or Company.

4.2    The Escrow Funds will be retained by the Escrow Agent in an Interest on Lawyers Trust Account (IOLTA).  Any interest on those funds are accrued within the trust fund administered by the Pennsylvania Interest in Lawyers trust Accounts Board, P.O. Box 62445, 601 Commonwealth

Avenue, Harrisburg, PA 17106-2445. The Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return with respect to the Escrow Funds or any income earned by the Escrow Funds. Buyer and the Company, jointly and severally, agree to indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the funds held under this Escrow Agreement or any earnings or interest thereon unless such tax, late payment, interest, penalty or other cost or expense was caused by the gross negligence or willful misconduct of the Escrow Agent; provided that the Company's indemnity obligations are limited to the Escrow Funds. The indemnification provided in this section is in addition to the indemnification provided to the Escrow Agent elsewhere in this Escrow Agreement and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

4.3.   Any notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given when delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by electronic mail to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by United States mail, postage prepaid, or by certified mail, return receipt requested and postage prepaid, in each case to the appropriate address set forth below or at such other address as any party hereto may have furnished to the other Parties hereto in writing:

If to the Escrow Agent:

Jeffrey R. Abbott, Esquire
103 Chesley Drive
Media, PA   19063
Telephone:  610-565-0330
Facsimile:   610-565-9363
Email:  dowjonesia@aol.com

If to Buyer:

William D. Staffieri
4233 Richmond Street
Philadelphia, PA 19137
Telephone: 215-831-1732
Email:  olimpiosts@aol.com

If to the Company:

M-III Advisory Partners, LP
1700 Broadway, 19th Floor,
New York, NY 10019
Attention: William Gallagher
Telephone: 212-202-2214
Email: wgallagher@m3-partners.com

with a copy (which shall not constitute notice) to

Weil, Gotshal & Manges LLP
2001 M Street NW, Suite 600

Washington, DC 20036
Attention: Thomas D. Goslin
Telephone: (212) 310-8552
Email: Thomas.Goslin@weil.com

Any Party may unilaterally designate a different address by giving written notice (e-mail shall suffice) of each change in the manner specified above to each other party.

4.4.   This Escrow Agreement is intended to be construed according to the laws of the Commonwealth of Pennsylvania. Except as permitted in Section 2.9, neither this Escrow Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of each of the other Parties hereto, provided that, upon the Effective Date[1] of the confirmed Plan in the Company's Chapter 11 case, all rights of the Company shall be automatically assigned to the Liquidation Trust in accordance with the Plan without need for any consent or written documentation. This Escrow Agreement shall inure to and be binding upon the Parties hereto and their respective successors, heirs and permitted assigns.

4.5.   The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the Parties hereto.

4.6.   If any provision of this Escrow Agreement shall be held or deemed to be or shall in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

4.7.   This Escrow Agreement is for the sole benefit of the Indemnified Parties, Buyer, the Company and the Escrow Agent, and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

4.8.   No party to this Escrow Agreement shall be liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, the COVID-19 pandemic or other causes reasonably beyond its control.

4.9.   This Escrow Agreement shall terminate upon the distribution of all Escrow Funds or upon the earlier joint written instructions of the the Buyer and the Company.

4.10.  All titles and headings in this Escrow Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

4.11.  This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

---

[1] All capitalized terms not otherwise defined in this paragraph shall have the meaning attributed to them in the *Order(I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation And Its Affiliated Debtors And (II) Granting Related Relief* [ECF No. 5370], entered in the Company's chapter 11 case (jointly administered under Case No. 18-23538 (RDD)).

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

ESCROW AGENT

_____

Jeffrey R. Abbott, Esquire

BUYER

_____

William D. Staffieri

INNOVEL SOLUTIONS, INC.

By: _____

Name: Mohsin Y. Meghji

Title:   Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

ESCROW AGENT

Jeffrey R. Abbott, Esquire

BUYER

William D. Staffieri

INNOVEL SOLUTIONS, INC.

By:_____
Name: Mohsin Y. Meghji
Title:   Chief Restructuring Officer

**EXHIBIT A**
**1994 Escrow Agreement**

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "Escrow Agreement") is made as of this 20th day of December, 1994, by and between SEARS LOGISTICS SERVICES, INC., a Delaware corporation (f/k/a SLS, Inc.)("Seller"), WILLIAM D. STAFFIERI, or nominee ("Buyer"), and CONGRESS ABSTRACT CORPORATION, a corporation ("Escrow Agent") with reference to the following facts:

A.   Seller and Buyer entered into that certain Agreement for Purchase and Sale of Property dated as of May 31, 1994, amended by First Amendment dated August 5, 1994, by Second Amendment dated October 10, 1994, and by Third Amendment dated October 21, 1994, and modified by letter agreement dated October 31, 1994 (collectively, the "Agreement") for a parcel of real property known as 3820 N. 2nd Street, Philadelphia, PA (the "Real Property"); and

B.   A portion of the Real Property (excluding the Northeast Parking Parcel) has been contaminated as described in the Site Characterization Report dated September 22, 1994 prepared by Seller's consultant, Resource Control Corporation ("Seller's Contamination"); and

C.   Seller has agreed with Buyer that Seller shall, at Seller's sole cost and expense, ensure the removal or remediation of the Seller's Contamination and that, to secure such agreement, Seller will escrow at the closing of the sale and conveyance of the Real Property, the sum of Two Hundred Thirty-Four Thousand and 00/100 Dollars ($234,000.00) (representing the amount of Seller's estimated project budget, reflected in Exhibit "A" hereto) with Escrow Agent, said sum to be utilized in the remediation of the Seller's Contamination; and

D.   The parties desire to enter into this Escrow Agreement for the purpose of creating the escrow required under the Agreement and for the further purpose of providing certain protections to Escrow Agent, in accordance with the provisions hereof.

IN CONSIDERATION of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby covenant and agree as follows:

1.   Seller has, simultaneously with the execution of this Escrow Agreement, delivered to Escrow Agent the sum of Two

STAFFESC.SAM

Hundred Thirty-Four Thousand and 00/100 Dollars ($234,000.00) (hereinafter referred to as the "Escrow Deposit"). Escrow Agent, by its execution hereof, acknowledges receipt of the Escrow Deposit, which Escrow Deposit shall be invested by Escrow Agent in an insured investment account or certificate of deposit reasonably acceptable to Seller (taking into consideration the need for liquidity and disbursements pursuant to the provisions hereinafter set forth). Interest earned on the Escrow Deposit shall remain in escrow, to be held and utilized in accordance with the provisions hereof, and shall be delivered to Seller upon termination of the escrow, subject, however, to the utilization thereof in connection with remediation as hereinafter set forth. The Federal ID No. of Seller is 36-1857180.

2.     Portions of the Escrow Deposit shall, subject to the provisions hereof, be released to Seller, as follows:

(a)  Following the completion of additional investigation and remedial testing, Seller will cause to be developed and will obtain approval by the Pennsylvania Department of Environmental Resources ("PADER") of a complete remedial action plan. Upon approval of a complete remedial action plan, Escrow Agent shall release to Seller that portion of the Escrow Deposit spent by Seller to date in such investigation, remedial testing, and plan preparation, the amount of said release not to exceed $80,000.00 or 34.35% of the total Escrow Deposit. Escrow Agent shall not be required to confirm such expenditures by Seller or plan approval by PADER, but Escrow Agent shall be entitled to rely upon a certification of Seller to that effect.

(b)  Three (3) months subsequent to the date of PADER approval of a remedial action plan, and provided that Seller has substantially completed the implementation of the approved remedial action plan by excavating and removing soil, installing the recovery system, installing equipment, and completing start-up and shake-down procedures, Escrow Agent shall release to Seller that portion of the Escrow Deposit which is equal to the costs of such implementation and associated equipment detailed in the approved plan and spent by Seller to date, the amount of said release not to exceed $105,000.00 or 45.15% of the total Escrow Deposit. Escrow Agent shall not be required to confirm the cost either of the implementation or of the equipment, but Escrow Agent shall be entitled to rely upon a certification of Seller to that effect.

(c)  One (1) year subsequent to the date Seller has completed implementation of the approved remedial action plan, Seller shall be entitled to an additional disbursement by Escrow Agent in an amount equal to the remediation costs spent by Seller since the disbursement pursuant to Subsection 2(b) above, the

STAFFESC.SAM                          2

amount of said disbursement not to exceed $40,000.00 or 17.16% of the total Escrow Deposit. Again, Escrow Agent shall be entitled to rely on a certification by Seller with respect to the amount of the Escrow Deposit to be so disbursed.

(d) Upon delivery by Seller to Escrow Agent and to Buyer of a letter from PADER concerning Seller's Contamination permitting Seller to deactivate the operation of any active remediation systems in place and to switch to passive monitoring only, Escrow Agent shall deliver to Seller such portion of the Escrow Deposit, together with all interest accrued on any thereof, then held by Escrow Agent.

3. (a) In the event that Seller, after receiving thirty (30) days prior written notice from Buyer, does not diligently pursue remediation of Seller's Contamination, then, and in such event, Buyer shall be entitled to deliver to Seller and Escrow Agent written notification that Buyer has decided to take over remediation of the Seller's Contamination in accordance with the approved remedial action. Seller shall provide to Escrow Agent and Buyer written acknowledgment of and agreement with Buyer's take-over of the remediation, and shall authorize Escrow Agent to act in accordance with Subsection 3(c) below. Provided, however, that delays in obtaining responses from or approvals by PADER, and delays caused by inclement weather or temporary unavailability of services, labor or material shall not be deemed to be a lack of diligence on the part of Seller.

