**Objection Deadline: January 21, 2021 at 4:00 p.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re                                                          :

                                                               :        **Chapter 11**

**SEARS HOLDINGS CORPORATION,** *et al.*,    :

                                                               :        **Case No. 18-23538 (RDD)**

                                                               :

    Debtors.[1]                                          :        **(Jointly Administered)**

                                                               :

-------------------------------------------------------------------x

## NOTICE OF DE MINIMIS ASSET SALE
## FOR VACANT LAND (CLEVELAND, OH)

   **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets of the Debtors (the "**Assets**") to Cleveland OH PAD, LLC (the "**Purchaser**") pursuant to the *Real Estate Sale Contract* dated December 31, 2020 (the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

   <u>Description of the Assets</u>. The Assets consist of a parcel of land and all real property interests of the Debtors located at Permanent Parcel Nos. 027-27-017 ("**Parcel 17**"), 027-

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 1700 Broadway, 19th Floor, New York, NY 10019.

27-019 ("**Parcel 19**"), and 027-27-020 ("**Parcel 20**") in the City of Cleveland, Cuyahoga County, State of Ohio.

   Relationship of the Purchaser to the Debtors. The Purchaser does not have any relationship with the Debtors.

   Liens and Encumbrances on the Assets. The Debtors are aware of the following Unemployment Compensation Liens in favor of the Ohio Department of Job and Family Security Services, Bureau of Unemployment Compensation Tax and against Kmart Corporation (each an "**Unemployment Lien**") on the Assets, which will be paid using proceeds from the sale, and Purchaser will receive the Assets free and clear of such liens:

1. An Unemployment Lien in the amount of $250.24, plus interest and costs, filed for record January 5, 2011.
2. An Unemployment Lien in the amount of $162.16, plus interest and costs, filed for record February 7, 2011.
3. An Unemployment Lien in the amount of $421.34, plus interest and costs, filed for record May 18, 2011.
4. An Unemployment Lien in the amount of $1,510.57, plus interest and costs, filed for record August 10, 2011.
5. An Unemployment Lien in the amount of $659.94, plus interest and costs, filed for record July 17, 2013.

   Further, the Debtors are aware of the following tax liens on the Assets, which the Debtors will satisfy from proceeds of the sale.

   2019 Tax Liens:

1. Parcel 17 - $1,370.17
2. Parcel 19 - $1,647.63
3. Parcel 20 - $430.14

   Additionally, taxes for the full year of 2020 are not yet due and payable, but the Debtors will pay estimated taxes, in full and final satisfaction of the 2020 tax liens, based on the most recent ascertainable tax information, in the following amounts

1. Parcel 17 - $2,740.32
2. Parcel 19 - $3,295.26
3. Parcel 20 - $860.28

   Finally, the Debtors will pay a prorated amount of 2021 taxes based on the most recent ascertainable tax information for the period prior to the Closing Date (as defined in the Purchase Agreement) to satisfy the 2021 tax lien in part.

   The Debtors are not aware of any other liens and/or encumbrances on the Assets. To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

Material Economic Terms and Conditions of the Proposed Sale. The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code. The Purchaser has agreed to pay a purchase price of $50,000.00 for the Assets. The Purchase Agreement is annexed hereto as **Exhibit 1**.

Commission, Fees, or other Similar Expenses: The Debtors are required to pay $2,500.00 in commission, fees, or other similar expenses in connection with the sale.

Procedures to Object to the Proposed Sale. Any objection to the proposed sale (an "**Objection**") must: (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Esq.; Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; and Sunny Singh, Esq.), as counsel to the Debtors **on or before January 21, 2021 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; and (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated: January 11, 2021
New York, New York

/s/ *Jacqueline Marcus*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

**<u>Exhibit 1</u>**

**Purchase Agreement**

## REAL ESTATE SALE CONTRACT
### *Cleveland, OH – Vacant Land*

     **THIS REAL ESTATE SALE CONTRACT** ("**Contract**") is made as of *December 31*, 2020 (the "**Effective Date**"), by and between **KMART CORPORATION**, a Michigan corporation ("**Seller**") and **CLEVELAND OH PAD, LLC**, an Ohio limited liability company ("**Purchaser**"; Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**"). Seller and Purchaser agree as follows:

1.  **PURCHASE AND SALE**

    Seller is the owner of three (3) contiguous parcels of land including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Real Property**"), known as Permanent Parcel Nos. 027-27-017, 027-27-019 and 027-27-020 in the City of Cleveland (the "**City**"), Cuyahoga County ("**County**"), State of Ohio legally described on **Exhibit "A"** attached hereto and made a part hereof. The Real Property is sometimes called the "**Property**". Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract, subject to adjustment as hereinafter provided. On the Closing Date set forth in Section 7 of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject only to the Permitted Title Exceptions (as defined in Section 4 of this Contract).

2.  **PURCHASE PRICE**

    (a)  **Purchase Price.**    The Purchase Price of the Property shall be Fifty Thousand and No/100 Dollars ($50,000.00), subject to adjustment as hereinafter provided (the "**Purchase Price**") and payable by Purchaser in United States currency in good and certifiable funds at Closing.

    (b)  **Options Consideration.** Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100.00 as independent and non-refundable contract consideration for any options granted in this Contract. This independent consideration is in addition to any other deposits made under this Contract, is earned by Seller upon its execution of this Contract, and will not be credited against the Purchase Price.

3.  **INTENTIONALLY DELETED**

4.  **TITLE AND SURVEY REVIEW**

    (a)  **Title Commitments/Title Exceptions**. Purchaser acknowledges that, prior to the Effective Date, Purchaser has obtained a title commitment for an ALTA Standard Form of Owner Policy of Title Insurance (the "**Title Commitment**")

issued by Chicago Title Insurance Company (the "**Title Insurer**") covering title to the Property and showing title to the Property vested in Seller.

