**Objection Deadline: March 3, 2021 at 4:00 p.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re
:
:                    **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,     :
:                    **Case No. 18-23538 (RDD)**
:
Debtors.[1]     :                    **(Jointly Administered)**
:

-----------------------------------------------------------------x

## NOTICE OF DE MINIMIS ASSET SALE
## FOR VACANT LAND #7246 (RICHMOND, IN)

  **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets of the Debtors (the "**Assets**") to Midwest Storage Development LLC (the "**Purchaser**") pursuant to the *Real Estate Sale Contract* dated December 23, 2020 and the *First Amendment to the Real Estate Sale Contract* dated February 16, 2021 (as amended, the "**Purchase Agreement**").  This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 1700 Broadway, 19th Floor, New York, NY 10019.

Description of the Assets.  The Assets consist of a parcel of land and all real property interests of the Debtors located at the corner of West National Road (aka U.S. Route 40) and Salisbury Road in the City of Richmond, Wayne County, State of Indiana.

Relationship of the Purchaser to the Debtors.  The Purchaser does not have any relationship with the Debtors.

Liens and Encumbrances on the Assets.  The Debtors are aware of two warrants for the collection of tax issued by the state of Indiana that have been asserted against the Assets in the aggregate amount of $2,827.48, which the Debtors may have to satisfy using proceeds from the sale in order for the Purchaser to receive the Assets free and clear of liens.  The Debtors are not aware of any other liens and/or encumbrances on the Assets.  To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

Material Economic Terms and Conditions of the Proposed Sale.  The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code.  The Purchaser has agreed to pay a purchase price of $85,000 for the Assets.  The Purchase Agreement is annexed hereto as **Exhibit 1**.

Commission, Fees, or other Similar Expenses:  The Debtors are required to pay $4,250 in commission, fees, or other similar expenses in connection with the sale.

Procedures to Object to the Proposed Sale.  Any objection to the proposed sale (an "**Objection**") must:  (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Ray C. Schrock, P.C., Esq.; Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; and Sunny Singh, Esq.), as counsel to the Debtors **on or before March 3, 2021 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors'

2

Committee; and (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated: February 22, 2021
New York, New York

/s/ *Jacqueline Marcus*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
*Attorneys for Debtors*
*and Debtors in Possession*

3

## __Exhibit 1__

**Purchase Agreement**

## REAL ESTATE SALE CONTRACT
*Richmond, IN, Vacant Land #7246*

**THIS REAL ESTATE SALE CONTRACT** ("**Contract**") is made as of ___December 23___, 2020 (the "**Effective Date**"), by and between **KMART CORPORATION,** a Michigan corporation ("**Seller**") and **MIDWEST STORAGE DEVELOPMENT LLC,** a Delaware limited liability company ("**Purchaser**"; Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**"). Seller and Purchaser agree as follows:

**1.    PURCHASE AND SALE**

Seller is the owner of a parcel of land including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Real Property**"), located at the corner of West National Road (aka U.S. Route 40) and Salisbury Road in the City of Richmond (the "**City**"), Wayne County ("**County**"), State of Indiana legally described on **Exhibit** "**A**" attached hereto and made a part hereof. The Real Property, together with the right, title and interest of Seller in and to the personal property situated on and/or used in connection with the operation of the Real Property, if any, is sometimes called the "**Property**". Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract. On the Closing Date set forth in Section 7 of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject to the Permitted Title Exceptions (as defined in Section 4 of this Contract).

**2.    PURCHASE PRICE**

(a)    **Purchase Price.**    The Purchase Price of the Property shall be Eighty-Five Thousand and No/100 Dollars ($85,000.00) (the "**Purchase Price**") and payable by Purchaser in United States currency in good and certifiable funds at Closing.

(b)    **Options Consideration**. Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $1.00 as independent and non-refundable contract consideration for any options granted in this Contract. This independent consideration is in addition to any other deposits made under this Contract, is earned by Seller upon its execution of this Contract, and will not be credited against the Purchase Price.

**3.    EARNEST MONEY DEPOSIT**

Within three (3) business days of the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company, 10 South LaSalle Street, Suite 3100, Chicago, Illinois 60603 Attention: Cheri L. Sutton, Telephone: (312) 223-2958, Fax: (312) 223-5801, Email: Cheri.Sutton@ctt.com ("**Title Insurer**" or "**Escrow Agent**") the sum of Eight Thousand Five Hundred and No/100 Dollars ($8,500.00) United States currency (the

"**Earnest Money Deposit**") by means of a company check or wire transfer, to be held by the Title Insurer in accordance with the terms of the strict joint order escrow instructions executed by the Parties attached hereto as **Exhibit "B"** and incorporated into this Contract by this reference (the "**Earnest Money Escrow Instructions**") and also the terms and conditions of this Contract.  Any escrow fees as set forth in the Earnest Money Escrow Instructions will be divided equally by the Parties.  Purchaser may elect to direct the Title Insurer to invest the Earnest Money Deposit on its behalf in compliance with the Title Insurer's standard investment instructions, and Purchaser agrees that it shall be solely responsible for any investment fees charged by the Title Insurer.  Subject to the terms and conditions as otherwise set forth in this Contract, any and all interest accrued on the Earnest Money Deposit shall be paid to Purchaser at Closing.  The Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, no later than 2:00 p.m. (Chicago time) on the Closing Date, by wire transfer of immediately available funds.  If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit, terminate this Contract, in which case this Contract shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

## 4.    TITLE AND SURVEY REVIEW

(a)    **Title Commitments/Title Exceptions**.  Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser a title commitment for an ALTA Standard Form of Owner Policy of Title Insurance (the "**Title Commitment**") issued by Title Insurer covering title to the Property and showing title to the Property vested in Seller.

(b)    **Objection Process**.  On or before the expiration of the Due Diligence Period, Purchaser may deliver to Seller a notice (a "**Title Objection Notice**") setting forth any matters shown on the Title Commitment to which Purchaser objects (the "**Defects**"). If Purchaser delivers a Title Objection Notice, Seller shall have thirty (30) days from the receipt of Purchaser's Title Objection Notice to provide Purchaser with written notice of Seller's election to remove or otherwise cure, to Purchaser's reasonable satisfaction, any Defects on or prior to the Closing ("**Seller Response Notice**").  If Seller timely delivers notice of election not to cure a Defect, then Purchaser may either (i) elect to terminate this Contract; or (ii) waive in writing its prior disapproval of such Defect and accept title subject to such Defect by delivering notice of Purchaser's election to Seller within fifteen (15) days after the receipt of the Seller Response Notice.  If Seller fails to timely deliver the Seller Response Notice within such thirty (30) day period, then Seller shall be deemed to have elected to not cure all of the Defects set forth in Purchaser's Title Objection Notice, and Purchaser may either (i) elect to terminate this Contract; or (ii) waive in writing its prior disapproval of such Defects and accept title subject to such Defects by delivering notice of Purchaser's election to Seller within fifteen (15) days after the 30-day period in which Seller was required under this Section to deliver the Seller Response Notice.  If Purchaser

WEIL:\97627236\15\73217.0004
Error! Unknown document property name.

2

fails to timely deliver notice waiving in writing its prior disapproval of the Defects that Seller has elected or is deemed to have elected not to cure, then Purchaser shall be deemed to have elected to terminate this Contract.  Upon the termination of this Contract pursuant to this <u>Subsection 4(b)</u>, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation <u>Section 9</u> hereof.

(c)      **Permitted Title Exceptions**. Notwithstanding anything contained in Subsection 4(b) above, the following (and any exception therefor contained in any Title Commitment, Supplemental Title Commitment, or Title Policy) shall be deemed Permitted Title Exceptions: (1) restrictive covenants common to the platted subdivision in which the Property is located, (2) standby fees, taxes and assessments, (3) utility easements created by the dedication deed or plat of the subdivision in which the Property is located or any other easements, rights of way, servitudes, encroachments, apparent servitudes, permits, surface leases or other similar rights, (4) exception as to waters, tidelands, beaches, streams, and related matters, (5) discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements (Purchaser, at Purchaser's expense, may have any related  title exception amended to read, "shortages in area"), (6) all matters set forth in the Title Commitment and the Supplemental Title Commitment(s) (defined below), if any, and approved by Purchaser or deemed approved by Purchaser as herein provided, (7) any title exception or encumbrance created directly by any act or omission of Purchaser, any of Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), or any party acting on behalf of Purchaser, (8) matters disclosed by the Survey or the Existing Survey (or if none is obtained or provided, as would be disclosed by a current and accurate survey or an inspection of the Property), (9) all applicable laws, ordinances, rules and governmental regulations affecting the development, use, occupancy and/or enjoyment of the Property, or any portion thereof, (10) encumbrances which will be and are discharged or released either prior to, or simultaneously with, the Closing, (11) the terms of any leases and tenancies assigned hereby, and (12) any of the foregoing or any other lien, encumbrance or title defect curable by expenditure of any funds or incurrence of any liabilities, as more specifically provided under subsection (f) of this <u>Section 4</u> (collectively, the "**Permitted Title Exceptions**").  On the Closing Date, Seller shall cause the Title Insurer to issue, at Seller's sole cost and expense, an ALTA owner's policy of title insurance in the amount of the Purchase Price insuring fee simple title to the Property in Purchaser as of the Closing Date, subject only to the Permitted Title Exceptions, but without exception for any Defects or Supplemental Unpermitted Exceptions (as hereinafter defined) unless Purchaser's prior disapproval of such Defects was subsequently waived by Purchaser pursuant to <u>Section 4(b)</u> above and Purchaser's prior disapproval of such Supplemental Unpermitted Exceptions was subsequently waived by Purchaser pursuant to <u>Section 4(e)</u> below and with extended coverage over all of the so-called preprinted standard exceptions (the

"**Title Policy**"). It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before the Closing Date. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for or any other ability to obtain any endorsement, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder.

