**Objection Deadline: March 5, 2021 at 4:00 p.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                                            :

                                                 :          **Chapter 11**

**SEARS HOLDINGS CORPORATION**, *et al.*,        :

                                                 :          **Case No. 18-23538 (RDD)**

                                                 :

Debtors.[1]                                      :          **(Jointly Administered)**

                                                 :

---------------------------------------------------------------x

## NOTICE OF DE MINIMIS ASSET SALE
## FOR VACANT PARCEL #3243 (NORTH CANTON, OH)

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets of the Debtors (the "**Assets**") to City of North Canton, Ohio (the "**Purchaser**") pursuant to the *Real Estate Sale Contract* dated September 9, 2020 and the *Amendment to the Real Estate Sale Contract* dated February 4, 2021 (as amended, the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 1700 Broadway, 19th Floor, New York, NY 10019.

Description of the Assets.  The Assets consist of a parcel of land and all real property interests of the Debtors known as Parcel No. 10002584 on Stratavon Street, NW in the City of North Canton, Stark County, State of Ohio.

Relationship of the Purchaser to the Debtors.  The Purchaser does not have any relationship with the Debtors.

Liens and Encumbrances on the Assets.  The Debtors are not aware of any liens and/or encumbrances on the Assets.  To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

Material Economic Terms and Conditions of the Proposed Sale.  The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code.  The Purchaser has agreed to pay a purchase price of $450,000 for the Assets.  The Purchase Agreement is annexed hereto as **Exhibit 1**.

Commission, Fees, or other Similar Expenses:  The Debtors are required to pay $27,000 in commission, fees, or other similar expenses in connection with the sale.

Procedures to Object to the Proposed Sale.  Any objection to the proposed sale (an "**Objection**") must:  (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Ray C. Schrock, P.C., Esq.; Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; and Sunny Singh, Esq.), as counsel to the Debtors **on or before March 5, 2021 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; and (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated: February 24, 2021
      New York, New York

                                    /s/ *Jacqueline Marcus*
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York  10153
                                    Telephone:  (212) 310-8000
                                    Facsimile:  (212) 310-8007
                                    Ray C. Schrock, P.C.
                                    Jacqueline Marcus
                                    Garrett A. Fail
                                    Sunny Singh
                                    *Attorneys for Debtors*
                                    *and Debtors in Possession*

WEIL:\97850103\2\73217.0004

## Exhibit 1

**Purchase Agreement**

**REAL ESTATE SALE CONTRACT**
*North Canton, OH, Vacant Parcel #3243*

**THIS REAL ESTATE SALE CONTRACT** ("**Contract**") is made as of September 9, 2020 (the "**Effective Date**"), by and between **KMART CORPORATION**, a Michigan corporation ("**Seller**") and **CITY OF NORTH CANTON, OHIO**, an Ohio municipal corporation ("**Purchaser**"; Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**"). Seller and Purchaser agree as follows:

1.  **PURCHASE AND SALE**

    Seller is the owner of a parcel of land including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Real Property**"), known as Parcel No. 10002584 on Stratavon Street, NW in the City of North Canton (the "**City**"), Stark County ("**County**"), State of Ohio legally described on **Exhibit "A"** attached hereto and made a part hereof. The Real Property is sometimes collectively called the "**Property**". Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract. On the Closing Date set forth in Section 7 of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject to the Permitted Title Exceptions (as defined in Section 4 of this Contract).

2.  **PURCHASE PRICE**

    (a)  **Purchase Price.**  The Purchase Price of the Property shall be Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00) (the "**Purchase Price**") and payable by Purchaser in United States currency in good and certifiable funds at Closing.

    (b)  **Options Consideration.**  Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100.00 as independent and non-refundable contract consideration for any options granted in this Contract. This independent consideration is in addition to any other deposits made under this Contract, is earned by Seller upon its execution of this Contract, and will not be credited against the Purchase Price.

3.  **EARNEST MONEY DEPOSIT**

    Within three (3) business days of the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company, 10 South LaSalle Street, Suite 3100, Chicago, Illinois 60603 Attention: Cheri L. Sutton, Telephone: (312) 223-2958, Fax: (312) 223-5801, Email: Cheri.Sutton@ctt.com ("**Title Insurer**" or "**Escrow Agent**") the sum of Ten Thousand and No/100 Dollars ($10,000.00) United States currency (the "**Earnest Money Deposit**") by means of a certified check, cashier's check or wire transfer, to be held by the Title

Insurer in an interest bearing account in accordance with the terms of the strict joint order escrow instructions executed by the Parties attached hereto as **Exhibit "B"** and incorporated into this Contract by this reference (the "**Earnest Money Escrow Instructions**") and also the terms and conditions of this Contract.  Any escrow fees as set forth in the Earnest Money Escrow Instructions will be paid by Purchaser.  Purchaser may elect to direct the Title Insurer to invest the Earnest Money Deposit on its behalf in compliance with the Title Insurer's standard investment instructions, and Purchaser agrees that it shall be solely responsible for any investment fees charged by the Title Insurer. Subject to the terms and conditions as otherwise set forth in this Contract, any and all interest accrued on the Earnest Money Deposit shall be paid to Purchaser at Closing.  The Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, no later than 11:00 am (Chicago time) on the Closing Date, by wire transfer of immediately available funds.  If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit, terminate this Contract, in which case this Contract shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

4.    **TITLE AND SURVEY REVIEW**

(a)    **Title Commitments/Title Exceptions**.  Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser a title commitment for an ALTA Standard Form of Owner Policy of Title Insurance (the "**Title Commitment**") issued by Title Insurer covering title to the Property and showing title to the Property vested in Seller.

(b)    **Objection Process**. On or before the expiration of the Due Diligence Period, Purchaser may deliver to Seller a notice (a "**Title Objection Notice**") setting forth any matters shown on the Title Commitment to which Purchaser objects. If Purchaser delivers a Title Objection Notice, Seller shall have thirty (30) days from the receipt of Purchaser's Title Objection Notice to provide Purchaser with written notice of Seller's election to remove or otherwise cure, to Purchaser's reasonable satisfaction, any objections on or prior to the Closing ("**Seller Response Notice**"). If Seller timely delivers notice of election not to cure a disapproved item, then Purchaser may either (i) elect to terminate this Contract; or (ii) waive in writing its prior disapproval of such item and accept title subject to such previously disapproved item by delivering notice of Purchaser's election to Seller within fifteen (15) days after the receipt of the Seller Response Notice.  If Seller fails to timely deliver the Seller Response Notice within such thirty (30) day period, then Seller shall be deemed to have elected to not cure all of the disapproved matters set forth in Purchaser's Title Objection Notice, and Purchaser may either (i) elect to terminate this Contract; or (ii) waive in writing its prior disapproval of such item and accept title subject to such previously disapproved item by delivering notice of Purchaser's election to Seller within ten (10) days after the 10-day period in which Seller was required under this Section to deliver the Seller Response Notice.

(c)     **Permitted Title Exceptions**. Notwithstanding anything contained in Subsection 4(a) above, the following (and any exception therefor contained in any Title Commitment, Supplemental Title Commitment, or Title Policy) shall be deemed Permitted Title Exceptions: (1) restrictive covenants common to the platted subdivision in which the Property is located, (2) standby fees, taxes and assessments, (3) utility easements created by the dedication deed or plat of the subdivision in which the Property is located or any other easements, rights of way, servitudes, encroachments, apparent servitudes, permits, surface leases or other similar rights, (4) exception as to waters, tidelands, beaches, streams, and related matters, (5) discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements (Purchaser, at Purchaser's expense, may have any related title exception amended to read, "shortages in area"), (6) all matters set forth in the Title Commitment and the Supplemental Title Commitment(s) (defined below), if any, and approved by Purchaser or deemed approved by Purchaser as herein provided, (7) any title exception or encumbrance created directly by any act or omission of Purchaser, any of Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), or any party acting on behalf of Purchaser, (8) matters disclosed by the Survey, (9) all applicable laws, ordinances, rules and governmental regulations affecting the development, use, occupancy and/or enjoyment of the Property, or any portion thereof, (10) encumbrances which will be and are discharged or released either prior to, or simultaneously with, the Closing, (11) the terms of any leases and tenancies assigned hereby, and (12) any of the foregoing or any other lien, encumbrance or title defect curable by expenditure of any funds or incurrence of any liabilities, as more specifically provided under subsection (f) of this Section 4 (collectively, the "**Permitted Title Exceptions**"). On the Closing Date, Purchaser shall cause the Title Insurer to issue, a title policy in the amount of the Purchase Price insuring fee simple title to the Property in Purchaser as of the Closing Date, subject to the Permitted Title Exceptions (the "**Title Policy**"). Pursuant to Section 5(b), Seller and Purchaser hereby agree that each shall equally share the cost of the Title Policy. It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before the Closing Date. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for or any other ability to obtain any endorsement, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder.

(d)     **Survey**.        No later than forty-five (45) days after the Effective Date, Purchaser, may, at Purchaser's sole cost and expense, obtain a new ALTA/NSPS land title survey with such Table A inclusions as indicated by Purchaser (excepting any Table A inclusions which would be disruptive to any ongoing use of the Property, relate to rights of any third parties, or are otherwise invasive, including but not limited to Table A, item 11, as to underground utilities, 10(a) and (b), and 19), of the Property meeting the 2016 ALTA/NSPS and Title Survey standards, prepared by a State licensed surveyor, certified in a form acceptable to Purchaser, Seller and Title Insurer (the "**Survey**").

(e)     **Supplemental Title Commitments, Supplemental Title Review Period**.  In the event that any new title matter is first raised by the Title Insurer in a supplement to the Title Commitment (each, a "**Supplemental Title Commitment**") after the Effective Date, and such new title matter is not a Permitted Title Exception (or deemed to be a Permitted Title Exception) (a "**Supplemental Unpermitted Exception(s)**"), then Purchaser shall immediately provide Seller with a copy of such Supplemental Title Commitment (together with copies of all documents relating to any new title matters set forth in such Supplemental Title Commitment). If Purchaser fails to give written notice to Seller within ten (10) Business Days after Purchaser becomes aware of any Supplemental Unpermitted Exceptions shown on any Supplemental Title Commitment, Purchaser shall be deemed to have approved such Supplemental Unpermitted Exceptions and such matters shall be deemed to be Permitted Title Exceptions. If Purchaser has given the required written notice described above identifying Supplemental Unpermitted Exceptions, Seller may, at its option (but with absolutely no obligation),  (i) have such Supplemental Unpermitted Exceptions removed from the Supplemental Title Commitment; (ii) commit to having such Supplemental Unpermitted Exceptions removed from the Title Policy when issued, (iii) have Title Insurer commit to insure over such Supplemental Unpermitted Exceptions and provide evidence thereof acceptable to Purchaser, or (iv) decline to take any action with respect to such Supplemental Unpermitted Exceptions. If Seller fails to commit to having such Supplemental Unpermitted Exceptions removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given within five (5) days (the "**Supplemental Response Period**") to either (i) terminate this Contract (in which event, provided no other event of default is outstanding and/or uncured, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof), or (ii) accept title to the Property subject to such Supplemental Unpermitted Exceptions without any credit, setoff or abatement therefor.  If Purchaser fails to elect either (i) or (ii) above within the Supplemental Response Period, Purchaser shall be deemed to have elected (ii) above and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof without any credit, setoff or abatement.

