UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
In re : Chapter 11
:
SEARS HOLDINGS CORPORATION, et al., : Case No. 18-23538 (RDD)
:
Debtors.1 : (Jointly Administered)
--------------------------------------------------------------- x

**BY E-FILING**
United States Bankruptcy Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

**Re:    Sears Holding Corporation, et. al - Case No. 18-23538 (RDD)
        Richard Alberigi – OBJECTION TO EXPUNGMENT OF CLAIM**

To Whom It May Concern:

As a former Massachusetts employee of Sears, I am writing to object to Sears' request for expungement of my claim. The Notice Of Objection alleges that my "asserted claim is not supported by the Debtors' books and records or no supporting documents were provided for all or a portion of the claim." This is untrue; this objection should be rejected because I have provided ample documentation and support for claim of wages rightfully owed to me in the amount of $70,000.00.

With this writing, I have also included here further documentation, including Exhibit 1, my Affidavit and related materials, as further documentation of the wages owed to me, which were earned prior to Sears' bankruptcy filing. Additionally, I have provided further documentation of the monies owed to me and attached this documentation as Exhibit 2.

In total, I am seeking payment in the amount of $70,000.00 because of Sears' wrongful termination of my employment and Sears' violation of the Massachusetts Payment of Wages Act the Fair Labor Standards Act, and Sears' breach of the implied covenant of good faith and fair dealing under Massachusetts, as set forth below.

   I.    **REASONS WHY MY CLAIM SHOULD NOT BE EXPUNGED**

On August 15, 2018, Sears abruptly, and in bad faith, terminated my employment as a Commercial Account Manager. On September 11, 2017, Sears had hired me to work at Sears Auto Center, located in Peabody, MA, as the Auto Center Manager. I excelled in this role and transformed this facility from a broken store immersed in dissension into a premier store location with a team of top producing revenue and high customer service professionals. *See* Exhibit 1.

Less than a year later, Sears rewarded my excellent performance with a promotion to Commercial Account Manager (CAM) for a multi-state region that included Massachusetts, New Hampshire, Maine, Connecticut, and New York. This region was then expanded to even more store locations in February 2018. *See* Exhibit 1.

My success continued as I consistently distinguished myself as a top performer, regularly receiving commission awards during his tenure. Indeed, during the most recent quarter of my tenure, I achieved "Distinguished Performer" status. Because of this status and as part of Sears' compensation agreement, I was entitled to receive approximately $35,000.00 as additional compensation for my superior performance. *See* Exhibit 1.

At that time, I had not only met all of Sears' sales goals, but I had surpassed them by 198% of my goal. My market goal for the second quarter 2018 was $641,076.00. I was able to beat this goal by achieving $1,271,907.00 in sales.

Based on these figures, my incentive payout was set to be $35,000.00. As Exhibit 1 demonstrates, this amount was calculated from the Commercial Account Manager (CAM) Incentive Plan, which provided as follows:

QUARTERLY AUTO COMMERCIAL NET REVENUE PERFORMANCE/PAYOUT GRID FY2016 Quarterly CAM YOY % Commercial Net Revenue Growth   Quarterly Payout

| | | |
|---|---|---|
| Minimum Threshold | 0% | $0 |
| 15% | | $3,750 |
| Target | 30% | $7,500 |
| 35% | | $9,000 |
| 40% | | $10,500 |
| 45% | | $12,000 |
| Distinguished Performer | 50% | $13,500 |
| 55% | | $16,000 |
| 60% | | $18,500 |
| 65% | | $21,000 |
| 70% | | $23,500 |
| 75% | | $26,000 |
| 80% | | $28,500 |
| 85% | | $31,000 |
| 90% | | $33,500 |
| **95%** | | **$36,000** |
| 100% | | $38,500 |

Additional $2.5k per 5% incremental YOY% growth >100%

2

Indeed, as Exhibit 2 indicates, my September 11, 2017 offer letter from Sears states that "[o]ne way we reward great Company and individual performance is through our annual incentive plan" and confirms that if earned, such compensation "will be paid" to me. Sears has failed to demonstrate otherwise.

