**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| SEARS HOLDINGS CORPORATION, et al., | : | Case No. 18-23538 (RDD) |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------x

     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holding Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, LLC (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR-Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rice, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holding Publishing Company, LLC (5554); Sears Protection Company (Florida), LLC (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 1700 Broadway, 19th Floor, New York, New York 10019.

**To:** The chambers of the Honorable Robert D. Drain, United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601;

Weil, Gotshal, & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, Esq., Jacqueline Marcus, Esq., Garrett A. Fail, Esq., and Sunny Singh, Esq.), attorneys for the Debtors;

Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Philip C. Dublin Esq., Ira Dizengoff, Esq., and Sara Lynne Brauner, Esq.), attorneys for the Official Committee of Unsecured Creditors appointed in these cases.

---

**RESPONSE OF MARSHALL LINDQUIST IN OPPOSITION TO OBJECTION OF DEBTORS TO PROOF OF CLAIM No. 9701 (OBJECTION REFERENCE No. 214) AND IN SUPPORT OF ALLOWANCE OF THAT CLAIM**

---

NOW COMES Marshall Lindquist, claimant in Claim No. 9701 (Objection Reference No. 214), who opposes Debtors' Objection to this Claim and, in support of the allowance of the Claim, shows to the Court the following.

I filed claim No. 9701 to collect the back pay owed to me pursuant to a labor arbitration award (copy attached to this response). I calculated that pay. Debtors never objected to my calculations; nor did they inform me of any claimed deficiency. The calculation was done after a review of my lost earnings and the Company's records of earnings for the person who worked in my place.

The claim should be allowed in full as a priority to the maximum extent possible under the law. I can provide any further information needed, if necessary.

Respectfully Submitted,

Marshall Lindquist
43734 Palisade
Canton, Michigan 48187
Phone: 734-693-6419
Email: Mgl230@hotmail.com

I certify that a copy of this Response was sent by UPS, Second Day delivery, to each of the following:

The chambers of the Honorable Robert D. Drain, United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601;

Weil, Gotshal, & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, Esq., Jacqueline Marcus, Esq., Garrett A. Fail, Esq., and Sunny Singh, Esq.), attorneys for the Debtors;

Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Philip C. Dublin Esq., Ira Dizengoff, Esq., and Sara Lynne Brauner, Esq.), attorneys for the Official Committee of Unsecured Creditors appointed in these cases.

enclosure

**IN THE MATTER OF THE
VOLUNTARY ARBITRATION
BETWEEN**

SEARS, ROEBUCK & CO.,

           Employer,

-and-                                  Gr.:   Marshall Lindquist/Termination

TEAMSTERS LOCAL 243,

           Union.

* * *

**ARBITRATION OPINION AND AWARD**

* * *

<u>APPEARANCES</u>

Skelly Harper, Esq.                             Scott D. Soldon, Esq.
Seyfarth Shaw                                   Soldon Law Firm, LLC
Two Seaport Lane, Suite 00            3924 N. Harcourt Place
Boston, MA 02210                       Shorewood, WI 53211

## ISSUE

### WAS THE DISCHARGE FOR
### JUST CAUSE, AND IF NOT,
### WHAT SHOULD BE THE REMEDY?

Marshall Lindquist, an on-site technician with nine years of seniority, was terminated on June 21, 2017 for a post-accident drug test that was positive for marijuana. A grievance was filed on June 23, 2017 seeking reinstatement and a make whole remedy.

Sears denied the grievance, in part, because "The Grievant was properly tested as he appeared to cause or contribute to an on-the-job accident that resulted in property damage of One Hundred Dollars ($100) or more."

A transcribed arbitration hearing was held on March 6, 2018. Testifying for Sears were: Clayton Holmes, General Manager for Product Repair Services and Susan Rapp, Director of Labor and Associate Relations. Testifying for the Union was Jim Cianciolo, President, Teamsters Local 243. Post-hearing briefs were submitted.

