**EXHIBIT F**

**Weil, Gotshal & Manges LLP**

CONFIDENTIAL
BY E-MAIL

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Jennifer Brooks Crozier**
+1 (212) 310-8005
Jennifer.Crozier@weil.com

February 11, 2021

Sean A. O'Neal
Samuel L. Levander
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470
soneal@cgsh.com
slevander@cgsh.com

**Re: In re Sears Holdings Corp. Chapter 11 Cases, Case No. 18-23538 (RDD) in the U.S. Bankruptcy Court for the Southern District of New York**

Dear Sean and Sam:

We write in response to your letter, dated February 1, 2021, concerning the cash and cash equivalents held as of the Closing Date in certain bank accounts owned by the Debtors' (i) Indian subsidiaries (the "**Indian Bank Accounts**"), (ii) former Hong Kong subsidiaries (the "**Hong Kong Bank Accounts**"), and (iii) former Sparrow subsidiaries (the "**Sparrow Bank Accounts**" and, collectively with the Indian Bank Accounts and Hong Kong Bank Accounts, the "**Subsidiary Bank Accounts**") (the "**Subsidiary Cash**" or "**Cash**").[1]  Contrary to the assertions in your letter, the Subsidiary Cash (approximately $6.8 million in total) belongs to the Debtors under the APA, and the Debtors are not estopped from demanding that Transform turn the Cash over to the Debtors immediately.

Your letter claims that, under Section 2.13(a) of the APA, Transform acquired "'all of the equity interests' in the Indian and Hong Kong subsidiaries, together with all of the assets . . . and liabilities held by such entities."  By selectively quoting Section 2.13(a), you both misconstrue the language and ignore the purpose of that provision.  The first sentence of Section 2.13(a) provides, in pertinent part:

> On the Closing Date, [] the Sellers shall use reasonable best efforts to cause such of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred[,] assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall use reasonable best efforts to purchase, all right,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement dated as of January 17, 2019 by and among Transform Holdco LLC, Sears Holdings Corporation, and Its Subsidiaries (as may be amended, restated, modified, or supplemented from time to time, the "**APA**").

Sean A. O'Neal  
Samuel L. Levander  
February 11, 2021  
Page 2

**Weil, Gotshal & Manges LLP**

> title and interest of each of the Foreign Subsidiaries, in, to or under all assets, properties and rights Related to the Business *(other than the Excluded Assets)* and any other *assets of the type that would have been Acquired Assets* had they been owned by the Sellers as of the Closing Date . . . .

APA § 2.13(a) (emphasis added).  The meaning of this sentence—when all of the words are included instead of your ellipses—is clear.  To the extent Transform chose to purchase the assets and assume the liabilities of the Foreign Subsidiaries, Transform would purchase only those assets that would have been Acquired Assets had the Sellers held them as of the Closing Date and would assume only those liabilities that would have been Assumed Liabilities had the Sellers been liable for them as of the Closing Date.  Under no circumstances would Transform acquire assets that would have been Excluded Assets had they been owned by the Sellers as of the Closing Date or assume liabilities that would have been Excluded Liabilities had the Sellers been liable for them as of the Closing Date.

The purpose of the sentence is likewise clear.  The governing principle of the sale transaction embodied in the APA was the balance struck between Acquired (and Excluded) Assets and Assumed (and Excluded) Liabilities.  *See* APA §§ 2.1-2.4; *see also* Kamlani Dep. 44:19-46:22, Jan. 23, 2019.  Consistent with the rest of the APA, under Section 2.13(a), that same balance applies to any potential subsequent transactions involving ***non-Debtor entities*** like the Foreign Subsidiaries.  Transform was purchasing Acquired Assets and assuming Assumed Liabilities—not Excluded Assets or Excluded Liabilities.  The APA expressly preserved that construct even where the target assets or liabilities belonged to the Foreign Subsidiaries.

The second sentence of Section 2.13(a) provides, in pertinent part:

> If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire all of the equity interests in any Foreign Subsidiary *in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a)*, then the Sellers shall use reasonable best efforts to transfer such equity interests, which equity interests shall be deemed to be Acquired Foreign Assets.

