WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus
Jared R. Friedmann
Jennifer Brooks Crozier

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                                       :
                                                            :       **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,                   :
                                                            :       **Case No. 18-23538 (RDD)**
                                                            :
        Debtors.[1]                                         :       **(Jointly Administered)**
------------------------------------------------------------x

## DEBTORS' REPLY IN FURTHER SUPPORT OF
## THIRD MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: SHC Holdings Corporation (0798) ("**SHC**"); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); SHC Operations LLC (4331); SHC, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); SHC Development Co. (6028); SHC Holdings Management Corporation (2148); SHC Home & Business Franchises, Inc. (6742); SHC Home Improvement Products, Inc. (8591); SHC Insurance Services, L.L.C. (7182); SHC Procurement Services, Inc. (2859); SHC Protection Company (1250); SHC Protection Company (PR) Inc. (4861); SHC Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a SHC, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); SHC Brands Business Unit Corporation (4658); SHC Holdings Publishing Company, LLC. (5554); SHC Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); SHC Brands, L.L.C. (4664); SHC Buying Services, Inc. (6533); Kmart.com LLC (9022); and SHC Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

I.      Preliminary Statement.................................................................................1

II.     Argument and Authorities ..........................................................................2

    A.      The Subsidiary Cash Belongs to the Debtors Under Sections 2.13(a),
        2.2(f), and 2.1(ee) of the APA; Transform's Objection to the Debtors'
        Motion Does Not Warrant a Different Conclusion.................................2

        1.      Transform's Reliance upon the First Clause of the Third Sentence
            of Section 2.13(a) of the APA Is Misplaced. ................................3

        2.      Transform's Argument Concerning the Purported Significance of
            the Term "in Lieu of" in the First Clause of the Third Clause of
            Section 2.13(a) of the APA Is Unavailing. ..................................4

        3.      The Parties' Use of "Deemed" in the Third Sentence Shows that
            the Parties Intended that Transform Would Only Take Acquired
            Foreign Assets under Section 2.13(a) of the APA. .....................5

        4.      The Debtors' Interpretation of Section 2.13(a) of the APA Provides
            For the Only Commercially Reasonable Result...........................7

    B.      The Debtors Are Neither Barred by the Doctrine of Acquiescence Nor
        Equitably Estopped from Pursuing and Recovering the Foreign Subsidiary
        Cash.....................................................................................9

        1.      The Debtors Have Not Acquiesced in Transform's Appropriation
            of the Foreign Subsidiary Cash.................................................9

        2.      Because Transform Did Not Lack the Knowledge or the Means of
            Obtaining the Knowledge of the Truth of the Debtors' Entitlement
            to the Foreign Subsidiary Cash, the Debtors Are Not Equitably
            Estopped from Asserting a Claim to the Cash. ..........................14

III.    Conclusion ...............................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Family Mortg. Corp. v. Acierno*,
    1994 Del. LEXIS 105 (Del. Mar. 28, 1994) ..........................................................................14

*Cantera v. Marriott Senior Living Servs., Inc.*,
    No. 16498, 1999 WL 118823 (Del. Ch. Feb. 18, 1999) .......................................................9, 10

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*,
    2012 Del. Ch. LEXIS 171 (Del Ch. Aug. 7, 2012)................................................................14

*Delta Air Lines, Inc. v. Bombardier, Inc.*,
    No. 1:20-CV-3025-GHW, 2021 WL 1163702 (S.D.N.Y. Mar. 25, 2021) ...............................6

*Hallisey v. Artic Intermediate, LLC*,
    2020 Del. Ch. LEXIS 331 (Del. Ch. October 29, 2020)........................................................14

*HC Cos. v. Myers Indus.*,
    2017 Del. Ch. 833 (Del. Ch. Dec. 5, 2017)...........................................................................14

*Heron Bay. Prop. Owners Ass'n v. Cootersunrise*,
    LLC, 2013 Del. Ch. LEXIS 157 (Del. Ch. June 17, 2013).....................................................14

*Hinton v. Rolison*,
    175 So.3d 1281 (Miss. 2015).................................................................................................6

*In re Hyegu Cho*,
    2016 WL 3597890 (Bankr. D. Me. June 27, 2016) ................................................................6

*Johnson v. Rambo*,
    No. C06-5258 RJB, 2006 WL 2401113 (W.D. Wa. Aug. 18, 2006).......................................6

*Julin v. Julin*,
    787 A.2d 82 (Del. 2001) .......................................................................................................13

*Klassen v. Allegro Dev. Corp.*,
    C.A. No. 8626-VCL, 2013 WL 5739680 (Del. Ch. Oct. 11, 2013)........................................13

*In re Lucas*,
    477 B.R. 236 (Bankr. M.D. Ala. 2012)..................................................................................5, 6

*Pellaton v. Bank of New York*,
    592 A.2d 473 (Del. 1991) .....................................................................................................3

*In re Shawe & Elting LLC*,
C.A. No. 9661-CB, 2015 WL 4874733 (Del. Ch. Aug. 13, 2015) ..........................................13

