

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDING CORPORATION, et al.,

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   April 27, 2021

17                   10:11 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:     JUSTIN WALKER

Page 2

1    HEARING re Case Status Conference

2

3    HEARING re Motion to Compel: Debtors Third Motion to Enforce

4    the Asset Purchase Agreement (ECF #9395)

5

6    HEARING re Opposition Brief / Transform Holdco LLCs Brief in

7    Opposition to the Debtors Third Motion to Enforce the Asset

8    Purchase Agreement (related document(s)9395) (ECF #9426)

9

10    HEARING re Response: Debtors' Reply in Further Support of

11    Third Motion to Enforce the Asset Purchase Agreement

12    (related document(s)9426, 9395 ) filed by Jacqueline Marcus

13    on behalf of Sears Holdings Corporation. (ECF #9436)

14

15    HEARING re Declaration of Charles W. Allen in Support of

16    Transform Holdco LLCs Brief in Opposition to the Debtors

17    Third Motion to Enforce the Asset Purchase Agreement

18    (related document(s)9395) (ECF #9427)

19

20    HEARING re Declaration of Jennifer Brooks Crozier in Support

21    of Debtors' Third Motion to Enforce the Asset Purchase

22    Agreement (related document(s)9395) filed by Jacqueline

23    Marcus on behalf of Sears Holdings Corporation. (ECF #9396)

24

25

Page 3

1    HEARING re Declaration of Enrique Acevedo in Support of

2    Debtors' Reply in Further Support of Third Motion to Enforce

3    the Asset Purchase Agreement (related document(s)9436) filed

4    by Jacqueline Marcus on behalf of Sears Holdings

5    Corporation. (ECF #9437)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

1   A P P E A R A N C E S :

2

3   WEIL, GOTSHAL & MANGES LLP

4        Attorneys for the Debtors

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:  GARRETT FAIL (TELEPHONICALLY)

9        JENNIFER CROZIER (TELEPHONICALLY)

10

11   SARACHEK LAW FIRM, PLLC

12        Attorneys for Creditors

13        670 White Plains Road

14        Scarsdale, NY 10583

15

16   BY:  JOSEPH SARACHEK (TELEPHONICALLY)

17

18

19   LOWENSTEIN SANDLER

20        Attorneys for GTM Europe Limited

21        1251 Avenue of the Americas

22        New York, NY 07068

23

24   BY:  ERIC CHAFETZ (TELEPHONICALLY)

25

1    CLEARY GOTTLIEB

2          Attorneys for Transform Holdco LLC

3          One Liberty Plaza

4          New York, NY 10006

5

6    BY:    ANDREW WEAVER (TELEPHONICALLY)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  This is Judge Drain.

3    We're here on In re. Sears Holdings Corporation, et al.

4              This is a completely telephonic hearing.  You

5    should introduce yourself and your client the first time

6    that you speak, and you should state your name if you speak

7    later so that the Court Reporter and I can put together your

8    voice with your name.

9              There's one authorized recording of these

10   hearings.  It's taken by Court Solutions, which provides a

11   copy to our clerk's office on a daily basis.  If you want a

12   transcript of your hearing, you should contact the clerk's

13   office to arrange for the production of one.

14             Because the hearings today are completely

15   telephonic, you need to keep your phone on mute unless

16   you're speaking, at which point, of course, you need to

17   unmute yourself.

18             So with that introduction, I have the agenda for

19   today's calendar and I'm happy to go down that agenda.  As I

20   see it, there's only -- there are only two matters on the

21   agenda, the first being a status conference and the second

22   being the Debtors' third motion to enforce the asset

23   purchase agreement.

24             MR. FAIL:  Thank you, Your Honor.  Garrett Fail,

25   Weil Gotshal & Manges, for the Debtors.  Are you able to

Page 7

1    hear me?

2             THE COURT:  Yes, I can hear you fine, thanks.

3             MR. FAIL:  Thank you very much, Your Honor.  We'll

4    take the hearing then in the order of the agenda, which for

5    parties' reference is filed at Docket 9440.

6             The status conference listed as agenda item one is

7    in accordance with paragraph 14 of the Court's confirmation

8    order.  The report that I'll provide today is an update to

9    the report my partner, Sunny Singh, gave on January 21st,

10   which was an update to ones that I'd previously provided.

11            We filed the presentation online prior to the

12   start of the hearing, and that's at Docket No. 9445 for

13   parties that want to follow along or to refer to it later.

14            Your Honor, do you have it available?

15            THE COURT:  Yes, I have a copy of it in front of

16   me.

17            MR. FAIL:  Thank you.  So the presentation

18   highlights the continued progress that the Debtors have made

19   in reconciling administrative claims.  They reconciled more

20   than 3,970 to date, up from 3,942 that was at the time of

21   our last report.  The Debtors have eliminated more than $1.3

22   billion in claims asserting entitlement to administrative or

23   priority status, and the Debtors have allowed 1,669 claims

24   in the process.

25            The chart on the bottom of page 2 of the

Page 8

1    presentation shows the positive updates from the last

2    report, a reduction in the Debtors' estimate of allowed opt-

3    out claims by $10 million and an overall reduction in the

4    estimate of remaining administrative claims from $90.1

5    million in January to $75.8 million today.

6           Page 3 of the presentation shows the continued

7    progress on post-confirmation distribution, essentially

8    catchup payments for parties that have settled subsequent to

9    the last update.  The total now is $42.8 million has been

10   made to creditors post-confirmation pursuant to the program.

11          Page 4 highlights a reduction in the difference

12   between estimated cash available and projected uses of cash

13   prior to a plan effective date, and the progress is down

14   from $97.3 million difference to $80.8 million.

15          Page 4 also shows on the source or asset side of

16   the balance sheet a slight reduction in cash on hand as a

17   result of payments that were made since our last report, a

18   decrease in non-cash assets as a result of assets that were

19   monetized, so it's really a reclassification.  On the uses

20   side of the balance sheet, Your Honor, we show a reduction

21   in claims estimates and a reduction in other expenses, both

22   positive developments.

23          The sources are broken out in the same level of

24   detail as we provided in our last report on page 5 of this

25   presentation.

1              In summary, sources, excluding recoveries from

2      avoidance actions, increased by $2 million since the last

3      report.  We'll also note that there's an increase from

4      confirmation date estimates, again, exclusive preference

5      recoveries, and the increase from that is $62.8 million.

6              Page 6 of the presentation provides a breakdown of

7      the projected uses, again, in the same level of detail as

8      we've previously provided.  Actual uses to date remain below

9      confirmation date estimates, despite the extended time pre-

10     effective date.  In addition, projected uses through the end

11     of the year would remain within the confirmation date

12     estimate range.

13             Page 7 of the report shows progress on the

14     avoidance action front: 35 percent in number of actions have

15     been settled, up from 33 percent in the last report; $43.2

16     million in cash and administrative claim waivers have been

17     achieved, up from $40 million in the last report.  And as

18     stated in our last update, emergence remains contingent on

19     the successful outcomes of litigation.

20             Your Honor, that would conclude the status update

21     portion of today's agenda.  And unless you have any

22     questions, which I'm happy to answer or try to answer, I'll

23     turn the virtual lectern over to Jennifer Crozier, who will

24     be handling item two on the agenda.

25             THE COURT:  Okay.  Well, before we do that, do any

Page 10

1    of the parties on the phone have any questions on the case

2    update?  Okay.

3                MR. SARACHEK:  Your Honor?

4                THE COURT:  I'm sorry, go ahead.

5                MR. SARACHEK:  Sorry.  This is Joe SARACHEK.  How

6    are you?

7                THE COURT:  Okay.

8                MR. SARACHEK:  I represent numerous creditors, and

9    I just need to convey to the Court a widespread feeling

10   among the creditor body, which is they're going broke

11   waiting for this money, the administrative creditors.  They

12   don't understand, as you'll recall at one point, we filed a

13   motion for mediation.  They don't understand why there can't

14   be a sit down and basically, you know, the matters with ESL

15   can't be resolved.

16               And I just need to, if the Court wants me to

17   formally reintroduce a motion for mediation again, I'll do

18   it.  But it's almost a weekly basis where I get asked about

19   this from one or another one of my clients.  And I'm not

20   pointing fingers at anyone, it just defies logic.  That's

21   it.

22               THE COURT:  Well, your focus is then on the

23   sources of cash going forward?

24               MR. SARACHEK:  Yes.

25               THE COURT:  Okay.  I mean, obviously there is a

Page 11

```
 1    built-in mediation feature in the preference litigation, and

 2    having seen a number of scheduling orders, it's clear to me

 3    that that is being used.  So I think your focus again is

 4    really on the litigation against ESL and other defendants in

 5    the now-consolidated adversary proceedings.

 6               The issue there is that your clients are not the

 7    plaintiffs in those proceedings and the plan and

 8    confirmation order contemplate, you know, how the claims

 9    representation will be handled through the Debtors, but more

10    importantly, the committee.

11               So I guess -- I don't know if you've raised this

12    with committee counsel, with plaintiffs' counsel in that

13    litigation.  I owe the parties a ruling on multiple motions

14    to dismiss the Complaints or portions of the Complaints,

15    which now are consolidated, the most recent motions to

16    dismiss being heard fairly recently.

17               So I guess you can make the motion, but it would

18    be more effective if it came from one of the parties to the

19    litigation.

20               MR. SARACHEK:  Okay.  I'll reach out to the

21    committee counsel.

22               THE COURT:  Yeah.  I think you should talk with

23    plaintiffs' counsel about it.  Obviously, they cannot waive

24    privilege issues, but I think that's what should be

25    considered here, or that's the avenue you should take here.
```

Page 12

1          MR. SARACHEK:  Okay.  Thank you, Your Honor.

2          THE COURT:  Okay.  All right, anyone else?

3          MR. CHAFETZ:  Yes, Your Honor.  Eric CHAFETZ, I

4    represent -- of Lowenstein Sandler.  I represent one of the

5    admin claimants who opted into the consent program, GTM

6    Europe Limited.

7          Just curious if there's any update as to when

8    creditors should expect the next installment payments to be

9    made on account of settled admin claims?

