UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
:
In re    :
:    Chapter 11 Case No.
:
SEARS HOLDINGS CORPORATION, *et al.*,    :    18-23538 (RDD)
Debtors.[1]    :
:    (Jointly Administered)
:
:
------------------------------------------------------------X

**TRANSFORM HOLDCO LLC'S
SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO THE
DEBTORS' THIRD MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT**

1.  Transform Holdco LLC ("Transform") respectfully submits this supplemental memorandum of law in opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement, ECF No. 9395 (the "Motion" or "Mot."). The memorandum addresses the issues left open at the hearing on April 27, 2021: (i) whether the Court and parties in interest had adequate notice of the First Amendment to the Asset Purchase Agreement (the "First Amendment") and, as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 130 W. 44nd St., 17th Fl., New York, NY 10036.

18-23538-shl    Doc 9483    Filed 05/11/21    Entered 05/11/21 16:58:42    Main Document
Pg 2 of 14


a consequence, the Court approved the First Amendment by virtue of the Sale Order; and (ii) whether the relevant amendments to Section 2.13(a) of the APA, as Transform argues the language should be read, were "material changes."

2.      The Court issued a preliminary ruling on the Motion at the end of the April 27, 2021 hearing, interpreting the relevant language of Section 2.13 of the APA, and finding "the arguments of both sides are reasonabl[y] counterbalanced against each other." Apr. 27, 2021 Hr'g Tr. 59:5-6. The Court went on to preliminarily find:

> However, given the overall context here and, importantly, the fact that it does not appear to me that the material change that would be represented by Transform's reading of this provision was, in fact, ever described to the Court or in any meaningful way before parties in interest and the Court, and indeed was not approved by the Court when it entered into -- I'm sorry -- when it signed and entered the sale approval order, which did not attach the Exhibit B that was supposed to be the amendment and only attached the original agreement, and then provided in paragraph 54 that changes could be to the asset purchase agreement only if they were not material.
>
> I find that the Debtors' interpretation is the better interpretation, and that any balance as between the two should be construed against Transform, given the circumstances of the submission of the amendment -- or non-submission rather -- to the Court and parties in interest in any way that would highlight the important change that Transform's interpretation would provide for.

Apr. 27, 2021 Hr'g Tr. 62:3-21.[2]

3.      As is true for many provisions of the APA (as well as other portions of the First Amendment), the specific language of the amendment to Section 2.13 was not discussed during the hearing to approve the global sale transaction by and among the Debtors and Transform (the "Sale Hearing"), but all parties of interest, including the Unsecured Creditors' Committee

---

[2] The Court in its preliminary ruling emphasized that extensive notice was necessary here because the APA was an agreement "with an insider of the Debtors, Transform, a company controlled by the controlling equity holder of the Debtors . . . ." Apr. 27, 2021 Hr'g Tr. 57:11-20. As discussed further below, the APA was negotiated on behalf of the Debtors by an independent restructuring committee and it was the Debtors, not Transform, with superior knowledge of the facts most relevant to the amendment to Section 2.13, namely the amount of cash in the Foreign Subsidiary Bank Accounts.

2

("UCC"), had notice of the changes and full opportunity to comment or object, but did not do so. Further, while not attached, the Sale Order specifically referred to, and cited the Docket Number for, the previously filed version of the First Amendment and noted that the First Amendment would be subsequently filed with the Court, which it was on February 14, 2019. Notably, the language of Section 2.13 in the initially filed (and cited) version of the First Amendment did not change in the final, executed version of the First Amendment.

4. Moreover, even assuming the Debtors' reading was correct, the changes to Section 2.13 of the APA resulted in an impact on the Debtors' estate of approximately 0.1 percent of the total $5.2 billion value under the APA, an objectively non-material change to the overall agreement. Accordingly, Transform respectfully requests the Court revisit its preliminary ruling, and in evaluating the counter-balanced interpretations offered by the parties, apply the plain language of the First Amendment and deny the Motion for the reasons set forth in Transform's Brief in Opposition to the Motion ("Transform Opposition").

