WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus
Jared R. Friedmann
Jennifer Brooks Crozier

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                                       :
                                                            :   **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,                   :
                                                            :   **Case No. 18-23538 (RDD)**
                                                            :
              Debtors.[1]                                   :   (Jointly Administered)
------------------------------------------------------------x

### DEBTORS' SUPPLEMENTAL REPLY IN FURTHER SUPPORT OF
### THIRD MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 1700 Broadway, 19th Fl., New York, NY 10019.

## TABLE OF CONTENTS

Page

I. **Background** ...........................................................................................................................1

II. **Argument and Authorities** ....................................................................................................3

    A. The Court Should Make Its Preliminary Ruling Final ............................................3

    B. Transform Improperly Conflates Notice and Approval...........................................3

    C. Transform's Interpretation of Section 2.13(a) Would Constitute a Material Change within the Meaning of the Sale Order..........................................................5

    D. Transform's Estoppel Argument Is Both Improper and Unavailing .......................7

III. **Conclusion** ............................................................................................................................9

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Lynch III Props. Corp.*,
   125 B.R. 857 (Bankr. E.D.N.Y. 1991)..................................................................................6

*Pike Creek Recreational Servs., LLC v. New Castle Cty.*,
   238 A.3d 208 (Del. Sup. Ct. 2020) .......................................................................................6

*Pilot Point Owners Ass'n v. Bonk*,
   C.A. No. 2717-CC, 2010 WL 3959570 (Del. Ch. Oct. 7, 2010) ...........................................7

*United States v. Shyne*,
   No. S405CR1067KMK, 2007 WL 1075035 (S.D.N.Y. Apr. 5, 2007).................................5

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

**I.     Background**

1.     *Debtors' Third Motion to Enforce the Asset Purchase Agreement* (Apr. 6, 2021) [Docket No. 9395] (the "**Third Motion to Enforce**") sought an order compelling Transform to transfer to the Debtors approximately $6.3 million in cash held as of the Closing Date in bank accounts owned by certain of the Debtors' Foreign Subsidiaries (the "**Foreign Subsidiary Cash**")[2] pursuant to, *inter alia*, Section 2.13(a) of the APA as amended by *Amendment No. 1 to Asset Purchase Agreement* (Feb. 14, 2019) [Docket No. 2599] (the "**First Amendment**").  At the April 27, 2021 hearing on the Third Motion to Enforce, the Bankruptcy Court issued a preliminary ruling granting the Debtors' requested relief (the "**Preliminary Ruling**").  *See* Hearing Transcript at 54:6-67:22 (April 27, 2021) ("**Apr. 27 Hr'g Tr.**").  After summarizing the Parties' arguments concerning the plain meaning of Section 2.13(a), the Court, "constru[ing] the contract as a whole" and "viewing each part in light of the others," *id.* at 56:1–10, concluded:

> The problem with [Transform's] interpretation . . . is that the phrase [A]cquired [F]oreign [A]ssets really had no[] meaning in the original agreement and only applies to terms in the amendment which are, in essence, self-referential to paragraph 2.13.  So while it is generally within the contemplation of people that when you buy stock, you get the underlying assets of the company whose stock has been sold to you, subject to any claims against that company, of course, which would have priority over the stock[, t]he context here would argue a more nuanced reading of this agreement and would accord more weight to the Debtors' interpretation of the phrase, 'deemed to be acquired foreign assets,' namely, that the parties put that provision in this agreement where they wouldn't have had to otherwise because they intended to exclude from the assets transferred the cash and other [E]xcluded [A]ssets from the businesses that were transferred.

Apr. 27 Hr'g Tr. at 61:1–18.  In short, the Court found that the Debtors' interpretation of Section 2.13(a) was "the better interpretation."  *Id.* at 62:15–16.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given them in the Third Motion to Enforce.

