Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8           Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 21-07011-rdd

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   SEARS HOLDING CORPORATION,

13               Plaintiff,

14           v.

15   1055 HANOVER, LLC et al.,

16               Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 20-06480-rdd

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   KMART HOLDING CORPORATION et al.,

21               Plaintiff,

22           v.

23   WINNING RESOURCES LIMITED,

24               Defendant.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Page 2

1                    United States Bankruptcy Court

2                    300 Quarropas Street, Room 248

3                    White Plains, NY 10601

4

5                    May 25, 2021

6                    10:15 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   UNKNOWN

Page 3

1    HEARING re THE SEARS HOLDINGS CORPORATION HEARING WILL BE

2    CONDUCTED USING ZOOM FOR GOVERNMENT VIDEO CONFERENCING.

3    THOSE THAT REQUIRE ACTIVE PARTICIPANT or LISTEN ONLY ACCESS

4    TO THE HEARING MUST EMAIL CHAMBERS AT

5    RDD.CHAMBERS@NYSB.USCOURTS.GOV FOR ZOOM ACCESS CREDENTIALS.

6

7    HEARING re Notice of Agenda of Matters Scheduled for Hearing

8    to be Conducted Through Zoom on May 25, 2021 at 10:00 a.m.

9

10   HEARING re Seventh Application of Weil, Gotshal & Manges

11   LLP, as Attorneys for the Debtors, for Interim Allowance of

12   Compensation for Professional Services Rendered and

13   Reimbursement of Actual and Necessary Expenses

14   Incurred from November 1, 2020 through and including

15   February 28, 2021 for Weil, Gotshal & Manges LLP,

16   Debtor's Attorney, period: 11/1/2020 to 2/28/2021,

17   fee:$2,141,539.50, expenses: $143,450.70. (ECF #9416)

18

19   HEARING re Application for Interim Professional Compensation

20   / Seventh Interim Fee Application of Prime Clerk LLC, as

21   Administrative Agent to the Debtors, for Services Rendered

22   and Reimbursement of Expenses for the period from

23   November 1, 2020 through February 28, 2021 for Prime Clerk

24   LLC, Other Professional, period: 11/1/2020 to 2/28/2021,

25   fee:$3617.28, expenses: $5014.75. (ECF #9409)

Page 4

1   HEARING re Seventh Application for Interim Professional

2   Compensation of Akin Gump Strauss Hauer & Feld LLP as

3   Counsel to the Official Committee of Unsecured Creditors for

4   Allowance of Compensation for Services Rendered and

5   Reimbursement of Expenses for the Period of November 1, 2020

6   through and including February 28, 2021 for Akin Gump

7   Strauss Hauer & Feld LLP, Creditor Comm. Aty, period:

8   11/1/2020 to 2/28/2021, fee:$ 1,721,849.50, expenses:

9   $2,262,474.82. (ECF #9412)

10

11   HEARING re Seventh Application for Interim Professional

12   Compensation of FTI Consulting, Inc., Financial Advisor to

13   the Official Committee of Unsecured Creditors of Sears

14   Holdings Corporation, et al. for Interim Allowance of

15   Compensation and Reimbursement of Expenses for the period:

16   1/1/2020 to 2/28/2021, fee: $39,085.00, expenses: $0. filed

17   by FTI CONSULTING, INC. (ECF #9415)

18

19   HEARING re Fourth Application for Interim Professional

20   Compensation for Herrick, Feinstein LLP, Special Counsel,

21   period: 11/1/2020 to 2/28/2021, fee:$565,994.5, expenses:

22   $1,133.2. filed by Herrick, Feinstein LLP. (ECF #9410)

23

24

25

Page 5

1    HEARING re Third Application for Interim Professional

2    Compensation for Maritt Hock & Hamroff LLP as Special

3    Conflicts Counsel to the Official Committee of Unsecured

4    Creditors for Allowance of Compensation for James P Chou

5    Maritt Hock & Hamroff LLP, Special Counsel, period:

6    11/1/2020 to 2/28/2021, fee:$29,686.00, expenses:

7    $503.08. filed by James P Chou. (ECF #9408)

8

9    HEARING re Sixth Joint Application of Paul E. Harner, as Fee

10   Examiner and Ballard Spahr LLP, as Counsel to the Fee

11   Examiner, for Interim Allowance of Compensation for

12   Professional Services Rendered and Reimbursement of Actual

13   and Necessary Expenses Incurred from November 1, 2020

14   through February 28, 2021 for Fee Examiner, fee:$155,232.00,

15   expenses: $700. 75. (ECF #9420)

16

17   HEARING re Debtors Twenty-Third Omnibus Objection to Proofs

18   of Claim (No Liability Claims) (ECF #9284)

19

20   HEARING re Response to Debtors' Twenty-Third Omnibus

21   Objection to Proofs of Claim (No Liability Claims)(RE: CLAIM

22   NOS. 19509, 18092, 13404) (related document(s)9284) filed by

23   James Edmond Smith. (ECF #9341)

24

25

Page 6

1   HEARING re Motion to Amend/ Motion of Debtors to Amend Terms

2   of Engagement of Preference Firms filed by Jacqueline Marcus

3   on behalf of Sears Holdings Corporation (ECF #9469)

4   Objection (related document(s)9469) filed by Joseph E.

5   Sarachek on behalf of A&A HK Industrial, Esjay International

6   Pvt. Ltd., Fuzhou Fushan Pneumatic Co., Ltd., Giza Spinning

7   & Weaving Co., Helen Andrews Inc., Mien Co., Ltd., Mingle

8   Fashion Limited, Samii Solutions, Shanghai Fochier, Vogue

9   Tex (Pvt) Ltd., Wing Hing Shoes Factory Limited. (ECF #9490)

10

11   HEARING re Objection to Motion (related document(s)9469)

12   filed by David H. Wander on behalf of Orient Craft Ltd.

13   (ECF# 9492)

14

15   HEARING re Adversary proceeding: 21-07011-rdd Sears Holding

16   Corporation v. I 055 Hanover, LLC et al Motion to Dismiss

17   Adversary Proceeding (related document(s) 1)

18

19   HEARING re Adversary proceeding: 21-07011-rdd Sears Holding

20   Corporation v. 1055 Hanover, LLC et al  Opposition: Debtors'

21   Opposition to Defendants' Motion to Dismiss (related

22   document(s)4) filed by Jacqueline Marcus on behalf of Sears

23   Holding Corporation. (ECF #9)

24

25

1    HEARING re Adversary proceeding: 20-06480-rdd Kmart Holding

2    Corporation et al v. Winning Resources Limited Motion to

3    Dismiss Adversary Proceeding filed by Alexander Tiktin on

4    behalf of Winning Resources Limited. (ECF #11)

5

6    HEARING re Adversary proceeding: 20-06480-rdd Kmart Holding

7    Corporation et al v. Winning Resources Limited Declaration

8    of David H. Wander, Esq. (related document(s) 11) filed by

9    Alexander Tiktin on behalf of Winning Resources Limited.

10   (ECF #12)

11

12   HEARING re Adversary proceeding: 20-06480-rdd Kmart Holding

13   Corporation et al v. Winning Resources Limited Declaration

14   of Syed Mohi (related document(s) 11) filed by Alexander

15   Tiktin on behalf of Winning Resources Limited. (ECF #13)

16

17   HEARING re Adversary proceeding: 20-06480-rdd Kmart Holding

18   Corporation et al v. Winning Resources Limited Objection to

19   Motion Plaintiff's Objection to Winning Resources Limited's

20   Motion to Dismiss (related document(s) 11) filed by Steven

21   J. Reisman on behalf of Kmart Holding Corporation, Sears,

22   Roebuck and Co. (ECF #14)

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 8

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4        Attorneys for

 5        767 Fifth Avenue

 6        New York, NY 10153

 7

 8   BY:  GARRETT FAIL

 9        DOMINIC A. LITZ

10        JACQUELINE MARCUS

11

12   KATTEN MUCHIN ROSENMAN LLP

13        Attorneys for Kmart Holding Corporation

14        575 Madison Avenue

15        New York, NY 10022

16

17   BY:  STEVEN REISMAN

18        TERENCE G. BANICH

19

20   ASK LLP

21        Attorneys for the Debtor

22        2600 Eagan Woods Drive, Suite 400

23        Saint Paul, MN 55121

24

25   BY:  KARA CASTEEL
```

1   ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

2        Attorneys for Landlords

3        Three Embarcadero Center, 12th Floor

4        San Francisco, CA 94111

5

6   BY:  MICHAEL S. GREGER

7

8

9   ALSO PRESENT TELEPHONICALLY:

10

11   DAN MCELHINNEY, Stretto

12   PAUL E. HARNER, Examiner

13   JENNIFER CROZIER

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

1               P R O C E E D I N G S

2               THE COURT:  Good morning, this is Judge Drain.

3      We're here in re Sears Corporation, et al. on an omnibus

4      day.  I have the agenda for today's hearings.  And I'm happy

5      to go down the agenda, unless counsel for the Debtors wanted

6      to make any opening remarks about the case generally.

7               MR. FAIL:  Good morning, Your Honor.  Garrett

8      Fail, Weil Gotshal & Manges for the Debtors.  Are you able

9      to hear me all right?

10              THE COURT:  Yes, fine.

11              MR. FAIL:  Thank you.  It's nice to see you.  No

12     statements about the case generally.  One housekeeping

13     matter.  I think I see some folks on the Zoom that were

14     subject to the Debtors' 23 omnibus objections to claims.  As

15     noted on the agenda, that matter is going forward today

16     solely with respect to one party's claims.  Mr. James Edmond

17     Smith.

18              If other folks are on, I just wanted to let them

19     know that the objection is not going forward with respect to

20     their claims.  They're welcome to watch the Zoom and watch

21     the hearing, but if they have better uses of their time, I

22     didn't want them to wait only to find out later.

23              THE COURT:  Okay.  Let me --

24              MR. FAIL:  And that was as noticed, Your Honor, as

25     noticed on the agenda and as folks were informed.  I just

Page 11

1    wanted to clean it up for housekeeping in case there are

2    folks that thought that theirs was going forward today.

3              THE COURT:  Okay.  Let me make sure I -- everyone

4    else understands that.  So do you intend to submit an order

5    granting the 23rd omnibus as to those parties who have not

6    raised opposition to that omnibus objection, either --

7              MR. FAIL:  That's happened already, Your Honor.

8              THE COURT:  That's happened already.

9              MR. FAIL:  Your Honor has granted on --

10             THE COURT:  All right.

11             MR. FAIL:  That's already happened.

12             THE COURT:  So if someone --

13             MR. FAIL:  But I think that there are a number of

14   folks that have been carried from month-to-month as we've

15   worked to resolve them.

16             THE COURT:  Right.  So if someone objected to that

17   omnibus objection either formally or informally and that

18   objection has not been resolved, it is not on for a hearing

19   today.  The only one that is on for a hearing is Mr. Smith.

20             MR. FAIL:  Correct, Your Honor.

21             THE COURT:  Okay.  Very well.  Thanks.  And you'll

22   notice the --

23             MR. FAIL:  Okay, then we can --

24             THE COURT:  -- you'll -- I'm sorry, you'll notice

25   the hearings on the other ones in due course, if you're

Page 12

1    unable to resolve them by agreement.

2              MR. FAIL:  Correct, Your Honor.

3              THE COURT:  Okay, all right.  So then why don't we

4    go back to the agenda?

5              MR. FAIL:  Thanks very much, Your Honor.  The

6    first section on the agenda are fee applications.  There are

7    seven on for this hearing.  All are uncontested.  The

8    applications are for in the order that they appear on the

9    agenda or for Weil, Gotshal and Manges for Prime Clerk for

10   Akin and Gump.  For FTI Consulting, our clients

11   (indiscernible) from Moritt Hock and for Mr. Harner as the

12   fee examiner.

13             As has been the practice, we propose to submit

14   (sound drops) omnibus order subject to anything that happens

15   today, including the reservation of rights with respect to

16   the fee examiner to challenge on a final basis as he

17   continues to work with the various professionals.

18             THE COURT:  Okay.

19             MR. FAIL:  If Your Honor has any questions, I'm

20   obviously happy to answer any.

21             THE COURT:  All right.  Now I see Mr. Harner on

22   the Zoom screen.  Even though there is this reservation of

23   rights, has the fee examiner also reviewed the interim

24   applications?

25             MR. HARNER:  Your Honor, we're in various stages

Page 13

1    of completion of review for various applications, including

2    and through the 7th, we have not yet submitted preliminary

3    reports on various of the 7th applications.  We have largely

4    submitted the preliminary reports rather on applications

5    through the sixth interim period.

6         We're also in various stages of discussion with

7    professionals about those and continue to hope to resolve

8    them on a consensual basis without the involvement of the

9    Court, but we have not submitted preliminary reports as of

10   yet with prospective seventh applications.  We are, however,

11   satisfied with the reservation of rights, which paralleled

12   that in the prior fee application orders with respect to the

13   fee -- the ongoing review.

14        THE COURT:  Okay.  All right.  As Mr. Fail noted,

15   the applications are unopposed with that reservation of

16   rights.  Does anyone have anything further to say on them?

17   All right.  I have reviewed them.

18        And again, with the understanding that the fee

19   examiner has been quite active in this case, and that his

20   work is ongoing, including with respect to the time covered

21   by these applications and all of his rights are reserved.  I

22   will grant the applications in the amounts sought.  And

23   again, subject to that reservation.

24        MR. FAIL:  Thank you very much, Your Honor.

25   Again, Garret Fail, Weil, Gotshal for the Debtors.  The next

Page 14

1    item on the agenda is the 23rd --

2              MR. HARNER:  Your Honor, apologies, it's Paul

3    Harner, the examiner.  With that (sound drops) may I be

4    excused?

5              THE COURT:  Yes, that's fine.  Thank you.

6              MR. HARNER:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              MR. FAIL:  For the next item, Your Honor, I'll

9    hand the virtual podium over to my colleague Dominic Litz.

10             THE COURT:  Okay.

11             MR. LITZ:  Good morning, Your Honor.  Dominic Litz

12   from Weil, Gotshal, Manges on behalf of the Debtors.  Can

13   you hear me all right?

14             THE COURT:  Yes, fine, thanks.

15             MR. LITZ:  Good.  Thank you, Your Honor.  Your

16   Honor, Item Number 8 is the Debtor's 23rd omnibus objection.

17   And as Mr. Fail noted, we are going forward solely with

18   respect to Mr. Smith's claims.  That is -- the claim numbers

19   are 8092, 13404 and 19509.

20             I'm going to collectively refer to those claims as

21   the claim.  Mr. Smith did file a response to the 23rd

22   omnibus at ETF number 9341, and the Debtors filed a reply in

23   support of the 23rd omnibus at ECF 9520.  I do not see Mr.

24   Smith in the video portion of the courtroom.

25             THE COURT:  Right.

1          MR. LITZ:  I don't know if he's appeared via

2     phone?

3          THE COURT:  Let me ask.  Mr. Smith, are you on the

4     phone?  Again, it's James Edwin Smith.  All right, he does

5     not appear to be attending the hearing.  He did receive

6     notice of this hearing, though.  And as you stated, filed an

7     objection to the claim objection to his three filed claims.

8     So you could go ahead, Mr. Litz.

9          MR. LITZ:  Great.  Thank you, Your Honor.  Your

10    Honor, the Debtors filed today 23rd omnibus objection back

11    February of 2021, which objected to the claims on the basis

12    that they failed to provide sufficient documentation support

13    for the significant claim that Mr. Smith searched, which is

14    in excess of $1.2 billion.

15         Mr. Smith has additionally failed to carry his

16    burden to show that he is entitled to priority status, given

17    the fact that the majority of his claims assert claims under

18    wages for contribution as an employee of the Debtors.

19         Provide the Court with a little background, the

20    three claims that Mr. Smith filed.  Claim Number 8092

21    asserts an aggregate claim of $1.86 million, consisting of a

22    secured claim for $874,000 and a claim for $836,000, keeping

23    priority pursuant to Section 504, 50784, excuse me, Your

24    Honor, of the Bankruptcy Code for hourly wages and a General

25    Unsecured Claim of (sound drops) dollars.

Page 16

1            We will lead to Claim Number 13404, Mr. Smith

2    asserts $392,000 on a secured and Section 50784 basis, which

3    appears to be a somewhat duplicative claim, 8092, and

4    finally, Claim Number 19509 asserts a claim for over $1.2

5    billion third priority pursuant to Section 50785 of the

6    Bankruptcy Code.

7            And Mr. Smith appears to assert all -- a small

8    portion of that claim on a secured basis related to a letter

9    (sound drops) First Trust of Illinois.  The documentation

10   and information provided with the claims falls well short of

11   being able to support this significant claim.

12           Mr. Smith, with respect to Claim 8092 only submits

13   a one-page questionnaire that seems to be prepared by Mr.

14   Smith stating that he was an associate of the Debtors and

15   had not received any benefits or wages since July of 2014.

16   In Claim Number 13404, Mr. Smith appears to submit an

17   alleged employment application, where he claims that he was

18   hired as an investor by Sears on a salary basis at $74,000

19   annually.

20           And an additional draft (sound drops) addendum,

21   which references Mr. Smith as the Director of the Debtor.

22   Finally, Claim Number 19509 is supported by a portion of the

23   one-page letter issuance of a letter of credit that speaks

24   to have Mr. Smith, the beneficiary of $1.2 billion of a

25   secured letter of credit.  Your Honor, the Debtor has no --

1           THE COURT:  There's no signature or any other

2      evidence that this letter of credit is genuine, correct?

3           MR. LITZ:  That is correct, Your Honor.  There is

4      an electronic signature.  The inconsistencies among the

5      documents are one of the many red flags that were pointed to

6      the Debtors.  It appears that an electronic signature of

7      William K. Phelan is attached to various documents in

8      different forms.

9           And one of the documents that shows a signature by

10     Phelan, William K. and the other ones, it is William K.

11     Phelan, who is a former Director or employee of Sears.

12     However, it is the Debtor's -- the Debtor's information

13     believes that, you know, Mr. Phelan did not sign his name

14     back essentially with Phelan, K. Williams.

15          Going back to the Debtor's review of the books and

16     records, there is no information or record of Mr. Smith

17     being an employee of any capacity, whether it was (sound

18     drops).  It's unclear what an investor for the Debtors would

19     appear to do, and there is no record of Mr. Smith being a

20     Director of the Debtors.

21          As the Court is aware, Mr. Smith bears the burden

22     to prove that he is entitled to priority status of these

23     claims.  And it is clear through the papers and the

24     documentation that he has failed to do so.  As the Debtors

25     wrote in their papers, there are many inconsistencies from

Page 18

1    when Mr. Smith was an alleged hire, the title or position

2    that Mr. Smith allegedly held with the Debtors, and whether

3    he was an hourly or salaried employee.

4            Your Honor, the Debtors will request that the

5    Court disallow and expunge all three claims in their

6    entirety on the basis that they lack sufficient

7    documentation information, and that Mr. Smith failed to

8    establish (sound drops).

9            However, if the Court -- to the extent the Court

10   disagrees and the Debtors -- and that the Debtors have to

11   evaluate the claim a little bit further, at a minimum, the

12   Debtors would request that the third claim be disallowed in

13   full because there's no property of estate that secures a

14   $1.2 billion letter of credit.

15           And to the extent that the Court believed that Mr.

16   Smith is entitled to and allowed wage claim, the Debtors

17   would note that it should be capped at $12,850, which is the

18   cap of Section 50784 at the time the Debtors filed it.  I'm

19   happy to answer any questions Your Honor may have.

20           THE COURT:  No, I don't have any questions.  I

21   will grant the objection to these three claims in full.

22   They're truly bizarre documents that have no support

23   whatsoever other than what appear to be forgeries.  The

24   Debtors have asserted that Mr. Smith had no employment

25   relationship with them.  He is not refuting that with any

Page 19

1    evidence other than his conclusory statements, which are

2    self-contradictory.

3            He's asserted claims based on purported stock

4    investments, and otherwise, really can't explain the claim

5    at all.  In addition, he's asserted priority claims, again,

6    in a situation where it does not appear that he was an

7    employee of the Debtors ever.  Those claims obviously due

8    exceed the statutory cap for priority in any event.

9            Similarly, he asserted a claim on a secured basis,

10   attaching a facially and credible purportedly heretical

11   standby letter of credit for in excess of $1.2 billion.  The

12   whole claim is -- all three claims, that is, are simply in-

13   credible.  And the Claimant hasn't carried his burden of

14   proof on any aspect of them.  So you can email me what are

15   disallowing the three claims in full.

16           MR. LITZ:  Great.  Thank you, Your Honor.  I'll

17   submit an order to Chambers, and I will cede the virtual

18   podium to my colleague, Ms. Jacqueline Marcus.

19           THE COURT:  Okay, thank you.

20           MS. MARCUS:  Good morning, Your Honor.  Jacqueline

21   Marcus from Weil, Gotshal on behalf of the Debtors.  Item

22   Number 9 on today's agenda, a motion of the Debtors to amend

23   the terms of engagement of preference firms, Docket Number

24   9469.

25           As laid out in the motion, back in June of 2019,

Page 20

1    the Debtors engaged a trio of law firms -- ASK LLP, Active

2    and Recovery Services, now Stretto, and Katten Muchin

3    Rosenman LLP, which we refer to in the motion as the

4    preference firms, to prosecute the Debtor's avoidance

5    actions, which constituted one of their largest assets.

6         At that time, we described the terms of the

7    engagement support and other parties in interest,

8    specifically the terms of the contingent fees that were to

9    be paid were set forth in the respective engagement letters.

10   Based upon their experience between April 2019 and December

11   2020, the preference firms realize that due to the

12   incompleteness or inaccuracy of the information which they

13   had been provided, the contingent fee schedule they had

14   negotiated did not fairly compensate them for the work they

15   were doing.

16        As noted in the motion, there were three primary

17   issues.  The number of executory contracts that would be

18   assumed and assigned to transform as part of the sale

19   transaction, the amount of the cash in advance payments that

20   were made by the Debtors prior to the commencement date, and

21   the lack of information to substantiate certain payments

22   made by treasury wire.

23        The preference firms approached the Debtors and

24   requested a modification of the contingent fee schedule, as

25   contemplated by each of the engagement letters.  On behalf

Page 21

1    of the Debtors, M3 and the restructuring committee of the

2    Debtor's Board of Directors, reviewed the proposed modified

3    terms and negotiated with the preference firms to actually

4    reduce the fees that had been requested.

5              The repricing proposal described in the motion

6    sets forth the result of those negotiations.  The key terms

7    of the repricing proposal are as follows -- an incremental

8    contingent fee that will enable the preference firms to

9    recoup some of what they had expected to earn -- excuse me -

10   - if certain thresholds were met, the potential for a one-

11   time $500,000 payment, if gross recoveries exceed a certain

12   designated threshold on July 31, 2022, and importantly, a

13   step down in the revised commission rates of 50 basis

14   points, if the thresholds are not as achieved by certain

15   target dates.

16             If approved by the Court, the new commission rates

17   will take effect as of January 1st, 2021.  The repricing

18   proposal has been discussed and vetted with the

19   administrative creditor's representative and the Creditor's

20   Committee, who has indicated in the motion to not oppose the

21   relief requested.

22             In addition, before it was filed, the motion was

23   provided to the Office of the US Trustee, and the US Trustee

24   authorized us to represent to the Court that it does not

25   object for the requested relief.

Page 22

1          The Debtors believe that the revised terms fairly

2     compensate the preference firms for the work they are doing,

3     and provide an incentive for them to maximize the value

4     realized on the preference claims, and to do so on an

5     expedited time frame.

6          Two objections to the motion were filed by

7     administrative expense creditors.  One group of Creditors

8     represented by Mr. Sarachek, who opted into the

9     administrative claims consent program or did not opt out.

10    And Orient Craft Limited, which opted out of the

11    administrative claims consent program.

12          Neither of the objections relates to the

13    reasonableness of the compensation to be provided to the

14    preference firms under the revising proposal.  Instead, they

15    both complain about the extent to which their respective

16    administrative expense claims have received distributions to

17    date, but that is not the issue before the Court today.

18          It's not the responsibility of the preference

19    firms to ensure that administrative creditors, whether opt-

20    in, non-opt out or opt out will be paid in full.  The

21    question before the Court is whether to approve the Debtor's

22    business judgment that modifying the compensation as set

23    forth in the repricing proposal is in the best interest of

24    the Debtors and their constituents, and provides a

25    reasonable rate of compensation for the preference firms.

Page 23

1          The Debtors believe that the answer to both of

2     these questions is yes, and we urge you to grant the motion.

3     Unless Your Honor has any further questions, I would cede

4     the virtually podium to Terence Banich of Katten.

5          MR. BANICH:  Good morning, Your Honor.  Terence

6     Banich of --

7          THE COURT:  I did have --

8          MR. BANICH:  Oh, excuse me.

9          THE COURT:  I did have some questions.  I'm not

10    sure why we're hearing from the three firms as opposed to

11    just the objectors first.  But my questions really go to

12    points that I think are separate from the objectors, which

13    is the standard by which I need to review this.

14          Each of these firms -- well, first of all, my

15    question is, which firms are we talking about?  Because

16    there is a tie-in to the Acumen firm.  And it's not clear to

17    me how that works in relation to this compensation package

18    as proposed.

19          Secondly, the firms, including Acumen, were

20    retained under 328(a), as far as their compensation was

21    concerned, which has a high standard for altering

22    compensation terms.

23          And then, finally, I'm just not -- it's not clear

24    to me whether that standard is satisfied here.  And then,

25    but finally, if it is, I guess I have a question as to what

Page 24

1    is a reasonable rate for a replacement firm at this point,

2    if the firms are not willing to work on the terms that they

3    had originally negotiated.

4            But maybe the first question I would have is,

5    which firms are covered by this and how does it relate to

6    the Acumen fees?

7            MS. MARCUS:  So I think I understand your

8    question, Your Honor.  This applies to all three firms,

9    which amongst themselves have an arrangement, and maybe Mr.

10   Banich can help me on this, in terms of the sharing of the

11   compensation.  But Stretto basically just stands in Acumen's

12   shoes and the revised terms would apply to all three firms.

13   I don't know if that answers your question.

14           THE COURT:  So I mean, each one had a different

15   percentage.  I mean, Acumen and Stretto had a different

16   percentage, for example.

17           MS. MARCUS:  Right, and --

18           THE COURT:  And the other ones, they're all now on

19   a uniform percentage.

20           MS. MARCUS:  I think it's -- the way I would

21   describe it is it's all in the mix.  I'm not sure with

22   respect to whether certain of the firms are getting more in

23   certain circumstances.  But the way we've presented it is

24   the blended basis at the end of the day for all three firms

25   working together.

1        THE COURT:  But how does that -- I'm just not sure

2   how one would measure that.  I mean, ultimately, if I grant

3   this, there will be fee applications.  And in fact, the fee

4   applications aren't normal fee applications.  They just show

5   what is recovered by the firm.

6        And I just -- I mean, are they the same ratios as

7   before, with Acumen?  I -- it's just not clear to me that --

8   how this -- I guess what you're saying to me is this is an -

9   - these are aggregate commissions or aggregate contingency

10  fees.

11       And as between any of, you know, ASK or Katten or

12  Stretto, they're going to allocate them as they allocate

13  them.  It doesn't really matter as far as the Debtors are

14  concerned?

15       MS. MARCUS:  It actually doesn't matter as far as

16  the Debtors are concerned, as long as the aggregate

17  compensation to be provided is reasonable and appropriate.

18  I don't know, and we have representatives of all three firms

19  on the Zoom, if any of them want to speak to that.

20       THE COURT:  Well, I mean, each of them separately

21  --

22       MS. MARCUS:  But that's not changing.

23       THE COURT:  Each of them --

24       MS. MARCUS:  I think the important thing -- I'm

25  sorry.

Page 26

1              THE COURT:  Okay.  Each of them separately submits

2       a report, which in essence is under their retention orders,

3       a request for compensation.  I don't even know if the other

4       ones get notice of that.  And I, you know, I review it.  And

5       if the math works out, I'll grant it.

6              But I don't want one of the other ones coming back

7       and said, oh, you over authorized ASK, for example.  And

8       under our sharing arrangement, we should get some of that.

9       That's a concern I have.  I understand the Debtor's point.

10      We want to -- they're just paying an aggregate sum, an

11      aggregate contingency fee.

12             But as among the various firms, I -- you know,

13      before, there were specific percentages for each firm.  And

14      they would represent that they were following those

15      percentages.  It's just not clear to me now if that's how

16      they're going to make their representation as to what they

17      themselves are owed as among the three of them.

18             MR. REISMAN:  Well, Your Honor -- Jackie -- sorry,

19      apologies, Jackie, to talk over you.  Your Honor, Steven

20      Reisman of Katten.  We will not be back before Your Honor

21      with an issue between Katten and Stretto.  You have my word.

22      I am telling you that.  We will never be before you to deal

23      with the issue.

24             We will work it out.  Mr. McElhinney is on the

25      line.  Basically ask that they're commissioned and Katten

Page 27

1    and Stretto get the same amount that ASK gets for the same

2    dollars, right, on what -- if they collect $5 million and

3    it's 10 percent, they get $500,000.

4            If we collect $5 million, 10 percent, you get

5    $500,000.  And we divide it out based upon an agreement that

6    we will disclose and share with the Court and state that

7    that is -- assuming Your Honor grants the relief.

8            I assure you, (sound drops) that we literally --

9    the last thing you'll have to deal with will be an issue.

10   Mr. McElhinney from Stretto is on the line.  We've been --

11   we've managed to -- are working together.  We're all really

12   working, all three of us are working together to maximize

13   the value here and spending.

14           You know, without getting into numbers or

15   anything, literally millions and millions and millions of

16   dollars in fees from (sound drops) to fully prosecute these

17   actions and maximize the recovery to the benefit of the

18   estate.

19           I don't want to get into the argument on the

20   motion.  Mr. Banich will handle that, but I want an answer

21   to Your Honor's questions to the extent that's a sufficient

22   answer.  And if you have any follow-up I'm happy to respond.

23           THE COURT:  Okay.  Well, I mean, under the

24   existing engagement agreements, the compensation is

25   different for each firm, right?  It's a different percent as

Page 28

1    far as the contingency fees are concerned.

2             MR. REISMAN:  Each share with Stretto at the same

3    level as when asked for the recovered -- Dan, will you care

4    to answer?

5             MR. MCELHINNEY:  Your Honor, Dan McElhinney on

6    behalf of Stretto.  I'm going to clarify first that Stretto

7    is not a law firm.  We were retained as an advisory.

8             THE COURT:  Right.

9             MR. MCELHINNEY:  An advisory firm to provide data

10   analysis of the advisory services.  And as Mr. Reisman

11   suggested suggested, we are teamed with Katten.  So the fees

12   -- ASK has one set of -- it has a fee that is mirrored by

13   the combination of fees in our retention applications

14   between Katten and Acumen.

15            So if you add up in each level, the percentages

16   for Katten and Acumen, they will equal at that level ASK's

17   percentage.  So they are mirroring.  It's just that you look

18   at Katten and Acumen with specific, you know, their

19   percentages -- the split between Katten and Acumen is

20   defined in our retention applications.

21            It's not intended to change by virtue of this

22   application.  So whatever those percentages are will remain

23   the same, or the split, the average split as between the two

24   firms could stay the same.  And ultimately, they will mirror

25   exactly the percentage that ASK will (sound drops) for their

Page 29

