**Objection Deadline: June 22, 2021 at 4:00 p.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
In re                                    :
                                         :          Chapter 11
SEARS HOLDINGS CORPORATION, et al.,      :
                                         :          Case No. 18-23538 (RDD)
                                         :
Debtors.¹                                :          (Jointly Administered)
                                         :
-------------------------------------------------------------x
```

### NOTICE OF DE MINIMIS ASSET SALE
### OF 3820 N. 2ND STREET, PHILADELPHIA, PENNSYLVANIA

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets of the Debtors (the "**Assets**") to 3820 N 2nd Street Koz LLC (the "**Purchaser**") pursuant to the *Real Estate Sale Contract* dated June 8, 2021 (the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 1700 Broadway, 19th Floor, New York, NY 10019.

Description of the Assets. The Assets consist of a parcel of land and all real property interests of the Debtors commonly known as 3820 N. 2nd Street in the City of Philadelphia, Philadelphia County, Commonwealth of Pennsylvania.

Relationship of the Purchaser to the Debtors. The Purchaser does not have any relationship with the Debtors.

Liens and Encumbrances on the Assets. The Debtors are not aware of any liens and/or encumbrances on the Assets. To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

While not a lien and/or encumbrance, the Assets have been impacted by certain contaminants and are subject to ongoing environmental investigation that is being conducted under the oversight of the Pennsylvania Department of Environmental Protection.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

Material Economic Terms and Conditions of the Proposed Sale. The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code. The Purchaser has agreed to pay a purchase price of $1.00 for the Assets. The Purchaser also released the Debtors from any claims that the Purchaser may have relating to the environmental condition of the Assets. The Purchase Agreement is annexed hereto as **Exhibit 1**.

The Debtors shall also release all funds remaining in the escrow account created pursuant to that certain Escrow Agreement, dated December 7, 2020, and discussed in section 6 of the Purchase Agreement, in accordance with Exhibit E to the Purchase Agreement. The Debtors estimate approximately $100,858 in funds remaining in the escrow account.

Commission, Fees, or other Similar Expenses: The Debtors are not required to pay any commission, fees, or other similar expenses in connection with the sale.

Procedures to Object to the Proposed Sale. Any objection to the proposed sale (an "**Objection**") must: (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Esq.; Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; and Sunny Singh, Esq.), as counsel to the Debtors **on or before June 22, 2021 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; and (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated: June 11, 2021
New York, New York

/s/ *Jacqueline Marcus*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
*Attorneys for Debtors*
*and Debtors in Possession*

## Exhibit 1

**Purchase Agreement**

## REAL ESTATE SALE CONTRACT
*3820 N. 2nd Street, Philadelphia, Pennsylvania*

**THIS REAL ESTATE SALE CONTRACT** ("**Contract**") is made as of June 8, 2021 (the "**Effective Date**"), by and between **INNOVEL SOLUTIONS, INC.**, a Delaware corporation ("**Seller**") and **3820 N 2nd STREET KOZ LLC**, a Delaware limited liability company ("**Purchaser**"; Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**"). Seller and Purchaser agree as follows:

1. **PURCHASE AND SALE**

   Seller is the owner of a parcel of land including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Real Property**"), commonly referred to as the Northeast Parking Parcel located at 3820 N. 2nd Street in the City of Philadelphia (the "**City**"), Philadelphia County ("**County**"), State of Pennsylvania legally described on **Exhibit "A"** attached hereto and made a part hereof. The Real Property is sometimes called the "**Property**". Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract. On the Closing Date set forth in Section 7 of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject to the Permitted Title Exceptions (as defined in Section 4 of this Contract).

2. **PURCHASE PRICE**

   (a) **Purchase Price.**     The Purchase Price of the Property shall be One and No/100 Dollars ($1.00) (the "**Purchase Price**") and payable by Purchaser in United States currency in good and certifiable funds at Closing.

   (b) **Intentionally Deleted.**

3. **TITLE INSURER/ESCROW AGENT**

   Escrow shall be opened at Land Services USA, Inc., 1 South Church Street, Suite 300, West Chester, PA 19382 Attention: Cori Connors, Telephone: (484) 885-2898, Fax: (610) 429-3149, Email: cconnors@lsutitle.com ("**Land Services**" or "**Title Insurer**" or "**Escrow Agent**") promptly following the expiration of the Sale Notice Period (as hereinafter defined).

4. **TITLE AND SURVEY REVIEW**

   (a) **Title Commitments/Title Exceptions**. Purchaser acknowledges that Purchaser has reviewed an ALTA Standard Form of Owner Policy of Title Insurance (the "**Title Commitment**") covering title to the Property and showing title to the Property vested in Seller. Purchaser acknowledges that Purchaser has reviewed the

Title Commitment and any exceptions to title shown on the Title Commitment or any Supplemental Title Commitment (as defined below) shall be "**Permitted Title Exceptions**".

(b)     **Permitted Title Exceptions**. Notwithstanding anything contained in Subsection 4(a) above, the following (and any exception therefor contained in any Title Commitment, Supplemental Title Commitment, or Title Policy) shall be deemed Permitted Title Exceptions: (1) restrictive covenants common to the platted subdivision in which the Property is located, (2) standby fees, taxes and assessments not yet due and payable, (3) utility easements created by the dedication deed or plat of the subdivision in which the Property is located or any other easements, rights of way, servitudes, encroachments, apparent servitudes, permits, surface leases or other similar rights, (4) exception as to waters, tidelands, beaches, streams, and related matters, (5) discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements (Purchaser, at Purchaser's expense, may have any related  title exception amended to read, "shortages in area"), (6) all matters set forth in the Title Commitment and the Supplemental Title Commitment(s) (defined below), if any, and approved by Purchaser or deemed approved by Purchaser as herein provided, (7) any title exception or encumbrance created directly by any act or omission of Purchaser, any of Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), or any party acting on behalf of Purchaser, (8) matters disclosed by the Survey or the Existing Survey (or if none is obtained or provided, as would be disclosed by a current and accurate survey or an inspection of the Property), (9) all applicable laws, ordinances, rules and governmental regulations affecting the development, use, occupancy and/or enjoyment of the Property, or any portion thereof, (10) encumbrances which will be and are discharged or released either prior to, or simultaneously with, the Closing, (11) the terms of any leases and tenancies assigned hereby and (12)  any of the foregoing or any other lien, encumbrance or title defect curable by expenditure of any funds or incurrence of any liabilities, as more specifically provided under subsection (f) of this <u>Section 4</u> (collectively, the "**Permitted Title Exceptions**").  On the Closing Date, Purchaser shall, at its sole election, cause the Title Insurer to issue, at Purchaser's sole cost and expense, a title policy in the amount of the Purchase Price insuring fee simple title to the Property in Purchaser as of the Closing Date, subject to the Permitted Title Exceptions (the "**Title Policy**").  It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before the Closing Date. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for or any other ability to obtain any endorsement, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder.

(c)     **Survey**.         Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser, to the extent available, if at all, in the "Potential Purchaser Diligence Documents" folder in Seller's electronic online data room for the Property (as the same may be updated from time-to-time), Seller's existing survey of the Real Property (the "**Existing Survey**"). Purchaser, may, at

Purchaser's sole cost and expense, obtain a new ALTA/NSPS land title survey, or an update to the Existing Survey, with such Table A inclusions as indicated by Purchaser (excepting any Table A inclusions which would be disruptive to any ongoing use of the Property, relate to rights of any third parties, or are otherwise invasive, including but not limited to Table A, item 11, as to underground utilities, 10(a) and (b), and 19), of the Property meeting the 2016 ALTA/NSPS and Title Survey standards, prepared by a State licensed surveyor, certified in a form acceptable to Purchaser, Seller and Title Insurer (the "**Survey**").

(d)     **Acceptance of Title and Survey**.  Purchaser acknowledges and agrees that Purchaser has approved the state of title to the Property as reflected in the Title Commitment and the Existing Survey as of the date hereof in all respects and waives any objections thereto.

(e)     **Supplemental Title Commitments, Supplemental Title Review Period**.  In the event that any new title matter is first raised by the Title Insurer in a supplement to the Title Commitment (each, a "**Supplemental Title Commitment**") after the Effective Date, and such new title matter is not a Permitted Title Exception (or deemed to be a Permitted Title Exception) (a "**Supplemental Unpermitted Exception(s)**"), then Purchaser shall immediately provide Seller with a copy of such Supplemental Title Commitment (together with copies of all documents relating to any new title matters set forth in such Supplemental Title Commitment). If Purchaser fails to give written notice to Seller within five (5) Business Days after Purchaser becomes aware of any Supplemental Unpermitted Exceptions shown on any Supplemental Title Commitment, Purchaser shall be deemed to have approved such Supplemental Unpermitted Exceptions and such matters shall be deemed to be Permitted Title Exceptions. If Purchaser has given the required written notice described above identifying Supplemental Unpermitted Exceptions, Seller may, at its option (but with absolutely no obligation),  (i) have such Supplemental Unpermitted Exceptions removed from the Supplemental Title Commitment; (ii) commit to having such Supplemental Unpermitted Exceptions removed from the Title Policy when issued, (iii) have Title Insurer commit to insure over such Supplemental Unpermitted Exceptions and provide evidence thereof acceptable to Purchaser, or (iv) decline to take any action with respect to such Supplemental Unpermitted Exceptions. If Seller fails to commit to having such Supplemental Unpermitted Exceptions removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given within five (5) days (the "**Supplemental Response Period**") if, but only if, such Supplemental Unpermitted Exception is reasonably likely to materially interfere with Purchaser's use and occupancy of the Property, to either (i) terminate this Contract (in which event, provided no other event of default is outstanding and/or uncured, the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof), or (ii) accept title to the Property subject to such Supplemental Unpermitted Exceptions without any credit, setoff or abatement therefor.  If Purchaser fails to elect either (i) or (ii) above within the Supplemental Response Period, Purchaser shall be deemed to have elected (ii) above and Purchaser shall remain obligated to

close this transaction in accordance with the terms hereof without any credit, setoff or abatement.  If any such Supplemental Unpermitted Exception if not reasonably likely to materially interfere with Purchaser's use and occupancy of the Property, then Purchaser shall have no right to terminate this Contract and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof without any credit, setoff or abatement.

