# EXHIBIT A

BOOK **390** PAGE **124**        BOOK  **66** PAGE **119**

LEASE AGREEMENT, dated as of December 1, 1983 (the Lease), between COLONIAL PROPERTIES LIMITED PARTNERSHIP, a Virginia limited partnership (Lessor), having an address c/o Lawrence Kadish, 666 Old Country Road, Suite 500, Garden City, New York 11530, and K MART CORPORATION, a Michigan corporation (Lessee), having an address at 3100 West Big Beaver Road, Troy, Michigan 48084.

1.  Definitions.  Whenever used in this Lease, the following words and phrases shall have the following meanings:

Addition Note:  As defined in Section 22(a) hereof.

Addition Owner:  As defined in Section 22(a) hereof.

Addition Purchase Price:  As defined in Section 22(a) hereof.

Additional Rent:  As defined in Section 6(b) hereof.

Additional Rental:  As defined in Exhibit C hereto.

Basic Rent:  As defined in Section 6(a) hereof.

Bonds:  As defined in Section 24 hereof.

Casualty:  As defined in Section 14 hereof.

Commencement Date:  As defined in Section 5(a) hereof.

Completion Date:  In the case of the Retail Space, the date on which the basic improvements constituting the Retail Space are substantially completed and available for leasing (provided substantial completion shall not require the installation of interior partitioning, drop ceilings, interior finish work and specialty store fronts) and in the case of the K mart Store, the date on which the K mart Store is substantially completed and ready for fixturing by Lessee, provided in each instance the Completion Date shall be certified to by a certificate signed by a Vice President of Lessee certifying as to the date of substantial completion of the Retail Space or K mart Store as the case may be.

Condemnation:  As defined in Section 14 hereof.

Development Agreement:  That certain Development Agreement between Lessor as owner and Lessee as agent of Lessor for the purpose of constructing the Improvements on behalf of Lessor.

Excluded Personal Property:  Any inventory, trade fixtures, machinery, equipment or other personal property, used or useful in Lessee's business owned by Lessee or third parties, other than permanently attached equipment or machinery constituting real estate fixtures

BOOK **390** PAGE **125**

BOOK **66** PAGE **120**

or such equipment or machinery as is necessary to the operation of the building.

Extended Terms:  As defined in Section 5(b) hereof.

Fair Market Value:  As defined in Section 34 hereof.

Improvements:  All buildings (including the K mart Store and the Retail Space) and other improvements (subject to Section 12(a) with respect to Lessee's Improvements) now or hereafter located on the land described in Exhibit A but excluding the Excluded Personal Property.

Indenture:  The Mortgage and Trust Indenture between the Issuer and the Trustee relating to the Permanent Financing.

Installment Sale Agreement:  The Installment Sale Agreement and Note issued in connection therewith between the Issuer and the Lessor relating to the Permanent Financing.

Interim Term:  As defined in Section 5(a)(ii) hereof.

Issuer:  The Industrial Development Authority of York County, Virginia.

Issuer's Agents:  Any member, director, officer, employee, representative or agent of the Issuer.

K mart Store:  A portion of the Premises constituting the 68,337 square foot retail building plus garden shop to be used initially as a K mart retail department store.

Lease:  This Lease Agreement and all amendments hereof and supplements hereto.

Legal Requirements:    As defined in Section 8(b) hereof.

Lessee's Improvements:  Additional improvements constructed by Lessee which are not in substitution for or replacement of Improvements theretofore constituting property of Lessor.

Permanent Financing:  The installment purchase by the Lessor of the Premises pursuant to the Installment Sale Agreement and the issuance of industrial development revenue bonds by the Issuer to fund the acquisition of the Premises by the Issuer.

Permitted Exceptions:  The matters set forth in Part II of Exhibit A hereto.

Preliminary Term:  As defined in Section 5(a)(i) hereof.

Premises:  The land described in Part I of Exhibit A hereto, the Improvements, and all easements, rights and appurtenances relating thereto.

Primary Term:  As defined in Section 5(a)(iii) hereof.

Purchase Option:  As defined in Section 34.

Purchase Option Date:  As defined in Section 34.

Reserve Fund Payments:  As set forth on Exhibit C.

Retail Space:  A portion of the Premises constituting approximately 44,000 square feet of buildings adjoining the K mart Store to be used initially for general retail sales.

Trustee:  Bank of Virginia Trust Company.

Year:  A twelve (12) month period commencing on the Commencement Date or on an annual anniversary date thereof, as the case may be.

2.   Lease of Premises.  In consideration of the rents and covenants herein stipulated to be paid and performed by Lessee and upon the terms and conditions herein specified, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises.

3.   Title and Condition.  The Premises are leased to Lessee in their present condition without representation or warranty, express or implied, by Lessor and subject to (i) the rights of parties in possession, (ii) Permitted Exceptions, and (iii) all applicable zoning rules, restrictions, regulations, resolutions and ordinances and building restrictions and governmental regulations now or hereafter in effect. Lessee has examined the Premises and title thereto and has found the same satisfactory.  Lessee is renting the Premises "as is" in its present condition and state of repair.  LESSOR MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE CONDITION OF THE PREMISES OR ITS FITNESS OR AVAILABILITY FOR ANY PARTICULAR USE AND LESSOR SHALL NOT BE LIABLE FOR ANY LATENT OR PATENT DEFECT THEREIN.

4.   Use; Quiet Enjoyment.  Lessee may occupy and use the Premises for any lawful purpose.  So long as no default has occurred and is continuing hereunder, Lessor covenants peaceful and quiet enjoyment of the Premises by Lessee; provided that Lessor and its agents may enter upon and examine the Premises at reasonable times after giving reasonable notice.

5.   Terms.   (a) Preliminary, Interim and Primary Terms. Subject to the terms and conditions hereof, Lessee shall have and hold the Premises for:

BOOK 390 PAGE 127    BOOK 66 PAGE 122

(i) a preliminary term (herein called the Preliminary Term) commencing on the date hereof and (a) with respect to the K mart Store ending on the Completion Date for the K mart Store and (b) with respect to the Retail Space ending on the Completion Date for the Retail Space;

(ii) An interim term (herein called the Interim Term) (a) with respect to the K mart Store commencing on the Completion Date for the K mart Store and ending on the Commencement Date which shall be the earlier of (y) the December 1 or June 1 next following the Completion Date for the Retail Space or (z) December 1, 1985, and (b) with respect to the Retail Space commencing on the Completion Date for the Retail Space and ending on the Commencement Date;

(iii) a primary term (herein called the Primary Term) commencing on the Commencement Date and ending on December 1, 2009.

(b) Extended Terms.  Thereafter, subject to the terms and conditions hereof and if and for so long as no event of default shall have occurred hereunder and be continuing, Lessee shall have the right and option to extend this Lease as follows:

(i) For ten (10) consecutive extended terms of five (5) years each (herein called the Extended Terms) unless this Lease shall be sooner terminated pursuant to the terms hereof.  Each Extended Term shall commence on the day immediately succeeding the expiration date of the next preceding term, and shall end at midnight on the day immediately preceding the fifth anniversary of the first day of such term. Lessee may exercise each such option to extend this Lease by giving written notice to Lessor at least one (1) year prior to the end of the then term of this Lease.

(ii) Regardless of the exercise or non-exercise by Lessee of any or all of the foregoing options in Section 5(b)(i) Lessee shall have, unless this Lease shall be sooner terminated pursuant to the terms hereof or unless the last day of the term hereof shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this Lease for such period of time (the "Supplemental Term") as shall cause the last day of the term of this Lease to be January 31 next succeeding the date upon which the term of this Lease would expire but for the exercise of this option.  This option shall be exercised by notice to Lessor given not less than one (1) year prior to the expiration of the then term of this Lease.  Lessee's rental during the Supplemental Term shall be the same rental payable under this Lease during the term immediately preceding the Supplemental Term.

In the case of any of the options set forth in Sections 5(b)(i) and (ii) above, the giving of notice shall automatically extend this Lease for an Extended Term, or a Supplemental Term, as the case may be, and no instrument of renewal need be executed, provided that no Extended Term or Supplemental Term shall take effect unless this Lease

-4-

BOOK **390** PAGE **128**        BOOK **66** PAGE **123**

is in full force and effect immediately prior to the commencement thereof. If Lessee fails to give the required notice, this Lease shall automatically terminate at the end of the then term of this Lease and Lessee shall have no further option to extend this Lease. If Lessee does not exercise any such option in a timely manner, then Lessor shall have the right during the remainder of the term of this Lease to advertise the availability of the Premises for sale or reletting and to erect upon the Premises signs indicating such availability; provided, that such signs do not unreasonably interfere with the use of the Premises by Lessee. The phrase "term of this Lease" or "term hereof" means the Preliminary Term, Interim Term and Primary Term, plus any Extended Terms with respect to which the right to extend has been exercised. Notwithstanding any provision in this Lease to the contrary, if Lessee shall exercise its option for the Supplemental Term during the Primary Term or during any Extended Term, then the Primary Term or such Extended Term, as the case may be, shall be deemed to include the Supplemental Term for all purposes under this Lease.

6. Rent. (a) Basic Rent. Lessee shall pay to Lessor in immediately available funds in lawful money of the United States, at Lessor's address set forth above, or at such other address or to such other person as Lessor from time to time may designate as fixed rent for the Premises (Basic Rent) during the term of this Lease as follows:

(i) during the Preliminary Term no rental shall be payable by Lessee to Lessor with respect to the K mart Store or the Retail Space;

(ii) during the Interim Term (a) with respect to the K mart Store the sum of 55% of the payments due under the Installment Sale Agreement during the Interim Term payable as and when due under the Installment Sale Agreement plus $9.61 per day payable on the first day of the Primary Term and (b) with respect to the Retail Space the sum of 45% of the payments due under the Installment Sale Agreement during the Interim Term payable as and when due under the Installment Sale Agreement plus $7.86 per day payable on the first day of the Primary Term;

(iii) during each Year of the Primary Term, installments of Basic Rent in amounts set forth in Column #1 on Exhibit C hereto payable semi-annually on the dates for payment ("Payment Dates" or individually "Payment Date") of semi-annual installments payable under the Installment Sale Agreement, the first such installment of Basic Rent to be due on the Payment Date which is six (6) months after the Commencement Date and the last of which installments occurs on December 1, 2009, provided, notwithstanding the foregoing, on the date for each payment of Basic Rent the Lessee shall be entitled to withhold as a reserve fund the amount specified as Contributions to Reserve Fund (Column #2) on Exhibit C. The amounts so held in such reserve fund shall be paid to Lessor at such time and in such amounts as are specified as Reserve Fund Payments (Column #4) on Exhibit C. On each Basic

BOOK **390** PAGE **129**    BOOK **66** PAGE **124**

Rent Payment Date the amount of cash payment to the Lessor shall be the amount specified as Cash Payments (Column #5) on Exhibit C.

(iv) during each Year of the Extended Terms, installments in such amounts and payable on such dates as set forth on Exhibit C hereto.

(b) Additional Rent. All amounts which Lessee is required to pay pursuant to this Lease (other than Basic Rent, amounts payable upon purchase of the Premises and amounts payable as liquidated damages pursuant to Section 20), together with every fine, penalty, interest and cost which may be added for non-payment or late payment thereof, and any and all fees and expenses including without limitation all out-of-pocket counsel fees, taxes and other charges payable to the Issuer or to the Trustee or Paying Agent for the bondholders pursuant to the Installment Sale Agreement, Indenture, and the assignment of this Lease to the Trustee or otherwise in connection with the Permanent Financing shall constitute additional rent (Additional Rent). If Lessee shall fail to pay any Additional Rent, Lessor shall have the right to pay the same and shall have all rights, powers and remedies with respect thereto as are provided herein or by law in the case of non-payment of Basic Rent.

(c) Late Payment. If any installment of Basic Rent shall not be paid within five (5) days after its due date, Lessee shall pay to Lessor, on demand, interest at the rate of 1% per annum over the then applicable stated per annum rate of interest on the Lessor's Note on the amount of such installment from the due date thereof until paid. Lessee shall pay to Lessor, on demand, interest at such rate on all overdue Additional Rent paid by Lessor on behalf of Lessee from the date of payment by Lessor until repaid by Lessee. Lessee shall perform all its obligations under this Lease at its sole cost and expense, and shall pay all Basic Rent and Additional Rent when due, without notice or demand.

(d) Accumulated Reserve Fund. Upon any termination of this Lease during the Primary Term for any reason other than a termination arising out of Lessor's bankruptcy where Lessee elects to remain in possession, the Lessee shall pay to Lessor the amount shown on Exhibit C as Accumulated Reserve Fund (Column #3) for the applicable date of termination. The Accumulated Reserve Fund shall be paid by Lessee to Lessor in the following manner: On each date after the termination date on which Basic Rent would have been due and payable to Lessor during the remainder of the Primary Term had not the Lease been terminated Lessee shall pay to Lessor an amount equal to the Accumulated Reserve Fund for the termination date multiplied by a fraction, the numerator of which is the amount specified as the Basic Rent Cash Payments (Column #5) on Exhibit C which would have been payable on the applicable date for payment of Basic Rent and the denominator of which is the sum of all Basic Rent Cash Payments which would otherwise have been payable from the first Basic Rent payment date after the termination date through the end of the Primary Term. The obligation of Lessee to pay Lessor the Accumulated Reserve Fund as provided herein shall survive the

BOOK 390 PAGE 130          BOOK 66 PAGE 125

termination of this Lease, and upon Lessor's request, Lessee will, upon termination of this Lease, execute and deliver written evidence of Lessee's obligation hereunder.

