**Objection Deadline: September 3, 2021 at 4:00 p.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re                                             :

                                                  :          **Chapter 11**

**SEARS HOLDINGS CORPORATION**, *et al.*,         :

                                                  :          **Case No. 18-23538 (RDD)**

                                                  :

Debtors.[1]                                        :          **(Jointly Administered)**

                                                  :

------------------------------------------------------------x

## NOTICE OF DE MINIMIS ASSET SALE
## MAYAGÜEZ, PUERTO RICO

      **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets of the Debtors (the "**Assets**") to Gator Development Corp. (the "**Purchaser**") pursuant to the *Real Estate Sale Contract* dated August 23, 2021

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 1700 Broadway, 19th Floor, New York, NY 10019.

(the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.[2]

_Description of the Assets_. The Assets consist of a parcel of land containing approximately 12.43 acres of undeveloped land and all real property interests of the Debtors commonly known as PR-2 Sabaneta Ward in the Municipality of Mayagüez, Commonwealth of Puerto Rico.

_Relationship of the Purchaser to the Debtors_. The Purchaser does not have any relationship with the Debtors.

_Liens and Encumbrances on the Assets_. The Debtors are not aware of any liens and/or encumbrances on the Assets. To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

_Material Economic Terms and Conditions of the Proposed Sale_. The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code. The Purchaser has agreed to pay a purchase price of $600,000 (the "**Purchase Price**") for the Assets. The Purchase Agreement is annexed hereto as **<u>Exhibit 1</u>**.

_Commission, Fees, or other Similar Expenses_: The Debtors are required to pay $34,320 in commission, fees, or other similar expenses in connection with the sale.

_Procedures to Object to the Proposed Sale_. Any objection to the proposed sale (an "**Objection**") must: (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; and Sunny Singh, Esq.), as counsel to the Debtors **on or before September 3, 2021 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then

---

[2] Although the seller under the Purchase Agreement, S.F.P.R., Inc., is a non-Debtor entity and, therefore, is not subject to the Sale and Abandonment Order, the Debtors have elected to adhere to the procedures set forth in the Sale and Abandonment Order to ensure that all potential parties in interest are on notice of the proposed sale.

the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; and (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated:  August 25, 2021
New York, New York

/s/ *Jacqueline Marcus*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
*Attorneys for Debtors*
*and Debtors in Possession*

## Exhibit 1

**Purchase Agreement**

## REAL ESTATE SALE CONTRACT
*Mayagüez, Puerto Rico*

**THIS REAL ESTATE SALE CONTRACT ("Contract")** is made as of August 23, 2021 (the **"Effective Date"**), by and between **S.F.P.R., INC.**, a Puerto Rico corporation (**"Seller"**) and **GATOR DEVELOPMENT CORP.**, a Florida corporation (**"Purchaser"**; Seller and Purchaser are also collectively referred to in this Contract as the **"Parties"** and individually referred to in this Contract as a **"Party"**). Seller and Purchaser agree as follows:

1. **PURCHASE AND SALE**

   Seller is the owner in fee simple of a parcel of land containing approximately 12.43 acres (12.83 cuerdas) of undeveloped land, including any interest of Seller in adjacent streets, alleys, rights-of-way, strip and gores, and together with all easements, hereditaments and appurtenances thereunto belonging (collectively, **"Real Property"**), located at PR-2 Sabaneta Ward in the Municipality of Mayagüez, Commonwealth of Puerto Rico (the **"Commonwealth"**), legally described on **Exhibit "A"** attached hereto and made a part hereof. The Real Property is sometimes called the **"Property"**. Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract. On the Closing Date set forth in Section 7 of this Contract, Seller shall cause to be conveyed to Purchaser marketable and insurable fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject to the Permitted Title Exceptions (as defined in Section 4 of this Contract).

2. **PURCHASE PRICE**

   (a) **Purchase Price.** The Purchase Price of the Property shall be Six Hundred Thousand and No/100 Dollars ($600,000.00) (the **"Purchase Price"**), payable by Purchaser in United States currency in good and certifiable funds at Closing.

   (b) **Intentionally Deleted.**

3. **EARNEST MONEY DEPOSIT**

   Within three (3) business days after the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company, 10 South LaSalle Street, Suite 3100, Chicago, Illinois 60603 Attention: Cheri L. Sutton, Telephone: (312) 223-2958, Fax: (312) 223-5801, Email: Cheri.Sutton@ctt.com (**"Title Insurer"** or **"Escrow Agent"**) the sum of Fifty Thousand and No/100 Dollars ($50,000.00) United States currency (the **"Earnest Money Deposit"**) by means of a certified check, cashier's check or wire transfer, to be held in escrow by the Title Insurer in an interest bearing account in accordance with the terms of the strict joint order escrow instructions executed by the Parties attached hereto as **Exhibit "B"** and incorporated into this Contract by this reference (the **"Earnest Money Escrow Instructions"**) and also the terms and conditions of this Contract. Any escrow fees as set forth in the Earnest Money Escrow Instructions will be paid by the Parties as provided in Section 5(b)(i) hereafter. Purchaser may elect to direct the Title Insurer to invest the

Earnest Money Deposit on its behalf in compliance with the Title Insurer's standard investment instructions, and Purchaser agrees that it shall be solely responsible for any investment fees charged by the Title Insurer.  Subject to the terms and conditions as otherwise set forth in this Contract, any and all interest accrued on the Earnest Money Deposit shall be paid to Purchaser at Closing.  The Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, no later than 3:00 pm (Chicago time) on the Closing Date, by wire transfer of immediately available funds.  If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit, terminate this Contract, in which case this Contract shall be null and void <u>ab initio</u> and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

4.    **TITLE AND SURVEY REVIEW**

(a)    **Title Commitments/Title Exceptions**.  Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser: (i) a current title commitment for an ALTA Standard Form of Owner Policy of Title Insurance (the "**Title Commitment**") issued by Title Insurer covering title to the Property and showing title to the Property vested in Seller and (ii) legible copies of all documents listed as exceptions in the Title Commitment to the extent available.

(b)    **Permitted Title Exceptions**.  Notwithstanding anything contained in Subsection 4(a) above, the following shall be deemed Permitted Title Exceptions: (1) restrictive covenants common to the platted subdivision in which the Property is located, provided any such restrictive covenants do not limit the commercial use or the type of development that can be done in the Property, (2) standby fees, taxes and assessments for the current period only and not yet due and payable, (3) utility easements created by the dedication deed or plat of the subdivision in which the Property is located or any other easements, rights of way, servitudes, encroachments, apparent servitudes, permits, or other similar rights (but excluding any leases, occupancy agreements or parties in possession other than Seller), (4) exception as to waters, tidelands, beaches, streams, and related matters, (5) discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements (Purchaser, at Purchaser's expense, may have any related  title exception amended to read, "shortages in area"), (6) all matters set forth in the Title Commitment and the Supplemental Title Commitment(s) (defined below), if any, and approved by Purchaser or deemed approved by Purchaser as herein provided, (7) any title exception or encumbrance created directly by any act or omission of Purchaser and/or its employees, agents, consultants and contractors (collectively, the "**Purchaser Representatives**"), or any party acting on behalf of Purchaser, (8) matters disclosed by the Survey or the Existing Survey (or if none is obtained or provided, as would be disclosed by a current and accurate survey or an inspection of the Property), (9) all applicable laws, ordinances, rules and governmental regulations affecting the development, use, occupancy and/or enjoyment of the Property, or any portion thereof, and (10)

encumbrances which will be and are discharged or released either prior to, or simultaneously with, the Closing (collectively, the "**Permitted Title Exceptions**"). On the Closing Date, Seller shall cause the Title Insurer to issue, at Purchaser's sole cost and expense, a title policy in the amount of the Purchase Price insuring marketable fee simple title to the Property in Purchaser as of the Closing Date, subject only to the Permitted Title Exceptions (the "**Title Policy**"). It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before the Closing Date. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for or any other ability to obtain any endorsement, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder.

(c)     **Survey**.  Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser, to the extent available, if at all, in the "Potential Purchaser Diligence Documents" folder in Seller's electronic online data room for the Property (as the same may be updated from time-to-time), Seller's existing survey of the Real Property (the "**Existing Survey**"). During the due Diligence Period, Purchaser, may, at Purchaser's sole cost and expense, obtain a new ALTA/NSPS land title survey, or an update to the Existing Survey, with such Table A inclusions as indicated by Purchaser, prepared by a licensed surveyor in the Commonwealth of Puerto Rico, certified in a form acceptable to Purchaser and Title Insurer (the "**Survey**").

