Get started      Open in app      

# Edward S. Lampert

18 Followers    About    Follow    

# The facts about the efforts to transform Sears Holdings

 Edward S. Lampert   Jun 13, 2019 · 22 min read

Late last month, Senator Warren and Representative Ocasio-Cortez wrote me a letter based on inaccurate media reports and asked me a series of questions. Earlier today, I sent Senator Warren and Representative Ocasio-Cortez a letter in response and have posted the text of my letter here. I decided to do this because I want to set the record straight and give everyone access to the important context and background that can only be obtained by reading the full letter, as opposed to media articles that selectively quote from the letter. The text of my earlier letter to Senator Warren that I sent this February immediately follows.

——————————————————————

*ESL Investments, Inc.*

1170 Kane Concourse, Suite 200

Bay Harbor Islands, FL 33154

(305) 702–2100

June 13, 2019

The Honorable Elizabeth Warren

317 Hart Senate Office Building

**EXHIBIT A**

Washington, DC 20510

The Honorable Alexandria Ocasio-Cortez
229 Cannon HOB
Washington, DC 20515

Dear Senator Warren and Congresswoman Ocasio-Cortez:

I write in response to your letter to me dated May 30, 2019, which refers to "reports" that Transform Holdco LLC (TransformCo or New Sears) is seeking to "back out of an agreement to pay [$43 million]" for severance payments. As you may now know from the statement we issued on May 31, 2019 (<u>a copy of which is enclosed</u>), these "reports" were and are false. The undisputed facts are as follows:

1. TransformCo's acquisition of Sears' business resulted in continued employment for approximately 45,000 Sears associates. As part of the transaction, New Sears committed to offer severance to eligible associates on the same terms as were available historically (which are more favorable than the severance plan that Old Sears offered during the bankruptcy). Without our transaction, all of those associates would have lost their jobs several months ago and all of the people who have received severance from New Sears would have nothing but claims, for whatever they were worth, in bankruptcy against Old Sears.

2. The "reports" mentioned above refer to a specific group of employees — those whose employment was terminated by Old Sears after the bankruptcy filing in October 2018. Our understanding is that those employees have already been paid severance by Old Sears.

3. The claim that New Sears is "backing out" of a supposed agreement appears to relate not to the payment of severance to the employees who were terminated by Old Sears, but rather to New Sears' conditional obligation, under the terms of the asset purchase agreement, to reimburse Old Sears for various costs, including those severance payments, in exchange for Old Sears transferring certain assets to New Sears. Because Old Sears failed to transfer all of the assets contemplated by the asset purchase agreement (as even Old Sears concedes as to more than $50 million worth of assets) to New Sears, any amounts that New Sears is required to pay as reimbursement to Old

Sears are reduced dollar-for-dollar by the amount of the shortfall in delivered assets. The asset purchase agreement expressly provides for such a reduction.

4. But, more importantly, this is entirely an issue between Old and New Sears. Again, to our knowledge, the eligible employees whose employment was terminated by Old Sears prior to our acquisition have received all severance due to them. In addition, New Sears has paid (and intends to continue to pay) all severance due to our former employees in accordance with its severance policies. No severance has been put "at risk" by New Sears.

5. I am unable to provide a meaningful response to your question as to how many additional stores we expect to close because every decision is made based on the individual performance and other circumstances of the particular store. As I stated in my letter to Senator Warren, we prioritize keeping people employed. That priority cannot, however, be the sole driver of the future of individual stores if, for example, they are losing money on a regular basis. Unfortunately, Old Sears' failure to deliver assets and operate in the ordinary course before New Sears assumed control of the stores has added challenges to the turnaround. To the extent we determine that stores should be closed, in many cases we will create new jobs through the redevelopment of those properties and employment driven by their new tenants. And, when we do, we will honor the severance commitment that we have made. I would also like you to be aware that, over the past month, we have opened three new smaller-format stores, and are excited about the promise these stores have to support our strategic plan to become a stronger, more profitable business.

