UNIVERSAL TERMS AND CONDITIONS Electrolux Home Products North America

The terms and conditions contained herein (the "UTC") shall be effective for all Merchandise (as hereinafter defined) sold by the undersigned vendor ("Seller"), directly or indirectly through Seller's dealers or distributors, to Sears, Roebuck and Co. ("Sears") on or after the date set forth below.

Seller and Sears hereby agree as follows:

1. DEFINITIONS. The following terms used in the UTC shall have the meanings described below: (a) "Change of Control" shall mean (i) a sale of all or substantially all of the assets of Seller, whether in a single transaction or a series of transactions; (ii) the merger or consolidation of Seller with or into any corporation or the merger of another corporation into Seller if the effect is that fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of the surviving or new corporation is held by a person or persons other than the shareholders of Seller immediately prior to such transaction, or (iii) the occurrence of any other event which results in fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of Seller being held by a person or persons other than the shareholders of Seller who, individually or as a group, held 50% or more of such voting power immediately prior to such event; (b) "Merchandise" shall mean the goods provided to Sears by Seller, directly or indirectly through Seller's dealers or distributors, as described in any applicable Specifications, including all packaging, tags, labels, hangers, and containers used in connection therewith, all parts relating to such goods provided to Sears and all literature (including owner manuals and training materials) pertaining to such goods, if applicable, whether or not any of such items are set forth separately on invoices to Sears; (c) "Purchase Order" shall mean a written or electronic order for Merchandise, setting forth price, quantities of Merchandise, delivery terms and payment terms or any other equivalent process by which Sears orders quantities of merchandise; (d) "Specification" shall mean all, and any part, of the detailed description of Merchandise agreed upon by Seller and Sears, or contained in the Vendor Guide (as defined below); (e) "Vendor Agreements" shall mean all written agreements between Sears and Seller relating to the purchase of Merchandise, including all Purchase Orders, agreements for selling assistance (including agreements for advertising, point of sale or promotional service or funding), buying agreements, exclusivity agreements, letter agreements, Specifications and any written amendments, waivers and consents relating to any of the foregoing; provided, however, that Vendor Agreements shall not include any response by Seller purporting to modify or supplement any Purchase Order issued by Sears unless such response is in writing and executed or consented to in writing by Sears. Terms used herein and not otherwise defined shall have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois (the "UCC"), including but not limited to Article 2 thereof.

2. VENDOR AGREEMENTS

2.1 Purchase Orders. The execution of the UTC shall not give rise to any commitment on the part of Sears to purchase any Merchandise, except as may be expressly set forth in another Vendor Agreement. In the absence of such other Vendor Agreement, a commitment to purchase Merchandise shall arise only at such time as Sears issues a Purchase Order to Seller for specified quantities of Merchandise, and Sears obligation to purchase Merchandise shall be limited to the quantities contained in Purchase Orders issued by it. When issued by Sears and accepted by Seller, all Purchase Orders shall become part of and be subject to the terms of the applicable Vendor Agreements, including the UTC. Any estimates or forecasts of Sears future needs for Merchandise which may be provided to Seller by Sears are for long range planning purposes only and shall not in any way represent a commitment of Sears. Sears shall have no responsibility for any actions taken by Seller based on such estimates or forecasts.

2.2 Construction and Amendment. Except as otherwise expressly provided in any Vendor Agreement executed after the date hereof, the UTC shall apply to all Vendor Agreements and is hereby incorporated into the Vendor Agreements, whether existing on the date hereof or hereafter executed. The Vendor Agreements, as supplemented and amended by the UTC and the Sears Vendor Information Guide supplied to Seller by Sears, as it may be amended from time to time (the "Vendor Guide") contain the entire understanding of the Seller and Sears with respect to the subject matter of such Vendor Agreements and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Purchase Order issued by Sears unless such response is in writing and executed or consented to in writing by Sears. The Vendor Agreements may be amended or supplemented only by the UTC, the Vendor Guide or another Vendor Agreement, which Vendor Agreement must be in writing and signed by an authorized representative of each party. The UTC supersedes all previous Vendor Agreements, communications, and understandings between the parties that are inconsistent with the terms hereof. With respect to any particular line of Merchandise, the applicable Vendor Agreements, the UTC and the Vendor Guide shall be deemed a series of installments in one and the same transaction and deemed to constitute a single contract between Sears and Seller within the meaning of Section 9-318(1) of the UCC.

2.3 Waiver. No right of either party under a Vendor Agreement, as modified by this UTC, may be waived except as expressly set forth in a writing signed by an authorized representative of the party waiving such right. No waiver of any provision shall be implied by a party's failure to enforce any of its rights or remedies herein provided, and no express waiver shall affect any provision other than that to which the waiver is applicable and only for that occurrence.

3. BUSINESS TERMS.

3.1 Specifications. Specifications shall be in writing. By agreeing to and/or using any Specification or any design, product modification or other manufacturing or production suggestion, whether originating with Sears or elsewhere, Seller adopts as its own, accepts full responsibility for, and relieves Sears of all responsibility for such Specification, design, modification or suggestion.

3.2 Price and Shipping. The price specified in the applicable Purchase Order shall include all costs of packing Merchandise and all costs of delivery of Merchandise to the "F.O.B. point" or other delivery point specified in the applicable Purchase Order, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where production or delivery takes place; (b) any commissions to selling agents; and (c) other incidenta[l] charges, whether or not such charges are itemized separately on invoices to Sears. Seller shall ship only the quantities of Merchandise ordered by Sear[s] in the applicable Purchase Order. Seller shall not make any substitutions without Sears prior written approval. Seller shall bill Sears for the Merchandise at the price specified in the applicable Purchase Order.

4. CODE OF CONDUCT. Seller acknowledges that Seller has been furnished a copy of Sears Code of Business Conduct (the "Code o[f] Conduct") and that Sears associates are required to follow the Code of Conduct. Seller shall support the Code of Conduct and shall not take any actio[n] which may cause a Sears associate to violate the Code of Conduct. Seller shall report to Sears any violation of or attempted violation of the Code o[f] Conduct.

5. PACKAGING, LABELING, SHIPPING AND BILLING; RISK OF LOSS.

5.1 Packaging, Labeling, Shipping and Billing. Seller shall be responsible for providing adequate packaging, tagging, labeling, packing, shipping and billing. Seller shall comply with all packaging, tagging, labeling, packing, shipping and billing requirements reasonably requested by Sears or established b[y] applicable laws, regulations, carrier tariffs and classifications. For Merchandise to be shipped to Sears from a point of origin within the United State[s] Seller shall deliver Merchandise to the designated carrier on or before the "ship date(s)" specified in the applicable Purchase Order. For Merchandise t[o] be shipped to Sears from a point of origin outside the United States, Seller shall deliver Merchandise in accordance with the delivery terms specified i[n] the applicable Purchase Order, and such delivery shall be made on or before the "ready date(s)" specified in the Purchase Order. Delivery times set fort[h] in a Purchase Order shall be of the essence of the Vendor Agreement. Seller shall ship all Merchandise in full packs and full shipments in accordance wit[h] Sears requirements.

01972 - 9000 - S

RECEIVED DEC 2 3 200

EXHIBIT 3

... risk of loss or damage to Merchandise shall remain with Seller until delivery of such Merchandise in accordance with the delivery or purchase terms specified by Sears in the applicable Purchase Order.

6 MANUFACTURING. Upon Sears request, Seller shall provide Sears with specific information, in such detail as Sears may reasonably request, as to the location(s) and method(s) of manufacturing Merchandise. Seller shall provide Sears with prior written notice of any change in the location(s) of manufacturing Merchandise, and Seller shall be fully responsible for all costs and/or delays resulting from such changes. Without advance notice but during regular business hours, Sears, its designated representatives and any independent inspectors approved by Sears may inspect any production facilities at which any Merchandise or any components for Merchandise are being produced (including any facilities of Seller, its subcontractors and suppliers) and any and all Merchandise at any stage of production or delivery (including at the delivery point specified in the applicable Purchase Order). Sears may require Seller to have Merchandise inspected prior to its shipment to the United States, such inspection to be performed at Seller's sole expense, by an independent inspector approved by Sears. Any inspection, any documentation thereof, and any corrective actions taken by Seller with respect to any Merchandise shall not be deemed an acceptance of any Merchandise, or a waiver of any nonconformities or defects in any Merchandise and shall not excuse any failure by Seller to deliver Merchandise in accordance with the terms of the applicable Vendor Agreement.

7. PARTS AND SERVICE.

7.1 Parts. Seller shall sell to Sears any and all parts shown on Merchandise parts lists referenced or included in any Vendor Agreement applicable to the Merchandise (if any) for a period of at least ten (10) years after the date such Merchandise is last produced by Seller for Sears; provided, however, that if Seller discontinues manufacturing or supplying any part shown on any such Merchandise parts list, Seller shall give Sears at least ninety (90) days prior written notice of such discontinuance and Seller shall promptly fulfill any and all orders placed by Sears within such 90-day period. The price of parts shall be specified on the applicable Purchase Orders, but in no event shall Seller charge Sears a price greater than the lowest price charged by Seller to any other customer for the same or similar parts sold on substantially similar terms.

7.2 Service. Seller shall provide Sears with all available information relating to Merchandise, including product specifications, parts lists and all training materials, service manuals and instructions developed by or for Seller. Seller authorizes Sears to reproduce such training materials, service manuals and instructions without payment of any royalties or other fees to Seller. Seller authorizes Sears to provide repair and maintenance services for all Merchandise sold to customers, and Sears may advertise that it is authorized to provide such services. Sears shall provide such repair and maintenance services in conformity with reasonable standards and guidelines. Sears may use its subsidiaries and independent subcontractors or licensees to provide such repair and/or maintenance services. Seller represents and warrants that the provision of such services by Sears will not violate the rights of any third party.

8. REPRESENTATIONS AND WARRANTIES. The provisions of this Section 8 shall survive the cancellation or termination of all Vendor Agreements between the parties relating to Merchandise.

8.1 Merchandise Warranties. Without in any way disclaiming implied remedies or limiting remedies for breach thereof, Seller represents and warrants that all Merchandise shall: (a) conform to the Specifications for such Merchandise; (b) be merchantable; (c) be free from defects in workmanship, materials and packaging; (d) be free from defects in construction and design; (e) be fit and sufficient for the purpose for which it is intended and/or which is stated on any packaging, labeling or advertising; and (f) be equivalent in materials, quality, fit, finish, workmanship, performance and design to any samples submitted to and approved by Sears.

8.2 Compliance with Law. Seller represents and warrants that: (a) all patents, trademarks, trade names, trade dress, copyrights, trade secrets, right of publicity and other proprietary rights (other than proprietary rights owned by Sears) used by Seller in connection with Merchandise or the development or manufacture of Merchandise are owned by Seller or that Seller has been properly authorized by the owner of such proprietary rights to use such rights in connection with such Merchandise and to sell such Merchandise as incorporates such proprietary rights to Sears for use or further resale; (b) all Merchandise has been or shall be produced, packaged, tagged, labeled, packed, shipped and invoiced in compliance with the applicable requirements of federal, state and local laws, regulations, ordinances and administrative orders and rules of the United States, its territories and all other countries in which Merchandise is produced or delivered; (c) Seller and all subcontractors and agents involved in the production or delivery of Merchandise strictly adhere, and shall continue throughout the term of each Vendor Agreement to strictly adhere, to all applicable federal, state and local laws, regulations and prohibitions of the United States, its territories and all countries in which Merchandise is produced or delivered with respect to the operation of their production facilities and their other business and labor practices, including laws, regulations and prohibitions governing the working conditions, wages, hours and minimum age of the work force; and (d) Merchandise has not been and shall not be produced or manufactured, in whole or in part, by child labor or by convict or forced labor. Seller shall provide Sears with any guaranty of compliance with the foregoing in such form as Sears may designate with respect to Merchandise. Seller represents and warrants that all sales of Merchandise to Sears are or shall be made at no less than fair value under the United States Antidumping Law. As long as Merchandise is not subject to a United States antidumping investigation on the date of this Agreement (as first set forth above), Seller represents and warrants that it shall indemnify Sears for all antidumping duties imposed on such Merchandise which is (i) sold prior to the date of publication of the International Trade Administration's preliminary determination of sales at less than fair value; and (ii) exported before the date of publication of the International Trade Administration's final determination of sales at less than fair value. Seller also represents and warrants that it shall indemnify Sears for any expenses (including reasonable attorneys' fees) and administrative costs incurred by Sears in its participation in any United States antidumping proceeding involving such Merchandise.

8.3 Century Compliance. Seller represents and warrants that all information, data transmissions and transactions, regardless of form, originating from Seller or any of its contractors or subcontractors or otherwise controlled by Seller or any of its contractors or subcontractors relating to the Merchandise or otherwise required or permitted under any Vendor Agreement shall utilize and include four digit year elements. The year must encompass a two digit century that precedes and is contiguous with, a two digit year of a century (e.g. 1999, 2000, etc.).

9. ELECTRONIC PROCESSING. Unless otherwise agreed to by Sears, the parties shall process Purchase Orders and other related documents (including invoices and ship notices) and installment payments and advances in respect of all monetary obligations between Sears and Seller electronically, through electronic data interchange ("EDI"), either directly or through a third party provider satisfactory to both parties. Each party shall be responsible for its own costs, including the costs of any provider with which it contracts. All EDI transactions shall be in accordance with standards approved by the Accredited Standards Committee X 12 (ASCX12), and in accordance with any instructions and procedures which Sears may supply from time to time. Each EDI invoice (or ship notice, in the absence of an invoice) shall contain an appropriate, agreed upon code, symbol or statement affirming Seller's compliance with all applicable requirements of the Fair Labor Standards Act (as amended), the regulations and orders of the United States Department of Labor issued pursuant thereto and of any similar state laws and regulations. All electronic fund transfers and wire transactions shall be in accordance with National Automated Clearing House Association (NACHA) rules, and in accordance with the instructions and procedures established by Sears from time to time. Neither party shall be liable to the other for any special, incidental, exemplary or consequential damages arising from or as a result of any delay, omission or error in the electronic transmission or receipt of any documents, even if the other party has been advised of the possibility of such damages.

10. SEARS IDENTIFICATION. If Sears directs Seller to mark or label any Merchandise with a trade name, trademark, logo or service mark owned by or licensed to Sears ("Sears Identification"), such marking or labeling shall be limited to the indicated quantities of such Merchandise and shall be done in accordance with Sears specific instructions. Seller shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any Sears Identification (including any rejected Merchandise) to anyone other than Sears without first obtaining Sears express written consent and then removing all Sears Identification prior to such sale or disposal. Sears may elect, but shall have no obligation, to purchase from Seller any surplus labels, packaging or other materials bearing Sears Identification. All such materials not purchased from Seller by Sears shall be destroyed at the cancellation or termination of the Vendor Agreement. Seller shall have no interest or rights in any Sears Identification except as expressly granted in a Vendor Agreement. The provisions of this Section 10 shall survive the cancellation or termination of each Vendor Agreement.

