1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8           Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11                   United States Bankruptcy Court

12                   300 Quarropas Street, Room 248

13                   White Plains, NY 10601

14

15                   September 27, 2021

16                   10:26 AM

17

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  UNKNOWN

1   HEARING re EIGHTH INTERIM FEE APPLICATION OF PRIME CLERK

2   LLC, AS ADMINISTRATIVE AGENT TO THE DEBTORS, FOR SERVICES

3   RENDERED AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM

4   MARCH 1, 2021 THROUGH JUNE 30, 2021 filed by Prime Clerk

5   LLC. (ECF #9736)

6

7   HEARING re Fifth Interim Fee Application of Herrick,

8   Feinstein LLP as Special Conflicts Counsel to the Official

9   Committee Of Unsecured Creditors for Allowance of

10  Compensation for Services Rendered and Reimbursement of

11  Expenses for the Period: 3/1/2021 to 6/30/2021, fee:

12  $95,0I4.00, expenses: $551.16. filed by Herrick, Feinstein

13  LLP. (ECF #9741).

14

15  HEARING re Seventh Joint Application of Paul E. Harner, as

16  Fee Examiner and Ballard Spahr LLP, as Counsel to the Fee

17  Examiner, for Interim Allowance of Compensation for

18  Professional Services Rendered and Reimbursement of Actual

19  and Necessary Expenses Incurred from: 3/1/2021 to 6/30/2021,

20  fee:$347092.50, expenses: $70.00 (ECF #9777)

21

22

23

24

25

Page 3

1    HEARING re Eighth Application of Weil, Gotshal & Manges LLP,

2    as Attorneys for the Debtors, for Interim Allowance of

3    Compensation for Professional Services Rendered and

4    Reimbursement of Actual and Necessary Expenses Incurred

5    from: 3/1/2021 to 6/30/2021, fee:$2,553,7IL00, expenses:

6    $218,228.99. filed by Weil, Gotshal & Manges LLP. (ECF

7    #9745)

8

9    HEARING re Objection BY ORIENT CRAFT LIMITED (ECF #9810)

10

11   HEARING re Response / Reply of Weil, Gotshal & Manges LLP in

12   Support of Interim Fee Application (related document(s)9745,

13   9810) filed by Garrett A. Fail on behalf of Weil, Gotshal &

14   Manges LLP. (ECF #9838)

15

16   HEARING re Eighth Interim Fee Application of Akin Gump

17   Strauss Hauer & Feld LLP as Counsel to the Official

18   Committee of Unsecured Creditors for Allowance of

19   Compensation for Services Rendered and Reimbursement of

20   Expenses for the Period: 3/1/2021 to 6/30/2021, fee:

21   $1,275,454.50, expenses: $1,215,770.92. filed by Akin Gump

22   Strauss Hauer & Feld LLP. (ECF #9742)

23

24   HEARING re Objection BY ORIENT CRAFT LIMITED (ECF #9810)

25

Page 4

1    HEARING re Response /Reply of Akin Gump Strauss Hauer & Feld

2    LLP and FTI Consulting, Inc. to Objection by Orient Craft

3    Limited to Interim Applications for Compensation (related

4    document(s) 9743, 9810, 9742) filed by Philip Dublin on

5    behalf of Official Committee of Unsecured Creditors of Sears

6    Holdings Corporation, et al. (ECF #9837)

7

8    HEARING re Eighth Interim Application of FTI Consulting,

9    Inc., Financial Advisor to the Official Committee of

10   Unsecured Creditors of Sears Holdings Corporation, et al.

11   for Interim Allowance of Compensation and Reimbursement of

12   Expenses for the Period : 3/1/2021 to 6/30/2021, fee:

13   $135,263.00, expenses: $0.00. filed by FTI Consulting, Inc.

14   (ECF #9743)

15

16   HEARING re Objection BY ORIENT CRAFT LIMITED (ECF #9810).

17

18   HEARING re Response /Reply of Akin Gump Strauss Hauer & Feld

19   LLP and FTI Consulting, Inc. to Objection by Orient Craft

20   Limited to Interim Applications for Compensation (related

21   document(s)9743, 9810, 9742) filed by Philip Dublin on

22   behalf of Official Committee of Unsecured Creditors of Sears

23   Holdings Corporation, et al. (ECF #9837)

24

25

1    HEARING re Motion to Compel /Motion to Enforce Order (I)

2    Approving the Asset Purchase Agreement Among Sellers and

3    Buyer, (II) Authorizing the Sale of Certain of the Debtors'

4    Assets Free and Clear of Liens, Claims, Interests and

5    Encumbrances, (III) Authorizing the Assumption and

6    Assignment of Certain Executory Contracts, and Leases in

7    Connection Therewith and (IV) Granting Related Relief filed

8    by Luke A Barefoot on behalf of Transform SR Brands LLC (LCF

9    #9647)

10

11   HEARING re Declaration of Kimberly Black in Support of

12   Defendant's Motion to Enforce Order (I) Approving the Asset

13   Purchase Agreement Among Sellers and Buyer, (II) Authorizing

14   the Sale of Certain of the Debtors' Assets Free and Clear of

15   Liens, Claims, Interests and Encumbrances, (III) Authorizing

16   the Assumption and Assignment of Certain Executory

17   Contracts, and Leases in Connection Therewith and (IV)

18   Granting Related Relief (related document(s)9647) filed by

19   Luke A Barefoot on behalf of Transform SR Brands LLC. (LCF

20   #9648).

21

22

23

24

25

1    HEARING re Response to Motion to Enforce Order (I) Approving

2    the Asset Purchase Agreement Among Sellers and Buyer, (II)

3    Authorizing the Sale of Certain of the Debtors Assets

4    Free and Clear of Liens, Claims, Interests and Encumbrances,

5    (III) Authorizing the Assumption and Assignment of Certain

6    Executory Contracts, and Leases in Connection Therewith and

7    (IV) Granting Related Relief (related document(s)9647).

8

9    HEARING re Response / Debtors' Reservation of Rights and

10   Statement Regarding Diana Arney's Response to Motion to

11   Enforce Sale Order (related document(s)9647, 9807) filed by

12   Jacqueline Marcus on behalf of Sears Holdings Corporation.

13   (LCF #9819)

14

15   HEARING re Declaration of Kimberly Black in Support of

16   Defendant's Motion to Enforce Order (I) Approving the Asset

17   Purchase Agreement Among Sellers and Buyer, (II) Authorizing

18   the Sale of Certain of the Debtors' Assets Free and Clear of

19   Liens, Claims, Interests and Encumbrances, (III) Authorizing

20   the Assumption and Assignment of Certain Executory

21   Contracts, and Leases in Connection Therewith and (IV)

22   Granting Related Relief (related document(s)9647) filed by

23   Luke A Barefoot on behalf of Transform SR Brands LLC. (LCF

24   #9648)

25

Page 7

1   HEARING re Reply to Motion / Transform SR Brands LLC's Reply

2   in Further Support of its Motion to Enforce Order (I)

3   Approving the Asset Purchase Agreement Among Sellers and

4   Buyer, (II) Authorizing the Sale of Certain of the Debtors'

5   Assets Free and Clear of Liens, Claims, Interests, and

6   Encumbrances, (III) Authorizing the Assumption and

7   Assignment of Certain Executory Contracts, and Leases in

8   Connection Therewith and (IV) Granting Related Relief

9   (related document(s) 9807) (related document(s)9647) filed

10  by Luke A. Barefoot on behalf of Transform SR Brands LLC.

11  (ECF #9828)

12

13  HEARING re Declaration of Kimberly Black in Support of

14  Transform SR Brands LLC's Reply in Further Support of its

15  Motion to Enforce Order (I) Approving the Asset Purchase

16  Agreement Among Sellers and Buyer, (II) Authorizing Sale of

17  Certain of the Debtors' Assets Free and Clear Liens, Claims,

18  Interests, and Encumbrances, (III) Authorizing the

19  Assumption and Assignment of Certain Executory Contracts,

20  and Leases in Connection Therewith and (IV) Granting Related

21  Relief (related document(s) 9807, 9828) (related document(s)

22  9647) filed by Luke A. Barefoot on behalf of Transform SR

23  Brands LLC (RVG $9829).

24

25

Page 8

1    HEARING re Notice of Agenda Matters Scheduled for Hearing to

2    be Conducted through Zoom on September 27, 2021 at 10:00

3    a.m.

4

5    HEARING re Amended Notice of Agenda / Notice of Agenda

6    Matters Scheduled for Hearing to be Conducted through Zoom

7    on September 27, 2021 at 10:00 a.m.

8

9    HEARING re Amended Notice of Agenda / Notice of Second

10   Amended Agenda of Matters Scheduled for Hearing to be

11   Conducted through Zoom on September 27, 2021 at 10:00 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 9

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors and Debtors in Possession

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  GARRETT FAIL (TELEPHONICALLY)

9

10   WILMER CUTLER PICKERING HALE & DORR

11        Attorneys for Lampert, et al.

12        7 World Trade Center

13        New York, NY 10007

14

15   BY:  PHILLIP D. ANKER (TELEPHONICALLY)

16

17   CLEARY GOTTLIEB STEEN HAMILTON LLP

18        Attorneys for Transform Holdco LLC

19        One Liberty Plaza

20        New York, NY 10006

21

22   BY:  LUKE A. BAREFOOT (TELEPHONICALLY)

23

24

25

```
 1   AKIN GUMP

 2        Attorneys for Unsecured Creditors Committee

 3        1 Bryant Park

 4        New York, NY 10036

 5

 6   BY:  SARA BRAUNER (TELEPHONICALLY)

 7        DEAN CHAPMAN (TELEPHONICALLY)

 8        PHILLIP DUBLIN (TELEPHONICALLY)

 9

10   HERRICK FEINSTEIN LLP

11        Attorneys for Official Committee of Unsecured Creditors

12        2 Park Avenue

13        New York, NY 10016

14

15   BY:  CHRISTOPHER CARTY (TELEPHONICALLY)

16

17   SHEPPARD MULLIN

18        Attorneys for Fee Examiner

19        30 Rockefeller Plaza

20        New York, NY 10112

21

22   BY:  PAUL HARNER (TELEPHONICALLY)

23

24

25
```

```
 1   BALLARD SPAHR LLP

 2       Attorneys for Fee Examiner

 3       1735 Market Street

 4       Philadelphia, PA 19103

 5

 6   BY:  VINCENT MARRIOTT (TELEPHONICALLY)

 7        CHANTELLE MCCLAMB (TELEPHONICALLY)

 8

 9   QUINN EMANUEL

10       Attorneys for Administrative Claims Representative

11       1300 I Street, NW

12       Washington, DC 20005

13

14   BY:  ERIKA MORABITO (TELEPHONICALLY)

15        BRITTANY NELSON (TELEPHONICALLY)

16

17   TANNEN LAW GROUP, P.C.

18       Attorneys for Diana Arney

19       77 W. Washington Street

20       Chicago, IL 60602

21

22   BY:  MICHAEL MURPHY TANNEN (TELEPHONICALLY)

23

24

25
```

Page 12

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for The United States Trustee

3         201 Varick Street

4         New York, NY 10015

5

6    BY:  PAUL KENAM SCHWARTZBERG (TELEPHONICALLY)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                            P R O C E E D I N G S

1              THE COURT:  Administrative priority in secured

2      claims, and ultimately with consummating the Chapter 11

3      Plan.  In the past, the Debtors have gone through this

4      report before we began the hearing and I don't know if they

5      want to do that this morning.  It probably makes sense to do

6      so.

7              MR. FAIL:  Good morning, Your Honor, Garrett Fail,

8      Weil, Gotshal for the Debtors.  Are you able to hear me?

9              THE COURT:  Yes.

10             MR. FAIL:  Thanks.  I'm -- just to confirm, we're

11     doing this by the Zoom audio today, right?  No dial-in

12     necessary for me?

