Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    October 26, 2021

17                    10:04 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  JUSTIN WALKER

1 HEARING re Notice of Agenda of Matters Scheduled for Hearing

2 to be Conducted through Zoom on October 26, 2021 at 10:00

3 a.m.

4

5 HEARING re Status Conference - Status Update on Debtors'

6 Progress Toward Effective Date

7

8 HEARING re Amended Notice of De Minimis Asset Sale

9 Cheboygan, Michigan (ECF #9870)

10

11 HEARING re Opposition and Bid (ECF #9964)

12

13 HEARING re Future Tort Claimant Diana Arney's Motion oft

14 Court to Take Judicial Notice of Litigation Involving

15 Electrolux-Manufactured Dryers with Ball-Hitch Design (ECF

16 #9966)

17

18

19

20

21

22

23

24

25 Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for the Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  GARRETT FAIL (TELEPHONICALLY)

9         JACQUELINE MARCUS (TELEPHONICALLY)

10

11   LAW OFFICES OF DAVID M. SCHLACHTER, LLC

12        Attorneys for Third Avenue Associates

13        8 Carefree Lane

14        Suffern, NY 10901

15

16   BY:  DAVID M. SCHLACHTER (TELEPHONICALLY)

17

18   TANNEN LAW GROUP, PC

19        Attorneys for Diana Arney

20        77 W. Washington Street, Suite 500

21        Chicago, IL 60602

22

23   BY:  MICHAEL MURPHY TANNEN (TELEPHONICALLY)

24

25

Page 4

1   CLEARY GOTTLIEB STEEN & HAMILTON LLP

2         Attorneys for Transform Holdco LLC

3         One Liberty Plaza

4         New York, NY 10006

5

6   BY:  LUKE BAREFOOT (TELEPHONICALLY)

7

8   ALSO PRESENT TELEPHONICALLY:

9   PHILIP D. ANKER

10  SARA BRAUNER

11  DEAN CHAMPMAN

12  PHILIP DUBLIN

13  PAUL HARNER

14  JACK HARRIS

15  DONNA H. LIEBERMAN

16  VINCENT MARRIOTT

17  ERIKA L. MORABITO

18  BRITTANY NELSON

19  GARY POLKOWITZ

20  DAVID H. WANDER

21  ARLENE R. ALVES

22  NATAN BANE

23  KIMBERLY BLACK

24  KEVIN ECKHARDT

25  SCOTT FLAHERTY

1    UDAY GORREPATI

2    ROBERT HONEYWELL

3    ALEXANDER HORN

4    CHLOE A. JASPER

5    JENNIFER KOOCKOGEY

6    HARRY LIEBERMAN

7    LAYA MAHESHWARI

8    BEN PAULL

9    TRAVIS JOHN PEENE

10    ALLYSON PIERCE

11    JOSEPH E. SARACHEK

12    JOSH SHLOMOWITZ

13    JOSEPH SZYDIO

14    ALEXANDER TIKTIN

15    UDAY GORREPATI

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Okay, good morning.  This is Judge

3    Drain.  We're here in In re Sears Holdings Corp., et al.

4              I have the notice of agenda and I'm happy to go

5    down that in order.  The first matter on the agenda is the

6    Debtors' status report on their effort to achieve the

7    effective date in these cases.  The Debtors have been

8    issuing these status reports now periodically for some time.

9    The most recent one was filed I believe on the 19th of

10   October.

11             So I'm not sure who from the Debtors is going to

12   be discussing this.

13             MR. FAIL:  Good morning, Your Honor.  Garrett

14   Fail, Weil, Gotshal & Manges for the Debtors.  Are you able

15   to hear me?

16             THE COURT:  Yes, I can hear you and see you fine.

17             MR. FAIL:  Thanks very much, Judge.

18             At the last hearing, you asked the Debtors to

19   provide an update today regarding ongoing discussions with

20   multiple parties as it relates to emerging strategy for

21   these cases.  To that end, the Debtors have coordinated with

22   those parties in advance of today's report.

23             As requested, the Debtors filed the presentation

24   you referenced on the docket one week ago.  For those

25   following along, it's at Docket 9979.  I'll walk the Court

Page 7

1    through that now and then conclude with some additional

2    remarks.

3              Starting at Page 1 of the report, Your Honor, the

4    chart shows that claims that have been -- the chart shows

5    the claims that have been satisfied in full post-

6    confirmation.  It's 1,068 claims, which is more than two-

7    thirds of the 1520 allowed opt-ins and non-opt-out claims.

8              The chart also shows that the Debtors settled and

9    allowed post-confirmation approximately 452 additional

10   claims.  It shows that the Debtors paid these claims $42.4

11   million, and that the Debtors owe $41 million on account of

12   these claims, so that the Debtors paid more than one-half of

13   what they owe on these claims to date in the aggregate.

14             The number of allowed claims receiving

15   distributions is up slightly, approximately nine, from the

16   last report, and the amount remaining to be paid is down

17   slightly, approximately 1.2 million from the last report,

18   all in a positive direction.

19             The chart then shows approximately 92 claims are

20   subject to preference actions; that number is down

21   approximately 19 from the last report.  That's a result of

22   judgments that have been entered in the preference actions.

23             The chart shows that there are 35 non-opt-out

24   claims remaining to be reconciled; that number is down also

25   approximately five from the last report.  Again, all

Page 8

1    positive directions.

2              The chart shows that there are about 123 opt-out

3    claims remaining; that's down about 31 in number and down

4    about $11.3 million from the last report, continued (sound

5    glitch).  The Debtors reconciled and estimate they will

6    allow about one-third of those in number.  The Debtors have

7    filed objections already to the remaining two-thirds in

8    (sound glitch).

9              The chart shows that there are two claims that

10   assert about $1.4 billion that the Debtors have gotten

11   disallowed, but that is subject to appeal.

