**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No.  18-23538 (RDD) |
| SEARS HOLDING CORPORATION, et. al., | (Jointly Administered) |
| Debtors[1]. | **Hearing Date: November 10, 2021 at 10:00 a.m.** |
| | **Objection Deadline: November 2, 2021, 4:00 p.m.** |

### RESPONSE OF GATOR OESTE OWNER, LLC TO DETORS' THIRTY-SEVENTH OMNIBUS OBJECTION TO CLAIMS

1.  Gator Oeste Owner, LLC ("Landlord") through its undersigned counsel files the following response (the "Response") to the Debtors' Thirty-Seventh Omnibus Objection to Claims (the "Objection").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is c/o M-III Partners, LP, 1700 Broadway, 19th Floor, New York, NY 10019.

4860-1130-1377, v. 1

2.   The Objection appears to seek reclassification of Landlord's proof of claim (Claim No. 7798)(the "Claim").  Specifically, it appears that the Debtors' wish to re-classify amounts asserted as being entitled to administrative priority pursuant to 11 U.S.C. 507(a)(8) in the amount of $44,682.05 (the "Priority Amounts").   The Priority Amounts included in the proof of claim were not yet fully reconciled at the time the claim was filed.  Based upon review of Landlord's books and records, the actual amount of Landlord's priority claim for unreconciled operating costs and taxes for which the Debtor was required to pay post-petition and pre-rejection is $139,092.98

## BACKGROUND

3.   On October 15, 2018 (the "Petition Date"), Sears Holding Corporation and certain of its affiliates each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.   The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.   Landlord and at least one of the Debtors were parties to an unexpired lease of nonresidential real property (the "Lease"), for property in San German, Puerto Rico (Previously Property No. 3896) (the "Premises").  A true copy of the Lease and is attached hereto as **Exhibit "A".**

6.   The Lease was ultimately rejected by the Debtors and turned over to the Landlord on February 26, 2019.  A true copy of the emails from Debtors Real Estate Manager, Cheryl Schwartz, evidencing the precise rejection and turnover date is attached hereto as **Exhibit "B".**

2

7.  The Proof of Claim reflected unreconciled amounts which accrued post-petition and pre-rejection for common area maintenance, real estate taxes and related charges.

## LEGAL ARGUMENT

8.  Through the objection, the Debtors are improperly seeking to reclassify Landlord's priority claims.  There is no basis for such reclassification.  Instead, the court should enter an order authorizing and allowing Landlord an administrative expense claim for amounts which accrued during post-petition and pre-rejection amounts due under the Lease, including utilities, CAM charges, taxes, and related amounts.

9.  Under 11 U.S.C. §365(d)(3) the Debtor is required to timely perform all its obligations under the Lease arising from and after the order for relief until such lease is assumed or rejected.  As §365(d)(3) expressly states, the Debtor must "timely perform all obligations...arising from and after the order of relief under any unexpired lease of non- residential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1)." 11 U.S.C. §365(d)(3); *See also In re Klein Sleep Prods.,* 78 F.3d 18 (2d Cir. 1996).

10. Moreover, Section 503(b)(1) of the Bankruptcy Code explicitly provides for administrative claims arising from the "actual necessary costs and expenses of preserving the estate..."

11. Here, the Lease require the Debtor to pay is proportional share of real-estate taxes and operating costs for the property.  The total amount of reconciled amounts which is unpaid and due for the post-petition, pre-petition period is actually $139,092.98, which can be broken down as follows: (1) Operating Costs - $63,420.21; (2) Real Estate Taxes - $75,979.24; and (3) Municipal Taxes - $693.53.  See updated break-down and

3

spreadsheet collectively  attached hereto as **Exhibit "C"**.  An amended claim will be filed to reflect these reconciled amounts.

    **WHEREFORE**, for the foregoing reasons, Landlord respectfully requests the relief set forth above, and such other and further relief as this Court deems just and proper.


Dated: November 2, 2021               Respectfully submitted,


               By: /s /*Joseph H. Lemkin*
                  Joseph H. Lemkin

               **STARK & STARK**
               **A Professional Corporation**
               Joseph H. Lemkin, Esq.
               993 Lenox Drive
               Lawrenceville, NJ 08648
               (609)791-7022 (direct)
               (609) 896-9060 (main)
               (609) 895-7395 (facsimile)

               *Attorneys for*
               *Gator Oeste Owner, LLC*

# EXHIBIT A

K mart #3896 - San German, P.R.

**Parties**

THIS LEASE made and entered into as of this 30th day of March, 19 90, between TJAC (SAN GERMAN), S.E., a Puerto Rico special partnership, c/o The Davis Villamil Companies having its principal office at 100 S. Dixie Highway, Suite 200, West Palm Beach, Florida 33401 (herein referred to as "Landlord"), and K MART CORPORATION, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

1.   Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term the following property: Tenant's completed building (designated K mart), together with site improvements located on the land on which such building is to be constructed as hereinafter specified by Landlord at its expense, together with the non-exclusive right to use in common with others the common areas located from time to time on the land comprising not less than fifteen (15) acres described in Exhibit "A", attached hereto and made a part hereof, and situated in the City of San German, Commonwealth of Puerto Rico; said building to be in the location depicted on Exhibit "B" attached hereto and made a part hereof, and of the following dimensions:

A single story structure containing eighty six thousand four hundred seventy nine thousand (86,479) square feet consisting of:
K mart unit of 361'4" in width by 239'4" in depth...

Said completed building, underlying land and site improvements, together with all licenses, rights, privileges and easements, appurtenant thereto shall be herein collectively referred to as the "demised premises". The demised premises are part of a shopping center depicted on Exhibit "B" (the "shopping center").

**Term**

2.   The term of this lease shall commence upon the "date of occupancy by Tenant", as that term is defined in Article 11 hereof, and shall terminate upon such date as shall be twenty five (25) years from the last day of the month in which said date of occupancy by Tenant shall occur; provided, however, the term of this lease may be extended as provided in Article 13 hereof. The phrase "lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant to said Article 13.

**Annual Minimum Rental**

3.   Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall designate in writing from time to time, an annual minimum rental of FIVE HUNDRED THIRTY SIX THOUSAND ONE HUNDRED SEVENTY DOLLARS ($536,170.00), unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the lease term; provided, however, in the event the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

**Additional Rental**

4.   In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of SIXTEEN MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($16,250,000.00), Tenant shall pay to Landlord as additional rental an amount equal to one per cent (1%) of gross sales exceeding SIXTEEN MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($16,250,000.00).

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve consecutive calendar

-1-

months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within twelve (12) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records. If such inspection reveals a deficiency in reported gross sales of more than 3%, Tenant shall pay for such inspection.

The term "gross sales", as used herein, shall be the total sales of merchandise and services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise and services ordered on the demised premises and delivered or provided from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a)  Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b)  Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross

-2-

sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c)  Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public; and

(d)  Service and interest charges for time payment accounts and charge accounts.

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention to so do and in such event the Landlord shall have one option subject to the written consent of the holder of any first or second mortgage or deed of trust on the premises, to be exercised by notice in writing given to the Tenant within one hundred eighty (180) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said one hundred eighty (180) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect. Notwithstanding the foregoing in the event the demised premises are re-opened as a K mart or K mart affiliated operation, the additional rental provided for in this Article 4 shall be applicable and due and payable to landlord; it being the intent of the parties hereto that additional rental shall not be payable only if after Tenant's discontinuance of operations, Tenant subleases or assigns the lease to an unrelated party.

Notwithstanding the foregoing, and in the event Tenant shall discontinue the operation of its store, the Tenant shall not be relieved of any obligations as set forth in this lease, except for its obligation to pay additional rental as set forth in Article 4.

Real
Estate
Taxes        5.  Tenant shall pay and discharge all ad valorem real estate taxes and assessments which shall be levied against the taxable premises during the lease term, excluding therefrom payment of assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

The date of levy of all ad valorem real property taxes shall be deemed to be the date specified by each applicable taxing jurisdiction for which such taxes become a lien on the property under issue. The tenant's liability and obligation hereunder to pay such ad valorem real property taxes shall be fully accrued, fixed, absolute, definite and final on the date of levy thereof.

