Objection Deadline: March 7, 2022 at 4:00 p.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re                                                 :

                                                      :        Chapter 11

SEARS HOLDINGS CORPORATION, *et al.*,                 :

                                                      :        Case No. 18-23538 (RDD)

                                                      :

Debtors.[1]                                           :        (Jointly Administered)

                                                      :

-----------------------------------------------------------------x

## NOTICE OF DE MINIMIS ASSET SALE
## CHICAGO, ILLINOIS

   **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets of the Debtors (the "**Assets**") to Greens Group, Inc. (the "**Purchaser**") pursuant to the *Real Estate Sale Contract* dated December 15, 2020 (together with any amendments thereto, the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is c/o M-III Partners, LP, 1700 Broadway, 19th Floor, New York, NY 10019.

<u>Description of the Assets</u>.  The Assets consist of twenty-nine (29) parcels of vacant land located on and around 79th and Stony Island in the City of Chicago, Cook County, State of Illinois.

<u>Relationship of the Purchaser to the Debtors</u>.  The Purchaser does not have any relationship with the Debtors.

<u>Liens and Encumbrances on the Assets</u>.  The Debtors are not aware of any liens and/or encumbrances on the Assets.  To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

<u>Material Economic Terms and Conditions of the Proposed Sale</u>.  The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code.  The Purchaser has agreed to pay a purchase price of $1,225,000 (the "**Purchase Price**") for the Assets.  The Purchase Agreement is annexed hereto as **<u>Exhibit 1</u>**.

<u>Commission, Fees, or other Similar Expenses</u>:  The Debtors are required to pay $73,500 in commission, fees, or other similar expenses in connection with the sale.

<u>Procedures to Object to the Proposed Sale</u>.  Any objection to the proposed sale (an "**Objection**") must:  (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; and Sunny Singh, Esq.), as counsel to the Debtors **on or before March 7, 2022 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; and (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated: February 24, 2022
      New York, New York

                        /s/ *Jacqueline Marcus*
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York  10153
                        Telephone:  (212) 310-8000
                        Facsimile:  (212) 310-8007
                        Ray C. Schrock, P.C.
                        Jacqueline Marcus
                        Garrett A. Fail
                        Sunny Singh

                        *Attorneys for Debtors*
                        *and Debtors in Possession*

## Exhibit 1

**Purchase Agreement**

## REAL ESTATE SALE CONTRACT
*Chicago, IL, Vacant Land*

**THIS REAL ESTATE SALE CONTRACT** ("**Contract**") is made as of  December 15th**,** 2020 (the "**Effective Date**"), by and between **KMART CORPORATION**, a Michigan corporation ("**Seller**") and **ALPCO VENTURES, LLC,** a New York  limited liability company ("**Purchaser**"; Seller and Purchaser are also collectively referred to in this Contract as  the "**Parties**" and individually referred to in this Contract as a "**Party**").  Seller and Purchaser agree as follows:

## 1.   PURCHASE AND SALE

Seller is the owner of a parcel of land including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Real Property**"), located at 79th and Stony Island in the City of Chicago (the "**City**"), Cook County ("**County**"), State of Illinois legally described on **Exhibit "A"** attached hereto and made a part hereof. The Real Property is sometimes called the "**Property**".  Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract.  On the Closing Date set forth in Section 7 of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject to the Permitted Title Exceptions (as defined in Section 4 of this Contract).

## 2.   PURCHASE PRICE

(a)   **Purchase Price.**   The Purchase Price of the Property shall be One Million Two Hundred Twenty Five Thousand and No/100 Dollars ($1,225,000.00) (the "**Purchase Price**") and payable by Purchaser in United States currency in good and certifiable funds at Closing.

(b)   **Options Consideration**.  Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100.00 as independent and non-refundable contract consideration for any options granted in this Contract.  This independent consideration is in addition to any other deposits made under this Contract, is earned by Seller upon its execution of this Contract, and will not be credited against the Purchase Price.

## 3.   NON-REFUNDABLE EARNEST MONEY

Within three (3) business days of the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company, 10 South LaSalle Street, Suite 3100, Chicago, Illinois 60603 Attention: Cheri L. Sutton, Telephone: (312) 223-2958, Fax: (312) 223-5801, Email: Cheri.Sutton@ctt.com ("**Title Insurer**" or "**Escrow Agent**") a non-refundable sum of Ten Thousand and No/100 Dollars ($10,000.00) United States currency (the "**Non-Refundable Earnest Money**") by means of a certified check, cashier's check or wire transfer, to be held by the Title Insurer in an interest bearing account in accordance with the terms of the

strict joint order escrow instructions executed by the Parties attached hereto as **Exhibit "B"** and incorporated into this Contract by this reference (the "**Earnest Money Escrow Instructions**") and also the terms and conditions of this Contract. Any escrow fees as set forth in the Earnest Money Escrow Instructions will be paid by Purchaser. The Non-Refundable Earnest Money shall be completely nonrefundable in any event. The Non-Refundable Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, no later than 11:00 am (Chicago time) on the Closing Date, by wire transfer of immediately available funds. If Purchaser shall fail to deposit the Non-Refundable Earnest Money within the time period provided for above, Seller may at any time prior to the deposit of the Non-Refundable Earnest Money, terminate this Contract, in which case this Contract shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

4.     **TITLE AND SURVEY REVIEW**

(a)     **Title Commitments/Title Exceptions**. Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser a title commitment for an ALTA Standard Form of Owner Policy of Title Insurance (the "**Title Commitment**") issued by Title Insurer covering title to the Property and showing title to the Property vested in Seller.

(b)     **Permitted Title Exceptions**. Notwithstanding anything contained in Subsection 4(a) above, the following (and any exception therefor contained in any Title Commitment, Supplemental Title Commitment, or Title Policy) shall be deemed Permitted Title Exceptions: (1) restrictive covenants common to the platted subdivision in which the Property is located, (2) standby fees, taxes and assessments, (3) utility easements created by the dedication deed or plat of the subdivision in which the Property is located or any other easements, rights of way, servitudes, encroachments, apparent servitudes, permits, surface leases or other similar rights, (4) exception as to waters, tidelands, beaches, streams, and related matters, (5) discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements (Purchaser, at Purchaser's expense, may have any related  title exception amended to read, "shortages in area"), (6) all matters set forth in the Title Commitment and the Supplemental Title Commitment(s) (defined below), if any, and approved by Purchaser or deemed approved by Purchaser as herein provided, (7) any title exception or encumbrance created directly by any act or omission of Purchaser, any of Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), or any party acting on behalf of Purchaser, (8) matters disclosed by the Survey or the Existing Survey (or if none is obtained or provided, as would be disclosed by a current and accurate survey or an inspection of the Property), (9) all applicable laws, ordinances, rules and governmental regulations affecting the development, use, occupancy and/or enjoyment of the Property, or any portion thereof, (10) encumbrances which will be and are discharged or released either prior to, or simultaneously with, the Closing, (11) the terms of any leases and

DocuSign Envelope ID: 3CD6BDC6-D132-4E18-B84E-37EC7D4F83F6

tenancies assigned hereby, and (12) any of the foregoing or any other lien, encumbrance or title defect curable by expenditure of any funds or incurrence of any liabilities, as more specifically provided under subsection (f) of this <u>Section 4</u> (collectively, the "**Permitted Title Exceptions**"). On the Closing Date, Purchaser shall cause the Title Insurer to issue, at Purchaser's sole cost and expense, a title policy in the amount of the Purchase Price insuring fee simple title to the Property in Purchaser as of the Closing Date, subject to the Permitted Title Exceptions (the "**Title Policy**"). It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before the Closing Date. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for or any other ability to obtain any endorsement, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder.

(c)    **Survey**.        Purchaser acknowledges that, prior to the Effective Date, Seller has made available to Purchaser, to the extent available, if at all, in the "Potential Purchaser Diligence Documents" folder in Seller's electronic online data room for the Property (as the same may be updated from time-to-time), Seller's existing survey of the Real Property (the "**Existing Survey**"). No later than fifteen (15) days after the Effective Date, Purchaser, may, at Purchaser's sole cost and expense, obtain a new ALTA/NSPS land title survey, or an update to the Existing Survey, with such Table A inclusions as indicated by Purchaser (excepting any Table A inclusions which would be disruptive to any ongoing use of the Property, relate to rights of any third parties, or are otherwise invasive, including but not limited to Table A, item 11, as to underground utilities, 10(a) and (b), and 19), of the Property meeting the 2016 ALTA/NSPS and Title Survey standards, prepared by a State licensed surveyor, certified in a form acceptable to Purchaser, Seller and Title Insurer (the "**Survey**").

(d)    **Supplemental Title Commitments, Supplemental Title Review Period**.  In the event that any new title matter is first raised by the Title Insurer in a supplement to the Title Commitment (each, a "**Supplemental Title Commitment**") after the Effective Date, and such new title matter is not a Permitted Title Exception (or deemed to be a Permitted Title Exception) (a "**Supplemental Unpermitted Exception(s)**"), then Purchaser shall immediately provide Seller with a copy of such Supplemental Title Commitment (together with copies of all documents relating to any new title matters set forth in such Supplemental Title Commitment). If Purchaser fails to give written notice to Seller within five (5) Business Days after Purchaser becomes aware of any Supplemental Unpermitted Exceptions shown on any Supplemental Title Commitment, Purchaser shall be deemed to have approved such Supplemental Unpermitted Exceptions and such matters shall be deemed to be Permitted Title Exceptions. If Purchaser has given the required written notice described above identifying Supplemental Unpermitted Exceptions, Seller may, at its option (but with absolutely no obligation), (i) have such Supplemental Unpermitted Exceptions removed from the Supplemental Title Commitment; (ii) commit to having such Supplemental Unpermitted Exceptions removed from the Title Policy when issued, (iii) have Title Insurer commit to insure over such

Supplemental Unpermitted Exceptions and provide evidence thereof acceptable to Purchaser, or (iv) decline to take any action with respect to such Supplemental Unpermitted Exceptions. If Seller fails to commit to having such Supplemental Unpermitted Exceptions removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given within five (5) days (the "**Supplemental Response Period**") if, but only if, such Supplemental Unpermitted Exception is reasonably likely to materially interfere with Purchaser's use and occupancy of the Property, to either (i) terminate this Contract (in which event, provided no other event of default is outstanding and/or uncured, the Parties shall have no further obligation hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation <u>Section 9</u> hereof), or (ii) accept title to the Property subject to such Supplemental Unpermitted Exceptions without any credit, setoff or abatement therefor.  If Purchaser fails to elect either (i) or (ii) above within the Supplemental Response Period, Purchaser shall be deemed to have elected (ii) above and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof without any credit, setoff or abatement.  If any such Supplemental Unpermitted Exception if not reasonably likely to materially interfere with Purchaser's use and occupancy of the Property, then Purchaser shall have no right to terminate this Contract and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof without any credit, setoff or abatement.

