Hearing Date and Time: To Be Determined
Objection Date and Time: To Be Determined

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Ira S. Dizengoff
Philip C. Dublin
Sara L. Brauner
Zachary D. Lanier

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re                                    :
                                         :    **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,  :
                                         :    **Case No. 18-23538 (RDD)**
                                         :
          Debtors.[1]                     :    **(Jointly Administered)**
------------------------------------------------------------x

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 362, 364 AND 1142 AND BANKRUPTCY RULES 3020(D), 4001 AND 9014 AUTHORIZING ENTRY BY THE DEBTORS' ESTATES INTO THE LITIGATION FUNDING ARRANGEMENT WITH BENCH WALK 21p, L.P.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Official Committee of Unsecured Creditors (the "Creditors' Committee"), appointed

in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Sears Holdings Corporation

and its affiliated debtors and debtors in possession (collectively, the "Debtors"), hereby files this

motion (the "Motion") on behalf of the Debtors' estates (the "Estates") and respectfully states as

follows.[2]

## PRELIMINARY STATEMENT

1.     Since confirmation in October 2019, the Debtors, the Creditors' Committee and

their respective advisors have worked diligently to implement the Plan.  These ongoing efforts

include reconciling and satisfying administrative claims, prosecuting preference actions and

liquidating the remaining assets of the Estates for the benefit of all creditors.[3]  The most valuable

of those remaining assets are the Jointly Asserted Causes of Action, which comprise any and all

claims and causes of action asserted in *Sears Holdings Corp. v. Lampert*, Case No. 19-08250

(RDD) (Bankr. S.D.N.Y.) (the "Insider Action") and *Sears Holdings Corp. v. Tisch*, Case No. 20-

07007 (RDD) (Bankr. S.D.N.Y.) (the "Public Shareholder Action" and, together with the Insider

Action, the "Adversary Proceeding"), as well as any and all claims or causes of action against

insurance carriers related to coverage for claims asserted in the Adversary Proceeding or a related

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors and (II) Granting Related Relief* [ECF No. 5370] (the "Confirmation Order") or the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5370-1] (the "Plan"), as applicable.  The Creditors' Committee, acting at the direction of the Litigation Designees, submits this Motion on behalf of the Estates pursuant to the authority granted under the Confirmation Order.  Specifically, as set forth herein, the Confirmation Order granted the Creditors' Committee "joint standing with the Debtors" with respect to the Jointly Asserted Causes of Action to be overseen by the Litigation Designees.  *See* Confirmation Order ¶ 17. The Confirmation Order further vested the Litigation Designees "with all rights and entitlements to be afforded to the Liquidation Trust Board on the Effective Date."  *Id.* ¶ 18.

[3] On a quarterly basis, the Debtors have filed status reports detailing the progress toward the Effective Date and briefed the Court and other parties in interest on those reports at subsequent omnibus hearings.  The most recent such report was filed on January 19, 2022 [ECF No. 10240] (the "Jan. 2022 Status Report") and was presented by the Debtors at the omnibus hearing held on January 20, 2022.

proceeding. The proceeds of these actions are critical to satisfying outstanding administrative, priority and secured claims, consummating the Plan and, ultimately, ensuring a recovery in these Chapter 11 Cases for holders of general unsecured claims.

2.     The Debtors and the Creditors' Committee have always recognized the paramount role this litigation would play in ensuring distributions under the Plan. Indeed, as part of the settlement achieved in respect of the Plan prior to the confirmation hearing, the Debtors, with the support of the Ad Hoc Vendor Group and the Creditors' Committee, agreed to grant joint standing to the Creditors' Committee to prosecute the Jointly Asserted Causes of Action. In connection with such agreement, the Confirmation Order (i) expressly vested the Creditors' Committee with such joint standing, (ii) set aside up to $25 million of the Estates' cash (the "Initial Litigation Funding") to ensure adequate initial funding for such prosecution prior to the Effective Date and the establishment of the Liquidating Trust and (iii) authorized the immediate appointment of the five initial members of the Liquidating Trust Board, two of whom were selected by the Debtors and three of whom were selected by the Creditors' Committee pursuant to the Creditors' Committee Settlement, to serve as Litigation Designees and oversee the prosecution prior to the Effective Date.

3.     For more than two years, that is precisely what the Litigation Designees have done. Specifically, on behalf of the Estates and at the direction of the Litigation Designees, the Creditors' Committee (i) filed an amended complaint in the Insider Action, (ii) identified Sears Holdings Corp.'s public shareholders and filed a complaint against certain of those shareholders on behalf of the Debtors' estates, (iii) served and largely completed document discovery in respect of the foregoing, (iv) retained and worked with six testifying and consulting experts and (v) briefed and argued myriad motions to dismiss filed by certain of the defendants.

4.      To litigate the Jointly Asserted Causes of Action effectively against numerous well-heeled defendants has required—and will continue to require—substantial resources. And as discussed in further detail herein, progress toward the Effective Date has been slower than anticipated. Accordingly, last year, the Litigation Designees and their advisors (collectively, the "Litigation Professionals") began exploring all available options and engaged in discussions with potential funding sources regarding additional financing for the Jointly Asserted Causes of Action. Ultimately, following extensive negotiations with several firms interested in providing such financing, the Litigation Designees approved, subject to this Court's approval, entry into a term sheet with Bench Walk 21p, L.P. ("Bench Walk" or the "Funder"), attached hereto as **Exhibit B** (the "Litigation Funding Term Sheet" and, together with any other documents that may reasonably be required to implement or give effect to the Litigation Funding Term Sheet, including the Litigation Funding Agreement, the "Litigation Funding Arrangement").[4] As set forth in further detail herein, the Litigation Funding Arrangement provides up to an aggregate $35 million in non-recourse funding (the "Funding") to prosecute the Jointly Asserted Causes of Action and, in turn, ensure that the value of such actions is maximized for the benefit of the Estates and creditors.

5.      Entry into the Litigation Funding Arrangement is of paramount importance to the prosecution of the Jointly Asserted Causes of Action. Indeed, there can be little dispute that, without additional funding, vigorous pursuit of the Jointly Asserted Causes of Action against the defendants, all of which are represented by sophisticated counsel and nearly all of which have substantial resources, is not possible. In that respect, prosecuting the complex claims that comprise the Jointly Asserted Causes of Action requires not only the dedication of substantial legal resources

---

[4] A copy of the agreement detailing the terms and conditions of the Litigation Funding Arrangement (the "Litigation Funding Agreement") will be filed in advance of the hearing to consider this Motion. The Jointly Asserted Causes of Action are referred to in the Litigation Funding Term Sheet as the Primary Causes of Action; there is no intended difference between the two terms.

and expertise, but also the retention of multiple testifying and consulting experts to opine on a range of complex topics.

6.      Critically, under any reasonable assessment—including the unrebutted testimony at the confirmation hearing—the value of the Jointly Asserted Causes of Action remains well in excess of the incremental cost to the Estates of the Funding.  As such, entry into the Litigation Funding Arrangement is in the best interests of the Estates and consistent with the goal of maximizing value for creditors.  Indeed, armed with the Funding, the Litigation Designees will have the means to advance the prosecution of the Jointly Asserted Causes of Action to their next phase and endeavor to achieve the best possible outcome for the Estates and creditors.

7.      In view of the foregoing, the Creditors' Committee respectfully submits that the Litigation Funding Arrangement should be approved.

## **BACKGROUND**

**A.      Commencement of the Chapter 11 Cases, the Sale to Transform and Confirmation of the Plan**

8.      Beginning on October 15, 2018 and continuing thereafter, each of the Debtors commenced in this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

9.      The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

10.     On October 24, 2018, the Office of the United States Trustee for Region 2 appointed the Creditors' Committee [ECF No. 276].[5]  No trustee or examiner has been appointed in these Chapter 11 Cases.

11.     On February 8, 2019, the Court entered an order approving the sale of substantially all of the Debtors' assets to Transform Holdco LLC [ECF No. 2507] (the "Sale Order").

12.     On October 7, 2019, the Court confirmed the Plan and, on October 15, 2019, entered the Confirmation Order.  The Plan contemplates that, upon the Effective Date, the Debtors' remaining assets, including the claims and causes of actions that comprise the Jointly Asserted Causes of Action, will be transferred to the Liquidating Trust, which will be governed by the Liquidating Trust Board.  *See* Plan, Art. X.3.

13.     At the time of confirmation, however, the Debtors did not have sufficient cash to consummate the Plan.  Therefore, for the interim period between confirmation and the Effective Date, the Confirmation Order provided for the immediate appointment of the initial members of the Liquidating Trust Board to serve as the Litigation Designees and oversee the prosecution of the Jointly Asserted Causes of Action with the same "rights and entitlement to be afforded to the Liquidation Trust Board on the Effective Date of the Plan in respect of the Jointly Asserted Causes of Action."  *See* Confirmation Order ¶ 18.[6]  In addition, the Confirmation Order granted the

---

[5] The following entities currently comprise the Creditors' Committee: (i) The Bank of New York Mellon Trust Company, N.A. as Indenture Trustee; (ii) Brixmor Operating Partnership, L.P.; (iii) Computershare Trust Company, N.A.; (iv) Oswaldo Cruz; (v) Pension Benefit Guaranty Corporation; (vi) Simon Property Group, L.P.; and (vii) Winiadaewoo Electronics America, Inc.  *See Amended Notice of Appointment of Official Committee of Unsecured Creditors*, dated March 31, 2020 [ECF No. 7539].

[6] Specifically, the Confirmation Order provides as follows:

> For the avoidance of doubt, the Litigation Designees shall have all rights and entitlements to be afforded to the Liquidation Trust Board on the Effective Date of the Plan in respect of the Jointly Asserted Causes of action, including, *inter alia*, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgement any Jointly Asserted Causes of Action pursuant to the terms of the Liquidation Trust Agreement applicable to the Liquidation Trust Board (including, for the avoidance of doubt, section 6.5(c) of the Liquidating Trust

Creditors' Committee joint standing with the Debtors to pursue the Jointly Asserted Causes of Action and authorized the retention of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as primary litigation counsel ("Primary Trust Litigation Counsel") "to act on behalf of the Litigation Designees to investigate, commence, prosecute, and otherwise litigate the Jointly Asserted Causes of Action." *Id.* ¶¶ 17, 22.

**B.    The Pursuit of the Jointly Asserted Causes of Action to Date**

14.    The Jointly Asserted Causes of Action involve three distinct transactions: (i) the 2014 spin-off of Lands' End, Inc. ("Lands' End") to Sears Holdings Corp. ("Sears Holdings") shareholders (the "Lands' End Spin-off"); (ii) the 2015 issuance of subscription rights (the "Seritage Rights") to Sears Holdings shareholders to purchase shares of Seritage Growth Properties, Inc. ("Seritage") at a specified price (the "Seritage Rights Offering") and subsequent sale of 235 properties and certain joint venture interests to Seritage by certain Debtors (the "Seritage Real Estate Transfer," and together with the Seritage Rights Offering, the "Seritage Transaction"); and (iii) the extension of financing to Sears Holdings by certain related-parties from 2016 through 2018 and subsequent receipt by those related-parties of certain interest payments and fees related to the financings (the "Related-Party Financings").

15.    The decision to retain and pursue the claims and causes of action that comprise the Jointly Asserted Causes of Action resulted from extensive and thorough investigations by the Debtors' Restructuring Subcommittee and the Creditors' Committee.[7]    These investigations

---

Agreement), which terms are incorporated herein by reference and shall govern the acts, conduct and rights of the Litigation Designees prior to the Effective Date.

