Edward M. Fox
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Phone: 212-218-5500
Fax: 212-218-5526
Email: emfox@seyfarth.com

*Attorneys for Wilmington Trust, National Association,*
*as indenture trustee and collateral agent*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION,
AS INDENTURE TRUSTEE AND COLLATERAL AGENT, TO MOTION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR
ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE
SECTIONS 105, 362, 364, AND 1142 AND BANKRUPTCY RULES 3020(D),
4001 AND 9014 AUTHORIZING ENTRY BY THE DEBTORS' ESTATES INTO
THE LITIGATION FUNDING ARRANGEMENT WITH BENCH WALK 21P, L.P.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365) (collectively, the "Debtors"). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Wilmington Trust, National Association, as indenture trustee and collateral agent ("Wilmington Trust"), by and through its undersigned counsel, hereby files this Objection of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent, to Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Code Sections 105, 362, 364, and 1142 and Bankruptcy Rules 3020(D), 4001 and 9014 Authorizing Entry by the Debtors' Estates Into the Litigation Funding Arrangement With Bench Walk 21p, L.P. [Dkt. No. 10407] in opposition to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Code Sections 105, 362, 364, and 1142 and Bankruptcy Rules 3020(D), 4001 and 9014 Authorizing Entry by the Debtors' Estates Into the Litigation Funding Arrangement With Bench Walk 21p, L.P. [Dkt. No. 10407] (the "Motion"), and in support thereof states as follows:

## INTRODUCTION

1.    At the hearing on confirmation of the Debtors' Modified Second Amended Joint Chapter 11 Plan (the "Plan") Dkt. No. 4476, the Debtors represented that the Plan would become effective within months after confirmation and that sufficient funding was available to prosecute the adversary proceedings entitled *Sears Holdings Corporation, et al. v. Edward S. Lampert, et al.*, Adversary Case No. 19-8250 (the "ESL Adversary Proceeding") and *Sears Holdings Corporation, et al. v. Tisch, et al.*, Adversary Case No. 20-7007 (the "Public Shareholder Adversary Proceeding") (together with the ESL Adversary Proceeding, the "Adversary Proceedings").

2.    Two and a half years later, the Official Committee of Unsecured Creditors ("UCC") admits in its Motion that no effective date for the Plan is in sight and that all but $300,000 of the $25 million that the UCC and the Debtors previously represented to the Court would be sufficient to fund the prosecution of the Adversary Proceedings has been spent.

2

81753568v.4

3.      By the Motion, the UCC now seeks to enter into a litigation funding arrangement

with Bench Walk 21p, L.P. (the "Funder") to fund up to an additional $35 million of professional

fees (the "Funding") to be incurred in prosecuting the Adversary Proceedings.  Under this

proposal, the Funder would receive all proceeds from any recovery in the Adversary Proceedings

until it recovered its initial outlay plus a 15% internal rate of return ("IRR") and would

potentially receive tens of millions, if not hundreds of millions, more dollars ahead of most of the

Debtors' existing creditors in return for this Funding.  The Motion provides no information by

which the Court or creditors can determine how this $35 million will be spent, whether it will be

sufficient to cover the cost of the Adversary Proceedings, what happens if it isn't and whether

the cost of appeals in included.

4.      The Motion is improper and fails for multiple, independent reasons.  First, Section

1142 of the Bankruptcy Code is not applicable here because no provision of the Debtors' Plan

provides for litigation funding on the terms proposed by the Motion and, to the extent the Plan

even permits parties other than the Debtor to move for such relief, it does not permit the UCC to

do so.

5.      Second, the UCC argues in the Motion that the Litigation Trust Board was

authorized by the Liquidating Trust Agreement, and therefore the Litigation Designees are

authorized, to obtain the Funding, but this is not the case and, even if true, and even if permitted

by the Bankruptcy Code, neither the Litigation Trust Board, which does not yet exist, nor the

Litigation Designees, are the movants under the Motion.  The UCC is, and nothing in the Motion

establishes that the UCC is so authorized.

6.      Third, as the UCC, itself, acknowledges in the Motion, only a debtor may seek

debtor-in-possession financing.  Consequently, even if otherwise authorized, the UCC, and the

3

Litigation Designees, lack standing to move under Section 364 of the Bankruptcy Code because they are not the trustee or debtor-in-possession.

7.      Fourth, even if the UCC could move pursuant to Section 364, the requirements of Section 364 are not met here because the UCC admits that it was able to obtain unsecured credit from Akin Gump allowable as an administrative expense but simply declined to accept it. Nor has the UCC sought unsecured financing allowable as an administrative expense from any other law firm which might take the case on a contingency. Consequently, the Court is prohibited from authorizing the obtaining of credit with priority over all other administrative expense claims or secured by liens on property of the estate.

8.      Fifth, the Motion asserts that the financing will only be secured by a lien on the recovery from the Adversary Proceedings, but it also states that the Funder will be given a superpriority administrative expense in the event of any diminution in the value of the collateral. What would constitute diminution in the value of the Adversary Proceedings is unspecified, but it appears that the Debtors' estates will essentially be insurers of the Funder's recovery of its fees, and all proceeds of the Adversary Proceedings will be at risk despite the supposed waterfall set forth in the Funder's term sheet.

9.      Sixth, the Motion is premature because there are numerous uncertainties, described further below, regarding both the Adversary Proceedings and the terms of the proposed litigation Funding, including the fact that pending motions to dismiss some or all of the claims in the Adversary Proceedings have yet to be decided and the mediation of the Adversary Proceedings has been extended to at least June 30, 2022.

10.     Seventh, the Motion violates Bankruptcy Rule 4001 because the UCC failed to attach to the Motion its final agreement with the Funder, as the Bankruptcy Rules require.

4

Consequently, it is impossible to determine, for example, how the IRR is calculated and what other terms of the Funding may exist.

11.     Although there is no urgency to obtaining the Funding, the proposed order attached to the Motion provides that it becomes effective immediately upon entry and the Funding must be drawn immediately and held in a non-interest bearing account by Akin Gump. These provisions serve no purpose other than to make it difficult, if not impossible, for any party to appeal any order granting the Motion, and should not be approved. This is not a first-day hearing where a debtor will not be able to make payroll and jobs and stores are on the line if funding is not immediately approved. The parties to the Adversary Proceedings are awaiting the resolution of motions to dismiss and the mediation of the Adversary Proceedings has been extended to June 30, 2022. If the Motion is adjourned or is not granted, Akin Gump cannot stop litigating the Adversary Proceedings because the applicable rules require it to continue the representation it voluntarily undertook, and it can ask the Court to modify any deadlines that create a timing imperative with respect to this Motion.

12.     Accordingly, the Motion should be denied or, at a minimum, adjourned to permit creditors to review the terms of the litigation funding agreement once it is filed and the Court's decision on the motions to dismiss the Adversary Proceedings and await the outcome of the mediation.

## BACKGROUND

### The Bankruptcy Filing

13.     On October 15, 2018, each of the Debtors filed voluntary petitions for relief under Chapter 11 of title 11, U.S.C. in this Court. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.     In February 2019, the Debtors sold substantially all of their assets pursuant to the

Order (i) Approving the Asset Purchase Agreement Among Sellers and Buyer, (ii) Authorizing

the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and

Encumbrances, (iii) Authorizing the Assumption and Assignment of Certain Executory

Contracts, and Leases in Connection Therewith and (iv) Granting Related Relief, entered

February 8, 2019 (Dkt. No. 2507).

## Confirmation of the Debtors' Chapter 11 Plan

15.     On July 9, 2019, the Debtors filed the Plan and their Disclosure Statement for

Modified Second Amended Joint Chapter 11 Plan (the "Disclosure Statement").  Dkt. No. 4478.

16.     In the Disclosure Statement, the Debtors stated that they believed the Plan met the

Bankruptcy Code's feasibility requirement because "the Debtors will be able to satisfy the

conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-

Confirmation Date (as hereafter defined) obligations to pay for the costs of administering and

fully consummating the Plan, including sufficient funds for the Plan Administrator to liquidate

the Debtors' remaining assets." Dkt. No. 4478 at pg. 158.

