**Hearing Date and Time: August 31, 2022 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: August 23, 2022 at 4:00 p.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

| | |
|---|---|
| In re | : |
| | : Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : Case No. 18-23538 (RDD) |
| | : **(Jointly Administered)** |
| Debtors.[1] | : |

---------------------------------------------------------- x

| | |
|---|---|
| **Sears Holding Corp.,** *et al.* | : |
| | : |
| **Plaintiffs** | : |
| vs. | : |
| **Edward Scott Lampert,** *et al.* | : |
| | : |
| **Defendants.** | : **Consolidated at** |

---------------------------------------------------------- x **Adv. Pro. 19-08250 (RDD)**

| | |
|---|---|
| **Sears Holdings Corporation,** *et al.*. | : |
| | : |
| **Plaintiffs** | : |
| vs. | : |
| **Andrew H. Tisch,** *et al.* | : |
| | : |
| **Defendants.** | : |

---------------------------------------------------------- x

## NOTICE OF JOINT MOTION OF DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENTS, GRANTING CERTAIN RELATED RELIEF AND AUTHORIZING CERTAIN NONMATERIAL PLAN MODIFICATIONS IN FURTHERANCE OF THE EFFECTIVE DATE OF THE PLAN

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is c/o M-III Partners, LP, 1700 Broadway, 19th Floor, New York, NY 10019.

**PLEASE TAKE NOTICE** that Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases, and the Official Committee of Unsecured Creditors of Sears Holdings Corporation, by and through their undersigned counsel, filed the *Joint Motion of Debtors and Official Committee of Unsecured Creditors for Entry of an Order Approving Settlement Agreements, Granting Certain Related Relief and Authorizing Certain Nonmaterial Plan Modifications in Furtherance of the Effective Date of the Plan* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge (the "Court") on **August 31, 2022 at 10:00 a.m. (Eastern Time)** (the "Hearing"), or as soon thereafter as counsel may be heard, provided that, pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("General Order M-543"), such Hearing shall be conducted via Zoom for Government® so long as General Order M-543 is in effect or unless otherwise ordered by the Court.[2]

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.ra.kroll.com/sears. You may also obtain copies of any pleadings filed with the Court by visiting the Court's website at https://www.nysb.uscourts.gov and following the procedures and paying any fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Motion (the "Objections") shall (i) be in writing; (ii) state the name and address of the objecting party and nature of the claim or interest of such party; (iii) state with particularity the legal and factual bases of such objection; (iv) conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York; (v) be filed with the Bankruptcy Court, together with proof of

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19.

service, electronically, in accordance with General Order M-399 (available at www.nysb.uscourts.gov) by registered users of the Court's Electronic Case Filing system, and by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Court and General Order M-399, to the extent applicable; and (vi) be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures* [ECF No. 405], so as to be filed and received no later than **August 23, 2022 at 4:00 p.m. (Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: August 9, 2022
      New York, New York

/s/ *Garrett Fail*                            /s/ *Ira S. Dizengoff*

| WEIL, GOTSHAL & MANGES LLP | AKIN GUMP STRAUSS HAUER & FELD LLP |
|---|---|
| 767 Fifth Avenue | One Bryant Park |
| New York, New York 10153 | New York, New York 10036 |
| Telephone: (212) 310-8000 | Telephone: (212) 872-1000 |
| Facsimile: (212) 310-8007 | Facsimile: (212) 872-1002 |
| Ray C. Schrock, P.C. | Ira S. Dizengoff |
| Garrett Fail | Philip C. Dublin |
| Sunny Singh | Sara L. Brauner |
| | Zachary D. Lanier |

*Counsel for the Debtors*                     *Counsel for the Official Committee*
*and Debtors in Possession*               *of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

In re                                                    :        **Chapter 11**
                                                         :
**SEARS HOLDINGS CORPORATION,** *et al.,*                :        **Case No. 18-23538 (RDD)**
                                                         :        **(Jointly Administered)**
        Debtors.[1]                                      :
--------------------------------------------------------- x

**Sears Holding Corp.,** *et al.*                        :
                                                         :
        **Plaintiffs**                                   :
            **vs.**                                      :
**Edward Scott Lampert,** *et al.*                       :
                                                         :
        **Defendants.**                                  :        **Consolidated at**
--------------------------------------------------------- x        **Adv. Pro. 19-08250 (RDD)**

**Sears Holdings Corporation,** *et al..*                :
                                                         :
        **Plaintiffs**                                   :
            **vs.**                                      :
**Andrew H. Tisch,** *et al.*                            :
                                                         :
        **Defendants.**                                  :
--------------------------------------------------------- x

## JOINT MOTION OF DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENTS, GRANTING CERTAIN RELATED RELIEF, AND AUTHORIZING CERTAIN NONMATERIAL PLAN MODIFICATIONS IN FURTHERANCE OF THE EFFECTIVE DATE OF THE PLAN

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is c/o M-III Partners, LP, 1700 Broadway, 19th Floor, New York, NY 10019.

### TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................2

JURISDICTION AND VENUE ..............................................................................................4

BACKGROUND .....................................................................................................................5

I.    The Chapter 11 Cases ...................................................................................................5
      A.    The Sale to Transform and Related Transform Disputes ................................5
      B.    The Disputes Regarding Claims Under Bankruptcy Code Sections 507(b)
            and 506(c) ........................................................................................................8
      C.    The Claims Between the Debtors and Seritage.................................................10
      D.    The Plan and Confirmation Order ...................................................................11
            1.    The Plan Settlement .............................................................................11
            2.    The PBGC Settlement .........................................................................11
            3.    The Committee Settlement ...................................................................13
            4.    The Retiree Settlement ........................................................................15
            5.    The Administrative Expense Claims Consent Program........................16

II.   The Consolidated Adversary Proceeding.....................................................................18
      A.    The Insider Action: Original Complaint and Amended Complaint ..................18
      B.    The Amended Complaint ..................................................................................20
      C.    The Motions to Dismiss the Insider Action .....................................................21
      D.    The Public Shareholder Action and Consolidation Order.................................22
      E.    D&O Insurance Coverage Actions....................................................................23
      F.    Mediation .........................................................................................................24

III.  The Settlement Agreement..........................................................................................25

IV.   The Second Lien Notes Settlement ..............................................................................30

V.    The Nonmaterial Plan Modifications ..........................................................................30

RELIEF REQUESTED...........................................................................................................32

BASIS FOR RELIEF .............................................................................................................32

I.    The Settlement Agreement Satisfies the Standards for Approval Under
      Bankruptcy Rule 9019(a).............................................................................................32
      A.    The Settlement of the Consolidated Adversary Proceeding Satisfies the
            Relevant Factors................................................................................................35
            1.    The Settlement Agreement Provides Significant Benefits to
                  Creditors and Is Supported by Key Constituencies ..................................35
            2.    The Outcome of the Consolidated Adversary Proceeding Is
                  Uncertain..............................................................................................36
            3.    Collecting any Judgment of More than $2 Billion Could Be
                  Difficult................................................................................................39
            4.    Continued Litigation Would Be Complex, Lengthy and Expensive..........39

5.      The Remaining Factors Support the Reasonableness of the
Settlement Agreement ................................................................................43

B.      The Settlement of the Other Disputes Subject to the Settlement Agreement
Satisfies the Relevant Factors ..................................................................................44

II.     The Second Lien Notes Settlement Should Be Approved ..................................................44

III.    The Nonmaterial Plan Modifications Should Be Approved ...............................................45

WAIVER OF BANKRUPTCY RULE 6004(h) REQUIREMENT IS WARRANTED.................47

NOTICE ........................................................................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................................34

*Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*,
  156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .......................33

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983)...................................................................................33

*Fla. Trailer & Equip. Co. v. Deal*,
  284 F.2d 567 (5th Cir. 1960) .................................................................................34

*In re Hibbard Brown & Co.*,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998) .....................................................................33

*In re Lynch*,
  No. 19-cv-3837(GRB), 2022 U.S. Dist. LEXIS 91195 (E.D.N.Y. May 20, 2022) ......................................................................................................................33

*Nellis v. Shugre*,
  165 B.R. 115 (S.D.N.Y. 1994)...............................................................................33

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972)...................................................................................33

*In re Oakwood Homes Corp.*,
  329 B.R. 19 .............................................................................................................9

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968)...........................................................................................33, 34

*In re Purofied Down Prods. Corp.*,
  150 B.R. 519 (S.D.N.Y. 1993)..........................................................................33, 34

*In re Texaco, Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. 1988) .....................................................................34

*Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
  134 B.R. 499 (Bankr. S.D.N.Y. 1991) ...............................................................33, 34

iv

**Statutes**

11 U.S.C. § 105 ..................................................................................................................4, 31

11 U.S.C. § 363 ..................................................................................................................4, 31

11 U.S.C. § 1127 ................................................................................................................4, 45

28 U.S.C. § 157 .......................................................................................................................4

28 U.S.C. § 1334 .....................................................................................................................4

28 U.S.C. § 1408 .....................................................................................................................4

28 U.S.C. § 1409 .....................................................................................................................4

**Other Authorities**

Fed. R. Bankr. P. 6004(h) .......................................................................................................46

Fed. R. Bankr. P. 9019(a) ..................................................................................................4, 32

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession

in the above-captioned chapter 11 cases (collectively, the "Debtors"), and the Official Committee

of Unsecured Creditors of Sears Holdings Corporation (the "Creditors' Committee" and, together

with the Debtors, the "Movants"), by and through their respective undersigned counsel, hereby file

this motion (the "Motion")[1] for entry of an order pursuant to sections 105(a), 363 and 1127 of title

11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"): (i) approving the settlement agreement dated

August 9, 2022, attached hereto as **Exhibit A** (the "Settlement Agreement" and the parties thereto,

the "Parties"), concerning (a) the Jointly Asserted Causes of Action, which comprise any and all

claims and causes of action asserted in *Sears Holdings Corp. v. Lampert*, Case No. 19-08250

(RDD) (Bankr. S.D.N.Y.) (the "Insider Action") and *Sears Holdings Corp. v. Tisch*, Case No. 20-

07007 (RDD) (Bankr. S.D.N.Y.) (the "Public Shareholder Action" and, together with the Insider

Action, the "Consolidated Adversary Proceeding"), as well as any and all claims or causes of action

against insurance carriers related to coverage for claims asserted in the Consolidated Adversary

Proceeding or a related proceeding, (b) certain additional matters in connection with the Chapter

11 Cases, including (1) the claims under Bankruptcy Code section 507(b) asserted by ESL

Investments, Inc., JPP, LLC and JPP II, LLC in *In re Sears Holdings Corp.*, No. 20-3343 (2d Cir.),

(2) certain of the liabilities contested by Transform in *In re Sears Holdings Corp.*, No. 22-1249

(2d Cir.) (the "Transform Foreign Cash Appeal") and (3) claims between the Debtors and the

Seritage Defendants (as defined below) (the "Seritage Disputes"); (ii) granting certain additional

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors and (II) Granting Related Relief* [ECF No. 5370] (the "Confirmation Order") or the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5370-1] (the "Plan"), as applicable.  ECF references are to Case No. 18-23538 unless otherwise indicated.

relief related to the Settlement Agreement; (iii) approving settlement of claims under Bankruptcy

Code section 507(b) asserted by Wilmington Trust, National Association ("Wilmington Trust") as

Indenture Trustee and Collateral Agent in *In re Sears Holdings Corp.*, No. 20-3343 (2d Cir.) and

related claims (the "Second Lien Notes Settlement" and, together with the Settlement Agreement,

the "Settlement Agreements"); and (iv) authorizing certain nonmaterial amendments to the Plan in

furtherance of the Effective Date.  In support of this Motion, the Movants rely on the *Declaration

of Patrick J. Bartels in Support of the Joint Motion of Debtors and Official Committee of

Unsecured Creditors for Entry of an Order Approving Settlement Agreements, Granting Certain

Related Relief and Authorizing Certain Nonmaterial Plan Modifications in Furtherance of the

Effective Date of the Plan*, dated August 9, 2022, and the *Declaration of William Murphy in

Support of the Joint Motion of Debtors and Official Committee of Unsecured Creditors for Entry

of an Order Approving Settlement Agreements, Granting Certain Related Relief and Authorizing

Certain Nonmaterial Plan Modifications in Furtherance of the Effective Date of the Plan*, dated

August 9, 2022, filed contemporaneously herewith and incorporated by reference, and respectfully

state as follows.

## PRELIMINARY STATEMENT

1.     The Settlement Agreement represents a monumental achievement by bringing

closer to a successful conclusion these historic Chapter 11 Cases and the related Consolidated

Adversary Proceeding.  Nearly three years after confirmation of the Plan in October 2019, and

following years of litigation on numerous fronts and, more recently, months of hard-fought

mediation and good faith, arm's-length negotiations, the Effective Date is now within reach.

2.     In the first year of the Chapter 11 Cases, the Debtors sold substantially all of their

assets on a going concern basis, assumed and assigned hundreds of contracts and leases and, with

the support of the Creditors' Committee, confirmed the Plan.  In doing so, the Debtors paid over

$4 billion in administrative expenses to thousands of parties in interest, including hundreds of vendors and suppliers and thousands of employees.

3.       Since confirmation, the Debtors, the Creditors' Committee and their respective professionals endeavored to bring sufficient additional value into the Estates and to reduce asserted liabilities to take the Plan effective.   Since confirmation, the Debtors satisfied more than $64 million in additional administrative expenses incurred prior to confirmation.  With the approval of the Settlement Agreement, the Debtors will be poised to consummate the Plan, complete final distributions to secured, administrative expense and priority creditors and, ultimately, wind-up the Estates.  The Settlement Agreement largely resolves the Consolidated Adversary Proceeding, ends the Transform Foreign Cash Appeal, significantly de-risks the 507(b) Appeal (particularly when combined with the Second Lien Notes Settlement) and will significantly narrow the remaining open issues in the Chapter 11 Cases.

4.       The Settlement Agreement will provide an immediate cash influx of more than $180 million into the Estates no later than 16 days after entry of a final order in respect of this Motion.  Additionally, the Settlement Agreement will eliminate the substantial financial burdens, risks and uncertainty associated with litigation of the underlying disputes and will minimize the ongoing expenses of administering the Chapter 11 Cases.  With this cash influx, in addition to the Debtors' current assets, the Debtors believe they will have sufficient funds to complete distributions to holders of Administrative Expense Claims and other claims that must be paid prior to the Effective Date.

5.       Like any compromise, the Settlement Agreement is neither poison nor panacea. The Litigation Designees—the parties vested under the Confirmation Order with the exclusive right to prosecute and settle the claims asserted in the Consolidated Adversary Proceeding—

believe that, in isolation, the asserted claims and causes of actions were worth more than the cash that will be obtained through the Settlement Agreement.  But potential value cannot be evaluated in a vacuum.  The Defendants (as defined below) have made clear that they believe that they have substantial defenses to the claims.  As with any litigation, the ultimate outcome if the case were litigated to judgment is uncertain.  Moreover, the Plaintiffs (as defined below) do not have the luxury of infinite time or resources, and the Debtors' secured, administrative expense and priority creditors have needs of their own.  The reality is that the circumstances of the Chapter 11 Cases necessitate material compromise, not intransigence, and the benefits of the Settlement Agreement—the prompt resolution not just of the Consolidated Adversary Proceeding, but other ancillary, costly and potentially value-destructive disputes—will give certainty to creditors and provide a viable path for the Debtors to emerge from bankruptcy.  These benefits cannot be understated.

6.      Accordingly, and for all of the reasons set forth herein, the Debtors and the Creditors' Committee believe that the Settlement Agreements are fair and equitable, reasonable and in the best interests of the Estates.  In addition, the Admin Representative supports the relief requested in this Motion and the Settlement Agreement.  As such, the Debtors and the Creditors Committee respectfully request that the Court grant the relief requested in this Motion.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).

8.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

9.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory and legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363 and 1127 and Bankruptcy Rule 9019.

## BACKGROUND

### I.    The Chapter 11 Cases

11.    Beginning on October 15, 2018, and continuing thereafter, each of the Debtors commenced in this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

12.    The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

13.    On October 24, 2018, the Office of the United States Trustee for Region 2 appointed the Creditors' Committee [ECF No. 276].    No trustee or examiner has been appointed in these Chapter 11 Cases.

### A.    The Sale to Transform and Related Transform Disputes

14.    On February 8, 2019, the Court entered an order [ECF No. 2507] (the "Sale Order") approving the sale of substantially all of the Debtors' assets and operations to Transform Holdco LLC ("Transform"), a newly-formed entity created by ESL to acquire the Debtors' assets, pursuant to the Asset Purchase Agreement (the "Sale Transactions").

15.    After the Sale Transactions closed on February 11, 2019, numerous disputes arose between Transform and the Debtors regarding the parties' rights and obligations under the Asset Purchase Agreement.  Most significantly, these disputes centered on cash disputes and the extent of the postpetition liabilities that Transform had agreed to assume from the Debtors and which, absent such assumption, would materially constrain the resources available to the Debtors to administer the Chapter 11 Cases.

16.    On January 10, 2020, after litigating before this Court for nearly a year on multiple, complex issues arising under the Asset Purchase Agreement, the Debtors filed the *Debtors' Motion*

*Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with Transform Holdco LLC* [ECF No. 6327] (the "<u>APA Settlement Motion</u>"), which sought approval of a settlement between the Debtors and Transform of all then-outstanding disputes relating to the Asset Purchase Agreement.  The Court approved the APA Settlement Motion on January 28, 2020.  *See Order Approving Settlement Agreement Between the Debtors and Transform Holdco LLC* [ECF No. 6413].

17.    In January 2021, the Debtors sought to recover approximately $6.3 million in cash held as of the closing of the Sale Transactions in bank accounts owned by certain of the Debtors' foreign subsidiaries (the "<u>Foreign Subsidiaries</u>" and such cash, the "<u>Foreign Subsidiary Cash</u>"). Transform refused to turn over the Foreign Subsidiary Cash, contending, among other things, that the cash was an "Acquired Foreign Asset" under the Asset Purchase Agreement and that, even if it were not, the Debtors had acquiesced to Transform's appropriation of it.  Accordingly, on April 6, 2021, the Debtors filed the *Debtors' Third Motion to Enforce the Asset Purchase Agreement* (the "<u>Third Motion to Enforce</u>").  The Debtors argued, in pertinent part, that Section 2.13(a) of the Asset Purchase Agreement (which governs the disposition of the Foreign Subsidiaries' assets) provides only for the sale of "Acquired Foreign Assets" to Transform and, further, makes clear that the term Acquired Foreign Assets excludes Excluded Assets and includes only "assets of the type that would have been Acquired Assets had they been owned by the Sellers as of the Closing Date." Under Section 2.2(f) of the Asset Purchase Agreement (which provides that "all cash and cash equivalents" are "Excluded Assets"), the Foreign Subsidiary Cash is an Excluded Asset (as defined under the Asset Purchase Agreement).  And under Section 2.1(ee) of the Asset Purchase Agreement (which excludes "any cash in [any bank accounts of the Sellers]" from the definition of "Acquired Assets"), the Foreign Subsidiary Cash would not have been an "Acquired Asset" had it been owned

6

by the "Sellers" as of the closing of the Sale Transactions.  The Debtors therefore argued that the Foreign Subsidiary Cash could not have been an "Acquired Foreign Asset"; it belonged to the Debtors.  The Court agreed, rejecting Transform's argument that the third sentence of Section 2.13(a) of the Asset Purchase Agreement allowed Transform to acquire "Excluded Assets."  The Court also rejected Transform's argument that the Debtors had acquiesced in Transform's appropriation of the Foreign Subsidiary Cash.  Accordingly, on June 15, 2021, the Court entered an order granting the Third Motion to Enforce and directing Transform to transfer the Foreign Subsidiary Cash to the Debtors within ten business days.  The following day, Transform appealed the order of the Court to the U.S. District Court for the Southern District of New York.  On May 12, 2022, the district court affirmed the order of the bankruptcy court.  Transform has now appealed the district court's order to the U.S. Court of Appeals for the Second Circuit.  Transform must file its opening brief on or by September 20, 2022; the Debtors must file their responsive brief on or by December 20, 2022.

18.     In addition to the Transform Foreign Cash Appeal, there were other issues disputed or in discussion between the Debtors and Transform arising under the Asset Purchase Agreement (the "Remaining APA Issues"):

- liability for the Administrative Expense Claim asserted by Oracle Corporation (and/or one or more affiliates thereof) (collectively, "Oracle");

- liability for the Administrative Expense Claims asserted by certain landlords;

- the ownership of claims and causes of action in that certain class action captioned *In re: Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, N.D. Ala. Master File No. 2:13-cv-20000-RDP (the "Class Action"), or in (and to share in any recovery from) any related claims that have been or may be asserted by Transform or the Debtors against the defendant(s) to the extent Transform or the Debtors opt out of the class;

- the assignment of certain software licenses granted to one or more of the Debtors;

- the title to the parcel of land located at 13 Beverly Road, Hoffman Estates, (Property Index Number (PIN) 06-05-200-010-0000) (the "Hoffman Estates Parcel");

- the continued provision of transition services to the Debtors pursuant to that certain Services Agreement, dated as of February 11, 2019, by and between Sears Holding Corporation, on the one hand, and Transform Holdco LLC and Transform SR Holdings LLC, on the other hand (as it has been amended from time to time, the "TSA") and that certain Settlement Agreement by, between and among Transform and the Debtors dated September 17, 2020 (the "TSA Settlement Agreement"); and

- the rights of Transform with respect to that certain lease for store number 1722 located at 200 N E Court, Bloomington, Minnesota (the "MOAC Lease") based on the outcome of the pending petition for certiorari granted by the U.S. Supreme Court (*MOAC Mall Holdings LLC v. Transform Holdco LLC*, No. 21-1270).

**B.  The Disputes Regarding Claims Under Bankruptcy Code Sections 507(b) and 506(c)**

19.    On May 26, 2019, the Debtors filed a motion to estimate the claims under Bankruptcy Code section 507(b) ("Section 507(b) Claims") asserted by ESL, Cyrus Capital Partners, L.P. and Wilmington Trust, National Association (collectively, in such capacities, the "Second Lien Parties").  *See* ECF No. 4034 (the "Estimation Motion").  After the Second Lien Parties objected to such estimation request, the parties to the Estimation Motion agreed to convert it into a request pursuant to Bankruptcy Rule 3012 to determine the amount of the Second Lien Parties' secured claims, Section 507(b) Claims, and any surcharge upon the collateral securing the Second Lien Parties' claims pursuant to Bankruptcy Code section 506(c) (the "Section 506(c) Claims") that could offset any Section 507(b) Claims.  *See Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims* [ECF No. 4102].

20.    Following extensive briefing, discovery and submission of expert reports, the Court held a two-day evidentiary trial in connection with the parties' disputes regarding the Section 507(b) Claims and Section 506(c) Claims on July 23, 2019 and July 31, 2019.  The Court ruled

from the bench on July 31, 2019, and subsequently issued a written order on August 5, 2019, in

which it held that: (i) there was no diminution in the value of the Second Lien Parties' collateral

after the Petition Date, and therefore the Second Lien Parties were not entitled to Section 507(b)

Claims; and (ii) the Debtors were not owed a surcharge on the Second Lien Parties' collateral

pursuant to Bankruptcy Code section 506(c). *See Order Determining the Amount of Second-Lien

Holders' Section 507(b) Administrative Claims Pursuant to Rule 3012 of the Federal Rules of

Bankruptcy Procedure* [ECF No. 4740] (the "507(b) Order") ¶ 1. In addition, given that the Court

had determined the Section 507(b) Claims to be zero and no stay of the 507(b) Order was sought,

the Court declined during the subsequent confirmation hearing to order a reserve for the Section

507(b) Claims as the Second Lien Parties had requested. *See* Oct. 7, 2019 Hr'g Tr. 123:11-3 (THE

COURT: "Okay. I'm not sure whether a reserve is required at any point, but I think at this point,

it's not appropriate to order one and it does seem to me that Judge Farnan is right on here in *In re

Oakwood Homes Corp.*, 329 B.R. 19." (affirming bankruptcy court decision to set a reserve

amount at zero in respect of a disputed claim based on the facts and circumstances of the case and

the likelihood of success on appeal as not erroneous)).