(b) In such event, Buyer shall be entitled, either through utilization of the contractor then performing the remediation work on behalf of Seller, or through utilization of another contractor chosen by Buyer, which substitute contractor shall be subject to the prior written consent, not to be unreasonably withheld or delayed, of Seller, to pursue the remediation of the Seller's Contamination to completion.

(c) In the event that Buyer does so take over the remediation of the Seller's Contamination then Buyer shall be entitled, on a monthly basis, to deliver to Escrow Agent certifications regarding its reasonable costs and expenses in connection therewith and Escrow Agent shall disburse to Buyer, out of the Escrow Deposit, monies to reimburse Buyer for such costs and expenses. Provided, however, that nothing contained herein is intended, or shall be construed, as an assumption by Buyer of any financial or other obligations with respect to the Seller's Contamination; and, with respect to the Seller's Contamination, the respective obligations and liabilities of Seller and Buyer shall continue as set forth in the Agreement. The provisions of this Section 3 relate solely to making the Escrow Deposit, or such portion thereof as is then remaining, available to Buyer for remediation of the Seller's Contamination.

4.   (a)  With respect to the certifications to be provided on behalf of Seller pursuant to Section 2 hereof, to the notice and certifications to be given by Buyer pursuant to Section 3 hereof, and with respect to all other notices, certifications, demands or requests required or permitted by this Escrow Agreement, all such certifications, notices or other communications shall be in writing and shall be delivered to the other parties hereto at the addresses set forth hereinbelow.   In the event that any such certification, notice or communication is not agreed to, in writing, or executed by both Seller and Buyer, Escrow Agent shall give to Seller or Buyer, as the case may be, copies of any certification, notice or communication received from the other and shall not take any actions with regard thereto until at least five (5) business days following the receipt by such other party of such copy.

(b)  In the event of any dispute between Seller and Buyer with respect to any certification, notice or direction (specifically including, but not limited to, any indication by Buyer that it does not agree with the requested disbursements set forth in Section 2 hereof), Escrow Agent shall not make such disbursement or follow such direction and, in the event of any disputes sufficient in the discretion of Escrow Agent to justify its doing so, Escrow Agent shall be entitled to tender to the registry or custody of any court of competent jurisdiction the Escrow Deposit, or such portion thereof as is then remaining, in its hands under the terms of this Escrow Agreement, together with such legal proceedings as it deems appropriate, and thereupon be discharged from all further duties under this Escrow Agreement.

5.   Escrow Agent shall not, in connection with its duties as escrow agent hereunder:

(a)  Be liable for any loss caused by the failure, suspension, bankruptcy or dissolution of the depository institution into which the Escrow Deposit is placed;

(b)  Be liable for loss or damage resulting from:

(i)  any good faith act or forbearance of Escrow Agent;

(ii)  any default, error, action or omission of any party other than Escrow Agent;

(iii)  the expiration of any time limit or other delay which is not solely caused by the failure of Escrow Agent to proceed in its ordinary course of business; and in no event where such time limit is not disclosed in writing to the Escrow Agent;

(iv)    the lack of authenticity of any writing delivered to Escrow Agent or of any signature thereto, or the lack of authority of the signatory to sign such writing;

(v)    Escrow Agent's compliance with all attachments, writs, orders, judgments, or other legal process issued out of any court;

(vi)    Escrow Agent's assertion or failure to assert any cause of action or defense in any judicial or administrative proceeding; or

(vii)    any loss or damage which arises after the Escrow Deposit has been disbursed in accordance with the terms of this Agreement.

6.    (a) Escrow Agent shall be fully indemnified by the parties hereto for all its expenses, costs, and reasonable attorney's fees incurred in connection with any interpleader action which Escrow Agent may file, in its sole discretion, to resolve any dispute between Seller and Buyer; or which may by filed against the Escrow Agent, as escrow agent, not as issuer of title insurance.

(b)    If Escrow Agent, as escrow agent, not as issuer of title insurance, is made a party to any judicial, non-judicial or administrative action, hearing or process based on acts of any of the other parties hereto and not on the malfeasance and/or negligence of Escrow Agent in performing its duties hereunder, the expenses, costs, and reasonable attorneys' fees incurred by Escrow Agent in responding to such action, hearing or process may be deducted from the funds held hereunder and the party/parties whose alleged acts are a basis for such proceedings shall indemnify, save and hold Escrow Agent harmless from said expenses, costs and fees so incurred.

7.    Any notice required or permitted to be given hereunder shall be in writing and either personally delivered, sent by facsimile transmission, sent by U.S. Certified Mail, return receipt requested, postage prepaid, or sent by Federal Express, or any similar service, to the party being given such notice at the following addresses:

Seller:                    Sears Logistics Services, Inc.
                           3333 Beverly Road, Building A3
                           Hoffman Estates,  IL   60179
                           Attn:  Vice President
                                  Planning and Operations Services

with a copy to:          Sears Logistics Services, Inc.
                         3333 Beverly Road, Building A3
                         Hoffman Estates,  IL   60179
                         Attn:  General Counsel


Buyer:                   William D. Staffieri
                         4219 Richmond Street
                         Philadelphia,  PA   19137


with a copy to:          Jeffrey R. Abbott, Esq.
                         25 West 3rd Street
                         Media,  PA   19063


Escrow Agent:            Congress Abstract Corporation

                         _230 South Broad Street_

                         _8th floor_

                         _Philadelphia, Pa. 19102_

                         Attn: _John J. Byers_


with a copy to:          _____

                         _____

                         _____

                         _____


        8.   (a)  This Escrow Agreement, together with the Agreement
and a License dated of even date herewith by and between Seller
and Buyer, constitutes the entire agreement between the parties
hereto and it is understood and agreed that all undertakings and
agreements heretofore and between these parties are merged herein
and superseded hereby.   No representation, promise or inducement
not included herein shall be binding upon any party hereto.


        (b)  This Agreement may not be changed orally, but only
by an agreement in writing signed by the parties hereto.


        (c)  The provisions of this Escrow Agreement shall
inure to the benefit of and shall be binding upon the parties
hereto and their respective heirs, successors and assigns and the
legal representatives of their estates, as the case may apply.

(d)   Time is of the essence of this Escrow Agreement.


(e)   In the event either party is required to enforce the provisions of this Escrow Agreement, such party, if it prevails, shall be entitled to receive from the other party all costs and expenses, including, without limitation, reasonable attorneys' fees incurred, at trial and on appeal, in connection with such enforcement.


(f)   If the time period by which any right, option or election provided under this Escrow Agreement must be exercised, or by which any act required hereunder must be performed, expires on a Saturday, Sunday or legal holiday, then such time period shall be automatically extended through the close of business on the next regular business day.   For the purposes hereof, a "business day" shall be deemed to be any day that is not a Saturday, Sunday or legal holiday.


(g)   This Escrow Agreement may be executed in counterparts, all of which counterparts taken together shall be deemed to be but one original.


IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date first above written.

WITNESS:

By: _Phillip E. Fairchild_

WITNESS:

By: _Jeff R. Abbott_

SELLER:

SEARS LOGISTICS SERVICES, INC.

By: _James E. Comerford_
James E. Comerford
President and
    Chief Executive Officer

BUYER:

By: _William D. Staffieri_
WILLIAM D. STAFFIERI

WITNESS:

By: _____

ESCROW AGENT:

CONGRESS ABSTRACT CORPORATION

By: _____

Name: JOHN J. BYERS

Title: Vice President

EXHIBIT_____A_____

Estimated Project Budget

Project No. 702
SLS, Inc., Terminal Freight  Site
Philadelphia, PA

**Task 01 - Phase II Site Characterization**

| | |
|---|---|
| Drilling | $5,000.00 |
| Soil Sampling | $4,000.00 |
| GW Sampling | $2,500.00 |
| Data Evaluation and Reporting | $4,500.00 |
| Risk Assessment | $5,000.00 |

**Task 02 - Pilot Tests and Feasibility Studies**

| | |
|---|---|
| Air Sparge Test | $10,000.00 |
| Venting Test | $10,000.00 |
| Bioremediation | $5,000.00 |
| Aquifer Test | $10,000.00 |

**Task 03 - Remediation System Design**

| | |
|---|---|
| Data Evaluation and RAP Preparation | $25,000.00 |

**Task 04 - Remedial Action Plan Implentation**

| | |
|---|---|
| Soil Excavation and Disposal | $25,000.00 |
| Recovery System Installation | $35,000.00 |
| Equipment | $35,000.00 |
| Start Up and Shake Down | $10,000.00 |

**Task 05 - Site Monitoring**

| | |
|---|---|
| Ground Water Monitoring (per year) | $8,000.00 |
| System Operation and Monitoring (per year) | $40,000.00 |

**Total Estimated Project Budget**                    **$234,000.00**

**EXHIBIT B**

<u>**Stipulation, Agreement and Order**</u>
<u>**Resolving Motion for Relief from the**</u>
<u>**Automatic Stay dated December 7, 2020**</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :     **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : |
| | :     **Case No. 18-23538 (RDD)** |
| | : |
| Debtors.[1] | :     **(Jointly Administered)** |

-----------------------------------------------------------------x

## STIPULATION, AGREEMENT AND ORDER
## RESOLVING MOTION FOR RELIEF FROM THE AUTOMATIC STAY

This stipulation, agreement, and proposed order (the "**Stipulation**") is entered into by and among Innovel Solutions, Inc., f/k/a Sears Logistics Services, Inc. ("**Innovel**") and certain of its affiliates (together with Innovel, the "**Debtors**"), Chicago Title Insurance Company ("**Chicago Title**"), and William D. Staffieri ("**Staffieri**"). The Debtors, Chicago Title, and Staffieri collectively are also sometimes referred to in this Stipulation as the "**Parties,**" and each, as a "**Party**." The Parties hereby stipulate and agree as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 130 West 42nd Street, 17th Floor, New York, NY 10036.