(b)    **Permitted Title Exceptions**. Notwithstanding anything contained in Subsection 4(a) above, the following (and any exception therefor contained in any Title Commitment, Supplemental Title Commitment, or Title Policy) shall be deemed Permitted Title Exceptions: (1) restrictive covenants common to the platted subdivision in which the Property is located, (2) standby fees, taxes and assessments subject to proration as hereinafter provided, (3) utility easements created by the dedication deed or plat of the subdivision in which the Property is located or any other easements, rights of way, servitudes, encroachments, apparent servitudes, permits, surface leases or other similar rights, (4) exception as to waters, tidelands, beaches, streams, and related matters, (5) discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements (Purchaser, at Purchaser's expense, may have any related title exception amended to read, "shortages in area"), (6) all other matters of record set forth in the Title Commitment and the Supplemental Title Commitment(s) (defined below), if any, and approved by Purchaser or deemed approved by Purchaser as herein provided, except all liens, claims and encumbrances, including, without limitation, Unemployment Compensation Liens in favor of the Ohio Department of Job and Family Services, Bureau of Unemployment Compensation Tax, recorded in the County records, referred to in exceptions 10 through 14 , Schedule B, Part I of the Title Commitment, and unpaid general and special real estate taxes which are a lien and are due and payable referred to in exception 3 , Schedule B, Part 1 of the Title Commitment, (7) any title exception or encumbrance created directly by any act or omission of Purchaser, any of Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), or any party acting on behalf of Purchaser, (8) matters disclosed by the Survey or the Existing Survey (or if none is obtained or provided, as would be disclosed by a current and accurate survey or an inspection of the Property), (9) all applicable laws, ordinances, rules and governmental regulations affecting the development, use, occupancy and/or enjoyment of the Property, or any portion thereof, (10) encumbrances which will be and are discharged or released either prior to, or simultaneously with, the Closing, (11) the terms of any leases and tenancies assigned hereby and (12) any of the foregoing or any other lien, encumbrance or title defect curable by expenditure of any funds or incurence of any liabilities, as more specifically provided under subsection (f) of this Section 4 (collectively, the "**Permitted Title Exceptions**").  Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, liens, claims and encumbrances shall not be Permitted Title Exceptions.  On the Closing Date, as a condition to Purchaser's obligations hereunder, subject to payment of the premium therefor, the Title Insurer shall issue a title policy in the amount of the Purchase Price insuring fee simple title to the Property in Purchaser as of the Closing Date, subject only to the Permitted Title Exceptions (the "**Title Policy**").  It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before the

Closing Date. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for or any other ability to obtain any endorsement, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder.

(c)    **Survey**.        Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser, to the extent available, if at all, in the "Potential Purchaser Diligence Documents" folder in Seller's electronic online data room for the Property (as the same may be updated from time-to-time), Seller's existing survey of the Real Property (the "**Existing Survey**"). No later than thirty (30) days after the Effective Date, Purchaser, may, at Purchaser's sole cost and expense, obtain a new ALTA/NSPS land title survey, or an update to the Existing Survey, with such Table A inclusions as indicated by Purchaser (excepting any Table A inclusions which would be disruptive to any ongoing use of the Property, relate to rights of any third parties, or are otherwise invasive, including but not limited to Table A, item 11, as to underground utilities, 10(a) and (b), and 19), of the Property meeting the 2016 ALTA/NSPS and Title Survey standards, prepared by a State licensed surveyor, certified in a form acceptable to Purchaser and Title Insurer (the "**Survey**").

(d)    **Supplemental Title Commitments, Supplemental Title Review Period**.    In the event that any new title matter is first raised by the Title Insurer in a supplement to the Title Commitment (each, a "**Supplemental Title Commitment**") after the Effective Date, and such new title matter is not a Permitted Title Exception (or deemed to be a Permitted Title Exception) (a "**Supplemental Unpermitted Exception(s)**"), then Purchaser shall promptly provide Seller with a copy of such Supplemental Title Commitment (together with copies of all documents relating to any new title matters set forth in such Supplemental Title Commitment). If Purchaser fails to give written notice to Seller within five (5) Business Days after Purchaser becomes aware of any Supplemental Unpermitted Exceptions shown on any Supplemental Title Commitment, Purchaser shall be deemed not to have approved such Supplemental Unpermitted Exceptions and such matters shall be deemed to be Permitted Title Exceptions. If Purchaser has given the required written notice described above identifying Supplemental Unpermitted Exceptions, Seller may, at its option (but with absolutely no obligation),  (i) have such Supplemental Unpermitted Exceptions removed from the Supplemental Title Commitment; (ii) commit to having such Supplemental Unpermitted Exceptions removed from the Title Policy when issued, (iii) have Title Insurer commit to insure over such Supplemental Unpermitted Exceptions and provide evidence thereof acceptable to Purchaser, or (iv) decline to take any action with respect to such Supplemental Unpermitted Exceptions. If Seller fails to commit to having such Supplemental Unpermitted Exceptions removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given at any time prior to Closing (the "**Supplemental Response Period**") if, but only if, such Supplemental Unpermitted Exception is reasonably likely to materially interfere with Purchaser's use and occupancy of the Property, to either (i) terminate this Contract (in which event, provided no other event of default is outstanding and/or

uncured, the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof), or (ii) accept title to the Property subject to such Supplemental Unpermitted Exceptions without any credit, setoff or abatement therefor.  If Purchaser fails to elect either (i) or (ii) above within the Supplemental Response Period, Purchaser shall be deemed to have elected (ii) above and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof without any credit, setoff or abatement.   If any such Supplemental Unpermitted Exception if not reasonably likely to materially interfere with Purchaser's use and occupancy of the Property, then Purchaser shall have no right to terminate this Contract and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof without any credit, setoff or abatement.    Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, liens, claims and encumbrances shall not be Supplemental Unpermitted Exceptions.

(e)    **No Obligation of Seller to Remove Exceptions**.    The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer.

5.    **PRORATIONS AND EXPENSES**

(a)    **Prorations.**    The following prorations, except as specifically provided in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date (the "**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)    Taxes.    All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property (A) due and payable as of the Closing Date (including, without limitation, taxes for the second half of 2019 referred to in exception ___, Schedule B, Part II of the Title Commitment) shall at Closing no longer be liens against the Property, and (B) not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel number(s) that is attributable to the Property.   All prorations shall be final.   Any installments of special or other assessments affecting the Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this Section 5(a)(i) includes general assessments, including, without limitation, regular annual assessments payable to any property

owners association - but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

(ii)    <u>Credit for Repairs</u>.    Purchaser shall receive at Closing a credit against the Purchase Price in the amount of $15,170 in reimbursement of that amount paid by Purchaser's affiliate to John Prochazka Plumbing & Heating, Inc. for storm sewer repairs on the Property authorized by Seller.

(iii)    <u>Miscellaneous.</u>        If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing as of the Proration Date. In the event that accurate prorations and other adjustments cannot be made at Closing because current bills are not available or the amount to be adjusted is not yet ascertainable, the Parties shall prorate on the best available information. All prorations shall be final.