(d)      **Survey**.          Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser, to the extent available, if at all, in the "Potential Purchaser Diligence Documents" folder in Seller's electronic online data room for the Property (as the same may be updated from time-to-time), Seller's existing survey of the Real Property (the "**Existing Survey**"). During the Due Diligence Period, Purchaser, may, at Purchaser's sole cost and expense, obtain a new ALTA/NSPS land title survey, or an update to the Existing Survey, with such Table A inclusions as indicated by Purchaser (excepting any Table A inclusions which relate to rights of any third parties, or are otherwise invasive, including but not limited to Table A, item 11, as to underground utilities, 10(a) and (b), and 19), of the Property meeting the 2016 ALTA/NSPS and Title Survey standards, prepared by a State licensed surveyor, certified in a form acceptable to Purchaser, Seller and Title Insurer (the "**Survey**"). If Purchaser fails to obtain the Survey, the Permitted Title Exceptions shall include any matters that would be disclosed by a current and accurate survey or an inspection of the Property and the Title Policy shall not be required to provide extended coverage over those of the so-called preprinted standard exceptions which require a Survey to remove. On or before the expiration of the Due Diligence Period, Purchaser may deliver to Seller a notice (a "**Survey Objection Notice**") setting forth any matters shown on the Survey to which Purchaser objects. If Purchaser delivers a Survey Objection Notice, Seller shall have thirty (30) days from the receipt of Purchaser's Survey Objection Notice to provide Purchaser with written notice of Seller's election to remove or otherwise cure, to Purchaser's reasonable satisfaction, any objections on or prior to the Closing ("**Seller Survey Response Notice**"). If Seller timely delivers notice of election not to cure a disapproved item, then Purchaser may either (i) elect to terminate this Contract; or (ii) waive in writing its prior disapproval of such item and accept title subject to such previously disapproved item by delivering notice of Purchaser's election to Seller within fifteen (15) days after the receipt of the Seller Response Notice. If Seller fails to timely deliver the Seller Survey Response Notice within such thirty (30) day period, then Seller shall be deemed to have elected to not cure all of the disapproved matters set forth in Purchaser's Survey Objection Notice, and Purchaser may either (i) elect to terminate this Contract; or (ii) waive in writing its prior disapproval of such item and accept title subject to such previously disapproved item by delivering notice of Purchaser's election to Seller within ten (10) days after the 30-day period in which Seller was required under this Section to deliver the Seller Survey Response Notice. If Purchaser fails to timely deliver notice waiving in writing its prior disapproval of the matters set forth in Purchaser's Survey Objection Notice that Seller has elected or is deemed to have elected not to cure, then Purchaser shall be deemed to have elected to terminate this Contract. Upon the termination

of this Contract pursuant to this <u>Subsection 4(d)</u>, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation <u>Section 9</u> hereof.

(e) **Supplemental Title Commitments, Supplemental Title Review Period**.  In the event that any new title matter is first raised by the Title Insurer in a supplement to the Title Commitment (each, a "**Supplemental Title Commitment**") after the Effective Date, and Purchaser objects to such new title matter (a "**Supplemental Unpermitted Exception(s)**"), then Purchaser shall promptly provide Seller with a copy of such Supplemental Title Commitment (together with copies of all documents relating to any new title matters set forth in such Supplemental Title Commitment).  If Purchaser fails to give written notice to Seller of any Supplemental Unpermitted Exceptions within ten (10) Business Days after Purchaser's receipt of the Supplemental Title Commitment, Purchaser shall be deemed to have approved the new title matters raised in the Supplemental Title Commitment and such matters shall be deemed to be Permitted Title Exceptions. If Purchaser has given the required written notice described above identifying Supplemental Unpermitted Exceptions, Seller may, at its option (but with absolutely no obligation), (i) have such Supplemental Unpermitted Exceptions removed from the Supplemental Title Commitment; (ii) commit to having such Supplemental Unpermitted Exceptions removed from the Title Policy when issued, (iii) have Title Insurer commit to insure over such Supplemental Unpermitted Exceptions in a manner acceptable to Purchaser and provide evidence thereof acceptable to Purchaser, or (iv) decline to take any action with respect to such Supplemental Unpermitted Exceptions. If Seller fails to commit to having such Supplemental Unpermitted Exceptions removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given within ten (10) days (the "**Supplemental Response Period**") to either (i) terminate this Contract (in which event, provided no other event of default is outstanding and/or uncured, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation <u>Section 9</u> hereof), or (ii) waive in writing its prior disapproval of such Supplemental Unpermitted Exceptions and accept title to the Property subject to such Supplemental Unpermitted Exceptions without any credit, setoff or abatement therefor.  If Purchaser fails to elect either (i) or (ii) above within the Supplemental Response Period, Purchaser shall be deemed to have elected to terminate this Contract.  Upon the termination of this Contract pursuant to this <u>Subsection 4(e)</u>, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation <u>Section 9</u> hereof.

(f) **No Obligation of Seller to Remove Exceptions**.  The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens,

claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer; provided, however, if Seller commits to remove a Defect or Supplemental Unpermitted Exception or cure a matter raised in the Survey Objection Notice and Seller shall fail to remove or cure the same, then Purchaser may either (i) terminate this Contract (in which event the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof), or (ii) accept title to the Property subject to such Defects, Supplemental Unpermitted Exceptions and Survey matters without any credit, setoff or abatement therefor.

**5.    PRORATIONS AND EXPENSES**

(a)    **Prorations.**    The following prorations, except as specifically provided in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date (the "**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)    Taxes.    All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel number(s) that is attributable to the Property with Purchaser receiving credit for accrued but unpaid taxes assessed for the year prior to the calendar year within which the Closing Date occurs and credit for the current year taxes prorated as of the Proration Date. All prorations shall be final. Any installments of special or other assessments affecting the Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this Section 5(a)(i) includes general assessments, including, without limitation, regular annual assessments payable to any property owners association but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

(ii)    Miscellaneous.    If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing as of the Proration Date in accordance with local custom. In the event that accurate prorations and other adjustments cannot be made at Closing because current bills are not available or the amount to be adjusted is not yet ascertainable, the Parties shall prorate on the best available information. All prorations shall be final.

WEIL:\97627236\15\73217.0004
Error! Unknown document property name.

6

(b)     **Closing-related Costs.**  At Closing, (i) Purchaser and Seller shall share equally the cost of the Closing Escrow; (ii) Seller shall pay the cost of the Owner's Title Policy (including both standard and any extended coverage) and Purchaser shall pay any endorsements to the Title Policy and Purchaser shall pay the costs of the Survey; (iii) Seller shall pay the amount of any stamp or transfer tax or other similar fees and amounts imposed by any municipality and any county ordinance, and the state in which the Property is located (the "**State**"), if any; (iv) Seller shall pay any costs related to any inspections by any municipality and repairs necessitated by any municipal, county and/or State inspections ("**Repairs**"), if any, and shall meet any other requirements as established by any municipal, county and/or State ordinance with regard to the transfer of real estate; (v) Purchaser shall pay all financing related fees pertaining to any Purchaser financing; and (vi) Purchaser shall pay all recording charges for the Deed and all documents pertaining to any Purchaser financing. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable by the Purchaser at Closing. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.     **CONDITIONS TO CLOSING**

(a)     **Conditions to Seller's Obligation to Close.** In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to sell the Property to Purchaser is subject to each and all of the following conditions precedent (or express written waiver thereof by Seller):

(i)     All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)     All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(iii)     Purchaser has not received any information not known to Purchaser upon the expiration of the Due Diligence Period that would make any of the following statements to be true:

(A)     The Property is no under investigation for a violation of any federal, state or local law, ordinance or regulation relating to Hazardous Materials in, at, on, under or about the Property including, but not limited to, soil and ground water condition.

(B)     A federal, state or local taxing authority has imposed special assessments affecting the Property.

WEIL:\97627236\15\73217.0004
**Error! Unknown document property name.**

7

(C)    The Property constitutes "plan assets" under the Employee Retirement Income Security Act of 1974 ("ERISA").

(b)    **Conditions to Purchaser's Obligation to Close**.    In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent (or express written waiver thereof by Purchaser):

(i)    All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(c)    **Conditions to Closing of Both Parties**:    In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

(i)    The sale shall be authorized by and subject to that certain Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

(ii)    Seller, a debtor in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court (the "**Chapter 11 Case**") shall within five (5) Business Days following the expiration of the Due Diligence Period file and serve a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property.  Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property.  In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property.

(iii)    In the event of an objection to the Sale Notice, Purchaser and Seller shall have approved the form of the Final Sale Order (as hereinafter defined), with such approval by Purchaser and Seller not to be unreasonably withheld.

7.    **CLOSING**

(a)    **Closing Date**. Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Title Insurer within thirty (30) days after the filing of the Sale Notice or, in the event a timely objection to the Sale Notice is

interposed, within thirty (30) days after entry of a final order from the Bankruptcy Court overruling the objection and specifically approving the sale of the Property (the "**Final Sale Order**"), or such other date as agreed to by Purchaser and Seller (the "**Closing Date**"), but in no event shall the Closing Date be earlier than fifteen (15) days following the expiration of the Due Diligence Period.  As used herein, the term "**Outside Date**" shall mean the earlier to occur of (i) seventy-five (75) days following the expiration of the Due Diligence Period or (ii) sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from the withdrawal of such objection or entry of the Final Sale Order.  If Closing does not occur by the Outside Date, the Parties shall have the rights set forth in Section 13(a)(i) hereof.

(b)     **Seller Closing Deliverables**. No later than 2:00 p.m. Chicago time on the Closing Date, Seller shall deliver or use commercially reasonable efforts to cause to be delivered to the Title Insurer the following Closing documents:

(i)      A Special Warranty Deed in the form attached hereto as **Exhibit "F"**, subject to approval by the Title Insurer, so as to convey the title required by this Contract (the "**Deed**") to Purchaser, subject only to the Permitted Title Exceptions;

(ii)     A bill of sale in the form attached hereto as **Exhibit "G"** covering the right, title and interest of Seller in and to the personal property situated on and/or used in connection with the operation of the Real Property;

(iii)    A FIRPTA Affidavit in customary form duly executed by Seller;

(iv)     A file-stamped copy of the Approval Order;

(v)      Such other evidence of Seller's authority to convey the Property, if any, as the Title Company may require to issue the Title Policy;

(vi)     An Owner's Affidavit of Title executed by Seller, in the form attached hereto as **Exhibit "C"** (or such other form as reasonably approved by Seller), with such additional certifications, if any, as the Title Company may require to issue the Title Policy without the so-called preprinted standard exceptions or without exception for recording gaps; and

(vii)    Such other documents, certificates, instruments and affidavits, if any, as are customarily executed by a seller of real property in the City, County and State, including without limitation a Sales Disclosure Form for each tax parcel comprising the Property.

(c)     **Purchaser Closing Deliverables** No later than 2:00 p.m. Chicago time on the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

(i)     The full amount of the Purchase Price, as adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account and deliver to Escrow Agent instructions to immediately release the full amount to Seller; and

(ii)    Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the City, County and State.

(d)     On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered a closing proration statement and State, county and municipal transfer tax declarations (if required), in each case duly approved by Seller and Purchaser, which approval by both parties shall not be unreasonably withheld or conditioned, and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

(e)     Seller shall deliver possession of the Property to Purchaser on the Closing Date, subject only to the Permitted Title Exceptions.

## 8.    CLOSING ESCROW

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**Closing Escrow**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control.  All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing.  Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

## 9.    DUE DILIGENCE PERIOD

(a)     **Access**.        As of the Effective Date and continuing until the Closing Date, Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), at Purchaser's sole cost, expense, and liability, shall have a non-exclusive revocable license to enter upon the Property for the purpose of conducting certain due diligence of the Property (collectively, "**Purchaser's Studies**"), in accordance with and subject to the terms, covenants, provisions, agreements, indemnifications, and conditions of that certain Non-Invasive

Inspection Agreement dated <u>December 23</u>, 2020 entered into between Seller and Purchaser (the "**Access Agreement**"), a copy of which is attached hereto and incorporated herein as **Exhibit "E"**. The terms, covenants, provisions, agreements, indemnifications, and conditions set forth in the Access Agreement are incorporated herein by reference with the same force and effect as though fully set forth herein.