(f)     **No Obligation of Seller to Remove Exceptions**.  The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer. Notwithstanding the foregoing, subject to entry of the Approval Order, Purchaser shall be afforded the protections of section 363(m) of title 11 of the United States Code as a good faith purchaser.

5.    **PRORATIONS AND EXPENSES**

(a)    **Prorations.**    The following prorations, except as specifically provided in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date (the "**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)    Taxes.    All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel number(s) that is attributable to the Property.  All prorations shall be final.  Any installments of special or other assessments affecting the Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser.  The term "general real estate taxes" as used in this Section 5(a)(i) includes general assessments, including, without limitation, regular annual assessments payable to any property owners association - but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

(ii)    Miscellaneous.    If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing as of the Proration Date. In the event that accurate prorations and other adjustments cannot be made at Closing because current bills are not available or the amount to be adjusted is not yet ascertainable, the Parties shall prorate on the best available information. All prorations shall be final.

(b)    **Closing-related Costs.**  At Closing, Purchaser shall pay (i) one-half (1/2) the cost of the Closing Escrow; (ii) one-half (1/2) of the cost of the Owner's Title Policy (including both standard and any extended coverage) and any endorsements to the Title Policy and 100% of the costs of any Updated Survey; (iii) the amount of any stamp or transfer tax or other similar fees and amounts imposed by any municipality and any county ordinance, and the state in which the Property is located (the "**State**"); (iv) all financing related fees; and (v) all recording charges for the Deed and all documents pertaining to any Purchaser financing. At Closing, Seller shall pay (a) one-half (1/2) the cost of the Closing Escrow; (b) one-half (1/2) of the cost of the Owner's Title Policy (including both standard and any extended coverage) and any endorsements to the Title Policy; and (c) the cost of the Stark County Conveyance fee.  All other customary purchase and sale closing costs shall be paid by Seller or Purchaser in accordance with the custom in the jurisdiction where the Property is located, as determined by the Title Insurer. Except as otherwise provided for in this Contract, the Parties shall each be solely

responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.    **CONDITIONS TO CLOSING**

(a)    **Conditions to Seller's Obligation to Close.** In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to sell the Property to Purchaser is subject to each and all of the following conditions precedent (or express written waiver thereof by Seller):

(i)    All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(b)    **Conditions to Purchaser's Obligation to Close.** In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent (or express written waiver thereof by Purchaser):

(i)    All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(c)    **Conditions to Closing of Both Parties**: In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

(i)    The sale shall be authorized by and subject to that certain Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

(ii)    Seller, a debtor in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court (the "**Chapter 11 Case**") shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property. Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property. In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to

close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property.

7.    **CLOSING**

    (a)    **Closing Date**. Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Title Insurer within thirty (30) days after the filing of the Sale Notice or, in the event a timely objection to the Sale Notice is interposed, within thirty (30) days after entry of a final order from the Bankruptcy Court overruling the objection and specifically approving the sale of the Property (the "**Final Sale Order**"), or such later date as reasonably requested by Seller (the "**Closing Date**"), but in no event shall the Closing Date be later than sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from the withdrawal of such objection or entry of the Final Sale Order (the "**Outside Date**"). If Closing does not occur by the Outside Date, the Parties shall have the rights set forth in Section 13(a)(i) hereof.

    (b)    **Seller Closing Deliverables**. On or before the Closing Date, Seller shall deliver or use commercially reasonable efforts to cause to be delivered to the Title Insurer the following Closing documents:

        (i)    A Special Warranty Deed (or its State equivalent) executed in proper form for recording so as to convey the title required by this Contract (the "**Deed**") to Purchaser, subject to the Permitted Title Exceptions;

        (ii)    A FIRPTA Affidavit in customary form duly executed by Seller;

        (iii)    A file-stamped copy of the Approval Order; and

        (iv)    An Owner's Affidavit of Title executed by Seller, in the form attached hereto as **Exhibit "C"** (or such other form as reasonably approved by Seller).

    (c)    **Purchaser Closing Deliverables** No later than 11:00 am Chicago time on the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

        (i)    The full amount of the Purchase Price, as adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account and deliver to Escrow Agent instructions to immediately release the full amount to Seller; and

(ii)     Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the City, County and State.

(d)     On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered a closing proration statement and State, county and municipal transfer tax declarations, in each case duly approved by Seller and Purchaser, which approval by both parties shall not be unreasonably withheld or conditioned, and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

8.    **CLOSING ESCROW**

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer (**"Closing Escrow"**) to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control. All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

9.    **DUE DILIGENCE PERIOD**

(a)    **Access**.        As of the Effective Date and continuing until the expiration of the Due Diligence Period (as defined below), Purchaser, and its employees, agents, consultants and contractors (collectively, the **"Purchaser Entities"**), at Purchaser's sole cost, expense, and liability, shall have a non-exclusive revocable license to enter upon the Property for the purpose of conducting certain due diligence of the Property (collectively, **"Purchaser's Studies"**), in accordance with and subject to the terms, covenants, provisions, agreements, indemnifications, and conditions of that certain Access Agreement dated September 9, 2020 entered into between Seller and Purchaser (the **"Access Agreement"**), a copy of which is attached hereto and incorporated herein as **Exhibit "E"**. The terms, covenants, provisions, agreements, indemnifications, and conditions set forth in the Access Agreement are incorporated herein by reference with the same force and effect as though fully set forth herein.

(b)    **Due Diligence Period**. Purchaser shall have until 5:00 pm (local Chicago time) on the one hundred twentieth (120th) day following the Effective Date (the **"Due**

**Diligence Period**"), at which time Purchaser's right (all in accordance with the terms and conditions of the Access Agreement and this Contract) to enter upon the Property and Purchaser's rights (including the Purchaser Entities) to conduct any of Purchaser's Studies, the Site Assessment Work (as such term is defined in the Access Agreement), the activities in the Work Plan (as such term is defined in the Access Agreement) shall immediately terminate. In the event Purchaser, in its sole discretion, shall conclude prior to the expiration of the Due Diligence Period, that any aspect of the Property is not suitable for Purchaser in any respect, Purchaser shall have the right to elect, by written notice to Seller given on or prior to the expiration of the Due Diligence Period (the "**Termination Notice**"), to terminate this Contract and this Contract thereupon shall be deemed to be terminated upon receipt of the Termination Notice and both Parties shall be released from any further liability hereunder, except for any obligations, which by their express terms survive the termination of this Contract, including, without limitation Section 9(d) hereof to the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law). If Purchaser gives Seller a Termination Notice, provided no other event of default is outstanding and/or uncured, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9(d) hereof to the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law). If Purchaser fails to timely give the Termination Notice to Seller as provided in this Section 9(b) and subject to the terms and provisions of this Contract, including Section 9(f) below, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, and (ii) Purchaser agrees to accept all aspects of the Property in its "AS-IS, WHERE-IS, AND WITH ALL FAULTS CONDITION" and to the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law), to release, defend, hold harmless and indemnify Seller and the Indemnified Parties from the Closing Date, for all costs and expenses (including reasonable attorneys' fees and costs) resulting from any claim, demand, damage, lien, penalty, fine, interest, cost, expense, liability or loss (collectively, "**Claims**") relating to the condition of the Property, including but not limited to the environmental condition of the Property and the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur. Notwithstanding the foregoing, [Y] Purchaser's obligations under this Section 9(b) are only to the extent such environmental matters are introduced or caused by Purchaser or Purchaser Entities, and [Z] Purchaser's obligations under this Section 9(b) for any pre-existing conditions (e.g., environmental contamination) shall only be to the extent Purchaser or Purchaser Entities exacerbates such pre-existing conditions. If Purchaser does not terminate the Contract in accordance with this Section 9(b), the Earnest Money Deposit shall be non-refundable to Purchaser (except as may otherwise be provided in this Contract) but shall be credited towards the Purchase Price at Closing.

(c)      **Extension Periods.**  Purchaser shall have two (2) options to extend the Due Diligence Period for thirty (30) days upon written notice to Seller and an additional

Earnest Money Deposit of Seven Thousand Five Hundred and No/100 Dollars ($7,500.00) per extension ("**Additional Earnest Money**"). Written notice and the Additional Earnest Money shall be provided to Title Insurer within three (3) business days of the expiration of the Due Diligence Period or any extension thereof. Additional Earnest Money shall be applicable to the Purchase Price and shall be completely non-refundable in any event.

(d)     **Indemnification**.  To the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law), Purchaser shall indemnify, protect, defend and hold harmless Seller, and any of its respective managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns (collectively, the "**Indemnified Parties**") from and against any and all costs, liabilities, claims, demands, liens, expenses, damages, including attorney's fees, losses, penalties, fines, interest or suits resulting from (i) any release of Hazardous Materials (as defined below) on, in, under, or about the Property caused by Purchaser and/or any of the Purchaser Entities during their entry on or use of the Property, (ii) Purchaser and/or any of the Purchaser Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (iii) the acts, omissions and/or willful misconduct of Purchaser and/or the Purchaser Entities during any entry upon and/or use of the Property, the Site Assessment Work or in performing the Work Plan under the Access Agreement, (iv) a breach of the terms and conditions of this Contract and/or the Access Agreement by Purchaser and/or any of the Purchaser Entities, and/or (v) personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work, the performance of the work under the Work Plan or any other work performed by Purchaser or any of the Purchaser Entities pursuant to this Contract or the Access Agreement. Notwithstanding this indemnity, to the extent permitted by law, Seller expressly reserves all rights Seller may have under the law to prosecute any claims or demands against Purchaser and/or any of the Purchaser Entities arising out of or related to the environmental condition of the Property or otherwise. This indemnity shall survive the termination of this Contract and the Access Agreement. As used herein, (1) "**Affiliate(s)**" shall mean, with respect to any Person (as defined below), any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; and (2) "**Person**" shall mean, any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, or other entity. Notwithstanding the foregoing, [Y] Purchaser's obligations under this Section 9(d) are only to the extent such environmental matters are introduced or caused by Purchaser or Purchaser Entities, and [Z] Purchaser's obligations under this Section 9(d) for any

pre-existing conditions (e.g., environmental contamination) shall only be to the extent Purchaser or Purchaser Entities exacerbates such pre-existing conditions.