I was unfairly deprived of these wages with a hasty and abrupt termination in mid-August 2018. On August 13, 2018, I flew to Chicago for the quarterly meetings that were scheduled for the ensuing days. While in Chicago, I met with all team members as expected. The next day, on August 14, 2018, I and my colleagues gathered at the company's office for a day-long meeting, which concluded with a team dinner. After dinner, when all employees arrived at the hotel, I was scheduled to meet with my superior, Mr. Reginald Philips, for an 8:00 a.m. meeting.

On August 15, 2018, I met with Mr. Philips as scheduled. This meeting was also attended by Alden Cummings. During this meeting, I was told that I was being "let go" and Mr. Philips handed me a check dated 8/16/2018 for unused earned vacation time. This check did not include the earned wages that were due in the amount of $35,000.00. As for any contention that my position was not needed, should be rejected in light of the fact that just days later, Sears posted my job online. *See* Exhibit 3.

### A. **VIOLATION OF THE WAGE ACT**

I believe the failure to pay my incentive compensation in the amount of $35,000.00 was a violation of the Massachusetts Payment of Wages Act (the Act), which provides that "[e]very person having employees in his service" shall pay "wages earned by him" within specified time frames. G.L. c. 149, § 148, and such payments include bonuses and commissions. With its 2008 amendments, G.L. c. 149, § 150 made clear that violations of Massachusetts' wage and hour laws subject to mandatory treble damage awards without the discretion of the court. 2008 Mass. Acts c. 80.

Accordingly, an employer is strictly liable and violations, as they occurred here, entitle me to treble damages and attorney's fees based on Sears' violation. Dixon v. City of Malden, 464 Mass. 437 (2013). Even in Dixon, where the employer claimed that the plaintiff employee suffered no damages as a result of its violation, the court admonished the employer as follows: "[c]ontrary to the city's assertion, a violation of the Wage Act results in damages. The court was emphatic: it is settled law that the Wage Act 'impose[s] strict liability on employers.'" Dixon v. City of Malden, 464 Mass. at 452, quoting Somers v. Converged Access, Inc., 454 Mass. 582, 592 (2009)).

Any contention that the incentive monies due to me do not constitute "commissions" or "wages" within the meaning of the Wage Act is erroneous and inconsistent with Massachusetts law. See McAleer v. Prudential Ins. Co. of Am., 928 F. Supp. 2d 280 (D. Mass. 2013). In McAleer, for example, the court held that although an employer may exercise discretion in the administration of the commission plan, commissions which were determinable at the time of an employee's termination were not discretionary, even where language had been inserted indicating that the award of commissions is discretionary. See McAleer v. Prudential Ins. Co. of Am., 928 F. Supp. 2d 280 (D. Mass. 2013) (motion to dismiss denied); see also Barthel v. One Cmty., Inc., 233 F.

3

Supp. 2d 125 (D. Mass. 2002) (Act expressly includes commissions; issue of due and payable sufficiently raised by pleadings to survive motion to dismiss).

Here, there cannot be any dispute that the monies due to me were determinable at the time of my unlawful termination on August 15, 2018 – the same day such monies were scheduled to be paid to me, as my documentation attached in Exhibits 1 and 2 demonstrates. Failure to pay me these wages violates the Massachusetts Wage Act and entitles me to not only receive the amount payable ($35,000.00), but actually treble that amount ($105,000.00). See DeSantis v. Commonwealth Energy System, 68 Mass. App. Ct. 759 (2007) (affirming Superior Court decision ruling that commissions that had been earned and were due constituted wages under G.L. c. 149, § 148, and court's decision trebling damages).

Such information and documentation more than amply demonstrates that these monies are owed to me. For similar reasons, I also believe I am entitled to these wages because of the Fair Labor Standards Act.