## BACKGROUND

On June 15, 2017 Mr. Lindquist, who drives a van to repair appliances at the customer's home, was in a car accident that he maintains was caused by the other driver. He was not ticketed.

The Sears van sustained over $100 of damage. Mr. Lindquist was not injured, and did not require medical attention. He was drug tested following the accident and tested positive for marijuana, leading to his termination.

Sears has a Company plan of drug testing, which is modified by Section 2 of Article XIX of the Drug Testing provision of the contract. Section 2 states:

2

**ARTICLE XIX**

**DRUG TESTING**

\* \* \*

Section 2 DRUG TESTING MODIFICATION OF COMPANY PLAN

    1. Delete any reference to: Retroactive pay will not apply even if the case does not result in a conviction. However, if the associate is not convicted, he/she will be reinstated provided it is resolved satisfactory (sic) before the leaves expires.

    2. If a split sample test result returns a "negative" test result Sears will pay for the cost of the test. A "positive" test will be paid for by the associate.

    3. Change all references to "a report (from reliable source) of drug or alcohol use during or immediately before work, or" to the following: a report (from reliable source verified by a manager) of drug or alcohol use during or immediately before work, or

    4. The Drug Consent Form must be given to the associate prior to the employee being tested for drugs or alcohol.

    5. All associates will be suspended pending the results of any reasonable cause drug test, associates will be paid for all time suspended if "negative" test results.

Post accident drug and alcohol tests are required when an associate appears to cause or contribute to an on-the-job accident that:

On-Site Technicians

    .results in injuries that require medical attention (more than first aid) and
    .results in lost time, and
    .results in the impairment of business operations, or
    .results in property damage of one hundred dollars ($100.00) or more

3

<u>Inside Technicians/Support Associates</u>

.results in injuries that require medical attention (more than
first aid) and
.results in lost time, and
.results in the impairment of business operations, or
.results in property damage of one hundred dollars ($100.00)
or more

(a)    All time spent involved in the testing procedure and/or
training will be paid for at the associates' classification rate of pay and
considered as hours worked for all purposes.  All scheduled hours
shall be paid at the applicable pay rates.

(b)    Associates must notify management immediately
concerning any accidents.  Associates shall be sent for testing
immediately upon notification to management.

(c)    Drugs and alcohol testing will be administered on a
uniform basis for all associates.  In order to assure uniformity the
Company will designate a manager to determine what associates
should be tested.  The manager will list on the clinic form whether
drug or alcohol tests are required.

(d)    On-Site Technicians awaiting results of a drug or alcohol
test, except random, will be placed on a training program for their
division until the test results are known.  It is understood that during
this period technicians shall not diagnose or repair merchandise.  The
on-site technicians training shall be at the associates' domicile/location
and the associate shall be permitted to commute to the training classes
with their service truck or at the Company's expense.

(e)    Failure by the company to comply with the Drug and
Alcohol resting policy implemented on April 4, 2008 and as modified
by this Section shall warrant the following remedy:

1. Test results will be voided.

2. If the parties are unable to resolve any grievance related to
this issue, the arbitrator shall have the authority to issue a remedy.

3. Sears agrees to bargain over any changes in a Drug Testing
program, prior to their implementation with the Union.

4

          4. The Union has the right to challenge any termination or
suspension through the grievance procedure.

Clayton Holmes, the general manager for product repair, supervised Mr. Lindquist. He said

that Sears always drug tests when there is an accident with damage over $100, or when the employee

is injured in the accident.

Mr. Holmes referenced an accident involving a Mark Chapman in May of 2015, who was sent

for drug testing. Chapman was not injured and tested negative for drugs. Mr. Holmes also cited a

Glenn Lamoreaux, who was sent for testing following an accident, and who was not injured.

Lamoreaux also tested negative for drugs. A Cass Edwards was also tested following an accident

where he was not injured. Edwards tested negative for drugs.

Mr. Holmes testified that there have been four previous cases, including Mr. Lindquist, where

the employee tested positive following a post-accident drug test. Two of the cases involved vehicular

accidents and one involved an injury to a James McFadden at a home. Mr. Holmes said that he

advised the Union president of the situations where the employee tested positive.