APA § 2.13(a) (emphasis added).  In short, Transform could, in its sole discretion, choose to take equity in the Foreign Subsidiaries instead of the assets and liabilities of the Foreign Subsidiaries that Transform was otherwise entitled to acquire and assume pursuant to the first sentence of Section 2.13(a).  But nowhere in that second sentence (or in the rest of Section 2.13(a) or the APA) did the Parties provide or even suggest that Transform's unilateral decision to take equity in the Foreign Subsidiaries could somehow upset the above-described balance or permit Transform to take what would have been Excluded Assets or Excluded Liabilities in the hands of the Debtors.  Your reading of that sentence is (i) belied by the sentence itself, which makes clear that Transform was only swapping equity for assets—not obliterating the Acquired/Excluded construct that underpins the entire APA; (ii) inconsistent with the meaning and purpose of Section 2.13(a) as a whole and, thus, inconsistent with fundamental principles of

Sean A. O'Neal  
Samuel L. Levander  
February 11, 2021  
Page 3

**Weil, Gotshal & Manges LLP**

contract interpretation; and, finally, (iii) antithetical to the governing principle of the sale transaction about which Mr. Kamlani testified more than two years ago.[2]

Your letter next argues that that the Debtors' position would mean that "Transform acquired the non-Debtor subsidiaries shorn of all cash, claims, contracts, leases and other assets." That is wrong. You ignore the fact that Transform acquired all of the non-Debtor assets that would have been Acquired Assets in the hands of the Debtors as of the Closing Date—just not assets that were specifically carved out as Excluded Assets, i.e., "all cash and cash equivalents."

Finally, you claim that the Debtors are equitably estopped and barred by the doctrine of laches from asserting a demand for the Subsidiary Cash. This argument is completely meritless for at least two reasons.

*First,* in order to prevail on a laches or equitable estoppel defense to the Debtors' claim for turnover of the Subsidiary Cash, Transform would have to establish, among other things, that the Debtors' alleged "delay" in asserting their claim was unreasonable or inexcusable (laches) or misleading (estoppel). This Transform cannot do.

As an initial matter, since even before the Closing, the Debtors and their advisors have been forced to spend inordinate amounts of time and resources enforcing the terms of the APA against Transform and collecting Excluded Assets that, post-Closing, were either in Transform's control and not turned over without a fight or in the control of third parties who were unwilling to turn them over without a court order (which often also entailed a fight with Transform). In dispute after dispute—from the Debtors' first Motion to Enforce the Asset Purchase Agreement [ECF No. 2796, Mar. 11, 2019] to their Motions to Compel Turnover of Estate Property [ECF Nos. 6084 and 9106, Nov. 22, 2019 and Nov. 19, 2020]—the Debtors and their advisors have had to contend with Transform's interpretations of the APA that ranged from questionable to absurd (and this one is no exception). Accordingly, any suggestion that the Debtors have been "sleeping on their rights" these last two years rings very hollow.

Further complicating matters, the Debtors' advisors have had to rely for their part in this seemingly never-ending struggle upon information supplied by Transform's Finance Department, which at times has been less than transparent or forthcoming. For example, in late January 2019, Sears's Finance Department (which became Transform's Finance Department) represented to M-III, the Debtors' financial advisor, that there would be "at most" $1 to $1.5 million in the Indian Bank Accounts at Closing, that recovering that cash would be difficult or impossible, and that there "could" be $0 in the Hong Kong Bank Accounts at Closing. It was therefore entirely reasonable for the Debtors to prioritize the litigation of disputes involving much greater sums (e.g., $166 million) and seeking the turnover of assets that we understood to

---

[2] For these reasons, Transform's first argument—that the Subsidiary Cash cannot be an "Excluded Asset" under the APA—is irrelevant. The Parties addressed the treatment of assets like the Subsidiary Cash (i.e., ensured they would be treated like Excluded Assets) in Section 2.13(a).

Sean A. O'Neal  
Samuel L. Levander  
February 11, 2021  
Page 4

**Weil, Gotshal & Manges LLP**

be far more valuable (e.g., $5.5 million in property-tax refunds), over attempts to recover what the Debtors reasonably believed was, at most, $1 million to $1.5 million from India and nothing from Hong Kong.