*Vila v. BVWeb Ties LLC*,
C.A. No. 4308-VCS, 2010 WL 3866098 (Del. Ch. Oct. 1, 2010).....................................13, 14

*Wohl v. Owen*,
580 N.Y.S.2d 854 (Sup. Ct. 1992)..............................................................................................6

**Statutes**

11 U.S.C. § 365(d)(4) ..................................................................................................................6

**Other Authorities**

*Deem*, Black's Law Dictionary 446 (8th ed. 1999) ...................................................................5, 6

Byron F. Egan, "Whether to Do an Asset Purchase," *Choice, Governance & Acquisition of Entities 7.III* (State Bar of Texas), 2018 WL 3407862 (2018)..........................8

Thomas Mantecon, *Mitigating Risks in Cross-Border Acquisitions*, 33 J. OF BANKING & FIN. 640 (2009) ..............................................................................................8

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

## I.    Preliminary Statement

1.      Under Section 2.13(a) of the APA,[2] Transform could elect, in its sole discretion, to acquire the Foreign Subsidiaries' assets by means of an equity acquisition instead of an asset acquisition if it determined that doing so was "necessary or desirable."  In the event that Transform elected to acquire the Foreign Subsidiaries' assets by means of an equity acquisition, those equity interests would be "deemed to be"—i.e., treated as if they were and as if they had the qualities of—"Acquired Foreign Assets," the definition of which excludes Excluded Assets and includes only assets of the type that would have been Acquired Assets had they been owned by the Sellers as of the Closing Date.  It is undisputed that the Foreign Subsidiary Cash is an Excluded Asset and is not an asset of the type that would have been an Acquired Asset had it been owned by the Sellers as of the Closing Date.  Accordingly, Transform cannot have acquired and did not acquire the Foreign Subsidiary Cash under Section 2.13(a).

2.      Transform attempts in its *Brief in Opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement* [Docket No. 9426] ("**Opposition**" or "**Opp.**") to avoid this inevitable outcome by (1) pointing the Court to evidence that is extrinsic to the APA; (2) distorting the plain meaning of the unambiguous terms of the APA; (3) claiming that there was no commercially reasonable basis for the Parties to give Transform the option to effectuate an equity acquisition if it meant that Transform would nevertheless acquire only the same Acquired Foreign Assets; and (4) arguing that, even if Transform did not acquire the Foreign Subsidiary Cash under

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given them in the *Debtors' Third Motion to Enforce the Asset Purchase Agreement* [Docket No. 9395].

Section 2.13(a) of the APA, the Debtors should be estopped from asserting a claim to the cash under the doctrines of equitable estoppel and acquiescence.

3.    Each of these attempts fails.  First, Transform itself admits that the language of Section 2.13(a) is unambiguous; accordingly, under Delaware law, the Court may not consider parol evidence in interpreting the provision but rather must enforce the APA according to its terms. Second, those unambiguous terms make indisputably clear that the Foreign Subsidiary Cash belongs to the Debtors.  Third, there are myriad reasons why a party in Transform's position would find it necessary or desirable to acquire foreign assets through an equity acquisition instead of an asset acquisition, many of which are applicable here.  Finally, the Debtors are not barred by the doctrines of equitable estoppel or acquiescence from asserting a claim to the Foreign Subsidiary Cash; as set forth below, the equities here plainly weigh in favor of the Debtors' recovery of the cash, which is just the latest in a long series of Excluded Assets the Debtors have been working to recover from Transform since just after the Closing Date.  Accordingly, the Debtors respectfully request that the Court grant the *Debtors' Third Motion to Enforce the Asset Purchase Agreement* [Docket No. 9395] ("**Motion**" or "**Mot.**") and enter an order compelling Transform to effectuate the transfer to the Debtors of $6,307,666 USD in Foreign Subsidiary Cash pursuant to Sections 2.13(a), 2.2(f), and 2.1(ee) of the APA.

II.    **Argument and Authorities**

A.    **The Subsidiary Cash Belongs to the Debtors Under Sections 2.13(a), 2.2(f), and 2.1(ee) of the APA; Transform's Objection to the Debtors' Motion Does Not Warrant a Different Conclusion.**

4.    Transform admits that the language of Section 2.13(a) of the APA is unambiguous, *see, e.g.*, Opp. ¶ 1, but nevertheless proceeds to dedicate the bulk of its Opposition to discussing evidence extrinsic to the APA—including but not limited to correspondence between the Parties' counsel exchanged in connection with the Debtors' attempts to negotiate the turnover of the

Foreign Subsidiary Cash—in a transparent but misguided effort to focus the Court on everything but the plain and ordinary meaning of the APA's terms, *see, e.g.*, Opp. ¶¶ 18-24.  Under Delaware law, however, where, as here, the language of a contract is unambiguous (as both Parties agree), the court must give the language its plain and ordinary meaning and enforce the contract as written, without reference to extrinsic evidence.  *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) ("[I]f the instrument is clear and unambiguous on its face" the court may not consider external evidence to "interpret it or search for" the parties' intent.).