10         THE COURT:  Okay, good question.  Mr. Fail, can

11   you answer that or perhaps counsel for the admin creditors

12   group under the admin settlement.

13         MR. FAIL:  I can answer it, Your Honor.  It's

14   Garrett Fail again for the record.

15         We are in contact and coordination with counsel

16   for the creditors' committee and counsel for the

17   administrative claims representative.  We don't -- we aren't

18   prepared to announce, you know, anything with respect to a

19   next distribution yet.  The information we've provided today

20   shows the assets that we have today, the projected assets in

21   the future, and the Court's aware of other parties that have

22   asserted secured claims in the case.

23         So we will, as we did before, provide advance

24   notice before any other distribution, but we don't have an

25   update today in terms of the next distribution.

1          THE COURT:  Okay.  Well, it seems to me given the

2     cash on hand, you have on here, unless I'm reading it

3     incorrectly, secured claims of, although they are subject to

4     review and objection, I think 17 million.  Do those

5     claimants assert claims to the cash?

6          MR. FAIL:  Yes, Your Honor, some of them -- yes,

7     Your Honor.

8          THE COURT:  Okay.  And in that full amount or a

9     much smaller amount?

10         MR. FAIL:  I think the largest claim in there --

11    and don't hold me to this, Your Honor -- but I think the

12    largest claim is the one that was filed by the relator for

13    the qui tam action that you may recall, which has a

14    replacement lien that was granted, so I think that's the

15    largest.  And then I think that there are a couple of other

16    smaller claims that haven't been allowed or reconciled yet,

17    but I think the material asserted that hasn't yet been

18    allowed is the qui tam relator action.

19         THE COURT:  Okay.  Well, that may well be an

20    appropriate focus sooner rather than later, given I think a

21    legitimate desire to have available cash, subject to

22    reserves of course, continue to be distributed under the

23    administrative claims settlement.

24         MR. FAIL:  Yes, Your Honor.  We obviously have our

25    eyes on that in terms of the amount of cash that's available

1    and in terms of who's in line to receive it.  We are also

2    focused on end-of-case strategies, and so, we're examining

3    all options and nothing's off the table, so we want to make

4    sure that, you know, the cases continue to be handled in the

5    appropriate professional manner that they have.

6          THE COURT:  And those discussions include the

7    administrative claims representative?

8          MR. FAIL:  Yes, Your Honor.

9          THE COURT:  As well as the committee.

10         MR. FAIL:  Yes, Your Honor.

11         THE COURT:  All right.  Well, I think we should

12   adjourn this conference no later than the omnibus date after

13   the next one and we'll see where we are at that point, so I

14   guess that would be the June omnibus date.

15         MR. FAIL:  Your Honor, the confirmation order

16   provides for quarterly updates, so that may be like one

17   more, but whatever Your Honor prefers, we're available.

18         THE COURT:  Well, I don't know how early in July

19   it is, but I think we can put it in July; that's fine.

20         MR. FAIL:  Thank you, Your Honor.  And obviously,

21   if there are material updates, we'll be happy to provide the

22   Court with updates and we remain available for questions.

23         THE COURT:  All right.  And then both for Mr.

24   SARACHEK and Mr. CHAFETZ and any other people representing

25   administrative, you can certainly, in addition to speaking

Page 15

1    to the Debtors' counsel and the committee counsel, reach out

2    to the administrative claims representative about moving --

3    steps that could be taken to move along an interim

4    distribution at least in the meantime.

5              MR. FAIL:  Certainly, Your Honor.  And again,

6    Garrett Fail for the record.  To the extent that parties,

7    you know, have suggestions or would like to make

8    concessions, we're available to hear them.  And I know the

9    administrative claim representative has received contacts

10   and is unfortunately somewhat hamstrung by the

11   confidentiality provisions, so we've provided these updates

12   to provide everybody with the same basis of information.

13             THE COURT:  Right.  Well clearly, that person

14   though can be a source of information for the other -- for

15   the parties who are subject to the confidentiality

16   agreement.  So if counsel for individual creditors have

17   ideas or proposals, they could certainly make them.

18             MR. FAIL:  Of course.

19             THE COURT:  It may not be a two-way dialogue, but

20   they can certainly make those proposals.  Okay.  Anyone else

21   on the case conference?  All right, thank you.

22             Why don't we turn then to the second and last

23   matter on the agenda, which again, is the Debtors' third

24   motion for an order enforcing the asset purchase agreement.

25   On that matter, I have reviewed the motion and supporting

1    papers, Transform Holdco's memorandum in opposition and the

2    supporting declaration of Mr. Allen, and finally, the

3    Debtors' reply in further support of the motion and the

4    declaration of Mr. Acevedo attached to it.  I've also

5    reviewed the declaration of Ms. Crozier that was attached to

6    the original motion.

7            So I'm happy to hear oral argument.  Let me ask

8    you first, have there been any developments on the motion?

9            MS. CROZIER:  Good morning, Your Honor, and may it

10   please the Court.  This is Jennifer Crozier, Weil Gotshal &

11   Manges, for the Debtors -- on behalf of the Debtors rather.

12           There have not been further developments, and so

13   should it please the Court, the Debtors are prepared to go

14   forward with oral argument this morning.

15           THE COURT:  Okay, that's fine.  I have a question

16   or an observation that I want to get out on the table first

17   before we do that.  The order granting the Debtors' motion

18   for approval of the Transform transaction and approving the

19   asset purchase agreement was dated and entered February 8,

20   2019.

21           It provides in paragraph 53 that, "If there's a

22   conflict between the sale order or the asset purchase

23   agreement and any documents executed in connection

24   therewith, the provision in the sale order and the asset

25   purchase agreement and any such documents shall govern in

1   that order," in that sequence in other words.

2        Paragraph 54 states that "The asset purchase

3   agreement and related agreements, documents or other

4   instruments executed in connection therewith may be

5   modified, amended, or supplemented by the parties thereto in

6   a writing signed by each party and in accordance with the

7   terms thereof without further order of the Court, provided

8   that any such modification, amendment, or supplement does

9   not materially change the terms of the asset purchase

10   agreement or related agreements, documents, or other

11   instruments."

12        And then if you go back to page 2 of the order --

13   the sale order, that is -- which is a carryover of recitals

14   describing the context of the order, the order refers to,

15   quote, "The Court having reviewed and considered, (i) the

16   sale motion and the exhibits thereto, (ii) the asset

17   purchase agreement dated as of January 17, 2019 by and among

18   the buyer and the seller's party thereto, including each

19   Debtor and certain of the subsidiaries of Sears Holding

20   Corporation, the defined term sellers," and then it has a

21   parenthetical, "(as maybe amended and restated from time to

22   time, including pursuant to that certain amendment no. 1 to

23   asset purchase agreement by and among the buyer and the

24   sellers," then it's the defined term, "the asset purchase

25   agreement)," closed parenthesis, a copy of which is attached

Page 18

1    hereto as Exhibit B.

2            As far as I can tell, neither the docket nor the

3    order that I sent to the clerk of the court to be entered on

4    February 8th of 2019 attach Exhibit B.  When I sent the

5    order to be entered, I instructed the clerk to attach the

6    exhibits that were sent to me and they are, in fact,

7    attached to the order, but there's no Exhibit B, so it's

8    hard to say that I reviewed it.

9            And yet, I believe it is Exhibit B that the

10   parties are currently addressing in this motion, since it

11   changed the terms of the original asset purchase agreement,

12   the execution version that was attached to the sale order as

13   Exhibit A, in particular, in paragraph 2.13 dealing with

14   foreign assets.

15           So am I missing something here?

16           MS. CROZIER:  Your Honor, Jennifer Crozier for the

17   record again on behalf of the Debtors.  No, we don't believe

18   Your Honor is missing anything.  By arguing as Transform

19   would have you believe that the parties intended in the

20   first amendment to give Transform the power to take millions

21   of dollars otherwise distributable to creditors for itself

22   and that they intended to give Transform that power without

23   explicitly seeking the Court's approval of what would be a

24   material change.

25           And as you yourself have pointed out, Your Honor,

1   the sale order at paragraph 54 requires Court approval of

2   any modification, amendment, or supplement that would amount

3   to a material change.  And it's one of the very reasons,

4   Your Honor, why the Debtors argue today that under Section

5   2.13(a) of the asset purchase agreement, Transform could

6   acquire nothing more than acquired foreign assets.  The

7   amendment could not have made the deal any worse for the

8   Debtors or its creditors.

9           THE COURT:  Okay.  I was going to say I'm happy to

10  hear something just on this point or Transform's counsel can

11  wait until it makes it, you know, responsive argument.  It's

12  up to you.

13          MR. WEAVER:  Your Honor, it's Andrew Weaver of

14  Cleary Gottlieb on behalf of Transform.  Just on this point,

15  Your Honor, we know that on February 7th, 2019 at ECF 2599,

16  that the parties filed a substantially final draft of the

17  first amendment of the APA, and that document itself -- it's

18  a redline -- includes the language that's at issue today,

19  and that's found at pages 355 to 56 of the redline.