**I. Third Parties, Including the UCC, Had Notice of the Amendment to Section 2.13, and the First Amendment, as Incorporated into the Sale Order, Was Approved by the Court**

5. At the hearing on April 27, 2021, the Court asked whether the First Amendment "was introduced into evidence at the sale hearing," and whether the UCC had "more notice" of the First Amendment beyond the fact that it was filed on the docket during the course of the Sale Hearing. Apr. 27, 2021 Hr'g Tr. 21:18-25, 23:23-24. Because this issue had not been raised by the Debtors, counsel for both parties were unprepared to fully address these issues that were first raised during the hearing, and Transform requested an opportunity to more fully review the record and submit this supplemental memorandum. A review of the Sale Hearing record shows that the parties and Court discussed the First Amendment at each day of the Sale Hearing, and the UCC

3

played an active role in negotiating the terms of the First Amendment. Indeed, the UCC offered to introduce a draft of the First Amendment into evidence at the Sale Hearing.

6. Because the First Amendment included the Credit Bid Release language that was central to the overall deal, it was the subject of extensive negotiation by the parties. On the first day of the Sale Hearing, counsel for the Restructuring Subcommittee referred to the draft First Amendment that was "going back and forth between the Subcommittee and ESL," and stated that they would "show it to the [UCC]." Feb. 4, 2019 Hr'g Tr. 32:20-33:8. By the second day of the Sale Hearing, the UCC had received a version of the First Amendment and engaged in active negotiations with the other parties in interest about the First Amendment. *See* Sept. 12, 2019 Hr'g Tr. 132:12-20 (counsel for the Debtors describing that during the week prior to February 8 "the advisors to the Debtor and advisor to the UCC – were actually litigating against each other . . . the M&A folks were drafting the first amendment to the APA").

7. On the second day of the Sale Hearing, counsel for the UCC offered to introduce the First Amendment to the APA into evidence. Feb. 6, 2019 Hr'g Tr. 289:16-20 ("Now, I am going to mark for identification as exhibit 181 an amendment to the asset purchase agreement that the committee received late last night, your Honor.").[3] Later that night, the UCC sent comments to the First Amendment to the Debtors, the Restructuring Subcommittee, and Transform, noting that the proposed amendment "remains subject to further review and comment in all respect."

---

[3] Counsel for the Restructuring Subcommittee objected on the basis that it was "not an appropriate line of inquiry except if it's simply to make a rhetorical point that has no meaning in this proceeding," and counsel for the UCC agreed to move on from this topic. *Id.* 291:3-293:18. But even if the draft First Amendment was not formally admitted into evidence, this exchange makes clear that (i) the UCC had reviewed the First Amendment before the close of evidence in the Sale Hearing; (ii) the UCC provided the Court with a physical copy of the draft First Amendment before the close of evidence; (iii) all parties in interest were on notice as to the existence and content of the First Amendment before the close of evidence; and (iv) the Court had the opportunity to ask questions with respect to, or request a copy of, the First Amendment that the UCC sought to introduce.

4

O'Neal Decl., Ex. A, Email from Philip Dublin, Counsel to the UCC (Feb. 6, 2019).[4] The provision of the First Amendment amending Section 2.13(a) of the APA did not change between this draft provided to (and proffered as an exhibit by) the UCC and the final version of the First Amendment. O'Neal Decl., Ex. B, Redline between 2.13 Language in Attachment to Ex. A and the final version of the First Amendment at ECF No. 2599.

8. At 6:53 AM on February 7, 2019, the final day of the Sale Hearing, the Debtors filed a substantially final draft of the First Amendment with the Court. *Notice of Filing Amendment to the Asset Purchase Agreement*, ECF No. 2456. That document filed with the Court included the exact final language of Section 2.13(a). *See Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement*, ECF No. 2599 at 355-56 (redline of the February 7, 2019 draft to the final version of the First Amendment showing that there were no changes to Section 2.13). At the UCC's request, the Debtors sent them an editable version of the First Amendment that morning before the start of the hearing. O'Neal Decl., Ex. C, Email from Naomi Munz, Counsel to the Debtors (Feb. 7, 2019). In Court that morning, counsel for the Restructuring Subcommittee distributed copies of the First Amendment that had been filed on the docket hours before. Feb. 7, 2019 Hr'g Tr. 648:5-14 ("MR. BRITTON: I have an amendment to the asset purchase agreement that was filed by the debtors this morning. . . . I have a copy here that I can hand up to your Honor. THE COURT: Okay.").