1

2. The Court further concluded that, to the extent there was "any balance as between the two" interpretations, that balance "should be construed against Transform, given the circumstances of the submission of the amendment—or non-submission rather—to the Court and parties in interest in any way that would highlight the important change that Transform's interpretation would provide for." *Id.* at 62:16–21. Because counsel for the Parties did not have at the ready answers to all of the Court's questions regarding the submission of the First Amendment, the Court noted several assumptions in the Preliminary Ruling, each of which was confirmed to be accurate in Transform's own *Supplemental Memorandum of Law in Opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement* (May 11, 2021) [Docket No. 9483] (the "**Supplemental Memorandum**" or "**Suppl. Mem.**"): *first*, that the "draft proposed amendment" was "filed on the docket sometime on February 7th, … during the highly contested sale hearing," Apr. 27 Hr'g Tr. at 54:14–15, 58:11–12; Suppl. Mem. ¶ 8; *second*, that the amendment was "provided to the Court during oral argument and after the evidence was closed on that day while the Court had turned to oral argument . . . on the Debtors' motion for approval of the sale agreement," Apr. 27 Hr'g Tr. at 54:15–19; Suppl. Mem. ¶ 8; *third*, that the amendment was "never introduced into evidence and only generically as an amendment referenced in oral argument to the Court," Apr. 27 Hr'g Tr. at 58:12–14; Suppl. Mem. ¶ 7 and n.3;[3] *fourth*, "that there was no discussion of this change that is the subject of this dispute during that oral argument or when it was provided to the Court or thereafter," Apr. 27 Hr'g Tr. at 54:20–23; Suppl. Mem. ¶¶ 3, 9; and, *fifth*, that the amendment was not "provided to the Court as a proposed attachment to

---

[3] To be sure, there was some substantive discussion of the First Amendment during the Sale Hearing, but that discussion addressed only what the Parties apparently believed were the significant changes to the APA, i.e., the changes to the Credit Bid Release provisions. *See* Suppl. Mem. ¶ 9. There was no discussion or even mention of the changes to Section 2.13(a) at any time during the Sale Hearing. *See generally* Hearing Transcript at 648–60, Feb. 7, 2019 [Docket No. 2886] ("**Feb. 7 Hr'g Tr.**"); *see also* Suppl. Mem. ¶¶ 3, 9.

2

the sale order," Apr. 27 Hr'g Tr. at 54:23–25; Suppl. Mem. ¶ 10, which both Parties agree was intentional.

3.  The Court found that "[i]t is in that context much more logical to assume that the Debtors' interpretation was correct and that . . . the Debtors and Transform therefore believed that [the First Amendment] really did not represent a material change from the asset purchase agreement that was attached as Exhibit A to the sale order and that was before the Court and the parties in interest at the sale hearing." Apr. 27 Hr'g Tr. at 62:22–63:3.

4.  The Court, however, did:

> give Transform two weeks to file any declaration exhibit that I can take judicial notice of and/or a memorandum of law to address the facts and circumstances and legal effect of the Court and parties in interest not being apprised until after the record was closed at the sale hearing, and more specifically, not being apprised of any material change as provided for in amendment number one before the sale order was entered into and the effect of the sale order not actually attaching amendment number one as an exhibit as referenced in the definition of the APA Exhibit B.

*Id.* at 66:18–67:3; *see also id.* at 54:7–19.

## II. Argument and Authorities

### A. The Court Should Make Its Preliminary Ruling Final

5.  As discussed above, the Court noted several assumptions in making its ruling, but gave Transform the opportunity to specifically address those issues either by providing exhibits that the Court could take judicial notice of and/or by submitting a memorandum of law. Because nothing in Transform's Supplemental Memorandum undermines the assumptions upon which the Court based its decision—rather it confirmed, with record citations, that each of those assumptions was accurate—there is no reason for the Court to modify its Preliminary Ruling.