```
 1    services.
 2            THE COURT:  Okay.  So in other words, the AS --
 3    I'm sorry.  The ASK Stretto arrangement and the Katten
 4    Stretto arrangement as far as the allocable share to --
 5    between the law firm and Stretto in each case doesn't change
 6    as far as allocable share.  It just changes as far as the
 7    base.
 8            MR. MCELHINNEY:  ASK -- it's -- ASK is essentially
 9    on its own.  They do the legal and the data advisory
10    portion.  So for example, in tier two, for matters that are
11    cases where complaints had been filed, under the existing
12    proposal or under the existing pricing, ASK would receive 17
13    percent.
14            For all of their settlements, they get a
15    commission of 17 percent.  On that same level, to -- they're
16    17 percent applicable to Katten and Acumen that's with 10
17    percent to Katten, seven percent to Acumen.  That's
18    essentially how the split works.  So Stretto only works with
19    Katten on their matters.  We provide the data advisory
20    component.  And Katten provides the legal services.
21            THE COURT:  So again, as far as Acumen and Stretto
22    are concerned, the split percentage doesn't change, just the
23    base amount of the aggregate commission changes?
24            MR. MCELHINNEY:  Right.  The commission to be
25    applied changes, but the split -- what we received versus
```

Page 30

1   what Katten receives is the same.  The percentage is the

2   same.  It won't change.  It won't increase any of the

3   percentage.

4                     THE COURT:  And is that the same for ASK and

5   Acumen?

6                     MR. MCELHINNEY:  Again, ASK doesn't work on -

7   - we basically split the entire portfolio so that Stretto

8   and Acumen have their and ASK have their cases.  Stretto

9   does not work or provide --

10                    THE COURT:  Okay.

11                    MR. MCELHINNEY:  -- for ASK.

12                    THE COURT:  All right.  Fine.

13                    MS. MARCUS:  Your Honor, if your second

14  question had to do with the standard in 328A --

15                    THE COURT:  Right.

16                    MS. MARCUS:  -- for modifying compensation --

17  excuse me.  I guess I'll start off by noting that the

18  engagement letters themselves have the possibility of

19  modifying the commission rates, upon Court approval.

20                    But, I read 328A and the standard of

21  improvident when granted more as the situation where the

22  Court has approved compensation and is then going to reduce

23  the compensation, as opposed to a modification going forward

24  of the terms.

25                    THE COURT:  It goes both ways.  If someone

Page 31

1    asks for more, the standard goes both ways.  Reductions and

2    increases.

3              MS. MARCUS:  I guess you could say that the

4    compensation was improvident -- it's a heard word, but

5    improvident when granted, because based on the facts as they

6    turned out to be -- the compensation that had been agreed to

7    turned out to be below a market rate of compensation for the

8    services.  And that's the reason that the preference firms

9    made the request, and that's the reason that the Debtors

10   took the time to really review the numbers and the

11   performance, and negotiated, at arm's length with the firms

12   over the modification.

13             THE COURT:  Well, again, it's, it's

14   improvident in light of developments not capable of being

15   anticipated at the time of fixing of such terms and

16   conditions.  So it's more than -- it, you know, it turns out

17   to be a bad deal.  It has to have been incapable of

18   anticipating that it would be a bad deal.

19             MS. MARCUS:  I'm sure when the terms were

20   negotiated that each of the firms made certain assumptions,

21   and provided some -- I would imagine, some amount of cushion

22   in terms of what the likely recoveries would be.  But given

23   the magnitude of the cases and the complexity of this failed

24   transaction, then the monumental task of assuming and

25   assigning contracts and all of that stuff, I think -- reason

Page 32

1    what we (indiscernible) could differ as whether it could

2    have been anticipated that numbers would be that far off.

3                    MR. STEINFELD:  Your Honor, this is Joseph

4    Steinfeld, can you hear me?

5                    THE COURT:  Yes.

6                    MR. STEINFELD:  Okay.  Hi.  I'm lead attorney

7    for ASK.  I will be and as was represented, our firm is

8    basically divided half the cases and we're a law firm, as

9    Your Honor knows, and we do the analysis as well.  So our

10   fees are completely set the same way.  They're not going to

11   change other than the percentages may slightly alter from

12   what we have right now.

13                   But I did want to address the Court's concern

14   about the process when we did this case.  I was intimately

15   aware of, and I was involved in that.  And one of the big

16   issues for us was we were told, we were given a list of

17   assumed contracts, and we did cull those out of our

18   analysis.  But then after we were engaged and the process

19   with Commensic Transform Halco had the ability, unbeknownst

20   to us at the time, to go in and for a period of time, to

21   assume additional contracts.  And that had a dramatic effect

22   on a lot of -- of the larger cases, a lot of the larger

23   recoveries.  So that did effect one thing.

24                   The other thing is, we were told that the

25   records of the Debtor were such that we were going to be

1    able to get the invoicing and the payment detail from

2    Treasury Checks, which were wires, and again, that was a

3    process that dragged on for months.  I mean, almost a year

4    with some difficulty from Transform Halco in giving us the

5    information we wanted.

6              And subsequently, when I did receive some of

7    that information, did reduce the entire portfolio.  Dan

8    McElhinney would know this, but I think it was a rather

9    significant percentage rate, 30, 40, 50 percent of the

10   actual portfolio was reduced.

11             So those, for some of the items that we were

12   facing that we were unhappy at the time that we did the

13   case.  So I'd just address the Court to say those are the

14   basic issues that -- I think we've plead those also, but

15   maybe there wasn't quite as much detail in the papers.

16             THE COURT:  Okay.

17             MS. MARCUS:  I think your last question, Your

18   Honor, was what it will cost to get another series of firms

19   or a firm in here --

20             THE COURT:  Right.  Well, before you answer

21   that one, I don't -- there's no statement in this motion as

22   to what the aggregate increase really is over what the

23   current arrangement is.  What is the -- what is the increase

24   in the percentage for the tiers involved?  That's T I E R S,

25   for the court reporter's benefit.  As against the existing

Page 34

1    percentage?

2                    MS. MARCUS:  So as you've noted, Your Honor,

3    and it is a very complex formula, in that M3 has sent an

4    analysis of what the blended rate would be under this same

5    proposal -- excuse me, under the existing arrangement and

6    the modified proposal.

7                    THE COURT:  Right.

8                    MS. MARCUS:  Under the existing arrangement,

9    the blended rate should come out to be approximately 14

10   percent.  Under the modified proposal, it could be as much

11   as 17.8 percent, if that one time $500,000 payment was

12   achieved, or as little as 15.5 percent, if alternatively,

13   the stepdown happens because the time thresholds haven't

14   been met.

15                   So I think it's fair to say that it's a

16   little more than 3 percent of a change.  And the, the basis

17   for that is there was some effort to enable the preference

18   firms to recover or recoup what they thought they would have

19   gotten if the data had been correct at the time.  So if

20   they're able to satisfy those thresholds, they'll recoup a

21   little bit of what they were, in effect, were giving up

22   because of the incompleteness or inaccuracy of the data.

23                   THE COURT:  Okay.  And is this -- is there

24   $500,000 for each firm?  Each of the two firms?  The law

25   firms?

1              MS. MARCUS:  No, Your Honor, it's to be

2      shared.

3              MR. STEINFELD:  It's an aggregate.

4              MS. MARCUS:  Yes, it's to be split.

5              THE COURT:  Okay.  All right.  And then you

6      were going to answer my question which is, what due

7      diligence have the Debtors done with regard to the potential

8      replacement compensation for a different firm?

9              MS. MARCUS:  So to be frank, Your Honor, I

10     don't think -- we haven't gone down that road to see what

11     the replacement compensation would be.  And part of the

12     reason, or the main reason for that is that this was not

13     posed to the Debtors as change or compensation or we're

14     quitting.  I don't think any of the firms has said that.

15     There hasn't been any discussion that I'm aware of that

16     they've said that.  It was more in the nature of we don't

17     think we're being fairly compensated so make the adjustment.

18              I do know that the people who were

19     responsible for negotiating the terms, initially, are very

20     well versed in what the market is for these kinds of

21     arrangements and were well aware of that when we were

22     negotiating a repricing proposal, but I don't think they've

23     gone out to seek other firms to replace these firms.  But

24     frankly, I would expect partly given the, you know, the

25     knowledge that we have now, and partly given the stage that

Page 36

1    we are in the cases, that any other firm who would come in

2    to replace these firms would probably be charging a lot

3    more.  But that's pure speculation on my part.

4                    THE COURT:  How does this compensation relate

5    to an hourly rate?  An average hourly rate?

6                    MR. STEINFELD:  Your Honor, without -- Your

7    Honor, without getting into -- without getting into

8    specifics, right?  And you can understand the reason for

9    that.  I think you can, based upon your prior experience.

10   This will be a -- this will not fully compensate us for our

11   hourly rates.  This will not.  And it will be below.  I

12   can't tell you how it's going to end up.  Right now, the gap

13   is wide.  The hope is that this will somewhat narrow that

14   gape as we had no -- we believed the information that we

15   got, and we did not think that Sears, you know, but and it's

16   no fault.  I don't want to try to put blame on anybody, but

17   we did this quickly.

18                    We did this as accurately as we could, and we

19   came up with the numbers that we came up with, and had the

20   numbers been what we had expected, we would not be coming

21   back.  Right?  Because the number went up as we went on.

22   Right?

23                    When you cut a major number off of the, you

24   know, nine figure number, off of the -- not the, we'll just

25   leave it at that.  But off of the numbers, it has a dramatic

Page 37

1    impact on the ultimate, which I've already -- and the

2    percentages that we would earn.  So that's why -- and we're

3    not, I would never do that.  That's not Katten, ASK,

4    Stretto, never.  We're not saying, Your Honor, you know,

5    either do this or -- we would never put you in that position

6    and we would never do that to a client that we are

7    privileged to have the pleasure of representing.  It's just

8    that the information, we had no possibility of any way

9    realizing that after the fact, that all of these contracts

10   that (indiscernible) were going to so -- and that all this

11   information that we relied on being one direction turned out

12   to be, sorry, it's another direction.

13                  THE COURT:  Okay.

14                  MR. MCELHINNEY:  I don't want to steal Mr.

15   Banage's thunder in any way, and I don't know if he has

16   anything further to add that regard, and apologies for

17   jumping in here.  Just wanted to try to help out with the

18   interest to the questions.  And if now, I'd be happy to

19   answer any further questions.

20                  Your Honor, I turn the podium over to the

21   next -- the next speaker.

22                  THE COURT:  Okay.  Well, why don't I hear

23   from the objectors.

24                  MR. WANDER:  Good morning, Your Honor, can

25   you hear me okay?

1                    THE COURT:  Yes, good morning.

2                    MR. WANDER:  David Wander of David Roth

3        Hatrens Hitron, Counsel for Oregon Craft.  It's very good to

4        see you, Judge, and it's good to see everybody else.

5                    Your Honor, I can't overstate the seriousness

6        of this application, and the implications, and no one really

7        wants to or seems to be addressing that.  When I read the

8        Debtor's motion, and I read what the preference firms are

9        alleging, it appears to be making out a claim for fraudulent

10       inducement.  And I found that shocking and I'm going to tell

11       you why.

12                   Last night, I went over the transcript from

13       the confirmation hearing.  And I read it from the beginning

14       to the end, skipping over a few portions that didn't really

15       involve this.  And first, it you're -- and I'm sure, Your

16       Honor, will recall, I cross-examined the Debtor's witnesses.

17       And the testimony on the purported preference recoveries,

18       the projected preference recoveries was tremendously

19       significant to the Court's decision to confirm the plan.

20       And I first cross-examined, Brian Griffin, on the preference

21       matters.  And his testimony was that the Debtor's projected

22       preference recoveries of $100 million.

23                   I pressed him on that, and I asked him, and

24       this is at page 70 of the transcript on October 3rd, 2019.

25       And he said it depends on when -- what the preference firms

1    are able to bring in, in the next three months.  So I

2    pressed him, what was his best guess of the preference

3    recoveries by the end of the year?  That would have been two

4    weeks in October, November, and December.  And his

5    testimony, at page 70 was by the end of the year, the

6    recoveries would be between $15 and $20 million.  Now, let's

7    keep in mind this is before Covid-19 pandemic.

8                    I then pressed him about 2020.  And his

9    testimony was that the projected recovery by the end of 2020

10   was $60 million.  Again, that would include months before

11   the Covid-19 pandemic resulted in global shutdown.  And the

12   balance $20 million would be in 2021.  And he testified

13   about discussions with the preference firms, and that's on

14   page 71.

15                   And, Your Honor, I've been asked about the

16   discussions with preference firms.  That's on page 80.  And

17   Debtor's counsel, Mr. Ganinder, talked about conversations

18   with preference firms on page 80.  And -- I'm sorry, on page

19   86.  And that they were relying, in part, on the preference

20   firms.  And Mr. Ganinder said on page 88, no administrative

21   claim shortfall was projected.

22                   Next was Mr. Murphy.  Mr. Murphy said the

23   preference firms were still conducting diligence relating to

24   perfect potential preference recoveries.  And that testimony

25   starts a little after page 134.  Mr. Shrop then stated at

1    page 145, he referred to the restructuring committee.  He

2    said, "they're pressing the preference firms.  You know,

3    making sure that they're going to be those complaint's filed

4    … in the very near term."  He goes on to say "we think that

5    we can go effective within a few months.  As early as, you

6    know, within a few months."  And then he says on page 164,

7    "I hit the preference actions, which, you know, we're

8    hopeful that those will be even larger than what we put the

9    estimates on."

10                Counsel for the committee, Mr. Dublin,

11    starting at page 205.  He talked about we've had recent

12    conversations with counsel for the states that are pursuing

13    the preference actions.  We expect upwards of 200 complaints

14    to be filed before the end of the month.  That process is

15    ongoing.

16                Then at the end of the testimony, Your Honor,

17    and I had some colloquy, and Your Honor, pressed me.  You

18    asked regarding the Debtor's plan, the why is this a

19    visionary skim?  That's what you asked me.  And I responded,

20    and I said, and this is at page 239, and it goes onto page

21    240.  I said, it will be years for money to come in based on

22    preference recoveries.  I repeated myself.  "So it'll be

23    years for the preference recoveries and the funds to come in

24    to pay administrative claim."  I then said, so we have a

25    plan that may be effective in three years.

Page 41

1              Now, Your Honor said, at page 248, as far as

2    -- "as far as I'm concerned, I have uncontroverted evidence

3    that there is a more than reasonable likelihood that there

4    will be at least $100 million in preference recoveries."

5    Then the confirmation hearing was adjourned.

6              As Your Honor, may recall at that time, I was

7    doing the cross-examine.  I was primarily representing Pro

8    Global, and in between the confirmation  hearings we settled

9    our claim.  And that was put on the record at the beginning

10   of the adjourned hearing that I believe was on October 7th.

11             Though I wasn't in a position, really, to

12   speak further, and then at the end on page 180 of the

13   transcript, when Your Honor, was explaining why you were

14   confirming the plan, you said, "I believe that the

15   likelihood of satisfying section 1129A9 in the relatively

16   near term, i.e. in a matter of months, is established."

17             But now, the firms that have been involved

18   since April.  May, June, July, August, September -- about

19   six months of working on the preference matters, no one said

20   anything at the confirmation hearing about these Transform

21   issues, about incomplete documentation.  With over $150

22   million, I believe at that time, in professional fees, on

23   these matters.  Now the preferenced firms say to Your Honor,

24   based in the debtor's motion, "Before the documentation and

25   information necessary to accurately address the Court's

Page 42

1    actions was available".  They agreed to the contingency

2    arrangement before they had accurate information.  And the

3    Debtor's Motion goes on to say, according to the Debtor's

4    the preference firms now allege "that a significant portion

5    of the documentation and information provided to the

6    preference firms, prior to the engagement, turned out to be

7    inaccurate or incomplete, requiring additional time, money,

8    and resources to prosecute the preference -- the avoidance

9    actions."

10                   According to the Debtor's motion, the

11   preference firms now allege "that had they been fully

12   apprised of the number of contracts that had been assumed by

13   the Debtors and aside to Transform, which necessarily

14   reduced potential preference claims".  Judge, we are now

15   here, and I submit that the information that was given to

16   Your Honor, to get this plan confirmed was false or

17   misleading.

18                   THE COURT:  Well, that's not the issue before

19   me today, and it's really unfair to bring it up today with

20   references to a transcript that no one has gone back to look

21   at, including myself.  So I'll say --

22                   MR. WANDER:  I think you should just --

23                   THE COURT:  -- let's focus on the standard

24   for this motion which --

25                   MR. WANDER:  -- yes, I would --

Page 43