(f)     **No Obligation of Seller to Remove Exceptions**.    The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer.

## 5.    PRORATIONS AND EXPENSES

(a)     **Prorations.**    The following prorations, except as specifically provided in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date (the "**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)     Taxes.        The Property is exempt from taxes and Seller shall have no tax liability in connection with this Contract or Closing.

(ii)     Miscellaneous.        If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing as of the Proration Date. In the event that accurate prorations and other adjustments cannot be made at Closing because current bills are not available or the amount to be adjusted is not yet ascertainable, the Parties shall prorate on the best available information. All prorations shall be final.

(b)     **Closing-related Costs.**  At Closing, Purchaser shall pay (i) the cost of the Closing Escrow; (ii) the cost of the Owner's Title Policy (including both standard and any extended coverage) and any endorsements to the Title Policy and the costs of any Updated Survey; (iii) the amount of any stamp or transfer tax or other similar fees and amounts imposed by any municipality and any county ordinance, and the state in which the Property is located (the "**State**"); (iv) any costs related to any inspections by any municipality and repairs necessitated by any municipal, county and/or State inspections ("**Repairs**"), if any, and shall meet any other requirements as established by any municipal, county and/or State ordinance with regard to the transfer of real estate; (v) all financing related fees relating to any Purchaser financing; and (vi) all recording charges for the Deed and all documents pertaining to any Purchaser financing. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable by the

Purchaser at Closing. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.  **ENVIRONMENTAL ESCROW RELEASE**

Seller, William Staffieri and Jeffery Abbott (as escrow agent) are parties to that certain Escrow Agreement, dated December 7, 2020, relating to certain environmental conditions at the Real Property (the "**Environmental Escrow Agreement**").  Pursuant to the terms of the letter from William Staffieri attached hereto as **Exhibit "E"**, upon the Closing, all funds remaining in the escrow created pursuant to the Environmental Escrow Agreement shall be distributed to Purchaser.

PURCHASER HEREBY RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE WILLIAM STAFFIERI OR JEFFERY ABBOTT, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORSEEN OR UNFORSEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO THE CONDITION OF THE REAL PROPERTY.

7.  **CONDITIONS TO CLOSING**

(a)  **Conditions to Seller's Obligation to Close.** In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to sell the Property to Purchaser is subject to each and all of the following conditions precedent (or express written waiver thereof by Seller):

(i)  All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)  All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(b)  **Conditions to Purchaser's Obligation to Close**.  In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent (or express written waiver thereof by Purchaser):

(i)  All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)  All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

    (c)    **Conditions to Closing of Both Parties**:  In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

    (i)    The sale shall be authorized by and subject to that certain Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

    (ii)    Seller, a debtor in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court (the "**Chapter 11 Case**") shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property (the "**Sale Notice Period**").  Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property. In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property.

8.    **CLOSING**

    (a)    **Closing Date**. Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of Land Services within ten (10) business days after the filing of the Sale Notice or, in the event a timely objection to the Sale Notice is interposed, within ten (10) business days after entry of a final order from the Bankruptcy Court overruling the objection and specifically approving the sale of the Property (the "**Final Sale Order**"), or such later date as reasonably requested by Seller (the "**Closing Date**"), but in no event shall the Closing Date be later than sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from the withdrawal of such objection or entry of the Final Sale Order (the "**Outside Date**").  If Closing does not occur by the Outside Date, the Parties shall have the rights set forth in <u>Section 13(a)(i)</u> hereof.

    (b)    **Seller Closing Deliverables**. On or before the Closing Date, Seller shall deliver or use commercially reasonable efforts to cause to be delivered to Land Services the following Closing documents:

    (i)    A Special Warranty Deed (or its State equivalent) executed in proper form for recording so as to convey the title required by this Contract (the "**Deed**")

to Purchaser, subject to the Permitted Title Exceptions, in the form attached hereto as **Exhibit "D"**;

(ii)    A Lease Termination, in the form attached hereto as **Exhibit "F"** (the "**Lease Termination**") duly executed by Seller;

(iii)    A FIRPTA Affidavit in customary form duly executed by Seller;

(iv)    A file-stamped copy of the Approval Order; and

(v)    An Owner's Affidavit of Title executed by Seller, in the form attached hereto as **Exhibit "B"** (or such other form as reasonably approved by Seller).

(c)    **Purchaser Closing Deliverables** No later than 11:00 am Chicago time on the Closing Date, Purchaser shall deliver or cause to be delivered to Land Services the following for Closing:

(i)    The full amount of the Purchase Price, as adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account and deliver to Escrow Agent instructions to immediately release the full amount to Seller;

(ii)    Lease Termination, duly executed by Purchaser; and

(iii)    Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the City, County and State.

(d)    On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered a closing proration statement and State, county and municipal transfer tax declarations, in each case duly approved by Seller and Purchaser, which approval by both parties shall not be unreasonably withheld or conditioned, and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

## 9.    CLOSING ESCROW

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**Closing Escrow**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control.  All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely

and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

## 10.    DUE DILIGENCE

(a)    **Due Diligence Materials**.    Purchaser acknowledges that, prior to the Effective Date, Seller has provided Purchaser with electronic access to the "Potential Purchaser Diligence Documents" in Seller's electronic online data room for the Property (as the same may be updated from time-to-time) which, to Seller's current actual knowledge, may (but shall not be obligated to) contain the following documents, and such electronic access to the "Potential Purchaser Diligence Documents" as provided herein shall be deemed to satisfy any and all notice requirements as set forth in <u>Section 14</u> hereof:

(i)    Current tax assessment statements and copies of the most recent tax bills for the Property;

(ii)    A copy of the most recent survey affecting the Property; and

(iii)    A copy of the most recent environmental report, if any.

(b)    **Seller's Service Contracts**. All of Seller's service contracts on the Property are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property to be released from such service contracts on or prior to the Closing Date.

In the event this Contract is terminated, all materials provided by or on behalf of Seller to Purchaser (the "**Due Diligence Materials**") shall be promptly returned by Purchaser to Seller at no cost to Seller. EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING (i) THE TRUTH, ACCURACY OR COMPLETENESS OF ANY OF THE DUE DILIGENCE MATERIALS, (ii) THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME, (iii) ANY DATA OR INFORMATION DELIVERED BY SELLER OR THE SOURCES THEREOF, (iv) WHETHER ANY OF THE DUE DILIGENCE MATERIALS REPRESENT ALL OF THE NECESSARY OR RELEVANT INFORMATION RELATING TO THE PROPERTY, OR (v) THE ENFORCEABILITY OR VALIDITY OF ANY OF THE DUE DILIGENCE MATERIALS. PURCHASER ACKNOWLEDGES AND AGREES THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT, THE DUE DILIGENCE MATERIALS ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF THE DUE DILIGENCE MATERIALS SHALL BE AT THE SOLE RISK OF PURCHASER AND WITHOUT ANY REPRESENTATIONS, WARRANTIES,

OR GUARANTIES OF SELLER, AND PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH DUE DILIGENCE MATERIALS. NEITHER SELLER, NOR ANY AFFILIATE OF SELLER ("**Seller's Affiliates**"), NOR THE PERSON OR ENTITY WHICH PREPARED ANY OF THE DUE DILIGENCE MATERIALS SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY, OR OMISSION, IN ANY OF THE DUE DILIGENCE MATERIALS. THE FAILURE TO DELIVER ANY REPORT, FINDINGS, RESULTS, FACTS, INFORMATION, OR DUE DILIGENCE MATERIALS SHALL NOT BE ACTIONABLE BY PURCHASER AND SELLER SHALL HAVE NO LIABILITY IN CONNECTION THEREWITH. PURCHASER ACKNOWLEDGES THAT THE DUE DILIGENCE MATERIALS PROVIDED BY SELLER MAY NOT NECESSARILY REPRESENT ALL OF THE DOCUMENTATION AND INFORMATION IN EXISTENCE (OR IN SELLER'S POSSESSION OR CONTROL) WITH RESPECT TO THE PROPERTY, BUT, RATHER, REPRESENTS DOCUMENTATION MADE AVAILABLE BY SELLER AS A CONVENIENCE FOR PURCHASER. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS MAY HAVE BEEN OBTAINED BY SELLER FROM A VARIETY OF SOURCES, AND THAT SELLER HAS NOT MADE (AND IS UNDER NO DUTY TO MAKE) ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF ANY DUE DILIGENCE MATERIALS. EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT, PURCHASER WAIVES, RELEASES AND FORFEITS ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER AGAINST SELLER OR THIRD PARTIES ARISING OUT OF PURCHASER'S USE OF THE DUE DILIGENCE MATERIALS. AS USED HEREIN, (1) "**AFFILIATE(S)**" SHALL MEAN, WITH RESPECT TO ANY PERSON (AS DEFINED BELOW), ANY OTHER PERSON THAT, DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLS OR IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH, SUCH PERSON, AND THE TERM "CONTROL" (INCLUDING THE TERMS "CONTROLLED BY" AND "UNDER COMMON CONTROL WITH") MEANS THE POSSESSION, DIRECTLY OR INDIRECTLY, OF THE POWER TO DIRECT OR CAUSE THE DIRECTION OF THE MANAGEMENT AND POLICIES OF SUCH PERSON, WHETHER THROUGH OWNERSHIP OF VOTING SECURITIES, BY CONTRACT OR OTHERWISE; AND (2) "**PERSON**" SHALL MEAN, ANY INDIVIDUAL, CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY, JOINT VENTURE, ASSOCIATION, JOINT-STOCK COMPANY, TRUST, UNINCORPORATED ORGANIZATION, OR OTHER ENTITY. THIS SECTION 9 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT.