(e) If at any time prior to or during the Primary Term the Bonds are redeemed in part pursuant to the provisions of the last paragraph of Section 301(a) of the Indenture which results in a reduction in the amount of Basic Payments due under Section 5.02(a) of the Installment Sale Agreement, the Basic Rent and Basic Rent Cash Payments due during the Interim Term and Primary Term which correspond by date to the Basic Payments which have been reduced shall also be reduced by a like amount and the Purchase Price set forth in Exhibit B shall be reduced by the amount of the Bonds so redeemed. Lessor and Lessee shall enter into a document setting forth a revised Primary Term Basic Rent Schedule reflecting the reductions in Basic Rent and the reduced Exhibit B Purchase Price.

7.   Net Lease; Non-Terminability.   (a) Net Lease.   This Lease is a net lease and, except as otherwise expressly provided herein, any present or future law to the contrary notwithstanding, shall not termi- nate, nor shall Lessee be entitled to any abatement, reduction, set-off, counterclaim, defense or deduction with respect to any Basic Rent, Addi- tional Rent or other sum payable hereunder, nor shall the obligations of Lessee hereunder be affected, by reason of:  any damage to or destruc- tion of the Premises; any taking of the Premises or any part thereof by condemnation or otherwise; any prohibition, limitation, restriction or prevention of Lessee's use, occupancy or enjoyment of the Premises, or any interference with such use, occupancy or enjoyment by any person; any eviction by paramount title or otherwise; any default by Lessor hereunder or under any other agreement; the impossibility or illegality of performance by Lessor, Lessee or both; any action of any governmental authority; or any other cause whether similar or dissimilar to the foregoing.  It is the intention of the parties hereto that the Basic Rent, Additional Rent and any other sum payable hereunder shall be paid by Lessee as absolutely net sums, without diminution for any reason. The parties intend that the obligations of Lessee hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or termi- nated pursuant to an express provision of this Lease.  Lessee shall have the right, however, by separate and independent action to pursue any claims it may have against Lessor or any assignee or successor of Lessor, subject to Section 42 hereof.

(b) Non-Terminability.  Lessee shall remain obligated under this Lease in accordance with its terms and shall not take any action to terminate, rescind or avoid this Lease, notwithstanding any damage to, or condemnation of, the Premises, or the lawful or unlawful prohibition or interference with the use of the Premises, or any bankruptcy, insol- vency, reorganization, liquidation, dissolution or other proceeding affecting Lessor or any assignee of Lessor or any action with respect to this Lease which may be taken by any trustee, receiver or liquidator or

BOOK **390** PAGE **131**        BOOK **66** PAGE **126**

by any court, or any failure of Lessor to perform its covenants set forth in Section 29 hereof. Lessee waives all rights to terminate or surrender this Lease, or to any set-off, reduction, abatement or deferment of Basic Rent, Additional Rent or other sums payable hereunder, except as otherwise expressly provided herein.

8. <u>Taxes and Assessments; Compliance With Law</u>. (a) Taxes and Assessments. Subject to the terms of Section 19, Lessee shall pay, or cause to be paid, before any fine, penalty, interest or cost may be added for non-payment: (i) all taxes, assessments, levies, fees, water and sewer rents and charges, and all other governmental charges, general and special, ordinary and extraordinary, foreseen and unforeseen, which are, at any time prior to or during the term hereof, imposed or levied upon or assessed against the Premises, Lessee's Improvements or the Excluded Personal Property; (ii) all gross receipts or other taxes imposed or levied upon, assessed against or measured by any Basic Rent, Additional Rent or other sum payable hereunder; (iii) all sales, use, single business and similar taxes at any time levied, assessed or payable on account of the acquisition, leasing or use of the Premises, and (iv) all charges for utilities serving the Premises. Lessee shall not be required to pay any franchise, corporate, estate, inheritance, transfer, value added or single business tax of Lessor or any gross receipts, income, revenue or profits tax of Lessor based on its general income or revenues (other than any tax referred to in clause (ii) or (iii) above) except to the extent, and only to the extent such tax is imposed, levied or assessed in substitution for any other tax, assessment, charge or levy which Lessee is required to pay pursuant to the preceding sentence of this Section 8(a). To the extent Lessee pays any single business tax or any tax which is levied upon or measured in whole or in part by gross receipts or income derived by Lessor from Basic Rent, the amount of such payment may be credited by Lessee to the payment of Basic Rent payable during the Extended Terms, provided that prior to the application of any such credit all sums secured by or payable under the Permanent Financing shall have been paid in full and provided further that the amount which may be credited in any one year shall not exceed the sum of $31,250. Lessee shall be entitled to the benefit of any credit which reduces any tax required hereunder to be paid by Lessee. Lessee will furnish to Lessor, promptly after written demand therefore, proof of payment of all items referred to above which are payable by Lessee. If any such assessment may legally be paid in installments, Lessee may pay such assessment in installments; in such event, Lessee shall be liable only for installments which become due and payable prior to or during the term hereof. Nothing in this Section 8(a) shall require the payment by Lessee of any tax, assessment, charge or levy imposed or levied upon or assessed against any property of Lessor other than the Premises or any income to, or business activity of, Lessor not connected with the Premises.

To the extent Lessee is responsible for the payment of any single business tax or gross receipts tax, Lessor shall prepare at Lessor's expense the required tax return and deliver a copy of same to

BOOK  390  PAGE 132          BOOK  66  PAGE  127

Lessee for approval at least twenty (20) days prior to the due date for
the payment of such tax; provided, however, that pursuant to a written
request of Lessor or its accountants not less than sixty (60) days prior
to the date on which such tax is due, Lessee, not less than forty (40)
days prior to the date on which such tax is due, shall provide Lessor
with any information which is in Lessee's possession or control and
otherwise unavailable to Lessor which is required for completion of such
tax return.  Upon approval of the computation of the tax, Lessee will
pay to Lessor the portion of the tax for which Lessee is responsible
hereunder.  Lessor will furnish to Lessee promptly upon request such
information as may be required by Lessee to verify the accuracy of the
tax return.  Failure of the Lessor to perform any of its obligations
pursuant to this Section 8(a) shall in no way affect Lessee's obliga-
tions pursuant to this Lease, including, without limitation, Lessee's
obligations pursuant to Section 6 hereof.

    (b)  Compliance with Legal Requirements.  Subject to the terms
of Section 19, Lessee shall comply with and cause the Premises to comply
with (i) any law, statute, ordinance, regulation, order, rule, decree or
similar requirement of the United States of America, the Commonwealth of
Virginia or any subdivision thereof applicable to the Premises or the
use thereof, and (ii) all contracts (including insurance policies),
agreements and restrictions (including without limitation the Permitted
Exceptions set forth in Part II of Exhibit A attached hereto) applicable
to the Premises or the ownership, occupancy or use thereof, including
but not limited to all such legal requirements, contracts, agreements
and restrictions which require structural, unforeseen or extraordinary
changes to the Improvements (collectively "Legal Requirements").

    9.  Liens.  Subject to the terms of Section 19, Lessee will
promptly remove and discharge, at its expense, any charge, lien, secur-
ity interest or encumbrance upon the Premises or any Basic Rent,
Additional Rent or other sum payable hereunder which arises for any
reason, including all liens which arise out of the use, occupancy,
construction, repair or rebuilding of the Premises or by reason of labor
or materials furnished or claimed to have been furnished to Lessee or
for the Premises, but not including: (i) the Permitted Exceptions; (ii)
any deed to secure debt, mortgage, charge, lien, security interest or
encumbrance created by Lessor or any successor of Lessor; (iii) ease-
ments granted pursuant to Section 13; (iv) liens for those taxes of
Lessor which Lessee is not required to pay hereunder; (v) liens for
taxes and assessments not yet payable by Lessee pursuant to Section 8(a)
above, and (vi) subleases permitted under Section 18 hereof.

    10.  Indemnification.  Lessee agrees that it will defend,
indemnify and save Lessor, the Issuer, the Trustee, and the Issuer's
Agents harmless from any and all liability, damage, expense, cause of
action, suits, claims, or judgments arising from injury to persons or
property on the Premises, or upon the adjoining streets and sidewalks or
arising from the occupation, use, possession, conduct or management of
the Premises.  Lessee further agrees to defend, indemnify and save

BOOK **390** PAGE **133**        BOOK  **66** PAGE **128**

Lessor, Issuer, Trustee, and Issuer's Agents harmless from any and all liability arising from any failure by Lessee to perform any of the agreements, terms, covenants or conditions of this Lease on Lessee's part to be performed. Nothing herein shall be construed as indemnifying Lessor, Issuer, Trustee, or Issuer's Agents against their own negligence or willful acts.

11. _Maintenance and Repair._ Lessee will, at its expense, maintain the Premises in good repair and condition, except for ordinary wear and tear, and will make all structural and non-structural, interior and exterior, foreseen and unforeseen and ordinary and extraordinary changes, replacements and repairs which may be required to keep the Premises in such good repair and condition, all of which shall be of quality at least equivalent to the original. Lessor shall not be required to maintain, repair or rebuild the Improvements or to maintain the Premises, and Lessee waives the right to make repairs at the expense of Lessor pursuant to any law at any time in effect.

12. _Alterations._ (a) In General. Lessee may, at its expense, make additions to and alterations of the Improvements, construct additional Improvements and make substitutions and replacements for the Improvements, provided that (i) the market value of the Premises shall not be lessened thereby, (ii) such work shall be expeditiously performed and completed in a good and workmanlike manner and in compliance with Sections 8(b) and 9 and all other applicable Legal Requirements, and (iii) no improvements shall be demolished unless Lessee shall have first furnished Lessor with such surety bonds or other security acceptable to Lessor as shall be necessary to assure rebuilding of such Improvements; provided, however, that no such security shall be required so long as Lessee's tangible net worth shall exceed $100,000,000 as determined in accordance with generally accepted accounting principles. All such additions, alterations, additional Improvements, substitutions and replacements shall be and remain part of the realty and the property of Lessor and shall be subject to this Lease; provided, however, that if Lessee's Improvements are constructed on the Premises then, until the expiration or earlier termination of the term of this Lease or such earlier date as Lessor shall reimburse Lessee for the cost of such Lessee's Improvements in accordance with Section 22, (x) title to such Lessee's Improvements shall remain in Lessee and (y) Lessee shall be entitled to all federal and state income tax deductions for depreciation with respect to such Lessee's Improvements. Prior to commencing any work contemplated by this Section 12(a) the cost of which is expected to equal or exceed $1,000,000, Lessee shall give Lessor _notice_ thereof and, upon Lessor's request, provide Lessor with copies of the _plans and_ specifications with respect thereto.

(b) Excluded Personal Property. Subject to compliance with Section 8(b), Lessee may place upon the Premises any Excluded Personal Property and may remove the Excluded Personal Property at any time during the term of this Lease or within 30 days after the expiration or

-10-

earlier termination of such term. Lessee shall repair any damage to the
Premises caused by such removal.

13. <u>Lessor to Grant Easements, Etc</u>. Lessor will, from time
to time, at the request of Lessee and at Lessee's cost and expense, and
Lessor does hereby irrevocably appoint Lessee the attorney-in-fact of
Lessor during the term of this Lease, subject to the proviso contained
in this sentence and the provisions of the succeeding sentence, to (i)
grant easements and other rights in the nature of easements, (ii)
release existing easements or other rights in the nature of easements
which are for the benefit of the Premises, (iii) dedicate or transfer
unimproved portions of the Premises for road, highway or other public
purposes, (iv) execute petitions to have the Premises annexed to any
municipal corporation or utility district, (v) execute amendments to any
covenants and restrictions affecting the Premises, (vi) execute such
instruments as are necessary to subdivide or plat the Premises, and
Lessor will execute and deliver to any person any instrument appropriate
to confirm or effect such grants, releases, dedications and transfers
(to the extent of its interests in the Premises), provided however, that
the rights granted to Lessee pursuant to the provisions of this para-
graph are subject to the prior delivery to Lessor of (x) a certificate
of Lessee signed by the President or any Vice President of Lessee
stating that such grant, release, dedication, transfer, petition or
amendment is not detrimental to the proper conduct of the business of
Lessee on the Premises, the consideration, if any, being paid for such
grant, release, dedication, transfer, petition or amendment, and that
such grant, release, dedication, transfer, petition or amendment does
not materially impair the use of the Premises or materially reduce their
value, (y) duly authorized and binding undertakings of Lessee that it
will remain obligated hereunder to the same extent as if such grant,
release, dedication, transfer, petition or amendment had not been made
(including, without limitation, the obligation to pay all Basic Rent
without reduction or set off), and that Lessee will perform all obliga-
tions of Lessor under such instrument. The consideration, if any,
received by Lessor or Lessee for such grant, release, dedication,
transfer, petition or amendment shall be applied pursuant to Section
14(d), as if such consideration were Net Proceeds from an event of
Condemnation.