(d)     **Intentionally Deleted.**

(e)     **Supplemental Title Commitments, Supplemental Title Review Period**.  In the event that any new title matter is first raised by the Title Insurer in a supplement to the Title Commitment (each, a "**Supplemental Title Commitment**") after the Effective Date (a "**Supplemental Exception(s)**"), then Purchaser shall promptly provide Seller with a copy of such Supplemental Title Commitment (together with copies of all documents relating to any new title matters set forth in such Supplemental Title Commitment). If Purchaser fails to give written notice to Seller within ten (10) Business Days after Purchaser becomes aware of any Supplemental Exceptions shown on any Supplemental Title Commitment and obtaining copies of the documents relating to any new matters, Purchaser shall be deemed to have approved such Supplemental Exceptions and such matters shall be deemed to be Permitted Title Exceptions. If Purchaser has given the required written notice described above identifying Supplemental Exceptions, Seller may, at its option (but with absolutely no obligation),  (i) have such Supplemental Exception(s) removed from the Supplemental Title Commitment; (ii) commit to having such Supplemental Exception(s) removed from the Title Policy when issued, (iii) have Title Insurer commit to insure over such Supplemental Exception(s) and provide evidence thereof acceptable to Purchaser, or (iv) decline to take any action with respect to any such Supplemental Exception(s). If Seller fails to commit to having such Supplemental Exception(s) removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given within five (5) days (the "**Supplemental Response Period**") to either (i) terminate this Contract (in which

event, provided no other event of default is outstanding and/or uncured on the part of Purchaser, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof), or (ii) accept title to the Property subject to such Supplemental Exceptions without any credit, setoff or abatement therefor. If Purchaser fails to elect either (i) or (ii) above within the Supplemental Response Period, Purchaser shall be deemed to have elected (ii) above and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof without any credit, setoff or abatement.

(f)    **No Obligation of Seller to Remove Exceptions**.    The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer.

## 5.    PRORATIONS AND EXPENSES

(a)    **Prorations**.    The following prorations, except as specifically provided in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date (the "**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)    Taxes.  All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel number(s) that is attributable to the Property.  All prorations shall be final.  Any general real estate taxes and installments of special or other assessments affecting the Property which are due and payable for the period(s) prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser.  The term "general real estate taxes" as used in this Section 5(a)(i) includes general assessments, including, without limitation, regular annual assessments payable to any property owners association - but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

(ii)    Miscellaneous.  If there are any other items of income or expense, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing as of the Proration Date. In the event that accurate prorations and other adjustments cannot

be made at Closing because current bills are not available or the amount to be adjusted is not yet ascertainable, the Parties shall prorate on the best available information. All prorations shall be final.

(b)    **Closing-related Costs.**

(i)    At Closing, Seller shall pay: (i) the aggregate amount of the internal revenue stamp, the legal aid stamp and the notarial stamp required to be affixed to the original of the Deed; (ii) the statutory notarial tariff required to be paid to the Notary from McConnell Valdés LLC for the execution of the Deed; (iii) all notarial fees relating to any of Seller's discharged indebtedness relating to the Property; (iv) the cost of the Title Commitment, and (v) one-half (1/2) of the cost of the escrow and closing fees to the Escrow Agent. At Closing Purchaser shall pay: (i) the premium for the Title Policy (including both standard and any extended coverage) and any endorsements to the Title Policy and the costs of any Updated Survey; (ii) the aggregate amount of the internal revenue stamp, the legal aid stamp and the notarial stamp required to be affixed to the first certified copy of the Deed; (iii) all filing and recording charges necessary for the filing and recordation of the first certified copy of the Deed at the Registry of Property; (iv) all financing related fees; (v) one-half (1/2) of the cost of the escrow and closing fees to the Escrow Agent and (vi) any costs related to any inspections or due diligence performed by Purchaser with respect to the Property.

(ii)    All closing costs specified above, or as may be specifically allocated elsewhere in this Contract, will be payable by the Parties at Closing. Any other closing costs not allocated above or elsewhere in this Contract, will be allocated to and payable by the Parties in accordance with the customary practice in the Commonwealth for similar commercial transactions. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.    **CONDITIONS TO CLOSING**

(a)    **Conditions to Seller's Obligation to Close**. In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to sell the Property to Purchaser is subject to each and all of the following conditions precedent (or express written waiver thereof by Seller):

(i)    All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(b)    **Conditions to Purchaser's Obligation to Close**. In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to

close the purchase of the Property is subject to each and all of the following conditions precedent (or express written waiver thereof by Purchaser):

(i)       All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects;

(ii)      All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects; and

(iii)     The Title Insurer shall be unconditionally committed to issue the Title Policy to Purchaser at Closing without any exceptions relating to the pending bankruptcy of Seller or any liens or encumbrances (except for the Permitted Exceptions), or other monetary encumbrances except for general real estate taxes for the applicable current tax period that are not then due and payable.

(c)     **Conditions to Closing of Both Parties**: In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

(i)       The sale shall be authorized by and subject to that certain Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

(ii)      Seller, a debtor in the chapter 11 case assigned number 18-23538 and currently pending in the Bankruptcy Court (the "**Chapter 11 Case**") shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property (the "**Objection Period**"). Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property. In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property. Seller agrees to duly file and serve the Sale Notice as required under the Approval Order within fifteen (15) days after the Effective Date and, if necessary, to diligently pursue an order of the Bankruptcy Court specifically approving the sale of the Property to Purchaser (the "**Final Sale Order**") in the event of the filing of any objection to the Sale Notice that is not withdrawn, provided that approval of the sale to Purchaser is consistent with Seller's fiduciary duties to its creditors. Seller shall provide Purchaser with a copy of the Sale Notice both prior to and upon filing the same and copies of any objections to the sale received by Seller and the Final Sale Order (if applicable) promptly after receipt of the same.

7.    **CLOSING**

(a)    **Closing Date**.  Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the offices of McConnell Valdés LLC located at the 270 Muñoz Rivera Avenue, 9th Floor in San Juan, Puerto Rico, on or before the later of: (i) thirty (30) days after the expiration of the Due Diligence Period (as hereinafter defined) and (ii) thirty (30) days after the satisfaction of the conditions to Closing in Section 6(c) above (the "**Closing Date**"), but in no event shall the Closing Date be later than one hundred eighty (180) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, one hundred twenty (120) days from the withdrawal of such objection or entry of the Final Sale Order (the "**Outside Date**").  If Closing does not occur by the Outside Date, the Parties shall have the rights set forth in Section 13(a) (i) hereof.

(b)    **Seller Closing Deliverables**. No later than 11:00 am Chicago time on the Closing Date, Seller shall deliver to Purchaser the following Closing documents (the "**Seller Closing Deliverables**"):

(i)    A deed of purchase and sale substantially in the form of **Exhibit "C"** hereto, executed before a Notary from McConnell Valdés LLC, so as to convey the title required by this Contract (the "**Deed**") to Purchaser, subject to the Permitted Title Exceptions; and

(ii)    A certified copy of the Approval Order and of the Final Sale Order, if applicable;

(iii)    An affidavit from Seller substantially in the form of **Exhibit "F"** attached hereto and made a part hereof (the "**Title Affidavit**");

(iv)    A so-called FIRPTA Affidavit from Seller, certifying that Seller (or the applicable transferor for tax purposes) is not a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust" or "foreign estate" within the meaning of the Internal Revenue Code of 1986 or any regulations thereunder; and

(v)    such other closing documents as may be reasonably necessary to consummate the transactions contemplated herein, including, but not limited to appropriate entity resolutions and approvals.

(c)    **Purchaser Closing Deliverables.** No later than 11:00 am Chicago time on the Closing Date, Purchaser shall execute and/or deliver or cause to be delivered to Seller the following for Closing:

(i)    The Deed;

(ii)    The full amount of the Purchase Price, as adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account

and deliver to Escrow Agent instructions to immediately release the full amount to Seller; and

(iii)    Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the Commonwealth.

(d)    On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered a closing proration statement and all other documents required hereunder in order to consummate the Closing as contemplated in this Contract.

## 8.    **RESERVED**

## 9.    **DUE DILIGENCE PERIOD**

(a)    **Access**.  Purchaser's temporary right to conduct full due diligence verifications on the Property is an essential condition of this Contract without which the Purchaser would not have entered into this Contract and placed the Earnest Money Deposit. Accordingly, notwithstanding anything to the contrary set forth in this Contract, as of the Effective Date and continuing until the expiration of the Due Diligence Period (as defined below), the Purchaser and Purchaser Representatives, at Purchaser's sole cost, expense, and liability, shall have a non-exclusive revocable license to enter upon the Property for the purpose of conducting certain due diligence of the Property (collectively, "**Purchaser's Studies**"), in accordance with and subject to the terms, covenants, provisions, agreements, indemnifications, and conditions of that certain Non-Invasive Inspection Agreement dated August _____, 2021 entered into between Seller and Purchaser (the "**Access Agreement**"), a copy of which is attached hereto and incorporated herein as **Exhibit "E"**. The terms, covenants, provisions, agreements, indemnifications, and conditions set forth in the Access Agreement are incorporated herein by reference with the same force and effect as though fully set forth herein.