As I indicated in my response to Senator Warren's first letter, I would appreciate the opportunity to discuss these issues with you. I hope that with a more complete understanding of the facts, including my prior letter to Senator Warren (attached to this letter for reference), in which I detail a more accurate and balanced history of my efforts to transform Old Sears, you can appreciate that to the extent our business efforts at Old Sears did not succeed, that lack of success was not due to a venal plot to steal its assets, but rather to a number of factors, including a terrible environment for brick and mortar retailers and legacy pension liabilities exacerbated by prolonged and historically low interest rates.

Unlike many other situations where private equity owners simply allowed companies to fail, ESL supported the company for years, advancing billions of dollars in financing, and then effectively subordinated those loans by credit bidding them in the acquisition of New Sears to avoid full-scale liquidation and the loss of more than 45,000 jobs. Sears' employees, pension plans and trade creditors are all much better off because of the efforts we made, and continue to make, to keep the business going. And, ESL is not in the business of "making short term profits"; such a strategy is hardly consistent with the 16 years ESL has stuck with Sears after rescuing Kmart from bankruptcy in 2003, putting billions of its own capital at risk and fighting for the ability to try to make a success of it again.

Sears has not been alone in struggling to adapt to changing circumstances and to compete with newer companies with no such legacy liabilities. General Motors, Chrysler, American Airlines and United Airlines are all iconic American companies that ended up in chapter 11 where, among other things, they shed their legacy pension liabilities and made substantial reductions in wages and benefits. By contrast, Old Sears took great efforts to preserve and strengthen its pension funding and added almost $5 billion to the pension plan since 2005, with $2 billion in the last five years alone.

The job losses at Sears are also far from isolated. I respectfully suggest that you consider the fate of hundreds of thousands of employees of other retail chains before concluding that reductions in Sears' workforce were attributable to ESL's actions. Macy's, for example, acquired May Department Stores in 2005 (the same year that Sears and Kmart merged). Combined, Macy's and May had 244,000 employees at that time. As of February 2019, Macy's employed 130,000 workers, representing a reduction of 114,000 workers, nearly a 50% decline. If even Macy's, which has been consistently and highly profitable, has chosen to reduce headcount by such a significant extent, it shows the nature of industry pressures.

The examples continue from there. JCPenney employed approximately 151,000 people as of 2005; as of February 2019, it employed 95,000 people, representing a decline of 56,000 workers (or nearly 40%). Many other retailers have been forced to close since 2005 due to the myriad issues that are plaguing the industry, with significant accompanying job losses (based on 2005 employment levels): Toys 'R' Us (60,000 in 2005 and 90,000 during that year's holiday season), Circuit City (42,425), Shopko

(22,800), Radio Shack (42,000), Payless Shoes (27,000), Sports Authority (15,000) and A&P (8,700), to name just a few.

Singling Sears out and publicly disparaging me and the company because we were not able to successfully transform Old Sears, when so many others have met a similar fate, is unfortunate and unfair. You have made harsh charges on the basis of allegations made in lawsuits and other court filings that have not been adjudicated and have accepted at face value claims that have been thrown about in years of slanted media coverage. Many of the parties who have trumpeted these allegations spent tens of millions of dollars in the bankruptcy case fighting ESL's going concern bid — that is, fighting for Sears to be liquidated. Had those parties had their way, all of the employees would have been out of work.

And every time these sorts of accusations are publicly disseminated, our turnaround becomes more challenging as a result of additional confusion among our employees, suppliers and customers. If we all share the same goal of seeing New Sears succeed, I beseech you to avoid inflicting further harm on the company by publicly citing "reports" that are no more than unproven accusations from highly questionable sources. At a minimum, I would ask that, before going public with any "reports," you reach out to confirm their accuracy. I would be pleased to make myself or my representatives available in the event you would like me to respond to such reports or otherwise to discuss any of these matters in person.

Sincerely,

Edward S. Lampert

━━━━━━━━━━━━━━━━━━━━━━━━━

*ESL Investments, Inc.*
*1170 Kane Concourse, Suite 200*
*Bay Harbor Islands, FL 33154*
*(305) 702–2100*

February 19, 2019

The Honorable Elizabeth Warren
317 Hart Senate Office Building
Washington, DC 20510

Dear Senator Warren:

I write in response to your letter of January 30, 2019.