RECEIVED DEC 2 3 2002

11. DEFENSE OF CLAIMS. Seller shall, at its own cost and expense, defend Sears, its subsidiaries, and the officers, directors, employees, licensees, agents, distributors and independent contractors of Sears and its subsidiaries (each an "Indemnified Party") from and against all allegations (even though such allegations may be false, fraudulent or groundless) asserted in any claim, action, lawsuit or proceeding between any Indemnified Party and any third party arising out of any of the following (collectively, the "Claims"), whether actual or alleged and whether or not Seller's Indemnity and Contribution Obligations (as defined below) shall apply: (a) infringement or misappropriation of any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary right in connection with Merchandise, or any unfair competition involving Merchandise; (b) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in Merchandise, whether latent or patent, including actual or alleged improper construction, installation, repair or design of Merchandise, or actual or alleged failure of Merchandise to comply with any specifications or samples or with any express or implied warranties of Seller, or any claim of strict liability in tort relating to any Merchandise; (c) violation by Merchandise in its manufacture, possession, use or sale, of any federal, state or local laws, regulations, ordinances or administrative orders or rules of the United States, its Territories or any other country in which Merchandise is produced or delivered; (d) defect involving the packaging, tagging, labeling, packing, shipping and/or invoicing of Merchandise; (e) failure to warn or inadequate warnings and/or instructions; or (f) display, assembly or installation of Merchandise. Seller shall use counsel reasonably satisfactory to Sears in the defense of such Claims. Sears may, at its election, take control of the defense and investigation of the Claims, and may employ and engage attorneys of its own choice to manage and defend such Claims, at Seller's cost, risk and expense, provided that Sears and its counsel shall proceed with diligence and good faith with respect thereto. The obligations of Seller under this Section 11 (collectively, "Defense Obligations") shall survive the cancellation or termination of each Vendor Agreement.

12. INDEMNIFICATION AND CONTRIBUTION. Seller shall hold harmless and indemnify the Indemnified Parties from and against any and all claims, demands, actions, lawsuits, proceedings, liabilities, losses, costs and expenses (including reasonable attorneys' fees and disbursements and costs of investigation) incurred by any of the Indemnified Parties in any claim, demand, action, lawsuit, or proceeding between Seller and any Indemnified Party or between any Indemnified Party and any third party or otherwise arising out of any Claims, including but not limited to claims of negligent acts or omissions by any Indemnified Party. In any case to which the Seller's indemnity obligation set forth in the preceding sentence is not enforceable under applicable law and in which either (a) any Indemnified Party or (b) Seller is found to be liable to a third party with respect to Merchandise, then Sears and Seller shall each contribute to the payment of any judgment awarded in favor of such third party in proportion to the comparative degree of culpability of the Indemnified Parties and Seller. The obligations of Seller and Sears under this Section 12 (collectively, "Indemnity and Contribution Obligations") shall survive the cancellation or termination of each Vendor Agreement.

13. INSURANCE. Seller shall obtain and maintain, at its expense, a policy or policies of Commercial General Liability Insurance covering liabilities relating to Merchandise, including products and completed operations, with a broad form Vendor's Endorsement naming Sears, in such amounts and with such companies and containing such other provisions satisfactory to Sears. All such policies shall provide that the coverage thereunder shall not be terminated without at least thirty (30) days prior written notice to Sears. Certificates of insurance evidencing such coverage shall be submitted in advance of or concurrent with the execution of the UTC by Seller and upon each policy renewal. Approval of any of Seller's insurance policies by Sears shall not relieve Seller of any obligations contained herein, including Seller's Defense and Indemnity and Contribution Obligations set forth above, even for claims in excess of Seller's policy limits. If at any time Seller does not provide Sears with the certificates of insurance required hereunder or if, in Sears opinion, such policies do not provide adequate protection for Sears, and Seller does not furnish evidence of acceptable coverage within fifteen (15) days after Sears so notifies Seller, Sears shall have the right to: (a) immediately terminate or cancel each Vendor Agreement or any part of Sears obligations under such agreements, or cancel all or any outstanding orders for Merchandise, upon written notice to Seller; and (b) withhold making any payment or advance in respect of any Sears monetary obligations which may be outstanding under the applicable Vendor Agreements until evidence of acceptable coverage is provided.

14. SEARS REMEDIES. In addition to all other remedies available to Sears under the UCC or otherwise, any Merchandise may be rejected by Sears and abandoned, returned or held at Seller's expense and risk, when such Merchandise: (a) is not produced, sold, shipped and/or delivered in compliance with the terms of the applicable Vendor Agreements, or otherwise does not conform to the applicable Vendor Agreements; (b) is delivered in excess of the quantities ordered, in broken packs or partial shipments, or in packages or assortments other than as specified; (c) allegedly violates any federal, state or local laws, regulations issued pursuant to such laws, or any governmental administrative orders, rules or regulations, of the United States, its territories or any other country in which Merchandise is produced or delivered; or (d) allegedly infringes any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary right, or allegedly involves any unfair competition. Sears right to reject and return or hold Merchandise at Seller's expense shall, without limiting such right, extend to Merchandise sold to Sears hereunder which was returned by a Sears customer for any reason entitling Sears to reject or revoke acceptance of such Merchandise. Sears may, at its option, require Seller to replace any nonconforming Merchandise or grant Sears a full refund or full credit (collectively, "Refund Credit"). At its election, Sears may accept nonconforming Merchandise, and Seller shall be liable for any reduced value of such Merchandise and to repair the same. Acceptance of Merchandise by Sears shall not relieve Seller of any of its warranty or other obligations hereunder. Sears may also charge to Seller all direct and indirect costs incurred by Sears as a result of any nonconforming Merchandise or delivery, or an administrative fee in an amount reasonably related to such costs whether or not the Merchandise is rejected by Sears (collectively, "Return Costs"). All Refund Credits, Return Costs, Defense Obligations, Indemnity and Contribution Obligations and other monetary obligations owing by Seller to Sears under the UTC (collectively, "Seller's Monetary Obligations"), may, at Sears option, be deducted and recouped from any monetary obligations which may be owing by Sears at any time pursuant to the Vendor Agreements. Acceptance by Sears of replacement Merchandise, of a full or partial credit or refund, or of Return Costs, shall not relieve Seller of liability for other damages sustained by Sears as a result of Seller's failure to deliver in a timely manner conforming Merchandise or arising as a result of any other breach by Seller.

15. CANCELLATION AND TERMINATION. Sears shall have the right to cancel or terminate immediately the related Vendor Agreements for any particular line or lines of Merchandise or any part of Sears obligations under such agreements, or cancel or terminate all or any outstanding orders for Merchandise under such Vendor Agreements if: (a) Sears reasonably believes that Seller does not have Merchandise which conforms to the terms hereof, and is ready for shipment in the specified quantities and at the delivery dates specified; (b) it is alleged that Merchandise infringes any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary rights; (c) it is alleged that Merchandise was manufactured or to be sold to Sears in violation of any applicable federal, state or local laws, regulations, ordinances or administrative orders or rules of the United States, its territories or any country in which the Merchandise is produced or delivered or in violation with the UTC; (d) Seller shall refuse to furnish appropriate guaranties to protect Sears as may be requested by Sears pursuant to Section 8.2; (e) Seller shall fail to maintain the insurance required hereunder or fail to produce evidence thereof; (f) Seller becomes the subject of a case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of Seller commences action to enforce or foreclose upon a lien or security interest in property of Seller, or any property of Seller passes into the hands of a creditor of Seller, receiver, or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment, or otherwise is attached for the benefit of a creditor of Seller (excluding the consensual granting of a lien or security interest by Seller to secure a debt); (g) Seller ceases operating the manufacturing or assembly line(s) applicable to the Merchandise or necessary components incorporated into the Merchandise, or announces its intention to do so prior to fulfilling all outstanding Purchase Orders, or otherwise becomes unable for any reason timely to fulfill outstanding Purchase Orders; (h) Seller commits a material breach of any Vendor Agreements relating to such Merchandise; (i) a Change of Control occurs with respect to Seller; (j) Seller shall fail to comply with the four digit year element requirement in Section 8.3 ; (k) Seller changes the location(s) of manufacturing Merchandise or (l) cancellation or termination is otherwise permitted by the UCC or other applicable law. For any imported Merchandise which is subject to a customs embargo or quota restriction, Sears may cancel or terminate any Purchase Order or delay any installment payment or advance in respect of Sears monetary obligations to Seller, if any, under each applicable Vendor Agreement until the embargo is lifted or necessary quota becomes available.

16. RECOUPMENT AND SET-OFF. Sears and Seller acknowledge and agree that Sears monetary obligations to Seller under the Vendor Agreements shall at all times be net of Seller's Monetary Obligations, and any installment payment or advance made by Sears to Seller in respect of any Purchase Order while any Seller's Monetary Obligations are outstanding shall be deemed to be an overpayment to Seller to the extent of such outstanding

RECEIVED DEC 2 3 2002

Seller's Monetary Obligation and be subject to recoupment by Sears. Without limiting the foregoing, Sears shall have the right, at all times, to deduct any Seller's Monetary Obligations from any amounts owed to Seller by Sears, and to pay only the net sum due, if any. Any Seller's Monetary Obligations which remain outstanding after any exercise by Sears of its recoupment and/or set-off rights shall be paid by Seller promptly upon demand by Sears. For the purpose of Sears exercise of the right of recoupment and/or setoff only, any raw materials, components and parts sold by Seller to Sears for use in Merchandise, if applicable, shall be deemed to be sold to Sears pursuant to a Purchase Order.

17. **CONFIDENTIALITY.** All Proprietary Information (as hereinafter defined) is the sole and exclusive property of Sears. Seller shall not in any manner use, reproduce or disclose, directly or indirectly, to any third party at any time any Proprietary Information, except in connection with Seller's performance under the Vendor Agreements. Upon demand by Sears, Seller shall deliver to Sears immediately all materials containing Proprietary Information in Seller's possession (whether prepared by Sears or Seller). Proprietary Information shall consist of: (a) all information relating to Sears sales, pricing, cost, inventory, operations, plans and programs; (b) all trade secrets of Sears, including any and all customer lists, customer survey responses and any other information concerning any of Sears customers; (c) Specifications, to the extent furnished by Sears; (d) patent applications, copyrights and other Sears intellectual property; and (e) any other information that is not publicly available and designated by Sears as Proprietary Information. The provisions of this Section 17 shall survive the cancellation or termination of each Vendor Agreement.

18. **ASSIGNMENT BY SELLER.** Seller shall not assign (by contract, operation of law or otherwise) its rights or obligations under any Vendor Agreement or grant a security interest in or pledge as collateral any interest herein or therein, except with Sears prior written consent, and the failure of Seller to obtain Sears prior written consent shall render any such attempt to assign, or grant a security interest or lien in its rights or obligations void and of no force and effect; provided, however, that Seller may assign its right to receive installment payments or advances from Sears in respect of any monetary obligations of Sears to Seller under any Vendor Agreement, subject to the terms and conditions contained herein. Any factor or permitted assignee, secured creditor or pledgee of Seller shall acquire such interest subject to all of Sears recoupments, set-offs, claims and defenses and all of the terms and conditions contained herein, and Seller shall notify any such factor, assignee, secured creditor or pledgee of such fact. Sears shall have no obligation to make payments to anyone other than Seller unless and until Seller: (a) notifies Sears in writing of the assignment of such installment payments or advances along with the name and address of the person to whom such installment payments or advances should be sent; (b) obtains a separate Sears accounts payable number for such installment payments or advances; and (c) uses such accounts payable number on every invoice which Sears is to pay directly to the third party. Seller retains responsibility for all allegedly misdirected installment payments or advances which result from Seller's failure to comply with the terms and conditions hereof.

19. **SEVERABILITY.** If any provision of any Vendor Agreement or this UTC is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, then such provision shall be deemed modified to the extent necessary to make such provision enforceable by such court, and the invalidity in whole or in part of any portion of such Vendor Agreement or this UTC shall not impair or affect the validity or enforceability of the remaining provisions of such Vendor Agreement or this UTC.

20. **CUMULATIVE RIGHTS.** All rights and remedies under the Vendor Agreements are cumulative, and the exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided for herein or at law or in equity.

21. **APPLICABLE LAW AND JURISDICTION.** The Vendor Agreements and the UTC shall be construed and enforced in accordance with the internal laws of the State of Illinois, without regard to its conflict of law principles. The rights and obligations of the parties hereto shall not be governed by the provisions of the United Nations Convention on Contracts for the International Sale of Goods. The UTC shall not be effective until the UTC has been received and executed by Sears in Hoffman Estates, Illinois. The federal and/or state courts of Illinois shall have personal and subject matter jurisdiction over, and the parties each hereby submit to the venue of such courts with respect to, any dispute arising pursuant to any Vendor Agreement, and all objections to such jurisdiction and venue are hereby waived. Seller consents to service of process permitted under Illinois law or by certified mail, return receipt requested.

IN WITNESS WHEREOF, Seller and Sears have each caused the UTC to be executed by its duly authorized representative as of the date written below and such execution evidences each party's acceptance of and agreement with the terms and conditions set forth herein.

Dated: 3/19/02

SEARS, ROEBUCK AND CO.

By: [signature] (Signature)

Title: VP/Gmm

Electrolux Home Products North America, A Wholly Owned Division of Electrolux North America Inc., a Delaware Corporation

SELLER

Company Name

By: [signature] (Signature)

Title: Vice President Sales and Marketing

[PLACE SELLER'S NAME LABEL HERE]

Rev. Date: 2/97

1071

RECEIVED DEC 2 3 2002

SUPPLY AGREEMENT

This Agreement (the "Agreement") is made as of January 1, 2004 (the "Effective Date") by and between Sears, Roebuck and Co., a New York corporation ("Sears"), and Electrolux Home Products, Inc. ("Seller") a Delaware corporation.

The parties agree as follows:

1. VENDOR AGREEMENT. This Agreement is a "Vendor Agreement" pursuant to the Universal Terms and Conditions (the "UTC") dated as of March 19, 2002, between Seller and Sears. The UTC, including the Vendor Information Guide (as supplemented and modified by Sears, the "Vendor Guide") incorporated into the UTC by reference, is incorporated into this Agreement. References herein to the Vendor Guide will mean the domestic Vendor Information Guide with respect to Domestic Products and the International Vender Information Guide with respect to Import Products. This Agreement will control over the UTC in case the terms of this Agreement are contradictory to or inconsistent with the terms of the UTC.