13             THE COURT:  Correct.

14             MR. FAIL:  All right.  Excellent.  So, Your

15     Honor's corrected, we did file a Second Amended Agenda.

16     It's at 9848.  I hate to correct Your Honor.  I don't

17     believe we filed another status report.  I think the last

18     one that I presented to you was at a --

19             THE COURT:  Well, I'm sorry, yes.  This was filed

20     -- I -- correct me if I'm wrong, but I saw the 27 and

21     assumed it was today, but it's July 27th.

22             MR. FAIL:  Exactly, Your Honor.

23             THE COURT:  Okay.

24             MR. FAIL:  I pointed that out to your Chambers

1   simply to show the last update, and I had walked the Court

2   through it.

3           THE COURT:  Okay.

4           MR. FAIL:  Following that -- following that

5   update, we did commence and execute the Third Interim

6   Distribution, sending $10.5 million out to opt-ins and

7   allowed not opt-out creditors.

8           THE COURT:  So, when will the --

9           MR. FAIL:  So --

10          THE COURT:  -- next update be, in October?

11          MR. FAIL:  That -- either October or November,

12  Judge.  I just have to go back to see if we were doing it

13  quarterly.  I thought we were doing it quarterly, and so 789

14  -- oh, I think it's November, Your Honor.  Although, that's

15  not quarterly, so I guess, it could be October, Your Honor.

16          THE COURT:  Right.  I think it would be October.

17          MR. FAIL:  It'll be October.

18          THE COURT:  All right.  Okay.  Very well.  So, I

19  think we should just then go down the agenda.

20          MR. FAIL:  Great, Your Honor.  There's six interim

21  fee applications on and listed.  They're -- the first three

22  that are listed are uncontested.  It's the Application for

23  Prime Clerk LLC, the Application of Herrick, Feinstein LLP,

24  and the Application of Mr. Harner as the Fee Examiner -- and

25  the -- and Ballard Spahr to the Fee Examiner.

1                    THE COURT:  Right.

2                    MR. FAIL:  The following three are for Weil,

3       Gotshal& Manges LLP, Akin Gump Strauss Hauer & Feld LLP, and

4       FTI Consulting, Inc.

5                    There was one objection filed to the last three by

6       Orient Craft, Weil Gotshal, filed reply.  Akin Gump and FTI

7       filed a reply as well.

8                    I'd like to be efficient so, Your Honor, I'm sure

9       that you've read each of the applications and the reply.

10      I'm happy to answer any questions, but would otherwise

11      request --

12                   THE COURT:  Well, why don't we deal with the first

13      three first.  Again, that's Prime Clerk, Herrick, Feinstein,

14      and Mr. Harner, and the Ballard Spahr firm, which are

15      unopposed.

16                   I also reviewed Mr. Harner's statement in respect

17      of the interim fee applications and his report on his

18      progress with regard to the Second through Seventh

19      Applications.

20                   Does anyone have anything to say on any of those

21      three applications?  Again, Herrick, Feinstein, Prime Clerk,

22      and Mr. Harner and Ballard Spahr?

23                   MR. MARRIOTT:  Your Honor, if I might?  Can you

24      hear me?

25                   THE COURT:  Yes.

Page 16

1          MR. MARRIOTT:  Hi.  Vince Marriott, Ballard Spahr

2     on behalf of Mr. Harner as the Fee Examiner.  With me is my

3     colleague, Chantelle McClamb.

4          Your Honor, Mr. Harner came down with a

5     breakthrough COVID infection in the last few days and is

6     flat on his back, and as a consequence, is unable to

7     participate in today's hearing.  I did -- he did want me to

8     send his apologies.  And I'll do my best to address any

9     questions that would have otherwise been directed to Mr.

10    Harner.

11         THE COURT:  Okay.  Well, I hope he feels better

12    soon.  And no apology is necessary.

13         The only questions I have really relate to the

14    other applications that are on for today.  I don't -- I

15    don't have any questions about these three.

16         And hearing no one else, I will grant each of them

17    on an interim basis.

18         So, Mr. Fail, is there going to be one proposed

19    order?

20         MR. FAIL:  Yes, Your Honor.

21         THE COURT:  Okay.  So, these three will be

22    included in that one order.

23         And then as far as the other three are concerned,

24    I have, in fact, read the objection by Orient Craft, which

25    was joined in by another administrative expense creditor,

1    and I've also read the two replies, as well as again, the

2    filing on behalf of Mr. Harner by Ballard Spahr, which

3    details the Fee Examiner's work with -- I'm assuming, one or

4    more, maybe all of these applicants as well as others -- for

5    the prior interim applications and the -- and these.  That

6    work is ongoing, although I gather that it's fairly far

7    along with preliminary proposals, or the first preliminary

8    reports having been made by the Fee Examiner.

9              But I -- Mr. Marriott, I understand that the

10   Examiner doesn't object to any of these applications but

11   wants to make sure that the same language that was in the

12   prior orders is in any order granting these applications on

13   an interim basis, that carves out and recognizes the rights

14   of the Fee Examiner to object on a final basis and to seek

15   disgorgement.

16             MR. MARRIOTT:  Yes.  Vince Marriott, Your Honor,

17   on behalf of the Fee Examiner.  That's correct.  We are in

18   ongoing discussions with all of the applicants and the

19   reservation of rights is designed to preserve whatever

20   outcome those ongoing discussions result in.  And we're

21   comfortable proceeding with approval of the applications,

22   subject to the reservation of rights.

23             THE COURT:  Okay.  So, these three firms Weil,

24   Akin Gump, and FTI, are all large firms.  There are times in

25   cases where there's not much work left to be done, and it

Page 18

1    may not be a large firm, that I require holdbacks.  Does the

2    examiner have any concern that, based on his work, the

3    amounts that he is discussing with the firms would be so

4    great that I should have a hold-back here, as opposed to --

5              MR. MARRIOTT:  Well, Your Honor, Vince Marriott --

6              THE COURT:  -- looking to disgorgement?

7              MR. MARRIOTT:  I'm sorry, Your Honor.  Vince

8    Marriott on behalf of the Examiner.  Given the size of the

9    firms and the amounts that are under discussion, we are not

10   concerned that there is a need for further hold-back.

11             THE COURT:  Okay.  And I guess these three firms -

12   - well, maybe not FTI, are doing substantial work on a going

13   forward basis too, I gather.  And there's always a basis to

14   -- since money is fungible -- deal with those applications.

15             MR. MARRIOTT:  Yes, that's -- that -- Vince

16   Marriott, Your Honor.  Yes, that is also true in this

17   instance.

18             THE COURT:  Okay.  All right.  So, again, I --

19   I've read these pleadings, but I'm happy to hear from you,

20   Mr. Wander, on the objection.

21             MR. WANDER:  Good morning.  David Wander, now with

22   Tarter Krinsky & Drogin, on behalf of Orient Craft Limited.

23   Your Honor, I'm aware that this is an interim fee

24   application and that it's subject to final review.

25             Prior to this hearing, I want Your Honor to know

1    that I did speak with the Fee Examiner, and the one comment

2    I'd like to make -- excuse me while I try and fix the video

3    here.

4              THE COURT:  That's fine.

5              MR. WANDER:  The one comment that I'd like to

6    make, in speaking with the Fee Examiner, I believe he

7    explained that the scope of his review is somewhat limited,

8    and one thing that he does not take into account is an

9    overview of the benefit of the services that were rendered.

10             So, I just want to make that point.  Now, if the

11   interim compensation that's been awarded is subject to

12   330(a)(5), which I believe one of the applicants, I think it

13   was Akin pointed out, I'm fine with that.  I'm fine with the

14   Court reviewing all of the fee applications when there's a

15   final hearing and taking into account everything that has

16   gone on with -- in this case.

17             One thing that the parties seem to agree on is

18   that -- and I'm referring to paragraph 3 of the Akin Gump

19   reply, that "professionals are subject to the right of any

20   party in interest to challenge fees it views as

21   unreasonable".

22             What I've tried to, Your Honor, is give the point

23   the view of an allowed administrative creditor who has not

24   received any money and who's concerned about being paid

25   because the prospects of the Plan going effective appear

1   very slim.

2        Now, Section 330 and 331 use the word "may," the

3   Court "may" award interim compensation, so -- indicating

4   that it's not automatic.  And we simply submit that given

5   the fees that have paid to date and the status of the

6   current case, it might be appropriate to defer any award of

7   internal compensation at this point given the relative small

8   amount of funds compared to the approximate $250 million in

9   fees that have been paid to the professionals.  We're not

10  talking about a large sum of money.  It's, to a certain

11  extent, it's symbolic of where we are today.

12        And while Weil, Gotshal pointed out that we are

13  not objecting to any particular time entries that they have,

14  because that's more of the Fee Examiner's role, there were

15  certain time entries by Akin and FTI that we were

16  specifically objecting to.  And that is, them seeking to be

17  paid, to find the litigation funder, which from our point of

18  view is being paid to find someone to pay their fees.

19        So, that being said, Your Honor, again,

20  recognizing this is an interim application, I wanted to have

21  my client's objections on the record, so when it's time for

22  a final hearing, Your Honor didn't say something, like, Mr.

23  Wander, where were you all along when there were interim

24  applications for compensation.  My objection in length, is

25  very limited, my views are well known, and I simply wanted

Page 21

1    to put before Your Honor the views of an allowed

2    administrative creditor at this juncture in the case.

3              THE COURT:  Okay.  All right.  Thank you.  Again,

4    I've read the replies.  I don't know if the -- any of those

5    firms wants to say anything in response to Mr. Wander's

6    remarks just now.

7              MR. FAIL:  Your Honor, it's Garrett Fail from

8    Weil, Gotshal.  I think we've said everything that we need

9    to in the reply.  I don't think it need any more airtime.

10             I'm happy to answer any other questions.  We

11   disagree with the objection; we think it should be

12   overruled.

13             THE COURT:  Okay.

14             MS. BRAUNER:  Good morning, Your Honor.  Sara

15   Brauner, Akin Gump on behalf of the Committee.  I will also

16   rest on our papers.  We also disagree with numerous comments

17   made by Mr. Wander and his characterizations.  But unless

18   the Court has any question, we'll rest on our papers.

19             THE COURT:  Okay.  All right.  All right.  I think

20   like everyone in this case is concerned that the Plan has

21   not yet gone effective.  On the other hand, I think I need

22   to shoulder some amount of the responsibility for that in

23   that the ESL litigation -- the large ESL litigation, that is

24   the avoidance litigation -- has not moved as quickly as I

25   would have liked it to.  And again, that's in large measure

Page 22

1    because I'm still working on the mammoth motions to dismiss.

2            Clearly, while the recoveries, in large measure,

3    have exceeded the estimates that I heard at Confirmation,

4    the fees have also been substantially greater.  However,

5    based on my review of the prior interim applications and

6    these interim applications, those fees are understandable,

7    and I believe, at least on an interim basis, reasonable.

8    And that includes the time spent by FTI, and to some extent

9    by Akin Gump, in considering and dealing with the potential

10   litigation funder.

11           Of course, I only see the time entries, but I

12   think I can reasonably infer that that funding is not just

13   to obtain compensation for the prosecution of the

14   litigation, but is, in fact, to enable the litigation to

15   proceed in way that benefits all the creditors.  The

16   litigation was always going to be a substantial source of

17   recovery here for creditors.

18           Now, I think there's no doubt that final fee

19   applications are subject to Section 330(a)(5), and in the

20   perspective of the entire case, parties in interest can

21   raise objections to final fees.  And I will note that one of

22   those objections could be, as recognized by Chief Judge

23   Morris in, In re Headlee Management Corp., that "the

24   professionals simply ran the Chapter 11 case into

25   administrative insolvency" and didn't pull the plug sooner.