12             Those claims are referenced to show that the work

13   being done to preserve this Court's order and the District

14   Court's order is necessary to prevent the priming or massive

15   dilution of every other remaining claim.

16             The chart also shows the Debtors estimate the

17   total amount they will need to pay all remaining

18   administrative expense claims is $54.2 million; that's down

19   2.6 million from the last report.

20             The chart then goes on to show the number and

21   asserted amounts of priority tax, priority non-tax, and

22   secured claims.  The takeaways here are as follows:  The

23   Debtors' estimates of allowable amounts remains the same,

24   $45.5 million.

25             The Debtors have filed objections already this

1    month to disallow or declassify the majority of priority

2    claims.  Your Honor knows that in the past, we filed our

3    written reports the day of the hearing because work

4    continues to be done through and up to the morning of the

5    hearings and we've tried to provide the latest numbers and

6    the clearest pictures at these hearings.

7            So as an update to the report that we filed, I'll

8    give you the latest.  The Debtors have objected to

9    approximately 30 priority tax claims that were listed as to

10   be reconciled last week.  The Debtors estimate that there

11   are approximately 137 priority tax claims to be reconciled

12   after that.

13           The Debtors also objected to a total of

14   approximately 1,112 priority non-tax claims, about 72 more

15   that were listed as to be reconciled in the report last

16   week.  The Debtors estimate that there are approximately 110

17   priority non-tax claims remaining to be reconciled after

18   that.

19           So the Debtors have objections pending to more

20   than 82 percent of the remaining priority claims that the

21   Debtors have to resolve in order to get down to their

22   estimate.

23           There are another 1300 plus claims that the

24   Debtors identified that will share in a $3 million claims

25   recovery.  Additional work will need to be done to allocate

Page 10

1    each creditor's share of the $3 million, but the Debtors are

2    not undertaking that work currently.

3            In terms of secured claims, Page 1 on the chart

4    show that as a result of the Debtors' objections to claims,

5    the count came down by more than half since the last report

6    we gave in July.  But as the chart indicates, additional

7    work is necessary to prevent the massive priming or massive

8    dilution of every other remaining claim in the case.

9            Since the filing of the report last week though,

10   the Debtors filed objections to disallow or reclassify as

11   general unsecured claims approximately 192 (sound glitch)

12   claim; that's about 50 percent in number of the 392 claims

13   listed on the report as to be reconciled.

14           In terms of dollars though, the objections that

15   the Debtor has filed will eliminate more than $34.46 billion

16   of the secured amounts, leaving 200 claims asserting only

17   $51.2 million to be reconciled.

18           So pausing a moment to consider the work that

19   we've done to get to this point, the Debtors started with

20   more than 9500 claims and ballots asserting more than $65

21   billion dollars in administrative, priority, or secured

22   claims.

23           The Debtors worked with creditors and worked

24   through the Court process to entirely eliminate thousands of

25   claims and ballots and eliminate administrative, priority,

Page 11

1    and secured claims asserting tens of billions of dollars

2    that would have primed or massively diluted the remaining

3    claims.  These numbers show this was not a case where the

4    Debtors' professionals had a clean claims register at

5    confirmation.

6              In addition, as the Court and parties in interest

7    know, this was a mega-retail case.  The number of parties in

8    interest, largely unfamiliar with Chapter 11 concepts, was

9    massive.  Confirmation was only one year after the case was

10   filed.  Confirmation was six months after the prepetition

11   bar date was set.  To date, there have been over 26,500

12   claims filed that the Debtors sorted through on last review.

13             The call for unpaid administrative claims ballots

14   came only after confirmation, and the bar date and claims

15   reconciliation all came after the Debtors sold all of their

16   assets and transferred all of their employees, essentially

17   all of the company's resources.

18             If Your Honor will turn to Page 2 of the report,

19   this page and the next page shows that this was not a case

20   where the Debtors had liquidated all of their assets and had

21   cash in hand at the confirmation date.

22             It shows that even at this point in these cases,

23   the value of the Debtors' remaining assets, excluding the

24   ESL and preference litigation, is more than three times than

25   net cash on hand.  It shows that work remains to be done to

Page 12

1    liquidate and to monetize the Debtors' remaining assets to

2    deliver recoveries to creditors.  It shows that the

3    projected recoveries are greater than the cost of pursuing

4    the recoveries.  It shows what will be lost if resources

5    were not and are not allocated to collect them.

6           Let's look at the specifics.  Page 2 shows the

7    Debtors' cash balance and the reserve from that cash for

8    disputed administrative claims.  It shows that the Debtors

9    estimate $3 million of recovery from the Debtors' 12

10   remaining real estate assets.  This is an increase in the

11   estimate from the Debtors' last report.

12          It also shows $39 million in other proceeds, which

13   includes the Debtors' estimates of recoveries of unclaimed

14   property from a Calder statue that we own or dispute, from

15   what's been referred to as PTAB appeals, and from Transform,

16   including the (sound glitch) that's subject to appeal in

17   these cases.  It also includes certain state tax refunds.

18          Note that if all of these are essentially

19   litigation proceeds, none of the defendants who are parties

20   were willing to pay the Debtors' (sound glitch) litigation,

21   forcing the Debtors to direct resources to pursue financial

22   recoveries.

23          The claim number on Page 2 are tied to the numbers

24   on Page 1.

25          THE COURT:  So can I interrupt you on the assets.

1          MR. FAIL:  Yes, sir.

2          THE COURT:  With the real estate, the estimated

3    remaining assets are 42.1 million.  When you look at the

4    July report, they are 15.5 million.  I think that difference

5    largely explains the difference between the two reports when

6    you get down to the bottom figure on this chart, the total

7    difference between cash available and projected uses, unless

8    I'm missing something.  I mean, the July --

9          MR. FAIL:  It is not because of the real estate

10   increase, Judge, the $3 million.