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall

-3-

become due and payable during the fiscal year of such installment. Any such installments due and payable in the fiscal years in which this lease commences and terminates shall be prorated proportionately.

Except as provided herein, Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the demised premises except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 5.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed SIXTY THOUSAND AND NO/100 DOLLARS ($60,000.00) during any lease year, shall be hereinafter referred to as an "excess tax payment". All excess tax payments paid for any lease year shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents reasonably required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises, the Tenant will similarly cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive (after first deducting Landlord's expenses, if any, incurred in such proceeding) all refunds paid by the taxing authorities directly attributable to the taxable premises, but not otherwise. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund. In addition, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the lease year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

The taxable premises as hereinafter defined, or the components thereof, shall, if possible, be separately assessed from any contiguous land and other Landlord improvements. If Landlord is unable to obtain such separate assessment, then for purposes of this article, the parties shall refer to the office records of the assessing authority to obtain the relevant valuations in order to calculate Tenant's liability for the taxes hereunder.

The term "taxable premises", as used in this lease shall be:

(a) The K mart building required to be constructed by Landlord under the terms of this lease and the land directly underlying said building; and

(b) Tenant's prorata share of the common areas and common facilities. Said prorata share will be determined in accordance with the ratio that the square foot area of Tenant's building bears to the total square foot area of all leaseable building space in the shopping center.

-4-

If the Landlord is unable to obtain such separate assessment, and if the parties shall be unable to obtain relevant information from the office records of the assessing authority from which to obtain such relevant valuations of the taxable premises as hereinabove provided, then Tenant shall pay that portion of the taxes due on the land described in Exhibit "A" and the buildings and improvements erected thereon, which shall be equal to the product of the total tax liability therefor multiplied by a fraction, the numerator of which shall be the number of square feet of Tenant's building, and the denominator of which shall be the total number of square feet of all buildings, including Tenant's building constructed on said land, but excluding outparcel buildings.

Tenant shall be responsible for reimbursing Landlord for Tenant's "pro rata share" of the taxes assessed against the land described in Exhibit "A" and said buildings and improvements within forty five (45) days of receipt of notice from the Landlord of the amount of Tenant's pro rata share of the taxes. In the event Tenant does not reimburse Landlord within the forty five (45) day period described above, the amount of the taxes owed by the Tenant to Landlord shall bear interest at the highest rate allowable by law or 15%, whichever is lesser. Said interest to run from the date commencing on the 46th day of receipt of Landlord's notice as hereinabove provided.

The provisions of this Article 5 to the contrary notwithstanding, if at any time during the term of this lease, under the laws of the Commonwealth of Puerto Rico a tax on rents is assessed against the Landlord or the Annual Minimum Rent set forth in Article 3 hereof, whether as an additional tax or as a substitution in whole or part for taxes assessed on land or buildings, such tax shall be deemed to be included within the amount which tenant is required to pay under this Article. Tenant shall be entitled to deduct any tax on rents so paid in any lease year from additional rentals, as defined in Article 4, due and payable for such lease year to the extent the total taxes so paid hereunder for any lease year when added to the real estate (ad valorem) taxes so paid for such year constitute excess tax payments.

**New Building by Landlord**
6.    Tenant's said building and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, court order, shortages of materials, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Subject to any force majeure, Landlord warrants that a general contract for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than October 1, 1990. Subject to any force majeure, if for any reason whatever Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord unless Landlord so complies within such 60-day period; provided, further, in the event that, subject to any force majeure, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to September 1, 1991, then Tenant shall, at any time thereafter, but prior to such completion, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

Drawings
and
Specifi-
cations

7.   Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. K-0564, containing such additions, changes and modifications set forth in that certain letter dated September 15, 1989 written by Stephen K. Li, R.A., Manager Design Division, Construction Department to The Davis Villamil Companies, 100 S. Dixie Hwy., Suite 200, West Palm Beach, Florida 33401, Attention: Mr. Mark B. Davis, a copy of which is attached hereto and marked Exhibit "C".

Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a)  Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on store layout drawings which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b)  Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Said working drawings and specifications shall be submitted to Tenant in time to permit a review and approval by Tenant prior to commencement of construction. Such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

Subsequent to approval of the typical drawings and specifications, in the event that criteria changes to the lease shall be requested by Tenant, which result in a savings to the Landlord in construction costs, then, Landlord shall retain the savings. Tenant shall work with diligence together with Landlord in a mutual effort to reduce the cost of construction of Tenant's building and required improvements where reasonably possible. In the event such criteria changes result in extra cost to the Landlord and Tenant requires the changes to be made, then Tenant shall pay Landlord the extra construction costs resulting from such changes.

Guarantee
of
Materials

8.   Landlord shall unconditionally guarantee all work performed by or for Landlord in the construction of Tenant's buildings and site improvements against defective workmanship and materials for the period of one (1) year from the commencement of the lease term. Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive.

| | |
|---|---|
| Advance Possession for Fixturing and Merchandising | 9.   For a period of sixty seven (67) days after completion of Tenant's building by Landlord, as set forth in Article 11 (b), Tenant shall have the privilege, rent free of entering said buildings for the purposes of installing stockroom equipment and salesfloor trade fixtures, storing merchandise, training personnel and other pre-opening activities. The Landlord's completion of the building shall be construed to mean the building is substantially complete except connections to tenants equipment, i.e. permanently enclosed, completely decorated inside and out, floor covering installed, electrical system complete, mechanical systems functioning on controls, toilet facilities complete for both sexes, fire protection system including alarms complete. |

Landlord shall advise Tenant's Regional Construction Manager in writing ninety (90) days prior to his projected completion date to allow tenant to place orders for fixtures, arrange for personnel and order merchandise.

| | |
|---|---|
| Parking and Other Common Areas | 10.   Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises described in Exhibit "A", and depicted on Exhibit B all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications (all of which improvements shall hereinafter, along with the land thereon constructed, be referred to as the "common areas"). |

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibit "A", and depicted on Exhibit B, all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements, if any, in accordance with said working drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.

Landlord further covenants that the aggregate area provided for the parking of automobiles in the shopping center shall during the lease term be sufficient to accommodate not less than eight hundred forty seven (847) automobiles on the basis of arrangement depicted on Tenant's working drawings and specifications.

At least sixty-seven (67) days prior to the commencement of the lease term, Landlord shall provide in accordance with said working drawings and specifications as approved by Tenant and as shown on Exhibit B all of the sidewalks, service drives, parking areas and entrances, from adjoining public streets to permit receiving and delivering of fixtures, merchandise and other property and to permit parking for persons involved in the pre-opening activities of the Tenant.

Liability Insurance.  During the lease term, Landlord at its sole expense shall keep Tenant insured against all statutory and common law liabilities for damage to property or injuries, including loss of life, sustained by any person or persons within or arising out of said common areas, whether caused by Tenant's negligence or otherwise, in a policy or policies with minimum coverage of Five Hundred Thousand Dollars ($500,000) with respect to injury to any one person and One Million Dollars ($1,000,000) with respect to any one accident or disaster, and One Hundred Thousand Dollars ($100,000) with respect to damage to property. All such policies shall bear endorsements to the effect that Tenant is named an additional insured and that Tenant shall be notified not less than five (5) days in advance of any modification or

cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor. Notwithstanding the foregoing provisions, Tenant shall reimburse Landlord for Tenant's pro rata share of Landlord's premium expense incurred in securing the policy of insurance as herein required. Said pro rata share shall be based upon the ratio of the floor area that Tenant's building bears to the total gross floor area of all buildings erected upon the premises described in Exhibit "A" and depicted upon Exhibit "B" (inclusive of Tenant's building, but excluding outparcel buildings). All such insurance policies may be carried under blanket policies.