(e)     **<u>No Obligation of Seller to Remove Exceptions</u>**.     The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer.

## 5.     <u>PRORATIONS AND EXPENSES</u>

(a)     **<u>Prorations.</u>**     The following prorations, except as specifically provided in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date (the "**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)     <u>Taxes</u>.          All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel number(s) that is attributable to the Property.  All prorations shall be final.  Any installments of special or other assessments affecting the Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be

DocuSign Envelope ID: 73D6BDC6-D132-4E18-B84E-37BC7D4F63F6

paid by Purchaser. The term "general real estate taxes" as used in this Section 5(a)(i) includes general assessments, including, without limitation, regular annual assessments payable to any property owners association - but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

(ii)    Miscellaneous.        If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing as of the Proration Date. In the event that accurate prorations and other adjustments cannot be made at Closing because current bills are not available or the amount to be adjusted is not yet ascertainable, the Parties shall prorate on the best available information. All prorations shall be final.

(b)    **Closing-related Costs.** At Closing, Purchaser shall pay (i) the cost of the Closing Escrow; (ii) the cost of the Owner's Title Policy (including both standard and any extended coverage) and any endorsements to the Title Policy and the costs of any Updated Survey; (iii) the amount of any stamp or transfer tax or other similar fees and amounts imposed by any municipality and any county ordinance, and the state in which the Property is located (the "**State**"); (iv) any costs related to any inspections by any municipality and repairs necessitated by any municipal, county and/or State inspections ("**Repairs**"), if any, and shall meet any other requirements as established by any municipal, county and/or State ordinance with regard to the transfer of real estate; (v) all financing related fees; and (vi) all recording charges for the Deed and all documents pertaining to any Purchaser financing. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable by the Purchaser at Closing. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

# 6.    **CONDITIONS TO CLOSING**

(a)    **Conditions to Seller's Obligation to Close.** In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to sell the Property to Purchaser is subject to each and all of the following conditions precedent (or express written waiver thereof by Seller):

(i)    All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(b)    **Conditions to Purchaser's Obligation to Close**.  In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent (or express written waiver thereof by Purchaser):

(i)    All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; and

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

(c)    **Conditions to Closing of Both Parties**:  In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

(i)    The sale shall be authorized by and subject to that certain Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

(ii)    Seller, a debtor in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court (the "**Chapter 11 Case**") shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property.  Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property.  In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property.

7.    **CLOSING**

(a)    **Closing Date**. Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Title Insurer within thirty (30) days after the filing of the Sale Notice or, in the event a timely objection to the Sale Notice is interposed, within thirty (30) days after entry of a final order from the Bankruptcy Court overruling the objection and specifically approving the sale of the Property (the "**Final Sale Order**"), or such later date as reasonably requested by Seller (the "**Closing Date**"), but in no event shall the Closing Date be later than sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from the withdrawal of such objection or entry of the Final Sale Order (the "**Outside Date**").  If Closing does not occur by

the Outside Date, the Parties shall have the rights set forth in <u>Section 13(a)(i)</u> hereof.

(b)     **<u>Seller Closing Deliverables</u>**. On or before the Closing Date, Seller shall deliver or use commercially reasonable efforts to cause to be delivered to the Title Insurer the following Closing documents:

     (i)     A Special Warranty Deed (or its State equivalent) executed in proper form for recording so as to convey the title required by this Contract (the "**<u>Deed</u>**") to Purchaser, subject to the Permitted Title Exceptions;

     (ii)     A FIRPTA Affidavit in customary form duly executed by Seller;

     (iii)     A file-stamped copy of the **Approval Order**;

     (iv)     Notice to tenant(s) of the transfer of interest in the Property (the "**<u>Tenant Notice</u>**"); and

     (v)     An Owner's Affidavit of Title executed by Seller, in the form attached hereto as **<u>Exhibit "C"</u>** (or such other form as reasonably approved by Seller).

(c)     **<u>Purchaser Closing Deliverables</u>** No later than 11:00 am Chicago time on the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

     (i)     The full amount of the Purchase Price, as adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account and deliver to Escrow Agent instructions to immediately release the full amount to Seller; and

     (ii)     Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the City, County and State.

(d)     On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered a closing proration statement and State, county and municipal transfer tax declarations, in each case duly approved by Seller and Purchaser, which approval by both parties shall not be unreasonably withheld or conditioned, and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

## 8.     <u>CLOSING ESCROW</u>

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**<u>Closing Escrow</u>**") to be opened with the Title Insurer on or before the Closing

Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control. All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

## 9.    **DUE DILIGENCE PERIOD**

(a)    **Access**.        As of the Effective Date and continuing until the expiration of the Due Diligence Period (as defined below), Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), at Purchaser's sole cost, expense, and liability, shall have a non-exclusive revocable license to enter upon the Property for the purpose of conducting certain due diligence of the Property (collectively, "**Purchaser's Studies**"), in accordance with and subject to the terms, covenants, provisions, agreements, indemnifications, and conditions of that certain Access Agreement dated December 15, 2020 entered into between Seller and Purchaser (the "**Access Agreement**"), a copy of which is attached hereto and incorporated herein as **Exhibit "E"**. The terms, covenants, provisions, agreements, indemnifications, and conditions set forth in the Access Agreement are incorporated herein by reference with the same force and effect as though fully set forth herein.

(b)    **Due Diligence Period**. Purchaser shall have until 5:00 pm (local Chicago time) on the One Hundred Eightieth day following the Effective Date (the "**Due Diligence Period**"), at which time Purchaser's right (all in accordance with the terms and conditions of the Access Agreement and this Contract) to enter upon the Property and Purchaser's rights (including the Purchaser Entities) to conduct any of Purchaser's Studies, the Site Assessment Work (as such term is defined in the Access Agreement), the activities in the Work Plan (as such term is defined in the Access Agreement) shall immediately terminate. In the event Purchaser, in its sole discretion, shall conclude prior to the expiration of the Due Diligence Period, that any aspect of the Property is not suitable for Purchaser in any respect, Purchaser shall have the right to elect, by written notice to Seller given on or prior to the expiration of the Due Diligence Period (the "**Termination Notice**"), to terminate this Contract and this Contract thereupon shall be deemed to be terminated upon receipt of the Termination Notice and both Parties shall be released from any further liability hereunder, except for any obligations, which by their express terms survive the termination of this Contract, including, without limitation Section 9(d) hereof. If Purchaser gives Seller a Termination Notice, provided no other event of default is outstanding and/or uncured, the Parties shall have no further obligation

hereunder, except for any obligations, which by their express terms, survive the termination of this Contract, including, without limitation <u>Section 9(d)</u> hereof. If Purchaser fails to timely give the Termination Notice to Seller as provided in this <u>Section 9(b)</u> and subject to the terms and provisions of this Contract, including <u>Section 9(f)</u> below, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, and (ii) Purchaser agrees to accept all aspects of the Property in its "AS-IS, WHERE-IS, AND WITH ALL FAULTS CONDITION" and to release, defend, hold harmless and indemnify Seller and the Indemnified Parties from the Closing Date, for all costs and expenses (including reasonable attorneys' fees and costs) resulting from any claim, demand, damage, lien, penalty, fine, interest, cost, expense, liability or loss (collectively, "**Claims**") relating to the condition of the Property, including but not limited to the environmental condition of the Property and the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur.

(c)    **Indemnification.**  Purchaser shall indemnify, protect, defend and hold harmless Seller, and any of its respective managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns (collectively, the "**Indemnified Parties**") from and against any and all costs, liabilities, claims, demands, liens, expenses, damages, including attorney's fees, losses, penalties, fines, interest or suits resulting from (i) any release of Hazardous Materials (as defined below) on, in, under, or about the Property caused by Purchaser and/or any of the Purchaser Entities during their entry on or use of the Property, (ii) Purchaser and/or any of the Purchaser Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (iii) the acts, omissions and/or willful misconduct of Purchaser and/or the Purchaser Entities during any entry upon and/or use of the Property, the Site Assessment Work or in performing the Work Plan under the Access Agreement, (iv) a breach of the terms and conditions of this Contract and/or the Access Agreement by Purchaser and/or any of the Purchaser Entities, and/or (v) personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work, the performance of the work under the Work Plan or any other work performed by Purchaser or any of the Purchaser Entities pursuant to this Contract or the Access Agreement. Notwithstanding this indemnity, Seller expressly reserves all rights Seller may have under the law to prosecute any claims or demands against Purchaser and/or any of the Purchaser Entities arising out of or related to the environmental condition of the Property or otherwise. This indemnity shall survive the termination of this Contract and the Access Agreement. As used herein, (1) "**Affiliate(s)**" shall mean, with respect to any Person (as defined below), any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through

ownership of voting securities, by contract or otherwise; and (2) "**Person**" shall mean, any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, or other entity.

(d)   **Survival of Purchaser's Obligations**.  Notwithstanding anything to the contrary herein, any and all obligations, commitments, and indemnifications by Purchaser and the Purchaser Entities specified in this <u>Section 9</u> and otherwise set forth in the Access Agreement shall survive the expiration or termination of this Contract (and the Access Agreement) and the delivery of the Deed without the further need to document such agreement.

(e)   All of Seller's service contracts on the Property are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property to be released from such service contracts on or prior to the Closing Date.