*See* Confirmation Order ¶ 18; *see also Notice of Filing of Fourth Plan Supplement in Connection with Modified Second Amended Joint Plan of Sears Holdings Corporation and its Affiliated Debtors*, dated October 7, 2019 [ECF No. 5335] (identifying the Litigation Designees and providing for compensation structure).

[7] The Sale Order contained a heavily negotiated and limited release of the ESL Parties for their prepetition conduct based on the findings developed through the investigation by the Restructuring Subcommittee and the Creditors' Committee into prepetition conduct of various parties. *See* Asset Purchase Agreement § 9.13.

encompassed all of the related-party prepetition transactions, including the Lands' End Spin-off, the Seritage Transaction and the Related-Party Financings. *See Transier Declaration in Support of Confirmation* [ECF No. 5146] ("Transier Decl.") ¶ 20.[8]

16.     On April 17, 2019, based on its investigation, the Restructuring Subcommittee filed a complaint against the ESL Parties and other defendants [ECF No. 3278] (the "Original Complaint"), seeking over $2 billion in damages arising from certain prepetition related-party transactions.

17.     On November 25, 2019, following confirmation of the Plan, the Creditors' Committee, on behalf of certain of the Estates, filed the First Amended Complaint in the Insider Action [Case No. 19-8250, ECF No. 52] (the "First Amended Complaint").

18.     On February 21, 2020, the defendants in the Insider Action filed 15 separate motions to dismiss (totaling 437 pages) certain of the claims in the First Amended Complaint [Case No. 19-8250, ECF Nos. 95-101, 103-111, 113-116, 118-127, 129-137] (collectively, the "Insider Action Motions to Dismiss").  Thereafter, on April 30, 2020, the Creditors' Committee, on behalf of the Estates, filed four briefs in opposition to the Insider Action Motions to Dismiss (totaling 336 pages) [Case No. 19-8250, ECF Nos. 163-166] (collectively, the "Opposition Briefs").  On June 15, 2020, the defendants filed 15 separate reply briefs (totaling 373 pages) in response to the Opposition Briefs [Case No. 19-8250, ECF Nos. 174-189].  On August 19, August 25 and August 31, 2020, the Court heard oral arguments on the Insider Action Motions to Dismiss.

---

[8] In addition, on November 16, 2018, the Court entered an order authorizing expedited discovery by the Creditors' Committee of the Debtors and other parties under Bankruptcy Rule 2004 [ECF No. 802] (the "2004 Order").  Under the 2004 Order, the Creditors' Committee received over 240,000 documents, amounting to over 4.8 million pages and conducted 12 interviews of key witnesses in the period leading up to confirmation of the Plan.  *See generally Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 4478], Art. IV.M.2.

19.    On September 24, 2020, the Litigation Designees, on behalf of the Estates, retained ASK LLP to pursue certain additional parties who benefited from certain of the transactions challenged under the First Amended Complaint. Those parties had been identified in an extensive discovery process in which counsel served and negotiated 127 subpoenas. Subsequently, on October 15, 2020, ASK LLP filed an adversary complaint in the Public Shareholder Action against 139 public shareholders of Sears Holdings, each of whom, individually or collectively with affiliates, received in excess of $2 million in benefits from either or both the Lands' End Spin-off and Seritage Transaction [Case No. 20-7007, ECF No. 1] (collectively, the "Public Shareholder Defendants"). On January 19, 2021, the Public Shareholder Defendants filed numerous motions to dismiss the Public Shareholder Action [Case No. 20-7007, ECF Nos. 39-40, 43, 46, 48, 55, 60-65, 67] (collectively, the "Public Shareholder Action Motions to Dismiss" and, together with the Insider Action Motions to Dismiss, the "Motions to Dismiss"). On February 19, 2021, the Creditors' Committee, on behalf of the Estates, filed its opposition brief [Case No. 20-7007, ECF No. 94]. On March 5, 2021, the Public Shareholder Defendants filed their reply briefs [Case No. 20-7007, ECF Nos. 109-112] and, on March 12, 2021, the Court heard oral argument on the Public Shareholder Action Motions to Dismiss [Case No. 20-7007, ECF Nos. 109-112].[9]

20.    A ruling on the Motions to Dismiss remains pending.

21.    While briefing and argument on the Motions to Dismiss progressed, the Litigation Designees and Litigation Professionals simultaneously pursued a number of other workstreams. Among other things, the Litigation Professionals interviewed and retained experts, who in turn

---

[9] Separately, certain former directors and officers of the Debtors that are defendants in the Adversary Proceeding have been litigating a state court action in New York, captioned *Alvarez v. XL Specialty Ins. Co.*, Case No. 655391/2019 (N.Y. Sup. Ct. Sept. 17, 2019), whereby those directors and officers have sought declaratory relief regarding the extent of coverage available for fees and potential damages awards. On December 24, 2020 and July 13, 2021, the trial court found in favor of the directors and officers. On February 17, 2022, the New York Appellate Division, First Judicial Department, unanimously affirmed the trial court's decision.

performed significant analyses in support of the prosecution of the Jointly Asserted Causes of Action. The Litigation Professionals also served documents requests and subpoenas on all of the defendants and a variety of third parties and engaged in countless meet-and-confers regarding the terms and scope of productions. The Litigation Professionals' efforts led to the production of approximately 500,000 documents by the defendants, more than 12 million documents by Transform and approximately 350,000 by all other third parties.[10]

22.     In light of these and other efforts, the Initial Litigation Funding is nearing exhaustion. Still, these costs pale in comparison to those incurred by the defendants in the Insider and Public Shareholder Actions. The carriers for the Debtors' directors and officers liability insurance have paid out at least $26.6 million in fees and expenses through December 31, 2021.[11] This amount represents only the fees incurred in connection with covered claims against defendants who are current or former directors and officers of the Debtors. It does not include legal defense costs incurred for (i) non-covered claims against such defendants (*e.g.*, fraudulent transfer claims) or (ii) claims against the defendants that are not current or former directors and officers,[12] meaning that the costs incurred by defendants likely are significantly more than those incurred by the plaintiffs.

23.     On March 15, 2021, the Court entered an order consolidating the Insider Action with the Public Shareholder Action [Case No. 19-8250, ECF No. 236] (the "Consolidation Order").

---

[10] As disclosed previously, nearly all first-level document review was performed by contract attorneys at a significantly lower cost to the Estates.

[11] This information is based on the quarterly notices that defendants are required to provide the Debtors and the Creditors' Committee under the *Order Modifying the Automatic Stay, to the Extent Applicable, to Permit Payment of Defense Costs Under the Directors & Officers Policies* [ECF No. 5382].

[12] This group of defendants includes ESL Investments, Inc., Fairholme Capital Management, LLC, Seritage Growth Properties, Inc., Duff & Phelps, LLC, Cushman & Wakefield, Inc., Cascade Investments, LLC, Cyrus Capital Partners, LP, Benefit Street 2018, LLC and all the defendants named in the Public Shareholder Action.

The Consolidation Order sets forth an amended scheduling order regarding discovery. Among other things, the Consolidation Order: (i) requires the plaintiffs and the defendants to exchange lists of proposed deponents no later than 28 days (with respect to the defendants in the Insider Action) or 60 days (with respect to the defendants in the Public Shareholder Action) after the Court issues an order deciding the last of the motions to dismiss in the Insider Action and the omnibus motions to dismiss in the Public Shareholder Action (the "Exchange Date"); (ii) requires the plaintiffs and the defendants to conduct one or more meet and confers regarding fact depositions within seven days of the Exchange Date (the "Deposition Scheduling Conference"); and (iii) permits the plaintiffs and the defendants to commence fact depositions beginning 45 days after the Deposition Scheduling Conference. *See* Consolidation Order ¶ 4. In short, once a ruling on the Motions to Dismiss is issued, the Consolidation Order contemplates that the litigation will proceed quickly into its next phase.

### C.    Evaluation of the Need for Additional Financing and the Litigation Funding Arrangement

24.    From the outset, the Debtors and the Creditors' Committee anticipated, based on the scope of their respective investigations and the magnitude of the litigation, that the Initial Litigation Funding alone likely would be insufficient to prosecute the Jointly Asserted Causes of Action through trial and cover other necessary costs. To this end, the Liquidating Trust Agreement provided that nothing therein prevented the Liquidating Trust Board from seeking additional financing if necessary to discharge its duties.[13] However, because it has taken longer to reach the Effective Date than contemplated, many of the necessary costs associated with prosecuting the

---

[13] *See* Liquidating Trust Agreement § 1.3(d) ("Notwithstanding anything in this Trust Agreement to the contrary, nothing herein shall preclude the Liquidating Trust Board from seeking additional financing from sources other than the Liquidating Trust Assets in the discharge of its responsibilities under the Plan, the Confirmation Order and this Trust Agreement.").

Jointly Asserted Causes of Action have been incurred (and will continue to be incurred) in the pre-Effective Date period and prior to obtaining any proceeds from such actions. Faced with declining cash reserves and relying on the rights and entitlements bestowed on the Litigation Designees by the Confirmation Order in respect of the Jointly Asserted Causes of Action, the Litigation Designees determined that seeking additional financing was the most value-maximizing alternative. *See Declaration of Patrick Bartels in Support of Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Code Section 105, 362, 364 and 1142 and Bankruptcy Rules 3020(d), 4001 and 9014 Approving the Litigation Funding Arrangement with Bench Walk Advisors LLC*, attached hereto as **Exhibit C** (the "Bartels Declaration"), ¶ 12.[14]

25.    Prior to soliciting interest from potential funders, a comprehensive budget was developed for purposes of the Jointly Asserted Causes of Action, covering the anticipated costs of fact discovery, expert discovery, summary judgment (if permission to file such motions is granted) and trial, with both "high end" and "low end" scenarios to guide expectations. Bartels Decl. ¶ 12. The costs and expenses in the budget include amounts for attorneys (including Primary Trust Litigation Counsel, as well as certain other firms retained to pursue the Public Shareholder Action and aspects of the Insider Action for which Primary Trust Litigation Counsel is conflicted), consulting and testifying experts, vendors and the quarterly fees due to the Litigation Designees. *Id.* The up to $35 million in litigation funding sought by this Motion is consistent with this budget. *Id.*[15]

---

[14] As discussed herein, the Confirmation Order expressly provides that "[T]he Litigation Designees shall have all rights and entitlements to be afforded to the Liquidation Trust Board on the Effective Date of the Plan in respect of the Jointly Asserted Causes of Action[.]" Confirmation Order ¶ 18.

[15] As described herein, the Litigation Funding will be drawn quarterly, as needed. As such, substantially less than $35 million may be drawn depending on how the case develops.