17.     The Debtors also stated that they "believe the Effective Date will occur soon after

the Confirmation Date," but that "there can be no assurance as to the timing of the Effective

Date." *Id.* at pg. 146.

## Effective Date Predictions

18.     On October 3 and October 7, 2019, the Court held a hearing on confirmation of

the Debtors' Plan.

19.     During the hearing, the Debtors' fact witness, Brian Griffith, testified that "[i]t

could take months [for the Plan to go effective].  It could take slightly longer than months."  Dkt.

No. 5395 at 74:5-22.  Mr. Griffith later testified that it "could probably take nine months of

6

preference recoveries" before the Plan could go effective, *i.e.*, approximately in July 2020. *See id.* at 79:5-80:9.

20.     Mr. Griffith also testified that his "estimate" of the "shortfall" of cash Debtors needed to overcome in order to go effective was "a little over 100 to 120 million." *Id.* at 80:10-81:5.

21.     The Debtors' counsel, Ray Schrock of Weil, Gotshal & Manges LLP ("Weil Gotshal"), represented to the Court that there would be a "potential brief gap between confirmation and the effective date." *Id.* at 140:16-24.

22.     Mr. Schrock later reiterated that "[w]e think that we can go effective within a few months, as early as, you know, within a few months. But we're mindful that we're not going to sit here in Chapter 11 for an effective date to occur for an extended period of time." *Id.* at 145:5-22.

23.     Mr. Schrock further stated that "the standing amount of the claims required to be paid on the effective date is approximately $86 million . . . ." *Id.* at 159:7-19.

24.     Phil Dublin of Akin Gump, counsel for the UCC, stated to the Court that "[w]e are all incentivized to go effective as soon as possible, and we think that working together with the debtors and the administrative expense representative, we will get to that goal very quickly." *Id.* at 206:15-21.

25.     Counsel for various creditors, in contrast, disputed the Debtors' and UCC's predictions about the effective date, arguing that it might be three or four years before the Plan could become effective. *See id.* at 238:18-240:8, 247:21-248:12; Dkt. No. 5396, 10/7/19 Tr. at 109:23-110:3.

26.     The Court stated that it was "reluctant to delay the effective date of this plan" for a period that could be "potentially two to four years." *Id.* at 179:16-20. The Court found,

7

however, based on the Debtors' and UCC's representations, that "the likelihood of satisfying Section 1129(a)(9) in the relatively near term, i.e. in a matter of a few months, is established." *Id.* at 179:21-180:5. Consequently, based in part on the Debtors' and UCC's representations, the Court confirmed the Plan.

**Litigation Funding Predictions at Confirmation**

27.    As part of their filings in connection with the proposed Plan, the Debtors and the UCC represented that they "anticipated . . . approximately twenty-five million dollars ($25,000,000)" would be "necessary to fund the activities of the Liquidating Trust" upon the effective date of the Plan. *See* Dkt. No. 5295 at Section 1.3(b).

28.    The Debtors also estimated that the Adversary Proceedings that the Liquidating Trust would ultimately pursue following confirmation of the Plan could yield a recovery of $334 million. *See* Dkt. No. 4478 (Disclosure Statement) at pg. 293 of 358; Dkt. No. 5146 (Transier Declaration) ¶ 25.

29.    The UCC suggested that the recoveries from the Adversary Proceedings would be even higher, but declined to put forth a specific number. *See, e.g.,* Dkt. No. 3995 ¶ 26 n. 14; Dkt. No. 5145 ¶ 11.

30.    Initially, the UCC vehemently opposed confirmation of the Plan. Dkt. No. 3995. It changed its position and agreed to support the Plan after the Debtors agreed to permit the UCC (and Akin Gump) to take over prosecution of the Adversary Proceedings. *See* Dkt. No. 5145.

31.    The Debtors, the UCC, and administrative expense claimants also reached an agreement on the eve of the confirmation hearings. Under this agreement, the Plan would provide for an initial amount of $15 million to be set aside for funding litigation, including the Adversary Proceedings, prior to the effective date of the Plan, and that pre-effective date funding would total $25 million. *See* Dkt. Nos. 5292, 5301.

8

32.      With respect to funding the Adversary Proceedings, Mr. Dublin discussed at the

confirmation hearing the Debtors' and the UCC's agreement with administrative creditors that

"the initial cash available to pursue the litigation" would be "$15 million. But there is a

mechanism to get that back up to $25 million once -- in advance of going effective in the

aggregate." Dkt. No. 5395 at 205:4-12.

33.      Mr. Dublin continued: "[s]o some of that money will be used. It's not going to

get replenished and become evergreen. But in the aggregate there will have been $25 million

available in the first instance for the pursuit of those causes of action." *Id.* at 205:13-16.

34.      Mr. Dublin argued that this funding was appropriate because the UCC "has been

bullish on the causes of action. . . .  And we expect the proceeds ultimately -- that will ultimately

come in will be greatly -- excuse me -- will be much greater than was put forth in the disclosure

statement which generally are conservative numbers . . . ." *Id.* at 204:20-205:3.

## The Confirmation Order and the Liquidation Trust

35.      The Court entered a written order confirming the Plan (the "Confirmation Order")

on October 15, 2019 (the "Confirmation Date"). Dkt. No. 5370.

36.      Consistent with the Debtors' and the UCC's agreement with administrative

expense claimants, the Confirmation Order provided for a segregated account for funding the

prosecution of the Adversary Proceedings. *Id.* ¶ 52(d). It also provided for that account to be

funded with $15 million shortly after entry of the Confirmation Order (*id.*), and that the account

would "in no event be funded by more than $25 million up to and including the Effective Date."

*Id.* at 28, n. 9.

37.      The Confirmation Order also provided that, upon the effective date, the Debtors'

Liquidating Trust would have the power "to determine and to initiate, file, prosecute, enforce,

abandon, settle, compromise, release, withdraw, or litigate to judgment any Jointly Asserted

9

Causes of Action pursuant to the terms of the Liquidating Trust Agreement applicable to the Liquidating Trust Board. . . ." Confirmation Order ¶ 18.

38.     The Confirmation Order further provided that, prior to the effective date, two persons designated by the Debtors and three designated by the UCC (the "Litigation Designees") would be entitled to exercise the powers of the Liquidating Trust. *Id.*

## Pre- and Post-Confirmation Professional Fees

39.     From the commencement of the bankruptcy case on October 15, 2018, through the confirmation hearing on October 3, 2019, the Debtors' and the UCC's various legal professionals and certain other consulting and tax professionals (such as Houlihan Lokey Capital, Inc., FTI Consulting, Inc., and Deloitte LLP) were paid $133,047,547.68 in fees pursuant to interim orders issued by the Court. *See* Dkt. No. 5507. Of those fees, the Debtors' lead counsel, Weil Gotshal, was paid $51,916,212.55, *Id.* and the UCC's lead counsel, Akin Gump, was paid $24,902,658.20. *Id.*

40.     In addition, M-III Advisory Partners, LP ("M-III") incurred $14,298,516.08 in fees prior to confirmation, according to its monthly fee statements. *See* Dkt. Nos. 1180, 1379, 1904, 2722, 2894, 3616, 4170, 4553, 4645, 5386, 5526, 5527, 5561. Combined, the Debtors' and the UCC's legal professionals and certain consulting and tax professionals were paid at least $147,346,063.76 prior to confirmation ($133,047,547.68 plus $14,298,516.08).

41.     Since the Confirmation Date, these professionals have been paid at least an additional $94,134,507 in fees pursuant to interim orders entered by the Court through March 16, 2022. *See* interim orders at Dkt. Nos. 6247, 6259, 6811, 7223, 7224, 7298, 7981, 7982, 7983, 8036, 8387, 8388, 8389, 9009, 9123, 9136, 9137, 9281, 9312, 9313, 9323, 9324, 9528, 9545, 9599, 9600, 9690, 9849, 9850, 9851, 9852, 9862, 10152, 10157, 10252, 10353, 10354 (interim

81753568v.4

orders). Of this amount, Weil Gotshal was paid $32,602,858.75 and Akin Gump was paid $28,425,126.50.