21.    In August 2019, the Second Lien Parties each filed notices of appeal of the 507(b)

Order (the "507(b) Appeals") to the United States District Court for the Southern District of New

York (the "District Court") [Case Nos. 7:19-cv-7660-VB; 7:19-cv-07697-VB; 7:19-cv-7782-VB],

which cases subsequently were consolidated [Case No. 7:19-cv-7660-VB, ECF No. 23].    On

August 27, 2019, and September 4, 2019, respectively, the Debtors and the Creditors' Committee

appealed the 507(b) Order's denial of a surcharge under Bankruptcy Code section 506(c) to the

District Court [Case Nos. 7:19-cv-8002-NSR; 7:19-cv-8237-UA] (the "506(c) Appeals").    The

506(c) Appeals subsequently were stayed pending resolution of the 507(b) Appeals. *See* Memorandum Opinion and Order, Case No. 7:19-cv-8002-NSR, ECF No. 25.

22.     On September 1, 2020, the District Court affirmed the Court's decision regarding the Second Lien Parties' asserted Section 507(b) Claims for the reasons set forth in the District Court's Opinion and Order, Case No. 7:19-cv-7660-VB, ECF No. 59, at 11-12.

23.     On September 30, 2020, each of the Second Lien Parties appealed the District Court's decision to the United States Court of Appeals for the Second Circuit [Case Nos. 20-3343; 20-3346; 20-3349] (each, a "Second Circuit 507(b) Appeal" and, collectively, the "Second Circuit 507(b) Appeals"). On September 24, 2021, the Second Circuit heard oral argument. As of the date hereof, the Second Circuit 507(b) Appeals remain pending before the Second Circuit, and no decision has been issued.

### C.     The Claims Between the Debtors and Seritage

24.     The Seritage Defendants have asserted approximately $4.1 million of Administrative Expenses Claims against 29 separate Debtors relating to leases that were rejected by the Debtors in these Chapter 11 Cases. *See* Proofs of Claim Nos. 16784, 17270, 17706, 17910, 18021, 18025, 18027, 18030, 18033, 18035, 18037, 18158, 18193 18218, 18251, 18266, 18276, 18282, 18294, 18297. The Debtors disputed the validity and the amount asserted by the Seritage Defendants. Further, the Debtors believe they are owed approximately $1.9 million of expense reimbursement obligations relating to repair and replacement work performed by the Debtors at certain of the leased properties prior to rejection. In addition, the Debtors believe that they have approximately $3 million of preference claims against the Seritage Defendants in connection with two prepetition payments made by the Debtors relating to lease termination agreements. The Debtors and the Seritage Defendants entered into a tolling agreement regarding the preference claims, which expires on October 15, 2022.

### D.       The Plan and Confirmation Order

25.       On October 7, 2019, following a two-day trial, the Court confirmed the Plan and, on October 15, 2019, entered the Confirmation Order.   The Plan contemplates that upon the Effective Date, the Debtors' remaining assets will be transferred to the Liquidating Trust.   *See* Plan Art X.3.   The Plan also incorporated a number of carefully crafted and delicately balanced settlements, each of which is described below.

### 1.       The Plan Settlement

26.       As described in more detail in the Disclosure Statement, the Debtors' prepetition financial and operational affairs were inextricably intertwined, and any efforts to disentangle such affairs were likely to be time consuming, expensive and mired by protracted litigation with respect to, among other issues, substantive consolidation.   *See* Disclosure Statement [ECF No. 4478], Art. IV.V.1.   Accordingly, the Plan sought approval of a settlement to resolve various inter-Estate and inter-creditor issues (the "Plan Settlement").   Specifically, the Plan Settlement provided, among other things, that all assets of the Debtors would be consolidated and treated as Liquidating Trust Assets as of the Effective Date, irrespective of which Debtor owned such assets.   In addition, subject to certain "Plan Settlement Premiums" afforded to creditors holding claims against certain Debtor entities, claims against the Debtors on account of joint obligations of two or more Debtors would be treated as a single claim entitled to a single recovery against the Liquidating Trust Assets. In this manner, the Plan Settlement resolved numerous significant disputes without delay and/or irreparable harm to the Debtors' restructuring efforts that could have resulted from extensive litigation.

### 2.       The PBGC Settlement

27.       On January 26, 2019, PBGC objected to the Sale Transaction on the grounds that (i) the Court could not approve a "free and clear" sale of any non-Debtor assets, including the

KCD Notes (as defined in the Asset Purchase Agreement) and certain intellectual property assets

owned by non-Debtor KCD IP, LLC ("KCD" and such intellectual property assets, the "KCD IP"),

(ii) pursuant to that certain *Pension Plan Protection and Forbearance Agreement,* dated as of

March 18, 2016 (as amended, supplemented or otherwise modified from time to time), KCD was

not permitted to transfer the KCD IP to its Debtor-affiliates absent consent of PBGC, and (iii) ESL

was required to allocate the consideration associated with each acquired asset under the Sale

Transaction. *See Objection and Reservation of Rights of Pension Benefit Guaranty Corporation

to Debtors' Sale Motion* [ECF No. 2002] ("PBGC Sale Objection") ¶¶ 2-5.[2]

28.    On February 6, 2019, the Debtors and PBGC executed a term sheet outlining the

principal terms of a settlement (the "PBGC Settlement") to resolve all issues raised by PBGC

related to the Sale Transaction and secure PBGC's support for the Plan.  Under the terms of the

PBGC Settlement, the Debtors agreed to provide PBGC with (i) a priority interest in the first $97.5

million of proceeds recovered by the Liquidating Trust after payment of all Administrative

Expense Claims, Priority Non-Tax Claims, Priority Tax Claims, Other 507(b) Priority Claims and

Secured Claims and (ii) a general unsecured claim of $800 million in consideration of PBGC's

asserted $1.4 billion claim for unfunded benefit liabilities and asserted $300 million termination

premium claim.  In addition, PBGC agreed to (x) support the Plan Settlement, including the

modified substantive consolidation of the Estates despite the fact that it held claims against every

Debtor, (y) forego recoveries at certain Kmart entities at which supplemental distributions would

be made to creditors with guarantee claims at such entities and (z) waive any other claims it may

---

[2] In addition, PBGC previously had issued a notice of determination for an "involuntary termination" of the Debtors'
pension plans (the "Pension Plans") under ERISA section 4042, and on February 1, 2019, filed an action in the United
States District Court for the Northern District of Illinois (Case No. 1:19-cv-00669) (the "PBGC Illinois Action")
against Sears Holdings Corp., as administrator of the Pension Plans, seeking entry of an order, among other things,
terminating the Pension Plans involuntarily, effective January 31, 2019. *See* Disclosure Statement, Art. IV.U.

have held against the Debtors.  *See* Confirmation Brief ¶ 31.  The PBGC Settlement was incorporated into the Plan and approved by the Court pursuant to the Confirmation Order.  *See* Confirmation Order ¶ 8.

### 3. The Committee Settlement

29.    On May 22, 2019, the Creditors' Committee filed an objection to the Disclosure Statement [ECF No. 3995] and raised objections to confirmation of the then-proposed plan. Thereafter, the Debtors and the Creditors' Committee engaged in negotiations in pursuit of a consensual resolution of the Creditors' Committee's plan-related concerns and worked cooperatively in order to avoid the significant cost, delay and uncertainty associated with a contested confirmation hearing.  These efforts ultimately proved successful and, on June 17, 2019, the Debtors and the Creditors' Committee reached an agreement in principle on the terms of a settlement (the "Committee Settlement"), which terms were incorporated in the Plan and approved by the Court pursuant to the Confirmation Order.  *See* Confirmation Order ¶ 8.

30.    Among other things, the Committee Settlement contemplated that the Liquidating Trust Board, which would govern the Liquidating Trust and select the Liquidating Trustee, would comprise five members, two of whom would be selected by the Debtors and three of whom would be selected by the Creditors' Committee.  In addition, the Debtors agreed to grant the Creditors' Committee joint standing to prosecute the Jointly Asserted Causes of Action.  In connection with such agreement, the Confirmation Order (i) expressly vested the Creditors' Committee with such joint standing, (ii) set aside up to $25 million of cash to fund such prosecution prior to the Effective Date and the establishment of the Liquidating Trust and (iii) in light of the fact that the Debtors did not have sufficient cash to consummate the Plan promptly following confirmation, authorized (a) the immediate appointment of the five initial members of the Liquidating Trust Board to serve as Litigation Designees and oversee the prosecution of the Jointly Asserted Causes of Action prior

to the Effective Date, with the same "rights and entitlement to be afforded to the Liquidation Trust

Board on the Effective Date of the Plan in respect of the Jointly Asserted Causes of Action,"

namely the exclusive right to prosecute and settle the such actions, and (b) the retention of Akin

Gump Strauss Hauer & Feld LLP as primary litigation counsel "to act on behalf of the Litigation

Designees to investigate, commence, prosecute, and otherwise litigate the Jointly Asserted Causes

of Action." *See* Confirmation Order ¶¶ 8, 17-19, 22.

31.    The Committee Settlement also vested the Creditors' Committee with consent

rights (which consent was not to be unreasonably withheld) with respect to: (i) any settlement or

resolution of Section 507(b) Claims asserted by certain parties in interest, including the Second

Lien Parties; and (ii) the settlement of any Administrative Expense Claims.    The Creditors'

Committee also was granted consultation rights with respect to the settlement or resolution of

issues related to disputes between the Debtors and Transform regarding the extent of Transform's

obligations to the Debtors under the Asset Purchase Agreement.    If any proposed settlement of

such Transform disputes were to settle or impair the Preserved Causes of Action, however, then

the consent of the Creditors' Committee would be required.    *See* Plan, Art. 9.3.    Finally, the

Committee Settlement contemplated that the Plan and related documentation were otherwise to be

acceptable to the Creditors' Committee.    *See id*.

32.    The Committee Settlement ensured that the interests of unsecured creditors were

represented appropriately and that their recoveries were to be maximized through the vigorous

prosecution of the Jointly Asserted Causes of Action.    Among other things, the Committee

Settlement (i) secured necessary funding to maximize the value of the Estates, (ii) ensured that

designees of the fiduciary for all unsecured creditors had a crucial voice in all decisions made by

the Liquidating Trust and (iii) provided the Creditors' Committee with consent or consultation

rights with respect to critical decisions made by the Debtors prior to the establishment of the Liquidating Trust. Absent the Debtors' entry into the Committee Settlement and the agreements incorporated therein, the Creditors' Committee would not have supported the Plan, nor would it have recommended to general unsecured creditors that they vote to accept the Plan.

### 4.      The Retiree Settlement

33.      On June 20, 2019, following the Debtors' termination of retiree life insurance benefits to certain of the Debtors' retired employees, the Court entered an order directing the U.S. Trustee to appoint an official committee of retired employees (the "Retiree Committee"). *See Order Granting Motion of Retirees Pursuant to Section 1114(d) of the Bankruptcy Code Directing the Appointment of a Committee of Retired Employees* [ECF No. 4357]. After the Retiree Committee was appointed, the Debtors made a proposal to the Retiree Committee for modification of benefits, as required under Bankruptcy Code section 1114. After the Retiree Committee failed to respond to the Debtors' proposal, the Debtors filed a motion seeking Court approval of the Debtors' proposed modifications. *See Motion of Debtors for Modification of Retiree Benefits* [ECF No. 4635].

34.      Ultimately, in connection with confirmation of the Plan, the Debtors, the Creditors' Committee and the Retiree Committee reached consensus on the terms of an agreement, which was approved by the Court pursuant to the *Order Authorizing Modification of Retiree Benefits* [ECF No. 5342] (the "Retiree Benefits Order"). The agreement provided, among other things: (i) procedures for the filing and allowance of Administrative Expense Claims in favor of Recently Deceased Class Members (as defined in the Retiree Benefits Order) in connection with the termination of the Retiree Plan; (ii) a $3 million reserve to be established on the Effective Date exclusively to pay allowed Administrative Expense Claims of Recently Deceased Class Members; and (iii) allowance of general unsecured claims for all Class Members (as defined in the Retiree

Benefits Order) who are not Recently Deceased Class Members up to the lesser of such Class Member's benefit and $10,500. *See* Retiree Benefits Order, Ex. 1.

### 5.    The Administrative Expense Claims Consent Program

35.    Following the Sale Transaction, the Estates had insufficient assets to satisfy the minority of remaining Administrative Expense Claims, including prepetition claims under Bankruptcy Code section 503(b)(9), in full. Accordingly, the Debtors engaged in discussions with the Creditors' Committee and an ad hoc group of holders of Administrative Expense Claims (the "Ad Hoc Group of Admin Claimants") in an effort to reach a settlement regarding Administrative Expense Claims. On October 1, 2019, the Debtors, the Creditors' Committee and the Ad Hoc Group of Admin Claimants executed a term sheet with respect to such settlement (the "Administrative Expense Claims Consent Program"), which was incorporated into the Plan and approved pursuant to the Confirmation Order. *See* Confirmation Order ¶ 52.

36.    The Ad Hoc Group of Admin Claimants had objected to confirmation of the Plan. There were substantial negotiations following the filing of that objection, which culminated in the Administrative Expense Claims Consent Program. The Debtors were informed that absent the settlements embodied in the Administrative Expense Claims Consent Program, the Ad Hoc Group of Admin Claimants would not have supported the Plan. The Court has recognized the work done by the Ad Hoc Group of Admin Claimants in connection with those negotiations and the Administrative Expense Claims Consent Program. *See* Jan. 21, 2021 Hr'g Tr. 76:15-77:8.

37.    Under the Administrative Expense Claims Consent Program, holders of Administrative Expense Claims that either (i) affirmatively opted in or (ii) did not opt out of the program agreed to either a 20% or 25% (with the higher discount applicable to those who affirmatively "opted-in") reduction of their Administrative Expense Claims in exchange for expedited payment and agreed upon procedures for the reconciliation of disputes regarding the

allowed amount of such claims. *See id.* Specifically, the Administrative Expense Claims Consent Program provided, in relevant part, that (i) each holder of an Administrative Expense Claim (each, an "Administrative Expense Claimant") that affirmatively opted in to the Administrative Expense Claims Consent Program would receive its pro rata share of an initial $21 million distribution (the "Initial Admin Distribution"),[3] capped at 75% of such holder's allowed Administrative Expense Claim, (ii) once the "Minimum Conditions"[4] were satisfied, each Administrative Expense Claimant that did not opt out of the Administrative Expense Claims Consent Program would receive its pro rata share of subsequent distributions (the "Second Admin Distribution"), capped at 80% of such holder's allowed Administrative Expense Claim, (iii) following the Second Admin Distribution, available Net Proceeds of Total Assets (other than the Litigation Funding and the Cash Reserve) would be distributed to Administrative Expense Claimants who did not opt out of the Administrative Expense Claims Consent Program in respect of their remaining Settled Administrative Expense Claims, to the extent allowed and (iv) on the Effective Date, Administrative Expense Claimants who affirmatively opted out of the Administrative Expense Claims Consent Program would receive distributions on account of their Administrative Expense Claims, to the extent allowed.

38.     In exchange for the expedited payment of their Administrative Expense Claims, Administrative Expense Claimants that participated in the Administrative Expense Claims Consent

---

[3] In addition to affirmatively opting in, Administrative Expense Claimants were required to reach consensus with the Debtors and the Creditors' Committee with respect to the allowed amount of their Administrative Expense Claims in order to receive their pro rata share of the Initial Distribution (each such Administrative Expense Claim a "Settled Administrative Expense Claim").

[4] The "Minimum Conditions" means (i) $25 million has been funded to the Litigation Funding Account, (ii) $10 million has been funded in the Cash Reserve Account and (iii) $10 million has been funded in the Segregated Account. *See id.*

Program agreed to withdraw any objections to confirmation that had been filed and to "support and take all commercially reasonable steps to facilitate confirmation of the Plan." *See id.*

39.    The Administrative Expense Claims Consent Program resolved all objections to the Plan filed by the Ad Hoc Group of Admin Claimants, allowed the Debtors to forgo time-consuming litigation in connection with confirmation of the Plan and the allowance of Administrative Expense Claims, preserved Estate resources and reduced the amount of outstanding Administrative Expense Claims required to be paid.

## II.    The Consolidated Adversary Proceeding

### A.    The Insider Action: Original Complaint and Amended Complaint

40.    The Insider Action arises out of three distinct prepetition transactions: (i) the 2014 spin-off of Lands' End, Inc. ("Lands' End") to Sears Holdings Corp.'s ("Sears Holdings") shareholders (the "Lands' End Spin-off"); (ii) the 2015 issuance of subscription rights (the "Seritage Rights") to Sears Holdings' shareholders to purchase shares of Seritage Growth Properties, Inc. ("Seritage") at a specified price (the "Seritage Rights Offering") and subsequent sale of 235 real properties and certain joint venture interests to Seritage by certain Debtors (the "Seritage Real Estate Transfer," and together with the Seritage Rights Offering, the "Seritage Transaction"); and (iii) the extension of financing to Sears Holdings by certain related-parties from 2016 through 2018 and subsequent receipt by those related-parties of certain interest payments and fees related to the financings (the "Related-Party Financings").

41.    The decision to retain and pursue the claims and causes of action that comprise the Insider Action resulted from extensive and thorough investigations by the Debtors' Restructuring

Subcommittee and the Creditors' Committee.[5] These investigations encompassed all of the related-party prepetition transactions, including the Lands' End Spin-off, the Seritage Transaction and the Related-Party Financings.[6] *See Declaration of William L. Transier in Support of Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5146] ¶ 20.

42.    On April 17, 2019, based on its investigation, the Restructuring Subcommittee filed a complaint on behalf of certain of the Debtors and their Estates against the ESL Parties and certain other defendants [ECF No. 3278] (the "Original Complaint"), seeking over $2 billion in damages arising from certain prepetition related-party transactions.

43.    As noted above, pursuant to the Committee Settlement, the Jointly Asserted Causes of Action were to be preserved by the Plan and transferred to the Liquidating Trust for the benefit of creditors upon the Effective Date. At the time of confirmation, however, the Debtors lacked the available cash necessary to make all necessary distributions and consummate the Plan. Therefore, the Confirmation Order authorized the appointment of the Litigation Designees to serve in an interim capacity to oversee the prosecution of the Jointly Asserted Causes of Action. For more than two years, that is what the Litigation Designees have done. Specifically, and as described at greater length herein, on behalf of the Estates and at the direction of the Litigation Designees, the Creditors' Committee, among other things, (i) filed an amended complaint in the Insider Action, (ii) identified Sears Holdings' public shareholders and filed a complaint against certain of those shareholders on behalf of the Estates, (iii) served and largely completed document discovery in

---

[5] The Sale Order contained a heavily negotiated and limited release of the ESL Parties for their prepetition conduct based on the findings developed through the investigation by the Restructuring Subcommittee and the Creditors' Committee into prepetition conduct of various parties. *See* Asset Purchase Agreement § 9.13.

[6] In addition, on November 16, 2018, the Court entered an order authorizing expedited discovery by the Creditors' Committee of the Debtors and other parties under Bankruptcy Rule 2004 [ECF No. 802] (the "2004 Order").

respect of the foregoing, (iv) retained and worked with six testifying and consulting experts and (v) briefed and argued myriad motions to dismiss filed by certain of the Defendants (as defined below).

### B.    The Amended Complaint

44.    On November 25, 2019, following confirmation of the Plan, the Creditors' Committee, on behalf of certain of the Debtors and their Estates (collectively, the "Plaintiffs"), and at the direction of the Litigation Designees, filed the Amended Complaint in the Insider Action [Case No. 19-8250, ECF No. 52] (the "Amended Complaint"). The Amended Complaint was the result of the Creditors' Committee's extensive investigation of the prepetition related-party transactions pursuant to the 2004 Order, including review of 240,000 documents (amounting to over 4.8 million pages) and interviews of 12 key witnesses. The Amended Complaint asserted 26 additional counts and named 27 additional defendants (collectively, the "Insider Action Defendants") not previously included in the Original Complaint. It also eliminated claims related to three related-party transactions the Litigation Designees did not view as likely to be successful. Critically, the new claims asserted in the Amended Complaint included breach of fiduciary duty claims against certain of the Debtors' directors and officers related to the Lands' End Spin-off and the Seritage Transaction, thereby triggering substantial additional D&O liability insurance coverage.

45.    Following the filing of the Amended Complaint, the Creditors' Committee, on behalf of the Plaintiffs and at the direction of the Litigation Designees, took extensive document discovery of each of the Defendants named in the Amended Complaint, as well as approximately 33 separate third parties. The Creditors' Committee served approximately 19 sets of document requests and approximately 33 subpoenas, exchanged dozens of letters with discovery targets, and engaged in more than 100 meet-and-confers. In response to the Creditors' Committee's efforts,

the Defendants produced approximately 500,000 documents, Transform produced more than 12 million documents and all other third parties produced approximately 350,000 documents. The Creditors' Committee reviewed a significant number of these documents with the assistance of low-cost contract attorneys and sophisticated search and predictive coding techniques. The Creditors' Committee also engaged in second-level document review and prepared multiple memoranda, chronologies and other work product in anticipation of fact depositions.

46.    Additionally, during this time, the Creditors' Committee, on behalf of the Plaintiffs and at the direction of the Litigation Designees, interviewed many potential experts on a range of subject areas. After completing interviews, counsel to the Creditors' Committee identified and retained six highly qualified individuals to serve as consulting and/or testifying experts. The Creditors' Committee provided critical materials to each expert and his or her supporting team and worked closely with the experts and their teams as they developed preliminary decks, draft expert reports and other work product in support of the prosecution of the Consolidated Adversary Proceeding.

### C.    The Motions to Dismiss the Insider Action

47.    On February 21, 2020, the Insider Action Defendants filed 15 separate motions to dismiss certain of the claims in the Amended Complaint [Case No. 19-8250, ECF Nos. 95-101, 103-111, 113-116, 118-127, 129-137] (collectively, the "Insider Action Motions to Dismiss"). Thereafter, on April 30, 2020, the Creditors' Committee, on behalf of the Estates, filed four briefs in opposition to the Insider Action Motions to Dismiss [Case No. 19-8250, ECF Nos. 163-166] (collectively, the "Opposition Briefs"). On June 15, 2020, the Insider Action Defendants filed 15 separate reply briefs in response to the Opposition Briefs [Case No. 19-8250, ECF Nos. 174-189]. The briefing was extensive and totaled more than 1,000 pages. On August 19, August 25 and August 31, 2020, the Court heard oral arguments on the Insider Action Motions to Dismiss.

### D.     The Public Shareholder Action and Consolidation Order

48.     On September 24, 2020, the Litigation Designees, on behalf of the Estates, retained ASK LLP to pursue certain claims against certain additional Sears Holdings shareholders who benefited from certain of the transactions challenged under the Amended Complaint.  Those parties had been identified in an extensive discovery process in which counsel served and negotiated 127 subpoenas to identify Sears Holdings' public shareholders.  Subsequently, on October 15, 2020, ASK LLP filed an adversary complaint in the Public Shareholder Action against 139 public shareholders of Sears Holdings, each of whom, individually or collectively with affiliates, received in excess of $2 million in benefits from either or both of the Lands' End Spin-off and Seritage Transaction [Case No. 20-7007, ECF No. 1] (collectively, the "Public Shareholder Defendants" and, together with the Insider Action Defendants, the "Defendants").  On January 19, 2021, the Public Shareholder Defendants filed numerous motions to dismiss the Public Shareholder Action [Case No. 20-7007, ECF Nos. 39-40, 43, 46, 48, 55, 60-65, 67] (collectively, the "Public Shareholder Action Motions to Dismiss" and, together with the Insider Action Motions to Dismiss, the "Motions to Dismiss").  On February 19, 2021, the Creditors' Committee, on behalf of the Estates, filed its opposition brief [Case No. 20-7007, ECF No. 94].  On March 5, 2021, the Public Shareholder Defendants filed their reply briefs [Case No. 20-7007, ECF Nos. 109-112] and, on March 12, 2021, the Court heard oral argument on the Public Shareholder Action Motions to Dismiss [Case No. 20-7007, ECF Nos. 109-112].