## RECITALS

A.  On October 15, 2018 (the "**Commencement Date**"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  The Debtors are continuing to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.  Innovel, Staffieri, and Congress Abstract Corporation, the predecessor in interest to Chicago Title,  entered into a certain Escrow Agreement, dated December 20, 1994 (the "**Escrow Agreement**") relating to the environmental remediation limited to an 11,000 +/- square foot parcel known as Parcel 3 and located at 3820 North Second Street, Philadelphia, PA (the "**Premises**").

C.  Chicago Title currently holds the sum of $223,827.47 under the terms of the Escrow Agreement (the "**Escrowed Funds**").  Pursuant to the terms of the Escrow Agreement, the Escrowed Funds were to be used to secure Innovel's agreement to remediate contamination at the Premises.

D.  On April 17, 2020, Chicago Title filed the *Motion for Relief from the Automatic Stay Pursuant* (ECF No. 7825) (the "**Stay Relief Motion**"), seeking relief from the Automatic Stay to allow Chicago Title to file a state court interpleader action regarding the Escrowed Funds in order to resolve any disputes as to the Escrowed Funds and permit disbursement of the Escrowed Funds.

E.  Subsequent to the filing of the Stay Relief Motion, Innovel and Staffieri have agreed that the amount necessary to complete any remediation at the Premises is estimated to not exceed $109,000.00.  Accordingly, the Parties have agreed, subject to approval of the Bankruptcy

Court, to the release of the Escrowed Funds and the establishment of a new escrow account, in a reduced amount, in accordance with the terms and conditions set forth below.

**NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT HEREBY IS STIPULATED AND AGREED, BY AND BETWEEN THE PARTIES, THROUGH THE UNDERSIGNED, AND UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED THAT:**

1.      This Stipulation shall have no force or effect unless and until approved by the Bankruptcy Court (the date of such approval is hereinafter referred to as the "**Effective Date**").

2.      On the Effective Date, the Escrow Agreement shall be terminated and Chicago Title shall be authorized and directed to release all of the Escrowed Funds as provided in paragraph 3 herein.  This Stipulation shall be deemed to constitute an agreement to terminate the Escrow Agreement.

3.      The Debtors and Staffieri shall execute and deliver a new escrow agreement, substantially in the form attached as **Exhibit A** hereto (the "**New Escrow Agreement**").  Chicago Title shall release the Escrow Funds as follows: $114,827.47 to Debtors, $5,617.00 to Staffieri, and $103,383.00 the Escrow Agent, to be held in the Escrow Account created pursuant to the New Escrow Agreement.[2]

4.      Upon the occurrence of the Effective Date, the Automatic Stay shall be lifted to the extent required to enable the Parties to comply with the terms of this Stipulation.

5.      All other provisions of the Automatic Stay, including, without limitation, those provisions prohibiting the commencement or continuation of any judicial proceeding against the Debtors that were or could have been commenced prior to the Commencement Date, and those provisions prohibiting any act to collect, assess, or recover a claim that arose prior to the

---

[2] For purposes of this paragraph, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the New Escrow Agreement.

Commencement Date from the respective estates and/or assets or property of any of the Debtors (as defined in section 541 of the Bankruptcy Code), shall remain in full force and effect.

6.      This Stipulation shall constitute the entire agreement and understanding of the Parties relating to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof.

7.      Each of the undersigned who executes this Stipulation by or on behalf of a Party represents and warrants that he or she has been duly authorized and empowered to execute and deliver this Stipulation on behalf of such Party.

8.      This Stipulation may be executed  in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation to present any copies, electronic copies, or facsimiles signed by the Parties here to be charged.

9.      This Stipulation shall not be modified, altered, amended or vacated without the written consent of all Parties hereto or by further order of the Bankruptcy Court.

10.     Notwithstanding the applicability of Bankruptcy Rule 4001(a)(3), the terms and provisions of this Stipulation shall be immediately effective and enforceable upon the Effective Date, and shall thereafter be binding upon the Parties hereto and their respective affiliates and successors.

11.     This Stipulation shall be governed by, and construed in accordance with, the laws of the State of New York, except to the extent that the Bankruptcy Code applies, without regard to principles of conflicts of law that would require the application of laws of another jurisdiction.

12.     The Bankruptcy Court shall retain jurisdiction to resolve any disputes or controversies arising from this Stipulation.

[*Signature page follows*]

IN WITNESS WHEREOF, this Stipulation has been executed and delivered as of the day and year first below written.

Dated:  December 7, 2020

By:    */s/ Jacqueline Marcus*
       Ray C. Schrock, P.C.
       Jacqueline Marcus
       Garrett A. Fail
       Sunny Singh
       WEIL, GOTSHAL & MANGES LLP
       767 Fifth Avenue
       New York, NY 10153
       Telephone:  (212) 310-8000
       Facsimile:  (212) 310-8007

       *Attorneys for Debtors*
       *and Debtors in Possession*

Dated:  December 8, 2020

By:    */s/ William D. Staffieri*
       William D. Staffieri
       4233 Richmond Street
       Philadelphia, PA   19137
       Telephone: 215-831-1732
       Email:  olimpiosts@aol.com

Dated:  December 7, 2020

By:    */s/  David J. Wolkenstein*
       David J. Wolkenstein
       Anastasia Filopoulos
       FIDELITY NATIONAL LAW GROUP
       711 Third Avenue, 8th Floor
       New York, New York 10017
       Telephone: (646) 708-8085
       Facsimile: (646) 219-2136

       *Attorneys for Chicago Title Insurance*
       *Company*

Dated:  _____, 2020
       New York, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**New Escrow Agreement**

**EXHIBIT C**

**Agreement for Purchase and Sale of Property between SLS, Inc. and Buyer dated May 31, 1994**

## AGREEMENT FOR PURCHASE AND SALE OF PROPERTY

THIS AGREEMENT FOR PURCHASE AND SALE OF PROPERTY (this "Agreement") is made as of the 31ˢᵗ day of MAY, 1994, by and between SLS, INC., a Delaware corporation ("Seller"), and William D. Staffieri, or nominee, ("Buyer"), upon the following terms and conditions:

### 1.   Purchase and Sale

Subject to the terms and conditions hereof, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, that certain parcel of real estate located at 3820 North 2nd. Street, Philadelphia, Pennsylvania, containing approximately ___ acres and legally described on Exhibit "A" attached hereto and made a part hereof (the "Land") (exempted therefrom is a parcel of land known to the parties as the Northeast Parking Parcel, outlined in red on Exhibit A-1, and to be more accurately described in the survey required under this Agreement (the "Northeast Parking Parcel")), together with all improvements, buildings, structures and attached fixtures (excluding any trade fixtures of Seller) located on the Land, including any and all rights, privileges, easements and appurtenances, if any, thereunto belonging (collectively the "Improvements") (the Land and the Improvements are hereinafter referred to collectively as the "Real Property"; together with the personal property used in connection with the operation of the Land and the Improvements and listed on Exhibit "B" attached hereto and made a part hereof (the "Personal Property"), together with Seller's interest, if any, in any and all assignable service and maintenance contracts relating to the Land or the Improvements and listed on Exhibit "C" attached hereto and made a part hereof (collectively, the "Contracts") (the Real Property, the Personal Property and the Seller's interest in the Contracts are hereinafter collectively referred to as the "Property").

### 2.   Purchase Price/Earnest Money

(a)  The purchase price ("Purchase Price") to be paid by Buyer to Seller for the Property shall be One Million One Hundred Fifty Thousand and 00/100 Dollars ($1,150,000.00) payable as follows:

(i)  Earnest money in the amount of Fifty Seven Thousand Five Hundred and 00/100 Dollars ($57,500.00) to be paid in good funds as provided in Section 2(b) below; and

(ii)  One Million Ninety Two Thousand Five Hundred and 00/100 Dollars ($1,092,500.00), payable at Closing, by wire transfer of current funds subject to the prorations and adjustments.

STAFFCNT.SAM /PEG/5-20-94/

(b) Within five (5) days of acceptance of this Agreement, Buyer will deliver to Congress Abstract Corporation ("Escrowee"), Fifty Seven Thousand Five Hundred and 00/100 Dollars ($57,500.00) (the "Earnest Money") by means of a certified check, cashier's check or wire transfer, to be held by Escrowee in an interest bearing account as earnest money in accordance with the terms of escrow instructions executed by the parties and this Agreement. Interest on the Earnest Money shall accrue to the benefit of Buyer and such interest shall be paid to Buyer at Closing unless the Earnest Money is forfeited to Seller pursuant to the terms of this Agreement. Any escrow fee or investment fee shall be paid out of the interest earned on such funds.