(b)    **Closing-related Costs.**  At Closing, Purchaser shall pay (i) one-half of the cost of the Closing Escrow; (ii) one-half of the cost of the Owner's Title Policy (including both standard and any extended coverage); (iii) any endorsements to the Title Policy; (iv) the costs of any Updated Survey; (v) all financing related fees; and (vi) all recording charges for the Deed and all documents pertaining to any Purchaser financing.  At Closing, Seller shall pay (i) one-half the cost of the Closing Escrow; (ii) the amount of any stamp or transfer tax or other similar fees and amounts imposed by any municipality and any county ordinance, and the state in which the Property is located (the "**State**"); and (iii) one-half of the cost of the Owner's Title Policy (including both standard and any extended coverage). All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable at Closing by Purchaser and/or Seller as is customary for commercial real estate sales in the City, County and State. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.    <u>**CONDITIONS TO CLOSING**</u>

(a)    <u>**Conditions to Seller's Obligation to Close.**</u>In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to sell the Property to Purchaser is subject to each and all of the following conditions precedent (or express written waiver thereof by Seller):

(i)    All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(b)    **Conditions to Purchaser's Obligation to Close**.    In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent (or express written waiver thereof by Purchaser):

(i)    All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects;

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects; and

Seller shall have provided to the Title Insurer documentation satisfactory to it that all sale procedures for this sale have been fully complied with in accordance with the Approval Order in order for the Title Insurer to omit from the Title Policy all exceptions for liens, claims and encumbrances.

(c)    **Conditions to Closing of Both Parties**:    In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

(i)    The sale shall be authorized by and subject to that certain Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**");

(ii)    Seller, a debtor in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court (the "**Chapter 11 Case**") shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property.  Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property.  In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property; and

(iii)    Within two (2) business days of filing the De Minimis Asset Sale Notice (as defined in the Approval Order), Seller shall deliver a copy thereof to Purchaser's

counsel together with a copy of an affidavit of service thereof on all De Minimis Asset Notice Parties (as defined in the Approval Order). Within two (2) business days of receipt of any objections to this sale during the Notice Period (as defined in the Approval Order), Seller shall deliver a copy thereof to Purchaser's counsel. If a hearing is held on any such objections, Seller shall promptly provide to Purchaser's counsel any written withdrawal of the objections or the order specifically approving or disapproving this sale.

7. **CLOSING**

(a) **Closing Date**. Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Title Insurer by Closing Escrow as provided in Section 8 below within thirty (30) days after the filing of the Sale Notice or, in the event a timely objection to the Sale Notice is interposed, within thirty (30) days after entry of a final order from the Bankruptcy Court overruling the objection and specifically approving the sale of the Property (the "**Final Sale Order**"), or such later date as reasonably requested by Seller (the "**Closing Date**"), but in no event shall the Closing Date be later than sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from the withdrawal of such objection or entry of the Final Sale Order (the "**Outside Date**"). If Closing does not occur by the Outside Date, the Parties shall have the rights set forth in Section 13(a)(i) hereof.

(b) **Seller Closing Deliverables**. On or before the Closing Date, Seller shall deliver or use commercially reasonable efforts to cause to be delivered to the Title Insurer the following Closing documents:

(i) A Special Warranty Deed (or its State equivalent) executed in proper form for recording so as to convey the title required by this Contract (the "**Deed**") to Purchaser, subject to the Permitted Title Exceptions;

(ii) A FIRPTA Affidavit in customary form duly executed by Seller;

(iii) A court certified file-stamped copy of the Approval Order;

(iv) An Owner's Affidavit of Title executed by Seller, in the form attached hereto as **Exhibit "B"** (or such other form as reasonably approved by Seller);

(v) Pursuant to Subsection 6(b)(iii) above, documentation as to all sale procedures for this sale having been duly complied with in accordance with the Approval Order; and

(vi) Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a seller of real property in the City, County and State.

(c) **Purchaser Closing Deliverables** No later than 11:00 am Chicago time on the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

    (i) The full amount of the Purchase Price, as adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account and deliver to Escrow Agent instructions to immediately release the full amount to Seller; and

    (ii) Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the City, County and State.

(d) On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered a closing proration statement and State, county and municipal transfer tax declarations, in each case duly approved by Seller and Purchaser, which approval by both parties shall not be unreasonably withheld or conditioned, and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

## 8.   CLOSING ESCROW

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**Closing Escrow**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control. All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

## 9.   DUE DILIGENCE PERIOD

(a) **Access**.    As of the Effective Date and continuing until the expiration of the Due Diligence Period (as defined below), Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), at Purchaser's sole cost, expense, and liability, shall have a non-exclusive revocable license to enter upon the Property for the purpose of conducting certain due diligence of the Property (collectively, "**Purchaser's Studies**"), in accordance

with and subject to the terms, covenants, provisions, agreements, indemnifications, and conditions of that certain Access Agreement dated _December 31_, 2020 entered into between Seller and Purchaser (the "**Access Agreement**"), a copy of which is attached hereto and incorporated herein as **Exhibit "A"**. The terms, covenants, provisions, agreements, indemnifications, and conditions set forth in the Access Agreement are incorporated herein by reference with the same force and effect as though fully set forth herein.

(b)    **Due Diligence Period**. Purchaser shall have until 5:00 pm (local Chicago time) on seventh day following the Effective Date (the "**Due Diligence Period**"), at which time Purchaser's right (all in accordance with the terms and conditions of the Access Agreement and this Contract) to enter upon the Property and Purchaser's rights (including the Purchaser Entities) to conduct any of Purchaser's Studies, the Site Assessment Work (as such term is defined in the Access Agreement), the activities in the Work Plan (as such term is defined in the Access Agreement) shall immediately terminate. In the event Purchaser, in its sole discretion, shall conclude prior to the expiration of the Due Diligence Period, that any aspect of the Property is not suitable for Purchaser in any respect, Purchaser shall have the right to elect, by written notice to Seller given on or prior to the expiration of the Due Diligence Period (the "**Termination Notice**"), to terminate this Contract and this Contract thereupon shall be deemed to be terminated upon receipt of the Termination Notice and both Parties shall be released from any further liability hereunder, except for any obligations, which by their express terms survive the termination of this Contract, including, without limitation Section 9(d) hereof. If Purchaser gives Seller a Termination Notice, the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9(d) hereof. If Purchaser fails to timely give the Termination Notice to Seller as provided in this Section 9(b) and subject to the terms and provisions of this Contract, including Section 9(f) below, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, and (ii) Purchaser agrees to accept all aspects of the Property in its "AS-IS, WHERE-IS, AND WITH ALL FAULTS CONDITION" and to release, defend, hold harmless and indemnify Seller and the Indemnified Parties from the Closing Date, for all costs and expenses (including reasonable attorneys' fees and costs) resulting from any claim, demand, damage, lien, penalty, fine, interest, cost, expense, liability or loss (collectively, "**Claims**") relating to the condition of the Property, including but not limited to the environmental condition of the Property and the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur.