(b)     **Due Diligence Period**. Purchaser shall have until 5:00 p.m. (local Chicago time) on the forty-fifth (45th) day following the Effective Date (the "**Due Diligence Period**"), at which time Purchaser's right (all in accordance with the terms and conditions of the Access Agreement and this Contract) to enter upon the Property and Purchaser's rights (including the Purchaser Entities) to conduct any of Purchaser's Studies, the Site Assessment Work (as such term is defined in the Access Agreement), the activities in the Work Plan (as such term is defined in the Access Agreement) shall immediately terminate. In the event Purchaser, in its sole discretion, shall conclude prior to the expiration of the Due Diligence Period, that any aspect of the Property is not suitable for Purchaser in any respect, Purchaser shall have the right to elect, by written notice to Seller given on or prior to the expiration of the Due Diligence Period (the "**Termination Notice**"), to terminate this Contract and this Contract thereupon shall be deemed to be terminated upon receipt of the Termination Notice and both Parties shall be released from any further liability hereunder, except for any obligations, which by their express terms survive the termination of this Contract, including, without limitation Section 9(d) hereof. If Purchaser gives Seller a Termination Notice, provided no other event of default is outstanding and/or uncured, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9(d) hereof. If Purchaser fails to timely give the Termination Notice to Seller as provided in this Section 9(b) and subject to the terms and provisions of this Contract, including Section 9(f) below, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, and (ii) at the time of the Closing, Purchaser agrees to accept all aspects of the Property in its "AS-IS, WHERE-IS, AND WITH ALL FAULTS CONDITION" and from and after the Closing, to release, defend, hold harmless and indemnify Seller and the Indemnified Parties for all costs and expenses (including reasonable attorneys' fees and costs) resulting from any claim, demand, damage, lien, penalty, fine, interest, cost, expense, liability or loss (collectively, "**Claims**") relating to the condition of the Property, including but not limited to the environmental condition of the Property and the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur. If Purchaser does not terminate the Contract in accordance with this Section 9(b), the Earnest Money Deposit shall be non-refundable to Purchaser (except as may otherwise be provided in this Contract) but shall be credited towards the Purchase Price at Closing.

(c)     **Indemnification**.  Purchaser shall indemnify, protect, defend and hold harmless Seller, and any of its respective managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns (collectively, the "**Indemnified Parties**") from and against any and all costs, liabilities, claims, demands, liens, expenses, damages, including attorney's fees, losses, penalties, fines, interest or suits resulting from (i) any release of Hazardous Materials (as defined below) on, in, under, or about the Property caused by Purchaser and/or any of the Purchaser Entities during their entry on or use of the Property, (ii) Purchaser and/or any of the Purchaser Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (iii) the acts, omissions and/or willful misconduct of Purchaser and/or the Purchaser Entities during any entry upon and/or use of the Property, the Site Assessment Work or in performing the Work Plan under the Access Agreement, and/or (iv) personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work, the performance of the work under the Work Plan or any other work performed by Purchaser or any of the Purchaser Entities pursuant to this Contract or the Access Agreement. Notwithstanding this indemnity, Seller expressly reserves all rights Seller may have under the law to prosecute any claims or demands against Purchaser and/or any of the Purchaser Entities arising out of or related to the environmental condition of the Property or otherwise. This indemnity shall survive the termination of this Contract and the Access Agreement. As used herein, (1) "**Affiliate(s)**" shall mean, with respect to any Person (as defined below), any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; and (2) "**Person**" shall mean, any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, or other entity. Notwithstanding the foregoing, Seller acknowledges that during any entry upon and/or use of the Property, the Site Assessment Work or in performing the Work Plan under the Access Agreement, Purchaser may discover a pre-existing condition on or about the Property, and in the event of such discovery, [Y] Purchaser's obligations under this Section 9(c) with respect to Hazardous Materials are only to the extent such Hazardous Materials are introduced or caused by Purchaser or Purchaser Entities, and [Z] Purchaser's obligations under this Section 9(c) for any pre-existing conditions (e.g., environmental contamination) shall only be to the extent Purchaser or Purchaser Entities exacerbates such pre-existing conditions.

(d)     **Survival of Purchaser's Obligations**.  Notwithstanding anything to the contrary herein, any and all obligations, commitments, and indemnifications by Purchaser and the Purchaser Entities specified in this Section 9 and otherwise set forth in the

WEIL:\97627236\15\73217.0004
Error! Unknown document property name.

12

Access Agreement shall survive the expiration or termination of this Contract (and the Access Agreement) and the delivery of the Deed for a period of two (2) years without the further need to document such agreement.

(e)     All of Seller's service contracts on the Property are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property to be released from such service contracts on or prior to the Closing Date.

(f)     Purchaser acknowledges that, prior to the Effective Date, Seller has provided Purchaser with electronic access to the "Potential Purchaser Diligence Documents" in Seller's electronic online data room for the Property (as the same may be updated from time-to-time) which, to Seller's current actual knowledge, may (but shall not be obligated to) contain the following documents, and such electronic access to the "Potential Purchaser Diligence Documents" as provided herein shall be deemed to satisfy any and all notice requirements as set forth in <u>Section 14</u> hereof:

(i)     Current tax assessment statements and copies of the most recent tax bills for the Property;

(ii)     Copies of any surveys affecting the Property; and

(iii)     Environmental reports and studies.

In the event this Contract is terminated, all materials provided by or on behalf of Seller to Purchaser (the "**<u>Due Diligence Materials</u>**") shall be promptly returned by Purchaser to Seller at no cost to Seller. SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, REGARDING (i) THE TRUTH, ACCURACY OR COMPLETENESS OF ANY OF THE DUE DILIGENCE MATERIALS, (ii) THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME, (iii) ANY DATA OR INFORMATION DELIVERED BY SELLER OR THE SOURCES THEREOF, (iv) WHETHER ANY OF THE DUE DILIGENCE MATERIALS REPRESENT ALL OF THE NECESSARY OR RELEVANT INFORMATION RELATING TO THE PROPERTY, OR (v) THE ENFORCEABILITY OR VALIDITY OF ANY OF THE DUE DILIGENCE MATERIALS. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF THE DUE DILIGENCE MATERIALS SHALL BE AT THE SOLE RISK OF PURCHASER AND WITHOUT ANY REPRESENTATIONS, WARRANTIES, OR GUARANTIES OF SELLER OR THE INDEMNIFIED PARTIES, AND PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH DUE DILIGENCE MATERIALS, BUT RATHER WILL RELY ON ITS OWN DUE DILIGENCE, INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AND ANY REPORTS COMMISSIONED BY PURCHASER WITH RESPECT THERETO. NEITHER SELLER, NOR ANY AFFILIATE OF

WEIL:\97627236\15\73217.0004
Error! Unknown document property name.

13

SELLER, NOR THE PERSON OR ENTITY WHICH PREPARED ANY OF THE DUE DILIGENCE MATERIALS SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY, OR OMISSION, IN ANY OF THE DUE DILIGENCE MATERIALS. THE FAILURE TO DELIVER ANY REPORT, FINDINGS, RESULTS, FACTS, INFORMATION, OR DUE DILIGENCE MATERIALS SHALL NOT BE ACTIONABLE BY PURCHASER AND SELLER SHALL HAVE NO LIABILITY IN CONNECTION THEREWITH. PURCHASER ACKNOWLEDGES THAT THE DUE DILIGENCE MATERIALS PROVIDED BY SELLER MAY NOT NECESSARILY REPRESENT ALL OF THE DOCUMENTATION AND INFORMATION IN EXISTENCE (OR IN SELLER'S POSSESSION OR CONTROL) WITH RESPECT TO THE PROPERTY, BUT, RATHER, REPRESENTS DOCUMENTATION MADE AVAILABLE BY SELLER AS A CONVENIENCE FOR PURCHASER. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS MAY HAVE BEEN OBTAINED BY SELLER FROM A VARIETY OF SOURCES, AND THAT SELLER HAS NOT MADE (AND IS UNDER NO DUTY TO MAKE) ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF ANY DUE DILIGENCE MATERIALS. PURCHASER WAIVES, RELEASES AND FORFEITS ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER AGAINST SELLER, THE INDEMNIFIED PARTIES, OR THIRD PARTIES ARISING OUT OF PURCHASER'S USE OF THE DUE DILIGENCE MATERIALS. THIS <u>SECTION 9(f)</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT.

10.    **<u>REPRESENTATIONS AND WARRANTIES</u>**

(a)    **<u>Seller Representations</u>**.      Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)    Subject to <u>Section 6(c)</u> of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to <u>Section 6(c)</u> of this Contract.

(ii)    To Seller's actual knowledge, and except as may be reflected in the Title Commitment, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except as set forth on **<u>Exhibit "D"</u>**.

(iii)    To Seller's actual knowledge, there are no service contracts affecting the Property other than those national contracts referred to in <u>Section 9(e)</u>.

(iv)    To Seller's actual knowledge, Seller has not received any notice that the Property or any portion thereof is situated, used or operated in violation of any law, court order, regulation, ordinance or requirement of any city, county, state or other governmental authority, including any laws or regulation pertaining to the regulation of Hazardous Materials.

(v)    As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of President of Real Estate, and shall not be construed to refer to the knowledge of any other person, including, without limitation, managers, members, officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b)    **Seller Covenants**.    Seller covenants with Purchaser as follows:

(i)    Prior to the Closing Date, Seller will not create any easements, liens, mortgages, leases or other encumbrances with respect to the Property.

(ii)    Seller will continue to maintain and repair the Property in at least the manner which Seller has previously maintained and repaired the Property and keep in effect Seller's existing policies of public liability and hazard and extended coverage insurance insuring the Property.

(iii)    Seller will deliver notice to Purchaser of (i) any suits or claims affecting the Property that Seller has or received knowledge of, or (ii) any actual or threatened condemnation of any portion of the Property for which Seller has received written notice.

(c)    **Purchaser Representations.** Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)    Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.  Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents.  The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

WEIL:\97627236\15\73217.0004
**Error! Unknown document property name.**

15

(ii) Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii) This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv) As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the United States Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v) Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this <u>Section 10</u> shall merge with the transfer of title and shall not survive Closing. If the Closing takes place, neither Party shall have any liability with respect to any claim which the other Party may have against such Party for a breach of any such representation or warranty, whether such breach is known or unknown.

## 11.   <u>AS IS/NO WARRANTIES</u>

(a)   **As-Is Condition.**        Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to all aspects of the Property without, except as otherwise expressly provided in this Contract, any warranty or representation of any kind by Seller or any of Seller's managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors, subcontractors, successors and assigns (the "**Indemnified Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Materials. As used in this Contract, the term "**Hazardous Material(s)**" shall mean asbestos,

WEIL:\97627236\15\73217.0004
Error! Unknown document property name.

16

petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any federal, state or local law, statute, ordinance or regulation. From and after the Closing, Purchaser hereby agrees to release, defend, hold harmless and indemnify Seller and the Indemnified Parties with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was directly caused by the affirmative acts of Seller, its employees, agents or contractors from and after the Effective Date) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source.