(e)    **Survival of Purchaser's Obligations**.  Notwithstanding anything to the contrary herein, to the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law) any and all obligations, commitments, and indemnifications by Purchaser and the Purchaser Entities specified in this Section 9 and otherwise set forth in the Access Agreement shall survive the expiration or termination of this Contract (and the Access Agreement) and the delivery of the Deed without the further need to document such agreement.

(f)    All of Seller's service contracts on the Property are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property to be released from such service contracts on or prior to the Closing Date.

In the event this Contract is terminated, all materials provided by or on behalf of Seller to Purchaser (the "**Due Diligence Materials**") shall be promptly returned by Purchaser to Seller at no cost to Seller. SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING (i) THE TRUTH, ACCURACY OR COMPLETENESS OF ANY OF THE DUE DILIGENCE MATERIALS, (ii) THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME, (iii) ANY DATA OR INFORMATION DELIVERED BY SELLER OR THE SOURCES THEREOF, (iv) WHETHER ANY OF THE DUE DILIGENCE MATERIALS REPRESENT ALL OF THE NECESSARY OR RELEVANT INFORMATION RELATING TO THE PROPERTY, OR (v) THE ENFORCEABILITY OR VALIDITY OF ANY OF THE DUE DILIGENCE MATERIALS. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF THE DUE DILIGENCE MATERIALS SHALL BE AT THE SOLE RISK OF PURCHASER AND WITHOUT ANY REPRESENTATIONS, WARRANTIES, OR GUARANTIES OF SELLER OR THE INDEMNIFIED PARTIES, AND PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH DUE DILIGENCE MATERIALS, BUT RATHER WILL RELY ON ITS OWN DUE DILIGENCE, INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AND ANY REPORTS COMMISSIONED BY PURCHASER WITH RESPECT THERETO. NEITHER SELLER, NOR ANY AFFILIATE OF SELLER, NOR THE PERSON OR ENTITY WHICH PREPARED ANY OF THE DUE DILIGENCE MATERIALS SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY, OR OMISSION, IN ANY OF THE DUE DILIGENCE MATERIALS. THE FAILURE TO DELIVER ANY REPORT, FINDINGS, RESULTS, FACTS, INFORMATION, OR DUE DILIGENCE MATERIALS SHALL NOT BE ACTIONABLE BY PURCHASER AND SELLER SHALL HAVE NO LIABILITY IN CONNECTION THEREWITH. PURCHASER ACKNOWLEDGES THAT THE DUE DILIGENCE MATERIALS PROVIDED BY SELLER MAY NOT NECESSARILY REPRESENT ALL OF THE DOCUMENTATION AND INFORMATION IN

EXISTENCE (OR IN SELLER'S POSSESSION OR CONTROL) WITH RESPECT TO THE PROPERTY, BUT, RATHER, REPRESENTS DOCUMENTATION MADE AVAILABLE BY SELLER AS A CONVENIENCE FOR PURCHASER. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS MAY HAVE BEEN OBTAINED BY SELLER FROM A VARIETY OF SOURCES, AND THAT SELLER HAS NOT MADE (AND IS UNDER NO DUTY TO MAKE) ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF ANY DUE DILIGENCE MATERIALS. PURCHASER WAIVES, RELEASES AND FORFEITS ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER AGAINST SELLER, THE INDEMNIFIED PARTIES, OR THIRD PARTIES ARISING OUT OF PURCHASER'S USE OF THE DUE DILIGENCE MATERIALS. THIS SECTION 9(f) SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT.

10.   **REPRESENTATIONS AND WARRANTIES**

   (a)   **Seller Representations**.   Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

   (i)   Subject to Section 6(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to Section 6(c) of this Contract.

   (ii)   To Seller's actual knowledge, and except as may be reflected in the Title Commitment, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except as set forth on **Exhibit "D"**.

   (iii)   As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of President of Real Estate, and shall not be construed to refer to the knowledge of any other person, including, without limitation, managers, members, officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

   (b)   **Purchaser Representations.** Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

    (i)       Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.  Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents.  The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

    (ii)     Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

    (iii)    This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

    (iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the United States Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

    (v)     Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 10 shall merge with the transfer of title and shall not survive Closing.  If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown.

11.    **AS IS/NO WARRANTIES**

(a)    **As-Is Condition.**    Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to all aspects of the Property without warranty or representation of any kind by Seller or any of Seller's managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns ( the "**Indemnified Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Materials. As used in this Contract, the term "**Hazardous Material(s)**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any federal, state or local law, statute, ordinance or regulation. To the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law), Purchaser, hereby agrees to release, defend, hold harmless and indemnify Seller and the Indemnified Parties with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was directly caused by the affirmative acts of Seller, its employees, agents or contractors from and after the Effective Date) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source.

(b)    **No Warranties, Representations**.    Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller.    Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price.    Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Section 10 of this Contract:

(i)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or

disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)    Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.  Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)    **WAIVER/RELEASE OF PURCHASER CLAIMS**.    WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 11(a) AND 11(b), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND THE INDEMNIFIED PARTIES, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORSEEN OR UNFORSEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)    **No Representations as to Condition/Full Investigation**.  Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any of the Indemnified

Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof.  The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto.  Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

**12.    NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section.  At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

**13.    DEFAULT AND REMEDIES**

(a)    **Termination Events:**

(i)    Termination by Either Party:  Notwithstanding anything to the contrary set forth herein, this Contract may be terminated by either Party if Closing does not occur by the Outside Date as contemplated in Section 7(a) of this Contract, provided, however, that the right to terminate this Contract pursuant to this Section 13(a) shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in Closing failing to occur.

(ii)    Termination by Purchaser.  If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of written notice of such default from Purchaser (the "Seller Cure Period") (excluding any default by Purchaser and Purchaser's failure to diligently complete or cure the same), Purchaser shall have as its sole and exclusive remedies (a) the right to terminate the Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon in full satisfaction of all damages suffered by Purchaser by reason of Seller's default and the Contract shall be terminated and of no further force or effect except as provided for in this Contract or (b) in the event that Seller's breach of this Contract does not arise out

of a refusal of the Bankruptcy Court to approve the Sale Notice, the right to specific performance of this Contract by the Bankruptcy Court; provided, however, Purchaser will seek this right of specific performance if at all within no more than one hundred twenty (120) days from the expiration of the Seller Cure Period.

(iii)    <u>Termination by Seller.</u>  If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default from Seller (excluding any default by Seller of Seller's failure to diligently complete or cure the same), and Seller's sole remedy shall be to terminate this Contract, in which event Seller shall be entitled to receive the Earnest Money Deposit as liquidated damages in lieu of all other remedies available to Seller and this Contract shall terminate with neither Party having any further rights or liabilities hereunder, except as those specifically provided to survive the termination of this Contract to the extent permitted by law; provided, however, that this <u>Section 13(a)(iii)</u> shall not limit Seller's claims pursuant to any of Purchaser's indemnification obligations in this Contract to the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law). Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money Deposit is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Earnest Money Deposit upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

(b)    **Effect of Termination.**    In the event of a termination of this Contract pursuant to this <u>Section 13</u> (other than a termination of this Contract pursuant to <u>Section 13 (a)(iii)</u>), Seller and Purchaser shall instruct the Escrow Agent to, and the Escrow Agent shall, promptly (but in any event within two (2) Business Days of such instruction) return to Purchaser the Earnest Money Deposit by wire transfer of immediately available funds and the return thereof shall constitute the sole and exclusive remedy of Purchaser in the event of a termination hereunder.

14.    <u>**NOTICES**</u>

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, by e-mail (provided that email notice shall not be effective unless a copy of such notice is concurrently sent in accordance with this sentence), or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

**To Seller:**            **M-III Partners**
                   130 West 42nd Street

17th Floor
New York, New York 10036
Attn: William Gallagher
Email: wgallagher@miiipartners.com

With copies to:                    **Weil, Gotshal & Manges LLP**
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Attn: W. Michael Bond, Esq.
                                   Phone: (212) 310-8035
                                   E-mail: Michael.Bond@weil.com

To Purchaser:                      **CITY OF NORTH CANTON, OH**
                                   **c/o Patrick DeOrio, Director of**
                                   **Administration**
                                   145 North Main Street
                                   North Canton, Ohio 44720
                                   Phone: (330) 499-8223 Ext. 1001
                                   E-mail: pdeorio@northcantonohio.gov

With copies to:                    Terry A. Moore
                                   Krugliak, Wilkins, Griffiths & Dougherty Co.,
                                   L.P.A.
                                   4775 Munson Street NW
                                   Canton, Ohio 44718
                                   Phone: (330) 497-0700
                                   E-mail: tmoore@kwgd.com

Notice of change of address for receipt of notices shall be sent in the manner set forth in this <u>Section 14</u>.

15.      <u>**ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**</u>

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

16.      <u>**FURTHER ASSURANCES**</u>

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

17.    **SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing. Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

18.    **CONFIDENTIALITY**

Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that (i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date, (ii) all terms of this Contract and any and all drafts of this Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Due Diligence Materials (as defined above) and any other electronic files and other documents in Seller's electronic online data room, and (iv) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is strictly confidential, shall remain confidential and shall not be disclosed to any Person by Purchaser or the Purchaser Entities without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, including, but not limited to, any federal, state and/or local governmental entity, except that Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this Section 18. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser, the Purchaser Entities, or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser, the Purchaser Entities, or the Permitted Parties. If Purchaser, the Purchaser Entities, or the Permitted Parties breach (or threaten the breach of) the terms of this Section 18, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Contract by any of the Purchaser Entities or Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this Section 18, in addition to all other rights and remedies available at law or in equity. Notwithstanding the foregoing, the Parties agree

that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser, the Purchaser Entities, or the Permitted Parties, (2) becomes available to Purchaser, the Purchaser Entities, or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information. Purchaser acknowledges that Seller may file this Contract and any related matters with the Bankruptcy Court and thus make this Contract publicly available. The terms of this <u>Section 18</u> shall survive termination of this Contract.

19. **BROKERAGE**

Except for NAI Spring representing Purchaser ("**Purchaser's Broker**") and Terra National representing the Seller ("**Seller's Broker**" together with Purchaser's Broker shall collectively be referred to as the "**Brokers**"), each Party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction. Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including the Brokers), finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party. Any commission or other compensation due the Seller's Broker shall be the responsibility of Seller, and Seller's Broker shall be paid at the Closing in accordance with separate agreements between Seller's Broker and Seller. Purchaser's Broker shall be paid in accordance with a separate agreement between Seller's Broker and Purchaser's Broker.

20. **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser has sole ownership interest provided that (i) written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing and (ii) any such assignee executes an assumption of this Contract, if requested by and in form and substance reasonably acceptable to Seller. No transfer or assignment by Purchaser shall relieve Purchaser of its obligations hereunder. No such transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

21. **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns and, except for any of the Indemnified Parties, no third

party is intended to or shall have any rights hereunder. This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

22.    **INTENTIONALLY DELETED**

23.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

24.    **RESERVED**

25.    **COUNTERPARTS**

This Contract may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Contract by signing any such counterpart delivery of an executed signature page of this Contract by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

26.    **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of <u>Section 20</u> of this Contract.