### B. **VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Additional grounds also support my claim for these unpaid wages. By terminating my employment and failing to pay my wages that were due on August 15, 2018, Sears has violated the implied covenant of good faith and fair dealing long established under Massachusetts law. Indeed, the evidence demonstrates that Sears intentionally and deliberately terminated me on August 15, 2018 to avoid paying me the wages that were due to me – and were in fact distributed to other employees - on that very date.

The Fortune-Gram line of Massachusetts cases articulates the duty of good faith and fair dealing in the employment setting and establishes indisputably that in Massachusetts that an employer owes an employee a duty to act in good faith and fair dealing in any termination, and that by failing to pay me the revenues that were due to me, Sears breached this duty. Indeed, by doing so, Sears was unjustly enriched by depriving me of the $35,0000.00 that I had fairly earned and legitimately expected.

In the Supreme Judicial Court's seminal decision in Fortune v. National Cash Register Co., 373 Mass. 96 (1977), the court expressly recognized that an employer owes an employee an obligation of good faith and fair and that that such duty precludes an employer from terminating an at-will employee in "bad faith" for the purpose of depriving the employee of benefits or compensation due or forthcoming at the time of discharge. Id. at 100-101. Here, Sears terminated me when I was on the "brink" of receiving my commission payable in the amount of $35,000.00 in violation of the implied covenant of good faith and fair dealing.

Fortune involved an at-will contract between a salesman and employer that required the salesman be paid a salary and bonus for sales. The salesman was terminated shortly before the receipt of a substantial sale, and just prior to when his commission would be paid to him. In upholding the verdict in the salesman's favor, the Court held that his termination was made in "bad faith" and constituted a breach of the implied covenant of good faith and fair dealing. While the

4

court recognized the general rule that at-will contracts allow termination "without reason," it also recognized that it was "the general requirement in this Commonwealth that parties to contracts and commercial transactions must act in good faith toward one another." Id. Citing to the Uniform Commercial Code, it called the duty of good faith and fair dealing between parties "pervasive requirements in [Massachusetts] law." Id. The court further determined the finding of bad faith was supported by evidence that the termination was motivated by a desire to pay the salesman as little as possible of the bonus credit otherwise due or for which he was on the "brink" of earning. Id.

In its subsequent decision in Gram v. Liberty Mutual Insurance. Co., 384 Mass. 659 (1981), the Supreme Judicial Court again addressed the issue of good faith and fair dealing in at-will employment. There it was held that even where there is no "bad faith" as to the termination, a termination without "good cause," resulting in deprivation of reasonably ascertainable "compensation based on past services," was actionable pursuant to the duty of good faith and fair dealing. Id. Here, especially with undisputed evidence of my excellent performance, no good cause supports Sears's termination decision.

Against this backdrop, it is clear that my claim for breach of the implied covenant of good faith and fair dealing is not only actionable, but buttressed by substantial evidence of Sears' misconduct and bad faith in terminating me.

## II.    CONCLUSION

Given these facts, this documentation and the applicable Massachusetts law, my claim should not be expunged. Indeed, I am entitled to recover approximately $105,000.00 as part of my claims, but for purpose of compromise, I am willing to resolve this matter with payment in the amount of $70,000.00.

Thank you for your time and attention to this matter.


Very truly yours,

/s/ Richard Alberigi

Richard Alberigi

## AFFIDAVIT OF RICHARD ALBERIGI

1. On August 15, 2018, I was abruptly, and in bad faith, terminated by my employer, Sears Holding Corporation ("Sears") as a Commercial Account Manager.

2. I am fifty-three years old and have been in the auto business on and off since approximately 1984. I have also worked in the beverage, telecom and software business for several years.

3. During November of 2016, Sears hired me at Sears Auto Center, located in Peabody, MA, as the Auto Center Manager.

4. During a brief nine-month period, I transformed this facility from a broken store failing to produce a profit and immersed in dissension into a premier store location with a team of top producing revenue and high customer service professionals.

5. Less than a year later, I was rewarded with an excellent performance review and promotion to Commercial Account Manager (CAM) for the northeast region, which included Massachusetts, New Hampshire, Maine, Connecticut, and New York.