Mr. Holmes testified that a Dennis Salamango resigned prior to his termination for a positive

test. He also said that a William Vendzuh was terminated after a vehicular accident and a positive

test for cocaine. Mr. Holmes contends that the Company terminates in all cases where there is a

positive test.

Mr. Holmes said that in over half of the positive test cases following an accident, the

employee was not at fault for the accident. He adds that the Union did not grieve when the tests were

negative. However, Mr. Holmes said that notification was not sent to the Union for a negative test.

Mr. Holmes indicated that Mr. Vendzuh sought treatment for his injury.

Susan Rapp, the director of Labor and Associate Relations, was first involved in the negotiations for the 2008-2011 contract. She said that there were no changes to the direct testing provisions of the contract in the 2011-2014 and the 2014-2017 contracts.

Ms. Rapp testified that in 2008 management achieved gains in the drug testing provision, when a Last Chance Agreement was removed and the threshold for accident testing was reduced from $500 to $100. There was also an update to reference the drug-free workplace policy of the Company.

Ms. Rapp testified that she received a letter from Mr. Cianciolo, in regard to Vendzuh, where Mr. Cianciolo indicated, among other things, that the discharge would be converted to a voluntary retirement and "the settlement of the grievance would be on a non-precedent basis for future or like cases." Ms. Rapp did not contest the representations by Mr. Cianciolo.

Jim Cianciolo, the Local president, became the chief negotiator for contracts with Sears in 1993. He indicated that the 1996 contract was the first with drug testing language. Mr. Cianciolo added that the four bullet points at issue were first introduced into the 1999-2000 contract, when he was the lead negotiator for the Union. Article XVIII of that contract said:

## ARTICLE XVIII

## DRUG TESTING

\* \* \*

## DRUG TESTING MODIFICATION OF COMPANY PLAN

\* \* \*

Post accident drug and alcohol tests are required when an associate appears to cause or contribute to an on-the-job accident that:

6

On-Site Technicians
- Results in injuries that require medical attention (more than first aid) and
- results in lost time, and
- results in the impairment of business operations, or
- results in property damage of five hundred dollars ($500.00) or more.

Shop Technicians/Inside Associates
- results in injuries that require medical attention (more than first aid) and
- results in lost time, and
- results in the impairment of business operations, and
- results in property damage of five hundred dollars ($500.00) or more.

Mr. Cianciolo testified that the bullet points were placed into the contract because:

> THE WITNESS:    Well, the bullets were put in because of the language and the drug policy where they had the right to amend or modify it, and we could bargain over it. But we wanted to have more extensive language on some things that they couldn't change. That's why we put the four bullets in for the on-site technicians and also for the shop technicians and the inside associates. The Company's policy at the time was basically – not basically, it was the results and injuries that required medical attention (more than first aid) was a stand alone. The results in lost time was a stand alone. The results in impairment of business operations was a stand alone, and the results in property damage of $500 or more was a stand alone. And then they didn't differentiate, as I recall, between shop technician/inside associates where the language is slightly different. We wanted that in there to lessen the company's ability to issue drug testing and people where they would be terminated for drug testing.

> Q.    When you say they were stand alone points, what do you mean by that, Cinci?

> A.    Well, if you would look at the policy it would be that if you had a result – an accident that resulted in an injury that required medical attention, and I don't remember off the top of my head if it said (more than just first aid), that was an offense that the employee could be – or the associate could be discharged for. That resulted in lost time, that would be an

7

incident that the employee or associate could be discharged for and so on.

Q.    So was it that any one of the four bullet points could result in a test?

A.    Yes. (T. 82-83.)

Mr. Cianciolo testified that the 1994 Policy Book allowed the Company to test when any of the four listed factors occurred.  The Policy said:

## OUR ASSOCIATE DRUG TESTING PROGRAM

➤Sears limits associate drug testing to certain specific situations: post-accident and reasonable cause.