The Debtors' post-Closing efforts to investigate whether other Debtor or Debtor-related entities—including the Foreign Subsidiaries—might in fact hold cash or cash equivalents as of the Closing Date was long, laborious, and complicated for a variety of reasons, including those described above (i.e., the protracted APA litigation and Transform's control over relevant information) and also because M-III, which undertook the investigation, is heavily involved in the time-consuming business of administering the Debtors' Estates. Ultimately, however, M-III's investigation culminated in the discovery that the Foreign Subsidiaries had indeed held large amounts of cash (significantly more than $1-1.5 million) as of the Closing Date. Our January 25, 2021 letter followed.

For all of these reasons, there has been no unreasonable, inexcusable, or misleading delay here. On the contrary, the Debtors' timing with respect to the Subsidiary Cash has been entirely reasonable and, indeed, influenced in no small part by Transform's lack of transparency and the many baseless and unsupportable positions Transform has taken concerning the interpretation of the APA over the course of the last two years.

*Second,* Transform must also establish that it suffered material prejudice or injury as a result of the Debtors' purported delay in order to prevail on a laches or estoppel defense. Transform knew (or reasonably should have known), based upon a plain reading of the APA, that at any point it could expect to receive a demand from the Debtors to turn over the Subsidiary Cash. And, in any event, Transform neither has pointed nor can point to any prejudice or injury here.

For example, you complain that the Debtors demanded the Subsidiary Cash only after Transform paid the Indian Gains Tax based upon valuations provided by the Debtors that included the cash in the Indian Bank Accounts. If, however, uncovering the truth about the cash had been easier, or if Transform had simply offered, pursuant to its obligations under the APA, to transfer the cash to the Debtors, the Debtors would have taken the cash and it would not have been in the Indian Bank Accounts to be valued. In any event, the Debtors are prepared to reimburse Transform for the relatively *de minimis* portion of the approximately $250,000 USD Indian Gains Tax attributable to the cash in the Indian Bank Accounts at the time of the valuation when Transform turns the Subsidiary Cash over to the Debtors.

Likewise, your assertion that we somehow acted in "bad faith" by not sending our letter until after Transform's agent transferred $300,000 to the Debtors pursuant to the Closed-Claims Dispute Letter Agreement ignores Transform's history of refusing to turn over what it had already agreed belonged to the Debtors without trying to extract some benefit for itself in return. The Debtors were justifiably concerned that if they sought the Subsidiary Cash from Transform before Transform satisfied its obligations under the Closed-Claims Dispute Letter Agreement, Transform might use it as an excuse not to satisfy those obligations. For that reason, we admittedly held our letter for a couple of weeks until after

Sean A. O'Neal  **Weil, Gotshal & Manges LLP**
Samuel L. Levander
February 11, 2021
Page 5

we had confirmed receipt of that payment.  Transform can hardly claim that it was prejudiced by that decision.

For all of the reasons set forth above, Transform is obligated under the APA to transfer the Subsidiary Cash to the Debtors.  The Debtors, therefore, reiterate their request that Transform take all necessary steps to effectuate the transfer to the Debtors of the Subsidiary Cash (**$6,817,438 USD** in total) immediately.  While the Debtors are prepared to act swiftly and definitively in pursuit of their interests, the Debtors understand that $6.8 million is a significant sum and that the Cash may be held in various bank accounts around the globe. In light of these circumstances, the Debtors are prepared to consider an equitable, appropriate, and organized plan for payment of the Subsidiary Cash.  Absent receipt of such a plan by **5:00 p.m. ET** on **Friday, February 19, 2021**, the Debtors will have no choice but to once again seek relief from the Bankruptcy Court.

We look forward to hearing from you.

Sincerely,

*s/ Jennifer Brooks Crozier*

Jennifer Brooks Crozier


cc: Jared R. Friedmann, Esq.
    Jacqueline Marcus, Esq.
    Naomi Munz, Esq.
    Hayden Guthrie, Esq.