5.    There can be no question that the Foreign Subsidiary Cash belongs to the Debtors under the unambiguous language of Sections 2.13(a), 2.2(f), and 2.1(ee) of the APA when those provisions are given their plain and ordinary meaning and when the APA is construed as a whole. Under Section 2.13(a), whether Transform opted for an asset acquisition or an equity acquisition, it could only acquire Acquired Foreign Assets, which are defined in the APA as excluding Excluded Assets (such as the Foreign Subsidiary Cash) and including only assets of the type that would have been Acquired Assets had they been owned by the Sellers as of the Closing Date.

**1.    Transform's Reliance upon the First Clause of the Third Sentence of Section 2.13(a) of the APA Is Misplaced.**

6.    Transform relies heavily on the first clause of the third sentence of Section 2.13(a), which reads:

> If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that ***it is necessary or desirable*** to acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a) . . . .

APA § 2.13(a) (emphasis added).  Transform argues that the phrase "all of the equity interests in any Foreign Subsidiary" includes the Foreign Subsidiary Cash.  Opp. ¶ 27.

7.     Transform is wrong.  That first clause of the third sentence of Section 2.13(a) imposes no obligation on either party.  The clause merely describes a condition (Transform's decision, in its sole discretion, to take Acquired Foreign Assets by means of an equity acquisition instead of an asset acquisition) that triggers the obligation set forth in the second clause of the third sentence of Section 2.13(a).  APA § 2.13(a).  That second clause provides that:

> the Sellers shall use reasonable best efforts to transfer such equity interests, ***which equity interests shall be deemed to be Acquired Foreign Assets*** [i.e., all right, title and interest of each of the Foreign Subsidiaries[] in, to or under all assets, properties and rights Related to the Business ***(other than the Excluded Assets) and any other assets of the type that would have been Acquired Assets had they been owned by the Sellers as of the Closing Date***].

*Id.* (emphasis added).  As the operative clause of the third sentence of Section 2.13(a) makes clear, the "equity interests" that the Sellers are to transfer expressly exclude Excluded Assets and include only assets of the type that would have been Acquired Assets had they been owned by the Debtors as of the Closing Date.  *Id.*; *see also* Mot. ¶¶ 2, 10, 13-14, 22, 24-26.   In short, those equity interests exclude the Foreign Subsidiary Cash.

**2.     Transform's Argument Concerning the Purported Significance of the Term "in Lieu of" in the First Clause of the Third Sentence of Section 2.13(a) of the APA Is Unavailing.**

8.      Transform next argues that the Debtors' reading of Section 2.13(a) ignores the provision's use of the term "in lieu of" in purported contravention of fundamental canons of contract interpretation.  Opp. ¶ 29.  This argument is easily disposed of.  The first clause of the third sentence of Section 2.13(a) merely gives Transform the option to consummate an equity acquisition "in lieu of" an asset acquisition—to move forward with one transaction type instead of another should Transform decide that doing so is either necessary or desirable.  That clause has

nothing to do with what Transform is acquiring.[3]  Moreover, the Debtors' reading of Section 2.13(a) does not render the term superfluous.  Rather, in the event Transform chose to consummate an equity acquisition "in lieu of" an asset acquisition, Transform would nevertheless acquire only Acquired Foreign Assets but would have to assume all of the liabilities of any entity that was an Acquired Foreign Asset.  Mot. ¶¶ 14-15 (citing APA §§ 2.13(a), 2.4).

> **3.     The Parties' Use of "Deemed" in the Third Sentence Shows that the Parties Intended that Transform Would Only Take Acquired Foreign Assets under Section 2.13(a) of the APA.**

9.     Transform also argues that the Debtors' interpretation of Section 2.13(a) distorts the meaning of the word "deemed."  Opp. ¶¶ 30-31.  As an initial matter, one does not distort a word by giving it its specific, and widely accepted, legal definition (as the Debtors have done here).  More problematic, however, is Transform's effort to pretend that this widely accepted, legal definition does not exist.  *Id.*  Specifically, Transform asserts that "'[d]eemed' . . . does not operate to transpose the qualities of 'Acquired Foreign Assets' on 'all of the equity interests.'"  *Id.* ¶ 31.  On the contrary, that is exactly what it does.

10.     In *In re Lucas*, 477 B.R. 236 (Bankr. M.D. Ala. 2012), the U.S. Bankruptcy Court for the Middle District of Alabama interpreted a consent judgment that repeatedly made use of the term "deemed."  *Id.* at 243-44 ("[T]his court cannot help but to notice all the 'deeming' taking place in the consent judgment.").  The consent judgment provided, for example, that "'the amount of this Judgment shall be *deemed* to be held in trust.'"  *Id.* at 243.  The court reproduced *Black's*

---

[3] Contrary to Transform's assertion, Opp. ¶ 33, it did not bargain for the option to acquire equity in the Foreign Subsidiaries in connection with the original APA.  The Parties added the third sentence of Section 2.13(a) as part of the First Amendment.  Transform did not pay the Debtors one additional dollar in exchange for this accommodation—i.e., the consideration was the same $5.2 billion specified in the APA prior to the First Amendment.

definition of "deem"—i.e., "[t]o treat (something) as if (1) it were really something else, or (2) it had qualities that it does not have"—as well as *Black's* expanded definition of the term:

> "'Deem' has been traditionally considered to be a useful word when it is necessary to establish a legal fiction either positively by deeming something to be what it is not or negatively by deeming something not to be what it is . . . .  All other uses of the word should be avoided . . . ."