20          And so that was submitted to the Court prior to

21  the final day of the sale hearing.  And then on the sale

22  hearing, the final day on February 8 -- I'm sorry -- on

23  February 7th, the parties during the hearing discussed the

24  scope and discussed the first amendment, and that's found on

25  page 648 line 8 of the February 7th hearing transcript.

```
 1              So, Your Honor, it's our position --

 2              THE COURT:  Well, no one -- that's the first I've

 3    heard of this, of that point.  How is it discussed?

 4              MR. WEAVER:  Your Honor, I don't have the

 5    specifics as to the discussion at that point.  I don't

 6    believe necessarily this particular language itself was

 7    discussed.  But the language itself had been submitted to

 8    the Court and was before the Court prior to conclusion of

 9    the sale hearing.

10              MS. CROZIER:  Your Honor, this is Jennifer Crozier

11    again on behalf of the Debtors, if I may.  The first

12    amendment was filed with the Court after the close of

13    evidence.  It was just referenced, as Mr. Weaver himself

14    points out, there was no discussion of the substance of this

15    language.

16              At no point, did the parties say, oh and by the

17    way, Your Honor, under Section 2.13 of the asset purchase

18    agreement, Transform is now entitled to take millions of

19    dollars' worth of cash otherwise distributable to creditors,

20    which in the Debtors' view weighs in favor of the Debtors'

21    argument here that the amendments to Section 2.13(a) of the

22    asset purchase agreement were not, in fact, intended to

23    affect a material change as Transform argues today.

24              MR. WEAVER:  Your Honor, again, it's Andrew Weaver

25    on behalf of Transform.
```

Page 21

1          I know we're getting into more of the substance

2    here and happy to hold my comments in more detail as we get

3    into the actual argument on the motion.  But, Your Honor,

4    again, the idea that this is some change as it relates to

5    the acquired foreign assets, you know, there was a

6    negotiation between the parties and the parties entered into

7    this deal granting Transform this option.

8          You know, we know that the Debtors have made a big

9    deal here about how their own employees within their own

10   subsidiaries felt there wasn't really much cash to be had,

11   there wouldn't be necessarily excluded assets.  I can't

12   explain their motivation for entering into the transaction,

13   but that was the deal in plain language that they entered

14   into.

15          THE COURT:  No, but deals in bankruptcy cases are

16   not two-party transactions.

17          MR. WEAVER:  Understood, Your Honor.

18          THE COURT:  They're subject to notice and Court

19   approval, particularly with deals with insiders.  And this

20   deal was quite strenuously opposed by, among other parties,

21   the unsecured creditors committee, and a material change

22   that would have been made to the deal after the hearing in

23   which that objection was overruled, I think would require

24   more notice than simply being filed on the docket and

25   actually not provided as an attachment to the Court's order.

Page 22

1          I don't really review the dockets in my cases.  If

2     I did, I would never do any other work.  As we heard in the

3     presentation earlier today and as is evidenced by the agenda

4     today, we are now up to docket item 9427 in these cases.

5     And even at the time of the sale hearing, we were up almost

6     to docket item 1000.

7          So I do have a serious concern about the context

8     of this, and I appreciate that Ms. Crozier's argument is

9     largely one of interpretation in that context, i.e., how

10    could we have agreed to this if it involved a material

11    change.

12         But again, it's not just a two-party agreement,

13    and the order itself defines asset purchase agreement as an

14    exhibit that isn't attached; what is attached is the January

15    17 asset purchase agreement, and then it has paragraph 54,

16    which says you can make changes, but only they're not

17    material, so I find that troubling.

18         But anyway, why don't we -- is it clear?  I just

19    do want to make one -- I want to make sure I understand two

20    points.  First, is it clear that the draft of amendment

21    number one that was filed after the close of the sale

22    hearing; that's question number one, or perhaps during the

23    sale hearing as opposed to before the sale hearing?  And

24    question number two is, is it clear that when it was

25    mentioned at the sale hearing, there was no discussion of

Page 23

1   its material terms as it pertains to this dispute that's now

2   before me?

3              MS. CROZIER:  Your Honor, Jennifer Crozier on

4   behalf of the Debtors.  The proposed first amendment to the

5   asset purchase agreement was filed (sound drops) on February

6   7th after the close of evidence but before closing

7   arguments.  And yes, there was a mention of the first

8   amendment, but no discussion of its material terms.

9              THE COURT:  Okay.  And Mr. Weaver, do you agree

10  with that?

11             MR. WEAVER:  Your Honor, again, Mr. Weaver, Andrew

12  Weaver for Transform.  It was filed, as I said, on the 7th.

13  Just looking very quickly here, it was given -- my

14  understanding from looking at the transcript, it was given

15  to Your Honor at the sale hearing at page 648.  But the

16  actual discussion of this particular language, Your Honor,

17  no, we're not suggesting that this particular language was

18  discussed during the hearing.

19             THE COURT:  Okay.  And it was provided after the

20  evidence and before or during oral argument?

21             MR. WEAVER:  Yes, Your Honor.  It would be day

22  three of the sale hearing.

23             THE COURT:  Okay.  So it wasn't introduced into

24  evidence at the sale hearing.

25             MR. WEAVER:  Your Honor, I have to -- I'll be

1    honest, I need to confirm specifically that question.

2              THE COURT:  Okay, all right.  Well, you have the

3    transcript there.  It was actually provided to me during

4    oral argument or (sound glitch) some other time with the

5    rest of that stuff?

6              MR. WEAVER:  Again, Andrew Weaver, Your Honor.

7    I'm sorry, I'm just looking at the transcript in real time

8    here.

9              THE COURT:  Sure.

10             MR. WEAVER:  Yeah, I see it at, again, page 648 of

11   the transcript, a copy of the amended APA was provided of

12   the language, the change, and there's a discussion about a

13   number of changes and the redline being provided.  But

14   again, I don't see a specific reference of introducing it

15   into evidence, but it was discussed and specifically was

16   raised by counsel for the restructuring subcommittee.

17             THE COURT:  Okay.  But is that during oral

18   argument?

19             MR. WEAVER:  Yes.

20             THE COURT:  Okay.  All right, thanks.  Okay, Ms.

21   Crozier, why don't you go ahead then.

22             MS. CROZIER:  Thank you, Your Honor, and may it

23   please the Court.

24             There was no discussion of any material change to

25   the asset purchase agreement in connection with the first

Page 25

1   amendment simply because there wasn't one and the plan and

2   unambiguous language of the contract makes that clear.  I

3   will try to be brief, Your Honor.

4           The question presented to the Court today is a

5   very simple one:  If Transform determined in its sole

6   discretion that it was necessary or desirable to acquire the

7   foreign subsidiaries through an equity acquisition, instead

8   of an asset acquisition, did Transform somehow get more than

9   acquired foreign assets as that term is defined in Section

10  213(a), and the answer is no.

11          Section 213(a) makes indisputably clear that if

12  Transform elected to pivot to an equity acquisition, that

13  the equity interest it acquired would be, quote, "deemed to

14  be acquired foreign assets."

15          In other words, those equity interests would be

16  treated as if they were and as if they had the qualities of

17  acquired foreign assets; that is to exclude excluded assets

18  and to include only assets of the type that would have been

19  acquired assets had they been owned by the sellers as of the

20  closing date.

21          Now there is no dispute here today that the

22  foreign subsidiary cash is an excluded asset, that's 2.2(s)

23  of the asset purchase agreement, and is not an asset of the

24  type that would have been an acquired asset had it been

25  owned by the sellers as of the closing dated; that's Section

Page 26

1    2.1(ee) of the asset purchase agreement.  And so, Transform

2    did not acquire it under Section 2.13(a) and it continues to

3    belong to the Debtors.

4              Now Transform attempts to evade this outcome by

5    pointing the Court away from the four corners of the asset

6    purchase agreement and toward all kinds of extrinsic

7    evidence, but this cannot succeed because the parties agree

8    that the language of Section 2.13(a) is clear and

9    unambiguous.

10             Accordingly, under governing Delaware law, the

11   Court must give the provision its plain and ordinary meaning

12   and enforce it as written without reference to all of that

13   extrinsic evidence with which Transform fills the pages of

14   its opposition.

15             Now Transform also argues that the Debtors are

16   barred by the doctrine of acquiescence or are equitably

17   estoppped from recovering the foreign subsidiary cash.  But

18   these arguments fail for all of the reasons set forth in our

19   papers, and I won't belabor them here.  But I will simply

20   say in short, there was no, quote, "considerable period

21   during which the Debtors failed to act despite some

22   purported knowledge that millions and millions of dollars in

23   cash was sitting in the Indian and Hong Kong bank accounts

24   as of February 11th, 2019.

25             In fact, quite the opposite is true.  The Debtors

Page 27

1    have been acting ceaselessly, in fact, as Your Honor well

2    knows, to recover excluded assets from Transform since just

3    after the closing date, despite having had considerably less

4    information concerning the nature and existence of some of

5    those assets than Transform.

6             Accordingly, Your Honor, we respectfully request

7    that the Court grant the Debtors' third motion to enforce

8    and enter an order compelling Transform to transfer to the

9    Debtors $6,307,656 in foreign subsidiary cash.

10            I'm prepared to answer any further questions that

11   Your Honor may have; otherwise, I will yield the virtual

12   podium to Mr. Weaver.

13            THE COURT:  Okay.  Both sides, I think do, in

14   fact, assert that amendment number one is unambiguous as far

15   as the meaning of Section 2.13, but I think that it's pretty

16   clear that they each assert that it's unambiguous in favor

17   of their interpretation.

18            And I guess the point there that I would like to

19   focus you on is that the language itself says that the

20   shares will be treated as acquired foreign assets, and it

21   doesn't say anything about the assets of the companies

22   themselves.  Does that -- I guess what you're asking me to

23   read into this document is that the equity interest would

24   somehow being press with the definition of acquired foreign

25   assets, which means that the seller would still own the

Page 28

1    exempt assets even though the shares were transferred?

2           MS. CROZIER:  Yes, that's right, Your Honor.  The

3    phrase, "deemed to be" operated, practically speaking, to

4    carve those excluded assets out of what was being

5    transferred under Section 2.13(a) precisely to ensure that

6    if Transform elected in its sole discretion and for its

7    convenience to pivot to an equity acquisition, the Debtors

8    and their creditors could be no worse off, and the language

9    deemed to be has that effect.