9. While the UCC's comments to the First Amendment and the discussions of the First Amendment that took place during the Sale Hearing focused primarily on the terms of the Credit Bid Release as defined in the Sale Order, and there was no specific discussion of the amendments to Section 2.13, there can be no question that all parties, including the UCC, had notice of the

---

[4] Transform's understanding is that there were also bilateral negotiations between the Debtors and the UCC regarding the First Amendment to which Transform was not a party.

changes to Section 2.13 and ample opportunity to comment or object. As the Court noted in its preliminary ruling, the UCC "was looking over [the restructuring] committee's shoulders … and casting a skeptical eye on the asset purchase agreement." Apr. 27, 2021 Hr'g Tr. 57:21-58:2. Yet, even though the UCC reviewed the First Amendment through its skeptical eye, it did not raise any objection or concern as to language that the Court has preliminarily found, based on reasonably balanced arguments, could be read to provide that Transform acquired all of the assets of the Foreign Subsidiaries.

10. On February 8, 2019, the Court entered the order approving the sale of substantially all of the Debtors' assets to Transform. *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief*, ECF No. 2507 (the "Sale Order"). The Sale Order makes clear that the First Amendment would not be attached as an exhibit, but rather Exhibit B to the Sale Order would be the January 17, 2019 version of the APA, "as may be amended, restated, amended and restated from time to time, **including pursuant to that certain Amendment No. 1**," defined under the Sale Order to be the Asset Purchase Agreement (emphasis added). *Id*. at 2.[5] Importantly, footnote 3 of the Sale Order, inserted where the Sale Order defines the term Asset Purchase Agreement, stated that "Amendment No. 1 to the Asset Purchase Agreement was filed in substantially final form on February 7, 2019 at Docket No. 2456 (the 'APA Amendment'). Upon Closing and execution the Debtors will file the executed version of the APA Amendment with the Court." Sale Order at 2 n.3. The substantially final form of the First Amendment – embodying the input of the Debtors,

---

[5] The January 17, 2019 APA was attached as Exhibit B to the Sale Order. Sale Order, Exhibit B (page 98 of the docket entry).

6

Restructuring Subcommittee, Transform, and the UCC – filed on February 7, 2019, included the amendments to Section 2.13.  The final version of the First Amendment was executed on February 11, 2019, and the APA sale closed that same day.  The Debtors filed the executed First Amendment with the Court on February 14, 2019.  *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement*, ECF No. 2599.

11. Accordingly, Transform respectfully submits that the Court's entry of the Sale Order demonstrates review, consideration, and approval of the First Amendment, including the amendment to Section 2.13.  The language at issue was finalized and offered into evidence during the Sale Hearing, later distributed during the Sale Hearing and handed up to the Court, filed on the docket prior to the close of Sale Hearing, and the Sale Order itself specifically referenced the substantially final form of the First Amendment and the fact that the executed version of the First Amendment would follow.  Transform was unaware of any disagreement as to the plain language reading of the amendment, and the UCC and other creditors who had notice of the First Amendment, and in fact extensively reviewed and commented on the language, did not raise to the Court's attention any objection regarding Section 2.13.

12. All parties in interest have treated the First Amendment as part and parcel of the APA for more than two years.  Shortly after the Closing Date, the Debtors and Transform took initial steps to effectuate the transfer of the Foreign Subsidiaries without any effort to carve out assets.  In response to a request from the Debtors, on March 4, 2019, Keith Stopen (a former employee of the Debtors who became employed by Transform post-closing) emailed William Murphy of M-III Partners the Foreign Subsidiaries' balance sheets, which indicated that they held

$6,687,388 in cash and cash equivalents as of February 2, 2019. Stopen Decl, Exs. A and B, Email from Keith Stopen of Transform and attachment (Mar. 4, 2019).[6]