### B. Transform Improperly Conflates Notice and Approval

6.  Transform first argues that, because the Court and parties in interest purportedly had "adequate notice" of the First Amendment, the Court approved the First Amendment, along

3

with the specific changes to Section 2.13(a) that are the subject of this dispute. *See* Suppl. Mem. ¶¶ 3, 5–17. As an initial matter, and as the Court recognized during the April 27 hearing, there is no legitimate argument that the Court "approved" the First Amendment—and certainly not the changes to Section 2.13(a) of the APA. *See* Apr. 27 Hr'g Tr. at 62:3–14 (stating that it did not "appear to [the Court] that the material change that would be represented by Transform's reading of [Section 2.13(a)] was, in fact, ever described to the Court, and indeed was not approved by the Court when it . . . signed and entered the sale approval order").

7.     Setting aside the question of whether the steps taken to apprise the Creditors' Committee and other parties in interest of the existence of the First Amendment even constituted adequate notice, notice to parties in interest certainly does not constitute court approval of the First Amendment's changes to Section 2.13(a) under the facts and circumstances here. *See supra* ¶ 2. As the hearing record makes plain, both the Court and parties in interest were focused entirely on the First Amendment's changes to the Credit Bid Release provisions of the APA (which were significant). Feb. 7 Hr'g Tr. at 648–60; Suppl. Mem. ¶ 9; *see also* Decl. of Sean A. O'Neal, (May 11, 2021) [Docket No. 9485], Ex. A. Not a single party—not the Debtors, Transform, or the Creditors' Committee—made any mention of the changes to Section 2.13(a) before, during, or after the Sale Hearing (until Transform refused to transfer the Foreign Subsidiary Cash to the Debtors). *See generally* Feb. 7 Hr'g Tr.; Suppl. Mem. ¶ 9. And not a single party even suggested the possibility that the changes to Section 2.13(a) permitted Transform, ***in its sole discretion***, to elect to take millions of dollars in Excluded Assets that would otherwise have been available for distribution to the estates' creditors. If anyone had suggested such a possibility, parties in interest would undoubtedly have had something to say about it—and the Court would have had the opportunity to hear and consider their views.

8. The fact remains, however, that the Parties did not suggest that, under the First Amendment, Transform could unilaterally elect to take Excluded Assets including Foreign Subsidiary Cash, parties in interest did not have an opportunity to object to that assertion, and the Court did not hear or consider any such objections. And there is a simple explanation for that: the unambiguous terms of Section 2.13(a) *did not* permit Transform, in its sole discretion, to elect to take millions of dollars in Excluded Assets, so there was no reason for any party to advise the Court of such a change to the APA or object on that basis. *See, e.g.*, *United States v. Shyne*, No. S405CR1067KMK, 2007 WL 1075035, at *24 (S.D.N.Y. Apr. 5, 2007) ("Occam's razor, a principle that is often paraphrased in English as 'all things being equal, the simplest solution tends to be the best one,' is apt here.").

    **C.**    **Transform's Interpretation of Section 2.13(a) Would Constitute a Material Change within the Meaning of the Sale Order**

9. Transform next argues that its interpretation of Section 2.13(a) of the APA, as amended, represents a non-material change to the APA and that, therefore, paragraph 54 of the Sale Order permitted the Parties to make such a change without further order of the Court. *See* Suppl. Mem. ¶¶ 4, 18–26. As an initial matter, this argument goes well beyond the scope of the supplemental briefing permitted by the Court. *See* Apr. 27 Hr'g Tr. at 54:7–19, 66:18–67:3. This was not an open issue or one with respect to which the Court relied on any assumptions. In fact, the Court stated at the hearing that "[t]here is no doubt in my mind that Transform's interpretation of the relevant provision to the present dispute, namely Section 2.13 as amended in amendment number one, would materially and adversely to the Debtors' estate modify the agreement that had been noticed for approval." *Id.* at 58:3–7.