```
 1                THE COURT:  -- some of your remarks are

 2      addressing, but other than that it's not -- it's not before

 3      me.

 4                MR. WANDER:  I wanted --

 5                THE COURT:  So we're not going to go down

 6      that road.

 7                MR. WANDER:  Okay.  I wanted just to set that

 8      up as part of the foundation for the objection.  I'm saying

 9      that these firms, who are among the most experienced firms

10      in the business of prosecuting preference actions, had

11      whatever information available to them that Your Honor, had

12      in confirming the plan.  And Oregon Craft opted out, so

13      every dollar that goes to the professional is one less

14      dollar that is available for the plan to become effective.

15                Now, when I read the motion, I was saying to

16      myself, if they don't get this increase, does that mean they

17      won't work diligently?  I frankly have never heard of that.

18      That a lawyer retained to represent a debtor, Chapter 11,

19      that if they're not going to get paid as much as they

20      thought they would, they then won't work as hard?  They

21      won't be incentive?  Oregon Craft has no objection to the

22      estates paying these firms whatever they want to after the

23      plan goes effective and Oregon Craft is paid it's undisputed

24      administrative claim, I think that the focus, going forward

25      in this case should be less concern about how much the
```

professionals are going to be making, what we're recouping, and should be concerned about the creditors. The administrative creditors being paid. Thank you, Your Honor.

THE COURT: Okay.

MR. SAROCHEK: Your Honor, Joe Sarochek from Sarochek Law Firm on behalf of Mead and various other administrative creditors. To address the standard, we are questioning the Debtor's business judgement, real hard, myself and Mr. Wander. We're in a situation now where -- and I want to preface by saying, these are quality firms that we're dealing with. Ms. Gressman's firm, the other firms, we've had a lot of interaction with them. They're very competent. They're quality firms. We're not questioning their competency in any way, shape, form.

We don't believe they are the issue here. The issue here is that there's an $80 million hole, and this debtor, and I've reviewed all of the fee applications, to date, last night, and this Debtor has generated over $240 million of fees without expenses, that have been paid. And we're focused on a 3 percent change in preference firms that, to date, have generated $16 million? We are questioning Debtor's business judgement. I want to be really, really clear. And we think there is cause, at this time, Your Honor, for the appointment of a trustee in this case as an alternative.

Page 45

```
 1                THE COURT:  Again, that is not before me
 2      either.
 3                MR. SAROCHEK:  I understand it's not before
 4      you, Judge, but you are being asked to modify a fee
 5      arrangement when we're in a situation, 18 months subsequent
 6      to confirmation and the Debtor is focused on a cut where the
 7      patient is bleeding to death.  I mean, this is equivalent to
 8      trying to solve the Covid crisis without finding a vaccine.
 9      What, what is the Debtor's business judgement in focusing on
10      this?  As opposed to focusing on resolving the ESL
11      litigation, which is the only source of funds.  It's crystal
12      clear.  The only source of potential funds to make this plan
13      go effective.  And for us to focus on the preference issue,
14      at this time, really we are questioning their business
15      judgement, Your Honor.  And we don't believe that you should
16      take this up at this time.  And we do believe that there are
17      other, more pressing issues.  Thank you.
18                THE COURT:  All right.  Well, I -- I guess I
19      understand you and your client's frustration, but I've never
20      heard of a situation where it's a requirement for a debtor
21      to carry a particular burden of proof on a particular motion
22      that they explain all of the other things that they're doing
23      or not doing in a case.  The two are just not combined.  So
24      I would have thought that if you were objecting on the
25      Debtor's business judgement, it would be their business
```

Page 46

1    judgement with respect to this particular proposed

2    agreement, as opposed to something else.

3                    You and your clients, certainly have their

4    rights to seek other forms of relief, but I guess, I don't -

5    - I don't really stand -- understand the objection of this

6    particular motion on that basis.  On the other hand, I do

7    have a concern that this request, although it might be

8    supported by business judgement to incentivize further the

9    firms to accelerate their recoveries, which is what at least

10   Mr. Sarochek is wanting, although he doesn't believe, and I

11   tend to agree with him at this point, that the recoveries

12   won't be sufficient even if accelerated to warrant the plan

13   going effective.

14                   I still have a problem with the 328A point.

15   I just don't -- I don't have enough of a record here to show

16   that these circumstances were not unanticipatable at the

17   time that these compensation agreement were entered into.

18   Including the fact Transform had the ability to assume

19   contracts and make cure payments, which in effect takes the

20   matter out of the preference category.

21                   So I think without more, I can't approve

22   this.  It's just not within 328A.  Which clearly does work

23   both ways.  There are times when firms get windfalls.  There

24   are times, on the other hand when their investment doesn't

25   turn out.  And I just don't have enough of a record today to

Page 47

1    establish that the exception to that provision would apply

2    here.

3                    MR. MCELHINNEY:  Your Honor, if I may make a

4    suggestion, right?  We've heard your ruling, right.  So

5    unless we think that we can meet that standard, right, and

6    make a supplementary little submission in that regard, we'll

7    pull the motion.  Right.  So it's either to be, right, we're

8    not going to make the motion, or we're going to supplement

9    the record.  So in the regard -- and I'm not looking to cut

10   off Mr. Sarochek and Mr. Wander, great respect to both of

11   them, and as professionals to preserve their right on

12   whatever supplemental submission was made as to the standard

13   in that regard to satisfy 328.

14                   That's just one point I wanted to suggest to

15   Your Honor, if I could.  The other is, is that I want to be

16   clear to Mr. Wander, none of these three firms that I would

17   speak, without having spoken to them, because I have spoken

18   to them enough.  We are going to act diligently.  We have

19   acted diligently.  We are, you know, working very hard.

20   That the polite say to say it.  Right.  It is the thought

21   that went to my head, but it is the polite way to say it.

22   We are working very hard to try and make this a success.

23   And appreciate Mr.  Sarochek's comments in that regard.  He

24   recognizing the work that we're doing, and we will continue

25   to do that, Your Honor.  It's not -- I understand the point

Page 48

1    of sometimes it turns out that, you know, but this, this was

2    like -- this is a big number.  Right.  So what I would like

3    to say is before we get into it, there are sensitivities in

4    regards to certain things.  If we could either we'll

5    withdraw it, or we will put in a supplemental sufficient and

6    we stand to adjourn.

7                    THE COURT:  Okay.

8                    MS. MARCUS:  And Your Honor, Your Honor, on

9    behalf --

10                   MR. MCELHINNEY:  Sorry, Jackie, it's not my,

11   oh I'm sorry, Ms. Marcus --

12                   MS. MARCUS:  That part of what I was going to

13   say, but what we'll do is, if you wouldn't mind adjourning

14   this matter and we'll consult with the preference firms and

15   the restructuring committee, and figure out what we're going

16   to do, and provide notice and act accordingly.

17                   I would like to just respond on a couple of

18   little point, and, Your Honor, I know you noted that they're

19   irrelevant.  This is not the forum for relitigating

20   confirmation, and likewise, no request has been made for the

21   appointment of a trustee.  And I think it's completely

22   inappropriate, and I won't even respond top that request.

23   It's just totally off based in this context.

24                   THE COURT:  Okay.  I will adjourn this to the

25   next omnibus date and again see whether at that point the

Page 49

1    firms and the debtors want to go ahead with the relief or

2    would rather, would extend withdraw it.  And again, I want

3    to be clear, the standard that I'm looking at this under,

4    is, is not the business standard judgement.  It's the 328A

5    standard.  As far as business judgement, the Debtors may

6    well have made their case except with regard to the $500,000

7    because I don't understand what triggers that.  And that is

8    probably about the same concerns about telegraphing too much

9    to the defendants in the preference actions.  But it's -- it

10   just says recovery support and agreed upon threshold,

11   without really, you know, fleshing that out.

12              And that does seem to have a disproportionate

13   effect on the aggregate estimated change from the estimated

14   contingency fee as it would exist today, as Ms. Marcus

15   represented at least, almost three points change.  But the

16   thing to focus on, again, is whether the information

17   available to the firms at the time that I approved the

18   certentions, was enough so that it was anticipatable that

19   they'd be in this position today.  Or alternatively, whether

20   there was something that was not available to them that

21   really means that this was improvident when entered into,

22   because it wasn't anticipatable.  And frankly, I think the

23   risk that Transform is going to assume contracts, is

24   something that you wouldn't have known about because that's

25   part of the deal.  But that's something that you can submit

1    additional evidence on if you want to.

2                    MR. STEINFELD:  Your Honor, can you hear me?

3    Joseph Steinfeld.  I just wanted to raise one issue and I

4    expect a ruling shortly, but I don't want to leave an

5    impression that we have not worked exceedingly hard in this

6    case and will --

7                    THE COURT:  I -- I don't have that impression

8    --

9                    MR. STEINFELD:  Okay.  Good.

10                   THE COURT:  -- and I frankly don't think

11   either of the objectors rise that objection.

12                   MR. STEINFELD:  But I also --

13                   THE COURT:  When they referenced the size of

14   fees, it's really not the fees of the --

15                   MR. STEINFELD:  It's not our fees, I know.

16                   THE COURT:  -- special counsel -- preference

17   counsel.

18                   MR. STEINFELD:  But I do want to also point

19   out, and I think Mr. Reesman said it as well, regardless of

20   what happens, whether we ever come back to the court or

21   doesn't get approved, we're going to work just as hard, and

22   I just don't want the implication that somehow in the motion

23   we need this in order to work harder, I disavow fairly

24   great.

25                   THE COURT:  I don't have any doubt in that --

Page 51

1                    MR. STEINFELD:  Thank you.

2                    THE COURT:  -- frankly, Ms. Marcus' remarks

3        confirmed that because the Debtors really didn't either.

4        That really wasn't their focus --

5                    MR. STEINFELD:  Very good.

6                    THE COURT:  -- their focus was on what

7        they --

8                    MR. STEINFELD:  Thank you, Your Honor.

9                    THE COURT:  -- believed was fair.  And

10       unfortunately, 328A is not necessarily a model of fairness.

11       It's fairness as of the time of retention, but not, not

12       later.  You know, these, these issues about the course of

13       the case and the payment of administrative expense creditors

14       come up at every conference we've had.  At every omnibus

15       day, and they've come up today too.  I trust that the

16       parties are working on them in a way to try to go effective.

17                    It doesn't appear to me that the best way to

18       reach a settlement with over 30 sophisticated defendants in

19       a mega lawsuit, is to tell them we really need some money

20       right now.  So I'm just not sure that's really the optimal

21       way to go, Mr. Sarochek, but on the other hand, I think that

22       they probably should be focusing on a way to share the

23       burden of the administrative expenses in order to go

24       effective.

25                    MS. MARCUS:  Your Honor, we are looking -- we

Page 52

1    are looking at that, and as you know, the Debtors don't

2    control the ESL litigation, pursuant to the confirmation

3    order.  But we're working with all parties to try to

4    expedite things and move this case alone.

5                    THE COURT:  All right.  Okay.

6                    MS. MARCUS:  The next item on the calendar,

7    Your Honor, we're moving into the advisory proceedings, and

8    the next item on the calendar is number ten, the Motion to

9    Dismiss.  I'm not quite sure which counsel is handling that

10   part, but the two landlords.

11                   MR. DEVAIN:  This is Robert Devain,

12   (indiscernible) on behalf of landlords 1055 --

13                   THE COURT:  You're -- you're --

14                   MR. DEVAIN:  Can you hear me?

15                   THE COURT:  -- almost too much.  You're

16   coming through really loudly.

17                   MR. DEVAIN:  Okay.  I will turn down my --

18   speak more softly then, if that's okay.

19                   THE COURT:  Yes, that's better,

20                   MR. DEVAIN:  Again, Robert Devain, Kelly Drye

21   and Warren, on behalf of landlords and defendants in this

22   case, and (indiscernible) and for LLC, and (indiscernible)

23   Boulevard, LLC., Your Honor. (Indiscernible) and my

24   colleague Mike Greger and Alan Mackets, I would like to

25   clear up a bit of housekeeping.

Page 53

1              Mr. Greger and I, and (indiscernible) were

2    admitted Pro hoc in the main proceeding back in November of

3    2018.  We filed Pro Hoc's for them this morning in this

4    atmosphere and those fees have been paid, but not entered,

5    but just with your permission be allowed to have Mr. Greger

6    on this motion from Alan Mackets.

7              THE COURT:  That's fine.

8              MR. DEVAIN:  Thank you very much.  With that,

9    I will cede the podium on our motion to dismiss to Mike

10   Greger.

11             THE COURT:  Okay.  And just so the parties

12   know, I've reviewed the complaint, the motion, the objection

13   to the motion, the reply, and the exhibits, which are the

14   two leases, which are obviously referenced in the complaint,

15   and therefore something that I can review as part of the

16   motion to dismiss.  So you should assume I have that

17   background here.

18             MR. GREGER:  Thank you, Your Honor, Michael

19   Greger of Alan Matkins (inaudible) on behalf of 1055

20   Hanover, LLC and 1 Imson Park Boulevard, LLC.  Your Honor,

21   the landlords seek dismissal under rule 12-B-6 of Debtors

22   adversary complaint, which asserts a single cause of action

23   for turn over under Section 542 of the code.

24             As set forth, more fully, in Landlord's

25   motion under subtle bankruptcy law, a turnover action, under

Page 54

1    Section 542 only applies to property that belongs to the

2    bankruptcy estate.  A debtor cannot use the turnover

3    provisions of Section 542 to liquidate contract disputes or

4    demand assets whose title is in dispute.  The existence of a

5    bonafide dispute regarding an asset or a debt prohibits the

6    turnover action under 542.

7                    As set forth more fully in our motion and our

8    reply papers, Your Honor, the Landlords submit the Debtor's

9    complaint should be dismissed with prejudice as it fails to

10   state a claim under Rule 12-B-6.  Because the Debtors have

11   failed to establish any valid basis, or at least have failed

12   to establish that the prepaid rent they're seeking to turn

13   over is not subject to a bonafide dispute.

14                Your Honor, the fact in this matter are really not

15   --

16                THE COURT:  Well, can I interrupt you on that

17   point?

18                MR. GREGER:  Yes, Your Honor.

19                THE COURT:  If I granted their complaint on

20   that basis -- I'm sorry, if I granted the motion on that

21   basis, the Debtors would be free to then seek a declaratory

22   judgment, I'm assuming, that this is -- the prepaid rent is

23   property of the estate, correct?  Or that there's an

24   obligation to turn it over -- not turn it over, to -- it's

25   free from either a set off of a couvment rider or a -- if

1    it's a debt?

2              MR. GREGER:  Your Honor, I -- in terms of

3    what theories the Debtors could pursue if the Court were to

4    deny a turnover under 542, what we know definitively, is the

5    Debtors have no right to assert any affirmative rights under

6    the contract.  They rejected the underlying leases and have

7    no, no rights any more to reap the benefits of the leases

8    they rejected.  That's the effective rejection.

9              Whether or not they have any additional

10   rights under state law, we don't think so.  We think under

11   the fact of this case, as set forth more fully, in motion,

12   the prepaid rent became nonrefundable upon payment except as

13   otherwise provided in the leases.  The leases here are very

14   clear, Your Honor, with respect to the right to recover

15   prepaid rent.  They're defined in both leases in paragraphs

16   36.

17             Paragraph 36 both state that upon execution

18   of the leases, the Debtors were to prepay months 7 through

19   18 of the leases.  The Debtors admit, in their complaint,

20   that they made the prepayments.  And Your Honor, we submit

21   under state law, the effect of that language is very clear.

22   And of course, state law is what controls this issue,

23   because the United States Supreme Court, long ago in Butner

24   vs. the United States, in the Seminole decision made very

25   clear that state law define property rights here.

1              THE COURT:  Except where the bankruptcy code

2    provides otherwise, which was the rest of the quote that

3    everyone leaves out from Butner.

4              MR. GREGER:  But the bankruptcy code does not

5    provide otherwise here, Your Honor, with respect to the

6    prepaid rent.  And when we look at paragraph 18, it uses

7    very -- I'm sorry, paragraph 36 of the leases, it uses very

8    specific language.  The landlords -- the Debtor's "prepaid

9    rent, due under the lease for the months 7 through 18 of the

10   term.  The term prepaid rent has a specific meaning, under

11   state law, as Landlord's briefed in their motion and replay,

12   under state common law, prepaid rent under a lease becomes

13   Landlord's property, under state common law, and may be

14   retained upon a tenant's default or breach, an absence of a

15   provision of the lease that requires a refund.

16              In determining whether or not prepaid rent

17   falls within this common law rule, the 5th Circuit

18   interpreting Florida law, which is relevant here, and of

19   course, this was back in 1962, before the 5th Circuit split

20   into the 5th and the 11th Circuit, so it was the controlling

21   Circuit, controlling Florida District Courts and Bankruptcy

22   Courts at the time, ruled that in determining what

23   constitutes prepaid rent, the Courts must "look to the

24   language of the lease".  In it's iconic the lease language

25   had -- the language is a simple language that provides for a

Page 57

1   deposit that was to be made upon execution of the lease that

2   was going to be applied against future rent.

3             The court in looking at that language said

4   proper construction of the lease is that the lease provided

5   for an advance payment of rent, which fell within the state

6   common law rule for the State of Florida.  And that rule, as

7   we already discussed provides that once paid, the rent

8   becomes nonrefundable, and in absence of the landlord's

9   default.  And of course there was no landlord default here.

10            The enforcement of the parties written

11  agreement as written, weaves its way in many cases in both

12  Florida and Pennsylvania.  The Florida Supreme Court has, on

13  multiple occasions, weighed in on what the effect of prepaid

14  rent is under state law.  And for example, in the casino

15  amusement case from the 1930's the Florida Supreme Court

16  found that a simple provision the lease provided for a

17  $25,000 payment, that "shall be credited as rent for the

18  last year of this lease", was prepaid rent that fell within

19  the common law rule.

20            In Householder Black in the 1950's the

21  Florida Supreme Court, again, weighed in and said where a

22  lease had a provision that said that a deposit was made and

23  will be applied against the third year of the term payable

24  in advance on execution of the lease.  The prepaid rent fell

25  within the common law rule.

Page 58

1             Similar to Florida, Pennsylvania courts have

2     a long history of enforcing parties agreements as written,

3     particularly in the commercial context where sophisticated

4     parties are involved.  Pennsylvania courts have specifically

5     recognized the rights of parties to negotiate for prepaid

6     rent.  Moreover, that right exists, notwithstanding any

7     potential forfeiture that occur -- can occur.

8             Pennsylvania courts have also articulated a

9     standard that in the breach of contract context, where a

10    party has advanced money and then stopped short of

11    performance, that party will not be permitted to recover

12    back the advance paid.  Given the strong common law favoring

13    freedom of contract in Florida and Pennsylvania, courts will

14    uphold the parties to their contracts, as written.

15            Here, Your Honor, we have sophisticated

16    commercial parties that were both represented by counsel.

17    They intentionally chose to define the payments at issue as

18    prepaid rent.  The language used is unambiguous and has

19    clear meaning under both Pennsylvania and Florida law.  The

20    parties written agreement in paragraph 36, the prepaid rent

21    falls squarely within the common law rule and becomes

22    nonrefundable, except as otherwise provided in the lease.

23            That leads us under what terms the leases

24    permit refundability.  And Your Honor, the leases do provide

25    a very limited right to refund in Section 36, but that right

Page 59

1    is limited to where the landlords are in default.  Where a

2    condemnation event has occurred, or where the landlords

3    exercise their right of early termination, provided in

4    paragraphs 3 of the leases.

5                      None of those provisions that are all -- are

6    at all applicable here.  Instead we have the Debtors reject

7    the lease, as we all know under 365G of the bankruptcy code

8    constitutes a default, a breach, and in the breach context,

9    Your Honor, the leases don't provide the Debtor with any

10   rights to refund.  So we fall up under the state common law

11   rule that the prepaid rent belongs to the Landlords and is

12   nonrefundable to the Debtor as a matter of law.

13                      THE COURT:  I've read the Florida cases.

14   It's not clear to me that that rule applies in Pennsylvania.

15   You're saying that it should apply because it generally

16   applies throughout the country?

17                      MR. GREGER:  Yes, Your Honor.  And more

18   specifically, we, we believe that the -- and I'm trying to

19   remember the name of the decision, I believe it's the

20   Hutchinson vs. Sunbeam decision from the Pennsylvania

21   Supreme Court in 1986, in footnote 4, the Court said very

22   specifically in Pennsylvania, that parties are free to

23   bargain for minimum advance rental.  So I think --

24                      THE COURT:  Well, I understand that, but that

25   just begs the question.  I mean, I understand that

Page 60

1    Pennsylvania like, I think all states, says that the parties

2    are free to bargain for what the contract will say.  The

3    issue here is that there is a unstated term on the contract

4    which is what happens to the prepaid rent in the event of

5    the Debtor default.  It doesn't say that the Landlord can

6    keep the money, it doesn't say that the Debtor can keep the

7    money.  It just is silent.  So the general principal from

8    Pennsylvania law doesn't really address that specific

9    situation when a contract is signed.  You're asking me to

10   read into a provision consistent with common law around the

11   country.

12                  MR. GREGER:  Actually, Your Honor, we don't

13   believe we're asking you to read into a provision.  We

14   believe that the contract clearly provides that the prepaid

15   rent was due upon execution of the leases.  And once paid,

16   the parties have the right to dictate in the commercial real

17   property lease when rent is due.  The parties agreed that

18   the rent was due upon execution, and it was paid upon

19   execution.

20                  Thereafter, the contract merely provided a

21   provision that how it would be applied, assuming the Debtors

22   weren't otherwise in default.  It provided, assuming the

23   Debtors, weren't in default, it would be applied against

24   the monthly rent for the months of 7 through 18 as and when

25   due.

Page 61