**11.**    **REPRESENTATIONS AND WARRANTIES**

(a)    **Seller Representations**.    Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)    Subject to <u>Section 6(c)</u> of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to <u>Section 6(c)</u> of this Contract.

(ii)    To Seller's actual knowledge, and except as may be reflected in the Title Commitment, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except as set forth on **Exhibit "C"**.

(iii)    As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of William Gallagher of M-III Partners, and shall not be construed to refer to the knowledge of any other person, including, without limitation, managers, members, officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b)    **Purchaser Representations.** Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)    Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii)    Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii)    This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)     As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the United States Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)      Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 10 shall merge with the transfer of title and shall not survive Closing. If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown.

12.     **AS IS/NO WARRANTIES**

(a)      **As-Is Condition.**        Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to all aspects of the Property without warranty or representation of any kind by Seller or any of Seller's managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), successors and assigns ( the "**Indemnified Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Materials. As used in this Contract, the term "**Hazardous Material(s)**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any federal, state or local law, statute, ordinance or regulation. Purchaser, hereby agrees to release Seller and the Indemnified Parties with regard to any demand, claim, liability, loss or damage incurred by Purchaser including reasonable

attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was directly caused by the affirmative acts of Seller, its employees, agents or contractors from and after the Effective Date) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source.

(b)     **No Warranties, Representations**.  Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller.  Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price.  Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Section 10 of this Contract:

(i)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)   Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.  Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)    **WAIVER/RELEASE OF PURCHASER CLAIMS**.    WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 11(a) AND 11(b), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND THE INDEMNIFIED PARTIES, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORSEEN OR UNFORSEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)    **No Representations as to Condition/Full Investigation**.  Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any of the Indemnified Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof.  The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto.  Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

13.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section.  At

Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

14.    **DEFAULT AND REMEDIES**

    (a)    **Termination Events:**

        (i)    Termination by Either Party:  Notwithstanding anything to the contrary set forth herein, this Contract may be terminated by either Party if Closing does not occur by the Outside Date as contemplated in Section 7(a) of this Contract, provided, however, that the right to terminate this Contract pursuant to this Section 13(a) shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in Closing failing to occur.

        (ii)    Termination by Purchaser.  If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of written notice of such default from Purchaser (excluding any default by Purchaser and Purchaser's failure to diligently complete or cure the same), Purchaser shall have as its sole and exclusive remedy the right to terminate the Contract, and the Contract shall be terminated and of no further force or effect except as provided for in this Contract.

        (iii)    Termination by Seller.  If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default from Seller (excluding any default by Seller of Seller's failure to diligently complete or cure the same), and Seller's sole remedy shall be to terminate this Contract, and this Contract shall terminate with neither Party having any further rights or liabilities hereunder, except as those specifically provided to survive the termination of this Contract; provided, however, that this Section 13(a)(iii) shall not limit Seller's claims pursuant to any of Purchaser's indemnification obligations in this Contract.

15.    **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

    **To Seller:**        M-III Partners, LP
                              1700 Broadway
                              19th Floor
                              New York, New York 10019
                              Attn: William Gallagher

Email: wgallagher@miiipartners.com

| | |
|---|---|
| **With copies to:** | **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn:  W. Michael Bond, Esq.<br>Phone: (212) 310-8035<br>E-mail: Michael.Bond@weil.com |
| **To Purchaser:** | **3820 N 2nd Street KOZ LLC**<br>c/o Prologis, Inc.<br>1800 Wazee Street, Suite 500<br>Denver, Colorado  80202<br>Attn:  Christianne Chen, Esq.<br>Phone:  (415) 733-9413 E-mail:<br>cchristi@prologis.com |
| **With copies to:** | **3820 N 2nd Street KOZ LLC**<br>c/o Prologis, Inc.<br>1800 Wazee Street, Suite 500<br>Denver, Colorado  80202<br>Attn:  Legal Department |

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 14.

## 16.    ENTIRE CONTRACT, AMENDMENTS AND WAIVERS

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

## 17.    FURTHER ASSURANCES

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

## 18.    SURVIVAL AND BENEFIT

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing.  Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and

obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

19.    **CONFIDENTIALITY**

Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that (i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date, (ii) all terms of this Contract and any and all drafts of this Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Due Diligence Materials (as defined above) and any other electronic files and other documents in Seller's electronic online data room, and (iv) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is strictly confidential, shall remain confidential and shall not be disclosed to any Person by Purchaser or the Purchaser Entities without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, including, but not limited to, any federal, state and/or local governmental entity, except that (i) Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the Confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this <u>Section 18,</u> and (ii) following Closing, Purchaser may (without disclosure to Seller nor Seller's consent) disclose any and all information to applicable governmental authorities in connection with any environmental investigation or remediation or close-out of any remediation concerning the Property. Without limiting the foregoing, Purchaser agrees and acknowledges that prior to Closing, no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser, the Purchaser Entities, or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser, the Purchaser Entities, or the Permitted Parties. If Purchaser, the Purchaser Entities, or the Permitted Parties breach (or threaten the breach of) the terms of this <u>Section 18</u>, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Contract by any of the Purchaser Entities or Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this <u>Section 18</u>, in addition to all other rights and remedies available at law or in equity. Notwithstanding the foregoing, the Parties agree that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser, the Purchaser Entities, or the Permitted Parties, (2) becomes available to

Purchaser, the Purchaser Entities, or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information. Purchaser acknowledges that Seller may file this Contract and any related matters with the Bankruptcy Court and thus make this Contract publicly available. The terms of this <u>Section 18</u> shall survive termination of this Contract.

**20.    <u>INTENTIONALLY DELTED.</u>**

**21.    <u>ASSIGNMENT</u>**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser has sole ownership interest provided that (i) written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing and (ii) any such assignee executes an assumption of this Contract, if requested by and in form and substance reasonably acceptable to Seller. No transfer or assignment by Purchaser shall relieve Purchaser of its obligations hereunder. No such transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

**22.    <u>NO THIRD PARTY BENEFITS</u>**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns and, except for any of the Indemnified Parties, no third party is intended to or shall have any rights hereunder. This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

**23.    <u>LITIGATION COSTS</u>**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "<u>**Action**</u>"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court. The term "prevailing party" as used in this <u>Section 22</u> includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it), or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled. In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to

enforce a judgment in such Action. It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

**24.    SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

**25.    RESERVED**

**26.    COUNTERPARTS**

This Contract may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Contract by signing any such counterpart delivery of an executed signature page of this Contract by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

**27.    SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of Section 20 of this Contract.

**28.    NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract. Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract.

**29.    TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed. The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.

30.    **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

31.    **RESERVED**

32.    **CONDEMNATION AND CASUALTY**

(a)    In the event of any taking of, or if notice is given of the intention to take, by the exercise of the power of eminent domain, all or a substantial portion of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation.  If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller.  If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned (A) all interest of Seller in and to any insurance proceeds actually received by Seller (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date) or (B) condemnation awards payable to Seller on account of that event, in the case of both (A) and (B), less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price.  A portion of the Real Property will be deemed "substantial," for purposes of this Section 31 to the extent the taking of such portion would materially impair or otherwise materially affect Purchaser's intended use of the Real Property.

(b)    If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof ("**Casualty Notice**").  After delivery of the Casualty Notice, if Seller reasonably estimates the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00), Seller or Purchaser may elect, within five (5) business days of delivery of the Casualty Notice (and if the Closing is scheduled within such five (5) business day period, the Closing shall be extended for up to five (5) business days), to terminate this Contract by written notice to such other Party, in which event, the Parties shall have no further obligation hereunder, except for any terms, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof.

33.    **SECTION HEADINGS**

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

34.    **INTERPRETATION**

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

35.    **GOVERNING LAW, JURISDICTION & VENUE**

This Contract will be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles thereof.   EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS CONTRACT.   SHOULD THE BANKRUPTCY COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO HAVE JURISDICTION OVER A MATTER RELATING TO THIS CONTRACT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF NEW YORK OR THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY, NEW YORK.   Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in <u>Section 14</u> of this Contract shall be effective service of process for any suit or proceeding in connection with this Contract.

36.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto.  However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

37.    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

38.    **PATRIOT ACT**

Seller certifies that its name is **INNOVEL SOLUTIONS, INC.** a Delaware corporation, and Seller is not (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.  Purchaser

certifies that its name is **3820 N 2nd STREET KOZ LLC**, a Delaware limited liability company, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

39.    **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages.   The provisions of this Section 39 shall survive the expiration of the term or any earlier termination of this Contract.