14. <u>Condemnation and Casualty</u>. (a) Awards. Lessor shall be
entitled to any award, compensation or insurance payment to which Lessor
or Lessee may become entitled by reason of their interests in the
Premises (i) if the Premises are damaged or destroyed by fire or other
casualty (Casualty) or (ii) if the use, occupancy or title of the
Premises or any part thereof is taken, requisitioned or sold in, by or
on account of any actual or threatened eminent domain proceeding or
other action by any person having the power of eminent domain (Condemna-
tion); provided, however, that if no event of default shall have oc-
curred hereunder and be continuing, Lessor shall pay over to or Lessee
may retain as the case may be such award, compensation or insurance
payment to be applied as provided in accordance with this Section 14;

BOOK **390** PAGE **135**        BOOK  **66** PAGE **130**

provided, however, if an event of default shall have occurred hereunder
which has not been waived, Lessor shall be entitled to retain such
award, compensation or insurance payment. If a Casualty or Condemnation
shall occur at any time during the term of this Lease and the apparent
damage resulting therefrom shall equal or exceed $100,000.00, Lessee
shall give written notice thereof to Lessor and Trustee promptly follow-
ing the occurrence thereof. Lessee is hereby authorized and empowered
in the name and on behalf of Lessor and hereby agrees to appear in any
such proceeding or action, to negotiate, prosecute and adjust any claim
for any award, compensation or insurance payment on account of any such
damage, destruction, taking, requisition or sale, and to collect and
retain in accordance with the terms hereof any such award, compensation
or insurance payment. Lessor shall be entitled to participate in any
such proceeding, action, negotiation, prosecution or adjustment. All
amounts paid in connection with any such damage, destruction, taking,
requisition or sale shall be applied pursuant to this Section 14, and
all such amounts (minus the expense of collecting such amounts) are
herein called the Net Proceeds. Lessee shall take all appropriate
action in connection with each such proceeding, action, negotiation,
prosecution and adjustment and shall pay all expenses thereof, including
the cost of Lessor's (and any Mortgagee's) participation therein
(including their reasonable attorneys' fees and expenses).

        (b)    Condemnation or Damage during Preliminary, Interim or
Primary Term.  If there shall occur during the Preliminary, Interim or
Primary Term: (i) a Condemnation of all of the Premises; or (ii) any
material damage to or destruction of the Premises or a Condemnation of
less than all of the Premises which, in either case, in the good faith
judgment of the Board of Directors of Lessee, as reflected in a certifi-
cate signed by a Vice President or the Treasurer of Lessee, renders
continued occupancy or use of the remainder of the Premises economically
unsound, then Lessee shall, not later than 180 days after such occur-
rence, deliver to Lessor (a) notice of its intention to terminate this
Lease on the next date for payment of semi-annual installments of Basic
Rent pursuant to Section 6(a)(iii) (the Termination Date) which occurs
not less than 210 days after the delivery of such notice and (b) the
certificate referred to above. Such notice shall be accompanied by an
irrevocable offer by Lessee to purchase any remaining portion of the
Premises and the Net Proceeds, if any, payable in connection with such
occurrence (or the right to receive the same when paid, if payment
thereof has not yet been made) on the Termination Date, at a price
determined in accordance with Exhibit B. If Lessor shall reject such
offer by notice given to Lessee not later than the 30th day prior to the
Termination Date, this Lease shall terminate on the Termination Date
except with respect to obligations and liabilities of Lessee hereunder,
actual or contingent, which have arisen on or prior to the Termination
Date, upon payment by Lessee of all Basic Rent, Additional Rent and
other sums then due and payable hereunder to and including the Termina-
tion Date, and the Net Proceeds (or the right to collect and receive the
same when paid, if payment thereof has not yet been made) shall belong
to Lessor. Unless Lessor shall have rejected such offer in accordance

BOOK **390** PAGE **136**        BOOK **66** PAGE **131**

with this paragraph, Lessor shall be conclusively presumed to have accepted such offer, and, on the Termination Date, shall convey the remaining portion of the Premises, if any, to Lessee or its designee and shall assign to Lessee or its designee all its interest in the Net Proceeds, pursuant to and upon compliance with Section 17.

(c)    Condemnation or Damage during Extended Term.    If there shall occur during an Extended Term any material damage to or destruction of the Premises or a Condemnation of all or less than all of the Premises, then Lessee may, not later than 180 days after such occurrence, deliver to Lessor notice of its intention to terminate this Lease on the next date for payment of installments of Basic Rent pursuant to Section 6(a)(iv) (the Termination Date) which occurs not less than 90 days after the delivery of such notice.    This Lease shall terminate on the Termination Date, except with respect to obligations and liabilities of Lessee hereunder, actual or contingent, which have arisen on or prior to the Termination Date, upon payment by Lessee of all Basic Rent, Additional Rent and other sums then due and payable hereunder to and including the Termination Date, and the Net Proceeds (or the right to collect and receive the same when paid, if payment thereof has not yet been made) shall belong to Lessor.

(d)    Restoration.    If, after an occurrence of a Casualty or Condemnation, Lessee is not required to give notice of its intention to terminate this Lease, or if Lessee elects not to give notice of its intention to terminate this Lease pursuant to subpart (b) or (c) of this Section 14, then this Lease shall continue in full effect, and Lessee shall promptly and expeditiously repair any damage to the Premises caused by such event in conformity with the requirements of Section 12 so as to restore the Premises (as nearly as practicable) to the condition and market value thereof immediately prior to such occurrence. Upon completion of the repair or restoration of the Premises, Lessee shall deliver to Lessor (i) a copy of a permanent, unconditional certificate of occupancy for the Premises and (ii) a certificate signed by a Vice President of Lessee certifying to the completion of the repair or restoration of the Premises, the payment of the cost thereof in full, and the amount of such cost.    In the event of a Casualty, if the cost of such repair shall be less than the Net Proceeds, Lessee shall be entitled to retain the balance of such Net Proceeds.    In the event of a Condemnation, if the cost of such repair shall be less than the Net Proceeds, the balance of the Net Proceeds shall, within 30 days after completion of restoration of the Premises and receipt of such balance, be divided between Lessor and Lessee in accordance with the fair market value of the respective interests of Lessor and Lessee which division for these purposes the parties have agreed shall be determined in the following manner:    The Lessor shall be entitled to that portion of the balance of the Net Proceeds as shall equal such balance multiplied by a fraction, the numerator of which is the number of complete Years which have passed from the Commencement Date to the date of the Condemnation and the denominator of which is the number of Years in the Primary Term and any Extended Terms for which the option to extend has been exercised

BOOK 390 PAGE 137      BOOK 66 PAGE 132

prior to the date of the Condemnation; the Lessee shall be entitled to the remainder of such balance. In any such event, Lessee shall remain obligated to pay the full amount of Basic Rent without reduction or set off.

In the event of any temporary requisition, this Lease shall remain in full effect for the remainder of the term hereof and Lessee shall be entitled to receive the entire Net Proceeds payable for the remainder of the term hereof by reason of such requisition, and the Lessor shall receive any proceeds allocable to any period thereafter. In any such event, Lessee shall remain obligated to pay the full amount of Basic Rent without reduction or set off.

If the cost of any repairs required to be made by Lessee pursuant to this Section 14(d) shall exceed the amount of such Net Proceeds, the deficiency shall be paid by Lessee. In any such event, Lessee shall remain obligated to pay the full amount of Basic Rent without reduction or set off.

15. Insurance. (a) Coverage. Lessee will maintain insurance on the Premises of the following character:

(i) Insurance against loss by fire, lightning and other risks from time to time included under "extended coverage" policies, including adequate explosion insurance in respect of steam or pressure boilers and similar apparatus, if any, located on the Premises, in amounts sufficient to prevent Lessor or Lessee from becoming a co-insurer of any partial loss but in any event in amounts not less than 80% of the actual replacement value of the Improvements (exclusive of foundations, excavations and Lessee's Improvements).

(ii) Comprehensive general public liability insurance against claims for bodily injury, death or property damage occurring on, in or about the Premises and adjoining streets and sidewalks, in the minimum amounts of $1,000,000 for bodily injury or death to any one person, $3,000,000 for any one accident, and $1,000,000 for property damage.

(iii) Workers' compensation insurance to the extent required by the law of the State in which the Premises are located and to the extent necessary to protect Lessor and the Premises against workers' compensation claims.

(iv) At any time when Improvements or Lessee's Improvements are being constructed, altered or replaced, builder's risk insurance (in completed

-14-

BOOK 390 PAGE 138          BOOK 66 PAGE 133

value non-reporting form) in an amount not less than
the actual replacement value of the Improvements,
exclusive of foundations and excavations.

(v)  Flood insurance in an amount equal to the
actual replacement value (as defined in clause (i)
above) of the Premises or the maximum amount
available, whichever is less, if the area in which
the Premises is located has been designated by the
Secretary of Housing and Urban Development as having
special flood hazards, and if flood insurance is
available under the National Flood Insurance Act.

Such insurance shall be written by companies of nationally recognized
financial standing legally qualified to issue such insurance and shall
name as insured parties Lessor and Lessee as their interests may appear.

In the event that Lessee shall give Lessor notice of its
intention to terminate this Lease in accordance with the provisions of
Section 14(b) or Section 14(c) hereinabove, the actual replacement value
and amount of physical depreciation of the Improvements shall be deter-
mined by an independent appraiser promptly selected and paid for by
Lessee and acceptable to Lessor who shall determine (i) the replacement
cost based on then current construction costs and (ii) the amount of
physical depreciation.

(b)  Loss Payable.  Every such policy (other than any general
public liability or workers' compensation policy) shall bear a first
mortgagee endorsement in favor of the Trustee under the Indenture; and
the proceeds payable by reason of any loss under any such policy shall
be payable to the Trustee to be held and applied pursuant to Section
14(d); provided, however, that if and for so long as (i) no event of
default hereunder shall have occurred and be continuing, (ii) Lessee
maintains a tangible net worth, determined in accordance with generally
accepted accounting principles, of at least $100,000,000, and (iii)
Lessee elects to restore the Premises, the proceeds payable by reason of
any such loss shall be payable to Lessee.  Every policy referred to in
Section 15(a) shall provide that it will not be cancelled except after
10 days written notice to Lessor and the Trustee and that it shall not
be invalidated by any act or neglect of Lessor or Lessee, nor by occu-
pancy of the Premises for purposes more hazardous than permitted by such
policy, nor by any foreclosure or other proceedings relating to the
Premises, nor by change in title to the Premises.

(c)  Evidence of Insurance.  Lessee shall deliver to the
Trustee original or duplicate policies or certificates of insurance,
satisfactory to the Trustee, evidencing the existence of all insurance
which is required to be maintained by Lessee hereunder, such delivery to
be made (i) promptly after the execution and delivery hereof and (ii)
not less than 30 days prior to the expiration of any such insurance.
Lessee shall not obtain or carry separate insurance concurrent in form

BOOK 390 PAGE 139

BOOK 66 PAGE 134

or contributing in the event of loss with that required by this Section 15 unless Lessor is a named insured therein, with loss payable as provided herein. Lessee shall immediately notify Lessor whenever any such separate insurance is obtained and shall deliver to the Trustee the policies or certificates evidencing the same. Any insurance required hereunder may be provided under blanket policies which comply with the provisions of this Lease and specify the coverage and amounts thereof with respect to the Premises. Copies of all policies and certificates of insurance delivered to Trustee hereunder shall be delivered at the same time to Lessor.

(d) Premium Refunds. There shall be no apportionment of premiums with respect to insurance maintained hereunder at the expiration or termination of this Lease; Lessee may cancel any such policies as of (i) 10 days following the date of termination of this Lease pursuant to Section 20(b) hereof or (ii) the date of any other termination or expiration of this Lease, and obtain any premium refunds incident thereto. Lessee shall be entitled to any premium refund or dividend received by Lessor or Lessee on account of any insurance maintained by Lessee hereunder.

(e) Self-Insurance. Anything contained in this Section 15 to the contrary notwithstanding, any and all insurance which Lessee is obligated to carry pursuant to Section 15(a) may be carried pursuant to a prudent self-insurance program so long as Lessee maintains a tangible net worth, determined in accordance with generally accepted accounting principles, of at least $100,000,000, provided that no event of default hereunder shall have occurred and be continuing. If the Premises shall be damaged or destroyed in a single casualty and Lessee shall be required to make an offer to purchase the Premises pursuant to Section 14(b) and such offer shall be rejected by Lessor pursuant to said Section 14(b), or if the Lease shall terminate pursuant to Section 14(c), Lessee shall pay to Lessor an amount equivalent to the Net Proceeds [as defined in Section 14(a)] which would exist or be payable with respect to such casualty if the insurance specified in Section 15(a) were being carried. Neither the maintenance of insurance or self-insurance for the risks specified in Sections 15(a)(ii) and (iii) nor the delivery of the proceeds thereof to Lessor shall diminish the obligations of Lessee with respect to such risks pursuant to Section 10 above.