(b)    **Due Diligence Period**. Purchaser shall have until 5:00 pm (local Chicago time) on the later of (i) ninety (90) days following the Effective Date and (ii) sixty (60) days following the satisfaction by Seller of the conditions to Closing in Section 6(c) of this Contract (the "**Due Diligence Period**") to perform the Purchaser's Studies in order to confirm whether the Property is suitable and adequate for acquisition by Purchaser in the exercise of Purchaser's sole and absolute discretion, at which time Purchaser's right (all in accordance with the terms and conditions of the Access Agreement and this Contract) to enter upon the Property and Purchaser's rights (including the Purchaser Representatives) to perform any of Purchaser's Studies, the Site Assessment Work (as such term is defined in the Access Agreement) shall immediately terminate. In the event Purchaser, in its sole and absolute discretion and for any or no reason, shall conclude prior to the expiration of the Due Diligence Period, that any aspect of the Property is not suitable for Purchaser in any respect, Purchaser shall have the right to elect, by simple written notice to Seller given on

or prior to the expiration of the Due Diligence Period (the "**Termination Notice**"), to terminate this Contract and this Contract shall thereupon terminate and shall be deemed to be terminated upon receipt of the Termination Notice and both Parties shall be released from any further liability hereunder, except for any obligations, which by their express terms survive the termination of this Contract, including, without limitation Section 9(d) hereof. If Purchaser gives Seller a Termination Notice, provided no other event of default is outstanding and/or uncured, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation Section 9(d) hereof. If Purchaser fails to timely give the Termination Notice to Seller as provided in this Section 9(b) and subject to the terms and provisions of this Contract, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, and (ii) Purchaser agrees to accept all aspects of the Property in its "AS-IS, WHERE-IS, AND WITH ALL FAULTS CONDITION" and to release, defend, hold harmless and indemnify Seller and the Indemnified Parties from and after the Closing Date, for all costs and expenses (including reasonable attorneys' fees and costs) resulting from any claim, demand, damage, lien, penalty, fine, interest, cost, expense, liability or loss (collectively, "**Claims**") relating to the condition of the Property, including but not limited to the environmental condition of the Property and the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur. If Purchaser does not terminate the Contract before the expiration of the Due Diligence period in accordance with this Section 9(b), the Earnest Money Deposit shall be non-refundable to Purchaser (except as may otherwise be provided in this Contract) but shall be credited towards the Purchase Price at Closing. Notwithstanding the foregoing, [Y] Purchaser's obligations under this Section 9(b) are only to the limited extent such environmental matters or conditions are introduced or caused by Purchaser or Purchaser Representatives, and [Z] Purchaser's obligations under this Section 9(b) for any pre-existing conditions (e.g., environmental contamination) shall only be to the limited extent Purchaser or Purchaser Representatives exacerbates such pre-existing conditions.

(c)     **Indemnification**.  Purchaser shall indemnify, protect, defend and hold harmless Seller, and any of its respective shareholders, managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns (collectively, the "**Indemnified Parties**") from and against any and all costs, liabilities, claims, demands, liens, expenses, damages, including reasonable attorney's fees, losses, penalties, fines, interest or suits resulting from (i) any release of Hazardous Materials (as defined below) on, in, under, or about the Property caused by Purchaser and/or any of the Purchaser Representatives during their entry on or use of the Property, (ii) Purchaser and/or any of the Purchaser Representatives' failure to remediate any such release described in the foregoing clause (i) according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (iii) the acts, omissions and/or

willful misconduct of Purchaser and/or the Purchaser Representatives during any entry upon and/or use of the Property, the Site Assessment Work under the Access Agreement, (iv) a breach of the terms and conditions of the Access Agreement by Purchaser and/or any of the Purchaser Representatives, and/or (v) personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Purchaser or any of the Purchaser Representatives pursuant to this Contract or the Access Agreement. Notwithstanding this indemnity, Seller expressly reserves all rights Seller may have under the law to prosecute any claims or demands against Purchaser and/or any of the Purchaser Entities arising out of or related to the environmental condition of the Property or otherwise. This indemnity shall survive the termination of this Contract and the Access Agreement. As used herein, (1) "**Affiliate(s)**" shall mean, with respect to any Person (as defined below), any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; and (2) "**Person**" shall mean, any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, or other entity. Notwithstanding the foregoing, [Y] Purchaser's obligations under this Section 9(c) are only to the limited extent such environmental matters or conditions are introduced or caused by Purchaser or Purchaser Representatives, and [Z] Purchaser's obligations under this Section 9(c) for any pre-existing conditions (e.g., environmental contamination) shall only be to the limited extent Purchaser or Purchaser Representatives exacerbates such pre-existing conditions.

(d)    **Survival of Purchaser's Obligations**.  Notwithstanding anything to the contrary herein, any and all obligations, commitments, and indemnifications by Purchaser and the Purchaser Representatives specified in this Section 9 and otherwise set forth in the Access Agreement shall survive the expiration or termination of this Contract (and the Access Agreement) and the delivery of the Deed without the further need to document such agreement.

(e)    Purchaser acknowledges that, prior to the Effective Date, Seller has provided Purchaser with electronic access to the "Potential Purchaser Diligence Documents" in Seller's electronic online data room for the Property (as the same may be updated from time-to-time) which, to Seller's current actual knowledge, may (but shall not be obligated to) contain the following documents, and such electronic access to the "Potential Purchaser Diligence Documents" as provided herein shall be deemed to satisfy any and all notice requirements as set forth in Section 14 hereof:

(i)    Current tax assessment statements and copies of the most recent tax bills for the Property;

(ii)    A copy of the most recent survey affecting the Property;

(iii)    A copy of the most recent environmental report, if any; and

(iv)    All zoning reports, studies and information, if any, relating to the Property.

In the event this Contract is terminated, all materials provided by or on behalf of Seller to Purchaser (the "**Due Diligence Materials**") shall either be promptly destroyed or returned by Purchaser to Seller at Purchaser's option and at no cost to Seller. SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING (i) THE TRUTH, ACCURACY OR COMPLETENESS OF ANY OF THE DUE DILIGENCE MATERIALS, (ii) THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME, (iii) ANY DATA OR INFORMATION DELIVERED BY SELLER OR THE SOURCES THEREOF, (iv) WHETHER ANY OF THE DUE DILIGENCE MATERIALS REPRESENT ALL OF THE NECESSARY OR RELEVANT INFORMATION RELATING TO THE PROPERTY, OR (v) THE ENFORCEABILITY OR VALIDITY OF ANY OF THE DUE DILIGENCE MATERIALS. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF THE DUE DILIGENCE MATERIALS SHALL BE AT THE SOLE RISK OF PURCHASER AND, EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT OR IN ANY OF THE SELLER CLOSING DELIVERABLES, WITHOUT ANY REPRESENTATIONS, WARRANTIES, OR GUARANTIES OF SELLER OR THE INDEMNIFIED PARTIES, AND PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH DUE DILIGENCE MATERIALS, BUT RATHER WILL RELY ON ITS OWN DUE DILIGENCE, INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AND ANY REPORTS COMMISSIONED BY PURCHASER WITH RESPECT THERETO. NEITHER SELLER, NOR ANY AFFILIATE OF SELLER, NOR THE PERSON OR ENTITY WHICH PREPARED ANY OF THE DUE DILIGENCE MATERIALS SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY, OR OMISSION, IN ANY OF THE DUE DILIGENCE MATERIALS. THE FAILURE TO DELIVER ANY REPORT, FINDINGS, RESULTS, FACTS, INFORMATION, OR DUE DILIGENCE MATERIALS SHALL NOT BE ACTIONABLE BY PURCHASER AND SELLER SHALL HAVE NO LIABILITY IN CONNECTION THEREWITH. PURCHASER ACKNOWLEDGES THAT THE DUE DILIGENCE MATERIALS PROVIDED BY SELLER MAY NOT NECESSARILY REPRESENT ALL OF THE DOCUMENTATION AND INFORMATION IN EXISTENCE (OR IN SELLER'S POSSESSION OR CONTROL) WITH RESPECT TO THE PROPERTY, BUT, RATHER, REPRESENTS DOCUMENTATION MADE AVAILABLE BY SELLER AS A CONVENIENCE FOR PURCHASER. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS MAY HAVE BEEN OBTAINED BY SELLER FROM A VARIETY OF SOURCES, AND THAT SELLER HAS NOT MADE (AND IS UNDER NO DUTY TO MAKE) ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF ANY DUE DILIGENCE

MATERIALS. PURCHASER WAIVES, RELEASES AND FORFEITS ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER AGAINST SELLER, THE INDEMNIFIED PARTIES, OR THIRD PARTIES ARISING OUT OF PURCHASER'S USE OF THE DUE DILIGENCE MATERIALS. THIS SECTION 9(e) SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT.

10.    **REPRESENTATIONS AND WARRANTIES**

(a)    **Seller Representations**.  Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)    Subject to Section 6(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to Section 6(c) of this Contract.

(ii)    To Seller's knowledge, Seller is a corporation duly organized and validly existing under the laws of the Commonwealth of Puerto Rico and is duly qualified to do business and in good standing under the laws of the Commonwealth of Puerto Rico.  To Seller's knowledge, Seller is engaged in trade or business in Puerto Rico for purposes of Section 1062.11 of the Puerto Rico Internal Revenue Code of 2011, as amended, and the regulations issued thereunder.