Your letter seeks my assurance that I will prioritize the long-term viability of the new Sears and its employees. I write in the hope that I can make it apparent to you that, on any fair appraisal of my lengthy record as an investor, nurturing growth and preserving jobs have been and remain my priorities. I have been a long-term investor in a small number of companies and believe strongly in creating value for all stakeholders, especially the employees.

Let me say first that nothing will reduce my deep disappointment at the decline of Sears Holdings Corporation ("Sears Holdings") and that I understand the frustration and anger felt by many people who had expected it to succeed based on my track record investing in other companies. I have invested billions of dollars of my own capital and most of my waking hours for the past 14 years in trying to make Sears Holdings profitable. I will continue to apply myself every day to the pursuit of that objective for the new Sears. It is my goal not only to preserve as many jobs as economically possible, but also to create the conditions to generate additional employment through profitable growth and investment in innovative customer offerings, services and property development that will drive value.

I made my first investment in the retail sector in 1997 in a company named AutoZone, which is the leading retailer of DIY auto parts in the United States. I held that investment for 15 years and served on its board of directors for seven of those years. In 2001, I invested in AutoNation, which is the largest automobile retailer in the country, and remain its second largest shareholder. AutoZone and AutoNation are leaders in their respective retail fields and have had outstanding operating and investment performance. My investments have provided me insight into the retail business more generally and I am proud of my association with these two companies, which today employ a combined total of more than 113,000 people.

My association with Sears and Kmart began in 2002, when I invested in Kmart debt after it filed for bankruptcy under Chapter 11. I became a member of the official committee representing financial creditors and ultimately provided capital (including converting debt to equity) to permit the company to emerge from bankruptcy — something no one had expected could happen. Without that new capital, Kmart would likely have shed its remaining 150,000 jobs and pension obligations at that time. While Kmart was in the process of liquidating hundreds of stores during the bankruptcy and had seen two years of billion-dollar losses, we succeeded in returning Kmart to significant profitability in 2003 and 2004. I saw opportunities in the complementary capabilities of Kmart and Sears Roebuck, where there were significant operational overlaps, and was instrumental in combining them into Sears Holdings Corporation in 2005.

Since 2005, I have been the largest shareholder of Sears Holdings and was, until just this month, Chairman of the Board. For several years, the company did well, and we engaged in several capital-intensive projects designed to position the company to compete with other big-box retailers and the emerging online revolution. Unfortunately, as has been the experience of so many retailers, our projects were not met with long-term success in the marketplace.

While our results have not been what I had hoped for back in 2005, I respectfully but emphatically take issue with the characterizations in your letter of my actions and motivations. I hope that you might reconsider your view with the benefit of facts that were not available from the media sources your letter cites.

*Loans to Sears Holdings from ESL*

At the time of its Chapter 11 filing on October 15, 2018, Sears Holdings had $11.34 billion in liabilities (as reported on the company's unaudited financial statements as of August 4, 2018). A significant portion of what is included in the liabilities is not debt in any meaningful sense, but rather accounting entries such as unearned revenues and deferred gains on sale leasebacks and similar items. The actual debt as of the petition date consisted essentially of funded debt of approximately $5 billion, pension liability of $1.2 billion on a GAAP basis and approximately $500 million of payables. Notably, $2.6 billion of the $5 billion in funded debt was loans made by my investment fund, ESL Investments, Inc. ("ESL"), and related affiliates. ESL was willing to lend on attractive and competitive terms and never made a loan against Sears Holdings' assets for any

purpose other than to permit Sears Holdings to fund pension contributions or pay operating expenses during a period when vendors drastically curtailed or eliminated access to trade credit to obtain inventory. By way of illustration, trade payables declined from $2.5 billion in 2014 to $487 million in 2018, a significant reduction even taking into account the lower store count. In addition, the underfunding claim of the Pension Benefit Guarantee Corporation ("PBGC") fell from approximately $2.8 billion in 2014 to less than $1 billion in 2018 on a GAAP basis — a reduction of almost $2 billion over the past four years. Over that same period, loans from ESL and its affiliates went from zero at the beginning of 2014 to $2.6 billion. In other words, ESL's financing made it possible for the company to continue operating and employing people for as long as it did and to make substantial pension contributions.