2. SUPPLY OBLIGATION.

2.A Products. Seller will sell to Sears the products listed on Exhibit A and the Seller Branded products as set forth on letters of agreement issued during the Term of this Agreement (collectively the "Products"). Seller will also sell Replacement Products and New Products to Sears. A Laundry, Cooking, Standard Refrigeration (i.e., top mount, bottom mount and side by side refrigerators), Specialty Refrigeration (i.e., compact refrigerators, wine coolers and ice makers), Freezer or Dishwashing product that is not listed on Exhibit A and that contains features and performs at a level sufficient to replace an existing Product in Sears' assortment is a "Replacement Product." A Laundry, Cooking, Standard Refrigeration, Specialty Refrigeration, or Dishwashing product that is neither listed on Exhibit A nor a Replacement Product is a "New Product." Sears will reasonably determine whether any Laundry, Cooking, Standard Refrigeration, Specialty Refrigeration, or Dishwashing Product that is not listed on Exhibit A is a New Product or a Replacement Product; provided, however, that if Seller has any concerns as to Sears' determination of the designation of any Product, the parties agree to discuss, in good faith, such determination. Effective as of the date of Sears' first order of a Replacement Product or a New Product, that Replacement Product or New Product will be a "Product" for all purposes of this Agreement. Sears may use other sources of supply for the Products. "Sears Branded Product" means any Product sold under a trademark, trade name, service mark or other commercial symbol that Sears owns, licenses, or otherwise has the right to use, including Kenmore, Kenmore Elite and Galaxy, and "Seller Branded Product" means all other Products. "Domestic Product" means a Product that has an F.O.B. Point in the United States, Canada or Mexico. "Import Product" means a Product with an F.O.B. Point outside the United States, Canada and Mexico. "Product Category" means the Laundry, Cooking, Standard Refrigeration, Specialty Refrigeration, or Dishwashing category, as applicable.

2.B Requirements. Seller acknowledges the importance to Sears of, and agrees to maintain, the "mores of Kenmore" with respect to Sears Branded Products during the Term of this Agreement, except as is otherwise agreed to by the Sears' buyer and Seller from time to time during the Term with regard to a specific Sears Branded Product. For purposes of this Agreement, the "mores of Kenmore" means that the Sears Branded Products shall represent a better value than any other comparatively branded Seller Branded Product. In the event of a disagreement between the parties concerning this Section 2.B, the parties will negotiate in good faith a mutually agreeable resolution concerning any such disagreement, for example, the parties' negotiation of a reduction in the Invoice Price of the effected Sears Branded Product in order to maintain the better value of the Sears Branded Product, or the development by Seller of improved features or performance of the effected Sears Branded Product, or any other remedy as is mutually agreed upon by the parties. This Section 2.B does not apply to Innovations (as defined herein) that are not selected by Sears for use in Kenmore branded Products.

3. PRICING.

3.A Invoice Price. Seller will sell to Sears each Product at the Invoice Price for that Product. The Invoice Price for each Sears Branded Product is the price listed on Exhibit A, as adjusted pursuant to the other provisions of this Section 3. The Invoice Price for each Seller Branded Product is the price agreed to from time to time by Seller and the applicable Sears buyer. After Seller and the Sears buyer agree on an Invoice Price for a Seller Branded Product, Seller may increase the price upon 90 days' written notice to Sears. The Invoice Price of each Product will include all costs of delivery of Products to the F.O.B. Point, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where production or delivery takes place; (b) any commissions to selling agents; and (c) other incidental charges, whether or not such charges are itemized separately on invoices to Sears. The Invoice Price will be effective for Products shipped on or after the Effective Date of this Agreement. The Invoice Price for any Replacement Product will not exceed the Invoice Price for the Product that the Replacement Product replaces. Sears and Seller will negotiate to determine the price for any New Product.

3.B Invoice Price Reductions. Effective on the first January 1 after Sears begins offering a Sears Branded Product for sale (the "First Reduction Date"), the Invoice Price of that Sears Branded Product will be reduced by the First Reduction Percentage indicated on Exhibit B from the Invoice Price in effect as of December 31 of the immediately preceding calendar year. Effective on the second January 1 after Sears begins carrying the Sears Branded Product (the "Second

Reduction Date"), the Invoice Price of that Sears Branded Product will be reduced by the Second Reduction Percentage indicated on Exhibit B from the Invoice Price in effect as of December 31 of the immediately preceding calendar year. For any Sears Branded Product listed on Exhibit A as of the date the parties execute this Agreement, the First Reduction Date will be January 1, 2005 and the Second Reduction Date will be January 1, 2006.

3.C Intentionally omitted.

3.D Colors. Seller will not charge Sears any additional "upcharge" over and above the Invoice Price stated in Exhibit A for different color versions of any Product or for "true color" glass for Cooking Products. The Invoice Price for any New Product or Replacement Product for different color versions shall be consistent with the pricing differences in Invoice Price stated in Exhibit A. For Cooking Products, Seller will charge no more than the upcharge for the Products as set forth on Exhibit A for the respective years indicated therein.

3.E "Similar to" Models. At Sears' request, Seller will sell to Sears "similar to" models of those Sears Branded Products that Sears from time to time designates. Seller will include features on each "similar to" model that are distinct from the features on the base Sears Branded Product. For example, "similar to" models for Cooking Products will include at least one additional rack. The Invoice Price of each "similar to" model will be the same as the Invoice Price of the corresponding base Product.

4. PAYMENT TERMS.

4.A Domestic Products. Seller will invoice Sears for Domestic Products via Electronic Data Interchange or such successor system as Sears designates ("EDI") no earlier than the date the invoiced Products depart the F.O.B. Point. Sears shall pay by electronic funds for the undisputed portion of each invoice not later than the 60th day after the Products covered by such invoice depart the F.O.B. Point provided that if that day is a Saturday, Sunday or bank holiday, Sears will initiate payment on the next banking day. Payments mailed or, in the case of electronic payments, initiated within such time will be deemed to be timely made.

4.B Import Products. On or after the date that Seller delivers Import Products to Sears or its agent at the F O B. Point, Seller will deliver the commercial invoice and the other payment documents specified in the International Vendor Guide (collectively, the "Payment Documents") to the freight forwarder designated by Sears. The freight forwarder will review and process the documentation and forward the Payment Documents to the Sears International Buying Office (the "IBO") on the "Commercial Invoice Date," which will be no later than five days after the date Seller delivers the Payment Documents to the freight forwarder.

- If the method of payment is letter of credit, the IBO will approve and return the Payment Documents to Seller or notify the Seller of any discrepancies no more than ten days after the Commercial Invoice Date. Seller will submit the approved Payment Documents to its advising bank. Terms of the letter of credit will be sixty (60) days, beginning on the date that Sears' Accounts Payable Center in Dallas, Texas receives the Payment Documents.

If the method of payment is wire transfer or electronic funds transfer, Sears will initiate payment sixty (60) days after the vessel ship date; provided that if that date is a Saturday, Sunday or bank holiday, Sears will initiate payment on the next banking day. Wire transfers and electronic funds transfers initiated by that date will be deemed timely made.

5. VOLUME INCENTIVE REBATES.

5 A Definitions.

5.A.i "Brand/Category" means, as the context requires, Sears Branded Laundry Products, Sears Branded Cooking Products, Sears Branded Standard Refrigeration Products, Sears Branded Specialty Refrigeration Products, Sears Branded Freezer Products, Sears Branded Dishwashing Products, Seller Branded Laundry Products, Seller Branded Cooking Products, Seller Branded Standard Refrigeration Products, Seller Branded Specialty Refrigeration Products, Seller Branded Freezer Products or Seller Branded Dishwashing Products.

5.A.ii "Total Purchases" means the aggregate Invoice Price of specified Products that are shipped to Sears in the applicable year. For purposes of calculating Total Purchases, Total Brand/Category Units Purchased, Total Contract Sales Purchases and Total Parts Purchases under this Agreement, goods will be deemed to have been shipped and purchased in a particular year if they were actually shipped in that year or if they were scheduled to be shipped in that year, regardless of when Seller issues an Invoice for those Products, unless Sears cancels the applicable order or requests the applicable shipment be delayed from one year to the next. As the context requires, Total Purchases may be calculated for a brand of Products (i.e., all Sears Branded Products or all Seller Branded Products), by a Product Category, by a Brand/Category or for all Products. Where "Total Purchases" is used without reference to a brand, Product Category or Brand/Category, it means the Total Purchases of all Products during the applicable year.

5.A.iii "Total Brand/Category Units Purchased" means the number of units of Products in the applicable Brand/Category that Sears purchased from Seller during the applicable year.

5.A.iv "VIR Percentage" means the applicable Volume Incentive Rebate Percentage listed on Exhibit B for the

applicable Brand/Category. The applicable VIR Percentage is determined based on the Total Brand/Category Units Purchased during the applicable year.

5.B Annual VIR. Each year Seller will pay Sears the following volume incentive rebates (collectively, the "Annual VIR"):

- Sears Branded Laundry VIR
- Sears Branded Free-Standing Cooking VIR
- Seller Branded Free-Standing Cooking VIR
- Sears Branded Standard Refrigeration VIR
- Sears Branded Specialty Refrigeration VIR
- Sears Branded Freezer VIR
- Sears Branded Dishwashing VIR
- Seller Branded Laundry VIR
- Sears Branded Built-In Cooking VIR
- Seller Branded Built-in Cooking VIR
- Seller Branded Standard Refrigeration VIR
- Seller Branded Specialty Refrigeration VIR
- Seller Branded Freezer VIR
- Seller Branded Dishwashing VIR

Each volume incentive rebate will be calculated annually by multiplying A times B, where:

A = the Total Purchases of Products in the applicable Brand/Category during the applicable year; and

B = the highest applicable VIR Percentage for the applicable Brand/Category.

The Annual VIR will be collected in accordance with Exhibit H.

6. SUBSIDIES AND MARKETING/MERCHANDISING SUPPORT.

6.A Intentionally Omitted.

6.B Source Rebate Credits ("SRCs").

6.B.i Regular SRCs. Regular SRCs shall be no less than the rates set forth in Schedule 6.B.i of Exhibit K, except as otherwise agreed to by Sears and Seller. Seller and the applicable Sears buyer will periodically negotiate to determine which Sears Branded Products and Seller Branded Products (if any) in the Product Categories will be featured in the Sears promotion(s) then being planned by Sears (the "SRC Products") and the subsidy that Seller will pay to Sears to partially offset Sears' costs in connection with such promotion(s) ("Regular SRCs").

During the Term of the Agreement, the parties will discuss and agree on the promotions that will be conducted on a monthly basis and Regular SRCs applicable to the promotions. The parties will determine the terms and conditions with respect to each promotion and Regular SRC, and such terms and conditions shall be set forth in an SRC Agreement and Pre-Bill, the form of which is attached hereto Schedule 6 B. i. of Exhibit K. Sears will provide Seller with a completed form of SRC Agreement and Pre-Bill no less than sixty (60) days prior to the month during which such promotion and Regular SRC will apply. Seller may not unreasonably withhold its agreement to the terms and conditions of the promotions or Regular SRCs.

Sears will estimate the aggregate Regular SRCs that it will earn for a particular month during the Term (the "Estimated Monthly Regular SRC"), based on the estimated Total Purchases for that month. Each month, Sears will "pre-bill" 80% of the Estimated Monthly Regular SRCs by issuing a debit memo to Seller. Within three business days after the end of each month during the Term, Sears will calculate the actual monthly SRC (the "Actual Monthly Regular SRC"), which shall equal: (i) the number of units of each SRC Product being promoted during that month that Sears sold during the applicable promotion, multiplied by (ii) the per-unit Regular SRC amount that Seller agreed to pay Sears for the applicable SRC Product, multiplied by (iii) 105%. After such calculation is made, the parties will "true-up" the amounts owing, and the Estimated Monthly Regular SRC amount (previously debited) shall be credited to Seller, and the Actual Monthly Regular SRC shall be debited via a debit memo issued to Seller.

Each year Seller will pay total Regular SRCs for each Category at least equal to: (i) total of that year's Total Purchases of all Seller and Sears Branded Products combined in the applicable Category multiplied by (ii) the SRC Percentage listed in Exhibit B for that Category (the "Yearly Minimum Category SRCs"). The combined total of Seller and Sears Branded Products shall be used to calculate the minimum Regular SRCs. With respect to Cooking Products, Seller shall pay a maximum of 6% of Total Purchases of all Cooking Products.

By the fourth business day of January each year, Seller will deliver to Sears a true and accurate calculation of the Yearly Minimum Brand/Category SRCs that Sears was entitled to

receive for each Brand/Category for the prior calendar year. If the aggregate of all Regular SRCs paid to Sears by Seller for any Brand/Category during the prior year is less than the applicable Yearly Minimum Brand/Category SRCs, Seller will immediately grant Sears a credit for the difference; provided, however, that if this amount exceeds the amounts then payable from Sears to Seller, Seller will immediately pay such excess to Sears by wire transfer. If the aggregate of all Regular SRCs paid to Sears by Seller for the prior year for any Brand/Category exceeds the applicable Yearly Minimum Brand/Category SRCs, Sears will have no obligation to reimburse Seller for the difference. Any changes to this Section 6.B.i will be negotiated in good faith by the parties within the first sixty (60) days of the Term of this Agreement.

6.B.ii (a) Special SRCs for Sears Branded Cooking and Refrigeration Products. Seller agrees during the term of this Agreement that if (i) Seller introduces a Seller branded or manufactured product bearing the trademarks Electrolux or Frigidaire ("Seller Primary Branded Product") with features comparable to the Sears Branded Product, and such Seller Primary Branded Products are sold by a competing national retailer at a lower price (as determined by such competing retailer's national advertisements that include only new, in carton products and exclude promotions such as grand openings, store special events, store closing sales, floor model or inventory clearances or closeouts, instant discount cards, in store coupons, in store rebates or in store credit card related discount offers) than the promotional price of the Sears Branded Product for a period of at least 32 days, or if (ii) Seller introduces a Seller Primary Branded Product with better features than the Sears Branded Product and such Seller Primary Branded Product is sold by a competing national retailer at the same advertised price as the Sears Branded Product, and (iii) Sears determines that it must lower its promotional price of the Sears Branded Product in order to keep Sears competitive on the Sears Branded Product in the marketplace, Seller shall lower the Invoice Price of the Sears Branded Product to allow Sears to earn a margin equal to the margin earned prior to the price reduction. Such lower Invoice Price shall apply retroactively to the first date when Sears lowers its promotion price of the Sears Branded Product in response to the competing retailer's promotion. At such time as the competing retailer's promotion ends, Seller's Invoice Price shall return to the price in place prior to the implementation of the SRC.

In the event a lower Invoice Price is implemented as a result of this Agreement and such lower price has a material adverse impact on Seller, then Seller reserves the right to discontinue the sale of the Sears Branded Product to Sears upon six months' prior written notice; provided, however, that in the case of Built-in Cooking Products, if Seller has been awarded all or substantially all of the Sears Built-in Cooking business, the right to discontinue the sale of Built-in Cooking Products shall be subject to twelve months' prior written notice.