Page 23

1   That last part is not the quote.

2           But I don't see that happening at this point at

3   all.  I mean, I think that the work is being done to finish

4   their liquidation of the claims, administrative expense

5   claims, priority claims, the secured claims that are on

6   appeal, to finish liquidating the assets, and pursue the

7   preference and fraudulent transfer claims.  If I felt that

8   professionals were spending $10 to make $5 or even $10 or

9   $9, that would be a problem.  But I don't sense that.  I

10  don't get that impression at this point.

11          So, I think that what I said at prior hearings on

12  requests for payment of administrative expenses applies

13  today as well, which is that the professionals are working

14  to obtain recoveries for the creditors in the case, and it

15  wouldn't be appropriate at this point to stop compensating

16  them to do that.

17          I do have orders that to some extent provide for

18  these types of payments.  I think the parties ought to look

19  at them carefully to see if they really do provide for a

20  sort of replenishing carveout or not before any of these

21  types of issues are raised in the future.  I mean,

22  obviously, if they do then we shouldn't even be talking

23  about this.  If they don't, then what I've just said for the

24  past five or so minutes applies.  And I'm not ruling on that

25  issue today.  I -- how and to what extent, those prior

Page 24

```
 1    orders, i.e., the Confirmation Order and the DIP/Cash

 2    Collateral Order do provide for a carveout or a replenishing

 3    fund.

 4            So, I will grant these interim applications and do

 5    so for the reasons that I've just stated, and subject to the

 6    caveats that I've just stated -- or qualifications for final

 7    applications, which are -- very clearly, would not be

 8    limited solely to the types of things that I think the fee

 9    examiner is primarily focusing on, which is, you know,

10    potentially overbilling, double entries, things like that,

11    but rather, more a sense that given its circumstances of the

12    case, have the professionals kept going when they should

13    have stopped.  And I clearly don't get that sense at this

14    point.

15            MR. WANDER:  So, Your Honor, can I get, or raise a

16    point of import?

17            THE COURT:  Sure.

18            MR. WANDER:  Yes, I've been requesting that Weil

19    and Akin at least disclose the amount of money in the

20    professional carveout account.  I don't think the amount

21    should be a secret.

22            THE COURT:  Well, that -- I mean, I think that

23    these reports generally do that, but they come every

24    quarter.

25            MR. WANDER:  I don't believe it's in the quarterly
```

1    report, Your Honor.

2            THE COURT:  Well, it shows what's been paid

3    though.

4            MR. WANDER:  Your Honor, I believe there's a --

5    there's a separate account that hasn't been disclosed, how

6    much money is in it.  I think there are tens of millions of

7    dollars, and both -- if I'm -- if I'm wrong, I'll be

8    corrected.

9            THE COURT:  Well, okay.  I mean, at least from --

10   I mean, I was reviewing the July one, although I thought --

11   I thought it was the September one, they do have entries for

12   the costs, generally, you know, in the aggregate.  And I'm

13   assuming that's the type of reporting we're talking about.

14           I also have the impression since that's gone up

15   and down, that -- and based on the replies too -- that there

16   is some interaction between the DIP/Cash Collateral Order

17   and the Confirmation Order, as far as funding of

18   professional fees, which is also complicated by the fact

19   that for a lot of the litigations, the counsel are on

20   contingency fees.

21           But, Mr. Fail, is there -- is there a specific

22   account that stays in a fixed --

23           MR. FAIL:  Your Honor, this is -- this is a lot to

24   do about nothing again.  The professionals get paid what

25   they invoice.  They get monthly, on or about -- you know, we

Page 26

1   don't chase, it does -- it's not on the dime.  But we file a

2   fee statement.  We get paid 80 percent before fee at

3   hearings, you approve quarterly, or thereabouts, the payment

4   of the 20 percent.  That's what the professionals get paid.

5        Mr. Wander did some calculations.  He got it right

6   or he got it wrong.  But they -- anybody can add that up.

7   The money that goes into the professional fee account goes

8   in and comes out.  He doesn't get access to accounting.  We

9   shouldn't spend any more time.

10        But, Your Honor, if you'll look at what we do in

11   our status reports, you know, we're showing a whole or a

12   deficiency to get to the effective date, you know, of a --

13   the last one was $80.5 million minus the litigation and plus

14   some other things.  But, I mean, there's no $80 million in

15   excess some place sitting around and waiting.  This is a lot

16   to do about nothing.

17        THE COURT:  Well, I guess --

18        MR. FAIL:  Professionals get what they invoice and

19   what you have paid.  They only get paid what you approve,

20   Judge.

21        THE COURT:  Well, so what I -- what I -- I guess

22   what I -- I'm coming back to what I said a few minutes ago,

23   which is that there were references, I think primarily in

24   the Akin Gump response, to carveouts and the mechanism for

25   funding the litigation in the Confirmation Order.

Page 27

1           MR. FAIL:  Are you talking about the litigation

2    trust fund?

3           THE COURT:  Yes.  Yeah.  And I think that may be

4    what Mr. Wander's referring to as opposed to something else.

5           MR. FAIL:  I'll let -- I'll let Ms. Brauner

6    respond if she wants to add anything further in that regard.

7           MS. BRAUNER:  For the record again, Sara Brauner,

8    Akin Gump, on behalf of the Committee.  I think there's been

9    some conflation.  There certainly was in Mr. Wander's

10   objection, of various sources of funding.

11          With respect to the Litigation Trust Account, as

12   it's called in the Confirmation Order and the Plan, that was

13   funded pursuant to Your Honor's order on Confirmation with

14   an amount certain.  The litigation work that Akin Gump and

15   FTI and other professionals and experts and document vendors

16   have been doing since Confirmation, has been paid out of

17   that account.

18          And I will make just one point to the extent it is

19   unclear --

20          THE COURT:  And it's not been replenished.  It's

21   just --

22          MS. BRAUNER:  That's right.

23          THE COURT:  -- that was a fixed amount of money.

24   Right.  Okay.

25          MS. BRAUNER:  That's right.  And just --

1          MR. WANDER:  Correct, Judge.  Correct, Judge.

2          MS. BRAUNER:  -- to be very clear, the funds that

3    Akin Gump has been paid, contrary to contentions in the

4    objection, were capped effectively on our own decision at

5    $10 million.  So, there is over $6 million that Akin Gump

6    has incurred in respect to the litigation that we have not

7    been paid on.

8          So, to the extent there's any insinuation that we

9    are not motivated to maximize value, we cannot have skin in

10   the game, it's simply not accurate.  Those decisions have

11   been made consensually and in consultation with the Debtors

12   to ensure that money is where it needs to be to continue

13   funding.  And yes, as we've disclosed, we are in the process

14   of looking for potential additional funding.

15         And to the extent Mr. Wander or any other claimant

16   would like to discuss that process with us, they know where

17   to find us, and we're happy to do so.

18         THE COURT:  Okay.  So, I think that, I mean, I

19   think that might clarify what admittedly could be confusing

20   to a creditor, which is that there was a special account set

21   up to fund the litigation trust.  But --

22         MR. FAIL:  Correct.

23         THE COURT:  -- I don't think there's any special

24   general fee account, it's just part of the Debtors' sources

25   and uses.  You know, things come in and things come out.

Page 29

1    And some things get paid with a Court order, namely fees and

2    expenses, interim distributions to creditors, some things

3    get paid in the ordinary course because they're ordinary

4    course business expenses.  But I don't believe there's a

5    separate from the litigation account --

6              MR. FAIL:  There has been, throughout the case,

7    Judge, a carveout for professional fees.

8              THE COURT:  Well, that's based though on the Cash

9    Collateral/DIP order.  That's a separate --

10             MR. FAIL:  Correct, Your Honor.

11             THE COURT:  Right.

12             MR. FAIL:  I agree.  Yes.  I'm sorry.  If you were

13   suggesting that, you know, post-Confirmation, money was set

14   aside on a go forward basis in advance, it is not true.

15   Cash sits in the Debtors' account, the $25 million got

16   funded to the -- to the litigation trust, and on a monthly

17   basis, expenses get paid.  And some of the fees get paid on

18   an ongoing basis into a side account rather than to the

19   professionals.  But it's not, you know, advanced for months

20   ahead.

21             So, to the extent that Your Honor decides the

22   professionals should stop working, then funding will stop,

23   and expenses will stop, and work will stop.

24             THE COURT:  So, I think therefore what is worth

25   sharing with anyone who's considering making an objection on

1    fees is what is left in respect of the carveout account, for

2    want of a better term.  Because obviously, a carveout is

3    something that people shouldn't be fighting over except as

4    far as the reasonableness of the fee, nothing else, nothing

5    about, you know, some people getting paid ahead of others

6    because the carveout is a carveout.  That's worth discussing

7    I think in advance of any objection.

8            MR. FAIL:  It'll be disclosed before any final fee

9    application hearing, Judge.  It, you know, that's not --

10   it's a non-issue.

11           THE COURT:  Okay.  All right.  Okay.  So --

12           MR. MARRIOTT:  Your Honor?  Oh, I'm sorry, Your

13   Honor.

14           THE COURT:  -- again, I'll grant these

15   applications as well, with the -- with the reservation of

16   rights that we discussed at the beginning for the Fee

17   Examiner in respect to disgorgement and obviously, subject

18   to every party in interest's rights in respect to the file

19   fee application, under Rule -- under Bankruptcy Code Section

20   330.

21           MR. MARRIOTT:  Thank you, Your Honor.  Vince

22   Marriott, again Ballard Spahr.  You went -- you did what I

23   was about to ask, and that was confirm the form of order

24   that you would be signing with the reservation of rights.

25           THE COURT:  Right.

1          MR. MARRIOTT:  If there's nothing further on the

2     fee application, might I ask that Ms. McClamb and I be

3     excused --

4          THE COURT:  Yes.

5          MR. MARRIOTT:  -- for the balance of the hearing?

6          THE COURT:  Yeah, that's fine.  Thanks.

7          MR. MARRIOTT:  Thank you.

8          THE COURT:  Okay.  All right.  I have one other

9     request before we get on to the other matter on the agenda,

10    which is the motion by Transform Hold Co., which is that

11    when the Debtors are coming up to the October hearing, you

12    file the status report, not on the eve of the hearing, but a

13    few days in advance so that people can focus on it and I can

14    focus on it to get a sense of where we're going.  There will

15    still clearly be a substantial open item, which is the

16    avoidance litigation, primarily the fraudulent transfer

17    avoidance litigation.  And hopefully, you'll have more

18    clarity on the appeals on the Transform litigation by then.

19          But I was informed at the last Omnibus hearing

20    that there had been active discussions with the

21    administrative expense group and the Debtors about potential

22    ways to expedite emergence, recognizing that those

23    litigations would continue and can continue under the trust

24    structure.  And I don't -- I don't know where those

25    discussions are and I'm not asking for any report on them

Page 32

1    today, but that's a topic that might well come up at the

2    next Omnibus hearing.

3            MR. FAIL:  Understood, Judge.

4            THE COURT:  Okay.  All right.  So, the other

5    matter on the calendar today is Transform Hold Co.'s motion

6    to enforce the Asset Purchase Agreement Approval Order or

7    the Sale Order.  I've read that motion and the objection by

8    Diana Arney, as well as the attachments or the exhibits to

9    it, and the status report.

10           I will note, and I think this -- I may need an

11   update on this, I may not -- that this motion relates to a

12   litigation pending in state court in Illinois.  But I have

13   attached to the response, or the objection, an order by

14   Judge O'Hara from July 26, which grants Transform SR Brands'

15   motion for stay pending my determination of this motion

16   before me, the motion to enforce.  I'm assuming there's no

17   other update for that, but could the parties let me know if

18   that's true, if that assumption is accurate?

19           MR. BAREFOOT:  Good morning, Your Honor.  Luke

20   Barefoot from Cleary Gottlieb for Transform Hold Co. and its

21   affiliates.  That's correct, Your Honor, the motion to stay

22   discovery in the Illinois action pending the outcome of

23   motion to just force -- to enforce was granted and that

24   remains the status.