11          THE COURT:  No, I'm not talking about the real

12   estate, but the other items listed and the real estate.  The

13   real estate is broken out, as is the utility deposit

14   category, which I assume was just in the other proceeds

15   category in the July report.

16          Anyway, the July report lists all of these things,

17   including the real estate, at 15.5 million estimate.  And

18   now, it's at 42.1, so just --

19          MR. FAIL:  If you look at the July report -- for

20   folks, that's at Docket 9680 --

21          THE COURT:  Right.

22          MR. FAIL:  -- there's a bullet on the bottom of

23   Page 4 on that that says the difference there is going to be

24   filled by ESL and preference, which was the same, but it

25   also includes the PTAB appeals.  And so, what we've done is

1    we've combined a number of different things into the line

2    item for these other proceeds.  And so, since the last

3    report, we've included our estimate for the PTAB appeals and

4    litigation against Transform --

5              THE COURT:  Okay.

6              MR. FAIL:  -- to provide a clearer picture of the

7    assets that we believe we will (sound glitch) and, you know,

8    excluding still from this calculation the ESL and preference

9    litigation.

10             THE COURT:  Okay.  So it's really the PTAB that's

11   added in.  I mean, there are probably some other adjustments

12   too, but...

13             MR. FAIL:  You know, the two ones that I'm calling

14   out -- there are other adjustments, but the two that I'll

15   call out are the PTAB appeals and litigation against

16   Transform, including the foreign cash of $6 million, an

17   estimate for our ability to recovery the $6 million.  It's

18   in an escrow, it's subject to appeal, but that's not

19   nothing, Judge, so we're going to --

20             THE COURT:  But you're still not including what's

21   been referred to as the ESL litigation, which is the

22   multiparty adversary proceeding.

23             MR. FAIL:  Those were excluded before.  They're

24   excluded from this, correct.

25             THE COURT:  Okay.  All right, sorry to interrupt

1    you, but I think you were then talking about the estimated

2    remaining amounts owed on administrative, priority, and

3    secured claims that are reserves.

4              MR. FAIL:  That's right.  So the claim numbers on

5    Page 2 do tie to the numbers on Page 1, the uses on --

6              THE COURT:  Well, can I ask you about that one

7    too.  Because on Page 1, you have a number for priority tax,

8    non-tax, and secured as 45.5, and here, it's 39.9.  Is it --

9              MR. FAIL:  We note that it is net of reserves for

10   claims.  There's some overlap that's really -- so if you

11   look on Page 2 of the report, there is a $9.8 million that's

12   reserved for claims if we didn't reduce the claims numbers

13   below.  And so, the bolded lines have net of reserves, so

14   we're applying a portion of the $9.8 million.

15             THE COURT:  In that category, okay.  And then I do

16   note that the April report, which was Docket No. 9445, had a

17   lower estimated number for priority and secured of 36.5

18   million.  Is that also because of net of reserves?

19             MR. FAIL:  I'm looking at that report, Judge.  And

20   can you just point me to what page you're looking at?

21             THE COURT:  Sure, Page 4.

22             MR. FAIL:  The priority tax one, priority non-tax?

23             THE COURT:  Right, and secured.  If you add those

24   up, it's 26.5.

25             MR. FAIL:  I can tell you, Judge, that we are

1    confident in the new numbers and that they come in within

2    confirmation range, if not below the confirmation range

3    estimates.  The numbers have moved around from categories,

4    you know, pre and post over time, as we've kind of sorted

5    through and gone through them.

6              THE COURT:  Okay.

7              MR. FAIL:  The numbers that we put out in the last

8    two reports, I'm confident, you know, reflect our current

9    estimate, and I think that the work that we are doing to

10   reconcile the claims and bring the actuals down to the

11   estimates -- you know, the actuals closer to the estimates

12   will kind of prove us out to where we're going to be.

13             I'm also informed that the increase is due to an

14   increase in tax claims.

15             THE COURT:  Now the secureds, I mean, they

16   actually have -- they have leads on actual existing

17   collateral, as opposed to just tax secureds at some point?

18             MR. FAIL:  No.  So we've gotten objections on

19   filing granted to several tens of billions of dollars of

20   folks that were asserted.  The biggest dollars include the

21   prepetition debt, which at one point, you know, was the

22   second lien debt, some of it was credit bids, some of it

23   was, you know, reclassified to general unsecured, some of it

24   expense, so we're reducing and taking those out.

25             Then there are folks that improperly -- a lot of

1    folks that improperly said that they were secureds when they

2    didn't have collateral of the Debtors.  They had their own

3    property, or they just objected on docs, so we're --

4            THE COURT:  So basically, you're going through the

5    always difficult task of reconciling tax claims, right?  I

6    mean, that's largely what it's coming down to?

7            MR. FAIL:  There's some overlap also in

8    prepetition priority, post-petition administrative, and

9    secured.  The taxing authorities like to cover their bases

10   and check all their boxes, you know.  I think we will speak

11   with the administrative claims rep.  We will speak with the

12   UCC and the pre-effective date committee.

13           We think we've identified to date approximately

14   200 tax claims that continue to update their files, continue

15   to update their claims, you know, and cause an

16   administrative burden.  For about $2 million, you know, 200

17   claims could be satisfied.  If you looked at claims under

18   $15,000, I think 150 of them could go away for 500-

19   something-thousand dollars.

20           So we're at the point where we are, as you said,

21   doing the difficult task of getting through real estate

22   taxes for what was one America's largest retailers, you

23   know, in every state across the country.

24           And if I told you, Judge, we were dealing with,

25   you know, pre-2002, pre old Kmart bankruptcy folks asserting

1    property taxes, I think you would believe me.  It's insane.