Indemnification. Landlord further agrees at its sole expense to defend, indemnify and hold Tenant (and all of its officers, agents and employees) harmless against any and all liabilities for damages for claims arising out of said common areas or Tenant's use thereof, by reason of any act, action, neglect or omission on the part of Landlord and/or Tenant; provided that in the case of Tenant's negligence, such indemnify shall be limited to the insurance proceeds required to be carried by Landlord on the common areas, as long as such insurance includes at least $5,000,000.00 of coverage.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be reasonably objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be so reasonably requested to prevent said unauthorized utilization, including the erection of fences or other barricades. Notwithstanding the foregoing, property abutting the main entrance road from Route 122 and lying to the south of such main entrance road along Route 122 (marked on Exhibit B as "future expansions") has been granted (and shall be entitled to use) an easement of ingress and egress to use such main entrance road for access.

Landlord hereby gives and grants unto Tenant, including Tenant's agents, employees, customers, licensees and invitees, the full licenses, rights, privileges and easements to use said common area, in common with Landlord and other tenants, if any, of the land described in said Exhibit "A" and their respective agents, employees, customers, licensees and invitees. Notwithstanding anything contained in this Article 10 to the contrary Tenant hereby grants to Landlord, including Landlord's tenants (and their agents, employees, customers, licensees and invitees), rights, privileges and easements to use said common areas in common with Tenant of the land described in said Exhibit "A".

Store Opening

11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty-seven (67) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if, subject to force majeure, Landlord shall have failed to complete said buildings and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens

-8-

for business, Tenant shall thereafter at any time be privileged, but not obligated, upon prior written notice to Landlord and failure of Landlord to so complete within the period of time thereafter, to complete, correct, or remedy in all or part any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

Landlord's Represent- ations and Warranties

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except shown or described on said Exhibit "B".

Landlord also represents, warrants and covenants that a Pueblo Supermarket of approximately thirty thousand (30,000) square feet shall be constructed within the shopping center premises as depicted on Exhibit B and shall open for business prior to or contemporaneously with Tenant K mart.

Landlord further represents, warrants and covenants that the land described in Exhibit "A" will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use, and that all necessary governmental consents, permits and approvals for such use shall have been obtained. Further, Landlord shall deliver to Tenant a Certificate of Occupancy (or its local equivalent) prior to commencement of the lease term; provided that if such certificate has not then been physically issued, Landlord shall deliver evidence satisfactory to Tenant of Tenant's right to use and occupy the demised premises for the purposes contemplated in this Lease.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event Landlord's representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant shall notify Landlord thereof in writing and Landlord shall have thirty (30) days within which to fulfill such representations and warranties. If said representations and warranties shall not have been fulfilled within such thirty (30) day period, Tenant thereafter shall have the option of either completing said representations and warranties at Landlord's cost and expense, or, alternatively, Tenant shall have an option to terminate this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

Options to Extend Lease

13. (a) Tenant shall have eight (8) successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or of this lease as extended.

-9-

(b)  Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option.  This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof.  Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

**First Refusal to Purchase Option**

14.  THIS LEASE DOES NOT CONTAIN AN ARTICLE 14

**Repairs and Maintenance**

15.  Tenant shall make and pay for all maintenance, replacement and repair necessary to keep the demised premises (including, but not limited to, all machinery, equipment and systems serving only the demised premises) in a good state of repair and tenantable condition, except for the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility:

(a)  all maintenance, replacement and repair to the roof, outer walls and structural portion of the buildings which shall be necessary to maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and

(b)  all repairs, maintenance or replacement of or to the utility services to the building and any underground storm sewers, sanitary sewers, water lines or electrical lines under the parking areas, service drives, streets, sidewalks, driveways, entrances; and

(c)  all repairs and replacement (exclusive of sweeping, striping and snow and ice removal) necessary to maintain all driveways, sidewalks, street and parking areas free of all settling, clear of standing water, and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks.

Notwithstanding the foregoing provisions of this Article 15, Tenant shall reimburse Landlord monthly in advance for Tenant's estimated pro rata share of Landlord's costs for cleaning, striping and illumination of the parking and common areas, maintenance and replacement of "In", "Out" and other parking control signs, maintenance of landscaping and other related operating costs which Landlord shall have undertaken under the provisions of this Article 15.  Said pro rata share shall be based upon the ratio of the floor area that Tenant's building bears to the total gross floor area of all buildings erected upon the premises described in Exhibit "A" and depicted upon Exhibit "B" (inclusive of Tenant's building, but excluding outparcel buildings).

In the event that at the end of the calendar year it is determined that the estimated common area maintenance expenses used to determine Tenant's common area maintenance contribution differed from the actual common area maintenance expense of Landlord, then any excess payments by Tenant shall be refunded promptly to Tenant and any shortage not paid promptly by Tenant shall be paid by Tenant to Landlord.

Notwithstanding the foregoing, if the parking lot lights for the parking areas in front of Tenant's building are wired to Tenant's electrical panel and Tenant pays the electrical bills for such lights, the cost of illuminating the parking area shall not be included in the computation of Landlord's costs for which Landlord is entitled to a reimbursement from Tenant.  Tenant hereby

-10-

covenants and agrees that, if the parking lot lights in front of Tenant's building are wired to Tenant's electrical panel, Tenant will burn such lights daily until the later of one-half hour after the closing of Tenant's store or 10:00 p.m. If the parking lot lights are not wired to Tenant's electrical panel, the cost of burning parking lot lights after the later of 10:00 p.m. or 1/2 hour after the closing of Tenant's store shall not be included in the computation of Landlord's costs for which Landlord is entitled to a reimbursement from Tenant. The computation of Landlord's costs for which Landlord is entitled to a reimbursement from Tenant shall not include the cost of phones, stamps or other administrative overhead of Landlord. At the end of each calendar year Landlord shall provide to Tenant, upon request by Tenant, invoices or other evidence of Landlord's cost of maintaining the shopping center and providing the services Landlord is obligated to provide under the lease. Landlord's contracts for maintenance and the services to be provided by Landlord hereunder shall be competitive and reasonable.

In the event Landlord's costs of maintaining the shopping center and providing the services required hereunder are not competitive and reasonable and/or in the event Landlord fails to maintain the aforesaid portions of the demised premises and the related areas described on Exhibit A as required herein, and Landlord fails to correct such default within thirty (30) days, or such longer time as may reasonably be necessary with Landlord exercising due diligence, after receipt by Landlord of written notice from Tenant, Tenant shall have the right to elect to maintain the premises and related areas cross hatched on Exhibit B by giving written notice to Landlord. In such case, and provided Tenant is actively maintaining such premises and related areas at all times thereafter, Tenant shall have no duty to reimburse Landlord for Landlord's costs as provided herein, except for lighting costs if the parking lot lights in front of Tenant's building are not wired to Tenant's electrical panel.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable.. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Five Thousand Dollars ($5,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations and Additional Construction**    16. Tenant may, at its own expense, from time to time make such alterations, expansions, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for structural alterations, expansions, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the buildings will not be impaired by such work. Upon completion, Tenant shall provide Landlord with a set of "as-built" plans and specifications of such alterations, additions or changes certified as accurate. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

**Utilities**    17. Landlord covenants and agrees that the demised premises shall be properly serviced with electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility services furnished to the demised premises during the lease term.

-11-

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

**Governmental Regulations**    18.    Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

**Exculpation**    19.    Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

**Damage to Demised Premises**    20.    From and after the "date of occupancy by Tenant" as that term is defined in Article 11 hereof, should Tenant's net worth at any time be less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00) upon written request of the Landlord or mortgagee, Tenant shall procure fire insurance with extended coverage endorsement upon the building erected by Landlord pursuant to Article 6 hereof in an amount equal to no less than eighty percent (80%) of the replacement value from time to time of the building. At any time while Tenant's net worth shall exceed ONE HUNDRED MILLION DOLLARS ($100,000,000.00), the Tenant may elect to self-insure its obligation to restore.

Policies of fire insurance procured pursuant to this Article shall assure and be payable to Landlord, Tenant and Landlord's mortgagee and shall provide for release of insurance proceeds to Tenant for restoration of loss.