(f)   Purchaser acknowledges that, prior to the Effective Date, Seller has provided Purchaser with electronic access to the "Potential Purchaser Diligence Documents" in Seller's electronic online data room for the Property (as the same may be updated from time-to-time) which, to Seller's current actual knowledge, may (but shall not be obligated to) contain the following documents, and such electronic access to the "Potential Purchaser Diligence Documents" as provided herein shall be deemed to satisfy any and all notice requirements as set forth in <u>Section 14</u> hereof:

a.   Current tax assessment statements and copies of the most recent tax bills for the Property;

b.   Copies of any surveys affecting the Property; and

c.   Environmental reports and studies.

d.   In the event this Contract is terminated, all materials provided by or on behalf of Seller to Purchaser (the "**Due Diligence Materials**") shall be promptly returned by Purchaser to Seller at no cost to Seller. SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING (i) THE TRUTH, ACCURACY OR COMPLETENESS OF ANY OF THE DUE DILIGENCE MATERIALS, (ii) THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME, (iii) ANY DATA OR INFORMATION DELIVERED BY SELLER OR THE SOURCES THEREOF, (iv) WHETHER ANY OF THE DUE DILIGENCE MATERIALS REPRESENT ALL OF THE NECESSARY OR RELEVANT INFORMATION RELATING TO THE PROPERTY, OR (v) THE ENFORCEABILITY OR VALIDITY OF ANY OF THE DUE DILIGENCE MATERIALS. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF THE DUE DILIGENCE MATERIALS SHALL BE AT THE SOLE RISK OF PURCHASER AND WITHOUT ANY REPRESENTATIONS,

WARRANTIES, OR GUARANTIES OF SELLER OR THE INDEMNIFIED PARTIES, AND PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH DUE DILIGENCE MATERIALS, BUT RATHER WILL RELY ON ITS OWN DUE DILIGENCE, INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AND ANY REPORTS COMMISSIONED BY PURCHASER WITH RESPECT THERETO. NEITHER SELLER, NOR ANY AFFILIATE OF SELLER, NOR THE PERSON OR ENTITY WHICH PREPARED ANY OF THE DUE DILIGENCE MATERIALS SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY, OR OMISSION, IN ANY OF THE DUE DILIGENCE MATERIALS. THE FAILURE TO DELIVER ANY REPORT, FINDINGS, RESULTS, FACTS, INFORMATION, OR DUE DILIGENCE MATERIALS SHALL NOT BE ACTIONABLE BY PURCHASER AND SELLER SHALL HAVE NO LIABILITY IN CONNECTION THEREWITH. PURCHASER ACKNOWLEDGES THAT THE DUE DILIGENCE MATERIALS PROVIDED BY SELLER MAY NOT NECESSARILY REPRESENT ALL OF THE DOCUMENTATION AND INFORMATION IN EXISTENCE (OR IN SELLER'S POSSESSION OR CONTROL) WITH RESPECT TO THE PROPERTY, BUT, RATHER, REPRESENTS DOCUMENTATION MADE AVAILABLE BY SELLER AS A CONVENIENCE FOR PURCHASER. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS MAY HAVE BEEN OBTAINED BY SELLER FROM A VARIETY OF SOURCES, AND THAT SELLER HAS NOT MADE (AND IS UNDER NO DUTY TO MAKE) ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF ANY DUE DILIGENCE MATERIALS. PURCHASER WAIVES, RELEASES AND FORFEITS ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER AGAINST SELLER, THE INDEMNIFIED PARTIES, OR THIRD PARTIES ARISING OUT OF PURCHASER'S USE OF THE DUE DILIGENCE MATERIALS. THIS SECTION 9(f) SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT.

10.    **REPRESENTATIONS AND WARRANTIES**

(a)    **Seller Representations**.    Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)    Subject to Section 6(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to Section 6(c) of this Contract.

(ii)    To Seller's actual knowledge, and except as may be reflected in the Title Commitment, there are no leases, tenancies, licenses, or other rights of

DocuSign Envelope ID: 73D6BDC6-D132-4E18-B84E-378C7D4F03F6

occupancy or use for any portion of the Property except as set forth on **Exhibit "D"**.

(iii)   As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of President of Real Estate, and shall not be construed to refer to the knowledge of any other person, including, without limitation, managers, members, officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b)   **Purchaser Representations.** Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)   Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.  Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents.  The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii)   Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii)   This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)   As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the United States Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)    Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this <u>Section 10</u> shall merge with the transfer of title and shall not survive Closing.  If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown.

## 11.    <u>AS IS/NO WARRANTIES</u>

(a)    <u>**As-Is Condition.**</u>    Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to all aspects of the Property without warranty or representation of any kind by Seller or any of Seller's managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns ( the "<u>**Indemnified Parties**</u>"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Materials. As used in this Contract, the term "<u>**Hazardous Material(s)**</u>" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any federal, state or local law, statute, ordinance or regulation. Purchaser, hereby agrees to release, defend, hold harmless and indemnify Seller and the Indemnified Parties with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was directly caused by the affirmative acts of Seller, its employees, agents or contractors from and after the Effective Date) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source.

(b)    <u>**No Warranties, Representations**</u>.  Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without

any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller.  Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price.  Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in <u>Section 10</u> of this Contract:

<blockquote>

(i)      Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)    Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.  Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

</blockquote>

(c)     <u>**WAIVER/RELEASE OF PURCHASER CLAIMS**</u>.     WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 11(a) AND 11(b), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND THE INDEMNIFIED PARTIES, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORSEEN OR UNFORSEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR

OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)    **No Representations as to Condition/Full Investigation**.  Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any of the Indemnified Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof.  The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto.  Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

## 12.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section.  At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

## 13.    **DEFAULT AND REMEDIES**

(a)    **Termination Events:**

(i)    Termination by Either Party:  Notwithstanding anything to the contrary set forth herein, this Contract may be terminated by either Party if Closing does not occur by the Outside Date as contemplated in Section 7(a) of this Contract, provided, however, that the right to terminate this Contract pursuant to this Section 13(a) shall not be available to any party whose breach of any of its representations,

warranties, covenants or agreements contained herein results in Closing failing to occur.

(ii)      <u>Termination by Purchaser.</u> If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of written notice of such default from Purchaser (excluding any default by Purchaser and Purchaser's failure to diligently complete or cure the same), Purchaser shall have as its sole and exclusive remedy the right to terminate the Contract.

(iii)     <u>Termination by Seller.</u> If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default from Seller (excluding any default by Seller of Seller's failure to diligently complete or cure the same), and Seller's sole remedy shall be to terminate this Contract, in which event Seller shall be entitled to receive the Non-Refundable Earnest Money as liquidated damages in lieu of all other remedies available to Seller and this Contract shall terminate with neither Party having any further rights or liabilities hereunder, except as those specifically provided to survive the termination of this Contract; provided, however, that this <u>Section 13(a)(iii)</u> shall not limit Seller's claims pursuant to any of Purchaser's indemnification obligations in this Contract. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Non-Refundable Earnest Money is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Non-Refundable Earnest Money upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

14.    <u>**NOTICES**</u>

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

|  |  |
|---|---|
| **To Seller:** | **M-III Partners, LP** |
| | 130 Weat 42nd Street |
| | 17th Floor |
| | New York, New York 10036 |
| | Attn: William Gallagher |
| | E-mail: wgallagher@m3-partners.com |
| **With copies to:** | **Weil, Gotshal & Manges LLP** |
| | 767 Fifth Avenue |
| | New York, New York 10153 |

|  | Attn:  W. Michael Bond, Esq. |
|---|---|
|  | Phone: (212) 310-8035 |
|  | E-mail: Michael.Bond@weil.com |

| **To Purchaser:** | **Alpco Ventures, LLC** |
|---|---|
|  | 1 Central Park South |
|  |  |
|  | New York, New York 10019 |
|  | Phone:917-775-1442 |
|  | E-mail: joseph@alpco.ventures |

**With copies to:**

_____
_____
_____
Phone:_____
E-mail:_____

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 14.

## 15.    ENTIRE CONTRACT, AMENDMENTS AND WAIVERS

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

## 16.    FURTHER ASSURANCES

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

## 17.    SURVIVAL AND BENEFIT

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing.  Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

## 18.    CONFIDENTIALITY

Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that

(i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date, (ii) all terms of this Contract and any and all drafts of this Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Due Diligence Materials (as defined above) and any other electronic files and other documents in Seller's electronic online data room, and (iv) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is strictly confidential, shall remain confidential and shall not be disclosed to any Person by Purchaser or the Purchaser Entities without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, including, but not limited to, any federal, state and/or local governmental entity, except that Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this <u>Section 18</u>. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser, the Purchaser Entities, or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser, the Purchaser Entities, or the Permitted Parties. If Purchaser, the Purchaser Entities, or the Permitted Parties breach (or threaten the breach of) the terms of this <u>Section 18</u>, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Contract by any of the Purchaser Entities or Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this <u>Section 18</u>, in addition to all other rights and remedies available at law or in equity. Notwithstanding the foregoing, the Parties agree that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser, the Purchaser Entities, or the Permitted Parties, (2) becomes available to Purchaser, the Purchaser Entities, or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information.  Purchaser acknowledges that Seller may file this Contract and any related matters with the Bankruptcy Court and thus make this Contract publicly available.  The terms of this <u>Section 18</u> shall survive termination of this Contract.

DocuSign Envelope ID: 73D6BDC6-D132-4E18-B84E-37EC7D4F63F6

## 19.   **BROKERAGE**

Except for Nate Grill representing Purchaser ("**Purchaser's Broker**") and Excess Space representing the Seller ("**Seller's Broker**" together with Purchaser's Broker shall collectively be referred to as the "**Brokers**"), each Party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction. Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including the Brokers), finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party. Any commission or other compensation due the Seller's Broker shall be the responsibility of Seller, and Seller's Broker shall be paid at the Closing in accordance with separate agreements between Seller's Broker and Seller. Purchaser's Broker shall be paid in accordance with a separate agreement between Seller's Broker and Purchaser's Broker.

## 20.   **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser has sole ownership interest provided that (i) written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing and (ii) any such assignee executes an assumption of this Contract, if requested by and in form and substance reasonably acceptable to Seller. No transfer or assignment by Purchaser shall relieve Purchaser of its obligations hereunder. No such transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

## 21.   **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns and, except for any of the Indemnified Parties, no third party is intended to or shall have any rights hereunder. This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

## 22.   **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "**Action**"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court. The term "prevailing party" as used in this Section 22 includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it), or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled. In addition, the prevailing party in any Action shall be entitled, in

addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action.  It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

23.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

24.    **RESERVED**

25.    **COUNTERPARTS**

This Contract may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Contract by signing any such counterpart delivery of an executed signature page of this Contract by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

26.    **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of Section 20 of this Contract.

27.    **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract.  Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract.

28.    **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.  The term "business day" as used in this Contract means any day that is not a

DocuSign Envelope ID: 73D6BDC6-D132-4E18-B84E-37BC7D4F03F6

Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.

**29.    TIME OF THE ESSENCE**

Time is of the essence of this Contract.

**30.    RESERVED**

**31.    CONDEMNATION AND CASUALTY**

(a)    In the event of any taking of, or if notice is given of the intention to take, by the exercise of the power of eminent domain, all or a substantial portion of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation.  If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller.  If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned (A) all interest of Seller in and to any insurance proceeds actually received by Seller (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date) or (B) condemnation awards payable to Seller on account of that event, in the case of both (A) and (B), less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price.  A portion of the Real Property will be deemed "substantial," for purposes of this Section 31 to the extent the taking of such portion would materially impair or otherwise materially affect Purchaser's intended use of the Real Property.