26.     Following preparation of the budget, ten initial institutions were contacted regarding this funding opportunity. *Id.* ¶ 13. These institutions included both traditional litigation financers and investment managers. *Id.* Of the ten parties solicited, eight signed confidentiality agreements. *Id.* Upon execution of the confidentiality agreements, each party received key documents and information necessary to assess the value of the claims comprising the Jointly Asserted Causes of Action, including access to the budget. *Id.* Negotiations with the parties subject to the confidentiality agreements generally focused on, among other things, the status of the Chapter 11 Cases and various issues regarding the merits of the Jointly Asserted Causes of Action. *Id.*

27.     Three of these parties made proposals for funding, one of which immediately was deemed non-actionable given highly unfavorable terms to existing creditors. *Id.* ¶ 14. The remaining two proposals—from Bench Walk and another potential funder ("Funder A")—were deemed potentially actionable by the Litigation Designees. *Id.* Accordingly, several rounds of hard-fought and arm's-length negotiations ensued with each of Bench Walk and Funder A, with significant improvements to the terms of each party's proposed financing in each round. *Id.* Ultimately, Bench Walk and Funder A were each asked to present a best and final offer. *Id.*

28.     After Bench Walk and Funder A presented their best and final offers, four other parties (including three institutions that are parties in interest in the Chapter 11 Cases) expressed interest in learning more about the financing opportunity. *Id.* ¶ 15. Three of these parties entered into confidentiality agreements, and two made proposals. *Id.* Both proposals contained numerous economic and non-economic terms that were determined by the Litigation Designees to be inferior to those proposed on a best and final basis by both Bench Walk and Funder A, and were therefore rejected after careful consideration. *Id.*

29.    Overall, negotiations with the various potential funders and evaluation of their respective proposals focused on ensuring sufficient funding to prosecute the Jointly Asserted Causes of Action to completion, on the one hand, without unduly worsening potential recoveries to the Estates and creditors, including administrative, priority, secured and unsecured creditors, on the other.  *Id.* ¶ 18.  As such, a key consideration in negotiating and assessing the different proposals was ensuring that the return to the financer (whether through an interest rate or a multiple) was favorable to the Estates ***overall***.  *Id.*  In particular, these negotiations were informed by an understanding that proceeds of the Jointly Asserted Causes of Action would be used in part to satisfy certain administrative, priority and secured claims and, therefore, that any "priming" of such claims by a funder should be limited to the extent feasible, while still safeguarding recoveries for general unsecured creditors.  *Id.*  Substantial progress was made in that regard, with Bench Walk significantly decreasing its economic demands as negotiations progressed and eventually lowering its proposed IRR on the litigation financing to 15% and agreeing to forego additional returns until after administrative, priority and secured claims are satisfied.  *Id.* ¶ 19.[16]

---

[16] The 15% IRR appears well within or below the range of interest rates typically associated with litigation financing. "[A] 2010 RAND study noted that 'there [was] no systematic empirical information about the sizes of financing fees' for any type of [commercial third-party funding], but reported anecdotal evidence of a range of 24%-60% per annum." Ronen Avraham & Anthony Sebok, *An Empirical Investigation of Third Party Consumer Litigant Funding*, 104 CORNELL L. REV. 1133, 1138 (2019) (citing STEVEN GARBER, ALTERNATIVE LITIGATION FINANCING IN THE UNITED STATES: ISSUES, KNOWNS, AND UNKNOWNS 12 (2010)).  And "[a]s recently as 2014 . . . a survey of [commercial third-party funding] stated that 'it is not atypical for [commercial third-party funding] to charge 80% interest in the first year of a loan and up to 280% of the total loan amount.'" 104 CORNELL L. REV. at 1138 (quoting Terrence Cain, *Third Party Funding of Personal Injury Tort Claims: Keep the Baby and Change the Bathwater*, 89 CHI.-KENT L. REV. 11, 12 (2014) (citing Jenna Wims Hashway, *Litigation Loansharks: A History of Litigation Lending and a Proposal to Bring Litigation Advances Within the Protection of Usury Laws*, 17 ROGER WILLIAMS U. L. REV. 750, 751 (2012))). Similarly, "[a] 2015 law review article . . . suggested that [commercial third-party funding] rates ranged between 30% to 180% per annum, with the typical rate falling, after compounding, at 47% per annum." 104 CORNELL L. REV. at 1138 (citing Carol Langford, *Betting on the Client: Alternative Litigation Funding Is an Ethically Risky Proposition for Attorneys and Clients*, 49 U.S.F. L. REV. 237, 239 (2015) (noting that "[i]nterest rates for loans can vary from 2.5-15%, compounded monthly")); *see* Martin J. Estevao, *The Litigation Financing Industry: Regulation to Protect and Inform Consumer*s, 84 U. COLO. L. REV. 467, 475 (2013).

30.     After evaluating each of the proposals made, the Litigation Designees determined that Bench Walk's proposal was the best available and that entry into the Litigation Funding Arrangement was in the best interests of the Estates and creditors.  Bartels Decl. ¶¶ 16-17.

31.     The Litigation Funding Arrangement provides that the Funder will commit up to $35 million in non-recourse funding to cover fees and expenses incurred in connection with the Jointly Asserted Causes of Action.  Certain of the key terms of the Litigation Funding Term Sheet, which will form the basis of the Litigation Funding Agreement, are as follows.[17]

32.     *Funding Amount & Use*:   Upon satisfaction of certain conditions precedent, including this Court's approval, the Funder shall provide a non-recourse funding facility in the aggregate amount of up to $35 million, to be made available to the Estates for the payment of professional fees, experts, vendors and other costs (including the fees of the Litigation Designees) related to the Jointly Asserted Causes of Action (such fees and costs, the "Covered Costs").

33.     *Funder Costs*:  Upon entry of the Proposed Order, the Debtors will reimburse the Funder for its reasonable and documented external costs (including legal fees and expenses) in connection with the transactions contemplated by the Litigation Funding Arrangement, in an amount not to exceed $200,000.00 (the "Funder Fees and Expenses").  *See* Litigation Funding Term Sheet at 3.  In addition, in the event the transactions contemplated by the Litigation Funding Arrangement cannot be consummated for any reason other than (i) something wholly or substantially within the control of Bench Walk or its affiliates or (ii) the absence of approval by the Court for any reason, the Funder will be entitled to a fee equal to twice its actually incurred legal and other external costs in connection with the transactions contemplated by the Litigation

---

[17] The summary set forth in this Motion of the terms of the Litigation Funding Arrangement is qualified in its entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

Funding Agreement (the "Break-Up Fee" and, together with the Funder Fees and Expenses, the "Transaction Fees"). *See id.* at 5. The Break-Up Fee will be payable solely from the proceeds of the Jointly Asserted Causes of Action and only after all Allowed Administrative Expense Claims, Allowed Secured Claims and Allowed Priority Claims have been satisfied in accordance with the Plan. *Id.*

34.    *Oversight & Governance*: The Funder shall have no rights with respect to oversight of the prosecution of the Jointly Asserted Causes of Action or any settlement decisions regarding the same. All such rights shall remain with the Litigation Designees in accordance with the terms of the Confirmation Order and the Liquidation Trust Agreement. Importantly, while the heavily-negotiated Creditors' Committee Settlement that resulted in the Creditors' Committee's support for the Plan (including the composition of the Litigation Designees and, ultimately, the Liquidating Trust Board) will not be disturbed under the Litigation Funding Arrangement,[18] the Litigation Designees recognize the significant role the Admin Representative plays in these Chapter 11 Cases. Accordingly, the Litigation Designees are willing to work constructively with the Admin Representative in the continued pursuit of the Jointly Asserted Causes of Action and continue to provide the Admin Representative with periodic updates and engage in regular discussions until such time as the Allowed Administrative Expense Claims, Allowed Secured Claims and Allowed Priority Claims have been satisfied pursuant to the terms of the Plan. The Litigation Designees

---

[18] *See, e.g.*, Confirmation Order ¶¶ I ("The Plan is dependent upon and incorporates the terms of compromises and settlements, which include the Plan Settlement, the PBGC Settlement, and the Creditors' Committee Settlement, which settlements were negotiated in good faith and at arm's length and are each, ***individually essential elements of the Plan***.") (emphasis added), 8 ("The compromises and settlements set forth in the Plan are approved, including, but not limited to, the PBGC Settlement, the Plan Settlement, and the Creditors' Committee Settlement, and, on the Effective Date, will be effective and binding on all parties in interest."); Plan § 9.3 (providing that, in exchange for the Creditors' Committee's support for the Plan, the composition of the Liquidating Trust Board would be as set forth in the Liquidating Trust Agreement, which, in turn, provides that three of the members of the Liquidating Trust Board would be selected by the Creditors' Committee and two of the members of the Liquidating Trust Board would be selected by the Debtors).

believe that this arrangement strikes the appropriate balance between ensuring that the interests of administrative expense claimants are adequately represented and respecting the settlements that resulted in a confirmable Plan.

35.     *Draws*:  The Borrower (as defined in the Litigation Funding Term Sheet) shall have the right to draw on the Funding quarterly in advance based on the Budget (as defined in the Litigation Funding Term Sheet), with proceeds from the draw being deposited into a segregated non-interest bearing trust account in the name of Akin Gump, and apply such proceeds to periodic invoices in respect of the Covered Costs.  The first draw on the Funding shall be made promptly following a ruling on the Motions to Dismiss (the "First Drawdown").  *See* Litigation Funding Term Sheet at 2.  Importantly, there is no fee assessed on the undrawn amounts.  Further, because draws are made on an as-needed basis, substantially less than the full amount ultimately may be borrowed.  *See id.*

36.     *Distributions*:  Upon receipt of proceeds from the Jointly Asserted Causes of Action (which, for the avoidance of doubt, exclude any proceeds recovered from preference actions), the Litigation Funding Term Sheet provides for the following distribution scheme:

- *first*, 100% to the Funder, until the cumulative amount distributed to the Funder equals the amount actually funded plus interest thereon calculated at an annualized internal rate of return of 15% (the "Initial Funder Returns");

- *second*, 100% to the Litigation Designees, until the cumulative amount distributed equals the applicable contingency fee payable to the Litigation Designees as set forth in, and in accordance with, Annex B to Exhibit A to the *Fourth Plan Supplement in Connection with Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5335];

- *third*, 100% to the Borrower for payment of (i) Allowed Administrative Expense Claims, (ii) Allowed Secured Claims and (iii) Allowed Priority Claims, until the cumulative amount distributed to the Borrower is in an amount sufficient to satisfy all such claims in accordance with the Plan or, if applicable

the Administrative Expense Claims Consent Program set forth in the Confirmation Order;[19]

- *fourth*, 100% to the Funder until the cumulative amount distributed to the Funder equals the product of (i) the Initial Funder Returns and (ii) the number obtained by multiplying (x) 0.015 and (y) the number of months since the First Drawdown and (z) dividing by three (the "<u>Funder Multiple</u>");

- *fifth*, 100% to Primary Trust Litigation Counsel until it has received (i) two-times (2x) the amount of the Go-forward Fee Holdback (as defined and discussed herein) and (ii) any portion of the Past Fee Holdback (as defined and discussed herein) that has not and cannot be paid from the Funding immediately following the Effective Date due to an insufficient amount of such Funding remaining at such time; and

- *sixth*, to the Borrower, for the benefit of the Estates, and the Funder, in amounts calculated by reference to the aggregate principal amount of the Funding actually advanced by the Funder and spent by the Borrower pursuant to the Litigation Funding Term Sheet (the "<u>Actual Funding</u>") as follows:

  o less than $10 million in Actual Funding, then 95.25% to the Borrower and 4.75% to the Funder;

  o $10 million or more, but less than $15 million in Actual Funding, then 92.75% to the Borrower and 7.25% to the Funder;

  o $15 million or more, but less than $20 million in Actual Funding, then 90.25% to the Borrower and 9.75% to the Funder; and

  o $20 million or more in Actual Funding, then 83.25% to the Borrower and 16.75% to the Funder.