42.    In addition to the $94,134,507.10 paid to the Debtors' and the UCC's legal professionals and certain consulting or tax professionals since the Confirmation Date, M-III has been paid an additional $22,452,365.10 from confirmation through March 16, 2022, according to its monthly fee statements. Dkt. Nos. 6400, 6401, 7442, 7500, 7805, 7941, 8011, 8291, 8363, 8418, 8961, 9077, 9145, 9222, 9303, 9351 9404, 9502, 9571, 9684, 9744, 9814, 10000, 10097, 10141, 10231, 10285, 10350, 10394, 10435. Combined, the professionals identified above were paid at least $116,586,872.10 from the Confirmation Date through March 16, 2022, ($94,134,507.10 plus $22,452,365.10).

43.    This $116,586,872.10 in professional fees eclipses the $86 million in administrative claims that Mr. Schrock stated needed to be paid on the effective date of the Plan. Dkt. No. 5395 at 159:7-19. The amount is essentially equal to the $100 to $120 million identified by Mr. Griffith during the confirmation hearing as the shortfall[2] Debtors needed to overcome in order for the Plan to go effective, *Id.* at 80:10-81:5, yet the Plan has not become effective and is unlikely to do so anytime soon.

### The Adversary Proceedings

44.    On April 17, 2019, the Debtors commenced the ESL Adversary Proceeding. *See* ESL Adversary Proceeding, Dkt. No. 1.

45.    On February 21, 2020, the defendants in the ESL Adversary Proceeding filed motions to dismiss. *See* ESL Adversary Proceeding, Dkt. Nos. 95-137. On August 19 and August 31, 2020, the Court held oral argument on the motions to dismiss. *See* ESL Adversary

---

[2] Although Mr. Griffith's shortfall included administrative expense claims that remain to be paid.

81753568v.4

Proceeding, Dkt. Nos. 215, 218. The motions to dismiss were taken under advisement and no decision has been rendered on them to date.

46.     On October 15, 2020, the Debtors commenced the Public Shareholder Adversary Proceeding. *See* Public Shareholder Adversary Proceeding, Dkt. No. 1.

47.     On January 19, 2021, certain of the defendants in the Public Shareholder Adversary Proceeding filed motions to dismiss. *See* Public Shareholder Adversary Proceeding, Dkt. Nos. 39-41, 43, 46, 48, 51, 55, 60-65, 67. On March 12, 2021, the Court held oral argument on those motions to dismiss. *See* Public Shareholder Adversary Proceeding, Dkt. No. 142. The motions to dismiss were taken under advisement and no decision has been rendered on them to date.

48.     On April 6, 2022, the Court issued an order directing the Debtors' and the ESL Defendants to a mediation to conclude by May 23, 2022. ESL Adversary Proceeding Dkt. No. 270. The deadline for the mediation has since been extended at the suggestion of the mediators until June 30, 2022.

49.     As part of its April 6, 2022 order, the Court held that "[t]he Litigation Designees may file a motion seeking approval of a litigation financing arrangement prior to April 25, 2022, *provided* that consideration and determination by this Court of any such motion shall occur no earlier than June 10, 2022. The deadline for any responses to such motion, including objections, shall be heard no later than 14 days prior to the hearing to consider such motion." ESL Adversary Proceeding Dkt. No. 270 at pg. 5. The hearing on the Motion has since been scheduled for June 29, 2022.

50.     On April 14, 2022, Akin Gump represented to the Court that it "sought to conserve resources by limiting the work performed in connection with the [ESL] Adversary Proceeding pending a ruling on certain motions to dismiss while still performing the tasks

12

necessary to ensure that the agreed-upon schedule . . . could be maintained following such ruling." Dkt. No. 10398 ¶ 34. The work included reviewing "the voluminous discovery produced" in the Adversary Proceedings, which "totals over 14,000,000 documents," "preparing for depositions by, among other things, drafting fact chronologies concerning the prepetition transactions," and exchanging "letters, emails and other correspondence with certain Defendants and third parties to resolve various discovery disputes." *Id* ¶ 36. Akin Gump also stated that it has "continued to communicate with certain experts who were retained previously to perform analyses, provide advice and, if appropriate, ultimately testify" in the Adversary Proceedings. *Id.* ¶ 37. Accordingly, Akin Gump is prepared to proceed with depositions once the motions to dismiss are decided. Motion ¶ 23.

## The Motion to Obtain Litigation Financing

51. On April 21, 2022, the UCC, not the Debtors or the Litigation Designees, filed the Motion. Dkt. No. 10407.

52. The Motion includes a copy of a term sheet between the Funder and the Litigation Designees (the "Term Sheet"), signed on their behalf by Akin Gump. *See id.* No definitive, final agreement between the Funder and either the Litigation Designees or the UCC was filed on the docket either with the Motion or since, despite being required by Rule 4001, although the UCC seems to know what the final agreement provides. Motion ¶ 50. The Motion is supported by a declaration from Patrick Bartels, a Litigation Designee (the "Bartels Decl."). *See id.*

53. The UCC reveals in the Motion that the $25 million in litigation funding set aside under the Plan "is nearing exhaustion," with only approximately $300,000 left. *See id.* ¶ 22; Bartels Decl. ¶ 10. Of this $25 million, the Motion states that Akin Gump has received $10 million, but has incurred an additional $7.1 million in fees relating to the Adversary Proceedings that have not yet been paid. Motion ¶ 38 n. 20.

13

54.     In the Motion, the UCC asks the Court to approve a litigation Funding arrangement with the Funder by which the Funder will provide up to an additional $35 million in funding for the Adversary Proceedings in exchange for 100% of the proceeds recovered from the Adversary Proceedings, if any, up to the full amount funded, plus "an annualized internal rate of return of 15%." Motion ¶ 36. Neither the Motion nor the Term Sheet explain or define how the "internal rate of return" is to be calculated.

55.     The proposed funding arrangement would also result in payment to the Funder of additional millions of dollars under certain conditions, described in the Motion and below. *See id.*

56.     The UCC argues that it should be permitted to obtain funding from the Funder on a secured basis because, among other things, "no lender was willing to provide litigation financing on an unsecured or junior priority basis," "the financing . . . is necessary to maximize the value of" the Debtors' causes of action, and "the Litigation Financing Arrangement is the result of extensive, arm's-length negotiations . . . ." *Id.* ¶ 53.

57.     Facts set forth elsewhere in the Motion, however, show that the foregoing statements are false. The UCC admits that Akin Gump agreed to payment of up to $10 million in fees and to thereafter "provide services on a contingency fee basis."[3] *Id.* ¶ 39. The UCC and Akin Gump apparently memorialized this agreement in an engagement letter, but, according to the UCC, this engagement letter was never signed. *Id.* ¶ 39.

58.     Bartels states that the Litigation Designees, as opposed to Akin Gump, decided at some point that this arrangement was "no longer appropriate." *Id.*; *see also* Bartels Decl. ¶ 21.

---

[3] Although Bartels states that "none of the law firms included in prosecuting the Jointly Asserted Causes of Action have agreed at this time to be compensated solely on a contingency basis," Bartels Decl. ¶ 21, this is misleading because Akin Gump was to be, and was, paid $10 million on an hourly basis with the remainder of its fee on contingency. Consequently, it would not have been compensated solely on a contingency.

14

59.    Bartels states that the proposed contingent fee arrangement with Akin Gump is not appropriate in light of "the expected length of time necessary to consummate the Plan" and the desire of the Funder to be paid ahead of other creditors. Bartels Decl. ¶ 21. Bartels does not explain why the delay in the effective date of the Plan has any bearing on the arrangement. *See id.* He also does not explain why the Funder's desires are relevant, since no Funding would be needed from the Funder if Akin Gump was retained on the terms to which Akin Gump and the Litigation Designees originally agreed. *See id.*

## OBJECTION

## I.    SECTION 1142 OF THE BANKRUPTCY CODE IS INAPPLICABLE HERE

60.    The UCC's first purported basis for relief is 11 U.S.C. § 1142(b). *See* Motion ¶¶ 42-47. That provision is inapplicable here, however.