49.     On March 15, 2021, the Court entered an order consolidating the Insider Action with the Public Shareholder Action [Case No. 19-8250, ECF No. 236] (the "Consolidation Order"). The Consolidation Order sets forth an amended scheduling order regarding discovery.  Among other things, the Consolidation Order: (i) requires the Plaintiffs and the Defendants to exchange lists of proposed deponents no later than 28 days (with respect to the Insider Action Defendants)

or 60 days (with respect to the Public Shareholder Defendants) after the Court issues an order

deciding the Motions to Dismiss (the "Exchange Date"); (ii) requires the Plaintiffs and the

Defendants to conduct one or more meet and confers regarding fact depositions within seven days

of the Exchange Date (the "Deposition Scheduling Conference"); and (iii) permits the Plaintiffs

and the Defendants to commence fact depositions beginning 45 days after the Deposition

Scheduling Conference. *See* Consolidation Order ¶ 4. In short, once a ruling on the Motions to

Dismiss is issued, the Consolidation Order contemplates that the litigation will proceed quickly

into its next phase.

50.    A ruling on the Motions to Dismiss remains pending.

**E.    D&O Insurance Coverage Actions**

51.    On September 17, 2019, certain Defendants who are former directors and officers

of Sears Holdings and certain of its subsidiaries (the "Director Defendants") initiated a state court

action in New York, captioned *Alvarez v. XL Specialty Insurance Co.*, Case No. 655391/2019 (N.Y.

Sup. Ct. Sept. 17, 2019), against certain providers of D&O liability insurance to the Debtors (the

"D&O Coverage Proceeding"). In the D&O Coverage Proceeding, the Director Defendants sought

declaratory relief relating to, among other things, the extent of coverage available for the Director

Defendants' fees incurred defending against the Insider Action and potential damages awards

issued against the Director Defendants in connection with the Insider Action.

52.    On July 13, 2021, the D&O Coverage Proceeding was fully resolved by the trial

court in favor of the Director Defendants. On August 2, 2021, one of the insurers appealed the

trial court's decision. On February 17, 2022, the appellate court affirmed the trial court's decision.

The result of the D&O Coverage Proceeding is that one tower of D&O liability insurance coverage

(the so-called 2015-2016 tower) applies to the claims and causes of action arising out of the

Seritage Transaction while another tower of D&O liability insurance coverage (the so-called 2017-

2024 tower) applies to the claims and causes of action arising out of the Lands' End Spin-off and the Related-Party Transactions.

53.     In addition, Seritage initiated a state court litigation in Delaware, captioned *Seritage Growth Properties, L.P. v. QBE Insurance Corp.*, Case No. N21C-03-015 (Del. Super. Ct. Mar. 2, 2021) (the "Seritage Coverage Action"), in which Seritage is seeking declaratory relief, money damages and other relief against its D&O insurers.  In its complaint, Seritage alleges that certain of its insurers breached their obligations to provide insurance coverage to Seritage in connection with the Consolidated Adversary Proceeding.

54.     A ruling on the Seritage Coverage Action remains pending.

**F.     Mediation**

55.     On April 6, 2022, by agreement of the Plaintiffs and the Insider Action Defendants, the Court entered an order appointing the Honorable Shelley C. Chapman, the Honorable James M. Peck, Ret. and Jed D. Melnick to mediate the Insider Action (the "Mediation").  *See* Case No. 19-8250, ECF No. 270 (the "Mediation Order").[7]  The mediation parties included the Debtors, the Litigation Designees, the Insider Action Defendants, the Admin Representative and the D&O insurance carriers (the "Mediation Parties").  *See* Mediation Order ¶ 3.

56.     On May 23, 2022, the Mediation was set to terminate by the terms of the Mediation Order without an agreement to settle the issues subject to the mediation, but on May 24, 2022, the mediators issued a report [Case No. 19-8250, ECF No. 272] stating that they were "hopeful that a successful outcome of the Mediation may be possible if more time is allowed and the May 23 deadline is extended to a date determined by the Court in its discretion."

---

[7] While neither the Public Shareholder Action nor any ancillary issues related to the Estates were originally subject to the mediation, the Settlement Agreement largely resolves the Public Shareholder Action (and provides a mechanism for additional defendants in that action who have not done so already to settle and avoid further litigation) and certain ancillary disputes according to the terms set forth therein.

57.     On May 31, 2022, the Court entered an order [Case No. 19-8250, ECF No. 275] extending the Mediation from May 23, 2022 through June 13, 2022, and providing the mediators with the right to extend the mediation in their sole discretion and without further order of the Court.

58.     On June 14, 2022, the mediators filed a notice extending the Mediation through and including June 30, 2022.  The Mediation has continued since that date.

59.     On August 9, 2022, the Mediation Parties executed the Settlement Agreement.

### III.   The Settlement Agreement

60.     The key terms of the Settlement Agreement are summarized below:[8]

| Parties | The parties to the Settlement Agreement are as follows:<br>• Litigation Designees;<br>• Debtors;<br>• Restructuring Subcommittee;<br>• Creditors' Committee;<br>• Original Action Defendants;<br>• Participating Public Shareholder Defendants;<br>• Administrative Expense Claims Representative; and<br>• Transform. |
|---|---|
| Settlement Amount | The Settlement Payment Parties/Entities will collectively pay or cause to be paid $175 million to the Debtors.  The Settlement Amount will be paid no later than the first business day that is 16 calendar days after the Final Approval Date.<br><br>The Settlement Amount is apportioned as follows:<br>• The Sears Insurers shall pay $125,625,000 on behalf of the Sears D&O Defendants.<br>• The Original Action Defendants shall pay $41,875,000 on claims not covered by the Sears Policies.<br>• The Participating Public Shareholder Defendants shall pay $7,500,000, subject to Section 3(d) of the Settlement Agreement. |
| Effective Date | The effectiveness of the Settlement Agreement is conditioned on its approval by the Court pursuant to the Settlement Approval Order and the occurrence of the Final Approval Date. |

---

[8] The following summary is for illustrative purposes only.  To the extent of any conflict between the Settlement Agreement and the summary below, the Settlement Agreement controls.  Capitalized terms used in the summary but not otherwise defined have the meanings ascribed to such terms in the Settlement Agreement.

| Releases | The Settlement Agreement provides mutual releases by and between the Sears Parties and the Defendant Parties and, as such, fully resolves any and all potential liability of the Original Action Defendants and the Participating Public Shareholder Defendants based on, relating to, in connection with or in any manner arising out of any and all claims and causes of action that are or were asserted in the Actions, that could have been asserted in the Actions, that relate to or arise out of any the transactions that are or were at any time at issue in the Actions and, except as otherwise expressly provided herein with respect to the Carve-Outs that otherwise concern the Debtors or the Bankruptcy Case. |
|---|---|
| Carve-Outs from Releases | The following matters are not subject to the releases set forth in the Settlement Agreement:<br>• All rights, claims and defenses of Transform (and its Related Parties), on the one hand, and the Debtors (and their Related Parties), on the other hand, with respect to the matters identified on Exhibit 9 to the Settlement Agreement (though that Exhibit 9 provides for the resolution of most such matters).<br>• All rights and claims of Cyrus as against the Debtors and the Estates with respect to the pending Section 507(b) Appeal, all rights and claims of the Debtors and the Estates as against Cyrus with respect to the pending Section 506(c) Appeal and all rights and claims that the Debtors and the Estates may have against Cyrus or any Related Party of Cyrus based on, relating to, in connection with or otherwise arising in any manner out of the Bankruptcy Cases other than any claims that were asserted against Cyrus in the Original Action or that otherwise relate to any of the transactions that are or were the subject of the Original Action.<br>• All rights and claims of any Original Action Defendant or Participating Public Shareholder Defendant (or of any Related Party of any Original Action Defendant or any Participating Public Shareholder Defendant) to seek any contribution, indemnification, reimbursement or other funding from any of their respective investors, partners, funds or insurers with respect to any portion of the Settlement Payment to be paid by such Original Action Defendant or Participating Public Shareholder Defendant (or of any Related Party of any Original Action Defendant or any Participating Public Shareholder Defendant) or with respect to any defense costs incurred by such Original Action Defendant or Participating Public Shareholder Defendant.<br>• Any prepetition claims that any of the Original Action Defendants or Participating Public Shareholder Defendants (or that any Related Party of any Original Action Defendant or of any Participating Public Shareholder Defendant) may have against the Debtors or their Estates in the Bankruptcy Cases and all rights appurtenant thereto, including all rights to share in distributions made to creditors from the Estates in the Bankruptcy Cases; *provided*, *however*, in light of and subject to |

| | |
|---|---|
| | the Releases provided by the Sears Parties, the Original Action Defendants and the Participating Public Shareholder Defendants agree that all such claims shall be treated as general unsecured claims (and not as secured or priority claims). |
| **507(b) Appeal** | The ESL Defendants shall, as soon as reasonably practicable after the Final Approval Date, either (i) withdraw the claims they have asserted in the Section 507(b) Appeal; or (ii) at the Debtors' election (subject to the consent of the Committee) assign any right to recovery on their disputed super-priority administrative expense claims that are the subject of the 507(b) Appeal to the Estates (which assignment shall be subject to all defenses, limitations and similar such rights as may exist with respect to such claims as when held by the ESL Defendants).<br><br>As soon as reasonably practicable after the Final Approval Date, the Debtors shall withdraw their claims as against the ESL Defendants in the Section 506(c) Appeal. |
| **Additional Seritage Payment** | In full satisfaction and settlement of any and all claims or expenses arising from or relating in any way to the Seritage Defendants' role as landlord to any of the Debtors as tenants, including, but not limited to, (1) any claims by the Debtors relating to lease termination payments, including lease termination payments pursuant to that certain lease termination agreement, dated August 22, 2018, between Seritage SRC Finance LLC, Seritage KMT Finance LLC, and Sears Operations LLC and Kmart Operations LLC, and (2) any prepetition or postpetition expense reimbursement obligations owed by the Seritage Defendants to the Debtors with respect to any of the properties leased by the Seritage Defendants to the Debtors, the Seritage Defendants will pay the Debtors $500,000 (the "<u>Additional Seritage Payment</u>").<br><br>The Additional Seritage Payment is in addition to the payment of a portion of the Settlement Amount that the Seritage Defendants are making pursuant to the Settlement Amount. The Seritage Defendants will make the Additional Seritage Payment at the same time as they pay their required portion of the Settlement Amount. |
| **Claim-Over Protections** | The Settlement Approval Order shall bar Non-Settling Parties from asserting any claim for non-contractual contribution, reimbursement or indemnification against any of the Settling Parties arising out of, based on or in connection with or relating to any of the claims or allegations set forth in the Actions and providing for the Sears Parties to reduce any judgment or other recovery they may obtain against any such Non-Settling Party by the amount required under applicable law calculated by reference to the proportionate share of fault attributable to the Settling Parties, to preclude the Non-Settling Party from asserting a Claim-Over. |

61.    In addition to the above, the Debtors and Transform have also agreed to resolve the

Remaining APA Issues, as detailed in Exhibit 9 of the Settlement Agreement.  The terms are

summarized below:[9]

| No. | Issue | Resolution |
|---|---|---|
| 1 | Transform Foreign Cash Appeal | In full and final resolution of the Transform Foreign Cash Appeal, Transform shall be entitled to $1 million of the approximately $6.3 million of the escrowed funds held by the Debtors, which shall be transferred to Transform no later than five (5) business days following the Final Approval Date (as defined in the Settlement Agreement). |
| 2 | Administrative Expense Claim (Claim No. 20588) asserted by Oracle | In final resolution of Claim No. 20588, Transform will pay Oracle $350,000 in three installments and the Debtors will pay Oracle $375,000.  The Debtors shall file a stipulation regarding the resolution of Claim No. 20588 to be so-ordered by the Bankruptcy Court in the near-term. |
| 3 | Administrative Expense Claims asserted against Debtors/Transform by certain landlords | The Debtors and Transform have agreed to pay their respective pro rata portion of the asserted Administrative Expense Claims in accordance with the Asset Purchase Agreement. |
| 4 | Dispute regarding the ownership of claims and causes of action in the Class Action, or in (and to share in any recovery from) any related claims that have been or may be asserted by Transform or the Debtors against the defendant(s) | Any right to participate in (or to share in any recovery from) the Class Action, or in (and to share in any recovery from) any related claims that have been or may be asserted by the Debtors or Transform shall be allocated on a 50/50 basis between the Debtors and Transform.  Transform and the Debtors shall, in good faith, coordinate regarding the governance of their participation in the Class Action or any related litigation, including the 50/50 split of the costs. |
| 5 | All rights with respect to certain software licenses granted to one or more of the Debtors | The Debtors shall execute (and/or file) such documents as may be reasonably requested by Transform to transfer to Transform all rights with respect to certain software licenses granted to one or more of the Debtors, provided that the licensor consents to such transfer. |

[9] The following summary is for illustrative purposes only.  To the extent any conflict between Exhibit 9 of the Settlement Agreement and the summary below, Exhibit 9 of the Settlement Agreement controls.

| No. | Issue | Resolution |
|-----|-------|------------|
| 6 | All rights with respect to the Hoffman Estates Parcel | Transform shall have all rights with respect to the Hoffman Estates Parcel.   To the extent reasonably requested by Transform, the Debtors shall execute and deliver (or file, as requested by Transform) such documents as may be necessary or appropriate to evidence the transfer of title to, and all such rights, in the Hoffman Estates Parcel to Transform.   Transform shall be responsible for the payment of all real estate taxes with respect to the Hoffman Estates Parcel for all periods from and after the closing of the Sale Transaction. |
| 7 | Transition services provided to the Debtors pursuant to the TSA and the TSA Settlement Agreement | Transform shall not bill the Debtors for, and will continue to provide, transition services from and including April 1, 2022, through and including December 31, 2022, subject to a cap of services of $10,000 per month for any services provided from the Execution Date (as defined in the TSA) through and including December 31, 2022.   To the extent the Debtors request services in excess of the cap or request services be provided from and after January 1, 2023, Transform shall be entitled to charge the Debtors for those services in accordance with the TSA, the Sale Order, and the TSA Settlement Agreement. |
| 8 | All rights and issues relating to the MOAC Lease and the pending petition for certiorari granted by the U.S. Supreme Court (*MOAC Mall Holdings LLC v. Transform Holdco LLC, et al.*, No. 21-1270) | Among other things, if Transform is unable to obtain assignment of the MOAC Lease as a result of a final, non-appealable order, Transform acknowledges and agrees that it will not be entitled to an adjustment in (and the repayment by the Debtors of any of) the consideration Transform paid to the Debtors under the APA (or the consideration it is paying to the Debtors under this Settlement Agreement).  The Debtors agree to execute any documents and to take any actions that Transform may reasonably request to effect the assignment of the Mall of America Lease to Transform or its designee and/or to allow Transform to obtain the economic benefits that the Debtors and Transform intended that Transform obtain from its acquisition of the Mall of America Lease.   Transform shall be responsible for all fees and costs incurred by the |

| No. | Issue | Resolution |
|-----|-------|------------|
|     |       | Debtors in connection with the foregoing. Any economic consideration that the Debtors or Transform may be able to obtain for the Mall of America Lease shall belong to and shall be turned over to Transform. |

## IV.    The Second Lien Notes Settlement

62.    Contemporaneously with the Mediation negotiations and, in part based on the ultimate terms of the Settlement Agreement, the Debtors also were able to resolve the Second Circuit 507(b) Appeal being prosecuted by Wilmington Trust, as Collateral Agent and Indenture Trustee of the 6-5/8 Senior Secured Notes due 2018 (the "Second Lien Notes"), as a result of which the Section 507(b) Claim asserted by Wilmington Trust against the Debtors on account of the Second Lien Notes will be resolved. Specifically, Wilmington Trust has agreed to withdraw its Second Circuit 507(b) Appeal on account of the Second Lien Notes (without prejudice to the rights of any other party to the Second Circuit 507(b) Appeals). In return, the Debtors have agreed to pay the accrued and unpaid compensation and expenses of Wilmington Trust, including the fees and expenses of its counsel and experts incurred during the course of these Chapter 11 Cases, which total approximately $4.1 million (the "Second Lien Notes Settlement Payment").

## V.    The Nonmaterial Plan Modifications

63.    As described above, the Confirmation Order contemplated a five-member governing body that would oversee the prosecution of the Jointly Asserted Causes of Action. Prior to the Effective Date, the members of this governing body are referred to as the Litigation Designees and, upon the Effective Date, such Litigation Designees would become the initial members of the Liquidating Trust Board that would oversee and direct the activities of the Liquidating Trust. For more than two years, the Litigation Designees have served in this role and

diligently carried out their duties in an effort to maximize value for the benefit of the Estates and creditors.

64.     The circumstances of these Chapter 11 Cases, however, have shifted since confirmation of the Plan.    Indeed, the Debtors, the Creditors' Committee, the Admin Representative and numerous other parties in interest have now reached consensus regarding a path forward that should enable the Debtors to consummate the Plan, complete long-awaited distributions to stakeholders and, ultimately, wind-up the Estates.    With the Settlement Agreement in hand, the Debtors have a viable path to exit chapter 11.    To effectuate an efficient and speedy process toward consummation of the Plan and administration of post-Effective Date matters, the Debtors and the Creditors' Committee have determined that a nonmaterial modification of the Confirmation Order and the Plan is necessary and appropriate.    Accordingly, the Debtors and the Creditors' Committee have agreed as follows, which will be reflected in redlines to the Plan and Liquidating Trust Agreement to be filed in advance of the hearing on this Motion (collectively, the "Plan Modifications"):

- Upon the effectiveness of the Settlement Agreement, the Litigation Designees will be relieved of any further duties and obligations, the role of the Litigation Designees will be eliminated and no further compensation will be paid by the Debtors to the Litigation Designees from and after the effective date of the Settlement Agreement.

- All references to the Liquidating Trust Board in the Confirmation Order and Plan (including the Liquidating Trust Agreement) will be removed, and no Liquidating Trust Board will be appointed upon the Effective Date.

- In lieu of the Liquidating Trust Board, upon the establishment of the Liquidating Trust on or after the Effective Date, the Liquidating Trust will be overseen solely by the Liquidating Trustee, who will have all the same powers, rights and obligations as the Liquidating Trust Board.    The Liquidating Trustee will be selected by the Litigation Designees.    For the avoidance of doubt, nothing in the Settlement Agreement, the Plan Modifications, or the relief sought in this Motion is intended to change the fact that the Liquidating Trust is to be established and effective only upon the Effective Date and not at any

time prior.  The Liquidating Trustee shall have no powers, rights, or authority prior to the Effective Date.

- The notice and reporting provisions in the Liquidating Trust Agreement will be revised in a manner consistent with the available distributions from the Settlement Agreement and to minimize extraneous administrative costs and burdens.

## RELIEF REQUESTED

65.    By this Motion, the Debtors and the Creditors' Committee respectfully request that the Court enter the proposed order attached hereto as **Exhibit B** (the "Proposed Order"), pursuant to Bankruptcy Code sections 105, 363, 1127 and 1129 and Bankruptcy Rule 9019(a): (i) approving the Settlement Agreement and the Second Lien Notes Settlement; (ii) authorizing the Parties to take any action as may be necessary, appropriate or advisable to implement, effectuate and fully perform under the Settlement Agreement and the Second Lien Notes Settlement, including making distributions in accordance with the terms of the Settlement Agreement and the Plan; (iii) approving the Plan Modifications, without any further disclosure or resolicitation; and (iv) waiving for cause any automatic 14-day stay that might apply under the Bankruptcy Rules.

## BASIS FOR RELIEF

**I.    The Settlement Agreement Satisfies the Standards for Approval Under Bankruptcy Rule 9019(a)**

66.    The Debtors, the Creditors' Committee and the Litigation Designees (on behalf of the Plaintiffs in the Consolidated Adversary Proceeding) have determined, in consultation with the Admin Representative, that the Settlement Agreement is fair and equitable, reasonable and in the best interests of the Estates and should be approved.

67.    Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the [Debtors] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  As such, Bankruptcy Rule 9019 "empowers the Bankruptcy Court to approve

compromises and settlements if they are in the best interests of the estate." *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

68.     In determining whether to approve a proposed settlement, a court must find that the settlement is fair and equitable, reasonable and in the best interests of the debtor's estates and creditors. *See Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). The decision to approve a particular compromise or settlement is within the sound discretion of the Bankruptcy Court. *Drexel Burnham*, 134 B.R. at 505. Further, courts' discretion should be exercised "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Nellis v. Shugre*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above.").

69.     A court need not decide the numerous issues of law and fact raised by a settlement in order to grant approval of a settlement under Bankruptcy Rule 9019; rather, it should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *In re Lynch*, No. 19-cv-3837(GRB), 2022 U.S. Dist. LEXIS 91195, at *8 (E.D.N.Y. May 20, 2022) (same); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits). Put another way, "[a]ll that [the proponent of the settlement] must do is establish [that] it is prudent to eliminate the risks of litigation to achieve

specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).

70.     Relying on the guiding language of *TMT Trailer Ferry*, courts in the Second Circuit have considered the following factors in evaluating the reasonableness of settlement:

a.   the probability of success in litigation, with due consideration for the uncertainty in fact and law;

b.   the difficulties of collecting any litigated judgment;

c.   the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay;

d.   the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement;

e.   the competence and experience of counsel who support the settlement;

f.   the relative benefits to be received by members of any affected class;

g.   the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and

h.   the debtor's informed judgment that the settlement is fair and reasonable.

*In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) (citing *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988)); *Purofied Down Prods.,* 150 B.R. at 522; *Drexel Burnham,* 134 B.R. at 506.

71.     Each of these factors militates strongly in favor of approving the Settlement Agreement.  While the claims and causes of action asserted in the Consolidated Adversary Proceeding may be meritorious and highly valuable, the substantial risks—which risks, ultimately, are borne by creditors (including administrative and priority creditors)—in pursuing those claims to final judgment must be weighed against the difficult circumstances of the Chapter 11 Cases and the limited resources that are available to pursue what certainly would be a multi-year, expensive

and complex litigation.  Compounding these concerns is the reality that (i) the Defendants have asserted numerous defenses to the claims and the ultimate outcome is uncertain, (ii) any judgment likely would be years into the future and uncertain and (iii) collecting on any judgments can be challenging (especially as insurance is a depleting resource).  These realities risk further delaying or threatening these already prolonged Chapter 11 Cases.  The Settlement Agreement, which is the product of arm's-length negotiations between experienced counsel overseen by highly-respected mediators, trades the substantial uncertainty and indeterminacy of the Chapter 11 Cases for closure.  Against this backdrop and as further described below, the settlement of the Consolidated Adversary Proceeding on the terms set forth in the Settlement Agreement is well "within the range of reasonableness" and in the best interests of creditors.

A.    **The Settlement of the Consolidated Adversary Proceeding Satisfies the Relevant Factors**

1.    **The Settlement Agreement Provides Significant Benefits to Creditors and Is Supported by Key Constituencies**

72.    The Court confirmed the Plan in October 2019.  Notwithstanding the nearly three years that have passed since, the Debtors have been unable to emerge from bankruptcy because there have been insufficient funds to satisfy holders of Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Other Secured Claims (collectively, "Priority and Secured Claims").  At confirmation, these claims generally were expected to be paid through the monetization of Estate assets other than the Jointly Asserted Causes of Action.  For various reasons, including the post-closing litigation with Transform that resulted in Transform assuming fewer obligations from the Debtors than anticipated at confirmation, the circumstances of the Chapter 11 Cases changed after confirmation.  Indeed, it became likely that the Jointly Asserted Causes of Action were the only remaining asset of the Estates with sufficient value to satisfy the

shortfall necessary to consummate the Plan.[10]  Of course, because the Jointly Asserted Causes of Action are a litigation asset, the timing in realizing any value (and whether any such value will be realized) in such actions is inherently uncertain and has always been subject to substantial risk.