3.  Title

No later than thirty (30) days following the full execution of this Agreement, Seller shall deliver to Buyer a commitment (the "Title Commitment"), for a standard ALTA Form B-1990 owner's policy of title insurance on the Real Property issued by Congress Abstract Corporation (the "Title Company") at Buyer's sole cost and expense. If the Title Commitment discloses exceptions to title other than those items set forth on Exhibit "D" attached hereto and by this reference incorporated herein, then Buyer shall have ten (10) business days from the date of receipt of the Title Commitment to deliver written objection as to such additional matters to Seller. If Buyer fails to object to any such additional matters, then such additional matters shall be deemed to be "Permitted Exceptions" along with those items set forth on Exhibit "D". If Buyer delivers such written notice to Seller, then Seller shall have until the later of five (5) business days prior to the Closing Date or thirty (30) business days after receipt of such objections to have such unpermitted exceptions removed from title or to cause the Title Company to commit to issue an endorsement insuring Buyer against loss or damage to Buyer that may be caused by such unpermitted exceptions. If Seller is unable to have such unpermitted exceptions removed from the Title Commitment or endorsed over, Buyer may elect, prior to the expiration of the period for Seller to remedy such unpermitted exceptions, as its sole remedy hereunder, to either (a) terminate this Agreement by written notice to Seller, in which event the Earnest Money and accrued interest thereon shall be returned to Buyer or (b) accept title to the Real Property subject to the Permitted Exceptions and such unpermitted exceptions which shall then be deemed to be Permitted Exceptions. On the Closing Date, the Title Company shall issue an owner's title insurance policy or title commitment therefor pursuant to and in accordance with the Title Commitment in the amount of the Purchase Price insuring the fee simple title to the Real Property in the Buyer as of the Closing Date, subject only to the Permitted Exceptions. The Title Commitment may be in a nominal amount but shall be "laterdated" and increased to the amount of the Purchase Price by Buyer's, at Buyer's sole cost and expense, prior to the Closing Date.

4.    Survey

Within ten (10) days of the date hereof, Seller will deliver
Buyer the most recent survey of the Real Property in its files,
if any. Buyer shall be responsible at Buyer's sole cost, to
update the survey or add any endorsements to the survey, if
necessary, but the updating of such survey shall not   be   a
condition of closing or extend the Closing Date.   In the event
survey or any update of the survey prepared by Buyer reflects
encroachments, easements, or other matters which materially
interfere with the present use of the Property, such matter shall
treated ·as an unpermitted title exception in accordance with
procedures set forth in Section 3 above.

5.    Conditions to Buyer's Obligations

(a) · Environmental Contingency   Buyer hereby acknowledges
that Seller has delivered to Buyer, concurrent with the execution
of this Agreement, a copy of its existing Phase II Environmental
Report on the Property.   Buyer shall have sixty (60) days from
the date hereof to satisfy itself as to the environmental condi-
tion of the Real Property.   If Buyer discovers the presence of
hazardous materials ·(as defined herein) in excess of levels per- ·
mitted under applicable state and federal law, then Buyer may
terminate this Agreement by written notice to Seller, delivered
within seventy (70) days of the date hereof which notice must
specify the hazardous materials and the estimated cost to remedy.
Seller shall have ten (10) days from receipt of such notice to
either accept the termination of this Agreement or to agree in
writing to remove such hazardous materials at Seller's cost. ·If
Buyer fails to deliver notice of termination to Seller within
seventy (70) days of the date hereof, then Buyer shall be deemed
to have accepted the environmental condition of the Real Property
and to have waived all conditions under this Section 5(a). .

(b)  Physical Investigation Contingency   Buyer will under- .
take and/or complete whatever studies of the Property it deems
necessary, including investigation with governmental agencies
having jurisdiction over the Property of all matters relating to
permits, licenses, entitlements, utilities,· traffic and ·zoning
and shall have the right to determine in its sole discretion the
suitability of the Property for its business use within sixty
(60) days of execution of this Agreement.   If Buyer timely
disapproves the suitability of the Property pursuant to this
paragraph, Buyer may terminate this Agreement by written notice
to Seller specifying the matters it disapproves.   Upon Buyer's
notice of termination the deposit made by Buyer shall be returned
to Buyer and neither party shall have any further rights or
obligations under this Agreement.   If Buyer timely approves the
suitability of the Property, Buyer agrees to accept the property
"as is" respecting matters covered in this paragraph.

(c)  <u>Subdivision Approval</u>  Buyer shall, at Buyer's cost and expense and with Seller's assistance, obtain subdivision approval from the City of Philadelphia if required for conveyance of the Land and the Northeast Parking Parcel.

(d)  All inspections of the Real Property made by Buyer under this Section 5 are subject to the terms of Section 13 below.

6.  <u>Seller's and Buyer's Representations</u>

(a)  Seller hereby represents and warrants to Buyer that Seller has the requisite power and authority to enter into and fully carry out this Agreement and the sale of the Property made pursuant hereto.

(b)  Buyer hereby represents and warrants to Seller that Buyer has the requisite power and authority to enter into and fully carry out this Agreement and the purchase of the Property made pursuant hereto.

7.  <u>Closing and Obligations at Closing</u>

(a)  Subject to any termination of this Agreement permitted hereunder by Buyer or Seller, closing ("Closing") shall take place at the office of the Title Company on a mutually agreeable date, but in no event later than November 30, 1994 ("Closing Date"). On the Closing Date, the obligations of Buyer and Seller shall be as follows:

(i)  Buyer shall cause the Purchase Price, as specified in Section 2(a) hereof, plus or minus prorations, to be wire transferred to or as directed by Seller.

(ii)  Seller shall execute and deliver a Special Warranty Deed, substantially in the form attached hereto as Exhibit E, conveying title to the Land and the Improvements to Buyer, subject to the Permitted Exceptions, and any exceptions created or suffered by Buyer.

(iii)  Seller shall execute and deliver a bill of sale conveying title to the Personal Property to Buyer, if any, which bill of sale shall contain a warranty as to Seller's title to the Personal Property but shall not contain any other warranties or representations and shall specifically exclude any warranties of fitness and merchantability.

(iv) Seller shall assign to Buyer the Contracts, if any, except for those which are terminated prior to the Closing Date by Seller. No later than sixty (60) days prior to the Closing Date, Buyer shall designate in writing which of the Contracts Buyer desires to have Seller terminate. On the Closing Date, Seller shall execute termination notices and Buyer and Seller shall cause such termination notices to be delivered to the other

party to each such Contract for any Contracts designated by Buyer so long as such Contracts are by their terms terminable upon the giving of notice and upon no other condition. Seller and Buyer shall execute an assignment and assumption agreement at Closing which shall include an agreement of Buyer to indemnify all obligations under the Contracts after the Closing Date.

(v)  All state and local transfer taxes shall be paid equally by Seller and Buyer. Seller and Buyer shall execute any documentation required in connection therewith.

(vi)  Seller and Buyer shall execute such other documentation as is required by applicable law to effectuate the transaction contemplated hereby, including, without limitation, a FIRPTA affidavit, if required, and such other documentation as is reasonably required by the Title Company to issue the title policy(ies) in accordance with Section 3 hereof, including, without limitation, ALTA statements and gap undertakings, if required. This Section 7(a)(vi) shall not require Buyer or Seller to incur any extraordinary obligations at the request of the Title Company.

(vii) Possession of the Property shall be delivered to Buyer.

(b)  At the request of either party, the transaction contemplated hereby shall be closed by means of a so-called "New York style closing", with the concurrent delivery of the documents of title, transfer of interests, delivery of the Title Policy and the payment of the Purchase Price. Buyer and Seller shall each provide undertakings to the Title Company necessary for the New York style closing to occur. Seller and Purchaser shall each pay 50% of any Closing escrow fees and the charges of the Title Company for such New York style closing.

8.    Prorations

All real estate taxes, expenses and charges in connection with ownership and use of the Property shall be prorated as of the Closing Date. To the extent that information for any such proration is not available on the Closing Date, the parties shall effect such prorations within thirty (30) days after such information is available.

9.    Default

If Seller fails or refuses to comply with the terms of this Agreement within fifteen (15) days of receipt by Seller of notice of such default, for any reason other than Buyer's default hereunder, Buyer's sole remedy shall be to either (a) terminate the Agreement, in which event Buyer shall be entitled to the prompt return of the Earnest Money and all accrued interest thereon in full satisfaction of all damages suffered by Buyer, or (b) sue

STAFFCNT.SAM /PEG/5-20-94/                                5

Seller for the specific performance of this Agreement if such
suit for specific performance is commenced within ninety (90)
days after the date of Seller's failure or refusal to comply with
the terms of this Agreement.  If Buyer fails or refuses to comply
with the terms of this Agreement within fifteen (15) days of re-
ceipt by Buyer of notice of such default, for any reason other
than Seller's default hereunder, Seller's sole remedy shall be to
terminate this Agreement, in which event Seller shall be entitled
to receive the Earnest Money and any accrued interest thereon as
liquidated damages and not as a penalty, as well as the return of
all documents and escrow deposits made by Seller, in full satis-
faction of all damages suffered by Seller by reason of Buyer's
default. The grace periods set forth in this Section 9 shall not
extend the periods for Buyer to review documents or inspect the
Property or the dates by which Buyer must deliver notice to ter-
minate this Agreement pursuant to any other Sections of this
Agreement. If Buyer fails to give Seller such notice by the dates
specified herein, Buyer shall be deemed to have accepted all such
items and waived any applicable right of termination.