(c)    **Indemnification**. Purchaser shall indemnify, protect, defend and hold harmless Seller, and any of its respective managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns (collectively, the "**Indemnified Parties**") from and against any and all costs, liabilities, claims, demands, liens, expenses, damages, including reasonable

attorney's fees, losses, penalties, fines, interest or suits resulting from (i) any release of Hazardous Materials (as defined below) on, in, under, or about the Property caused by Purchaser and/or any of the Purchaser Entities during their entry on or use of the Property, (ii) Purchaser and/or any of the Purchaser Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (iii) the acts, omissions and/or willful misconduct of Purchaser and/or the Purchaser Entities during any entry upon and/or use of the Property, the Site Assessment Work or in performing the Work Plan under the Access Agreement, (iv) a breach of the terms and conditions of this Contract and/or the Access Agreement by Purchaser and/or any of the Purchaser Entities, and/or (v) personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work, the performance of the work under the Work Plan or any other work performed by Purchaser or any of the Purchaser Entities pursuant to this Contract or the Access Agreement. Notwithstanding this indemnity, Seller expressly reserves all rights Seller may have under the law to prosecute any claims or demands against Purchaser and/or any of the Purchaser Entities arising out of or related to the environmental condition of the Property caused by Purchaser and/or any of the Purchaser Entities during their entry on or use of the Property. This indemnity shall survive the termination of this Contract and the Access Agreement. As used herein, (1) "**Affiliate(s)**" shall mean, with respect to any Person (as defined below), any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; and (2) "**Person**" shall mean, any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, or other entity.

(d)     **Survival of Purchaser's Obligations**.  Notwithstanding anything to the contrary herein, any and all obligations, commitments, and indemnifications by Purchaser and the Purchaser Entities specified in this <u>Section 9</u> and otherwise set forth in the Access Agreement shall survive the expiration or termination of this Contract (and the Access Agreement) and the delivery of the Deed for a period of one (1) year without the further need to document such agreement.

(e)     All of Seller's service contracts on the Property are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property to be released from such service contracts on or prior to the Closing Date.

(f)     Purchaser acknowledges that, prior to the Effective Date, Seller has provided Purchaser with electronic access to the "Potential Purchaser Diligence Documents" in Seller's electronic online data room for the Property (as the same

may be updated from time-to-time) which, to Seller's current actual knowledge, may (but shall not be obligated to) contain the following documents, and such electronic access to the "Potential Purchaser Diligence Documents" as provided herein shall be deemed to satisfy any and all notice requirements as set forth in Section 14 hereof:

    a.    (i)    Current tax assessment statements and copies of the most recent tax bills for the Property;

    b.    (ii)    Copies of any surveys affecting the Property; and

    c.    (iii)    Environmental reports and studies.

    d.    In the event this Contract is terminated, all materials provided by or on behalf of Seller to Purchaser (the "**Due Diligence Materials**") shall be promptly returned by Purchaser to Seller at no cost to Seller. SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING (i) THE TRUTH, ACCURACY OR COMPLETENESS OF ANY OF THE DUE DILIGENCE MATERIALS, (ii) THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME, (iii) ANY DATA OR INFORMATION DELIVERED BY SELLER OR THE SOURCES THEREOF, (iv) WHETHER ANY OF THE DUE DILIGENCE MATERIALS REPRESENT ALL OF THE NECESSARY OR RELEVANT INFORMATION RELATING TO THE PROPERTY, OR (v) THE ENFORCEABILITY OR VALIDITY OF ANY OF THE DUE DILIGENCE MATERIALS. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF THE DUE DILIGENCE MATERIALS SHALL BE AT THE SOLE RISK OF PURCHASER AND WITHOUT ANY REPRESENTATIONS, WARRANTIES, OR GUARANTIES OF SELLER OR THE INDEMNIFIED PARTIES, AND PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH DUE DILIGENCE MATERIALS, BUT RATHER WILL RELY ON ITS OWN DUE DILIGENCE, INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AND ANY REPORTS COMMISSIONED BY PURCHASER WITH RESPECT THERETO. NEITHER SELLER, NOR ANY AFFILIATE OF SELLER, NOR THE PERSON OR ENTITY WHICH PREPARED ANY OF THE DUE DILIGENCE MATERIALS SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY, OR OMISSION, IN ANY OF THE DUE DILIGENCE MATERIALS. THE FAILURE TO DELIVER ANY REPORT, FINDINGS, RESULTS, FACTS, INFORMATION, OR DUE DILIGENCE MATERIALS SHALL NOT BE ACTIONABLE BY PURCHASER AND SELLER SHALL HAVE NO LIABILITY IN CONNECTION THEREWITH. PURCHASER ACKNOWLEDGES THAT THE DUE DILIGENCE MATERIALS PROVIDED BY SELLER MAY NOT NECESSARILY REPRESENT ALL OF THE DOCUMENTATION AND INFORMATION IN EXISTENCE (OR IN SELLER'S POSSESSION OR CONTROL) WITH RESPECT TO THE

PROPERTY, BUT, RATHER, REPRESENTS DOCUMENTATION MADE AVAILABLE BY SELLER AS A CONVENIENCE FOR PURCHASER. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS MAY HAVE BEEN OBTAINED BY SELLER FROM A VARIETY OF SOURCES, AND THAT SELLER HAS NOT MADE (AND IS UNDER NO DUTY TO MAKE) ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF ANY DUE DILIGENCE MATERIALS. PURCHASER WAIVES, RELEASES AND FORFEITS ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER AGAINST SELLER, THE INDEMNIFIED PARTIES, OR THIRD PARTIES ARISING OUT OF PURCHASER'S USE OF THE DUE DILIGENCE MATERIALS. THIS SECTION 9(f) SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT FOR A PERIOD OF ONE (1) YEAR.

10. **REPRESENTATIONS AND WARRANTIES**

   (a)    **Seller Representations**.    Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

      (i)    Subject to Section 6(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to Section 6(c) of this Contract.

      (ii)    To Seller's actual knowledge, and except as may be reflected in the Title Commitment, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except as set forth on **Exhibit "C"**.