(b)     **No Warranties, Representations**.  Purchaser warrants, acknowledges to, and agrees with Seller that except as otherwise expressly provided in this Contract, Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller, other than those expressly set forth in this Contract.  Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price.  Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in this Contract:

(i)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)     Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser

deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof. Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State; and

(iv)     Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)     **WAIVER/RELEASE OF PURCHASER CLAIMS**.     WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 11(a) AND 11(b), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS CONTRACT, IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND THE INDEMNIFIED PARTIES, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORSEEN OR UNFORSEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)     **No Representations as to Condition/Full Investigation**. Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any of the Indemnified Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof. The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their

Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto.  Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that except as expressly set forth in this Contract Purchaser shall rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

## 12.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section.  At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

## 13.    **DEFAULT AND REMEDIES**

(a)    **Termination Events:**

(i)    <u>Termination by Either Party</u>:  Notwithstanding anything to the contrary set forth herein, this Contract may be terminated by either Party if Closing does not occur by the Outside Date as contemplated in <u>Section 7(a)</u> of this Contract, provided, however, that the right to terminate this Contract pursuant to this <u>Section 13(a)</u> shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in Closing failing to occur. In the event Seller is unable to satisfy the conditions set forth in Section 6(c) of this Contract and the Court approves the sale of the Property to another Purchaser with a higher or better offer, Seller shall reimburse Purchaser in an amount not to exceed $8,500.00 for reasonable out of pocket expenses.

(ii)    <u>Termination by Purchaser.</u>  If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of written notice of such default from Purchaser (the "<u>Seller Cure Period</u>") (excluding any default by Purchaser and Purchaser's failure to diligently complete or cure the same), Purchaser shall have as its sole and exclusive remedies (a) the right to terminate the Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon in full satisfaction of all damages suffered by Purchaser by reason of Seller's default and the Contract shall be terminated and of no further force or effect except as provided for in this Contract or (b) in the event that Seller's breach of this Contract does not arise out of a refusal of the Bankruptcy Court to approve the Sale Notice, the right to specific performance of this Contract by the Bankruptcy

Court or any other court of competent jurisdiction should the Bankruptcy Court abstain from exercising its jurisdiction or be found not to have jurisdiction; provided, however, Purchaser will seek this right of specific performance if at all within no more than sixty (60) days from the expiration of the Seller Cure Period.

(iii)    Termination by Seller.  If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of written notice of such default from Seller (excluding any default by Seller and Seller's failure to diligently complete or cure the same), Seller shall have as its sole and exclusive remedy the right to terminate the Contract, in which event Seller shall be entitled to receive the Earnest Money Deposit as liquidated damages in lieu of all other remedies available to Seller and this Contract shall terminate with neither Party having any further rights or liabilities hereunder, except as those specifically provided to survive the termination of this Contract; provided, however, that this Section 13(a)(iii) shall not limit Seller's claims pursuant to any of Purchaser's indemnification obligations in this Contract. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money Deposit is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Earnest Money Deposit upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

(b)    **Effect of Termination.**    In the event of a termination of this Contract pursuant to this Section 13 (other than a termination of this Contract pursuant to Section 13 (a)(iii), Seller and Purchaser shall instruct the Escrow Agent to, and the Escrow Agent shall, promptly (but in any event within two (2) Business Days of such instruction) return to Purchaser the Earnest Money Deposit by wire transfer of immediately available funds and the return thereof shall constitute the sole and exclusive remedy of Purchaser in the event of a termination hereunder.

## 14.    NOTICES

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

|  |  |
|---|---|
| To Seller: | **M-III Partners, LP** |
|  | 130 West 42nd Street |
|  | 17th Floor |
|  | New York, New York 10036 |
|  | Attn: William Gallagher |

WEIL:\97627236\15\73217.0004
Error! Unknown document property name.

20

Email: wgallagher@miiipartners.com

| | |
|---|---|
| **With copies to:** | **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn:  W. Michael Bond, Esq.<br>Phone: (212) 310-8035<br>E-mail: Michael.Bond@weil.com |
| **To Purchaser:** | **Midwest Storage Development LLC**<br>19 Benedict Place<br>Greenwich, Connecticut 06830<br>Attn: Kenneth F. Boyle<br>Phone: (203) 862-8482<br>E-mail: kboyle@hanover-partners.com |
| **With copies to:** | Honigman LLP<br>39400 Woodward Avenue, Suite 101<br>Bloomfield Hills, Michigan 48304<br>Attn: Alan J. Salle<br>Phone: (248) 566-8426<br>E-mail: asalle@honigman.com |

Notice of change of address for receipt of notices shall be sent in the manner set forth in this <u>Section 14</u>.

## 15.    <u>ENTIRE CONTRACT, AMENDMENTS AND WAIVERS</u>

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

## 16.    <u>FURTHER ASSURANCES</u>

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

## 17.    <u>SURVIVAL AND BENEFIT</u>

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing.  Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and

obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

18.    **CONFIDENTIALITY**

Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that (i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date, (ii) all terms of this Contract and any and all drafts of this Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Due Diligence Materials (as defined above) and any other electronic files and other documents in Seller's electronic online data room, and (iv) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is strictly confidential, shall remain confidential and shall not be disclosed to any Person by Purchaser or the Purchaser Entities without the prior written consent of Seller, not to be unreasonably withheld conditioned or delayed, including, but not limited to, any federal, state and/or local governmental entity, except that Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this Section 18. Purchaser may disclose the Confidential Information as may be necessary to conduct Purchaser's Studies or effect the Closing, Purchaser may disclose the Confidential Information following the Closing, if it occurs, and Purchaser may disclose the Confidential Information if required by law. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser, the Purchaser Entities, or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser, the Purchaser Entities, or the Permitted Parties. If Purchaser, the Purchaser Entities, or the Permitted Parties breach (or threaten the breach of) the terms of this Section 18, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Contract by any of the Purchaser Entities or Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this Section 18, in addition to all other rights and remedies available at law or in equity. Notwithstanding the foregoing, the Parties agree that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser, the Purchaser Entities, or the Permitted Parties, (2) becomes available to

Purchaser, the Purchaser Entities, or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information. Except as required by law or to effect Closing, none of the terms of this Contract nor any draft of this Contract, nor any documents or instruments executed in connection therewith shall be disclosed to any Person by Seller or the Seller Entities without the prior written consent of Purchaser, not to be unreasonably withheld conditioned or delayed. Purchaser acknowledges that Seller may file this Contract and any related matters with the Bankruptcy Court and thus make this Contract publicly available.  The terms of this <u>Section 18</u> shall survive termination of this Contract.

## 19.    <u>BROKERAGE</u>

Except for Excess Space and Thompson Thrift Retail Group representing the Seller ("<u>**Seller's Brokers**</u>"), each Party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction.  Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified Party) resulting from the claims of any broker or finder claiming by, through or under the acts or agreements of the indemnifying Party.  Any commission or other compensation due the Seller's Brokers shall be the responsibility of Seller, and Seller's Brokers shall be paid at the Closing in accordance with separate agreements between Seller's Brokers and Seller. Notwithstanding anything to the contrary herein, any and all obligations, commitments, and indemnifications by the Parties specified in this <u>Section 19</u> shall survive the expiration or termination of this Contract and the delivery of the Deed without the further need to document such agreement.

## 20.    <u>ASSIGNMENT</u>

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting of which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an Affiliate of Purchaser provided that written notice of such assignment is delivered to Seller at least five (5) business days prior to Closing.  No transfer or assignment by Purchaser shall relieve Purchaser of its obligations hereunder. No such transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

## 21.    <u>NO THIRD PARTY BENEFITS</u>

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns and, except for any of the Indemnified

WEIL:\97627236\15\73217.0004
Error! Unknown document property name.

23

Parties, no third party is intended to or shall have any rights hereunder. This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

22.    **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "**Action**"), the prevailing Party shall be entitled to the payment by the losing Party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court. The term "prevailing Party" as used in this Section 22 includes, without limitation, a Party: (i) who agrees to dismiss an Action on the other Party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a Party who has an Action voluntarily dismissed against it), or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled. In addition, the prevailing Party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing Party of the prevailing Party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action. It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

23.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

24.    **RESERVED**

25.    **COUNTERPARTS**

This Contract may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Contract by signing any such counterpart delivery of an executed signature page of this Contract by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

26.    **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of Section 20 of this Contract.

WEIL:\97627236\15\73217.0004
**Error! Unknown document property name.**

24

27.  **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract.  Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract and retain the Earnest Money Deposit.

28.  **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.  The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.

29.  **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

30.  **RESERVED**

31.  **CONDEMNATION AND CASUALTY**

(a)  In the event of any taking of, or if notice is given of the intention to take, by the exercise of the power of eminent domain, all or a substantial portion of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation.  If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Earnest Money Deposit, plus any interest accrued thereon, shall be promptly returned to Purchaser and the Parties shall have no further obligation hereunder, except for any terms, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof.  If Purchaser elects not to terminate this Contract, said right to terminate shall be deemed waived and Purchaser shall be assigned all condemnation awards payable to Seller on account of that event, less reasonable sums which Seller incurs before the Closing Date in participating in any condemnation proceeding, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price.  If Purchaser fails to give Seller notice of termination within said thirty (30) day period, Purchaser shall be deemed to have terminated this Contract.  A portion of the Real Property will be deemed "substantial," for purposes of this Section 31(a) to the extent the taking of such portion would materially impair or otherwise materially affect Purchaser's intended use of the Real Property.

(b)  If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof ("**Casualty Notice**").  After delivery of the Casualty Notice, if Seller reasonably estimates the cost to repair such damage is

greater than Fifty Thousand Dollars ($50,000.00), Purchaser may elect, within five (5) business days of delivery of the Casualty Notice (and if the Closing is scheduled within such five (5) business day period, the Closing shall be extended for up to five (5) business days), to terminate this Contract by written notice to such other Party, in which event, provided no other event of default is outstanding and/or uncured, the Earnest Money Deposit, plus any interest accrued thereon, shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any terms, which by their express terms, survive the termination of this Contract, including, without limitation <u>Section 9</u> hereof.  If Purchaser elects not to terminate this Contract, said right to terminate shall be deemed waived and Purchaser shall be assigned all interest of Seller in and to any insurance proceeds actually received by Seller (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date), less reasonable sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage that Seller may elect, in its reasonable discretion, to undertake or in pursuing the collection of any such insurance proceeds, Purchaser shall remain obligated to purchase the Property and the Purchase Price shall be reduced by the amount of any deductible or self-insured retention carried by Seller.  If Purchaser fails to give Seller notice of termination within said five (5) business day period, Purchaser shall be deemed to have terminated this Contract.