27.    **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract. Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract and retain the Earnest Money Deposit.

28.    **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed. The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.

29.     **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

30.     **RESERVED**

31.     **CONDEMNATION AND CASUALTY**

(a)     In the event of any taking of, or if notice is given of the intention to take, by the exercise of the power of eminent domain, all or a substantial portion of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation.  If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Deposit, plus any interest accrued thereon, shall be promptly returned to Purchaser.  If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned (A) all interest of Seller in and to any insurance proceeds actually received by Seller (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date) or (B) condemnation awards payable to Seller on account of that event, in the case of both (A) and (B), less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price.  A portion of the Real Property will be deemed "substantial," for purposes of this Section 31 to the extent the taking of such portion would materially impair or otherwise materially affect Purchaser's intended use of the Real Property.

(b)     If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof ("**Casualty Notice**").  After delivery of the Casualty Notice, if Seller reasonably estimates the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00), Seller or Purchaser may elect, within five (5) business days of delivery of the Casualty Notice (and if the Closing is scheduled within such five (5) business day period, the Closing shall be extended for up to five (5) business days), to terminate this Contract by written notice to such other Party, in which event, provided no other event of default is outstanding and/or uncured, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any terms, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof.

32.     **SECTION HEADINGS**

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

33.     **INTERPRETATION**

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

34.     **GOVERNING LAW, JURISDICTION & VENUE**

This Contract will be exclusively governed by and construed and enforced in accordance with the laws of the State of Ohio, without regard to conflicts of law principles thereof. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS CONTRACT. SHOULD THE BANKRUPTCY COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO HAVE JURISDICTION OVER A MATTER RELATING TO THIS CONTRACT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF OHIO OR THE STATE COURT OF OHIO LOCATED IN STARK COUNTY, OHIO. Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in Section 14 of this Contract shall be effective service of process for any suit or proceeding in connection with this Contract.

35.     **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto. However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

36.     **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

37.     **PATRIOT ACT**

Seller certifies that its name is KMART CORPORATION, a Michigan corporation, and Seller is not (i) in violation of any laws relating to terrorism or money laundering, or (ii)

among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.  Purchaser certifies that its name is CITY OF NORTH CANTON, OHIO, a [          ], and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

38.    **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages.   The provisions of this Section 38 shall survive the expiration of the term or any earlier termination of this Contract.

39.    **PRESS RELEASES**

Neither Purchaser nor any of Purchaser's Affiliates shall make any press release or other public announcement concerning the transaction(s) contemplated by this Contract without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. If Purchaser desires to make a press release or other public announcement respecting this Contract or the transaction(s) contemplated hereby, Purchaser shall wait until the Closing Date (the "**No Public Announcement Period**") to do so. Notwithstanding anything to the contrary herein, any press release or other public announcement shall not reveal any Confidential Information and otherwise be in accordance with Section 18 hereof.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**KMART CORPORATION**,
a Michigan corporation

By:
Name: Mohsin Y. Meghji
Its: Chief Restructuring Officer

**PURCHASER:**

**CITY OF NORTH CANTON, OHIO,**
an Ohio municipal corporation

By:
Name: Stephan B. Wilder
Its: Mayor

**EXHIBITS**

Exhibit "A":    Legal Description
Exhibit "B":    Earnest Money Escrow Instructions
Exhibit "C":    Owner's Affidavit of Title
Exhibit "D":    Leases, tenancies and licenses
Exhibit "E":    Access Agreement

**EXHIBIT "A"**

**LEGAL DESCRIPTION OF PROPERTY**

Situated in the Southeast Quarter of Section 6, Township of Plain, (T-11, R-8) and also being part of Outlot 193 in the City of North Canton, County of Stark and State of Ohio and being further bounded and described as follows:

Commencing at an iron bar at the southwest corner of the Southeast Quarter of Section 6 of Plain Township;

thence S 84° 32' 00" E, a distance of 699.88 feet along the South line of said section and along the centerline of Applegrove Street (60 feet wide) to the southeast corner of a tract now or formerly owned by North Canton Recreation, Inc., as described in Volume 2671, Page 389 in the Stark County Records of Deeds;

thence N 05° 30' 40" E, a distance of 578.45 feet along the East line of said North Canton Recreation Inc., tract, to an iron bar being the true place of beginning of the tract herein described;

1) Thence N 84° 31' 56" W, a distance of 399.89 feet along the North line of said North Canton Recreation, Inc. tract to a bolt;

2) Thence N 05° 31' 20" E, a distance of 830.02 feet along the East line of a tract now or formerly owned by G. and P. Smith, as described in Volume 1697, Page 373 of the Stark County Records of Deeds, to an iron bar which is S 05° 31' 20" W, 15.00 feet from an iron bar on the North corporation line of the City of North Canton;

3) Thence S 84° 31' 16" E and parallel to said corporation line, a distance of 1,085.10 feet to a point on the centerline of North Main Street (66 feet wide);

4) Thence S 05° 00' 10" W, a distance of 440.38 feet along the centerline of North Main Street, to a point of curvature of a curve to the left, said point being Station 37+67.17 as per the Stark County Right-of-Way Plans (I.C.H. 66, Sec. G and I., Page 2);

5) Thence continuing along the centerline of North Main Street and along the arc of said curve to the left having a radius of 3,125.22 feet, a chord of 52.90 feet, a chord bearing of S 04° 31' 05" W, a central angle of 00° 58' 11", and a tangent of 26.45 feet, an arc distance of 52.90 feet to a point;

6) Thence N 84° 59' 50" W, a distance of 148.45 feet to a point;

7) Thence S 48° 50' 01" W, a distance of 69.31 feet to a point;

8) Thence N 84° 59' 50" W, a distance of 220.93 feet to a point;

9) Thence S 05° 30' 40" W, a distance of 61.79 feet to a point;

10) Thence N 84° 29' 20" W, a distance of 275.25 feet to a point;

11) Thence S 05° 00' 10" W, a distance of 221.60 feet to the true place of beginning and containing 16.409 acres, more or less, as surveyed by Friedl and Harris, Inc., Engineers and Surveyors of North Canton, Ohio in August of 1974. Excepting that portion that went to street per Plat Book 48, Page 34 of the Stark County Records.

LESS AND EXCEPTING THEREFROM THE FOLLOWING:

Situated in the City of North Canton, County of Stark, State of Ohio, and known as being part of Out Lot Number 193 of said City of North Canton. Also being part of a tract of land conveyed to KMART Corporation by a deed recorded in Official Record 576 Page 991 of the Stark County Recorder's Office, more fully bounded and described as follows:

Beginning at a three quarter inch diameter iron bar found at the intersection of the centerline of North Main Street and the centerline of Applegrove Street, said iron bar being at Station 27+88.68 of the centerline of right of way and construction of the North Main Street Improvements Phase IV;

thence N 15° 58' 29" W along said centerline of right of way and construction a distance of 43.31 feet to a point of curve located at Station 28+31.99;

thence continuing along said centerline of right of way and construction on a curve to the right having a radius of 3125.22 feet, a central angle of 16° 11' 43" an arc distance of 883.37 feet, a tangent of 444.65 feet, a chord distance of 880.43 feet, and a chord bearing of N 7° 52' 38" W to a point located at Station 37+15.36, said point being the True Place of Beginning for the tract of land herein described;

1) Thence N 88° 52' 33" W along grantor's southerly property line and the northerly property line of a tract of land conveyed to Marin Access LLC by a deed recorded in Instrument Number 200309050086279 a distance of 48.00 feet to an iron bar set;

2) Thence northerly along the proposed right of way line of North Main Street on a curve to the right having a radius of 3173.22 feet, a central angle of 0° 52' 32", an arc distance of 48.49 feet, a tangent of 24.24 feet, a chord distance of 48.49 feet, and a chord bearing of N 0° 40' 19" E to an iron bar set;

3) Thence N 01° 06' 35" E and continuing along the proposed westerly right of way line of North Main Street and the existing westerly right of way line of North Main Street a distance of 412.07 feet to an iron bar set;

4) Thence S 88° 24' 51" E along grantor's northerly property line and the southerly right of way line of Stratavon Drive a distance of 48.00 feet to a point on said centerline of right of way and construction;

5) Thence S 01° 06' 35" W along said centerline of right of way and construction a distance of 411.68 feet to a point of curve;

6) Thence continuing along said centerline of right of way and construction on a curve to the left having a radius of 3125.22 feet, a central angle of 0° 53' 21", an arc distance of 48.50 feet, a tangent of 24.25 feet, a chord distance of 48.50 feet, and a chord bearing of S 0° 39' 54" W and returning to the True Place of Beginning and containing 0.507 acres of land of which 0.478 acres are within the present road occupied.

The above described area is contained within the Stark County Auditor's Permanent Parcel Number 9205819.

Grantor claims title by a deed recorded in Official Record 576 Page 991 of the Stark County Recorder's Office.

The basis of bearings used in this description is the Ohio North Zone, State Plane Coordinates, NAD 83 (1986).

Iron bars referred to as set are 1/2 inch in diameter, 30 inches in length, and topped with a M-E Companies cap.

<u>**EXHIBIT "B"**</u>

<u>**EARNEST MONEY ESCROW INSTRUCTIONS**</u>

(please see attached)

 **CHICAGO TITLE AND TRUST COMPANY:  ESCROW TRUSTEE**

**10 S. LASALLE, STE 3100, CHICAGO, IL 60603**

Refer to: Krystina Cozzie
Phone no.: 312-223-3366
Fax no: 312-223-2076

## STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)

ESCROW TRUST NO:                                                    DATE:

To: Chicago Title and Trust Company, Escrow Trustee:

Customer Identification:

Seller:  Kmart Corporation

Purchaser:  City of North Canton, Ohio

Property Address:  Parcel No. 10002584, Stratavon Street, NW, North Canton, Stark County, Ohio

Project Reference:

Proposed Disbursement Date:

Escrow Deposits:

1. The sum of $10,000 by WIRE Representing:  INITIAL EARNEST MONEY

2. The sum of $                                    by       CHECK/WIRE
Representing:  (Additional)

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

Funds:

(  ) WILL    ( X ) WILL NOT BE INVESTED
NOTE: If funds are to be invested, an investment package will be sent.  Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

02734617-1 / 29750.01-0003

WEIL:\97461208\10\73217.0004

Delivery of Deposits:

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:

Escrow trust fee will be deducted as follows: $300 escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.
The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

Standard Provisions:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement. Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disputes/Circumstance not contemplated:

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Trustee is unsure as to its duties as a result, Escrow Trustee may continue to hold said funds until either in receipt of a joint order from the parties or a court order directing payment. In such instance, Escrow Trustee may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Trustee for any

action taken by it in good faith in the execution of its duties hereunder. The parties further agree that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties. Notwithstanding the foregoing, where a party to this escrow agreement has been placed in default and the period to cure such default has lapsed, without cure, upon the delivery to Escrow Trustee of commercially reasonable documentation evidencing the same, Escrow Trustee shall, without delay, release the Escrow Deposit to the non-defaulting party entitled to receive such Escrow Deposit without direction from a court or delivery of a joint order from the parties to this escrow agreement.