6. This region was then expanded to even more store locations in February 2018. My success continued as I consistently distinguished myself as a top performer, regularly receiving commission awards during my tenure with Sears.

7. Indeed, during the most recent quarter of my tenure, I achieved "Distinguished Performer" status and was due to receive approximately $35,000.00 for my superior performance, in accordance with the incentive plan detailed in Exhibit A, attached hereto.

8. I had not only met all sales goals, but had surpassed them by 198% to goal. My market goal for the second quarter 2018 was $641,076.00. I was able to beat this goal by achieving $1,271,907.00 in sales.

9. Based on these figures, my incentive payout was set to be $35,000.00. This amount was calculated from the Commercial Account Manager (CAM) Incentive Plan, which provided as follows:

QUARTERLY AUTO COMMERCIAL NET REVENUE PERFORMANCE/PAYOUT GRID FY2016 Quarterly CAM YOY % Commercial Net Revenue Growth   Quarterly Payout $s*

| | | |
|---|---|---|
| Minimum Threshold | 0% | $0 |
| 15% | | $3,750 |
| Target | 30% | $7,500 |
| 35% | | $9,000 |
| 40% | | $10,500 |
| 45% | | $12,000 |

| | | |
|---|---|---|
| Distinguished Performer | 50% | $13,500 |
| | 55% | $16,000 |
| | 60% | $18,500 |
| | 65% | $21,000 |
| | 70% | $23,500 |
| | 75% | $26,000 |
| | 80% | $28,500 |
| | 85% | $31,000 |
| | 90% | $33,500 |
| | **95%** | **$36,000** |
| | 100% | $38,500 |

Additional $2.5k per 5% incremental YOY% growth >100%

10. I, however, was unfairly deprived of these wages with a hasty and abrupt termination in mid-August 2018.

11. On August 13, 2018, I flew to Chicago for the quarterly meetings that were scheduled for the ensuing days.

12. While in Chicago, I met with all team members as expected. The next day, on August 14, 2018, I, along with my colleagues, gathered at the company's office for a day-long meeting, which concluded with a team dinner.

13. After dinner, when all employees arrived at the hotel, I was scheduled to meet with my superior, Mr. Reginald Philips, for an 8:00 a.m. meeting.

14. On August 15, 2018, I met with Mr. Philips as scheduled. This meeting was also attended by Alden Cummings. During this meeting, I was told that I was being let go and Mr. Philips handed me a check dated 8/16/2018 for my unused earned vacation time.

15. This check did not include the earned wages that were due in the amount of $35,000.00. See Exhibit B, Sears' Wage Verification for Richard Alberigi.

16. Notably, Mr. Phillips also provided me with a new plane ticket to leave earlier than the one I had been scheduled to fly home on.

17. While other team members headed to company headquarters, I was driven to the airport, having been terminated and without my earned $35,000.00 commission.

18. Against this backdrop, I believe I am entitled to my earned $35,000.00 commission and request prompt payment of these wages.

19. I expressly reserve the right to amend and supplement this statement and my accompanying proof of claim form, and he expressly reserves the right to setoff, if applicable.

2

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS DATE, MARCH 27, 2019.

/s/ Richard Alberigi

_____

RICHARD ALBERIGI

# EXHIBIT A

## Commercial Account Manager (CAM) Incentive Plan (CAM01)
### 2016 Plan Summary (Effective Date – 1/31/16)

**PROGRAM OBJECTIVES**
- Simplification
- Net Revenue Growth
- Motivate sales behaviors and ownership of the Commercial Business in the CAM assigned territories

**ELIGIBLE ASSOCIATES***

Salaried associates in the following position are eligible to participate:  TG1012 – Commercial Account Manager

*Please refer to Program Rules for eligibility requirements.

**PROGRAM PERIOD**

The program begins on January 31, 2016 (fiscal year 2016) and eligible incentive, if any, will be paid quarterly based upon fiscal quarterly Year-Over-Year (YOY) (e.g. Q1 FY16 vs. Q1 FY15) percentage growth of individual Auto Commercial Net Revenues.  Quarterly YOY performance greater than 0% is required to be eligible for a quarterly incentive payout under the program.  Quarterly Commercial Net Revenue Growth goals will be provided individually to each CAM.