- Post-accident testing means that drug and alcohol tests are required when an associate appears to cause or contribute to an on-the-job accident that...

  - results in injuries that require medical attention more than first-aid,

  - results in lost time,

  - results in property damage of $500 or more, or

  - results in the impairment of business operations.

The 2002-2005 contract had the following language on drug testing:

## ARTICLE XVIII

## DRUG TESTING

\* \* \*

## DRUG TESTING MODIFICATION OF COMPANY PLAN

\* \* \*

8

Post accident drug and alcohol tests are required when an associate appears to cause or contribute to an on-the-job accident that:

On-Site Technicians

- Results in injuries that require medical attention (more than first aid) and
- results in lost time, and
- results in the impairment of business operations, or
- results in property damage of five hundred dollars ($500.00) or more.

Shop Technicians/Inside Associates

- results in injuries that require medical attention (more than first aid) and
- results in lost time, and
- results in the impairment of business operations, and
- results in property damage of five hundred dollars ($500.00) or more.

Mr. Cianciolo said that when the $500 threshold was lowered to $100 in the 2008-2011 negotiations, there was no discussion about the four points required before drug testing.

Mr. Cianciolo testified that grievances had never been filed over negative drug test results. He said, "If they don't get in trouble, they don't file grievances." He added that he has never been made aware by the Company of negative test results. However, Mr. Cianciolo said that if there is a positive result, he is advised by Mr. Holmes that there is going to be a termination.

Mr. Cianciolo said that Mr. Salamango did not file a grievance, and that he was never notified about his case. Regarding McFadden, Mr. Cianciolo said the employee was treated in the ER and was off work for a couple of days. Therefore, he contends that the employee was injured unlike Mr. Lindquist, who was uninjured.

9

Mr. Cianciolo states that he sent a letter to Ms. Rapp on the McFadden grievance indicating that it was being settled on a non-precedent setting basis. He indicated that she did not tell him that his understanding was incorrect.

Mr. Cianciolo further said that Ms. Rapp never indicated that the Vendzuh settlement was not on a non-precedential basis.

Mr. Cianciolo testified that this is the first case where the criteria is present to create the need to challenge the Company's Drug Testing Policy. He said:

> A.    Well, they would have met items with respect to the on-site technicians, they would have met the criteria of they had medical attention more than just first aid, they would have had lost time, and they would have had either impairment of business operations or property damage in excess of $100.

> Q.    So there's never before been a grievance raising the issue that we've discussed here today?

> A.    Not that I'm aware of other than the Lindquist case. (T. 91.)

Mr. Cianciolo testified that it was the Union that prepared the language on bullet points for the on-site technicians that is found in the contract.

The Local president further indicated that he advised the Company, when their bullet points were first introduced in the 1999 contract:

> Q.    What did you tell the company about why you added "and, and, and/or"?

> A.    To make it more difficult for them to give a drug testing, a drug test to the people, to restrict it and to make sure that it was in the contract so that they wouldn't change it. That was the whole purpose of section 2. To put some things that we're uncomfortable with into that CBA. (T. 100.)

Mr. Cianciolo added:

10

THE WITNESS: I recall when in the 19 - when this language went in 1999 to 2002, we wanted to put this language - you asked me.

MR. SOLDON: Go ahead.

THE WITNESS: Okay. We wanted to put this language into the contract so that it wouldn't be changed - the contract language couldn't be changed with respect to these bullets, because the company had a right to amend or modify the drug program. So we put it in. We made these changes, and the purpose of the changes were to make it more restrictive for the company to give drug tests. Not only for on-site technicians but inside technicians and support associates. Those associates had to meet all four bullet points in order to be tested. We developed this language, made the changes, discussed the changes and eventually agreed to them.

BY MR. HARPER:

Q.    When I asked you do you recall anything that was said at the bargaining table, do you understand what I'm asking?

A.    I think so.

Q.    What's your understanding of that question?

A.    My understanding of that question is what we discussed. We discussed bullet 1 with the and, bullet 2 with the and, bullet 3 with the or and bullet five with a dollar amount. (T. 103-104).