*Id.* at 243 (quoting *Black's Law Dictionary* 446 (8th ed. 1999).  Based upon these definitions, the court concluded that the judgment creditor's use of the term "deem" constituted "an admission that there [was] no express trust, for if there were an express trust, the consent judgment would not need to use the word 'deem' to create the legal fiction, a trust, when in fact there [was] none."  *Id.* at 244.  Several other courts have interpreted "deem" in the same way.  *See, e.g.*, *Delta Air Lines, Inc. v. Bombardier, Inc.*, No. 1:20-CV-3025-GHW, 2021 WL 1163702, at *7 (S.D.N.Y. Mar. 25, 2021) ("As described in *Black's*, the verb ["deem"] asks the reader to treat something as if it was something else—no construction of the word asks the reader to treat something as if it were . . . still the thing itself[.]"); *Hinton v. Rolison*, 175 So.3d 1281, 1284-85 (Miss. 2015); *Johnson v. Rambo*, No. C06-5258 RJB, 2006 WL 2401113, at *1 (W.D. Wa. Aug. 18, 2006); *Wohl v. Owen*, 580 N.Y.S.2d 854, 855 (N.Y. Sup. Ct. 1992) ("The word deem has been defined to mean 'treat as if[.]'").  Indeed, it is the meaning given "deem" in the Bankruptcy Code itself.  *See, e.g.*, *In re Hyegu Cho*, No. 15-20638, 2016 WL 3597890, at *4 (Bankr. D. Maine June 27, 2016) (stating that "deemed," as used in 11 U.S.C. § 365(d)(4), means "'[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have'").

11.    Just as in *Lucas*'s consent judgment, the Parties here used the term "deem" to convey that, if Transform decided that it was "necessary or desirable" to acquire the Acquired Foreign Assets through an equity acquisition rather than an asset acquisition, the Parties would "deem" the transferred equity interests to be—i.e., treat those interests as if they were and had the

qualities of—Acquired Foreign Assets.    Stated differently, the Parties would "deem" the transferred equity interests to exclude—or treat them to exclude—Excluded Assets like the Foreign Subsidiary Cash.

12.    The Debtors' interpretation of "deem" as it is used in Section 2.13(a) is not only consistent with the plain meaning of the term, it also makes sense within the context of the rest of Section 2.13(a), including the second clause of the third sentence. *See supra* at  Part II.A.1.  The unambiguous terms of the APA, when construed in the context of the contract as a whole and viewing each term in light of the others, make clear that the third sentence of Section 2.13(a) merely allowed Transform to elect a different transaction structure.  The Parties clearly did not intend to empower Transform unilaterally to reap a windfall at the expense of the Debtors' estates. *See also, e.g.*, Mot. ¶¶ 15, 25.

### 4.    The Debtors' Interpretation of Section 2.13(a) of the APA Provides For the Only Commercially Reasonable Result.

13.    Finally, Transform argues that the Debtors' interpretation of Section 2.13(a) would effect an "absurd, commercially unreasonable" result. Opp. ¶ 33-34.  Why, Transform asks, would it ever elect to acquire the Foreign Subsidiaries' assets by means of an equity acquisition if such a choice meant taking only Acquired Foreign Assets but also having to take all of the Foreign Subsidiaries' liabilities? *Id.* ¶ 34.  The answer is quite obvious.  This ability to acquire the Acquired Foreign Assets through an equity acquisition instead of an acquisition of foreign assets gave Transform the flexibility to choose the form of transaction and pivot to an equity acquisition if it subsequently determined that doing so was "necessary or desirable."

14.    Generally speaking, there is a whole host of reasons why a party would bargain for the option to acquire an entity's equity instead of its assets.  For example, (1) asset acquisitions "are typically more complicated and time consuming than stock purchases;" (2)  asset acquisitions

are "cumbersome because transfer of the seller's assets to the buyer must be documented and separate filings or recordings may be necessary to effect the transfer;" (3) often, in an asset acquisition, contractual rights cannot be assigned without first obtaining third-party consents, which might be avoided in an equity acquisition; (4) transfer taxes on the sale of certain categories of assets can, in most cases, be avoided in the context of an equity acquisition; and (5) an asset acquisition may present "more employment or labor issues" than an equity acquisition, including the need to renegotiate employment agreements with key employees. *See* Byron F. Egan, "Whether to Do an Asset Purchase," *Choice, Governance & Acquisition of Entities 7.III* (State Bar of Texas), 2018 WL 3407862, at *1, 2, 7-8 (2018). Moreover, the entity could hold registrations, permits, or licenses that are not transferable; an asset acquisition could give rise to a change of control (and concomitant tax consequences); and assets might need to be revalued or retitled. Cross-border acquisitions present even greater challenges. *See* Thomas Mantecon, *Mitigating Risks in Cross-Border Acquisitions*, 33 J. Banking & Fin. 640, 640 (2009) ("Compared to domestic acquisitions, cross-border acquisitions present greater challenges for buyers."). "Buyers face higher levels of uncertainty in cross-border acquisitions," and "[t]he use of stock as currency can be a contractual tool to reduce investment risk because it has contingent-pricing effect." *Id.* at 641.