10          Again, it's defined in Blacks and all of the cases

11   that we've made reference to in our papers show that deemed

12   to be means to treat something as if it is and as if it had

13   the qualities of some other thing.  And it's not only the

14   cases or Blacks that uses deemed in that way; the parties

15   themselves used deemed in that way in other places in the

16   asset purchase agreement.

17          For example, in Section 4.1 of the asset purchase

18   agreement, the parties agreed that the closing date would be

19   deemed to be 12:01 a.m. New York City time on the date on

20   which the closing actually occurs.  Well, the closing didn't

21   actually occur at 12:01 a.m. New York City time, but the

22   parties decided that they would treat the closing date to

23   have occurred for purposes of the parties' interactions or

24   relationship going forward, and that's precisely what

25   happened here.

Page 29

1           THE COURT:  So, in essence, what you're saying is

2     that all the parties really needed to say was that the

3     sellers shall transfer the equity interests.  So this extra

4     clause really has to have a separate meaning, which is that

5     the equity interests are, in essence, limited by the

6     definition of acquired foreign assets?

7           MS. CROZIER:  Yes, Your Honor.

8           THE COURT:  I mean, I guess that ultimately is a

9     question for Mr. Weaver.  Why have that extra clause in

10    there if, in fact, the Debtors are selling the assets

11    already, i.e., the equity interest, which are their assets,

12    so they're allowed to sell them.

13          Okay.  I think I don't have any questions other

14    than that at this point, but obviously something else may

15    come up.  So why don't I hear from Transform then.

16          MS. CROZIER:  Thank you, Your Honor.

17          MR. WEAVER:  Thank you, Your Honor.  Andrew Weaver

18    on behalf of Transform.  Your Honor, I think there are two

19    issues.  I'd like to try to address the first issue.

20          We have the issue of what the contract language

21    means, so I want to talk about that.  But you've raised this

22    other issue about Court approval, and I want to put that

23    aside just for a moment if I can and have initial discussion

24    just as to what the contract says and what it means.

25          And if I may, Your Honor, I can answer the

Page 30

1    question you just asked kind of in the context of our

2    argument to you today.  There is really no question about

3    what the definitions of the two key phrases here means,

4    right.  In lieu of means in place of or instead of.  There

5    were two options that were given to Transform: an asset

6    purchase or an equity transfer, an equity purchase.  And

7    then the language, deemed to be, and then what does that

8    language actually mean as it relates to these terms.

9              And, Your Honor, I oftentimes hesitate to do

10   simple analogies for contract cases, but I think here it's

11   informative because I think it demonstrates kind of the

12   legal fiction aspect of deemed to be and what that really

13   means in the context of a contract.

14             It's just by way of a very simple example:  If you

15   have a contract where you are going to have an obligation to

16   create a three-sided structure that will define as a

17   triangle, to have the option also to create a circle, which

18   isn't defined, but everyone knows is round, and you shall

19   deem that circle to be a triangle, you've created a legal

20   fiction.  It's still a round object; the nature of the

21   object doesn't change.  It's just that you satisfy your

22   obligations under the contract if you make a circle as well.

23   You've made a triangle for purposes of the contract.

24             And the idea that the legal fiction somehow

25   actually changes the thing is not what the case law says and

Page 31

1    it's not what the definition means.  It's still, in our

2    example, it's still a round shape even though we're going to

3    call it a triangle and by building it, we've satisfied the

4    agreement.  And if the contract requires us to paint every

5    triangle green, I have to paint the circle as well.

6         Here in this instance, the thing is an equity

7    transaction, which is a standard understood commercial

8    transaction.  It is the transfer of all assets and liability

9    as part of the transaction.  The deemed to be legal fiction

10   doesn't take that item and make it into the definition of

11   acquired foreign asset, it doesn't.

12        What it does is it means wherever in the APA,

13   however it's used where we're talking about acquired foreign

14   assets, this equity transaction, this thing, will count as

15   that and we referred to that.  And for instance, in this

16   agreement under 2.1 in the amendment, there was an addition

17   of section (dd) of 2.1 says that Transform would be

18   acquiring free of any encumbrances acquired foreign assets,

19   and by having the equity transaction be deemed as such, that

20   is picked up by that provision.  That is why you're required

21   to have this additional comment, additional language within

22   the agreement.

23        And the cases, Your Honor, that the Debtors cite,

24   they cite in their reply, even though this is the core of

25   their argument, they cite on the reply, so we didn't get a

Page 32

1   chance to distinguish.  But the cases they cite are fully

2   supportive of this very straightforward process.

3           Just two quick examples, Your Honor.  In the Lucas

4   case, which they rely on most -- I mean, they cite the

5   general premise, but they don't talk about how the legal

6   fiction is applied to the case.  And in that instance, there

7   was a consent judgment and there was an amount due under the

8   consent judgment and the agreement said that that amount due

9   will be deemed to be in trust; that was the legal fiction,

10  there wasn't a trust created.

11          And the Court was specifically asked to determine

12  whether or not there was, in fact, a trust because it was

13  deemed to be a trust, and the Court found it wasn't; it

14  didn't change the thing.  The thing was still money owed

15  under the terms of a consent judgment, but it didn't

16  actually create the trust.

17          And here in our situation, this language does not

18  mean an equity transaction shall now become an asset sale,

19  an affected asset sale.  And even I think more tellingly in

20  another case that the Debtors cite, the Wahl v. Owen case;

21  it's a very simple case.  It's a lease agreement where

22  there's a living space provided; it's deemed to be 660

23  square feet and, in fact, it's less than that.  And by

24  making the living space being deemed to be 660 feet, it

25  didn't create additional living space; it was still a

Page 33

1   smaller living space.

2           But what that language meant was that, as the

3   Court found, the tenant could not claim a misrepresentation

4   because they received less than 660 square feet.  It was

5   deemed to be, the legal fiction was, well, going to act like

6   it was, but the living space was still the living space; it

7   was still less than 660 feet, and that's the situation here,

8   Your Honor.

9           And we know that, we know that because we had an

10  equity transfer; it's exhibit to the Allen declaration, Your

11  Honor, specifically Exhibit B.  But in that equity transfer,

12  the parties were very clear about what was being

13  transferred; it was all the shares.  There was no carveout,

14  there was no mention of anything related to excluded assets.

15  It was an equity transfer; that was enforcing the thing that

16  the parties agreed to under the APA.

17          The fact it was deemed to be an acquired foreign

18  asset did not change that structure and, in fact, that

19  transaction was effectuated as you would expect any

20  transaction to be.  And, in fact, in that purchase

21  agreement, the language of liabilities, which was also added

22  to the APA about Transform taking all of the liabilities for

23  the avoidance of doubt, was specifically included in the SPA

24  for the Hong Kong entity.  So the parties brought in

25  language from the APA about the liabilities, but they didn't

1    bring in anything about excluded assets, they didn't bring

2    in anything about the definition of acquired foreign assets

3    because it was a standard equity transaction.

4            And, Your Honor, we think it's -- you put your

5    finger on it about how this is even supposed to work; how

6    you're going to, in fact, have excluded assets that don't

7    come over as part of the transfer.  I think you would have

8    done it in the SPA.  And in the Hong Kong SPA, that wasn't

9    done; there was never a mention of where are the excluded

10   assets.

11           And frankly, Your Honor, you know, the idea that

12   this might now be a material change, well, you know, under

13   that amendment, Transform took all of the liabilities which

14   was added as a part of the amendment to the AAPA.  If that's

15   not really what was to happen, why is that language included

16   and how is that unwound if this, in fact, was not the deal

17   that was struck and approved by the Court.

18           So Your Honor, on just -- setting aside your

19   approval, but just on the issue of the language of this

20   agreement being plain and straightforward, and what does it

21   mean for this legal fiction.  Your Honor, we think it would

22   be very difficult to read into this agreement, as you said,

23   some type of carveout of the equity transaction when it's

24   very clear why you have the language deemed to be in the

25   agreement.

1              I want to pause there, Your Honor, as to the

2       language of the agreement and see if you have questions on

3       that specific aspect.

4              THE COURT:  Well, I actually have a question on in

5       the in lieu of point.

6              MR. WEAVER:  Sure.

7              THE COURT:  Isn't in lieu of not really in

8       substitution for, but just, in essence, supposed to be an

9       exchange, one thing for another?

10             MR. WEAVER:  Rather than doing option one, you can

11      do option two instead of.

12             THE COURT:  You think it's instead of, as opposed

13      to just they're really the same things except for the form?

14             MR. WEAVER:  Correct.  It's an option, it's a

15      choice; it's not the same thing.  You wouldn't, I don't

16      think --

17             THE COURT:  Well, I know it's a choice.  I guess

18      the question I have though is whether the commonly

19      understood meaning of in lieu of doesn't mean a completely

20      different choice, but rather a choice that's basically the

21      same as the original choice but for its form.

22             MR. WEAVER:  Your Honor, respectfully, I don't

23      think that's the case.  And, you know, we cite to the

24      definition in our papers in place of/instead of, and I don't

25      think that that definition has been questioned by the

1    Debtors.  Instead of means you're not doing the first thing,

2    you're doing something else, it's in placed of.  We're

3    developing a mechanism to sell, to transfer these foreign

4    assets.  And here is an asset purchase structure; instead of

5    that, we might do an equity transfer.

6         And, Your Honor, I would just add -- and again, I

7    know it's the four corners, but, you know, it's not -- it's

8    a little bit surprising, Your Honor, that when the Debtors

9    first made this demand of Transform.  This wasn't their

10   interpretation of the agreement.  They didn't cite to the

11   deemed of language.  And then the second time they made a

12   demand, they didn't cite to this language.