13. On April 9, 2019, Transform elected to acquire "all of the equity interests" in the Foreign Subsidiaries. *Declaration of Charles W. Allen in Support of Transform Holdco LLC's Brief in Opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9427 ("Allen Decl."), Ex. A, Email from Kristen Arn-O'Rourke (Apr. 9, 2019) (providing notice that Transform "deemed it necessary and desirable to acquire all of the equity interests identified below as Acquired Foreign Assets," including "[a]ll equity interests held by Sellers or their Subsidiaries in each of" the Foreign Subsidiaries). One week later, the Debtors transferred all of the equity interests in the Hong Kong Subsidiaries to Transform. Allen Decl., Ex. B, Share Purchase Agreement (Apr. 16, 2019) (the "Hong Kong SPA"). The Debtors did not seek to carve any assets out of this transfer, and specifically did not attempt to carve out the cash in the bank accounts.

14. In the course of the parties' APA disputes over the last two years, both the Debtors and Transform have always treated the APA and First Amendment as a single integrated agreement, and no third party has raised any concerns about lack of notice regarding the First Amendment. The parties' defined term "APA" in the APA disputes has always incorporated both the Asset Purchase Agreement executed on January 17, 2019, and the First Amendment executed on

---

[6] The Debtors submitted the Declaration of Enrique Acevedo in support of their reply brief, ECF No. 9437, which was not admitted into evidence at the April 27, 2021 hearing. Nor could it have been: Under Local Rule 9014-2 of the United States Bankruptcy Court for the Southern District of New York, that hearing – the first scheduled in this contested matter – was not an evidentiary hearing.

In any event, while Mr. Acevedo's Declaration describes M-III's perception in January and February 2019 of the Foreign Subsidiaries' cash position, it omits that M-III received documentation in March 2019 evidencing that the Foreign Subsidiaries had more than $6.5 million in cash and cash equivalents as of February 2, 2019. To the extent that the Court holds an evidentiary hearing on this matter and accepts Mr. Acevedo's Declaration into evidence, Transform requests the opportunity to cross-examine him.

8

February 11, 2019. *See, e.g.*, *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation*, ECF No. 2796 at 2 (defining "APA" as "that certain Asset Purchase Agreement, dated January 17, 2019 (as amended on February 11, 2019, and as amended or modified from time to time)"); *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement*, ECF No. 4430 at 1 (same).

15. The parties have frequently relied on the terms of the First Amendment in the course of their APA disputes, and the Court's decisions resolving these disputes have relied on the APA as revised by the First Amendment. For example, the Court relied on language in the First Amendment to resolve disputes involving EDA funds (First Amendment § 1.02 (amending APA § 2.1(p)), mechanics' liens (First Amendment § 1.44 (amending APA § 9.11(a)(vi))), and property in Hoffman Estates (First Amendment § 1.48 (amending APA Schedule 1.1(p))). *See, e.g.*, July 11, 2019 Hr'g Tr. 129:22-130:3 ("THE COURT: [T]he first of the disputes between Transform, the buyer and the Sears Debtors over the meaning and enforcement of their asset purchase agreement <u>as amended</u> pertains to Section 2.1(a) of the agreement . . . .") (emphasis added); Sept. 12, 2019 Hr'g Tr. 238:15-24 ("THE COURT: I have not changed my mind on my interpretation of Section 2.3(p), and how that ties into Section 9.11. . . . Both of these provisions appear in the first amendment."). None of these changes set forth in the First Amendment were subject to exceptional notice or specifically discussed during the Sale Hearing.

16. At no point in the 27 months since the First Amendment was executed has the UCC or any other creditor or party in interest suggested that any aspect of the First Amendment was enacted without proper notice or Court approval. *Compare In re Lehman Bros. Holdings Inc.,* 445

9

Pg 10 of 14

B.R. 143, 151 (Bankr. S.D.N.Y. 2011) (deciding to treat a clarification letter that "radically" changed provisions of an asset purchase agreement but lacked bankruptcy court approval "as having been approved by virtue of the combination of references made to the Clarification Letter in the Sale Order and the conduct of the parties demonstrating unequivocal reliance on the document"); *see also id.*, 478 B.R. 570, 584-85 (S.D.N.Y. 2012) (finding that the clarification letter was enforceable because "the Sale Order explicitly *pre*-approved the Clarification Letter").