10. Even if the Court were to consider Transform's improper materiality argument, it should not change the outcome here. Contrary to Transform's argument, it does not matter that

5

the Debtors believed there was only approximately $1.5 million in the Foreign Subsidiary bank accounts as of the Closing Date. What matters is that, if Transform's reading of the changes to Section 2.13(a) is correct, the Debtors would be deprived of $6.3 million in Excluded Assets that could be used to pay the estates' creditors and facilitate the occurrence of the effective date of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5370] (as they unquestionably would have been under the APA that the Debtors noticed for approval).[4] That is a material change to the APA: it significantly impacts the rights of the Parties—and, more importantly, the estates' creditors—going forward. *See In re Lynch III Props. Corp.*, 125 B.R. 857, 961 (Bankr. E.D.N.Y. 1991) ("A modification is deemed material when its (a) alters the rights and liabilities otherwise existing between the parties to the agreement [or] (b) enlarges, restricts, or impairs the rights of third party beneficiaries"); *Pike Creek Recreational Servs., LLC v. New Castle Cty.*, 238 A.3d 208, 216 (Del. Sup. Ct. 2020) (discussing that an alteration is material when it changes the rights or liabilities of the parties). Paragraph 54 of the Sale Order protects the estates' creditors by prohibiting the Parties from modifying the APA in ways that could result in such a change without notice, a hearing, and Court approval.

11. Transform also states that the Creditors' Committee reviewed and commented on the draft First Amendment before the close of evidence in the Sale Hearing. Suppl. Mem. ¶ 7 n.3. Had the Creditors' Committee—which strenuously objected to the proposed sale, including and especially on the basis that the sale would leave the Debtors without adequate means to pay their administrative creditors—believed that the changes to Section 2.13(a) allowed Transform, in its sole discretion, to acquire Excluded Assets otherwise distributable to the estates' creditors, it

---

[4] Transform argues that the $6.3 million figure overstates the amount available to the Debtors' creditors because the amount should be offset by Transform's assumption of additional liabilities pursuant to Section 2.13(a) as amended. Suppl. Mem. ¶ 25. But Transform makes this bald assertion without offering a single shred of evidence that it assumed even a single dollar's worth of additional liabilities under Section 2.13(a).

6

would unquestionably have raised those changes with the Parties and the Court, just as it raised the changes to the Credit Bid Release provisions. *See* Apr. 27 Hr'g Tr. at 57:21–58:2. The Creditors' Committee (and everyone else's) silence with respect to the changes to Section 2.13(a) speaks volumes—specifically, it demonstrates that no one understood the changes to Section 2.13(a) to effect the material change to the APA that Transform's interpretation represents.

### D. Transform's Estoppel Argument Is Both Improper and Unavailing

12. Transform's attempt to resurrect its estoppel argument also goes well beyond the supplemental briefing permitted by the Court and should be disregarded. In any event, the materials now proffered by Transform—a March 4, 2019 email from Keith Stopen purportedly attaching the "Foreign Subsidiaries' balance sheets," an April 9, 2019 email from Kristen Arn-O'Rourke notifying the Debtors that Transform had elected to acquire the Acquired Foreign Assets through an equity acquisition, and the April 16, 2019 Share Purchase Agreement, *See* Suppl. Mem. ¶¶ 13–14—do not come close to the "clear and convincing evidence" Transform must offer to establish the elements of its equitable estoppel defense. *See Pilot Point Owners Ass'n v. Bonk*, C.A. No. 2717-CC, 2010 WL 3959570, at *1 (Del. Ch. Oct. 7, 2010) ("[T]he party asserting equitable estoppel . . . bears the burden of demonstrating [the elements of the defense] by clear and convincing evidence").