```
 1                THE COURT:  Well, actually, it actually says
 2   otherwise due during the months of 7 through 18.  That's
 3   where the use of the term due is provide -- is used.
 4                MR. GREGER:  Right.  That's correct.
 5                THE COURT:  It just says the Debtor shall
 6   provide the amount in advance, but it's with respect to the
 7   amount otherwise due, and then it says how it shall be
 8   applied.
 9                MR. GREGER:  Assuming the Debtors aren't in
10   default.
11                THE COURT:  I understand.  I understand.
12                MR. GREGER:  Right.  Where they're in
13   default, they don't get that application, nor do they get
14   the prepaid rent back, which was paid --
15                THE COURT:  Well, it doesn't say that.  I
16   guess that's, that's my point.  I doesn't really say what
17   happens when they are in default.  Now, there is a --
18                MR. GREGER:  But the --
19                THE COURT:  -- I think it's fair to say there
20   are, there are plenty of Florida cases that say you don't
21   have -- and the debtor doesn't have an interest in that --
22   an ownership interest in that rent at that point.  I
23   understand that proposition.  I'm just saying I don't see
24   that dealt with yet under Pennsylvania law.
25                MR. GREGER:  And what we submit, Your Honor,
```

Page 62

1    is the state law of the common law, virtually all of the

2    states that we've seen, as we've submitted the ALR article

3    that deals with these issues.  And we've identified numerous

4    states in our brief, but it seems to be the vast majority,

5    if not exclusive that virtually all states under the common

6    law, provide for a concept of prepaid rent that becomes

7    nonrefundable, absence a default.

8                    THE COURT:  Okay.

9                    MR. GREGER:  And we submit that Pennsylvania

10   would follow a similar rule.

11                   THE COURT:  Okay.

12                   MR. GREGER:  The Debtors -- the Debtors have

13   no real response to the state law, other than to interject a

14   whole host of arguments trying to argue that somehow the

15   prepaid rent they admitted paid to the Landlord, actually

16   wasn't the Landlords.  For example, the Debtors make the

17   argument what the prepaid rent was actually in what amounted

18   to a trust.  I'm not really certain what is meant in the

19   complaint, when they say it amounted to the trust, because

20   there is no such concept under the law.  Are they referring

21   to an express trust?  Because there is no express trust

22   here, as we cited in our reply brief.  In order to create an

23   express trust, you have to have an expressed intent to

24   create a trust.

25                        Here, the lease doesn't say the money is put

Page 63

1    in a trust.  It has no prohibitions against comingling, it

2    has no requirements against segregation.  It has no --

3    imposes no responsibilities on the landlord, it imposes no

4    duties at all, other than provided in Section 36, the

5    limited right of refund, and the right of the Debtor to have

6    it applied against the rent, assuming it's not then in

7    default.  Other than that, it's entirely silent.  And we

8    submit, Your Honor, without any such provisions in a lease,

9    it can come no where near establishing an express trust,

10   under the law.

11            With respect of a constructive trust, the

12   Debtors due argue that there is some form of unjust

13   enrichment here, but as we cited under both very clear and

14   dispositive Pennsylvania and Florida law, the doctrine of

15   unjust enrichments is inapplicable when the relationship

16   between the parties is founded upon a written agreement or

17   an expressed contract, regardless of how harsh the

18   provisions of such a contract may seem in light of

19   subsequent happenings.

20            There's just no basis, therefore, to have a

21   constructive trust here.  They next argue that maybe this is

22   a bailment, but then of course a bailment is a specific

23   contract where the parties agree to the delivery of

24   personality, for the accomplishment of the purpose in the

25   contract.  That also requires an expressed intent to create

Page 64

1    a bailment, and there's no provision in this contract for

2    the creation of a bailment.  There's not even an obligation

3    to comingle.  Or to segregate the funds, or to return the

4    same funds, so there can't be a bailment.

5              The debtors then respond with a very bizarre

6    arguments, as far as I can tell, that, that what really is

7    happening here is that we have some property interest in the

8    prepaid rent, and because we reject the leases, we

9    "terminated" the Landlord's right to rent and their

10   obligation to pay rent, and because there's nothing to apply

11   the prepaid rent against, it has to be refunded based upon

12   the power provided under 365 of the code, Your Honor.

13             It's extinguishment theory, however, was

14   expressly refutiated and rejected by the Supreme Court

15   Mission Product.  Where the Supreme Court expressly

16   determined that the rejection does not terminate and

17   agreement or strip a counter party of its rights.  In fact,

18   quoting the language from the Supreme Court, the Supreme

19   Court said a rejection does not terminate the contract.

20   When it occurs, the debtor and the counter party do not go

21   back to their prepetition positions.  Instead, the

22   counterparty would change the rights it has received under

23   the agreement, as after a breach, so too after rejection.

24   Those rights survive.  In other words, Your Honor, rejection

25   doesn't terminate any of our rights to the prepaid rent.

Page 65

1    All of the rights under the contract and the rights under

2    state law, survive.  So the debtor's argument that somehow

3    365 is an affirmative avoidance action that allows it to

4    recover the prepaid rent, is just simply false, Your Honor.

5    We submit.

6               The last arguments we deal with, Your Honor,

7    is that even if we are incorrect on a concept that state law

8    makes prepaid rent nonrefundable, landlords still have

9    rights of recoupments.  And recoupments rights arise as an

10   affirmative defense to a payment obligation.  When the party

11   -- when the obligation arise out of the same agreement.  You

12   know the debtor's response to recoupment is that should

13   apply here because that would frustrate priority schemes of

14   the code.  Well, that's what the courts have determined that

15   recoupment does.  Recoupment isn't subject to the priority

16   schemes of the code.  It's a state law defense that where

17   obligations -- mutual obligations arise under the same

18   agreement.  The obligations effectively cancel each other.

19   And we asset, Your Honor, there's no better case for

20   recoupment than here.  That the lease and the prepaid rent,

21   all of the obligations arose under the same agreement.  The

22   obligation to pay prepaid rent is set off or recouped

23   against the obligation to pay the same rent.  So for

24   example, the debtors reap the benefit of the prepaid rent

25   for months 7 through 12 of this lease by not paying their

Page 66

1   365-D3 obligations by recouping it, literally here.  And now

2   when the flip side of the situation arises and the landlords

3   want to recoup months 8 through 13, post rejection,the

4   Debtors argue that recoupment's not available.  I mean, very

5   inconsistent positions the Debtor is taking here with

6   respect to recoupment.  They themselves --

7               THE COURT:  Well, one could argue you're doing the

8   flip side of that.  I mean, which is natural because

9   whenever you're opponent takes a position, you would oppose

10  it.  So --

11              MR. GREGER:  Right, Your Honor.  But they received

12  --

13              THE COURT:  But if -- but if the amount is --

14              MR. GREGER:  -- they took the --

15              THE COURT:  -- due prepetition, how could it be

16  applied to a post-petition obligation given a mutuality --

17              MR. GREGER:  What is --

18              THE COURT:  -- the mutuality requirement?

19              MR. GREGER:  Well, recoupment --

20              THE COURT:  If the prepaid rent is, in fact, due

21  prepetition --

22              MR. GREGER:  Yeah.  So --

23              THE COURT:  -- how could it be applied to a post-

24  petition obligation?

25              MR. GREGER:  With -- with respect to recoupment,

Page 67

1    Your Honor, the obligation mutuality doesn't apply.  You can

2    cross --

3              THE COURT:  Well, I know.  I know.

4              MR. GREGER:  -- petition date.

5              THE COURT:  But that's -- that's an issue that --

6              MR. GREGER:  So, now you're talking --

7              THE COURT:  -- that's an issue that the parties

8    have barely touched upon, the recoupment issue.  And

9    frankly, since this is a motion to dismiss a complaint that

10   seeks turnover, which goes back to my first question, I'm

11   not sure it's really proper for me to decide that issue in

12   this context, as opposed to, as you've requested -- and I

13   think is a legitimate request -- although here, I'm not sure

14   who's arguing this on the Debtor's counsel's side, them on

15   it -- say that the turnover complaint is dismissed without

16   prejudice because there is a bona fide dispute here as to

17   ownership of the property.

18              But there's a fundamental dispute beyond that,

19   which is if it's not owned, literally owned, by either side,

20   what sort of obligation was created by the lease with regard

21   to the prepaid rent, and what are the parties' rights under

22   the Bankruptcy Code with respect it?

23              It seems to me that that's --

24              MR. GREGER:  Well --

25              THE COURT:  -- that's barely touched upon in the

Page 68

1    briefing and isn't really addressed in the complaint at all.

2            MR. GREGER:  If I'm understanding Your Honor

3    correctly, you -- your concern is that the -- the rights of

4    the parties with respect to prepaid rent under state law was

5    not adequately addressed?

6            THE COURT:  No, no.  No, again, Buckner says state

7    law controls unless the Bankruptcy Code says otherwise.  The

8    Bankruptcy Codes says a lot, both in the Code and in the

9    caselaw about set off and recoupment in making --

10           MR. GREGER:  Right.

11           THE COURT:  -- a distinction between pre and post,

12   et cetera.

13           In state law cases, it really doesn't matter what

14   sort of characterization is paid -- placed on prepaid rent

15   as long as it's not determined to be the tenant's property

16   because the money's owed to the landlord in some way, shape,

17   or form.  Although, I suppose there may be cases out there,

18   although no one's really addressed in assist to, you know,

19   prepaid rent for the last three months of the lease, the

20   debtor -- the debtor breaches the lease well before then,

21   and the landlord actually mitigates, then where does the

22   prepaid rent go?  You know that -- that would be --

23           MR. GREGER:  Actually, Your Honor, we have -- we

24   have addressed that.

25           THE COURT:  Well --

1              MR. GREGER:  We've asked the Wagner decision from

2      the Supreme Court in Florida, where the Florida Supreme

3      Court said that the prepaid rent is earned.  It -- it

4      doesn't get reduced.

5              THE COURT:  Earned when?  Pre or post?

6              MR. GREGER:  Earned upon payment.

7              THE COURT:  Well, that's pre then.

8              MR. GREGER:  So, that -- and --

9              THE COURT:  So, yeah, I think, again, it's -- it's

10     -- to me, it would be premature to decide that issue, the

11     recoupment, or setoff issue, in this context where I have a

12     motion to dismiss a complaint that seeks turnover, which I

13     think you correctly state -- although, again, I'll hear the

14     Debtors' counsel on this -- requires that the interest not

15     be in dispute, the interest and the property to be turned

16     over.  And I think it's clearly in dispute.  I would say so,

17     even under Pennsylvania law.

18             But beyond that, where it may be a debt as opposed

19     to an interest, I think we're really getting pretty really

20     far afield from the complaint and the motion to dismiss.  I

21     mean, I guess it's conceivable to me that I could, on a

22     motion to dismiss, not only decide that it's not the

23     Debtors' property, but that, in fact, it's the defendant's

24     property.  But this -- this record doesn't really let me

25     decide that.  I think -- I think it's just -- I think it --

Page 70

1   I mean, I think there should be a separate, if the Debtors

2   want to bring it, action as to declaratory judgment as to

3   what this asset is, this money is.  Is it a debt, is it a

4   property interest?  And if it's a property interest, whose?

5   If it's a debt, how it subject to either setoff or

6   recoupment?  How is it characterized pre and post, for

7   example?

8           MR. GREGER:  Yeah, and Your Honor --

9           THE COURT:  Post-petition.

10          MR. GREGER:  Your Honor, we touched on the issue

11   of setoff.

12          THE COURT:  I know you touched on it --

13          MR. GREGER:  But again --

14          THE COURT:  -- but the -- but in this context,

15   it's pretty -- pretty remote touching.

16          MR. GREGER:  But -- but I -- let me speak to

17   setoff then very -- very quickly.

18          Obviously, 553 allows setoff, and Your Honor

19   correct points out that in the context of setoff under 553,

20   you're out the recoupment.  Setoff requires mutuality, which

21   the courts have interpreted to mean both the underlying debt

22   owed by the counterparty to the debtor and the claim that

23   the counterparty has against the debtor, both arise in

24   prepetition period.

25          We submit, Your Honor, that's easily established

Page 71

1    here because the courts -- for example, we cited the Braniff

2    decision in our reply brief.  The courts look at the

3    transactional basis for the genesis of when a claim arises.

4    This is not when the obligation actually comes due.  It

5    doesn't matter if it's matured or contingent.  What matters

6    is when the underlying action was -- that gave rise -- the

7    transaction that gave rise to the claim was entered into.

8    If it was prepetition, then it's a prepetition obligation.

9              And here, there's just simply no debate.  We

10   entered into a lease prepetition.  The prepaid rent was paid

11   prepetition.  All the underlying actions that give rise to a

12   potential right of repayment to the extent the Debtors have

13   one at all under state law relate to those prepetition

14   actions, and thus, by -- by definition, any rights the

15   Debtors have are prepetition.

16             We know on the flip side of this transaction,

17   Congress has been eminently clear in 365(g) of the Code that

18   the landlords' rights of -- to the payment of damages from

19   the rejection of the lease are a prepetition claim.  And in

20   fact, courts have now fairly and almost universally found

21   that it's appropriate for a landlord to set off its

22   rejection damage claim against a security deposit, which is

23   delivered prepetition on the basis that that security

24   deposit is in effect a prepetition debt that the landlord

25   owns -- owns -- owes the tenant.  Sorry.

Page 72

1          THE COURT:  All right.  But this isn't a security

2      deposit.

3          MR. GREGER:  Right.  Which means that the Debtor

4      (sic) doesn't even have a claim here.  There is no debt owed

5      by the landlord, but assuming that it -- it is a contingent

6      debt, it clearly is a prepetition debt that the Debtor has.

7      It had a contingent right to payment under the terms of the

8      lease in the event there was a contingency or a default.

9          But let's assume that it -- somehow, the Debtors'

10     still able to assert it, it's still a prepetition claim

11     because the underlying prepaid rent was paid prepetition and

12     the lease was entered into prepetition.

13         Then we look at the landlords' rights to damages

14     as a result of the rejection of the lease.  Your Honor, we

15     filed proofs of claim here under -- following the rejection

16     of the lease.  The claims were filed timely.  The landlord

17     asserts more than $11 million -- well, approximately $11

18     million in combined damages.  The Debtors haven't even

19     reject -- objected to those claims.  Those claims are deemed

20     allowed under 502 of the Code.

21         So, purposes of set off as we stand here today,

22     Your Honor, I disagree with -- with Your Honor.  There is no

23     basis to assume anything other than there's a complete set

24     off because the Debtors have not and will not object to the

25     52 -- 502(b)(6) damages because we know why, Your Honor.

Page 73

1    They're subject to Rule 11.  If they want to make that

2    objection, they better have a reasonable basis to do it, and

3    of course, there is none, which is why they haven't

4    challenged the claim here.

5              That claim is deemed allowed.  There's no basis

6    for the Debtor to argue otherwise, unless and until it

7    brings an appropriate qualified objection to that claim.

8    So, as we stand here today, there is -- after we go through

9    all this, a complete setoff of everything.

10             And then, Your Honor, I do want to see --

11             THE COURT:  Well, do you -- what is -- what is

12   your client's administrative expense claim?

13             MR. GREGER:  So, Your Honor, remember the -- the

14   Debtor took the position that the base rent was satisfied,

15   that it could recoup effectively, the base rent obligations

16   for months 6 through 12, against the prepaid rent.  Assuming

17   the Debtor is correct -- and so far, we haven't challenged

18   the Debtor -- the only additional administrative obligations

19   the Debtor had were the additional rent under the lease.

20             And the claim that we filed was $145,000 combined

21   for the two leases of unpaid post-petition 365(d)(3)

22   additional rent obligations that accrued.  Since the time we

23   filed that claim, Your Honor, we actually believe that that

24   number's big -- larger.  But that's not relevant to today's

25   hearing.

Page 74