40.    **PRESS RELEASES**

Neither Purchaser nor any of Purchaser's Affiliates shall make any press release or other public announcement concerning the transaction(s) contemplated by this Contract without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. If Purchaser desires to make a press release or other public announcement respecting this Contract or the transaction(s) contemplated hereby, Purchaser shall wait at least five (5) business days after the Closing (the "**No Public Announcement Period**"), and after the expiration of the No Public Announcement Period, shall provide Seller with a draft of the press release or other public announcement for review at least ten (10) business days prior to the time that such press release or other public announcement is to be made. The Parties will attempt in good faith to expeditiously reach agreement on such press release or other public announcement and the contents thereof. Seller's failure to provide comments back to Purchaser within ten (10) business days of receipt of the draft release or announcement will be deemed consent to the public disclosure of such press release or other public announcement and the content thereof. Purchaser shall be liable for the compliance of its respective Affiliates with the terms of this Section 40. Notwithstanding anything to the contrary herein, any press release or other public announcement shall not reveal any Confidential Information and otherwise be in accordance with Section  18 hereof. This Section 40 shall survive the Closing.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**INNOVEL SOLUTIONS, INC.,**
a Delaware corporation

By: _____
Name: William Gallagher
Its: Authorized Signatory

**PURCHASER:**

**3820 N 2nd STREET KOZ LLC,**
a Delaware limited liability company

By: _____
Name: _____
Its: _____

## EXHIBITS

Exhibit "A":    Legal Description
Exhibit "B":    Owner's Affidavit of Title
Exhibit "C":    Leases, tenancies and licenses
Exhibit "D":    Form of Deed
Exhibit "E":    Staffieri Escrow Instruction Letter
Exhibit "F":    Form of Lease Termination

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**INNOVEL SOLUTIONS, INC.**,
a Delaware corporation

By:_____
Name: William Gallagher
Its: Authorized Signatory

**PURCHASER:**

**3820 N 2nd STREET KOZ LLC**,
a Delaware limited liability company

By:_____
Name:____Megan Robert_____
Its:_____Senior Vice President_____

**EXHIBITS**

Exhibit "A":    Legal Description
Exhibit "B":    Owner's Affidavit of Title
Exhibit "C":    Leases, tenancies and licenses
Exhibit "D":    Form of Deed
Exhibit "E":    Staffieri Escrow Instruction Letter
Exhibit "F":    Form of Lease Termination

# EXHIBIT "A"

## LEGAL DESCRIPTION OF PROPERTY

ALL THAT CERTAIN interior lot or piece of ground with the buildings and improvements thereon erected, situate in the 7th Ward of the City of Philadelphia, and described according to a Plan of Property, made by James E. Shomper, Surveyor and Regulator of the Sixth Survey District, dated December 13, 1994, filed BB100.

BEGINNING at an interior point located the following (2) courses and distances from a point formed by the intersection of the Northerly side of Erie Avenue (120' wide) and the Westerly side of 2nd Street (variable width); (1) N. 11° 08' 30" E., along the Westerly side of said 2nd Street, the distance of 947.039' to a point on the Southeasterly corner of Easement 4Z, as shown on the aforementioned Plan of Property; (2) N. 81° 41' 10" W., along the Southerly side of said Easement 4Z, the distance of 201.764' to the true point of beginning; thence extending from said point of beginning S. 42° 17' 55" E., the distance of 34.983' to a point; thence extending S. 38° 01' 00" E., the distance of 59.335' to a point; thence extending S.11° 08' 30" W., the distance of 52.708' to a point; thence extending N. 53° 03' 25" W., the distance of 109.627' to a point; thence extending N. 60° 48' 42" W., the distance of 104.666' to a point; thence extending N. 12°18' 02" W., the distance of 27.771' to a point on the Southerly side of said Easement 4Z; thence extending S. 81° 41' 10" E., along the southerly side of said Easement 4Z, the distance of 136.441' to the first mentioned point and place of beginning.

CONTAINING in area 11,210 square feet, 0.257346 acres, more or less.

## EXHIBIT "B"

## OWNER'S AFFIDAVIT OF TITLE

[See attached]

# Title Affidavit

dated as of ____/_____/21

Re:     **Insured:**
        **Title Insurer:**
        Land Services USA, Inc.
        **Master #:**

        **Commitment #:**
        **Premises:**
        as legally described in the Commitments

**Certifications:**

The undersigned owner of the Premises hereby certifies that to the best knowledge of the undersigned (as to its respective estate and/or interest in the Premises):

**Mechanics Liens:**

All labor, services or materials rendered or furnished within the last six months in connection with the Premises or with the construction or repair of any building or improvements on the Premises have been paid for in full or will be paid in full.

**Tenants/Parties in Possession:**

There are no tenants or other parties who are in possession or have the right to be in possession of said Premises other than tenants listed on Exhibit A hereto.

**Bankruptcy:**

A proceeding in bankruptcy has been instituted by or against the undersigned (or its constituent entities) which is now pending in the Bankruptcy Court for the Southern District of New York under Docket No. 18-23538.

**Gap Indemnification:**

Between the most recent Effective Date of the Commitment (or any bring down thereof) and the date of recording of the Insured Instrument(s) but in no event later than sixty (60) days from the date hereof (hereinafter, the "Gap Period"), the undersigned has not taken and will not take any action to encumber or otherwise affect title to the Premises.  In the event of any lien, encumbrance or other matter affecting title to the Premises in the Gap Period arising as a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof.  The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

**Municipal Assessments:**

That there are no unpaid or delinquent water and/or sewer bills for the Property nor are there any delinquent real estate taxes or assessments against the Property; that the Owner has not received notice, nor knows of any recent or future planned improvements (such as street paving, sewers, sidewalks, etc.) that will or might result in a special assessment against the Property.

**Counterparts:**

This document may be executed in counterparts.

- see annexed signature page -

WEIL:\97979679\7\73217.0004

**Signatory/Signatories to Title Affidavit:**


By:     _____
         Name:
         Title:
         Solely in his/her capacity as _____ of the _____ and not individually


Subscribed and sworn to on ____/_____/21


_____
Notary Public

**Exhibit A to Title Affidavit**

Lease dated December 19, 1994 by and between Innovel Solutions, Inc., as successor in interest to Sears Logistics Services, Inc., as landlord, and Philly 3800 LLC, as successor in interest to William D. Stafieri, as tenant.

## EXHIBIT "C"

## Leases, Tenancies and Licenses

Lease dated December 19, 1994 by and between Innovel Solutions, Inc., as successor in interest to Sears Logistics Services, Inc., as landlord, and Philly 3800 LLC, as successor in interest to William D. Stafieri, as tenant.

## EXHIBIT "D"

<u>Record and Return to</u>:

3820 N 2nd Street KOZ LLC
c/o Prologis, L.P.
1800 Wazee Street, Suite 500
Denver, CO 80202
Attn: Gayle Orman, Real Estate Paralegal

### DEED

**THIS INDENTURE**, Made the _____ day of _____, 2021.

**BETWEEN**

(i)      3820 N 2nd LLC, a Delaware limited liability company (hereinafter "3820 N 2nd LLC"), and

(ii)     INNOVEL SOLUTIONS, INC., a Delaware corporation (Sears Logistics Services, Inc. changed its name to Innovel Solutions, Inc., a Delaware corporation, by Certificate of Amendment dated July 22, 2014 and filed with the State of Delaware Secretary of State, Division of Corporations on July 23, 2014 (SRV 140989709-0370030 File) (hereinafter "Innovel"); (i) and (ii) being collectively, of the first part, and

3820 N 2nd Street KOZ LLC, a Delaware limited liability company (hereinafter the "Grantee") of the second part,

**WITNESSETH,** that 3820 N 2nd LLC and Innovel (each a "Grantor" and collectively, the "Grantors"), for and in consideration of the sum of **FIFTEEN MILLION AND 00/100 DOLLARS PAID** to the Grantors by the Grantee, receipt of which is hereby acknowledged, does grant, bargain, sell and convey to the said Grantee, its successors and assigns,

(i)      all of 3820 N 2nd LLC's right, title and interest in and to the following property:

***ALL*** that certain lot or piece of ground situate in the 7th Ward of the City of Philadelphia, County of Philadelphia and Commonwealth of Pennsylvania, and bounded and described as more fully set forth on <u>Exhibit A</u> attached hereto (the "3820 N 2nd LLC Property").

**BEING** the same premises which Pike Street, LLC and William D. Staffieri, by Deed dated November 7, 2018, and recorded November 14, 2013, in the City of Philadelphia, County of Philadelphia as Document ID: 53442034, granted and conveyed unto 3820 N 2nd LLC in fee;

and

(ii)     all of Innovel's right, title and interest in and to the following property:

**ALL** that certain lot or piece of ground situate in the 7th Ward of the City of Philadelphia, County of Philadelphia and Commonwealth of Pennsylvania, and bounded and described as more fully set forth on Exhibit B (the "Innovel Property") attached hereto (the "INNOVEL Property").

**BEING** part of the same premises which Sears. Roebuck and Co., a New York corporation, by Deed dated May 7, 1985 and recorded July 26, 1985 in Deed Book FHS 209, Page 518, conveyed unto Terminal Freight Handling Company, a Delaware corporation, in fee, and the said Terminal Freight Handling Company has since changed its name to SLS, Inc., Sears Logistics Services, Inc. and is now known as INNOVEL SOLUTIONS, INC.

**TAX PARCEL NOS.**      88-5-0922-40
                       87-4-2000-00
                       88-5-2000-00
                       88-4-0385-10

**HAVING AN ADDRESS** of 3770 Rear N. 2nd Street, 3750 N. 2nd Street, 3800 N. 2nd Street; 3800 R-60 N. 2nd Street (aka 3820 N. 2nd Street), Philadelphia, PA.