16. Uneconomic Use. If the Premises shall have become uneconomic or unsuitable for continued use in Lessee's business as a retail department store and Lessee has discontinued use thereof or decided to discontinue use thereof, then Lessee may, on or after ten (10) years from the Commencement Date, give notice to Lessor of its intention to terminate this Lease on any date for payment of semi-annual installments of Basic Rent (the Termination Date) during the Primary Term specified in such notice which occurs not less than 210 days after the giving of such notice. Such notice shall include (i) an irrevocable offer by Lessee to purchase the Premises on the Termination Date at a

BOOK **390** PAGE **140**    BOOK **66** PAGE **135**

price determined in accordance with Exhibit B, (ii) a certificate of
Lessee signed by a Vice President or Treasurer of Lessee that its board
of directors has determined that the Premises are uneconomic or unsuit-
able for continued use in Lessee's business and (iii) an agreement of
Lessee that Lessee has discontinued use thereof or will discontinue use
thereof within 12 months following the delivery of such notice.    If
Lessor shall reject such offer by notice given to Lessee not later than
the 30th day prior to the Termination Date this Lease shall terminate on
the Termination Date, except with respect to obligations and liabilities
of Lessee hereunder, actual or contingent, which have arisen on or prior
to the Termination Date, upon payment by Lessee of all Basic Rent,
Additional Rent and other sums then due and payable hereunder to and
including the Termination Date.    Unless Lessor shall have rejected such
offer in accordance with this paragraph, Lessor shall be conclusively
presumed to have accepted such offer, and, on the Termination Date,
Lessor shall convey the Premises to Lessee or its designee pursuant to
and upon compliance with Section 17.

17. Procedure Upon Purchase. (a) Title Conveyed. If Lessee
shall purchase the Premises pursuant to this Lease, Lessor need not
convey any better title thereto than existed on the date of the com-
mencement of the term hereof, and Lessee or its designee shall accept
such title, subject, however, to all charges, liens, security interests
and encumbrances on the Premises (including without limitation those
created or caused to be created by Lessee) and all applicable legal
requirements, but free of the lien of the Indenture and Installment Sale
Agreement and charges, liens, security interests and encumbrances
created by or resulting from acts of Lessor or any successor of Lessor
without the written consent of Lessee.

(b) Payment of Purchase Price; Costs. Upon the date fixed
for any purchase of the Premises hereunder, Lessee or its designee shall
pay to Lessor the purchase price therefor specified herein together with
all Basic Rent, Additional Rent and other sums then due and payable
hereunder to and including such date of purchase, and Lessor shall
deliver to Lessee or its designee an appropriate deed to the Premises
with covenants against grantor's acts and any other instruments neces-
sary to assign any other property then required to be assigned by Lessor
pursuant hereto. Lessee or its designee may pay the purchase price in
cash or in immediately available funds or, in whole or in part, by
assuming and agreeing to pay the Installment Sale Agreement in
accordance with its terms; provided, however, that in the event such
purchase is made pursuant to Section 14 or Section 37 hereof, such
purchase price may be paid in cash only. In the event Lessee shall
elect to assume and agree to pay the Installment Sale Agreement, Lessee
shall designate a designee other than Lessee to assume and pay
Installment Sale Agreement and to take title to the Premises and such
designee shall accept title to the Premises subject to the Installment
Sale Agreement and the lien of the Indenture. In either event, Lessee
shall pay all charges incident to such conveyance and assignment,
including counsel fees, escrow fees, recording fees, title insurance

-17-

BOOK **390** PAGE **141**      BOOK   **66** PAGE **136**

premiums and all applicable taxes (other than any net income taxes of
Lessor) which may be imposed by reason of such conveyance and assignment
and the delivery of said deed and other instruments. Upon the
completion of such purchase, but not prior thereto (whether or not any
delay or failure in the completion of such purchase shall be the fault
of Lessor), this Lease shall terminate, except with respect to
obligations and liabilities of Lessee hereunder, actual or contingent,
which have arisen on or prior to such date of purchase, provided in the
event of a purchase with respect to which Lessee is permitted and elects
to have Lessee's designee assume and pay the Installment Sale Agreement,
this Lease shall continue, and the transfer shall be made by an
assignment without recourse to Lessee's designee of all of Lessor's
interest under the Installment Sale Agreement and the execution and
delivery of such other instruments as may be reasonably be necessary to
convey the Lessor's right, title and interest in the Premises to
Lessee's designee.

18.  Assignment and Subletting.  Lessee may sublet all or any
part of the Premises or assign its interests hereunder, provided that
each sublease shall expressly be made subject to the provisions hereof.
No such assignment or sublease shall modify or limit any right or power
of Lessor hereunder or affect or reduce any obligation of Lessee here-
under, and all such obligations shall continue in full effect during the
term of this Lease as obligations of a principal and not of a guarantor
or surety, as though no assignment or subletting has been made.

19.  Permitted Contests.  Lessee shall not be required, nor
shall Lessor have the right, to pay, discharge or remove any tax, as-
sessment, levy, fee, charge, lien or encumbrance, or to comply with any
legal requirement applicable to the Premises or the use thereof, so long
as Lessee shall contest at its own expense the existence, amount or
validity thereof by appropriate proceedings which shall prevent the
collection of or other realization upon the tax, assessment, levy, fee,
charge, lien or encumbrance so contested, and the sale, forfeiture or
loss of the Premises or any Basic Rent or any Additional Rent, to satis-
fy the same, and which shall not affect the payment of any Basic Rent or
any Additional Rent, provided that such contest shall not subject Lessor
to the risk of any criminal liability.  Lessor, at the expense of
Lessee, will cooperate with Lessee and execute any documents or plead-
ings legally required for any such contest.

20.  Conditional Limitations; Default Provision.  (a) Events
of Default. Any of the following occurrences or acts shall constitute
an event of default under this Lease:  (i) if Lessee shall (1) fail to
pay any Basic Rent when due or (2) fail to pay any Additional Rent or
other sum required to be paid by Lessee hereunder and such failure shall
continue for 10 days after notice to Lessee of such failure, or (3) fail
to observe or perform any other provision hereof and such failure shall
continue for 30 days after notice to Lessee of such failure (provided,
that in the case of any such default which cannot be cured by the

BOOK 390 PAGE 142    BOOK 66 PAGE 137

payment of money and cannot with diligence be cured within such 30-day period, if Lessee shall commence promptly to cure the same and there-after prosecute the curing thereof with diligence, the time within which such default may be cured shall be extended for such period as is necessary to complete the curing thereof with diligence); or (ii) if Lessee shall file a petition in bankruptcy or for reorganization or for an arrangement pursuant to any federal or state bankruptcy law or any similar federal or state law, or shall be adjudicated a bankrupt or become insolvent or shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts generally as they become due, or if a petition or answer proposing the adjudication of Lessee as a bankrupt or its reorganization pursuant to any federal or state bankruptcy law or any similar federal or state law shall be filed in any court and Lessee shall consent to or acquiesce in the filing thereof or such petition or answer shall not be discharged or denied within 60 days after the filing thereof; or (iii) if a receiver, trustee or liquidator of Lessee or of all or substantially all of the assets of Lessee, or of the Premises or Lessee's estate therein shall be appointed in any proceeding brought by Lessee, or if any such receiver, trustee or liquidator shall be appointed in any proceeding brought against Lessee and shall not be discharged within 60 days after such appointment, or if Lessee shall consent to or acquiesce in such appointment; or (iv) if the Premises shall have been left unoccupied and unattended for a period of 60 consecutive days; or (v) if Lessee shall, in any manner, permit the divestiture of all or substantially all of its assets (other than in connection with a merger of Lessee into, or a sale of all or substantially all of Lessee's assets to, another corporation provided that the survivor of such merger or the purchaser of such assets shall assume in writing all of Lessee's obligations under this Lease). The foregoing subparagraph (v) shall not be deemed to prohibit any bona fide borrowing by Lessee or any of its subsidiaries in connection with which Lessee grants a lien or other security interest in its assets.

(b)  Notice to Terminate.  If an event of default shall have happened and be continuing, Lessor shall have the right to give Lessee notice of Lessor's intention to terminate the term of this Lease on a date not less than 10 days after the date of such notice.  On the date set forth in such notice, the term of this Lease and the estate hereby granted shall expire and terminate as fully and completely and with the same effect as if such date were the date herein fixed for the expiration of the term of this Lease, and all rights of Lessee hereunder shall expire and terminate, (but Lessee shall remain liable as hereinafter provided), unless before such date (i) all arrears in Basic Rent and Additional Rent shall have been paid in full, and (ii) all other defaults at the time existing under this Lease shall have been fully remedied.

(c)  Right to Re-enter.  If an event of default shall have happened and be continuing, Lessor shall have the right to give Lessee notice of Lessor's intention to re-enter and repossess the Premises on a

-19-

BOOK **390** PAGE**143**       BOOK **66** PAGE **138**

date not less than 10 days after the date of such notice. On and after
the expiration of such period, Lessor shall have the immediate right to
re-enter and repossess the Premises by summary proceedings, ejectment or
in any manner Lessor determines to be necessary or desirable and the
right to remove all persons and property therefrom. Lessor shall be
under no liability by reason of any such re-entry, repossession or
removal. No such re-entry or repossession of the Premises shall be
construed as an election by Lessor to terminate the term of this Lease
unless a notice of such intention is given to Lessee pursuant to Section
20(b), or unless such termination is decreed by a court of competent
jurisdiction.

(d)  Authority to Relet.  At any time or from time to time
after the re-entry or repossession of the Premises pursuant to Section
20(c), Lessor may (but shall be under no obligation to) relet the
Premises for the account of Lessee, in the name of Lessee or Lessor or
otherwise, without notice to Lessee, for such term or terms and on such
conditions and for such uses as Lessor, in its absolute discretion, may
determine. Lessor may collect and receive any rents payable by reason
of such reletting. Lessor shall not be liable for any failure to relet
the Premises or for any failure to collect any rents due upon any such
reletting.

(e)  Lessee's Liability Continues.  No expiration or termina-
tion of the term of this Lease pursuant to Section 20(b), by operation
of law or otherwise, and no re-entry or repossession of the Premises
pursuant to Section 20(c) or otherwise, and no reletting of the Premises
pursuant to Section 20(d) or otherwise, shall relieve Lessee of its
liabilities and obligations hereunder, all of which shall survive such
expiration, termination, re-entry, repossession or reletting.

(f)  Current Damages.  In the event of any expiration or
termination of the term of this Lease or re-entry or repossession of the
Premises by reason of the occurrence of an event of default, Lessee will
pay to Lessor all Basic Rent, Additional Rent and other sums required to
be paid by Lessee to and including the date of such expiration, ter-
mination, re-entry or repossession; and thereafter Lessee shall, until
the end of what would have been the term of this Lease in the absence of
such expiration, termination, re-entry or repossession, and whether or
not the Premises shall have been relet, be liable to Lessor for, and
shall pay to Lessor, as liquidated and agreed current damages: (i) all
Basic Rent, Additional Rent and other sums which would be payable under
this Lease by Lessee in the absence of such expiration, termination,
re-entry or repossession, less (ii) the net proceeds, if any, of any
reletting effected for the account of Lessee pursuant to Section 20(d),
after deducting from such proceeds all Lessor's expenses in connection
with such reletting (including all repossession costs, brokerage com-
missions, reasonable attorneys' fees and expenses, employees' expenses,
alteration costs and expenses of preparation for such reletting).
Lessee will pay such current damages on the days on which Basic Rent
would be payable under this Lease in the absence of such expiration,

-20-

BOOK **390** PAGE**144**    BOOK **66** PAGE **139**

termination, re-entry or repossession, and Lessor shall be entitled to recover the same from Lessee on each such day.

(g)  Liquidated Damages.  At any time after any such expiration or termination of the term of this Lease or re-entry or repossession of the Premises by reason of the occurrence of an event of default, whether or not Lessor shall have collected any current damages pursuant to Section 20(f), Lessor shall be entitled to recover from Lessee, and Lessee will pay to Lessor on demand, as and for liquidated and agreed final damages for Lessee's default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the excess, if any, of (a) all Basic Rent, Additional Rent and other sums which would be payable under this Lease from the date of such demand (or, if it be earlier, the date to which Lessee shall have satisfied in full its obligations under Section 20(f) to pay current damages) for what would be the then unexpired term of this Lease in the absence of such expiration, termination, re-entry or repossession, discounted at the rate of 4% per annum over (b) the then fair rental value of the Premises (determined by applying a discount rate of 4% per annum) for the same period, provided however, the amount of liquidated damages so determined shall in no event be less than the amount determined pursuant to Exhibit B for the last date on which a Basic Rent payment was made. If any law shall limit the amount of such liquidated final damages to less than the amount above agreed upon, Lessor shall be entitled to the maximum amount allowable under such law.