(iii)    To Seller's actual knowledge, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except as set forth on **Exhibit "D"**.

(iv)    Prior to the Closing Date, Seller will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

(v)    Seller is not a "non-resident alien," "foreign person" or "foreign entity" within the meaning of the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

(vi)    To Seller's knowledge, Seller has not entered into a right of first refusal, right of first offer or purchase option with respect to the Property or any portion of the Property.

(vii)    To Seller's knowledge, within the twelve (12) month period prior to the Effective Date, Seller has not received written notice that the Property is in material violation of any applicable federal, state, Commonwealth or local environmental laws, in each case which has not been cured, dismissed, settled or otherwise resolved.

(viii)    To Seller's knowledge, within the twelve (12) month period preceding the Effective Date, Seller has not received written notice of any eminent domain or private purchase in lieu of such proceeding that would materially adversely affect the Property, and which has not been completed.

(ix)    To Seller's knowledge, Seller has not been informed of any reassessment or potential reassessment of the real estate taxes of the Property by the Municipal Revenues Collection Center ("CRIM," for its Spanish acronym).

(x)    As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of William Gallagher of M-III Partners, L.P., and shall not be construed to refer to the knowledge of any other person, including, without limitation, managers, members, officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b)    **Purchaser Representations**.  Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)    Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.  Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents.   The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii)    Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii)    This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the United States Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or

decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)    Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 10 shall merge with the transfer of title and shall not survive Closing. If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown.

11.    **AS IS/NO WARRANTIES**

(a)    **As-Is Condition**. Purchaser expressly acknowledges that, except as expressly provided in this Contract or in any of the Seller Closing Deliverables, Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to all aspects of the Property without warranty or representation of any kind by Seller or any of Seller's managers, members, officers, directors, employees, partners, agents, representatives, attorneys, subsidiaries, Affiliates (as defined below), successors and assigns ( the "**Indemnified Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Materials. As used in this Contract, the term "**Hazardous Material(s)**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any federal, state or local law, statute, ordinance or regulation. Purchaser, hereby agrees to release, defend, hold harmless and indemnify Seller and the Indemnified Parties with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was directly caused by the affirmative acts of Seller, its employees, agents or contractors from and after the Effective Date) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the

Property, from any source.  Notwithstanding the foregoing, [Y] Purchaser's obligations under this Section 11(a) are only to the limited extent such Hazardous Materials and/or environmental matters are introduced or caused by Purchaser or Purchaser Representatives, and [Z] Purchaser's obligations under this Section 11(a) for any pre-existing Hazardous Materials and/or conditions (e.g., environmental contamination) shall only be to the limited extent Purchaser or Purchaser Representatives exacerbates such pre-existing conditions.

(b)    **No Warranties, Representations**.  Purchaser warrants, acknowledges to, and agrees with Seller that, except for the representations and warranties of Seller contained herein or in any of the Seller Closing Deliverables, Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller.  Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price.  Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Section 10 of this Contract or in any of the Seller Closing Deliverables:

(i)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)    Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.  Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the Commonwealth; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c) **WAIVER/RELEASE OF PURCHASER CLAIMS**. WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 11(a) AND 11(b), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED HEREIN OR IN ANY OF THE SELLER CLOSING DELIVERABLES, IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND THE INDEMNIFIED PARTIES, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORSEEN OR UNFORSEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d) **No Representations as to Condition/Full Investigation**. Except as expressly set forth in this Contract or in any of the Seller Closing Deliverables, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any of the Indemnified Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof. The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto. Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser as to the condition of the Property, rather than any information that may have been provided by Seller to Purchaser.

12.    **RESERVED**

13.    **DEFAULT AND REMEDIES**

(a)    **Termination Events:**

(i)    Termination by Either Party:  Notwithstanding anything to the contrary set forth herein, this Contract may be terminated by either Party if Closing does not occur by the Outside Date as contemplated in Section 7(a) of this Contract, provided, however, that the right to terminate this Contract pursuant to this Section 13(a) shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in Closing failing to occur.

Termination by Purchaser.  If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of written notice of such default from Purchaser (the "**Seller Cure Period**") (excluding any default by Purchaser and Purchaser's failure to diligently complete or cure the same), Purchaser shall have as its sole and exclusive remedies (a) the right to terminate the Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon in full satisfaction of all damages suffered by Purchaser by reason of Seller's default and the Contract shall be terminated and of no further force or effect except as provided for in this Contract or (b) in the event that Seller's breach of this Contract does not arise out of a refusal of the Bankruptcy Court to approve the sale or the Seller's exercise of its fiduciary duties related to any offers and/or objections received during the Objection Period, the right to specific performance of this Contract by the Bankruptcy Court; provided, however, Purchaser will seek this right of specific performance if at all within no more than sixty (60) days from the expiration of the Seller Cure Period. If the remedy of specific performance is not available to Purchaser due to Seller's intentional or wrongful breach of its obligations under this Contract by selling the Property to a third party in violation of this Contract prior to Closing, then, in addition to the full and immediate refund of the Earnest Money Deposit held by the Escrow Agent, Buyer shall be entitled to pursue a claim for damages against Seller. Notwithstanding the foregoing, Buyer shall not be entitled to pursue a claim for damages against Seller in the event Seller accepts a competing bid for an offer or objection made during the Objection Period consistent with Seller's fiduciary duties to its creditors or the Bankruptcy Court does not approve the sale of the property to Purchaser.

(ii)    Termination by Seller.  If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of written notice of such default from Seller (excluding any default by Seller and Seller's failure to diligently complete or cure the same), Seller's sole remedy shall be to terminate this Contract, in which event Seller shall be entitled to receive the Earnest Money Deposit as liquidated damages in lieu of all other remedies available to Seller (except as otherwise set forth in Section 9 hereof) and this Contract shall terminate

with neither Party having any further rights or liabilities hereunder, except as those specifically provided to survive the termination of this Contract; provided, however, that this Section 13(a)(iii) shall not limit Seller's claims pursuant to any of Purchaser's indemnification obligations in this Contract. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money Deposit is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Earnest Money Deposit upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

(b) **Effect of Termination**.  In the event of a termination of this Contract pursuant to this Section 13 (other than a termination of this Contract pursuant to Section 13 (a)(iii), Seller and Purchaser shall instruct the Escrow Agent to, and the Escrow Agent shall, promptly (but in any event within two (2) Business Days of such instruction) return to Purchaser the Earnest Money Deposit by wire transfer of immediately available funds and the return thereof shall constitute the sole and exclusive remedy of Purchaser in the event of a termination hereunder.

14. **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

| | |
|---|---|
| **To Seller:** | **S.F.P.R. INC.**<br>c/o M-III Partners, L.P.<br>1700 Broadway, 19th Floor<br>New York, New York 10019<br>Attn: William Gallagher<br>E-mail: wgallagher@m3-partners.com |
| **With copies to:** | **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn:  W. Michael Bond, Esq.<br>Phone: (212) 310-8035<br>E-mail: Michael.Bond@weil.com |
| | and |
| | **McConnell Valdés LLC**<br>270 Muñoz Rivera Avenue |

San Juan, Puerto Rico 00918
Attn: Antonio Escudero Viera, Esq.
Phone: (787) 250-5625
E-mail: aev@mcvpr.com

**To Purchaser:**              **Gator Development Corp.**
7850 NW 146th Street, 4th Floor
Miami Lakes, Florida 33016
**Attn:** James A. Goldsmith
Phone: (305) 949-9049
E-mail: jag@gatorinvestments.com

**With copies to:**            **Gator Development Corp.**
7850 NW 146th Street, 4th Floor
Miami Lakes, Florida 33016
**Attn:** Marc Shandler, General Counsel
Phone: (305) 949-9049
E-mail: mshandler@gatorinv.com


and

**McConnell Valdés LLC**
270 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Attn: Tatiana Roman Orozco, Esq.
Phone: (787) 250-2637
E-mail: tro@mcvpr.com

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 14.

15.   **ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

16.   **FURTHER ASSURANCES**

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

17.    **SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing.  Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

18.    **CONFIDENTIALITY**

Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that (i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date, (ii) all terms of this Contract and any and all drafts of this Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Due Diligence Materials (as defined above) and any other electronic files and other documents in Seller's electronic online data room, and (iv) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is strictly confidential, shall remain confidential and shall not be disclosed to any Person by Purchaser or the Purchaser Representatives without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, including, but not limited to, any federal, state and/or local governmental entity, except that Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants, lenders, and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this Section 18. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser, the Purchaser Representatives, or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser, the Purchaser Representatives, or the Permitted Parties. If Purchaser, the Purchaser Representatives, or the Permitted Parties breach (or threaten the breach of) the terms of this Section 18, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Contract by any of the Purchaser Representatives or Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this Section 18, in addition to all other rights and remedies available at law or in equity.