*Protecting Jobs and Pensions*

For many years, Sears Holdings received unsolicited advice from some quarters that it should be shutting many more stores and doing so more quickly. That is not what the company did. Instead, it consistently gave a loss-making store "the benefit of the doubt" — looking for ways to improve performance long before conceding, after several years of losses, that there was no choice but to close it. We did everything we could to avoid employee layoffs, with the result that we lost a great deal of money keeping unprofitable stores open.

I am unaware of any basis for the statement in your letter that I am being sued for "mismanagement of employee retirement money." There has never been an allegation of mismanagement of those funds made by the PBGC or anyone else. Indeed, since Sears and Kmart merged in 2005 and, as illustrated in the attached Table 1, the company contributed more than $4.5 billion to fund its legacy defined-benefit pension plans. Despite these enormous contributions, the deficit grew on an actuarial basis because of the combined impact of historically low interest rates driven by Federal Reserve policy since the 2008 financial crisis and increased life expectancy. These obligations left Sears Holdings at a severe economic disadvantage in relation to traditional and online retail competitors that do not have these legacy pension liabilities. Regardless, Sears Holdings honored its commitments year after year and did not take the bankruptcy route to eliminate this pension burden, as other major players in other industries have done in recent decades. I am proud that we honored our obligations to loyal retirees and that,

thanks to annuitization transactions and lump-sum payments alternatives that we offered, the number of pension plan participants exposed to the 2018 bankruptcy filing was fewer than 90,000, compared to more than 394,000 in 2005.

*Share Repurchases*

Commentators have tried to conflate the recent situation of Sears Holdings with private equity-backed retail failures by insinuating that the company's debt was a result of share repurchases. In reality, and as illustrated in the attached Table 2:

· Share repurchases ended in 2011 and more than two-thirds of the repurchases occurred more than a decade ago, prior to the financial crisis in 2008.

· They represented less than 50 percent of the positive EBITDA of almost $14 billion that the company generated during the period of the repurchases from 2005 to 2011.

· Over that same period, Sears Holdings invested more than $3.3 billion in capital expenditures, contributed more than $2.2 billion to its pension plans and reduced overall debt.

ESL did not participate in the share repurchases and, in fact, ESL never sold a single share of its Sears Holdings stock, which has now been wiped out by the bankruptcy. While I understand that there are differing views on using capital to buy back stock, there is certainly a credible view that companies need to reward shareholders when times are good, or not many will be interested in being shareholders.

*The Spin-offs, Rights Offerings and Seritage*

By 2011, as it became clear that it would be difficult to exploit the opportunities that some of the company's key brands and businesses had under the umbrella of Sears Holdings, we began looking for ways to restructure the company to allow these businesses the independence and flexibility to operate without the central bureaucratic involvement embedded in Sears Holdings. In 2014, the Board of Directors decided to spin off Sears Holdings' interest in the Lands' End lifestyle brand, based on the conclusion that Lands' End had a better chance to thrive on its own. Sears Holdings received a $500 million dividend from Lands' End in connection with the spin-off, which was used to reduce its debt. All holders of Sears Holdings common stock received shares

of Lands' End common stock on the same basis and ESL received no special treatment, only its proportionate share.

The other transactions and financings which are now under attack from self-interested parties who pushed for and stood to gain from a liquidation of Sears Holdings, were all conducted after 2011, with the proceeds used to fund additional pension obligations, unlock value for component businesses and give Sears Holdings the runway and liquidity to survive and pursue a transformation of its business model.

Thus, rights offerings to all Sears shareholders were conducted (i) for the Sears Hometown and Outlet Stores business in October 2012, (ii) for Sears Holdings' shares in Sears Canada in 2014 and (iii) later in 2014, for unsecured notes and warrants for shares in Sears Holdings.

In 2015, Sears Holdings developed an innovative alternative transaction that involved the creation of a real estate investment trust (Seritage) combined with the sale and leaseback of a selection of properties to raise a substantial amount of capital. This structure provided an opportunity for Sears Holdings to monetize real estate at an attractive valuation while being able to continue to operate its stores, but also enabled it to shrink its footprint, as it had become apparent that many of the stores were significantly larger than was optimal.