At the end of each calendar year of this Agreement, Sears and Seller shall enter into discussions to reassess the Sears Branded Product offerings in relation to other products offered in the marketplace in order to maintain Sears' ability to remain competitive in the marketplace with Sears Branded Products.

6B.ii (b) Special SRCs for Sears Branded Dishwashers. Seller agrees during the term of this Agreement that if (i) Seller introduces a Seller branded or manufactured dishwasher product ("Seller Branded Dishwasher") with features comparable to the Sears Branded Dishwasher, and such Seller Branded Dishwasher is sold by a competing national retailer at a lower price (as determined by such competing national retailer's national advertisements or the results of independent national shopping surveys that include only new, in carton products and exclude promotions such as grand openings, store special events, store closing sales, floor model or inventory clearances or closeouts, instant discount cards, in store coupons, in store rebates or in store credit card related discount offers) than the promotional price of the Sears Branded Dishwasher, or if (ii) Seller introduces a Seller Branded Dishwasher with better features than the Sears Branded Dishwasher and such Seller Branded Dishwasher is sold by a competing national retailer at the same advertised price as the Sears Branded Dishwasher, and (iii) Sears determines that it must lower its promotional price of the Sears Branded Dishwasher in order to keep Sears competitive on the Sears Branded Dishwasher in the marketplace, Seller shall lower the Invoice Price of the Sears Branded Dishwasher to allow Sears to earn a margin equal to the margin earned prior to the price reduction.

In the event a lower Invoice Price is implemented as a result of this Agreement and such lower price has a material adverse impact on Seller, then Seller reserves the right to discontinue the sale of the Sears Branded Dishwasher to Sears upon six months' prior written notice.

At the end of each calendar year of this Agreement, Sears and Seller shall enter into discussions to reassess the Sears Branded Dishwasher offerings in relation to other dishwasher products offered in the marketplace in order to maintain Sears' ability to remain competitive in the marketplace with Sears Branded Dishwashers.

6.C Advertising Subsidies. Seller will pay advertising subsidies to Sears ("Advertising Subsidies") for each Product Category. Sears will calculate each year's Advertising Subsidy for each Product Category by multiplying that year's Total Purchases of Products in the applicable Product Category by the Advertising Subsidy Percentage listed for that Product Category on Exhibit B The Advertising Subsidies will be collected in accordance with Exhibit H.

6 D Floor Models. For each floor model of a Product that Sears closes out or discontinues, Seller will pay Sears a subsidy (a "Floor Model Subsidy") to support the liquidation

of Product floor models equal to the amount indicated in Exhibit B. Seller will also provide Sears with free non-functioning units of each cooktop Product ("Dummy Cooktops"). The number of Dummy Cooktops for each cooktop Product will equal the number of stores in which Sears chooses to display the cooktop Product. The Floor Model Subsidies will be collected in accordance with Exhibit H.

If Seller has agreed to pay 100% of the Invoice Price for Seller Branded Wall Ovens Floor Model Subsidy per Exhibit B, then upon Seller's discretion, Sears will, at Seller's expense (including handling charges, if applicable), either return or dispose of the Seller Branded Wall ovens.

6.E Display Subsidy. To subsidize fixture costs associated with floor displays for Built-in Cooking Products (i.e., wall ovens, drop-in ranges, slide-in ranges and cooktops) and for Dishwashing Products, Seller will pay Sears Seller's Pro Rata Share of the cost of remodeling the Built-in Cooking Product displays (the "Cooking Display Subsidy") and the Dishwashing Product displays (the "Dishwashing Display Subsidy"). Sears will calculate "Seller's Pro Rata Share" based on the percentage of Sears' total Built-in Cooking business or total Dishwashing business, as applicable, in dollars at sell, that is represented by the Products. Sears will only assess the Cooking Display Subsidy and the Dishwashing Display Subsidy for a single round of Cooking remodels and a single round of Dishwashing remodels during the Term. Sears will issue debit memos for the Cooking Display Subsidy and the Dishwashing Display Subsidy after calculating Seller's Pro Rata Share of the applicable remodeling costs.

6.F Intentionally omitted.

6.G Intentionally omitted.

6.H 0% Financing/Free Delivery/Discount Installation. 0% Financing allows customers to purchase Products and pay no interest for a specified period of time. Free Delivery/Discount Installation allows customers to have Products delivered to their homes at no charge and/or to have Products installed at a reduced charge. Seller and Sears will periodically negotiate to determine the specific subsidy amount that Seller will pay per Product to Sears to support Sears' 0% Financing and Free Delivery/Discount Installation programs.

Each month Sears will debit Seller for the 0%/Free Subsidies earned in the prior month. The "0%/Free Subsidies" earned in a month will be (i) the number of units of each Product that Sears sold during the month multiplied by (ii) the 0% Financing/Free Delivery/Discount Installation Subsidy Percentage for the applicable Product Category listed on Exhibit B. Each year, Seller will pay Sears an amount for each Product Category at least equal to (i) the Total Purchases of Products in that Product Category during the year, multiplied by (ii) the 0% Financing/Free Delivery/Discount Installation Subsidy Percentage for the applicable Product Category listed on Exhibit B (the "Yearly Minimum Category 0%/Free Subsidy")

By the fourth business day of January each year, Seller will deliver to Sears a true and accurate calculation of the Yearly Minimum Category 0%/Free Subsidy that Sears was entitled to receive for each Product Category for the prior calendar year. If the aggregate of all 0%/Free Subsidies paid to Sears by Seller for any Product Category the prior year is less than the applicable Yearly Minimum Category 0%/Free Subsidy, Seller will immediately grant Sears a credit for the difference; provided, however, that if this amount exceeds the amounts then payable from Sears to Seller, Seller will immediately pay such excess to Sears by wire transfer. If the aggregate of all 0%/Free Subsidies paid to Sears by Seller for the prior year for any Product Category exceeds the applicable Yearly Minimum Category 0%/Free Subsidy, Sears will have no obligation to reimburse Seller for the difference

6.I. Rebate Weeks. "Rebate Week(s)" are promotions during which Sears' customers who purchase specified Cooking Product models, excluding frequency models ("Models"), identified from the Products identified in Exhibit A and national brand items, receive rebate coupons redeemable for cash. Each year during the Term, Seller will participate in up to 16 Rebate Weeks on Models to be agreed upon by Seller and the Sears buyer. For each rebate promotion, the Sears buyer and Seller will determine the eligible models and the amount of rebate per Model. For each redeemed coupon issued on the sale of a Model by Sears during a rebate Week, Seller, or a third party ("Third Party") designated by Seller and approved by Sears, will pay the Sears' customer redeeming the rebate the amount agreed upon by Sears and Seller. Seller shall bear all costs associated with the administration of the rebate promotion by a Third Party. Rebates shall be in lieu of SRCs and SRCs shall not apply during the Rebate period.

If the Model Sales during the Rebate Weeks are less than the planned Model sales, Seller agrees to negotiate additional Rebate Weeks upon request by Sears

6.J Kenmore Brand Building. Seller and Sears acknowledge the importance of, and the benefit they derive from, advertising, marketing and promoting the Kenmore brand and other brands associated with the Sears Branded Products ("Kenmore Brand Building"). Seller will pay "Kenmore Brand Building Subsidies" to Sears based on the Total Purchases of all Sears Branded Products in each Product Category for each calendar year. Each year's Kenmore Brand Building Subsidy will equal that year's Total Purchases of Sears Branded Products in the applicable Product Category multiplied by the Kenmore Brand Building Subsidy Percentage for that Product Category and year listed in Exhibit B. The Kenmore Brand Building Subsidies will be collected in accordance with Exhibit H.

6.K Intentionally omitted.

6.L New Outlet Subsidy. For each new outlet that begins to sell Products during the Term, including each new Sears Contract Sales Appliance Select location, Seller will pay Sears a New Outlet Subsidy equal to ten percent of the net sales of the Products sold through the new outlet during the outlet's first thirty days of selling the Products. Sears will issue a debit memo for the New Outlet Subsidy for each new outlet after the end of the thirty-day-period.

6.M Intentionally omitted.

6.N Returns/Exchanges. To partially offset Sears' costs of handling, marking down and selling Products that customers return to Sears or exchange, each year Seller will pay a Returns Subsidy to Sears in an amount equal to (i) that year's Total Purchases of Products (other than Seller Branded Built-In Cooking Products), multiplied by (ii) the Returns Subsidy Percentage listed on Exhibit B. The Returns Subsidy will be collected in accordance with Exhibit H.

Sears may return to Seller any Seller Branded Built-in Cooking Product for a full refund of the Invoice Price plus the cost of returning the Product to Seller, provided that the Product is returned unused, without visible damage and in its original carton and is returned no later than sixty days after Seller has notified Sears in writing that Seller has discontinued the Product. Sears will return Built-in Cooking Products once per month. Each month Sears will debit Seller for the Built-in Cooking Products returned in the prior month.

6.0 Model Home Subsidy. To partially offset the cost incurred by Sears for providing sample Products to Sears Contract Sales customers for use in model homes, Seller will pay subsidies to Sears ("Model Home Subsidies") for each Product Category. Sears will calculate each year's Model Home Subsidy for each Product Category by multiplying Total Contract Sales' Purchases of Products as determined by Sears SPRS Reporting System in the applicable Product Category by the Model Home Subsidy Percentage listed for that Product Category on Exhibit B. "Total Contract Sales Purchases" means the aggregate Invoice Price of specified Products that are shipped to the Contract Sales division of Sears in the applicable year. The Model Home Subsidies will be collected in accordance with Exhibit H.

6.P Contract Sales Marketing Subsidy. To partially offset Sears Contract Sales' marketing and sales expenses, Seller will pay subsidies to Sears ("Contract Sales Marketing Subsidies") for each Product Category. Sears will calculate each year's Contract Sales Marketing Subsidy for each Product Category by multiplying that year's Total Contract Sales Purchases of Products as determined by Sears SPRS Reporting System in the applicable Product Category by the Contract Sales Marketing Subsidy Percentage listed for that Product Category on Exhibit B. The Contract Sales Marketing Subsidies will be collected in accordance with Exhibit H.

6.Q Launch Support. Periodically during the Term, Sears and Seller will negotiate to determine the level of Seller's support required to appropriately launch New Products. Such support will be determined on a case-by-case basis, in view of competitive conditions in the marketplace.

6.R Other Marketing Support. Periodically during the Term, Sears and Seller will negotiate other subsidies and marketing support that Seller will provide to Sears to support the Products. This support will include at least the following:

6.R.i Sales Contests. Seller will financially support sales contests that motivate Sears' sales associates by offering them opportunities to win prizes based on their sales of Products over a specified period of time.

6.R.ii Marketing and Promotional Materials. Seller will develop and provide to each Store a reasonable supply of consumer literature and other marketing and promotional items (collectively, "Marketing Materials") for Seller Branded Products. Seller also will develop and provide Sears with, and/or reimburse Sears for its cost in developing and manufacturing or having manufactured, a reasonable supply of Marketing Materials for Sears Branded Products.

6.R.iii ML Books and EZ Order Flip Books. Seller will subsidize its pro rata share of the cost of producing merchandise list books ("ML books") and EZ Order Flip Books ("Flip Books") for Sears sales associates. Seller's pro rata share will be as determined by Sears based on the number of Products included in the ML Book or EZ Order Book, as applicable, compared to the total number of items included in the applicable book and such other factors as Sears reasonably deems relevant. If Sears begins selling a Product not included in the then-current ML Book or EZ Order Book and a new book is not scheduled to be printed within 90 days, Seller will provide to each Store a reasonable supply of ML Book or EZ Order Book inserts for the new Product.

6.R.iv Electronic Efforts. Seller will support Sears' electronic marketing, distribution, logistic, accounting and sales efforts, including by:

- Providing to Sears in electronic format (or other format reasonably requested by Sears) such Product descriptions, text, high-resolution Product images (including supplemental feature shots), audio, video and other web content as Sears reasonably requests from time to time for any Sears-designated web site or any other Internet-based application relating to the Products and other Products manufactured by Seller but not sold to Sears, as Sears may request from time to time (collectively "Web Content"); and

Reimbursing Sears for programming and other costs and expenses incurred in developing, designing, implementing, maintaining and updating Web Content.

6.S Subsidies and Marketing/Merchandising Support Generally. Seller acknowledges and agrees that the support, subsidies and funding described in Section 6.A through Section 6.R are cumulative, and that no amount that Sears collects or Seller spends for any support, subsidy or funding may be credited against Seller's obligations with respect to any other support, subsidy or funding. Unless otherwise specifically set forth herein, Sears may use the support, subsidies and funding it collects under Section 6.A. through 6.R in any manner that Sears, in its reasonable discretion, deems appropriate, to support the sale of the Products and the mutual business relationship of Seller and Sears.

7. PRODUCT QUALITY AND SERVICE RECOURSE.

The parties agree to negotiate in good faith the terms and conditions with regard to Product Quality and Service Recourse as soon as practicable, which may be memorialized in an amendment to this Agreement or a separate agreement. The existing terms and conditions with regard to Product Quality and Service Recourse will remain in place until such amendment or agreement is entered into between the parties, except with regard to Service Incident Rates, which are set forth on Exhibit B.3.

8. INTENTIONALLY OMITTED.

9. ORDERING PROCESS.

9.A Standard Ordering Process for Domestic Products. Sears' orders for Domestic Products will be subject to the Standard Ordering Process described in this Section 9.A only with respect to Domestic Products that are manufactured in facilities that have not implemented the Rapid Deployment Ordering System described in Section 9.B. Sears will deliver to Seller a forecast indicating the Products that Sears expects to sell to its customers over the following sixteen weeks, and will update this forecast periodically (the "Sales Forecast"). If Sears desires to order any Product from Seller, Sears will issue a purchase order (each a "Purchase Order") indicating the required shipment date and quantities for each product (the "Ship Date"). Sears will issue each Purchase Order at least 21 days before the Ship Date listed in the Purchase Order. Seller will be deemed to have automatically accepted each Purchase Order Sears issues according to this Section 9.A, provided that the Product quantity in the Purchase Order is less than or equal to the Product quantity listed on the most recent Sales Forecast Sears issued for that Product (the "Forecasted Quantity"). If the Product quantity on any Purchase Order exceeds the Forecasted Quantity, then Seller may reject the Purchase Order with respect only to the excess quantity by delivering written notice to Sears within two business days after Seller receives the Purchase Order; otherwise, Seller will be deemed to have accepted the Purchase Order in its entirety

9.B Rapid Deployment Ordering System.