25           THE COURT:  Okay.

1          MR. TANNEN:  Your Honor, Michael Murphy.  I'm

2     preliminarily honored to appear before you.  I've made it

3     very clear to the Debtor and to (indiscernible) that we're

4     not going to go down the discovery goat until you resolve

5     the motion.

6          THE COURT:  Okay.

7          MR. TANNEN:  I made it very clear.

8          THE COURT:  All right.  Thank you, Mr. Tannen.

9     All right.

10         And I -- I'm right, I think.  I mean, I -- we

11    checked this morning.  There's not been a reply by Transform

12    to the objection by the plaintiff in the Illinois action?

13         MR. BAREFOOT:  Your Honor, there was a reply filed

14    on the 22nd and it's at Docket item 9828.

15         THE COURT:  Huh.

16         MR. BAREFOOT:  It should be in Your Honor's

17    hearing binder.

18         THE COURT:  I think -- I actually didn't see -- I

19    don't have it in this binder.  The last thing I had in the

20    binder is a declaration by Kimberly Black.  I don't have a

21    legal -- I don't have a reply setting forth Transform's

22    legal arguments in response to the objection.  My clerk is

23    checking.

24         MR. BAREFOOT:  It is at Docket 9828, Your Honor.

25    I'm not sure what the problem with the binders is, but --

1           THE COURT:  I -- I've just been handed it to me.

2      It's just been handed to me.

3           MR. BAREFOOT:  Would Your Honor like to take a

4      short recess --

5           THE COURT:  Yes, I would.  Thank you.

6           MR. BAREFOOT:  -- so you have a chance to review

7      it?

8           THE COURT:  I would like to.  And I apologize.

9      I'll be back in about 10 minutes.

10          MR. BAREFOOT:  Very good, Your Honor.

11          THE COURT:  Okay.

12          (Recess)

13          THE COURT:  Okay.  This is Judge Drain.  I'm back

14     on the bench in, In re Sears Holdings Corp., et al., and I

15     apologize.  I actually had two binders.  I had one that I

16     guess had been prepared by the Debtor and then a separate

17     binder, which I guess came in from one of you two.  And only

18     the latter one had the reply to it, which I've not been

19     through as well as the supporting documents for that reply.

20          MR. TANNEN:  Your Honor?  Your Honor?

21          THE COURT:  Yes?

22          MR. TANNEN:  This is Michael Tannen, and I, as

23     I've said, got involved in this case very late in the game,

24     and there was a very accelerated briefing schedule.  I

25     wanted to make sure that you've received the status reports

Page 35

```
 1   --
 2           THE COURT:  Yes, I did.
 3           MR. TANNEN:  -- Docket 9845.
 4           THE COURT:  I did.
 5           MR. TANNEN:  I apologize for getting it to you.
 6   However, I felt it duty-bound to get it to you.  It's
 7   information that just came to us and that's why we sent it.
 8   And I'm glad you have it.
 9           THE COURT:  Right.  I do.  And it's relevant to
10   obviously, the basis for the objection, which didn't address
11   that basis when it was made.  But I think it's still
12   relevant in light of the case law.
13           Let me -- I'm happy to hear oral argument from
14   both of you.  But in large measure, I'm guided here I think
15   by In re Motors Liquidation Company, 829 F.3d 135 (2d Cir.
16   2016), which I think is the last word from the Circuit on
17   these types of issues which go both to the power of the
18   Court to issue an order that would cover this type of claim,
19   and also to the due process argument that has been made by
20   Ms. Avery.
21           So, again, I'm happy to hear brief oral argument.
22           MR. BAREFOOT:  Your Honor, Luke Barefoot from
23   Cleary Gottlieb again.  I'll be brief, guided by Your
24   Honor's comments.
25           Your Honor, I just want to walk through briefly
```

Page 36

1   the relevant provisions of the Sale Order that support the

2   relief that we're seeking.  And specifically, there's a

3   number of provisions where the Court made factual findings

4   that Transform was not a successor to the Debtors, that

5   Transform would not have entered into (indiscernible) or

6   consummated the transaction without the free and clear

7   provisions of the order and a finding that the consideration

8   paid by Transform reflected its reliant (indiscernible).

9         The Sale Order then goes on to say that Transform

10  would have no liability for any claims against the Debtors,

11  whether known or unknown, and separately ordered in

12  paragraph 27, that there would be no (indiscernible) for the

13  claims against the Debtors, including any successor

14  liability claims (indiscernible).

15        Your Honor, I -- just a few brief additional

16  points.  The claim here plainly arose before the petition

17  date.  While there has been some suggestion by Ms. Arney in

18  their -- her paper, that the claim didn't arise until the

19  injury manifested itself.  By definition, in pursuing a

20  successor liability claim, of necessity, that claim had to

21  exist in the first instance against the Debtors.

22        And given the breath of the Bankruptcy Code's

23  definition of claim, it clearly existed based on her

24  allegations when she purchased the dryer with what she

25  claims was a latent defect in (indiscernible).  Even though

Page 37

1   the claim did not manifest itself or become liquidated until

2   after the sale, that claim still existed as a contingent

3   unknown claim in 2008, (indiscernible) the dry was

4   (indiscernible).

5           In addition, Ms. Arney was an unknown creditor who

6   was only entitled to publication.  There was no information

7   that gave the Debtors or Transform reason to believe that

8   Ms. Arney had a claim, and the Court found that the -- in

9   its Sale Order, paragraph (indiscernible)(p) and paragraph

10  4, that publication notice was good, sufficient, and

11  appropriate.

12          THE COURT:  Well, can I -- can I interrupt you on

13  this point?

14          MR. BAREFOOT:  Please.

15          THE COURT:  The status report that was filed on

16  the -- on the 24th asserts with references to other

17  litigations that there was a known defect to this type of

18  appliance, and therefore, at least asks that I draw an

19  inference that Ms. Arney was entitled to actual notice as

20  opposed to publication notice, as per the Motors Liquidation

21  case.  What is --

22          MR. BAREFOOT:  Your Honor --

23          THE COURT:  -- what is your response to that?

24          MR. BAREFOOT:  Your Honor, the first of the --

25  there are two litigations that are cited in that status

Page 38

1    report.  And I want to just say at the outset, that while

2    it's characterized as a status report, we believe that it's

3    effectively an attempt sur-reply on grounds that certainly

4    could have been raised in the original timely objection but

5    were not.  So, I would ask that to the extent the Court

6    wants to rely on that, that we would have an opportunity to

7    respond.

8              But briefly, there are two litigations that are

9    cited in that -- in that status report.  The first of them,

10   the Roberts case, was the class action to which the Debtors

11   were in no way named or a party.  So, I don't see how a

12   litigation against other defendants would necessarily put

13   the Debtors on notice that any of the purchasers of any of

14   their products would have been known creditors.

15             The second one of those actions is an individual

16   case from 2015.  And that one did involve the Debtors and

17   was settled.  But I think it's a very slim read to say that

18   on the existence of a single product liability action that

19   the Debtors were then obligated to send specific notice to

20   the hundreds of thousands, or potentially millions, of

21   customers that purchased dryers from Sears.

22             And I think this is quite distinguishable from,

23   you know, the ignition switch litigation where the

24   evidentiary record that was before the Court established

25   that Debtors had extensive knowledge and detailed internal

Page 39

1   documents that made them specifically aware of the ignition

2   switch defect.  And they also were required to maintain

3   records under federal law of all of the purchasers of their

4   vehicles.

5        A single product liability action, having been

6   filed against the Debtors, it would be relatively

7   unprecedented to say that based on that, the Debtors, who

8   don't have the same requirements under -- that car

9   manufacturers were subject to under federal law -- were

10  somehow required to go out and provide very extensive

11  individualized notice to anyone who conceivably purchased a

12  similar product.

13       THE COURT:  Okay.

14       MR. BAREFOOT:  And, Your Honor, I'll just briefly

15  end by discussing the distinction between Grumman and Old

16  Carco.  You know, the -- Ms. Arney relies extensively on

17  Grumman and argues that it's directly on point.

18       We do not believe that it is.  First off, in

19  Grumman, there was no direct relationship between the

20  debtors and the plaintiff, who was making a product

21  liability (indiscernible).  Because in that case, the

22  plaintiff did not purchase the vehicle directly from the

23  debtors.  Instead, the debtors made a component part that

24  went into the vehicle.

25       So, in that context, it certainly makes sense to

Page 40

1    say that there would be a due process issue with publication

2    notice where even if the plaintiff had read the publication

3    notice not knowing where the component parts that went into

4    the car came from or were acquired, they wouldn't have a

5    reason to know that they had a claim or needed to take

6    action to reserve their rights.

7              By contracts, both here and in the Old Carco case,

8    there was a direct relationship.  Ms. Arney alleges that the

9    purchased the dryer directly from the Debtors, and

10   therefore, she would have had a reason to believe that upon

11   reading the publication notice, that she needed to take

12   action to protect her rights.

13             And unless Your Honor has any questions, I'll cede

14   the podium.

15             THE COURT:  I may after I hear from Mr. Tannen,

16   but not for now.  Thanks.

17             MR. BAREFOOT:  Thank you.

18             MR. TANNEN:  Thank you, Your Honor, for allowing

19   me to appear.  (indiscernible) 9,647 documents filed in this

20   case for the bankruptcy came into my life.  I viewed all the

21   applicable caselaw, and we believe that this boils down to

22   just several elemental questions.

23             Did Ms. Arney have a right to payment when the

24   bankruptcy was filed and the sale confirmed?  I think the

25   answer to that is no because she had not been injured yet,

1    and no injury had manifested itself, which is why I think

2    Sears's reliance on asbestos cases are not helpful.

3            In re Carco was an extended warranty case with

4    prior recall notices, and the Court premised its belief or

5    its finding on notice grounds that it's reasonable to expect

6    that someone who buys a car on a warranty contract is

7    actually going to get service.  The idea that the

8    prepetition relationship is the touchstone for this I think

9    is not consistent with the law as I've read it.

10           THE COURT:  Well --

11           MR. TANNEN:  Did Ms. Arney have a Section 105

12   claim --

13           THE COURT:  What is your take on the Motors

14   Liquidation cases determination that claimants who had

15   economic damages claims, i.e. their car was worth less

16   because of the post-bankruptcy sale publicity of the

17   ignition switch defect, would have a claim that could be

18   covered by -- or would be covered by the free and clear

19   order, even though they didn't know of that defect until

20   years after the sale order?

21           MR. TANNEN:  Your Honor, are you talking about the

22   2016 case you cited earlier, the last pronouncement --

23           THE COURT:  Yeah.

24           MR. TANNEN:  -- by the Second Circuit?

25           THE COURT:  Yes.

Page 42

1            MR. TANNEN:  The Second Circuit, at the end of its

2    opinion, specifically preserved any discussion at all about

3    situations where someone was injured post-confirmation from

4    a prepetition product.  And I personally believe that these

5    extended warranty cases and ignition switch cases are

6    (indiscernible) because they're grounded in service

7    warranties where it's reasonable to expect that everyone is

8    going to get their car fixed.  I don't think Sears is going

9    to admit that they -- that they knew of this hazard.

10           And I have a-- this is something that the Second

11   Circuit, the Southern District of New York, and courts

12   throughout the country have been grappling with, and she

13   didn't know she had a claim, and they chose not to advise

14   her about it.  And I just uncovered a nationwide class

15   action lawsuit involving their business partner, Electrolux,

16   that formed a class of people --

17           THE COURT:  I understand, but that's a different

18   argument.  That's a due process argument, and I understand

19   that argument.  I mean, car -- I'm sorry -- Motors

20   Liquidation also held that if a Debtor knows of a claim that

21   could be asserted by a particular creditor, a particular

22   party, they need actual notice, not publication notice.