2            THE COURT:  All right.  So then at the end, you

3    basically get to a current shortfall with the reserves

4    obviously and the estimates, which are just estimates on

5    ultimate liquidation of the tax claims of 58.2 million,

6    which is considerably lower than the estimate for July and

7    April, which was between 80 and 81 million.

8            MR. FAIL:  That's right.  And, Judge, you

9    recognize that the cash numbers turn, the other assets, you

10   know, need to be monetized.  We don't have that in hand.

11   The claims numbers is the number, if you wanted to pay it

12   out today, what you need.  But the overall 58.2 is if the

13   assets come in where we think and if the claims come out

14   where we think, this is where, you know, the shortfall that

15   you would need.  But if you wanted to get it done today and

16   pay out the estimate, you obviously need more than 58.2.

17           THE COURT:  Okay.

18           MR. FAIL:  Thanks, Judge.  And, you know, as

19   you've said and as the note on Page 2 says, you know,

20   consistent with our last report, the Debtors continue to

21   estimate that that difference will be covered by preference

22   claims and ESL litigation.

23           THE COURT:  Right.

24           MR. FAIL:  Here's another view that shows that at

25   confirmation, the Debtors had $48.5 million in cash, but

1    that post-confirmation, the Debtors' efforts collected $90.7

2    million to date, and the Debtors expect their efforts to

3    lead to collection of another $42.1 million.  Again, this

4    excludes preference, and this excludes litigation proceeds.

5            Page 3 also shows the Debtors collected $20

6    million in cash proceeds from preference settlements to

7    date.  This is a slight increase from the Debtors last

8    report, and I'll cover preferences in a little more detail

9    later in the presentation.

10           Flipping to Page 4.  Page 4 shows an update on

11   uses.  The total uses was increased slightly as a result of

12   the extended estimated timeframe for the cases.  The prior

13   reports included estimates through 12/31/21.  This current

14   report includes estimates through 6/30/22.

15           Importantly, Judge, the new total estimate of

16   total uses, which is 259.3, is still well within the

17   confirmation date estimates of uses, which was 210 on the

18   low end and 278 on the high end.

19           Finally, Page 5 gives additional details on the

20   status of preference actions.  We disclosed on the prior

21   pages that efforts yielded $20 million in cash recoveries to

22   date.  We also disclosed on Page 1 that the Debtors

23   benefited from the elimination or reduction of approximately

24   $23.4 million in administrative claims as a result of

25   preference settlements or judgments to date.

1           The Debtors' preference teams have settled

2      approximately 68 percent of eligible matters.  There are

3      still approximately 715 eligible matters that are open.  The

4      total amount of the preferential transfers for those matters

5      is about $353.5 million.

6           The Debtors wish that these actions would be

7      resolved quickly and without prolonged litigation.  We're

8      sure that the Court does as well.  Unfortunately, though,

9      that requires agreements from defendants.

10          The Debtors' professionals have spent a

11     significant amount of time post-confirmation updating

12     parties in interest on the steady forward progress of these

13     cases.  In prior reports, we've covered in detail how we got

14     to where we are.

15          The Debtors have been continuing to work with the

16     pre-effective date committee and the professionals for the

17     UCC and the administrative claims representative on options

18     for going forward, including options for a plan effective

19     date.  Those parties have been working productively,

20     discussing the various options and different points of view.

21          The Debtors understand that those parties too have

22     had numerous discussions with their constituents, as well as

23     other parties.

24          The Debtors view the options to include paths that

25     do not put any creditor in a worse position than they are

Page 21

1    currently.  They include options to incentivize allowed

2    claimholders and options to incentivize or otherwise address

3    parties with disputed claims.

4              For obvious reason, given the public nature of

5    this report and the ongoing nature of discussions, I will

6    not go into more details at this point.  The Debtors are

7    optimistic, however, that all parties in interest will

8    recognize that the best path forward includes pursuit of the

9    remaining assets.

10             If there is no requests before the Court today,

11   all parties in interest are reserved.  As the Court has seen

12   time and time again in these cases, the cost of addressing

13   objections that ultimately get overruled are significant in

14   terms of dollars, distraction, and delay.

15             The Debtors have the means to continue operating

16   as Debtors-in-possession and look forward to working with

17   various constituents to conclude these cases as efficiently

18   as possible.  The Debtors will disclose material updates on

19   asset recoveries and paths to resolve these cases as they

20   develop.

21             Your Honor, that concludes the Debtors'

22   presentation this morning.  Unless Your Honor has any

23   questions, I propose to return back to the agenda and move

24   to the next item.

25             THE COURT:  Okay.  Well, the purpose of these

Page 22

1    reports is not just for enabling me to ask questions, but to

2    have it aired on a public basis so that the progress towards

3    the effective date of a plan or alternatives can be

4    evaluated.

5           It is the case now, as it was the case for the

6    last two reports and for all of the reports, that on a cash

7    basis, the Debtor is administratively insolvent.  On the

8    other hand, it appears to me -- and again, I'm seeing these

9    reports and nothing else -- that the money that the Debtor

10   is spending to resolve claims would have to be resolved in

11   any case, whether the case remained in its current posture

12   or was converted, for example, to Chapter 7.

13          So it seems to me that the money that is being

14   incurred to liquidate claims and realize on the remaining

15   realizable assets is being spent in an appropriate way, but

16   I guess that is really what the parties need to focus on

17   privately.  Any creditor is certainly free to settle its

18   claim for a lesser payment if other creditors are not

19   disadvantaged by that.

20          But I don't, from these reports, see a need for

21   any dramatic change from the path that the Debtors are on at

22   this point.

23          MR. FAIL:  Thank you.

24          THE COURT:  Okay.  But obviously, that requires

25   serious monitoring and that's what you're doing, it appears

1    to me.