Tenant agrees to indemnify, defend and save harmless the Landlord from any claim of loss by reason of an accident or damage to any person or property happening on the demised premises, excluding all common areas. In the event the demised premises are assigned or sublet to someone other than a successor, subsidiary or affiliate or controlling corporation of Tenant, the new tenant shall, in addition to being liable to Landlord as set forth above, at its expense, purchase public liability insurance coverage on the demised premises, with a contractual liability endorsement on the policy in a company qualified to do business in the Commonwealth of Puerto Rico, stipulating limits of liability of not less than $1,000,000 for an accident affecting any one person and not less than $2,000,000 for an accident affecting more than one person, and $100,000 property damage. A certificate of such coverage from the insurer providing thirty (30) days notice to Landlord prior to cancellation or termination shall be furnished to Landlord.

Landlord and its mortgagee, if any, shall be named as additional insureds and furnished certificates from the insuring company showing the existence of such insurance. In case of loss, Tenant is hereby authorized to adjust the loss and execute proof thereof in the name of all parties in interest.

In the event, that at any time during the lease term, the permanent improvements then constituting Tenant's building and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insured under a standard fire and extended coverage endorsement Tenant shall at its expense promptly and with due diligence either (1) repair, rebuild and restore the same as nearly as practicable to the condition existing just prior

to such damage or destruction or (2) repair, rebuild and restore the same for the same use and purposes but in accordance with such plans and specification as are then generally in use by Tenant for the construction of K marts and related structures, provided, however, the repaired, rebuilt or replaced building will have a value of not less than its value just prior to said loss. Anything herein to the contrary notwithstanding, it is understood and agreed that if (1) as a result of any such damage or destruction during the last two years of the Lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding ONE HUNDRED THOUSAND DOLLARS ($100,000.00), or (2) if such damage or destruction shall have taken place within five years of the then scheduled expiration date of the current term of the Lease and if the extent of such damage or destruction is such that the cost of restoration would exceed fifty percent (50%) of the amount it would have cost to replace the Tenant's building on the demised land in its entirety at the time such damage or destruction took place, then Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice to the Landlord within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. If Tenant is carrying fire insurance to eighty percent (80%) of the then insurable value, all the insurance proceeds shall belong to Landlord and/or the Landlord's mortgagee as their interest may appear; in the event the property is self insured at the time of the loss, Tenant shall reimburse Landlord and/or the mortgagee for an amount equivalent to the insurance proceeds that would have been paid had insurance been in force but not to exceed eighty percent (80%) of the then insurable value of the building. In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant. Evidence of Tenant's election to self-insure its obligation hereunder shall be forwarded to Landlord upon written request therefor.

For the purposes of this article the term "insurable value" shall be defined as being measured on the basis of the "full replacement cost" of Tenant's building.

Each party hereto has hereby remised, released and discharged the other party hereto and any partner, officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

**Eminent Domain**    21. In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or quasi-public authority and not replaced with substantially equivalent points, Tenant shall have the option to terminate this lease as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than fifteen percent (15%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like

quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than fifteen percent (15%) of the land described in Exhibit "A", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign subject to the prior rights of the first mortgagee to Tenant that portion of any award payable for such unamortized expenditures, if any, as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

Use, Assign-
ment and
Subletting
22. The premises hereby demised may be used for any lawful purpose. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease.

Anything to the contrary in the Lease notwithstanding, Tenant agrees with Landlord that the demised premises shall not be used or occupied as a food supermarket or the equivalent thereof (including, without limitation, a food discount store or a hypermarket or wholesale cash and carry food store (e.g., Pace, Price Club, etc.)) for so long as a lease with Pueblo International, Inc. (or any parent, subsidiary, affiliate or successor to Pueblo International, Inc. or any sublessee or assignee thereof) is in effect so long as said successor, subtenant or assignee is operating a full service

supermarket in the shopping center; except that Tenant, its successors and assigns, may sell candy, cookies and other wrapped, canned, boxed or packaged foods (not prepared in the premises), and other miscellaneous food products, snack items and beer, wine, liquor and other alcoholic beverages for off-premises consumption, in areas totaling not more than 5,000 square feet of sales area (excluding aisle space); and may sell prepared foods from its lunch counter and fountain for on- or off-premises consumption. Notwithstanding this paragraph, if no supermarket should be in operation for a continuous period of one year (365 days) not including closing for renovation or for damage by fire or other casualty then this restriction shall become null and void during such period following such one-year period as Tenant or its successors or assigns operates a food supermarket or the equivalent thereof as aforesaid in the demised premises. The demised premises also shall not be used as a funeral parlor, movie theatre, house of worship, health spa, gymnasium, bowling alley, so-called "flea market", book store which excludes minors from any part thereof, automobile repair shop (except the demised premises may include a "TBA" type operation), or an office (other than financial institutions, professional offices, insurance or brokerage offices and an office necessary for the operation of, and ancillary to, Tenant's store).

Signs          23.  The demised premises shall be referred to by only such designation as Tenant may indicate.  Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant.  Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant and Landlord shall each have the option to erect at their respective sole cost and expense, upon and within the areas designated of Exhibit B, signs of such height and dimensions as Tenant and Landlord, respectively shall determine, bearing such legend or inscription as Tenant and Landlord shall determine, including, but not limited to, a joint pylon sign (similar to the joint pylon sign in Vega Baja, which shall be in lieu of a separate K mart pylon sign).  Tenant shall pay its pro rata cost of erecting, illuminating and maintaining any joint pylon sign.  Such pro rata share shall be equal to a fraction, the numerator of which is the square foot area of Tenant's sign panel and the denominator of which is the square foot area of all other tenants' sign panels.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

In addition, Tenant shall be entitled to erect such signs or other identification as it deems appropriate on the wall, roof or canopy of its building.

Ingress and    24.  Landlord warrants as a consideration for Tenant entering into this
Egress         lease it will initially provide and will maintain, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.  Anything to the contrary herein

-15-

notwithstanding, reasonable relocation of points of ingress and egress to adjoining public streets shall not give rise to a landlord default under the terms of this Article.

**Landlord's Remedies**

25. If Tenant shall be in default under any other provision of this lease and shall remain so for a period of twenty one (21) days (in the case of a monetary default) or thirty (30) days (in the case of a non-monetary default) after written notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent and other charges) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default acting continuously and with diligence before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to use reasonable efforts to attempt to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

26. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

27. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is (or will soon be) seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Exhibit "A", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a) Public utility and other easements and matters not impairing Tenant's use of the demised premises.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) a copy of Landlord's title insurance policy acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by a licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Subordination**
28. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first or second mortgage or deed of trust upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**
29. During the lease term Tenant shall indemnify, defend and save Landlord and Landlord's mortgagees and ground lessor, if any, harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord.

**Tenant's Right to Cure Landlord's Defaults**
30. In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant and the failure of the cure thereof by Landlord, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of twelve percent (12%) per annum or the then current prime rate, whichever is the higher, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first or second mortgage or deed of trust shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**
31. At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and, subject in all cases to Tenant's obligations under Article 20 hereof, loss or damage by fire, the elements and other casualty. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such

-17-

trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

Holding Over        32.  In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

Investment          33.  Landlord hereby agrees to elect under the applicable provisions of
Tax Credit      the Internal Revenue Code of 1954, as amended, (hereinafter referred to as the "Code") to pass through to the Tenant all investment tax credit which may be available from time to time in respect of the demised premises under Section 38 of said Code to the extent such investment tax credit is not usable under said Code by the Landlord, its successors and assigns.  Landlord agrees to timely execute all documents required by said Code, and regulations issued thereunder, to enable Tenant to obtain such investment tax credit.

                    Landlord further agrees to maintain adequate records so that the qualifying property can be identified and the cost thereof can be determined and to provide such records to the Tenant upon written request and otherwise to cooperate with Tenant in said matter.  Landlord agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Tenant.