(b)    If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof ("**Casualty Notice**").  After delivery of the Casualty Notice, if Seller reasonably estimates the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00), Seller or Purchaser may elect, within five (5) business days of delivery of the Casualty Notice (and if the Closing is scheduled within such five (5) business day period, the Closing shall be extended for up to five (5) business days), to terminate this Contract by written notice to such other Party, in which event, provided no other event of default is outstanding and/or uncured, the Parties shall have no further obligation hereunder, except for any terms, which by their express terms, survive the termination of this Contract, including, without limitation Section 9 hereof.

**32.    SECTION HEADINGS**

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

33.    **INTERPRETATION**

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

34.    **GOVERNING LAW, JURISDICTION & VENUE**

This Contract will be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles thereof.    EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS CONTRACT.    SHOULD THE BANKRUPTCY COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO HAVE JURISDICTION OVER A MATTER RELATING TO THIS CONTRACT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF NEW YORK OR THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY, NEW YORK.    Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in Section 14 of this Contract shall be effective service of process for any suit or proceeding in connection with this Contract.

35.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto.  However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

36.    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

37.    **PATRIOT ACT**

Seller certifies that its name is **KMART CORPORATION**, a Michigan corporation, and Seller is not (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Purchaser certifies that its name is **ALPCO VENTURES, LLC,** a New York limited liability company, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

38.    **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages.    The provisions of this Section 38 shall survive the expiration of the term or any earlier termination of this Contract.

39.    **PRESS RELEASES**

Neither Purchaser nor any of Purchaser's Affiliates shall make any press release or other public announcement concerning the transaction(s) contemplated by this Contract without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. If Purchaser desires to make a press release or other public announcement respecting this Contract or the transaction(s) contemplated hereby, Purchaser shall wait at least five (5) business days after the Closing (the "**No Public Announcement Period**"), and after the expiration of the No Public Announcement Period, shall provide Seller with a draft of the press release or other public announcement for review at least ten (10) business days prior to the time that such press release or other public announcement is to be made. The Parties will attempt in good faith to expeditiously reach agreement on such press release or other public announcement and the contents thereof. Seller's failure to provide comments back to Purchaser within ten (10) business days of receipt of the draft release or announcement will be deemed consent to the public disclosure of such press release or other public announcement and the content thereof. Purchaser shall be liable for the compliance of its respective Affiliates with the terms of this Section 39. Notwithstanding anything to the contrary herein, any press release or other public

DocuSign Envelope ID: 73D6BDC6-D132-4E18-B84E-378C7D4F03F6

announcement shall not reveal any Confidential Information and otherwise be in accordance with Section  18 hereof. This Section 39 shall survive the Closing.


    *[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**KMART CORPORATION**,
a Michigan corporation

By: _____
Name: Mohsin Y. Meghji
Its: Chief Restructuring Officer

**PURCHASER:**

**ALPCO VENTURES, LLC**
a New York limited liability company

By _____
Name: Joseph Dabbah
Its: President

## EXHIBITS

Exhibit "A":    Legal Description
Exhibit "B":    Earnest Money Escrow Instructions
Exhibit "C":    Owner's Affidavit of Title
Exhibit "D":     Leases, tenancies and licenses
Exhibit "E":    Non-Invasive Inspection Agreement

## EXHIBIT "A"

## LEGAL DESCRIPTION OF PROPERTY

Parcel 1:

Lots 3, 4, 5, 6, 7, 8, 9 and 10 in Block 70 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Parcel 2:

That part of Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, East of the Third Principal Meridian, described as follows: beginning at the Northeast Corner of Lot 1 in Said Block 71 ; thence South 01 degree, 35 minutes, 12 seconds East along the West Line of South Harper Avenue, a distance of 634.15 feet to a bend point in said West Line; thence South 44 degrees, 13 minutes, 11 seconds West along the Southeast line of Said Block 71, a distance of 124.57 feet to the Southeast corner of Lot 21 in said Block 71; thence North 46 degrees, 39 minutes, 53 seconds West along the Northeast line of South Chicago Avenue, a distance of 403.28 feet to the Southwest corner of Lot 36 in said Block 71; thence North 43 degrees, 02 minutes, 39 seconds East along the Southeast line of South Blackstone Avenue, a distance of 108.07 feet to the Northwest corner of Said Lot 36; thence North 88 degrees, 46 minutes, 33 seconds East along the North Line of Lots 33 to 36, both inclusive and the Easterly extension thereof, a distance of 172.50 feet to a point on the East line of the 14-foot north/south alley in said Block 71; thence North 01 degree, 33 minutes, 32 seconds West along said East alley line, a distance of 361 .20 feet to the Northwest Corner of Lot 1 in said Block 71; thence North 88 degrees, 46 minutes, 33 seconds East along the South Line of East 77TH street, a distance of 126.27 feet to the point of beginning, all in Cook County, Illinois.

Parcel 3:

Lots 37, 38 and 39 in Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

DocuSign Envelope ID: 73D6BDC6-D132-4E18-B84E-37BC7D4F03F6

Parcel 4:

Lots 40 to 49, both inclusive in Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

Parcel 5:

Lots 5, 6, the North 4feet of lot 7 and lots 8, 9, 10, Lot 11 (except the Northwesterly 3.00 feet of Lot 11) in Block 72 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

Parcel 6:

Lots 11, 12 and 13 in block 70 in Cornell, being a subdivision of the west% of section 26, southeast 1/4 of section 26 (except the east 1/2 of the northeast 1/4 of said southeast 1/4); the north 1/2 of the northwest 1/4, the south 1/2 of the northwest 1/4 west of the Illinois Central Railroad and the northwest 1/4 of the northeast 1/4 of section 35, all in township 38 north, range 14, east of the third principal meridian, in Cook County, Illinois.

Parcel 7:

Lots 14, 15 and 16 in block 70 in Cornell, being a subdivision of the west % of section 26, southeast 1 /4 of section 26 (except the east 1/2 of the northeast 1/4 of said southeast 1/4); the north 1/2 of the northwest 1/4, the south 1/2 of the northwest 1/4 west of the Illinois Central Railroad and the northwest 1/4 of the northeast 1/4 of section 35, all in township 38 north, range 14, east of the third principal meridian, in Cook County, Illinois.

DocuSign Envelope ID: 7CD6BDC6-D132-4E18-B84E-378C7D4F03E6

**EXHIBIT "B"**

**EARNEST MONEY ESCROW INSTRUCTIONS**

(please see attached)



**CHICAGO TITLE AND TRUST COMPANY:  ESCROW TRUSTEE**

**10 S. LASALLE, STE 3100, CHICAGO, IL 60603**

Refer to: Krystina Cozzie
Phone no.: 312-223-3366
Fax no: 312-223-2076

<u>STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)</u>

ESCROW TRUST NO:                                                  DATE:

To: Chicago Title and Trust Company, Escrow Trustee:

<u>Customer Identification:</u>

Seller:  KMART CORPORATION

Purchaser:  ALPCO VENTURES, LLC

Property Address:  79th and Stony Island, Chicago, IL

Project Reference:

Proposed Disbursement Date:

<u>Escrow Deposits:</u>

1. The sum of $10,000 by WIRE representing:  INITIAL EARNEST MONEY

2. The sum of $                                         by        CHECK/WIRE
Representing:  (Additional)

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

<u>Funds:</u>

(  ) WILL     (X) WILL NOT BE INVESTED
NOTE: If funds are to be invested, an investment package will be sent.  Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

<u>Delivery of Deposits:</u>

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:

Escrow trust fee will be deducted as follows: $300 escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.
The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

Standard Provisions:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement.  Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the  undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disputes/Circumstance not contemplated:

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Trustee is unsure as to its duties as a result, Escrow Trustee may continue to hold said funds until either in receipt of a joint order from the parties or a court order directing payment. In such instance, Escrow Trustee may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Trustee for any action taken by it in good faith in the execution of its duties hereunder. The parties further agree

that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties. Notwithstanding the foregoing, where a party to this escrow agreement has been placed in default and the period to cure such default has lapsed, without cure, upon the delivery to Escrow Trustee of commercially reasonable documentation evidencing the same, Escrow Trustee shall, without delay, release the Escrow Deposit to the non-defaulting party entitled to receive such Escrow Deposit without direction from a court or delivery of a joint order from the parties to this escrow agreement.

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person.  Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

*[Signature Page to Follow]*

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:                                         For Purchaser:

Name: Kmart Corporation                    Name: Alpco Ventures, LLC

By: _____      By: _____
Name: Mohsin Y. Meghji                     Name: Joseph Dabbah
Its: Chief Restructuring Officer             Its: President

Accepted: Chicago Title and Trust Company, as Escrow Trustee

By:                                                     Date:

**\*Upon receipt of the funds, the escrow agreement becomes effective.**

## EXHIBIT "C"

## OWNER'S AFFIDAVIT OF TITLE

[See attached]

# Title Affidavit

dated as of  ____/_____/20

___

Re:    **Insured:**
      **Title Insurer:**
      Chicago Title Insurance Company, a NE corporation ("CTIC")
      **CTIC Master #:**

      **Commitment #:**
      **Premises:**
      as legally described in the Commitments

___

**Certifications:**

The undersigned owner of the Premises hereby certifies the following to Title Insurer (as to its respective estate and/or interest in the Premises):

**Mechanics Liens:**

All labor, services or materials rendered or furnished within the last 90 days in connection with the Premises or with the construction or repair of any building or improvements on the Premises have been paid for in full or will be paid in full.

**Tenants/Parties in Possession:**

There are no tenants or other parties who are in possession or have the right to be in possession of said Premises.

**Bankruptcy:**

A proceeding in bankruptcy has been instituted by or against the undersigned (or its constituent entities) which is now pending in the Bankruptcy Court for the Southern District of New York under Docket No. 18-23538.

**Gap Indemnification:**

Between the most recent Effective Date of the Commitment (or any bring down thereof) and the date of recording of the Insured Instrument(s) but in no event later than five (5) business days from the date hereof (hereinafter, the "Gap Period"), the undersigned has not taken and will not take any action to encumber or otherwise affect title to the Premises.  In the event of any lien, encumbrance or other matter affecting title to the Premises in the Gap Period arising as a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof.  The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

**Counterparts:**

This document may be executed in counterparts.

- see annexed signature page -

**Signatory/Signatories to Title Affidavit:**

By:     _____
        Name:    Mohsin Y. Meghji
        Title:     Chief Restructuring Officer
        Solely in his capacity as Chief Restructuring Officer of the Kmart Corporation and not individually

Subscribed and sworn to on ____/_____/20

_____
Notary Public

# EXHIBIT "D"

## Leases, Tenancies and Licenses

None.