*See id.* at 4-5.

37.    Critically, as set forth above, recoveries to holders of Allowed Administrative Expense Claims, Allowed Secured Claims and Allowed Priority Claims will be subordinated only to the Initial Funder Returns and not the Funder Multiple, thus decreasing the hurdle rate for

---

[19] According to the Jan. 2022 Status Report, the Debtors estimated that an additional $86.6 million currently is needed to satisfy administrative, secured and priority creditors in accordance with the Plan and the Administrative Expense Claims Consent Program.  Following monetization of additional assets, including preferences, the Debtors estimate that such amount will total approximately $62.6 million.  Proceeds from litigation, including both the Jointly Asserted Causes of Action and preference actions, are expected to cover this estimated shortfall.  This projection assumes that the Debtors will realize the full value of various estate assets and that related costs do not exceed current projections, which may or may not be the case.

satisfying such claims.  In addition, the payment of such claims will be senior to the payment of the Past Fee Holdback and Go-forward Fee Holdback of Primary Trust Litigation Counsel.

38.    *Attorney Fees & Holdback*:  Past and future fees of Primary Trust Litigation Counsel incurred in connection with the investigation and prosecution of the Jointly Asserted Causes of Action in excess of the $10 million already paid shall be subject to the following: (i) a 20% holdback for go-forward fees, starting from entry of the Proposed Order (the "Go-forward Fee Holdback"); and (ii) a holdback in respect of all fees incurred as of the entry of the Proposed Order but not yet paid (the "Past Fee Holdback").  *See id.* at 3.[20]  The Go-forward Fee Holdback shall be treated in accordance with waterfall described above and in more detail in the Litigation Funding Term Sheet.  The Past Fee Holdback will be paid immediately following the Effective Date and, in the first instance, solely from the Funding.  If, however, there is an insufficient amount of Funding available to satisfy the Past Fee Holdback in full upon the Effective Date, the portion of the Past Fee Holdback in excess of the available Funding will be paid in accordance with the waterfall described above.  For the avoidance of doubt, all fees and expenses of (i) Primary Trust Litigation Counsel, other than with respect to the Go-forward Fee Holdback and the Past Fee Holdback, and (ii) other professionals retained in connection with prosecution of the Primary Causes of Action will be paid on a monthly basis in accordance with applicable interim compensation procedures with the proceeds from the Funding, without any holdback or reserve unless otherwise ordered by the Court.  *See id.*

---

[20] As noted in prior filings and on the record during hearings, Akin Gump, as Primary Trust Litigation Counsel, has not sought payment in respect of significant fees incurred post-confirmation in connection with prosecuting the Jointly Asserted Causes of Action.  *See, e.g.*, *Reply of Akin Gump Strauss Hauer & Feld LLP and FTI Consulting, Inc. to Objection by Orient Craft Limited to Interim Fee Applications for Compensation* [ECF No. 10232] ¶ 5.  As of the filing of this Motion, approximately $7.1 million remains incurred and unpaid.

39.     As set forth in the Bartels Declaration, the terms on which Akin Gump, as Primary

Trust Litigation Counsel, would be retained by the Litigation Designees and, after the Effective

Date, the Liquidating Trust Board, as contained in the Litigation Funding Arrangement differ from

previously proposed terms (the "Initial Proposed Compensation Terms").  Bartels Decl. ¶ 20.  The

Initial Proposed Compensation Terms contemplated, among other things, that the Primary Trust

Litigation Counsel would be paid up to $10 million on an hourly rate basis.  *Id.* ¶ 21.  Thereafter,

Primary Trust Litigation Counsel would provide services on a contingency fee basis.  *Id.*  The

Initial Proposed Compensation Terms were negotiated, but not finally agreed, at the time of Akin

Gump's retention as Primary Trust Litigation Counsel on or about July 2019.  *Id.* [21]  In light of the

changes in circumstance between July 2019 and the date of this Motion—including, among other

things, the expected length of time necessary to consummate the Plan and establish the Liquidating

Trust (including as a result of a reduction in expected preference recoveries and the fact that the

Funder has required a portion of its return to come first in any proceed waterfall)[22]—the Litigation

Designees determined that the Initial Proposed Compensation Terms no longer were appropriate

and, accordingly, have agreed to revise the terms of Akin Gump's retention as Primary Trust

Litigation Counsel in the manner set forth in the Litigation Funding Term Sheet and Litigation

Funding Agreement.  *Id.*

---

[21] Specifically, the unexecuted engagement letter contemplated that Akin Gump would receive a sliding percentage of the gross proceeds obtained through the Jointly Asserted Causes of Action, starting at 8% once at least $100 million in cash proceeds were recovered and increasing to up to 12% after $500 million in gross proceeds were obtained.

[22] The testimony provided at confirmation estimated that the Debtors would realize, on a net basis, $118 million to $130 million on account of preference recoveries. *See Declaration of Brian J. Griffith in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5148] ¶ 69.

## JURISDICTION AND VENUE

40.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska,

C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

41.    By this Motion, the Creditors' Committee respectfully requests entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) authorizing the

Litigation Designees, on behalf of certain of the Estates, to enter into the Litigation Funding

Arrangement, pursuant to Bankruptcy Code sections 105, 362, 364 and 1142 and Bankruptcy Rules

3020 and 4001, (ii) granting the Funder Liens and Funder Superpriority Claims (each as defined

herein), (iii) approving the Transaction Fees, (iv) modifying the automatic stay pursuant to

Bankruptcy Code section 362(d) to implement the terms of the Litigation Funding Arrangement

and (v) granting related relief.

## BASIS FOR RELIEF REQUESTED

### I.    Bankruptcy Code Section 1142 and the Confirmation Order Authorize Entry into the Litigation Funding Arrangement

42.    Bankruptcy Code section 1142(b) authorizes the Court to "direct the debtor and any

other necessary party to execute or deliver or to join in the execution or delivery of any instrument

required to effect a transfer of property dealt with by a confirmed plan, and to perform any other

act . . . that is necessary for consummation of the plan."  11 U.S.C. § 1142(b); *see also In re Lehman*

*Bros. Holdings, Inc.*, 591 B.R. 153, 158-59 (Bankr. S.D.N.Y. 2018); *LTV Corp. v. Back (In re*

*Chateaugay Corp.)*, 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996), *aff'd in part*, 213 B.R. 633 (S.D.N.Y.

1997) ("The clear intent of [s]ection 1142(b) of the Bankruptcy Code is to assure that the terms

and provisions of a confirmed chapter 11 plan are carried out until the plan is completed and the

final decree is entered closing the case."). Further, Bankruptcy Rule 3020(d) provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Fed. R. Bankr. P. 3020(d).

43.    Here, the Confirmation Order provides that, "[p]ursuant to sections 105(a) and 1142 of the Bankruptcy Code . . . this Court, except as otherwise provided in the Plan or herein, shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article XVI of the Plan." *See* Confirmation Order ¶ 67.[23] Significantly, the Confirmation Order and the Liquidating Trust Agreement explicitly contemplate that additional funding may be required to prosecute the Jointly Asserted Causes of Action. The Confirmation Order granted the Creditors' Committee "joint standing with the Debtors" with respect to the Jointly Asserted Causes of Action, *see* Confirmation Order ¶ 17, and, further, vested the Litigation Designees "with all rights and entitlements to be afforded to the Liquidation Trust Board on the Effective Date of the Plan[.]" *Id.* ¶ 18. These rights and entitlements include the

> ***exclusive*** right, authority[] and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw[] or litigate to judgment any Jointly Asserted Causes of Action pursuant to the terms of the Liquidating Trust Agreement applicable to the Liquidating Trust Board (including, for the avoidance of doubt, section 6.5(c) of the Liquidating Trust Agreement), which terms are incorporated by reference and shall govern the acts, conduct and rights of the Litigation Designees prior to the Effective Date.

*Id.* (emphasis added).

---

[23] *See also* Plan § 16.1(e) (providing that the Court retains non-exclusive jurisdiction "to ensure that Distributions to holders of Allowed claims are accomplished pursuant to the provisions of the Plan and the Liquidating Trust Agreement; enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan or the Disclosure Statement[.]").

44.     The Liquidating Trust Agreement, in turn, ensures that the Liquidating Trust Board (or, in the interim period prior to the Effective Date, the Litigation Designees) has the right to incur additional financing to support the prosecution of the Jointly Asserted Causes of Action. Specifically, the Liquidating Trust Agreement provides that "the Funding [*i.e.*, the initial funding of the Liquidating Trust] may be increased from time to time during the term of the Liquidating Trust from the proceeds of the Liquidating Trust Assets or from such other sources as may be determined in the **sole** discretion of the Liquidating Trust Board."  Liquidating Trust Agreement § 1.3(b) (emphasis added).   The Liquidating Trust Agreement also provides that "[n]otwithstanding anything in this Trust Agreement to the contrary, nothing herein shall preclude the Liquidating Trust Board from seeking additional financing from sources other than the Liquidating Trust Assets in the discharge of its responsibility under the Plan, the Confirmation Order and this Trust Agreement." *Id.* § 1.3(d).

45.     In sum, while the Jointly Asserted Causes of Action are assets of the Estates, the exclusive control of those assets vested with the Litigation Designees, and then the Liquidating Trust, pursuant to the Confirmation Order.  *See* Confirmation Order ¶ 17.  These provisions, together with the right, pursuant to Bankruptcy Code section 364, to obtain postpetition credit, make clear that the entry into the Litigation Funding Arrangement is authorized by the Court's prior orders and the Bankruptcy Code, and no modification to the Plan or Confirmation Order is required.  In this respect, the terms of the Litigation Funding Arrangement affect **only** the distribution of proceeds from the Jointly Asserted Causes of Action and no other asset of the Estates.  Indeed, the only modification to the existing distribution scheme under the Confirmation Order and the Plan that impacts pre-Effective Date recoveries is, pursuant to Bankruptcy Code section 364(c), to insert the Initial Funder Returns (which is calculated based on the amount

*actually* borrowed and not the full amount of the Funding) ahead of Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Secured Claims, but only with respect to proceeds from the Jointly Asserted Causes of Action. Such claims will not be subordinated to the Funder Multiple or the Go-forward Fee Holdback, and the Past Fee Holdback will be paid only after the Effective Date has occurred—and thus Allowed Administrative Claims, Allowed Priority Claims and Allowed Secured Claims have been satisfied pursuant to the terms of the Plan. Moreover, because the Funding is drawn quarterly based only on need and holders may still be satisfied in part through other remaining assets of the Estates, the ultimate impact to the holders of such claims may be limited.

46. Finally, as set forth herein, proceeds from the Jointly Asserted Causes of Action are necessary for consummation of the Plan. Indeed, the best means to maximize the value of the Jointly Asserted Causes of Action is through the Litigation Funding Arrangement and the provision of the Funding to the Estates.

47. In sum, the Litigation Funding Arrangement resolves significant funding issues for the Jointly Asserted Causes of Action, fulfills the purpose of the Plan and benefits all affected parties. With the Funding available, the Litigation Designees will have the means to advance the prosecution of the Jointly Asserted Causes of Action to their next phase and maximize value for the benefit of all creditors. Accordingly, the Creditors' Committee submits that the requested relief is warranted under Bankruptcy Code section 1142.