61.    Section 1142(b) provides that "[t]he court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b).

62.    "Section 1142(b) empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan," but it is "not an independent source of power" and "does not confer any substantive rights on a party apart from what is provided for in the plan." *In re Lehman Bros. Holdings, Inc.*, 591 B.R. 153, 159 (Bankr. S.D.N.Y. 2018) (cited in Motion ¶ 42).

63.    The Plan provides that, pending the effective date of the Plan, the Debtors' and UCC's "Litigation Designees" have "all rights and entitlements to be afforded to the Liquidation Trust Board on the Effective Date of the Plan . . . ." Confirmation Order ¶ 18.

15

64.    The Confirmation Order provides that the Litigation Designees have the right "to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Jointly Asserted Causes of Action pursuant to the terms of the Liquidating Trust Agreement applicable to the Liquidating Trust Board. . . ." Confirmation Order ¶ 18; *see also* Dkt. No. 4476 (Plan) at Section 9.5 (same list of rights); Dkt. No. 4478 (Disclosure Statement) at pg. 115 of 358 (same).

65.    Notably absent from the powers set forth in the Confirmation Order and the Plan, however, is the power to obtain litigation financing.

66.    Although the UCC points to the Liquidating Trust Agreement, which permits the Liquidating Trust to increase funding for the Adversary Proceeding "from the proceeds of the Liquidating Trust Assets or from other sources . . . ." Motion ¶ 44 (quoting Liquidating Trust Agreement §§ 1.3(b), (d)), the Liquidating Trust Agreement does not expressly authorize the Liquidating Trust to borrow from a third-party lender on a secured or superpriority basis in order to fund the Adversary Proceedings and certainly does not authorize the UCC to seek authorization to do so.

67.    Because Section 1142(b) is not a "independent source of power" and cannot be used to create rights not set forth in the Plan, *Lehman Bros.*, 591 B.R. at 159, and because nothing in the Plan provides for the relief sought, or permits the UCC, as opposed to the Liquidating Trust or the Litigation Designees, to seek that relief in any event, the Motion may not be granted pursuant to Section 1142.  Also, the Litigation Designees cannot show that obtaining the Funding is "necessary" for the consummation of the Plan because a contingent fee arrangement was available to them.

68.    Moreover, because the Plan has not yet become effective, Section 364 of the Bankruptcy Code provides the exclusive means to obtain credit.

16

81753568v.4

## II.    THE UCC LACKS STANDING UNDER SECTION 364

### A.    The UCC Has Not Been Authorized to Bring the Motion

69.    The UCC also asserts that it is entitled to bring the Motion under 11 U.S.C. § 364. *See* Motion ¶¶ 48-62.  The UCC lacks standing to move under Section 364, however.

70.    As an initial matter, this Motion was brought by the UCC, which does not even purport to be authorized by the Plan or the Confirmation Order to seek approval for the Funding sought in the Motion.  Although the Litigation Designees, purportedly "direct[ed]" the UCC to file the Motion, the Litigation Designees are not themselves the movants.  *See* Motion at pg. 1 n.2.  Accordingly, even if the Litigation Designees had the power to seeking litigation funding under the Plan, the UCC has no standing or authority to bring this Motion.

### B.    Neither the UCC Nor the Litigation Designees May Move Pursuant to Section 364

71.    Nothing in Section 364, or in Sections 1102 and 1103 of the Bankruptcy Code, governing creditors' committees, permits a creditors' committee or a Litigation Designee to move under Section 364.

72.    Rather, Section 364 permits "the trustee" or debtor-in-possession to obtain credit under certain circumstances.  11 U.S.C. §§ 364, 1107.

73.    The plain language of Section 364 makes clear that "[o]nly the trustee has the authority to incur debt or sell or use property of the estate, pursuant to §§ 363 & 364. . . ."  *In re William*, 2018 Bankr. LEXIS 816, at *8 (Bankr. N.D. Ga. Mar. 22, 2018).  "[I]f *the trustee* is unable to obtain secured credit" it may seek relief under that provision.  *Id.* (italics in original) (internal quotation marks omitted) (prohibiting Chapter 7 debtor from moving under Sections 363 and 364 to obtain financing for its bankruptcy estate).

74.    This interpretation of Section 364 is consistent with the interpretation of other provisions of the Bankruptcy Code authorizing the trustee or debtor-in-possession, but not other

17

parties, to seek relief. For example, courts in this Circuit have held that "[t]he plain meaning of section 506(c) [of the Bankruptcy Code] permits only trustees and debtors in possession to recover expenses . . . ." *Gravel, Shea & Wright, Ltd. v. New England Carpet Co.*, 38 B.R. 703, 704 (D. Vt. 1983) *aff'd* 744 F.2d 16 (2d Cir. 1984) (citing *In re Codesco, Inc.*, 18 Bankr. 225, 230 (Bankr. S.D.N.Y. 1982)); *see also In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) (citing *Gravel* and *Codesco* with approval, but declining to address the issue because "the debtor in possession joined in the officers' motion" under Section 506(c)); *In re S&S Industries, Inc.*, 30 B.R. 395, 397 (Bankr. E.D. Mich. 1983) ("Section 506(c) enables a trustee to recover . . . reasonable necessary costs and expenses . . . . It does not confer this right upon a creditors' committee . . . . An unsecured creditors' committee is appointed to protect the interests of unsecured creditors. Its duties are spelled out in section 1103").

75.    There is no basis for a different result here. Nothing in the statutory language of Section 364 suggests that a creditors' committee, or a Litigation Designee, has the right to seek relief under that provision. Indeed, the UCC concedes in the Motion that Section 364 only applies to the debtor: "To satisfy the requirements of Bankruptcy Code Section 364(c), a **debtor** need only demonstrate . . . ." Motion ¶ 51 (emphasis added). "Bankruptcy Code Section 364(d) provide that a **debtor** may obtain credit . . . ." Motion ¶ 56 (emphasis added).

76.    The cases cited by the UCC confirm this. Those cases all involve **the debtor** seeking relief under Section 364, not a creditors' committee. *See* Motion ¶ 51, citing *In re Republic Airways Holdings Inc.*, 2016 U.S. Bankr. LEXIS 1927, at *33-34 (Bankr. S.D.N.Y. May 3, 2016); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

77.    That the UCC lacks standing under Section 364 is further confirmed by Bankruptcy Rule 4001, which provides, in relevant part, that notice of a motion to obtain credit

18

under Section 364 must be provided to, *inter alia*, "any committee elected under § 705 or appointed under § 1102." Fed. R. Bankr. P. 4001(c)(1)(C), (c)(3).

78.    The fact that Rule 4001 requires notice of a Section 364 motion to the creditors' committee confirms that someone ***other than*** the creditors' committee must be the movant.

79.    Permitting the UCC to seek relief under Section 364 would eviscerate the adversarial process Rule 4001(c) is intended to promote. Rather than vetting a motion made by the Debtors to ensure that it does not harm creditors, the UCC, advised, presumably, by its counsel who will be paid from the Funding, is making the Motion solely for the purpose of ensuring the payment of that very counsel's fees.

80.    This is exactly why the adversarial process prior to granting a motion under Section 364 is so important, and why only the Debtors should be permitted to make this Motion.

## III.    EVEN IF THE UCC HAD STANDING UNDER SECTION 364, THE PROPOSED LITIGATION FUNDING DOES NOT SATISFY THE REQUIREMENTS OF SECTION 364

81.    Even if the UCC (or the Litigation Designees) had standing to seek relief under Section 364, the proposed litigation Funding does not meet the requirements of that provision in any event.

82.    As the UCC concedes, the trustee or debtor-in-possession moving under Section 364(c) must show:

(a)    the debtor is unable to obtain unsecured credit under Bankruptcy Code section 364(b), *i.e.*, by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and proposed lenders.