73.    The Settlement Agreement eliminates this risk and provides finality to creditors. Specifically, the cash proceeds from the Settlement Agreement will provide sufficient funds not only to pay Allowed Priority and Secured Claims, but also to pay other administrative costs, including taxes, and facilitate an orderly wind-down of the Estates.  The PBGC, which has a $97.5 million priority interest under the Plan as a result of the PBGC Settlement, stands as the party to recover first after the Allowed Priority and Secured Claims are satisfied.  The Admin Representative affirmatively supports the Settlement Agreement and the holders of Allowed Priority and Secured Claims can expect to be paid in accordance with their entitlements.  The lack of potential objection or affirmative support of these parties and the "relative benefits" to these "affected classes" weighs in favor of approval of the Settlement Agreement.

74.    Although the consideration paid under the Settlement Agreement will almost assuredly not reach holders of general unsecured claims other than PBGC, those parties will nonetheless have finality and closure.

### 2.    The Outcome of the Consolidated Adversary Proceeding Is Uncertain

75.    As set forth above, the Consolidated Adversary Proceeding involves three distinct transactions, each of which gives rise to claims allegedly worth hundreds of millions of dollars in

---

[10] Specifically, according to the status report filed on January 19, 2022 [ECF No. 10240], the Debtors estimated that an additional $86.6 million is needed to satisfy administrative, secured and priority creditors in accordance with the Plan and the Administrative Expense Claims Consent Program.  Following monetization of additional assets, including preferences, the Debtors estimate that such amount will total approximately $62.6 million.  Proceeds from litigation, including both the Jointly Asserted Causes of Action and preference actions, are expected to cover this estimated shortfall.  This projection assumes that the Debtors will realize the full value of various estate assets and that related costs do not exceed current projections, which may or may not be the case.

damages: (i) the Lands' End Spin-Off; (ii) the Seritage Transaction; and (iii) the Related Party

Financings.

- **Lands' End Spin-Off.**  The Plaintiffs have alleged that the Lands' End business that was spun off to shareholders was worth between $800 and $900 million, net of debt, and seek to recover this amount plus interest from Sears Holdings shareholders and the directors, officers and advisors of Sears Holdings and an affiliate that orchestrated and approved the Lands' End Spin-Off.

- **Seritage Transaction.**  The Plaintiffs have alleged that the Seritage Rights transferred to Sears Holdings shareholders were worth approximately $600 to $700 million and seek to recover this amount in damages plus interest. Furthermore, Plaintiffs have alleged that the real estate transferred to Seritage in the Seritage Real Estate Transfer was undervalued by at least hundreds of millions of dollars.  Plaintiffs are seeking recovery of these amounts in damages from Sears Holdings shareholders who received the Seritage Rights, Seritage, which acquired the transferred real estate, and the directors, officers and advisors of Sears Holdings and certain affiliates who orchestrated and approved the Seritage Transaction.

- **Related-Party Financings.**  The Plaintiffs in the Insider Action have alleged that the Related-Party Financings were, in sum and substance, disguised equity investments, and that the Estates are entitled to the recovery of approximately $400 million of interest and fees paid on these "loans" and seek to recover this amount plus interest.  Plaintiffs are seeking recovery of these amounts from the parties who received the interest and fees and the directors and officers of Sears Holdings and certain affiliates who orchestrated and approved the Related-Party Financings.

76.    The outcome of any litigation is inherently uncertain and must be evaluated in light

of applicable facts and circumstances.  The Consolidated Adversary Proceeding is no exception.

If the Consolidated Adversary Proceeding were litigated to completion, the result could be a $2

billion judgment (plus interest) in the Plaintiffs' favor—but the result also could be zero.  And of

course, the outcome could fall somewhere between those two extremes, as certain claims may be

successful and others may fail.  The Court has already indicated that the decisions on the Motions

to Dismiss will not be an "all or nothing" for either side.  *See* July 27, 2021 Hr'g Tr. 35:21-25 ("I

think all of the movants who made motions to dismiss in those two litigations would have to

understand from the oral argument that took place that those motions are not going to be uniformly successful and that that litigation will continue in some form").

77.     Central to the Plaintiffs' claims is the key question of insolvency.  Indeed, nearly all of the claims asserted in the Consolidated Adversary Proceeding require, or would be significantly enhanced by, a finding that the Plaintiff asserting the claim was insolvent at the time of the operative transaction at issue (or rendered insolvent by the operative transaction at issue).[11] Insolvency requires consideration of a significant number of complicated factual issues and would be the subject of extensive expert opinions and testimony.  The Plaintiffs anticipate that insolvency would become a central focus of the Consolidated Adversary Proceeding going forward, and would ultimately be determined in a highly uncertain "battle of the experts."  The Plaintiffs are informed that the Defendants would hotly contest that the Debtors were insolvent at the time of (or rendered so by) the transactions, including based on the positive trading value of Sears Holdings stock following both the Lands' End Spin-off and the Seritage Transaction.  Moreover, just like the Plaintiffs, the Defendants have retained experts who would support their views on not only solvency, but also whether the transactions resulted in the Debtors' receipt of reasonably equivalent value, including with respect to the value of the real estate sold to Seritage.

78.     In addition, the Defendants have raised several other defenses in the Consolidated Adversary Proceeding, including, among others, good faith reliance on professional opinions, statutes of limitations, *in pari delicto*, *res judicata* and the Bankruptcy Code section 546(e) safe harbor.  The Insider Action Defendants set forth these and other arguments in 15 Motions to Dismiss spanning 437 pages, along with another 15 reply briefs spanning 373 pages—and the Public Shareholder Defendants filed many briefs of their own.  In other words, the Defendants

---

[11] Plaintiffs use the broad terms "insolvent" and "insolvency" herein for convenience only; the precise tests that must be met are set forth in greater detail in the state law statutes governing the Plaintiffs' claims.

have raised many defenses.  These Motions to Dismiss remain pending, and if granted in whole or part, could result in the dismissal of certain Defendants or claims from the Consolidated Adversary Proceeding, rendering the ultimate outcome of the litigation more uncertain.

79.     Accordingly, the "probability of success in litigation" factor weighs in favor of approval of the Settlement Agreement.

### 3.     Collecting any Judgment of More than $2 Billion Could Be Difficult

80.     The total amount sought in the Consolidated Adversary Proceeding is in excess of $2 billion plus interest.  It stands to reason that collecting a judgment of this size could be difficult and would almost certainly be protracted and expensive to attempt.  Indeed, available insurance is approximately 10% of the sum sought in the Amended Complaint, and it is diminishing with every day of continued litigation because defense costs count against the limits of the policies.

81.     Accordingly, as the Estates could face significant obstacles to collecting any judgment, this factor weighs in favor of approval of the Settlement Agreement.

### 4.     Continued Litigation Would Be Complex, Lengthy and Expensive

82.     *Complexity*.  Prosecution of the Consolidated Adversary Proceeding would be extraordinarily complex.  Specifically, the Consolidated Adversary Proceeding involves more than 30 claims against nearly 200 defendants, including the Debtors' officers, directors, and controlling (and non-controlling) shareholders, as well as the Debtors' advisors and lenders.  The claims stem from three separate, complex transactions (or sets of transactions)—the Lands' End Spin-off, the Seritage Transaction and the Related-Party Financings—that unfolded over more than four years, and each of which individually could have given rise to its own sprawling litigation.

83.     The complexity of the litigation involved is evidenced both by the magnitude of the Motions to Dismiss discussed herein and the volume of document discovery taken to date.  To date, the Defendants have produced approximately 500,000 documents; Transform has produced

more than 12 million documents; and all other third parties have produced approximately 350,000 documents. This is in addition to the 240,000 documents produced to the Creditors' Committee at the outset of the Chapter 11 Cases pursuant to Bankruptcy Rule 2004. Moreover, document discovery is not yet complete. For example, the ESL Defendants, which already have produced nearly 175,000 documents over the course of two years, have not entirely completed their production.

84. *Length*. The Consolidated Adversary Proceeding effectively was launched in November 2019 with the Plaintiffs' filing of the Amended Complaint in the Insider Action. Over the next year, the parties briefed and argued the Insider Action Motions to Dismiss and also took and produced the substantial document discovery outlined above. The Plaintiffs also identified the Public Shareholder Defendants and filed the Public Shareholder Action. Since November 2020, the Insider Action has been largely stayed while the parties wait for the Court to issue its ruling on the Motions to Dismiss. This pause was in keeping with the Court's instruction during the June 9, 2020 pre-trial conference that fact depositions not proceed until such time as it rendered a decision on the Motions to Dismiss and was accounted for in each of the various scheduling orders entered in the cases. *See* Insider Action ECF Nos. 210, 219, 230, and 236.

85. Following the Court's issuance of a decision in respect of the Motions to Dismiss, the parties would need to engage in fact depositions, issue expert reports and engage in expert depositions. The Plaintiffs expect there could be up to 50 fact depositions and anticipate approximately a dozen expert reports and depositions. This process would be lengthy. Following the completion of discovery, one or more parties might seek to file summary judgment motions and, if permission to file such motions were granted, the Plaintiffs anticipate that briefing summary judgment and receiving a decision from the Court could take a meaningful amount of time. Only

then would the Consolidated Adversary Proceeding progress to trial (which itself could involve substantial pre- and post-trial briefing). Following trial, the Plaintiffs expect that one or more parties might seek to appeal the outcome (first to the District Court and then to the Second Circuit), and the Defendants have the resources to post a bond if necessary pending appeal.[12]

86.     In sum, even if the Court were to issue a decision on the pending Motions to Dismiss in the near term, the Plaintiffs anticipate it could be several years before they may be able to realize any proceeds from the litigation to distribute to creditors.[13]  By contrast, the Settlement Agreement would provide the Estates with a meaningful economic recovery immediately.

87.     ***Expense***.  Litigating the Consolidated Adversary Proceeding has been—and would continue to be—expensive.  To date, in addition to briefing and arguing more than a thousand pages of Motions to Dismiss, the Litigation Designees and their advisors have (i) interviewed and retained experts, who in turn performed significant analyses in support of the prosecution of the claims asserted in the Consolidated Adversary Proceeding; (ii) served documents requests and subpoenas on all of the Defendants and a variety of third parties; and (iii) engaged in countless meet-and-confers regarding the terms and scope of productions, resulting in the voluminous discovery noted above.  In light of these and other efforts, the Plaintiffs have spent approximately $25 million litigating the Consolidated Adversary Proceeding to date and, as explained at greater length in the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Code Sections 105, 362, 364, and 1142 and Bankruptcy Rules 3020(D), 4001 and 9014 Authorizing Entry by the Debtors' Estates into the Litigation Funding Arrangement*

---

[12] Other litigation in the Chapter 11 Cases has led to cert petitions in the Supreme Court.

[13] While the Plaintiffs would evaluate a settlement in whole or in part prior to complete adjudication, there are no assurances such a settlement would be possible.  Indeed, depending on how the Court ruled on the motions to dismiss and other pre-trial motions (and how the depositions proceeded), and because additional defense costs would reduce the limits under the D&O insurance policies, settlement in the future on terms comparable to those available now could be more difficult.

*with Bench Walk 21p, L.P.* [ECF No. 10407] (the "Litigation Funding Motion"), anticipate they would need up to $35 million more to take the case through trial.

88.    Such funds would be necessary to prosecute these large, complex cases against Defendants, which include financial institutions and asset managers.  The Defendants are represented by more than a dozen premier law firms.  Moreover, certain of the Defendants (*i.e.*, the Debtors' former directors and officers) have access to approximately $200 million in D&O insurance policy coverage.

89.    The Plaintiffs have already spent virtually all of the $25 million set aside under the Confirmation Order to prosecute this litigation.  As set forth in the Litigation Funding Motion, the lack of funds available to finance the Consolidated Adversary Proceeding has required exploration of litigation funding options on the open market, resulting in a proposed litigation funding arrangement that still remains subject to consideration by this Court unless otherwise mooted by approval of the Settlement Agreement.

90.    The Litigation Designees stand by the arguments set forth in the Litigation Funding Motion and believe that, but for the Settlement Agreement, approval of the proposed litigation funding would be in the best interests of the Estates.  Nevertheless, the Litigation Funding Motion presently faces six separate objections.  Further, the Admin Representative shared its draft objection to the Litigation Funding Motion with the Litigation Designees, and indicated that it would have filed its objection and taken extensive discovery with respect to the Litigation Funding Motion if the parties had not arrived at the Settlement Agreement.  If the Litigation Funding Motion were not approved in full (either by reducing the amount of the proposed funding or by denying the Litigation Financing Motion outright), the Plaintiffs' ability to prosecute the Consolidated

Adversary Proceeding would be materially handicapped and the value of the Jointly Asserted Causes of Action necessarily would be far less.

91.     Accordingly, "the complexity and likely duration of the litigation" weighs heavily in favor of approval of the Settlement Agreement.

> **5.     The Remaining Factors Support the Reasonableness of the Settlement Agreement**

92.     With respect to the remaining factors, there can be no dispute that the Settlement Agreement is "truly the product of arm's-length bargaining and not the product of fraud or collusion." The Settlement Agreement is the result of the four-month Mediation overseen by three highly skilled and credentialed mediators and has been approved by the Litigation Designees on behalf of the Estates, the Debtors and the Admin Representative. Indeed, the Debtors—in consultation with the Creditors' Committee and the Litigation Designees, and supported by the reasoned judgment of experienced restructuring counsel that have been deeply involved with the Chapter 11 Cases since their filing in 2018—believe the Settlement Agreement is fair and equitable, reasonable and in the best interests of the Estates. Additionally, the other Parties, as well as the Admin Representative, have highly experienced and competent counsel.

93.     Lastly, the Bar Order (as defined in the Settlement Agreement) and judgment reduction provisions contained in the Settlement Agreement are customary terms that are appropriate in light of the "partial" nature of the proposed settlement. Under the terms of the Settlement Agreement, the Plaintiffs retain the right to continue to pursue the Public Shareholder Action against all Public Shareholder Action Defendants who do not elect to make the requisite settlement contribution. The Bar Order and judgment reduction provisions provide certainty to all Settling Parties that they will not face any claims for non-contractual indemnification, reimbursement or contribution from any non-settling Public Shareholder Defendants (or any other

non-settling party against whom the Estates could conceivably assert claims). Such terms are standard and were necessary to induce the Settling Parties to enter into the Settlement Agreement.

### B.    The Settlement of the Other Disputes Subject to the Settlement Agreement Satisfies the Relevant Factors

94.    The settlement of other disputes—primarily, the Second Circuit 507(b) Appeal as it relates to ESL, the Seritage Disputes, the Transform Foreign Cash Appeal and the Remaining APA Issues—subject to the Settlement Agreement satisfies the relevant factors. The Debtors have prevailed before this Court and the District Court on both the 507(b) Appeals and the Transform Foreign Cash Appeal and are confident in their legal positions. But settling those matters now will eliminate the overhang of appellate risk and reduce the number of open disputes in the Chapter 11 Cases and related proceedings. Further, as this Court is aware, disputes arising under the Asset Purchase Agreement and any interpretation thereof is fact-intensive, time-consuming, costly and uncertain. The resolution of the Remaining APA Issues as provided in Exhibit 9 of the Settlement Agreement provides for reasonable compromises by both parties for the benefit of the Estates and eliminates the need for further litigation.

95.    As such, based on the foregoing, the Debtors believe that the Settlement Agreement is fair and equitable, falls well within the required range of reasonableness and should be approved by the Court as being in the best interests of the Estates.

## II.    The Second Lien Notes Settlement Should Be Approved

96.    Similar to the reasons stated above, the Second Lien Notes Settlement satisfies the relevant reasonableness factors. Indeed, while the Debtors are confident in their legal positions in the Second Circuit 507(b) Appeals, the outcome is uncertain in light of the complexity of the issues. Should Wilmington Trust be successful in the Second Circuit 507(b) Appeals, and

irrespective of whether any other defendant in such action prevails,[14] the Debtors could be liable for hundreds of millions of dollars of Section 507(b) Claims, which would delay and which could derail the Debtors' efforts to go effective. The Second Lien Notes Settlement, together with ESL's agreement to withdraw its Second Circuit 507(b) Appeal, significantly mitigates the risk the Estates face on the Second Circuit 507(b) Appeals to the benefit of the Estates. The Second Lien Notes Settlement (i) represents the resolution of a meaningful aspect of complex, costly and uncertain litigation that will likely be appealed again by any losing party, (ii) is supported by the Debtors, the Creditors' Committee and the Litigation Designees, (iii) is a product of arm's-length negotiation, (iv) is consistent with the Confirmation Order provision requiring payment of indenture trustee fees incurred during the Chapter 11 Cases and (v) is fair and reasonable in light of the benefits it provides to the Estates.

97.     Based on the foregoing, the Debtors believe the Second Lien Notes Settlement falls well within the range of reasonableness and should be approved by the Court.

## III.    The Nonmaterial Plan Modifications Should Be Approved

98.     The Plan Modifications are a necessary and appropriate component of the Settlement Agreement. With the Plan Modifications, the Debtors will streamline the administration of the Chapter 11 Cases and the eventual transfer of the Debtors' assets on the Effective Date to the Liquidating Trust. Prior to the Settlement Agreement, it was contemplated that the five-member Litigation Designees and the Liquidating Trust Board would oversee the prosecution of the Jointly Asserted Causes of Action. Given that those actions will have been

---

[14] As set forth in the Settlement Agreement, although ESL and Wilmington Trust have agreed to dismiss their Second Circuit 507(b) Appeals, the Second Circuit 507(b) Appeal with respect to Cyrus Capital Partners, L.P. will remain outstanding.

resolved fully by the Settlement Agreement, the circumstances no longer warrant the administrative cost and same level of oversight as before.

99.     The Plan provides, in relevant part, that after entry of the Confirmation Order, the Debtors, subject to the reasonable consent of the Creditors' Committee, reserve the right to amend, modify, or supplement the Plan "in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case, without additional disclosure pursuant to section 1125 of the Bankruptcy Code."  Plan § 17.4.  In turn, Bankruptcy Code section 1127 provides as follows:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

11 U.S.C. 1127(b).

100.    The proposed Plan Modifications satisfy Bankruptcy Code section 1127(b) because the changed circumstances of these Chapter 11 Cases resulting from the Settlement Agreement warrant modification of the Plan and Confirmation Order, and the Plan as modified meets the requirements of Bankruptcy Code sections 1122, 1123 and 1129.  The Plan Modifications will allow a more efficient administration of these Chapter 11 Cases and the Liquidating Trust, and minimize the costs associated with the Liquidating Trust Board.  Bankruptcy Code section 1127(b) is further satisfied because the Plan Modifications do not affect classification or treatment of claims under the Plan and thus do not implicate this Court's previous findings that the Plan satisfies the requirements under Bankruptcy Code sections 1122, 1123 and 1129.  Finally, the Plan

Modifications will not alter the treatment to be received by impaired, voting creditors under the Plan.  Accordingly, the Plan Modifications should be approved.

101.    In addition, because the Plan Modifications have no material and adverse effect on parties that previously voted for the Plan—and, indeed, the Plan Modifications are ministerial, not substantive from the perspective of creditors—no further disclosure or re-solicitation of the Plan is necessary.

## <u>WAIVER OF BANKRUPTCY RULE 6004(H) REQUIREMENT IS WARRANTED</u>

102.    To implement the foregoing successfully, the Movants request that the Court waive the fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary for the Parties to expeditiously consummate the Settlement Agreements and realize the benefits thereunder. Accordingly, ample cause exists to justify granting a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## <u>NOTICE</u>

103.    Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures* [ECF No. 405].  Notice also will be provided to all Parties to the Settlement Agreement.  The Movants respectfully submit that no further notice is required.

104.    No previous request for the relief sought herein has been made by any of the Movants to this or any other Court.

**WHEREFORE** the Movants respectfully request entry of an order, substantially in the form attached hereto as **Exhibit B**, approving the Settlement Agreements and granting the relief requested herein and such other and further relief as is just, proper and equitable.

Dated: August 9, 2022
      New York, New York

| | |
|---|---|
| */s/ Garrett Fail* | */s/ Ira S. Dizengoff* |
| WEIL, GOTSHAL & MANGES LLP | AKIN GUMP STRAUSS HAUER & FELD LLP |
| 767 Fifth Avenue | One Bryant Park |
| New York, New York 10153 | New York, New York 10036 |
| Telephone: (212) 310-8000 | Telephone: (212) 872-1000 |
| Facsimile: (212) 310-8007 | Facsimile: (212) 872-1002 |
| Ray C. Schrock, P.C. | Ira S. Dizengoff |
| Garrett Fail | Philip C. Dublin |
| Sunny Singh | Sara L. Brauner |
| | Zachary D. Lanier |
| | |
| *Counsel for the Debtors* | *Counsel for the Official Committee* |
| *and Debtors in Possession* | *of Unsecured Creditors* |

## Exhibit A

## Settlement Agreement

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Agreement") is made as of this 9th day of August, 2022 (the "Execution Date") by and among:

- Patrick J. Bartels, Eugene I. Davis, Raphael T. Wallander, Alan J. Carr, and William L. Transier (collectively, the "Litigation Designees");

- Sears Holdings Corporation, Kmart Holding Corporation, Kmart Operations LLC, Sears Operations LLC, Sears, Roebuck and Co., ServiceLive Inc., SHC Licensed Business LLC, A&E Factory Service, LLC, A&E Home Delivery, LLC, A&E Lawn & Garden, LLC, A&E Signature Service, LLC, FBA Holdings Inc., Innovel Solutions, Inc., Kmart Corporation,  MaxServ, Inc., Private Brands, Ltd., Sears Development Co., Sears Holdings Management Corporation, Sears Home & Business Franchises, Inc., Sears Home Improvement Products, Inc.,  Sears Insurance Services, L.L.C., Sears Procurement Services, Inc., Sears Protection Company, Sears Protection Company (PR) Inc., Sears Roebuck Acceptance Corp., SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.), SYW Relay LLC, Wally Labs LLC, SHC Promotions LLC, Big Beaver of Florida Development, LLC,  California Builder Appliances, Inc., Florida Builder Appliances, Inc., KBL Holding Inc., KLC, Inc., Kmart of Michigan, Inc., Kmart of Washington LLC,  Kmart Stores of Illinois LLC, Kmart Stores of Texas LLC, MyGofer LLC, Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation), Sears Holdings Publishing Company, LLC., Sears Protection Company (Florida), L.L.C., SHC Desert Springs, LLC, SOE, Inc., StarWest, LLC, STI Merchandising, Inc., Troy Coolidge No. 13, LLC, BlueLight.com, Inc., Sears Brands, L.L.C., Sears Buying Services, Inc., Kmart.com LLC, Sears Brands Management Corporation, and SRe Holding Corporation (each, a "Debtor" and collectively, the "Debtors");

- The Restructuring Subcommittee, as defined below;

- The Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (as defined below) (the "Committee");

- Cushman & Wakefield, Inc., Duff & Phelps, LLC, Joseph Jordan, Lawrence Meerschaert, Dave Rodney, Leena Munjal, Scott Huckins, Robert Riecker, Robert Schriesheim, William C. Kunkler, Ann N. Reese, Paul G. DePodesta, Benefit Street 2018, LLC, Cyrus 1740 Master Fund, LP, Cyrus Special Strategies Master Fund, LP, Cyrus Select Opportunities Master Fund, Ltd., Canary SC Master Fund, LP, CRS Master Fund, LP, Cyrus Opportunities Master Fund II, Ltd., CMH VI, LP, CYR Fund, LP, Canary SC Fund, LP, Crescent 1, LP, Cyrus Capital Partners, LP, Cascade Investment, L.L.C., Bruce Berkowitz, CRK Partners LLC, Cesar L. Alvarez, ESL Institutional Partners L.P., ESL Investments, Inc., ESL Investors, L.L.C., ESL Partners L.P., Fairholme Capital Management, L.L.C., Fairholme Funds, Inc., JPP II LLC, JPP LLC, Kunal S. Kamlani, Edward Scott Lampert,

Steven Mnuchin, RBS Investment Management LLC, RBS Partners LP, SPE I Partners L.P., SPE Master I L.P., Seritage GS Holding LLC, Seritage Growth Properties, Inc., Seritage Growth Properties, L.P., Seritage KMT Finance LLC, Seritage KMT Mezzanine Finance LLC, Seritage MS Holdings LLC, Seritage SPS Holdings LLC, Seritage SRC Finance LLC, Seritage SRC Mezzanine Finance LLC, Thomas J. Tisch (collectively, the "Original Action Defendants");

- The Participating Public Shareholder Defendants, as defined below and as identified in **Exhibit 1** attached hereto, as such Exhibit may be amended, modified or supplemented prior to the Settlement Approval Date (defined below) in accordance with the terms of this Agreement;

- The Administrative Expense Claims Representative, as defined below; and

- Transform Holdco LLC, Transform Leaseco LLC, Transform SR Holdings LLC (together, "Transform" and together with the Litigation Designees, the Debtors, the Restructuring Subcommittee, the Committee, the Original Action Defendants, the Participating Public Shareholder Defendants, and the Administrative Expense Claims Representative, the "Parties"; each of Transform, the Litigation Designees, the Debtors, the Restructuring Subcommittee, the Committee, the Original Action Defendants, the Participating Public Shareholder Defendants, and the Administrative Expense Claims Representative, a "Party").