### 10.  As Is/No Warranties

Buyer expressly acknowledges that Buyer and Buyer's agents
have made, or will have the opportunity pursuant to Section 5 of
this Agreement to make, independent investigations of the Prop-
erty and have reviewed or will review pursuant to Section 5 all
materials regarding the condition of the Property which it deems
necessary. Subject to Buyer's rights to terminate this Agreement
pursuant to Section 5,  Buyer is buying the Property in an "AS
IS" "WHERE IS" condition.   Buyer is, or after completion of such
inspections pursuant to Section 5 will be, in all respects
satisfied with the Property, including the physical condition
thereof, and Buyer has not relied upon any representation or
warranty made by either Seller or any officer, employee, agent or
representative of Seller in connection with the Property,
including specifically, without limitation, any warranty or rep-
resentation as to the condition of the Personal Property, the
Land or the Improvements, planning status, topography, grading,
climate, air, flood or mudslide hazards, water rights, water,
utilities, present and future zoning, governmental entitlements
and restrictions, soil, subsoil, paint or contamination of soil
or water, access to public roads or the presence or absence of
any hazardous material. As used herein, the term "hazardous
material" shall mean asbestos, petroleum products and any
materials defined as "hazardous substances", "hazardous waste",
"hazardous constituents" or "solid waste" or language of similar
import in (a) the Comprehensive Environmental Response,
Compensation and Liability Act of 1980, 42 U.S.C. §§9601-9657 and
any amendments thereto and regulations thereunder, (b) the Re-
source Conservation and Recovery Act, 42 U.S.C. §§6901-6987 and
any amendments thereto and regulations thereunder, and (c) any
other federal, state or local environmental statute, ordinance or
regulation. The foregoing agreement of Buyer shall be extended to

and shall be in full force and effect as of the Closing Date and shall survive the Closing Date. BUYER HEREBY DISCLAIMS ANY AND ALL WARRANTIES WITH RESPECT TO THE PROPERTY TO BE SOLD PURSUANT HERETO, INCLUDING, WITHOUT LIMITATION, WARRANTIES AS TO QUALITY, HABITABILITY, FITNESS, MERCHANTABILITY AND SUITABILITY FOR ANY PURPOSE. Buyer releases Seller from and covenants not to sue Seller upon any claim based on warranty or any statutorily-created cause of action. Buyer agrees to assume all responsibility for the environmental condition of the Property from and after the Closing Date, including, without limitation, the cost to remove all hazardous materials located on, in or under the Property regardless of whether such hazardous materials were located on, in or under the Property on or before the Closing Date or after the Closing Date or whether such hazardous materials migrated onto, into or under the Property from other property, except with respect to the contamination identified in Section 18 below regarding the Northeast Parking Parcel for the period from the Closing Date through the date of completion of remediation of the Northeast Parking Parcel. Buyer acknowledges that Buyer's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" condition was bargained for in the Purchase Price. Buyer agrees to dispose of all such hazardous materials located on, in or under the Property, if any, in compliance with all applicable laws and ordinances and at no cost to Seller. Buyer further agrees to indemnify, defend and hold Seller harmless from any liability in connection with such hazardous materials and the disposition thereof, including, without limitation, all reasonable attorneys' fees and costs.

11. <u>Destruction or Damage</u>

In the event that prior to the Closing Date all or any material portion of the Improvements shall be destroyed or damaged by fire or other casualty ("Casualty"), Seller shall give Buyer notice of such occurrence and notice of Seller's election either to (i) terminate this Agreement, in which event the Earnest Money, plus interest accrued thereon, shall be returned to Buyer, all obligations of the parties hereunder shall cease and this Agreement shall have no further force or effect, or (ii) within such reasonable period of time following the date of such Casualty as circumstances permit, restore and repair the Improvements to a condition substantially comparable to that which existed prior to the date of the Casualty, in which event the Closing Date shall be postponed until such repairs are completed by Seller. Notwithstanding the foregoing, if Seller elects to terminate this Agreement, Buyer shall have the option, which must be exercised within fifteen (15) days of receipt of Seller's notice of termination, to nullify Seller's notice of termination by giving notice to Seller of Buyer's intention to accept the Property in its "as is" and "where is" condition irrespective of such Casualty, in which event the parties shall proceed to close this transaction in accordance with the terms hereof with no reduction in the Purchase Price. If Buyer fails to exercise said

option within such fifteen (15) day period, this Agreement shall
be deemed terminated, all rights and obligations of the parties
hereunder shall cease and the Earnest Money, plus any interest
accrued thereon, shall be returned to Buyer. Notwithstanding the
foregoing, in the event a non-material portion of the Improve-
ments (being a portion costing no more than $50,000.00 to re-
pair), or a portion of the Improvements which Buyer planned to
demolish for purposes of its intended development, is damaged or
destroyed by fire or other casualty, Buyer shall accept the
Property in its "as is" and "where is" condition irrespective of
such Casualty and the parties shall proceed to close this trans-
action in accordance with the terms hereof with no reduction in
the Purchase Price.

12.  Condemnation

In the event of any taking by the exercise of the power of
eminent domain of a substantial portion of the Real Property
prior to the Closing Date (such portion as would impair or
otherwise affect the intended use of the Real Property will be
deemed substantial), Buyer shall have the right to terminate this
Agreement by giving written notice to Seller within thirty (30)
days after receipt by Buyer of written notification of any such
condemnation. If Buyer elects to terminate this Agreement, all
awards and compensation arising out of said condemnation shall be
the property of Seller and the Earnest Money, plus any interest
accrued thereon, shall be promptly returned to Buyer. If Buyer
fails to give Seller notice of termination within said thirty
(30) day period, said right to terminate shall be deemed waived
and Buyer shall be credited with or assigned all of Seller's
right, title and interest to all awards and compensation arising
out of said condemnation, and Buyer shall remain obligated to
purchase the Property with no reduction in the Purchase Price. In
the event of any taking of an insubstantial portion of the Real
Property prior to the Closing Date (such portion as would not
impair or otherwise affect the intended use of the Real Property
will be deemed insubstantial), Seller shall assign to Buyer all
of Seller's right, title and interest to all awards and
compensation therefor and Buyer shall remain obligated to pur-
chase the Property with no reduction in the Purchase Price.

13.  Buyer's Right to Enter and Inspect the Property

Prior to the Closing Date, upon two (2) business day's prior
written notice, Seller shall permit Buyer, or its authorized or
designated representatives or agents, to enter the Real Property
from time to time, so long as any such entry does not disturb the
use of the Real Property by any occupant of the Real Property and
is made during reasonable business hours and so long as such en-
try is accompanied by a representative, agent or employee of
Seller, for the purpose of performing tests, environmental
audits, engineering and marketing studies, surveys, and other
inspections, studies and tests on the Real Property as Buyer may

reasonably deem necessary, at Buyer's sole cost and expense. Buyer shall maintain and require any party hired by Buyer to perform such inspections and tests to maintain insurance in amounts and coverages acceptable to Seller. Buyer agrees to defend, indemnify, protect and hold Seller harmless from any claim, loss, liability or expense (including reasonable attorney's fees) in connection with any entry on the Real Property by Buyer, its representatives, agents, employees and independent contractors, including, without limitation, any tests, inspections, studies and surveys performed thereon, and Buyer shall promptly repair and restore the Real Property to the same condition as existed immediately prior to such entry if such entry resulted in any damage thereto. Buyer's obligations set forth in the immediately preceding sentence shall survive the Closing of the transaction contemplated hereby or the termination of this Agreement prior to such Closing and the limitation on Buyer's liability hereunder shall not apply to the matters covered by this indemnity. Notwithstanding the foregoing, Buyer agrees that prior to Closing it shall neither make nor allow to be made any changes in or to the Real Property without the prior written consent of Seller. Buyer agrees that it will not disclose the results of any such investigation, test, audit, study or survey to any third party, other than Buyer's advisors, attorneys or engineers, for the purpose of evaluating such results, unless required by law. If Buyer fails to close the purchase of the Property for any reason, then Buyer shall deliver all such copies to Seller and such items shall become property of Seller. Buyer agrees to deliver all copies of such reports, test results, surveys and audits including copies of all drafts received by Buyer or its counsel to Seller immediately upon receipt.

14. **Notices**

Any and all notices, demands, consents and approvals required under this Agreement shall be sent by certified or registered mail, postage prepaid, return receipt requested, or by reputable overnight delivery service (such as Federal Express or Airborne), addressed to the parties as follows:

Seller:  SLS, Inc.
3333 Beverly Road, Bldg. A-3
Hoffman Estates, IL 60179
Attention:  Vice President
Planning and Operations Services

with copies to:  SLS, Inc.
3333 Beverly Road, Bldg. A-3
Hoffman Estates, IL 60179
Attention:  General Counsel

STAFFCNT.SAM /PEG/5-20-94/                    9

Buyer:          William D. Staffieri
                        4219 Richmond Street
                        Philadelphia, PA 19137

with copies to:     Jeffrey R. Abbott, Esq.
                        25 W. 3rd Street
                        Media, PA 19063

Notices shall be deemed to have been received on the third (3rd) business day after they are deposited in the United States mail as provided above and one (1) business day after deposit with a reputable overnight delivery service for guaranteed overnight delivery.

### 15. Assignment

Buyer shall not have the right to assign or transfer Buyer's interest in this Agreement without the prior written consent of Seller. Buyer shall not be released from its obligations hereunder as a result of such assignment. Such assignee must assume Buyer's obligations hereunder and Buyer shall deliver a copy of such assignment to Seller immediately upon execution. Any purported assignment or transfer in violation of this Section shall be null and void and of no effect and further, at Seller's election, shall constitute a default by Buyer hereunder, entitling Seller to terminate this Agreement and retain the Earnest Money, plus interest accrued thereon.