      (iii)    As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of President of Real Estate, and shall not be construed to refer to the knowledge of any other person, including, without limitation, managers, members, officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

   (b)    **Purchaser Representations.** Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

    (i)    Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.  Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents.  The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

    (ii)    Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

    (iii)    This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

    (iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the United States Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

    (v)    Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 10 shall not merge with the transfer of title, but shall survive Closing for a period of one (1) year.

11.    **AS IS/NO WARRANTIES**

(a)    **As-Is Condition.**    Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to all aspects of the Property without warranty or representation of any kind by Seller or any of Seller's managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns ( the "**Indemnified Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Materials. As used in this Contract, the term "**Hazardous Material(s)**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any federal, state or local law, statute, ordinance or regulation. Purchaser, hereby agrees to release, defend, hold harmless and indemnify Seller and the Indemnified Parties with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was directly caused by the affirmative acts of Seller, its employees, agents or contractors from and after the Effective Date) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source. Notwithstanding the foregoing, [Y] Purchaser's obligations under this Section 11(a) are only to the extent such environmental matters are introduced or caused by Purchaser or Purchaser Entities, and [Z] Purchaser's obligations under this Section 11(a) for any pre-existing conditions (e.g., environmental contamination) shall only be to the extent Purchaser or Purchaser Entities exacerbates such pre-existing conditions.

(b)    **No Warranties, Representations**.    Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller. Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price. Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Section 10 of this Contract:

(i)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)   Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.  Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)     **WAIVER/RELEASE OF PURCHASER CLAIMS**.     WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 11(a) AND 11(b), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND THE INDEMNIFIED PARTIES, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORSEEN OR UNFORSEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE

IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)    **No Representations as to Condition/Full Investigation**.  Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any of the Indemnified Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof. The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto.  Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

12.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section.  At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

13.    **DEFAULT AND REMEDIES**

(a)    **Termination Events:**

(i)    Termination by Either Party:  Notwithstanding anything to the contrary set forth herein, this Contract may be terminated by either Party if Closing does not occur by the Outside Date as contemplated in Section 7(a) of this Contract, provided, however, that the right to terminate this Contract pursuant to this Section 13(a) shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in Closing failing to occur.

(ii)    Termination by Purchaser.  If Seller fails or refuses to comply with the terms of this Contract within ten (10) days of receipt by Seller of written notice of such default from Purchaser (the "Seller Cure Period") (excluding any default by Purchaser and Purchaser's failure to diligently complete or cure the same),

Purchaser shall have as its sole and exclusive remedies either, at Purchaser's election (a) the right to terminate the Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon in full satisfaction of all damages suffered by Purchaser by reason of Seller's default and the Contract shall be terminated and of no further force or effect except as provided for in this Contract or (b) in the event that Seller's breach of this Contract does not arise out of a refusal of the Bankruptcy Court to approve the Sale Notice, the right to specific performance of this Contract by the Bankruptcy Court; provided, however, Purchaser will seek this right of specific performance if at all within no more than sixty (60) days from the expiration of the Seller Cure Period.

(iii)    <u>Termination by Seller.</u>  If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default from Seller (excluding any default by Seller of Seller's failure to diligently complete or cure the same), and Seller's sole remedy shall be to terminate this Contract, and this Contract shall terminate with neither Party having any further rights or liabilities hereunder, except as those specifically provided to survive the termination of this Contract; provided, however, that this <u>Section 13(a)(iii)</u> shall not limit Seller's claims pursuant to any of Purchaser's indemnification obligations in this Contract.

## 14.  **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

| | |
|---|---|
| **To Seller:** | M-III Partners, LP<br>1700 Broadway<br>19th Floor<br>New York, New York 10019<br>Attn: William Gallagher<br>E-mail: <u>wgallagher@m3-partners.com</u> |
| **With copies to:** | **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn:  W. Michael Bond, Esq.<br>Phone: (212) 310-8035<br>E-mail: Michael.Bond@weil.com |

| | |
|---|---|
| **To Purchaser:** | Cleveland OH Pad, LLC<br>c/o TLM Realty corp.<br>295 Madison Avenue, 37th Floor<br>New York, New York  10017<br>Attn:  Ronald J. Oehl<br>Phone: (212) 753-4570<br>E-mail: roehl@tlmltd.com |
| **With copies to:** | Dahan & Nowick LLP<br>123 Main Street, 9th Floor<br>White Plains, New York  10601<br>Attn: M. Marc Dahan, Esq.<br>Phone: (914) 461-1650<br>E-mail: marcdahan@dahannowick.com |

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 14.

## 15. ENTIRE CONTRACT, AMENDMENTS AND WAIVERS

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

## 16. FURTHER ASSURANCES

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

## 17. SURVIVAL AND BENEFIT

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing.  Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

## 18. CONFIDENTIALITY

Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that (i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date,

(ii) all terms of this Contract and any and all drafts of this Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Due Diligence Materials (as defined above) and any other electronic files and other documents in Seller's electronic online data room, and (iv) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is strictly confidential, shall remain confidential and shall not be disclosed to any Person by Purchaser or the Purchaser Entities without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, including, but not limited to, any federal, state and/or local governmental entity, except that Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this Section 18. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser, the Purchaser Entities, or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser, the Purchaser Entities, or the Permitted Parties. If Purchaser, the Purchaser Entities, or the Permitted Parties breach (or threaten the breach of) the terms of this Section 18, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Contract by any of the Purchaser Entities or Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this Section 18, in addition to all other rights and remedies available at law or in equity. Notwithstanding the foregoing, the Parties agree that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser, the Purchaser Entities, or the Permitted Parties, (2) becomes available to Purchaser, the Purchaser Entities, or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information. Purchaser acknowledges that Seller may file this Contract and any related matters with the Bankruptcy Court and thus make this Contract publicly available. The terms of this Section 18 shall survive termination of this Contract for a period of one (1) year, but shall not survive the Closing.

19.    **BROKERAGE**

Except for Terra National representing the Seller ("**Seller's Broker**"), each Party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction. Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including as to Seller, Seller's Broker), finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party. Any commission or other compensation due the Seller's Broker shall be the responsibility of Seller, and Seller's Broker shall be paid at the Closing in accordance with separate agreements between Seller's Broker and Seller.

20.    **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser has majority ownership interest or which is an Affiliate provided that (i) written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing and (ii) any such assignee executes an assumption of this Contract, if requested by and in form and substance reasonably acceptable to Seller. No transfer or assignment by Purchaser shall relieve Purchaser of its obligations hereunder. No such transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

21.    **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns and, except for any of the Indemnified Parties, no third party is intended to or shall have any rights hereunder. This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

22.    **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "**Action**"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court. The term "prevailing party" as used in this Section 22 includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it), or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled. In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the

payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action.  It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

23.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

24.    **RESERVED**

25.    **COUNTERPARTS**

This Contract may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Contract by signing any such counterpart delivery of an executed signature page of this Contract by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

26.    **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of Section 20 of this Contract.