**32.**     <u>**SECTION HEADINGS**</u>

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

**33.**     <u>**INTERPRETATION**</u>

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

**34.**     <u>**GOVERNING LAW, JURISDICTION & VENUE**</u>

This Contract will be exclusively governed by and construed and enforced in accordance with the laws of the State of Indiana, without regard to conflicts of law principles thereof. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS CONTRACT. SHOULD THE BANKRUPTCY COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO HAVE JURISDICTION OVER A MATTER RELATING TO THIS CONTRACT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF INDIANA OR THE STATE COURT OF THE STATE OF INDIANA LOCATED IN WAYNE COUNTY, INDIANA, without regard to conflicts of law principles thereof. Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in <u>Section 14</u> of this Contract shall be effective service of process for any suit or proceeding in connection with this Contract.

WEIL:\97627236\15\73217.0004
**Error! Unknown document property name.**

26

35.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto.  However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

36.    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

37.    **PATRIOT ACT**

Seller certifies that its name is **KMART CORPORATION,** a Michigan corporation, and neither Seller or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.   Purchaser certifies that its name is **MIDWEST STORAGE DEVELOPMENT LLC,** a Delaware limited liability company, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

38.    **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract.   Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this <u>Section 38</u> shall survive the expiration of the term or any earlier termination of this Contract.

WEIL:\97627236\15\73217.0004
**Error! Unknown document property name.**

27

39.    **PRESS RELEASES**

Neither Party nor any of such Party's Affiliates shall make any press release or other public announcement concerning the transaction(s) contemplated by this Contract without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed. If either Party desires to make a press release or other public announcement respecting this Contract or the transaction(s) contemplated hereby, such Party shall wait at least five (5) business days after the Closing (the "**No Public Announcement Period**"), and after the expiration of the No Public Announcement Period, shall provide the other Party with a draft of the press release or other public announcement for review at least ten (10) business days prior to the time that such press release or other public announcement is to be made. The Parties will attempt in good faith to expeditiously reach agreement on such press release or other public announcement and the contents thereof. The failure of the other Party to provide comments back to the requesting Party within ten (10) business days of receipt of the draft release or announcement will be deemed consent to the public disclosure of such press release or other public announcement and the content thereof. Each Party shall be liable for the compliance of its respective Affiliates with the terms of this Section 39. Notwithstanding anything to the contrary herein, any press release or other public announcement shall not reveal any Confidential Information and otherwise be in accordance with Section 18 hereof. This Section 39 shall survive the Closing.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

SELLER:

**KMART CORPORATION**,
A Michigan corporation

By: _____
Name: Mohsin Y. Meghji
Its: Chief Restructuring Officer

PURCHASER:

**MIDWEST STORAGE DEVELOPMENT LLC,**
a Delaware limited liability company

By: _____
Name: _____
Its: _____

## EXHIBITS

Exhibit "A":    Legal Description
Exhibit "B":    Earnest Money Escrow Instructions
Exhibit "C":    Owner's Affidavit of Title
Exhibit "D":    Leases, tenancies and licenses
Exhibit "E":    Non-Invasive Inspection Agreement
Exhibit "F":    Special Warranty Deed
Exhibit "G":    Bill of Sale

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**KMART CORPORATION,**
A Michigan corporation


By:_____
Name: Mohsin Y. Meghji
Its: Chief Restructuring Officer



**PURCHASER:**

**MIDWEST STORAGE DEVELOPMENT LLC,**
a Delaware limited liability company

By:_____
Name:_____
Its:_____

**EXHIBITS**

| | |
|---|---|
| Exhibit "A": | Legal Description |
| Exhibit "B": | Earnest Money Escrow Instructions |
| Exhibit "C": | Owner's Affidavit of Title |
| Exhibit "D": | Leases, tenancies and licenses |
| Exhibit "E": | Non-Invasive Inspection Agreement |
| Exhibit "F": | Special Warranty Deed |
| Exhibit "G": | Bill of Sale |

## EXHIBIT "A"

## LEGAL DESCRIPTION OF PROPERTY

For APN/Parcel ID(s): 89-10-22-200-209.000-006 and 89-17-01-130-102.000-030

Being part of Fractional Section 1, Township 13 North, Range 2 West, in Wayne Township, Wayne County, Indiana and part of Fractional Section 22, Township 16 North, Range 14 East, in Center Township, Wayne County, Indiana, more particularly described as follows:

Beginning at a point on the present center line of Salisbury Road, said point described as follows: Beginning at the northwest corner of Fractional Section 1, Township 13 North, Range 2 West, and running thence South 09 degrees and 06 minutes West, along the centerline of Salisbury Road, and along said centerline extended, 386.50 feet; thence South 18 degrees and 22 minutes East, along said centerline and the extension thereof, 675.31 feet; thence South 20 degrees and 22 minutes East, along said centerline and the extension thereof, 202.04 feet to a point of curve to the right in said centerline; thence South 16 degrees and 18 minutes East, along a chord of said curve to the right, a chord distance of 232.19 feet; thence South 07 degrees and 36 minutes East, along a chord of said curve to the right, a chord distance of 264.48 feet to the True Beginning Point of this description; thence, from said beginning point, South 0 degrees and 15 minutes East, along a chord of said curve to the right in the centerline of Salisbury Road, having a radius of 1637.02 feet, a chord distance of 154.24 feet to a point of tangency; thence South 02 degrees and 27 minutes West, along said centerline, 254.49 feet; thence South 77 degrees and 42 minutes West, 208.95 feet; thence South 12 degrees and 18 minutes East, 66.16 feet; thence South 01 degree and 41 minutes East, 120.91 feet to a point on the centerline of United States Highway 40; thence South 77 degrees and 42 minutes West, along said centerline, 18.50 feet; thence South 77 degrees and 49 minutes West, along said centerline, 914.97 feet; thence North 02 degrees and 23 minutes West, 835.37 feet; thence North 89 degrees and 58 minutes East, 1143.91 feet to the True Place of Beginning.

EXCEPTING THEREFROM that part conveyed to Dumfrieshire Corporation by Corporate Warranty Deed, recorded July 1, 1980 in Book 409, page 532 and more particularly described as follows:

Being a part of Fractional Section 1, Township 13 North, Range 2 West, and a part of Fractional Section 22, Township 16 North, Range 14 East, all being in the City of Richmond, Indiana, and being more particularly described as follows:

BEGINNING at an iron pipe set, said point being more particularly described as follows: Commencing at a brass monument at the northwest corner of said Fractional Section 1, Township 13 North, Range 2 West, and running thence South 9 degrees and 06 minutes West, along the centerline of the Salisbury Road, 386.50 feet;

Thence South 18 degrees and 22 minutes East, along said centerline, 675.31 feet;

Thence South 20 degrees and 22 minutes East, along said centerline, 202.04 feet to a point of curve to the right in said centerline;

Thence South 16 degrees and 18 minutes East, along a chord of said curve to the right, a chord distance of 232.19 feet;

Thence South 7 degrees and 36 minutes East, along a chord of said curve to the right, a chord distance of 264.48 feet to an iron rod in said centerline;

Thence South 89 degrees and 58 minutes West 659.24 feet to the BEGINNING POINT of this description;

And running thence, from said BEGINNING POINT, South 9 degrees, 43 minutes and 38 seconds East 91.12 feet to the southeast corner of a truck loading dock on the K Mart building;

Thence South 80 degrees, 16 minutes and 22 seconds West, along the south line of said loading dock, 14.00 feet to the east line of the K Mart building;

Thence South 9 degrees, 43 minutes and 38 seconds East, along the east line of said building, 25.00 feet to a corner thereof;

Thence South 80 degrees, 16 minutes and 22 seconds West, along the south line of said building, 11.00 feet to a corner thereof;

Thence South 9 degrees, 43 minutes and 38 seconds East, along the east line of said building, and along the extension thereof, 378.07 feet to a P.K. nail set;

Thence South 80 degrees, 16 minutes and 22 seconds West 170.88 feet to a P.K. nail set;

Thence South 9 degrees, 43 minutes and 38 seconds East 176.00 feet to a P.K. nail set on the northward right of way of United States Highway Number 40;

Thence North 77 degrees and 49 minutes East, along said north right of way and said line extended, 69.53 feet to a P.K. nail set;

Thence North 9 degrees, 43 minutes and 38 seconds West 11.32 feet to a P.K. nail set;

Thence North 80 degrees, 16 minutes and 22 seconds East 10.00 feet to a P.K. nail set;

Thence South 9 degrees, 43 minutes and 38 seconds East 70.95 feet to a nail in the centerline of said United States Highway Number 40;

Thence South 77 degrees and 49 minutes West, along said centerline, 468.54 feet to a nail;

Thence North 2 degrees and 23 minutes West 835.37 feet to an iron pipe found;

Thence North 89 degrees and 58 minutes East 484.67 feet to the PLACE OF BEGINNING. Containing an area of 8.331 acres, there being 7.896 acres in said Fractional Section 22, Township 16 North, Range 14 East, of which area 0.515 acres lie within the right of way of said United States Highway Number 40, and 0.435 acres in said Fractional Section 1, Township 13 North, Range 2 West, of which area 0.109 acres lie within the right of way of said United States Highway Number 40.

ALSO EXCEPTING THEREFROM that part conveyed to McDonald's Corporation by Corporate Warranty Deed, recorded September 19, 1980 in Book 411, page 115, more particularly described as follows:

Being part of Fractional Section 1, Township 13 North, Range 2 West, and part of Fractional Section 22, Township 16 North, Range 14 East, all being in the City of Richmond, Indiana and being more particularly described as follows:

Beginning at a P.K. nail set, said point being more particularly described as follows; Commencing at a brass monument at the northwest corner of said Fractional Section 1, Township 13 North, Range 2 West, and running thence South 9 degrees and 06 minutes West, along the centerline of the Salisbury Road, 386.50 feet; thence South 18 degrees and 22 minutes East, along said centerline, 675.31 feet; thence South 20 degrees and 22 minutes East, along said centerline, 202.04 feet to a point of curve to the right in said centerline; thence South 16 degrees and 18 minutes East, along a chord of said curve, a chord distance of 232.19 feet; thence South 7 degrees and 36 minutes East, along a chord of said curve, a chord distance of 264.48 feet to an iron rod on the centerline of said Salisbury Road; thence South 89 degrees and 58 minutes West 659.24 feet to an iron pipe; thence South 9 degrees, 43 minutes and 38 seconds East 91.12 feet to the southeast corner of a truck loading dock on the present K Mart building; thence South 80 degrees, 16 minutes and 22 seconds West, along the south line of said loading dock, 14.00 feet to the east line of said K Mart building; thence South 9 degrees, 43 minutes and 38 seconds East, along the east line of said building, 25.00 feet to a corner thereof; thence South 80 degrees, 16 minutes and 22 seconds West 11.00 feet to a corner of said building; thence South 9 degrees, 43 minutes and 38 seconds East, along the east line of said building, and said line extended, 378.07 feet to the Beginning Point of this description; and running thence, from said beginning point, North 80 degrees, 16 minutes and 22 seconds East 57.93 feet to a P.K. nail set; thence South 9 degrees, 43 minutes and 38 seconds East 226.24 feet to a nail in the centerline of United States Highway Number 40; thence South 77 degrees, and 49 minutes West, along said centerline, 149.48 feet to a nail; thence North 9 degrees, 43 minutes and 38 seconds West 70.95 feet to a P.K. nail set; thence South 80 degrees, 16 minutes and 22 seconds West 10.00 feet to a P.K. nail set; thence South 9 degrees, 43 minutes and 38 seconds East 11.32 feet to a P.K. nail set; thence South 77 degrees and 49 minutes West 69.53 feet to a P.K. nail set on the northward right of way of said United States Highway Number 40; thence North 9 degrees, 43 minutes and 38 seconds West 176.00 feet to a P.K. nail set; thence North 80 degrees, 16 minutes and 22 seconds East 170.88 feet to the Beginning Point of this description. Containing an area of 1.102 acres, there being 0.140 acres in said Fractional Section 22, Township 16 North, Range 14 East, and 0.962 acres in said Fractional Section 1, Township 13 North, Range 2 West, of which area 0.124 acres lies within the right of way of United States Highway Number 40.