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person. Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

*[Signature Page to Follow]*

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:                                    For Purchaser:

Name: Kmart Corporation                        Name: City of North Canton, Ohio


By: _____                    By: _____
Name: Mohsin Y. Meghji                         Name: Stephan B. Wilder
Its: Chief Restructuring Officer               Its: Mayor



By:                                            Date:

**\*Upon receipt of the funds, the escrow agreement becomes effective.**

## EXHIBIT "C"

## OWNER'S AFFIDAVIT OF TITLE

[See attached]

# Title Affidavit

dated as of _____/_____/20

---

Re:      **Insured:**
      **Title Insurer:**
      Chicago Title Insurance Company, a NE corporation ("CTIC")
      **CTIC Master #:**

      **Commitment #:**
      **Premises:**
      as legally described in the Commitments

---

**Certifications:**

The undersigned owner of the Premises hereby certifies the following to Title Insurer (as to its respective estate and/or interest in the Premises):

**Mechanics Liens:**

All labor, services or materials rendered or furnished within the last 90 days in connection with the Premises or with the construction or repair of any building or improvements on the Premises have been paid for in full or will be paid in full.

**Tenants/Parties in Possession:**

There are no tenants or other parties who are in possession or have the right to be in possession of said Premises other than tenants listed on Exhibit A hereto.

**Bankruptcy:**

A proceeding in bankruptcy has been instituted by or against the undersigned (or its constituent entities) which is now pending in the Bankruptcy Court for the Southern District of New York under Docket No. 18-23538.

**Gap Indemnification:**

Between the most recent Effective Date of the Commitment (or any bring down thereof) and the date of recording of the Insured Instrument(s) but in no event later than five (5) business days from the date hereof (hereinafter, the "Gap Period"), the undersigned has not taken and will not take any action to encumber or otherwise affect title to the Premises. In the event of any lien, encumbrance or other matter affecting title to the Premises in the Gap Period arising as a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof. The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

**Counterparts:**

This document may be executed in counterparts.

- see annexed signature page -

**Signatory/Signatories to Title Affidavit:**

By: _____

      Name:

      Title:

      Solely in his/her capacity as _____ of the _____ and not individually

Subscribed and sworn to on _____/_____/20

_____

Notary Public

**EXHIBIT "D"**

**Leases, Tenancies and Licenses**

None.

**EXHIBIT "E"**

**ACCESS AGREEMENT**

[See attached]

## ACCESS AGREEMENT
*North Canton, OH, Vacant Parcel #3243*

This ACCESS AGREEMENT (this "**Agreement**") is made and entered into as of this 9th day of September, 2020 ("**Effective Date**"), by and between **CITY OF NORTH CANTON, OHIO**, an Ohio municipal corporation ("**Purchaser**"), and **KMART CORPORATION**, a Michigan corporation ("**Seller**") (Purchaser and Seller may also be collectively referred to in this Agreement as the "**Parties**" and individually referred to as a "**Party**").

## RECITALS

A.      Seller is the owner of that certain real property known as Parcel No. 10002584 on Stratavon Street, NW in the City of North Canton, Stark County, in the State of Ohio, as legally described on **Exhibit "A"** attached hereto (the "**Property**").

B.      Purchaser and Seller are parties to a written agreement ("**Contract**") for the sale of the Property by Seller to Purchaser.

C.      Purchaser desires to have access to Confidential Information (as defined below) and enter onto the Property and perform certain activities, physical inspections, site investigations, site assessments, and, if permitted by Seller pursuant to the terms of this Agreement, an invasive environmental investigation of the Property (collectively, "**Due Diligence**"), all as may be permitted hereunder as part of Purchaser's due diligence prior to the execution of the Contract.

D.      Subject to the terms of this Agreement, Seller has agreed to permit Purchaser and/or Purchaser's agents to conduct Due Diligence of the Property for the purposes set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller agree as follows:

**1.**      **Incorporation of Recitals**.  The foregoing recitals are true and correct and are incorporated into this Agreement by reference.

**2.**      **Grant of Access**.

**(a)**      As of the Effective Date and continuing until the Expiration Date (as defined below), Seller grants to Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), at Purchaser's sole cost, expense, and liability, a non-exclusive revocable license to enter upon the Property to conduct certain Due Diligence, subject to the terms and conditions of this Agreement. Purchaser and the Purchaser Entities shall be permitted to visually inspect the physical condition of the Property and conduct certain non-invasive or non-destructive physical and environmental inspections, activities, studies, evaluations, tests, and investigations of the Property or any part thereof, including, without limitation, all structural, physical, electrical and mechanical aspects of the Property, supports, site work, foundations, drainage, and make

general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment, or perform an ALTA/NSPS land title survey conducted by a licensed surveyor (collectively, the "**Site Assessment Work**").

**(b)** Seller agrees to use commercially reasonable efforts to provide Purchaser with reasonable access to the Property to perform the Site Assessment Work at reasonable times and upon not less than two (2) business days prior written notice to Seller, at no cost to Seller or its agents, consultants and contractors, and, at Seller's option, accompanied by a representative of Seller.

**(c)** Without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, Purchaser and the Purchaser Entities shall not: (i) take photographs of store contents or any items owned or sold by Seller; provided that, notwithstanding the foregoing, Purchaser and Purchaser Entities are permitted to take photographs in connection with the Site Assessment Work, Invasive Testing (defined below) and Work Plan (defined below); (ii) perform tests, work or investigations not included in scope of the Site Assessment Work including, but not limited to roof penetrations, borings, asbestos samplings, invasive or destructive testing, or any Phase II Environmental Assessment, unless approved by Seller in accordance with Section 3 hereof; (iii) contact any tenant, sub-tenant, invitee, guest, or licensee of Seller, unless approved by Seller in writing and required in connection with a Phase I Environmental Assessment; (iv) perform any Invasive Testing (as defined below) other than in accordance with the manner and scope described in the Work Plan, unless approved by Seller in accordance with Section 3 hereof; or (v) perform any Due Diligence not in accordance with the terms and conditions of this Agreement (collectively, "**Unauthorized Activity**").

**3.** **Invasive Testing**. At Purchaser's sole cost, expense and liability, invasive or destructive testing, including but not limited to roof penetrations, borings, asbestos samplings, or any Phase II Environmental Assessment of the Property ("**Invasive Testing**"), may only be performed at, under, or upon the Property, or any part thereof, with Seller's prior written approval (which may be via email from Seller or Seller's counsel), which written approval may be conditioned, delayed, or withheld at the sole and absolute discretion of Seller. If, and only if, Seller provides prior written approval to Purchaser for any Invasive Testing, then beginning on the date of Seller's approval and continuing until the Expiration Date, Purchaser may enter upon the Property to carry out any Invasive Testing in accordance with the written work plan, attached hereto as **Exhibit "B"**, approved in writing by Seller (as amended, the "**Work Plan**"). Notwithstanding anything contrary in this Agreement, execution by Seller of this Agreement with a Work Plan attached as Exhibit B shall constitute Seller's prior written approval of the Work Plan and any Invasive Testing provided in the Work Plan. All Invasive Testing shall be performed in accordance with the manner and scope described in the Work Plan, the terms of this Agreement, and such other conditions as may be required by Seller, including, without limitation, the following express conditions:

**(a)** At reasonable times and upon not less than two (2) business days prior written notice to Seller, Purchaser shall have reasonable access to the Property to perform the Invasive Testing in accordance with the Work Plan, at no cost to Seller or its agents,

02734617-1 / 29750.01-0003                    5
EAST\157795606.10

WEIL:\97461208\10\73217.0004

consultants and contractors, and, at Seller's option, accompanied by a representative of Seller.

(b)    Any changes to the existing Work Plan shall be submitted to Seller in writing for Seller's prior written approval, which written approval may be conditioned, delayed, or withheld at the sole and absolute discretion of Seller. Any changes to the existing Work Plan shall be subject to the terms and conditions of this Agreement.

(c)    Except for any Site Assessment Work, Purchaser and the Purchaser Entities shall not conduct any work or engage in any activities on the Property other than in accordance with the manner and scope described in the Work Plan. Seller reserves all rights or claims that Seller may have at law or in equity against Purchaser and/or the Purchaser Entities related to or arising from the environmental condition of the Property to the extent permitted by law.

(d)    Seller shall have the right to obtain split samples or conduct contemporaneous sampling, and shall be given two (2) business days' prior written notice, when any sampling may be conducted by Purchaser or the Purchaser Entities on the Property so as to allow a representative of Seller to observe such activity. A copy of any correspondence, data, report, test or other communication with any governmental agency relating to the environmental condition of the Property or the presence of any petroleum or other Hazardous Substances shall be simultaneously sent to Seller, provided that, notwithstanding the foregoing, the foregoing requirements do not apply to contacts with governmental agencies in connection with the Site Assessment Work, Invasive Testing, and the Work Plan, as such information, as appropriate, will be incorporated into any final reports, if any. As used in this Agreement, the term "**Hazardous Substances**" shall mean any hazardous substance or waste as defined in federal and state or local laws, regulations or ordinances.

(e)    If monitoring wells are permitted in the Work Plan, Purchaser shall, at Purchaser's sole cost and expense, install a locked cap on such wells, shall ensure that said caps are secure, and take commercially reasonable steps necessary to prohibit access to the recovery wells by parties not authorized to do so by Purchaser. As between Purchaser and Seller, Purchaser is responsible for any contamination or damage caused by the authorized or unauthorized access to the recovery wells. Purchaser agrees to ensure that all of the Purchaser Entities also close any recovery wells upon the completion of the investigation or the termination of this Agreement, whichever is sooner, and perform the Work Plan in accordance with the terms of this Agreement, including, without limitation Section 11 hereof, and prudent engineering principles.

(f)    If the location of the equipment installed pursuant to the approved Work Plan shall at any time interfere or conflict with Seller's use of the Property, as may be determined by Seller in its sole and absolute discretion, Purchaser shall upon receipt of a written request from Seller to do so, close, remove and/or relocate, all at Purchaser's sole cost and expense, said equipment, including any monitoring wells set forth in the Work Plan, within a reasonable time after receipt by Purchaser of such governmental approvals

as may be required to close, remove or relocate said well or wells. Purchaser shall use its best efforts to obtain all such required governmental approvals.