**TARGET TOTAL CASH AND INCENTIVE STRUCTURE**

Incentive calculations are all calculated using the corresponding performance level of the grid below and will be interpolated between corresponding performance levels.

### QUARTERLY AUTO COMMERCIAL NET REVENUE PERFORMANCE/PAYOUT GRID

| | FY2016 Quarterly CAM YOY % Commercial Net Revenue Growth | Quarterly Payout $s* |
|---|---|---|
| **Minimum Threshold** | 0% | $0 |
| | 15% | $3,750 |
| **Target** | **30%** | $7,500 |
| | 35% | $9,000 |
| | 40% | $10,500 |
| | 45% | $12,000 |
| **Distinguished Performer** | 50% | $13,500 |
| | 55% | $16,000 |
| | 60% | $18,500 |
| | 65% | $21,000 |
| | 70% | $23,500 |
| | 75% | $26,000 |
| | 80% | $28,500 |
| | 85% | $31,000 |
| | 90% | $33,500 |
| | 95% | $36,000 |
| | 100% | $38,500 |
| | | Additional $2.5k per 5% incremental YOY% growth >100% |

\* Incentive payout calculations are interpolated between corresponding performance levels in table.

**QUARTERLY AUTO COMMERCIAL NET REVENUE PERFORMANCE/PAYOUT**
- A minimum Quarterly Net Revenue performance YOY greater than 0% is required in order to receive a quarterly payout.
- The incentive plan will pay specific and escalating amounts for each whole percentage point of Quarterly Net Revenue growth YOY with the following three levels of payout per each percent of growth:
    - $250 payout for every percent of growth between 1%-30% over prior year per performance per applicable quarter
    - $300 payout for every percent of growth between 31%-50% over prior year per performance per applicable quarter
    - $500 payout for every percent of growth greater than 50% over prior year per performance per applicable quarter
- Incentive payout is uncapped. Quarterly performance above 100% will be paid an additional $2,500 per 5% incremental quarterly YOY% growth greater than 100%.
- Commercial Net Revenue for the Auto BU is defined as:
    - Gross Revenue less off-invoice ('back-end') discounts given to certain commercial National Fleet and National Dealer accounts not reflected at the point of sale.

**PAYOUT INFORMATION AND EXCEPTIONS**

Any disputes or exceptions, based on scenarios not previously contemplated, will be reviewed by an Incentive Review Committee which will consist of at a minimum:
- DVP, Human Resources
- Auto BU President
- Auto BU CFO
- Auto BU CMO

All decisions by the Incentive Review Committee will be final.

- Once the fiscal period is closed and the performance metric achievements are validated, program payments will be calculated.
- Any applicable payout to associates will be processed and paid as soon as administratively feasible, and typically within 30 days upon completion of the fiscal quarter.
- All incentive payments will be clearly identified in associate's paycheck statements and are subject to federal, state and local taxes as well as 401(k) deductions.
- Associates will receive a payout statement after the completion of each fiscal quarter.

**PROGRAM RULES**

Program rules include, but are not limited to the following:
- New associates, or associates who change job assignments or classification (for example, from hourly to salaried or from salaried to hourly) during the performance period will be eligible for a pro-rata portion of the incentive based on the number of full days worked on active payroll in an incentive-eligible position during the performance period.
- Changes related to a job title change will be effective on the applicable payroll change date.
- Associates on a <u>leave of absence</u> during the performance period will be eligible for a pro-rata portion of the bonus based on the number of full days worked on active payroll during the performance period, provided they fulfill all other eligibility requirements for payout. Short-term disability leave periods are considered as being actively at work and exempt from the pro-ration. Associates on Military Leave are considered active during that leave period and are governed by the same eligibility and pro-rata payment rules as other active associates.
- Associates <u>must be active on payroll</u> at the time the incentive is paid in order to be eligible for payment.