Mr. Cianciolo stated at T. 105-196:

THE WITNESS:    I was asked why I wanted it in the contract. The reason why I wanted it in the contract was to restrict the company's ability to just test for any one of the three issues. We proposed the language that is there today, other than the $100 it was $500. We said "and" so that they would have to meet the requirement of the first bullet and the second bullet. And then we put in the "and" so that they would meet the requirement of the third bullet or the fourth bullet in the inside technician, support associates we put in the "and" because that would require them and it was explained that they would have to meet the first criteria, results in injuries that require medical attention (more than first aid) and,

11

second bullet, result in lost time and results in impairment of
business operations and results in property damage of $100 or
more. That's what we discussed. That's what was agreed to.
That's what was explained. I hope I answered your question.
(T. 105-106.)

Mr. Cianciolo additionally said:

> Q.  So just so I understand your reading of the language,
> your reading is that bullet 3 and bullet 4, they have to
> have one or the other, correct?
>
> A.  Yes. Well, 1, 2 and then 3 or 4.
>
> Q.  So here it's not disputed that 2 is present and 1 is not,
> correct?
>
> A.  Correct. (T. 109.)

Mr. Cianciolo said that changing the order of the bullet points in 4 and 3 did not change the
intent.

## POSITION OF THE UNION

Initially, it is argued that the drug testing in this case was improper because there is no proof
that Mr. Lindquist caused or contributed to causing an on-the-job accident as required by the Drug
Testing provision of the contract. Further, drug testing is contended to be impermissible because Mr.
Lindquist did not sustain an injury requiring medical attention. It is maintained that the Company
must prove bullet point 1, bullet point 2 and either bullet point 3 or 4.

Subsection E is argued to require that the test results be voided, since the Company failed to
prove the contractual basis for drug testing Mr. Lindquist.

The 2008 Sears Drug Testing Policy is argued to fail to supersede the contract. The plain
meaning of the contract, as well as the bargaining history are said to support the Union's position.

12

Sears's position in this arbitration is said to render the Union's gains in bargaining totally superfluous, because the Employer's position returns the parties in the situation prior to the changes that were made in the collective bargaining agreement regarding the four bullet points.

A past practice is denied because the specific circumstances in this case have never previously occurred. The prior negative tests are said to be without precedent, because employees do not file grievances when they are not harmed. It is further argued that Local 243 is not notified of negative drug tests.

The prior case of Vendzuh is argued to have been settled on a non-precedential basis. Salamango, it is argued, resigned before a grievance was filed and McFadden received medical treatment and settled on a non-precedential basis. The other two cases are also argued to have been settled on a non-precedential basis.

## POSITION OF THE COMPANY

It is argued that since 2008 there has been a practice of testing for drugs after an accident exceeding $100 in damage to the Company vehicle. Further, it is asserted that the Union never disputed testing based upon the language referring to appearing to cause or contributing to the accident.

The Company disagrees with the Union's position that an injury is always a pre-condition to a drug test, but rather contends that $100 of damage is a stand-alone basis for testing. The Employer also references the language, "Associates must notify management immediately concerning any accidents. Associates shall be sent for testing immediately upon notification to management."

The past practice is said to show that many employees are not injured in accidents, yet, are drug tested when there is $100 of damage. The Company contends that the Union was well aware

13

of the practice. The Employer further emphasizes that the Union drafted the language in contention, and led Sears to believe that the damage threshold following an accident was a sufficient basis for drug testing.

It is further argued that following the elimination of the Last Chance provision, the Union agreed that termination was required for a positive test.

The Employer asserts that the Union never communicated during bargaining what it purports to be its position regarding the four bullets in this case. Mr. Cianciolo's testimony is argued to fail to support the Union's position. The Company contends that if the language is intended to mean what the Union asserts, "There would have been no reason for the Union to invert bullets 3 and 4."