15.    Here, the third sentence of Section 2.13(a) gave Transform the flexibility to deal with potential challenges as of the Closing Date, including whether there would be practical problems associated with extracting assets from unknown overseas jurisdictions. For example, to extract assets from India and Hong Kong, Transform might have needed to form new entities in each of these jurisdictions; obtain third-party consents to any assignment of contractual rights; pay taxes on the sale of certain, specific categories of assets; and renegotiate employment agreements

with the Indian and Hong Kong subsidiaries' employees.  An asset acquisition of the Indian and

Hong Kong subsidiaries would have been more complicated and time consuming and would have

presented significant levels of uncertainty.  Transform may have been able to avoid some or all of

these challenges through an equity acquisition.

16.      As set forth in the Debtors' Motion, in exchange for the potentially significant

benefit of an option to effectuate an equity acquisition, Transform agreed that, if it elected to do

so, it would assume all of the entities' Liabilities.  Mot. ¶¶ 14-15 (citing APA §§ 2.13(a), 2.4).

This agreement reflected the Parties' decision to allocate any risk associated with Transform's

unilateral determination to proceed with an equity acquisition to Transform.  Mot. ¶ 15.

17.      For all of these reasons and those set forth in the Debtors' Motion, the Foreign

Subsidiary Cash belongs to the Debtors under the unambiguous language of Sections 2.13(a),

2.2(f), and 2.1(ee) of the APA and Transform should be ordered to turn it over immediately.

> **B.      The Debtors Are Neither Barred by the Doctrine of Acquiescence Nor Equitably Estopped from Pursuing and Recovering the Foreign Subsidiary Cash.**

18.      Transform's desperate attempt to keep the Foreign Subsidiary Cash (that belongs

to the Debtors under the APA) by arguing that Debtors are barred by the doctrine of acquiescence

or equitably estopped from recovering their assets is plainly meritless.

> **1.      The Debtors Have Not Acquiesced in Transform's Appropriation of the Foreign Subsidiary Cash.**

19.      Under governing Delaware law, a claimant "acquiesces" to a complained-of act

when he:

> (1) has full knowledge of his rights and the material facts and (2) remains inactive
> for a considerable period of time; or freely gives recognition to the act; or conducts
> himself in a manner inconsistent with any subsequent repudiation of the act, thereby
> leading the other party to believe the act has been approved.

*Cantera v. Marriott Senior Living Servs., Inc.*, No. 16498, 1999 WL 118823, at *8 (Del. Ch. Feb. 18, 1999) (rejecting the defendant's acquiescence defense despite the plaintiffs' period of inaction where "[t]here was no direct proof in the record that [the] plaintiffs 'had full knowledge of their rights' or 'of all material facts' . . . or 'freely [gave] recognition to' the complained-of transactions"). Transform has not established and cannot establish any of these facts.

20.    As a threshold matter, the Debtors have not had "full knowledge of . . . the material facts" with respect to the Foreign Subsidiary Cash. In the weeks preceding the Closing Date, the Debtors and their financial advisor, M-III Advisory Partners, L.P. ("**M-III**"), evaluated numerous potential sources of cash—including the Indian and Hong Kong subsidiaries—in connection with their effort to mitigate what they had identified as a multi-million-dollar administrative shortfall. Acevedo Decl. ¶¶ 8-10 and Exs. A, B.[4] In or around mid-January 2019, however, Sears's Finance Department (which would soon become Transform's Finance Department) represented to M-III that the Debtors might recover "at most" $1 million to $1.5 million from India (and likely nothing) and "could" recover nothing from Hong Kong. *See* Acevedo Decl. ¶ 11 and Ex. B. Indeed, the Debtors had transferred $620,000 to Hong Kong on January 18 to ensure the subsidiary's solvency through February 1. *See id.* Based at least in part upon these representations, M-III concluded that any attempt to recover cash held in the Indian and Hong Kong subsidiaries would be futile and, accordingly, focused its energies on opportunities that were more likely to bear fruit. *See* Acevedo Decl. ¶ 12 and Ex. C.