13        Transform's interpretation has been consistent

14   throughout because, again, we think it is the plain reading

15   of this language.

16        THE COURT:  Okay.

17        MR. WEAVER:  Your Honor, I'll -- I'm sorry.

18        THE COURT:  Just going back to the point that I

19   was discussing with the Debtors' counsel, you're saying that

20   there is a use for the phrase deemed to be acquired assets

21   because that term is used elsewhere in the agreement and so

22   that would make sure that these shares would fall within

23   that definition.

24        MR. WEAVER:  Correct, Your Honor.  On page 14 of

25   our papers, we point to Section 2.1(dd), which was part of

1    the amendment; this was added as part of the amendment to

2    the APA.

3              THE COURT:  You mean 2.1(dd), right?

4              MR. WEAVER:  It's 2.1(dd).

5              THE COURT:  Right, okay.  Let me just take a quick

6    look at that.  But this was -- I'm sorry, I guess I'm

7    confused -- this was added in the amendment itself.

8              MR. WEAVER:  Correct.

9              THE COURT:  So it didn't incorporate -- I

10   understood your argument to say that there were other

11   provisions of the asset purchase agreement that had already

12   been negotiated.  I'm sorry, I'm looking at another

13   provision.  But it's self-referential.  Acquired foreign

14   assets shall have the meaning set forth in 2.13(a); that was

15   what was in the original amendment -- I'm sorry, the

16   original agreement.

17             MR. WEAVER:  The original agreement.

18             THE COURT:  Excuse me, the original agreement.

19             MR. WEAVER:  Yes, Your Honor.

20             THE COURT:  And then (dd) just says, "Subject to

21   Section 213, any acquired foreign assets are acquired."

22             MR. WEAVER:  Correct.

23             THE COURT:  So how was the clause being added in

24   amendment number one referring to any existing provision of

25   the asset purchase agreement, as opposed to --

Page 38

1          MR. WEAVER:  Well, Your Honor -- sorry.

2          THE COURT:  -- also added in the amendment.

3          MR. WEAVER:  Well, Your Honor, I think the point

4    is that although it was added as part of the amendment, this

5    was all part of -- this is all one -- I know we talked about

6    this amendment and we'll come to the other point -- this was

7    one transaction.  And as, you know, it's deemed to be makes

8    clear that this non-defined transaction, this equity

9    transaction, that counts as assets being acquired under

10   Section 2.1, free and clear.

11         THE COURT:  But where is acquired foreign assets

12   otherwise used in the original asset purchase agreement?

13         MR. WEAVER:  I believe pre-amendment, it's within

14   the section of 2.13.  But again, I guess, Your Honor, the

15   point I'm trying to make is that everything -- this was an

16   amendment, this was a change, and it all has to be read

17   together.  I wasn't trying to imply that this was only

18   limited to instances prior to the amendment.  This is all --

19         THE COURT:  But your statement in paragraph 31 on

20   page 14 of your objection says that the phrase deemed to be

21   acquired foreign assets -- in essence, you say rather, but

22   I'll put in the word merely -- merely establishes that when

23   the defined term acquired foreign assets is used elsewhere

24   in the APA, these equity interests will be included within

25   that defined term.

1              But the only example given isn't elsewhere in the

2      APA, it's the same use -- it's the use of the term in the

3      amendment, not elsewhere in the APA.

4              MR. WEAVER:  Apologies, Your Honor, I think I

5      understand the confusion.  The APA is defined to be the

6      amendment, the first amendment.  I think that's how

7      typically the APA is defined.

8              THE COURT:  I understand.  But if the defined

9      term, acquired foreign assets, was used in sections of the

10     original APA and, therefore, you know, you wanted to make

11     sure that the defined term as used throughout the APA would

12     apply to the stock, I think I understand your argument.

13             But if it really wasn't used anywhere else, it's

14     only used in the amendment, I don't understand the argument

15     because then it doesn't seem to me that there's any use for

16     that phrase because it's not being used elsewhere in the

17     original APA.

18             MR. WEAVER:  Well, I guess, Your Honor, just to

19     point out the hypothetical.  Let's say that language is not

20     used and we have just the equity transaction, there could be

21     a dispute -- I'm not saying this would happen -- there could

22     be a dispute about whether or not we somehow, Transform

23     somehow took those assets through the equity transaction

24     were somehow encumbered where there was a claim against

25     them.

1          If we don't have the amendment, but we just we

2     don't use that deemed to be and include then in 2.1(dd),

3     there's -- again, I'm not saying this necessarily would

4     happen, but there is a gap there.  There's an opportunity to

5     say that we did not acquire those equity interests in the

6     same manner as we acquired everything else laid out in 2.1.

7          THE COURT:  Well, but if that's the case, then

8     that was the problem with the original agreement because

9     it's added to 2. -- let's see, let's go to the -- 2.1(dd) is

10    a new term and that is the acquired foreign assets.  In

11    other words, even though it apparently was, it was defined

12    as a defined term in the original APA, it was not listed

13    specifically as an acquired asset, i.e., acquired foreign

14    assets, although it did fit in, I think, the general rubric

15    of acquired assets.

16         MR. WEAVER:  Your Honor, you're correct.  But even

17    if you see that addition as a correction, that protection

18    would not apply to the equity transactions unless it was

19    included within that definition.

20         THE COURT:  Well, actually, it would because it

21    was assumed that it would when the parties entered into it

22    in the first place because it was just an acquired asset.

23    The definition of foreign acquired assets was only used in

24    2.13 apparently in the original document.

25         MR. WEAVER:  Correct, Your Honor.

Page 41

```
 1              THE COURT:  So there was really no reason to add
 2    that deemed language to somehow include it in terms that
 3    were already being used in the original agreement because
 4    they weren't being used.  The operative language of the 2.1,
 5    the acquired assets, just defines it generically in the
 6    original agreement, i.e., assets, properties, and rights
 7    related to the business, other than the excluded assets;
 8    that's 2.1, and then it lists the specific one, but those
 9    aren't the only ones.
10              So I guess if that's -- this point is a neutral
11    one to me is between the Debtors and Transform.  I did have
12    another question related to this.  Rather than saying, shall
13    be deemed to be an acquired foreign asset, why didn't it
14    just say shall be an acquired asset or an acquired foreign
15    asset, the stock shall be.  It didn't say that, and that's
16    really what you're basically saying, right?
17              MR. WEAVER:  Respectfully --
18              THE COURT:  You need to say it needs to be.
19              MR. WEAVER:  Your Honor, I apologize.  I think
20    frankly, the shall be would I think be more supportive of
21    the Debtors' position because you're going to make that
22    equity transaction be defined, actually meet that
23    definition.  But by saying shall be deemed to be, it's that
24    legal fiction, it's creating the fiction; it never becomes
25    the defines term.  And none of the cases that the plaintiffs
```

Page 42

```
 1    or the Debtors cite have the item that's deemed to be, it
 2    doesn't change, it doesn't become the defined term.
 3            And so, you know, if the parties wanted this to
 4    be, in fact, just a way to do an asset purchase with
 5    excluded assets, then you would want to make the equity
 6    transaction something different than an equity transaction.
 7    But by having it be deemed to be, you created this legal
 8    fiction.  And again, it's not only the idea of a legal
 9    fiction, but we know it's what happened.
10            THE COURT:  Well, that's a separate point.  And
11    frankly, again, what happens in a bankruptcy case is very
12    different than what happens in another case when you have
13    get approval of a material transaction.
14            MR. WEAVER:  Understood, Your Honor.
15            THE COURT:  But again, just to use a legal
16    fiction, I think, makes this more of an acquired foreign
17    asset, i.e., more of the definition in my mind than less.  I
18    don't understand why they just wouldn't -- you wouldn't just
19    say it's an acquired asset, as opposed to an acquired
20    foreign asset which has the carveout.
21            MR. WEAVER:  Again, Your Honor, the idea of --
22    reading the agreement as a whole and putting all the pieces
23    together, you know, including also the idea that there's
24    this explicit reference that Transform is now taking the
25    liabilities.  You know, if this was attempting to just
```

Page 43

1   replicate what was as defined an acquired foreign asset in

2   that process, there'd be no reason to vary from that process

3   and you would include excluded liabilities as well.  The

4   idea seems to us clear on its face in the agreement --

5           THE COURT:  Well, I guess I would push back on

6   that.  You can certainly take liabilities; that doesn't

7   necessarily mean you take assets.  I mean, it's convenient--

8           MR. WEAVER:  Correct.

9           THE COURT:  -- to take the stock.  You could take

10  the stock under a free and clear order, for example.  Since

11  these were non-debtor subs, you can't take the assets free

12  and clear.

13          MR. WEAVER:  Understood, Your Honor.  But the

14  point being that the makings of an equity transaction as you

15  just described are understood and are consistent with the

16  idea that we're going to acquire assets and we're going to

17  acquire liabilities, and the deemed --

18          THE COURT:  Well, it doesn't say you're going to

19  acquire assets; it does say you're going to acquire

20  liabilities.

21          MR. WEAVER:  Well, for the avoidance of doubt.

22  It's not as if it's saying they're creating something

23  special; it was for the avoidance of doubt.

24          THE COURT:  Well, it doesn't say for the avoidance

25  of doubt, we're acquiring assets.

Page 44

1          MR. WEAVER:  No, it says we're acquiring the

2     shares.

3          THE COURT:  Right.  And then it says for the

4     avoidance of doubt, that also means we're acquiring the

5     liabilities.

6          MR. WEAVER:  Understood, but it's straightforward

7     that we are, in fact, acquiring the shares.  So the idea

8     that --

9          THE COURT:  I'm sorry to interrupt you.  In the

10    definition of acquired foreign assets, you don't have the

11    liabilities.  It just talks about the assets that you

12    acquire and the assets that are excluded.