17. In sum, Transform respectfully submits that the Court and all parties in interest had proper notice of the First Amendment – and the final amended language of Section 2.13(a) – before the close of evidence during the Sale Hearing, and the Court's entry of the Sale Order specifically referencing the First Amendment.

## II. The Changes to Section 2.13(a) in the First Amendment Were Not "Material Changes" in the Context of the APA As a Whole

18. Even if the Court determined that there was insufficient notice of the First Amendment and that the Court did not approve the First Amendment in the Sale Order, the Debtors have offered no evidence that the amendments to Section 2.13(a) would constitute "material changes" to the APA given the context of the APA as a whole. Transform respectfully submits that, given the amounts at issue, the changes could not be material.

19. The Sale Order approving the APA provides: "The Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not **materially change** the terms of the Asset Purchase Agreement or Related Agreements, documents or other instruments." Sale Order at ¶ 54 (emphasis added).

20. Transform acquired substantially all of the Debtors' assets for $5.2 billion in value. *See* Feb. 7, 2021 Hr'g Tr. 915:13-14 (the Court concluding that the transaction has $5.2 billion in value). The Debtors now seek $6,307,666 from Transform – approximately 0.12% of the total value of the APA transaction. As an objective matter, this amount does not "materially change the terms of the [APA]." Sale Order at ¶ 54.

21. Neither the Sale Order nor the APA defines the term "material change." Courts both in this District and in Delaware look to dictionaries for assistance in determining the plain language of an undefined term. *See In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 182 (S.D.N.Y. 2020) (consulting Webster's Dictionary and Black's Law Dictionary to determine the ordinary meaning of a term in a court order that was undefined); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

22. Black's Law Dictionary defines "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential <material alteration of the document>." *Material*, BLACK'S LAW DICTIONARY (11th ed. 2019). Importantly, a change to an agreement is material only if it "result[s] in surprise and hardship if incorporated without express awareness by the other party." *In re Chateaugay Corp.*, 162 B.R. 949, 955 (Bankr. S.D.N.Y. 1994) (quoting U.C.C. 2-207, Official Uniform Comment, No. 4); *see also Fresh Direct, Inc. v. Harvin Foods, Inc.*, 2017 WL 1197674, at *7 (D. Del. Mar. 30, 2017) (quoting U.C.C. §2-207 and holding that the disputed contract provision was not a material alteration). In making this determination, the court must "ignore the temptation to conclude that if parties are litigating over a term, it is most likely to be a 'material alteration'. . . ." *In re Chateaugay Corp.*, 162 B.R. at 955.

11

23. Here, the plain language changes to Section 2.13 of the APA, which enabled Transform to elect to acquire all of the assets and liabilities of certain foreign subsidiaries, would not cause the Debtors or creditors surprise, hardship, or change the Debtors' decision to close on the APA. The Debtors have admitted that at the time of the closing, they believed the amount of cash in the Foreign Subsidiary Bank Accounts was essentially immaterial in the context of the overall transaction, at most $1.5 million. *See Debtors' Reply in Further Support of Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9436, at ¶ 20; Exhibit F to the Allen Declaration, ECF No. 9427-6. Accordingly, the Debtors' argument that they did not pursue the cash in the Foreign Subsidiary Bank Accounts after the Sale because it was such a small amount within the context of the $5.2 billion transaction applies equally to the possibility that the Debtors agreed to transfer all of the assets in the Foreign Subsidiaries, including cash, as part of the amendment to Section 2.13 because at the time there was no expectation that this would result in any – let alone material – diminution in value to the Debtors' estate, especially in light of the fact that Transform was taking on what would otherwise be Excluded Liabilities.[7]

24. Now, knowing that there was in fact a little more than $6.3 million in the Foreign Subsidiary Bank Accounts at the time of closing – less than $5 million more than the Debtors believed might be in the accounts at the time of the Sale – does not change the analysis on the question of materiality within the context of the APA, especially as the $6.3 million in cash was