13. Most notably, Transform disingenuously claims that Transform employee Keith Stopen emailed William Murphy of M-III "the Foreign Subsidiaries' balance sheets" on March 4, 2019. Suppl. Mem. ¶ 12. That is a gross mischaracterization of Mr. Stopen's email and corresponding attachments (only a single page of which is selectively included in Mr. Stopen's

declaration).[5]  The email, which has no subject (and certainly not "Foreign Subsidiary Balance Sheets," as Transform suggests), simply reads:

> Bill
> We can talk on Tuesday
> thx [sic]

Murphy Decl. at Ex. A.  The attachments are nondescript, voluminous, and contain thousands of lines of data and numerous tabs.  *Id.* at Exs. B, C.  At the time he received the email, Mr. Murphy was undertaking an extensive analysis of the Debtors' pre- and post-petition books and records, in particular their post-petition intercompany transactions, to evaluate whether intercompany liabilities between the Debtor entities could be accurately determined or if substantive consolidation would be appropriate (the "**Intercompany Analysis**").  *See id.* ¶ 4.  The Intercompany Analysis was laborious and extensive, *id.*, and, as part of the Intercompany Analysis, Mr. Murphy requested information from time to time from Transform, *id.* ¶ 5.  Mr. Stopen's March 4, 2019 email and attachments were a response to one such request.  *Id.*  Mr. Murphy reviewed the attachments specifically with respect to the issues he was evaluating in connection with the Intercompany Analysis; he did not examine any line items regarding the cash accounts of the Debtors' Foreign Subsidiaries, nor did he have any reason to, since that information would not have been germane to the Intercompany Analysis.  *Id.* ¶ 7.  Indeed, if one were not laser focused

---

[5] *See* Declaration of William Murphy in Support of Debtors' Supplemental Reply in Further Support of Debtors' Third Motion to Enforce the Asset Purchase Agreement ("**Murphy Decl.**"), Ex. A (Mar. 4, 2019 Email from K. Stopen to W. Murphy Re: [No Subject]), Ex. B (Debtor_Non_Debtor 2.2.2019 Closing BS_Clean_v2.xlsx), Ex. C (Intercompany matrix P12 2018 v3.xlsx), filed concurrently herewith.  The table shown in Exhibit B to Mr. Stopen's declaration, *see* Decl. of Keith Stopen in Supp. of Transform Holdco LLC's Suppl. Mem. of Law in Opp. to the Debtors' Third Mot. to Enforce the Asset Purchase Agreement (May 11, 2021) [Docket No. 9486] ¶ 7 and Ex. B, appears at PDF pages 124–135 of the Murphy Declaration, *see* Murphy Decl. Ex. B.  The two tables appear to be different only because Mr. Stopen expanded row nos. 8-12 of the table, while Mr. Murphy attached the spreadsheet as it was sent to him— i.e., with hidden rows collapsed.  *See* Murphy Decl. ¶ 6.

8

on the Foreign Subsidiary Cash issue, it would be well-nigh impossible to pick the Foreign Subsidiary cash balances out of the haystacks of financial data attached to Mr. Stopen's email.

14. In any event, Transform's new materials do not bear on the Court's findings that Transform has not shown that it "lacked [the] knowledge or [the] means of obtaining the knowledge of the truth regarding the proper interpretation of this agreement" or that "the conduct, namely the stock sale . . . does not constitute leading Transform to rely on that conduct to change its position to its detriment." *See* Apr. 27 Hr'g Tr. at 64:12–66:8.

15. Accordingly, the Court should again reject Transform's estoppel defense.

### III. Conclusion

16. For all of the foregoing reasons, the Debtors respectfully request that the Court make its Preliminary Ruling final, grant the Third Motion to Enforce, and enter an order compelling Transform to transfer to the Debtors $6,307,666 USD in Foreign Subsidiary Cash pursuant to Sections 2.13(a), 2.2(f), and 2.1(ee) of the APA.

Dated: May 18, 2021
New York, New York

*/s/ Jacqueline Marcus*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus
Jared R. Friedmann
Jennifer Brooks Crozier

*Attorneys for Debtors
and Debtors in Possession*