```
 1              And then the final issue here, Your Honor, and --

 2    and this is -- is interesting because the Second Circuit in

 3    -- in In re Stoltz, actually addressed with the effective

 4    rejection is, you know, and I -- I think it compliments what

 5    the Supreme Court did in (indiscernible) --

 6              THE COURT:  I'm not focusing really on the

 7    effective rejection.  I'm focusing on what the prepaid rent

 8    should be applied to.  I mean, it's -- it says in the

 9    parties' agreement, it should be applied to specific months.

10              MR. GREGER:  That's correct.

11              THE COURT:  So --

12              MR. GREGER:  And rejection didn't terminate the

13    Debtor's obligation to pay those months.

14              THE COURT:  Well, if those months --

15              MR. GREGER:  It --

16              THE COURT:  -- are administrative, then you're

17    saying it would be applied to those?

18              MR. GREGER:  That's what the -- with respect to

19    the administrative months, that's the position the Debtor

20    took.  And that's what they did.

21              THE COURT:  But -- but -- I know.  Are you

22    disagreeing with that?

23              MR. GREGER:  Your Honor, we believe what's good

24    for the goose is good for the gander.  And the Debtor gets

25    it with respect to months 6 through 12, then the same
```

Page 75

1    recoupment analysis applies with respect to months 13

2    through 18.  It's the same -- same issue on the flip side.

3    We're literally taking the prepaid rent for each month and -

4    - and recouping it against their obligation to pay the rent

5    for that corresponding month, which they breached.

6           It is -- is the closest case for recoupment that I

7    can think of.  Not only it -- does it arise under a single

8    integrated transaction -- well, actually two because there's

9    two separate leases and two different prepayments of prepaid

10   rent, but it's the same corresponding obligations that are

11   being recouped.  Month 13 of prepaid rent against month 13

12   of -- of the rent that they breached by rejecting the lease,

13   and we go up, 14 to 14, 15 to 15, 16 to 16.

14          And it is -- it is literally the closest case, and

15   best case, for recoupment I can think of.  And of course,

16   when recoupment applies then there is no claim.  It

17   literally extinguishes the claim altogether.  So, there's

18   nothing for the Debtor to pursue here.

19          The same analysis would apply with respect to the

20   common law rule with respect to prepaid rent.  Once it's

21   paid, it only become not refundable as provided in the

22   lease.  And the provisions in the lease for refund are not

23   applicable here, so the Debtor doesn't even have a right to

24   -- to get paid anything under state law.  But assuming it

25   did, it's recouped and it's done.  It's -- there's not --

Page 76

1    there's no claim here.

2              And that's why we submit, Your Honor, particularly

3    in the context of a 542 action, there's no basis for the

4    Debtor to stand in front of this Court and say, this is an

5    undisputed amount that's owed to us, we hereby invoke the

6    core jurisdiction of this Court, and have the right to

7    pursue this core claim.  There's just no basis for it.

8              THE COURT:  Okay.

9              MR. GREGER:  And it needs to be dismissed.

10             THE COURT:  All right.  Why don't I hear from the

11   Debtors?

12             MS. CROZIER:  Good morning, Your Honor, and may it

13   please the Court?  Jennifer Crozier, Weil, Gotshal & Manges

14   for the Debtors on the Debtors' opposition to the landlord's

15   motion to dismiss.

16             THE COURT:  Morning.

17             MS. CROZIER:  Good morning, Your Honor.

18             The Debtors acknowledge that the -- that if there

19   is a legitimate dispute concerning title through the subject

20   property, then this action was not properly brought as a

21   turnover proceeding.  However, for the reasons I'll discuss

22   in a moment, Your Honor, the Debtors submit that there is no

23   legitimate dispute concerning whom owns these unused prepaid

24   rent it owns, and that accordingly, this property falls

25   clearly within Your Honor's turnover power.

Page 77

```
 1              Now, the landlord's relied very heavily on this

 2      argument that caselaw determines the nature and extent of a

 3      debtor's interest in property, and that Florida and

 4      Pennsylvania law, which govern the Imeson and Hanover

 5      leases, respectively, provide that landlords are entitled to

 6      overturn of the prepaid rent, or rather to retain the

 7      prepaid rent upon a tenant's default.

 8              But as the landlords themselves admit, the parties

 9      to a contract can contract around state law with respect to

10      prepaid rent, and that's exactly what the parties did here.

11      So, even if Florida and Pennsylvania law do provide that

12      landlords are entitled to retain prepaid rent on a tenant

13      default, and as Your Honor, yourself recognized, that's not

14      at all here, with respect to Pennsylvania law.  But even if

15      they do, Sections 36 and 10 of the leases provide otherwise.