**UNDER AND SUBJECT ONLY**, nevertheless to any matter of record, including, (i) the Permitted Exceptions as to the 3820 N 2nd LLC Property set forth on **Exhibit C**, attached hereto and made a part hereof and (ii) the Permitted Exceptions as to the Innovel Property set forth on **Exhibit D**, attached hereto and made a part hereof.

**TOGETHER** with all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in any wise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of (i) 3820 N 2nd LLC as to the 3820 N 2nd LLC Property and (ii) INNOVEL as to the INNOVEL Property, as well at law as in equity, of, in, and to the same.

**TO HAVE AND TO HOLD** the said lot or piece of ground above described, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, subject to the matters set forth herein, unto the said Grantee, its successors and assigns, to and for the only proper use and behoof of the said Grantee, its successors and assigns forever.

**UNDER AND SUBJECT**, nevertheless, as aforesaid.

**AND EACH GRANTOR,** for itself, its successors and assigns, does covenant, promise and agree, to and with the said Grantee, its successors and assigns, by these presents, that each Grantor, as to its respective property, and its successors and assigns, do, all and singular the hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances, unto the said Grantee, its successors and assigns, against either Grantor, as to its respective property, and its respective successors and assigns, and against all and every person and persons whomsoever lawfully claiming or to claim the same or any part thereof, by, from or under each Grantor, as to its respective property, but not otherwise, shall and will, **WARRANT AND FOREVER DEFEND**, subject as aforesaid.

[Remainder of page intentionally blank; signature page follows]

**IN WITNESS WHEREOF:**

The undersigneds, by its respective duly elected officers and pursuant to proper authority, has each duly executed, acknowledged and delivered this instrument as of the day and year first above written.

**GRANTORS:**

3820 N 2ND LLC
a Delaware limited liability company

_____          _____
Witness                                                        Name:
                                                                      Title:


_____
Witness




COMMONWEALTH OF PENNSYLVANIA
CITY/COUNTY OF _____

On this _____ day of May, 2021, before me, the undersigned officer, personally appeared _____, who is the _____ of 3820 N 2nd LLC, who acknowledged himself to be the _____ of 3820 N 2nd LLC, and that he as such being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability company by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My Commission Expires: _____

[NOTARIAL SEAL]

INNOVEL SOLUTIONS, INC.
a Delaware corporation

_____

Witness

_____
Name:
Title:

_____

Witness

STATE/COMMONWEALTH OF _____
CITY/COUNTY OF _____

On this \_\_\_\_ day of _____, 2021, before me, the undersigned officer, personally appeared _____, who is the _____ of INNOVEL SOLUTIONS, INC.   Who acknowledged himself to be the _____ of INNOVEL SOLUTIONS, INC., and that he as such being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My Commission Expires: _____

[NOTARIAL SEAL]

**The address of the above-named Grantee:**

3820 N 2nd Street KOZ LLC
c/o Prologis, L.P.
1800 Wazee Street, Suite 500
Denver, CO  80202
Attn: Gayle Orman, Real Estate Paralegal

**EXHIBIT A**
[3820 N 2nd LLC Property]

**PREMISES "A"**

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements erected thereon, situate in the 7th Ward of the City of Philadelphia, and described in accordance with a Survey made by Bruce E. Lewis, P.L.S. for Newlines Engineering & Survey, Project No. 18197A, Dated August 14, 2018, as follows:

BEGINNING at a point on the Northerly side of Erie Avenue (120' wide), at the distance of 712.354' Westwardly from the Westerly side of 2nd Street (70' wide);

THENCE extending North 78 degrees 39 minutes 00 seconds West, along the said Northerly side of Erie Avenue, the distance of 67.161' to a point;

THENCE extending North 11 degrees 21 minutes 00 seconds East, the distance of 10.146' to a point of curvature;

THENCE extending along the arc of a circle curving to the right, having a radius of 750.583' and a central angle of 17 degrees 47 minutes 35 seconds and the arc length of 233.090' to a point;

THENCE extending North 58 degrees 09 minutes 30 seconds East, the distance of 51.115' to a point;

THENCE extending North 78 degrees 10 minutes 30 seconds West, the distance of 18.582' to a point;

THENCE extending North 58 degrees 20 minutes 00 seconds East, the distance of 237.848' to a point of curvature;

THENCE extending along the arc of a circle curving to the left, having a radius of 2,905.940' and a central angle of 8 degrees 22 minutes 48.3 seconds and the arc length of 425.023' to a point of compound curvature;

THENCE extending along the arc of a circle curving to the left, having a radius of 777.923' and a central angle of 5 degrees 43 minutes 12 seconds and the arc length of 77.662' to a point on a curve;

THENCE extending South 44 degrees 13 minutes 59.7 seconds West, the distance of 61.698' to a point of curvature;

THENCE extending along the arc of a circle curving to the left, having a radius of 498.901' and a central angle of 17 degrees 36 minutes 12.3 seconds and the arc length of 153.274' to a point of tangency;

THENCE extending North 27 degrees 34 minutes 56 seconds West, the distance of 5.272' to a point;

THENCE extending South 50 degrees 35 minutes 45 seconds West, the distance of 120.323' to a point;

THENCE extending South 55 degrees 11 minutes 31 seconds West, the distance of 323.771' to a point;

THENCE extending South 21 degrees 23 minutes 15 seconds West, the distance of 20.000' to a point;

THENCE extending South 11 degrees 21 minutes 00 seconds West, the distance of 2.823' to a point;

THENCE extending South 54 degrees 34 minutes 21 seconds West, the distance of 268.010' to a point;

THENCE extending South 35 degrees 57 minutes 15 seconds West, the distance of 37.052' to a point on the said Northerly side of Erie Avenue, being the first mentioned point and place of beginning.

BEING known as 3770 North 2nd Street - Rear.

BEING Parcel #88-5-0922-40.

**PREMISES "B"**

ALL THAT CERTAIN lot or parcel of ground.

SITUATE in the 7th Ward of the City of Philadelphia, Commonwealth of Pennsylvania, bounded and described according to a survey made by Bruce E. Lewis, P.L.S. for Newlines Engineering & Survey, Project No. 18197A, Dated August 14, 2018 as follows to wit:

BEGINNING at a point on the Westerly side of North 2nd Street (70 feet wide on City Plan, legally open) at the distance of 399.029 feet Northwardly from the Northerly side of Erie Avenue (120 feet wide, legally open);

THENCE extending North 78 degrees 39 minutes 00 seconds West the distance of 160.247 feet to a point on a curve;

THENCE extending Northeastwardly on the arc of a circle curving to the right having a radius of 438.901 feet and extending the arc length of 352.783 feet to a point of reverse curve;

THENCE extending Northeastwardly on the arc of a circle curving to the left having a radius of 498.901 feet and extending the arc length of 99.521 feet to a point on the Northerly side of said Second Street;

THENCE extending along the Westerly (erroneously referred to as Northerly in prior deed) side of said North 2nd Street South 11 degrees 08 minutes 30 seconds West the distance of 409.565 feet to the first mentioned point and place of beginning.

BEING known as 3750 North 2nd Street.

BEING Parcel #87-4-2000-00.

**PREMISES "C"**

ALL THAT CERTAIN lot or parcel of ground.

SITUATE in the 7th Ward of the City of Philadelphia, Commonwealth of Pennsylvania, bounded and described according to a survey made by Bruce E. Lewis, P.L.S. for Newlines Engineering & Survey, Project No. 18197A, dated August 14, 2018 as follows to wit:

BEGINNING at a point on the Westerly (erroneously referred to as Northerly in prior deed) side of North 2nd Street (70 feet wide on City Plan, legally open) at the distance of 808.594 feet Northwardly from the Northerly side of West Erie Avenue (120 feet wide, legally open);

THENCE extending North 11 degrees 08 minutes 30 seconds East along the Northerly side of said North 2nd Street and crossing the head of the bed of a certain 25 feet wide easement that extends Northwestwardly the distance of 163.475 feet to a point on the Northerly side of said easement;

THENCE extending North 81 degrees 41 minutes 10 seconds West along the Northerly side of said easement, the distance of 12.964 feet to a point;

THENCE extending Southwestwardly and partly recrossing said easement, on the arc of a circle curving to the right having a radius of 777.923 feet and extending the arc length of 227.275 feet to a point on curve (POC);

THENCE extending South 44 degrees 13 minutes 59.7 seconds West the distance of 61.698 feet to a point of curve;

THENCE extending on the arc of a circle curving to the left, having a radius of 498.901 feet and extending the arc length of 153.274 feet to a point of tangent;

THENCE extending North 27 degrees 34 minutes 56 seconds West the distance of 5.272 feet to a point;

THENCE extending South 50 degrees 35 minutes 45 seconds West the distance of 120.323 feet to an angle point;

THENCE extending South 55 degrees 11 minutes 31 seconds West the distance of 119.234 feet to a point;

THENCE extending South 78 degrees 39 minutes 00 seconds East the distance of 206.529 feet to a point on a curve;

THENCE extending Northeastwardly on the arc of a circle curving to the right having a radius of 438.901 feet and extending the arc length of 352.783 feet to a point of reverse curve;

THENCE extending Northeastwardly on the arc of a circle curving to the left having a radius of 498.901 feet and extending the arc length of 99.521 feet to a point on the Northerly side of said Second Street, being the first mentioned point and place of beginning.

BEING known as 3800 North 2nd Street.

BEING Parcel #88-5-20000-00.