(h)  Right to Contest.  Notwithstanding the foregoing provisions of this Section 20, no default hereunder, other than a default in the payment of Basic Rent or a default in the payment of interest on overdue Basic Rent, shall give rise to a right on the part of Lessor to terminate this Lease, if (i) at the time of the giving of notice of such default the tangible net worth of Lessee, determined in accordance with generally accepted accounting principles shall be more than $100,000,000, and (ii) Lessee shall contest the existence of such default by appropriate legal proceedings conducted in good faith and with due diligence within 60 days after the giving of notice of such default (provided that no sale or forfeiture of the Premises or criminal liability to Lessor will result by reason of the failure of Lessee to cure the default), and shall comply with any final order of the court or appellate court hearing such proceedings within the grace period applicable to such default provided for in Section 20(a).

21.  Additional Rights of Lessor.  (a)  Rights Cumulative.  No right or remedy hereunder shall be exclusive of any other right or remedy, but shall be cumulative and in addition to any other right or remedy hereunder or now or hereafter existing. Failure to insist upon the strict performance of any provision hereof or to exercise any option, right, power or remedy contained herein shall not constitute a waiver or relinquishment thereof for the future. Receipt by Lessor of any Basic Rent, Additional Rent or other sum payable hereunder with

-21-

 BOOK **390** PAGE **145**     BOOK    **66** PAGE **140**

knowledge of the breach of any provision hereof shall not constitute a waiver of such breach, and no waiver by Lessor of any provision hereof shall be deemed to have been made unless made in writing. Lessor shall be entitled to injunctive relief in case of the violation, or attempted or threatened violation, of any of the provisions hereof, or to a decree compelling performance of any of .the provisions hereof, or to any other remedy allowed to Lessor by law.

(b)  Waiver.  Lessee hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have to redeem the Premises or to have a continuance of this Lease after termination of Lessee's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease, or after the termination of the term of this Lease as herein provided, and (ii) the benefits of any law which exempts property from liability for debt or for distress for rent.

(c)  Expenses.  If Lessee shall be in default in the perfor-mance of any of its obligations hereunder, Lessee shall pay to Lessor, on demand, all expenses incurred by Lessor as a result thereof, includ-ing reasonable attorneys' fees and expenses.  If Lessor shall be made a party to any litigation commenced against Lessee and Lessee, at its expense, shall fail to provide Lessor with counsel approved by Lessor, Lessee shall pay all costs and reasonable attorneys' fees incurred by Lessor in connection with such litigation.

22.  <u>Financing of Additional Improvements</u>.  (a)  Lessor to Finance.  If during the Primary Term or Extended Terms of this Lease, Lessee intends to construct additional Improvements which it wishes to finance under this Section 22, Lessee shall give written notice of its intention to Lessor ("Notice of Intent"), which notice shall contain a certification by Lessee of the estimated cost of the additional Improve-ments.  If at the time of the Notice of Intent the tangible net worth of Lessee shall be more than $100,000,000 as determined in accordance with generally accepted accounting principles and if the estimated cost as certified by Lessee of the additional Improvements exceeds $100,000 during any twelve month period, and subject to compliance with all the conditions of this Section, Lessee shall sell and Lessor shall purchase the additional Improvements, or cause its designee to purchase the additional Improvements (whichever entity that purchases the additional Improvements being hereinafter referred to as "Addition Owner"), for an amount ("Addition Purchase Price") equal to the Lessee's cost of comple-ting the additional Improvements, which completion cost shall include the cost of any land contiguous to the Premises purchased for the pur-pose of placing thereon the additional Improvements or any portion thereof or for providing means of access thereto, or parking facilities therefor, all direct and indirect costs associated with the construction of the additional Improvements, and the conveyance thereof to Addition Owner, including all closing costs required in connection with Addition Owner's acquisition and financing thereof.  Lessor shall finance the

BOOK **390** PAGE **146**        BOOK **66** PAGE **141**

purchase by borrowing the amount of the Addition Purchase Price, such borrowing to be evidenced by the issuance of an addition note ("Addition Note"), or by the issuance of additional industrial development revenue bonds. Lessor shall not be obligated to purchase the additional Improvements unless it has obtained a commitment acceptable to it and to Lessee for financing of one hundred per cent (100%) of the Addition Purchase Price. Lessor shall use reasonable efforts to secure the financing of the additional Improvements as herein provided.

(b) Procedure. Forthwith upon receipt of Lessee's Notice of Intent, Addition Owner shall use reasonable efforts to secure the financing of the additional Improvements from an institutional lender, or take such steps as may be provided under the Indenture for the issuance of additional industrial development revenue bonds if the Permanent Financing is arranged by the issuance of industrial development revenue bonds.

If within 90 days from the date of receipt of Lessee's Notice of Intent, (i) Lessor shall secure a commitment from an institutional lender setting forth the terms and conditions on which it proposes to purchase the Addition Note or (ii) if the Permanent Financing is arranged by the issuance of industrial development revenue bonds, Lessor secures the agreement of the Issuer to issue additional industrial development bonds, Lessor shall forthwith furnish evidence thereof to Lessee who, within 60 days of its receipt thereof, shall accept or reject such terms. If Lessee accepts, Addition Owner shall accept the commitment or secure the Issuer and Trustee's final approval of such terms. If Lessee advises rejection and simultaneously furnishes Addition Owner with a letter of intent or commitment from another institutional lender setting forth, in substance, the terms and conditions on which such other lender proposes to purchase the Addition Note, Addition Owner shall accept the commitment of such other lender on the terms and conditions set forth in such lender's letter of intent or commitment, provided the same are acceptable in all respects to Addition Owner.

(c) Conditions. Notwithstanding any provision contained in the preceding paragraphs, Lessor shall not be required to purchase the additional Improvements or to accept a commitment from any institutional lender unless the conditions set forth in the preceding paragraphs of this section, and all of the following conditions are satisfied:

(i) Addition Owner and Lessee shall have amended this Lease to provide that: (u) Lessee shall convey title to the additional Improvements and any land purchased for the purpose of constructing the additional Improvements as referred to in subsection 22(a) to Addition Owner and Addition Owner shall pay to Lessee the Addition Purchase Price upon Addition Owner's sale of the Addition Note or issuance of additional industrial development revenue bonds; (v) the description of the land described in Part I of Exhibit A hereto will be amended to add any land purchased for the purpose of constructing or operating the

-23-

BOOK **390** PAGE**147**       BOOK **66** PAGE **142**

additional Improvements as referred to in subsection 22(a); (w) Basic
Rent thereafter for the balance of the term of this Lease will be
increased by an amount sufficient to amortize principal and pay interest
fully on the Addition Note or additional industrial development revenue
bonds over the balance of the Primary Term and any Extended Terms with
respect to which Lessee has exercised its rights and options under
Section 5(b) hereof; (x) If Addition Owner and Lessee shall have agreed
upon the terms and conditions of additional equity investment by
Addition Owner in connection with such financing, rent for the Extended
Terms shall be increased appropriately, otherwise there shall be no
increase in rent during the Primary and Extended Terms except pursuant
to subpart (w); and (y) the repurchase price computed from Exhibit B
will be increased by (i) an amount equal to the then unamortized balance
of the Addition Note or principal amount of additional industrial
development revenue bonds, including interest accrued thereon, and (ii)
if Addition Owner has made an additional equity investment, by such
other premium as may be agreed upon, and (z) the amounts in the
Accumulated Reserve Fund shall be adjusted, as necessary.

(ii)  There is no event of default by the Lessee under
this Lease continuing at the date of issuance of the Addition Note.

(iii)  If the Addition Note is not purchased by Trustee
or additional industrial development revenue bonds are not issued,
Trustee shall have agreed with the lender who purchases the Addition
Note that the Bonds and the Addition Note are secured pari passu, and
such other lender shall have agreed that, in the event of default under
the Indenture or the Addition Note, or both, the Trustee shall determine
the manner and extent to which the remedies available at law or under
the Indenture or the instruments securing the Addition Note are
utilized.  The Trustee shall have the right to approve the form and
content of such agreement, which approval shall not be unreasonably
withheld.  All such agreements and approvals shall be in writing and
delivered to Addition Owner.

(iv)  The Addition Note and the instruments securing said
Note shall be without personal liability to Addition Owner, Lessor, or
any of its designees or affiliates for payment of any indebtedness or
performance of any obligation.

(v)  Such other certificates (including, but not limited
to, endorsements increasing the insurance coverage, if any, at the time
required by Section 15(a)), documents, opinions of counsel, surveys, and
any other instruments as may be reasonably required by Lessor and any
lenders acquiring the Addition Note shall have been delivered.

(vi)  Whether or not the sale of the Addition Note or
issuance of additional industrial development bonds is actually con-
summated, Lessee shall pay or cause to be paid all reasonable costs and
expenses of Lessor and Trustee and any lender which has committed to
acquire the Addition Note or Issuer which have agreed to issue such

BOOK **390** PAGE **148**        BOOK **66** PAGE **143**

additional bonds paid or incurred by them in connection therewith, including, but not limited to, (i) the reasonable fees and expenses of their respective counsel, (ii) all printing expenses, (iii) the amount of any filing, registration and recording taxes and fees, (iv) documentary stamp taxes, if any, and (v) title insurance charges.

(d)  Lessee may Finance.  Lessee shall have the right at any time to finance the additional Improvements through mortgage of its leasehold interest in this Lease, in which case the provisions of this Section 22 shall not apply.

23.    Notices, Demands and Other Instruments.    All notices, demands, designations, certificates, requests, offers, consents, approvals and other instruments given pursuant to this Lease shall be in writing and shall be validly given when mailed by prepaid registered or certified mail, (a) if to Lessor, addressed to Lessor at its address set forth above, and (b) if to Lessee, addressed to Lessee at its address set forth above, marked "Attention: Vice President, Real Estate". Lessor and Lessee each may from time to time specify any address in the United States as its address for purposes of this Lease by giving 15 days' notice to the other party.

24.    Tax-Exempt Status of Bonds.    Lessor and Lessee hereby mutually acknowledge that the financing of the Premises is being funded through the issuance of "industrial development revenue bonds" as defined by Section 103(b)(2) of the Internal Revenue Code of 1954, as amended (the "Code").  Lessor and Lessee acknowledge that the Issuer will prior to the issuance of the Industrial Development Revenue Bonds (K mart Corporation Project) Series 1983 of the Industrial Development Authority of York County, Virginia (herein the "Bonds") duly elect to have the provisions of Section 103(b)(6)(D) of the Code apply to such issue and such election shall be made in accordance with the procedure set forth in Section 1.103-10(b)(2)(vi) of the Regulations (26 CFR Part 1) (the "Regulations").  In order to effectuate such election and to continue the same in full force and effect so long as any of the Bonds shall remain outstanding, both Lessor and Lessee agree to: (1) attach a copy of the Issuer's statement of election to their respective income tax returns for the taxable year during which the election is made, in accordance with Section 1.103-10(b)(2)(vi)(a) of the Regulations; (2) file or cause to be filed the supplemental statements required by Section 1.103-10(b)(2)(vi)(c) of the Regulations, and (3) take such further action and file or cause to be filed such further instruments, documents, statements or reports with the United States Treasury Department or other authorized governmental agency, and at such office or offices, as may from time to time be required by applicable law or regulation in connection therewith.

Both Lessor and Lessee understand that the term "capital expenditures" as used in this Agreement, as of the date of execution of this Agreement, means any expenditure made by any person which, under any rule or election under the Code, may be treated as a capital

-25-



BOOK **390** PAGE **149**        BOOK **66** PAGE **144**

expenditure (whether or not such expenditure is so treated) and
determined without regard to any rule of the Code which permits
expenditures properly chargeable to capital account to be treated as
current expenses, unless such expenditure is an "excluded expenditure"
under Section 1.103-10(b)(2)(iv) of the Regulations.

Lessor covenants that it is a principal user (within the
meaning of Section 103(b)(6)(E) of the Code), of the Premises and that
there are no outstanding obligations which are classified as "exempt
small issues" under Section 103(b)(6) of the Code, and any Regulations
with respect to Section 103(b)(6) of the Code, issued subsequent to
April 30, 1968, of any state, territory or possession of the United
States, or any political subdivision of the foregoing or of the District
of Columbia, substantially all of the proceeds of which have been or are
to be used with respect to facilities which are located in the unincor-
porated areas of the County of York, Virginia and the City of
Williamsburg, Virginia (herein collectively the "Municipality") and the
principal user (or a principal user) of which is Lessor (including any
person related to the Lessor within the meaning of Section 103(b)(6)(C)
of the Code), other than the Bonds.

Lessee covenants that it is a principal user (within the
meaning of Section 103(b)(6)(E) of the Code), of the Premises, and that
there are no outstanding obligations which are classified as "exempt
small issues" under Section 103(b)(6) of the Code, and any Regulations
with respect to Section 103(b)(6), issued subsequent to April 30, 1968,
of any state, territory or possession of the United States, or any
political subdivision of the foregoing or of the District of Columbia,
substantially all of the proceeds of which have been or are to be used
with respect to facilities which are located in the Municipality and the
principal user (or a principal user) of which is Lessee (including any
person relating to the Lessee within the meaning of Section 103(b)(6)(C)
of the Code), other than the Bonds.