Notwithstanding the foregoing, the Parties agree that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser, the Purchaser Representatives, or the Permitted Parties, (2) becomes available to Purchaser, the Purchaser Representatives, or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information. Purchaser acknowledges that Seller may file this Contract and any related matters with the Bankruptcy Court and thus make this Contract publicly available. The terms of this Section 18 shall survive termination of this Contract.

19. **BROKERAGE**

Except for representing Jones Lang LaSalle, Cushman and Wakefield, and Property Concepts Commercial representing the Seller (collectively, "**Seller's Brokers**"), each Party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction. Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including Seller's Brokers), finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party. Any commission or other compensation due the Seller's Brokers shall be the responsibility of Seller, and Seller's Brokers shall be paid at the Closing in accordance with separate agreements between Seller's Brokers and Seller.

20. **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity controlling, controlled by, or under common control with either Purchaser or James A. Goldsmith provided that (i) written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing and (ii) any such assignee executes an assumption of this Contract, if requested by and in form and substance reasonably acceptable to Seller. No transfer or assignment by Purchaser shall relieve Purchaser of its obligations hereunder. No such transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

21. **NO THIRD-PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns and, except for any of the Indemnified Parties, no third

party is intended to or shall have any rights hereunder.  This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

22.    **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "**Action**"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court.   The term "prevailing party" as used in this Section 22 includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it), or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled.   In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action.   It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

23.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

24.    **RESERVED**

25.    **COUNTERPARTS**

This Contract may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Contract by signing any such counterpart delivery of an executed signature page of this Contract by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

26.    **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of Section 20 of this Contract.

27.    **NO RECORDING**

Except in the event of a default by Seller under this Contract, Purchaser agrees not to record this Contract or any memorandum or short form of this Contract. Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract and retain the Earnest Money Deposit.

28.    **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the Commonwealth are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the Commonwealth are authorized or required to be closed. The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the Commonwealth are authorized or required to be closed.

29.    **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

30.    **RESERVED**

31.    **CONDEMNATION AND CASUALTY**

(a)    In the event of any taking of, or if notice is given of the intention to take, by the exercise of the power of eminent domain, all or a substantial portion of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Earnest Money Deposit, plus any interest accrued thereon, shall be promptly returned to Purchaser. If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned (A) all interest of Seller in and to any insurance proceeds actually received by Seller (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date) or (B) condemnation awards payable to Seller on account of that event, in the case of both (A) and (B), less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price. A portion of the Real Property will be deemed "substantial," for purposes of this Section 31 to the extent the taking of such portion would materially impair or

otherwise materially affect Purchaser's intended use of the Real Property in Purchaser's sole judgment and discretion.

(b)     If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof ("**Casualty Notice**"). After delivery of the Casualty Notice, if Seller reasonably estimates the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00) (the "**Casualty Threshold**"), Seller or Purchaser may elect, within five (5) business days of delivery of the Casualty Notice (and if the Closing is scheduled within such five (5) business day period, the Closing shall be extended for up to five (5) business days), to terminate this Contract by written notice to such other Party, in which event, provided no other event of default is outstanding and/or uncured, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder, except for any terms, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof. In the event the damage as a result of any casualty is less than the Casualty Threshold or neither Seller nor Purchaser elects to terminate this Contract as provided above, Purchaser shall be assigned all interest of Seller in and to any insurance proceeds actually received by Seller (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date) less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price.

## 32.    SECTION HEADINGS

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

## 33.    INTERPRETATION

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

## 34.    GOVERNING LAW, JURISDICTION & VENUE

This Contract will be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles thereof.  EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS CONTRACT.  SHOULD THE BANKRUPTCY COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO HAVE JURISDICTION OVER A MATTER RELATING TO THIS CONTRACT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF NEW YORK OR THE SUPREME COURT OF THE STATE OF NEW YORK

LOCATED IN NEW YORK COUNTY, NEW YORK. Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in <u>Section 14</u> of this Contract shall be effective service of process for any suit or proceeding in connection with this Contract.

## 35.    AMENDMENTS

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto. However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

## 36.    ENTIRE CONTRACT

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

## 37.    PATRIOT ACT

Seller certifies that its name is **S.F.P.R. Inc.**, a Puerto Rico corporation, and Seller is not (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Purchaser certifies that its name is **Gator Development Corp.**, a Florida corporation, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

## 38.    EXCULPATION; LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against

the other for such consequential, special or punitive damages.    The provisions of this Section 38 shall survive the expiration of the term or any earlier termination of this Contract.

39.    **PRESS RELEASES**

Prior to Closing, neither Purchaser nor any of Purchaser's Affiliates shall make any press release or other public announcement concerning the transaction(s) contemplated by this Contract without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

40.    **MAINTENANCE; RISK OF LOSS**

From and after the Effective Date and until the Closing Date, Seller shall maintain the Property in substantially the same condition as it exists on the Effective Date, reasonable wear and tear and casualty damage excepted.  The risk of loss with respect to the Property prior to the Closing shall be with Seller.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**S.F.P.R. INC.,**
a Puerto Rico corporation

By:_____
Name: William Gallagher
Its: Authorized Signatory

**PURCHASER:**

**GATOR DEVELOPMENT CORPORATION**
a Florida corporation

By:_____    8/23/2021
Name: James A. Goldsmith
Its: President

**EXHIBITS**

Exhibit "A":    Legal Description
Exhibit "B":    Earnest Money Escrow Instructions
Exhibit "C":    Deed
Exhibit "D":    Leases, Tenancies and Licenses
Exhibit "E":    Non-Invasive Inspection Agreement
Exhibit "F":    Title Affidavit

## EXHIBIT "A"

## LEGAL DESCRIPTION OF PROPERTY

URBAN: Parcel of land located in the Sabaneta Ward of the Municipality of Mayagüez with the following boundaries: Beginning at a point number one hundred one (101), point to be established located at the North-Western corner of the Lot, thence South eighty nine (89) degrees fifty nine (59) minutes zero zero (00) seconds East, in a boundary with Lot A-1, a distance of three hundred two point two hundred fifty two meters (302.252mts.), to point umber one hundred two (102) for cornerl thence South forty eight (48) degrees twenty five (25) minutes forty three (43) seconds West, in boundary with property of Lorenzo Casiano, a distance of two point four hundred ninety six meters (2.496mts.), to point number twelve (12); thence South twenty two (22) degrees thirty four (34) minutes thirty four (34) second West, in boundary with property of Lorenzo Casiano, a distance of fifty three point four hundred twenty one meters (53.421mts.), to point number thirteen (13); thence South twenty seven (27) degrees zero nine (09) minutes thirty five (35) seconds West, in which property of Lorenzo Casiano, a distance of sixteen point sixty nine meters (16.69mts.), number fourteen (14); thence South sixteen (16) degrees forty eight (48) minutes zero three (03) seconds boundary with property of Lorenzo Casiano, a distance of nine point nine hundred seventy one meters (9.971mts.), to point number fifteen (15); thence South fifteen (15) degrees (10) minutes ten (10) seconds West, in boundary with property of Lorenzo Casiano, a distance of nine point four hundred twenty nine meters (9.429mts.), to point number sixteen (16); thence South sixteen (16) degrees twenty four (24) minutes twenty six (26) seconds West, in boundary with property of Lorenzo Casiano, a distance of eight point eight hundred ninety three meters (8.893mts.), to point number seventeen (17); thence South thirteen (13) degrees seventeen (17) minutes twenty three (23) seconds West, in a boundary with property of Lorenzo Casiano, a distance of eleven point one hundred thirty five meters (11.135mts.) to point number eighteen (18); thence South eleven (11) degrees forty (40) minutes zero one (01) seconds West, in boundary with property of Arroyo Estate, a distance of four point seven hundred twelve meters (4.712mts.), to point number nineteen (19); thence South twenty two (22) degrees twelve (12) minutes fifty two (52) seconds West in boundary with property of Arroyo Estate, in a distance of seven point one hundred two meters (7.172mts.), to point number twenty (20); thence South twelve (12) degrees zero six (06) minutes twelve (12) seconds West, in boundary with property of Arroyo Estate, a distance of sixteen point six hundred thirty three meters (16.633mts.), to point number twenty one (21); thence South twelve (12) degrees nineteen (19) minutes forty four (44) second West, in boundary with property of Arroyo Estate, a distance of eleven point seven hundred eighty two meters (11.782mts.), to point number twenty two (22); thence South twenty one (21) degrees twenty nine (29) minutes forty one (41), second West, in boundary with property of Arroyo Estate, a distance of nine point eight hundred eighteen meters (9.818mts.), to point number twenty three (23), thence South twelve (12) degrees zero zero (00) minutes zero two (02) seconds West in boundary with property of Arroyo Estate in a distance of sixteen point five hundred fifty two meters (16.552mts.) to point number twenty four (24), thence South eleven (11) degrees forty eight (48) minutes thirty seven (37) seconds West, in boundary with property of Arroyo Estate, a distance of twenty one point four hundred nineteen meters (21.419mts.) to point number twenty five (25), North eighty nine (89) degrees fifty (50) minutes zero zero (00) seconds East, in boundary with property of Investment G.P. & S.R., Inc.,

a distance of one hundred eighty nine point zero seven meters (189.07mts.), to point number one hundred one (101); point of beginning, enclosing an area of fifty thousand four hundred forty one point five thousand three square meters (50,441.5303sq.mts.), equivalent to twelve point eight thousand three hundred forty two (12.8342 cuerdas).