Collectively, these transactions raised substantial capital for Sears Holdings (an aggregate of more than $4.5 billion) that was used to reduce debt and contribute additional funding to the company's pension plans, and every one was open to all Sears Holdings shareholders on the same basis. In addition, all of these transactions, as well as financings in which ESL participated, were reviewed and approved by the Board of Directors, including a majority of independent directors and a special committee (the Related Party Transactions Committee) of only independent directors, all with advice from their own separate and independent legal and financial advisors.

It is also important to point out that in April 2014, more than one year before the Seritage transaction, the PBGC began conducting extensive due diligence on Sears Holdings. This exercise included a review of all details surrounding Sears Holdings' real estate and the PBGC used expert real estate advisers to conduct its own analysis. The company worked constructively with the PBGC and its advisers and agreed to enter into

a Pension Plan Protection and Forbearance Agreement (PPPFA) in the fall of 2014 that was ultimately memorialized in early 2016. Those who argue that ESL was able to engage in transactions to benefit itself at the expense of other shareholders or creditors by securing valuable company assets ignore the reality that Sears Holdings' single largest creditor, the PBGC — a government agency — and its advisors were intimately involved in reviewing the Seritage transaction and apprised of the terms of other material transactions.

As the company's operating performance continued to decline, the Board of Directors made decisions to monetize assets and raise additional funds to enable the company to fund its pension plans and meet its liquidity needs. While some observers have opined that the company should have filed for bankruptcy at an earlier time (with significant financial consequences for vendors and the PGBC as well as accelerated store closures and commensurate job losses), the Board of Directors recognized that the company had substantial asset value that would be compromised in bankruptcy as well as access to liquidity from selling assets (including some of its real estate portfolio). Accordingly, the company sought to work with its vendors and other constituents to reduce their risk and to restore the company to profitability as a smaller entity.

*Bankruptcy*

Obviously, the financial crisis and economic recession that began in 2008 had an enormous impact on the company, the retail industry, the housing market and the U.S. economy overall. In addition, the significant reduction in interest rates driven by the policy adopted by the Federal Reserve in response to the recession, which has now been in effect for more than a decade, imposed enormous additional funding needs on the company's pension plans. There is no doubt that Sears Holdings' performance was well below our expectations and that billions of dollars were lost. But Sears Holdings is far from alone. This is a sad story that has repeated itself many times all over the country, with a host of household names in the retail industry filing for bankruptcy, laying off their workers and going into liquidation. In so many of those situations, where significant private equity investors were involved, they ultimately walked away. The one advantage that Sears Holdings had over those other companies was a committed long-term investor in the form of ESL, which has not walked away. Indeed, quite the opposite.

When Sears Holdings filed for Chapter 11, the official Unsecured Creditors' Committee ("UCC") quickly announced that it intended to see the company liquidated (with the loss of tens of thousands of jobs). The fact that the UCC never wavered from that position regardless of how much ESL improved its bid makes it apparent that their interests did not lie with the employees or vendors, but rather with the mall owners, whose goal was to get their properties back for nothing. That was a result that could only be accomplished in a liquidation. Suffice it to say that the allegations of the Creditors' Committee should not simply be accepted at face value. ESL, on the other hand, proposed to acquire the vast majority of Sears Holdings' assets as a going concern, retain existing employees, guarantee severance if those employees were later terminated and even provide severance for employees who were terminated during the bankruptcy and would not be moving to the new Sears. Not a single other bidder emerged who proposed to acquire Sears as a going concern; the sole competing bids were from liquidation firms seeking to conduct going-out-of-business sales.

Notwithstanding the many millions of dollars of professional fees incurred by the UCC (all paid for by Sears Holdings) to fight ESL's bid to keep the company alive, on February 8, 2019, Judge Robert Drain of the United States Bankruptcy Court for the Southern District of New York entered an order approving the acquisition by an ESL affiliate of substantially all of the go-forward retail stores and other assets and component businesses of Sears Holdings for a total consideration of approximately $5.2 billion. Among other things, Judge Drain found that the sale to ESL maximized value and that ESL had acted in good faith throughout the bankruptcy sale process.