9.B.i Sears' orders for Domestic Products that are manufactured in facilities that have adopted the Rapid Deployment Ordering Process will be subject to the ordering process described in this Section 9.B. Under the Rapid Deployment Ordering System, each week Sears will deliver to Seller a transmission (using EDI 862 or such other electronic communication as Sears periodically designates) (the "Deployment Forecast") indicating the quantities of the Products that Sears estimates it may need from Seller each week over the following 11 weeks (each week's estimate is the "Netted Needs" for that week). Sears will update these Deployment Forecasts weekly and will set regular Ship Dates for Products under the Rapid Deployment Ordering System. On the day that is twenty-one days before each Ship Date (the "Firm Order Date"), Seller will obtain from the most recent Deployment Forecast the Netted Needs for the week in which that Ship Date occurs (the "Firm Deployment Quantity") (e.g., if the Ship Date is August 21, 2005, Seller will obtain the Netted Needs for the week of August 20, 2005 from the Deployment Forecast received by Seller closest to, but no later than, July 31, 2005). On each Firm Order Date, Sears agrees to buy from Seller, and Seller agrees to sell to Sears, the Firm Deployment Quantity of each Product. On the day that is seven days before each Ship Date (the "Firm Deployment Date"), Seller will send Sears EDI 830 informing Sears of the quantity Seller has ready for Sears, which should match the Firm Deployment Quantity, and Sears will issue EDI 862 Shipping Instructions for the quantity indicated in Seller's EDI 830. The Shipping Instructions will tell Seller the quantity of each SKU that Seller is to load on trailers designated for each Sears Distribution Center (the "Firm Deployment Instructions"). Seller will load delivery trailers in accordance with the Firm Deployment Instructions.

9.B.ii Sears may periodically and in its discretion after prior notice to Seller supplement and modify the Sears Vendor Information Guide (as supplemented and modified by Sears from time to time, the "Vendor Guide") to supplement the terms of the Rapid Deployment Ordering System, but these supplements and modifications will not contradict any of the terms of this Section 9.B. No changes to the Vendor Guide pertaining to the Rapid Deployment Ordering System will be effective against Seller until Sears has e-mailed notice of the change to registered users of the Sears Business Exchange or has provided written notice to Seller. Sears will provide a reasonable time (at least thirty (30) days) for Seller to implement such changes.

9.B.iii When the term "Purchase Order" is used in this Agreement with respect to Products ordered under the Rapid Deployment System, that term will mean EDI 862 (or such other electronic communication as Sears periodically

designates), but only with respect to the quantity specified in Seller's EDI 830. Such Purchase Orders are deemed automatically accepted by Seller when issued.

Throughout the Term Sears and Seller will work together to reduce the number of days between the Ship Date and the Firm Order Date and between the Ship Date and the Firm Deployment Date

9.C Delivery Dates. Notwithstanding the foregoing, as to any Domestic Product that is designated as "Ship Prepaid" on Exhibit A, references in Sections 9.A and 9.B and in any Purchase Order to a "Ship Date" will be deemed to mean "Receipt Date," i.e., the date on which the Products are to be received by Sears at the facility designated by Sears in the applicable Purchase Order.

9.D Ordering Process for Import Products. All Import Products will be ordered using the process described in this Section 9.D. Sears will issue a rolling six-month forecast indicating the Import Products and quantities Sears estimates it may purchase from Seller (the "Import Forecast") and the estimated Ship Dates for such Products. Sears may increase or decrease the quantities Sears estimates it may purchase by issuing new Import Forecasts. Sixty days prior to any Ship Date set forth in an Import Forecast, the then-current Import Forecast will be deemed a Firm Order with respect to the quantity of Products forecasted for that Ship Date (the "Preliminary Import Quantity"), provided that until thirty days prior to the Ship Date Sears can increase or decrease the Preliminary Import Quantity up to 20%. Seller will be deemed to have accepted each Firm Order Sears' Issues according to this Section 9.D.

9.E Intentionally omitted.

9.F EZ Order System. Sears' EZ Order System ("EZ Order") is a system through which Sears' customers can order Products from Seller that are not in stock or that are not carried by a particular Sears store, including an expanded assortment of merchandise that is not contained in Sears' core assortment. Seller will participate in EZ Order, as Sears may modify it from time to time by changes to the Vendor Guide or otherwise in writing. No modification to EZ Order will be effective against Seller until Sears has e-mailed notice of the modification to registered users of the Sears Business Exchange or has provided written notice of the modification to Seller. Modifications to EZ Order that materially increase Seller's obligations under this Section will not be effective against Seller until Seller agrees to the modification in writing.

The Products that Seller will sell to Sears through the EZ Order Price (the "EZ Order Products") are listed on Exhibit A under the "EZ ORDER PRODUCTS" caption. Sears may from time to time choose to add an EZ Order Product to Sears core assortment. For each EZ Order Product, Exhibit A lists the "Core Invoice Price" (i.e., the Invoice Price if Sears purchases the Product as part of Sears' core assortment), the "Base EZ Order Price" (i.e., the base price, excluding any transportation charges, that Seller will charge Sears for the Product if Sears does not add it to Sears' core assortment), the "Transit Adder" (i.e., the amount Seller will charge Sears for shipping the EZ Order Product from Seller's distribution facility to a Sears MDO or DDC, which amount will be in addition to the Base EZ Order Price) and the "EZ Order Invoice Price" (i.e., the Invoice Price if Sears does not add the Product to Sears' core assortment).

Seller acknowledges that the delivery dates Sears provides to its customers for EZ Order Products are determined in part on data Seller provides to Sears (e.g., SAS feeds of inventory availability). If inaccurate data from Seller causes Sears to give a customer a delivery date for an EZ Order Product that Sears is subsequently unable to meet, then for each such incident Seller will pay Sears an amount equal to 10% of the Invoice Price of the Product as liquidated damages.

9.G Conflicting Terms. In the event of any conflict or inconsistency between this Agreement and the terms and condition of any forecast, purchase order, or other order document, including any inconsistency as to the Invoice Price of any Product, the terms and conditions of this Agreement will control unless such other document expressly references and supersedes this Agreement.

9.H Intentionally omitted.

9.I Intentionally omitted.

9.J Intentionally omitted.

9.K Forecasts. Domestic Forecasts, Forecasted Quantities, Import Forecasts and any other forecasts or estimates Sears may communicate to Seller (including, under the Rapid Deployment Ordering System, EDI 862 with respect to quantities other than the Firm Deployment Quantity) will be estimates only and will not be binding upon Sears or give rise to an obligation by Sears to purchase any Products. Seller will not rely on such forecasts except as expressly provided herein.

9.L Production Schedules. On the last business day of each month, Seller will deliver to the applicable Sears buyers production schedules identifying the dates and quantities by Sears Branded Product of Seller's scheduled production for the following month. At the same time Seller will deliver to the applicable Sears buyer production schedules identifying the dates and quantities by Seller Branded Product of Seller's scheduled production for the following month, but only with respect to the Seller Branded Product production that is being manufactured for sale to Sears. Throughout each month of the Term Seller will promptly notify the applicable Sears buyer of any material changes to the production schedules.

9.M Discontinued Products. Seller will provide Sears no less than six month's notice and obtain Sears' written approval before discontinuing any Product. Sears and Seller will negotiate in good faith to develop an action plan with respect to any Product which Sears and Seller agree has become obsolete, and Seller will pay to Sears an amount mutually determined by the parties to partially defray Sears costs in connection with any Product discontinuation.

10. DELIVERY TERMS.

10.A Order Completion; On Time Delivery; Shipping Documents. Seller will deliver the Products listed in each Purchase Order (including Purchase Orders as defined in Section 9.B.iii) to the applicable F.O.B. Point on the Ship Date specified in the Purchase Order. Seller will immediately notify Sears if there is a reasonable likelihood that Seller may not meet a required Ship Date. In the event of a conflict between Sears and another customer, Seller will give first priority to meeting Sears' required Ship Date. Seller will accurately complete such paper work and/or electronic communications for each shipment (e.g., bills of lading, packing lists and UCC 128 labels) as Sears periodically requires. The quantity stated by Seller for each Product on the advance shipping notice ("ASN"), invoice, bill of lading, packlist/manifest and any other documentation will equal the actual quantity shipped by Seller.

10.B.i Product Delivery During Product Launch. Provided Seller is awarded all or substantially all of the Sears Branded built-in Cooking Products business, if during the first one hundred and twenty (120) days of the launch of a New built-in Cooking Product model not previously sold by Seller, Seller materially fails to deliver to Sears in accordance with the mutually agreed upon rollout timetable, which shall be set forth in Exhibit 10B (the initial version of which shall be agreed upon by and between the parties within 120 days of the execution of this Agreement and incorporated herein; and thereafter, the rollout timetable shall be set forth in the monthly forecast reports prepared by Sears), Seller shall pay to Sears an amount equal to Sears' Lost Profit – Cooking Product for each Product delivered to Sears more than thirty (30) days after the promised delivery date set forth in the mutually agreed upon rollout timetable. Sears' "Lost Profit – Cooking Product" shall equal Sears' projected selling price for the Product minus the sum of the Invoice Price of the Product and all associated administrative and selling costs multiplied by the difference between the quantity of delivered units in the mutually agreed upon rollout and the quantity of units which was delivered more than thirty (30) days after the mutually agreed timetable.

10.B.ii Delivery of Free Standing Ranges. During 2004, Provided Seller is awarded a substantial increase in the Sears free standing range Products business, if during the first year cooking season (beginning October 1, 2004 and ending on December 22, 2004) (the "Cooking Season"), Seller materially fails to deliver free standing ranges to Sears in accordance with the mutually agreed upon delivery timetable, which shall be set forth in Exhibit 10.B.ii (the initial version of which shall be agreed upon by and between the parties within 120 days of the execution of this Agreement and incorporated herein; and thereafter, the rollout timetable shall be set forth in the monthly forecast reports prepared by Sears), Seller shall pay to Sears an amount equal to Sears' Lost Profit - Ranges for each free standing range Product delivered to Sears more than thirty (30) days after the promised delivery date set forth in the mutually agreed delivery timetable. Sears' "Lost Profit - Ranges" shall equal Sears' projected selling price for the free standing range Product minus the sum of the Invoice Price of the free standing range Product and all associated administrative and selling costs multiplied by the difference between the quantity of delivered units in the mutually agreed timetable and the quantity of units which was delivered more than thirty (30) days after the dates set forth in the mutually agreed timetable.

10.B.iii Limitation of Liability. Seller's total liability for Lost Profit under Sections 10.B.i and 10.B.ii shall not exceed $5,000,000.00 USD in the aggregate over the Term of this Agreement.

10.C Vendor Guides. For Seller to meet its obligations under this Section 10, Domestic Products must be delivered in accordance with the Domestic Vendor Guide and Import Products must be delivered in accordance with the International Vendor Guide, including the sections of the applicable Vendor Guide pertaining to shipment labeling, shipping documents and transportation.

10.D F.O.B. Point. All Products will be shipped F.O.B. the "Distribution Location" specified in Exhibit A. All risk of loss will remain with Seller until the Products are delivered to the Distribution Location. In addition, Seller is solely responsible for any damage to the Products caused by improper loading or improper packaging until the Product reaches a Sears distribution facility (e.g., Sears DDR or RRC).

10.E No Partial Shipments or Split Loads of Domestic Products. If Sears transmits a Purchase Order requiring Seller to ship a quantity of Domestic Product(s) that is greater or less than a full truckload, and another complete Purchase Order cannot be placed on the partially full truck, then Seller will follow the prioritization schedule that Sears periodically designates to determine which additional Domestic Products should be added to that truckload. Seller will not ship Domestic Products in partial shipments or split loads except in accordance with this Agreement and the prioritization schedule.

10.F Multiple SKUs. At Sears' request, Seller will load multiple SKUs and/or brands in single shipments of Import Products.

10.G Administrative Fees. In addition to its other rights under this Agreement or applicable law, Sears may assess "administrative fees" (as that term is used in the Vendor Guide and/or the "Sears Remedies" section of the UTC) ("Administrative Fees") against Seller if Seller breaches this Section 10.

11. PACKAGING AND PRODUCT DESIGN.

11.A Structural Packaging Requirements. Seller will package each Sears Branded Product in a container that ensures that the Product will withstand, without damage, the testing protocol described in *Exhibit C*. Seller will use commercially reasonable efforts to adopt new structural packaging as necessary to ensure that Sears Branded Products withstand, without damage, the new testing protocols that Sears reasonably designates in writing from time to time.

11.B Visual Branding Language. Seller will design all Sears Branded Products to be consistent with the principles of the Kenmore Visual Brand Language Manual (the "Manual"), as Sears may amend the Manual from time to time. The version of the Manual that was in effect as of June 1, 2003 is attached as Exhibit G.

12. MANUFACTURING TERMS.

12.A Contract Specifications. Seller covenants that each Product it provides to Sears will meet or exceed the following (collectively, the "Contract Specifications"):

- the feature specifications described in Exhibit I.
- the technical and performance specifications provided, described or made available by Seller to Sears with respect to the Product;
- all industry or government standards applicable to the Product, as modified from time to time (such as UL, CPSC and other standards for safety and efficiency); and
- any performance claim that Seller makes or has made in connection with the Product.

The term "Specifications" in the UTC will be deemed to include the Contract Specifications.

Seller will regularly test the Products to ensure they meet the Contract Specifications and the structural packaging requirements identified in Section 11.A. The timing and protocol for such testing must be approved in advance in writing by the Sears Laboratory.

12.B Non-Conforming Products. If any Product fails to meet any applicable Contract Specification, including any performance claim, then, in addition to any other remedies available to Sears under this Agreement or applicable law, Sears may notify Seller in writing of the affected Products (the "Non-Conforming Products") and Seller will comply with the terms of this Section 12.B. Within a reasonable time after receipt of Sears' notice (not to exceed thirty (30) days), Seller will recommend to Sears remedial measures ("Remedial Measures") to maintain the market viability of the Non-Conforming Products, including changes in the Contract Specifications, changes in the promotional support or subsidies or changes in the Invoice Price. If Sears approves of Seller's recommendations, the Remedial Measures will be implemented at the earliest possible date. Any Remedial Measures requiring changes to product design will not increase the Invoice Price of the Product.

12.C Performance Claims. Pursuant to Seller's defense and indemnification obligations under the UTC, Seller will indemnify and defend Sears for any claims or liabilities arising from any challenge to any performance claim that Seller makes in connection with any Seller Branded Product.

12.D Claims Data. In determining what performance claims to make on Sears Branded Products, Sears may rely on test data and other claim substantiation materials provided by Seller (the "Claims Data"). Pursuant to Seller's defense and indemnification obligations under the UTC, Seller will indemnify and defend Sears for any claims or liabilities arising from performance claims that Sears makes in reliance on inaccurate Claims Data, whether such inaccuracy results from flawed analysis, flawed testing, flawed reporting, unqualified technicians or otherwise. Subject to the foregoing, Sears will be solely responsible for determining the sufficiency of the Claims Data to support a performance claim on a Sears Branded Product.

12.E Changes to Specifications. Seller will obtain Sears' prior written approval of any change in the manufacturing process or location, supplier parts, materials or design or any other Specification for a Sears Branded Product. Change notices shall be sent to Sears' testing lab engineer, with a copy to the buyer and the product service engineer. No such approval from Sears will relieve Seller of its defense and indemnity obligations under the UTC.