23           And they -- the circuit in part relying on other

24   applicable law and the facts as developed to that point

25   reasoned that Judge Gerber's determination that, in fact, GM

Page 43

1    did have the ability to identify individual buyers meant

2    that -- which they upheld not an abuse of discretion -- but

3    that meant that there wasn't due process notice of the sale,

4    of the free and clear sale.

5            But that's different than saying that a claim like

6    this that someone didn't experience until after the sale

7    would not be subject to the free and clear nature.  They're

8    two different points.

9            And I do want to address your due process point at

10   some length, but I just don't -- I think the -- I appreciate

11   the law may be different in other circuits, but I think that

12   in the Second Circuit it's pretty clear that if you buy a

13   product before a bankruptcy sale, you will have a -- and

14   your product causes an injury after the sale, and the sale

15   order is drafted to be free and clear of successor liability

16   that you have the type of claim that would, in fact, not

17   survive that order.

18           And there may -- you know, under particular facts,

19   there may be some sort of claim against the buyer because it

20   assumes some sort of legality under warranties, or it had

21   some -- its own duty to warn, something like that, under

22   applicable law.  But it doesn't appear to me that the law in

23   the second circuit is such that a person like Ms. Arney,

24   whose product was purchased presale and had a defect that

25   caused either economic or actual physical injury can get out

Page 44

1   from under a free and clear order just because of that fact

2   pattern, i.e. they didn't have the injury until after the

3   sale.

4           MR. TANNEN:  Your Honor, I hear what you're

5   saying, but I must disagree with it.  And before I go

6   further, this is based on the assumption that Ms. Arney

7   purchased the dryer, which is the -- apparently the entire

8   basis for this prepetition relationship.

9           THE COURT:  Right.

10          MR. TANNEN:  I have been conducting my own

11  investigation, and it could well be -- and I think it's true

12  -- that the dryer was purchased for her family, and she's an

13  intended user.  I'm getting -- we don't allege in the

14  complaint that she purchased it, but what I'm saying is if

15  she purchased it, her claim would be barred.  If she's an

16  intended user, her claim wouldn't be barred.

17          I just think that the second circuit and all these

18  cases that we've cited throughout our brief talk about the

19  actual and metaphysical problems of what a claim is when

20  someone has not even yet been injured.  What Sears is saying

21  is her claim was over the second she purchased the -- if she

22  purchased the dryer, and I don't the cases hold for that.  I

23  think the Chateaugay -- I can't pronounce it.

24          THE COURT:  Chateaugay.

25          MR. TANNEN:  Chateaugay and In re Grumman, the

Page 45

1    cases we cite talk about this netherworld where someone is

2    injured by a product that's manufactured and sold

3    prepetition, and the injury manifests itself, and they're

4    injured post-sale confirmation.

5            THE COURT:  But the --

6            MR. TANNEN:  And I think the case is --

7            THE COURT:  But the principle that the circuit

8    adopts -- and it was adopted also before then, you know, In

9    re Old Carco, which was by the same judge -- Judge Bernstein

10   -- that authored the bankruptcy court Grumman ruling -- is

11   that there must be some contact or relationship between the

12   debtor and the claimant such that the claimant is

13   identifiable, and a purchase relationship is such a

14   relationship.

15           That's what they hold in Motors Liquidation three

16   paragraphs below there.  The economic -- where they say the

17   economic loss claims arising from the ignition switch defect

18   or other defects present a closer call than those who had

19   accidents before the sale.  But then they say like the

20   claims of pre-closing accident plaintiffs, these claims flow

21   from the operation of Old GM's automaker business.  These

22   individuals also, by virtue of owning Old GM cars, had come

23   into contact with the debtor prior to the bankruptcy

24   petition.

25           And they say that the -- those claims would be

Page 46

1    covered by the free and clear sale because they had that

2    relationship.  And similar in Old Carco -- In re Old Carco,

3    Judge Bernstein says anyone who owns a car contemplates that

4    it will need to be repaired.  That was a repair claim as

5    opposed to, you know, an exploding dryer claim.  I

6    understand that different.

7             But the key was that there was that relationship,

8    and the folks in the GM switch litigation who represented

9    the economic loss claimants made the same argument that you

10   made, which is that, well, yes, but in Old Carco, Old Carco

11   had already issued recall notices for certain Durango and

12   other Old Carco vehicles, and Judge Bernstein does say that

13   in Carco, but then in both the bankruptcy court and district

14   court onions in the GM switch litigation, Judge Gerber at

15   the bankruptcy level and the district judge at the district

16   level said Carco was right, and that the fact that there had

17   been recall notices was irrelevant.

18            The relevant point was the relationship, the

19   buyer-seller relationship.  And in fact, as the district

20   court pointed out, the people that were complaining before

21   it didn't get that recall notice because it was for a

22   different car.  The real key was just the prepetition

23   relationship -- the presale relationship, and that's In re

24   GM Liquidations switch litigation 257 F.Supp.3d 372-402

25   (S.D.N.Y. 2017).

Page 47

1          And Judge Gerber's discussion of Old Carco where

2     he distinguishes Old Carco on the due process point is at In

3     re Motors Liquidation Co., 529 B.R. 510-559360 (Bankr.

4     S.D.N.Y. 2015)

5          I mean, I think you're right.  The courts have

6     grappled with this, and it does get pretty metaphysical, but

7     Chateaugay's reference was to a bridge.  No one knows --

8     just because you're going to cross a bridge sometime in the

9     future doesn't give you a relationship with the people that

10    built the bridge.

11         You know, it's a matter of pure chance.  I think

12    they probably had in mind when they came up with that

13    hypothetical the bridge over -- the bridge over Saint Luis

14    Rey by Thornton Wilder, which is all about the effects of

15    chance on people.  You know, they just happened to cross the

16    bridge, these six people.  Very little in common with

17    anything to do with the bridge.  It just collapsed when they

18    happened to be on it.  You couldn't expect them to have a

19    claim because, you know, they didn't have a relationship.

20         At some level, it seems unfair.  At a pretty basic

21    level, it seems unfair.  But if you have a product, you

22    know, I guess where the Second Circuit is coming out,

23    subject to due process issues which we have to discuss

24    still, is that, look, if there's publication notice, that's

25    enough.  And they're not alone.  I mean, the Chemetron case

Page 48

1    from the Third Circuit held this a long time ago, 72 F.3d

2    341 (3d Cir. 1995) as far as due process notice where you

3    don't know the potential claimant.

4            So I think for this circuit, that argument, unless

5    there are distinguishing factors, like did Transform somehow

6    assume the warranty liability, or did Transform under some

7    non-bankruptcy law duty of care as the purchase have some

8    duty to warn, something like that.  Or was Ms. Arney someone

9    who should've gotten actual notice because of Sears's

10   knowledge of a problem with the dryer?

11           But none of that is really in the facts except for

12   the inference you're asking me to draw in the supplemental

13   pleading that you filed.

14           MR. TANNEN:  Well, Your Honor, I -- in my brief,

15   initially I called Diane Arney a future tort claimant who

16   was unidentified and unidentifiable.  Either --

17           THE COURT:  Well, that's not a good fact for you

18   though.  If she was identifiable, then she should've gotten

19   actual notice, but --

20           MR. TANNEN:  Well, that's why this discovery of

21   these class action -- this nationwide class action lawsuit,

22   which was prepetition, pre-sales order formed a class of

23   folks which included Ms. Arney --

24           THE COURT:  Right.

25           MR. TANNEN:  -- which required notice to be sent

Page 49

1    by actual notice -- as best as I can tell based on my

2    invitation, actual notice was to be sent by -- to people

3    whose addresses were known to Electrolux.  The reason why we

4    cited that Member Select case is that Sears controlled all

5    of the information as it relates to its own customers and

6    its own warranties.

7              And so I keep on returning to the fact that what

8    at bottom here Sears is seeking, new Sears, is an

9    injunction.  And it's based on the fact that she was either

10   completely unknown to old Sears, which I think may not be

11   true, or she was known and she wasn't listed or identified.

12             She's -- she -- the practical effect of what's

13   going on here is her claim was extinguished even before she

14   was injured or knew she had an injury by virtue of the fact

15   that she bought a dryer.  And I think the ignition switch

16   cases and the Carco cases in the -- in the first instance

17   are grounded in reasonable foreseeability, warranty, and

18   contract law that these people bought warranties.  They

19   expected their cars to be fixed.  She didn't expect her

20   dryer to explode.  Her claim is being vaporized before she

21   was even injured.  That's very troubling to get an

22   injunction to prevent her from even trying to establish

23   successor liability.

24             THE COURT:  Well, let's focus on the due process

25   point.  It was raised in the supplement, the notice part,

Page 50

1    that she should've gotten actual notice.

2          The record in that supplement isn't -- it doesn't

3    leap out at you that Sears knew or should have known of her

4    potential -- the potential that she would be injured by this

5    product.  On the other hand, I don't know what opportunities

6    you had to take discovery or to learn the facts as to what

7    Sears knew or should have known.

8          MR. TANNEN:  May I address that, Your Honor?  Yes.

9    That -- if you're talking about the class action lawsuit

10   that we cited, this is -- this is kind of my whole point is

11   that when Sears declares that Sears the Debtor had no reason

12   to believe that Ms. Arney was a future tort claimant,

13   everyone's accepting that as gospel and then extinguishing

14   her rights.

15          And one of the conversations I had with Mr.

16   Barefoot before I filed my reposes is, you know, a lot of

17   times these matters are thrashed out through adversary

18   complaints, and there's something very summary -- not E-R-Y

19   but a summary determination through a motion to enforce.

20          What if it turns out -- what if it turns out that

21   in this class action property damage lawsuit, Kenmore and

22   Sears got actual notice of dryer fires?  What if they find -

23   - what if we find out that Sears actually knew of this

24   nationwide class action lawsuit involving its iconic Kenmore

25   brand, which pursuant to contract they protected zealously?

1      I think the record's undeveloped, Your Honor.  And to

2      proceed to enjoin her, I think it's a harsh remedy.

3              THE COURT:  Well, there's already an injunction.

4      I mean, there's a -- the sale order itself is an injunction,

5      so it's really -- and this is a point that Motors

6      Liquidation makes.  I am just -- I am being asked to enforce

7      an existing order that has an injunction in it.  So it's not

8      an injunction of an injunction.  It's not a new injunction.

9              But going -- I want to go with your hypothetical.

10     The motion was filed July 13th, and we're here on September

11     27th.  That's not the length of time that a plaintiff in a

12     lawsuit in, you know, X v. Y type litigation generally has

13     to deal with developing facts.  On the other hand, there is

14     this existing order, and it would seem to me that the proper

15     vehicle for you to deal with that hypothetical, if it ever

16     becomes true, would be a motion to vacate an order enforcing

17     sale --

18              MR. TANNEN:  A motion to vacate which order?

19              THE COURT:  An order enforcing the sale order, an

20     order granting this motion.  In other words, if I determined

21     that what you've offered up to date is not enough to show

22     that Ms. Arney should've gotten actual notice, and she

23     should've instead have just gotten publication notice, which

24     I've found was adequate, if you learn later of facts, then

25     you're always free within the time prescribed by Rule 60 to

Page 52

1    move to vacate an order.

2           There's a standard for that.  You know, should you

3    have known or could you have known of those facts before

4    today?  But if it's newly discovered evidence that couldn't

5    have been discovered reasonably before this hearing, then

6    what you've just outlined would be a clear basis to vacate

7    the order because you've learned new facts, which is --

8           I mean, it's been asserted to me by Transform that

9    there was no knowledge of this problem with the dryer, and

10   therefore they didn't need to give -- Sears didn't need to

11   give actual notice.  What you've asserted really, I think,

12   requires me to make an inferential leap that I'm not sure

13   I'm ready to make here, unless you can point out to me

14   something -- and I want to give you the chance to do that

15   during this argument -- which is Kenmore is the

16   manufacturer.  How does Sears know of the problem if it's

17   not the manufacture?  It's not GM, for example, that tested

18   the ignition switch.  You know, if it did or it's not Dodge

19   that trust the fuel line or was aware of the fuel line

20   problems in the cars at Old Carco.