2             Okay.  So unless anyone has anything further to

3    say, I'll turn to the two other matters on the agenda.  And

4    I'll note that a number of matters were adjourned, I'm

5    assuming because, in large measure, that's consistent with

6    the process that Mr. Fail has described in terms of

7    reconciling claims and the like.

8             MR. HARNER:  Your Honor, it's Paul Harner, the fee

9    examiner, with apologies for the interruption.  May I be

10   excused?

11            THE COURT:  Yes, sure.

12            MR. HARNER:  Thank you, Your Honor.

13            THE COURT:  Okay.  All right.

14            MS. MARCUS:  Good morning, Your Honor.  If you're

15   ready for me.

16            THE COURT:  Yes.

17            MS. MARCUS:  Okay.  Jacqueline Marcus from Weil,

18   Gotshal & Manges LLP on behalf of the Debtors.

19            The next matter on the agenda, Your Honor, is the

20   amended notice of di minimis asset sale for a property in

21   Cheboygan, Michigan.  Your Honor, this is a di minimis

22   matter both literally and figuratively, and I don't want to

23   take up too much of the Court's time with it, so I'll try to

24   be quick.

25            Pursuant to the di minimis asset sale procedures

1   approved by the Court at Docket No. 856, the Debtors have

2   filed numerous notices of proposed sales of di minimis

3   assets.  To my knowledge, this is the only one that had

4   ended up in a hearing before the Court.

5        The Debtors filed an amended notice of sale of the

6   Cheboygan property to Princess Riverboats, LLC, on October

7   4th, 2021.  The purchase agreement provides for a sale of

8   the property for $165,000.  As reflected on the docket,

9   Third Avenue Associates, Inc., filed an objection and

10  essentially made a bid for $225,000.

11       The Debtors had determined that the difference in

12  price was not substantial enough to warrant the delay and

13  expense associated with switching to a different buyer, but

14  we advised Third Avenue that we would do that if they signed

15  a purchase and sale agreement provided for a price of at

16  least $300,000.

17       If Third Avenue had done that, our intent was to

18  organize a mini-auction, which we've done before.  We were

19  going to ask the two bidders to submit their highest and

20  best offer simultaneously, and if the two bids were within

21  10 percent of one another, we were going to have a second

22  round of bidding.  Despite providing mixed signals over the

23  past two weeks, Third Avenue has not been willing to

24  increase its offer to 300,000, and it has also not been

25  willing to withdraw its objection so that the Debtors can

Page 25

1    proceed to a closing with Princess Riverboats.

2           The Debtors, Your Honor, in the exercise of their

3    business judgment, are seeking approval of the sale to

4    Princess Riverboats at the $165,000 price provided in the

5    purchase and sale agreement.

6           I believe Mr. Schlachter is on the call on Zoom

7    and he represents Third Avenue.

8           THE COURT:  Okay.

9           MR. SCHLACHTER:  Yes, good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. SCHLACHTER:  David M. Schlachter, Law Office

12   of David M. Schlachter on behalf of Third Avenue Associates.

13          THE COURT:  Good morning.

14          So, Ms. Marcus, let me just make sure I

15   understand.  The difference here is $60,000 between the

16   225,000 that was in the bid.  And I think what you outlined

17   is really two potential issues with the bid by Third Avenue

18   Associates, and I just want to make sure I understand them.

19          Is the original buyer, Riverboat, although I think

20   they assigned it to someone else or maybe I have it

21   backwards.  I think there's a Hiyawa in the amendment in an

22   assignment agreement.  But in any event, let's just go with

23   Riverboat as the purchaser.

24          Are they done with their due diligence?  They're

25   ready, willing, and able to close?

1            MS. MARCUS:  Yes, they're ready.  They are ready

2     to close.

3            THE COURT:  Okay.

4            MS. MARCUS:  And I'll add that Mr. Schlachter's

5     client has also waived any due diligence.

6            THE COURT:  All right.  So it's ready, willing,

7     and able to close too?

8            MR. SCHLACHTER:  Yes, Your Honor.

9            THE COURT:  Okay.

10            MR. SCHLACHTER:  And we provided proof of funds as

11     well.

12            THE COURT:  So the only issue is -- okay, so

13     that's issue one.  But there is no contract, right, with

14     Third Avenue?

15            MR. SCHLACHTER:  Well, we signed a contract -- but

16     not for 300 -- for 225, Your Honor.

17            THE COURT:  So it's just the price then, I guess,

18     because if you compare apples to apples, there's a contract

19     that's on the same terms and they both waived due diligence.

20            So why would the Debtors be turning down the extra

21     $60,000?

22            MS. MARCUS:  So it's really just the delay and the

23     time associated with getting Third Avenue on board.  What we

24     were hoping was to stimulate competitive bidding so that the

25     two parties would go head to head.  But the Debtors'

Page 27

```
 1   financial advisor, M3, who's handling the real estate sales,

 2   believed that it was more appropriate to go with the 165 if

 3   Third Avenue wasn't willing.

 4          It's almost like -- I know we don't have formal

 5   bidding procedures, but almost like incremental bidding.

 6   What makes it worth their while to hold off.  We were also

 7   concerned about some opposition from the original buyer, and

 8   that's why we had decided it wasn't worth it for 225, but it

 9   would be for 300.

10          THE COURT:  But if Third Avenue is ready, willing,

11   and able to close on the same schedule as the other one, as

12   Riverboats, then it would seem to me it's just a desire to

13   get them to bid up from what they've already bid up, right?

14          MS. MARCUS:  That's correct, Your Honor.

15          THE COURT:  I mean, the Riverboat folks knew, I

16   think, that their agreement was subject to Bankruptcy Court

17   approval.

18          MS. MARCUS:  Yes, they do.

19          THE COURT:  So I cannot approve it in light of

20   this other agreement on the condition that the closing

21   happen by X date, and if not, then you would go forward with

22   Riverboat.  I mean, it would be great to get an auction

23   going, I appreciate that, but it would seem to me that

24   60,000 is a pretty meaningful step up here, and you could

25   have an auction starting at 60,000 if you want.
```

1          MS. MARCUS:  We can do that, Your Honor, if that's

2     what you're directing us --

3          THE COURT:  I think you need to do that.  Look,

4     this is -- I appreciate it's not a great deal of money.  But

5     I think the purpose of the di minimis sale order to give the

6     Debtor flexibility to use its business judgment to close di

7     minimis sales that were not objected to.