Notices             34.  Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail or by recognized overnight delivery service to Landlord at the last address where rent was paid or to Tenant at its principal office in Troy, Michigan, or to any subsequent address which Tenant shall designate for such purpose.  Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service or with such delivery service.

Captions and        35.  Marginal captions of this lease are solely for convenience of refer-
Definitions     ence and shall not in any way limit or amplify the terms and provisions thereof.  The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided in this Lease, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

Successors          36.  The conditions, covenants and agreements contained in this lease
and Assigns     shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  All covenants and agreements of this lease shall run with the land.

Memorandum          37.  The parties hereto have simultaneously with the execution and deliv-
of Lease        ery of this lease executed and delivered a Memorandum of Lease which Tenant may cause to be recorded following delivery of this lease.

Entry on            38.  Tenant shall permit Landlord and its authorized representatives to
Premises by     enter the demised premises at all reasonable times for the purpose of inspect-
Landlord        ing the same.  Any entry by Landlord shall not unreasonably interfere with the conduct of the Tenant's business, and, except in the event of an emergency, entry may be made only upon reasonable prior notice to Tenant.

–18–

Landlord shall have the right to enter the demised premises at reasonable times during usual business hours for the purpose of showing the same to prospective purchasers or mortgagees of the demised premises, and any time within 12 months prior to the expiration of the term of this lease for the purpose of showing the same to prospective tenants. Any such entry may be made only upon reasonable prior notice to Tenant.

**Non-Waiver**    39.    The failure of Landlord or Tenant to insist upon strict performance of any of the terms, conditions and covenants herein shall not be deemed to be a waiver of any rights or remedies that Landlord or Tenant may have and shall not be deemed a waiver of any subsequent breach or default in the terms, conditions or covenants herein contained, except only as may be expressly waived in writing.

The maintenance of any action or proceeding to recover possession of the demised premises, or any installment or installments of rent or any other moneys that may be due or become due from Tenant to Landlord, shall not preclude Landlord from thereafter instituting and maintaining subsequent actions or proceedings for the recovery of possession of the demised premises or of any other moneys that may be due or become due from Tenant. Any entry, re-entry or termination by Landlord shall not be deemed to absolve or discharge Tenant from liability hereunder. Any acceptance of less than the full amount owed, shall not be deemed an accord and satisfaction, but merely payment on account.

**Enforcement Expenses**    40.    If Landlord or Tenant shall at any time be in default hereunder, and if Landlord or Tenant shall deem it necessary to engage attorneys to enforce its rights hereunder, the non-prevailing party shall reimburse the prevailing party for the expenses incurred thereby, including, but not limited to, court costs and attorneys' fees.

**Remedies Cumulative**    41.    All remedies of Landlord or Tenant hereunder are cumulative and not mutually exclusive and may be exercised in addition to all other remedies available to Landlord or Tenant at law and in equity.

**Definition and Liability of Landlord**    42.    The term "Landlord" as used in this Lease means only the owner or (mortgagee in possession) for the time being of the demised premises, so that in the event of the sale of said demised premises or an assignment of this Lease, Landlord named herein (and any successor and managing agent other than the then owner or mortgagee, as appropriate) shall be and hereby is entirely freed and relieved of all obligations of Landlord subsequently accruing.

**Damage to Property or Persons**    43.    Landlord shall not be liable for any loss of or damage to property of Tenant or of others located in the demised premises or the shopping center, by theft or otherwise, nor for any loss or damage whatsoever to any property of Tenant, whether or not Tenant could remove same at the end of the term as herein provided. Landlord shall not be liable for any injury or damage to persons or property or to the interior of the demised premises resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or leaks from any part of the demised premises or from the pipes, appliances, or plumbing works or from the roof, walls, glass frames, doors, street or subsurface or from any other place or by dampness of by any other cause of whatsoever nature. Landlord shall not be liable for any such injury or damage caused by other tenants or any person(s) either in the demised premises or elsewhere in the shopping center, or by occupants of property adjacent to the shopping center, or by the public, or by operations in the construction of any private, public or quasi-public work. Landlord shall not be responsible for damage or loss of property of Tenant kept or stored on the demised premises no matter how caused.

**Liens**    44.    The interest of Landlord shall not be subject to liens for improvements made by Tenant or Tenant's contractors. Tenant shall discharge or bond against any lien filed against the shopping center, and any part thereof, for

work done or materials furnished with respect to the demised premises by Tenant or at its request within thirty (30) days after such lien is filed. If Tenant fails to keep this covenant, in addition to any other remedies available to Landlord under this Lease or otherwise, Landlord may at its option discharge such lien, in which event Tenant agrees to pay Landlord a sum equal to the amount of the lien thus discharged plus Landlord's internal administrative costs, reasonable attorney's fees, expenses and damages thereby caused Landlord.

**Entire and Binding Agreement; <u>Survival</u>**

45.  This Lease contains all of the agreements between the parties hereto, supersedes all prior and/or contemporaneous agreements and understandings and it may not be modified in any manner other than by an agreement in writing signed by all parties hereto or their successors in interest. The terms, covenants, and conditions contained herein shall inure to the benefit of and be binding upon Landlord and Tenant, and their respective successors and assigns, except as may be otherwise expressly provided in this Lease.

All obligations of Landlord or Tenant which are or may be intended by their nature to be performed and/or complied with after the expiration or earlier termination of this Lease shall survive such expiration or termination. Express provisions herein which require or permit survival in specific instances, or as to specific obligations, shall not be deemed a limitation upon the generality of this survival clause.

**Provisions <u>Severable</u>**

46.  If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be determined by appropriate judicial authority to be illegal, invalid or unenforceable, the same shall be struck from this Lease as if never included herein; but the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held illegal, invalid or unenforceable, shall not be affected thereby and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**Governing Law; Negotiated <u>Agreement</u>**

47.  This Lease shall be construed and governed in accordance with the laws of the Commonwealth of Puerto Rico. All of the parties to this Lease have participated fully in the negotiation and preparation hereof, and accordingly, this Lease shall not be more strictly construed against any one of the parties hereto.

**Payment of Additional <u>Charges</u>**

48.  At the request of Landlord, Tenant's payment of its pro rata shares of insurance premiums and taxes shall be made monthly in advance (based on estimates provided by Landlord), together with the monthly installments of Minimum Rent, provided that if the estimates used in such insurance and tax payments differ from the actual amounts thereof, promptly, following the end of each calendar year, Landlord shall reimburse to Tenant any excess payments made by Tenant during such year or Tenant shall pay to Landlord any shortfalls in such payments, as appropriate.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:                          TJAC (SAN GERMÁN), S.E.

_Lynn M. Johnson_                   By: _____
                                                              Partner
_Trudy H. Crowetz_


                                    K MART CORPORATION

_Marilyn J. Thomas_                 By: _____
                                                        Vice President
_Shelley Kenda_                     Attest: _____
                                                   Assistant Secretary

1288q

ACKNOWLEDGMENTS

STATE OF  FloRida    )
COUNTY OF Palm Beach )ss:

I do hereby certify that on this 19th day of MARch , 19 70 ,
before me, MARk B. Davis , a Notary Public in and
for the County and State aforesaid, and duly commissioned, personally appeared
Mark B. Davis, known to me to be ~~the President and Secretary of~~ a partner of
TJAC (San German), S.E., a Puerto Rico special partnership
, who, being by me duly sworn, did
depose and say that he resides in Boca Raton, Florida, that he is a partner of
TJAC (San German), S.E., a Puerto Rico special partnership,
the partnership described in and which executed the foregoing instrument;
that, on behalf of said partnership and by order of its partners, he has
signed, sealed and delivered said instrument for the uses and purposes therein
set forth, as its and his free and voluntary act; and that he signed his name
thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

My commission expires:_____

_Lynn M. Johnson_
Notary Public

NOTARY PUBLIC, STATE OF FLORIDA AT LARGE
MY COMMISSION EXPIRES MAY 25, 1992
BONDED THRU HUCKLEBERRY & ASSOCIATES

STATE OF MICHIGAN)
COUNTY OF OAKLAND)ss:

I do hereby certify that on this 30th day of March , 1990 ,
before me, Deborah Daras , a Notary
Public in and for the County and State aforesaid, and duly commissioned,
personally appeared M.L. Shilts and
C.E. Lorton , known to me to be the
Vice President and Assistant Secretary of K mart Corporation, who, being by me
duly sworn, did depose and say that they reside in Rochester, Michigan
and Birmingham, Michigan
respectively; that they are the Vice President and Assistant Secretary
respectively of K mart Corporation, the corporation described in and which
executed the foregoing instrument; that they know the seal of said
corporation; that the seal affixed to said instrument is the corporate seal of
said corporation; that, on behalf of said corporation and by order of its
board of directors, they signed, sealed and delivered said instrument for the
uses and purposes therein set forth, as its and their free and voluntary act;
and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

My commission expires: DEBORAH DARAS
Notary Public, Oakland County, Mich.
My Commission Expires January 10, 1994

_Deborah Daras_
Notary Public

-22-

LEGAL DESCRIPTION OF SAN GERMAN SHOPPING CENTER

A parcel of land lying within the official map of San German
Quadrangle of Puerto Rico, said parcel being more particularly
described as follows:

Commencing at the intersection of the centerlines of roads P.R. #
122 and P.R.# 2;  thence South 35 degrees 44 minutes 08 seconds
West a distance of 662.62 feet (point 1010), being the point of
beginning of the herein described parcel of land; thence North 69
degrees 05 minutes 07 seconds West a distance 27.49 feet (point
96); thence North 88 degrees 52 minutes 48 seconds West a distance
of 61.31 feet (point 97); thence South 32 degrees 24 minutes 30
seconds West a distance of 64.60 feet (point 98);  thence South 57
degrees 14 minutes and 59 seconds West a distance of 32.94 feet
(point 143);  thence South 81 degrees 52 minutes 48 seconds West
a distance of 13.14 feet (point 144);  thence North 35 degrees 36
minutes 04 seconds West a distance of 23.90 feet (point 100);
thence North 21 degrees 58 minutes 47 seconds East a distance of
27.91 feet (point 101);  thence North 21 degrees 51 minutes 55
seconds West a distance of 20.18 feet (point 102);  thence North
76 degrees 06  minutes 32 seconds West a distance of 16.29 feet
(point 103); thence South 38 degrees 48 minutes 20 seconds West a
distance of 21.91 feet (point 104);  thence South 84 degrees 36
minutes 23 seconds West a distance of 63.97 feet (point 105);
thence South 37 degrees 18 minutes 13 seconds West a distance of
26.04 feet (point 106);  thence South 13 degrees 05 minutes 18
seconds West a distance of 22.05 feet (point 107);  thence South
86 degrees 34 minutes 30 seconds West a distance of 44.60 feet
(point 108);  thence North  15 degrees 58 minutes 51 seconds West
a distance of 103.71 feet (point 109);  thence North 78 degrees 11
minutes 54 seconds West a distance of 57.70 feet (point 110);
thence North 30 degrees 31 minutes 51 seconds West a distance of
29.05 feet (point 111);  thence North 10 degrees 46 minutes 50
seconds West a distance of 34.45 feet (point 112);  thence North
53 degrees 42 minutes 54 seconds West a distance of 37.60 feet
(point 113);  thence North 81 degrees 40 minutes 57 seconds West
a distance 26.46 feet (point  114);  thence South 82 degrees 31
minutes 26 seconds West a distance of 39.15 feet (point 115);
thence South 69 degrees 16  minutes 31 seconds West a distance of
36.79 feet (point 116);  thence North 79 degrees 08 minutes 22
seconds West a distance of 111.94 feet (point 122);  thence North
19 degrees 24 minutes 55 seconds West a distance of 48.86 feet
(point 141); thence North 05 degrees 08 minutes 25 seconds East a
distance of 22.96 feet (point 142);  thence North 05 degrees 22
minutes 37 seconds East a distance of 204.17 feet (point 121);
thence North 04 degrees 11 minutes 06 seconds East a distance of
177.10 feet (point 123);  thence North 04 degrees 13 minutes 14
seconds East a distance of 304.41 feet (point 124);  thence North
00 degrees 20 minutes 14 seconds West a distance of 211.34 feet
(point 127);  thence North 01 degrees 31 minutes 09 seconds East
a distance of 110.60 feet (point 139); thence South 51 degrees 07
minutes 38 seconds East, a distance of 783.39 feet (point 136);
thence along an arc to the right with a central angle of 65 degrees

EXHIBIT   A

A Parcel of Land for San Germán
Page 2

59 minutes 40 seconds and a radius of 387.07 feet for a distance
of 421.59 feet (point 134); thence South 14 degrees 52 minutes 02
seconds West a distance of 62.91 feet (point 137); thence South 14
degrees 52 minutes 02 seconds West, a distance of 177.25 feet
(point 138); thence South 26 degrees 55 minutes 10 seconds West
a distance of 96.58 feet (point 1010), being the point of beginning
of the herein described parcel of land.

TOGETHER WITH an easement for ingress and egress over and upon a
portion of the following described property which may be paved from
time to time for such purposes:

A parcel of land lying within the official map of San German
Quadrangle of Puerto Rico, said parcel being more particularly
described as follows:

Commencing at the intersection of the centerlines of roads P.R.
#122 and P.R. #2; thence South 35 degrees 44 minutes 08 seconds
West a distance of 662.62 feet (Point 1010), being the point of
beginning of the herein described parcel of land; thence South 26
degrees 55 minutes 10 seconds West a distance of 31.48 feet (Point
942); thence South 28 degrees 25 minutes 01 seconds West a
distance of 474.25 feet (Point 940); thence North 8 degrees 51
minutes 06 seconds West a distance of 295.56 feet (Point 630);
thence North 47 degrees 22 minutes 28 seconds East a distance of
97.79 feet (Point 612); thence North 56 degrees 53 minutes and 25
seconds East a distance of 38.75 feet (Point 610); thence North
82 degrees 16 minutes 03 seconds East a distance of 18.88 feet
(Point 144); thence North 81 degrees 52 minutes 48 seconds East
a distance of 13.14 feet (Point 143); thence North 57 degrees 14
minutes 59 seconds East a distance of 32.94 feet (Point 98);
thence North 32 degrees 24 minutes 30 seconds East a distance of
64.60 feet (Point 97); thence South 88 degrees 52 minutes 48
seconds East a distance of 61.31 feet (point 96); thence South 69
degrees 05 minutes 07 seconds East a distance of 27.49 feet (Point
1010), being the point of beginning of the herein described parcel
of land.



K MART CORPORATION

INTERNATIONAL HEADQUARTERS
3100 WEST BIG BEAVER RD.
TROY, MICHIGAN 48084
FAX #313-643-3061

September 15, 1989
"EXPRESS MAIL"

The Davis Villamil Companies
100 S. Dixie Highway
Suite 200
West Palm Beach, Florida  33401

Attention:  Mr. Mark B. Davis

Re:  K mart #3896 - San German, PR
SWC S.R. #2 & S.R. #122

Dear Mr. Davis:

At the request of Mr. D. L. Dayne of our Real Estate Department, we are
forwarding to you two (2) sets of Typical Criteria Drawings and Outline
Specifications identified with the set number K-0564, covering our minimum
requirements for the construction of a K mart.

The Typical K mart Criteria Drawings and Specifications consist of the
following:

86,479 sq. ft. K mart dated November 28, 1988

    SD-1, L-1, I-1              M-1G thru M-5G
    A-1 thru A-11              E-1 thru E-12

Outline Specifications dated November 28,1988, including Specification
Revision Sheet SPR-103 dated February 7, 1989 and Bulletin #2 dated April 24,
1989.

Please Note:
1.   Site irrigation is required at this location.

    SITE DEVELOPMENT

    The K mart Corporation shall be party to the initial site development
    decisions.  To enable the K mart Corporation to properly evaluate the
    site conditions and have a meaningful input in these major decisions, the
    Developer shall submit to the K mart Corporation, in written and drawing
    form, a description of his proposed preliminary site development design.