DocuSign Envelope ID: 73D6BDC6-D132-4E18-B84E-378C7D4F03F6

# EXHIBIT "A"

## NON-INVASIVE INSPECTION AGREEMENT

[See attached]

<u>**NON-INVASIVE INSPECTION AGREEMENT**</u>
*Chicago, IL, Vacant Land*

      **THIS NON-INVASIVE INSPECTION AGREEMENT** (t<u>his **"Agreement"**</u>) is made and entered into as of this 15th day of December,  <u>2020</u> (<u>"**Effective Date**"</u>), by and between **KMART CORPORATION**, a Michigan cor<u>poration ("</u>**Company**") and **ALPCO VENTURES, LLC**, a New York limited liability <u>company ("</u>**Investigating Party**"), in connection with investigation and site assessment work to be performed on the property controlled by Company located at 79th and Stony Island in the Cit<u>y of C</u>hicago (the "**City**"), Cook C<u>ounty, Ill</u>inois (the "**Property**"), as more particularly described on **Exhibit <u>"A"</u>** attached hereto and made a part hereof.

<u>**RECITALS:**</u>

A.      Company desires to sell the Property to Investigating Party;

B.      Investigating Party desires to buy the Property from Company;

C.      Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the "**<u>Contract</u>**") to further such ends; and

D.      Investigating Party desires to perform a site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

      **NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

**1.**      Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property at reasonable times and upon not less than 2 business days prior notice to Company, at no cost to Company or its agents, consultants and contractors and, at Company's option, accompanied by a representative of Company.

**2.**      The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: Investigating Party shall walk the Property and inspect the roof, all heating and cooling systems and any other mechanical equipment situated on the Property and make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA ASTM E1527-13 (the "**<u>Site Assessment Work</u>**").  If Company elects to have its representative present during the Site Assessment Work and has such representative present at the times and dates scheduled by Investigating Party, then all Site Assessment shall be performed only in the presence of the Company's local manager or any other such person assigned by Company. Investigating Party shall not: (i) take photographs of store contents or any items owned or sold by Company; or (ii) perform tests, work or investigations not included in scope of the Site Assessment Work without the prior written consent of Company, in Company's sole discretion.  In the event that Investigating Party engages in activity outside of or beyond the Site Assessment Work ("**<u>Unauthorized Activity</u>**"), the Parties agree that it would be difficult to ascertain the extent of damages caused to Company, and accordingly, the Parties agree that Company shall be entitled to a one-time liquidated damages payment of Ten Thousand and No/100 Dollars ($10,000.00) from Investigating Party for any Unauthorized Activity. The Parties agree that such liquidated damages payment for Unauthorized Activity is in addition to , and does not limit in any manner whatsoever, any other actual damages, remedy or relief that otherwise might be available to the Parties herein.

1

DocuSign Envelope ID: 73D6BDC6-D132-4E18-B84E-37BC7D4F63F6

Provided further, that in the event Investigating Party engages in Unauthorized Activity, Company shall have the right to terminate access to the Property for such Unauthorized Activity.

3.      This Agreement shall terminate the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, (b) immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice and cure period, or (c) 45 days from the Contract's Effective Date, in each such event Investigating Party shall promptly restore the Property as provided in Section 9 of this Agreement.

4.      Within seven (7) days after receipt by Investigating Party, Investigating Party agrees to provide Company with all test results and reports, including all correspondence and draft reports prepared in connection with the Site Assessment Work. This provision shall survive the termination of this Agreement.

5.      Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal, state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their counsel or environmental consultants, as applicable. The foregoing restriction shall not be binding on Investigating Party following the closing under a Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this Section 5.

6.      Investigating Party agrees to defend and indemnify Company, its officers, directors, employees, and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement. This indemnity shall survive the termination of this Agreement.

7.      Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies reasonably satisfactory to Company and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

(i)      Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

(ii)     Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

(iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

2

(iv)    Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Company as an additional insured.

(v)    Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above. Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty. Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

8.    Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

9.    If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property and to restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

10.    This Agreement shall be governed by and construed in accordance with the laws of the State in which the Property is located.

11.    By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

12.    Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company. Investigating Party agrees to conduct the Site Assessment Work in such a way as to minimize interference with the conduct of Company's business on the Property.

13.    This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

3

**IN WITNESS WHEREOF**, Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

**INVESTIGATING PARTY:**

**ALPCO VENTURES, LLC**,
a New York  limited liability company

By: _____
Name:    Joseph Dabbah
Title:    President


**COMPANY:**

**KMART CORPORATION**,
a Michigan corporation

By: _____
Name:    Mohsin Y. Meghji
Title:    Chief Restructuring Officer

4

## EXHIBIT "A" TO NON-INVASIVE INSPECTION AGREEMENT

Parcel 1:

Lots 3, 4, 5, 6, 7, 8, 9 and 10 in Block 70 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Parcel 2:
That part of Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, East of the Third Principal Meridian, described as follows: beginning at the Northeast Corner of Lot 1 in Said Block 71 ; thence South 01 degree, 35 minutes, 12 seconds East along the West Line of South Harper Avenue, a distance of 634.15 feet to a bend point in said West Line; thence South 44 degrees, 13 minutes, 11 seconds West along the Southeast line of Said Block 71, a distance of 124.57 feet to the Southeast corner of Lot 21 in said Block 71; thence North 46 degrees, 39 minutes, 53 seconds West along the Northeast line of South Chicago Avenue, a distance of 403.28 feet to the Southwest corner of Lot 36 in said Block 71; thence North 43 degrees, 02 minutes, 39 seconds East along the Southeast line of South Blackstone Avenue, a distance of 108.07 feet to the Northwest corner of Said Lot 36; thence North 88 degrees, 46 minutes, 33 seconds East along the North Line of Lots 33 to 36, both inclusive and the Easterly extension thereof, a distance of 172.50 feet to a point on the East line of the 14-foot north/south alley in said Block 71; thence North 01 degree, 33 minutes, 32 seconds West along said East alley line, a distance of 361 .20 feet to the Northwest Corner of Lot 1 in said Block 71; thence North 88 degrees, 46 minutes, 33 seconds East along the South Line of East 77TH street, a distance of 126.27 feet to the point of beginning, all in Cook County, Illinois.

Parcel 3:

Lots 37, 38 and 39 in Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

Parcel 4:

Lots 40 to 49, both inclusive in Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

Parcel 5:
Lots 5, 6, the North 4feet of lot 7 and lots 8, 9, 10, Lot 11 (except the Northwesterly 3.00 feet of Lot 11) in Block 72 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

Parcel 6:

Lots 11, 12 and 13 in block 70 in Cornell, being a subdivision of the west% of section 26, southeast 1/4 of section 26 (except the east 1/2 of the northeast 1/4 of said southeast 1/4); the north 1/2 of the northwest 1/4, the south 1/2 of the northwest 1/4 west of the Illinois Central Railroad and the northwest 1/4 of the northeast 1/4 of section 35, all in township 38 north, range 14, east of the third principal meridian, in Cook County, Illinois.

Parcel 7:

Lots 14, 15 and 16 in block 70 in Cornell, being a subdivision of the west % of section 26, southeast 1 /4 of section 26 (except the east 1/2 of the northeast 1/4 of said southeast 1/4); the north 1/2 of the northwest 1/4, the south 1/2 of the northwest 1/4 west of the Illinois Central Railroad and the northwest 1/4 of the northeast 1/4 of section 35, all in township 38 north, range 14, east of the third principal meridian, in Cook County, Illinois.

## FIRST AMENDMENT TO REAL ESTATE SALE CONTRACT

THIS FIRST AMENDMENT TO REAL ESTATE SALE CONTRACT (this "First Amendment") dated as of June 15, 2021 (the "Effective Date"), is made and entered into between **KMART CORPORATION**, a Michigan Corporation (hereinafter "Seller") and **ALPCO VENTURES, LLC**, a New York limited liability company (hereinafter "Purchaser").

RECITALS:

A.    Seller and Purchaser are parties to that certain Real Estate Sale Contract for the Purchase and Sale of Real Property, dated as of December 15, 2020 (the "Agreement"), for the purchase and sale of approximately vacant land in the city of Chicago, Cook County, California, as further described in the Agreement;

B.    Seller and Purchaser now desire to amend the Agreement as set forth in this First Amendment.

NOW THEREFORE, for and in consideration of the understandings set forth herein, and for Ten Dollars ($10.00) and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    The first sentence of Section 9(b) of the Agreement is hereby deleted in its entirety and replaced with the following:

> Purchaser shall have until 5:00 pm (local Chicago time) on the three hundredth (300th) day following the Effective Date (the "**Due Diligence Period**"), at which time Purchaser's right (all in accordance with the terms and conditions of the Access Agreement and this Contract) to enter upon the Property and Purchaser's rights (including the Purchaser Entities) to conduct any of Purchaser's Studies, the Site Assessment Work (as such term is defined in the Access Agreement), the activities in the Work Plan (as such term is defined in the Access Agreement) shall immediately terminate.

2.    Purchaser shall deposit with Title Insurer the sum of Twenty Thousand and No/100 Dollars ($20,000.00) ("the **Additional Earnest Money**"). The Additional Earnest Money shall be applicable to the Purchase Price and shall be completely non-refundable in any event.

3.    **Exhibit "E"** of the Agreement shall be deleted in its entirety and replaced with **Exhibit "A"** attached hereto.

4.    Successors and Assigns.  This First Amendment shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

5.    Governing Law.  This First Amendment will be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles thereof.   EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS FIRST AMENDMENT.  SHOULD THE BANKRUPTCY

COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO HAVE JURISDICTION OVER A MATTER RELATING TO THIS FIRST AMENDMENT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF NEW YORK OR THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY, NEW YORK  Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in <u>Section 14</u> of the Agreement shall be effective service of process for any suit or proceeding in connection with this First Amendment.

6.    <u>Signatures; Counterparts</u>.  This First Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument.  An executed signature page delivered via facsimile transmission or electronic signature shall be deemed as effective as an original executed signature page.

7.    <u>Time of the Essence</u>.  Time is of the essence of this First Amendment.

8.    <u>Ratification and Control</u>.  Except as expressly set forth herein, the Agreement remains unmodified and unchanged.  In the event of any conflict or inconsistency between the terms and conditions of the Agreement and the terms and conditions of this First Amendment, the terms and conditions of the latter shall control.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

WEIL:\98007115\1\73217.0004

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment effective as of the day and year first set forth above.