## II.    Entry into the Litigation Funding Arrangement Represents a Sound Exercise of Business Judgment Under Bankruptcy Code Section 364

48. The Creditors' Committee also requests authority, pursuant to Bankruptcy Code section 364 and Bankruptcy Rule 4001, to obtain post-confirmation loans, advances and other financial accommodations on behalf of the Estates from the Funder under the Litigation Funding

Arrangement on the terms set forth therein.  As evidenced by the extensive negotiation process undertaken with numerous potential funders, credit is unavailable on any better basis than that as described in the Litigation Funding Arrangement, including credit under Bankruptcy Code sections 364(a) and 364(b).  Specifically, none of the parties contacted to consider providing litigation financing were willing to do so on an unsecured basis, and the terms of the Funding contemplated by the Litigation Funding Arrangement are the result of extensive, arm's-length negotiations with Bench Walk.

49.    Accordingly, after considering all available alternatives and an extensive diligence and negotiation period, the Litigation Designees have concluded that the Litigation Funding Arrangement represents the best financing available and is in the best interests of the Estates and creditors.

### A.    The Funder Liens and Funder Superpriority Claims Should Be Authorized

50.    The Litigation Funding Agreement will provide the Funder with security interests and liens (including priming liens) (the "Funder Liens") and superpriority claims (the "Funder Superpriority Claims") pursuant to Bankruptcy Code sections 364(c) and 364(d).  The Funder Liens and Funder Superpriority Claims are a necessary feature to obtain the Funding, and such provisions are appropriate under the circumstances that are present here.

51.    To satisfy the requirements of Bankruptcy Code section 364(c), a debtor need only demonstrate "that it has made a reasonable effort to seek other sources of credit" on an unsecured or administrative expense basis.  *See, e.g.*, *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 LEXIS 1927, at *33-34 (Bankr. S.D.N.Y. 2016) (citing *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)) (secured credit under Bankruptcy Code section 364(c) is authorized upon showing that unsecured credit cannot be obtained).  Moreover, when few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic

and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

52.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Bankruptcy Code section 364(c).  Specifically:

    a.  the debtor is unable to obtain unsecured credit under Bankruptcy Code section 364(b), *i.e.*, by allowing a lender only an administrative claim;

    b.  the credit transaction is necessary to preserve the assets of the estate; and

    c.  the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See Ames Dep't Stores*, 115 B.R. at 37-40.

53.     The Funding satisfies each part of this test.  *First*, given the circumstances present in these Chapter 11 Cases and as evidenced by the Bartels Declaration, no lender was willing to provide litigation financing on an unsecured or junior priority basis.  *Second*, the financing provided through the Litigation Financing Arrangement is necessary to maximize the value of the Jointly Asserted Causes of Action and, absent approval of such arrangement, there is no clear path to monetize these valuable assets.  In turn, the value of the Estates will be significantly impaired to the detriment of all stakeholders.  *Finally*, the Litigation Financing Arrangement is the result of extensive, arm's-length negotiations with multiple potential funders, which negotiations resulted in material improvements to the terms of such arrangement.  Given these circumstances, the terms of the Litigation Financing Arrangement are fair, reasonable and adequate.

54.     Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 504(b)(1), Bankruptcy Code section 364(c) provides that a court "may authorize the obtaining of credit or incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b)

or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not

otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject

to a lien." 11 U.S.C. § 364(c).

55.     As described herein, efforts to obtain unsecured credit given the status of the

Chapter 11 Cases would have been futile.  *See* Bartels Decl. ¶ 20.  Moreover, under the waterfall

in the Litigation Funding Arrangement, only the Initial Funder Returns will have priority above

Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Secured Claims

and, even then, only with respect to proceeds from the Jointly Asserted Causes of Action and no

other asset of the Estates.  Further, the Initial Funder Returns are based on the amount actually

drawn; if actual costs are lower than anticipated or proceeds are recovered sooner than expected,

the impact to holders of Allowed Administrative Expense Claims, Allowed Priority Claims and

Allowed Secured Claims will be minimized accordingly.  Finally, the Funder Multiple and the Go-

forward Fee Holdback will not be paid until such claims are satisfied in accordance with the Plan,

and the Past Fee Holdback will be paid only upon the Effective Date (*i.e.*, only after Allowed

Administrative Claims, Allowed Priority Claims and Allowed Secured Claims have been satisfied

pursuant to the terms of the Plan).  Therefore, approving Funder Liens and Funder Superpriority

Claims is reasonable and appropriate.

### B.     *The Interests of Secured Parties Are Adequately Protected*

56.     The Litigation Funding Arrangement contemplates that the Funder will receive a

security interest in and lien against the Jointly Asserted Causes of Action senior to all other liens

against such assets, provided that application of the proceeds of the Jointly Asserted Causes of

action are subject in all respects to the waterfall set forth in the Litigation Funding Arrangement.

Bankruptcy Code section 364(d) provides that a debtor may obtain credit secured by a senior or

equal lien on property of the estate already subject to a lien, after notice and a hearing, where the

debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

57.     Here, the Jointly Asserted Causes of Action are subject only to the postpetition replacement lien of Relator Carl Ireland and the United States, which lien is subject to the Carve-Out and senior to all other liens against the Total Assets (including the Jointly Asserted Causes of Action). *See* Confirmation Order ¶ 65 ("In addition to the Sale Order Grants, Mortgagees [Relator and the United States] shall also have a replacement lien against Total Assets as additional adequate protection."). The Mortgagees are adequately protected and thus no additional protection is required under Bankruptcy Code section 364.

58.     Critically, at confirmation, the Court found that (i) the Mortgagees are not entitled to payment on their secured claim prior to the Effective Date, (ii) a cash reserve is not warranted given that the Court found the Plan to be feasible and (iii) the Mortgagees have not shown that they are not adequately protected. *See* Oct. 3, 2019 Hr'g Tr. 157:7-9, 210:7-211:19-22 (the Court stating, among other things, that, because the Relator is first in line, the Estates need only "be solvent to the tune of $18 million . . . . All other assets add up to . . . far more than your client is owed."). Even with the incurrence of superpriority claims and priming liens in connection with the Litigation Funding Arrangement, the Mortgagees will remain more than adequately protected. *See* Bartels Decl. ¶¶ 22-28.

59.     The purpose of adequate protection is to protect the secured creditor from diminution in the value of its collateral. *See, e.g.*, *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). The Mortgagees remain vastly oversecured, given that they have a lien against "Total Assets"—effectively all remaining assets in the Estates. While all parties have

reserved their rights to contest the value of the Mortgagees' claim, such claim, at best, is equal to $22.1 million. *See Debtors' Objection to Motion of Relator Carl Ireland, Administrator of the Estate of James Garbe, for an Order (I) Determining the Value of the Relator's Collateral as of the Sale of Such Collateral; (II) Determining the Amount of Any Diminution in the Amount of the Sales Proceeds Allocable to Such Collateral After the Sale; (III) Directing Payment of Relator's Secured and Superpriority Administrative Claim; and (IV) Granting Related Relief* [ECF No. 7471] ¶ 16 (discussing the appraisals conducted and noting the Mortgagees' appraisal determined the value of the property to be $22.1 million).

60.    As set forth in the Jan. 2022 Status Report and noted herein, the Debtors estimate an ultimate shortfall of approximately $62.6 million (currently $86.6 million) between projected sources of cash (other than the Jointly Asserted Causes of Action and preference proceeds) and the projected amount of administrative, priority and secured claims remaining to be satisfied, before taking into account any additional preference recoveries. Entry into the Litigation Funding Arrangement will increase the claims ahead of the Mortgagees by up to $35 million (and potentially less, based on the amount that is actually drawn down). Even with a $35 million increase in the claims ahead of the Mortgagees (which assumes all Funding is drawn), the value of the remaining preference recoveries and any proceeds from the Jointly Asserted Causes of Action will be sufficient to ensure payment of administrative, priority and secured claims. Indeed, the record at the Confirmation Hearing showed that:

- "The claims asserted in the Subcommittee Adversary Complaint are valuable assets belonging to the Debtors' estates." Transier Decl. ¶ 27.

- "[T]here is at least $150 million of available directors and officers liability insurance that provides a source of recovery to the Debtor plaintiffs in the Subcommittee Adversary Complaint against parties (in their capacity as directors and/or officers) who are covered by such insurance." *Id.* ¶ 28.

- "It is my view that the proceeds ultimately received from (a) prosecution of the Subcommittee Adversary Complaint (including proceeds from insurance referenced above) and (b) the preference claims referenced in Mr. Griffith's declaration will supplement the cash on hand and other proceeds identified by Mr. Griffith and are likely to comfortably satisfy the potential outstanding claims at the amounts identified by Mr. Murphy to the extent it is necessary to access such proceeds to pay administrative claims []."). *Id.* ¶ 29.

61.     The Bartels Declaration reaffirms the testimony at confirmation.  Specifically, the asserted damages are approximately $2 billion plus interest—and approximately $5 billion plus interest inclusive of an additional approximately $3 billion in damages sought in connection with the Related-Party Financings.  Bartels Decl. ¶ 26.  As described in the Bartels Declaration, many sources of recovery on any damages claim exist, including from (i) financial institutions and asset managers, (ii) high net-worth individuals, (iii) large companies and (iv) D&O insurance policies. *Id.* ¶ 26.  With respect to the latter category, the Litigation Designees estimate approximately $66 million in policy proceeds remaining on the 2015-2016 D&O tower covering the claims asserted in respect of the Seritage Transaction and approximately $141 million in policy proceeds remaining on the 2017-2024 D&O tower covering the claims asserted in respect of the Lands' End Spin-off and Related-Party Financings. *Id.*

62.     As such, the replacement lien granted to the Mortgagees at confirmation remains sufficient adequate protection.

**III.   The Transaction Fees Due Under the Litigation Funding Arrangement Should Be Approved**

63.     The Transaction Fees constitute the best terms on which the Estates could obtain the financing necessary to support the prosecution of the Jointly Asserted Causes of Action.  Paying these fees in order to obtain the Funding is in the best interest of the Estates.  Significantly, with respect to the Break-Up Fee, the Funder has agreed to seek payment of such fee, if due, solely from the proceeds of the Jointly Asserted Causes of Action and only after Allowed Administrative

Expense Claims, Allowed Priority Claims and Allowed Secured Claims have been satisfied in accordance with the Plan.

## IV.    The Funder Should Be Deemed a Good Faith Lender Under Bankruptcy Code Section 364(e)

64.    Bankruptcy Code section 364(e) protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  As explained in detail herein, the Litigation Funding Arrangement is the result of the Litigation Designees' reasonable and informed determination that such arrangement offered the most favorable terms under the circumstances.  All negotiations of the Litigation Funding Arrangement were conducted in good faith and at arm's length.  The terms and conditions in the Litigation Funding Arrangement are fair and reasonable, and the Funding will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the Litigation Funding Arrangement.  Further, no consideration is being provided to any party to the Litigation Funding Arrangement other than as described herein.  Accordingly, the Creditors' Committee respectfully submits that the Funder is a "good faith" lender within the meaning of Bankruptcy Code section 364(e) and is entitled to all the protection afforded by that section.

## V.    Modification of the Automatic Stay Is Warranted

65.    The relief requested contemplates a modification of the automatic stay to permit the Funder to exercise remedies in accordance with the Litigation Funding Arrangement.  Stay modifications of this kind are ordinary and standard features of postpetition financing and are appropriate under the present context.

## **NOTICE**

66.     Notice of this Motion will be provided in accordance with the procedures set forth in the Amended Case Management Order.  The Creditors' Committee respectfully submits that no further notice is required.