19

Motion ¶ 52 (citing *Ames*, 115 B.R. at 37-40).

### A.    The UCC Could Have Obtained Unsecured Credit, and On More Favorable Terms

83.    The UCC's assertion that it could not obtain unsecured credit or obtain financing on more favorable terms than the Funding is, respectfully, false.  As the UCC specifically explains in the Motion, Akin Gump originally agreed to receive payment of up to $10 million in fees, after which it would "provide services on a contingency fee basis."  Motion ¶ 39.  "The contemplated contingency fee was a sliding percentage of gross proceeds obtained through the Jointly Asserted Causes of Action, starting at 8% once at least $100 million in cash proceeds were recovered and increasing up to 12% after $500 million or greater in gross proceeds were obtained."  Bartels Dec'l ¶ 21.  Accordingly, Section 364(c) prohibits the Court from authorizing the Debtor, the UCC or the Litigation Designees from obtaining funding allowable on a superpriority or secured basis.

84.    Moreover, there are likely other law firms that would be willing to take on the prosecution of the Adversary Proceedings on a contingency basis.  Although the Litigation Designee claims they considered various secured lenders, nothing in the Motion indicates that the UCC, the Litigation Designees, the Debtors, or anyone else has inquired whether another law firm would prosecute the litigation on a contingency fee basis, which would provide the estate with credit on an administrative expense basis. *See, e.g.,* Bartels Decl. ¶¶ 20-21.  The Debtors may well be able to obtain unsecured credit on an administrative expense basis from a different law firm, but have provided no evidence they tried to obtain it.

### B.    The Proposed Litigation Funding is Less Favorable Than the Contingent Fee Arrangement

85.    Moreover, even if Section 364(c) was not an absolute bar to approval of the Motion, the Motion fails to meet the second and third prongs of this test because the proposed

20

litigation financing arrangement is inferior to other available funding options, and it would be
detrimental to creditors.

86.    "[U]nder chapter 11, the Code's objective is to 'preserv[e] going concerns and
maximiz[e] property available to satisfy creditors . . . and [to]achieve fundamental fairness and
justice.'" *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 601 (S.D.N.Y. 2018)
(quoting *In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012)); *In re Ditech Holding
Corp.*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019) (same). *See also In re The Great Atlantic &
Pacific Tea Company, Inc.*, 2016 WL 6084012, at *4 (S.D.N.Y. Oct. 17, 2016) (affirming this
Court's decision and holding that "one of the Code's central purposes" is "the maximization of
the value of the bankruptcy estate for the benefit of creditors" (internal quotation marks
omitted)).

87.    Maximizing the property available to creditors and achieving fundamental
fairness would be served by proceeding under the superior form of financing that the UCC
admits the Litigation Designees were offered by Akin Gump.  Permitting the litigation Funding,
by contrast, would reduce the property available to creditors, could delay the effectiveness of the
Plan and would be fundamentally unfair.

88.    The UCC offers only a conclusory statement that "the Litigation Designees,"
determined a contingent fee arrangement with Akin Gump was "no longer appropriate" because
of the delay in the Plan's effective date and the Funder's desire to be paid ahead of other
creditors.  Motion ¶ 39; Bartels Decl. ¶ 21.

89.    As set forth above, however, the Debtors put aside $25 million to fund the
Adversary Proceedings.  Once those funds were exhausted, there was not going to be additional
funding on the effective date other than what the Debtors recovered in the meantime, if anything.

21

90.     Thus, the funding for the Adversary Proceedings was either going to be limited to $25 million or depend on additional recoveries once the $25 million was exhausted—whether the effective date had occurred with a few months of confirmation, as the UCC and the Debtors erroneously asserted, or whether it occurred years later, as the Debtors' creditors accurately predicted.

91.     The UCC's conclusory assertion that a delay in the effective date somehow rendered the Litigation Designee's original agreement with Akin Gump "inappropriate," therefore, makes no sense.

92.     The UCC's other contention makes even less sense: that Akin Gump's engagement must be changed because the Funder wants to be paid ahead of other creditors. Motion ¶ 39; Bartels Decl. ¶ 21.

93.     If the Litigation Designee proceeded with the terms of Akin Gump's original contingent engagement, there would be no need for litigation Funding from the Funder and its apparent desire to be paid first would be irrelevant.

94.     In contrast to Akin Gump's original terms of engagement, the proposed litigation Funding arrangement would not maximize recoveries for existing creditors.

95.     As set forth above, under the proposed litigation Funding arrangement, the Funder would receive 100% of the amount funded "plus interest thereon calculated at an annualized internal rate of return of 15%," and then, after the Litigation Designees are paid and "(i) Allowed Administrative Expense Claims, (ii) Allowed Secured Claims and (iii) Allowed Priority Claims" are paid, the Funder would receive "the product of (i) the Initial Funder Returns," *i.e.*, up to $35 million plus the undefined "internal rate of return of 15%," and (ii) the number obtained by multiplying (x) 0.015 and (y) the number of months since the First Drawdown and (z) dividing by three." Motion ¶ 36. The Internal Rate of Return of 15% is not an interest rate of 15% but

22

appears to be 15% on top of the Funder's cost of funds.  Thus, if the Funder is paying, for example, on a conservative basis, 7% to obtain its funding, the estate would have to pay it 22% for the Funder to receive a 15% IRR.

96.     Then, once the "Primary Trust Litigation Counsel" has received both its Past Fee Holdback of $7.1 million and its Go-Forward Fee Holdback of 20% of its prospective fees, the Funder is entitled to a percentage of all recoveries from the Adversary Proceedings based upon the amount of money the Funder has provided, ranging from 4.75% of all recoveries if the Funder provides less than $10 million in funding to 16.75% of all recoveries if the Funder provides more than $20 million in funding. *Id.*

97.     Although it is difficult to determine exactly how much the Funder might recover under this arrangement because certain key terms are not outlined in the Motion or in the attached term sheet, it is clear that no creditor will receive anything until the Funder is repaid its $35 million plus its 15% IRR, and the Funder would receive tens of millions, if not hundreds of millions, of dollars before the Debtors' unsecured creditors receive anything.

98.     Assuming for example, that, at a minimum, the Funder would receive interest, not an Internal Rate of Return, but just interest, of 15% per annum and lends the full $35 million, the Funder would be entitled to receive $5,250,000 in interest, alone, after one year of litigation and $10,500,000 in interest alone after two years of litigation, over and above the $35 million principal amount it advances, for a total of $45.5 million after two years, before any creditor receives anything.

99.     After the Litigation Designees and certain creditors are paid, the Funder would receive an additional $5.46 million (.015 x 24 months = 36 ÷ 3 = .12 x $45,500,000 =

$5,460,000). The Primary Trust Litigation Counsel would then be paid its holdbacks[4] and the Funder would receive even more money.

100.    For example, the Debtors have estimated that the Adversary Proceedings could yield a recovery of $334 million. *See* Dkt. No. 4478 (Disclosure Statement) at pg. 293 of 358; Dkt. No. 5146 (Transier Declaration) ¶ 25. The UCC has suggested that the recoveries will be even higher, but has declined to put forth a specific number. *See, e.g.,* Dkt. No. 3995 ¶ 26 n. 14; Dkt. No. 5145 ¶ 11.

101.    If the Funder lends the full $35 million, and the Adversary Proceedings take two years, then assuming the Debtors' predicted recovery, the Funder would receive $55,945,000 (16.75% of $334 million), on top of payment of the $35 million loaned plus $10.5 million at 15% interest, which is less than the "internal rate of return," plus an additional $5.46 million, for a total of over $106,905,000 on a $334 million recovery.

102.    If the UCC is correct, and the recoveries in the Adversary Proceedings are higher than $334 million, then the Funder would receive even more.  Conversely, if the recovery in the Adversary Proceedings is less than $45.5 million, the entire recovery will be paid to the Funder and no creditor will receive anything on account of the Adversary Proceedings.