## RECITALS

**WHEREAS**, beginning on October 15, 2018 and continuing thereafter, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (such title, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing bankruptcy cases that are jointly administered under Case No. 18-23538 (RDD) (the "Bankruptcy Cases") and creating estates under section 541 of the Bankruptcy Code (the "Estates"); and

**WHEREAS**, a subcommittee of the board of directors of Sears Holdings Corporation was formed (the "Restructuring Subcommittee"), consisting of independent directors, to investigate potential claims and causes of action that the Debtors and their Estates might have as a result of transactions that occurred before October 15, 2018, involving persons or entities that were at the time affiliates of the Debtors, including the ESL Defendants (as defined below); and

**WHEREAS**, on October 24, 2018, the United States Trustee appointed the Committee [ECF No. 276][1] in the Bankruptcy Cases; and

**WHEREAS**, on January 17, 2019, Transform Holdco LLC and the Debtors entered into an asset purchase agreement and related agreements (collectively, as they may have been amended, modified or supplemented from time to time, the "Asset Purchase Agreement"), and on February

---

[1]   ECF references are to Case No. 18-23538 (the Bankruptcy Cases) unless otherwise indicated.

2

8, 2019, the Bankruptcy Court entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith, and (IV) Granting Related Relief* [ECF No. 2507] approving the Debtors' entry into the Asset Purchase Agreement and the Debtors' performance of their obligations thereunder (the "Sale Order"); and

WHEREAS, pursuant to the Asset Purchase Agreement and the Sale Order, the Debtors sold to Transform Holdco LLC, and Transform Holdco LLC purchased from the Debtors, substantially all of the assets and businesses of the Debtors, subject to and in accordance with the terms of the Asset Purchase Agreement and the Sale Order (the "Sale Transaction"); and

WHEREAS, the Sale Transaction closed on February 11, 2019 at 12:01 a.m. Eastern Time; and

WHEREAS, on April 18, 2019, certain of the Debtors filed a complaint (the "Original Complaint"), on their own behalf and on behalf of the Estates, against Edward S. Lampert, ESL Investments, Inc., RBS Partners LP, CRK Partners LLC, SPE Master I L.P., ESL Partners L.P., SPE I Partners L.P., RBS Investment Management LLC, ESL Institutional Partners L.P., ESL Investors, L.L.C., JPP LLC, JPP II LLC, Fairholme Capital Management, L.L.C., Cesar L. Alvarez, Bruce Berkowitz, Alesia Haas, Kunal S. Kamlani, Steven Mnuchin, Thomas J. Tisch, Seritage Growth Properties, Inc., Seritage Growth Properties, L.P., Seritage KMT Mezzanine Finance LLC, Seritage SRC Mezzanine Finance LLC, Seritage KMT Finance LLC, Seritage SRC Finance LLC, Seritage GS Holding LLC, Seritage SPS Holdings LLC, and Seritage MS Holdings LLC, thereby initiating an adversary proceeding, Adv. Proc. No. 19-08250 (RDD) (the "Original Action"), in the Bankruptcy Court; and

WHEREAS, on October 15, 2019, the Bankruptcy Court entered the *Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors and (II) Granting Related Relief* (ECF No. 5370) (the "Confirmation Order"), which confirmed the *Debtors' Modified Second Amended Joint Chapter 11 Plan of Sears Holding Corporation and Its Affiliated Debtors* [ECF No. 5293] (as amended, supplemented, or modified, the "Plan");[2] and

WHEREAS, as of the Execution Date, the Plan has not yet gone effective; and

WHEREAS, the Confirmation Order approved, among other things, the settlement and treatment of certain Administrative Expense Claims against the Debtors pursuant to a settlement between and among the Debtors, the Committee, and an ad hoc group of administrative expense claims (the "Administrative Expense Claims Consent Program"); and

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Confirmation Order, as applicable.

**WHEREAS**, the Administrative Expense Claims Consent Program and the Confirmation Order provided for the appointment of a representative of holders of administrative expense claims (the "Administrative Expense Claims Representative"); and

**WHEREAS**, the Confirmation Order also granted the Committee joint standing with the Debtors to investigate, commence, prosecute, settle and otherwise dispose of the Jointly Asserted Causes of Action and provided for the immediate appointment of the Litigation Designees, comprising three individuals selected by the Committee and two individuals selected by the Debtors; and

**WHEREAS**, the Confirmation Order granted the Litigation Designees the "exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Jointly Asserted Causes of Action pursuant to the terms of the Liquidating Trust Agreement applicable to the Liquidating Trust Board (including, for the avoidance of doubt, section 6.5(c) of the Liquidating Trust Agreement)," which Jointly Asserted Causes of Action include all claims and causes of action asserted in the Original Action, and any other claims or causes of action ancillary thereto, including additional claims or causes of action related to the subject matter of the Original Action, *see* Confirmation Order ¶ 18; and

**WHEREAS**, on November 25, 2019, the Committee, acting through the Litigation Designees and on behalf of the Debtors and their Estates, filed the *First Amended Complaint* [Ad. Pro. No. 19-8250, ECF No. 52] (the "First Amended Complaint") in the Original Action against the Original Action Defendants; and

**WHEREAS**, the First Amended Complaint does not include any claims against Alesia Haas, one of the defendants named in the Original Complaint, and Ms. Haas is no longer a party to the Original Action (and is not a party to the Public Shareholder Action (as defined below)); and

**WHEREAS**, on February 21, 2020, the Original Action Defendants filed motions to dismiss several counts in the First Amended Complaint and memoranda in support thereof (the "Motions to Dismiss"); and

**WHEREAS**, between April 30, 2020 and June 15, 2020, the plaintiffs in the Original Action and the Original Action Defendants submitted further briefs regarding the Motions to Dismiss; and

**WHEREAS**, on August 19, 25, and 31, 2020, the Bankruptcy Court held oral argument on the Motions to Dismiss, which remain pending; and

**WHEREAS**, on October 15, 2020, the Committee, acting though the Litigation Designees and on behalf of the Debtors and their Estates, filed a complaint against certain defendants who were public shareholders of the Debtors at various times prior to the commencement of the Bankruptcy Cases (the "Public Shareholder Defendants"), Adv. Pro. No. 20-07007 (RDD) (the "Public Shareholder Action"); and

**WHEREAS**, on January 19, 2021, various Public Shareholder Defendants filed motions to dismiss the Public Shareholder Action (the "Public Shareholder Motions to Dismiss"), and those Public Shareholder Defendants and the plaintiffs in the Public Shareholder Action subsequently completed briefing of the Public Shareholder Motions to Dismiss; and

**WHEREAS**, on March 12, 2021, the Bankruptcy Court heard oral argument on the Public Shareholder Motions to Dismiss, which remain pending; and

**WHEREAS**, on March 15, 2021, the Bankruptcy Court consolidated the Original Action and the Public Shareholder Action (together, the "Actions") pursuant to Federal Rule of Bankruptcy Procedure 7042; and

**WHEREAS**, as of the date of this Agreement, the Bankruptcy Court has not issued a decision with respect to any portion of the Motions to Dismiss or the Public Shareholder Motions to Dismiss; and

**WHEREAS**, on April 6, 2022, the Bankruptcy Court entered an order [Ad. Pro. No. 19-8250, ECF No. 270] (the "Mediation Order") appointing the Hon. Shelley C. Chapman, the Hon. James M. Peck (Ret.), and Jed D. Melnick to serve as co-mediators (collectively, the "Mediators") to conduct a mediation (the "Mediation") in connection with the Original Action; and

**WHEREAS**, pursuant to the terms of the Mediation Order, the Mediation concluded on May 23, 2022, without an agreement to settle any of the claims in the Original Action; and

**WHEREAS**, on May 24, 2022, the Mediators filed a report regarding the Mediation [Ad. Pro. No. 19-8250, ECF No. 272]; and

**WHEREAS**, on May 31, 2022, the Bankruptcy Court entered an order [Ad. Pro. No. 19-8250, ECF No. 275] extending the Mediation without interruption from and including May 23, 2022, through and including June 13, 2022; and

**WHEREAS**, on June 14, 2022, the Mediators filed a notice [Ad. Pro. No. 19-8250, ECF No. 276] that the Mediation would be extended through and including June 30, 2022, subject to potential further discretionary extensions; and

**WHEREAS**, since June 30, 2022, the Mediation has continued; and

**WHEREAS**, as a result of good faith negotiations that have occurred as part of the Mediation, the Parties have reached this Agreement, under which they desire to settle and compromise certain disputes, including all disputes between and among them relating to the claims that were or could have been asserted in the Actions, on the terms and subject to the conditions set forth herein, to avoid the cost and uncertainty of further litigation; and

**WHEREAS**, the Parties desire to fully and finally settle and resolve all claims and other disputes that were brought or could have been brought in the Actions and certain other disputes related to the Bankruptcy Cases without any concession or admission of liability by any Party on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for and in consideration of the promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be bound, do promise and agree as follows:

1.     Definitions.    As used in this Agreement (including the Exhibits hereto), the following capitalized terms shall have the meanings specified below (in addition to the definitions of other capitalized terms appearing elsewhere in this Agreement):

"*Final Approval Date*" means the first date on which the time to file a notice of appeal from the Settlement Approval Order has expired without the filing of such a notice (or, if such a notice is timely filed, the date on which the Settlement Approval Order has been affirmed pursuant to an order that has become final and is no longer subject to further appeal or review), and the Settlement Approval Order is no longer subject to appeal or petition for review as a matter of law; *provided, however,* that the Settlement Payment Parties/Entities (as defined below) may agree in writing on an earlier Final Approval Date, in which case the Final Approval Date shall be the earlier date agreed upon and set forth in that writing.

"*Related Parties*" means, with respect to a Party, (i) each of, and in each case in its capacity as such, that Party's current and former affiliates, predecessors, successors, family members, and assigns, (ii) any advisory clients, funds, or other investment vehicles to which such Party (or any person or entity controlled by, or under common control with, such Party) served as investment manager, manager, adviser, sub-adviser, general partner, or equivalent (collectively "Adviser"), or which were under common management or shared a common Adviser with such Party, (iii) any recipients or subsequent  transferees of any transfers that are alleged in one or both of the Actions to be avoidable and alleged to have been received by the Party, and (iv) with respect to such Party and any persons and entities coming within any of clauses (i), (ii), and (iii), each of its and their representatives, employees, officers, directors, managers, members, shareholders, partners, parents, subsidiaries, agents, attorneys, and other advisors, in each case in their capacity as such, and, solely with respect to the Sears D&O Defendants (as defined below), the Sears Insurers in their capacities as insurers for those defendants; *provided, however,* that for any Participating Public Shareholder Defendant, the term "Related Parties" shall only include persons and entities coming within clause (ii) if the provided Certification (defined below) from that Participating Public Shareholder Defendant encompasses securities received by the persons and entities coming within clause (ii).

"*Releases*" means the releases set forth in Section 7 of this Agreement.

"*Sears D&O Defendants*" means the following individuals, each of which was named as a defendant in the Original Action, in whole or in part, for acts or omissions in his or her capacity as a director or officer of one or more of the Debtors: Cesar L. Alvarez, Bruce Berkowitz, Paul G. DePodesta, Scott Huckins, Kunal S. Kamlani, William C. Kunkler, Joseph Jordan, Edward S. Lampert, Lawrence Meerschaert, Steven Mnuchin, Leena Munjal, Ann N. Reese, Robert Riecker, Dave Rodney, Robert Schriesheim, and Thomas J. Tisch.

"*Sears Insurers*" means the insurers, listed in **Exhibit 2** attached hereto, but only in their capacities as insurers under the Sears Policies.

"*Sears Policies*" means the 2015-16 and 2017-24 insurance policies, listed in **Exhibit 3** issued to Sears Holdings Corporation and its affiliates providing coverage for the Debtors' directors and officers, including the Sears D&O Defendants.

"*Seritage Defendants*" means Seritage GS Holding LLC, Seritage Growth Properties, Seritage Growth Properties, L.P., Seritage KMT Finance LLC, Seritage KMT Mezzanine Finance LLC, Seritage MS Holdings LLC, Seritage SPS Holdings LLC, Seritage SRC Finance LLC, and Seritage SRC Mezzanine Finance LLC.

"*Settlement Approval Date*" means the date of entry of the Settlement Approval Order.

"*Settlement Approval Order*" means an order, in form and substance reasonably acceptable to the Parties, entered by the Bankruptcy Court, pursuant to sections 105 and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019, approving this Agreement and including the Bar Order (as defined in Section 12 below).

"*Settlement Payment Parties/Entities*" means the Sears Insurers, the Original Action Defendants making the Original Action Defendants Payment (as defined in Section 3(c)(ii) below) and paying any Deficit (as defined below), and the Participating Public Shareholder Defendants.

2.    <u>Dismissal of Actions</u>.  Within three (3) business days after Debtors' receipt of the Settlement Amount as set forth in Section 3 below, counsel for the Committee, acting through the Litigation Designees and on behalf of the Debtors, their Estates, and the Restructuring Subcommittee will cause to be filed stipulations of dismissal, with prejudice, signed by counsel for all applicable Parties pursuant to Federal Rule of Civil Procedure 41(a), made applicable to the Actions by Federal Rule of Bankruptcy Procedure 7041, of (i) all claims against all Original Action Defendants in the Original Action, (ii) all claims against the Participating Public Shareholder Defendants in the Public Shareholder Action, and (iii) all claims against any Related Parties of Original Action Defendants who were also named as defendants in the Public Shareholder Action (which Related Parties are identified and set forth in **Exhibit 4**).

3.    <u>Settlement Payment</u>.

a.    In consideration for the other terms of this Agreement, including the dismissal of the Actions as and to the extent set forth in Section 2 above and the Releases set forth in Section 7 below, the Settlement Payment Parties/Entities will collectively pay or cause to be paid $175,000,000 (the "<u>Settlement Amount</u>") to the Debtors as set forth in the subparagraphs below of this Section 3, which amount shall be distributed in accordance with the terms of the Settlement Approval Order and the Plan.

b.    The Settlement Amount will be paid, in accordance with the payment instructions set forth in **Exhibit 5**, no later than the first business day that is at least sixteen (16) calendar days after the Final Approval Date; *provided, however, that*

7

each Participating Public Shareholder Defendant shall be required to pay its Allocable Portion of the Public Shareholder Payment, as set forth in Sections 3(c)(iii) and 3(d) below and on **Exhibit 1**, to the Debtors no later than five calendar (5) days after the Settlement Approval Date, which payment shall be returned by the Debtors to the applicable Participating Public Shareholder Defendant in the event that the Final Approval Date does not occur; and, *provided, further,* the Debtors shall, before the date by when payment is due, provide the Settlement Payment Parties/Entities supporting tax information and other documentation reasonably necessary to make the Settlement Payment.

c.      Responsibility for the Settlement Amount shall be apportioned as follows:

i.      The Sears Insurers shall pay a total of $125,625,000 (the "D&O Insurer Payment") on behalf of and as directed by the Sears D&O Defendants, with the amount of the D&O Insurer Payment to be paid by each of the Sears Insurers as agreed among those Sears Insurers and set forth in a separate agreement between and among the Sears Insurers and the Sears D&O Defendants in which the Sears Insurers have obligated themselves to make the D&O Insurer Payment;

ii.     Original Action Defendants sued, in whole or in part, on claims not covered by the Sears Policies shall pay a total of $41,875,000 (the "Original Action Defendants Payment"), with the amount of the Original Action Defendants Payment to be paid by each of those Original Action Defendants to be as agreed among them as specified in **Exhibit 6** hereto; and

iii.    Subject to Section 3(d) below, the Participating Public Shareholder Defendants shall pay a total of $7,500,000 (the "Public Shareholder Payment"), with the amount of the Public Shareholder Payment to be paid by each Participating Public Shareholder Defendant to be as calculated in accordance with Section 3(d) below and as specified on **Exhibit 1**.

iv.     Other than as specified in sub-section (c)(ii) above and in sub-section (d) below, no Original Action Defendant shall have any obligation to pay the Settlement Amount or any portion thereof.

d.      The portion of the $7,500,000 Public Shareholder Payment allocated to each Participating Public Shareholder Defendant (the "Allocable Portion") is based on each such Participating Public Shareholder Defendant's confidential certification of the total number of shares of stock in Lands' End, Inc. and total number of Seritage Growth Properties subscription rights that the Participating Public Shareholder Defendant or, as applicable, one or more of its Related Parties as set forth in such certification, received in connection with the transfers alleged in the Public Shareholder Action (the "Certification"), as calculated in accordance with the formula set forth on **Exhibit 7** hereto.  As of the Execution Date, the aggregate

amount of the Public Shareholder Payment so allocated to Public Shareholder Defendants that have become Parties to this Agreement and thus have become Participating Public Shareholder Defendants totals $4,035,712.51 (the "Already Committed Portion of the Public Shareholder Payment"), not the full $7,500,000. Any additional Public Shareholder Defendant (an "Additional Public Shareholder Defendant") may become a Participating Public Shareholder Defendant prior to the Settlement Approval Date, without the need for further amendment of this Agreement (other than the amendment of **Exhibit 1** to identify all Participating Public Shareholder Defendants, which amendment the Parties shall cause to be filed with the Bankruptcy Court), in accordance with the following process: Any Additional Public Shareholder Defendant wishing to join and receive the benefits of this Agreement must execute, prior to the Settlement Approval Date, a joinder to this Agreement in the form set forth on **Exhibit 8** hereto, which joinder shall include a confidential Certification of the total number of shares of stock in Lands' End, Inc. and the total number of Seritage Growth Properties subscription rights that the Additional Public Shareholder Defendant or, as applicable, one or more of its Related Parties as set forth in such certification, as well as its Related Parties (if known), received in connection with the transfers that are alleged in the Public Shareholder Action to be avoidable. Counsel for a majority (based on Allocable Portion) of those Public Shareholder Defendants that have become Participating Public Shareholder Defendants by the Execution Date and by counsel for the Original Action Defendants that are making the Original Action Defendants Payment are entitled to review, confirm, and approve the Public Shareholder Defendant's joinder. If such counsel approves in writing the joinder, then the Additional Public Shareholder Defendant, in order to become a Participating Public Shareholder Defendant, must pay, within five (5) days after the Settlement Approval Date, its Allocable Portion of the $7,500,000 Public Shareholder Payment (the Allocable Portions of the Public Shareholder Payment allocated to and paid by all such Additional Public Shareholder Defendants, the "Additional Portion of the Public Shareholder Payment"). The portion of the Public Shareholder Payment not allocated to Participating Public Shareholder Defendants in accordance with the terms hereof shall be the Deficit, which shall be calculated by subtracting (i) the sum of (x) $4,035,712.51 (the Already Committed Portion of the Public Shareholder Payment) and (y) the total amount of the Additional Portion of the Public Shareholder Payment from (ii) $7,500,000 (the Public Shareholder Payment). Notwithstanding anything to the contrary contained in this Agreement, any such Deficit shall be paid by the Sears Insurers and the Original Action Defendants who are making the Original Action Defendants Payment, with the Sears D&O Defendants directing the Sears Insurers to pay 75% of the Deficit and the Original Action Defendants to pay 25% of the Deficit, and with each such Original Action Defendant to pay that portion of such 25% in accordance with its percentage of the Original Action Defendants Payment as set forth on **Exhibit 6** hereto.

e.       Each of the Settlement Payment Parties/Entities shall be liable severally for only that portion of the Settlement Payment specified in this Agreement, including the Exhibits hereto (or, with respect to the Sears Insurers, as agreed by and among

them), to be paid by it and shall not be jointly and severally liable for the full Settlement Payment.

4.    <u>Public Shareholder Action</u>.  Each Participating Public Shareholder Defendant that pays its Allocable Portion of the Public Shareholder Payment in accordance with this Agreement shall be treated as Party to this Agreement and shall obtain the benefit of the Releases, as set forth in Section 7 below, and of the dismissal of all claims in the Public Shareholder Action asserted against all Participating Public Shareholder Defendants, as set forth in Section 2 above.  Each other Public Shareholder Defendant shall not be a Party to this Agreement, shall not receive the benefit of the Releases set forth in Section 7, and shall not have the claims asserted against it in the Public Shareholder Action dismissed pursuant to this Agreement (except if and to the extent any such other Public Shareholder Defendant is a Related Party of an Original Action Defendant as listed on Exhibit 4).

5.    <u>Bankruptcy Court Approval</u>.  Effectiveness of this Agreement is conditioned on its approval by the Bankruptcy Court pursuant to a Settlement Approval Order and the occurrence of the Final Approval Date.  By the motion seeking entry of the Settlement Approval Order, the Parties will request a stay from the Bankruptcy Court of the Actions and of the motion by the Committee, acting through the Litigation Designees on behalf of the Debtors and their Estates, for approval of litigation funding [ECF No. 10407] pending in the Bankruptcy Cases and a continuation of the Mediation, pending the Bankruptcy Court's consideration of approval of this Agreement (and pending any related appellate proceedings) and the occurrence of the Final Approval Date.

6.    <u>Cooperation and Further Assurances</u>.  The Parties agree to cooperate with each other to execute such further documents or instruments or to take such other steps as may be reasonably necessary to: (i) obtain the Settlement Approval Order, and (ii) effectuate the terms, intent and conditions of this Agreement.