### 16. Brokerage

Each party hereby represents and warrants to the other that no commission or other amount is payable to any other person or entity for brokerage or similar services performed hereunder except for a commission which is due to CB Commercial Real Estate and M. M. Collins Real Estate Co., Inc. (collectively, "Broker") if and only if the sale of the Property by Seller to Buyer is closed and each party hereto agrees to indemnify, protect, defend and hold harmless the other party for any commission or amount owed to or claimed by any person or entity claiming through such indemnifying party other than the Broker. Seller agrees to pay the commission specified above to the Broker and agrees to indemnify, protect, defend, and hold Buyer harmless from such commission.

### 17. Preclosing Lease

(a) Simultaneously with the execution and delivery of the Agreement, Seller and Buyer shall enter into a Preclosing Lease in the form attached hereto as Exhibit F (the "Preclosing Lease").

(b)  At the commencement of the Preclosing Lease and through the Closing Date, Buyer shall pay to Seller Ten Thousand and 00/100 Dollars ($10,000.00) per month, as rent for the Property and the Northeast Parking Parcel (hereinafter described).  Upon the Closing of the sale of the Property, Seller shall credit to Buyer fifty percent (50%) of the rent paid by Buyer up to the Closing Date.

18.  **Lease and Remediation of Northeast Parking Parcel**

(a)  Seller has disclosed to Buyer and Buyer acknowledges the existence of soil contamination on and under the Northeast Parking Parcel, described in the Limited Phase II Site Investigation Report dated June 23, 1993 prepared by Dames & Moore.  At such time as such contamination on the Northeast Parking Parcel is remediated to standards of regulatory acceptance (Seller reserving solely to itself the right to negotiate such acceptance with the Pennsylvania Department of Environmental Resources ("PADER")), Seller shall convey to Buyer and Buyer shall accept title to the Northeast Parking Parcel for $1.00. The parties agree that Seller shall not itself be obligated to remediate the contamination on the Northeast Parking Parcel, and shall not be obligated to cause the remediation to be completed by a date certain or to deliver a "clean" parcel by a date certain.

(b)  Commencing on the Closing Date for the sale of the Property, and during the period of remediation of the Northeast Parking Parcel, Seller shall lease the Northeast Parking Parcel to Buyer for a rent of $1.00 per month, for parking of tractors and trailers and for no other purpose.  The terms and conditions of such lease will be agreed to by the parties and a lease agreement executed on or before the Closing Date.  During the term of the lease, Seller shall release Buyer from liability for the contamination identified in the Dames & Moore Report.  Upon remediation of such contamination and from the date of conveyance of the Northeast Parking Parcel to Buyer, Buyer shall indemnify, protect, defend and hold Seller harmless from and against all claims relating to the environmental condition of the Northeast Parking Parcel arising after the date of such conveyance.

19.  **Other Acts**

Buyer and Seller each hereby agree to perform such other acts, and to execute, acknowledge, and/or deliver such other instruments, documents and materials, as may be reasonably necessary to effect consummation of the transaction contemplated herein.

20.  **Time is of the Essence**

Buyer and Seller mutually agree that time is of the essence throughout the term of this Agreement and every provision hereof

STAFFCNT.SAM /PEG/5-20-94/                                     11

in which time is an element. No extension of time for perform-
ance of any obligations or acts shall be deemed an extension of
time for performance of any other obligations or acts. If any
date for performance of any of the terms, conditions or provi-
sions hereof shall fall on a Saturday, Sunday or legal holiday,
then the time of such performance shall be extended to the next
business day thereafter.

### 21.   Section Headings

The section headings contained in this Agreement are for
convenience only and shall in no way enlarge or limit the scope
or meaning of the various and several paragraphs hereof.

### 22.   Interpretation

Whenever used in this Agreement, the singular number shall
include the plural, the plural the singular, and the use of any
gender shall include all genders.

### 23.   Applicable Law and Parties Bound

This Agreement shall be construed and enforced in accordance
with the laws of the state in which the Real Property is located
and shall be binding upon and inure to the benefit of the parties
hereto and their respective heirs, legal representatives,
successors and permitted assigns.

### 24.   Attorneys' Fees

In the event either party elects to file any action in order
to enforce the terms of this Agreement, or for a declaration of
rights hereunder, the prevailing party, as determined by the
court in such action, shall be entitled to recover all of its
court costs and reasonable attorneys' fees as a result thereof
from the losing party.

### 25.   Amendments

All amendments and/or supplements to this Agreement must be
in writing and executed by each party hereto. However, such
amendments and/or supplements may be executed in counterparts,
all of which shall be deemed to constitute one document.

### 26.   No Merger

The obligations, representations and warranties herein con-
tained shall not merge with transfer of title but shall survive
the Closing and remain in effect until fulfilled.

27. <u>Entire Agreement</u>

The parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either party, and that they would be bound to each other only by a single, formal, comprehensive document containing this paragraph and all of the agreements of the parties, in final form, which has been executed and delivered by Buyer and Seller. The parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Agreement shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Agreement.

28. <u>No Recording</u>

Buyer shall not record this Agreement or any memorandum or short form hereof.

29. <u>Counterparts</u>

This Agreement may be executed in counterparts, all of which counterparts taken together shall be deemed to be but one original.

30. <u>Publicity</u>

All notices to third parties and all other publicity concerning the transaction contemplated herein shall be jointly planned and coordinated. Neither of the parties shall act unilaterally in this regard without the prior written consent of the other; which consent shall not be unreasonably withheld or delayed.

IN WITNESS WHEREOF, this Agreement has been executed by the parties here to as of the date first above written.

BUYER:                              SELLER:

                                    SLS, INC.

By: _____         By: _____
    William D. Staffier                 William M. Kenney
    or nominee                          Vice President
                                        Planning and Operations
                                        Services

PROPERTY
MANAGER
LEGAL

<u>Schedule of Exhibits</u>

Exhibit A  -  Legal Description

Exhibit A1 -  Northeast Parking Parcel

Exhibit B  -  Personal Property

Exhibit C  -  Service or Maintenance Contracts

Exhibit D  -  Permitted Exceptions

Exhibit E  -  Special Warranty Deed

Exhibit F  -  Preclosing Lease

## EXHIBIT A

### LEGAL DESCRIPTION

[To be provided upon completion of survey]

## EXHIBIT B

### PERSONAL PROPERTY

The personal property presently located in the Real Property, if any.

**EXHIBIT C**

SERVICE OR MAINTENANCE CONTRACTS

[To be provided by Seller]

## EXHIBIT D

### PERMITTED EXCEPTIONS

1.　Covenants, conditions, and restrictions or record, which do not interfere with Buyer's intended use of the Property.

2.　Taxes and assessments not yet due and payable.

3.　Reservation of mineral rights, if any.

4.　Utility and other unrecorded easements, which do not interfere with Buyer's intended use of the Property.

5.　Acts done or suffered to be done by Buyer.

EXHIBIT E

This Instrument was prepared by
and return to when recorded:

Phillip E. Goodchild
SLS, Inc.
3333 Beverly Road, Bldg. A-3
Hoffman Estates, IL 60179

## SPECIAL WARRANTY DEED

    THIS SPECIAL WARRANTY DEED is made as of this _____ day of
_____, 1991, by SLS, INC., a Delaware corporation
_____,
("Grantor"), to_____ ("Grantee"), whose address is
a _____.

## W I T N E S S E T H:

    THAT Grantor, in consideration of the sum of Ten Dollars
($10.00) to it in hand paid by Grantee, the receipt whereof is
hereby acknowledged, does hereby grant, bargain and sell unto
Grantee, its successors and assigns forever, the following de-
scribed real property situated in the City of _____,
County of _____, State of _____ to-wit:

    See Exhibit A attached hereto and made a part hereof.

Subject to the matters set forth on Exhibit B attached hereto and
made a part hereof.

    IN WITNESS WHEREOF, Grantor has caused its name to be signed
to these presents by its _____, and attested
by its Secretary as of the date and year first above written.

                    SLS, INC.


                    By: _____

                    Name: _____

                    Its:_____

ATTEST:

Name: _____
      Secretary

STATE OF ILLINOIS )
                  ) ss
COUNTY OF COOK    )


THE UNDERSIGNED, a Notary Public, in and for said County, in the State aforesaid, DOES HEREBY CERTIFY that William M. Kenney personally known to me to be the Vice President, Planning and Operations Services of SLS, Inc., a Delaware corporation, and Phillip E. Goodchild personally known to me to be the Assistant Secretary of said corporation, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as such Vice President and Assistant Secretary they signed and delivered the said instrument as Vice President, Planning and Operations Services and Assistant Secretary, respectively, of said corporation, pursuant to authority, as their free and voluntary act, and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and official seal this ___ day of _____, 1994.


_____
                          Notary Public


My Commission Expires

_____, 19__ .

## AMENDMENT TO
## AGREEMENT FOR PURCHASE AND SALE OF PROPERTY
## AND TO PRECLOSING LEASE

THIS FIRST AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF PROPERTY AND TO PRECLOSING LEASE (the "First Amendment") is made as of this 5th day of August, 1994, by and between SLS, INC. ("Seller") and WILLIAM D. STAFFIERI, or nominee ("Buyer") with reference to the following facts:

A.   Seller and Buyer entered into that certain Agreement for Purchase and Sale of Property dated as of May 31, 1994 (the "Agreement") for a parcel of real property commonly known as 3820 North 2nd Street, Philadelphia (the "Real Property"), as more fully described in the Agreement.