27.    **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract.  Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract.

28.    **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.  The term "business day" as used in this Contract means any day

that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.

**29.    TIME OF THE ESSENCE**

Time is of the essence of this Contract.

**30.    RESERVED**

**31.    CONDEMNATION AND CASUALTY**

(a)    In the event of any taking of, or if notice is given of the intention to take, by the exercise of the power of eminent domain, all or a substantial portion of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller. If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned (A) all interest of Seller in and to any insurance proceeds actually received by Seller (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date) or (B) condemnation awards payable to Seller on account of that event, in the case of both (A) and (B), less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price. A portion of the Real Property will be deemed "substantial," for purposes of this Section 31 to the extent the taking of such portion would materially impair or otherwise materially affect Purchaser's intended use of the Real Property.

(b)    If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof ("**Casualty Notice**"). After delivery of the Casualty Notice, if Seller reasonably estimates the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00), Purchaser may elect, within five (5) business days of delivery of the Casualty Notice (and if the Closing is scheduled within such five (5) business day period, the Closing shall be extended for up to five (5) business days), to terminate this Contract by written notice to Seller, in which event, the Parties shall have no further obligation hereunder, except for any terms, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof.

**32.    SECTION HEADINGS**

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

33.    **INTERPRETATION**

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

34.    **GOVERNING LAW, JURISDICTION & VENUE**

This Contract will be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles thereof.   EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS CONTRACT.  SHOULD THE BANKRUPTCY COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO HAVE JURISDICTION OVER A MATTER RELATING TO THIS CONTRACT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF NEW YORK OR THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY, NEW YORK.  Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in Section 14 of this Contract shall be effective service of process for any suit or proceeding in connection with this Contract.

35.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto.   However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

36.    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

37.    **PATRIOT ACT**

Seller certifies that its name is **KMART CORPORATION**, a Michigan corporation, and Seller is not (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.  Purchaser certifies that its name is **CLEVELAND OH PAD, LLC**, an Ohio limited liability company, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

38.    **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract.   Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this Section 38 shall survive the expiration of the term or any earlier termination of this Contract.

39.    **PRESS RELEASES**

Neither Purchaser nor any of Purchaser's Affiliates shall make any press release or other public announcement concerning the transaction(s) contemplated by this Contract without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. If Purchaser desires to make a press release or other public announcement respecting this Contract or the transaction(s) contemplated hereby, Purchaser shall wait at least five (5) business days after the Closing (the "**No Public Announcement Period**"), and after the expiration of the No Public Announcement Period, shall provide Seller with a draft of the press release or other public announcement for review at least ten (10) business days prior to the time that such press release or other public announcement is to be made. The Parties will attempt in good faith to expeditiously reach agreement on such press release or other public announcement and the contents thereof. Seller's failure to provide comments back to Purchaser within ten (10) business days of receipt of the draft release or announcement will be deemed consent to the public disclosure of such press release or other public announcement and the content thereof. Purchaser shall be liable for the compliance of its respective Affiliates with the terms of this Section 39. Notwithstanding anything to the contrary herein, any press release or other public announcement shall not reveal any Confidential Information and otherwise be in accordance with Section 18 hereof. This Section 39 shall survive the Closing.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written

SELLER:

KMART CORPORATION
a Michigan corporation

By: _____
Name: William Gallagher
Its: Authorized Signatory

PURCHASER:

CLEVELAND OH PAD, LLC,
an Ohio limited liability company

By:   ILM Realty Corp.,
      a Delaware corporation,
      Manager

By: _____
Ronald J. Oehl, President

EXHIBITS

Exhibit "A":    Legal Description
Exhibit "B":    Owner's Affidavit of Title
Exhibit "C":    Leases, tenancies and licenses
Exhibit "D":    Non-Invasive Inspection Agreement

## EXHIBIT "A"

## LEGAL DESCRIPTION OF PROPERTY

PARCEL 1:

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as begin part of Original Rockport Township, Section No. 12, and further bounded and described as follows:

Beginning at the intersection of the centerline of Lorain Avenue, (80 feet wide) with the centerline of West 150th Street, (75 feet wide);

Thence South 1 deg. 06' 20" West, along the centerline of said West 150th Street, 558.49 feet to a point;

Thence South 88 deg. 53' 40" East, 352.21 feet along the Northerly line and its Westerly prolongation of a parcel of land conveyed to G. O'Neil Post #2533 V.F.W. by deed recorded in Volume 6686, Page 441 of Cuyahoga County Deed Records to the Northeasterly corner therein;

Thence North 80 deg. 02' 09" East, 268.66 feet along the North line of a parcel of land conveyed to Chem-Materials Co., Inc. by deed recorded in Volume 13820, Page 89 of Cuyahoga County Deed Records and the Place of Beginning of the parcel herein described;

Course No. 1:
Thence North 1 deg. 06' 20" East, 258.09 feet to a point;

Course No. 2:
Thence South 88 deg. 53' 40" East, 85.80 feet to a point on the West line of a proposed 30 foot ingress egress easement;

Course No. 3:
Thence due South 240.44 feet along the West line of said easement to a point on the North line of said Chem-Materials parcel;

Course No. 4:
Thence South 80 deg. 02' 09" West, 92.15 feet along the said North line of the Chem-Materials parcel to the Place of Beginning and containing 0.505 Acres of land, be the same more or less, but subject to all easements of record.

PPN: 027-27-017

PARCEL 2:

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Original Rockport Township, Section No. 12, and further bounded and described as follows:

Beginning at the intersection of the centerline of Lorain Avenue, (80 feet wide) with the centerline of West 150th Street, (75 feet wide);

Thence South 1 deg. 06' 10" West, along the centerline of West 150th Street, 558.49 feet to a point;

Thence South 88 deg. 53' 40" East, 352.21 feet along the Northerly line and its Westerly prolongation of a parcel of land conveyed to G. O'Neil Post #2533 V.F.W. by deed recorded in Volume 6686, Page 441 of Cuyahoga County Deed Records to the Northeasterly corner therein;

Thence North 80 deg. 02' 09" East, 181.24 feet along the North line of a parcel of land conveyed to Chem-Materials Co., Inc. by deed recorded in Volume 13820, Page 89 of Cuyahoga County Deed Records to the Place of Beginning of the parcel herein described;

Course No. 1:
Thence North 1 deg 06' 20" East 274.87 feet along the East line and its southerly prolongation of a lease to the K-Mart Corporation, (a Michigan Corporation) as recorded in Volume 544, Page 903 of Cuyahoga County Lease Records to a deflection point therein;

Course No. 2:
Thence South 88 deg. 53' 40" East, 85.79 feet to a point;

Course No. 3:
Thence South 1 deg. 06' 20" West, 258.09 feet to a point of the North line of the Chem-Materials parcel as aforesaid;

Course No. 4:
Thence South 80 deg. 02' 09" West, 87.42 feet along the North line of said Chem-Materials parcel to the Place of Beginning and containing 0.525 acres of land, be the same more or less, but subject to all legal highways and easements of record.