ALSO EXCEPTING THEREFROM that part conveyed to the State of Indiana by Warranty Deed recorded May 26, 2000 as Instrument No. 2000005820, more particularly described as follows:

A part of Fractional Section 1, Township 13 North, Range 2 West, Wayne County, Indiana, described as follows: Commencing at a point on the present center line of Salisbury Road, said point described as follows: Beginning at the northwest corner of Fractional Section 1, Township 13 North, Range 2 West, and running thence South 09 degrees and 06 minutes West, along the centerline of Salisbury Road, and along said centerline extended, 386.50 feet; thence South 18 degrees and 22 minutes East, along said centerline and the extension thereof, 675.31 feet; thence South 20 degrees and 22 minutes East, along said centerline and the extension thereof, 202.04 feet to a point of curve to the right in said centerline; thence South 16 degrees and 18 minutes East, along a chord of said curve to the right, a chord distance of 232.19 feet; thence South 07 degrees and 36 minutes East, along a chord of said curve to the right, a chord distance of 264.48 feet (the foregoing portion of this description beginning with the words "at a point on the present center line" is quoted from Deed Record 395, page 252) to the northeast corner of the grantor's land; thence South 0 degrees and 15 minutes East, along a chord of said curve to the right in the centerline of Salisbury Road, having a radius of 1637.02 feet, a chord distance of 154.24 feet to a point of tangency; thence South 02 degrees and 27 minutes West, along said centerline, 254.49 feet; thence South 77 degrees and 42 minutes West, 208.95 feet; thence South 12 degrees and 18 minutes East, 66.16 feet (the foregoing portion of this description beginning with the words "thence South 0 degrees" is quoted from Deed Record 395, page 252); thence South 1 degree 40 minutes 51 seconds East 74.11 feet to the Point of Beginning of this description; thence South 1 degree 40 minutes 51 seconds East 6.10 feet to the northern boundary of U.S.R. 40; thence South 78 degrees 22 minutes 12 seconds West 231.20 feet along the boundary of said U.S.R. 40; thence South 7 degrees 02 minutes 10 seconds West 6.42 feet along said boundary; thence South 77 degrees 46 minutes 00 seconds West 87.99 feet along said boundary to the western line of the grantor's land; thence North 9 degrees 43 minutes 38 seconds West 9.78 feet along said western line; thence North 77 degrees 49 minutes 00 seconds East 174.46 feet; thence North 77 degrees 45 minutes 55 seconds East 147.52 feet to the Point of Beginning and containing 0.046 acres, more or less.

Also, A part of Fractional Section 1, Township 13 North, Range 2 West, Wayne County, Indiana, described as follows: Commencing at a point on the present center line of Salisbury Road, said point described as follows: Beginning at the   06 minutes West, along the centerline of Salisbury Road, and along said centerline extended, 386.50 feet; thence South 18 degrees and 22 minutes East, along said centerline and the extension thereof, 675.31 feet; thence South 20 degrees and 22 minutes East, along said centerline and the extension thereof, 202.04 feet to a point of curve to the right in said centerline; thence South 16 degrees and 18 minutes East, along a chord of said curve to the right, a chord distance of 232.19 feet; thence South 07 degrees and 36 minutes East, along a chord of said curve to the right, a chord distance of 264.48 feet (the foregoing portion of this description beginning with the words "at a point on the present center line" is quoted from Deed Record 395, page 252) to the northeast corner of the grantor's land; thence South 89 degrees 58 minutes 00 seconds West 25.04 feet along the north line of the grantor's land to the west boundary of Salisbury Road and the Point of Beginning of this description; thence along the boundary of said Salisbury Road, Southerly 152.93 feet along an

Error! Unknown document property name.

arc to the right having a radius of 1,612.02 feet and subtended by a long chord having a bearing of South 0 degrees 29 minutes 51 seconds East and a length of 152.88 feet; thence South 2 degrees 13 minutes 13 seconds West 14.11 feet along said boundary; thence North 87 degrees 46 minutes 47 seconds West 3.00 feet along said boundary; thence South 2 degrees 13 minutes 13 seconds West 247.95 feet along said boundary to a southern line of the grantor's land; thence South 77 degrees 42 minutes 09 seconds West 2.57 feet along said southern line; thence North 2 degrees 36 minutes 44 seconds East 79.89 feet; thence North 0 degrees 41 minutes 01 second East 335.39 feet to the north line of the grantor's land; thence North 89 degrees 58 minutes 00 seconds East 6.70 feet along said north line to the Point of Beginning and containing 0.057 acres, more or less.

**EXHIBIT "B"**

**EARNEST MONEY ESCROW INSTRUCTIONS**

(please see attached)



**CHICAGO TITLE AND TRUST COMPANY:  ESCROW TRUSTEE**

**10 S. LASALLE, STE 3100, CHICAGO, IL 60603**

Refer to: Krystina Cozzie
Phone no.: 312-223-3366
Fax no: 312-223-2076

<u>STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)</u>

ESCROW TRUST NO:                                                    DATE:

To: Chicago Title and Trust Company, Escrow Trustee:

<u>Customer Identification:</u>

Seller:  Kmart Corporation, a Michigan corporation

Purchaser:  Midwest Storage Development LLC

Property Address:  The corner of West National Road (aka U.S. Route 40) and Salisbury Road, Ricmond, Wayne County, Indiana

Project Reference:

Proposed Disbursement Date:

<u>Escrow Deposits:</u>

1. The sum of $8,500.00 representing:  INITIAL EARNEST MONEY

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

<u>Funds:</u>

(  ) WILL     (X) WILL NOT BE INVESTED
NOTE: If funds are to be invested, an investment package will be sent.  Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

<u>Delivery of Deposits:</u>

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:

Escrow trust fee will be deducted as follows: $300 escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.
The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

Standard Provisions:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement.  Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disputes/Circumstance not contemplated:

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Trustee is unsure as to its duties as a result, Escrow Trustee may continue to hold said funds until either in receipt of a joint order from the parties or a court order directing payment. In such instance, Escrow Trustee may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Trustee for any action taken by it in good faith in the execution of its duties hereunder. The parties further agree

that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties. Notwithstanding the foregoing, where a party to this escrow agreement has been placed in default and the period to cure such default has lapsed, without cure, upon the delivery to Escrow Trustee of commercially reasonable documentation evidencing the same, Escrow Trustee shall, without delay, release the Escrow Deposit to the non-defaulting party entitled to receive such Escrow Deposit without direction from a court or delivery of a joint order from the parties to this escrow agreement.

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person.  Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

*[Signature Page to Follow]*

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:                                    For Purchaser:

Name: Kmart Corporation                        Name: Midwest Storage Development LLC

By:_____                       By:_____
Name: Mohsin Y. Meghji                         Name:_____
Its: Chief Restructuring                        Its:_____
Officer

Accepted: Chicago Title and Trust Company, as Escrow Trustee

By:                                            Date:

*Upon receipt of the funds, the escrow agreement becomes effective.

**Error! Unknown document property name.**

## EXHIBIT "C"

## OWNER'S AFFIDAVIT OF TITLE

[See attached]

# Title Affidavit

dated as of  ____/_____/20

---

Re:  **Insured:**
**Title Insurer:**
Chicago Title Insurance Company, a NE corporation ("CTIC")
**CTIC Master #:**

**Commitment #:**
**Premises:**
as legally described in the Commitments

---

**Certifications:**

The undersigned owner of the Premises hereby certifies the following to Title Insurer (as to its respective estate and/or interest in the Premises):

**Mechanics Liens:**
All labor, services or materials rendered or furnished within the last 90 days in connection with the Premises or with the construction or repair of any building or improvements on the Premises have been paid for in full or will be paid in full.

**Tenants/Parties in Possession:**
There are no tenants or other parties who are in possession or have the right to be in possession of said Premises other than tenants listed on Exhibit A hereto.

**Bankruptcy:**
A proceeding in bankruptcy has been instituted by or against the undersigned (or its constituent entities) which is now pending in the Bankruptcy Court for the Southern District of New York under Docket No. 18-23538.

**Gap Indemnification:**
Between the most recent Effective Date of the Commitment (or any bring down thereof) and the date of recording of the Insured Instrument(s) but in no event later than five (5) business days from the date hereof (hereinafter, the "Gap Period"), the undersigned has not taken and will not take any action to encumber or otherwise affect title to the Premises.  In the event of any lien, encumbrance or other matter affecting title to the Premises in the Gap Period arising as a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof.  The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

**Counterparts:**
This document may be executed in counterparts.

- see annexed signature page -

**Error! Unknown document property name.**

**Signatory/Signatories to Title Affidavit:**

By:     _____

       Name:    Mohsin Y. Meghji
       Title: Chief Restructuring Officer
       Solely in his capacity as Chief Restructuring Officer of the Kmart Corporation and not individually

Subscribed and sworn to on ____/_____/20

_____
Notary Public

1

**Error! Unknown document property name.**

## EXHIBIT "D"

## Leases, Tenancies and Licenses

None.

2

## **EXHIBIT "E"**

## **Non-Invasive Inspection Agreement**

[see attached]

WEIL:\97627236\15\73217.0004
**Error! Unknown document property name.**

## NON-INVASIVE INSPECTION AGREEMENT
*Richmond, IN, Vacant Land #7246*

**THIS NON-INVASIVE INSPECTION AGREEMENT** (this "**Agreement**") is made and entered into as of this _____ day of _____, 2020 ("**Effective Date**"), by and between KMART CORPORATION, a Michigan corporation ("**Company**") and MIDWEST STORAGE DEVELOPMENT LLC, a Delaware limited liability company ("**Investigating Party**"), in connection with investigation and site assessment work to be performed on the property controlled by Company located at the corner of West National Road (aka U.S. Route 40) and Salisbury Road in the City of Richmond (the "**City**"), Wayne County, Indiana (the "**Property**"), as more particularly described on **Exhibit "A"** attached hereto and made a part hereof.

### RECITALS:

A.      Company desires to sell the Property to Investigating Party;

B.      Investigating Party desires to buy the Property from Company;

C.      Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends; and

D.      Investigating Party desires to perform a site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

1.      Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property at reasonable times and upon not less than 2 business days prior notice to Company, at no cost to Company or its agents, consultants and contractors, and, at Company's option, accompanied by a representative of Company.