4.    **Term**. Except for the provisions which expressly survive the termination of this Agreement, this Agreement and the non-exclusive revocable license granted hereby shall immediately terminate on the earliest to occur of either of the following (the "**Expiration Date**"): (a) the Closing on the property under the Contract, (b) upon the breach by Purchaser of any covenant of this Agreement, (c) upon written notice thereof from Seller to Purchaser, for any reason or for no reason, all as determined in Seller's sole and absolute discretion, or (d) ninety (90) days after the Effective Date (the "**Outside Date**"). Immediately upon the Expiration Date, Purchaser shall promptly restore the Property as provided in this Agreement.

5.    **Presence of Seller's Representative**. If Seller elects to have its representative(s) present during the Site Assessment Work, the performance of the Work Plan, and/or Invasive Testing, if any, and has such representative(s) present at the times and dates scheduled by Purchaser, then all Site Assessment Work, activities performed under the Work Plan, and/or Invasive Testing as the case may be, shall be performed only in the presence of the Seller's local manager(s) or any other such person(s) assigned or designated by Seller.

6.    **Repairs**. If any portion of the Property, including any improvements and/or personal property of Seller, suffers damage by reason of the entry of Purchaser or any of the Purchaser Entities on the Property, including but not limited to damage arising from any tests, investigations and/or monitoring conducted upon the Property, Purchaser and the Purchaser Entities shall, at its own cost and expense, immediately repair such damage and restore the Property to as good a condition as before such damage occurred.  Repair of damage includes, without limitation, re-grouting and resurfacing any holes, ditches, or other indentations, as well as any mounds or other inclines caused by Purchaser or any of the Purchaser Entities.

7.    **Reports**.  Within two (2) business days after receipt by Purchaser (not following receipt by Purchaser Entities), Purchaser agrees to provide Seller with all test results and final reports, quality assured results of samples taken pursuant to the Work Plan prepared in connection with the Site Assessment Work, Invasive Testing, or otherwise (collectively, the "**Reports**"). This provision shall survive the termination of this Agreement.

8.    **Confidentiality**. Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that (i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date, (ii) all terms of this Agreement and any and all drafts of the Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Property Documents (as defined below) and any other electronic files and other documents in Seller's electronic online data room, (iv) any results or findings, whether in draft form or made final, written or otherwise, of the Site Assessment Work or the Invasive Testing, and (v) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is

strictly confidential, shall remain confidential and shall not be disclosed to any Person by Purchaser or the Purchaser Entities without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, including, but not limited to, any federal, state and/or local governmental entity, except that Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this Section 8. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser or the Permitted Parties. If Purchaser or the Permitted Parties breach (or threaten the breach of) the terms of this Section 8, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Agreement by any of the Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this Section 8, in addition to all other rights and remedies available at law or in equity. Notwithstanding the foregoing, the Parties agree that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser or the Permitted Parties, (2) becomes available to Purchaser or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information. The terms of this Section 8 shall survive termination of this Agreement.

9.    **Indemnification**.  Purchaser shall indemnify, protect, defend and hold harmless Seller, and any of its respective managers, members, officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors and subcontractors (collectively the "**Indemnified Parties**") (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law) from and against any and all costs, liabilities, claims, expenses, damages, including attorney's fees, losses, penalties, or suits resulting from (i) any release of Hazardous Substances on, in, under, or about the Property caused by Purchaser and/or any of the Purchaser Entities during their entry on or use of the Property, (ii) Purchaser and/or any of the Purchaser Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (iii) the acts, omissions and/or willful misconduct of Purchaser and/or the Purchaser Entities during any entry upon and/or use of the Property, the Site Assessment Work, the Invasive Testing, or in performing the Work Plan under this Agreement, (iv) a breach of the terms and conditions of this Agreement by Purchaser and/or any of the Purchaser Entities, and/or (v) personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site

Assessment Work, the performance of the work under the Work Plan, the Invasive Testing or any other work performed by Purchaser pursuant to this Agreement or otherwise. Notwithstanding this indemnity, to the extent permitted by law, Seller expressly reserves all rights Seller may have under the law to prosecute any claims or demands against Purchaser and/or any of the Purchaser Entities arising out of or related to the environmental condition of the Property or otherwise. This indemnity (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law) shall survive the termination of this Agreement. As used herein, (1) "**Affiliate(s)**" shall mean, with respect to any Person (as defined below), any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; and (2) "**Person**" shall mean, any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, or other entity.

**10.    Insurance**. Purchaser shall maintain, at its own cost and expense, or shall ensure that all of the Purchaser Entities entering the Property, or otherwise performing any work or activities hereunder, including any Site Assessment Work, the Invasive Testing, or any activities performed under the Work Plan, shall maintain, at its/their sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Seller) from insurance companies reasonably satisfactory to Seller and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Seller or a rating otherwise approved by Seller:

(i)    Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Seller, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

(ii)    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

(iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Seller as an additional insured.

(iv)    If Purchaser is performing any Invasive Testing or other work in accordance with a Work Plan, Environmental Impairment or Pollution Liability Insurance, including clean-up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Seller as an additional insured.

(v)    Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

Purchaser warrants that, if any of the Purchaser Entities enter the Property, or otherwise perform any work or activities hereunder, including any Site Assessment Work, Invasive Testing, or any activities performed under the Work Plan, such Purchaser Entities will maintain insurance as set forth above.    To the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law), Purchaser further agrees to indemnify, defend and hold Seller harmless from any loss, cost, liability, expense and damage suffered by Seller as a result of Purchaser's breach of this warranty.    Purchaser or any of the Purchaser Entities shall not enter into the Property or commence any portion of the Site Assessment Work, Invasive Testing, or any activities performed under the Work Plan prior to delivering to Seller an insurance certificate evidencing that it has the foregoing insurance. As applicable, Purchaser shall provide Seller with certificates of insurance evidencing the insurance coverage required hereunder for Purchaser and all Purchaser Entities, and at the request of the Seller, provide certified copies of such policies or portions thereof. All such insurance policies shall provide that they may not be changed, non-renewed or canceled without at least thirty (30) days' prior written notice to Seller. All such insurance policies, except worker's compensation and Motor Vehicle Insurance shall name Seller and its Affiliates as additional insureds and shall stipulate that such party's insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Seller or its Affiliates.    Completed operations coverage shall continue to be maintained for at least one (1) year following the completion of the Work Plan or any Invasive Testing, naming Seller and its Affiliates as additional insureds during such period of continuation.

**11.    Compliance with Legal Requirements.**    Purchaser shall comply in all material respects, and shall by contract require all the Purchaser Entities to comply, with all applicable federal, state, and local laws, ordinance, statutes, recorded restrictions on the Property, and governmental regulations in the performance of the (i) investigation of the Property, including any Invasive Testing, (ii) Site Assessment Work, (iii) performance of the work under the Work Plan, if any, or (iv) other work performed by Purchaser pursuant to this Agreement or otherwise. Purchaser or Purchaser Entities shall obtain, at its/their own expense, and prior to any access to the Property by any of the Purchaser Entities under this Agreement, all permits and authorizations of whatever nature from any and all governmental agencies necessary for conducting the investigation pursuant to this Agreement, as applicable. Purchaser and Purchaser shall Entities shall properly handle, sort, and dispose of at its own expense all Hazardous Substances on, in, under, or about the Property generated by the Purchaser Entities in the course of conducting the investigation under this Agreement, as applicable. Purchaser agrees that it shall be the licensee and/or generator of any and all Hazardous Substances generated in the course of conducting the investigation authorized in this Agreement, and shall identify itself as the licensee and/or generator of such Hazardous Substances on any and all documentation, including without limitation all hazardous waste manifests, associated with the handling, storage, treatment, disposal or transportation of any and all Hazardous Substances generated in the course of the investigation.

**12.    Safety**.    Purchaser shall comply, and Purchaser shall take commercially reasonable steps to ensure that the Purchaser Entities comply, with commercially reasonable safety and

WEIL:\97461208\10\73217.0004

security practices in the performance of the (i) investigation of the Property, including any Invasive Testing, (ii) Site Assessment Work, (iii) performance of the work under the Work Plan, if any, or (iv) other work performed by Purchaser pursuant to this Agreement or otherwise.

13.    **Restoration of Property.**    Purchaser agrees, all at the sole cost and expense of Purchaser, to immediately (i) repair any damage to the Property, (ii) restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work, (iii) remove any of the equipment, fixtures, improvements and other property located on any portion of the Property which was installed during the term of this Agreement, and (iv) to the extent applicable, if at all, close all work performed by Purchaser and/or the Purchaser Entities, including all wells, in compliance with applicable federal, state, and local laws, rules and regulations and/or to industry standards.

14.    **Liens**.    Purchaser shall discharge at once or bond or otherwise secure all liens and attachments that are filed in connection with Purchaser's implementation of the Site Assessment Work, the Work Plan, the Invasive Testing, or other work performed by Purchaser pursuant to this Agreement or otherwise, and shall indemnify and hold harmless the Indemnified Parties from and against any and all loss, damage, injury, liability, and claims thereof resulting directly or indirectly from such liens and attachments.

15.    **Property Materials**.    Subject to the terms and conditions of this Agreement, Seller may make or cause to be made available to Purchaser, in Seller's sole and absolute discretion, electronic access to the "Potential Buyer Diligence Documents" in Seller's electronic online data room for the Property which may contain certain documents and information about the Property (collectively, the "**Property Materials**"). The Property Materials shall expressly not include the following documents: (i) those documents that are protected by the attorney-client and/or attorney work produce privileges; (ii) Seller's formation documentation or organizational documents; (iii) financial analyses, appraisals, property condition reports and internal memoranda relating to the operation, maintenance or condition of the Property; (iv) any information which is the subject of a confidentiality agreement; and (v) Seller's internal communications and correspondence. Seller shall not and does not represent, warrant or guaranty: (a) the truth, accuracy, or completeness of any of the Confidential Information; (b) that the Confidential Information represents all of the necessary or relevant information relating to the Property; and (c) the enforceability of the Confidential Information, as applicable.

16.    **Governing Law.**    This Agreement shall be governed by and construed in accordance with the laws of the state in which the Property is located.

17.    **Voluntary Agreement.**    By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

18.    **Coordination of Due Diligence.**    Purchaser agrees that the Site Assessment Work and Invasive Testing, if any, shall be coordinated with Seller's local manager or any other such person assigned or designated by Seller.  Purchaser agrees to conduct any Site Assessment Work and Invasive Testing, if any, in such a way as to minimize interference with the conduct of Seller's

business on the Property, and shall at all times be subject to the rights, if any, of any licensee, tenant, occupant, or other Person to use or occupy the Property, or any part thereof.