Other program rules mirror the existing SHC AIP Administrative Guidelines.

The company expects to continue all benefit and bonus plans, but reserves the right to modify, amend or terminate any or all of the plans at any time. Incentive and bonus plans, in particular, are changed/modified periodically including performance targets that affect incentive and bonus payouts. These plans can be changed or suspended at management's discretion. This document should not be interpreted as a contract of employment, nor does it change the "At-Will" employment relationship.

# EXHIBIT B

*Sears Holdings Corp*
*c/o Conduent Inc, 510 W Parkland Dr, Sandy, UT 84070*

ALBERIGI,RICK
Service Date: 11/28/2016

Hourly/Salaried: Salaried

Address: 19 ARLINGTON STREET
AMESBURY, MA 01913

Termination Date: 8/15/2018

Emplid: 91024427799

Job Title: Commercial Account Mgr

Unit: - 59072

Department: 59072CMFD1

Employment Status: Terminated

Pay Rate Hourly: $33.65

---

I hereby certify that the information entered on this report is true and correct.

_____

HRS Representative

Date: 8/23/2018     Time: 11:32:03PM

Query Name: ASC_INQ_EMPL_INFO_JBCD

## Sears Holdings Corp
c/o Conduent Inc, 510 W Parkland Dr, Sandy, UT 84070

1-888-88SEARS

---

### Wage Verification
#### Gross Wages & Hours Report

---

Emplid: 91024427799

Name: ALBERIGI,RICK

| Pay End Date | Gross Pay | Regular Hours | Other Hours |
|---|---|---|---|
| 12/3/2016 | 1,201.93 | 0.00 | 0.00 |
| 12/17/2016 | 2,403.85 | 0.00 | 0.00 |
| 12/31/2016 | 2,403.85 | 0.00 | 0.00 |
| 12/31/2016 | 146.98 | 0.00 | 0.00 |
| 1/14/2017 | 3,127.65 | 0.00 | 0.00 |
| 1/28/2017 | 2,403.85 | 0.00 | 0.00 |
| 2/11/2017 | 2,406.54 | 0.00 | 0.00 |
| 2/25/2017 | 2,403.85 | 0.00 | 0.00 |
| 3/11/2017 | 2,403.85 | 0.00 | 0.00 |
| 3/25/2017 | 2,403.85 | 0.00 | 0.00 |
| 4/8/2017 | 2,403.85 | 0.00 | 0.00 |
| 4/22/2017 | 2,403.85 | 0.00 | 0.00 |
| 5/6/2017 | 2,403.85 | 0.00 | 0.00 |
| 5/20/2017 | 2,403.85 | 0.00 | 0.00 |
| 6/3/2017 | 2,403.85 | 0.00 | 0.00 |
| 6/17/2017 | 2,403.85 | 0.00 | 0.00 |
| 7/1/2017 | 2,403.85 | 0.00 | 0.00 |
| 7/15/2017 | 2,403.85 | 0.00 | 0.00 |
| 7/29/2017 | 2,403.85 | 0.00 | 0.00 |
| 8/12/2017 | 2,403.85 | 0.00 | 0.00 |
| 8/26/2017 | 2,403.85 | 0.00 | 0.00 |
| 9/9/2017 | 2,403.85 | 0.00 | 0.00 |
| 9/23/2017 | 1,201.93 | 0.00 | 0.00 |
| 9/30/2017 | 2,916.67 | 0.00 | 0.00 |
| 10/15/2017 | 2,916.67 | 0.00 | 0.00 |
| 10/31/2017 | 2,916.67 | 0.00 | 0.00 |
| 11/15/2017 | 2,916.67 | 0.00 | 0.00 |
| 11/30/2017 | 2,916.67 | 0.00 | 0.00 |
| 11/30/2017 | 185.30 | 0.00 | 0.00 |
| 12/15/2017 | 2,916.67 | 0.00 | 0.00 |
| 12/31/2017 | 2,916.67 | 0.00 | 0.00 |
| 1/15/2018 | 2,916.67 | 0.00 | 0.00 |
| 1/31/2018 | 2,916.67 | 0.00 | 0.00 |
| 2/15/2018 | 6,666.67 | 0.00 | 0.00 |