The Company's reading of the disputed language is argued to be superior to the Union's. Because Lindquist met the $100 threshold for damage following the accident, it is argued that he was properly drug tested. The Employer further maintains that the Union cannot explain the comma in the third bullet.

The Employer argues that the Union proposed the language that led the Company to believe that the $100 threshold was an independent basis for drug testing. It asks that the grievance be denied.

## DISCUSSION

I have carefully considered the evidence and the well-reasoned arguments of the attorneys; however, I will focus only on those areas that are relevant to my decision.

Initially, there is sufficient evidence to conclude that Mr. Lindquist appeared to cause or contributed to an on-the-job accident, which is the first basis for drug testing. The evidence does not show that he caused the accident, but there is enough in the record for a conclusion that he contributed to the accident. Therefore, the predicate for a consideration of the four bullet points has been proven.

14

## THE MEANING OF THE FOUR BULLET POINTS

The four bullet points were first introduced into the 1999-2002 contract and state:

Post accident drug and alcohol tests are required when an associate appears to cause or contribute to an on-the-job accident that:

On-Site Technicians
- Results in injuries that require medical attention (more than first aid) and
- results in lost time, and
- results in the impairment of business operations, or
- results in property damage of five hundred dollars ($500.00) or more.

The use of the word **or** after impairment of business and before resulting in $500 of property damage suggests an alternative. *The Random House Dictionary of the English Language* defines **or** as: "used to connect words, phrases, or clauses representing alternatives".

Therefore, the impairment of business and $500 of damages could be alternatives under the Union's position. However, it could also represent an alternative to the three prior bullet points, consistent with the Employer's position. The contract is therefore ambiguous, and it is necessary to use contract construction techniques to determine the intent of the parties.

## SHOULD THE DISPUTED CONTRACT LANGUAGE BE CONSTRUED AGAINST THE UNION, SINCE IT DRAFTED IT?

The Union drafted the bullet point language, and Sears argues that it should be responsible for any ambiguities. However, University of Michigan law professor and arbitrator Theodore St. Antoine writes in his paper, "Ten Most Common Errors in Contract Interpretation":

X.    ERROR NINE:    In a dispute over the meaning of language in a collective bargaining agreement, doubts are always resolved against the party that drafted the provision.

15

A.   Correction:   Although there is some reason to hold the draftsperson responsible for ambiguities in the language used, this is an interpretive rule that is generally applied as a last resort, and in instances where one party has little or no control over the terminology (e.g., insurance contract, retail sales contracts). In collective bargaining, the negotiators on both sides are likely to be experienced, knowledgeable, and deeply involved in the choice of words. There is thus usually less justification for construing contract language against the drafting party.

Sears is both sophisticated and knowledgeable in labor relations. The parties have a mature relationship. Accordingly, the contract language should not be construed against the Union.

## IS PARAGRAPH (b) OF PARAGRAPH 5
## OF SECTION 2 APPLICABLE?

The Company contends that the following language requires testing in this case:

(b)    Associates must notify management immediately concerning any accidents. Associate shall be sent for testing immediately upon notification to management.

However, the prior language on when post-accident testing is required is specific to on-site technicians, and includes the four bullet points. Specific provisions of the contract control over more general ones, and the specific four bullet points control the result in this case. Further, applying paragraph (b) in this case would render the bullet point language superfluous. It is a basic tenet of contract interpretation that all provisions of a contract should be applied. Therefore, paragraph (b) does not determine the result.

16

## IS THERE A BINDING PAST PRACTICE?

The past practice of the parties can be used to interpret ambiguous contract language. Richard Mittenthal in "Past Practice and the Administration of Agreements", (Arbitration in Practice, Zack Ed., ILR Press, 1984) explains that a binding past practice requires mutual acceptability, clarity and consistency and longevity and repetition.

The Company presented numerous cases where employees tested negative after an accident. However, the local is not informed of a negative result, so as to be in a position to challenge the testing. Further, the employees that tested negative did not file grievances, with the Union explaining that employees do not grieve when there is no harm.