21.    It was not until July 2020, when the Debtors discovered that Sears-Israel employees had been drawing upon the Debtors' Israel cash reserves and had thereby depleted those cash

---

[4] Exhibits referenced herein are appended to the *Declaration of Enrique Acevedo in Support of Debtors' Reply in Further Support of Third Motion to Enforce the Asset Purchase Agreement*, dated April 23, 2021, filed concurrently herewith ("**Acevedo Decl.**").

reserves by hundreds of thousands of dollars, that M-III re-examined whether other Debtor-related entities had in fact also held substantial amounts of cash as of the Closing Date.  *See* Acevedo Decl. ¶ 13.  By that point, however, Transform had long since removed the India and Hong Kong cash balances from the estates' non-debtor balance sheet and had taken possession and control of the Company's books and records, *see id.* and Ex. D, and Transform was no longer obligated to provide the Debtors with access to those books and records under the APA, *see* APA § 9.5 (obligating Transform to allow the Debtors "reasonable access" to the Company's books and records for twelve months after the end of the Designation Rights Period).  M-III, therefore, had to rely during its investigation upon information supplied by Transform's Finance Department. *See* Acevedo Decl. ¶ 13.  In short, if any party had "full knowledge of . . . the material facts" with respect to the Foreign Subsidiary Cash, it was Transform—and Transform did not volunteer that information to the Debtors or their advisors.  *See id.*

22.     Further, Sears Holdings Corporation was a complex organization, with a long history and vast, sprawling organizational structure composed of numerous divisions, projects, and teams and operated by a multitude of people pursuant to many and varied practices and processes. *See* Acevedo Decl. ¶ 14.  The sale of Sears Holdings Corporation to Transform pursuant to the Asset Purchase Agreement was  a highly complex transaction, and the subsequent administration and wind-down of the Debtors' estates has been correspondingly complex.  *See id.*  For all of these reasons, among others, it can be challenging to identify assets to be recovered and to determine which entity (the Debtors or Transform) owns those assets.  *See id.*

23.     By way of example, just a little over a week ago, on April 13, 2021, Transform personnel emailed M-III and explained that, in 2019, a Transform-related investment was "mistakenly funded with $99,999 from a non-debtor, SHC Israel Ltd."  *See id.* and Ex. E.

Transform then offered to repay those funds to the Debtors. *See id.* It took Transform **two years** to discover this mistake and to offer to remedy it—not because it was attempting to mislead the Debtors or was sitting on its hands or was negligent in failing to discover the error, but because it simply is hard to untangle these complicated finance and accounting issues. This complexity and these challenges further explain why it took the Debtors time to arrive at anything like a full knowledge of the material facts with respect to the Foreign Subsidiary Cash. As soon as they did, they acted on that knowledge and demanded that Transform turn over the cash.

24.    Second, the Debtors have not "remain[ed] inactive for a considerable time" with respect to the Foreign Subsidiary Cash. Indeed, as described in the Debtors' Motion, the Debtors and their advisors have spent the last twenty-four months litigating one dispute after another with Transform concerning the ownership, under the APA, of various assets. Time and time again, the Debtors and their advisors have found themselves in the unenviable position of having to demand that Transform turn over Excluded Assets to the Debtors, only to have Transform respond that, for whatever (frequently illogical, sometimes nonsensical) reason, the demanded assets were actually Acquired Assets.[5] It has been a relentless struggle, and its most recent incarnation is the Debtors' current effort to recover the Foreign Subsidiary Cash from Transform and Transform's predictable refusal to turn the Cash over on the all-too-familiar but no less erroneous ground that Transform actually acquired the Foreign Subsidiary Cash under the APA.

25.    Finally, the Debtors have neither recognized Transform's appropriation of the Foreign Subsidiary Cash nor acted in a manner that could lead Transform to believe that its appropriation of the Foreign Subsidiary Cash was approved. *See generally* Mot. The Debtors

---

[5] Attached hereto as **Appendix A** is a summary timeline of the APA litigation which demonstrates that each of the many APA-related disputes has followed hard upon the heels (or, indeed, in many cases, has overlapped with) another.

have been battling to recover Excluded Assets from Transform for more than two years.  Under such circumstances, Transform cannot have reasonably believed that the Debtors would not ultimately come for the Foreign Subsidiary Cash.  Transform alludes to the Debtors' failure to include the Foreign Subsidiary Cash in the solvency trackers previously filed with the Court.  Opp. ¶ 3.  That fact actually supports the Debtors' position: until recently (unlike Transform), the Debtors and their advisors did not have full knowledge of the material facts with respect to the Foreign Subsidiary Cash and, once they did, they demanded that Transform return the cash and reasonably characterized it as a "contingent" asset.

26.    The circumstances here are simply worlds apart from those in which Delaware courts have found acquiescence.  *See, e.g.*, *Julin v. Julin*, 787 A.2d 82, 84 (Del. 2001) (holding that a former wife acquiesced in her former husband's reduction of his direct monthly alimony payments where she accepted such reduction without protest for more than four years); *In re Shawe & Elting LLC*, C.A. No. 9661-CB,  2015 WL 4874733, at *37 (Del. Ch. Aug. 13, 2015) (holding that a plaintiff acquiesced in the defendant's payment of her housekeeper through the company they co-founded where the plaintiff "admitted he knew about these payments, which had been made for over a decade"); *Klassen v. Allegro Dev. Corp.*, C.A. No. 8626-VCL, 2013 WL 5739680, at *20-21 (Del. Ch. Oct. 11, 2013) (holding that a former CEO acquiesced in his termination where he "had full knowledge of his rights and the material facts surrounding his removal" and "subsequently took numerous actions that necessarily conceded the validity of his termination," including "[a]pproving drafts of the proposed consulting agreement that included language barring [him] from holding himself out as a [current] employee" and "voting at meetings of the Compensation Committee as a member of the committee, which he could not do under the Bylaws if he continued to be CEO"); *Vila v. BVWeb Ties LLC*, C.A. No. 4308-VCS, 2010 WL 3866098,

13

at *9-10 (Del. Ch. Oct. 1, 2010) (holding that a plaintiff acquiesced in the defendant's withdrawal of $100,000 from their LLC's bank account where he testified at trial that he "acquiesced" to the withdrawal).