13         MR. WEAVER:  Correct.

14         THE COURT:  So I guess you think that you would

15    actually need to clarify since you're clarifying the assets,

16    which -- I mean, the liabilities that you'd also clarify the

17    assets if you were going to get the assets, the excluded

18    assets.

19         MR. WEAVER:  Your Honor, you know, we're within

20    the four corners here.  And, you know, the idea that we're

21    going to create this mechanism of somehow carving out assets

22    from the equity transaction -- and again, trying to stay

23    within the four corners -- but when there's never been any

24    indication or any request for any such excluded assets or

25    any mechanism for excluded assets.

Page 45

1           THE COURT:  I understand that they could have

2     provided, or the parties could have provided that there be

3     condition to the stock transfer, which is that all excluded

4     assets will be transferred to the Debtor or you attain --

5     well, yeah, will be transferred to the Debtor at the time of

6     the stock transfer.

7           On the other hand, the Debtors says that's

8     subsumed within the deeming language, deemed acquired for

9     and assets, which also means that you don't need to pay any

10    transfer tax on that transfer; it's just part of the deal.

11          MR. WEAVER:  But, you know, Your Honor, at least

12    from our opinion, it comes back to the fact that the idea of

13    changing the thing, which is what really the Debtors are

14    asking to do, to change this form of transaction, you know,

15    we've not seen any precedent for that, any model for that

16    type of understanding and no case that would provide for

17    that type of mechanism.

18          THE COURT:  Okay.  Well, why don't we then go to

19    the point that we started with, which is --

20          MR. WEAVER:  Sure.

21          THE COURT:  -- that assumes, I believe, that

22    there's a significant change to the original agreement.  Why

23    should I assume that that change got proper approval?

24          MR. WEAVER:  Your Honor, on that point, you know,

25    as we've said, as I mentioned earlier that, you know, this

Page 46

1    information was submitted and understood that it was a part

2    of the docket and put in during oral argument.  But to be

3    honest, Your Honor, if that is a concern that you have about

4    whether or not -- if this is -- you see it as a significant

5    change that was perhaps -- if there's a question of whether

6    it was given proper attention, frankly, Your Honor, we'd

7    like the opportunity to kind of -- to brief that point.

8              It really wasn't raised by the Debtors and,

9    therefore, I think we would like -- you know, there's a lot

10   of history there, Your Honor, and I think we'd prefer to put

11   it in a more organized kind of answer to that question.

12             THE COURT:  Well, what more history is there than

13   what we went through at the start of the hearing?

14             MR. WEAVER:  Well, Your Honor, the idea of the

15   full review of the transcript and what was said, what was

16   done, what was discussed, all those types of things, Your

17   Honor, I think, you know, we would like the opportunity to

18   present it and do a more careful read.  Frankly, this was

19   not something that we'd understood was going to be an issue

20   today, so therefore, I just would feel the opportunity to

21   provide more description and perhaps even some precedents

22   from where the situation may have arisen in other instances.

23             THE COURT:  Okay.  As far as the Debtors are

24   concerned, what is your response to that, Ms. Crozier?

25             MS. CROZIER:  Jennifer Crozier for the record on

Page 47

1     behalf of the Debtors.

2           Your Honor, it is our position that the agreement

3     unambiguously and, on its face, provides that, to the extent

4     Transform pivoted to an equity acquisition, they could not

5     acquire excluded assets.

6           And I will make a few points in response to Mr.

7     Weaver's argument, if I may.  First, Your Honor is correct:

8     in lieu of means in place of.  So all that was happening

9     here, Transform could swap one type of transaction out for

10    another; it could not unilaterally and in its sole

11    discretion alter the economics of the deal in a manner that

12    made the Debtors or their creditors worse off.  So the use

13    of in lieu of there actually supports the Debtors' position

14    here and not Transform's.

15          The second point concerning the fact that deemed

16    to be is merely meant to include the equity interests in the

17    definition of acquired foreign assets.  Mr. Weaver,

18    Transform is wrong about that, Your Honor, and there are

19    several places in the asset purchase agreement that make

20    that clear, and the first is the addition of that last

21    clause to Section 2.4 of the agreement in which the parties

22    made clear that the liabilities of any entity that is an

23    acquired foreign asset shall not be excluded liabilities.

24          The Debtors acknowledge that generally speaking an

25    equity acquisition involves the acquisition of all of the

1    entities' assets and liabilities.  Here, however, the

2    parties, consistent with the economics of the entire deal,

3    the parties made clear that if Transform chose to pivot to

4    an equity acquisition, the excluded assets would be carved

5    out.  But we also wanted to make clear that we were not

6    carving out excluded liabilities, which is precisely why we

7    added that last clause to Section 2.4.

8            Another example in the APA of deemed to be being

9    used is in Section 2.13(b) of the asset purchase agreement.

10   I'm going to turn to it quickly, Your Honor, if I may.

11   There, 2.13(b) relates to minority equity interests in non-

12   US persons.  And as you'll see at the very end of that

13   paragraph -- or rather, it's on the first page of -- it's

14   right below; it's right at the top of page 56 of the

15   redline.

16           It says, "Buyer may elect to acquire other

17   minority equity interests directly from the seller, it being

18   agreed by the parties that such equity interests will be

19   deemed to be acquired for and assets for the purposes of

20   this agreement."  Now that provision concerned primarily the

21   Debtors' shares in a Mexico entity.

22           Sears held less than 50 percent of Sears Mexico

23   and Transform wanted to take those shares.  And so, the

24   parties provided for a similar way of acquiring those

25   shares; they would go through the same process for the same

Page 49

1  reason.  Those shares would form acquired foreign assets and

2  the mechanisms of the asset purchase agreement would flow

3  through and apply to those acquired foreign assets.

4          But here, because Sears held less than 50 percent

5  of Sears Mexico, there were no assets or liabilities to be

6  included or excluded.  We were really just handing --

7  transferring those shares to Transform.

8          So here, the parties said, "The equity interests

9  will be deemed to be acquired foreign assets for the

10  purposes of this agreement."  Whereas, in Section 2.13(a),

11  where we were carving out excluded assets, we said, "Those

12  equity interests shall be deemed to be acquired foreign

13  assets," full stop.

14          And then the two other points I'd like to make,

15  Your Honor.  First is concerning the authority we've

16  referenced in our brief.  It does support our argument here.

17  I can point Your Honor specifically to Johnson against

18  Rambo, which is a case in which the Court would deem a legal

19  action to be against the United States.

20          Even though the United States was not a party to

21  the action, the Court treated the government as though it

22  were a party to the action and the government filed

23  pleadings and, again, behaved in every respect as though it

24  were a party to the agreement, and that's the point that the

25  Debtors are making here, Your Honor.

1           By deeming the equity interests to be acquired

2     foreign assets, that deeming changes or governs the

3     relationship of the parties going forward and the nature of

4     the assets, specifically to exclude excluded assets.

5           And then last but not least, I would point Your

6     Honor to Section 2.1(ee) of the asset purchase agreement,

7     which was also added in the first amendment.  And that

8     provision makes clear, Your Honor, that acquired assets

9     include, "Any bank accounts of the sellers as may be agreed

10    by buyer and sellers prior to the closing date, but for the

11    avoidance of doubt, not including any cash in any such bank

12    accounts."

13          And so, here, this was one of the means by which

14    the parties made clear that Transform was under no

15    circumstances going to acquire excluded assets that the cash

16    or cash equivalents in those bank accounts or any bank

17    accounts being transferred were going to remain with the

18    Debtors.

19           And again, prepared to answer any questions Your

20    Honor may have concerning those points.  Otherwise, I will

21    again yield the virtual podium.

22          THE COURT:  Well, I just go back to my question of

23    you, which is Transform has said it would like some

24    additional time to review the transcript of the sale hearing

25    and to consider whether there is any other response to the

Page 51

1    point I began with, which is that at a minimum here, the

2    context of this amendment would, I believe, require

3    meaningful disclosure to the parties in interest and the

4    Court if the agreement is to be interpreted the way that

5    Transform asserts that it is.

6          And I guess my question of you is, what is your

7    response to that request for additional time?

8          MS. CROZIER:  Your Honor, the Debtors' position is

9    that no further briefing is necessary.  The history was laid

10   out at the outset of the hearing today.

11         THE COURT:  Well, you also say in your motion, you

12   refer to paragraph 54 and to the amendments that were made.

13   Let me ask you a related question.  In one of the letters

14   that's attached to the papers where the counsel had been

15   talking to each other about this issue, obviously before

16   this motion was filed, and one of the points that counsel

17   for Transform makes is that Transform paid taxes on the cash

18   in India.

19         And in the response, the letter from counsel for

20   the Debtors says, well, we can -- we'll refund you the tax

21   payment or you can deduct the tax payment from the money you

22   owe us under the APA because that would have been our taxes.

23   Is that still the Debtors' position?

24         MS. CROZIER:  Yes, it is, Your Honor.  Or I should

25   be specific and say that any portion of that tax related to

Page 52

1    the cash, the Debtors would agree to reimburse that to

2    Transform.

3            THE COURT:  To the cash on the sale date.

4            MS. CROZIER:  That's right.

5            THE COURT:  Okay.  And I guess there's another

6    point I'd like to clear up.  I gather that the Indian

7    transfer still hasn't occurred; is that true?

8            MS. CROZIER:  Your Honor, Jennifer Crozier.  It

9    is, Your Honor.  There has been -- there have been delays in

10   connection with that transfer, largely associated with the

11   global pandemic.  But I can say that the transfer is now

12   moving forward, and I believe it was in process as of April

13   21st, 2021, so that is now moving forward.