---

[7] While the Court noted in its preliminary ruling that extensive notice was needed because Transform was an insider, the Court also acknowledged that the Debtors established an independent board committee to negotiate the Sale. Apr. 27, 2021 Hr'g Tr. 57:21-23. Moreover, as to the impact of the amendments to Section 2.13, it was the Debtors, not Transform, that had access to the necessary information. This is not a situation where Transform gained an advantage over the estates' creditors due to superior knowledge. The independent board committee was the party in the best position at the time of the Sale to know the true impact of these changes. Indeed, as the Court is well aware after overseeing the APA disputes, the Debtors were hyper-focused on cash positions prior to the Sale, accelerating collections and delaying payments that did not benefit the purchaser, Transform. Likewise here, the Debtors were the ones with the information necessary to understand the actual impact of the changes to Section 2.13 embodied in the First Amendment.

12

partially (or entirely) offset by additional liabilities assumed by Transform. At the end of the day, the changes to Section 2.13 amounted, in dollar terms, to not more than 0.12% of the $5.2 billion Sale. The Debtors have offered no other evidence of materiality to meet their burden. Under any definition, a change in value of not more than 0.12% was not material within the context of the APA. *See e.g., Tosco Corp. v. Oxygenated Mktg. & Trading A.G.*, 1999 WL 328342, at *1-2 (S.D.N.Y. May 24, 1999), *aff'd sub nom.*, *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219 (2d Cir. 2000) (finding that a change in the sales contract was not material despite the fact that the amount at issue equaled over 30% of the transaction in dispute).

25. As noted, even that $6,307,666 figure overstates the change in value to the Debtors' estates and amount available to the Debtors' creditors. When Transform acquired all of the equity interests of the Foreign Subsidiaries, it not only acquired assets that otherwise would have been Excluded Assets under Section 2.2 of the APA, but also assumed liabilities that otherwise would have been Excluded Liabilities under Section 2.4. This additional assumption of liabilities mitigates any adverse effect to the Debtors' estates that may have been incurred by structuring the transfer of the Foreign Subsidiaries as an equity sale, making the actual amount at issue arising from the amendment to Section 2.13 even more immaterial.[8]

26. Accordingly, the amendment to Section 2.13 giving Transform the option to acquire all of the assets, including cash, of the Foreign Subsidiaries did not materially alter the APA as set

---

[8] The changes to Section 2.13 did not provide Transform with a windfall. For example, Debtors acknowledge that they needed to transfer $620,000 to the Hong Kong subsidiary in late January "to ensure the subsidiary's solvency through February 1." Declaration of Enrique Acevedo at ¶ 11, ECF No. 9437. The Debtors, however, did not appear to pay any liabilities due from those amounts as there was more than $1 million of cash sitting in the Hong Kong subsidiary at the time of the Sale, even though it was at risk of insolvency. *Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9395, at ¶ 18. Following the Sale, Transform acquired those and other liabilities, which were offset by the cash in the Foreign Subsidiary Bank Accounts (and additional money transferred in by Transform as necessary to pay the acquired liabilities). For Debtors now to seek to take back the cash they put into the subsidiary for the purpose of avoiding insolvency when those liabilities were transferred to Transform would be both inequitable and inconsistent with the plain language of the equity transaction set forth in Section 2.13.

forth in paragraph 54 of the Sale Order. Therefore, even if the Court concludes there was insufficient notice or approval by the Court, the immaterial impact of the First Amendment does not prevent applying the plain language of Section 2.13 as argued by Transform.

## CONCLUSION

27. For the reasons stated above, Transform submits that the "balance as between the two [interpretations]" should not be construed against Transform "given the circumstances" of the First Amendment's submission and consideration, and requests, for the reasons set forth in the Transform Opposition, that the Court deny the Debtors' Third Motion to Enforce the Asset Purchase Agreement.

Dated: May 11, 2021
New York, New York

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

*/s/ Sean A. O'Neal*
Sean A. O'Neal
Andrew Weaver
Samuel Levander
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel for Transform Holdco LLC*