16              First, Your Honor, to Section 36.  The landlords

17      have argued that they earned the prepaid rent at the moment

18      they received it.  But the language in Section 36 belies

19      this argument.  Section 36 provides in pertinent part, and I

20      quote, "Provided Sears has not been in default under this

21      lease, the landlord shall apply the prepaid rent, Sears's

22      obligation to pay monthly fixed rent as and when due".  So,

23      in the ordinary course, that is when the Debtors were not in

24      default -- in the ordinary course, the Debtors could only

25      apply the prepaid rent, is Sears's obligation to pay monthly
```

Page 78

1    fixed rent as and when due, which the Debtors submit means

2    that under the leases, the landlords didn't earn the prepaid

3    rent until the moment it became due.

4              Now, the cases the landlords themselves --

5              THE COURT:  But what -- what about the opening

6    provisor there?  I mean, Sears is in default because it

7    rejected the leases.

8              MS. CROZIER:  Right.  And I'm going to address

9    that in a moment, Your Honor because Section 10 of the

10   leases address the landlord's obligation with respect to the

11   prepaid rent upon Sears's default.

12             But if I may for a moment address Section 36 very

13   briefly and then I'll turn to Section 10?

14             THE COURT:  Okay.

15             MS. CROZIER:  The -- the landlords cite Burns

16   Trading against Welborn, it's a Tenth Circuit case, 1936.

17   Rather old, but in that case, the Tenth Circuit considered a

18   provision very like the one that's in here, which among

19   other things, provided for the application of a prepayment

20   for the last years' rent, "when due".  And the court in that

21   case concluded, "It is clear from these provisions that

22   title to the deposit was to remain in the" lessee "until it

23   should be properly applied on rental or retained as

24   liquidated damages on termination of the lease."  And that's

25   what we're arguing here.  Until the moment that monthly

Page 79

1    fixed rent obligation became due, (indiscernible) to the

2    unused prepaid rent amount, (indiscernible) to the prepaid

3    rent remained a retainer.

4           Now, in that case -- in the Burns Trading case,

5    the landlord was entitled to retain the prepaid rent

6    precisely because there was an express provision in the

7    contract that said upon termination, you get it as

8    liquidated damages.  But here, the leases don't have that.

9    In fact, they say just the opposite.

10          Now, I'll turn to -- to Section 10 now, which

11   addresses the remedies to which the landlords are entitled

12   upon Sears's default.  And if Your Honor looks to Section

13   10(a), (indiscernible) (iii), the -- the very last clause of

14   that provision, it says, "In no event shall Sears be liable

15   for any consequential, special, punitive, or other similar

16   damages."

17          Now, again, Section 10 enumerates the remedies to

18   which the landlords are entitled upon Sears's default, and

19   not one of those remedies allows the landlords to retain the

20   prepaid rent.  But again, what's most important here, is

21   what this provision does say, and it does say they don't get

22   consequential, special, punitive, or other similar damages.

23          Now, should the landlords retain the unused

24   prepaid rent amounts, that would constitute an award of

25   consequential, special, punitive, or other similar damages

Page 80

1    because these amounts are over and above the landlords'

2    rejection damages claim.  The landlords --

3               THE COURT:  Why?

4               MS. CROZIER:  Well, the landlords' rejection

5    damages claim, Your Honor, that asserts their direct

6    damages, up to the statutory cap set forth in Section

7    502(b)(6) of the Code.

8               To be clear, the landlords have not considered the

9    unused prepaid rent amount in their calculation of their

10   rejection damages.  They themselves treat these amounts as

11   separate and apart from their direct damages.

12              THE COURT:  Is that right, Mr. Greger?

13              MS. CROZIER:  But in --

14              THE COURT:  I don't -- I don't think that's -- I

15   mean, look, I'm assuming they filed a breach claim for the

16   remaining amount -- the remaining term of the lease.

17              MR. GREGER:  Your Honor, our claim is for the

18   damages that stem from the rejection of the lease capped by

19   502(b)(6).  There's no --

20              THE COURT:  But --

21              MR. GREGER:  -- provision of our claim -- our

22   state law damages far exceed 502(b)(6), and counsel's

23   represent --

24              THE COURT:  I know.  I understand.  But to get to

25   the 502(b)(6) cap, you first do the calculation of your --

Page 81

1          MR. GREGER:  State law damages.

2          THE COURT:  -- breached damages.

3          MR. GREGER:  That's correct.

4          THE COURT:  And I'm assuming that would include --

5    maybe I'm wrong.  I'm assuming that would include these

6    months of the lease.

7          MR. GREGER:  It would, but our position -- and I

8    guess this is an issue for the Court to decide later on --

9    our position is that it doesn't get reduced against the

10   502(b)(6) cap.  And maybe counsel's suggesting that the

11   prepaid rent should be treated akin to a security deposit

12   and reduce the cap.  It's a distinction without a difference

13   because it -- it's not going to affect our rights to the

14   prepaid rent.

15         THE COURT:  Well, I don't know.  I mean, I -- but

16   I -- but I -- it would seem to me that -- I could certainly

17   envision scenarios where a landlord's rejection claim under

18   502(b)(6), just for amounts that would have been paid under

19   the lease if the lease hadn't been rejected, you know, i.e.,

20   breached, would not be consequential, special, punitive, or

21   other similar damages, but would just be lease breach

22   damages, which Subsection 3 of Article 10, gives the

23   landlord the right to assert.

24         MR. GREGER:  Correct.

25         THE COURT:  But if -- if the landlord wants to

Page 82

1    treat the lease as terminated, 3(c) says, the "worth at the

2    time of the award of the amount by which the unpaid rent for

3    the balance of the term after the term of the award exceeds

4    the amount of unpaid rent."  And then five -- little Roman

5    (v) says, "If the landlord does not elect to terminate the

6    lease, it can enforce all of the landlord's rights and

7    remedies under this lease, including the right to recover

8    all rent as it becomes due."

9          Now, of course here, the -- I don't know what

10   you've done as far as terminating or not terminating, but

11   the rejection creates a prepetition claim, in --

12         MR. GREGER:  Right.

13         THE COURT:  -- any event.  So --

14         MR. GREGER:  That's correct.

15         THE COURT:  -- I'm just not sure that the analogy

16   to the Tenth Circuit case works here because here, we're

17   talking about a breach claim that arguably, at least --

18   unless the parties stipulate that this isn't the case -- is

19   greater than consequential, special -- you know, it's just

20   the claims for breach as opposed to consequential, special,

21   punitive, or other similar damages.

22         MS. CROZIER:  Understood, Your Honor.  And again,

23   the Debtors submit, at the very least, there is a legitimate

24   -- at the very least, if there is a legitimate dispute here,

25   then the -- you know, to the extent there is a legitimate

Page 83

1    dispute, that the Court should dismiss the complaint without

2    prejudice --

3                THE COURT:  Okay.  All right.

4                MS. CROZIER:  -- for the Debtors to seek relief by

5    --

6                THE COURT:  I mean, I didn't know -- for example -

7    - the facts don't really -- because it's a motion to dismiss

8    -- it's not clear to me whether the landlords re-let the

9    space.  I don't whether that's the case.  I mean, it --

10   warehouses are actually -- because some places are premium

11   because they're being used by Amazon and people like that,

12   or to house multiple computers that are mining Bitcoin.  So,

13   I -- you know, it's -- I don't -- I don't have those facts

14   that this point.

15               MR. GREGER:  Your Honor, we -- what we do know is

16   that the claim hasn't been objected to, so it's --

17               THE COURT:  Well --

18               MR. GREGER:  -- deemed allowed.

19               THE COURT:  -- there's -- there's no -- yeah.  But

20   that's -- that's -- that -- there's no deadline to -- I

21   think --

22               MR. GREGER:  Understood.  But as we stand here

23   today, there is no dispute that our claim is valid and

24   deemed allowed.  That's what 502 provides.

25               THE COURT:  All right.

Page 84

1        MS. CROZIER:  Your Honor, it's like -- if I may,

2    as you yourself recognize, you know, whether -- whether the

3    landlords have mitigated is not in the record.  It's not

4    before Your Honor.  We don't know whether they've mitigated.

5    We don't know whether they've gotten more rent, the same

6    amount.  So -- you know, these set off and recoupment

7    issues really aren't appropriate for adjudication at this

8    stage on a -- on a motion to dismiss.

9        THE COURT:  Okay.

10       MS. CROZIER:  If I may just address one more

11   issue?  You know, our position has been that -- that in

12   order for setoff and recoupment to apply, the property or

13   (indiscernible), there must be a debt, and the Debtors'

14   position is that the unused prepaid rent amounts do not

15   constitute a debt.  And in fact, Mr. Greger himself said

16   that in his argument a moment ago.  He said there is no debt

17   owed by the landlord and, you know, to the extent -- again,

18   there's been a lot of argument about setoff and recoupment.

19   We don't believe it, you know, adjudicable (sic) at a motion

20   to dismiss.  So, our position has been that no debt exists

21   here; rather, the landlords are hold the Debtors' property

22   and such setoff and recoupment would not apply.

23       THE COURT:  Well, I guess the -- the dispute there

24   though is that the landlord is saying it's not a debt

25   because it's -- it's the landlords' property, or at a

Page 85

1    minimum, it's subject to recoupment, which is just a running

2    account as opposed to a debt.  So, I think that -- I mean, I

3    agree there's a dispute over that.  But -- but I don't think

4    they conceded that -- I mean, far from it, that, in fact,

5    not only is there no debt, but the property is the Debtors'.

6              MS. CROZIER:  Understood.  They have not conceded

7    that, Your Honor.

8              THE COURT:  Okay.  Okay.  All right.  Anything

9    else from anyone?

10             All right.  I -- I have a motion before me by the

11   defendants in this adversary proceeding, Sears Holdings

12   Corporation, et al., v. 1055 Hanover Bell Atlantic Corp. v.

13   Twombly, 550 U.S. 544 (2007) and one Imeson, I-M-E-S-O-N,

14   Park Boulevard, LLC, to dismiss the sole count in the

15   complaint pursuant to Federal Rule of Civil Procedure

16   12(b)(6), as incorporated by Bankruptcy Rule 7012.

17             The standard for a motion to dismiss is well

18   recognized in the caselaw as set forth in the statute

19   itself, or the rule itself, as well as the Supreme Court's

20   decisions, Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell

21   Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  The courts

22   must accept as true all well pleaded factual allegations and

23   draw reasonable inferences from them.  But the court should

24   not credit merely conclusory allegations or legal

25   conclusions couched as factual allegations, i.e.,

Page 86

1   allegations that simply mirror the underlying elements of

2   the cause of action without setting forth the factual basis

3   for the cause of action.  And of course, the complaint must

4   state a claim that is above the speculative level over the

5   plausible claim for relief.

6           Plausibility is not really the issue here.  The

7   issue is whether the facts as alleged in the complaint set

8   forth a basis for the underlying cause of action, which is a

9   asserted right to turnover of prepaid monthly rent under the

10  respective leases, which have the same term as to prepaid

11  rent in each lease, Paragraph 36.

12          Section 542(a) of the Bankruptcy Code requires

13  "that an entity in possession, custody, or control, during

14  the case, of property that the trustee may use, sell, or

15  lease under Section 363 of this title, or that the debtor

16  may exempt under Section 522 of this title shall deliver to

17  the trustee," or the debtor in possession, "and account for,

18  such property or the value of such property, unless such

19  property is of inconsequential value or benefit to the

20  estate."

21          Clearly here, the complaint relies upon the terms

22  of the two leases, which are effectively incorporated into

23  the complaint.  So, of course I can consider the leases as

24  part of my consideration of the underlying motion to

25  dismiss.

Page 87

1            Based on its plain terms, Bankruptcy Code Section

2      542(a), requires the trustee or debtor in possession to

3      establish three things.  One, the property's in the

4      possession, custody, or control of another entity.  Two, the

5      property can be used in accordance with the provision of

6      Section 363 of the Bankruptcy Code.  And three, the property

7      has more than inconsequential value to the debtor's estate.

8      In re Khan, K-H-A-N, 2014 WL4956676 at p. 22 (Bankr. EDNY,

9      September 30, 2014.

10           There's really no issue here as to the value of

11     this property.  It's in excess of a million dollars under

12     each lease, and the property's clearly -- or was at least

13     clearly in the possession, custody, or control of the

14     respective landlords, post-petition, and thus demanded by

15     the Debtors and they have refused to provide it.  The issue

16     as to whether the property would, in fact, be property of

17     the Debtors' estate and could be used in accordance with

18     Section 363 of the Bankruptcy Code, the Debtors acknowledge

19     that where there is a bona fide dispute or during the

20     dispute, as to the estate's interest in the property sought

21     to be turned over, a turnover claim does not lie.  Instead,

22     the Debtor must establish its right in the property, at

23     which point it can assert turnover or some other right to

24     relief based on the results of that resolution of the

25     dispute.

1          Even if the Debtors had not recognized, it's a

2    well-established proposition.  See, for example, In re

3    Lexington Healthcare Group, Inc., 363 B.R. 713, 716-17

4    (Bankr.D.Del. 2007), and the cases cited therein.

5          On the flip side, in a motion to dismiss context,

6    the defendants here are not seeking, or they could not be

7    seeking a determination of their entitlement to the prepaid

8    rent, but are rather simply seeking to dismiss the

9    complaint.

10          Of course, the dispute might be so obvious that I

11   could make a ruling on that basis.  But I am not prepared on

12   the record before me to do more than dismiss the complaint

13   without prejudice, thereby preserving the Debtors' rights to

14   argue either through a separate proceeding that they, in

15   fact, have an enforceable interest in the prepaid rent, or

16   alternatively that if they don't have such an interest, it

17   is subject to application as they assert -- or as they would

18   assert in such proceeding to the landlords' claims in this

19   case, with any excess to be returned to the estate.

20          The Debtors contend that on the plain language of

21   the lease the parties agreed that under the facts as they

22   exist today, the prepaid rent is either refundable to the

23   Debtors, or actually for turnover purposes, the property of

24   the Debtors, not subject to any claim of the landlords.  I

25   conclude, based on my reading of the lease that there's at

1    least a bona fide dispute as to that contention.

2            Paragraph 36 of each lease states, "On the

3    effective date, Sears shall provide landlord with an amount

4    equal to" then it states the amount -- it's different for

5    each lease --- "i.e., 12 months of monthly fixed rent

6    otherwise due during months 7 through 18 of the term", and

7    then "(the defined term, prepaid rent) as prepaid due under

8    this lease for months 7 through 18 of the term."  The next

9    sentence states, "Provided Sears is not then in default

10   under this lease beyond any applicable notice or cure

11   period, landlord shall apply the prepaid rent to Sears's

12   obligation to pay monthly fixed rent as and when due until

13   the entire amount of the prepaid rent has been exhausted,

14   provided however, if this lease is terminated due to a

15   landlord default," casually -- "casualty condemnation or the

16   early termination rights described in Section 3 above, then

17   landlord shall promptly return the unapplied portion of the

18   prepaid rent to Sears".

19           It's clear from that provision that the parties

20   did agree specifically when the landlord shall return the

21   prepaid rent to Sears, and the complaint does not assert

22   that any of those things have, in fact, occurred.  There is

23   no other provision of the lease that says what happens to

24   the prepaid rent other than in those specific circumstances,

25   which don't apply on the face of the complaint.

Page 90

1           The landlord asserts that one would incorporate

2    applicable state law to fill that gap.  And it appears to me

3    that the law in Florida is clear that under those

4    circumstances where the parties have not agreed to the

5    express return of the prepaid rent to the tenant, the

6    landlord, at a minimum, can apply it to amounts owing under

7    the lease.  Those cases are cited at some length in the

8    motion itself, and they include Wagner v. Rice, 97 So.2d,

9    267, 271 (1957) and Casino Amusement Co. v. Ocean Beach

10   Amusement Co., 101 F. 59 (1931).  Florida law, as I said, is

11   relatively clear on this issue as to the gap-filling

12   provisions of state and common law.

13           Pennsylvania law is less clear.  But at least for

14   purposes of the motion to dismiss, one can confer -- infer

15   that there's at least a bona fide dispute that the courts in

16   Pennsylvania that applying their state's law would follow,

17   what appears to be the majority view on this issue, which is

18   unless the parties have expressly provided otherwise, the

19   landlord can use prepaid rent upon a default under the

20   lease.

21           What is not clear to me, however, is how such a

22   right, if established, on the part of a landlord, would be

23   affected by the parties' agreements and the operations of

24   Section 365, 502(b)(6) and 502(g) -- I'm sorry.  Yeah,

25   502(g) and 365(g) of the Bankruptcy Code, as well as the

Page 91

1    Bankruptcy Code setoff provision, Section 553, as well the

2    Bankruptcy Court's interpretation of the recoupment doctrine

3    and its applicability here.

4          Before turning to those issues, I do want to

5    discuss two of the cases cited, really against the majority

6    view in the caselaw that's cited by the movants.  Those two

7    cases cited by the Debtors, both come in a bankruptcy

8    context, and they argue that in a bankruptcy context the

9    rule under the majority common law as to the landlord's

10   right to prepaid rent, unless the parties clearly provide

11   otherwise, is somehow modified and create an actual property

12   interest in the prepaid rent in the Debtors estate.

13         The first one, Marshall v. Shipment Elevator Co.

14   (In re Marshall), 240 B.R. 302 (Bankr. S.D. Ill. 1999) is

15   clearly distinguishable.  There, the Court found a

16   constructive trust in favor of the debtor with respect to

17   the equivalent of prepaid rent.  In that case, it was

18   prepaid storage charges.  However, in that case, the grain

19   storage facility or operator -- shipment, acknowledged that

20   "the storage arrangement was one which the debtors were free

21   to terminate at any time whereupon shipment would have the

22   obligation to refund the unused portion of the money."  It

23   was under that circumstance where the defendant acknowledged

24   that it would have that obligation that the court found a

25   constructive trust in favor of the debtor.

Page 92

1          The other case relied upon by the debtors, In re

2     Orangebrook Concessions, Inc., 47 B.R. 858 (Bankr. S.D. Fla.

3     1985), really addresses a different issue.  There, the

4     debtor was not looking to assert an interest to the

5     exclusion of the interest of the landlord in prepaid rent

6     when a lease had terminated or been rejected under Section

7     365 of the Bankruptcy Code.

8          Instead, the landlord was looking to retain

9     prepaid rent as adequate protection, relying on lien rights

10    under Section 553 of the Bankruptcy Code.  The court

11    determined that in those circumstances the landlord did not

12    have a lien, or under 553 of the Bankruptcy Code, a

13    statutory right equivalent to a lien on the prepaid rent

14    that will require it to be adequately protected.  In part,

15    it did so in way that's frankly puzzling to me,

16    notwithstanding that the lease said that the prepaid rent

17    would be held that a security deposit under Paragraph 24 of

18    the parties' lease.

19         The case really did not deal at all with the fact

20    pattern where a lease has been rejected and the landlord is

21    holding prepaid rent in that circumstance.  And therefore,

22    it did not address how that prepaid rent could be applied,

23    if at all, by the landlord.

24         Here, I could take judicial notice of the fact

25    that the two leases have been rejected under Section 365 of

Page 93

1    the Bankruptcy Code, which clearly gives rise under the Code

2    itself and is acknowledged by the Supreme Court recently in

3    the Mission Product Co. v. Tempnology (sic) case, 139 S.Ct.

4    1652 (2019), that gives rise to a prepetition claim and a

5    breach, but does not, in the words of the Supreme Court,

6    "vaporize" the lease as if it doesn't exist, and therefore,

7    eliminate that claim.

8              That leaves, however, open what the prepaid rent

9    amount could be applied to, and I believe in a motion to

10   dismiss context that issue on this record should not be

11   decided.  I don't have the claim in front of me.  I don't

12   know what its components are.  The Debtors' have not sought

13   to object to the claim.  And until there is an objection

14   that's deemed allowed, but that doesn't mean that I can

15   determine on a motion to dismiss that, in fact, the claim is

16   allowed, and, more importantly, how this money can be

17   applied to it.  That is a proper subject to mitigation

18   should the Debtors choose to bring it, or alternatively, if

19   the landlord would want to make a motion for relief from the

20   stay to apply the money to its claim, in each -- in each --

21   with respect to each claim.

22             So, I will grant the motion and enter an order

23   dismissing the complaint, which again, seeks only a turnover

24   claim.  But I will do so without prejudice since -- if the

25   Debtor establishes a right in the property with respect to

Page 94

1    either of the two leases, in a separate complaint, the

2    turnover cause of action would be appropriate to put in that

3    complaint as well.

4           And separately, because I believe it's neither the

5    subject of the complaint, all of the Debtors' rights with

6    respect to setoff and recoupment, and the ability to object

7    to claims that have been filed should be fully preserved, as

8    would be the respective landlords' rights.

9           So, I'll ask counsel for the landlords to submit

10   an order to that effect.  You don't need to formally settle

11   that order on the Debtors, but you should copy their counsel

12   on the email to chambers so that they can confirm that it's

13   consistent with my ruling.  And it's probably a good idea

14   just to run it by them briefly before you send it.

15          We don't have to do anything more than refer to my

16   bench ruling.  You don't have to summarize or quote it, but

17   simply say, for the reasons stated in the Court's bench

18   ruling at the hearing, the motion should be granted as

19   provided in the -- in the order.

20          So, are there any questions on that?

21          MR. GREGER:  No, Your Honor.  Thank you for your

22   time.

23          MS. CROZIER:  No --

24          THE COURT:  Okay.

25          MS. CROZIER:  No.  Thank you, Your Honor.

Page 95

1            THE COURT:  Thank you.

2            MS. MARCUS:  Thank you, Your Honor.

3            THE COURT:  Okay.

4            MS. MARCUS:  Going back to the agenda, we have one

5    more matter on for today.  Before we get to that though,

6    Your Honor, if I may, one sort of housekeeping matter?  As

7    you may recall, at the April 27th hearing, we had oral

8    argument regarding the Debtors' motion to compel, transform

9    to pay additional funds related to the foreign cash.

10            THE COURT:  Yes.

11            MS. MARCUS:  And at that time, you -- you issued a

12    preliminary ruling and gave Transform time to file

13    additional pleadings, which they did --

14            THE COURT:  Right.

15            MS. MARCUS:  -- and the Debtors filed their

16    additional pleadings.  I was just wondering if you could

17    give us some insight and -- as to when we'll know when

18    whether your order has become final?

19            THE COURT:  I haven't -- I haven't had a chance to

20    go through them, frankly.  I was waiting for them to get --

21    to get filed.  They were emailed to chambers I think at the

22    end of last week.  And I'll -- I'll give you a link if I

23    think a further ruling is warranted at the next omnibus

24    date.  But I may enter the order before then if I believe

25    that those pleadings don't change my mind from the

Page 96

1    preliminary ruling that I gave the parties, in which case

2    I'll reach out to the Debtors to submit the order.

3              MS. MARCUS:  All right.  Thank you, Your Honor.

4              THE COURT:  Okay.

5              MS. MARCUS:  So, the last -- the last matter on

6    the calendar is another -- is another motion to dismiss.

7    It's Matter No. 11 on the agenda, and I believe Ms. Casteel

8    will be handling that.  I'm -- well, I guess it's not the

9    Debtors' motion.  It's the other side's motion.

10             THE COURT:  All right.  Right.  It's the motion of

11   Winning, W-I-N-N-I-N-G, Resources Limited to dismiss the

12   complaint in Kmart Holding Corp. and Sears Roebuck and Co.

13   v. Winning Resources Limited on the basis of Federal Rule of

14   Civil Procedure 12(b)(5), incorporated by Bankruptcy Rule

15   7012, i.e., insufficient service of process.

16             And on this one, I have read the pleadings through

17   the reply filed by the movant on the 21st -- yeah, on the

18   21st.

19             MR. BANICH:  Good afternoon.

20             MS. CASTEEL: Your Honor, sorry.  This is Kara

21   Casteel.  I just wanted to clarify that it's the Katten Law

22   Firm responding to this motion, so not me.

23             THE COURT:  Okay.  All right.  So, who is it going

24   to be?  It's going to be Mr. Wander for the movant and who

25   for the -- for the plaintiff?

Page 97

1            MR. BANICH:  That would be me, Your Honor.

2    Terence Banich from Katten.

3            THE COURT:  Okay.  Very well.  Thank you.

4            MR. BANICH:  Thank you.

5            THE COURT:  All right.  I -- I guess I have a

6    basic question here.  When did the plaintiff start to serve

7    the defendant under the Hague Convention?  When did that

8    process start?

9            MR. BANICH:  Yes, I'm sorry.  I wasn't sure if you

10   were done speaking, Your Honor.  Terence Banich from Katten.

11   It is my understanding that the process with the -- for

12   service under the Hague Convention began on or about

13   February 12th of this year.

14           THE COURT:  And the complaint was filed when?

15           MR. BANICH:  I believe it was in October of 2020.

16   I can get you the exact date, if I could just shift over to

17   the docket on this.  One second.

18           MR. WANDER:  Your Honor, July 7, 2020.

19           MR. BANICH:  Ah, July 7th.  Okay.  It was in an

20   earlier (indiscernible).

21           THE COURT:  Okay.  And when was the answer filed?

22           MR. BANICH:  We have that -- our objection --

23           THE COURT:  I mean, I -- I --

24           MR. BANICH:  October 12th, 2020.

25           THE COURT:  I guess that was the -- that was the

Page 98

1    October date you probably had in mind.

2              MR. BANICH:  Yes, Your Honor.

3              THE COURT:  Okay.  All right.  So, was there any

4    discussion after the answer was filed and before the process

5    under the Hague Convention was started regarding service

6    between the plaintiff and the defendant, i.e., an extension

7    of the time or discussion about accepting service otherwise,

8    or anything like that?

9              MR. BANICH:  Your Honor, I guess I should probably

10   address that first.  In our objection to the motion, on page

11   1, we recite various interactions we had with defense

12   counsel --

13             THE COURT:  Right.

14             MR. BANICH:  -- on this matter.  In particular,

15   the stipulations to extend time reference therein with

16   regard to discovery, and that was after the answer was

17   filed.  So, this would have been in November of 2020.  And

18   then following that in December, we entered into another

19   stipulation -- and again, though that was with regard to

20   discovery.

21             THE COURT:  Right.

22             MR. BANICH:  And then it was only six months after

23   the answer, defendant the answer, and following the two

24   stipulations I just referenced, that the defendant filed

25   this motion.

1           THE COURT:  Right.  So --

2           MR. BANICH:  I'm not -- sure.

3           THE COURT:  -- were there any discussions about

4    service during that period?

5           MR. BANICH:  Oh, yes.  We did have -- Mr. Wander

6    and my firm, we did have some discussions wherein Mr. Wander

7    indicated that there was a problem with service, and we had

8    some discussions that -- about that issue that may be more

9    appropriately characterized as settlement discussions.  So,

10   I'm not sure of what extent I want to get into them.  But we

11   did discuss settlement; rather, I should say, service at

12   that time.

13          THE COURT:  Well, I -- I think, again, 408 just

14   goes to settlement discussions not being disclosed as for

15   the evidence of the bona fides of the claims.  I'm just

16   focusing here on whether there was any -- on the one hand,

17   suggestion that -- coming from the defendant that the

18   plaintiff could delay service or hold off on service, or

19   effect service some other way.  Or alternatively, any

20   statements from the defendant that, you know, I told you

21   that you haven't served this properly, you need to serve it

22   properly, we're pursuing this.  One or the other?  Did any

23   of that --

24          MR. BANICH:  That --

25          THE COURT:  Either of those things occur?

Page 100

1           MR. BANICH:  Assuming that question's directed at

2    me --

3           THE COURT:  Yeah.

4           MR. BANICH:  -- and I'll take that liberty, Your

5    Honor.  At -- Mr. Wander, in our discussions, did indicate

6    that they were taking the service issue seriously.  I don't

7    believe that they ever indicated that we could serve them in

8    another way or that they would agree to accept service.

9           Though, I will say that in the context of those

10   discussions, we -- the plaintiffs did try to get past the

11   issue of service in the context of getting to the point

12   where we could negotiate an agreed resolution of the merits.

13   But I cannot say that Mr. Wander agreed to accept service.

14          THE COURT:  Okay.  Okay.  All right.

15          So, this is the odd motion to dismiss where the

16   Plaintiff actually has the burden to show a proper service,

17   although the inability to satisfy that burden on the facts

18   is fairly light so, I actually directed my questions to Mr.

19   Banich for that reason.  And maybe given the extensive and

20   fairly clear briefing on the parties, I should ask some more

21   pointed questions on this point.

22          One of the points that the reply makes is that --

23   well, it acknowledges that the Plaintiff raises two grounds

24   for service being sufficient.  The first being that I can

25   apply the exception for a foreign defendant in Rule 4(m),

1    and/or the good cause exception on top of the exception to

2    the exception.

3         The reply states that's well and all good, but

4    there's no factual support for it offered up, no declaration

5    or affidavit or emails or anything to that effect.  The

6    motion also states that under Rule 4(f)(3) three,

7    alternative service on Mr. Wander will be sufficient, given

8    his participation in the case, the stipulations that you've

9    referred to, etc.

10        But the reply makes the argument that that really

11   needs to be done, again, proactively by the Plaintiff and

12   can't be asserted in a reply to a motion to dismiss, but

13   rather should be in a separate motion.  I guess I'd like to

14   have your response to both of those points.

15        MR. BANICH:  Yes, Your Honor.  I believe, with --

16   when it comes -- let's -- if I could take the -- take up the

17   second point first.

18        THE COURT:  Sure.

19        MR. BANICH:  Since we're fresh off of it.  Yeah.

20   So, there are a number of points, although I do -- I would

21   like to take the liberty to interpose what I consider to be

22   a threshold issue is whether this motion is timely or not.

23        THE COURT:  Well, we'll come back to that.

24        MR. BANICH:  And I don't know if we'll come back -

25   - okay.  I know -- don't want to come -- lose sight of that,

Page 102

1    but --

2              THE COURT:  Right.

3              MR. BANICH:  But focusing on the matter of the --

4    I believe this is what Mr. Wander refers to as a procedural

5    defect with the 4(f)(3) argument.

6              THE COURT:  Right.

7              MR. BANICH:  Specifically that it requires a

8    motion.  It is somewhat ironic that that argument appears in

9    the reply brief, because just a few pages before, the

10   Defendant complained that the debtors were elevating form

11   over substance and this is perhaps a fairly good example of

12   elevating form over substance, but nonetheless, I would

13   suggest that the plain language Rule 4(f) resolves this

14   issue because it does not, by its plain terms, require that

15   alternative service only be granted upon a motion or after

16   notice at a hearing or words to that effect that appear in

17   several other rules, where that type of formality is

18   required.

19             Rather, subsection three simply says the Court can

20   approve alternative service, "as the Court orders".  It

21   doesn't say how the Court gets to actually render such an

22   order, but I would suggest there's a motion before the Court

23   now to dismiss and part of the order that the Court may

24   enter could in -- authorize an alternative form of service

25   and the rule would be satisfied.

1           THE COURT:  Okay.

2           MR. BANICH:  So, I -- that's sort of, I think the

3    plain language of the rule there; where is the requirement

4    that it be by motion?  We just can't do it without Your

5    Honor's authority.  I think that's the takeaway from

6    4(f)(3), and that makes sense.

7           THE COURT:  So, could I interrupt you on that

8    point?

9           MR. BANICH:  Yeah.

10          THE COURT:  Because that is --

11          MR. BANICH:  Of course.

12          THE COURT:  -- what the rule says.  Mr. Wander,

13   what would the debtors request in their -- actually it's an

14   it.  What would the Plaintiff's request in their objection

15   to the motion deprive you of by having it heard now as

16   opposed to by a separate motion under Rule 4(f)(3)?  I mean,

17   do I have all the facts in front of me?  Is there something

18   that you think that the record needs to be developed on?

19          MR. WANDER:  Well, I don't think it can get to

20   Rule 4(f), because there's no showing that they made any

21   attempt to properly serve.  So, I would not stand on --

22   necessarily on the formality of the not serving a notice of

23   motion.  Because, you know, Your Honor, we're here.  I made

24   the point, but the point really -- the issue really is that

25   they didn't try at all to serve.  Not at all.  And if I can

Page 104

1    address the undisputed facts --

2            THE COURT:  Well no, I guess -- so, it's really

3    not a -- I'm just drawing your -- we'll get to those other

4    points, I'm just looking at the procedural point.  So, it's

5    really less a procedural point than you're relying on

6    7004(m), really.

7            MR. WANDER:  Yeah, because I don't want this to be

8    adjourned and then they file a cross motion, so I'm --

9            THE COURT:  Yeah, but what I'm saying is, you

10   really -- your focus on (f)(3) is to take me to (F)(4), I

11   mean 4(m), time before service.  Right?

12           MR. WANDER:  Yes.

13           THE COURT:  Okay.  All right.  So then, Mr.

14   Banich, on the first point that I raised, the evidentiary

15   burden that you have?

16           MR. BANICH:  Right.  I would say there's two real

17   responses to that.  I think we return to Rule 4(m) in the

18   advisory committee notes that added subsection (m) in 1993,

19   and that the point here is is that the Defendant's motion

20   seems to assume that the Plaintiffs are subject to a good

21   cause requirement under Rule 4(m), but if, as we pointed out

22   in our objection and as the advisory committee notes from

23   1993 state, and I'm going to quote, it's not that long, it

24   says 4(m), "explicitly provides that the Court shall allow

25   additional time if there is good cause for Plaintiff's

Page 105

1    failure to effect service in the prescribed 120 days, and

2    authorizes the Court to relieve a Plaintiff of the

3    consequences of an application of this subdivision even if

4    there is no good cause shown."

5              So, I don't want to lose sight, this is -- that's

6    from the advisory committee notes.  So, I don't want to lose

7    sight of the premise might be in error; that there is this

8    good cause requirement that's inescapable.  I think the

9    Court has more latitude than that.  So, I don't want the

10   record to reflect that I'm agreeing that we're bound by that

11   showing.

12             Nonetheless, as we pointed out, and I don't think

13   I need to belabor the point about the effect of COVID and

14   the timing here.  I mean, the complaint was filed in July,

15   and if we're not talking about good cause and how to

16   evidence that, and the answer was filed in October. I mean,

17   that was the height of the pandemic.

18             There are plenty of cases, and we cited a few of

19   them, that talk about, and the Court can take judicial

20   notice of the disruption to every aspect of American life,

21   or life on this planet, frankly, because of COVID, and so

22   kind of not sending someone into China to try to effect

23   service of process at that time seems to be somewhat more

24   understandable when considered in light of what was going

25   on, particularly last summer.

Page 106

1           But, to get to the more specific point about how

2    to evidence it, we're happy to submit some form of

3    declaration from the process server that we've engaged for

4    this purpose, if that would be of use or be necessary for

5    that point.

6           THE COURT:  Okay.  All right.  Why don't we go,

7    then to the point, Mr. Banich, that you alluded to, which is

8    this motion to dismiss was made after the answer.

9           MR. BANICH:  Yes, Sir.

10          THE COURT:  And you contend that we shouldn't be

11   hearing on a motion to dismiss basis.

12          MR. BANICH:  Yes.

13          THE COURT:  It's not a waiver point, right,

14   because the answer itself --

15          MR. BANICH:  That's correct.

16          THE COURT:  -- raised the defense of improper

17   service.

18          MR. BANICH:  Yes, sir, and you're quite right,

19   it's -- and I think the case that we cited from the Northern

20   District of Illinois actually, there's a block quote in our

21   objection, makes that precise point.  There's a distinction

22   between being able to file a Rule 12(b) motion to try to get

23   dismissal for insufficient service, that's over here, and on

24   the other side you have a waiver of a defense from a Rule 8

25   perspective, which is a totally different issue.  We are not

1     contending, for the record, that the Defendant here waived

2     the affirmative defense of its insufficient service.

3            I mean it -- the Defense appears in the answer

4     it's obvious they have it, the only issue is whether this

5     motion is untimely, and the -- this is one of those

6     situations where the rule itself actually is pretty clear

7     and addresses this, and it makes it clear you cannot file

8     one of these types of Rule 12(b) motions after filing an

9     answer, and I think the flashpoint between the parties on

10    this is that, and concededly, there are lower court

11    decisions that go both ways on this issue.

12           We have argued that there is the Second Circuit's

13    decision in Beacon Enterprises actually is controlling, and

14    kind of points the way with regard to which line of cases

15    the Court should follow here.  And I have a number of things

16    to say about that, and I've heard Your Honor say you read

17    everything, so.

18           THE COURT:  No, go ahead.

19           MR. BANICH:  I --

20           THE COURT:  It's fine.

21           MR. BANICH:  Okay.  What I mean to do is simply

22    just go through the points raised in the reply, so I don't

23    more or less repeat stuff you've already read.  Let's start

24    with the Beacon point, if I may.  Mr. Wanders' main response

25    to this is that it's -- that the -- what the Second Circuit

Page 108

1   said here about, you know, in connection with this issue was

2   dicta.  But, I would say that -- in an attempt to elevate

3   form over substance, that's why I mentioned that point

4   earlier.  I would argue that identifying a case that's

5   probable circuit precedent is controlling is not elevating

6   form over substance, it's what we do and how we make

7   arguments and carry out our duty of candor.

8           And by the way, it's not -- there's really no

9   analysis in the reply about why Beacon is dicta.  Dicta as

10  I'm sure Your Honor knows, is whether the statement in the

11  the opinion we're citing is necessary for the decision of

12  the case.  Second Cir -- I can cite cases along the way for

13  things I'm going to say, Your Honor, do you want me to do

14  that or only if you say where does that proposition come

15  from?  I'm happy to do it either way.

16          THE COURT: Whatever you're more comfortable with.

17          MR. BANICH:  All right, well, I'll include cites

18  for the record, and if it gets -- if you feel it's too

19  pedantic, please let me know.

20          THE COURT:  Okay.

21          MR. BANICH:  Anyway, it's a common principle that

22  dicta is, whether or not the resolute -- the statement was

23  necessary for the resolution of the case, and that's, for

24  example, Morrison v. Eminence Partners, 714 F.App'x 14 at

25  1617, (2d Cir. 2017).

Page 109

1        Now, what was going on in Beacon Enterprises is

2   necessary to understand why it wasn't dicta.  And so, very

3   briefly, what was going on there?  The Defendant in that

4   case contested personal jurisdiction and, like the Defendant

5   here, she answered but then later moved to dismiss under

6   Rule 12(b)(2), which deals with lack of personal

7   jurisdiction.

8        Later in the proceedings, the District Court

9   converted her motion to dismiss to a motion for summary

10  judgment without any notice to anyone and then proceeded to

11  deny her motion for summary judgement as it had then become,

12  and found that the court had jurisdiction over her and then,

13  also that she'd lost on the merits.

14       The Second Circuit reversed that decision, and

15  without getting into the merits, which have literally

16  nothing to do with what we're talking about today, the court

17  held that it was error among other things to convert her

18  dismissal motion to one for summary judgement without

19  notice, including as to the personal jurisdiction issue.

20       And then, bringing us to the point of why I'm

21  talking about this decision, the court concluded that, and

22  I'm going to quote here, "because untimeliness of the motion

23  to dismiss contributed to the procedural confusion at the

24  hearing below, Beacon, the Plaintiff, should receive

25  opportunities for discovery on the jurisdictional issue and

Page 110

1    be allowed to present evidence at a formal hearing on the

2    motion to dismiss for lack of jurisdiction".  That's 715

3    F.2d 757, 768.

4            So, I would say the untimeliness of the motion and

5    its -- and what happened to it was relevant to how the Court

6    issued the remand, what the lower Court was to do on remand.

7            THE COURT:  But, I guess --

8            MR. BANICH:  So -- yeah, sorry.

9            THE COURT:  Here, I mean I'll ask you the same

10   question I asked Mr. Wander.  Is there any real prejudice,

11   at this point, by treating this as a 12(c) motion?

12           MR. BANICH:  Well, there are cases that say it's

13   not legally appropriate to convert a Rule 12(b)(5) motion to

14   a Rule 12(c) motion.  So, I guess the -- it would be a legal

15   problem, rather than one of prejudice, I would say.

16           THE COURT:  Right, but the record isn't -- unlike

17   in Beacon, it doesn't seem like -- I mean, everyone has

18   notice, what's -- what Mr. Wander is arguing here.

19           MR. BANICH:  Yes.

20           THE COURT:  I think the facts -- I don't know what

21   needs to be developed further, if anything.  Is there

22   anything that needs to be developed further?

23           MR. BANICH:  Not factually, if that's what Your

24   Honor's referring to.

25           THE COURT:  Right.

Page 111

1           MR. BANICH:  Other than the matter of the evidence

2    of -- if we're going to discuss when the debtors tried to

3    commence Hague service, so for (indiscernible).

4           THE COURT:  Right.

5           MR. BANICH:  Other than the good cause -- evidence

6    of good cause, on the other matters I would say no, it's on

7    -- some -- as to insufficient service there is no factual

8    record that needs to be developed, other than if we're going

9    to talk about good cause, or its absence.

10          So, the -- I don't know if weu drifted into the

11   12(c) argument, but I have a couple of -- if you want -- if

12   Your Honor wants --

13          THE COURT:  Well, let me ask Mr. Wander, what else

14   could I do besides 12(c) here to get around the limitation

15   on bringing a motion to dismiss after there's been an

16   answer?

17          MR. WANDER:  Well, first of all for the record, if

18   I may just, Your Honor -- David Wander of Davidoff Hutcher

19   and Citron, counsel for the (indiscernible).

20          Judge, so, very interesting issue, and I don't

21   think Beacon is a bar, at least the Second Circuit didn't

22   think it was a bar, and we've cited Agency Rent A Car System

23   v. Grand Rent A Car.  That was a 1996 Second Circuit

24   decision and that described courts in the Circuit and others

25   that have allowed a rule 12(b) motion to dismiss in cases

Page 112