**PREMISES "D"**

**TRACT 1**

ALL THAT CERTAIN tract or parcel of land together with buildings and improvements thereon, situate in the 7th Ward of the City of Philadelphia, County of Philadelphia, Commonwealth of Pennsylvania, bounded and described in accordance with a Survey made by Bruce E. Lewis, P.L.S. for Newlines Engineering & Survey, Project No. 18197A, Dated August 14, 2018.

BEGINNING at an interior point located the following two courses and distances from a point formed by the intersection of the Westerly side of 2nd Street (variable width) and the Northerly side of Erie Avenue (120 feet, 0 inches wide): (1) North 78 degrees 39 minutes 00 seconds West along the Northerly side of the said Erie Avenue, the distance of 825.707 feet to a point; (2) North 11 degrees 21 minutes 00 seconds East

**Error! Unknown document property name.**

(and at right angles to the said Erie Avenue), the distance of 230.164 feet to the point of beginning; thence extending North 11 degrees 49 minutes 45 seconds East the distance of 1,096.997 feet to a point; thence extending South 78 degrees 10 minutes 45 seconds East the distance of 254.406 feet to a point; thence extending South 7 degrees 55 minutes 43 seconds East the distance of 190.215 feet to a point; thence extending South 11 degrees 49 minutes 45 seconds West partially along the Westerly side of Easement "4Z" as shown on the aforementioned survey plan, the distance of 812.516 feet to a point; thence extending South 58 degrees 20 minutes 00 seconds West the distance of 153.254 feet to a point; thence extending North 78 degrees 10 minutes 30 seconds West the distance of 207.535 feet to the first mentioned point and place of beginning.

## TRACT 2 (EASEMENT):

TOGETHER with and subject to the use of Easement No. 1 (shown as "4Z" on the aforementioned survey).

BEGINNING at a point on the Westerly side of 2nd Street (variable width) at the distance of 947.030 feet Northwardly from the Northerly side of Erie Avenue (120 feet wide); thence extending North 81 degrees 41 minutes 10 seconds West and crossing over the bed of a 30 feet wide railroad easement, the distance of 498.470 feet to a point; thence extending North 11 degrees 49 minutes 45 seconds East the distance of 219.745 feet to a point; thence extending South 15 degrees 14 minutes 51 seconds East the distance of 78.641 feet to a point; thence extending South 11 degrees 49 minutes 45 seconds West the distance of 50.172 feet to a point of curve; thence extending Southwestwardly along an arc curving to the left having a radius of 68 feet, sub-tending a central angle of 93 degrees 30 minutes 55 seconds an arc distance of 110.986 feet to a point of tangent; thence extending South 81 degrees 41 minutes 10 seconds East and partially crossing the Northerly head of said 30 feet wide railroad easement the distance of 390 feet to a point on the Westerly side of the said 2nd Street; thence extending South 11 degrees 08 minutes 30 seconds West along the Westerly side of the said 2nd Street, the distance of 25.030 feet to the first mentioned point and place of beginning.

## TRACT 3 (EASEMENT):

TOGETHER with and subject to the use of Easement No. 2 (shown as a 30 foot wide easement for railroad purposes over and across Parcel No. 2) on the aforementioned survey.

BEGINNING at an interior point located the following two courses and distances from a point of intersection formed by the Westerly side of 2nd Street (variable width) and the Northerly side of Erie Avenue (120 feet wide): (1) North 11 degrees 08 minutes 30 seconds East along the Westerly side of said 2nd Street and crossing the head of a 25 foot wide easement designated "4Z" on the aforementioned survey the distance of 972.069 feet to a point on the Northerly side of said Easement "4Z"; (2) North 81 degrees 41 minutes 10 seconds West along the Northerly side of said Easement "4Z", the distance of 349.202 feet to the point of beginning; thence extending Southwardly along an arc curving to the right having a radius of 475 feet, sub-tending a central angle of 26 degrees 24 minutes 41 seconds an arc distance of 218.960 feet to a point of compound curve; thence extending Southwestwardly along an arc curving to the right having a radius of 1,211.570 feet sub-tending a central angle of 5 degrees 36 minutes 52 seconds an arc distance of 118.723 feet to a point of compound curve; thence extending Southwestwardly along an arc curving to the right having a radius of 390 feet sub-tending a central angle of 15 degrees 55 minutes 12 seconds an arc distance of 108.365 feet to a point on an arc; thence extending Southwestwardly along an arc curving to the right having a radius of 2,905.940 feet sub-tending a central angle of 01 degrees 50 minutes 46 seconds an arc distance of 93.630 feet to a point; thence extending Northeastwardly along an arc curving to the left having a radius of 360 feet, sub-tending a central angle of 29 degrees 30 minutes 49 seconds an arc distance of 185.439 feet to a point of compound curve; thence extending Northwardly along an arc curving to the left having a radius of 1,181.570 feet, sub-tending a central angle of 5 degrees 36 minutes 52 seconds an

arc distance of 115.783 feet to a point of compound curve; thence extending Northeastwardly along an arc curving to the left having a radius of 445 feet, sub-tending a central angle of 28 degrees 18 minutes 31 seconds an arc distance of 219.865 feet to a point on the Northerly side of said Easement "4Z"; thence extending South 81 degrees 41 minutes 10 seconds East and also partially along the Northerly side of said Easement "4Z", the distance of 33.641 feet to the first mentioned point and place of beginning.

## TRACT 4 (EASEMENT):

TOGETHER with (1) the right and privilege in common with Grantor, its successors and assigns, for a permanent and perpetual easement for ingress, egress and regress for vehicles and pedestrians over and across that portion of an existing driveway situate on the Westerly side of 2nd Street as shown in Deed to Sears, Roebuck and Co., recorded in Deed Book EFP 796 page 372.

## PREMISES "E"

## TRACT 1

AND ALSO ALL THAT CERTAIN tract or parcel of land together with buildings and improvements thereon, Situate in the 7th Ward of the City of Philadelphia, County of Philadelphia, Commonwealth of Pennsylvania, bounded and described in accordance with a Survey made by Bruce E. Lewis, P.L.S. for Newlines Engineering & Survey, Project No. 18197A, Dated August 14, 2018.

BEGINNING at an interior point located the following two courses and distances from a point formed by the intersection of the Northerly side of Erie Avenue (120 feet wide) and the Westerly side of 2nd Street (variable width): (1) North 11 degrees 08 minutes 30 seconds East along the Westerly side of said 2nd Street and crossing the head of Easement "4Z" as shown on the aforementioned plan of property, the distance of 972.069 feet to a point on the Northeasterly corner of Easement "4Z"; (2) North 81 degrees 41 minutes 10 seconds West along the Northerly side of said Easement "4Z" the distance of 12.964 feet to the true point of beginning; thence extending from said point of beginning, Southwestwardly along an arc curving to the right having a radius of 777.923 feet (sub-tending a central angle of 22 degrees 27 minutes 33.2 seconds and crossing said Easement "4Z"), the arc distance of 304.937 feet to a point of compound curve; thence extending Southwestwardly along an arc curving to the right having a radius of 2,905.940 (sub-tending a central angle of 8 degrees 22 minutes 48.3 seconds and crossing the Southerly head of a 30 feet wide railroad easement) the arc distance of 425.023 feet to a point of tangent; thence extending South 58 degrees 20 minutes 00 seconds West the distance of 84.594 feet to a point; thence extending North 11 degrees 49 minutes 45 seconds East partially along the Westerly side of said Easement "4Z" the distance of 807.401 feet to a point; thence extending South 15 degrees 14 minutes 51 seconds East along the Northeasterly side of said Easement "4Z" the distance of 78.641 feet to a point; thence extending South 11 degrees 49 minutes 45 seconds West along the Easterly side of said Easement "4Z" the distance of 50.172 feet to a point of curve; thence extending Southwestwardly and Southeastwardly along an arc curving to the left having a radius of 68 feet (sub-tending a central angle of 93 degrees 30 minutes 55 seconds and also being the Northeasterly side of said Easement "4Z"), the arc distance of 110.986 feet to a point of tangent; thence extending South 81 degrees 41 minutes 10 seconds East along the Northerly side of said Easement "4Z" and crossing the head of said 30 feet wide railroad easement, the distance of 187.001 feet to a point; thence extending South 8 degrees 18 minutes 50 seconds West crossing said Easement "4Z", the distance of 25.000 feet to the point of beginning of interior parcel #3; thence extending from said point of beginning of Parcel #3, South 42 degrees 17 minutes 55 seconds East the distance of 34.983 feet to a point; thence extending South 38 degrees 01 minutes 00 seconds East the distance of 59.335 feet to a point; thence extending South 11 degrees 08 minutes 30 seconds West the distance of 52.708 feet to a point; thence extending North 53 degrees 03 minutes 25 seconds West the distance of 109.627 feet to a point; thence extending North 60 degrees 48 minutes 42 seconds West the distance of 104.666 feet to a point; thence extending North 12 degrees 18 minutes 02 seconds West the distance of 27.771 feet to a point on the Southerly side of said

Easement "4Z"; thence extending South 81 degrees 41 minutes 10 seconds East along the Southerly side of said Easement "4Z", the distance of 136.441 feet to a point and place of beginning of parcel #3; thence extending North 8 degrees 18 minutes 50 seconds East, crossing said Easement "4Z" the distance of 25.000 feet to a point; thence extending South 81 degrees 41 minutes 10 seconds East along the Northerly side of said Easement "4Z", the distance of 190.035 feet to the first mentioned point and place of beginning.

**TRACT 2 (EASEMENT):**

TOGETHER with and subject to the use of Easement No. 1 (shown as "4Z" on the aforementioned survey).