Lessor covenants that it (and any "related person" to Lessor
as defined in Section 103(b)(6)(C) of the Code) will not, before the
third anniversary of the date of issuance of the Bonds, (1) pay or incur
any capital expenditure (as defined in Section 1.103-10(b)(2)(ii) of the
Regulations), with respect to the Premises or any other property or
facilities located in the Municipality other than (a) those to be paid
with the proceeds of the Bonds and (b) any additional amount required to
complete the Premises, or (2) be the principal user (or a principal
user) of any property or facilities other than those constituting the
Premises located in the Municipality with respect to which any capital
expenditure is paid or incurred by others, without, in either case (1)
or (2), obtaining consent from Lessee. Lessee may withhold such consent
if it, in its sole discretion, determines that such expenditure or
principal use by Lessor, together with any actual or possible capital
expenditure or use of other facilities by Lessee within the Municipality
could cause the interest on the Bonds to be subject to Federal income
taxes. Lessor further covenants that the total of Bond proceeds and
capital expenditures within the Municipality not requiring Lessee's

BOOK 390 PAGE 150          BOOK 66 PAGE 145

consent made by Lessor or any related person to Lessor or made by any
other persons with respect to facilities within the Municipality of
which Lessor or a related person to Lessor is a principal user, shall
not exceed $6,500,000 before the third anniversary date of the issuance
of the Bonds.

Lessee covenants that it (and any "related person" to Lessee
as defined in Section 103(b)(6)(C) of the Code) will not make any capi-
tal expenditures which will cause the interest on the Bonds to become
subject to Federal income taxes pursuant to Section 103(b) of the Code.

25.  Estoppel Certificates.  Lessee and Lessor will, from time
to time, upon 20 days prior request by the other, cause to be executed,
acknowledged and delivered a certificate stating that this Lease is
unmodified and in full effect (or, if there have been modifications,
that this Lease is in full effect as modified, and setting forth such
modifications) and the then amount of Basic Rent and the dates to which
Basic Rent, Additional Rent and other sums payable hereunder have been
paid, and either stating that to the knowledge of the signer of such
certificate no default exists hereunder or specifying each such default
of which the signer has knowledge.  Any such certificate may be relied
upon by any prospective mortgagee or purchaser of the Premises.

26.  No Merger.  There shall be no merger of this Lease or of
the leasehold estate hereby created with the fee estate in the Premises
by reason of the fact that the same person acquires or holds, directly
or indirectly, this Lease or the leasehold estate hereby created by any
interest herein or in such leasehold estate as well as the fee estate in
the Premises or any interest therein.

27.  Surrender.  Upon the expiration or termination of the
term of this Lease (other than a termination pursuant to Section 17),
Lessee shall surrender the Premises to Lessor in the condition in which
the Premises were originally received from Lessor, except as repaired,
rebuilt, restored, altered or added to as permitted or required hereby
and except for ordinary wear and tear.  Lessee shall remove from the
Premises within 30 days after such expiration or termination all of the
Excluded Personal Property then situated thereon and shall repair any
damage caused by such removal.  Excluded Personal Property not so re-
moved shall become the property of Lessor, and Lessor may cause such
Excluded Personal Property to be removed from the Premises and disposed
of, but the cost of any such removal and disposition (less the proceeds
thereof) and of repairing any damage caused by such removal shall be
borne by Lessee.

28.  Separability; Binding Effect.  Each provision hereof
shall be separate and independent and the breach of any such provision
by Lessor shall not discharge or relieve Lessee from its obligations to
perform each and every covenant to be performed by Lessee hereunder.  If
any provision hereof or the application thereof to any person or circum-
stance shall to any extent be invalid or unenforceable, the remaining

BOOK 390 PAGE 151

BOOK 66 PAGE 146

provisions hereof, or the application of such provisions to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforceable to the extent permitted by law. All provisions contained in this Lease shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and assigns of Lessor and Lessee to the same extent as if each such successor and assign were named as a party hereto. It is agreed that any covenant or obligation of Lessor under this Lease shall not be binding upon Lessor herein named or any subsequent lessor with respect to any period subsequent to the transfer of all its interests in the Premises by operation of law or otherwise, and that in the event of any such transfer, Lessee agrees to look solely to the transferee for the performance of any obligation of Lessor hereunder, but only with respect to the period beginning with such transfer and ending with a subsequent transfer of such interest. This Lease may not be changed, modified or discharged except by a writing signed by Lessor and Lessee.

29.  Investment Tax Credit.    Lessor hereby agrees to elect under the applicable provisions of the Code to pass through to the Lessee all investment tax credits which may be available from time to time in respect of the Premises under Section 38 of said Code to the extent such investment tax credit is not usable under said Code by the Lessor, its successors and assigns. Lessor agrees, at Lessee's expense, to execute timely all documents prepared by Lessee and delivered to Lessor in advance and required by said Code, and regulations issued thereunder, to enable Lessee to obtain such investment tax credit.

Lessor further agrees to maintain adequate records so that the qualifying property can be identified and the cost thereof can be determined and to provide such records to the Lessee upon written request and otherwise to cooperate with Lessee in said matter; provided, however, that the foregoing shall not be binding upon a mortgagee that acquires the premises by foreclosure or deed-in-lieu thereof. Lessor agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Lessee.

30.  Lessor's Right to Cure Lessee's Default.    If Lessee shall fail to make any payment or perform any act required to be made or performed under this Lease, Lessor, after notice to and demand upon Lessee, and without waiving or releasing any obligation or default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Lessee, and may enter upon the Premises for such purpose and take all such action thereon as, in Lessor's opinion, may be necessary or appropriate therefor. No such entry shall be deemed an eviction of Lessee. All sums so paid by Lessor and all costs and expenses (including, without limitation, attorneys' fees and expenses) so incurred, together with interest thereon (to the extent permitted by law) at the rate of 1% per annum over the then applicable stated per annum rate of interest on the

-28-

BOOK **390** PAGE **152**    BOOK  **66** PAGE **147**

Bonds from the date on which such sums or expenses are paid or incurred by Lessor, shall be paid by Lessee to Lessor on demand.

31.  Lessor's Right to Inspect.  Lessee shall permit Lessor, the Trustee, if any, and their respective authorized representatives to inspect the Premises during usual business hours.

32.  Conveyance by Lessor.  If the Trustee shall acquire the Premises upon foreclosure or deed-in-lieu thereof and shall convey the Premises other than as security for a debt, such Trustee shall thereupon be released from all future liabilities and obligations of the Lessor under this Lease and all such future liabilities and obligations shall thereupon be binding upon the new owner of the Premises.

33.  Mortgage Subordination.  At any time subsequent to the payment in full of the Bonds and upon written request by Lessor, Lessee shall execute and deliver an agreement subordinating this Lease to any first mortgage or deed of trust upon the Premises, provided however, such subordination shall be upon the express condition that the validity of this Lease and all of the rights of Lessee hereunder shall be reorganized by the mortgagee or the holder of the deed of trust, and that, notwithstanding any default by the Lessor with respect to such mortgage or deed of trust or any foreclosure thereof, Lessee's rights under this Lease shall not be disturbed for so long as no Event of Default shall have occurred hereunder and be continuing.

34.  Option to Purchase at Fair Market Value.  Lessor hereby grants to Lessee the option to purchase (the "Purchase Option") the Premises, if no Event of Default shall have occurred that has not been waived, as of the end of the Primary Term, or if and to the extent Lessee exercises its options to extend the term of this Lease, as of the end of any current Extended Term (the "Purchase Option Date") for a price equal to the fair market value of the Premises as unencumbered by this Lease as hereinafter determined (the "Fair Market Value") plus in either case all closing costs including without limitation any applicable prepayment penalty.  Such option shall be exercised by written notice from Lessee to Lessor, given not less than one year prior to the expiration of the Primary Term or such Extended Term, as the case may be, and in each case accompanied by a statement of the Fair Market Value determined in accordance with Section 35.

To enable Lessee to make an informed judgment with respect to the foregoing option, and to establish the Fair Market Value as of the end of the Primary Term or any Extended Term, as the case may be, Lessee may notify Lessor in writing not more than 24 months prior to the expiration of the term of the Lease stating that Lessee desires a determination of Fair Market Value of the premises as of the end of the term of the Lease.  Thereafter, Lessor and Lessee shall consult for the purpose of determining such Fair Market Value as of the end of the term of the Lease and any value agreed upon in writing shall constitute such Fair Market Value for the purposes of this Section.  If Lessor and

-29-

BOOK 390 PAGE 153    BOOK 66 PAGE 148

Lessee fail to agree upon such Fair Market Value prior to 16 months
before the expiration of the term of this Lease, Lessee may request that
such Fair Market Value be determined by the appraisal procedure here-
inafter described. Lessee's request for a determination of such Fair
Market Value shall not obligate Lessee to exercise the option provided
in this Article but, if Lessee exercises such option, Lessee and Lessor
shall each pay the fees and disbursements of any appraiser appointed by
it and shall share equally the fees and expenses of any third appraiser
and any other costs and expenses of any appraisal pursuant to this
Section 34, while, if Lessee does not exercise such option, Lessee shall
pay all costs and expenses of any appraisal pursuant to this Section 34.
If Lessee exercises the Purchase Option, Lessor shall transfer and
convey or cause the transfer and conveyance of the Premises to the
Lessee in accordance with the provisions of Section 17 on the Purchase
Option Date, unless Lessor by written notice to Lessee specifies a
different date, which date may be not more than 30 days prior to or 60
days after the Purchase Option Date.

There shall be no closing adjustments, other than for the rent
payable by Lessee hereunder for the month in which the Purchase Option
Date occurs and other accrued obligations of Lessee under the Lease.

If Lessor shall be unable to give title or make conveyance as
stipulated, Lessor shall convey such title as it then has if Lessee
elects to accept the same. The termination of this Lease prior to
exercise of the Purchase Option, or prior to or after exercise of the
Purchase Option if such termination is pursuant to Section 20, shall
terminate all rights and obligations of Lessor and Lessee under this
Section. If the Purchase Option has been exercised, then the termina-
tion of this Lease for any cause except pursuant to Section 20 shall not
terminate the rights and obligations of Lessee and Lessor under this
Section. The Purchase Option shall not be assignable except as part of
this Lease.

In the event of Lessee's exercise of the Purchase Option, this
Lease shall not terminate, except pursuant to Section 20, until the
Premises shall have been conveyed to Lessee and the purchase price
therefor and all other sums due under this Lease shall have been paid.

35. Appraisal to Determine Fair Market Value. The term "Fair
Market Value" as used in this Section shall mean the fair market value
of the Premises unencumbered by this Lease, determined using the stan-
dards then commonly used by professional appraisers in determining fair
market value of similarly improved real property in the state in which
the Premises are located. If the parties hereto fail to agree under
Section 34 as to the Fair Market Value such question shall be submitted
upon Lessee's request to a board of appraisers, two in number, one named
by Lessor and one named by Lessee, each of whom shall be a qualified
member of the American Institute of Real Estate Appraisers, or any
successor of such Institute, or if such organization or successor shall
no longer be in existence, a recognized national association or

-30-

BOOK **390** PAGE **154**    BOOK **66** PAGE **149**

institute of appraisers. Each appraiser so appointed shall be instructed to determine independently the Fair Market Value in accordance with the definition of such term contained herein and within 50 days after the making of Lessee's request. If only one appraiser shall have been so appointed within 20 days after the making of Lessee's request, or if two appraisers shall have been so appointed but only one such appraiser shall have made such determination within 50 days after the making of Lessee's request, then the determination of such appraiser shall be final and binding upon the parties. If two appraisers shall have been appointed and shall have made their determinations within the respective requisite periods set forth above and if the difference between the amounts so determined shall not exceed ten per cent (10%) of the lesser of such amounts, then the Fair Market Value shall be an amount equal to 50% of the sum of the amounts so determined. If the difference between the amounts so determined shall exceed ten percent (10%) of the lesser of such amounts, then such two appraisers shall have 20 days to appoint a third appraiser, but if such appraisers fail to do so, then either party may request the American Arbitration Association or any successor organization thereto to appoint an appraiser within 20 days of such request, and both parties shall be bound by any appointment so made within such 20 day period. If no such appraiser shall have been appointed within such 20 days or within 90 days of the original request for a determination of Fair Market Value, whichever is earlier, either Lessor or Lessee may apply to any court having jurisdiction to make such appointment made by such court. Any appraiser appointed by the original appraisers, by the American Arbitration Association or by such court shall be instructed to determine the respective fair market value in accordance with the definition of such term contained herein and within 30 days after its appointment. The determination of the appraiser which differs most in terms of dollar amount from the determinations of the other two appraisers shall be excluded, and 50% of the sum of the remaining two determinations shall be final and binding upon Lessor and the Lessee as the Fair Market Value for such interest. This provision for determination by appraisal shall be specifically enforceable to the extent such remedy is available under applicable law, and any determination hereunder shall be final and binding upon the parties except as otherwise provided by applicable law.