This is the description of the Remnant, pursuant to deed number 54, issued in San Juan, Puerto Rico, on August 11, 1993, before notary Alberto Cayetano Rodríguez, and recorded at the margin of the overleaf of page 45 of volume 1,229 of Mayagüez, property number 38,288.

Property Number 38,288, recorded at page 40 of volume 1,229 of Mayagüez,
Registry of the Property of Puerto Rico, Section of Mayagüez.

**EXHIBIT "B"**

**EARNEST MONEY ESCROW INSTRUCTIONS FORM**

(please see attached)

CHICAGO TITLE AND TRUST COMPANY: ESCROW TRUSTEE
**10 S. LASALLE, STE 3100, CHICAGO, IL 60603**

Refer to: Krystina Cozzie
Phone no.: 312-223-3366
Fax no: 312-223-2076

## STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)

ESCROW TRUST NO:                                                   DATE:

To: Chicago Title Insurance Company, Escrow Trustee:

Customer Identification:

Seller:  S.F.P.R. Inc.

Purchaser:  Gator Development Corp.

Property Address:  PR-2 Sabaneta Ward, Mayaguez, PR 00680

Project Reference:

Proposed Disbursement Date:

Escrow Deposits:

1. The sum of $50,000 by WIRE representing:  INITIAL EARNEST MONEY

2. The sum of $                            by        CHECK/WIRE
Representing:  (Additional)

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

Funds:

(X) WILL    ( ) WILL NOT BE INVESTED
NOTE: If funds are to be invested, an investment package will be sent.  Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

Delivery of Deposits:

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:

Escrow trust fee will be as follows: $300 escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.

The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title Insurance Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

<u>Standard Provisions</u>:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title Insurance Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement.  Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disputes/Circumstance not contemplated:

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Trustee is unsure as to its duties as a result, Escrow Trustee may continue to hold said funds until either in receipt of a joint order from the parties or a court order directing payment. In such

instance, Escrow Trustee may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Trustee for any action taken by it in good faith in the execution of its duties hereunder. The parties further agree that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties. Notwithstanding the foregoing, where a party to this escrow agreement has been placed in default and the period to cure such default has lapsed, without cure, upon the delivery to Escrow Trustee of commercially reasonable documentation evidencing the same, Escrow Trustee shall, without delay, release the Escrow Deposit to the non-defaulting party entitled to receive such Escrow Deposit without direction from a court or delivery of a joint order from the parties to this escrow agreement.

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person. Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

*[Signature Page to Follow]*

.0004

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:

Name: S.F.P.R. Inc.

By: _____
Name: William Gallagher
Its: Authorized Signatory

For Purchaser:

Name: Gator Development Corp.

By: _____
Name: JAMES A. Coolismith
Its: President

Accepted: Chicago Title Insurance Company, as Escrow Trustee

By:

Date:

**\*Upon receipt of the funds, the escrow agreement becomes effective.**

.0004

**EXHIBIT "C"**

**DEED FORM**

-------------------------------------NUMBER _____ (__) ------------------------------------------

------------------------------ DEED OF PURCHASE AND SALE -------------------------------

------------------------------- (Store #_____; Location: Mayagüez)------------------------------

---In San Juan, Puerto Rico, this _____ (__) day of _____, two thousand twenty one (2021). -

---------------------------------------------- BEFORE ME------------------------------------------------

---_____, Attorney-at-Law and Notary in and for the Commonwealth of

Puerto Rico, with residence in San Juan, Puerto Rico, and offices on the building located at Two

Hundred Seventy (270) Muñoz Rivera Avenue, Hato Rey, San Juan, Puerto Rico. ------------------

------------------------------------------------ APPEAR ------------------------------------------------

---AS PARTY OF THE FIRST PART: S.F.P.R. INC. a Puerto Rico corporation (hereinafter

referred to as the "Seller"), represented herein by its attorney-in-fact, Antonio Escudero Viera, of

legal age, married, attorney and resident of San Juan, Puerto Rico, who is duly authorized to appear

herein pursuant to Special Power of Attorney executed by _____, on _____ _____ (__),

two thousand twenty one (2021) before Notary Public _____, a Notary Public for the State

of _____ whose commission has been verified pursuant to a Certificate issued by the

Department of the State of _____ and subscribed by _____ as Secretary of State of the State

of _____ on _____ _____ (__), two thousand nineteen (2019), as protocolized by Deed

Number _____ (__) executed on _____ _____ (__), two thousand nineteen (2019) before

Notary _____. ---------------------------------

---AS PARTY OF THE SECOND PART: GATOR DEVELOPMENT CORP., a Florida

corporation (hereinafter referred to as the "Purchaser"), represented herein by

_____, of legal age, _____, executive and resident of _____, Puerto Rico, who

is duly authorized to appear herein pursuant to that certain Certificate executed by its _____,

_____, on _____ _____ (__), two thousand twenty one (2021) before Notary

_____. ---------------------------------------------------------------------------

---Seller and Purchaser are hereafter referred to collectivelly as the "Appearing Parties".-----------

---Pursuant to Article Ten (10) of the Registry of Property of the Commonwealth of Puerto Rico

Act, Act Number Two Hundred Ten (210) of December eight (8), two thousand fifteen (2015), as

amended, I, the Notary, certify that the documents which attest to the representative capacity of

the representatives of the Appearing Parties, comply with the applicable requirements under Puerto Rico Law.----------------------------------------------

---I, THE NOTARY, further certify that I personally know the representatives of the Appearing Parties, and through their statements I certify as to their age, civil status, profession and residence. They assure me that they have, and in my judgment they do have, the necessary legal capacity to execute this instrument, as well as sufficient understanding of the English language, and therefore, they freely and voluntarily -------------------------------------------------------------

-------------------------------------------------- STATE---------------------------------------------------

---FIRST: Title; Description of Property; Cadaster Number; and Liens and Encumbrances.--------

---One: Title. Seller, a debtor in Chapter Eleven (11) Case Number eighteen, dash, two, three, five, three, eight, parenthesis, R, D, D (18-23538 (RDD)), currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), is the owner in fee simple of the real property described in Subparagraph Two of this FIRST Paragraph (the "Property"). -----------------------------------------------------------------

---Two: Description of Property. The Property is located in the Municipality of Mayagüez, Puerto Rico and is described in the Spanish language in the Registry of Property of Puerto Rico, Section of Mayaguez (the "Registry") as follows: --------

---"_____."---------------------------------------------------

---The Property is recorded in the Registry at page _____ of volume _____ of Mayagüez, property number _____. ----------------------------------------------------------------------

---Seller acquired the Property pursuant to Deed Number _____ ( ) executed on _____ _____ (__), _____ (_____) before Notary _____, recorded in the Registry at page ___ of volume ___ of Mayagüez, property number _____, first (1st) inscription. ------------------

---Three: Cadaster Number. Seller represents that the Property has the following cadastre number assigned by the Municipal Revenues Collection Center ("CRIM," for its Spanish acronym): _____.-----------------------------------------------------------

---Four: Liens and Encumbrances. The Property is subject to the following liens and encumbrances: ---------------------------------------------------------------------

---(a) By its origin, _____: -----------------------------------------------

---(b) By itself, _____.-----------------------------------------------------

.0004

---SECOND: <u>Purchase and Sale</u>. The Appearing Parties state that they have agreed to the purchase and sale of the Property and that such purchase and sale has been authorized by certain Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments (ECF No. 856) (the "Approval Order") issued by the Bankruptcy Court on November twenty-one (21), two thousand eighteen (2018). A certified copy of the Approval Order is attached hereto as <u>Exhibit A</u>. Therefore, the Appearing Parties carry out the aforesaid purchase and sale under the following terms and conditions: -----------------------------------------------------------

-----------------------------------CLAUSES AND CONDITIONS ------------------------------------

---<u>One</u>: <u>Conveyance</u>. Seller hereby remises, releases, grants, sells and conveys to the Pucharser, and Purchaser hereby purchases, accepts and receives from Seller, in accordance with the Approval Order, the Property, together with all its rights, structures, improvements, immunities, privileges, and appurtenances thereto belonging and subject to the terms and conditions set forth in this Deed. This Deed is executed by Seller and accepted by Purchaser subject to the covenants, restrictions, reservations, rights-of-way, roadways, plats, easements, servitudes, taxes, assessments, encumbrances, liens, covenants, conditions, obligations and liabilities and all other matters as they may appear of record and without any warranty or representation (express, implied, statutory or otherwise), except that Seller warrants that Seller is possessed of the Property and has not previously conveyed any fee title to the Property.-------------------------------------------------------