*Responses to Questions*

1. Although we recognize the challenges, the new Sears will be significantly better positioned to succeed, with a healthier capital structure, including a substantially reduced debt load, lower expenses and excess funding availability. Significantly, the vast majority of the $2.6 billion in secured debt owed to ESL has been converted to equity, once again demonstrating our commitment to and belief in the company's future and willingness to put our money where our mouth is.

2. Eligible employees of the new Sears will be entitled to the same severance benefits as they were entitled to as employees of Sears Holdings prior to the Chapter 11 filing on October 15, 2018. Those "pre-petition" benefits are superior to the severance benefits

that were put in place following the bankruptcy filing. In addition, the ESL transaction assures severance payments to employees who lost their jobs after October 15, 2018 and did not join the new Sears. But for the sale to ESL, these employees would be getting nothing.

3. The new company will consider all relevant factors when evaluating returning capital to its shareholders through stock buybacks, including debt covenants that must be satisfied in order to do so. Inasmuch as the new company will not be publicly traded, however, it is unlikely to be a significant issue.

4. As I have explained, closing stores has always been our act of last resort. Thus, while it is impossible at this point to specify what cost-cutting measures will be taken, I can assure you that, as I have in the past, I intend to prioritize the ability to keep people employed and expect to create new employment opportunities from the redevelopment of our significant real estate assets as we seek to reduce the size of our stores and open new, smaller stores.

5. I have always taken matters of corporate governance very seriously. For years, at considerable expense, the Board of Directors has operated in the most scrupulous fashion. As I have explained above, all of the transactions involving ESL were reviewed and approved by the Board of Directors, including a majority of independent directors and a special committee (the Related Party Transactions Subcommittee) of only independent directors, all with advice from their own separate and independent legal and financial advisors. As a private company, the new Sears will not be required to maintain such corporate structures but will certainly take appropriate steps to safeguard the interests of its stakeholders.

6. The PBGC has reached an agreement with Sears Holdings which clears the way for the PBGC to assume responsibility for Sears Holdings' two pension plans, which are covered under PBGC's Single-Employer Insurance Program and withdrew its objection to the proposed sale. Further, as I have described, the underfunding claim of the PBGC was reduced by almost $2 billion over the past four years, and the number of retirees whose benefits are dependent upon the plans was reduced from 394,000 in 2005 to 90,000 at the time of the bankruptcy filing.

7. Please see my answer to Question 2.

8. I confess that I am not entirely sure that I understand this question. If the question is what we intend to do about the litigation that has been threatened against ESL and Seritage in the bankruptcy case, we consider that litigation to be meritless for all of the reasons I have set forth in this letter and intend to contest it vigorously. If the concern is with those who will become unsecured creditors going forward by continuing to do business with Sears, I refer you to a statement made by counsel to a number of vendors at the sale hearing, in which he expressed the appreciation of those vendors for my willingness to step up and acquire Sears Holdings as a going concern and to work to make it a continuing purchaser of their products. He noted that in addition to the approximately 45,000 Sears employees whose jobs were at stake, the vendors themselves have tens if not hundreds of thousands of employees whose jobs were also at stake, and that the prospect of a continued Sears was of tremendous importance to those employees and their families. It is also important to point out that the new Sears cannot survive if it does not receive the support of those vendors. As I described above, the trade payables at filing were remarkably low for a company of our size, because the trade had essentially been strangling the company on credit terms. If the trade does not provide normal credit terms to the new Sears, the company's path to success will be that much steeper.

* * * * * *

In conclusion, allow me to say that I am proud of the efforts so many people at Sears Holdings made in the face of severe adversity to put the company on a sustainable path. I also take personal pride in not running away from the responsibility of managing the company through a period that included the worst recession since the Great Depression and the fundamental shifts in consumer technology and purchasing preferences that have killed off (and continue to kill off) so many retail companies with the loss of millions of jobs. Sears, by contrast, survives. While some people may have wished we had simply closed up shop completely, the willingness of ESL and others to provide financing to the company allowed many of our vendors, the PBGC and other creditors to significantly reduce their exposure by the time of the bankruptcy. That "soft landing" would certainly have not occurred without a Board of Directors focused on realizing and preserving value instead of taking more expedient actions that would have inflicted far more pain on many constituents.