12.F Exclusive Features. Seller will provide to Sears the exclusive feature(s) for Products as set forth in Exhibit D (the "Exclusive Features"), for the duration(s) specified in such Exhibit following Sears' first sale of the Product incorporating the Exclusive Feature (the "Exclusivity Period").

13. WARRANTIES. Seller will include in each Sears Branded Product package a consumer warranty pre-approved in writing by Sears, with such terms and conditions as Sears may require from time to time (each a "Warranty"). Seller will not be liable to Sears for the cost of warranted repairs and warranted product replacements under the Warranties, except with respect to Excess Service Call payments, Catastrophic

Failure payments and except for Sears' rights under the "Warranties" and "Sears Remedies" sections of the UTC

14. REPORTS, TRAINING AND SUPPORT.

14.A Single Point of Contact. Seller will dedicate such assistance and resources as are reasonably necessary to manage Sears' account with Seller and to manage Seller's administrative and other obligations under this Agreement. Seller will designate a single point of contact (whether by name or title) to ensure that all Products and all brands supplied by Seller are managed effectively and are consistent with Sears' overall product strategy. Seller further agrees to add a Quality Field Tech Manager and a dedicated Marketing Manager whose primary responsibility will be to support Cooking Products for Sears sales in the United States only

14.B Product Category Tracking and Reporting. To improve the efficiency of the buying process and strengthen the relationship between Sears and Seller, throughout the Term, Seller will provide sufficient resources and respond to reasonable information requests relating to Product Category tracking and accounting support. Such resources will include: (i) Periodic line assessments that summarize sales performance, advertising subsidies and source rebate credits and plans for improving Sears' sales of Products; (ii) Periodic reports summarizing market and industry trends, and detailing the Products' positioning in the market; (iii) monthly reports to reflect Seller's annual forecast for each Product on forms provided by Sears; and (iv) monthly reports to reflect units and dollars for each Product actually shipped to Sears on forms provided by Sears within five days after the end of each month.

14.C In-Store Sales Support. Seller will provide sales support representatives who will call on any Store at which Products supplied by Seller are sold by Sears, upon the opening or grand re-opening of any new or remodeled Store and as otherwise agreed by the parties. The term "Store" will mean each store now or hereafter owned or operated by Sears or any of its subsidiaries or licensees (regardless of whether such store is operated under the "Sears" name or under a different name), including Sears Dealer Stores. The duration of each call will be on an as-needed basis as reasonably requested by Sears Seller's sales support representatives will have superior technical expertise on all Product features and uses to train any in-store selling and management personnel reasonably selected by Sears. The training Seller provides will focus on Product knowledge and features, Product application, selling skills (such as qualifying the customer for sale, ensuring a match of Product to customer needs, and techniques for closing the sale and ensuring high customer satisfaction), customer complaints, retail information communicated by Sears to Seller, promotions, marketing initiatives and other related issues. For new technologies and features, Seller's sales support representative will also provide in-store Product demonstrations. Seller's sales support representative will also be available to assist both Store personnel and Sears' buying teams as they reasonably request in the rollout of local market initiatives and handling customer' complaints. Seller will develop computer-based training courses (i.e, "e-learning" courses) to train Sears' sales associates on the features and benefits of Products and on effective selling techniques. If requested by Sears, Seller will provide articles and other content for Sales Today magazine (or such other training magazine as Sears may implement) and will pay Sears' standard fee for being included in Sales Today at least once annually.

14.D Service/Installation Training Support. Seller will provide Sears with service and installation training support for the Products. Seller's service/installation representatives will have substantial technical expertise on all Product usage, installation and service issues to train Sears personnel, including service technicians, STAC associates, Rapid Resolution associates, Product installers, field trainers, category technical managers and various other service personnel reasonably selected by Sears. This training will focus on Product knowledge and features, Product use, installation, repair and other related issued as reasonably requested by Sears. For service associates, training also will include skills such as how to ensure the customer's current product meets his or her needs as well as techniques for gaining high customer satisfaction. For Rapid Resolution associates, training also will include Product use and care information to improve associates' ability to resolve customers' service issues on the telephone. Seller will: (i) make all Product training material produced by or on behalf of Seller available to Sears in quantities sufficient for distribution to train Sears' personnel, including service technicians, STAC associates, Rapid Resolution associates, Product installers, field trainers, category technical managers and other service personnel reasonably selected by Sears; (ii) develop training materials jointly with Sears; (iii) conduct training sessions as Sears reasonably requests at those locations and for those trainers and/or associates that Sears reasonably designates; (iv) develop computer-based training courses for use by Sears service/installation personnel and Rapid Resolution associates relating to use, care understanding and troubleshooting Products; (v) produce and make available to Sears training videos (on video tape, DVDs or such other technology as Sears and Seller agree) with each material change to Product features, packaging, use or technology or any other material change affecting a Product; (vi) promptly provide service flashes relating to Products to the Sears Product Engineering Manager; (vii) participate in Sears' Quality Improvement City (QIC) and Product Management Team (PMT) program sessions as Sears reasonably requests and will maintain an action register to ensure that all issues identified are prioritized and expeditiously handled; (viii) make technical support available to Sears service/installation personnel by telephone to answer questions concerning service, installation and related issues from 8:00 a.m. to 7:00 p.m. CST or match the same time periods offered by Seller for Seller-Branded

Products, whichever is longer; and (ix) Seller will provide Sears designated associates with access (via sign-on capabilities, passwords or any other vehicle for access) to Seller's website(s) or intranet(s) containing information or other materials with regard to the Products including, but not limited to, wiring diagrams, factory service manuals and other technical information. In addition, as reasonably requested by Sears in connection with platform changes, new technology or new installation or repair procedures, Seller will give eleven units of each affected Product for training purposes at no charge to Sears.

14.E After-Sales Support. Seller will maintain at least one dedicated toll-free telephone number exclusively for Sears' customers and Sears' associate support and assistance relating to the Sears Branded Products. The call center(s) (each a "Call Center"), answering such calls will be open at least from 8:00 a.m. to 5:00 p.m. Monday through Friday Eastern Standard or Daylight Time, as applicable, except for national holidays. The Call Center must have, or have the capability to connect Sears' customers and Sears' associates directly with, English-speaking and Spanish-speaking personnel knowledgeable in all technical and functional aspects of the Sears Branded Products. Seller will print the applicable telephone number, along with the model number, current industry marking standard, and Sears web site address on all Sears Branded Product literature. All data and information related to the Sears Branded Products that Seller collects in connection with the Call Centers, including, without limitation, any customer names, customer addresses and warranty card information, will be deemed "Sears Information" as defined in Section 17.B.ii. Effective upon this Agreement's expiration (without renewal or extension) or termination and subject to approval by the applicable telephone company (which approval the parties will use their best efforts to obtain), Seller hereby assigns to Sears all of Seller's right, title and interest in and to all telephone numbers (the "Sears Numbers") used in connection with Sears Branded Products under this Section. Upon the expiration or termination of this Agreement, Seller will have no further right, obligation, title or interest in or to those Sears Numbers, but will remain liable for all fees and costs relating to those Sears Numbers incurred prior to the effective date of the assignment. Such assignment will not be effective unless accepted by Sears, in its sole discretion. Prior to its acceptance of the assignment, Sears will have no liability or obligation whatsoever in connection with the Sears Numbers. Seller acknowledges and agrees that as between Seller and Sears, upon this Agreement's expiration or termination, Sears will, if it so elects, have the sole right to and interest in those Sears Numbers, which right may be exercised by Sears providing written notice to Seller of its intention to exercise the right within thirty (30) days after the expiration or termination of this Agreement. If Sears exercises its rights pursuant to this Section 14.E, and solely for the purposes thereof, Seller will direct the telephone company with which Seller has placed listings of the Sears Numbers to assign the Sears Numbers and listings to Sears (or Sears' designee), and to sign and deliver any documents and take any actions as may be reasonably necessary to effectuate this assignment.

14.F sears.com. Upon request from Sears, Seller will use commercially reasonable efforts, including implementing new systems and packaging standards, to ship Products directly to consumers who order Products through a Sears internet site. These reasonable efforts may include additional costs to ensure products quality and shipping for which Sears will reimburse Seller.

14.G Miscellaneous Support. As reasonably requested by Sears, Seller will provide support and assistance to, and will cooperate with, Sears' product services division, Sears' Contract Sales division, Sears' logistics/delivery organization (including Sears Logistics Services, Inc.), Sears Product Quality Assurance Laboratory, Sears International Marketing, Inc., Sears' field support organization, and any other individual or group included in or affiliated with Sears.

14.H Consumer Reports Rating for Cooking Products. Throughout each year of the Term, Seller shall use commercially reasonable efforts to increase the rating it receives for Sears Branded Cooking Products from the previous year's rating it received from Consumer Reports. By the final year of the Term of this Agreement, Seller shall use commercially reasonably efforts to achieve one of the top three rated spots by Consumer Reports for each Sears Branded Cooking Product.

15. PARTS.

15.A Intentionally omitted.

15.B Definitions.

- "Part" means any part that is used in any Product and that Seller manufactures or purchases on or prior to the Effective Date.
- "Functional Part" means any Part that is reasonably necessary for the Product's proper and safe operation and functioning, including owner's manuals.
- "Non-Functional Part" means any Part that is not a Functional Part.
- "New Part" means any Product part that Seller begins to manufacture or purchase after the Effective Date
- "Parts Source" means Sears or any third party that Sears engages to purchase Parts and manage Parts inventory for Sears.

- "Bulk Discount Part" means, for any year, any Part that Parts Source purchased at least 12,000 units of in the prior year or that Seller's good faith forecasts indicate Parts Source will purchase at least 12,000 units in the then-current year.

- "Emergency Order," "Customer Waiting Order," and "Stock Order" (also called a "Mechanized Inventory Control Order") mean an order for a Part placed by Sears and designated by Sears as an Emergency Order, a Customer Waiting Order or a Stock Order.

15.C Parts Pricing, Availability and Delivery; Technical Information.

15.C.i The Invoice Price for any Part that, as of the June 1, 2003, Parts Source bought from Seller will be the lesser of (i) the price Parts Source paid Seller for that Part as of June 1, 2003 multiplied by the Parts Price Percentage listed on Exhibit E and (ii) the lowest price Seller charges any other customer that purchases an equal or smaller annual quantity of units of that Part (a "Comparable Customer"). Seller and Sears will negotiate to determine the prices for all New Parts, provided, however, that (i) the price for any New Part that causes an existing Part to become obsolete as described in Section 15.E will not exceed the price of the existing Part; and (ii) no price that Seller charges the Parts Source for any Part will exceed the price that Seller charges to any Comparable Customer.

Upon five business days' advance notice to Seller, Sears may retain an independent auditor of nationally recognized standing to examine Seller's books, systems and records relating to Parts sales to third parties for purposes of determining Seller's compliance with the foregoing pricing terms. Prior to commencing any audit, the independent auditors will execute a standard confidentiality agreement pursuant to which the auditors will agree not to disclose to Sears any information other than whether Seller has complied with the pricing terms contained in this Section and, if not, the aggregate dollar amount of any over-charges, the Parts for which Seller over-charged Sears and the per-Part over-charge.

15.C.ii Seller will grant Parts Source a discount on each bulk purchase of a Bulk Discount Part. A bulk purchase is any single purchase of at least the bulk purchase quantity listed on Exhibit E. The amount of the discount will be at least equal to the discount percentage listed on Exhibit E. Any New Part that causes an existing Bulk Discount Part to become obsolete as described in Section 15.E will be a Bulk Discount Part.

15.C.iii Seller agrees to comply with the following stocking policy:

| Product | Functional Parts | Non-Functional Parts |
| --- | --- | --- |
| Washer | 15 years | 5 years |
| Dryer, Electric | 15 years | 5 years |
| Dryer, Gas | 15 years | 5 years |
| Dishwasher | 11 years | 6 years |
| Range, Electric | 15 years | 5 years |
| Range, Gas | 15 years | 5 years |
| Refrigerator | 15 years | 5 years |
| Freezer | 15 years | 5 years |
| Range Hoods | 15 years | 5 years |

Seller will offer and sell Parts to the Parts Source for the number of years listed on Exhibit E after the last Ship Date of the Product in which the Part is used (whether that Ship Date is during or after the Term) (the "Part Availability Period"). If the Parts Source buys 36 or more units of any given Functional Part per year, then Seller will make reasonable efforts to maintain supply of that Part beyond the applicable Part Availability Period. After the end of the Term but during the Part Availability Period for any Part, the price of that Part will be increased or decreased as follows:

- A party must notify the other party of the requested price change by delivering a Parts Price Change Notification to the other party. The Parts Price Change Notification must set forth the PPI data and calculations described in this Section 15.C.iii. The Parts Price Change Notification must be delivered during the Notification Period. If neither party delivers a Parts Price Change Notification during a Notification Period, there will be no change to the Parts prices during the following calendar year.

- Any Parts price change will be effective for orders placed on or after January 1 of the year following the year in which the Parts Price Change Notification is delivered.

- The amount of any price change will be calculated by multiplying the price of each Part that is in effect on the date of the applicable Parts Price Change Notification by the applicable Index Percent Change.

- If either party objects to the data or calculations contained in a Parts Price Change Notification, it may submit its objection to an accounting firm of national standing to make a binding determination of the amount of change, if any, to the Parts prices. The party submitting the objection will pay the costs of the accounting firm unless the accounting firm determines the price change stated in the Parts Price Change Notification was overstated, in which case the other party will pay the accounting firm's costs.

- All Parts price changes will be rounded down to the nearest penny.

- "Notification Period" means November 1 through November 30 of a Calculation Year
- "PPI" means the U.S. Bureau of Labor Statistics Producer Price Index that most accurately reflects price changes in Laundry, Cooking, Standard Refrigeration, Specialty Refrigeration, Freezer and Dishwashing parts or similar commodities.
- "Calculation Year" means the calendar year prior to the year for which the price adjustment is being sought. For example, if a party desires a Parts price adjustment for January 1, 2008, the Calculation Year would be 2007.
- "Current Month Index" means the latest version of the PPI for June of the Calculation Year, as published in *Producer Price Indexes* as of October 20 of the Calculation Year.
- "Reference Month Index" means the latest version of the PPI for June of the year prior to the Calculation Year, as published in *Producer Price Indexes* as of October 20 of the year prior to the Calculation Year.
- "Index Point Change" means the number obtained by subtracting the Reference Month Index from the Current Month Index. If the Index Point Change is a negative number, the Parts prices will be decreased by the Index Percent Change. If the Index Point Change is a positive number, the Parts prices will be increased by the Index Percent Change.
- "Index Percent Change" means the (i) the quotient obtained by dividing the Index Point Change by the Reference Month Index, (ii) multiplied by fifty percent (50%), plus (iii) one, rounded to the nearest ten-thousandth (i.e., to the fourth decimal).