21          So I think that's a step that's hard for me to

22   take.  But I can infer that it knew that because Kenmore

23   settling a lawsuit against it --

24          MR. TANNEN:  Your Honor, what happened was it was

25   a class action lawsuit against Electrolux, the manufacturer

1    --

2              THE COURT:  I'm sorry.  Electrolux.  Excuse me.

3    Electrolux.

4              MR. TANNEN:  And so the reason why I attach the

5    Member Select case was there are contracts which vested

6    remarkable ability and gave contractual rights to Sears to

7    approve everything, to dictate everything, and to know

8    everything.

9              THE COURT:  Well, can you point out to me where

10   they -- those rights would've given Sears the ability to

11   know of manufacturing defects that were identified in the

12   lawsuit that was settled?

13             MR. TANNEN:  There were -- within the sales,

14   within the contracts between Electrolux and Sears,

15   Electrolux had reporting requirements.  Sears could come in

16   and check out the manufacturing process.

17             THE COURT:  Well, where is that --

18             MR. TANNEN:  They had --

19             THE COURT:  Where is that?  I want to make sure I

20   have that in the record.

21             MR. TANNEN:  Well, hold on, Your Honor.

22             THE COURT:  Okay.

23             MR. TANNEN:  So judge -- the judge in the federal

24   court case involving a situation where Sears had withheld

25   the agreements between it and Electrolux, we (indiscernible)

Page 54

1    cited it in our brief that the universe -- uniform terms and

2    conditions gave Sears the right to receive from Electrolux

3    information about the methods of manufacturing products, the

4    right to inspect its production facility, the merchandise

5    being manufactured.

6              The supply agreement gave Sears the right to

7    require Electrolux manufacture products for Sears according

8    to specifications set forth in the agreement, to approve any

9    changes to products, to require that testing be done.  And

10   then Electrolux awes actually supposed to train Sears

11   personnel about how to answer questions and service dryers.

12   And so in this class action that settled in 2015, Electrolux

13   was supposed to train Sears personnel about how to better

14   clean the dryers to prevent that accumulation of lint.

15             MR. BAREFOOT:  Your Honor, could I respond to this

16   point?

17             MR. TANNEN:  Excuse me, Mr. Barefoot, I'm still

18   speaking.

19             THE COURT:  I'm sorry.  I know that you refer to a

20   potential joint venture --

21             MR. TANNEN:  Yes.

22             THE COURT:  -- between Electrolux and Sears.

23             MR. TANNEN:  Yes.

24             THE COURT:  But where is the rest of this coming

25   from?  What document is it in that you've submitted to me?

1           MR. TANNEN:  Well, Your Honor, I'm going to say

2   somewhat defensively we just found out about this class

3   action lawsuit, and I've been speeding along to try and

4   provide the Court with --

5           THE COURT:  No, I --

6           MR. TANNEN:  -- information.

7           THE COURT:  That's fine.  I'm just trying to

8   figure out where this -- what you're reading from, where is

9   it?  Is it in something you've given me already?

10          MR. TANNEN:  Yes, yes.  I'm sorry, Your Honor.  We

11  attached the -- we attached the uniform terms and conditions

12  and the supply agreement to Exhibit 3 to our status report.

13  It's in seven-point font.  It's hard to read, but the clear

14  impact of the relationship between Sears and Electrolux is

15  Sears says "jump," and Electrolux says, "how high?"

16          There was a call center maintained by Electrolux

17  for Sears customers.  Sears held on to all the warranty

18  claims and purchase information of Electrolux dryers.  What

19  we've learned in discovery so far, Your Honor, is Electrolux

20  does not -- the name Electrolux does not appear in any of

21  the consumer product literature, the safety manual, the use

22  and care manual.  Electrolux was behind the scenes.

23          This is Kenmore's iconic brand.  Sears protected

24  it, and I think it's extremely premature, in my view in

25  light of these facts and inferences, to say that -- to

1    accept that Sears had no reason to know, and to foist upon

2    us the duty of Rule 60, I don't know, Your Honor.  It seems

3    very harsh based on this.

4            And one more thing, Your Honor.  What if it does

5    turn out, as it might, that if Diana Arney is a record owner

6    of the home, but what if her -- which I think is going to

7    show her daughter ordered the dryer online on Black Friday,

8    and it was brought to her house, so she's an intended user.

9            THE COURT:  Again, that's a -- look.  We only

10   decide things that are before us.  Those facts will raise

11   literally at 12 noon today.  They're not even asserted

12   before in either of the pleadings that are filed.

13           MR. TANNEN:  I under -- I recognize that, Your

14   Honor.  I recognize that, Honor, but there is a tremendous

15   amount at stake for Ms. Arney.

16           THE COURT:  Well, I understand that.

17           MR. TANNEN:  And Your Honor, it's been two months

18   since the motion was filed.  I've been all over this case

19   trying to learn information.  You've seen the letters that

20   I've tried to get information from Sears.  And all of this

21   is premised on Sears ipse dixit declaration that they had no

22   reason to know of Diane Arney's identity, existence, or type

23   of claim.

24           I think that I've clearly shown that that might

25   not be true.  I've distinguished the caselaw that tort

Page 57

1    claims like this as opposed to asbestos claims or mass tort

2    claims, or warranty claims, that this is different.  This is

3    carved out in the Second Circuit case in 2016.  It wasn't

4    answered by Grumman because it was not ripe.  I think it's

5    right in -- this is the fact pattern that the Second Circuit

6    and the Southern District of New York has been grappling

7    with.

8              THE COURT:  Okay.

9              MR. BAREFOOT:  Your Honor, could I respond to this

10   due process point relative to the supplement, please?

11             THE COURT:  Sure, but I think, Mr. Tannen, you

12   were pretty much finished except in responding to whatever

13   Mr. Barefoot has to say.

14             MR. TANNEN:  Well, except, Your Honor, that this

15   supply agreement has numerous exhibits.  There are documents

16   out there I haven't seen yet, and a federal court has

17   already ruled about Sears' very strong authority and ability

18   to dictate the entire relationship between it and

19   Electrolux.

20             Her claim is being extinguished before she was

21   even injured, before she even knew she was injured, and

22   without any notice whatsoever, particularly when there was a

23   class action lawsuit, Your Honor, which required actual --

24   which required Kenmore, which is Sears, to send out post-

25   manufacture warnings about these dryer fires.

1          This -- I don't know, Judge.  This is -- I've read

2     every single case --

3          THE COURT:  So you haven't --

4          MR. TANNEN:  I just -

5          THE COURT:  You haven't looked into yet how

6     Kenmore went about giving those notices, right?

7          MR. TANNEN:  I am looking into it, Your Honor.  I

8     want to tell you that the case -- we've discovered the case.

9     I was talking to class counsel as late as Friday, and there

10    was a claims administrator, and notice was -- she said in

11    her report to the Court that 660,000 notices would be sent

12    out after 2015 specifically notifying class claimants of the

13    class action settlement.  A questionnaire was to be given

14    about whether they had had a dryer fire.

15         These amplified notices were supposed to be sent

16    out.  I don't know as I sit here today whether Kenmore

17    customers were given actual notice.  One of my sayings, Your

18    Honor -- and I have many -- is that even hypochondriacs get

19    sick, and I think it's possible that Kenmore -- Sears and

20    Kenmore knew about this litigation, and they fought to not

21    have actual notice sent to Ms. Arney, so she had no notice

22    of the class action lawsuit, no notice of the bankruptcy, no

23    notice of the motion to approve the plan, and her rights

24    were extinguished before she had an injury.

25         Now, based on your prior comments, I think you're

1    about to tell me that all those things are the perfect

2    recipe for you to conduct a bunch of discovery and come back

3    to you, you know, a year from now.  But I have not seen that

4    remedy set forth in any of the cases that I've read, and I

5    think it's very problematic to accept Sears' declaration

6    that they had no knowledge.  She didn't have a right to

7    payment when her -- when the bankruptcy was filed.

8            THE COURT:  Well, in Motors Liquidation, there was

9    a whole report on what GM knew, and when, and the like.  So

10   there was a well-developed factual record.

11           MR. TANNEN:  And I think, Your Honor -- and

12   correct me if I'm wrong.  I'm not sure if that arose in the

13   motion to enforce context or in adversarial context.

14           THE COURT:  No, in the --

15           MR. TANNEN:  I don't --

16           THE COURT:  I think they were going back and forth

17   the whole time.

18           MR. TANNEN:  But what did Sears know, and when did

19   they know it I think is important to resolving this issue.

20   And I've been on this case for two months, and the sale was

21   accomplished in five months.  And new Sears cited zero cases

22   in their motion to enforce.  They're threatening my client

23   with sanctions.  They're saying we're being disingenuous,

24   and they may be sitting on reams, and reams, and reams of

25   information.  And she -- I don't know if we've gotten to the

Page 60

1      due process argument.  She hasn't gotten any.

2              THE COURT:  Okay.  So Mr. Barefoot?

3              MR. BAREFOOT:  Just very briefly, Your Honor.  I

4      think with respect to the cases that are cited in the

5      supplement, the Roberts case that was the class action Mr.

6      Tannen referred to, Sears was not a party to that case, so I

7      think it's a mischaracterization to say that Kenmore or

8      Sears were required by the settlement decree there to send

9      out notices.  Sears was not a party, and that's not what the

10     settlement order says.

11             As to the second case, it was a discovery issue.

12     There was no finding in that case as to whether the

13     plaintiffs would ultimately prevail, and certainly no

14     finding as to whether the provisions of the supply agreement

15     that Mr. Tannen has referred to were actually used or

16     implement.

17             And those processes -- you know, he pointed out a

18     number of remedies and rights in that supply agreement that

19     Electrolux -- or Sears had as to Electrolux.  There's no

20     indication -- first off, none of those refer to notices that

21     Electrolux would be required to deliver to Sears or vice

22     versa concerning a product's liability.  And there's

23     certainly no finding that any of those potential channels of

24     communication were ever used.  And I think that's a very

25     important distinction between the ignition switch case and

Page 61

1   the very slim read of one product's liability case having

2   been filed against the Debtors prepetition with no findings

3   of liability.

4           In the ignition switch case, GM admitted that they

5   had knowledge.  There was an extensive documentary record of

6   that, and they issued recall notices.  They admitted that

7   there was a product defect.  It's quite a different

8   situation when you have a single plaintiff.

9           THE COURT:  Well, why shouldn't I give Mr. Tannen

10  a limited opportunity to take discovery as to what notice

11  Sears had of the lint issue or lint problem with Electrolux

12  dryers.  And included within that would be whether, as part

13  of the notice program -- so you can have it pinpointed to

14  that period -- Sears was aware of the what would appear to

15  be pretty extensive notice to potentially a lot of their

16  customers since, I think I can reasonably infer that

17  Electrolux dryers were sold a lot by Sears, and including

18  whether, you know, their customer records were used as part

19  of that notice program.

20          I mean, to me, that's not the type of discovery

21  that you're concerned about in the Illinois state court

22  litigation, which is discovery going to the merits of

23  whether there's a successor liability claim.  This is

24  discovery as to whether there was a due process notice to

25  Ms. Arney.  So that would be discovery in the auspices -- or

1    under the auspices of this motion, this -- you know, this

2    dispute.

3          I appreciate -- I think your answer's probably

4    going to be, "Well, they could've done that over the last

5    couple of months," but I -- frankly, if I granted your

6    motion, I have the feeling that Mr. Tannen will be able to

7    arguably get some other facts anyway and come back to me

8    seeking a motion to vacate.  So my inclination is probably

9    to give him, you know, a couple of months to have that

10   targeted discovery.