8          But ultimately if there is an objection and the

9     Court reviews it, one could argue that a prospective bidder

10    doesn't really have standing to object.  But I do have an

11    objection before me and I have the facts before me and it's

12    a meaningful increase with, I don't believe, any additional

13    risk given the requirement for Bankruptcy Court approval and

14    the exact overlap of the two agreements, except for the

15    price.

16         So it seems to me that you should give both

17    parties notice of a potential auction to make a simultaneous

18    bid starting at a number north of 225,000 and the winner

19    gets to purchase.

20         MS. MARCUS:  We'll do that, Your Honor.  Just as a

21    matter of procedure, if we do that, regardless of who the

22    winner is, I don't think we technically need an order under

23    the di minimis asset procedures.  We normally don't, but

24    given that there was an objection filed, we could.

25         THE COURT:  I think you could just -- I think you

1    should submit an order confirming the winner and confirming

2    my ruling today.  The title insurer may want that.

3            MS. MARCUS:  Okay.  We'll do that, Your Honor.

4            THE COURT:  Okay.

5            MR. SCHLACHTER:  Thank you, Your Honor.

6            THE COURT:  All right.  So I don't think this

7    needs to drag out.  If the parties' principals are

8    available, I think you should have the bids come in, you

9    know, on a specific day within a week.

10           MS. MARCUS:  Sure.

11           THE COURT:  Okay.

12           MR. SCHLACHTER:  Thank you, Your Honor.

13           THE COURT:  Okay.

14           MS. MARCUS:  Thank you, Your Honor.

15           THE COURT:  Very well.

16           MS. MARCUS:  The next matter, Your Honor, is the

17   motion of Ms. Arney at Docket No. 9966.  And Mr. Tannen, I

18   believe, will handle that.

19           THE COURT:  Right.

20           MR. TANNEN:  Good morning, Your Honor.  Michael

21   Tannen on behalf of Diana Arney.

22           Having listened to the comprehensive status

23   report, I want to assure the Court that I'm doing my best to

24   get to the heart of the matter and not burden the estate

25   with administrative expenses.

Page 30

1           So we have filed a motion for you to take judicial

2   notice of various pieces of litigation which involve dryer

3   fires involving ball-hitch dryers manufactured by

4   Electrolux, and we mentioned two of the cases when we

5   appeared before you about a month ago: one was the Roberts

6   nationwide class action, and the other was a suit by and

7   between Sears and Electrolux.

8           And through our continuing investigation, we have

9   learned that there was an effort to consolidate roughly

10  dryer fire cases, many of which were subrogation cases, into

11  multidistrict litigation.  We have learned that Sears was

12  named as a party in three of the suits, and we learned that

13  Sears formally opposed the multidistrict litigation.

14          So we sent you a binder of the various pieces of

15  litigation, the orders, the dockets, some of the motions,

16  and we believe that these matters are not subject to

17  reasonable dispute and are capable of accurate and ready

18  determination by you.  It would obviate some expense with

19  regard to obtaining actual evidence, and we cited a slew of

20  cases standing for the proposition that a court can take

21  notice of cases pending in other jurisdictions.

22          I would say that the significance of the

23  nationwide class action had to do, in part, with Kenmore

24  dryers being part of the class and future relief extending

25  into 2022 in the form of rebates and future dryer repairs,

1    and so, we're asking that the Court take judicial notice.

2            I wasn't sure about what sort of proposed order to

3    tender to you in the event you agree with our position.

4    There's been no objection filed, and Federal Rule of

5    Evidence 201, we're asking that you take judicial notice.

6    What weight you ascribe to it obviously is up to you.

7            THE COURT:  Okay.  Well, let me -- I'll note also

8    that there's been no objection to this motion.  But you're

9    right, there was no proposed order and I think one needs to

10   be careful with the order.

11           Just as far as context here, when we had a hearing

12   on the underlying request for relief -- and that was

13   Transform or New Sears request that the litigation by Ms.

14   Arney be barred because of the free and clear order -- I

15   stated that there were two potential issues, both going to

16   due process, that might limit the effect of the free and

17   clear order.

18           They involve whether the Debtors knew or

19   reasonably should have known about the claims in the Arney

20   lawsuits, which under the case law including the Motors

21   Liquidation case, would have required actual notice as

22   opposed to publication notice of the sale.

23           And I also noted that conceivably Miss Arney

24   wasn't the purchaser, that she was somehow a secondary

25   purchaser that might have taken her out of the free and

Page 32

1    clear order under a different segment of the Motors

2    Liquidation case, and I said the parties should discuss

3    discovery on those two issues only and give me a discovery

4    cutoff date as part of a pretrial order.  And obviously,

5    that was back on September 27th; it's now October 26th.  I

6    don't have a pretrial order.

7              And I'm assuming that this motion to take judicial

8    notice of the three specific litigations is to enable the

9    parties to sort of somewhat streamline that discovery, which

10   makes sense to me.  I think that's fine if that's the

11   purpose of it.

12             But again, the judicial notice I'm taking or I'm

13   being asked to take of these three litigations is only as to

14   how they relate to the notice points, I think, right, and

15   not as to the truth or facts asserted in the underlying

16   litigations, which obviously -- and the motion acknowledges

17   this too -- is not a function of judicial notice for or of

18   litigations or lawsuits that were pending.