    The site development design shall encompass all aspects of the proposed
    K mart operation i.e. access, site drainage and the relationship of the
    K mart floor elevation to adjacent grades, roads and buildings.  Land
    balance shall be given consideration but shall not be the overriding
    factor in the ultimate site design.

EXHIBIT   C

The Davis Villamil Companies            -2-            September 15, 1989
Attention:  Mr. Mark B. Davis
Re:  K mart #3896 - San German, PR

### SITE DEVELOPMENT  (Continued)

Preparation of final engineering drawings or commitments affecting site
improvements and development shall not be made by the Developer until
approval has been granted by the K mart Corporation.

The design package shall indicate the proposed building location, floor
elevation, site drainage pattern and utilities.  The design package shall
also include a topographical survey of the entire site including an area
extending approximately 150' onto all adjacent properties and to the
centerline of all boundary roads, or as may be required to determine any
adjacent terrain conditions which might influence the site development
design.  The survey shall also include the site description, measurements
and all existing utilities.  Preliminary test boring reports indicating
the sub-surface soil conditions shall also be submitted.

The K mart Corporation will review all submitted data and if necessary,
visit the site.  If in the judgement of the K mart Corporation the
proposed site development design would be detrimental to the K mart
operation, the design will be returned to the Developer for re-study.
Upon approval of the Site Development Design by the K mart Corporation,
the Developer may proceed with final engineering drawing.

### BUILDING DESIGN DEVELOPMENT

The K mart Corporation shall be party to the initial design phase of the
K mart building exterior in order to ensure its compatability with the
entire development.  The K mart exterior can be modified to achieve this
requirement.  However, the economy of the design concept should be
preserved.

The Developer shall submit to the Tenant's Design Division two (2) sets
of preliminary design presentation drawings depicting the total project.
The drawings shall include elevations, sections, dimensions and indicate
proposed materials.  A sample board of the proposed materials shall be
submitted.

The submittal shall be made and Tenant's approval shall be obtained prior
to the start of Construction Documents.

The checking and approval of the Contract Documents will not be processed
without the compliance of the above.

The Typical K mart store plans and specifications described above are to be
modified as indicated in the criteria revisions outlined in the following
paragraphs.

1.    Layaway Door Revision consisting of drawing TD-323 dated August 30, 1989.

These drawings and specifications describe a 86,479 sq. ft. K mart with the
Garden Shop to the right.  At this location, however, the K mart is opposite
hand.  We are including a Preliminary Layout #K-0564, dated September 14,
1989, for this size and hand store.  This drawing also indicates any required
modifications to the Typicals for this specific location.

EXHIBIT    C

The Davis Villamil Companies          -3-          September 15, 1989
Attention: Mr. Mark B. Davis
Re: K mart #3896 - San German, PR

Please note the following:

1.  Garden Shop and Pharmacy have been deleted.  All references to these
    features contained in the Criteria Documents are to be disregarded.

2.  Delicatessen and Cafeteria have been indicated.  We enclose herewith two
    (2) copies of design drawings from another project, for your information:

        Deli - Snack Bar dated August 28, 1989.
        Cafeteria dated August 28, 1989.
        Design Drawings D-3 and D-4 dated May 30, 1989 for a similar store.
        Please consider these opposite hand.

    Mechanical and electrical requirements will be furnished at a later date
    when requested by your Architect.

3.  Mezzanine storage has been extended over most of the rear Stock Area.

Please be advised that a pylon sign is approved for this location and we are
enclosing herewith two (2) copies of drawing SN-207 K mart Pylon Sign dated
June 3, 1988.  Pylon sign will be furnished and installed by Tenant.  Landlord
shall provide electric service and control from Tenant's panel to pylon sign
location.  Final connection to pylon sign by Tenant.

Please advise your consultants regarding the following utilities, services,
and the supplemental mechanical/electrical information which augments the
enclosed drawings/specifications for the above mentioned location:

The Contractor shall provide a primary electric service from Puerto Rico Power
Authority with a transformer, associated accessories and primary voltage
resulting in the most advantageous electric rate available.  Necessary
capacitors are required to maintain the power factor at minimum of 97% under
all load conditions.

Copper bus shall be used in primary switchgear whenever primary switchgear is
required by the local Power Company.

An emergency stand-by generator shall be provided to feed the following:

1.  50% lighting (one (1) row of fluorescent tubes 12'-0" o/c in sales area
    and 50% of other 277 volt lighting).
2.  Supply fans on all Roof Top Air Conditioning units.
3.  Cafeteria power with a 55% diversity.
4.  Electronic cash register (POS) system with a 50% diversity.
5.  KIN power 4.0 KW.
6.  Burglar Alarm System.
7.  Sprinkler Alarm System.
8.  Public Address System.
9.  Telephone Systems.

**EXHIBIT   C**

The Davis Villamil Companies        -4-         September 15, 1989
Attention: Mr. Mark B. Davis
Re: K mart #3896 - San German, PR

The emergency power supply shall be connected to the distribution system so
that with interruption of normal power, an automatic transfer switch starts
the generator set and transfers the load circuits indicated when the generator
reaches proper speed and voltage.  When normal power resumes, the transfer
switch retransfers the load to the line and stops the generator set.  The
generator shall be diesel driven by Onan or Kohler, six cylinder with radiator
cooling, exciser clock 24 volt battery starting system, critical silencing
muffler, 250 KW minimum, 277/480 wye.  The system shall have a 285 gal.
underground fuel tank with electric fuel pump and a weatherproof generator
housing.

Follow all aspects of the Environmental Protection Agency (EPA) as required
for underground storage tanks and as stipulated in their latest amendments to
the Resource Conservation Recovery Act.

If applicable, include their requirements for monitoring underground storage
tanks.

A remotely mounted annunciator panel located in the Manager's office shall
include the following:

| | | |
|---|---|---|
| a. | Generating | Electric plant is generating and is connected to load circuits. |
| b. | Overcrank | Electric plant failed to start. |
| c. | Lo oil pressure | Low lube oil pressure. |
| d. | Hi Eng. Temperature | Excessive water temperature. |
| e. | Lo Eng. Temperature | Low water jacket temperature. |
| f. | Overspeed | Excessive RPM of electric plant. |
| g. | Lo Battery voltage | Low battery voltage. |
| h. | Hi Battery voltage | High battery voltage. |

An audible signal shall sound with visual signals b, c, d, e, f and g.  A
switch shall be incorporated to silence the audible alarm until the alarm
condition is corrected.

The generator shall be located outside at the side of the building in close
proximity to the main transformer.

Due to the climatic conditions prevailing at this location, all heating
apparatus, outside air economizers and barometric relief for Sales Area and
Stock Area roof top A.C. units and Sales Area tranfer air fans indicated on
the enclosed drawings shall not be required by K mart Corporation unless they
are required by code.  Landlord shall determine if code requires any of these
options.  Each roof top unit shall have a manually operated adjustable outside
air damper which shall be set to provide minimum c.f.m. as indicated in the
roof top air conditioning unit schedule of the criteria set.

The roof top unit serving the Office Area will not require the economizer and
barometric relief air dampers as scheduled.  Manually set minimum OA cfm
levels as described for Sales Area A.C. units.

All air cooled condensers shall be complete with copper tubes, copper fins and
copper casing.

The Davis Villamil Companies          -5-          September 15, 1989
Attention:  Mr. Mark B. Davis
Re:  K mart #3896 - San German, PR

Provide one (1) meter for each utility to the K mart.

All public utilities (including the sprinkler system) for other co-tenant
facilities, shall be separate and completely independent from the K mart and
shall be provided by the Landlord.

The parking lot lighting and service drive lighting shall be on Landlord's
separate meter and separate electric service.  Landlord shall re-bill
appropriate charges for the K mart area to K mart Corporation.

Landlord's Engineer shall consult the telephone company relative to proper
facilities, including conduit, to handle the telephone installation.

The following features shall be incorporated into the design:

1.   Stockroom air conditioning, per Criteria requirements, is required.

Please be advised that our insurance underwriter is:

            Protection Mutual Insurance Company
            17330 Preston Road
            Suite 200C
            L.B. 436 & 442
            Dallas, Texas  75252
            Contact:  Mr. G. Charles Striemer
            Phone:    (214) 931-7650

Direct any inquiries to the listed individual at the above address.

At this time we are also enclosing six (6) copies of our plot plan #K-198
dated revised September 19, 1989 for this location, as approved by K mart
Corporation Management.  Please forward four (4) copies to your
Architect/Engineers for implementation into the Contract Documents.  If any
deviation is contemplated from the above plot plan arrangement, please advise
immediately.

These sets of Typical plans and specifications are to be used only as a guide
for the preparation of complete working drawings and specifications and as
such are not intended, nor will their use be permitted, for construction
purposes.

This project has been assigned a number (#3896) and you are at liberty to
proceed with your site development design package and contract drawings and
specifications.  Please notify the writer of the names and addresses of your
Architect and Engineers within thirty (30) days of projected date of
completion of contract drawings and specifications.  Also please notify
Mr. C. E. Strom, Manager, Building Division, of the names and addresses of
your Contractors as soon as possible.

EXHIBIT    C

The Davis Villamil Companies       -6-       September 15, 1989
Attention:  Mr. Mark B. Davis
Re:  K mart #3896 - San German, PR

Please Note:  K mart Corporation requires that the Developer's Architects
submit the contract drawings and specifications at least sixty (60) days
before the start of construction.

Very truly yours,

Stephen K. Li, A.I.A.
Manager, Design Division
Construction Department

SKL:cm
cc:  Mr. J. M. Vaohon
      Mr. C. E. Strom
      Mr. J. E. Dinkins
      Mr. D. L. Dayne
      Mr. L. H. Furman - Furman & Furman
      Energy Systems
4T/69-74

EXHIBIT    C

# EXHIBIT B

**Lisha Miller**

**From:** Schwartz, Cheryl <Cheryl.Schwartz@searshc.com>
**Sent:** Tuesday, February 26, 2019 5:49 PM
**To:** Lisha Miller <lmiller@gatorinv.com>
**Cc:** Schwartz, Cheryl <Cheryl.Schwartz@searshc.com>
**Subject:** Lease for property #3896 - San German, PR

- As you may be aware, on October 15, 2018 (the "Petition Date"), the Debtor and certain of its affiliates commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The cases are being jointly administered under chapter 11 case number 18-23538 (RDD).
- As you may also be aware, on November 16, 2018, the Bankruptcy Court entered the *Order Authorizing Debtors to Establish Procedures for Rejection of Unexpired Leases of Nonresidential Real Property and Abandon Property in Connection Therewith* (the procedures approved therein, the "Lease Rejection Procedures").
- In accordance with the Lease Rejection Procedures, the Debtors hereby unequivocally surrender possession of the premises as of February 26, 2019 by providing the lockbox and alarm codes below.

Lockbox code 2018 Burg code 2410

Cheryl Schwartz
Real Estate Manager
Acquisitions and Dispositions
Sears Holdings Corporation
3333 Beverly Road, BC-152A
Hoffman Estates, IL 60179
847-286-1696 (office)
847-286-7946 (fax)

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. This message is confidential and may contain attorney work product and/or proprietary information intended only for the use of the addressee(s) named above and/or may contain information that is

1

# EXHIBIT C

KMART CORPORATION
GATOR OESTE OWNER, LLC
ACCOUNT RECONCILIATION

| Date | Description | Monthly Minimum Rent | Estimated Operating Costs | Estimated Real Estate Taxes | Estimated Insurance | Municipal Tax | Additional Tax | Sub Total | Monthly Total | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/01/19 02/06/19 | ck#34001360 | 44,680.83 (44,680.83) | 16,296.72 (16,296.72) | | 1,061.80 (1,061.80) | 310.19 (310.19) | 316.05 (316.05) | 62,665.59 (62,665.59) | - | - |
| SUB TOTAL THROUGH 2/28/2019 | - | 63,104.69 | 75,601.23 | - | 693.53 | - | 139,399.45 | 139,399.45 | 139,399.45 |
| 2018 RECONCILIATIONS | | 63,104.69 | 75,601.23 | | 693.53 | | 139,399.45 | 139,399.45 | 139,399.45 |
| REJECTION DAMAGES | | | | | | | | | | |
| 03/01/19 through 02/29/20 | 12 mos | 536,169.96 | 195,560.64 | | 12,741.60 | 3,722.28 | 3,792.60 | 751,987.08 | 751,987.08 | 751,987.08 |
| TOTAL REJECTION DAMAGES | | 536,169.96 | 195,560.64 | - | 12,741.60 | 3,722.28 | 3,792.60 | 751,987.08 | 751,987.08 | |
| TOTALS | | 536,169.96 | 258,665.33 | 75,601.23 | 12,741.60 | 4,415.81 | 3,792.60 | 891,386.53 | 891,386.53 | 891,386.53 * |

* this amount does not include any amounts not stated herein or yet billed.

Greater of (a)
or
(b)

One Year's Rent = $ 751,987.08 ( $62,665.59 x 12 months)

15% of Remaining Value = $ 291,394.99 ( $1,942,633.29 x 15%)
March 1, 2019-September 30, 2021 = 31 months
31 mos x $62,665.59=$1,942,633.29

**2018 OPERATING COSTS RECONCILIATION**
**PLAZA DEL OESTE**
**K-MART**

**BREAKDOWN OF OPERATING COSTS**

| | | |
|---|---|---:|
| Lease start date | 09/30/91 | |
| Lease expiration date (closing date) | 02/26/19 | |
| Days in occupancy | 365 | |

| | | |
|---|---|---:|
| CLEANING | $ | 115,490.06 |
| GENERAL REPAIRS & MAINTENANCE | | 8,163.42 |
| INSURANCE | | 21,532.93 |
| LANDSCAPING | | 32,808.12 |
| MANAGEMENT FEES | | 107,627.18 |
| SECURITY | | 223,686.33 |
| SNOW REMOVAL | | - |
| UTILITIES | | 80,431.61 |
| | | |
| SUB TOTAL OPERATING COSTS | $ | 589,739.65 |
| LESS OUTPARCEL CONTRIBUTIONS | | (61,110.40) |
| | | |
| BILLABLE OPERATING COSTS | $ | **528,629.25** |

CALCULATIONS

| | | |
|---|---:|---:|
| Tenant's space | | 86,479 |
| Shopping Center GLA | | 168,080 |
| Tenant's Pro Rata Percentage | | 0.5145 |
| | | |
| Tenant's % x Billable Operating Costs | $ | 271,985.54 |

| | | |
|---|---|---:|
| Tenant's Pro Rata Share | | 271,985.54 |
| Less Amount previously billed | | (208,880.85) |
| Total | | 63,104.69 |
| Sales tax | | 315.52 |
| **Amount Due to Landlord/(Tenant)** | $ | **63,420.21** |

**2018 REAL ESTATE TAXES**
**PLAZA DEL OESTE**
**K-MART**

**BREAKDOWN OF REAL ESTATE TAXES**

| | | |
|---|---|---:|
| REAL ESTATE TAXES | | 149,441.69 |
| LESS OUTPARCELS CONTRIBUTIONS | | (2,503.65) |
| BILLABLE REAL ESTATE TAXES | $ | **146,938.04** |

**CALCULATIONS**

| | |
|---|---:|
| Tenant's space | 86,479 |
| Shopping Center GLA | 168,080 |
| Tenant's Pro Rata Percentage | 0.5145 |

| | | |
|---|---|---:|
| Tenant's % x Billable Real Estate Taxes | $ | 75,601.23 |

| | | |
|---|---|---:|
| Tenant's Pro Rata Share | | 75,601.23 |
| Less Amount previously billed | | - |
| Total | | 75,601.23 |
| Sales tax | | 378.01 |
| **Amount Due to Landlord/(Tenant)** | $ | **75,979.24** |