**SELLER:**

**KMART CORPORATION**, a Michigan Corporation

By: _William Gallagher_
Name:    William Gallagher
Title:    Authorized Signatory

**PURCAHSER:**

**ALPCO VENTURES, LLC**, a New York limited liability company

By: _____
Name:    Joseph Dabbah
Title:    Principal

## EXHIBIT "A"

## ACCESS AGREEMENT
*Chicago, Illinois, Vacant Land*

This ACCESS AGREEMENT (this "**Agreement**") is made and entered into as of this 15 day of June 2020 ("**Effective Date**"), by and between **ALPCO VENTURES, LLC**, a New York limited liability company ("**Purchaser**"), and **KMART CORPORATION**, a Michigan corporation ("**Seller**") (Purchaser and Seller may also be collectively referred to in this Agreement as the "**Parties**" and individually referred to as a "**Party**").

## RECITALS

A.      Seller is the owner of that certain real property known as 79th and Stony Island in the City of Chicago, Cook County, in the State of Illinois, as legally described on **Exhibit "A"** attached hereto (the "**Property**").

B.      Purchaser and Seller are parties to a written agreement ("**Contract**") for the sale of the Property by Seller to Purchaser.

C.      Purchaser desires to have access to Confidential Information (as defined below) and enter onto the Property and perform certain activities, physical inspections, site investigations, site assessments, and, if permitted by Seller pursuant to the terms of this Agreement, an invasive environmental investigation of the Property (collectively, "**Due Diligence**"), all as may be permitted hereunder as part of Purchaser's due diligence prior to the execution of the Contract.

D.      Subject to the terms of this Agreement, Seller has agreed to permit Purchaser and/or Purchaser's agents to conduct Due Diligence of the Property for the purposes set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller agree as follows:

1.      **Incorporation of Recitals**.  The foregoing recitals are true and correct and are incorporated into this Agreement by reference.

2.      **Grant of Access**.

(a)      As of the Effective Date and continuing until the Expiration Date (as defined below), Seller grants to Purchaser, and its employees, agents, consultants and contractors (collectively, the "**Purchaser Entities**"), at Purchaser's sole cost, expense, and liability, a non-exclusive revocable license to enter upon the Property to conduct certain Due Diligence, subject to the terms and conditions of this Agreement. Purchaser and the Purchaser Entities shall be permitted to visually inspect the physical condition of the Property and conduct certain non-invasive or non-destructive physical and environmental inspections, activities, studies, evaluations, tests, and investigations of the Property or any

1

part thereof, including, without limitation, all structural, physical, electrical and mechanical aspects of the Property, supports, site work, foundations, drainage, and make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment, or perform an ALTA/NSPS land title survey conducted by a licensed surveyor (collectively, the "**Site Assessment Work**").

       **(b)**     Seller agrees to use commercially reasonable efforts to provide Purchaser with reasonable access to the Property to perform the Site Assessment Work at reasonable times and upon not less than two (2) business days prior written notice to Seller, at no cost to Seller or its agents, consultants and contractors, and, at Seller's option, accompanied by a representative of Seller.

       **(c)**     Without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, Purchaser and the Purchaser Entities shall not: (i) take photographs of store contents or any items owned or sold by Seller; provided that, notwithstanding the foregoing, Purchaser and Purchaser Entities are permitted to take photographs in connection with the Site Assessment Work, Invasive Testing (defined below) and Work Plan (defined below); (ii) perform tests, work or investigations not included in scope of the Site Assessment Work including, but not limited to roof penetrations, borings, asbestos samplings, invasive or destructive testing, or any Phase II Environmental Assessment, unless approved by Seller in accordance with Section 3 hereof; (iii) contact any tenant, sub-tenant, invitee, guest, or licensee of Seller, unless approved by Seller in writing and required in connection with a Phase I Environmental Assessment; (iv) perform any Invasive Testing (as defined below) other than in accordance with the manner and scope described in the Work Plan, unless approved by Seller in accordance with Section 3 hereof; or (v) perform any Due Diligence not in accordance with the terms and conditions of this Agreement (collectively, "**Unauthorized Activity**").

       **3.**     **Invasive Testing**.  At Purchaser's sole cost, expense and liability, invasive or destructive testing, including but not limited to roof penetrations, borings, asbestos samplings, or any Phase II Environmental Assessment of the Property ("**Invasive Testing**"), may only be performed at, under, or upon the Property, or any part thereof, with Seller's prior written approval (which may be via email from Seller or Seller's counsel), which written approval may be conditioned, delayed, or withheld at the sole and absolute discretion of Seller. If, and only if, Seller provides prior written approval to Purchaser for any Invasive Testing, then beginning on the date of Seller's approval and continuing until the Expiration Date, Purchaser may enter upon the Property to carry out any Invasive Testing in accordance with the written work plan, attached hereto as **Exhibit "B"**, approved in writing by Seller (as amended, the "**Work Plan**"). Notwithstanding anything contrary in this Agreement, execution by Seller of this Agreement with a Work Plan attached as Exhibit B shall constitute Seller's prior written approval of the Work Plan and any Invasive Testing provided in the Work Plan. All Invasive Testing shall be performed in accordance with the manner and scope described in the Work Plan, the terms of this Agreement, and such other conditions as may be required by Seller, including, without limitation, the following express conditions:

(a)    At reasonable times and upon not less than two (2) business days prior written notice to Seller, Purchaser shall have reasonable access to the Property to perform the Invasive Testing in accordance with the Work Plan, at no cost to Seller or its agents, consultants and contractors, and, at Seller's option, accompanied by a representative of Seller.

(b)    Any changes to the existing Work Plan shall be submitted to Seller in writing for Seller's prior written approval, which written approval may be conditioned, delayed, or withheld at the sole and absolute discretion of Seller. Any changes to the existing Work Plan shall be subject to the terms and conditions of this Agreement.

(c)    Except for any Site Assessment Work, Purchaser and the Purchaser Entities shall not conduct any work or engage in any activities on the Property other than in accordance with the manner and scope described in the Work Plan. Seller reserves all rights or claims that Seller may have at law or in equity against Purchaser and/or the Purchaser Entities related to or arising from the environmental condition of the Property to the extent permitted by law.

(d)    Seller shall have the right to obtain split samples or conduct contemporaneous sampling, and shall be given two (2) business days' prior written notice, when any sampling may be conducted by Purchaser or the Purchaser Entities on the Property so as to allow a representative of Seller to observe such activity. A copy of any correspondence, data, report, test or other communication with any governmental agency relating to the environmental condition of the Property or the presence of any petroleum or other Hazardous Substances shall be simultaneously sent to Seller, provided that, notwithstanding the foregoing, the foregoing requirements do not apply to contacts with governmental agencies in connection with the Site Assessment Work, Invasive Testing, and the Work Plan, as such information, as appropriate, will be incorporated into any final reports, if any. As used in this Agreement, the term "**Hazardous Substances**" shall mean any hazardous substance or waste as defined in federal and state or local laws, regulations or ordinances.

(e)    If monitoring wells are permitted in the Work Plan, Purchaser shall, at Purchaser's sole cost and expense, install a locked cap on such wells, shall ensure that said caps are secure, and take commercially reasonable steps necessary to prohibit access to the recovery wells by parties not authorized to do so by Purchaser. As between Purchaser and Seller, Purchaser is responsible for any contamination or damage caused by the authorized or unauthorized access to the recovery wells. Purchaser agrees to ensure that all of the Purchaser Entities also close any recovery wells upon the completion of the investigation or the termination of this Agreement, whichever is sooner, and perform the Work Plan in accordance with the terms of this Agreement, including, without limitation Section 11 hereof, and prudent engineering principles.

(f)    If the location of the equipment installed pursuant to the approved Work Plan shall at any time interfere or conflict with Seller's use of the Property, as may be determined by Seller in its sole and absolute discretion, Purchaser shall upon receipt of a written request from Seller to do so, close, remove and/or relocate, all at Purchaser's sole

3

cost and expense, said equipment, including any monitoring wells set forth in the Work Plan, within a reasonable time after receipt by Purchaser of such governmental approvals as may be required to close, remove or relocate said well or wells. Purchaser shall use its best efforts to obtain all such required governmental approvals.

4.      **Term**.  Except for the provisions which expressly survive the termination of this Agreement, this Agreement and the non-exclusive revocable license granted hereby shall immediately terminate on the earliest to occur of either of the following (the "**Expiration Date**"): (a) the Closing on the property under the Contract, (b) upon the breach by Purchaser of any covenant of this Agreement, (c) upon written notice thereof from Seller to Purchaser, for any reason or for no reason, all as determined in Seller's sole and absolute discretion, or (d) one hundred twenty (120) days after the Effective Date (the "**Outside Date**"). Immediately upon the Expiration Date, Purchaser shall promptly restore the Property as provided in this Agreement.

5.      **Presence of Seller's Representative**.  If Seller elects to have its representative(s) present during the Site Assessment Work, the performance of the Work Plan, and/or Invasive Testing, if any, and has such representative(s) present at the times and dates scheduled by Purchaser, then all Site Assessment Work, activities performed under the Work Plan, and/or Invasive Testing as the case may be, shall be performed only in the presence of the Seller's local manager(s) or any other such person(s) assigned or designated by Seller.

6.      **Repairs**. If any portion of the Property, including any improvements and/or personal property of Seller, suffers damage by reason of the entry of Purchaser or any of the Purchaser Entities on the Property, including but not limited to damage arising from any tests, investigations and/or monitoring conducted upon the Property, Purchaser and the Purchaser Entities shall, at its own cost and expense, immediately repair such damage and restore the Property to as good a condition as before such damage occurred.  Repair of damage includes, without limitation, re-grouting and resurfacing any holes, ditches, or other indentations, as well as any mounds or other inclines caused by Purchaser or any of the Purchaser Entities.

7.      **Reports**.  Within two (2) business days after receipt by Purchaser (not following receipt by Purchaser Entities), Purchaser agrees to provide Seller with all test results and final reports, quality assured results of samples taken pursuant to the Work Plan prepared in connection with the Site Assessment Work, Invasive Testing, or otherwise (collectively, the "**Reports**"). This provision shall survive the termination of this Agreement.