67.     No previous request for the relief sought herein has been made by the Creditors' Committee to this or any other court.

**WHEREFORE** the Creditors' Committee respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just, proper and equitable.

Dated: April 21, 2022
　　　 New York, New York

　　　　　　　　　　　　　　　　　 /s/  *Ira S. Dizengoff*
　　　　　　　　　　　　　　　　　 AKIN GUMP STRAUSS HAUER & FELD LLP
　　　　　　　　　　　　　　　　　 One Bryant Park
　　　　　　　　　　　　　　　　　 New York, New York 10036
　　　　　　　　　　　　　　　　　 Telephone: (212) 872-1000
　　　　　　　　　　　　　　　　　 Facsimile: (212) 872-1002
　　　　　　　　　　　　　　　　　 Ira S. Dizengoff
　　　　　　　　　　　　　　　　　 Philip C. Dublin
　　　　　　　　　　　　　　　　　 Sara L. Brauner
　　　　　　　　　　　　　　　　　 Zachary D. Lanier

　　　　　　　　　　　　　　　　　 *Counsel for the Official Committee*
　　　　　　　　　　　　　　　　　 *of Unsecured Creditors*

**<u>Exhibit A</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re                                              :

                                                   :        **Chapter 11**

**SEARS HOLDINGS CORPORATION**, *et al.*,          :

                                                   :        **Case No. 18-23538 (RDD)**

                                                   :

Debtors.[1]                                         :        **(Jointly Administered)**

-----------------------------------------------------------------x

### ORDER GRANTING MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 362, 364 AND 1142 AND BANKRUPTCY RULES 3020(D), 4001 AND 9014 AUTHORIZING ENTRY BY THE DEBTORS' ESTATES INTO THE LITIGATION FUNDING ARRANGEMENT WITH BENCH WALK 21p, L.P.

Upon the motion (the "Motion")[2] of the Official Committee of Unsecured Creditors (the

"Creditors' Committee"), appointed in the above-captioned chapter 11 cases (the "Chapter 11

Cases") of Sears Holdings Corporation and its affiliated debtors and debtors in possession

(collectively, the "Debtors"), for entry of an order pursuant to sections 105(a), 362, 364 and 1142

of title 11 of the United States Code (the "Bankruptcy Code") and Rules 3020(d), 4001 and 9014

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking approval of the

Litigation Funding Arrangement on behalf of the Estates, all as more fully set forth in the Motion;

and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to

28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated

January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant

to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion

having been provided in accordance with the Amended Case Management Order, and such notice

having been adequate and appropriate under the circumstances, and it appearing that no other or

further notice need be provided; and the Court having held a hearing to consider the relief requested

in the Motion (the "Hearing"); and upon the record of the Hearing, and upon all of the proceedings

had before the Court; and the Court having determined that the legal and factual bases set forth in

the Motion establish just cause for the relief granted herein; and is in the best interests of the

Debtors, the Estates, their creditors and all parties in interest; and after due deliberation and

sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Litigation Funding Arrangement is hereby approved, and the Litigation

Designees are authorized to enter into the Litigation Funding Arrangement (including the

Litigation Funding Agreement) on behalf of the Estates.

2.      The Litigation Funding Agreement has been negotiated in good faith and at arm's

length between the Litigation Designees and the Funder, and all of the Estates' obligations and

indebtedness arising under, in respect of or in connection with the Funding and the Litigation

Funding Arrangement shall be deemed to have been extended by the Funder in good faith as that

term is used in the Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e). The Funding, the Funder Superpriority Claims (as defined below) and the Funder Liens (as defined below) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise and any liens or claims granted to the Funder hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

3.      Obligations of the Estates to the Funder under the Litigation Funding Arrangement shall constitute joint and several allowed administrative expense claims in the Chapter 11 Cases having superpriority over all administrative expenses of the kind specified in Bankruptcy Code sections 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d) (the "Funder Superpriority Claims") to the extent contemplated by the waterfall in the Litigation Funding Arrangement; *provided*, *however*, that the Funder Superpriority Claims shall be payable only from the proceeds of the Jointly Asserted Causes of Action and no other asset of the Estates.

4.      As security for the Funding, effective and automatically perfected upon entry of this Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the Funder is hereby granted a perfected, first priority security interests in and lien on the Jointly Asserted Causes of Action pursuant to Bankruptcy Code section 364(c) and 364(d) (the "Funder Liens"), which Funder Liens shall not be subordinate to any other interests, liens, claims, charges, encumbrances, security interests or surcharges, including surcharges under Bankruptcy Code section 506(c) or any other section of the Bankruptcy Code, in

the amount of any sums due under the Litigation Funding Agreement; *provided* that application of proceeds of the Jointly Asserted Causes of Action on account of the Funder Liens shall be subject in all events to the waterfall set forth in the Litigation Funding Arrangement.  Notwithstanding the automatic perfection of the Funder Liens pursuant to this Order, the Funder may, in its sole discretion and at its own expense, file such mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, and is hereby granted relief from the automatic stay of Bankruptcy Code section 362 in order to do so, and all such mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents shall be deemed to have been filed or record at the time and on the date of the entry of this Order.

5.      The Transaction Fees under the Litigation Funding Arrangement are hereby approved, are actual and necessary costs of the Estates and shall constitute superpriority claims over all administrative expenses of the kind specified in Bankruptcy Code sections 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d); *provided*, *however*, that the Break-Up Fee, if due, shall be payable solely from the proceeds of the Jointly Asserted Causes of Action and after Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Secured Claims have been satisfied in accordance with the Plan.  The Debtors are authorized to pay the Funder Fees and Expenses upon entry of this Order.

6.      Nothing in the Litigation Funding Arrangement, including the Litigation Funding Agreement, shall prejudice in any way the standing, right or authority of the Plaintiffs (as defined in the First Amended Complaint) to prosecute the Jointly Asserted Causes of Action at the direction of the Litigation Designees prior to the Effective Date and the Liquidating Trust Board following the Effective Date.

7.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

8.      Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.      The Litigation Designees and the Creditors' Committee, as applicable, are authorized to take all action necessary to effectuate the relief granted in this Order.

10.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order.


Dated: _____, 2022
       White Plains, New York

                                   _____
                                   THE HONORABLE ROBERT D. DRAIN
                                   UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Litigation Funding Term Sheet**

EXECUTION VERSION
March 29, 2022
SUBJECT TO DEFINITIVE DOCUMENTATION



This term sheet ("Term Sheet")[1] provides an outline of proposed terms for Litigation Funding (as defined herein) to finance the costs associated with the continued investigation and prosecution of the Primary Causes of Action (as defined herein) and does not purport to summarize all terms, conditions, representations, warranties and other provisions with respect to the transactions contemplated herein.

Without limiting the foregoing, proposals contained herein remain subject to final documentation. Moreover, any agreement to provide the Litigation Funding or any other financing arrangement will be subject to the execution and delivery of definitive documentation by and between certain of the Debtors, the Creditors' Committee, and Bench Walk Advisors ("Funder" or "Bench Walk" ). Finally, the Litigation Funding will be subject to and conditioned upon entry of an order by the Bankruptcy Court approving the Litigation Funding (the "Approval Order"), after notice and a hearing.

This Term Sheet is strictly confidential and may not be shared with anyone other than Bench Walk, the Creditors Committee, the Litigation Designees and the Debtors absent the consent of the Bench Walk and the Litigation Designees.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL TRANSACTIONS REFERENCED HEREIN, AND THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE DEBTORS AND CREDITORS' COMMITTEE. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES PROTECTING THE USE OR DISCLOSURE OF INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.

---

[1] Capitalized terms used herein but otherwise not defined have the meaning ascribed to such terms in the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5370-1] (the "Plan") or the *Order (I) Confirming the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors and (II) Granting Related Relief* [ECF No. 5370] (the "Confirmation Order"), as applicable.

**EXECUTION VERSION**
**March 29, 2022**
**SUBJECT TO DEFINITIVE DOCUMENTATION**



**BENCH WALK
ADVISORS**

### PRINCIPAL TERMS

| 1.  PURPOSE OF LITIGATION FUNDING |
| --- |

The Litigation Funding will be used exclusively to fund the professional fees and costs incurred by the Debtors' estates in connection with the investigation and prosecution of:

- any and all Claims and Causes of Action asserted in the pending proceedings captioned (i) *Sears Holdings Corp. v. Lampert*, Adv. Proc. No. 19-08250 (RDD) (Bankr. S.D.N.Y.) (the "Insider Action") and (ii) *Sears Holdings Corp. v. Tisch*, Adv. Proc. 20-07007 (RDD) (Bankr. S.D.N.Y.) (the "Public Shareholder Action"), which actions have been consolidated (the Insider Action and the Public Shareholder Action, collectively, the "Adversary Proceeding") and/or any other Claims or Causes of Action ancillary thereto, including, *inter alia*, additional Claims or Causes of Action related to the subject matter of the Adversary Proceeding (including Claims or Causes of Action asserted in an amended complaint and Claims and Causes of Action asserted in one or more separate proceedings); and

- any and all Claims or Causes of Action against insurance carriers related to coverage for claims asserted in the Adversary Proceeding or a related proceeding.

"Primary Causes of Action" means all of the causes of action referred to in the preceding two sub-paragraphs.

| 2.  STRUCTURAL TERMS | |
| --- | --- |
| Structure Summary: | Bench Walk shall provide a financing facility to the Debtors' estates (collectively, the "Borrower") [2] with respect to the payment of professional fees and other costs related to the Primary Causes of Action. |
| Facility Amount: | Up to $35 million on a non-recourse basis (the "Litigation Funding"). |
| Drawings: | Quarterly in advance based on "High Scenario" set out in the Budget (as defined below). Proceeds of the Litigation Funding shall be held in a non-interest bearing account with Akin Gump Strauss Hauer & Feld ("Akin Gump" or "Primary Litigation Counsel") and applied against periodic invoices to satisfy the fees and expenses of professionals engaged in connection with the prosecution of the Primary Causes of Action and third party costs related thereto (regardless when incurred). |
| First Drawdown: | To be made promptly following a determination by the Bankruptcy Court in respect of the pending motions to dismiss. |

---

[2] All Debtor entities shall be co-borrowers under the facility.

EXECUTION VERSION
March 29, 2022
SUBJECT TO DEFINITIVE DOCUMENTATION



BENCH WALK
ADVISORS

| | |
|---|---|
| Budget:[3] | Facility may be drawn to fund amounts provided for in the budgeted "High Scenario". All drawdown amounts capped as set out in the Budget, including experts and other out of pocket costs. |
| Fees: | Past and future fees of Primary Litigation Counsel incurred in connection with the investigation and prosecution of the Primary Causes of Action in excess of $10 million already paid shall be subject to the following:<br><br>• A 20% holdback for go-forward fees starting as of the entry of the Approval Order (the "Go-forward Fee Holdback"); and<br><br>• A holdback in respect of fees incurred prior to entry of the Approval Order but not yet paid (the "Past Fee Holdback"), which fees shall be paid either: (i) from the Litigation Funding immediately following the Effective Date of the Plan; or (ii) in accordance with the Waterfall below, only if and to the extent insufficient amounts remain in the Litigation Funding facility to pay such Past Fee Holdback immediately following the Effective Date of the Plan.<br><br>For the avoidance of doubt, all past and future fees incurred by other counsel, professionals, experts or vendors in connection with prosecution of the investigation and prosecution of the Primary Causes of Action shall be paid from the First Drawdown, which shall be made promptly following a determination by the Bankruptcy Court in respect of the pending motions to dismiss, and thereafter on a monthly basis in accordance with the Budget. |
| Transaction Costs: | Bench Walk's reasonable and documented external costs not to exceed $200,000 (but funded solely from the Litigation Funding). |
| **3. PRICING TERMS** | |
| Preference Claim Recoveries: | All recoveries from preference claims fall outside the Waterfall. |
| Waterfall: | All recoveries from the Primary Causes of Action will be applied in accordance with the following waterfall (the "Waterfall") following the first draw on the Litigation Funding:<br><br>(a)    First, to Bench Walk until it has received a return of its capital outlay plus a 15% IRR; |

---

[3] "Budget" to be updated by the Borrower on a quarterly basis, each of which update shall be reasonably acceptable to Bench Walk, and defined as the latest update thereof for purposes of the Litigation Funding draws.