103.    In contrast, under the Akin Gump contingency, it has already been paid $10 million at its hourly rates so the first $100 million received would be immediately available to creditors without payment to Akin Gump of any amount.  Akin Gump would then receive 8% of the next $234 million, for a total of $18,720,000, which is far less than the Funder would receive.[5]

---

[4] Although it is not clear from the Motion, Akin Gump should clarify that these payments to it will continue to be subject to the Fee Order entered in this case and the applicable provisions of the Bankruptcy Code.

[5] The failure of the Litigation Designees to accept the Akin Gump contingent fee arrangement would appear to constitute gross negligence or willful misconduct for which they may be held liable to creditors.

81753568v.4

104.    The Funder's proposal does not maximize recovery for existing creditors and would instead be fundamentally unfair to those creditors.  It should be rejected.

### C.    The Proposed Litigation Funding Arrangement Would Prevent the Plan From Going Effective Prior to Complete Resolution of the Adversary Proceedings

105.    As currently proposed, the litigation Funding arrangement would make the Funder's claims an administrative expense which must be paid in full before the Plan may become effective.  But the Funding cannot be fully repaid until the Adversary Proceedings have reached a final resolution.

106.    Under the Funding proposal, there is no way for the Funder to *ever* be paid in full prior to the resolution of all of the Adversary Proceedings.  Simply repaying the amounts loaned by the Funder with a 15% IRR will not satisfy its administrative claim against the estate. Because the Funder is entitled to receive a percentage of the proceeds of all of the Adversary Proceedings after certain other parties are paid, the Funder will remain an administrative expense claimant, no matter how much money is received, until the Adversary Proceedings are completely resolved through settlement, judgment, or a similar resolution.  *See* Motion ¶ 36. Accordingly, the proposed Funding arrangement will prevent the Plan from going effective before the Adversary Proceedings have finally concluded.

### D.    The Grant of a Superpriority Administrative Expense Claim to the Funder Makes No Sense

107.    The UCC states in the Motion that the estates' obligations to the Funder "shall constitute joint and several allowed administrative claims in the Chapter 11 Cases having superpriority over all administrative expenses of the kind specified in Bankruptcy Code sections 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d)."  Proposed Order ¶ 3; Motion ¶ 50, ("the Funder Liens and Funder superpriority claims are a necessary feature to obtain the Funding . . . ." *Id.* ¶ 50.

25

108.    A superpriority claim of the type described by the UCC permits the holder to
"have priority over every other claim allowable" in the proceeding.  11 U.S.C. § 507(b).  A
Section 507(b) claim, in turn, arises from a diminution in the value of the creditors' collateral.
*See, e.g., In re Mary Holder Agency, Inc.*, 2012 WL 4434362, at *3 (Bankr. D.N.J. Sept. 24,
2012) ("the superpriority of section 507(b) is intended to compensate the secured claimant for
the difference between the adequate protection provided by the debtor and any actual decrease in
the value of the collateral occurring during the pendency of the bankruptcy action").  The holder
of a 507(b) superpriority claim can typically recover against all of the Debtors available assets,
*see* 11 U.S.C. § 507(b), although the proposed order appears to limit recovery on any
superpriority claim to the proceeds of the Jointly Asserted Causes of Action.

109.    The UCC fails to explain how the Funder, which is funding the prosecution of
certain avoidance and related actions, could suffer a diminution in value of its collateral such that
it would be entitled to a superpriority administrative expense claim.  Unless the estate is to
become a guarantor of the outcome of the Adversary Proceedings and of the collection of the
amounts awarded, what sort of diminution of that collateral could there possibly be other than a
loss of the Adversary Proceedings, which should not be considered a diminution of the Funder's
collateral at all.

110.    Nevertheless, by granting the Funder such a superpriority claim, the UCC sets up
a situation in which the Funder would, apparently, be able to seek recovery from all proceeds of
the Adversary Proceedings, not just the amount allocated for payment of its considerable fees by
claiming a diminution in the value of its collateral.  Under such circumstances, the Funder would
be entitled to payment ahead of Allowed Administrative Expense Claims and Allowed Priority
Claims, which obviates the supposed benefit of the Funding.

111.    Any agreement which permits the Funder any right to seek payment from recoveries by the Debtors from proceeds of the Adversary Proceedings, ahead of the waterfall set forth in its term sheet, even if it suffers a diminution in the value of its collateral, however that could even occur, would be contrary to the UCC's representations concerning the benefit of the terms of the Funding, however, and must not be permitted.

### E.    The Motion Does Not Define The "Internal Rate of Return"

112.    The Motion and Term Sheet propose that the Funder will recover the amount it lends "plus interest thereon calculated at an annualized internal rate of return of 15%." Motion ¶ 36. The Motion, the Term Sheet, and the Bartels Declaration do not explain what the "internal rate of return" is, however, or how it will be calculated. *See* Motion ¶ 29; Term Sheet at pg. 3; Bartels Decl. ¶ 19.

113.    It would appear to mean, however, that the Funder's cost of funds would be added to the 15% IRR in order to determine the net cost to the debtors' estates. Thus, if the Funder, for example, borrows the money used for the litigation funding at a rate of 7%, it would be entitled to 22% interest (*i.e.*, 7% more than what it cost Funder to borrow the money it then lends to the estate). The Court and interested parties are left to guess about whether that is the case. The Motion should not be approved until the UCC clarifies the exact nature of the "internal rate of return."

### F.    There is No Reason Why The Funds Must be Deposited Into Akin Gump's Trust Account and Held in a Non-Interest Bearing Account

114.    The Motion and Term Sheet provide that when the UCC draws on the funds, those funds will be "deposited into a segregated non-interest bearing trust account in the name of Akin Gump." Motion ¶ 35. There is no reason why the estate should not be permitted to earn interest on the funds once they are drawn.

27

115.    For example, the Debtors could deposit the funds into an interest-bearing account to recover some of the cost of the Funding.

116.    The Motion should not be approved unless the Funding arrangement is amended to permit the Debtors to earn a return on the funds as otherwise permitted under the Bankruptcy Code.

### G.    The Motion Does Not Provide the Budget or Explain Why $35 Million is Necessary

117.    The Motion and the Term Sheet refer to a budget, but the UCC has not provided this budget to the Court or other interested parties. *See* Motion ¶ 25; Term Sheet at pg. 3. Accordingly, the Court and creditors have no way of knowing how the UCC came to conclude that $35 million was an appropriate amount of Funding or how the UCC anticipates spending those funds.

118.    Notably, the UCC previously represented to the Court that it "anticipated . . . approximately twenty-five million dollars ($25,000,000)" would be "necessary to fund the **activities** of the Liquidating Trust" upon the effective date of the Plan. *See* Dkt. No. 5295 at Section 1.3(b) (emphasis added).  The $25 million has now been consumed and the Plan is still not effective.

119.    The UCC and the Debtors also told the Court that the Plan would become effective in a matter of months after confirmation.  Instead, years have passed, the Plan is still not effective, and no effective date is in sight.

120.    The UCC's prior predictions have, unfortunately, turned out to be woefully incorrect.  Given this track record, the Court, creditors and interested parties should not be required to simply accept the UCC's conclusory assertions that an additional $35 million is appropriate.

28

81753568v.4

121.    The Court and interested parties are entitled to know exactly how the UCC plans to spend the Funding and a budget would typically be included as a part of any motion for approval of debtor-in-possession financing.  Importantly, it is not clear whether the $35 million is intended to cover all fees through trial in the Adversary Proceedings; whether it covers any appeals; or what will happen if, as with the UCC's prior predictions, its prediction that $35 million is sufficient turns out to be wrong and it needs more funds prior to the resolution of the Adversary Proceedings.  Because the UCC has already revealed the total amount of its proposed war chest, which is typically the number a litigant seeks to keep private, there is no apparent reason why the component parts of that amount set forth in the budget cannot be revealed.