7.    <u>Party Releases</u>.  The Parties acknowledge that this Agreement is intended to fully resolve any and all potential liability of the Original Action Defendants and the Participating Public Shareholder Defendants based on, relating to, in connection with or in any manner arising out of any and all claims and causes of action that are or were asserted in the Actions, that could have been asserted in the Actions, that relate to or arise out of any the transactions that are or were at any time at issue in the Actions and, except as otherwise expressly provided herein with respect to the Carve-Outs (as defined in Section 8 below), that otherwise concern the Debtors or the Bankruptcy Case. Without limiting the foregoing, and except as expressly set forth in this Agreement with respect to the Carve-Outs (defined below), effective as of the Final Approval Date and payment of the Settlement Amount:

a.    The Debtors, the Restructuring Subcommittee and each of its members, the Committee and each of its members, each of the Litigation Designees, and the Administrative Expense Claims Representative (collectively,  the "<u>Sears Parties</u>"), on behalf of themselves and the Estates, forever release, acquit and discharge the Original Action Defendants, the Participating Public Shareholder Defendants, the Sears Insurers, and Transform (collectively, the "<u>Defendant Parties</u>"), all Related Parties of each such Party and all Insured Persons as that term is defined in the

D&O Policies, of and from any and all claims, causes of action, liabilities, obligations, demands, suits, objections, counterclaims, defenses, debts, damages, sums of money due or owed, expenses, damages, attorneys' fees, accounts, covenants, contracts, agreements, arrangements, promises, indemnities, warranties, trespasses, torts, injuries or losses, of whatever kind or character, whether known or unknown, anticipated or unanticipated, foreseen or unforeseen, suspected or unsuspected, absolute, fixed, conditional or contingent, matured or unmatured, liquidated or unliquidated, disputed or undisputed, assertable directly or derivatively, due or to become due, whether arising from contract, equity,  tort or otherwise, and whether arising out of common law or pursuant to statute ("Claims"), that the Sears Parties and the Estates have, ever had or may have, based on, relating to, in connection with, or in any manner arising out of any act or omission through and including the Execution Date, against the Defendant Parties and their Related Persons, and such Insured Persons, based on, relating to, in connection with, or in any manner arising out of the Debtors, the Bankruptcy Cases, the Actions, the Asset Purchase Agreement, or the Sale Transaction, including those Claims that were asserted, or could have been asserted, at any time in the Actions (including in the Original Complaint and the First Amended Complaint, as well as the complaint in the Public Shareholder Action), or that are based on, relate to, are in connection with, or in any manner arise out of any act undertaken or omission by any Defendant Party or Related Party thereto or any transaction engaged in by or on behalf of any of the Debtors whether or not at issue at any time in the Actions.

b.      The Defendant Parties forever release, acquit and discharge the Sears Parties and their Related Parties of and from all Claims that the Defendant Parties have, ever had, or may have, based on, relating to, in connection with, or in any manner arising out of  any act or omission through and including the Execution Date, against the Sears Parties and their Related Parties based on, relating to, in connection with, or in any manner arising out of the Debtors, the Bankruptcy Cases, the Actions, the Asset Purchase Agreement, or the Sale Transaction, including those Claims that were asserted, or could have been asserted, at any time in the Actions, or that are based on, relate to, are in connection with, or in any manner arise out of any act undertaken or omission by any Sears Party or Related Party thereto or any transaction engaged in by or on behalf the Debtors whether or not at issue at any time in the Actions.

c.      Each of the Original Action Defendants and each of the Participating Public Shareholder Defendants forever releases, acquits and discharges each of the other Original Action Defendants and the Related Parties of each such other Original Action Defendants, and each of the other Participating Public Shareholder Defendants and the Related Parties of each such other Participating Public Shareholder Defendants, of and from all Claims based on, relating to, in connection with, or in any manner arising out of the Actions, including any Claims for contribution, indemnification or reimbursement with respect to any portion of the Settlement Payment paid by an Original Action Defendant or Participating Public Shareholder Defendant and any defense costs incurred by any such Original Action

Defendant or Participating Public Shareholder Defendant in connection with the Actions.

8.    <u>Carve-Outs and Reservations of Rights</u>.  Notwithstanding anything to the contrary contained in this Agreement, including the Releases, nothing in this Agreement shall release, discharge or otherwise impair or affect the Parties' (or their Related Parties') claims, rights and defenses based on, relating to, in connection with, or otherwise arising in any manner out of the following matters (collectively, the "<u>Carve-Outs</u>"):

a.    All rights, claims and defenses of Transform (and its Related Parties), on the one hand, and the Debtors (and their Related Parties), on the other hand, with respect to the matters identified on **Exhibit 9**; *provided, however,* if and to the extent such Exhibit provides for any such matters to be settled or otherwise resolved on the terms specified therein, such terms shall control.  For the avoidance of doubt, nothing in this Agreement waives or otherwise releases Transform's indemnification obligations under section 9.2(e) of the Asset Purchase Agreement for taxes.

b.    All rights and claims of Cyrus (as defined in Section 9(b) below) as against the Debtors and the Estates with respect to the pending Section 507(b) Appeal (as defined in Section 9(a) below), all rights and claims of the Debtors and the Estates as against Cyrus with respect to the pending Section 506(c) Appeal (as defined in Section 9(a) below), and all rights and claims that the Debtors and the Estates may have against Cyrus or any Related Party of Cyrus based on, relating to, in connection with or otherwise arising in any manner out of the Bankruptcy Cases other than any claims that were asserted against Cyrus in the Original Action or that otherwise relate to any of the transactions that are or were the subject of the Original Action, as more fully set forth in Section 9 below (any such rights and claims of the Debtors and the Estates, the "<u>Cyrus Carved-Out Claims</u>").

c.    All rights and claims of any Original Action Defendant or Participating Public Shareholder Defendant (or of any Related Party of any Original Action Defendant or any Participating Public Shareholder Defendant) to seek any contribution, indemnification, reimbursement or other funding from any of their respective investors, partners, funds or insurers with respect to any portion of the Settlement Payment to be paid by such Original Action Defendant or Participating Public Shareholder Defendant (or by any Related Party of such Original Action Defendant or Participating Public Shareholder Defendant) or with respect to any defense costs incurred by such Original Action Defendant or Participating Public Shareholder Defendant in connection with the Actions; *provided, however,* that (i) the Sears Insurers shall be responsible for the D&O Insurer Payment and 75% of any Deficit as provided in this Agreement,  and (ii) the Sears Insurers and the Sears D&O Defendants are entering into a separate agreement that will set forth the Sears Insurers' ongoing responsibilities and obligations under the Sears Policies and that will address specifically the obligations of the Sears Insurers with respect to the payment or reimbursement of outstanding defense costs incurred by the Sears D&O Defendants in connection with the Original Action and provide releases among

those Parties on the terms set forth in that separate agreement; *provided, further*, that no Original Action Defendant (and no Related Party of such an Original Action Defendant) shall seek contribution, indemnification, reimbursement or other funding for any portion of the Settlement Amount to be paid (or for any defense costs incurred) by such Original Action Defendant (or a Related Party) from any Participating Public Shareholder Defendant or from any of its Related Parties to the extent that such Participating Public Shareholder Defendant (or Related Party) received transfers that are the subject of the Actions directly in its own name (rather than as an investor or partner in the Original Action Defendant (or in its Related Party)), and no Participating Public Shareholder Defendant (and no Related Parties of any Participating Public Shareholder Defendant) shall seek contribution, indemnification, reimbursement, or other funding for any portion of the Settlement Amount to be paid (or for any defense costs incurred) by such Participating Public Shareholder Defendant (or a Related Party) from any Original Action Defendant or from any of its Related Parties to the extent that such Original Action Defendant (or Related Party) received transfers that are the subject of the Actions directly in its own name (rather than as an investor or partner in the Participating Public Shareholder Defendant (or in its Related Party)).

d.      Any pre-petition claims that any of the Original Action Defendants or Participating Public Shareholder Defendants (or that any Related Party of any Original Action Defendant or of any Participating Public Shareholder Defendant) may have against the Debtors or their Estates in the Bankruptcy Cases and all rights appurtenant thereto, including all rights to share in distributions made to creditors from the Estates in the Bankruptcy Cases; *provided, however,* in light of and subject to the Releases provided by the Sears Parties as set forth in Section 7 above, and except as provided in Sections 8(b) and 9(b) of this Agreement, the Original Action Defendants and the Participating Public Shareholder Defendants agree that all such claims shall be treated as general unsecured claims (and not as secured or priority claims).

e.      All rights and claims of all Parties to enforce this Agreement or for damages for its breach.

9.      <u>Section 507(b) Appeal/Section 506(c) Appeal Litigation</u>.

a.      ESL Investments, Inc., JPP, LLC, and JPP II, LLC (the "<u>ESL Defendants</u>"), all of which are Original Action Defendants, are appellants in the appeals styled *ESL Investments, Inc., et al. v. Sears Holding Corporation*, Case Nos. 20-3343(L), 20-3346 (CON), and 20-3349 (CON), that are currently pending in the U.S. Court of Appeals for the Second Circuit (including any proceedings that may ensue if there is a remand or other proceedings relating to the disputes at issue in these appeals, the "<u>Section 507(b) Appeal</u>").  The ESL Defendants shall, as soon as reasonably practicable after the Final Approval Date, either (i) withdraw the claims they have asserted in the Section 507(b) Appeal; or (ii) at the Debtors' election (subject to the consent of the Committee) assign any right to recovery on their disputed super-priority administrative expense claims that are the subject of the

507(b) Appeal to the Estates (which assignment shall be subject to all defenses, limitations and similar such rights as may exist with respect to such claims as and when held by the ESL Defendants); *provided, however,* that if the Debtors, with the Committee's consent, elect option (ii), then the assignment documentation shall be reasonably acceptable to the ESL Defendants, the Debtors shall cover the reasonable legal expenses of the preparation of such documentation, and the Debtors and not the ESL Defendants shall substitute themselves for the ESL Defendants in any further legal proceedings relating to the Section 507(b) Appeal and shall be responsible for all legal or other expenses that may need to be incurred in connection therewith; and *provided, further,* that the Debtors shall, as soon as reasonably practicable after the Final Approval Date, withdraw their claims as against the ESL Defendants in the related appeal that is currently pending (but stayed) in the U.S. District Court for the Southern District of New York styled *In re Sears Holdings Corp.*, Case Nos. 19 Civ. 8002 (VB) & 19 Civ. 8237 (VB) (the "Section 506(c) Appeal").

b.     Original Action Defendant Cyrus Capital Partners, L.P. ("Cyrus") does not release its claims at issue in the Section 507(b) Appeal.  The Debtors and their Estates shall retain all defenses to the claims asserted in the Section 507(b) Appeal by Cyrus.  In addition, the Debtors and their Estates shall retain, and shall not release under this Agreement, their claims in the Section 506(c) Appeal as against Cyrus and all Cyrus Carved-Out Claims.

10.     No Admission of Liability.  Each Party acknowledges that this Agreement is a compromise of disputed claims and defenses and that the Settlement Payment provided hereunder shall not be construed as an admission with respect to the merits of the claims and defenses by any Party.

11.     Acknowledgement of Defendants' Good Faith. The Debtors acknowledge that, notwithstanding the allegations made in the Actions, (a) all of the Original Action Defendants and the Participating Public Shareholder Defendants, and all of the Related Parties of the Original Action Defendants and the Participating Public Shareholder Defendants, acted in good faith in taking the actions they took (and in refraining from taking the actions they did not take) that are the subject of the Actions, and (b) without limiting the foregoing, the Debtors' directors and officers (including those named as Original Action Defendants) acted in good faith in what they believed to be the best interests of the Debtors after obtaining and reasonably relying on the advice of legal, financial and other professionals in effectuating and approving, on behalf of the Debtors, the transactions at issue in the Actions.  No Party shall publicly claim that it has prevailed or succeeded in the Actions or characterize the terms of this Agreement as such, and no Party shall publicly refer to the amount of the Settlement Payment as evidence of the strength or viability or legitimacy of its claims or defenses; *provided, however,* that this shall not prevent any Party from referring to the actual terms of this Agreement in response to an inquiry about the Agreement. For the avoidance of doubt, the acknowledgement set forth in the first sentence of this Section 11 is made by the Debtors (and not the Committee or the Litigation Designees); and *provided, further,* if the Final Approval Date does not occur and the Settlement Amount is not paid, this acknowledgment will be of no force and effect and may not be cited, relied upon, or in any way used in connection with continued litigation of the Actions or otherwise.

12.    <u>Claim-Over Protections</u>.  As part of the Settlement Approval Order, the Committee, acting through the Litigation Designees and on behalf of the Debtors and their Estates shall seek the entry by the Bankruptcy Court of, and this Agreement is conditioned upon the entry of, a standard and customary order, in form and substance reasonably acceptable to the Parties, and effective as of the Final Approval Date, barring (a) any Public Shareholder Defendants that do not become Participating Public Shareholder Defendants and against whom the Public Shareholder Action is not therefore dismissed and (b) any other person or entity that the Sears Parties (or any Related Parties of any Sears Parties) have sued or may sue, or against whom the Sears Parties (or any Related Parties of any Sears Parties) have asserted or may otherwise assert a claim, and that is not a Party to this Agreement (each person or entity falling within clause (a) or clause (b), a "<u>Non-Settling Party</u>"), from asserting any claim for contribution, reimbursement or indemnification against any of the Original Action Defendants, the Participating Public Shareholder Defendants or any of the foregoing's Related Parties (collectively, a "<u>Settling Party</u>") arising out of, based on, in connection with or relating to any of the claims or allegations set forth in the Actions (a "<u>Claim-Over</u>") and providing for the Sears Parties to reduce any judgment or other recovery they may obtain against any such Non-Settling Party by the amount required under applicable law, calculated by reference to the proportionate share of fault attributable to the Settling Parties, to preclude the Non-Settling Party from asserting a Claim-Over (a "<u>Bar Order</u>"); *provided, however,* the Bar Order shall not apply to (i) any claim for contribution, reimbursement or indemnification that is based on a contract entered into by a Non-Settling Party with a Settling Party providing for such contribution, reimbursement or indemnification by the Settling Party; (ii) any claim for which a court determines joint liability does not exist as a matter of law, equity or fact as between any Non-Settling Party and any Settling Party; or (iii) any claims for contribution, reimbursement or indemnification asserted with respect to claims or causes of action that are brought by any person or entity other than the Sears Parties or any Related Parties of any Sears Parties.  For the avoidance of doubt, this Agreement is not and shall not be deemed or construed to be an admission or evidence that any Original Action Defendants or the Participating Public Shareholder Defendants, or any Related Parties of the foregoing, are joint tortfeasors with any Non-Settling Party or that any Original Action Defendants or Participating Public Shareholder Defendants share any liability with any Non-Settling Party.

13.    <u>Additional Seritage Payment</u>.  As further consideration for the Releases set forth in Section 7(a) above, and in full satisfaction and settlement of any and all claims or expenses arising from or relating in any way to the Seritage Defendants' role as landlord to any of the Debtors as tenants, including, but not limited to, (1) any claims by the Debtors relating to lease termination payments, including lease termination payments pursuant to that certain lease termination agreement, dated August 22, 2018, between Seritage SRC Finance LLC, Seritage KMT Finance LLC, and Sears Operations LLC and Kmart Operations LLC, and (2) any pre-petition or post-petition expense reimbursement obligations owed by the Seritage Defendants to the Debtors with respect to any of the properties leased by the Seritage Defendants to the Debtors, the Seritage Defendants will pay the Debtors $500,000 (the "<u>Additional Seritage Payment</u>").  For the avoidance of doubt, the Additional Seritage Payment shall be in addition to the payment of a portion of the Settlement Amount that the Seritage Defendants are making pursuant to Section 3 above and **Exhibit 6** hereto, and the Seritage Defendants shall make the Additional Seritage Payment at the same time as they pay their required portion of the Settlement Amount.

14.     <u>Representations and Warranties by the Debtors, the Litigation Designees and the Committee</u>.  Each of the Sears Parties represents and warrants that  (a) it has all corporate or other power and authority necessary to enable it to enter into this Agreement and carry out the transactions contemplated by this Agreement and to grant the releases and make the commitments specified in this Agreement; (b) all corporate or other actions necessary to authorize it to enter into this Agreement and to carry out the transactions contemplated by it have been taken and that each person executing this Agreement on its behalf has the authority to execute this Agreement on its behalf and to bind it to the terms of this Agreement; (c) the execution and performance of this Agreement does not and shall not conflict with or contravene any agreement, undertaking, commitment, or law or regulation by which it is bound or to which its assets or properties are subject; and (d) before executing this Agreement, (i) it has been fully informed of its terms, contents, conditions, and effects; (ii) it has had a full and complete opportunity to discuss this settlement with its attorney or attorneys; (iii) it is not relying in any respect on any statement or representation made by any other Party; and (iv) no promise or representation of any kind has been made to such Party separate and apart from what is expressly contained in this Agreement.

15.     <u>Representations and Warranties by the Original Action Defendants, the Participating Public Shareholder Defendants, and Transform</u>.  Each of the Original Action Defendants, Participating Public Shareholder Defendants, and Transform represents and warrants that (a) it has all corporate or other power and authority necessary to enable it to enter into this Agreement and carry out the transactions contemplated by this Agreement and to grant the releases and make the commitments specified in this Agreement; (b) all corporate or other actions necessary to authorize it to enter into this Agreement and to carry out the transactions contemplated by it have been taken and that each person executing this Agreement on its behalf has the authority to execute this Agreement on its behalf and to bind it to the terms of this Agreement; (c) the execution and performance of this Agreement does not and shall not conflict with or contravene any agreement, undertaking, commitment, or law or regulation by which it is bound or to which its assets or properties are subject; and (d) before executing this Agreement, (i) it has been fully informed of its terms, contents, conditions, and effects; (ii) it has had a full and complete opportunity to discuss this settlement with its attorney or attorneys; (iii) it is not relying in any respect on any statement or representation made by any other Party; and (iv) no promise or representation of any kind has been made to such Party separate and apart from what is expressly contained in this Agreement.

16.     <u>Governing Law</u>.  Except to the extent the Bankruptcy Code may control, this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York without giving effect to the conflicts of laws rules of the State of New York.

17.     <u>Forum</u>.  Each of the Parties hereto irrevocably consents to the exclusive jurisdiction of the state and federal courts situated in the State of New York to interpret and enforce this Agreement and to resolve any disputes relating to or concerning this Agreement.  The Parties further agree to submit any such dispute(s) to the Bankruptcy Court to the extent permitted under law.

18.     <u>Entire Agreement; Amendment</u>.  This Agreement, including the Exhibits hereto which are an integral part of this Agreement, constitutes the complete understanding between and among the Parties and any prior understandings and agreements with regard to subject matter of

16

this Agreement, written or oral, are superseded in their entirety. This Agreement cannot be altered, amended, or modified in any respect, except by a writing duly executed by all Parties.

19.    Waiver. The failure of any of the Parties to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Agreement or any part thereof or any right of any person thereafter to enforce each and every provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other breach.

20.    Nature of Releases. The Releases in this Agreement include an express, informed, knowing, and voluntary waiver and relinquishment of claims to the fullest extent permitted by law. The Parties acknowledge that they may have sustained damages, losses, costs, or expenses that are presently unknown and unsuspected and that such damages, losses, costs, or expenses as may have been sustained may give rise to additional damages, losses, costs, or expenses in the future. The Parties further acknowledge that they have negotiated this Agreement taking into account presently unasserted, unsuspected, and unknown claims, counterclaims, causes of action, damages, losses, costs, and expenses, and the Parties voluntarily and with full knowledge of its significance, expressly waive and relinquish any and all rights they may have under any state or federal statute, rule, regulation, or common law principle, in law or equity, relating to limitations on general release. Specifically, without suggesting that California law is applicable, each Party expressly waives any rights it may have under California Civil Code Section 1542 (and other similar statutory provisions) which provides that: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party."

21.    Construction of Terms, Headings. When necessary herein, all terms used in the singular shall apply to the plural, and vice versa, and all terms used in the masculine shall apply to the neuter and feminine genders, and vice versa. Unless the context of this Agreement clearly requires otherwise: (a) "or" has the inclusive meaning frequently identified with the phrase "and/or"; (b) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation"; and (c) references to "hereunder," "herein," "or "hereof" relate to this Agreement as a whole. The division of this Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

22.    Calculation of Days. In computing any period of time specified by the terms of this Agreement, the term "days" (unless specified otherwise) shall be deemed to refer to calendar days. If the last day of any period described in this Agreement is a Saturday, Sunday, or legal holiday, the period is extended to include the next day that is not a Saturday, Sunday, or legal holiday.

23.    Costs and Fees. Each Party shall bear its own attorneys' fees and costs relating to the negotiation and execution of this Agreement (but subject to the rights of the Sears D&O Defendants to obtain payment or reimbursement of their fees and costs from the Sears Insurers under the Sears Policies and subject to Section 8(c) above); *provided*, *however*, that nothing herein shall preclude any Estate professional, including any counsel or other professional for the Debtors, the Committee, or the Restructuring Subcommittee, or the Administrative Expense Claims

17

Representative or any of his professionals, from being paid or reimbursed for its fees and costs from the Debtors and the Estates pursuant to order of the Bankruptcy Court or, in the case of the Administrative Expense Claims Representative and his professionals, pursuant to ECF No. 7454. If any Party(ies) reasonably determines to file a motion or to commence an action to enforce the terms of this Agreement, however, the prevailing Party(ies) shall be entitled to seek an award, in addition to any other claims or damages, of its (their) reasonable costs and expenses including reasonable attorneys' fees, incurred in connection with such enforcement motion or action.

24.    <u>Waiver of Jury Trial</u>.  The Parties hereby waive any right to trial by jury in any action at law or in equity or in any other proceeding seeking to enforce or interpret the terms of this Agreement.

25.    <u>Joint Preparation</u>.  The Parties jointly prepared this Agreement.  Any rule of law or any other statute or legal decision or common law principle that would require interpretation of any term or alleged ambiguity in this Agreement against the person or entity who drafted this Agreement is of no application and hereby is expressly waived and disclaimed and may not be utilized or relied upon by any of the Parties.

26.    <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and their respective successors, endorsees, transferees, heirs, beneficiaries, and assigns.

27.    <u>Severability</u>.  If any provision of this Agreement is or may be held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall nonetheless survive and continue in full force and effect without being impaired or invalidated in any way.

28.    <u>Counterparts</u>.  It is understood and agreed that this Agreement may be executed in identical counterparts and may be transmitted by email or facsimile, each of which shall be deemed an original for all purposes.  The Parties agree that electronic signatures shall have the same force and effect as original signatures.

29.    <u>Notices</u>.  Any notices or communications relating to this Agreement shall be in writing and sent by electronic mail or overnight mail to the Parties through their counsel, as listed below.  Any Executing Party may change its address for notices and communications by supplying all Executing Parties with new contact information:

a.    Litigation Designees and the Committee

Ira S. Dizengoff (idizengoff@akingump.com)
David M. Zensky (dzensky@akingump.com)
Sara L. Brauner (sbrauner@akingump.com)
Dean Chapman (dchapman@akingump.com)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036

b.      Debtors

Ray C. Schrock, P.C. (Ray.Schrock@Weil.com)
Garrett A. Fail (Garrett.Fail@Weil.com)
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

c.      The Restructuring Subcommittee

Paul M. Basta (pbasta@paulweiss.com)
Kelley A. Cornish (kcornish@paulweiss.com)
Robert A. Britton (rbritton@paulweiss.com)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

d.      Original Action Defendants

Philip D. Anker (Philip.Anker@wilmerhale.com)
Noah Levine (Noah.Levine@wilmerhale.com)
Ryanne Perio (Ryanne.Perio@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Counsel for Edward Scott Lampert, ESL Institutional Partners L.P., ESL
Investments, Inc., ESL Investors, L.L.C., ESL Partners L.P., JPP II LLC,
and JPP LLC

Robert A. Sacks (sacksr@sullcrom.com)
Brian D. Glueckstein (gluecksteinb@sullcrom.com)
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Counsel for Steven Mnuchin

Sidney P. Levinson (slevinson@debevoise.com)
Erica S. Weisgerber (eweisgerber@debevoise.com)
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Counsel for Cascade Investment, L.L.C.

Brad Scheler (Brad.eric.scheler@friedfrank.com)
Scott Luftglass (Scott.luftglass@friedfrank.com)
Michael Keats (Michael.keats@friedfrank.com)
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Counsel for Seritage GS Holding LLC, Seritage Growth Properties,
Seritage Growth Properties, L.P., Seritage KMT Finance LLC, Seritage
KMT Mezzanine Finance LLC, Seritage MS Holdings LLC, Seritage SPS
Holdings LLC, Seritage SRC Finance LLC, and Seritage SRC Mezzanine
Finance LLC.

Evan R. Chesler (echesler@cravath.com)
J. Wesley Earnhardt (wearnhardt@cravath.com)
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
Counsel for Ann Reese, Paul DePodesta, and
William Kunkler

Gregory P. Joseph (gjoseph@jhany.com)
Rachel M. Cherington (rcherington@jhany.com)
Courtney A. Solomon (csolomon@jhany.com)
Joseph Hage Aaronson LLC
485 Lexington Avenue, 30th Floor
New York, NY 10017
(212) 407-1210
Counsel for Cesar L. Alvarez

Andrew J. Frackman (afrackman@omm.com)
Daniel S. Shamah (dshamah@omm.com)
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
(212) 326-2000
Counsel for Thomas Tisch and Benefit Street
2018, LLC

Mark J. Hyland (hyland@sewkis.com)
Paul M. Miller (millerp@sewkis.com)
Robert J. Gayda (gayda@sewkis.com)
Thomas Ross Hooper (hooper@sewkis.com)
Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
(212) 574-1200
Counsel for Bruce Berkowitz, Fairholme Capital Management, L.L.C.,
and Fairholme Funds, Inc.