B.   Simultaneously with the execution and delivery of the Agreement, Seller and Buyer entered into that certain Preclosing Lease dated as of May 31, 1994 (the "Preclosing Lease") for the occupancy by Buyer of the Real Property and of the parcel known to the parties as the Northeast Parking Parcel.

C.   The parties now mutually desire to modify and amend the Agreement and the Preclosing Lease, as hereinafter provided.

IN CONSIDERATION of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer, each intending to be legally bound, hereby covenant and agree as follows:

1.   Section 2(a)(i) of the Agreement shall be deleted and replaced with the following:

"(i) Earnest money in the amount of Seventy-Two Thousand Five Hundred and 00/100 Dollars ($72,500.00) to be paid in good funds as provided in Sections 2(b) and 2(c) below; and"

2.   Section 2(a)(ii) of the Agreement shall be deleted and replaced with the following:

"(ii) One Million Seventy-Seven Thousand Five Hundred and 00/100 Dollars ($1,077,500.00) payable at Closing, by wire transfer of current funds subject to prorations and adjustments."

STAFFAM1.SAM/PEG/8-3-94

3.    The following Section 2(c) shall be added to the Agreement:

"(c)  Seller acknowledges receipt of $15,000.00 as nonrefundable Earnest Money to be applied towards the Purchase Price at Closing."

4.    Buyer hereby waives the environmental contingency contained in Section 5(a) of the Agreement and accepts the environmental condition of the Real Property, except as provided in the next sentence hereof.  With respect only to the release of heating oil from an underground storage tank located on the west side of the terminal building located on the Real Property referred to in a letter dated July 18, 1994 from Seller to Buyer, Seller and Buyer agree that the parties shall have until September 2, 1994 to further investigate said heating oil release and to agree in writing to the removal or remediation of said heating oil at Seller's cost before or after Closing.

5.    Section 7(a)(v) of the Agreement shall be deleted and replaced by the following:

"All state and local transfer taxes and any other assessment or tax associated with the conveyance of the real estate shall be paid by Buyer.  Seller and Buyer shall execute any documentation required in connection therewith."

6.    Section 17(b) of the Agreement shall be deleted and replaced with the following:

"(b)  At the commencement of the Preclosing Lease and through the Closing Date, Buyer shall pay to Seller Five Thousand and 00/100 Dollars ($5,000.00) per month, as rent for the Property and the Northeast Parking Parcel (hereinafter described)."

7.    The monthly rental payments listed in Section 2.1 of the Preclosing Lease payable by Buyer, as tenant, to Seller, as landlord, shall be changed from Ten Thousand and 00/100 Dollars ($10,000.00) per month to Five Thousand and 00/100 Dollars ($5,000.00) per month.

8.    Except as modified or amended by this First Amendment, all of the terms, covenants and conditions of the Agreement and

## SECOND AMENDMENT TO AGREEMENT
## FOR PURCHASE AND SALE OF PROPERTY

THIS SECOND AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF PROPERTY (the "Second Amendment") is made as of this _____ day of October, 1994, by and between **SLS, INC.** a Delaware corporation ("Seller") and **WILLIAM D. STAFFIERI**, or nominee ("Buyer") with reference to the following facts:

A.    Seller and Buyer entered into that certain Agreement for Purchase and Sale of Property dated as of May 31, 1994 ("Agreement") for a parcel of real property known as 3820 N. 2nd Street, Philadelphia, PA ("Real Property"); and

B.    Seller and Buyer entered into an Amendment (the "First Amendment") to the Agreement dated as of August 5, 1994; and

C.    The parties now mutually desire to modify and amend the Agreement and First Amendment as hereinafter provided.

IN CONSIDERATION of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer, each intending to be legally bound, hereby covenant and agree as follows:

1.    Buyer has waived the environmental contingency contained in Section 5(a) of the Agreement and has accepted the environmental condition of the Real Property, except as provided in the next sentence hereof. With respect only to the release of heating oil from the underground 5,000 gallon storage tank located on the west side of the terminal building and referred to in a letter dated July 18, 1994 from Seller to Buyer and in the Site Characterization Report dated September 22, 1994 prepared by Resource Control Corporation delivered by Seller to Buyer, Seller and Buyer agree that Buyer shall have until October 21, 1994 to provide Seller with notice to terminate this Agreement in accordance with Section 5(a). Failure by Buyer to give such notice to terminate shall be deemed a waiver by Buyer of this environmental contingency.

2.    Except as modified or amended by this Second Amendment, all of the terms, covenants and conditions of the Agreement and First

the Preclosing Lease, as amended, shall continue and remain in full force and effect and are hereby ratified and confirmed.

9.   Buyer and Seller each represent and warrant to the other that they have full right, power and authority to enter into this First Amendment.

10.   Capitalized terms used in this First Amendment are intended to have the meaning ascribed to them in the Agreement and the Preclosing Lease unless otherwise defined herein.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the day and year first above written.

ATTEST:                                 SLS, INC.

By: _Phillip E. Dordelied_              By: _Joe J. Strauss_
ASSISTANT SECRETARY                         James J. Strauss
                                            Vice President Planning
                                            and Operations Services

WITNESS OR ATTEST:                      WILLIAM D. STAFFIERI,
                                        or nominee

By: _Cheryl Kaminski_                   By: _William D. Stffieri_

                                        Name: _____

## THIRD AMENDMENT TO AGREEMENT
## FOR PURCHASE AND SALE OF PROPERTY

THIS THIRD AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF PROPERTY (the "Third Amendment") is made as of this _2/_ day of October, 1994, by and between **SLS, INC.** a Delaware corporation ("Seller") and **WILLIAM D. STAFFIERI**, or nominee ("Buyer") with reference to the following facts:

**A.** Seller and Buyer entered into that certain Agreement for Purchase and Sale of Property dated as of May 31, 1994, amended by First Amendment dated August 5, 1994 and by Second Amendment dated October 10, 1994 ("Agreement") for a parcel of real property known as 3820 N. 2nd Street, Philadelphia, PA ("Real Property"); and

**B.** The parties now mutually desire to modify and amend the Agreement as hereinafter provided.

**IN CONSIDERATION** of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer, each intending to be legally bound, hereby covenant and agree as follows:

1. Seller and Buyer agree that Buyer shall have until October 31, 1994 to provide Seller with notice to terminate the Agreement in accordance with Section 5(a). Failure by Buyer to give such notice to terminate shall be deemed a waiver by Buyer of the environmental contingency contained in Section 5(a) of the Agreement.

2. Except as modified or amended by this Third Amendment, all of the terms, covenants and conditions of the Agreement shall continue and remain in full force and effect and are hereby ratified and confirmed.

3. Buyer and Seller each represent and warrant to the other that they have full right, power and authority to enter into this Third Amendment.

STAFFAH3.SAM/PEG/10-20-94/A:#4                    1

Amendment shall continue and remain in full force and effect and are hereby ratified and confirmed.

3.   Buyer and Seller each represent and warrant to the other that they have full right, power and authority to enter into this Second Amendment.

4.   Capitalized terms used in this Second Amendment are intended to have the meaning ascribed to them in the Agreement and the Preclosing Lease unless otherwise defined herein.

**IN WITNESS WHEREOF,** the parties hereto have executed this Second Amendment as of the day and year above written.

Attest or Witness:                    SLS, INC.

By: _Phillip E. Broadchild_           By: _____
                                       James J. Strauss
                                       Vice President
                                       Planning and Operations
                                       Services

Attest or Witness:                    **WILLIAM D. STAFFIERI**

By: _____           By: _____
                                       Title: _____

STAFFAM2.SAM/PEG/10-3-94/A:#4               2

EXHIBIT _____ A _____

ALL THOSE CERTAIN two tracts or parcels of land together with buildings and improvements thereon, situate in the 7th Ward of the City of Philadelphia, County of Philadelphia, Commonwealth of Pennsylvania, bounded and described in accordance with a Survey and Plan prepared by James E. Shomper, Surveyor and Regulator of the Sixth Survey District, dated December 13, 1994, File No. BB100

PARCEL NO. 1

BEGINNING at an interior point located the following two (2) courses and distances from a point formed by the intersection of the westerly side of 2nd Street (variable width) and the northerly side of Erie Avenue (120 feet 0 inches wide); (1) North 78 degrees 39 minutes 00 seconds West along the northerly side of the said Erie Avenue, the distance of 825.707 feet to a point; (2) North 11 degrees 21 minutes 00 seconds East, (and at right angles to the said Erie Avenue), the distance of 230.164 feet to the point of beginning; thence, extending North 11 degrees 49 minutes 45 seconds East, the distance of 1,096.997 feet to a point; thence, extending South 78 degrees 10 minutes 45 seconds East, the distance of 254.406 feet to a point; thence, extending South 7 degrees 55 minutes 43 seconds East, the distance of 190.215 feet to a point; thence, extending South 11 degrees 49 minutes 45 seconds West partially along the westerly side of Easement "4Z", as shown on the aforementioned survey plan, the distance of 812.516 feet to a point; thence, extending South 58 degrees 20 minutes 00 seconds West, the distance of 153.254 feet to a point, thence, extending North 78 degrees 10 minutes 30 seconds West, the distance of 207.535 feet to the first mentioned point and place of beginning.

CONTAINING 338.006 square feet, more or less or 7.75955 acres, more or less.