PPN: 027-27-019

PARCEL 3:

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

Known as being part of Original Rockport Township, Section #12, further bounded and described as follows:

Beginning at the intersection of the centerline of Lorain Avenue (80 feet wide) with the centerline of West 150th Street (75 feet wide);

Thence S. 1° 04' 20" W., along the centerline of said West 150th Street, 558.49 feet to a point;

Thence S. 88° 53' 40" E., 352.2 feet along the northerly line and its westerly prolongation of a parcel of land conveyed to G. O'Neill Post #2533 V.F.W. by deed recorded in Volume 6486, Page 441 of Cuyahoga County Deed Records to the Northeasterly corner therein:

Thence N. 80° 02' 09" E., 360.82 feet along the North line of a parcel of land conveyed to Chem-Materials Co., Inc. by deed recorded in Volume 13820, Page 89 of Cuyahoga County Deed Records and the Place of Beginning of the parcel herein described:

Course No. 1
Thence Due North 240.44 feet to a point;

Course No. 2
Thence S. 88° 53' 40" E., 30 feet to a point;

Course No. 3
Thence Due South 227.99 feet to a point on the North line of said Chem-Materials Parcel;

Course No. 4
Thence S. 61° 15' 40" W., 20.19 feet along the said North line of the Chem-Materials parcel, to an angle point;

Course No. 5
Thence continuing along the North line of said Chem-Materials parcel S. 80° 02' 09" W., 12.48 feet to the place of beginning and containing 0.162 acres of land be the same more or less, but subject to all easements and conditions of record.

PPN: 027-27-020

## EXHIBIT "B"

## OWNER'S AFFIDAVIT OF TITLE

[See attached]

# Title Affidavit

dated as of _____/_____/20

---

Re:     **Insured:**
        **Title Insurer:**
        Chicago Title Insurance Company, a NE corporation ("CTIC")
        **CTIC Master #:**

        **Commitment #:**
        **Premises:**
        as legally described in the Commitments

---

**Certifications:**

The undersigned owner of the Premises hereby certifies the following to Title Insurer (as to its respective estate and/or interest in the Premises):

**Mechanics Liens:**
All labor, services or materials rendered or furnished within the last 90 days in connection with the Premises or with the construction or repair of any building or improvements on the Premises have been paid for in full or will be paid in full.

**Tenants/Parties in Possession:**
There are no tenants or other parties who are in possession or have the right to be in possession of said Premises

**Bankruptcy:**
A proceeding in bankruptcy has been instituted by or against the undersigned (or its constituent entities) which is now pending in the Bankruptcy Court for the Southern District of New York under Docket No. 18-23538.

**Gap Indemnification:**
Between the most recent Effective Date of the Commitment (or any bring down thereof) and the date of recording of the Insured Instrument(s) but in no event later than five (5) business days from the date hereof (hereinafter, the "Gap Period"), the undersigned has not taken and will not take any action to encumber or otherwise affect title to the Premises. In the event of any lien, encumbrance or other matter affecting title to the Premises in the Gap Period arising as a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof. The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

**Counterparts:**
This document may be executed in counterparts.

- see annexed signature page -

**Signatory/Signatories to Title Affidavit:**

By: _____

      Name:    William Gallagher
      Title:
      Solely in his capacity as Authorized Signatory of the Kmart Corporation and not individually

Subscribed and sworn to on ____/_____/20

_____
Notary Public

## EXHIBIT "C"

### Leases, Tenancies and Licenses

None.

## EXHIBIT "D"

## Non-Invasive Inspection Agreement

[attached]

## NON-INVASIVE INSPECTION AGREEMENT
*Cleveland, Ohio – Vacant Land*

**THIS NON-INVASIVE INSPECTION AGREEMENT** (this "**Agreement**") is made and entered into as of this _____ day of _____, 2020 ("**Effective Date**"), by and between **KMART CORPORATION**, a Michigan corporation ("**Company**") and **CLEVELAND OH PAD, LLC**, an Ohio limited liability company ("**Investigating Party**"), in connection with investigation and site assessment work to be performed on the property controlled by Company located at Permanent Parcel Nos.: 027-27-017, 027-27-019 and 027-27-020 in the City of Cleveland (the "**City**"), Cuyahoga County, Ohio (the "**Property**"), as more particularly described on **Exhibit "A"** attached hereto and made a part hereof.

### RECITALS:

A.    Company desires to sell the Property to Investigating Party;

B.    Investigating Party desires to buy the Property from Company;

C.    Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends; and

D.    Investigating Party desires to perform a site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

**NOW, THEREFORE,** in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

1.    Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property, at no cost to Company or its agents, consultants and contractors.

2.    The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: Investigating Party shall walk the Property and make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA ASTM E1527-13 (the "**Site Assessment Work**").  Investigating Party shall not perform tests, work or investigations not included in scope of the Site Assessment Work without the prior written consent of Company, in Company's sole discretion.  In the event that Investigating Party engages in activity outside of or beyond the Site Assessment Work  ("**Unauthorized Activity**"), the Parties agree that it would be difficult to ascertain the extent of damages caused to Company, and accordingly, the Parties agree that Company shall be entitled to a one-time liquidated damages payment of Ten Thousand and No/100 Dollars ($10,000.00) from Investigating Party for any Unauthorized Activity. The Parties agree that such liquidated damages payment for Unauthorized Activity is in addition to, and does not limit in any manner whatsoever, any other actual damages, remedy or relief that otherwise might be available to the Parties herein. Provided further, that in the event Investigating Party engages in Unauthorized Activity, Company shall have the right to terminate access to the Property for such Unauthorized Activity.