2.      The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: Investigating Party shall conduct and make any and all reasonable and customary, non-invasive and non-destructive studies, tests, examinations, inspections and investigations of or concerning the Property, ascertain and confirm the suitability of the Property for Investigating Party 's intended uses, walk the Property and make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA ASTM E1527-13 (the "**Site Assessment Work**"). If Company elects to have its representative present during the Site Assessment Work and has such representative present at the times and dates scheduled by Investigating Party, then all Site Assessment shall be performed only in the presence of the Company's local manager or any other such person assigned by Company.  Investigating Party shall not perform tests, work or investigations not included in scope of the Site Assessment Work without the prior written consent of Company, in Company's sole discretion; provided, however, Company shall not unreasonably withhold, condition or delay its consent to a geotechnical investigation to confirm the bearing capacity of the soils at the Property.  In the event that Investigating Party engages in activity outside of or beyond the Site

4

Assessment Work ("**Unauthorized Activity**"), the Company shall have the right to terminate access to the Property for such Unauthorized Activity.

3.      This Agreement shall terminate the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, or (b) immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice and cure period, in each such event Investigating Party shall promptly restore the Property as provided in Section 9 of this Agreement.

4.      Intentionally Deleted.

5.      Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal, state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their counsel or environmental consultants, as applicable.  The foregoing restriction shall not be binding on Investigating Party following the closing under a Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this Section 5.

6.      Investigating Party agrees to defend and indemnify Company, its officers, directors, employees, and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement.  This indemnity shall survive the termination of this Agreement for a period of two years. Notwithstanding the foregoing, Company acknowledges that Investigating Party may discover a pre-existing condition on or about the Property, and in the event of such discovery, Investigating Party shall have no liability in connection therewith, except to the extent Investigating Party violates the scope of investigations, tests, and inspections permitted by this Agreement or exacerbates such condition by Investigating Party or its employees, agents or contractor's acts or omissions.  This indemnity shall survive the termination of this Agreement for a period of two years.

7.      Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies rated "A-/VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

(i)      Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

(ii)     Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage, if applicable.

(iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising

WEIL:\97627236\15\73217.0004
**Error! Unknown document property name.**

injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

(iv) Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Company as an additional insured.

(v) Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above. Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty. This indemnity shall survive the termination of this Agreement for a period of two years. Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

8.    Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

9.    If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property and to restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

10.    This Agreement shall be governed by and construed in accordance with the laws of the State in which the Property is located.

11.    By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

12.    Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company.

13.    This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

6

**IN WITNESS WHEREOF**, Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

**INVESTIGATING PARTY:**

**MIDWEST STORAGE DEVELOPMENT LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**COMPANY:**

**KMART CORPORATION,**
a Michigan corporation

By: _____
Name:   Mohsin Y. Meghji
Title:   Chief Restructuring Officer

7

## EXHIBIT "A" TO NON-INVASIVE INSPECTION AGREEMENT

## LEGAL DESCRIPTION

For APN/Parcel ID(s): 89-10-22-200-209.000-006 and 89-17-01-130-102.000-030

Being part of Fractional Section 1, Township 13 North, Range 2 West, in Wayne Township, Wayne County, Indiana and part of Fractional Section 22, Township 16 North, Range 14 East, in Center Township, Wayne County, Indiana, more particularly described as follows:

Beginning at a point on the present center line of Salisbury Road, said point described as follows: Beginning at the northwest corner of Fractional Section 1, Township 13 North, Range 2 West, and running thence South 09 degrees and 06 minutes West, along the centerline of Salisbury Road, and along said centerline extended, 386.50 feet; thence South 18 degrees and 22 minutes East, along said centerline and the extension thereof, 675.31 feet; thence South 20 degrees and 22 minutes East, along said centerline and the extension thereof, 202.04 feet to a point of curve to the right in said centerline; thence South 16 degrees and 18 minutes East, along a chord of said curve to the right, a chord distance of 232.19 feet; thence South 07 degrees and 36 minutes East, along a chord of said curve to the right, a chord distance of 264.48 feet to the True Beginning Point of this description; thence, from said beginning point, South 0 degrees and 15 minutes East, along a chord of said curve to the right in the centerline of Salisbury Road, having a radius of 1637.02 feet, a chord distance of 154.24 feet to a point of tangency; thence South 02 degrees and 27 minutes West, along said centerline, 254.49 feet; thence South 77 degrees and 42 minutes West, 208.95 feet; thence South 12 degrees and 18 minutes East, 66.16 feet; thence South 01 degree and 41 minutes East, 120.91 feet to a point on the centerline of United States Highway 40; thence South 77 degrees and 42 minutes West, along said centerline, 18.50 feet; thence South 77 degrees and 49 minutes West, along said centerline, 914.97 feet; thence North 02 degrees and 23 minutes West, 835.37 feet; thence North 89 degrees and 58 minutes East, 1143.91 feet to the True Place of Beginning.

EXCEPTING THEREFROM that part conveyed to Dumfrieshire Corporation by Corporate Warranty Deed, recorded July 1, 1980 in Book 409, page 532 and more particularly described as follows:

Being a part of Fractional Section 1, Township 13 North, Range 2 West, and a part of Fractional Section 22, Township 16 North, Range 14 East, all being in the City of Richmond, Indiana, and being more particularly described as follows:

BEGINNING at an iron pipe set, said point being more particularly described as follows: Commencing at a brass monument at the northwest corner of said Fractional Section 1, Township 13 North, Range 2 West, and running thence South 9 degrees and 06 minutes West, along the centerline of the Salisbury Road, 386.50 feet;

Thence South 18 degrees and 22 minutes East, along said centerline, 675.31 feet;

**Error! Unknown document property name.**

Thence South 20 degrees and 22 minutes East, along said centerline, 202.04 feet to a point of curve to the right in said centerline;

Thence South 16 degrees and 18 minutes East, along a chord of said curve to the right, a chord distance of 232.19 feet;

Thence South 7 degrees and 36 minutes East, along a chord of said curve to the right, a chord distance of 264.48 feet to an iron rod in said centerline;

Thence South 89 degrees and 58 minutes West 659.24 feet to the BEGINNING POINT of this description;

And running thence, from said BEGINNING POINT, South 9 degrees, 43 minutes and 38 seconds East 91.12 feet to the southeast corner of a truck loading dock on the K Mart building;

Thence South 80 degrees, 16 minutes and 22 seconds West, along the south line of said loading dock, 14.00 feet to the east line of the K Mart building;

Thence South 9 degrees, 43 minutes and 38 seconds East, along the east line of said building, 25.00 feet to a corner thereof;

Thence South 80 degrees, 16 minutes and 22 seconds West, along the south line of said building, 11.00 feet to a corner thereof;

Thence South 9 degrees, 43 minutes and 38 seconds East, along the east line of said building, and along the extension thereof, 378.07 feet to a P.K. nail set;

Thence South 80 degrees, 16 minutes and 22 seconds West 170.88 feet to a P.K. nail set;

Thence South 9 degrees, 43 minutes and 38 seconds East 176.00 feet to a P.K. nail set on the northward right of way of United States Highway Number 40;

Thence North 77 degrees and 49 minutes East, along said north right of way and said line extended, 69.53 feet to a P.K. nail set;

Thence North 9 degrees, 43 minutes and 38 seconds West 11.32 feet to a P.K. nail set;

Thence North 80 degrees, 16 minutes and 22 seconds East 10.00 feet to a P.K. nail set;

Thence South 9 degrees, 43 minutes and 38 seconds East 70.95 feet to a nail in the centerline of said United States Highway Number 40;

Thence South 77 degrees and 49 minutes West, along said centerline, 468.54 feet to a nail;

Thence North 2 degrees and 23 minutes West 835.37 feet to an iron pipe found;

Thence North 89 degrees and 58 minutes East 484.67 feet to the PLACE OF BEGINNING. Containing an area of 8.331 acres, there being 7.896 acres in said Fractional Section 22, Township 16 North, Range 14 East, of which area 0.515 acres lie within the right of way of said United States Highway Number 40, and 0.435 acres in said Fractional Section 1, Township 13 North, Range 2 West, of which area 0.109 acres lie within the right of way of said United States Highway Number 40.

ALSO EXCEPTING THEREFROM that part conveyed to McDonald's Corporation by Corporate Warranty Deed, recorded September 19, 1980 in Book 411, page 115, more particularly described as follows:

Being part of Fractional Section 1, Township 13 North, Range 2 West, and part of Fractional Section 22, Township 16 North, Range 14 East, all being in the City of Richmond, Indiana and being more particularly described as follows:

Beginning at a P.K. nail set, said point being more particularly described as follows; Commencing at a brass monument at the northwest corner of said Fractional Section 1, Township 13 North, Range 2 West, and running thence South 9 degrees and 06 minutes West, along the centerline of the Salisbury Road, 386.50 feet; thence South 18 degrees and 22 minutes East, along said centerline, 675.31 feet; thence South 20 degrees and 22 minutes East, along said centerline, 202.04 feet to a point of curve to the right in said centerline; thence South 16 degrees and 18 minutes East, along a chord of said curve, a chord distance of 232.19 feet; thence South 7 degrees and 36 minutes East, along a chord of said curve, a chord distance of 264.48 feet to an iron rod on the centerline of said Salisbury Road; thence South 89 degrees and 58 minutes West 659.24 feet to an iron pipe; thence South 9 degrees, 43 minutes and 38 seconds East 91.12 feet to the southeast corner of a truck loading dock on the present K Mart building; thence South 80 degrees, 16 minutes and 22 seconds West, along the south line of said loading dock, 14.00 feet to the east line of said K Mart building; thence South 9 degrees, 43 minutes and 38 seconds East, along the east line of said building, 25.00 feet to a corner thereof; thence South 80 degrees, 16 minutes and 22 seconds West 11.00 feet to a corner of said building; thence South 9 degrees, 43 minutes and 38 seconds East, along the east line of said building, and said line extended, 378.07 feet to the Beginning Point of this description; and running thence, from said beginning point, North 80 degrees, 16 minutes and 22 seconds East 57.93 feet to a P.K. nail set; thence South 9 degrees, 43 minutes and 38 seconds East 226.24 feet to a nail in the centerline of United States Highway Number 40; thence South 77 degrees, and 49 minutes West, along said centerline, 149.48 feet to a nail; thence North 9 degrees, 43 minutes and 38 seconds West 70.95 feet to a P.K. nail set; thence South 80 degrees, 16 minutes and 22 seconds West 10.00 feet to a P.K. nail set; thence South 9 degrees, 43 minutes and 38 seconds East 11.32 feet to a P.K. nail set; thence South 77 degrees and 49 minutes West 69.53 feet to a P.K. nail set on the northward right of way of said United States Highway Number 40; thence North 9 degrees, 43 minutes and 38 seconds West 176.00 feet to a P.K. nail set; thence North 80 degrees, 16 minutes and 22 seconds East 170.88 feet to the Beginning Point of this description. Containing an area of 1.102 acres, there being 0.140 acres in said Fractional Section 22, Township 16 North, Range 14 East, and 0.962 acres in said Fractional Section 1, Township 13 North, Range 2 West, of which area 0.124 acres lies within the right of way of United States Highway Number 40.