19.    **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

20.    **Binding Effect**.  This instrument shall bind and inure to the benefit of the respective heirs, executors, administrators, other personal and legal representatives, grantees, successors and assigns of the Parties hereto.

21.    **Entire Agreement: Modification**.  This Agreement between Seller and Purchaser contains the entire understanding and agreement among the Parties and supersedes all prior understandings and agreements between the Parties whether oral or written.  This instrument may be modified only by a writing signed by all Parties.

22.    **Survival of Purchaser's Obligations; No Obligation to Buy or Sell**. Notwithstanding anything to the contrary herein, all obligations and commitments by Purchaser and the Purchaser Entities specified in this Agreement shall survive the expiration or termination of this Agreement. Neither Purchaser nor Seller has any obligation to enter into or execute the Contract as a result of this Agreement. Use of the term "Purchaser" is for convenience only and does not convey, imply, or otherwise mean that an existing contract or other commitment, promise, agreement or obligation of any kind, oral or written, express or implied, has been made or entered by either of the Parties hereto for purchase or sale of the Property to Purchaser. Purchaser acknowledges and agrees that Seller is entering into this Agreement solely for providing Purchaser access to the Property and certain Confidential Information and for setting out the conditions of such access and Confidential Information and that, in doing so, Seller is not in any way, expressly or impliedly, promising, covenanting, agreeing or in any other way committing to sell the Property to Purchaser, or enter into any other obligation to or with Purchaser.

23.    **Notice**.  Except as provided in <u>Section 3</u> hereof, any and all notices required by this Agreement, or by law, to be delivered to, served on, or given to any Party to this Agreement shall be in writing, may be given by legal counsel on behalf of such Party, and shall be deemed properly delivered, given or served (a) when personally delivered to such Party, (b) when electronically delivered with receipt acknowledged, together with a copy sent by United States mail, express, certified or registered with the return receipt requested, postage paid (or other overnight delivery service, charges prepaid), or (c) when mailed by United States mail, express, certified or registered with the return receipt requested, postage paid (or other overnight delivery service, charges prepaid), addressed as follows:

**To Seller:**              M-III Partners, LP
                            130 West 42nd Street
                            17th Floor

02734617-1 / 29750.01-0003              12
EAST\157795606.10

WEIL:\97461208\10\73217.0004

New York, New York 10036
Attn: William Gallagher
Email: wgallagher@miiipartners.com

**With copies to:**          **Weil, Gotshal & Manges LLP**
                             767 Fifth Avenue
                             New York, New York 10153
                             Attn: W. Michael Bond, Esq.
                             Phone: (212) 310-8035
                             E-mail: Michael.Bond@weil.com

**To Purchaser:**            **CITY OF NORTH CANTON, OH**
                             145 North Main Street
                             North Canton, Ohio 44720
                             Attn: Patrick DeOrio
                             Phone: (330) 499-8223
                             E-mail: pdeorio@northcantonohio.gov

**With copies to:**          **Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A.**
                             4775 Munson St NW
                             North Canton, Ohio 44720
                             Attn: Terry A. Moore
                             Phone: (330) 497-0700
                             E-mail: tmoore@kwgd.com

Any Party may change its address by giving ten (10) day advance written notice of such change to the other Parties in the manner provided in this Section 23.

24.    **Severability**.  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, unless such ruling shall materially alter the economic effect of this Agreement.

25.    **Representation**. Purchaser represents and warrants that it does not need the consent of any other party or Person to enter into this Agreement.

26.    **Assignment**.  Purchaser may not assign, delegate or subcontract (by contract, operation of law or otherwise) its rights or obligations under this Agreement, except with Seller's prior written consent, and the failure of Purchaser to obtain Seller's prior written consent shall render any such attempt to assign, delegate, or subcontract of no force and effect.

27. **No Waiver; Cumulative Remedies**. The failure of any Party to insist, in any one or more instances, or the delay in insisting, upon the performance of any provision of this Agreement or to exercise any right hereunder, does not constitute an election of remedies or waiver, and the obligations of the Parties with respect to such future performance will continue in full force and effect. Except as otherwise provided in this Agreement, the remedies in this Agreement are cumulative with and not in lieu of other remedies available to a Party at law or in equity.

28. **No Third Party Beneficiaries**. Other than Indemnified Parties, this Agreement shall not be deemed to confer any rights to any other party (other than Purchaser or any of the Purchaser Entities) as a third party beneficiary or otherwise.

**[END OF TEXT – SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, Purchaser and the Seller have executed this Access Agreement as of the Effective Date first above stated.

PURCHASER:

**CITY OF NORTH CANTON, OHIO**,
an Ohio municipal corporation

By: _Stephan B. Wilder_

Name:  Stephan B. Wilder
Title:   Mayor

SELLER:

**KMART CORPORATION,**
a Michigan corporation

By: _____

Name:  Mohsin Y. Meghji
Title:   Chief Restructuring Officer

## EXHIBIT "A"

## LEGAL DESCRIPTION

Situated in the Southeast Quarter of Section 6, Township of Plain, (T-11, R-8) and also being part of Outlot 193 in the City of North Canton, County of Stark and State of Ohio and being further bounded and described as follows:

Commencing at an iron bar at the southwest corner of the Southeast Quarter of Section 6 of Plain Township;

thence S 84° 32' 00" E, a distance of 699.88 feet along the South line of said section and along the centerline of Applegrove Street (60 feet wide) to the southeast corner of a tract now or formerly owned by North Canton Recreation, Inc., as described in Volume 2671, Page 389 in the Stark County Records of Deeds;

thence N 05° 30' 40" E, a distance of 578.45 feet along the East line of said North Canton Recreation Inc., tract, to an iron bar being the true place of beginning of the tract herein described;

1) Thence N 84° 31' 56" W, a distance of 399.89 feet along the North line of said North Canton Recreation, Inc. tract to a bolt;

2) Thence N 05° 31' 20" E, a distance of 830.02 feet along the East line of a tract now or formerly owned by G. and P. Smith, as described in Volume 1697, Page 373 of the Stark County Records of Deeds, to an iron bar which is S 05° 31' 20" W, 15.00 feet from an iron bar on the North corporation line of the City of North Canton;

3) Thence S 84° 31' 16" E and parallel to said corporation line, a distance of 1,085.10 feet to a point on the centerline of North Main Street (66 feet wide);

4) Thence S 05° 00' 10" W, a distance of 440.38 feet along the centerline of North Main Street, to a point of curvature of a curve to the left, said point being Station 37+67.17 as per the Stark County Right-of-Way Plans (I.C.H. 66, Sec. G and I., Page 2);

5) Thence continuing along the centerline of North Main Street and along the arc of said curve to the left having a radius of 3,125.22 feet, a chord of 52.90 feet, a chord bearing of S 04° 31' 05" W, a central angle of 00° 58' 11", and a tangent of 26.45 feet, an arc distance of 52.90 feet to a point;

6) Thence N 84° 59' 50" W, a distance of 148.45 feet to a point;

7) Thence S 48° 50' 01" W, a distance of 69.31 feet to a point;

8) Thence N 84° 59' 50" W, a distance of 220.93 feet to a point;

02734617-1 / 29750.01-0003                     2

WEIL:\97461208\10\73217.0004

9) Thence S 05° 30' 40" W, a distance of 61.79 feet to a point;

10) Thence N 84° 29' 20" W, a distance of 275.25 feet to a point;

11) Thence S 05° 00' 10" W, a distance of 221.60 feet to the true place of beginning and containing 16.409 acres, more or less, as surveyed by Friedl and Harris, Inc., Engineers and Surveyors of North Canton, Ohio in August of 1974. Excepting that portion that went to street per Plat Book 48, Page 34 of the Stark County Records.

LESS AND EXCEPTING THEREFROM THE FOLLOWING:

Situated in the City of North Canton, County of Stark, State of Ohio, and known as being part of Out Lot Number 193 of said City of North Canton. Also being part of a tract of land conveyed to KMART Corporation by a deed recorded in Official Record 576 Page 991 of the Stark County Recorder's Office, more fully bounded and described as follows:

Beginning at a three quarter inch diameter iron bar found at the intersection of the centerline of North Main Street and the centerline of Applegrove Street, said iron bar being at Station 27+88.68 of the centerline of right of way and construction of the North Main Street Improvements Phase IV;

thence N 15° 58' 29" W along said centerline of right of way and construction a distance of 43.31 feet to a point of curve located at Station 28+31.99;

thence continuing along said centerline of right of way and construction on a curve to the right having a radius of 3125.22 feet, a central angle of 16° 11' 43" an arc distance of 883.37 feet, a tangent of 444.65 feet, a chord distance of 880.43 feet, and a chord bearing of N 7° 52' 38" W to a point located at Station 37+15.36, said point being the True Place of Beginning for the tract of land herein described;

1) Thence N 88° 52' 33" W along grantor's southerly property line and the northerly property line of a tract of land conveyed to Marin Access LLC by a deed recorded in Instrument Number 200309050086279 a distance of 48.00 feet to an iron bar set;

2) Thence northerly along the proposed right of way line of North Main Street on a curve to the right having a radius of 3173.22 feet, a central angle of 0° 52' 32", an arc distance of 48.49 feet, a tangent of 24.24 feet, a chord distance of 48.49 feet, and a chord bearing of N 0° 40' 19" E to an iron bar set;

3) Thence N 01° 06' 35" E and continuing along the proposed westerly right of way line of North Main Street and the existing westerly right of way line of North Main Street a distance of 412.07 feet to an iron bar set;

4) Thence S 88° 24' 51" E along grantor's northerly property line and the southerly right of way line of Stratavon Drive a distance of 48.00 feet to a point on said centerline of right of way and construction;

02734617-1 / 29750.01-0003                          3

WEIL:\97461208\10\73217.0004

5) Thence S 01° 06' 35" W along said centerline of right of way and construction a distance of 411.68 feet to a point of curve;

6) Thence continuing along said centerline of right of way and construction on a curve to the left having a radius of 3125.22 feet, a central angle of 0° 53' 21", an arc distance of 48.50 feet, a tangent of 24.25 feet, a chord distance of 48.50 feet, and a chord bearing of S 0° 39' 54" W and returning to the True Place of Beginning and containing 0.507 acres of land of which 0.478 acres are within the present road occupied.

The above described area is contained within the Stark County Auditor's Permanent Parcel Number 9205819.

Grantor claims title by a deed recorded in Official Record 576 Page 991 of the Stark County Recorder's Office.

The basis of bearings used in this description is the Ohio North Zone, State Plane Coordinates, NAD 83 (1986).

Iron bars referred to as set are 1/2 inch in diameter, 30 inches in length, and topped with a M-E Companies cap.