SEARS                Page 1 of 3                August 23, 2018

-7

Emplid: 91024427799

Name: **ALBERIGI,RICK**

| Pay End Date | Gross Pay | Regular Hours | Other Hours |
|---|---|---|---|
| 2/28/2018 | 2,916.67 | 0.00 | 0.00 |
| 3/15/2018 | 2,916.67 | 0.00 | 0.00 |
| 3/31/2018 | 2,916.67 | 0.00 | 0.00 |
| 4/15/2018 | 2,916.67 | 0.00 | 0.00 |
| 4/30/2018 | 2,916.67 | 0.00 | 0.00 |
| 5/15/2018 | 2,916.67 | 0.00 | 0.00 |
| 5/25/2018 | 11,100.00 | 0.00 | 0.00 |
| 5/31/2018 | 2,916.67 | 0.00 | 0.00 |
| 5/31/2018 | 265.95 | 0.00 | 0.00 |
| 6/15/2018 | 2,916.67 | 0.00 | 0.00 |
| 6/30/2018 | 2,916.67 | 0.00 | 0.00 |
| 7/15/2018 | 2,916.67 | 0.00 | 0.00 |
| 7/31/2018 | 2,916.67 | 0.00 | 0.00 |
| 8/15/2018 | 2,916.67 | 0.00 | 0.00 |
| Total: | $130,822.32 | 0.00 | 0.00 |

Emplid: 91024427799

Name: ALBERIGI,RICK

| Pay End Date | Gross Pay | Regular Hours | Other Hours |
|---|---|---|---|
| | | | |

Sears' pay frequency for this associate is semi-monthly and received on the Friday following the pay end date.

I hereby certify that the information entered on this report is true and correct.

_____
HR Support Representative



September 11, 2017

Rick Alberigi
19 Arlington Street
Amesbury, Massachusetts 01913

Congratulations!

Rick, we are pleased to extend to you our offer to join Sears, Roebuck and Co., a Sears Holdings Corporation Company, in the position of Commercial Account Manager - New England reporting to MICHAEL FERGUSON. This letter outlines the details of our offer and key elements that will help you solidify your decision.

Your start date will be September 15, 2017. If this date needs to change for any reason, please do not hesitate to contact us.

**Compensation**
You are an exempt associate and will be paid an annual salary of: $70000 on a salary basis in accordance with applicable law. You will receive this salary at the rate of $1346.15 per week regardless of the number of hours you work during that work week as those hours will vary, and your salary is intended to compensate you for all hours that you work. We have a talent management approach that encompasses dynamic feedback that enables us to recognize and be recognized for the value we add to the company.

**Variable Compensation**
As all positions are structured differently, please see remaining sections for details that pertain to your role.

**Bonus**
You will receive a one-time sign-on bonus of $$2,000 (Gross). This sign-on bonus will be payable on the pay period following thirty (30) days from your start date. In the event you voluntarily terminate your employment with SHC or are terminated by SHC for misconduct or integrity issues within twelve (12) months of your start date, you will be required to repay the full amount of the payment paid to you, including any taxes withheld, unless prohibited by law, to SHC within thirty (30) days of your last day worked.

**Incentive**
One way we reward great Company and individual performance is through our annual incentive plan. You will be eligible for an annual target incentive opportunity of 0% of your base salary. Your award for this fiscal year will be prorated based on your start date. Any incentive payable with respect to a fiscal year will be paid by April 15 of the following fiscal year.

**Relocation**
You will be eligible for relocation assistance in accordance with Sears Holding's standard relocation policy. In order to receive relocation assistance, you will be required to sign the Sears Holdings Relocation Repayment Agreement. The Agreement will be included in the Relocation Benefits package that will be sent to you from the Company's relocation vendor. Repayment is required under circumstances specifically outlined in the Agreement. The repayment obligation encompasses all relocation benefits paid to you and on your behalf, including all tax assistance.