I am persuaded that the necessary element of mutual acceptability is missing in regard to the cases where the employees tested negative. Those cases do not support a past practice.

In regard to the three cases other where employees tested positive, there was a case where the employee resigned before termination, and this would not be relevant to a practice, since there was no opportunity for a grievance. There are also situations where positive test cases were resolved without precedent.

A definitive past practice was not established; however, the evidence supports some existence of a practice that is supportive of the Employer's position.

17

## DOES THE BARGAINING HISTORY
## SUPPORT THE UNION'S POSITION?

The bargaining history of the parties can prove the intent of the parties when there is ambiguous contract language. Elkouri and Elkouri in "How Arbitration Works" (BNA 8th Ed. 9.3.A.i.c.) states:

> Precontract negotiations frequently offer a valuable aid in the interpretation of ambiguous provisions. Where the meaning of a term is in dispute, it will be deemed, if there is no evidence to the contrary, that the parties intended it to have the same meaning as that given it during the negotiations leading up to the agreement.

The Local president, Jim Cianciolo, explained that he discussed at the table that the Company would have to meet the first two bullet points (injury and lost time) and either impairment of business operation or the threshold for accident damage. Mr. Cianciolo testified:

> THE WITNESS:    I was asked why I wanted it in the contract. The reason why I wanted it in the contract was to restrict the company's ability to just test for any one of the three issues. We proposed the language that is there today, other than the $100 it was $500. We said "and" so that they would have to meet the requirement of the first bullet and the second bullet. And then we put in the "and" so that they would meet the requirement of the third bullet or the fourth bullet. In the inside technician, support associates we put in the "and" because that would require them and it was explained that they would have to meet the first criteria, results in injuries that require medical attention (more than first aid) and, second bullet, result in lost time and results in impairment of business operations and results in property damage of $100 or more. That's what we discussed. That's what was agreed to. That's what was explained. I hope I answered your question. (T. 105-106.)

The Company challenges Mr. Cianciolo's explanation of the bargaining history. However, there is no indication that Mr. Cianciolo is anything but an honorable person. Certainly, Sears has

18

not alleged that it cannot trust him in his dealings with the Union over the many years that he has led the Local.

If I were to disregard Mr. Cianciolo's bargaining history, I would inappropriately impugn his integrity, and perhaps would irrevocably harm the bargaining relationship between Sears and Local 243. I am not prepared to do this. The bargaining history supports the Union's interpretation.

## WHAT SHOULD BE THE RESULT?

At a minimum the bargaining history, which supports the Union, is in equipoise with the past practice, which somewhat supports the Employer. This is a just cause discharge case where Sears has the burden of proof. Based upon the bargaining history, there is insufficient proof to support the Employer's position and the discharge.

Further, just cause requires that employees have notice of the rules that they are said to have violated. Elkouri and Elkouri state at 15.3.f.x:

> Concerning notice of the rules, one arbitrator stated that 'an employee can hardly be expected to abide by the rules of the game if the employer has not communicated those rules, and it is unrealistic to think, after the fact, an arbitrator will uphold a penalty for conduct that an employee did not know was prohibited.

The Grievant may not have properly understood that he could be drug tested even without an injury, based upon the ambiguous contract language. Therefore, this represents an additional reason for granting the grievance.

Based primarily upon the testimony of Union president Cianciolo, the grievance should be granted. Further, paragraph (e) of Section 2 on drug testing states that: "The failure of the Company to comply with the drug and alcohol testing policy implemented on April 4, 2008 and as modified by this Section, shall warrant the following remedy:

1.    Test results will be voided."

19

Since the test results must be voided, the Grievant should be reinstated with seniority and made whole.

**AWARD**

For the foregoing reasons, the grievance is granted. Mr. Lindquist shall be reinstated with seniority and made whole, less earnings from other employment and unemployment compensation, if any. I will retain jurisdiction for six months for problems, if any, with the remedy. However, the expenses of arbitration are due immediately.

*Mark J. Glazer*
Mark J. Glazer
Arbitrator

Dated:   June 13, 2018