        **2.**      **Because Transform Did Not Lack the Knowledge or the Means of Obtaining the Knowledge of the Truth of the Debtors' Entitlement to the Foreign Subsidiary Cash, the Debtors Are Not Equitably Estopped from Asserting a Claim to the Cash.**

27.    "Equitable estoppel is a narrow doctrine that is sparingly invoked." *Hallisey v. Artic Intermediate, LLC*, 2020 Del. Ch. LEXIS 331, at *8 (Del. Ch. October 29, 2020) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 2012 Del. Ch. LEXIS 171, at *92–93 (Del Ch. Aug. 7, 2012)).  Estoppel is appropriate "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." *Id.* (quoting *Am. Family Mortg. Corp. v. Acierno*, 1994 Del. LEXIS 105, at *14 (Del. Mar. 28, 1994)).  The party invoking estoppel must prove the claim by clear and convincing evidence.  *Id.* Finally, courts require the party asserting estoppel to show that it "lacked knowledge or the means of obtaining knowledge of the truth" in order to prevent parties who were willfully, recklessly, or negligently blind to the truth from exploiting estoppel to their advantage.  *See HC Cos. v. Myers Indus.*, 2017 Del. Ch. 833, at *14 (Del. Ch. Dec. 5, 2017); *Heron Bay. Prop. Owners Ass'n v. Cootersunrise*, LLC, 2013 Del. Ch. LEXIS 157, at *26 (Del. Ch. June 17, 2013).

28.    Transform cannot prevail on an equitable estoppel defense, including because Transform and its advisors did not lack the knowledge or the means of obtaining the knowledge of the truth of the Debtors' entitlement to the Foreign Subsidiary Cash.  Indeed, Transform had *more* knowledge than the Debtors and their advisors concerning the existence and extent of the Foreign Subsidiary Cash.  Sears's Finance Department (with all of its institutional knowledge and experience) became Transform's Finance Department as of the Closing Date; Transform took

possession and control of the Company's books and records as of the Closing Date; and Transform moved the India and Hong Kong cash balances off of the non-debtor balance sheet as of the Closing Date.  *See* Acevedo Decl. ¶¶ 11, 13.   Moreover, Transform and its advisors obviously have the same copies of the APA that the Debtors and their advisors do.  Thus, Transform cannot colorably argue that it was unaware of the possibility that the Debtors might, at some point in the future, come to claim the Foreign Subsidiary Cash.  There it was, in black and white: under Section 2.13(a), Transform could only acquire assets of the type that would have been Acquired Assets had they been owned by the Sellers as of the Closing Date.   Under no circumstances could Transform acquire Excluded Assets.  Under no circumstances could Transform acquire the Foreign Subsidiary Cash.

29.    Another critical component of estoppel is lacking.  Transform cannot show that it changed its position to its detriment in reliance upon any Debtor conduct.  Transform argues that it has been prejudiced because "the Debtors made Transform pay capital gains tax and interest on the cash in the Indian Subsidiaries' bank accounts."  Opp. ¶ 3.  The Debtors do not concede that Transform's payment of some amount of capital gains tax on the cash in the Indian Subsidiaries' bank accounts constitutes a "detrimental change of position," because Transform was obligated under the unambiguous terms of the APA to pay the tax, which amounted to approximately $250,000.  The Debtors will nevertheless agree to reimburse Transform for any portion of the tax that Transform can prove corresponds solely to the cash in the Indian subsidiaries' bank accounts that belongs to the Debtors.

*[The remainder of this page is intentionally left blank.]*

**III.**    **Conclusion**

30.    For all of the foregoing reasons, the Debtors respectfully request that the Court grant the Third Motion to Enforce and enter an order compelling Transform to effectuate the transfer to the Debtors of $6,307,666 USD in Foreign Subsidiary Cash pursuant to Sections 2.13(a), 2.2(f), and 2.1(ee) of the APA.