14           THE COURT:  Okay.

15           MR. WEAVER:  Your Honor, Andrew Weaver for

16   Transform, if I may.  On the point on additional time, we

17   really -- Transform really do believe it's necessary to have

18   a chance to really present on this issue.  As you noted, the

19   Debtors in their motion, you know, were seeking to enforce

20   the amendment as written as they read it.

21           And to the extent Your Honor has questions -- has

22   raised a question about sufficient notice, we do believe we

23   have a right to address that fully and properly if that may

24   be a basis for the Court's decision.

25           THE COURT:  Okay.  I mean, they did in the first

Page 53

1    couple of pages of their objection refer to the sale order,

2    paragraph 54 of the sale order and the subsequent filing of

3    the APA, so it did appear to me to be present, although

4    honestly, not really addressed by either side.

5              And before I cover this, I want to go back to the

6    original 2.13 and the amendment.  Yeah, I guess that's fine.

7    I think I understand both of your arguments on that point.

8              But what is the response on the argument that

9    2.1(ee) specifies bank accounts of the sellers, but for the

10   avoidance of doubt, not including any cash in any such bank

11   accounts.  I mean, the sellers include -- the sellers who

12   are transferring equity interests.

13             MR. WEAVER:  Your Honor, Andrew Weaver on behalf

14   of Transform.

15             Your Honor, you know, the sellers -- to be clear,

16   that language applies to the seller's bank accounts, which

17   are not the foreign subs, they're not sellers.  You know,

18   that language becomes relevant if --

19             THE COURT:  No, no, but I'm sorry, the sellers are

20   selling the foreign subs.

21             MR. WEAVER:  They're selling the foreign subs, but

22   it's not the seller's bank accounts.  They are the foreign

23   subs bank accounts.  They wouldn't be picked up by the

24   definition, Your Honor.

25             THE COURT:  I got you.

Page 54

1            MR. WEAVER:  And so, that only becomes relevant if

2    we go through the definition of acquired foreign assets.

3            THE COURT:  Right.

4            MR. WEAVER:  So it doesn't change the analysis at

5    all, Your Honor.

6            THE COURT:  Okay.  All right.  I'm going to give

7    you my preliminary ruling on this.  I will give you a couple

8    of weeks to address the context of the transaction, namely

9    the motion for approval of the executed APA that was

10    attached as Exhibit A to the sale order, and then the

11    amendment that was filed and is the amendment that the

12    parties have been addressing, dated February 14, six days

13    after the sale order, filed at Docket No. 2599, as well as

14    the draft proposed amendment number one that was apparently

15    filed on the docket sometime on February 7th and provided to

16    the Court during oral argument and after the evidence was

17    closed on that day while the Court had turned to oral

18    argument on approval -- on the Debtors' motion for approval

19    of the sale agreement.

20            I am also assuming here that there was no

21    discussion of this change that is the subject of this

22    dispute during that oral argument or when it was provided to

23    the Court or thereafter.  And frankly, I don't believe it

24    was provided to the Court as a proposed attachment to the

25    sale order.

1          The parties dispute their intent in entering into

2     amendment number one, and more specifically, the amendment

3     to Section 2.13 of that amendment, as well as related

4     amendments in Section 2.1(dd) and (ee) of the asset purchase

5     agreement.

6          The parties agree on the applicable law for

7     construing the parties' intent under a contract, namely

8     Delaware law, which is the law that the parties chose for

9     the agreement.  The primary objective in construing a

10    contract under Delaware law is to give effect of the intent

11    of the parties.  Lorillard Tobacco Co. v. Legacy Foundation,

12    903 A.2d 728, 739 (Del. 2006).

13         To determine what contractual parties intended,

14    Delaware courts start with the text of their agreement.

15    Sunline Commercial Carriers, Inc. v. Citgo Petroleum Corp.,

16    206 A.3d 836, 846 (Del. 2019).  And it's clear under

17    Delaware law that courts interpreting contracts will give

18    effect to the plain meaning of the contract's terms and

19    provisions to best indicate their intent.  Lorillard

20    Tobacco, 903 A.2d 739.  See also, Osborn Ex Rel. Osborn v.

21    Kemp, 991 A.2d 1153, 1159-60 (Del. 2010).

22         Further, unless there is an ambiguity in the

23    language of the agreement, Delaware courts interpret the

24    contract terms according to their plan ordinary meaning.

25    Alta Berkeley VI C.V. v. Omneon, Inc., 41 A.3d 318, 385,

Page 56

```
 1    (Del. 2012).  In construing that plain meanings, the Court

 2    must construe the contract as a whole viewing each part in

 3    light of the others, which means that the intent of the

 4    parties may not be gathered from tax portions of the

 5    contract or from any clause or provision standing by itself

 6    and meaning which arises from particular portion of an

 7    agreement cannot control the meaning of the entire agreement

 8    if such inference runs counter to the agreement's overall

 9    scheme or plan.  EI Du Pont De Nemours v. Shell Oil Co., 498

10    A.2d 1108, 1113 (Del. 1985).

11            Finally, a contract is not rendered ambiguous

12    simply because the parties do not agree upon its proper

13    construction.  Rhone-Poulenc v. American Motorists Insurance

14    Co., 616 A.2d 1192, 1195 (Del. 1992).  While a court under

15    Delaware law, as noted just now, should not look to parol

16    evidence or extrinsic evidence if the terms of an agreement

17    are not ambiguous.

18            The Court should consider undisputed background

19    facts to place the contractual provision in its historical

20    setting.  S.I. Management LP v. Charlebois, C-H-A-R-L-E-B-O-

21    I-S, 707 A.2d 3743 (Del. 1998) and Eagle Industries v.

22    DeVilbiss Health Care, 702 A.2d 1228, 1233 (Del. 1997).

23            In the former case, that is the Charlebois case,

24    the setting was important to the Delaware Supreme Court in

25    that the agreement was a multiparty agreement that the Court
```

Page 57

1    said should be construed against the general partner to one

2    part of that agreement, given that multiparty nature where

3    the other parties were limited partners.

4            That latter point is important here because there

5    is an important bankruptcy law based on the facts as I

6    understand them today on the record of this hearing and the

7    documents on the docket; namely, any transaction out of the

8    ordinary course, including the asset purchase agreement, is

9    not binding on a debtor-in-possession until after notice of

10   hearing and court approval.

11           The asset purchase agreement here is no exception

12   is subject to extensive notice, that is the original form of

13   the agreement, and substantial objections, including by the

14   Official Unsecured Creditors' Committee.  One reason for

15   that extensive notice and the creditors' committee's

16   scrutiny of the agreement is that the agreement was with an

17   insider of the Debtors, Transform, a company controlled by

18   the controlling equity holder of the Debtors and that would,

19   in large measure, take over the Debtors' employees and

20   management.

21           The Debtors, to protect the estate in light of the

22   foregoing, established a special board committee to

23   negotiate the agreement with Transform and its principal.

24   However, every step of the way, the committee was looking

25   over that committee's shoulders, that board committee

Page 58

1    shoulders, and casting a skeptical eye on the asset purchase

2    agreement.

3           There is no doubt in my mind that Transform's

4    interpretation of the relevant provision to the present

5    dispute, namely Section 2.13 as amended in amendment number

6    one, would materially and adversely to the Debtors' estate

7    modify the agreement that had been noticed for approval and

8    that, at least until the time that a substantially similar

9    version of Docket 2599, namely the executed amendment number

10   one dated February 14, 2019, was filed.

11          Again, I am assuming it was filed sometime during

12   the highly contested sale hearing, and I believe never

13   introduced into evidence and only generically as an

14   amendment referenced in oral argument to the Court, did the

15   agreement provide for, under Transform's interpretation of

16   it, the ability of the buyer to retain what would otherwise

17   have been clearly an excluded asset, namely the cash in the

18   foreign subsidiaries bank accounts.

19          I believe there is no dispute that the original

20   agreement and the one that was attached to the Court's order

21   approving the Debtors' motion and that agreement as Exhibit

22   A would have provided, based on the interaction of its

23   Section 2.13 and the definition of the acquired assets in

24   Section 2.1, that the cash in the foreign subsidiaries bank

25   accounts would have been an excluded asset and not had gone

1   to Transform.  It turns out that it appears that cash is in

2   excess of $6.3 million or was in excess of $6.3 million on

3   the closing date of the transaction.

4          The parties disagree as to the plain meaning of

5   Section 2.13, and frankly, the arguments of both sides are

6   reasonable counterbalanced against each other.  The Debtor

7   contends that given the clear exclusion of the cash in the

8   foreign subsidiaries bank accounts under the original APA,

9   that the option that the Debtors provided in the amendment

10  to transfer instead of the assets of the foreign

11  subsidiaries, but instead the stock of those subsidiaries

12  was intended to exclude or impress upon that transferor the

13  exclusion of the cash in the bank accounts.

14         And in addition to the context that I've already

15  described, that was memorialized by the parties' actual

16  language in the added toggle or option provision in 2.13(a),

17  which provided not only that the sellers shall use

18  reasonable best efforts to transfer such equity interests,

19  but also provided which equity interests shall be deemed to

20  be acquired foreign assets, namely shall be deemed to be

21  governed by the definition of acquired foreign assets, which

22  would exclude cash.

23         The Debtors also assert that the phrase embodying

24  the option, which states that if at any time prior to the

25  date, that it's 60 days after the closing date, the buyer

Page 60

1    determines in its sole discretion and notice by the seller

2    that may be necessary or desirable to acquire all of the

3    equity interests in the foreign subsidiary in lieu of the

4    acquisition of assets and assumptions and liabilities

5    contemplated by the first sentence of this Section 2.13,

6    i.e., the original provision of 2.13, then the seller shall

7    use reasonable best efforts to transfer such equity

8    interests, and then it adds, "which equity interests shall

9    be deemed to be acquired foreign assets."