```
1    with analogous procedural patterns after the filing of an

2    answer preserving the affirmative defense on which the Rule

3    12(b) motion was raised.

4              Then you have a whole slew of District Court

5    decisions that have allowed the 12(b) motion to dismiss

6    after the filing of an answer.  We even cited one case where

7    they did it under Rule 12(c) and the District Court, I

8    believe it was, criticized them -- the Defendant for not

9    moving under 12(b).  So, I don't believe there's any bar to

10   this Court ruling under 12(b), but another way to deal with

11   that conundrum as we cited, and as Your Honor was just

12   alluding to is under 12(c), and the standard's the same.

13   The standard's the same.  But, let me tell you --

14             THE COURT:  Although it's on the pleadings, which

15   is a different -- I mean this isn't really on the pleadings,

16   right, this is based on service.

17             MR. WANDER:  Yeah, and there's --

18             THE COURT:  So, it's really -- to me, it really

19   just goes to the case law that says you can do this or not

20   do it after an answer's been filed, under 12(b).

21             MR. WANDER:  But we -- since everyone agrees the

22   Defendant preserved the issue, no one's arguing waiver,

23   we've got to be able to bring it before Your Honor in some

24   fashion, and I submit better sooner than later, why go

25   through discovery and anything else in the case --
```

Page 113

```
 1              THE COURT:  Well, the only issue would be whether
 2     there is -- there needs to be this --
 3              MR. WANDER:  Go ahead.
 4              THE COURT:  The only issue would be whether there
 5     needs to be further discovery on this issue.  On the service
 6     issue.
 7              MR. WANDER:  Can I address that?
 8              THE COURT:  Yeah.
 9              MR. WANDER:  So, we pointed out in our papers, in
10     our reply, that there's no evidence to support the
11     Plaintiff's burden.  None.  And --
12              THE COURT:  What that -- but that begs the
13     question, if they want to -- arguably that's because they
14     want to have a ruling first on whether you could do this
15     under 12(b) after an answer.
16              MR. WANDER:  Judge, if they want to tell Your
17     Honor what actually happened, you asked counsel for plain --
18     for the Plaintiff whether any discussions, I'm the one who
19     had the discussions if Your Honor would like to hear what
20     exactly happened I'll -- I'm happy to tell you what happened
21     and what they --
22              THE COURT:  Well, again, I guess Mr. Banich, let
23     me go back to how -- what prejudice would there be to the
24     Plaintiff here if I ruled on these papers, on this issue?
25     Is there additional evidence that you would want to
```

Page 114

1   introduce, now that you would know that I might be ruling on

2   a 12(b)(5) basis regarding the Plaintiff's attempts to

3   serve, the limitations on service, anything like that?

4         MR. BANICH:  I would answer that as follows.  I

5   would say, if the scope of Your Honor's ruling included the

6   matter of good cause, the 4(m) issue, if it included, for

7   example, the 4(f)(3) arguments we made about what counsel

8   has done, even though I think that contacts with the case

9   and with us, even though I think the docket would evidence

10  that, then I think we would want to make sure that Your

11  Honor had the benefit of knowing when we, for example,

12  commence service under the Hague Convention and things of

13  that nature, but I -- do I think we're going to take

14  discovery on anything?  I don't believe so, Your Honor.

15        THE COURT:  But you would want to submit an

16  affidavit and Mr. Wander could cross-examine the affiant if

17  he wanted to?

18        MR. BANICH:  The only -- I imagine the only matter

19  addressed by the affiant, other than who the affiant is and

20  what they do was when they put the papers out for service,

21  as it were.  I don't think the affidavit really addresses

22  anything else.

23        THE COURT:  Well, they could be willing to talk to

24  someone and they said it's going to be really hard, I'm just

25  speculating --

Page 115

```
 1                 MR. BANICH:  Oh.

 2                 THE COURT:  -- about this.  I'm sure this is going

 3      to be really hard to do in Hong Kong, etc. because they're

 4      locked down or whatever, I don't know if that happens, but

 5      that -- conceivably that could be --

 6                 MR. BANICH:  Right.

 7                 THE COURT:  -- something that you'd want to

 8      submit.

 9                 MR. BANICH:  Yeah, I -- that's right.  If we were

10      having a discussion about good faith attempts and the

11      difficulties of effecting service in the Far East at this

12      time, then yes, I would want to expand it to include that.

13      I'm just trying to figure out what would we be considering

14      the whole group of arguments that have been made here today

15      or just some lesser, smaller subset?  And it sounds like

16      everything.  So.

17                 THE COURT:  Okay.  All right.

18                 MR. BANICH:  Did you -- would you -- would Your

19      Honor want me to address the 12(c) argument that --

20                 THE COURT:  I think this is really best --

21                 MR. BANICH:  No?

22                 THE COURT:  -- addressed under 12(b), if you're

23      going to address it at all, just by the plain terms in

24      12(c).