BEGINNING at a point on the Westerly side of 2nd Street (variable width) at the distance of 947.030 feet Northwardly from the Northerly side of Erie Avenue (120 feet wide); thence extending North 81 degrees 41 minutes 10 seconds West and crossing over the bed of a 30 feet wide railroad easement, the distance of 498.470 feet to a point; thence extending North 11 degrees 49 minutes 45 seconds East the distance of 219.745 feet to a point; thence extending South 15 degrees 14 minutes 51 seconds East the distance of 78.641 feet to a point; thence extending South 11 degrees 49 minutes 45 seconds West the distance of 50.172 feet to a point of curve; thence extending Southwestwardly along an arc curving to the left having a radius of 68 feet, sub-tending a central angle of 93 degrees 30 minutes 55 seconds an arc distance of 110.986 feet to a point of tangent; thence extending South 81 degrees 41 minutes 10 seconds East and partially crossing the Northerly head of said 30 feet wide railroad easement the distance of 390 feet to a point on the Westerly side of the said 2nd Street; thence extending South 11 degrees 08 minutes 30 seconds West along the Westerly side of the said 2nd Street, the distance of 25.030 feet to the first mentioned point and place of beginning.

**TRACT 3 (EASEMENT):**

TOGETHER with and subject to the use of Easement No. 2 (shown as a 30 foot wide easement for railroad purposes over and across Parcel No. 2) on the aforementioned survey.

BEGINNING at an interior point located the following two courses and distances from a point of intersection formed by the Westerly side of 2nd Street (variable width) and the Northerly side of Erie Avenue (120 feet wide): (1) North 11 degrees 08 minutes 30 seconds East along the Westerly side of said 2nd Street and crossing the head of a 25 foot wide easement designated "4Z" on the aforementioned survey the distance of 972.069 feet to a point on the Northerly side of said Easement "4Z"; (2) North 81 degrees 41 minutes 10 seconds West along the Northerly side of said Easement "4Z", the distance of 349.202 feet to the point of beginning; thence extending Southwardly along an arc curving to the right having a radius of 475 feet, sub-tending a central angle of 26 degrees 24 minutes 41 seconds an arc distance of 218.960 feet to a point of compound curve; thence extending Southwestwardly along an arc curving to the right having a radius of 1,211.570 feet sub-tending a central angle of 5 degrees 36 minutes 52 seconds an arc distance of 118.723 feet to a point of compound curve; thence extending Southwestwardly along an arc curving to the right having a radius of 390 feet sub-tending a central angle of 15 degrees 55 minutes 12 seconds an arc distance of 108.365 feet to a point on an arc; thence extending Southwestwardly along an arc curving to the right having a radius of 2,905.940 feet sub-tending a central angle of 01 degrees 50 minutes 46 seconds an arc distance of 93.630 feet to a point; thence extending Northeastwardly along an arc curving to the left having a radius of 360 feet, sub-tending a central angle of 29 degrees 30 minutes 49 seconds an arc distance of 185.439 feet to a point of compound curve; thence extending Northwardly along an arc curving to the left having a radius of 1,181.570 feet, sub-tending a central angle of 5 degrees 36 minutes 52 seconds an arc distance of 115.783 feet to a point of compound curve; thence extending Northeastwardly along an arc curving to the left having a radius of 445 feet, sub-tending a central angle of 28 degrees 18 minutes 31

seconds an arc distance of 219.865 feet to a point on the Northerly side of said Easement "4Z"; thence extending South 81 degrees 41 minutes 10 seconds East and also partially along the Northerly side of said Easement "4Z", the distance of 33.641 feet to the first mentioned point and place of beginning.

**TRACT 4 (EASEMENT):**

TOGETHER with (1) the right and privilege in common with Grantor, its successors and assigns, for a permanent and perpetual easement for ingress, egress and regress for vehicles and pedestrians over and across that portion of an existing driveway situate on the Westerly side of 2nd Street as shown in Deed to Sears, Roebuck and Co., recorded in Deed Book EFP 796 page 372.

Premises "D" and "E" being known as 3800R-60 North 2nd Street (a/k/a 3820 North 2nd Street).

Premises "D" and "E" being Parcel #88-4-0385-10.

## EXHIBIT B
[INNOVEL Property]

ALL THAT CERTAIN interior lot or piece of ground with the buildings and improvements thereon erected, situate in the 7th Ward of the City of Philadelphia, and described according to a Plan of Property, made by James E. Shomper, Surveyor and Regulator of the Sixth Survey District, dated December 13, 1994, filed BB100.

BEGINNING at an interior point located the following (2) courses and distances from a point formed by the intersection of the Northerly side of Erie Avenue (120' wide) and the Westerly side of 2nd Street (variable width): (1) N. 11º 08' 30" E., along the Westerly side of said 2nd Street, the distance of 947.039' to a point on the Southeasterly corner of Easement 4Z, as shown on the aforementioned Plan of Property; (2) N. 81º 41' 10" W., along the Southerly side of said Easement 4Z, the distance of 201.764' to the true point of beginning; thence extending from said point of beginning S. 42º 17' 55" E., the distance of 34.983' to a point; thence extending S. 38º 01' 00" E., the distance of 59.335' to a point; thence extending S.11º 08' 30" W., the distance of 52.708' to a point; thence extending N. 53º 03' 25" W., the distance of 109.627' to a point; thence extending N. 60° 48' 42" W., the distance of 104.666' to a point; thence extending N. 12°18' 02" W., the distance of 27.771' to a point on the Southerly side of said Easement 4Z; thence extending S. 81º 41' 10" E., along the southerly side of said Easement 4Z, the distance of 136.441' to the first mentioned point and place of beginning.

CONTAINING in area 11,210 square feet, 0.257346 acres, more or less.

Being Parcel #88-4-0385-10 (Part of)

## EXHIBIT C
[3820 N 2nd LLC Permitted Exceptions]

1.    Possible tax increase based on additional assessments, not yet due and payable. City and county real estate taxes and school taxes for the year 2022, not yet due and payable.

2.    Restrictions affecting title as in Deed Book ADB 18 page 268 and Deed Book GWC 107 page 339. (Affects Premises "A", "D" and "E")

3.    Easement as in Deed Book FHS 710 page 322.  (Affects Premises "B")

4.    Covenants, conditions and restrictions as in Document No. 52322235. (Affects Premises "A")

5.    Grant of Easement from Pike Street, LLC to NAYA, LLC dated 8/30/2016 and recorded 9/2/2016 as Document No. 53106775. (Affects Premises "A")

6.    Operations and Maintenance Agreement for Stormwater Management Practices by and between William Staffieri and Pike Street, LLC and the City of Philadelphia, acting through the Water Department, dated 4/5/2018 and recorded 5/2/2018 as Document No. (Affects Premises "A" and "B")

7.    Restrictions affecting title as in Deed Book GGP 574 page 515, Deed Book FTW 173 page 112, Deed Book ADB 18 page 268, Deed Book GWC 107 page 339. (Affects Premises "C")

8.    Conditions and easements as in Deed Book FHS 972 page 259. (Affects Premises "A")

9.    Covenants and conditions as in Deed from Consolidated Rail Corporation to The North Pennsylvania Railroad Company and Andrew L. Lewis, Jr. and Joseph L. Castle, Trustees of the Property of Reading Company, debtor, recorded in Deed Book EFP 74 page 129. (Affects      Premises "C", "D" and "E")

10.    Covenants, conditions and reservations as in Deed from Reading Real Estate Company to Sears, Roebuck and Co. recorded in Deed Book EFP 796 page 372. (Affects Premises "D" and "E")

11.    Deed of Easement by 3820 N 2nd, LLC and Commonwealth of Pennsylvania, Department of Transportation dated 7/2/2019 and recorded 7/9/2019 in Document 53535530. (Affects Premises "A")

12.    Rights granted Verizon Pennsylvania LLC dated 10/8/2019 and recorded 11/13/2019 in Document 53591898. (Affects Premises "D" and "E")

13.    Rights granted Verizon Pennsylvania LLC dated 10/8/2019 and recorded 11/14/2019 in Document 53592035. (Affects Premises "D" and "E")

**EXHIBIT D**
[INNOVEL Property Permitted Exceptions]

1.      Restrictions affecting title as in Deed Book ADB 18 page 268, Deed Book GWC 109 page 205 and  Deed Book GWC 107 page 339.

2.      Easement of pipes and manholes running across property.

3.      Terms, conditions, easements and possible effects of Deed from North Pennsylvania Railroad Company to Consolidated Rail Corporation dated 3/29/1976 and recorded 5/11/1979 in Deed Book DCC 1948 page 195.

4.      Covenants and conditions as in Deed from Consolidated Rail Corporation to The North Pennsylvania Railroad Company and Andrew L. Lewis, Jr. and Joseph L. Castle, Trustees of the Property of Reading Company, debtor, recorded in Deed Book EFP 74 page 129.

5.      Covenants, conditions and reservations as in Deed from Reading Real Estate Company to Sears, Roebuck and Co. recorded in Deed Book EFP 796 page 372.

6.      Terms and conditions of lease dated 1/1/1971, a Memorandum thereof between Reading Company and Eastern Real Estate Company, Lessor, and Sears, Roebuck and Co., Lessee, dated  1/2/1971 and recorded in Deed Book PLMcS 225 page 272.

7.      Premises is an interior lot having no frontage on any legally opened road, lane, street or avenue, ingress and regress thereto is insured to Second Street, over and along Easement 4-Z as shown on Plan of Property made by Joseph Stefanco, Surveyor and Regulator, Sixth Survey District, April 18, 1983.

8.      Deed of Easement by 3820 N 2nd, LLC and Commonwealth of Pennsylvania, Department of Transportation dated 7/2/2019 and recorded 7/9/2019 in Document ID #53535530.