36.  _Right of First Offer_.  From and after the date hereof, Lessor shall not sell or convey (other than to Lessee as contemplated by this Lease) all or any part of the Premises/unless Lessor first notifies Lessee of Lessor's intention so to convey and simultaneously offers to sell the Premises, or such part thereof, to Lessee or its designee at the price and on such other terms as Lessor would accept with respect to such a sale to any other person or entity. Within 30 days after the giving of such notice and offer, Lessee or its designee may accept such offer by giving written notice to Lessor. Any such sale shall be effected in the manner provided in Section 17, with conveyance of the Premises, or such part thereof, to be made within 90 days after the acceptance of such offer. If Lessee or its designee does not accept such offer, this Lease shall continue in full force and effect and

* or its interest therein

-31-

BOOK **390** PAGE**155**    BOOK  **66** PAGE **150**

Lessor may convey the Premises or such part thereof to any third party, but only at such price and upon such terms as are no more favorable to such third party than those set forth in Lessor's offer to Lessee referred to above, and provided, however, that Lessor shall have sold, or entered into a contract to sell, the Premises, or such part thereof, within 180 days after the giving of the aforesaid notice and offer. It is expressly understood and agreed that Lessor's obligations under this Section 36 are recurring obligations that shall also bind the successors and assigns of Lessor.

37.    Lessee's Obligation to Purchase in Certain Events.    In the event the interest on the Bonds or any portion thereof is determined to be taxable, the Lessee shall make an offer to purchase the Premises for a price which is equal to the purchase price for the Premises determined in accordance with Exhibit B to this Lease, provided that should the interest on the Bonds be determined to be taxable as a result of acts or omissions of Lessor, the purchase price shall be equal to the unpaid principal balance on Bonds plus interest accrued and unpaid to the date of purchase. Such offer shall be irrevocable for a period of ninety (90) days and shall be rejectable by Lessor. If such offer is accepted, the purchase shall be made in accordance with Section 17 hereof and the closing shall occur on a date not later than the date set for redemption of the Bonds. Any determination referred to above shall have been made by published or a private ruling or technical advice by the Internal Revenue Service or a judicial decision in a proceeding by any court of competent jurisdiction in the United States (from which ruling, advice or decision no further right of appeal exists) in all cases in which Lessee has been given the opportunity to contest the same or participate or be a party therein. Notwithstanding the foregoing, in the event the Bonds are finally determined to be taxable (in accordance with, and as of the respective dates, set forth in the Bonds) as aforesaid, Lessor may, at its option or at the request of Lessee, use its reasonable best efforts to refinance the Permanent Financing; provided, however, if Lessor is unable to arrange such refinancing, Lessee may arrange such refinancing; provided further, however, in either event, the terms and conditions of such refinancing shall be consistent with the Rent Schedule set forth in Exhibit C hereto or a revision of such rent schedule acceptable to Lessor and Lessee. In the event the Lessee's offer to purchase is not accepted by Lessor, this Lease shall continue.

38.    Headings.    The headings used in this Lease are for convenient reference only and shall not to any extent have the effect of modifying, amending or changing the provisions of this Lease.

39.    Governing Law.    This Lease shall be governed by and interpreted under the laws of the state in which the Premises are located.

40.    Memorandum of Lease.    Lessor and Lessee shall, promptly upon the request of either, enter into a short form memorandum of this

BOOK **390** PAGE **156**    BOOK **66** PAGE **151**

Lease, in form suitable for recording under the laws of the state in
which the Premises are located, in which reference to this Lease shall
be made.

41.  Exhibits.  Attached hereto are Exhibits A, B, and C
referred to in this Lease, which Exhibits are hereby incorporated by
reference herein.

42.  Exculpation.  Any other provisions either expressly or
impliedly contained herein to the contrary, no recourse shall be had for
any claim based on this Lease or for any claim based herein or otherwise
in respect hereof, against either (a) the Lessor or its successors or
assigns, or (b) any present or future partner, general or limited, of
the Lessor, in any such case, under any rule of law, statute or other-
wise, or by the enforcement of any assessment, penalty or the obtaining
of a monetary judgment, it being expressly understood that all such
liability of (i) the Lessor and its successors or assigns, and (ii) any
present or future partner, general or limited, of the Lessor, in each
case, is hereby expressly waived and released as a condition of, and as
consideration for, the execution of this Lease; provided, however, that
this provision shall not (i) impair in any way the effectiveness of this
Lease, or (ii) prevent recourse to (but solely to) the Premises or any
part thereof and any proceeds thereof, including but not limited to
future rents, issues and profits therefrom, or (iii) limit the right of
any person to name the Lessor or any transferee of any interest in the
Premises as a party defendant in any action or suit or in the exercise
of any other remedy under this Lease, so long as no judgment in the
nature of a deficiency judgment shall be asked for or (if obtained)
enforced against the Lessor or such transferee and so long as no exer-
cise of any other remedy results in a judgment, decree or order requir-
ing the payment of money which is to be enforced against the Lessor or
such transferee other than against its interest in the Premises.

43.  Completion of Improvements.  (a)  Lessee shall cause the
construction of the Improvements to be completed and fully paid for as
provided in that certain Development Agreement dated as of the date
hereof between Lessor and Lessee.  The Improvements shall be completed
by the Completion Deadline as the same may be extended as provided in
the Development Agreement.

(b)  Failure to Meet Completion Deadline; Purchase Offer.  If
such construction is not completed on or before the earlier of
December 1, 1985 and the Completion Deadline as set forth in subsection
(a), then Lessee shall make an offer (or upon Lessee's failure to make
an offer shall be deemed to have made an offer) to Lessor as of the
earlier of December 1, 1985 and the Completion Deadline to purchase the
Premises for the purchase price computed from Exhibit B hereof, provided
however, in the event the Lessee shall elect to pay the entire purchase
price in cash and not to have its designee assume and agree to pay the
Installment Sale Agreement as permitted by Section 17 hereof, the
purchase price shall be reduced by such amounts as are retained by the

-33-

BOOK **390** PAGE **157**    BOOK    **66** PAGE **152**

Trustee in the Construction Fund under the Indenture. Lessor shall accept or shall duly reject Lessor's offer in writing within 30 days after the earlier of December 1, 1985 and the Completion Deadline. If Lessor fails to accept or duly to reject Lessee's offer within 30 days after receipt of Lessee's offer, such offer shall be deemed to have been accepted. If such offer is accepted, or is deemed to have been accepted, Lessor on the Specified Date as hereinafter defined shall transfer and convey or cause the transfer or conveyance of the Premises in the manner provided in Section 17 hereof. If Lessor accepts such offer, Lessor shall designate the Specified Date in its notice of acceptance, which date shall be the next succeeding date for the payment of semi-annual installments of interest under Bonds which occurs not less than 60 days after the date of such notice of acceptance. If such offer shall be deemed accepted by reason of a failure to accept or duly to reject an offer, the Specified Date shall be the next succeeding date for the payment of semi-annual installments of interest under Bonds which occurs not less than 60 days after the Completion Deadline. If Lessor accepts or is deemed to have accepted such offer and Lessee has elected to pay the entire purchase price in cash, this Lease shall in no event terminate until the Premises shall have been conveyed to Lessee and the purchase price and all other sums due under this Lease shall have been paid. If Lessee elects to have its designee assume and agree to pay the Installment Sale Agreement or if Lessor duly rejects Lessee's offer to purchase the Premises or if Lessor is unable to effectuate conveyance of the Premises to Lessee by the Specified Date, and provided Lessee has fully complied with Section 3.4 of the Development Agreement, then this Lease shall remain in full force and effect and Lessee shall thereafter proceed with due diligence to complete the construction of the Improvements on the Premises.

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be signed and sealed as of the date first above written.

WITNESSED:

_Irwin Reicher_

_Grace Altadonna_

COLONIAL PROPERTIES LIMITED
    PARTNERSHIP
"LESSOR"

By: _____
        General Partner
        _LAWRENCE KADISH_

BOOK 390 PAGE 158        BOOK 66 PAGE 153

K MART CORPORATION
"LESSEE"

By: _____
     HELEN C. LEFLER
Its: Vice President

_____
LINDA M. HOLSER

Attest: _____
        A.N. PALIZZI
        Its: Assistant Secretary

_____
CAROLYN M. MANSFIELD

ACKNOWLEDGEMENTS

STATE OF New York )
                  ) SS.
COUNTY OF Nassau )

          BEFORE ME, the undersigned authority, personally appeared
Lawrence Kadish _____ in his capacity as a General Partner of
Colonial Properties Limited Partnership, a Virginia limited partnership,
and acknowledged to me that he executed the foregoing instrument for the
purposes and consideration therein expressed, in the capacity therein
stated and as the free act and deed of the duly authorized General
Partner of Colonial Properties Limited Partnership.

          GIVEN under my hand and official seal hereto affixed this
21 day of December 1983.

_____
Notary Public, _____ County,
State of _____
My Commission Expires:

IRWIN REICHER
Notary Public, State of New York
No. 30-4662355
Qualified in Nassau County
Commission Expires March 30, 198?

-35-

BOOK 390 PAGE 159



BOOK 66 PAGE 154

STATE OF MICHIGAN )
                  ) SS.
COUNTY OF OAKLAND )

The foregoing instrument was acknowledged before me this 16th day of _December_, 1983 by _____ **HELEN C. LEFLER** and **A.N. PALIZZI** _____, the Vice President and Assistant Secretary, respectively, of K MART CORPORATION, a Michigan corporation, on behalf of the corporation, and acknowledged that the seal affixed to the foregoing instrument is the corporate seal of said corporation.

Notary Public, Oakland County,
State of Michigan
My Commission Expires:

CAROLYN M. MANSFIELD
Notary Public Oakland County, Mich.
My Commission Expires July 27, 1987.

Drafted by and when recorded,
return to:

R. V. Peterson, Esq.
Dickinson, Wright, Moon,
 Van Dusen & Freeman
P.O. Box 509
525 N. Woodward Avenue
Bloomfield Hills, MI  48013

-36-

BOOK  66 PAGE 155

EXHIBIT A TO LEASE

Part I

Description of Leased Premises

Parcel A of the Subdivision of the Property of K mart Corporation dated December 9, 1983 recorded on December 23, 1983 in the Clerk's Office of the Circuit Court for the County of York in Plat Book 9 at Page 622.

Together with the rights, easements and benefits granted under that certain Declaration of Easements dated as of the 1st day of December, 1983, by K mart Corporation.

BOOK **390** PAGE **160**

BOOK **66** PAGE **156**

Part II

Permitted Exceptions

1.  Taxes for the year, 1984, not yet due and payable, and subsequent
    years.

2.  Easement granted Virginia Electric and Power Company by instrument
    recorded in Deed Book 48, Page 424.

3.  Easement granted Chesapeake and Potomac Telephone Company by
    instrument recorded in Deed Book 33, page 426.

4.  Easement granted Virginia Electric and Power Company by instrument
    recorded in Deed Book 161, Page 701.  (Affects easement parcels
    only).

5.  Easement granted Chesapeake and Potomac Telephone Company by
    instrument recorded in Deed Book 208, page 619.

6.  Easement granted Virginia Electric and Power Company by instrument
    recorded in Deed Book 212, Page 113.  (Affects easement parcels
    only).

7.  Easement granted Virginia Electric and Power Company by instrument
    recorded in Deed Book 304, Page 338.

8.  Easement granted Chesapeake and Potomac Telephone Company by
    instrument recorded in Deed Book 327, page 585.  (Affects easement
    parcels only).

9.  Easement for ingress/egress to Casey's, Inc., recorded in Deed Book
    124, page 478.  (Affects easement parcels only).

10. Private waterline established at instruments recorded in Deed Book
    68, page 95, and Deed Book 75, page 299.

11. Easement from K mart Corporation to Williamsburg Land Associates,
    recorded December 1, 1983, by instrument recorded in Deed Book 388,
    page 651.

12. Declaration of Easements by K mart Corporation dated as of
    December 1, 1983.

13. Easements and other matters shown on the Subdivision of the
    Property of K mart Corporation, prepared by AES, a professional
    corporation, dated December 9, 1983, a copy of which is recorded in
    the Clerk's Office of the Circuit Court for the County of York.

York Co., VA
12/22/83

-1-

BOOK **390** PAGE **161**          BOOK **66** PAGE **157**

## Permitted Exceptions (continued)

14. Easement granted Virginia Electric and Power Company by instrument recorded in Deed Book 208, Page 741. (Affects easement parcels only).

15. Easement granted Virginia Electric and Power Company by instrument recorded in Deed Book 304, Page 327. (Affects easement parcels only).

York Co., VA
12/22/83

BOOK  66 PAGE 158

<u>EXHIBIT B</u>

(Intentionally Omitted)

BOOK **66** PAGE **159**

<u>EXHIBIT C</u>

(Intentionally Omitted)

VIRGINIA: County of York to-wit:

In the Clerk's Office of the Circuit Court for the County of York, the _2d_ day of _December_ 19 _83_ This deed was presented with the certificate annexed and admitted to record at _11:23_ o'clock _Am_.

Teste: Edith M. Elliott, Clerk

By: _____ Deputy Clerk

VIRGINIA: City of Williamsburg and County of James City, to wit:

In the Clerk's office of the Circuit Court of the City of Williamsburg and County of James City the ___ day of _Dec_, 1984 ___ Lease Agreement was presented with certificate annexed and admitted to record at ___ o'clock _12:51 PM_.

Teste: Helen S. Ward, Clerk

by _Wilma S. Ward_ Deputy Clerk

32

# 5578

VIRGINIA: CITY

Received at 11:23 o'clock in the Clerk's Office of
York County, Va., with certificate annexed and re-
corded in Deed Book 390 Page 122 and
examined. State Tax $_____ Local Tax $_____

December 28 19 83

Edith M. Elliott, Clerk

20

Received at 12:35 o'clock in the Clerk's Office
of the City of Williamsburg, and County of James
City, Va, with certificate annexed and recorded
In Deed Book 66 Page 111 20
and Examined, State Tax $20.00 Tax $
Addl Tax $61.00

17 Jan 19 84

Helene S. Ward, Clerk

Return to:
Lawyers Title Insurance Co.
P.O. Box 3296
Norfolk, Va. 23514



FILE TO:
FIRST AMERICAN TITLE CO.
ATTE: T&H

BK0767PG0711

## FIRST AMENDMENT TO LEASE

This First Amendment to Lease is made and entered into as of this 1st day of December, 1993 between COLONIAL PROPERTIES LIMITED PARTNERSHIP, a Virginia limited partnership, having its principal office at c/o Mr. Lawrence Kadish, Lawrence Kadish Real Estate, 135 Jericho Turnpike, Old Westbury, New York 11568 ("Landlord"), and KMART CORPORATION, a Michigan corporation, having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 ("Tenant").

### RECITALS:

A.    As of December 1, 1983, Landlord and Tenant entered into a Lease of certain land and buildings ("Premises") situated in the County of York, Commonwealth of Virginia, as more particularly described in the Lease (as amended hereby and entitled and designated herein, "Lease").

B.    On or about December 20, 1983, The County of York, Virginia ("Issuer") delivered its Industrial Development Revenue Bonds, Series 1983 (Kmart Corporation Project), dated December 1, 1983 in the principal amount of $6,190,000 (the "1983 Bonds"), the proceeds of which were used to finance the acquisition, construction and improvement of the Kmart store and other retail store facilities upon the Premises.

C.    Issuer has issued of even date herewith new bonds [Industrial Development Revenue Refunding Bonds (Kmart Corporation Project) Series 1993] in the principal amount of $6,010,000 (the "Refunding Bonds"), all of the proceeds of which will be used to refund the 1983 Bonds.    In consideration for the proceeds of the Refunding Bonds, Issuer and Landlord have executed a Loan Agreement dated as of December 1, 1993 pertaining to the loan of the proceeds of the Refunding Bonds by the Issuer to the Landlord ("1993 Loan Agreement") and Landlord pursuant to a mortgage and security agreement dated as of December 1, 1993 has granted to the Signet Trust Company, Richmond, Virginia, as Trustee ("Trustee") under an Indenture dated as of December 1, 1993 a first mortgage lien on the Premises.    Landlord has also executed a Collateral Assignment of the Landlord's Interests in the Rents and Leases dated as of December 1, 1993 and delivered such Assignment to the Trustee.    Tenant is guaranteeing payment of the Refunding Bonds.

D.    As a result of the refunding, Landlord will realize interest cost savings ("Interest Cost Savings") under the 1993 Loan Agreement with Issuer, as compared to its interest payable to the Issuer under the installment sale agreement entered into with respect to the 1983 Bonds.

York County (Williamsburg), VA
Store #7259
12/07/93

BK0767PG0712

E.   Landlord and Tenant have agreed  to  share on a similar basis
the Interest Cost Savings as well as  the Issuance Costs (as hereinafter
defined) of  the  Refunding Bonds  (excluding  their  respective attorneys'
fees).  Landlord is to realize  approximately eighty-five percent (85%) of
the Interest Cost Savings and to  be  responsible for eighty-five percent
(85%) of the Issuance Costs and  Tenant is to realize approximately fifteen
percent (15%) of the Interest  Cost  Savings and be responsible for fifteen
percent (15%) of the Issuance Costs.

NOW,  THEREFORE,  for  valuable  consideration,  the  receipt  and
sufficiency of which are hereby  acknowledged, Landlord and Tenant agree as
follows:

1.   Section 6, Rent (a),  Basic  Rent (iii)  shall be amended to
include a new last sentence as follows:

Further provided, that as  a  result  of the issuance of
the Refunding Bonds at a significant lower interest rate than
the 1983 Bonds, Tenant may  reduce the Cash Payments (Column
#5) on Exhibit  C  in  the  amounts  indicated  on Schedule I
hereto so that the payments  due  on the semi-annual Payment
Dates will be in  the  amounts  specified on Schedule I below
the heading "Revised Column #5 - Semi-Annual Rent, etc. $."

2.   Landlord and Tenant shall  pay  all  of the Issuance Costs of
the Refunding Bonds ("Issuance Costs") according  to the 85% Landlord, 15%
Tenant ratio above referenced and, within one hundred twenty (120) days
from the date hereof, shall certify  to  each other the Issuance Costs they
have paid and the date  they  were  paid.   Thereafter, Landlord and Tenant
will reimburse each other to the extent that one of them has paid more than
its agreed to payment percentage.

"Issuance Costs" as used herein includes, without limitation,
call premiums on the 1983  Bonds,  accrued  interest on the 1983 Bonds from
the date of the closing on the Refunding Bonds to the date of redemption of
the 1983 Bonds and other  monies  necessary to effectuate the redemption of
the 1983 Bonds (to the extent  not  provided by proceeds of the Refunding
Bonds), underwriter's fees, issuer's  fees, trustee's fees, including their
respective counsel fees,  bond  counsel  fees,  title insurance costs, bond
printing and advertising costs,  rating  agency fees  and recording fees.
"Issuance Costs" shall not include  Landlord's and Tenant's attorneys' fees
for which each party shall pay its own.

3.   The parties hereby agree that  neither  of them is in default
of any provision of the Lease and hereby acknowledge their mutual intent to
preserve  the  tax-exempt  benefit   of the  industrial  development  bond
financing pursuant to the Refunding Bonds  to the same extent as previously
enjoyed  pursuant  to  the  1983  Bonds  and  agree  and  confirm  that the
provisions of Section 24 of  the  Lease  shall  continue in full force and
effect with respect  to  the  Refunding  Bonds  to  the extent necessary to
effect the intent and purpose of such Section 24.

-2-

BK0767PG0713

4.    Tenant knows the terms of Landlord's borrowing under the 1993 Loan Agreement and that to evidence and secure same Landlord has delivered its Promissory Note, Mortgage and Security Agreement, Collateral Assignment of Rents and Leases and the 1993 Loan Agreement, itself ("Loan Documents"). It is the intention of the Landlord and Tenant that except for such matters and obligations which are unique to the Landlord under the Loan Documents and the payment of regular interest and principal under the Promissory Note, all of the other terms, covenants, conditions and obligations of the Landlord as Borrower/Grantor undertaken by it under the Loan Documents are to be considered obligations of the Tenant under this Lease. In the event there is any provision in the Loan Documents which is inconsistent with or not addressed in this Lease other than any term, covenant, condition or obligation contained in the Loan Documents unique to the Borrower/Grantor, this Lease shall in each such instance be deemed amended to conform to the provisions of said Loan Documents; provided, however, that such amendment shall not in any event be deemed to detract from or negate any rights of Tenant under the Disposition Agreement which is an integral and paramount part of the subject financing and without which Tenant would not be guaranteeing the Refunding Bonds.

5.    Tenant represents, warrants and covenants that it has not used or caused to exist and will not use or cause to exist on the Premises during the Lease term any Hazardous Materials (as hereinafter defined) in any manner which violates federal, state or local laws, ordinances, regulations, orders, directives or policies governing the use, storage, treatment, transportation, manufacture, refinement, handling, production or disposal of Hazardous Materials. For purposes of this paragraph 6, "Hazardous Materials" includes, without limitation, any flammable explosives, radioactive materials, petroleum products or derivatives, asbestos, polychlorinated biphenyls, hazardous materials, hazardous substances, hazardous wastes, toxic substances or related materials defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 USC 9601 et seq.), the Hazardous Materials Transportation Act, as amended (49 USC 1801 et seq.), the Resource Conservation and Recovery Act, as amended (42 USC 6901 et seq.), and in the regulations adopted in publications promulgated pursuant thereto or any other federal, state or local governmental law, ordinance, rule, regulation or policy.

6.    The references in Section 24 of the Lease to certain defined terms and definitions that appear in various provisions of the Lease including Section 24 shall be expanded and amended to include the Definitions in the 1993 Indenture relating to the Refunding Bonds for the following words and phrases: "Bonds" or "Outstanding Series 1993 Bonds," "Indenture," "Issuer," "Project," "Series 1993 Bonds" and "Trustee."

7.    The parties agree that, except as hereby amended, the Lease as previously amended and all terms and provisions thereof shall remain unmodified and in full force and effect.

-3-

BK0767PG0714

8.   This First Amendment to Lease  may  be executed in any number of counterparts  each  of  which  shall  be  deemed  an  original but which together shall constitute a single instrument.

IN WITNESS WHEREOF, Landlord  and  Tenant have executed this First Amendment to Lease as of the day and year first above written.

LANDLORD:

COLONIAL PROPERTIES LIMITED PARTNERSHIP,
a Virginia limited partnership

By: _____
    Lawrence Kadish
    General Partner

Print Name: _IRWIN Reichel_

Print Name: _MARCELLA PRUSMACK_

TENANT:

KMART CORPORATION

By: _____
    M. L. Skiles
    Its:  Senior Vice President

Print Name: _____

Print Name: _____

-4-

BK0767PG0715

ACKNOWLEDGMENT

STATE OF NEW YORK   )
                    ) SS.
COUNTY OF NASSAU    )

The foregoing instrument was acknowledged before me this 6ᵗʰ day
of December, 1993, by Lawrence Kadish, General Partner of COLONIAL
PROPERTIES LIMITED PARTNERSHIP, a Virginia limited partnership, on behalf
of the Partnership.

_____
Notary Public

[Notary Seal]                          _____ County, _____
                                       My Commission Expires:

                                       ANN J. DALE
                                       Notary Public, State of New York
                                       No. 01DA5012124
                                       Qualified in Suffolk County
                                       Commission Expires June 15, 19__

STATE OF MICHIGAN   )
                    ) SS.
COUNTY OF OAKLAND   )


The foregoing instrument was acknowledged before me this ____ day
of December, 1993, by M. L. Skiles, a Senior Vice President of KMART
CORPORATION, a Michigan corporation, on behalf of the Corporation.


                                       _____
[Notary Seal]                          Notary Public
                                       Oakland County, Michigan
                                       My Commission Expires:

FGP/11335/2336/AL8/jfk

-5-

BK0767PG0716

8.   This First Amendment to Lease  may  be executed in any number of counterparts each of which shall be deemed an original but which together shall constitute a single instrument.

IN WITNESS WHEREOF, Landlord  and  Tenant have executed this First Amendment to Lease as of the day and year first above written.

LANDLORD:

COLONIAL PROPERTIES LIMITED PARTNERSHIP, a Virginia limited partnership

By: _____
    Lawrence Kadish
Print Name:_____    General Partner


Print Name:_____


TENANT:

KMART CORPORATION

By: _____
    M. L. Skiles
Print Name: JANET A. BARKHOUSE    Its:  Senior Vice President

Print Name: SUSAN F MARKS

-4-

BK0767PG0717

## ACKNOWLEDGMENT

STATE OF NEW YORK   )
                    ) SS.
COUNTY OF NASSAU    )


        The foregoing instrument was acknowledged before me this _____ day
of December, 1993, by Lawrence Kadish, General Partner of COLONIAL
PROPERTIES LIMITED PARTNERSHIP, a Virginia limited partnership, on behalf
of the Partnership.


                            _____
                            Notary Public
        [Notary Seal]       _____ County, _____
                            My Commission Expires:


STATE OF MICHIGAN   )
                    ) SS.
COUNTY OF OAKLAND   )


        The foregoing instrument was acknowledged before me this _6_ day
of December, 1993, by M. L. Skiles, a Senior Vice President of KMART
CORPORATION, a Michigan corporation, on behalf of the Corporation.


                            _Mary A. Schnitzler_____
                            Notary Public
        [Notary Seal]       Oakland County, Michigan
                            My Commission Expires:

                               MARY A. SCHNITZLER
                               Notary Public, Oakland County, Michigan
                               My Commission Expires May 15, 1995


FGP/11335/2336/AL8/jfk

BK0767PG0718

SCHEDULE I

INTENTIONALLY LEFT BLANK

Virginia: County of York to-wit:
    In the Clerk's Office of the Circuit Court for the
County of York, the 22 day of Dec 19 93
This deed was presented with the certificate annexed
and admitted to record at 8:33 o'clock AM
        Teste: Nancy B. Kane, Clerk
By: [signature] Deputy Clerk

4

R... 8:33 o'clock in the Clerk's Office of
Y: with certificate annexed and re-
c 'oak feza and
Suntines certified by s
~ Nancy E. ...

12-22-93

020172
First Amer. Title Insu. Co