---<u>Two</u>: <u>Purchase Price</u>. The Property is sold for a purchase price equal to the amount of SIX HUNDRED THOUSAND DOLLARS ($600,000.00) (the "Purchase Price"), the receipt of which is hereby acknowledged. -------------------------------------------------------------------------

---The Appearing Parties acknowledge that the Purchase Price is lower than the last value recorded in the Registry, but the parties have agreed to carry out this purchase and sale since this is the best offer Seller has received under the current economic situation. The parties hereby manifest and confirm that they are unrelated parties to each other and that the Purchase Price has been a negotiated price, therefore the difference in value between the Purchase Price and the recorded value of the Property should not be interpreted as a donation because there is no intention to donate on either part. ---------------------------------------------------------------------------------

---<u>Three</u>: <u>Legal Possession</u>. By virtue of this Deed and without any further formality, Seller delivers possession of the Property to Purchaser and Purchaser accepts the same. Seller expressly

warrants to Purchaser the legal and peaceful physical possession in fee simple title ("pleno dominio") of the Property sold. -------------------------------------------------------------------------

---Four: Real Estate Taxes and Assessments. All real estate taxes and assessments with respect to the Property for any period of time prior to the date of this Deed shall be for the account of Seller and for any period of time thereafter for the account of Purchaser. Seller further agrees that in connection with the foregoing, it shall be responsible for any real property taxes on improvements located on the Property that may not have been assessed by taxing authorities as of the date of this Deed for any period of time prior to the date of this Deed. Seller states and Purchaser acknowledges that Seller furnished to Purchaser evidence of payment of all real estate taxes and assessments due and payable with respect to the Property that were due prior to the date of this Deed. --------------

---Five: As Is. Purchaser had the opportunity to conduct an inspection of the Property; therefore, Purchaser accepts the Property "as is", "where is", "with all faults" without reliance upon any representations, warranties or guarantees, either expressed or implied, of Seller or its agents, other than those made herein.----------------------------------------------------------------------------------

---Six: Further Assurances. The Appearing Parties, binding themselves and their respective successors and assigns by virtue of any title, hereby agree to carry out any and all acts and things, and execute and deliver any and all other public and/or private instruments or documents, as may be necessary, required or expedient to more fully effectuate the terms of this Deed (including, without limitation, any deed of clarification) and/or to remedy any omission or provision which needs to be clarified, corrected, amended or added so that this Deed and/or any prior deed or other document with precedence to this Deed, is adequately recorded at the Registry.----------------------

---THIRD: Expenses: The notarial fees and the cost of internal revenue, legal assistance and notarial stamps to be affixed to the the original of this Deed shall be for the account of Purchaser, and the cost of internal revenue, legal assistance and notarial stamps to be affixed to the first certified copy thereof as well as the vouchers for its filing and recordation in the Registry shall be for the account of Purchaser. --------------------------------------------------------------------

---FOURTH: Request to the Registrar. The Honorable Registrar of the Property is respectfully requested to record the conveyance and transfer of the Property in fee simple (*pleno dominio*) in favor of Purchaser, so that the records of the Registry under his/her authority will attest to this fact.

--------------------------------------------------------------------------------------------------------

.0004

---FIFTH: Severability. If any provision of this Deed, or the application of such provision to any person or circumstances, shall be held invalid or unenforceable to any extent, the remainder of this Deed, or the application of such provision to persons or circumstances other than those to which this Deed is held invalid or unenforceable, shall not be affected thereby. ------------------------------

---SIXTH: Tax Withholding. The parties hereby recognize that the transaction effected pursuant to this Deed may be subject to the applicable tax statutes and regulations, including but not limited to, Section one thousand sixty two point zero eight (1062.08) of the Internal Revenue Code of Puerto Rico of Two Thousand Eleven (2011), Act Number One of Two Thousand Eleven (Act No. 1-2011)), as amended, which specify that when a seller of a real estate property located in Puerto Rico is a United States Citizen and nonresident of Puerto Rico, Purchaser shall withhold fifteen percent (15%) of the purchase price of the property. If Purchaser fails to retain the aforementioned amount, Purchaser may be responsible for paying any amount that Seller may be liable to pay to the Secretary of the Treasury of Puerto Rico by reason of this sale.-------------------------------------

---SEVENTH: Section Headings. The headings of the various sections of this Deed have been inserted only for the purpose of convenience, and shall not be deemed in any manner to modify explain, expand or restrict any of the provisions of this Deed. -------------------------------------

---EIGHTH: Governing Law. This Deed and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the Commonwealth of Puerto Rico. --------------

-------------------------------------------------WARNINGS -----------------------------------------------

----I, the Notary, made to the Appearing Parties the necessary legal warnings concerning the execution of this Deed and they were fully advised by me thereon. Specifically, I also advised them of the following: -------------------------------------------------------------------------

---(a) any liens or encumbrances affecting title to the Property that may be filed for recordation prior to the filing of this Deed may be legally binding and could take precedence over this Deed;

---(b) this Deed and the liens and encumbrances mentioned herein are described as per that certain title abstract dated _____  _____  (__), two thousand nineteen (2019) prepared by _____ (the "Title Abstract") an independent third party, and not by the undersigned Notary, who was not asked, nor engaged by any party to perform direct title investigations for this transaction. The Appearing Parties accept the Title Abstract and are satisfied with the contents thereof and acknowledge that the Property is not subject to any liens or encumbrances other than those mentioned in the Title Abstract with regard to the Property. Consequently, the Appearing

Parties release the Notary from any responsibility due to errors or omissions in said Title Abstract and/or due to any changes in the title to the Property or in their liens and encumbrances that might occur between the date of the Title Abstract and the date this deed is presented to the Registry for registration;---------------------------------------------------------------------------------------------------------

---(c) it is convenient for the parties to obtain a certification from the Registry prior to the execution of this Deed, but it is also advisable to verify the status of liens and encumbrances on the Property as they may appear from the Registry on the date hereof and of the adverse consequences which may result from the failure to do so;---------------

---(d) this Deed must be promptly filed for recordation in the Registry in order to be effective as against third parties;------------------------------------------------------------------------------------------------------

---(e) the possible existence and pendency of unrecorded statutory liens, including but not limited to, the statutory preferred lien in favor of the Commonwealth of Puerto Rico for unpaid property taxes; ----------------------------------------------------------------------------------------------------------------

---(f) the necessity and convenience of obtaining a negative certification of debt from the CRIM regarding the property tax assessments against the Property;--------------------------------------------

---(g) that, if the Property are located in a flood zone according to the Municipal Flood Plans prepared by the Federal Government, any title holder and/or present or future occupant thereof is obligated by law to observe and comply with the requirements and provisions of the Regulations for Flood Zones, under admonishment that non-compliance therewith may be an illegal act as provided by the Flood Zone Act, Section Three (3) of Act Eleven (11) dated March Eight (8), Nineteen Hundred and Eighty Eight (1988), 23 L.P.R.A. Sec. 225(g). Purchaser acknowledges having been fully warned of this requirement and binds itself to fully comply therewith to the full extent the same is applicable--------------------------------------------------------------------------------

---(h) that Purchaser should request the change of ownership of the Property to be recorded with the CRIM; ---------------------------------------------------------------------------------------------------------

---(i) notwithstanding the statements made by the parties hereto, the transactions contained in this Deed are subject to scrutiny by the corresponding local and federal taxing authorities which may result in the imposition of taxes; ----------------------------------------------------------------------------------

---(j) as to the provisions of 42 U.S.C. § 4852 (D) - "DISCLOSURE OF INFORMATION CONCERNING LEAD UPON TRANSFER OF RESIDENTIAL PROPERTY", which require that every purchaser of any interest in residential real property on which a residential dwelling was

.0004

built prior to Nineteen Hundred Seventy Eight (1978) be notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. Seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in Seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase; ------

--------------------------ACCEPTANCE, READING AND EXECUTION --------------------------

---The Appearing Parties accept the same as drafted after I, the Notary, made to the Appearing Parties the necessary legal warnings concerning the execution of this Deed, of which they acknowledge having been fully advised by me thereon.-----------------------------------------------------

---I advised the Appearing Parties as to their right to read this Deed by themselves, which they did, and to have witnesses present at the execution thereof, which they waived. After having read the contents of this Deed, the Appearing Parties fully ratified and confirmed all statements included herein as the true and correct embodiment of their stipulations, terms and conditions.---------------

---Whereupon, the Appearing Parties signed this Deed before me, the Notary, and wrote their initials on each and every page hereof.----------------------------------------------------------------

---To all of which, as well as to everything contained or related in this Deed, I the Notary, under my sign, signature, seal and flourish DO HEREBY CERTIFY AND ATTEST. ---------------------

**EXHIBIT "D"**

**LEASES, TENANCIES AND LICENSES**

None.

**EXHIBIT "E"**

**NON-INVASIVE INSPECTION AGREEMENT**

[See attached]

## NON-INVASIVE INSPECTION AGREEMENT
### *Mayagüez, Puerto Rico*

**THIS NON-INVASIVE INSPECTION AGREEMENT** (this **"Agreement"**) is made and entered into as of this 23rd day of August, 2021 (**"Effective Date"**), by and between **S.F.P.R. INC.**, a Puerto Rico corporation (**"Company"**) and **GATOR DEVELOPMENT CORP.**, a Florida corporation (**"Investigating Party"**), in connection with investigation and site assessment work to be performed on the property controlled by Company located at PR-2 Sabaneta Ward in the Municipality of Mayaguez, Puerto Rico (the **"Property"**), as more particularly described on **Exhibit "A"** attached hereto and made a part hereof.

### RECITALS:

A.    Company desires to sell the Property to Investigating Party;

B.    Investigating Party desires to buy the Property from Company;

C.    Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the **"Contract"**) to further such ends; and

D.    Investigating Party desires to perform a site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

1.    Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property at reasonable times and upon not less than 2 business days prior notice to Company, at no cost to Company or its agents, consultants and contractors, and, at Company's option, accompanied by a representative of Company.

2.    The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: Investigating Party may (i) walk the Property and inspect all components of the Property, (ii) make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA ASTM E1527-13, and (iii) conduct a survey of the Property (collectively, the **"Site Assessment Work"**). If Company elects to have its representative present during the Site Assessment Work and has such representative present at the times and dates scheduled by Investigating Party, then all Site Assessment shall be performed only in the presence of the Company's local manager or any other such person assigned by Company. Investigating Party shall not perform tests, work or investigations not included in scope of the Site Assessment Work without the prior written consent of Company, which consent shall not be unreasonably, withheld, delayed or conditioned. In the event Investigating Party engages in any activity not authorized above, Company shall have the right to terminate access to the Property for such unauthorized activity.

3.    This Agreement shall terminate the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, (b) immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice and cure period, or (c) expiration of the Due Diligence Period (as defined in the Contract), in each such

1

event Investigating Party shall promptly restore the Property as provided in Section 9 of this Agreement.

4.    Intentionally deleted.

5.    Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal, state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their counsel or environmental consultants, as applicable.  The foregoing restriction shall not be binding on Investigating Party following the closing under the Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this Section 5.

6.    Investigating Party agrees to defend and indemnify Company, its officers, directors, employees, and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement. This indemnity shall survive the termination of this Agreement.

7.    Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies reasonably satisfactory to Company and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

    (i)    Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the Property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

    (ii)    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

    (iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above.  Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty.  Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

2

8.  Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

9.  If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property and to restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

10. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth in which the Property is located.

11. By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

12. Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company.

13. This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

3

**IN WITNESS WHEREOF**, Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

INVESTIGATING PARTY:

**GATOR DEVELOPMENT CORP.,**
a Florida corporation

By: _____
Name:   James A. Goldsmith
Title:   President

COMPANY:

**S.F.P.R. INC.,**
a Puerto Rico corporation

By: _____
Name:   William Gallagher
Title:   Authorized Signatory

4

## EXHIBIT "A" TO NON-INVASIVE INSPECTION AGREEMENT

## LEGAL DESCRIPTION

URBAN: Parcel of land located in the Sabaneta Ward of the Municipality of Mayagüez with the following boundaries: Beginning at a point number one hundred one (101), point to be established located at the North-Western corner of the Lot, thence South eighty nine (89) degrees fifty nine (59) minutes zero zero (00) seconds East, in a boundary with Lot A-1, a distance of three hundred two point two hundred fifty two meters (302.252mts.), to point umber one hundred two (102) for cornerl thence South forty eight (48) degrees twenty five (25) minutes forty three (43) seconds West, in boundary with property of Lorenzo Casiano, a distance of two point four hundred ninety six meters (2.496mts.), to point number twelve (12); thence South twenty two (22) degrees thirty four (34) minutes thirty four (34) second West, in boundary with property of Lorenzo Casiano, a distance of fifty three point four hundred twenty one meters (53.421mts.), to point number thirteen (13); thence South twenty seven (27) degrees zero nine (09) minutes thirty five (35) seconds West, in which property of Lorenzo Casiano, a distance of sixteen point sixty nine meters (16.69mts.), number fourteen (14); thence South sixteen (16) degrees forty eight (48) minutes zero three (03) seconds boundary with property of Lorenzo Casiano, a distance of nine point nine hundred seventy one meters (9.971mts.), to point number fifteen (15); thence South fifteen (15) degrees (10) minutes ten (10) seconds West, in boundary with property of Lorenzo Casiano, a distance of nine point four hundred twenty nine meters (9.429mts.), to point number sixteen (16); thence South sixteen (16) degrees twenty four (24) minutes twenty six (26) seconds West, in boundary with property of Lorenzo Casiano, a distance of eight point eight hundred ninety three meters (8.893mts.), to point number seventeen (17); thence South thirteen (13) degrees seventeen (17) minutes twenty three (23) seconds West, in a boundary with property of Lorenzo Casiano, a distance of eleven point one hundred thirty five meters (11.135mts.) to point number eighteen (18); thence South eleven (11) degrees forty (40) minutes zero one (01) seconds West, in boundary with property of Arroyo Estate, a distance of four point seven hundred twelve meters (4.712mts.), to point number nineteen (19); thence South twenty two (22) degrees twelve (12) minutes fifty two (52) seconds West in boundary with property of Arroyo Estate, in a distance of seven point one hundred two meters (7.172mts.), to point number twenty (20); thence South twelve (12) degrees zero six (06) minutes twelve (12) seconds West, in boundary with property of Arroyo Estate, a distance of sixteen point six hundred thirty three meters (16.633mts.), to point number twenty one (21); thence South twelve (12) degrees nineteen (19) minutes forty four (44) second West, in boundary with property of Arroyo Estate, a distance of eleven point seven hundred eighty two meters (11.782mts.), to point number twenty two (22); thence South twenty one (21) degrees twenty nine (29) minutes forty one (41), second West, in boundary with property of Arroyo Estate, a distance of nine point eight hundred eighteen meters (9.818mts.), to point number twenty three (23), thence South twelve (12) degrees zero zero (00) minutes zero two (02) seconds West in boundary with property of Arroyo Estate in a distance of sixteen point five hundred fifty two meters (16.552mts.) to point number twenty four (24), thence South eleven (11) degrees forty eight (48) minutes thirty seven (37) seconds West, in

boundary with property of Arroyo Estate, a distance of twenty one point four hundred nineteen meters (21.419mts.) to point number twenty five (25), North eighty nine (89) degrees fifty (50) minutes zero zero (00) seconds East, in boundary with property of Investment G.P. & S.R., Inc., a distance of one hundred eighty nine point zero seven meters (189.07mts.), to point number one hundred one (101); point of beginning, enclosing an area of fifty thousand four hundred forty one point five thousand three square meters (50,441.5303sq.mts.), equivalent to twelve point eight thousand three hundred forty two (12.8342 cuerdas).

This is the description of the Remnant, pursuant to deed number 54, issued in San Juan, Puerto Rico, on August 11, 1993, before notary Alberto Cayetano Rodríguez, and recorded at the margin of the overleaf of page 45 of volume 1,229 of Mayagüez, property number 38,288.

Property Number 38,288, recorded at page 40 of volume 1,229 of Mayagüez,
Registry of the Property of Puerto Rico, Section of Mayagüez.

## EXHIBIT "F"

## OWNER'S AFFIDAVIT OF TITLE

[See attached]

# Title Affidavit

dated as of _____/_____/21

Re:     **Insured:**
        **Title Insurer:**
        Chicago Title Insurance Company, a NE corporation ("CTIC")
        **CTIC Master #:**

        **Commitment #:**
        **Premises:**
        as legally described in the Commitments

**Certifications:**

The undersigned owner of the Premises hereby certifies the following to Title Insurer (as to its respective estate and/or interest in the Premises):

**Mechanics Liens:**
All labor, services or materials rendered or furnished within the last 90 days in connection with the Premises or with the construction or repair of any building or improvements on the Premises have been paid for in full or will be paid in full.

**Tenants/Parties in Possession:**
There are no tenants or other parties who are in possession or have the right to be in possession of said Premises..

**Bankruptcy:**
A proceeding in bankruptcy has been instituted by or against the undersigned (or its constituent entities) which is now pending in the Bankruptcy Court for the Southern District of New York under Docket No. 18-23538.

**Gap Indemnification:**
Between the most recent Effective Date of the Commitment (or any bring down thereof) and the date of recording of the Insured Instrument(s) but in no event later than five (5) business days from the date hereof (hereinafter, the "Gap Period"), the undersigned has not taken and will not take any action to encumber or otherwise affect title to the Premises.  In the event of any lien, encumbrance or other matter affecting title to the Premises in the Gap Period arising as a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof.  The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

**Counterparts:**
This document may be executed in counterparts.

- see annexed signature page -

**Signatory/Signatories to Title Affidavit:**

By: _____

      Name:    William Gallagher
      Title:     Authorized Signatory
      Solely in his capacity as Authorized Signatory of S.F.P.R., Inc., and not individually

Subscribed and sworn to on ____/_____/21

_____
Notary Public