Throughout my almost 14-year association with Sears Holdings, I have worked to save a retail icon that faced enormous challenges since well before I came onto the scene. I have been accused by pundits, critics and commentators at various times of either starving stores of capital to invest instead in digital assets or in failing to keep pace with the online revolution; either closing stores too quickly or keeping them open for too long; delaying bankruptcy through the commitment of additional capital or using bankruptcy for some strategic gain; and, most ludicrous of all, that at the same time as ESL loaned the company billions of dollars, I was also pursuing a campaign to strip assets from Sears Holdings for my benefit.

The truth is so much simpler and more straightforward. I believed in my vision for Sears Holdings and that the company could emerge from the retail revolution as a successful, transformative leader, and I was prepared to invest in that goal. It is why I never sold a single share in Sears Holdings and chose to be paid $1 a year and otherwise entirely in stock throughout my time as its Chief Executive Officer. It is why ESL lent Sears Holdings $2.6 billion and why I have agreed to convert the vast majority of these loans into equity in the new Sears. It is why ESL never received or charged Sears Holdings any management fees. It is why, today, I continue to believe in and work for a profitable future for the new Sears.

Sincerely,

Edward S. Lampert
Chairman and CEO, ESL Investments

*Table 1: Pension Plan Contributions and Participant Payments, 2005–2018*

| Year | Assets | Liabilities | Deficit | Discount Rate | Plan Contributions | Actual Return | | Expected Return | | Participant Count* | Participant Payments** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 4,289 | 6,134 | -1,845 | 5.50% | 261 | 241 | 5.8% | 294 | 8.00% | 394,231 | 480.782 |
| 2006 | 4,558 | 5,631 | -1,073 | 5.90% | 318 | 434 | 11.7% | 335 | 8.00% | 372,854 | 472.378 |
| 2007 | 4,421 | 5,232 | -811 | 6.45% | 181 | 215 | 5.1% | 346 | 7.75% | 354,632 | 527.634 |
| 2008 | 3,215 | 4,920 | -1,705 | 7.00% | 259 | -1,061 | -22.4% | 355 | 7.50% | 340,514 | 367.742 |
| 2009 | 3,633 | 5,435 | -1,802 | 6.00% | 173 | 591 | 19.0% | 241 | 7.75% | 333,262 | 348.692 |
| 2010 | 4,054 | 5,623 | -1,569 | 5.75% | 277 | 452 | 19.0% | 287 | 7.75% | 327,916 | 307.156 |
| 2011 | 4,051 | 6,109 | -2,058 | 4.90% | 352 | 4 | 0.0% | 302 | 7.50% | 323,606 | 354.774 |
| 2012 | 3,221 | 5,311 | -2,090 | 4.25% | 516 | 382 | 9.0% | 291 | 7.25% | 305,975 | 1,623.018 |
| 2013 | 3,490 | 4,981 | -1,491 | 4.60% | 361 | 333 | 10.0% | 224 | 7.00% | 215,139 | 528.253 |
| 2014 | 3,616 | 5,874 | -2,258 | 3.70% | 418 | 52 | 4.0% | 246 | 7.00% | 204,050 | 337.998 |
| 2015 | 3,189 | 5,265 | -2,076 | 4.50% | 299 | -258 | -7.4% | 249 | 7.00% | 199,059 | 436.342 |
| 2016 | 3,567 | 5,165 | -1,598 | 4.15% | 314 | 499 | 16.1% | 202 | 6.50% | 191,507 | 437.768 |
| 2017 | 2,528 | 4,003 | -1,475 | 3.75% | 295 | 231 | 8.0% | 190 | 6.50% | 184,450 | 523 |
| 2018 | 2,393 | 3,321 | -928 | 4.35%/4.40% | 617 | -140 | -5.6% | 163 | 6.50% | 99,080 | 611 |
| | | | | | 4,641 | | | | | | 6,745.536 |
| | | | | | | | | | Current | 88,229 | |

*Participant count as of the beginning of the Plan year.
** Participant payments based on calendar year

Table 2: Repurchases and Certain Financial Metrics, 2005–2018



EBITDA calculated per Capital IQ formula.

Source: Original financial statement disclosures (not adjusted for subsequent spin-offs or other transactions).

Finance    Business