HYPOTHETICAL. Assume the following facts: As of November 15, 2007, the price for Part A is $5.00 and for Part B is $7.52. The final PPI for June 2006, as published in *Producer Price Indexes* as of October 20, 2006, is 118.5. The final PPI for June 2007, as published in *Producer Price Indexes* as of October 20, 2007, is 121.3. On November 15, 2007, Seller delivers a Parts Price Change Notification to Sears. The Parts Price Change Notification states the June 2006 and June 2007 PPIs and the following calculations:

Index Point Change = 121.3 – 118.5 = 2.8

Index Percent Change = [(2.8 ÷ 118.5) × 50%] + 1 = 1.0118

Effective January 1, 2008, the prices will be:

$5.05 for Part A ($5.00 × 1.0118, rounded down to the nearest penny); and

$7.60 for Part B ($7.52 × 1.0118, rounded down to the nearest penny).

In the event of any inconsistency between the Hypothetical and the definitions and price change calculation methodology contained in this Section 15.C.iii, the Hypothetical will control.

15.C.iv Seller will notify the Parts Source at least sixty (60) days before ceasing production of any Part to enable the Parts Source to analyze potential needs for and to place a final order for the Part.

15.C.v Seller will ship all Emergency Orders to the Parts Source the same day as Seller receives the order, provided that Seller receives the Emergency Order 2:00 p.m. Central Time on a business day. Seller will ship all Customer Waiting Orders (and all Emergency Orders that Seller received after 2:00 p.m. Central Time) to the designated Parts Source the next business day after Seller receives the order. Seller shall use all commercially reasonable efforts to maintain an on-time parts delivery percentage of at least 95%.

15.C.vi If, during the Availability Period of any Part, Seller is unable to ship that Part to the Parts Source within thirty (30) days after the Parts Source orders it, the Part will be deemed "unavailable." Seller shall use commercially reasonable efforts to identify alternate sources for the unavailable Part. In the event Sears can identify an alternate source for any unavailable Part, Sears shall inform Seller and Seller shall use commercially reasonable efforts to obtain such Part from the alternate source. If Sears is required to replace any Product due to the Part's unavailability, Seller shall compensate Sears up to $10,000 per calendar year; provided, however, that if the expenses exceed $10,000 in any calendar year, the parties will meet to negotiate in good faith a mutually agreeable solution.

15.C.vii At no cost to the Parts Source, Seller will make available to the Parts Source, in the format requested by the Parts Source (e.g., as a PDF file), all technical information about the Parts and Products, including parts, service and owner's manuals (in English and Spanish), Failure Mode and Effects Analyses, training materials, Parts diagrams, schematics, and Parts lists with pricing (collectively, "Technical Information"). Specifically but not in limitation of the foregoing, Seller will provide to the Parts Source the texts and images described in the Sears Parts and Image Files Standard Layout document (as modified or amended from time to time, the "Image Standards Document"), in the formats specified in the Image Standards Document.

15.D New Parts.

15.D.i Any New Part will become a Part for purposes of this Agreement effective as of the date the Parts Source first orders such New Part.

15.D.ii Seller and Sears will cooperate and share information relating to the need to develop New Parts, both to replace existing Parts and for Replacement Products and New Products. Seller will identify to the Parts Source New Parts that Seller anticipates will be "high usage parts" based on the Failure Modes and Effects Analysis. At least four weeks before the first Ship Date for any Replacement Product or New Product ("New Product Ship Date"), Seller will deliver copies of the Technical Information to the Parts Source in the requested format. At least four weeks before the New Product Ship Date, Parts Source will place one or more orders for New Parts designated as "high usage parts," provided that such orders will not exceed a ninety (90) day supply, as reasonably estimated by Parts Source. On or before the first Ship Date for any Replacement Product or New Product, Seller will deliver to the Parts Source the quantity of the high usage New Parts ordered by Parts Source.

15.E Obsolete Parts. Seller will give Sears sixty (60) days' notice of any engineering, procurement and/or design changes to Products and Parts. If any part is replaced by a new part for quality related issues (this forcing the original part to become obsolete) the Seller agrees to re-purchase any of Sears existing inventory of the original part after a reasonable effort has been made by Sears to consolidate the part within the DDC's. Any part which has been replaced by a new part whether for engineering, procurement and/or design change, (providing that the original part continues to be a valid service replacement component) will be Sears responsibility to determine how to best manage their inventory. Any part that can no longer be produced making the part obsolete will be communicated to Sears as stated in section 15.C.iv

15.F Combined Orders. Seller will notify the Parts Source prior to placing any high volume Parts order (such as production buys) so there is sufficient time for the Parts Source to place a combined order with Seller for such Parts (a "Combined Order"). Seller and the Parts Source will share pro rata in any volume purchase or other discounts Seller receives from Seller's supplier.

15.G Parts Volume Incentive Rebate. Seller will pay annual volume incentive rebates ("Annual Parts VIR") to Sears. Sears will calculate the Annual Parts VIR based on the "Total Parts Purchases" for each calendar year. "Total Parts Purchases" means the total invoice cost of all Parts that are shipped to the Parts Source in the applicable year. The sum of the Total Parts Purchases will then be multiplied by the highest applicable "Parts VIR Percentage" listed on Exhibit B to calculate the total Annual Parts VIR. The Annual Parts VIR will be collected in accordance with Exhibit H.

15.H Inventory Rebalancing. On or before June 30 each year of the Term, Parts Source and Seller will review Part Source's inventory of excess current Parts inventory (the "Rebalance Inventory"). The value of the Rebalance Inventory (calculated based on the price paid by Parts Source) will not exceed two percent (2%) of Parts Source's Total Parts Purchases from Seller during the first and second fiscal quarters of the prior year. No later than thirty (30) days after receipt of a Rebalance Inventory, Seller may, upon discussion and agreement with Sears, repurchase the Parts included in the Rebalance Inventory at the price originally sold by Seller.

15.I Parts Marketing Subsidy. Seller will pay Parts marketing subsidies to Sears ("Parts Marketing Subsidies"). Sears will calculate each year's Parts Marketing Subsidy by multiplying that year's Total Parts Purchases by the Parts Marketing Subsidy Percentage listed on Exhibit B. The Parts Marketing Subsidies will be collected in accordance with Exhibit H.

15.J Payment Terms. The payment terms stated in Section 4 will apply to all Parts purchases under this Section 15.

15.K Intentionally omitted.

16. BAR CODES. Seller will affix a permanent bar code label to each Product in accordance with the specifications described on Exhibit F. No later than July 25, 2003, Seller will provide to Sears an example of the bar code labeling that Seller proposes to use for review. Seller will use reasonable commercial efforts to implement any comments Sears provides to Seller regarding the proposed bar code labeling. If Sears Product Repair Services files a claim with Seller on a Product that does not have a bar code label as required by this Section, Seller may not assert Sears' failure to provide a complete model number or serial number as a basis for rejecting the claim.

17. INTELLECTUAL PROPERTY.

17.A Work Product.

17.A.i Sears Work Product. Any marketing materials, advertising materials, promotional materials, point of sale displays, packaging, customer information and material, warranty card information, service training materials, owner's manuals, service manuals, Web Content, performance claims, testing protocols used to evaluate performance claims, results and data from testing under such testing protocols, database formats, methods used to assemble and maintain electronic Sears Branded Product catalogs, and programming related to Sears' web sites (including programs that enable Sears' web sites to link with third party sites), and all files, data, notes, copies, abstracts, copyrights, summaries and other materials relating to Sears Branded Products, which materials are prepared, developed or created by or on behalf of Sears or

Seller or any of their personnel, agents or contractors (collectively, "Sears Work Product"), will be owned by Sears or its affiliate. Seller acknowledges and agrees that all Sears Work Product will be deemed "work made for hire" as that term may be defined from time to time in Section 101 of the Copyright Act, 17 U.S.C. Section 101 (or any successor provision), that Sears or its affiliate will be deemed the author of the Sears Work Product, and that Sears or its affiliate will be the owner of all right, title and interest, including all copyrights, in and to the Sears Work Product. If for any reason the Sears Work Product is found not to have been created as work made for hire, Seller hereby assigns to Sears or its affiliate without limitation all right, title and interest, including the copyrights and any other intellectual property rights in and to the Sears Work Product. Seller further agrees to execute and deliver to Sears or its affiliate any and all further documents deemed by Sears to be useful in documenting, effectuating or recording the foregoing assignment. Seller will not, and will not permit any third party to, disclose or provide any of the Sears Work Product to any person or entity other than Sears or its affiliate. Seller will consult with Sears or its affiliate and obtain Sears' or its affiliate's prior clearance before developing or implementing any changes to the advertising and marketing materials and owner's or other manuals used in connection with any of the Sears Branded Products.

17.A.ii Seller Work Product. Seller grants Sears a perpetual, royalty free, non-exclusive license to use, copy, reproduce, display and distribute any marketing materials, advertising materials, promotional materials, point of sale displays, packaging, product development information and material, customer information and material, warranty card information, Product installation and service training materials, owner's manuals, service manuals, studies, research, software, Web Content support videos, Web Content, performance claims, files, data, notes, copies, abstracts, copyrights, trade names, trademarks, service marks, domain names, parts and Product schematics, summaries and other materials relating to any Seller Branded Products, which materials are prepared, developed or created by or on behalf of Seller or any of its personnel, agents or contractors (collectively, "Seller Work Product").

17.B Sears Marks and Sears Trade Dress.

17.B.i Seller hereby acknowledges that (i) the trademarks, service marks, trade names and domain names listed on Exhibit J (collectively, the "Sears Marks"), and (ii) any distinctive trade dress of any Sears Branded Products (the "Sears Trade Dress") constitute valuable intellectual property which, as between Sears and Seller, are owned solely and exclusively by Sears. During the Term only, Sears hereby grants to Seller a non-exclusive, limited license to use the Sears Marks and Sears Trade Dress for the sole purpose of affixing the Sears Marks or incorporating the Sears Trade Dress into (1) any Sears Branded Products supplied to Sears by Seller, in accordance with Sears' instructions; and (2) any Sears Work Product developed, prepared or supplied by or on behalf of Seller relating to any Sears Branded Products. Seller will not distribute to any person or entity other than Sears any Products or any Sears Work Product relating to any Products bearing the Sears Marks or incorporating Sears Trade Dress or any patents, patent applications, copyrights, domain names or trade secrets of Sears or its affiliates (collectively, the "Sears Intellectual Property") without Sears' or its affiliate's specific written authorization prior to such distribution. The foregoing license is personal to Seller, and Seller will not grant sublicenses under such license to any other person or entity, except with Sears' prior written consent.

17.B.ii Seller will not claim any right, title or interest in, or challenge Sears' or its affiliates' ownership of: (i) the Sears Marks; (ii) the Sears Trade Dress; (iii) the Sears Work Product; (iv) the Sears Intellectual Property; or (v) any lists, files or other information or material provided or made available by Sears or its affiliates (or by Sears' customers in connection with purchases of Products) to Seller (the items described in the preceding clauses (i) through (v) are collectively referred to as "Sears Information"). Seller recognizes and acknowledges that the use of any Sears Information will not confer upon Seller any right or interest therein.

17.B.iii Seller will use the Sears Information only in the performance of its obligations under this Agreement and in accordance with this Section 17. Upon the expiration or termination of this Agreement, or at any time during the Term upon demand by Sears, Seller will immediately stop using all Sears Information and will transfer to Sears or its affiliate all Sears Work Product and all other materials containing or based on Sears Information. Should Sears demand that Seller stop using the Sears Information in accordance with this Section, Seller will have no obligation to pay damages for any failure to supply Products that is caused by such demand.

17.B.iv Nothing in this Agreement will be construed to bar Sears or its affiliates from protecting their rights to the exclusive ownership of Sears Information against unfair competition, infringement or appropriation by any party or parties, including any use by Seller not expressly authorized by this Agreement. Seller acknowledges that Sears Information possesses a special, unique and extraordinary character that makes it difficult to assess the monetary damage Sears or its affiliates would sustain in the event of unauthorized use thereof. Seller agrees and acknowledges: (i) that irreparable injury would be caused to Sears or its affiliates by unauthorized use of Sears Information; (ii) that if Seller breaches this Section 17 there would be no adequate remedy at law; and (iii) that in the event of such breach, a temporary restraining order or preliminary or permanent injunctive relief, in each case without bond, would be appropriate. Seller waives any right it may have to require Sears or its affiliates to post a bond in connection with any such order.

17.C Innovations to Products

17.C.i Innovations. Seller will consult with Sears periodically during the Term in the process of Seller's developing new or improved products in any Product Category, including new or improved features, design, parts or technology (collectively, "Innovations"). Seller will disclose to Sears any and all Innovations prior to the disclosure of any Innovation to any third party and prior to the sale of any product incorporating an Innovation to any third party. "Innovations" as used herein, does not include designed that are suggested or requested by customers of Seller other than Sears or to features or designs developed for incorporation in Electrolux branded premium brands sold exclusively through high end channels which select high end channels include Sears select channels such as the The Great Indoors; however, Seller shall disclose to Sears the existence and nature of features and designs developed for incorporation into Electrolux branded premium brands. In the event Sears desires to add features identified as exclusive to Electrolux branded premium brands to Sears Branded Products, Seller and Sears will negotiate in good faith to mutually agree upon a timetable and plan for migration of the desired feature to the Sears Branded Product.

17.C.ii Sears Right of First Offer. Sears will have a right of first offer to purchase or license from Seller any or all of the Innovations presented to Sears during the Term of this Agreement on an exclusive basis, subject, however, to mutually agreeable volume commitments and advertising commitments. The minimum period of exclusivity will be one year from the date Sears first sells a Product with the applicable innovation or such other period as Sears and Seller may mutually agree upon (the "Minimum Exclusivity Period"). Prior to offering any Innovation and/or product incorporating such Innovation for sale or license to any third party, Seller will present the Innovation to the Sears buyer for the applicable Product. Seller's presentation will include a written description of the Innovation or a pre-production prototype and will include a written notice that the presentation is being made pursuant to this Section 17.C.ii. Sears will have sixty (60) days after Seller's presentation to notify Seller whether Sears elects to exercise its right to purchase or license the Innovation exclusively for Sears Branded Products. If Sears elects to exercise this right, Sears and Seller will negotiate in good faith the terms of such sale or license. If Sears and Seller fail to agree on the terms of such sale or license within thirty (30) days following the commencement of such negotiations, Seller will have the right to offer the Innovation to other customers on Seller Branded Products that are comparable to the Sears Branded Products that were the subject of previous negotiations between Seller and Sears pursuant to this Section 17.C.ii on terms no more favorable than the most favorable terms offered to Sears.

17.C.iii Sears Right of First Refusal. If, following termination of any negotiations of Seller with Sears as set forth in Section 17.C.ii, Seller determines that it wishes to offer an Innovation on more favorable terms, Seller will offer such terms to Sears and will negotiate with Sears in good faith for an additional period of thirty (30) days. If, at the end of each additional thirty (30)-day period, Seller and Sears fail to agree on the terms for Sears to purchase Products with the Innovation on an exclusive basis for at least the Minimum Exclusivity Period, then Seller may offer the Innovation to other customers on Seller Branded Products that are comparable to the Sears Branded Products that were the subject of previous negotiations between Seller and Sears pursuant to this Section 17.C.iii on terms no more favorable than the most favorable terms offered to Sears.

18. CONFIDENTIALITY.

18.A Confidential Information. "Confidential Information" means any information, whether disclosed in oral, written, visual, electronic or other form, that (i) one party (the "Disclosing Party") discloses to the other party (the "Receiving Party"), (ii) relates to or is disclosed in connection with this Agreement or Sears' business and (iii) is or reasonably should be understood by the Receiving Party to be confidential or proprietary to the Disclosing Party. The Disclosing Party's sales, pricing, costs, inventory, operations, employees, current and potential customers, financial performance and forecasts and business plans, strategies, forecasts and analyses, as well as the terms of this Agreement, are Confidential Information.

18.B Treatment of Confidential Information. The Receiving Party agrees to use any Confidential Information only in accordance with this Agreement for three years from the date of receipt. The Receiving Party will:

- restrict disclosure of the Confidential Information to its employees, advisors and contractors ("Representatives") with a need to know the Confidential Information for purposes of performing the Receiving Party's responsibilities under this Agreement;
- advise those Representatives of the obligation not to disclose the Confidential Information;
- copy the Confidential Information only as necessary for those Representatives who need it for performing the Receiving Party's responsibilities under this Agreement, and ensure that confidentiality is maintained in the copying process; and
- protect the Confidential Information, and require those Representatives to protect it, using the same degree of care as the Receiving Party uses with its own Confidential Information, but no less than reasonable care.

Either party may disclose the Confidential Information to any direct or indirect subsidiary or affiliate (an "Affiliate Group"), provided that such party agrees in writing to be bound by this Agreement to the same extent as Sears or Seller, as applicable, is bound.

The Receiving Party will be liable to the Disclosing Party for any unauthorized disclosure or use of Confidential Information by any of its current or former personnel or any Affiliate Group.

Within ten days after receiving the Disclosing Party's written request, the Receiving Party will: (a) destroy or return (as instructed by the Disclosing Party) any materials containing Confidential Information; and (b) certify to the Disclosing Party that it has satisfied its obligations under this Section 18.B.

18.C Exceptions to Confidential Treatment. The obligations under this Section 18 do not apply to any Confidential Information that the Receiving Party can demonstrate:

- was previously known to the Receiving Party without any obligation to hold it in confidence;
- is disclosed to third parties by the Disclosing Party without an obligation of confidentiality to the Disclosing Party;
- is or becomes available to any member of the public other than by unauthorized disclosure;
- was or is independently developed by the Receiving Party without use of the Confidential Information;
- in the reasonable opinion of legal counsel, is required to be disclosed by law or the rules and regulations of any applicable regulatory authority; or
- in the reasonable opinion of legal counsel, is required to be disclosed in response to a valid subpoena or order of a court or other governmental body of competent jurisdiction or other valid legal process.

In the case of any disclosure under the last two bullets above, the Receiving Party must notify the Disclosing Party prior to disclosure and use reasonable efforts to cooperate with the Disclosing Party so that the Disclosing Party may take legally available steps to resist or narrow the requested disclosure and obtain an appropriate protective order or other assurance that confidential treatment will be accorded the Confidential Information.

19. TERM. The term of this Agreement (the "Term") will begin on January 1, 2004 and will end, unless sooner terminated under the terms of this Agreement, on December 31, 2006 (the "Expiration Date"). This Agreement will apply to all Products shipped on or after the applicable Effective Date and before the Expiration Date, regardless of when Sears placed the order for the Products.

20. MISCELLANEOUS.

20.A Minimum Quantities. Sears agrees to purchase at least $100 of Products during the Term. If at the expiration of the Term Sears has ordered less than $100 of Products, Sears will pay Seller (upon request) the difference between the amount ordered and $100. Seller must request payment of any amount due under this Section 20.A in writing within thirty (30) days after the expiration or termination of this Agreement. Seller acknowledges and agrees that except as set forth in this Section 20.A, Sears is not obligated or committed to purchase any quantities except as expressly ordered by Sears (and subject to any modification and/or cancellation rights Sears may have under this Agreement) according to the procedures described in Section 9.

20.B SPRS. For purpose of this Agreement, unless otherwise indicated herein, all calculations and measurements with respect to Sears' purchases, sale of Products, average retail selling prices, Average Parts Cost per Incident and similar information will be measured in units or dollars, as the context requires, and determined by reference to Sears' Strategic Performance Reporting system ("SPRS") or any successor system implemented by Sears.

20.C Governing Law. The substantive law of the State of Illinois, applicable to contracts entered into and wholly to be performed in Illinois by Illinois residents, without reference to any principles concerning conflict of law, will govern the validity of this Agreement, the construction of its terms and the interpretation of the rights, duties and remedies of the parties hereunder.

20.D Representations and Warranties. Each party represents and warrants to the other that it has the right, power and authority to grant to the other the rights provided under this Agreement and to perform its obligations under this Agreement, and that such party's execution, delivery and performance of this Agreement have been duly authorized and will not violate any other agreement, restriction, or Applicable Law to which such party is a party or by which such party is bound.

20.E Notices. Notices under this Agreement are sufficient if given by nationally recognized overnight courier service, certified mail (return receipt requested), facsimile with electronic confirmation or personal delivery to the other party at the address below:

| | |
|---|---|
| If to Sears: | Sears, Roebuck and Co.<br>3333 Beverly Road, Mail Station: C2-266B<br>Hoffman Estates, IL 60179<br>Attn: Vice President and GMM, Home Appliances<br>Facsimile: (847) 286-6195 |
| With a copy to: | Sears, Roebuck and Co.<br>3333 Beverly Road, Mail Station: B6-260A<br>Hoffman Estates, IL 60179<br>Attn: Deputy General Counsel, Retail Merchandising and Marketing<br>Facsimile: (847) 286-0266 |
| If to Seller: | Electrolux Home Products, Inc<br>250 Bobby Jones Expressway<br>Augusta, GA 30907<br>Attn.: Vice President, Sears Sales<br>Facsimile: (706) 228-4750 |
| With a copy to: | Electrolux Home Products, Inc.<br>18013 Cleveland Parkway, #100<br>Cleveland, Ohio 44135<br>Attn.: Legal Department - NOTICE<br>Facsimile: (216) 898-2340 |

Notice is effective: (i) when delivered personally, (ii) three business days after sent by certified mail, (iii) on the business day after sent by a nationally recognized courier service, or (iv) on the business day after sent by facsimile with electronic confirmation to the sender. A party may change its notice address by giving notice in accordance with this Section 20.D.

20.F Publicity. Seller acknowledges that Sears requires manufacturers of Sears Branded merchandise to reinforce the Sears brand names as opposed to emphasizing the manufacturers who make Sears Branded merchandise. Except as expressly permitted herein or with Sears' prior written consent, Seller will not disclose the existence or terms of this Agreement or any other information regarding Seller's supply of the Sears Branded Products to Sears in any advertising, promotional or sales activity or publicity release or otherwise. Seller will refrain from making any reference to this Agreement or to Sears in the solicitation of business, unless Sears gives its prior written consent to such action and approves any press release or other publicity materials prior to their dissemination. If Seller is required to make any disclosure pertaining to this Agreement under any Applicable Law, Seller will afford Sears a reasonable opportunity to review the content of such disclosure and will incorporate all reasonable modifications to such disclosure that Sears may request.

20.G Injunctive Relief. Seller acknowledges that any breach by Seller of Section 17 or 18 of this Agreement by Seller would cause Sears and its affiliates irreparable harm for which Sears and its affiliates have no adequate remedies at law. Accordingly, Sears and its affiliates are entitled to injunctive relief for any such breach. Seller waives all claims for damages by reason of the wrongful issuance of an injunction and acknowledges that its only remedy in that case is the dissolution of that injunction.

20.H Recoupment and Set-off. "Seller's Monetary Obligations" under the "Sears Remedies" section of the UTC will include any payments that Seller must pay Sears hereunder, including Administrative Fees and all payments under Sections 5 through 8. Sears may, at any time after they accrue, collect Seller's Monetary Obligations by debit memo. To the extent a debit memo exceeds the amounts owed by Sears at the time it is issued, Seller will immediately pay the difference by wire transfer.

20.I Liquidated Damages. Seller and Sears hereby agree that the Administrative Fees, On-Time Parts Delivery charges and other liquidated payments which are due hereunder are not intended by the parties as penalty payments, but are instead intended as liquidated damages to compensate Sears should Seller fail to meet its obligations hereunder. Furthermore, the parties agree that these amounts are reasonable and appropriate because of the difficulty, time and cost of determining Sears' actual damages resulting from such failure.

20.J Relationship of the Parties. The relationship of Seller and its personnel to Sears will be that of independent contractors, and Seller will not purport to represent Sears as Sears' agent, employee or partner in any manner. Seller has no authority to enter into any contract or incur any expense or obligation of any kind in Sears' name.

20.K *Computer Access*. If Seller is given access, whether on-site or through remote facilities, to any computer or electronic data storage system of Sears or its affiliates in order for Seller to perform its obligations under this Agreement, then Seller will use access solely to perform such obligations and will not attempt to access any computer system, electronic file, software or other electronic services other than those specifically required to perform its obligations under this Agreement. Seller will limit such access to those of its personnel who need to have such access in connection with this Agreement, will advise Sears in writing of the name of each such personnel who will be granted such access, and will strictly follow all Sears' security rules and procedures for use of Sears' electronic resources. All user identification numbers and passwords disclosed to Seller and any information obtained by Seller as a result of Seller's access to, and use of, Sears' computer and electronic storage systems will be deemed to be, and will be treated as, Confidential Information of Sears Seller will cooperate with Sears in the investigation of any apparent unauthorized access by Seller to Sears' or its affiliates' computer or electronic data storage systems or unauthorized release of Sears' Confidential Information by Seller.

20.L GlobalNetXchange. Sears is conducting business with some suppliers via GlobalNetXchange ("GNX"), an internet-based electronic marketplace that links manufacturers, wholesalers and retailers. Sears intends to expand the business it conducts over GNX. Transactions to be conducted through GNX may include Purchase Orders, Advance Shipping Notices, invoicing, forecasting and reporting. GNX may supplement or replace EDI processing and Sears' current order processing procedures. If requested by Sears, Seller will use reasonable commercial efforts to conduct business via GNX.

20.M Federal Contracting Requirement. As a federal contractor, Sears is subject to affirmative action and other federal contracting requirements, and is required to include those requirements in its subcontracts for commercial items and commercial components. Therefore, this Agreement incorporates by reference, and Seller will comply with, the following provisions of Title 48 of the Code of Federal Regulations: 52-219.8, Utilization of Small Business Concerns, 52.222-26, Equal Opportunity; 52.222-35, Affirmative Action for Special Disabled and Vietnam Era Veterans; 52.222-36, Affirmative Action for Handicapped Workers; and 52.244-6, Subcontracts for Commercial Items and Commercial Components. Furthermore, Seller acknowledges that Sears is committed to helping bring small business, small disadvantaged businesses, and women-owned businesses into the American economic system. In furtherance of this goal, if Seller uses the services of subcontractors, Seller will use reasonable efforts to involve qualified small, small disadvantaged, and women-owned sources in its selection process.

20.N Entire Agreement. This Agreement, which includes the UTC, the Vendor Guide, and each of the Exhibits attached hereto, sets forth the entire agreement and understanding between the parties hereto with respect to the Products. All prior and contemporaneous discussions and negotiations relating to the Products are merged herein. This Agreement will not be supplemented, modified or amended except by a written instrument signed by a duly authorized representative of each of Sears and Seller. Furthermore, this Agreement will supersede, and Sears will not be bound by, any "disclaimers" or "click to approve" terms or conditions now or hereafter contained in any web site used by Sears in connection with the Products or this Agreement. This Agreement will be binding upon and inure to the benefit of the successors, representatives and permitted assigns of the parties hereto. The terms and conditions of this Agreement supercede and replace those of the Sears Request for Proposal dated on or about June 2003 and those of any term sheets, negotiations, RFP responses, award letters and any other documents that the parties have exchanged in connection therewith (collectively, "RFP Documents"). Sears and Seller represent and warrant that they are entering into this Agreement based solely on the provisions set forth herein and not in reliance, in whole or in part, on any claim or representation contained in any RFP Document. For purposes of this Agreement, only Sears employees with the title "Senior Vice President" or higher will be deemed duly authorized representatives of Sears; provided, however, that Sears employees with the title "Buyer" will be deemed duly authorized representatives of Sears for purposes of agreeing to changes to any items on one or more Exhibit, and provided further that no such change will alter the definition of any term defined in this Agreement.

20.O Survival. All obligations of Sears and Seller which expressly or by their nature survive the expiration or termination of this Agreement, including the obligation of either party to pay any amounts accrued hereunder and the obligations of Seller under Sections 7, 8 and 15, will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement and until they are satisfied in full or by their nature expire.

20.P No Waiver. The terms, covenants and conditions of this Agreement may be waived only by a written instrument signed by the party waiving compliance. Any party's failure at any time to require performance of any provision will not affect that party's right to enforce that or any other provision at a later date. No waiver of any condition or breach of any provision, term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances will be deemed to be or construed as a further or continuing waiver of that or any other condition or of the breach of that or another provision, term or covenant of this Agreement.

20.Q Construction. The Section headings of this Agreement are for convenience only and have no interpretive value. All references in this Agreement to "including" will be interpreted to mean "including, but not limited to," and unless otherwise indicated all references to a number of days will mean calendar (and not business) days and all references to months or years will mean retail calendar months or years, using the "4-4-5" retail calendar.

20.R Counterparts; Facsimile. This Agreement may be executed in any number of separate counterparts, all of which, when taken together, will constitute one and the same instrument, notwithstanding the fact that all parties did not sign the same counterpart. Each of the parties agrees that a signature transmitted to the other party or its counsel by facsimile transmission will be effective to bind the party whose signature was transmitted, as a duly executed and delivered original. Each party further agrees to promptly deliver its original signature pages to this Agreement to counsel for the other party promptly following execution, but any failure to do so will not affect the binding effect of such signature.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first set forth above.

SEARS:

Sears, Roebuck and Co.

By: Daniel F. Laughlin

Print Name: DANIEL F. LAUGHLIN

Title: SVP-Home

Date: 6/29/04

APPROVED ... DATES

SELLER:

Electrolux Home Products, Inc.

By: [signature]

Print Name: LEE H. HELDT

Title: VP SALES

Date: 6-10-04