11         MR. BAREFOOT:  Your Honor, if that's your ruling,

12   we'll of course respect that.  I'm not sure that we need a

13   couple of months for what I think you're characterizing

14   would be --

15         THE COURT:  Well, I think it would be -- I would

16   say normally if it was just discovery between new Sears and

17   Ms. Arney, I might agree with you, but I think there's going

18   to be third parties involved here.  You know, Electrolux,

19   Kenmore, maybe someone who --

20         MR. BAREFOOT:  Your Honor --

21         THE COURT:  -- can be identified as a relationship

22   person who's no longer at new Sears.  So I think it probably

23   will take longer than you want.

24         MR. TANNEN:  Your Honor, I will work with all

25   deliberate speed to get to the bottom of this through what I

Page 63

1    will call fracking of court records all over the country.

2    But --

3              THE COURT:  First I thought you were just pausing

4    in thought, but I think you're frozen on the screen.

5              MS. MARCUS:  Your Honor, maybe this is a good time

6    for me to intercede.  Jacqueline Marcus, Weil Gotshal &

7    Manges on behalf of the Debtors.

8              I've been quiet all morning, Your Honor, because

9    this issue largely doesn't involve the Debtors, as Mr.

10   Tannen had indicated earlier.  He stated on numerous

11   occasions that Ms. Arney is not pursuing the Debtors.  But

12   when we start talking about discovery, I get a little bit

13   concerned (indiscernible) conversation regarding

14   professional fees because as Your Honor may be aware,

15   substantially all of our books and records were transferred

16   to Transform in connection with the sale.

17             THE COURT:  Right.

18             MS. MARCUS:  And therefore, we don't have any

19   records.  And I'd like to, as best we can, insulate the

20   Debtors from trying to effectively duplicate.  If Mr. Tannen

21   seems to seek discovery from Transform, I assume that will

22   largely encompass the records that were turned over from

23   Sears to Transform, and therefore the Debtors don't have to

24   participate in that effort.

25             THE COURT:  Right.  Well, look.  Both you and Mr.

Page 64

```
1    Barefoot have been involved in litigations in this case with
2    me.  I know that the two of you will work constructively to
3    avoid duplication.
4            Mr. Tannen has not appeared before me before, but
5    he looks like he really knows what he's doing too, so I
6    expect all three of you to coordinate the discovery to
7    minimize, you know, duplication of effort, to have the meet-
8    and-confers in advance so that you can sort of focus on how
9    to target this.
10           Again, the data mining of, you know, for potential
11   lawsuits doesn't involve either new Sears or old Sears.  It
12   does seem to me that targeted discovery could be clearly had
13   as far as the notice program that we've been discussing in
14   connection with the lawsuit, how that was done, and of
15   course at around that time would be the logical time that
16   Sears would've been informed of this type of problem, if
17   they were informed.  So I think it can be pretty targeted.
18           MR. TANNEN:  Your Honor, I just had my internet go
19   in and out, and I didn't hear what Ms. Marcus said.  I
20   apologize.
21           THE COURT:  All she --
22           MR. TANNEN:  I didn't hear --
23           THE COURT:  That's fine.  All she was saying is
24   she would hope that since the Debtor Sears, old Sears,
25   really doesn't have any former employees who would be
```

Page 65

1    involved in this or books and records that would relate to

2    it since those were transferred to new Sears that you would

3    coordinate so that the discovery burden would be minimal on

4    old Sears.  And that's why I was responding the way I did.

5           MR. TANNEN:  Okay.  Your Honor, two more points,

6    and I'm supremely grateful that you've allowed me to speak

7    as much as I've been able to today.

8           There's two other issues.  And what this began

9    with for me initially is a search for applicable insurance

10   proceeds that might be able to be applicable here, and I

11   think this is relevant.

12          Sears claims that the policy that was triggered is

13   a 2008 policy when the dryer was manufactured and sold.  I

14   happen to believe that under a current policy, that

15   should've been a policy when the injury occurred.  I'm being

16   informed that new -- old Sears has no insurance going

17   forward, that they got no tail coverage whatsoever, and this

18   is kind of what sent me, you know, down this path.  But I do

19   think it's relevant because it's conceivable that through

20   the sale order with no notice to my client, her rights were

21   extinguished.

22          The second point I wanted to add --

23          THE COURT:  But I think that's why they don't keep

24   spending money for insurance, because they were relying on

25   the sale.  But anyway.

1          MR. TANNEN:  I got that.  And then the second

2     point, Your Honor, which if it's true, we will establish it

3     via affidavit, but if Ms. Arney was not the actual purchaser

4     of this dryer, that in fact it was her daughter, that

5     undercuts the prepetition relationship argument --

6          THE COURT:  I don't know.

7          MR. TANNEN:  -- potentially.

8          THE COURT:  Potentially it does.  But that --

9     you're right.  That is a potential fact issue.  On the other

10    hand, it's a little different than someone who buys a used

11    car and later claims loss of economic value.  I mean, if

12    they're -- so it's a fact issue.  But that's something that

13    you and Transform may want to have discovery on too,

14    clearly.

15         MR. TANNEN:  Okay.

16         THE COURT:  Yeah.

17         MR. TANNEN:  Thank you, Your Honor, for all the

18    time.

19         THE COURT:  All right.  So I have a motion by

20    Transform SR Brands LLC, which is the Defendant, in a

21    lawsuit pending in state court in Illinois asserting

22    successor liability on behalf of Diana Arney, A-R-N-E-Y.

23    The underlying facts of the lawsuit are that Ms. Arney had a

24    clothes dryer purchased from Sears that is alleged to be the

25    cause of a fire that caused substantial property damage and

Page 67

1    personal injury.

2         The washer-dryer was manufactured by a company

3    called Electrolux.  The fire occurred after the date of the

4    sale of substantially all of the Sears Debtor's assets to

5    Transform Holdco, which I approved by an order dated

6    February 8, 2019.  That order contains findings in Paragraph

7    M that the buyer that would have no successor or other

8    derivative liability, and in Paragraph P that there was due

9    insufficient notice of the proposed sale, which was a free

10   and clear sale under Section 363(f) of the bankruptcy code.

11        The order then went on to provide in Paragraph 4

12   that such notice was adequate, appropriate, fair, and

13   equitable under the circumstances, provided in Paragraph 19

14   that the sale would be free and clear under Section 363(f)

15   of the bankruptcy code of essentially all liens, claims, and

16   interests, claims being very broadly defined in coterminous

17   with the definition of claim in Section 101(5) of the

18   bankruptcy code.

19        And then specifically also provided in Paragraph

20   27 that the buyer and the buyer-related parties and their

21   affiliates and successors (indiscernible) shall not be

22   deemed or considered to be a legal successor, a de facto, or

23   otherwise merged, be the alter ego of, etc.  In essence, a

24   determination that there would be no successor liability.

25        The motion therefore seeks a determination that

Page 68

1   the Illinois lawsuit by Ms. Arney is barred by the sale

2   order.  And it does appear to me that, at least for purposes

3   of this ruling, the root cause of the injuries as alleged in

4   the complaint, the dryer, was indeed purchased before the

5   sale to Transform, and that because of that, at least before

6   me today, purchase relationship between the Plaintiff, Ms.

7   Arney, and the Debtor, Sears, a claim arising from the dryer

8   would be barred by the sale order.

9           The Second Circuit has grappled with fact patterns

10  like this for many years now in a bankruptcy context but

11  lent a great degree of clarity to the issues in In re Motors

12  Liquidation Company, 829 F.3d 135 (2d Cir. 2016).

13          There, the Court dealt with a similar fact

14  pattern, a motion by a purchaser in a Section 363(f) free

15  and clear sale, in that case referred to as new GM, to

16  prevent further litigation by various plaintiffs who alleged

17  -- among other things but this is -- these are the

18  allegations that are relevant as far as that opinion in this

19  matter before me -- that while they purchased their car from

20  old GM before the 363(f) sale, they became aware of the

21  defect in the product, namely a faulty ignition switch that

22  would at times cause cars, including running at full speed,

23  to stall or turn off.  And therefore, it caused serious

24  physical injuries as well as economic damage.

25          The Court dealt with certain arguments that are

Page 69

1    raised in Ms. Arney's objection to Transform's motion in

2    that context.  First, it concluded that the Court, that is

3    the bankruptcy court and therefore the federal courts

4    through the appeal process -- had subject matter

5    jurisdiction under 28 U.S.C. Section 1334(b) in that the

6    dispute arose in the bankruptcy case, which the Court

7    determined at least included disputes that would have no

8    existence outside of the bankruptcy.

9            And here, as in the Motors Liquidation case, the

10   dispute involved the interpretation and enforcement of the

11   prior sale order, and "An order consummating a debtor's sale

12   of property would not exist but for the Code."  Therefore,

13   the Court plainly has jurisdiction to interpret and enforce

14   its own prior orders.  829 F.3d at 153, citing, among other

15   cases, Travelers Indemnity Co. v. Bailey, 557 U.S. 137, 151

16   (2009).

17           The next issue that the Court dealt with was the

18   precise -- was not withstanding, rather, that Section

19   360(3)(f) does not precisely define an interest in property

20   that a 360(3)(f) sale would be free and clear of, but the

21   Court concluded, as had prior courts in the Southern

22   District of New York, as well as circuit courts nationwide,

23   that successor liability claims would qualify as claims

24   under Chapter 11, through the definition of 11 U.S.C.

25   Section 1015 and Section 363(f) extended to, or extends to,

Page 70

1    claims.  In Re Motors Liquidation, 829 F.3d 155, citing

2    among other cases, In re Trans World Airlines, Inc., 322

3    F.3d 283, 289 (3d Cir. 2003).  That had generally been the

4    approach of courts, as I noted, in the Southern District of

5    New York, even before the Motors Liquidation case.  See, for

6    example, Burton v. Chrysler Group, LLC (In re Old Carco

7    LLC), 492 B.R. 392, 402-403 (Bankr. S.D.N.Y. 2013).

8            The Court then grappled with the fundamental issue

9    as to how far the definition of claim should be taken in a

10   363(f) context.  The Second Circuit noted that claim is

11   defined quite broadly and includes any right to payment,

12   whether or not such right is reduced to judgment,

13   liquidated, unliquidated, fixed, contingent, matured,

14   unmatured, disputed, undisputed, legal, equitable, secured

15   or unsecured.

16           It noted that it had come up to the point of

17   recognizing the issue, but not deciding it in In re

18   Chateaugay Corp., 944 F.2d 997, 1005 (2nd Cir. 1991), but

19   then in a later opinion in the same case had recognized that

20   claim could not be infinite and have to have some limits to

21   it to avoid enormous practical and perhaps constitutional

22   problems.  In re Chateaugay Corp., 53 F.3d 478, 497.

23           In reviewing the case law then, including those

24   decisions, the Circuit stated as follows:  "To summarize, a

25   bankruptcy court may approve a Section 363 sale free and

Page 71

1   clear of successor liability claims if those claims flow

2   from the debtor's ownership of the sold assets.  Such a

3   claim must arise from a (1) right to payment, (2) that arose

4   before the filing of the petition or resulted from

5   prepetition conduct fairly giving rise to the claim.

6   Further, there must be some contact or relationship between

7   the debtor and the claimant such that the claimant is

8   identifiable."  In re Motors Liquidation Co., 829 F.3d 156.

9           In applying that rule, the Court found no problem,

10  of course, in finding that pre-closing accident claims would

11  be not assertable on a successor liability basis against New

12  GM, but then determined that economic loss claims arising

13  from the ignition switch defect or other defects because

14  they arose based on an individual's purchasing and ownership

15  of Old G M cars would be covered by the free and clear order

16  because the relationship was close enough.  "In other words,

17  Old GM's creation of the ignition switch defect fairly gave

18  rise to these claims, even if the claimants did not yet

19  know."  Id. at 157.

20          This is in keeping with the In re Old Carco LLC

21  case that I previously cited, where Judge Bernstein found

22  that the plaintiffs who were asserting successor liability

23  in that case had a pre-petition relationship with the

24  debtor, i.e., their purchase and ownership of the debtor's

25  cars and, of course, that the design flaws there, as is

Page 72

1    alleged here, existed pre-petition, and therefore, they had

2    a close enough relationship to have a claim that would be

3    subject to the free and clear order.  As stated by Judge

4    Bernstein, "Anyone who owns a car contemplates that it will

5    need to be repaired, particularly when, as here, Old Carco

6    had already issued at least two and possibly three recall

7    notices for the 'fuel spit back' problem for certain Durango

8    and other Old Carco vehicles before bought the vehicles from

9    Old Carco."  492 B.R. 403.

10             The Plaintiff objector here, Ms. Arney,

11   understandably latches onto the last clause that I quoted to

12   distinguish the Old Carco case from the present facts.

13   There were no recall notices, to the extent we're aware of,

14   with regard to the dryer at issue here.  However, since that

15   decision, courts have not required that level of extra

16   relationship beyond the seller/buyer relationship to subject

17   a purchaser of a debtor product to a free and clear order.

18   See, for example, In re GM Liquidation Switch Litigation,

19   257 F. Supp. 3d 372, 402 (S.D.N.Y. 2017).  And of course,

20   the Motors Liquidation Co. case itself found a sufficient

21   relationship without any notice to the economic loss

22   claimants.

23             Similarly, these cases are distinguishable from

24   Morgan Olson LLC v. Frederico (In re Grumman Olson

25   Industries) 467 B.R. 694 (S.D.N.Y. 2012).  Indeed, the same

Page 73

1   judge, Judge Bernstein, issued the underlying opinion that

2   was affirmed by the District Court that I just cited, that

3   appears at 445 B.R. 243.  The relationship in the Grumman

4   case was between a post-sale tort claimant and a parts

5   manufacturer.  It's reasonable to assume that there was an

6   insufficient connection, therefore, between the plaintiff

7   and the parts manufacturer, as opposed to the purchaser of a

8   car that malfunctions, or in this case, a dryer.

9           So, I conclude that assuming there was

10  procedurally proper due process as far as the sale notice

11  was concerned, I would grant the motion and enforce the sale

12  order.  However, it appears to me that there is a potential

13  issue as to procedural due process that warrants limited and

14  focused discovery before such an order is granted.

15          The same case that I've been relying on, In re

16  Motors Liquidation Co., in essence has a second holding

17  which discusses procedural due process in this context, and

18  notes that in a bankruptcy context, the general principle of

19  Mullane v. Century Hanover Bank & Trust Co., 339 U.S. 306,

20  314 (1950) applies in the following way:  "The general rule

21  that emerges is that notice by publication is not enough

22  with respect to a person whose name and address are known or

23  very easily ascertainable, and whose legally protected

24  interests are directly affected by the proceedings in

25  question."  829 F.3d at 159, quoting Schroeder v. City of

Page 74

1    New York, 371 U.S. 208, 212-13 (1962).  The Circuit then

2    goes on to say, "In other words, adequacy of notice turns on

3    what the debtor knew about the claim, or with reasonable

4    diligence should have known.  Id.

5           In that case, the lower court had found that based

6    on its obligations under applicable non-bankruptcy law as a

7    manufacturer of the vehicle, Old GM knew or should have

8    known of the ignition switch defects, and therefore, that

9    due process notice was not provided to the plaintiffs, who

10   knew GM was seeking to enjoin by enforcing the sale order.

11   The circuit agreed with that determination and further said

12   that those parties' rights needed to be specifically

13   recognized as assertable by them, as opposed to by others

14   who stood in their same position.

15          Here, albeit really quite recently as far as this

16   motion is concerned, i.e., on September 24, the motion

17   having been filed on July 13, Ms. Arney has submitted

18   materials related to two litigations involving dryer fires,

19   which includes also a contract between Old Sears and the

20   dryer manufacturer or marketer, that suggests at least a

21   reasonable basis for further discovery as to whether Old

22   Sears knew or reasonably should have known that those who

23   purchased these types of dryers from it were at risk of

24   having a dryer fire, and therefore, should have given notice

25   that clearly the parties acknowledge was not given, i.e.,

1   individualized notice as opposed to publication notice to

2   Ms. Arney.

3          The class action settlement referred to

4   contemplate an extensive notice process to buyers of these

5   types of dryers that I believe is worth delving into as to

6   how that notice was provided.  I could, I believe,

7   reasonably infer that it might have been provided to the

8   original purchase information, which again, one could

9   reasonably infer was within Sears' control, and that

10  therefore, Sears may have been asked to assist in the notice

11  process.

12         As the Motors Liquidation case makes clear, the

13  facts requiring individualized or particularized notice, as

14  opposed to publication notice, may turn on unique

15  circumstances.  So I cannot say today what would be enough

16  of a basis to put Sears on inquiry notice as far as having

17  to give notice to Ms. Arney.  But I believe that the

18  targeted discovery should take place so that she has a

19  reasonable opportunity to show that she was entitled to

20  individualized notice.

21         So, I'm ruling definitively, or dispositively, as

22  to the -- to grant the motion insofar as it asserts that the

23  order would have covered this dryer, assuming as I am for

24  today, that Ms. Arney was the purchaser of it.  But I am

25  leaving open for further discovery and further submission by

Page 76

1   the parties whether she obtained due process, as regards to

2   the sale motion that led to the order that Transform seeks

3   to enforce.

4           As noted during oral argument, although this is

5   apparently different than the theory of the complaint, it

6   turns out that Ms. Arney did not purchase the dryer, and it

7   can be established in some way that she did not have the

8   type of relationship with Old Sears that I've found would

9   exist clearly if she were the purchaser.  That issue is also

10  open.

11          So I'll ask the parties to confer about the scope

12  of the discovery consistent with my ruling and how long they

13  expect it to take and ask you to submit a pre-trial order

14  that would have a discovery cutoff date based on that

15  discussion.

16          I would hope that it would take 60 days after that

17  meet and confer, although I recognize that some of the

18  discovery may be taken from third parties, which may delay

19  or lead to a reasonable basis to extend that 60 day period,

20  in which case, if it turns out that notwithstanding good

21  faith efforts by Ms. Arney's counsel to be diligent in

22  taking that discovery, it's being delayed, in all

23  likelihood, I would enter an amended pre-trial order to

24  reflect that.

25          You should also get a hearing date from Ms. Lee,

1    my Courtroom Deputy, for a renewal of this hearing on the

2    due process issues that I've outlined.  And conceivably, if

3    the facts show, or at least one side says the facts show,

4    that Ms. Arney wasn't the purchaser and had enough of a

5    remote relationship so that my ruling wouldn't apply to her,

6    we'll have that hearing then.

7            If it's to be an evidentiary hearing, i.e., if

8    there's a dispute about those issues, you should have the

9    provisions that are in my standard pre-trial order about the

10   conduct of that evidentiary hearing.  But we would have a

11   pre-trial conference before the hearing, if it's to be an

12   evidentiary hearing.  It may not be.  You may agree on the

13   factual record.

14           But if it is, my practice, Mr. Tannen, for

15   evidentiary hearings, particularly where you're appearing by

16   Zoom, requires the parties to submit direct testimony by

17   declaration or affidavit, with the witness to be available

18   for cross and redirect, and for the parties to meet and

19   confer and agree on the admissibility of as many exhibits as

20   they can in good faith, and to have a joint exhibit binder

21   for the witnesses and the Court, with any exhibits for cross

22   or impeachment to be provided to the witness, assuming we're

23   still going to do this by Zoom, in a closed file or closed

24   binder that the witness opens when they're being cross-

25   examined.

1          MR. TANNEN:  Like the old days.

2          THE COURT:  Yeah.  So, I'll look for that order.

3     Frankly, I think all three of you would be delighted if

4     there actually were insurance that would pay for this, but I

5     don't see any reason that any of you should be hiding the

6     ball on that.  So hopefully, that isn't happening, and that

7     if there is insurance, it'll be identified, and perhaps this

8     can be resolved that way.  But if not, we'll proceed along

9     the lines that I've just outlined.

10         MR. TANNEN:  Your Honor, two questions.  And it

11    may seem like I'm seeking an advisory in from you, but you

12    stated that you're making a dispositive ruling on the issue

13    of whether the type of claim that Ms. Arney had may or may

14    not have been encompassed by the sales order and we're

15    moving to the due process claim.  I don't want to be forced

16    to file some sort of notice of appeal from that until

17    everything is all done.

18         THE COURT:  No, that would be an interlocutory

19    ruling.  You should wait --

20         MR. TANNER:  That's what I thought.

21         THE COURT:  You can wait until I rule on the

22    entire motion.

23         MR. TANNER:  And then secondly, Your Honor, I have

24    had many, many conversations with Ms. Marcus, and I must say

25    I recognize the pressures that they're under, based on the

1    fact that they're no longer doing business.  There is

2    baseline insurance information, which I'm hearing you say we

3    should encourage to try to get, but you're not directly

4    ordering insurance information at this point.

5              THE COURT:  Well, I mean, I think if the Debtor

6    has insurance, they'll provide it, because that's what

7    insurance is for.  They're not trying to save it for someone

8    else.  Right, Ms. Marcus?

9              MS. MARCUS:  And we have responded, Your Honor,

10   and answered all of Mr. Tannen's questions.  To the extent

11   he wants policies that we haven't been able to locate yet,

12   we're trying to do that.  But we've been very forthcoming

13   with the insurance information.

14             THE COURT:  Yeah.  I mean, I really -- in this

15   case, I mean, I've issued a lot of lift stay orders, for

16   example, where parties have gone to the insurance.  And the

17   Debtors, they're not -- they have no reason to hoard

18   insurance here.  You know, it's not that type of case.

19   There's not like a -- it's not a mass tort case where the

20   insurance is going to need to be parceled out on anything

21   other than a first-come first-served basis.

22             So I think -- I don't think you should be

23   skeptical, but they're going to come up with whatever they

24   can.  If you become aware of something that they're not

25   aware of, let them know it and, you know, they'll look for

Page 80

1    it.

2              MR. TANNEN:  Your Honor, thank you very much again

3    for allowing me to appear.

4              THE COURT:  Okay.  Very well.  And again, this is

5    discovery that's going to take place here.  And I really

6    can't issue a final order on this motion until that's done.

7    So I think you should probably let the judge in Illinois

8    know that as far as Transform is concerned, there's going to

9    be further delay because of that.  Although I'll try to move

10   it along as fast as I can.

11             MR. TANNER:  We will so advise the Court and will,

12   of course, copy Mr. Barefoot or their Illinois counsel on

13   whatever we communicate with the Court.

14             THE COURT:  Okay.  Thanks, everyone.  I think that

15   concludes --

16             ALL:  Thank you, Your Honor.

17             THE COURT:  -- today's Sears calendar.  Thank you.

18             (Whereupon these proceedings were concluded at

19   12:57 PM)

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3                          RULINGS

 4                                          Page      Line

 5    Eighth Interim Fee Application

 6    for Prime Clerk LLC, the Fifth Interim

 7    Fee Application for Herrick, Feinstein LLP,

 8    and Seventh Joint Application of Paul E.

 9    Harner, as Fee Examiner and Ballard

10    Spahr, LLP Granted                      16        16

11

12    Eighth Interim Fee Application of

13    Weil, Gotshal & Manges LLP, Eighth Interim

14    Fee Application of Akin Gump Strauss Hauer

15    & Feld LLP, and Eighth Interim Fee Application

16    Of FTI Consulting, Inc. Granted         24         4

17

18    Transform Hold Co.'s Motion to Enforce the

19    Asset Purchase Agreement Approval Order

20    or the Sale Order Granted               75        22

21

22

23

24

25
```

Page 82

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 29, 2021