19             So if the order seeks that type of relief, I think

20   I'm fine with it, but that's just my preliminary review on

21   this.  I mean, clearly courts frequently take judicial

22   notice of the existence of litigation in other forums as

23   that fact; the fact of that litigation may bear on matters

24   that are before them.

25             And to me, that's appropriate here under FRE

Page 33

1   201(c)(2), but I think the order needs to be clear that it's

2   focusing on the notice issue and the existence of those

3   litigations.  For example, it wouldn't apply to statements

4   in the litigations as for the truth of those statements, and

5   that could even include, I guess, whether a document

6   actually was served, for example.  There'd be a certificate

7   of service on the docket, and I'll note, you know, that it's

8   on the docket, but that doesn't necessarily mean it was

9   served.

10          I've been talking for a while, but that's my

11   preliminary view of this.  I'm happy to hear from both of

12   you because I think the focus needs to be on the order, as

13   opposed to the basic request for underlying relief.

14          MR. TANNEN:  Your Honor, I can speak with opposing

15   counsel about this.  And we had some internal debates in the

16   office about whether we would be providing a proposed order

17   and we decided to ditch that until we heard from you.

18          An example of -- and I don't know if it's a bright

19   line or a continuum what I'm about to say.  But the fact

20   that Old Sears filed a motion joining Electrolux's argument

21   opposing multidistrict litigation, which included a

22   nationwide class action involving hundreds of thousands, if

23   not millions, of dryers, is a fact, and the weight that you

24   will ascribe to it, I'm presuming, will be up to you.

25          THE COURT:  Right.

1          MR. TANNEN:  We were talking again in the office

2    that we think what we've presented is very compelling, and

3    then we get to the prayer for relief and it's kind of like a

4    nothingburger because we don't know what you're going to be

5    focusing on when we filed the motion, but we thought it was

6    significant to bring to your attention.  We also didn't want

7    to spend a lot of time establishing the existence of this

8    litigation if you could take judicial notice of it.

9          THE COURT:  Right.  Okay, very well.

10          MR. BAREFOOT:  Your Honor, could I be heard

11    briefly?

12          THE COURT:  Sure.

13          MR. BAREFOOT:  Luke Barefoot from Cleary Gottlieb

14    for Transform Holdco for the record.

15          Your Honor, we were a little surprised to be

16    before you this morning on this motion.  There was -- we

17    were not clear until we received a direction from your

18    chambers that this was going to be on the agenda, given that

19    it wasn't noticed in accordance with the case management

20    order.

21          But to some of the points that Your Honor made,

22    most of what was in this motion was already put before the

23    Court in the -- what I think was styled as a status report

24    that was filed shortly before the last hearing.

25          THE COURT:  Right, on the 24th.

Page 35

1            MR. BAREFOOT:  It was -- I apologize.

2            THE COURT:  September 24.

3            MR. BAREFOOT:  Correct.

4            THE COURT:  Right.

5            MR. BAREFOOT:  So, you know, it was unclear to us

6    what exactly the form of relief that plaintiffs were seeking

7    by putting those cases, as well as some other, you know,

8    proceedings in other districts before the Court.

9            You know, we're happy to work with Mr. Tannen on a

10   form of order, but what we would object to and what was not

11   clear to us that this was seeking was to end run the

12   discovery that Your Honor had directed at the last hearing.

13   Mr. Tannen has --

14           THE COURT:  Well, I mean, this might inform that

15   discovery because the order will show that I've taken

16   judicial notice of the dockets of these three cases.  And

17   then you all can, I hope, maybe avoid some additional fact

18   discovery because those dockets will be in the record.

19           But the interpretation of the dockets and anything

20   other than just that these documents are on the dockets,

21   whichever documents anyone wants to refer to when we get

22   back to a hearing on this, I think that should be the extent

23   of the order.

24           I don't want to pick and choose --

25           MR. BAREFOOT:  Understood.

1          THE COURT:  I don't want to pick and choose from

2    the dockets.  I don't want to interpret the dockets.  I know

3    there's some bullet points in the motion that suggest that I

4    should take judicial notice of the following things and it

5    kind of describes what they are.  I don't want to have that

6    in the order.

7          I just want, I'll just take judicial notice of the

8    three litigations and the dockets in those litigations, and

9    I think that --

10          MR. BAREFOOT:  Understood, Your Honor.

11          THE COURT:  Right.

12          MR. BAREFOOT:  And I just wanted to be heard to be

13    clear that, exactly as Your Honor said, we would disagree

14    with some of the characterizations or conclusions that the

15    plaintiffs would --

16          THE COURT:  That's fine.

17          MR. BAREFOOT:  -- draw from those, and that will

18    be the subject of discovery.

19          THE COURT:  Right, that's right.  And so, if you

20    want to put something in that, you know, any other relief

21    requested in the motion is denied, that's fine.  And

22    obviously, that doesn't mean that I'm granting the

23    underlying motion by Transform, but it's just the relief

24    requested in the motion is limited to or the relief granted

25    from that request in the motion is limited to the following,

Page 37

1    and then just say the Court will take judicial notice of the

2    three captioned litigations and the dockets in those

3    litigations.

4              MR. TANNEN:  Your Honor, this is Michael Tannen

5    again.

6              There were cases in which Sears was a defendant in

7    those underlying 35 cases that were sought to be collected

8    together, so it's more than just three.  There were two

9    cases --

10             THE COURT:  But isn't it the docket that lists all

11   those cases?

12             MR. TANNEN:  Yes, it is, and the Complaints.

13             THE COURT:  Because one's an MDL, so I understand.

14             MR. TANNEN:  So the MDL captures the other 35

15   umbrella.

16             THE COURT:  I think so.  Yeah, I think it does.

17             MR. TANNEN:  Okay.  I also wanted to advise the

18   Court that we are continuing our investigation as to the

19   prepetition relationship prong that you mentioned before.

20   We believe -- we are collecting evidence, and I will, of

21   course, share it with Transform and Old Sears that, in fact,

22   Diana Arney did not physically buy the dryer at issue, nor

23   did she pay for it.  She may have been an intended user, but

24   we do not think she was the actual person who bought it, and

25   I will give that evidence over to Mr. Barefoot when I get

1    it.

2           Again, I am moving as quickly as possible to get

3    that information and I will share it, and if that's

4    something we have to investigate and go through discovery,

5    we will.

6           THE COURT:  Okay.  Well, I had assumed that I

7    would get a pretrial order fairly soon after that hearing,

8    and it's now been a month.  I just want to make sure as to

9    Transform, the Arney litigation is still not going forward,

10   right?

11          MR. BAREFOOT:  That's correct.

12          MR. TANNEN:  The litigation is not going forward

13   as to the successor liability discovery or the amendment of

14   the pleadings.

15          Your Honor, a couple of other things.  Mr.

16   Barefoot, Ms. Marcus, and I had conversations.  Mr. Barefoot

17   is requesting that I serve all the discovery at once upon

18   him.  I understand.  The logistical issue I'm encountering

19   with Old Sears is they assert that they don't have anyone to

20   sign interrogatories or attest to the completeness of

21   production requests.

22          I hope that that's not going to be a problem

23   because I think they have a duty to find somebody to attest

24   to the accuracy and completeness of discovery that we might

25   tender.  I'm just alerting the Court that's an issue that's

1    out there currently.

2            THE COURT:  Okay.  Well, I'm not sure what you

3    will be able to get from Sears because I think Transform has

4    those records at this point, but you can discuss that with

5    opposing counsel.

6            MR. TANNEN:  I shall.

7            MS. MARCUS:  Your Honor, if I may be heard for

8    just a moment.  At the last hearing, I know the Debtors

9    concern about the administrative expenses that might pile up

10   if Ms. Arney pursues extensive discovery from the Debtors.

11           Recently, maybe about a week or so ago, Mr. Arney

12   provided notice that she's serving a subpoena on Sedgwick

13   Claims Management, which provides insurance services for the

14   Debtors.  The information sought is quite extensive.  For

15   example, she seeks information for the period between 2002

16   and the present -- that's almost 20 years -- regarding

17   claims and notices related to fires involving these dryers.

18           We believe that Sedgwick will be able to assert a

19   claim back against the Debtors for their expenses associated

20   with complying with that discovery.

21           So we'll talk to Mr. Tannen, but I just wanted to

22   alert you to that.

23           THE COURT:  Okay.  I mean, there are really two

24   issues within that: one is the breadth of the discovery

25   sought, which comes up often in litigation; the other is

1    whether Sedgwick has any records that would be responsive.

2           And again, it seems to me that -- I understand,

3    Mr. Tannen, you want to make sure that Old Sears doesn't

4    have records, but that is an interrogatory that I believe

5    Sears can complete and attest to.  I don't know about

6    Sedgwick.  I don't know what they have, and that may just be

7    a question of burdensomeness, but that's a separate issue.

8           So I can understand I guess why I haven't gotten

9    the pretrial order yet.  There's still some work to be done

10   among the lawyers.

11          MR. TANNEN:  And, Your Honor, with respect to the

12   subpoena to Sedgwick James, we attached the cases that were

13   insurance subrogation cases, and we've attached all the list

14   of subrogors by address, name, date of loss.  So I believe

15   that this information is Sedgwick James -- or Sedgwick

16   Management still has the documents, are readily findable

17   because I gave them the list of cases.  They may or -- some

18   of them have to involve Kenmore dryers and we'll see.

19          But I'll work with everyone.  I don't want to

20   burden anybody with anything.

21          THE COURT:  Okay.  All right.

22          MR. TANNEN:  I'm reasonable.

23          THE COURT:  Okay, very well.  So I'll look for the

24   order, Mr. Tannen, and either you or Mr. Barefoot can submit

25   it.  You obviously need to cc the other person and Ms.

Page 41

1    Marcus on it.  It should be consistent with my ruling.

2           Again, it's clear to me that notice, judicial

3    notice being taken of the three lawsuits and the dockets in

4    the lawsuits is appropriate here for the issue of the

5    Debtors' knowledge that I identified during the hearing in

6    reference to the Motors Liquidation case back on September

7    27, but not more than that.  I mean, not for the assertions

8    in the pleadings, but rather just for the fact of the

9    litigations and the dockets.  See Beauvoir v. Israel, 794

10   F.3d 244, 248 (2d Cir. 2015) and Shank v. Citibank,

11   Citigroup, Citicorp., 2010 WL 5094360 at page 2 (S.D.N.Y.,

12   Dec. 9, 2010) and the large number of cases that cited that

13   decision.

14           And then I'll decide, if this ever goes to a

15   hearing, what to make of the specific docket entries that

16   I'm assuming someone will point to me as to the knowledge of

17   Sears of these types of claims at the appropriate time.  See

18   also Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).

19           So I'll look for that order.

20           MR. TANNEN:  I'll prepare the order and circulate

21   it, and I apologize for using the word nothingburger.  I

22   haven't used it in 31 years, but it should be in Black's Law

23   Dictionary Urban Edition.

24           THE COURT:  Okay, very well.

25           MR. TANNEN:  Thank you, Your Honor.

Page 42

1              THE COURT:  Okay.  All right.  I think that

2    concludes the omnibus hearing agenda for today, so I'll be

3    signing off at this point.

4              MS. MARCUS:  Thank you, Your Honor.

5              THE COURT:  Okay.

6              (Whereupon these proceedings were concluded at

7    11:02 AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 43

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  October 29, 2021