8.      **Confidentiality**. Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that (i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date, (ii) all terms of this Agreement and any and all drafts of the Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Property Documents (as defined below) and any other electronic files and other documents in Seller's electronic online data room, (iv) any results or findings, whether in draft form or made final, written or otherwise, of the Site Assessment Work or the

4

Invasive Testing, and (v) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is strictly confidential, shall remain confidential and shall not be disclosed to any Person by Purchaser or the Purchaser Entities without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and absolute discretion, including, but not limited to, any federal, state and/or local governmental entity, except that Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this <u>Section 8</u>. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser or the Permitted Parties. If Purchaser or the Permitted Parties breach (or threaten the breach of) the terms of this <u>Section 8</u>, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Agreement by any of the Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this <u>Section 8</u>, in addition to all other rights and remedies available at law or in equity. Notwithstanding the foregoing, the Parties agree that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser or the Permitted Parties, (2) becomes available to Purchaser or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information. The terms of this <u>Section 8</u> shall survive termination of this Agreement.

9.      **Indemnification**.  Purchaser shall indemnify, protect, defend and hold harmless Seller, and any of its respective managers, members, officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors and subcontractors (collectively the "**Indemnified Parties**") (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law) from and against any and all costs, liabilities, claims, expenses, damages, including attorney's fees, losses, penalties, or suits resulting from (i) any release of Hazardous Substances on, in, under, or about the Property caused by Purchaser and/or any of the Purchaser Entities during their entry on or use of the Property, (ii) Purchaser and/or any of the Purchaser Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (iii) the acts, omissions and/or willful misconduct of Purchaser and/or the Purchaser Entities during any entry upon and/or use of the Property, the Site Assessment Work, the Invasive Testing, or in performing the Work Plan under this Agreement, (iv) a breach of the terms and conditions of this

5

Agreement by Purchaser and/or any of the Purchaser Entities, and/or (v) personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work, the performance of the work under the Work Plan, the Invasive Testing or any other work performed by Purchaser pursuant to this Agreement or otherwise. Notwithstanding this indemnity, to the extent permitted by law, Seller expressly reserves all rights Seller may have under the law to prosecute any claims or demands against Purchaser and/or any of the Purchaser Entities arising out of or related to the environmental condition of the Property or otherwise. This indemnity (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law) shall survive the termination of this Agreement. As used herein, (1) "**Affiliate(s)**" shall mean, with respect to any Person (as defined below), any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; and (2) "**Person**" shall mean, any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, or other entity.

10.    **Insurance**. Purchaser shall maintain, at its own cost and expense, or shall ensure that all of the Purchaser Entities entering the Property, or otherwise performing any work or activities hereunder, including any Site Assessment Work, the Invasive Testing, or any activities performed under the Work Plan, shall maintain, at its/their sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Seller) from insurance companies reasonably satisfactory to Seller and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Seller or a rating otherwise approved by Seller:

(i)    Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Seller, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

(ii)    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

(iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Seller as an additional insured.

(iv)    If Purchaser is performing any Invasive Testing or other work in accordance with a Work Plan, Environmental Impairment or Pollution Liability Insurance, including clean-up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Seller as an additional insured.

6

(v)    Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

Purchaser warrants that, if any of the Purchaser Entities enter the Property, or otherwise perform any work or activities hereunder, including any Site Assessment Work, Invasive Testing, or any activities performed under the Work Plan, such Purchaser Entities will maintain insurance as set forth above. To the extent permitted by law (and Purchaser has advised Seller that this indemnification is not enforceable under Ohio law), Purchaser further agrees to indemnify, defend and hold Seller harmless from any loss, cost, liability, expense and damage suffered by Seller as a result of Purchaser's breach of this warranty. Purchaser or any of the Purchaser Entities shall not enter into the Property or commence any portion of the Site Assessment Work, Invasive Testing, or any activities performed under the Work Plan prior to delivering to Seller an insurance certificate evidencing that it has the foregoing insurance. As applicable, Purchaser shall provide Seller with certificates of insurance evidencing the insurance coverage required hereunder for Purchaser and all Purchaser Entities, and at the request of the Seller, provide certified copies of such policies or portions thereof. All such insurance policies shall provide that they may not be changed, non-renewed or canceled without at least thirty (30) days' prior written notice to Seller. All such insurance policies, except worker's compensation and Motor Vehicle Insurance shall name Seller and its Affiliates as additional insureds and shall stipulate that such party's insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Seller or its Affiliates. Completed operations coverage shall continue to be maintained for at least one (1) year following the completion of the Work Plan or any Invasive Testing, naming Seller and its Affiliates as additional insureds during such period of continuation.

11.    **Compliance with Legal Requirements.** Purchaser shall comply in all material respects, and shall by contract require all the Purchaser Entities to comply, with all applicable federal, state, and local laws, ordinance, statutes, recorded restrictions on the Property, and governmental regulations in the performance of the (i) investigation of the Property, including any Invasive Testing, (ii) Site Assessment Work, (iii) performance of the work under the Work Plan, if any, or (iv) other work performed by Purchaser pursuant to this Agreement or otherwise. Purchaser or Purchaser Entities shall obtain, at its/their own expense, and prior to any access to the Property by any of the Purchaser Entities under this Agreement, all permits and authorizations of whatever nature from any and all governmental agencies necessary for conducting the investigation pursuant to this Agreement, as applicable. Purchaser and Purchaser shall Entities shall properly handle, sort, and dispose of at its own expense all Hazardous Substances on, in, under, or about the Property generated by the Purchaser Entities in the course of conducting the investigation under this Agreement, as applicable. Purchaser agrees that it shall be the licensee and/or generator of any and all Hazardous Substances generated in the course of conducting the investigation authorized in this Agreement, and shall identify itself as the licensee and/or generator of such Hazardous Substances on any and all documentation, including without limitation all hazardous waste manifests, associated with the handling, storage, treatment, disposal or transportation of any and all Hazardous Substances generated in the course of the investigation.

12.    **Safety**. Purchaser shall comply, and Purchaser shall take commercially reasonable steps to ensure that the Purchaser Entities comply, with commercially reasonable safety and

security practices in the performance of the (i) investigation of the Property, including any Invasive Testing, (ii) Site Assessment Work, (iii) performance of the work under the Work Plan, if any, or (iv) other work performed by Purchaser pursuant to this Agreement or otherwise.

13.    **Restoration of Property.**  Purchaser agrees, all at the sole cost and expense of Purchaser, to immediately (i) repair any damage to the Property, (ii) restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work, (iii) remove any of the equipment, fixtures, improvements and other property located on any portion of the Property which was installed during the term of this Agreement, and (iv) to the extent applicable, if at all, close all work performed by Purchaser and/or the Purchaser Entities, including all wells, in compliance with applicable federal, state, and local laws, rules and regulations and/or to industry standards.

14.    **Liens**.  Purchaser shall discharge at once or bond or otherwise secure all liens and attachments that are filed in connection with Purchaser's implementation of the Site Assessment Work, the Work Plan, the Invasive Testing, or other work performed by Purchaser pursuant to this Agreement or otherwise, and shall indemnify and hold harmless the Indemnified Parties from and against any and all loss, damage, injury, liability, and claims thereof resulting directly or indirectly from such liens and attachments.

15.    **Property Materials**.  Subject to the terms and conditions of this Agreement, Seller may make or cause to be made available to Purchaser, in Seller's sole and absolute discretion, electronic access to the "Potential Buyer Diligence Documents" in Seller's electronic online data room for the Property which may contain certain documents and information about the Property (collectively, the "**Property Materials**"). The Property Materials shall expressly not include the following documents: (i) those documents that are protected by the attorney-client and/or attorney work produce privileges; (ii) Seller's formation documentation or organizational documents; (iii) financial analyses, appraisals, property condition reports and internal memoranda relating to the operation, maintenance or condition of the Property; (iv) any information which is the subject of a confidentiality agreement; and (v) Seller's internal communications and correspondence. Seller shall not and does not represent, warrant or guaranty: (a) the truth, accuracy, or completeness of any of the Confidential Information; (b) that the Confidential Information represents all of the necessary or relevant information relating to the Property; and (c) the enforceability of the Confidential Information, as applicable.

16.    **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the state in which the Property is located.

17.    **Voluntary Agreement.**  By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

18.    **Coordination of Due Diligence.**  Purchaser agrees that the Site Assessment Work and Invasive Testing, if any, shall be coordinated with Seller's local manager or any other such person assigned or designated by Seller.  Purchaser agrees to conduct any Site Assessment Work and Invasive Testing, if any, in such a way as to minimize interference with the conduct of Seller's

8

business on the Property, and shall at all times be subject to the rights, if any, of any licensee, tenant, occupant, or other Person to use or occupy the Property, or any part thereof.

**19.** **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

**20.** **Binding Effect**. This instrument shall bind and inure to the benefit of the respective heirs, executors, administrators, other personal and legal representatives, grantees, successors and assigns of the Parties hereto.

**21.** **Entire Agreement: Modification**. This Agreement between Seller and Purchaser contains the entire understanding and agreement among the Parties and supersedes all prior understandings and agreements between the Parties whether oral or written. This instrument may be modified only by a writing signed by all Parties.

**22.** **Survival of Purchaser's Obligations; No Obligation to Buy or Sell.** Notwithstanding anything to the contrary herein, all obligations and commitments by Purchaser and the Purchaser Entities specified in this Agreement shall survive the expiration or termination of this Agreement. Neither Purchaser nor Seller has any obligation to enter into or execute the Contract as a result of this Agreement. Use of the term "Purchaser" is for convenience only and does not convey, imply, or otherwise mean that an existing contract or other commitment, promise, agreement or obligation of any kind, oral or written, express or implied, has been made or entered by either of the Parties hereto for purchase or sale of the Property to Purchaser. Purchaser acknowledges and agrees that Seller is entering into this Agreement solely for providing Purchaser access to the Property and certain Confidential Information and for setting out the conditions of such access and Confidential Information and that, in doing so, Seller is not in any way, expressly or impliedly, promising, covenanting, agreeing or in any other way committing to sell the Property to Purchaser, or enter into any other obligation to or with Purchaser.

**23.** **Notice**. Except as provided in Section 3 hereof, any and all notices required by this Agreement, or by law, to be delivered to, served on, or given to any Party to this Agreement shall be in writing, may be given by legal counsel on behalf of such Party, and shall be deemed properly delivered, given or served (a) when personally delivered to such Party, (b) when electronically delivered with receipt acknowledged, together with a copy sent by United States mail, express, certified or registered with the return receipt requested, postage paid (or other overnight delivery service, charges prepaid), or (c) when mailed by United States mail, express, certified or registered with the return receipt requested, postage paid (or other overnight delivery service, charges prepaid), addressed as follows:

    To Seller:          **M-III Partners, LP**
                        1700 Broadway
                        19th Floor

9

New York, New York 10036
Attn: William Gallagher
Email: wgallagher@miiipartners.com

**With copies to:**            **Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153
Attn:  W. Michael Bond, Esq.
Phone: (212) 310-8035
E-mail: Michael.Bond@weil.com

**To Purchaser:**            **Alpco Ventures, LLC**
1 Central Park South
New York, New York 10019
Phone:917-775-1442
E-mail: joseph@alpco.ventures

**With copies to:**            _____
_____
_____
**Phone:**_____
**E-mail:**_____

Any Party may change its address by giving ten (10) day advance written notice of such change to the other Parties in the manner provided in this Section 23.

24.    **Severability**.  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, unless such ruling shall materially alter the economic effect of this Agreement.

25.    **Representation**. Purchaser represents and warrants that it does not need the consent of any other party or Person to enter into this Agreement.

26.    **Assignment**.  Purchaser may not assign, delegate or subcontract (by contract, operation of law or otherwise) its rights or obligations under this Agreement, except with Seller's prior written consent, and the failure of Purchaser to obtain Seller's prior written consent shall render any such attempt to assign, delegate, or subcontract of no force and effect.

27.    **No Waiver; Cumulative Remedies**.  The failure of any Party to insist, in any one or more instances, or the delay in insisting, upon the performance of any provision of this Agreement or to exercise any right hereunder, does not constitute an election of remedies or waiver, and the obligations of the Parties with respect to such future performance will continue in full force and effect. Except as otherwise provided in this Agreement, the remedies in this

EAST\157795606.10

WEIL:\98007115\1\73217.0004

Agreement are cumulative with and not in lieu of other remedies available to a Party at law or in equity.

28.    **No Third Party Beneficiaries**.  Other than Indemnified Parties, this Agreement shall not be deemed to confer any rights to any other party (other than Purchaser or any of the Purchaser Entities) as a third party beneficiary or otherwise.

**[END OF TEXT – SIGNATURE PAGE TO FOLLOW]**

11

**IN WITNESS WHEREOF**, Purchaser and the Seller have executed this Access Agreement as of the Effective Date first above stated.

PURCHASER:

**ALPCO VENTURES, LLC**,
a New York limited liability company

By: _____

Name: Joseph Dabbah
Title:   Principal

SELLER:

**KMART CORPORATION**,
a Michigan corporation

By: _____

Name: William Gallagher
Title:   Authorized Signatory

## EXHIBIT "A"

## LEGAL DESCRIPTION

Parcel 1:

Lots 3, 4, 5, 6, 7, 8, 9 and 10 in Block 70 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Parcel 2:

That part of Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, East of the Third Principal Meridian, described as follows: beginning at the Northeast Corner of Lot 1 in Said Block 71 ; thence South 01 degree, 35 minutes, 12 seconds East along the West Line of South Harper Avenue, a distance of 634.15 feet to a bend point in said West Line; thence South 44 degrees, 13 minutes, 11 seconds West along the Southeast line of Said Block 71, a distance of 124.57 feet to the Southeast corner of Lot 21 in said Block 71; thence North 46 degrees, 39 minutes, 53 seconds West along the Northeast line of South Chicago Avenue, a distance of 403.28 feet to the Southwest corner of Lot 36 in said Block 71; thence North 43 degrees, 02 minutes, 39 seconds East along the Southeast line of South Blackstone Avenue, a distance of 108.07 feet to the Northwest corner of Said Lot 36; thence North 88 degrees, 46 minutes, 33 seconds East along the North Line of Lots 33 to 36, both

inclusive and the Easterly extension thereof, a distance of 172.50 feet to a point on the East line of the 14-foot north/south alley in said Block 71; thence North 01 degree, 33 minutes, 32 seconds West along said East alley line, a distance of 361 .20 feet to the Northwest Corner of Lot 1 in said Block 71; thence North 88 degrees, 46 minutes, 33 seconds East along the South Line of East 77TH street, a distance of 126.27 feet to the point of beginning, all in Cook County, Illinois.

Parcel 3:

Lots 37, 38 and 39 in Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

Parcel 4:

EAST\157795606.10

WEIL:\98007115\1\73217.0004

Lots 40 to 49, both inclusive in Block 71 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

Parcel 5:

Lots 5, 6, the North 4feet of lot 7 and lots 8, 9, 10, Lot 11 (except the Northwesterly 3.00 feet of Lot 11) in Block 72 in Cornell, being a Subdivision of the West 1/2 of Section 26; the Southeast 1/4 of Section 26, (with the exception of the East 1/2 of the Northeast 1/4 of Said Southeast 1/4): the North 1/2 of the Northwest 1/4; the South 1/2 of the Northwest 1/4; the West of the Illinois Central Railroad and the Northwest 1/4 of the Northeast 1/4 of Section 35, all in Township 38 North, Range 14, in Cook County, Illinois.

Parcel 6:

Lots 11, 12 and 13 in block 70 in Cornell, being a subdivision of the west% of section 26, southeast 1/4 of section 26 (except the east 1/2 of the northeast 1/4 of said southeast 1/4); the north 1/2 of the northwest 1/4, the south 1/2 of the northwest 1/4 west of the Illinois Central Railroad and the northwest 1/4 of the northeast 1/4 of section 35, all in township 38 north, range 14, east of the third principal meridian, in Cook County, Illinois.

Parcel 7:

Lots 14, 15 and 16 in block 70 in Cornell, being a subdivision of the west % of section 26, southeast 1 /4 of section 26 (except the east 1/2 of the northeast 1/4 of said southeast 1/4); the north 1/2 of the northwest 1/4, the south 1/2 of the northwest 1/4 west of the Illinois Central Railroad and the northwest 1/4 of the northeast 1/4 of section 35, all in township 38 north, range 14, east of the third principal meridian, in Cook County, Illinois.

EAST\157795606.10

WEIL:\98007115\1\73217.0004

## EXHIBIT "B"

## WORK PLAN

15

EAST\157795606.10

WEIL:\98007115\1\73217.0004

## SECOND AMENDMENT TO REAL ESTATE SALE CONTRACT

THIS SECOND AMENDMENT TO REAL ESTATE SALE CONTRACT (this "**Second Amendment**") dated as of February 7, 2022 (the "**Effective Date**") is made and entered into between **KMART CORPORATION**, a Michigan corporation ("**Seller**") and **REGAL MILE VENTURES LLC**, a Delaware limited liability company ("**Purchaser**").

### RECITALS:

A.     Seller and Alpco Ventures, LLC, a New York limited liability company ("**ALPCO**") are parties to that certain Real Estate Sale Contract for the Purchase and Sale of Real Property dated as of December 15, 2020 (the "**Initial Agreement**"), as amended by that certain First Amendment to Agreement to Real Estate Sale Contract dated as of June 15, 2021 (the "**First Amendment**" and together with the Initial Agreement, the "**Original Agreement**") for the purchase and sale of vacant land in the City of Chicago, County of Cook, State of Illinois, as further described in the Original Agreement;

B.     ALPCO has assigned all of its right, title and interest in and to the Original Agreement to Purchaser and Purchaser has assumed all of ALPCO's right, title and interest in and to the Original Agreement; and

C.     Seller and Purchaser now desire to amend the Original Agreement as set forth in this Second Amendment.

NOW THEREFORE, for and in consideration of the understandings set forth herein, and Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Definitions.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Original Agreement.  All references to the term "**Agreement**" in the Original Agreement and in this Second Amendment shall mean and refer to the Original Agreement as amended by this Second Amendment.

2.     Consent to Assignment.  In accordance with the terms and provisions of Section 20 of the Agreement, Seller hereby consents to ALPCO's assignment of the Agreement to Purchaser.

3.     Closing Date.  Section 7(a) of the Original Agreement is hereby deleted in its entirety and replaced with the following:

**Closing Date**. Provided all conditions and/or contingencies to Closing described in this contract have been fulfilled or waived; the Closing (the "**Closing**") shall take place at the office of the Title Insurer on the later of (i) March 31st, 2022, (ii) thirty (30) days after the filing of the Sale Notice (or, in the event a timely objection to the Sale Notice is interposed, within thirty (30) days after entry of a final order from the Bankruptcy Court overruling the objection and specifically approving the sale of the Property (the "**Final Sale Order**")), or (iii) such later date as reasonably requested by Seller (the "**Closing Date**"); provided, however, in no event shall the Closing Date be later than the later of (i) sixty (60) days from the filing and service of a Sale Notice, (ii) in the event a timely objection to the Sale Notice is

interposed, sixty (60) days from the withdrawal of such objection or entry of the Final Sale Order, or (iii) March 31ˢᵗ, 2022 (the "**Outside Date**"). If Closing does not occur by the Outside Date, the Parties shall have the rights set forth in Section 13(a)(i) hereof.

4.      Purchaser has deposited with Title Insurer the sum of Seventy Thousand and No/100 Dollars ($70,000.00) ("the **Supplemental Earnest Money**"). The Supplemental Earnest Money shall be applicable to the Purchase Price and shall be completely non-refundable in any event.  The term "Non-Refundable Earnest Money" as used in the Original Agreement and this Second Amendment, shall mean and refer to the sum of the Non-Refundable Earnest Money deposited pursuant to Section 3 of the Original Agreement together with the Additional Earnest Money (as defined in the First Amendment) deposited pursuant to Section 2 of the First Amendment, and the Supplemental Earnest Money deposited hereunder.

5.      Successors and Assigns. This Second Amendment shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

6.      Signatures; Counterparts. This Second Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute one and the same agreement.  The parties hereto consent and agree that this Second Amendment may be signed and/or transmitted by e-mail of a .pdf document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed electronic record shall be valid and as effective to bind the party so signing as a paper copy bearing such party's handwritten signature.  The parties further consent and agree that (i) to the extent a party signs this Second Amendment using electronic signature technology, by clicking "SIGN", such party is signing this Second Amendment electronically, and (ii) the electronic signatures appearing on this Second Amendment shall be treated, for purposes of validity, enforceability and admissibility, the same as handwritten signatures. The parties intend to be bound by the signatures of the electronically mailed signatures or using electronic signature technology, and hereby waive any defenses to the enforcement of the terms of the Original Agreement or this Second Amendment based on the form of the signature.

7.      Time of the Essence. Time is of the essence of this Second Amendment.

8.      Ratification and Control. Except as expressly set forth herein, the Agreement remains unmodified and unchanged. In the event of any conflict or inconsistency between the terms and conditions of the Agreement and the terms and conditions of this Second Amendment, the terms and conditions of the latter shall control.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment effective as of the day and year first set forth above.

**SELLER:**

**KMART CORPORATION**,
a Michigan corporation

By: _____
Name:    William Gallagher
Title:    Authorized Signatory

**PURCHASER:**

**REGAL MILE VENTURES LLC**, a Delaware
limited liability company

By: _____
Name: _____
Title:  Authorized Signatory