EXECUTION VERSION
March 29, 2022
SUBJECT TO DEFINITIVE DOCUMENTATION



**BENCH WALK
ADVISORS**

| | | |
|---|---|---|
| | (b) | Second, to Litigation Designees until they have received the Designee Contingency Fee (as defined below); |
| | (c) | Third, to the Borrower for payment of Allowed Administrative Expense Claims,[4] Allowed Secured Claims and Allowed Priority Claims (collectively, the "Funding Gap Claims") until all such claims are paid in full;[5] |
| | (d) | Fourth, 100% to Bench Walk until it has received a multiple of all amounts paid under sub-paragraph (a) above equal to: |
| | | (i)      0.015x; multiplied by |
| | | (ii)      the number of months since the first drawdown; divided by |
| | | (iii)      3; |
| | (e) | Fifth, 100% to Primary Litigation Counsel until it has received (i) 2x the amount of the Go-forward Fee Holdback; and (ii) any portion of the Past Fee Holdback that has not and cannot be paid from the Litigation Funding immediately following the Effective Date of the Plan due to an insufficient amount remaining in such facility; and |
| | (g) | Sixth, to the Borrower and Bench Walk a share of the residual amount calculated by reference to the amount of capital actually spent by Borrower in the aggregate as follows:[6] |
| | | (i)      Less than $10 million = 95.25% to the Borrower and 4.75% to Bench Walk |

---

[4] Administrative Expense Claims contemplated to be paid in full or as otherwise estimated in connection with the Administrative Expense Claim Settlement set forth in the Plan.

[5] On a quarterly basis, the Debtors have prepared and filed status reports detailing the progress toward the Effective Date and briefed the Court and other parties in interest on those reports at subsequent omnibus hearings. The most recent such report was filed on January 19, 2022 [ECF No. 10240] (the "Jan. 2022 Status Report") and was presented by the Debtors at the omnibus hearing held on January 20, 2022. According to the Jan. 2022 Status Report, the Debtors estimated that an additional $86.6 million currently is needed to satisfy administrative, secured and priority creditors in accordance with the Plan and the Administrative Expense Claims Consent Program and that following monetization of additional assets, including preferences, such amount will total approximately $62.2 million. Proceeds from litigation, including both the Jointly Asserted Causes of Action and preference actions, are expected to cover this estimated shortfall.  This projection assumes that the Debtors will realize the full value of various estate assets and that related costs do not exceed current projections, which may or may not be the case.  For the avoidance of doubt, the Funding Gap Claims—regardless of their ultimate quantum—must be paid in full (or as otherwise contemplated by the Plan) prior to any payments contemplated by (d) through (e) of the Waterfall.

[6] Borrower shall, in its sole discretion and in accordance with the Budget, reserve from its portion of these residual distributions an amount up to the portion of the Litigation Funding that remains undrawn at that time, which amount shall be used to fund future costs in the Primary Causes of Action, in lieu of drawing further from the Litigation Funding.

EXECUTION VERSION
March 29, 2022
SUBJECT TO DEFINITIVE DOCUMENTATION



| | |
|---|---|
| | (ii)   $10 million or more but less than $15 million = 92.75% to the Borrower and 7.25% to Bench Walk |
| | (iii)  $15 million or more but less than $20 million = 90.25% to the Borrower and 9.75% to Bench Walk |
| | (iv)  $20 million or more = 83.25% to the Borrower and 16.75% to Bench Walk. |
| Designee Contingency Fee: | No change in fee arrangements for Litigation Designees from structure approved in connection with confirmation of the Plan:<br><br>• 0.0% of Gross Litigation proceeds < $150M<br><br>• 1.5% between $150M and $250M<br><br>• 2.0% between $250M and $350M<br><br>• 2.5% between $350M and $450M<br><br>• 3.0% above $450M |

## 4. EXCLUSIVITY & DUE DILIGENCE

| | |
|---|---|
| Exclusivity | Upon execution of this Term Sheet, Bench Walk shall receive a two–week exclusivity period during which the representatives of the Borrower will not engage in discussions with any other litigation funders in connection with litigation funding for the Primary Causes of Action. During this two-week period, Bench Walk will prepare first drafts of the funding agreement and related documents. |
| Break Fee: | If, within the exclusivity period, Bench Walk has provided first drafts of the core funding documents and obtained all necessary internal approvals (subject to final documentation, agreement among Bench Walk, the Creditors' Committee and the Debtors, all at the direction of the Litigation Designees, and approval by the Bankruptcy Court) and the final transaction is not consummated for any reason other than (i) something wholly or substantially within the control of Bench Walk or its affiliates or (ii) absence of approval by the Bankruptcy Court for any reason, Bench Walk will be entitled to be paid a break fee equal to 2x its actually incurred legal and other external costs through to the end of the exclusivity period to be paid solely from proceeds from the Primary Causes of Action after the repayment in full of all Funding Gap Claims. |

EXECUTION VERSION
March 29, 2022
SUBJECT TO DEFINITIVE DOCUMENTATION



**BENCH WALK ADVISORS**

IN WITNESS HEREOF, the parties hereto have caused this Term Sheet to be duly executed by their respective authorized representative as of the day and year indicated below.

**BENCH WALK ADVISORS**

By: _____

Name: Adrian Chopin

Title:    Authorised Signatory


**THE LITIGATION DESIGNEES ON BEHALF OF THE ESTATES**

By: _____

Name:    Sara Brauner

Title:    Partner, Akin Gump Strauss Hauer & Feld LLP

6

## **Exhibit C**

**Bartels Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------x
```
In re                                          :
                                               :          **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*      :
                                               :          **Case No. 18-23538 (RDD)**
                    **Debtors.**               :          **(Jointly Administered)**
```
--------------------------------------------------------------x
```

### DECLARATION OF PATRICK BARTELS IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 362, 364 AND 1142 AND BANKRUPTCY RULES 3020(D), 4001 AND 9014 APPROVING THE LITIGATION FUNDING ARRANGEMENT WITH BENCH WALK 21p, L.P.

I, Patrick Bartels, make this declaration under 28 U.S.C. § 1746:

1.      I submit this declaration ("Declaration") in support of entry of the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Code Sections 105, 362, 364 and 1142 and Bankruptcy Rules 3020(d), 4001 and 9014 Approving the Litigation Funding Arrangement with Bench Walk Advisors LLC* (the "Motion").[1]

2.      Except as otherwise indicated, all statements and opinions in this Declaration are based on my personal experience and knowledge, my discussions with the other Litigation Designees and the Litigation Professionals and my review of the relevant documents.  If called to testify, I could and would testify competently to each of the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Litigation Designees.

3.      I currently serve as a Litigation Designee and have acted in such capacity since the Court entered the Confirmation Order on October 15, 2019 authorizing the appointment of five

---

[1] Capitalized terms used in this Declaration but not otherwise defined have the meanings given to them in the Motion, the Confirmation Order or the Plan, as applicable.

Litigation Designees to oversee prosecution of the Jointly Asserted Cause of Action prior to the Effective Date. Upon the Effective Date, I will be a member of the Liquidating Trust Board.

4.      I do not serve and have never served in any other role in connection with or related to the Chapter 11 Cases or the Debtors.

5.      I am a senior investment professional with 20 years of experience with stressed and distressed situations, including investments in complex financial/corporate rehabilitations and process intensive situations worldwide across a broad universe of industries. I have experience leading creditors' committees and serving as a director on numerous public and private boards, all with an extensive track record of driving value-added returns for all stakeholders through governance, incentive alignment, talent evaluation, cost rationalization, corporate finance, capital markets and liability management transactions and M&A.

6.      I currently work as a Managing Member at Redan Advisors LLC. Prior to that, I served as Managing Principal at Monarch Alternative Capital LP, as a High-Yield Investments Analyst for Invesco, and as a Senior Associate for PricewaterhouseCoopers LLP.

7.      I have served in the past or currently serve on the boards of numerous debtors in chapter 11, including but not limited to: Noble Corporation; Arch Resources, Inc.; Libbey Inc.; Monitronics International, Inc.; Hexion Inc.; Vanguard Natural Resources, Inc.; Centric Brands Inc.; B. Riley Principal Merger Corp.; B. Riley Principal Merger Corp. II; and WCI Communities.

8.      As a Litigation Designee, I participate in periodic discussions with the other Litigation Designees and the Litigation Professionals regarding the Jointly Asserted Causes of Action, including the merits and value of the asserted claims, and the status of the Jointly Asserted Causes of Action and the Chapter 11 Cases generally.

**A.   The Need for Additional Funding To Prosecute the Jointly Asserted Causes of Action**

9.      I understand that the Confirmation Order provided that an aggregate amount of up to $25 million would be set aside as initial funding for the prosecution of the Jointly Asserted Causes of Action (the "Initial Litigation Funding").  Disbursements from the Initial Litigation Funding require the approval of the Litigation Designees, and consistent with the purpose of the funding, the Initial Litigation Funding has been used solely to pay the fees and expenses, including experts and other vendors, of the Litigation Professionals retained by the Litigation Designees, as well as the quarterly fees payable to the Litigation Designees.

10.      Of the Initial Litigation Funding, I understand that approximately $300,000 remains.  Given the current circumstances, until additional financing is available, the Litigation Professionals and the Litigation Designees themselves have deferred a significant amount of their fees and expenses to ensure such funding does not reach $0.  Specifically, I understand that Akin Gump, as Primary Trust Litigation Counsel, has not sought payment in respect of approximately $7.1 million in fees incurred post-confirmation in connection with prosecuting the Jointly Asserted Causes of Action.  Similarly, I understand that certain other Litigation Professionals are awaiting payment of outstanding fees pending approval of additional funding, and the Litigation Designees chose to defer their quarterly compensation from the Initial Litigation Funding for the third and fourth quarters of 2021 and the first and second quarters of 2022.

11.      I am aware that the current scheduling order in respect of the Adversary Proceeding contemplates that the litigation will quickly accelerate into its next phase once the Court rules on the Motions to Dismiss.  As a result, the costs of prosecuting the Jointly Asserted Causes of Action, which have been minimized in the period between oral arguments on the Motions to Dismiss and now, including payments to vendors and experts, necessarily will increase.

12.     In my view, it will not be possible to maximize the value of the Jointly Asserted Causes of Action without additional funding, as contemplated by the Motion.  Therefore, the Litigation Designees, through the Litigation Professionals, sought to solicit interest from third parties to provide funding in respect of the Jointly Asserted Causes of Action.  Prior to soliciting interest from potential funders, the Litigation Professionals developed a comprehensive budget for purposes of the Jointly Asserted Causes of Action, covering the anticipated costs of fact discovery, expert discovery, summary judgment (if permission to file such motions is granted) and trial, with both "high end" and "low end" scenarios to guide expectations.  The costs and expenses in the budget include amounts for attorneys (including Primary Trust Litigation Counsel as well as certain other firms retained to pursue the Public Shareholder Action and aspects of the Insider Action for which Primary Trust Litigation Counsel is conflicted), consulting and testifying experts, vendors and the quarterly fees due to the Litigation Designees.  The Litigation Designees reviewed the budget and determined that up to $35 million in funding would be necessary to fund the prosecution of the Jointly Asserted Causes of Action to completion (*i.e.*, through trial). Accordingly, the Litigation Designees authorized Primary Trust Litigation Counsel to explore available funding options for the Jointly Asserted Causes of Action.

### B.  The Negotiation of the Proposed Litigation Funding

13.     I, along with the other Litigation Designees, have been involved in the efforts to secure additional funding for the Jointly Asserted Causes of Action.  In the initial state of this process, approximately 10 potential financing providers, comprising both traditional litigation financers and investment managers, were contacted to solicit interest in a financing opportunity.  I understand that of the approximately 10 institutions contacted, eight signed non-disclosure agreements.  Upon execution of the confidentiality agreements, each party received key documents and information necessary to assess the value of the claims comprising the Jointly Asserted Causes

4

of Action, as well as access to the budget.  Negotiations with the parties subject to the confidentiality agreements generally focused on, among other things, the status of the Chapter 11 Cases and various issues regarding the merits of the Jointly Asserted Causes of Action.

14.     I understand that three of these parties made proposals to provide funding.  One such proposal was determined to be non-actionable, as it contained highly unfavorable terms to existing creditors.  The Litigation Designees believed that the remaining two proposals—from Bench Walk and Funder A—were potentially actionable.  Accordingly, several rounds of competitive negotiations with Bench Walk and Funder A followed, with significant improvements to the economic and non-economic terms of each party's proposed financing.  Ultimately, Bench Walk and Funder A were each asked to present a best and final offer.

15.     I understand that after Bench Walk and Funder A presented their best and final offers, four other parties (including three institutions that are parties in interest in the Chapter 11 Cases) expressed interest in learning more about the financing opportunity.  Three of these parties entered into non-disclosure agreements, and two made proposals.  Both proposals contained numerous economic and non-economic terms that were determined by the Litigation Designees to be inferior to those proposed on a best and final basis by both Bench Walk and Funder A, and were therefore rejected after careful consideration.

16.     Throughout this competitive process, I, along with the other Litigation Designees, was apprised of developments in respect of each of the proposals received, considered the terms of each and, ultimately, was involved in the decision to enter into the Litigation Funding Term Sheet with Bench Walk after a careful analysis of all the available funding options.

17.     I believe that the Litigation Funding Arrangement provides the necessary funding for the Jointly Asserted Causes of Action on the most favorable economic terms available to the

Debtors and their estates from third-party funders, and I am not aware of any better alternative funding that is available at this time.

18.    Overall, negotiations with the various potential funders and evaluation of their respective proposals focused on ensuring sufficient funding to prosecute the Jointly Asserted Causes of Action to completion as well as an appropriate balance between the economic returns to the Funder, on the one hand, and the Estates and creditors, including administrative, priority, secured and unsecured creditors, on the other.  In evaluating the various proposals, the Litigation Designees sought to ensure that the return to the Funder (whether through an interest rate or a multiple) was favorable to the Estates *overall*.  In particular, negotiations were informed by an understanding that proceeds of the Jointly Asserted Causes of Action would be used in part to satisfy certain administrative, priority and secured claims and, therefore, that any "priming" of such claims by a funder should be limited to the extent feasible, while still safeguarding recoveries for general unsecured creditors.

19.    The Litigation Designees believe that, ultimately, the Funding will be beneficial to holders of administrative, priority and secured claims by ensuring the value of the Jointly Asserted Causes of Action is maximized, while at the same time minimizing the economic cost of the Funding to such holders.  Specifically, among other things, the draws under the Funding facility are to be made quarterly and based on need, and, moreover, no commitment fee is paid on the undrawn amounts, thereby lessening the economic costs to the estates.  Further, during the course of negotiations, Bench Walk agreed to accept an IRR on the litigation financing of 15% and that any amounts to which it may become entitled over and above the repayment of principal and the 15% IRR will not be paid until holders of Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Secured Claims are paid in full.

20.     Additionally, given the current status of the Chapter 11 Cases, the Litigation Designees believed that efforts to obtain unsecured credit would have been futile.  Indeed, all the proposals received contemplated that the funder would be provided with at least a superpriority claim in the Chapter 11 Cases.

21.     Finally, I do not believe that relying solely on contingency fees is a viable option for prosecuting the Jointly Asserted Causes of Action or would maximize the value of the litigation. I understand that the payment of vendors and experts should not be contingent on receiving proceeds from the Jointly Asserted Causes of Action.  Likewise, none of the law firms involved in prosecuting the Jointly Asserted Causes of Action have agreed at this time to be compensated solely on a contingency basis.  While it was originally contemplated that Primary Trust Litigation Counsel would be compensated on a mixed hourly and contingent basis, the Litigation Designees determined that this proposal was no longer appropriate under the current circumstances. Specifically, the Initial Proposed Compensation Terms negotiated in July 2019 contemplated that Primary Trust Litigation Counsel would be paid up to $10 million on an hourly rate basis and, thereafter, would be compensated on a contingency fee basis.  The contemplated contingency fee was a sliding percentage of gross proceeds obtained through the Jointly Asserted Causes of Action, starting at 8% once at least $100 million in cash proceeds were recovered and increasing up to 12% after $500 million or greater in gross proceeds were obtained.  The engagement letter reflecting these Initial Proposed Compensation Terms, however, was never executed.  Because of the changes in circumstance since July 2019—including, among other things, the expected length of time necessary to consummate the Plan and establish the Liquidating Trust (including as a result of a reduction in expected preference recoveries), and the fact that the Funder has required a portion of its return to come first in any proceed waterfall—the Litigation Designees determined

7

that the Initial Proposed Compensation Terms no longer were appropriate. Therefore, the Litigation Designees have agreed to revise the terms of Akin Gump's retention as Primary Trust Litigation Counsel in the manner set forth in the Litigation Funding Term Sheet. Importantly, Primary Trust Litigation Counsel has agreed to defer payment in respect of (i) all fees incurred as of the entry of the order approving the Motion but not yet paid, which I understand currently is approximately $7.1 million and (ii) certain of its go-forward fees (representing 20% of its fees starting from entry of the order approving the Motion) until holders of Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Secured Claims receive payment in full or as otherwise agreed.

### C. The Value of the Underlying Jointly Asserted Causes of Action

22.     I believe the Jointly Asserted Causes of Action are valuable assets. The causes of action involve three distinct transactions, each of which gives rise to claims worth hundreds of millions of dollars in damages: (i) the Lands' End Spin-off; (ii) the Seritage Transaction; and (iii) the Related-Party Financings.[2]

23.     **Lands' End Spin-Off.** Plaintiffs in the Jointly Asserted Causes of Action have alleged that the Lands' End business that was spun-off to shareholders was worth between $800 and $900 million (net of debt) and seek to recover this amount plus interest. Plaintiffs are seeking recovery of these amounts from: (i) Sears Holdings shareholders who were gifted shares of Lands' End for no consideration; and (ii) the directors, officers and advisors of Sears Holdings and an affiliate who orchestrated and approved the Lands' End Spin-off.

---

[2] Any references contained herein to damages related to the Jointly Asserted Causes of Action are preliminary estimates based on efforts undertaken by the Litigation Professionals to date. The estimates are subject to potentially significant change based on new information learned or developed in the course of ongoing fact and expert discovery. Further, these estimates are high level, and nothing herein is intended to modify, alter or amend the preliminary damages computations disclosed by Plaintiffs in the Insider Action pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii), which contain significantly more detail regarding anticipated damages (including additional types and categories of damages) than the summary information provided herein.

24.    **Seritage Transaction.** Plaintiffs in the Jointly Asserted Causes of Action have alleged that the Seritage Rights transferred to Sears Holdings shareholders for no consideration were worth approximately $600 to 700 million and seek to recover this amount plus interest. Furthermore, Plaintiffs have alleged that the real estate transferred to Seritage in the Seritage Real Estate Transfer was undervalued by at least hundreds of millions of dollars. Plaintiffs are working with their experts to determine the precise amount by which the real estate was undervalued and will seek to recover that amount plus interest. Plaintiffs are seeking recovery of these amounts from: (i) Sears Holdings shareholders who received the Seritage Rights; (ii) Seritage, which acquired the transferred real estate; and (iii) the directors, officers and advisors of Sears Holdings and certain affiliates who orchestrated and approved the Seritage Transaction.

25.    **Related-Party Financings.** Plaintiffs in the Jointly Asserted Causes of Action have alleged that the Related-Party Financings were, in sum and substance, disguised equity investments, and that the estates are entitled to the recovery of approximately $400 million of interest and fees paid on these "loans" and seek to recover this amount plus interest. Plaintiffs are seeking recovery of these amounts from: (i) the parties who received the interest and fees; and (ii) the directors and officers of Sears Holdings and certain affiliates who orchestrated and approved the Related-Party Financings.

26.    In total, the Jointly Asserted Causes of Action seek damages of approximately $2 billion plus interest.

27.    There are numerous sources of material recovery for the Jointly Asserted Causes of Action, which sources fall in four general categories. The first is financial institutions and asset managers, including ESL Investments, Inc., Fairholme Capital Management, LLC, Benefit Street 2018, LLC, Cascade Investments, LLC, Cyrus Capital Partners and nearly all the 139 defendants

named in the Public Shareholder Action. The second is ultra-high net worth individuals, namely, Edward Lampert, Thomas Tisch, Steven Mnuchin and Bruce Berkowitz. The third is large companies, namely Seritage, Duff & Phelps, LLC and Cushman & Wakefield, Inc. And the fourth is D&O insurance policies. While the Litigation Designees have only limited knowledge of the amounts remaining on the D&O insurance policies, the Litigation Designees estimate based on information provided to them by certain defendants and information otherwise learned during the course of these cases that there is approximately $66 million in policy proceeds remaining on the 2015-2016 D&O tower covering the claims asserted in respect of the Seritage Transaction and approximately $141 million in policy proceeds remaining on the 2017-2024 D&O tower covering the claims asserted in respect of the Lands' End Spin-off and Related-Party Financings.

28.     In light of the strength of the Jointly Asserted Causes of Action, the significant damages sought and the many deep-pocketed sources of potential recovery, I believe the Jointly Asserted Causes of Action are extremely valuable assets that, upon realization through either judgment or settlement, will easily provide a complete recovery to holders of Allowed Administrative Expense Claims, Priority Claims and Secured Claims, as well as a complete recovery to the PBGC on its priority unsecured claim and meaningful recoveries to the remainder of the Debtors' unsecured creditors. But to realize this value, it is essential that the Funding sought in the Motion be approved so that financing is available as the Plaintiffs proceed to the next steps of the litigation.

29.     In view of the foregoing, I support the Motion.

Dated: April 20, 2022
      North Carolina

Patrick Bartels
Redan Advisors LLC, Managing Member