122.    The need for additional information is particularly acute because it is not clear why $35 million is needed in light of the amount of work done to date.  Akin Gump has represented that it has done extensive document review, deposition preparation, and coordination with experts.  Dkt. No. 10398 ¶¶ 36-37; *see also* Motion ¶ 15 n.8.  With so much of the discovery process completed, it is not clear why the UCC needs even more than the initial $25 million to bring the Adversary Proceedings to resolution.

123.    The Court and interested parties are entitled to see the litigation budget, and the UCC should be required to file it and articulate precisely why $35 million, as opposed to some lesser amount, is needed.

**H.    The UCC Has Not Demonstrated That the "Break-Up" Fee is Reasonable**

124.    The UCC also requests that the Court approve a "break-up" fee of up to $400,000 that is "equal to twice [the Funder's] actually incurred legal and other external costs in connection with the transactions contemplated by the Litigation Funding Arrangement." *See* Motion ¶ 33.

29

125.   The UCC offers no justification for providing the Funder with twice its actual costs if the Funding arrangement cannot be consummated.  It states simply that this fee is reasonable because it will purportedly be paid out of recoveries from the Adversary Proceedings.  Motion ¶ 63.  The manner in which the fee will be paid says nothing about whether the amount of the fee is reasonable, however.

126.   "A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. 'when [sic] reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible.'"  *In re Integrated Resources*, 147 B.R. 650, 662 (S.D.N.Y. 1992) (approving break-up fee after it was reduced to "3.2 percent of [potential purchaser's] 'out-of-pocket' expenses").  Courts frequently reject break-up fees where they are "not actually necessary to preserve the value of [the Debtors'] estate." *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 537-38 (3d Cir. 1999); *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137-38 ("the proposed $200,000 breakup fee does not serve and protect the interests of the estate, creditors and equity holders").

127.   Here, the UCC has offered no explanation as to why any breakup fee, much less the amount of the proposed break-up fee, equal to twice the amount of the Funder's actual costs, is necessary to preserve the value of the Debtors' estates or otherwise protects the interests of the estates, creditors, and equity holders.  This proposed break-up fee is improper.

I.      **The Funder's Payments Must Be Subject to Payment of "Disputed Claims" If Those Claims Are Ultimately Allowed**

128.   Although the UCC touts the Funding as beneficial to the estate and creditors because certain payments to the Funder are subject to payment in full of "(i) Allowed Administrative Expense Claims, (ii ) Allowed Secured Claims and (iii) Allowed Priority Claims," Motion ¶ 36, this supposed benefit appears somewhat illusory.

30

81753568v.4

129.    The Plan creates a reserve for "Disputed Claims" which are claims which have not yet been Allowed or disallowed by Final Order. *See id.* at Section 11.4(a) and Article 12. "Disputed Claims" may become "Allowed Claims" depending on the outcome of the final order. *See, e.g., id.* at Sections 12.1(a), 12.5, 12.7.

130.    Wilmington Trust, as indenture trustee and collateral agent for the holders of the 6-5/8 Senior Secured Notes due 2018[6] (the "2018 Notes") asserted secured claims in the bankruptcy case as well as superpriority administrative expense claims pursuant to Section 507(b) of the Bankruptcy Code.

131.    On August 5, 2019, the Court entered its Order Determining the Amount of Second-Lien Holders' Section 507(B) Administrative Claims Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure (the "507(b) Order"). Dkt. No. 4740.

132.    Wilmington Trust has appealed the 507(b) Order to the United States Court of Appeals for the Second Circuit (the "Second Circuit"). The Second Circuit held oral argument on September 24, 2021, but has not yet rendered a decision. Second Circuit Case No. 20-3343, Dkt. No. 156.

133.    Wilmington Trust thus currently has a "Disputed Claim" that is the subject of its pending Second Circuit appeal. If Wilmington Trust prevails in that appeal, in whole or in part, it would then have an Allowed Secured Claim or superpriority administrative expense claim, subject to the Debtors' and the UCC's pending appeal to the United States District Court of this Court's Order Determining the Amount to Surcharge Second-Lien Collateral Pursuant to Section 506(c) of the Bankruptcy Code. Dkt. No. 4793.

---

[6] The 2018 Notes for which Wilmington Trust serves as collateral agent and indenture trustee are not held by ESL Investments, Inc. ("ESL") or its affiliates, or by Cyrus Capital Partners, L.P. ("Cyrus"). *See* Dkt. No. 4445 at 10. To the extent Wilmington Trust has an allowed claim in this proceeding, the proceeds will first be used to pay the fees and costs incurred by Wilmington Trust in connection with its role as collateral agent and as indenture trustee acting on behalf of those non-ESL, non-Cyrus bondholders.

31

134.    These "Disputed Claims" must be reserved for under the Plan and must be treated as "Allowed Secured Claims" as required under the Plan under the terms of the proposed litigation Funding to the extent the "Disputed Claims" are subsequently resolved in favor of Wilmington Trust and thus become Allowed Secured Claims or Allowed Superpriority Administrative Expense Claims.

135.    Moreover, the Second Circuit's decision could have a significant impact on, among other things, the effective date of the Plan and whether there are secured creditors adversely affected by the litigation Funding proposed in the Motion.

136.    Although it is impossible to predict how the Second Circuit will rule, if Wilmington Trust prevails on some or all of the issues raised on appeal, it may be entitled to secured and superpriority claims under Section 507(b). The Funder should not be permitted to prime Wilmington Trust while it still has "Disputed Claims" that may eventually become "Allowed Secured Claims" and/or "Allowed Priority Claims."

137.    The Court should thus wait for the Second Circuit's decision before ruling on this Motion. *See, e.g., In re MF Global Holdings Ltd.*, 515 B.R. 193, 196 (Bankr. S.D.N.Y. 2014) (court denied motion to lift cap on insurance proceeds former directors and officers of the debtor could access "without prejudice because of a pending appeal in the Second Circuit"); *In re Studio # 54 Disco, Inc.*, 21 B.R. 308, 312 (Bankr. E.D.N.Y. 1982) (denying motions "without prejudice to their renewal after the resolution of the appeal" because "it would be inappropriate for this Court to grant such relief" while the appeal "is presently pending").

138.    If the Court, nevertheless, does proceed, it would be a waste of judicial resources, as a Second Circuit decision in favor of Wilmington Trust would likely require the Court to vacate its order granting the Motion. *See, e.g., RLS Associates, LLC v. United Bank of Kuwait PLC*, 2003 WL 22801918, at \*2 (S.D.N.Y. Nov. 24, 2003) ("the more efficient course is to hold

32

defendant's motion for attorney's fees in abeyance pending the outcome of the appeal");

*Canfield Sci, Inc. v. Drugge*, 2020 WL 6375654, at *2 (D.N.J. Oct. 30, 2020) ("the Court finds

that it cannot address Defendants' motion . . . since the Federal Circuit has yet to decide

[Plaintiff's] appeal"); *Optimal Golf Solutions, Inc. v. Altex Corporation*, 2009 WL 10733424, at

*1 (N.D. Tx. Sept. 30, 2009) ("Plaintiffs . . . appealed this Court's order dismissing the previous

action . . . . To continue this case, while the appeal is pending, would require all parties, as well

as this Court, to waste both time and resources . . . .").

## IV.    THE PROPOSED ORDER SHOULD NOT TAKE EFFECT IMMEDIATELY AND THE UCC SHOULD NOT BE REQUIRED TO DRAW ON THE FUNDING IMMEDIATELY FOLLOWING RESOLUTION OF THE MOTIONS TO DISMISS

139.    The proposed order provides that it shall take effect immediately and the Term

Sheet annexed to the Motion provides that the draws are to be made quarterly in advance and

that the first drawdown must be made immediately "following a determination by the

Bankruptcy Court in respect of the pending motions to dismiss." Term Sheet at pg. 2, "First

Drawdown."

140.    There is no reason why the order should take effect immediately, thus requiring

an appellant to seek a stay pending appeal if it even has the time to do so, or why funds must be

drawn immediately, other than to prevent creditors from appealing any order approving the

Funding.

141.    Moreover, as noted above, certain defendants may settle during the mediation or

quickly after the motions to dismiss are decided. Rather than being permitted to draw the funds

from the Funder immediately, because there are no urgent deadlines, at least none that this Court

cannot adjourn as they relate to the Adversary Proceedings, the Motion should not be approved

33

as long as it requires immediate effectiveness of the order approving the Motion and immediate funding.

## V.    THE MOTION VIOLATES RULE 4001

142.    The Motion should also be denied because it violates Fed. R. Bankr. P. 4001.  A motion to obtain credit must "be accompanied by a copy of the credit agreement . . . ."  Fed. R. Bankr. P. 4001(c)(1)(A).

143.    Courts have interpreted this rule as requiring a copy of "the final agreement."  *In re Tamarack Resort, LLC*, 2010 WL 4117459, at *10 (Bankr. D. Id. Oct. 19, 2010).  Moreover, the movant cannot wait to disclose the final agreement because "creditors are entitled to know precisely what is being proposed and provided an opportunity to evaluate the facts, and legal sufficiency, of the request.  This is true for all creditors, *and even more critical for those creditors whose liens are proposed to be primed under § 364(d)*."  *Id.*

144.    Rule 4001 requires disclosure of the final agreement with the motion itself because creditors need time "to digest and evaluate a proposed financing arrangement."  *Id.*  Thus, "piece-meal disclosure" of the agreement in violation of Rule 4001 is not "harmless or nonprejudicial."  *Id.*

145.    Here, the UCC has provided the Term Sheet, but not a final agreement with the Funder.  The Term Sheet itself provides that its terms "remain subject to final documentation."  Term Sheet at pg. 1.  The UCC states that the final agreement "will be filed in advance of the hearing to consider this Motion," at some unspecified time.  Motion ¶ 4 n.4.

146.    The UCC's conduct is exactly what Rule 4001 prohibits.  It cannot spring the final agreement with the Funder on creditors with little time for evaluation prior to the hearing, and after the deadline for objections to the Motion has already passed.  *See Tamarack*, 2010 WL

34

4117459, at *10 (disclosure of agreement terms only 14 days before hearing insufficient time for evaluation of proposed credit agreement).

147.    The UCC's failure is particularly egregious because the Motion was filed on April 21, 2022 and it is now June 15.  The UCC has had nearly two months in which to file the final agreement.  It has no excuse for this delay.

148.    This violation of Rule 4001 is an independent basis for denying the Motion.

## VI.    THE MOTION IS PREMATURE DUE TO UNCERTAINTY ABOUT THE DEBTORS' CLAIMS  AND THE STATUS OF THE MEDIATION

149.    The Motion is also premature because there is significant uncertainty about the Debtors' claims in the Adversary Proceedings and the status of the mediation.

150.    The scope of the Debtors' claims in the Adversary Proceedings and the potential for settlements in the Adversary Proceedings will not be clear until the motions to dismiss are decided and the mediation has concluded.

151.    The fact that the motions to dismiss have not yet been decided indicates that they present difficult questions, some or all of which may be resolved against the Debtors, and the decisions on those motions could fundamentally alter the scope of the Adversary Proceedings. For example, the Adversary Proceedings could be dismissed in part in a manner that significantly reduces the amount of the Debtors' potential recoveries if they ultimately prevail.  If so, then significantly less than $35 million in Funding may be needed, if any funding is needed at all.

152.    Conversely, if the Court's decision on the motions to dismiss is favorable to the Debtors, then certain of the defendants may settle quickly thereafter, obviating the need for litigation funding.

153.    For example, the Motion identifies D&O policies with remaining policy proceeds of $66 million and $141 million, respectively.  Motion ¶ 61.  The defendants covered by those

35

policies may wish to use those proceeds to settle the claims against them relatively quickly after the motions to dismiss are resolved. If so, then the Debtors' estates would potentially receive tens of millions, if not hundreds of millions, of dollars that could then be used to fund the litigation against the remaining defendants.

154.    Moreover, the parties to the Adversary Proceedings are currently in mediation, the expiration of which has been extended to June 30, 2022, and the outcome of the mediation may also impact, if not eliminate, the need for litigation Funding.

155.    It makes little sense to authorize litigation Funding without knowing exactly how much there is to litigate and how much money will be needed to pursue any remaining claims.

156.    Notably, there is no urgency to this Motion. This is not a first-day hearing, where the Debtors' ability to keep stores open and pay employees is at stake. This is a Motion to obtain funding for Adversary Proceedings that are currently at a standstill due to the pendency of the motions to dismiss. Any urgency to proceed with discovery once the motions to dismiss are decided is entirely within the Court's control and can be addressed, if necessary, to give creditors a chance to address the Motion once the actual circumstances of the Adversary Proceedings are clear.

157.    Moreover, if the Motion is not granted or is delayed, Akin Gump cannot abandon the prosecution of the Adversary Proceedings. It is *required* to continue to litigate those Proceedings until the Court enters an order relieving it. *See, e.g.,* Local Rule 2090-1(e) ("An attorney who has appeared as attorney of record may withdraw or be replaced only by order of the Court for cause shown"); *In re Mercury*, 280 B.R. 35, 51 (Bankr. S.D.N.Y. 2002) ("A lawyer who has undertaken a professional representation of a client is not at liberty to simply abandon that responsibility"); *In re Egwim*, 291 B.R. 559, 576-77 (Bankr. N.D. Ga. 2003) ("courts have always limited the right of attorneys to withdraw from a case once they have appeared" because

36

"counsel cannot be permitted to initiate cases and then simply abandon debtors. Absent exceptional or unusual circumstances, counsel will be required to represent the debtor client until the conclusion of the case").[7]

158. Accordingly, there is no reason for the Court and interested parties to rush while there is significant uncertainty about the proposed financing, the Adversary Proceedings and the Mediation.

159. Accordingly, the Court should, at a minimum, deny the Motion without prejudice, or hold the Motion in abeyance, pending decisions on the motions to dismiss that will confirm what claims, if any, the Debtors actually have to pursue and the outcome of the mediation.

160. Because the Court will likely issue its decisions on the motions to dismiss after the deadline for filing objections to the Motion, although possibly before the hearing on the Motion, the Court should also continue the hearing on the Motion to give creditors and other interested parties time to analyze the decisions and assess their impact on this Motion, as well as to await the outcome of the mediation.

## VII.    THE FUNDER MUST CONSENT TO THIS COURT'S JURISDICTION

161. The Funder, Bench Walk 21p, L.P., appears to be a United Kingdom limited partnership based in London.

162. Based upon Wilmington Trust's research in the New York Department of State business entity database, it does not appear that the Funder is registered to do business in New York.

---

[7] That result is particularly warranted here because the UCC only withdrew its objection (see Dkt. No. 3995) and agreed to support confirmation of the Plan after the Plan was revised to give the UCC (and Akin Gump) control over the prosecution of the Adversary Proceedings. *See* Dkt. No. 5145 ¶ 3. Having not only volunteered to take on this representation, but having actually opposed Plan confirmation until the Debtors agreed to permit them to take on this representation, the UCC and Akin Gump cannot now abandon the obligations they previously demanded simply because the Litigation Designees now wish to provide more favorable payment terms to Akin Gump.

81753568v.4

163.    Any proposed litigation Funding agreement must provide that the Funder waives

all defenses relating, and that it submits, to the Court's jurisdiction in the event of a dispute

arising from the Funding or related matters.

## CONCLUSION

164.    For the foregoing reasons, Wilmington Trust requests that the Motion be denied.


Dated: New York, New York
       June 15, 2022

                                    SEYFARTH SHAW LLP


                                    By:    */s/ Edward M. Fox*
                                          Edward M. Fox
                                    *Attorneys for Wilmington Trust, National*
                                    *Association, as indenture trustee and collateral*
                                    *agent*
                                    620 Eighth Avenue
                                    New York, NY 10018
                                    Direct Dial:  (212) 218-4646
                                    Direct Fax:  (917) 344-1339
                                    Email:  emfox@seyfarth.com

81753568v.4