Michael S. Shuster (mshuster@hsgllp.com)
Vincent Levy (vlevy@hgsllp.com)
Matthew Gurgel (mgurgel@hsgllp.com)
Holwell Shuster & Goldberg LLP
425 Lexington Avenue
New York, New York 10017
(646) 837-5151
Counsel for Kunal S. Kamlani

Chris Gair (cgair@gairlawgroup.com)
Jeffrey S. Eberhard (jeberhard@gairlawgroup.com)
Gair Eberhard Nelson Dedinas Ltd.
1 E. Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 600-4900
Counsel for Robert Riecker, Robert Schriesheim,
and Scott Huckins

Sawnie McEntire (smcentire@pmmlaw.com)
Robert Rosen (rrosen@pmmlaw.com)
Parsons McEntire McCleary
1700 Pacific Ave., Ste. 4400
Dallas, TX 75201
(214) 237-4303
Counsel for Cushman & Wakefield

Elliot Moskowitz (elliot.moskowitz@davispolk.com)
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY  10017
Counsel for Cushman & Wakefield

Andrew Devore (andrew.devore@ropesgray.com)
Timothy Farrell (timothy.farrell@ropesgray.com)
Ropes & Gray
800 Boylston Street
Boston, MA 02199
Counsel for Duff & Phelps, LLC

Eric R. Reimer (ereimer@milbank.com)
Tom Kreller (tkreller@milbank.com)
Andrew Leblanc (aleblanc@milbank.com)
Milbank LLP
55 Hudson Yards
New York, NY  10001
Counsel for Cyrus 1740 Master Fund, LP, Cyrus Special Strategies Master
Fund, LP, Cyrus Select Opportunities Master Fund, Ltd., Canary SC
Master Fund, LP, CRS Master Fund, LP, Cyrus Opportunities Master
Fund II, Ltd., CMH VI, LP, CYR Fund, LP, Canary SC Fund, LP,
Crescent 1, LP, and Cyrus Capital Partners, LP

Howard J. Kaplan (hkaplan@kaplanrice.com)
Michelle Rice (mrice@kaplanrice.com)
Kaplan Rice LLP
142 W 57th St,
New York, NY 10019
Counsel for Leena Munjal, Lawrence Meerschaert, and Joseph Jordan

e.      Participating Public Shareholder Defendants

Julia Frost-Davies (Julia.Frost-Davies@morganlewis.com)
John C. Goodchild, III (john.goodchild@morganlewis.com)
Morgan, Lewis & Bockius LLP
One Federal St.
Boston, MA 02110
Counsel for certain Participating Public Shareholder Defendants indicated
on Exhibit 1

William H. Gussman, Jr. (bill.gussman@srz.com)
Randall T. Adams (randall.adams@srz.com)
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Counsel for Lockheed Martin Corporation Master Retirement, Mason
Capital Management LLC, and S.A.C. Capital Associates, LLC (n/k/a
Point72 Associates, LLC)

C. Lee Wilson (clwilson@jonesday.com)

Jones Day
250 Vesey Street
New York, New York 10281
Counsel for QIC Limited as Trustee for the Queensland Investment Trust
No. 2 (incorrectly named in the public shareholder action as "QIT2 IE
DFA CORE MANDATE")

John B. Orenstein (JOrenstein@greeneespel.com)
Holley C.M. Horrell (hhorrell@greeneespel.com)
Greene Espel PLLP
222 South Ninth Street
Suite 2200
Minneapolis, MN 55402
Counsel for AQR Delta Fund, LP, AQR Delta Master Account, L.P., AQR
Delta Sapphire Fund, LP, and AQR Delta XN Fund, LP

Daniel Guyder (Daniel.Guyder@AllenOvery.com)
Justin Ormand (Justin.Ormand@AllenOvery.com)
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY 10020
Counsel for certain Participating Public Shareholder Defendants, as
indicated on Exhibit 1

Jack Yoskowitz (yoskowitz@sewkis.com)
Paul Koepp (koepp@sewkis.com)
Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
Counsel for certain Participating Public Shareholder Defendants, as
indicated on Exhibit 1

Honeywell, Robert T. (Robert.Honeywell@klgates.com)
K&L Gates LLP
599 Lexington Avenue
New York, New York 10022
Counsel for certain Participating Public Shareholder Defendants, as
indicated on Exhibit 1

Joseph T. Kelleher (JKelleher@stradley.com)
Keith R. Dutill (kdutill@stradley.com)
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Counsel for certain Participating Public Shareholder Defendants, as
indicated on Exhibit 1

James Miller (JDMiller@cahill.com)
Joel H. Levitin (JLevitin@cahill.com)
Michael J. Birnkrant (MBirnkrant@cahill.com)
Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005
Counsel for certain Participating Public Shareholder Defendants, as
indicated on Exhibit 1

f.       Administrative Expense Claims Representative

Erika L. Morabito (erikamorabito@quinnemanuel.com)
Brittany J. Nelson (brittanynelson@quinnemanuel.com)
Quinn Emanuel
1300 I Street
Suite 900
Washington, D.C. 20005

g.       Transform

Sean A. O'Neal (soneal@cgsh.com)
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

Such notices shall be deemed to have been served when received by the addressee.  Any Party
may give written notice of a change of address and, after notice of such change has been
received, any notice or request shall then be given to such Party as above provided at such
changed address.

[*Signatures on Following Pages*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**For Litigation Designees & Committee:**

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: _____
     Ira S. Dizengoff

*Counsel for Litigation Designees & Committee*

**For Debtors:**

**WEIL, GOTSHAL & MANGES LLP**

By: _____
     Ray C. Schrock, P.C.
     Garrett A. Fail

*Counsel for Sears Holdings Corporation, et al., Debtors and Debtors in Possession*

**For Restructuring Subcommittee:**

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: _____
     Robert A. Britton

*Counsel for the Restructuring Subcommittee*

**<u>For Edward Scott Lampert, ESL
Institutional Partners L.P., ESL Investments,
Inc., ESL Investors, L.L.C., ESL Partners
L.P., JPP II LLC, and JPP LLC:</u>**

**WILMER CUTLER PICKERING HALE
AND DORR LLP**

By: _____

    Philip D. Anker

*Counsel for Edward Scott Lampert, ESL
Institutional Partners L.P., ESL Investments,
Inc., ESL Investors, L.L.C., ESL Partners L.P.,
JPP II LLC, and JPP LLC*

**<u>For Steve Mnuchin:</u>**

**SULLIVAN AND CROMWELL LLP**

By: _____

    Robert A. Sacks

*Counsel for Steve Mnuchin*

**<u>For Cascade Investment, L.L.C.:</u>**

**DEBEVOISE & PLIMPTON LLP**

By: _____

    Sidney P. Levinson

*Counsel for Cascade Investment, L.L.C.*

**<u>For Seritage GS Holding LLC, Seritage Growth Properties, Seritage Growth Properties, L.P., Seritage KMT Finance LLC, Seritage KMT Mezzanine Finance LLC, Seritage MS Holdings LLC, Seritage SPS Holdings LLC, Seritage SRC Finance LLC, and Seritage SRC Mezzanine Finance LLC:</u>**

**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**

By: _____
     Michael C. Keats

*Counsel for Seritage GS Holding LLC, Seritage Growth Properties, Seritage Growth Properties, L.P., Seritage KMT Finance LLC, Seritage KMT Mezzanine Finance LLC, Seritage MS Holdings LLC, Seritage SPS Holdings LLC, Seritage SRC Finance LLC, and Seritage SRC Mezzanine Finance LLC*

**<u>For Ann Reese, Paul DePodesta, and William Kunkler:</u>**

**CRAVATH, SWAINE & MOORE LLP**

By: _____
     J. Wesley Earnhardt

*Counsel for Ann Reese, Paul DePodesta, and William Kunkler*

**For Cesar L. Alvarez:**

**JOSEPH HAGE AARONSON LLC**

By: _____

     Gregory P. Joseph

*Counsel for Cesar L. Alvarez*


**For Thomas Tisch and Benefit Street 2018, LLC:**

**O'MELVENY & MYERS LLP**

By: _____

     Andrew J. Frackman

*Counsel for Thomas Tisch and Benefit Street 2018, LLC*


**For Bruce Berkowitz, Fairholme Capital Management, L.L.C., and Fairholme Funds, Inc.:**

**SEWARD & KISSEL LLP**

By: _____

     Mark J. Hyland

*Counsel for Bruce Berkowitz, Fairholme Capital Management, L.L.C., and Fairholme Funds, Inc.*

**For Kunal S. Kamlani:**

**HOLWELL SHUSTER & GOLDBERG LLP**

By: _____
        Matthew Gurgel

*Counsel for Kunal S. Kamlani*

**For Robert Riecker, Robert Schriesheim, and Scott Huckins:**

**GAIR EBERHARD NELSON DEDINAS LTD**

By: _____
        Chris Gair

*Counsel for Robert Riecker, Robert Schriesheim, and Scott Huckins*

**For Cushman & Wakefield:**

**DAVIS POLK & WARDWELL LLP**

By: _____

     Elliot Moskowitz

*Counsel for Cushman & Wakefield*

**For Duff & Phelps, LLC:**

**ROPES & GRAY LLP**

By: _____

     Timothy Farrell

*Counsel for Duff & Phelps, LLC*

**For Cyrus 1740 Master Fund, LP, Cyrus Special Strategies Master Fund, LP, Cyrus Select Opportunities Master Fund, Ltd., Canary SC Master Fund, LP, CRS Master Fund, LP, Cyrus Opportunities Master Fund II, Ltd., CMH VI, LP, CYR Fund, LP, Canary SC Fund, LP, Crescent 1, LP, and Cyrus Capital Partners, LP:**

**MILBANK LLP**

By: _____

     Eric R. Reimer

*Counsel for Cyrus 1740 Master Fund, LP, Cyrus Special Strategies Master Fund, LP, Cyrus Select Opportunities Master Fund, Ltd., Canary SC Master Fund, LP, CRS Master Fund, LP, Cyrus Opportunities Master Fund II, Ltd., CMH VI, LP, CYR Fund, LP, Canary SC Fund, LP, Crescent 1, LP, and Cyrus Capital Partners, LP*

**For Leena Munjal, Lawrence Meerschaert,
and Joseph Jordan:**

**KAPLAN RICE LLP**

By: _____

    Howard J. Kaplan
    Michelle Rice

*Counsel for Leena Munjal, Lawrence
Meerschaert, and Joseph Jordan*

**For Administrative Expense Claims
Representative:**

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: _____

    Erika L. Morabito

*Counsel for the Administrative Claims
Representative*

**For Transform:**

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**

By: _____

    Sean A. O'Neal

*Counsel for Transform*

**<u>For certain Participating Public Shareholder Defendants (as indicated on Exhibit 1 to this Agreement):</u>**

**MORGAN, LEWIS & BOCKIUS LLP**

By: _____

    John C. Goodchild

*Counsel for certain Participating Public Shareholder Defendants, as indicated on Exhibit 1*

**<u>For certain Participating Public Shareholder
Defendants (as indicated on Exhibit 1 to this
Agreement):</u>**

**SCHULTE ROTH & ZABEL LLP**

By: _____

　　Randall T. Adams

*Counsel for Lockheed Martin Corporation
Master Retirement, Mason Capital
Management LLC, and S.A.C. Capital
Associates, LLC (n/k/a Point72 Associates,
LLC)*

**<u>For certain Participating Public Shareholder Defendants (as indicated on Exhibit 1 to this Agreement):</u>**

**JONES DAY**

By:  _____

     C. Lee Wilson

*Counsel for QIC Limited as Trustee for the Queensland Investment Trust No. 2 (incorrectly named in the public shareholder action as "QIT2 IE DFA CORE MANDATE")*

**For certain Participating Public Shareholder Defendants (as indicated on Exhibit 1 to this Agreement):**

**GREENE ESPEL PLLP**

By: _____

     John B. Orenstein

*Counsel for AQR Delta Fund, LP, AQR Delta Master Account, L.P., AQR Delta Sapphire Fund, LP, and AQR Delta XN Fund, LP*

**For certain Participating Public Shareholder Defendants (as indicated on Exhibit 1 to this Agreement):**

**ALLEN & OVERY LLP**

By: _____

    Daniel Guyder

*Counsel for certain Participating Public Shareholder Defendants, as indicated on Exhibit 1*

**<u>For certain Participating Public Shareholder
Defendants (as indicated on Exhibit 1 to this
Agreement):</u>**

**SEWARD & KISSEL LLP**

By: _____

     Jack Yoskowitz

*Counsel for certain Participating Public
Shareholder Defendants, as indicated on
Exhibit 1*

**<u>For certain Participating Public Shareholder
Defendants (as indicated on Exhibit 1 to this
Agreement):</u>**

**K&L GATES LLP**

By:    _____

    Robert T. Honeywell

*Counsel for certain Participating Public
Shareholder Defendants, as indicated on
Exhibit 1*

**<u>For certain Participating Public Shareholder Defendants (as indicated on Exhibit 1 to this Agreement):</u>**

**STRADLEY RONON STEVENS & YOUNG, LLP**

By: _____

    Joseph T. Kelleher

*Counsel for certain Participating Public Shareholder Defendants, as indicated on Exhibit 1*

**<u>For certain Participating Public Shareholder Defendants (as indicated on Exhibit 1 to this Agreement):</u>**

**CAHILL GORDON & REINDEL LLP**

By: _____

James Miller

*Counsel for certain Participating Public Shareholder Defendants, as indicated on Exhibit 1*

## EXHIBIT 1

List of Participating Public Shareholder Defendants

| Participating Public Shareholder Defendant | Settlement Payment Amount | Law Firm / Counsel |
|---|---|---|
| T. Rowe Price Associates, Inc. (on behalf of T. Rowe Price High Yield Fund, T. Rowe Price Institutional High Yield Fund; T. Rowe Price Funds SICAV - Global High Yield Bond Fund; T. Rowe Price U.S. Equities Trust; T. Rowe Price Total Equity Market Index Fund; and T. Rowe Price Extended Equity Market Index Fund) | $63,160.00 | Morgan, Lewis & Bockius LLP |
| Ori Uziel | $61,759.00 | Morgan, Lewis & Bockius LLP |
| Blackrock Asset Management Ireland Limited BlackRock Inc. The Bank of New York Mellon (International) Limited, as Trustee of the Blackrock iShares UK Equity Index Fund (UK) | $488,325.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw All Country Global Alpha Extension Portfolios, L.L.C. | $809.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw All Country Global Alpha Plus Special Fund, L.P. | $2,371.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw Kalon Portfolios, L.L.C. | $20,104.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw Oculus Portfolios, L.L.C. | $46,928.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw U.S. Broad Market Core Alpha Extension Portfolios, L.L.C. | $8,538.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw U.S. Broad Market Core Alpha Extension Special Portfolios II (MA), L.L.C. | $2,374.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw U.S. Broad Market Core Alpha Plus Special Fund, L.P. | $10,671.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw U.S. Large Cap Core Alpha Extension Portfolios, L.L.C. | $1,187.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw Valence Portfolios, L.L.C. | $129,943.00 | Morgan, Lewis & Bockius LLP |
| D. E. Shaw World Alpha Extension Portfolios, L.L.C. | $3,436.00 | Morgan, Lewis & Bockius LLP |
| Dekel Partners, L.P. Fine Offshore Partners, L.P. Fine Partners I, L.P. Noga Partners, L.P. Tapuz Partners, L.P. | $469,061.00 | Morgan, Lewis & Bockius LLP |
| Sculptor Domestic Partners II LP Sculptor Domestic Partners, LP Sculptor Capital Investments, LLC  (aka Sculptor Group fdba Och-Ziff Capital Management Group, LLC) Sculptor Capital Management, Inc. (fdba Och-Ziff Capital Management Group Inc., aka Oz Group) | $64,089.00 | Morgan, Lewis & Bockius LLP |
| Force Capital II LLC Force Capital II Ltd Force Capital Ltd Force Select Ltd | $177,582.00 | Morgan, Lewis & Bockius LLP |

| | | |
|---|---|---|
| The Vanguard Group, Inc., as Agent<br>Vanguard Balanced Index Fund<br>Vanguard Consumer Discretionary Index Fund<br>Vanguard Extended Market Index Fund<br>Vanguard Growth and Income Fund<br>Vanguard Institutional Total Stock Market Index Fund<br>Vanguard Large-Cap Index Fund<br>Vanguard Mid-Cap Index Fund<br>Vanguard Mid-Cap Index Portfolio<br>Vanguard Mid-Cap Value Index Fund<br>Vanguard Small-Cap Index Fund<br>Vanguard Small-Cap Value Index Fund<br>Vanguard Tax-Managed Capital Appreciation Fund<br>Vanguard Total Stock Market Index Fund<br>Vanguard Total Stock Market Index Trust<br>Vanguard Value Index Fund | $477,619.00 | Morgan, Lewis & Bockius LLP |
| MOST DIVERSIFIED PORTFOLIO SICAV - TOBAM ANTIBENCHMARK GLOBAL EQUITY FUND | $1,664.00 | Morgan, Lewis & Bockius LLP |
| MOST DIVERSIFIED PORTFOLIO SICAV - TOBAM ANTI-BENCHMARK US EQUITY FUND | $55,359.00 | Morgan, Lewis & Bockius LLP |
| MOST DIVERSIFIED PORTFOLIO SICAV - TOBAM ANTI-BENCHMARK WORLD EQUITY FUND | $24,441.00 | Morgan, Lewis & Bockius LLP |
| Omega Advisors Inc.<br>Omega Capital Investors, L.P.<br>Omega Capital Partners, L.P.<br>Omega Charitable Partnership, L.P.<br>Omega Equity Investors, L.P.<br>Omega Overseas Partners, Ltd | $107,288.00 | Morgan, Lewis & Bockius LLP |
| Karlin Holdings Limited Partnership | $154,829.00 | Morgan, Lewis & Bockius LLP |
| GSO Aiguille Des Grands Montets Fund I LP<br>GSO Aiguille Des Grands Montets Fund II LP<br>GSO Aiguille Des Grands Montets Fund III LP<br>GSO Cactus Credit Opportunities Fund LP<br>GSO Coastline Credit Partners LP<br>GSO Credit Alpha Trading (Cayman) LP<br>GSO Credit-A Partners LP<br>GSO Palmetto Opportunistic Investment Partners LP GSO Special Situations Fund LP<br>GSO Special Situations Master Fund LP<br>GSO Special Situations Overseas Fund Ltd<br>Steamboat Credit Opportunities Master Fund LP | $419,624.00 | Morgan, Lewis & Bockius LLP |
| Barclays Capital Inc.<br>Barclays Capital Securities Limited<br>Barclays Capital Derivative Funding | $154,841.00 | Morgan, Lewis & Bockius LLP |
| Fiam LLC<br>Jonathan Chiel, as Trustee of the Fidelity Concord Street Trust | $72,403.00 | Morgan, Lewis & Bockius LLP |
| Gothic HSP Corporation | $57,588.00 | Morgan, Lewis & Bockius LLP |
| First Trust Consumer Discretionary Alphadex® Fund | $40,661.00 | Morgan, Lewis & Bockius LLP |
| HBOS Final Salary Pension Scheme | $62,603.74 | Allen & Overy LLP |
| SAC Capital Associates, LLC (n/k/a Point72 Associates, LLC) | $259,842.75 | Schulte Roth & Zabel LLP |

| | | |
|---|---|---|
| Lockheed Martin Corporation Master Retirement Trust | $7,895.37 | Schulte Roth & Zabel LLP |
| MASON CAPITAL MGMT LLC | $82,899.15 | Schulte Roth & Zabel LLP |
| Kenden Alfond | $1,901.33 | Seward & Kissel LLP |
| AQR DELTA Fund, LP<br>AQR DELTA Master Account, L.P.<br>AQR DELTA Sapphire Fund, LP<br>AQR DELTA XN Fund, LP | $55,968.97 | Greene Espel PLLP |
| Credit Suisse First Boston | $1,893.57 | Cahill Gordon & Reindel LLP |
| Credit Suisse Funds AG | $531.71 | Cahill Gordon & Reindel LLP |
| Horizon Spin-off and Corporate Restructuring Fund | $11,160.70 | K&L Gates LLP |
| Kinetics Portfolio Trust | $142,275.67 | K&L Gates LLP |
| Luma Capital S.A. - SPF | $121,272.57 | K&L Gates LLP |
| Prescott Associates L.P.<br>Prescott General Partners LLC<br>Prescott International Partners L.P.<br>Prescott Investors, Inc. | $82,412.25 | K&L Gates LLP |
| Global Targeted Value Fund, a subfund of Dimensional Funds plc | $4,168.67 | Stradley Ronon Stevens & Young, LLP |
| U.S. Targeted Value Portfolio, a series of DFA Investment Dimensions Group Inc. | $1,325.78 | Stradley Ronon Stevens & Young, LLP |
| U.S. Core Equity 1 Portfolio, a series of DFA Investment Dimensions Group Inc. | $22,730.91 | Stradley Ronon Stevens & Young, LLP |
| U.S. Core Equity 2 Portfolio, a series of DFA Investment Dimensions Group Inc. | $33,445.69 | Stradley Ronon Stevens & Young, LLP |
| U.S. Sustainability Core 1 Portfolio, a series of DFA Investment Dimensions Group Inc. | $1,025.09 | Stradley Ronon Stevens & Young, LLP |
| U.S. Social Core Equity 2 Portfolio, a series of DFA Investment Dimensions Group Inc. | $906.10 | Stradley Ronon Stevens & Young, LLP |
| U.S. Large Cap Equity Portfolio, a series of DFA Investment Dimensions Group Inc. | $555.25 | Stradley Ronon Stevens & Young, LLP |
| VA U.S. Large Value Portfolio, a series of DFA Investment Dimensions Group Inc. | $1,169.35 | Stradley Ronon Stevens & Young, LLP |
| U.S. Vector Equity Portfolio, a series of DFA Investment Dimensions Group Inc. | $10,580.74 | Stradley Ronon Stevens & Young, LLP |
| Dimensional U.S. Core Equity 2 ETF, a series of Dimensional ETF Trust (into which T.A. U.S. Core Equity 2 Portfolio, a series of DFA Investment Dimensions Group Inc., was converted) | $9,032.20 | Stradley Ronon Stevens & Young, LLP |
| Dimensional U.S. Targeted Value ETF, a series of Dimensional ETF Trust (into which Tax-Managed U.S. Targeted Value Portfolio, a series of DFA Investment Dimensions Group Inc., was converted) | $239.87 | Stradley Ronon Stevens & Young, LLP |
| Dimensional U.S. Equity ETF, a series of Dimensional ETF Trust (into which Tax-Managed U.S. Equity Series, a series of DFA Investment Dimensions Group Inc., was converted) | $1,213.08 | Stradley Ronon Stevens & Young, LLP |
| QIC Limited as Trustee for the Queensland Investment Trust No. 2 (incorrectly named in the public shareholder action as QIT2 IE DFA CORE MANDATE) | $2,008.00 | Jones Day |
| **Total Settlement Payment from Participating Public Shareholder Defendants** | **$4,035,712.51** | |

## EXHIBIT 2

**Sears Insurers**

- XL Specialty Insurance Company

- QBE Insurance Corporation

- Lloyd's of London

- Beazley Group

- AXIS Insurance Company

- Illinois National Insurance Company

- American International Group UK Limited

- Berkshire Hathaway Specialty Insurance

- Hiscox Insurance Company, Inc.

- Allied World Assurance Company

- The Hartford, Navigators Insurance Company

- Westchester Fire Insurance Company

- Enstar (US) Inc. as claims administrator for Aspen American Insurance Company

- Allianz Global Risks US Insurance Company

- Swiss Re Corporate Insurance Solutions America Insurance Corporation f/k/a North American Specialty Insurance Company

- Enstar (UK) Inc. as claims administrator for Aspen Insurance UK Ltd.

- ACT

- Continental Casualty Company

- StartPoint,

- Argo Re Limited

- Validus Specialty (RT)

- Old Republic Insurance Company

## EXHIBIT 3

### Sears Policies

1. XL Policy No. ELU139030-15
2. QBE Policy No. QPL0045025
3. Lloyd's (Beazley) Policy No. FD1581481
4. AXIS Policy No. MCN738227/01/2015
5. Illinois National (AIG) Policy No. 01-309-63-06
6. Berkshire Hathaway Policy No. 47-XDA-301368-01
7. Lloyd's (Hiscox) Policy No. FD1581601
8. Allied World Policy No. 0308-3251
9. Illinois National (AIG) Policy No. 01-310-13-60
10. The Hartford (Navigators) Policy No. CH15DOL586634IV
11. Westchester Policy No. G2759699A 001
12. Aspen American Insurance Company Policy No. MCAA1K415
13. XL Policy No. ELU149912-17
14. Lloyd's (Beazley) Policy No. FSUSC1800413
15. Allianz Policy No. DOD2009095
16. NAS (Swiss Re) Policy No. DAX 2000102 00
17. Illinois National (AIG) Policy No. 01-423-10-78
18. Lloyd's (Hiscox and ACT) Policy No. FSUSC1802479
19. CNA Policy No. 596686796
20. Certain Underwriters of Lloyds, London, Aspen Insurance UK Ltd., and ACT Policy No. FSUSC1800410
21. Lloyd's (Hiscox and ACT) and AIG UK Policy No. FSUSC1800971
22. AXIS Policy No. MCN738227/01/2017
23. Argo Policy No. ARGO-ASIDE-17-001041.1
24. Lloyd's (Beazley), Aspen Insurance UK Ltd., ACT, Certain Underwriters of Lloyds, London, and AIG UK Policy No. FSUSC1801088
25. AIG UK and ACT Policy No. FSUSC1801090
26. Validus Policy No. PDX0000018
27. Old Republic Policy No. ORPRO 39488
28. Illinois National (AIG) Policy No. 01-423-04-29

**EXHIBIT 4**

| Related Party | Original Action Defendant |
|---|---|
| Andrew H. Tisch | Thomas J. Tisch |
| Daniel R. Tisch | Thomas J. Tisch |
| Trustee of the Andrew H. Tisch 10/10/2014 Annuity Trust | Thomas J. Tisch |
| Trustee of the DRT 12/5/13 Annuity Trust | Thomas J. Tisch |
| Trustee of the DRT 1/14/14 Annuity Trust | Thomas J. Tisch |
| JHT 12/5/13 Annuity Trust | Thomas J. Tisch |
| Trustee of the Thomas J. Tisch 1994 Issue Trust | Thomas J. Tisch |
| Kenden Alfond* | Fairholme Capital Management |
| Luma Capital S.A.-SPF* | Fairholme Capital Management |
| Perceval Investment Partners, L.P. | Fairholme Capital Management |
| SFM Capital Markets, L.P. | Fairholme Capital Management |
| Timothy F. Palmer | Fairholme Capital Management |

* Related Party is contributing to Public Shareholder Payment per Exhibit 1

## **EXHIBIT 5**

**Payment by wire:**

    Payee on the wire instructions: Sears Holdings Corporation

    Account Title:  Sears Holdings Corporation
                    Wind-Down Account
    Address: 1700 Broadway, 19th Floor
          New York, New York 10019

    Account Number: 4686303281

    Wire Domestic/Intl Routing: 041000124
    SWIFT Code: PNCCUS33 (International Wires)

    Bank Address:  PNC Bank
               500 First Avenue
               Pittsburgh, PA 15219

    Memo of the payment: Global Settlement and [name of payor in Settlement Agreement]

    **In advance** of making the wire payment, please call Antonio Concolino (212) 202-2267 to verbally confirm the wire instructions.

**Payment by check:**

    Make the check payable to: Sears Holdings Corporation

    Memo of the check: Global Settlement and [name of payor in Settlement Agreement]

    Mailing Address[1]:    M3 Advisory Partners, LP
                        c/o Mary Korycki
                        1700 Broadway, 19th Floor
                        New York, NY 10019

---

[1]     M3 Advisory Partners, LP was formerly known as and retained in the case as M-III Advisory Partners, LP [ECF 814].

**EXHIBIT 6**

| PARTY[1] | DOLLAR AMOUNT OF SETTLEMENT PAYMENT (EXCLUDING ANY PAYMENT OF DEFICIT) TO BE PAID | PERCENTAGE OF ANY DEFICIT TO BE PAID |
|---|---|---|
| | | |
| Sears Insurers | 125,625,000 | 75.00 |
| Cushman & Wakefield, Inc. | 1,000,000 | 0.60 |
| ESL Institutional Partners L.P., ESL Investments, Inc., ESL Investors, L.L.C., ESL Partners L.P., JPP LLC, and/or JPP II, LLC | 3,000,000 | 1.80 |
| Fairholme Capital Management, LLC | 1,750,000 | 1.04 |
| Seritage Defendants | 34,375,000 | 20.52 |
| Thomas J. Tisch | 1,750,000 | 1.04 |

---

[1]     Other than the portion of the Settlement Payment to be paid by the Sears Insurers on behalf of all the Original Action Defendants that were directors and/or officers of the Debtors, no Original Action Defendants not listed on this Exhibit will be responsible for payment of any portion of the Settlement Payment.

## **EXHIBIT 7**

**Formula for calculation of each Participating Public Shareholder Defendant's Allocable Portion of the Public Shareholder Payment**, based on the information provided in each Participating Public Shareholder Defendant's Certification:

- For every one (1) share of Lands' End Inc. received by the applicable Participating Public Shareholder Defendant in connection with the transfers alleged in the Public Shareholder Action, a settlement payment of $0.651810 shall be made.

- For every one (1) subscription right of Seritage Growth Properties received by the applicable Participating Public Shareholder Defendant in connection with the transfers alleged in the Public Shareholder Action, a settlement payment of $0.083972 shall be made.

## EXHIBIT 8

## FORM OF JOINDER TO SETTLEMENT AGREEMENT

The undersigned hereby enter(s) into this Joinder to Settlement Agreement ("Joinder"), whereby it/they agree(s) to become a Participating Public Shareholder Defendant party to the Settlement Agreement, dated as of _____ (the "Agreement"), for all purposes thereunder. Capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement. In consideration for the promises and agreements set forth in the Agreement, the undersigned agree(s) as follows:

Payment of Allocable Portion.  The undersigned shall pay its/their Allocable Portion of the Public Shareholder Payment, in the amount of AMOUNT ($_____), within five (5) days after the Settlement Approval Date, in accordance with Sections 3(d) of the Agreement.

Certification.  For purposes of determining its Allocable Portion (based on the formula set forth in Exhibit 7 to the Agreement), the undersigned certify/certifies that it/they received the following securities in connection with the transfers that are alleged in the Public Shareholder Action to be avoidable:

| Lands' End Shares | Seritage Growth Properties Subscription Rights |
|---|---|
|  |  |

Reservation of Rights.  For the avoidance of doubt, this Joinder shall not take effect, and the undersigned shall not constitute a Participating Public Shareholder Defendant, until it has paid its Allocable Portion of the Public Shareholder Payment.

Reaffirmation.  Except as provided herein, all other terms and provisions of the Agreement remain in full force and effect without modification.

Dated: _____, 2022.

[ENTITY NAME]

By: _____
          Name:
          Title:

**on behalf of Public Shareholder Defendant(s):**

[ENTITY NAME]
[ENTITY NAME]
[ENTITY NAME]

## **EXHIBIT 9**

Notwithstanding anything to the contrary contained in the Agreement, and subject to and conditioned on the occurrence of the Final Approval Date, the following matters at issue between Transform and its Related Parties, on the one hand, and the Debtors and the Estates, on the other hand, shall be settled and resolved on the following terms:

1.  The appeal currently pending in the United States Court of Appeals for the Second Circuit captioned *Transform Holdco LLC v. Sears Holding Corporation*, Case No. 22-1249, concerning approximately $6.3 million in escrowed funds shall be resolved as follows: Transform shall be entitled to $1.0 million of the funds held by the Debtors in escrow, which shall be turned over to Transform no later than five (5) business days following the Final Approval Date, and the Debtors shall be entitled to the remaining funds in such escrow account. Transform and the Debtors shall take all reasonably necessary actions to effect this division of the funds in escrow, to obtain extensions of any briefing deadlines in the appeal pending the occurrence of the Final Approval Date, and to cause the withdrawal of the appeal as soon as reasonably practicable after the occurrence of the Final Approval Date.

2.  The administrative expense claim asserted by Oracle Corporation (and/or one or more affiliates thereof) ("Oracle") against Transform and/or the Debtors in the approximate amount of $1.3 million (Claim No. 20588) shall be handled as follows: The parties have reached an agreement in principle to resolve this matter under which Transform will pay Oracle $350,000 (in three installments) and the Debtors will pay Oracle $375,000. The Debtors will file a stipulation on notice of presentment with the Bankruptcy Court for approval of this resolution of Claim No. 20588. Subject to final documentation and court approval, both Transform and the Debtors reserve all rights with respect to amounts claimed to be owed by Oracle against Transform and/or the Debtors.

3.  The following vendors have asserted that they are owed money for goods or services provided post-petition in the following approximate amounts: Colonial Properties, $30,000; Fox Run, $30,000; and Covington Gallery, $5,000. Transform reserves the right to dispute some or all of the charges, but acknowledges that to the extent these amounts are owed to these vendors, Transform is responsible for the payments.

4.  Any right to participate in (and to share in any recovery from) that certain class action captioned as *In re: Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, N.D. Ala. Master File No. 2:13-cv-20000-RDP, or in (and to share in any recovery from) any related claims that have been or may be asserted by Transform or the Debtors against the defendant(s) to the extent that Transform or the Debtors opt out of the class, shall be allocated on a 50/50 basis between Transform and the Debtors. Transform and the Debtors shall, in good faith, coordinate on any filings, any retention of counsel, and the strategy for the pursuit of their claims in the class action (or in any related potential litigation to the extent that they elect, after consulting and coordinating with each other, to opt-out of the class). All reasonable out-of-pocket costs incurred from and after the Final Approval Date in the pursuit of such claims, including any reasonable fees of counsel whose retention the Debtors and Transform agree upon, shall be allocated on a 50/50 basis between Transform

and the Debtors; *provided, however*, such fees incurred from and after the Final Approval Date to be so allocated on a 50/50 basis shall be limited to those of counsel retained by the Debtors and Transform for the specific purpose of pursuing these claims and shall not include the fees (or costs) of or incurred by counsel representing Transform or the Debtors in the Bankruptcy Cases.  For the avoidance of doubt, each of Transform and the Debtors shall be responsible for all fees and other costs as it may have incurred or may incur prior to the Final Approval Date with respect to this action and all fees and costs relating to the action that it may incur from and after the Final Approval Date that are not expressly provided to be allocated on a 50/50 basis between them as specified in this paragraph.

5.      The Debtors shall execute (and/or file) such documents as may be reasonably requested by Transform to transfer to Transform all rights with respect to any software licenses granted to one or more of the Debtors by ASG Technologies Group, Inc. (and/or one or more affiliates thereof) ("ASG"), provided that ASG consents to such transfer.

6.      Transform shall have all rights with respect to the parcel of land located at 13 Beverly Road, Hoffman Estates, (Property Index Number (PIN) 06-05-200-010-0000) (the "Hoffman Estates Parcel").  To the extent reasonably requested by Transform, the Debtors shall execute and deliver (or file, as requested by Transform) such documents as may be necessary or appropriate to evidence the transfer of title to, and all such rights, in the Hoffman Estates Parcel to Transform.  Transform shall be responsible for the payment of all real estate taxes with respect to the Hoffman Estates Parcel for all periods from and after the closing of the Sale Transaction.

7.      Transform shall not bill the Debtors for the transition services it has provided to the Debtors for the period from and including April 1, 2022, through and including the Execution Date under that certain Services Agreement, dated as of February 11, 2019, by and between Sears Holding Corporation, on the one hand, and Transform Holdco LLC and Transform SR Holdings LLC, on the other hand (as it has been amended from time to time, the "TSA").  Transform shall also continue to provide transition services reasonably requested by the Debtors, in accordance with the TSA but without charge to the Debtors, for the period after the Execution Date through and including December 31, 2022, up to a cap for the services of $10,000 per month (as calculated in accordance with the TSA, the Sale Order and that certain Settlement Agreement by, between and among Transform and the Debtors dated September 17, 2020 (the "TSA Settlement Agreement").  To the extent that the Debtors (a) request that Transform provide transition services under the TSA in excess of $10,000 per month for the period from the after the Execution Date through and including December 31, 2022, or (b) continue to request that Transform provide transition services under the TSA from and after January 1, 2023, Transform shall be entitled to charge the Debtors for those services in accordance with the TSA, the Sale Order and the TSA Settlement Agreement. For the avoidance of doubt, to the extent that the TSA obligates the Debtors to indemnify Transform in connection with services provided by Transform for the Debtors under the TSA, those indemnification obligations shall continue in effect.

8.      The Asset Purchase Agreement, the Sale Order, and subsequent orders entered by the Bankruptcy Court[1] provided for the Debtors' assumption and assignment to Transform of the lease for store number 1722 located at 2000 N E Court, Bloomington, Minnesota (the "Mall of America Lease") and that the Mall of America Lease was an "Acquired Asset" under the APA.  However, the lessor objected to that assumption and assignment, and appealed the Bankruptcy Court's orders providing for that assumption and assignment. The lessor's challenges to the assumption and assignment are the subject of a petition for certiorari that the U.S. Supreme Court has granted.  In light of this, the Debtors and Transform acknowledge and agree to the following:  Transform reserves all rights to obtain the assignment of the Mall of America Lease, including all such rights arising under or based on the Asset Purchase Agreement, the Sale Order, the Assumption and Assignment Order, the MOAC Assumption and Assignment Order, the Bankruptcy Court's *Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors and (II) Granting Related Relief* (ECF No. 5370) (the "Confirmation Order"), and the *Debtors' Modified Second Amended Joint Chapter 11 Plan of Sears Holding Corporation and Its Affiliated Debtors* (ECF No. 5293) (as amended, supplemented, or modified, the "Plan"), and any related orders, notices or other filings in the Bankruptcy Cases or in any related appellate proceedings.  In the event, however, that as a result of a final, non-appealable order entered by a court of competent jurisdiction Transform is unable to obtain the assignment of the Mall of America Lease (a "Denial Order"), Transform acknowledges and agrees that it will not be entitled to an adjustment in (and the repayment by the Debtors of any of) the consideration Transform paid to the Debtors under the APA (or the consideration it is paying to the Debtors under this Settlement Agreement).  The Debtors agree to execute any documents and to take any actions that Transform may reasonably request to effect the assignment of the Mall of America Lease to Transform or its designee and/or to allow Transform to obtain the economic benefits that the Debtors and Transform intended that Transform obtain from its acquisition of the Mall of America Lease.  Transform shall be responsible for all reasonable fees and out-of-pocket costs incurred by the Debtors in connection with the foregoing.  Any economic consideration that the Debtors or Transform may be able to obtain for the Mall of America Lease shall belong to and shall be turned over to Transform.

---

[1]      *Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* (ECF. No. 3008) (the "Assumption and Assignment Order"), and *Order (I) Authorizing Assumption and Assignment of Lease with MOAC Mall Holdings LLC and (II) Granting Related Relief entered in the Bankruptcy Cases* (ECF No. 5074) (the "MOAC Assumption and Assignment Order").

**Exhibit B**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
In re                                                   :      Chapter 11
                                                        :
**SEARS HOLDINGS CORPORATION**, *et al.*,               :      **Case No. 18-23538 (RDD)**
                                                        :      **(Jointly Administered)**
        Debtors.[1]                                     :
------------------------------------------------------- x
Sears Holding Corp., *et al.*                           :
                                                        :
        **Plaintiffs**                                  :
    vs.                                                 :
Edward Scott Lampert, *et al.*                           :
                                                        :
        **Defendants.**                                 :      **Consolidated at**
------------------------------------------------------- x      **Adv. Pro. 19-08250 (RDD)**
Sears Holdings Corporation, *et al.*.                   :
                                                        :
        **Plaintiffs**                                  :
    vs.                                                 :
Andrew H. Tisch, *et al.*                                :
                                                        :
        **Defendants.**                                 :
------------------------------------------------------- x

### ORDER APPROVING JOINT MOTION OF DEBTORS AND
### OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR
### ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENTS, GRANTING
### RELATED RELIEF AND AUTHORIZING CERTAIN NONMATERIAL PLAN
### MODIFICATIONS IN FURTHERANCE OF THE EFFECTIVE DATE OF THE PLAN

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is c/o M-III Partners, LP, 1700 Broadway, 19th Floor, New York, NY 10019.

Upon the motion (the "Motion")[2] of the Debtors and the Creditors' Committee, for entry of an order pursuant to sections 105(a), 363, 1127(b) and (c) and 1129 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking approval of the Settlement Agreements, the grant of certain related relief and authorization to make the Plan Modifications, having found that the Plan Modifications are not material and do not have an adverse effect on creditors who voted in favor of the Plan; and determining that further disclosure and re-solicitation of votes are not required, all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion having been provided in accordance with the Amended Case Management Order, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and is in the best interests of the Debtors, the Estates, their creditors and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or, if not defined in the Motion, in the Settlement Agreement.

1.       The Motion is granted.  All responses and objections not withdrawn or resolved by this Order are overruled in all respects.

2.       The Settlement Agreement is approved under Bankruptcy Code section 363 and Bankruptcy Rule 9019, and the Debtors, the Creditors' Committee and the Litigation Designees are authorized to enter into and perform under the Settlement Agreement.

3.       The Parties are authorized to take any action as may be necessary or appropriate to implement, effectuate and fully perform under the Settlement Agreement in accordance with this Order, including without limitation to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement, effectuate and fully perform under the Settlement Agreement in accordance with this Order, including making distributions in accordance with the terms of the Settlement Agreement and the Plan.

4.       The Consolidated Adversary Proceeding is stayed pending the occurrence of the Final Approval Date (as defined in the Settlement Agreement).

5.       The Second Lien Notes Settlement is approved under Bankruptcy Code section 363 and Bankruptcy Rule 9019.  Wilmington Trust shall, as soon as reasonably practicable after the Final Approval Date and upon receipt of the Second Lien Notes Settlement Payment, withdraw its Second Circuit 507(b) Appeal.  As soon as reasonably practicable after the Final Approval Date, the Debtors shall withdraw their claims as against Wilmington Trust in the Section 506(c) Appeal.

6.       The *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Code Sections 105, 362, 364, and 1142 and Bankruptcy Rules 3020(D), 4001 and 9014 Authorizing Entry by the Debtors' Estates into the Litigation Funding Arrangement with Bench Walk 21p, L.P.* [ECF No. 10407] is stayed pending the occurrence of the Final Approval Date.

7.      The Mediation is continued pending occurrence of the Final Approval Date.

8.      The Plan Modifications comply with Bankruptcy Code section 1127.

9.      The Plan, as modified, complies with Bankruptcy Code sections 1122, 1123 and 1129.

10.     The Confirmation Order applies to the Plan as modified by this Order.

11.     Any holder of a claim that has accepted the Plan is deemed to have accepted the Plan, as modified, and such creditor shall not have the opportunity to change its previous acceptance.

12.     For the avoidance of doubt, (i) the Plan, Confirmation Order and Liquidating Trust Agreement, as applicable, govern the use and distribution of proceeds from the Settlement Agreement; and (ii) nothing in this Order or the Settlement Agreements impairs or modifies the priority of the PBGC Liquidating Trust Priority Interest under the Plan, the Confirmation Order and the Liquidating Trust Agreement, as applicable.

13.     The following provisions are hereby approved (the "Bar Order"):

a.      it is hereby ordered that all Non-Settling Parties are permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity, reimbursement, or contribution against any Settling Party, arising out of, based on, or in connection with or related to the claims or allegations set forth in the Actions (collectively, the "Barred Claims"). If a court or tribunal determines that Barred Claims exist that would have given rise to liability of any Settling Party to a Non-Settling Party Person but for this Bar Order, the Non-Settling Parties are also entitled to the judgment reduction provisions set forth herein; and it is further

b.      ordered that in the event any Sears Party (or any Related Parties of any Sears Parties) asserts or continues to assert a claim (a "Sears Plaintiff") against any Non-Settling Party arising out of, based on, or in connection with the claims or allegations set forth in the Actions (such claim, a "Continued Action"), then, prior to entry of any judgment or arbitration award ("Judgment") in the Continued Action, the Sears Plaintiff shall provide

4

notice of this Bar Order to the court or tribunal presiding over the Continued Action.  Such court or tribunal shall determine whether the Continued Action gives rise to Barred Claims on which Settling Parties would have been liable to the Non-Settling Parties in the absence of this Bar Order.  If the court or tribunal so determines, it shall reduce any Judgment against such Non-Settling Party in an amount equal to (a) the amount of the Judgment against any such Non-Settling Party times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Settling Party or Parties that would have been liable on a Barred Claim in the absence of this Bar Order expressed as a percentage of the aggregate fault of (i) the Non-Settling Party, (ii) such Settling Party or Parties, and (iii) all other persons, parties, or entities determined by such court or tribunal to be liable to the Non-Settling Party in connection with the Continued Action, whether or not such persons, parties, or entities are sued in such Continued Action.  Nothing herein shall prejudice or operate to preclude the right of any defendant in such Continued Action to (i) provide notice of this Bar Order to the court or tribunal presiding over the Continued Action at any point or (ii) raise any issues, claims, or defenses regarding judgment reduction or proportionate share of fault in the court or tribunal presiding over the Continued Action at any point in accordance with applicable law or procedure and this Bar Order.  For the avoidance of doubt, nothing herein shall be deemed to entitle a Sears Plaintiff to more than a single satisfaction of the loss or liability; and it is further

c.      ordered that nothing herein shall prejudice or operate to preclude the rights of any Non-Settling Party to assert any claims or causes of action (including, without limitation, any direct or personal claims or causes of action), other than claims for non-contractual indemnity, reimbursement, or contribution against any Settling Party as set forth above.  For the avoidance of doubt, the provisions of this Bar Order, including the judgment reduction provisions set forth herein, shall not apply to (i) any claim for contribution, reimbursement or indemnification that is based on a contract entered into by a Non-Settling Party with a Settling Party providing for such contribution, reimbursement or indemnification by the Settling Party; (ii) any claim for which a court determines joint liability does not exist as a matter of law, equity, or fact as between any Non-Settling Party and any Settling Party; or (iii) any claims for non-contractual indemnity, reimbursement, or contribution asserted with respect to claims or causes of action that are brought by any persons, parties or entities other than a Sears Party (or any Related Party of a Sears Party); and it is further

d.      ordered that if any Sears Plaintiff enters into a settlement with any Non-Settling Party with respect to one or more claims arising out of, based on, or in connection with or related to the claims or allegations set forth in the Actions, then such Sears Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release, and waiver of any Barred Claims with respect to such settlement; and it is further

     e.    ordered that each Sears Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Non-Settling Parties in any manner that fails to conform to the terms of this Bar Order, including, without limitation, the proportionate judgment reduction provision set forth herein; and it is further

     f.    ordered that this Court shall retain continuing jurisdiction with respect to all matters concerning this Bar Order, including, without limitation, hearing a petition for relief by a Non-Settling Party or any other party in interest in the event that a court or tribunal presiding over a Continued Action fails to apply the judgment reduction provisions of this Bar Order.

14.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

15.    Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

16.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order.

Dated: _____, 2022
      White Plains, New York

                         _____
                         THE HONORABLE ROBERT D. DRAIN
                         UNITED STATES BANKRUPTCY JUDGE