PARCEL NO. 2

BEGINNING at an interior point located the following two (2) courses and distances from a point formed by the intersection of the northerly side of Erie Avenue (120' wide) and the westerly side of 2nd Street (variable width); (1) North 11 degrees 08' 30" East, along the westerly side of said 2nd Street and crossing the head of Easement "4Z", as shown on the aforementioned Plan of Property, the distance of 972.069' to a point on the Northeasterly corner of Easement "4Z"; (2) North 81 degrees 41' 10" West, along the Northerly side of said Easement "4Z", the distance of 12.964' to the true Point of Beginning; thence extending, from said Point of Beginning, Southwestwardly along an arc curving to the right, having a radius of 777.923' (sub-tending a central angle of 22 degrees 27' 33.2" and crossing said Easement "4Z"), the arc distance of 304.937' to a point of dompound curve; thence extending Southwestwardly along an arc curving to the right having a radius of 2,905.940' (sub-tending a central angle of 8 degrees 22' 48.3" and crossing the Southerly head of a 30' wide railroad easement) the arc distance of 425.023' to a point of tangent;

4.   Capitalized terms used in this Third Amendment are intended to have the meaning ascribed to them in the Agreement unless otherwise defined herein.


**IN WITNESS WHEREOF,** the parties hereto have executed this Third Amendment as of the day and year above written.


Attest or Witness:                          SLS, INC.


By:_____        By:_____
                                        James J. Strauss
                                        Vice President
                                        Planning and Operations
                                        Services


Attest or Witness:                  **WILLIAM D. STAFFIERI**


By:_____        By:_____

                                    Title:_____

thence extending South 58 degrees 20' 00" West, the distance of 84.594' to a point; thence extending North 11 degrees 49' 45" East, partially along the Westerly side of said Easement "4Z", the distance of 807.401' to a point; thence extending South 15 degrees 14' 51" East, along the Northeasterly side of said Easement "4Z", the distance of 78.641' to a point; thence extending South 11 degrees 49' 45" West, along the Easterly side of said Easement "4Z", the distance of 50.172' to a point of curve; thence extending Southwestwardly and Southeastwardly along an arc curving to the left having a radius of 68' (sub-tending a central angle of 93 degrees 30' 55" and also being the Northeasterly side of said Easement "4Z"), the arc distance of 110.986' to a point of tangent; thence extending South 81 degrees 41' 10" East, along the Northerly side of said Easement "4Z" and crossing the head of said 30' wide railroad easement, the distance of 187.001' to a point; thence extending South 8 degrees 18' 50" West, crossing said Easement "4Z", the distance of 25.000' to the point of beginning of interior parcel #3; thence extending from said point of beginning of parcel #3, South 42 degrees 17' 55" East, the distance of 34.983' to a point; thence extending South 38 degrees 01' 00" East, the distance of 59.335' to a point; thence extending South 11 degrees 08' 30" West, the distance of 52.708' to a point; thence extending North 53 degrees 03' 25" West, the distance of 109.627' to a point; thence extending North 60 degrees 48' 42" West, the distance of 104.666' to a point; thence extending North 12 degrees 18' 02" West, the distance of 27.771' to a point, on the Southerly side of said Easement "4Z"; thence extending South 81 degrees 41' 10" E, along the Southerly side of said Easement "4Z", the distance of 136.441' to a point and place of beginning of parcel #3; thence extending North 8 degrees 18' 50" East, crossing said Easement "4Z", the distance of 25.000' to a point; thence extending South 81 degrees 41' 10" East, along the Northerly side of said Easement "4Z", the distance of 190.035' to the first mentioned point and place of beginning.

CONTAINING in area 171,905.984 square feet, 3.9464184 acres.

TOGETHER with ;and subject to the use of Easement No. 1 (shown as "4Z" on the aforementioned survey)

BEGINNING at a point on the westerly side of 2nd Street (variable width) at the distance of 947.030 feet Northwardly from the northerly side of Erie Avenue (120 feet wide); thence, extending North 81 degrees 41 minutes 10 seconds West, and crossing over the bed of a 30 feet wide railroad easement, the distance of 498.470 feet to a point; thence, extending North 11 degrees 49 minutes 45 seconds East, the distance of 219.745 feet to a point; thence, extending South 15 degrees 14 minutes 51 seconds East, the distance of 78.641 feet to a point; thence, extending South 11 degrees 49 minutes 45 seconds West, the distance of 50.172 feet to a point of curve; thence, extending southwestwardly along an arc curving to the left having a radius of 68 feet, sub-tending a central angle of 93 degrees 30 minutes 55 seconds, an arc distance of 110.986 feet to a point of tangent; thence, extending South 81 degrees 41 minutes 10 seconds East, and partially crossing the northerly head of said 30 feet wide railroad easement the distance of 390 feet to a point on the westerly side of the said 2nd Street; thence, extending South 11 degrees 08 minutes 30 seconds West, along the westerly side of the said 2nd Street, the distance of 25.030 feet to the first mentioned point and place of beginning.

CONTAINING in total area 19,278.053 square feet, more or less, or 0.4425632 acres, more or less.
        subject
TOGETHER with and^to the use of Easement No. 2 (shown as a 30 foot wide easement for railroad purposes over and across Parcel No. 2) on the aforementioned Survey.

BEGINNING at an interior point located the following two (2) courses and distances from a point of intersection formed by the westerly side of 2nd Street (variable width) and the northerly side of Erie Avenue (120 feet wide), (1) North 11 degrees 08 minutes 30 seconds East, along the westerly side of said 2nd Street, and crossing the head of a 25 foot wide easement designated, "4Z" on the aforementioned survey, the distance of  972.069 feet to a point on the northerly side of said Easement "4Z"; (2) North 81 degrees 41 minutes 10 seconds West along the northerly side of said Easement "4Z", the distance of 349.202 feet to the point of beginning; thence, extending southwardly along an arc curving to the right having a radius of 475 feet, sub-tending a central angle of 26 degrees 24 minutes, 41 seconds, an arc distance of 218.960 feet to a point of compound curve; thence, extending southwestwardly along an arc curving to the right having a radius of 1,211.570 feet sub-tending a central angle of 5 degrees 36 minutes 52 seconds", an arc distance of 118.723 feet to a point of compound curve; thence, extending southwestwardly along an arc curving to the right having a radius of 390 feet sub-tending a central angle of 15 degrees 55 minutes 12 seconds, an arc distance of 108.365 feet to a point on an arc; thence, extending southwestwardly along an arc curving to the right having a radius of 2,905.940 feet sub-tending a central angle of 01 degrees 50 minutes 46 seconds an arc distance of 93.630 feet to a point; thence, extending northeastwardly along an arc curving to the left, having a radius of 360 feet, sub-tending a central angle of 29 degrees 30 minutes 49 seconds, an arc distance of 185.439 feet to a point of compound curve; thence, extending northwardly along an arc curving to the left having a radius of 1,181.570 feet, sub-tending a central angle of 5 degrees 36 minutes 52 seconds, an arc distance of 115.783 feet to a point of compound curve; thence, extending northeastwardly along an arc curving to the left having a radius of 445 feet, sub-tending a central angle of 28 feet 18 minutes  31  seconds an arc distance of 219.865 feet to a point on the northerly side of said Easement "4Z"; thence, extending South 81 degrees 41 minutes 10 seconds East and also partially along the northerly side of said Easement "4Z", the distance of 33.641 feet to the first mentioned point and place of beginning.

CONTAINING in area 14,374.099 square feet, more or less, or 0.3299839 acres, more or less.

TOGETHER WITH
    1)  The right and privilege in common with Grantor, its successors and assigns, for a permanent and perpetual easement for ingress, egress and regress for vehicles and pedestrians over and across that portion of an existing driveway situate on the westerly side of 2nd Street as shown in          Deed to Sears, Roebuck and Co., recorded in Deed Book EFP 796 page 372

BEING the same premises which Sears, Roebuck and Co., A New York Corporation, by Quit Claim Deed dated May 7, 1985 and recorded July 26, 1985, in Philadelphia County Deed Book FHS 209 page 518 etc, conveyed to terminal Freight Handling Company, A Delaware Corporation, its successors and assigns, in fee.

And by Corporate succession, the said Terminal Freight Handling Company, is now known as  Sears Logistics Services, Inc., a Delaware corporation.

December 13, 1994

## DESCRIPTION PARCEL #3

All that certain interior lot or piece of ground with the buildings and improvements thereon erected, situate in the 7th Ward of the City of Philadelphia, and described according to a Plan of Property, made by James E. Shomper, Surveyor and Regulator of the Sixth Survey District, dated December 13, 1994, filed BB100.

Beginning at an interior point located the following (2) courses and distances from a point formed by the intersection of the northerly side of Erie Avenue (120' wide) and the westerly side of 2nd Street (variable width); (1) N-11°08'30"-E, along the westerly side of said 2nd Street, the distance of 947.039' to a point on the southeasterly corner of Easement 4Z, as shown on the aforementioned Plan of Property; (2) N-81°41'10"-W along the southerly side of said Easement 4Z, the distance of 201.764' to the true Point of Beginning; thence extending from said point of beginning S-42°17'55"-E, the distance of 34.983' to a point; thence extending S-38°01'00"-E, the distance of 50.335' to a point; thence extending S-11°08'30"-W, the distance of 52.708' to a point; thence extending N-53°03'25"-W, the distance of 109.627' to a point; thence extending N-60°48'42"-W, the distance of 104.666' to a point; thence extending N-12°18'02"-W, the distance of 27.771' to a point on the southerly side of said Easement 4Z; thence extending S-81°41'10"-E, along the southerly side of said Easement 4Z, the distance of 136.441' to the first mentioned point and place of beginning.

Containing in area 11,210 sq. ft., 0.257346 acres.

James E. Shomper
Surveyor & Regulator
Sixth Survey District