3.    This Agreement shall terminate the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, **(b)** immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice

1

and cure period, or (c) 45 days from the Contract's Effective Date, in each such event Investigating Party shall promptly restore the Property as provided in Section 9 of this Agreement.

4.    Within seven (7) days after receipt by Investigating Party, Investigating Party agrees to provide Company with all test results and reports, including all correspondence and draft reports prepared in connection with the Site Assessment Work. This provision shall survive the termination of this Agreement.

5.    Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal, state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their counsel or environmental consultants, as applicable.  The foregoing restriction shall not be binding on Investigating Party following the closing under a Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this Section 5.

6.    Investigating Party agrees to defend and indemnify Company, its officers, directors, employees, and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement.  This indemnity shall survive the termination of this Agreement.

7.    Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies reasonably satisfactory to Company and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

(i)    Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

(ii)    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

(iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

(iv)    Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Company as an additional insured.

2

(v) Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above. Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty. Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

8. Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

9. If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property and to restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

10. This Agreement shall be governed by and construed in accordance with the laws of the State in which the Property is located.

11. By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

12. Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company. Investigating Party agrees to conduct the Site Assessment Work in such a way as to minimize interference with the conduct of Company's business on the Property.

13. This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

C:\NRPORTBL\WEIL\NAMEROWD\97682237_11.DOC
WEIL:\97682237\10\73217.0004

**IN WITNESS WHEREOF,** Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

**INVESTIGATING PARTY:**

**CLEVELAND OH PAD, LLC,**
an Ohio limited liability company

By:  TLM Realty Corp.,
     a Delaware corporation,
     Manager

By:_____
     Ronald J. Oehl, President

**COMPANY:**

**KMART CORPORATION,**
a Michigan corporation

By:
Name:  William Gallagher
Title:  Authorized Signatory

4

**EXHIBIT "A" TO NON-INVASIVE INSPECTION AGREEMENT**

**LEGAL DESCRIPTION**

PARCEL I:

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as begin part of Original Rockport Township, Section No. 12, and further bounded and described as follows:

Beginning at the intersection of the centerline of Lorain Avenue, (80 feet wide) with the centerline of West 150th Street, (75 feet wide);

Thence South 1 deg. 06' 20" West, along the centerline of said West 150th Street, 558.49 feet to a point;

Thence South 88 deg. 53' 40" East, 352.21 feet along the Northerly line and its Westerly prolongation of a parcel of land conveyed to G. O'Neil Post #2533 V.F.W. by deed recorded in Volume 6686, Page 441 of Cuyahoga County Deed Records to the Northeasterly corner therein;

Thence North 80 deg. 02' 09" East, 268.66 feet along the North line of a parcel of land conveyed to Chem-Materials Co., Inc. by deed recorded in Volume 13820, Page 89 of Cuyahoga County Deed Records and the Place of Beginning of the parcel herein described;

Course No. 1:
Thence North 1 deg. 06' 20" East, 258.09 feet to a point;

Course No. 2:
Thence South 88 deg. 53' 40" East, 85.80 feet to a point on the West line of a proposed 30 foot ingress egress easement;

Course No. 3:
Thence due South 240.44 feet along the West line of said easement to a point on the North line of said Chem-Materials parcel;

Course No. 4:
Thence South 80 deg. 02' 09" West, 92.15 feet along the said North line of the Chem-Materials parcel to the Place of Beginning and containing 0.505 Acres of land, be the same more or less, but subject to all easements of record.

PPN: 027-27-017

PARCEL 2:

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Original Rockport Township, Section No. 12, and further bounded and described as follows:

Beginning at the intersection of the centerline of Lorain Avenue, (80 feet wide) with the centerline of West 150th Street, (75 feet wide);

Thence South 1 deg. 06' 10" West, along the centerline of West 150th Street, 558.49 feet to a point;

Thence South 88 deg. 53' 40" East, 352.21 feet along the Northerly line and its Westerly prolongation of a parcel of land conveyed to G. O'Neil Post #2533 V.F.W. by deed recorded in Volume 6686, Page 441 of Cuyahoga County Deed Records to the Northeasterly corner therein;

Thence North 80 deg. 02' 09" East, 181.24 feet along the North line of a parcel of land conveyed to Chem-Materials Co., Inc. by deed recorded in Volume 13820, Page 89 of Cuyahoga County Deed Records to the Place of Beginning of the parcel herein described;

Course No. 1:
Thence North 1 deg 06' 20" East 274.87 feet along the East line and its southerly prolongation of a lease to the K-Mart Corporation, (a Michigan Corporation) as recorded in Volume 544, Page 903 of Cuyahoga County Lease Records to a deflection point therein;

Course No. 2:
Thence South 88 deg. 53' 40" East, 85.79 feet to a point;

Course No. 3:
Thence South 1 deg. 06' 20" West, 258.09 feet to a point of the North line of the Chem-Materials parcel as aforesaid;

Course No. 4:
Thence South 80 deg. 02' 09" West, 87.42 feet along the North line of said Chem-Materials parcel to the Place of Beginning and containing 0.525 acres of land, be the same more or less, but subject to all legal highways and easements of record.

PPN: 027-27-019

PARCEL 3:

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

Known as being part of Original Rockport Township, Section #12, further bounded and described as follows:

Beginning at the intersection of the centerline of Lorain Avenue (80 feet wide) with the centerline of West 150th Street (75 feet wide);

Thence S. 1° 04' 20" W., along the centerline of said West 150th Street, 558.49 feet to a point;

Thence S. 88° 53' 40" E., 352.2 feet along the northerly line and its westerly prolongation of a parcel of land conveyed to G. O'Neill Post #2533 V.F.W. by deed recorded in Volume 6486, Page 441 of Cuyahoga County Deed Records to the Northeasterly corner therein:

Thence N. 80° 02' 09" E., 360.82 feet along the North line of a parcel of land conveyed to Chem-Materials Co., Inc. by deed recorded in Volume 13820, Page 89 of Cuyahoga County Deed Records and the Place of Beginning of the parcel herein described:

Course No. 1
Thence Due North 240.44 feet to a point;

Course No. 2
Thence S. 88° 53' 40" E., 30 feet to a point;

Course No. 3
Thence Due South 227.99 feet to a point on the North line of said Chem-Materials Parcel;

Course No. 4
Thence S. 61° 15' 40" W., 20.19 feet along the said North line of the Chem-Materials parcel, to an angle point;

Course No. 5
Thence continuing along the North line of said Chem-Materials parcel S. 80° 02' 09" W., 12.48 feet to the place of beginning and containing 0.162 acres of land be the same more or less, but subject to all easements and conditions of record.

PPN: 027-27-020