ALSO EXCEPTING THEREFROM that part conveyed to the State of Indiana by Warranty Deed recorded May 26, 2000 as Instrument No. 2000005820, more particularly described as follows:

A part of Fractional Section 1, Township 13 North, Range 2 West, Wayne County, Indiana, described as follows: Commencing at a point on the present center line of Salisbury Road, said point described as follows: Beginning at the northwest corner of Fractional Section 1, Township 13 North, Range 2 West, and running thence South 09 degrees and 06 minutes West, along the centerline of Salisbury Road, and along said centerline extended, 386.50 feet; thence South 18 degrees and 22 minutes East, along said centerline and the extension thereof, 675.31 feet; thence South 20 degrees and 22 minutes East, along said centerline and the extension thereof, 202.04 feet to a point of curve to the right in said centerline; thence South 16 degrees and 18 minutes East, along a chord of said curve to the right, a chord distance of 232.19 feet; thence South 07 degrees and 36 minutes East, along a chord of said curve to the right, a chord distance of 264.48 feet (the foregoing portion of this description beginning with the words "at a point on the present center line" is quoted from Deed Record 395, page 252) to the northeast corner of the grantor's land; thence South 0 degrees and 15 minutes East, along a chord of said curve to the right in the centerline of Salisbury Road, having a radius of 1637.02 feet, a chord distance of 154.24 feet to a point of tangency; thence South 02 degrees and 27 minutes West, along said centerline, 254.49 feet; thence South 77 degrees and 42 minutes West, 208.95 feet; thence South 12 degrees and 18 minutes East, 66.16 feet (the foregoing portion of this description beginning with the words "thence South 0 degrees" is quoted from Deed Record 395, page 252); thence South 1 degree 40 minutes 51 seconds East 74.11 feet to the Point of Beginning of this description; thence South 1 degree 40 minutes 51 seconds East 6.10 feet to the northern boundary of U.S.R. 40; thence South 78 degrees 22 minutes 12 seconds West 231.20 feet along the boundary of said U.S.R. 40; thence South 7 degrees 02 minutes 10 seconds West 6.42 feet along said boundary; thence South 77 degrees 46 minutes 00 seconds West 87.99 feet along said boundary to the western line of the grantor's land; thence North 9 degrees 43 minutes 38 seconds West 9.78 feet along said western line; thence North 77 degrees 49 minutes 00 seconds East 174.46 feet; thence North 77 degrees 45 minutes 55 seconds East 147.52 feet to the Point of Beginning and containing 0.046 acres, more or less.

Also, A part of Fractional Section 1, Township 13 North, Range 2 West, Wayne County, Indiana, described as follows: Commencing at a point on the present center line of Salisbury Road, said point described as follows: Beginning at the   06 minutes West, along the centerline of Salisbury Road, and along said centerline extended, 386.50 feet; thence South 18 degrees and 22 minutes East, along said centerline and the extension thereof, 675.31 feet; thence South 20 degrees and 22 minutes East, along said centerline and the extension thereof, 202.04 feet to a point of curve to the right in said centerline; thence South 16 degrees and 18 minutes East, along a chord of said curve to the right, a chord distance of 232.19 feet; thence South 07 degrees and 36 minutes East, along a chord of said curve to the right, a chord distance of 264.48 feet (the foregoing portion of this description beginning with the words "at a point on the present center line" is quoted from Deed Record 395, page 252) to the northeast corner of the grantor's land; thence South 89 degrees 58 minutes 00 seconds West 25.04 feet along the north line of the grantor's land to the west boundary of Salisbury Road and the Point of Beginning of this description; thence along the boundary of said Salisbury Road, Southerly 152.93 feet along an

arc to the right having a radius of 1,612.02 feet and subtended by a long chord having a bearing of South 0 degrees 29 minutes 51 seconds East and a length of 152.88 feet; thence South 2 degrees 13 minutes 13 seconds West 14.11 feet along said boundary; thence North 87 degrees 46 minutes 47 seconds West 3.00 feet along said boundary; thence South 2 degrees 13 minutes 13 seconds West 247.95 feet along said boundary to a southern line of the grantor's land; thence South 77 degrees 42 minutes 09 seconds West 2.57 feet along said southern line; thence North 2 degrees 36 minutes 44 seconds East 79.89 feet; thence North 0 degrees 41 minutes 01 second East 335.39 feet to the north line of the grantor's land; thence North 89 degrees 58 minutes 00 seconds East 6.70 feet along said north line to the Point of Beginning and containing 0.057 acres, more or less.

## EXHIBIT "F"

### SPECIAL WARRANTY DEED

**THIS SPECIAL WARRANTY DEED** is made as of the ___ day of _____, 20___, by KMART CORPORATION, a Michigan corporation, whose address is 130 West 42nd Street, 17th Floor, New York, New York 10036 ("Grantor"), in favor of MIDWEST STORAGE DEVELOPMENT LLC, a Delaware limited liability company, whose address is 19 Benedict Place, Greenwich, Connecticut 06830 ("Grantee").

### W I T N E S S E T H:

That Grantor, for and in consideration of the sum of $10.00 and other good and valuable considerations, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, and convey unto Grantee and Grantee's heirs, successors and assigns, in and to the following described land (the "Land") in the City of Richmond, Wayne County, Indiana:

See Exhibit A attached hereto and incorporated herein by reference for the description of the Land conveyed herein.

TOGETHER with all the tenements, hereditaments, and appurtenances thereto.

TO HAVE AND TO HOLD the same unto Grantee and Grantee's heirs, successors and assigns in fee simple forever.

This conveyance is made subject to the Permitted Exceptions, attached hereto as Exhibit B.

And Grantor does hereby covenant with Grantee that, except as noted above, title to the Land is free from all encumbrances made by Grantor, and that Grantor will warrant and defend the same against the lawful claims and demands of all persons claiming by, through or under Grantor (except as noted above), but against none other.

Dated as of the _____ day of _____, 20_____.

Witness:

KMART CORPORATION,
a Michigan corporation

_____

Print Name: _____

By: _____
Name: _____
Title: _____


STATE OF                                    )
                                            ) ss.
COUNTY OF                                   )

      On this _____ day of _____, 20_____, before me, a Notary Public within and for said County, personally appeared _____, to me personally known, being first by me duly sworn, did say that he is the _____ of Kmart Corporation, a Michigan corporation, and that said instrument was signed by such person on behalf of said corporation pursuant to authority as the free act and deed of said corporation.

                                  _____
                                  Notary Public
                                  My commission expires: _____


STATE OF                                    )
                                            ) ss.
COUNTY OF                                   )

      On this _____ day of _____, 20_____, before me, a Notary Public within and for said County, personally appeared _____ [insert name of witness] to me personally known, being first by me duly sworn, did say that the execution of said instrument was witnessed by such person.

                                    _____
                                  Notary Public
                                  My commission expires: _____

THIS DOCUMENT WAS PREPARED BY:

Alan J. Salle
Honigman LLP
39400 Woodward Avenue, Suite 101
Bloomfield Hills, Michigan 48304

UPON RECORDING RETURN TO:

Midwest Storage Development LLC
19 Benedict Place
Greenwich, Connecticut 06830

MAIL SUBSEQUENT TAX BILLS TO:  Grantee


I affirm, under penalties for perjury, that I
have taken reasonable care to redact each
social security number in this document,
unless required by law


_____

## EXHIBIT "G"

## Bill of Sale

FOR $1.00 RECEIVED as of _____, 2020, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, KMART CORPORATION, a Michigan corporation ("Assignor"), does hereby quit claim, assign, transfer, convey and deliver to MIDWEST STORAGE DEVELOPMENT LLC, a Delaware limited liability company, the undivided right, title and interest in and to the personal property situated on and/or used in connection with the operation of that certain real property more particularly described on Schedule A attached hereto and incorporated herein by reference, to the extent of Assignor's right, title and interest, if any, therein or thereto, but without warranty of title, condition or otherwise.

IN WITNESS WHEREOF, Assignor has executed this Bill of Sale.

KMART CORPORATION,
a Michigan corporation

By: _____
Name: _____
Title: _____

FIRST AMENDMENT TO REAL ESTATE SALE CONTRACT

THIS FIRST AMENDMENT TO REAL ESTATE SALE CONTRACT (this "First Amendment") dated as of February 16, 2021 (the "Effective Date"), is made and entered into between **KMART CORPORATION**, a Michigan Corporation (hereinafter "Seller") and **MIDWEST STORAGE DEVELOPMENT LLC**, a Delaware limited liability company (hereinafter "Purchaser").

RECITALS:

A.      Seller and Purchaser are parties to that certain Real Estate Sale Contract for the Purchase and Sale of Real Property, dated as of December 23, 2020 (the "Agreement"), for the purchase and sale of real property located at the corner of West National Road (aka U.S. Route 40) and Salisbury Road, in the city of Richmond, Wayne County, Indiana, as further described in the Agreement;

B.      Seller and Purchaser now desire to amend the Agreement as set forth in this First Amendment.

NOW THEREFORE, for and in consideration of the understandings set forth herein, and for Ten Dollars ($10.00) and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Section 6(c)(ii) is hereby deleted in its entirety and replaced with the following:

Seller, a debtor in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court (the "Chapter 11 Case") shall within ten (10) Business Days following the expiration of the Due Diligence Period file and serve a notice of sale of the Property (the "Sale Notice") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property. Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property. In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property.

2.      Successors and Assigns. This First Amendment shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

3.      Governing Law. This First Amendment will be exclusively governed by and construed and enforced in accordance with the laws of the State of Indiana, without regard to conflicts of law principles thereof. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS FIRST AMENDMENT. SHOULD THE BANKRUPTCY COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO

HAVE JURISDICTION OVER A MATTER RELATING TO THIS FIRST AMENDMENT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF INDIANA OR THE STATE COURT OF THE STATE OF INDIANA LOCATED IN WAYNE COUNTY, INDIANA, without regard to conflicts of law principles thereof. Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in <u>Section 14</u> of the Agreement shall be effective service of process for any suit or proceeding in connection with this First Amendment.

4.    <u>Signatures; Counterparts</u>.    This First Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument.    An executed signature page delivered via facsimile transmission or electronic signature shall be deemed as effective as an original executed signature page.

5.    <u>Time of the Essence</u>.    Time is of the essence of this First Amendment.

6.    <u>Ratification and Control</u>.    Except as expressly set forth herein, the Agreement remains unmodified and unchanged.    In the event of any conflict or inconsistency between the terms and conditions of the Agreement and the terms and conditions of this First Amendment, the terms and conditions of the latter shall control.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*



2

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment effective as of the day and year first set forth above.

SELLER:

KMART CORPORATION,
a Michigan Corporation

By:
Name:    William Gallagher
Title:    Authorized Signatory

PURCAHSER:

MIDWEST STORAGE DEVELOPMENT LLC,
a Delaware limited liability company

By:
Name:    Reed A. Miller
Its:    Managing Member