**EXHIBIT "B"**

**WORK PLAN**

**WORK PLAN**

**Phase II Environmental Site Assessment**

**Former Hoover Stratavon Property,**
**North Main Street,**
**North Canton, Ohio**

Burgess & Niple, Inc. (B&N) has prepared this work plan for the City of North Canton, Ohio to conduct Phase II Environmental Site Assessment (ESA) activities following Voluntary Action Program (VAP) protocol at the former Hoover Stratavon Property (Stratavon) Property located on North Main Street, North Canton, Ohio. **Figure 1** displays the Site Location. The work plan for the Phase II ESA has been prepared pursuant to the findings of a VAP Phase I Environmental Site Assessment (ESA) prepared by B&N (July, 2020). The findings of the Phase I ESA indicated that a Phase II Property Assessment (PA) is required to define the nature and extent of identified and potential impacts to soil, groundwater, and vapor across the Property. The Phase II ESA will be conducted such that data can be used for a VAP Phase II PA and subsequent NFA submittal in the future once the eligibility issues have been rectified. The following sections provide a summary of the site history and a proposed scope of services to complete the Phase II ESA. It is important to note that the proposed scope may not be sufficient to fully comply with VAP protocol, depending on the complexity of the site hydrogeology and level of soil/groundwater impacts, if any.

**Site History**

A preliminary site investigation was performed by the U.S. EPA, who ordered the assessment when the Hoover Co. filed a notification to U.S. EPA stating that plating wastes had been disposed of on the Property by their company.

The Property was strip mined prior to 1968 for coal at depths less than 50 ft. The Hoover Co. then bought the Property in 1968 and began dumping unknown quantities of plating rinse wastes and solvent wastes from degreasing operations. In 1973, the Hoover Co. ceased dumping and sold it to Developers Diversified of Cleveland, Ohio. The site has since been inactive, although it is apparent that indiscriminate dumping of household and other construction and demolition debris was placed on the property at different times.

Observations during previous site reconnaissance performed by Ecology & Environment, Inc. Field Investigation Team (FIT) as tasked by the U.S. EPA, included a cement slab, approximately 8 ft. x 8 ft. in the northwest corner of the Property that appeared to be covering a hole, an area of black soot in the western part of the Property that prevented

vegetation growth, and an old roadway that ran from the southeast corner of the Property to the northwest corner. Within the southeast corner of the site, FIT observed a footpath with several berms, exposed drums, and other debris along it. During interviews of adjacent neighbors during the B&N Phase I, one resident stated that not only was Hoover disposing of wastes but some dumping was of municipal solid wastes (household trash).

**Phase II ESA**

The Phase II ESA will be completed in accordance with the protocol outlined for VAP in OAC 3745-300. Based upon the findings of the ASTM Phase I ESA prepared by B&N (July 2010), historical operations pose a higher possibility of impacts to soil and/or groundwater. This finding requires further investigation at the Property prior to redevelopment. Figure 1 displays the Property and the areas of potential historical release. The following tasks will be completed as part of the Phase II PA:

A. Field investigation including the following:

1. Subcontract and utility locating service for 2 days to clear proposed soil boring and monitoring well locations.

2. Installation of up to 50 soil borings, collect a maximum of 105 soil samples and 11 groundwater screening samples. The 105 samples include 5 QA/QC samples required under the VAP. In general, two soil samples will be collected per boring location and varying depth intervals. Soil samples will be submitted to a VAP-certified laboratory for analysis of RCRA/VAP metals, volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), polychlorinated biphenols (PCBs), and total petroleum hydrocarbons (TPH). Boring locations are subject to change and will be determined in the field based on access/lack of access and/or field observations.

3. Installation and development of up to 11 monitoring wells, where 8 monitoring wells will be installed in the first zone of saturation (assumed to be approximately 10 to 15 feet below ground surface (bgs), and 3 monitoring wells installed in the next lowest aquifer, or the unconsolidated/bedrock interface. The depth of the disturbed bedrock is approximately 50 feet bgs. Please note, that the location of the deeper monitoring wells will be determined after initial field activities and will be located as nested wells near three of the shallow well locations. Also note that locations may change based on access, or lack of access to that location.

4. Conduct a site survey of the monitoring well locations and soil boring locations to obtain lateral coordinates and elevations to aid in groundwater flow direction and elevation of any potential impacts.

5. Completion of one groundwater sampling event for the 10 newly installed monitoring wells. Groundwater samples will be submitted to a VAP-certified laboratory for analysis of RCRA metals, volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), and polychlorinated biphenols (PCBs). A second round of groundwater samples is also included.

6. Installation of 8 soil vapor sample locations. Collection of one grab soil vapor event at each of the 8 soil vapor sample locations. Vapor samples will be submitted to a VAP-certified laboratory for analysis of TO-15 VOCs.

7. The scope also includes sample, transport and disposal of up to 30 drums of investigative derived waste (IDW), consisting of drummed soil and water during the Phase II ESA investigation. The generator will be identified as the City of North Canton, Ohio.

B. Prepare a Phase II ESA Report which summarizes the findings of the field investigation in accordance with VAP protocol. The report will include a preliminary risk-based evaluation of data, figures, boring logs, photographs, and laboratory reporting.


**LIMITATIONS**

The scope of the Phase II ESA is based upon the information assembled and reviewed as part of the VAP Phase I PA. The proposed scope presented above includes the field investigation, data analysis, property-specific human health-based risk evaluation, and final Phase II ESA Report. However, the proposed scope does not include additional sampling and analysis that may be required based upon the findings of the defined field investigation, data gaps identified in the risk assessment, or potential comments or issues that may arise from discussions with Ohio EPA. In addition, the scope does not include the preparation of a VAP Phase II PA or the final preparation of the NFA deliverable.

Proposed sampling locations presented in **Figure 2** are subject to change depending upon site conditions or other information obtained from Ohio EPA, U.S. EPA or the seller.

HOOVER STRATAVON PROPERTY

# FIGURE 1

SITE LOCATION MAP

JULY 2020

SOURCE:
7.5 MINUTE  North Canton, OH U.S.G.S. QUADRANGLE MAP, 2019.

**BURGESS & NIPLE**
Engineers ▪ Environmental Scientists ▪ Geologists



STRATAVON ST. NW

N MAIN ST.

PROPERTY OUTLINE

LEGEND

● PROPOSED SOIL BORING LOCATION

✦ PROPOSED GROUNDWATER WELL
LOCATION

NOTE: 3 DEEP WELL LOCATIONS
ARE TO BE DETERMINED

SOURCE:
OGRIP Ohio Spatial Data Infrastructure Downloads.

HOOVER STRATAVON PROPERTY
FIGURE 2
PROPOSED SOIL BORING AND
WELL LOCATION MAP
JULY 2020

BURGESS & NIPLE
Engineers ■ Environmental Scientists ■ Geologists

## AMENDMENT TO REAL ESTATE SALE CONTRACT
### *North Canton, OH, Vacant Parcel #3243*

THIS AMENDMENT TO REAL ESTATE SALE CONTRACT ("Amendment") is made and entered into as of the 4th day of February, 2021, by and between KMART CORPORATION, a Michigan corporation (the "Seller") and CITY OF NORTH CANTON, OHIO, an Ohio municipal corporation, the "Purchaser" and, collectively with the Seller, the "Parties"). Any terms used herein but not defined herein shall have the meaning ascribed thereto in that certain Real Estate Sale Contract between the Parties dated September 9, 2020 (the "Purchase Agreement").

### RECITALS:

WHEREAS, Seller and Purchaser entered into the Purchase Agreement, whereby Seller agreed to sell and convey to Purchase, and Purchaser agreed to purchase and take title to, certain property located in the City of North Canton, County of Stark and State of Ohio, containing approximately 15.11 acres and being further described as Stark County Parcel No. 10002584 (the "Property"); and

WHEREAS, the Parties now desire to amend the Purchase Agreement pursuant to the terms and conditions contained in this Amendment.

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the Parties hereto agree to amend the Purchase Agreement as follows:

1.      Incorporation of Recitals.  The foregoing recitals are true and correct and are incorporated into this Amendment by reference.

2.      Purchase Price. The Parties hereby agree to delete Paragraph 2(a) of the Purchase Agreement in its entirety and replace it with the following:

Purchase Price. The Purchase Price of the Property shall be Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00) (the "Purchase Price") and payable by Purchaser in United States currency in good and certifiable funds at Closing.

3.      Indemnification. The Parties hereby agree to add the following language to Paragraph 11(a) of the Purchase Agreement:

Notwithstanding the foregoing, [1] Purchaser's obligations under this Section 11(a) are only to the extent such Hazardous Materials are introduced or caused by Purchaser or Purchaser Entities, and [2] Purchaser's obligations under this Section 11(a) for any Hazardous Materials (e.g., environmental contamination) shall only be to the extent Purchaser or Purchaser Entities exacerbates such Hazardous Materials.

4.      Assignment. The Parties hereby agree to add the following language to Section 20 of the Purchase Agreement:

Notwithstanding the foregoing, Purchaser may assign its right or obligations under this Contract to North Canton Community Improvement Corporation with notice to Seller but without Seller's prior written consent.

5.    _Amendments_. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, and all of such counterparts shall constitute one agreement. To facilitate execution of the Amendment, the parties may execute and exchange facsimile or electronic counterparts of the signature pages, and such counterparts shall serve as originals.

6.    _Conflict of Terms_. Except as expressly provided herein, the Purchase Agreement shall, in all other respects, remain as originally written. In the event of any conflict between the terms of Purchase Agreement and this Amendment, the terms of this Amendment shall prevail.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Amendment to be executed and delivered on the day and year first above written.

Seller:

**KMART CORPORATION**, a Michigan corporation

_February 4, 2021_
Date

By: William Gallagher
Its: Authorized Signatory

Purchaser:

**CITY OF NORTH CANTON, OHIO**, an Ohio municipal corporation

_____
Date

_____

By: Stephan B. Wilder
Its: Mayor

02874609-1 / 29750.01-0003

WEIL:\97819728\1\73217.0004

2

Notwithstanding the foregoing, Purchaser may assign its right or obligations under this Contract to North Canton Community Improvement Corporation with notice to Seller but without Seller's prior written consent.

5.    Amendments. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, and all of such counterparts shall constitute one agreement. To facilitate execution of the Amendment, the parties may execute and exchange facsimile or electronic counterparts of the signature pages, and such counterparts shall serve as originals.

6.    Conflict of Terms. Except as expressly provided herein, the Purchase Agreement shall, in all other respects, remain as originally written. In the event of any conflict between the terms of Purchase Agreement and this Amendment, the terms of this Amendment shall prevail.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Amendment to be executed and delivered on the day and year first above written.

Seller:

**KMART CORPORATION**, a Michigan corporation

_____            By: _____
Date

Its: _____

Purchaser:

**CITY OF NORTH CANTON, OHIO**, an Ohio municipal corporation

4 February 2021                     Stephan B. Wilder
_____
Date

By: Stephan B. Wilder
Its: Mayor