**Benefits**
In addition to the above, during the course of your employment, you will be entitled to participate in a variety of benefits available to salaried associates, including medical, dental and long-term disability. Your benefits coverage will begin on your first day of employment provided you enroll within your eligibility period. You will also be eligible to begin participation in the 401(k) savings plan on the first day of the third month following your date of hire. The Company expects to continue its benefit programs, but reserves the right to modify, amend or terminate any or all of the benefit programs at any time.

**Vacation**

We also understand how important it is to get away from work from time to time, so you are eligible to receive 4 week(s) paid vacation, which will be pro-rated during your first year of service based on your start date. In addition, you will receive up to six paid National Holidays each year. In accordance with Company policy, you may be eligible for personal/sick days.

**Associate Discount Points Program (ADPP)**
Once on payroll, associates who become Shop Your Way members are eligible for discounts on certain merchandise and services purchased for various Sears Holdings business. The discount is in the form of Shop Your Way points, redeemable on future purchases. Eligibility is determined by the line of business in which you work and subject to the terms and conditions of the Associate Discount Points Program.

**Employment At Will**
While we hope this is the beginning of a long and rewarding career, as with all of our associates, your employment with the Company is "at will," and not for a specific term. You or the Company may terminate the employment relationship at any time for any reason, with or without cause or notice. This letter is not a contract of employment and you should not regard it, or other statements, policies or representations, as such.

**Pre-Hire Screening**
As part of our process, you must successfully complete a background check and/or a pre-employment drug test prior to your start date. Your offer and employment are contingent upon satisfactory reference checks, the results of the background check and/or a drug test, and on timely completion of the Form I-9. Accordingly, you should be aware of the following:

- If applicable, you will need to complete the drug test within two business days of your acceptance of the offer. You will schedule your drug test in our system. Please bring government issued photo identification when taking the drug test.
- You must successfully complete the background check. In the event that the Company receives background check information after your employment starts that either contradicts the information you provided during the application process and/or that would preclude employment, the Company reserves the right to terminate your employment immediately. Please note that a conviction record will not automatically preclude employment.

- Section 1 of the Form I-9 must be completed on or before your first day of work. Supporting documentation must be provided within three days of your hire date. Details on how you can complete Section 1 and the documents you must provide will be included with your Welcome Letter. You will need to review this information carefully to ensure timely completion. If your eligibility to work cannot be verified or if you do not timely provide supporting documentation within three days of your hire date, you may be subject to termination.

Rick, we are looking forward to you joining us. I am sure you will make an important contribution to the success of the Company and Sears Holdings Corporation. This offer is valid until September 14, 2017. If you need additional information or clarification, please do not hesitate to contact me.

Sincerely,

NICK TAYLOR
Nick.Taylor@searshc.com

https://jobs.sears.com/en-US/job/commercial-account-manager-new-england/J3P2VQ7907HBG29MSCM

# Commercial Account Manager - Northeast in Braintree, MA at Sears Auto Center

Date Posted: 8/21/2018

Share With:

Not Ready To Apply?

## Job Snapshot

- **Employee Type:**
  Full-Time

- **Location:**
  250 Granite Street
  Braintree, MA

- **Date Posted:**
  8/21/2018

- **Job ID:**
  947563BR



## About Us

Sears Auto Center is a leading provider of personalized, trusted automotive maintenance and repair solutions delivered through a certified team of experts. By proudly investing it its people, products and technology, Sears Auto Center is entirely dedicated to serving the individual needs of its customers. Sears Auto Center offers comprehensive automotive services and products, including tires, DieHard® batteries, oil changes, brakes and alignments at 500 conveniently-located stores nationwide. Sears Auto Center is a division of Sears, Roebuck and Co., a subsidiary of Sears Holdings Corporation, and has a long history as America's trusted place for car care, having offered automotive parts since 1905 and service since 1931. For more information, visit www.SearsAuto.com/careers

## Job Description