Dated: April 23, 2021
         New York, New York

                                    */s/ Jacqueline Marcus*
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York  10153
                                    Telephone:  (212) 310-8000
                                    Facsimile:  (212) 310-8007
                                    Jacqueline Marcus
                                    Jared R. Friedmann
                                    Jennifer Brooks Crozier

                                    *Attorneys for Debtors*
                                    *and Debtors in Possession*

**Appendix A**

| Mar. 11, 2019 | Debtors file the First Motion to Enforce, seeking, *inter alia*, entry of an order compelling turnover of approximately $57.5 million in funds being held by Transform, including approximately $14.6 million in credit-card proceeds from transactions that occurred prior to Closing (the "**Credit Card Accounts Receivable**") held in reserve accounts by certain credit-card payment processors (the "**Reserve Accounts**"). |
|---|---|
| Apr. 8, 2019 | Debtors file *Supplemental Memorandum of Law in Further Support of Their Motion to Enforce the Automatic Stay* [Docket No. 3079]. |
| Apr. 11, 2019 | Transform files *Supplemental Reply Brief and Supporting Documents in Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement Against Transform Holdco LLC and (B) Compel Turnover of Estate Property* [Docket No. 3156]. |
| Apr. 18, 2019 | Bankruptcy Court rules that the Reserve Accounts are Credit Card Accounts Receivable under the APA. |
| May 8, 2019 | Bankruptcy Court enters order that, *inter alia*, entitles Debtors to retain as an Excluded Asset the oldest Credit Card Accounts Receivable in an amount of approximately $14.6 million held in Reserve Accounts. |
| May 24, 2019 | Debtors file *Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4029] (the "**Supplemental Motion to Enforce**"), seeking, *inter alia*, entry of an order compelling Transform to assume (a) up to $166 million in Other Payables and (b) all payment obligations with respect to Ordered Inventory pursuant to Section 2.3(k)(v) of the APA. |
| May 25, 2019 | Transform files *Adversary Complaint* [Docket No. 4033], seeking, *inter alia*, a declaration that the Debtors caused Transform to assume accounts payable beyond those it agreed to assume including by acting outside the ordinary course of business in the week before the Closing. |
| May - July 2019 | Parties take discovery and submit additional briefing and declarations in support of and in opposition to the Supplemental Motion to Enforce and Adversary Complaint [Docket Nos. 4430, 4464, 4480, 4767, 4973, 5085, 5796, 6079]. |
| July 11, 2019 | Bankruptcy Court rules, *inter alia*, that Section 2.3(k) of the APA obligates Transform to assume, effective as of the Closing, liability for both (a) up to $166 million in Other Payables and (b) all payment obligations with respect to the Ordered Inventory. |
| July - Sept. 2019 | Parties attempt to reach consensual resolution of outstanding disputes and agree to extend deadline for appointment of examiner. |
| Sept. 12, 2019 | Bankruptcy Court rules, *inter alia*, that Debtors' delay of payments to certain vendors in the week before the Closing was not a violation of the Debtors' obligation to act in the ordinary course of business because such delays were consistent with Debtors' prior practices. |
| Nov. 8, 2019 | Transform files *Second Supplemental Memorandum of Law in Support of Transform Holdco LLC's Adversary Complaint* [Docket No. 5796]. |

| Nov. 22, 2019 | Debtors file *Opposition to Transform Holdco LLC's Second Supplemental Memorandum of Law in Support of Its Adversary Complaint* [Docket No. 6079]. |
|---|---|
| Nov. 22, 2019 | Debtors file *Motion of Debtors to Compel Turnover of Estate Property* [Docket No. 6084] (the "**Cook County Tax Refunds Turnover Motion**"). |
| Dec. 6, 2019 | Transform files *Objection of Transform Holdco LLC to Motion of Debtors to Compel Turnover of Estate Propert*y [Docket No. 6150]. |
| Dec. 13, 2019 | Bankruptcy Court rules, *inter alia*, that the Cook County Tax Refunds should be turned over to Debtors pursuant to the APA subject to the submission of additional information. |
| Jan. 10 - Jan. 28, 2020 | Parties execute, and Bankruptcy Court enters, the First APA Settlement Agreement [Docket No. 6413]. Agreement obviates the need for appointment of examiner. |
| Jan. 14, 2020 | Counsel for Transform emails counsel for Debtors concerning the Altaquip litigation, the first of many disputes that would be resolved in the Second APA Settlement Agreement. |
| Jan. 31, 2020 | Debtors withdraw First Motion to Enforce, Supplemental Motion to Enforce, and Cook County Tax Refunds Turnover Motion [Docket No. 6809]. |
| Jan. – July 2020 | Parties engage in frequent correspondence, teleconferences, and virtual meetings concerning the several disputes that would be resolved in the Second APA Settlement Agreement. |
| Aug. 2020 | Parties begin negotiating Second APA Settlement Agreement. |
| Sept. 17 - Oct. 16, 2020 | Parties execute, and Bankruptcy Court enters, the Second APA Settlement Agreement [Docket No. 9025]. |
| Nov. 19, 2020 | Debtors file *Motion to Compel Turnover of Estate Property* [Docket No. 9106] (the "**Closed-Claim Proceeds Turnover Motion**"). |
| Dec. 3, 2020 | Transform files *Brief in Opposition to the Debtors' Motion to Compel Turnover of Estate Property* [Docket No. 9138]. |
| Dec. 8, 2020 | Debtors file *Reply in Further Support of Motion to Compel Turnover of Estate Property* [Docket No. 9156]. |
| Dec. 30, 2020 - Jan. 22, 2021 | Parties resolve Closed-Claim Proceeds dispute and Debtors withdraw Closed-Claim Proceeds Turnover Motion [Docket No. 9261]. |