10          The Debtors assert that the phrase "in lieu of"

11   should be construed as not simply a switch to a very

12   different transaction that would capture the cash for

13   Transform, but instead a transaction that, albeit in

14   different form, would be in place of and substantially

15   consistent with the original and exclusive right of

16   Transform, which was to buy the assets and related

17   liabilities.

18          Transform contends to the contrary that in lieu of

19   means simply instead of, and that can be instead of and very

20   different from, as opposed to instead of and similar to

21   except different in form, and that the phrase shall be

22   deemed to be acquired foreign assets merely incorporates the

23   definition of acquired foreign assets as it applies to the

24   sold equity interest that it has the option to buy under

25   this amendment.

1           The problem with that interpretation, that latter

2     interpretation, is that the phrase acquired foreign assets

3     really had not meaning in the original agreement and only

4     applies to terms in the amendment which are, in essence,

5     self-referential to paragraph 2.13.

6           So while it is generally within the contemplation

7     of people that when you buy stock, you get the underlying

8     assets of the company whose stock has been sold to you,

9     subject to any claims against that company, of course, which

10    would have priority over the stock.

11          The context here would argue a more nuanced

12    reading of this agreement and would accord more weight to

13    the Debtors' interpretation of the phrase, "deemed to be

14    acquired foreign assets," namely, that the parties put that

15    provision in this agreement where they wouldn't have had to

16    otherwise because they intended to exclude from the assets

17    transferred the cash and other excluded assets from the

18    businesses that were transferred.

19          Of course, one could have documented this to

20    specifically provided for that and the parties did not do

21    that.  And one could have made it clearer than simply using

22    the phrase, "in lieu of," which is often misused simply to

23    reflect any change, even if it's a dramatic change, from

24    what was supposed to be in its stead, although I believe the

25    proper usage of the term contemplates a change in form and

Page 62

1    not in value, i.e., X in lieu of salary, and they did not do

2    so.

3           However, given the overall context here and,

4    importantly, the fact that it does not appear to me that the

5    material change that would be represented by Transform's

6    reading of this provision was, in fact, ever described to

7    the Court or in any meaningful way before parties in

8    interest and the Court, and indeed was not approved by the

9    Court when it entered into -- I'm sorry -- when it signed

10   and entered the sale approval order, which did not attach

11   the Exhibit B that was supposed to be the amendment and only

12   attached the original agreement, and then provided in

13   paragraph 54 that changes could be to the asset purchase

14   agreement only if they were not material.

15          I find that the Debtors' interpretation is the

16   better interpretation, and that any balance as between the

17   two should be construed against Transform, given the

18   circumstances of the submission of the amendment -- or non-

19   submission rather -- to the Court and parties in interest in

20   any way that would highlight the important change that

21   Transform's interpretation would provide for.

22          It is in that context much more logical to assume

23   that the Debtors' interpretation was correct and that it,

24   therefore, believed that the Debtors and Transform therefore

25   believed that disagreement really did not represent a

Page 63

1    material change from the asset purchase agreement that was

2    attached as Exhibit A to the sale order and that was before

3    the Court and the parties in interest at the sale hearing.

4           Transform has argued that at this point, the

5    Debtors should be equitably estopped from taking their

6    position and/or be deemed to have acquiesced in Transform's

7    interpretation, but I conclude that Delaware law on both of

8    those equitable doctrines would not, in fact, apply here.

9           The doctrine of acquiescence is a doctrine that

10   requires a showing of the acquiescence, which would then be

11   binding on a party in interest, where that party has full

12   knowledge of his rights and material facts at the time and

13   remains inactive for a considerable period of time or freely

14   give recognition to the act or conducts himself in a manner

15   inconsistent with any subsequent repudiation of the act,

16   thereby leading the other party to believe the act has been

17   approved.  Cantera v. Marriott Senior Living Services, Inc.,

18   1999 WL 18823 at page 8 (indiscernible) Feb. 18, 1999.

19          Here, the facts which are uncontroverted as set

20   forth in the declaration of Mr. Acevedo show that the Debtor

21   did not have the critical fact of the dollar amount of cash

22   in the Debtors' bank accounts -- again, I'm referring to the

23   Acevedo declaration as to the circumstances why they did not

24   have that knowledge -- until well after the stock transfer.

25   And really rather shortly thereafter, albeit with an

Page 64

1    exchange of correspondence where they made demand and tried

2    to resolve the matter without the need for litigation,

3    commenced this litigation.  That set of facts does not fit

4    into the acquiescence doctrine in Delaware.

5            Moreover, again given the notice requirements for

6    such a change if Transform's interpretation is correct, the

7    other party, i.e., Transform, should not reasonably have

8    believed that merely the Debtors' inaction, even assuming

9    there was inaction, was sufficient to really think that this

10   material change had received the requisite approvals, i.e.,

11   after due notice and Court approval.

12           Similarly, the doctrine of estoppel is applied

13   under the law of Delaware would not apply here.  The type of

14   estoppel asserted by Transform is equitable estopped; that

15   has been defined by the Delaware courts as, quote, "A narrow

16   doctrine that is sparingly invoked."  Hallisey, H-A-L-L-I-S-

17   E-Y v. Arctic Intermediate, LLC (2020 Del. Chancery) Lexis

18   331 at page 8 (Del. Chancery, Oct. 29, 2020).  And according

19   to the Hallisey Court, the party asserting equitable

20   estoppel bears the burden of proof, which is clear and

21   convincing evidence.

22           Here, there is not clear and convincing evidence

23   that the elements of equitable estoppel have been

24   established.  Those are when a party by its conduct,

25   intentionally or unintentionally, leads another in reliance

Page 65

1    upon that conduct to change position to its detriment.  Id,

2    quoting American Family Mortgage Corp. v. Acierno, 1994

3    Delaware Lexis 105 at page 14 (Del. Supreme Court, March 28,

4    1994).

5              In addition, courts in Delaware require the party

6    asserting estoppel to show that it, quote, "Lacked knowledge

7    or the means of obtaining knowledge of the truth," in order

8    to prevent parties who were willfully reckless

9    (indiscernible) and blind to the truth and exploiting

10   estoppel to their advantage.  HC Companies v. Myers

11   Industries, M-Y-E-R-S, 2017 Del. Chancery 833 at page 14

12   (Del. Chancery, Dec. 5, 2019).

13             Here again, I believe the facts and circumstances

14   whereby this amendment was entered into and, frankly, it

15   appears not reasonably put before the Court and parties in

16   interest, would show that Transform lacked -- has failed to

17   show that it lacked knowledge or means of obtaining

18   knowledge of the truth regarding the proper interpretation

19   of this agreement, and that the issue remained open,

20   notwithstanding the stock sale.

21             Indeed, the parties have disputed the consequences

22   of the stock sale in interpreting Section 2.13.  The Debtor

23   is stating that the stock sale is not the end of the meaning

24   of the provision, and it also includes a limitation on the

25   stock sale, namely that cash and other excluded assets

Page 66

1    should be carved out of it, which they only relatively

2    recently learned such assets existed; whereas, Transform has

3    said the interpretation ends with -- begins and ends with

4    the stock sale.

5            So the conduct, namely the stock sale, to my mind

6    does not constitute leading Transform to rely on that

7    conduct to change its position to its detriment, which it

8    also has not shown for equitable estoppel to be found here.

9            I will note that, consistent with the equities

10   however, the Debtors continued to propose that Transform can

11   set off from the cash that it would otherwise have to

12   transfer to the Debtors based on my ruling, that portion of

13   the taxes paid by them post-closing based on their holding

14   the cash.  To me, that is a proper equitable result and

15   would be the only portion of equitable estoppel that would,

16   in fact, apply here, and the Debtors have recognized it by

17   permitting that deduction.

18           So that is my preliminary ruling.  I will give

19   Transform two weeks to file any declaration exhibit that I

20   can take judicial notice of and/or a memorandum of law to

21   address the facts and circumstances and legal effect of the

22   Court and parties in interest not being apprised until after

23   the record was closed at the sale hearing, and more

24   specifically, not being apprised of any material change as

25   provided for in amendment number one before the sale order

Page 67

1   was entered into and the effect of the sale order not

2   actually attaching amendment number one as an exhibit as

3   referenced in the definition of the APA Exhibit B.

4            The Debtors will have a week if they choose to

5   reply to any such pleadings that are filed within the two-

6   week deadline, and I'll decide whether I will amend my

7   ruling or instead make it my final ruling.  If I make it my

8   final ruling, I will ask the Debtors to submit an order

9   consistent with the relief that they've requested, and

10   direct them not to formally settle the order on counsel for

11   Transform, but to copy them on it so that they could confirm

12   that it's consistent with my ruling.

13            If I decide to modify my preliminary ruling, I may

14   or may not need a hearing.  I may simply, again, direct

15   someone to submit an order.

16            So as far as a deadline is concerned, that would

17   be the close of business on May 11th for any supplemental

18   filing by Transform on that narrow issue and/or fact

19   pattern, and the Debtors would have until May 18th to file

20   and serve a response.  Both sent to counsel should email

21   those filings to chambers, and I would also ask you to email

22   a copy of the transcript of today's hearing to chambers.

23            Does anyone have any questions?

24            MS. CROZIER:  No, Your Honor, thank you.

25            MR. WEAVER:  No, Your Honor.

Page 68

1              THE COURT:  All right, very well.  So I think that

2    concludes this morning's hearing, unless anyone has anything

3    else that I missed on the agenda.  Okay, thank you everyone.

4    I'll go off at this point.

5              (Whereupon these proceedings were concluded at

6    12:20 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 69

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5     Sonya Ledanski       Digitally signed by Sonya Ledanski
                           Hyde
6     Hyde                 DN: cn=Sonya Ledanski Hyde, o, ou,
                           email=digital@veritext.com, c=US
7                          Date: 2021.04.29 15:44:36 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  April 29, 2021