25                 MR. BANICH:  All right.
```

1          THE COURT:  This isn't really judgement on the

2     pleadings.

3          MR. BANICH:  Right.

4          THE COURT:  It really isn't.

5          MR. BANICH:  Right, I agree with that.  Right.

6     So, I think we're on the same page there.  So, the issue, I

7     don't know if you've moved past the Beacon Enterprises issue

8     or not, but we're not a -- the debtors aren't on an island

9     on this issue, as we pointed out in our objection, it was

10    Judge Torres followed Beacon in this Moore v. Shahine

11    decision, 2019 WL 948349, (S.D.N.Y. Feb. 27, 2019).  So, if

12    district judges are relatively recently treating Beacon as -

13    - and this point Beacon as a holding, it's not unreasonable

14    for us to suggest to Your Honor that it's also a holding.

15         THE COURT:  Right.

16         MR. BANICH:  And if that's the case, then this

17    motion is untimely and we don't really have to go any

18    further.  So, with that I guess I'll take Your Honor's

19    suggestion about where you'd like -- what points you'd like

20    me to address next.

21         THE COURT:  Well, I mean I think you've addressed

22    all your points, really.  The first one is the timeliness

23    issue.

24         MR. BANICH:  Mm hmm.

25         THE COURT:  And the meaning of Beacon.  And the

Page 117

1    second and third are the 4(f)(3) and 4(m) issues.

2            MR. BANICH:  There are a few more points I like

3    that came up in the reply on 4(f)(3) that I'd like to

4    address, if that's all right.

5            THE COURT:  Okay.

6            MR. BANICH:  That I -- we didn't have occasion to

7    discuss before.

8            THE COURT:  Okay.

9            MR. BANICH:  Okay.  Now, there's a couple of

10   points.  We've just -- we've discussed the alleged

11   procedural effect, I'll skip that one.  The main argument

12   here is -- the main point in both the motion and the reply

13   is that the debtors were somehow obligated to at least

14   attempt service first before trying to under -- and that's

15   under 4(f)(1), before trying to invoke 4(f)(3) for authority

16   to affect a form of alternate service, and that's -- that is

17   at least incorrect under a line of cases that we have

18   argued.

19            But before we even get to that issue -- well,

20   actually I'll come back to that.  That's fine.  So, the --

21   as we pointed out in our objection, 4(f)(3) is an option

22   that has equal dignity with the options under subsections

23   (1) and (2) of 4(f).

24            So, three is an option just as equally as one

25   under Hague service as an option, and that's what Judge

Page 118

1    Buchwald noted in a decision we call Zhang v. Valaris, 2021

2    WL 982460, *3, (S.D.N.Y. Mar. 16, 2021).  And I would add to

3    that that nothing in the text, syntax or structure of Rule

4    4(f) requires a party to attempt Hague service, that is

5    attempt subsection (1) before seeking alternate service

6    under subsection (3).

7           Now, obviously, there's some cannons to statutory

8    interpretation we could go through, but suffice it to say

9    Federal Rules is interpreted for its plain language just

10   like a statute is and, obviously, that means it's

11   inappropriate to graft things onto the rule that aren't

12   there.  And there's a lot of cases out there that do that.

13   And Mr. Wanders cited and talked about a lot of them.

14   However, I think that absent a controlling decision here,

15   which is apparently the case, the safer course and better

16   course is to do a -- follow the plain language of the text

17   of the rule.

18          And that is that the three subsections of Rule

19   4(f), Your Honor, are phrased in the disjunctive.  There's

20   an "or" that follows subsection (2) leading into subsection

21   (3), and when that happens, statutes written in the

22   disjunctive create, "separate and distinct alternatives".

23   And that's in re: Modansky, M-O-D-A-N-S-K-Y 159 B.R. 139,

24   143, (Bankr. S.D.N.Y. 1993).

25          So that is to say, if that's the case the

Page 119

1    disjunctive phrase -- phraseology of Rule 4(f) compels the

2    conclusion that service under subsection three is a separate

3    and distinct alternative than Hague service under subsection

4    (1).

5              THE COURT:  Although --

6              MR. BANICH:  Yeah.

7              THE COURT:  Doesn't China's opting out of any

8    other alternative besides the Hague Convention mean that

9    (f)(3) wouldn't apply because service on Mr. Wander, where

10   he's not active as the agent for service or otherwise said

11   he would accept it is prohibited by international agreement.

12             MR. BANICH:  That's obviously an excellent

13   question and the first time you encounter this issue you

14   would not be faulted for thinking that.  But the cases that

15   hold, that service on a domestic representative such as a

16   domestic lawyer who has been -- who has shown to have some

17   contact with a foreign Defendant, the reason it doesn't

18   offend the international agreement, the Hague Convention, is

19   because the Hague Convention does not regulate service

20   domestically in the United States.  And that is why it --

21   the analysis the Courts go through.  So, it is -- China only

22   gets to talk about service within China.

23             But this is a form of service within the United

24   States.  So, that concern -- that is why the two pre-

25   requisites for 4(f)(3) service, which I would point out, Mr.

Page 120

1   Wander doesn't address at all in his motion or reply, so the

2   point I would suggest to you is tacitly admitted that we've

3   satisfied the elements for 4(f)(3) that's why it doesn't

4   offend an international agreement because we're talking

5   about serving the Defendant via an agent within the United

6   States.

7           THE COURT:  Okay.

8           MR. BANICH:  And that -- I mean, that's the

9   analysis these courts use, including Judge Leisure in the

10  Madu, Edozie & Madu, P.C. case cited in our objection when

11  Judge Leisure wrote that service of process under 403 is

12  neither a last resort nor extraordinary relief.  It's merely

13  one means, amongst several, which enable service of process

14  under an international Defendant.

15          I think that our -- although there's plenty of

16  cases that the defense talk about, that go on for many pages

17  discussing this case and that case that went the other way

18  on this issue, I would suggest though, that the way I've --

19  the case is holding that there is no threshold showing

20  required, that we at least tried Hague service first.  It's

21  the better course to follow, because it's more -- it is more

22  in line with the plain language and syntax of the rule.  Of

23  Rule 4(f), I should say.

24          So, that is -- I think that is the -- all I wanted

25  to say in addition on the 4(f)(3) point.  Happy to take any

Page 121

1    questions Your Honor has.

2            THE COURT:  No, I guess I have a question for Mr.

3    Wander, which is, do you have a response to the other -- to

4    the -- you've made -- and I've reviewed and considered your

5    respense -- response on the timing point and whether I

6    should allow (f)(3), given the timing of the attempted serve

7    under the Hague Convention.  Do you -- I think it's true,

8    you haven't really addressed the other elements of (f)(3).

9    Due process and -- is there a problem there?

10           MR. WANDER:  Well Judge, I think we addressed the

11   fact that, in order to get to (f)(3), you have to first at

12   least attempt to comply with the Hague Convention, and to a

13   certain extent there should be a stop from making this

14   argument --

15           THE COURT:  Actually, you don't really need to.  I

16   mean, one of the very cases you cited summarizes the case

17   law that says you don't.  There's no pre-requisite.

18           MR. WANDER:  Judge, they have a --

19           THE COURT:  In that case, that's the Halverson

20   case, they hadn't ever tried, even at the time of the

21   motion.  So --

22           MR. WANDER:  Judge --

23           THE COURT:  -- they were -- they fell into the

24   "whimsically seeking an order of alternative service".

25           MR. WANDER:  So, we had a proceed -- we have a

Page 122

1     procedures motion.  And the procedures motion says in sum

2     and substance, Plaintiffs will follow the Hague Convention

3     and they've never said why they didn't.  There's no issue

4     that they have the right address.  There's no issue that the

5     Defendant did not try and evade service.  And every case

6     basically that I've looked at where the Court granted some

7     alternative means is because there was a basis for them.

8     There was a reason why they couldn't try serving.

9               Here, they made no effort, even to comply with

10    their own procedures motion.  They never --

11              THE COURT:  Well -- I -- the procedures order

12    doesn't require service under the Hague Convention.

13              MR. WANDER:  Judge, but --

14              THE COURT:  And the motion just alerts people in

15    the context of telling them that they may not actually, in

16    terms of the timing issues for the settlement dealing with

17    claims and claims objections and administrative expenses,

18    this may -- as I read it, the reference to compliance with

19    the Hague Convention is one to alert people who ask to make

20    a choice as to how they elect to have their administrative

21    expense treated, that it may take a while for their claim to

22    be resolved because it takes a long time, often, to serve

23    under the Hague Convention.  I didn't see it as a

24    requirement that it be done.

25              MR. WANDER:  Well, it's interesting your -- as

Page 123

1    Your Honor pointed out, what they put in the motion and have

2    been -- this is just the fifth one, what they've put in the

3    motion they didn't track in the order.  Now, my client

4    hadn't been served at that time, I couldn't really respond

5    to it, but the motion made it clear to the Court, it made it

6    clear to everyone that they intended to serve under whatever

7    international law required the service.  If they simply

8    could -- if they can ignore it, simply ignore it, and then

9    after a Defendant makes the motion to dismiss, then they ask

10   Your Honor for relief that they never needed, because they

11   could have followed the Hague Convention.

12            THE COURT:  Right.

13            MR. WANDER:  They could have --

14            THE COURT:  But that's different than saying the

15   debtors in a motion said that they would only follow the

16   Hague Convention.

17            MR. WANDER:  The procedures motion, I think it was

18   paragraph five, made it very clear that that's how they were

19   going to do it.  And here, they didn't even try.  My client

20   did not evade service.  The address they have is not

21   incorrect.

22            THE COURT:  Well they -- but they have tried.

23   They were outside 100 -- they were outside 90 days, but they

24   have initiated that service.

25            MR. WANDER:  They weren't.  After I had

Page 124

1   discussions with them and asked them why they didn't follow

2   their own procedures motion --

3          THE COURT:  Well, but -- look.  You're not going

4   to convince me that the procedures motion set a specific way

5   as the only way to serve foreign Defendants here.  The

6   reference in that motion to service under applicable

7   conventions, like the Hague Convention, I took to mean to

8   make it clear to parties that it might take a long time for

9   adversary proceedings, upon which recovery parties were

10  going to be relying to get paid, now that -- to get off the

11  road.  This wasn't --

12         MR. WANDER:  Well --

13         THE COURT:  -- a matter where the money was going

14  to be coming in with regard to foreign Defendants quickly,

15  because it often takes hundreds of days to serve it.  That

16  was the context of that motion.

17         MR. WANDER:  Right, and also, by the time they got

18  around to filing the summons and complaint, it was something

19  like nine months after the confirmation hearing, and when

20  they say that well, what about COVID, they knew about COVID.

21  In the procedures motion that we're dealing with in August,

22  I believe, they didn't change what they may have

23  (indiscernible) instead to Your Honor in the first

24  procedures motion.  They could have come to Your Honor and

25  said COVID.  We need alternate means of service.  It's

Page 125

1    difficult to get into China or any --

2              THE COURT:  The procedures motion doesn't limit

3    how you serve someone.  It just doesn't.

4              MR. WANDER:  Correct.  The law does.  The statute

5    does.

6              THE COURT:  Well all right, so you should stop

7    referring to the procedures motions that somehow it either

8    constitutes a waiver or some negative circumstance.  I think

9    -- I understand your other points.  What we're talking about

10   here, I believe, is a -- I'm just doing the math, here.  The

11   process to serve under the Hague Convention started February

12   2.

13             MR. BANICH:  I'm sorry, Your Honor.  February

14   12th.

15             THE COURT:  12th.

16             MR. BANICH:  Just so we're clear.

17             THE COURT:  So, you'd be in mid-May, basically,

18   with the 90 days to initiate the process.  And no I --

19   excuse me.  I believe I have the wrong date.  You'd be in

20   September.  The beginning of September because the complaint

21   was filed in, did you say July --

22             MR. BANICH:  July.

23             THE COURT:  -- 6th?  Or June 7th?  Was it July?

24             MR. BANICH:  It was July, Your Honor.

25             THE COURT:  July.  So, it'd be in October.  July

Page 126

1    6th, roughly would be the 90 days.  So, you're talking about

2    a four-month delay.  The answer was filed October 12th and I

3    don't know if there were any discussion before then.  I

4    mean, the answer was filed well after I think the time to

5    file an answer, so were there discussions before then, about

6    your -- we'll extend your time to answer?

7              MR. WANDER:  Well first of all, Your Honor.

8              MR. BANICH:  Yes.  Yes, Your Honor, I'm sorry.  I

9    didn't mean to interrupt, but yes, Mr. Wander and -- did

10   contact us and we evidently entered into a stipulation on

11   October 7th to extend time to answer or respond to the

12   complaint.  Yes.  And that's docket number four in the

13   adversary proceeding, Your Honor.

14             THE COURT:  Okay.

15             MR. BANICH:  Sir, I didn't mean to interrupt.  I'm

16   sorry.

17             THE COURT:  So, anyway Mr. Wander, are you -- you

18   were saying that the time limit just wasn't met here?

19             MR. WANDER:  What I'm saying is they deliberately

20   didn't meet the time.  There was no excuse.  They simply

21   chose to serve by mail.

22             THE COURT:  But the case law doesn't require an

23   excuse.  There are two standards to apply, and the likely

24   standard, the one that should apply under 4(m) is a standard

25   that says if you really delay a lot, then you should go to

Page 127

1   the good cause standard.

2            MR. WANDER:  And here they waited more than --

3            THE COURT:  Well, when I say a lot, the cases are

4   talking about two years.

5            MR. WANDER:  But I think a lot of the cases are

6   talking about less.  They filed the com -- the summons and

7   complaint in July and they didn't make any attempt until the

8   following February, after we made the motion.  After I told

9   them, we're making a motion to dismiss because you haven't

10  given any reason why you didn't try and properly serve.  So,

11  after then, we say we're going to file the motion to

12  dismiss.  At that point in time I submit, it's too late.

13  Otherwise we've --

14           THE COURT:  Do you have a case that says that?  I

15  dealt with this issue a week or so ago, and looked at it

16  pretty carefully, and I don't think the case law actually

17  says that.  It doesn't have a drop-dead when someone makes a

18  motion to dismiss like that.

19           MR. WANDER:  Correct, there is no specific date, I

20  know we cited the Veon case, there are cases -- there is no

21  specific date.  It doesn't say -- it basically says if you

22  want to ask for something alternative relief, then you need

23  --

24           THE COURT:  That's fair, I'm focusing on 4(m) at

25  this point.

Page 128

1              MR. WANDER:  Well, I submit that under the facts

2       of this case, you can't just wait 200 days.  I'm not saying

3       199 days is okay, but 200 isn't.  But where you have a

4       situation where the Plaintiff simply decides not to follow

5       the rules that we're supposed to be guided by, then that's -

6       - they should not be given additional time.  Otherwise why

7       have the rule?

8              THE COURT:  Well, it would be 120 days after the

9       90-day deadline.

10              MR. WANDER:  Right.  After the 90-day deadline

11      when they should have asked Your Honor for some alternative

12      means, if they thought they were going to have difficulty.

13      Here they just didn't try.

14              THE COURT:  No, but again, I'm just focus -- I'm

15      not focusing on (f)(3).

16              MR. WANDER:  Right, so there's no --

17              THE COURT:  I'm focusing on m, 4(m).  And the

18      cases dealing with 4(m) don't really -- particularly in a

19      situation like this where there was an extension of the time

20      to answer and it appears, at least from what you both have

21      told me, that the discussions about the failure to serve

22      took place in October, November at the earliest, that what

23      we're talking about here is a meaningful delay.  I just --

24      to me it's not consistent with -- at least the case law,

25      which really references either still not having made an

1    attempt to serve, I'm not talking about the 4(m) case law.

2    Or, not having done so for like, two years, five years, one

3    was five years.  I mean, they're a long period.

4           MR. WANDER:  Well, Judge, we have a case here with

5    hundreds of adversary proceedings being filed.  It's not

6    like this got lost in the sauce.  They made a deliberate,

7    strategic decision not to follow the rules.

8           THE COURT:  The rules don't -- the rules are not

9    expressed.  4(m) actually says the 90-days doesn't apply

10   under 4(m).  When it's a service on a foreign party.

11          MR. WANDER:  Almost every case that deals with

12   giving additional time, the Plaintiff has given some cause.

13   Something.  I haven't seen a decision where they did

14   absolutely nothing and even contradicted what they had said

15   they would do.  They haven't even met the lowest threshold

16   of seeking the relief.  It was not until more than 200 days

17   after they originally filed, multiple discussions with them

18   asking them why didn't they follow the proper procedure, and

19   then they said, we're going to be filing a motion to

20   dismiss.  At that point I submit, it's too late, Your Honor.

21          THE COURT:  You -- I know you've submitted that,

22   but you haven't given me any cases to that effect, and I

23   have plenty on the other side, so I guess I -- to me this

24   fits under 4(m).

25          MR. WANDER:  Well, again, I don't know of a case

Page 130

1    where the Plaintiff deliberately didn't try and serve the

2    way they were supposed to, engaged in discussions --

3            THE COURT:  There are plenty of cases like that,

4    where they just sent a letter or an email.  There are lots

5    of cases like that.

6            MR. WANDER:  Judge, we've had the -- I know the

7    procedures motion was not engrafted in the order.  I know

8    there's no specific deadline by which time it's too late,

9    but if you allow the late service in this case, then the

10   procedures that we follow in these cases become meaningless.

11   I mean, they could have taken a default against my client,

12   gotten a default judgement, because they were serving by

13   mail.  Had my client not contacted me, they probably would

14   have gotten a default judgement.

15           THE COURT:  No, they wouldn't because they would

16   have had to have submitted their certificate of service.

17   And I wouldn't have granted it.

18           MR. WANDER:  Well, Judge, I submit under the facts

19   of this case, where they did nothing.  They haven't

20   submitted a declaration, anything.

21           THE COURT:  But we have the facts.  I -- we have

22   the facts.  I don't think there's anything more -- it's

23   acknowledged that they didn't commence the effort to serve

24   until February 12th.  Is that -- Mr. Banich, is that when

25   you actually served it, put it in the mail, or did you hire

Page 131

1    a process server before then?

2           MR. BANICH:  I'd have to -- there's some

3    complexities associated with Hague service, I don't want to

4    characterize it the wrong way, but I -- it's my

5    understanding that the -- if you're the service company,

6    they consider the process to have been started on their end

7    on February 12th.

8           THE COURT:  But you -- I'm assuming you reached

9    out to them beforehand?  I don't --

10          MR. BANICH:  Oh, yes.  That's correct.  We had to

11   find the right person who does this sort of work and that

12   part of the --

13          THE COURT:  That's all part -- I actually think,

14   frankly, it's likely that I will grant -- I will deny the

15   motion saying that the standard under Rule 4(m) has been

16   satisfied here.  But, I do think that the Plaintiff here is

17   entitled, because this motion was made after a answer was

18   filed, the Plaintiff here is entitled to submit the facts to

19   justify either relief under 4(m) or 4(f)(3).  And I'd like

20   to have that record before deciding the motion.

21          But, I can tell you that given the back and forth

22   with counsel, including the extensions of the time to answer

23   and three stipulations and the like, that I don't think

24   that, at least from what I've heard thus far, the Plaintiff

25   runs afoul of the Court-imposed process for fixing a

Page 132

1    deadline to serve a foreign Defendant under Rule 4(m).

2            There's a very good discussion of those rules, a

3    recent one by Judge Engelmeyer and On re Astor Chocolate

4    Corp. v Elite Gold, 2020 U.S. LEXIS 78862, (S.D.N.Y. May 5,

5    2020) that I think is a very good summary of the law on this

6    issue.  It doesn't deal with (f)(3).  I'll note that the

7    (f)(3) cases give a considerable amount of discretion to the

8    Judge, separate and apart, and I think frankly, both

9    analyses come down to whether the Court feels that the

10   Plaintiff, under the specific facts, has been unduly

11   dilatory in serving.  Not on excuses regarding service,

12   which would be the good cause standard, a separate, extra

13   right that this Circuit gives Plaintiffs under 4(m), but

14   that is not -- I would think even necessary to get into here

15   given the interpretation of 4(m) in the Circuit.

16           I will note that I think that there are cases that

17   say that the Plaintiff must have begun within the 90-day

18   period to try to serve, or else they fall into the good

19   cause only exception, like Bozel, which you refer to.  But,

20   they rely upon a case that really doesn't stand for that

21   proposition, which is the Honeywell case.  And then, I

22   believe they mis-cited that case by -- one was federal

23   practice, Section 4.52(d)(4).  In fact, the case law in that

24   case, the Honeywell case, the Plaintiff never tried to

25   serve, ever.

Page 133

1              Which is a far cry from saying that you have to

2    try to serve within the 90 days.  So, it's fact-based and in

3    fact the cases that -- except for the ones that I think

4    misread Honeywell, and they're the distinct minority, that

5    don't allow service outside of that -- either the 120 days

6    or now the 90 days, have focused on a really lengthy period,

7    with no excuse whatsoever, no pre -- and plenty of prejudice

8    to the other side, which I don't think is the case here.

9              So, I don't think we need to get into the exercise

10   of discretion beyond good cause either, which is yet another

11   way out that the Courts have given Plaintiffs, which takes

12   into account, among other things, the anal -- the

13   applicability of the statute of limitations and the like.

14             But, we don't have a full factual record here.

15   I'd -- I rarely have one.  But, I think at this point, in --

16   to me the choice is either 4(m), and the Hague Convention,

17   or (f)(3) -- 4(f)(3) and service on Mr. Wander, and I'm --

18   it seems to me that if -- at this point, the Plaintiff's

19   going to rely on the Hague Convention, then the motion

20   really should be denied.  I think I would need a better

21   record under (f)(3) than I have now, if the Plaintiff also

22   wants to say that the drawback of a -- the service on Mr.

23   Wander through (f)(3).

24             MR. BANICH:  Okay.

25             THE COURT:  But I'm assuming if we -- if there's a

Page 134

1    record of settlement discussions, if there's -- there are

2    three stipulations, October, November, and December, I just

3    clearly Mr. Wanders' been in contact with the client, he

4    couldn't engage in settlement discussions without that.  I

5    mean, otherwise you wouldn't be engaging in settlement

6    discussions because you wouldn't have authority.

7            MR. WANDER:  There weren't any.

8            THE COURT:  What?

9            MR. WANDER:  There weren't any settlement -- they

10   were not settlement....

11           THE COURT:  Well, that's the say -- that's why I

12   would want a record, to see whether there were such a

13   things.  But if there were, than (f)(3) might well apply.

14   But I don't have that record.

15           MR. BANICH:  Is the -- may I ask a clarification

16   question?  Is -- a moment ago I thought I heard Your Honor

17   say the -- to the effect that the choices between 4(m) and

18   the Hague Convention on the one hand, or 4(f)(3) in service

19   on --

20           THE COURT:  Right.

21           MR. BANICH:  -- Mr. Wander on the other, and I

22   believe Your Honor went on to say that if the Plaintiff were

23   to stand on Hague service the motion should be denied?

24           THE COURT:  With one exception, which is Mr.

25   Wander --

Page 135

 1                MR. BANICH:  Okay.

 2                THE COURT:  -- do you dispute that it -- that at

 3    least at the latest, the process was started on February

 4    12th, 2021?  Or is that also not established?

 5                MR. WANDER:  I have no reason to dispute it.  I

 6    don't know.

 7                THE COURT:  Okay.  So, I think to just answer your

 8    question, Mr. Banich, I think I need evidence on that.  I

 9    can't grant the -- I can't deny the motion based on this

10    record.

11                MR. BANICH:  All right.

12                THE COURT:  I'm not going to grant it either, so -

13    -

14                MR. BANICH:  Okay.

15                THE COURT:  -- we can adjourn it to the next round

16    of this.  I'll see the affidavits, but until I do that

17    everything -- if that's the date or even if it's earlier

18    when you began the process based on the case law that I

19    cited to you all, I will deny that motion under 4(m).

20                MR. BANICH:  Very good.  I appreciate that very

21    much.

22                THE COURT:  And again, if you want to still seek

23    alternative basis under (f)(3), then you do obviously need

24    to get that record before me as well, for that adjourned

25    hearing.

Page 136

1              MR. BANICH:  I understand, Your Honor.  Thank you.

2              THE COURT:  Okay.  All right.  Thank you.

3              MR. WANDER:  Thank you, Judge.

4              THE COURT:  Okay.

5              MR. BANICH:  Thank you, Your Honor.

6              CLERK:  And then I think that brings us to the

7    conclusion of this rather lengthy hearing.

8              THE COURT:  Right.

9              CLERK:  Thank you for your time.

10             THE COURT:  Okay, very well, thank you all.

11             CLERK:  Thank you.

12             MR. BANICH:  Thank you.

13             (Whereupon these proceedings were concluded at

14   3:29 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 137

1              C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 25, 2021