9.      Right of way granted to Verizon Pennsylvania LLC dated 10/8/2019 and recorded 11/13/2019 in  Document ID #53591898.

10.     Right of way granted to Verizon Pennsylvania LLC dated 10/8/2019 and recorded 11/14/2019 in  Document ID #53592035.

DEED

3820 N 2nd LLC
and
INNOVEL SOLUTIONS, INC.

-to-

3820 N 2nd Street KOZ LLC

Premises:

3770 Rear N. 2nd Street, 3750 N. 2nd Street, 3800 N.
2nd Street; 3800 R-60 N. 2nd Street (aka 3820 N. 2nd
Street), Philadelphia, PA

WEIL:\97979679\7\73217.0004

<u>EXHIBIT "E"</u>

**STAFFIERI ESCROW INSTRUCTION LETTER**

<u>**RELEASE AND INDEMNITY AGREEMENT**</u>

This Release and Indemnity Agreement ("Agreement") is entered into this _____ day of _____, 2021 between **Innovel Solutions, Inc.** ("Innovel"), **William D. Staffieri** ("Staffieri"), **3820 N. 2nd** LLC, ("3820"), **3820 N. 2nd Street KOZ LLC** ("KOZ"), **Philly 3800, LLC** ("Philly") and **Jeffrey R. Abbott** ("Abbott").

WHEREAS, Staffieri as "Buyer" and Sears Logistic Services, Inc. as "Seller" entered into an Agreement of Sale on May 31, 1994 to purchase and sell 3820 N. 2nd Street, Philadelphia, PA ("Property"); and

WHEREAS, the parcel of land known as the Northeast Parking Parcel was exempted from the sale, however, the obligation to remediate soil contamination on that parcel was retained by Seller; and

WHEREAS, Staffieri, as "Tenant", and Sears Logistics Services, Inc., as "Landlord", entered into that certain Northeast Parking Parcel Lease dated December 19, 1994 (the "Lease") until such time as the soil contamination was remediated to standards of regulating acceptance (as determined by the Pennsylvania Department of Environmental Resources – "PADER") at which point Seller was to convey the parcel to Buyer; and

WHEREAS, Staffieri as "Buyer" and Sears Logistics Services, Inc. as "Seller" entered into an Escrow Agreement dated December 20, 1994 with Congress Abstract Corporation as escrow agent; and

WHEREAS, Sears Logistics Services, Inc. changed its name to Innovel Solutions, Inc., a Delaware Corporation, by Certificate of Amendment dated July 22, 2014 and filed with the State of Delaware, Secretary of State, Division of Corporations on July 23, 2014 (SRV 140989709 – 0370030 File), and

WHEREAS the 1994 Escrow Agreement was terminated on or about December 7, 2020 and $103,383.00 was retained in a New Escrow Agreement ("New Escrow") with Abbott acting as escrow agent; and

WHEREAS, pursuant to that certain Contract of Sale dated August 14, 2018 by and between Staffieri and 3820, Staffieri sold the Property to 3820; and

WHEREAS, Staffieri and Philly (as Designee of 3820) entered into an Assignment and Assumption Agreement dated November 6, 2018 and Innovel has now consented to that assignment; and

WHEREAS, Philly entered into an Assignment and Assumption Agreement dated June ___, 2021 transferring all of Philly's right, title, interest and obligations to KOZ and Innovel has consented to that assignment; and

WHEREAS, Innovel has entered into a Real Estate Sales contract dated June ___, 2021 with KOZ to transfer the Northeast Parkway Parcel in accordance with the Lease subject to the New Escrow to KOZ; and

WHEREAS, Innovel, KOZ, 3820, and Philly wish to release, hold harmless and/or indemnify Staffieri and Abbott in consideration for the release of the New Escrow.

NOW THEREFORE, the parties agree as follows:

1.      Abbott, as escrow agent, received $103,383.00 on December 24, 2020 and immediately paid GAC Associates $2,525.00 in accordance with the terms of the New Escrow. With the execution of this Agreement Abbott shall immediately pay the following:

| | | |
|---|---|---|
| a. | GAC Associates | $ 1,300.00 |
| b. | Vertex | $ 1,413.75 |
| c. | Staffieri | $ 2,500.00 |
| d. | KOZ | $95,644.25 plus any remaining funds |

2.      Upon receipt of the payments listed above the New Escrow shall terminate.

3.      KOZ shall take full responsibility for the release of the New Escrow funds as well as any and all obligations and liabilities related to the Northeast Parking Parcel remediation.

4.      **Innovel, KOZ, 3820 and Philly, and their respective successors and assigns absolutely and irrevocably release Staffieri and Abbott, their successors, heirs and assigns (collectively, the "Indemnified Parties"), from any and all claims related to the environmental condition of the Northeast Parking Parcel and the release of the New Escrow and KOZ agrees to indemnify and hold harmless Staffieri and Abbott, from and against any and all claims (including, but not limited to, counsel fees) by third parties (specifically including PADER) related to the remediation of the environmental condition of the Northeast Parking Parcel and the release of the New Escrow, but expressly excluding any claim resulting from actions (including contracts entered into by) or willful misconduct of any Indemnified Parties.**

5.      If any provision of this Agreement is deemed invalid or unenforceable, the balance of this Agreement shall remain in full force and effect.

6.      This Agreement constitutes the entire understanding of the parties as to its subject matter.

7.      The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of that provision or any other provisions of this Agreement.

8.      This Agreement shall be binding upon the successors and assigns of the parties. No assignment or delegation of the obligations in this Agreement will release the assigning party without the prior written consent of the other parties

9.      The signatories hereto represent that they are familiar with the provisions of this Agreement and that they are fully authorized to enter into this Agreement on behalf of and to bind the party for who they are a signatory.  This Agreement may be executed in two or more signature counterparts, each of which shall constitute an original, but all of which, taken together, shall constitute one and the same instrument.

10.     This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

*[SIGNATURE PAGE TO FOLLOW]*

**IN WITNESS THEREOF**, the parties through their authorized representatives have executed this Agreement in counterparts on the dates set forth under their respective signatures attached hereto intending to be legally bound.

Agreed to and accepted:

**Innovel Solutions, Inc,**

by: _____

Date: _____

_____

**William D. Staffieri**

Date: _____

**3820 N. 2nd Street KOZ, LLC**

by: _____

Name: _____

Title: _____

Date: _____

**3820 N. 2nd LLC**

by: _____

**Member**

Date: _____

**Philly 3800, LLC**

by: _____

**Member**

Date: _____

_____

**Jeffrey R. Abbott**

Date: _____

## EXHIBIT "F"

## FORM OF LEASE TERMINATION

LEASE ASSIGNMENT AND TERMINATION AGREEMENT

THIS ASSIGNMENT AND LEASE TERMINATION AGREEMENT ("Agreement") dated _____ ___, 2021 by and between INNOVEL SOLUTIONS, INC., a Delaware corporation ("Landlord") and 3820 N 2ND STREET KOZ LLC, a Delaware limited liability company ("New Tenant").

WHEREAS, William D. Staffieri ("WDS"), as "Tenant" and Sears Logistics Services, Inc., as "Landlord" entered into the certain Northeast Parking Parcel Lease dated December 19, 1994 (the "Lease") to demise certain land known as the "Northeast Parking Parcel" (the "Sears Parcel"); and

WHEREAS, WDS as "Buyer" and Sears Logistics Services, Inc. as "Seller" entered into an Escrow Agreement dated December 20, 1994 with Congress Abstract Corporation as escrow agent succeeded by Chicago Title Insurance Company ("Original Escrow Agreement"), which was replaced by a certain Escrow Agreement, dated December 7, 2020 between WDS, Jeffrey R. Abbot and the Sears Entity (the "2020 Escrow Agreement" and together with the Original Escrow Agreement are collectively referred to as the "Escrow Agreement"); and

WHEREAS, Sear Logistics Services, Inc. changed its name to Innovel Solutions, Inc., a Delaware Corporation, by Certificate of Amendment dated July 22, 2014 and filed with the State of Delaware, Secretary of State, Division of Corporations on July 23, 2014 (SRV 140989709-0370030 File) (hereinafter "Sears Entity"), and

WHEREAS, WDS assigned to Philly 3800 LLC all of its right, title and interest as "Tenant" in the Lease; and

WHEREAS, pursuant hereto, Philly 3800 LLC is assigning  all of its right, title and interest as "Tenant" in the Lease to New Tenant; and

WHEREAS, consistent with the Lease, Landlord is transferring the Sears Parcel to New Tenant; and

NOW, THEREFORE, in consideration of the mutual agreement hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by each of the parties hereto, the parties intending to be legally bound do hereby agree as follows:

1. <u>Lease Termination</u>. Concurrently with the transfer of the Sears Parcel and the release of the escrow funds under the Escrow Agreement to New Tenant, both the Lease and the Escrow Agreement shall be terminated in their entirety.

2. <u>Successors and Assigns</u>.  The terms and conditions of the Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

3. <u>Counterparts</u>.  This Assignment may be executed in several counterparts, each of which shall constitute one and the same instrument.

LANDLORD:

INNOVEL SOLUTIONS, INC.,
a Delaware Corporation, formerly known as
Sear Logistics Services, Inc.


By:_____
Name:
Title:

NEW TENANT:

3820 N 2nd STREET KOZ LLC

By: _____
Name:
Title:


PHILLY 3800 LLC:
PHILLY 3800 LLC

By: _____
Name:
Title: