**Hearing Date and Time:  August 31, 2022 at 10:00 a.m. (Eastern Time)**
**Objection Deadline:  August 24, 2022 at 4:00 p.m. (Eastern Time)**

**FAEGRE DRINKER BIDDLE & REATH LLP**
James H. Millar, Esq.
Brian P. Morgan, Esq.
1177 Avenue of the Americas, 41st Floor
New York, New York, 10036-2714
Telephone: (212) 248-3184
Facsimile: (212) 248-3141
Email: James.Millar@faegredrinker.com
        Brian.Morgan@faegredrinker.com

*Counsel to Whitebox Multi-Strategy Partners, LP;*
*Whitebox Asymmetric Partners, LP; Hain*
*Capital Investors Master Fund, Ltd. and; Cherokee*
*Debt Acquisition, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | Case No. 18-23538 (RDD) |
| | (Jointly Administered) |
| **Debtors.**[1] | |

**NOTICE OF APPLICATION OF AD HOC GROUP OF**
**ADMIN CLAIMANTS PURSUANT TO 11 U.S.C. §§ 503(b)(1),**
**503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT**
**OF REASONABLE PROFESSIONAL FEES AND ACTUAL,**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

## NECESSARY EXPENSES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CHAPTER 11 CASES

**PLEASE TAKE NOTICE** that Whitebox Multi-Strategy Partners, LP, Whitebox Asymmetric Partners, LP, Hain Capital Investors Master Fund, Ltd., and Cherokee Debt Acquisition, LLC (collectively, the "Ad Hoc Group of Admin Claimants"), by and through their undersigned counsel, filed the *Application of Ad Hoc Group of Admin Claimants Pursuant to 11 U.S.C. §§ 503(b)(1), 503(b)(3)(D) and 503(b)(4) For Allowance and Reimbursement of Reasonable Professional Fees and Actual, Necessary Expenses in Making a Substantial Contribution in These Chapter 11 Cases* (the "Application").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Application will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge (the "Court") on August 31, 2022 at 10:00 a.m. (Eastern Time) (the "Hearing"), or as soon thereafter as counsel may be heard, provided that, pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("General Order M-543"), such Hearing shall be conducted via Zoom for Government® so long as General Order M-543 is in effect or unless otherwise ordered by the Court.[2]

**PLEASE TAKE FURTHER NOTICE** that copies of the Application may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.ra.kroll.com/sears. You may also obtain copies of any pleadings filed with the Court by visiting the Court's website at https://www.nysb.uscourts.gov and following the procedures and paying any fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Application (the "Objections") shall (i) be in writing; (ii) state the name and address of the

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m543-court-operations-under-exigent-circumstances-created-covid-19.

objecting party and nature of the claim or interest of such party; (iii) state with particularity the legal and factual bases of such objection; (iv) conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in accordance with General Order M-399 (available at www.nysb.uscourts.gov) by registered users of the Court's Electronic Case Filing system, and by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Court and General Order M-399, to the extent applicable; and (vi) be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures* [ECF No. 405], so as to be filed and received no later than **August 24, 2022 at 4:00 p.m. (Eastern Time)**.  The relief requested may be granted without a hearing if no Objection is timely filed and served.

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: August 10, 2022
      New York, New York

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Brian P. Morgan*
James H. Millar
Brian P. Morgan
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
Tel:  (212) 248-3140
Fax:  (212) 248-3141
James.Millar@faegredrinker.com
Brian.Morgan@faegredrinker.com

*Counsel to Whitebox Multi-Strategy Partners, LP; Whitebox Asymmetric Partners, LP; Hain Capital Investors Master Fund, Ltd. and; Cherokee Debt Acquisition, LLC*

**Hearing Date and Time:  August 31, 2022 at 10:00 a.m. (Eastern Time)**
**Objection Deadline:  August 24, 2022 at 4:00 p.m. (Eastern Time)**

**FAEGRE DRINKER BIDDLE & REATH LLP**
James H. Millar, Esq.
Brian P. Morgan, Esq.
1177 Avenue of the Americas, 41st Floor
New York, New York, 10036-2714
Telephone: (212) 248-3184
Facsimile: (212) 248-3141
Email: James.Millar@faegredrinker.com
            Brian.Morgan@faegredrinker.com

*Counsel to Whitebox Multi-Strategy Partners, LP;*
*Whitebox Asymmetric Partners, LP; Hain*
*Capital Investors Master Fund, Ltd. and; Cherokee*
*Debt Acquisition, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | Case No. 18-23538 (RDD) |
| **Debtors.**[1] | (Jointly Administered) |

## APPLICATION OF AD HOC GROUP OF ADMIN CLAIMANTS PURSUANT TO 11 U.S.C. §§ 503(b)(1), 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT OF REASONABLE PROFESSIONAL FEES AND ACTUAL, NECESSARY EXPENSES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CHAPTER 11 CASES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

JURISDICTION AND VENUE ........................................................................................... 3

RELIEF REQUESTED.......................................................................................................... 4

BACKGROUND ................................................................................................................... 4

    I.    The Chapter 11 Cases ................................................................................... 4

    II.    Sale to Transform Holdco.............................................................................. 5

    III.    The Plan ......................................................................................................... 5

    IV.    Ad Hoc Group of Admin Claimants' Plan Objection ............................... 6

    V.    The Ad Hoc Group of Admin Claimants' Substantial Contribution ..................... 7

    VI.    The Admin Claim Consent Program.................................................... 10

LEGAL ARGUMENT................................................................................................ 12

    A.    The Ad Hoc Group of Admin Claimants' Efforts Benefited the Debtors'
    Estates, Improved Creditor Recoveries, Safeguarded the Interests of All
    Creditors, and Were Not Duplicated by Any Other Constituents........................ 13

    B.    The Ad Hoc Group of Admin Claimants Took on a Leadership Role in
    These Chapter 11 Cases ............................................................................... 15

    C.    The Ad Hoc Group of Admin Claimants' Fees and Expenses are
    Reasonable, Necessary and Beneficial to the Debtors' Estates And Should
    Be Allowed. ............................................................................................ 16

        i.    These Chapter 11 Cases Present Complex Legal and Factual Issues ....... 17

        ii.    Foley's Fees and Expenses are Customary............................................. 17

    D.    Alternatively, The Ad Hoc Group of Admin Claimants Should be Granted
    a Claim Under Section 503(b)(1).......................................................... 18

CONCLUSION........................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re AMR Corp.*,
    Case No. 11-15463 (SHL), 2014 Bankr. LEXIS 3298 (Bankr. S.D.N.Y. Aug.
    5, 2014) ................................................................................................................................12

*In re Bayou Grp.*,
    431 B.R. 549 (Bankr. S.D.N.Y. 2010) ...............................................................................12

*In re Eagle-Picher Indus., Inc.*,
    447 F.3d 461 (6th Cir. 2006) ...............................................................................................18

*In re Hancock Street SML LLC*,
    Case No. 1–14–45491–nhl, 2016 WL 6271329 (Bankr. E.D.N.Y. Oct. 25,
    2016) ....................................................................................................................................12

*Microsoft Corp. v. DAK Indus., Inc.* (*In re DAK Indus., Inc.*),
    66 F.3d 1091 (9th Cir. 1995) ...............................................................................................18

*In re Tyson*,
    Case No. 03-41900, 2005 Bankr. LEXIS 3230 (Bankr. S.D.N.Y. June 3, 2005)...................18

*In re U.S. Lines, Inc.*,
    103 B.R. 427 (Bankr. S.D.N.Y. 1989), *aff'd*, No. 90 CIV. 3823 (MGC), 1991
    U.S. Dist. LEXIS 5262 (S.D.N.Y. Apr. 22, 1991)..............................................................12

STATUTES, RULES & REGULATIONS

11 U.S.C. § 105 ...........................................................................................................................3

11 U.S.C. § 503 ....................................................................................................................*passim*

11 U.S.C. § 1129 .....................................................................................................................5, 13

28 U.S.C. § 157 ...........................................................................................................................3

28 U.S.C. § 1334 .........................................................................................................................3

28 U.S.C. § 1408 .........................................................................................................................3

28 U.S.C. § 1409 .........................................................................................................................3

Fed. R Bankr. P. 1015(b) ............................................................................................................4

Fed. R Bankr. P. 2019 ..............................................................................................................6, 15

Whitebox Multi-Strategy Partners, LP, Whitebox Asymmetric Partners, LP, Hain Capital Investors Master Fund, Ltd., and Cherokee Debt Acquisition, LLC (collectively, the "Ad Hoc Group of Admin Claimants"), by and through their undersigned counsel, hereby move this Court (the "Application") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order") allowing as an administrative priority claim, and authorizing the Debtors to reimburse, the reasonable fees and expenses incurred by the Ad Hoc Group of Admin Claimants for making a substantial contribution in these chapter 11 cases.  In support of this Application, the Ad Hoc Group of Admin Claimants respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Ad Hoc Group of Admin Claimants has made a substantial contribution in these chapter 11 cases, including working with the Debtors and Official Committee of Unsecured Creditors (the "Committee") to conceive and negotiate the Admin Claims Consent Program (as defined below), whereby certain administrative creditors agreed to cap their claims at 75% of the allowed amount.  This contribution significantly and positively impacted the Debtors' ability to confirm a plan that ensures administrative claims are paid in full or as agreed to, and provides junior creditors with an opportunity to receive a distribution on account of their claims.  Without the settlements embodied in the Administrative Expense Claims Consent Program, the Priority Claim Consortium would not have supported the plan, rendering it far less likely that the Debtors would have been able to confirm a plan.  Indeed, had the Ad Hoc Group of Admin Claimants not expended considerable time, effort, and resources in negotiating and implementing a construct for all administrative claims, it is entirely possible the Debtors' cases would have converted to chapter 7 – a disastrous result for the Debtors' estates and all of their stakeholders.

- 1 -

2.      After several months of working to understand the financial, operational, and legal issues facing the Debtors, including without limitation, attending and taking depositions of the Debtors' confirmation witnesses, nearly daily correspondence and conferences with the Debtors' legal and financial advisors, discussions on the plan and confirmation with the Debtors' and Committee's representatives, and dispersing information, where and when appropriate, to various other administrative claim holders for purposes of building a global consensus, the Ad Hoc Group of Admin Claimants, along with the Debtors and Committee, constructed and agreed to the Administrative Expense Claims Consent Program (the "Admin Claim Consent Program"). This Court has previously recognized that the Ad Hoc Group of Admin Claimants "served as the fulcrum point for the negotiations." *See In re Sears Holding Corp.*, Case No. 18-2353 (RDD) Hr'g Tr. 77:4-8 (Bankr. S.D.N.Y. Jan. 3, 2019) ("1/21/21 Tr.") which is annexed hereto as Exhibit B.

3.      The Admin Claim Consent Program contains several mechanisms both with respect to process and substance that provided all parties with the ability to make a meaningful choice with respect to its claims, while allowing the plan to go effective in a much shorter time than would have possible had the Admin Claim Consent Program not been proposed and approved.

4.      Simply stated, without the meaningful and hard-fought work of the Ad Hoc Group of Admin Claimants, the prospect of paying any significant recovery to allowed administrative claims in any realistic time frame was in serious doubt. Indeed, the Court itself took "additional comfort" that the Admin Claim Consent Program would allow the plan to go effective more quickly than had it not been proposed. *See In re Sears Holding Corp.*, Case No. 18-2353 (RDD) Hr'g Tr. 180:6-11 (Bankr. S.D.N.Y. Oct. 7, 2019) ("10/7/19 Tr.") which is annexed hereto as Exhibit C. In essence, the Bankruptcy Code section on substantial contribution was designed to

award those parties – such as the Ad Hoc Group of Admin Claimants – that worked in exactly the circumstances present here and for those without the financial wherewithal to do so alone.

5.      This case presents but one example of the benefits that trade claim buyers can bring to the Chapter 11 process. Only the Ad Hoc Group of Admin Claimants had the critical mass, restructuring experience, and flexibility to negotiate a compromise that would cap their administrative claims (and those of others opting into similar treatment) to obtain confirmation in a tough case for the benefit of all stakeholders.  As a result of the Ad Hoc Group of Admin Claimants' contribution, together with the efforts of the Debtors, the Committee and their respective professionals, the Plan (as hereafter defined) was confirmed and is on the verge of going effective.[2]

6.      For these reasons, the Ad Hoc Group of Admin Claimants is entitled to allowance and reimbursement of its reasonable professional fees and necessary expenses in making a substantial contribution to these chapter 11 cases.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider this Application under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The predicates for the relief requested herein are sections 105 and 503 of title 11 of the United States Code (the "Bankruptcy Code").

---

[2] While the Ad Hoc Group of Admin Claimants could have sought reimbursement for their efforts immediately after confirmation, they intentionally delayed the filing of this Motion until it was clear that administrative claims would be satisfied (through payment in full or subject to an agreed-upon cap, as applicable).

## RELIEF REQUESTED

9.      Pursuant to Sections 503(b)(1), 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, the Ad Hoc Group of Admin Claimants seeks entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, allowing as administrative priority claims, and authorizing the Debtors to reimburse, the reasonable fees and expenses incurred by the Ad Hoc Group of Admin Claimants for making a substantial contribution in these chapter 11 cases for the period from July 9, 2019 through and including appointment of and transition to the Administrative Expense Claims Representative, in the amount of $750,000.00.  The Debtors supported the relief requested herein.

## BACKGROUND

### I.      The Chapter 11 Cases

10.     The Debtors commenced voluntary cases under chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") beginning on October 15, 2018, in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").

11.     On October 16, 2018, the Court entered an order administratively consolidating the Debtors' bankruptcy cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") [ECF No. 118].

12.     On October 24, 2018, the United States Trustee appointed the Official Committee of Unsecured Creditors.

- 4 -

## II.    Sale to Transform Holdco

13.    On January 17, 2019, with their cash runway evaporating, the Debtors entered into an Asset Purchase Agreement (the "APA") with Transform Holdco LLC ("Transform"), to sell substantially all of the Debtors' remaining operating assets (the "Sale Transaction").

14.    On February 8, 2019, the Court entered an order approving the Sale Transaction which closed on February 11, 2019.

15.    Almost immediately after closing, the Debtors and Transform began to dispute their respective understandings of provisions in the APA that governed the payment of certain obligations, including, among other things, the timing and payment of 503(b)(9) and 503(b)(1) claims and severance obligations (the "Transform Dispute").

16.    Whereas, prior to the Transform Dispute, the Debtors' ability to confirm a plan in which administrative claims were paid in full was already on thin ground, the Transform Dispute caused delays and additional expenses that made clear that the Debtors' had very little or no ability to confirm a plan that satisfied Bankruptcy Code section 1129.

## III.    The Plan

17.    On July 9, 2019, the Debtors filed the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors  [ECF No. 4476] (the "Plan"), along with the corresponding Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors [ECF No. 4478].

18.    The Plan contained nothing more than a restatement of the Bankruptcy Code provision on the treatment of Administrative Expense Claims, *to wit*, – if an Administrative Expense Claim is Allowed on the Effective Date, that claim will be paid on the Effective Date. *See* Plan § 2.1(a); 11 U.S.C. §1129(a)(9)(A).  The Plan was silent as to how the Debtors intended

- 5 -

to get to a relatively short effective date given the significant administrative insolvency, only worsened by the Transform Dispute and delays in monetizing other assets (including the ESL litigation). Due to the delays in monetizing assets, the Debtors were expected to pursue strategies that might allow confirmation, but delay the effective date or delay payments on administrative claims beyond the effective date.

19.     Moreover, the Plan contained provisions which would have set aside significant monies – otherwise available to administrative claims – to fund (a) a litigation trust to pursue various insider and other claims for the benefit of unsecured creditors, and (b) various reserves (on a very conservative basis to cover potential downside scenarios).

## IV.    **Ad Hoc Group of Admin Claimants' Plan Objection**

20.     On July 9, 2019, the same day the Plan was filed, Foley & Lardner LLP ("Foley")filed the Verified Statement of Foley & Lardner LLP Pursuant to Bankruptcy Rule 2019 [ECF No. 4490] (the "Foley 2019 Statement"), in which Foley disclosed its representation of the parties in the Ad Hoc Group of Admin Claimants and stated that the parties have formed an *ad hoc* group of 11 U.S.C. § 503(b)(9) claimants that has retained Foley to represent it. Foley's representation was led by Ms. Erika Morabito.[3]

21.     On August 2, 2019, the Ad Hoc Group of Admin Claimants filed its objection to the Plan [ECF No. 4721] (the "Objection"). In the Objection, the Ad Hoc Group of Admin Claimants recognized that given the facts on hand at the time the Plan was filed, there was a significant shortfall in the Debtors' ability to pay administrative trade claims on an effective date

---

[3] Lead counsel for the Ad Hoc Vendor Group, Erika L. Morabito, Esq., has since changed firms. Ms. Morabito is now a partner at Quinn Emanuel Urquhart & Sullivan, LLP, and represents Gary Polkowitz, the Administrative Expense Claims Representative in these chapter 11 cases (the "Admin Representative"). The Admin Representative has, since his appointment, continued to work with the Ad Hoc Group of Admin Claimants in representing the interests of all administrative creditors.

that was even remotely tied to Plan confirmation. In essence, given the Debtors' then current projections – which had significantly deteriorated from prior projections – it appeared that the Debtors were attempting to get to confirmation despite uncertainty over when (and whether) the Debtors would have the financial wherewithal to get to an effective date.

22.     Moreover, the Ad Hoc Group of Admin Claimants vigorously argued that the Debtors and Committee put the risk of whether an effective date occurred on the administrative creditors while funding a litigation trust and various reserves.

## V.     The Ad Hoc Group of Admin Claimants' Substantial Contribution

23.     The Ad Hoc Group of Admin Claimants is made up of multiple creditors who hold a variety of priority claims classified as section 503(b) claims under the Bankruptcy Code. As of October 1, 2019, immediately prior to the confirmation of the Plan, these allowed claims totaled more than $25.4 million, subject to certain reservations. *See* ECF No. 5298.[4]

24.     As noted above, immediately upon being retained on or about July 9, 2019, Foley, as counsel for the Ad Hoc Group of Admin Claimants, quickly digested the approximately ten (10) months of pleadings filed in these cases to understand the current state of play and possible avenues for resolution. Declaration by Andrew Thau ("Thau Dec.") ¶ 6.

25.     In addition, the Ad Hoc Group of Admin Claimants and Ms. Morabito immediately began corresponding with the professionals for the Debtor and the Committee to better understand the operational and legal issues involved so as to understand whether confirmation was achievable and advantageous to all of the Debtors' stakeholders, or if conversion was a viable alternative. Even then, the Ad Hoc Group of Admin Claimants had volumes of information to review to

---

[4] Pursuant to the Administrative Expense Claims Consent Program (the "Admin Claim Consent Program"), the Ad Hoc Group of Admin Claimants agreed to cap their total recovery at 75% of their allowed administrative expense claim. [ECF No. 5298].

understand whether confirmation could be followed closely by an effective date or when administrative claims were likely to be paid. Thau Dec. ¶ 7.

26.    This team was uniquely posed to make this contribution. Among other things, Ms. Morabito was integrally involved in the Toys "R" Us administrative claim program, which program wrestled substantial funds from the secured lenders to administrative trade claimants.[5] Understanding that these two retail behemoths were similar only in size and not in operational or legal foundation, counsel for the Ad Hoc Group of Admin Claimants spent considerable time and resources in understanding the reality of the situation presented in these cases and ultimately determined that confirmation and not conversion was in all of the Debtors' stakeholders' collective interest.

27.    Thus, within several weeks of being retained and after dozens of meetings both over the phone and in-person, the Ad Hoc Group of Admin Claimants, through Foley, sent an administrative claim construct to both the Debtors' and Committee's professionals. This early construct was designed to solve for the following issue: how could the Debtors confirm a plan where there was simply not enough funding to pay all allowed claims in full either on confirmation or upon a near term effective date? Thau Dec. ¶ 8.

28.    Almost immediately upon providing the construct, the Ad Hoc Group of Admin Claimants was viewed by the Debtors' professionals as the "steering committee" for all administrative claims. The Ad Hoc Group of Admin Claimants was the most constructive and efficient counterparty with whom the Debtors could negotiate and discuss issues of import to all

---

[5] The ad hoc group of postposition vendor administrative claimants represented by Foley in Toys "R" Us received substantial contribution under section 503(b) of the Bankruptcy Code, despite having achieved a less favorable recovery for administrative claimants than the Ad Hoc Group of Admin Claimants. *See In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) Order (I) Approving (A) The Settlement Agreement, (B) Opt-Out Procedures Applicable to the Settlement Agreement, (C) A Substantial Contribution Claim Under Section 503(B)(3)(D) of the Bankruptcy Code, and Granting Related Relief [ECF No. 4083] (Bankr. E.D. Va.).

administrative creditors.  The Ad Hoc Group of Admin Claimants was somewhat unique in that it held a critical mass of the administrative claim pool in relatively few entities, and also that even the "business" people in the group were experienced restructuring professionals.  In essence, the Ad Hoc Group of Admin Claimants' ability to gather resources in a timely fashion, digest the status of these cases, and negotiate and execute a construct that would provide a reasonable basis to have confirmation tied to an effective date, made it a one-stop shop for the Debtors and Committee to negotiate an acceptable resolution for all of the Debtors' stakeholders.  Thau Dec. ¶ 9.

29.     As such, the negotiation over the exact terms of the Admin Claim Consent Program took weeks – or months – to accomplish.  Foley spent several days with the Debtors' counsel negotiating the terms of what eventually became the Admin Claim Consent Program.  Thau Dec. ¶ 10.

30.     However, because there was no way to know whether a consensual resolution could or would be achieved, the Ad Hoc Group of Admin Claimants had no choice but to dual-track preparing for a contested confirmation hearing in addition to spending considerable resources in understanding the playing field and negotiating a construct for resolving administrative claims. Without an agreed-to resolution with respect to allowance of, treatment of and distribution to administrative claims, the Ad Hoc Group of Admin Claimants was required to spend additional resources to prepare for a contested hearing on confirmation.  Thau Dec. ¶ 11.

31.     In this regard, Foley drafted objections to confirmation and pleadings seeking to conserve estate resources, prepared discovery, attended status conferences before the Court, and took the depositions of all of Debtors' confirmation witnesses.  The work performed by Foley was

extensive and all of it was both necessary and for the benefit of all of the Debtors' administrative claim holders.  Thau Dec. ¶ 12.

32.    Further, the Ad Hoc Group of Admin Claimants, either directly or via Foley, when and where appropriate, to coordinate and provide information on the status of both negotiations and litigation to numerous other administrative creditors or, in most cases, their advisors.  These discussions were necessary for two purposes; first, it provided a mechanism for consensus building among the Debtors, Committee, and many administrative claim holders; and second, it allowed those administrative creditors that did not have the financial ability to take on this fight to understand the perspective of the Ad Hoc Group of Admin Claimants and the proposals it was supporting so they could be comfortable those proposals would benefit them as well.  Thau Dec. ¶ 13.

## VI.    **The Admin Claim Consent Program**

33.    On the eve of confirmation, the Admin Claim Consent Program was agreed to by and among the Debtors, the Committee and the Ad Hoc Group of Admin Claimants.  A full recitation of the terms and conditions of the Admin Claim Consent Program can be found in the *Order (1) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holding Corporation and its Affiliated Debtors and (II) Granting Related Relief* [ECF No. 5370] at ¶¶ 52 - 58.  Below are key provisions:

a.    Early opt-in claim holders would agree to 75% of their allowed claim and be entitled to the Initial Distribution – which were funds negotiated to be set aside from the professional fee carve-out and funds originally intended to seed a litigation trust for the benefit of unsecured creditors;

- 10 -

b.      Those that did not affirmatively opt-in or opt-out would receive 80% of their allowed claim[6];

c.      Those that affirmatively opted-out would receive 100% of their allowed claim;

d.      A paid Administrative Claim Representative with insurance/indemnification will be appointed to assist with allowance of administrative claims.

e.      All opt-ins will be entitled to a thirty (30) day streamlined reconciliation process which will include not only their affirmative claims against the Debtor(s) but any avoidance liability as well.

34.     Each of the above points were the result of constant attention, negotiation, and feedback by the Ad Hoc Group of Admin Claimants, all while also preparing for litigation in the event an agreement was not reached.  Thau Dec. ¶ 14.

35.     Ms. Morabito appeared at the confirmation hearing on behalf of the Ad Hoc Group of Admin Claimants and advocated in favor of the Admin Claim Consent Program and confirmation of the Plan.  *See In re Sears Holding Corp.*, Case No. 18-2353 (RDD) Hr'g Tr. 186:24 – 203:8 (Bankr. S.D.N.Y. Oct. 3, 2019) ("10/3/19 Tr.") which is annexed hereto as Exhibit D.

36.     Finally, the Ad Hoc Group of Admin Claimants' work was not done at confirmation.  Given the necessity to retain an Administrative Expense Claims Representative to ensure fairness to the process, the Ad Hoc Group of Admin Claimants took the lead in gathering submissions for the position, and interviewing and selecting the Administrative Expense Claims Representative to work on behalf of all administrative creditors.  This was not a small task as several parties engaged in the process and it was important that all were heard.  Nevertheless, the Ad Hoc Group of Admin Claimants, at their sole cost and expense, instructed Foley to ensure a

---

[6] This provision was a change precipitated by the Court when reviewing the first filed Admin Claim Consent Program. This earlier program provided that those that neither opted-in or opted-out would receive 75% of their allowed claim.

fair process so that a consensus could be reached on the appropriate Administrative Claims Representative.  Thau Dec. ¶ 16.

## LEGAL ARGUMENT

37.    Section 503(b) of the Bankruptcy Code provides that certain administrative expenses shall be allowed after notice and a hearing.  11 U.S.C. § 503(b).  Section 503(b)(3)(D) of the Bankruptcy Code grants administrative expense status to claims for the "actual, necessary expenses" incurred by a creditor "in making a substantial contribution in a case under chapter 9 or 11 of this title."  11 U.S.C. § 503(b)(3)(D).  Section 503(b)(4) of the Bankruptcy Code provides for the allowance as an administrative expense reasonable compensation for professional services rendered to a creditor entitled to recover under section 503(b)(3)(D).  11 U.S.C. § 503(b)(4).

38.    Although the term "substantial contribution" is not defined in the Bankruptcy Code, courts have held that that an applicant satisfies the substantial contribution test when it has provided an "actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders."  *In re U.S. Lines, Inc.,* 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989), *aff'd*, No. 90 CIV. 3823 (MGC), 1991 U.S. Dist. LEXIS 5262 (S.D.N.Y. Apr. 22, 1991).  "Broadly speaking, services which substantially contribute to a case are those which foster and enhance, rather than retard or interrupt the progress of reorganization."  *Id.*

39.    Courts in this Circuit consider various factors when analyzing a request for substantial contribution, including: "(i) whether the services benefited a creditor, the estate itself, or all interested parties; (ii) whether the services resulted in an actual significant and demonstrable benefit to the estate; and (iii) whether the services were duplicated by the efforts of others involved in the case."  *In re AMR Corp.*, Case No. 11-15463 (SHL), 2014 Bankr. LEXIS 3298, at *1 (Bankr. S.D.N.Y. Aug. 5, 2014).  Moreover, a request for substantial contribution is even more appropriate

where the party seeking reimbursement has engaged in a "leadership role that normally would be expected of an estate-compensated professional." *In re Bayou Grp.*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010). "This includes activities such as active facilitation and negotiation of a confirmed plan, or efforts to oppose a plan that resulted in a more favorable one." *In re Hancock Street SML LLC*, Case No. 1–14–45491–nhl, 2016 WL 6271329, at *7 (Bankr. E.D.N.Y. Oct. 25, 2016) (citing *Bayou*, 431 B.R. at 562)).

40.    Here, it is unquestionably the case that the Ad Hoc Group of Admin Claimants' engagement fostered and enhanced the 'progress of reorganization', benefited **all** of the Debtors' stakeholders, provided a demonstrable benefit to the estate, and were unique in terms of service.

### A.    The Ad Hoc Group of Admin Claimants' Efforts Benefited the Debtors' Estates, Improved Creditor Recoveries, Safeguarded the Interests of All Creditors, and Were Not Duplicated by Any Other Constituents

41.    Without question, the Ad Hoc Group of Admin Claimants' efforts benefited the Debtors' estates, improved creditor recoveries, were undertaken on behalf of all administrative claim holders – even all stakeholders, and were not duplicated by other constituents.

42.    As set forth above, the Plan had no reasonable likelihood of being confirmed given the deepening administrative insolvency threatening the Debtors' estates.  Even if the Debtors were able to establish satisfaction of the elements of Bankruptcy Code section 1129 – which they could not – any effective date tied to a naked confirmation order likely would have been years away.

43.    As this Court has previously recognized, the Ad Hoc Group of Admin Claimants was able to negotiate an agreement where funds originally earmarked for professionals and trust fees eventually inuring to the benefit of unsecured creditors were paid to administrative claim holders that affirmatively opted-in to the Admin Claim Consent Program in a timely manner.  *See In re Sears Holding Corp.*, Case No. 18-2353 (RDD) Hr'g Tr. 72:5-13 (Bankr. S.D.N.Y. Jan. 3,

2019) ("1/21/21 Tr.") which is annexed hereto as <u>Exhibit B</u>. The transfer of these funds – $21,000,000 – to administrative claim holders, caused the Debtors' administratively insolvency to lessen and thereby ensuring that any effective date would occur in a much sooner time frame.

44.    The Debtors support the relief requested herein, and recently acknowledged that:

> The Administrative Expense Claims Consent Program resolved all objections to the Plan filed by the Ad Hoc Group of Admin Claimants, allowed the Debtors to forgo time-consuming litigation in connection with confirmation of the Plan and the allowance of Administrative Expense Claims, preserved Estate resources and reduced the amount of outstanding Administrative Expense Claims required to be paid.

Joint Motion of Debtors and Official Committee of Unsecured Creditors For Entry of Order Approving Settlement Agreements, Granting Certain Related Relief, and Authorizing Certain Nonmaterial Plan Modifications In Furtherance of the Effective Date of the Plan [D.I. 10566] ¶ 39. [7]

45.    The time, attention and resources devoted to what eventually became the Admin Claim Consent Program were not deployed for only the Ad Hoc Group of Admin Claimants. To the contrary, **<u>all</u>** of the Debtors' administrative claim holders benefited from this work and all were invited to participate in the Admin Claim Consent Program. In turn, getting to a sooner effective date, meant a greater opportunity for unsecured creditors to recover from the Debtors' estates and a reduction of the administrative costs associated with the bankruptcy cases.

46.    Finally, after being retained and demonstrating to the Debtors' and Committee's professionals that the Ad Hoc Group of Admin Claimants had the resources, knowledge, and skill set to help build a construct that would shape these cases, the Debtors' indicated that the Ad Hoc Group of Admin Claimants would be the "steering committee" for all administrative claimants.

---

[7]   The Debtors' also acknowledged their support for this Application at Plan Confirmation. *See* Ex. C (10/7/19 Tr.) 186:15-23.

Where and when appropriate, and guided by the Debtors' and Committee's approval, the Ad Hoc Group of Admin Claimants (and their professionals) spent significant time disseminating appropriate information to and speaking with, other administrative claim holders in an effort to build consensus.

**B.      The Ad Hoc Group of Admin Claimants Took on a Leadership Role in These Chapter 11 Cases**

47.      The Ad Hoc Group of Admin Claimants' efforts are exactly those that section 503(b)(3)(D) of the Bankruptcy Code and case law in this Circuit contemplate as a "substantial contribution."

48.      As set forth above, upon being retained by the Ad Hoc Group of Admin Claimants, Foley quickly caught up to speed with the legal and operational landscape of these Chapter 11 cases, engaged with Debtors' and Committee's professionals, was named as the "steering committee" for administrative claim holders and provided a construct that, after extensive negotiation, became the Admin Claim Consent Program.

49.      Moreover, while doing all of the above, the Ad Hoc Group of Admin Claimants deployed resources to prepare for a contested hearing on confirmation should a consensual resolution not have been reached.  In this regard, the Ad Hoc Group of Admin Claimants alone prepared for and took the depositions of Debtors' confirmation witnesses in relation to the Debtors' administrative insolvency on confirmation.

50.      In denying the Application of Pearl Global Industries Ltd. for Allowance and Payment of Reasonable Compensation, Pursuant to Bankruptcy Code §§ 503(b)(3)(D) and 503(b)(4), For Making a "Substantial Contribution" In These Cases [ECF No. 9130], this Court drew a sharp distinction between the efforts of Pearl Global Industries Ltd., undertaken for its own

- 15 -

benefit, and those of the Ad Hoc Group of Admin Claimants, who spearheaded negotiations on behalf of all administrative claimants:

> Pearl Global did not speak for the so-called ad hoc group, its counsel did not file the statement required to be filed when representing a group under Bankruptcy Rule 2019, and it was not acting as a fiduciary for any of those parties, no[r] did it actually engage in negotiations in which it kept any of those parties informed with respect to the negotiations that led to its actual statement, i.e., between the October 3 hearing and the adjourned confirmation hearing that resumed on October 7.
>
> It simply did not play the leadership role in these cases that is generally required by the case law, nor did it provide any contribution to the overall estate in those rare cases, such as the McLean Industries case that I previously cited, will at times justify an award under 503(b)(1). In other words, notwithstanding the repeated references repeatedly to its group or my group, ***there was no such group that could have served as the fulcrum point for the negotiations, in contrast to the group represented by Foley & Lardner and actually acting as a group.***

Ex. B (1/21/21 Tr.) 76:15 – 77:8 (emphasis added).

51.    The Admin Claim Consent Program is the product of hard-fought and hard-won negotiations and tactical litigation planning by and among the Debtors, Committee, and Ad Hoc Group of Admin Claimants. The Ad Hoc Group of Admin Claimants undertook all of these actions and substantial efforts at its own cost and expense and is entitled to reimbursement of those amounts.

### C.    <u>The Ad Hoc Group of Admin Claimants' Fees and Expenses are Reasonable, Necessary and Beneficial to the Debtors' Estates And Should Be Allowed.</u>

52.    Under section 503(b) of the Bankruptcy Code, the reasonableness of professional fees and expenses is measured on the time, nature, extent and value of the services and whether the related expenses are actual and necessary. 11 U.S.C. § 503(b). The Ad Hoc Group of Admin Claimants' fees and expenses for which reimbursement is sought represent the actual and necessary fees and expenses in connection with the work performed in these cases **<u>and only in connection with the work performed on behalf of all administrative creditors</u>**. In other words,

- 16 -

the Ad Hoc Group of Admin Claimants is **not** seeking fees and expenses incurred for work performed that uniquely benefited individual members of the Ad Hoc Group of Admin Claimants. *See* Declaration by Andrew Thau ¶ 21; Declaration by Bryant Oberg ¶ 6; Declaration by Vladimir Jelisavic ¶ 6.

53.    The fees and expenses of Foley satisfy the requirements of sections 503(b) of the Bankruptcy Code based on the (a) complexity of the issues presented, (b) the time and labor required, (c) the skill necessary and (d) the customary fees charged to clients in bankruptcy and non-bankruptcy cases.

### i.    These Chapter 11 Cases Present Complex Legal and Factual Issues

54.    As set forth above, the Foley team counseling the Ad Hoc Group of Admin Claimants was immediately thrown into one of – if not the largest – retail bankruptcies of all time. The Sears Debtors presented a multitude of complex factual issues including without limitation, a hornet's nest of financial accounting practices that made it difficult to discern which Debtor was solvent and which was not and how that analysis could or would effect confirmation.

55.    Moreover, given the factual disputes with Transform, an insider, and the factual disputes with the Debtors' second lien lenders, a legal analysis on confirmation was incredibly complex.

56.    Nevertheless, upon being retained, the Foley team immediately threw themselves into the mix so as to understand all factual and legal issues.  By doing so, Foley was prepared to present an early administrative claim construct, which of course, eventually led to the fully baked and consensual Admin Claim Consent Program.

### ii.    Foley's Fees and Expenses are Customary

57.    The hourly fees and expenses charged and incurred by Foley are in-line with the fees and expenses charged by other firms in these cases.  Moreover, the fees and expenses charged

- 17 -

and incurred by Foley are reasonable and represent only a fraction of the additional value achieved

by the Debtors' estates given Foley's involvement in these cases.

58.     Further, the hourly rates and expense reimbursement policies of Foley are

substantially similar to the other professionals involved in these cases.  The amount of time spent

and level of staffing were tailored to the specific needs and junior lawyers were used when

appropriate.

### D.    Alternatively, The Ad Hoc Group of Admin Claimants Should be Granted a Claim Under Section 503(b)(1)

59.     Alternatively, the requested administrative claim and payment for contributions

made to the estate by the Ad Hoc Group of Admin Claimants is also justified under Section

503(b)(1)(A) of the Bankruptcy Code.  To determine whether a claim is entitled to administrative

expense priority under Section 503(b)(1)(A), courts require that the claim (i) arise from a

transaction with the bankruptcy estate, and (ii) must have directly and substantially benefited the

estate.  *See, e.g.*, *In re Eagle-Picher Indus., Inc.*, 447 F.3d 461, 464 (6th Cir. 2006); *In re Tyson*,

Case No. 03-41900, 2005 Bankr. LEXIS 3230, *8 (Bankr. S.D.N.Y. June 3, 2005); *Microsoft*

*Corp. v. DAK Indus., Inc.* (*In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995).

60.     When a party can demonstrate that its actions assisted the Debtors and directly

contributed to a result where the estate received more than it would have otherwise, a section

503(b)(1)(A) claim is appropriate.  *See, In re Tyson, et al.,* Case No. 03-41900 (ALG), 2005 Bankr.

LEXIS 3230 (Bankr. S.D.N.Y. Jun. 3, 2005).

61.     Here, there can be no question that the Ad Hoc Group of Admin Claimants' actions

directly contributed to a result where the estate received more than it would have otherwise.

Indeed, even the Debtors' counsel informed the Court as such at the confirmation hearing.  *See*

Ex. C (10/7/19 Tr.) 15-23. As such, a section 503(b)(1)(A) claim is appropriate in these circumstances.

62.     No previous request for the relief sought herein has been made by the Ad Hoc Group of Admin Claimants to this or any other Court.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, the Ad Hoc Group of Admin Claimants respectfully requests that the fees and expenses it incurred be treated as administrative priority claims against the Debtors' estates and the Debtors be authorized and directed to pay such fees and expenses.

Dated: August 10, 2022
       New York, New York

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Brian P. Morgan*
James H. Millar
Brian P. Morgan
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
Tel:  (212) 248-3140
Fax:  (212) 248-3141
James.Millar@faegredrinker.com
Brian.Morgan@faegredrinker.com

*Counsel to Whitebox Multi-Strategy Partners, LP;
Whitebox Asymmetric Partners, LP; Hain Capital
Investors Master Fund, Ltd. and; Cherokee Debt
Acquisition, LLC*

- 19 -

**<u>EXHIBIT A</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re** | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | Case No. 18-23538 (RDD) |
| | (Jointly Administered) |
| Debtors.[1] | |

### ORDER GRANTING APPLICATION OF AD HOC GROUP OF ADMIN CLAIMANTS PURSUANT TO 11 U.S.C. §§ 503(b)(1), 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT OF REASONABLE PROFESSIONAL FEES AND ACTUAL, NECESSARY EXPENSES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CHAPTER 11 CASES

Upon the Application (the "Application")[2] of Whitebox Multi-Strategy Partners, LP, Whitebox Asymmetric Partners, LP, Hain Capital Investors Master Fund, Ltd., and Cherokee Debt Acquisition, LLC (collectively, the "Ad Hoc Group of Admin Claimants") for entry of an order allowing as an administrative priority claim, and authorizing the Debtors to reimburse, the reasonable fees and expenses incurred by the Ad Hoc Group of Admin Claimants for making a substantial contribution in these chapter 11 cases, as more fully set forth in the Application; and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Application.

the Court having jurisdiction to decide the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Application having been provided in accordance with the Amended Case Management Order, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.      The Application is granted.

2.      The Ad Hoc Group of Admin Claimants shall have an administrative priority claim under Sections 503(b)(1), 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code in the amount of $750,000.00 (the "Substantial Contribution Claim").

3.      The Debtors are authorized and directed to pay the Substantial Contribution Claim at the time other administrative expense claims are paid.

4.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order.

Dated: _____, 2022
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION, et al.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                    United States Bankruptcy Court

14                    300 Quarropas Street, Room 248

15                    White Plains, NY 10601

16

17                    January 21, 2021

18                    10:09 AM

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JUSTIN WALKER

Page 2

1   HEARING re Notice of Agenda of Matters Scheduled for

2   Telephonic Hearing on January 21, 2021 at 10:00 a.m.

3

4   Case Status Conference

5

6   Motion to Shorten Time (related document(s) 9130, 9131)

7   filed by David H. Wander on behalf of Pearl Global

8   Industries, Ltd. (ECF #9132)

9

10  Motion for Payment of Administrative Expenses APPLICATION OF

11  PEARL GLOBAL INDUSTRIES LTD. FOR ALLOWANCE AND PAYMENT OF

12  REASONABLE COMPENSATION, PURSUANT TO BANKRUPTCY CODE §§

13  503(b)(3)(D) AND 503(b)(4), FOR MAKING A SUBSTANTIAL

14  CONTRIBUTION IN THESE CASES. filed by David H. Wander (ECF

15  #9130)

16

17  Declaration BY DAVID H. WANDER, ESQ. IN SUPPORT OF

18  APPLICATION BY PEARL GLOBAL INDUSTRIES LTD. FOR ALLOWANCE

19  AND PAYMENT OF REASONABLE COMPENSATION, PURSUANT TO§§

20  503(b)(3)(D) AND 503(b)(4) OF THE BANKRUPTCY CODE, FOR

21  MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CASES (related

22  document(s)9130) (ECF #9131)

23

24

25

Page 3

```
 1    Debtors' Objection to Substantial Contribution Application

 2    of Pearl Global Industries Ltd. (related document(s) 9130)

 3    filed by Sunny Singh on behalf of Sears Holdings

 4    Corporation. (ECF #9233)

 5

 6    Joinder of the Official Committee of Unsecured Creditors to

 7    Debtors' Objection to Substantial Contribution Application

 8    of Pearl Global Industries Ltd. (related document(s) 9233,

 9    9130) filed by Philip Dublin on behalf of Official Committee

10    of Unsecured Creditors of Sears Holdings Corporation, et al.

11    (ECF #9234)

12

13    Joinder of Gary Polkowitz, Administrative Expense Claims

14    Representative to Debtors' Objection to Substantial

15    Contribution Application of Pearl Global Industries Ltd.

16    (related document(s) 9233, 9130) filed by Carly Everhardt on

17    behalf of Gary Polkowitz. (ECF #9235)

18

19    REPLY BY PEARL GLOBAL INDUSTRIES LTD. IN SUPPORT OF

20    APPLICATION FOR ALLOWANCE AND PAYMENT OF REASONABLE

21    COMPENSATION, PURSUANT TO BANKRUPTCY CODE§§ 503(b)(3)(D) AND

22    503(b)(4), FOR MAKING A SUBSTANTIAL CONTRIBUTION IN THESE

23    CASES (related document(s) 9130) filed by David H. Wander on

24    behalf of Pearl Global Industries, Ltd. (ECF #9243)

25
```

Page 4

1    Declaration Reply Wander in support of substantial

2    contribution (related document(s) 9130) filed by David H.

3    Wander on behalf of Pearl Global Industries, Ltd. (ECF

4    #9244)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

**Page 5**

1   A P P E A R A N C E S :

2

3   DAVIDOFF HUTCHER & CITRON LLP

4       Attorney for Pearl Global Industries, Ltd.

5       605 3rd Avenue

6       New York, NY 10158

7

8   BY:  DAVID H. WANDER

9

10   WEIL, GOTSHAL & MANGES LLP

11       Attorneys for the Debtors

12       767 Fifth Avenue

13       New York, NY 10153

14

15   BY:  SUNNY SINGH (TELEPHONICALLY)

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2                  P R O C E E D I N G S

 3           THE COURT:  Good morning.  This is Judge Drain.

 4    We're here on in re:  Sears Holding Corp., et al., for our

 5    regularly scheduled omnibus date.  This is a completely

 6    telephonic hearing.  You should identify yourself and your

 7    client the first time you speak.  It's a good idea to do so

 8    thereafter so that the court reporter and I can put together

 9    your voice with your name.

10           There's one authorized recording of this hearing.

11    It's taken by Court Solutions, which provides a copy of the

12    reporting to our clerk's office on a daily basis.  If you

13    want to obtain a transcript of today's hearing, you should

14    contact our clerk's office to arrange for the production of

15    one.  Because these hearings or this hearing is on -- is

16    completely telephonic, you should keep your phone on mute

17    unless you're speaking, at which point you should unmute

18    yourself, of course.

19           So, with that introduction, I have the amended

20    agenda for today's hearing provided by the Debtor's counsel

21    and I'm happy to go down that agenda.

22           MR. SINGH:  Thank you, Your Honor.  Good morning.

23    Sunny Singh, Weil Gotshal on behalf of the Debtors. Your

24    Honor, can you hear me okay?

25           THE COURT:  Yes, I can hear you fine.
```

1          MR. SINGH:  Okay, thank you, Your Honor.  Your

2     Honor, I'm joined by my partner Garrett Fail this morning.

3     As Your Honor indicated, we did file the amended agenda, and

4     the first item is really a status update on getting to an

5     effective date.

6          Your Honor, we did file this morning on the docket

7     the report that I'm about to go through and did email it to

8     chambers as well, so Your Honor had an advanced copy before

9     this morning.  So, if it's okay with Your Honor, I'll kind

10    of just walk through it.  And, of course, if you have

11    questions, I'm happy to answer them at any time.

12          THE COURT:  That's fine.  I have a copy here.

13          MR. SINGH:  Okay, great.  So, Your Honor, just

14    picking up or starting off on page 2 of the presentation --

15    and, actually, before I do that, I would just note, Your

16    Honor, you know, we, the Debtors, and the restructuring

17    committee sort of worked on this obviously with M3.

18          You know, we do have an administrative claims

19    representative on the Creditors Committee but these are the

20    Debtor's estimates.  Not sort of -- we're not representing

21    on behalf of the administrative claims representative, for

22    example.  We'll work with Mr. Polkowitz, as we've been

23    doing, and his counsel to answer any questions, etc., after,

24    but these are the Debtor's numbers and estimates, Your

25    Honor.

Page 8

```
 1              THE COURT:  Okay.

 2              MR. SINGH:  Your Honor, in terms of progress on

 3      the administrative claims reconciliation in the program on

 4      page 2, to date we've reconciled almost about 4,000 claims

 5      and other requests for payment, eliminating $1.3 billion of

 6      claims that were asserted and claiming entitlement to

 7      administrative or priority status.  And we've allowed about

 8      1,700 claims, Your Honor.

 9              There's still ongoing disputes with respect to

10      roughly 50 claims.  49 here asserting about $11 million.

11      Excluding claims that -- you know, we've reconciled the

12      amounts but they have open preference issues.

13              So, Your Honor, if you look the chart below, which

14      hopefully provides a helpful summary to the Court and

15      parties, the first two lines under the Administrative

16      Consent Program deal with the opt in and non-opt out

17      creditors, the first sort of two categories.  The opt-ins

18      get up to 75 percent and the non-opt outs get up to 80

19      percent of their allowed claim.

20              And if you look all the way to the right, Your

21      Honor, you see the last three rows there show the allowed

22      amount post the settlement discount, roughly $99.3 million.

23      We've made two distributions to date of almost $40 million,

24      leaving for that group at least $59.5 million.

25              And then a few lines down, Your Honor, there's the
```

Page 9

1    opt-out group, you know, the folks that have not received

2    any payments opted out, so they're entitled to a full 100

3    cents, but entitled to that when we go effective.  The

4    asserted amount there, Your Honor, is 28.3 million and the

5    Debtor's estimates remain consistent with sort of what we've

6    had since the confirmation hearing at about $25 million.

7    So, roughly $90 million total when you take into -- some

8    disputed disclaims that are still ongoing that we think are

9    going to ultimately be allowed.

10           THE COURT:  Can I -- can I interrupt you here at

11   this point?

12           MR. SINGH:  Of course, Your Honor.

13           THE COURT:  You referred earlier to a group of

14   claims, administrative expense claims that have -- where the

15   dollar amount has been fixed but they're subject to

16   outstanding preference issues?

17           MR. SINGH:  Correct, Judge.

18           THE COURT:  I guess the question I have is --

19   first, I just want to confirm, they are not in the chart

20   itself, right?

21           MR. SINGH:  Well, you can see -- Your Honor, we

22   did account for them if you'd look right below the line that

23   says Total Opt-In and Allowed Non-Opt Out, it says,

24   "Reconciled claims subject to preference issues, about $4.1

25   million."  Do you see that number?

1            THE COURT:  Okay.  Right, I see it.

2            MR. SINGH:  Yeah.

3            THE COURT:  So, that's a relatively small amount.

4            MR. SINGH:  Correct, Judge.

5            THE COURT:  And the preference issues obviously

6    would be a setoff to the extent that there would be a

7    preference determined or a settlement.

8            MR. SINGH:  That's right, Your Honor.

9            THE COURT:  And the 4.1 is before that, right?

10   It's --

11           MR. SINGH:  That's right.

12           THE COURT:  Okay.

13           MR. SINGH:  Right, that's what we've reconciled as

14   the amount on the claim.  There's a preference on top of

15   that.  And, you're right, Your Honor, as in most of these,

16   we sort of settled and came up with a net amount either of

17   the claim or a payment to the estate.

18           THE COURT:  Okay, very well.

19           MR. SINGH:  Yeah.  And right below that line, Your

20   Honor, just to close it out, you can see the remaining

21   disputed claims from an asserted amount of 11.4.  We believe

22   that it's going to be around $2.8 million in terms of the

23   reconciliation and the Debtor's amount.  So, we really, in

24   terms of reconciling and allowing administrative claims, are

25   in the homestretch, I would say, in terms of just claims

Page 11

1    resolution.

2              THE COURT:  Okay.

3              MR. SINGH:  Your Honor, in terms of progress --

4              THE COURT:  I'm sorry, this was -- this dollar

5    amount of total estimated allowed admins of 177 or so, do

6    you remember how that related to the estimate at the

7    confirmation hearing?

8              MR. SINGH:  Yes, Your Honor, and we actually have

9    a chart on that.  If you scroll down, I can go to it down

10   and then come back.  If you look at Slide 6, Your Honor,

11   this is the uses estimate, which shows you the confirmation

12   hearing estimates for claims, etc., that we were using at

13   the time of the hearing.

14             We also had the June status update and you can see

15   the estimates as of that date, and then sort of actual

16   today.  The answer to your question, Your Honor, is all of

17   the estimates are consistent and within the confirmation

18   hearing range.  When we were at 210 to 278 total, we're at

19   256.

20             And in the breakdown, we're actually, in terms of

21   503(b)(9)s and other admins, we're actually a little bit

22   lower than even our low range, Your Honor.  We're showing

23   about 83 million for 503(b)(9), the low range was 90.  And

24   for the other administrative expense claims, we were at

25   about estimating 50 million and they're showing now 42.1.

Page 12

1    So, we're a little bit ahead in terms of the confirmation

2    estimates of what the claims were going to be.

3                THE COURT:  Okay.  Thanks.

4                MR. SINGH:  You're welcome, Your Honor.  Just,

5    Your Honor, I'll scroll back up on Slide 3 just to summarize

6    the distributions that have been made for administrative

7    creditors.  So far there have been two:  the initial

8    distribution of 21 million, plus there was a second

9    distribution that commenced in August of last year of

10   roughly 19 million.  So, we have disbursed that amount.

11               We've got some uncashed checks and issues like

12   that, Your Honor, and disputed claims reserves, but we've

13   gotten 18.8 million ready for distribution out the door for

14   folks that are entitled to them.

15               THE COURT:  In the second distribution?

16               MR. SINGH:  Correct, Judge, in the second

17   distribution.

18               THE COURT:  Yeah, okay.

19               MR. SINGH:  Which included a catchup distribution

20   for those who didn't participate in the first to sort of

21   bring everybody parry.

22               THE COURT:  Right.

23               MR. SINGH:  So, Your Honor, if you look at Slide

24   4, this is really the key slide, I would say, for today's

25   presentation, which is the additional funds necessary to go

Page 13

1    effective.  And what we've shown here judge is the estimates

2    or sort of the numbers that were before you on the June

3    status conference and where we are today, and the variance,

4    so you can sort of see how we've been tracking during the

5    case.

6              Your Honor, the estimated cash -- and you can see

7    that up top -- is -- or I should say estimated assets, is

8    $39.2 million.  The cash line there is 16.8 after you take

9    into account total reserves, that's the net cash line.  And

10   I would just note, Your Honor, the 16.8, if you recall from

11   our Administrative Consent Program, there were sort of two

12   reserve accounts.

13             One was the $25 million for litigation trust

14   expenses, so that's not in this number.  That was segregated

15   and is being dealt with and administered.  And then the

16   other was $10 million, which we've noted in Footnote 1, for

17   a cash reserve account for estate expenses, etc., to assist

18   in going effective, that would not be distributed to

19   administrative creditors.

20             So, really, the sort of total available cash, when

21   you take into account that 10 million reserve, is 6.8.  Your

22   Honor --

23             THE COURT:  I'm sorry, 16.8?

24             MR. SINGH:  16.8 but there's two 10 millions, Your

25   Honor.

Page 14

1                THE COURT:  Minus the reserves?

2                MR. SINGH:  Correct, correct.

3                THE COURT:  Okay.

4                MR. SINGH:  It's a little confusing because

5    there's two 10 millions.  There's total reserves for the

6    estate for ongoing sort of administration expenses, etc.,

7    other disputes that we have, disputed claims -- that's 10

8    million.  And then we had a separate 10 million of the cash

9    reserve that's permitted under the Administrative Consent

10   Program.

11               So, really it's $20 million and that's how I get

12   to 6.8.  But the 16.8 includes that cash reserve that's not

13   really allocated for anything, it's just a permitted reserve

14   under the Consent Program.

15               THE COURT:  Okay.

16               MR. SINGH:  Your Honor, so really estimated cash

17   before you have certain tax appeals we're taking, the

18   preference claims, and what we use shorthand as the ESL

19   litigation, but really the sort of larger litigation that's

20   being handled by the Akin firm, and Mr. Dublin is on.  But

21   that -- estimated assets is $39.2 million.

22               The reduction, Your Honor, I would just note that

23   it sort of gets you to -- the $20.5 million reduction, it's

24   not like we've lost assets.  We've made a distribution of

25   almost 19 million, so that accounts for pretty much all of

Page 15

1    it.  But that's the delta.

2           We've projected here, Your Honor, in terms of

3    claims and then estimated uses or expenses, you can see

4    below.  The total remaining claims to be satisfied are

5    $109.1 million.  You know, that includes the Administrative

6    Consent Program, you know, $85 million, and just, Your

7    Honor, so you have the reconciliation, the 90 and 85, the

8    difference just is the $5 million of reserves that we have

9    for ongoing disputed claims.

10          The priority tax is 3 million. Your Honor, I just

11   want to note here, we were originally showing $15 million

12   but, as permitted under the plan, we can stretch out the

13   priority tax payments.  So, in terms of just going

14   effective, we only need $3 million.

15          It's not that the estimate of tax claims has been

16   reduced.  We just sort of adjusted our thinking and

17   clarified that for going effective you need three, although

18   the asserted amount is 15.  Or we think the estimated amount

19   is 15.

20          And then you've got the secured claim and the

21   priority nontax, which generally remain consistent, and we

22   just adjusted our estimate for what we think the claim is

23   allowed.

24          I would note, Your Honor, the secured creditor

25   obviously continues to maintain its claim at 18, and we are

1    in discussions with them in hopes that we can try to come to

2    a resolution.

3            So, for claims purposes, Judge, what's remaining

4    and sort of the shortfall between current asset is 69.9.

5    We've included in here an estimate, assuming another year.

6    And I'm not here to suggest, Judge, that we intend to go

7    another year.

8            We just sort of projected those out and what that

9    would look like potentially.  And that's roughly $27.5

10   million of expenses, leaving you -- if we were to go

11   effective at the end of the year -- 97.3.  Now, we hope to

12   go effective much sooner than that.

13           I would note, Your Honor, we've already commenced

14   discussions with the administrative claims representative,

15   the Creditors Committee, to start thinking about ways to

16   accelerate the effective date and recognizing, of course,

17   really that at this point, as we sort of expected, the key

18   to going effective will be dependent on recoveries and

19   timing from remaining preference claims and the sort of

20   larger ESL litigation that's before Your Honor.

21           THE COURT:  Can I interrupt you again?

22           MR. SINGH:  Yes, of course.

23           THE COURT:  The estimated 27.5 million for post-

24   confirmation expenses for another year, that doesn't include

25   the $25 million, for want of a better term, litigation

Page 17

1    reserve, right, for ESL?

2              MR. SINGH:  Right, that's separate and apart.

3    This is -- this is the sort of other estate expenses, Your

4    Honor.

5              THE COURT:  And as far as preference claims or

6    preference litigation, that's really on a contingency fee --

7              MR. SINGH:  Correct, yeah.

8              THE COURT:  So, I'm puzzled by that amount.  I

9    understand that a lot of work has been done already on the

10   claims, and that obviously requires significant work by

11   professionals to deal with a billion and a half of

12   administrative expense claims that have been asserted and

13   other claims.

14             But it looks like, as you said, you're kind of at

15   the homestretch with that effort, and the remaining assets,

16   other than the litigation, are fairly -- you know, there's

17   real estate -- it's fairly de minimis.  I mean, a lot of

18   works' been done on those too, I think, at least as far as

19   the Calder sculpture is concerned.  So, what's going into

20   that $27 million number?

21             MR. SINGH:  So, Your Honor, there's a couple of

22   things that are making it up, and we may be a little too

23   conservative.  I'm very hopeful that we spend a lot less

24   than this amount.  But we did sort of -- and we are seeing

25   all of the fees trending down considerably.  There are a

1   couple of things that do remain, Your Honor, that sort of

2   are building into the expenses.

3           One, of course, we are expecting a negotiation

4   here and hopefully a resolution with the administrative

5   claims representative and other administrative creditors,

6   the Creditors Committee, etc., of trying to accelerate the

7   effective date and negotiate around that.  So, we do expect

8   there to be some work around case resolution.

9           In addition, Your Honor, you're right on the

10  preference claims, that that is all sort of contingency fee-

11  based, so there's really not much, if anything, of a

12  preference fee claim base in here.  But there are still some

13  other administrative expense claims that remain, so we do

14  have that.  On top of it we have remaining real estate

15  assets.  As you can see, I mean, we are down to sort of the

16  tail end of those.

17          So, it's a culmination of those things and you're

18  really looking at about maybe $2 million a month is kind of

19  where we were, and maybe that's a little too high, but

20  that's what we were expecting.  I really don't expect that

21  we're going to be spending all of the $27.5 million, but

22  that was what was building into the estimate.

23          THE COURT:  Okay, all right, thanks.

24          MR. SINGH:  Your Honor, post -- what we tried to

25  do on page 5, and I already kind of walked through it with

Page 19

1    you on page 6, is just to offer a bridge for Your Honor and

2    parties in terms of just sources and uses.  Kind of what we

3    were projecting at the confirmation date.  We also included

4    the estimates as of the May 30th status update and just what

5    we've collected through the estimate through the end.

6              Your Honor, I think the good news is at least that

7    sources have increased considerably in terms of estimates

8    and actuals.  From the confirmation date -- and this is

9    excluding the preference recoveries and the ESL-related

10   litigation -- have increased $60 million since where we were

11   at confirmation, and another $11 million from where we were

12   at the may hearing.

13             I think most -- or not most, I should say -- some

14   of that you can see is real estate proceeds.  We've already

15   collected -- and confirmation of this on the third line --

16   we were projecting 13.1 million.  We've already collected

17   14.1 and are expecting another $3.5 million.

18             We've had the ESL, or I should say transform -- I

19   apologize, Your Honor -- settlement that Your Honor approved

20   last year where we were able to pick up the utility deposit.

21   So, that went from 4.7 to $9 million.  And we've -- it also

22   includes the transform 503(b)(9) obligations that were

23   satisfied.  And you can sort of see here the deltas and the

24   differences from where we were able to pick up that

25   additional value.

Page 20

1          So, that kind of gets you from confirmation,

2    Judge, to where we are today in remaining assets -- of

3    course, excluding, again, as I mentioned, the preference

4    recoveries and what we refer to as the ESL litigation,

5    although obviously that's a much broader dispute.

6          THE COURT:  Right.

7          MR. SINGH:  And then, Your Honor, you've got the

8    uses line, which I touched upon earlier in response to Your

9    Honor's question.

10         What we've got really here are totally remaining

11   uses which do remain within the confirmation range.

12   Obviously, given that the case has taken longer than we all

13   had hoped and were expecting, there is the professional

14   fees, board fees, etc., have sort of continued.

15         I would note, Your Honor, it's not as if those are

16   expenses that would not had been incurred in large part

17   anyway.  I mean, a lot of that does relate to claims

18   reconciliation, resolving disputes in connection with making

19   distributions and sort of getting to the point where we've

20   gotten.  I'm not suggesting all of it would have been

21   incurred but certainly there is a big chunk in there that is

22   timing related.

23         THE COURT:  Right.

24         MR. SINGH:  Your Honor, and then finally we wanted

25   to just give a high-level update on avoidance recovery.

Page 21

1    Your Honor may have seen, or I'm sure you get the updates --

2    there are a lot of adversary proceedings.  Luckily, I don't

3    think you've had to handle much of that.  We've been dealing

4    with most of it directly in the background with

5    counterparties.

6              But approximately a third, I would say at this

7    point, of the preference matter just in terms of the number

8    of preference issues, have been settled, have been resolved,

9    resulting in about $40 million of value, which includes both

10   cash that's come in the door as well as administrative or

11   priority claims that have been waived.  So, sort of the

12   aggregate value that we've collected.

13             What we've got remaining, Judge, and complaints

14   are filed is another, I'd call it, about 1,100 matters, as

15   you can see from this chart.  Roughly, $600 million of gross

16   preference period transfers that are remaining after you

17   eliminate what the preference specialists have determined to

18   be ineligible for various reasons, such as assumption and

19   they're dealt with as part of cure or what's already been

20   settled.  So, still quite a bit of wood to chop there and

21   continue on, but we are making progress.

22             THE COURT:  Okay.  Can we go back to page 6 for a

23   second?

24             MR. SINGH:  Yes, Judge.

25             THE COURT:  What is the other liability to the

Page 22

1    expenses category?

2             MR. SINGH:  Your Honor, let me see if I can...

3    I'm not sure.  Let me see if I can get an answer to that

4    question from Mr. Murphy.  I don't recall exactly what that

5    line item included.

6             THE COURT:  Okay.

7             MR. SINGH:  But I will get Your Honor an answer.

8             THE COURT:  Okay.  All right.  You can just keep

9    going and he'll probably email you or --

10            MR. SINGH:  Yeah.  The luxury of remote, Your

11   Honor, is that I'll probably get a text or an email very

12   shortly.  So, Your Honor, just in terms of sort of the

13   remaining takeaways, the key takeaways here: our performance

14   and projections are consistent with what we've been

15   estimating throughout, although obviously we're here longer

16   and haven't gone effective longer than what we were hoping

17   and would have liked because of the challenges that remain

18   in the case.

19            Really emergence does remain, in terms of if we

20   were to just sort of come up with the cash to sort of, you

21   know, finalize the claims and make those distributions, does

22   remain heavily contingent on the -- because of the larger

23   ESL litigation and collection of preference recoveries.

24            I would note, Your Honor, we are, as I said

25   earlier, we've commenced discussions, productive discussions

Page 23

1   with the administrative representative and the Creditors

2   Committee to think about other ways to accelerate an

3   effective date and get this case to the finish line.  I

4   would say those are the very early stages but we're hopeful

5   that the parties can put their heads together, as we've done

6   before, and come up with the right answer.

7           In terms of remaining disputed claims, as I said,

8   Your Honor, there's not much left, thankfully.  I mean,

9   we've done a lot of work already but we are sort of ready to

10  finalize those reconciliations and get those finalized and

11  done.

12          So, Your Honor, that was the full presentation I

13  had this morning.  I'll get you an answer to your question.

14  I apologize.  But happy to answer any other questions Your

15  Honor may have.

16          THE COURT:  Okay.  Other than the one that you're

17  going to get a reaction from from Mr. Murphy, I don't have

18  any other questions.  I do note that I owe the parties a

19  ruling on the hundreds of pages of motions to dismiss in the

20  so-called ESL litigation and that will be coming fairly

21  soon.

22          But it's also, I think, fair to assume that that

23  litigation, unless settled and there may be incentive to

24  settle it on both sides, including insurers, won't be for

25  quite a long time.

Page 24

```
 1            So, it would seem to me that if there is to be a

 2   way to promptly or reasonably promptly come up with

 3   sufficient cash to go effective by paying the admin claims,

 4   it would either have to be, as you were suggesting, as part

 5   of some sort of agreement or through the preference

 6   litigation.

 7            MR. SINGH:  Yes, Your Honor.

 8            THE COURT:  Okay.  Does anyone have any questions

 9   for Mr. Singh or the Debtors?  No?  Okay, all right.  Thank

10   you for the update.  I guess we should expect one --

11            MR. SINGH:  Your Honor, probably -- yeah, I mean,

12   we'll try to do it sooner, Judge.  We'll try to do it

13   quarterly especially if there is a meaningful update for the

14   Court.  But, yes, certainly no later than May.

15            THE COURT:  Okay, very well, thanks.

16            MR. SINGH:  Thank you, Your Honor.

17            THE COURT:  All right. So, why don't we then just

18   continue down the agenda.  And at this point, it's not a

19   long agenda.  Most of the matters that are on it have been

20   adjourned.

21            MR. SINGH:  Correct, Judge.

22            THE COURT:  But I have actually the only matter to

23   be considered on today's agenda besides the report that you

24   just gave is the motion by Pearl Global Industries, Ltd. for

25   allowance and payment of a substantial contribution claim
```

1   under Sections 503(b)(3)(d) and 503(b)(4), the Bankruptcy

2   Code.

3          MR. SINGH:  That's right, Your Honor.  That's the

4   only matter.  And I see Mr. Wander on the dashboard and so

5   I'll cede the podium to him to present his motion.

6          THE COURT:  Okay.  Before -- actually, before we

7   do that, and maybe this is just a -- maybe I just hit the

8   wrong button -- I do see that Mr. Harner from Ballard Spahr

9   might've raised his hand to speak.  Is that right, Mr.

10  Harner?  Sorry, I can't hear you.  You might be muted.

11         MR. HARNER:  Apologies, Your Honor, I had pressed

12  the hand raise successfully but not the unmute button.  It

13  was only for the purpose of asking to be excused, if I

14  could.

15         THE COURT:  Oh, that's fine.  That's fine, you

16  can.

17         MR. HARNER:  Thank you, Your Honor.

18         THE COURT:  And anyone else who's on the line for

19  something other than the Pearl motion under 503(b)(3) and

20  (4).  Before I hear from Mr. Wander, counsel for Pearl

21  Global Industries, let me just say that I think I've read

22  all the pleadings on this, which are the motion and

23  supporting affidavit with exhibits, of course, by Global,

24  the objection by the Debtor, the pleadings filed in support

25  of the objection by the administrative expense claims

Page 26

1    representative and by the Official Unsecured Creditors

2    Committee. And then Pearl Global's reply and the

3    accompanying affidavit by Mr. Wander. I don't think there's

4    anything filed in connection with this motion besides that,

5    but I've reviewed each of those documents.

6              So, Mr. Wander, if you want to go ahead.  You can

7    assume that I've reviewed those but you can supplement them

8    or rest on them or argue whatever you want to in support of

9    this motion.

10             MR. WANDER:  Thank you very much, Your Honor.

11   David Wander of Davidoff Hutcher & Citron, counsel for Pearl

12   Global.  Your Honor, I just want to highlight a few points.

13   And in the preliminary statement in Pearl's reply I set

14   forth what really are the questions raised by the objections

15   that have been filed.

16             The first one, and it's really kind of a

17   gatekeeping issue for Your Honor, is is a million dollars in

18   the context of the distribution to the administrative

19   creditors who've received in round numbers $40 million?  So,

20   that would represent 2.5 percent of the total funds that

21   have been paid to date.

22             And based on the status report by the Debtor, that

23   may be the only funds right now we see for possibly another

24   year that will have been paid, absent some change to the

25   plan that Debtor's counsel indicated may be under discussion

Page 27

```
 1   with the administrative claims representative and the

 2   Creditors Committee.

 3            So, from the point of view of the administrative

 4   creditors who've received the money -- and I represent one

 5   who's received the money, that's Pearl Global -- I represent

 6   several who have not received any money -- that's a

 7   substantial amount.

 8            In fact, if this case were to be very successful

 9   and the people litigating against ESL get a tremendous

10   recovery, I believe the projections in the disclosure

11   statement for the possible distributions to unsecured

12   creditors is a couple of penny.  Maybe one penny, two

13   pennies, three pennies.

14            So, from the point of view of the creditors, not

15   the professionals, because as I say to them, I agree, a

16   million dollars to the professionals is -- the retained

17   professionals -- it's not a lot of money.  But I submit to

18   Your Honor that the million dollars that Pearl Global

19   negotiated when it settled its claim with no obligation to

20   try and get the million dollars for everyone, that that's a

21   substantial amount.

22            The second issue --

23            THE COURT:  Can I interrupt you on that?

24            MR. WANDER:  Yes, Your Honor.

25            THE COURT:  Maybe you're going to get to this in a
```

Page 28

1    minute but I thought the main point raised here was not that

2    a million dollars is insubstantial -- to most people, a

3    million dollars is a lot of money -- but rather that the

4    payment was merely a timing issue.  That if it wasn't paid

5    in distribution number one, it would have been paid in

6    distribution number two, i.e., the $18.4 million second

7    distribution would've been 19.4.  And, therefore, all you're

8    talking about is the time value of a million dollars between

9    the first distribution and the second one.

10           MR. WANDER:  Yes, Your Honor, I honestly didn't

11   understand that point because I negotiated for the million

12   dollars as part of the settlement of Pearl Global's claim.

13   Had I not done that, there would not be that million

14   dollars.

15           THE COURT:  Why is that?  Wouldn't it be simply

16   freed up for the next distribution?

17           MR. WANDER:  No, because that came from the

18   professionals.  That was their money that they were giving

19   up.  It was a contribution from them.  And if Your Honor may

20   recall, you had a colloquy with Debtor's counsel, Mr.

21   Schrock, talking about how his partners may not be too happy

22   with him.  You understood that.  By money -- at that time,

23   you were talking about the additional 9 million, I believe.

24           So, I, for lack of better words, grabbed a million

25   dollars from their pocket and Your Honor later in the

Page 29

1    hearing at the second day of the confirmation hearing, you

2    added another 9 million.  So, that million dollars, Pearl

3    Global created that million dollars.  But for Pearl Global's

4    settlement, that wouldn't have been paid.  You would have --

5              THE COURT:  You don't think I might not have said

6    to Mr. Schrock in any event, you're going to have to hold

7    back and take a risk on 10 million instead of 9 million?

8              MR. WANDER:  But that money has not been paid.  If

9    Your Honor looks at the status report that the Debtor just

10   provided, you'll see the professional fee carve out funding

11   of $9 million, I believe, that's being held in reserve.  So,

12   that would've been 10 million.  That million dollars would

13   not have been paid in the second distribution.

14             THE COURT:  We're still talking about time value

15   of money, though, right?

16             MR. WANDER:  Right, that's money that would not

17   have been paid out at all by now and maybe never.

18             THE COURT:  Well, again, that's assuming that I

19   wouldn't have just had a round 10 million be held back by

20   the professionals because they're sort of expense creditors,

21   too.

22             MR. WANDER:  Correct, Your Honor.  They're

23   administrative creditors and they received a round number of

24   over 200 million.  If there's 50 -- there's 49.5 million in

25   the professional fee carve out funding that I'm looking at,

Page 30

```
 1    which includes the 9 million.
 2             So, yes, time value of money is important,
 3    especially to the administrative creditors who hadn't been
 4    paid for providing services during the bankruptcy or during
 5    the 20 days before the bankruptcy.
 6             So, the additional million, the additional 2.5
 7    percent on a blended rate, Your Honor, is a significantly
 8    amount that they've received and is probably all the will
 9    have received for the next year.  So, that's for two years
10    after confirmation.
11             THE COURT:  Well, the federal judgment rate, $1
12    million over two years, is less than the amount you're
13    seeking.
14             MR. WANDER:  But the point is that the creditors
15    need that money.  So, the time value in theory doesn't
16    address the real needs of the creditors of this Debtor, who
17    supported the Chapter 11.  We're talking about the vendors
18    who continued to supply goods and services to the Debtor
19    with the expectation that they would be paid in the ordinary
20    course of business.  Now, Your Honor previously said --
21             THE COURT:  I understand all that, Mr. Wander, I'm
22    just focusing on the arguments back and forth as to whether
23    this sum was de minimis or not, or extraordinary.  And I
24    think we've had enough on it.  I understand your arguments.
25    I think you probably understand mine, and we can move on.
```

1          MR. WANDER:  Thank you, Your Honor.  So, the next

2     point that was raised by the objections is whether Pearl was

3     acting purely for its own benefit as the objector's contend

4     --

5          THE COURT:  Well, the word purely is a red

6     herring, right?  Because that's not the standard when one

7     looks at benefit.

8          MR. WANDER:  Correct.

9          THE COURT:  They're two different points.  It's

10    primarily to benefit the client as opposed to purely.

11         MR. WANDER:  Correct.

12         THE COURT:  So, anyway -- but in any event --

13         MR. WANDER:  If I may, Your Honor?

14         THE COURT:  Yeah.

15         MR. WANDER:  You're correct, Your Honor.  The word

16    purely is a red herring.  It has really nothing to do with

17    the standard.  What the standard is a direct net benefit.

18    If I was simply advocating for Pearl and only for Pearl,

19    which is what happened in all of the cases that have been

20    cited -- none of the cases did a creditor altruistically try

21    and benefit others.

22         The law, the standard, is the direct benefit, not

23    indirect.  So, I submit there's nothing more direct than

24    getting money for all administrative creditors.  So, that's

25    the standard as Your Honor mentioned in Bayou --

Page 32

1           THE COURT:  I'm sorry to interrupt you but there's

2   a second element to the standard besides a direct and

3   substantial net benefit to the creditors and/or the estate

4   as a whole -- and that phrase as a whole is important.

5           It is well-recognized -- and this is from the

6   Bayou case, too -- that, quote, "Creditors face an

7   especially difficult burden in passing the substantial

8   contribution test since they are presumed to act

9   primarily..." -- again, primarily, not purely --

10  "...primarily for their own interest.  And services

11  calculated primarily to benefit the client do not justify an

12  award, even if they also confer an indirect benefit on the

13  estate."  So, and that's articulated in many cases.

14          So, I think there are really two points here.  It

15  has to be a direct benefit, and if you want to say that

16  direct includes primarily for the estate and creditors as

17  opposed to primarily for the movant, then you can conflate

18  the two.  But who this work is for and the burden that a

19  movant faces on that issue I think is a factor that the

20  Court needs to consider, besides just whether there is a

21  material net benefit to the creditors and/or the estate as a

22  whole.

23          MR. WANDER:  Yes, Your Honor.  And this was

24  addressed actually by Judge Galgay -- if those -- some

25  people remember Judge Galgay, as I'm sure Your Honor does.

Page 33

1    It involved a case where Weil Gotshal was seeking a

2    substantial contribution, and I believe that was mentioned

3    in -- I believe it was Best Products, it may have been -- I

4    believe it was Judge Brozman's case for General Oil.  And in

5    this case, what Judge Galgay -- what was noted in the

6    decision was that when Weil Gotshal requested the

7    substantial contribution award, they did not include

8    services that directly benefitted their client.  And that's

9    what I did, Your Honor.

10           The fees that I'm seeking and the time records do

11   not include any services that were only for Pearl Global.

12   So, the services that Pearl Global is seeking payment for

13   are only those services that related to its actions for all

14   of the administrator creditors or, in particular, the

15   foreign vendor administrative creditors.

16           But in the end, when Pearl Global got the million

17   dollars, it got it for all administrative creditors with

18   allowed claims and it wasn't limited to any category.

19           So, I addressed that, Your Honor.  And so all the

20   services that Pearl Global is seeking payment for had to do

21   with forming the committee, organizing it, giving the

22   committee for a period -- I'm sorry, it wasn't a committee,

23   it was a group, our ad hoc group.  It was to give them a

24   seat at the negotiating table.  We had a seat for a while,

25   then it was to advocate for all administrative creditors,

Page 34

1   other than professionals, at the confirmation hearing.  And

2   I spent several hours cross-examining the Debtor's

3   witnesses.  I believe I was the only one who cross-examined

4   in a fulsome manner the Debtor's witnesses.  And it provided

5   for a much more fulsome record.

6              And then after the first day, during the

7   continuation, I argued not just for Pearl Global but for all

8   the nonprofessional administrative creditors.  I can't -- in

9   looking at the cases, Your Honor, it's extraordinary what

10  Pearl Global did.  It's exactly, I submit, what the statute

11  is for.  And knowing that your --

12             THE COURT:  Can I interrupt you there?

13             MR. WANDER:  Sure.

14             THE COURT:  When you appeared at the confirmation

15  hearing, you appeared on behalf of Pearl Global and two

16  other entities, not on behalf of an ad hoc committee or a

17  group, right?  That's how you're listed, that's how you were

18  introduced --

19             MR. WANDER:  Correct.

20             THE COURT:  And let me just continue.  The

21  pleadings that were filed were on behalf of Pearl Global and

22  the other two clients that are listed in the Notice of

23  Appearance, right?

24             MR. WANDER:  Correct.

25             THE COURT:  And other members of this ad hoc group

Page 35

1   also appeared for their clients at the confirmation hearing,

2   like Mr. Sarachek.

3           MR. WANDER:  Yes, Your Honor.

4           THE COURT:  And, in contrast, Foley and Lardner

5   appeared on behalf of an ad hoc group or committee of admin

6   expense creditors, I think.

7           MR. WANDER:  Yeah.

8           THE COURT:  One last question.  There was never

9   any statement filed under Bankruptcy Rule 2019 by your firm

10  as a representative of this ad hoc group, right?

11          MR. WANDER:  Correct, Your Honor.  And if Your

12  Honor may recall, and it's in my declaration, before

13  confirmation, I attended several chambers conferences along

14  with Debtor's counsel and the committee, and I think one

15  before Foley and Lardner and I think one after they became

16  involved.  And I let Your Honor know when I appeared that I

17  was appearing for Pearl and also for an ad hoc group.  I

18  made that clear.  But --

19          THE COURT:  But formally you didn't do that,

20  right?  So, they wouldn't know that you were appearing on

21  their behalf.

22          MR. WANDER:  Your Honor, all the people in the

23  group knew throughout that I was advocating for everyone.

24  Weil Gotshal knew that --

25          THE COURT:  But we don't know what that group is

Page 36

1    and there was no 2019 statement filed, the purpose of which

2    is to make all of that clear.

3              MR. WANDER:  Well, Your Honor, again, I advised

4    Your Honor at the chambers conferences.  I had communicated

5    -- it was no secret to the Debtor.  I originally reached out

6    before Foley & Lardner was involved -- I originally reached

7    out to first the Debtor and then the Creditors Committee on

8    behalf of the group.

9              We negotiated over a term sheet with the

10   committee.  They knew I was representing -- not formally

11   representing -- I was organizing and advocating for a group

12   of approximately 35-40 foreign vendors.  The Debtor knew

13   this.

14             When I attended the meeting with the Debtor, the

15   committee and other representatives of the estate along with

16   Foley & Lardner, they knew I was coming, not as -- only as

17   Pearl Global's attorney; I was coming to represent the

18   group, the ad hoc group that I organized and it's been known

19   all along.

20             And then during the confirmation hearing -- and

21   this is in the reply papers -- at one point when I was

22   advocating for the non-opt out group, Your Honor said to me,

23   Mr. Wander, you have no standing to make that argument.  But

24   I made it for the others.  And in the beginning and during

25   my presentation when I was saying that a lot of the cash on

Page 37

1    hand should go to the administrative creditors, I was

2    arguing for everyone.

3              It's a well-known fact.  It's documented in the

4    record that while I formally was representing Pearl Global

5    and two other administrative creditors at that time,

6    everyone in the case knew I was there advocating for all of

7    the nonprofessional administrative creditors. And --

8              THE COURT:  Mr. Wander, you didn't have the

9    authority to bind anyone other than your client, right?

10             MR. WANDER:  Correct.  And that was clear to the

11   Debtor, the committee.  They knew I was acting as a conduit

12   for a group of creditors, a stakeholder group, that had

13   become the fulcrum creditor group.  So --

14             THE COURT:  Did you inform that whole group of

15   their ability to not accept the terms of the settlement that

16   Pearl Global negotiated?

17             MR. WANDER:  No, if Your Honor remembers, the

18   timing was the settlement construct was announced, I think,

19   two days before the confirmation hearing.  As of the

20   confirmation hearing, I hadn't even had a chance to really

21   review it because I was preparing for the hearing.  And then

22   it was a weekend that I negotiated and I think we showed up

23   on Monday, and Mr. Singh read the settlement into the

24   record.  And all I was doing was giving everything a million

25   dollars.

1          THE COURT:  And how much was the ad hoc -- were

2     the members of the ad hoc group informed of those

3     negotiations?

4          MR. WANDER:  I'm sorry, Your Honor?

5          THE COURT:  How much were the members of that ad

6     hoc group informed of your negotiations?

7          MR. WANDER:  Well, anyone who was listening in or

8     attending the confirmation hearing would've heard Your Honor

9     several times saying to me or Mr. Schrock, go in the hallway

10    and settle Pearl's claim, or why don't you settle with Mr.

11    Wander?  And that's how we left the hearing was Your Honor

12    basically saying to the Debtor and to me, go do your best to

13    settle this claim and Pear Global's objections.  So,

14    everyone who was listening in knew that.

15          But, no, over the next few days, I was dealing

16    with the Debtor with respect to their preference claim and I

17    spoke to the attorney at Ask who was handling that, and we

18    went over that, and that was encapsulated into the

19    settlement and the reduction of Pearl Global's claim from

20    approximately a million-5, to I think a million-130.

21          And Your Honor asked Mr. Singh on the record when

22    he announced the settlement whether that had been looked

23    into.  And Mr. Singh made it clear that they analyzed the

24    claim and they just weren't throwing the money at Pearl

25    Global to get rid of me.

1          So, everything was on the record and the people in

2     our group, they had their own counsel.  Everyone knew I was

3     playing a facilitating role, and that's what I did.  And

4     that is what I submit the statute is supposed to cover.

5     We're supposed to encourage, in appropriate cases, an

6     attorney doing something extraordinary.

7          I pointed out in my reply that there's no -- in

8     the Bankruptcy Code, there's no fiduciary to represent

9     administrative creditors in an administratively insolvent

10    case.

11         And so I think it's extraordinary what Pearl

12    Global did through their counsel, and they've had a direct

13    benefit.  And I think what I did and what Pearl Global did

14    should be applauded and not attacked.  And in the grand

15    scheme of this case with 200 million going to the

16    professionals and Pearl Global, you know, fighting against

17    the Debtor's counsel and the committee counsel to extract

18    value for all administrative creditors, that should be

19    applauded and it should be rewarded.

20         And for the million dollars that represents now

21    2.5 percent of what's been distributed, I submit that the

22    217,000 requests -- that's 215 in fees and approximately

23    2,000 in expenses -- is very reasonable.  I mean, it's

24    basically a 4.5 one return on the money.

25              THE COURT:  Okay.  Anything more?

Page 40

1           MR. WANDER:  I think what I just said, Your Honor,

2    and the papers -- if Your Honor has any other questions, or

3    I'll respond to any comments by the objectors.

4           THE COURT:  Okay.

5           MR. SINGH:  Good morning again, Your Honor. Sunny

6    Singh, Weil Gotshal, on behalf of the Debtors.  Your Honor,

7    the back and forth between Your Honor and Mr. Wander, you

8    covered actually a lot of points that I was going to raise,

9    so I will not repeat those.  I'll just highlight a couple of

10   issues, Your Honor.

11          As you noted, Your Honor, there was no 2019 ever

12   filed.  You know, Mr. Wander never had the ability to bind a

13   larger group of creditors and was certainly not representing

14   them, although I don't disagree that he was trying to

15   collect larger creditors so that he had a larger -- or they

16   had a larger voice in the case.  But that's not really the

17   standard, Your Honor.

18          And I would note -- and I really didn't intend to

19   get into all the back and forth of why negotiations broke

20   down -- but, frankly, once the Debtors realized that he did

21   not have a, quote-unquote, "ad hoc group" that he could

22   find, that was a significant factor for why it really didn't

23   make sense to continue communicating with him about a

24   settlement because it was a settlement to nowhere.

25          In terms of -- Your Honor, let me just address one

Page 41

1    factual point, his comments about the $9 million, and the

2    report we gave this morning, and the carve out.  The 9

3    million is separately listed but that does not mean that the

4    other funds were not moved over and would not have

5    ultimately been moved over.

6            Your Honor may recall that initially, as part of

7    the administrative claim settlement program that we agreed

8    to with the Foley group, the professionals had agreed to

9    move over $2 million.

10           That number was increased to $3 million after the

11   discussion and resolution with Mr. Wander.  That number is

12   already in the cash number in the line items because it had

13   already been moved over in sort of the way the confirmation

14   hearing estimates were.  And the 9 million was as a result

15   of Your Honor's ruing that subsequently came over and, to

16   correct what Mr. Wander said, has already been moved over.

17   So, Judge, there really was a total of 12 million that was

18   moved over.  And I would also note --

19           THE COURT:  That's fine.  When you say -- Mr.

20   Singh, when you say moved over, what do you mean?  Moved

21   over --

22           MR. SINGH:  I'm sorry, Your Honor, just to be

23   clear.  So, there was the professional fee escrow account

24   that was set up under the DIP order, where professionals

25   were providing estimates -- retained professionals were

Page 42

1   providing estimates for professional fees as they were being

2   incurred, and then they get trued up from time to time.

3             So, there are two accounts:  there's the

4   professional fee escrow account, and then there's the

5   Debtor's general operating accounts.  So, the professional

6   fee escrow account was segregated, held in trust exclusively

7   for the benefit of the professionals.

8             So, as part of the settlement with the Foley group

9   and then Pearl, $3 million was transferred voluntarily from

10  the professional fee escrow account in connection with the 2

11  million before confirmation, to move it over into the

12  general operating account so that it could be distributed.

13            Later, as Your Honor -- after Your Honor's ruling

14  regarding an additional incremental $9 million to be

15  transferred from the professional fee escrow account to the

16  general operating account -- and I would note, Your Honor,

17  your ruling just said, you know, if it's needed later.

18            The professionals just went ahead and moved it

19  right away and dealt with it in the confirmation order of,

20  you know, if there was a shortfall, how the sharing would

21  work.  But that was transferred from the professional fee

22  account, again, to the general operating account to satisfy

23  the various conditions under the Administrative Consent

24  Program.

25            So, including the, for example -- you know, we had

Page 43

1    to hit $25 million, which we didn't have at the time, for

2    the litigation trust funding, we had to hit the 10 million

3    for the cash reserve account, and then the excess was

4    distributed.

5           So, you know, all of those funds, 12 million in

6    total, were transferred from the professional fee account to

7    the general operating account and used for purposes of

8    satisfying the conditions under the Administrative Consent

9    Program and making distributions.

10          THE COURT:  So, I think both you and the committee

11   in its statement of support of the objection state that the

12   $1 million that Mr. Wander is referring to would have been

13   part of a second distribution anyway.  What is the -- what

14   is the basis for that statement then?

15          MR. SINGH:  Two bases, Your Honor:  One, we think

16   Your Honor would've required it anyway as part of the

17   ruling.

18          Two, Your Honor, the professional fee escrow

19   account is trued up from time to time as estimates become

20   actuals.  And I would report, Your Honor, that in subsequent

21   distributions and the second distribution in particular, an

22   incremental $7 million was moved over from the professional

23   fee account as estimates became actuals and we recognized

24   that there were some excess in there.

25          So, you know, over time, those amounts, we think -

Page 44

1    - and they were moved over in the second distribution but

2    over time they would've been moved over anyway.

3                    THE COURT:  Okay.  I.e., the reserves are not

4    permanent reserves.  They're adjusted based on actual --

5                    MR. SINGH:  Exactly, exactly, Your Honor.

6                    THE COURT:  -- quote on fees.

7                    MR. SINGH:  Of course, exactly.  We estimate them

8    as we're going but, of course, once the professionals have

9    their final tallies and statements are filed, you know,

10   there's true ups in accordance with the DIP order.

11                   THE COURT:  Okay.

12                   MR. SINGH:  Your Honor, with those corrections to

13   the record, I would then sort of just go back to, you know,

14   the overall context in which Mr. Wander is appearing for

15   this claim.  And Your Honor knows the standard very well so

16   I'm not going to sort of sit here and repeat.

17                   But I think there's a stark contrast, and when you

18   just look at the Bayou case where Your Honor awarded

19   substantial contribution applications and Judge Brozman's

20   decision in Best Products and the facts of the two cases,

21   and the distinctions and why she denied it, and I think this

22   all becomes very clear.

23                   I mean, it's very extraordinary relief that Mr.

24   Wander is asking for.  I mean, you don't see a substantial

25   contribution application filed and let alone granted every

Page 45

1    day.  In Bayou, Your Honor had a fraud situation, right?

2    There was a group of creditors who authorized prior to the

3    filing because the Debtor was engaged in fraud and there was

4    sort of nobody looking out for the protection of those

5    unsecured creditors.

6         Not the case here, Your Honor.  Not even close.

7    We've got the Debtors who've had an independent

8    Restructuring Committee since day one of this case.  You've

9    got the Creditors Committee who have been all over the

10   issues since day one of the case.  And the issue of

11   administrative claims, Your Honor, has been on the table

12   since day one of the case, and everybody's been laser-

13   focused on it.

14        Your Honor will recall the painful hearing we had

15   with respect to the Transform sale and all of the back and

16   forth and the insistence that the Restructuring Committee

17   had in accepting that transaction as to whether the estate

18   would remain administratively solvent, and the disputes back

19   and forth we had with the committee with that.

20        And so I submit, Your Honor, that Mr. Wander's

21   saying, you know, there's no fiduciary for administrative

22   creditors is just absolutely wrong.  There's a Restructuring

23   Committee.  We represent the interest -- or they represent

24   the interest of all creditors of the estate.  And by no

25   means have they sort of overlooked the issues of

Page 46

1   administrative creditors.  I would say that that's probably

2   been one of the most singular, most focused issues in this

3   entire case.  You know, we frankly -- there's not some gap

4   or void by the retained professionals that Mr. Wander needed

5   to fill here.

6           So, Your Honor, that's Bayou.  They just didn't

7   have that and the group was focused on preserving assets.

8   They investigated causes of actions and turned that over to

9   a trustee that was ultimately appointed, and it resulted in

10  a real net benefit to the estate.

11          On the opposite end of the spectrum, you had Best

12  Products, which, coincidentally, was a group of trade

13  creditors.  One on the Creditors Committee, who was trying

14  to get its own counsel's fee -- not the Creditors Committee

15  counsel -- its own counsel's fees reimbursed for doing work

16  on behalf of trade creditors, and another who was organizing

17  a group of other trade creditors and said, well, I made some

18  objections to the plan and I put forward alternatives, and

19  that changed the outcome of the case because there were

20  incidental changes to the plan.

21          And Judge Brozman said, no, that's not enough for

22  substantial contribution.  You were primarily representing

23  the interest of your creditors.  And even if you had some

24  indirect benefit, that's not a substantial contribution.

25          And, Your Honor, I submit that's exactly what we

1    have here.  We have best products, we don't have Bayou.  We

2    have a creditor who objected to the plan who ultimately

3    settled for its singular benefit and, yes, fine, there was a

4    million dollars that they insisted would come in that,

5    frankly, as I've pointed out, would have come in anyway.

6    And they were trying to coordinate with other creditors,

7    who, by the way, appeared through other counsel to just have

8    a larger leverage and voice in the case.

9            And, Your Honor, there's nothing unique about

10   that.  There's nothing remarkable about that to get a

11   substantial contribution claim.  That happens every single

12   day in bankruptcy cases.  It'd be a real slippery slope if

13   Mr. Wander's application is granted.  You know, why not the

14   other parties who objected to confirmation?  So, I really

15   don't think that there's anything unique that happened here,

16   and certainly not close to the heavy standard and the high

17   standard of a substantial contribution claim.

18           Your Honor, on the three items that Mr. Wander

19   points out in his papers as to why he's entitled to

20   substantial contribution claim, first and foremost, he

21   concedes he had absolutely nothing to do with the

22   Administrative Consent Program.  I think that's an important

23   concession.

24           Frankly, maybe we gave him too much benefit of

25   what he was trying to claim.  Because, you know, it's

Page 48

1    certainly more arguable if you had involvement in the

2    Administrative Consult Program that there was a substantial

3    contribution.  But he says, I had nothing to do with that.

4            So, then there's three things.  And at this point,

5    he really is hanging his hat on the million dollars that

6    were added to the initial distribution.  There's the --

7    well, he tries to allege that he had a lot to do, whether he

8    had something even to do with the change in the sort of non-

9    opt out treatment where creditors went from -- originally

10   the Debtors were proposing a 75 percent cap to an 80

11   percent.

12           And, Your Honor, if you go back, as I'm sure you

13   did, and you look at the confirmation hearing transcript, I

14   mean, it's clear as day.  One of the first issues after Mr.

15   Schrock describes the Administrative Consent Program and

16   anyone is even heard on any issues, Your Honor raises the

17   point that, you know, why have this separate class?  And you

18   started to ask about, you know, it's different from Toys and

19   some of the other cases, and what was the Debtor's

20   rationale, and the notice that would go out and all the back

21   and forth.

22           And following that conversation and that sort of

23   dialogue with the Court, the next day or immediately after

24   that when we could, we started to think about that. And the

25   next day when we were back before Your Honor, Mr. Schrock

Page 49

1    announced -- or I announced, excuse me, the change to the

2    treatment.  It had nothing to do with the objection or the

3    issues Mr. Wander was raising.

4            Similarly, Your Honor, although he has been on

5    attack of the retained professionals since he's been

6    involved in this case, which is fine -- I'm not here to

7    defend that -- but he had nothing to do with the $9 million

8    that Your Honor required in connection with your feasibility

9    ruling, right?  He was just saying, don't approve the

10   Administrative Consent Program, or if you're going to

11   approve it, move over 50 million or some ridiculous number

12   from the professional fee escrow just because it would be

13   more equitable to do that.

14           But Your Honor is the one that actually ruled,

15   based upon a feasibility determination that Your Honor made

16   after he settled, that that money may need to be available

17   and the professionals went ahead and moved it.  So, really,

18   no credit can be awarded to Mr. Wander or any linkage,

19   frankly, to that.

20           And then, finally, you've got the $1 million. And

21   putting aside the issue of -- let's just come back to the 1

22   million for a second, of how much it increased, if at all,

23   for anybody.

24           But the standard is there had to be a substantial

25   contribution, and Your Honor touched on this, to the

Page 50

1    administration of the case.  Right?  Not just one little

2    issue or one, you know, sort of what we believe is a de

3    minimis increase that, at best, is a timing acceleration --

4    because, as I noted for Your Honor, it came over anyway.

5              But I don't see how it -- his actions advanced the

6    administration of the case.  He was objecting at

7    confirmation, which happens quite often in Chapter 11 cases,

8    and in resolution of that objection, the Debtors resolved

9    his claim and offered one other issue that he was focused

10   on.  And certainly nowhere near the amount that he was

11   originally requesting, and not something he was requesting

12   on behalf of all creditors, Your Honor.

13             As you noted, he appeared on behalf of Pearl and

14   two other creditors. It was not sort of negotiating on

15   behalf of a larger group of creditors.  So I just don't see

16   the linkage to the administration of the case, which is the

17   legal standard, and an incremental million dollars that was

18   sent out earlier than -- as I reported to Your Honor, than

19   it would have been.  Not that it never would have come in,

20   but just earlier than it would have been.

21             So, Your Honor, for those reasons, we would submit

22   that he has not satisfied his heavy burden to demonstrate a

23   substantial contribution to the case.

24             We think this is very, very different than Bayou

25   and, frankly, in line with all the other cases where

Page 51

1    substantial contribution applications were denied and for

2    good reason, Your Honor.  And for those reasons, we would

3    request that Your Honor deny the application.

4              THE COURT:  Okay.  All right, thank you.  Anyone

5    else have anything to say before I turn it back to Mr.

6    Wander?

7              MS. MORABITO:  Good morning, Your Honor.  This is

8    Erika Morabito, Foley & Lardner, on behalf of Gary Polkowitz

9    in his capacity as the administrative expense claims

10   representative.  Can you hear me okay?

11             THE COURT:  Yes, I can hear you fine, thanks.

12             MS. MORABITO:  Thank you, Your Honor.  Mr.

13   Polkowitz is also on the phone as well with me today.  Your

14   Honor, as you know, we filed a joinder to the Debtor's

15   objection to the substantial contribution application of

16   Pearl Global, and that can be found at Docket Number 9235.

17   And while we share many of the arguments you heard already

18   this morning by Mr. Singh as to why we believe this

19   application should be denied, and I'll try not to repeat any

20   of those, there are a few key points that the administrative

21   expense claims representative would like to make.

22             As Your Honor may recall, a significant and very

23   important part of the Administrative Expense Claims Consent

24   Program was something that was very heavily negotiated with

25   both the Debtors and the UCC prior to plan confirmation, was

Page 52

1   the requirement of the appointment of the admin

2   representative.  And it was important because he was

3   mandated with completing certain things that were set forth

4   in paragraph 52A7 and 52B of the confirmation order.

5          And Your Honor may recall because there was some

6   colloquy back and forth with Your Honor and myself about

7   those duties, and part of those were that the obligation of

8   the admin representative was to assist with the review and

9   analysis of the claims, the settlements and related

10  litigation.  And he was tasked to do that to ensure both

11  fairness in the process but also to help maximize the value

12  of the Debtor's estates.

13         And part of that was to ensure that the

14  administrative creditors, who agreed to accept less than the

15  100 cents on the dollar as part of that admin expense

16  program, was ultimately paid; and, equally important, to

17  help push this case to go effective as expeditiously as

18  possible.

19         Mr. Polkowitz was selected as the admin expense

20  claim representative on March 13th, so roughly about 10

21  months ago.  And as you heard earlier, in the short time and

22  through the hard work of Mr. Polkowitz, the UCC, and the

23  Debtors and others, many matters have been settled and two

24  significant distributions have been made to date to those

25  admin creditors who opted into the settlement program.

1          That said, Your Honor, it is not lost on us to

2    spend over a year now since the plan was confirmed and those

3    same admin creditors have received less than 30 percent of

4    their allowed admin claim.  And, frankly, as you heard from

5    the Debtors themselves, it's unclear when and if another

6    distribution is forthcoming and when and if this plan will

7    go effective.

8          That said, we are optimistic about the plan going

9    effective.  We do think it's going to create -- it's going

10   to require creative hard work on the part of everybody

11   involved.  We continue to work closely with the Debtors and

12   the UCC and many admin creditors have reached out to us

13   throughout this process.

14         But this is why this is so important.  Like any

15   claim, seeking a priority status like what is being sought

16   here, this application of Pearl that's before the Court

17   needs to be carefully scrutinized.

18         As noted in the objection in both of the joinders

19   as well as the oral arguments and comments that the Court

20   made today, Mr. Polkowitz does not believe that Pearl has

21   met its burden to satisfy the stringent standard for relief

22   being sought.  And, in fact, we think the record

23   demonstrates that Pearl has failed to show that it has made

24   a direct substantial contribution to the Debtor's estate.

25   It would warrant it receiving a priority claim in the form

Page 54

1    of a substantial contribution.

2            Your Honor, on a personal level, I'm very fond of

3    Mr. Wander and certainly the passion he's shown in this

4    case.  I've gotten to know him quite well over the past year

5    and a half and I've been involved personally in the

6    negotiations with the Debtors, the UCC and many admin

7    creditors leading up to plan confirmation.

8            But when you read through the plan confirmation

9    transcript carefully and you look at his two declarations

10   that he filed, one for his application and one for his

11   reply, by his own admission, his client stopped being a

12   constructive part of a global solution almost a month before

13   plan confirmation.

14           And Pearl argued against both confirmation of the

15   plan and the Administrative Expense Claims Consent Program,

16   and that cost the estate significant dollars.  Pearl was not

17   left at the altar while some backdoor deal was cut.

18           But, rather, Pearl and Mr. Wander consciously made

19   the decision to not engage in any meaningful settlement

20   discussion that they felt did not give Pearl a homerun type

21   scenario.

22           Well, nobody in this case got a homerun.  In fact,

23   most everybody involved here left significant value on the

24   table and were forced to make concessions that they did not

25   want to make for the greater good of all the creditors in

1       this case.  And maybe that's why it as a good settlement in

2       the end and ultimately the Court approved it, but the Court

3       only approved it after the Court added further value to the

4       program.  It wasn't added by Pearl.

5              The ad hoc vendor group -- you asked the question

6       earlier about whether or not the ad hoc vendor group was

7       involved in the negotiations with Pearl and that we were

8       aware of the negotiations that were being made allegedly on

9       behalf of all the admin creditors.  We were not.

10             The $1 million, in our view, was done, when you

11      look at the transcript, at the urging of the Court.  And

12      that extra $1 million was a timing issue.  There's no cap on

13      the amount of money that would be paid to the admin

14      creditors except for the 80 and 75 percent case that was

15      negotiated.

16             In other words, that $20 million that became $21

17      million was not a settlement amount, it was not a cap that

18      was ultimately going to be distributed; it was just how much

19      was going to be distributed in the first interim

20      distribution before there were subsequent distributions.

21      And as Mr. Singh pointed out, it is a timing issue because

22      it was ultimately distributed and would have bene in the

23      second distribution.

24             So, in sum, Your Honor, while the administrative

25      expense claims representative will continue to look at every

Page 56

1    claim, as he has done so far, including any future

2    application for substantial contributions on a case-by-case

3    basis and, frankly, believes in certain circumstances

4    substantial contribution in this case may be warranted, he

5    does not feel that the facts in record before this Court

6    demonstrate that Pearl meets the stringent requirements of

7    Section 503(b)(3)(d) and 503(b)(4) of the Bankruptcy Code.

8    Pearl did not engage in extraordinary actions which led

9    directly to tangible benefits to the creditors, Debtors or

10   the estate.  As such, we believe the Pearl application

11   should be denied.

12          Your Honor, I have nothing further to add but I'm

13   happy to answer any questions you might have.

14          THE COURT:  No, that's fine, thanks.

15          MS. MORABITO:  Thank you, Your Honor.

16          THE COURT:  Okay, anyone else?  All right.  Mr.

17   Wander, do you have anything to say in reply or in response?

18          MR. WANDER:  Yes, Your Honor, thank you.  David

19   Wander of Davidoff Hutcher & Citron, counsel for Pearl

20   Global.  Your Honor, the Debtor and Ms. Morabito just made

21   some statements on the record that are not in any papers and

22   so I'd like to address those comments and tell Your Honor

23   what really happened with the negotiations with my group and

24   why the Debtor stopped negotiating with me and my group.

25   And here's really the overview, and it really gets down to

1  world imports.

2          And what I'm going to touch on on this will also

3  address the comment by Mr. Singh about the Restructuring

4  Committee being a fiduciary and looking out for all

5  creditors including administrative creditors.

6          So, here's what happened.  After the hearing on

7  the 503(b)(1) motion, I believe it was either April 21st or

8  May 21st, and that involved several other attorneys -- the

9  issue of World Imports was not before the Court because

10  that's 503(b)(9), as everyone knows, and we were litigating

11  503(b)(1) and goods that were ordered prepetition and

12  delivered post-petition.

13          And in the colloquy between Your Honor and

14  counsel, Your Honor made some comments about Your Honor's

15  view on the world import's decision.  And Your Honor's

16  comments indicated that you looked favorably upon the lower

17  court decision that was reversed by the Third Circuit.

18          And so what happened after that is the Debtors --

19  and I believe with the Restructuring Committee -- they

20  decided that the best way they could address the

21  administrative insolvency issue was to attack the foreign

22  vendor claims on the World Imports issue and take a contrary

23  position.  And that actually, I submit based upon my

24  discussions with the Debtor, and the committee, and the

25  meetings I attended, it was no secret that their way of

Page 58

1    achieving an effective date was to object to all of the

2    World Import's vendors claims.  And it was a significant

3    amount of money.

4         Now, the proposal that I had that I went over with

5    the committee and that then, when I met with the Debtor and

6    the committee and Foley Lardner, I made it clear that World

7    Imports was an issue that needed to be resolved.  And that's

8    where the Foley group and my group, our interests were not

9    aligned.

10        Because the Foley group were, I believe, hedge

11   funds, claims traders that, you know -- people involved in

12   the large bankruptcies all know of Lightbox, and Hanes, and

13   Cherokee and they purchased non-foreign vendor trade claims.

14        So, for the Foley group, supporting the Debtor and

15   the committee's attack on the foreign vendors made sense to

16   them.  What I was suggesting is why don't all administrative

17   creditors take a 25 percent haircut, agree to support the

18   plan going effective, even though the admins wouldn't be

19   paid 100 cents, and give them whatever cash is available?

20        And had that been done, the plan would've been

21   effective and you would've had a lot less litigation.  But

22   it would've meant that the Debtors and the committee

23   would've had to give up on their attempts -- I think it was

24   like a 30 or $40 million number that they thought they could

25   knock down on the administrative foreign vendors.

1            And that's why I was no longer given a seat at the

2    table, and I allude to this or I mention this, Judge, in

3    Footnote 2 of the reply by Pearl Global.  What was good for

4    the Foley group was not necessarily good for other

5    administrative creditors, especially the foreign vendors.

6            So, that's why the Debtor, and committee, and the

7    Foley group teamed up.  It was not because I couldn't bind

8    my group.  Everybody knew that my group was different from

9    the Foley group.  The Foley firm had been retained by the

10   Lightbox, Cherokee and Hanes.  I believe they filed in 2019.

11   They're a formal group or committee, and they were being

12   paid by their client, presumably.

13           I had organized a group of foreign vendors and

14   some other administrative creditors, and many of them had

15   their counsel.

16           So, I want to be clear that that's why the

17   administrative foreign vendor group that I was representing

18   was no longer included.  And that's how they went forward

19   with the plan.

20           Now, one of the things the cases state -- this is

21   in Bayou and the other cases when they talk about

22   substantial contribution -- one of the things they mention

23   is a creditor who objects to a plan so that a better plan

24   can be confirmed.  And that is what happened here.

25           Pearl Global objected to the plan vigorously.  And

Page 60

1    I put on the record all of Pearl's objections.  And Pearl's

2    objections were the objections by all of the nonprofessional

3    administrative creditors.  Not enough cash was being paid to

4    the nonprofessionals.  Not wasn't being paid to Pearl.

5    Because I took a position that a rising tide lifts all

6    boats.  So, if I could do better for all of the

7    administrative creditors, that would help Pearl.

8              And so I argued to give more cash to the

9    administrative creditors.  I said the non-opt out -- no, I

10   said, in the beginning, the consent plan would bind

11   creditors who didn't opt out.  And I said a lot of them are

12   foreign vendors, they don't have lawyers.  I don't know if I

13   mentioned that they may not speak English but probably

14   that's the case.  And I made that point.  And that

15   subsequently was changed.

16             And I'm not taking sole credit for the changes to

17   the plan.  Your Honor identified some deficiencies in the

18   original settlement program.  That was only announced two

19   days or a day and a half before the confirmation hearing.

20             So, I'm checking my notes, Your Honor.  I just

21   want to make sure that I responded to the different points

22   and that was that Mr. Singh said I had no group that I could

23   bind; Ms. Morabito saying I was no longer involved in the

24   negotiations a few months before confirmation.

25             Actually, it was only about two weeks before the

Page 61

1   confirmation hearing that things split up and the Foley

2   group then reached their construct.

3           I didn't support the Administrative Consent

4   Program and that was clear.  But through my conduct at the

5   confirmation hearing, I submit, you ended up with, albeit a

6   flawed plan, it was a better plan.  And I submit that this

7   timing issue and the tweaking, it's all a red herring.

8   Because the million dollars that I included out of purely

9   altruistic motives that while I was settling Pearl Global's

10  claim, I was still doing whatever I could for all the other

11  creditors.  And that, to me, should satisfy the standard of

12  a substantial contribution of extraordinary effort.

13          Now, in preparing for today's hearing and going on

14  the docket, I saw that there's another fee application next

15  month when the professionals are going to be asking for, in

16  round numbers, Judge, another $7 million.

17          So, one must wonder why all of this objection to a

18  $215,000 free request for someone who, in addition to

19  settling their client's claim, got a million dollars for all

20  the other creditors.  They should be applauding what I did,

21  but for the fact I was a thorn in their side.

22          I objected to what they were doing.  I've been

23  critical of their conduct.  So, of course they're going to

24  object to my amazingly de minimis substantial fee

25  application. I mean, it's a rounding error on their fees.

Page 62

1          And I submit that what I did in this case -- all

2    Pearl Global.  And the record is clear that I was arguing,

3    advocating zealously for many months before confirmation and

4    during confirmation, not just for Pearl but for all of the -

5    -

6          THE COURT:  All right, Mr. Wander, I think we're

7    going over old ground and I don't want to interrogate you

8    again as to your authority, so I think we should wrap this

9    up.

10          MR. WANDER:  Your Honor, I just wrapped up.

11          THE COURT:  Okay.

12          MR. WANDER:  That was what I wanted to say, that I

13    advocated for all of the non-professional administrative

14    creditors.  I think that was extraordinary conduct.  The fee

15    application, the fee aspect is very reasonable, and I

16    submit, based on the record with the undisputed facts

17    basically, that the application should be granted.

18          THE COURT:  Okay, all right.  I have before me a

19    motion by Pearl Global Industries Ltd for allowance and

20    payment of a claim under Section 503(b)(3)(d) and 503(b)(4),

21    which provide that an administrative expense can include the

22    actual and necessary expenses on your three; it's other than

23    compensation or reimbursement specified in paragraph (4) of

24    the subsection.

25          Paragraph (4) refers to compensation for

Page 63

1   professional services and reimbursement for professionals of

2   Section 503(b) incurred by, in subsection (d), a creditor,

3   which Pearl Global is, in making a substantial contribution

4   in a case under Chapter 11 of this title.

5           And then again, Section 503(b)(4) provides for the

6   reasonable compensation of professional services, for

7   professional services rendered by an attorney whose expense

8   is allowable under subparagraph (d) of paragraph (3) of this

9   subsection, based on the time, the nature, the extent of the

10  value of such services and the cost of comparable services

11  other than in a case under this title, and reimbursement of

12  actual necessary expenses incurred by such attorney or

13  accountant.

14          The case law under Section 503(b)(3) and (4) is,

15  in this district and in the Second Circuit generally, well

16  developed at this point.  It's well discussed in a fairly

17  recent case by Judge Lord out of the Eastern District of New

18  York, In re. Hancock St., SML LLC, 2016 B.R. Lexis 3828

19  (Bankr. E.D.N.Y., Oct. 25, 2016).

20          There, Judge Lord notes, first, that a party

21  seeking administrative expense under -- or seeking allowance

22  and payment of administrative expenses under that section

23  must prove substantial contribution by a preponderance of

24  the evidence; that mere conclusory statements regarding

25  one's substantial contribution are insufficient for such

Page 64

1      involvement to be deemed compensable under the section; and

2      that the circumstances entailing a party to a substantial

3      contribution expense are case specific, fact intensive, and

4      unusual.  That's at page 19 of the decision.

5              She also states that courts in this circuit have

6      considered the following factors in determining whether a

7      party has made a substantial contribution under Section

8      503(b): one, whether the services benefited the estate

9      itself or all of the parties in the bankruptcy case; two,

10     whether the service resulted in a direct, significant, and

11     demonstratively positive benefit for the estate, and I will

12     add that most other courts have added the word net between

13     positive and benefit, i.e., positive net benefit for the

14     estate; and three, whether the services duplicated the

15     efforts of others, citing Bedford JV, LLC v. Sky Lofts, LLC,

16     2013 U.S. District Lexis 125965 (E.D.N.Y., Sept. 3, 2013).

17             She further notes, and this is consistent with the

18     case law including the cases that she cites, the substantial

19     contribution must be more than an incidental one arising

20     from activities the applicant has pursued in protecting his

21     or her own interest, citing In re. Dana Corp., 390 B.R. 100,

22     108 (Bankr. S.D.N.Y. 2008).  She goes further, again citing

23     the Dana case, to say creditors are presumed to act in their

24     own interest and thus, face an especially difficult burden

25     in meeting the substantial contribution test,

Page 65

1    notwithstanding the fact that mere self-interest in and of

2    itself does not preclude reimbursement.

3            Nevertheless, as she notes correctly, compensation

4    under Section 503 is, quote, "rare" close quote, and

5    requires, quote, "extraordinary circumstances when the

6    creditors involvement truly enhances the administration of

7    the estate," closed quote.  See also the cases cited for

8    that proposition in the opinion which carries over to page

9    20.

10           In light of all of those requirements, Judge Lord

11   notes further, cases finding that a creditor made a

12   substantial contribution generally involve a creditor

13   playing a leadership role that would normally be expected of

14   an estate compensated professional.  This includes

15   activities such as active facilitation and negotiation of a

16   confirmed plan or efforts to impose a plan -- or oppose a

17   plan that resulted in a more favorable one.

18           In that decision, the movant who represented a

19   creditor in the case like the movant here, alleged in that

20   his legal services in being involved in negotiation of a

21   confirmed plan and opposing the original plan that was filed

22   in support of a more favorable one warranted the admission -

23   - I'm sorry -- the allowance of a substantial contribution

24   claim.

25           Consistent with most cases that deny substantial

Page 66

1    contribution claims under similar facts -- in fact, frankly,

2    I think all cases -- where the movant was not the proponent

3    or draftsperson or a prime mover with respect to a plan or

4    the objections to a plan in which its objections resume

5    after adopted largely wholesale in the new plan.  Judge Lord

6    in the Hancock case found to the contrary, that the movant

7    had not done enough to warrant a substantial contribution

8    allowance.  See also In re. Westinghouse Electric Co., LLC,

9    2019 B.R. Lexis 2981 (Bankr. S.D.N.Y. Sept. 19, 2019).

10           The decision in In re. Bayou Group, LLC, 431 B.R.

11   549 (Bankr. S.D.N.Y. 2010) echoes substantially all of the

12   foregoing standards.  In that case, I note that certain

13   aspects of the term "substantial contribution" are well

14   recognized, i.e., that it is factual with the movant bearing

15   the burden by the preponderance of the evidence.

16           Moreover, that provisions establishing

17   administrative expenses should be construed narrowly and

18   administrative expenses kept to a minimum, citing among

19   other cases, In re. United States Lines, Inc., 103 B.R. 427,

20   429 (Bankr. S.D.N.Y. 1989), and Dana Corp. at 390 B.R. 108.

21           And then in the Bayou case, I went on to hold, or

22   state rather, at page 560:  "Accordingly, the integrity of

23   Section 503(b) can only be maintained by strictly limiting

24   compensation to extraordinary creditor actions which lead

25   directly to tangible benefits to the creditors, debtor or

Page 67

1    estate," citing among other case, In re. Best Products Co.,

2    Inc., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994) and In re.

3    Granite Partners, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997).

4         The Bayou case goes on to state at page 561:  "The

5    problem with all of these synonyms, i.e., concrete benefit,

6    direct significant, and demonstrative positive benefit, and

7    a contribution of this considerable in amount value or work,

8    in each case of debtor's estate, the creditors and, to the

9    extent relevant, the stockholders, is that they do little to

10   shed any real light on how to apply the direct benefit rule

11   in practice."

12        The decision goes on to note, however, that the

13   case law has narrowed the imprecision arising from the

14   statute's language to qualify the direct benefit must be a

15   substantial net benefit.  A direct benefit also cannot be

16   established merely by a movant's extensive participation in

17   the case or be based on services that duplicated those of

18   professionals already compensated by the estate, such as

19   counsel for the debtor or an official committee.

20        And again, as Judge Lord noted, the creditors face

21   an especially difficult burden in passing the substantial

22   contribution test since they are presumed to act primarily

23   for their own interests, and efforts undertaken by creditors

24   solely to further their own self-interests are not

25   compensable under Section 503(b), and services calculated

Page 68

1    primarily to benefit the client do not justify an award,

2    even if they also confer an indirect benefit on the estate.

3         In light of all of the foregoing, Bayou also notes

4    at page 561 that it is -- 503(b) awards are reserved for

5    those rare and extraordinary circumstances where the

6    creditors involvement truly enhances the administration of

7    the estate.  So I think again, Dana Corp., as well as two

8    other cases from the Southern District of New York.

9         The opinion goes on to state:  Thus, Section

10   503(b)(3)(d) and (b)(4) may not be used to buy off a pest

11   who did little, if anything, to advance, and in fact may

12   have impeded, the proper administration of the case, such as

13   where it is alleged that a settlement benefited not only the

14   creditor, but also others similarly situated, or where the

15   creditor, as was the case in Best Products Company, or the

16   creditor group was throughout the case merely an advocate

17   for its position on some issues of which it prevailed, on

18   some it didn't, but in all of the cases was looking after

19   its own interests.

20        In sum, again consistent with Judge Lord's opinion

21   in the Hancock St. case, Bayou states, "The majority of

22   cases allowing creditors substantial contribution claims

23   under Sections 503(b)(3)(d) and (b)(4) have therefore found

24   that the creditor played a leadership role that normally

25   would be expected of an estate compensated professional but

Page 69

1     was not so performed."

2              Most have, consistent with pre-bankruptcy code

3     practice, involved a creditor who actively facilitated the

4     negotiation and successful confirmation of the Chapter 11

5     plan or in opposing a plan brought about the confirmation of

6     a more favorable one.  And even in other contexts, the

7     movant has performed functions that normally would have been

8     undertaken by estate compensated professionals when it had

9     to be performed because estate compensated professionals

10    were not doing their jobs.

11             In the Bayou case, I awarded a substantial

12    contribution claim for creditors who clearly acted on behalf

13    of all creditors in the case and performed an important

14    administrative role, where the debtor was, in essence, non-

15    existent because it had engaged in fraud and, therefore, the

16    movants assumed the mantle of, in large measure, the

17    professionals for the debtor in moving forward with the

18    plan.

19             As counsel for the debtors here have observed, a

20    contrary fact pattern appeared at In re. Best Products Co.,

21    Inc., 173 B.R. at 866, where the Court found that the mere

22    participation in a case which resulted in some results that

23    could arguably be viewed as favorable not only to the

24    creditors who made the motion, but parties-in-interest was

25    insufficient to warrant a substantial contribution aware,

1      given all of the foregoing requirements.

2               A similar point is made in In re. Brooke Corp., B-

3      R-O-O-K-E, 433 B.R. 856, 873 (Bankr. D. Kansas, Jan. 5,

4      2011), in contrasting the facts set forth in that case from

5      the facts in the Bayou case, and noting that in Bayou, the

6      committee expressly took upon itself the representation of

7      all the debtors' creditors.  In these cases, the movant

8      represented only two of the banks who held Brooke's

9      securitizations.  See also with regard to the general

10     standard, as well as how it is applied, In re. AMR Corp.,

11     2014 B.R. Lexis 3298 at pages 6 through 10, (Bankr. S.D.N.Y.

12     Aug. 4, 2014).

13              Here, it is clear to me, and frankly not even a

14     close call, that the movant has not carried its burden to

15     show an entitlement to allowance of a substantial

16     contribution claim under Sections 503(b)(3)(d) and (4).

17              It is asserted in the motion and supporting

18     affidavit, as well as the reply and reply affidavit, that

19     counsel for the movant organized an ad hoc group of

20     similarly situated administrative expense claimants and, for

21     their benefit, acted in these Chapter 11 cases to represent

22     the interests of the group in negotiations and thereafter in

23     objecting to the debtors' proposed Chapter 11 plan, which

24     included in it a proposed global administrative expense

25     claim procedure, and then negotiated a settlement thereafter

1   which modified that procedure in three respects, and in each

2   case, which the movant contends, provided a substantial

3   direct benefit for purposes of Section 503(b)(3)(d) and

4   (b)(4).

5          There are several problems with this argument.

6   First, the claimed benefit, or the benefit that is claimed

7   to have been conferred by the movant was not to all

8   creditors or to the debtors' estates in general or, frankly,

9   to the administration of the case and the case law and the

10  statute's own reference to the administration of the case

11  generally requires.

12         Instead, the claimed benefit was to a subset of

13  the administrative expense claimants in the case, namely

14  certain unidentified foreign vendors among or perhaps all of

15  the foreign vendors that had submitted administrative

16  expense claims in the case.

17         Moreover, it appears clear to me that the asserted

18  or the claimed benefit conferred was not substantial and

19  direct by any means or the result of the movant's efforts.

20  Three claimed benefits conferred are asserted: first, the

21  settlement negotiated on behalf of Pearl Global, in addition

22  to fixing Pearl Global's administrative expense claim and

23  its preference exposure under Section 547 of the Bankruptcy

24  Code provided for an increase by $1 million of the amount to

25  be paid in the initial distribution to administrative

Page 72

1    expense creditors who opted in to the administrative expense

2    claims settlement, a settlement that the claimant Pearl

3    Global had originally opposed but accepted as part of its

4    own settlement.

5         It is clear to me from the record in this case

6    that under the terms of the plan and the administrative

7    expense claims resolution settlement, that that extra $1

8    million would have been paid in not the first but the second

9    distribution, which was made approximately eight months

10   later under the administrative expense settlement negotiated

11   not by Pearl Global by its counsel, but instead by the ad

12   hoc committee of administrative expense creditors

13   represented by Foley & Lardner.

14        So the benefit to their debt was claimed here is

15   merely a benefit of an acceleration of $1 million payment by

16   eight months, the interest on which is considerably less

17   than, at any reasonable rate, the amount of the

18   administrative expense claim asserted here, which is in

19   excess of $217,000.

20        It is additionally alleged that Pearl Global and

21   its counsel had a direct role and the Court's having the

22   escrow for professional fees under the cash collateral and

23   DIP order reduced by $9 million, with that amount of money

24   instead being put into general funds for the performance of

25   the administrative expense program.

Page 73

1          It is clear to me from my recollections of the

2     confirmation hearing, as well as my review of the transcript

3     of that hearing, that, in fact, in keeping with my duties

4     under Section 1129(a) of the Bankruptcy Code, and more

5     specifically 1129(a)(9)(A) and 1129(a)(11), that for the

6     plan to satisfy the confirmation requirements, based on the

7     entire record for me, very little of which, if any, was

8     developed by Pearl Global, the plan required that amount of

9     money to go into general funds up front before I would enter

10    the order confirming the plan, albeit that the escrow was

11    one that is adjustable in the first place and would become

12    available later in any event.

13         A similar observation can be made with respect to

14    the third and last claimed benefit to have been conferred by

15    Pearl Global and its counsel, which was an increase in the

16    percentage distribution on account of administrative expense

17    claims under the administrative expense program in the plan

18    for so-called non-optout administrative expense creditors,

19    that is creditors who neither opted in to the administrative

20    expense program or affirmatively opted out of it.  This was,

21    therefore, a third group or a third subclass of

22    administrative expense creditors.  Originally, they would

23    receive the same 75 percent that the opt-in group received.

24         Simply based on my review of the plan and cases

25    where there were similar programs, such as the Toys 'R Us

Page 74

1     plan, I did not see a logical basis for the same percentage

2     treatment or same percentage cap for those who opted in and

3     those who did nothing.  As a result of my comments at the

4     confirmation hearing, the cap for the non-optout class was

5     raised to 80 percent.

6            Again, I conclude based on the fact specific

7     analysis that is required that the actual and demonstrable

8     benefit to the debtors' estate, creditors -- and, of course,

9     not here -- but to the extent relevant, stockholders, and

10    that benefit being a substantial net benefit directly

11    attributable to Pearl Global and its counsels' actions

12    simply is not going to establish with regard to any of the

13    three claimed benefits provided here, even if I were to

14    conclude that a benefit to a subset of a class of

15    administrative expense creditors would satisfy the statute.

16           I will note that Pearl Global actually negotiated

17    the $1 million distribution as the advance distribution for

18    a subset of the subset, i.e., those who opted in to the

19    settlement, so it is even a more narrowly tailored benefit

20    and, therefore, even more remote from the type of benefit

21    that the case law and I believe congress contemplated in

22    these two sections of the Bankruptcy Code.

23           I think it's also important to note the context of

24    Pearl Global's efforts in this case, as asserted by it, to

25    be compensable under Section 503(b)(3)(d) and (b)(4).  Under

1    Section 1129(9)(a) of the Bankruptcy Code, unless an

2    administrative expense creditor consents to a different

3    treatment, the plan must pay all administrative expense

4    claims in full on the effective date.  That means that any

5    administrative expense creditor with a material claim has

6    considerable leverage over the confirmation process, i.e.,

7    it must be paid in full unless it agrees otherwise.  Each

8    creditor, therefore, has its own mini-veto over confirmation

9    if it appears that the debtor may not be able, under

10   reasonable projections, to pay all allowable administrative

11   expense claims in full on confirmation.

12        Counsel for Pearl Global noted during oral

13   argument that he viewed a rising tide lifts all boats and,

14   therefore, he was effectively negotiating for all

15   administrative expense creditors when seeking more money

16   from the debtor than was set forth in the administrative

17   claims process or procedure.

18        But, of course, at the same time since the debtor

19   cannot discriminate unless the creditor consents to such

20   discrimination under 1129(9)(a), raising the interests of

21   all creditors is, in fact, raising one's own interest in

22   this context and, in fact, increasing arguably the leverage

23   that one has, which to me means that the high burden to show

24   that Pearl Global was actually acting in the interests of

25   all creditors or even a subset of all creditors has not been

Page 76

1    carried here.

2           Finally, the record is clear that Pearl Vision

3    (sic) really was not acting formally for all creditors; it

4    did not assume that mantle.  It never represented anyone, or

5    its counsel never represented anyone more than it and the

6    other three creditors that it appeared on behalf of,

7    including, as stated in the transcript of the confirmation

8    hearing.  Indeed, other parties to this so-called group that

9    it organized appeared by their own counsel at the

10   confirmation hearing and continued to oppose confirmation

11   even after Pearl Vision (sic) settled.

12          It is clear for me that it did not have any

13   ability to bind any other creditor.  There's no formal

14   organizational documents referred to for the so-called ad

15   hoc group, Pearl Global did not speak for the so-called ad

16   hoc group, its counsel did not file the statement required

17   to be filed when representing such a group under Bankruptcy

18   Rule 2019, and it was not acting as a fiduciary for any of

19   those parties, not did it actually engage in negotiations in

20   which it kept any of those parties informed with respect to

21   the negotiations that led to its actual settlement, i.e.,

22   between the October 3 hearing and the adjourned confirmation

23   hearing that resumed on October 7.

24          It simply did not play the leadership role in

25   these cases that is generally required by the case law, nor

1    did it provide any contribution to the overall estate in

2    those rare cases, such as the McLean Industries case that I

3    previously cited, will at times justify an award under

4    Section 503(b)(1).  In other words, notwithstanding the

5    references repeatedly to its group or my group, there was no

6    such group that could have served as the fulcrum point for

7    negotiations, in contrast to the group represented by Foley

8    & Lardner and actually acting as a group.

9            So taking into account all of the foregoing and

10   recognizing that there's no direct significant and

11   demonstrable benefit to the estate, that the benefit exceeds

12   the costs of either the award itself or the costs to the

13   estate of getting the asserted benefit, that the party acted

14   primarily for its own benefit and not for the benefit of all

15   parties in the case or the estate or even to further the

16   administration of the case by furthering a global settlement

17   that would clearly bind all parties or at least form a

18   framework for binding all parties, and that it does not

19   appear to me that Pearl Global did all of this except on its

20   own behalf and, therefore, did not have and would not have

21   done this unless it had an expectation of reimbursement by

22   the estate, I conclude that the motion should be denied.

23           In addition to all the case law I've cited, those

24   factors all come out of the discussion of this section

25   generally in "Collier on Bankruptcy" at paragraphs 4301[5] -

Page 78

1    - that's brackets 5, bracket [a] bracket, and bracket [b]

2    bracket 16th Edition 2021.

3             Now, I should be clear, although I think this is

4    implicit, I am dealing solely with the right to a

5    substantial contribution claim under Section 503(b).  I am

6    not making any comment on the quality of Davidoff Hutcher &

7    Citron's work on behalf of its clients, Pearl Global and

8    others in these cases.  I am assuming that it has been paid

9    by them and that they are happy with its work because they

10   obtained a settlement that they agreed to.  But that is not

11   -- doing good work in a case, in other words, is not a basis

12   for charging the debtors' estate for that work.

13            Chapter 11 is a multiparty process.  I assume that

14   most law firms and lawyers who appear in Chapter 11 cases

15   will be doing good work for their clients, and that includes

16   taking actions that may result in improvements in the case

17   for not only their clients, but other clients, as well as at

18   times taking actions where they are ruled against.

19            But the standard here is far higher than that type

20   of work because in general, it's an extraordinary thing to

21   award a creditor or a firm administrative expense allowance

22   under Sections 503(b)(3)(d) and (4).

23            So I'll ask the debtors' counsel to submit an

24   order denying the motion.  You don't have to formally settle

25   it on Mr. Wander, but you should copy him, as well as

1    counsel for the administrative expense claims representative

2    and the committee when you email it to chambers.

3                MR. SINGH:  Thank you, Your Honor.  We will do so.

4                THE COURT:  Okay.  I think that concludes the

5    agenda for today.

6                MR. SINGH:  That's right, Your Honor, that's all

7    we have on.  I did want to just go back and answer your -- I

8    did get an answer on your open question from the status

9    report regarding the other expense line item.  I did get an

10   email from Mr. Murphy.

11               Your Honor, a couple of things go into this

12   category.  One sort of relates to remaining real estate that

13   Sears continues to own, so insurance, real estate taxes and

14   the like.

15               There's also outstanding OCP costs that were

16   incurred during the case that still haven't been paid and

17   other sort of non- -- sort of estate retained, formally

18   retained professionals that were either ordinary course or,

19   you know, vendors and the like that continue to have some

20   obligations.

21               We've also got reserves or estimated amounts for

22   the administrative claims representative and its counsel,

23   and there's some vendor A/P remaining for the systems that,

24   you know, the estate continues to use, so that's a combined

25   line item for those various ongoing costs.

Page 80

1          And again, it's projected out for a year only if

2    we go that long, but it's not -- just to show you what it

3    would be.  But obviously, if the case ends sooner, the

4    number would go down.

5          THE COURT:  Okay.  All right, thank you.  Okay,

6    very well.  I'll conclude the hearing then and hang up.

7    Thanks, everyone.

8          MR. SINGH:  Thank you, Your Honor.

9          (Whereupon these proceedings were concluded at

10   12:16 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 25, 2021

## &

**&**   5:3,10 26:11
36:6,16 51:8
56:19 72:13 77:8
78:6

## 1

**1**   13:16 30:11
43:12 49:20,21
55:10,12 57:7,11
71:24 72:7,15
74:17 77:4
**1,100**   21:14
**1,700**   8:8
**1.3**   8:5
**10**   13:16,21,24
14:5,7,8 29:7,12
29:19 43:2 52:20
70:11
**100**   9:2 52:15
58:19 64:21
**10153**   5:13
**10158**   5:6
**103**   66:19
**10601**   1:15
**108**   64:22 66:20
**109.1**   15:5
**10:00**   2:2
**10:09**   1:18
**11**   8:10 19:11
30:17 50:7 63:4
69:4 70:21,23
73:5 78:13,14
**11.4.**   10:21
**1129**   73:4,5,5 75:1
75:20
**11501**   81:23
**12**   41:17 43:5
**125965**   64:16
**12:16**   80:10
**13.1**   19:16
**130**   38:20
**13th**   52:20

**14.1**   19:17
**15**   15:11,18,19
**16.8**   13:8,10,23,24
14:12
**16th**   78:2
**173**   67:2 69:21
**177**   11:5
**18**   15:25
**18-23538**   1:3
**18.4**   28:6
**18.8**   12:13
**19**   12:10 14:25
64:4 66:9
**19.4.**   28:7
**1989**   66:20
**1994**   67:2
**1997**   67:3

## 2

**2**   7:14 8:4 18:18
41:9 42:10 59:3
**2,000**   39:23
**2.5**   26:20 30:6
39:21
**2.8**   10:22
**20**   14:11 30:5
55:16 65:9
**20.5**   14:23
**200**   29:24 39:15
**2008**   64:22
**2010**   66:11
**2011**   70:4
**2013**   64:16,16
**2014**   70:11,12
**2016**   63:18,19
**2019**   35:9 36:1
40:11 59:10 66:9
66:9 76:18
**2021**   1:17 2:2 78:2
81:25
**21**   1:17 2:2 12:8
55:16
**210**   11:18

**213**   67:3
**215**   39:22
**215,000**   61:18
**217,000**   39:22
72:19
**21st**   57:7,8
**248**   1:14
**25**   9:6 13:13 16:25
43:1 58:17 63:19
81:25
**256**   11:19
**27**   17:20
**27.5**   16:9,23 18:21
**278**   11:18
**28.3**   9:4
**2981**   66:9

## 3

**3**   2:13,20 3:21
12:5 15:10,14
25:1,19 41:10
42:9 56:7 62:20
63:8,14 64:16
68:10,23 70:16
71:3 74:25 76:22
78:22
**3.5**   19:17
**30**   53:3 58:24
**300**   1:14 81:22
**30th**   19:4
**3298**   70:11
**330**   81:21
**35-40**   36:12
**3828**   63:18
**39.2**   13:8 14:21
**390**   64:21 66:20
**3rd**   5:5

## 4

**4**   2:13,20 3:22
12:24 25:1,20
56:7 62:20,23,25
63:5,14 68:10,23
70:12,16 71:4
74:25 78:22

**4,000**   8:4
**4.1**   9:24 10:9
**4.5**   39:24
**4.7**   19:21
**40**   8:23 21:9 26:19
58:24
**42.1.**   11:25
**427**   66:19
**429**   66:20
**4301**   77:25
**431**   66:10
**433**   70:3
**440**   67:3
**445**   67:3
**49**   8:10
**49.5**   29:24

## 5

**5**   15:8 18:25 38:20
70:3 77:25 78:1
**50**   8:10 11:25
29:24 49:11
**503**   2:13,13,20,20
3:21,22 11:21,23
19:22 25:1,1,19
56:7,7 57:7,10,11
62:20,20 63:2,5
63:14 64:8 65:4
66:23 67:25 68:4
68:10,23 70:16
71:3 74:25 77:4
78:5,22
**52a7**   52:4
**52b**   52:4
**547**   71:23
**549**   66:11
**560**   66:22
**561**   67:4 68:4
**59.5**   8:24

## 6

**6**   11:10 19:1 21:22
70:11
**6.8.**   13:21 14:12

**60** 19:10
**600** 21:15
**605** 5:5
**69.9.** 16:4

**7**

**7** 43:22 61:16
76:23
**75** 8:18 48:10
55:14 73:23
**767** 5:12

**8**

**80** 8:18 48:10
55:14 74:5
**83** 11:23
**85** 15:6,7
**856** 70:3
**862** 67:2
**866** 67:2 69:21
**873** 70:3

**9**

**9** 11:21,23 19:21
19:22 28:23 29:2
29:7,11 30:1 41:1
41:2,14 42:14
49:7 57:10 72:23
73:5 75:1,20
**90** 9:7 11:23 15:7
**9130** 2:6,15,22 3:2
3:9,16,23 4:2
**9131** 2:6,22
**9132** 2:8
**9233** 3:4,8,16
**9234** 3:11
**9235** 3:17 51:16
**9243** 3:24
**9244** 4:4
**97.3.** 16:11
**99.3** 8:22

**a**

**a.m.** 2:2
**ability** 37:15
40:12 76:13

**able** 19:20,24 75:9
**absent** 26:24
**absolutely** 45:22
47:21
**accelerate** 16:16
18:6 23:2
**aceleration** 50:3
72:15
**accept** 37:15
52:14
**accepted** 72:3
**accepting** 45:17
**accompanying**
26:3
**account** 9:22 13:9
13:17,21 41:23
42:4,6,10,12,15
42:16,22,22 43:3
43:6,7,19,23
73:16 77:9
**accountant** 63:13
**accounts** 13:12
14:25 42:3,5
**accurate** 81:4
**achieving** 58:1
**act** 32:8 64:23
67:22
**acted** 69:12 70:21
77:13
**acting** 31:3 37:11
75:24 76:3,18
77:8
**actions** 33:13 46:8
50:5 56:8 66:24
74:11 78:16,18
**active** 65:15
**actively** 69:3
**activities** 64:20
65:15
**actual** 11:15 44:4
62:22 63:12 74:7
76:21

**actuals** 19:8 43:20
43:23
**ad** 33:23 34:16,25
35:5,10,17 36:18
38:1,2,5 40:21
55:5,6 70:19
72:11 76:14,15
**add** 56:12 64:12
**added** 29:2 48:6
55:3,4 64:12
**addition** 18:9
61:18 71:21 77:23
**additional** 12:25
19:25 28:23 30:6
30:6 42:14
**additionally**
72:20
**address** 30:16
40:25 56:22 57:3
57:20
**addressed** 32:24
33:19
**adjourned** 24:20
76:22
**adjustable** 73:11
**adjusted** 15:16,22
44:4
**admin** 24:3 35:5
52:1,8,15,19,25
53:3,4,12 54:6
55:9,13
**administered**
13:15
**administration**
14:6 50:1,6,16
65:6 68:6,12 71:9
71:10 77:16
**administrative**
2:10 3:13 7:18,21
8:3,7,15 9:14
10:24 11:24 12:6
13:11,19 14:9
15:5 16:14 17:12

18:4,5,13 21:10
23:1 25:25 26:18
27:1,3 29:23 30:3
31:24 33:15,17,25
34:8 37:1,5,7 39:9
39:18 41:7 42:23
43:8 45:11,21
46:1 47:22 48:2
48:15 49:10 51:9
51:20,23 52:14
54:15 55:24 57:5
57:21 58:16,25
59:5,14,17 60:3,7
60:9 61:3 62:13
62:21 63:21,22
66:17,18 69:14
70:20,24 71:13,15
71:22,25 72:1,6
72:10,12,18,25
73:16,17,18,19,22
74:15 75:2,3,5,10
75:15,16 78:21
79:1,22
**administratively**
39:9 45:18
**administrator**
33:14
**admins** 11:5,21
58:18
**admission** 54:11
65:22
**adopted** 66:5
**advance** 68:11
74:17
**advanced** 7:8 50:5
**adversary** 21:2
**advised** 36:3
**advocate** 33:25
68:16
**advocated** 62:13
**advocating** 31:18
35:23 36:11,22
37:6 62:3

[affidavit - avoidance]                                                    Page 3

**affidavit** 25:23
26:3 70:18,18
**affirmatively**
73:20
**agenda** 2:1 6:20
6:21 7:3 24:18,19
24:23 79:5
**aggregate** 21:12
**ago** 52:21
**agree** 27:15 58:17
**agreed** 41:7,8
52:14 78:10
**agreement** 24:5
**agrees** 75:7
**ahead** 12:1 26:6
42:18 49:17
**akin** 14:20
**al** 1:7 3:10 6:4
**albeit** 61:5 73:10
**aligned** 58:9
**allege** 48:7
**alleged** 65:19
68:13 72:20
**allegedly** 55:8
**allocated** 14:13
**allowable** 63:8
75:10
**allowance** 2:11,18
3:20 24:25 62:19
63:21 65:23 66:8
70:15 78:21
**allowed** 8:7,19,21
9:9,23 11:5 15:23
33:18 53:4
**allowing** 10:24
68:22
**allude** 59:2
**altar** 54:17
**alternatives** 46:18
**altruistic** 61:9
**altruistically**
31:20

**amazingly** 61:24
**amended** 6:19 7:3
**amount** 8:22 9:4
9:15 10:3,14,16
10:21,23 11:5
12:10 15:18,18
17:8,24 27:7,21
30:8,12 50:10
55:13,17 58:3
67:7 71:24 72:17
72:23 73:8
**amounts** 8:12
43:25 79:21
**amr** 70:10
**analysis** 52:9 74:7
**analyzed** 38:23
**announced** 37:18
38:22 49:1,1
60:18
**answer** 7:11,23
11:16 22:3,7 23:6
23:13,14 56:13
79:7,8
**anybody** 49:23
**anyway** 20:17
31:12 43:13,16
44:2 47:5 50:4
**apart** 17:2
**apologies** 25:11
**apologize** 19:19
23:14
**appeals** 14:17
**appear** 77:19
78:14
**appearance** 34:23
**appeared** 34:14
34:15 35:1,5,16
47:7 50:13 69:20
76:6,9
**appearing** 35:17
35:20 44:14
**appears** 71:17
75:9

**applauded** 39:14
39:19
**applauding** 61:20
**applicant** 64:20
**application** 2:10
2:18 3:1,7,15,20
44:25 47:13 51:3
51:15,19 53:16
54:10 56:2,10
61:14,25 62:15,17
**applications**
44:19 51:1
**applied** 70:10
**apply** 67:10
**appointed** 46:9
**appointment** 52:1
**appropriate** 39:5
**approve** 49:9,11
**approved** 19:19
55:2,3
**approximately**
21:6 36:12 38:20
39:22 72:9
**april** 57:7
**arguable** 48:1
**arguably** 69:23
75:22
**argue** 26:8
**argued** 34:7 54:14
60:8
**arguing** 37:2 62:2
**argument** 36:23
71:5 75:13
**arguments** 30:22
30:24 51:17 53:19
**arising** 64:19
67:13
**arrange** 6:14
**articulated** 32:13
**aside** 49:21
**asked** 38:21 55:5
**asking** 25:13
44:24 61:15

**aspect** 62:15
**aspects** 66:13
**asserted** 8:6 9:4
10:21 15:18 17:12
70:17 71:17,20
72:18 74:24 77:13
**asserting** 8:10
**asset** 16:4
**assets** 13:7 14:21
14:24 17:15 18:15
20:2 46:7
**assist** 13:17 52:8
**assume** 23:22
26:7 76:4 78:13
**assumed** 69:16
**assuming** 16:5
29:18 78:8
**assumption** 21:18
**attack** 49:5 57:21
58:15
**attacked** 39:14
**attempts** 58:23
**attended** 35:13
36:14 57:25
**attending** 38:8
**attorney** 5:4
36:17 38:17 39:6
63:7,12
**attorneys** 5:11
57:8
**attributable**
74:11
**aug** 70:12
**august** 12:9
**authority** 37:9
62:8
**authorized** 6:10
45:2
**available** 13:20
49:16 58:19 73:12
**avenue** 5:5,12
**avoidance** 20:25

**[award - case]**                                           Page 4

**award** 32:12 33:7
68:1 77:3,12
78:21
**awarded** 44:18
49:18 69:11
**awards** 68:4
**aware** 55:8 69:25

**b**

**b** 1:21 2:13,13,20
2:20 3:21,22
11:21,23 19:22
25:1,1,19 56:7,7
57:7,10,11 62:20
62:20 63:2,5,14
64:8 66:23 67:25
68:4,10,10,23,23
70:2,16 71:3,4
74:25,25 77:4
78:1,5,22
**b.r.** 63:18 64:21
66:9,10,19,20
67:2,3 69:21 70:3
70:11
**back** 11:10 12:5
21:22 29:7,19
30:22 40:7,19
44:13 45:15,18
48:12,20,25 49:21
51:5 52:6 79:7
**backdoor** 54:17
**background** 21:4
**ballard** 25:8
**bankr** 63:19
64:22 66:9,11,20
67:2,3 70:3,11
**bankruptcies**
58:12
**bankruptcy** 1:1
1:13,23 2:12,20
3:21 25:1 30:4,5
35:9 39:8 47:12
56:7 64:9 69:2
71:23 73:4 74:22

75:1 76:17 77:25
**banks** 70:8
**base** 18:12
**based** 18:11 26:22
44:4 49:15 57:23
62:16 63:9 67:17
73:6,24 74:6
**bases** 43:15
**basically** 38:12
39:24 62:17
**basis** 6:12 43:14
56:3 74:1 78:11
**bayou** 31:25 32:6
44:18 45:1 46:6
47:1 50:24 59:21
66:10,21 67:4
68:3,21 69:11
70:5,5
**bearing** 66:14
**bedford** 64:15
**beginning** 36:24
60:10
**behalf** 2:7 3:3,9
3:17,24 4:3 6:23
7:21 34:15,16,21
35:5,21 36:8 40:6
46:16 50:12,13,15
51:8 55:9 69:12
71:21 76:6 77:20
78:7
**believe** 10:21
27:10 28:23 29:11
33:2,3,4 34:3 50:2
51:18 53:20 56:10
57:7,19 58:10
59:10 74:21
**believes** 56:3
**bene** 55:22
**benefit** 31:3,7,10
31:17,21,22 32:3
32:11,12,15,21
39:13 42:7 46:10
46:24 47:3,24

64:11,13,13 67:5
67:6,10,14,15,15
68:1,2 70:21 71:3
71:6,6,12,18
72:14,15 73:14
74:8,10,10,14,19
74:20 77:11,11,13
77:14,14
**benefited** 64:8
68:13
**benefits** 56:9
66:25 71:20 74:13
**benefitted** 33:8
**best** 33:3 38:12
44:20 46:11 47:1
50:3 57:20 67:1
68:15 69:20
**better** 16:25 28:24
59:23 60:6 61:6
**big** 20:21
**billion** 8:5 17:11
**bind** 37:9 40:12
59:7 60:10,23
76:13 77:17
**binding** 77:18
**bit** 11:21 12:1
21:20
**blended** 30:7
**board** 20:14
**boats** 60:6 75:13
**bracket** 78:1,1,1,2
**brackets** 78:1
**breakdown** 11:20
**bridge** 19:1
**bring** 12:21
**broader** 20:5
**broke** 40:19
**brooke** 70:2
**brooke's** 70:8
**brought** 69:5
**brozman** 46:21
**brozman's** 33:4
44:19

**building** 18:2,22
**burden** 32:7,18
50:22 53:21 64:24
66:15 67:21 70:14
75:23
**business** 30:20
**button** 25:8,12
**buy** 68:10

**c**

**c** 5:1 6:1,2 81:1,1
**calculated** 32:11
67:25
**calder** 17:19
**call** 21:14 70:14
**called** 23:20 73:18
76:8,14,15
**can't** 25:10 34:8
**cap** 48:10 55:12
55:17 74:2,4
**capacity** 51:9
**carefully** 53:17
54:9
**carly** 3:16
**carried** 70:14
76:1
**carries** 65:8
**carve** 29:10,25
41:2
**case** 1:3 2:4 13:5
18:8 20:12 22:18
23:3 27:8 32:6
33:1,4,5 37:6
39:10,15 40:16
44:18 45:6,8,10
45:12 46:3,19
47:8 49:6 50:1,6
50:16,23 52:17
54:4,22 55:1,14
56:2,2,4 60:14
62:1 63:4,11,14
63:17 64:3,9,18
64:23 65:19 66:6
66:12,21 67:1,4,8

change   26:24 48:8
49:1
changed   46:19
60:15
changes   46:20
60:16
chapter   30:17
50:7 63:4 69:4
70:21,23 78:13,14
charging   78:12
chart   8:13 9:19
11:9 21:15
checking   60:20
checks   12:11
cherokee   58:13
59:10
chop   21:20
chunk   20:21
circuit   57:17
63:15 64:5
circumstances
56:3 64:2 65:5
68:5
cited   31:20 65:7
77:3,23
cites   64:18
citing   64:15,21,22
66:18 67:1
citron   5:3 26:11
56:19
citron's   78:7
claim   8:19 10:14
10:17 15:20,22,25
18:12 24:25 27:19
28:12 38:10,13,16
38:19,24 41:7
44:15 47:11,17,20
47:25 50:9 52:20
53:4,15,25 56:1
61:10,19 62:20
65:24 69:12 70:16
70:25 71:22 72:18
75:5 78:5

67:13,17 68:12,15
68:16,21 69:11,13
69:22 70:4,5 71:2
71:9,9,10,13,16
72:5 74:21,24
76:25 77:2,15,16
77:23 78:11,16
79:16 80:3
cases   2:14,21 3:23
31:19,20 32:13
34:9 39:5 44:20
47:12 48:19 50:7
50:25 59:20,21
64:18 65:7,11,25
66:2,19 68:8,18
68:22 70:7,21
73:24 76:25 77:2
78:8,14
cash   13:6,8,9,17
13:20 14:8,12,16
21:10 22:20 24:3
36:25 41:12 43:3
58:19 60:3,8
72:22
catchup   12:19
categories   8:17
category   22:1
33:18 79:12
causes   46:8
cede   25:5
cents   9:3 52:15
58:19
certain   14:17 52:3
56:3 66:12 71:14
certainly   20:21
24:14 40:13 47:16
48:1 50:10 54:3
certified   81:3
challenges   22:17
chambers   7:8
35:13 36:4 79:2
chance   37:20

claimant   72:2
claimants   70:20
71:13
claimed   71:6,6,12
71:18,20 72:14
73:14 74:13
claiming   8:6
claims   3:13 7:18
7:21 8:3,4,6,8,10
8:11 9:14,14,24
10:21,24,25 11:12
11:24 12:2,12
14:7,18 15:3,4,9
15:15 16:3,14,19
17:5,10,12,13
18:5,10,13 20:17
21:11 22:21 23:7
24:3 25:25 27:1
33:18 45:11 51:9
51:21,23 52:9
54:15 55:25 57:22
58:2,11,13 66:1
68:22 71:16 72:2
72:7 73:17 75:4
75:11,17 79:1,22
clarified   15:17
class   48:17 74:4
74:14
clear   35:18 36:2
37:10 38:23 41:23
44:22 48:14 58:6
59:16 61:4 62:2
70:13 71:17 72:5
73:1 76:2,12 78:3
clearly   69:12
77:17
clerk's   6:12,14
client   6:7 31:10
32:11 33:8 37:9
54:11 59:12 68:1
clients   34:22 35:1
78:7,15,17,17

client's   61:19
close   10:20 45:6
47:16 65:4 70:14
closed   65:7
closely   53:11
code   2:12,20 3:21
25:2 39:8 56:7
69:2 71:24 73:4
74:22 75:1
coincidentally
46:12
collateral   72:22
collect   40:15
collected   19:5,15
19:16 21:12
collection   22:23
collier   77:25
colloquy   28:20
52:6 57:13
combined   79:24
come   11:10 16:1
21:10 22:20 23:6
24:2 47:4,5 49:21
50:19 77:24
coming   23:20
36:16,17
commenced   12:9
16:13 22:25
comment   57:3
78:6
comments   40:3
41:1 53:19 56:22
57:14,16 74:3
committee   3:6,9
7:17,19 16:15
18:6 23:2 26:2
27:2 33:21,22,22
34:16 35:5,14
36:7,10,15 37:11
39:17 43:10 45:8
45:9,16,19,23
46:13,14 57:4,19
57:24 58:5,6,22

59:6,11 67:19
70:6 72:12 79:2

**committee's**
58:15

**communicated**
36:4

**communicating**
40:23

**company** 68:15

**comparable** 63:10

**compensable** 64:1
67:25 74:25

**compensated**
65:14 67:18 68:25
69:8,9

**compensation**
2:12,19 3:21
62:23,25 63:6
65:3 66:24

**complaints** 21:13

**completely** 6:5,16

**completing** 52:3

**concedes** 47:21

**concerned** 17:19

**concession** 47:23

**concessions** 54:24

**conclude** 74:6,14
77:22 80:6

**concluded** 80:9

**concludes** 79:4

**conclusory** 63:24

**concrete** 67:5

**conditions** 42:23
43:8

**conduct** 61:4,23
62:14

**conduit** 37:11

**confer** 32:12 68:2

**conference** 2:4
13:3

**conferences** 35:13
36:4

**conferred** 71:7,18
71:20 73:14

**confirm** 9:19

**confirmation** 9:6
11:7,11,17 12:1
16:24 19:3,8,11
19:15 20:1,11
29:1 30:10 34:1
34:14 35:1,13
36:20 37:19,20
38:8 41:13 42:11
42:19 47:14 48:13
50:7 51:25 52:4
54:7,8,13,14
60:19,24 61:1,5
62:3,4 69:4,5 73:2
73:6 74:4 75:6,8
75:11 76:7,10,10
76:22

**confirmed** 53:2
59:24 65:16,21

**confirming** 73:10

**conflate** 32:17

**confusing** 14:4

**congress** 74:21

**connection** 20:18
26:4 42:10 49:8

**consciously** 54:18

**consent** 8:16
13:11 14:9,14
15:6 42:23 43:8
47:22 48:15 49:10
51:23 54:15 60:10
61:3

**consents** 75:2,19

**conservative**
17:23

**consider** 32:20

**considerable** 67:7
75:6

**considerably**
17:25 19:7 72:16

**considered** 24:23
64:6

**consistent** 9:5
11:17 15:21 22:14
64:17 65:25 68:20
69:2

**construct** 37:18
61:2

**constructive**
54:12

**construed** 66:17

**consult** 48:2

**contact** 6:14

**contemplated**
74:21

**contend** 31:3

**contends** 71:2

**context** 26:18
44:14 74:23 75:22

**contexts** 69:6

**contingency** 17:6
18:10

**contingent** 22:22

**continuation** 34:7

**continue** 21:21
24:18 34:20 40:23
53:11 55:25 79:19

**continued** 20:14
30:18 76:10

**continues** 15:25
79:13,24

**contrary** 57:22
66:6 69:20

**contrast** 35:4
44:17 77:7

**contrasting** 70:4

**contribution** 2:14
2:21 3:1,7,15,22
4:2 24:25 28:19
32:8 33:2,7 44:19
44:25 46:22,24
47:11,17,20 48:3
49:25 50:23 51:1

51:15 53:24 54:1
56:4 59:22 61:12
63:3,23,25 64:3,7
64:19,25 65:12,23
66:1,7,13 67:7,22
68:22 69:12,25
70:16 77:1 78:5

**contributions**
56:2

**conversation**
48:22

**coordinate** 47:6

**copy** 6:11 7:8,12
78:25

**corp** 6:4 64:21
66:20 68:7 70:2
70:10

**corporation** 1:7
3:4,10

**correct** 9:17 10:4
12:16 14:2,2 17:7
24:21 29:22 31:8
31:11,15 34:19,24
35:11 37:10 41:16

**corrections** 44:12

**correctly** 65:3

**cost** 54:16 63:10

**costs** 77:12,12
79:15,25

**couldn't** 59:7

**counsel** 6:20 7:23
25:20 26:11,25
28:20 35:14 39:2
39:12,17,17 46:15
47:7 56:19 57:14
59:15 67:19 69:19
70:19 72:11,21
73:15 75:12 76:5
76:9,16 78:23
79:1,22

**counsels** 74:11

**counsel's** 46:14
46:15

**counterparties**
21:5
**country** 81:21
**couple** 17:21 18:1
27:12 40:9 79:11
**course** 6:18 7:10
9:12 16:16,22
18:3 20:3 25:23
30:20 44:7,8
61:23 74:8 75:18
79:18
**court** 1:1,13 6:3,8
6:11,25 7:12 8:1
8:14 9:10,13,18
10:1,3,5,9,12,18
11:2,4 12:3,15,18
12:22 13:23 14:1
14:3,15 16:21,23
17:5,8 18:23 20:6
20:23 21:22,25
22:6,8 23:16 24:8
24:14,15,17,22
25:6,15,18 27:23
27:25 28:15 29:5
29:14,18 30:11,21
31:5,9,12,14 32:1
32:20 34:12,14,20
34:25 35:4,8,19
35:25 37:8,14
38:1,5 39:25 40:4
41:19 43:10 44:3
44:6,11 48:23
51:4,11 53:16,19
55:2,3,11 56:5
56:14,16 57:9,17
62:6,11,18 69:21
79:4 80:5
**court's** 72:21
**courts** 64:5,12
**cover** 39:4
**covered** 40:8
**create** 53:9

**created** 29:3
**creative** 53:10
**credit** 49:18 60:16
**creditor** 15:24
31:20 37:13 47:2
59:23 63:2 65:11
65:12,19 66:24
68:14,15,16,24
69:3 75:2,5,8,19
76:13 78:21
**creditors** 3:6,10
7:19 8:17 12:7
13:19 16:15 18:5
18:6 23:1 26:1,19
27:2,4,12,14
29:20,23 30:3,14
30:16 31:24 32:3
32:6,16,21 33:14
33:15,17,25 34:8
35:6 36:7 37:1,5,7
37:12 39:9,18
40:13,15 45:2,5,9
45:22,24 46:1,13
46:13,14,16,17,23
47:6 48:9 50:12
50:14,15 52:14,25
53:3,12 54:7,25
55:9,14 56:9 57:5
57:5 58:17 59:5
59:14 60:3,7,9,11
61:11,20 62:14
64:23 65:6 66:25
67:8,20,23 68:6
68:22 69:12,13,24
70:7 71:8 72:1,12
73:18,19,22 74:8
74:15 75:15,21,25
75:25 76:3,6
**critical** 61:23
**cross** 34:2,3
**culmination** 18:17
**cure** 21:19

**current** 16:4
**cut** 54:17

**d**

**d** 1:22 2:13,20
3:21 6:1,2 25:1
56:7 62:20 63:2,8
68:10,23 70:3,16
71:3 74:25 78:22
**daily** 6:12
**dana** 64:21,23
66:20 68:7
**dashboard** 25:4
**date** 6:5 7:5 8:4
8:23 11:15 16:16
18:7 19:3,8 23:3
26:21 52:24 58:1
75:4 81:25
**david** 2:7,14,17
3:23 4:2 5:8 26:11
56:18
**davidoff** 5:3 26:11
56:19 78:6
**day** 29:1 34:6
45:1,8,10,12
47:12 48:14,23,25
60:19
**days** 30:5 37:19
38:15 60:19
**de** 17:17 30:23
50:2 61:24
**deal** 8:16 17:11
54:17
**dealing** 21:3
38:15 78:4
**dealt** 13:15 21:19
42:19
**debt** 72:14
**debtor** 1:9 25:24
26:22 29:9 30:16
30:18 36:5,7,12
36:14 37:11 38:12
38:16 45:3 56:20
56:24 57:24 58:5

58:14 59:6 66:25
67:19 69:14,17
75:9,16,18
**debtor's** 67:8
**debtors** 3:1,7,14
5:11 6:23 7:16
24:9 40:6,20 45:7
48:10 50:8 51:25
52:23 53:5,11
54:6 56:9 57:18
58:22 69:19 70:7
70:23 71:8 74:8
78:12,23
**debtor's** 6:20 7:20
7:24 9:5 10:23
26:25 28:20 34:2
34:4 35:14 39:17
42:5 48:19 51:14
52:12 53:24
**decided** 57:20
**decision** 33:6
44:20 54:19 57:15
57:17 64:4 65:18
66:10 67:12
**declaration** 2:17
4:1 35:12
**declarations** 54:9
**deemed** 64:1
**defend** 49:7
**deficiencies** 60:17
**delivered** 57:12
**delta** 15:1
**deltas** 19:23
**demonstrable**
74:7 77:11
**demonstrate**
50:22 56:6
**demonstrates**
53:23
**demonstrative**
67:6
**demonstratively**
64:11

[denied - entitlement]                                                      Page 8

**denied** 44:21 51:1
51:19 56:11 77:22
**deny** 51:3 65:25
**denying** 78:24
**dependent** 16:18
**deposit** 19:20
**describes** 48:15
**determination**
49:15
**determined** 10:7
21:17
**determining** 64:6
**developed** 63:16
73:8
**dialogue** 48:23
**didn't** 12:20
28:10 35:19 37:8
40:18,22 43:1
46:6 60:11 61:3
**difference** 15:8
**differences** 19:24
**different** 31:9
48:18 50:24 59:8
60:21 75:2
**difficult** 32:7
64:24 67:21
**dip** 41:24 44:10
72:23
**direct** 31:17,22,23
32:2,15,16 39:12
53:24 64:10 67:6
67:10,14,15 71:3
71:19 72:21 77:10
**directly** 21:4 33:8
56:9 66:25 74:10
**disagree** 40:14
**disbursed** 12:10
**disclaims** 9:8
**disclosure** 27:10
**discount** 8:22
**discriminate**
75:19

**discrimination**
75:20
**discussed** 63:16
**discussion** 26:25
41:11 54:20 77:24
**discussions** 16:1
16:14 22:25,25
57:24
**dismiss** 23:19
**dispute** 20:5
**disputed** 9:8
10:21 12:12 14:7
15:9 23:7
**disputes** 8:9 14:7
20:18 45:18
**distinctions** 44:21
**distributed** 13:18
39:21 42:12 43:4
55:18,19,22
**distribution** 12:8
12:9,13,15,17,19
14:24 26:18 28:5
28:6,7,9,16 29:13
43:13,21 44:1
48:6 53:6 55:20
55:23 71:25 72:9
73:16 74:17,17
**distributions** 8:23
12:6 20:19 22:21
27:11 43:9,21
52:24 55:20
**district** 1:2 63:15
63:17 64:16 68:8
**docket** 7:6 51:16
61:14
**document** 2:6,22
3:2,8,16,23 4:2
**documented** 37:3
**documents** 26:5
76:14
**doesn't** 16:24
30:15

**doing** 7:23 37:24
39:6 46:15 61:10
61:22 69:10 78:11
78:15
**dollar** 9:15 11:4
52:15
**dollars** 26:17
27:16,18,20 28:2
28:3,8,12,14,25
29:2,3,12 33:17
37:25 39:20 47:4
48:5 50:17 54:16
61:8,19
**don't** 18:20 21:2
22:4 23:17 24:17
26:3 29:5 35:25
38:10 40:14 44:24
47:1,15 49:9 50:5
50:15 58:16 60:12
60:12 62:7
**door** 12:13 21:10
**draftsperson** 66:3
**drain** 1:22 6:3
**dublin** 3:9 14:20
**duplicated** 64:14
67:17
**duties** 52:7 73:3

**e**

**e** 1:21,21 5:1,1 6:1
6:1,2,2 70:3 81:1
**e.d.n.y.** 63:19
64:16
**earlier** 9:13 20:8
22:25 50:18,20
52:21 55:6
**early** 23:4
**eastern** 63:17
**ecf** 2:8,14,22 3:4
3:11,17,24 4:3
**echoes** 66:11
**ecro** 1:25
**edition** 78:2

**effective** 7:5 9:3
13:1,18 15:14,17
16:11,12,16,18
18:7 22:16 23:3
24:3 52:17 53:7,9
58:1,18,21 75:4
**effectively** 75:14
**effort** 17:15 61:12
**efforts** 64:15
65:16 67:23 71:19
74:24
**eight** 72:9,16
**either** 10:16 24:4
57:7 77:12 79:18
**electric** 66:8
**element** 32:2
**eliminate** 21:17
**eliminating** 8:5
**email** 7:7 22:9,11
79:2,10
**emergence** 22:19
**encapsulated**
38:18
**encourage** 39:5
**ended** 61:5
**ends** 80:3
**engage** 54:19 56:8
76:19
**engaged** 45:3
69:15
**english** 60:13
**enhances** 65:6
68:6
**ensure** 52:10,13
**entailing** 64:2
**enter** 73:9
**entire** 46:3 73:7
**entities** 34:16
**entitled** 9:2,3
12:14 47:19
**entitlement** 8:6
70:15

equally  52:16
equitable  49:13
erika  51:8
error  61:25
escrow  41:23 42:4
  42:6,10,15 43:18
  49:12 72:22 73:10
esl  14:18 16:20
  17:1 19:9,18 20:4
  22:23 23:20 27:9
especially  24:13
  30:3 32:7 59:5
  64:24 67:21
esq  2:17
essence  69:14
establish  74:12
established  67:16
establishing  66:16
estate  10:17 13:17
  14:6 17:3,17
  18:14 19:14 32:3
  32:13,16,21 36:15
  45:17,24 46:10
  53:24 54:16 56:10
  64:8,11,14 65:7
  65:14 67:1,8,18
  68:2,7,25 69:8,9
  74:8 77:1,11,13
  77:15,22 78:12
  79:12,13,17,24
estates  52:12 71:8
estimate  11:6,11
  15:15,22 16:5
  18:22 19:5 44:7
estimated  11:5
  13:6,7 14:16,21
  15:3,18 16:23
  79:21
estimates  7:20,24
  9:5 11:12,15,17
  12:2 13:1 19:4,7
  41:14,25 42:1
  43:19,23

estimating  11:25
  22:15
et  1:7 3:10 6:4
event  29:6 31:12
  73:12
everhardt  3:16
everybody  12:21
  53:10 54:23 59:8
everybody's
  45:12
evidence  63:24
  66:15
exactly  22:4 34:10
  44:5,5,7 46:25
examined  34:3
examining  34:2
example  7:22
  42:25
exceeds  77:11
excess  43:3,24
  72:19
excluding  8:11
  19:9 20:3
exclusively  42:6
excuse  49:1
excused  25:13
exhibits  25:23
existent  69:15
expect  18:7,20
  24:10
expectation  30:19
  77:21
expected  16:17
  65:13 68:25
expecting  18:3,20
  19:17 20:13
expeditiously
  52:17
expense  3:13 9:14
  11:24 17:12 18:13
  25:25 29:20 35:6
  51:9,21,23 52:15
  52:19 54:15 55:25

62:21 63:7,21
  64:3 70:20,24
  71:13,16,22 72:1
  72:1,7,10,12,18
  72:25 73:16,17,18
  73:20,22 74:15
  75:2,3,5,11,15
  78:21 79:1,9
expenses  2:10
  13:14,17 14:6
  15:3 16:10,24
  17:3 18:2 20:16
  22:1 39:23 62:22
  63:12,22 66:17,18
exposure  71:23
expressly  70:6
extensive  67:16
extent  10:6 63:9
  67:9 74:9
extra  55:12 72:7
extract  39:17
extraordinary
  30:23 34:9 39:6
  39:11 44:23 56:8
  61:12 62:14 65:5
  66:24 68:5 78:20

f

f  1:21 81:1
face  32:6 64:24
  67:20
faces  32:19
facilitated  69:3
facilitating  39:3
facilitation  65:15
fact  27:8 37:3
  53:22 54:22 61:21
  64:3 65:1 66:1
  68:11 69:20 73:3
  74:6 75:21,22
factor  32:19 40:22
factors  64:6 77:24
facts  44:20 56:5
  62:16 66:1 70:4,5

factual  41:1 66:14
fail  7:2
failed  53:23
fair  23:22
fairly  17:16,17
  23:20 63:16
fairness  52:11
far  12:7 17:5,18
  56:1 78:19
favorable  65:17
  65:22 69:6,23
favorably  57:16
feasibility  49:8,15
federal  30:11
fee  17:6 18:10,12
  29:10,25 41:23
  42:4,6,10,15,21
  43:6,18,23 46:14
  49:12 61:14,24
  62:14,15
feel  56:5
fees  17:25 20:14
  20:14 33:10 39:22
  42:1 44:6 46:15
  61:25 72:22
felt  54:20
fiduciary  39:8
  45:21 57:4 76:18
fifth  5:12
fighting  39:16
file  7:3,6 76:16
filed  2:7,14 3:3,9
  3:16,23 4:2 21:14
  25:24 26:4,15
  34:21 35:9 36:1
  40:12 44:9,25
  51:14 54:10 59:10
  65:21 76:17
filing  45:3
fill  46:5
final  44:9
finalize  22:21
  23:10

finalized 23:10
finally 20:24
  49:20 76:2
find 40:22
finding 65:11
fine 6:25 7:12
  25:15,15 41:19
  47:3 49:6 51:11
  56:14
finish 23:3
firm 14:20 35:9
  59:9 78:21
firms 78:14
first 6:7 7:4 8:15
  8:17 9:19 12:20
  26:16 28:9 34:6
  36:7 47:20 48:14
  55:19 63:20 71:6
  71:20 72:8 73:11
fixed 9:15
fixing 71:22
flawed 61:6
focused 45:13
  46:2,7 50:9
focusing 30:22
foley 35:4,15 36:6
  36:16 41:8 42:8
  51:8 58:6,8,10,14
  59:4,7,9,9 61:1
  72:13 77:7
folks 9:1 12:14
following 48:22
  64:6
fond 54:2
footnote 13:16
  59:3
forced 54:24
foregoing 66:12
  68:3 70:1 77:9
  81:3
foreign 33:15
  36:12 57:21 58:13
  58:15,25 59:5,13

59:17 60:12 71:14
  71:15
foremost 47:20
form 53:25 77:17
formal 59:11
  76:13
formally 35:19
  36:10 37:4 76:3
  78:24 79:17
forming 33:21
forth 26:14 30:22
  40:7,19 45:16,19
  48:21 52:3,6 70:4
  75:16
forthcoming 53:6
forward 46:18
  59:18 69:17
found 51:16 66:6
  68:23 69:21
framework 77:18
frankly 40:20
  46:3 47:5,24
  49:19 50:25 53:4
  56:3 66:1 70:13
  71:8
fraud 45:1,3
  69:15
free 61:18
freed 28:16
front 73:9
fulcrum 37:13
  77:6
full 9:2 23:12 75:4
  75:7,11
fulsome 34:4,5
functions 69:7
funding 29:10,25
  43:2
funds 12:25 26:20
  26:23 41:4 43:5
  58:11 72:24 73:9
further 55:3
  56:12 64:17,22

65:11 67:24 77:15
furthering 77:16
future 56:1

g

g 6:1,2
galgay 32:24,25
  33:5
gap 46:3
garrett 7:2
gary 3:13,17 51:8
gatekeeping
  26:17
general 33:4 42:5
  42:12,16,22 43:7
  70:9 71:8 72:24
  73:9 78:20
generally 15:21
  63:15 65:12 71:11
  76:25 77:25
getting 7:4 20:19
  31:24 77:13
give 20:25 33:23
  54:20 58:19,23
  60:8
given 20:12 59:1
  70:1
giving 28:18
  33:21 37:24
global 2:7,11,18
  3:2,8,15,19,24 4:3
  5:4 24:24 25:21
  25:23 26:12 27:5
  27:18 29:3 33:11
  33:12,16,20 34:7
  34:10,15,21 37:4
  37:16 38:25 39:12
  39:13,16 51:16
  54:12 56:20 59:3
  59:25 62:2,19
  63:3 70:24 71:21
  72:3,11,20 73:8
  73:15 74:11,16
  75:12,24 76:15

77:16,19 78:7
global's 71:22
  74:24
global's 26:2
  28:12 29:3 36:17
  38:13,19 61:9
go 6:21 7:7 9:3
  11:9 12:25 16:6
  16:10,12 21:22
  24:3 26:6 37:1
  38:9,12 44:13
  48:12,20 52:17
  53:7 73:9 79:7,11
  80:2,4
goes 64:22 67:4
  67:12 68:9
going 9:9 10:22
  12:2 13:18 15:13
  15:17 16:18 17:19
  18:21 22:9 23:17
  27:25 29:6 39:15
  40:8 44:8,16
  49:10 53:8,9,9
  55:18,19 57:2
  58:18 61:13,15,23
  62:7 74:12
good 6:3,7,22 19:6
  40:5 51:2,7 54:25
  55:1 59:3,4 78:11
  78:15
goods 30:18 57:11
gotshal 5:10 6:23
  33:1,6 35:24 40:6
gotten 12:13
  20:20 54:4
grabbed 28:24
grand 39:14
granite 67:3
granted 44:25
  47:13 62:17
great 7:13
greater 54:25

gross 21:15
ground 62:7
group 8:24 9:1,13
  33:23,23 34:17,25
  35:5,10,17,23,25
  36:8,11,18,18,22
  37:12,12,13,14
  38:2,6 39:2 40:13
  40:21 41:8 42:8
  45:2 46:7,12,17
  50:15 55:5,6
  56:23,24 58:8,8
  58:10,14 59:4,7,8
  59:8,9,11,13,17
  60:22 61:2 66:10
  68:16 70:19,22
  73:21,23 76:8,15
  76:16,17 77:5,5,6
  77:7,8
guess 9:18 24:10

### h

h 2:7,14,17 3:23
  4:2 5:8
hadn't 30:3 37:20
haircut 58:17
half 17:11 54:5
  60:19
hallway 38:9
hancock 63:18
  66:6 68:21
hand 25:9,12 37:1
handle 21:3
handled 14:20
handling 38:17
hanes 58:12 59:10
hang 80:6
hanging 48:5
happened 31:19
  47:15 56:23 57:6
  57:18 59:24
happens 47:11
  50:7

happy 6:21 7:11
  23:14 28:21 56:13
  78:9
hard 52:22 53:10
harner 25:8,10,11
  25:17
hat 48:5
haven't 22:16
heads 23:5
hear 6:24,25
  25:10,20 51:10,11
heard 38:8 48:16
  51:17 52:21 53:4
hearing 2:1,2 6:6
  6:10,13,15,20 9:6
  11:7,12,13,18
  19:12 29:1,1 34:1
  34:15 35:1 36:20
  37:19,20,21 38:8
  38:11 41:14 45:14
  48:13 57:6 60:19
  61:1,5,13 73:2,3
  74:4 76:8,10,22
  76:23 80:6
hearings 6:15
heavily 22:22
  51:24
heavy 47:16 50:22
hedge 58:10
held 29:11,19
  42:6 70:8
help 52:11,17
  60:7
helpful 8:14
here's 56:25 57:6
herring 31:6,16
  61:7
he'll 22:9
he's 47:19 49:5
  54:3
high 18:19 20:25
  47:16 75:23

higher 78:19
highlight 26:12
  40:9
hit 25:7 43:1,2
hoc 33:23 34:16
  34:25 35:5,10,17
  36:18 38:1,2,6
  40:21 55:5,6
  70:19 72:12 76:15
  76:16
hold 29:6 66:21
holding 6:4
holdings 1:7 3:3
  3:10
homerun 54:20
  54:22
homestretch
  10:25 17:15
hon 1:22
honestly 28:10
honor 6:22,24 7:1
  7:2,3,6,8,9,13,16
  7:25 8:2,8,13,21
  8:25 9:4,12,21
  10:8,15,20 11:3,8
  11:10,16,22 12:4
  12:5,12,23 13:6
  13:10,22,25 14:16
  14:22 15:2,7,10
  15:24 16:13,20
  17:4,21 18:1,9,24
  19:1,6,19,19 20:7
  20:15,24 21:1
  22:2,7,11,12,24
  23:8,12,15 24:7
  24:11,16 25:3,11
  25:17 26:10,12,17
  27:18,24 28:10,19
  28:25 29:9,22
  30:7,20 31:1,13
  31:15,25 32:23,25
  33:9,19 34:9 35:3
  35:11,12,16,22

36:3,4,22 37:17
  38:4,8,11,21 40:1
  40:2,5,6,7,10,11
  40:17,25 41:6,22
  42:13,16 43:15,16
  43:18,20 44:5,12
  44:15,18 45:1,6
  45:11,14,20 46:6
  46:25 47:9,18
  48:12,16,25 49:4
  49:8,14,15,25
  50:4,12,18,21
  51:2,3,7,12,14,22
  52:5,6 53:1 54:2
  55:24 56:12,15,18
  56:20,22 57:13,14
  60:17,20 62:10
  79:3,6,11 80:8
honor's 20:9
  41:15 42:13 57:14
  57:15
hope 16:11
hoped 20:13
hopeful 17:23
  23:4
hopefully 8:14
  18:4
hopes 16:1
hoping 22:16
hours 34:2
hundreds 23:19
hutcher 5:3 26:11
  56:19 78:6
hyde 4:25 81:3,8

### i

i.e. 28:6 44:3
  64:13 66:14 67:5
  74:18 75:6 76:21
idea 6:7
identified 60:17
identify 6:6
immediately
  48:23

impeded 68:12
implicit 78:4
important 30:2
  32:4 47:22 51:23
  52:2,16 53:14
  69:13 74:23
imports 57:1,9,22
  58:7
import's 57:15
  58:2
impose 65:16
imprecision 67:13
improvements
  78:16
incentive 23:23
incidental 46:20
  64:19
include 16:24
  33:7,11 62:21
included 12:19
  16:5 19:3 22:5
  59:18 61:8 70:24
includes 14:12
  15:5 19:22 21:9
  30:1 32:16 65:14
  78:15
including 23:24
  42:25 56:1 57:5
  64:18 76:7
increase 50:3
  71:24 73:15
increased 19:7,10
  41:10 49:22
increasing 75:22
incremental 42:14
  43:22 50:17
incurred 20:16,21
  42:2 63:2,12
  79:16
independent 45:7
indicated 7:3
  26:25 57:16

indirect 31:23
  32:12 46:24 68:2
industries 2:8,11
  2:18 3:2,8,15,19
  3:24 4:3 5:4 24:24
  25:21 62:19 77:2
ineligible 21:18
inform 37:14
informed 38:2,6
  76:20
initial 12:7 48:6
  71:25
initially 41:6
ins 8:17
insisted 47:4
insistence 45:16
insolvency 57:21
insolvent 39:9
insubstantial 28:2
insufficient 63:25
  69:25
insurance 79:13
insurers 23:24
integrity 66:22
intend 16:6 40:18
intensive 64:3
interest 32:10
  45:23,24 46:23
  64:21,24 65:1
  69:24 72:16 75:21
interests 58:8
  67:23,24 68:19
  70:22 75:20,24
interim 55:19
interrogate 62:7
interrupt 9:10
  16:21 27:23 32:1
  34:12
introduced 34:18
introduction 6:19
investigated 46:8
involve 65:12

involved 33:1
  35:16 36:6 49:6
  53:11 54:5,23
  55:7 57:8 58:11
  60:23 65:20 69:3
involvement 48:1
  64:1 65:6 68:6
issue 26:17 27:22
  28:4 32:19 45:10
  49:21 50:2,9
  55:12,21 57:9,21
  57:22 58:7 61:7
issues 8:12 9:16
  9:24 10:5 12:11
  21:8 40:10 45:10
  45:25 46:2 48:14
  48:16 49:3 68:17
item 7:4 22:5 79:9
  79:25
items 41:12 47:18
it'd 47:12
it's 6:7,11 7:9
  10:10,22 14:4,11
  14:13,23 15:15
  17:17 18:17 20:15
  23:22 24:18 26:16
  27:17 31:9 34:9
  34:10 35:12 36:18
  37:3,3 39:11,23
  42:17 44:23 47:25
  48:14,18 53:5,9,9
  61:7,25
i'd 21:14 56:22
i'll 7:9 12:5 22:11
  23:13 25:5 40:3,9
  51:19
i'm 6:21 7:2,7,11
  11:4 13:23 16:6
  17:8,23 20:20
  21:1 22:3 29:25
  30:21 32:1,25
  33:10,22 38:4
  41:22 44:16 48:12

49:6 54:2 56:12
57:2 60:16,20
i've 25:21 26:5,7
  47:5 54:4,5 61:22

## j

jan 70:3
january 1:17 2:2
  81:25
jobs 69:10
joinder 3:6,13
  51:14
joinders 53:18
joined 7:2
judge 1:23 6:3
  9:17 10:4 12:16
  13:1 16:3,6 20:2
  21:13,24 24:12,21
  32:24,25 33:4,5
  41:17 44:19 46:21
  59:2 61:16 63:17
  63:20 65:10 66:5
  67:20 68:20
judgment 30:11
june 11:14 13:2
justify 32:11 68:1
  77:3
justin 1:25
jv 64:15

## k

k 70:3
kansas 70:3
keep 6:16 22:8
keeping 73:3
kept 66:18 76:20
key 12:24 16:17
  22:13 51:20
kind 7:9 17:14
  18:18,25 19:2
  20:1 26:16
knew 35:23,24
  36:10,12,16 37:6
  37:11 38:14 39:2
  59:8

knock  58:25
know  7:16,18
  8:11 9:1 15:5,6
  17:16 22:21 35:16
  35:20,25 39:16
  40:12 42:17,20,25
  43:5,25 44:9,13
  45:21 46:3 47:13
  47:25 48:17,18
  50:2 51:14 54:4
  58:11,12 60:12
  79:19,24
knowing  34:11
known  36:18 37:3
knows  44:15
  57:10

**l**

lack  28:24
language  67:14
lardner  35:4,15
  36:6,16 51:8 58:6
  72:13 77:8
large  20:16 58:12
  69:16
largely  66:5
larger  14:19
  16:20 22:22 40:13
  40:15,15,16 47:8
  50:15
laser  45:12
law  31:22 63:14
  64:18 67:13 71:9
  74:21 76:25 77:23
  78:14
lawyers  60:12
  78:14
lead  66:24
leadership  65:13
  68:24 76:24
leading  54:7
leaving  8:24 16:10
led  56:8 76:21

ledanski  4:25 81:3
  81:8
left  23:8 38:11
  54:17,23
legal  50:17 65:20
  81:20
let's  49:21
level  20:25 54:2
leverage  47:8 75:6
  75:22
lexis  63:18 64:16
  66:9 70:11
liability  21:25
lifts  60:5 75:13
light  65:10 67:10
  68:3
lightbox  58:12
  59:10
liked  22:17
limited  33:18
limiting  66:23
line  9:22 10:19
  13:8,9 19:15 20:8
  22:5 23:3 25:18
  41:12 50:25 79:9
  79:25
lines  8:15,25
  66:19
linkage  49:18
  50:16
listed  34:17,22
  41:3
listening  38:7,14
litigating  27:9
  57:10
litigation  13:13
  14:19,19 16:20,25
  17:6,16 19:10
  20:4 22:23 23:20
  23:23 24:6 43:2
  52:10 58:21
little  11:21 12:1
  14:4 17:22 18:19

50:1 67:9 68:11
  73:7
llc  63:18 64:15,15
  66:8,10
llp  5:3,10
lofts  64:15
logical  74:1
long  23:25 24:19
  80:2
longer  20:12
  22:15,16 59:1,18
  60:23
look  8:13,20 9:22
  11:10 12:23 16:9
  44:18 48:13 54:9
  55:11,25
looked  38:22
  57:16
looking  18:18
  29:25 34:9 45:4
  57:4 68:18
looks  17:14 29:9
  31:7
lord  63:17,20
  65:10 66:5 67:20
lord's  68:20
lost  14:24 53:1
lot  17:9,17,23
  20:17 21:2 23:9
  27:17 28:3 36:25
  40:8 48:7 58:21
  60:11
low  11:22,23
lower  11:22 57:16
luckily  21:2
luxury  22:10

**m**

m3  7:17
main  28:1
maintain  15:25
maintained  66:23
majority  68:21

making  2:13,21
  3:22 17:22 20:18
  21:21 43:9 63:3
  78:6
mandated  52:3
manges  5:10
manner  34:4
mantle  69:16 76:4
march  52:20
material  32:21
  75:5
matter  1:5 21:7
  24:22 25:4
matters  2:1 21:14
  24:19 52:23
maximize  52:11
mclean  77:2
mean  17:17 18:15
  20:17 23:8 24:11
  39:23 41:3,20
  44:23,24 48:14
  61:25
meaningful  24:13
  54:19
means  45:25
  71:19 75:4,23
meant  58:22
measure  69:16
meeting  36:14
  64:25
meetings  57:25
meets  56:6
members  34:25
  38:2,5
mention  59:2,22
mentioned  20:3
  31:25 33:2 60:13
mere  63:24 65:1
  69:21
merely  28:4 67:16
  68:16 72:15
met  53:21 58:5

**might've** 25:9
**million** 8:10,22,23
  8:24 9:4,6,7,25
  10:22 11:23,25
  12:8,10,13 13:8
  13:13,16,21 14:8
  14:8,11,21,23,25
  15:5,6,8,10,11,14
  16:10,23,25 17:20
  18:18,21 19:10,11
  19:16,17,21 21:9
  21:15 26:17,19
  27:16,18,20 28:2
  28:3,6,8,11,13,23
  28:24 29:2,2,3,7,7
  29:11,12,19,24
  29:24 30:1,6,12
  33:16 37:24 38:20
  38:20 39:15,20
  41:1,3,9,10,14,17
  42:9,11,14 43:1,2
  43:5,12,22 47:4
  48:5 49:7,11,20
  49:22 50:17 55:10
  55:12,16,17 58:24
  61:8,16,19 71:24
  72:8,15,23 74:17
**millions** 13:24
  14:5
**mine** 30:25
**mineola** 81:23
**mini** 75:8
**minimis** 17:17
  30:23 50:3 61:24
**minimum** 66:18
**minus** 14:1
**minute** 28:1
**modified** 71:1
**monday** 37:23
**money** 27:4,5,6,17
  28:3,18,22 29:8
  29:15,16 30:2,15
  31:24 38:24 39:24

49:16 55:13 58:3
  72:23 73:9 75:15
**month** 18:18
  54:12 61:15
**months** 52:21
  60:24 62:3 72:9
  72:16
**morabito** 51:7,8
  51:12 56:15,20
  60:23
**morning** 6:3,22
  7:2,6,9 23:13 40:5
  41:2 51:7,18
**motion** 2:6,10
  24:24 25:5,19,22
  26:4,9 57:7 62:19
  69:24 70:17 77:22
  78:24
**motions** 23:19
**motives** 61:9
**movant** 32:17,19
  65:18,19 66:2,6
  66:14 69:7 70:7
  70:14,19 71:2,7
**movant's** 67:16
  71:19
**movants** 69:16
**move** 30:25 41:9
  42:11 49:11
**moved** 41:4,5,13
  41:16,18,20,20
  42:18 43:22 44:1
  44:2 49:17
**mover** 66:3
**moving** 69:17
**multiparty** 78:13
**murphy** 22:4
  23:17 79:10
**mute** 6:16
**muted** 25:10

**n**

**n** 5:1 6:1,2 81:1
**name** 6:9
**narrowed** 67:13
**narrowly** 66:17
  74:19
**nature** 63:9
**near** 50:10
**necessarily** 59:4
**necessary** 12:25
  62:22 63:12
**need** 15:14,17
  30:15 49:16
**needed** 42:17 46:4
  58:7
**needs** 30:16 32:20
  53:17
**negotiate** 18:7
**negotiated** 27:19
  28:11 36:9 37:16
  37:22 51:24 55:15
  70:25 71:21 72:10
  74:16
**negotiating** 33:24
  50:14 56:24 75:14
**negotiation** 18:3
  65:15,20 69:4
**negotiations** 38:3
  38:6 40:19 54:6
  55:7,8 56:23
  60:24 70:22 76:19
  76:21 77:7
**neither** 73:19
**net** 10:16 13:9
  31:17 32:3,21
  46:10 64:12,13
  67:15 74:10
**never** 29:17 35:8
  40:12 50:19 76:4
  76:5
**nevertheless** 65:3
**new** 1:2 5:6,13
  63:17 66:5 68:8

**news** 19:6
**non** 8:16,18 9:23
  36:22 48:8 58:13
  60:9 62:13 69:14
  73:18 74:4 79:17
**nonprofessional**
  34:8 37:7 60:2
**nonprofessionals**
  60:4
**nontax** 15:21
**normally** 65:13
  68:24 69:7
**note** 7:15 13:10
  14:22 15:11,24
  16:13 20:15 22:24
  23:18 40:18 41:18
  42:16 66:12 67:12
  74:16,23
**noted** 13:16 33:5
  40:11 50:4,13
  53:18 67:20 75:12
**notes** 60:20 63:20
  64:17 65:3,11
  68:3
**notice** 2:1 34:22
  48:20
**noting** 70:5
**notwithstanding**
  65:1 77:4
**number** 9:25
  13:14 17:20 21:7
  28:5,6 29:23
  41:10,11,12 49:11
  51:16 58:24 80:4
**numbers** 7:24
  13:2 26:19 61:16
**ny** 1:15 5:6,13
  81:23

**o**

**o** 1:21 6:1,2 70:3,3
  81:1
**object** 58:1 61:24

objected 47:2,14 59:25 61:22
objecting 50:6 70:23
objection 3:1,7,14 25:24,25 43:11 49:2 50:8 51:15 53:18 61:17
objections 26:14 31:2 38:13 46:18 60:1,2,2 66:4,4
objectors 40:3
objector's 31:3
objects 59:23
obligation 27:19 52:7
obligations 19:22 79:20
observation 73:13
observed 69:19
obtain 6:13
obtained 78:10
obviously 7:17 10:5 15:25 17:10 20:5,12 22:15 80:3
ocp 79:15
oct 63:19
october 76:22,23
offer 19:1
offered 50:9
office 6:12,14
official 3:6,9 26:1 67:19
oh 25:15
oil 33:4
okay 6:24 7:1,9,13 8:1 10:1,12,18 11:2 12:3,18 14:3 14:15 18:23 21:22 22:6,8 23:16 24:8 24:9,15 25:6 39:25 40:4 44:3

44:11 51:4,10 56:16 62:11,18 79:4 80:5,5
old 62:7 81:21
omnibus 6:5
once 40:20 44:8
one's 63:25 75:21
ongoing 8:9 9:8 14:6 15:9 79:25
open 8:12 79:8
operating 42:5,12 42:16,22 43:7
opinion 65:8 68:9 68:20
oppose 65:16 76:10
opposed 31:10 32:17 72:3
opposing 65:21 69:5
opposite 46:11
opt 8:16,16,17,18 9:1,23,23 36:22 48:9 60:9,11 73:23
opted 9:2 52:25 72:1 73:19,20 74:2,18
optimistic 53:8
optout 73:18 74:4
oral 53:19 75:12
order 41:24 42:19 44:10 52:4 72:23 73:10 78:24
ordered 57:11
ordinary 30:19 79:18
organizational 76:14
organized 36:18 59:13 70:19 76:9
organizing 33:21 36:11 46:16

original 60:18 65:21
originally 15:11 36:5,6 48:9 50:11 72:3 73:22
outcome 46:19
outs 8:18
outstanding 9:16 79:15
overall 44:14 77:1
overlooked 45:25
overview 56:25
owe 23:18

## p

p 5:1,1 6:1,2 79:23
page 7:14 8:4 18:25 19:1 21:22 64:4 65:8 66:22 67:4 68:4
pages 23:19 70:11
paid 26:21,24 28:4,5 29:4,8,13 29:17 30:4,19 52:16 55:13 58:19 59:12 60:3,4 71:25 72:8 75:7 78:8 79:16
painful 45:14
papers 36:21 40:2 47:19 56:21
paragraph 52:4 62:23,25 63:8
paragraphs 77:25
parry 12:21
part 20:16 21:19 24:4 28:12 41:6 42:8 43:13,16 51:23 52:7,13,15 53:10 54:12 72:3
participate 12:20
participation 67:16 69:22

particular 33:14 43:21
parties 8:15 19:2 23:5,18 47:14 64:9 69:24 76:8 76:19,20 77:15,17 77:18
partner 7:2
partners 28:21 67:3
party 63:20 64:2 64:7 77:13
passing 32:7 67:21
passion 54:3
pattern 69:20
pay 75:3,10
paying 24:3
payment 2:10,11 2:19 3:20 8:5 10:17 24:25 28:4 33:12,20 62:20 63:22 72:15
payments 9:2 15:13
pear 38:13
pearl 2:7,11,18 3:2,8,15,19,24 4:3 5:4 24:24 25:19 25:20 26:2,11 27:5,18 28:12 29:2,3 31:2,18,18 33:11,12,16,20 34:7,10,15,21 35:17 36:17 37:4 37:16 38:19,24 39:11,13,16 42:9 50:13 51:16 53:16 53:20,23 54:14,16 54:18,20 55:4,7 56:6,8,10,19 59:3 59:25 60:4,7 61:9 62:2,4,19 63:3

71:21,22 72:2,11
72:20 73:8,15
74:11,16,24 75:12
75:24 76:2,11,15
77:19 78:7
**pearl's** 26:13
38:10 60:1,1
**pennies** 27:13,13
**penny** 27:12,12
**people** 27:9 28:2
32:25 35:22 39:1
58:11
**percent** 8:18,19
26:20 30:7 39:21
48:10,11 53:3
55:14 58:17 73:23
74:5
**percentage** 73:16
74:1,2
**performance**
22:13 72:24
**performed** 69:1,7
69:9,13
**period** 21:16
33:22
**permanent** 44:4
**permitted** 14:9,13
15:12
**personal** 54:2
**personally** 54:5
**pest** 68:10
**petition** 57:12
**philip** 3:9
**phone** 6:16 51:13
**phrase** 32:4
**pick** 19:20,24
**picking** 7:14
**place** 73:11
**plains** 1:15
**plan** 15:12 26:25
46:18,20 47:2
51:25 53:2,6,8
54:7,8,13,15

58:18,20 59:19,23
59:23,25 60:10,17
61:6,6 65:16,16
65:17,21,21 66:3
66:4,5 69:5,5,18
70:23 72:6 73:6,8
73:10,17,24 74:1
75:3
**play** 76:24
**played** 68:24
**playing** 39:3
65:13
**pleadings** 25:22
25:24 34:21
**plus** 12:8
**pm** 80:10
**pocket** 28:25
**podium** 25:5
**point** 6:17 9:11
16:17 20:19 21:7
24:18 27:3,14
28:1,11 30:14
31:2 36:21 41:1
48:4,17 60:14
63:16 70:2 77:6
**pointed** 39:7 47:5
55:21
**points** 26:12 31:9
32:14 40:8 47:19
51:20 60:21
**polkowitz** 3:13,17
7:22 51:8,13
52:19,22 53:20
**position** 57:23
60:5 68:17
**positive** 64:11,13
64:13 67:6
**possible** 27:11
52:18
**possibly** 26:23
**post** 8:22 16:23
18:24 57:12

**potentially** 16:9
**practice** 67:11
69:3
**pre** 69:2
**preclude** 65:2
**preference** 8:12
9:16,24 10:5,7,14
14:18 16:19 17:5
17:6 18:10,12
19:9 20:3 21:7,8
21:16,17 22:23
24:5 38:16 71:23
**preliminary**
26:13
**preparing** 37:21
61:13
**prepetition** 57:11
**preponderance**
63:23 66:15
**present** 25:5
**presentation** 7:14
12:25 23:12 36:25
**preserving** 46:7
**pressed** 25:11
**presumably** 59:12
**presumed** 32:8
64:23 67:22
**pretty** 14:25
**prevailed** 68:17
**previously** 30:20
77:3
**primarily** 31:10
32:9,9,10,11,16
32:17 46:22 67:22
68:1 77:14
**prime** 66:3
**prior** 45:2 51:25
**priority** 8:7 15:10
15:13,21 21:11
53:15,25
**probably** 22:9,11
24:11 30:8,25
46:1 60:13

**problem** 67:5
**problems** 71:5
**procedure** 70:25
71:1 75:17
**proceedings** 21:2
80:9 81:4
**proceeds** 19:14
**process** 52:11
53:13 75:6,17
78:13
**production** 6:14
**productive** 22:25
**products** 33:3
44:20 46:12 47:1
67:1 68:15 69:20
**professional**
20:13 29:10,25
41:23 42:1,4,5,10
42:15,21 43:6,18
43:22 49:12 62:13
63:1,6,7 65:14
68:25 72:22
**professionals**
17:11 27:15,16,17
28:18 29:20 34:1
39:16 41:8,24,25
42:7,18 44:8 46:4
49:5,17 61:15
63:1 67:18 69:8,9
69:17 79:18
**program** 8:3,16
13:11 14:10,14
15:6 41:7 42:24
43:9 47:22 48:2
48:15 49:10 51:24
52:16,25 54:15
55:4 60:18 61:4
72:25 73:17,20
**programs** 73:25
**progress** 8:2 11:3
21:21
**projected** 15:2
16:8 80:1

**projecting** 19:3
19:16
**projections** 22:14
27:10 75:10
**promptly** 24:2,2
**proper** 68:12
**proponent** 66:2
**proposal** 58:4
**proposed** 70:23
70:24
**proposing** 48:10
**proposition** 65:8
**protecting** 64:20
**protection** 45:4
**prove** 63:23
**provide** 62:21
77:1
**provided** 6:20
29:10 34:4 71:2
71:24 74:13
**provides** 6:11
8:14 63:5
**providing** 30:4
41:25 42:1
**provisions** 66:16
**purchased** 58:13
**purely** 31:3,5,10
31:16 32:9 61:8
**purpose** 25:13
36:1
**purposes** 16:3
43:7 71:3
**pursuant** 2:12,19
3:21
**pursued** 64:20
**push** 52:17
**put** 6:8 23:5 46:18
60:1 72:24
**putting** 49:21
**puzzled** 17:8

**q**

**qualify** 67:14
**quality** 78:6
**quarropas** 1:14
**quarterly** 24:13
**question** 9:18
11:16 20:9 22:4
23:13 35:8 55:5
79:8
**questions** 7:11,23
23:14,18 24:8
26:14 40:2 56:13
**quite** 21:20 23:25
50:7 54:4
**quote** 32:6 40:21
44:6 65:4,4,5,7

**r**

**r** 1:21 5:1 6:1,2
70:3 73:25 81:1
**raise** 25:12 40:8
**raised** 25:9 26:14
28:1 31:2 74:5
**raises** 48:16
**raising** 49:3 75:20
75:21
**range** 11:18,22,23
20:11
**rare** 65:4 68:5
77:2
**rate** 30:7,11 72:17
**rationale** 48:20
**rdd** 1:3
**reached** 36:5,6
53:12 61:2
**reaction** 23:17
**read** 25:21 37:23
54:8
**ready** 12:13 23:9
**real** 17:17 18:14
19:14 30:16 46:10
47:12 67:10 79:12
79:13

**realized** 40:20
**really** 7:4 10:23
12:24 13:20 14:11
14:13,16,19 16:17
17:6 18:11,18,20
20:10 22:19 26:14
26:16 31:16 32:14
37:20 40:16,18,22
41:17 47:14 48:5
49:17 56:23,25,25
76:3
**reason** 51:2
**reasonable** 2:12
2:19 3:20 39:23
62:15 63:6 72:17
75:10
**reasonably** 24:2
**reasons** 21:18
50:21 51:2
**recall** 13:10 22:4
28:20 35:12 41:6
45:14 51:22 52:5
**receive** 73:23
**received** 9:1 26:19
27:4,5,6 29:23
30:8,9 53:3 73:23
**receiving** 53:25
**recognized** 32:5
43:23 66:14
**recognizing** 16:16
77:10
**recollections** 73:1
**reconciled** 8:4,11
9:24 10:13
**reconciliation** 8:3
10:23 15:7 20:18
**reconciliations**
23:10
**reconciling** 10:24
**record** 34:5 37:4
37:24 38:21 39:1
44:13 53:22 56:5
56:21 60:1 62:2

62:16 72:5 73:7
76:2 81:4
**recording** 6:10
**records** 33:10
**recoveries** 16:18
19:9 20:4 22:23
**recovery** 20:25
27:10
**red** 31:5,16 61:7
**reduced** 15:16
72:23
**reduction** 14:22
14:23 38:19
**refer** 20:4
**reference** 71:10
**references** 77:5
**referred** 9:13
76:14
**referring** 43:12
**refers** 62:25
**regard** 70:9 74:12
**regarding** 42:14
63:24 79:9
**regularly** 6:5
**reimbursed** 46:15
**reimbursement**
62:23 63:1,11
65:2 77:21
**relate** 20:17
**related** 2:6,21 3:2
3:8,16,23 4:2 11:6
19:9 20:22 33:13
52:9
**relates** 79:12
**relatively** 10:3
**relevant** 67:9 74:9
**relief** 44:23 53:21
**remain** 9:5 15:21
18:1,13 20:11
22:17,19,22 45:18
**remaining** 10:20
15:4 16:3,19
17:15 18:14 20:2

20:10 21:13,16 22:13 23:7 79:12 79:23
**remarkable** 47:10
**remember** 11:6 32:25
**remembers** 37:17
**remote** 22:10 74:20
**rendered** 63:7
**repeat** 40:9 44:16 51:19
**repeatedly** 77:5
**reply** 3:19 4:1 26:2,13 36:21 39:7 54:11 56:17 59:3 70:18,18
**report** 7:7 24:23 26:22 29:9 41:2 43:20 79:9
**reported** 50:18
**reporter** 6:8
**reporting** 6:12
**represent** 26:20 27:4,5 36:17 39:8 45:23,23 70:21
**representation** 70:6
**representative** 3:14 7:19,21 16:14 18:5 23:1 26:1 27:1 35:10 51:10,21 52:2,8 52:20 55:25 79:1 79:22
**representatives** 36:15
**represented** 65:18 70:8 72:13 76:4,5 77:7
**representing** 7:20 36:10,11 37:4 40:13 46:22 59:17

76:17
**represents** 39:20
**request** 51:3 61:18
**requested** 33:6
**requesting** 50:11 50:11
**requests** 8:5 39:22
**require** 53:10
**required** 43:16 49:8 73:8 74:7 76:16,25
**requirement** 52:1
**requirements** 56:6 65:10 70:1 73:6
**requires** 17:10 65:5 71:11
**reserve** 13:12,17 13:21 14:9,12,13 17:1 29:11 43:3
**reserved** 68:4
**reserves** 12:12 13:9 14:1,5 15:8 44:3,4 79:21
**resolution** 11:1 16:2 18:4,8 41:11 50:8 72:7
**resolved** 21:8 50:8 58:7
**resolving** 20:18
**respect** 8:9 38:16 45:15 66:3 73:13 76:20
**respects** 71:1
**respond** 40:3
**responded** 60:21
**response** 20:8 56:17
**rest** 26:8
**restructuring** 7:16 45:8,16,22 57:3,19

**result** 41:14 71:19 74:3 78:16
**resulted** 46:9 64:10 65:17 69:22
**resulting** 21:9
**results** 69:22
**resume** 66:4
**resumed** 76:23
**retained** 27:16 41:25 46:4 49:5 59:9 79:17,18
**return** 39:24
**reversed** 57:17
**review** 37:21 52:8 73:2,24
**reviewed** 26:5,7
**rewarded** 39:19
**rid** 38:25
**ridiculous** 49:11
**right** 8:20 9:20,22 10:1,8,9,11,13,15 10:19 12:22 17:1 17:2 18:9,23 20:6 20:23 22:8 23:6 24:9,17 25:3,9 26:23 29:15,16 31:6 34:17,23 35:10,20 37:9 42:19 45:1 49:9 50:1 51:4 56:16 62:6,18 78:4 79:6 80:5
**rising** 60:5 75:13
**risk** 29:7
**road** 81:21
**robert** 1:22
**role** 39:3 65:13 68:24 69:14 72:21 76:24
**room** 1:14
**roughly** 8:10,22 9:7 12:10 16:9 21:15 52:20

**round** 26:19 29:19,23 61:16
**rounding** 61:25
**rows** 8:21
**ruing** 41:15
**rule** 35:9 67:10 76:18
**ruled** 49:14 78:18
**ruling** 23:19 42:13,17 43:17 49:9

| s |
| --- |

**s** 2:6,22 3:2,8,16 3:23 4:2 5:1 6:1,2 11:21
**s.d.n.y.** 64:22 66:9 66:11,20 67:2,3 70:11
**sale** 45:15
**sarachek** 35:2
**satisfied** 15:4 19:23 50:22
**satisfy** 42:22 53:21 61:11 73:6 74:15
**satisfying** 43:8
**saw** 61:14
**saying** 36:25 38:9 38:12 45:21 49:9 60:23
**says** 9:23,23 48:3
**scenario** 54:21
**scheduled** 2:1 6:5
**scheme** 39:15
**schrock** 28:21 29:6 38:9 48:15 48:25
**scroll** 11:9 12:5
**scrutinized** 53:17
**sculpture** 17:19
**sears** 1:7 3:3,10 6:4 79:13

seat 33:24,24 59:1
second 12:8,15,16
  21:23 27:22 28:6
  28:9 29:1,13 32:2
  43:13,21 44:1
  49:22 55:23 63:15
  72:8
secret 36:5 57:25
section 56:7 62:20
  63:2,5,14,22 64:1
  64:7 65:4 66:23
  67:25 68:9 71:3
  71:23 73:4 74:25
  75:1 77:4,24 78:5
sections 25:1
  68:23 70:16 74:22
  78:22
secured 15:20,24
securitizations
  70:9
see 8:21 9:21,25
  10:1,20 11:14
  13:4,6 15:3 18:15
  19:14,23 21:15
  22:2,3 25:4,8
  26:23 29:10 44:24
  50:5,15 65:7 66:8
  70:9 74:1
seeing 17:24
seeking 30:13
  33:1,10,12,20
  53:15 63:21,21
  75:15
seen 21:1
segregated 13:14
  42:6
selected 52:19
self 65:1 67:24
sense 40:23 58:15
sent 50:18
separate 14:8
  17:2 48:17

separately 41:3
sept 64:16 66:9
served 77:6
service 64:10
services 30:4,18
  32:10 33:8,11,12
  33:13,20 63:1,6,7
  63:10,10 64:8,14
  65:20 67:17,25
set 26:13 41:24
  52:3 70:4 75:16
setoff 10:6
settle 23:24 38:10
  38:10,13 78:24
settled 10:16 21:8
  21:20 23:23 27:19
  47:3 49:16 52:23
  76:11
settlement 8:22
  10:7 19:19 28:12
  29:4 37:15,18,23
  38:19,22 40:24,24
  41:7 42:8 52:25
  54:19 55:1,17
  60:18 68:13 70:25
  71:21 72:2,2,4,7
  72:10 74:19 76:21
  77:16 78:10
settlements 52:9
settling 61:9,19
share 51:17
sharing 42:20
shed 67:10
sheet 36:9
short 52:21
shorten 2:6
shortfall 16:4
  42:20
shorthand 14:18
shortly 22:12
show 8:21 53:23
  70:15 75:23 80:2

showed 37:22
showing 11:22,25
  15:11
shown 13:1 54:3
shows 11:11
sic 76:3,11
side 61:21
sides 23:24
significant 17:10
  40:22 51:22 52:24
  54:16,23 58:2
  64:10 67:6 77:10
significantly 30:7
similar 66:1 70:2
  73:13,25
similarly 49:4
  68:14 70:20
simply 28:15
  31:18 73:24 74:12
  76:24
singh 3:3 5:15
  6:22,23 7:1,13 8:2
  9:12,17,21 10:2,4
  10:8,11,13,19
  11:3,8 12:4,16,19
  12:23 13:24 14:2
  14:4,16 16:22
  17:2,7,21 18:24
  20:7,24 21:24
  22:2,7,10 24:7,9
  24:11,16,21 25:3
  37:23 38:21,23
  40:5,6 41:20,22
  43:15 44:5,7,12
  51:18 55:21 57:3
  60:22 79:3,6 80:8
single 47:11
singular 46:2 47:3
sit 44:16
situated 68:14
  70:20
situation 45:1

sky 64:15
slide 11:10 12:5
  12:23,24
slippery 47:12
slope 47:12
small 10:3
sml 63:18
sole 60:16
solely 67:24 78:4
solution 54:12
solutions 6:11
  81:20
solvent 45:18
sonya 4:25 81:3,8
soon 23:21
sooner 16:12
  24:12 80:3
sorry 11:4 13:23
  25:10 32:1 33:22
  38:4 41:22 65:23
sort 7:17,20 8:17
  9:5 10:16 11:15
  12:20 13:2,4,11
  13:20 14:6,19,23
  15:16 16:4,8,17
  16:19 17:3,24
  18:1,10,15 19:23
  20:14,19 21:11
  22:12,20,20 23:9
  24:5 29:20 41:13
  44:13,16 45:4,25
  48:8,22 50:2,14
  79:12,17,17
sought 53:15,22
sources 19:2,7
southern 1:2 68:8
spahr 25:8
speak 6:7 25:9
  60:13 76:15
speaking 6:17
specialists 21:17
specific 64:3 74:6

specifically 73:5
specified 62:23
spectrum 46:11
spend 17:23 53:2
spending 18:21
spent 34:2
split 61:1
spoke 38:17
st 63:18 68:21
stages 23:4
stakeholder 37:12
standard 31:6,17
  31:17,22,25 32:2
  40:17 44:15 47:16
  47:17 49:24 50:17
  53:21 61:11 70:10
  78:19
standards 66:12
standing 36:23
stark 44:17
start 16:15
started 48:18,24
starting 7:14
state 43:11 59:20
  66:22 67:4 68:9
stated 76:7
statement 26:13
  27:11 35:9 36:1
  43:11,14 76:16
statements 44:9
  56:21 63:24
states 1:1,13 64:5
  66:19 68:21
status 2:4 7:4 8:7
  11:14 13:3 19:4
  26:22 29:9 53:15
  79:8
statute 34:10 39:4
  74:15
statute's 67:14
  71:10
stockholders 67:9
  74:9

stopped 54:11
  56:24
street 1:14
stretch 15:12
strictly 66:23
stringent 53:21
  56:6
subclass 73:21
subject 9:15,24
submit 27:17
  31:23 34:10 39:4
  39:21 45:20 46:25
  50:21 57:23 61:5
  61:6 62:1,16
  78:23
submitted 71:15
subparagraph
  63:8
subsection 62:24
  63:2,9
subsequent 43:20
  55:20
subsequently
  41:15 60:15
subset 71:12
  74:14,18,18 75:25
substantial 2:13
  2:21 3:1,7,14,22
  4:1 24:25 27:7,21
  32:3,7 33:2,7
  44:19,24 46:22,24
  47:11,17,20 48:2
  49:24 50:23 51:1
  51:15 53:24 54:1
  56:2,4 59:22
  61:12,24 63:3,23
  63:25 64:2,7,18
  64:25 65:12,23,25
  66:7,13 67:15,21
  68:22 69:11,25
  70:15 71:2,18
  74:10 78:5

substantially
  66:11
successful 27:8
  69:4
successfully 25:12
sufficient 24:3
suggest 16:6
suggesting 20:20
  24:4 58:16
suite 81:22
sum 30:23 55:24
  68:20
summarize 12:5
summary 8:14
sunny 3:3 5:15
  6:23 40:5
supplement 26:7
supply 30:18
support 2:17 3:19
  4:1 25:24 26:8
  43:11 58:17 61:3
  65:22
supported 30:17
supporting 25:23
  58:14 70:17
supposed 39:4,5
sure 21:1 22:3
  32:25 34:13 48:12
  60:21
synonyms 67:5
systems 79:23

**t**

t 81:1,1
table 33:24 45:11
  54:24 59:2
tail 18:16
tailored 74:19
take 9:7 13:8,21
  29:7 57:22 58:17
takeaways 22:13
  22:13
taken 6:11 20:12

talk 59:21
talking 28:8,21,23
  29:14 30:17
tallies 44:9
tangible 56:9
  66:25
tasked 52:10
tax 14:17 15:10
  15:13,15
taxes 79:13
teamed 59:7
telephonic 2:2 6:6
  6:16
telephonically
  5:15
tell 56:22
term 16:25 36:9
  66:13
terms 8:2 10:22
  10:24,25 11:3,20
  12:1 15:2,13 19:2
  19:7 21:7 22:12
  22:19 23:7 37:15
  40:25 72:6
test 32:8 64:25
  67:22
text 22:11
thank 6:22 7:1
  24:9,16 25:17
  26:10 31:1 51:4
  51:12 56:15,18
  79:3 80:5,8
thankfully 23:8
thanks 12:3 18:23
  24:15 51:11 56:14
  80:7
that's 7:12 10:3,8
  10:11,13 13:9,14
  14:7,9,11,12,19
  15:1 16:9,20 17:2
  17:6 18:19,20
  20:5 21:10 25:3,3
  25:15,15 27:5,6

27:20 29:11,16,18
30:9 31:6,24
32:13 33:8 34:17
34:17 38:11 39:3
39:22 40:16 41:19
46:1,6,21,24,25
47:22 53:16 55:1
56:14 57:10 58:7
59:1,6,16,18
60:14
**theory** 30:15
**there's** 6:10 8:9
8:25 10:14 13:24
14:5,5 17:16,21
18:11 23:8 26:3
29:24,24 31:23
32:1 39:7,8 42:3,4
44:10,17 45:21,22
46:3 47:9,10,15
48:4,6 55:12
61:14
**they're** 9:2,15
11:25 21:19 29:20
29:22 31:9 44:4
59:11 61:23
**they've** 30:8
39:12
**thing** 78:20
**things** 17:22 18:1
18:17 48:4 52:3
59:20,22 61:1
79:11
**think** 9:8 15:18,22
17:18 19:6,13
21:3 23:2,22
25:21 26:3 29:5
30:24,25 32:14,19
35:6,14,15 37:18
37:22 38:20 39:11
39:13 40:1 43:10
43:15,25 44:17,21
47:15,22 48:24
50:24 53:9,22

58:23 62:6,8,14
66:2 68:7 74:23
78:3 79:4
**thinking** 15:16
16:15
**third** 19:15 21:6
57:17 73:14,21,21
**thorn** 61:21
**thought** 28:1
58:24
**three** 8:21 15:17
27:13 47:18 48:4
62:22 64:14 71:1
71:20 74:13 76:6
**throwing** 38:24
**tide** 60:5 75:13
**time** 2:6 6:7 7:11
11:13 23:25 28:8
28:22 29:14 30:2
30:15 33:10 37:5
42:2,2 43:1,19,19
43:25 44:2 52:21
63:9 75:18
**times** 38:9 77:3
78:18
**timing** 16:19
20:22 28:4 37:18
50:3 55:12,21
61:7
**title** 63:4,11
**today** 11:16 13:3
20:2 51:13 53:20
79:5
**today's** 6:13,20
12:24 24:23 61:13
**top** 10:14 13:7
18:14
**total** 9:7,23 11:5
11:18 13:9,20
14:5 15:4 26:20
41:17 43:6
**totally** 20:10

**touch** 57:2
**touched** 20:8
49:25
**toys** 48:18 73:25
**tracking** 13:4
**trade** 46:12,16,17
58:13
**traders** 58:11
**transaction** 45:17
**transcribed** 4:25
**transcript** 6:13
48:13 54:9 55:11
73:2 76:7 81:4
**transferred** 42:9
42:15,21 43:6
**transfers** 21:16
**transform** 19:18
19:22 45:15
**treatment** 48:9
49:2 74:2 75:3
**tremendous** 27:9
**trending** 17:25
**tried** 18:24
**tries** 48:7
**true** 44:10 81:4
**trued** 42:2 43:19
**truly** 65:6 68:6
**trust** 13:13 42:6
43:2
**trustee** 46:9
**try** 16:1 24:12,12
27:20 31:20 51:19
**trying** 18:6 40:14
46:13 47:6,25
**turn** 51:5
**turned** 46:8
**tweaking** 61:7
**two** 8:15,17,23
12:7 13:11,24
14:5 27:12 28:6
30:9,12 31:9
32:14,18 34:15,22
37:5,19 42:3

43:15,18 44:20
50:14 52:23 54:9
60:18,25 64:9
68:7 70:8 74:22
**type** 54:20 74:20
78:19

**u**

**u.s.** 1:23 64:16
**ucc** 51:25 52:22
53:12 54:6
**ultimately** 9:9
41:5 46:9 47:2
52:16 55:2,18,22
**uncashed** 12:11
**unclear** 53:5
**understand** 17:9
28:11 30:21,24,25
**understood** 28:22
**undertaken** 67:23
69:8
**undisputed** 62:16
**unidentified**
71:14
**unique** 47:9,15
**united** 1:1,13
66:19
**unmute** 6:17
25:12
**unquote** 40:21
**unsecured** 3:6,10
26:1 27:11 45:5
**unusual** 64:4
**update** 7:4 11:14
19:4 20:25 24:10
24:13
**updates** 21:1
**ups** 44:10
**urging** 55:11
**use** 14:18 79:24
**uses** 11:11 15:3
19:2 20:8,11
**utility** 19:20

**v**

**v**  64:15
**value**  19:25 21:9
  21:12 28:8 29:14
  30:2,15 39:18
  52:11 54:23 55:3
  63:10 67:7
**variance**  13:3
**various**  21:18
  42:23 79:25
**vendor**  33:15 55:5
  55:6 57:22 58:13
  59:17 79:23
**vendors**  30:17
  36:12 58:2,15,25
  59:5,13 60:12
  71:14,15 79:19
**veritext**  81:20
**veto**  75:8
**view**  27:3,14
  55:10 57:15
**viewed**  69:23
  75:13
**vigorously**  59:25
**vision**  76:2,11
**voice**  6:9 40:16
  47:8
**void**  46:4
**voluntarily**  42:9

**w**

**waived**  21:11
**walk**  7:10
**walked**  18:25
**walker**  1:25
**wander**  2:7,14,17
  3:23 4:1,3 5:8
  25:4,20 26:3,6,10
  26:11 27:24 28:10
  28:17 29:8,16,22
  30:14,21 31:1,8
  31:11,13,15 32:23
  34:13,19,24 35:3
  35:7,11,22 36:3

36:23 37:8,10,17
38:4,7,11 40:1,7
40:12 41:11,16
43:12 44:14,24
46:4 47:18 49:3
49:18 51:6 54:3
54:18 56:17,18,19
62:6,10,12 78:25
**wander's**  45:20
  47:13
**want**  6:13 9:19
  15:11 16:25 26:6
  26:8,12 32:15
  54:25 59:16 60:21
  62:7 79:7
**wanted**  20:24
  62:12
**warrant**  53:25
  66:7 69:25
**warranted**  56:4
  65:22
**wasn't**  28:4 33:18
  33:22 55:4 60:4
**way**  8:20 24:2
  41:13 47:7 57:20
  57:25
**ways**  16:15 23:2
**we've**  21:12 79:21
**weekend**  37:22
**weeks**  60:25
**weil**  5:10 6:23
  33:1,6 35:24 40:6
**welcome**  12:4
**went**  19:21 38:18
  42:18 48:9 49:17
  58:4 59:18 66:21
**weren't**  38:24
**westinghouse**
  66:8
**we'll**  7:22 24:12
  24:12
**we're**  6:4 7:20
  11:18,20,21,22

12:1 14:17 18:21
22:15 23:4 29:14
30:17 39:5 44:8
62:6
**we've**  7:22 8:4,7
  8:11,23 9:5 10:13
  12:11,12 13:1,4
  13:16 14:24,24
  15:2 16:5,13 19:5
  19:14,16,18,21
  20:10,19 21:3,13
  22:14,25 23:5,9
  30:24 45:7
**what's**  16:3 17:19
  21:19 39:21
**white**  1:15
**wholesale**  66:5
**who's**  25:18 27:5
**who've**  26:19 27:4
  45:7
**witnesses**  34:3,4
**wonder**  61:17
**won't**  23:24
**wood**  21:20
**word**  31:5,15
  64:12
**words**  28:24
  55:16 77:4 78:11
**work**  7:22 17:9,10
  18:8 23:9 32:18
  42:21 46:15 52:22
  53:10,11 67:7
  78:7,9,11,12,15
  78:20
**worked**  7:17
**works'**  17:18
**world**  57:1,9,15
  57:22 58:2,6
**wouldn't**  28:15
  29:4,19 35:20
  58:18
**would've**  28:7
  29:12 38:8 43:16

44:2 58:20,21,22
58:23
**wrap**  62:8
**wrapped**  62:10
**wrong**  25:8 45:22

**x**

**x**  1:4,10

**y**

**yeah**  10:2,19
  12:18 17:7 22:10
  24:11 31:14 35:7
**year**  12:9 16:5,7
  16:11,24 19:20
  26:24 30:9 53:2
  54:4 80:1
**years**  30:9,12
**york**  1:2 5:6,13
  63:18 68:8
**you'd**  9:22
**you'll**  29:10
**you're**  6:17 10:15
  12:4 17:14 18:9
  18:17 23:16 27:25
  28:7 29:6 30:12
  31:15 34:17 49:10
**you've**  15:20 20:7
  21:3 45:8 49:20

**z**

**zealously**  62:3

**<u>EXHIBIT C</u>**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  October 7, 2019

17                  1:07 PM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

Page 2

1    HEARING re Notice of Hearing : Notice of Continuation of

2    Hearing on Confirmation of Modified Second Amended Joint

3    Chapter 11 Plan of Sears Holdings Corporation and Its

4    Affiliated Debtors

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

 1    A P P E A R A N C E S :

 2

 3    AKIN GUMP STRAUSS HAUER & FELD LLP

 4        Attorneys for Unsecured Creditors Committee

 5        One Bryant Park

 6        New York, NY 10036

 7

 8    BY:  PHILIP C. DUBLIN

 9        SARA L. BRAUNER

10        ZACH LANIER

11

12    WEIL, GOTSHAL & MANGES LLP

13        Attorneys for the Debtors

14        767 Fifth Avenue

15        New York, NY 10153

16

17    BY:  JARED R. FRIEDMANN

18        JACQUELINE MARCUS

19        SUNNY SINGH

20

21

22

23

24

25

```
 1   WEIL, GOTSHAL & MANGES LLP

 2        Attorneys for the Debtors

 3        200 Crescent Court, Suite 300

 4        Dallas, TX 75201

 5

 6   BY:  PAUL R. GENENDER

 7

 8   MILBANK, TWEED, HADLEY & MCCLOY LLP

 9        Attorneys for Cyrus Capital

10        28 Liberty Street

11        New York, NY 10005

12

13   BY:  THOMAS R. KRELLER

14

15   DAVIDOFF HUTCHER & CITRON LLP

16        Attorneys for Pearl Global

17        605 Third Avenue

18        New York, NY 10158

19

20   BY:  DAVID H. WANDER

21

22

23

24

25
```

Page 5

 1   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 2        Attorneys for Transform Holdco LLC

 3        One Liberty Plaza

 4        New York, NY 10006

 5

 6   BY:  THOMAS J. MOLONEY

 7

 8   LOCKE LORD LLP

 9        Attorneys for Pension Benefit Guaranty Corp.

10        111 South Wacker Drive

11        Chicago, IL 60606

12

13   BY:  BRIAN A. RAYNOR

14

15   WILMER CUTLER PICKERING HALE and DORR LLP

16        Attorneys for ESL in the Litigation

17        7 World Trade Center

18        250 Greenwich Street

19        New York, NY 10007

20

21   BY:  PHILIP D. ANKER

22

23

24

25

Page 6

1    THE SARACHEK LAW FIRM

2         Attorneys for Mien Co. Ltd., Helen Andrews, Strong

3         Progress Garment Factory Company, Ltd., Samil

4         Solutions, Shanghai Fochier, Purcell Murry, A&A HK

5         Industrial, Mingle Fashion Limited Mansheen Industries,

6         Ltd., AMW Vietnam Co. Ltd., Holdsun Group Ltd.,

7         Auxo International Ltd., Beauty Gem, Inc., and Meenu

8         Creations LLP

9         101 Park Avenue, 27th Floor

10        New York, NY 10178

11

12   BY:  JOSEPH E. SARACHECK

13

14   FOLEY & LARDNER LLP

15        Attorneys for the Ad Hoc Admin Group

16        90 Park Avenue

17        New York, NY 10016

18

19   BY:  PAUL J. LABOV

20

21

22

23

24

25

Page 7

```
 1    VEDDER PRICE LLP

 2          Attorneys for Village Hoffman Estates & North Star

 3          Group Services

 4          1633 Broadway, 31st Floor

 5          New York, NY 10019

 6

 7    BY:  MICHAEL L. SCHEIN

 8

 9    SEYFARTH SHAW LLP

10          Attorneys for Wilmington Trust National Association, as

11          Indenture Trustee

12          620 Eighth Avenue

13          New York, NY 10018

14

15    BY:  EDWARD M. FOX

16

17    ALSO PRESENT TELEPHONICALLY:

18

19    LEE J. ROHN

20    SOMA BISWAS

21    CATHERINE LOTEMPIO

22    LIGEE GU

23    RONALD GOLD

24    DUSTIN SMITH

25    ROCCO CAVALIERE
```

Page 8

1   BRYAN CIMALA

2   KIMBERLY GIANIS

3   THERESE SCHEUER

4   RICK SZAMBEL

5   BARBARA WALANCIK

6   COURTNEY SCHAEL

7   RACHEL ALBANESE

8   EMILY HOLT

9   MAEGHAN MCLOUGHLIN

10  ARLENE ALVES

11  ALANA FRIEDBERG

12  DAN SHARNAH

13  ANTHONY GREENE

14  KATHLEEN AIELLO

15  STEVEN KOSSON

16  TERESA LII

17  BRYANT OBERG

18  ALIX BROZMAN

19  MINTA NESTER

20  ANDREW THAU

21  MATTHEW KOCH

22  SAM ASHURAEY

23  LESLIE HEILMAN

24  CATHERINE HEITZENRATER

25  WILLIAM HOLSTE

Page 9

 1  ALLEN KADISH

 2  HOO RI KIM

 3  ROBERT KOLTAI

 4  JULIE MAY

 5  BEN MINKOFF

 6  MICHAEL MITTELMAN

 7  JASON JANJANA

 8  SUNNY SINGH

 9  JOSEPH SZYDLO

10  SHARON HARRIS

11  SHELLEY KINSELLA

12  RONALD SPINNER

13  ROBERT FITZGERALD

14  BETH ROGERS

15  LINDA RIFFKIN

16  PAUL SCHWARTZBERG

17  GUSTAVO CHICO-BARRIS

18  SONIA COLON

19  JOHN BRINGARDNER

20

21

22

23

24

25

1               P R O C E E D I N G S

2   THE COURT:  Okay.  Good afternoon.  In Re: Sears Holdings

3   Corporation, et al.

4           MR. SINGH:  Good afternoon, Your Honor.  Sunny

5   Singh, Weil Gotshal, on behalf of the Debtors.

6           Your Honor, we're here for the continued

7   confirmation hearing.  Before we pick up with where we left

8   off, I thought I could give the Court with some updates.  We

9   do have at least one resolution I'd like to announce, as

10  well as some other matters.

11          THE COURT:  Okay.

12          MR. SINGH:  So, Your Honor, following the hearing

13  last week, I would like to report that we have settled the

14  objection filed by Pearl Global Industries, with Mr. Wander,

15  who is here.  I'm just going to recite the terms of the

16  parties' agreement and I'll ask him to just confirm.

17          Your Honor, Pearl Global Industries will receive

18  an allowed claim of $1,130,000 without offset or deduction.

19  That's an administrative expense claim.  That's reduced,

20  Your Honor, from something in excess of $1.5 million that

21  had been asserted.

22          There will be a waiver, by the estate, of any

23  potential preference claims against Pearl.  An additional $1

24  million, Your Honor, will be contributed from the carveout

25  to the estate for distribution in the initial distribution.

Page 11

1    So, Your Honor, under the consent program we had the initial

2    distribution of $20 million, so now that will be $21 million

3    and it will include this additional increment of $1 million

4    from the carveout.

5              THE COURT:  Okay.

6              MR. SINGH:  In addition, Pearl agrees, excuse me,

7    that it will opt-in to the consent program and that it now

8    withdraws its objection and supports confirmation of the

9    plan.

10             Your Honor, those are the terms with Mr. Wander.

11   Maybe I'll just ask him to confirm in case I missed anything

12   or --

13             MR. WANDER:  That's correct, Your Honor.

14             THE COURT:  Okay.  Was --

15             MR. SINGH:  So, Your Honor, that issue is

16   resolved.  I would just like --

17             THE COURT:  Was the assessment of Pearl's claim

18   and preference risk done on an assessment of the merits?

19             MR. SINGH:  Yes, Your Honor.  So as I mentioned,

20   Mr. Wander's client, Pearl, had asserted a claim of an

21   administrative expense at -- in excess of $1.5 million.  So

22   over the weekend, and finally last hearing, we considered,

23   you know, the validity of his claims.  He had -- you know,

24   they had somewhat of a world import issue, also inducement

25   arguments with respect to 503(b)(1), which were sort of

Page 12

1   legal disputes between us and we think we've resolved those

2   at a fair place.

3          We also did look at, obviously, the preference

4   exposure, you know, that has -- that Pearl had, took that

5   into consideration, as well as the incremental $1 million

6   coming in from the carveout.  And, Your Honor, we did review

7   all of that with the Creditors Committee, Akin Gump, in

8   particular and, you know, everybody's signed off and on

9   board as to where those issues have now landed.

10          THE COURT:  Okay.  And did -- was that preference

11   resolution consistent with the analysis by the firms that

12   had been retained to do the --

13          MR. SINGH:  Yes, they were -- we were coordinating

14   with them every step of the way, and it took into account,

15   sort of, you know, what potential defenses could be

16   asserted, and at the end of the day what we thought the

17   exposure really could be.  So yes, we -- you know, that was

18   in complete coordination with the ASK firm.

19          THE COURT:  Okay.

20          MR. SINGH:  So, Your Honor, we think we've landed

21   in a good spot there.  Just one or two other changes I would

22   just like to note, with respect to the consent program.

23   Your Honor, following the hearing last week, and some of the

24   concerns the Court raised with respect to those creditors,

25   administrative expense creditors, who neither opt-in, nor

Page 13

1    opt-out of the settlement, so that sort of third class we

2    were talking about.  So, Your Honor, we've changed the

3    consent program so that those parties now, their aggregate

4    recovery, instead of being capped at 75 cents of the allowed

5    amount of their administrative expense claim, they would be

6    capped at 80 percent of the allowed amount of their

7    administrative expense claim.

8            So you've really got, sort of, three categories of

9    administrative expense creditors.  Those who affirmatively

10   opt-in.  And we've made the opt-in timing the same for both,

11   so everybody gets 33 days to opt-in or opt-out.  Those who

12   affirmatively opt-in will get the benefit of the initial

13   distribution, they will also get -- but they will be capped

14   at 75 cents of the allowed amount of their claim.  The

15   second category, who neither opt-in nor opt-out, they will

16   be bound by the administrative expense consent program but

17   they will have their aggregate recovery capped at 80 cents.

18   And although they won't participate in the initial

19   distribution, the second distribution first has to go to

20   true them up to the initial recovery.  And then finally,

21   anybody who opts-out, of course, will retain their rights

22   under the plan to be paid in full, a hundred percent of the

23   allowed amount of their claim on the later of the effective

24   date or the date that the claim actually becomes allowed.

25           So we've made those changes and we did file a

Page 14

1    proposed confirmation order that reflects those changes,

2    Your Honor.  We'll have some more clean up based upon what I

3    announced earlier.  And we also did file a revised form of

4    notice that would go out, and Your Honor has a copy of those

5    and we can review those towards the end, if Your Honor would

6    like to.

7            But that basically takes into account some of the

8    issues that you had raised and also just making it clear, we

9    included a chart that sort of makes it clear, you know, what

10    happens if you are in the opt-in category, what happens if

11    you're in the opt-out, and what happens if you're, you know,

12    in neither opt-in or opt-out.  So hopefully that's much

13    clearer.  And we added, you know, some of the information

14    from the declarations, in particular, about estate assets,

15    et cetera.

16            THE COURT:  And the risk factor discussion?

17            MR. SINGH:  Right, exactly.  We updated all of

18    that.

19            And Judge, just a couple of other changes or

20    issues we're working through.  ESL and Cyrus had asked us to

21    just make clear that the segregation of funds that we've

22    been talking about in connection with the litigation trust

23    funding, that's the $25 million and the 10 million, they are

24    going to send us some language and we may just recite it in

25    the record later, but I just wanted the Court to know that

Page 15

1    we're talking through that to make it clear that it's not --

2    those assets, although they're being put in segregated

3    accounts, they remain the property of the estate, they're

4    not, sort of, being removed as you would think of maybe

5    carveout funds that go to a trust fund, but they're sort of

6    available --

7              THE COURT:  That's consistent with the language

8    you've already offered up that --

9              MR. SINGH:  Correct.  Paragraph --

10             THE COURT:  -- distribution into the trust doesn't

11   --

12             MR. SINGH:  Exactly.  It's Paragraph 59 of the

13   proposed confirmation order.

14             THE COURT:  Okay.

15             MR. SINGH:  And then I think Cyrus had requested

16   additional notice, which we've agreed to.  Just 20 days, we

17   would provide notice.  So we put in, you know, the sort of

18   reporting prior to the effective date, we would also add in,

19   you know, prior to make any post-effective date

20   distributions, we'll provide parties-in-interest with 20

21   days' notice so they have an opportunity to know that.

22             THE COURT:  Just the first distribution?

23             MR. SINGH:  Just -- well, any distribution

24   following the effective date.

25             THE COURT:  Oh, okay.

Page 16

1                MR. SINGH:  Yeah.

2                THE COURT:  All right.

3                MR. SINGH:  So, Your Honor, those are some of the

4       changes we're working through, I just wanted to give the

5       Court an update before we started with the balance of the

6       hearing.  But I'm happy to proceed however you'd like at

7       this point.

8                THE COURT:  All right.  Well, I've seen those

9       documents, I also saw the proposed fourth supplement that

10      has the proposed terms for the --

11               MR. SINGH:  Oh, yes, I failed to mention --

12               THE COURT:  -- liquidation trustee's --

13               MR. SINGH:  Yes.  We did file --

14               THE COURT:  -- compensation?

15               MR. SINGH:  Exactly.  I failed to mention.  I

16      apologize.

17               We did file the proposed compensation for the

18      litigation trustees.  That would kick in, Your Honor, should

19      you enter the confirmation order, basically on the

20      confirmation date, because those individuals are stepping in

21      as litigation designees, you know, as soon as the

22      confirmation order is entered, other than with respect to

23      the preference claims, because that's outside of their

24      mandate.  But then post-effective date it, sort of, would

25      include the preference claims.  But we did file that,

Page 17

1    parties have three weeks to object.  We have extra copies if

2    anybody didn't see it.  We filed it just this morning before

3    the hearing.  And so that is now always been on file, and we

4    took it out of the confirmation order.

5                    THE COURT:  Okay.

6                    MR. SINGH:  Okay.  Thank you, Your Honor.

7                    THE COURT:  Okay.  So I think where we left off

8    Mr. Fox was speaking.  And I have to say, at the end of a

9    very long hearing, I think I did a disservice to Mr. Fox.

10   He's always been a very aggressive advocate, but never

11   untethered from reality.  And I hope he didn't have an

12   existential moments over the weekend where he doubted that,

13   but in any event, if you did, I'm sorry if you did.

14                   MR. FOX:  Actually, Your Honor, I thought you

15   handed me the keys.  Thank you.

16                   THE COURT:  Well, then maybe you did.

17                   MR. FOX:  Thank you, Your Honor.  I appreciate

18   that.  It was a long day.

19                   I do want to just make a couple of preliminary

20   comments before I get back to the argument.  One, I want to

21   be clear, Wilmington Trust is the indentured trustee for the

22   6-and-5/8th percent senior secured notes to 2010.  That's

23   the capacity in which I appear today, not on behalf of

24   anybody else.

25                   And just so it's clear, in case there's any

Page 18

1    confusion, ESL does not own any of how to notes.  And -- so

2    I'll leave it at that.

3           Secondly, Your Honor, just as a preliminary

4    matter, as they say in public speaking, tell them what

5    you're going to say, say it, and then then tell them what

6    you said.  So I started into the argument about the

7    settlement, but I want to be clear, and I'm going to say

8    this at the end, that there is a plan here that Your Honor

9    could confirm, assuming that the other issues that have been

10   raised by others are addressed, that does not require the

11   plan settlement to be approved.  And in fact, the very fact

12   that that plan exists I think may make it impossible for the

13   Court to approve the plan settlement, but I'll come to that

14   a little bit later.

15          To get back to it, Your Honor, the -- in making a

16   determination as to whether the facts the Debtors have

17   elicited satisfy the requirements to confirm the -- or to

18   approve the planned settlement, the Court must also look to

19   the Debtors' action in this case, not just to the

20   declarations that have been offered into evidence.  And

21   we've included, in the exhibits, the documentation that

22   shows those actions.

23          In particular, Your Honor, on February 9th, 2019,

24   the Debtors announced a settlement with the PBGC that -- to

25   allow the PBGC an $80 million priority claim and an $800

1    million unsecured claim.  Notably, that agreement provided

2    that the Debtors would not seek to substantively consolidate

3    the Debtors' estates.  Following that, on April 17th, 2019,

4    the Debtors filed a plan, which again, did not provide for

5    substantive consolidation of these cases.  It wasn't until

6    May 16th, a month later, that the Debtors filed an amended

7    plan which purported to settle substantive consolidation by

8    substantively consolidating the Debtors.

9            And according to the confirmation brief, pursuant

10   to the plan settlement, the PBGC agreed to settle

11   substantive consolidation issues under the plan, that's at

12   Paragraph 261 of Docket 5144.  So it seems, at least in the

13   initial go round, or the initial rollout of the substantive

14   consolidation settlement, it was allegedly a settlement

15   between the Debtors and the PBGC over an issue that was not

16   in dispute between them since they had both agreed not to do

17   that and the Debtor had filed a plan that provided that it

18   would not do that.

19           So a debtor can settle or compromise a -- you

20   know, can enter into settlements and compromises, but the

21   definition of settlement or compromise requires that there

22   be an active dispute.  So at least at that time, with

23   respect to the PBGC, there was not.

24           So -- and when we asked Mr. Murphy, and your

25   comment -- your request before the lunch break on Thursday

Page 20

1    was that we provide you with the specific areas of testimony

2    that we had designated from the deposition, so I'll do that

3    as I go through, but Mr. Murphy didn't know what dispute the

4    Debtors referred to in the disclosure statement for the

5    amended plan either.

6            When he was asked about that, this is on Page 72,

7    Line 11 of the deposition testimony that was designated, the

8    question was:  "So it says discuss below, after filing the

9    initial plan and disclosure statement on April 17th, 2019,

10    the Debtors and the PBGC agreed to certain modifications to

11    the PBGC settlement in exchange for the settlement of

12    disputes and potential litigation regarding whether the

13    Debtors should be substantively consolidated.  Do you know

14    what disputes this is referring to?"  Answer: "Specifically,

15    I was relying on counsel for the detailed disputes.  At a

16    high level it's their claim for substantial unsecured debt

17    and administrative debt claims."  Question:  "Whose claims?"

18    Answer:  "The PBGC."  Question:  "Well, it refers to a

19    settlement of disputes and potential litigation regarding

20    whether the Debtor should be substantive consolidated.  So

21    who are the parties to that dispute; do you know?"  Answer:

22    "I'd have to rely on counsel for that specific answer."

23    Question:  "So you don't know what dispute and you don't

24    know who the parties were; is that correct?" Answer:  "I'm

25    not sure what specifically.  This says settlement of

1    disputes and potential litigation, and I'm taking it at face

2    value.  There were disputes and litigation.  I'm not -- I'm

3    providing financial information analysis -- and analysis

4    with regards to any settlement offers."

5            Mr. Genender:  "To be fair, he's just asking if

6    you know who the parties to this -- to the dispute

7    referenced understand that language are."  Mr. Fox:  "That's

8    correct."  Mr. Genender:  "If you don't know, he's asked --

9    answer I don't know."

10           Mr. Murphy didn't know why the Debtors decided to

11   file a substantive consolidation plan on May 16th, 2019

12   either and he was involved in that decision.  Again, he was

13   asked -- I asked him:  "Between April 17th, 2019 and May 16,

14   2019, what changed that led to the Debtors to file a

15   substantive consolidation plan rather than the

16   nonconsolidation plan filed on April 17th?  What changed in

17   that one-month period?"  Answer:  "I can't answer."  Mr.

18   Genender:  "To be fair, he asked you to rephrase it, you

19   repeated it.  Just to be fair, he asked you to rephrase it."

20   By Mr. Fox:  "Do you understand my question, Mr. Murphy?"

21   Answer:  "Yes."  Question:  "Is there some reason why you

22   can't answer it?"  Answer:  "Basically I wasn't involved in

23   the high-level discussions regarding that final decision."

24           He then went on, though, to provide that it

25   appears that the real problem was the administrative

1    insolvency of Debtors other than Kmart.  So I asked him:

2    "So far as you know, is it fair to say -- is it fair to say,

3    as far as you know, sitting here today, nothing changed

4    between April 17th, 2019 and May 16, 2019 that caused the

5    Debtors to switch from a nonconsolidation plan to

6    substantive consolidation plan?"  Mr. Genender:  "I'm going

7    to object.  That misstates his testimony and lack of

8    foundation."  Answer:  "I'd have to reflect on that period

9    of time and what I have in my declaration to see if there's

10   a better answer than say other than during that 30 days

11   there was additional analysis and discussions.  It's an

12   evolving process.  That's as far as I could go."

13          Question:  "What additional analysis are you

14   referring to?"  Answer:  "The intercompany analysis, the

15   waterfall effect of where a value is landing with regards to

16   each Debtor."  Question:  "When you say the analysis of

17   where value is landing, how is that relevant to the analysis

18   of whether you find -- filed a substantive consolidation

19   plan or not?"  Answer:  "Based on the information and the

20   analysis of the intercompany waterfall.  If you looked at

21   the deconsolidation liquidation analysis, the value at the

22   end of the waterfall was substantially ending up in the

23   Kmart corporation entity."  Question:  "So is it fair to say

24   that the problem became that there were a bunch of

25   administratively insolvent Debtors on a standalone basis,

Page 23

1    after you did your analysis, and maybe Kmart and some others

2    that were administratively solvent?"  Mr. Genender:

3    "Objection to form."  Answer:  "Hypothetically, based on

4    that analysis, yes."

5              Despite the fact that Mr. Murphy was not involved

6    in the decision to change to a substantive consolidation

7    plan, although he's their witness on this, and the real

8    problem was administrative solvency of some Debtors, the

9    Debtors used Mr. Murphy to try to justify substantive

10   consolidation.  Mr. Murphy enumerates what he says are other

11   factors for substantive consolidation, and that's at

12   Paragraph 24 of his declaration.

13             But when I asked him if he knew what the factors

14   for substantive consolidation were, he couldn't answer and

15   he said he's not a lawyer.  The question was:  "How do you

16   know what the factors are for consolidation?"  Mr. Genender:

17   "He answered questions about the facts."  Mr. Fox:  "I'm not

18   asking that."  Question:  "You can answer."  Answer:

19   "Please rephrase the question. I just don't want to make a

20   legal -- I'm not a lawyer, so I'm not going to answer a

21   legal question."

22             Mr. Murphy asserts, in his declaration, that

23   Creditors dealt with Debtors on a consolidated basis.  And

24   that's one of the two prongs in the Augie/Restivo Test, as

25   you know, to determine whether or not substantive

Page 24

1    consolidation is appropriate.  But he really has no basis

2    for his assertion.  First of all, the loans specifically

3    indicate who the borrowers and the guarantors are.

4            The question, this is at Page 126 of his

5    deposition:  "When you say the creditors, and you refer to

6    the lenders, particularly dealt with Sears as a consolidated

7    company, isn't it the case that all the loans specifically

8    indicate who the borrower is, or who the guarantors are of

9    those loans?"  Mr. Genender:  "Objection.  Form."  Answer:

10   "Yes."

11           And the trade creditors had written contractors,

12   but Mr. Murphy never even looked at them, he just determined

13   that they must have been confused.  On Page 72 of the

14   deposition, Question:  "Mr. Murphy, take a look at Page 13

15   of your declaration that's been marked as Exhibit 6, if you

16   would."  Answer:  "Okay."  Question:  "In Paragraph 24, at

17   the bottom of that page, you say, at the second sentence of

18   subparagraph A, 'Many Creditors conducted business primarily

19   with three Debtors, Sears Holding, Sears Roebuck and Kmart

20   Corporation.'  Do you see that?"  Answer:  "Yes."  Question:

21   "Then you say, at the bottom of that paragraph, 'Sears

22   Roebuck purchased a significant amount of the store

23   merchandise, both in sold Sears and Kmart stores, right?"

24   Answer: "Yes."

25           Question:  "When the Debtor entered into their

Page 25

1    transactions that are referenced here with whichever

2    Creditor, and I'm not talking about loans now, I'm just

3    talking about trade, were there written contracts, or

4    purchase orders, or invoices pursuant to which those goods

5    and services were purchased?"  Answer:  "Yes."  Question:

6    "Okay.  And did those invoices, or contracts or purchase

7    orders list the name of the Debtor which was buying the

8    goods or services?"  Answer:  "Yeah, I don't know."

9    Question:  "You don't know?"  Answer:  "For specific

10   invoices for that the Debtors specifically did I didn't get

11   into that detail."  Question:  "Never looked at that?"

12   Answer:  "No, not for this, no."  Question:  "Not for any

13   part of your substantive consolidation analysis?"  Answer:

14   "No."

15           Now, we did take a look, just randomly, at a

16   couple of proofs of claim that are on the docket and in fact

17   the proofs of claim have attached to them specific invoices

18   which specifically have the legal name of the legal entity

19   that purchased them.  We included four of them, it's Joint

20   Exhibit 57, 58, 59 and 60, which specifically indicate who

21   those entities are dealing with.

22           And then what we did was we found entities where

23   the same entity filed different proofs of claim against

24   different entities, because they had different claim -- they

25   had different contracts that specifically name those

Page 26

1    different entities.  So what appears to be to be the case is

2    the Debtor made an assumption about this, or Mr. Murphy did,

3    but never actually looked and in fact the evidence would

4    seem to suggest otherwise.

5         Mr. Murphy also indicated, though, that the

6    financing method that the Debtors were using was not unusual

7    for a large public company.  Page 174 of his declaration, I

8    asked him -- I said, "Now turn to Page 14, if you would of

9    Exhibit 6, at the bottom of the page in Paragraph F.  Do you

10   see that?"  Answer: "Yes."  Question:  "So it says there,

11   'Financing was provided principally through Sears Holdings

12   or Sears Roebuck Acceptance Corp with the majority of the

13   remaining Debtors providing guarantees of the debt.  Funds

14   were centralized and available for all entities.'  Do you

15   see that?"  Answer: "Yes."  Question:  "Okay.  Is this

16   unusual in terms of the large public company operation that

17   has outstanding loans?  Is this description unusual?"

18   Answer:  "Not in my experience."

19        Now, Mr. Murphy says, in his declaration in

20   Paragraph 24, at Pages 14 to 15, there are a number of

21   factors which are satisfied to show that there may have been

22   confusion among the Creditors as to what entities they were

23   dealing with, and it's the usual list of overlapping board

24   members, a central office, centralized operations, et

25   cetera, you know, tax statements, consolidated financial

1    statements being filed, all those things.  First of all,

2    with respect to tax returns, they're required to file

3    consolidated tax returns and they're required, by SEC rules,

4    a public company is, to file consolidated financial

5    statements.

6           But the problem with all this is that, among other

7    things, the Debtors knew all of this when they got the PBGC

8    deal which was in early 2019.  It was just figured out after

9    filing the plan in April, or even after agreeing in February

10   who the directors were of which entities, where the offices

11   were located, which is in Huffman Estates, as the world

12   knows, or, you know, that they had centralized financial

13   reporting, Treasury, HR, Tax Planning, Real Estate

14   Management, Internal Audit, et cetera.  All of that was

15   known, that was no secret to anybody.  So nothing changed

16   between the time that the Debtors filed their -- at least

17   with respect to this prong of substantive consolidation,

18   with respect to the issue of Creditors not understanding who

19   they were dealing with.

20          And I think it's also important to note that this

21   was a public company that filed financial statements, and

22   you can take judicial notice of those, the fact that it was

23   very clear to everybody, or anybody who bothered to look,

24   that they had outstanding loans, that those loans were

25   guaranteed at multiple entities within the Debtors.  The

Page 28

 1    documents are actually in the SEC files.  That they had

 2    multiple, you know, obligations of each of the entities to

 3    the PBGC as part of the control group.  This wasn't any

 4    surprise to anybody, or certain not to other -- to trade

 5    creditors or others who dealt with a single entity, when

 6    they decided to enter into agreements, or make loans, or

 7    sell goods and services to any of these debtor entities.

 8             Now, with respect to the analysis of hopeless

 9    entanglement, Mr. Murphy, and I think you've heard this now,

10    testified that he joined M3 in December of 2018, which was

11    three months after the bankruptcy cases were commenced, but

12    perhaps more importantly, he hasn't done this type of an

13    analysis before.  When I asked him, at Page 40 of his

14    declaration, "Have you done this sort of analysis at other

15    companies besides the Sears Debtors?"  Mr. Genender:

16    "Objection."  Answer:  "I would say there are very few

17    people who've done this type of analysis.  There are a few,

18    very few companies the size of Sears with the methodology

19    they used for using intercompany accounting to track all

20    their activities, certainly not the size of the company.

21    This is -- I've done second intercompany analyses for other

22    liquidation analyses for other companies, never the size of

23    this one."  And then at Page 41, Question:  "All right.  Let

24    me ask it this way.  Have you ever performed a similar

25    analysis of intercompany claims at a company the size of

Page 29

1    Sears, laying aside the volume of transactions?"  Answer:

2    "No."

3           Now, Mr. Murphy claims that there were potential

4    difficulties in reviewing financial records --

5           THE COURT:  I'm not sure what that question --

6           MR. FOX:  I'm sorry?

7           THE COURT:  That question didn't seem to make any

8    sense to me.  I mean, is there any such entity?

9           MR. FOX:  There may be.

10          THE COURT:  It would seem to be almost

11   inconceivable that there'd be a company like Sears that

12   wouldn't have the same types of intercompany transactions --

13          MR. FOX:  Well --

14          THE COURT:  -- because Sears has these three main

15   operating centers.  But anyway, you can go ahead.

16          MR. FOX:  Mr. Murphy claimed a potential

17   difficulty in reviewing the financial records and in fact

18   that was not actually the case.  When Mr. Murphy looked at

19   post-petition financials, and found what appeared to be

20   incorrect entries, it turned out that Sears could show him

21   where those entries had been corrected.

22          So at Page 31 he testified, Question:  "So those

23   adjustments that you concluded Sears had entered incorrectly

24   during the post-petition period?"  Answer:  "Those were

25   adjustments when we queried, we followed up with the

1    company, that the company said, oh, that was incorrect,

2    here's where we corrected it."  Question:  "And were their

3    corrections accurate?"  Answer:  "They appeared accurate

4    based on their responses.  Again, as far as the intercompany

5    activity was concerned, for the accountant perspective, if

6    the debit and credits matched, and their explanation for

7    what the correction was meant to be, then we moved forward.

8    We made sure we either identified the correction in our

9    overall matrix to make sure we weren't grossing up

10   receivables and payables this far, or due to and due froms

11   from a company sense for our net results."  Question:

12   "Well, what I'm trying to understand is did you find errors

13   in work that Sears had done that were not corrected?"

14   Answer:  "No."

15           And Mr. Murphy's conclusion was that the activity

16   was -- that the activity he summarized was consistent with

17   the balance sheet.  So on Page 39, when I asked, "Well, you

18   said it was a process for you to understand how the

19   intercompany transactions were recorded on the balance sheet

20   and how the balance sheet damages would match up.  So my

21   question is, after you went through that process to

22   understand this, what did you finally determine?"  Mr.

23   Genender:  "The balance sheet changes, you said damages."

24   Mr. Fox:  "I'm sorry, changes."  Mr. Genender:  "Objection.

25   Form."  Answer:  "Our conclusion was that the activity we

Page 31

1    were summarizing by debtor entity for due to and due from,

2    based on the methodology of the company the Debtors used to

3    aggregate the various entries, was consistent with what was

4    reported in the balance sheet."

5         Mr. Murphy's analysis left him with an 80 to 90

6    percent confidence level of the post-petition intercompany

7    balances.  And on Page 54 when I asked, "Now turning to Page

8    3 of Exhibit 1, you say that after you receive -- you

9    reviewed analysis and discussions with Sears management, you

10   have an 80 to 90 percent confidence level of a current

11   intercompany post-petition activity as a reasonable

12   indication of the due from and due to balances amongst the

13   Debtors; is that correct?"  Mr. Genender:  "Objection.

14   Form."  Answer:  "That's what I stated.  Yes."  Question:

15   "And what's the due from and due to balances amongst the

16   Debtors on just a post-petition basis, right?"  I'm sorry,

17   let me read that again.  Question:  "And that's the due from

18   and due to balances amongst the Debtors on just a post-

19   petition basis, right?"  Answer:  "Yes."

20        Now, Mr. Murphy complains, in his declaration, as

21   did the Debtors in their disclosure statement from May,

22   starting in May, which seems, in some cases, to word-for-

23   word mirror what Mr. Murphy's declaration then said in

24   September, but he refers to an antiquated system, but

25   nevertheless basically admitted it does not affect the

Page 32

1    company's accounting.  It simply was problematic for him

2    because he couldn't push a button and get a query of what

3    all the intercompany transfers were, so that he could look

4    at them and review the history.

5              Question, this is on Page 57, starting on

6    Line 6:  "Now, in the next point underneath that, as part of

7    the second bullet point, it says 'Legacy accounting systems

8    are not adequately robust in our view.  What do you mean by

9    that?"  Answer:  "They're not modern, they're antiquated and

10   we weren't able to request a summary of intercompany

11   transactions that made it easy to understand the activity

12   between all entities."  Question:  "You were not able to

13   obtain this for most petition activity?"  Answer:

14   "Correct."

15             Question: "Well, does the fact that the accounting

16   system is what you call antiquated mean that it does not

17   correctly keep track of the company's accounting?"  Answer:

18   "No, I'm not saying that."  And he went on.

19             And on Page 56, Question: "But to go back to my

20   question, does the fact that the accounting system is, as

21   you call it, antiquated, mean that it was not properly

22   handling the accounting for the Debtors?"  Answer: "That's a

23   conclusion for the auditors.  For a consolidated financial

24   statement, you have to talk to their auditors about that

25   type of question.  My point was more specifically to

Page 33

1    intercompany transactions."

2              Question: "Well, because the accounting system is

3    antiquated, are you saying that sometimes it added two plus

4    two to equal five instead of four?  Are you saying it was

5    adding or subtracting incorrectly?"  The Answer: "No."

6              On Page 6 he's continuing.  Question: "And if you

7    -- if this antiquated accounting system is not keeping

8    proper track of the books and records, would you expect that

9    the auditors would not be able to issue an opinion?"  Mr.

10   Genender: "Objection."

11             Question: "Of the annual audit."  Mr. Genender:

12   "Objection, form."  Answer: "That's my understanding."

13             Question: "What's you understanding?"  Answer:

14   "For public accountants on a consolidated -- on a

15   consolidated financial statement which they are opining on,

16   they had to have comfort that the consolidated financial

17   statements met their requirements as far as generally

18   accepted accounting principles."

19             Question: "And you're not aware that the

20   accounting statements did not meet the requirements, right?"

21   Mr. Genender: "Objection, form."  Answer: "If they provided

22   clean opinions, then that would be an indication that they

23   were okay for the consolidated financial statements."

24             Question on Page 62:  "Are you aware that the

25   company's outside auditors provided anything other than

Page 34

1    clean opinions?"  Mr. Genender: "Asked and answered

2    (indiscernible)."  Answer: "I don't know."  Question: "I'm

3    sorry."  Answer: "I don't know."

4            Now, the other thing is that this all related to

5    the post-petition activity, which is what Mr. Murphy was

6    really looking at.  Mr. Murphy didn't really analyze

7    prepetition accounting activity.

8            When I asked him on Page 91 of his deposition

9    transcript, Question: "You previously, as I understood your

10   testimony, were talking about your analysis of post-petition

11   intercompany transactions.  Was there also an analysis that

12   you conducted of prepetition intercompany activity?"

13   Answer: "Yes."

14           Question: "Okay.  And was that part of the same

15   analysis you conducted with respect to the post-petition

16   activity that we've already talked about, or was that a

17   separate analysis?"  Answer: "With regards to the

18   prepetition analysis, there wasn't an organized effort

19   similar to what we did with the post-petition detail."

20           The prepetition analysis was simply limited to

21   responding to questions about what Mr. Murphy referred to as

22   the due to/due from by Debtor, by which he means on the

23   intercompany basis, which Debtors owed money to which other

24   Debtors, and which Debtors were owed money by other Debtors.

25           And so when I asked him about that starting at

1    Page 93, Question: "You said in your prior answer that you

2    responded to questions that came up.  As I understood your

3    prior answer, and I'm paraphrasing, it's my understanding

4    that you were responding to questions that came up with

5    respect to prepetition intercompany activity.  My question

6    is was your analysis of prepetition intercompany activity

7    limited to responding to those questions that came up, or

8    was it more expansive than that?"  Mr. Genender: "Objection,

9    form."  Answer: "It was more to respond to questions based

10   on our observations of the prepetition balances from looking

11   at the balance sheet."

12          Question: "And what questions were those?"

13   Answer: "Primarily questions regarding what type of effort

14   would we need to perform in order to break out the

15   prepetition balances so that we understood the due to/due

16   forms by Debtor."

17          Question: "And did you prepare any kind of written

18   analysis that would set forth that analysis?"  Mr. Genender:

19   "Objection, form."  Question: "Or that effort?"  Answer:

20   "No."

21          Question: "And do you know when that analysis was

22   undertaken?"  Answer: "Which analysis?"

23          Question: "The one you're referring to of the

24   questions that came up with respect to prepetition

25   activity."  Answer: "That occurred over the period from

1    January through the filing of this claim."

2              Question: "And that was May 16th?"  Answer: "Yes."

3              Now, with respect to the inter -- in the

4    disclosure statement, the -- and this is the May 16th, and

5    it's pretty much the same since then, the Debtors have

6    indicated the -- pointed to the fact that intercompany

7    amounts were netted out.

8              When I asked Mr. Murphy about that, Question:

9    "Let's see.  Go to 11 -- go to 10 lines from the bottom of

10   Page 53 -- and this -- that was of the May 16th version of

11   the disclosure statement.  And the sentence in the middle

12   starts in the middle of the page, says while the Debtors'

13   accounting systems identifies the entities to which

14   intercompany payables are due or for which intercompany

15   receivables are due in the ordinary course, the millions of

16   entries are netted automatically by the accounting system

17   and are not summarized by Debtor.  Do you see that

18   sentence?"  Answer: "Yes."

19             Question: "Okay.  Is that sentence accurate?"

20   Answer: "Yes."

21             The point is that the Debtors did in fact keep

22   track of their intercompany accounts, and they did in fact

23   net them out.  Typically what you'll find is that that's not

24   the case.

25             Mr. Murphy didn't analyze or, I believe,

Page 37

1    understand the interplay between the intercompany claims and

2    the cash management system.  If you look at the Debtors'

3    schedules, they'll either show in Schedule AB intercompany

4    obligations owed to a particular Debtor or in Schedule EF

5    intercompany obligations owed by that Debtor entity.  And in

6    some cases, there are some Debtors that neither have a

7    receivable -- an intercompany receivable or an intercompany

8    payable.

9           What these ultimately are, to the extent they even

10   have -- either have a receivable or payable is an obligation

11   effectively to the centralized cash management system.  And

12   when I asked Mr. Murphy about that, this is at Page 99.  I

13   asked him:  "When you say not settled, do you mean did not

14   hand cash around to settle those; is that what you mean?"

15   Answer: "In its simplest form.  But the bottom line is that

16   they did not either collect on the receivables or pay on the

17   payable."

18           Question: "To each other?"  Answer: "Correct."

19           Question: "But they kept track of how much each

20   one owed to each other one, and they did, and they netted

21   those out, right?"  Mr. Genender: "Objection, form."

22   Answer: "In the millions of transactions that relied on the

23   balancing, the general ledger balancing effort by the, you

24   know, the information systems, millions -- billions of

25   transactions, that as long as those transactions netted to

Page 38

1   zero on a consolidated basis, the company moved on to the

2   next period.  Where the difficulty arises is when you want

3   to now separate the intercompany transactions from one big

4   bucket that needs to net to zero to individual Debtors."

5          Question: "Well, if I owe you a dollar, and you

6   owe Mr. Genender a dollar, and Mr. Genender owes me a

7   dollar, are you saying that it's not appropriate for us to

8   just agree that nobody owes anybody anything because we

9   netted those transactions, or do we actually have to pass

10  the dollar around to each of us to settle the transaction?"

11  Mr. Genender: "Objection to form."  Answer: "Under that

12  example, if we all agreed to settle that way, then that

13  would be the settlement.  But if you owed me a dollar, in a

14  one-dollar example, it's actually too simple.  If you owed

15  me a dollar but that dollar went to a bunch of other

16  creditors and I have no money to pay Mr. Genender, then it's

17  not fair.  He's not going to receive any recovery from his

18  payable or receivable from me."

19         Question: "Okay.  But the Debtors' records reflect

20  the fact that some Debtors are in the deficit position,

21  correct?"  Answer: "On a net basis, correct."  Okay.

22         Question: "And they just simply don't have the

23  ability to pay their creditors.  That's what it means to be

24  bankrupt, right?"  Mr. Genender: "Objection, form."  Answer:

25  "You're going to have to rephrase that question as to how

1    I'm supposed to answer that with regards to intercompany."

2            Question: "Well, it's the case that on some of the

3    schedules that the Debtors filed, some of them have

4    intercompany receivables that are owed to them, and some of

5    them have intercompany payables that they owe to other

6    Debtors, and some of them have neither intercompany

7    receivables nor intercompany payables, correct?"  Answer: "I

8    couldn't answer that because that analysis was not done."

9            Question: "Well, the Debtors filed schedules and

10   statements under penalty of perjury that say exactly that.

11   Are you saying those are not true?"  Mr. Genender:

12   "Objection, form.  Argumentative.  Come on."  Answer: "The

13   schedules were filed based on the best information the

14   company had -- the Debtors had at that time, and those were

15   net balances."

16           Question: "Right.  Does that mean they're not

17   accurate?"  Answer: "That means that the detail didn't

18   identify each individual Debtor."

19           The Debtor had a -- Question: "The Debtor had an

20   integrated cash management system, correct?"  Answer:

21   "That's my understanding."

22           Question: "And all the cash from all the different

23   Debtors float up into the integrated cash management system,

24   correct?"  "Again, my understanding."

25           Question: "Okay.  So if Debtors put cash into that

Page 40

1    system, or -- then they'd get a credit.  And if they took

2    cash out of that system on a net basis, they'd owe a

3    payable, correct?"  Answer:  "Correct."

4         Question: "Okay.  And effectively, aren't all

5    those intercompany payables and receivables simply claims

6    against the integrated cash management system and the funds

7    that are available there?"  Mr. Genender: "Objection, form."

8    Answer: "You've got to rephrase that because I'm not sure

9    what that question is for."

10        Question: "Do you not understand the question?"

11   Answer: "No, I don't."

12        Question: "Okay.  The Debtors kept books and

13   records of intercompany activity, correct?"  Answer:

14   "Correct."

15        Question: "Okay.  But the Debtors did not -- did

16   not settle between themselves on a periodic basis by

17   actually transferring cash or property, correct?"  Answer:

18   "Correct."

19        Question: "They simply kept track of their books

20   of those transfers, correct?"  Answer: "Correct."

21        Question: "Okay.  To the extent that the Debtors

22   were dealing with cash and they were running a retail

23   business, so cash would come in every day, they sold

24   product, all that cash went into a single cash management

25   system, correct?"  Mr. Genender: "Objection, form."  Answer:

Page 41

1    "Yes."

2             Question: "Okay.  And the Debtors' accounting

3    system would keep track of which entities would put cash

4    into that accounting system, into that cash management

5    system, correct?"  Answer: "I'm not an expert on that

6    system, so whether the system provided, quote, and I'm not

7    sure what you mean by system, but whether the system

8    provided the detail or individuals had to gather

9    information, which is my understanding, and book entries,

10   you know, they did it to the best of their abilities."

11            Question: "Okay.  And if the Debtors took cash out

12   of the system or bills were paid on their behalf, then the

13   Debtors' books and records would record the fact that

14   whichever particular Debtor was benefited by that owed a

15   payable for that benefit, correct?"  Answer: "It would be

16   the ideal system.  Whether the Sears -- I didn't audit their

17   systems to know specifically how all the transactions were

18   recorded."

19            In other words, Mr. Murphy's testifying that he

20   can't figure out which Debtors owe money to which other

21   Debtors or which Debtors are owed money, and he's worried

22   that they may not be able to pay each other off, but he

23   doesn't understand anything, apparently, about the cash

24   management system because that wasn't within his area of

25   expertise or his area of responsibility, I should say. So he

Page 42

1    doesn't seem to understand, or the Debtors don't want to

2    talk about the fact that these are all claims into and out

3    of the cash management system, the centralized pot of money.

4            And, in fact, he had testified previously -- and I

5    think I read that portion where he said the Debtors that

6    needed money would take -- you know, there were -- there

7    were borrowers and guarantors, and entities that needed

8    money would take it out.  But the Debtors recorded all this

9    information, so it's available.

10           THE COURT:  But I guess it's an integrated cash

11   management system, so they net out an aggregate amount, but

12   not Debtor by Debtor.  It goes out of the system to whoever

13   needs it, but it doesn't show -- it doesn't match up who

14   gets it and who put it in.

15           MR. FOX:  No, it does.  Your Honor, it's the same

16   as if you put your money in a bank.  The bank then lends

17   that money out to a whole bunch of people.  You don't know

18   who they are.  And most of them hopefully pay it back.

19           THE COURT:  But as far as intercompany claims go

20   --

21           MR. FOX:  Mh hmm.

22           THE COURT:  -- I don't -- I don't know whether I

23   have a claim against, if you bank at my bank, you or anyone

24   else.  I just have a claim against the bank.

25           MR. FOX:  That's right.

1           THE COURT:  On an integrated basis.

2           MR. FOX:  And that's exactly what was happening

3   here.

4           THE COURT:  So how do you track the intercompany

5   claims that way?

6           MR. FOX:  They kept track of who put money, who

7   took money out.

8           THE COURT:  Yeah, but not -- out of the integrated

9   system but not vis-à-vis each entity.

10          MR. FOX:  That's all there was though.

11          THE COURT:  I know.  That's -- I guess that's why

12  I'm saying that doesn't seem to be a ready way to determine

13  which entity owes the other entity as opposed to sort of a

14  general cash management system on a net basis.

15          MR. FOX:  All the borrowers owe it to the bank,

16  and all the -- all the --

17          THE COURT:  Right.

18          MR. FOX:  -- lenders are owed by the --

19          THE COURT:  But if that's -- but the bank is

20  consolidated.  That's all of -- all of the Debtors.

21          MR. FOX:  Mh hmm.

22          THE COURT:  So to me, the testimony you were

23  reading doesn't show an ability to break out which Debtor

24  owes which other Debtor.  It just shows which Debtor is net

25  negative and net positive against a collective bank.

1          MR. FOX:  That's right, and that's all you need to

2     know because they --

3          THE COURT:  Well, I'm not sure about that.  If the

4     money that K-Mart puts in goes 90 percent to Sears X and 5

5     percent to Sears Y and 2 percent to Sears Z, and 1 percent

6     to (indiscernible), how do you work out the intercompany

7     claims among those entities?

8          MR. FOX:  Those entities that have a net payable

9     have to pay money back into the centralized pot to the

10    extent that they can, and they do.  Then the creditors with

11    the net receivable get to take their money out.

12         THE COURT:  Of what, though?  Because --

13         MR. FOX:  Out of that centralized pot.

14         THE COURT:  But then it's centralized.

15         MR. FOX:  Yes.  It's --

16         THE COURT:  It's not -- the assets -- you're --

17    that presumes the substantive consolidation of the assets

18    but not the liabilities.

19         MR. FOX:  It's not -- but they kept track of it.

20         THE COURT:  Of what?

21         MR. FOX:  They kept track of, in a sense, the

22    centralized bank account.

23         THE COURT:  I get that.

24         MR. FOX:  Right.

25         THE COURT:  But --

```
1              MR. FOX:  So --
2              THE COURT:  Again, if you look at the assets of
3    one of the Sears entities, in a -- in a non-substantive
4    consolidation context, those assets would include the claims
5    of that entity against each of the other entities because
6    each of them -- it wouldn't matter if they were all solvent.
7    But if they're not solvent, then it depends on whose claim
8    -- whose claim is against who.
9              You know, if one entity on perhaps a net basis
10   neither owes nor is owed on a consolidated basis through the
11   integrated system but it owes a lot of money to an entity
12   that can't pay it and is owed a lot of money by another
13   entity that can pay it, you can see how that would be
14   different than the flipside of that, which is it owes a lot
15   of money to a company that it can pay, but it collects from
16   a company that can't pay it at all.
17             MR. FOX:  But the point is that the company's
18   systems have already netted all those amounts.
19             THE COURT:  Only as far as the company as a whole
20   is concerned, not again each entity.
21             MR. FOX:  No, they have netted it against each
22   entity.  And, in fact, the Debtors have said exactly that.
23             THE COURT:  Well, that -- maybe I'm missing --
24   see, I thought --
25             MR. FOX:  But --
```

Page 46

 1              THE COURT:  What I took away from it is that

 2      there's a net amount owed to the bank.

 3              MR. FOX:  Yes.

 4              THE COURT:  And a net amount owed by the bank in

 5      some instances.

 6              MR. FOX:  Mh hmm.

 7              THE COURT:  But not entity by entity.

 8              MR. FOX:  Because they've netted it entity by

 9      entity, leaving claims against the bank or amounts owed to

10      the bank.

11              THE COURT:  But the --

12              MR. FOX:  So --

13              THE COURT:  I think the net -- entity-by-entity

14      netting is as against each entity as against the whole, not

15      as against each entity separately.

16              MR. FOX:  But the point -- the ultimate point is

17      that we know who has to put money in, assuming they have it,

18      and who gets to take money out.

19              THE COURT:  That's what -- that's the part I'm

20      missing.  I don't see -- if you're saying they take it out

21      of the common pot, then again it seems to me that you're

22      substantively -- you're presuming substantive consolidation

23      of assets but not liabilities.

24              MR. FOX:  No, because they know who owes what to

25      the pot and who's entitled to what from the pot.

1          THE COURT:  But it -- but it's the common --

2          MR. FOX:  In other words, they know --

3          THE COURT:  But it's the common pot.  It's not the

4     individual Debtors owing each other.

5          MR. FOX:  I understand your point, Your Honor, but

6     I'm suggesting -- and I don't know a quicker way to -- a

7     better way to say it.  We shouldn't -- we don't need to get

8     hung up on which entity owes to which other entity when

9     that's all been addressed within the system, leaving simple

10    claims to and from the centralized pot.

11         THE COURT:  But that may make sense if everyone

12    gets paid the same from everyone, but that's not what

13    happens here.  So I think you would -- clearly, there would

14    be creditors of individual entities that would want to say,

15    I want to make sure my entity gets paid by the entity that I

16    actually lent to.  And actually, you don't really show any

17    lending to an entity because it all goes through the common

18    pot.

19         MR. FOX:  What you ultimately want to wind up is

20    getting the money back that you're owed.

21         THE COURT:  But by -- but by whom?  But the money

22    back you're owed is by the bank.  I don't --

23         MR. FOX:  Yes.

24         THE COURT:  Again, when I lend to Chase by putting

25    my money in Chase Bank --

1           MR. FOX:  Right.

2           THE COURT:  -- I don't -- I get it back from

3    Chase.  I don't get it back from each individual account at

4    Chase.

5           MR. FOX:  That's correct.

6           THE COURT:  But this -- but this is not that type

7    of situation because you're talking about individual Debtors

8    owing each other --

9           MR. FOX:  That's --

10          THE COURT:  -- as opposed to the -- to the company

11   bank, which combines it all.

12          MR. FOX:  Well, based --

13          THE COURT:  And you have to unscramble all that to

14   determine who owes who.

15          MR. FOX:  Well, actually, based on Mr. Murphy's

16   testimony, that's not exactly right that monies that -- if

17   they needed money, they took it out.  If they had money,

18   they put it in.  It all went into the centralized system.

19   It -- Sears Roebuck didn't say, hey, K-Mart, you need some

20   money?  Here you go.  If K-Mart needed money, it went to the

21   treasury and took it out of the cash management system to

22   pay its bills.

23          THE COURT:  But who -- but who would it get paid

24   from now?

25          MR. FOX:  It would get --

1          THE COURT:  You would say it would get paid from

2     the main pot.

3          MR. FOX:  Yes.

4          THE COURT:  So how do you -- so that's the only

5     intercompany claim you're counting.

6          MR. FOX:  That's -- yes, and the intercompany --

7     the Debtors that have intercompany obligations have to put

8     money in and -- to the extent that they have it, and the

9     entities that are -- have intercompany receivables would

10    then get to take their -- that money out.  And if there's

11    not enough, they would do it on a pro rata basis, which is

12    what we would always do.  You don't need to go back and look

13    at every single transaction for the last five years or 10

14    years or, as Mr. Murphy seemed to think, 100 years because

15    Sears is that old in order to sort this out.  It's been

16    sorted, and you can -- you can determine that.

17          Now, and in fact, you know, Mr. Murphy didn't seem

18    to know that the Debtors don't have separate bank accounts

19    with which to settle up intercompany accounts.  They just

20    leave it to the pot.  So at Page 111 when I asked, "That

21    disclosure statement says the Debtors believe there would be

22    significant difficulties and enormous costs that would be

23    borne by the estates in order to disentangle the prepetition

24    intercompany claims on a Debtor-by-debtor basis, which would

25    deplete the recoveries for all creditors and cause

1    unnecessary and costly delays in the confirmation of the

2    plan and distributions to creditors; do you see that

3    statement?" Answer: "Yes."

4            Question: "Why would -- as far as you know, why

5    would it be necessary to disentangle the prepetition

6    intercompany claims on a Debtor-by-debtor basis?"  Answer:

7    "On a Debtor-by-debtor basis -- because the numbers that are

8    reflected in the books and records are on a net basis, they

9    do not reflect those receivables that may or may not be

10   collectible on a Debtor-by-debtor basis from each Debtor or

11   non-Debtor entity in order to pay or which Debtor may be

12   able to pay its particular payables.  Those are net

13   numbers."

14           Question: "Do any of the Debtor have separate bank

15   accounts other than the concentration account?"  Answer: "I

16   don't know the answer to that question.  I wasn't involved

17   with the treasury."

18           Question: "Okay.  Do any of the Debtors hold or

19   have bank accounts that are used really for anything other

20   than to have funds flow up to the concentration account?"

21   Answer: "Again, I don't have firsthand knowledge of that."

22           He's making assumptions that he can know the due

23   from and due to, and that if he knew that, somehow it would

24   make a difference.  And the point is it would not because

25   that's not the way the Debtors operated, which he admits is

1    not an unusual way for companies like this to operate.

2              There is further -- he prepared -- and has -- and

3    the Debtors have offered no analysis showing the cost to

4    disentangle other than to say how difficult it would be.  So

5    when I asked him -- make sure I have the right page.

6              Question -- it's the top of Page 113.  "Now, this

7    statement refers to the enormous cost that would be borne in

8    order to disentangle.  Do you see that phrase, enormous

9    cost?"  The Answer: "Yes."

10             Question: "Is there an analysis that was prepared

11   that shows what the cost would be expected to be?"  Answer:

12   "Not that I'm aware of."

13             So while they make the assertion that it would be

14   an enormous cost, the never actually prepared any analysis.

15             Now, Mr. Murphy asserts -- not that he's qualified

16   to do so -- that there's a 75 percent chance of substantive

17   consolidation.  That's his opinion, obviously, and he's not

18   an expert as we've qualified as such.  And, in fact, he

19   really has no idea.

20             So when I asked him on Page 146 of his deposition,

21   Question: "Let me ask you my question again, which is what's

22   the basis for your assumption that there's a 75 percent risk

23   of interstate, intercreditor litigation?"  Mr. Genender:

24   "Objection, form.  Asked and answered."  Answer:  "I don't

25   know how to answer it any way other than how I just did."

1        Question: "How did you come up with 75 percent?"

2    Answer: "We basically -- we looked at the factors that we

3    established based on experience and then putting all the

4    challenges that we saw for executing a deconsolidated plan

5    as substantial and made an approximation that there would be

6    a 75-percent risk that should be applied."

7        Question: "Who is we?  You said we."  Answer: "The

8    M-III team in discussions of the litigation challenges that

9    would exist in trying to prosecute this."

10        Question: "Does the M-III -- do you have

11    experience assessing the risk of litigation of substantive

12    consolidation?"  Answer: "I'm not a lawyer.  I do not."

13        Question: "Does anybody else at M-III have

14    experience assessing the risk of litigation of substantive

15    consolidation?"  Mr. Genender: "Objection, form."  Answer:

16    "I don't know."

17        So the result, though, based on that analysis, is

18    that in a non-consolidation plan, K-Mart guarantee claims --

19    which our noteholders have, as do many others -- would get a

20    recovery at K-Mart of, according to the Debtors, of 7.02

21    percent.  And then the substantive consolidation plan, as

22    purposed, the recovery would be 2.77 percent, and that's a

23    significant difference, Your Honor.  And that's why we're

24    here.

25        Now, the -- there is an enhancement that was

1    finally negotiated -- I assume between the Debtors and the

2    Creditors Committee.  We were not party to any of those

3    discussions -- that there's a 7.6 percent enhancement for K-

4    Mart guarantees.

5            Now, the Debtors cite a number of cases where

6    substantive consolidation was approved.  Largely, those are

7    lists for the purpose of establishing that these sorts of

8    issues have been compromised.  And most of them don't really

9    -- first of all, it seems in most of those cases that the

10   Debtors cite that the Creditors overwhelmingly seem to

11   approve the plan, which is not entirely the case here.  And

12   -- but there's not a lot more information about the

13   circumstances and whether the particular percentages or the

14   ultimate determination of how the assets were divided up is

15   set forth.

16           But too, there is some indication, and those are

17   the Enron case and the WorldCom case.  And in Enron, the

18   Creditors received 70 percent of what they would recover

19   without substantive consolidation from their own entity and

20   plus 30 percent of what they would recover on a

21   substantively consolidated basis.  And guaranteed claims got

22   a 50 percent recovery.

23           And that's a case where there were massive

24   restatements, and you can take judicial notice of that.  And

25   the people running that entity were convicted of crimes,

1    involved in representing that entity, and you can take

2    judicial notice of that.  And yet the chance of substantive

3    consolidation was only 70 percent, and guarantees got 50

4    percent.

5            In contrast, here the Debtors -- Mr. Murphy,

6    without knowledge, is asserting there's a 75 percent chance

7    of substantive consolidation and that the enhancement for

8    guarantee claims would only be 7.6 percent, and otherwise

9    we'd lose the balance of the value of that.

10           Secondly --

11           THE COURT:  Of course, there was a lot more money

12   to spend in Enron than there is here on that fight.

13           MR. FOX:  Well, nobody got 100 cents.

14           THE COURT:  No.  But there was a lot more money to

15   spend on the lawyers for fighting that issue, ultimately.

16           MR. FOX:  Well, the point there as here was to

17   obviate that fight, was to avoid that.

18           In WorldCom, the other one where the numbers are

19   available in the decisions, the MCI pre-merger, unsecured

20   creditors, received 42 percent of their allowed claims, and

21   the MCI senior noteholders recovered 80 cents on the dollar,

22   while the WorldCom unsecured creditors got new common stock

23   in 18 percent of their allowed claims.

24           And again, that was a case where it was so

25   hopelessly entangled that the Debtors claimed that they

Page 55

1    could not prepare schedules and statements for each of the

2    Debtor entities.  And yet here, we're being told that

3    there's a 75 percent chance and that the recoveries should

4    be grossly limited.

5          It -- just as a matter of fact, as a matter of

6    equity and exercising the Court's discretion, I would argue

7    that there's a slim, if any, case for substantive

8    consolidation and that what's been put on the table is

9    grossly unfair, particularly to the guarantee claimants, and

10   that may reflect why the vote by -- apparently by those

11   creditors seems to be overwhelmingly negative.

12         THE COURT:  Well, again, the numbers voting was

13   overwhelmingly in favor as the dollar amount was less.

14         MR. FOX:  I understand that, Your Honor.

15         THE COURT:  That's how Judge Funk in Winn-Dixie

16   evaluated it in terms of numbers of those actually voting as

17   opposed to the dollar amount.

18         MR. FOX:  I understand.  I would simply say that

19   the code requires both of those things.  But to the extent

20   that we believe -- and I think we do, or Your Honor seems to

21   -- that those voting no, to reject the plan, were holders of

22   guaranteed claims that, I think, does reflect their view of

23   this, their concern about this, and the adverse effect that

24   that has on them.

25         Now, I want to just talk briefly about the PBGC

Page 56

1    settlement, and then I went to get back to the plan itself.

2            The PBGC settlement currently is that they would

3    get a $97.5 million priority claim up from $80 million and

4    an $800 million unsecured claim.  The -- because of the

5    (indiscernible) Fabricators case, which the Creditors

6    Committee raised in their objection to the disclosure

7    statement of the May plan, typically the view would be that

8    the PBGC is not entitled to a priority claim.  The

9    explanation largely in this case seems to be that,

10   nevertheless, it's an appropriate disposition of their

11   claims because they were going to use their best efforts to

12   cause KCD to give up its administrative claim of 140 -- of

13   potentially $146 million on a post-petition basis.

14           The problem is there's nothing that I can find --

15   in the record at least, in either the Debtors' brief or the

16   PBGC's -- that shows how the PBGC actually has the ability

17   to control or cause KCD to actually do anything with respect

18   to that claim.

19           So while there's the assertion that that's the

20   case and that that's the justification, there's no

21   indication that they're actually able to accomplish that.

22   And our understanding is that because Transform bought those

23   KCD notes, that if anybody had the ability to do that, it

24   would be Transform, which we understand they did, not the

25   PBGC.

1           So we're -- we just don't see the justification.

2    But I think the more -- perhaps for this purpose, as I'll

3    get to, more important point really is that the PBGC was

4    willing to take the $80 million claim.  And, yes, they

5    traded that when the Debtors wanted to shift to substantive

6    consolidation.  But I'll come back to that in a minute when

7    we talk about what plan you could or should confirm.

8           We also raised issues, which I don't think I need

9    to belabor, about the appropriate classification of the

10   claim and whether the Plaintiff was fair and equitable

11   giving the way -- given the way the PBGC's claim has been

12   classified.

13          But, I mean, the fact that it's joint in several

14   claim, so are the guaranteed claims effectively.  That

15   really doesn't make much difference.

16          The point, though, that I think ultimately you can

17   take away from this -- and this is an important point -- is

18   that you can actually confirm a plan today assuming you deal

19   with the other objections -- you're comfortable the other

20   objections have been satisfied.  And that plan is the toggle

21   plan.  There's no need to approve the substantive

22   consolidation settlement because the toggle plan can be

23   confirmed right now.

24          Now, that plan is a pot plan, and the creditors of

25   each Debtor entity receive their pro rata percentage based

**Page 58**

1   on the amount that their claims against whichever entity

2   bear to the total of all claims against all of the Debtors.

3   So, in effect, it follows what the Debtors have been doing

4   all along, which is to keep all their money in one place and

5   to have claims from various entities against that particular

6   one pot of money.

7          The difference is that the holders of guarantee

8   claims don't see their rights decimated.  So, you know, they

9   did the right thing to make sure that they would be

10  protected, and now that's just being taken away from them

11  under the terms of the settlement to which they clearly have

12  not agreed but which will have a tremendous effect on them.

13         And the entire justification for the settlement is

14  to avoid all this litigation, which so far has not occurred,

15  and nobody seemingly wanted it to occur.  The PBGC was

16  opposed to it.  The Creditors Committee expressed their

17  opposition to it, to substantive consolidation.  The Debtors

18  were opposed to it too until they changed their minds.

19         So I'm not sure who's out there pushing in favor

20  of substantive consolidation.  But regardless, the plan, the

21  toggle plan, is confirmable right now without the

22  settlement, and I would suggest that it would become an

23  abusive discretion to approve of a subs native consolidation

24  settlement given the fact that the toggle plan has the votes

25  and could be confirmed.

1          So there's no real necessity at this point to

2     approve it other than to cause harm to the guarantee claims,

3     help a class of claimants who I think fairly knew what they

4     were getting into, knew that the guarantees were there, knew

5     what they were up against, knew who they were trading with,

6     and somehow now we've decided that under the guise of a

7     substantive consolidation settlement of a non-existent

8     dispute that somehow they should be favored at this point.

9          Two other points.  We had raised an issue about

10    the way in which Section 9.2(a) had been drafted and whether

11    it really carried into effect the -- at least the 7.6

12    percent additional recovery from K-Mart guarantees.

13    Finally, the Debtors corrected the plan, in this October 1

14    version from last Monday, and resolved that problem.

15          The last point relates to indentured trustees'

16    fees and how those get treated under the plan.  The plan

17    says -- and it's different than the liquidating trust

18    agreement.  So the plan says that the Debtors and the

19    Creditors Committee will negotiate over the treatment of

20    indentured trustees' fees, but under no circumstances will

21    indentured trustees' fees incurred in connection with

22    objecting to the plan, to the disclosure statement, to the

23    sale, or a bunch of other things -- there's a laundry list -

24    -- be paid.

25          The liquidating trust agreement then says that in

Page 60

1    return for indentured trustees agreeing to make the

2    distributions to their holders on behalf of the liquidating

3    trust, that in payment for that service, they will be paid

4    their fees not just for that service but all of their fees

5    since the inception of the case -- except, however, not the

6    laundry list of these other activities objecting to the

7    plan, to the disclosure statement, the sale, etc.

8           If the Debtors want to pay indentured trustees the

9    reasonable amount of their fees, we're all for it.  We'd

10   never say no.  But when the Debtors start to pick and choose

11   which activities they will or will not pay for that occurred

12   during the case, we see that as a significant problem, and

13   it has the potential -- we're not suggesting that that's the

14   case here, but it certainly has the potential to cause

15   indentured trustees to potentially temper their views about

16   how they're going to do their jobs based on whether they

17   will or won't get paid because of language like this.

18          And I -- we believe that Your Honor ought not

19   start to head down that slippery slope and allow that kind

20   of a provision to be put in the plan.  If they want to pay,

21   fine.  Great.  If they don't, then they don't have to.  If

22   they want to pay the reasonable fees, that's fine too.  But

23   when they start picking and choosing among specific issues

24   that were litigated or not, then we see that as

25   inappropriate.

1           And we would note that there are several

2    indentured trustees on the Creditors Committee.  They may

3    well have participated -- we don't know, but they may well

4    have participated in the determinations to cause the

5    Creditors Committee to do those very things that the Debtors

6    and the Committee say they don't want the Debtor to pay for.

7    So we believe that provision should be changed.

8           But, as I said, short of that, Your Honor, we

9    believe that Your Honor can approve a plan today, but that

10   plan is the toggle plan.  It is not the substantive

11   consolidation settlement, which we do not believe there's

12   either a basis for either as a matter of fact or, quite

13   frankly, as a matter of law.

14          Thank you.

15          THE COURT:  Okay.  Does anyone who's objected to

16   confirmation have anything more to say on substantive

17   consolidation?  No?  So why don't we deal with that specific

18   point with the Debtors' response?

19          MR. SCHROCK:  Good afternoon, Your Honor.  Ray

20   Schrock, Weil Gotshal for the Debtors.

21          Your Honor, I'll try to take some of these just in

22   turn in which they were made.

23          As to the arguments around the PBGC settlement

24   that the Debtors had, you know, effectively changed their

25   mind between February and May, there were ongoing

Page 62

1    negotiations with the -- with the PBGC and, in fact, the

2    unsecured Creditors Committee.

3            Those parties, we -- in the meantime, we were also

4    doing the intercompany claims analysis which, as we

5    highlighted, took approximately two and a half months just

6    to review, you know, the majority of the post-petition

7    period.  And it became clear to us during that period that

8    it was going to be, frankly, impossible to review the

9    literally billions of transactions that went into -- that

10   went into the intercompany claims pool.

11           And if I can summarize Mr. Fox's argument around

12   the cash pool, as I heard it, I think it was because the

13   Debtors used a centralized cash management system and

14   consolidated their assets, they can't substantively

15   consolidate.  But I would submit to you that's the whole

16   point.  There was -- and as detailed in Mr. Murphy's

17   declaration at Paragraphs 22, you know, there was a

18   centralized cash management system.  There was an ability

19   for us to know if there's a net payable, you know, due and

20   owing from the cash management system.  But that's not the

21   point.  You have to know who it was due from and to in order

22   to be able to track, you know, that analysis.

23           So as the uncontroverted testimony here supports,

24   the intercompany balances are consolidated for all

25   intercompany transactions recorded for each Debtor over

Page 63

1    time, aggregated into one net balance of either a receivable

2    or a payable for each Debtor that it collectively has with

3    all the other entities, and is recorded as the net

4    receivable or payable.  That is the way this cash management

5    system works.

6              Asking these estates with limited funds to go back

7    and try and, you know, untangle that, frankly, we don't

8    think that you can do it.

9              THE COURT:  Well, Mr. Fox says you don't need to

10   untangle it.  You just -- you just, you know, if the cash --

11   under the cash management system, K-Mart is owed X and Sears

12   Roebuck is owed Y and, you know, Sears Insurance Services is

13   owed Z, you just have the money -- again, distributions run

14   through that system and net it out as to each estate.

15             MR. SCHROCK:  That, to me, sounds like substantive

16   consolidation.  I mean, when I pull it apart, you're talking

17   about a centralized pool of assets from which everybody has

18   either a net payable or receivable due from.  I don't

19   understand how you can call it anything other than that.  I

20   mean, the receivables and payables were -- they were -- they

21   were substantively consolidated for all intents and

22   purposes.  You just have -- you have to have a transaction

23   net due and owing to the actual entity.  Otherwise, I think

24   that, you know, you're having parties act for -- as parties

25   becomes insolvent, your acting parties act as conduits for,

**Page 64**

1    you know, frankly, fraudulent conveyances, preferences, and

2    a whole mess of other items that we noted in our brief and

3    as well as Mr. Murphy noted in his declaration.

4            There's little doubt here that the creditor

5    entanglement prong of the Augie/Restivo test is the one

6    certainly that we found to be most prevalent here, creditor

7    reliant.  I think there were facts that were going both

8    ways.

9            We did outline on Page 136 of our brief for

10   several pages, you know, what some of those tos and fros

11   are, but I will say that what's really missing from Mr.

12   Fox's argument and was missing from the record is that

13   Wilmington Trust had the opportunity and the ability to

14   present contrary evidence.  It is our burden to prove up the

15   settlement within a lowest range of reasonableness, but

16   there's nothing here as there were in other cases in which

17   he cited about parties going and arguing that you can

18   actually pull these entities apart.  And I submit it's just

19   not possible.  You know, this is a 125-year-old company.  It

20   has been operated on a consolidated basis, as far as we can

21   tell, forever.  And certainly since it's merger with K-Mart

22   in the early 2000s, it's been operating out of three primary

23   entities.

24            But as to the percent chance that Mr. Murphy gives

25   substantive consolidation, Mr. Murphy's not a lawyer.  Mr.

Page 65

1    Murphy takes the facts, presents those facts, and then it's

2    up to the lawyers to make the arguments around how those

3    facts are then applied to the law.  That is what we've done

4    in the context of this brief, and that's certainly what the

5    parties did in negotiating the premiums that are payable on

6    account of guarantee claims.

7          But, Your Honor, there's little doubt that the

8    facts are here for a sub con.  They're uncontroverted.

9    There's some deposition testimony that has been highlighted,

10   I think in a rather confusing manner, to suggest that Mr.

11   Murphy didn't understand the nature of a sub con analysis.

12   I think that his -- certainly his declaration suggests

13   otherwise.

14          As to the Trustee, we're happy to have the

15   Trustees rely, frankly, on their charging lien if that's the

16   way the Court wants to -- wants to deal with that issue.  We

17   are -- we're also, you know, not in a position where we can,

18   you know, go forward with a toggle plan.

19          And I think what Mr. Fox really meant on the

20   toggle plan was confirm a plan for the Debtors that are able

21   to, and for everybody else, I guess they liquidate and go

22   into a Chapter 7.

23          But the -- you know, the toggle plan under -- you

24   know, on Page 50 in Section 9.2(e) notes that in the event

25   the bankruptcy court does not approve the plan settlement,

Page 66

1    the plan shall, subject to the reasonable consent of the

2    PBGC and the Creditors Committee revert to a joint plan of

3    liquidation for each Debtor, a toggle plan.

4                Now, the PBGC is here.  They've certainly made

5    clear to us, and one of the reasons that we couldn't strike

6    the deal around the non-sub con plan is because the PBGC in

7    the Court's settlement discussions indicated that they would

8    not consent to the toggle plan.  They're the largest

9    creditor of these estates.  It's certainly something that we

10   took into account in formulating the settlement.  But I'm

11   happy to answer any other questions the Court has.

12                THE COURT:  What is -- what is or was the power of

13   the PBGC to cause KCD to pursue the $146 million

14   administrative expense claim?

15                MR. SCHROCK:  Your Honor, as I recall, there's

16   three directors that are on the KCD board.  The one

17   independent director that is on KCD serves at the pledger of

18   the PBGC.  We're still working with them around getting the

19   actual -- getting the admin claim, you know, waived.  We're

20   confident that, in fact, we will.  But, you know, those are

21   the -- you know, there's been some issues just around,

22   frankly, just some of the legal fees that have incurred at

23   KCD, so there's ongoing negotiations associated with that.

24   But they've certainly been holding up their end of the

25   bargain as to -- as to KCD.  But that is a waivable

1    condition, certainly, too, to the effective date as well.

2                THE COURT:  Which is?

3                MR. SCHROCK:  The waiver of the KCD administrative

4    claim.

5                THE COURT:  Well, except the feasibility estimates

6    don't have $146 million in it.

7                MR. SCHROCK:  That's correct, Your Honor.  That's

8    not our anticipation as to how that's going to play out, and

9    we've certainly been working toward that.  And, in fact,

10   it's just a matter of time before we -- before we get that

11   claim waived.

12               THE COURT:  Okay.  The other two directors have

13   indicated that they're prepared to approve the waiver?

14               MR. SCHROCK:  That's correct, Your Honor.

15               THE COURT:  Okay.  Okay.

16               MR. SCHROCK:  Okay.

17               THE COURT:  Someone behind you wants to speak.

18               MR. RAYNOR:  Good afternoon, Your Honor.  Brian

19   Raynor of Locke Lord on behalf of the Pension Benefit

20   Guaranty Corporation.  I just wanted to add a little bit of

21   flesh to the nature of the waiver.

22               Prior to the bankruptcy case, a number of Debtors

23   and PBGC entered into agreement where PBGC was able to

24   appoint, to identify or select one of the three managers at

25   KCD, the independent manager.  Also --

1          THE COURT:  And that was part of a pre-bankruptcy

2    settlement with the PBGC.

3          MR. RAYNOR:  That's correct, but as of the

4    bankruptcy filing and as of today, that independent manager

5    is still there, and KCD is not a -- is not a bankrupt

6    entity.

7          THE COURT:  Right.

8          MR. RAYNOR:  Also, the way the structure works is

9    that there are essentially two creditors at KCD.  One was

10   the holder of the KCD notes, and one was Pension Benefit

11   Guaranty Corporation by virtue of it joining several claims.

12   So in connection with the sale, the eventual noteholders

13   waived their claims to any admin claim that was approving at

14   KCD, which leaves PBGC as the only entity at that claim, so

15   there was essentially a derivative claim for the rights of

16   the administrative expense claim at KCD, and there are

17   definitely disputes around the bankruptcy filing as to

18   PBGC's asserting that amount, and it was one of a number of

19   disputes with the Debtors that was eventually settled

20   pursuant to the PBGC's settlement.

21          And I'll also say that there have been discussions

22   with the Debtors about making sure that that claim is

23   waived, and those are -- assuming that the plan settlement

24   goes effective -- that is not going to be a problem.  PBGC

25   will be lending its support to that waiver any way possible.

Page 69

```
 1              THE COURT:  As the only creditor of KCD.

 2              MR. RAYNOR:  That's correct.

 3              THE COURT:  Okay.  And was Mr. Schrock correct

 4    that PBGC is not consenting to the pivot, to the toggle

 5    plan?

 6              MR. RAYNOR:  That's correct, Your Honor.  We

 7    submitted a ballot in support of the plan, but the toggle

 8    would be --

 9              THE COURT:  I managed to use two financial clichés

10    in one clause, but --

11              MR. RAYNOR:  That's correct, Your Honor.

12              THE COURT:  Okay.  All right.  Thank you.

13              MR. O'NEIL:  Just really quickly, Your Honor, Sean

14    O'Neil, Cleary Gottlieb on behalf of Transform.  Actually,

15    Transform owns the KCD notes, so I just -- I just wanted to

16    make it clear that Transform, as the holder of the KCD

17    notes, is also a creditor of KCD.  I don't -- I don't think

18    there's any dispute about that.  I just wanted --

19              THE COURT:  But I thought -- well, I was just told

20    that it's part of the sale, the right to assert that -- or

21    to look to that claim was waived.

22              MR. O'NEIL:  Correct.

23              THE COURT:  Okay.

24              MR. O'NEIL:  But --

25              THE COURT:  So you're creditor, but you're not
```

1     looking to that asset.

2              MR. O'NEIL:  But we've waived the -- we've said

3     that we would do the same thing that PBGC has said it will

4     do.

5              THE COURT:  Okay.

6              MR. O'NEIL:  Thank you, Your Honor.

7              THE COURT:  All right.

8              MR. DUBLIN:  Good afternoon, Your Honor.  Phil

9     Dublin, Akin Gump, on behalf of the Committee.  I just want

10    to touch on two points and expand on things that Mr. Schrock

11    said, first with respect to substantive consolidation.

12              I think Mr. Fox's description of the cash

13    management system and its impact on substantive

14    consolidation oversimplified the issue.  Each time money

15    goes into the centralized cash management system, money then

16    goes out somewhere.  And Mr. Schrock touched on this,

17    whether the cash management entity is a mere conduit and you

18    have to then determine where each dollar went and who each

19    dollar went in from and where it went to awards to determine

20    proper intercompany claims is an issue that is being settled

21    as part of the plan settlement.

22              And if you ignore that issue, as Mr. Schrock

23    alluded to, when you have every entity inside the structure

24    insolvent and you have K-Mart, for example, sending a dollar

25    into the cash management system and the cash management

Page 71

1    system sending that dollar out to Sears, Sears Roebuck, K-

2    Mart can look through for the immediate transferee of the

3    initial transferee to try to get back the value that it

4    transferred out, creating fraudulent transfer claims all

5    over the places inside of the Sears corporate structure,

6    which creates the same intercompany conundrum as if the

7    centralized cash management system didn't exist.

8           So I think just looking at money in and money

9    going out and only looking at the cash management entity as

10   to who owes moony to the various entities is just not giving

11   the proper oversight analysis with respect to the issue at

12   play.

13          THE COURT:  But you don't know who owes money to

14   various entities.  You owe -- you know what the cash

15   management system shows the cash management system owes to

16   each entity.

17          MR. DUBLIN:  And that's the point, Your Honor.  As

18   K-Mart puts money in, that's a fraud -- that -- as a -- into

19   the insolvent cash management entity, that's a fraudulent

20   conveyance because it's not getting it back.  It's putting

21   100-cent dollars in, and it's getting an unsecured claim

22   back.  That's not worth the value that it put into the cash

23   management system.

24          The cash management system then sends that dollar

25   out to another entity inside the structure.  Then K-Mart

1    would have a claim to the immediate transferee of the

2    initial transferee, the initial transferee being the cash

3    management entity, and the immediate transferee of the cash

4    management entity being somebody else inside the Sears

5    structure creating another intercompany claim.

6                THE COURT:  And why wouldn't the ultimate, just

7    netting through the cash management system itself, solve

8    that problem, just saying that --

9                MR. DUBLIN:  Because then you get the different --

10   then you have the entity that put in the 100-cent dollar is

11   not getting back the value for its 100-cent dollars because

12   it's then looking -- the cash management entity is then

13   looking to Roebuck to pay back what it owes, and Roebuck

14   doesn't have 100-cent dollars to put back in, so you have

15   the creditors being disadvantageous.

16               THE COURT:  Or it would be collecting from one of

17   the other ones that owes -- that is healthier.

18               MR. DUBLIN:  Correct.  Then you have entities all

19   competing for that same pot of cash, and the entity that put

20   the money in not getting back what it would otherwise be

21   entitled to.

22               THE COURT:  Okay.

23               MR. DUBLIN:  On the point with respect to the

24   Trustee's fees, that was a point that was --

25               THE COURT:  It seems like it should just be the

Page 73

1    charging lien.

2           MR. DUBLIN:  The way it was worked out was that if

3    the trustee wants to help with the distractions, this is

4    what they can get.  If they don't want to help out, they

5    don't have to take it, and they can execute on their

6    charging lien.

7           THE COURT:  Well, when you say help, I mean, it's

8    more than just makes the distributions.  It's also not

9    objecting to confirmation (indiscernible).

10          MR. DUBLIN:  Exactly.  And also trying to figure

11   out where all the money goes, and working with DTC, and

12   making all the appropriate --

13          THE COURT:  So --

14          MR. DUBLIN:  -- distributions to various

15   noteholders.

16          THE COURT:  Let me make sure I understand then.

17   The Debtor is prepared to say that -- and the Committee is

18   prepared to support not only the charging lien but also the

19   actual distribution money being paid on top of the charging

20   lien, for distribution services.  So if they're going to be

21   facilitating the distribution, they get paid for that up

22   front, as opposed to a charging lien?  And they have a

23   charging lien for everything else?

24          MR. DUBLIN:  Well, they would -- they would get

25   their -- they have two things, that the indenture trustee

Page 74

1    would have there to help facilitate distributions when

2    they're actually made, and none of the money that would go

3    to pay Trustee fees would happen (indiscernible) actually

4    have money to make distributions.

5    One, they would be paid for their costs and expenses

6    occurred during the case in consideration for being the

7    disbursing agent for the trust when noteholders are entitled

8    to distributions.  And then the de minimis -- the additional

9    costs that are incurred in actually making those

10    distributions, they would be paid as well.  Ultimately, you

11    have a difficult construct of figuring out how you're going

12    to make distributions to public noteholders without the use

13    of the trustees, which they're not obligated to do.

14           And the -- if a trustee doesn't want to act as the

15    --

16           THE COURT:  But I'm sorry, just on the first point

17    there.

18           MR. DUBLIN:  Yep.

19           THE COURT:  I want to make sure I understand.

20    They get -- they get their reasonable fees and expenses from

21    what's incurred during the case for acting as the --

22    facilitating distributions.  But that -- would that include,

23    for example, objection to the disclosure statement?

24           MR. DUBLIN:  No.

25           THE COURT:  No.

Page 75

1                MR. DUBLIN:  It would not.

2                THE COURT:  So what would it include?

3                MR. DUBLIN:  It's --

4                THE COURT:  Just being there to field phone calls?

5                MR. DUBLIN:  And being the trust -- like the role

6     that the Trustee plays.

7                THE COURT:  Just as the normal Trustee.

8                MR. DUBLIN:  Correct.

9                THE COURT:  Okay.

10               MR. DUBLIN:  Right, the administrative function

11    that the Trustee plays.

12               THE COURT:  Okay.  So it wouldn't cover -- let's

13    assume that instead of objecting to the plan, the indentured

14    trustee not only didn't sit quietly but actually spent

15    $100,000 writing a brief in support of the plan, that

16    wouldn't have been compensated either because that's not

17    your normal thing?

18               MR. DUBLIN:  Nobody did that --

19               THE COURT:  Well --

20               MR. DUBLIN:  -- so we didn't have to -- it's not

21    an issue that had to be faced by the estate.

22               THE COURT:  Okay.  All right.

23               MR. DUBLIN:  Thank you, Your Honor.

24               THE COURT:  Okay.

25               MR. FOX:  Your Honor, if I may.

1          THE COURT:  Sure.

2          MR. FOX:  Your Honor, there's a few of Mr.

3    Schrock's points in terms of the ongoing review.  The

4    written analysis, and this is again in the deposition

5    testimony of Mr. Murphy, was finished on April 17th, which

6    is the day they filed the non-consolidation plan.  Mr.

7    Murphy did testify that they continued to do some additional

8    work and basically answer questions after that.  Their

9    primary analysis of the, you know, the intercompany

10   accounting was done at that time.

11         THE COURT:  But that's the post-petition --

12         MR. FOX:  Yes.

13         THE COURT:  -- analysis?  Yes.

14         MR. FOX:  Yes.

15         THE COURT:  Okay.

16         MR. FOX:  And basically, I mean, although he said

17   they didn't actually extrapolate, that's effectively what

18   they did.  There wasn't --

19         THE COURT:  But to me, you are pointing to the

20   fact that one of the reasons that the parties moved to a

21   substantive consolidation plan and then a substantive

22   consolidation settlement was because of the effect of non-

23   consolidation on various Debtors where there would be a

24   larger administrative insolvency.

25         And I guess I'm less troubled by that because it

Page 77

1    would seem to me that in the normal case where that doesn't

2    pertain, you wouldn't -- you wouldn't get into these types

3    of issues because the transfers actually do net out in 100-

4    cent dollars whereas in an insolvency situation, they don't.

5    Plus, what you're spending, 100-cent dollars, to fight over

6    fractional-dollar disputes, and that doesn't make sense to

7    me either.

8            MR. FOX:  Well, I guess it depends whether they're

9    your fractional dollars in dispute --

10           THE COURT:  Well --

11           MR. FOX:  -- or somebody else's.

12           THE COURT:  I appreciate it's a different on the

13   upside between 7 percent and 2 and --

14           MR. FOX:  2.7.

15           THE COURT:  -- 2.7 percent or 2.77 percent.  And

16   albeit, that's a difference of $23 million, but that's on

17   the -- the 2.7 is, of course, a bump up from 1.85 and you're

18   spending several million dollars to have that fight.

19           MR. FOX:  Well, I would look at it this way, and I

20   think this is -- in my view, there's a fundamental

21   difference between this sort of a "settlement" and a

22   settlement of a two-party dispute, if you will.

23           THE COURT:  Well, no, I appreciate that, but the

24   caselaw is clear that you can settle substantive

25   consolidation with some people who are unhappy about it.

1           MR. FOX:  Well, okay, so --

2           THE COURT:  It just has to be reasonably fair.

3           MR. FOX:  Well, A, I would suggest this is not,

4  but more importantly, Your Honor, I don't think that that

5  settlement of the issue of substantive consolidation allows

6  the Debtors to throw in everything including -- every other

7  problem in the case including the kitchen sink and then call

8  it, well, substantive consolidation because that --

9           THE COURT:  You mean the PBGC settlement.

10          MR. FOX:  Well not just -- laying aside that for a

11  minute, just the fact that some entities are

12  administratively insolvent and others may not be, okay,

13  that's a problem, but does that justify substantive

14  consolidation?  Is that one of the factors that the Second

15  Circuit identified in Augie/Restivo?

16          THE COURT:  Well, if you run out of the money --

17  well, actually, it is identified in the cases that have that

18  issue.  The Republic case and the Winn-Dixie case both talk

19  about cost of the litigation over substantive consolidation,

20  rendering the whole issue academic.

21          MR. FOX:  But -- well, the cost is one thing. But

22  whether one estate is dealing with the administrative

23  insolvency of certain Debtor entities is a whole different

24  question.

25          THE COURT:  I understand, but --

Page 79

1              MR. FOX:  So --

2              THE COURT:  But again, it -- I mean, it's not like

3    Kmart is rolling in dough.

4              MR. FOX:  Well, by all accounts, they eventually

5    will be and we all hope --

6              THE COURT:  Well, eventually is one thing, yes.

7              MR. FOX:  -- for that day.

8              THE COURT:  But not in the cost of litigating

9    these.  I'm talking about today, litigating these issues.

10             MR. FOX:  Well --

11             THE COURT:  And --

12             MR. FOX:  There was --

13             THE COURT:  You say that the Court -- the Debtors

14   can't wrap all of these problems into a settlement and I

15   agree with that, but the PBGC settlement at this point is

16   premised upon substantive consolidation under the plan, and

17   if you add $146 million of admin costs, that just --

18             MR. FOX:  Well, the PBGC --

19             THE COURT:  -- a deal killer.

20             MR. FOX:  I don't think the PBGC settlement,

21   despite counsel's representation, can really be used as an

22   excuse to stay with substantive consolidation.  The -- what

23   the plan provides in 9.2E is that the PBGC would have to

24   approve it and it would have to be reasonable, determining

25   whether to approve it or not.

1          Given the fact that the PBGC already entered into

2     a settlement in February -- we have signed terms sheets that

3     are in the record agreeing to not -- in fact, they didn't

4     want to consolidate -- for them to now say oh, we do, I

5     think it would be a little hard for them to suggest that

6     they're going to object to it based on -- that they would be

7     reasonable in refusing to agree to that.  If Your Honor

8     approves the PBGC settlement separately, so be it.  We can

9     still have the toggle plan.

10          THE COURT:  Well, no.  They have the right to veto

11     the toggle plan.

12          MR. FOX:  They don't have an absolute right.  They

13     have to act reasonably and I'm suggesting they would not,

14     especially given the fact they previously agreed to this

15     and, as counsel admitted, they voted in favor of this in

16     every class.  That's the class the Debtor is relying on.

17          THE COURT:  But that's circular because they voted

18     in a situation where they have this consent right.  It's not

19     like they voted and then it could be imposed on.

20          MR. FOX:  But the exercise has to be reasonable.

21          THE COURT:  Well, why is it unreasonable for PBGC

22     to say, we don't want months of litigation and several of

23     these Debtors to go into Chapter 7?

24          MR. FOX:  No, no, no.  There would not be months

25     of litigation and they would not go into a Chapter 7.  You'd

Page 81

1    confirm the toggle plan.

2           THE COURT:  No, but the toggle plan is just --

3    it's only for those entities, because it's an entity by

4    entity plan.

5           MR. FOX:  It's all of the --

6           THE COURT:  It's only for the entities that can

7    actually confirm the plan.  I would have to have whole new

8    hearings.  I mean, the plan actually contemplates that, is

9    that you give notice and then you have, like, the whole

10   separate hearings or objection to the entity by entity plan.

11          MR. FOX:  Well, the Debtors' confirmation brief

12   dropped a footnote to suggest something like that, but I

13   don't think the plan itself said --

14          THE COURT:  Well, no.  I think it actually is

15   worded that way.

16          MR. FOX:  Your Honor, the vote --

17          THE COURT:  I mean, how could I confirm individual

18   plans without going through the individual confirmation

19   standards for each entity, including A9 and A11?  I don't

20   think I could.

21          MR. FOX:  You -- that's right, Your Honor, but the

22   funds -- just like the funds are available to confirm the

23   consolidated plan, the same funds are available.  Instead of

24   being gifted, they'd be lent as -- the plan provides that

25   the solvent entities would lend to the insolvent in order to

 1    get this done.  There are --

 2              THE COURT:  And how do we know which is which,

 3    then?  So we're back to that same litigation again.

 4              MR. FOX:  No, it's not litigation.  They'd either

 5    have the funds at the effective date to make the payment of

 6    the administrative expense --

 7              THE COURT:  I can pretty much guarantee you that

 8    when each individual case was noticed for confirmation,

 9    there would be someone equally talented as you on the other

10    side saying, my Debtor is actually a net winner when you do

11    the analysis.  And they're going to be paying me, not Kmart.

12              MR. FOX:  If they can make that case, God bless

13    them, but I don't --

14              THE COURT:  Well, that's the point is that --

15              MR. FOX:  No --

16              THE COURT:  -- we'll be spending all the next

17    several months doing that with the litigation costs when $1

18    or $2 million in the settlement means a lot.

19              MR. FOX:  Your Honor -- well, losing 60 percent of

20    what would otherwise be one's recovery means a lot and --

21              THE COURT:  Well --

22              MR. FOX:  -- and the --

23              THE COURT:  If you assume that that's actually

24    what you would recover.

25              MR. FOX:  Well, based on -- well, we're all basing

Page 83

1       everything on the Debtors' assumptions.  Now, if the

2       Creditors' Committee hits a home run, then maybe it'll be a

3       lot more than the Debtor assumed and lower percentages will

4       nevertheless not matter.  The toggle plan itself, just to be

5       clear, it's a pot plan to begin with and it -- and the

6       Debtors effectively lend to each other to make sure they're

7       all administratively -- to pay their administrative

8       expenses.

9               In effect, it contains elements of substantive

10      consolidation already.  We're not challenging that.  But

11      this is just -- the sub con settlement is just a bridge too

12      far.  It's wildly excessive, particularly under these

13      circumstances.  Now, let me just move on because I

14      appreciate the opportunity to respond to the points.

15              The point about the netting and Mr. Schrock said

16      that the Debtors can't determine who owes what to whom, the

17      point again is, you don't need to.  And in fact, the toggle

18      plan, the pot plan, you don't need to, either because

19      everybody's just getting out of the pot.  The fact --

20              THE COURT:  But, again, in fact you just said it.

21      That's in essence, a substantive consolidation.

22              MR. FOX:  No, well, what it really does --

23              THE COURT:  On the asset side.

24              MR. FOX:  Well, you could view it that way, but

25      effectively what it does is follows exactly the way the

Page 84

1    Debtors ran their business and the way everybody did

2    business with the Debtors.  It's, in a sense, the fairest

3    way because it follows what was going on and what everybody

4    was dealing with.  The --

5              THE COURT:  But it's a black box, so how could you

6    say everyone was dealing with it?  It's a black box.  It

7    goes in.  Everyone was dealing with it on the assumption

8    that each of these entities would be good for the whole

9    amount.

10             MR. FOX:  That's why people extend credit.

11             THE COURT:  So they didn't account for each

12   transaction as to who benefitted from what.  But now that it

13   matters, it seems to be that a more nuanced approach is

14   appropriate, which is what they've come up with.

15             MR. FOX:  Well, what they've come up with is an

16   approach that takes it all out of the guarantee claims.

17             THE COURT:  Well, it gives the guarantors

18   something.

19             MR. FOX:  Not much.

20             THE COURT:  Well --

21             MR. FOX:  And it doesn't even reflect if there's a

22   25 percent chance.  It doesn't even reflect that.  And

23   compared to 50 percent in Enron, I mean --

24             THE COURT:  I'm sorry, why doesn't it reflect the

25   25 percent?

1            MR. FOX:  Well, it's a 7.6 percent enhancement.

2   If you have -- for a Kmart guarantee claim, now that they

3   fixed the plan.

4            THE COURT:  Well, it goes --

5            MR. FOX:  9.2(a)(7), I think.

6            THE COURT:  It goes from -- I'm sorry, from 7.7 to

7   11.6?

8            MR. FOX:  I'm not sure what you're looking at,

9   Your Honor.

10            THE COURT:  The recovery.

11            MR. FOX:  Oh, the disclosure statement?

12            THE COURT:  Well, the various charts.  They're all

13   basically the same, but it -- before the settlement, the

14   recovery by the non-ESL guarantee claims would be $7.7

15   million projected and under the settlement, it goes to 11.6.

16   So that's a little over $4 million.

17            MR. FOX:  Well, I'm not sure how they came up

18   that.  As I say, the --

19            THE COURT:  Well, the --

20            MR. FOX:  -- plan itself provides for the 7.6

21   percent enhancement on the recovery.  So putting aside the

22   dollar amount, that's the enhancement to negate the adverse

23   impact on the guarantee claims that we have against Kmart

24   that we would lose.  That's what the plan provides.  I can't

25   speak to their analysis.  And their analysis makes various

1    assumptions.

2            THE COURT:  I'm sorry.  Under a deconsolidated

3    plan, it's a little under $31 million, is the recovery.

4    They discount that by 75 percent to $7.7, so they are giving

5    you the 25 percent.  You don't think of it as a gift, but

6    they're giving you the 25 percent and then they're adding on

7    top of that $3.9 million which is about 10 percent more of

8    the $30.9 million, a little over that, 11 percent more.

9            MR. FOX:  Yeah, I'm not sure how they --

10           THE COURT:  So totally -- so the total amount is

11   like 33 -- I'm sorry, 36 percent recovery.

12           MR. FOX:  Your Honor, I'm not sure how -- I don't

13   have that in front of me.  I'm not sure how you're getting -

14   -

15           THE COURT:  Well, I mean, I think that --

16           MR. FOX:  But I --

17           THE COURT:  I mean, that's -- I think I'm doing

18   the math right.

19           MR. FOX:  That may be.  All I'm saying is that

20   when you look at the plan itself in 9.2(a)(vii), the

21   enhancement is you get, then, 7.6 percent of your recovery

22   on account of your guarantee claim.  You don't get 25 --

23           THE COURT:  Oh, well, yeah, because you're not

24   expected to get anything anyway.  I mean, you expect to get

25   a very little amount, but the enhancement isn't -- I mean,

1    I'm just focusing on the fact that you're saying that the

2    bump up here is miniscule.  Maybe in terms of dollar amount

3    it is small, but you're talking about small projected

4    recoveries anyway because the Debtors are being conservative

5    here on litigation recoveries and again, it's a 25 percent

6    recovery and then you add another 10 percent onto what you'd

7    be getting under a consolidated plan.

8              MR. FOX:  Well, as I said, I was referring to the

9    percent of the -- recovery percentages.  If I could, I just

10   want to address the last points about the Trustee's fees

11   that Mr. Dublin raised.  In order for a Trustee to exercise

12   his charging lien, it must make the distribution.

13             THE COURT:  Right.

14             MR. FOX:  Otherwise, it can't assert.

15             THE COURT:  Right.

16             MR. FOX:  And it's entitled under the rules to

17   receive the distribution for exactly that purpose.

18             THE COURT:  Right.

19             MR. FOX:  So --

20             THE COURT:  No, but they're prepared to pay on top

21   of your charging lien, so you don't have to hold back the

22   distribution -- it's really for the benefit of the

23   noteholders -- your distribution charges.

24             MR. FOX:  Yeah.

25             THE COURT:  Your normal charges --

 1            MR. FOX:  We --

 2            THE COURT:  -- for being an indentured Trustee, so

 3    that's on top of the charging lien.

 4            MR. FOX:  Right.  Well, ordinarily the fees to

 5    actually do the distribution or charge separately to the

 6    estate --

 7            THE COURT:  No --

 8            MR. FOX:  -- and they're paid.  But what the

 9    Debtor -- what the plan and the liquidation trust agreement

10    provide is much more than that.

11            THE COURT:  I understand, and I don't -- I agree

12    with you.  I think the deathtrap aspect of it isn't

13    appropriate, but I will interpret that provision to say that

14    if the Trustee just does its normal duties, the noteholders

15    won't be charged for those through the charging lien.

16    They'll pay you directly for that so that every dollar that

17    you get after that you can pay them or assert some other

18    charging lien for whatever else you've got in the case.

19            MR. FOX:  So it's just the actual distribution

20    cost --

21            THE COURT:  Well, I don't know if it's that.  I

22    mean, there may be other things your client did during the

23    case, like field phone calls or keep lists or, I don't know.

24    I don't know what else to --

25            MR. FOX:  Right.

1          THE COURT:  Indentured Trustees normally get paid

2     a ridiculously low amount of money for those types of

3     things, so I'm assuming it's not a lot, but maybe they do

4     something.  I don't know.

5          MR. FOX:  Well, okay, because the language that's

6     in the --

7          THE COURT:  But --

8          MR. FOX:  -- now is not that --

9          THE COURT:  I agree with that.

10          MR. FOX:  That's everything they did.  If they

11     spent 1,000 hours reading every document that was filed --

12          THE COURT:  I agree.

13          MR. FOX:  -- but never took a position, the plan

14     and the liquidation trust agreement would pay them for all

15     of that work.

16          THE COURT:  Well, that doesn't make sense.

17          MR. FOX:  Well, that's what it provides.

18          THE COURT:  Okay.  All right.

19          MR. FOX:  Thank you, Your Honor.

20          THE COURT:  Okay.

21          MR. SCHROCK:  Your Honor, just really quickly for

22     the record.  I think it's important to note that when

23     Wilmington Trust makes these arguments, as they noted,

24     they're making for the 2L notes which are payments

25     subordinated, the $89 million that's at the bottom tranche,

```
 1   so as you may recall --

 2            THE COURT:  So the recoveries are going to be low

 3   to begin with.

 4            MR. FOX:  Your Honor --

 5            THE COURT:  They're subordinated as liens and to

 6   other debt, but --

 7            MR. FOX:  Only the liens are subordinated.

 8            THE COURT:  Yeah.

 9            MR. FOX:  The debt is not.

10            THE COURT:  But we're talking about projected low

11   recoveries for all unsecured creditors.

12            MR. FOX:  Right.

13            THE COURT:  So to complain that it's only a 7.7

14   percent recovery, it's lower for the other unsecured

15   creditors by about 50 percent of that, so it's not -- I

16   think you're mixing apples and oranges, Mr. Fox, as far as

17   the bump up as part of the sub con settlement is concerned.

18   No one else has a substantive consolidation issue?  I don't

19   think so.  All right.  I...

20            MR. KRELLER:  Your Honor, Thomas Kreller from

21   Millbank, LLP for Cyrus Capital.

22            THE COURT:  Okay.

23            MR. KRELLER:  I actually do have a few other

24   issues.

25            THE COURT:  No, I know, but I'm wondering if you
```

1    have a substantive consolidation --

2            MR. KRELLER:  I don't have a substantive --

3            THE COURT:  Okay.  So I'm going to rule on that

4    issue now.  I have before me in the plan a proposal under

5    which -- under the plan the Debtors would be substantively

6    consolidated under the Court's general equitable powers,

7    which is well recognized in the Second Circuit including In

8    RE:  Augie/Restivo Baking Company, Limited, 860 F.2d. 515,

9    518 Note 1 (Second Circuit, 1988).

10           Substantive consolidation is the effect of

11   consolidating the assets and liabilities of multiple Debtors

12   and treating them as if the liabilities were owed by and the

13   assets held by a single legal entity.  In the course of

14   satisfying the liabilities of the consolidated Debtors form

15   the common pool of assets, other company claims are

16   eliminated and guarantees from co-debtors -- unsecured

17   guarantees, that is -- are disregarded.

18           In RE:  Republic Airways Holdings, Inc., 565 B.R.

19   710, 716 (Bankruptcy S.D.N.Y. 2017) and In RE:  WorldCom,

20   Inc., 2003 Bankruptcy Lexus 1401 (Bankruptcy S.D.N.Y.

21   October 31, 2003).

22           While the Court has considerable discretion in

23   ordering substantive consolidation, the Circuit has made it

24   clear that the power should be used sparingly because of the

25   possibility of unfair treatment of creditors who have dealt

Page 92

1    solely with that Debtor without knowledge of its

2    interrelationship with others.  Chemical Bank, New York

3    Trust Company v. Kheel, K-H-E-E-L, 369 F.2d. 845, 847

4    (Second Circuit 1966).

5         Courts apply multiple factors in determining

6    whether substantive consolidation is appropriate but the

7    Circuit in Augie/Restivo distilled those considerations into

8    two primary or critical inquiries phrased in the

9    disjunctive, i.e., whether "creditor dealt with the entities

10   as a single economic unit and did not rely on their separate

11   identity in extending credit," or separately, the affairs of

12   the Debtors are so entangled, consolidation will benefit all

13   creditors.  Augie/Restivo, 860 F.2d. 518.

14        Substantive consolidation, given its equitable

15   basis is not a black and white or all or nothing result.

16   The Courts look at whether the proposed consolidation will

17   yield an equitable treatment of creditors without any undue

18   prejudice to any particular group, In RE:  Food Fair Inc.,

19   10 B.R. 123, 127 (Bankruptcy S.D.N.Y. 1981) and Republic

20   Airways Holdings, 585 B.R. at 716 and should apply the

21   remedy in a practical manner.

22        Thus, it quoted, "It is well accepted that

23   substantive consolidation is a flexible concept and that a

24   principal question is whether creditors are adversely

25   affected by consolidation, and if so, whether the adverse

1    effects can be eliminated or otherwise dealt with," id.,

2    Page 717.

3            It is also the case, consistent with the point I

4    just made that substantive consolidation can be proposed in

5    the form of a settlement of substantive consolidation issues

6    or issues pertaining to substantive consolidation under

7    Bankruptcy Rule 9019 and there are numerous cases that apply

8    the substantive consolidation in the context of aw related

9    settlement analysis that is applying the so-called iridium

10   factors or TMT Ferry factors applicable to analysis of a

11   proposed settlement as set forth in In RE:  Iridium

12   Operating, LLC, 478 F.3d. 452, 462, citing among other

13   cases, In RE:  TMT Trailer Ferry, 390 U.S. at 424.

14           In the substantive consolidation context, in

15   addition to the Republic Airways case that I've previously

16   cited, such an approach applying a settlement analysis as

17   well as substantive consolidation analysis was undertaken in

18   In RE:  Winn-Dixie Stores, 356 B.R. 239 (Bankruptcy N.D.

19   Florida 2006) as well as in a number of reported and

20   unreported decisions cited in the Debtors' brief -- reply

21   brief in support of substantive consolidation, albeit that

22   those settlements did not have extensive analysis.

23           They include, though, In RE:  WorldCom, Inc. that

24   I previously cited as well as the Enron confirmation ruling

25   that is cited in the Debtors' reply memorandum where a

Page 94

1    substantive consolidation analysis which at the confirmation

2    hearing took up a lot of time and argument, was resolved on

3    a consensual basis except for some relatively modest

4    remaining objections and dealt with in about a page-and-a-

5    half of a 200-page decision.

6            Obviously, in approving or in considering a

7    settlement, particularly in the context of substantive

8    consolidation being among the settled issues, the Court

9    needs to ensure that the settlement isn't unduly at the

10   expense of a party or parties who are not on board with the

11   settlement and who are affirmatively objecting to it.

12   Nevertheless, I can clearly approve a settlement where not

13   every affected creditor consents.

14           That's the case under the substantive

15   consolidation caselaw as well as the settlement caselaw,

16   even where a class does not accept a settlement.  Again, see

17   In RE:  Winn-Dixie Stores, 356 B.R. at 249.

18           The settlement here is complicated by the fact

19   that it is not only a proposed settlement of substantive

20   consolidation issues, or issues pro and con in favor of

21   substantive consolidation, but also incorporates a complex

22   settlement between the Debtors and the PBGC, their largest

23   creditor.

24           That settlement as originally proposed by the

25   Debtors and PBGC in a terms sheet did not contemplate

1    substantive consolidation, but as ultimately proposed, while

2    it contains or contemplates the possibility of a non-

3    substantive consolidation plan, i.e., the so-called toggle

4    plan, a switch to the toggle plan requires the consent not

5    to be unreasonably withheld of PBGC and the Official

6    Unsecured Creditors' Committee which joined in the PBGC

7    settlement in its ultimate version.

8            The PBGC in the settlement substantially

9    compromises its claims and looks for one consolidated

10   recovery.  In addition, and importantly here, the PBGC

11   agrees to use its best efforts to cause a non-Debtor

12   subsidiary of the Debtors, KCD, not to pursue a $146 million

13   administrative expense claim against the Debtors.

14           I believe on the record before me, it is clear

15   that PBGC not only has the requisite influence to cause that

16   to occur given that the independent director of KCD was

17   subject to the nomination by PBGC and PBGC is currently the

18   only creditor of KCD that would have an interest through KCD

19   in such a claim or on KCD pursuing such a claim.  Clearly,

20   if PBGC, as is stated on the record today, informs KCD's

21   board that it has no desire to have KCD collect on their

22   claim, it's highly likely that the KCD board would not

23   pursue the claim.

24           The record of this confirmation hearing generally

25   makes it clear that the Debtors' current cash position would

Page 96

1    not let them emerge from bankruptcy until various events

2    occur in the future that would enable them to pay allowed

3    administrative expenses in full or as agreed by the

4    administrative expense creditors holding allowed

5    administrative expenses, in compliance with Section

6    1129(a)(9) of the Bankruptcy Code.  That is the case even

7    without a $146 million administrative expense claim.

8            To add that administrative expense onto the

9    Debtors' balance sheet would raise very serious feasibility

10   issues for these Debtors, in all likelihood causing most and

11   perhaps all of them, including the entity that apparently

12   the objector, Wilmington Trust, looks to most prominently,

13   the Kmart Debtors, to be rendered administratively

14   insolvent.

15           So the PBGC settlement is important.  It appears,

16   based on the record before me, that the final version of

17   that settlement was negotiated with the administrative claim

18   position of these cases or these Debtors well in mind.  I

19   believe that was a good faith and rational and reasonable

20   basis for the negotiation of the settlement and that the two

21   are, in fact, properly linked, that is the substantive

22   consolidation settlement and the PBGC settlement.

23           PBGC's counsel has represented that it is not

24   prepared to waive its right to object to switching to a

25   debtor-by-debtor so-called toggle plan and given the facts

Page 97

1    before me, that insistence does not appear to me to be

2    unreasonable.

3            In evaluating a settlement, the Court considers,

4    as laid out by the Second Circuit in Iridium and WorldCom

5    and TMT Trailer Ferry, one, the balance between the

6    litigation's possibility of success and the settlement's

7    future benefits, the likelihood of complex and protracted

8    litigation with its attendant expense, inconvenience, and

9    delay, including the difficulty in collecting on the

10   judgment, the paramount interests of the creditors including

11   each affected class's relative benefits and the degree to

12   which creditors either do not object to or affirmatively

13   support the proposed settlement, whether other parties in

14   interest support the settlement, the competency and

15   experience of counsel supporting and the experience and

16   knowledge of the Bankruptcy Court judge -- well, this is on

17   appeal, obviously -- reviewing the settlement, the nature

18   and breadth of releases to be obtained by officers and

19   directors and the extent to which the settlement is the

20   product of arm's length bargaining.

21           Obviously, in any multifactor test, certain

22   factors simply don't apply and some factors may, under the

23   particular -- or in the particular context, be more

24   important than others.  In addition, as laid out by the

25   Iridium Court, the paramount determination in reviewing the

Page 98

1    settlement, if this issue exists, is whether the settlement

2    violates some other fundamental principle of the Bankruptcy

3    Code including, as was the case in Iridium, the fair and

4    equitable absolute priority rule.

5            That does not appear to me to be the case here, so

6    I will look at the other factors in the context of

7    substantive consolidation analysis.  It is clear to me that

8    there is a material, legitimate dispute that good lawyers

9    could pursue for a long and expensive time over whether

10    these Debtors should be substantively consolidated or not.

11    Frankly, it does not appear to me that the first of the two

12    Augie/Restivo prongs raises much of an issue.

13            At least while these Debtors were solvent, the

14    creditors dealt with them on an independent basis, by and

15    large, including Wilmington Trust where there were separate

16    guarantees of the notes for which Wilmington Trust is the

17    Trustee as well as trade creditors who had agreements with

18    specific Debtor entities.

19            On the other hand, the Debtors had a fundamentally

20    fairly simple cash management system where their receipts

21    were swept on a daily basis into a concentration account, in

22    essence consolidated, and only net balances were maintained

23    so you would have multiple Debtors contributing or borrowing

24    from the concentration account without any easily

25    implemented way to determine which Debtors could, in effect,

1    be said to be making transfers to which other Debtors and

2    vice versa.

3            It is clear to me from Mr. Murphy's declaration

4    that tracing those types of transactions between the

5    entities as opposed to a net amount owing to the group would

6    be complex, lengthy, and very expensive, and ultimately

7    fraught with uncertainty.

8            Even in the two-and-a-half months spent in tracing

9    post-petition transactions on a debtor-by-debtor basis, Mr.

10    Murphy testified credibly that he had only a 80 to 90

11    percent level of confidence that that tracing was accurate

12    and, of course, that was an expensive and lengthy process

13    just for the slightly under one-year period of this case,

14    although at that time it was, I guess, probably about 10

15    months or even shorter since I believe it was completed in

16    May.

17            That problem highlights the very real likelihood

18    that in a fully contested substantive consolidation case,

19    the second prong in the Augie/Restivo analysis, which again,

20    is an independent basis for substantive consolidation, would

21    be found.  Again, although that prong is sometimes loosely

22    referred to in briefs and even in some cases as requiring an

23    impossibility of disentangling the corporate affairs, that's

24    not how the Circuit phrases it.  Again, it's phrased as the

25    affairs of the Debtors are so entangled, consolidation will

Page 100

1    benefit all creditors.

2            And it is clear that where the Court believes that

3    the cost of conducting such an investigation,

4    reconciliation, and audit will be prohibitive in the context

5    of the case, the Court will approve a reasonable substantive

6    consolidation settlement.  See In RE:  Republic Airways

7    Holdings, 565 B.R. at 719 and In RE:  Winn-Dixie Stores at

8    Page 750 -- I'm sorry, 356 B.R. at Page 250.

9            Again, the context here is not something that,

10   when the parties dealt with -- when the creditors dealt with

11   these Debtors pre-bankruptcy, they reasonably contemplated,

12   which is that there would be such a thin margin on

13   administrative expense solvency that enforcing intercompany

14   claims debtor by debtor as opposed to simply netting out

15   those claims through the cash management system against an

16   overall solvent business would be meaningful.

17           It appears to me, therefore, that settling

18   substantive consolidation issues on an assumption that it

19   would be likely on a 75 percent basis that the Court would

20   ultimately direct substantive consolidation is reasonable in

21   light of the Iridium factors pertaining to the costs, risks,

22   and delay of litigation.

23           The parties negotiating the settlement were

24   clearly fiduciaries for all the Debtors as well as the

25   Debtors unsecured creditors, on the one hand, that is, the

1    Debtors themselves and the Unsecured Creditors' Committee

2    and the PBGC on the other, the Debtors' largest creditor and

3    also a member of the Creditors' Committee.

4         I believe not only were the professionals

5    negotiating that substantive consolidation settlement

6    capable and experienced, but actually acting in good faith

7    and respect of all the Debtors including Debtors that could

8    make an argument that they would be unduly harmed by the

9    substantive consolidation.

10        The plan went out for a vote and generally was

11   accepted, but there are classes of unsecured creditors of

12   certain Debtors that have rejected the plan under Section

13   1129(a)(8) on the dollar threshold; although, as set forth

14   in the ballot declarations, in terms of numbers of those

15   voting, the majority -- actually, a super majority in each

16   rejecting class -- accepted the plan.  So at best, it

17   appears to me that the paramount interests of creditors and

18   their support of the settlement, at best for Wilmington

19   Trust, is neutral.

20        No other creditor has objected to substantive

21   consolidation; although, of course, Wilmington Trust is

22   speaking as an indentured Trustee for a group of creditors,

23   some of whom, however, are very well-heeled and have not

24   made their own separate objection.  And the creditors in the

25   rejecting classes in terms of numbers of those voting,

1    again, have by a large majority accepted the plan which was

2    a factor that the Winn-Dixie Stores opinion took into

3    account as a positive, 356 B.R. at 249 through 250.

4            As I noted, substantive consolidation being an

5    equitable remedy and a flexible concept, the Court has the

6    power to approve adjustments to substantive consolidation

7    that would relieve those who would otherwise be unduly

8    prejudiced by the consolidation of, at least, the undue

9    amount of the prejudice.  That is the case under this plan

10   which provides that certain holders of claims at estates

11   that appear to be more solvent than others will have a bump-

12   up in their recovery.

13           That chart is laid out in the Debtors' reply

14   memorandum as well as Mr. Murphy's declaration.  As a

15   percentage matter, the bump-up is meaningful and I believe

16   when taking into account the relatively modest recoveries of

17   all unsecured creditors that are projected and the benefits

18   of the interlinked PBGC settlement, particularly the KCD

19   resolution which would, if not approved, substantially

20   reduce down to nearly nothing the recoveries by the bump-up

21   creditors against their then deconsolidated, more solvent

22   Debtors.

23           The bump-up is sufficient to adequately protect

24   creditors that have multiple sources of recovery that would

25   have those sources eliminated or reduced to one under a

Page 103

1    strict substantive consolidation plan.  Again, the

2    alternative would be, I believe, a necessity to open up

3    confirmation for individual Debtors on a debtor-by-debtor

4    basis which then would require as part of the 1129(a)(9) and

5    1129(a)(11) feasibility analyses to do an analysis on a

6    debtor-by-debtor basis of intercompany claims.

7            And by intercompany claims, I don't mean claims

8    against the common pot through the consolidation account,

9    but rather a debtor-by-debtor, transfer-by-transfer

10   analysis.  I believe that would be prohibitively expensive

11   based on the facts before me and the Debtors' current cash

12   positions on a debtor-by-debtor basis.

13           As far as the prohibitively expensive aspect of

14   it, there is no dollar estimate of what it would cost, but I

15   do accept as credible Mr. Murphy's testimony that based on

16   the two-and-a-half months' effort to do such an analysis

17   with respect to the post-petition period, to do a

18   comprehensive analysis on the prepetition period would be

19   extremely expensive, and prohibitively so given the Debtors'

20   cash position.

21           It would, to my mind, simply lead to another

22   settlement after all of the estate's assets would be reduced

23   and the KCD claim laid on top of the Debtors' balance

24   sheets, which would benefit no one.  Given the ultimate

25   flexibility that I have based on an across the board benefit

Page 104

1    analysis, it appears to me, therefore, under the caselaw

2    that the substantive consolidation/PBGC settlement is

3    warranted here, so I will deny Wilmington Trust's objection

4    on that basis.

5           Wilmington Trust also objected on the grounds that

6    separately classifying the PBGC violated Section 1122 and

7    1123 of the Bankruptcy Code and/or arguably meant that the

8    plan was not being pursued in good faith under Section

9    1129(a)(3).  I find, to the contrary, that given PBGC's

10   unusual rights against the Debtors and its power with

11   respect to KCD, it was entirely reasonable and appropriate

12   to classify it separately.  Lumping it in with other

13   unsecured creditors would've, in fact, skewed those classes.

14          Indeed, it appears to me, given the size of PBGC's

15   claims, it may have well results in the rejecting classes

16   voting in favor of -- being deemed to have voted in favor of

17   the plan in certain of the Debtor entities, which wouldn't

18   have been right anyway, given PBGC's unique position in the

19   case, including its rights, explicit and implicit, with

20   respect to KCD.  Given that it was properly classified, the

21   1129(a)(3) objection would not fly, either.

22          Finally, Wilmington Trust objects to a provision

23   in the plan which is somewhat differently worded in the

24   liquidation trust agreement regarding the payment of its

25   reasonable fees and expenses.  Frankly, to my mind, there is

1   some confusion on how those provisions work.  It is clear to

2   me, however, that both sides agree that Wilmington can be

3   limited to its charging lien and that the Debtors' estates

4   do not have to separately in a legal manner pay its fees and

5   expenses.

6          I think the confirmation order should be made

7   clear that under the plan, the Debtors' estates will pay

8   Wilmington Trust's legal fees and expenses regardless of

9   whether it opposes any action that the Debtors take, but

10  that such payment shall be only in the discretion of the

11  Debtors and the Debtors can limit such payment to the

12  ordinary and customary work that an indentured Trustee does

13  outside of a bankruptcy case, including in facilitating

14  distributions and answering questions.

15         The reason for that limitation is that I think it

16  is -- there should be no question that an indentured Trustee

17  should feel free to raise any legitimate objection or make

18  any legitimate statement in support of an action by a Debtor

19  in bankruptcy and should not be forced to decide whether to

20  do so based on whether its fees will be paid or not by the

21  Debtors' estate.

22         Okay.  So I think we have, then, Cyrus.

23         MR. KRELLER:  Good afternoon, Your Honor.  Thomas

24  Kreller of Millbank, LLP on behalf of Cyrus Capital

25  Partners.

```
 1              THE COURT:  Afternoon.

 2              MR. KRELLER:  Your Honor, just for -- just as a

 3      reminder, Cyrus is the holder of unsecured claims in the

 4      approximate amount -- in something like $600 million against

 5      various Debtors.  By virtue of those claims, I believe Cyrus

 6      is next to PBGC, the biggest unsecured creditor in these

 7      cases.  We also have a disputed 507(b) claim, disputed and

 8      under appeal from your ruling disallowing that claim.

 9              Your Honor, I'll be relatively brief, recognizing

10      that at least most of the horse just left the barn.  We --

11              THE COURT:  Well, again, you -- I asked you.

12      You're not -- you didn't deal with substantive

13      consolidation, so you're -- I haven't dealt with your issues

14      yet.

15              MR. KRELLER:  I understand that, Your Honor.

16              THE COURT:  Okay.

17              MR. KRELLER:  But clearly, the approval of those

18      settlements, it leads a long way towards confirmation.

19              THE COURT:  Right.

20              MR. KRELLER:  That's my only point.

21              THE COURT:  Okay.

22              MR. KRELLER:  And so I'm not going to belabor

23      those particular arguments.  I do want to state, for the

24      record, our objections still stand, and notwithstanding our

25      attempting to work with the Debtors and others on language
```

1    in the confirmation order that are under discussion, some

2    points I'll talk about, our doing so doesn't constitute a

3    withdrawal of our objection.  Our objections still stand,

4    Your Honor.  We don't believe this plan should be confirmed.

5    We think the estates are hopelessly administratively

6    insolvent and likely will be at least for a very long time.

7            The plan -- this plan is not the simple waterfall

8    plan that Mr. Schrock has been touting for months now.  It

9    has become a bit of a Frankenstein monster with various

10   funds being diverted in various directions that are not

11   necessarily consistent with a simple waterfall plan.  And,

12   Your Honor, I'd note, obviously already you've approved the

13   PBGC settlement and the substantive consolidation

14   settlement, so I won't get into the how the effects of

15   those, a bit of a shell game going there on some of that

16   stuff, but the other --

17           THE COURT:  Well, if it's a shell game, you

18   should've raised the issues.  I'm going to say it again.  Do

19   you really want to go over it?  I mean, do you have new

20   facts to raise on those issues?

21           MR. KRELLER:  No, I don't, Your Honor.

22           THE COURT:  So what's the -- so how is it a shell

23   game?

24           MR. KRELLER:  Your Honor, the other piece of the

25   diversion of funds is the $25 million that's going out to

1    essentially serve as a retainer for the Committee

2    professionals and that UCC settlement as well is a bit

3    suspect because all that was really resolved there was which

4    law firm was going to represent the Trust in the litigation

5    and --

6            THE COURT:  It's not a big settlement as far as

7    I'm concerned, although it's important to get done.  I agree

8    with that.

9            MR. KRELLER:  Well, Your Honor, well -- I want to

10   talk about the $25 million in a minute.  It's not a big

11   settlement.  It certainly doesn't appear to have had any

12   benefit for the creditors or their recovery.  The

13   beneficiary of that settlement appears to be Akin Gump.

14           THE COURT:  Wait, the $25 million or --

15           MR. KRELLER:  Yes.

16           THE COURT:  -- so, you stated -- is that even in

17   your objection?  I don't think you raised that in your

18   objection.

19           MR. KRELLER:  I don't know that I did, Your Honor.

20           THE COURT:  No, you didn't.

21           MR. KRELLER:  But the --

22           THE COURT:  So what is the point?  I mean, you're

23   saying that the Debtors should not have a litigation fund to

24   pursue their complaint?

25           MR. KRELLER:  I'm not saying that, Your Honor.

1    I'm saying --

2              THE COURT:  Okay.

3              MR. KRELLER:  -- that those funds coming out of

4    the estate ahead of potentially administrative claimants

5    isn't appropriate and I would question the magnitude of that

6    fund given the fact that the work has already been done and

7    paid for twice by the estates to both the UCC's

8    investigation and the special committee of the board's

9    investigation.

10             But, Your Honor, I'm not standing her to belabor

11   any of these points.

12             THE COURT:  Well, good, because they're not in

13   your objection.

14             MR. KRELLER:  You have your record.  You've made

15   the assessment.  Apparently, the Debtors have cleared the

16   lowest rung on the range of reasonableness and so I'll move

17   on, Your Honor.  The point that I really want to address is

18   kind of the metaphysical question that you were dealing with

19   a bit on Thursday and less so today which is, what happens

20   when you have a confirmed plan that may not go effective for

21   a prolonged period of time, and I think that's the upshot of

22   even the Debtors' own testimony on there.

23             I don't believe any of their witnesses could give

24   you any real sense of how long it would be before there

25   would actually be funds sufficient to pay the administrative

1    claims, so Your Honor, my view is it's probably closer to

2    three years than three months, but that will be what it will

3    be.

4            The issue of a confirmed but not yet effective

5    plan, though, Your Honor, gives rise to a handful of issues

6    and these really come up in the proposed confirmation order

7    and we've been discussing these with Debtors' counsel and we

8    have -- I think we've had agreement on a couple and we still

9    have some outstanding, but I think they're important.  Your

10   Honor, when the plan is confirmed but not yet effective,

11   nothing really changes in terms of the Debtor.  The Debtor

12   is a Debtor in Possession.  The plan is not actionable or

13   implementable and the parties simply wait in the status quo,

14   waiting for the effective date.

15           That leaves the Debtors remaining as Debtors in

16   Possession.  It leaves the UCC in place with its rights and

17   duties and the case, essentially, proceeds as it is with

18   ordinary course transactions being permitted under the code,

19   but anything outside the ordinary course or any

20   extraordinary creditor distributions to await the effective

21   date of the plan.

22           That structure, that confirm and wait for

23   effective date the Debtors have proposed conceptually works

24   and occurs in other cases, but the notion there is that

25   essentially the money doesn't start moving until the

Page 111

1    effective date occurs because you don't have an effective

2    plan.  Now, in the administrative expense settlement that

3    got announced earlier last week, there's -- that created

4    this wrinkle where the Debtors actually start to move money.

5            They start to fund $20 million into the litigation

6    to be earmarked, to be segregated into the litigation trust

7    or into litigation activities.  Your Honor, we don't believe

8    the segregation is appropriate or necessary, but if those

9    words are going to be used, we think it ought to be clear

10   that they are without prejudice to the rights of any of the

11   creditors to pursue those funds as assets of the estate.

12           THE COURT:  Okay.

13           MR. KRELLER:  The --

14           THE COURT:  I thought the proposed order actually

15   made it clear that this was estate -- this continued to be

16   estate property, it was not property held in trust or

17   anything like that.

18           MR. KRELLER:  Well, it doesn't go quite that far.

19   It does say it's estate property.

20           THE COURT:  Right.

21           MR. KRELLER:  But the very notion that it's

22   somehow being segregated or that segregation is appropriate

23   leads to the implication that somehow rights are being

24   affected.  And, Your Honor, in our view --

25           THE COURT:  It's $15 million, right?  It's not --

Page 112

1              MR. KRELLER:  It's -- I believe it's $20 million.

2      It's 15 and then 5 coming out of one of the -- out of the

3      winddown account.

4              THE COURT:  Right.  Okay.

5              MR. KRELLER:  And then that's subject to top up

6      from first assets in to get it up to 25.

7              THE COURT:  Right.  Okay.

8              MR. KRELLER:  So certainly, the implication is

9      that those funds are being set aside, segregated, ear

10     marked, which sounds to me -- and I don't see anything in

11     the documents that gives me great comfort otherwise -- that

12     they're being removed one step further away from creditors

13     and potential creditor distributions than other assets or

14     cash the estates may have.

15              And, Your Honor, I would submit that during the

16     post-confirmation, pre-effective date period, there's no

17     reason for that money to move and there's no reason for

18     creditors' rights to be impaired or potentially impaired by

19     virtue of the segregation of those funds.  The professionals

20     will remain.  They'll be doing the work they do.  The estate

21     professionals will be subject to ordinary course fee

22     procedures in these cases and they'll have access to the

23     carveout and the other accounts that they have for their

24     benefit.

25              There's no reason to move this money.  They'll do

Page 113

1    the work.  They'll do whatever they're doing in the

2    litigation at the direction of the litigation designees, but

3    somehow setting this money aside to the potential prejudice

4    of creditors is a problem and it's premature.  That money

5    was always going to be funded under the plan on the

6    effective date, but somehow this provision pulling it

7    forward to the confirmation order found its way into the

8    administrative claims settlement, an issue that appears to

9    be completely unrelated but nonetheless is significant.

10            We've proposed language and there's some language

11   going back and forth to try to make clear and amplify and

12   extend upon the Debtors' draft language about the funds

13   being estate funds, but we don't have agreement there yet,

14   Your Honor, and that language ought to be protective of

15   creditors and it ought to make clear that those funds,

16   whether they're in the estate as estate funds or whether the

17   plan goes effective and those funds go into the litigation

18   trust, that they are litigation trust assets that are

19   subject to the claims and rights of creditors to creditor

20   distributions.

21            That money ought to be available to creditors, if

22   it hasn't been expended.

23            THE COURT:  So what is the language you're

24   proposing?

25            MR. KRELLER:  Your Honor, I can -- well, we don't

1    have agreement on the language and there's, I guess, a

2    couple of different sets of language going back and forth.

3    I had proposed language last -- earlier this morning to the

4    Debtors which they rejected and ESL's counsel had proposed

5    language to that effect that's been circulating during the

6    hearing and that's been rejected as well.

7             Your Honor, I'll look for -- if you give me a

8    moment, I'll look for my...  The language, Your Honor, and

9    this is language that ESL and Cyrus would live with, and

10   that language is, "for the avoidance of doubt and

11   notwithstanding anything to the contrary contained in the

12   plan or the liquidating trust agreement, in the event that

13   any disputed claim ultimately becomes an allowed claim," --

14   and it's defined as a subsequently allowed claim --

15   "including by reason of any appeals of any orders of this

16   Court disallowing such claim, nothing in the confirmation

17   order, plan, or the liquidating trust agreement limits the

18   ability of the holder of any such subsequently allowed claim

19   to assert a claim including a priority claim or to obtain a

20   recovery from any liquidating trust assets to satisfy such

21   subsequently allowed claim including, without limitation,

22   the funds in the litigation funding --

23             THE COURT:  That's quite different than what you

24   were just talking to me about.  That's basically saying that

25   even after -- the liquidating trust doesn't go into

Page 115

1    existence until the plan actually goes effective.

2         MR. KRELLER:  Correct.

3         THE COURT:  So that doesn't work.  I can see why

4    they rejected that.

5         MR. KRELLER:  Well, Your Honor, it's at both

6    points in time, though.

7         THE COURT:  No.

8         MR. KRELLER:  The liquidating trust assets are

9    defined as the assets that in the liquidating trust and

10   available for distributions to creditors.

11        THE COURT:  I think you're going to have to divide

12   up the two.  I mean, there's a fundamental issue that was

13   raised in your objection, was that you wanted a reserve for

14   the claim that I had already ruled on.  To me, that seemed

15   to be contrary to the caselaw and flipping the whole notion

16   of who should be posting a bond for a stay pending appeal.

17        But I thought you were going on a very different

18   tack here, which is that pending the effective date, the

19   money is property of the estate and is not being held in

20   trust or otherwise.  I mean --

21        MR. KRELLER:  And that's --

22        THE COURT:  I have no problem with that.  It's not

23   being held in trust, right?

24        MR. SCHROCK:  Your Honor, we have language in the

25   confirmation order that says that.  It's Paragraph 57.

Page 116

1          THE COURT:  Well, does it say it's not being held

2     in trust?

3          MR. SCHROCK:  Yeah, Your Honor, I'll just read it.

4     It says, "For the avoidance of doubt, the funds in the

5     litigation funding account and the cash reserve account

6     shall remain property of the estates and after the effective

7     date, liquidating trust assets provided that use of such

8     funds shall be subject to plan and/or liquidating trust

9     agreement and the funds in the cash reserve account shall be

10    subject to the administrative expense claims consent

11    program."

12         THE COURT:  Okay.  So, look, if -- dealing with

13    the post-effective date aspect of this, I think you all

14    should just stay away from.  I mean, that all -- it's all

15    wrapped up in issues of mootness and appeal and all those

16    sorts of things.  Seeking a stay, which hasn't been sought

17    because there's nothing to seek a stay of because the plan

18    hasn't been confirmed.  I think you should just focus on the

19    pre-effective date period.

20         And I mean, as long as it's clear that this money

21    is property of the estate and not being held in trust...

22         MR. KRELLER:  Your Honor, it ought not be held in

23    trust in the post-effective date period.  I --

24         THE COURT:  Well, if the plan provides for that

25    level of funding, it's not held in trust but that's what the

1    plan would provide for.

2           MR. KRELLER:  The cash will, to the extent it's

3    not been consumed, that cash will be a liquidating trust

4    asset that ought --

5           THE COURT:  Right.

6           MR. KRELLER:  -- to be available to creditors.

7           THE COURT:  If the plan says to the contrary, and

8    literally no one has objected on that basis, I don't see why

9    -- except for ESL, the target of the litigation.  You know -

10   -

11          MR. KRELLER:  The --

12          THE COURT:  -- I guess the answer is, tough.  The

13   plan controls.  I --

14          MR. KRELLER:  Well, Your Honor, this issue came

15   about because of how this provision found its way into the

16   administrative expense settlement.  And so the notion that

17   no one objected to it, the money was always going to be an

18   effective date issue; otherwise, everything was staying in

19   the estate.  And all we're looking for in terms of the post-

20   effective date period is clarification that there's no

21   intention that the liquidating trust assets including those

22   funds would somehow be withheld from creditors with allowed

23   claims.

24          THE COURT:  Well --

25          MR. KRELLER:  If it gets used up, it gets used up

Page 118

```
 1   and it's not there.  But if it is there and creditors

 2   including administrative creditors, have claims assertible

 3   against that money, they should have that right to be able

 4   to pursue those funds and not --

 5              THE COURT:  Well --

 6              MR. KRELLER:  -- have the professionals play keep-

 7   away with them.

 8              THE COURT:  But it's -- the money is being --

 9   well, when you say used up, what do you mean?  I mean,

10   obviously --

11              MR. KRELLER:  Spent on --

12              THE COURT:  It will be --

13              MR. KRELLER:  Spend on professionals.

14              THE COURT:  If it's not spent on professionals,

15   then yes, it goes over to the general uses, but I guess I...

16              MR. KRELLER:  Your Honor, I'm actually surprised

17   this is controversial with the Debtors and the UCC.

18              THE COURT:  It's controversial for the post-

19   effective date period and I understand their position

20   entirely on that point.  As far as the pre-effective date

21   period is concerned, saying that it's property of the estate

22   and not being held in trust is enough.  You don't need to

23   specify who has a right to it under what circumstances.

24   Everyone would have a right to it, pre-bankruptcy, if

25   there's circumstances that would give you a right to it.
```

```
 1                MR. KRELLER:  I --

 2                THE COURT:  I mean, pre-effective date.

 3                MR. KRELLER:  That's my position, Your Honor,

 4    which is why I don't understand the --

 5                THE COURT:  Well, the language you read me also

 6    covered the post-effective date.

 7                MR. KRELLER:  It does, but --

 8                THE COURT:  Well, but it shouldn't.

 9                MR. KRELLER:  What is the purpose of the

10    segregation if, in fact, they remain estate assets --

11                THE COURT:  Because you want to keep track of it.

12                MR. KRELLER:  -- subject to creditor claims?

13                THE COURT:  You want to know where it is.  You

14    know what?  It's psychological, frankly.  That's what it is.

15    And I think who is objecting -- I think the people who are

16    objecting to this are experiencing the psychological effect

17    which, I think, was intended.  That's why litigation budgets

18    are largely created, just for that reason.

19                MR. KRELLER:  Your Honor --

20                THE COURT:  So I don't --

21                MR. KRELLER:  Your Honor, as the second largest

22    unsecured creditors in the case and potentially with a 507,

23    we stand to benefit probably more than most from successful

24    -- from the successes of the litigation trust.

25                THE COURT:  Well, you're also --
```

Page 120

1          MR. KRELLER:  So --

2          THE COURT:  -- an investor in Transform and could

3    be -- that investment could be hurt by adverse litigation

4    against Transform's controlling party, so look.  It's fine

5    that you're a large creditor.  I get that.  But I don't see

6    anyone else complaining about this language.  It just

7    doesn't -- it's property of the estate.  It's there, yes.

8    Everyone knows that it's intended to be used post-effective

9    date to litigate with.

10          And if the rulings against your clients are

11    reversed or if I confirm the plan, the plan confirmation

12    order is reversed, we'll be in a different environment.  But

13    that presumes all sort of things that I can't deal with at

14    this point, including your burden to get a stay of various

15    orders and maybe have to post a bond and all those sorts of

16    things.  I think you're basically trying to get the bond

17    flipped on its head here by having the debtor, in essence,

18    post the bond.

19          At least that's what the objection was all about

20    and I'm setting up a reserve.  It just doesn't --

21          MR. KRELLER:  Well --

22          THE COURT:  Doesn't compute.

23          MR. KRELLER:  Your Honor, I'll -- on this point,

24    the reason that nobody else has objected to this is because

25    this showed up at midnight in a Tuesday night filing last

 1    week that --

 2              THE COURT:  Well --

 3              MR. KRELLER:  That was the first point in time in

 4    which any money was going to move --

 5              THE COURT:  But it's not moving.

 6              MR. KRELLER:  -- pre-effective date

 7              THE COURT:  It's not moving.  It's clear that it's

 8    property of the estate, not being held in trust.  It's under

 9    this rubric because everyone knows that's what this is

10    intended to do ultimately when the plan goes effective and

11    it was part of the negotiation of the administrative claims

12    settlement procedures for the party to know where the money

13    was going to be ultimately.  But it's not -- it's

14    psychological.  It has no legal consequences.

15              MR. KRELLER:  Your Honor, with that statement from

16    you that it -- that the segregation has no legal

17    consequences --

18              THE COURT:  Pre-effective.

19              MR. KRELLER:  -- I'll stop talking about --

20              THE COURT:  Okay.  Pre-effective.

21              MR. KRELLER:  -- that issue.

22              THE COURT:  Okay.

23              MR. KRELLER:  On the reserve issue, the plan

24    provides that disputed claims reserves shall be provided on

25    the effective date for disputed claims.  The 507(b) claims

1    are disputed claims because they are not the subject of a

2    final order.  The plain reading, the words of the plan, are

3    what would entitle us to a reserve.

4             THE COURT:  There's not --

5             MR. KRELLER:  And now, Your Honor, I don't think

6    that's --

7             THE COURT:  There's no stay of my order.

8             MR. KRELLER:  There is no stay of your order, but

9    it is not a final order.

10            THE COURT:  I --

11            MR. KRELLER:  But, Your Honor, that's not for

12   today, either.  That only becomes relevant if there is an

13   effective date coming where there's actually money to deal

14   with and the appeal might be in a different -- those --

15            THE COURT:  It may well be --

16            MR. KRELLER:  -- claims might be in a different

17   status --

18            THE COURT:  But I'm certainly not --

19            MR. KRELLER:  -- at that point in time.

20            THE COURT:  I'm not setting a reserve at this

21   point.

22            MR. KRELLER:  I'm not asking you to, Your Honor.

23            THE COURT:  Okay.

24            MR. KRELLER:  I interpret the plan as it's

25   written.

1           THE COURT:  Okay.  I'm not sure whether a reserve

2      is required at any point, but I think at this point, it's

3      not appropriate to order one and it does seem to me that

4      Judge Farnan is right on here in In RE:  Oakwood Homes

5      Corp., 329 B.R. 19.

6           MR. KRELLER:  Your Honor, I think the facts of

7      that case were a bit different.  I think that that claim,

8      the request for a disputed claims reserve was actually

9      denied in those cases.  I think there was a different

10     procedural posture.  It wasn't just simply a disputed claim

11     for plan purposes.  But again, Your Honor, that's not --

12     that's actually not a confirmation issue for today.  It's an

13     effective date issue for the flow of funds, what the flow of

14     funds looks like in the event that there are funds to flow.

15          THE COURT:  Okay.

16          MR. KRELLER:  Your Honor, a couple of other

17     points. I had simply -- I had requested of the Debtors a

18     fairly simple sentence or two basically stating that in the

19     confirmation order that pending the plan effective date,

20     Debtors remain as Debtors in Possession with all of their

21     rights and obligations and subject to the requirements of

22     the Bankruptcy Code and the Bankruptcy Rules and other

23     applicable law, while in the estates and while as Debtors in

24     Possession.

25          That language was rejected out of hand.  I don't

Page 124

1      quite understand that.  It appears to be that that is, I

2      think the reality and that's what I hear you saying as well.

3                  THE COURT:  Right.

4                  MR. KRELLER:  And, Your Honor, I --

5                  THE COURT:  I mean, that's the law.

6                  MR. KRELLER:  It is, Your Honor, but in a case

7      where these Debtors may be operating as Debtors in

8      Possession for a long time before a plan ever goes

9      effective, it would seem to me that a simple statement in

10     the confirmation order --

11                 THE COURT:  We don't need that.  I mean, then

12     (indiscernible) start incorporating specific provisions of

13     the bankruptcy code and it's just --

14                 MR. KRELLER:  The language --

15                 THE COURT:  The law is clear on this point.

16                 MR. KRELLER:  That's fine, Your Honor.  We had

17     also asked, there's a provision and it's been beefed up in

18     the order for advance notice of the anticipated occurrence

19     of the effective date.

20                 THE COURT:  Right.

21                 MR. KRELLER:  Twenty days' notice with a 10-day

22     period to -- for parties to object if they have issues with

23     that.

24                 THE COURT:  Right.

25                 MR. KRELLER:  We had proposed that a similar

Page 125

1    notice provision go in with respect to post-effective date -

2    -

3              THE COURT:  That's --

4              MR. KRELLER:  -- future distributions.

5              THE COURT:  And I asked Mr. Singh that.  I think

6    that's in there now, you said?

7              MR. SCHROCK:  We put in the 20 days, Your Honor.

8              THE COURT:  For each distribution?

9              MR. SCHROCK:  Yes, Your Honor.

10             THE COURT:  Okay.

11             MR. SCHROCK:  Well, we didn't put in, you know,

12   the rights to object and the like.

13             THE COURT:  Just the notice?

14             MR. SCHROCK:  Just the notice.

15             THE COURT:  In 20 days.

16             MR. SCHROCK:  Correct.

17             MR. SINGH:  Your Honor, there's actually a 30-day

18   provision already in the plan and the trust agreement.

19             THE COURT:  Okay.  I don't think there should be -

20   -

21             MR. SINGH:  For future --

22             THE COURT:  -- any implications that you can't

23   come in and say, they're making payments that they shouldn't

24   be making or whatever.

25             MR. KRELLER:  I'll accept that, Your Honor.  I

1    have not --

2              THE COURT:  I mean, there's only one reason to

3    give notice, which is someone complains.

4              MR. DUBLIN:  It's in the definition of

5    distribution.  It says 30 days' advance notice.

6              MR. KRELLER:  Okay.

7              MR. DUBLIN:  You get an extra 10.

8              MR. KRELLER:  Your Honor, the confirmation order

9    in various places contains provision approving things like

10   the plan supplement documents and finding those and

11   approving those documents.  I had suggested language that

12   simply said those -- only those documents that are in

13   existence and on file as of the date of the confirmation

14   order are you approving.  And again --

15             THE COURT:  I can't approve something I haven't

16   seen.

17             MR. KRELLER:  Well, Your Honor, that -- that

18   seemed to be the case to me as well, but I do think, again,

19   given the potentially prolonged lag, I think that would be a

20   clarification that would be worth having.

21             THE COURT:  Well, I mean, there -- this wasn't a

22   provision I focused on, but I'm assuming the plan supplement

23   and related documents are defined in a way so it's not

24   including documents that would be submitted in the future

25   unless they're amendments that don't have any material

Page 127

1    adverse effect on anybody.

2             MR. KRELLER:  I don't know whether they are or

3    not, Your Honor.

4             THE COURT:  No --

5             MR. KRELLER:  But there's -- you have a long --

6             THE COURT:  That's how it should be.

7             MR. KRELLER:  You have a long period of time with

8    --

9             THE COURT:  I know, but --

10            MR. KRELLER:  -- with potentially --

11            THE COURT:  I'm not going to approve anything I

12   haven't seen.

13            MR. KRELLER:  I understand, Your Honor.

14            THE COURT:  Okay.

15            MR. KRELLER:  Nor should you be asked to, but

16   that's --

17            THE COURT:  All right.

18            MR. KRELLER:  -- the way the language reads --

19            MR. SINGH:  Your Honor, can assure you, we're not

20   --

21            THE COURT:  Well, when I go through it, I'll -- if

22   there's an issue there, I'll strike that out.

23            MR. KRELLER:  Thank you, Your Honor.

24            THE COURT:  Okay.

25            MR. KRELLER:  And then, Your Honor, I would just

1    note in Paragraph 24, I believe, of the draft order, there's

2    actually a provision that allows the Debtors to be -- and

3    this, again, is in our limbo pre-effective date period --

4    that would allow the Debtors to be paying litigation

5    professionals subject to monthly invoices and it looks to be

6    something that -- again, I think this is just inadvertence -

7    - because we're still in the cases at that point in time,

8    those professionals should just be getting paid under the

9    existing fee --

10              THE COURT:  Under the fee order.

11              MR. KRELLER:  Under the fee order.

12              THE COURT:  Right.

13              MR. KRELLER:  And there's no reason that that

14    would -- should change on confirmation --

15              THE COURT:  Okay.

16              MR. KRELLER:  -- of the plan.

17              THE COURT:  No, that's fine.  Again, it's not a

18    limbo period.  It's, as you said, the Debtor is the Debtor

19    in Possession and this litigation committee has been created

20    to deal with the committee -- I mean, deal with the

21    litigation.  Similarly, there's the reporting mechanism on

22    the claims settlement, but those are things that I'm

23    approving.

24              MR. SINGH:  To the extent it was unclear, we so

25    stipulate.

Page 129

1          THE COURT:  Okay. All right.

2          MR. KRELLER:  That's all I have --

3          THE COURT:  Okay.

4          MR. KRELLER:  -- Your Honor.  Thank you.

5          THE COURT:  And we've confirmed that Cyrus is not

6   a releasing party, right?

7          MR. KRELLER:  Right, Your Honor.

8          THE COURT:  Okay.

9          MR. KRELLER:  Correct, Your Honor.

10         THE COURT:  Okay.  So, I mean, are there -- I

11  don't think there are any other objections in your

12  objection.  Is there something that is raised that I should

13  address?

14         MR. KRELLER:  No, Your Honor.  I believe we

15  covered it all.

16         THE COURT:  Okay.  All right, thanks.

17         MR. MOLONEY:  Good afternoon, Your Honor.  Tom

18  Moloney on behalf ESL.

19         THE COURT:  Afternoon.

20         MR. MOLONEY:  Your Honor, we filed two objections.

21  The first one related to the plan and I think that was,

22  essentially, worked out so the plan actually doesn't really

23  prejudice the ability of a subsequently allowed creditor to

24  participate fully.  We filed the second objection when saw

25  the plan supplement and I think Your Honor is right.  There

1    are two points in time that are relevant.

2             There's a point in time when we're still basically

3    in the same status that we are now which is a Debtor in

4    Possession status and as to that point in time, I think Your

5    Honor's statement that they've created an account but it

6    doesn't -- just a nominal account and it has no trust

7    significant, if Paragraph 57 of their order said that, we

8    wouldn't be objecting.  It doesn't say that.  It says it

9    shall be property of the estate subject to this liquidating

10   trust agreement which had provisions which include not only

11   a single --

12            THE COURT:  But that's subject -- that doesn't go

13   into effect until confirmation.

14            MR. MOLONEY:  I don't know what --

15            THE COURT:  I mean, I'm sorry, the effective date.

16            MR. MOLONEY:  I don't know what that means for --

17   then for it to be part of the order, though, at this point -

18   -

19            THE COURT:  Well, it's a confirmation order, so

20   when it goes effective, the liquidation trust goes

21   effective.  Before that, it's not.

22            MR. MOLONEY:  Okay, so then I'll just go to the

23   second part of the argument, what happens then.

24            THE COURT:  Okay.

25            MR. MOLONEY:  But for point of clarity, then,

1    because I think that it's a mistake to walk away from this

2    podium, I think, without having perfect clarity --

3            THE COURT:  Okay.

4            MR. MOLONEY:  For a point of clarity, unless and

5    until they actually confirm a plan, whatever money they put

6    into --

7            THE COURT:  Unless and until it goes effective.

8            MR. MOLONEY:  It goes effective, until -- have an

9    effective plan, whatever they want to call this account

10   they're setting up, it remains property of the estate and

11   remains subject to the rights of potentially secured

12   creditors and potentially priority creditors who have a

13   higher priority than administrative -- (indiscernible)

14   administrative claims.  So now we go to future

15   (indiscernible).  Your Honor, admittedly, this is a place

16   holder point.

17           It's not for -- and we did not seek a reserve and

18   we're not asking you to stay anything.  But this is a

19   liquidating plan.  Under the code, 1145, they are not

20   entitled to a discharge so they can't get a de facto

21   discharge of our priority claim by playing some game through

22   a trust agreement.  So once they're in this future world, if

23   we do, in that future world, prevail and Your Honor, I

24   understand that they don't think we'll prevail.  Probably

25   Your Honor doesn't think we'll prevail.

1           But, you know, I'm always an optimist and so I

2     think there's a chance we'll prevail.  And we come back down

3     here and we say, well, Judge, we actually have a secured

4     claim.  We can trace our proceeds to this account.  Or,

5     Judge, we have a super priority claim and we have higher

6     priority than whatever other chunk they want to use the money

7     in this account.  I don't think at that point in time they

8     can say, well, sorry, if the liquidating trust wants to use

9     that money, so for you to fund a lawsuit against yourself,

10    they should be allowed to do that.

11          I don't think the plan can provide for that

12    outcome.  I don't think it legally can provide for that

13    outcome.

14          THE COURT:  Well, I guess certainly if the plan

15    were confirmed, you would have to get two reversals, right?

16    You'd have to reverse the claims order and confirmation.

17    But you're saying it shouldn't be confirmed in the first

18    place?

19          MR. MOLONEY:  No, I'm not, Your Honor.  All --

20    what I'm saying is, I don't need -- I don't think I need to

21    challenge this plan in any respect.  I think the plan as

22    drafted is fine and I don't think I -- I can pursue my

23    appeal.  I (indiscernible) claim.  I can come back and live

24    in the regime that exists post-confirmation of a liquidating

25    pot plan.  This is not a case where, Your Honor, there's a

1    new business and it needs to have a clean balance sheet --

2            THE COURT:  No, but this is --

3            MR. MOLONEY:  -- and it can't have contingent

4    liabilities.

5            THE COURT:  Look, I think it's -- I ruled on this

6    issue on the U.S. Trustee's objection.  I don't believe that

7    the -- I guess you're saying the plan injunction is,

8    effectively, a discharge?

9            MR. MOLONEY:  No, I'm not arguing that.

10           THE COURT:  You're not.

11           MR. MOLONEY:  I'm saying it's just a supplement

12   that they put out.  It's only -- it's not the plan at all.

13   I don't have a problem with the plan at all.  The plan

14   supplement, which they now incorporate into this order,

15   purports to give to this litigation trust board discretion

16   to set aside on an evergreen basis $25 million or more into

17   an account which no one can get a hold of but them.

18           THE COURT:  But if -- so then the issue is, I

19   think, a fairly technical one.

20           MR. MOLONEY:  Right.

21           THE COURT:  Which is, I think -- I'll go back to

22   what I said earlier.  I think you would need to have the

23   reversal of two orders.

24           MR. MOLONEY:  No.

25           THE COURT:  You would have to have the reversal of

Page 134

1    the -- well, depends on the timing.  But let's say that the

2    plan went effective before there was a determination on the

3    appeal on the 507(b) issue.

4              MR. MOLONEY:  Right.

5              THE COURT:  The plan -- if the plan did go

6    effective, then.

7              MR. MOLONEY:  I don't see why we need any

8    reversals, Your Honor.  We just --

9              THE COURT:  Well --

10             MR. MOLONEY:  -- come right back down and assert

11   our claim, if it's allowed.

12             THE COURT:  I'm not sure of that.  I think you

13   might need a reversal of the plan, too, of the confirmation

14   order.

15             MR. MOLONEY:  Not if I'm successful right now.

16   Not if I'm successful --

17             THE COURT:  well, but you just said you don't --

18             MR. MOLONEY:  -- right now in getting Your Honor -

19   -

20             THE COURT:  But you just said you don't mind if

21   the plan is confirmed.

22             MR. MOLONEY:  Correct.  It's just the plan

23   supplement provision.

24             THE COURT:  But that's --

25             MR. MOLONEY:  If the plan supplement provision is

Page 135

1    consistent with the plan, I don't have a problem with the

2    plan.  The plan supplement provision, what is says, Your

3    Honor, in the plan supplement, it says the litigation board

4    has the right to create a $25 million entitlement or such

5    ever amount as they want, whatever they want.  And that -- I

6    want to be clear, if that happens and it's just these three

7    guys --

8              THE COURT:  But the --

9              MR. MOLONEY:  -- sitting there decided that they

10   don't want to pay a particular creditor and they'd rather

11   have the money available to pursue a pipe dream litigation,

12   then I don't think I should have to pay for it.

13             THE COURT:  But the plan itself contemplated

14   funding of the litigation trust.

15             MR. MOLONEY:  I have no problem with that, Your

16   Honor.

17             THE COURT:  So what's the distinction?

18             MR. MOLONEY:  The distinction is that the money

19   that's available depends on what's the money that's

20   available.  They just cannot cut off the rights -- the plan

21   doesn't create money, right?  The plan doesn't create

22   assets.  The plan just says, whatever money is here is for

23   use in these purposes.  And so if there is no money to fund

24   this trust, that's not my problem, all due respect.

25             And certainly if I have a super priority claim and

Page 136

1    I say, you're going to have to pay me before you -- you can

2    go ahead and fund the trust.  You can go out and get -- find

3    litigation funding or you can go out and find a contingency

4    lawyer to do this because there's no way that if this was a

5    viable claim it couldn't be funded a million ways other than

6    stealing my money.

7             THE COURT:  Is this in your supplemental

8    objection?

9             MR. MOLONEY:  Yes, Your Honor.

10            THE COURT:  Where?

11            MR. MOLONEY:  Exactly.

12            THE COURT:  I don't --

13            MR. MOLONEY:  This is exactly the part.  We made

14   this so we wanted clarity that these funds -- Paragraph 6.

15   "ESL, of course, recognizes it will have no right to payment

16   unless it prevails on appeal, but should ESL prevail, its

17   ability to collect on traceable collateral proceeds or to

18   assert a 507(b) statutory priority claim cannot lawfully be

19   compromised by these self-help measures in the plan trust

20   agreement."  That's our position.

21            And this is not -- there's nothing in the

22   Bankruptcy Code that authorizes you to do this.  They're not

23   held in the discharge.  There's nothing in the Bankruptcy

24   Code that says --

25            THE COURT:  But this doesn't have anything to do

Page 137

1    with the discharge.

2              MR. MOLONEY:  Effectively, it's a billed --

3    pertained to discharge because it's aimed at one group of

4    creditors.  It's to say, look, if they don't want to pay

5    you, they have a right sitting there in the liquidated trust

6    not to pay you.  Even though you have a priority claim and

7    you've won an appeal and the Bankruptcy Code says you should

8    be paid ahead of everybody else, if they don't want to do

9    it, they don't have to.

10             THE COURT:  The only thing I'm grappling with is,

11   again, if you just appeal the -- well, if you just have the

12   appeal that's currently on file.

13             MR. MOLONEY:  Correct.

14             THE COURT:  And you don't appeal confirmation,

15   then there's a -- or you do appeal confirmation, there's all

16   separate standard for dealing with that type of appeal --

17             MR. MOLONEY:  Yeah, but I don't see --

18             THE COURT:  -- that deals with mootness and those

19   sorts of --

20             MR. MOLONEY:  Yeah.  I don't see why I have to be

21   involved in that at all.  I really have no interest in it.

22             THE COURT:  Because it's the plan.

23             MR. MOLONEY:  But the plan doesn't -- with all due

24   respect, Your Honor.  I'm fine with the plan.  This is a

25   trust supplement agreement filed at 2:00 in the morning the

Page 138

1    day before a hearing that contains other provisions that are

2    not in the plan.

3              THE COURT:  Well, we should look at -- we should

4    at the disclosure too.  What does the disclosure statement

5    say on the funding of the plan?

6              MR. SINGH:  Your Honor, I believe it -- you know,

7    we'll get the specific page reference.  But I know it

8    references the liquid- -- you know, the liquidating trust

9    with approximately $25 million in it for --

10             THE COURT:  Yeah.  I mean, the settlement that

11   came out recently cut back on that.

12             MR. SINGH:  Right.

13             THE COURT:  Didn't add to it.

14             MR. SINGH:  Right.

15             MR. MOLONEY:  But the language in the trust

16   agreement makes it evergreen, Your Honor.  There's nothing

17   in that disclosure statement that says they can do it on an

18   evergreen basis.

19             MR. SINGH:  This seems like an equitable move.

20             MR. MOLONEY:  It's not an equitable move.

21             THE COURT:  I understand if you're modifying the

22   plan, including how it's described in the disclosure

23   statement.  You certainly can describe generally in the

24   disclosure statement documents that are filed later, if

25   they're consistent with that, then that's what I would be

1    confirming.  So maybe it's the evergreen feature.  I don't,

2    you know -- I think they contemplated 20 million -- I think

3    it's --

4                MR. MOLONEY:  As a practical matter, $25 million

5    is probably going to be spent before I ever can get back

6    down here, so I'm really more concerned with the evergreen.

7                THE COURT:  Well, I doubt that.  I doubt it would

8    be all spent, although when litigators, as I say, breathe on

9    a file, it's $50,000.  I'm looking for the disclosure

10   statement reference to this at this point.  I think it's --

11               MR. SINGH:  Your Honor, first of all, I don't

12   think it's an evergreen.  I think it's a one-time funding.

13               THE COURT:  Okay.

14               MR. MOLONEY:  It's what it says.

15               MR. SINGH:  Oh, Your Honor, it's in Page -- excuse

16   me -- it's Page 3 of the disclosure statement where we talk

17   about the litigation assets.  So I'll read the two

18   sentences: "Upon the transfer of the liquidating trust

19   assets, the Debtors shall have no interest in or with

20   respect to the liquidating trust assets or liquidating

21   trust.  The Debtors estimate that the liquidating trust will

22   be funded with approximately $25 million on the effective

23   date," which relates to this issue of segregation, which we

24   disclosed.

25               MR. MOLONEY:  Okay.  That makes my point for me,

Page 140

1    Your Honor.  But before I get there, if I --

2              THE COURT:  But why?  That's the plan that -- I

3    mean, why is that -- look, again --

4              MR. MOLONEY:  It doesn't say a word about it being

5    segregated from other creditors.  It doesn't say --

6              THE COURT:  No, but it'll be transferred to the

7    trust, so that's --

8              MR. MOLONEY:  The trust is for the benefit of the

9    creditors, right, not for the benefit -- I thought it was

10   for the benefit of the creditors, not for the benefit of the

11   three trustees and professionals.

12             THE COURT:  No, but it says it's funded with the -

13   - can you read the sentence again, Mr. Singh?

14             MR. SINGH:  Yes.  Again, Page 3: "Debtors estimate

15   that the liquidating trust will be funded with approximately

16   $25 million on the effective date."

17             THE COURT:  Okay.  All right.

18             MR. MOLONEY:  If they have the money and there's

19   no prior claim to it, they can fund it; I have no problem

20   with that.

21             THE COURT:  Okay.

22             MR. MOLONEY:  But if they don't -- but if we have

23   a prior claim, we should be able to object to that, and we

24   shouldn't have to object to the plan.

25             THE COURT:  No.  I think you should -- I think you

1    do have to seek a stay if you're saying that this funding

2    shouldn't happen.  I think the $25 million is clearly for

3    litigation purposes, right?  It's not for distribution

4    purposes.

5              MR. SINGH:  Absolutely, Your Honor.  And if you

6    read the definitions throughout the plan, they make clear

7    that what we are distributing is net proceeds, which allows

8    the directors the discretion every time they go to make a

9    distribution to decide how much they want to hold back for

10   going forward purposes.

11             THE COURT:  Right.

12             MR. SINGH:  I feel like we're being penalized that

13   we actually went out and said well, it'll be $25 million,

14   what everybody's been told.

15             THE COURT:  I agree with you, Mr. Moloney, that if

16   the effective date occurs and subsequently, the 507 is

17   reversed and you have -- you can trace your claim to the

18   funds, et cetera, that you should be able to go after them.

19   But I think you will need, in addition to getting that order

20   reversed, you would have to get either a stay or you'd have

21   to get the confirmation order reversed.  Because I think

22   that clear context of this plan is that the funding, subject

23   to, you know, the appeal issues, is for litigation purposes.

24             MR. MOLONEY:  Your Honor, can I just raise an

25   issue then?  The document that they actually filed, which

Page 142

1    says that --

2                THE COURT:  This is the supplement.

3                MR. MOLONEY:   The supplement, in Paragraph B --

4    I'm reading from Paragraph B on Page 4, it's 1.3(b).  It's

5    what we quoted in our objection.  It says that, "In addition

6    to that there should be set outside $25 million, is it

7    provided, however, that the funding may be increased from

8    time to time during the term of litigation trust, from the

9    proceeds of the liquidating trust assets, or from such other

10   sources as may be determined in the sole discretion of the

11   liquidating trust board."

12               I read that as evergreen language.  That, where it

13   says that, "funding may be increased from time to time

14   during the term of the litigation trust, from the proceeds

15   of the liquidating trust assets, or from such other sources

16   as may be determined in the sole discretion of the

17   litigation trust board."

18               I read that -- I don't read that as being

19   consistent at all with the disclosure of, we may have $25

20   million.  This says that we're going to have a reprise of

21   what happened under the DIP order where they're going to say

22   there's a special account set aside and they're going to put

23   all money in there.  And it's going to just frustrate our

24   rights to get paid if we win our appeal, and that will not

25   be right.

Page 143

1          THE COURT:  But, again, you can -- right now,

2     there's no allowed claim, all right?  So if you win on

3     appeal, it depends on whether the plan has been confirmed

4     and gone effective as to whether and how you could get that

5     money back.  It's not just based on winning on the appeal

6     necessarily, because if the plan is confirmed and goes

7     effective, it's binding, it's terms are binding.

8          MR. MOLONEY:  Correct.  But today is the day when

9     I have a chance to tell Your Honor that I shouldn't have to

10    -- and I have to tell Your Honor because I can't appeal your

11    ruling, with all due respect, unless I make the case today

12    and you disagree, which you're quite entitled to do.  But I

13    have to make the case that perhaps that this particular

14    provision is overreaching and I shouldn't have to include

15    this in my appellate brief; the fact that they've created a

16    liquidating trust fund, which they built a wall -- build a

17    wall around.

18          THE COURT:  But your only basis for going after

19    that provision on a legitimate basis is that the money is

20    more properly distributed on account of a claims that I said

21    it can't be distributed on.

22          MR. MOLONEY:  Well, at the moment -- actually I

23    think at the moment --

24          THE COURT:  Right.  And so --

25          MR. MOLONEY:  At the moment, our administrative

Page 144

1    claimants who also could be prejudiced by these provisions.

2            THE COURT:  But they don't -- they haven't

3    objected.  In fact, they negotiated a reduction of the

4    initial funding instead because they want the lawsuit to go

5    ahead against your clients.

6            MR. MOLONEY:  I don't know that that -- I don't

7    know -- I don't know --

8            THE COURT:  And everyone else did too.  Every

9    single administrative objector who objected said, we don't

10   want to cut back on the litigation against ESL.  So I think

11   --

12           MR. MOLONEY:  I think -- you know, Your Honor, I

13   think you got to take that with a grain of sale, right?

14           THE COURT:  Well, no.  I mean, if I'm going to

15   take any grains of salt, it's ESL saying there shouldn't be

16   so much money to sue me with.

17           MR. MOLONEY:  Well, they're not going to get --

18   they're not --

19           THE COURT:  So, I mean, the only issue is --

20           MR. MOLONEY:  They're not getting more money from

21   their lawsuit, Your Honor, so why would they care?

22           THE COURT:  All right.

23           MR. MOLONEY:  I mean, as you said, they've

24   objected on the administrative claim and they're getting

25   paid a discount on administrative claim and so, they're

Page 145

```
 1    done.  So what'll -- they don't have a -- they didn't throw
 2    in a kicker.
 3              THE COURT:  No, no, that's not true.  There are
 4    plenty of people who are not going to do the settlement and
 5    they're going to wait and get their hundred cents.
 6              MR. MOLONEY:  Those people have not -- I've not
 7    heard from in court saying --
 8              THE COURT:  Well, because they're not unhappy with
 9    the result.  But, again, it's an easy thing on your brief,
10    which says that to get my remedy, we have to reverse this
11    provision of the plan and go after it.  It's pretty easy.
12    And I don't, frankly, even see mootness because it's there,
13    it's sitting there.
14              MR. MOLONEY:  Thank you, Your Honor.
15              THE COURT:  So, you know, so if you asked for a
16    stay, you'd have -- you probably wouldn't get one because it
17    wouldn't be moot.  You wouldn't have to post a bond; you
18    just go forward.
19              MR. MOLONEY:  Exactly, Your Honor.  Thank you.
20              THE COURT:  Okay, all right.
21              MR. ANKER:  Your Honor, Philip Anker, Wilmer
22    Cutler Pickering Hale and Door.  We represent ESL in the
23    litigation that will occur.  And I apologize first for tag-
24    teaming you.
25              THE COURT:  All right.
```

Page 146

1           MR. ANKER:  And I want to say in interest of full

2    disclosure that I want to give an explanation.

3           THE COURT:  Well, I'm sorry, this is the --

4           MR. ANKER:  Fraudulent transfer.

5           THE COURT:  So ESL as defendant.

6           MR. ANKER:  Correct.

7           THE COURT:  As opposed to --

8           MR. ANKER:  We represent ESL, Mr. Lampert and

9    related entities.

10           THE COURT:  As opposed to Appellant.

11           MR. ANKER:  Pardon me, Your Honor?

12           THE COURT:  As opposed to Appellant.

13           MR. ANKER:  Correct, Your Honor.

14           THE COURT:  Okay.

15           MR. ANKER:  We're also on the appeal brief.  But,

16    yes, Your Honor.  I'm here in a different capacity.

17           THE COURT:  Okay.

18           MR. ANKER:  And I want to raise an issue, to be

19    candid, it's not in any objection, but it arises out of the

20    revised administrative claim notice filed this morning.

21           THE COURT:  Right.

22           MR. ANKER:  I didn't see it until I got here at

23    noon.

24           THE COURT:  Okay.

25           MR. ANKER:  And Your Honor obviously was concerned

1    about disclosure, and my only -- I am rising solely on

2    disclosure.

3              THE COURT:  Okay.

4              MR. ANKER:  In the quote/unquote, "risk factors",

5    the Debtors now say -- and I can point you to the page, but

6    I think you read it today, so I don't think I have to --

7    that, quote, "The Debtors believe they will receive

8    significant recoveries" end quote, from the proceeds of

9    various litigation, including that against my client.

10             THE COURT:  All right.

11             MR. ANKER:  And that they believe, having done an

12   investigation, that the claims are, quote, "highly

13   meritorious" end quote.  And this is obviously a document

14   going out under the imprimatur of a court notice.

15             THE COURT:  No, I read that.  And I think it

16   should say that the prospective -- the current and

17   prospective defendants in that litigation disagree with this

18   assessment and the ultimate result is unknowable at this

19   time.

20             MR. ANKER:  Your Honor, that's fine.  I was going

21   to say, I was surprised by all of this because in the

22   disclosure statement, there was nothing of the kind.  There

23   was simply a statement that they did an investigation and

24   then they filed suit, and then there was a paragraph setting

25   forth our position.

Page 148

1          THE COURT:  Okay.

2          MR. ANKER:  And our position, including that many

3   of the claims here are time barred, there are releases.

4          THE COURT:  Right.  No, that's fine.

5          MR. ANKER:  Your Honor noted today that many of

6   the creditors, when they were dealing with this Debtor, must

7   have thought the Debtor was solvent because they separate --

8   dealt with separate Debtors.  We also noted there that if

9   you look at the market evidence, including where the market

10  price of the stock was, it was in the billions upon billions

11  of dollars.  But that's not for today.

12          I was going to suggest the following language, but

13  I'm happy to have your language, and I'm happy to take out

14  adjectives if they take out adjectives.  I was going to say

15  ESL thinks the claims are entirely meritless, and we think

16  the Debtors will receive recoveries of nothing because that

17  is what we think.

18          THE COURT:  All right.

19          MR. ANKER:  But either way, I'm happy to have it.

20  The only other point I would add, Your Honor, and I leave

21  this to you -- I have two other points.  One is this is

22  coming under the imprimatur of a court notice, and I think

23  they were emboldened, frankly, by some of what occurred last

24  Thursday.

25          I think it would be appropriate to add a sentence

1    that simply says, the Court has obviously not heard any

2    legal argument or heard any evidence and it's not endorsing

3    anyone's view with respect to the litigation.

4            THE COURT:  This is -- I think it just can say

5    there can be no assurance of any recovery.

6            MR. ANKER:  Okay.  Your Honor, the last comment I

7    make, and this, I really rise only as an Officer of the

8    Court.  It's not -- frankly, if this were true, it might be

9    good for us.  There's a paragraph on D&O insurance that

10   says, and the key language here is in bold and italics:

11   "There is at least 150 million of available directors and

12   liability insurance that provides a source of recovery to

13   the Debtor plaintiffs in the subcommittee adversary

14   complaint against various parties."

15           With that were the case, and maybe it will be.

16   Let me tell you the facts as I interpret them, and you can

17   decide what disclosure you think is appropriate.  It is true

18   that the annual policy limit -- so for the 2015 year,

19   separately for 2016, separately for 2017 -- is 150 million.

20   But first, defense costs go against it.  And there is, right

21   now, litigation pending, both in state court in Illinois and

22   state court in New York, involving disputes between insurers

23   that D&Os are now being caught in.  One litigation, D&Os

24   have commenced, one has been commenced by the insurers, in

25   which they point to different years.  One, the primary

Page 150

1    insurance, Excel with respect to 2015 says, we are

2    exhausted.

3            Because one of the things you will hear when you

4    get into this litigation is there was a settlement of

5    litigation relating to Seritage with full releases granted,

6    you'll have to assess the effect of those releases.  But it

7    says it is already between that and the Sears Canada

8    litigation fully paid $15 million, so that policy is drawing

9    down to 135 million, and it says that is the only policy

10   that could conceivably bill a year that could conceivably

11   respond.

12           So if that's right, we're down to 135 million

13   right now, and defense costs are going every day against it.

14   And at the end of the day when the Debtor has a war chest of

15   25 million for itself alone and there's not just ESL, but

16   lots and lots of different defendants here, they will go

17   through that D&O insurance, at least a good amount of it, I

18   suspect.

19           Another insurer says, oh no, no, it isn't the 2015

20   policy -- because they're the second in line, this is QBE --

21   it is the 2018 current policy, '17 policy -- '18 policy,

22   excuse me, that applies; that's the one that's triggered.

23   Not surprisingly, QBE is not in that, but Excel is; it would

24   have the first 15.

25           So here's the real truth.  There may be 150

Page 151

1    million in insurance, minus defense costs; there may be 135

2    million, minus defense costs.  Maybe we can say that some

3    claims are covered by 2018, some are covered by 2015.  But

4    one thing is for sure: the insurers are fighting right now

5    paying anything.

6              THE COURT:  Well, that's the case --

7              MR. ANKER:  And so, this disclosure --

8              THE COURT:  -- with any insurance policy, frankly.

9              MR. ANKER:  Your Honor, that's right, that's

10   exactly right.  But this is a disclosure to foreign --

11             THE COURT:  No, that's fair.  No, I agree with

12   that.

13             MR. ANKER:  This is completely --

14             THE COURT:  So I think you should tone down that

15   description and refer to insurers disclaiming certain

16   coverage.

17             MR. ANKER:  And I would be happy to work with Mr.

18   Singh or others for a disclosure that is accurate.

19             THE COURT:  Okay.

20             MR. ANKER:  But this is simply overstated.  And I

21   rose just for those two reasons for disclosure.

22             THE COURT:  Well, I don't know.  I mean, having

23   dealt with insurers for too long, it's always good to remind

24   them of the risks of improperly disclaiming coverage too.

25             MR. ANKER:  Understood, Your Honor.  Thank you.

 1                THE COURT:  Okay.

 2                MR. DUBLIN:  Your Honor, Phil Dublin for the

 3     record for the Committee.  We've done analysis on the

 4     Committee's side.  We actually believe there may be more

 5     than $150 million in insurance.

 6                THE COURT:  That's fine.

 7                MR. DUBLIN:  I just wanted to clarify Mr. Anker's

 8     comments.

 9                THE COURT:  I think dollars to doughnuts, some

10     insurer is going to take a different position.

11                MR. DUBLIN:  Oh, I'm sure about that.

12                MR. ANKER:  We too think there may be more

13     insurance.

14                THE COURT:  Right, okay.

15                MR. ANKER:  The (indiscernible) of statement there

16     is.

17                THE COURT:  No, that's fair.  You don't want to

18     just fix the amount.  I think you need to say that certain

19     insurers have disclaimed some portion of the coverage.  And

20     I wouldn't say in excess; I would just say approximately.

21                MR. ANKER:  And we understand that a sentence will

22     be added, Your Honor, in light of your prior remarks that

23     ESL --

24                THE COURT:  Right, strongly disputes all of the

25     claims and there's no assurance of any recovery.

Page 153

1          MR. SINGH:  That's fair.

2          MR. ANKER:  We'll go with your language.

3          MR. SINGH:  That's fine.

4          THE COURT:  Okay.  All right.

5          MR. FOX:  Your Honor, if I may?

6          THE COURT:  Yes.

7          MR. FOX:  Just two points with respect to the

8    order.  Edward Fox, Wilmington Trust.  First, the paragraph

9    8 in the proposed order, it's not clear whether the Debtors

10   are saying that the compromises in settlements are effective

11   immediately, meaning now, or immediately upon the effective

12   date.  In other language, in other paragraphs, it means on

13   the effective date.  I don't know what the intention was

14   here.

15          The second point, because we're getting a little

16   bit pregnant, so it's helpful to know what and when.

17          MR. SINGH:  Your Honor, I apologize.  We can

18   clarify this.  It's supposed to be on the effective date,

19   with the exception, I would say, obviously of the

20   administrative expense consent program, which is happening

21   now.

22          THE COURT:  Well, it says they're approved, and

23   then it says will be effective immediately on all parties-

24   in-interest on the effective date.

25          MR. FOX:  It's a little ambiguous.  It was

```
 1    ambiguous to me as to whether effective immediately, stop

 2    there, or it was then modified by on the effective date.

 3                 THE COURT:  I think effecting and binding are the

 4    same thing.

 5                 MR. SINGH:  Right.

 6                 MR. FOX:  Well, binding -- okay.

 7                 MR. SINGH:  It's an important -- we'll add --

 8                 THE COURT:  Well, you can put on the effective

 9    date in front, and on the effective date will be effective

10    and binding immediately.

11                 MR. FOX:  That'd be fine.

12                 MR. SINGH:  Right.  And with the exception, of

13    course, of the administrative program.

14                 THE COURT:  Right, of the administrative claims.

15                 MR. SINGH:  Right.

16                 MR. FOX:  And then the other point, Your Honor, I

17    just wanted to clarify in your ruling with respect to the

18    indentured trustees fees.  In that, the argument was

19    different than the way you phrased it in your decision,

20    which related specifically -- and seemingly only -- to

21    Wilmington Trust.  So I just want to make sure it was not

22    your intention to treat us differently than the other

23    indentured trustees are proposed -- were proposed to be

24    treated.

25                 THE COURT:  Well, they didn't object.
```

1           MR. FOX:  No, no, no.  Then they'd be treated

2    better than us; that that was the problem, they were being

3    treated differently, meaning better.

4           THE COURT:  All right.  I understand that point.

5    That provision should be modified to just provide for the

6    charging lien and the reasonable fees and expenses for

7    routine ordinary course matters, not any litigation either

8    pro or against the plan.

9           MR. FOX:  Thank you, Your Honor.

10          THE COURT:  I mean, the other folks, I'm assuming,

11   didn't incur those costs because they're not here.

12          MR. FOX:  I'm sure that they incurred costs.  I

13   mean, several --

14          THE COURT:  But not the litigation costs.

15          MR. FOX:  Two of them were on the Committee, so

16   I'm sure --

17          THE COURT:  No, but that's -- but that's -- look,

18   if you're on the Committee, that's routine bankruptcy -- I'm

19   just -- I wanted -- your objection really went to, there

20   shouldn't be a penalty for litigating.

21          MR. FOX:  Right.

22          THE COURT:  But that should cover -- there

23   shouldn't be anything for litigating; that's the way you get

24   rid of the penalty.  There's no plus for litigating or

25   negative for litigating.  So, for example, if you guys had

Page 156

1    stood up and filed a 50-page brief in favor of the plan,

2    that shouldn't get paid for under this provision, nor should

3    the objection get paid for.  Everything else that you

4    normally do would get paid for.

5            MR. FOX:  Okay.  I think we can make that work.

6            THE COURT:  Okay.  Because, again, you didn't want

7    to -- the notion was, this should not be a damper on your

8    litigation rights.

9            MR. FOX:  Yes, that's correct.

10           THE COURT:  Okay.

11           MR. SARACHEK:  Your Honor, Joe Sarachek for me and

12   other 15 trade creditors, trade vendors.

13           THE COURT:  Right.

14           MR. SARACHEK:  And particularly in light of the

15   fact that Mr. Wander, who was shepherding along with me this

16   trade ad hoc trade vendor committee.  This -- we filed it

17   last night and delivered to the Court, really in response to

18   a colloquy between you and Mr. Wander about the professional

19   fee carveout.  We spent an extensive amount of time over the

20   weekend looking at this issue.

21           And we think there's a serious issue there as to

22   whether, after February 11th, the professional had the right

23   to a carveout.  We think that number amounts to some $50

24   million, and it's at Docket No. 5332.  We would ask -- and

25   the Court indicated at the hearing on Thursday that you were

Page 157

1    prepared to sit down with the parties and -- I don't know if

2    you used the word mediate, but you certainly spoke to Mr.

3    Wander.  And, again, Mr. -- there's probably 50 to 60

4    members of this ad hoc trade vendor committee, as opposed to

5    trade claims purchasers who have settled to date.

6              So this is a serious issue.  It goes to good

7    faith.  We spent a considerable amount of time looking at

8    it.  And to the extent that the report -- well, over the

9    week --

10             THE COURT:  I mean, not by the objection deadline,

11   although others raised the objection.

12             MR. SARACHEK:  But what I'd ask, Your Honor, is we

13   see the train is going down the tracks.  But whatever the

14   confirmation order might say, to the extent that this issue

15   can be tabled and determined later, it's a significant

16   issue, Judge.  It's a significant amount of money.  There's

17   a real -- there's a legitimate question in the documents.

18   In fact, there was no budget after February 11th.  There was

19   no budget after February 11th that was approved by any other

20   party.  Prior to that date, of course, there was a secured

21   creditor.

22             And so, we would ask that this issue -- and I get

23   it, the hour is late, but this is a significant amount of

24   money.  And just to give you a sense on 180 million of

25   administrative claims, this would amount to 25 cents if

Page 158

1    those claims were allowed in full.

2            THE COURT:  Well, what you're asking is the same

3    thing Mr. Wander was asking, which I told him last Friday

4    was unrealistic given the parties' rights under the DIP

5    agreement.  That being said, I do believe that there should

6    be -- and that this should be put in a notice -- some

7    additional forbearance on immediate payment by the

8    professionals in the case.  But it's nowhere close to what

9    you've suggested, which is everything.  And that would be

10    part of my ruling.

11            MR. SARACHEK:  Okay.  Thank you, Your Honor.

12            THE COURT:  Okay.  Frankly, I think it would go to

13    just align the administrative creditors better.  I'm sure

14    that will not necessarily endear me to your partners, but --

15            MR. SCHROCK:  Yeah.  I mean, Your Honor, may I be

16    heard on the issue?

17            THE COURT:  Sure.

18            MR. SCHROCK:  Okay.  It's certainly, you know,

19    this is obv- -- it's an important issue to the

20    professionals.  We -- and when we came into these cases, we,

21    you know, on behalf of our partners and our law firms, you

22    know, and consistent with the requirements in the Code, we

23    said we will do so, we'll perform these services provided

24    that we have the protection of this carveout.  And that's

25    the basis upon which, you know, we went to, you know, our

1     firms and did that; as opposed to, when you talk about

2     fairness, an administrative expense creditor extending

3     unsecured credit to Sears, we certainly -- we look at the

4     order, we think it's plain on its face.

5             This is the specific circumstance in which we have

6     negotiated for this protection.  And because we went, and we

7     had made, frankly, another concession that we didn't even

8     think we were required to make, to try and solve an

9     administrative expense creditor objection.  I feel like, you

10    know, now we're being thrown in with all other admin claims

11    and the carveout for which we negotiated, Your Honor, is,

12    you know, effectively going to be put on hold.

13            And I just want to say for the record, you know,

14    listen, we stand by our disclosure, we stand by what we've

15    done in the case.  There's been billions of dollars of

16    administrative claims paid in these cases.  And now, for

17    some reason, you know, the 150 that's being paid to the

18    professionals are being singled out and parties are plucking

19    at those.  And I --

20            THE COURT:  I'm focusing at -- I'm focusing on the

21    -- a portion of the 50 that's currently being held, which I

22    think mostly came in after the sale.

23            MR. SCHROCK:  It did, Your Honor.

24            THE COURT:  Right.  And I think a portion of that

25    should -- the collection, their portion of that should be

1    deferred.

2          MR. SCHROCK:  Your Honor, I don't have a lot of

3    success changing your mind on these sorts of issues.  But I

4    will say that when you're talking about --

5          THE COURT:  I'll put it in this context.  It's

6    really the same context that Judge Sontchi dealt with in

7    Molycorp.  I understand there are carveouts and there are

8    provisions in DIP orders that provide how money is to be

9    spent on professional fees.  But there's a separate

10   requirement under the plan that the plan be feasible.

11         MR. SCHROCK:  Certainly.

12         THE COURT:  And while I generally believe that the

13   projections that the Debtors have provided are reasonable

14   under the circumstances.  There's $100 million swing even

15   in those projections -- I'm sorry, not 100 million -- a $65

16   million swing even in those projections of an administrative

17   shortfall.  And if you get beyond those -- and my view is

18   the higher end was probably another 10 or million above

19   that.  I kept saying I think that the high end was 70

20   million more, and I think you guys are at 65, 55, that

21   range.  The emergent state is going to be considerably

22   delayed because you're not just dealing with preference

23   claims and liquidating the dogs and cats, which are well in

24   the process of being liquidated.

25         MR. SCHROCK:  Right.  Well, you know, there is --

1    there's still an interim comp order that's in effect.  There

2    are certainly no final fee applications that are in front of

3    the court --

4              THE COURT:  No, I understand.

5              MR. SCHROCK:  -- in front of the court.

6              THE COURT:  I understand.  And that's -- I mean,

7    that's another point I would make.

8              MR. SCHROCK:  Thank --

9              THE COURT:  Which is --

10             MR. SCHROCK:  You know, if --

11             THE COURT:  -- if I'm going to have a holdback, I

12   can do it now or I can do it later.  I think it probably

13   makes sense to do it now as part of a finding on

14   feasibility.  I mean, I'm just going to the chart here, if I

15   can.  The shortfall, as projected, ranges from 36.5 million

16   to 104.5 million.  So I can see, even with the claims

17   settlement, that that goes up another, you know, $7- to $10

18   million.

19             And more importantly, the low hanging fruit on the

20   preference claims is probably in that 36 to 50 million

21   range.  And I think it would be a good thing for this

22   company to go effective at that point, rather than having to

23   win bigger preference claims.  Now, that's the legal

24   analysis.  Because it's a feasibility analysis, there is a

25   related appearance analysis, which may not a whole lot,

Page 162

1    except for the fact that -- whereas, I think it's really a

2    disserve to the professionals to say they've been paid --

3    they shouldn't have been paid $150 million because they

4    actually really helped bring about the recovery that exists

5    here.

6              But we're not there yet, we're not at the end game

7    yet, and I would probably, in your next fee application,

8    probably have a callback in light of that.  My inclination

9    is to combine both of them now and have a $10 million

10   holdback.

11             MR. SCHROCK:  And, Your Honor --

12             THE COURT:  Actually, 9 million because 1 million

13   was added in.  And I think that is approximately on the 50

14   percent, at least puts at risk kind of the same amount that

15   the claim program puts at risk on the 50 million.  I think

16   up until the closing date, and some period thereafter,

17   there's absolutely no question.

18             And although there's not a lot of case law on

19   this, I think the US Flow case, In re. US Flow Corp., 332

20   B.R. 792 (Bankr. W.D. Mich. 2005) basically.  I think that

21   money is gone, as far as other creditors are concerned.

22   It's not property of the estate, it's gone, there's a true

23   carveout, et cetera.  I think once the debt was paid down, I

24   know there's the desegregated account in trust, et cetera,

25   but you still have to go effective.  And I think, for me to

1    make my feasibility finding, that's -- that's called for.

2              MR. SCHROCK:  And, Your Honor, listen, you're the

3    Judge obviously.  We want the plan confirmed.  And if Your

4    Honor determines that a holdback of $10 million is

5    appropriate from the carveout account --

6              THE COURT:  Well, a total amount, because you

7    probably contributed 3, would be another 9.

8              MR. SCHROCK:  Right.

9              THE COURT:  And it's from the carveout account,

10   which is, you know, all the professionals.

11             MR. SCHROCK:  Yes.

12             THE COURT:  I guess that would be done pro rata.

13             MR. SCHROCK:  And, Your Honor, I think obviously

14   that's fair.  But what I don't want to have happen is,

15   listen, my firm --

16             THE COURT:  And have that keep happening?  No.

17             MR. SCHROCK:  We need a finding that the order is

18   final.

19             THE COURT:  That's the legal -- that's the legal

20   context; it's to find feasibility.

21             MR. SCHROCK:  Right.

22             THE COURT:  And a reasonable time for the

23   effective date to occur.

24             MR. SCHROCK:  Right.  But to continue that -- you

25   know, while we're still performing services --

Page 164

1                    THE COURT:  No, no.

2                    MR. SCHROCK:  -- and parties are still challenging

3        a DIP order from --

4                    THE COURT:  I'm frontloading --

5                    MR. SCHROCK:  -- a year ago?

6                    THE COURT:  I'm frontloading the ruling in the

7        context of a feasibility ruling.

8                    MR. SCHROCK:  Okay.

9                    THE COURT:  Not in the context of unfairness or

10       Rule 60; that's not going to fly.

11                   MR. SCHROCK:  Okay.

12                   THE COURT:  But I believe that 50 percent -- I'm

13       sorry, the 50 million that's sitting in that account today,

14       this amount should be held back.  The fee order still

15       operates going forward, et cetera.  I would not expect there

16       to be, you know, further holdbacks.

17                   MR. SCHROCK:  Okay.

18                   THE COURT:  Because this is simply to ensure that

19       you get to the effective date within a reasonable time.

20                   MR. SCHROCK:  Thank you, Your Honor.

21                   THE COURT:  Okay.  Well, I appreciate your saying

22       thank you.  It's not an easy give.

23                   MR. SCHROCK:  That's all I could think of to say.

24       No, thank you would be -- but we'll take it.

25                   THE COURT:  It's, you know, unfortunately, it's a

1       lot of money, but it's something that I actually see pretty

2       often in cases, smaller cases, and it's to confirm the plan.

3       It's not for general -- it's not a reflection on the work

4       that was done, just as the fact that allowed administrative

5       claims are not getting paid right now is not a reflection

6       that they're not owed their allowed amount.

7               But I think, given the testimony and my

8       understanding of the timing on realizing remaining assets, I

9       think the ESL litigation will either go quickly or take a

10      long time, and so you'll be the preference litigation.  Even

11      though you have, I think, generally realistic estimates

12      between 11 and 23 percent recoveries, the low hanging fruit

13      is probably going to be, you know, about $50 million, and

14      you need that 10 to sort of get there.

15              MR. SCHROCK:  That makes sense, Your Honor, and

16      know the preference firms are preparing to file most of the

17      lawsuits.  I think the court staff was in a bit of a state

18      of shock.  By the end, there's about 2,000 preference

19      actions that are going to be filed here over the next couple

20      of days.

21              THE COURT:  All right.  Okay.  I asked on Friday

22      if there were any other objections besides the 1129(a)(9)

23      and (a)(11) objections, and no one spoke up other than the

24      people who are here today and spoke up today.

25              In my review of the objections, there were a

Page 166

1    couple that I don't think the Debtors' counsel told me were

2    resolved when we started the hearing on Friday.  But it

3    seems to me that, looking through them -- looking through

4    them, a couple might not be either resolved or have raised

5    another issue.  And I'm thinking of Santa Rosa Mall, who

6    complains about some -- I didn't really understand the

7    objection -- complained about a settlement and somehow it

8    wasn't properly noticed.

9            Is anyone on for Santa Rosa Mall?  They were the

10   ones that hung up?  Oh, the whole line just died?  Yeah, you

11   can do that?  Thanks.

12           THE COURT:  Okay.  This is Judge Drain again.  The

13   line -- yes.  This is Judge Drain again.  When the call-in

14   line died, I was starting to say that when the Debtors

15   recited at the start of the confirmation hearing on Friday

16   the plan objections that had been resolved and withdrawn, it

17   appeared to me that most of the remaining objections dealt

18   with either 1129(a)(9) or 1129(a)(11), which I've addressed.

19   I have addressed the handful of objections that I've

20   addressed today that didn't deal with those issues, and also

21   addressed the U.S. Trustee's objection on Friday.

22           It appears to me in going through the other

23   objections, there may be some objections by parties that

24   have not been formally settled that do not pertain to the

25   issues that I've already addressed.  But I'm not sure, so

Page 167

1    I'm going to just go through these quickly.  And if you're

2    on the phone, you should speak up to let me know if this is

3    still a live objection that you want to argue.

4              The first one is the objection of Mario Aliano.

5              MS. HARRIS:  Your Honor, this is Sharon Harris.

6    I'm on the phone on behalf of Mario Aliano.

7              THE COURT:  Yes.

8              MS. HARRIS:  And that's correct that my objection

9    has not been addressed yet.  If I could briefly just address

10   the Court?

11             THE COURT:  Okay.

12             MS. HARRIS:  Mr. Aliano has a Class 4 general

13   unsecured claim.  And if the plan is confirmed, he would get

14   a pro rata share, although not set forth in Section 4.4.

15   Aliano voted to reject the plan and filed an objection,

16   which is very narrow.

17             As a really quick background, he's the plaintiff

18   in a civil action that obtained a judgment against Sears.

19   Sears then appealed it, and there's an appeal bond to cover

20   the judgment, plus one year of interest.  We agreed to only

21   seek the amount of the appeal bond, and the matter is fully

22   briefed on appeal in the Illinois Appellate Court.  And

23   also, we have been working with Sears and Transform on a

24   stipulation whereby Transform would be substituted in as the

25   defendant in the Illinois action in place of Sears.

Page 168

1    The issue is, we filed a motion to lift the
2 automatic stay, which was previously presented to the court
3 and continued to October 23rd.  And the objection to the
4 Chapter 11 plan is that if the plan is confirmed, then
5 Aliano would only be able to get the pro rata share.  And
6 all the stays that are in effect would remain in full force
7 and effect, which would effectively deny our motion to lift
8 the stay without being heard on the merits.  Plus, we'd like
9 to make sure that our motion to lift the stay is heard on
10 the merits, and that Aliano's civil action is carved out so
11 the stay is not confirmed for his case.
12    THE COURT:  So can the Debtors confirm that the
13 stay motion will still be considered and that the bond
14 doesn't go away as a result of the plan?
15    MR. FAIL:  Your Honor, Garrett Fail,
16 Weil, Gotshal for the record.  The automatic stay will
17 remain in effect, as will parties' ability to seek relief
18 from the stay for cause.  And we are working with counsel
19 for Mr. Aliano to try to resolve it by stipulation with all
20 the parties.
21    THE COURT:  And the bond -- the bond will still be
22 outstanding.  This bond will still be posted.  The
23 confirmation doesn't --
24    MR. FAIL:  The Debtors are taking no steps
25 whatsoever with respect to it, so it'll be outstanding to

Page 169

1    the extent it was outstanding.

2            THE COURT:  Right.  If there's some resolution

3    among all the parties, then the bond will be involved in

4    that.  But the confirmation and effective date of the plan

5    doesn't change the status of the bond.

6            MR. FAIL:  Correct, Your Honor.

7            THE COURT:  Okay.  And similarly, it doesn't

8    change the fact that if Mr. Aliano wants to proceed with a

9    lift stay motion, he can do that.

10           MR. FAIL:  Correct, Your Honor.  We're hopeful

11   that this'll be resolved.  We've worked with Transform and

12   with --

13           THE COURT:  But even if it isn't.

14           MR. FAIL:  Even if it isn't the motion will go

15   forward and we'll deal with it at that point, Your Honor.

16           THE COURT:  All right.  So, I mean, I frankly

17   wouldn't -- didn't view the plan as changing those rights.

18   I think the record is clear on that effect.  If you want to

19   send language to that effect to Weil, Gotshal, you can do

20   that.  But I don't -- I didn't read the plan as somehow

21   causing the bond to disappear or the stay motion to be moot.

22           MS. HARRIS:  Okay.  Thank you, Your Honor.

23           THE COURT:  Okay.

24           MR. FAIL:  Thank you, Your Honor.

25           THE COURT:  Alpine Creations, I think is now --

1    it's clear that they are not a releasing party, and I

2    believe the other objection was an 1129(a)(11) and a (9)

3    objection.

4            MR. CAVALIERE:  Your Honor, Rocco Cavaliere at

5    Tarter Krinsky on behalf of Alpine Creations.  I actually

6    just got cutoff for five minutes and I just heard you

7    speaking about my objection.  I just signed back on.

8            THE COURT:  Right.  I just wanted to -- I just

9    wanted to make sure that this is -- if there's anything left

10   at this point on the objection that I haven't already ruled

11   on or confirmed that the plan addressed?

12           MR. CAVALIERE:  Your Honor, I think we had raised

13   a minor objection with respect to our setoff recoupment, and

14   there's some language that was circulated that is

15   acceptable.

16           THE COURT:  Okay.

17           MR. CAVALIERE:  The only objections that remain

18   are with respect to 1129(a)(9) and (11).

19           THE COURT:  All right.  So I've ruled on those,

20   although I may have to fight a little bit at the end.  Carl

21   Island -- Ireland.  Was that -- were the parties able to

22   resolve that with some adequate protection language?

23           MR. SINGH:  Your Honor, we're working on some

24   language to stipulate to the discussion.

25           THE COURT:  Replacement lien?

Page 171

```
 1              MR. SINGH:  Yeah, exactly, to provide the
 2    replacement lien on all assets.  I don't know if they're
 3    here, but we've exchanged language and we'll take care of
 4    that, Your Honor.
 5              THE COURT:  Okay.  All right.  I think
 6    (indiscernible) International was an 1129 objection, (a)(9)
 7    and (a)(11), if anyone's on if there's anything else that
 8    I'm missing.
 9              PeopleReady wanted clarification that its contract
10    is not deem objected since it's subject to the pending
11    assumption notice.  Has that been resolved?
12              MR. SINGH:  Your Honor, that issue I don't think
13    is open.  I understand that Transform is negotiating
14    directly with that counterparty.
15              THE COURT:  All right.  Well, so -- but as far as
16    you're concerned, is it being deemed rejected under the plan
17    or did you -- since there's a pending notice, I guess it's
18    only when that's withdrawn that it is.
19              MR. SINGH:  Correct.  It's on an assumption notice
20    that was proposed to be assumed, so the plan is not
21    impacting the issue.
22              THE COURT:  All right.  So if someone -- if
23    someone who's a party, a non-debtor contract party, and
24    there's a pending assumption motion --
25              MR. SINGH:  Right.
```

Page 172

1          THE COURT:  -- the plan doesn't reject.

2          MR. SINGH:  Correct.

3          THE COURT:  You would separate reject if their

4     assumption notice is withdrawn.

5          MR. SINGH:  That's correct.

6          THE COURT:  Okay.  All right.  Santa Rosa Mall.  I

7     don't know if you heard me or whether the call conked out.

8     I didn't -- some of the points have been resolved, i.e.

9     Santa Rosa is not a releasing party.  And I believe Santa

10    Rosa -- well, I'm not sure if there's anything left, let me

11    just put it that way, given the stipulation of voluntary

12    dismissal of its claims in the adversary proceeding.  Is

13    there -- is counsel for Santa Rosa on the phone?

14         MR. CHICO:  Yes, Your Honor.  Good afternoon.

15    Gustavo Chico on behalf of Santa Rosa.

16         THE COURT:  Is there anything left to the

17    objection, other than clarification that Santa Rosa is not a

18    releasing party?

19         MR. CHICO:  Right.  That's basically what we're

20    trying to get a clarification on that.  We were often --

21         THE COURT:  Well, that's clear.  The Debtors are

22    treating all parties who objected on the basis of a third-

23    party release, or of course, who opted out, as a non-

24    releasing party.

25         MR. CHICO:  Right.  And our concern was regarding

Page 173

1    the injunction provision in Section 15.8 of the plan.  The

2    way it's drafted, it seems that parties will be -- Santa

3    Rosa or any party will be injuncted from collecting or

4    otherwise recovering by any means or manner, whether

5    directly or indirectly.  And since we're trying to pursue

6    our claim against the insurance carriers from the insurance

7    company, that that may be construed as an indirect action

8    against the Debtor, and that's why we wanted that

9    clarification.

10          THE COURT:  All right.  Well, I don't read the

11   injunction as protecting third parties.

12          MR. SINGH:  That's right, Your Honor.  It's just

13   for implementation of the plan as it relates to the Debtors.

14          THE COURT:  As it relates to the Debtors.

15          MR. SINGH:  Right.

16          THE COURT:  I think maybe the thing to do is

17   simply to send a letter and I'll put it on the docket to

18   Santa Rosa confirming that.

19          MR. SINGH:  Sure, we can do that, Your Honor.

20          THE COURT:  Okay.

21          MR. CHICO:  Thank you.

22          THE COURT:  Okay.  Edgewell Personal Care, in

23   addition to the 1129(a)(9) and (11), objected on the basis

24   that it's not clear whether its contract is assumed or

25   rejected, and is arguing that it was a de facto assumption,

Page 174

1    which isn't true -- I mean, there's no de facto assumption

2    under the Bankruptcy Code.  But can you clarify whether it's

3    being assumed or rejected as of the confirmation date?

4              MR. SINGH:  One second, Your Honor.

5              THE COURT:  Okay.

6              MR. SINGH:  Your Honor, my understanding with

7    respect to this agreement is that it's not an executory --

8              THE COURT:  Not an executory contract.

9              MR. SINGH:  Right, as of today.  So I think there

10   may just be a dispute with respect to whether or not we've

11   assumed or rejected it, which may have to happen.

12             THE COURT:  All right.  Well, you've done neither,

13   right, at this point?

14             MR. SINGH:  Right, we've done neither; that's

15   exactly right.

16             THE COURT:  So my ruling is, you have to either do

17   -- let me back up.  There's no such thing as a de facto

18   assumption or rejection while you're in bankruptcy prior to

19   the confirmation date.

20             MR. SINGH:  Right.

21             THE COURT:  If the plan is confirmed and it goes

22   effective and you've done nothing, the contract, to the

23   extent it's executory, rides through.

24             MR. SINGH:  No, Your Honor.  The plan says it's

25   rejected if we've done nothing.

1          THE COURT:  If you've done nothing.

2          MR. SINGH:  Right.

3          THE COURT:  Okay, correct.  So if there's not been

4     a notice of assumption, it will be deemed rejected.

5          MR. SINGH:  Correct.

6          THE COURT:  All right.

7          MR. SINGH:  And I guess they can try to argue

8     whatever they want later.

9          THE COURT:  Well, you can't argue that there's a

10    de facto assumption.

11         MR. SINGH:  Right, because that issue, you've

12    ruled on.

13         THE COURT:  Right.  See, among other authorities,

14    In re. Child World, Inc., 147 B.R. 847 (Bankr. S.D.N.Y.

15    1992), but also the plain language of Section 365.  So I

16    don't know if Edgewell's counsel is on the phone.  But,

17    consequently as a consequence of the plan's confirmation and

18    there being no assumption notice, it's deemed rejected to

19    the extent it is executory.

20         MR. SINGH:  Right.

21         THE COURT:  That's an open issue too, whether it

22    is executory.  Vehicle Service Group, in addition to

23    1129(a)(9) and (a)(11) raise the third-party release point.

24    But the Debtors have confirmed that it is being treated as

25    opting out of the third-party release.  Is counsel for VSG

1    on; is there any other issue that I missed here?  Okay.

2            I think we briefly addressed this, but Team

3    Worldwide Corporation, I think you've resolved it.

4            MR. SCHROCK:  It's resolved, Your Honor, yeah.

5            THE COURT:  Okay.  And that's correct, Team

6    Worldwide are you on?  No, okay.  All right.  Is there any

7    objection that I missed?  Okay.

8            Let me go back then to the 1129(a) findings.  I'm

9    prepared to make each of the findings that I need to make

10   under 1129(a) for confirmation of the plan.  I've already

11   ruled as far as the PBGC classification; that the plan

12   complies with the other provisions of the Bankruptcy Code as

13   far as classification is concerned.  With regard to the only

14   objection, I believe that was to classification, which was

15   to the classification of the PBGC claim.  There's clearly a

16   reasonable basis for classifying that claim separately,

17   given the PBGC's rights and position in the case.

18            I also find that the plan is proposed in good

19   faith under 1129(a)(3).  It's been proposed for a valid

20   bankruptcy purposes, and I believe is intended to and does

21   have the best chances of maximizing recoveries for creditors

22   here, and has been carefully thought through to do so in a

23   way that is fair in light of all the creditors' rights under

24   the applicable agreements and the Bankruptcy Code, including

25   the DIP agreement and order, the cash collateral order and

1    the carveout provided for in it, including the language that

2    I've already referenced regarding the placement of the

3    carveout amounts in a segregated account and in trust solely

4    for the use of the professionals.

5           The only other objections on 1129(a) grounds were

6    on the requirement 1129(a)(9) that to be confirmed, a plan

7    must accept, to the extent of a particular claim has agreed

8    to a different treatment of such claim, provide that, with

9    respect to the claim of a kind specified in Section

10   507(a)(2) or 507(a)(3) of this title.  On the effective date

11   of the plan, the holder of such claim will receive on

12   account of such claim cash equal to the allowed amount of

13   such claim.

14          1129(a)(11) provides that the plan proponent must

15   show, as it must show with regard to all the 1129(a)

16   provisions by a preponderance of the evidence that, quote,

17   "Confirmation of the plan is not likely to be filed by the

18   liquidation or the need for further financial reorganization

19   of the Debtor or any successor to the Debtor under the plan,

20   unless such liquidation or reorganization is proposed in the

21   plan.

22          I'll note that Section 1129(a)(9) does not require

23   that confirmation of the plan be immediately followed by the

24   effective date of the plan.  It simply requires that on the

25   effective date of the plan, the plan provides for payment in

1    cash of the allowed amount of administrative expenses, with

2    the exception of those where the holder has agreed to a

3    different treatment of such claim.

4            Here, as with many plans, the Debtor has proposed

5    -- the Debtors are proposing that the Court confirm the

6    plan, knowing that there will be a hiatus while the Debtor

7    is still a debtor-in-possession until the plan goes

8    effective.  That is because there is a projected shortfall,

9    as of today, of between $36.5 and $104.5 million of cash

10    payments necessary to implement the plan, including payment

11    of projected allowed administrative expenses -- priority

12    tax, secured claims, and priority non-tax claims -- in light

13    of the Debtors' projection of sources beyond those that are

14    in hand.

15            Having reviewed the Declarations, including the

16    supplemental Griffith Declaration in support of confirmation

17    of the plan, I find that the witnesses testimony, including

18    on cross-examination, is credible and that the projections

19    are reasonable.  Nevertheless, they are just projections

20    and, as I said, they show a shortfall of between $36.5 and

21    $104.5 million if the plan were to go effective promptly

22    upon entry of the confirmation order, i.e. later this week,

23    for example.

24            Based on the total sources, however, I believe

25    that it is reasonable to project substantial recoveries in a

1    relatively brief period on the Debtors' preference claims

2    and/or settlements of administrative expenses that would

3    include a preference claim release in return for a reduction

4    of the administrative claim.  That would reduce that

5    shortfall dramatically.

6              I also believe, based on Mr. Transier's

7    Declaration, which was uncontroverted in my own review of

8    the Complaint attached to it, that the Debtors have

9    substantial potential claims against the defendants in that

10   adversary proceeding, which clearly will take longer to test

11   and potentially obtain recoveries on, but -- which have been

12   treated throughout these cases by the Debtors and the

13   Creditors' Committee, both represented by well-informed and

14   sophisticated counsel, as claims that should not be settled

15   for relatively small amounts.

16             However, that litigation, I believe, unless there

17   is a meaningful settlement of it in the relatively near

18   term, I think will take a substantial amount of time to

19   resolve, potentially two to four years, and I am reluctant

20   to delay the effective date of this plan that long.

21             So I am focused on the claims' side of the balance

22   sheet, the administrative claims' side of the balance sheet

23   and the other 100-cent dollar amounts that would need to be

24   paid, as well as the other assets besides the so-called ESL

25   litigation.  Based on the record before me and including the

1    additional exception from the carveout that I've previously

2    discussed on the record of another $9 million, I believe

3    that the likelihood of satisfying Section 1129(a)(9) in the

4    relatively near term, i.e. in a matter of a few months, is

5    established.

6         I have additional comfort, besides the concession

7    I've asked of the professional here, in that conclusion from

8    the claims' resolution program that I am also approving

9    today and then would become effective today, which would

10   provide for incentives to settle claims for less than 100

11   cents on the dollar by administrative expense creditors.

12        It has been argued that that settlement has been

13   announced too promptly for proper review.  And, secondly,

14   that the, in essence, third tier of the settlement or

15   sandwich group in the settlement who neither affirmatively

16   opt out or opt in, are not really -- or I couldn't find

17   would be really agreeing, for purposes of 1129(a)(9), to

18   their treatment under the settlement.

19        As to the first point, I do not believe that the

20   settlement requires more notice to parties-in-interest

21   generally.  I say so because it appears to me to be a

22   reasonable resolution of a relatively simple issue, which is

23   that the Debtors lack sufficient cash to pay administrative

24   expense claims in full, but have agreed on a reasonable

25   mechanism supported by informed counsel on both sides -- and

1    that includes the Official Unsecured Creditors Committee --

2    as to the allocation of a meaningful amount of cash in

3    return for a discount for opting in to the settlement and a

4    second tier of meaningful cash, albeit it a later tier, for

5    doing nothing and obtaining a 5 percent greater maximum

6    recovery, as well as the option clearly to opt out and

7    simply wait for a full 100 percent recovery.

8            Given those options for administrative expense

9    creditors, I don't believe any administrative expense

10    creditor can criticize the settlement.  They have the option

11    either to be bound by it or not be bound by it.  And,

12    therefore, it's neither too good nor too poor, because both

13    options are available to them under it.  And I believe now,

14    they have more than sufficient time to review it to make

15    that choice, i.e. the 33 days plus the disclosure, as

16    modified on the record today, of the risk factors.

17            The second objection, as I noted, is that I should

18    not find that parties who neither affirmatively opt in nor

19    affirmatively opt out can be said to have agreed to the

20    settlements' treatment of that group for purposes of Section

21    1129(a)(9).  The agreement here is not the deemed agreement

22    that I've consistently found is proper to find, if there's

23    proper disclosure, under a plan, which has its own specific

24    treatment under Section 1141 of the Bankruptcy Code, i.e.

25    it's binding, the terms of the plan are binding on all

Page 182

1    parties.

2              The agreement here is an agreement under normal

3    contract law principles.  So the issue for me is can one

4    agree under normal contract law principles by implication or

5    non-action.  This issue was dealt with by Bankruptcy Judge

6    Bernstein in In re. Teligent, Inc., 282 B.R. 765 (Bankr.

7    S.D.N.Y. 2002), where he determined under those

8    circumstances that administrative expense creditors who did

9    not return a consent form would be deemed to agree, inferred

10   to agree, having been given the option to either object or

11   to affirmatively agree.

12             Judge Bernstein concluded with appropriate

13   disclosure, as there was here in an effort to provide enough

14   notice to parties to make a decision, that he could infer

15   agreement under applicable non-bankruptcy law, including the

16   Restatement (Second) of Contract, Section 69-1, which sets

17   forth exceptions to the rule that ordinarily an offeror

18   cannot treat silence or inaction as an acceptance.  The

19   exceptions where the offeree will be deemed to accept the

20   offer through silence are when he has a duty to speak and,

21   second, when the offeree's silence may constitute acceptance

22   where the offeror has stated his intention or given the

23   offeree reason to understand that he will do so, and the

24   offeree, in remaining silent and inactive, intends,

25   therefore, to accept the offer.

1          That latter principle, I believe, applies here,

2     although, frankly, Judge Bernstein applied the former too,

3     finding a duty to speak in the context of plan confirmation

4     where it would be clear to the party that the plan was being

5     confirmed in reliance on that construct, which is clearly

6     the case here because it is part of my 1129(a)(11) analysis

7     that at least some parties will neither opt in nor

8     affirmatively opt out of the settlement.

9          There's not a lot of case law on this issue, at

10    least one case.  In re. Real Wilson Enterprises,

11    (indiscernible) B.R. LEXIS 3997 (Bankr. E.D. Calif.

12    September 23, 2013) has disagreed with Teligent.  But I

13    believe it does so under quite different facts where the

14    choice was not laid out in a way that was laid out in

15    Teligent or here.  In re. Global Aircraft Solutions, Inc.,

16    2011 B.R. LEXIS 2063 (BAP 9th Circuit, May 11, 2011) relied

17    on the Restatement provision that I previously cited for a

18    deemed consent.  And there is precedent from the Toys 'R Us

19    case where a similar program, albeit one without a lengthy

20    opinion, but a bench ruling in favor of the same type of

21    notice and deemed consent.

22          Given that the Debtors are relying upon a

23    different treatment where there is silence than either of

24    the other two options where there was affirmatively

25    reaction, can that reliance carry through in this case,

1    including in respective rulings on feasibility.  I believe

2    that under these circumstances, I can find agreement under

3    normal contract law principles.

4           So the only other finding I need to make is

5    against entities that have not objected to confirmation,

6    which is the cramdown finding, for those classes that have

7    not accepted the plan and certain Debtors.  It's clear from

8    the plan that no junior class is receiving any property

9    under the plan; and, consequently, the plan satisfies the

10   requirements of the cramdown of the unsecured non-voting

11   classes, as well as the equity classes.

12          I had I believe already ruled on the other

13   objections by the United States Trustee, and I will not

14   reiterate my ruling here on that, other than to note that

15   for the same reasons that I previously ruled, and certain

16   colleagues of mine have previously ruled.  I believe that in

17   connection with the plan with a disclosure statement ballot

18   and plan itself alert creditors that if they do not opt out

19   of a third-party release, they will be bound by that release

20   means that if they do not object to the release, they are

21   bound by the terms of the plan as provided in 11 U.S.C.

22   Section 141 of the Bankruptcy Code, i.e., the plan is more

23   than just a contract by analogy; it has its own statutory

24   and common law res judicata effects, including with respect

25   to any provision, including a release provision, as long as

1    the release provision is drafted clearly and the option to

2    opt out is clear.

3            Here, the Debtors have treated not only those who

4    affirmatively opted out, but those who have actually

5    objected to confirmation on the basis of the third-party

6    releases, having opted out of the release.  The other

7    parties who have done nothing should be bound by the plan,

8    given the clarity of the release and the fact that it is not

9    unduly broad and, instead, is carefully tailored and has

10   authority for that proposition.  I'll simply refer to the

11   Debtors' reply memorandum of law, which cites my prior

12   rulings on that topic, as well as rulings by Judge Lane and

13   Judge Chapman.

14           So I think you need to make some relatively modest

15   changes to the confirmation order.  And you don't need to

16   formally settle those -- that draft, but you should

17   circulate it perhaps a day before the submission of it to

18   chambers.

19           I guess I should also say, although I said this

20   during oral argument on Friday.  Certain objectors have

21   questioned why one should proceed to confirmation now, as

22   opposed to waiting until more cash is brought into the

23   estate.  In my view, the Debtors and the Committee are

24   entirely correct in seeking confirmation at this point.  It

25   has helped to provide enough certainty and clarity for, at

1    this point, the administrative expenses creditors primarily

2    to be ready to focus on a resolution of their claims, and

3    has further, I believe, and materially so, reduced the

4    continuing costs of these cases where uncertainty inevitably

5    would lead to more issues to be litigated, raised and

6    disposed of, with an eye to positioning the parties for an

7    ultimate confirmation fight.  It's better to have had that

8    fight over the last two days of hearings and be in a

9    position now where the Debtors have a clear path to going

10   effective.

11           MR. SCHROCK:  Thank you.  Thank you very much,

12   Your Honor.  On behalf of the Debtors and the Board, the

13   restructuring committee, and all the constituents, we really

14   do appreciate it.

15           I have one last just housekeeping item.  It's not

16   a matter for today.  But the ad hoc administrative

17   claimants, you know, we've incurred, you know, roughly

18   $700,000 in fees and, you know, getting to the consent

19   program here.  The Debtors and the Committee did agree that

20   they would support their motion for substantial contribution

21   up to $400,000.  I know that's not up for today, but I did

22   want to note that for the record because it is certainly

23   part of our agreement.

24           THE COURT:  Okay.  Well, as we made clear, until

25   the plan goes effective, all of the rules and principles of

Page 187

1    an ongoing Chapter 11 case applies, so I'm sure I'll have

2    that application in due course.  Okay.  All right.  Thank

3    you.

4                 MR. SCHROCK:  This is Ms. Marcus.  If we could

5    just very quickly, I'm sorry.

6                 THE COURT:  That's all right.

7                 MS. MARCUS:  Sorry.  Sorry to keep everybody here

8    any longer.  Just very quickly, Your Honor.  As you know, we

9    had the 1114 hearing on Thursday.

10                 THE COURT:  Right.

11                 MS. MARCUS:  Your Honor ruled we submit an order.

12                 THE COURT:  Right.  I sent an order in to be

13    entered last night.

14                 MS MARCUS:  Perfect.  We haven't seen it yet.

15                 THE COURT:  I read Mr. -- well, I sent in, like,

16    60 orders over the weekend, so they've been busy.  They'll

17    be entering it soon.  I read Mr. Gerson's letter, and I had

18    a very minor change to the order in light of the letter, but

19    I didn't redo the settlement.  And I think that was the

20    problematic aspect of the letter is there was some aspects

21    of the letter that really sought to redo that settlement,

22    and I wasn't going to do that.

23                 MS. MARCUS:  Thank you, Your Honor.

24                 THE COURT:  Okay.

25

Page 188

1          (Whereupon these proceedings were concluded at

2    05:27 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 189

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 9, 2019

[& - 2:00]

| **&** | **10601** 1:14 | **146** 51:20 56:13 | **2003** 91:20,21 |
|---|---|---|---|
| **&** 3:3,12 4:1,8,15 | **11** 2:3 20:7 36:9 | 66:13 67:6 79:17 | **2005** 162:20 |
| 5:1 6:14 7:2 | 86:8 103:5 165:12 | 95:12 96:7 | **2006** 93:19 |
| **0** | 165:23 166:18 | **147** 175:14 | **2010** 17:22 |
| | 168:4 170:2,18 | **15** 26:20 111:25 | **2011** 183:16,16 |
| **05:27** 188:2 | 171:7 173:23 | 112:2 150:8,24 | **2013** 183:12 |
| **1** | 175:23 177:14 | 156:12 | **2015** 149:18 150:1 |
| | 183:6,16 184:21 | **15.8** 173:1 | 150:19 151:3 |
| **1** 10:23 11:3,25 | 187:1 | **150** 149:11,19 | **2016** 149:19 |
| 12:5 31:8 44:5 | **11.6** 85:7 | 150:25 152:5 | **2017** 91:19 149:19 |
| 59:13 82:17 91:9 | **11.6.** 85:15 | 159:17 162:3 | **2018** 28:10 150:21 |
| 162:12 | **111** 5:10 49:20 | **16** 21:13 22:4 | 151:3 |
| **1,000** 89:11 | **1114** 187:9 | **1633** 7:4 | **2019** 1:16 18:23 |
| **1,130,000** 10:18 | **1122** 104:6 | **16th** 19:6 21:11 | 19:3 20:9 21:11 |
| **1.3** 142:4 | **1123** 104:7 | 36:2,4,10 | 21:13,14 22:4,4 |
| **1.5** 10:20 11:21 | **1129** 96:6 101:13 | **17** 150:21 | 27:8 189:25 |
| **1.85** 77:17 | 103:4,5 104:9,21 | **174** 26:7 | **2063** 183:16 |
| **10** 14:23 36:9 | 165:22 166:18,18 | **17th** 19:3 20:9 | **21** 11:2 |
| 49:13 86:7 87:6 | 170:2,18 171:6 | 21:13,16 22:4 | **22** 62:17 |
| 92:19 99:14 | 173:23 175:23 | 76:5 | **23** 77:16 165:12 |
| 124:21 126:7 | 176:8,10,19 177:5 | **18** 54:23 150:21 | 183:12 |
| 160:18 161:17 | 177:6,14,15,22 | **18-23538** 1:3 | **239** 93:18 |
| 162:9 163:4 | 180:3,17 181:21 | **180** 157:24 | **23rd** 168:3 |
| 165:14 | 183:6 | **19** 123:5 | **24** 23:12 24:16 |
| **100** 49:14 54:13 | **113** 51:6 | **1966** 92:4 | 26:20 128:1 |
| 71:21 72:10,11,14 | **1141** 181:24 | **1981** 92:19 | **248** 1:13 |
| 77:3,5 160:14,15 | **1145** 131:19 | **1988** 91:9 | **249** 94:17 102:3 |
| 179:23 180:10 | **11501** 189:23 | **1992** 175:15 | **25** 14:23 84:22,25 |
| 181:7 | **11th** 156:22 | **1:07** 1:17 | 86:5,6,22 87:5 |
| **100,000** 75:15 | 157:18,19 | **2** | 107:25 108:10,14 |
| **10005** 4:11 | **123** 92:19 | | 112:6 133:16 |
| **10006** 5:4 | **125** 64:19 | **2** 44:5 77:13 82:18 | 135:4 138:9 139:4 |
| **10007** 5:19 | **126** 24:4 | 177:10 | 139:22 140:16 |
| **10016** 6:17 | **127** 92:19 | **2,000** 165:18 | 141:2,13 142:6,19 |
| **10018** 7:13 | **13** 24:14 | **2.7** 77:15,17 | 150:15 157:25 |
| **10019** 7:5 | **135** 150:9,12 | **2.7.** 77:14 | **250** 5:18 100:8 |
| **10036** 3:6 | 151:1 | **2.77** 52:22 77:15 | 102:3 |
| **101** 6:9 | **136** 64:9 | **20** 11:2 15:16,20 | **261** 19:12 |
| **10153** 3:15 | **14** 26:8,20 | 111:5 112:1 125:7 | **27th** 6:9 |
| **10158** 4:18 | **140** 56:12 | 125:15 139:2 | **28** 4:10 |
| **10178** 6:10 | **1401** 91:20 | **200** 4:3 94:5 | **282** 182:6 |
| **104.5** 161:16 | **141** 184:22 | **2000s** 64:22 | **2:00** 137:25 |
| 178:9,21 | | **2002** 182:7 | |

[2l - acceptance]                                                                    Page 2

| | | | |
|---|---|---|---|
| **2l** 89:24 | **5** | **7** | 177:6,22 180:2,3 |
| **3** | **5** 44:4 112:2 181:5 | **7** 1:16 5:17 65:22 | 180:17 181:21 |
| **3** 31:8 104:9,21 | **5/8th** 17:22 | 77:13 80:23,25 | 189:25 |
| 139:16 140:14 | **50** 53:22 54:3 | 85:5 161:17 | **9.2** 59:10 65:24 |
| 163:7 176:19 | 65:24 84:23 90:15 | **7.02** 52:20 | 85:5 86:20 |
| 177:10 | 156:1,23 157:3 | **7.6** 53:3 54:8 | **9.2e** 79:23 |
| **3.9** 86:7 | 159:21 161:20 | 59:11 85:1,20 | **90** 6:16 31:5,10 |
| **30** 22:10 53:20 | 162:13,15 164:12 | 86:21 | 44:4 99:10 |
| 125:17 126:5 | 164:13 165:13 | **7.7** 85:6,14 86:4 | **9019** 93:7 |
| **30.9** 86:8 | **50,000** 139:9 | 90:13 | **91** 34:8 |
| **300** 1:13 4:3 | **503** 11:25 | **70** 53:18 54:3 | **93** 35:1 |
| 189:22 | **507** 106:7 119:22 | 160:19 | **97.5** 56:3 |
| **31** 29:22 86:3 | 121:25 134:3 | **700,000** 186:18 | **99** 37:12 |
| 91:21 | 136:18 141:16 | **710** 91:19 | **9th** 18:23 183:16 |
| **31st** 7:4 | 177:10,10 | **716** 91:19 92:20 | **a** |
| **329** 123:5 | **5144** 19:12 | **717** 93:2 | **a&a** 6:4 |
| **33** 13:11 86:11 | **515** 91:8 | **719** 100:7 | **a11** 81:19 |
| 181:15 | **518** 91:9 92:13 | **72** 20:6 24:13 | **a9** 81:19 |
| **330** 189:21 | **53** 36:10 | **75** 13:4,14 51:16 | **ab** 37:3 |
| **332** 162:19 | **5332** 156:24 | 51:22 52:1,6 54:6 | **abilities** 41:10 |
| **356** 93:18 94:17 | **54** 31:7 | 55:3 86:4 100:19 | **ability** 38:23 |
| 100:8 102:3 | **55** 160:20 | **750** 100:8 | 43:23 56:16,23 |
| **36** 86:11 161:20 | **56** 32:19 | **75201** 4:4 | 62:18 64:13 |
| **36.5** 161:15 178:9 | **565** 91:18 100:7 | **765** 182:6 | 114:18 129:23 |
| 178:20 | **57** 25:20 32:5 | **767** 3:14 | 136:17 168:17 |
| **365** 175:15 | 115:25 130:7 | **792** 162:20 | **able** 32:10,12 33:9 |
| **369** 92:3 | **58** 25:20 | **8** | 41:22 50:12 56:21 |
| **39** 30:17 | **585** 92:20 | **8** 101:13 153:9 | 62:22 65:20 67:23 |
| **390** 93:13 | **59** 15:12 25:20 | **80** 13:6,17 18:25 | 118:3 140:23 |
| **3997** 183:11 | **6** | 31:5,10 54:21 | 141:18 168:5 |
| **4** | **6** 17:22 24:15 26:9 | 56:3 57:4 99:10 | 170:21 |
| **4** 85:16 142:4 | 32:6 33:6 136:14 | **800** 18:25 56:4 | **absolute** 80:12 |
| 167:12 | **60** 25:20 82:19 | **845** 92:3 | 98:4 |
| **4.4.** 167:14 | 157:3 164:10 | **847** 92:3 175:14 | **absolutely** 141:5 |
| **40** 28:13 | 187:16 | **860** 91:8 92:13 | 162:17 |
| **400,000** 186:21 | **600** 106:4 | **89** 89:25 | **abusive** 58:23 |
| **41** 28:23 | **605** 4:17 | **9** | **academic** 78:20 |
| **42** 54:20 | **60606** 5:11 | **9** 96:6 103:4 | **accept** 94:16 |
| **424** 93:13 | **62** 33:24 | 162:12 163:7 | 103:15 125:25 |
| **452** 93:12 | **620** 7:12 | 165:22 166:18 | 177:7 182:19,25 |
| **462** 93:12 | **65** 160:15,20 | 170:2,18 171:6 | **acceptable** 170:15 |
| **478** 93:12 | **69-1** 182:16 | 173:23 175:23 | **acceptance** 26:12 |
| | | | 182:18,21 |

**accepted** 33:18
92:22 101:11,16
102:1 184:7
**access** 112:22
**accomplish** 56:21
**account** 12:14
14:7 44:22 48:3
50:15,20 65:6
66:10 84:11 86:22
98:21,24 102:3,16
103:8 112:3 116:5
116:5,9 130:5,6
131:9 132:4,7
133:17 142:22
143:20 162:24
163:5,9 164:13
177:3,12
**accountant** 30:5
**accountants**
33:14
**accounting** 28:19
32:1,7,15,17,20
32:22 33:2,7,18
33:20 34:7 36:13
36:16 41:2,4
76:10
**accounts** 15:3
36:22 49:18,19
50:15,19 79:4
112:23
**accurate** 30:3,3
36:19 39:17 99:11
151:18 189:4
**act** 63:24,25 74:14
80:13
**acting** 63:25
74:21 101:6
**action** 18:19
105:9,18 167:18
167:25 168:10
173:7 182:5
**actionable** 110:12

**actions** 18:22
165:19
**active** 19:22
**activities** 28:20
60:6,11 111:7
**activity** 30:5,15
30:16,25 31:11
32:11,13 34:5,7
34:12,16 35:5,6
35:25 40:13
**actual** 63:23
66:19 73:19 88:19
**ad** 6:15 156:16
157:4 186:16
**add** 15:18 67:20
79:17 87:6 96:8
138:13 148:20,25
154:7
**added** 14:13 33:3
152:22 162:13
**adding** 33:5 86:6
**addition** 11:6
93:15 95:10 97:24
141:19 142:5
173:23 175:22
**additional** 10:23
11:3 15:16 22:11
22:13 59:12 74:8
76:7 158:7 180:1
180:6
**address** 87:10
109:17 129:13
167:9
**addressed** 18:10
47:9 166:18,19,20
166:21,25 167:9
170:11 176:2
**adequate** 170:22
**adequately** 32:8
102:23
**adjectives** 148:14
148:14

**adjustments**
29:23,25 102:6
**admin** 6:15 66:19
68:13 79:17
159:10
**administrative**
10:19 11:21 12:25
13:5,7,9,16 20:17
21:25 23:8 56:12
66:14 67:3 68:16
75:10 76:24 78:22
82:6 83:7 95:13
96:3,4,5,7,8,17
100:13 109:4,25
111:2 113:8
116:10 117:16
118:2 121:11
131:13,14 143:25
144:9,24,25
146:20 153:20
154:13,14 157:25
158:13 159:2,9,16
160:16 165:4
178:1,11 179:2,4
179:22 180:11,23
181:8,9 182:8
186:1,16
**administratively**
22:25 23:2 78:12
83:7 96:13 107:5
**admits** 50:25
**admitted** 31:25
80:15
**admittedly**
131:15
**advance** 124:18
126:5
**adversary** 149:13
172:12 179:10
**adverse** 55:23
85:22 92:25 120:3
127:1

**adversely** 92:24
**advocate** 17:10
**affairs** 92:11
99:23,25
**affect** 31:25
**affiliated** 2:4
**affirmatively** 13:9
13:12 94:11 97:12
180:15 181:18,19
182:11 183:8,24
185:4
**afternoon** 10:2,4
61:19 67:18 70:8
105:23 106:1
129:17,19 172:14
**agent** 74:7
**aggregate** 13:3,17
31:3 42:11
**aggregated** 63:1
**aggressive** 17:10
**ago** 164:5
**agree** 38:8 79:15
80:7 88:11 89:9
89:12 105:2 108:7
141:15 151:11
182:4,9,10,11
186:19
**agreed** 15:16
19:10,16 20:10
38:12 58:12 80:14
96:3 167:20 177:7
178:2 180:24
181:19
**agreeing** 27:9
60:1 80:3 180:17
**agreement** 10:16
19:1 59:18,25
67:23 88:9 89:14
104:24 110:8
113:13 114:1,12
114:17 116:9
125:18 130:10
131:22 136:20

[agreement - appeal]                                                    Page 4

137:25 138:16
158:5 174:7
176:25 181:21,21
182:2,2,15 184:2
186:23
**agreements** 28:6
98:17 176:24
**agrees** 11:6 95:11
**ahead** 29:15 109:4
136:2 137:8 144:5
**aiello** 8:14
**aimed** 137:3
**aircraft** 183:15
**airways** 91:18
92:20 93:15 100:6
**akin** 3:3 12:7 70:9
108:13
**al** 10:3
**alana** 8:11
**albanese** 8:7
**albeit** 77:16 93:21
181:4 183:19
**alert** 184:18
**aliano** 167:4,6,12
167:15 168:5,19
169:8
**aliano's** 168:10
**align** 158:13
**alix** 8:18
**allegedly** 19:14
**allen** 9:1
**allocation** 181:2
**allow** 18:25 60:19
128:4
**allowed** 10:18
13:4,6,14,23,24
54:20,23 96:2,4
114:13,14,18,21
117:22 129:23
132:10 134:11
143:2 158:1 165:4
165:6 177:12
178:1,11

**allows** 78:5 128:2
141:7
**alluded** 70:23
**alpine** 169:25
170:5
**alternative** 103:2
**alves** 8:10
**ambiguous**
153:25 154:1
**amended** 2:2 19:6
20:5
**amendments**
126:25
**amount** 13:5,6,14
13:23 24:22 42:11
46:2,4 55:13,17
58:1 60:9 68:18
84:9 85:22 86:10
86:25 87:2 89:2
99:5 102:9 106:4
135:5 150:17
152:18 156:19
157:7,16,23,25
162:14 163:6
164:14 165:6
167:21 177:12
178:1 179:18
181:2
**amounts** 36:7
45:18 46:9 156:23
177:3 179:15,23
**amplify** 113:11
**amw** 6:6
**analogy** 184:23
**analyses** 28:21,22
103:5
**analysis** 12:11
21:3,3 22:11,13
22:14,16,17,20,21
23:1,4 25:13 28:8
28:13,14,17,25
31:5,9 34:10,11
34:15,17,18,20

35:6,18,18,21,22
39:8 51:3,10,14
52:17 62:4,22
65:11 71:11 76:4
76:9,13 82:11
85:25,25 93:9,10
93:16,17,22 94:1
98:7 99:19 103:5
103:10,16,18
104:1 152:3
161:24,24,25
183:6
**analyze** 34:6
36:25
**andrew** 8:20
**andrews** 6:2
**anker** 5:21 145:21
145:21 146:1,4,6
146:8,11,13,15,18
146:22,25 147:4
147:11,20 148:2,5
148:19 149:6
151:7,9,13,17,20
151:25 152:12,15
152:21 153:2
**anker's** 152:7
**announce** 10:9
**announced** 14:3
18:24 111:3
180:13
**annual** 33:11
149:18
**answer** 20:14,18
20:21,22,24 21:9
21:17,17,21,22,22
22:8,10,14,19
23:3,14,18,18,20
24:9,16,20,24
25:5,8,9,12,13
26:10,15,18 28:16
29:1,24 30:3,14
30:25 31:14,19
32:9,13,17,22

33:5,12,13,21
34:2,3,13,17 35:1
35:3,9,13,19,22
35:25 36:2,18,20
37:15,18,22 38:11
38:21,24 39:1,7,8
39:12,17,20 40:3
40:8,11,13,17,20
40:25 41:5,15
50:3,6,15,16,21
51:9,11,24,25
52:2,7,12,15
66:11 76:8 117:12
**answered** 23:17
34:1 51:24
**answering** 105:14
**anthony** 8:13
**anticipated**
124:18
**anticipation** 67:8
**antiquated** 31:24
32:9,16,21 33:3,7
**anybody** 13:21
17:2,24 27:15,23
28:4 38:8 52:13
56:23 127:1
**anyone's** 149:3
171:7
**anyway** 29:15
86:24 87:4 104:18
**apart** 63:16 64:18
**apologize** 16:16
145:23 153:17
**apparently** 41:23
55:10 96:11
109:15
**appeal** 97:17
106:8 115:16
116:15 122:14
132:23 134:3
136:16 137:7,11
137:12,14,15,16
141:23 142:24

[appeal - assurance]                                                                                    Page 5

143:3,5,10 146:15
167:19,21,22
**appealed** 167:19
**appeals** 114:15
**appear** 17:23 97:1
98:5,11 102:11
108:11
**appearance**
161:25
**appeared** 29:19
30:3 166:17
**appears** 21:25
26:1 96:15 100:17
101:17 104:1,14
108:13 113:8
124:1 166:22
180:21
**appellant** 146:10
146:12
**appellate** 143:15
167:22
**apples** 90:16
**applicable** 93:10
123:23 176:24
182:15
**application** 162:7
187:2
**applications**
161:2
**applied** 52:6 65:3
183:2
**applies** 150:22
183:1 187:1
**apply** 92:5,20
93:7 97:22
**applying** 93:9,16
**appoint** 67:24
**appreciate** 17:17
77:12,23 83:14
164:21 186:14
**approach** 84:13
84:16 93:16

**appropriate** 24:1
38:7 56:10 57:9
73:12 84:14 88:13
92:6 104:11 109:5
111:8,22 123:3
148:25 149:17
163:5 182:12
**approval** 106:17
**approve** 18:13,18
53:11 57:21 58:23
59:2 61:9 65:25
67:13 79:24,25
94:12 100:5 102:6
126:15 127:11
**approved** 18:11
53:6 102:19
107:12 153:22
157:19
**approves** 80:8
**approving** 68:13
94:6 126:9,11,14
128:23 180:8
**approximate**
106:4
**approximately**
62:5 138:9 139:22
140:15 152:20
162:13
**approximation**
52:5
**april** 19:3 20:9
21:13,16 22:4
27:9 76:5
**area** 41:24,25
**areas** 20:1
**arguably** 104:7
**argue** 55:6 167:3
175:7,9
**argued** 180:12
**arguing** 64:17
133:9 173:25
**argument** 17:20
18:6 62:11 64:12

94:2 101:8 130:23
149:2 154:18
185:20
**argumentative**
39:12
**arguments** 11:25
61:23 65:2 89:23
106:23
**arises** 38:2 146:19
**arlene** 8:10
**arm's** 97:20
**ashuraey** 8:22
**aside** 29:1 78:10
85:21 112:9 113:3
133:16 142:22
**asked** 14:20 19:24
20:6 21:8,13,13
21:18,19 22:1
23:13 26:8 28:13
30:17 31:7 34:1,8
34:25 36:8 37:12
37:13 49:20 51:5
51:20,24 106:11
124:17 125:5
127:15 145:15
165:21 180:7
**asking** 21:5 23:18
63:6 122:22
131:18 158:2,3
**aspect** 88:12
103:13 116:13
187:20
**aspects** 187:20
**assert** 69:20 87:14
88:17 114:19
134:10 136:18
**asserted** 10:21
11:20 12:16
**assertible** 118:2
**asserting** 54:6
68:18
**assertion** 24:2
51:13 56:19

**asserts** 23:22
51:15
**assess** 150:6
**assessing** 52:11,14
**assessment** 11:17
11:18 109:15
147:18
**asset** 70:1 83:23
117:4
**assets** 14:14 15:2
44:16,17 45:2,4
46:23 53:14 62:14
63:17 91:11,13,15
103:22 111:11
112:6,13 113:18
114:20 115:8,9
116:7 117:21
119:10 135:22
139:17,19,20
142:9,15 165:8
171:2 179:24
**associated** 66:23
**association** 7:10
**assume** 53:1
75:13 82:23
**assumed** 83:3
171:20 173:24
174:3,11
**assuming** 18:9
46:17 57:18 68:23
89:3 126:22
155:10
**assumption** 26:2
51:22 84:7 100:18
171:11,19,24
172:4 173:25
174:1,18 175:4,10
175:18
**assumptions**
50:22 83:1 86:1
**assurance** 149:5
152:25

**assure** 127:19
**attached** 25:17
179:8
**attempting**
106:25
**attendant** 97:8
**attorneys** 3:4,13
4:2,9,16 5:2,9,16
6:2,15 7:2,10
**audit** 27:14 33:11
41:16 100:4
**auditors** 32:23,24
33:9,25
**augie** 23:24 64:5
78:15 91:8 92:7
92:13 98:12 99:19
**authorities**
175:13
**authority** 185:10
**authorizes** 136:22
**automatic** 168:2
168:16
**automatically**
36:16
**auxo** 6:7
**available** 15:6
26:14 40:7 42:9
54:19 81:22,23
113:21 115:10
117:6 135:11,19
135:20 149:11
181:13
**avenue** 3:14 4:17
6:9,16 7:12
**avoid** 54:17 58:14
**avoidance** 114:10
116:4
**aw** 93:8
**await** 110:20
**awards** 70:19
**aware** 33:19,24
51:12

**b**
**b** 1:21 11:25
106:7 121:25
134:3 136:18
142:3,4,4
**b.r.** 91:18 92:19
92:20 93:18 94:17
100:7,8 102:3
123:5 162:20
175:14 182:6
183:11,16
**back** 17:20 18:15
32:19 42:18 44:9
47:20,22 48:2,3
49:12 56:1 57:6
63:6 71:3,20,22
72:11,13,14,20
82:3 87:21 113:11
114:2 132:2,23
133:21 134:10
138:11 139:5
141:9 143:5
144:10 164:14
170:7 174:17
176:8
**background**
167:17
**baking** 91:8
**balance** 16:5
30:17,19,20,23
31:4 35:11 54:9
63:1 96:9 97:5
103:23 133:1
179:21,22
**balances** 31:7,12
31:15,18 35:10,15
39:15 62:24 98:22
**balancing** 37:23
37:23
**ballot** 69:7 101:14
184:17
**bank** 42:16,16,23
42:23,24 43:15,19

43:25 44:22 46:2
46:4,9,10 47:22
47:25 48:11 49:18
50:14,19 92:2
**bankr** 162:20
175:14 182:6
183:11
**bankrupt** 38:24
68:5
**bankruptcy** 1:1
1:12,23 28:11
65:25 67:22 68:1
68:4,17 91:19,20
91:20 92:19 93:7
93:18 96:1,6
97:16 98:2 100:11
104:7 105:13,19
118:24 123:22,22
124:13 136:22,23
137:7 155:18
174:2,18 176:12
176:20,24 181:24
182:5,15 184:22
**bap** 183:16
**barbara** 8:5
**bargain** 66:25
**bargaining** 97:20
**barn** 106:10
**barred** 148:3
**barris** 9:17
**based** 14:2 22:19
23:3 30:4 31:2
35:9 39:13 48:12
48:15 52:3,17
57:25 60:16 80:6
82:25 96:16
103:11,15,25
105:20 143:5
178:24 179:6,25
**basically** 14:7
16:19 21:22 31:25
52:2 76:8,16
85:13 114:24

120:16 123:18
130:2 162:20
172:19
**basing** 82:25
**basis** 22:25 23:23
24:1 31:16,19
34:23 38:1,21
40:2,16 43:1,14
45:9,10 49:11,24
50:6,7,8,10 51:22
53:21 56:13 61:12
64:20 92:15 94:3
96:20 98:14,21
99:9,20 100:19
103:4,6,12 104:4
117:8 133:16
138:18 143:18,19
158:25 172:22
173:23 176:16
185:5
**bear** 58:2
**beauty** 6:7
**beefed** 124:17
**behalf** 10:5 17:23
41:12 60:2 67:19
69:14 70:9 105:24
129:18 158:21
167:6 170:5
172:15 186:12
**belabor** 57:9
106:22 109:10
**believe** 36:25
49:21 55:20 60:18
61:7,9,11 95:14
96:19 99:15 101:4
102:15 103:2,10
106:5 107:4
109:23 111:7
112:1 128:1
129:14 133:6
138:6 147:7,11
152:4 158:5
160:12 164:12

[believe - carveouts]                                                                    Page 7

170:2 172:9
176:14,20 178:24
179:6,16 180:2,19
181:9,13 183:1,13
184:1,12,16 186:3
**believes** 100:2
**ben** 9:5
**bench** 183:20
**beneficiary**
108:13
**benefit** 5:9 13:12
41:15 67:19 68:10
87:22 92:12 100:1
103:24,25 108:12
112:24 119:23
140:8,9,10,10
**benefited** 41:14
**benefits** 97:7,11
102:17
**benefitted** 84:12
**bernstein** 182:6
182:12 183:2
**best** 39:13 41:10
56:11 95:11
101:16,18 176:21
**beth** 9:14
**better** 22:10 47:7
155:2,3 158:13
186:7
**beyond** 160:17
178:13
**big** 38:3 108:6,10
**bigger** 161:23
**biggest** 106:6
**bill** 150:10
**billed** 137:2
**billions** 37:24
62:9 148:10,10
159:15
**bills** 41:12 48:22
**binding** 143:7,7
154:3,6,10 181:25
181:25

**biswas** 7:20
**bit** 18:14 67:20
107:9,15 108:2
109:19 123:7
153:16 165:17
170:20
**black** 84:5,6
92:15
**bless** 82:12
**board** 12:9 26:23
66:16 94:10 95:21
95:22 103:25
133:15 135:3
142:11,17 186:12
**board's** 109:8
**bold** 149:10
**bond** 115:16
120:15,16,18
145:17 167:19,21
168:13,21,21,22
169:3,5,21
**book** 41:9
**books** 33:8 40:12
40:19 41:13 50:8
**borne** 49:23 51:7
**borrower** 24:8
**borrowers** 24:3
42:7 43:15
**borrowing** 98:23
**bothered** 27:23
**bottom** 24:17,21
26:9 36:9 37:15
89:25
**bought** 56:22
**bound** 13:16
181:11,11 184:19
184:21 185:7
**box** 84:5,6
**brauner** 3:9
**breadth** 97:18
**break** 19:25 35:14
43:23

**breathe** 139:8
**brian** 5:13 67:18
**bridge** 83:11
**brief** 19:9 56:15
64:2,9 65:4 75:15
81:11 93:20,21
106:9 143:15
145:9 146:15
156:1 179:1
**briefed** 167:22
**briefly** 55:25
167:9 176:2
**briefs** 99:22
**bring** 162:4
**bringardner** 9:19
**broad** 185:9
**broadway** 7:4
**brought** 185:22
**brozman** 8:18
**bryan** 8:1
**bryant** 3:5 8:17
**bucket** 38:4
**budget** 157:18,19
**budgets** 119:17
**build** 143:16
**built** 143:16
**bullet** 32:7
**bump** 77:17 87:2
90:17 102:11,15
102:20,23
**bunch** 22:24
38:15 42:17 59:23
**burden** 64:14
120:14
**business** 24:18
40:23 84:1,2
100:16 133:1
**busy** 187:16
**button** 32:2
**buying** 25:7

**c**

**c** 3:1,8 10:1 189:1
189:1
**calif** 183:11
**call** 32:16,21
63:19 78:7 131:9
166:13 172:7
**callback** 162:8
**called** 93:9 95:3
96:25 163:1
179:24
**calls** 75:4 88:23
**canada** 150:7
**candid** 146:19
**can't** 79:14 83:16
85:24 87:14
120:13 125:22
126:15 131:20
133:3
**capable** 101:6
**capacity** 17:23
146:16
**capital** 4:9 90:21
105:24
**capped** 13:4,6,13
13:17
**care** 144:21 171:3
173:22
**carefully** 176:22
185:9
**carl** 170:20
**carried** 59:11
**carriers** 173:6
**carry** 183:25
**carved** 168:10
**carveout** 10:24
11:4 12:6 15:5
112:23 156:19,23
158:24 159:11
162:23 163:5,9
177:1,3 180:1
**carveouts** 160:7

[case - cite]                                                                 Page 8

**case** 1:3 11:11
17:25 18:19 24:7
26:1 29:18 36:24
39:2 53:11,17,17
53:23 54:24 55:7
56:5,9,20 60:5,12
60:14 67:22 74:6
74:21 77:1 78:7
78:18,18 82:8,12
88:18,23 93:3,15
94:14 96:6 98:3,5
99:13,18 100:5
102:9 104:19
105:13 110:17
119:22 123:7
124:6 126:18
132:25 143:11,13
149:15 151:6
158:8 159:15
162:18,19 168:11
176:17 183:6,9,10
183:19,25 187:1
**caselaw** 77:24
94:15,15 104:1
115:15
**cases** 19:5 28:11
31:22 37:6 53:5,9
64:16 78:17 93:7
93:13 96:18 99:22
106:7 110:24
112:22 123:9
128:7 158:20
159:16 165:2,2
179:12 186:4
**cash** 37:2,11,14
39:20,22,23,25
40:2,6,17,22,23
40:24,24 41:3,4
41:11,23 42:3,10
43:14 48:21 62:12
62:13,18,20 63:4
63:10,11 70:12,15
70:17,25,25 71:7

71:9,14,15,19,22
71:24 72:2,3,7,12
72:19 95:25 98:20
100:15 103:11,20
112:14 116:5,9
117:2,3 176:25
177:12 178:1,9
180:23 181:2,4
185:22
**categories** 13:8
**category** 13:15
14:10
**catherine** 7:21
8:24
**cats** 160:23
**caught** 149:23
**cause** 49:25 56:12
56:17 59:2 60:14
61:4 66:13 95:11
95:15 168:18
**caused** 22:4
**causing** 96:10
169:21
**cavaliere** 7:25
170:4,4,12,17
**cent** 71:21 72:10
72:11,14 77:4,5
179:23
**center** 5:17
**centers** 29:15
**central** 26:24
**centralized** 26:14
26:24 27:12 37:11
42:3 44:9,13,14
44:22 47:10 48:18
62:13,18 63:17
70:15 71:7
**cents** 13:4,14,17
54:13,21 145:5
157:25 180:11
**certain** 20:10 28:4
78:23 97:21
101:12 102:10

104:17 151:15
152:18 184:7,15
185:20
**certainly** 28:20
60:14 64:6,21
65:4,12 66:4,9,24
67:1,9 108:11
112:8 122:18
132:14 135:25
138:23 157:2
158:18 159:3
160:11 161:2
186:22
**certainty** 185:25
**certified** 189:3
**cetera** 14:15
26:25 27:14
141:18 162:23,24
164:15
**challenge** 132:21
**challenges** 52:4,8
**challenging** 83:10
164:2
**chambers** 185:18
**chance** 51:16 54:2
54:6 55:3 64:24
84:22 132:2 143:9
**chances** 176:21
**change** 23:6
128:14 169:5,8
187:18
**changed** 13:2
21:14,16 22:3
27:15 58:18 61:7
61:24
**changes** 12:21
13:25 14:1,19
16:4 30:23,24
110:11 185:15
**changing** 160:3
169:17
**chapman** 185:13

**chapter** 2:3 65:22
80:23,25 168:4
187:1
**charge** 88:5
**charged** 88:15
**charges** 87:23,25
**charging** 65:15
73:1,6,18,19,22
73:23 87:12,21
88:3,15,18 105:3
155:6
**chart** 14:9 102:13
161:14
**charts** 85:12
**chase** 47:24,25
48:3,4
**chemical** 92:2
**chest** 150:14
**chicago** 5:11
**chico** 9:17 172:14
172:15,19,25
173:21
**child** 175:14
**choice** 181:15
183:14
**choose** 60:10
**choosing** 60:23
**cimala** 8:1
**circuit** 78:15 91:7
91:9,23 92:4,7
97:4 99:24 183:16
**circular** 80:17
**circulate** 185:17
**circulated** 170:14
**circulating** 114:5
**circumstance**
159:5
**circumstances**
53:13 59:20 83:13
118:23,25 160:14
182:8 184:2
**cite** 53:5,10

**cited** 64:17 93:16
93:20,24,25
183:17
**cites** 185:11
**citing** 93:12
**citron** 4:15
**civil** 167:18
168:10
**claim** 10:18,19
11:17,20 13:5,7
13:14,23,24 18:25
19:1 20:16 25:16
25:17,23,24 36:1
42:23,24 45:7,8
49:5 56:3,4,8,12
56:18 57:4,10,11
57:14 66:14,19
67:4,11 68:13,14
68:15,16,22 69:21
71:21 72:1,5 85:2
86:22 95:13,19,19
95:22,23 96:7,17
103:23 106:7,8
114:13,13,14,16
114:18,19,19,21
115:14 123:7,10
131:21 132:4,5,23
134:11 135:25
136:5,18 137:6
140:19,23 141:17
143:2 144:24,25
146:20 162:15
167:13 173:6
176:15,16 177:7,8
177:9,11,12,13
178:3 179:3,4
**claimants** 55:9
59:3 109:4 144:1
186:17
**claimed** 29:16
54:25
**claims** 10:23
11:23 16:23,25

20:17,17 28:25
29:3 37:1 40:5
42:2,19 43:5 44:7
45:4 46:9 47:10
49:24 50:6 52:18
53:21 54:8,20,23
55:22 56:11 57:14
58:1,2,5,8 59:2
62:4,10 65:6
68:11,13 70:20
71:4 84:16 85:14
85:23 91:15 95:9
100:14,15 102:10
103:6,7,7 104:15
106:3,5 110:1
113:8,19 116:10
117:23 118:2
119:12 121:11,24
121:25,25 122:1
122:16 123:8
128:22 131:14
132:16 143:20
147:12 148:3,15
151:3 152:25
154:14 157:5,25
158:1 159:10,16
160:23 161:16,20
161:23 165:5
172:12 178:12,12
179:1,9,14,21,22
180:8,10,24 186:2
**clarification**
117:20 126:20
171:9 172:17,20
173:9
**clarify** 152:7
153:18 154:17
174:2
**clarity** 130:25
131:2,4 136:14
185:8,25
**class** 13:1 59:3
80:16,16 94:16

101:16 167:12
184:8
**classes** 101:11,25
104:13,15 184:6
184:11,11
**classification** 57:9
176:11,13,14,15
**classified** 57:12
104:20
**classify** 104:12
**classifying** 104:6
176:16
**class's** 97:11
**clause** 69:10
**clean** 14:2 33:22
34:1 133:1
**clear** 14:8,9,21
15:1 17:21,25
18:7 27:23 62:7
66:5 69:16 77:24
83:5 91:24 95:14
95:25 98:7 99:3
100:2 105:1,7
111:9,15 113:11
113:15 116:20
121:7 124:15
135:6 141:6,22
153:9 169:18
170:1 172:21
173:24 183:4
184:7 185:2 186:9
186:24
**cleared** 109:15
**clearer** 14:13
**clearly** 47:13
58:11 94:12 95:19
100:24 106:17
141:2 176:15
179:10 181:6
183:5 185:1
**cleary** 5:1 69:14
**clichés** 69:9

**client** 11:20 88:22
147:9
**clients** 120:10
144:5
**close** 158:8
**closer** 110:1
**closing** 162:16
**code** 55:19 96:6
98:3 104:7 110:18
123:22 124:13
131:19 136:22,24
137:7 158:22
174:2 176:12,24
181:24 184:22
**collateral** 136:17
176:25
**colleagues** 184:16
**collect** 37:16
95:21 136:17
**collectible** 50:10
**collecting** 72:16
97:9 173:3
**collection** 159:25
**collective** 43:25
**collectively** 63:2
**collects** 45:15
**colloquy** 156:18
**colon** 9:18
**combine** 162:9
**combines** 48:11
**come** 18:13 39:12
40:23 52:1 57:6
84:14,15 110:6
125:23 132:2,23
134:10
**comfort** 33:16
112:11 180:6
**comfortable**
57:19
**coming** 12:6
109:3 112:2
122:13 148:22

[commenced - consequently]

commenced 28:11
149:24,24
comment 19:25
149:6
comments 17:20
152:8
committee 3:4
12:7 53:2 56:6
58:16 59:19 61:2
61:5,6 62:2 66:2
70:9 73:17 83:2
95:6 101:1,3
108:1 109:8
128:19,20 152:3
155:15,18 156:16
157:4 179:13
181:1 185:23
186:13,19
committee's 152:4
common 46:21
47:1,3,17 54:22
91:15 103:8
184:24
comp 161:1
companies 28:15
28:18,22 51:1
company 6:3 24:7
26:7,16 27:4,21
28:20,25 29:11
30:1,1,11 31:2
38:1 39:14 45:15
45:16,19 48:10
64:19 91:8,15
92:3 161:22 173:7
company's 32:1
32:17 33:25 45:17
compared 84:23
compensated
75:16
compensation
16:14,17
competency 97:14

competing 72:19
complain 90:13
complained 166:7
complaining
120:6
complains 31:20
126:3 166:6
complaint 108:24
149:14 179:8
complete 12:18
completed 99:15
completely 113:9
151:13
complex 94:21
97:7 99:6
compliance 96:5
complicated
94:18
complies 176:12
comprehensive
103:18
compromise
19:19,21
compromised
53:8 136:19
compromises
19:20 95:9 153:10
compute 120:22
con 65:8,11 66:6
83:11 90:17 94:20
conceivably
150:10,10
concentration
50:15,20 98:21,24
concept 92:23
102:5
conceptually
110:23
concern 55:23
172:25
concerned 30:5
45:20 90:17 108:7
118:21 139:6

146:25 162:21
171:16 176:13
concerns 12:24
concession 159:7
180:6
concluded 29:23
182:12 188:1
conclusion 30:15
30:25 32:23 180:7
condition 67:1
conducted 24:18
34:12,15
conducting 100:3
conduit 70:17
conduits 63:25
confidence 31:6
31:10 99:11
confident 66:20
confirm 10:16
11:11 18:9,17
57:7,18 65:20
81:1,7,17,22
110:22 120:11
131:5 165:2
168:12 178:5
confirmable
58:21
confirmation 2:2
10:7 11:8 14:1
15:13 16:19,20,22
17:4 19:9 50:1
61:16 73:9 81:11
81:18 82:8 93:24
94:1 95:24 103:3
105:6 106:18
107:1 110:6
112:16 113:7
114:16 115:25
120:11 123:12,19
124:10 126:8,13
128:14 130:13,19
132:16,24 134:13
137:14,15 141:21

157:14 166:15
168:23 169:4
174:3,19 175:17
176:10 177:17,23
178:16,22 183:3
184:5 185:5,15,21
185:24 186:7
confirmed 57:23
58:25 107:4
109:20 110:4,10
116:18 129:5
132:15,17 134:21
143:3,6 163:3
167:13 168:4,11
170:11 174:21
175:24 177:6
183:5
confirming 139:1
173:18
confused 24:13
confusing 65:10
confusion 18:1
26:22 105:1
conked 172:7
connection 14:22
59:21 68:12
184:17
consensual 94:3
consent 11:1,7
12:22 13:3,16
66:1,8 80:18 95:4
116:10 153:20
182:9 183:18,21
186:18
consenting 69:4
consents 94:13
consequence
175:17
consequences
121:14,17
consequently
175:17 184:9

[conservative - counsel]                                                                                     Page 11

conservative 87:4
considerable
  91:22 157:7
considerably
  160:21
consideration
  12:5 74:6
considerations
  92:7
considered 11:22
  168:13
considering 94:6
considers 97:3
consistent 12:11
  15:7 30:16 31:3
  93:3 107:11 135:1
  138:25 142:19
  158:22
consistently
  181:22
consolidate 19:2
  62:15 80:4
consolidated
  20:13,20 23:23
  24:6 26:25 27:3,4
  32:23 33:14,15,16
  33:23 38:1 43:20
  45:10 53:21 62:14
  62:24 63:21 64:20
  81:23 87:7 91:6
  91:14 95:9 98:10
  98:22
consolidating
  19:8 91:11
consolidation
  19:5,7,11,14
  21:11,15 22:6,18
  23:6,10,11,14,16
  24:1 25:13 27:17
  44:17 45:4 46:22
  51:17 52:12,15,18
  52:21 53:6,19
  54:3,7 55:8 57:6

57:22 58:17,20,23
59:7 61:11,17
63:16 64:25 70:11
70:14 76:6,21,22
76:23 77:25 78:5
78:8,14,19 79:16
79:22 83:10,21
90:18 91:1,10,23
92:6,12,14,16,23
92:25 93:4,5,6,8
93:14,17,21 94:1
94:8,15,20,21
95:1,3 96:22 98:7
99:18,20,25 100:6
100:18,20 101:5,9
101:21 102:4,6,8
103:1,8 104:2
106:13 107:13
constituents
  186:13
constitute 107:2
  182:21
construct 74:11
  183:5
construed 173:7
consumed 117:3
contained 114:11
contains 83:9 95:2
  126:9 138:1
contemplate
  94:25
contemplated
  100:11 135:13
  139:2
contemplates 81:8
  95:2
contested 99:18
context 45:4 65:4
  93:8,14 94:7
  97:23 98:6 100:4
  100:9 141:22
  160:5,6 163:20
  164:7,9 183:3

contingency
  136:3
contingent 133:3
continuation 2:1
continue 163:24
continued 10:6
  76:7 111:15 168:3
continuing 33:6
  186:4
contract 171:9,23
  173:24 174:8,22
  182:3,4,16 184:3
  184:23
contractors 24:11
contracts 25:3,6
  25:25
contrary 64:14
  104:9 114:11
  115:15 117:7
contrast 54:5
contributed 10:24
  163:7
contributing
  98:23
contribution
  186:20
control 28:3 56:17
controlling 120:4
controls 117:13
controversial
  118:17,18
conundrum 71:6
conveyance 71:20
conveyances 64:1
convicted 53:25
coordinating
  12:13
coordination
  12:18
copies 17:1
copy 14:4
corp 5:9 26:12
  123:5 162:19

corporate 71:5
  99:23
corporation 1:7
  2:3 10:3 22:23
  24:20 67:20 68:11
  176:3
correct 11:13 15:9
  20:24 21:8 31:13
  32:14 37:18 38:21
  38:21 39:7,20,24
  40:3,3,13,14,17
  40:18,20,20,25
  41:5,15 48:5 67:7
  67:14 68:3 69:2,3
  69:6,11,22 72:18
  75:8 115:2 125:16
  129:9 134:22
  137:13 143:8
  146:6,13 156:9
  167:8 169:6,10
  171:19 172:2,5
  175:3,5 176:5
  185:24
corrected 29:21
  30:2,13 59:13
correction 30:7,8
corrections 30:3
correctly 32:17
cost 51:3,7,9,11
  51:14 78:19,21
  79:8 88:20 100:3
  103:14
costly 50:1
costs 49:22 74:5,9
  79:17 82:17
  100:21 149:20
  150:13 151:1,2
  155:11,12,14
  186:4
couldn't 136:5
counsel 20:15,22
  80:15 96:23 97:15
  110:7 114:4 166:1

[counsel - creditor]

168:18 172:13
175:16,25 179:14
180:25
**counsel's** 79:21
**counterparty**
171:14
**counting** 49:5
**country** 189:21
**couple** 14:19
17:19 25:16 110:8
114:2 123:16
165:19 166:1,4
**course** 13:21
36:15 54:11 77:17
91:13 99:12
101:21 110:18,19
112:21 136:15
154:13 155:7
157:20 172:23
187:2
**court** 1:1,12 4:3
10:2,8,11 11:5,14
11:17 12:10,19,24
14:16,25 15:7,10
15:14,22,25 16:2
16:5,8,12,14 17:5
17:7,16 18:13,18
29:5,7,10,14
42:10,19,22 43:1
43:4,8,11,17,19
43:22 44:3,12,14
44:16,20,23,25
45:2,19,23 46:1,4
46:7,11,13,19
47:1,3,11,21,24
48:2,6,10,13,23
49:1,4 54:11,14
55:12,15 61:15
63:9 65:16,25
66:11,12 67:2,5
67:12,15,17 68:1
68:7 69:1,3,9,12
69:19,23,25 70:5

70:7 71:13 72:6
72:16,22,25 73:7
73:13,16 74:16,19
74:25 75:2,4,7,9
75:12,19,22,24
76:1,11,13,15,19
77:10,12,15,23
78:2,9,16,25 79:2
79:6,8,11,13,13
79:19 80:10,17,21
81:2,6,14,17 82:2
82:7,14,16,21,23
83:20,23 84:5,11
84:17,20,24 85:4
85:6,10,12,19
86:2,10,15,17,23
87:13,15,18,20,25
88:2,7,11,21 89:1
89:7,9,12,16,18
89:20 90:2,5,8,10
90:13,22,25 91:3
91:22 94:8 97:3
97:16,25 100:2,5
100:19 102:5
106:1,11,16,19,21
107:17,22 108:6
108:14,16,20,22
109:2,12 111:12
111:14,20,25
112:4,7 113:23
114:16,23 115:3,7
115:11,22 116:1
116:12,24 117:5,7
117:12,24 118:5,8
118:12,14,18
119:2,5,8,11,13
119:20,25 120:2
120:22 121:2,5,7
121:18,20,22
122:4,7,10,15,18
122:20,23 123:1
123:15 124:3,5,11
124:15,20,24

125:3,5,8,10,13
125:15,19,22
126:2,15,21 127:4
127:6,9,11,14,17
127:21,24 128:10
128:12,15,17
129:1,3,5,8,10,16
129:19 130:12,15
130:19,24 131:3,7
132:14 133:2,5,10
133:18,21,25
134:5,9,12,17,20
134:24 135:8,13
135:17 136:7,10
136:12,25 137:10
137:14,18,22
138:3,10,13,21
139:7,13 140:2,6
140:12,17,21,25
141:11,15 142:2
143:1,18,24 144:2
144:8,14,19,22
145:3,7,8,15,20
145:25 146:3,5,7
146:10,12,14,17
146:21,24 147:3
147:10,14,15
148:1,4,18,22
149:1,4,8,21,22
151:6,8,11,14,19
151:22 152:1,6,9
152:14,17,24
153:4,6,22 154:3
154:8,14,25 155:4
155:10,14,17,22
156:6,10,13,17,25
157:10 158:2,12
158:17 159:20,24
160:5,12 161:3,4
161:5,6,9,11
162:12 163:6,9,12
163:16,19,22
164:1,4,6,9,12,18

164:21,25 165:17
165:21 166:12
167:7,10,11,22
168:2,12,21 169:2
169:7,13,16,23,25
170:8,16,19,25
171:5,15,22 172:1
172:3,6,16,21
173:10,14,16,20
173:22 174:5,8,12
174:16,21 175:1,3
175:6,9,13,21
176:5 178:5
186:24 187:6,10
187:12,15,24
**court's** 55:6 66:7
**courtney** 8:6
**courts** 92:5,16
**court's** 91:6
**cover** 75:12
155:22 167:19
**coverage** 151:16
151:24 152:19
**covered** 119:6
129:15 151:3,3
**cramdown** 184:6
184:10
**create** 135:4,21
135:21
**created** 111:3
119:18 128:19
130:5 143:15
**creates** 71:6
**creating** 71:4 72:5
**creations** 6:8
169:25 170:5
**credible** 103:15
178:18
**credibly** 99:10
**credit** 40:1 84:10
92:11 159:3
**creditor** 25:2 64:4
64:6 66:9 69:1,17

[creditor - debtors]                                                                    Page 13

69:25 92:9 94:13
94:23 95:18 101:2
101:20 106:6
110:20 112:13
113:19 119:12
120:5 129:23
135:10 157:21
159:2,9 181:10
**creditors** 3:4 12:7
12:24,25 13:9
23:23 24:5,11,18
26:22 27:18 28:5
38:16,23 44:10
47:14 49:25 50:2
53:2,10,18 54:20
54:22 55:11 56:5
57:24 58:16 59:19
61:2,5 62:2 66:2
68:9 72:15 90:11
90:15 91:25 92:13
92:17,24 96:4
97:10,12 98:14,17
100:1,10,25
101:11,17,22,24
102:17,21,24
104:13 108:12
111:11 112:12
113:4,15,19,21
115:10 117:6,22
118:1,2 119:22
131:12,12 137:4
140:5,9,10 148:6
156:12 158:13
162:21 176:21,23
179:13 180:11
181:1,9 182:8
184:18 186:1
**creditors'** 83:2
95:6 101:1,3
112:18
**credits** 30:6
**crescent** 4:3

**crimes** 53:25
**critical** 92:8
**criticize** 181:10
**cross** 178:18
**current** 31:10
95:25 103:11
147:16 150:21
**currently** 56:2
95:17 137:12
159:21
**customary** 105:12
**cut** 135:20 138:11
144:10
**cutler** 5:15 145:22
**cutoff** 170:6
**cyrus** 4:9 14:20
15:15 90:21
105:22,24 106:3,5
114:9 129:5

### d

**d** 1:22 5:21 10:1
**d&o** 149:9 150:17
**d&os** 149:23,23
**daily** 98:21
**dallas** 4:4
**damages** 30:20,23
**damper** 156:7
**dan** 8:12
**date** 13:24,24
15:18,19,24 16:20
16:24 67:1 82:5
110:14,21,23
111:1 112:16
113:6 115:18
116:7,13,19,23
117:18,20 118:19
118:20 119:2,6
120:9 121:6,25
122:13 123:13,19
124:19 125:1
126:13 128:3
130:15 139:23
140:16 141:16

153:12,13,18,24
154:2,9,9 157:5
157:20 162:16
163:23 164:19
169:4 174:3,19
177:10,24,25
179:20 189:25
**david** 4:20
**davidoff** 4:15
**day** 12:16 17:18
40:23 76:6 79:7
124:21 125:17
138:1 143:8
150:13,14 185:17
**days** 13:11 15:16
15:21 22:10 125:7
125:15 165:20
181:15 186:8
**days'** 124:21
126:5
**de** 74:8 131:20
173:25 174:1,17
175:10
**deadline** 157:10
**deal** 27:8 57:18
61:17 65:16 66:6
79:19 106:12
120:13 122:13
128:20,20 166:20
169:15
**dealing** 25:21
26:23 27:19 40:22
78:22 84:4,6,7
109:18 116:12
137:16 148:6
160:22
**deals** 137:18
**dealt** 23:23 24:6
28:5 91:25 92:9
93:1 94:4 98:14
100:10,10 106:13
148:8 151:23
160:6 166:17

182:5
**deathtrap** 88:12
**debit** 30:6
**debt** 20:16,17
26:13 90:6,9
162:23
**debtor** 1:9 19:17
19:19 20:20 22:16
24:25 25:7 26:2
28:7 31:1 34:22
35:16 36:17 37:4
37:5 39:18,19,19
41:14 42:12,12
43:23,24,24 49:24
49:24 50:6,6,7,7
50:10,10,10,11,11
50:14 55:2 57:25
61:6 62:25 63:2
66:3 73:17 78:23
80:16 82:10 83:3
88:9 92:1 95:11
96:25,25 98:18
99:9,9 100:14,14
103:3,3,6,6,9,9,12
103:12 104:17
105:18 110:11,11
110:12 120:17
128:18,18 130:3
148:6,7 149:13
150:14 171:23
173:8 177:19,19
178:4,6,7
**debtors** 2:4 3:13
4:2 10:5 18:16,19
18:24 19:2,3,4,6,8
19:15 20:4,10,13
21:10,14 22:1,5
22:25 23:8,9,23
24:19 25:10 26:6
26:13 27:7,16,25
28:15 31:2,13,16
31:18,21 32:22
34:23,24,24,24

36:5,12,21 37:2,6
38:4,19,20 39:3,6
39:9,14,23,25
40:12,15,21 41:2
41:11,13,20,21,21
42:1,5,8 43:20
45:22 47:4 48:7
49:7,18,21 50:18
50:25 51:3 52:20
53:1,5,10 54:5,25
56:15 57:5 58:2,3
58:17 59:13,18
60:8,10 61:5,18
61:20,24 62:13
65:20 67:22 68:19
68:22 76:23 78:6
79:13 80:23 83:6
83:16 84:1,2 87:4
91:5,11,14,16
92:12 94:22,25
95:12,13 96:10,13
96:18 98:10,13,19
98:23,25 99:1,25
100:11,24,25
101:1,7,7,12
102:22 103:3
104:10 105:9,11
105:11 106:5,25
108:23 109:15
110:15,15,23
111:4 114:4
118:17 123:17,20
123:20,23 124:7,7
128:2,4 139:19,21
140:14 147:5,7
148:8,16 153:9
160:13 166:1,14
168:12,24 172:21
173:13,14 175:24
178:5,13 179:1,8
179:12 180:23
183:22 184:7
185:3,11,23 186:9

186:12,19
**debtors'** 81:11
83:1 93:20,25
95:25 96:9 101:2
102:13 103:11,19
103:23 105:3,7,21
109:22 110:7
113:12
**december** 28:10
**decide** 105:19
141:9 149:17
**decided** 21:10
28:6 59:6 135:9
**decimated** 58:8
**decision** 21:12,23
23:6 94:5 154:19
182:14
**decisions** 54:19
93:20
**declaration** 22:9
23:12,22 24:15
26:7,19 28:14
31:20,23 62:17
64:3 65:12 99:3
102:14 178:16
179:7
**declarations**
14:14 18:20
101:14 178:15
**deconsolidated**
52:4 86:2 102:21
**deconsolidation**
22:21
**deduction** 10:18
**deem** 171:10
**deemed** 104:16
171:16 175:4,18
181:21 182:9,19
183:18,21
**defendant** 146:5
167:25
**defendants**
147:17 150:16

179:9
**defense** 149:20
150:13 151:1,2
**defenses** 12:15
**deferred** 160:1
**deficit** 38:20
**defined** 114:14
115:9 126:23
**definitely** 68:17
**definition** 19:21
126:4
**definitions** 141:6
**degree** 97:11
**delay** 97:9 100:22
179:20
**delayed** 160:22
**delays** 50:1
**delivered** 156:17
**denied** 123:9
**deny** 104:3 168:7
**depends** 45:7 77:8
134:1 135:19
143:3
**deplete** 49:25
**deposition** 20:2,7
24:5,14 34:8
51:20 65:9 76:4
**derivative** 68:15
**describe** 138:23
**described** 138:22
**description** 26:17
70:12 151:15
**desegregated**
162:24
**designated** 20:2,7
**designees** 16:21
113:2
**desire** 95:21
**despite** 23:5 79:21
**detail** 25:11 34:19
39:17 41:8
**detailed** 20:15
62:16

**determination**
18:16 53:14 97:25
134:2
**determinations**
61:4
**determine** 23:25
30:22 43:12 48:14
49:16 70:18,19
83:16 98:25
**determined** 24:12
142:10,16 157:15
182:7
**determines** 163:4
**determining**
79:24 92:5
**didn't** 80:3 84:11
106:12 108:20
125:11
**died** 166:10,14
**difference** 50:24
52:23 57:15 58:7
77:16,21
**different** 25:23,24
25:24,25 26:1
39:22 45:14 59:17
72:9 77:12 78:23
114:2,23 115:17
120:12 122:14,16
123:7,9 146:16
149:25 150:16
152:10 154:19
177:8 178:3
183:13,23
**differently** 104:23
154:22 155:3
**difficult** 51:4
74:11
**difficulties** 29:4
49:22
**difficulty** 29:17
38:2 97:9
**dip** 142:21 158:4
160:8 164:3

176:25
**direct** 100:20
**direction** 113:2
**directions** 107:10
**directly** 88:16
171:14 173:5
**director** 66:17
95:16
**directors** 27:10
66:16 67:12 97:19
141:8 149:11
**disadvantageous**
72:15
**disagree** 143:12
147:17
**disagreed** 183:12
**disallowing** 106:8
114:16
**disappear** 169:21
**disbursing** 74:7
**discharge** 131:20
131:21 133:8
136:23 137:1,3
**disclaimed** 152:19
**disclaiming**
151:15,24
**disclosed** 139:24
**disclosure** 20:4,9
31:21 36:4,11
49:21 56:6 59:22
60:7 74:23 85:11
138:4,4,17,22,24
139:9,16 142:19
146:2 147:1,2,22
149:17 151:7,10
151:18,21 159:14
181:15,23 182:13
184:17
**discount** 86:4
144:25 181:3
**discretion** 55:6
58:23 91:22
105:10 133:15

141:8 142:10,16
**discuss** 20:8
**discussed** 180:2
**discussing** 110:7
**discussion** 14:16
107:1 170:24
**discussions** 21:23
22:11 31:9 52:8
53:3 66:7 68:21
**disentangle** 49:23
50:5 51:4,8
**disentangling**
99:23
**disjunctive** 92:9
**dismissal** 172:12
**disposed** 186:6
**disposition** 56:10
**dispute** 19:16,22
20:3,21,23 21:6
59:8 69:18 77:9
77:22 98:8 174:10
**disputed** 106:7,7
114:13 121:24,25
122:1 123:8,10
**disputes** 12:1
20:12,14,15,19
21:1,2 68:17,19
77:6 149:22
152:24
**disregarded**
91:17
**disserve** 162:2
**disservice** 17:9
**distilled** 92:7
**distinction** 135:17
135:18
**distractions** 73:3
**distributed**
143:20,21
**distributing** 141:7
**distribution** 10:25
10:25 11:2 13:13
13:19,19 15:10,22

15:23 73:19,20,21
87:12,17,22,23
88:5,19 125:8
126:5 141:3,9
**distributions**
15:20 50:2 60:2
63:13 73:8,14
74:1,4,8,10,12,22
105:14 110:20
112:13 113:20
115:10 125:4
**district** 1:2
**diversion** 107:25
**diverted** 107:10
**divide** 115:11
**divided** 53:14
**dixie** 55:15 78:18
93:18 94:17 100:7
102:2
**docket** 19:12
25:16 156:24
173:17
**document** 89:11
141:25 147:13
**documentation**
18:21
**documents** 16:9
28:1 112:11
126:10,11,12,23
126:24 138:24
157:17
**doesn't** 84:21,22
84:24 89:16 107:2
108:11 110:25
111:18 114:25
115:3 120:7,20,22
129:22 130:6,8,12
131:25 135:21,21
**dogs** 160:23
**doing** 58:3 62:4
82:17 86:17 107:2
112:20 113:1
181:5

**dollar** 38:5,6,7,10
38:13,14,15,15
54:21 55:13,17
70:18,19,24 71:1
71:24 72:10 77:6
85:22 87:2 88:16
101:13 103:14
179:23 180:11
**dollars** 71:21
72:11,14 77:4,5,9
77:18 148:11
152:9 159:15
**don't** 78:4 79:20
80:12,22 81:13,19
82:13 83:17,18
86:5,12,22 87:21
88:11,21,23,24
89:4 90:18 91:2
97:22 103:7 107:4
107:21 108:17,19
109:23 111:1,7
112:10 113:13,25
117:8 118:22
119:4,20 120:5
122:5 123:25
124:11 125:19
126:25 127:2
129:11 130:14,16
131:24 132:7,11
132:12,20,20,22
133:6,13 134:7,17
134:20 135:1,10
135:12 136:12
**door** 145:22
**dorr** 5:15
**doubt** 64:4 65:7
114:10 116:4
139:7,7
**doubted** 17:12
**dough** 79:3
**doughnuts** 152:9
**draft** 113:12
128:1 185:16

**drafted** 59:10
132:22 173:2
185:1
**drain** 1:22 166:12
166:13
**dramatically**
179:5
**drawing** 150:8
**dream** 135:11
**drive** 5:10
**dropped** 81:12
**dtc** 73:11
**dublin** 3:8 70:8,9
71:17 72:9,18,23
73:2,10,14,24
74:18,24 75:1,3,5
75:8,10,18,20,23
87:11 126:4,7
152:2,2,7,11
**due** 30:10,10 31:1
31:1,12,12,15,15
31:17,18 34:22,22
35:15,15 36:14,15
50:22,23 62:19,21
63:18,23 135:24
137:23 143:11
187:2
**dustin** 7:24
**duties** 88:14
110:17
**duty** 182:20 183:3

**e**

**e** 1:21,21 3:1,1
6:12 10:1,1 65:24
92:3,3 189:1
**e.d.** 183:11
**ear** 112:9
**earlier** 14:3 111:3
114:3 133:22
**early** 27:8 64:22
**earmarked** 111:6
**easily** 98:24

**easy** 32:11 145:9
145:11 164:22
**economic** 92:10
**ecro** 1:25
**edgewell** 173:22
**edgewell's** 175:16
**edward** 7:15
153:8
**ef** 37:4
**effect** 22:15 55:23
58:3,12 59:11
76:22 83:9 91:10
98:25 114:5
119:16 127:1
130:13 150:6
161:1 168:6,7,17
169:18,19
**effecting** 154:3
**effective** 13:23
15:18,19,24 16:24
67:1 68:24 82:5
109:20 110:4,10
110:14,20,23
111:1,1 112:16
113:6,17 115:1,18
116:6,13,19,23
117:18,20 118:19
118:20 119:2,6
120:8 121:6,10,18
121:20,25 122:13
123:13,19 124:9
124:19 125:1
128:3 130:15,20
130:21 131:7,8,9
134:2,6 139:22
140:16 141:16
143:4,7 153:10,11
153:13,18,23,24
154:1,2,8,9,9
161:22 162:25
163:23 164:19
169:4 174:22
177:10,24,25

178:8,21 179:20
180:9 186:10,25
**effectively** 37:11
40:4 57:14 61:24
76:17 83:6,25
133:8 137:2
159:12 168:7
**effects** 93:1
107:14 184:24
**effort** 34:18 35:13
35:19 37:23
103:16 182:13
**efforts** 56:11
95:11
**eighth** 7:12
**either** 20:5 21:12
30:8 37:3,10,16
56:15 61:12,12
63:1,18 75:16
77:7 82:4 83:18
97:12 104:21
122:12 141:20
148:19 155:7
165:9 166:4,18
174:16 181:11
182:10 183:23
**elements** 83:9
**elicited** 18:17
**eliminated** 91:16
93:1 102:25
**else's** 77:11
**emboldened**
148:23
**emerge** 96:1
**emergent** 160:21
**emily** 8:8
**enable** 96:2
**endear** 158:14
**endorsing** 149:2
**enforcing** 100:13
**enhancement**
52:25 53:3 54:7
85:1,21,22 86:21

86:25
**enormous** 49:22
51:7,8,14
**enron** 53:17,17
54:12 84:23 93:24
**ensure** 94:9
164:18
**entangled** 54:25
92:12 99:25
**entanglement**
28:9 64:5
**enter** 16:19 19:20
28:6
**entered** 16:22
24:25 29:23 67:23
80:1 187:13
**entering** 187:17
**enterprises**
183:10
**entire** 58:13
**entirely** 53:11
104:11 118:20
148:15 185:24
**entities** 25:21,22
25:24 26:1,14,22
27:10,25 28:2,7
32:12 36:13 41:3
42:7 44:7,8 45:3,5
47:14 49:9 55:2
58:5 63:3 64:18
64:23 71:10,14
72:18 78:11,23
81:3,6,25 84:8
92:9 98:18 99:5
104:17 146:9
184:5
**entitle** 122:3
**entitled** 46:25
56:8 72:21 74:7
87:16 131:20
143:12
**entitlement** 135:4

[entity - experience]                                                                    Page 17

**entity** 22:23 25:18
25:23 28:5 29:8
31:1 37:5 43:9,13
43:13 45:5,9,11
45:13,20,22 46:7
46:7,8,9,13,13,14
46:15 47:8,8,15
47:15,17 50:11
53:19,25 54:1
57:25 58:1 63:23
68:6,14 70:17,23
71:9,16,19,25
72:3,4,10,12,19
81:3,4,10,10,19
91:13 96:11
**entries** 29:20,21
31:3 36:16 41:9
**entry** 178:22
**enumerates** 23:10
**environment**
120:12
**equal** 33:4 177:12
**equally** 82:9
**equitable** 57:10
91:6 92:14,17
98:4 102:5 138:19
138:20
**equity** 55:6
184:11
**errors** 30:12
**esl** 5:16 14:20
18:1 85:14 114:9
117:9 129:18
136:15,16 144:10
144:15 145:22
146:5,8 148:15
150:15 152:23
165:9 179:24
**esl's** 114:4
**especially** 80:14
**essence** 83:21
98:22 120:17
180:14

**essentially** 68:9
68:15 108:1
110:17,25 129:22
**established** 52:3
180:5
**establishing** 53:7
**estate** 10:22,25
14:14 15:3 27:13
63:14 75:21 78:22
88:6 105:21 109:4
111:11,15,16,19
112:20 113:13,16
113:16 115:19
116:21 117:19
118:21 119:10
120:7 121:8 130:9
131:10 162:22
185:23
**estates** 7:2 19:3
27:11 49:23 63:6
66:9 102:10 105:3
105:7 107:5 109:7
112:14 116:6
123:23
**estate's** 103:22
**estimate** 103:14
139:21 140:14
**estimates** 67:5
165:11
**et** 10:3 14:15
26:24 27:14
141:18 162:23,24
164:15
**evaluated** 55:16
**evaluating** 97:3
**event** 17:13 65:24
114:12 123:14
**events** 96:1
**eventual** 68:12
**eventually** 68:19
79:4,6
**evergreen** 133:16
138:16,18 139:1,6

139:12 142:12
**everybody** 13:11
27:23 63:17 65:21
84:1,3 137:8
187:7
**everybody's** 12:8
141:14
**everybody's**
83:19
**evidence** 18:20
26:3 64:14 148:9
149:2 177:16
**evolving** 22:12
**exactly** 14:17
15:12 16:15 39:10
43:2 45:22 48:16
73:10 83:25 87:17
136:11,13 145:19
151:10 171:1
174:15
**examination**
178:18
**example** 38:12,14
70:24 74:23
155:25 178:23
**excel** 150:1,23
**exception** 153:19
154:12 178:2
180:1
**exceptions** 182:17
182:19
**excess** 10:20
11:21 152:20
**excessive** 83:12
**exchange** 20:11
**exchanged** 171:3
**excuse** 11:6 79:22
139:15 150:22
**execute** 73:5
**executing** 52:4
**executory** 174:7,8
174:23 175:19,22

**exercise** 80:20
87:11
**exercising** 55:6
**exhausted** 150:2
**exhibit** 24:15
25:20 26:9 31:8
**exhibits** 18:12 96:1
**exist** 52:9 71:7
**existence** 115:1
126:13
**existent** 59:7
**existential** 17:12
**existing** 128:9
**exists** 18:12 98:1
132:24 162:4
**expand** 70:10
**expansive** 35:8
**expect** 33:8 86:24
164:15
**expected** 51:11
86:24
**expended** 113:22
**expense** 10:19
11:21 12:25 13:5
13:7,9,16 66:14
68:16 82:6 94:10
95:13 96:4,7,8
97:8 100:13 111:2
116:10 117:16
153:20 159:2,9
180:11,24 181:8,9
182:8
**expenses** 74:5,20
83:8 96:3,5
104:25 105:5,8
155:6 178:1,11
179:2 186:1
**expensive** 98:9
99:6,12 103:10,13
103:19
**experience** 26:18
52:3,11,14 97:15
97:15

[experienced - financial]                                                      Page 18

**experienced**
101:6
**experiencing**
119:16
**expert** 41:5 51:18
**expertise** 41:25
**explanation** 30:6
56:9 146:2
**explicit** 104:19
**exposure** 12:4,17
**expressed** 58:16
**extend** 84:10
113:12
**extending** 92:11
159:2
**extensive** 93:22
156:19
**extent** 37:9 40:21
44:10 49:8 55:19
97:19 117:2
128:24 157:8,14
169:1 174:23
175:19 177:7
**extra** 17:1 126:7
**extraordinary**
110:20
**extrapolate** 76:17
**extremely** 103:19
**eye** 186:6

**f**

**f** 1:21 26:9 189:1
**f.2d.** 91:8 92:3,13
**f.3d.** 93:12
**fabricators** 56:5
**face** 21:1 159:4
**faced** 75:21
**facilitate** 74:1
**facilitating** 73:21
74:22 105:13
**fact** 18:11,11 23:5
25:16 26:3 27:22
29:17 32:15,20
36:6,21,22 38:20

41:13 42:2,4
45:22 49:17 51:18
55:5 57:13 58:24
61:12 62:1 66:20
67:9 76:20 78:11
80:1,3,14 83:17
83:19,20 87:1
94:18 96:21
104:13 109:6
119:10 143:15
144:3 156:15
157:18 162:1
165:4 169:8 185:8
**facto** 131:20
173:25 174:1,17
175:10
**factor** 14:16 102:2
**factors** 23:11,13
23:16 26:21 52:2
78:14 92:5 93:10
93:10 97:22,22
98:6 100:21 147:4
181:16
**factory** 6:3
**facts** 18:16 23:17
64:7 65:1,1,3,8
96:25 103:11
107:20 123:6
149:16 183:13
**fail** 168:15,15,24
169:6,10,14,24
**failed** 16:11,15
**fair** 12:2 21:5,18
21:19 22:2,2,23
38:17 57:10 78:2
92:18 98:3 151:11
152:17 153:1
163:14 176:23
**fairest** 84:2
**fairly** 59:3 98:20
123:18 133:19
**fairness** 159:2

**faith** 96:19 101:6
104:8 157:7
176:19
**far** 22:2,3,12 30:4
30:10 33:17 42:19
45:19 50:4 58:14
64:20 83:12 90:16
103:13 108:6
111:18 118:20
162:21 171:15
176:11,13
**farnan** 123:4
**fashion** 6:5
**favor** 55:13 58:19
80:15 94:20
104:16,16 156:1
183:20
**favored** 59:8
**feasibility** 67:5
96:9 103:5 161:14
161:24 163:1,20
164:7 184:1
**feasible** 160:10
**feature** 139:1
**february** 18:23
27:9 61:25 80:2
156:22 157:18,19
**fee** 112:21 128:9
128:10,11 156:19
161:2 162:7
164:14
**feel** 105:17 141:12
159:9
**fees** 59:16,20,21
60:4,4,9,22 66:22
72:24 74:3,20
87:10 88:4 104:25
105:4,8,20 154:18
155:6 160:9
186:18
**feld** 3:3
**ferry** 93:10,13
97:5

**fiduciaries** 100:24
**field** 75:4 88:23
**fifth** 3:14
**fight** 54:12,17
77:5,18 170:20
186:7,8
**fighting** 54:15
151:4
**figure** 41:20 73:10
**figured** 27:8
**figuring** 74:11
**file** 13:25 14:3
16:13,17,25 17:3
21:11,14 27:2,4
126:13 137:12
139:9 165:16
**filed** 10:14 17:2
19:4,6,17 21:16
22:18 25:23 27:1
27:16,21 39:3,9
39:13 76:6 89:11
129:20,24 137:25
138:24 141:25
146:20 147:24
156:1,16 165:19
167:15 168:1
177:17
**files** 28:1
**filing** 20:8 27:9
36:1 68:4,17
120:25
**final** 21:23 96:16
122:2,9 161:2
163:18
**finally** 11:22
13:20 30:22 53:1
59:13 104:22
**financial** 21:3
26:25 27:4,12,21
29:4,17 32:23
33:15,16,23 69:9
177:18

[financials - fruit]                                                      Page 19

**financials** 29:19
**financing** 26:6,11
**find** 22:18 30:12
  36:23 56:14 104:9
  136:2,3 163:20
  176:18 178:17
  180:16 181:18,22
  184:2
**finding** 126:10
  161:13 163:1,17
  183:3 184:4,6
**findings** 176:8,9
**fine** 60:21,22
  120:4 124:16
  128:17 132:22
  137:24 147:20
  148:4 152:6 153:3
  154:11
**finished** 76:5
**firm** 6:1 12:18
  108:4 163:15
**firms** 12:11
  158:21 159:1
  165:16
**first** 13:19 15:22
  24:2 27:1 53:9
  70:11 74:16 98:11
  112:6 121:3
  129:21 132:17
  139:11 145:23
  149:20 150:24
  153:8 167:4
  180:19
**firsthand** 50:21
**fitzgerald** 9:13
**five** 33:4 49:13
  170:6
**fix** 152:18
**fixed** 85:3
**flesh** 67:21
**flexibility** 103:25
**flexible** 92:23
  102:5

**flipped** 120:17
**flipping** 115:15
**flipside** 45:14
**float** 39:23
**floor** 6:9 7:4
**florida** 93:19
**flow** 50:20 123:13
  123:13,14 162:19
  162:19
**fly** 104:21 164:10
**fochier** 6:4
**focus** 116:18
  186:2
**focused** 126:22
  179:21
**focusing** 87:1
  159:20,20
**foley** 6:14
**folks** 155:10
**followed** 29:25
  177:23
**following** 10:12
  12:23 15:24 19:3
  148:12
**follows** 58:3 83:25
  84:3
**food** 92:18
**footnote** 81:12
**forbearance**
  158:7
**force** 168:6
**forced** 105:19
**foregoing** 189:3
**foreign** 151:10
**forever** 64:21
**form** 14:3 23:3
  24:9 30:25 31:14
  33:12,21 35:9,19
  37:15,21 38:11,24
  39:12 40:7,25
  51:24 52:15 91:14
  93:5 182:9

**formally** 166:24
  185:16
**former** 183:2
**forms** 35:16
**formulating** 66:10
**forth** 35:18 53:15
  93:11 101:13
  113:11 114:2
  147:25 167:14
  182:17
**forward** 30:7
  65:18 113:7
  141:10 145:18
  164:15 169:15
**found** 25:22 29:19
  64:6 99:21 113:7
  117:15 181:22
**foundation** 22:8
**four** 25:19 33:4
  179:19
**fourth** 16:9
**fox** 7:15 17:8,9,14
  17:17 21:7,20
  23:17 29:6,9,13
  29:16 30:24 42:15
  42:21,25 43:2,6
  43:10,15,18,21
  44:1,8,13,15,19
  44:21,24 45:1,17
  45:21,25 46:3,6,8
  46:12,16,24 47:2
  47:5,19,23 48:1,5
  48:9,12,15,25
  49:3,6 54:13,16
  55:14,18 63:9
  65:19 75:25 76:2
  76:12,14,16 77:8
  77:11,14,19 78:1
  78:3,10,21 79:1,4
  79:7,10,12,18,20
  80:12,20,24 81:5
  81:11,16,21 82:4
  82:12,15,19,22,25

  83:22,24 84:10,15
  84:19,21 85:1,5,8
  85:11,17,20 86:9
  86:12,16,19 87:8
  87:14,16,19,24
  88:1,4,8,19,25
  89:5,8,10,13,17
  89:19 90:4,7,9,12
  90:16 153:5,7,8
  153:25 154:6,11
  154:16 155:1,9,12
  155:15,21 156:5,9
**fox's** 62:11 64:12
  70:12
**fractional** 77:6,9
**frankenstein**
  107:9
**frankly** 61:13
  62:8 63:7 64:1
  65:15 66:22 98:11
  104:25 119:14
  145:12 148:23
  149:8 151:8
  158:12 159:7
  169:16 183:2
**fraud** 71:18
**fraudulent** 64:1
  71:4,19 146:4
**fraught** 99:7
**free** 105:17
**friday** 158:3
  165:21 166:2,15
  166:21 185:20
**friedberg** 8:11
**friedmann** 3:17
**froms** 30:10
**front** 73:22 86:13
  154:9 161:2,5
**frontloading**
  164:4,6
**fros** 64:10
**fruit** 161:19
  165:12

[frustrate - goods]                                                                                       Page 20

**frustrate** 142:23
**full** 13:22 96:3
  146:1 150:5 158:1
  168:6 180:24
  181:7
**fully** 99:18 129:24
  150:8 167:21
**function** 75:10
**fund** 15:5 108:23
  109:6 111:5 132:9
  135:23 136:2
  140:19 143:16
**fundamental**
  77:20 98:2 115:12
**fundamentally**
  98:19
**funded** 113:5
  136:5 139:22
  140:12,15
**funding** 14:23
  114:22 116:5,25
  135:14 136:3
  138:5 139:12
  141:1,22 142:7,13
  144:4
**funds** 14:21 15:5
  26:13 40:6 50:20
  63:6 81:22,22,23
  82:5 107:10,25
  109:3,25 111:11
  112:9,19 113:12
  113:13,15,16,17
  114:22 116:4,8,9
  117:22 118:4
  123:13,14,14
  136:14 141:18
**funk** 55:15
**further** 51:2
  112:12 164:16
  177:18 186:3
**future** 96:2 97:7
  125:4,21 126:24
  131:14,22,23

**g**

**g** 10:1
**game** 107:15,17
  107:23 131:21
  162:6
**garment** 6:3
**garrett** 168:15
**gather** 41:8
**gem** 6:7
**genender** 4:6 21:5
  21:8,18 22:6 23:2
  23:16 24:9 28:15
  30:23,24 31:13
  33:10,11,21 34:1
  35:8,18 37:21
  38:6,6,11,16,24
  39:11 40:7,25
  51:23 52:15
**general** 37:23
  43:14 91:6 118:15
  165:3 167:12
**generally** 33:17
  95:24 101:10
  138:23 160:12
  165:11 180:21
**gerson's** 187:17
**getting** 47:20 59:4
  66:18,19 71:20,21
  72:11,20 83:19
  86:13 87:7 128:8
  134:18 141:19
  144:20,24 153:15
  165:5 186:18
**gianis** 8:2
**gift** 86:5
**gifted** 81:24
**give** 10:8 16:4
  56:12 81:9 109:23
  114:7 118:25
  126:3 133:15
  146:2 157:24
  164:22

**given** 57:11 58:24
  80:1,14 92:14
  95:16 96:25
  103:19,24 104:9
  104:14,18,20
  109:6 126:19
  158:4 165:7
  172:11 176:17
  181:8 182:10,22
  183:22 185:8
**gives** 64:24 84:17
  110:5 112:11
**giving** 57:11
  71:10 86:4,6
**global** 4:16 10:14
  10:17 183:15
**go** 13:19 14:4 15:5
  19:13 20:3 22:12
  29:15 32:19 36:9
  36:9 42:19 48:20
  49:12 63:6 65:18
  65:21 74:2 80:23
  80:25 107:19
  109:20 111:18
  113:17 114:25
  125:1 127:21
  130:12,22 131:14
  133:21 134:5
  136:2,2,3 141:8
  141:18 144:4
  145:11,18 149:20
  150:16 153:2
  158:12 161:22
  162:25 165:9
  167:1 168:14
  169:14 176:8
  178:21
**god** 82:12
**goes** 42:12 44:4
  47:17 68:24 70:15
  70:16 73:11 84:7
  85:4,6,15 113:17
  115:1 118:15

  121:10 124:8
  130:20,20 131:7,8
  143:6 157:6
  161:17 174:21
  178:7 186:25
**going** 10:15 14:24
  18:5,7 22:6 23:20
  38:17,25 56:11
  60:16 62:8 64:7
  64:17 67:8 68:24
  71:9 73:20 74:11
  80:6 81:18 82:11
  84:3 90:2 91:3
  106:22 107:15,18
  107:25 108:4
  111:9 113:5,11
  114:2 115:11,17
  117:17 121:4,13
  127:11 136:1
  139:5 141:10
  142:20,21,22,23
  143:18 144:14,17
  145:4,5 147:14,20
  148:12,14 150:13
  152:10 157:13
  159:12 160:21
  161:11,14 164:10
  164:15 165:13,19
  166:22 167:1
  186:9 187:22
**gold** 7:23
**good** 10:2,4 12:21
  61:19 67:18 70:8
  84:8 96:19 98:8
  101:6 104:8
  105:23 109:12
  129:17 149:9
  150:17 151:23
  157:6 161:21
  172:14 176:18
  181:12
**goods** 25:4,8 28:7

[gotshal - honor]                                                                                    Page 21

gotshal  3:12 4:1
  10:5 61:20 168:16
  169:19
gottlieb  5:1 69:14
grain  144:13
grains  144:15
granted  150:5
grappling  137:10
great  60:21
  112:11
greater  181:5
greene  8:13
greenwich  5:18
griffith  178:16
grossing  30:9
grossly  55:4,9
grounds  104:5
  177:5
group  6:6,15 7:3
  28:3 92:18 99:5
  101:22 137:3
  175:22 180:15
  181:20
gu  7:22
guarantee  52:18
  54:8 55:9 58:7
  59:2 65:6 82:7
  84:16 85:2,14,23
  86:22
guaranteed  27:25
  53:21 55:22 57:14
guarantees  26:13
  53:4 54:3 59:4,12
  91:16,17 98:16
guarantors  24:3,8
  42:7 84:17
guaranty  5:9
  67:20 68:11
guess  42:10 43:11
  65:21 76:25 77:8
  99:14 114:1
  117:12 118:15
  132:14 133:7

  163:12 171:17
  175:7 185:19
guise  59:6
gump  3:3 12:7
  70:9 108:13
gustavo  9:17
  172:15
guys  135:7 155:25
  160:20

## h

h  4:20 92:3
hadley  4:8
hale  5:15 145:22
half  62:5 94:5
  99:8 103:16
hamilton  5:1
hand  37:14 98:19
  100:25 123:25
  178:14
handed  17:15
handful  110:5
  166:19
handling  32:22
hanging  161:19
  165:12
happen  74:3
  141:2 163:14
  174:11
happened  142:21
happening  43:2
  153:20 163:16
happens  14:10,10
  14:11 47:13
  109:19 130:23
  135:6
happy  16:6 65:14
  66:11 148:13,13
  148:19 151:17
hard  80:5
harm  59:2
harmed  101:8
harris  9:10 167:5
  167:5,8,12 169:22

hasn't  113:22
  116:16,18
hauer  3:3
haven't  106:13
  126:15 127:12
head  60:19 120:17
healthier  72:17
hear  124:2 150:3
heard  28:9 62:12
  145:7 149:1,2
  158:16 168:8,9
  170:6 172:7
hearing  2:1,1,2
  10:7,12 11:22
  12:23 16:6 17:3,9
  94:2 95:24 114:6
  138:1 156:25
  166:2,15 187:9
hearings  81:8,10
  186:8
heeled  101:23
heilman  8:23
heitzenrater  8:24
held  91:13 111:16
  115:19,23 116:1
  116:21,22,25
  118:22 121:8
  136:23 159:21
  164:14
helen  6:2
help  59:3 73:3,4,7
  74:1 136:19
helped  162:4
  185:25
helpful  153:16
hey  48:19
hiatus  178:6
high  20:16 21:23
  160:19
higher  131:13
  132:5 160:18
highlighted  62:5
  65:9

highlights  99:17
highly  95:22
  147:12
history  32:4
hits  83:2
hk  6:4
hmm  42:21 43:21
  46:6
hoc  6:15 156:16
  157:4 186:16
hoffman  7:2
hold  50:18 87:21
  133:17 141:9
  159:12
holdback  161:11
  162:10 163:4
holdbacks  164:16
holdco  5:2
holder  68:10
  69:16 106:3
  114:18 131:16
  177:11 178:2
holders  55:21
  58:7 60:2 102:10
holding  24:19
  66:24 96:4
holdings  1:7 2:3
  10:2 26:11 91:18
  92:20 100:7
holdsun  6:6
holste  8:25
holt  8:8
home  83:2
homes  123:4
hon  1:22
honor  10:4,6,12
  10:17,20,24 11:1
  11:10,13,15,19
  12:6,20,23 13:2
  14:2,4,5 16:3,18
  17:6,14,17 18:3,8
  18:15,23 42:15
  47:5 52:23 55:14

Page 22

55:20 60:18 61:8
61:9,19,21 65:7
66:15 67:7,14,18
69:6,11,13 70:6,8
71:17 75:23,25
76:2 78:4 80:7
81:16,21 82:19
85:9 86:12 89:19
89:21 90:4,20
105:23 106:2,9,15
107:4,12,21,24
108:9,19,25
109:10,17 110:1,5
110:10 111:7,24
112:15 113:14,25
114:7,8 115:5,24
116:3,22 117:14
118:16 119:3,19
119:21 120:23
121:15 122:5,11
122:22 123:6,11
123:16 124:4,6,16
125:7,9,17,25
126:8,17 127:3,13
127:19,23,25
129:4,7,9,14,17
129:20,25 131:15
131:23,25 132:19
132:25 134:8,18
135:3,16 136:9
137:24 138:6,16
139:11,15 140:1
141:5,24 143:9,10
144:12,21 145:14
145:19,21 146:11
146:13,16,25
147:20 148:5,20
149:6 151:9,25
152:2,22 153:5,17
154:16 155:9
156:11 157:12
158:11,15 159:11
159:23 160:2

162:11 163:2,4,13
164:20 165:15
167:5 168:15
169:6,10,15,22,24
170:4,12,23 171:4
171:12 172:11
173:12,19 174:4,6
174:24 176:4
186:12 187:8,11
187:23
**honor's** 130:5
**hoo** 9:2
**hope** 17:11 79:5
**hopeful** 169:10
**hopefully** 14:12
42:18
**hopeless** 28:8
**hopelessly** 54:25
107:5
**horse** 106:10
**hour** 157:23
**hours** 89:11
**housekeeping**
186:15
**hr** 27:13
**huffman** 27:11
**hundred** 13:22
145:5
**hung** 47:8 166:10
**hurt** 120:3
**hutcher** 4:15
**hyde** 2:25 189:3,8
**hypothetically**
23:3

**i**

**i.e.** 92:9 95:3
172:8 178:22
180:4 181:15,24
184:22
**idea** 51:19
**ideal** 41:16
**identified** 30:8
78:15,17

**identifies** 36:13
**identify** 39:18
67:24
**identity** 92:11
**ignore** 70:22
**iii** 52:8,10,13
**il** 5:11
**illinois** 149:21
167:22,25
**immediate** 71:2
72:1,3 158:7
**immediately**
153:11,11,23
154:1,10 177:23
**impact** 70:13
85:23
**impacting** 171:21
**impaired** 112:18
112:18
**implement** 178:10
**implementable**
110:13
**implementation**
173:13
**implemented**
98:25
**implication**
111:23 112:8
182:4
**implications**
125:22
**implicit** 104:19
**import** 11:24
**important** 27:20
57:3,17 89:22
96:15 97:24 108:7
110:9 154:7
158:19
**importantly**
28:12 78:4 95:10
161:19
**imposed** 80:19

**impossibility**
99:23
**impossible** 18:12
62:8
**imprimatur**
147:14 148:22
**improperly**
151:24
**inaction** 182:18
**inactive** 182:24
**inadvertence**
128:6
**inappropriate**
60:25
**incentives** 180:10
**inception** 60:5
**inclination** 162:8
**include** 11:3
16:25 45:4 74:22
75:2 93:23 130:10
143:14 179:3
**included** 14:9
18:21 25:19
**includes** 181:1
**including** 78:6,7
81:19 91:7 96:11
97:9,10 98:3,15
101:7 104:19
105:13 114:15,19
114:21 117:21
118:2 120:14
126:24 138:22
147:9 148:2,9
176:24 177:1
178:10,15,17
179:25 182:15
184:1,24,25
**inconceivable**
29:11
**inconvenience**
97:8
**incorporate**
133:14

**incorporates** 94:21

**incorporating** 124:12

**incorrect** 29:20 30:1

**incorrectly** 29:23 33:5

**increased** 142:7 142:13

**increment** 11:3

**incremental** 12:5

**incur** 155:11

**incurred** 59:21 66:22 74:9,21 155:12 186:17

**indenture** 7:11 73:25

**indentured** 17:21 59:15,20,21 60:1 60:8,15 61:2 75:13 88:2 89:1 101:22 105:12,16 154:18,23

**independent** 66:17 67:25 68:4 95:16 98:14 99:20

**indicate** 24:3,8 25:20

**indicated** 26:5 36:6 66:7 67:13 156:25

**indication** 31:12 33:22 53:16 56:21

**indirect** 173:7

**indirectly** 173:5

**indiscernible** 34:2 44:6 56:5 73:9 74:3 124:12 131:13,15 132:23 152:15 171:6 183:11

**individual** 38:4 39:18 47:4,14 48:3,7 81:17,18 82:8 103:3

**individuals** 16:20 41:8

**inducement** 11:24

**industrial** 6:5

**industries** 6:5 10:14,17

**inevitably** 186:4

**infer** 182:14

**inferred** 182:9

**influence** 95:15

**information** 14:13 21:3 22:19 37:24 39:13 41:9 42:9 53:12

**informed** 179:13 180:25

**informs** 95:20

**initial** 10:25 11:1 13:12,18,20 19:13 19:13 20:9 71:3 72:2,2 144:4

**injuncted** 173:3

**injunction** 133:7 173:1,11

**inquiries** 92:8

**inside** 70:23 71:5 71:25 72:4

**insistence** 97:1

**insolvency** 22:1 76:24 77:4 78:23

**insolvent** 22:25 63:25 70:24 71:19 78:12 81:25 96:14 107:6

**instances** 46:5

**insurance** 63:12 149:9,12 150:1,17 151:1,8 152:5,13 173:6,6

**insurer** 150:19 152:10

**insurers** 149:22 149:24 151:4,15 151:23 152:19

**integrated** 39:20 39:23 40:6 42:10 43:1,8 45:11

**intended** 119:17 120:8 121:10 176:20

**intends** 182:24

**intention** 117:21 153:13 154:22 182:22

**intents** 63:21

**inter** 36:3

**intercompany** 22:14,20 28:19,21 28:25 29:12 30:4 30:19 31:6,11 32:3,10 33:1 34:11,12,23 35:5 35:6 36:6,14,14 36:22 37:1,3,5,7,7 38:3 39:1,4,5,6,7 40:5,13 42:19 43:4 44:6 49:5,6,7 49:9,19,24 50:6 62:4,10,24,25 70:20 71:6 72:5 76:9 100:13 103:6 103:7

**intercreditor** 51:23

**interest** 15:20 95:18 97:14 137:21 139:19 146:1 153:24 167:20 180:20

**interests** 97:10 101:17

**interim** 161:1

**interlinked** 102:18

**internal** 27:14

**international** 6:7 171:6

**interplay** 37:1

**interpret** 88:13 122:24 149:16

**interrelationship** 92:2

**interstate** 51:23

**investigation** 100:3 109:8,9 147:12,23

**investment** 120:3

**investor** 120:2

**invoices** 25:4,6,10 25:17 128:5

**involved** 21:12,22 23:5 50:16 54:1 137:21 169:3

**involving** 149:22

**ireland** 170:21

**iridium** 93:9,11 97:4,25 98:3 100:21

**island** 170:21

**isn't** 86:25 88:12 94:9 109:5

**issue** 11:15,24 19:15 27:18 33:9 54:15 59:9 65:16 70:14,20,22 71:11 75:21 78:5,18,20 90:18 91:4 98:1 98:12 110:4 113:8 115:12 117:14,18 121:21,23 123:12 123:13 127:22 133:6,18 134:3 139:23 141:25 144:19 146:18

156:20,21 157:6
157:14,16,22
158:16,19 166:5
168:1 171:12,21
175:11,21 176:1
180:22 182:3,5
183:9
**issues** 12:9 14:8
14:20 18:9 19:11
53:8 57:8 60:23
66:21 77:3 79:9
90:24 93:5,6 94:8
94:20,20 96:10
100:18 106:13
107:18,20 110:5
116:15 124:22
141:23 160:3
166:20,25 186:5
**it'll** 140:6 141:13
168:25
**italics** 149:10
**item** 186:15
**items** 64:2
**it'll** 83:2
**it's** 79:2 80:18
81:3,3,5,6 82:4
83:5,12 84:2,5,6
85:1 86:3 87:5,16
87:22 88:19,21
89:3,22 90:13,14
90:15 95:22 99:24
107:17 108:6,7,10
110:1 111:19,21
111:25,25 112:1,1
112:2 113:4
114:14 115:5,22
115:25 116:1,14
116:20,25 117:2
118:1,8,14,18,21
119:14 120:4,7,7
120:8 121:5,7,7,7
121:8,13,13
122:24 123:2,12

124:13,17 126:4
126:23 128:17,18
130:19,21 131:1
131:17 133:5,11
133:12,12 134:11
134:22 135:6
**i'd** 107:12
**i'll** 106:9 107:2
109:16 114:7,8
116:3 120:23
121:19 125:25
127:21,22 130:22
133:21
**i'm** 79:9 80:13
84:24 85:6,8,17
86:2,9,11,12,13
86:17,19 87:1
89:3 90:25 91:3
100:8 106:22
107:18 108:7,25
109:1,10 118:16
120:20 122:18,20
122:22 123:1
126:22 127:11
128:22 130:15
132:1,19,20 133:9
133:11 134:12,15
134:16
**i've** 93:15

**j**

**j** 5:6 6:19 7:19
**jacqueline** 3:18
**janjana** 9:7
**january** 36:1
**jared** 3:17
**jason** 9:7
**jobs** 60:16
**joe** 156:11
**john** 9:19
**joined** 28:10 95:6
**joining** 68:11
**joint** 2:2 25:19
57:13 66:2

**joseph** 6:12 9:9
**judge** 1:23 14:19
55:15 97:16 123:4
132:3,5 157:16
160:6 163:3
166:12,13 182:5
182:12 183:2
185:12,13
**judgment** 97:10
167:18,20
**judicata** 184:24
**judicial** 27:22
53:24 54:2
**julie** 9:4
**junior** 184:8
**justification**
56:20 57:1 58:13
**justify** 23:9 78:13

**k**

**k** 44:4 48:19,20
52:18,20 53:3
59:12 63:11 64:21
70:24 71:1,18,25
92:3
**kadish** 9:1
**kathleen** 8:14
**kcd** 56:12,17,23
66:13,16,17,23,25
67:3,25 68:5,9,10
68:14,16 69:1,15
69:16,17 95:12,16
95:18,18,19,21,22
102:18 103:23
104:11,20
**kcd's** 95:20
**keep** 32:17 36:21
41:3 58:4 88:23
118:6 119:11
163:16 187:7
**keeping** 33:7
**kept** 37:19 40:12
40:19 43:6 44:19
44:21 160:19

**key** 149:10
**keys** 17:15
**kheel** 92:3
**kick** 16:18
**kicker** 145:2
**killer** 79:19
**kim** 9:2
**kimberly** 8:2
**kind** 35:17 60:19
109:18 147:22
162:14 177:9
**kinsella** 9:11
**kitchen** 78:7
**kmart** 22:1,23
23:1 24:19,23
79:3 82:11 85:2
85:23 96:13
**knew** 23:13 27:7
50:23 59:3,4,4,5
**know** 11:23,23
12:4,8,15,17 14:9
14:11,13,25 15:17
15:19,21 16:21
19:20 20:3,13,21
20:23,24 21:6,8,9
21:10 22:2,3
23:16,25 25:8,9
26:25 27:12 28:2
34:2,3 35:21
37:24 41:10,17
42:6,17,22 43:11
44:2 45:9 46:17
46:24 47:2,6
49:17,18 50:4,16
50:22 51:25 52:16
58:8 61:3,24 62:6
62:17,19,19,21,22
63:7,10,12,24
64:1,10,19 65:17
65:18,23,24 66:19
66:20,21 71:13,14
76:9 82:2 88:21
88:23,24 89:4

[know - light]                                                                    Page 25

90:25 108:19
117:9 119:13,14
121:12 125:11
127:2,9 130:14,16
132:1 138:6,7,8
139:2 141:23
144:6,7,7,12
145:15 151:22
153:13,16 157:1
158:18,21,22,25
158:25 159:10,12
159:13,17 160:25
161:10,17 162:24
163:10,25 164:16
164:25 165:13,16
167:2 171:2 172:7
175:16 186:17,17
186:18,21 187:8
**knowing** 178:6
**knowledge** 50:21
54:6 92:1 97:16
**known** 27:15
**knows** 27:12
120:8 121:9
**koch** 8:21
**koltai** 9:3
**kosson** 8:15
**kreller** 4:13 90:20
90:20,23 91:2
105:23,24 106:2
106:15,17,20,22
107:21,24 108:9
108:15,19,21,25
109:3,14 111:13
111:18,21 112:1,5
112:8 113:25
115:2,5,8,21
116:22 117:2,6,11
117:14,25 118:6
118:11,13,16
119:1,3,7,9,12,19
119:21 120:1,21
120:23 121:3,6,15

121:19,21,23
122:5,8,11,16,19
122:22,24 123:6
123:16 124:4,6,14
124:16,21,25
125:4,25 126:6,8
126:17 127:2,5,7
127:10,13,15,18
127:23,25 128:11
128:13,16 129:2,4
129:7,9,14
**krinsky** 170:5

**l**

**l** 3:9 7:7 92:3
**labov** 6:19
**lack** 22:7 180:23
**lag** 126:19
**laid** 97:4,24
102:13 103:23
183:14,14
**lampert** 146:8
**landed** 12:9,20
**landing** 22:15,17
**lane** 185:12
**language** 14:24
15:7 21:7 60:17
89:5 106:25
113:10,10,12,14
113:23 114:1,2,3
114:5,8,9,10
115:24 119:5
120:6 123:25
124:14 126:11
127:18 138:15
142:12 148:12,13
149:10 153:2,12
169:19 170:14,22
170:24 171:3
175:15 177:1
**lanier** 3:10
**lardner** 6:14
**large** 26:7,16
98:15 102:1 120:5

**largely** 53:6 56:9
119:18
**larger** 76:24
**largest** 66:8 94:22
101:2 119:21
**late** 157:23
**laundry** 59:23
60:6
**law** 6:1 61:13 65:3
108:4 123:23
124:5,15 158:21
162:18 182:3,4,15
183:9 184:3,24
185:11
**lawfully** 136:18
**lawsuit** 132:9
144:4,21
**lawsuits** 165:17
**lawyer** 23:15,20
52:12 64:25 136:4
**lawyers** 54:15
65:2 98:8
**laying** 29:1 78:10
**lead** 103:21 186:5
**leads** 106:18
111:23
**leave** 18:2 49:20
148:20
**leaves** 68:14
110:15,16
**leaving** 46:9 47:9
**led** 21:14
**ledanski** 2:25
189:3,8
**ledger** 37:23
**lee** 7:19
**left** 10:7 17:7 31:5
106:10 170:9
172:10,16
**legacy** 32:7
**legal** 12:1 23:20
23:21 25:18,18
66:22 91:13 105:4

105:8 121:14,16
149:2 161:23
163:19,19 189:20
**legally** 132:12
**legitimate** 98:8
105:17,18 143:19
157:17
**lend** 47:24 81:25
83:6
**lenders** 24:6
43:18
**lending** 47:17
68:25
**lends** 42:16
**length** 97:20
**lengthy** 99:6,12
183:19
**lent** 47:16 81:24
**leslie** 8:23
**letter** 173:17
187:17,18,20,21
**let's** 134:1
**level** 20:16 21:23
31:6,10 99:11
116:25
**lexis** 183:11,16
**lexus** 91:20
**liabilities** 44:18
46:23 91:11,12,14
133:4
**liability** 149:12
**liberty** 4:10 5:3
**lien** 65:15 73:1,6
73:18,20,22,23
87:12,21 88:3,15
88:18 105:3 155:6
170:25 171:2
**liens** 90:5,7
**lift** 168:1,7,9
169:9
**ligee** 7:22
**light** 100:21
152:22 156:14

[light - manager]                                                                    Page 26

162:8 176:23
178:12 187:18
**lii** 8:16
**likelihood** 96:10
97:7 99:17 180:3
**limbo** 128:3,18
**limit** 105:11
149:18
**limitation** 105:15
114:21
**limited** 6:5 34:20
35:7 55:4 63:6
91:8 105:3
**limits** 114:17
**linda** 9:15
**line** 20:7 32:6
37:15 150:20
166:10,13,14
**lines** 36:9
**linked** 96:21
**liquid** 138:8
**liquidate** 65:21
**liquidated** 137:5
160:24
**liquidating** 59:17
59:25 60:2 114:12
114:17,20,25
115:8,9 116:7,8
117:3,21 130:9
131:19 132:8,24
138:8 139:18,20
139:20,21 140:15
142:9,11,15
143:16 160:23
**liquidation** 16:12
22:21 28:22 66:3
88:9 89:14 104:24
130:20 177:18,20
**list** 25:7 26:23
59:23 60:6
**listen** 159:14
163:2,15

**lists** 53:7 88:23
**literally** 62:9
117:8
**litigate** 120:9
**litigated** 60:24
186:5
**litigating** 79:8,9
155:20,23,24,25
**litigation** 5:16
14:22 16:18,21
20:12,19 21:1,2
51:23 52:8,11,14
58:14 78:19 80:22
80:25 82:3,4,17
87:5 97:8 100:22
108:4,23 111:5,6
111:7 113:2,2,17
113:18 114:22
116:5 117:9
119:17,24 120:3
128:4,19,21
133:15 135:3,11
135:14 136:3
139:17 141:3,23
142:8,14,17
144:10 145:23
147:9,17 149:3,21
149:23 150:4,5,8
155:7,14 156:8
165:9,10 179:16
179:25
**litigation's** 97:6
**litigators** 139:8
**little** 18:14 64:4
65:7 67:20 80:5
85:16 86:3,8,25
153:15,25 170:20
**live** 114:9 132:23
167:3
**llc** 5:2 93:12
**llp** 3:3,12 4:1,8,15
5:1,8,15 6:8,14
7:1,9 90:21

105:24
**loans** 24:2,7,9
25:2 26:17 27:24
27:24 28:6
**located** 27:11
**locke** 5:8 67:19
**long** 17:9,18
37:25 98:9 106:18
107:6 109:24
116:20 124:8
127:5,7 151:23
165:10 179:20
184:25
**longer** 179:10
187:8
**look** 12:3 18:18
24:14 25:15 27:23
32:3 37:2 45:2
49:12 69:21 71:2
77:19 86:20 92:16
98:6 114:7,8
116:12 120:4
133:5 137:4 138:3
140:3 148:9
155:17 159:3
**looked** 22:20
24:12 25:11 26:3
29:18 52:2
**looking** 34:6
35:10 70:1 71:8,9
72:12,13 85:8
117:19 139:9
156:20 157:7
166:3,3
**looks** 95:9 96:12
123:14 128:5
**loosely** 99:21
**lord** 5:8 67:19
**lose** 54:9 85:24
**losing** 82:19
**lot** 45:11,12,14
53:12 54:11,14
82:18,20 83:3

89:3 94:2 160:2
161:25 162:18
165:1 183:9
**lotempio** 7:21
**lots** 150:16,16
**low** 89:2 90:2,10
161:19 165:12
**lower** 83:3 90:14
**lowest** 64:15
109:16
**lumping** 104:12
**lunch** 19:25

---

**m**

**m** 7:15 52:8,10,13
**m3** 28:10
**maeghan** 8:9
**magnitude** 109:5
**main** 29:14 49:2
**maintained** 98:22
**majority** 26:12
62:6 101:15,15
102:1
**making** 14:8
18:15 50:22 68:22
73:12 74:9 89:24
99:1 125:23,24
**mall** 166:5,9
172:6
**managed** 69:9
**management**
27:14 31:9 37:2
37:11 39:20,23
40:6,24 41:4,24
42:3,11 43:14
48:21 62:13,18,20
63:4,11 70:13,15
70:17,25,25 71:7
71:9,15,15,19,23
71:24 72:3,4,7,12
98:20 100:15
**manager** 67:25
68:4

managers 67:24
mandate 16:24
manges 3:12 4:1
manner 65:10
  92:21 105:4 173:4
mansheen 6:5
marcus 3:18
  187:4,7,11,14,23
margin 100:12
mario 167:4,6
marked 24:15
  112:10
market 148:9,9
mart 44:4 48:19
  48:20 52:18,20
  53:4 59:12 63:11
  64:21 70:24 71:2
  71:18,25
massive 53:23
match 30:20
  42:13
matched 30:6
material 98:8
  126:25
materially 186:3
math 86:18
matrix 30:9
matter 1:5 18:4
  45:6 55:5,5 61:12
  61:13 67:10 83:4
  102:15 139:4
  167:21 180:4
  186:16
matters 10:10
  84:13 155:7
matthew 8:21
maximizing
  176:21
maximum 181:5
mccloy 4:8
mci 54:19,21
mcloughlin 8:9

mean 29:8 32:8,16
  32:21 37:13,14
  39:16 41:7 57:13
  63:16,20 73:7
  76:16 78:9 79:2
  81:8,17 84:23
  86:15,17,24,25
  88:22 103:7
  107:19 108:22
  115:12,20 116:14
  116:20 118:9,9
  119:2 124:5,11
  126:2,21 128:20
  129:10 130:15
  138:10 140:3
  144:14,19,23
  151:22 155:10,13
  157:10 158:15
  161:6,14 169:16
  174:1
meaning 153:11
  155:3
meaningful
  100:16 102:15
  179:17 181:2,4
means 34:22
  38:23 39:17 82:18
  82:20 130:16
  153:12 173:4
  184:20
meant 30:7 65:19
  104:7
measures 136:19
mechanism
  128:21 180:25
mediate 157:2
meenu 6:7
meet 33:20
member 101:3
members 26:24
  157:4
memorandum
  93:25 102:14

185:11
mention 16:11,15
mentioned 11:19
merchandise
  24:23
mere 70:17
merger 54:19
  64:21
meritless 148:15
meritorious
  147:13
merits 11:18
  168:8,10
mess 64:2
met 33:17
metaphysical
  109:18
method 26:6
methodology
  28:18 31:2
mh 42:21 43:21
  46:6
mich 162:20
michael 7:7 9:6
middle 36:11,12
midnight 120:25
mien 6:2
milbank 4:8
millbank 90:21
  105:24
million 10:20,24
  11:2,2,3,21 12:5
  14:23,23 18:25
  19:1 56:3,3,4,13
  57:4 66:13 67:6
  77:16,18 79:17
  82:18 85:15,16
  86:3,7,8 89:25
  95:12 96:7 106:4
  107:25 108:10,14
  111:5,25 112:1
  133:16 135:4
  136:5 138:9 139:2

139:4,22 140:16
  141:2,13 142:6,20
  149:11,19 150:8,9
  150:12,15 151:1,2
  152:5 156:24
  157:24 160:14,15
  160:16,18,20
  161:15,16,18,20
  162:3,9,12,12,15
  163:4 164:13
  165:13 178:9,21
  180:2
millions 36:15
  37:22,24
mind 61:25 96:18
  103:21 104:25
  134:20 160:3
minds 58:18
mine 184:16
mineola 189:23
mingle 6:5
minimis 74:8
miniscule 87:2
minkoff 9:5
minor 170:13
  187:18
minta 8:19
minus 151:1,2
minute 57:6 78:11
  108:10
minutes 170:6
mirror 31:23
missed 11:11
  176:1,7
missing 45:23
  46:20 64:11,12
  171:8
misstates 22:7
mistake 131:1
mittelman 9:6
mixing 90:16
modern 32:9

**modest** 94:3
102:16 185:14
**modifications**
20:10
**modified** 2:2
154:2 155:5
181:16
**modifying** 138:21
**moloney** 5:6
129:17,18,20
130:14,16,22,25
131:4,8 132:19
133:3,9,11,20,24
134:4,7,10,15,18
134:22,25 135:9
135:15,18 136:9
136:11,13 137:2
137:13,17,20,23
138:15,20 139:4
139:14,25 140:4,8
140:18,22 141:15
141:24 142:3
143:8,22,25 144:6
144:12,17,20,23
145:6,14,19
**molycorp** 160:7
**moment** 114:8
143:22,23,25
**moments** 17:12
**monday** 59:14
**money** 34:23,24
38:16 41:20,21
42:3,6,8,16,17
43:6,7 44:4,9,11
45:11,12,15 46:17
46:18 47:20,21,25
48:17,17,20,20
49:8,10 54:11,14
58:4,6 63:13
70:14,15 71:8,8
71:13,18 72:20
73:11,19 74:2,4
78:16 89:2 110:25

111:4 112:17,25
113:3,4,21 115:19
116:20 117:17
118:3,8 121:4,12
122:13 131:5
132:6,9 135:11,18
135:19,21,22,23
136:6 140:18
142:23 143:5,19
144:16,20 157:16
157:24 160:8
162:21 165:1
**monies** 48:16
**monster** 107:9
**month** 19:6 21:17
**monthly** 128:5
**months** 28:11
62:5 80:22,24
82:17 99:8,15
107:8 110:2 180:4
**months'** 103:16
**moony** 71:10
**moot** 145:17
169:21
**mootness** 116:15
137:18 145:12
**morning** 17:2
114:3 137:25
146:20
**motion** 168:1,7,9
168:13 169:9,14
169:21 171:24
186:20
**move** 83:13
109:16 111:4
112:17,25 121:4
138:19,20
**moved** 30:7 38:1
76:20
**moving** 110:25
121:5,7
**multifactor** 97:21

**multiple** 27:25
28:2 91:11 92:5
98:23 102:24
**murphy** 19:24
20:3 21:10,20
23:5,9,10,22
24:12,14 26:2,5
26:19 28:9 29:3
29:16,18 31:20
34:5,6,21 36:8,25
37:12 49:14,17
51:15 54:5 64:3
64:24 65:1,11
76:5,7 99:10
**murphy's** 30:15
31:5,23 41:19
48:15 62:16 64:25
**murphy's** 99:3
102:14 103:15
**murry** 6:4

# n

**n** 3:1 10:1 189:1
**n.d.** 93:18
**name** 25:7,18,25
**narotam** 1:25
**narrow** 167:16
**national** 7:10
**native** 58:23
**nature** 65:11
67:21 97:17
**near** 179:17 180:4
**nearly** 102:20
**necessarily**
107:11 143:6
158:14
**necessary** 50:5
111:8 178:10
**necessity** 59:1
103:2
**need** 35:14 44:1
47:7 48:19 49:12
57:8,21 63:9
83:17,18 118:22

124:11 132:20,20
133:22 134:7,13
141:19 152:18
163:17 165:14
176:9 177:18
179:23 184:4
185:14,15
**needed** 42:6,7
48:17,20
**needs** 38:4 42:13
94:9 133:1
**negate** 85:22
**negative** 43:25
55:11 155:25
**negotiate** 59:19
**negotiated** 53:1
96:17 144:3 159:6
159:11
**negotiating** 65:5
100:23 101:5
171:13
**negotiation** 96:20
121:11
**negotiations** 62:1
66:23
**neither** 12:25
13:15 14:12 37:6
39:6 45:10 174:12
174:14 180:15
181:12,18 183:7
**nester** 8:19
**net** 30:11 36:23
38:4,21 39:15
40:2 42:11 43:14
43:24,25 44:8,11
45:9 46:2,4,13
50:8,12 62:19
63:1,3,14,18,23
77:3 82:10 98:22
99:5 141:7
**netted** 36:7,16
37:20,25 38:9
45:18,21 46:8

[netting - offered]                                                                 Page 29

**netting** 46:14 72:7
83:15 100:14
**neutral** 101:19
**never** 17:10 24:12
25:11 26:3 28:22
51:14 60:10 89:13
**nevertheless**
31:25 56:10 83:4
94:12 178:19
**new** 1:2 3:6,15
4:11,18 5:4,19
6:10,17 7:5,13
54:22 81:7 92:2
107:19 133:1
149:22
**night** 120:25
156:17 187:13
**nominal** 130:6
**nomination** 95:17
**non** 45:3 50:11
52:18 59:7 66:6
76:6,22 85:14
95:2,11 171:23
172:23 178:12
182:5,15 184:10
**nonconsolidation**
21:16 22:5
**noon** 146:23
**normal** 75:7,17
77:1 87:25 88:14
182:2,4 184:3
**normally** 89:1
156:4
**north** 7:2
**notably** 19:1
**note** 12:22 27:20
61:1 89:22 91:9
107:12 128:1
177:22 184:14
186:22
**noted** 64:2,3
89:23 102:4 148:5
148:8 181:17

**noteholders** 52:19
54:21 68:12 73:15
74:7,12 87:23
88:14
**notes** 17:22 18:1
56:23 65:24 68:10
69:15,17 89:24
98:16
**notice** 2:1,1 14:4
15:16,17,21 27:22
53:24 54:2 81:9
124:18,21 125:1
125:13,14 126:3,5
146:20 147:14
148:22 158:6
171:11,17,19
172:4 175:4,18
180:20 182:14
183:21
**noticed** 82:8
166:8
**notion** 110:24
111:21 115:15
117:16 156:7
**notwithstanding**
106:24 114:11
**nuanced** 84:13
**number** 26:20
53:5 67:22 68:18
93:19 156:23
**numbers** 50:7,13
54:18 55:12,16
101:14,25
**numerous** 93:7
**ny** 1:14 3:6,15
4:11,18 5:4,19
6:10,17 7:5,13
189:23

---

**o**

---

**o** 1:21 10:1 189:1
**o'neil** 69:13,14,22
69:24 70:2,6

**oakwood** 123:4
**oberg** 8:17
**object** 17:1 22:7
80:6 96:24 97:12
124:22 125:12
140:23,24 154:25
182:10 184:20
**objected** 61:15
101:20 104:5
117:8,17 120:24
144:3,9,24 171:10
172:22 173:23
184:5 185:5
**objecting** 59:22
60:6 73:9 75:13
94:11 119:15,16
130:8
**objection** 10:14
11:8 23:3 24:9
28:16 30:24 31:13
33:10,12,21 35:8
35:19 37:21 38:11
38:24 39:12 40:7
40:25 51:24 52:15
56:6 74:23 81:10
101:24 104:3,21
105:17 107:3
108:17,18 109:13
115:13 120:19
129:12,24 133:6
136:8 142:5
146:19 155:19
156:3 157:10,11
159:9 166:7,21
167:3,4,8,15
168:3 170:2,3,7
170:10,13 171:6
172:17 176:7,14
181:17
**objections** 57:19
57:20 94:4 106:24
107:3 129:11,20
165:22,23,25

166:16,17,19,23
166:23 170:17
177:5 184:13
**objector** 96:12
144:9
**objectors** 185:20
**objects** 104:22
**obligated** 74:13
**obligation** 37:10
**obligations** 28:2
37:4,5 49:7
123:21
**observations**
35:10
**obtain** 32:13
114:19 179:11
**obtained** 97:18
167:18
**obtaining** 181:5
**obv** 158:19
**obviate** 54:17
**obviously** 12:3
51:17 94:6 97:17
97:21 107:12
118:10 146:25
147:13 149:1
153:19 163:3,13
**occur** 58:15 95:16
96:2 145:23
163:23
**occurred** 35:25
58:14 60:11 74:6
148:23
**occurrence**
124:18
**occurs** 110:24
111:1 141:16
**october** 1:16
59:13 91:21 168:3
189:25
**offer** 182:20,25
**offered** 15:8 18:20
51:3

[offeree - owed]                                                         Page 30

**offeree**  182:19,23
  182:24
**offeree's**  182:21
**offeror**  182:17,22
**offers**  21:4
**office**  26:24
**officer**  149:7
**officers**  97:18
**offices**  27:10
**official**  95:5 181:1
**offset**  10:18
**oh**  15:25 16:11
  30:1 80:4 85:11
  86:23 139:15
  150:19 152:11
  166:10
**okay**  10:2,11 11:5
  11:14 12:10,19
  15:14,25 17:5,6,7
  24:16 25:6 26:15
  33:23 34:14 36:19
  38:19,21 39:25
  40:4,12,15,21
  41:2,11 50:18
  61:15 67:12,15,15
  67:16 69:3,12,23
  70:5 72:22 75:9
  75:12,22,24 76:15
  78:1,12 89:5,18
  89:20 90:22 91:3
  105:22 106:16,21
  109:2 111:12
  112:4,7 116:12
  121:20,22 122:23
  123:1,15 125:10
  125:19 126:6
  127:14,24 128:15
  129:1,3,8,10,16
  130:22,24 131:3
  139:13,25 140:17
  140:21 145:20
  146:14,17,24
  147:3 148:1 149:6

151:19 152:1,14
153:4 154:6 156:5
156:6,10 158:11
158:12,18 164:8
164:11,17,21
165:21 166:12
167:11 169:7,22
169:23 170:16
171:5 172:6
173:20,22 174:5
175:3 176:1,5,6,7
186:24 187:2,24
**old**  49:15 64:19
  189:21
**once**  131:22
  162:23
**ones**  72:17 166:10
**one's**  82:20
**ongoing**  61:25
  66:23 76:3 187:1
**open**  103:2 171:13
  175:21
**operate**  51:1
**operated**  50:25
  64:20
**operates**  164:15
**operating**  29:15
  64:22 93:12 124:7
**operation**  26:16
**operations**  26:24
**opining**  33:15
**opinion**  33:9
  51:17 102:2
  183:20
**opinions**  33:22
  34:1
**opportunity**
  15:21 64:13 83:14
**opposed**  43:13
  48:10 55:17 58:16
  58:18 73:22 99:5
  100:14 146:7,10
  146:12 157:4

159:1 185:22
**opposes**  105:9
**opposition**  58:17
**opt**  11:7 12:25
  13:1,10,10,11,11
  13:12,15,15 14:10
  14:11,12,12
  180:16,16 181:6
  181:18,19 183:7,8
  184:18 185:2
**opted**  172:23
  185:4,6
**optimist**  132:1
**opting**  175:25
  181:3
**option**  181:6,10
  182:10 185:1
**options**  181:8,13
  183:24
**opts**  13:21
**oral**  185:20
**oranges**  90:16
**order**  14:1 15:13
  16:19,22 17:4
  35:14 49:15,23
  50:11 51:8 62:21
  81:25 87:11 105:6
  107:1 110:6
  111:14 113:7
  114:17 115:25
  120:12 122:2,7,8
  122:9 123:3,19
  124:10,18 126:8
  126:14 128:1,10
  128:11 130:7,17
  130:19 132:16
  133:14 134:14
  141:19,21 142:21
  153:8,9 157:14
  159:4 161:1
  163:17 164:3,14
  176:25,25 178:22
  185:15 187:11,12

187:18
**ordering**  91:23
**orders**  25:4,7
  114:15 120:15
  133:23 160:8
  187:16
**ordinarily**  88:4
  182:17
**ordinary**  36:15
  105:12 110:18,19
  112:21 155:7
**organized**  34:18
**originally**  94:24
**ought**  60:18 111:9
  113:14,15,21
  116:22 117:4
**outcome**  132:12
  132:13
**outline**  64:9
**outside**  16:23
  33:25 105:13
  110:19 142:6
**outstanding**  26:17
  27:24 110:9
  168:22,25 169:1
**overall**  30:9
  100:16
**overlapping**
  26:23
**overreaching**
  143:14
**oversight**  71:11
**oversimplified**
  70:14
**overstated**  151:20
**overwhelmingly**
  53:10 55:11,13
**owe**  38:5,6 39:5
  40:2 41:20 43:15
  71:14
**owed**  34:23,24
  37:4,5,20 38:13
  38:14 39:4 41:14

[owed - people]                                                                 Page 31

41:21 43:18 45:10
45:12 46:2,4,9
47:20,22 63:11,12
63:13 91:12 165:6
**owes** 38:6,8 43:13
43:24 45:10,11,14
46:24 47:8 48:14
71:10,13,15 72:13
72:17 83:16
**owing** 47:4 48:8
62:20 63:23 99:5
**owns** 69:15

**p**

**p** 3:1,1 10:1
**page** 20:6 24:4,13
24:14,17 26:7,8,9
28:13,23 29:22
30:17 31:7,7 32:5
32:19 33:6,24
34:8 35:1 36:10
36:12 37:12 49:20
51:5,6,20 64:9
65:24 93:2 94:4,5
100:8,8 138:7
139:15,16 140:14
142:4 147:5 156:1
**pages** 26:20 64:10
**paid** 13:22 41:12
47:12,15 48:23
49:1 59:24 60:3
60:17 73:19,21
74:5,10 88:8 89:1
105:20 109:7
128:8 137:8
142:24 144:25
150:8 156:2,3,4
159:16,17 162:2,3
162:23 165:5
179:24
**paragraph** 15:9
15:12 19:12 23:12
24:16,21 26:9,20
115:25 128:1

130:7 136:14
142:3,4 147:24
149:9 153:8
**paragraphs** 62:17
153:12
**paramount** 97:10
97:25 101:17
**paraphrasing**
35:3
**pardon** 146:11
**park** 3:5 6:9,16
**part** 25:13 28:3
32:6 34:14 46:19
68:1 69:20 70:21
90:17 103:4
121:11 130:17,23
136:13 158:10
161:13 183:6
186:23
**participate** 13:18
129:24
**participated** 61:3
61:4
**particular** 12:8
14:14 18:23 37:4
41:14 50:12 53:13
58:5 92:18 97:23
97:23 106:23
135:10 143:13
177:7
**particularly** 24:6
55:9 83:12 94:7
102:18 156:14
**parties** 10:16 13:3
15:20 17:1 20:21
20:24 21:6 62:3
63:24,24,25 64:1
65:5 76:20 94:10
97:13 100:10,23
110:13 124:22
149:14 153:23
157:1 158:4
159:18 164:2

166:23 168:17,20
169:3 170:21
172:22 173:2,11
180:20 181:18
182:1,14 183:7
185:7 186:6
**partners** 105:25
158:14,21
**party** 53:2 77:22
94:10 120:4
121:12 129:6
157:20 170:1
171:23,23 172:9
172:18,23,24
173:3 175:23,25
183:4 184:19
185:5
**pass** 38:9
**path** 186:9
**paul** 4:6 6:19 9:16
**pay** 37:16 38:16
38:23 41:22 42:18
44:9 45:12,13,15
45:16 48:22 50:11
50:12 60:8,11,20
60:22 61:6 72:13
74:3 83:7 87:20
88:16,17 89:14
96:2 105:4,7
109:25 135:10,12
136:1 137:4,6
180:23
**payable** 37:8,10
37:17 38:18 40:3
41:15 44:8 62:19
63:2,4,18 65:5
**payables** 30:10
36:14 39:5,7 40:5
50:12 63:20
**paying** 82:11
128:4 151:5
**payment** 60:3
82:5 104:24

105:10,11 136:15
158:7 177:25
178:10
**payments** 89:24
125:23 178:10
**pbgc** 18:24,25
19:10,15,23 20:10
20:11,18 27:7
28:3 55:25 56:2,8
56:16,25 57:3
58:15 61:23 62:1
66:2,4,6,13,18
67:23,23 68:2,14
68:24 69:4 70:3
78:9 79:15,18,20
79:23 80:1,8,21
94:22,25 95:5,6,8
95:10,15,17,17,20
96:15,22 101:2
102:18 104:2,6
106:6 107:13
176:11,15
**pbgc's** 56:16
57:11 68:18,20
176:17
**pbgc's** 96:23
104:9,14,18
**pearl** 4:16 10:14
10:17,23 11:6,20
12:4
**pearl's** 11:17
**penalized** 141:12
**penalty** 39:10
155:20,24
**pending** 115:16
115:18 123:19
149:21 171:10,17
171:24
**pension** 5:9 67:19
68:10
**people** 28:17
42:17 53:25 77:25
84:10 119:15

Page 32

145:4,6 165:24
**peopleready**
171:9
**percent** 13:6,22
17:22 31:6,10
44:4,5,5,5 51:16
51:22 52:1,6,21
52:22 53:3,18,20
53:22 54:3,4,6,8
54:20,23 55:3
59:12 64:24 77:13
77:15,15 82:19
84:22,23,25 85:1
85:21 86:4,5,6,7,8
86:11,21 87:5,6,9
90:14,15 99:11
100:19 162:14
164:12 165:12
181:5,7
**percentage** 57:25
102:15
**percentages** 53:13
83:3 87:9
**perfect** 131:2
187:14
**perform** 35:14
158:23
**performed** 28:24
**performing**
163:25
**period** 21:17 22:8
29:24 35:25 38:2
62:7,7 99:13
103:17,18 109:21
112:16 116:19,23
117:20 118:19,21
124:22 127:7
128:3,18 162:16
179:1
**periodic** 40:16
**perjury** 39:10
**permitted** 110:18

**personal** 173:22
**perspective** 30:5
**pertain** 77:2
166:24
**pertained** 137:3
**pertaining** 93:6
100:21
**petition** 29:19,24
31:6,11,16,19
32:13 34:5,10,15
34:19 56:13 62:6
76:11 99:9 103:17
**phil** 70:8 152:2
**philip** 3:8 5:21
145:21
**phone** 75:4 88:23
167:2,6 172:13
175:16
**phrase** 51:8
**phrased** 92:8
99:24 154:19
**phrases** 99:24
**pick** 10:7 60:10
**pickering** 5:15
145:22
**picking** 60:23
**piece** 107:24
**pipe** 135:11
**pivot** 69:4
**place** 12:2 58:4
110:16 131:15
132:18 167:25
**placement** 177:2
**places** 71:5 126:9
**plain** 122:2 159:4
175:15
**plains** 1:14
**plaintiff** 57:10
167:17
**plaintiffs** 149:13
**plan** 2:3 11:9
13:22 18:8,11,12
18:13 19:4,7,10

19:11,17 20:5,9
21:11,15,16 22:5
22:6,19 23:7 27:9
50:2 52:4,18,21
53:11 55:21 56:1
56:7 57:7,18,20
57:21,22,24,24
58:20,21,24 59:13
59:16,16,18,22
60:7,20 61:9,10
61:10 65:18,20,20
65:23,25 66:1,2,3
66:6,8 68:23 69:5
69:7 70:21 75:13
75:15 76:6,21
79:16,23 80:9,11
81:1,2,4,7,8,10,13
81:23,24 83:4,5
83:18,18 85:3,20
85:24 86:3,20
87:7 88:9 89:13
91:4,5 95:3,4,4
96:25 101:10,12
101:16 102:1,9
103:1 104:8,17,23
105:7 107:4,7,7,8
107:11 109:20
110:5,10,12,21
111:2 113:5,17
114:12,17 115:1
116:8,17,24 117:1
117:7,13 120:11
120:11 121:10,23
122:2,24 123:11
123:19 124:8
125:18 126:10,22
128:16 129:21,22
129:25 131:5,9,19
132:11,14,21,21
132:25 133:7,12
133:13,13 134:2,5
134:5,13,21,22,25
135:1,2,2,3,13,20

135:21,22 136:19
137:22,23,24
138:2,5,22 140:2
140:24 141:6,22
143:3,6 145:11
155:8 156:1
160:10,10 163:3
165:2 166:16
167:13,15 168:4,4
168:14 169:4,17
169:20 170:11
171:16,20 172:1
173:1,13 174:21
174:24 176:10,11
176:18 177:6,11
177:14,17,19,21
177:23,24,25,25
178:6,7,10,17,21
179:20 181:23,25
183:3,4 184:7,8,9
184:9,17,18,21,22
185:7 186:25
**plan's** 175:17
**planned** 18:18
**planning** 27:13
**plans** 81:18 178:4
**play** 67:8 71:12
118:6
**playing** 131:21
**plays** 75:6,11
**plaza** 5:3
**please** 23:19
**pledger** 66:17
**plenty** 145:4
**plucking** 159:18
**plus** 33:3 53:20
77:5 155:24
167:20 168:8
181:15
**pm** 1:17 188:2
**podium** 131:2
**point** 16:7 32:6,7
32:25 36:21 45:17

46:16,16 47:5
50:24 54:16 57:3
57:16,17 59:1,8
59:15 61:18 62:16
62:21 71:17 72:23
72:24 74:16 79:15
82:14 83:15,17
93:3 106:20
108:22 109:17
118:20 120:14,23
121:3 122:19,21
123:2,2 124:15
128:7 130:2,4,17
130:25 131:4,16
132:7 139:10,25
147:5 148:20
149:25 153:15
154:16 155:4
161:7,22 169:15
170:10 174:13
175:23 180:19
185:24 186:1
**pointed** 36:6
**pointing** 76:19
**points** 59:9 70:10
76:3 83:14 87:10
107:2 109:11
115:6 123:17
130:1 148:21
153:7 172:8
**policy** 149:18
150:8,9,20,21,21
150:21 151:8
**pool** 62:10,12
63:17 91:15
**poor** 181:12
**portion** 42:5
152:19 159:21,24
159:25
**position** 38:20
65:17 89:13 95:25
96:18 103:20
104:18 118:19

119:3 136:20
147:25 148:2
152:10 176:17
186:9
**positioning** 186:6
**positions** 103:12
**positive** 43:25
102:3
**possession** 110:12
110:16 123:20,24
124:8 128:19
130:4 178:7
**possibility** 91:25
95:2 97:6
**possible** 64:19
68:25
**post** 15:19 16:24
29:19,24 31:6,11
31:16,18 34:5,10
34:15,19 56:13
62:6 76:11 99:9
103:17 112:16
116:13,23 117:19
118:18 119:6
120:8,15,18 125:1
132:24 145:17
**posted** 168:22
**posting** 115:16
**posture** 123:10
**pot** 42:3 44:9,13
46:21,25,25 47:3
47:10,18 49:2,20
57:24 58:6 72:19
83:5,18,19 103:8
132:25
**potential** 10:23
12:15 20:12,19
21:1 29:3,16
60:13,14 112:13
113:3 179:9
**potentially** 56:13
60:15 109:4
112:18 119:22

126:19 127:10
131:11,12 179:11
179:19
**power** 66:12
91:24 102:6
104:10
**powers** 91:6
**practical** 92:21
139:4
**pre** 54:19 68:1
100:11 112:16
116:19 118:20,24
119:2 121:6,18,20
128:3
**precedent** 183:18
**preference** 10:23
11:18 12:3,10
16:23,25 160:22
161:20,23 165:10
165:16,18 179:1,3
**preferences** 64:1
**pregnant** 153:16
**prejudice** 92:18
102:9 111:10
113:3 129:23
**prejudiced** 102:8
144:1
**preliminary**
17:19 18:3
**premature** 113:4
**premised** 79:16
**premiums** 65:5
**prepare** 35:17
55:1
**prepared** 51:2,10
51:14 67:13 73:17
73:18 87:20 96:24
157:1 176:9
**preparing** 165:16
**prepetition** 34:7
34:12,18,20 35:5
35:6,10,15,24
49:23 50:5 103:18

**preponderance**
177:16
**present** 7:17
64:14
**presented** 168:2
**presents** 65:1
**presumes** 44:17
120:13
**presuming** 46:22
**pretty** 36:5 82:7
145:11 165:1
**prevail** 131:23,24
131:25 132:2
136:16
**prevails** 136:16
**prevalent** 64:6
**previously** 34:9
42:4 80:14 93:15
93:24 168:2 180:1
183:17 184:15,16
**price** 7:1 148:10
**primarily** 24:18
35:13 186:1
**primary** 64:22
76:9 92:8 149:25
**principal** 92:24
**principally** 26:11
**principle** 98:2
183:1
**principles** 33:18
182:3,4 184:3
186:25
**prior** 15:18,19
35:1,3 67:22
140:19,23 152:22
157:20 174:18
185:11
**priority** 18:25
56:3,8 98:4
114:19 131:12,13
131:21 132:5,6
135:25 136:18
137:6 178:11,12

**pro** 49:11 57:25
94:20 155:8
163:12 167:14
168:5
**probably** 99:14
110:1 119:23
131:24 139:5
145:16 157:3
160:18 161:12,20
162:7,8 163:7
165:13
**problem** 21:25
22:24 23:8 27:6
56:14 59:14 60:12
68:24 72:8 78:7
78:13 99:17 113:4
115:22 133:13
135:1,15,24
140:19 155:2
**problematic** 32:1
187:20
**problems** 79:14
**procedural**
123:10
**procedures**
112:22 121:12
**proceed** 16:6
169:8 185:21
**proceeding**
172:12 179:10
**proceedings**
188:1 189:4
**proceeds** 110:17
132:4 136:17
141:7 142:9,14
147:8
**process** 22:12
30:18,21 99:12
160:24
**product** 40:24
97:20
**professional**
156:18,22 160:9

180:7
**professionals**
101:4 108:2
112:19,21 118:6
118:13,14 128:5,8
140:11 158:8,20
159:18 162:2
163:10 177:4
**program** 11:1,7
12:22 13:3,16
116:11 153:20
154:13 162:15
180:8 183:19
186:19
**progress** 6:3
**prohibitive** 100:4
**prohibitively**
103:10,13,19
**project** 178:25
**projected** 85:15
87:3 90:10 102:17
161:15 178:8,11
**projection** 178:13
**projections**
160:13,15,16
178:18,19
**prolonged** 109:21
126:19
**prominently**
96:12
**promptly** 178:21
180:13
**prong** 27:17 64:5
99:19,21
**prongs** 23:24
98:12
**proofs** 25:16,17
25:23
**proper** 33:8 70:20
71:11 180:13
181:22,23
**properly** 32:21
96:21 104:20

143:20 166:8
**property** 15:3
40:17 111:16,16
111:19 115:19
116:6,21 118:21
120:7 121:8 130:9
131:10 162:22
184:8
**proponent** 177:14
**proposal** 91:4
**proposed** 14:1
15:13 16:9,10,17
92:16 93:4,11
94:19,24 95:1
97:13 110:6,23
111:14 113:10
114:3,4 124:25
153:9 154:23,23
171:20 176:18,19
177:20 178:4
**proposing** 113:24
178:5
**proposition**
185:10
**prosecute** 52:9
**prospective**
147:16,17
**protect** 102:23
**protected** 58:10
**protecting** 173:11
**protection** 158:24
159:6 170:22
**protective** 113:14
**protracted** 97:7
**prove** 64:14
**provide** 15:17,20
19:4 20:1 21:24
88:10 117:1
132:11,12 155:5
160:8 171:1 177:8
180:10 182:13
185:25

**provided** 19:1,17
26:11 33:21,25
41:6,8 116:7
121:24 142:7
158:23 160:13
177:1 184:21
**provides** 79:23
81:24 85:20,24
89:17 102:10
116:24 121:24
149:12 177:14,25
**providing** 21:3
26:13
**provision** 60:20
61:7 88:13 104:22
113:6 117:15
124:17 125:1,18
126:9,22 128:2
134:23,25 135:2
143:14,19 145:11
155:5 156:2 173:1
183:17 184:25,25
185:1
**provisions** 105:1
124:12 130:10
138:1 144:1 160:8
176:12 177:16
**psychological**
119:14,16 121:14
**public** 18:4 26:7
26:16 27:4,21
33:14 74:12
**pull** 63:16 64:18
**pulling** 113:6
**purcell** 6:4
**purchase** 25:4,6
**purchased** 24:22
25:5,19
**purchasers** 157:5
**purported** 19:7
**purports** 133:15
**purpose** 53:7 57:2
87:17 119:9

**purposed** 52:22
**purposes** 63:22
  123:11 135:23
  141:3,4,10,23
  176:20 180:17
  181:20
**pursuant** 19:9
  25:4 68:20
**pursue** 66:13
  95:12,23 98:9
  108:24 111:11
  118:4 132:22
  135:11 173:5
**pursued** 104:8
**pursuing** 95:19
**push** 32:2
**pushing** 58:19
**put** 15:2,17 39:25
  41:3 42:14,16
  43:6 46:17 48:18
  49:7 55:8 60:20
  71:22 72:10,14,19
  125:7,11 131:5
  133:12 142:22
  154:8 158:6
  159:12 160:5
  172:11 173:17
**puts** 44:4 71:18
  162:14,15
**putting** 47:24
  52:3 71:20 85:21

**q**

**qbe** 150:20,23
**qualified** 51:15,18
**quarropas** 1:13
**queried** 29:25
**query** 32:2
**question** 20:8,17
  20:18,23 21:20,21
  22:13,16,23 23:15
  23:18,19,21 24:4
  24:14,16,20,25
  25:5,9,11,12

26:10,15 28:23
29:5,7,22 30:2,11
30:21 31:14,17
32:5,12,15,19,20
32:25 33:2,6,11
33:13,19,24 34:2
34:9,14 35:1,5,12
35:17,19,21,23
36:2,8,19 37:18
37:19 38:5,19,22
38:25 39:2,9,16
39:19,22,25 40:4
40:9,10,10,12,15
40:19,21 41:2,11
50:4,14,16,18
51:6,10,21,21
52:1,7,10,13
78:24 92:24
105:16 109:5,18
157:17 162:17
**questioned**
  185:21
**questions** 23:17
  34:21 35:2,4,7,9
  35:12,13,24 66:11
  76:8 105:14
**quick** 167:17
**quicker** 47:6
**quickly** 69:13
  89:21 165:9 167:1
  187:5,8
**quietly** 75:14
**quite** 61:12
  111:18 114:23
  124:1 143:12
  183:13
**quo** 110:13
**quote** 41:6 147:4
  147:7,8,12,13
  177:16
**quoted** 92:22
  142:5

**r**

**r** 1:21 3:1,17 4:6
  4:13 10:1 183:18
  189:1
**rachel** 8:7
**rai** 1:25
**raise** 96:9 105:17
  107:20 141:24
  146:18 175:23
**raised** 12:24 14:8
  18:10 56:6 57:8
  59:9 87:11 107:18
  108:17 115:13
  129:12 157:11
  166:4 170:12
  186:5
**raises** 98:12
**ran** 84:1
**randomly** 25:15
**range** 64:15
  109:16 160:21
  161:21
**ranges** 161:15
**rata** 49:11 57:25
  163:12 167:14
  168:5
**rational** 96:19
**ray** 61:19
**raynor** 5:13 67:18
  67:19 68:3,8 69:2
  69:6,11
**rdd** 1:3
**reaction** 183:25
**read** 31:17 42:5
  116:3 119:5
  139:17 140:13
  141:6 142:12,18
  142:18 147:6,15
  169:20 173:10
  187:15,17
**reading** 43:23
  89:11 122:2 142:4

**reads** 127:18
**ready** 43:12 186:2
**real** 21:25 23:7
  27:13 59:1 99:17
  109:24 150:25
  157:17 183:10
**realistic** 165:11
**reality** 17:11
  124:2
**realizing** 165:8
**really** 12:17 13:8
  24:1 34:6,6 47:16
  50:19 51:19 53:8
  57:3,15 59:11
  64:11 65:19 69:13
  79:21 83:22 87:22
  89:21 107:19
  108:3 109:17
  110:6,11 129:22
  137:21 139:6
  149:7 155:19
  156:17 160:6
  162:1,4 166:6
  167:17 180:16,17
  186:13 187:21
**reason** 21:21
  105:15 112:17,17
  112:25 114:15
  119:18 120:24
  126:2 128:13
  159:17 182:23
**reasonable** 31:11
  60:9,22 66:1
  74:20 79:24 80:7
  80:20 96:19 100:5
  100:20 104:11,25
  155:6 160:13
  163:22 164:19
  176:16 178:19,25
  180:22,24
**reasonableness**
  64:15 109:16

reasonably 78:2
80:13 100:11
reasons 66:5
76:20 151:21
184:15
recall 66:15 90:1
receipts 98:20
receivable 37:7,7
37:10 38:18 44:11
63:1,4,18
receivables 30:10
36:15 37:16 39:4
39:7 40:5 49:9
50:9 63:20
receive 10:17 31:8
38:17 57:25 87:17
147:7 148:16
177:11
received 53:18
54:20
receiving 184:8
recite 10:15 14:24
recited 166:15
recognized 91:7
recognizes 136:15
recognizing 106:9
reconciliation
100:4
record 14:25
41:13 56:15 64:12
80:3 89:22 95:14
95:20,24 96:16
106:24 109:14
152:3 159:13
168:16 169:18
179:25 180:2
181:16 186:22
189:4
recorded 30:19
41:18 42:8 62:25
63:3
records 29:4,17
33:8 38:19 40:13

41:13 50:8
recoupment
170:13
recover 53:18,20
82:24
recovered 54:21
recoveries 49:25
55:3 87:4,5 90:2
90:11 102:16,20
147:8 148:16
165:12 176:21
178:25 179:11
recovering 173:4
recovery 13:4,17
13:20 38:17 52:20
52:22 53:22 59:12
82:20 85:10,14,21
86:3,11,21 87:6,9
90:14 95:10
102:12,24 108:12
114:20 149:5,12
152:25 162:4
181:6,7
redo 187:19,21
reduce 102:20
179:4
reduced 10:19
102:25 103:22
186:3
reduction 144:3
179:3
refer 24:5 151:15
185:10
reference 138:7
139:10
referenced 21:7
25:1 177:2
references 138:8
referred 20:4
34:21 99:22
referring 20:14
22:14 35:23 87:8

refers 20:18 31:24
51:7
reflect 22:8 38:19
50:9 55:10,22
84:21,22,24
reflected 50:8
reflection 165:3,5
reflects 14:1
refusing 80:7
regard 176:13
177:15
regarding 20:12
20:19 21:23 35:13
104:24 172:25
177:2
regardless 58:20
105:8
regards 21:4
22:15 34:17 39:1
regime 132:24
reiterate 184:14
reject 55:21
167:15 172:1,3
rejected 101:12
114:4,6 115:4
123:25 171:16
173:25 174:3,11
174:25 175:4,18
rejecting 101:16
101:25 104:15
rejection 174:18
related 34:4 93:8
126:23 129:21
146:9 154:20
161:25
relates 59:15
139:23 173:13,14
relating 150:5
relative 97:11
relatively 94:3
102:16 106:9
179:1,15,17 180:4
180:22 185:14

refers 20:18 31:24
release 172:23
175:23,25 179:3
184:19,19,20,25
185:1,6,8
releases 97:18
148:3 150:5,6
185:6
releasing 129:6
170:1 172:9,18,24
relevant 22:17
122:12 130:1
reliance 183:5,25
reliant 64:7
relied 37:22
183:16
relief 168:17
relieve 102:7
reluctant 179:19
rely 20:22 65:15
92:10
relying 20:15
80:16 183:22
remain 15:3
112:20 116:6
119:10 123:20
168:6,17 170:17
remaining 26:13
94:4 110:15 165:8
166:17 182:24
remains 131:10
131:11
remarks 152:22
remedy 92:21
102:5 145:10
remind 151:23
reminder 106:3
removed 15:4
112:12
rendered 96:13
rendering 78:20
reorganization
177:18,20

**repeated** 21:19
**rephrase** 21:18,19
  23:19 38:25 40:8
**replacement**
  170:25 171:2
**reply** 93:20,25
  102:13 185:11
**report** 10:13
  157:8
**reported** 31:4
  93:19
**reporting** 15:18
  27:13 128:21
**represent** 108:4
  145:22 146:8
**representation**
  79:21
**represented** 96:23
  179:13
**representing** 54:1
**reprise** 142:20
**republic** 78:18
  91:18 92:19 93:15
  100:6
**request** 19:25
  32:10 123:8
**requested** 15:15
  123:17
**require** 18:10
  103:4 177:22
**required** 27:2,3
  123:2 159:8
**requirement**
  160:10 177:6
**requirements**
  18:17 33:17,20
  123:21 158:22
  184:10
**requires** 19:21
  55:19 95:4 177:24
  180:20
**requiring** 99:22

**requisite** 95:15
**res** 184:24
**reserve** 115:13
  116:5,9 120:20
  121:23 122:3,20
  123:1,8 131:17
**reserves** 121:24
**resolution** 10:9
  12:11 102:19
  169:2 180:8,22
  186:2
**resolve** 168:19
  170:22 179:19
**resolved** 11:16
  12:1 59:14 94:2
  108:3 166:2,4,16
  169:11 171:11
  172:8 176:3,4
**respect** 11:25
  12:22,24 16:22
  19:23 27:2,17,18
  28:8 34:15 35:5
  35:24 36:3 56:17
  70:11 71:11 72:23
  101:7 103:17
  104:11,20 125:1
  132:21 135:24
  137:24 139:20
  143:11 149:3
  150:1 153:7
  154:17 168:25
  170:13,18 174:7
  174:10 177:9
  184:24
**respective** 184:1
**respond** 35:9
  83:14 150:11
**responded** 35:2
**responding** 34:21
  35:4,7
**response** 61:18
  156:17

**responses** 30:4
**responsibility**
  41:25
**restatement**
  182:16 183:17
**restatements**
  53:24
**restivo** 23:24 64:5
  78:15 91:8 92:7
  92:13 98:12 99:19
**restructuring**
  186:13
**result** 52:17 92:15
  145:9 147:18
  168:14
**results** 30:11
  104:15
**retail** 40:22
**retain** 13:21
**retained** 12:12
**retainer** 108:1
**return** 60:1 179:3
  181:3 182:9
**returns** 27:2,3
**reversal** 133:23
  133:25 134:13
**reversals** 132:15
  134:8
**reverse** 132:16
  145:10
**reversed** 120:11
  120:12 141:17,20
  141:21
**revert** 66:2
**review** 12:6 14:5
  32:4 62:6,8 76:3
  165:25 179:7
  180:13 181:14
**reviewed** 31:9
  178:15
**reviewing** 29:4,17
  97:17,25

**revised** 14:3
  146:20
**ri** 9:2
**rick** 8:4
**rid** 155:24
**rides** 174:23
**ridiculously** 89:2
**riffkin** 9:15
**right** 14:17 16:2,8
  24:23 28:23 31:16
  31:19 33:20 37:21
  38:24 39:16 42:25
  43:17 44:1,24
  48:1,16 51:5
  57:23 58:9,21
  68:7 69:12,20
  70:7 75:10,22
  80:10,12,18 81:21
  86:18 87:13,15,18
  88:4,25 89:18
  90:12,19 96:24
  104:18 106:19
  111:20,25 112:4,7
  115:23 117:5
  118:3,23,24,25
  123:4 124:3,20,24
  127:17 128:12
  129:1,6,7,16,25
  132:15 133:20
  134:4,10,15,18
  135:4,21 136:15
  137:5 138:12,14
  140:9,17 141:3,11
  142:25 143:1,2,24
  144:13,22 145:20
  145:25 146:21
  147:10 148:4,18
  149:20 150:12,13
  151:4,9,10 152:14
  152:24 153:4
  154:5,12,14,15
  155:4,21 156:13
  156:22 159:24

[right - secondly]                                                        Page 38

160:25 163:8,21
163:24 165:5,21
169:2,16 170:8,19
171:5,15,22,25
172:6,19,25
173:10,12,15
174:9,12,13,14,15
174:20 175:2,6,11
175:13,20 176:6
187:2,6,10,12
**rights** 13:21 58:8
68:15 104:10,19
110:16 111:10,23
112:18 113:19
123:21 125:12
131:11 135:20
142:24 156:8
158:4 169:17
176:17,23
**rise** 110:5 149:7
**rising** 147:1
**risk** 11:18 14:16
51:22 52:6,11,14
147:4 162:14,15
181:16
**risks** 100:21
151:24
**road** 189:21
**robert** 1:22 9:3,13
**robust** 32:8
**rocco** 7:25 170:4
**roebuck** 24:19,22
26:12 48:19 63:12
71:1 72:13,13
**rogers** 9:14
**rohn** 7:19
**role** 75:5
**rolling** 79:3
**rollout** 19:13
**ronald** 7:23 9:12
**room** 1:13
**rosa** 166:5,9
172:6,9,10,13,15

172:17 173:3,18
**rose** 151:21
**roughly** 186:17
**round** 19:13
**routine** 155:7,18
**rubric** 121:9
**rule** 91:3 93:7
98:4 164:10
182:17
**ruled** 115:14
133:5 170:10,19
175:12 176:11
184:12,15,16
187:11
**rules** 27:3 87:16
123:22 186:25
**ruling** 93:24
106:8 143:11
154:17 158:10
164:6,7 174:16
183:20 184:14
**rulings** 120:10
184:1 185:12,12
**run** 63:13 78:16
83:2
**rung** 109:16
**running** 40:22
53:25

**s**

**s** 3:1 10:1
**s.d.n.y.** 91:19,20
92:19 175:14
182:7
**sale** 59:23 60:7
68:12 69:20
144:13 159:22
**salt** 144:15
**sam** 8:22
**samil** 6:3
**sandwich** 180:15
**santa** 166:5,9
172:6,9,9,13,15
172:17 173:2,18

**sara** 3:9
**saracheck** 6:12
**sarachek** 6:1
156:11,11,14
157:12 158:11
**satisfied** 26:21
57:20
**satisfies** 184:9
**satisfy** 18:17
114:20
**satisfying** 91:14
180:3
**saw** 16:9 52:4
129:24
**saying** 32:18 33:3
33:4 38:7 39:11
43:12 46:20 72:8
82:10 86:19 87:1
108:23,25 109:1
114:24 118:21
124:2 132:17,20
133:7,11 141:1
144:15 145:7
153:10 160:19
164:21
**says** 20:8,25 23:10
26:10,19 32:7
36:12 49:21 59:17
59:18,25 63:9
115:25 116:4
117:7 126:5 130:8
135:2,3,22 136:24
137:7 138:17
139:14 140:12
142:1,5,13,20
145:10 149:1,10
150:1,7,9,19
153:22,23 174:24
**schael** 8:6
**schedule** 37:3,4
**schedules** 37:3
39:3,9,13 55:1

**schein** 7:7
**scheuer** 8:3
**schrock** 61:19,20
63:15 66:15 67:3
67:7,14,16 69:3
70:10,16,22 83:15
89:21 107:8
115:24 116:3
125:7,9,11,14,16
158:15,18 159:23
160:2,11,25 161:5
161:8,10 162:11
163:2,8,11,13,17
163:21,24 164:2,5
164:8,11,17,20,23
165:15 176:4
186:11 187:4
**schrock's** 76:3
**schwartzberg**
9:16
**sean** 69:13
**sears** 1:7 2:3 10:2
24:6,19,19,21,23
26:11,12 28:15,18
29:1,11,14,20,23
30:13 31:9 41:16
44:4,5,5 45:3
48:19 49:15 63:11
63:12 71:1,1,5
72:4 150:7 159:3
167:18,19,23,25
**sec** 27:3 28:1
**second** 2:2 13:15
13:19 24:17 28:21
32:7 78:14 91:7,9
92:4 97:4 99:19
119:21 129:24
130:23 150:20
153:15 174:4
181:4,17 182:16
182:21
**secondly** 18:3
54:10 180:13

**secret** 27:15
**section** 59:10
  65:24 96:5 101:12
  104:6,8 167:14
  173:1 175:15
  177:9,22 180:3
  181:20,24 182:16
  184:22
**secured** 17:22
  131:11 132:3
  157:20 178:12
**see** 17:2 22:9
  24:20 26:10,15
  36:9,17 45:13,24
  46:20 50:2 51:8
  57:1 58:8 60:12
  60:24 94:16 100:6
  112:10 115:3
  117:8 120:5 134:7
  137:17,20 145:12
  146:22 157:13
  161:16 165:1
  175:13
**seek** 19:2 116:17
  131:17 141:1
  167:21 168:17
**seeking** 116:16
  185:24
**seemingly** 58:15
  154:20
**seen** 16:8 126:16
  127:12 187:14
**segregated** 15:2
  111:6,22 112:9
  140:5 177:3
**segregation** 14:21
  111:8,22 112:19
  119:10 121:16
  139:23
**select** 67:24
**self** 136:19
**sell** 28:7

**send** 14:24 169:19
  173:17
**sending** 70:24
  71:1
**sends** 71:24
**senior** 17:22
  54:21
**sense** 29:8 30:11
  44:21 47:11 77:6
  84:2 89:16 109:24
  157:24 161:13
  165:15
**sent** 187:12,15
**sentence** 24:17
  36:11,18,19
  123:18 140:13
  148:25 152:21
**sentences** 139:18
**separate** 34:17
  38:3 49:18 50:14
  81:10 92:10 98:15
  101:24 137:16
  148:7,8 160:9
  172:3
**separately** 46:15
  80:8 88:5 92:11
  104:6,12 105:4
  149:19,19 176:16
**september** 31:24
  183:12
**serious** 96:9
  156:21 157:6
**seritage** 150:5
**serve** 108:1
**serves** 66:17
**service** 60:3,4
  175:22
**services** 7:3 25:5
  25:8 28:7 63:12
  73:20 158:23
  163:25
**set** 35:18 53:15
  93:11 101:13

112:9 133:16
  142:6,22 167:14
**setoff** 170:13
**sets** 114:2 182:16
**setting** 113:3
  120:20 122:20
  131:10 147:24
**settle** 19:7,10,19
  37:14 38:10,12
  40:16 49:19 77:24
  180:10 185:16
**settled** 10:13
  37:13 68:19 70:20
  94:8 157:5 166:24
  179:14
**settlement** 13:1
  18:7,11,13,18,24
  19:10,14,14,21
  20:11,11,19,25
  21:4 38:13 56:1,2
  57:22 58:11,13,22
  58:24 59:7 61:11
  61:23 64:15 65:25
  66:7,10 68:2,20
  68:23 70:21 76:22
  77:21,22 78:5,9
  79:14,15,20 80:2
  80:8 82:18 83:11
  85:13,15 90:17
  93:5,9,11,16 94:7
  94:9,11,12,15,16
  94:18,19,22,24
  95:7,8 96:15,17
  96:20,22,22 97:3
  97:13,14,17,19
  98:1,1 100:6,23
  101:5,18 102:18
  103:22 104:2
  107:13,14 108:2,6
  108:11,13 111:2
  113:8 117:16
  121:12 128:22
  138:10 145:4

150:4 161:17
  166:7 179:17
  180:12,14,15,18
  180:20 181:3,10
  183:8 187:19,21
**settlements** 19:20
  93:22 106:18
  153:10 179:2
  181:20
**settlement's** 97:6
**settling** 100:17
**seyfarth** 7:9
**shanghai** 6:4
**share** 167:14
  168:5
**sharnah** 8:12
**sharon** 9:10 167:5
**shaw** 7:9
**sheet** 30:17,19,20
  30:23 31:4 35:11
  94:25 96:9 133:1
  179:22,22
**sheets** 80:2 103:24
**shell** 107:15,17,22
**shelley** 9:11
**shepherding**
  156:15
**shift** 57:5
**shock** 165:18
**short** 61:8
**shorter** 99:15
**shortfall** 160:17
  161:15 178:8,20
  179:5
**shouldn't** 119:8
  125:23 132:17
**should've** 107:18
**show** 26:21 29:20
  37:3 42:13 43:23
  47:16 177:15,15
  178:20
**showed** 120:25

[showing - start]                                                                    Page 40

| | | | |
|---|---|---|---|
| **showing** 51:3 | 138:6,12,14,19 | **solvent** 23:2 45:6 | **sparingly** 91:24 |
| **shows** 18:22 43:24 | 139:11,15 140:13 | 45:7 81:25 98:13 | **speak** 67:17 85:25 |
| 51:11 56:16 71:15 | 140:14 141:5,12 | 100:16 102:11,21 | 167:2 182:20 |
| **side** 82:10 83:23 | 151:18 153:1,3,17 | 148:7 | 183:3 |
| 152:4 179:21,22 | 154:5,7,12,15 | **soma** 7:20 | **speaking** 17:8 |
| **sides** 105:2 180:25 | 170:23 171:1,12 | **somebody** 72:4 | 18:4 101:22 170:7 |
| **signed** 12:8 80:2 | 171:19,25 172:2,5 | 77:11 | **special** 109:8 |
| 170:7 | 173:12,15,19 | **somewhat** 11:24 | 142:22 |
| **significant** 24:22 | 174:4,6,9,14,20 | 104:23 | **specific** 20:1,22 |
| 49:22 52:23 60:12 | 174:24 175:2,5,7 | **sonia** 9:18 | 25:9,17 60:23 |
| 113:9 130:7 147:8 | 175:11,20 | **sontchi** 160:6 | 61:17 98:18 |
| 157:15,16,23 | **single** 28:5 40:24 | **sonya** 2:25 189:3 | 124:12 138:7 |
| **silence** 182:18,20 | 49:13 91:13 92:10 | 189:8 | 159:5 181:23 |
| 182:21 183:23 | 130:11 144:9 | **soon** 16:21 187:17 | **specifically** 20:14 |
| **silent** 182:24 | **singled** 159:18 | **sophisticated** | 20:25 24:2,7 |
| **similar** 28:24 | **sink** 78:7 | 179:14 | 25:10,18,20,25 |
| 34:19 124:25 | **sit** 75:14 157:1 | **sorry** 17:13 29:6 | 32:25 41:17 |
| 183:19 | **sitting** 22:3 135:9 | 30:24 31:16 34:3 | 154:20 |
| **similarly** 128:21 | 137:5 145:13 | 74:16 84:24 85:6 | **specified** 177:9 |
| 169:7 | 164:13 | 86:2,11 100:8 | **specify** 118:23 |
| **simple** 38:14 47:9 | **situation** 48:7 | 130:15 132:8 | **spend** 54:12,15 |
| 98:20 107:7,11 | 77:4 80:18 | 146:3 160:15 | 118:13 |
| 123:18 124:9 | **size** 28:18,20,22 | 164:13 187:5,7,7 | **spending** 77:5,18 |
| 180:22 | 28:25 104:14 | **sort** 11:25 12:15 | 82:16 |
| **simplest** 37:15 | **skewed** 104:13 | 13:1,8 14:9 15:4,5 | **spent** 75:14 89:11 |
| **simply** 32:1 34:20 | **slightly** 99:13 | 15:17 16:24 28:14 | 99:8 118:11,14 |
| 38:22 40:5,19 | **slim** 55:7 | 43:13 49:15 77:21 | 139:5,8 156:19 |
| 55:18 97:22 | **slippery** 60:19 | 120:13 165:14 | 157:7 160:9 |
| 100:14 103:21 | **slope** 60:19 | **sorted** 49:16 | **spinner** 9:12 |
| 110:13 123:10,17 | **small** 87:3,3 | **sorts** 53:7 116:16 | **spoke** 157:2 |
| 126:12 147:23 | 179:15 | 120:15 137:19 | 165:23,24 |
| 149:1 151:20 | **smaller** 165:2 | 160:3 | **spot** 12:21 |
| 164:18 173:17 | **smith** 7:24 | **sought** 116:16 | **staff** 165:17 |
| 177:24 181:7 | **sold** 24:23 40:23 | 187:21 | **stand** 106:24 |
| 185:10 | **sole** 142:10,16 | **sounds** 63:15 | 107:3 119:23 |
| **singh** 3:19 9:8 | **solely** 92:1 147:1 | 112:10 | 159:14,14 |
| 10:4,5,12 11:6,15 | 177:3 | **source** 149:12 | **standalone** 22:25 |
| 11:19 12:13,20 | **solutions** 6:4 | **sources** 102:24,25 | **standard** 137:16 |
| 14:17 15:9,12,15 | 183:15 189:20 | 142:10,15 178:13 | **standards** 81:19 |
| 15:23 16:1,3,11 | **solve** 72:7 159:8 | 178:24 | **standing** 109:10 |
| 16:13,15 17:6 | **solvency** 23:8 | **south** 5:10 | **star** 7:2 |
| 125:5,17,21 | 100:13 | **southern** 1:2 | **start** 60:10,19,23 |
| 127:19 128:24 | | | 110:25 111:4,5 |

[start - supplemental]                                                                                                           Page 41

| | | | |
|---|---|---|---|
| 124:12 166:15 | stays 168:6 | submit 62:15 | 107:13 |
| **started** 16:5 18:6 | **stealing** 136:6 | 64:18 112:15 | **substantively** |
| 166:2 | **steen** 5:1 | 187:11 | 19:2,8 20:13 |
| **starting** 31:22 | **step** 12:14 112:12 | **submitted** 69:7 | 46:22 53:21 62:14 |
| 32:5 34:25 166:14 | **stepping** 16:20 | 126:24 | 63:21 91:5 98:10 |
| **starts** 36:12 | **steps** 168:24 | **subordinated** | **substituted** |
| **state** 106:23 | **steven** 8:15 | 89:25 90:5,7 | 167:24 |
| 149:21,22 160:21 | **stipulate** 128:25 | **subparagraph** | **subtracting** 33:5 |
| 165:17 | 170:24 | 24:18 | **success** 97:6 160:3 |
| **stated** 31:14 95:20 | **stipulation** 167:24 | **subs** 58:23 | **successes** 119:24 |
| 108:16 182:22 | 168:19 172:11 | **subsequently** | **successful** 119:23 |
| **statement** 20:4,9 | **stock** 54:22 | 114:14,18,21 | 134:15,16 |
| 31:21 32:24 33:15 | 148:10 | 129:23 141:16 | **successor** 177:19 |
| 36:4,11 49:21 | **stood** 156:1 | **subsidiary** 95:12 | **sue** 144:16 |
| 50:3 51:7 56:7 | **stop** 121:19 154:1 | **substantial** 20:16 | **sufficient** 102:23 |
| 59:22 60:7 74:23 | **store** 24:22 | 52:5 178:25 179:9 | 109:25 180:23 |
| 85:11 105:18 | **stores** 24:23 93:18 | 179:18 186:20 | 181:14 |
| 121:15 124:9 | 94:17 100:7 102:2 | **substantially** | **suggest** 26:4 |
| 130:5 138:4,17,23 | **strauss** 3:3 | 22:22 95:8 102:19 | 58:22 65:10 78:3 |
| 138:24 139:10,16 | **street** 1:13 4:10 | **substantive** 19:5,7 | 80:5 81:12 148:12 |
| 147:22,23 152:15 | 5:18 | 19:11,13 20:20 | **suggested** 126:11 |
| 184:17 | **strict** 103:1 | 21:11,15 22:6,18 | 158:9 |
| **statements** 26:25 | **strike** 66:5 127:22 | 23:6,9,11,14,25 | **suggesting** 47:6 |
| 27:1,5,21 33:17 | **strong** 6:2 | 25:13 27:17 44:17 | 60:13 80:13 |
| 33:20,23 39:10 | **strongly** 152:24 | 45:3 46:22 51:16 | **suggests** 65:12 |
| 55:1 | **structure** 68:8 | 52:11,14,21 53:6 | **suit** 147:24 |
| **states** 1:1,12 | 70:23 71:5,25 | 53:19 54:2,7 55:7 | **suite** 4:3 189:22 |
| 184:13 | 72:5 110:22 | 57:5,21 58:17,20 | **summarize** 62:11 |
| **stating** 123:18 | **stuff** 107:16 | 59:7 61:10,16 | **summarized** |
| **status** 110:13 | **sub** 65:8,11 66:6 | 63:15 64:25 70:11 | 30:16 36:17 |
| 122:17 130:3,4 | 83:11 90:17 | 70:13 76:21,21 | **summarizing** 31:1 |
| 169:5 | **subcommittee** | 77:24 78:5,8,13 | **summary** 32:10 |
| **statutory** 136:18 | 149:13 | 78:19 79:16,22 | **sunny** 3:19 9:8 |
| 184:23 | **subject** 66:1 95:17 | 83:9,21 90:18 | 10:4 |
| **stay** 79:22 115:16 | 112:5,21 113:19 | 91:1,2,10,23 92:6 | **super** 101:15 |
| 116:14,16,17 | 116:8,10 119:12 | 92:14,23 93:4,5,6 | 132:5 135:25 |
| 120:14 122:7,8 | 122:1 123:21 | 93:8,14,17,21 | **supplement** 16:9 |
| 131:18 141:1,20 | 128:5 130:9,12 | 94:1,7,14,19,21 | 126:10,22 129:25 |
| 145:16 168:2,8,9 | 131:11 141:22 | 95:1,3 96:21 98:7 | 133:11,14 134:23 |
| 168:11,13,16,18 | 171:10 | 99:18,20 100:5,18 | 134:25 135:2,3 |
| 169:9,21 | **submission** | 100:20 101:5,9,20 | 137:25 142:2,3 |
| **staying** 117:18 | 185:17 | 102:4,6 103:1 | **supplemental** |
| | | 104:2 106:12 | 136:7 178:16 |

[support - they'll]                                                                    Page 42

**support** 68:25
69:7 73:18 75:15
93:21 97:13,14
101:18 105:18
178:16 186:20
**supported** 180:25
**supporting** 97:15
**supports** 11:8
62:23
**supposed** 39:1
153:18
**sure** 20:25 29:5
30:8,9 40:8 41:7
44:3 47:15 51:5
58:9,19 68:22
73:16 74:19 76:1
83:6 85:8,17 86:9
86:12,13 123:1
134:12 151:4
152:11 154:21
155:12,16 158:13
158:17 166:25
168:9 170:9
172:10 173:19
187:1
**surprise** 28:4
**surprised** 118:16
147:21
**surprisingly**
150:23
**suspect** 108:3
150:18
**swept** 98:21
**swing** 160:14,16
**switch** 22:5 95:4
**switching** 96:24
**system** 31:24
32:16,20 33:2,7
36:16 37:2,11
39:20,23 40:1,2,6
40:25 41:3,4,5,6,6
41:7,7,12,16,24
42:3,11,12 43:9

43:14 45:11 47:9
48:18,21 62:13,18
62:20 63:5,11,14
70:13,15,25 71:1
71:7,15,15,23,24
72:7 98:20 100:15
**systems** 32:7
36:13 37:24 41:17
45:18
**szambel** 8:4
**szydlo** 9:9

                    **t**

**t** 189:1,1
**table** 55:8
**tabled** 157:15
**tack** 115:18
**tag** 145:23
**tailored** 185:9
**take** 24:14 25:15
27:22 42:6,8
44:11 46:18,20
49:10 53:24 54:1
57:4,17 61:21
73:5 105:9 144:13
144:15 148:13,14
152:10 164:24
165:9 171:3
179:10,18
**taken** 58:10
**takes** 14:7 65:1
84:16
**talented** 82:9
**talk** 32:24 42:2
55:25 57:7 78:18
107:2 108:10
139:16 159:1
**talked** 34:16
**talking** 13:2 14:22
15:1 25:2,3 34:10
48:7 63:16 79:9
87:3 90:10 114:24
121:19 160:4

**target** 117:9
**tarter** 170:5
**tax** 26:25 27:2,3
27:13 178:12,12
**team** 52:8 176:2,5
**teaming** 145:24
**technical** 133:19
**telephonically**
7:17
**teligent** 182:6
183:12,15
**tell** 18:4,5 64:21
143:9,10 149:16
**temper** 60:15
**teresa** 8:16
**term** 142:8,14
179:18 180:4
**terms** 10:15 11:10
16:10 26:16 55:16
58:11 76:3 80:2
87:2 94:25 101:14
101:25 110:11
117:19 143:7
181:25 184:21
**test** 23:24 64:5
97:21 179:10
**testified** 28:10
29:22 42:4 99:10
**testify** 76:7
**testifying** 41:19
**testimony** 20:1,7
22:7 34:10 43:22
48:16 62:23 65:9
76:5 103:15
109:22 165:7
178:17
**thank** 17:6,15,17
61:14 69:12 70:6
75:23 89:19
127:23 129:4
145:14,19 151:25
155:9 158:11
161:8 164:20,22

164:24 169:22,24
173:21 186:11,11
187:2,23
**thanks** 129:16
166:11
**that'd** 154:11
**that's** 77:16,16
78:13 80:16,17
81:21 82:14,23
83:21 84:10 85:16
85:22,24 86:17
88:3 89:5,10,17
89:25 94:14 99:23
106:20 107:25
109:21 112:5
114:5,6,23,24
115:21 116:25
119:3,14,17
120:19 121:9
122:6,11 123:11
123:12 124:2,5,16
125:3,6 127:6,16
128:17 129:2
130:12 134:24
135:19,19,24
136:20
**thau** 8:20
**therese** 8:3
**there's** 77:20
84:21 111:3
112:16,17,25
113:10 114:1
115:12 116:17
117:20 118:25
122:4,7,13 124:17
125:17 126:2
127:5,22 128:1,13
128:21 130:2
132:2,25 136:4
**they'd** 81:24 82:4
135:10
**they'll** 88:16
112:20,22,25

[they'll - trailer]                                                                    Page 43

113:1

**they're** 80:6 82:11
83:6 85:12 86:6,6
87:20 88:8 89:24
90:5 109:12 110:9
112:12 113:1,16
125:23 126:25
131:10,22

**they've** 84:14,15
130:5

**thin** 100:12

**thing** 34:4 58:9
70:3 75:17 78:21
79:6 137:10 145:9
151:4 154:4 158:3
161:21 173:16
174:17

**things** 27:1,7
55:19 59:23 61:5
70:10 73:25 88:22
89:3 116:16
120:13,16 126:9
128:22 150:3

**think** 12:1,20 15:4
15:15 17:7,9
18:12 27:20 28:9
42:5 46:13 47:13
49:14 55:20,22
57:2,8,16 59:3
62:12 63:8,23
64:7 65:10,12,19
69:17 70:12 71:8
77:20 78:4 79:20
80:5 81:13,14,20
85:5 86:5,15,17
88:12 89:22 90:16
90:19 105:6,15,22
107:5 108:17
109:21 110:8,9
111:9 115:11
116:13,18 119:15
119:15,17 120:16
122:5 123:2,6,7,9

124:2 125:5,19
126:18,19 128:6
129:11,21,25
130:4 131:1,2,24
131:25 132:2,7,11
132:12,20,21,22
133:5,19,21,22
134:12 135:12
139:2,2,10,12,12
140:25,25 141:2
141:19,21 143:23
144:10,12,13
147:6,6,15 148:15
148:17,22,25
149:4,17 151:14
152:9,12,18 154:3
156:5,21,23
158:12 159:4,8,22
159:24 160:19,20
161:12,21 162:1
162:13,15,19,20
162:23,25 163:13
164:23 165:7,9,11
165:17 166:1
169:18,25 170:12
171:5,12 173:16
174:9 176:2,3
179:18 185:14
187:19

**thinking** 166:5

**thinks** 148:15

**third** 4:17 13:1
172:22 173:11
175:23,25 180:14
184:19 185:5

**this'll** 169:11

**thomas** 4:13 5:6
90:20 105:23

**thought** 10:8
12:16 17:14 45:24
69:19 111:14
115:17 140:9
148:7 176:22

**three** 13:8 17:1
24:19 28:11 29:14
64:22 66:16 67:24
110:2,2 135:6
140:11

**threshold** 101:13

**throw** 78:6 145:1

**thrown** 159:10

**thursday** 19:25
109:19 148:24
156:25 187:9

**tier** 180:14 181:4
181:4

**time** 19:22 22:9
27:16 39:14 63:1
67:10 70:14 76:10
94:2 98:9 99:14
107:6 109:21
115:6 121:3
122:19 124:8
127:7 128:7 130:1
130:2,4 132:7
139:12 141:8
142:8,8,13,13
147:19 148:3
156:19 157:7
163:22 164:19
165:10 179:18
181:14

**timing** 13:10
134:1 165:8

**title** 177:10

**tmt** 93:10,13 97:5

**today** 17:23 22:3
57:18 61:9 68:4
79:9 95:20 109:19
122:12 123:12
143:8,11 147:6
148:5,11 164:13
165:24,24 166:20
174:9 178:9 180:9
180:9 181:16
186:16,21

**toggle** 57:20,22
58:21,24 61:10
65:18,20,23 66:3
66:8 69:4,7 80:9
80:11 81:1,2 83:4
83:17 95:3,4
96:25

**told** 55:2 69:19
141:14 158:3
166:1

**tom** 129:17

**tone** 151:14

**top** 51:6 73:19
86:7 87:20 88:3
103:23 112:5

**topic** 185:12

**tos** 64:10

**total** 58:2 86:10
163:6 178:24

**totally** 86:10

**touch** 70:10

**touched** 70:16

**tough** 117:12

**touting** 107:8

**toys** 183:18

**trace** 132:4
141:17

**traceable** 136:17

**tracing** 99:4,8,11

**track** 28:19 32:17
33:8 36:22 37:19
40:19 41:3 43:4,6
44:19,21 62:22
119:11

**tracks** 157:13

**trade** 5:17 24:11
25:3 28:4 98:17
156:12,12,16,16
157:4,5

**traded** 57:5

**trading** 59:5

**trailer** 93:13 97:5

[train - understand]                                                      Page 44

train 157:13
tranche 89:25
transaction 38:10
  49:13 63:22 84:12
transactions 25:1
  29:1,12 30:19
  32:11 33:1 34:11
  37:22,25,25 38:3
  38:9 41:17 62:9
  62:25 99:4,9
  110:18
transcribed 2:25
transcript 34:9
  189:4
transfer 71:4
  103:9,9 139:18
  146:4
transferee 71:2,3
  72:1,2,2,3
transferred 71:4
  140:6
transferring
  40:17
transfers 32:3
  40:20 77:3 99:1
transform 5:2
  56:22,24 69:14,15
  69:16 120:2
  167:23,24 169:11
  171:13
transform's 120:4
transier's 179:6
treasury 27:13
  48:21 50:17
treat 154:22
  182:18
treated 59:16
  154:24 155:1,3
  175:24 179:12
  185:3
treating 91:12
  172:22

treatment 59:19
  91:25 92:17 177:8
  178:3 180:18
  181:20,24 183:23
tremendous 58:12
triggered 150:22
troubled 76:25
true 13:20 39:11
  145:3 149:8,17
  162:22 174:1
  189:4
trust 7:10 14:22
  15:5,10 17:21
  59:17,25 60:3
  64:13 74:7 75:5
  88:9 89:14,23
  92:3 96:12 98:15
  98:16 101:19,21
  104:5,22,24 108:4
  111:6,16 113:18
  113:18 114:12,17
  114:20,25 115:8,9
  115:20,23 116:2,7
  116:8,21,23,25
  117:3,21 118:22
  119:24 121:8
  125:18 130:6,10
  130:20 131:22
  132:8 133:15
  135:14,24 136:2
  136:19 137:5,25
  138:8,15 139:18
  139:20,21,21
  140:7,8,15 142:8
  142:9,11,14,15,17
  143:16 153:8
  154:21 162:24
  177:3
trustee 7:11 17:21
  65:14 73:3,25
  74:3,14 75:6,7,11
  75:14 87:11 88:2
  88:14 98:17

101:22 105:12,16
  184:13
trustee's 16:12
  72:24 166:21
trustees 16:18
  59:15,20,21 60:1
  60:8,15 61:2
  65:15 74:13 89:1
  140:11 154:18,23
trustee's 87:10
  133:6
trust's 104:3
  105:8
truth 150:25
try 23:9 61:21
  63:7 71:3 113:11
  159:8 168:19
  175:7
trying 30:12 52:9
  73:10 120:16
  172:20 173:5
tuesday 120:25
turn 26:8 61:22
turned 29:20
turning 31:7
tweed 4:8
twenty 124:21
twice 109:7
two 12:21 23:24
  33:3,4 59:9 62:5
  67:12 68:9 69:9
  70:10 73:25 77:22
  92:8 96:20 98:11
  99:8 103:16
  115:12 123:18
  129:20 130:1
  132:15 133:23
  139:17 148:21
  151:21 153:7
  155:15 179:19
  183:24 186:8
tx 4:4

type 28:12,17
  32:25 35:13 48:6
  137:16 183:20
types 29:12 77:2
  89:2 99:4
typically 36:23
  56:7

u

u.s. 1:23 93:13
  133:6 166:21
u.s.c. 184:21
ucc 108:2 110:16
  118:17
ucc's 109:7
ultimate 46:16
  53:14 72:6 95:7
  103:24 147:18
  186:7
ultimately 37:9
  47:19 54:15 57:16
  74:10 95:1 99:6
  100:20 114:13
  121:10,13
uncertainty 99:7
  186:4
unclear 128:24
uncontroverted
  62:23 65:8 179:7
underneath 32:6
understand 21:7
  21:20 30:12,18,22
  32:11 37:1 40:10
  41:23 42:1 47:5
  55:14,18 56:24
  63:19 65:11 73:16
  74:19 78:25 88:11
  106:15 118:19
  119:4 124:1
  127:13 131:24
  138:21 152:21
  155:4 160:7 161:4
  161:6 166:6
  171:13 182:23

[understanding - way]                                                        Page 45

**understanding**
27:18 33:12,13
35:3 39:21,24
41:9 56:22 165:8
174:6
**understood** 34:9
35:2,15 151:25
**undertaken** 35:22
93:17
**undue** 92:17
102:8
**unduly** 94:9 101:8
102:7 185:9
**unfair** 55:9 91:25
**unfairness** 164:9
**unfortunately**
164:25
**unhappy** 77:25
145:8
**unique** 104:18
**unit** 92:10
**united** 1:1,12
184:13
**unknowable**
147:18
**unnecessary** 50:1
**unquote** 147:4
**unrealistic** 158:4
**unreasonable**
80:21 97:2
**unreasonably**
95:5
**unrelated** 113:9
**unreported** 93:20
**unscramble** 48:13
**unsecured** 3:4
19:1 20:16 54:19
54:22 56:4 62:2
71:21 90:11,14
91:16 95:6 100:25
101:1,11 102:17
104:13 106:3,6
119:22 159:3

167:13 181:1
184:10
**untangle** 63:7,10
**untethered** 17:11
**unusual** 26:6,16
26:17 51:1 104:10
**update** 16:5
**updated** 14:17
**updates** 10:8
**upshot** 109:21
**upside** 77:13
**use** 56:11 69:9
74:12 95:11 116:7
132:6,6,8 135:23
177:4
**uses** 118:15
**usual** 26:23

**v**

**v** 92:3
**valid** 176:19
**validity** 11:23
**value** 21:2 22:15
22:17,21 54:9
71:3,22 72:11
**various** 31:3 58:5
71:10,14 73:14
76:23 85:12,25
96:1 106:5 107:9
107:10 120:14
126:9 147:9
149:14
**vedder** 7:1
**vehicle** 175:22
**vendor** 156:16
157:4
**vendors** 156:12
**veritext** 189:20
**versa** 99:2
**version** 36:10
59:14 95:7 96:16
**veto** 80:10
**viable** 136:5

**vice** 99:2
**vietnam** 6:6
**view** 32:8 55:22
56:7 77:20 83:24
110:1 111:24
149:3 160:17
169:17 185:23
**views** 60:15
**vii** 86:20
**village** 7:2
**violated** 104:6
**violates** 98:2
**virtue** 68:11 106:5
112:19
**vis** 43:9,9
**volume** 29:1
**voluntary** 172:11
**vote** 55:10 81:16
101:10
**voted** 80:15,17,19
104:16 167:15
**votes** 58:24
**voting** 55:12,16
55:21 101:15,25
104:16 184:10
**vsg** 175:25

**w**

**w.d.** 162:20
**wacker** 5:10
**wait** 108:14
110:13,22 145:5
181:7
**waiting** 110:14
185:22
**waivable** 66:25
**waive** 96:24
**waived** 66:19
67:11 68:13,23
69:21 70:2
**waiver** 10:22 67:3
67:13,21 68:25
**walancik** 8:5

**walk** 131:1
**wall** 143:16,17
**wander** 4:20
10:14 11:10,13
156:15,18 157:3
158:3
**wander's** 11:20
**want** 17:19,20
18:7 23:19 38:2
42:1 47:14,15,19
55:25 60:8,20,22
61:6 70:9 73:4
74:14,19 80:4,22
87:10 106:23
107:19 108:9
109:17 119:11,13
131:9 132:6 135:5
135:5,6,10 137:4
137:8 141:9 144:4
144:10 146:1,2,18
152:17 154:21
156:6 159:13
163:3,14 167:3
169:18 175:8
186:22
**wanted** 14:25
16:4 57:5 58:15
67:20 69:15,18
115:13 136:14
152:7 154:17
155:19 170:8,9
171:9 173:8
**wants** 65:16,16
67:17 73:3 132:8
169:8
**war** 150:14
**warranted** 104:3
**wasn't** 123:10
126:21
**waterfall** 22:15,20
22:22 107:7,11
**way** 12:14 28:24
38:12 43:5,12

[way - you've]                                                              Page 46

47:6,7 50:25 51:1
51:25 57:11,11
59:10 63:4 65:16
68:8,25 73:2
77:19 81:15 83:24
83:25 84:1,3
98:25 106:18
113:7 117:15
126:23 127:18
136:4 148:19
154:19 155:23
172:11 173:2
176:23 183:14
**ways** 64:8 136:5
**we've** 12:1,20
13:2,10,25 14:21
15:16 18:21 34:16
51:18 59:6 65:3
67:9 70:2,2 152:3
159:14 169:11
171:3 174:10,14
174:25 186:17
**week** 10:13 12:23
111:3 121:1 157:9
178:22
**weekend** 11:22
17:12 156:20
187:16
**weeks** 17:1
**weil** 3:12 4:1 10:5
61:20 168:16
169:19
**went** 21:24 30:21
32:18 38:15 40:24
48:18,20 56:1
62:9,10 70:18,19
70:19 101:10
134:2 141:13
155:19 158:25
159:6
**we'll** 82:16 120:12
131:24,25 132:2

**we're** 82:3,25
83:10 90:10
117:19 127:19
128:7 130:2
131:18
**we've** 110:7,8
113:10 129:5
**whatsoever**
168:25
**what's** 107:22
135:17,19
**whichever** 25:1
41:14 58:1
**white** 1:14 92:15
**who've** 28:17
**wildly** 83:12
**william** 8:25
**willing** 57:4
**wilmer** 5:15
145:21
**wilmington** 7:10
17:21 64:13 89:23
96:12 98:15,16
101:18,21 104:3,5
104:22 105:2,8
153:8 154:21
**wilson** 183:10
**win** 142:24 143:2
161:23
**wind** 47:19
**winddown** 112:3
**winn** 55:15 78:18
93:18 94:17 100:7
102:2
**winner** 82:10
**winning** 143:5
**withdrawal** 107:3
**withdrawn**
166:16 171:18
172:4
**withdraws** 11:8
**withheld** 95:5
117:22

**witness** 23:7
**witnesses** 109:23
178:17
**won** 137:7
**wondering** 90:25
**won't** 88:15
107:14
**word** 31:22,23
140:4 157:2
**worded** 81:15
104:23
**words** 41:19 47:2
111:9 122:2
**work** 30:13 44:6
76:8 89:15 105:1
105:12 106:25
109:6 112:20
113:1 115:3
151:17 156:5
165:3
**worked** 73:2
129:22 169:11
**working** 14:20
16:4 66:18 67:9
73:11 167:23
168:18 170:23
**works** 63:5 68:8
110:23
**world** 5:17 11:24
27:11 131:22,23
175:14
**worldcom** 53:17
54:18,22 91:19
93:23 97:4
**worldwide** 176:3
176:6
**worried** 41:21
**worth** 71:22
126:20
**wouldn't** 104:17
130:8
**would've** 104:13

**wrap** 79:14
**wrapped** 116:15
**wrinkle** 111:4
**writing** 75:15
**written** 24:11
25:3 35:17 76:4
122:25

| x |
|---|

**x** 1:4,10 44:4
63:11

| y |
|---|

**y** 44:5 63:12
**yeah** 16:1 25:8
43:8 86:9,23
87:24 90:8 116:3
137:17,20 138:10
158:15 166:10
171:1 176:4
**year** 64:19 99:13
149:18 150:10
164:5 167:20
**years** 49:13,14,14
110:2 149:25
179:19
**yep** 74:18
**yield** 92:17
**york** 1:2 3:6,15
4:11,18 5:4,19
6:10,17 7:5,13
92:2 149:22
**you'd** 80:25 87:6
132:16
**you're** 77:17 85:8
86:13,23 87:1,3
90:16 106:12,13
108:22 113:23
115:11 119:25
120:5,16 132:17
133:7,10 136:1
**you've** 88:18
107:12 109:14

[z - à]

| z | | |
|---|---|---|
| **z** | 44:5 | 63:13 |
| **zach** | 3:10 | |
| **zero** | 38:1,4 | |
| **à** | | |
| **à** | 43:9 | |

**EXHIBIT D**

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 18-23538-rdd

5

6   - - - - - - - - - - - - - - - - - - - - -x

7

8   In the Matter of:

9

10   SEARS HOLDINGS CORPORATION, et al.,

11

12              Debtors.

13

14   - - - - - - - - - - - - - - - - - - - - -x

15

16              United States Bankruptcy Court

17              300 Quarropas Street, Room 248

18              White Plains, New York 10601

19

20              October 3, 2019

21              10:32 AM

22

23   B E F O R E:

24   HON. ROBERT D. DRAIN

25   U.S. BANKRUPTCY JUDGE

1   18-23538-rdd Sears Holdings Corporation, et al.

2   Ch 11

3   10:00 AM

4

5   HEARING re Modified Second Amended Joint Chapter 11 Plan of

6   Sears Holdings Corporation and Its Affiliated Debtors (ECF

7   #5293)

8

9   Limited Objection and Reservation of Rights of Liberty

10  Mutual Insurance Company (ECF #3989)

11

12  Objection to Confirmation of Plan filed by Mark A. Frankel

13  on behalf of 233 S. Wacker, LLC (ECF #4668)

14

15  Objection of Tannor Capital Advisors LLC (ECF #4673)

16

17  Limited Objection of Winners Industry Co. (ECF #4678)

18

19  UST's Objection (ECF #4681)

20

21  Objection of Acadia Realty Limited Partnership (ECF #4684)

22

23  Objection of Mario Aliano (ECF #4690)

24

25  Objection of Alpine Creations Ltd (ECF #4700)

Page 3

1

2    Objection of Retiree Committee (ECF #4702)

3

4    Objection of Carl Ireland, Administrator of the Estate of

5    James Garbe (ECF #4707)

6

7    Objection of Weihai Lianqiao International Coop. Group Co.,

8    Ltd. (ECF #4708)

9

10   Limited Objection of PeopleReady, Inc. (ECF #4709)

11

12   Objection of A.O. Smith Corporation's Joinder to Objection

13   of Alpine Creations Ltd. (ECF #4712)

14

15   Objection of Community School District 300 (ECF #4713)

16

17   Objection of Santa Rosa Mall (ECF #4714)

18

19   Objection of Mien Co. Ltd. (ECF #4716)

20

21   Objection of Everlast World's Boxing Headquarters Corp. (ECF

22   #4717)

23

24   Limited Objection of and Reservation of Rights of ESL

25   Investments Inc. and Transform Holdco LLC (ECF #4718)

1

2    Redacted Declaration of Chelsey Rosenbloom in Support

3    Limited Objection and Reservation Rights of ESL Investments,

4    Inc. and Transform Holdco LLC (ECF 4719)

5

6    Objection of Edgewell Personal Care PR Inc. (ECF #4720)

7

8    Objection of Whitebox Asymmetric Partners, LP (ECF #4721)

9

10   Objection of Wilmington Trust, National Association, as

11   Indenture Trustee (ECF #4724)

12

13   Objection of Vehicle Service Group, LLC (ECF #4725)

14

15   Amended Objection of Mien Co. Ltd. (ECF #4726)

16

17   Objection of Pearl Global Industries, Ltd. (ECF #4730)

18

19   Limited Objection of Cyrus Capital Partners, L.P. (ECF

20   #4731)

21

22   Limited Objection and Reservation of Rights of ESL

23   Investments Inc. and Transform Holdco LLC (ECF #4759)

24

25   Objection of Team Worldwide Corporation (ECF #4773)

1

2    Joinder of Twentieth Century Fox Home Entertainment LLC (ECF

3    #4780)

4

5    Supplemental Objection of Wilmington Trust, N.C. (ECF #4785)

6

7    Limited Objection of and Reservation of Rights of ESL

8    Investments Inc. and Transform Holdco LLC (ECF #4786)

9

10   Joinder of Mien Co. Ltd. to Limited Objection of and

11   Reservation of Rights of ESL Investments Inc. and Transform

12   Holdco LLC (ECF #4801)

13

14   Joinder of Schumacher Electric Corporation (ECF 4861)

15

16   Supplemental Objection of Community Unit School District 300

17   to Confirmation (ECF #5005)

18

19   Joinder of Aspen Marketing Services, Inc. to Objection of

20   Alpine Creations Ltd. (ECF #5041)

21

22   Joinder of Groupby USA, Inc. (ECF #5048)

23

24   Santa Rosa Mall, LLC's Supplemental Objection (ECF #5088)

25

1    Supplemental Response of ESL (ECF #5192)

2

3    Supplemental Objection of Mien Co. Ltd. (ECF #5266)

4

5    Joinder of EPI Printers, Inc. (ECF #5271)

6

7    Joinder of BST International Ltd to Supplemental Objection

8    Mein Co. Ltd (ECF #5273)

9

10   Joinder of EPI Partners, Inc. (ECF #5274)

11

12   Objection of Mien Co. Ltd., et al. [ECF No. 5277]

13

14   Joinder by Edgewell Personal Care Puerto Rico Inc. (ECF

15   #5283)

16

17   Joinder by Eric Jay Ltd (ECF #5285)

18

19   Joinder by A.O. Smith Corporation (ECF #5286)

20

21   Joinder by Weihai Lianqiao International Coop. Group Co.,

22   Ltd (ECF 5287)

23

24   Joinder of Peral Global Industries, Ltd (ECF 5289)

25

Page 7

1    Joinder of BH North American Corporation (ECF #5290)

2    10:59 AM

3    18-23538-rdd Sears Holdings Corporation Ch. 11

4

5    HEARING re Motion of Debtors for Modification of Retiree

6    Benefits [ECF No. 4635]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Lisa Beck, Sheila Orms, Sherri Breach,

25    Jamie Gallagher and William Garling

Page 8

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for Debtors and Debtors in Possession

4         767 Fifth Avenue

5         New York, NY 10153

6

7    BY:  JACQUELINE MARCUS, ESQ.

8         RAY C. SCHROCK, ESQ.

9         SUNNY SINGH, ESQ.

10        NATASHA S. HWANGPO, ESQ.

11        JARED R. FRIEDMANN, ESQ.

12

13   WEIL, GOTSHAL & MANGES LLP

14        Attorneys for Debtors and Debtors in Possession

15        200 Crescent Court

16        Suite 300

17        Dallas, TX 75201

18

19   BY:  JAKE RUTHERFORD, ESQ.

20        PAUL R. GENENDER, ESQ.

21

22

23

24

25

Page 9

1   AKIN GUMP STRAUSS HAUER & FELD LLP

2        Attorneys for the Official Committee of Unsecured

3         Creditors

4        One Bryant Place

5        New York, NY 10036

6

7   BY:  PHILIP C. DUBLIN, ESQ.

8        SARA L. BRAUNER, ESQ.

9        ZACH LANIER, ESQ.

10

11  U.S. DEPARTMENT OF JUSTICE

12       Office of the United States Trustee

13       U.S. Federal Office Building

14       201 Varick Street

15       Suite 1006

16       New York, NY 10014

17

18  BY:  PAUL K. SCHWARTZBERG, AUST

19

20

21

22

23

24

25

```
 1   U.S. DEPARTMENT OF JUSTICE
 2        United States Attorney's Office
 3        Southern District of New York
 4        86 Chambers Street
 5        New York, NY 10007
 6
 7   BY:  PETER ARONOFF, AUSA
 8
 9   U.S. DEPARTMENT OF LABOR
10        Office of the Solicitor
11        200 Constitution Avenue, NW
12        Room N-4611
13        Washington, DC 20210
14
15   BY:  LEONARD H. GERSON, ESQ.
16
17   PENSION BENEFIT GUARANTY CORPORATION
18        Office of the General Counsel
19        1200 K Street NW
20        Washington, DC 20005
21
22   BY:  GARTH D. WILSON, ESQ.
23
24
25
```

 1   LOCKE LORD LLP

 2        Attorneys for Pension Benefit Guaranty Corporation

 3        111 South Wacker Drive

 4        Chicago, IL 60606

 5

 6   BY:  BRIAN A. RAYNOR, ESQ.

 7

 8   ALSTON & BIRD LLP

 9        Attorneys for Twentieth Century Fox Home

10         Entertainment LLC

11        90 Park Avenue

12        New York, NY 10016

13

14   BY:  ANTHONY L. GREENE, ESQ.

15

16   ARCHER & GREINER, P.C.

17        Attorneys for Community Unit School District 300

18        630 Third Avenue

19        New York, NY 10017

20

21   BY:  ALLEN G. KADISH, ESQ.

22

23

24

25

Page 12

1    ASHFORD SCHAEL LLC

2         Attorneys for Creditor, Shinn Fu America

3         100 Quimby Street

4         Suite 1

5         Westfield, NJ 07090

6

7    BY:  COURTNEY A. SCHAEL, ESQ. (TELEPHONICALLY)

8

9    BALLARD SPAHR LLP

10        Attorneys for Creditor, Brixmor Property Group

11        919 North Market Street

12        11th Floor

13        Wilmington, DE 19801

14

15   BY:  LESLIE C. HEILMAN, ESQ. (TELEPHONICALLY)

16        CHANTELLE D. MCCLAMB, ESQ. (TELEPHONICALLY)

17

18   BUCHANAN INGERSOLL & ROONEY PC

19        640 Fifth Avenue

20        9th Floor

21        New York, NY 10019

22

23   BY:  KEITH A. LAZERE, ESQ.

24

25

```
 1    CLEARY GOTTLIEB STEEN & HAMILTON LLP

 2         Attorneys for ESL Investments, Inc.

 3         One Liberty Plaza

 4         New York, NY 10006

 5

 6    BY:  THOMAS J. MOLONEY, ESQ.

 7         SEAN O'NEAL, ESQ.

 8

 9    DAVIDOFF HUTCHER & CITRON LLP

10         Attorneys for Creditors, Pearl Global Industries, Ltd.,

11    Eric Jay, Ltd. and

12         605 Third Avenue

13         New York, NY 10158

14

15    BY:  DAVID H. WANDER, ESQ.

16

17    DIAMOND MCCARTHY LLP

18         Attorneys for Creditor, Team Worldwide

19         295 Madison Avenue

20         27th Floor

21         New York, NY 10017

22

23    BY:  CHARLES M. RUBIO, ESQ. (TELEPHONICALLY)

24

25
```

```
 1   FERRAIUOLI LLC

 2         Attorneys for Creditor, Santa Rosa Mall LLC

 3         221 Ponce de León Avenue

 4         5th Floor

 5         San Juan, PR 00917

 6

 7   BY:  SONIA E. COLON, ESQ. (TELEPHONICALLY)

 8

 9   FOLEY & LARDNER LLP

10         Attorneys for Ad Hoc Group of Admin Claimants

11         90 Park Avenue

12         New York, NY 10016

13

14   BY:  PAUL J. LABOV, ESQ.

15         ERIKA MORABITO, ESQ.

16

17   FOX ROTHSCHILD LLP

18         Attorneys for Aspen Marketing, Inc.

19         101 Park Avenue

20         17th Floor

21         New York NY 10178

22

23   BY:  KATHLEEN M. AIELLO, ESQ. (TELEPHONICALLY)

24

25
```

Page 15

1     GENSBURG CALANDRIELLO & KANTER, PC

2          Attorneys for Community Unit School District 300

3          200 West Adams Street

4          Suite 2425

5          Chicago, IL 60606

6

7     BY:  MATTHEW T. GENSBURG, ESQ.

8

9     HALPERIN BATTAGLIA BENZIJA, LLP

10         Attorneys for Carl Ireland, Administrator of the Estate

11          of James Garbe

12         40 Wall Street

13         37th Floor

14         New York, NY 10005

15

16    BY:  DONNA H. LIEBERMAN, ESQ.

17

18    LEVENE NEALE BENDER YOO & BRILL, LLP

19         Attorneys for Creditor, Weihai Lianqiao International

20          Coop. Group. Co.

21         10250 Constellation Blvd.

22         Suite 1700

23         Los Angeles, CA 90067

24

25    BY:  TODD M. ARNOLD, ESQ. (TELEPHONICALLY)

Page 16

1    MCKOOL SMITH, P.C.

2        Attorneys for Winners Industry Co., Ltd.

3        One Bryant Park

4        47th Floor

5        New York, NY 10036

6

7    BY:  H. JEFFREY SCHWARTZ, ESQ.

8

9    MILBANK LLP

10       Attorneys for Cyrus Capital Partners, L.P.

11       2029 Century Park East

12       33rd Floor

13       Los Angeles, CA 90067

14

15   BY:  THOMAS R. KRELLER, ESQ.

16       ERIC R. REIMER, ESQ.

17

18   ROGERS LAW OFFICES

19       Attorneys for Creditor, Serta Simmons Bedding, LLC

20       The Equitable Building

21       100 Peachtree Street

22       Suite 1950

23       Atlanta, GA 30303

24

25   BY:  ELLEN ROGERS, ESQ. (TELEPHONICALLY)

1

2    THE SARACHEK LAW FIRM

3         Attorneys for Mien Co. Ltd., Helen Andrews, Strong

4          Progress Garment Factory Company, Ltd., Samil

5          Solutions, Shanghai Fochier, Purcell Murry, A&A HK

6          Industrial, Mingle Fashion Limited Mansheen

7          Industries, Ltd., AMW Vietnam Co. Ltd., Holdsun Group

8          Ltd., Auxo International Ltd. and Beauty Gem, Inc.

9         101 Park Avenue

10        27th Floor

11        New York, NY. 10178

12

13   BY:  JOSEPH E. SARACHEK, Esq.

14

15   SEYFARTH SHAW LLP

16        Attorneys for Wilmington Trust, National Association,

17         as Indenture Trustee

18        620 Eighth Avenue

19        New York, NY 10018

20

21   BY:  EDWARD M. FOX, ESQ.

22

23

24

25

Page 18

1    TARTER KRINSKY & DROGIN

2         Attorneys for Creditor, Alpine Creations Ltd.

3         1350 Broadway

4         New York, NY 10018

5

6    BY:  ROCCO A. CAVALIERE, ESQ. (TELEPHONICALLY)

7

8    TOGUT, SEGAL & SEGAL LLP

9         Attorneys for Tannor Capital Advisors

10        One Penn Plaza

11        New York, NY 10119

12

13   BY:  MINTA NESTER, ESQ.

14

15   VEDDER PRICE LLP

16        Attorneys for Village Hoffman Estates and NorthStar

17         Recovery Group

18        1633 Broadway

19        31st Floor

20        New York, NY 10019

21

22   BY:  MICHAEL L. SCHEIN, ESQ.

23

24

25

Page 19

1   WALSH PIZZI O'REILLY FALANGA LLP

2        Attorneys for Creditor, Groupby USA, Inc.

3        Three Gateway Center

4        100 Mulberry Street

5        15th Floor

6        Newark, NJ 07102

7

8   BY:  CHRISTOPHER M. HEMRICK, ESQ. (TELEPHONICALLY)

9

10  WOLLMUTH MAHER & DEUTSCH LLP

11       Attorneys for the Retirees Committee

12       One Gateway Center

13       Newark, NJ 07102

14

15  BY:  JAMES N. LAWLOR, ESQ.

16

17  ZIMMERMAN LAW OFFICES, P.C.

18       Attorneys for Movant, Mario Aliano

19       77 West Washington St

20       Suite 1220

21       Chicago, IL 60602

22

23  BY:  SHARON A. HARRIS, ESQ. (TELEPHONICALLY)

24

25

```
 1                 P R O C E E D I N G S

 2          THE COURT:  Okay.  Good morning.  In re Sears

 3   Holdings Corporation.  I'm sorry I kept you waiting.  I had

 4   some last minute filings that I wanted to go through and

 5   think about.

 6          MS. MARCUS:  Good morning, Your Honor.  Jacqueline

 7   Marcus of Weil Gotshal & Manges, LLP on behalf of Sears

 8   Holdings Corporation and its affiliated debtors.

 9          THE COURT:  Good morning.

10          MS. MARCUS:  Before we get to the main event, Your

11   Honor, the confirmation hearing, as we advised chambers last

12   night, we'd like to start with what's number 2 on the agenda

13   which is the motion of the debtors for modification of

14   retiree benefits --

15          THE COURT:  Right.

16          MS. MARCUS:  -- ECF number 4635 which is now

17   uncontested.

18          You have a packed courtroom, Your Honor, so I'll

19   be brief.

20          The debtors filed their 1114 motion and the

21   supporting declaration of William Murphy on July 29th.

22   Since that time, the debtors, with input from the creditors'

23   committee, have gone back and forth with the retiree

24   committee and continue to modify the proposal.  And within

25   the past 24 hours, I'm happy to report that the debtors, the
```

1    retiree committee and the creditors' committee have reached

2    an agreement on a revised proposal.

3            I have, Your Honor, a revised version of the order

4    together with a blackline and the exhibit to the blackline

5    reflects the changes to the proposal.  If I may approach?

6            THE COURT:  Okay.

7            MS. MARCUS:  The salient terms of the proposal are

8    as follows, and I will be brief:

9            The effective date of the termination of the

10    retiree plan is March 15th, 2019.  On the effective date of

11    the Chapter 11 plan, the debtors will establish an

12    administrative reserve in the amount of $3 million for the

13    benefit of retirees who are members of the class covered by

14    the 2001 stipulation of settlement whose benefits were not

15    paid by Securian.

16            The estate of each member of the class that died

17    between March 15th and the date of entry of the order, we

18    call them for purposes of the proposal "The recently

19    deceased members" -- who filed a proof of claim will have an

20    allowed administrative expense claim in the amount of his or

21    her benefits under the retiree plan that can share in that

22    reserve fund.  If its filed and allowed claims exceed $3

23    million, the claimant will share pro rata and any remaining

24    claim for benefits will be a general unsecured claim.  And

25    conversely, if there are remaining funds after the payment

Page 22

1    of all the filed and allowed claims then those funds would

2    be transferred to the liquidating trust and be available for

3    payment of general unsecured claims.

4           The debtors and the creditors' committee will have

5    the right to dispute the filed claims but they have waived

6    the argument that the benefits have not vested.  And the

7    proposed administrative claims will not be part of the

8    administrative claim settlement that the debtors have

9    announced.

10          Each member of the class who is not what we've

11   called a recently deceased member and who files a proof of

12   claim by a date to be agreed to will have a general

13   unsecured claim in the Sears Roebuck case in an amount equal

14   to the lesser of his or her benefits under the plan and

15   $10,500.  We believe that setting the cap at that level will

16   mean that all but about 650 of the retirees would have a

17   claim in the full amount of their benefits.

18          Finally, Your Honor, even though they're not

19   technically members of the class covered by the stipulation,

20   the proposal does cover what we've described previously as

21   the grandfathered disableds as well as the retirees whose

22   benefits were less than $5,000.  And they, if they file

23   claims, will have general unsecured claims subject to the

24   same cap of 10,500 at an aggregate cap of 16.9 million.

25          The last element of the proposal is that the

Page 23

1    retiree committee will withdraw its confirmation objection

2    and support confirmation of the Chapter 11 plan.

3            The debtors believe, Your Honor, that with the

4    consent of the retiree committee, which is the authorized

5    representative of the retirees, we've satisfied the

6    requirements for modification of benefits as provided in

7    Section 1114(e)(1)(B).  Nevertheless, we also think we meet

8    the requirements for modification under Section 1114(f) by

9    making a proposal that provides for modification of the plan

10   that is necessary to permit confirmation of the Chapter 11

11   plan and ensures that all creditors, the debtors and all

12   affected parties are treated fairly and equitably.

13           Accordingly, Your Honor, the debtors request that

14   the Court grant the motion and enter the revised form of the

15   order which includes the proposal.

16           THE COURT:  Okay.  There's a lot of people.  There

17   you are.

18           The retiree committee is on board with this

19   resolution, I'm assuming, as well as the DOL?

20           MR. LAWLOR:  Yes, Your Honor.  James Lawlor for

21   the retirees committee.

22           Yes.  We support this.  It was a collaborative

23   effort and it was longer than we anticipated but we did the

24   best we could and we appreciate the debtors' cooperation.

25           THE COURT:  Okay.  And this reflects the due

1    diligence that the parties --

2            MR. LAWLOR:  Yes, Your Honor.

3            THE COURT:  -- conducted as far as actuarial

4    information and --

5            MR. LAWLOR:  Yes, Your Honor.

6            THE COURT:  -- other due diligence?

7            MR. LAWLOR:  That was -- the biggest delay was we

8    spent a significant amount of time working with the debtors

9    to try to get as much information as we could and we

10   extrapolated as best we could and we came up with this

11   proposal.

12           THE COURT:  Okay.  And I'm assuming nothing turned

13   up to suggest that other parties, unlike the primary

14   beneficiaries to this proposal, had protection from

15   termination at will?

16           MR. LAWLOR:  Right.  Your Honor, the only

17   information we were able to find was the stipulation of

18   settlement.  There was no other indication of vested

19   benefits as far as we know.

20           THE COURT:  Okay.  Very well.  Thank you.

21           MR. LAWLOR:  Thank you.

22           MR. GERSON:  Good morning, Your Honor.

23           THE COURT:  Good morning.

24           MR. GERSON:  Leonard Gerson, Department of Labor.

25           Glad the settlement has been reached.  My one

1    concern is that these retirees, the beneficiaries, are not

2    your typical administrative claimants.  They haven't had

3    recent contact, most likely, with Sears.  Who knows where

4    their insurance policy might be?  It's going to be not an

5    easy matter resolving the individual claims.  So I would

6    hope that some sort of provision get made, particularly

7    possibly with the office of the liquidating trust, to make

8    sure that there's somebody specifically identified to deal

9    with this problem because they're not typical administrative

10   claimants.

11              THE COURT:  Okay.

12              MR. GERSON:  And I don't know whether that can be

13   memorialized in the order or --

14              THE COURT:  Do you mean that they would have like

15   one point of contact, in essence --

16              MR. GERSON:  Yes.  And to be recog --

17              THE COURT:  -- among the staff for the liquidating

18   trust?

19              MR. GERSON:  Yes.

20              THE COURT:  Just like, I'm assuming, at this

21   point, they have one contact or one set of people that they

22   contact if they have a question.

23              MR. GERSON:  Yes.

24              THE COURT:  Okay.  All right.

25              MR. GERSON:  Thank you.

1          MS. MARCUS:  Your Honor, we haven't quite settled

2     on the form of the notice but we're going to work with the

3     retiree committee and the creditors' committee in terms of

4     the notice --

5          THE COURT:  Right.

6          MS. MARCUS:  -- what the appropriate date will be.

7     And we can include a person to be designated as the point of

8     contact.

9          THE COURT:  Okay.  That seems to be appropriate as

10    opposed to building it into an order.  The notice is

11    important to lay this out.  And it's an obvious aspect of

12    that notice that they have someone that they can call or

13    e-mail or write to if they have a question about what they

14    need to do to get the benefits under the settlement; if

15    there's an objection to their claim, how to deal with that,

16    et cetera.

17         MS. MARCUS:  We'll make sure that's in there, Your

18    Honor.

19         THE COURT:  Okay.  All right.  Does anyone have

20    anything more to say on this matter?

21         All right.  I had prepared for this matter as if

22    it was going to be litigated and I don't mind that it was

23    settled, late as it was.  Looking at the requirements under

24    Section 1114(f), it's clear to me that Congress contemplated

25    such -- in fact, mandated such negotiations.  And they often

1    result in last minute agreements.

2           It appears to be here that the retirees were well

3    represented as were the debtors and that these negotiations

4    were at arm's length, didn't unduly favor any particular

5    group of retirees given the underlying legal rights of the

6    respective retirees, and that the settlement is a fair

7    resolution of the dispute that was going to be tried by me

8    today, which I am -- on which I was pretty well focused.

9    And this appears to me to be a reasonable settlement in

10   light of all the issues.

11          MS. MARCUS:  Thank you, Your Honor.

12          THE COURT:  Okay.

13          MR. LAWLOR:  Thank you, Your Honor.

14          THE COURT:  Thanks.

15          MR. SCHROCK:  Good morning, Your Honor.  Ray

16   Schrock, Weil Gotshal, for the debtors.

17          The next matter on the agenda is the debtors'

18   confirmation hearing, their second amended plan.

19          Your Honor, in terms of how we proceed, I'd like

20   to propose that I walk through what objections have been

21   resolved so that we can deal with those.  And then we would

22   propose to move straight into the evidence.

23          Now I know the U.S. trustee did file a pleading

24   within the last day that said that they thought the time was

25   short between filing the administrative consent program

Page 28

1    materials and moving forward with confirmation.  Your Honor,

2    I think if you want to address that upfront, I'm happy to do

3    so.  But otherwise, I'd like to move forward and get on with

4    the hearing.

5              THE COURT:  Okay.  I think it's worth addressing

6    preliminarily --

7              MR. SCHROCK:  Okay.

8              THE COURT:  -- and then seeing where we are at

9    that point.

10             MR. SCHROCK:  Okay.  Your Honor, in terms of --

11   and I'll ask the other parties that are moving in support of

12   the plan also to rise here.

13             In terms of where we are, these issues have been

14   teed up, frankly, for months.  We have the support of the

15   official unsecured creditors' committee, the PBGC.  Of

16   course, the estates are moving forward.  We've now struck a

17   deal on a consent program with a core group and the largest

18   group we could frankly find of administrative claimants.

19   And now we have the support of the official committee of

20   retirees.

21             The administrative consent program is

22   fundamentally designed so that parties, after receiving

23   notice, can decide whether or not they want to opt in to the

24   settlement and that they're going to have 17 days after

25   entry of the confirmation order for that to happen.  And

1    they can decide 33 days after entry of the confirmation

2    order if they'd like to opt out.

3            And, really, fundamentally, everything that we're

4    doing here from the participation of the professionals

5    contributing funds from the carve-out, which is voluntary,

6    putting money aside and kind of tiering out these things,

7    these are all implementation issues associated with a plan.

8            Now one could argue that the issue of binding

9    someone with consent associated with the failure to opt out,

10   that that issue -- that certainly, that issue is before the

11   Court today and it's based upon materials that we filed just

12   a couple of days ago.  Now I believe, Your Honor, that given

13   where we are and given the need to move expeditiously with

14   confirmation, we would submit that that issue should be teed

15   up for argument today.  However, if Your Honor had

16   reservations about that particular issue on the binding

17   consent, my suggestion would be let's get all the evidence

18   in today.  Let's deal with every issue that we can.  And if

19   we need to put off a few days for that last issue on the

20   consent, we could certainly do that.  But, Your Honor, we're

21   prepared -- you know, all of these claimants -- and, listen,

22   I feel like this is a bit like -- you know, we're trying to

23   find a way to end these cases and it's not easy.  We're

24   striking as many deals as we can.  The idea of going to some

25   sort of further mediation and continuing to allow -- you

1    know, every day that goes by, there's more pleadings that

2    are filed.  And we have to have a stopping mechanism.  The

3    only way that's going to happen is through entry of the

4    confirmation order.

5            And it is -- listen, it's very tough sledding for

6    the debtors.  And getting this hearing through, getting the

7    relief in the order, it's a value maximizing proposition.

8    We'd like the opportunity to put on that case.  And it's

9    basically -- it's a winddown mechanism to distribute the

10   proceeds of the estate.  We are very ready and I think

11   everybody who says, listen, this is a surprise or something,

12   we have been trying to keep people informed.  We've relied

13   on the administrative -- the ad hoc administrative claimants

14   to keep some of the other admins informed.  But it's a --

15   listen, we think it's a reasonable resolution.  And the fact

16   that you have consent -- the failure to opt out being deemed

17   consent is completely consistent with applicable law in

18   other circumstances.

19           THE COURT:  Okay.  Well, I think the debtors have

20   been clear that while they are proposing this resolution

21   mechanism as additional support for confirmation of the

22   plan, they are prepared to show that the plan satisfies

23   1129(a) and, to the extent relevant, (b) --

24           MR. SCHROCK:  Correct.

25           THE COURT:  -- even without it.  That's right,

```
 1    right?

 2              MR. SCHROCK:  That is correct, Your Honor.

 3              THE COURT:  Okay.  Okay.

 4              MR. SCHROCK:  Okay.

 5              MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

 6    for the U.S. trustee's office.

 7              That was -- the point Your Honor just made was one

 8    of the points I was going to bring up.  This isn't necessary

 9    for confirmation according to the debtors.  And we are

10    concerned about the notice to the admin creditors.  Not only

11    is the consent issue upfront right now, Your Honor, as

12    opposed to down the line, but also, there is an impact on

13    the admin creditors that opt out or don't opt in as they're

14    now put behind other creditors.  And that may impact their

15    ability to get (indiscernible).  We believe that notice

16    should be provided to those creditors to allow them to come

17    in if they want.  And --

18              THE COURT:  Notice of what, though?

19              MR. SCHWARTZBERG:  Notice of this new procedure

20    that was filed after close of business on October 1st.

21              THE COURT:  Well, there are two different types of

22    notice.  The debtor has given notice that -- you know, back

23    in July that it's seeking to confirm the plan.  And clearly,

24    that was sufficient to inform administrative expense

25    creditors that they have rights, as all creditors do, to
```

1     object to the plan.  And there have been a number of

2     objections, under 1129(a), from the administrative expense

3     creditors.

4            So I guess, as far as notice is concerned, the

5     debtors are proposing notice of this procedure.  And there

6     may be issues with respect to what that notice says, how

7     informative it is.  But as far as -- that's not the notice

8     you're talking about, right?  You're talking about the

9     notice of approving this procedure today.

10           MR. SCHWARTZBERG:  Correct, Your Honor.  People --

11    or administrative creditors might not approve of the

12    procedure.  They might not approve of the deemed consent.

13    They might not approve of the --

14           THE COURT:  No.  But the -- let's leave that

15    aside.  I think that the debtors have already said that's

16    something that can be discussed later in the hearing.

17           But I guess, the -- as I read it, the proposal,

18    the proposed agreement, with the settling administrative

19    expense creditors is not a simple we will take 25 percent

20    less.  It says that with respect to the 25 percent -- I'm

21    sorry -- with respect to the 75 percent that we are

22    asserting, we get certain first money out.  And I guess,

23    you're suggesting that that affects the rights of the other

24    creditors?

25           MR. SCHWARTZBERG:  Puts them behind both the opt-

1    in creditors and those that --

2            THE COURT:  Well, but again, if they can opt in

3    also, affirmatively opt in, then they're not behind them,

4    right?

5            MR. SCHWARTZBERG:  But --

6            THE COURT:  So, to me, they have that right, too.

7    It's not like the people who have settled are looking to get

8    an exclusive right.  Anyone can opt in.  So, to me, that's

9    not a disparate treatment issue.  You know?  It's one thing

10   to make sure the notice is right so that people know enough

11   to make an informed decision or a reasonably informed

12   decision.  But if they have the same right to opt in, I'm

13   not sure there's an issue there.

14           MR. SCHWARTZBERG:  All right.  Thank you, Your

15   Honor.

16           THE COURT:  I mean, if they didn't, I would

17   certainly understand your point.

18           And that leaves the issue of the third option, if

19   you will, which is either you could opt out, you could opt

20   in, but there's something in between, which is you don't do

21   anything but you get certain rights but you also get a

22   certain -- you don't get exactly the same treatment.  But

23   Mr. Schrock said we can discuss that as we go along.  And I

24   think that's part of the notice and part of the -- you know,

25   the mechanic as opposed to the underlying legal right to get

1    additional notice to focus on whether this changes the plan.

2    See, fundamentally, I don't think this changes the plan.  I

3    guess that's what I'm (indiscernible).

4              MR. SCHWARTZBERG:  I guess, also, Your Honor, just

5    to point out, it's not necessary for today.  We don't know

6    what arguments admin creditors are going to make.  So to

7    give them less than 48 hours notice --

8              THE COURT:  Admin creditors will make any argument

9    they want to.  I mean, I've had no -- I have no doubt about

10   that having read the objections.  So that's not really the

11   point.  I think the point is, objectively, rationally, other

12   than issues about the adequacy of the notice, a deal with 18

13   percent of them that lets every other 82 percent of them

14   have the same deal, to me, is -- that doesn't change

15   anything.  That's just making it clear that some people have

16   made a deal that is open to everybody.  So I just don't --

17   what are they going to say that actually is worth listening

18   to in response to that?

19             MR. SCHWARTZBERG:  Your Honor, not being in their

20   shoes, I don't know what their argument's going to be.

21             THE COURT:  Well, I know, but it just doesn't

22   compute to me.  So I'm going to go ahead with the hearing.

23   Again, with the caveat that I think we do need to focus on

24   the notice that's given to this group and the mechanism for

25   it.  And also, you know, the third category, if you will,

1      the abstain category.

2              MR. SCHWARTZBERG:  All right.  Thank you, Your

3      Honor.

4              THE COURT:  Okay.

5              MR. WANDER:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. WANDER:  David Wander of Davidoff Hutcher &

8      Citron.  I represent three creditors today:  Pearl Global

9      Industries, Eric Jay and (indiscernible) Company.

10             Pearl Global is a foreign vendor and it's affected

11     by this administrative claim settlement.  Eric Jay is a

12     domestic vendor.

13             I filed two declarations, Your Honor, in

14     connection with the negotiations that have been going on

15     recently.  I attended a chambers call with Your Honor the

16     other week.  And I just want to correct some things on the

17     record or make them clear and in response to some comments

18     the debtors' counsel made.

19             First of all, the largest group in number of

20     administrative creditors were not included in the

21     negotiations.  You have two groups.  One group is comprised

22     of a bunch of claims traders.  They purchased claims in the

23     case presumably at some kind of a discount.  They're larger

24     in number -- in the amount of the claims they may represent,

25     30, $40 million in claims, or to about half a dozen of them.

1    The other vendor group has in excess of 50 vendors and, in

2    round numbers, the claims are approximately 15, $20 million.

3    A lot of them are the foreign vendors.

4            Other than an initial meeting, a settlement

5    meeting, that both ad hoc groups attended and we were given

6    a confidential term sheet, there's been no further

7    negotiations with the largest group of ad hoc vendors.  And

8    the proposed confidential settlement agreement shortly

9    thereafter was filed as an exhibit to the plan.

10            So, first, to be clear, most of the administrative

11    creditors have not been parties to the negotiations.  And

12    the settlement adversely affects them.  And honestly, Judge

13    --

14            THE COURT:  How?

15            MR. WANDER:  I'll tell you how.

16            THE COURT:  'Cause your declarations didn't say

17    that.

18            MR. WANDER:  Well, Your Honor, first --

19            THE COURT:  Didn't say the reason.  It just made

20    the statement.

21            MR. WANDER:  First of all, Your Honor, we received

22    the document that, close to midnight --

23            THE COURT:  No.  How does it adversely affect

24    them?

25            MR. WANDER:  Sure.  I'll address that, Your Honor.

1              THE COURT:  Okay.

2              MR. WANDER:  First of all, it's -- two ways.  The

3    first way the U.S. trustee's office noted, which is an

4    automatic opt-in wherein administrative creditor with an

5    allowed claim is entitled to get 100 cents under the

6    Bankruptcy Code, under the automatic opt-in, they may get 75

7    cents of an allowed claim.  So that's a fatal flaw in the

8    mechanism right there.

9              The second flaw and the second prejudice is it

10   takes a certain amount of available cash that should be

11   available for all the administrative creditors and it locks

12   those funds up for the settling creditors.  And for that

13   reason, it prejudices the group.  So --

14             THE COURT:  But you still have -- the debtors are

15   still going to be making their showing today and you've

16   already objected, twice in fact, that they can't make the

17   showing that they'll satisfy 1129(a)(9).  So --

18             MR. WANDER:  But we're saying, Judge, even under

19   any construct of confirmation with this construct of

20   settlement, it's taking cash and it's saying if you settle,

21   you get it on December 1.  If you don't settle, the cash may

22   not be there -- the cash is not there for you.  And it could

23   be the only cash that, in the end, is available for the

24   creditors.

25             THE COURT:  But again, you have your objection

1    where you can try to convince me that -- and the debtors

2    have the burden of proof so they have to convince in light

3    of your objection -- that on the effective date, the cash

4    won't be there to pay those who don't opt in.

5            MR. WANDER:  Well, Your Honor, so the effective

6    date, we don't know when that's --

7            THE COURT:  Well, that's the confirmation issue.

8    But this settlement doesn't affect that.

9            MR. WANDER:  Yes.  What it does is, it takes cash

10   that's available before the plan goes effective --

11           THE COURT:  Right.

12           MR. WANDER:  -- and it gives that cash to the

13   settling creditors.

14           THE COURT:  Okay.

15           MR. WANDER:  So if you don't settle --

16           THE COURT:  So it varies that the -- it's proposed

17   as a means to get people paid before the effective date.

18   And if people want to get paid before the effective date in

19   a reduced amount, they can opt in.  If they want to wait,

20   assuming that I confirm the plan, which we're on for today

21   to decide, they could wait to get the full amount.  What is

22   that -- I mean, I --

23           MR. WANDER:  Let me explain --

24           THE COURT:  To me, that's just not --

25           MR. WANDER:  Here -- let me explain, Your Honor.

1   So -- and I'll focus on Pearl Global.  The debtor recently

2   filed their tenth omnibus objection to the claims and that

3   included an objection to Pearl Global's -- one of their

4   503(b)(9) claims.

5               THE COURT:  Okay.

6               MR. WANDER:  But they did not object in full.  The

7   claim, in round numbers, Your Honor, is $450,000.  After the

8   objection, round numbers, they say my client has an allowed

9   claim of $350,000.

10              THE COURT:  Okay.

11              MR. WANDER:  So my client should be entitled to

12  get paid its undisputed allowed administrative claim.

13  There's funds to pay it.  The debtor is going to --

14              THE COURT:  No, no, no.  It is entitled to get

15  paid it on the effective date.

16              MR. WANDER:  So creditors --

17              THE COURT:  If it wants to take at a discount and

18  get paid before the effective date, some portion, it can

19  negotiate with the debtor to do that.

20              MR. WANDER:  But an allowed administrative

21  claimant is not supposed to have to wait until an effective

22  date --

23              THE COURT:  Absolutely wrong.  The case law is

24  entirely clear that while, in the ordinary course, where

25  there are no issues of administrative insolvency, a debtor

Page 40

1    should be paying its administrative expenses as they come

2    due.  In fact, if there is an issue of administrative

3    insolvency, or the claims are still being worked out, it

4    needs to wait.  And that's why I'm assuming this group is

5    compromising because they don't want to wait.  But that's

6    the law and you're not going to convince me otherwise.

7    That's the Second Circuit on down.

8              MR. WANDER:  Right.  So, as Your Honor said, that

9    the debtor can and should pay --

10             THE COURT:  No, I didn't say that.

11             MR. WANDER:  Let me finish, Your Honor.

12             THE COURT:  I said that's -- no.

13             MR. WANDER:  In the ordinary course --

14             THE COURT:  Look, I'm not going to reargue that

15   point with you.  You're just wrong on that point.

16             MR. WANDER:  In the ordinary course --

17             THE COURT:  No one is entitled to be paid 100

18   cents on the dollar today.  Period.

19             MR. WANDER:  I didn't say today.

20             THE COURT:  Well, you just did.

21             MR. WANDER:  No.  What I'm --

22             THE COURT:  You said because they have an allowed

23   claim of $350,000, they're entitled to be paid today and pay

24   someone else 75 percent, or some portion of that, capped at

25   75 percent today, violates your client's rights.  And the

```
 1    answer to that is no, it does not --

 2              MR. WANDER:  What I'm saying is --

 3              THE COURT:  -- particularly when they have the

 4    option to take the same treatment.

 5              MR. WANDER:  What I'm saying is, allowed --

 6    undisputed administrative claims -- and this includes just

 7    simple post-petition claims from October, November, December

 8    of 2018 -- were entitled and should have been paid in the

 9    ordinary course of business.  That's the point that I was

10    picking up from what Your Honor said.

11              THE COURT:  Look, if that's what you're telling

12    your client, they're being misinformed.  They're not

13    entitled to be paid in full.  They took that risk when they

14    extended the trade credit.  It's that simple.  So don't tell

15    them otherwise.  They're entitled to be paid in full on the

16    effective date.

17              MR. WANDER:  Right.  So if the funds that are

18    available to pay allowed administrative claims if the

19    effective date is pushed out for a year or two --

20              THE COURT:  That's the confirmation argument you

21    made in two objections to the plan.

22              MR. WANDER:  And --

23              THE COURT:  I will get to that.  This is a

24    different issue we're discussing today --

25              MR. WANDER:  Okay.
```

1          THE COURT:  -- right now.

2          MR. WANDER:  Your Honor, as I said, I think that

3     it prejudices two things.  One, we haven't had enough time

4     to even read the papers in support of it.  The opt-in

5     provision, we submit, is patently improper.  And as I'm

6     saying, Your Honor, they're taking available cash and

7     they're saying if you settle under their construct, the cash

8     will be there.  If you have an allowed claim and it's

9     December 2nd, the cash is gone.  And that's just not fair,

10    Your Honor.

11         THE COURT:  Okay.  All right.  Well, I don't

12    really see how adjourning this hearing will change the

13    statements you just made.

14         MR. WANDER:  Well, one further thing.

15         THE COURT:  No.  How would adjourning the hearing

16    add any new light or color to those statements?

17         MR. WANDER:  I'll tell you, Your Honor.  Counsel

18    for the debtor made a comment about further mediation would

19    not make any sense.  I wrote that down.  I just want Your

20    Honor to be aware that yesterday, I was contacted by the

21    attorneys for ESL and Transform who indicated that they were

22    ready, willing and able to attend mediation of --

23         THE COURT:  Mr. Wander, please.  These are the

24    people that are being sued for over $2 billion.  I think you

25    just have to take the offer to put things off with a grain

1    of salt.

2              Now go back to my question.  What additional facts

3    will be elucidated other than the hope that -- or the

4    leverage that you would obtain as a result of an

5    adjournment, including with respect to claim allowance as

6    well as settlement, to enable me to evaluate this

7    settlement?  We have the information, which you've had for

8    months now, in the declarations.  You say they've had to be

9    updated because of various rulings by the Court and the like

10   regarding the company's asset and liability position.

11   That's not going to change except the assets will be

12   smaller, right?  There's no additional information you need

13   to evaluate the objection to the settlement which is that

14   those who opt in to the settlement will be getting

15   potentially, and maybe more than potentially, a greater

16   recovery on their administrative expense than those who opt

17   out.

18              MR. WANDER:  Well, actually, Your Honor, the

19   information that we get has been changing every --

20              THE COURT:  All right.  But it's not going to

21   change any more than what it is today except for the fact

22   that there may be one more ruling by me for more expenses

23   incurred in terms of an all-hands mediation.  It's not going

24   to change in any other way.  And I can factor that into

25   account.

1          MR. WANDER:  Well, Your Honor, as I said, if the

2     effective date is going to be pushed out and the only money

3     that very likely may be available is the money that's going

4     to go on December 1, all of the other administrative

5     creditors who are not even included in this are going to be

6     prejudiced because the funds are going to be gone --

7          THE COURT:  No.  That's the -- no.  I'm sorry.

8     You're just repeating yourself on this.  That's the case

9     that you can make in objecting to the debtors' plan.  You've

10    had all that information to the extent you had it.  And they

11    have the burden of proof on showing that they won't be

12    prejudiced.  So let's get on with it.

13         MR. WANDER:  Okay, Your Honor.  Thank you.

14         MR. SCHROCK:  Thanks, Your Honor.  Again, Ray

15    Schrock, Weil Gotshal, for the debtors.

16         Your Honor, can I go through just quickly which

17    objections have been resolved?

18         THE COURT:  Yes.  And I know we have a crowded

19    courtroom.  I also have a number of people on the phone.

20         MR. SCHROCK:  Yes.

21         THE COURT:  And if you are representing an

22    objectant and Mr. Schrock says your objection's been

23    resolved and you disagree with that, you need to speak up.

24    And I wouldn't mind if you also state, yes, we agree with

25    him but I'm not going to require that.  I'm assuming that

Page 45

1    there may be some people whose objections were resolved who

2    decided that they don't want to spend the money on a lawyer

3    to hear it all over again --

4              MR. SCHROCK:  All right, Your Honor.  Just so --

5              THE COURT:  -- and, therefore, won't be on the

6    phone or in the courtroom to tell me that the objection's

7    been resolved.

8              MR. SCHROCK:  I apologize, Your Honor.  I was just

9    going to say that when I go through these resolved

10   objections, I'll note the ECF number and I'll also note the

11   reference on the agenda --

12             THE COURT:  Okay.

13             MR. SCHROCK:  -- so the parties can follow along.

14             So the first one that's been noted as resolved is

15   the Liberty Mutual Insurance Company.  That's at ECF number

16   3989.  And that's at 1(A) in the agenda.  That's resolved.

17             THE COURT:  Okay.  And this is -- it's resolved by

18   the plan just basically saying that a surety program --

19             MR. SCHROCK:  Correct.

20             THE COURT:  -- runs through until it runs out by

21   its own terms?

22             MR. SCHROCK:  Yes.

23             THE COURT:  Okay.

24             MR. SCHROCK:  The next one's 223 South Wacker,

25   LLC.  That's at ECF number 4668.  That's at 1(B).  We've

1    included language in the confirmation order to resolve the

2    objection.

3            THE COURT:  Right.  And, in essence, here, the

4    conformation order states that the plan injunction doesn't

5    enjoin 223 South Wacker to the extent it has the rights

6    under its stipulation from proceeding with the litigation --

7            MR. SCHROCK:  Correct.

8            THE COURT:  -- involving the sculpture.

9            MR. SCHROCK:  And the next one that's been

10    resolved, Your Honor, is LBG Hilltop, LLC.

11            THE COURT:  Can I stop you there for a second?

12            MR. SCHROCK:  Sure.

13            THE COURT:  223 South Wacker also, arguably,

14    objected that the plan wasn't feasible to the extent that it

15    was counting on a $4 million projected recovery.  I'm not

16    sure that really was part of the objection but is anyone

17    from the objectant here to prosecute that or on the phone?

18            MR. SCHROCK:  No.  We understood it was all --

19            THE COURT:  I think -- I mean, their main issue

20    was they just wanted to continue with litigation --

21            MR. SCHROCK:  Okay.

22            THE COURT:  -- to the extent they're able to.

23            MR. SCHROCK:  And again, Your Honor, LBG Hilltop,

24    LLC, which is at ECF number 4680, has been resolved.  We

25    have confirmed here with Transform that the landlord for the

 1    lease was assigned to Transform subject to the Hilltop REA

 2    and other applicable restrictive covenants.  But we also

 3    added in paragraph 37 to the confirmation order that

 4    "Nothing in the Plan alters the terms and provisions of the

 5    Construction, Operation and Reciprocal Easement Agreement".

 6              Next one, Your Honor, it's on the chart, it's

 7    number 7.  It's Acadia Realty Limited Partnership.  It's at

 8    ECF number 4684, on the agenda as 1(F).  We have resolved

 9    this -- they had a few objections.  We've resolved these by

10    adding to paragraph 34 of the order that notwithstanding

11    anything in the documents -- anything in the plan or the

12    other related documents affect the rights "to any executory

13    contract, whether current or previously executory, or a

14    lease of non-residential real property to assert any right

15    of setoff or recoupment".

16              THE COURT:  Right.  And this is an objection that

17    was raised by a number of parties --

18              MR. SCHROCK:  Yes.

19              THE COURT:  -- that you could read the plan

20    injunction and maybe other provisions as precluding setoff

21    or recoupment.  And the debtors were making it clear that

22    that is not the case.

23              MR. SCHROCK:  Yes.

24              THE COURT:  I think you also have agreed to treat

25    all of the landlords, as defined in that objection, as

```
 1    having opted out of the release?

 2              MR. SCHROCK:  That's correct, Your Honor.

 3              THE COURT:  Okay.

 4              MR. SCHROCK:  Yeah.  We treated them all as opting

 5    out.

 6              THE COURT:  Right.

 7              MS. HEILMAN:  Your Honor, if I may --

 8              THE COURT:  Yes.  Go ahead.

 9              MS. HEILMAN:  -- on the phone?  Your Honor, Leslie

10    Heilman on behalf of Ballard Spahr on behalf of the Acadia

11    Realty Limited Partnership Group landlord.  The statements

12    on the record, I've confirmed that we are resolved --

13              THE COURT:  Okay.

14              MS. HEILMAN:  -- with the changes.

15              THE COURT:  Thank you.

16              MS. HEILMAN:  Thank you.

17              MR. SCHROCK:  Okay.  Next, we go to number 11 on

18    the chart which was the official committee of retirees --

19              THE COURT:  Right.

20              MR. SCHROCK:  -- which we've just addressed.  It's

21    1(I).  And as set forth on the record by Ms. Marcus, that

22    has been resolved.

23              THE COURT:  Okay.

24              MR. SCHROCK:  Next, we're going to number 15 on

25    the chart which is McDonald's Corporation, which is at 1(WW)
```

1    in the agenda.  This is regarding, you know, an outstanding

2    cure issue.  And a stipulation and proposed order resolving

3    this objection was filed on the docket on October 3rd at ECF

4    number --

5                THE COURT:  Well, not October 3rd.  Was it,

6    really?

7                MR. SCHROCK:  It was at 5303.

8                THE COURT:  I mean, that's today.  Was it just

9    filed?

10                MR. SCHROCK:  Yesterday.  Oh, sorry --

11                THE COURT:  Oh, okay.

12                MR. SCHROCK:  -- the 2nd.

13                THE COURT:  All right.

14                MR. SCHROCK:  October 2nd.

15                THE COURT:  So that's resolved.

16                MR. SCHROCK:  That's resolved.

17                THE COURT:  Okay.  Very well.  I mean, this was

18    just a cure reservation anyway, I think.  So --

19                MR. SCHROCK:  Right.  Yeah.  I don't think it --

20                THE COURT:  Okay.

21                MR. SCHROCK:  -- was going to be fatal.

22                Your Honor, I believe that number 16 on the

23    objection chart, Community Unit School District 300, which

24    is at 1(M), has been resolved.

25                THE COURT:  Okay.

1           MR. SCHROCK:  My understanding is that they'll be

2      withdrawing all objections to the plan.  And there's an

3      agreement where, essentially, five million of the EDA

4      proceeds will be going to the estate, two million will be

5      returned.  They're going to withdraw all proofs of claims --

6           THE COURT:  Returned to the school district or --

7           MR. SCHROCK:  Yes.

8           MR. FRIEDMANN:  Your Honor, Jared Friedmann, from

9      Weil Gotshal.

10          It's a more complicated settlement agreement than

11     we had hoped for.  And while we finalized it literally just

12     this morning on the way in -- and a copy, I think, was

13     provided, too.  But the idea is that there was a 2017 EDA

14     funds that were $7.1 million that had not yet been

15     distributed.

16          THE COURT:  Right.

17          MR. FRIEDMANN:  We reached an agreement with the

18     school district where the Village will disburse $5.1 million

19     to the debtors.  The other two million dollars will go to

20     the school district.

21          THE COURT:  Okay.

22          MR. FRIEDMANN:  It also resolves a number of other

23     issues allowing them to withdraw their plan objection with

24     certain carve-outs.  They're releasing also claims relating

25     to prior years of distributions as it relates to the

Page 51

1    debtors.  They're maintaining claims they may have against

2    the Village and other third parties.

3              THE COURT:  Okay.

4              MR. FRIEDMANN:  But it allows --

5              THE COURT:  In any event, there's a --

6              MR. FRIEDMANN:  There's a deal which allows us to

7    get money and get out --

8              THE COURT:  Okay.

9              MR. FRIEDMANN:  -- which was the goal.

10             THE COURT:  All right.  Very well.  When I focus

11   on return, it is because I'm fully aware that there's an

12   intermediary here that's actually holding the money and I

13   just wanted to make sure I knew where the money -- when you

14   say return, where I was going.  But the record's clear on

15   that.

16             MR. FRIEDMANN:  All right.  Thank you.

17             MR. GENSBURG:  Good morning, Your Honor.  Matthew

18   Gensburg on behalf of the school district.

19             THE COURT:  Good morning.

20             MR. GENSBURG:  We do have an agreement.  The

21   Village is a party to the agreement for some of the clauses

22   that involve what they need to do.  It was just filed today

23   and I think is set up for approval by the Court after notice

24   sometime next week.

25             THE COURT:  Okay.

1           MR. GENSBURG:  There is one paragraph that I do

2    want to highlight.  There's paragraph 11 -- and there's two

3    paragraphs, actually.  So paragraph 11, Your Honor, says

4    that we're withdrawing our -- thank you -- withdrawing our

5    claims -- cure objections but then it says we're not

6    withdrawing any cure objections that we're asserting them.

7    The fact of the matter is, is cure objections are being

8    preserved and the ability to argue that the EDA agreement

9    cannot be assumed and assigned because of violations to that

10   agreement are being preserved.

11           I've been exchanging e-mails with Mr. Friedmann.

12   I think we both understand what the intent was.  We may have

13   to clarify that language but that's the intent.

14           The other thing I wanted to highlight to the Court

15   is it does provide the automatic stay will be modified to

16   the extent it's applicable because of the resolution that

17   states not asserting an interest in these assets any longer

18   and that the Court will defer -- rule on the cure issues to

19   allow the state court to resolve the underlying state law

20   issues that are also implicated by the cure issues.  And

21   that's, I believe, in paragraph 15.

22           THE COURT:  I had earlier lifted the stay in part.

23   And this lifts it further?  Is that the contemplation?

24           MR. GENSBURG:  No -- yeah.  Actually, Your Honor,

25   I think it was -- you abstained in the 1334(c) --

1          THE COURT:  To what was already going on.

2          MR. GENSBURG:  Yes.  And so this relates exactly

3    to that.  It doesn't really change anything but we --

4          THE COURT:  Right.

5          MR. GENSBURG:  -- just clarified that point with

6    respect to the cure and the 365 issues.

7          THE COURT:  Okay.  All right.  Very well.

8          MR. GENSBURG:  Thank you, Judge.

9          THE COURT:  Thank you.

10         MR. SCHROCK:  Okay.  So that's I and 1(M).

11         Number -- pardon me.

12     (Pause)

13         MR. SCHROCK:  I think we just have a partial

14   resolution -- you know, frankly -- ESL still has a number of

15   pending objections.  So I'll just note what's resolved

16   during the course --

17         THE COURT:  Okay.

18         MR. SCHROCK:  -- of oral argument.

19         The item number 21 in the objection chart, which

20   is at ECF number 4721, item 1(XX), has been resolved.  Those

21   are -- well, it's one of the Whitebox objection.  That is --

22   they're one of the parties to the administrative claim

23   consent program.

24         THE COURT:  Right.  Okay.  So the Whitebox

25   objection is resolved.

1           MR. SCHROCK:  It's resolved in totality, yes.

2           THE COURT:  Okay.

3           MR. SCHROCK:  Let's see if we have any more here

4    through the Court's -- and I believe, Your Honor, that wraps

5    it up.  The remainder, at least of this moment, remain

6    outstanding.  And I think what we would like to do at this

7    time, Your Honor, is just move straight to the evidence.

8           THE COURT:  Okay.  I'll note, though, that at

9    least with respect to some of the objections that were

10   resolved, the debtors have proposed clarifying language not

11   just for those objections but similar objections that you

12   haven't stated were resolved that, for example, make it

13   clear that the plan injunction doesn't --

14          MR. SCHROCK:  Affect the setoff and recoupment.

15          THE COURT:  -- preclude setoff or setoff -- setoff

16   or recoupment or somehow circumvent cure obligations or

17   assignment and assumption orders or previously lifted -- or

18   where the stay was previously lifted or the Court had

19   already previously abstained.  It doesn't rewrite past

20   history.

21          MR. SCHROCK:  Correct.

22          THE COURT:  So those agreements by the debtors are

23   not limited to the people who actually said yes to the

24   debtors.

25          Okay.  So why don't we move -- unless anyone has

Page 55

1    anything further to say on resolved objections, why don't we

2    move to the rest of the confirmation hearing?

3              MR. SCHROCK:  Okay.  Yeah.  Your Honor, I think I

4    can handle the first one here.  It's -- the first witness we

5    have a -- the declaration of Prime Clerk from Mr. Craig

6    Johnson.  It's at ECF number 5137.  And we'd like to move

7    his declaration into evidence.

8              THE COURT:  Okay.  Does anyone wish to cross-

9    examine Mr. Johnson?

10             Okay.  And this was on noticing and --

11             MR. SCHROCK:  Balloting.

12             THE COURT:  -- balloting?

13             MR. SCHROCK:  Yes.

14             THE COURT:  Okay.  I will accept that declaration

15   as his direct testimony.

16        (Declaration of Craig E. Johnson of Prime Clerk LLC re

17   solicitation of votes and tabulation of ballots received in

18   evidence)

19             MR. SCHROCK:  Okay.  Thanks, Your Honor.

20             I'm going to turn the podium over to my partner,

21   Mr. Genender.

22             MR. GENENDER:  Good morning, Your Honor.  Paul

23   Genender, Weil, Gotshal & Manges, for the debtors.

24             We have three witnesses to call -- three

25   additional witnesses to call this morning.  The first we

1    would call would be Bill Transier, Your Honor.  His

2    declaration has been filed on September 13th, 2019, at ECF

3    number 5146.

4              THE COURT:  Okay.

5              MR. GENENDER:  He's in the courtroom, Your Honor.

6              THE COURT:  Okay.  Mr. Transier, could you take

7    the stand, please?

8         (Pause)

9              THE COURT:  Would you raise your right hand,

10   please?

11        (Witness sworn)

12             THE COURT:  And it's William T-R-A-N-S-I-E-R?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Okay.  So, Mr. Transier, I have the

15   declaration of yours dated September 13, 2019 which is

16   intended to be your direct testimony in this confirmation

17   hearing.  Sitting here today, is there anything in it that

18   you wish to change?

19             THE WITNESS:  No.  No, sir.

20             THE COURT:  And you understand that it's your

21   direct testimony?

22             THE WITNESS:  Yes.

23        (Declaration of William Transier, dated 9/13/19,

24   submitted as direct testimony received in evidence)

25             THE COURT:  Okay.  Does anyone want to

Page 57

1    cross-examine Mr. Transier?

2             MR. WANDER:  Yes, Your Honor.

3             THE COURT:  Okay.

4        (Pause)

5                     CROSS-EXAMINATION

6    BY MR. WANDER:

7    Q    Good morning, Mr. Transier.  My name is David Wander of

8    Davidoff Hutcher & Citron.  And I represent the -- three of

9    the objecting creditors.

10        Mr. Transier, you're going to be a member of the

11   liquidating trust board, correct?

12   A    Yes.  I've been asked to join them.

13   Q    Okay.  Now on October 1, in the evening, the debtor

14   filed document 5292, Notice of Filing of Revised Plan

15   Supplement in Connection with Modified Second Amended Joint

16   Chapter 11 plan of Sears Holdings Corporation and its

17   Affiliated Debtors.  Annexed to that document is an Annex B

18   which is page 58 and 60.  And it says "Liquidating Trust

19   Board Member Compensation.  (a) Base Compensation:  The

20   base" -- and I'm quoting now.  "The base compensation of

21   each member of the Liquidating Trust Board shall be [dollar

22   sign] [blank] per member, which amount shall be paid in

23   twelve equal installments on a monthly basis in advance."

24   And it has footnote 5.  And footnote 5 says, "Note to Draft:

25   The annual base compensation of each member of the

1    Liquidating Trust Board shall be disclosed prior to the

2    Confirmation Hearing."

3         Can you tell me how much is the base compensation of

4    each member of the liquidating trust board?

5    A    I cannot.  It's my understanding that that is still

6    being discussed with the UCC.  And I'm not aware of what

7    that compensation is.

8    Q    You have no knowledge at all of what the possible

9    ranges of the compensation would be?

10   A    I don't at this time, no.

11   Q    Do you have any idea what the minimum amount or the

12   maximum amount --

13          MR. GENENDER:  Objection, Your Honor.  He just

14   answered that question.

15          THE WITNESS:  I do not.

16   BY MR. WANDER:

17   Q    Okay.  And do you know why the annual base compensation

18   of each member has not been disclosed prior to the

19   confirmation hearing?

20   A    I think that there has been extensive discussions of

21   two of the other members that are proposed to the

22   liquidating trust board with counsel for the UCC.  And I

23   have not been party to those conversations.

24   Q    Okay.  Paragraph (b) of this Annex B is labeled

25   "Incentive Compensation".  Can you describe the incentive

1    compensation to which you might be entitled?

2    A    I cannot.  I think that's part of the discussions,

3    ongoing discussions, about what the compensation should be.

4    And I know that it's an open item in the confirmation

5    briefing that will be filled in due course.

6    Q    There's a third item.  It's just a footnote 6.  Do you

7    know if there's any other compensation that's being

8    discussed other than the base compensation and the incentive

9    compensation?

10   A    I don't believe that there is.

11             MR. WANDER:  Okay.  Thank you.

12             THE COURT:  Okay.  Does anyone else have any

13   questions for Mr. Transier?

14             Okay.  You can step down, sir.  Thank you.

15             THE WITNESS:  Thank you, Your Honor.

16             MR. GENENDER:  Your Honor, may Mr. Transier be

17   excused?

18             THE COURT:  Yes.

19             MR. GENENDER:  Your Honor, as a housekeeping

20   matter, the parties have submitted to Your Honor joint

21   exhibits.  And I would like to formally move them -- offer

22   them into evidence for record purposes.

23             THE COURT:  Well, when you say the parties, who --

24             MR. GENENDER:  The debtors and we certainly worked

25   with Wilmington Trust.  And I believe the administrative

Page 60

1    claimants.

2              THE COURT:  Okay.  All right.  That's fine.  They

3    are agreed deemed admitted.

4              MR. GENENDER:  Thank you.

5         (Joint exhibits of debtors, Wilmington Trust and

6    administrative claimants received in evidence)

7              MR. GENENDER:  Your Honor, next, the debtors would

8    call Brian Griffith.  He submitted two declarations, one on

9    September 13th, 2019, docket 5148, and one on October 1,

10   2019, a supplemental declaration at 5297.

11             THE COURT:  Okay.

12             MR. GENENDER:  And he's in the courtroom, Your

13   Honor.

14             THE COURT:  Okay.  Would you come up to the stand,

15   please?

16        (Pause)

17             THE COURT:  Would you raise your right hand?

18        (Witness sworn)

19             THE COURT:  And it's B-R-I-A-N, G-R-I-F-F-I-T-H?

20             THE WITNESS:  Correct.

21             THE COURT:  Okay.  So, Mr. Griffith, you've

22   submitted two declarations as your direct testimony in this

23   confirmation hearing.  One's dated September 13th and then

24   you have a supplemental declaration dated October 1st.

25   Sitting here today, is there anything in them that you would

1    wish to change as your direct testimony?

2              THE WITNESS:  No, Your Honor.

3              THE COURT:  Okay.  Very well.

4         (Declarations of Brian Griffith, dated 9/13/19 and

5    10/1/19, respectively, submitted as direct testimony

6    received in evidence)

7              THE COURT:  Does anyone wish to cross-examine Mr.

8    Griffith?

9              MR. FOX:  Your Honor, Edward Fox from Seyfarth

10   Shaw on behalf of Wilmington Trust.

11             Your Honor, I just want to note, I'm not going to

12   cross-examine Mr. Griffith but we did take his deposition

13   and designated portions of his deposition which Your Honor

14   has.

15             THE COURT:  That's part of the exhibit book.

16             MR. FOX:  Yeah.  I'm sorry?

17             MR. GENENDER:  They're not in the exhibit book.

18   They were --

19             THE COURT:  But it's part of the agreed exhibits?

20   I want to make sure I have them, that's all.

21             MR. GENENDER:  My understanding is they were

22   submitted to the Court, Your Honor, yes.

23             THE COURT:  Okay.

24             MR. FOX:  So we'll rest on that, Your Honor.

25             THE COURT:  All right.  That's fine.

1          Does anyone else have questions for Mr. Griffith?

2      (Pause)

3                      CROSS-EXAMINATION

4  BY MR. WANDER:

5  Q    Good morning, Mr. Griffith.  David Wander of Davidoff

6  Hutcher & Citron.

7          First, I'd like to ask you the questions that I asked

8  Mr. Transier.  Are you familiar with the annual base

9  compensation of each member of the liquidating trust board?

10 A    I'm not, no.

11 Q    But have you been involved in any of the negotiation?

12 A    I have not.

13 Q    In paragraph -- I'm looking at your declaration,

14 document number 5148.  And if I could turn your attention to

15 paragraph 14, you state in the first sentence, "Further, I

16 understand the Debtors may require the proceeds of, among

17 other things, the ESL Litigation (defined below) to fund

18 payments under the Plan."  Do you see where I'm referring

19 to?

20 A    Yes.

21 Q    Okay.  It's possible that the debtors will not receive

22 any funds as a result of the ESL litigation, correct?

23 A    It's possible.  But we're also saying that it's not

24 necessarily required.

25     (Pause)

1    Q    Now in paragraph 55 of your declaration, it refers to

2    "Cash on Hand".  Do you see that?

3    A    Yes.

4    Q    Okay.  And it talks about approximately $50.1 million

5    in unrestricted cash on September 21.  Do you see that?

6    A    I do.

7    Q    And as of today, approximately how much is the

8    unrestricted cash?

9    A    Approximately 46 million, 46 and a half.

10   Q    And what happened to that four million approximate

11   dollars?

12   A    I believe it was used to fund the professional fee

13   carve-out account.

14   Q    Thank you.  And footnote 6 makes a reference to the

15   carve-account.  Do you see that?

16          THE COURT:  You mean, footnote -- I'm sorry.

17   Footnote 6 in what -- in that paragraph or --

18          MR. WANDER:  On that page.  On page 29 of document

19   5148 right below paragraph 55, there's a footnote 6.

20          THE COURT:  Right.

21   BY MR. WANDER:

22   Q    And it says, "This does not include the Carve-Out

23   Account".  Do you see where I'm reading?

24   A    Yes.

25   Q    And approximately how much money is in the carve-out

Page 64

1    account as of today?

2    A    Approximately, I think it's around $50 million.

3        (Pause)

4    Q    Now in paragraph 56 of your declaration, you discuss

5    additional asset proceeds.  Do you see that on your

6    declaration?

7    A    I do.

8    Q    Okay.  And you talk about, "n addition to the cash on

9    hand, additional assets of the Estates include a total of

10    $130.4 million".  Do you see that?

11    A    I do.

12    Q    And the first line -- or the first item you mention is

13    the "Calder Net Proceeds".  As of today, how much do you

14    expect the estate to recover from the Calder net proceeds?

15    A    We are still in negotiations with the Calder parties on

16    that deal.  I think, as we say in my testimony, it's --

17    could be from $10 million potentially 8 million depending on

18    how we settle with the other parties.

19    Q    What's the lowest amount that's possible?

20    A    We haven't come to a final conclusion so I don't know.

21    Q    No.  But what is the -- is a high and a low.  What is

22    the lowest amount possible based upon your current

23    negotiations?

24    A    I mean, it's hard to say.  We don't have a final

25    agreement yet.  So we're not -- it isn't -- I'm not sure I'm

Page 65

1    following the question.

2    Q    Well, has there been any offer by the other side to

3    give the estate x dollars?

4    A    They've offered six million but we're not willing to

5    accept that because we have, we think, a much better case

6    pursuing what we've laid out here.

7    Q    And how long do you expect those negotiations to take?

8    A    Again, it's very hard to say.  We're in active

9    negotiations with them.  But we have not come to a

10   settlement yet.

11   Q    And how long have you been having active negotiations?

12   A    I'd say the last month.

13   Q    The next line item is real estate proceeds, 13.1

14   million.  Do you see that?

15   A    I do.

16   Q    And as of today, what's your best estimate of the real

17   estate proceeds?

18   A    Same as what we have in here.

19   Q    The next line item is de minimis assets $5.3 million.

20   Do you see that?

21   A    I do.

22   Q    And as of today, what's your best estimate as to the de

23   minimis assets to be recovered?

24   A    I still believe the number we have in here is

25   conservative.  We've heard numbers that could be as much as

1    10 million but we're not relying on that.  I believe it's 5

2    million in the near term recoveries.

3    Q    And the next line item is 2017 EDA funds.  As of today,

4    what's your best estimate of that as additional asset

5    proceeds?

6    A    It's the same.  It was already discussed this morning.

7    It's 5.1 million.

8    Q    Okay.  The next line item is Transform 503(b)(9)

9    obligations, $97 million.  Do you see that?

10   A    I do.

11   Q    And as of today, what's your best estimate on the

12   recovery from Transform on 503(b)(9) obligations?

13   A    The same as what's in my declaration.

14   Q    You're expecting Transform to pay $97 million in

15   503(b)(9) claims?

16   A    That would be my expectation, yes.

17   Q    Okay.  And have -- has the debtor given Transform a

18   list of the 503(b)(9) obligations that the debtor would

19   expect Transform to pay?

20   A    I believe they've seen the list of the 503(b)(9)

21   claimants.  Not anything that specifically speaks to this 97

22   million directly but they understand, I think, the

23   mechanics.

24   Q    No.  My question is has the debtor given Transform a

25   list of the 503(b)(9) claims that the debtor believes

1    Transform should be paying?

2    A    We have not split the 503(b)(9) obligations between

3    what we would be retaining and what Transform would be

4    responsible for paying, no.

5    Q    Okay.  So the debtor -- I want to be clear on this.

6    The debtor has not given a list to -- if Transform said it

7    would pay the $97 million today, has the debtor given

8    Transform a list of the 503(b)(9) claims that Transform

9    should be paying with that $97 million?

10   A    Not to my knowledge.

11   Q    Okay.  So the debtor has not given Transform a list of

12   the 503(b)(9) claims that the debtor believes Transform

13   should pay, is that correct?

14            MR. GENENDER:  Your Honor, I think I've heard it

15   four times.

16            THE WITNESS:  Yeah.  I thought we've answered it.

17            THE COURT:  Yes.

18   BY MR. WANDER:

19   Q    Now if you can turn your attention to paragraph 61 of

20   your declaration.

21   A    Okay.

22   Q    It has a heading "Transform 503(b)(9) Obligations".  Do

23   you see that?

24   A    I do.

25   Q    Now in the last sentence, you refer to the $97 million

1    on account of 503(b)(9) claims.  Do you see that?

2    A    I do.

3    Q    But then  you go on to say, "which may be offset

4    depending on how the Specified Receivable and Prepaid

5    Inventory issues are resolved".  Do you see that?

6    A    I do.

7    Q    And can you explain that?

8    A    This is subject to ongoing litigation with Transform

9    under the EPA.  So there is still the opportunity and

10   potential that there is some type of reduction to the

11   obligation they're required to take.  Our position is that

12   we still have the right to (indiscernible) and position on

13   these amounts.

14   Q    Well, how much is Transform saying should be offset

15   based upon specified receivables?

16   A    I don't know the number off the top of my head but I

17   think it's rather large.

18   Q    Approximately.

19   A    It may be 50 to 60 million.

20   Q    And how much is the prepaid inventory issue,

21   approximately?

22   A    I think it might be about five million.

23   Q    Isn't it true that Transform has taken the position

24   that it doesn't owe any of that $97 million on account of

25   the 503(b)(9) claims?

1    A    It's possible.

2    Q    Isn't that Transform's position that it doesn't owe any

3    money on the 503(b)(9)?

4    A    There are a lot of open items on the litigation with

5    Transform.  I don't know the exact position they're taking

6    on that.

7    Q    So as of today, would it be fair to say that it's

8    unclear whether the debtor will receive any of the $97

9    million?

10   A    I'd be speculating.  I don't know.  This is what we

11   believe is still owed to the estate.

12   Q    Well, would you be speculating that the debtor would

13   recover the $97 million?

14   A    It's open to litigation at this point.  So I don't have

15   an answer on that.

16   Q    If you could turn your attention to paragraph 67 in

17   your declaration.  Now this relates to recoveries of

18   preferential transfers, correct?

19   A    That's right.

20   Q    And you're estimating a recovery range -- you put down

21   $100 million as reasonable?

22   A    That's right.

23   Q    And of that $100 million, how much do you project the

24   debtor will recover by the end of 2019?

25   A    Hard to say.  I think that's really based on what the

1    preference actions and the preference firms are able to

2    bring in over the next three months.  Again, I'd be

3    speculating on the exact amount in the next two to three

4    months.

5    Q    Okay.  Well, what's your best guess to the nearest 10

6    million of what the recovery by the end of the year?  Do you

7    have any idea?

8    A    Fifteen to twenty million would be just a guess.

9    Q    Oh, I don't want you to guess.

10   A    Okay.  I don't have a --

11   Q    So do you have any --

12   A    I don't have a great idea, no.

13   Q    Sure.  Okay.  And without guessing, can you tell me how

14   much in preference recoveries you believe the debtor will

15   recover in 2020?

16   A    I believe what we are anticipating is another 60

17   million or so.

18   Q    In 2020?

19   A    Yes.  I think that's correct.

20   Q    Okay.  And what about in 2021?  Approximately, how much

21   of the $100 million are you going to recover -- the debtors'

22   estate will recover or the liquidating trust will recover in

23   2021?

24   A    It would be the balance of whatever we just laid out

25   for 2019/2020.  So the balance would be in 2021.  So maybe

```
 1    that's another $20 million.

 2    Q    Okay.  So is it your testimony that you believe the

 3    debtor will recover all of the potential preference

 4    recoveries totaling $100 million by the end of 2021?

 5    A    That would be my assumption, yes.

 6    Q    Okay.  Now what do you base that assumption on?  And

 7    let me tell you why I'm curious about this.  I'm negotiating

 8    a settlement with one of the companies that has been

 9    retained by the debtor.  It's a 2010 bankruptcy, I believe,

10    PCD Communications.  And we're still finalizing the

11    settlement and it's about eight years later.  So I'm trying

12    to understand why you think --

13              THE COURT:  Is that testimony, Mr. Wander?

14              MR. WANDER:  No.  That was --

15              THE COURT:  Do we need to say when the demand was

16    made and when the complaint was filed and all of those

17    points, too?

18    BY MR. WANDER:

19    Q    Well, in your estimate of the recovery by 2021, does

20    that assume complaints will be filed, answers, discovery,

21    trials on ordinary course of business defenses and

22    everything will be completed by 2021 resulting in $100

23    million recovery?

24    A    It's based on the discussions we've had internally and

25    with the preference firms that we've retained.
```

1    Q    Okay.  So the record's clear, you expect it all to be

2    completed by the end of 2021.

3              MR. GENENDER:  Objection.  Restates his testimony.

4    He said that's his assumption.  He's misstating his

5    testimony.

6              THE WITNESS:  We've been more focused over the

7    last -- over the next, call it 12 to 15 months.  So anything

8    past that period, it is my assumption but I don't know

9    exactly.

10   BY MR. WANDER:

11   Q    No.  It's possible that the preference litigation could

12   go on for five years, isn't it?

13   A    Anything's possible, yes.

14   Q    Is it possible that it would go on for five years as it

15   would be completed in two?

16   A    I'd be speculating.  I don't know.

17   Q    Well, is your testimony that in the analysis of the

18   other large bankruptcy cases that was done that the

19   litigation -- the preference litigation is usually concluded

20   in about less than three years?

21   A    I'd say the majority of the preference recoveries are.

22   I don't know the tail on the last pieces of it but the

23   majority of it is, to my understanding.

24   Q    How long do you think the ESL litigation might take?

25   A    It all depends on if there's potential settlements

1    involved, what happens with the D&O policy recoveries, and

2    ultimately if there's a settlement with ESL.

3    Q    So as of today, you have no idea how long it might

4    take.

5    A    I'd be speculating.  I don't know.

6    Q    Now if you could turn your attention to paragraph 75.

7    And there's a heading above that, "Claims to be Satisfied".

8    Do you see where I'm referring to?

9    A    I do.

10   Q    And in the second line of the first sentence, it refers

11   to the -- I'll just read the beginning part:

12        "As detailed in the Murphy Declaration, the Debtors,

13   with the assistance of their financial advisors, have been

14   carefully tracking administrative expense claims (including

15   503(b)(9) claims)" -- do you see where I'm reading?

16   A    Yes.

17   Q    How do you think the debtor and its financial advisors

18   have been doing so far with respect to carefully tracking

19   administrative expense claims?

20   A    As I think it says here, this is more detailed in the

21   Murphy declaration.  He's been in charge of handling most of

22   the claims side of this analysis.

23   Q    Okay.  I'll save some questions then for Mr. Murphy

24   instead of asking you on that.

25        Now if you could look at paragraph 76 of your

1   declaration, you state in the middle, " I believe the

2   Debtors will be able to satisfy Administrative Expense

3   Claims, Secured Claims".  Do you see where I'm reading?

4   A    I do.

5   Q    Okay.  And what year do you believe the debtors will

6   likely be able to satisfy all allowed administrative expense

7   claims?

8   A    Again, that's to be determined.  It could take months.

9   It could take slightly longer than months.  We have five or

10  six kind of major items that are still in play for the

11  estate --

12  Q    It could take some --

13  A    -- that we'll decide.

14  Q    I'm sorry.  I didn't mean to interrupt.

15  A    So, first of all is how many administrative claims will

16  actually be allowed.  We have not gotten to that point yet.

17  So we don't know the size of that pool precisely.  How many

18  of those that are actually allowed will opt in to the admin

19  consent program?  When do the preference dollars come in as

20  you talked about?  What happens with the ESL litigation and

21  D&O settlements?  And just all the other remnant asset

22  recoveries, how quickly can we bring those in?

23  Q    Now so the preference recoveries are approximately $100

24  million.  That sounds pretty important in order to get

25  administrative claims paid.  Would you agree?

1   A     It'll depend on the size of the ultimate pool and what

2   happens with the other four or five areas we just laid out.

3   But it's possible that could be material, yes.

4   Q     Right.  And getting those preference recoveries could

5   go into at least 2021, correct?

6   A     The tail piece of it, potentially.

7   Q     And the ESL litigation can take several years, correct?

8   A     It'll depend on what we were able to settle and how

9   quickly.

10  Q     Well, so as of today, you have no idea whether you'll

11  be able to pay --

12              MR. WANDER:  Oh, strike that.

13  BY MR. WANDER:

14  Q     Now allowed administrative claims, there are a bunch of

15  disputes over administrative claims, aren't there?

16  A     That's correct.

17  Q     Like hundreds of millions of dollars in disputes?

18  A     It depends.  Again, this is probably better covered

19  under the Murphy declaration.

20  Q     Well, you've read the Murphy declaration, right?

21  A     I have.

22  Q     Right.  And doesn't it refer to over a billion dollars

23  in administrative claims being filed?

24  A     I'd have to refer to the Murphy declaration.  I don't

25  have it -- I don't believe I have it in front of me.

1   Q   Well, do you recall in the Murphy declaration, it

2   indicating that most of the objections to administrative

3   claims have not been filed?

4           MR. GENENDER:  Your Honor, I'm going to object.

5   He's outside the scope of his direct.  And he will have a

6   chance to ask Mr. Murphy these questions.  So foundation,

7   Your Honor.

8           MR. WANDER:  Well, Your Honor, I believe he --

9           THE COURT:  Well, paragraph 76 says "Based on my

10  understanding of the Murphy and Transier declarations".  So

11  --

12          MR. GENENDER:  If I could have a copy of it, I

13  could respond.  But --

14          THE COURT:  Right.

15          MR. GENENDER:  -- I didn't understand there were

16  tons of duplicate claims --

17          THE COURT:  So you can --

18          MR. GENENDER:  -- that were filed.  I don't know

19  the basis to --

20          THE COURT:  Yeah.  You could --

21          MR. GENENDER:  -- these numbers.

22          THE COURT:  One of you should provide him with a

23  copy.

24          MR. WANDER:  Oh.  I'll save those questions for

25  Mr. -- are you saying Mr. Murphy is better equipped to

1    respond to that?

2              MR. GENENDER:  He can respond to his own

3    declaration, yes.

4              MR. WANDER:  Well -- okay.

5    BY MR. WANDER:

6    Q    I'd like to turn your attention to the last couple of

7    paragraphs starting with paragraph 88.  And it refers to the

8    carve-out account.

9         Now there's a reference in paragraph 88 to a

10   termination notice.  Do you see that?

11   A    I do see it, yes.

12   Q    Can you explain that to me, how this carve-out account

13   works and the funding and the termination notice?

14   A    My understanding, as long as there were secured claims

15   outstanding for the estate that we'd be operating under the

16   DIP order.  And to the extent that that was to be

17   terminated, somebody would have to file a termination notice

18   of that order.

19   Q    And who would be the party to send or file this

20   termination notice?

21   A    I don't know.

22   Q    Well, are you saying that until the termination notice

23   was sent or filed then every week funds would be taken out

24   of the debtors' accounts and put into the carve-out account?

25   A    As long as the order was still in place, yes.

1    Q    Okay.  So how could that procedure end as a practical

2    matter in this case?

3    A    Somebody would file a termination notice.

4    Q    And who is that?

5    A    I don't know.

6    Q    Do you know who would know?

7    A    I don't.

8    Q    So until this termination notice is filed by someone,

9    we don't know who, every week funds get taken out of the

10   debtors' accounts and fund the carve-out account, is that

11   it?

12   A    As long as secured claims are outstanding, yes.

13   Q    And what secured claims are still outstanding?

14   A    My understanding is it was the intercompany claims that

15   were being processed post-petition.

16   Q    So there are no claims other than intercompany claims,

17   no secured claims currently outstanding.

18   A    To my knowledge, those are the ones that I've been

19   relying on, yes.

20   Q    Okay.  So if the remaining secured claims are

21   intercompany claims, wouldn't then that be the debtor who

22   would say there are no secured claims outstanding and would

23   submit a termination notice?

24   A    But they were outstanding.  So we wouldn't submit a

25   termination notice.

Page 79

1    Q    Okay.

2              MR. WANDER:  No further questions.  Thank you.

3              THE COURT:  Okay.  Does anyone else want to

4    cross-examine Mr. Griffith?

5              Mr. Griffith, paragraph 77 of your declaration,

6    the second sentence, says "I believe the Debtors have

7    sufficient Assets to pay all Administrative Expense Claims

8    as of the Effective Date and require at most a short delay

9    of the Effective Date to allow for the monetization of

10   significant assets".

11             Can you put any more flesh on what you mean by a

12   short delay?

13             THE WITNESS:  As I said earlier, I would say it's

14   several months, but potentially longer depending upon the

15   tentative five major items that we've laid out as what's

16   going to make us be able to take to the restructuring

17   committee what would actually be -- put us in a position to

18   go effective.

19             THE COURT:  Assuming that the administrative

20   expenses and 503(b)(9) claims are liquidated, i.e., fixed,

21   the amount is fixed --

22             THE WITNESS:  Yes.

23             THE COURT:  -- as per Mr. Murphy's declaration, so

24   you take that variable out of the equation.  How does that

25   affect your assumption regarding the several months delay

1    and what assets you need to fill the gap?

2            THE WITNESS:  On that basis, I think what we would

3    be requiring is, based on the conversations with the

4    preference firms and their experience, that could probably

5    take nine months of preference recoveries as long as we also

6    are working towards a settlement with the D&O policies and

7    if the recovery on the kind of the remnant assets that we

8    have out there that we believe will all take less than a

9    year to kind of recover.

10           THE COURT:  So the shortfall is what?  About 100

11   million?  I'm just trying to figure out.  Assuming Mr.

12   Murphy's estimates are reasonably accurate, between cash on

13   hand and --

14           THE WITNESS:  Between the cash on hand and the

15   other assets outside of --

16           THE COURT:  Right.

17           THE WITNESS:  -- the ESL litigation and the

18   preference?  Is that the question?

19           THE COURT:  Yes.

20           THE WITNESS:  Yeah.  I think that shortfall is

21   probably -- I'll call it about 100 to 120 million.

22           THE COURT:  So other than the miscellaneous

23   assets, you need recovery from some litigation source of

24   approximately, what, 15 million, roughly?  Twenty million?

25   I'm just trying to get a sense of it.

1           THE WITNESS:  It would be between any further --

2   we assume right now no further dollars come in on the APA

3   Transform litigation.  So between that, between the ESL

4   litigation and the preference actions, we would probably

5   need a little over 100 to 120 million would be my estimate.

6           THE COURT:  Okay.  Okay.  I'll let you -- I just

7   want to ask a couple more questions.

8           Can you turn to your October 1 declaration?

9       (Pause)

10          THE COURT:  If you go to paragraph 5, you note

11  that you were "personally involved in the negotiations of

12  the Administrative Expense Claim Consent Program".  And then

13  in the next sentence, the second sentence of that paragraph,

14  it says:

15          "Over the course of these negotiations, the

16  Debtors shared this analysis with the Ad Hoc Vendor Group

17  and the Creditors' Committee and engaged in multiple

18  diligence discussions in respect to [the] analysis."

19          And the analysis was -- I believe you're referring

20  back to the first sentence where it says "where extensive

21  review and analysis was conducted of the Claims asserted by

22  the members of the Ad Hoc Vendor Group".

23          You see that?

24          THE WITNESS:  Yes.

25          THE COURT:  So were the discussions just about

Page 82

1    their claims and the merits of their claims against the

2    debtors or was the analysis broader and more along the lines

3    of what you've just been questioned about and that are in

4    your declarations, i.e., the timing of payments, the

5    ultimate likelihood of receipt of payments versus claims?

6            THE WITNESS:  The initial focus was on the ad hoc

7    group's claims --

8            THE COURT:  Right.

9            THE WITNESS:  -- and understanding how quickly we

10    could get to some type of resolution with them on what would

11    potentially be an allowed claim.

12            THE COURT:  Right.

13            THE WITNESS:  And then a potential, you know,

14    consent amount where they might be willing to reduce.  And

15    then from there, we did do some other analysis around if we

16    were able to get other portions of the admin claimants to

17    accept a similar plan, what would that mean in terms of what

18    do we need to recover from all the assets and how quickly

19    can we go effective.

20            THE COURT:  Okay.  So some of the due diligence

21    discussions were about the topics that you've just been

22    questioned about.

23            THE WITNESS:  Yes.

24            THE COURT:  Okay.  Were they materially different

25    than what you have in your declaration and what you've just

```
 1    been questioned about?

 2              THE WITNESS:  No, Your Honor.

 3              THE COURT:  Okay.  Okay.

 4    BY MR. WANDER:

 5    Q    Picking up on what the judge was just asking about,

 6    were you directly involved in the negotiations with the

 7    other ad hoc group?

 8    A    I was, yes.

 9    Q    Okay.  And isn't it true that there was a concern by

10    the ad hoc group that the funds available on December 1 may

11    be the only funds that would be available for administrative

12    claims?

13    A    Not that I'm aware of.  I don't recall that.

14    Q    Okay.  So I got back up because I forgot about your

15    supplemental declaration from the other day, so I just want

16    to --

17              MR. GENENDER:  Your Honor, I object.  He sat down.

18              THE COURT:  I think -- I really don't think you

19    can raise that at this point.

20              MR. WANDER:  I can't ask one question about his

21    other declaration?  I apologize, the other supplemental

22    declaration?

23              THE COURT:  Go ahead, that's fine.

24    BY MR. WANDER:

25    Q    I'm looking at your supplemental declaration that's
```

Page 84

1    Document 5297 filed on October 1, 2019. And in paragraph

2    five -- strike that. That was the Judge's paragraph.

3         In paragraph 9, which is on page 5 of 6, six lines from

4    the bottom you state in the middle, "I believe that the

5    administrative expense claims consent program allows the

6    debtors to forgo time consuming litigation in connection

7    with the plan and the allowance of settled administrative

8    expense claims."

9         Now, are you -- what litigation are you referring to?

10   A    Disputing the amount of the allowed claims.

11   Q    Okay. Now, you don't expect all of the administrative

12   vendor creditors to be caught in the settlement. It would

13   be fair to say will be some people who don't opt in?

14   A    I would agree with that, yes.

15   Q    Okay. So isn't one of the outstanding litigation

16   issues, what we've been referring to as the World Imports

17   issue?

18   A    I believe it is, but again this is probably for the

19   Murphy declaration.

20   Q    Well, can you explain the World Imports issue?

21   A    Again, that's probably better described by Mr. Murphy.

22   Q    Well, isn't it true that the World Imports issue which

23   it pertains to approximately $30 million in foreign vendor

24   claims?

25             MR. GENENDER: Your Honor, I'm going to object,

1    there's lack of foundation and it's way beyond one question.

2         THE COURT:  I think you should talk to Mr. Murphy

3    about this.

4         MR. WANDER:  I'll save it for Mr. Murphy, Your

5    Honor.

6         THE COURT:  Okay.

7         MR. WANDER:  Thank you.

8         THE COURT:  Does anyone else want to cross-

9    examine?

10         (No response)

11         THE COURT:  You can step down.

12         MR. GENENDER:  Your Honor, may I do brief

13    redirect?

14         THE COURT:  Oh, I'm sorry, I didn't know you had

15    any.  Yes, go ahead.

16         MR. GENENDER:  I'm not normally so patient, Your

17    Honor.

18                     REDIRECT EXAMINATION

19    BY MR. GENENDER:

20    Q    Mr. Griffith, let me hit a couple of points.  Do you

21    under -- with respect to 503(b)(9) claims, do you understand

22    that the debtors have objected to substantially all of those

23    claims?

24    A    I do.

25    Q    And that the debtors are working on resolving the

1    remainder of them?

2    A    Yes.

3    Q    So that in your mind is there a possibility that there

4    may not be 503(b)(9) claims?

5    A    Very minimal to, yes, it's possible.

6    Q    So that would eliminate the discussion you had about

7    the 97 million, that wouldn't even be an issue; is that

8    fair?

9    A    That's right.

10    Q    Thank you.  You were asked some questions about the

11    preference recoveries and the timing.  Did you rely on the

12    professionals, the preference firms, as stated set forth in

13    your declaration for that testimony?

14    A    It was part of it, yes.

15    Q    I want to go to some of the questions that -- I'm going

16    to refer you to your declaration starting with paragraph 62

17    and walk you through a couple of things.  I take that back,

18    paragraph 55.

19         Your -- would you agree, Mr. Murphy (sic), that your

20    declaration address --

21              THE COURT:  Mr. Griffith.

22              MR. GENENDER:  I'm jumping ahead, Your Honor,

23    thank you.

24    BY MR. GENENDER:

25    Q    Mr. Griffith, would you agree that your declaration

```
 1    sets forth various sources of funds.

 2    A    Yes.

 3    Q    I'd like to go through and add those up to clarify the

 4    record if that's okay, please.  Starting with paragraph 55,

 5    you address cash on hand.

 6    A    Yes.

 7    Q    50.1 million.

 8    A    Correct.

 9    Q    As of that date, right?

10    A    Yes.

11    Q    Paragraph 56 you address total additional proceeds,

12    130.4 million.

13    A    Yes.

14    Q    And then you in paragraph 57, 58, 59, 60 and 61 address

15    those elements, correct?

16    A    That's correct.

17    Q    And then you address additional litigation proceeds in

18    the paragraphs thereafter with respect to the preference

19    actions in the ESL litigation; is that right?

20    A    Yes.

21    Q    And to the extent there are claims allowed, did you

22    personally handle that process, administrative claims,

23    excuse me?

24    A    Not personally, no.

25    Q    Mr. Murphy did, right?
```

Page 88

1    A    Correct.

2    Q    And you reviewed his declaration?

3    A    I did.

4    Q    And you understand that -- do you defer to whatever his

5    conclusions were and observations were as to what if any

6    administrative claim shortfall there existed, right?

7    A    That's correct.

8    Q    All right.  And do you understand from reading his

9    declaration that he has a view that there may not be an

10   administrative claim shortfall at all?

11   A    I do.

12   Q    If that were the case, how much money would the estate

13   need to meet a shortfall that doesn't exist?

14   A    None.

15        MR. GENENDER:  Thank you.  One second, Your Honor.

16        Nothing further, Your Honor, thank you.

17        THE COURT:  Okay.

18        MR. WANDER:  Your Honor, briefly?

19        THE COURT:  Sure.

20                    RECROSS-EXAMINATION

21   BY MR. WANDER:

22   Q    You were just asked some questions about 503(b)(9)

23   claims I believe, correct?

24   A    Yes.

25   Q    I thought Mr. Murphy was the one who had that

1    information based on your earlier testimony when I was

2    asking you very similar questions.

3            MR. GENENDER:  Your Honor --

4            THE COURT:  No, he said he wasn't going to deal

5    with the 503(b)(9) claims --

6            MR. WANDER:  Right, but --

7            THE COURT:  -- he was going to rely on Murphy.

8    BY MR. WANDER:

9    Q    I believe that counsel just asked you about the

10   503(b)(9) claims --

11           THE COURT:  No, he didn't.

12   Q    -- and asked whether objections to most of those claims

13   has been filed.

14           MR. GENENDER:  I asked if there were objections to

15   the claims.

16           THE COURT:  He's just focusing on the assets.

17           MR. WANDER:  Okay.  I thought he was -- counsel

18   was eliciting important testimony from him on the 503(b)(9)

19   issue that I agreed not to ask him about.

20           THE COURT:  As far as objections are concerned,

21   I'll listen to Mr. Murphy.

22           MR. WANDER:  Okay.  Thank you, Your Honor.

23           THE COURT:  Objections to the 503(b)(9) claims

24   that have been filed.

25           Okay.  You can step down.

1                    THE WITNESS:  Thank you.

2                    MR. GENENDER:  Your Honor, at this time the

3          debtors would call William Murphy who submitted a

4          declaration on September 13th, 2019 at ECF No. 5149.

5                    THE COURT:  Okay.  If you can take a seat, please.

6                    Would you raise your right hand, please?

7               (Witness sworn)

8                    THE COURT:  And it's William M-U-R-P-H-Y?

9                    THE WITNESS:  Yes.

10                   THE COURT:  Okay.  So, Mr. Murphy, you've

11         submitted a declaration intended to be your direct testimony

12         in this confirmation hearing that's dated September 13,

13         2019.  Sitting here today is there anything that you wish to

14         change in it as your direct testimony?

15                   THE WITNESS:  No, Your Honor.

16                   THE COURT:  Okay.  All right.  Does anyone wish to

17         cross-examine Mr. Murphy?

18                   MR. FOX:  Your Honor, Edward Fox from Seyfarth

19         Shaw on behalf of Wilmington Trust, we also designated

20         portions of the deposition testimony of Mr. Murphy and the

21         debtors made cross designations.  And I believe you have

22         those and we rest on that.

23                   THE COURT:  Okay.

24                   MS. LIEBERMAN:  Good afternoon, Your Honor, Donna

25         Lieberman, Halperin Battaglia Benzija for Relator Carl

 1    Ireland, who's the administrator of the Estate of James

 2    Garbe.

 3                        CROSS-EXAMINATION

 4    BY MS. LIEBERMAN:

 5    Q    Mr. Murphy, could I ask you to look at your

 6    declaration --

 7    A    Yeah.

 8    Q    -- specifically paragraph 29 and in paragraph 55?

 9         Mr. Murphy, do you see in those paragraphs that you've

10    indicated that the estimate for secured claims is $18

11    million?

12    A    Yes.

13    Q    Has anything changed in those estimates to your

14    knowledge?

15    A    No.

16    Q    Do you know what secured claims are included in those

17    estimates?

18    A    Your client's claim.

19    Q    Are any -- and obviously jointly my client and the

20    United States, any other secured claims in there -- in those

21    -- in that $18 million?

22    A    No.

23    Q    Mr. Murphy, do you know if the debtors have enough cash

24    on hand to reserve for those secured claims?

25    A    Yes, they --

1    Q    Yes, you know or you --

2    A    The debtors -- but there's other demands for the cash

3    that the debtors have on hand.

4    Q    I'm not sure I understand.  Do you anticipate that when

5    this -- when the plan goes effective that the debtors will

6    have enough cash on hand?

7    A    Yes, when the plan goes effective, debtors will have

8    enough cash on hand.

9    Q    And do the debtors currently have enough cash on hand

10   to reserve $18 million for the secured claim?

11   A    The current plan would be to make sure that the funds

12   are available as of the effective date, which we believe

13   they're going to be available.

14   Q    Mr. Murphy, are you generally familiar with the

15   administrative claims procedures settlement that recently

16   got filed?

17   A    Yes.

18   Q    Are you aware that that contemplates $20 million being

19   put in a segregated account?

20   A    Yes.

21   Q    Will that affect the availability of the debtors to

22   reserve for the secured claims?

23   A    No.

24   Q    So even with that $20 million being segregated solely

25   for opt in administrative claimants, the debtors have

Page 93

1    sufficient money to reserve $18 million for these secured

2    claims?

3    A    As of the effective date, yes.

4    Q    What about as of the current date?

5    A    No.

6         MS. LIEBERMAN:  No further questions, Your Honor.

7         THE COURT:  Okay.  Does anyone else want to cross-

8    examine Mr. Murphy?

9                    CROSS-EXAMINATION

10   BY MR. WANDER:

11   Q    Mr. Murphy, my name is David Wander of Davidoff Hutcher

12   & Citron.  I'm going to first ask you the questions that I

13   asked others but no one seems to know and this has to do

14   with the compensation of the liquidating trust board

15   members.

16        Can you tell me how much is being discussed for the

17   annual based compensation?

18   A    I'm not involved with that, so no.

19   Q    And who is?

20   A    I don't know.

21   Q    Okay.  Do you have any idea about the incentive

22   compensation?

23   A    I'm not involved with those discussions.

24   Q    Do you know who would know about that?

25   A    No.

Page 94

1    Q    I'm going to start out with the question that I was

2    asking Mr. Griffith regarding the administrative expense

3    claim settlement.  And I was referring to paragraph 9 of his

4    declaration, document 5297.  And he said, "I believe that

5    the administrative expense claims consent program allows the

6    debtors to forego time consuming litigation in connection

7    with the plan and the allowance of settled administrative

8    expense claims."

9         Can you describe the time consuming litigation that

10    this settlement will make unnecessary?

11    A    If you don't mind, can you repeat the paragraph that I

12    want to read here?

13    Q    Sure.  It's paragraph 9 and it starts six lines from

14    the bottom, we're in the middle of the page, it says, "I

15    believe that the administrative claims."  Do you see where

16    I'm referring to?

17    A    I see the statement, yes.

18    Q    And you see the reference to time consuming litigation?

19    A    Yes.

20    Q    Okay.  Other than the objection to the plan by the

21    Foley & Lardner firm, what time consuming litigation is

22    going to be resolved by this settlement construct?

23    A    To the extent administrative claimants opt in there's a

24    procedure to review the claims and go forward with the

25    consent program.

Page 95

1   Q    Well, would it be fair to say that it's very likely not

2   all of the administrative claimants with 503(b)(9) claims

3   and the foreign vendors who have those claims are going to

4   opt in?

5   A    That would be speculation.  I don't know what they'll

6   be thinking about.

7   Q    Well, isn't one of the litigation issues that remain

8   unresolved that we refer to as the World Imports issue?

9   A    That's -- that will be one of the issues as part of the

10  objections that will be filed.

11  Q    Right.  And can you explain what the World Imports

12  issue is?

13  A    I'm not an attorney, but as a businessman, my

14  understanding it's using a receipt date based on port of

15  origin versus a domestic receipt date.

16  Q    Okay.  And that relates to approximately $30 million of

17  foreign vendor claims?

18  A    I'd have to add up the claims.  The 30 million I'm

19  aware of is the amount of claims that -- the dollar amount

20  that's, you know, our estimated objection amounts to be

21  objected to.

22  Q    Okay.  Now, the World Imports issue is not resolved in

23  any way by the settlement, correct, it's still out there?

24  A    That's correct.

25  Q    There are also litigation issues with many of the same

Page 96

1    vendors having to do with prepetition orders of goods that

2    were delivered post-petition, correct?

3    A     Correct.

4    Q     And the administrative claim settlement doesn't resolve

5    those litigation issues with regard to creditors who do not

6    opt in, correct?

7    A     Correct.

8    Q     So the time consuming litigation relating to 503(b)(9)

9    claims and even 503(b)(1) claims of the foreign vendors are

10   not resolved by the settlement, correct?

11   A     It's a consent program and it's -- it allows a process

12   where we're able to agree to allowed amounts outside of the

13   court process.

14   Q     But as long as all the creditors haven't opted in, the

15   time consuming litigation --

16              THE COURT:  It's a tautology, you settle/you

17   settle, you don't/you don't.  I get that, Mr. Wander, we

18   don't need to spend more time on this.

19              MR. WANDER:  Okay.  I'll move on, Your Honor.

20              THE COURT:  Plus which as Mr. Murphy says there is

21   a mechanism for specifically exchanging information and I

22   guess progressing a possible settlement with people who

23   haven't immediately settled.

24   BY MR. WANDER:

25   Q     Now, you're a senior director of M3 Partners, correct?

Page 97

1   A    Correct.

2   Q    And how long has M3 been involved with Sears?

3   A    My understanding is for several years.

4   Q    And can you describe M3's role with Sears prior to the

5   bankruptcy filing?

6   A    I cannot.

7   Q    Wasn't M3 involved in maintaining and overseeing the

8   books and records of Sears prior to the bankruptcy?

9   A    I joined M3 in December, so I'm not aware of any events

10  prior to that.

11  Q    December of what year?

12  A    2018.

13  Q    So you have no knowledge of M3's involvement in the

14  debtors' books and records prior to the bankruptcy filing?

15  A    That's correct.

16  Q    I'd like to direct your attention to paragraph 20 of

17  your declaration which is on page 11.  Three lines from the

18  bottom in the middle you state, "Among other things we found

19  that historical intercompany data was incomplete and at

20  times inaccurate creating a possibility of inaccurate

21  results by orders of magnitude."

22       What do you mean by orders of magnitude?

23  A    The total intercompany due to or due from receivable

24  and payables as of the filing date again netted even at this

25  level, exceeded $100 billion.  As we evaluated the host

Page 98

1    petition intercompany balances, we found entries that

2    depending on which account you looked at may have had

3    adjustments in the tens and hundreds of millions of dollars

4    and it took -- it takes to summarize that data particularly

5    historically is magnitudes of millions and billions of

6    dollars.

7    Q    So when you used the phrase order of magnitude, meaning

8    a large amount?

9    A    Yes.

10   Q    Okay.  And you continue after the phrase orders of

11   magnitude, you mention antiquated accounting systems.  Do

12   you see that?

13   A    Yes.

14   Q    And so those would be the accounting systems that Sears

15   was maintaining for the several years before the bankruptcy

16   when M3 was involved in the company, correct?

17   A    Yes.

18   Q    Do you know -- strike that.

19        Because you weren't with M3, you wouldn't know what --

20   prior to December 2018, you don't know or do you, why they

21   maintain this -- continued to maintain an antiquated

22   accounting system?

23   A    M3 wasn't maintaining.  The firm was not maintaining

24   the systems.  The debtor, these are the debtors' systems.

25   Q    Right.  So what was M3's role though with respect to

1    Sears in those couple of years before the bankruptcy when

2    Sears had an antiquated accounting system?

3             THE COURT:  He's already answered this, he doesn't

4    know.  He got here -- you asked him five questions about

5    this.

6             MR. WANDER:  Okay.

7    BY MR. WANDER:

8    Q    Now, if you turn to page 12 of your declaration, there

9    -- and in particular footnote 5.  Okay.  You refer to how

10   information is recorded currently, correct, and you refer to

11   this People Soft Oracle system.

12   A    Yes.

13   Q    Okay.  Now, the last sentence in that footnote you

14   state, "this process is cumbersome and extremely time

15   consuming."  Can you explain what you mean?

16   A    To evaluate the post-petition intercompany activity, we

17   work with the now transformed accountants and this was a

18   three or four month process to summarize post-petition

19   intercompany activity that was being monitored on a bi-

20   weekly basis.

21        To summarize that data was a pretty intensive effort on

22   their part and it was cumbersome and time consuming just for

23   three or four month period that we were tracking -- you

24   know, the debtor process was being tracked as part of the

25   DIP loan agreement.

1   Q    And how accurate has that process been?

2   A    Accurate enough that we've concluded we -- it was

3   better to do a plan settlement than to utilize the

4   intercompany activity even though we had millions of data --

5   millions of lines of data to -- that they summarized to

6   identify intercompany receivable and payable activity

7   between debtors.

8        There was -- we were never able to get down to the raw

9   data of receivables and activity between both -- any

10  particular debtor, due to the volume of the data.

11  Q    You're talking now about the debtors' currently

12  accounting, correct?  The problems you were just talking

13  about is now the current post-petition data; isn't that

14  correct?

15  A    The issue is more the volume of the data in summarizing

16  that data.

17  Q    The issue is not at all reconciling the data?

18  A    And reconciling it.

19  Q    Right.  There are major problems the debtor has faced

20  reconciling the data post-petition, correct?

21  A    Which is the current -- what I'm referring to

22  specifically is the intercompany activities.

23  Q    Now, I'd like to turn your attention to paragraph 28 on

24  page 16 of your declaration and there's a heading, claims

25  analysis.

Page 101

1   A    Okay.

2   Q    Okay.  Now, the debtors have asked the Court to set a

3   bar date for the filing of certain claims, correct?

4   A    Yes, they did.

5   Q    And the debtor asked the Court for a bar date for

6   503(b)(9) claims, correct?

7   A    Correct.

8   Q    And the debtors asked the Court to set a bar date for

9   unsecured claims, correct?

10  A    It was the same date I understand.

11  Q    The debtors have not asked the Court to set a date for

12  administrative claims under 503(b)(9) claims, correct?

13  A    That's my understanding.

14  Q    And that's been a deliberate choice by the debtor not

15  to seek that bar date; isn't that correct?

16  A    An administrative claim bar date has not been set as

17  far as the discussions of whether or not to file it.  That's

18  out of my realm of expertise.

19  Q    Okay.  Well, why would the debtor have the Court set a

20  bar date for unsecured claims and 503(b)(9) --

21            THE COURT:  He just said he doesn't know.

22            MR. WANDER:  I'm sorry?

23            THE COURT:  He just said he doesn't know, Mr.

24  Wander.

25  BY MR. WANDER:

1    Q    There could be a lot of administrative claims that have

2    not been filed, correct?

3    A    I guess anything is possible.

4    Q    Well, there hasn't been a bar date, there could be

5    hundreds of millions of administrative claims that haven't

6    been filed, correct?

7    A    You want my professional opinion?

8    Q    I'm asking whether the fact that the debtor has not an

9    administrative claims bar date could result in there being

10   hundreds of millions of dollars of administrative claims to

11   be filed in the case.

12   A    My opinion it's unlikely.

13   Q    Well, hasn't there been additional administrative

14   claims being filed last week, the week before?  Every week

15   don't we see additional administrative claims being filed?

16   A    I believe so, yes.

17   Q    Have you been adding up those additional administrative

18   claims that have been filed in your calculations of the

19   total administrative claims that may be allowed in this

20   case?

21   A    Yes.  Most of them currently are -- they're included in

22   the accounts payable that's been outstanding since February

23   11th.

24   Q    You're saying all of the claims that have been filed

25   recently are listed in the debtors' books as being

1    outstanding payables?

2    A    I have to look at all of those motions you're referring

3    to to know whether I'm accurately answering your question,

4    but the ones that I've looked at, I find that they're in the

5    accounts payable.

6    Q    And which ones are those?

7    A    I'd have to go back and look at the documents.  I just

8    know that as I look at documents and I look at particular

9    claims when asked, I've found that they've also been in the

10   accounts payable.

11   Q    Well, is it your testimony that administrative claims

12   that have been filed in the past two weeks, you've checked

13   and determined that they were listed in the debtors' books

14   as payables?

15   A    No, I can't say that.

16   Q    Now, I'd like to turn your attention to paragraph 29

17   which talks about outstanding claims.

18            THE COURT:  I'm sorry, before we go to that, can I

19   just ask you, Mr. Murphy, you have a paragraph in your

20   declaration, paragraph 41 that states "other administrative

21   expense claims" that's the heading for it.  And it has a

22   chart and the first box in the chart says "claims filed to

23   date."  And then you deduct from it objections filed and

24   anticipated objections claims to be expunged upon

25   confirmation, and then, plus additional amounts related to

Page 104

1    post-petition pre-closing accounts payable --

2              THE WITNESS:  Correct.

3              THE COURT:  -- 30 million.

4              Is that 30 million the accounts payable that you

5    -- I mean, to put it differently the heading here is claims

6    filed to date, but then you say plus additional amounts

7    related to post-petition pre-closing amounts payable.  Are

8    those -- is that 30 million derived at looking at the

9    debtors' accounts payable books or claims that have actually

10   been filed?

11             THE WITNESS:  It's the former, the --

12             THE COURT:  Accounts payable books.

13             THE WITNESS:  -- records of accounts payable.

14             THE COURT:  So this claims filed to date is not

15   just the claims filed, but also you're looking at the

16   accounts payable records.

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Okay.  So even if someone hadn't filed

19   a claim, the accounts payable records if they show 30

20   million that's what you put down here.

21             THE WITNESS:  Correct.

22             THE COURT:  Okay.

23   BY MR. WANDER:

24   Q    Well again, is it your testimony that the

25   administrative claims that have been filed in the last two

Page 105

1   weeks you cross-referenced and determined they were included

2   in the $30 million of payables?

3                MR. GENENDER:  Asked and answered, Your Honor.  In

4   response to your question, Your Honor, he just answered it.

5                THE WITNESS:  As I answered prior, no.

6   Q    Right.  So your response to the Judge's question you

7   indicated that the $30 million covered possible additional

8   administrative claims but you just said you haven't checked

9   claims that haven't been filed in the past two weeks.

10               THE COURT:  All right.  Let me, do you have

11  confidence in the debtors' books and records that they

12  reflect accurately the accounts payable?

13               THE WITNESS:  Yes.

14               THE COURT:  So if someone filed a bogus claim and

15  it didn't show up in the accounts payable you wouldn't count

16  it, right?

17               THE WITNESS:  That's correct.

18               THE COURT:  All right.  Let's move on.

19               MR. WANDER:  Look --

20               THE COURT:  No, that's enough.  I mean, honestly.

21  BY MR. WANDER:

22  Q    With regard to the chart the Court was just referring

23  to it talks about $1.157 billion in claims filed to date,

24  correct?

25  A    Correct.

Page 106

1    Q    Okay.  And then it refers to, it subtracts the $17.3

2    million of objections filed to date.

3    A    Yes.

4    Q    Okay.  But no order's been entered by the Court

5    disallowing those $17.3 million of claims, has there been?

6    A    They've been filed recently.  They have not had final

7    court orders.

8    Q    Right.  And there's actually not even been any hearing

9    on it so far, correct?

10   A    Not that I'm aware of.

11   Q    Okay.  And then you subtract $44 million in additional

12   anticipated objections.  So not only is there no order filed

13   disallowing those $44 million of claims, the debtor hasn't

14   even filed the objections, correct?

15   A    Correct.

16   Q    So those would be deemed allowed -- to be allowed

17   pending the filing of an objection, correct?

18   A    No.

19   Q    A proof of claim filed --

20          THE COURT:  It's a legal issue.

21          MR. WANDER:  Okay.

22   BY MR. WANDER:

23   Q    So going back to paragraph 29 where it refers to

24   outstanding claims, in subsection A you refer to the

25   503(b)(9) claims.  Do you see that?

1    A    Yes.

2    Q    Now, you say zero when taking into account transforms

3    obligations under Section 2.3(k)(IV) of the APA.  Do you see

4    that?

5    A    Yes.

6    Q    And can you explain how you get the -- well, what's the

7    -- prior to taking the number down to zero, what's the

8    starting number that you have for the 503(b)(9) claims?

9    A    90 million.

10   Q    Okay.  And did you analyze the 503(b)(9) claims using

11   what I'll refer to as the World Imports analysis or a point

12   of origin analysis?

13   A    We used the debtors' records and their -- the debtors'

14   records and how the debtor recorded the merchandise on its

15   books and records, you know, the receipt date that they

16   used.

17   Q    But do you know what is meant when I refer to the World

18   Imports analysis?

19            MR. GENENDER:  Asked and answered, Your Honor.

20            THE COURT:  No, you can answer that question, do

21   you know of that?

22            THE WITNESS:  Yes.

23   BY MR. WANDER:

24   Q    Okay.  Now, is there a list -- has the debtor compiled

25   the list of 503(b)(9) claims using the point of origin and

Page 108

1    503(b)(9) claims using a World Imports analysis?

2    A    No, there's one reconciliation per vendor and the match

3    of the debtors' records to the claimant's records were based

4    on the debtors' receipt dates.

5    Q    And the receipt date being when?  How did you determine

6    the receipt date?

7    A    The receipt date for foreign vendors was the port of

8    origin.

9    Q    Okay.  And what's the difference in amount between

10   using the point of origin and using the World Imports

11   analysis, to the nearest $5 million?

12   A    We didn't do that analysis to answer that question.  If

13   you take the objections that the debtors ultimately will

14   have against the import vendors and you say that all of the

15   import vendor claims are based on a different date than the

16   debtors' date, then that objection is in excess of $30

17   million, that difference.

18   Q    So if it was determined that the World Imports analysis

19   is the proper way to analyze the receipt date to the foreign

20   vendor claims there'd be an additional approximate $30

21   million in 503(b)(9) claims, correct?

22   A    There's additional analysis that would have to be

23   completed comparing the different receipt dates to the

24   debtors' records.

25   Q    And that might be another $30 million, correct?

1  A    Depending on the analysis.

2  Q    Right.  I'm saying if the analysis went the other way,

3  not the way the debtor would like it to go, that analysis

4  would end up being another $30 million in foreign vendor

5  503(b)(9) claims; isn't that correct?

6  A    I haven't done that analysis --

7          THE COURT:  Well, I'm sorry --

8          THE WITNESS:  -- so I can't answer the question.

9          THE COURT:  -- I'm not sure I understand whether

10  you understand the question.  Or I understand what you just

11  said, Mr. Murphy.

12          I think what I heard you say is that if you look

13  at the amount of the claims of foreign vendors that the

14  debtors have objected to or will object to its roughly 30

15  million that's at issue.

16          THE WITNESS:  Yes.

17          THE COURT:  Is it your testimony that not all of

18  that 30 million in dispute is attributable to the so-called

19  World Imports issue?

20          THE WITNESS:  Yes, Your Honor, thank you.

21          THE COURT:  Okay.  So some might be because even

22  at point of delivery as opposed to point of origin it might

23  be outside 503(b)(9)?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Okay.  So the outside would be 30

1    million --

2              THE WITNESS:  Yes.

3              THE COURT:  -- if all the issues were related to

4    the so-called World Imports issue, the outside amount, the

5    aggregate, but you don't know how much within that 30

6    million would be specifically attributable to the World

7    Imports?

8              THE WITNESS:  Yes, Your Honor, thank you.

9              THE COURT:  Okay.  All right.

10   BY MR. WANDER:

11   Q    But you don't know the difference in amount?

12             THE COURT:  No, I just said that.

13             MR. WANDER:  Okay.

14   Q    So I believe that originally Transform was under the

15   APA going to pick up approximately 139 million in 503(b)(9)

16   claims?

17   A    Yes.

18   Q    And then that number got reduced to 97 million subject

19   to possible offsets, correct?

20   A    Yes.

21   Q    And those offsets include a dispute over inventory,

22   correct?

23   A    Yes.

24   Q    And it also includes a dispute over receivables,

25   correct?

Page 111

1    A    Correct.

2    Q    And Transform has asserted offsets to the full $97

3    million, correct?

4    A    I don't know if I would say full amount, but they are

5    substantial.  They have a substantial -- a claim of

6    substantial reduction.

7    Q    Okay.  Well, approximately how much reduction, to the

8    nearest $10 million?

9    A    60.

10   Q    So the 97 million minus the 60 would mean they would

11   just pick up 37 million?

12   A    That would be the math.

13   Q    Okay.  So there could be -- then what you have in

14   paragraph 29(a) you have a zero, the number could be 60

15   million?

16   A    Well, subject to that litigation the number could be

17   higher.

18   Q    And when do you expect that litigation to be completed?

19   A    I have no idea.

20   Q    And as of today, you have no idea as to how much of the

21   503(b)(9) claims Transform may be legally obligated to pay;

22   isn't that correct?

23   A    Where I stand today they're obligated to pay the 90

24   million that we estimate would be the 503(b)(9) claims.

25   Q    Are you saying you completely discounted all the

```
 1    offsets for inventory and receivables?

 2    A    I'm not involved in that specific detail.

 3    Q    So you don't know?

 4    A    My understanding is it's still a litigated and open

 5    issue.

 6    Q    Correct.

 7    A    As far as I know right now we have a claim against them

 8    for the 90 million and 503(b)(9).

 9    Q    Do you have any idea how Transform is doing these days

10    financially?

11    A    No.

12    Q    No idea?

13    A    I understand that as any retail operation there's, you

14    know, they're in retail.  But I'm not following their

15    financial performance.

16    Q    Well, isn't it true that the debtor has serious

17    concerns about Transform's ability to pay any amount that

18    the Court might deem it liable to pay under the APA?

19             MR. GENENDER:  Your Honor, that's beyond the scope

20    of his direct.

21             MR. WANDER:  Well --

22             THE COURT:  That's true.

23             MR. WANDER:  Your Honor, he has a zero amount

24    which indicates that Transform is going to pick up all of

25    those 503(b)(9) claims, could be up to $97 million of an
```

1   offset.

2          THE COURT:  But he's already answered, he didn't

3   really examine Transform's ability to pay.  So there's

4   nothing more to go into.

5   BY MR. WANDER:

6   Q    Well so Transform may not be able to pay any of the

7   503(b)(9) claims even if it's deemed illegally obligated to;

8   isn't that true?

9          MR. GENENDER:  Objection, misstates the testimony.

10          THE COURT:  Well, you can answer it, you've

11   answered the question.  It's not misstated testimony, just

12   answer the question.

13          THE WITNESS:  If Transform is unable to make

14   payments then that's an issue.

15   BY MR. WANDER:

16   Q    And isn't it true that as of today the debtor has

17   serious concerns about Transform's financial ability to make

18   any payments of monies that may be deemed owed under the

19   APA?

20   A    It has to be a concern.

21   Q    It's a very big concern right now, isn't it?

22   A    I don't know their records, so I can't tell you whether

23   it's a big concern or a small concern.

24   Q    No, I'm talking about, isn't the debtor very concerned

25   as of today about Transform's financial ability to pay any

1     amount the Judge deems is owed under the APA?

2     A     I'm not party to those discussions.  I would be

3     concerned about any party being able to make payments, but

4     as far as that statement, I can't answer that.

5     Q     So you have not been involved in any discussions with

6     the debtor concerning Transform's financial ability to pay

7     and concerns by the debtor that it doesn't have the money?

8     Is that your testimony, you haven't been involved in any

9     such discussions?

10    A     I can't say we haven't had a sidebar discussion by a

11    water cooler that there's, you know, a potential issue for

12    any particular company or particular in retail.

13    Q     Well, what about not in the water cooler, what about in

14    a conference room in negotiations with the ad hoc claimants?

15    A     I would think it would be a statement that anyone would

16    have a concern about.

17    Q     Okay.  Well, is it that anyone would have a concern

18    about Transform in particular knowing what might be known

19    about their financial condition today?

20    A     Yes.

21    Q     Now, in paragraph 31 of your declaration, you refer to

22    filed claims objections for approximately $710 million.  Do

23    you see that?

24    A     Yes.

25    Q     Okay.  And based upon orders entered by this Court that

Page 115

1    a final and non-appealable, how much of those $710 million

2    in claim objections of claims have been disallowed?

3    A    I'm not aware of any court orders yet addressing the

4    710 million.

5    Q    Because those claim objections have only been recently

6    filed.

7    A    Correct.

8    Q    And the debtor has another $5.8 billion of claims to be

9    filed in the future.

10   A    Yes.

11   Q    Okay.  Now, if it's taken this long to file $710

12   million of these claims, how long do you think it's going to

13   take for the additional $5.8 billion in claims to be filed?

14   A    I'd have to go through the detail, I believe a

15   substantial amount of those dollars would be addressed upon

16   confirmation of a plan.

17   Q    Okay.  So let's take out the intercompany claims that

18   would be -- is that what you're referring to, claims that

19   would be addressed by the plan confirmation?

20   A    No, that would be multiple better and duplicate claims.

21   Q    Okay.  So excluding those, how long do you think it

22   will take for all of these additional claim objections to be

23   filed, the ones that need to be filed and won't be expunged

24   as a result of confirmation?

25   A    Well, it includes a legal process.  I'd have to discuss

Page 116

1    it with counsel, but my --

2              THE COURT:  Is this all the claims including

3    unsecured claims in 31?  31 is all the claims, right, not

4    just admins?  Can we focus just on the admins is all we care

5    about?

6              MR. WANDER:  Your Honor, looking at paragraph 29

7    which defines the outstanding claims, which is what

8    paragraph 31 is about, and it doesn't seem to include

9    unsecured claims.

10             THE COURT:  I don't know, that was my question.

11             THE WITNESS:  The majority of the billions of

12   dollars would be the debt that's been addressed as far as

13   the Transform transaction and duplicates.

14   BY MR. WANDER:

15   Q    Right.  So I'm talking about just outstanding claims,

16   not unsecured claims, the ones referred to in paragraph 31,

17   approximately how long do you believe it'll take for all of

18   those claims to first get filed?

19   A    It's probably several months.

20   Q    Okay.  And when you say several, two to three?

21   A    I would think no more, but you know, it's going to be

22   coordinating with counsel.

23   Q    Now which counsel will be filing those claims?  Would

24   that be the debtors' counsel or would that be counsel for

25   the liquidating trust or both?

1    A    The debtors' counsel, is my understanding.

2    Q    And approximately how long do you estimate those claim

3    objections will be litigated until the final resolution?

4    A    It all depends on whether we are able to settle before

5    having to go through a full court process or not.

6    Q    Right.  But if you have this large amount of claims to

7    be filed and then litigated, approximately how long do you

8    think that's going to take?

9    A    When you're talking about a large number of claims to

10   be filed, what are you referring to?

11   Q    I'm referring to the claims that you're referring to in

12   paragraph 31; all the claims, administrative types of claims

13   that have to get funded fully in order for the plan to go

14   effective.

15   A    My -- from my experience and looking at these claims, I

16   would expect us to be able to file the claims over the next

17   couple of months.

18   Q    Right.  But my question -- we went through that.  My

19   question now is how long do you project the process will

20   take for those claims to be litigated so that you now know

21   how much allowed administrative claims have to be funded in

22   order for the plan to go effective?  That could take several

23   years; isn't that true?

24   A    It could, but I don't -- in this case I don't -- you

25   know, it all depends on how fast we process the claims and

1    the discussions through the court.

2    Q    Right.  And some of those claims relate to the World

3    Imports issue, correct?

4    A    Yes, with regard --

5    Q    That may need to be litigated not just in this court

6    but either party may lose and take an appeal, correct?

7    A    Anything's possible.

8    Q    But isn't it likely that this claims adjudication

9    process just dealing with administrative claims can take

10   several years.

11   A    That wouldn't be our intent.

12   Q    I'm not talking about your intent, isn't it likely that

13   the claims adjudication process of all of these tens if not

14   hundreds of millions of dollars in numerous claims can

15   likely take several years.

16   A    I'm not equipped to answer that question.

17   Q    Okay.  Do you know why there's been no bar dates for

18   administrative claims filed in this case?

19   A    No.

20   Q    Isn't it true that the debtors deliberately decided not

21   to file an administrative claims bar date motion?

22          THE COURT:  I'm have déjà vu all over again.  We

23   spent ten minutes on this.

24          MR. WANDER:  I thought he was the one who was --

25          THE COURT:  No, you asked him.

1        MR. GENENDER:  It just feels like it was yesterday

2   but --

3        THE COURT:  You asked him already.

4   BY MR. WANDER:

5   Q    Now, I hope I didn't ask you this one --

6        MR. GENENDER:  I'll take the ender.

7        THE COURT:  Go ahead, Mr. Wander.

8   Q    If you'd turn to paragraph 44.  So in paragraph 44, you

9   refer to $44 million of anticipated objections and it talks

10  about reclassified.  Can you explain that?

11  A    Yes.  Looking at the remaining claims that have been

12  filed after duplicates, there were about 44 million of open

13  issues and looking at those claims our view is that the

14  majority of them will be reclassified to general unsecured

15  claims, assuming the amounts are agreed to.

16  Q    When you say assuming the amounts are agreed to, you

17  mean the creditor who filed the claim agrees?

18  A    A claim was filed with an amount.

19  Q    Right.

20  A    The debtor doesn't necessarily agree with the total

21  dollar amounts, but to the extent they agree with the

22  amounts, the belief is that they would be reclassified as

23  general unsecured.

24  Q    Right.  But the creditors may disagree and those are

25  $44 million that have to be possibly litigated, they haven't

1    been filed yet, correct?

2    A    You mean the objections have not been filed?

3    Q    Right.

4    A    Correct.

5    Q    And do any of those $44 million refer to 503(b)(9)

6    claims by vendors in the Sears Marketplace?

7    A    No.

8    Q    Okay.  Now, what about the chart above on page 23 where

9    it lists the first, second, third, fourth, fifth, sixth,

10   seventh and eighth claim omnibus claim objections, do any of

11   those relate to 503(b)(9) claims filed by the Sears

12   Marketplace vendors?

13   A    They may.  I know that's an issue.  I just -- I

14   couldn't tell you which particular objection relates to

15   that.

16   Q    Sure, I'm not penning you down as to which one.  Now,

17   when you say the word issue, can you explain what issue

18   there is with regards to those claims?

19   A    I would be inarticulate, so I know that the Marketplace

20   -- the vendors determined to be a Marketplace vendor have --

21   we've -- have been identified with vendors without a

22   503(b)(9) claim.

23   Q    Okay.  But the Sears Marketplace vendors, they -- a lot

24   of them filed 503(b)(9) claims, correct?

25   A    Correct.

Page 121

1   Q    And they -- the creditors claim that the debtors

2   through their customer the -- or through the party that

3   bought the goods from the Sears Marketplace, the vendors are

4   claiming that those goods should be deemed received by the

5   debtors within 20 days of the bankruptcy, correct?

6   A    That would be their assertion.

7   Q    Right.  And the debtors claiming if they were

8   considered to be drop ship, that would not be a 503(b)(9)

9   claim, correct?

10  A    I believe that's the issue.

11  Q    All right.  And that's an issue that has to be

12  litigated, correct?

13  A    The objections have to be litigated, correct.

14  Q    And that legal issue relating to the Sears Marketplace

15  claims have to be litigated.

16  A    Yes.

17  Q    Now, if you could turn to paragraph 46 of your

18  declaration where you talked about priority claims.  You

19  reference $2.37 billion in priority claims filed to date,

20  correct?

21  A    Correct.

22  Q    And objections filed to date are only $14.7 million,

23  correct?

24  A    Correct.

25  Q    And have any orders been entered by the Court

1    disallowing any of those $14.7 million of claims?

2    A    Not that I'm aware of.

3    Q    Okay.  And there's another $1.55 billion in claim

4    objections for priority claims.

5    A    Yes.

6    Q    And do you have any idea how many claimants we're

7    talking about?

8    A    There's -- it's probably 50 to 60.  There's one claim

9    for a billion two.

10   Q    Okay.  So the 50 or 60 would cover some $350 million?

11   A    Yes, 320 million.

12   Q    And who's going to file those claims?  Is that going to

13   be the debtors' counsel or the committee or the liquidating

14   trust counsel?

15   A    My understanding would be debtors' counsel.

16   Q    Okay.  Now, the committee's counsel they have certain

17   review or consent rights relating to these claim objections;

18   isn't that correct?

19   A    I have to go back to the disclosure statement and the

20   plan to answer that question.

21   Q    Okay.  So sitting here today, you do not know whether

22   both law firms are going to be involved in the claim

23   objections for the priority claims?

24   A    I do not.

25   Q    And sitting here today, do you know whether both firms

1   will be involved in the objections to the administrative

2   claims?

3   A    My understanding is we're coordinating, but the debtors

4   are going to be filing the objections.

5   Q    Well, when you say coordinating, doesn't that mean and

6   isn't it true that both law firms are going to be involved

7   in all of these claim objections?

8   A    I don't believe so.  We -- the debtors are going to be

9   filing the objections from what I understand, but this is --

10  you're getting into discussions about what counsels are

11  deciding, and you know, I'm not driving that bus.

12  Q    Is there a budget for Weil Gotshal handling all of

13  these claim objections and I'm referring to administrative

14  claims and priority claims that you've stated debtors'

15  counsel will be filing?

16  A    There are estimates for professional fees, but I'm not

17  aware of a budget.

18  Q    Okay.  Well, right now I just want to focus on debtors'

19  counsel who you've indicated will be prosecuting these claim

20  objections.  Is there a round number to the nearest $10

21  million that are going to be needed for the legal fees of

22  debtors' counsel for all of these administrative and

23  priority claim objections?

24  A    You'll have to ask counsel.

25  Q    Well, I'm asking you because you're the witness.

Page 124

```
 1   A    I don't have that, no, I can't answer that question.

 2   Q    Okay.  You're the one who's supposed to be able to

 3   determine the assets, the liabilities if there's -- you're

 4   the numbers guy, right?

 5   A    I'm an accountant.  I'm also addressing the claims.

 6   Q    Among the three witnesses, you're the numbers guy;

 7   isn't that true?

 8   A    I'm one of the three numbers guys.

 9   Q    Okay.  Can you turn to Exhibit A --

10   A    A as in --

11           THE COURT:  I'm sorry, are we moving off the

12   priority claims?

13           MR. WANDER:  Oh, I'm moving off the whole main

14   declaration.  I'm going to --

15           THE COURT:  Okay.  I had a question, Mr. Murphy.

16   On the priority claims --

17           THE WITNESS:  Yeah.

18           THE COURT:  -- if you go to page 24 the chart

19   there, it says "Mias (ph) anticipated objections $1.55

20   billion".

21           THE WITNESS:  Yes.

22           THE COURT:  What is the analysis behind that?  I

23   mean, what is the basis for the objection, just that they

24   checked the wrong box or are there legal issues involved?

25           THE WITNESS:  One claim -- an individual filed a
```

1    claim on behalf of a pension plan for a billion two.

2              THE COURT:  Okay.

3              THE WITNESS:  And that should be addressed with

4    the PGC settlement.

5              THE COURT:  Okay.  And the other roughly 300

6    million?

7              THE WITNESS:  The others, there's -- they're

8    primarily litigation, lawsuits, like slip and fall claims.

9    There's -- at least -- in that, there's a couple of $100

10   million lawsuit claims that are covered by insurance.

11   They're -- you know, someone bought a, you know, piece of a

12   shirt or something and it caught fire and they're going to

13   have a hundred million dollar claim against the debtors.

14             THE COURT:  Okay.

15             THE WITNESS:  That's the type of claims that are

16   in there.

17             THE COURT:  Okay.  So to your knowledge, do any of

18   these claims represent complex issues as to whether someone

19   has a priority or not, leaving aside the merits of the

20   amount, just as to whether there's a priority or not?

21             THE WITNESS:  Based on my experience in looking at

22   all the claims my sense was no, but you know, in discussions

23   with counsel and some of the claims that I was not familiar

24   with.

25             THE COURT:  Okay.

Page 126

1    BY MR. WANDER:

2    Q    Can you describe what you would consider a complex

3    issue relating to these claims?

4    A    It would be a priority claim.  Most of the priority

5    claims relate to either employee or tax issues.

6              THE COURT:  You mean legitimate ones?

7              THE WITNESS:  Legitimate, yes.  So it would be a

8    priority claim that I'm not familiar with that was may

9    appear to be either a tax or some type of employee related

10   claim that I would discuss with counsel as to whether, you

11   know, it's complicated or not.

12   BY MR. WANDER:

13   Q    Well, you were answering the Judge's question about

14   complex claims.  Would you consider tax issues in connection

15   with priority claims to be complex issues or not complex

16   issues?

17   A    It could be complex.

18   Q    Got it, thank you.

19        I'd like to turn your attention to Exhibit A to your

20   declaration.  Now, I honestly couldn't understand the chart

21   and some of the print is really small so I'm going to need

22   your help walking me through it and understanding what it

23   means.

24        So can you first read note 11 into the record?

25   A    This is page 30 of 75?

Page 127

1    Q    Yes.

2    A    So note 11 says, "reductions in column E, reduce and

3    allow represent debtors' estimated reductions to filed

4    claims for the following:  Some or all of the invoices of

5    the following invoices have been paid or satisfied through

6    credits or returns or the debtors' record show the receipt

7    date of the merchandise was before 9/25 or after" it should

8    be 10/14, 2018 "or allowed by the Court."

9    Q    What do you -- what's meant by "merchandise received

10   after 10/14/18"?  Is that relating to prepetition orders

11   that were received post-petition?

12   A    Well, after 10/14 would be post-petition, correct.

13   Q    But you're making a reduction for goods received post-

14   petition.  Aren't goods received post-petition supposed to

15   be paid?

16   A    Yes, that's correct.  The reductions primarily relate

17   to amounts received prior to 9/25.

18   Q    Okay.  But you also -- I'm trying to understand the

19   deduction for amounts received after 10/14 and I'm trying to

20   understand if that has anything to do with goods ordered

21   prepetition that were received post-petition.

22   A    No.

23   Q    Okay.  So can -- excuse me.

24   A    When you say ordered, are you saying invoiced?

25   Q    I'm saying ordered.  So here, are you familiar with the

1    motion the debtors filed, one of the first day motions I

2    think it's Document 14, and it included a request to have

3    $162 million of goods ordered prepetition but delivered

4    post-petition allowed as administrative expenses?

5    A    No, I'm not.

6    Q    Okay.  Does your analysis of allowed administrative

7    claims take into account any of the goods ordered

8    prepetition that were delivered post-petition?

9    A    Our analysis revolves around goods invoiced and

10   received pre or post-petition and for the 503(b)(9) period,

11   between that 25 -- that 20-day period between 9/25 and

12   10/14.  When you say ordered, you can order something a year

13   in advance.  Until it's invoiced, it's not an obligation of

14   the company.

15   Q    Well, when the debtor uses the word ordered as in

16   prepetition goods ordered, do you know whether the debtor is

17   referring to the invoice date or another date?

18   A    I wasn't around when that motion was prepared.

19   Q    Okay.  You don't know how much of the $162 million in

20   goods referred to in the debtors' motion at Document 14 have

21   been actually paid, do you?

22   A    I'm not familiar with that.

23   Q    Do you know who would have that information?

24   A    The debtors', Transform's accounting groups, their

25   accounts payable group, whoever was involved with the

1    development of that particular motion.

2    Q    So can you walk me through in the column that has note

3    11 and going down you have 503(b)(9) claims high paren note

4    9 and that's a $32 million number, and then 503(b)(9) claims

5    low note $966 million number.  Can you explain that?

6    A    Those are estimates at the time this was put together

7    of reductions to the 503(b)(9) claims that we were currently

8    estimating based on our reconciliation effort.

9    Q    Okay.  Now, with this page in mind, I'd like you to

10   skip five pages to page 35 of 75.

11   A    Okay.

12   Q    And now this is your analysis of the 503(b)(9) claims?

13   A    Yes.

14   Q    And first, tell me what are those bottom line numbers,

15   where it says Transform, max Transform current estimate and

16   there's 155 million and there's 90 million.

17   A    I think the reference to Transform is an incorrect

18   reference.  It should be max 503(b)(9) and current estimate

19   503(b)(9).

20   Q    So I should just strike the word Transform?

21   A    Correct.

22   Q    Now, the current estimate, whose estimate is that?

23   A    The debtors'.

24   Q    And this is an estimate based on July 15, 2019?

25   A    Correct.

Page 130

1   Q    And what's the current estimate, the max and current?

2   A    Current estimate is 90 million.

3   Q    And what's the max?

4   A    On this schedule it says 155.

5   Q    No, that's as of July 15.  I'm asking you what is the

6   max estimate as of today.  You said the $90 million becomes

7   99 million, right?

8   A    Well, I said the 90 is still 90.

9   Q    Oh, sorry, I apologize.  So there hasn't been any

10  change in the current estimate?

11  A    Based on objections filed it might go -- it might be

12  slightly lower.

13  Q    Okay.  So after duplicates, I'm looking at the top, and

14  if it's okay with you I'm going to use round numbers.

15  A    Sure.

16  Q    So the total surviving filed claims is approximately

17  $209 million, right?

18  A    Correct.

19  Q    And then you're subtracting approximately 4.8 million

20  beneath that, correct?

21  A    Correct.

22  Q    And the comment says, "Those claims identified in

23  reclassification group."

24  A    Yes.

25  Q    Okay.  But there's been no -- are these -- does this

Page 131

1  relate to claim objections that have been filed seeking to

2  reclassify?

3  A    That was as of July 15th.  That was before the

4  objections had been filed.

5  Q    So there's obviously no order disallowing any of these

6  $4.8 million claims?

7  A    These were all estimates.

8  Q    Okay.  So the next one is the Marketplace vendors.  Are

9  those the claims that we were talking about before?

10  A    Yes.

11  Q    And again that's just an estimate, it doesn't have

12  anything to do with any filed claims?

13  A    Correct.  Let me rephrase that.  That relates to the

14  filed claims that we're --

15  Q    I'm sorry --

16  A    -- proposing that would be the objection.

17  Q    Okay.  It doesn't relate to any objections.

18  A    Correct.

19  Q    Okay.  And then the next line item is 19 million is

20  being deducted for a domestic 503(b)(9) claims, correct?

21  A    Correct.

22  Q    And again, no objections have been filed.  This is just

23  -- is it the debtors' estimate or M3's estimate, whose

24  estimate is this?

25  A    This is the estimate that M3 analysis has come up with.

Page 132

1   Q    How would you say M3 is doing so far in this case since

2   the beginning in estimating administrative insolvency?

3   A    Rephrase the question.

4   Q    Do you think M3 has been giving accurate information to

5   the Court on the administrative solvency or insolvency of

6   the estate as the case has been going on?

7   A    I'm not sure what we've been providing with regards to

8   that, but any information we have provided is accurate.

9   Q    Okay.  Well, when the disclosure statement was filed,

10  wasn't M3 projecting there would be a surplus of funds on

11  hand and all of the allowed administrative claims would be

12  paid in full and it'd go effective very quickly?

13  A    You have to show me the sections in the disclosure

14  statement that you're referring to.

15  Q    You don't remember that M3 was saying in connection

16  with the disclosure statement that there's a surplus, not a

17  big surplus, but there was a surplus?

18  A    I don't recall that particular statement, you would

19  have to point me to that section in the disclosure statement

20  you're referring to.

21  Q    No, I'm just asking your recollection --

22            THE COURT:  He's answered that question, so --

23            MR. WANDER:  Okay.  I'll move on, Your Honor.

24            THE COURT:  -- you should move on, if you want to

25  show him the disclosure statement, if you want to.

Page 133

```
 1          (Pause)

 2              MR. WANDER:  May I approach, Your Honor?

 3              THE COURT:  No, I have a copy.

 4          (Pause)

 5     BY MR. WANDER:

 6     Q    Showing you -- can you identify this document?  It says

 7     Admin Solvency Tracker.

 8              THE COURT:  I'm sorry, I thought you were going to

 9     show him the disclosure statement.  You're referring to some

10     other document?

11              MR. WANDER:  I believe this was in connection with

12     the disclosure statement.

13              THE COURT:  Is it part of the disclosure

14     statement?  Otherwise, you need to give it to me because I'm

15     looking at the disclosure statement.

16          (Pause)

17     BY MR. WANDER:

18     Q    Now, at the bottom left there looks like a logo for M3.

19     A    Yes.

20     Q    Okay.  So was this document prepared by M3?

21     A    Yes.

22     Q    And this document is M3's estimate of administrative

23     solvency at a certain point in time in this case, correct?

24     I see it's dated, is that June 4, 2019?

25     A    Yes, that's the date, June 4, 2019.
```

Page 134

1    Q    Okay.  So as of June 4, 2019 M3 was telling the Court

2    that the estate looked to be administratively solvent by

3    which number should I use, is it the 7 million, the 34 or

4    the 40?

5             THE COURT:  Was this document actually filed on

6    the docket or provided to the Court?

7             MR. GENENDER:  It's Exhibit C, Your Honor.

8             THE COURT:  To the disclosure statement.  Okay.

9    Great.

10             MR. GENENDER:  It's ECF No. 4478.

11             THE COURT:  Okay.  So do you remember the

12    question?

13             THE WITNESS:  I have the question, you know, I'm

14    not the one that prepared the document.

15    BY MR. WANDER:

16    Q    Well, the bottom line number it says at the bottom

17    solvency or gap.  So this is indicating the estate would be

18    solvent, correct?

19    A    This is indicating that there's 7 million of excess

20    cash between the claims at the top of the page and the

21    assets at the bottom of the page.

22    Q    But this was M3 analyzing the financials as of June 4th

23    and stating that the estate was administratively solvent by

24    $7 million, correct?

25    A    Yes.

1    Q    Okay.  And how does that number look today?  How far

2    off was M3, a $100 million, $50 million?

3    A    You'd have to -- I'd have to do an analysis.  I didn't

4    prepare this schedule, but the -- there's a significant

5    number of events that have occurred since then that are

6    impacting these numbers.

7    Q    So M3's prediction when this document was filed was

8    pretty far off, wasn't it, where we are today?

9    A    The estimates are different today than they are in this

10   schedule.

11   Q    Well, when you say different today, better or worse?

12   A    Worse.

13   Q    And a lot worse, aren't they?

14   A    If you look at one of the significant items is in

15   Transform liabilities assumed column $139 million.  That's a

16   significant adjustment there, a significant impact to the

17   numbers to where we are today.

18   Q    Is that the only significant impact to the numbers or

19   are there other numbers here that seem to be off?

20   A    I would have to do the analysis line-by-line.

21   Q    I will not ask you to do that right now.

22            MR. WANDER:  No further questions, Your Honor.

23            THE COURT:  Okay.  Does anyone else have any

24   cross?

25        (No response)

```
 1              THE COURT:  Redirect?

 2              MR. GENENDER:  Thank you, Your Honor.  Paul

 3   Genender for the debtors.

 4                    REDIRECT EXAMINATION

 5   BY MR. GENENDER:

 6   Q    Mr. Murphy, the document you were just shown, can you

 7   turn to page 272 of it, which is Exhibit C to the disclosure

 8   statement of July 9th?  Do you see the note 35 on that page

 9   at the bottom?

10   A    Yes.  Do you want me to read it?

11   Q    Yes.  Do you see it?  Yes, please.

12   A    "Preference firms still conducting diligence related to

13   potential preference recoveries."

14   Q    And on the prior page, correspondingly there's a dash

15   there, correct?

16   A    That's correct.

17              MR. GENENDER:  I have no further questions.

18              THE COURT:  Okay.  You can step down.

19              MR. GENENDER:  Your Honor, that concludes the

20   debtors' presentation of evidence in connection with

21   confirmation.

22              THE COURT:  Okay.  Does anyone have any -- do any

23   of the objectors have any evidence that they want to

24   introduce besides the joint exhibit book and the agreed

25   deposition designations?
```

Page 137

```
 1        (No response)

 2              THE COURT:  No?  Okay.  It's 1:30.  It's probably

 3    a good time to take a break, and then I'll come back and

 4    hear oral argument on the debtor's request for confirmation.

 5              I just mention the deposition designations.  I

 6    think unless they're quoted in your objection or in your

 7    response to objection, you should save some portion of your

 8    oral argument to tell me why they're important as opposed to

 9    just assuming that I'll divine that by looking at the

10    deposition.

11              But why don't we come back here -- it's 1:30 now.

12    Why don't we come back here at 2:30?

13        (Recess from 1:32 p.m. until 2:33 p.m.)

14              THE COURT:  Please be seated.  Okay.  Good

15    afternoon.  We're back on the record in In Re: Sears

16    Holdings Corporation.

17              MR. SCHROCK:  Good afternoon, Your Honor.  Ray

18    Schrock, Weil Gotshal for the debtors.

19              Your Honor, I took the liberty of putting a

20    presentation on the bench and with your clerk.  And we'll

21    try and keep it to the points.  Of course, if you would like

22    to direct me in any particular direction as we're moving

23    along here, I'm happy to address anything, any questions

24    that you may have.

25              THE COURT:  Okay.
```

1              MR. SCHROCK:  So, Your Honor, we've now concluded

2       the evidence and, you know, we would submit that the

3       evidence is nearly undisputed.  There's no one that has

4       really challenged the recoveries.  Certainly, with regard to

5       Mr. Transier, his testimony regarding the litigation is

6       wholly unrefuted.

7              Regarding Mr. Griffith, no one has challenged the

8       recoveries and what we call the sources side.  Mr. Griffith,

9       you know, testified to the sources, Mr. Murphy largely to

10      the uses.  And no one really challenged the sources side,

11      aside from the ESL APA pick up of the 503(b)(9)s which I

12      will discuss.

13             On the uses side, we think the Court should find

14      Mr. Murphy's testimony extremely credible.  He has been the

15      person on the front lines dealing with these claims day to

16      day.  He knows them.  It's a significant amount of work.  I

17      think the parties tried to poke holes in his testimony, but

18      we believe that that testimony is also largely

19      uncontroverted.

20             I will note that, of course, none of the objectors

21      presented any evidence as to why the debtors could not

22      satisfy the confirmation standards, but, you know, it is our

23      burden.

24             So moving along in the deck, Your Honor, you know,

25      we believe that the evidence has demonstrated that we will

Page 139

1    be able to pay administrative expense claims.  That's

2    largely a lot of the objections that we heard, that the plan

3    is otherwise feasible in accordance with 1129(a)(11).  And

4    we will discuss the global settlement and the -- you know,

5    comprised of the PBGC, the plan settlement and the

6    creditors' committee settlement and why we believe those

7    meet the standards.  And there has been uncontroverted

8    testimony in support of those.

9              On Slide 5 we do note -- and, again, we -- I'm

10   sure that the evidence is consistent with this, that the

11   debtor's estimate will be about approximately 210 to 278

12   million in outstanding claims that have to be paid on the

13   effective date of when such claims would be allowed.

14             We believe we have about $173 million in assets

15   plus the proceeds from litigation.  And I do want to note

16   that no one really challenged the testimony of Mr. Griffith

17   and the analysis that we put in to the preference

18   litigation.  I mean, that is not speculative litigation.

19   The testimony is uncontroverted.  Nobody even challenged,

20   you know, the -- there was not one question around the

21   amount.

22             Those litigation actions will constitute -- will

23   come from preference actions, ESL litigation, DNO litigation

24   coupled with the ESL litigation, which were tenants of the

25   APA sale.

1            We are highly confident that confirming these

2      cases at this juncture and allowing litigation to proceed,

3      it's the best outcome that we could ask for in these cases.

4      We've already come a long way in terms of being able to sell

5      these assets of going concerns, frankly, against all odds.

6      And to be able to conclude these cases, we think, in an

7      efficient fashion is the responsible thing to do and it will

8      also maximize recoveries and minimize claims.

9            Conversely, we think the alternative is really not

10     a real alternative at all, conversion to Chapter 7 in likely

11     one of the largest Chapter 7's in history and failure to

12     confirm the plan as we meander around and allow litigation

13     to continue to consume the valuable resources of the estate.

14     Confirmation is the most efficient outcome and we believe

15     should be granted.

16            On the mechanics, I want to do this for the Court,

17     but also for the parties in interest, that to address the

18     potential brief gap between confirmation and the effective

19     date, we have five litigation designees that we have

20     selected to oversee the litigation.  The debtor's

21     designee -- and this is on page 7 of the deck -- are Alan

22     Carr and William Transier.  The creditors' committee's

23     designees are Patrick Bartels (ph), Jean Davis and Ralph

24     Wallender (ph).

25            In the interim, those designees shall have the

Page 141

1    rights and entitlements with respect to jointly asserted

2    causes of action and any protections granted to the members

3    of the liquidating trust board.

4            We don't know what the compensation is.  I know

5    there was some questions around that.  It's not settled, but

6    as soon as it's settled, should the Court confirm the plan,

7    we will file -- we would file a notice for parties.

8    1129(a)(5) requires that we, you know, disclose to the

9    extent known.

10           THE COURT:  Well, can I -- you may be getting into

11   this, but I would like to focus on it.

12           MR. SCHROCK:  Sure.

13           THE COURT:  The plan is currently -- if I were to

14   confirm the plan today --

15           MR. SCHROCK:  Yes.

16           THE COURT:  -- and enter the confirmation order on

17   Tuesday --

18           MR. SCHROCK:  Yes.

19           THE COURT:  -- in looking at conditions precedent

20   to the effective date, which is at page 73 of the plan, the

21   first one is the disclosure statement order shall have been

22   entered.  Well, that's occurred.

23           MR. SCHROCK:  Yes.

24           THE COURT:  The plan supplement shall have been

25   filed.  And you're saying that the compensation of the

Page 142

1    board, the trust board doesn't need to be in that or --

2              MR. SCHROCK:  It's just not settled yet, Your

3    Honor.

4              THE COURT:  Right.

5              MR. SCHROCK:  So to the extent known, but, yes, we

6    would expect that it would be settled before we would

7    emerge.

8              THE COURT:  Okay.  So that is something that would

9    be a condition to the effective date, right?

10             MR. SCHROCK:  Yes.

11             THE COURT:  Confirmation order shall have been

12   entered in satisfactory form.  Definitive documents should

13   be in form as such is reasonably acceptable.  KCD shall have

14   waived its assertion to an administrative expense.  I'm

15   going to skip F and H.  I'll go to G and H.  All government

16   approvals shall have been obtained, and the carve out, as

17   provided for by the plan, should be fully funded.

18             And then -- I mean, those could occur promptly.

19             MR. SCHROCK:  Yes.

20             THE COURT:  So then we have F, which says all

21   actions, documents and agreements necessary to implement and

22   consummate the plan shall have been effected or executed and

23   binding.

24             So I guess it's really just the, in a way the

25   fortuity that you don't have the compensation worked out

Page 143

1    yet.  But that could be worked out in a matter of days, too.

2              MR. SCHROCK:  It could.

3              THE COURT:  So once the plan goes effective, you

4    have to pay all the allowed administrative expenses --

5              MR. SCHROCK:  That's correct.

6              THE COURT:  -- under the Code --

7              MR. SCHROCK:  Correct.

8              THE COURT:  -- except as otherwise agreed.

9              MR. SCHROCK:  Correct.

10             THE COURT:  So conceivably that -- conceivably you

11   could go effective but for perhaps F in this list --

12             MR. SCHROCK:  Yes.  Correct.

13             THE COURT:  -- you know, by the end of next week

14   or the following week, a short time.  But that wouldn't

15   work.  I couldn't confirm the plan if that was going to

16   occur.

17             MR. SCHROCK:  That's right, Your Honor.

18             THE COURT:  So are you -- so when it says, all

19   actions necessary to implement the plan have been

20   effected --

21             MR. SCHROCK:  Yes.

22             THE COURT:  -- are you basically saying that,

23   well, that means that we have to have the cash.  Until we

24   have the cash sufficient to pay the allowed administrative

25   expenses and/or as they have been agreed to be paid --

 1                  MR. SCHROCK:  Yes.

 2                  THE COURT:  -- this means we're not going to go

 3       effective.

 4                  MR. SCHROCK:  That's the way we read it, Judge.

 5                  THE COURT:  Okay.

 6                  MR. SCHROCK:  And, you know, certainly the

 7       conditions precedent are waivable.  But when we've talked

 8       about this issue with the restructuring committee and how

 9       this will work, we filed many objections to administrative

10       claims.  We think we have a very good construct for, you

11       know, frankly, incentivizing people to come into an early,

12       earlier potential for payment and that's going to really --

13       we think -- we actually believe that will really save a lot

14       of money in terms of encouraging people to want to have an

15       allowed claim to be able to share in that.

16                  But, frankly, we want to make sure that we can

17       also -- we don't want to go effective and then the moment,

18       you know, we go effective we're not able to pay everything

19       that we're --

20                  THE COURT:  Well --

21                  MR. SCHROCK:  -- agreeing to have.

22                  THE COURT:  -- I wouldn't confirm --

23                  MR. SCHROCK:  So we're tracking --

24                  THE COURT:  -- the plan if I knew you were going

25       to go effective next week --

1        MR. SCHROCK:  Yes.  Yes.

2        THE COURT:  -- because I couldn't.

3        MR. SCHROCK:  Yes.  Yes.  So we're --

4        THE COURT:  So --

5        MR. SCHROCK:  -- we're definitely very mindful of

6   that.  And the restructuring committee, in fact, when we,

7   you know, last met just a couple of days ago said that they

8   wanted to -- you know, they're still -- they are a very

9   diligent group.  They want to go effective as soon as

10  possible.  I think everybody does.  But they're really

11  pressing people.  They're pressing the preference firms, you

12  know, making sure that there's going to be those complaints

13  filed --

14       THE COURT:  Right.

15       MR. SCHROCK:  -- in the very near term.  And

16  they're pressing us on the objections, and they pressed us

17  to -- you know, on the admin claim consent program.  They

18  want to go effective as soon as possible.  We think that we

19  can go effective within a few months, as early as, you know,

20  within a few months.  But we're mindful that we're not going

21  to sit here in Chapter 11 waiting for an effective date to

22  occur for an extended period of time.  That --

23       THE COURT:  So how --

24       MR. SCHROCK:  -- doesn't help anyone.

25       THE COURT:  And I understand that.  The Code, as I

1    read it, but I'm happy to hear objectors on this, doesn't

2    put an outside date on going effective.

3              MR. SCHROCK:  We noticed that, Your Honor.

4              THE COURT:  Well, and it -- that's consistent with

5    many plans, particularly plans that require third party

6    approvals --

7              MR. SCHROCK:  Right.

8              THE COURT:  -- late approvals, approvals by boards

9    to close transactions, approval by State AG's offices for

10   transfers of non-profit property, and all sorts of things

11   like that.  Courts have nevertheless confirmed plans knowing

12   that that process might be several months long.

13             At the same time, I think Courts have a natural

14   reluctance just to have an open-ended period --

15             MR. SCHROCK:  Uh-huh.

16             THE COURT:  -- for those types of things to occur.

17   There's no real limitation on that here.

18             MR. SCHROCK:  Uh-huh.  Would --

19             THE COURT:  And it -- I mean, other than one that

20   I might impose.  But --

21             MR. SCHROCK:  We --

22             THE COURT:  -- there's nothing in the plan that

23   puts a limit on that.

24             MR. SCHROCK:  Yeah.  We're sensitive to that, Your

25   Honor, and we thought that your -- you may suggest that we

Page 147

1    check in, frankly, once a quarter or once every, you know,

2    some --

3            THE COURT:  With a progress report on getting --

4            MR. SCHROCK:  Yeah, a progress report on how are

5    we doing toward -- because we want people to know what --

6    you know, we're going to make reporting.  But we want people

7    to know what kind of progress are we making, what kind of

8    claims are outstanding, are we, you know, in fact, you know,

9    progressing toward the effective date.  And, you know, and

10   that's something that, you know, Mr. Dublin, in fact,

11   suggested as a way to have a nice check on the process to

12   ensure that, you know, everybody's doing their job and

13   we're, in fact, moving expeditiously towards emergence.

14           THE COURT:  Okay.  Well, I just wanted to raise

15   the issue so that everyone could be focusing on it.  And I

16   wanted to make sure I was reading the plan you were, that

17   this provision, 14.1 --

18           MR. SCHROCK:  Yes.

19           THE COURT:  -- really does -- I mean, it is kind

20   of tautological.  But you don't get to the effective date

21   until you can achieve the effective date without the plan

22   collapsing.

23           MR. SCHROCK:  Right.

24           THE COURT:  Okay.

25           MR. SCHROCK:  All right.

1           THE COURT:  So, anyway, you were starting to go

2      into the mechanics of the --

3           MR. SCHROCK:  Yes.  Towards the interim mechanics

4      that --

5           THE COURT:  Right.

6           MR. SCHROCK:  -- that those parties will be there.

7      So we will have one that, you know, is really the

8      restructuring subcommittee --

9           THE COURT:  Well, can I interrupt you again, then?

10          MR. SCHROCK:  Of course.  Anytime.

11          THE COURT:  If I confirm the plan --

12          MR. SCHROCK:  Yes.

13          THE COURT:  -- it doesn't yet go effective.

14          MR. SCHROCK:  Yes.

15          THE COURT:  So who -- the liquidation trust isn't

16     in effect yet.  It's still the estate.  So that's why you

17     have the litigation designees.

18          MR. SCHROCK:  That's correct, Your Honor.  So the

19     litigation designees we are granting standing and allowing,

20     you know, allowing that litigation to progress.  The

21     restructuring committee would still oversee the

22     administration of the estates until the effective date.

23          THE COURT:  All right.  Okay.

24          MR. SCHROCK:  With the -- of course as we'll get

25     to, with the administrative consent program we propose to

1    appoint, you know, as another member effectively to serve

2    alongside the restructuring committee and to ensure that

3    we're making progress, assist with the reconciliation of the

4    claims, and to really give them a voice to make sure that

5    we're -- they're getting the benefit of --

6            THE COURT:  So on that point, and I appreciate

7    that the parties have been working on this sort of around

8    the clock.  But that person --

9            MR. SCHROCK:  Uh-huh.

10           THE COURT:  -- how is he or she selected?  There's

11   a suggestion that it's a vote, but I can't see how you would

12   do the vote.  How is it -- how are they selected?

13           MR. SCHROCK:  That's a great question, Your Honor.

14   We left it to the admin -- to the ad hoc group --

15           THE COURT:  Okay.

16           MR. SCHROCK:  -- frankly, to make the selection.

17   They were the ones who negotiated the transaction and I

18   imagine they will talk to -- they'll talk to their fellow

19   administrative claimants and come up with a person.

20           THE COURT:  Okay.  So there's a minimum 17-day --

21           MR. SCHROCK:  Correct.

22           THE COURT:  -- period to opt in.

23           MR. SCHROCK:  Correct.

24           THE COURT:  So I guess maybe they would look at

25   who opt in, who opts in and then poll those folks as to who

Page 150

1    would be the --

2                  MR. SCHROCK:  That's right.

3                  THE COURT:  -- who would be the designee.  Someone

4    is nodding in the background.  Is that on behalf of the ad

5    hoc group?  That's --

6                  MR. SCHROCK:  Yes.  Ms. --

7                  THE COURT:  -- that's what you were thinking of?

8                  MR. SCHROCK:  Ms. Morabito.

9                  THE COURT:  Okay.

10                 MR. SCHROCK:  Okay.  That reminds me that during

11   the break I can confirm that Tannor Capital Advisors, LLC,

12   which is Number 3 in the objectants, are at ECF 4673 --

13                 THE COURT:  Right.

14                 MR. SCHROCK:  They've agreed to withdraw their

15   objection and they're going to be an opt-in party to the

16   administrative claims consent program.

17                 THE COURT:  Okay.

18                 MR. SCHROCK:  So the Court can confirm the plan.

19                 THE COURT:  All right.  Someone is standing up

20   behind you to perhaps confirm that.

21                 MS. NESTER:  Good afternoon, Your Honor.  Minta

22   Nester, Togut, Segal & Segal, counsel for Tannor.  I just

23   wanted to confirm what counsel has said; that, yes, provided

24   that the term sheet is approved as is or with no material

25   modifications that would impact Mr. Tannor's claims, we

1    would be prepared to opt in and, in connection with that,

2    withdraw the confirmation objection.

3         THE COURT:  Okay.  Thank you.

4         MR. SCHROCK:  Sorry about that.  Forgot to do that

5    for --

6        (Pause)

7         MR. SCHROCK:  Your Honor, just quickly I would

8    like to talk about the global settlement and what the

9    standard is and what some of the benefits of it are.  It's

10   on Slide 10.

11        You know, we're talking about something that must

12   fall within the lowest point in the range of reasonableness.

13   The global settlement is compromised of the PBGC settlement,

14   the creditors' committee settlement, and the plan

15   settlement.

16        The plan settlement, which I note nobody has

17   frankly challenged on the evidence, is a settlement, a

18   substantive consolidation rather than a substantive

19   consolidation of the debtors.  This is a settlement that's

20   in line with other settlements of this issue in this and

21   other circuits.

22        And what Mr. Murphy's testimony really elucidated

23   was that we tried to -- you know, when you went back and

24   really saw how long is this going to take to reconcile all

25   of these claims and how would it be possible, compounded by

1    the fact that you have to get -- transform to allow us to do

2    this, you know, they're still an operating enterprise and

3    have us be able to do this, it really -- we never like to

4    say it was borderline impossible, but it certainly was

5    getting there.

6            And, you know, we all believed, I think, the

7    creditors' committee, the debtors, that it would be a

8    massive waste of resources to be able to do that.  And

9    that's what really gave rise to, you know, in part the

10    discussions with the PBGC settlement that we outline on page

11    12.

12            And the key terms of that -- and, you know, we

13    haven't talked about it in a long time, but the -- you know,

14    they are the largest creditor in these estates.  They

15    receive one consolidated $800 million allowed general

16    unsecured claim in satisfaction of approximately $1.4

17    billion in general unsecured claims that could be asserted

18    by the PBGC at each debtor.

19            The PBGC receives a liquidating trust priority

20    interest consisting of the first 97.5 million in net

21    proceeds, you know, after satisfaction in full of senior

22    claims, specified causes of action and other causes of

23    action, namely preference claims.

24            They have and agreed to vote in favor of the plan

25    and a consensual termination of the pension plans.  They're

Page 153

1    also assisting with the KCD waiver, and there's a mutual

2    release provision.

3              The benefits are outlined on Slide 13.  We think

4    that it's really beyond dispute that that settlement is a

5    key aspect of the plan and something that we believe is in

6    all parties' interests.

7              THE COURT:  Okay.  Just to -- their priority

8    interest is as an unsecured creditor.

9              MR. SCHROCK:  That's correct.  So, yes, as an

10   unsecured creditor.  That's correct.

11             THE COURT:  Right.  So the --

12             MR. SCHROCK:  So it's not a priority --

13             THE COURT:  -- the admins come before.

14             MR. SCHROCK:  Yes, they do.

15             THE COURT:  Right.

16             MR. SCHROCK:  Yes, they do.

17             THE COURT:  Okay.  I saw some --

18             MR. SCHROCK:  We were careful to note that.

19             THE COURT:   I saw some expense lawyers looking

20   around frantically on that.

21             MR. SCHROCK:  Yes.  No.  The PBGC is not jumping

22   in front of the administrative claims.

23             THE COURT:  Okay.

24             MR. SCHROCK:  That's correct.

25             The plan settlement which we've, you know, already

1    discussed in part is outlined in the briefing.  Unless Your

2    Honor has, you know, specific questions around the plan

3    settlement I'm going to, you know, forego, you know, an

4    explicit presentation on those topics.

5             THE COURT:  Well, the plan settlement is really

6    part of the --

7             MR. SCHROCK:  The settlement of substantive

8    consolidation.

9             THE COURT:  Yeah.  It's all -- it's really all

10   interlinked.

11            MR. SCHROCK:  It is.

12            THE COURT:  You have the --

13            MR. SCHROCK:  It is all interlinked.

14            THE COURT:  -- PBGC settlement, the so-called plan

15   settlement, which is the plan substantive consolidation that

16   adjusts certain recoveries in light of the perceived

17   unfairness of just having a flat substantive consolidation,

18   and finally mechanisms for dealing with the liquidating

19   trust.

20            MR. SCHROCK:  That's correct, Your Honor.  They

21   all build on one another.  You know, it's that the plan

22   settlement was the starting point, you know, coupled with

23   the PBGC settlement, it's provided the basis for the

24   unsecured creditors' committee settlement.

25            THE COURT:  Okay.

Page 155

1           MR. SCHROCK:  Mr. Murphy gave undisputed testimony

2     around the benefits of the plan settlement.  We think that,

3     you know, there's really nothing on the record to say

4     otherwise.  We've gone through some of the, you know, some

5     of the real monetary benefits.  But without that initial

6     settlement, the plan settlement, without the PBGC settlement

7     we wouldn't be before Your Honor seeking confi9mation of the

8     plan today.  And we are grateful that they decided to

9     support the estate, both at the APA hearing and now here at

10    the plan because they really did provide us a pathway to get

11    these cases concluded, should Your Honor confirm the plan.

12          The creditors' committee settlement, which came to

13    this summer, they've agreed to support the plan including

14    the PBGC settlement.  And on page 20 we talk about that

15    issues regarding post-effective date governance, which have

16    all been settled now, as well as the creditors' committee

17    settlement will have been -- provided certain consent

18    rights.

19          Now we've walked through in the briefing all the

20    9019 standards around these various settlements, but I think

21    that since the debtors and the creditors' committee have

22    come to peace, you know, we have been, you know, kind of

23    single minded in terms of prosecuting the plan and trying to

24    get these cases to conclusion, but it has not been easy.

25    They have been a good partner.

Page 156

1                1129(a)(9), which has gotten a lot of focus, you

2        know, provides for persons holding allowed claims, the type

3        of priority under 507(a) to receive specified cash payments.

4        The plan provides for full payment of all those allowed

5        security and priority claims.  We did have an objection

6        talking about the requirement of a secured creditor.  They

7        want a cash reserve as of the confirmation date,

8        effectively.

9                And, Your Honor, we are not going to go effective

10       without paying our secured claims.  There was certainly no

11       reserve that was put in place prior to this point.  We've

12       got a mechanism through the administrative claims consent

13       program to bring people in to get earlier payment.  We don't

14       think that there's a requirement that while you're still in

15       Chapter 11 and prior to the effective date that we have to

16       put up a cash reserve.  It's the debtors' cash.  We're

17       paying administrative claims.  We're moving forward.  But at

18       the time of emergence, we will have the $19 million actually

19       reserved and we don't have an issue doing that.

20               THE COURT:  Well, I'm sorry.  There are two

21       different -- I think there are two different issues there.

22       There's the issue of reserves for administrative

23       expenses  --

24               MR. SCHROCK:  Uh-huh.

25               THE COURT:  -- which, to me, is more of an issue

Page 157

```
 1   of feasibility than a legal requirement to provide a

 2   reserve.  But you did have an objection by at least one

 3   creditor that I believe was given a replacement lien or a

 4   lien?

 5             MR. SCHROCK:  Correct.

 6             THE COURT:  And I think their rights may be

 7   different in that the lien has to be protected.  It may not

 8   need to be a cash reserve, but I think you need to protect

 9   the lien --

10             MR. SCHROCK:  Okay.

11             THE COURT:  -- under the --

12             MR. SCHROCK:  We could --

13             THE COURT:  -- well, either -- under --

14             MR. SCHROCK:  You're saying come up with

15   another --

16             THE COURT:  -- under 362 --

17             MR. SCHROCK:  -- form of security.

18             THE COURT:  -- under 362(d)(1) ultimately and 361.

19   This is the Mr. Ireland --

20             MR. SCHROCK:  Yes.  That's right.

21             THE COURT:  -- and the U.S.

22             MR. SCHROCK:  That's right.

23             THE COURT:  So --

24             MR. SCHROCK:  We can certainly, I think --

25             THE COURT:  I mean, there are a lot of --
```

1             MR. SCHROCK:  There are a lot of different ways to

2      do it.

3             THE COURT:  Well, free assets, you know.

4             MR. SCHROCK:  Yes.

5             THE COURT:  So I see that.  But I think there's a

6      separate adequate protection obligation there.

7             MR. SCHROCK:  Okay.

8             THE COURT:  Or if there isn't right there, there

9      would be as soon as they move to lift the stay, so.

10             MR. SCHROCK:  Understood.

11             So with that, Your Honor, let us huddle after I

12      sit down and we'll talk about, you know, how we're going to

13      address that.  But I'm --

14             THE COURT:  Okay.

15             MR. SCHROCK:  -- I'm not surprised to hear you say

16      that.

17             Now in terms of the estimate of claims to be

18      satisfied, you know, there was quite a bit of, you know,

19      back and forth with Mr. Wander over, you know, the number of

20      proofs of claims and which have been objected at this very

21      point.  Like any complex Chapter 11 case, we have 23,000

22      proofs of claim that have been filed.  To say that we've

23      reconciled every single proof of claim would not be true.

24             We have certainly done everything we can up to

25      this point to have -- and, you know, the restructuring

1    committee has demanded it, that we were, you know, careful

2    about where we were on admin solvency throughout these

3    cases.  This is the first, you know, one of the first cases

4    certainly where I've, you know, been kind of hammering on

5    that issue from, really from the first day of the case and

6    we set up the wind down accounts.

7            But when you take into account the claims

8    reconciliation process and the objections' process, the

9    standing amount of the claims required to be paid on the

10    effective date is approximately $86 million, which we

11    believe because you if you look at the 503(b)(9)'s -- and I

12    know parties can argue, well, geez, there's still some

13    litigation outstanding on the 503(b)(9)'s.  It's undeniable

14    there is an APA contractual provision that says they have to

15    pay it.  Okay.  If there's something that parties want to

16    put into evidence to say why that's a bad -- that's a bad

17    assumption, right now we have a court-approved order coupled

18    with, you know, the requirement for them to pay the

19    503(b)(9) claims.

20            There's 50 million other administrative claims and

21    18 million in priority (indiscernible) claims, 18 million in

22    secured claims.

23            THE COURT:  And 3 million of other priority, I

24    guess.

25            MR. SCHROCK:  That's right.  Three million of

Page 160

1    other priority claims, that's right, with the settlement in

2    particular.

3              But, you know, we felt as a team and with the

4    restructuring committee that this was not a case where we

5    needed to file an administrative claims bar date.  When you

6    actually sold all the assets in February and, you know, you

7    have the accounts payable, you have the records, an

8    administrative claims bar date, in our judgment, was simply

9    going to generate a bunch of claims that we would then have

10   to object to and deal with over the course of the next

11   several months.

12             So it was, in fact, a very deliberate effort I

13   would say --

14             THE COURT:  Well, let me just follow through on

15   that.

16             MR. SCHROCK:  Sure.

17             THE COURT:  Mr. Murphy had in his administrative

18   expense claims estimate chart $30 million just based on the

19   accounts payable.

20             MR. SCHROCK:  Yes.

21             THE COURT:  It's certainly conceivable to me that

22   a fairly large portion of that involves amounts payable

23   where there hasn't yet been an administrative expense motion

24   or claim filed.

25             So how would the debtors deal with that?  Would

Page 161

1    they just ignore it or would they -- are they going to make

2    them payable if -- you know, depending on whether someone

3    opts in?

4           Well, first of all, would they get notice of the

5    opt in, just if they have filed a claim, if they just are on

6    the payables list?

7           MR. SCHROCK:  Yes.  To the extent we would be --

8    we're giving specific notice to all known creditors.

9           THE COURT:  So that would include not only those

10   who file claims, but who are listed on the accounts payable

11   of the book --

12          MR. SCHROCK:  Yes.

13          THE COURT:  -- on the books and records?

14          MR. SCHROCK:  Yes.

15          THE COURT:  So then let's assume that they don't

16   opt in.

17          MR. SCHROCK:  Yes.

18          THE COURT:  As I under -- and you're going to

19   explain this later, but as I understand that consent

20   program, they get treated as an administrative expense

21   creditor, but they don't have the right to certain dollars

22   out first.  They will get paid in full --

23          MR. SCHROCK:  Yes.

24          THE COURT:  -- on the effective date.  Does that

25   include those who don't file an administrative expense

1    motion, who just appear on the debtors' books and records as

2    having an account payable?

3                MR. SCHROCK:  Well, they are certainly going to --

4    it's a fair point.  They are certainly going to have to --

5    we're not going to go looking for people to pay on

6    administrative expense claims.  We are -- we have estimated,

7    you know, what we think is payable.

8                THE COURT:  Right.

9                MR. SCHROCK:  If parties --

10               THE COURT:  No.  But what I'm saying, if you -- if

11   they're on your account payables list --

12               MR. SCHROCK:  Yes.  If we think we owe them, yes,

13   then they're --

14               THE COURT:  Then you'll pay them.

15               MR. SCHROCK:  -- they're going to get paid.

16               THE COURT:  Okay.

17               MR. SCHROCK:  Absolutely.

18               THE COURT:  All right.

19               MR. SCHROCK:  Yes.  If they're -- if we believe we

20   owe them, we have a record of it and we're liable for it

21   under the terms of the APA, we're going to be, you know --

22               THE COURT:  And there's nothing to stop anyone

23   from -- who has done business with Sears or fallen down in a

24   Sears store to call up Sears and say, am I on your accounts

25   payable lists.  And if you say no, then they can file an

ram

Proper:

1 administrative expense at least up through the effective
2 date.
3     MR. SCHROCK: Certainly. Up through the effective
4 date. Yes, Your Honor.
5     THE COURT: Okay. So I'm not troubled by the lack
6 of an administrative claims bar date then because you don't
7 -- I don't see how you -- why you would necessarily need
8 one.
9     MR. SCHROCK: Yeah. Our judgment was that it
10 would simply generate a lot of claims reconciliation work.
11     THE COURT: I mean, oddly the fact that there is a
12 delayed effective date --
13     MR. SCHROCK: Right.
14     THE COURT: -- argues for not having to do it.
15 You would -- if you were going to go effective tomorrow, I
16 would be wondering why you hadn't done it because the cash
17 might all be gone.
18     MR. SCHROCK: Right. But -- and, Your Honor, when
19 -- especially here where we sold all of the assets primarily
20 other than the remnant assets in --
21     THE COURT: Well, there's no ongoing --
22     MR. SCHROCK: Yeah. There's no ongoing
23 enterprise.
24     THE COURT: -- accrual. Right.
25     MR. SCHROCK: Your Honor, we talked and went

Page 164

1    through the estimate of available funds.  I don't think that

2    those are really in dispute as I highlighted earlier.  I hit

3    the preference actions, which, you know, we're hopeful that

4    those will be even larger than what we put the estimates on.

5    But, you know, these are -- we undertook, we set the

6    preference firms to say, listen, what can we count on, what

7    can we do.

8            And we had, you know, Mr. Griffith tested against

9    other cases.  We think that that evidence is, you know,

10   valuable to the Court in showing that it's not speculative

11   around the preference proceeds.

12           We highlight some of his testimony on pages -- on

13   page 28.  And I want to note and make clear that although we

14   do think the ESL litigation proceeds will be significant,

15   we're not counting on ESL litigation proceeds, you know, to

16   go effective.  I want to be clear on that.  This -- you

17   know, when you run through the numbers, when you run through

18   the claims reconciliation, you know, we're -- if that comes

19   in, great, but it's certainly not a requirement in order to

20   go effective.  And the math, you know, in the declaration

21   certainly bears that out.

22           Just let me hit on the administrative consent

23   program for a few minutes and I'm going to ask --

24           THE COURT:  Well, can I go back, I'm sorry, to the

25   available funds?

 1              MR. SCHROCK:  Yeah.

 2              THE COURT:  In looking at the summary of available

 3     funds --

 4              MR. SCHROCK:  Yeah.

 5              THE COURT:  -- in Mr. Griffith's declaration --

 6              MR. SCHROCK:  Uh-huh.

 7              THE COURT:  -- that was before I ruled on the cash

 8     in transit.

 9              MR. SCHROCK:  You're talking about that was in

10     Exhibit C to the disclosure statement?

11              THE COURT:  No.  His declaration.

12              MR. SCHROCK:  Yeah.  Okay.

13              THE COURT:  I don't -- he -- there's -- I think it

14     was fairly recently I ruled that 22 and a half million

15     dollars suspended was the debtors' property under the APA.

16     How is that taken into account in that chart?

17              MR. SCHROCK:  Hold on just a second.

18              THE COURT:  Are the debtors already holding that

19     money and, therefore, it's not -- you know, it's already in

20     the cash position and --

21              MR. SCHROCK:  I believe that's right, Your Honor,

22     that we are --

23              THE COURT:  -- ESL was just wanting it back?

24              MR. SCHROCK:  That's right.  It wasn't something

25     we had to give back.

Page 166

1         THE COURT:  But were you counting it?  I couldn't

2    tell whether --

3         MR. SCHROCK:  Yeah.

4         THE COURT:  -- that was being counted.

5         MR. SCHROCK:  Yes.  I believe -- it is counted, I

6    believe, on the cash on hand.

7      (Pause)

8         MR. SINGH:  Your Honor, Sunny Singh on behalf of

9    the debtors.  Just one clarification.  The cash in transit

10   is not included in the cash on hand.  So we do have the

11   $50.1 million.

12        THE COURT:  Separate from that.

13        MR. SINGH:  Right, separate and apart.  The 22 and

14   a half, really the argument around that was ESL had an

15   argument that -- against -- excuse me -- Transform, that the

16   166 that Your Honor -- remember the 166 issue, that there's

17   -- you know, they have an obligation to pay those payables,

18   that the 22 and a half was a deduct to that which Your Honor

19   ruled against.  So it was not incremental cash.  It was

20   related to the deduct portion.

21        THE COURT:  But who has the money?

22        MR. SINGH:  They have the cash, right, because

23   they have our bank account.  So they have that 22.1.

24        THE COURT:  But you're entitled to it.

25        MR. SINGH:  Well, that's the issue of dispute, I

1    think, that's --

2              THE COURT:  No.  I already ruled on that.

3              MR. SINGH:  No.  Once -- it's subject to the

4    reconciliation, right, and you've ruled on the portion that

5    -- you ruled on the portion that it's not a deduct and it's

6    subject to the reconciliation of what we're owed versus what

7    they're owed.

8              THE COURT:  That's on the other open issues.

9              MR. SINGH:  That's correct.  This -- yeah.  So

10   that's -- I'm sorry.

11             THE COURT:  All right.

12             MR. SINGH:  We'll try --

13             THE COURT:  Just --

14             MR. SINGH:  -- maybe --

15             THE COURT:  No one mentioned it, so I wanted to

16   make sure how it factors in.

17             MR. SCHROCK:  Yeah.  I mean --

18             THE COURT:  And there was discussion, for example,

19   that there's, you know, a ten to $15 million estimated high

20   and low on the receivables and prepaid inventory issues,

21   which brought the 139 down to 99, but it could lower than --

22   90, but it could go lower than that.  But was -- I guess my

23   question was, would it go lower after application of the 22

24   some million or is that, you know, something that would be

25   set off first before you reduce the, you know, the rest of

1    the 139 for the 503(b)(9) claims?

2            MR. FRIEDMANN:  Yeah.  It's an additional

3    incremental money -- it's an amount that's still out there.

4    So it's one of the three issues that Your Honor deferred to

5    be examine -- that go to an examiner was this idea that

6    there was a cash in transit along with other --

7            THE COURT:  Right.

8            MR. FRIEDMANN:  -- monies that we believe --

9            THE COURT:  Well, but I didn't need the --

10           MR. FRIEDMANN:  -- belong to the estate.

11           THE COURT:  -- examiner on cash in transit.  I

12    ruled on that one.

13           MR. FRIEDMANN:  Well, the issue I think is that

14    they've argued that that should be offset against other

15    items.

16           THE COURT:  Well, but they were first arguing that

17    they got it and now they don't.  So --

18           MR. FRIEDMANN:  Right.  I mean --

19           THE COURT:  -- I mean, it's -- that's fine to have

20    it be offset, but it's not being -- in other words, there

21    was testimony by Mr. Griffith that his estimates of the

22    available funds included $90 million for 503(b)(9) claims,

23    and there's some back and forth about whether that should be

24    further reduced because of the accounts receivable prepaid

25    inventory disputes.

Page 169

1          MR. FRIEDMANN:  Correct.

2          THE COURT:  But would also, I guess, either there

3     or because the money is fundable somewhere else be increased

4     by the 22 and a half million?

5          MR. FRIEDMANN:  Yeah.  The answer is yes.  So

6     there --

7          THE COURT:  All right.

8          MR. FRIEDMANN:  -- would be additional money

9     available to the estate in the event --

10          THE COURT:  Right.

11          MR. FRIEDMANN:  -- that the examiner looked at the

12     -- has also included the checks that were written pre-

13     closing that got cash on the books post-closing and vice

14     versa.  So, yeah, there's all the issues with the

15     reconciliation of the offsets which would be incremental in

16     addition to the money we currently have on hand that right

17     now is --

18          THE COURT:  Right.  But I've already decided that

19     one issue.  You don't need anyone else to decide it except

20     maybe on appeal.  I've decided that issue on the 22 and a

21     half million.

22          MR. O'NEAL:  And, Your Honor, Sean O'Neal for

23     Transform.  I think Mr. Singh was correct.  I think that

24     cash in transit issue related to the 166 and also related to

25     the DIP shortfall amount.  And what we're in discussions now

```
 1    with the debtors and we've got proposed orders going back

 2    and forth is to have an expert or an examiner --

 3               THE COURT:  Well, that's --

 4               MR. O'NEAL:  -- look at the reconciliation.

 5               THE COURT:  -- that's fine.  I understand they are

 6    open issues.

 7               MR. O'NEAL:  Certainly.

 8               THE COURT:  I just wanted to just fix on the

 9    record that that issue, the cash in transit issue, isn't

10    open anymore.  It's something that Transform may be able to

11    set off against --

12               MR. O'NEAL:  Correct, Your Honor.

13               THE COURT:  -- but the testimony, I guess, may

14    well have indicated that there wasn't anything to set that

15    off against except for the 90 million that --

16               MR. O'NEAL:  And, Your Honor, there's a --

17               THE COURT:  -- the debtor was assuming would go to

18    503(b)(9) claims.

19               MR. O'NEAL:  And there's a disagreement.  And we

20    didn't actually engage on the $97 million issue because I

21    think they -- the debtors have been clear in their

22    declarations that they're not counting on that money for

23    purposes of the effective date.  So --

24               THE COURT:  Okay.

25               MR. O'NEAL:  -- we didn't feel the need to
```

Page 171

1    challenge that.

2              THE COURT:  All right.  Okay.

3              MR. SINGH:  Your Honor, the other thing I would

4    just point out, in Mr. Griffith's declaration, paragraph 73,

5    he walks through the impact and, basically, for purposes of

6    the numbers that are in his declaration or Mr. Schrock has

7    reviewed the 50 million, we've just ignored, you know, for

8    example, what's coming in from Transform in respect with

9    those disputes.

10             THE COURT:  No.  I understand.  But --

11             MR. SINGH:  Yeah.

12             THE COURT:  -- one of those disputes has been

13   resolved.

14             MR. SINGH:  Yes.

15             THE COURT:  So there was no reason to ignore that

16   one.

17             MR. SINGH:  Well, it was a timing issue.  When he

18   filed the declaration --

19             THE COURT:  I understand.  I'm saying --

20             MR. SINGH:  Yeah.  And now we can --

21             THE COURT:  -- today there's no reason toe --

22             MR. SINGH:  -- I think take into account --

23             THE COURT:  -- ignore it.

24             MR. SINGH:  -- that we have additional --

25             THE COURT:  Right.

1          MR. SINGH:  -- money subject to the reconciliation

2     -- subject to their --

3          THE COURT:  Okay.

4          MR. SINGH:  -- offset on this.

5          THE COURT:  All right.  Okay.  All right.

6          MR. SCHROCK:  All right.  I think that's clear.

7          Your Honor, on the administrative expense claims

8     consent program, and I should first note we did present

9     evidence and we believe we don't need the administrative

10    expense claim consent program in order to go effective.  Our

11    agreement with the ad hoc group is, however, is that if for

12    whatever reason Your Honor wasn't inclined to allow us to

13    implement that program, that they've kind of put their

14    swords down and agreed to support confirmation, they would

15    want to be able to raise those issues.  And we said, if that

16    happens, we don't think it's going to happen, but if it

17    happens we'll agree to adjourn it.

18          So I just wanted to note that for the record.

19          THE COURT:  Okay.

20          MR. SCHROCK:  Although we are -- you know, we do

21    believe the evidence supports approving the plan without

22    that program.  I think that they certainly wanted to make

23    sure that I mentioned that.

24          This program -- this was a difficult thing to put

25    together.  We had a lot of competing groups that wanted a

1    dialogue with the debtors.  We chose the largest group.  I

2    think the fact that they may have --

3              THE COURT:  In dollar amount?

4              MR. SCHROCK:  Yes, in terms of dollar amount.  And

5    they were a manageable group, you know, for us to be able to

6    deal with.  There were three primary clients.  You know,

7    trying to deal with, you know, 50 creditors, it's just like

8    dealing with a bondholder group.  You know, you have to have

9    a steering committee of some sort to -- in order to get

10   traction.

11             I do believe that those parties will ultimately,

12   you know, come into the program should Your Honor approve

13   the confirmation of the plan.  But we really think that this

14   was nothing but upside for the estate and provides a very

15   good incentive for parties to come into it.

16             So, you know, broadly speaking, this plan will

17   have, you know, parties who affirmatively opt in or do not

18   opt out because of the settled claims, will receive a max

19   recovery of 75 percent of the allowed amount of their

20   claims.  So each holder of an allowed admin claim that opts

21   in, then the 17 days after entry of the confirmation order

22   shall receive a pro rata share of 20 million on or about

23   December 1st, 2019 and consensual resolution of that amount

24   within 30 days from the date of the receipt of the opt in

25   form.

```
 1              THE COURT:  Well, can we --

 2              MR. SCHROCK:  Yes.

 3              THE COURT:  -- stop on that point?

 4              MR. SCHROCK:  Sure.

 5              THE COURT:  I want to make sure I understand.  If

 6   you opt in, in addition to getting your pro rata share of

 7   the 20 million capped at a 75 percent recovery, how is your

 8   -- how is the amount of your claim treated?  Is it deemed

 9   allowed?  I didn't think it was.

10              MR. SCHROCK:  Yeah.  We --

11              THE COURT:  I thought I heard you say that your

12   claim would be allowed in 30 days and I didn't follow that.

13              MR. SCHROCK:  I think we have to work with them to

14   --

15              THE COURT:  To go over the merits of the claim.

16              MR. SCHROCK:  -- to go over the merits of the

17   claim.

18              THE COURT:  All right.

19              MR. SCHROCK:  And then we consensually agree on

20   the amount.  And so when Mr. Wander was --

21              THE COURT:  Well, but what if you -- but if you

22   don't -- but if you don't consensually agree, then it's left

23   up to the Court?  That's how I would look at it.

24              MR. SCHROCK:  Yeah.  I believe yes, Your Honor,

25   that, you know, 30 days --
```

1          THE COURT:  But there's a real effort to try to --

2          MR. SCHROCK:  Yes.

3          THE COURT:  -- to sit down and go through the

4     numbers and --

5          MR. SCHROCK:  And we think that --

6          THE COURT:  -- agree on what makes sense and agree

7     to disagree on what doesn't make sense.

8          MR. SCHROCK:  Yeah.  And I think that's what's

9     going to save -- when we talk about the significant

10    litigation expense, parties who want to get paid quicker --

11    and we are, you know, we're going to be very reasonable in

12    terms of sitting down, especially for parties who are

13    coming, you know, coming in to the settlement.  Sometimes

14    there's preference recovery and we have to balance, you

15    know, those issues where you have to look at, can we -- you

16    know, how is it going to effect the ultimate recovery to the

17    estates.  And so we won't be able to reach an agreement on

18    every single instance.

19         But there's going to be a real effort here to try

20    and get those claims consensually resolved.  We're

21    contemplating hiring a smaller firm, not Weil Gotshal, to do

22    the, you know, administrative claims reconciliation.  We

23    will, you know, be happy to assist because we know a lot

24    about the company and have been working there.  But we think

25    it would be more cost effective to have a different firm

 1    assist with some of those negotiations.

 2              THE COURT:  And when you refer to administrative

 3    claims reconciliation, there's obviously been a fair amount

 4    of work done already --

 5              MR. SCHROCK:  Yes.

 6              THE COURT:  -- on the claims, particularly the

 7    larger ones.

 8              MR. SCHROCK:  Yes.

 9              THE COURT:  So the reconciliation is more sitting

10    down with your sleeves rolled up and talking to the other

11    side and going through the numbers?

12              MR. SCHROCK:  Going through the numbers, having

13    preference counsel, you know, involved to the extent that,

14    you know, because there's a -- you know, there's a waiver

15    that would be contemplated.  So you have to look at that

16    side of it as well.

17              THE COURT:  Okay.

18              MR. SCHROCK:  But, you know, we're organized.  You

19    know, we're prepared to do it.

20              THE COURT:  So it's not starting from scratch.

21    It's building on --

22              MR. SCHROCK:  No.

23              THE COURT:  -- the work that Mr. Murphy and his

24    group --

25              MR. SCHROCK:  Yes.

Page 177

1                THE COURT:  -- has been doing.

2                MR. SCHROCK:  And Mr. Murphy and his group,

3      they -- I mean, they really do know the claims.  They're

4      living with them every day.

5                For parties who don't timely opt out, but don't

6      opt in, they are going to receive their pro rata share of

7      the second distribution basically to catch them up.  And

8      then of course parties who don't want to be part of the

9      settlement, they can just opt out.  They'll get paid 100

10     cents, you know, on the effective date, the later of

11     effective date and when their claim is actually allowed.

12               THE COURT:  So can I interrupt you again?

13               MR. SCHROCK:  Of course.

14               THE COURT:  This is a -- what is the rationale

15     behind that middle group or having that middle group?  I

16     mean, it's -- you know, opting in you check a box.

17               MR. SCHROCK:  Right.

18               THE COURT:  Opting out you check a box.  The

19     middle group doesn't do anything.

20               MR. SCHROCK:  The middle group --

21               THE COURT:  Why --

22               MR. SCHROCK:  -- we were --

23               THE COURT:  Why have them?

24               MR. SCHROCK:  So we were sensitive to, you know,

25     discriminatory treatment issues.  If you're going to deem

1    somebody to consent effectively by not taking an action to

2    affirmatively opt out, that we wanted to make sure that

3    those parties, you know, basically, you know, could still

4    participate, you know, in the settlement itself.  And we

5    thought that, you know, requiring an affirmative act, much

6    like on a ballad to actually, you know, get out of this --

7    get out of the consent program was a fair way to deal

8    with --

9            THE COURT:  Yeah.  But why put them -- why have a

10   third group?  Why not just have opt ins and opt outs?  I'm

11   struggling with the rationale for that third group which

12   does get --

13           MR. SCHROCK:  Uh-huh.

14           THE COURT:  -- not as good treatment as the first

15   group and you don't know whether they're going to have as

16   good treatment ultimately as the second group or not.

17           MR. SCHROCK:  Well, the way -- from the estate's

18   perspective, we looked at it and said we think that if you

19   send a notice out to everyone and it's adequate notice and

20   you don't take an action to actually opt out, that

21   consistent with the applicable law, you know, in this

22   circuit, including this court, that that's actually consent

23   to come into the program.

24           THE COURT:  No.  I understand --

25           MR. SCHROCK:  And so we want the --

Page 179

1              THE COURT:  Look, there's a separate --

2              MR. SCHROCK:  We would like to get the 25 percent

3    discount.

4              THE COURT:  Well, okay.  So it's to get the 25

5    percent discount.

6              MR. SCHROCK:  That's the benefit to the estate, of

7    course.  Yes.

8              THE COURT:  But there's a -- but they're not

9    getting the first payment.

10             MR. SCHROCK:  But they're getting the second

11   distribution.  So they're catching up with the same group

12   who, you know, like affirmatively opted in.  And it's a --

13             THE COURT:  Well, when you say catch up, are they

14   always behind or do they catch up --

15             MR. SCHROCK:  No.  They catch up with the second

16   distribution and then --

17             THE COURT:  So they're pro rata with the first

18   people --

19             MR. SCHROCK:  Correct.

20             THE COURT:  -- as part of the second distribution.

21             MR. SCHROCK:  That's correct.

22             But this is a similar mechanism that's, you know,

23   been used in at least, you know, the Toys case.  We think

24   that if the notice is adequate, it's fair to ask parties,

25   you know, listen, you're going to get a, you know, an

Page 180

1    earlier payment if you just fail to take an action.  And it

2    is consent, you know, we believe under applicable law.

3              THE COURT:  And the reconciliation process, the

4    claims liquidation allowance process, that starts for that

5    second group when, after the first one is done with or --

6              MR. SCHROCK:  I mean, we're going to have to spend

7    a lot of time between now and December 1st on -- depending

8    on how many people come in, I think, with the first group.

9    If resources allow us to keep reconcile -- we've got

10   objections on file which has been the impetus for

11   reconciling a lot of the other administrative claims that

12   are -- that we're aware of or that are on file with the

13   Court.

14             So I would say it's -- I want to say that that's

15   something that's going on now, but certainly will be at a

16   much more intense focus after December 1st.

17             THE COURT:  All right.  I didn't see this three

18   group mechanism in the Toys "R" Us construct or in the

19   Teligent construct.  It was really just --

20             MR. SCHROCK:  Right.

21             THE COURT:  -- you know, opt in or opt out.

22             MR. SCHROCK:  Right.

23             THE COURT:  Well, no.  Teligent had the deemed --

24             MR. SCHROCK:  Yeah.  They had the deemed --

25             THE COURT:  -- the deemed agreement.

1                    MR. SCHROCK:  Yeah.

2                    THE COURT:  But there was no -- there were only

3       two treatments.

4                    MR. SCHROCK:  Right.  Right.

5                    THE COURT:  So to me if you're going to have a

6       deemed opt in, the explanation needs to be -- the context

7       needs to be set quite clearly, not just the context of what

8       it is that or how the agreement works as a mechanical

9       matter, i.e., the opt ins, the affirmative opt ins get their

10      share of the first distribution, pro rata up to the 75

11      percent recovery and first look at as far as the

12      reconciliation process, and the second group then catches up

13      in the second distribution and gets looked at.  And then the

14      opt outs get paid when they get paid on the effective date.

15                   But I think it's important to have some basic

16      information shared with them as to the, you know, as to the

17      economic consequences of making these decisions.  You know,

18      I mean we just had a lengthy hearing on when the -- when you

19      would normally expect to get paid --

20                   MR. SCHROCK:  Yes.

21                   THE COURT:  -- a hundred cents on your claim.  And

22      I think people should have a sense of that, if they're going

23      to make that type of decision.

24                   For example, there is some risk, I suppose,

25      although hearing the evidence I don't think it's a very

1    large one, but some risk that if you neither opted out nor

2    opted in you might not get paid --

3                    MR. SCHROCK:  Right.

4                    THE COURT:  -- as much as the first group.

5                    So I think you have to come up with something to

6    lay that out.  And a fair amount of that has already been

7    laid out in the charts that support -- not the exhibits, but

8    the charts within the declarations of --

9                    MR. SCHROCK:  Uh-huh.

10                   THE COURT:  -- Mr. Griffith and Mr. Murphy.  But I

11   just don't see how --

12                   MR. SCHROCK:  You want them to be getting some

13   more context and make a better --

14                   THE COURT:  I think so.  Yeah.

15                   MR. SCHROCK:  -- decision.

16                   THE COURT:  I mean, that's why I asked Mr.

17   Griffith, because he referred to due diligence as part of

18   the negotiations.

19                   MR. SCHROCK:  Right.

20                   THE COURT:  I'm assuming that the group that

21   settled on the consent program didn't just do it blindly.

22   They asked you what's available --

23                   MR. SCHROCK:  Yes.

24                   THE COURT:  -- you know, the timing, et cetera, et

25   cetera.

Page 183

```
 1              MR. SCHROCK:  Right.

 2              THE COURT:  I mean, you could certainly point them

 3    to his -- to those declarations.  But I think a paragraph or

 4    two that lays out the expected timing.

 5              To put it differently, the more you're relying on

 6    preference recoveries in the ESL DNO litigation --

 7              MR. SCHROCK:  Right.

 8              THE COURT:  -- the more you're going to have to

 9    wait.

10              MR. SCHROCK:  Right.

11              THE COURT:  And you may be willing to wait for

12    that extra 25 percent.

13              MR. SCHROCK:  Right.  They're almost -- I'm

14    picturing it.  It's something almost like risk factors --

15              THE COURT:  Yeah.

16              MR. SCHROCK:  -- associated with each choice.

17              THE COURT:  Correct.  And the reason I raise the

18    intermediate choice --

19              MR. SCHROCK:  Uh-huh.

20              THE COURT:  -- was to me that's the hardest one to

21    handicap.

22              MR. SCHROCK:  Yeah.

23              THE COURT:  Now it may be that someone's just not

24    paying any attention and they don't deserve any notice

25    because they're not paying any attention.  But --
```

Page 184

1           MR. SCHROCK:  Right.

2           THE COURT:  -- at the same time you're not really

3   relying on that.  You're relying on the fact that you're

4   giving them an actual choice to make, what's the legal basis

5   for it at least.

6           MR. SCHROCK:  Well, should Your Honor -- we could

7   certainly draft something that -- and come up with

8   something, I believe, for that should you --

9           THE COURT:  I mean, for example, in Teligent it

10  was clear that if they didn't make this choice --

11          MR. SCHROCK:  Right.

12          THE COURT:  -- they would get nothing.

13          MR. SCHROCK:  Right.

14          THE COURT:  So that's really easy.  That's a

15  really easy risk factor.

16          MR. SCHROCK:  Right.  We can't say that.

17          THE COURT:  You can't say that.

18          MR. SCHROCK:  Right.  Right.

19          THE COURT:  But I think that without --

20          MR. SCHROCK:  Right.  There's a risk, though, that

21  you could get substantial delayed payment and, you know,

22  there's some risk that you may not get anything --

23          THE COURT:  Right.

24          MR. SCHROCK:  -- or get a reduced amount.

25          THE COURT:  Right.

Page 185

1          MR. SCHROCK:  Yeah.  I think that we can certainly

2     draft that and we'll have our -- I know -- I get what you're

3     looking for, Judge.  We'll put something together on that.

4          THE COURT:  So can I -- I go back to maybe a more

5     fundamental question, which is I guess ultimately the one

6     the U.S. trustee raised initially, which is why seek

7     confirmation now when you won't be going effective for some

8     time?  I'm assuming the answer is that you could now give

9     assurance to all of these administrative expense creditors

10    that this is it.

11         MR. SCHROCK:  This is it.

12         THE COURT:  The plan's confirmed.  You could see

13    your recovery and you have a fairly simple choice, which is

14    opt in, don't do anything, or opt out.  But you know that

15    there won't be any other contingencies because --

16         MR. SCHROCK:  Right.

17         THE COURT:  -- other than what's been -- what is

18    disclosed to you in the election form because the plan has

19    been confirmed.

20         MR. SCHROCK:  And we think that there's a

21    substantial administrative expense savings, you know, by

22    just kind of going into that mode, whether -- we're not

23    going to be dealing with the onslaught of frankly an

24    administrative claim request that parties aren't going to be

25    trying to -- plan related litigation obviously is off the

1    table.

2              THE COURT:  Right.

3              MR. SCHROCK:  We're just purely in kind of just

4    the wind down estate mode where the cases are still open.

5              THE COURT:  Okay.

6              MR. SCHROCK:  Your Honor, as to feasibility, we do

7    think that, you know, that consistent with the law we've

8    made our showing.  We've carried our burden.  Feasibility is

9    not a guaranteed, you know, success, a reasonable

10   probability.  And we think that with the unrefuted evidence

11   in front of the Court that -- about what we already have,

12   about what we expect to have and all of the work we've done

13   around the claims, that we can certainly say we have a

14   reasonable probability, and more than that, to be able to go

15   effective.  And that is certainly everybody's single mission

16   to be able to do that.

17             I think that, you know, I'll save the remainder of

18   my comments for any other -- for rebuttal in terms of any

19   other arguments that are posed in opposition to

20   confirmation.  But I know the ad hoc claimants and a couple

21   of other parties in support of confirmation wanted to stand

22   up and say a few words.

23             THE COURT:  Okay.

24             MS. MORABITO:  Good afternoon, Your Honor.  Erika

25   Morabito at Foley & Lardner on behalf of the ad hoc vendor

Page 187

1    group.

2             THE COURT:  Good afternoon.

3             MS. MORABITO:  And I refer to that group as it's

4    defined in the administrative expense claim program.  But to

5    be clear, our group is comprised really primarily of three

6    creditors:  Whitebox Asymmetric Partners, Cherokee Debt

7    Acquisition and Hain Capital.

8             Together they've asserted about $35 million in

9    administrative claims.  But in addition to these clients, we

10   also have original holders of claims.  And I think that's an

11   important distinction because I don't think that was clear

12   on some of the pleadings that we've seen recently.

13            It's difficult to stand here today, to be honest

14   with you.  On one hand we're very proud of what we've

15   accomplished recently and the fact that the debtors have a

16   plan that we believe does give the best chance of recovery

17   to the admins.  But on the other hand, we're really all

18   trying to, I think, make best of a very difficult situation.

19            A lot of things happened good in this case that

20   people forget.  Everybody wants to talk about conversion.

21   And this case did get vendors paid.  It did get landlords

22   paid.  And people were employed for a much longer time than

23   they had been in the past.

24            But the case took a turn for the worse.  We know

25   that.  That's why we're here.  Obviously, it's been a domino

Page 188

1    effect since then with people pointing fingers at each other

2    and a lot of inter-creditor fighting.  And these are all

3    factors that were taken into account when we decided to

4    ultimately agree to an administrative expense program.

5              And I think it's important from a timing

6    standpoint in terms of when we got involved and why we got

7    involved.  We entered our appearance on July 9th.  That's

8    important because a lot of stuff in this case had happened

9    previously.  And the reason we got involved and the reason

10   we got calls from administrative creditors primarily was

11   because it was almost very similar to what happened in Toys

12   R Us when we were called there and asked to see if we

13   couldn't somehow get involved and see if we could bridge a

14   gap so the plan could be confirmed and that we could at

15   least try to help to get a recovery for the administrative

16   creditors.

17             The other reason that date is important, Your

18   Honor, is July 10th we got a call from Mr. Wander and his

19   group, and I sat here this morning and was a little

20   disappointed and offended by some of the statements that

21   were made.  And the reason I say that today is because we

22   have a ton of admin creditors that are listening in on this

23   call, and there's a lot of administrative creditors in this

24   courtroom today who don't have the benefit of understanding

25   the diligence and the process and what was involved to

1    getting to an agreement such as the one that's been reached

2    and set forth before Your Honor today.

3            We've been contacted by a lot of them to

4    understand what the process was and how the Court was

5    involved and the diligence that was done, a lot of the

6    questions that you asked Mr. Griffith and Mr. Schrock just a

7    few minutes ago.

8            And so I do want to walk the Court through that

9    because I do think for those that are listening and those

10   that are considering whether or not it is in their best

11   interest to opt in, all they really heard today is kind of a

12   one-sided view of that.

13           We were contacted by Mr. Wander on July 10th, and

14   since that time in this three months I think maybe there's a

15   been a couple or a handful of days that have gone by that we

16   have not been on the phone with him or his group or Mr.

17   Sarachek and his group.  We saw this as a combined effort

18   and an opportunity to join forces to see if we couldn't find

19   a mechanism and a way to be able to get some sort of cash

20   distributed to the administrative creditors.

21           Along those lines, because maybe we are the larger

22   firm and we have greater resources and because our clients

23   had greater resources, we were sort of pushed out in front

24   and asked if we could kind of plow the path.  And we did

25   that, and our clients paid for that.  And nobody cared at

1    that time that some of our clients were claims purchasers.

2    It made sense to them because we had a mechanism and an

3    avenue to be able to get a seat at the table.

4            We have taken depositions in this case.  We have

5    appeared at depositions in this case.  We have shared

6    transcripts.  We have entered a common interest agreement

7    with them.  They knew about the agreement, not just by when

8    the filing occurred.  They knew about the details and the

9    terms of an agreement that we were considering reaching way

10   before we saw the filing last night.  They didn't ultimately

11   know what the final terms were because we didn't agree to

12   the final terms of the settlement until the 11th hour.

13           But I think it's disingenuous for Mr. Wander to

14   make a representation to other admin creditors who are

15   listening that this was somehow some behind closed doors

16   deal that was struck with a couple of admin creditors who

17   had the largest claims, and that he and his clients and

18   constituents weren't involved in the process because, to the

19   contrary, they were.

20           We said we got involved on July 7th.  On July 9th,

21   we filed -- I'm sorry -- on August 2nd, we filed our

22   objection, which is docket number 4721, to confirmation.

23   And like other admin creditors at that time, we did not

24   think that keeping this plan going was in the best interest

25   of the estate.  And we were certainly an advocate of

1    conversion or some sort of mechanism that would allow for a

2    recovery.  But watching an estate diminish in resources was

3    not something that our clients wanted either.

4            Frankly, when we had the first chamber conference

5    on September -- let me see when that was -- on September

6    9th, we -- the biggest concern that we had was how do we

7    really get a seat at the table.  We weren't getting a lot of

8    love.  I think we were considered the Johnnie come lately by

9    the committee and some of the other professionals.  But we

10   needed an opportunity and a wedge to be able to get --

11           THE COURT:  Well, there's no love in bankruptcy,

12   so.

13           MS. MORABITO:  Fair enough.

14           And so we did.  And so we had a judge's chamber's

15   conference on September 12th.  And Your Honor said at that

16   point that we would have a seat at the table, not just us

17   but the administrative creditors.

18           And it was really after that point, and I think

19   the message was received by all parties, that we needed to

20   work harder.  We needed to try to come together at this

21   juncture in the case and try to make something better or

22   good out of something that wasn't what any of us intended

23   when this case began.

24           And so we did and we entered into real settlement

25   discussions.  And while those settlement discussions, as Mr.

1  Schrock said, might have been led by Foley after that point,

2  like we said they -- all of the admin creditors that we were

3  dealing with, including Mr. Wander and Mr. Sarachek's groups

4  were involved.

5          Additionally, we have had several administrative

6  creditors call us throughout this process to try to get a

7  sense of whether or not what we were considering doing made

8  sense to them.

9          On September 23rd, we had a second meeting with

10  Weil Gotshal and that meeting lasted virtually all day.  And

11  that was when we worked on a construct and a settlement that

12  we thought would be something that was much better than what

13  you saw was attached to their -- it was attached as a

14  construct presented with a confirmation brief which was

15  Exhibit B filed on September 13th, 2019.  That was the

16  original construct we had, versus where we are today and the

17  difference in what the construct is.

18          We walked away feeling pretty optimistic at that

19  meeting on September 23rd, but we knew there was still more

20  work to be done.  We circled back and we talked to the other

21  administrative creditors again, and while they were grateful

22  at that time for the work that's been -- that had been done

23  and the additional items that we got as part of a

24  concession, they still wanted more.

25          And so, again, we went back and we continued to

Page 193

1  negotiate.  What we did get, and I think you saw this in the

2  debtors' pleadings, was we got a confirmation hearing

3  adjourned, which is why we went to the new dates of the 27th

4  of September and October 3rd.  And that was really well

5  intended, I think, by all the professionals to see if we

6  could reach some sort of compromise such that we could be

7  here today sitting on the same side as opposed to being

8  allies.

9          Ultimately, though, and sadly, I think, the

10  interests of the admins diverged when our philosophy is that

11  a settlement means there's compromise and it means you don't

12  get everything that you want.  These claims in this case are

13  very unique.  What may be beneficial to one creditor is not

14  necessarily beneficial to another.

15          For example we hear a lot about the World Imports

16  case.  Not all creditors have World Imports case issues.

17  And to those creditors that don't have World Import case

18  issues, it would be disadvantageous to them for the debtors

19  to take a blanket position on a theory of law that could

20  ultimately then negate or significantly -- I'm sorry --

21  which would ultimately, if the debtors lost, increase the

22  amount of claims that would come into the estate and

23  significantly reduce the recoveries that could go to the

24  other admins.

25          Like that you also had the preferences.  Not all

Page 194

1    claimants had preferences.  So asking the debtors to enter

2    into a settlement agreement that meant that the debtors

3    could have no defenses or minimal defenses to claims at the

4    end of the day is not advantageous to all of the admins.

5    You would be forced with an unknown number of claims and

6    very limited cash.

7             So why did we enter into the administrative

8    expense claim program?  First, the debtors set this forth in

9    their materials, but really what we were looking at is, is

10   conversion better or worse for the administrative creditors

11   than what we have now with this program.  And when we looked

12   at the alternative versus what we were able to get from this

13   program, it was pretty clear that conversion certainly was a

14   far less better option than what this program offered.

15            First of all, conversion was too risky.  There was

16   incredible potential downside to all the claimants.  Many of

17   the creditors again talking about how they had different

18   interests.  Some of these creditors only have claims against

19   certain debtors and not other debtors.

20            What this program allows is the claim which

21   essentially is akin to a claim against a substantially

22   consolidated debtor, so that if you have a claim against one

23   of the debtors, it's a claim against all, and then there's a

24   mechanism for payment.

25            If you went in to a Chapter 7 conversion there

Page 195

1    would be a big risk there that if you did not have claims

2    against anybody other than K-Mart, you may not have an

3    opportunity to get your claim paid.

4        Moreover, if there was a preference action against

5    you, you could find yourself in the horrible position

6    whereby you don't have claims against the only solvent

7    debtor, but yet you're subject to preferences.  So you could

8    ultimately end up owing the estate money.

9        You also had the issue with respect to litigation.

10   While the debtors don't rely, for purposes of being able to

11   meet the standards of 1129(a)(9) for purposes of

12   confirmation on recoveries from Transform or ESL, the admin

13   creditors are certainly hoping that the debtors are

14   successful with that because that's going to be a large

15   number that would come in and would be available for

16   distributions to the admins and possibly unsecureds.

17       If you convert to a 7, we believe that it

18   jeopardizes the current litigation that's pending against

19   Transform and ESL.  It would require delay in the litigation

20   and a substitution of counsel possibly that may not have the

21   same institutional knowledge that the debtors and Akin has.

22       Comparatively let's look at the admin expense

23   program.  One of the biggest things we wanted to get, and

24   Your Honor hit on this earlier, was $20 million, we wanted

25   some component of cash.  And the reason we came up with $20

1    million was we looked at it as at least ten percent of what

2    they believed could be the outside number in terms of

3    administrative claims.  So $20 million was roughly assuming

4    that you had $200 million administrative claims.

5            That's something that if this case converted to a

6    7 they wouldn't have.  And you heard Mr. Griffith testify

7    today that they have about $50 million in cash.  The estate

8    isn't getting more flush with cash.  There is a large

9    dependent on recoveries, both from preference actions and

10   also from litigation.  So cash is premium right now.  And so

11   to get the debtors to agree to segregate $20 million into a

12   fund so that it would be available for the admin creditors

13   we thought was an enormous benefit.

14           Secondly, we've always approached this with

15   everybody needs to share in this.  And so both the debtors'

16   counsel as well as the committee's counsel did agree to put

17   $2 million of their current carve out into this segregated

18   account to make it available for admins.

19           The other thing that we kept hearing from admins

20   when we went to negotiate this was that it was very

21   important to them, and they didn't understand the concept of

22   the creditors' committee having 20 -- having the

23   availability of $25 million up front in their view that

24   could be distributed to administrative creditors.  And they

25   felt like that number was too big.

Page 197

1          And so one of the things that we asked for was

2    could there be a delay in time such that they could still

3    have sufficient funds to litigate the claims against ESL and

4    Transform, but could they free up some of that cash now so

5    that the administrative creditors could also get a portion

6    of that.  And ultimately that was another big part of the

7    agreement.

8          The other thing that I think is important and,

9    frankly, a reason why it took us as late as it did to get to

10   an agreement that we were ultimately able to file on

11   December -- I'm sorry -- on October 1 was the administrative

12   expense claims representative.

13         This is so important and I can't underestimate

14   that.  We keep hearing people talk about what the

15   restructuring committee is going to do and that there's

16   going to be clearly a period of lapse between confirmation

17   and the effective date.  And the administrative creditors

18   are concerned that if there is no representation for them at

19   a level that involves both the claims reconciliation process

20   and also distributions to administrative creditors pursuant

21   to this program, that they won't be treated fairly or it

22   won't be done efficiently, or that what we're going to see

23   is just additional fees going to professionals.

24         So while everybody seemed to be on board, meaning

25   all of the parties that were negotiating the construct at

Page 198

1    least with respect to having a representative, the biggest

2    disagreement was the role that that representative would

3    play.  And in our view this couldn't be window dressing.  It

4    needed to be somebody that really had the ability to be able

5    to make decisions on behalf of the admins and potentially

6    participate in some of the decisions as it relates to

7    reconciliation, including the World Imports case.

8            So I would direct Your Honor's attention to the

9    debtors' supplemental memorandum of law, which is

10   document -- I'm sorry -- docket entry 5296.  And if you turn

11   to -- on the top, it says page 78 and 79 of 140.  This is

12   part of the construct that I think those administrative

13   creditors that have concern about how this process is going

14   to work and to make sure that it's fair and efficient really

15   need to see.

16           The first one is on page 27 at the bottom, which

17   would be page 78 of 140 of docket 5296.  And this talks

18   about the appointment of the administrative representative

19   and that it would be done after confirmation.  And the

20   important part of this is, if you read halfway through

21   paragraph 7, it says that this administrative  -- let's see:

22           "Prior to the effective date, and once the cash

23   reserve account has been funded with 10 million in the

24   aggregate, the debtors' restructuring committee together

25   with the creditors' committee and admin representative will

Page 199

1    commence a telephonic meeting no less than every 30 days to

2    review, among other things, the status of the reconciliation

3    of administrative expense claims as well as the latest

4    budget and variance reporting of the debtors, provided that

5    in the interim the debtors shall provide, among other

6    things, weekly budgets, various reporting, as well as an

7    accounting of the total assets and any net proceeds derived

8    there from to the pre-effective date committee on a

9    confidential basis."

10            Additionally, this administrative representative

11   who will be, as Your Honor pointed out, how are they going

12   to be selected?  Once we do have the opt in group and people

13   are able to weigh in on who that representative will be,

14   they will be appointed.  And this is important because

15   here's where we get to paragraph V on page 28.

16            "This person shall serve alongside the debtors'

17   restructuring committee and the creditors' committee to work

18   through 503(b)(9) and 503(b)(1) issues regarding inducement,

19   date of receipt, port of origin, and any exposure on account

20   of preference actions, and to ensure and expedite a fair

21   process to claims resolution in emergence."

22            Each of those elements were specifically chosen

23   because it addressed the issues of (indiscernible).  So

24   while we couldn't get the debtors to agree to take a blanket

25   position on a legal theory because it could have both

1    positive and negative consequences to admin creditors based

2    on your claim, we at least got a representative involved

3    that could look at those issues fairly.

4            Additionally, and this was important, the admin

5    representative will be entitled to applicable insurance

6    coverage.  They will have adequate compensation provided and

7    paid for by the debtors.  And that's important.  We don't

8    want someone there that basically is a figurehead and

9    doesn't have any teeth to do anything.

10           By having them to be adequately compensated, we

11   believe that will provide or at least for the opportunity to

12   have somebody on there that can represent the interest of

13   the admins.

14           Secondly, the other role of this person which is

15   really important is to help the admins to get comfortable

16   with understanding that there's going to be costs going

17   forward in this case, but it's not going to be an evergreen

18   account.  It's not going to be one carve out of this

19   transitioning over to a post-confirmation carve out whereby

20   the estates and the professionals have free will to use

21   whatever money they need to to prosecute the cases and the

22   claims.

23           What this person does is to the extent that a

24   distribution is wanting to be held up to pay to the admins

25   because the estate believes that they need additional cash

 1    to be able to resolve or respond to pending motions in the

 2    case, it can't just be done by those representatives without

 3    input from the admin.  And by input I mean they have to

 4    agree unanimously that if a distribution, a further

 5    distribution to admins is to be held up in favor of putting

 6    more money into the operational costs of the estate, which

 7    includes professional fees, then those parties would need to

 8    come before the Court and the Court would have an

 9    opportunity to make a decision as to whether or not it's

10    more appropriate to give distributions to admin creditors or

11    if the estate needs additional funds.

12           So each of those were heavily negotiated.  Those

13    were things that we thought were extremely important.  And

14    we read a declaration yesterday, again, that made it seem as

15    though we just cut a deal and had our claims allowed and

16    that's why we entered into this settlement.

17           If I haven't said enough already to show that

18    that's true, this last provision about having a claims

19    representative --

20           THE COURT:  Well, not true you mean.

21           MS. MORABITO:  Yeah.  Not true.  You're right.

22           To have this claims representative involved in the

23    reconciliation process has absolutely nothing to do with us

24    now because we went through an extensive reconciliation

25    process with Mr. Murphy, also with the representatives from

Page 202

1    the committee and specifically FTI.  We had a large discount

2    given on our claims and yet again we still agreed to only

3    get up to 75 percent by opting in.

4           When we asked for this admin expense claim to be

5    involved in reconciliation it was certainly not to benefit

6    my clients because our claims have already been reconciled.

7    Yet our clients are the ones that paid the legal fees to go

8    through and ask for these additional items for other

9    administrative creditors.

10          So I can't emphasize enough that this was a highly

11   negotiated program that we do believe ultimately benefits

12   the administrative creditors.

13          Unfortunately, though, we heard today, we saw from

14   the objections, we saw from the declarations that this is

15   just still not enough for other admin creditors.  I'm

16   hopeful though and cautiously optimistic.  We've -- now that

17   we've talked to a couple of people today and we spoke to a

18   couple of people yesterday, we do believe that pretty soon

19   you are going to see relatively quickly several

20   administrative creditors opting in now that they understand

21   the construct and how the negotiation process worked.

22          Again, at the end of the day there's a lot of

23   emotion now.  There's a lot of strong personalities.  This

24   is a difficult case.  I think to sort of echo what Mr. Shock

25   said, which is we're trying to make the best of a difficult

1   situation and we can't come to another scenario whereby this

2   isn't in the best interest of the estate and the best

3   interest of the administrative creditors.

4           I don't have anything else, Your Honor.  If you

5   have any questions, I'm happy to answer any questions about

6   the program itself.

7           THE COURT:  Okay.  No.  I don't think so.

8           MS. MORABITO:  Thank you.

9           THE COURT:  Thanks.

10      (Pause)

11          MR. DUBLIN:  Good afternoon, Your Honor.  Phil

12  Dublin, Akin Gump, on behalf of the committee.  I'll be

13  brief.

14          THE COURT:  Good afternoon.

15          MR. DUBLIN:  We've been -- Your Honor has been at

16  this for a long time and has about 300 admin creditors that

17  probably still want to say something about the program that

18  the ad hoc group's counsel just went through.

19          I just want to highlight a couple of things,

20  acknowledging that what we're looking to do here is a little

21  unorthodox with confirming the plan and not really being

22  sure when we're going to go effective subject to the types

23  of situations that Your Honor referenced where there's

24  regulatory pools and things of that nature which sometimes

25  leave companies in bankruptcy for a while, while they wait

1    to go effective.

2            We've been at this since -- for about just about a

3    year.  Obviously, a lot of contentious issues before Your

4    Honor and with the debtors and with Transform.  We were

5    able, shortly after the disclosure statement hearing, to put

6    our differences aside with the debtors and jointly pursue

7    the path that got us to where we are today.

8            There were a number of changes made to the plan

9    right before the disclosure statement hearing that address a

10    number of the committee's concerns with respect to the

11    proposed substantive consolidation as well as with respect

12    to the PBGC settlement.

13            One of the things I want to highlight about the

14    PBGC settlement, which at least a couple of creditors I

15    think have raised issues within propriety of is as greater

16    proceeds come in from the causes of action there are

17    benefits to unsecured creditors from the PBGC settlement

18    because their claim is essentially reduced from their

19    original $1.4 billion claim that they were seeking to have.

20            The creditors' committee has been bullish on the

21    causes of action.  That will be pursued jointly by the

22    debtors and the committee pre-effective date, and by the

23    trust post-effective date.  And we expect the proceeds

24    ultimately -- that will ultimately come in will be

25    greatly -- excuse me -- will be much greater than was put

Page 205

1   forth in the disclosure statement which generally are
2   conservative numbers to ensure that the plan is feasible and
3   satisfies the best interest of creditors' test and the like.
4           The path forward is not going to be easy.  We know
5   that the estates are up against an adversary in ESL and
6   other well healed defendants.  And it was important that we
7   have appropriate financing to pursue those causes of action.
8   And part of the compromise with the admin creditors was to
9   reduce the initial cash available to pursue the litigation
10  to $15 million.  But there is a mechanism to get that back
11  up to $25 million once -- in advance of going effective in
12  the aggregate.
13          So some of that money will be used.  It's not
14  going to get replenished and become evergreen.  But in the
15  aggregate there will have been $25 million available in the
16  first instance for the pursuit of those causes of action.
17          We believe that the agreement that's been reached
18  with the admin creditors is beneficial to everybody.  I
19  think that our pleading that we submitted in connection with
20  confirmation and the liquidation analysis made clear that a
21  substantial number of admin creditors will get no recovery
22  in these cases if these cases are converted.
23          Mr. Schrock highlighted that confirming the plan
24  now will save administrative expenses.  We agree with that
25  wholeheartedly.  Everyday there are numerous motions being

 1    filed for payment of admin expenses.  The agreement that's

 2    been reached sets forth the path forward and the options

 3    available for admin creditors to get paid sooner or to wait

 4    and get 100 cents.  And that is purely voluntary and

 5    available for them.

 6            Just to highlight a couple of other things, we've

 7    had recent conversations with counsel for the estates that

 8    are pursuing the preference actions.  We expect upwards of

 9    200 complaints to be filed before the end of the month.

10    That process is ongoing.  There's been a lot of work.

11    There's been about 140 settlements already.  So that's

12    something that has been bringing funds into the estate as

13    part of the cash that's available now and we expect it to

14    continue to come in.

15            We heard earlier about the $5.1 million that's

16    coming in from the school district.  And we expect most of

17    those assets to be monetized very quickly.  We are all

18    incentivized to go effective as soon as possible, and we

19    think that working together with the debtors and the

20    administrative expense representative, we will get to that

21    goal very quickly.

22            With that, Your Honor, unless you have any

23    comments, I will reserve some time to respond to any

24    objections to the extent necessary.

25            THE COURT:  Okay.  Thanks.

1           MR. DUBLIN:  Thank you.

2      (Pause)

3           MR. RAYNOR:  Good afternoon, Your Honor.  Brian

4  Raynor from Locke Lord on behalf of the Pension Benefit

5  Guarantee Corporation.  In comparison, I'll be very brief

6  with my comments.

7           PBGC is the largest unsecured creditor in this

8  case with upwards of $1.7 billion in claims.  Those claims

9  are joint and several against all of the debtors.  So to put

10  it mildly, PBGC has a lot of -- a lot on the line in these

11  cases.  We have had some severe disagreements with the

12  debtors and at times with some of the professionals for the

13  committee on a number of issues, including the sale, the

14  rights to the KCD admin claims, the amount of the PBGC

15  claims, the termination of the pension plans, the plan

16  structure, the toggle, the settlement of Subcon, and the K-

17  Mart premium.

18           Despite all these disagreements we worked at arm's

19  length to settle them with the debtors' professionals.  The

20  PBGC didn't get everything that it wants.  The debtors

21  didn't get everything that they want.  But ultimately it was

22  a building block for a global settlement and a framework for

23  these cases to reach some sort of finality.

24           We think this framework is fair.  We think it

25  offers finality, and we think that it is clearly better than

Page 208

1    the alternative which would be a Chapter 7 liquidation.

2              As the largest creditor in these cases PBGC asks

3    that the plan be confirmed and that confirmation incorporate

4    the global settlement.

5              THE COURT:  Okay.

6              MR. RAYNOR:  Thank you, Your Honor.

7              THE COURT:  Thank you.

8         (Pause)

9              MS. LIBERMAN:  Sadly, Your Honor, you're now going

10   to hear some objections.

11             THE COURT:  Yes.

12             MS. LIBERMAN:  Donna Lieberman for Relator Carl

13   Ireland.  Your Honor, I note that counsel to our

14   co-mortgagee, the United States, is here today as well from

15   the U.S. Attorney's Office.

16             I will keep it brief.  I very much appreciate the

17   Court's comments about the lien having to be protected.  We

18   objected to the sale of our collateral.  We got a

19   replacement lien.  We also got, to the extent of diminution

20   in that lien, a super priority administrative claim with

21   respect to all of the debtors' assets.

22             We've filed a motion seeking a determination of

23   our claim and payment of our claim.  Your Honor, we filed a

24   very narrow objection and in some respects it's not an

25   original one.  Like many others we want to know that the

1      money is there or will be there in the very near term.

2                  We have a somewhat unusual situation, Your Honor,

3      though.  The debtors' response to our objection, and in its

4      initial confirmation brief was that no creditors junior to

5      us would receive a distribution unless our claim could be

6      reserved for or paid.

7                  We then learned yesterday morning that there is a

8      proposal, and it's very much a plan proposal.  These are not

9      ordinary course payments.  But there is a proposal to induce

10     administrative claimants to come to the table.  And it

11     involves $20 million going into a segregated account within

12     days of this Court entering a confirmation order.

13                 Your Honor, respect -- with all due respect to the

14     debtors we believe that our client has a superior claim and

15     essentially the debtor is paying others ahead of our client

16     without adequately reserving for our client and without

17     paying our client.

18                 THE COURT:  Well, you have a superior claim to the

19     extent that your collateral has diminished, right?

20                 MS. LIBERMAN:  True.  But we also have a unique

21     claim, Your Honor, because as --

22                 THE COURT:  Well, but where's the evidence that

23     your collateral is diminished?

24                 MS. LIBERMAN:  But we -- we're also in an unusual

25     situation.  I guess you heard the testimony as far as the

Page 210

1    debtors are aware and Mr. Murphy addressed.  We are the only

2    secured claim out there that the debtors are kind of

3    conceding they think is valid.  And they're not making any

4    provision to protect us.  They're -- you know, they're --

5    you know, one way or the other it appears they're giving us

6    a valueless lien.

7              THE COURT:  Well, I don't understand that.  You

8    have a lien on all of the assets.

9              MS. LIBERMAN:  No.  We have -- the replacement

10   lien is limited to the proceeds of --

11             THE COURT:  All right.  So you have --

12             MS. LIBERMAN:  -- our collateral.

13             THE COURT:  -- a right, though, for adequate

14   protection --

15             MS. LIBERMAN:  Yes.

16             THE COURT:  -- yet you could look to all the

17   assets for that, right?

18             MS. LIBERMAN:  But our concern, Your Honor, is the

19   assets are being diminished, not just in the ordinary

20   course, but with $20 million being moved into --

21             THE COURT:  But does that --

22             MS. LIBERMAN:  -- an account --

23             THE COURT:  -- does that leave you without

24   adequate protection?  That's really the underlying issue.

25   And I am having a hard time seeing that given the other

Page 211

1    assets.

2              MS. LIBERMAN:  Your Honor, I -- respectfully I

3    disagree.  What we've been hearing all day is the debtors

4    don't have as much cash as they would like.  They don't have

5    the cash --

6              THE COURT:  Cash isn't the only --

7              MS. LIBERMAN:  -- to go effective.

8              THE COURT:  -- asset.

9              MS. LIBERMAN:  They're hopeful that things will

10   improve.  And it's all very uncertain.  We still don't know

11   that this case is administratively solvent.

12             THE COURT:  It doesn't have to be administratively

13   solvent.  You're first.  It just has to be solvent to the

14   tune of $18 million.

15             MS. LIBERMAN:  But, Your Honor, that's why I'm

16   concerned about $20 million --

17             THE COURT:  No, but --

18             MS. LIBERMAN:  -- and I can --

19             THE COURT:  I know your concerned, but you need to

20   show me why you're not adequately protected with all the

21   other assets.  All the other assets add up to like before

22   the litigation far more than your client is owed.

23             MS. LIEBERMAN:  Your Honor, we are simply asking

24   that the debtors --

25             THE COURT:  Why don't you sit down with the

Page 212

1    debtors and work out an adequate protection stipulation

2    where your lien extends to the other assets first?  I mean,

3    Mr. Schrock said he was aware of that.  I -- this is

4    circular.  I know you're concerned.  Right now, you don't

5    really have anything more than a superpriority claim,

6    although it is a superpriority claim.

7            But I don't see why, if they're going to be using

8    your collateral, you're not entitled to a replacement lien

9    on -- if it's not cash, than something that's on its face

10   worth a lot more than $18 million.

11           MS. LIEBERMAN:  Your Honor, we would be delighted

12   to discuss that with the debtors.  To date, we've had no

13   success.

14           THE COURT:  Okay.  I think that would satisfy the

15   objection as far as I'm concerned, based on this record,

16   because I do believe that eventually -- and as far as just

17   the 18 million is concerned, really rather soon that money

18   will come in.

19           MR. SCHWARTZ:  Well, we're happy to sit down and

20   work that out, Your Honor.

21           THE COURT:  Okay.

22           MS. LIEBERMAN:  Thank you, Your Honor.

23           MR. SCHWARTZ:  Your Honor, good afternoon.

24   Jeffrey Schwartz, McKool Smith, on behalf of Winners

25   Limited, an administrative expense claimant.

Page 213

1          Very briefly, Your Honor, we have -- Winners has a

2     strong concern about a plan going effective without a

3     further review by the court as to feasibility.  We filed an

4     objection.  Our --

5          THE COURT:  I just had the review.  That's why

6     I've been here since 10 o'clock --

7          MR. SCHWARTZ:  No --

8          THE COURT:  -- 10:30.  I mean, what more review do

9     you want me to do?

10          MR. SCHWARTZ:  Okay.  Well, in terms of going

11     effective.  A plan -- confirming a plan, per se, has no

12     legal significance.  It is accepted when it goes effective,

13     then it has legal significance.  Thus far, Winners'

14     experience in this case is that -- filed our motion for the

15     administrative expense on December 21, 2018.  We appeared

16     before the Court on April 14th and were not heard.  Then we

17     appeared before the Court on May 21st, and -- with just a

18     simple legal question as to the proposed 503(b)(1)(A).  Your

19     Honor ruled against us.  Your Honor instructed debtor's

20     counsel to submit an order accordingly, and to just share

21     the order but not require Winners' consent.  And there's

22     some other parties involved in this.

23          To date, debtor's counsel has not submitted the

24     order to you.  So this is five months later.  We've had some

25     discussions with them and there was circulation of a draft

1    order, but the debtor told us that -- debtor's counsel told

2    us, who's sitting here, that they didn't see the value in

3    following the Court's instructions to submit the order.

4                UNIDENTIFIED SPEAKER:  I'm sure we didn't say

5    that.

6                MR. SCHWARTZ:  Okay, well -- we have the --

7                THE COURT:  Can you give me a copy of your

8    objection?  I'm looking for it here in the binder.

9                MR. SCHWARTZ:  Yes.  It is -- what was before you

10   on May 21st --

11               THE COURT:  No, no, your plan objection.

12               MR. SCHWARTZ:  Oh --

13               THE COURT:  If you don't have an extra copy, I'll

14   just keep looking for it.

15               UNIDENTIFIED SPEAKER:  Your Honor, we do.  We can

16   hand it up.

17               UNIDENTIFIED SPEAKER:  May I approach?

18               THE COURT:  Sure.  Thank you.  All right.  None of

19   this is in your objection.  So your objection is based on

20   1129 and 11(a)(9) and (a)(11).

21               MR. SCHWARTZ:  Feasibility.

22               THE COURT:  Yes.

23               MR. SCHWARTZ:  Yeah.

24               THE COURT:  All right.  So let's get to that, sir.

25               MR. SCHWARTZ:  Okay.  So our issue is that there

Page 215

```
 1    will not be money -- the debtors -- this 503(b)(9) claims

 2    procedures program, there were no negotiations.  There was

 3    no contact.  It was to delay allowing the claim, delay us

 4    from going to an appellate tribunal on that issue.

 5              THE COURT:  Can we focus on the issues in front of

 6    me?  I'm going to say it one more time, sir, or else I'll

 7    ask you to move on.

 8              MR. SCHWARTZ:  Okay.

 9              THE COURT:  1129(a)(9) and 1129(a)(11), those were

10    the two issues you raised in your three -- two and a half

11    page objection.

12              MR. SCHWARTZ:  Right.  And our --

13              THE COURT:  Now, let's focus on those.

14              MR. SCHWARTZ:  -- issue is that  we will -- that

15    there will not be money in this trust to pay, even if we

16    succeed in getting the claim, the Winners' claim allowed,

17    and we'll have the money in the trust --

18              THE COURT:  And what is the basis?  And what is

19    your basis for saying that?

20              MR. SCHWARTZ:  Because Your Honor has said in

21    April and in May, there will be an estimation proceeding.

22    There's no expert witness as to the value of the preference

23    claims, an 80 percent assumption of preference claims is

24    certainly not in my experience --

25              THE COURT:  That's not an 80 percent assumption of
```

Page 216

1       preference claims.  It's about a 15 percent assumption.

2               MR. SCHWARTZ:  And the other --

3               THE COURT:  Bud do you disagree with that?  Should

4       we go to the declaration and look at that?

5               MR. SCHWARTZ:  Well, I'll accept that I saw

6       something earlier that it was a much higher number.  The

7       other point is --

8               THE COURT:  Well, it isn't.  I mean --

9               MR. SCHWARTZ:  On the --

10              THE COURT:  -- you can't just go throwing things

11      out like that.  I mean, honestly.

12              MR. SCHWARTZ:  On the 503(b)(1)(a), and this is

13      feasibility --

14              THE COURT:  Right.

15              MR. SCHWARTZ:  -- the debtor had filed something

16      which said that that amount, if the debtor -- if the Court

17      ruled against the debtors and the -- and if we prevailed and

18      others similarly situated prevailed, it would be a $64

19      million incremental obligation, administrative expense to

20      the estate.  We may prevail if we get an order --

21              THE COURT:  Being on appeal.

22              MR. SCHWARTZ:  On appeal.  We may prevail.  And I

23      don't -- and I would urge on the Court --

24              THE COURT:  I would urge you to think of

25      something, sir.

1          MR. SCHWARTZ:  Yes, sir.

2          THE COURT:  What is the alternative to not

3    confirming a plan based on your argument of administrative

4    insolvency?  It's conversion of the case, correct?

5          MR. SCHWARTZ:  That's one option.  Another option

6    is at least before the plan goes effective, we actually see

7    that there's -- what these claims, administrative claims are

8    as allowed, and what the real results on preference

9    recoveries in so far --

10          THE COURT:  But that's what I spent the first ten

11    minutes of this hearing on.  Those were my first questions.

12    When does the plan go effective?  Only when you know you can

13    make the payments you need to make.

14          MR. SCHWARTZ:  And what I'm saying to -- Winners'

15    position --

16          THE COURT:  What you're saying to me is you, in

17    essence, want to stay all of that until your appeal is

18    determined.  So, in essence, you're flipping the argument on

19    an appellate bond in favor of letting your appeal go forward

20    on an issue you've lost on below.

21          MR. SCHWARTZ:  I'd rather have you decide -- my

22    client would rather have you decide whether it's proper for

23    the plan to go effective.  That's all I'm saying.

24          THE COURT:  But it's not -- it's --

25          MR. SCHWARTZ:  Confirmation is one thing, but its

1    effective date -- that's the request.

2              THE COURT:  All right.  This was not -- either in

3    your objection, but are you basically saying that as part of

4    the quarterly reporting mechanism to the Court, perhaps with

5    status conferences on proceeding towards the effective date,

6    the debtors would say, "We're ready to go effective now in

7    the notice of that conference."  And the parties who review

8    that on the docket could say, "Why are you ready to go

9    effective?  You still have all of these claims to be

10   liquidated."  Correct?  Is that what you're suggesting?

11   Because that makes sense to me.  That's part of the review

12   process.

13             MR. SCHWARTZ:  All I'm trying to say is --

14             THE COURT:  Okay.

15             MR. SCHWARTZ:  -- I trust you --

16             THE COURT:  Right.  Right.  All right, fine.  I

17   understand that.

18             MR. SCHWARTZ:  Right.

19             THE COURT:  But I'm telling you right now, though,

20   that's not a backdoor way to get a stay pending appeal.

21             MR. SCHWARTZ:  I'm not seeking to appeal anything.

22             THE COURT:  All right.

23             MR. SCHWARTZ:  There's not even an order entered

24   yet.

25             THE COURT:  Well, I know, but I'm just

Page 219

 1   contemplating that argument being made.  But I understand

 2   the other point, and I think that's part of what I was

 3   raising with Mr. Schrock and what he said he's been talking

 4   about with Mr. Dublin.  SO I understand that argument.

 5                MR. SCHWARTZ:  That's exactly what we're seeking,

 6   Your Honor.  Thank you so very much.

 7                THE COURT:  Thank you.

 8                MR. SINGH:  Your Honor, Sunny Singh.  If I could

 9   just make one point on that.  Just so Your Honor is aware,

10   in paragraph 14 of the proposed order, in response to

11   something ESL had raised, we do say we'll give 20 days'

12   notice before going effective --

13                THE COURT:  All right.  Well --

14                MR. SINGH:  -- so the parties will have a chance

15   to address that issue.

16                THE COURT:  -- but I say --

17                MR. SINGH:  Broad notice.

18                THE COURT:  -- but you could build that into a

19   reporting process.

20                MR. SINGH:  Yes.  We will report on it, and of

21   course, we will give that final notice before.

22                THE COURT:  Okay.  Okay.

23                MR. WANDER:  Good afternoon, Your Honor.  I have a

24   bunch of comments, but I'll be fairly brief.  First of all,

25   I want to thank the Foley and Lardner attorneys, Erica

Page 220

1    Morabito and Paul Labov.  They were great working with and I

2    think they're fabulous lawyers.  And maybe if I was in their

3    position with their clients, I might have agreed to the

4    construct, because they should do what's best for their

5    clients.

6            Let me tell you what's really where things fell

7    apart and how I see things, which may be different than --

8    obviously than the professionals, maybe different than Your

9    Honor.  But let me tell you what my problem is in the case

10   where we are today.

11           I don't see why the vendors who provided the goods

12   within 20 days of the bankruptcy, and during the bankruptcy,

13   should be so far behind the professionals.  And where I

14   think I lost my seat at the negotiating table is I made a

15   statement that I guess is kind of heresy in some of these

16   cases.  I said, "Maybe the lawyers shouldn't get the next

17   dollars."  Maybe the professionals, who in my rough numbers,

18   Judge, have gotten around $150 million, and administrative

19   creditors with undisputed claims have gotten zero.

20           THE COURT:  No, I understand that point, but --

21           MR. WANDER:  And --

22           THE COURT:  But what you're dealing with here are

23   two things, I think.  One is the DIP order and the

24   professionals' rights under it, and the other is just a

25   matter of negotiation.

Page 221

 1                MR. WANDER:  So --

 2                THE COURT:  But the negotiation is with the DIP

 3      order as a background, because normally or often when this

 4      issue arises, and fortunately it doesn't arise that often,

 5      but it does arise in cases, the administrative expense

 6      creditors, including the professionals who are still owed

 7      money, look at each other and say, "All right.  What's going

 8      to happen if this case converts?  And who's going to be hurt

 9      most by that?"  And they'll work out some agreement between

10      themselves or among themselves.

11                That plays into any situation like this.  And it's

12      not necessarily a forgiveness, it's just, you know, a timing

13      issue often.  But on top of that here, you have the final

14      order, a DIP order.  So that changes that leverage a bit.

15                MR. WANDER:  Let's talk about the DIP order, if I

16      may.

17                THE COURT:  Okay.

18                MR. WANDER:  And I apologize, Judge.  I was not

19      involved in the case in the first day motions.

20                THE COURT:  All right.

21                MR. WANDER:  But --

22                THE COURT:  This isn't a first day order.  This is

23      an order issued on due notice.

24                MR. WANDER:  No, no, but -- so my general

25      understanding is in a Chapter 11 case, the administrative

Page 222

1    creditors get paid in the ordinary course of business, and

2    my understanding is 503(b)(9) vendors can actually be paid

3    in the ordinary course of business.  There was a motion in

4    this case to pay $162 million of vendor claims.  These are

5    the vendors who are shipping to a company that some of them

6    that was financially troubled, some may not, but I believe

7    that the bankruptcy code and courts want to incentivize

8    vendors to continue to ship.  Otherwise, we'll have Chapter

9    11 cases filed and there's no inventory.

10           So we say to the vendors, and Congress actually

11   said when they amended the Bankruptcy Code in BAPCPA 2005

12   and have 503(b)(9), they basically -- Congress said not only

13   are the vendors and all of the creditors who provide goods

14   and services during the case supposed to be at the top of

15   the waterfall chain, so to speak, but also those who are

16   providing goods into a financially troubled company should

17   also be protected.

18           So in the end, and again bankruptcy there are two

19   principles that I always keep reading about, one, it's a

20   Court of Equity; and the other is we're here to pay

21   creditors.  This is not a reorganization case.  No one's

22   talking about Sears as it filed on the filing date

23   reorganizing.  It sold substantially all of its assets.

24           Now, the administrative creditors don't get a

25   committee in the beginning of the case.  There's no one

Page 223

1    really speaking with them.  So to afford them in the Court,

2    and so you have a situation where debtor's counsel

3    negotiates with the DIP lender this order that seems to

4    guarantee the professionals getting 100 cents on the dollar.

5    They're protected -- 80 cents every week it's taken out like

6    clockwork.

7            THE COURT:  Well, that's a separate order.

8            MR. WANDER:  Okay.

9            THE COURT:  I'm focusing on the DIP order.

10           MR. WANDER:  Well, so we have a situation where

11   the professionals to date have been paid approximately $150

12   million.  There's $100 million in cash that's there.  Do I

13   want the -- that's 50 million in the carve-out and they have

14   50.1 in available cash.  So there's $100 million.  And what

15   things boil down to is I said, "I think we should put a hold

16   on the professionals getting paid, and let's take that

17   money, and let's pay undisputed allowed administrative

18   claims."

19           Now, maybe that's a crazy idea that 150 million to

20   the professionals, zero to those allowed claimants, another

21   100 million is really a simple choice.  Do we then make it

22   250 million, basically, because it's 50 in the carve-out?

23   You're going to take 25 plus 10 for the liquidating trust.

24   What the Foley people negotiated of to take 20 million out,

25   basically the -- where it's coming from is just going to be

1    replenished by December 1.  So they still get the 25 million

2    funding of the trust, plus the 10 million.

3              And I simply said, "I don't think the

4    professionals should be guaranteed 100 cents while the

5    allowed administrative vendor creditors have gotten zero."

6    So maybe that's completely wrong, and if so, that's just --

7              THE COURT:  Well, you haven't addressed the order.

8              MR. WANDER:  Well, you know, Judge, in order for

9    them not to be able to take out the money each week, there

10   has to be a notice given that there's some type of

11   termination.  But the only one to give that notice -- well,

12   the witnesses didn't even know who gives the notice.  It

13   seems to be that the debtor would have to give a notice --

14             THE COURT:  Well, but we're at the point where

15   they will give the notice because the plan is going to be

16   confirmed and those entities will not have their claims

17   anymore.

18             MR. WANDER:  Well, and then the $100 million has

19   now been disbursed.  So if Your Honor confirms this plan,

20   then it's 200 -- and in round numbers, Judge, it's 250

21   million to the professionals, and it's zero --

22             THE COURT:  No, no, it's not 100.  It's 50.

23             MR. WANDER:  In the carve-out, but you're also

24   taking another 25 million --

25             THE COURT:  But that's for the future.  That's to

Page 225

1    litigate with.

2              MR. WANDER:  Again, that's -- and by the way, part

3    of the litigation is against the administrative creditors.

4    So if you have an allowed administrative claim, because you

5    gave goods and services to the debtor, even during the

6    bankruptcy.  I'm not talking about (indiscernible) or

7    anything, there are people who provided goods and services

8    during the bankruptcy.  They have not been paid.

9              So -- and now, some of them is subject to

10   objections and preference claims.

11             THE COURT:  That's how it works.  You know,

12   there's nothing wrong with --

13             MR. WANDER:  So --

14             THE COURT:  It's just a -- preferences are not

15   immoral on either side.  This is how the code is written.

16   Look, I'm sorry, you can't just sort of come up here and

17   give me sort of general notions about fairness without

18   actually looking at the parties' underlying rights.

19             Now, it may be that there is some argument to be

20   made on your -- on the first point that I raised, which is

21   in any situation like this, there's usually a negotiation,

22   because no one really wants the case to convert.  And so

23   parties focus on that.  And sometimes people give on their

24   rights just to defer.

25             But these other points are just points that I

Page 226

1    think probably just confuse people and make them think that

2    they have rights when they don't have rights.  And that's a

3    disservice to them.

4            MR. WANDER:  Well, Judge --

5            THE COURT:  You know, you don't have a right not

6    to be sued for a preference.

7            MR. WANDER:  I'm not saying that, Judge.

8            THE COURT:  Well, I think you were.  I think you

9    were saying it's really bad that these people might be sued

10   for a preference.  Well, too bad.  You know, it's in the

11   code.  So what do you say?  Obviously, they don't like it,

12   but it's perfectly fine for them to be sued if you satisfy

13   Rule 11 and there's a rational basis that you could recover.

14   There's nothing wrong with that.

15           MR. WANDER:  I wasn't --

16           THE COURT:  I just -- you know, and --

17           MR. WANDER:  I wasn't saying there's something --

18           THE COURT:  And there's nothing wrong with relying

19   on a final order that says that this money will be held in

20   trust and no one else can get it.  And I'd like to focus on

21   that language.  If there's something I'm missing, you should

22   tell me about it, but --

23           MR. WANDER:  I was --

24           THE COURT:  -- paragraph 21 of the DIP order sets

25   out this carve-out reserve, a carve-out account, and it says

Page 227

 1   that it'll be held in trust and notwithstanding anything to

 2   the contrary in this or any other Court order, the carve-out

 3   account in the amounts on deposit or the carve-out account

 4   shall be available and used only to satisfy obligations of

 5   professional persons benefiting from the carve-out.  How do

 6   you get around that?

 7               MR. WANDER:  I'll tell you how, Your Honor.  If at

 8   the beginning of the case you were told that --

 9               THE COURT:  So you're saying the order was fraud?

10   There was fraud on the Court?

11               MR. WANDER:  That's not what I said.

12               THE COURT:  Well, okay.  So then I'm not going to

13   relive history.  The order is what it is.

14               MR. WANDER:  I'm trying to address.

15               THE COURT:  All right.

16               MR. WANDER:  I'm trying to answer Your Honor's

17   question.

18               THE COURT:  Okay.  All right.  It was odd that

19   you'd say if I was told at the beginning of the case,

20   because we're not there anymore.  We're here.

21               MR. WANDER:  Right.  And what I was -- what I'm

22   saying, Your Honor, is -- and hindsight is 20/20.  And

23   Courts sometimes can revisit orders.  If Your Honor --

24               THE COURT:  On what basis?

25               MR. WANDER:  Your Honor -- if it was told at the

1    beginning of the case that we may end up with a huge hole in

2    paying administrative creditors during the case their

3    allowed claims, I submit Your Honor might rethink whether

4    the $50 million that's in this carve-out --

5          THE COURT:  I would rethink under Rule 9024,

6    right?  So what are the grounds under Rule 9024 to vacate

7    that order, which adopts Rule 60 of the civil rules?

8          MR. WANDER:  Your Honor, at the time it was

9    entered, administrative creditors were not being told they

10   weren't going to be paid.

11         THE COURT:  But they weren't told they weren't.  I

12   just -- Mr. Wander, this isn't -- this is -- I don't believe

13   this is productive.  Let's go through Rule 9024 together.

14   Why don't we do that?  Mistake, inadvertent surprise, or

15   inexcusable neglect.  I'm sorry.  Is that what you'd be

16   relying on?  Mistake, inadvertent surprise, or inexcusable

17   neglect?

18         MR. WANDER:  Well, mature --

19         THE COURT:  Newly discovered evidence that with

20   reasonable diligence could not have been discovered in time

21   to move for a new trial, fraud.

22         MR. WANDER:  Well, Judge --

23         THE COURT:  Judgment is void, the judgment has

24   been satisfied.

25         MR. WANDER:  Your Honor, it's sure surprising

Page 229

1    right now that we have a hole of over $100 million of

2    administrative insolvency.  I'm just telling Your Honor --

3              THE COURT:  But the point of a carve-out is to

4    deal with that issue.  I think it contemplates.  There's no

5    reason to have a carve-out other than if you're worried

6    about that very issue.  So if anyone was worried about it,

7    they could've stood up and said, "For example, you know,

8    this isn't the type of carve-out you should be granting,

9    Judge.  Instead, it should be a 506(c) carve-out.  So in

10   fact, some amount of the expenses should actually be

11   deducted from the secured creditor's claim."

12             MR. WANDER:  And --

13             THE COURT:  You know, things like that.  But to

14   say that this order should be vacated based on the now

15   reality of what was then the possibility for which the

16   carve-out was expressly negotiated, which in the event of an

17   administrative insolvency or the risk of that, this doesn't

18   seem to make a lot of sense to me.

19             MR. WANDER:  Well, here, Your Honor, and I don't

20   know if this rises to fraud, but it may get close to it is

21   if the debtor filed a motion in the beginning of the case

22   and said to $162 million of vendors, "We're going to pay you

23   those claims," those vendors have no reason to object to --

24             THE COURT:  Well, look --

25             MR. WANDER:  -- any type --

```
 1                 THE COURT:  -- I'm going to cut this off right
 2      here.  In your objection and in the record today, there has
 3      been no attempt to make any effort to vacate that order in
 4      any respect.  So to me, this is just not germane.  Why are
 5      we even dealing with this?  If you really seriously felt
 6      this, it should be in the pleadings --
 7                 MR. WANDER:  Judge --
 8                 THE COURT:  -- or in the record.
 9                 MR. WANDER:  Judge, we -- objections have been
10      filed on the fee issue --
11                 THE COURT:  You said the creditors should give up
12      their rights.  That's what you have said.  They should give
13      up their rights under the DIP order and --
14                 MR. WANDER:  No, I'm --
15                 THE COURT:  -- without a basis for it.
16                 MR. WANDER:  What I'm saying is there should be a
17      balancing.  Why should the administrative vendors --
18                 THE COURT:  That's a separate issue.  That's an
19      equitable issue.  That's the negotiations.
20                 MR. WANDER:  Correct.
21                 THE COURT:  That's not a legal issue.
22                 MR. WANDER:  So as an equitable issue where we are
23      today, when you have 162 million --
24                 THE COURT:  All right.  So you're just basically
25      negotiating in the open on this, right?  Because that's all
```

1    we're talking about is the negotiation over it.

2         MR. WANDER:  No --

3         THE COURT:  So what -- in your mind, what would it

4    take?  To give up all the money?  I mean, what -- there's --

5    it just doesn't --

6         MR. WANDER:  No, I wasn't talking about giving up.

7    I'm not saying the 80 percent, the 150 million they've

8    received they should give up.  I did not say that, Your

9    Honor.  I am not saying that.

10        THE COURT:  But you --

11        MR. WANDER:  I'm talking --

12        THE COURT:  But you're basically just negotiating

13   right now, right?  That's really what's going on.

14        MR. WANDER:  No, I'm saying what's wrong --

15        THE COURT:  So what's the legal basis for the

16   argument?

17        MR. WANDER:  I'm saying what's wrong with this

18   plan is there is $100 million of cash.  That's what I'm

19   saying, number one.  While I do not think a conversion is a

20   great result, for administrative creditors under this plan,

21   a conversion to a Chapter 7, where the trustee has $100

22   million and can pursue all of the litigation to bring in the

23   additional assets, which will probably take several years,

24   very likely could be better for the administrative

25   creditors, particularly the ones of the K-Mart estate.

1          THE COURT:  I'm sorry, what is the difference

2     between having 100 million and 25 million?  I mean, it's a

3     big litigation budget, 100 million.

4          MR. WANDER:  No.  What I'm saying is the trustee

5     can distribute those funds.  Instead of the hundred -- would

6     it hurt the professionals if it got converted?  Yes.  They

7     don't get necessarily the 20 percent holdback.  Would it be

8     good for other creditors if a trustee was able to distribute

9     that $50 million?  Yes.  It might be good, and better, for

10    administrative creditors, particularly of the K-Mart estate

11    --

12         THE COURT:  Have you made that case anywhere to me

13    as to how that works?  I mean, the debtor had laid out

14    pretty carefully in their liquidation analysis the argument

15    that at least most of the administrative expense creditors,

16    particularly after you factor in not only the cost of coming

17    up to speed by a Chapter 7 trustee, as well as the Chapter 7

18    trustee administrative expenses, including the cost of the

19    trustee herself, the cost of going through all of the

20    accompanying claims and litigating those issues, they make a

21    pretty compelling case that whereas on the evidence before

22    me, whether you accept the claims program or you wait until

23    the effective date and get paid in full, you will get paid

24    in full.

25         So I think what you're saying to me is that you'll

1    get some more money now and maybe not get paid in full.  At

2    least that's what their Chapter 11 analysis shows me.

3                 MR. WANDER:  Well, actually what --

4                 THE COURT:  Can you point to something that shows

5    different?

6                 MR. WANDER:  I think what their Chapter 7 analysis

7    shows, and what the creditor's committee argued before they

8    made their deal, was the K-Mart estate is the ones who would

9    probably get 100 cents.  So administrative creditors in the

10   K-Mart estate, in a Chapter 7, probably would get 100 cents

11   on the dollar.  That's what I believe their liquidation now

12   shows.

13                THE COURT:  When?

14                MR. WANDER:  What?

15                THE COURT:  When?

16                MR. WANDER:  Okay, so when?  So when will the plan

17   go effective based on the testimony?  Now --

18                THE COURT:  No -- well, let's put it differently.

19   Almost by definition, the plan would go effective before

20   there would be a distribution in a Chapter 7 case, right?

21                MR. WANDER:  No.  There could be in term

22   distributions, a Chapter 7 trustee can pay undisputed

23   allowed claims with an order from Your Honor --

24                THE COURT:  From what source, given the

25   intercompany claim analysis that would have to take place?

Page 234

1          MR. WANDER:  I don't believe there's any bar in a

2     Chapter 7 trustee distributing --

3          THE COURT:  That wasn't my question.  If you

4     really don't know what the intercompany claims are,

5     including secured claims, how do you make an interim

6     distribution?  What trustee would do that?

7          MR. WANDER:  They --

8          THE COURT:  For the risks that she would face?

9          MR. WANDER:  Well, I believe we -- based upon what

10    the committee has set forth, and the debtor's liquidation

11    analysis, I believe the K-Mart estate is administratively

12    solvent.

13         THE COURT:  But their --

14         MR. WANDER:  And it may hurt other administrative

15    creditors --

16         THE COURT:  But you're not focusing on the

17    intercompany claims, of which under the DIP order they are

18    secured and superpriority claims, so --

19         MR. WANDER:  I am.  I'm saying the funds would be

20    going to the K-Mart estate, based upon the disclosure

21    statement, the K-Mart estate is the one where all the money

22    would go to.  If you're an administrative creditor, and I'm

23    sure there are some who have claims against K-Mart but not

24    Sears.  Some like my clients have claims against both.

25    Their claims could be paid very quickly, 100 cents in the K-

Page 235

1    Mart estate by the Chapter 7 trustee, there doesn't seem to

2    be any dispute of the papers filed with the disclosure

3    statement and the committee's filings that the K-Mart estate

4    is the solvent one.

5              So yes, in a Chapter 7, administrative creditors

6    for the K-Mart --

7              THE COURT:  Is there a dispute on that?  And if

8    there isn't, is it solvent all the way after doing the

9    intercompany claims reconciliation analysis?

10             MR. WANDER:  I --

11             THE COURT:  No, I'm asking counsel for the company

12   and the committee.

13             MR. SINGH:  Your Honor, Sunny Singh for the

14   debtors.  We don't necessarily think -- there is a dispute

15   on that because we don't necessarily think that K-Mart would

16   absolutely be administratively solvent.  If you take the

17   post-petition intercompany analysis that we were able to do,

18   yes, K-Mart is entitled to those intercompany claims.  But

19   we believe, as we've assumed in our liquidation analysis,

20   that there would be inter-estate liquidation.  And after

21   that, it's unclear how much K-Mart would recover, but --

22             THE COURT:  There would be what?  Inter what?

23             MR. SINGH:  Excuse me, litigation.  I used the

24   wrong word.  Inter-estate litigation between the three to

25   say there should be substantive consolidation or there

1    should not be substantive consolidation.  And after that,

2    we're not saying that K-Mart is absolutely administratively

3    solvent in a hypothetical liquidation scenario.  What we're

4    saying is it's pretty clear that only K-Mart would be able

5    to pay something to administrative creditors in that

6    scenario.

7            MR. WANDER:  So in that situation, a trustee could

8    distribute an interim distribution of 50 cents.  It may not

9    be the 100 cents.  I understand what he just said.  But

10   that's the solvent estate.

11           So K-Mart administrative creditors very likely

12   would do better in a Chapter 7.  But let me talk about --

13           THE COURT:  I don't -- I guess I don't agree with

14   that, based on the evidence I've actually had.  And just

15   saying he -- she could make a 50 cent distribution.

16   Trustees are very conservative people.  They face liability

17   for letting money go out too early.  If they're being sued

18   by the Mr. Foxes of the world, no offense, that all these

19   other companies have claims against them, they're not going

20   to make it into a distribution.  They're going to have that

21   litigation play out.

22           MR. WANDER:  You'll still probably have that

23   resolved as soon as this plan will go effective.  And let me

24   just deal with the --

25           THE COURT:  I disagree with that completely.

1           MR. WANDER:  But let me deal with that issue, Your

2     Honor.  Because we have the testimony of the three witnesses

3     --

4           THE COURT:  And the -- I'm sorry, the

5     administrative claims would include the professionals claims

6     that you say wouldn't get paid.  They would be part of that.

7           MR. WANDER:  Right.  But they wouldn't be able to

8     get additional distribution until the other administrative

9     creditors caught up.  So okay, they would get 80 cents.

10    They may not get 100 cents, but the professionals, I don't

11    believe we're getting more --

12          THE COURT:  Caught up on what?

13          MR. WANDER:  If you're an administrative creditor

14    of K-Mart and you've gotten zero so far and the

15    professionals have gotten 80 cents, then I believe the

16    administrative creditors with allowed claims would be

17    entitled to get 80 percent because it would go pro rata --

18          THE COURT:  I don't understand that argument

19    either.  They've been paid under the order that says that

20    it's going to them and only to them.

21          MR. WANDER:  Correct.

22          THE COURT:  So it --

23          MR. WANDER:  So I'm saying the additional money,

24    the $50 million carve-out in the Chapter 7 would go to the

25    Chapter 7 trustee.

Page 238

1              THE COURT:  To go to admin expenses.

2              MR. WANDER:  Correct.

3              THE COURT:  So it existed at that time.

4              MR. WANDER:  And --

5              THE COURT:  Why would you have a lookback?  Again,

6    you're just ignoring the order.  This is the difference

7    between equities and a negotiation on the one side and legal

8    claims and rights on the other.  You know, at some point

9    when you're negotiating, you've got to face reality.

10             MR. WANDER:  I understand, Your Honor, but if the

11   bankruptcy code says that administrative creditors are

12   supposed to be paid in the ordinary course, I think there's

13   something inherently wrong --

14             THE COURT:  No, no, I'm not talking about

15   inherently wrong.  I'm talking about rights under a specific

16   order and specific provisions of the code.  So let's just

17   move off of inherently wrong or inequitable.

18             MR. WANDER:  Okay.  So let me talk about some of

19   the testimony, because when we had chambers -- a few

20   chambers conference ago and it was brought up that it may

21   take a while for this plan to be effective, I think -- and I

22   pointed out, we may be talking years, I think Your Honor had

23   a reaction of, "I'm not confirming a plan that may not go

24   effective for years."

25             I believe -- I'm not saying a chambers conference

1      is binding, I'm just setting the stage for the testimony.

2      The testimony, Mr. Schrock said no one poked holes in it.  I

3      respectfully disagree.  I think I poked the Grand Canyon in

4      it.  These people have no basis for the numbers coming in,

5      the numbers going out.

6                THE COURT:  I don't agree with that.

7                MR. WANDER:  Meaning the claims and the assets.

8                THE COURT:  Look, are we talking about feasibility

9      now?

10               MR. WANDER:  Yes.

11               THE COURT:  Because I think that's what we are

12     talking about it.

13               MR. WANDER:  Yes.

14               THE COURT:  So why is this a "visionary scheme,"

15     which seems to be the one phrase that all courts that deal

16     with 1129 (a)(11) find is something that is not feasible?

17     Why is this a visionary scheme?

18               MR. WANDER:  Well, the question right now is when

19     will it be feasible?  So I submit this plan, based upon the

20     testimony of billions -- hundreds of millions, and maybe --

21     you know, I use the word billions, you know, not too loosely

22     because, you know, one billion two is a lot.  Most of the

23     claims haven't been filed.  None of them have been

24     litigated.  There are serious legal issues.  There are

25     serious factual issues.  My client has an inducement claim.

1    I haven't even been able to get going with discovery.

2              You're talking about years of litigation on the

3    administrative claims.  So if the -- it will be years for

4    money to come in based upon preference recoveries, likely

5    with the ESO litigation.  So it'll be years for the

6    preference recoveries and the funds to come in to pay

7    administrative claims.  It'll take years to determine the

8    universe of the administrative claims.

9              So we have a plan that may be effective in easily

10   three years.  And between that time, you are simply going to

11   have more of the funds being used on litigation against the

12   administrative --

13             THE COURT:  When would they not be used in a

14   conversion?  Same funds would be used, right?

15             MR. WANDER:  I think a Chapter 7 trustee is going

16   to be less likely to have the litigation against the

17   administrative creditors.  Yes, we want the --

18             THE COURT:  What's that -- why?  What's that based

19   on?

20             MR. WANDER:  Because -- I'll tell you why.  A

21   Chapter 7 trustee is going to have fiduciary duties to

22   everyone.  And he probably is going to look at the

23   administrative creditors differently than the lawyers for

24   the creditors committee.  See, if you're under -- the lawyer

25   for the creditors committee and the liquidating trust, every

Page 241

1    dollar you give to the administrative creditors is one less

2    dollar to the unsecured creditors.  I get that.  That's who

3    they represent.

4            If you're a trustee, you're not representing the

5    unsecured creditors.

6            THE COURT:  The litigation group is not the

7    creditors committee.

8            MR. WANDER:  Okay.  So the -- they fought over who

9    would control it, and the creditors committee won.  They get

10   the three votes versus the tooth of the debtor.  And there

11   was a big brouhaha --

12           THE COURT:  And you have the --

13           MR. WANDER:  Let's see --

14           THE COURT:  -- consenting admin creditor

15   representative.

16           MR. WANDER:  I'm sorry?

17           THE COURT:  You have the consenting admin creditor

18   representative, and you need the unanimity on expending

19   extra money.  And if you don't have it, you come back to me.

20           MR. WANDER:  Okay.  So --

21           THE COURT:  So you have three versus two to begin

22   with, in terms of numbers, as far as committee and other

23   fiduciaries.  I just --

24           MR. WANDER:  What I was saying -- I was trying to

25   explain the dynamics --

Page 242

1          THE COURT:  I know, but I'm reacting to that by

2    saying I don't see the dynamics the way you do, given where

3    we are at this moment.

4          MR. WANDER:  Well, first of all, because there's

5    an -- the administrative creditors, the two groups, were

6    aligned up to a point.  It's natural at a certain point they

7    would not be aligned because if you're claims traders and

8    you don't have the world imports issue --

9          THE COURT:  That issue can be decided quite

10   quickly.  It's a pure legal issue.  To some extent, I've

11   already dealt with it.  It's just -- you know, that's just

12   not -- no trustee would just give up on that issue.

13         MR. WANDER:  I'm not saying a trustee would give

14   up.  I'm saying --

15         THE COURT:  Well, so that's fine, but --

16         MR. WANDER:  No.  A trustee would look at it

17   differently.  He would not look at --

18         THE COURT:  A trustee would, I think, actually in

19   a case of this magnitude, be very reluctant to settle that

20   issue.  It would be a brave trustee that would settle it,

21   particularly in a settlement that was favorable on the side

22   that I think you wouldn't want to come out on.  It's just --

23   you know, it's not --

24         MR. WANDER:  Your Honor, fine.  I make that point

25   -- I don't believe if you don't confirm the plan today, I

1    don't think the world comes to an end.  I don't believe the

2    only alternative is conversion.

3         What's happened here is everything is being pushed

4    based upon can we pay the lawyers for another week.  And --

5         THE COURT:  Where's that in the record?

6         MR. WANDER:  Well, Judge, if we just had a --

7         THE COURT:  The lawyers are going to get -- I

8    mean, lawyers will be incurring the funds to do the work

9    that you acknowledge needs to get done no matter what.

10         MR. WANDER:  Okay.  So if we just had an

11    administrative claims settlement construct less than 48

12    hours ago, it has an automatic opt in.  And I would say if

13    there's one thing I would request that Your Honor change, is

14    not to have the automatic opt in.  It's patently unfair to

15    foreign vendors.  You have people in Asia, other places who

16    are the main suppliers.  They don't have lawyers.  They're

17    not going to understand what the notice is.

18         It's unfair and I submit as the U.S. Trustee's

19    Office in their objection said, "Contrary to the bankruptcy

20    code, to have them -- by doing nothing, automatically not

21    getting 100 cents and getting a" --

22         THE COURT:  That's not how this -- that's not what

23    this settlement provides for.

24         MR. WANDER:  I believe --

25         THE COURT:  I'm sorry.  I'm sorry.  We're talking

Page 244

1    about the deemed opt ins where they --

2              MR. WANDER:  Right.  It's --

3              THE COURT:  -- were deemed to agree to 75 percent.

4              MR. WANDER:  Yeah.  If there's just one thing that

5    I submit should be --

6              THE COURT:  All right.  Although you're doing that

7    for someone other than your client, right?  Because your

8    client knows how to read and they've hired you, so that's

9    really just --

10             MR. WANDER:  Correct.  I'm saying --

11             THE COURT:  Okay.

12             MR. WANDER:  -- they're a lot -- I'm saying based

13   upon my discussions with a lot of --

14             THE COURT:  You know, let's -- I don't need to

15   hear from you on this point.  You don't have standing on

16   that point.

17             MR. WANDER:  I may not have -- well, Your Honor --

18             THE COURT:  You don't.  You don't have standing on

19   that point.  You're pleading the cause of someone that you

20   don't represent.

21             MR. WANDER:  Who doesn't have a lawyer, who --

22             THE COURT:  Fine.  I get that.  I've already taken

23   that into account.  But you don't have standing on it.

24             MR. WANDER:  Your Honor, if you -- if Your Honor

25   doesn't confirm the plan today, I don't believe that means

1    things go into a Chapter 7 conversion.

2              THE COURT:  No, I'm sure it wouldn't because

3    people would then negotiate more and that's what you want.

4    You want to negotiate.  But I have no confidence that your

5    clients or you would ever agree to anything that actually is

6    reasonable.

7              MR. WANDER:  Well, I don't think that's a fair

8    comment, Your Honor.

9              THE COURT:  Well, you've just said that the

10   professionals should give up $50 million.  That makes no

11   sense.  I mean, I wouldn't if I were them.  I have better

12   rights than that.  They might be persuaded to give up

13   something more, but not that.

14             MR. WANDER:  Your Honor --

15             THE COURT:  So I would suggest that maybe you make

16   a reasonable proposal to them on that score.

17             MR. WANDER:  Your Honor, I respectfully disagree

18   as to that --

19             THE COURT:  Well, I was giving you a chance to

20   actually get some money in.  But if you're not willing to

21   take it, then that's fine.

22             MR. WANDER:  Your Honor, as I said, we lost our

23   seat at the table --

24             THE COURT:  No, Mr. -- Mr. Wander, listen to me

25   carefully.  I'm giving you a chance to get something more.

1    Just telling you that what you are asking for is

2    unreasonable.  Listen to what I am saying.  You won't have

3    this chance for very long.  I'm suggesting we maybe take a

4    break and talk to them about it.

5              MR. WANDER:  Well, so, Judge, you brought that up.

6    So yesterday, the debtor reached out to me --

7              THE COURT:  No, no, I --

8              MR. WANDER:  Okay.

9              THE COURT:  Hold on.  That's -- I'm saying that to

10   you.  You should finish the rest of your argument, all

11   right?

12             MR. WANDER:  Your Honor, sure.  I don't believe

13   that the debtor has met its burden.  I don't believe that

14   the testimony by the witnesses was credible.  I don't

15   believe --

16             THE COURT:  But why?

17             MR. WANDER:  I'll tell you why, because they

18   haven't factored in the length of time it will take for the

19   funds to come in under any realistic scenario with hundreds,

20   if not thousands of claim objections --

21             THE COURT:  Right.  But can we stop there?  If

22   it's a time argument.  Again, I have two sections of the

23   code, right?  1129(a)(9), which is the section that requires

24   unless otherwise agreed, that administrative expense claims

25   be allowed on the effective date.  Or if they're not -- if

Page 247

1    they're objected to then as soon as they're allowed.  And

2    then I have 1129(a)(11), which is the feasibility section.

3    As far as (a)(9) is concerned, there's nothing in the code

4    or the case law that says that a plan has to go effective by

5    a date certain, some specific date.  So time isn't really

6    relevant to (a)(9).  It is relevant to (a)(11) but not to

7    (a)(9).

8              So unless you can point to me for something, I'm

9    going to move to (a)(11).  I don't see it as relevant to

10   (a)(9).  It's not there.

11             MR. WANDER:  Your Honor, most --

12             THE COURT:  Congress could have easily said, "But

13   in no event shall the effective date be later than X, or

14   later than Y if it's conditioned upon regulatory approval,"

15   or something like that.

16             MR. WANDER:  Right.  And Your Honor mentioned that

17   example of regulatory approval.  And very often, we need a

18   third party to approve, so we can't go effective for that

19   reason.

20             THE COURT:  Congress doesn't limit it that way.

21             MR. WANDER:  I understand.  But I don't believe

22   the case law supports extending the effective date four

23   years --

24             THE COURT:  What --

25             MR. WANDER:  -- simply to have litigation

 1    recoveries.

 2          THE COURT:  Give me a case.  Give me a case.

 3          MR. WANDER:  I don't have one offhand.

 4          THE COURT:  All right.  So let's move to

 5    feasibility, because that's --

 6          MR. WANDER:  Sure.

 7          THE COURT:  -- I think, the relevant issue.

 8          MR. WANDER:  Okay.

 9          THE COURT:  Feasibility.  I can't confirm a plan

10    that fails the feasibility test.  And generally speaking,

11    what the courts turn to is, is the plan premised on

12    visionary schemes or unduly risky or unreasonable or

13    improbable assumptions, including litigation assumptions,

14    although it doesn't have to be limited to litigation.  It

15    could be the hockey stick projection.

16          Unlike the cases that the parties have cited that

17    dealt with litigation that was highly improbable, including

18    one litigation that the party had already lost and had on

19    appeal, the litigation we're talking about here is in two

20    forms, as far as bringing assets into the estate.  Form one

21    is preference litigation.  As far as I'm concerned, I have

22    uncontroverted evidence that there is a more than reasonable

23    likelihood that there will be at least 100 million in

24    preference recoveries where the estimate is that that's

25    about 10 or 15 percent of what was determined to be, you

1    know, subject to demand.

2            In my experience in dealing with preference cases,

3    10 or 15 percent is a pretty good estimate when you look at

4    the whole ball of wax of demands.  It's also my experience

5    that those cases are hardly ever litigated beyond the

6    complaint stage.  Every now and then you get to a motion for

7    summary judgment and generally speaking, because there are

8    serious factual issues usually.  If it's gone that long,

9    that's denied, and then the parties settle.

10           This is not just my experience.  This is the

11   experience in case after case, where there are thousands of

12   potential litigation preference claims.  And then when you

13   go to the ESL litigation, this is something that extremely

14   well-informed parties on the creditors committee's side, and

15   the debtor's side through the special committee, looked at

16   extensively and took into account when negotiating the

17   transformed deal.  And they -- the one thing they insisted

18   on is that those claims not be released.

19           And based on my review of the complaint and the

20   summary of those claims, they are real claims.  They are not

21   visionary schemes.  So what is not feasible here in terms of

22   actually achieving the effective date?

23           MR. WANDER:  Sure.  So I fully support the estate

24   going after ESL and Mr. Lamper (ph).  I'm all for that,

25   Judge.  What they believe those who've analyzed it, what

1    they believe would likely be recovered is a separate issue.

2    Now, I'm not saying you don't do the litigation, because

3    instead of 2 billion, you're only going to recover 50

4    million or 150 million, hey go sue them.  Prosecute the

5    lawsuit.  Bring in the 150 million.

6              But there's nothing in the record that can give

7    the Court any comfort as to what that number will be and

8    when it will be achieved.

9              THE COURT:  Does that mean the ultimate

10   collection?

11             MR. WANDER:  Correct.  Correct.

12             THE COURT:  Okay.

13             MR. WANDER:  The amount and the collectability are

14   two issues that I'm told --

15             THE COURT:  Well, as far as the amount, I have the

16   complaint and I have the analysis of the transfers that are

17   being attacked.  So that is in the record.

18             MR. WANDER:  There's the complaint.  I'm not --

19             THE COURT:  And there's this summary of the

20   transfers that are the subject of the complaint.

21             MR. WANDER:  Right, but I believe a summary of the

22   transfers doesn't set forth whatever the defenses are going

23   to be.  It says --

24             THE COURT:  Look, I have been reviewing litigation

25   claims since 1984.  I can do that, particularly when I know

1    that two extremely experienced litigation firms have done it

2    also and have said, "Over my dead body will these claims be

3    settled in the transform negotiations."

4                    MR. WANDER:  Right.  And I --

5                    THE COURT:  I understand their collectability

6    point, but that's, you know --

7                    MR. WANDER:  Well, let's talk about that.  So

8    first of all, I was fully supportive of the --

9                    THE COURT:  I don't care whether you're fully

10   supportive.  I just -- look --

11                   MR. WANDER:  Not giving a release was one thing.

12   I agree.  They shouldn't have given the release.  I'm glad

13   they held out.  It's a separate thing as to how much are we

14   going to collect.

15                   THE COURT:  Right.

16                   MR. WANDER:  That's what I'm saying.  I'm saying

17   the evidence --

18                   THE COURT:  You don't need a lot here.  You really

19   don't need a lot.  The shortfall is somewhere between 35 and

20   $100 million.

21                   MR. WANDER:  Well, I submit based upon the

22   testimony that's not correct.  And I don't believe they

23   really established it.  When I asked them about the various

24   claims, the witnesses really didn't know much about it.

25   They don't even know about the $162 million that was

1    promised to the vendors.  I've asked I don't know how many -

2    - how much has been paid.  Judge, it could be 162 million

3    that should be added.  It could be $1.  But they did not

4    know.  That's my point.

5              When I asked them about all the claim objections,

6    how can you assume you're winning everything?  I understand

7    what Your Honor's comments were at the May 21 hearing on the

8    world imports, but they don't know.  They have no idea how

9    that litigation will pan out.

10             THE COURT:  Well, I do.  I mean, come on.  Look,

11   as far as the claim objections, every single big case -- I

12   mean, as far as -- most of the claims that are being

13   objected to in those charts are duplicates or in connection

14   with priority claims.  People who think priority -- I might

15   as well check that box because it's really important to me.

16   That's not what priority claim really means under 507.

17             MR. WANDER:  I'm not dealing with the -- I didn't

18   attack their --

19             THE COURT:  Well, you did a bit --

20             MR. WANDER:  No, no, no --

21             THE COURT:  -- until I -- anyway.  In any event, I

22   just -- look --

23             MR. WANDER:  I'm talking about the testimony.

24   That's what I'm talking about, Judge.  I'm talking about the

25   record before the Court.

Page 253

1          THE COURT:  I understand, but as far as the claims

2     that they're talking about, and I bumped -- you heard me say

3     it.  I bumped it up from the 35 to, you know, over 100.  And

4     I think that swing takes into account the potential that

5     some of these claim objections may raise issues that are not

6     -- no brainers, that the people won't just default, which is

7     what happens with about 99 percent of omnibus claim

8     objections, and they'll actually litigate them.

9          But to say that it's just out -- you know, I

10    should just disregard the testimony, I don't have a basis

11    for that.

12         MR. WANDER:  No.  I'm talking about the testimony.

13    I had no problem with them knocking off $1 billion from a

14    roughly a billion two in the administrative claims.  I

15    didn't challenge that.  They're smart enough to know what a

16    duplicate claim is.  I get that.

17         I was talking about when they got it down to 200

18    million, I'm basically saying, "You're at 200 million.

19    You're not at 30.  You're not at 60.  You're not at 90."

20         THE COURT:  So 30 is the shortfall.  That's the

21    low end of the shortfall, 35 million.  And the high end is -

22    - so --

23         MR. WANDER:  I'm talking about the record.

24         THE COURT:  I agree.  I understand.

25         MR. WANDER:  I'm talking about the testimony.

Page 254

1              THE COURT:  No, but I'm doing -- I'm going through

2       that and I'm saying to you that I'm not necessarily

3       accepting that the shortfall here is $35 million based on

4       their estimate of 50 million of allowed administrative

5       expenses, and 90 million that will net out to zero with the

6       section 2 -- asset purchase agreement, but that it could be

7       well higher.  There could be another easily 70 million hire.

8              MR. WANDER:  Or it could be another 100 million --

9              THE COURT:  No.  Well, another 100 million on top

10      of the 100?

11             MR. WANDER:  Yeah.  I'll tell you why.

12             THE COURT:  All right.

13             MR. WANDER:  If I may.

14             THE COURT:  It would be 270 million.

15             MR. WANDER:  If I may.

16             THE COURT:  All right.

17             MR. WANDER:  And again, it's their burden to

18      satisfy.  So let me tell you the numbers.

19             THE COURT:  All right.

20             MR. WANDER:  Okay.  162 million of vendor claims

21      that they said they would pay, prepetition orders, post-

22      petition delivery.  It's in their motion.  If they didn't

23      pay it, that's $162 million of potential more administrative

24      claims.

25             THE COURT:  Well, the big word is potential,

Page 255

1    because then you have to show a lot of other facts,

2    including that they -- people actually relied on that in

3    making deliveries, and that they didn't pay --

4              MR. WANDER:  No, that's a different claim.  I'm

5    not up to that.  That's the inducement claim.  I'm talking

6    about their motion where they said to Your Honor in the

7    papers that, "We have $162 million of goods in transit.  And

8    if we don't give the vendors the comfort of the

9    administrative claim, they will demand that we reissue" --

10             THE COURT:  I'm going to stop you right there.

11   The authority I gave was authorization to make the payment.

12   I didn't direct them to make the payment.  So it is an

13   inducement claim.  So let's move on from that.

14             MR. WANDER:  Okay.  So there's 162 --

15             THE COURT:  Outside, the outside amounts.

16             MR. WANDER:  Right.

17             THE COURT:  Well, so --

18             MR. WANDER:  And so I asked them --

19             THE COURT:  But you've got to discount that.

20             MR. WANDER:  But they don't know how many of them

21   have been paid.  It's their burden.  So that's the first

22   number, Judge.

23             THE COURT:  Okay.

24             MR. WANDER:  It's their burden.

25             THE COURT:  Right.

Page 256

1          MR. WANDER:  And I asked them about it.  They

2     didn't even know about the issue.

3          THE COURT:  But the issue is a specific factual

4     issue, which is who -- it's not a basis for an objection to

5     claims.

6          MR. WANDER:  They haven't factored it into their

7     analysis.

8          THE COURT:  No, but they have looked at the claims

9     that were filed, all right?  And you'd think that if someone

10    really believed that they were defrauded, they would file a

11    claim on that basis.  So they looked at the claims that were

12    filed and they looked at their accounts payable.

13         So the analysis you're asking them to make isn't

14    an analysis that they should be making at this point.

15         MR. WANDER:  Yes.  They could've --

16         THE COURT:  Look, we're going to move on from

17    this.

18         MR. WANDER:  Okay.

19         THE COURT:  I'm just -- sorry, Mr. Wander.  This

20    is --

21         MR. WANDER:  Well, Your Honor, the -- it gets back

22    to the administrative bar order.

23         THE COURT:  No, it -- I'm sorry.  There's no

24    reason to have an administrative bar order.

25         MR. WANDER:  It's in the plan.

Page 257

1           THE COURT:  I've already found that.  There's no

2    need to have an administrative claims bar order here.

3           MR. WANDER:  I'm just saying it's in the plan.

4    It's just to the record in Section 1.2.  I'm looking at

5    document 5293, filed October 1, 2019, in the definition

6    section of 1.12.  It's administrative expense claims bar

7    date, means the date fixed by the Bankruptcy Court as the

8    deadline to file administrative expense claims, et cetera.

9           THE COURT:  And I haven't fixed on.  And I see no

10   reason to fix one.

11          MR. WANDER:  Your Honor, I'd submit, based upon

12   the record, this plan will likely not go effective at the

13   least, for several years, if at all.  I think that based on

14   the testimony -- and they have the burden -- the witnesses

15   did not have a good handle on the claims against the estate.

16   They assume all of the objections, the reclassifications.

17   They win on every issue, and there are no orders disallowing

18   the claims.

19          They made a deal -- an issue in addressing an

20   objection by, I think, Transform ESL, where they're not

21   counting their claims in 507(b) because they said, We have

22   an order disallowing it.  So, those claims are not in the

23   analysis.

24          Well, we can't say that to them and then say are,

25   We don't have orders on all of these claim objections, but

1   we're going to give you everything that we've objected to

2   and that we're thinking of objecting to, and we're assuming

3   the money is gone --

4           THE COURT:  But I just told you, I'm adding on

5   more money to that number, and they have added to it just

6   for that very reason.

7           MR. WANDER:  And I think that based the -- based

8   upon the testimony, that there's no way of knowing within a

9   hundred million dollars of what that number is.  Based on

10  the record, based upon what the witnesses have said.

11          THE COURT:  I have a slightly lower number.  I put

12  another 70 on it.  And you're putting, I guess, 170 on it.

13          MR. WANDER:  Because there are hundreds of

14  millions of dollars of claims that haven't even been filed,

15  and so --

16          THE COURT:  Now, let's just stop right there.

17  They're counting the accounts payable.  What other claims

18  are you talking about?

19          MR. WANDER:  Judge --

20          THE COURT:  They have their records of who their

21  vendors are and those are the accounts payable.  What else

22  is there?

23          MR. WANDER:  Judge, with all due respect to those

24  professionals, I don't believe, based upon their track

25  record in the case of the numbers they've been giving, that

1    they are reliable figures.  They simply said, Yes, and we

2    took that into account.

3                THE COURT:  No, no, no.  He testified that the

4    number is right off of their accounts payable; that's how he

5    came up with that number.  Those are the accounts payable.

6                MR. WANDER:  Judge, in the claim objections that

7    have been filed in the past two weeks, and they were not

8    able to --

9                THE COURT:  That's a separate point.  I want to go

10   back to the point where you said that they're not taking

11   into account countless claims that will be filed.

12               MR. WANDER:  Yep.  Because you're talking about

13   just simple payables.  What I'm saying is every re-

14   classification --

15               THE COURT:  No.  What else is there in what is to

16   be filed, other than -- what is to be paid are the payables

17   that haven't already been filed.

18               MR. WANDER:  Oh, there's the 503(b)(9) claims.

19   There's 50 --

20               THE COURT:  There's a bar date for that, right?

21               MR. WANDER:  So, they'd just assume --

22               THE COURT:  No, I'm talking about -- you said

23   there were -- I'm questioning your credibility.  You just

24   said to me that there are countless claims that are to be

25   filed that they haven't counted.

1    So, what claims that are to be filed, have they not counted,

2    other than you said payables, which they have counted.  So,

3    what else is there?

4              MR. WANDER:  They counted as they went.

5              THE COURT:  No, no.  Payables are payables.  They

6    counted those.

7              MR. WANDER:  No, I'm --

8              THE COURT:  I'm talking about what you told me:

9    There are many countless claims to be filed.

10             MR. WANDER:  Right.

11             THE COURT:  So, are you backing off of that now?

12   Are you saying that there really aren't countless claims to

13   be filed?

14             MR. WANDER:  No, it's in their chart.

15             THE COURT:  Is there anything beyond that?

16   Because that's really what you just said to me, there are

17   countless claims beyond what they have said in their chart

18   are to be filed.

19             MR. WANDER:  No, I didn't say not in their chart.

20   I'm saying in their chart there are hundreds of millions of

21   dollars of claims relating to administrative claims -- it's

22   defined as outstanding claims -- hundreds of millions of

23   dollars of claims, objections that have been filed, and even

24   more that haven't been filed, that they assume they win each

25   one.  That's how --

Page 261

1          THE COURT:  How can you object to a claim that

2     hasn't been filed?

3          MR. WANDER:  No, no, no.  Their claim objections

4     haven't been filed.  If I misspoke, I apologize.

5     There are hundreds of millions of dollars of claim

6     objections filed --

7          THE COURT:  All right.  Let's go through the

8     chart.  Let's do it.  I mean, I guess we have to.

9     Sorry, Mr. Fox.  We'll probably get to you tomorrow, all

10    right.

11         (Pause.)

12         THE COURT:  All right.  I'm looking at Mr.

13    Murphy's declaration.  Do you have that there?

14         MR. WANDER:  One moment, Your Honor.

15         (Pause.)

16         THE COURT:  Okay.  So, on Page 21 he has his

17    503(b)(9) chart.  On Page 23 he has the other expense chart.

18         MR. WANDER:  Okay.

19         THE COURT:  In Paragraph 44 he says, "Additional

20    anticipated objections totaling 44 million are expected to

21    be filed."  Not hundreds of millions -- 44 million, all

22    right -- and that's for a re-classification.

23         MR. WANDER:  Right.  So, starting on Page --

24         THE COURT:  Well, let's just focus on that.  Do

25    you have --

1              MR. WANDER:  I was going to start on 71.

2              THE COURT:  So, as far as the to-be-filed

3    objections on re-classification --

4              MR. WANDER:  Are you talking about the forty-four

5    million-dollar number?

6              THE COURT:  Yes.

7              MR. WANDER:  Yeah.

8              THE COURT:  Right.  Right.

9              MR. WANDER:  Okay.  So, that's 44 million.

10             THE COURT:  Right.

11             MR. WANDER:  I would --

12             THE COURT:  For re-classification.  So, as you

13   know, it is difficult to establish an administrative

14   expense.  I think as you also know, people often check the

15   administrative expense box or whatever --

16             MR. WANDER:  I believe that a lot of these -- the

17   issues within this have to do with the received date.

18   Not --

19             THE COURT:  No, that's fine.

20             MR. WANDER:  And I want you to know that the

21   receive date is not only for foreign vendors.  My other

22   client --

23             THE COURT:  I understand the issue, all right.

24   So, that's 44 million.

25             MR. WANDER:  Okay.

Page 263

1              THE COURT:  And then we have the pending

2     objections, right --

3              MR. WANDER:  Which page is Your Honor on?

4              THE COURT:  -- which is at the top of that page.

5     So, I don't see hundreds of millions there.  I see an

6     outside amount of 44 million.

7              MR. WANDER:  Well, Your Honor, if we could -- you

8     first pointed to Page 21 --

9              THE COURT:  Well, let's deal with 23 first, the

10    admins.

11             MR. WANDER:  Okay.  That is also on Page 21.

12             THE COURT:  Well, that's dealing with the

13    503(b)(9)s.

14             MR. WANDER:  Right.

15             THE COURT:  So, let's deal with the other admins

16    first.

17             MR. WANDER:  Okay.  So, I'm looking at

18    Paragraph 41 --

19             THE COURT:  Right.

20             MR. WANDER:  -- okay.  So, they have minus

21    objections filed to date, 17.3.

22             THE COURT:  Right.

23             MR. WANDER:  And my point is there's no order

24    disallowing those claims.

25             THE COURT:  That's fine.  But almost half of those

1    are claims that are objected to -- well, 10 million --

2    actually 11 million are claims that are objected to because

3    they're satisfied, all right.  That's --

4              MR. WANDER:  I'm not talking about those.

5              THE COURT:  Well, you just said that there are 17

6    million that are pending, and you're basically telling me

7    that since I haven't granted them, I should ignore them.

8    I'm not going to ignore a claim objection on the basis that

9    it's satisfied until I see some evidence that, no, we

10   haven't been satisfied, and, generally speaking, in my

11   experience, when people like MIII object to claims and while

12   (indiscernible) signs off on it, they have a valid basis for

13   saying it's satisfied; similarly, for amended and

14   superseding.  So, that's all that this is.

15             MR. WANDER:  No.  The -- I don't --

16             THE COURT:  This 17,329,000, which you say I

17   shouldn't count because the order hasn't been entered yet.

18   So, let's get off of that.  Then we're talking about the 44

19   million that is to be objected to.  And I understand that we

20   don't have a lot of information on that.  I appreciate that.

21             MR. WANDER:  Your Honor, the 17.3 million --

22             THE COURT:  Yes?

23             MR. WANDER:  -- okay, I didn't see where it says

24   that those are claims that have been satisfied.

25             THE COURT:  It's on the chart on Page 23.

Page 265

1          MR. WANDER:  Correct.  So --

2          THE COURT:  Type:  Satisfied, 7.883 million.

3    Seventh one:  Amended superseding, 975,000.  Eighth:

4    Duplicate, 4.8 million.  Sixth:  Satisfied, 3.66 million.

5          MR. WANDER:  Okay.  So, then we have the line

6    items for the second --

7          THE COURT:  That's not being counted.

8          MR. WANDER:  There's no number there.

9          THE COURT:  I know.  It's not being counted.

10         MR. WANDER:  It's not listed.

11         THE COURT:  I agree.  It's not being counted.

12   Look, there are a lot of people here.  This is not making a

13   whole lot of sense to me.  So, let's move to the big item

14   here, which is the billion -- one billion seventy-five

15   million claims expunged upon confirmation, right.

16         MR. WANDER:  Which paragraph, Your Honor?

17         THE COURT:  In the chart on Page 22.  That's how

18   you get the 1.157 billion down to 50 million.  So, do you

19   have any reason to say that those would not be expunged on

20   confirmation --

21         MR. WANDER:  Your Honor, --

22         THE COURT:  -- because they're filed against every

23   single debtor?

24         MR. WANDER:  The second line item is minus

25   additional anticipated --

1          THE COURT:  Wait.  That's what I started with.

2     You're trying to get me to say it was something other than

3     that 44 million, and we spent the last five minutes showing

4     that there isn't.

5          MR. WANDER:  They have the -- there's the $30

6     million --

7          THE COURT:  Under payables, yes.

8          MR. WANDER:  -- and then I was pointing out on the

9     prior page on 21, which is the first page that Your Honor

10    mentioned, that's the 503(b)(9).

11         THE COURT:  Well, I'm first dealing with your

12    statement that there are hundreds of millions of

13    administrative expenses that they're not counting.  I don't

14    see it.  At most, they're not counting 44 million.  If you

15    give them no credit -- and you're saying that they should

16    have none for saying that they intend to object to them.

17         MR. WANDER:  Judge, there are three groups.

18         THE COURT:  And I intend to discount that 44

19    million and say that they probably won't be able to object

20    to all of successfully.  So, let's move to Page 21.  That's

21    the 503(b)(9)s.  There, you have a couple of legal issues.

22         MR. WANDER:  So, this --

23         THE COURT:  Is there anything else?

24         MR. WANDER:  So, you have 36 million of claims

25    that they say reclassified --

1           THE COURT:  Right.

2           MR. WANDER:  -- that basically, I believe, relates

3     to delivery dates, which is a disputed issue --

4           THE COURT:  Right.

5           MR. WANDER:  -- and not just for foreign vendors.

6           THE COURT:  Right.

7           MR. WANDER:  And then there's another -- the fifth

8     claim objection is another $20 million, and then it says

9     below that, "Additional anticipated objections totaling 105

10    million and there's another 35 million of reclassified and

11    then there's 60 million of reduced and allow, which, again,

12    means someone may have said it's an administrative claim --

13          THE COURT:  I'm sorry, let me just --

14          MR. WANDER:  Sure.  I'm on Paragraph 38.  And I'm

15    not counting late-filed.  I'm taking reclassified, reduce,

16    and allow.  So, that's 95 million.

17          THE COURT:  I'm sorry.  Reclassified, 36 --

18          MR. WANDER:  Reclassified, 35 million, I think

19    that is.

20          THE COURT:  Well, I'm looking at the chart.

21          MR. WANDER:  Okay.  That's a separate 36, Your

22    Honor.  In the chart --

23          THE COURT:  Okay.

24          MR. WANDER:  So, that's 36,087,000.  Those are

25    claim objections that have been filed very recently and no

```
 1    ruling.
 2              THE COURT:  Right.
 3              MR. WANDER:  And below is another 35 million of
 4    reclassified.
 5              THE COURT:  Right.
 6              MR. WANDER:  So, that's 71.  Then there's 60
 7    million in the reduce and allow; that's another 60 --
 8              THE COURT:  That's just -- look, to me, that's
 9    accounting.
10              MR. WANDER:  No, because, for example, with my
11    client Pearl Global, it has an administrative -- a 503(b)(9)
12    claim in rough numbers, 450,000, and their objection says it
13    should be allowed at 350,000.  So, they're taken off
14    100,000, but I have no idea why.
15              THE COURT:  Well, I hope you do.
16              MR. WANDER:  They haven't said anything.
17              THE COURT:  Well, it's probably because of the
18    purchase orders --
19              MR. WANDER:  Judge, I'm simply --
20              THE COURT:  -- of what was provided.
21              MR. WANDER:  -- saying --
22              THE COURT:  All right.  So, they have anticipated
23    objections of 105 million, although, 10 of that is late --
24              MR. WANDER:  So, I wasn't counting that.
25              THE COURT:  All right.  So --
```

1                MR. WANDER:  So, you have the 95 there.

2                THE COURT:  Right.

3                MR. WANDER:  You have the thirty-six oh eight

4       seven above.  You have the reclassified, the fifth objection

5       is 20 -- this is the 503(b)(9).  You then have the ones we

6       went through before, the 44 million that Your Honor was

7       discounting.

8                THE COURT:  Right.

9                MR. WANDER:  And I said there's also 162 million

10      that's out there unknown.  So, that's where I came up with

11      the additional hundred thousand -- hundred million dollars

12      that --

13               THE COURT:  Well, and I came up with 70.

14               MR. WANDER:  No, no.  But I'm saying on top of

15      that, because --

16               THE COURT:  So, 270, even though these numbers add

17      up to 240?

18               MR. WANDER:  Plus the 162 that's not on the chart.

19               THE COURT:  I mean, that's -- look, I've already

20      concluded that that is just -- I don't know what that is.

21      That's not a basis to argue any --

22               MR. WANDER:  I'm saying it doesn't potentially --

23               THE COURT:  But it's not a claim.  It's nothing.

24      It's nothing, other than these claims.  You can't double

25      count that.  It's nothing.

Page 270

1          MR. WANDER:  I'm not double-counting.  These are

2     claims --

3          THE COURT:  No, they're not claims.  They've not

4     been asserted on top of these claims.

5          MR. WANDER:  Well, I agree that they haven't been

6     asserted again.  There hasn't been a bar date that would cut

7     these.

8          THE COURT:  Look, the only basis for those claims,

9     other than them showing up in the debtors' books and records

10    or having been filed, is that they were defrauded.  And I

11    would think that someone who felt that they were defrauded

12    would have filed a claim.

13         So, going through all of these numbers, you're

14    counting -- unless your basing it on that 162,000 -- 162

15    million, excuse me -- that the debtors lose on all of these

16    claim objections and to-be-filed claim objections, and I'm

17    basically cutting it in and a half -- actually a little less

18    in a couple categories -- and that's why instead of being

19    170 million on the outside, I basically said 100.

20         So, you know, just -- you know, which is what was

21    the debtor's outside, which, to me, I think was a reasonable

22    projection.

23         MR. WANDER:  Again -- okay.  Your Honor, I'm --

24    based upon the testimony, I don't believe that they have

25    shown --

Page 271

1           THE COURT:  Well, we disagree on that point and

2    we've just spent 20 minutes going through it and I believe

3    it even more so now.  So, enough of that.  I'm sorry to be

4    abrupt with you, Mr. Wander.

5           MR. WANDER:  No, that's fine, Your Honor.

6           So, the -- as I said before, if there was one

7    thing that should be changed, it's the automatic opt-in and

8    I also believe that it's improper that they haven't

9    disclosed the compensation as the amended documents say --

10          THE COURT:  Well, they're going to have to do that

11   before I sign off on the order.  And I think Mr. Schrock

12   knows that.

13          MR. WANDER:  And I think there should be an

14   opportunity --

15          THE COURT:  Well, on notice.  Yeah, on notice.

16          MR. WANDER:  Okay.  Because it has, in addition --

17          THE COURT:  I understand.

18          MR. WANDER:  Thank you, Your Honor.

19          THE COURT:  Okay.

20          MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

21   for the U.S. Trustee's Office.  I'll be quick.

22          THE COURT:  Okay.

23          MR. SCHWARTZBERG:  Your Honor, we filed an

24   objection -- two points.  The only point I want to raise at

25   this point is the 1143(d) -- I think I got the Code section

1    right --  where the debtors are getting both in this case, a

2    release -- I think as they are defined as a released

3    party -- as well as the injunction.  Parties are enjoined

4    from going after the debtor --

5                 THE COURT:  Except to enforce the plan.

6                 MR. SCHWARTZBERG:  Excuse me, Your Honor?

7                 THE COURT:  Except to enforce the plan.

8                 MR. SCHWARTZBERG:  The injunction.  Combining the

9    injunction, Your Honor, and release, we believe is akin to a

10   discharge.  If --

11                THE COURT:  I don't understand that.  I mean the

12   whole purpose of the plan is that the parties are bound by

13   it, assuming it goes effective, and --

14                MR. SCHWARTZBERG:  Well, after the assets are all

15   transferred to the litigation trust, you're just left with a

16   shell.

17                THE COURT:  I understand that, but 1140 --

18                MR. SCHWARTZBERG:  41(d)(3).

19                THE COURT:  No, I'm focusing on a different

20   section -- 1141.  Except as provided in Subsections (b)(2)

21   and (b)(3), the provisions of a confirmed plan bind the

22   debtor, et cetera, et cetera, et cetera, including the

23   creditors, whether or not such creditors, equity, security

24   holders, or general partners have accepted the plan.

25                So, if the injunction simply means that people's

1    rights to go after the debtor is limited to as long as the

2    plan is ongoing, enforcing the plan just would seem to be

3    completely consistent with 1141(a).  All you're doing with

4    the injunction is preventing people to ignore -- from

5    ignoring the plan and going around the plan.

6              MR. SCHWARTZBERG:  Well, I --

7              THE COURT:  Now, as far as the release point is

8    concerned, it seems to me that, again, the release should

9    apply to the debtor, only to the extent that the plan is

10   operative, right?

11             MR. SCHWARTZBERG:  Uh-huh.

12             THE COURT:  I'm not sure that's the case here in

13   looking at it, but I think it's worth clarifying that point.

14             But other than that, I don't see why this is an

15   issue.  I mean, I -- if you didn't have this, the debtor

16   would have to sue everybody for breaching the plan if they

17   went in and tried to collect.  You know, if some creditor

18   said, I'm unhappy with my result under the plan, an

19   unsecured creditor, so they go and try to collect the money

20   that's in the trust.

21             MR. SCHWARTZBERG:  Your Honor, we're not objecting

22   to the injunction as it applies to the trust (indiscernible)

23   as it applies to the debtor's property, but as is applied --

24             THE COURT:  But the property is going into the

25   trust.  I don't understand --

1          MR. SCHWARTZBERG:  Well, only to the debtor's

2   shell, Your Honor, after all the assets are transferred.

3          THE COURT:  But what does it matter?

4          MR. SCHWARTZBERG:  At that point, we're concerned

5   about trafficking in an empty shell.

6          THE COURT:  But that certainly didn't come out of

7   the objection.

8          MR. SINGH:  Your Honor, I'm rising -- not to

9   interrupt --

10         THE COURT:  (Indiscernible) brief.

11         MR. SINGH:  But just one clarification that people

12  might be misreading.  The release provision specifically

13  carves out the debtor.

14         THE COURT:  Right.

15         MR. SINGH:  So, the debtors are not getting a

16  release.  They, as you said, are just relying on the

17  injunction.  It's in 10.6(b)(3), you know, as to who's

18  getting a release.  Each of the release parties

19  parenthetical, other than the debtors --

20         MR. SCHWARTZBERG:  Okay.  Because --

21         MR. SINGH:  -- because they just get the

22  injunction --

23         MR. SCHWARTZBERG:  Section 1.135 includes the

24  definition of released parties.

25         THE COURT:  No, then it says, Other than --

1            MR. SINGH:  It's other than the debtors in the

2     operative release section.

3            THE COURT:  Okay.

4            MR. SINGH:  It's just the injunction for the

5     debtors.

6            THE COURT:  But, again, I just don't --

7            MR. SINGH:  Other than that, Your Honor, I don't

8     want to belabor the point.

9            THE COURT:  I mean, there's one case on this.  The

10    Judge's colleague in the Southern District of Texas pretty

11    rudely disagreed with him, and without being rude, I

12    disagree with him, too.  I just think In re ASR 2401

13    Fountain -- whatever it's called -- Fountainview, I think,

14    LLC, 2515 LexisNexis 1783, Page 15, (Bankr. S.D. Tex.

15    May. 29, 2015) actually got it right in (indiscernible) or

16    it's really dicta anyway, since the plan wasn't going to be

17    confirmed in the first place and the judge was just pretty

18    mad about the release provisions in the plan.  I think went

19    overboard on this point.  Didn't really focus on 1141(a).

20            Is there any indication that there's going to be

21    some sort of sale of --

22            MR. SCHWARTZBERG:  No, Your Honor.

23            THE COURT:  Okay.  So, I don't -- I mean, look,

24    obviously, there's a separate provision of the Code that

25    talks about tax avoidance and the like or any other

 1    provision violating the law.  I just don't have that in the

 2    record, so I'm don't -- I'm going to overrule that part of

 3    the objection.

 4            MR. SCHWARTZBERG:  And I'll rely on my pleadings

 5    on the nondebtor release.

 6            THE COURT:  Another nondebtor release.  It's --

 7    the debtors have treated everyone who's objected on that

 8    basis and anyone who opted out as being not bound by the

 9    release, and as far as I'm concerned, that's enough.  I

10    mean, I think the notice was very clear, and, again, I don't

11    believe that where clearly I have jurisdiction under the

12    case law, which the debtors have cited, including the

13    CareOne case, that there's any basis to not object to a plan

14    where the release language is clear and then come back later

15    and say, Oh, you know, this provision of the plan should be

16    carved out.

17            I think a plan is much broader than a contract, as

18    the debtor's brief said.  So, I will overrule that

19    objection, too.

20            MR. SCHWARTZBERG:  Thank you.

21            THE COURT:  Anyone else?

22            MS. SCHAEL:  Your Honor, I'm on the telephone.

23    Can I be heard?

24            THE COURT:  Sure.

25            MS. SCHAEL:  Courtney Schael, on behalf of Shinn

1    Fu.  We filed an objection to confirmation going into the

2    other objections by the administrative creditors.

3            I just wanted to -- I tend to agree with Mr.

4    Wander on the disconnect with the 503(b) claims.  The

5    testimony was that they're going to rely on their accounts

6    payable books and records to determine what those claims

7    are.  But very early on in the case, I was informed by the

8    debtor's counsel that they consider any of the post-petition

9    deliveries, so prepetition orders to be unsecured claims.

10           And I think the testimony was a little vague on

11   this, but it seemed to indicate that those post-petition

12   payables, books and records of the debtors would not include

13   those claims --

14           THE COURT:  No, I --

15           MS. SCHAEL:  -- of creditors who --

16           THE COURT:  -- I didn't take the testimony to

17   suggest that.

18           What I was focusing on, and what I asked Mr.

19   Murphy about was the specific item in the chart in his

20   declaration that had $30 million of other claims.  And I

21   took those to be current accounts payable, not claims that

22   have been asserted already or the like.  That's just

23   covering the remaining accounts payable.

24           They're not cutting -- in other words, I did not

25   take his testimony to mean that they're somehow only looking

1    at their accounts payable for the post-petition period and

2    saying that's the ambit of claims.  They have to deal with

3    it, and I think he has dealt with the claims that have been

4    asserted, including, claims in transit, et cetera -- goods

5    in transit, and the like, for the prepetition hearing.

6          MS. SCHAEL:  I guess the disconnect that I'm

7    having is if delivered goods post-petition and sent the

8    debtor an invoice and said we have a post-petition claim,

9    here's our bill.  And then this plan gets confirmed and we

10   go forward with the procedure that they're talking about

11   now, those creditors will never have an administrative bar

12   date to file an administrative claim, that the debtor has

13   already, at least, represented to my client that they

14   consider those claims unsecured and there would be no

15   process, where my client, having not filed a claim, would

16   even know that the debtor was going to write it off and

17   treat it as unsecured because it was from a prepetition

18   order.

19         THE COURT:  Well, they can always file an

20   administrative expense, always.

21         MS. SCHAEL:  Yeah.  My other concern was the

22   proposed settlement with the ad hoc committee.  Given the

23   lack of notice and that the Debtor has indicated that it's

24   not required under confirmation of the plan, I would ask the

25   Court to adjourn approval of that so that the parties have a

1   chance to review it and file objections in the appropriate

2   time period.

3              THE COURT:  Well, the objection would only be that

4   it's too good, right?  It's too good a settlement for the

5   administrative creditors who are the beneficiaries of it?

6   I'm not trying to be facetious, but I think the objection

7   would be that the debtors have made a bad deal and it's too

8   good for the administrative expense creditors that have

9   signed onto it.

10             MS. SCHAEL:  Exactly.  I think the creditors --

11             THE COURT:  All right.  So, but if your client has

12  the right to opt into it, as well, then what's the problem?

13             MS. SCHAEL:  Because under the Code -- the problem

14  is, under the Code, my client is entitled to 100 percent

15  payment on the effective date.

16             THE COURT:  No.  But I'm just focusing on the

17  notice point.  What's there to -- you will have an

18  appropriate time to review it and determine to determine

19  whether you want to opt into it.  So, I don't understand why

20  you would need more notice to determine whether it was too

21  good or not as far as objecting to it, as long as you have

22  the chance to object to it.

23             MS. SCHAEL:  I'm talking about objecting to it,

24  the whole settlement as a whole.  If there's any chance that

25  creditors that opt-out of the settlement will not get paid

Page 280

1    100 percent at the end of the day, then the creditors who

2    opt-in are getting treated better than the creditors who

3    waited.  I mean, they're effectively circumventing the Code

4    that requires in the plan confirmation, that creditors get

5    paid 100 cents on the dollar to the settlement.

6            THE COURT:  Okay.  I've heard --

7            MS. SCHAEL:  There's also problems with the

8    objecting procedures.  I think the debtor purposefully --

9    and knowing we didn't file the orders on the administrative

10   claim issue, because now that you have the door left open

11   where they can resolve claims anywhere they see fit.  They

12   can -- some people might get the benefit of -- well, the

13   Court's in a "behind the door" settlement, some creditors

14   might not.

15           With this procedure that's in place, nobody is

16   going to know if another creditor got a better deal and got,

17   you know, and gets a (indiscernible) from another creditor.

18   It's all going to be done (indiscernible) and -- excuse me,

19   I have a slight cold here -- and the creditors won't be

20   treated the same.

21           Those are the types of things that I think parties

22   should have the right to review the settlement and to look

23   at the entire construct of it and object to it on those --

24   on points like those.

25           THE COURT:  Well, under liquidation procedures --

Page 281

1    I guess this is a question for Mr. Schrock -- what is the

2    check on the debtors cutting a sweetheart deal with someone?

3            MR. SCHROCK:  Your Honor, there's an

4    administrative claims representative that's on the

5    restructuring committee or serving alongside.  You've got,

6    certainly, the creditors' committee is still in place.

7            But all we do, frankly, now as an estate, is, you

8    know, we're reconciling claims as fiduciaries.  And when it

9    comes to administrative claims, those are things that,

10   frankly, you know, any debtor is doing all the time.  We're

11   going to be recording --

12           THE COURT:  Well, there's a claims procedures

13   order in place in the case --

14           MR. SCHROCK:  Yes.

15           THE COURT:  -- right?  Is that what you would

16   follow or would there be -- I mean, obviously there's a

17   separate procedure for sharing information, having Ruby the

18   parties who are entitled to, you know, review that analysis;

19   otherwise, would you be following the claims procedures.

20           MR. SCHROCK:  Well, not with regard to

21   administrative claims, no --

22           THE COURT:  No?  All right.

23           MR. SCHROCK:  -- Your Honor.  I mean, we would --

24   you know, if people want some additional -- we have

25   reporting that's going on in accordance with the settlement.

Page 282

1  We have the administrative claims rep and we felt that that

2  was, frankly, sufficient.

3          I'd look at it this way, if we didn't have the

4  settlement and all this is, is an opt-in settlement, the

5  debtors would be reconciling administrative claims in the

6  ordinary course as they prepare for the effective date.  So,

7  I didn't understand why we need to put, like, another check

8  on it simply because we had an opt-in process.

9          THE COURT:  Well, that's why I was asking about

10  the claims procedures order.  You're saying that doesn't --

11  I haven't looked at it -- that doesn't apply to admins?

12          MR. SCHROCK:  That's correct.

13          THE COURT:  So, then you're just guided by 9019.

14          MR. SCHROCK:  Right.

15          THE COURT:  And I guess there's certain agreements

16  that are significant enough that you would need to notice

17  them up under 9019 and the rest you wouldn't.

18          MR. SCHROCK:  Right.

19          THE COURT:  And that would still apply -- and that

20  wouldn't change under this order?

21          MR. SCHROCK:  That's correct, Your Honor.

22          THE COURT:  You know, you could do them a notice

23  of presentment, but it would only be things that were out of

24  the ordinary course.

25          Okay.  All right.

Page 283

1           MR. SARACHEK:  Your Honor, Joe Sarachek.  I

2    represent 15 administrative creditors.  The bulk of them are

3    foreign creditors.

4           And while I want to thank Ms. Morabito for her

5    efforts and really hard work in negotiating this, I think

6    it's important that the Court know that she represents --

7    the only people that have signed onto this are trade claim

8    purchasers and they are all purchasers of domestic Claims.

9           And the issue, really, that I'm going to say where

10   there's discrimination here and where I have a lot of

11   concern under 11-2099, is that foreign trade vendors -- and

12   I'm not going to repeat all of what Mr. Wander said -- but

13   foreign trade vendors who are seeing this settlement -- and

14   we haven't even been able to get the settlement to all of

15   our creditors -- we're in China, Vietnam, India -- they're

16   going to be -- the practical reality of this settlement is

17   that there's going to be a preponderance of sales claims.

18          And just to give you a sense, the bid from one of

19   Ms. Morabito's clients last week, what time this was still

20   being negotiated, was 20 cents, okay, which tells you that

21   everybody -- like, we're all adults here, we all know that

22   the debtor is administratively, let's call it on the line of

23   being administratively insolvent or is administratively

24   insolvent, and the practical effect of that agreement is

25   going to be that vendors, particularly foreign vendors are

Page 284

1    going to be compelled to basically take cash now.

2              THE COURT:  Why?

3              MR. SARACHEK:  Because they're going to see what

4    amounts to a pool of cash that is, let's call it 10 percent,

5    as Ms. Morabito said, and there's just like an inherent

6    discrimination in the plan with this settlement agreement --

7              THE COURT:  They would have the right to opt-in.

8              MR. SARACHEK:  I get it, but, by the way, many of

9    those vendors' claims -- and, again, I'm not debating world

10   imports -- have been objected to already.  I will tell

11   you --

12             THE COURT:  Okay.  But they still get -- but --

13   I'm sorry -- they still have the right to opt-in.

14             MR. SARACHEK:  I understand, but in reality, you

15   are faced with two choices:  you sell your claim or,

16   basically, you compromise your claim at a considerable

17   discount and opt-in.  And that's --

18             THE COURT:  Well, you have -- you have another

19   choice:  you can opt-out.

20             MR. SARACHEK:  You can opt-out and get no cash

21   and, basically, be in a situation -- and most of these

22   vendors, just to it's clear, continue to supply transform,

23   which brings me to my next point, which is I really don't

24   see -- the elephant in the room here is ESL.  Had they paid

25   the 503(b)(9) claims, these people would have money in their

 1   pocket.

 2            THE COURT:  Yes.

 3            MR. SARACHEK:  Money that they were counting on in

 4   their pocket.  And, Your Honor, I just don't see --

 5            THE COURT:  By the way, that's why I was somewhat

 6   skeptical when M3's projections were being attacked, because

 7   I understand your point.

 8            MR. SARACHEK:  I'm not attacking them.

 9            THE COURT:  No, I understand.

10            MR. SARACHEK:  But, as you know, I also moved for

11   a mediation hearing and I know everyone laughs at it and so

12   on and so forth, but there have been other big cases with

13   contentious issues, okay, where mediation has brought about

14   a result.

15            And the reality is that these vendors, who have

16   been the lifeblood of Sears when it was going on, these

17   vendors need to be paid.  They need the cash.  They will --

18   I have many clients who are, themselves, on the verge of

19   insolvency.

20            So, mediation -- and I don't see the need for

21   confirmation today.  We're not talking about going effective

22   today.

23            Our hearing is on the 23rd.  My -- and I would

24   urge the Court to bring the parties together -- ESL, as

25   well -- because at the end of the day, that's the elephant

Page 286

1   until the room.  That's where, ultimately, do we really have

2   to wait three years?  Do we have to burn -- and no offense

3   meant to akin or anyone else -- do we have to burn $20

4   million in legal fees?

5           It doesn't make sense to me.  It doesn't make

6   sense to my clients.  We need all parties around the table

7   to negotiate a resolution, and not a resolution that gives

8   clients 10 cents.

9           As you know, these foreign manufacturers, they're

10  not working on huge margins in today's marketplace --

11  they're not -- so they can't afford to take 10 cents,

12  20 cents -- they can't afford it.  And they're the real

13  victims here.

14          THE COURT:  Well, I believe the evidence shows

15  that if they don't opt-in, they will get 100 cents,

16  eventually.  There's a time issue and there's a risk issue

17  but given the litigation backdrop here that you're referring

18  to -- and I thought about this carefully -- I'm a firm

19  proponent of mediation; I served as a mediator in a number

20  of large cases -- I don't see a basis for a mediation here

21  that would involve ESL in any sort of meaningful settlement,

22  at this point.  It's not in their interests to do it.  If I

23  were representing them, I wouldn't do it.

24          MR. SARACHEK:  But it is in their --

25          THE COURT:  No, it isn't.  It's not in their

1    interests at this point.

2              MR. SARACHEK:  Because their former Board is being

3    sued.  Lawyers -- there's a hundred-fifty-million-dollar D&O

4    policy there.

5              THE COURT:  I saw that.  It's not in their

6    interests --

7              MR. SARACHEK:  Seritage --

8              THE COURT:  -- you know, at this point in the case

9    to settle for an amount that is actually warranted solely to

10   provide people with cash now.  It's not advantageous to do

11   it.

12             And I don't see the mediation succeeding, and I

13   see the burning of a lot of cash in the meantime, to learn

14   that result, which I can predict.  I put myself, mentally,

15   as if I were the mediator in that conference room.  It ain't

16   going to happen.

17             The mediation that might happen is the one that I

18   suggested to Mr. Wander about half an hour ago -- that might

19   happen -- and the parties are perfectly capable of

20   negotiating that result.

21             MR. SARACHEK:  I will tell you, Your Honor,

22   respectfully, one reason ESL should mediate is because

23   they're not getting trade credit today.

24             THE COURT:  They should mediate, but then hold out

25   for a ridiculously low sum.  I'm not going to let that

Page 288

1    happen.

2              MR. SARACHEK:  And it's -- by the way, the fact

3    that ESL is not getting trade credit today is affecting the

4    future of new Sears.

5              THE COURT:  That's a separate issue.

6              MR. SARACHEK:  I understand, but we're talking

7    about why to mediate.

8              THE COURT:  And they may well want to deal with

9    your clients on -- they may want to deal with your clients

10   on that basis, but, clearly, the mediation that you're

11   talking about is one where they would raise all of these

12   other issues in the litigation and it would either not go

13   anywhere or there would be pressure for a deal that just

14   isn't warranted from the estate's point of view.

15             The other points that you're making are legitimate

16   points and they're points that, certainly, Transform should

17   think about, but that affects Transform's business going

18   forward, not the claims against ESL.

19             MR. SARACHEK:  Thank you, Your Honor.

20             THE COURT:  Before we -- we've been just dealing

21   with the admins.  Are there any other people with admin,

22   (a)(9), or (a)(11) objections that want to be heard?

23             Okay.  I --

24             MR. ARNOLD:  Your Honor, this is Tom Arnold,

25   appearing telephonically, on behalf of Weihai Lianqiao.  I

1    just wanted to state my appearance on the record so our

2    objection wasn't waived.

3              THE COURT:  Okay.  All right.

4              MS. ROGERS:  Your Honor, this is Beth Rogers for

5    Serta Simmons Bedding Company.  I also wanted to state our

6    objection on the record so it wouldn't be waived.

7              THE COURT:  Okay.  You know, there are many other

8    people who joined in other objections.  If those objections

9    that they've joined in have been settled, I'm not sure what

10   their status is, but by taking people or acknowledging

11   people on the record, I'm not conferring on them anything

12   more than their rights as a joining party.

13             MR. GREENE:  Good afternoon, Your Honor.  Anthony

14   Greene, from Alston & Bird, on behalf of 20th Century Fox

15   Entertainment.

16             We joined in an objection that was settled, but we

17   were not part of the settlement, so our objection still

18   stands.

19             THE COURT:  Well, I'm not sure about that.

20   Frankly, if you join in something and then people have

21   settled it, what have you joined in?  Something that's been

22   settled.

23             I'm not ruling on that today, but I'm just saying

24   when people stand up and say, I'm here to note my rights on

25   the record, the rights are only the rights that you have as

1        a party that's joined.

2                    MR. GREENE:  Understood.  Thank you.

3                    THE COURT:  Okay.  I did not understand, before we

4        get to other objections, while you only have 17 days to opt-

5        in and 33 days to opt-out, particularly, given that there

6        are foreign creditors and we're dealing with a deemed opt-

7        in, why can't there just be the 30 days for everybody?

8                    MR. SCHROCK:  Just so I understand -- Ray Schrock

9        from Weil Gotshal, for the debtors -- so, you're saying, why

10       couldn't we have the same time limit for everyone?

11                   THE COURT:  Yes.  Yeah.

12                   MR. SCHROCK:  I suppose we could.  That would be

13       fine.

14                   THE COURT:  And, particularly, since I think the

15       opt-outs and the opt-ins will have focused on it --

16                   MR. SCHROCK:  Right.

17                   THE COURT:  -- but the noes -- no responses at all

18       may not focus on it --

19                   MR. SCHROCK:  Yes.

20                   THE COURT:  -- and I'd rather give them a little

21       more time so they could talk --

22                   MR. SCHROCK:  Sure.

23                   THE COURT:  -- to someone about it.

24                   MS. MORABITO:  Your Honor, Erika Morabito, on

25       behalf of the ad hoc.

1           We have no problem with that.  I think the intent

2     was just so that we could get an administrative

3     representative --

4               THE COURT:  Going.

5               MS. MORABITO:  -- from the point of sooner, rather

6     than later.

7               THE COURT:  Okay.  But I think that's -- I'd

8     rather have the group who are in better informed.

9               MR. SCHROCK:  Okay.

10              THE COURT:  Okay.

11         (Pause.)

12              MR. FOX:  Good afternoon, Your Honor.  Edward Fox,

13    from Seyfarth Shaw, on behalf of the Wilmington Trust

14    National Association, as indenture trustee and filing agent.

15              Your Honor, shifting gears to a slightly different

16    set of issues, I want to address my counts mainly to the

17    what is sometimes known as, I guess what was originally

18    known as the substantive consolidation settlement.  It has

19    more recently been known as the plan settlement, and now,

20    seemingly, Murphy into some other settlements.

21              I want to begin, though, by just pointing out the

22    fact of how the voting broke down here.  I know we have in

23    the record the declaration, with respect to voting, and it

24    has a chart attached to it, which is in very small print --

25    we blew it up and I can share it with you if you'd like --

Page 292

1    but I think it's important to know that despite the -- you

2    know, the phraseology in the confirmation brief and among

3    the debtor's comments, I think the reality is that this plan

4    was crushed, with respect to the unsecured creditors in

5    Class 4 in a couple of instances, where they were the

6    guaranteed claims, I think it was in Kmart, Illinois, and

7    Washington.

8              It was rejected by the unsecured creditors that 30

9    of the debtor entities --

10             THE COURT:  Any dollar amount?

11             MR. FOX:  In dollar amount.

12             THE COURT:  Not in number, but in dollar amount,

13   because of the guaranteed claims.

14             MR. FOX:  Well, whatever those claims were -- in

15   most cases, as I was saying, according to the chart, they

16   were listed as unsecured claims in Class 4.

17             Just to go through a few of the significant

18   debtors in the case, at Kmart, 83 million accepted, 302

19   million rejected.  It was a 78 percent rejection.

20             THE COURT:  In number or dollar amount?

21             MR. FOX:  That's in dollar amount.

22             THE COURT:  But in number, it was?

23             MR. FOX:  So, probably flipped slightly the other

24   way.

25             THE COURT:  Well, it was like 87, wasn't it, 87

Page 293

1    percent of the number accepted?

2             MR. FOX:  I can --

3             THE COURT:  In any event, the dollar amount

4    rejected.  I get that.

5             MR. FOX:  Right.  And at Kmart Holding

6    Corporation, there was 93 percent rejection that amounted to

7    6 percent acceptance --

8             THE COURT:  In dollar amount?

9             MR. FOX:  In dollar amount.

10            THE COURT:  So, obviously, this is not an accepted

11   class.  So, substantive consolidation can't be based on

12   1129(a), acceptance.

13            MR. FOX:  Yes, that's right.

14            THE COURT:  Okay.

15            MR. FOX:  So, the debtors could cram the plan

16   down, but when you get to the question, the real question of

17   whether or not the substantive consolidation settlement

18   should be approved, then that's where the Iridium factors,

19   the paramount interests of creditors and their views,

20   becomes important.  And I think that's what these numbers

21   reflect.

22            And even at some -- and, remember, we're talking

23   about a substantive consolidation.  In many of these

24   situations -- many of these cases, the Kmart creditors would

25   get a greater recovery.  The Sears creditors would probably

Page 294

1    get no recovery, absent substantive consolidation, and even

2    the notice, for instance, of Sears Holding Corporation, the

3    vote to reject was 74 in amount versus 25 percent in an

4    amount to accept, with 595 million voting to reject.

5            And at Sears Roebuck Acceptance Corp., the

6    rejection was 667 million rejected, which was an 88 percent

7    rejection.

8            THE COURT:  But these are all the same guarantee

9    creditors, right?

10           MR. FOX:  Well --

11           THE COURT:  So, they're voting their interests

12   across the board, aren't they?

13           MR. FOX:  Well, I'm not sure.  They're not the

14   same dollar amount at every plan -- at every debtor.

15           As I said, for instance, Sears Roebuck, it's 667

16   million rejected.  Sears Holdings is 595 million.  Sears

17   Roebuck, 340 million rejected for 75 percent.

18           There's probably overlap in many of these cases,

19   but there's, obviously, more of what I consider rejected,

20   and in some cases, I think they may not have even had

21   guarantee claims.  I just don't know.

22           But the point is, at the significant debtors, the

23   unsecured claims, that class did not accept this plan

24   because they didn't have -- they didn't get the votes on the

25   amount.

Page 295

1          And of the 22 accepting debtors, the largest

2     amount of accepting unsecured creditors was $1.7 million,

3     and that was at Max Irving.

4          So, as I said, the voting results are particularly

5     important here because of the third Iridium factor, which

6     considers the paramount interest of creditors, including

7     each affected class' relative benefits and the degree to

8     which creditors either do not object to or affirmatively

9     support the proposed settlement.

10         And in the 30 of the most significant debtors with

11    the most substantial claims, by far, the unsecured creditors

12    who would be affected by this settlement rejected -- their

13    class is rejected.

14         And I believe as we walk through this --

15         THE COURT:  Well, you know what?  It's late and I

16    do want Mr. Wander to talk to Mr. Schrock about what I

17    suggested.  So, I want you as a representative of indenture

18    trustee to think about the consequences of a rejection and

19    how your beneficiaries would react to that, and I'll resume

20    next week.

21         UNIDENTIFIED SPEAKER:  I'm tired of hypotheticals.

22         THE COURT:  People, try to negotiate in person.  I

23    have the record here.  You're representing an indenture

24    trustee.  I don't get it.  I don't get your point.

25         I don't see any alternative, other than

Page 296

1    liquidation here, or a negotiation, and you've had your

2    chance to negotiate.  So, I want to give Mr. Wander a chance

3    to do something realistic with the professionals and,

4    frankly, I could meet with you and give you my idea of what

5    I think would be realistic and I want to see the notice that

6    would go to the admins and maybe a memorialization of some

7    of the points that we've otherwise laid, and we'll resume

8    with more argument on this, but -- put your money where your

9    mouth, as far as the indenture trustee is concerned.  If you

10   want it, you could have it.

11          (Whereupon, these proceedings were concluded at 5:54

12   p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 297

```
 1                         I N D E X

 2

 3                     T E S T I M O N Y

 4

 5      WITNESS              EXAM BY              PAGE        LINE

 6      William Transier     Mr. Wander           57          5

 7      Brian Griffith       Mr. Wander           62          3

 8      Brian Griffith       Mr. Genender         85          18

 9      Brian Griffith       Mr. Wander           88          20

10      William Murphy       Ms. Lieberman        91          3

11      William Murphy       Mr. Wander           93          9

12      William Murphy       Mr. Genender        136          4

13

14                     R U L I N G S

15

16      DESCRIPTION                               PAGE        LINE

17      Court will enter an order approving        26          10

18        Debtor's proposed settlement with

19        retiree committee

20

21

22

23

24

25
```

Page 298

```
1                        I N D E X, cont'd

2

3                        E X H I B I T S

4    NO.        DESCRIPTION                    ID.      EVID.

5    ---        Declaration of Craig E. Johnson of  ---       54

6               Prime Clerk LLC re solicitation of

7               votes and tabulation of ballots

8    ---        Declaration of William Transier,    ---       55

9               dated 9/13/19, submitted as

10              direct testimony

11   ---        Declaration of Brian Griffith,      ---       60

12              dated 9/13/19, submitted as

13              direct testimony

14   ---        Supplemental declaration of Brian   ---       60

15              Griffith, dated 10/1/19, submitted

16              as direct testimony

17

18   FOR THE DEBTOR/WILMINGTON TRUST/ADMINISTRATIVE CLAIMANTS:

19   Joint exhibits                             ---       59

20

21

22

23

24

25
```

Page 299

1                        C E R T I F I C A T I O N

2

3    We, Lisa Beck, Sheila Orms, Sherri Breach, Jamie Gallagher

4    and William Garling certify that the foregoing transcript is

5    a true and accurate record of the proceedings.

6

7    _____

8    Lisa Beck

9    _____

10   Sheila Orms

11   _____

12   Sherri L. Breach (CERT**D-397)

13   AAERT Certified Reporter & Transcriber

14   _____

15   Jamie Gallagher

16   _____

17   William Garling

18

19   Date:  October 7, 2019

20

21   Veritext Legal Solutions

22   330 Old Country Road

23   Suite 300

24   Mineola, NY 11501

25

[& - 166]                                                                                    Page 1

**&**

**&**  8:2,13 9:1 11:8
11:16 12:18 13:1
13:9 14:9 15:1,18
18:1,8 19:10 20:7
35:7 55:23 57:8
62:6 93:12 94:21
150:22 186:25
289:14 299:13

**0**

**00917**  14:5
**07090**  12:5
**07102**  19:6,13

**1**

**1**  12:4 23:7 37:21
44:4 45:16,25
47:8 48:21,25
49:24 53:10,20
57:13 60:9 81:8
83:10 84:1 96:9
157:18 197:11
199:18 213:18
216:12 224:1
252:3 253:13
257:5
**1.12.**  257:6
**1.135**  274:23
**1.157**  105:23
265:18
**1.2.**  257:4
**1.4**  152:16 204:19
**1.55**  122:3 124:19
**1.7**  207:8 295:2
**10**  64:17 66:1 70:5
111:8 123:20
151:10 198:23
213:6 223:23
224:2 248:25
249:3 264:1
268:23 284:4
286:8,11 297:17

**10,500**  22:15,24
**10.6**  274:17
**10/1/19**  61:5
298:15
**10/14**  127:8,12,19
128:12
**10/14/18**  127:10
**100**  12:3 16:21
19:4 37:5 40:17
69:21,23 70:21
71:4,22 74:23
80:10,21 81:5
97:25 125:9 135:2
177:9 206:4 223:4
223:12,14,21
224:4,18,22 229:1
231:18,21 232:2,3
233:9,10 234:25
236:9 237:10
243:21 248:23
251:20 253:3
254:8,9,10 270:19
279:14 280:1,5
286:15
**100,000**  268:14
**10005**  15:14
**10006**  13:4
**10007**  10:5
**10014**  9:16
**10016**  11:12 14:12
**10017**  11:19 13:21
**10018**  17:19 18:4
**10019**  12:21 18:20
**10036**  9:5 16:5
**1006**  9:15
**101**  14:19 17:9
**10119**  18:11
**10153**  8:5
**10158**  13:13
**10178**  14:21 17:11
**10250**  15:21
**105**  267:9 268:23

**10601**  1:18
**10:00**  2:3
**10:30**  213:8
**10:32**  1:21
**10:59**  7:2
**10th**  188:18
189:13
**11**  2:2,5 7:3 21:11
23:2,10 48:17
52:2,3 57:16
97:17 126:24
127:2 129:3 139:3
145:21 156:15
158:21 214:20,20
215:9 221:25
222:9 226:13
233:2 239:16
247:2,6,9 264:2
288:22
**11-2099**  283:11
**111**  11:3
**1114**  20:20 23:7,8
26:24
**1129**  30:23 32:2
37:17 139:3 141:8
156:1 195:11
214:20 215:9,9
239:16 246:23
247:2 293:12
**1140**  272:17
**1141**  272:20 273:3
275:19
**1143**  271:25
**11501**  299:24
**11th**  12:12 102:23
190:12
**12**  72:7 99:8
152:11
**120**  80:21 81:5
**1200**  10:19
**1220**  19:20
**12th**  191:15

**13**  56:15 90:12
153:3
**13.1**  65:13
**130.4**  64:10 87:12
**1334**  52:25
**1350**  18:3
**136**  297:12
**139**  110:15 135:15
167:21 168:1
**13th**  56:2 60:9,23
90:4 192:15
**14**  62:15 128:2,20
219:10
**14.1**  147:17
**14.7**  121:22 122:1
**140**  198:11,17
206:11
**14th**  213:16
**15**  36:2 48:24
52:21 72:7 80:24
129:24 130:5
167:19 205:10
216:1 248:25
249:3 275:14
283:2
**150**  220:18 223:11
223:19 231:7
250:4,5
**155**  129:16 130:4
**15th**  19:5 21:10
21:17 131:3
**16**  49:22 100:24
**16.9**  22:24
**162**  128:3,19
222:4 229:22
230:23 251:25
252:2 254:20,23
255:7,14 269:9,18
270:14
**162,000**  270:14
**1633**  18:18
**166**  166:16,16
169:24

[17 - 36]                                                                                          Page 2

**17** 28:24 149:20
173:21 264:5
290:4
**17,329,000** 264:16
**17.3** 106:1,5
264:21
**17.3.** 263:21
**170** 258:12 270:19
**1700** 15:22
**173** 139:14
**1783** 275:14
**17th** 14:20
**18** 34:12 91:10,21
92:10 93:1 159:21
159:21 211:14
212:10,17 297:8
**18-23538** 1:4 2:1
7:3
**19** 131:19 156:18
**1950** 16:22
**19801** 12:13
**1984** 250:25
**1:30** 137:2,11
**1:32** 137:13
**1st** 31:20 60:24
173:23 180:7,16

**2**

**2** 20:12 42:24
196:17 250:3
254:6 272:20
**2.3** 107:3
**2.37** 121:19
**20** 36:2 71:1 92:18
92:24 97:16 121:5
128:11 155:14
173:22 174:7
195:24,25 196:3
196:11,22 209:11
210:20 211:16
219:11 220:12
223:24 232:7
267:8 269:5 271:2
283:20 286:3,12

**297:9**
**20/20** 227:22
**200** 8:15 10:11
15:3 196:4 206:9
224:20 253:17,18
**20005** 10:20
**2001** 21:14
**2005** 222:11
**201** 9:14
**2010** 71:9
**2015** 275:15
**2017** 50:13 66:3
**2018** 41:8 97:12
98:20 127:8
213:15
**2019** 1:20 21:10
56:2,15 60:9,10
69:24 84:1 90:4
90:13 129:24
133:24,25 134:1
173:23 192:15
257:5 299:19
**2019/2020** 70:25
**2020** 70:15,18
**2021** 70:20,23,25
71:4,19,22 72:2
75:5
**20210** 10:13
**2029** 16:11
**209** 130:17
**20th** 289:14
**21** 53:19 63:5
213:15 226:24
252:7 261:16
263:8,11 266:9,20
**210** 139:11
**21st** 213:17
214:10
**22** 165:14 166:13
166:18 167:23
169:4,20 265:17
295:1

**22.1.** 166:23
**221** 14:3
**223** 45:24 46:5,13
**23** 120:8 261:17
263:9 264:25
**23,000** 158:21
**233** 2:13
**23rd** 192:9,19
285:23
**24** 20:25 124:18
**240** 269:17
**2401** 275:12
**2425** 15:4
**248** 1:17
**25** 32:19,20
128:11 179:2,4
183:12 196:23
205:11,15 223:23
224:1,24 232:2
294:3
**250** 223:22 224:20
**2515** 275:14
**26** 297:17
**27** 198:16
**270** 254:14 269:16
**272** 136:7
**278** 139:11
**27th** 13:20 17:10
193:3
**28** 100:23 164:13
199:15
**29** 63:18 91:8
103:16 106:23
111:14 116:6
275:15
**295** 13:19
**29th** 20:21
**2:30** 137:12
**2:33** 137:13
**2nd** 42:9 49:12,14
190:21

**3**

**3** 1:20 21:12,22
150:12 159:23
272:18,21 274:17
297:7,10
**3.66** 265:4
**30** 35:25 84:23
95:16,18 104:3,4
104:8,19 105:2,7
108:16,20,25
109:4,14,18,25
110:5 126:25
160:18 173:24
174:12,25 199:1
253:19,20 266:5
277:20 290:7
292:8 295:10
**300** 1:17 3:15 5:16
8:16 11:17 15:2
49:23 125:5
203:16 299:23
**302** 292:18
**30303** 16:23
**31** 114:21 116:3,3
116:8,16 117:12
**31st** 18:19
**32** 129:4
**320** 122:11
**33** 29:1 290:5
**330** 299:22
**33rd** 16:12
**34** 47:10 134:3
**340** 294:17
**35** 129:10 136:8
187:8 251:19
253:3,21 254:3
267:10,18 268:3
**350** 122:10
**350,000** 39:9
40:23 268:13
**36** 266:24 267:17
267:21

[36,087,000 - 62]                                                                 Page 3

| | | | |
|---|---|---|---|
| **36,087,000**  267:24 | **4708**  3:8 | 236:15 237:24 | **5149**  90:4 |
| **361**  157:18 | **4709**  3:10 | 245:10 250:3 | **5192**  6:1 |
| **362**  157:16,18 | **4712**  3:13 | 254:4 259:19 | **5266**  6:3 |
| **365**  53:6 | **4713**  3:15 | 265:18 | **5271**  6:5 |
| **37**  47:3 111:11 | **4714**  3:17 | **50.1**  63:4 87:7 | **5273**  6:8 |
| **37th**  15:13 | **4716**  3:19 | 166:11 223:14 | **5274**  6:10 |
| **38**  267:14 | **4717**  3:22 | **5005**  5:17 | **5277**  6:12 |
| **397**  299:12 | **4718**  3:25 | **503**  39:4 66:8,12 | **5283**  6:15 |
| **3989**  2:10 45:16 | **4719**  4:4 | 66:15,18,20,25 | **5285**  6:17 |
| **3rd**  49:3,5 193:4 | **4720**  4:6 | 67:2,8,12,22 68:1 | **5286**  6:19 |
| **4** | **4721**  4:8 53:20 | 68:25 69:3 73:15 | **5287**  6:22 |
| **4**  46:15 133:24,25 | 190:22 | 79:20 85:21 86:4 | **5289**  6:24 |
| 134:1 292:5,16 | **4724**  4:11 | 88:22 89:5,10,18 | **5290**  7:1 |
| 297:12 | **4725**  4:13 | 89:23 95:2 96:8,9 | **5292**  57:14 |
| **4.8**  130:19 131:6 | **4726**  4:15 | 101:6,12,20 | **5293**  2:7 257:5 |
| 265:4 | **4730**  4:17 | 106:25 107:8,10 | **5296**  198:10,17 |
| **40**  15:12 35:25 | **4731**  4:20 | 107:25 108:1,21 | **5297**  60:10 84:1 |
| 134:4 | **4759**  4:23 | 109:5,23 110:15 | 94:4 |
| **41**  103:20 263:18 | **4773**  4:25 | 111:21,24 112:8 | **5303**  49:7 |
| 272:18 | **4780**  5:3 | 112:25 113:7 | **54**  298:5 |
| **44**  106:11,13 | **4785**  5:5 | 120:5,11,22,24 | **55**  63:1,19 86:18 |
| 119:8,8,9,12,25 | **4786**  5:8 | 121:8 128:10 | 87:4 91:8 298:8 |
| 120:5 261:19,20 | **47th**  16:4 | 129:3,4,7,12,18 | **56**  64:4 87:11 |
| 261:21 262:9,24 | **48**  34:7 243:11 | 129:19 131:20 | **57**  87:14 297:6 |
| 263:6 264:18 | **4801**  5:12 | 138:11 159:11,13 | **58**  57:18 87:14 |
| 266:3,14,18 269:6 | **4861**  5:14 | 159:19 168:1,22 | **59**  87:14 298:19 |
| **4478**  134:10 | **4th**  134:22 | 170:18 199:18,18 | **595**  294:4,16 |
| **450,000**  39:7 | **5** | 213:18 215:1 | **5th**  14:4 |
| 268:12 | **5**  57:24,24 66:1 | 216:12 222:2,12 | **6** |
| **46**  63:9,9 121:17 | 81:10 84:3 99:9 | 259:18 261:17 | **6**  59:6 63:14,17,19 |
| **4611**  10:12 | 108:11 139:9 | 263:13 266:10,21 | 84:3 293:7 |
| **4635**  7:6 20:16 | 141:8 297:6 | 268:11 269:5 | **60**  57:18 68:19 |
| **4668**  2:13 45:25 | **5,000**  22:22 | 277:4 284:25 | 70:16 87:14 111:9 |
| **4673**  2:15 150:12 | **5.1**  50:18 66:7 | **5041**  5:20 | 111:10,14 122:8 |
| **4678**  2:17 | 206:15 | **5048**  5:22 | 122:10 228:7 |
| **4680**  46:24 | **5.3**  65:19 | **506**  229:9 | 253:19 267:11 |
| **4681**  2:19 | **5.8**  115:8,13 | **507**  156:3 252:16 | 268:6,7 298:11,14 |
| **4684**  2:21 47:8 | **50**  36:1 64:2 68:19 | 257:21 | **605**  13:12 |
| **4690**  2:23 | 122:8,10 135:2 | **5088**  5:24 | **60602**  19:21 |
| **4700**  2:25 | 159:20 171:7 | **5137**  55:6 | **60606**  11:4 15:5 |
| **4702**  3:2 | 173:7 196:7 | **5146**  56:3 | **61**  67:19 87:14 |
| **4707**  3:5 | 223:13,22 224:22 | **5148**  60:9 62:14 | **62**  86:16 297:7 |
| | 228:4 232:9 236:8 | 63:19 | |

**620**  17:18
**630**  11:18
**64**  216:18
**640**  12:19
**650**  22:16
**667**  294:6,15
**67**  69:16

**7**

**7**  47:7 134:3,19,24
  140:10,21 194:25
  195:17 196:6
  198:21 208:1
  231:21 232:17,17
  233:6,10,20,22
  234:2 235:1,5
  236:12 237:24,25
  240:15,21 245:1
  299:19
**7's**  140:11
**7.1**  50:14
**7.883**  265:2
**70**  254:7 258:12
  269:13
**71**  262:1 268:6
**710**  114:22 115:1
  115:4,11
**73**  141:20 171:4
**74**  294:3
**75**  32:21 37:6
  40:24,25 73:6
  126:25 129:10
  173:19 174:7
  181:10 202:3
  244:3 294:17
**75201**  8:17
**76**  73:25 76:9
**767**  8:4
**77**  19:19 79:5
**78**  198:11,17
  292:19
**79**  198:11
**7th**  190:20

**8**

**8**  64:17
**80**  215:23,25
  223:5 231:7 237:9
  237:15,17
**800**  152:15
**82**  34:13
**83**  292:18
**85**  297:8
**86**  10:4 159:10
**87**  292:25,25
**88**  77:7,9 294:6
  297:9

**9**

**9**  37:17 39:4 66:8
  66:12,15,18,20,25
  67:2,8,12,22 68:1
  68:25 69:3 73:15
  79:20 84:3 85:21
  86:4 88:22 89:5
  89:10,18,23 94:3
  94:13 95:2 96:8
  101:6,12,20
  106:25 107:8,10
  107:25 108:1,21
  109:5,23 110:15
  111:21,24 112:8
  112:25 113:7
  120:5,11,22,24
  121:8 128:10
  129:3,4,4,7,12,18
  129:19 131:20
  138:11 156:11
  159:11,13,19
  168:1,22 170:18
  195:11 199:18
  214:20 215:1,9
  222:2,12 246:23
  247:3,6,7,10
  259:18 261:17
  263:13 266:10,21
  268:11 269:5
  284:25 288:22

297:11
**9/13/19**  56:23 61:4
  298:9,12
**9/25**  127:7,17
  128:11
**90**  11:11 14:11
  107:9 111:23
  112:8 129:16
  130:2,6,8,8
  167:22 168:22
  170:15 253:19
  254:5
**90067**  15:23 16:13
**9019**  155:20
  282:13,17
**9024**  228:5,6,13
**91**  297:10
**919**  12:11
**93**  293:6 297:11
**95**  267:16 269:1
**966**  129:5
**97**  66:9,14,21 67:7
  67:9,25 68:24
  69:8,13 86:7
  110:18 111:2,10
  112:25 170:20
**97.5**  152:20
**975,000**  265:3
**99**  130:7 167:21
  253:7
**9th**  12:20 136:8
  188:7 190:20
  191:6

**a**

**a&a**  17:5
**a.o.**  3:12 6:19
**aaert**  299:13
**ability**  31:15 52:8
  112:17 113:3,17
  113:25 114:6
  198:4
**able**  24:17 42:22
  46:22 70:1 74:2,6

75:8,11 79:16
82:16 96:12 100:8
113:6 114:3 117:4
117:16 124:2
139:1 140:4,6
144:15,18 152:3,8
170:10 172:15
173:5 175:17
186:14,16 189:19
190:3 191:10
194:12 195:10
197:10 198:4
199:13 201:1
204:5 224:9 232:8
235:17 236:4
237:7 240:1 259:8
266:19 283:14
**abrupt**  271:4
**absent**  294:1
**absolutely**  39:23
  162:17 201:23
  235:16 236:2
**abstain**  35:1
**abstained**  52:25
  54:19
**acadia**  2:21 47:7
  48:10
**accept**  55:14 65:5
  82:17 216:5
  232:22 294:4,23
**acceptable**  142:13
**acceptance**  293:7
  293:12 294:5
**accepted**  213:12
  272:24 292:18
  293:1,10
**accepting**  254:3
  295:1,2
**accompanying**
  232:20
**accomplished**
  187:15

**account** 43:25
63:13,15,23 64:1
68:1,24 77:8,12
77:24 78:10 92:19
98:2 107:2 128:7
159:7 162:2,11
165:16 166:23
171:22 188:3
196:18 198:23
199:19 200:18
209:11 210:22
226:25 227:3,3
244:23 249:16
253:4 259:2,11
**accountant** 124:5
**accountants**
99:17
**accounting** 98:11
98:14,22 99:2
100:12 128:24
199:7 268:9
**accounts** 77:24
78:10 102:22
103:5,10 104:1,4
104:9,12,13,16,19
105:12,15 128:25
159:6 160:7,19
161:10 162:24
168:24 256:12
258:17,21 259:4,5
277:5,21,23 278:1
**accrual** 163:24
**accurate** 80:12
100:1,2 132:4,8
299:5
**accurately** 103:3
105:12
**achieve** 147:21
**achieved** 250:8
**achieving** 249:22
**acknowledge**
243:9

**acknowledging**
203:20 289:10
**acquisition** 187:7
**act** 178:5
**action** 141:2
152:22,23 178:1
178:20 180:1
195:4 204:16,21
205:7,16
**actions** 70:1 81:4
87:19 139:22,23
142:21 143:19
164:3 196:9
199:20 206:8
**active** 65:8,11
**activities** 100:22
**activity** 99:16,19
100:4,6,9
**actual** 184:4
**actuarial** 24:3
**ad** 14:10 30:13
36:5,7 81:16,22
82:6 83:7,10
114:14 149:14
150:4 172:11
186:20,25 203:18
278:22 290:25
**adams** 15:3
**add** 42:16 87:3
95:18 211:21
269:16
**added** 47:3 252:3
258:5
**adding** 47:10
102:17 258:4
**addition** 64:8
169:16 174:6
187:9 271:16
**additional** 30:21
34:1 43:2,12
55:25 64:5,9 66:4
87:11,17 102:13
102:15,17 103:25

104:6 105:7
106:11 108:20,22
115:13,22 168:2
169:8 171:24
192:23 197:23
200:25 201:11
202:8 231:23
237:8,23 261:19
265:25 267:9
269:11 281:24
**additionally**
192:5 199:10
200:4
**address** 28:2
36:25 86:20 87:5
87:11,14,17
137:23 140:17
158:13 204:9
219:15 227:14
291:16
**addressed** 48:20
115:15,19 116:12
125:3 199:23
210:1 224:7
**addressing** 28:5
115:3 124:5
257:19
**adequacy** 34:12
**adequate** 158:6
178:19 179:24
200:6 210:13,24
212:1
**adequately**
200:10 209:16
211:20
**adjourn** 172:17
278:25
**adjourned** 193:3
**adjourning** 42:12
42:15
**adjournment** 43:5
**adjudication**
118:8,13

**adjustment**
135:16
**adjustments** 98:3
**adjusts** 154:16
**admin** 14:10
31:10,13 34:6,8
74:18 82:16 133:7
145:17 149:14
159:2 173:20
188:22 190:14,16
190:23 192:2
195:12,22 196:12
198:25 200:1,4
201:3,10 202:4,15
203:16 205:8,18
205:21 206:1,3
207:14 238:1
241:14,17 288:21
**administration**
148:22
**administrative**
21:12,20 22:7,8
25:2,9 27:25
28:18,21 30:13,13
31:24 32:2,11,18
35:11,20 36:10
37:4,11 39:12,20
39:25 40:1,2 41:6
41:18 43:16 44:4
53:22 59:25 60:6
73:14,19 74:2,6
74:15,25 75:14,15
75:23 76:2 79:7
79:19 81:12 83:11
84:5,7,11 87:22
88:6,10 92:15,25
94:2,5,7,15,23
95:2 96:4 101:12
101:16 102:1,5,9
102:10,13,15,17
102:19 103:11,20
104:25 105:8
117:12,21 118:9

[administrative - allowed]                                              Page 6

118:18,21 123:1
123:13,22 128:4,6
132:2,5,11 133:22
139:1 142:14
143:4,24 144:9
148:25 149:19
150:16 153:22
156:12,17,22
159:20 160:5,8,17
160:23 161:20,25
162:6 163:1,6
164:22 172:7,9
175:22 176:2
180:11 185:9,21
185:24 187:4,9
188:4,10,15,23
189:20 191:17
192:5,21 194:7,10
196:3,4,24 197:5
197:11,17,20
198:12,18,21
199:3,10 202:9,12
202:20 203:3
205:24 206:20
208:20 209:10
212:25 213:15
216:19 217:3,7
220:18 221:5,25
222:24 223:17
224:5 225:3,4
228:2,9 229:2,17
230:17 231:20,24
232:10,15,18
233:9 234:14,22
235:5 236:5,11
237:5,8,13,16
238:11 240:3,7,8
240:12,17,23
241:1 242:5
243:11 246:24
253:14 254:4,23
255:9 256:22,24
257:2,6,8 260:21

262:13,15 266:13
267:12 268:11
277:2 278:11,12
278:20 279:5,8
280:9 281:4,9,21
282:1,5 283:2
291:2 298:18
**administratively**
134:2,23 211:11
211:12 234:11
235:16 236:2
283:22,23,23
**administrator** 3:4
15:10 91:1
**admins** 30:14
116:4,4 153:13
187:17 193:10,24
194:4 195:16
196:18,19 198:5
200:13,15,24
201:5 263:10,15
282:11 288:21
296:6
**admitted** 60:3
**adopts** 228:7
**adults** 283:21
**advance** 57:23
128:13 205:11
**advantageous**
194:4 287:10
**adversary** 205:5
**adversely** 36:12
36:23
**advised** 20:11
**advisors** 2:15 18:9
73:13,17 150:11
**advocate** 190:25
**affect** 36:23 38:8
47:12 54:14 79:25
92:21
**affiliated** 2:6 20:8
57:17

**affirmative** 178:5
181:9
**affirmatively** 33:3
173:17 178:2
179:12 295:8
**afford** 223:1
286:11,12
**afternoon** 90:24
137:15,17 150:21
186:24 187:2
203:11,14 207:3
212:23 219:23
289:13 291:12
**ag's** 146:9
**agenda** 20:12
27:17 45:11,16
47:8 49:1
**agent** 291:14
**aggregate** 22:24
110:5 198:24
205:12,15
**ago** 29:12 145:7
189:7 238:20
243:12 287:18
**agree** 44:24 74:25
84:14 86:19,25
96:12 119:20,21
172:17 174:19,22
175:6,6 188:4
190:11 196:11,16
199:24 201:4
205:24 236:13
239:6 244:3 245:5
251:12 253:24
265:11 270:5
277:3
**agreed** 22:12
47:24 60:3 61:19
89:19 119:15,16
136:24 143:8,25
150:14 152:24
155:13 172:14
202:2 220:3

246:24
**agreeing** 144:21
**agreement** 21:2
32:18 36:8 47:5
50:3,10,17 51:20
51:21 52:8,10
64:25 99:25
172:11 175:17
180:25 181:8
189:1 190:6,7,9
194:2 197:7,10
205:17 206:1
221:9 254:6
283:24 284:6
**agreements** 27:1
54:22 142:21
282:15
**agrees** 119:17
**ahead** 34:22 48:8
83:23 85:15 86:22
119:7 209:15
**aiello** 14:23
**ain't** 287:15
**akin** 9:1 194:21
195:21 203:12
272:9 286:3
**al** 1:10 2:1 6:12
**alan** 140:21
**aliano** 2:23 19:18
**aligned** 242:6,7
**allen** 11:21
**allies** 193:8
**allow** 29:25 31:16
52:19 79:9 127:3
140:12 152:1
172:12 180:9
191:1 267:11,16
268:7
**allowance** 43:5
84:7 94:7 180:4
**allowed** 21:20,22
22:1 37:5,7 39:8
39:12,20 40:22

[allowed - applies]                                                                       Page 7

41:5,18 42:8 74:6
74:16,18 75:14
82:11 84:10 87:21
96:12 102:19
106:16,16 117:21
127:8 128:4,6
132:11 139:13
143:4,24 144:15
152:15 156:2,4
173:19,20 174:9
174:12 177:11
201:15 215:16
217:8 223:17,20
224:5 225:4 228:3
233:23 237:16
246:25 247:1
254:4 268:13
**allowing** 50:23
140:2 148:19,20
215:3
**allows** 51:4,6 84:5
94:5 96:11 194:20
**alongside** 149:2
199:16 281:5
**alpine** 2:25 3:13
5:20 18:2
**alston** 11:8 289:14
**alternative** 140:9
140:10 194:12
208:1 217:2 243:2
295:25
**alters** 47:4
**ambit** 278:2
**amended** 2:5 4:15
27:18 57:15
222:11 264:13
265:3 271:9
**america** 12:2
**american** 7:1
**amount** 21:12,20
22:13,17 24:8
35:24 37:10 38:19
38:21 57:22 58:11

58:12 64:19,22
70:3 79:21 82:14
84:10 95:19,19
98:8 108:9 109:13
110:4,11 111:4
112:17,23 114:1
115:15 117:6
119:18 125:20
138:16 139:21
159:9 168:3
169:25 173:3,4,19
173:23 174:8,20
176:3 182:6
184:24 193:22
207:14 216:16
229:10 250:13,15
263:6 287:9
292:10,11,12,20
292:21 293:3,8,9
294:3,4,14,25
295:2
**amounted** 293:6
**amounts** 68:13
95:20 96:12
103:25 104:6,7
119:15,16,21,22
127:17,19 160:22
227:3 255:15
284:4
**amw** 17:7
**analysis** 72:17
73:22 81:16,18,19
81:21 82:2,15
100:25 107:11,12
107:18 108:1,11
108:12,18,22
109:1,2,3,6
124:22 128:6,9
129:12 131:25
135:3,20 139:17
205:20 232:14
233:2,6,25 234:11
235:9,17,19

250:16 256:7,13
256:14 257:23
281:18
**analyze** 107:10
108:19
**analyzed** 249:25
**analyzing** 134:22
**andrews** 17:3
**angeles** 15:23
16:13
**annex** 57:17 58:24
**annexed** 57:17
**announced** 22:9
**annual** 57:25
58:17 62:8 93:17
**answer** 41:1 69:15
107:20 108:12
109:8 113:10,12
114:4 118:16
122:20 124:1
169:5 185:8 203:5
227:16
**answered** 58:14
67:16 99:3 105:3
105:4,5 107:19
113:2,11 132:22
**answering** 103:3
126:13
**answers** 71:20
**anthony** 11:14
289:13
**anticipate** 92:4
**anticipated** 23:23
103:24 106:12
119:9 124:19
261:20 265:25
267:9 268:22
**anticipating**
70:16
**antiquated** 98:11
98:21 99:2
**anybody** 195:2

**anymore** 170:10
224:17 227:20
**anything's** 72:13
118:7
**anytime** 148:10
**anyway** 49:18
148:1 252:21
275:16
**apa** 81:2 107:3
110:15 112:18
113:19 114:1
138:11 139:25
155:9 159:14
162:21 165:15
**apart** 166:13
220:7
**apologize** 45:8
83:21 130:9
221:18 261:4
**appeal** 118:6
169:20 216:21,22
217:17,19 218:20
218:21 248:19
**appealable** 115:1
**appear** 126:9
162:1
**appearance** 188:7
289:1
**appeared** 190:5
213:15,17
**appearing** 288:25
**appears** 27:2,9
210:5
**appellate** 215:4
217:19
**applicable** 30:17
47:2 52:16 178:21
180:2 200:5
**application**
167:23
**applied** 273:23
**applies** 273:22,23

[apply - attended]                                                                    Page 8

**apply** 273:9
282:11,19
**appoint** 149:1
**appointed** 199:14
**appointment**
198:18
**appreciate** 23:24
149:6 208:16
264:20
**approach** 21:5
133:2 214:17
**approached**
196:14
**appropriate** 26:6
26:9 201:10 205:7
279:1,18
**approval** 51:23
146:9 247:14,17
278:25
**approvals** 142:16
146:6,8,8
**approve** 32:11,12
32:13 173:12
247:18
**approved** 150:24
159:17 293:18
**approving** 32:9
172:21 297:17
**approximate**
63:10 108:20
**approximately**
36:2 63:4,7,9,25
64:2 68:18,21
70:20 74:23 80:24
84:23 95:16
110:15 111:7
114:22 116:17
117:2,7 130:16,19
139:11 152:16
159:10 223:11
**april** 213:16
215:21

**archer** 11:16
**areas** 75:2
**arguably** 46:13
**argue** 29:8 52:8
159:12 269:21
**argued** 168:14
233:7
**argues** 163:14
**arguing** 168:16
**argument** 22:6
29:15 34:8 41:20
53:18 137:4,8
166:14,15 217:3
217:18 219:1,4
225:19 231:16
232:14 237:18
246:10,22 296:8
**argument's** 34:20
**arguments** 34:6
186:19
**arises** 221:4
**arm's** 27:4 207:18
**arnold** 15:25
288:24,24
**aronoff** 10:7
**ashford** 12:1
**asia** 243:15
**aside** 29:6 32:15
125:19 138:11
204:6
**asked** 57:12 62:7
86:10 88:22 89:9
89:12,14 93:13
99:4 101:2,5,8,11
103:9 105:3
107:19 118:25
119:3 182:16,22
188:12 189:6,24
197:1 202:4
251:23 252:1,5
255:18 256:1
277:18

**asking** 73:24 83:5
89:2 94:2 102:8
123:25 130:5
132:21 194:1
211:23 235:11
246:1 256:13
282:9
**asks** 208:2
**aspect** 26:11
153:5
**aspen** 5:19 14:18
**asr** 275:12
**assert** 47:14
**asserted** 81:21
111:2 141:1
152:17 187:8
270:4,6 277:22
278:4
**asserting** 32:22
52:6,17
**assertion** 121:6
142:14
**asset** 43:10 64:5
66:4 74:21 211:8
254:6
**assets** 43:11 52:17
64:9 65:19,23
79:7,10 80:1,7,15
80:23 82:18 89:16
124:3 134:21
139:14 140:5
158:3 160:6
163:19,20 199:7
206:17 208:21
210:8,17,19 211:1
211:21,21 212:2
222:23 231:23
239:7 248:20
272:14 274:2
**assigned** 47:1
52:9
**assignment** 54:17

**assist** 149:3
175:23 176:1
**assistance** 73:13
**assisting** 153:1
**associated** 29:7,9
183:16
**association** 4:10
17:16 291:14
**assume** 71:20
81:2 161:15 252:6
257:16 259:21
260:24
**assumed** 52:9
135:15 235:19
**assuming** 23:19
24:12 25:20 38:20
40:4 44:25 79:19
80:11 119:15,16
137:9 170:17
182:20 185:8
196:3 258:2
272:13
**assumption** 54:17
71:5,6 72:4,8
79:25 159:17
215:23,25 216:1
**assumptions**
248:13,13
**assurance** 185:9
**asymmetric** 4:8
187:6
**atlanta** 16:23
**attached** 192:13
192:13 291:24
**attack** 252:18
**attacked** 250:17
285:6
**attacking** 285:8
**attempt** 230:3
**attend** 42:22
**attended** 35:15
36:5

[attention - basis]                                                                    Page 9

attention  62:14
  67:19 69:16 73:6
  77:6 97:16 100:23
  103:16 126:19
  183:24,25 198:8
attorney  95:13
attorney's  10:2
  208:15
attorneys  8:3,14
  9:2 11:2,9,17 12:2
  12:10 13:2,10,18
  14:2,10,18 15:2
  15:10,19 16:2,10
  16:19 17:3,16
  18:2,9,16 19:2,11
  19:18 42:21
  219:25
attributable
  109:18 110:6
august  190:21
ausa  10:7
aust  9:18
authority  255:11
authorization
  255:11
authorized  23:4
automatic  37:4,6
  52:15 243:12,14
  271:7
automatically
  243:20
auxo  17:8
availability  92:21
  196:23
available  22:2
  37:10,11,23 38:10
  41:18 42:6 44:3
  83:10,11 92:12,13
  164:1,25 165:2
  168:22 169:9
  182:22 195:15
  196:12,18 205:9
  205:15 206:3,5,13

223:14 227:4
avenue  8:4 10:11
  11:11,18 12:19
  13:12,19 14:3,11
  14:19 17:9,18
  190:3
avoidance  275:25
aware  42:20
  51:11 58:6 83:13
  92:18 95:19 97:9
  106:10 115:3
  122:2 123:17
  180:12 210:1
  212:3 219:9

**b**

b  1:23 23:7 30:23
  39:4 45:25 57:17
  58:24,24 60:19
  66:8,12,15,18,20
  66:25 67:2,8,12
  67:22 68:1,25
  69:3 73:15 79:20
  85:21 86:4 88:22
  89:5,10,18,23
  95:2 96:8,9 101:6
  101:12,20 106:25
  107:8,10,25 108:1
  108:21 109:5,23
  110:15 111:21,24
  112:8,25 113:7
  120:5,11,22,24
  121:8 128:10
  129:3,4,7,12,18
  129:19 131:20
  138:11 159:11,13
  159:19 168:1,22
  170:18 192:15
  199:18,18 213:18
  215:1 216:12
  222:2,12 257:21
  259:18 261:17
  263:13 266:10,21
  268:11 269:5

272:20,21 274:17
  277:4 284:25
  298:3
back  20:23 31:22
  43:2 81:20 83:14
  86:17 103:7
  106:23 122:19
  137:3,11,12,15
  151:23 158:19
  164:24 165:23,25
  168:23 170:1
  185:4 192:20,25
  205:10 241:19
  256:21 259:10
  276:14
backdoor  218:20
backdrop  286:17
background
  150:4 221:3
backing  260:11
bad  159:16,16
  226:9,10 279:7
balance  70:24,25
  175:14
balances  98:1
balancing  230:17
ball  249:4
ballad  178:6
ballard  12:9
  48:10
balloting  55:11,12
ballots  55:17
  298:7
bank  166:23
bankr  275:14
bankruptcy  1:2
  1:16,25 37:6 71:9
  72:18 97:5,8,14
  98:15 99:1 121:5
  191:11 203:25
  220:12,12 222:7
  222:11,18 225:6,8
  238:11 243:19

257:7
bapcpa  222:11
bar  101:3,5,8,15
  101:16,20 102:4,9
  118:17,21 160:5,8
  163:6 234:1
  256:22,24 257:2,6
  259:20 270:6
  278:11
bartels  140:23
base  57:19,20,20
  57:25 58:3,17
  59:8 62:8 71:6
based  29:11 64:22
  68:15 69:25 71:24
  76:9 80:3 89:1
  93:17 95:14 108:3
  108:15 114:25
  125:21 129:8,24
  130:11 160:18
  200:1 212:15
  214:19 217:3
  229:14 233:17
  234:9,20 236:14
  239:19 240:4,18
  243:4 244:12
  249:19 251:21
  254:3 257:11,13
  258:7,7,9,10,24
  270:24 293:11
basic  181:15
basically  30:9
  45:18 143:22
  171:5 177:7 178:3
  200:8 218:3
  222:12 223:22,25
  230:24 231:12
  253:18 264:6
  267:2 270:17,19
  284:1,16,21
basing  270:14
basis  57:23 76:19
  80:2 99:20 124:23

[basis - book]                                                                                    Page 10

154:23 184:4
199:9 215:18,19
226:13 227:24
230:15 231:15
239:4 253:10
256:4,11 264:8,12
269:21 270:8
276:8,13 286:20
288:10
**battaglia** 15:9
90:25
**bears** 164:21
**beauty** 17:8
**beck** 7:24 299:3,8
**bedding** 16:19
289:5
**began** 191:23
**beginning** 73:11
132:2 222:25
227:8,19 228:1
229:21
**behalf** 2:13 20:7
48:10,10 51:18
61:10 90:19 125:1
150:4 166:8
186:25 198:5
203:12 207:4
212:24 276:25
288:25 289:14
290:25 291:13
**belabor** 275:8
**belief** 119:22
**believe** 22:15 23:3
29:12 31:15 49:22
52:21 54:4 59:10
59:25 63:12 65:24
66:1,20 69:11
70:14,16 71:2,9
74:1,5 75:25 76:8
79:6 80:8 81:19
84:4,18 88:23
89:9 90:21 92:12
94:4,15 102:16

110:14 115:14
116:17 121:10
123:8 133:11
138:18,25 139:6
139:14 140:14
144:13 153:5
157:3 159:11
162:19 165:21
166:5,6 168:8
172:9,21 173:11
174:24 180:2
184:8 187:16
195:17 200:11
202:11,18 205:17
209:14 212:16
222:6 228:12
233:11 234:1,9,11
235:19 237:11,15
238:25 242:25
243:1,24 244:25
246:12,13,15
247:21 249:25
250:1,21 251:22
258:24 262:16
267:2 270:24
271:2,8 272:9
276:11 286:14
295:14
**believed** 152:6
196:2 256:10
**believes** 66:25
67:12 200:25
**belong** 168:10
**bench** 137:20
**bender** 15:18
**beneath** 130:20
**beneficial** 193:13
193:14 205:18
**beneficiaries**
24:14 25:1 279:5
295:19
**benefit** 10:17 11:2
21:13 149:5 179:6

188:24 196:13
202:5 207:4
280:12
**benefiting** 227:5
**benefits** 7:6 20:14
21:14,21,24 22:6
22:14,17,22 23:6
24:19 26:14 151:9
153:3 155:2,5
202:11 204:17
295:7
**benzija** 15:9
90:25
**best** 23:24 24:10
65:16,22 66:4,11
70:5 140:3 187:16
187:18 189:10
190:24 202:25
203:2,2 205:3
220:4
**beth** 289:4
**better** 65:5 75:18
76:25 84:21 100:3
115:20 135:11
182:13 191:21
192:12 194:10,14
207:25 231:24
232:9 236:12
245:11 280:2,16
291:8
**beyond** 85:1
112:19 153:4
249:5 260:15,17
**bh** 7:1
**bi** 99:19
**bid** 283:18
**big** 113:21,23
132:17 195:1
196:25 197:6
232:3 241:11
252:11 254:25
265:13 285:12

**biggest** 24:7 191:6
195:23 198:1
**bill** 56:1 278:9
**billion** 42:24
75:22 97:25
105:23 115:8,13
121:19 122:3,9
124:20 125:1
152:17 204:19
207:8 239:22
250:3 253:13,14
265:14,14,18
**billions** 98:5
116:11 239:20,21
**bind** 272:21
**binder** 214:8
**binding** 29:8,16
142:23 239:1
**bird** 11:8 289:14
**bit** 29:22 158:18
221:14 252:19
**blackline** 21:4,4
**blank** 57:22
**blanket** 193:19
199:24
**blew** 291:25
**blindly** 182:21
**block** 207:22
**blvd** 15:21
**board** 23:18 57:11
57:19,21 58:1,4
58:22 62:9 93:14
141:3 142:1,1
197:24 287:2
294:12
**boards** 146:8
**body** 251:2
**bogus** 105:14
**boil** 223:15
**bond** 217:19
**bondholder** 173:8
**book** 61:15,17
136:24 161:11

[books - case]                                                                                    Page 11

**books** 97:8,14
102:25 103:13
104:9,12 105:11
107:15 161:13
162:1 169:13
270:9 277:6,12
**borderline** 152:4
**bottom** 84:4 94:14
97:18 129:14
133:18 134:16,16
134:21 136:9
198:16
**bought** 121:3
125:11
**bound** 272:12
276:8
**box** 103:22 124:24
177:16,18 252:15
262:15
**boxing** 3:21
**brainers** 253:6
**brauner** 9:8
**brave** 242:20
**breach** 7:24 299:3
299:12
**breaching** 273:16
**break** 137:3
150:11 246:4
**brian** 11:6 60:8
61:4 207:3 297:7
297:8,9 298:11,14
**bridge** 188:13
**brief** 20:19 21:8
85:12 140:18
192:14 203:13
207:5 208:16
209:4 219:24
274:10 276:18
292:2
**briefing** 59:5
154:1 155:19
**briefly** 88:18
213:1

**brill** 15:18
**bring** 31:8 70:2
74:22 156:13
231:22 250:5
285:24
**bringing** 206:12
248:20
**brings** 284:23
**brixmor** 12:10
**broad** 219:17
**broader** 82:2
276:17
**broadly** 173:16
**broadway** 18:3,18
**broke** 291:22
**brought** 167:21
238:20 246:5
285:13
**brouhaha** 241:11
**bryant** 9:4 16:3
**bst** 6:7
**buchanan** 12:18
**bud** 216:3
**budget** 123:12,17
199:4 232:3
**budgets** 199:6
**build** 154:21
219:18
**building** 9:13
16:20 26:10
176:21 207:22
**bulk** 283:2
**bullish** 204:20
**bumped** 253:2,3
**bunch** 35:22
75:14 160:9
219:24
**burden** 38:2
44:11 138:23
186:8 246:13
254:17 255:21,24
257:14

**burn** 286:2,3
**burning** 287:13
**bus** 123:11
**business** 31:20
41:9 71:21 162:23
222:1,3 288:17
**businessman**
95:13

**c**

**c** 8:1,8 9:7 12:15
20:1 52:25 134:7
136:7 165:10
229:9 299:1,1
**ca** 15:23 16:13
**calandriello** 15:1
**calculations**
102:18
**calder** 64:13,14
64:15
**call** 21:18 26:12
35:15 55:24,25
56:1 60:8 72:7
80:21 90:3 138:8
162:24 188:18,23
192:6 283:22
284:4
**called** 22:11
109:18 110:4
154:14 188:12
275:13
**calls** 188:10
**canyon** 239:3
**cap** 22:15,24,24
**capable** 287:19
**capital** 2:15 4:19
16:10 18:9 150:11
187:7
**capped** 40:24
174:7
**care** 4:6 6:14
116:4 251:9
**cared** 189:25

**careful** 153:18
159:1
**carefully** 73:14,18
232:14 245:25
286:18
**careone** 276:13
**carl** 3:4 15:10
90:25 208:12
**carr** 140:22
**carried** 186:8
**carve** 29:5 50:24
63:13,15,22,25
77:8,12,24 78:10
142:16 196:17
200:18,19 223:13
223:22 224:23
226:25,25 227:2,3
227:5 228:4 229:3
229:5,8,9,16
237:24
**carved** 276:16
**carves** 274:13
**case** 1:4 22:13
30:8 35:23 39:23
44:8 47:22 65:5
78:2 88:12 102:11
102:20 117:24
118:18 132:1,6
133:23 158:21
159:5 160:4
179:23 187:19,21
187:24 188:8
190:4,5 191:21,23
193:12,16,16,17
196:5 198:7
200:17 201:2
202:24 207:8
211:11 213:14
217:4 220:9 221:8
221:19,25 222:4
222:14,21,25
225:22 227:8,19
228:1,2 229:21

[case - choice]                                                                    Page 12

232:12,21 233:20
242:19 247:4,22
248:2,2 249:11,11
252:11 258:25
272:1 273:12
275:9 276:12,13
277:7 281:13
287:8 292:18
**cases** 29:23 72:18
140:2,3,6 155:11
155:24 159:3,3
164:9 186:4
200:21 205:22,22
207:11,23 208:2
220:16 221:5
222:9 248:16
249:2,5 285:12
286:20 292:15
293:24 294:18,20
**cash** 37:10,20,21
37:22,23 38:3,9
38:12 42:6,7,9
63:2,5,8 64:8
80:12,14 87:5
91:23 92:2,6,8,9
134:20 143:23,24
156:3,7,16,16
157:8 163:16
165:7,20 166:6,9
166:10,19,22
168:6,11 169:13
169:24 170:9
189:19 194:6
195:25 196:7,8,10
197:4 198:22
200:25 205:9
206:13 211:4,5,6
212:9 223:12,14
231:18 284:1,4,20
285:17 287:10,13
**catch** 177:7
179:13,14,15

**catches** 181:12
**catching** 179:11
**categories** 270:18
**category** 34:25
35:1
**caught** 84:12
125:12 237:9,12
**cause** 36:16
244:19
**causes** 141:2
152:22,22 204:16
204:21 205:7,16
**cautiously** 202:16
**cavaliere** 18:6
**caveat** 34:23
**cent** 236:15
**center** 19:3,12
**cents** 37:5,7 40:18
177:10 181:21
206:4 223:4,5
224:4 233:9,10
234:25 236:8,9
237:9,10,15
243:21 280:5
283:20 286:8,11
286:12,15
**century** 5:2 11:9
16:11 289:14
**cert** 299:12
**certain** 32:22
33:21,22 37:10
50:24 101:3
122:16 133:23
154:16 155:17
161:21 194:19
242:6 247:5
282:15
**certainly** 29:10,20
33:17 59:24 138:4
144:6 152:4
156:10 157:24
158:24 159:4
160:21 162:3,4

163:3 164:19,21
170:7 172:22
180:15 183:2
184:7 185:1
186:13,15 190:25
194:13 195:13
202:5 215:24
274:6 281:6
288:16
**certified** 299:13
**certify** 299:4
**cetera** 26:16
182:24,25 257:8
272:22,22,22
278:4
**ch** 2:2 7:3
**chain** 222:15
**challenge** 171:1
253:15
**challenged** 138:4
138:7,10 139:16
139:19 151:17
**chamber** 191:4
**chamber's** 191:14
**chambers** 10:4
20:11 35:15
238:19,20,25
**chance** 76:6
187:16 219:14
245:19,25 246:3
279:1,22,24 296:2
296:2
**change** 34:14
42:12 43:11,21,24
53:3 56:18 61:1
90:14 130:10
243:13 282:20
**changed** 91:13
271:7
**changes** 21:5 34:1
34:2 48:14 204:8
221:14

**changing** 43:19
**chantelle** 12:16
**chapter** 2:5 21:11
23:2,10 57:16
140:10,11 145:21
156:15 158:21
194:25 208:1
221:25 222:8
231:21 232:17,17
233:2,6,10,20,22
234:2 235:1,5
236:12 237:24,25
240:15,21 245:1
**charge** 73:21
**charles** 13:23
**chart** 47:6 48:18
48:25 49:23 53:19
103:22,22 105:22
120:8 124:18
126:20 160:18
165:16 260:14,17
260:19,20 261:8
261:17,17 264:25
265:17 267:20,22
269:18 277:19
291:24 292:15
**charts** 182:7,8
252:13
**check** 147:1,11
177:16,18 252:15
262:14 281:2
282:7
**checked** 103:12
105:8 124:24
**checks** 169:12
**chelsey** 4:2
**cherokee** 187:6
**chicago** 11:4 15:5
19:21
**china** 283:15
**choice** 101:14
183:16,18 184:4
184:10 185:13

[choice - claims]                                                                    Page 13

223:21 284:19
**choices** 284:15
**chose** 173:1
**chosen** 199:22
**christopher** 19:8
**circled** 192:20
**circuit** 40:7
178:22
**circuits** 151:21
**circular** 212:4
**circulation**
213:25
**circumstances**
30:18
**circumvent** 54:16
**circumventing**
280:3
**cited** 248:16
276:12
**citron** 13:9 35:8
57:8 62:6 93:12
**civil** 228:7
**claim** 21:19,20,24
21:24 22:8,12,13
22:17 26:15 35:11
37:5,7 39:7,9,12
40:23 42:8 43:5
53:22 81:12 82:11
88:6,10 91:18
92:10 94:3 96:4
101:16 104:19
105:14 106:19
111:5 112:7 115:2
115:5,22 117:2
119:17,18 120:10
120:10,22 121:1,9
122:3,8,17,22
123:7,13,19,23
124:25 125:1,13
126:4,8,10 131:1
144:15 145:17
152:16 158:22,23
160:24 161:5

172:10 173:20
174:8,12,15,17
177:11 181:21
185:24 187:4
194:8,20,21,22,23
195:3 200:2 202:4
204:18,19 208:20
208:23,23 209:5
209:14,18,21
210:2 212:5,6
215:3,16,16 225:4
229:11 233:25
239:25 246:20
252:5,11,16 253:5
253:7,16 255:4,5
255:9,13 256:11
257:25 259:6
261:1,3,5 264:8
267:8,12,25
268:12 269:23
270:12,16,16
278:8,12,15
280:10 283:7
284:15,16
**claimant** 21:23
39:21 212:25
**claimant's** 108:3
**claimants** 14:10
25:2,10 28:18
29:21 30:13 60:1
60:6 66:21 82:16
92:25 94:23 95:2
114:14 122:6
149:19 186:20
194:1,16 209:10
223:20 298:18
**claiming** 121:4,7
**claims** 21:22 22:1
22:3,5,7,23,23
25:5 35:22,22,24
35:25 36:2 39:2,4
40:3 41:6,7,18
50:5,24 51:1 52:5

66:15,25 67:8,12
68:1,25 73:7,14
73:15,19,22 74:3
74:3,7,15,25
75:14,15,23 76:3
76:16 77:14 78:12
78:13,14,16,16,17
78:20,21,22 79:7
79:20 81:21 82:1
82:1,5,7 83:12
84:5,8,10,24
85:21,23 86:4
87:21,22 88:23
89:5,10,12,15,23
91:10,16,20,24
92:15,22 93:2
94:5,8,15,24 95:2
95:3,17,18,19
96:9,9 100:24
101:3,6,9,12,12
101:20 102:1,5,9
102:10,14,15,18
102:19,24 103:9
103:11,17,21,22
103:24 104:5,9,14
104:15,25 105:8,9
105:23 106:5,13
106:24,25 107:8
107:10,25 108:1
108:15,20,21
109:5,13 110:16
111:21,24 112:25
113:7 114:22
115:2,8,12,13,17
115:18,20 116:2,3
116:3,7,9,15,16
116:18,23 117:6,9
117:11,12,12,15
117:16,20,21,25
118:2,8,9,13,14
118:18,21 119:11
119:13,15 120:6
120:11,18,24

121:15,18,19
122:1,4,12,23
123:2,14,14 124:5
124:12,16 125:8
125:10,15,18,22
125:23 126:3,5,14
126:15 127:4
128:7 129:3,4,7
129:12 130:16,22
131:6,9,12,14,20
132:11 134:20
138:15 139:1,12
139:13 140:8
144:10 147:8
149:4 150:16,25
151:25 152:17,22
152:23 153:22
156:2,5,10,12,17
158:17,20 159:7,9
159:19,20,21,22
160:1,5,8,9,18
161:10 162:6
163:6,10 164:18
168:1,22 170:18
172:7 173:18,20
175:20,22 176:3,6
177:3 180:4,11
186:13 187:9,10
190:1,17 193:12
193:22 194:3,5,18
195:1,6 196:3,4
197:3,12,19 199:3
199:21 200:22
201:15,18,22
202:2,6 207:8,8
207:14,15 215:1
215:23,23 216:1
217:7,7 218:9
220:19 222:4
223:18 224:16
225:10 228:3
229:23 232:20,22
233:23 234:4,5,17

[claims - committee's]                                                    Page 14

234:18,23,24,25
235:9,18 236:19
237:5,5,16 238:8
239:7,23 240:3,7
240:8 242:7
243:11 246:24
249:12,18,20,20
250:25 251:2,24
252:12,14 253:1
253:14 254:20,24
256:5,8,11 257:2
257:6,8,15,18,21
257:22 258:14,17
259:11,18,24
260:1,9,12,17,21
260:21,22,23
263:24 264:1,2,11
264:24 265:15
266:24 269:24
270:2,3,4,8 277:4
277:6,9,13,20,21
278:2,3,4,14
280:11 281:4,8,9
281:12,19,21
282:1,5,10 283:8
283:17 284:9,25
288:18 292:6,13
292:14,16 294:21
294:23 295:11
**clarification**
166:9 274:11
**clarified** 53:5
**clarify** 52:13 87:3
**clarifying** 54:10
273:13
**class** 21:13,16
22:10,19 292:5,16
293:11 294:23
295:7,13
**classification**
259:14 261:22
262:3,12

**clauses** 51:21
**clear** 26:24 30:20
34:15 35:17 36:10
39:24 47:21 51:14
54:13 67:5 72:1
164:13,16 170:21
172:6 184:10
187:5,11 194:13
205:20 236:4
276:10,14 284:22
**clearly** 31:23
181:7 197:16
207:25 276:11
288:10
**cleary** 13:1
**clerk** 55:5,16
137:20 298:6
**client** 39:8,11
41:12 91:19
209:14,15,16,17
211:22 217:22
239:25 244:7,8
262:22 268:11
278:13,15 279:11
279:14
**client's** 40:25
91:18
**clients** 173:6
187:9 189:22,25
190:1,17 191:3
202:6,7 220:3,5
234:24 245:5
283:19 285:18
286:6,8 288:9,9
**clock** 149:8
**clockwork** 223:6
**close** 31:20 36:22
146:9 229:20
**closed** 190:15
**closing** 104:1,7
169:13,13
**code** 37:6 143:6
145:25 222:7,11

225:15 226:11
238:11,16 243:20
246:23 247:3
271:25 275:24
279:13,14 280:3
**cold** 280:19
**collaborative**
23:22
**collapsing** 147:22
**collateral** 208:18
209:19,23 210:12
212:8
**colleague** 275:10
**collect** 251:14
273:17,19
**collectability**
250:13 251:5
**collection** 250:10
**colon** 14:7
**color** 42:16
**column** 127:2
129:2 135:15
**combined** 189:17
**combining** 272:8
**come** 31:16 40:1
60:14 64:20 65:9
74:19 81:2 131:25
137:3,11,12
139:23 140:4
144:11 149:19
153:13 155:22
157:14 173:12,15
178:23 180:8
182:5 184:7 191:8
191:20 193:22
195:15 201:8
203:1 204:16,24
206:14 209:10
212:18 225:16
240:4,6 241:19
242:22 246:19
252:10 274:6
276:14

**comes** 164:18
243:1 281:9
**comfort** 250:7
255:8
**comfortable**
200:15
**coming** 171:8
175:13,13 206:16
223:25 232:16
239:4
**commence** 199:1
**comment** 42:18
130:22 245:8
**comments** 35:17
186:18 206:23
207:6 208:17
219:24 252:7
292:3
**committee** 3:2 9:2
19:11 20:23,24
21:1,1 22:4 23:1,4
23:18,21 26:3,3
28:15,19 48:18
79:17 81:17
122:13 139:6
144:8 145:6
148:21 149:2
151:14 152:7
154:24 155:12,16
155:21 159:1
160:4 173:9 191:9
196:22 197:15
198:24,25 199:8
199:17,17 202:1
203:12 204:20,22
207:13 222:25
233:7 234:10
235:12 240:24,25
241:7,9,22 249:15
278:22 281:5,6
297:19
**committee's**
122:16 140:22

196:16 204:10
235:3 249:14
**common** 190:6
**communications**
71:10
**community** 3:15
5:16 11:17 15:2
49:23
**companies** 71:8
203:25 236:19
**company** 2:10
17:4 35:9 45:15
98:16 114:12
128:14 175:24
222:5,16 235:11
289:5
**company's** 43:10
**comparatively**
195:22
**comparing** 108:23
**comparison** 207:5
**compelled** 284:1
**compelling**
232:21
**compensated**
200:10
**compensation**
57:19,19,20,25
58:3,7,9,17,25
59:1,3,7,8,9 62:9
93:14,17,22 141:4
141:25 142:25
200:6 271:9
**competing** 172:25
**compiled** 107:24
**complaint** 71:16
249:6,19 250:16
250:18,20
**complaints** 71:20
145:12 206:9
**completed** 71:22
72:2,15 108:23
111:18

**completely** 30:17
111:25 224:6
236:25 273:3
**complex** 125:18
126:2,14,15,15,17
158:21
**complicated**
50:10 126:11
**component**
195:25
**compounded**
151:25
**comprised** 35:21
139:5 175:24
**compromise**
193:6,11 205:8
284:16
**compromised**
151:13
**compromising**
40:5
**compute** 34:22
**conceding** 210:3
**conceivable**
160:21
**conceivably**
143:10,10
**concept** 196:21
**concern** 25:1 83:9
113:20,21,23,23
114:16,17 191:6
198:13 210:18
213:2 278:21
283:11
**concerned** 31:10
32:4 89:20 113:24
114:3 197:18
211:16,19 212:4
212:15,17 247:3
248:21 273:8
274:4 276:9 296:9
**concerning** 114:6

**concerns** 112:17
113:17 114:7
140:5 204:10
**concession** 192:24
**conclude** 140:6
**concluded** 72:19
100:2 138:1
155:11 269:20
296:11
**concludes** 136:19
**conclusion** 64:20
155:24
**conclusions** 88:5
**condition** 114:19
142:9
**conditioned**
247:14
**conditions** 141:19
144:7
**conducted** 24:3
81:21
**conducting**
136:12
**conference**
114:14 191:4,15
218:7 238:20,25
287:15
**conferences** 218:5
**conferring** 289:11
**confi9mation**
155:7
**confidence** 105:11
245:4
**confident** 140:1
**confidential** 36:6
36:8 199:9
**confirm** 31:23
38:20 140:12
141:6,14 143:15
144:22 148:11
150:11,18,20,23
155:11 242:25
244:25 248:9

**confirmation** 2:12
5:17 20:11 23:1,2
23:10 27:18 28:1
28:25 29:1,14
30:4,21 31:9
37:19 38:7 41:20
46:1 47:3 55:2
56:16 58:2,19
59:4 60:23 90:12
103:25 115:16,19
115:24 136:21
137:4 138:22
140:14,18 141:16
142:11 151:2
156:7 172:14
173:13,21 185:7
186:20,21 190:22
192:14 193:2
195:12 197:16
198:19 200:19
205:20 208:3
209:4,12 217:25
265:15,20 277:1
278:24 280:4
285:21 292:2
**confirmed** 46:25
48:12 146:11
185:12,19 188:14
208:3 224:16
272:21 275:17
278:9
**confirming** 140:1
203:21 205:23
213:11 217:3
238:23
**confirms** 224:19
**conformation**
46:4
**confuse** 226:1
**congress** 26:24
222:10,12 247:12
247:20

connection 35:14
  57:15 84:6 94:6
  126:14 132:15
  133:11 136:20
  151:1 205:19
  252:13
consensual
  152:25 173:23
consensually
  174:19,22 175:20
consent 23:4
  27:25 28:17,21
  29:9,17,20 30:16
  30:17 31:11 32:12
  53:23 74:19 81:12
  82:14 84:5 94:5
  94:25 96:11
  122:17 145:17
  148:25 150:16
  155:17 156:12
  161:19 164:22
  172:8,10 178:1,7
  178:22 180:2
  182:21 213:21
consenting 241:14
  241:17
consequences
  181:17 200:1
  295:18
conservative
  65:25 205:2
  236:16
consider 126:2,14
  277:8 278:14
  294:19
considerable
  284:16
considered 121:8
  191:8
considering
  189:10 190:9
  192:7

considers 295:6
consistent 30:17
  139:10 146:4
  178:21 186:7
  273:3
consisting 152:20
consolidated
  152:15 194:22
consolidation
  151:18,19 154:8
  154:15,17 204:11
  235:25 236:1
  291:18 293:11,17
  293:23 294:1
constellation
  15:21
constituents
  190:18
constitute 139:22
constitution 10:11
construct 37:19
  37:19 42:7 94:22
  144:10 180:18,19
  192:11,14,16,17
  197:25 198:12
  202:21 220:4
  243:11 280:23
construction 47:5
consume 140:13
consuming 84:6
  94:6,9,18,21 96:8
  96:15 99:15,22
consummate
  142:22
cont'd 298:1
contact 25:3,15
  25:21,22 26:8
  215:3
contacted 42:20
  189:3,13
contemplated
  26:24 176:15

contemplates
  92:18 229:4
contemplating
  175:21 219:1
contemplation
  52:23
contentious 204:3
  285:13
context 181:6,7
  182:13
contingencies
  185:15
continue 20:24
  46:20 98:10
  140:13 206:14
  222:8 284:22
continued 98:21
  192:25
continuing 29:25
contract 47:13
  276:17
contractual
  159:14
contrary 190:19
  227:2 243:19
contributing 29:5
control 241:9
conversations
  58:23 80:3 206:7
conversely 21:25
  140:9
conversion
  140:10 187:20
  191:1 194:10,13
  194:15,25 217:4
  231:19,21 240:14
  243:2 245:1
convert 195:17
  225:22
converted 196:5
  205:22 232:6
converts 221:8

convince 38:1,2
  40:6
cooler 114:11,13
coop 3:7 6:21
  15:20
cooperation 23:24
coordinating
  116:22 123:3,5
copy 50:12 76:12
  76:23 133:3 214:7
  214:13
core 28:17
corp 3:21 294:5
corporation 1:10
  2:1,6 4:25 5:14
  6:19 7:1,3 10:17
  11:2 20:3,8 48:25
  57:16 137:16
  207:5 293:6 294:2
corporation's
  3:12
correct 30:24 31:2
  32:10 35:16 45:19
  46:7 48:2 54:21
  57:11 60:20 62:22
  67:13 69:18 70:19
  75:5,7,16 87:8,15
  87:16 88:1,7,23
  95:23,24 96:2,3,6
  96:7,10,25 97:1
  97:15 98:16 99:10
  100:12,14,20
  101:3,6,7,9,12,15
  102:2,6 104:2,21
  105:17,24,25
  106:9,14,15,17
  108:21,25 109:5
  110:19,22,25
  111:1,3,22 112:6
  115:7 118:3,6
  120:1,4,24,25
  121:5,9,12,13,20
  121:21,23,24

[correct - court]                                                      Page 17

122:18 127:12,16
129:21,25 130:18
130:20,21 131:13
131:18,20,21
133:23 134:18,24
136:15,16 143:5,7
143:9,12 148:18
149:21,23 153:9
153:10,24 154:20
157:5 167:9 169:1
169:23 170:12
179:19,21 183:17
217:4 218:10
230:20 237:21
238:2 244:10
250:11,11 251:22
265:1 282:12,21

**correspondingly**
136:14

**cost**  175:25
232:16,18,19

**costs**  200:16 201:6

**could've**  229:7
256:15

**counsel**  10:18
35:18 42:17 58:22
89:9,17 116:1,22
116:23,24,24
117:1 122:13,14
122:15,16 123:15
123:19,22,24
125:23 126:10
150:22,23 176:13
195:20 196:16,16
203:18 206:7
208:13 213:20,23
214:1 223:2
235:11 277:8

**counsels**  123:10

**count**  105:15
164:6 264:17
269:25

**counted**  166:4,5
259:25 260:1,2,4
260:6 265:7,9,11

**counting**  46:15
164:15 166:1
170:22 257:21
258:17 266:13,14
267:15 268:24
270:1,14 285:3

**countless**  259:11
259:24 260:9,12
260:17

**country**  299:22

**counts**  291:16

**couple**  29:12 77:6
81:7 85:20 86:17
99:1 117:17 125:9
145:7 186:20
189:15 190:16
202:17,18 203:19
204:14 206:6
266:21 270:18
292:5

**coupled**  139:24
154:22 159:17

**course**  28:16
39:24 40:13,16
41:9 53:16 59:5
71:21 81:15
137:21 138:20
148:10,24 160:10
177:8,13 179:7
209:9 210:20
219:21 222:1,3
238:12 282:6,24

**court**  1:2,16 8:15
20:2,9,15 21:6
23:14,16,25 24:3
24:6,12,20,23
25:11,14,17,20,24
26:5,9,19 27:12
27:14 28:5,8
29:11 30:19,25

31:3,18,21 32:14
33:2,6,16 34:8,21
35:4,6 36:14,16
36:19,23 37:1,14
37:25 38:7,11,14
38:16,24 39:5,10
39:14,17,23 40:10
40:12,14,17,20,22
41:3,11,20,23
42:1,11,15,23
43:9,20 44:7,18
44:21 45:5,12,17
45:20,23 46:3,8
46:11,13,19,22
47:16,19,24 48:3
48:6,8,13,15,19
48:23 49:5,8,11
49:13,15,17,20,25
50:6,16,21 51:3,5
51:8,10,19,23,25
52:14,18,19,22
53:1,4,7,9,17,24
54:2,8,15,18,22
55:8,12,14 56:4,6
56:9,12,14,20,25
57:3 59:12,18,23
60:2,11,14,17,19
60:21 61:3,7,15
61:19,22,23,25
63:16,20 67:17
71:13,15 76:9,14
76:17,20,22 79:3
79:19,23 80:10,16
80:19,22 81:6,10
81:25 82:8,12,20
82:24 83:3,18,23
85:2,6,8,11,14
86:21 88:17,19
89:4,7,11,16,20
89:23 90:5,8,10
90:16,23 93:7
96:13,16,20 99:3
101:2,5,8,11,19

101:21,23 103:18
104:3,12,14,18,22
105:10,14,18,20
105:22 106:4,7,20
107:20 109:7,9,17
109:21,25 110:3,9
110:12 112:18,22
113:2,10 114:25
115:3 116:2,10
117:5 118:1,5,22
118:25 119:3,7
121:25 124:11,15
124:18,22 125:2,5
125:14,17,25
126:6 127:8 132:5
132:22,24 133:3,8
133:13 134:1,5,6
134:8,11 135:23
136:1,18,22 137:2
137:14,25 138:13
140:16 141:6,10
141:13,16,19,24
142:4,8,11,20
143:3,6,8,10,13
143:18,22 144:2,5
144:20,22,24
145:2,4,14,23,25
146:4,8,16,19,22
147:3,14,19,24
148:1,5,9,11,13
148:15,23 149:6
149:10,15,20,22
149:24 150:3,7,9
150:13,17,18,19
151:3 153:7,11,13
153:15,17,19,23
154:5,9,12,14,25
156:20,25 157:6
157:11,13,16,18
157:21,23,25
158:3,5,8,14
159:17,23 160:14
160:17,21 161:9

[court - creditor]                                                                                                Page 18

| | | | |
|---|---|---|---|
| 161:13,15,18,24 | 214:24 215:5,9,13 | 254:9,12,14,16,19 | 293:3,8,10,14 |
| 162:8,10,14,16,18 | 215:18,25 216:3,8 | 254:25 255:10,15 | 294:8,11 295:15 |
| 162:22 163:5,11 | 216:10,14,16,21 | 255:17,19,23,25 | 295:22 297:17 |
| 163:14,21,24 | 216:23,24 217:2 | 256:3,8,16,19,23 | **court's** 54:4 |
| 164:10,24 165:2,5 | 217:10,16,24 | 257:1,7,9 258:4 | 208:17 214:3 |
| 165:7,11,13,18,23 | 218:2,4,14,16,19 | 258:11,16,20 | 280:13 |
| 166:1,4,12,21,24 | 218:22,25 219:7 | 259:3,9,15,20,22 | **courtney** 12:7 |
| 167:2,8,11,13,15 | 219:13,16,18,22 | 260:5,8,11,15 | 276:25 |
| 167:18 168:7,9,11 | 220:20,22 221:2 | 261:1,7,12,16,19 | **courtroom** 20:18 |
| 168:16,19 169:2,7 | 221:17,20,22 | 261:24 262:2,6,8 | 44:19 45:6 56:5 |
| 169:10,18 170:3,5 | 222:20 223:1,7,9 | 262:10,12,19,23 | 60:12 188:24 |
| 170:8,13,17,24 | 224:7,14,22,25 | 263:1,4,9,12,15 | **courts** 146:11,13 |
| 171:2,10,12,15,19 | 225:11,14 226:5,8 | 263:19,22,25 | 222:7 227:23 |
| 171:21,23,25 | 226:16,18,24 | 264:5,16,22,25 | 239:15 248:11 |
| 172:3,5,19 173:3 | 227:2,9,10,12,15 | 265:2,7,9,11,17 | **covenants** 47:2 |
| 174:1,3,5,11,15 | 227:18,24 228:5 | 265:22 266:1,7,11 | **cover** 22:20 |
| 174:18,21,23 | 228:11,19,23 | 266:18,23 267:1,4 | 122:10 |
| 175:1,3,6 176:2,6 | 229:3,13,24 230:1 | 267:6,13,17,20,23 | **coverage** 200:6 |
| 176:9,17,20,23 | 230:8,11,15,18,21 | 268:2,5,8,15,17 | **covered** 21:13 |
| 177:1,12,14,18,21 | 230:24 231:3,10 | 268:20,22,25 | 22:19 75:18 105:7 |
| 177:23 178:9,14 | 231:12,15 232:1 | 269:2,8,13,16,19 | 125:10 |
| 178:22,24 179:1,4 | 232:12 233:4,13 | 269:23 270:3,8 | **covering** 277:23 |
| 179:8,13,17,20 | 233:15,18,24 | 271:1,10,15,17,19 | **craig** 55:5,16 |
| 180:3,13,17,21,23 | 234:3,8,13,16 | 271:22 272:5,7,11 | 298:5 |
| 180:25 181:2,5,21 | 235:7,11,22 | 272:17,19 273:7 | **cram** 293:15 |
| 182:4,10,14,16,20 | 236:13,25 237:4 | 273:12,24 274:3,6 | **crazy** 223:19 |
| 182:24 183:2,8,11 | 237:12,18,22 | 274:10,14,25 | **creating** 97:20 |
| 183:15,17,20,23 | 238:1,3,5,14 | 275:3,6,9,23 | **creations** 2:25 |
| 184:2,9,12,14,17 | 239:6,8,11,14 | 276:6,21,24 | 3:13 5:20 18:2 |
| 184:19,23,25 | 240:13,18 241:6 | 277:14,16 278:19 | **credibility** 259:23 |
| 185:4,12,17 186:2 | 241:12,14,17,21 | 278:25 279:3,11 | **credible** 138:14 |
| 186:5,11,23 187:2 | 242:1,9,15,18 | 279:16 280:6,25 | 246:14 |
| 189:4,8 191:11 | 243:5,7,22,25 | 281:12,15,22 | **credit** 41:14 |
| 201:8,8,20 203:7 | 244:3,6,11,14,18 | 282:9,13,15,19,22 | 266:15 287:23 |
| 203:9,14 206:25 | 244:22 245:2,9,15 | 283:6 284:2,7,12 | 288:3 |
| 208:5,7,11 209:12 | 245:19,24 246:7,9 | 284:18 285:2,5,9 | **creditor** 12:2,10 |
| 209:18,22 210:7 | 246:16,21 247:12 | 285:24 286:14,25 | 13:18 14:2 15:19 |
| 210:11,13,16,21 | 247:20,24 248:2,4 | 287:5,8,24 288:5 | 16:19 18:2 19:2 |
| 210:23 211:6,8,12 | 248:7,9 250:7,9 | 288:8,20 289:3,7 | 37:4 119:17 |
| 211:17,19,25 | 250:12,15,19,24 | 289:19 290:3,11 | 152:14 153:8,10 |
| 212:14,21 213:3,5 | 251:5,9,15,18 | 290:14,17,20,23 | 156:6 157:3 |
| 213:8,16,17 214:7 | 252:10,19,21,25 | 291:4,7,10 292:10 | 161:21 188:2 |
| 214:11,13,18,22 | 253:1,20,24 254:1 | 292:12,20,22,25 | 193:13 207:7 |

| | | | |
|---|---|---|---|
| 208:2 234:22 237:13 241:14,17 273:17,19 280:16 280:17 | 236:5,11 237:9,16 238:11 240:17,23 240:24,25 241:1,2 241:5,7,9 242:5 | **cutting** 270:17 277:24 281:2 **cyrus** 4:19 16:10 | 188:17 197:17 198:22 199:8,19 204:22,23 212:12 213:23 218:1,5 |
| **creditor's** 229:11 233:7 | 249:14 272:23,23 277:2,15 278:11 | **d** | 222:22 223:11 232:23 246:25 |
| **creditors** 9:3 13:10 20:22 21:1 22:4 23:11 26:3 28:15 31:10,13,14 31:16,25,25 32:3 32:11,19,24 33:1 34:6,8 35:8,20 36:11 37:11,12,24 38:13 39:16 44:5 57:9 84:12 96:5 96:14 119:24 121:1 139:6 140:22 151:14 152:7 154:24 155:12,16,21 161:8 173:7 185:9 187:6 188:10,16 188:22,23 189:20 190:14,16,23 191:17 192:2,6,21 193:16,17 194:10 194:17,18 195:13 196:12,22,24 197:5,17,20 198:13,25 199:17 200:1 201:10 202:9,12,15,20 203:3,16 204:14 204:17,20 205:3,8 205:18,21 206:3 209:4 220:19 221:6 222:1,13,21 222:24 224:5 225:3 228:2,9 230:11 231:20,25 232:8,10,15 233:9 234:15 235:5 | 279:5,8,10,25 280:1,2,4,13,19 281:6 283:2,3,15 290:6 292:4,8 293:19,24,25 294:9 295:2,6,8 295:11 **creditors'** 81:17 **credits** 127:6 **crescent** 8:15 **cross** 55:8 57:1,5 61:7,12 62:3 79:4 85:8 90:17,21 91:3 93:7,9 105:1 135:24 **crowded** 44:18 **crushed** 292:4 **cumbersome** 99:14,22 **cure** 49:2,18 52:5 52:6,7,18,20 53:6 54:16 **curious** 71:7 **current** 47:13 64:22 92:11 93:4 100:13,21 129:15 129:18,22 130:1,1 130:2,10 195:18 196:17 277:21 **currently** 78:17 92:9 99:10 100:11 102:21 129:7 141:13 169:16 **customer** 121:2 **cut** 201:15 230:1 270:6 | **d** 1:24 10:22 12:16 20:1 157:18 271:25 272:18 297:1 298:1 299:12 **d&o** 73:1 74:21 80:6 287:3 **dallas** 8:17 **dash** 136:14 **data** 97:19 98:4 99:21 100:4,5,9 100:10,13,15,16 100:17,20 **date** 21:9,10,17 22:12 26:6 38:3,6 38:17,18 39:15,18 39:22 41:16,19 44:2 79:8,9 87:9 92:12 93:3,4 95:14,15 97:24 101:3,5,8,10,11 101:15,16,20 102:4,9 103:23 104:6,14 105:23 106:2 107:15 108:5,6,7,15,16 108:19 118:21 121:19,22 127:7 128:17,17 133:25 139:13 140:19 141:20 142:9 145:21 146:2 147:9,20,21 148:22 155:15 156:7,15 159:10 160:5,8 161:24 163:2,4,6,12 170:23 173:24 177:10,11 181:14 | 247:5,5,13,22 249:23 257:7,7 259:20 262:17,21 263:21 270:6 278:12 279:15 282:6 299:19 **dated** 56:15,23 60:23,24 61:4 90:12 133:24 298:9,12,15 **dates** 108:4,23 118:17 193:3 267:3 **david** 13:15 35:7 57:7 62:5 93:11 **davidoff** 13:9 35:7 57:8 62:5 93:11 **davis** 140:23 **day** 27:24 30:1 83:15 128:1,11 138:15,16 149:20 159:5 177:4 192:10 194:4 202:22 211:3 221:19,22 280:1 285:25 **days** 28:24 29:1 29:12,19 112:9 121:5 143:1 145:7 173:21,24 174:12 174:25 189:15 199:1 209:12 219:11 220:12 290:4,5,7 **dc** 10:13,20 **de** 12:13 14:3 65:19,22 |

**dead** 251:2
**deadline** 257:8
**deal** 25:8 26:15
  27:21 28:17 29:18
  34:12,14,16 51:6
  64:16 89:4 160:10
  160:25 173:6,7
  178:7 190:16
  201:15 229:4
  233:8 236:24
  237:1 239:15
  249:17 257:19
  263:9,15 278:2
  279:7 280:16
  281:2 288:8,9,13
**dealing** 118:9
  138:15 154:18
  173:8 185:23
  192:3 220:22
  230:5 249:2
  252:17 263:12
  266:11 288:20
  290:6
**deals** 29:24
**dealt** 242:11
  248:17 278:3
**debating** 284:9
**debt** 116:12 187:6
**debtor** 31:22 39:1
  39:13,19,25 40:9
  42:18 57:13 66:17
  66:18,24,25 67:5
  67:6,7,11,12 69:8
  69:12,24 70:14
  71:3,9 73:17
  78:21 98:24 99:24
  100:10,19 101:5
  101:14,19 102:8
  106:13 107:14,24
  109:3 112:16
  113:16,24 114:6,7
  115:8 119:20
  128:15,16 152:18

170:17 194:22
195:7 209:15
214:1 216:15,16
224:13 225:5
229:21 232:13
241:10 246:6,13
265:23 272:4,22
273:1,9,15 274:13
278:8,12,16,23
280:8 281:10
283:22 292:9
294:14 298:18
**debtor's** 137:4
  139:11 140:20
  213:19,23 214:1
  223:2 234:10
  249:15 270:21
  273:23 274:1
  276:18 277:8
  292:3 297:18
**debtors** 1:12 2:6
  7:5 8:3,3,14,14
  20:8,13,20,22,25
  21:11 22:4,8 23:3
  23:11,13,24 24:8
  27:3,16,17 30:6
  30:19 31:9 32:5
  32:15 35:18 37:14
  38:1 44:9,15
  47:21 50:19 51:1
  54:10,22,24 55:23
  57:17 59:24 60:5
  60:7 62:16,21
  70:21 73:12 74:2
  74:5 77:24 78:10
  79:6 81:16 82:2
  84:6 85:22,25
  90:3,21 91:23
  92:2,3,5,7,9,21,25
  94:6 97:14 98:24
  100:7,11 101:2,8
  101:11 102:25
  103:13 104:9

105:11 107:13,13
108:3,4,13,16,24
109:14 116:24
117:1 118:20
121:1,5,7 122:13
122:15 123:3,8,14
123:18,22 125:13
127:3,6 128:1,20
128:24 129:23
131:23 136:3,20
137:18 138:21
151:19 152:7
155:21 156:16
160:25 162:1
165:15,18 166:9
170:1,21 173:1
187:15 193:2,18
193:21 194:1,2,8
194:19,19,23
195:10,13,21
196:11,15 198:9
198:24 199:4,5,16
199:24 200:7
204:4,6,22 206:19
207:9,12,19,20
208:21 209:3,14
210:1,2 211:3,24
212:1,12 215:1
216:17 218:6
235:14 270:9,15
272:1 274:15,19
275:1,5 276:7,12
277:12 279:7
281:2 282:5 290:9
292:18 293:15
294:22 295:1,10
**deceased** 21:19
  22:11
**december** 37:21
  41:7 42:9 44:4
  83:10 97:9,11
  98:20 173:23
  180:7,16 197:11

213:15 224:1
**decide** 28:23 29:1
  38:21 74:13
  169:19 217:21,22
**decided** 45:2
  118:20 155:8
  169:18,20 188:3
  242:9
**deciding** 123:11
**decision** 33:11,12
  181:23 182:15
  201:9
**decisions** 181:17
  198:5,6
**deck** 138:24
  140:21
**declaration** 4:2
  20:21 55:5,7,14
  55:16 56:2,15,23
  60:10,24 62:13
  63:1 64:4,6 66:13
  67:20 69:17 73:12
  73:21 74:1 75:19
  75:20,24 76:1
  77:3 79:5,23 81:8
  82:25 83:15,21,22
  83:25 84:19 86:13
  86:16,20,25 88:2
  88:9 90:4,11 91:6
  94:4 97:17 99:8
  100:24 103:20
  114:21 121:18
  124:14 126:20
  164:20 165:5,11
  171:4,6,18 201:14
  216:4 261:13
  277:20 291:23
  298:5,8,11,14
**declarations**
  35:13 36:16 43:8
  60:8,22 61:4
  76:10 82:4 170:22
  182:8 183:3

[declarations - disagree]                                                           Page 21

202:14
**deduct** 103:23
166:18,20 167:5
**deducted** 131:20
229:11
**deduction** 127:19
**deem** 112:18
177:25
**deemed** 30:16
32:12 60:3 106:16
113:7,18 121:4
174:8 180:23,24
180:25 181:6
244:1,3 290:6
**deems** 114:1
**default** 253:6
**defendants** 205:6
**defenses** 71:21
194:3,3 250:22
**defer** 52:18 88:4
225:24
**deferred** 168:4
**defined** 47:25
62:17 187:4
260:22 272:2
**defines** 116:7
**definitely** 145:5
**definition** 233:19
257:5 274:24
**definitive** 142:12
**defrauded** 256:10
270:10,11
**degree** 295:7
**delay** 24:7 79:8,12
79:25 195:19
197:2 215:3,3
**delayed** 163:12
184:21
**deliberate** 101:14
160:12
**deliberately**
118:20

**delighted** 212:11
**delivered** 96:2
128:3,8 278:7
**deliveries** 255:3
277:9
**delivery** 109:22
254:22 267:3
**demand** 71:15
249:1 255:9
**demanded** 159:1
**demands** 92:2
249:4
**demonstrated**
138:25
**denied** 249:9
**department** 9:11
10:1,9 24:24
**depend** 75:1,8
**dependent** 196:9
**depending** 64:17
68:4 79:14 98:2
109:1 161:2 180:7
**depends** 72:25
75:18 117:4,25
**deposit** 227:3
**deposition** 61:12
61:13 90:20
136:25 137:5,10
**depositions** 190:4
190:5
**derived** 104:8
199:7
**describe** 58:25
94:9 97:4 126:2
**described** 22:20
84:21
**description**
297:16 298:4
**deserve** 183:24
**designated** 26:7
61:13 90:19
**designations**
90:21 136:25

137:5
**designed** 28:22
**designee** 140:21
150:3
**designees** 140:19
140:23,25 148:17
148:19
**despite** 207:18
292:1
**detail** 112:2
115:14
**detailed** 73:12,20
**details** 190:8
**determination**
208:22
**determine** 108:5
124:3 240:7 277:6
279:18,18,20
**determined** 74:8
103:13 105:1
108:18 120:20
217:18 248:25
**deutsch** 19:10
**development**
129:1
**dialogue** 173:1
**diamond** 13:17
**dicta** 275:16
**didn't** 174:9
**died** 21:16
**difference** 108:9
108:17 110:11
192:17 232:1
238:6
**differences** 204:6
**different** 31:21
41:24 82:24
108:15,23 135:9
135:11 156:21,21
157:7 158:1
175:25 194:17
220:7,8 233:5
255:4 272:19

291:15
**differently** 104:5
183:5 233:18
240:23 242:17
**difficult** 172:24
187:13,18 202:24
202:25 262:13
**diligence** 24:1,6
81:18 82:20
136:12 182:17
188:25 189:5
228:20
**diligent** 145:9
**diminish** 191:2
**diminished**
209:19,23 210:19
**diminution**
208:19
**dip** 77:16 99:25
169:25 220:23
221:2,14,15 223:3
223:9 226:24
230:13 234:17
**direct** 55:15 56:16
56:21,24 60:22
61:1,5 76:5 90:11
90:14 97:16
112:20 137:22
198:8 255:12
298:10,13,16
**direction** 137:22
**directly** 66:22
83:6
**director** 96:25
**disableds** 22:21
**disadvantageous**
193:18
**disagree** 44:23
119:24 175:7
211:3 216:3
236:25 239:3
245:17 271:1
275:12

[disagreed - duplicate]                                                        Page 22

disagreed 275:11
disagreement
  170:19 198:2
disagreements
  207:11,18
disallowed 115:2
disallowing 106:5
  106:13 122:1
  131:5 257:17,22
  263:24
disappointed
  188:20
disburse 50:18
disbursed 224:19
discharge 272:10
disclose 141:8
disclosed 58:1,18
  185:18 271:9
disclosure 122:19
  132:9,13,16,19,25
  133:9,12,13,15
  134:8 136:7
  141:21 165:10
  204:5,9 205:1
  234:20 235:2
disconnect 277:4
  278:6
discount 35:23
  39:17 179:3,5
  202:1 255:19
  266:18 284:17
discounted
  111:25
discounting 269:7
discovered 228:19
  228:20
discovery 71:20
  240:1
discrimination
  283:10 284:6
discriminatory
  177:25

discuss 33:23 64:4
  115:25 126:10
  138:12 139:4
  212:12
discussed 32:16
  58:6 59:8 66:6
  93:16 154:1
discussing 41:24
discussion 86:6
  114:10 167:18
discussions 58:20
  59:2,3 71:24
  81:18,25 82:21
  93:23 101:17
  114:2,5,9 118:1
  123:10 125:22
  152:10 169:25
  191:25,25 213:25
  244:13
disingenuous
  190:13
disparate 33:9
dispute 22:5 27:7
  109:18 110:21,24
  153:4 164:2
  166:25 235:2,7,14
disputed 267:3
disputes 75:15,17
  168:25 171:9,12
disputing 84:10
disregard 253:10
disservice 226:3
distinction 187:11
distribute 30:9
  232:5,8 236:8
distributed 50:15
  189:20 196:24
distributing 234:2
distribution 177:7
  179:11,16,20
  181:10,13 200:24
  201:4,5 209:5
  233:20 234:6

236:8,15,20 237:8
distributions
  50:25 195:16
  197:20 201:10
  233:22
district 1:3 3:15
  5:16 10:3 11:17
  15:2 49:23 50:6
  50:18,20 51:18
  206:16 275:10
diverged 193:10
divine 137:9
dno 139:23 183:6
docket 49:3 60:9
  134:6 190:22
  198:10,17 218:8
document 36:22
  57:14,17 62:14
  63:18 84:1 94:4
  128:2,20 133:6,10
  133:20,22 134:5
  134:14 135:7
  136:6 198:10
  257:5
documents 47:11
  47:12 103:7,8
  142:12,21 271:9
doesn't 177:19
doing 29:4 73:18
  112:9 132:1 147:5
  147:12 156:19
  177:1 192:7 235:8
  243:20 244:6
  254:1 273:3
  281:10
dol 23:19
dollar 40:18 57:21
  95:19 119:21
  125:13 173:3,4
  223:4 233:11
  241:1,2 262:5
  280:5 287:3
  292:10,11,12,20

292:21 293:3,8,9
  294:14
dollars 50:19
  63:11 65:3 74:19
  75:17,22 81:2
  98:3,6 102:10
  115:15 116:12
  118:14 161:21
  165:15 220:17
  258:9,14 260:21
  260:23 261:5
  269:11
domestic 35:12
  95:15 131:20
  283:8
domino 187:25
donna 15:16
  90:24 208:12
door 280:10,13
doors 190:15
double 269:24
  270:1
doubt 34:9
downside 194:16
dozen 35:25
draft 57:24 184:7
  185:2 213:25
drain 1:24
dressing 198:3
drive 11:3
driving 123:11
drogin 18:1
drop 121:8
dublin 9:7 147:10
  203:11,12,15
  207:1 219:4
due 23:25 24:6
  40:2 59:5 82:20
  97:23,23 100:10
  182:17 209:13
  221:23 258:23
duplicate 76:16
  115:20 253:16

265:4
**duplicates** 116:13
19:12 130:13
252:13
**duties** 240:21
**dynamics** 241:25
242:2
**déjà** 118:22

**e**

**e** 1:23,23 8:1,1
14:7 17:13 20:1,1
23:7 26:13 52:11
55:16 56:12 127:2
297:1,3 298:1,3,5
299:1
**earlier** 52:22
79:13 89:1 144:12
156:13 164:2
180:1 195:24
206:15 216:6
**early** 144:11
145:19 236:17
277:7
**easement** 47:5
**easily** 240:9
247:12 254:7
**east** 16:11
**easy** 25:5 29:23
155:24 184:14,15
205:4
**ecf** 2:6,10,13,15
2:17,19,21,23,25
3:2,5,8,10,13,15
3:17,19,21,25 4:4
4:6,8,11,13,15,17
4:19,23,25 5:2,5,8
5:12,14,17,20,22
5:24 6:1,3,5,8,10
6:12,14,17,19,22
6:24 7:1,6 20:16
45:10,15,25 46:24
47:8 49:3 53:20
55:6 56:2 90:4

134:10 150:12
**echo** 202:24
**economic** 181:17
**eda** 50:3,13 52:8
66:3
**edgewell** 4:6 6:14
**edward** 17:21
61:9 90:18 291:12
**effect** 148:16
175:16 188:1
283:24
**effected** 142:22
143:20
**effective** 21:9,10
38:3,5,10,17,18
39:15,18,21 41:16
41:19 44:2 79:8,9
79:18 82:19 92:5
92:7,12 93:3
117:14,22 132:12
139:13 140:18
141:20 142:9
143:3,11 144:3,17
144:18,25 145:9
145:18,19,21
146:2 147:9,20,21
148:13,22 155:15
156:9,15 159:10
161:24 163:1,3,12
163:15 164:16,20
170:23 172:10
175:25 177:10,11
181:14 185:7
186:15 197:17
198:22 199:8
203:22 204:1,22
204:23 205:11
206:18 211:7
213:2,11,12 217:6
217:12,23 218:1,5
218:6,9 219:12
232:23 233:17,19
236:23 238:21,24

240:9 246:25
247:4,13,18,22
249:22 257:12
272:13 279:15
282:6 285:21
**effectively** 149:1
156:8 178:1 280:3
**efficient** 140:7,14
198:14
**efficiently** 197:22
**effort** 23:23 99:21
129:8 160:12
175:1,19 189:17
230:3
**efforts** 283:5
**eight** 71:11 269:3
**eighth** 17:18
120:10 265:3
**either** 33:19 118:6
126:5,9 157:13
169:2 191:3 218:2
225:15 237:19
288:12 295:8
**election** 185:18
**electric** 5:14
**element** 22:25
**elements** 87:15
199:22
**elephant** 284:24
285:25
**eliciting** 89:18
**eliminate** 86:6
**ellen** 16:25
**elucidated** 43:3
151:22
**emerge** 142:7
**emergence** 147:13
156:18 199:21
**emotion** 202:23
**emphasize** 202:10
**employed** 187:22
**employee** 126:5,9

**empty** 274:5
**enable** 43:6
**encouraging**
144:14
**ended** 146:14
**ender** 119:6
**enforce** 272:5,7
**enforcing** 273:2
**engage** 170:20
**engaged** 81:17
**enjoin** 46:5
**enjoined** 272:3
**enormous** 196:13
**ensure** 147:12
149:2 199:20
205:2
**ensures** 23:11
**enter** 23:14
141:16 194:1,7
297:17
**entered** 106:4
114:25 121:25
141:22 142:12
188:7 190:6
191:24 201:16
218:23 228:9
264:17
**entering** 209:12
**enterprise** 152:2
163:23
**entertainment** 5:2
11:10 289:15
**entire** 280:23
**entirely** 39:24
**entities** 224:16
292:9
**entitled** 37:5
39:11,14 40:17,23
41:8,13,15 59:1
166:24 200:5
212:8 235:18
237:17 279:14
281:18

entitlements
  141:1
entries 98:1
entry 21:17 28:25
  29:1 30:3 173:21
  198:10
epa 68:9
epi 6:5,10
equal 22:13 57:23
equation 79:24
equipped 76:25
  118:16
equitable 16:20
  230:19,22
equitably 23:12
equities 238:7
equity 222:20
  272:23
eric 6:17 13:11
  16:16 35:9,11
erica 219:25
erika 14:15
  186:24 290:24
esl 3:24 4:3,22 5:7
  5:11 6:1 13:2
  42:21 53:14 62:17
  62:22 72:24 73:2
  74:20 75:7 80:17
  81:3 87:19 138:11
  139:23,24 164:14
  164:15 165:23
  166:14 183:6
  195:12,19 197:3
  205:5 219:11
  249:13,24 257:20
  284:24 285:24
  286:21 287:22
  288:3,18
eso 240:5
especially 163:19
  175:12
esq 8:7,8,9,10,11
  8:19,20 9:7,8,9

10:15,22 11:6,14
  11:21 12:7,15,16
  12:23 13:6,7,15
  13:23 14:7,14,15
  14:23 15:7,16,25
  16:7,15,16,25
  17:13,21 18:6,13
  18:22 19:8,15,23
essence 25:15
  46:3 217:17,18
essentially 50:3
  194:21 204:18
  209:15
establish 21:11
  262:13
established
  251:23
estate 3:4 15:10
  21:16 30:10 50:4
  64:14 65:3,13,17
  69:11 70:22 74:11
  77:15 88:12 91:1
  132:6 134:2,17,23
  140:13 148:16
  155:9 168:10
  169:9 173:14
  179:6 186:4
  190:25 191:2
  193:22 195:8
  196:7 200:25
  201:6,11 203:2
  206:12 216:20
  231:25 232:10
  233:8,10 234:11
  234:20,21 235:1,3
  235:20,24 236:10
  248:20 249:23
  257:15 281:7
estate's 178:17
  288:14
estates 18:16
  28:16 64:9 148:22
  152:14 175:17

200:20 205:5
  206:7
estimate 65:16,22
  66:4,11 71:19
  81:5 91:10 111:24
  117:2 129:15,18
  129:22,22,24
  130:1,2,6,10
  131:11,23,23,24
  131:25 133:22
  139:11 158:17
  160:18 164:1
  248:24 249:3
  254:4
estimated 95:20
  127:3 162:6
  167:19
estimates 80:12
  91:13,17 123:16
  129:6 131:7 135:9
  164:4 168:21
estimating 69:20
  129:8 132:2
estimation 215:21
et 1:10 2:1 6:12
  26:16 182:24,24
  257:8 272:22,22
  272:22 278:4
evaluate 43:6,13
  99:16
evaluated 97:25
evening 57:13
event 20:10 51:5
  169:9 229:16
  247:13 252:21
  293:3
events 97:9 135:5
eventually 212:16
  286:16
evergreen 200:17
  205:14
everlast 3:21

everybody 30:11
  34:16 145:10
  187:20 196:15
  197:24 205:18
  273:16 283:21
  290:7
everybody's
  147:12 186:15
everyday 205:25
evid 298:4
evidence 27:22
  29:17 54:7 55:7
  55:18 56:24 59:22
  60:6 61:6 136:20
  136:23 138:2,3,21
  138:25 139:10
  151:17 159:16
  164:9 172:9,21
  181:25 186:10
  209:22 228:19
  232:21 236:14
  248:22 251:17
  264:9 286:14
exact 69:5 70:3
exactly 33:22 53:2
  72:9 219:5 279:10
exam 297:5
examination 57:5
  62:3 85:18 88:20
  91:3 93:9 136:4
examine 55:9 57:1
  61:7,12 79:4 85:9
  90:17 93:8 113:3
  168:5
examiner 168:5
  168:11 169:11
  170:2
example 54:12
  167:18 171:8
  181:24 184:9
  193:15 229:7
  247:17 268:10

[exceed - far]                                                                           Page 25

exceed  21:22
exceeded  97:25
excess  36:1
  108:16 134:19
exchanging  52:11
  96:21
excluding  115:21
exclusive  33:8
excuse  87:23
  127:23 166:15
  204:25 235:23
  270:15 272:6
  280:18
excused  59:17
executed  142:22
executory  47:12
  47:13
exhibit  21:4 36:9
  61:15,17 124:9
  126:19 134:7
  136:7,24 165:10
  192:15
exhibits  59:21
  60:5 61:19 182:7
  298:19
exist  88:13
existed  88:6 238:3
expect  64:14 65:7
  66:19 72:1 84:11
  111:18 117:16
  142:6 181:19
  186:12 204:23
  206:8,13,16
expectation  66:16
expected  183:4
  261:20
expecting  66:14
expedite  199:20
expeditiously
  29:13 147:13
expending  241:18
expense  21:20
  31:24 32:2,19

43:16 73:14,19
74:2,6 79:7 81:12
84:5,8 94:2,5,8
103:21 139:1
142:14 153:19
160:18,23 161:20
161:25 162:6
163:1 172:7,10
175:10 185:9,21
187:4 188:4 194:8
195:22 197:12
199:3 202:4
206:20 212:25
213:15 216:19
221:5 232:15
246:24 257:6,8
261:17 262:14,15
278:20 279:8
expenses  40:1
43:22 79:20 128:4
143:4,25 156:23
205:24 206:1
229:10 232:18
238:1 254:5
266:13
experience  80:4
117:15 125:21
213:14 215:24
249:2,4,10,11
264:11
experienced
251:1
expert  170:2
215:22
expertise  101:18
explain  38:23,25
68:7 77:12 84:20
95:11 99:15 107:6
119:10 120:17
129:5 161:19
241:25
explanation  181:6

explicit  154:4
exposure  199:19
expressly  229:16
expunged  103:24
  115:23 265:15,19
extended  41:14
  145:22
extending  247:22
extends  212:2
extensive  58:20
  81:20 201:24
extensively
  249:16
extent  30:23
  44:10 46:5,14,22
  52:16 77:16 87:21
  94:23 119:21
  141:9 142:5 161:7
  176:13 200:23
  206:24 208:19
  209:19 242:10
  273:9
extra  183:12
  214:13 241:19
extrapolated
  24:10
extremely  99:14
  138:14 201:13
  249:13 251:1

f

f  1:23 23:8 26:24
  47:8 60:19,19
  142:15,20 143:11
  299:1
fabulous  220:2
face  212:9 234:8
  236:16 238:9
faced  100:19
  284:15
facetious  279:6
fact  26:25 30:15
  37:16 40:2 43:21
  52:7 102:8 145:6

147:8,10,13 152:1
160:12 163:11
173:2 184:3
187:15 229:10
288:2 291:22
factor  43:24
  184:15 232:16
  295:5
factored  246:18
  256:6
factors  167:16
  183:14 188:3
  293:18
factory  17:4
facts  43:2 255:1
factual  239:25
  249:8 256:3
fail  180:1
fails  248:10
failure  29:9 30:16
  140:11
fair  27:6 42:9
  69:7 84:13 86:8
  95:1 162:4 176:3
  178:7 179:24
  182:6 191:13
  198:14 199:20
  207:24 245:7
fairly  23:12
  160:22 165:14
  185:13 197:21
  200:3 219:24
fairness  225:17
falanga  19:1
fall  125:8 151:12
fallen  162:23
familiar  62:8
  92:14 125:23
  126:8 127:25
  128:22
far  24:3,19 32:4,7
  73:18 89:20
  101:17 106:9

112:7 114:4
116:12 132:1
135:1,8 181:11
194:14 209:25
211:22 212:15,16
213:13 217:9
220:13 237:14
241:22 247:3
248:20,21 250:15
252:11,12 253:1
262:2 273:7 276:9
279:21 295:11
296:9
**fashion** 17:6
140:7
**fast** 117:25
**fatal** 37:7 49:21
**favor** 27:4 152:24
201:5 217:19
**favorable** 242:21
**feasibility** 157:1
186:6,8 213:3
214:21 216:13
239:8 247:2 248:5
248:9,10
**feasible** 46:14
139:3 205:2
239:16,19 249:21
**february** 102:22
160:6
**federal** 9:13
**fee** 63:12 230:10
**feel** 29:22 170:25
**feeling** 192:18
**feels** 119:1
**fees** 123:16,21
197:23 201:7
202:7 286:4
**feld** 9:1
**fell** 220:6
**fellow** 149:18
**felt** 160:3 196:25
230:5 270:11

282:1
**ferraiuoli** 14:1
**fiduciaries** 241:23
281:8
**fiduciary** 240:21
**fifteen** 70:8
**fifth** 8:4 12:19
120:9 267:7 269:4
**fifty** 287:3
**fighting** 188:2
**figure** 80:11
**figurehead** 200:8
**figures** 259:1
**file** 22:22 27:23
77:17,19 78:3
101:17 115:11
117:16 118:21
122:12 141:7,7
160:5 161:10,25
162:25 180:10,12
197:10 256:10
257:8 278:12,19
279:1 280:9
**filed** 2:12 20:20
21:19,22 22:1,5
29:11 30:2 31:20
35:13 36:9 39:2
49:3,9 51:22 56:2
57:14 71:16,20
75:23 76:3,18
77:23 78:8 84:1
89:13,24 92:16
95:10 102:2,6,11
102:14,15,18,24
103:12,22,23
104:6,10,14,15,18
104:25 105:9,14
105:23 106:2,6,12
106:14,19 114:22
115:6,9,13,23,23
116:18 117:7,10
118:18 119:12,17
119:18 120:1,2,11

120:24 121:19,22
124:25 127:3
128:1 130:11,16
131:1,4,12,14,22
132:9 134:5 135:7
141:25 144:9
145:13 158:22
160:24 161:5
171:18 190:21,21
192:15 206:1,9
208:22,23 213:3
213:14 216:15
222:9,22 229:21
230:10 235:2
239:23 256:9,12
257:5 258:14
259:7,11,16,17,25
260:1,9,13,18,23
260:24 261:2,4,6
261:21 262:2
263:21 265:22
267:15,25 270:10
270:12,16 271:23
277:1 278:15
**files** 22:11
**filing** 27:25 57:14
97:5,14,24 101:3
106:17 116:23
123:4,9,15 190:8
190:10 222:22
291:14
**filings** 20:4 235:3
**fill** 80:1
**filled** 59:5
**final** 64:20,24
106:6 115:1 117:3
190:11,12 219:21
221:13 226:19
**finality** 207:23,25
**finalized** 50:11
**finalizing** 71:10
**finally** 22:18
154:18

**financial** 73:13,17
112:15 113:17,25
114:6,19
**financially** 112:10
222:6,16
**financials** 134:22
**financing** 205:7
**find** 24:17 28:18
29:23 103:4
138:13 189:18
195:5 239:16
**fine** 60:2 61:25
83:23 168:19
170:5 218:16
226:12 242:15,24
244:22 245:21
262:19 263:25
271:5 290:13
**fingers** 188:1
**finish** 40:11
246:10
**fire** 125:12
**firm** 17:2 94:21
98:23 175:21,25
189:22 286:18
**firms** 70:1 71:25
80:4 86:12 122:22
122:25 123:6
136:12 145:11
164:6 251:1
**first** 32:22 35:19
36:10,18,21 37:2
37:3 45:14 55:4,4
55:25 62:7,15
64:12,12 73:10
74:15 81:20 93:12
103:22 116:18
120:9 126:24
128:1 129:14
141:21 152:20
159:3,3,5 161:4
161:22 167:25
168:16 172:8

[first - funds]                                                                                    Page 27

178:14 179:9,17
180:5,8 181:10,11
182:4 191:4 194:8
194:15 198:16
205:16 211:13
212:2 217:10,11
219:24 221:19,22
225:20 242:4
251:8 255:21
263:8,9,16 266:9
266:11 275:17
**fit** 280:11
**five** 50:3 68:22
72:12,14 74:9
75:2 79:15 84:2
99:4 129:10
140:19 213:24
265:14 266:3
**fix** 170:8 257:10
**fixed** 79:20,21
257:7,9
**flat** 154:17
**flaw** 37:7,9
**flesh** 79:11
**flipped** 292:23
**flipping** 217:18
**floor** 12:12,20
13:20 14:4,20
15:13 16:4,12
17:10 18:19 19:5
**flush** 196:8
**fochier** 17:5
**focus** 34:1,23 39:1
51:10 82:6 116:4
123:18 141:11
156:1 180:16
215:5,13 225:23
226:20 261:24
275:19 290:18
**focused** 27:8 72:6
290:15
**focusing** 89:16
147:15 223:9

234:16 272:19
277:18 279:16
**foley** 14:9 94:21
186:25 192:1
219:25 223:24
**folks** 149:25
**follow** 45:13
160:14 174:12
281:16
**following** 65:1
112:14 127:4,5
143:14 214:3
281:19
**follows** 21:8
**footnote** 57:24,24
59:6 63:14,16,17
63:19 99:9,13
**forced** 194:5
**forces** 189:18
**forego** 94:6 154:3
**foregoing** 299:4
**foreign** 35:10 36:3
84:23 95:3,17
96:9 108:7,19
109:4,13 243:15
262:21 267:5
283:3,11,13,25
286:9 290:6
**forget** 187:20
**forgiveness**
221:12
**forgo** 84:6
**forgot** 83:14
151:4
**form** 23:14 26:2
142:12,13 157:17
173:25 185:18
248:20
**formally** 59:21
**former** 104:11
287:2
**forms** 248:20

**forth** 20:23 48:21
86:12 87:1 158:19
168:23 170:2
189:2 194:8 205:1
206:2 234:10
250:22 285:12
**fortuity** 142:25
**fortunately** 221:4
**forty** 262:4
**forward** 28:1,3,16
94:24 156:17
200:17 205:4
206:2 217:19
278:10 288:18
**fought** 241:8
**found** 97:18 98:1
103:9 257:1
**foundation** 76:6
85:1
**fountain** 275:13
**fountainview**
275:13
**four** 63:10 67:15
75:2 99:18,23
247:22 262:4
**fourth** 120:9
**fox** 5:2 11:9 14:17
17:21 61:9,9,16
61:24 90:18,18
261:9 289:14
291:12,12 292:11
292:14,21,23
293:2,5,9,13,15
294:10,13
**foxes** 236:18
**framework**
207:22,24
**frankel** 2:12
**frankly** 28:14,18
53:14 140:5
144:11,16 147:1
149:16 151:17
185:23 191:4

197:9 281:7,10
282:2 289:20
296:4
**frantically** 153:20
**fraud** 227:9,10
228:21 229:20
**free** 158:3 197:4
200:20
**friedmann** 8:11
50:8,8,17,22 51:4
51:6,9,16 52:11
168:2,8,10,13,18
169:1,5,8,11
**front** 75:25
138:15 153:22
186:11 189:23
196:23 215:5
**fti** 202:1
**fu** 12:2 277:1
**full** 22:17 38:21
39:6 41:13,15
111:2,4 117:5
132:12 152:21
156:4 161:22
232:23,24 233:1
**fully** 51:11 117:13
142:17 249:23
251:8,9
**fund** 21:22 62:17
63:12 78:10
196:12
**fundable** 169:3
**fundamental**
185:5
**fundamentally**
28:22 29:3 34:2
**funded** 117:13,21
142:17 198:23
**funding** 77:13
224:2
**funds** 21:25 22:1
29:5 37:12 39:13
41:17 44:6 50:14

[funds - going]                                                                    Page 28

62:22 66:3 77:23
78:9 83:10,11
87:1 92:11 132:10
164:1,25 165:3
168:22 197:3
201:11 206:12
232:5 234:19
240:6,11,14 243:8
246:19
**further** 29:25
36:6 42:14,18
52:23 55:1 62:15
79:2 81:1,2 88:16
93:6 135:22
136:17 168:24
201:4 213:3
**future** 115:9
224:25 288:4

**g**

**g** 11:21 20:1 60:19
142:15 297:14
**ga** 16:23
**gallagher** 7:25
299:3,15
**gap** 80:1 134:17
140:18 188:14
**garbe** 3:5 15:11
91:2
**garling** 7:25 299:4
299:17
**garment** 17:4
**garth** 10:22
**gateway** 19:3,12
**gears** 291:15
**geez** 159:12
**gem** 17:8
**genender** 8:20
55:21,22,23 56:5
58:13 59:16,19,24
60:4,7,12 61:17
61:21 67:14 72:3
76:4,12,15,18,21
77:2 83:17 84:25

85:12,16,19 86:22
86:24 88:15 89:3
89:14 90:2 105:3
107:19 112:19
113:9 119:1,6
134:7,10 136:2,3
136:5,17,19 297:8
297:12
**general** 10:18
21:24 22:3,12,23
119:14,23 152:15
152:17 221:24
225:17 272:24
**generally** 92:14
205:1 248:10
249:7 264:10
**generate** 160:9
163:10
**gensburg** 15:1,7
51:17,18,20 52:1
52:24 53:2,5,8
**germane** 230:4
**gerson** 10:15
24:22,24,24 25:12
25:16,19,23,25
**getting** 30:6,6
43:14 75:4 123:10
141:10 147:3
149:5 152:5 174:6
179:9,10 182:12
189:1 191:7 196:8
215:16 223:4,16
237:11 243:21,21
272:1 274:15,18
280:2 287:23
288:3
**give** 34:7 65:3
133:14 149:4
165:25 185:8
187:16 201:10
214:7 219:11,21
224:11,13,15
225:17,23 230:11

230:12 231:4,8
241:1 242:12,13
245:10,12 248:2,2
250:6 255:8 258:1
266:15 283:18
290:20 296:2,4
**given** 27:5 29:12
29:13 31:22 34:24
36:5 66:17,24
67:6,7,11 157:3
202:2 210:25
224:10 233:24
242:2 251:12
278:22 286:17
290:5
**gives** 38:12
224:12 286:7
**giving** 132:4
161:8 184:4 210:5
231:6 245:19,25
251:11 258:25
**glad** 24:25 251:12
**global** 4:17 6:24
13:10 35:8,10
39:1 139:4 151:8
151:13 207:22
208:4 268:11
**global's** 39:3
**go** 20:4 33:23
34:22 43:2 44:4
44:16 45:9 48:8
48:17 50:19 68:3
72:12,14 75:5
79:18 81:10 82:19
83:23 85:15 86:15
87:3 94:24 103:7
103:18 109:3
113:4 115:14
117:5,13,22 119:7
122:19 124:18
130:11 132:12
142:15 143:11
144:2,17,18,25

145:9,18,19 148:1
148:13 156:9
162:5 163:15
164:16,20,24
167:22,23 168:5
170:17 172:10
174:15,16 175:3
185:4 186:14
193:23 202:7
203:22 204:1
206:18 211:7
216:4,10 217:12
217:19,23 218:6,8
228:13 233:17,19
234:22 236:17,23
237:17,24 238:1
238:23 245:1
247:4,18 249:13
250:4 257:12
259:9 261:7 273:1
273:19 278:10
288:12 292:17
296:6
**goal** 51:9 206:21
**goes** 30:1 38:10
92:5,7 143:3
213:12 217:6
272:13
**going** 25:4 26:2
26:22 27:7 28:24
29:24 30:3 31:8
34:6,17,20,22
35:14 37:15 39:13
40:6,14 43:11,20
43:23 44:2,3,5,6
44:25 45:9 48:24
49:21 50:4,5
51:14 53:1 55:20
57:10 61:11 70:21
76:4 79:16 84:25
86:15 89:4,7
92:13 93:12 94:1
94:22 95:3 106:23

110:15 112:24
115:12 116:21
117:8 122:12,12
122:22 123:4,6,8
123:21 124:14
125:12 126:21
129:3 130:14
132:6 133:8 140:5
142:15 143:15
144:2,12,24
145:12,20 146:2
147:6 150:15
151:24 154:3
156:9 158:12
160:9 161:1,18
162:3,4,5,15,21
163:15 164:23
170:1 172:16
175:9,11,16,19
176:11,12 177:6
177:25 178:15
179:25 180:6,15
181:5,22 183:8
185:7,22,23,24
190:24 195:14
197:15,16,22,23
198:13 199:11
200:16,16,17,18
202:19 203:22
205:4,11,14 208:9
209:11 212:7
213:2,10 215:4,6
219:12 221:7,8
223:23,25 224:15
227:12 228:10
229:22 230:1
231:13 232:19
234:20 236:19,20
237:20 239:5
240:1,10,15,21,22
243:7,17 247:9
249:24 250:3,22
251:14 254:1

255:10 256:16
258:1 262:1 264:8
270:13 271:2,10
272:4 273:5,24
275:16,20 276:2
277:1,5 278:16
280:16,18 281:11
281:25 283:9,12
283:16,17,25
284:1,3 285:16,21
287:16,25 288:17
291:4
**good** 20:2,6,9
24:22,23 27:15
35:5,6 51:17,19
55:22 57:7 62:5
90:24 137:3,14,17
144:10 150:21
155:25 173:15
178:14,16 186:24
187:2,19 191:22
203:11,14 207:3
212:23 219:23
232:8,9 249:3
257:15 279:4,4,8
279:21 289:13
291:12
**goods** 96:1 121:3
121:4 127:13,14
127:20 128:3,7,9
128:16,20 220:11
222:13,16 225:5,7
255:7 278:4,7
**gotshal** 8:2,13
20:7 27:16 44:15
50:9 55:23 123:12
137:18 175:21
192:10 290:9
**gotten** 74:16
156:1 220:18,19
224:5 237:14,15
**gottlieb** 13:1

**governance**
155:15
**government**
142:15
**grain** 42:25
**grand** 239:3
**grandfathered**
22:21
**grant** 23:14
**granted** 140:15
141:2 264:7
**granting** 148:19
229:8
**grateful** 155:8
192:21
**great** 70:12 134:9
149:13 164:19
220:1 231:20
**greater** 43:15
189:22,23 204:15
204:25 293:25
**greatly** 204:25
**greene** 11:14
289:13,14 290:2
**greiner** 11:16
**griffith** 60:8,21
61:4,8,12 62:1,5
79:4,5 85:20
86:21,25 94:2
138:7,8 139:16
164:8 168:21
182:10,17 189:6
196:6 297:7,8,9
298:11,15
**griffith's** 165:5
171:4
**grounds** 228:6
**group** 3:7 4:13
6:21 12:10 14:10
15:20 17:7 18:17
27:5 28:17,18
34:24 35:19,21
36:1,7 37:13 40:4

48:11 81:16,22
83:7,10 128:25
130:23 145:9
149:14 150:5
172:11 173:1,5,8
176:24 177:2,15
177:15,19,20
178:10,11,15,16
179:11 180:5,8,18
181:12 182:4,20
187:1,3,5 188:19
189:16,17 199:12
241:6 291:8
**group's** 82:7
203:18
**groupby** 5:22
19:2
**groups** 35:21 36:5
128:24 172:25
192:3 242:5
266:17
**guarantee** 207:5
223:4 294:8,21
**guaranteed** 186:9
224:4 292:6,13
**guaranty** 10:17
11:2
**guess** 32:4,17,22
34:3,4 70:5,8,9
96:22 102:3
142:24 149:24
159:24 167:22
169:2 170:13
185:5 209:25
220:15 236:13
258:12 261:8
278:6 281:1
282:15 291:17
**guessing** 70:13
**guided** 282:13
**gump** 9:1 203:12
**guy** 124:4,6

[guys - honor]                                                                                    Page 30

**guys** 124:8

**h**

**h** 10:15 13:15
  15:16 16:7 60:19
  90:8 142:15,15
  298:3
**hain** 187:7
**half** 35:25 63:9
  165:14 166:14,18
  169:4,21 215:10
  263:25 270:17
  287:18
**halfway** 198:20
**halperin** 15:9
  90:25
**hamilton** 13:1
**hammering** 159:4
**hand** 56:9 60:17
  63:2 64:9 80:13
  80:14 87:5 90:6
  91:24 92:3,6,8,9
  132:11 166:6,10
  169:16 187:14,17
  214:16
**handful** 189:15
**handicap** 183:21
**handle** 55:4 87:22
  257:15
**handling** 73:21
  123:12
**hands** 43:23
**happen** 28:25
  30:3 172:16 221:8
  287:16,17,19
  288:1
**happened** 63:10
  187:19 188:8,11
  243:3
**happens** 73:1
  74:20 75:2 172:16
  172:17 253:7
**happy** 20:25 28:2
  137:23 146:1

175:23 203:5
  212:19
**hard** 64:24 65:8
  69:25 210:25
  283:5
**harder** 191:20
**hardest** 183:20
**harris** 19:23
**hauer** 9:1
**head** 68:16
**heading** 67:22
  73:7 100:24
  103:21 104:5
**headquarters**
  3:21
**healed** 205:6
**hear** 45:3 137:4
  146:1 158:15
  193:15 208:10
  244:15
**heard** 65:25 67:14
  109:12 139:2
  174:11 189:11
  196:6 202:13
  206:15 209:25
  213:16 253:2
  276:23 280:6
  288:22
**hearing** 2:5 7:5
  20:11 27:18 28:4
  30:6 32:16 34:22
  42:12,15 55:2
  56:17 58:2,19
  60:23 90:12 106:8
  155:9 181:18,25
  193:2 196:19
  197:14 204:5,9
  211:3 217:11
  252:7 278:5
  285:11,23
**heavily** 201:12
**heilman** 12:15
  48:7,9,10,14,16

**held** 200:24 201:5
  226:19 227:1
  251:13
**helen** 17:3
**help** 126:22
  145:24 188:15
  200:15
**hemrick** 19:8
**heresy** 220:15
**hey** 250:4
**high** 64:21 129:3
  167:19 253:21
**higher** 111:17
  216:6 254:7
**highlight** 52:2,14
  164:12 203:19
  204:13 206:6
**highlighted** 164:2
  205:23
**highly** 140:1
  202:10 248:17
**hilltop** 46:10,23
  47:1
**hindsight** 227:22
**hire** 254:7
**hired** 244:8
**hiring** 175:21
**historical** 97:19
**historically** 98:5
**history** 54:20
  140:11 227:13
**hit** 85:20 164:2,22
  195:24
**hk** 17:5
**hoc** 14:10 30:13
  36:5,7 81:16,22
  82:6 83:7,10
  114:14 149:10
  150:5 172:11
  186:20,25 203:18
  278:22 290:25
**hockey** 248:15

**hoffman** 18:16
**hold** 165:17
  223:15 246:9
  287:24
**holdback** 232:7
**holdco** 3:25 4:4
  4:23 5:8,12
**holder** 173:20
**holders** 187:10
  272:24
**holding** 51:12
  156:2 165:18
  293:5 294:2
**holdings** 1:10 2:1
  2:6 7:3 20:3,8
  57:16 137:16
  294:16
**holdsun** 17:7
**hole** 228:1 229:1
**holes** 138:17
  239:2
**home** 5:2 11:9
**hon** 1:24
**honest** 187:13
**honestly** 36:12
  105:20 126:20
  216:11
**honor** 20:6,11,18
  21:3 22:18 23:3
  23:13,20 24:2,5
  24:16,22 26:1,18
  27:11,13,15,19
  28:1,10 29:12,15
  29:20 31:2,5,7,11
  32:10 33:15 34:4
  34:19 35:3,5,13
  35:15 36:18,21,25
  38:5,25 39:7 40:8
  40:11 41:10 42:2
  42:6,10,17,20
  43:18 44:1,13,14
  44:16 45:4,8
  46:10,23 47:6

[honor - imports]                                                                 Page 31

48:2,7,9 49:22
50:8 51:17 52:3
52:24 54:4,7 55:3
55:19,22 56:1,5
57:2 58:13 59:15
59:16,19,20 60:7
60:13 61:2,9,11
61:13,22,24 67:14
76:4,7,8 83:2,17
84:25 85:5,12,17
86:22 88:15,16,18
89:3,22 90:2,15
90:18,24 93:6
96:19 104:17
105:3,4 107:19
109:20,24 110:8
112:19,23 116:6
132:23 133:2
134:7 135:22
136:2,19 137:17
137:19 138:1,24
142:3 143:17
146:3,25 148:18
149:13 150:21
151:7 154:2,20
155:7,11 156:9
158:11 163:4,18
163:25 165:21
166:8,16,18 168:4
169:22 170:12,16
171:3 172:7,12
173:12 174:24
184:6 186:6,24
188:18 189:2
191:15 195:24
199:11 203:4,11
203:15,23 204:4
206:22 207:3
208:6,9,13,23
209:2,13,21
210:18 211:2,15
211:23 212:11,20
212:22,23 213:1

213:19,19 214:15
215:20 219:6,8,9
219:23 220:9
224:19 227:7,22
227:23,25 228:3,8
228:25 229:2,19
231:9 233:23
235:13 237:2
238:10,22 242:24
243:13 244:17,24
244:24 245:8,14
245:17,22 246:12
247:11,16 255:6
256:21 257:11
261:14 263:3,7
264:21 265:16,21
266:9 267:22
269:6 270:23
271:5,18,20,23
272:6,9 273:21
274:2,8 275:7,22
276:22 281:3,23
282:21 283:1
285:4 287:21
288:19,24 289:4
289:13 290:24
291:12,15
**honor's** 198:8
227:16 252:7
**hope** 25:6 43:3
119:5 268:15
**hoped** 50:11
**hopeful** 164:3
202:16 211:9
**hoping** 195:13
**horrible** 195:5
**host** 97:25
**hour** 190:12
287:18
**hours** 20:25 34:7
243:12
**housekeeping**
59:19

**huddle** 158:11
**huge** 228:1 286:10
**huh** 146:15,18
149:9 156:24
165:6 178:13
182:9 183:19
273:11
**hundred** 125:13
181:21 232:5
258:9 269:11,11
287:3
**hundreds** 75:17
98:3 102:5,10
118:14 239:20
246:19 258:13
260:20,22 261:5
261:21 263:5
266:12
**hurt** 221:8 232:6
234:14
**hutcher** 13:9 35:7
57:8 62:6 93:11
**hwangpo** 8:10
**hypothetical**
236:3
**hypotheticals**
295:21

**i**

**i.e.** 79:20 82:4
181:9
**idea** 29:24 50:13
58:11 70:7,12
73:3 75:10 93:21
111:19,20 112:9
112:12 122:6
168:5 223:19
252:8 268:14
296:4
**identified** 25:8
120:21 130:22
**identify** 100:6
133:6

**ignore** 161:1
171:15,23 264:7,8
273:4
**ignored** 171:7
**ignoring** 238:6
273:5
**il** 11:4 15:5 19:21
**illegally** 113:7
**illinois** 292:6
**imagine** 149:18
**immediately**
96:23
**immoral** 225:15
**impact** 31:12,14
135:16,18 150:25
171:5
**impacting** 135:6
**impetus** 180:10
**implement** 142:21
143:19 172:13
**implementation**
29:7
**implicated** 52:20
**import** 108:14,15
193:17
**important** 26:11
74:24 89:18 137:8
181:15 187:11
188:5,8,17 196:21
197:8,13 198:20
199:14 200:4,7,15
201:13 205:6
252:15 283:6
292:1 293:20
295:5
**imports** 84:16,20
84:22 95:8,11,22
107:11,18 108:1
108:10,18 109:19
110:4,7 118:3
193:15,16 198:7
242:8 252:8
284:10

**impose** 146:20
**impossible** 152:4
**improbable**
  248:13,17
**improper** 42:5
  271:8
**improve** 211:10
**inaccurate** 97:20
  97:20
**inadvertent**
  228:14,16
**inarticulate**
  120:19
**incentive** 58:25,25
  59:8 93:21 173:15
**incentivize** 222:7
**incentivized**
  206:18
**incentivizing**
  144:11
**inclined** 172:12
**include** 26:7
  63:22 64:9 110:21
  116:8 161:9,25
  237:5 277:12
**included** 35:20
  39:3 44:5 46:1
  91:16 102:21
  105:1 128:2
  166:10 168:22
  169:12
**includes** 23:15
  41:6 110:24
  115:25 201:7
  274:23
**including** 43:5
  73:14 116:2
  155:13 178:22
  192:3 198:7
  207:13 221:6
  232:18 234:5
  248:13,17 255:2
  272:22 276:12

278:4 295:6
**incomplete** 97:19
**incorporate** 208:3
**incorrect** 129:17
**increase** 193:21
**increased** 169:3
**incredible** 194:16
**incremental**
  166:19 168:3
  169:15 216:19
**incurred** 43:23
**incurring** 243:8
**indenture** 4:11
  17:17 291:14
  295:17,23 296:9
**india** 283:15
**indicate** 277:11
**indicated** 42:21
  91:10 105:7
  123:19 170:14
  278:23
**indicates** 112:24
**indicating** 76:2
  134:17,19
**indication** 24:18
  275:20
**indiscernible**
  31:15 34:3 35:9
  68:12 159:21
  199:23 225:6
  264:12 273:22
  274:10 275:15
  280:17,18
**individual** 25:5
  124:25
**induce** 209:9
**inducement**
  199:18 239:25
  255:5,13
**industrial** 17:6
**industries** 4:17
  6:24 13:10 17:7
  35:9

**industry** 2:17
  16:2
**inequitable**
  238:17
**inexcusable**
  228:15,16
**inform** 31:24
**information** 24:4
  24:9,17 43:7,12
  43:19 44:10 89:1
  96:21 99:10
  128:23 132:4,8
  181:16 264:20
  281:17
**informative** 32:7
**informed** 30:12
  30:14 33:11,11
  249:14 277:7
  291:8
**ingersoll** 12:18
**inherent** 284:5
**inherently** 238:13
  238:15,17
**initial** 36:4 82:6
  155:5 205:9 209:4
**initially** 185:6
**injunction** 46:4
  47:20 54:13 272:3
  272:8,9,25 273:4
  273:22 274:17,22
  275:4
**input** 20:22 201:3
  201:3
**ins** 178:10 181:9,9
  244:1 290:15
**insisted** 249:17
**insolvency** 39:25
  40:3 132:2,5
  217:4 229:2,17
  285:19
**insolvent** 283:23
  283:24

**installments**
  57:23
**instance** 175:18
  205:16 294:2,15
**instances** 292:5
**institutional**
  195:21
**instructed** 213:19
**instructions** 214:3
**insurance** 2:10
  25:4 45:15 125:10
  200:5
**intend** 266:16,18
**intended** 56:16
  90:11 191:22
  193:5
**intense** 180:16
**intensive** 99:21
**intent** 52:12,13
  118:11,12 291:1
**inter** 188:2 235:20
  235:22,24
**intercompany**
  78:14,16,21 97:19
  97:23 98:1 99:16
  99:19 100:4,6,22
  115:17 233:25
  234:4,17 235:9,17
  235:18
**interest** 52:17
  140:17 152:20
  153:8 189:11
  190:6,24 200:12
  203:2,3 205:3
  295:6
**interests** 153:6
  193:10 194:18
  286:22 287:1,6
  293:19 294:11
**interim** 140:25
  148:3 199:5 234:5
  236:8

**interlinked**
154:10,13
**intermediary**
51:12
**intermediate**
183:18
**internally** 71:24
**international** 3:7
6:7,21 15:19 17:8
**interrupt** 74:14
148:9 177:12
274:9
**introduce** 136:24
**inventory** 68:5,20
110:21 112:1
167:20 168:25
222:9
**investments** 3:25
4:3,23 5:8,11 13:2
**invoice** 128:17
278:8
**invoiced** 127:24
128:9,13
**invoices** 127:4,5
**involve** 51:22
286:21
**involved** 62:11
73:1 81:11 83:6
93:18,23 97:2,7
98:16 112:2 114:5
114:8 122:22
123:1,6 124:24
128:25 176:13
188:6,7,9,13,25
189:5 190:18,20
192:4 200:2
201:22 202:5
213:22 221:19
**involvement**
97:13
**involves** 160:22
197:19 209:11

**involving** 46:8
**ireland** 3:4 15:10
91:1 157:19
208:13
**iridium** 293:18
295:5
**irving** 295:3
**issue** 29:8,10,10
29:14,16,18,19
31:11 33:9,13,18
38:7 40:2 41:24
46:19 49:2 68:20
84:17,20,22 86:7
89:19 95:8,12,22
100:15,17 106:20
109:15,19 110:4
112:5 113:14
114:11 118:3
120:13,17,17
121:10,11,14
126:3 144:8
147:15 151:20
156:19,22,25
159:5 166:16,25
168:13 169:19,20
169:24 170:9,9,20
171:17 195:9
210:24 214:25
215:4,14 217:20
219:15 221:4,13
229:4,6 230:10,18
230:19,21,22
237:1 242:8,9,10
242:12,20 248:7
250:1 256:2,3,4
257:17,19 262:23
267:3 273:15
280:10 283:9
286:16,16 288:5
**issued** 221:23
**issues** 27:10 28:13
29:7 32:6 34:12
39:25 50:23 52:18

52:20,20 53:6
68:5 84:16 95:7,9
95:25 96:5 110:3
119:13 124:24
125:18 126:5,14
126:15,16 155:15
156:21 167:8,20
168:4 169:14
170:6 172:15
175:15 177:25
193:16,18 199:18
199:23 200:3
204:3,15 207:13
215:5,10 232:20
239:24,25 249:8
250:14 253:5
262:17 266:21
285:13 288:12
291:16
**it'd** 132:12
**it'll** 75:1,8 116:17
227:1 240:5,7
**item** 53:19,20
59:4,6 64:12
65:13,19 66:3,8
131:19 265:13,24
277:19
**items** 69:4 74:10
79:15 135:14
168:15 192:23
202:8 265:6
**iv** 107:3
**i'm** 86:22 109:2

**j**

**j** 13:6 14:14
**jacqueline** 8:7
20:6
**jake** 8:19
**james** 3:5 15:11
19:15 23:20 91:1
**jamie** 7:25 299:3
299:15

**jared** 8:11 50:8
**jay** 6:17 13:11
35:9,11
**jean** 140:23
**jeffrey** 16:7
212:24
**jeopardizes**
195:18
**job** 147:12
**joe** 283:1
**johnnie** 191:8
**johnson** 55:6,9,16
298:5
**join** 57:12 189:18
289:20
**joinder** 3:12 5:2
5:10,14,19,22 6:5
6:7,10,14,17,19
6:21,24 7:1
**joined** 97:9 289:8
289:9,16,21 290:1
**joining** 289:12
**joint** 2:5 57:15
59:20 60:5 136:24
207:9 298:19
**jointly** 91:19
141:1 204:6,21
**joseph** 17:13
**juan** 14:5
**judge** 1:25 36:12
37:18 53:8 83:5
114:1 144:4 185:3
220:18 221:18
224:8,20 226:4,7
228:22 229:9
230:7,9 243:6
246:5 249:25
252:2,24 255:22
258:19,23 259:6
266:17 268:19
275:17
**judge's** 84:2 105:6
126:13 191:14

[judge's - laid]                                                          Page 34

275:10

**judgment** 160:8
163:9 228:23,23
249:7

**july** 20:21 31:23
129:24 130:5
131:3 136:8 188:7
188:18 189:13
190:20,20

**jumping** 86:22
153:21

**juncture** 140:2
191:21

**june** 133:24,25
134:1,22

**junior** 209:4

**jurisdiction**
276:11

**justice** 9:11 10:1

**k**

**k** 9:18 10:19
107:3 195:2
207:16 231:25
232:10 233:8,10
234:11,20,21,23
234:25 235:3,6,15
235:18,21 236:2,4
236:11 237:14

**kadish** 11:21

**kanter** 15:1

**kathleen** 14:23

**kcd** 142:13 153:1
207:14

**keep** 30:12,14
137:21 180:9
197:14 208:16
214:14 222:19

**keeping** 190:24

**keith** 12:23

**kept** 20:3 196:19

**key** 152:12 153:5

**kind** 29:6 35:23
74:10 80:7,9

147:7,7,19 155:22
159:4 172:13
185:22 186:3
189:11,24 210:2
220:15

**kmart** 292:6,18
293:5,24

**knew** 51:13
144:24 190:7,8
192:19

**knocking** 253:13

**know** 24:19 25:12
27:23 29:21,22
30:1 31:22 33:9
33:10,24 34:5,20
34:21,25 38:6
44:18 49:1 53:14
58:17 59:4,7
64:20 68:16 69:5
69:10 72:8,16,22
73:5 74:17 76:18
77:21 78:5,6,6,9
82:13 85:14 91:16
91:23 92:1 93:13
93:20,24,24 95:5
95:20 98:18,19,20
99:4,24 101:21,23
103:3,8 107:15,17
107:21 110:5,11
111:4 112:3,7,14
113:22 114:11
116:10,21 117:20
117:25 118:17
120:13,19 122:21
122:25 123:11
125:11,11,22
126:11 128:16,19
128:23 134:13
138:2,9,22,24
139:4,20 141:4,4
141:8 143:13
144:6,11,18 145:7
145:8,12,17,19

147:1,5,6,7,8,8,9
147:10,12 148:7
148:20 149:1
151:11,23 152:2,6
152:9,12,13,21
153:25 154:2,3,3
154:21,22 155:3,4
155:22,22 156:2
158:3,12,18,18,19
158:25 159:1,3,4
159:12,18 160:3,6
161:2 162:7,21
164:3,5,8,9,15,17
164:18,20 165:19
166:17 167:19,24
167:25 171:7
172:20 173:5,6,7
173:8,12,16,17
174:25 175:11,13
175:15,16,22,23
175:23 176:13,14
176:14,18,19
177:3,10,16,24
178:3,3,4,5,6,15
178:21 179:12,22
179:23,25,25
180:2,21 181:16
181:17 182:24
184:21 185:2,14
185:21 186:7,9,17
186:20 187:24
190:11 205:4
208:25 210:4,5
211:10,19 212:4
217:12 218:25
221:12 224:8,12
225:11 226:5,10
226:16 229:7,13
229:20 234:4
238:8 239:21,21
239:22 242:1,11
242:23 244:14
249:1 250:25

251:6,24,25 252:1
252:4,8 253:3,9
253:15 255:20
256:2 262:13,14
262:20 265:9
269:20 270:20,20
273:17 274:17
276:15 278:16
280:16,17 281:2
281:10,18,24
282:22 283:6,21
285:10,11 286:9
287:8 289:7
291:22 292:1,2
294:21 295:15

**knowing** 114:18
146:11 258:8
280:9

**knowledge** 58:8
67:10 78:18 91:14
97:13 125:17
195:21

**known** 114:18
141:9 142:5 161:8
291:17,18,19

**knows** 25:3
138:16 244:8
271:12

**kreller** 16:15

**krinsky** 18:1

**l**

**l** 9:8 11:14 18:22
297:14 299:12

**l.p.** 4:19 16:10

**labeled** 58:24

**labor** 10:9 24:24

**labov** 14:14 220:1

**lack** 85:1 163:5
278:23

**laid** 65:6 70:24
75:2 79:15 182:7
232:13 296:7

[lamper - lisa]                                                                                        Page 35

**lamper** 249:24
**landlord** 46:25
  48:11
**landlords** 47:25
  187:21
**language** 46:1
  52:13 54:10
  226:21 276:14
**lanier** 9:9
**lapse** 197:16
**lardner** 14:9
  94:21 186:25
  219:25
**large** 68:17 72:18
  98:8 117:6,9
  160:22 182:1
  195:14 196:8
  202:1 286:20
**largely** 138:9,18
  139:2
**larger** 35:23
  164:4 176:7
  189:21
**largest** 28:17
  35:19 36:7 140:11
  152:14 173:1
  190:17 207:7
  208:2 295:1
**lasted** 192:10
**late** 26:23 146:8
  197:9 267:15
  268:23 295:15
**lately** 191:8
**latest** 199:3
**laughs** 285:11
**law** 16:18 17:2
  19:17 30:17 39:23
  40:6 52:19 122:22
  123:6 178:21
  180:2 186:7
  193:19 198:9
  247:4,22 276:1,12

**lawlor** 19:15
  23:20,20 24:2,5,7
  24:16,21 27:13
**lawsuit** 125:10
  250:5
**lawsuits** 125:8
**lawyer** 45:2
  240:24 244:21
**lawyers** 153:19
  220:2,16 240:23
  243:4,7,8,16
  287:3
**lay** 26:11 182:6
**lays** 183:4
**lazere** 12:23
**lbg** 46:10,23
**learn** 287:13
**learned** 209:7
**lease** 47:1,14
**leave** 32:14
  203:25 210:23
**leaves** 33:18
**leaving** 125:19
**led** 192:1
**left** 133:18 149:14
  174:22 272:15
  280:10
**legal** 27:5 33:25
  106:20 115:25
  121:14 123:21
  124:24 157:1
  184:4 199:25
  202:7 213:12,13
  213:18 230:21
  231:15 238:7
  239:24 242:10
  266:21 286:4
  299:21
**legally** 111:21
**legitimate** 126:6,7
  288:15
**lender** 223:3

**length** 27:4
  207:19 246:18
**lengthy** 181:18
**leonard** 10:15
  24:24
**leslie** 12:15 48:9
**lesser** 22:14
**letting** 217:19
  236:17
**level** 22:15 97:25
  197:19
**levene** 15:18
**leverage** 43:4
  221:14
**lexisnexis** 275:14
**león** 14:3
**liabilities** 124:3
  135:15
**liability** 43:10
  236:16
**liable** 112:18
  162:20
**lianqiao** 3:7 6:21
  15:19 288:25
**liberman** 208:9
  208:12 209:20,24
  210:9,12,15,18,22
  211:2,7,9,15,18
**liberty** 2:9 13:3
  45:15 137:19
**lieberman** 15:16
  90:24,25 91:4
  93:6 208:12
  211:23 212:11,22
  297:10
**lien** 157:3,4,7,9
  208:17,19,20
  210:6,8,10 212:2
  212:8
**lifeblood** 285:16
**lift** 158:9
**lifted** 52:22 54:17
  54:18

**lifts** 52:23
**light** 27:10 38:2
  42:16 154:16
**likelihood** 82:5
  248:23
**limit** 146:23
  247:20 290:10
**limitation** 146:17
**limited** 2:9,17,21
  3:10,24 4:3,19,22
  5:7,10 17:6 47:7
  48:11 54:23 194:6
  210:10 212:25
  248:14 273:1
**line** 31:12 64:12
  65:13,19 66:3,8
  73:10 129:14
  131:19 134:16
  135:20,20 151:20
  207:10 265:5,24
  283:22 297:5,16
**lines** 82:2 84:3
  94:13 97:17 100:5
  138:15 189:21
**liquidated** 79:20
  218:10
**liquidating** 22:2
  25:7,17 57:11,18
  57:21 58:1,4,22
  62:9 70:22 93:14
  116:25 122:13
  141:3 152:19
  154:18 223:23
  240:25
**liquidation**
  148:15 180:4
  205:20 208:1
  232:14 233:11
  234:10 235:19,20
  236:3 280:25
  296:1
**lisa** 7:24 299:3,8

**list** 66:18,20,25
67:6,8,11 107:24
107:25 143:11
161:6 162:11
**listed** 102:25
103:13 161:10
265:10 292:16
**listen** 29:21 30:5
30:11,15 89:21
164:6 179:25
245:24 246:2
**listening** 34:17
188:22 189:9
190:15
**lists** 120:9 162:25
**literally** 50:11
**litigate** 197:3
225:1 253:8
**litigated** 26:22
112:4 117:3,7,20
118:5 119:25
121:12,13,15
239:24 249:5
**litigating** 232:20
**litigation** 46:6,20
62:17,22 68:8
69:4,14 72:11,19
72:19,24 74:20
75:7 80:17,23
81:3,4 84:6,9,15
87:17,19 94:6,9
94:18,21 95:7,25
96:5,8,15 111:16
111:18 125:8
138:5 139:15,18
139:18,22,23,23
139:24 140:2,12
140:19,20 148:17
148:19,20 159:13
164:14,15 175:10
183:6 185:25
195:9,18,19
196:10 205:9

211:22 225:3
231:22 232:3
235:23,24 236:21
240:2,5,11,16
241:6 247:25
248:13,14,17,18
248:19,21 249:12
249:13 250:2,24
251:1 252:9
272:15 286:17
288:12
**little** 81:5 188:19
203:20 270:17
277:10 290:20
**living** 177:4
**llc** 2:13,15 3:25
4:4,13,23 5:2,8,12
11:10 12:1 14:1,2
16:19 45:25 46:10
46:24 55:16
150:11 275:14
298:6
**llc's** 5:24
**llp** 8:2,13 9:1 11:1
11:8 12:9 13:1,9
13:17 14:9,17
15:9,18 16:9
17:15 18:8,15
19:1,10 20:7
**loan** 99:25
**locke** 11:1 207:4
**locks** 37:11
**logo** 133:18
**long** 65:7,11
72:24 73:3 77:14
77:25 78:12 80:5
96:14 97:2 115:11
115:12,21 116:17
117:2,7,19 140:4
146:12 151:24
152:13 203:16
246:3 249:8 273:1
279:21

**longer** 23:23
52:17 74:9 79:14
187:22
**look** 40:14 41:11
73:25 91:5 103:2
103:7,8,8 105:19
109:12 135:1,14
149:24 159:11
170:4 174:23
175:15 176:15
179:1 181:11
195:22 200:3
210:16 216:4
221:7 225:16
229:24 239:8
240:22 242:16,17
249:3 250:24
251:10 252:10,22
256:16 265:12
268:8 269:19
270:8 275:23
280:22 282:3
**lookback** 238:5
**looked** 98:2 103:4
134:2 169:11
178:18 181:13
194:11 196:1
249:15 256:8,11
256:12 282:11
**looking** 26:23
33:7 62:13 83:25
104:8,15 116:6
117:15 119:11,13
125:21 130:13
133:15 137:9
141:19 153:19
162:5 165:2 185:3
194:9 203:20
214:8,14 225:18
257:4 261:12
263:17 267:20
273:13 277:25

**looks** 133:18
**loosely** 239:21
**lord** 11:1 207:4
**los** 15:23 16:13
**lose** 118:6 270:15
**lost** 193:21 217:20
220:14 245:22
248:18
**lot** 23:16 36:3
69:4 102:1 120:23
135:13 139:2
144:13 156:1
157:25 158:1
163:10 172:25
175:23 180:7,11
187:19 188:2,8,23
189:3,5 191:7
193:15 202:22,23
204:3 206:10
207:10,10 212:10
229:18 239:22
244:12,13 251:18
251:19 255:1
262:16 264:20
265:12,13 283:10
287:13
**love** 191:8,11
**low** 64:21 129:5
167:20 253:21
287:25
**lower** 130:12
167:21,22,23
258:11
**lowest** 64:19,22
151:12
**lp** 4:8

| m |
| --- |

**m** 13:23 14:23
15:25 17:21 19:8
49:24 53:10 90:8
297:3
**m3** 96:25 97:2,7,9
98:16,19,23

**[m3 - memorandum]**                                                                                                       Page 37

131:25 132:1,4,10
132:15 133:18,20
134:1,22 135:2
**m3's** 97:4,13
98:25 131:23
133:22 135:7
285:6
**mad** 275:18
**madison** 13:19
**magnitude** 97:21
97:22 98:7,11
242:19
**magnitudes** 98:5
**maher** 19:10
**mail** 26:13
**mails** 52:11
**main** 20:10 46:19
124:13 243:16
**maintain** 98:21,21
**maintaining** 51:1
97:7 98:15,23,23
**major** 74:10
79:15 100:19
**majority** 72:21,23
116:11 119:14
**making** 23:9
34:15 37:15 47:21
127:13 145:12
147:7 149:3
181:17 210:3
255:3 256:14
265:12 288:15
**mall** 3:17 5:24
14:2
**manageable** 173:5
**mandated** 26:25
**manges** 8:2,13
20:7 55:23
**mansheen** 17:6
**manufacturers**
286:9
**march** 21:10,17

**marcus** 8:7 20:6,7
20:10,16 21:7
26:1,6,17 27:11
48:21
**margins** 286:10
**mario** 2:23 19:18
**mark** 2:12
**market** 12:11
**marketing** 5:19
14:18
**marketplace**
120:6,12,19,20,23
121:3,14 131:8
286:10
**mart** 195:2
207:17 231:25
232:10 233:8,10
234:11,20,21,23
235:1,3,6,15,18
235:21 236:2,4,11
237:14
**massive** 152:8
**match** 108:2
**material** 75:3
150:24
**materially** 82:24
**materials** 28:1
29:11 194:9
**math** 111:12
164:20
**matter** 1:8 25:5
26:20,21 27:17
52:7 59:20 78:2
143:1 181:9
220:25 243:9
274:3
**matthew** 15:7
51:17
**mature** 228:18
**max** 129:15,18
130:1,3,6 173:18
295:3

**maximize** 140:8
**maximizing** 30:7
**maximum** 58:12
**mccarthy** 13:17
**mcclamb** 12:16
**mcdonald's** 48:25
**mckool** 16:1
212:24
**mean** 22:16 25:14
33:16 34:9 38:22
46:19 49:8,17
63:16 64:24 74:14
79:11 82:17 97:22
99:15 104:5
105:20 111:10
119:17 120:2
123:5 124:23
126:6 139:18
142:18 146:19
147:19 157:25
163:11 167:17
168:18,19 177:3
177:16 180:6
181:18 182:16
183:2 184:9 201:3
201:20 212:2
213:8 216:8,11
231:4 232:2,13
243:8 245:11
250:9 252:10,12
261:8 269:19
272:11 273:15
275:9,23 276:10
277:25 280:3
281:16,23
**meander** 140:12
**meaning** 98:7
197:24 239:7
**meaningful**
286:21
**means** 38:17
126:23 143:23
144:2 193:11,11

244:25 252:16
257:7 267:12
272:25
**meant** 107:17
127:9 194:2 286:3
**mechanic** 33:25
**mechanical** 181:8
**mechanics** 66:23
140:16 148:2,3
**mechanism** 30:2,9
30:21 34:24 37:8
96:21 156:12
179:22 180:18
189:19 190:2
191:1 194:24
205:10 218:4
**mechanisms**
154:18
**mediate** 287:22
287:24 288:7
**mediation** 29:25
42:18,22 43:23
285:11,13,20
286:19,20 287:12
287:17 288:10
**mediator** 286:19
287:15
**meet** 23:7 88:13
139:7 195:11
296:4
**meeting** 36:4,5
192:9,10,19 199:1
**mein** 6:8
**member** 21:16
22:10,11 57:10,19
57:21,22,25 58:4
58:18 62:9 149:1
**members** 21:13
21:19 22:19 58:21
81:22 93:15 141:2
**memorandum**
198:9

[memorialization - money]                                                      Page 38

**memorialization**
296:6
**memorialized**
25:13
**mentally** 287:14
**mention** 64:12
98:11 137:5
**mentioned** 167:15
172:23 247:16
266:10
**merchandise**
107:14 127:7,9
**merits** 82:1
125:19 174:15,16
**message** 191:19
**met** 145:7 246:13
**mias** 124:19
**michael** 18:22
**middle** 74:1 84:4
94:14 97:18
177:15,15,19,20
**midnight** 36:22
**mien** 3:19 4:15
5:10 6:3,12 17:3
**miii** 264:11
**milbank** 16:9
**mildly** 207:10
**million** 21:12,23
22:24 35:25 36:2
46:15 50:3,4,14
50:18,19 63:4,9
63:10 64:2,10,17
64:17 65:4,14,19
66:1,2,7,9,14,22
67:7,9,25 68:19
68:22,24 69:9,13
69:21,23 70:6,8
70:17,21 71:1,4
71:23 74:24 80:11
80:21,24,24 81:5
84:23 86:7 87:7
87:12 91:11,21
92:10,18,24 93:1

95:16,18 104:3,4
104:8,20 105:2,7
106:2,5,11,13
107:9 108:11,17
108:21,25 109:4
109:15,18 110:1,6
110:15,18 111:3,8
111:10,11,15,24
112:8,25 114:22
115:1,4,12 119:9
119:12,25 120:5
121:22 122:1,10
122:11 123:21
125:6,10,13 128:3
128:19 129:4,5,16
129:16 130:2,6,7
130:17,19 131:6
131:19 134:3,19
134:24 135:2,2,15
139:12,14 152:15
152:20 156:18
159:10,20,21,21
159:23,25 160:18
165:14 166:11
167:19,24 168:22
169:4,21 170:15
170:20 171:7
173:22 174:7
187:8 195:24
196:1,3,4,7,11,17
196:23 198:23
205:10,11,15
206:15 209:11
210:20 211:14,16
212:10,17 216:19
220:18 222:4
223:12,12,13,14
223:19,21,22,24
224:1,2,18,21,24
228:4 229:1,22
230:23 231:7,18
231:22 232:2,2,3
232:9 237:24

245:10 248:23
250:4,4,5 251:20
251:25 252:2
253:18,18,21
254:3,4,5,7,8,9,14
254:20,23 255:7
258:9 261:20,21
262:5,9,24 263:6
264:1,2,6,19,21
265:2,4,4,15,18
266:3,6,14,19,24
267:8,10,10,11,16
267:18 268:3,7,23
269:6,9,11 270:15
270:19 277:20
286:4 287:3
292:18,19 294:4,6
294:16,16,17
295:2
**millions** 75:17
98:3,5 100:4,5
102:5,10 118:14
239:20 258:14
260:20,22 261:5
261:21 263:5
266:12
**mind** 26:22 44:24
86:3 94:11 129:9
231:3
**minded** 155:23
**mindful** 145:5,20
**mineola** 299:24
**mingle** 17:6
**minimal** 86:5
194:3
**minimis** 65:19,23
**minimize** 140:8
**minimum** 58:11
149:20
**minta** 18:13
150:21
**minus** 111:10
263:20 265:24

**minute** 20:4 27:1
**minutes** 118:23
164:23 189:7
217:11 266:3
271:2
**miscellaneous**
80:22
**misinformed**
41:12
**misreading**
274:12
**missing** 226:21
**mission** 186:15
**misspoke** 261:4
**misstated** 113:11
**misstates** 113:9
**misstating** 72:4
**mistake** 228:14,16
**mode** 185:22
186:4
**modification** 7:5
20:13 23:6,8,9
**modifications**
150:25
**modified** 2:5
52:15 57:15
**modify** 20:24
**moloney** 13:6
**moment** 54:5
144:17 242:3
261:14
**monetary** 155:5
**monetization** 79:9
**monetized** 206:17
**money** 29:6 32:22
44:2,3 45:2 51:7
51:12,13 63:25
69:3 88:12 93:1
114:7 144:14
165:19 166:21
168:3 169:3,8,16
170:22 172:1
195:8 200:21

[money - negotiations]                                                    Page 39

201:6 205:13
209:1 212:17
215:1,15,17 221:7
223:17 224:9
226:19 231:4
233:1 234:21
236:17 237:23
240:4 241:19
245:20 258:3,5
273:19 284:25
285:3 296:8
**monies** 113:18
168:8
**monitored** 99:19
**month** 65:12
99:18,23 206:9
**monthly** 57:23
**months** 28:14
43:8 70:2,4 72:7
74:8,9 79:14,25
80:5 116:19
117:17 145:19,20
146:12 160:11
189:14 213:24
**morabito** 14:15
150:8 186:24,25
187:3 191:13
201:21 203:8
220:1 283:4 284:5
290:24,24 291:5
**morabito's** 283:19
**morning** 20:2,6,9
24:22,23 27:15
35:5,6 50:12
51:17,19 55:22,25
57:7 62:5 66:6
188:19 209:7
**mortgagee** 208:14
**motion** 7:5 20:13
20:20 23:14
118:21 128:1,18
128:20 129:1
160:23 162:1

208:22 213:14
222:3 229:21
249:6 254:22
255:6
**motions** 103:2
128:1 201:1
205:25 221:19
**mouth** 296:9
**movant** 19:18
**move** 27:22 28:3
29:13 54:7,25
55:2,6 59:21
96:19 105:18
132:23,24 158:9
215:7 228:21
238:17 247:9
248:4 255:13
256:16 265:13
266:20
**moved** 210:20
285:10
**moving** 28:1,11
28:16 124:11,13
137:22 138:24
147:13 156:17
**mulberry** 19:4
**multiple** 81:17
115:20
**murphy** 20:21
73:12,21,23 75:19
75:20,24 76:1,6
76:10,25 84:19,21
85:2,4 86:19
87:25 88:25 89:7
89:21 90:3,10,17
90:20 91:5,9,23
92:14 93:8,11
96:20 103:19
109:11 124:15
136:6 138:9 155:1
160:17 176:23
177:2 182:10
201:25 210:1

277:19 291:20
297:10,11,12
**murphy's** 79:23
80:12 138:14
151:22 261:13
**murry** 17:5
**mutual** 2:10 45:15
153:1

**n**

**n** 8:1 10:12 19:15
20:1 56:12 60:19
64:8 297:1,3,14
298:1 299:1
**n.c.** 5:5
**name** 57:7 93:11
**narrow** 208:24
**natasha** 8:10
**national** 4:10
17:16 291:14
**natural** 146:13
242:6
**nature** 203:24
**neale** 15:18
**near** 66:2 145:15
209:1
**nearest** 70:5
108:11 111:8
123:20
**nearly** 138:3
**necessarily** 62:24
119:20 163:7
193:14 221:12
232:7 235:14,15
254:2
**necessary** 23:10
31:8 34:5 142:21
143:19 206:24
**need** 26:14 29:13
29:19 34:23 43:12
44:23 51:22 71:15
80:1,23 81:5
82:18 88:13 96:18
115:23 118:5

126:21 133:14
142:1 157:8,8
163:7 168:9
169:19 170:25
172:9 198:15
200:21,25 201:7
211:19 217:13
241:18 244:14
247:17 251:18,19
257:2 279:20
282:7,16 285:17
285:17,20 286:6
**needed** 123:21
160:5 191:10,19
191:20 198:4
**needs** 40:4 181:6
181:7 196:15
201:11 243:9
**negate** 193:20
**negative** 200:1
**neglect** 228:15,17
**negotiate** 39:19
193:1 196:20
245:3,4 286:7
295:22 296:2
**negotiated** 149:17
201:12 202:11
223:24 229:16
283:20
**negotiates** 223:3
**negotiating** 71:7
197:25 220:14
230:25 231:12
238:9 249:16
283:5 287:20
**negotiation** 62:11
202:21 220:25
221:2 225:21
231:1 238:7 296:1
**negotiations**
26:25 27:3 35:14
35:21 36:7,11
64:15,23 65:7,9

[negotiations - objection]                                                      Page 40

65:11 81:11,15
83:6 114:14 176:1
182:18 215:2
230:19 251:3
**neither** 182:1
**nester** 18:13
150:21,22
**net** 64:13,14
152:20 199:7
254:5
**netted** 97:24
**never** 100:8 152:3
278:11
**nevertheless** 23:7
146:11
**new** 1:3,18 8:5 9:5
9:16 10:3,5 11:12
11:19 12:21 13:4
13:13,21 14:12,21
15:14 16:5 17:11
17:19 18:4,11,20
31:19 42:16 193:3
228:21 288:4
**newark** 19:6,13
**newly** 228:19
**nice** 147:11
**night** 20:12
190:10
**nine** 80:5
**nj** 12:5 19:6,13
**nodding** 150:4
**noes** 290:17
**non** 47:14 115:1
146:10
**nondebtor** 276:5
276:6
**normally** 85:16
181:19 221:3
**north** 7:1 12:11
**northstar** 18:16
**note** 45:10,10
53:15 54:8 57:24
61:11 81:10

126:24 127:2
129:2,3,5 136:8
138:20 139:9,15
151:16 153:18
164:13 172:8,18
208:13 289:24
**noted** 37:3 45:14
**notice** 26:2,4,10
26:12 28:23 31:10
31:15,18,19,22,22
32:4,5,6,7,9 33:10
33:24 34:1,7,12
34:24 51:23 57:14
77:10,13,17,20,22
78:3,8,23,25
141:7 161:4,8
178:19,19 179:24
183:24 218:7
219:12,17,21
221:23 224:10,11
224:12,13,15
243:17 271:15,15
276:10 278:23
279:17,20 282:16
282:22 294:2
296:5
**noticed** 146:3
**noticing** 55:10
**notions** 225:17
**notwithstanding**
47:10 227:1
**november** 41:7
**number** 20:12,16
32:1 35:19,24
44:19 45:10,15,25
46:24 47:7,8,17
48:17,24 49:4,22
50:22 53:11,14,19
53:20 55:6 56:3
62:14 65:24 68:16
107:7,8 110:18
111:14,16 117:9
123:20 129:4,5

134:3,16 135:1,5
150:12 158:19
190:22 194:5
195:15 196:2,25
204:8,10 205:21
207:13 216:6
231:19 250:7
255:22 258:5,9,11
259:4,5 262:5
265:8 286:19
292:12,20,22
293:1
**numbers** 36:2
39:7,8 65:25
76:21 124:4,6,8
129:14 130:14
135:6,17,18,19
164:17 171:6
175:4 176:11,12
205:2 220:17
224:20 239:4,5
241:22 254:18
258:25 268:12
269:16 270:13
293:20
**numerous** 118:14
205:25
**nw** 10:11,19
**ny** 8:5 9:5,16 10:5
11:12,19 12:21
13:4,13,21 14:12
14:21 15:14 16:5
17:11,19 18:4,11
18:20 299:24

**o**

**o** 1:23 20:1 297:3
299:1
**o'clock** 213:6
**o'neal** 13:7 169:22
169:22 170:4,7,12
170:16,19,25
**o'reilly** 19:1

**object** 32:1 39:6
76:4 83:17 84:25
109:14 160:10
229:23 261:1
264:11 266:16,19
276:13 279:22
280:23 295:8
**objectant** 44:22
46:17
**objectants** 150:12
**objected** 37:16
46:14 85:22 95:21
109:14 158:20
208:18 247:1
252:13 258:1
264:1,2,19 276:7
284:10
**objecting** 44:9
57:9 258:2 273:21
279:21,23 280:8
**objection** 2:9,12
2:15,17,19,21,23
2:25 3:2,4,7,10,12
3:12,15,17,19,21
3:24 4:3,6,8,10,13
4:15,17,19,22,25
5:5,7,10,16,19,24
6:3,7,12 23:1
26:15 37:25 38:3
39:2,3,8 43:13
46:2,16 47:16,25
49:3,23 50:23
53:19,21,25 58:13
72:3 94:20 95:20
106:17 108:16
113:9 120:14
124:23 131:16
137:6,7 150:15
151:2 156:5 157:2
190:22 208:24
209:3 212:15
213:4 214:8,11,19
214:19 215:11

| | | | |
|---|---|---|---|
| 218:3 230:2 | **obligated** 111:21 | **office** 9:12,13 | 77:4 78:1,20 79:1 |
| 243:19 256:4 | 111:23 113:7 | 10:2,10,18 25:7 | 79:3 81:6,6 82:20 |
| 257:20 264:8 | **obligation** 68:11 | 31:6 37:3 208:15 | 82:24 83:3,3,9,14 |
| 267:8 268:12 | 128:13 158:6 | 243:19 271:21 | 84:11,15 85:6 |
| 269:4 271:24 | 166:17 216:19 | **offices** 16:18 | 87:4 88:17 89:17 |
| 274:7 276:3,19 | **obligations** 54:16 | 19:17 146:9 | 89:22,25 90:5,10 |
| 277:1 279:3,6 | 66:9,12,18 67:2 | **official** 9:2 28:15 | 90:16,23 93:7,21 |
| 289:2,6,16,17 | 67:22 107:3 227:4 | 28:19 48:18 | 94:20 95:16,22 |
| **objection's** 44:22 | **observations** 88:5 | **offset** 68:3,14 | 96:19 98:10 99:6 |
| 45:6 | **obtain** 43:4 | 113:1 168:14,20 | 99:9,13 101:1,2 |
| **objections** 27:20 | **obtained** 142:16 | 172:4 | 101:19 104:18,22 |
| 32:2 34:10 41:21 | **obvious** 26:11 | **offsets** 110:19,21 | 106:1,4,11,21 |
| 44:17 45:1,10 | **obviously** 91:19 | 111:2 112:1 | 107:10,24 108:9 |
| 47:9 50:2 52:5,6,7 | 131:5 176:3 | 169:15 | 109:21,25 110:9 |
| 53:15 54:9,11,11 | 185:25 187:25 | **oh** 49:10,11 70:9 | 110:13 111:7,13 |
| 55:1 76:2 89:12 | 204:3 220:8 | 75:12 76:24 85:14 | 114:17,25 115:11 |
| 89:14,20,23 95:10 | 226:11 275:24 | 124:13 130:9 | 115:17,21 116:20 |
| 103:23,24 106:2 | 281:16 293:10 | 214:12 259:18 | 118:17 120:8,23 |
| 106:12,14 108:13 | 294:19 | 269:3 276:15 | 122:3,10,16,21 |
| 114:22 115:2,5,22 | **occur** 142:18 | **okay** 20:2 21:6 | 123:18 124:2,9,15 |
| 117:3 119:9 120:2 | 143:16 145:22 | 23:16,25 24:12,20 | 125:2,5,14,17,25 |
| 120:10 121:13,22 | 146:16 | 25:11,24 26:9,19 | 127:18,23 128:6 |
| 122:4,17,23 123:1 | **occurred** 135:5 | 27:12 28:5,7,10 | 128:19 129:9,11 |
| 123:4,7,9,13,20 | 141:22 190:8 | 30:19 31:3,3,4 | 130:13,14,25 |
| 123:23 124:19 | **october** 1:20 | 35:4 37:1 38:14 | 131:8,17,19 132:9 |
| 130:11 131:1,4,17 | 31:20 41:7 49:3,5 | 39:5,10 41:25 | 132:23 133:20 |
| 131:22 139:2 | 49:14 57:13 60:9 | 42:11 44:13 45:12 | 134:1,8,11 135:1 |
| 144:9 145:16 | 60:24 81:8 84:1 | 45:17,23 46:21 | 135:23 136:18,22 |
| 159:8 180:10 | 193:4 197:11 | 48:3,13,17,23 | 137:2,14,25 142:8 |
| 202:14 206:24 | 257:5 299:19 | 49:11,17,20,25 | 144:5 147:14,24 |
| 208:10 225:10 | **odd** 227:18 | 50:21 51:3,8,25 | 148:23 149:15,20 |
| 230:9 246:20 | **oddly** 163:11 | 53:7,10,17,24 | 150:9,10,17 151:3 |
| 252:5,11 253:5,8 | **odds** 140:5 | 54:2,8,25 55:3,8 | 153:7,17,23 |
| 257:16,25 259:6 | **offended** 188:20 | 55:10,14,19 56:4 | 154:25 157:10 |
| 260:23 261:3,6,20 | **offense** 236:18 | 56:6,14,25 57:3 | 158:7,14 159:15 |
| 262:3 263:2,21 | 286:2 | 57:13 58:17,24 | 162:16 163:5 |
| 267:9,25 268:23 | **offer** 42:25 59:21 | 59:11,12,14 60:2 | 165:12 170:24 |
| 270:16,16 277:2 | 65:2 | 60:11,14,21 61:3 | 171:2 172:3,5,19 |
| 279:1 288:22 | **offered** 65:4 | 61:23 62:21 63:4 | 176:17 179:4 |
| 289:8,8 290:4 | 194:14 | 64:8 66:8,17 67:5 | 186:5,23 203:7 |
| **objectively** 34:11 | **offers** 207:25 | 67:11,21 70:5,10 | 206:25 208:5 |
| **objectors** 136:23 | **offhand** 248:3 | 70:13,20 71:2,6 | 212:14,21 213:10 |
| 138:20 146:1 | | 72:1 73:23 74:5 | 214:6,25 215:8 |

[okay - outstanding]                                                    Page 42

218:14 219:22,22
221:17 223:8
227:12,18 233:16
237:9 238:18
241:8,20 243:10
244:11 246:8
248:8 250:12
254:20 255:14,23
256:18 261:16,18
262:9,25 263:11
263:17,20 264:23
265:5 267:21,23
270:23 271:16,19
271:22 274:20
275:3,23 280:6
282:25 283:20
284:12 285:13
288:23 289:3,7
290:3 291:7,9,10
293:14
**old** 299:22
**omnibus** 39:2
120:10 253:7
**once** 143:3 147:1
147:1 167:3
198:22 199:12
205:11
**one's** 45:24 60:23
222:21
**ones** 78:18 103:4
103:6 115:23
116:16 126:6
149:17 176:7
202:7 231:25
233:8 269:5
**ongoing** 59:3 68:8
163:21,22 206:10
273:2
**onslaught** 185:23
**open** 34:16 59:4
69:4,14 112:4
119:12 146:14
167:8 170:6,10

186:4 230:25
280:10
**operating** 77:15
152:2
**operation** 47:5
112:13
**operational** 201:6
**operative** 273:10
275:2
**opinion** 102:7,12
**opportunity** 30:8
68:9 189:18
191:10 195:3
200:11 201:9
271:14
**opposed** 26:10
31:12 33:25
109:22 137:8
193:7
**opposition** 186:19
**opt** 28:23 29:2,9
30:16 31:13,13
32:25 33:2,3,8,12
33:19,19 37:4,6
38:4,19 42:4
43:14,16 74:18
84:13 92:25 94:23
95:4 96:6 149:22
149:25 150:15
151:1 161:5,16
173:17,18,24
174:6 177:5,6,9
178:2,10,10,20
180:21,21 181:6,9
181:9,14 185:14
185:14 189:11
199:12 243:12,14
244:1 271:7
279:12,19,25
280:2 282:4,8
284:7,13,17,19,20
286:15 290:4,5,6
290:15,15

**opted** 48:1 96:14
179:12 182:1,2
276:8
**optimistic** 192:18
202:16
**opting** 48:4
177:16,18 202:3
202:20
**option** 33:18 41:4
194:14 217:5,5
**options** 206:2
**opts** 149:25 161:3
173:20
**oracle** 99:11
**oral** 53:18 137:4,8
**order** 21:3,17
23:15 25:13 26:10
28:25 29:2 30:4,7
46:1,4 47:3,10
49:2 74:24 77:16
77:18,25 98:7
106:12 117:13,22
128:12 131:5
141:16,21 142:11
159:17 164:19
172:10 173:9,21
209:12 213:20,21
213:24 214:1,3
216:20 218:23
219:10 220:23
221:3,14,14,15,22
221:23 223:3,7,9
224:7,8 226:19,24
227:2,9,13 228:7
229:14 230:3,13
233:23 234:17
237:19 238:6,16
256:22,24 257:2
257:22 263:23
264:17 271:11
278:18 281:13
282:10,20 297:17

**order's** 106:4
**ordered** 127:20
127:24,25 128:3,7
128:12,15,16
**orders** 54:17 96:1
97:21,22 98:10
106:7 114:25
115:3 121:25
127:10 170:1
227:23 254:21
257:17,25 268:18
277:9 280:9
**ordinary** 39:24
40:13,16 41:9
71:21 209:9
210:19 222:1,3
238:12 282:6,24
**organized** 176:18
**origin** 95:15
107:12,25 108:8
108:10 109:22
199:19
**original** 187:10
192:16 204:19
208:25
**originally** 110:14
291:17
**orms** 7:24 299:3
299:10
**outcome** 140:3,14
**outline** 152:10
**outlined** 153:3
154:1
**outs** 50:24 178:10
181:14 290:15
**outside** 76:5 80:15
96:12 109:23,25
110:4 146:2 196:2
255:15,15 263:6
270:19,21
**outstanding** 49:1
54:6 77:15 78:12
78:13,17,22,24

84:15 102:22
103:1,17 106:24
116:7,15 139:12
147:8 159:13
260:22
**overboard** 275:19
**overlap** 294:18
**overrule** 276:2,18
**oversee** 140:20
148:21
**overseeing** 97:7
**owe** 68:24 69:2
162:12,20
**owed** 69:11
113:18 114:1
167:6,7 211:22
221:6
**owing** 195:8

**p**

**p** 8:1,1 20:1 90:8
**p.c.** 11:16 16:1
19:17
**p.m.** 137:13,13
296:12
**packed** 20:18
**page** 57:18 63:18
63:18 84:3 94:14
97:17 99:8 100:24
120:8 124:18
126:25 129:9,10
134:20,21 136:7,8
136:14 140:21
141:20 152:10
155:14 164:13
198:11,16,17
199:15 215:11
261:16,17,23
263:3,4,8,11
264:25 265:17
266:9,9,20 275:14
297:5,16
**pages** 129:10
164:12

**paid** 21:15 38:17
38:18 39:12,15,18
40:17,23 41:8,13
41:15 57:22 74:25
127:5,15 128:21
132:12 139:12
143:25 159:9
161:22 162:15
175:10 177:9
181:14,14,19
182:2 187:21,22
189:25 195:3
200:7 202:7 206:3
209:6 222:1,2
223:11,16 225:8
228:10 232:23,23
233:1 234:25
237:6,19 238:12
252:2 255:21
259:16 279:25
280:5 284:24
285:17
**pan** 252:9
**papers** 42:4 235:2
255:7
**paragraph** 47:3
47:10 52:1,2,3,21
58:24 62:13,15
63:1,17,19 64:4
67:19 69:16 73:6
73:25 76:9 77:7,9
79:5 81:10,13
84:1,2,3 86:16,18
87:4,11,14 91:8,8
94:3,11,13 97:16
100:23 103:16,19
103:20 106:23
111:14 114:21
116:6,8,16 117:12
119:8,8 121:17
171:4 183:3
198:21 199:15
219:10 226:24

261:19 263:18
265:16 267:14
**paragraphs** 52:3
77:7 87:18 91:9
**paramount**
293:19 295:6
**pardon** 53:11
**paren** 129:3
**parenthetical**
274:19
**park** 11:11 14:11
14:19 16:3,11
17:9
**part** 22:7 33:24
33:24 46:16 52:22
59:2 61:15,19
73:11 86:14 95:9
99:22,24 133:13
152:9 154:1,6
177:8 179:20
182:17 192:23
197:6 198:12,20
205:8 206:13
218:3,11 219:2
225:2 237:6 276:2
289:17
**partial** 53:13
**participate** 178:4
198:6
**participation** 29:4
**particular** 27:4
29:16 99:9 100:10
103:8 114:12,12
114:18 120:14
129:1 132:18
137:22 160:2
**particularly** 25:6
41:3 98:4 146:5
176:6 231:25
232:10,16 242:21
250:25 283:25
290:5,14 295:4

**parties** 23:12 24:1
24:13 28:11,22
36:11 45:13 47:17
51:2 53:22 59:20
59:23 64:15,18
138:17 140:17
141:7 148:6 149:7
153:6 159:12,15
162:9 173:11,15
173:17 175:10,12
177:5,8 178:3
179:24 185:24
186:21 191:19
197:25 201:7
213:22 218:7
219:14 225:18,23
248:16 249:9,14
272:3,12 274:18
274:24 278:25
280:21 281:18
285:24 286:6
287:19
**partner** 55:20
155:25
**partners** 4:8,19
6:10 16:10 96:25
187:6 272:24
**partnership** 2:21
47:7 48:11
**party** 51:21 58:23
77:19 114:2,3
118:6 121:2 146:5
150:15 247:18
248:18 272:3
289:12 290:1
**patently** 42:5
243:14
**path** 189:24 204:7
205:4 206:2
**pathway** 155:10
**patient** 85:16
**patrick** 140:23

[paul - pick]                                                                    Page 44

**paul**  8:20 9:18
  14:14 31:5 55:22
  136:2 220:1
  271:20
**pause**  53:12 56:8
  57:4 60:16 62:2
  62:25 64:3 81:9
  133:1,4,16 151:6
  166:7 203:10
  207:2 208:8
  261:11,15 291:11
**pay**  38:4 39:13
  40:9,23 41:18
  66:14,19 67:7,13
  75:11 79:7 111:21
  111:23 112:17,18
  113:3,6,25 114:6
  139:1 143:4,24
  144:18 159:15,18
  162:5,14 166:17
  200:24 215:15
  222:4,20 223:17
  229:22 233:22
  236:5 240:6 243:4
  254:21,23 255:3
**payable**  100:6
  102:22 103:5,10
  104:1,4,7,9,12,13
  104:16,19 105:12
  105:15 128:25
  160:7,19,22 161:2
  161:10 162:2,7,25
  256:12 258:17,21
  259:4,5 277:6,21
  277:23 278:1
**payables**  97:24
  103:1,14 105:2
  161:6 162:11
  166:17 259:13,16
  260:2,5,5 266:7
  277:12
**paying**  40:1 67:1
  67:4,9 156:10,17

  183:24,25 209:15
  209:17 228:2
**payment**  21:25
  22:3 144:12 156:4
  156:13 179:9
  180:1 184:21
  194:24 206:1
  208:23 255:11,12
  279:15
**payments**  62:18
  82:4,5 113:14,18
  114:3 156:3 209:9
  217:13
**pbgc**  28:15 139:5
  151:13 152:10,18
  152:19 153:21
  154:14,23 155:6
  155:14 204:12,14
  204:17 207:7,10
  207:14,20 208:2
**pc**  12:18 15:1
**pcd**  71:10
**peace**  155:22
**peachtree**  16:21
**pearl**  4:17 13:10
  35:8,10 39:1,3
  268:11
**pending**  53:15
  106:17 195:18
  201:1 218:20
  263:1 264:6
**penn**  18:10
**penning**  120:16
**pension**  10:17
  11:2 125:1 152:25
  207:4,15
**people**  23:16
  25:21 30:12 32:10
  33:7,10 34:15
  38:17,18 42:24
  44:19 45:1 54:23
  84:13 96:22 99:11
  144:11,14 145:11

  147:5,6 156:13
  162:5 179:18
  180:8 181:22
  187:20,22 188:1
  197:14 199:12
  202:17,18 223:24
  225:7,23 226:1,9
  236:16 239:4
  243:15 245:3
  252:14 253:6
  255:2 262:14
  264:11 265:12
  273:4 274:11
  280:12 281:24
  283:7 284:25
  287:10 288:21
  289:8,10,11,20,24
  295:22
**people's**  272:25
**peopleready**  3:10
**peral**  6:24
**perceived**  154:16
**percent**  32:19,20
  32:21 34:13,13
  40:24,25 173:19
  174:7 179:2,5
  181:11 183:12
  196:1 202:3
  215:23,25 216:1
  231:7 232:7
  237:17 244:3
  248:25 249:3
  253:7 279:14
  280:1 284:4
  292:19 293:1,6,7
  294:3,6,17
**perfectly**  226:12
  287:19
**performance**
  112:15
**period**  40:18 72:8
  99:23 128:10,11
  145:22 146:14

  149:22 197:16
  278:1 279:2
**permit**  23:10
**person**  26:7
  138:15 149:8,19
  199:16 200:14,23
  295:22
**personal**  4:6 6:14
**personalities**
  202:23
**personally**  81:11
  87:22,24
**persons**  156:2
  227:5
**perspective**
  178:18
**persuaded**  245:12
**pertains**  84:23
**peter**  10:7
**petition**  41:7
  78:15 96:2 98:1
  99:16,18 100:13
  100:20 104:1,7
  127:11,12,14,14
  127:21 128:4,8,10
  235:17 254:22
  277:8,11 278:1,7
  278:8
**pgc**  125:4
**ph**  124:19 140:23
  140:24 249:24
**phil**  203:11
**philip**  9:7
**philosophy**
  193:10
**phone**  44:19 45:6
  46:17 48:9 189:16
**phrase**  98:7,10
  239:15
**phraseology**
  292:2
**pick**  110:15
  111:11 112:24

138:11
**picking** 41:10
83:5
**picturing** 183:14
**piece** 75:6 125:11
**pieces** 72:22
**pizzi** 19:1
**place** 9:4 77:25
156:11 233:25
275:17 280:15
281:6,13
**places** 243:15
**plains** 1:18
**plan** 2:5,12 21:10
21:11,21 22:14
23:2,9,11 27:18
28:12 29:7 30:22
30:22 31:23 32:1
34:1,2 36:9 38:10
38:20 41:21 44:9
45:18 46:4,14
47:4,11,19 50:2
50:23 54:13 57:14
57:16 62:18 82:17
84:7 92:5,7,11
94:7,20 100:3
115:16,19 117:13
117:22 122:20
125:1 139:2,5
140:12 141:6,13
141:14,20,24
142:17,22 143:3
143:15,19 144:24
146:22 147:16,21
148:11 150:18
151:14,16 152:24
153:5,25 154:2,5
154:14,15,21
155:2,6,8,10,11
155:13,23 156:4
172:21 173:13,16
185:18,25 187:16
188:14 190:24

203:21 204:8
205:2,23 207:15
208:3 209:8 213:2
213:11,11 214:11
217:3,6,12,23
224:15,19 231:18
231:20 233:16,19
236:23 238:21,23
239:19 240:9
242:25 244:25
247:4 248:9,11
256:25 257:3,12
272:5,7,12,21,24
273:2,2,5,5,9,16
273:18 275:16,18
276:13,15,17
278:9,24 280:4
284:6 291:19
292:3 293:15
294:14,23
**plan's** 185:12
**plans** 146:5,5,11
152:25 207:15
**play** 74:10 198:3
236:21
**plays** 221:11
**plaza** 13:3 18:10
**pleading** 27:23
205:19 244:19
**pleadings** 30:1
187:12 193:2
230:6 276:4
**please** 42:23 56:7
56:10 60:15 87:4
90:5,6 136:11
137:14
**plow** 189:24
**plus** 96:20 103:25
104:6 139:15
223:23 224:2
269:18
**pocket** 285:1,4

**podium** 55:20
**point** 25:15,21
26:7 28:9 31:7
33:17 34:5,11,11
40:15,15 41:9
53:5 69:14 74:16
83:19 107:11,25
108:10 109:22,22
132:19 133:23
149:6 151:12
154:22 156:11
158:21,25 162:4
171:4 174:3 183:2
191:16,18 192:1
216:7 219:2,9
220:20 224:14
225:20 229:3
233:4 238:8 242:6
242:6,24 244:15
244:16,19 247:8
251:6 252:4
256:14 259:9,10
263:23 271:1,24
271:25 273:7,13
274:4 275:8,19
279:17 284:23
285:7 286:22
287:1,8 288:14
291:5 294:22
295:24
**pointed** 199:11
238:22 263:8
**pointing** 188:1
266:8 291:21
**points** 31:8 71:17
85:20 137:21
225:25,25 271:24
280:24 288:15,16
288:16 296:7
**poke** 138:17
**poked** 239:2,3
**policies** 80:6

**policy** 25:4 73:1
287:4
**poll** 149:25
**ponce** 14:3
**pool** 74:17 75:1
284:4
**pools** 203:24
**port** 95:14 108:7
199:19
**portion** 39:18
40:24 137:7
160:22 166:20
167:4,5 197:5
**portions** 61:13
82:16 90:20
**posed** 186:19
**position** 43:10
68:11,12,23 69:2
69:5 79:17 165:20
193:19 195:5
199:25 217:15
220:3
**positive** 200:1
**possession** 8:3,14
**possibility** 86:3
97:20 229:15
**possible** 58:8
62:21,23 64:19,22
69:1 72:11,13,14
75:3 86:5 96:22
102:3 105:7
110:19 118:7
145:10,18 151:25
206:18
**possibly** 25:7
119:25 195:16,20
**post** 41:7 78:15
96:2 99:16,18
100:13,20 104:1,7
127:11,12,13,14
127:21 128:4,8,10
155:15 169:13
200:19 204:23

[post - process]                                                                              Page 46

235:17 254:21
277:8,11 278:1,7
278:8
**potential** 68:10
71:3 72:25 82:13
114:11 136:13
140:18 144:12
194:16 249:12
253:4 254:23,25
**potentially** 43:15
43:15 64:17 75:6
79:14 82:11 198:5
269:22
**pr** 4:6 14:5
**practical** 78:1
283:16,24
**pre** 104:1,7
128:10 169:12
199:8 204:22
**precedent** 141:19
144:7
**precisely** 74:17
**preclude** 54:15
**precluding** 47:20
**predict** 287:14
**prediction** 135:7
**preference** 70:1,1
70:14 71:3,25
72:11,19,21 74:19
74:23 75:4 80:4,5
80:18 81:4 86:11
86:12 87:18
136:12,13 139:17
139:23 145:11
152:23 164:3,6,11
175:14 176:13
183:6 195:4 196:9
199:20 206:8
215:22,23 216:1
217:8 225:10
226:6,10 240:4,6
248:21,24 249:2
249:12

**preferences**
193:25 194:1
195:7 225:14
**preferential** 69:18
**prejudice** 37:9
**prejudiced** 44:6
44:12
**prejudices** 37:13
42:3
**preliminarily**
28:6
**premised** 248:11
**premium** 196:10
207:17
**prepaid** 68:4,20
167:20 168:24
**prepare** 135:4
282:6
**prepared** 26:21
29:21 30:22
128:18 133:20
134:14 151:1
176:19
**prepetition** 96:1
127:10,21 128:3,8
128:16 254:21
277:9 278:5,17
**preponderance**
283:17
**present** 172:8
**presentation**
136:20 137:20
154:4
**presented** 138:21
192:14
**presentment**
282:23
**preserved** 52:8,10
**pressed** 145:16
**pressing** 145:11
145:11,16
**pressure** 288:13

**presumably** 35:23
**pretty** 27:8 74:24
99:21 135:8
192:18 194:13
202:18 232:14,21
236:4 249:3
275:10,17
**prevail** 216:20,22
**prevailed** 216:17
216:18
**preventing** 273:4
**previously** 22:20
47:13 54:17,18,19
188:9
**price** 18:15
**primarily** 125:8
127:16 163:19
187:5 188:10
**primary** 24:13
173:6
**prime** 55:5,16
298:6
**principles** 222:19
**print** 126:21
291:24
**printers** 6:5
**prior** 50:25 58:1
58:18 97:4,8,10
97:14 98:20 105:5
107:7 127:17
136:14 156:11,15
198:22 266:9
**priority** 121:18,19
122:4,23 123:14
123:23 124:12,16
125:19,20 126:4,4
126:8,15 152:19
153:7,12 156:3,5
159:21,23 160:1
208:20 252:14,14
252:16
**pro** 21:23 173:22
174:6 177:6

179:17 181:10
237:17
**probability**
186:10,14
**probably** 75:18
80:4,21 81:4
84:18,21 116:19
122:8 137:2
203:17 226:1
231:23 233:9,10
236:22 240:22
261:9 266:19
268:17 292:23
293:25 294:18
**problem** 25:9
220:9 253:13
279:12,13 291:1
**problems** 100:12
100:19 280:7
**procedure** 31:19
32:5,9,12 78:1
94:24 278:10
280:15 281:17
**procedures** 92:15
215:2 280:8,25
281:12,19 282:10
**proceed** 27:19
140:2
**proceeding** 46:6
215:21 218:5
**proceedings**
296:11 299:5
**proceeds** 30:10
50:4 62:16 64:5
64:13,14 65:13,17
66:5 87:11,17
139:15 152:21
164:11,14,15
199:7 204:16,23
210:10
**process** 87:22
96:11,13 99:14,18
99:24 100:1

[process - putting]                                                    Page 47

115:25 117:5,19
117:25 118:9,13
146:12 147:11
159:8,8 180:3,4
181:12 188:25
189:4 190:18
192:6 197:19
198:13 199:21
201:23,25 202:21
206:10 218:12
219:19 278:15
282:8
**processed** 78:15
**productive**
228:13
**professional**
63:12 102:7
123:16 201:7
227:5
**professionals** 29:4
86:12 191:9 193:5
197:23 200:20
207:12,19 220:8
220:13,17,24
221:6 223:4,11,16
223:20 224:4,21
232:6 237:5,10,15
245:10 258:24
296:3
**profit** 146:10
**program** 27:25
28:17,21 45:18
53:23 74:19 81:12
84:5 94:5,25
96:11 145:17
148:25 150:16
156:13 161:20
164:23 172:8,10
172:13,22,24
173:12 178:7,23
182:21 187:4
188:4 194:8,11,13
194:14,20 195:23

197:21 202:11
203:6,17 215:2
232:22
**progress** 17:4
147:3,4,7 148:20
149:3
**progressing** 96:22
147:9
**project** 69:23
117:19
**projected** 46:15
**projecting** 132:10
**projection** 248:15
270:22
**projections** 285:6
**promised** 252:1
**promptly** 142:18
**proof** 21:19 22:11
38:2 44:11 106:19
158:23
**proofs** 50:5
158:20,22
**proper** 108:19
217:22
**property** 12:10
47:14 146:10
165:15 273:23,24
**proponent** 286:19
**proposal** 20:24
21:2,5,7,18 22:20
22:25 23:9,15
24:11,14 32:17
209:8,8,9 245:16
**propose** 27:20,22
148:25
**proposed** 22:7
32:18 36:8 38:16
49:2 54:10 58:21
170:1 204:11
213:18 219:10
278:22 295:9
297:18

**proposing** 30:20
32:5 131:16
**proposition** 30:7
**propriety** 204:15
**prosecute** 46:17
200:21 250:4
**prosecuting**
123:19 155:23
**protect** 157:8
210:4
**protected** 157:7
208:17 211:20
222:17 223:5
**protection** 24:14
158:6 210:14,24
212:1
**protections** 141:2
**proud** 187:14
**provide** 52:15
76:22 155:10
157:1 199:5
200:11 222:13
287:10
**provided** 23:6
31:16 50:13 132:8
134:6 142:17
150:23 154:23
155:17 199:4
200:6 220:11
225:7 268:20
272:20
**provides** 23:9
156:2,4 173:14
243:23
**providing** 132:7
222:16
**provision** 25:6
42:5 147:17 153:2
159:14 201:18
210:4 274:12
275:24 276:1,15
**provisions** 47:4
47:20 238:16

272:21 275:18
**puerto** 6:14
**purcell** 17:5
**purchase** 254:6
268:18
**purchased** 35:22
**purchasers** 190:1
283:8,8
**pure** 242:10
**purely** 186:3
206:4
**purpose** 272:12
**purposefully**
280:8
**purposes** 21:18
59:22 170:23
171:5 195:10,11
**pursuant** 197:20
**pursue** 204:6
205:7,9 231:22
**pursued** 204:21
**pursuing** 65:6
206:8
**pursuit** 205:16
**pushed** 41:19 44:2
189:23 243:3
**put** 29:19 30:8
31:14 42:25 69:20
77:24 79:11,17
92:19 104:5,20
129:6 139:17
146:2 156:11,16
159:16 164:4
172:13,24 178:9
183:5 185:3
196:16 204:5,25
207:9 223:15
233:18 258:11
282:7 287:14
296:8
**puts** 32:25 146:23
**putting** 29:6
137:19 201:5

[putting - reasonably]                                                                    Page 48

258:12

**q**

**quarropas** 1:17
**quarter** 147:1
**quarterly** 218:4
**question** 25:22
  26:13 43:2 58:14
  65:1 66:24 80:18
  83:20 85:1 94:1
  103:3 105:4,6
  107:20 108:12
  109:8,10 113:11
  113:12 116:10
  117:18,19 118:16
  122:20 124:1,15
  126:13 132:3,22
  134:12,13 139:20
  149:13 167:23
  185:5 213:18
  227:17 234:3
  239:18 281:1
  293:16,16
**questioned** 82:3
  82:22 83:1
**questioning**
  259:23
**questions** 59:13
  62:1,7 73:23 76:6
  76:24 79:2 81:7
  86:10,15 88:22
  89:2 93:6,12 99:4
  135:22 136:17
  137:23 141:5
  154:2 189:6 203:5
  203:5 217:11
**quick** 271:21
**quicker** 175:10
**quickly** 44:16
  74:22 75:9 82:9
  82:18 132:12
  151:7 202:19
  206:17,21 234:25
  242:10

**quimby** 12:3
**quite** 26:1 158:18
  181:7 242:9
**quoted** 137:6
**quoting** 57:20

**r**

**r** 1:23 8:1,11,20
  16:15,16 20:1
  56:12,12 60:19,19
  90:8 180:18
  188:12 297:14
  299:1
**raise** 56:9 60:17
  83:19 90:6 147:14
  172:15 183:17
  253:5 271:24
  288:11
**raised** 47:17
  185:6 204:15
  215:10 219:11
  225:20
**raising** 219:3
**ralph** 140:23
**range** 69:20
  151:12
**ranges** 58:9
**rata** 21:23 173:22
  174:6 177:6
  179:17 181:10
  237:17
**rational** 226:13
**rationale** 177:14
  178:11
**rationally** 34:11
**raw** 100:8
**ray** 8:8 27:15
  44:14 137:17
  290:8
**raynor** 11:6 207:3
  207:4 208:6
**rdd** 1:4 2:1 7:3
**rea** 47:1

**reach** 175:17
  193:6 207:23
**reached** 21:1
  24:25 50:17 189:1
  205:17 206:2
  246:6
**reaching** 190:9
**react** 295:19
**reacting** 242:1
**reaction** 238:23
**read** 32:17 34:10
  42:4 47:19 73:11
  75:20 94:12
  126:24 136:10
  144:4 146:1
  198:20 201:14
  244:8
**reading** 63:23
  73:15 74:3 88:8
  147:16 222:19
**ready** 30:10 42:22
  218:6,8
**real** 47:14 65:13
  65:16 140:10
  146:17 155:5
  175:1,19 191:24
  217:8 249:20
  286:12 293:16
**realistic** 246:19
  296:3,5
**reality** 229:15
  238:9 283:16
  284:14 285:15
  292:3
**really** 29:3 34:10
  42:12 46:16 49:6
  53:3 69:25 83:18
  113:3 126:21
  138:4,10 139:16
  140:9 142:24
  144:12,13 145:10
  147:19 148:7
  149:4 151:22,24

152:3,9 153:4
  154:5,9 155:3,10
  159:5 164:2
  166:14 173:13
  177:3 180:19
  184:2,14,15 187:5
  187:17 189:11
  191:7,18 193:4
  194:9 198:4,14
  200:15 203:21
  210:24 212:5,17
  220:6 223:1,21
  225:22 226:9
  230:5 231:13
  234:4 244:9 247:5
  251:18,23,24
  252:15,16 256:10
  260:12,16 275:16
  275:19 283:5,9
  284:23 286:1
**realm** 101:18
**realty** 2:21 47:7
  48:11
**reargue** 40:14
**reason** 36:19
  37:13 171:15,21
  172:12 183:17
  188:9,9,17,21
  195:25 197:9
  229:5,23 247:19
  256:24 257:10
  258:6 265:19
  287:22
**reasonable** 27:9
  30:15 69:21
  175:11 186:9,14
  228:20 245:6,16
  248:22 270:21
**reasonableness**
  151:12
**reasonably** 33:11
  80:12 142:13

rebuttal 186:18
recall 76:1 83:13
  132:18
receipt 82:5 95:14
  95:15 107:15
  108:4,5,6,7,19,23
  127:6 173:24
  199:19
receivable 68:4
  97:23 100:6
  168:24
receivables 68:15
  100:9 110:24
  112:1 167:20
receive 62:21 69:8
  152:15 156:3
  173:18,22 177:6
  209:5 262:21
received 36:21
  55:17 56:24 60:6
  61:6 121:4 127:9
  127:11,13,14,17
  127:19,21 128:10
  191:19 231:8
  262:17
receives 152:19
receiving 28:22
recess 137:13
reciprocal 47:5
reclassification
  130:23
reclassifications
  257:16
reclassified
  119:10,14,22
  266:25 267:10,15
  267:17,18 268:4
  269:4
reclassify 131:2
recog 25:16
recollection
  132:21

reconcile 151:24
  180:9
reconciled 158:23
  202:6
reconciliation
  108:2 129:8 149:3
  159:8 163:10
  164:18 167:4,6
  169:15 170:4
  172:1 175:22
  176:3,9 180:3
  181:12 197:19
  198:7 199:2
  201:23,24 202:5
  235:9
reconciling
  100:17,18,20
  180:11 281:8
  282:5
record 35:17
  48:12,21 59:22
  87:4 126:24 127:6
  137:15 155:3
  162:20 170:9
  172:18 212:15
  230:2,8 243:5
  250:6,17 252:25
  253:23 257:4,12
  258:10,25 276:2
  289:1,6,11,25
  291:23 295:23
  299:5
record's 51:14
  72:1
recorded 99:10
  107:14
recording 281:11
records 97:8,14
  104:13,16,19
  105:11 107:13,14
  107:15 108:3,3,24
  113:22 160:7
  161:13 162:1

258:20 270:9
  277:6,12
recoupment 47:15
  47:21 54:14,16
recover 64:14
  69:13,24 70:15,21
  70:22,22 71:3
  80:9 82:18 226:13
  235:21 250:3
recovered 65:23
  250:1
recoveries 66:2
  69:17 70:14 71:4
  72:21 73:1 74:22
  74:23 75:4 80:5
  86:11 136:13
  138:4,8 140:8
  154:16 183:6
  193:23 195:12
  196:9 217:9 240:4
  240:6 248:1,24
recovery 18:17
  43:16 46:15 66:12
  69:20 70:6 71:19
  71:23 80:7,23
  173:19 174:7
  175:14,16 181:11
  185:13 187:16
  188:15 191:2
  205:21 293:25
  294:1
recross 88:20
redacted 4:2
redirect 85:13,18
  136:1,4
reduce 82:14
  127:2 167:25
  193:23 205:9
  267:15 268:7
reduced 38:19
  110:18 168:24
  184:24 204:18
  267:11

reduction 68:10
  111:6,7 127:13
reductions 127:2
  127:3,16 129:7
refer 67:25 75:22
  75:24 86:16 95:8
  99:9,10 106:24
  107:11,17 114:21
  119:9 120:5 176:2
  187:3
reference 45:11
  63:14 77:9 94:18
  121:19 129:17,18
referenced 105:1
  203:23
referred 116:16
  128:20 182:17
referring 62:18
  73:8 81:19 84:9
  84:16 94:3,16
  100:21 103:2
  105:22 115:18
  117:10,11,11
  123:13 128:17
  132:14,20 133:9
  286:17
refers 63:1 73:10
  77:7 106:1,23
reflect 105:12
  293:21
reflects 21:5
  23:25
regard 96:5
  105:22 118:4
  138:4 281:20
regarding 43:10
  49:1 79:25 94:2
  138:5,7 155:15
  199:18
regards 120:18
  132:7
regulatory 203:24
  247:14,17

[reimer - respect]                                                      Page 50

reimer 16:16
reissue 255:9
reject 294:3,4
rejected 292:8,19
  293:4 294:6,16,17
  294:19 295:12,13
rejection 292:19
  293:6 294:6,7
  295:18
relate 118:2
  120:11 126:5
  127:16 131:1,17
related 47:12
  103:25 104:7
  110:3 126:9
  136:12 166:20
  169:24,24 185:25
relates 50:25 53:2
  69:17 95:16
  120:14 131:13
  198:6 267:2
relating 50:24
  96:8 121:14
  122:17 126:3
  127:10 260:21
relative 295:7
relatively 202:19
relator 90:25
  208:12
release 48:1 153:2
  251:11,12 272:2,9
  273:7,8 274:12,16
  274:18,18 275:2
  275:18 276:5,6,9
  276:14
released 249:18
  272:2 274:24
releasing 50:24
relevant 30:23
  247:6,6,9 248:7
reliable 259:1
relied 30:12 255:2

relief 30:7
relive 227:13
reluctance 146:14
reluctant 242:19
rely 86:11 89:7
  195:10 276:4
  277:5
relying 66:1 78:19
  183:5 184:3,3
  226:18 228:16
  274:16
remain 54:5 95:7
remainder 54:5
  86:1 186:17
remaining 21:23
  21:25 78:20
  119:11 277:23
remember 132:15
  134:11 166:16
  293:22
reminds 150:10
remnant 74:21
  80:7 163:20
reorganization
  222:21
reorganizing
  222:23
rep 282:1
repeat 94:11
  283:12
repeating 44:8
rephrase 131:13
  132:3
replacement
  157:3 208:19
  210:9 212:8
replenished
  205:14 224:1
report 20:25
  147:3,4 219:20
reporter 299:13
reporting 147:6
  199:4,6 218:4

219:19 281:25
represent 35:8,24
  57:8 125:18 127:3
  200:12 241:3
  244:20 283:2
representation
  190:14 197:18
representative
  23:5 197:12 198:1
  198:2,18,25
  199:10,13 200:2,5
  201:19,22 206:20
  241:15,18 281:4
  291:3 295:17
representatives
  201:2,25
represented 27:3
  278:13
representing
  44:21 241:4
  286:23 295:23
represents 283:6
request 23:13
  128:2 137:4
  185:24 218:1
  243:13
require 44:25
  62:16 79:8 146:5
  195:19 213:21
required 62:24
  68:11 159:9
  278:24
requirement
  156:6,14 157:1
  159:18 164:19
requirements
  23:6,8 26:23
requires 141:8
  246:23 280:4
requiring 80:3
  178:5
reservation 2:9
  3:24 4:3,22 5:7,11

49:18
reservations
  29:16
reserve 21:12,22
  91:24 92:10,22
  93:1 156:7,11,16
  157:2,8 198:23
  206:23 226:25
reserved 156:19
  209:6
reserves 156:22
reserving 209:16
residential 47:14
resolution 23:19
  27:7 30:15,20
  52:16 53:14 82:10
  117:3 173:23
  199:21 286:7,7
resolve 46:1 52:19
  96:4 201:1 280:11
resolved 27:21
  44:17,23 45:1,7,9
  45:14,16,17 46:10
  46:24 47:8,9
  48:12,22 49:15,16
  49:24 53:15,20,25
  54:1,10,12 55:1
  68:5 94:22 95:22
  96:10 171:13
  175:20 236:23
resolves 50:22
resolving 25:5
  49:2 85:25
resources 140:13
  152:8 180:9
  189:22,23 191:2
respect 32:6,20,21
  43:5 53:6 54:9
  73:18 81:18 85:21
  87:18 98:25 141:1
  171:8 195:9 198:1
  204:10,11 208:21
  209:13,13 230:4

[respect - rights]                                                                                  Page 51

258:23 291:23
292:4
**respectfully** 211:2
239:3 245:17
287:22
**respective** 27:6
**respectively** 61:5
**respects** 208:24
**respond** 76:13
77:1,2 201:1
206:23
**response** 6:1
34:18 35:17 85:10
105:4,6 135:25
137:1,7 209:3
219:10
**responses** 290:17
**responsible** 67:4
140:7
**rest** 55:2 61:24
90:22 167:25
246:10 282:17
**restates** 72:3
**restrictive** 47:2
**restructuring**
79:16 144:8 145:6
148:8,21 149:2
158:25 160:4
197:15 198:24
199:17 281:5
**result** 27:1 43:4
62:22 102:9
115:24 231:20
273:18 285:14
287:14,20
**resulting** 71:22
**results** 97:21
217:8 295:4
**resume** 295:19
296:7
**retail** 112:13,14
114:12

**retained** 71:9,25
**retaining** 67:3
**rethink** 228:3,5
**retiree** 3:2 7:5
20:14,23 21:1,10
21:21 23:1,4,18
26:3 297:19
**retirees** 19:11
21:13 22:16,21
23:5,21 25:1 27:2
27:5,6 28:20
48:18
**return** 51:11,14
**returned** 50:5,6
**returns** 127:6
**review** 81:21
94:24 122:17
199:2 213:3,5,8
218:7,11 249:19
279:1,18 280:22
281:18
**reviewed** 88:2
171:7
**reviewing** 250:24
**revised** 21:2,3
23:14 57:14
**revisit** 227:23
**revolves** 128:9
**rewrite** 54:19
**rico** 6:14
**ridiculously**
287:25
**right** 20:15 22:5
24:16 25:24 26:5
26:19,21 30:25
31:1,11 32:8 33:4
33:6,8,10,12,14
33:25 35:2 37:8
38:11 40:8 41:17
42:1,11 43:12,20
45:4 46:3 47:14
47:16 48:6,19
49:13,19 50:16

51:10,16 53:4,7
53:24 56:9 60:2
60:17 61:25 63:19
63:20 68:12 69:19
69:22 75:4,20,22
76:14 80:16 81:2
82:8,12 86:9 87:9
87:19,25 88:6,8
89:6 90:6,16
95:11 98:25
100:19 105:6,10
105:16,18 106:8
109:2 110:9 112:7
113:21 116:3,15
117:6,18 118:2
119:19,24 120:3
121:7,11 123:18
124:4 130:7,17
135:21 142:4,9
143:17 145:14
146:7 147:23,25
148:5,23 150:2,13
150:19 153:11,15
157:20,22 158:8
159:17,25 160:1
161:21 162:8,18
163:13,18,24
165:21,24 166:13
166:22 167:4,11
168:7,18 169:7,10
169:16,18 171:2
171:25 172:5,5,6
174:18 177:17
180:17,20,22
181:4,4 182:3,19
183:1,7,10,13
184:1,11,13,16,18
184:18,20,23,25
185:16 186:2
196:10 201:21
204:9 209:19
210:11,13,17
212:4 214:18,24

215:12 216:14
218:2,16,16,16,18
218:19,22 219:13
221:7,20 226:5
227:15,18,21
228:6 229:1 230:1
230:24,25 231:13
231:13 233:20
237:7 239:18
240:14 244:2,6,7
246:11,21,23
247:16 248:4
250:21 251:4,15
254:12,16,19
255:10,16,25
256:9 258:16
259:4,20 260:10
261:7,10,12,22,23
262:8,8,10,23
263:2,14,19,22
264:3 265:15
267:1,4,6 268:2,5
268:22,25 269:2,8
272:1 273:10
274:14 275:15
279:4,11,12
280:22 281:15,22
282:14,18,25
284:7,13 289:3
290:16 293:5,13
294:9
**rights** 2:9 3:24 4:3
4:22 5:7,11 27:5
31:25 32:23 33:21
40:25 46:5 47:12
122:17 141:1
155:18 157:6
207:14 220:24
225:18,24 226:2,2
230:12,13 238:8
238:15 245:12
273:1 289:12,24
289:25,25

[rise - schrock]                                                              Page 52

rise  28:12 152:9
rises  229:20
rising  274:8
risk  41:13 181:24
  182:1 183:14
  184:15,20,22
  195:1 229:17
  286:16
risks  234:8
risky  194:15
  248:12
road  299:22
robert  1:24
rocco  18:6
roebuck  22:13
  294:5,15,17
rogers  16:18,25
  289:4,4
role  97:4 98:25
  198:2 200:14
rolled  176:10
room  1:17 10:12
  114:14 284:24
  286:1 287:15
rooney  12:18
rosa  3:17 5:24
  14:2
rosenbloom  4:2
rothschild  14:17
rough  220:17
  268:12
roughly  80:24
  109:14 125:5
  196:3 253:14
round  36:2 39:7,8
  123:20 130:14
  224:20
rubio  13:23
ruby  281:17
rude  275:11
rudely  275:11
rule  52:18 226:13
  228:5,6,7,13

ruled  165:7,14
  166:19 167:2,4,5
  168:12 213:19
  216:17
rules  228:7
ruling  43:22
  268:1 289:23
rulings  43:9
run  164:17,17
runs  45:20,20
rutherford  8:19

s

s  2:13 8:1,10 20:1
  56:12 138:11
  159:11,13 263:13
  266:21 297:3,14
  298:3
s.d.  275:14
sadly  193:9 208:9
sale  139:25
  207:13 208:18
  275:21
sales  283:17
salient  21:7
salt  43:1
samil  17:4
san  14:5
santa  3:17 5:24
  14:2
sara  9:8
sarachek  17:2,13
  189:17 283:1,1
  284:3,8,14,20
  285:3,8,10 286:24
  287:2,7,21 288:2
  288:6,19
sarachek's  192:3
sat  83:17 188:19
satisfaction
  152:16,21
satisfactory
  142:12

satisfied  23:5 73:7
  127:5 158:18
  228:24 264:3,9,10
  264:13,24 265:2,4
satisfies  30:22
  205:3
satisfy  37:17 74:2
  74:6 138:22
  212:14 226:12
  227:4 254:18
save  73:23 76:24
  85:4 137:7 144:13
  175:9 186:17
  205:24
savings  185:21
saw  151:24
  153:17,19 189:17
  190:10 192:13
  193:1 202:13,14
  216:5 287:5
saying  37:18,20
  41:2,5 42:6,7
  45:18 62:23 68:14
  76:25 77:22
  102:24 109:2
  111:25 127:24,25
  132:15 141:25
  143:22 157:14
  162:10 171:19
  215:19 217:14,16
  217:23 218:3
  226:7,9,17 227:9
  227:22 230:16
  231:7,9,14,17,19
  232:4,25 234:19
  236:2,4,15 237:23
  238:25 241:24
  242:2,13,14
  244:10,12 246:2,9
  250:2 251:16,16
  253:18 254:2
  257:3 259:13
  260:12,20 264:13

266:15,16 268:21
  269:14,22 278:2
  282:10 289:23
  290:9 292:15
says  30:11 32:6,20
  44:22 52:3,5
  57:18,24 63:22
  73:20 76:9 79:6
  81:14,20 94:14
  96:20 103:22
  124:19 127:2
  129:15 130:4,22
  133:6 134:16
  142:20 143:18
  159:14 198:11,21
  226:19,25 237:19
  238:11 247:4
  250:23 261:19
  264:23 267:8
  268:12 274:25
scenario  203:1
  236:3,6 246:19
schael  12:1,7
  276:22,25,25
  277:15 278:6,21
  279:10,13,23
  280:7
schedule  130:4
  135:4,10
schein  18:22
scheme  239:14,17
schemes  248:12
  249:21
school  3:15 5:16
  11:17 15:2 49:23
  50:6,18,20 51:18
  206:16
schrock  8:8 27:15
  27:16 28:7,10
  30:24 31:2,4
  33:23 44:14,15,20
  44:22 45:4,8,13
  45:19,22,24 46:7

[schrock - seemingly]                                                    Page 53

| | | | |
|---|---|---|---|
| 46:9,12,18,21,23 | 177:24 178:13,17 | **scratch** 176:20 | 93:1 156:6,10 |
| 47:18,23 48:2,4 | 178:25 179:2,6,10 | **sculpture** 46:8 | 159:22 210:2 |
| 48:17,20,24 49:7 | 179:15,19,21 | **se** 213:11 | 229:11 234:5,18 |
| 49:10,12,14,16,19 | 180:6,20,22,24 | **sean** 13:7 169:22 | **securian** 21:15 |
| 49:21 50:1,7 | 181:1,4,20 182:3 | **sears** 1:10 2:1,6 | **security** 156:5 |
| 53:10,13,18 54:1 | 182:9,12,15,19,23 | 7:3 20:2,7 22:13 | 157:17 272:23 |
| 54:3,14,21 55:3 | 183:1,7,10,13,16 | 25:3 57:16 97:2,4 | **see** 34:2 42:12 |
| 55:11,13,19 | 183:19,22 184:1,6 | 97:8 98:14 99:1,2 | 54:3 62:18 63:2,5 |
| 137:17,18 138:1 | 184:11,13,16,18 | 120:6,11,23 121:3 | 63:15,23 64:5,10 |
| 141:12,15,18,23 | 184:20,24 185:1 | 121:14 137:15 | 65:14,20 66:9 |
| 142:2,5,10,19 | 185:11,16,20 | 162:23,24,24 | 67:23 68:1,5 73:8 |
| 143:2,5,7,9,12,17 | 186:3,6 189:6 | 222:22 234:24 | 73:15 74:3 77:10 |
| 143:21 144:1,4,6 | 192:1 205:23 | 285:16 288:4 | 77:11 81:23 91:9 |
| 144:21,23 145:1,3 | 212:3 219:3 239:2 | 293:25 294:2,5,15 | 94:15,17,18 98:12 |
| 145:5,15,24 146:3 | 271:11 281:1,3,14 | 294:16,16 | 102:15 106:25 |
| 146:7,15,18,21,24 | 281:20,23 282:12 | **seat** 90:5 190:3 | 107:3 114:23 |
| 147:4,18,23,25 | 282:14,18,21 | 191:7,16 220:14 | 133:24 136:8,11 |
| 148:3,6,10,12,14 | 290:8,8,12,16,19 | 245:23 | 149:11 158:5 |
| 148:18,24 149:9 | 290:22 291:9 | **seated** 137:14 | 163:7 180:17 |
| 149:13,16,21,23 | 295:16 | **second** 2:5 27:18 | 182:11 185:12 |
| 150:2,6,8,10,14 | **schumacher** 5:14 | 37:9,9 40:7 46:11 | 188:12,13 189:18 |
| 150:18 151:4,7 | **schwartz** 16:7 | 57:15 73:10 79:6 | 191:5 193:5 |
| 153:9,12,14,16,18 | 212:19,23,24 | 81:13 88:15 120:9 | 197:22 198:15,21 |
| 153:21,24 154:7 | 213:7,10 214:6,9 | 165:17 177:7 | 202:19 212:7 |
| 154:11,13,20 | 214:12,21,23,25 | 178:16 179:10,15 | 214:2 217:6 220:7 |
| 155:1 156:24 | 215:8,12,14,20 | 179:20 180:5 | 220:11 240:24 |
| 157:5,10,12,14,17 | 216:2,5,9,12,15 | 181:12,13 192:9 | 241:13 242:2 |
| 157:20,22,24 | 216:22 217:1,5,14 | 265:6,24 | 247:9 257:9 263:5 |
| 158:1,4,7,10,15 | 217:21,25 218:13 | **secondly** 196:14 | 263:5 264:9,23 |
| 159:25 160:16,20 | 218:15,18,21,23 | 200:14 | 266:14 273:14 |
| 161:7,12,14,17,23 | 219:5 | **section** 23:7,8 | 280:11 284:3,24 |
| 162:3,9,12,15,17 | **schwartzberg** | 26:24 107:3 | 285:4,20 286:20 |
| 162:19 163:3,9,13 | 9:18 31:5,5,19 | 132:19 246:23 | 287:12,13 295:25 |
| 163:18,22,25 | 32:10,25 33:5,14 | 247:2 254:6 257:4 | 296:5 |
| 165:1,4,6,9,12,17 | 34:4,19 35:2 | 257:6 271:25 | **seeing** 28:8 |
| 165:21,24 166:3,5 | 271:20,20,23 | 272:20 274:23 | 210:25 283:13 |
| 167:17 171:6 | 272:6,8,14,18 | 275:2 | **seek** 101:15 185:6 |
| 172:6,20 173:4 | 273:6,11,21 274:1 | **sections** 132:13 | **seeking** 31:23 |
| 174:2,4,10,13,16 | 274:4,20,23 | 246:22 | 131:1 155:7 |
| 174:19,24 175:2,5 | 275:22 276:4,20 | **secured** 74:3 | 204:19 208:22 |
| 175:8 176:5,8,12 | **scope** 76:5 112:19 | 77:14 78:12,13,17 | 218:21 219:5 |
| 176:18,22,25 | **score** 245:16 | 78:20,22 91:10,16 | **seemingly** 291:20 |
| 177:2,13,17,20,22 | | 91:20,24 92:10,22 | |

**seen** 66:20 187:12
**segal** 18:8,8
  150:22,22
**segregate** 196:11
**segregated** 92:19
  92:24 196:17
  209:11
**selected** 140:20
  149:10,12 199:12
**selection** 149:16
**sell** 140:4 284:15
**send** 77:19 178:19
**senior** 96:25
  152:21
**sense** 42:19 80:25
  125:22 175:6,7
  181:22 190:2
  192:7,8 218:11
  229:18 245:11
  265:13 283:18
  286:5,6
**sensitive** 146:24
  177:24
**sent** 77:23 278:7
**sentence** 62:15
  67:25 73:10 79:6
  81:13,13,20 99:13
**separate** 158:6
  166:12,13 179:1
  223:7 230:18
  250:1 251:13
  259:9 267:21
  275:24 281:17
  288:5
**september** 56:2
  56:15 60:9,23
  63:5 90:4,12
  191:5,5,15 192:9
  192:15,19 193:4
**serious** 112:16
  113:17 239:24,25
  249:8

**seriously** 230:5
**seritage** 287:7
**serta** 16:19 289:5
**serve** 149:1
  199:16
**served** 286:19
**service** 4:13
**services** 5:19
  222:14 225:5,7
**serving** 281:5
**set** 25:21 48:21
  51:23 86:12 101:2
  101:8,11,16,19
  159:6 164:5
  167:25 170:11,14
  181:7 189:2 194:8
  234:10 250:22
  291:16
**setoff** 47:15,20
  54:14,15,15,15
**sets** 87:1 206:2
  226:24
**setting** 22:15
  239:1
**settle** 37:20,21
  38:15 42:7 64:18
  75:8 96:16,17
  117:4 207:19
  242:19,20 249:9
  287:9
**settled** 26:1,23
  33:7 84:7 94:7
  96:23 141:5,6
  142:2,6 155:16
  173:18 182:21
  251:3 289:9,16,21
  289:22
**settlement** 21:14
  22:8 24:18,25
  26:14 27:6,9
  28:24 35:11 36:4
  36:8,12 37:20
  38:8 43:6,7,13,14

50:10 65:10 71:8
  71:11 73:2 80:6
  84:12 92:15 94:3
  94:10,22 95:23
  96:4,10,22 100:3
  125:4 139:4,5,6
  151:8,13,14,15
  151:16,17,19
  152:10 153:4,25
  154:3,5,7,14,15
  154:22,23,24
  155:2,6,6,6,12,14
  155:17 160:1
  175:13 177:9
  178:4 190:12
  191:24,25 192:11
  193:11 194:2
  201:16 204:12,14
  204:17 207:16,22
  208:4 242:21
  243:11,23 278:22
  279:4,24,25 280:5
  280:13,22 281:25
  282:4,4 283:13,14
  283:16 284:6
  286:21 289:17
  291:18,19 293:17
  295:9,12 297:18
**settlements** 72:25
  74:21 151:20
  155:20 206:11
  291:20
**settling** 32:18
  37:12 38:13
**seven** 269:4
**seventh** 120:10
  265:3
**seventy** 265:14
**severe** 207:11
**seyfarth** 17:15
  61:9 90:18 291:13
**shanghai** 17:5

**share** 21:21,23
  144:15 173:22
  174:6 177:6
  181:10 196:15
  213:20 291:25
**shared** 81:16
  181:16 190:5
**sharing** 281:17
**sharon** 19:23
**shaw** 17:15 61:10
  90:19 291:13
**sheet** 36:6 150:24
**sheila** 7:24 299:3
  299:10
**shell** 272:16 274:2
  274:5
**sherri** 7:24 299:3
  299:12
**shifting** 291:15
**shinn** 12:2 276:25
**ship** 121:8 222:8
**shipping** 222:5
**shirt** 125:12
**shock** 202:24
**shoes** 34:20
**short** 27:25 79:8
  79:12 143:14
**shortfall** 80:10,20
  88:6,10,13 169:25
  251:19 253:20,21
  254:3
**shortly** 36:8 204:5
**show** 30:22
  104:19 105:15
  127:6 132:13,25
  133:9 201:17
  211:20 255:1
**showing** 37:15,17
  44:11 133:6
  164:10 186:8
  266:3 270:9
**shown** 136:6
  270:25

[shows - speaks]                                                                          Page 55

**shows**  233:2,4,7
  233:12 286:14
**sic**  86:19
**side**  65:2 73:22
  138:8,10,13
  176:11,16 193:7
  225:15 238:7
  242:21 249:14,15
**sidebar**  114:10
**sided**  189:12
**sign**  57:22 271:11
**signed**  279:9
  283:7
**significance**
  213:12,13
**significant**  24:8
  79:10 135:4,14,16
  135:16,18 138:16
  164:14 175:9
  282:16 292:17
  294:22 295:10
**significantly**
  193:20,23
**signs**  264:12
**similar**  54:11
  82:17 89:2 179:22
  188:11
**similarly**  216:18
  264:13
**simmons**  16:19
  289:5
**simple**  32:19 41:7
  41:14 185:13
  213:18 223:21
  259:13
**simply**  160:8
  163:10 211:23
  224:3 240:10
  247:25 259:1
  268:19 272:25
  282:8
**singh**  8:9 166:8,8
  166:13,22,25

167:3,9,12,14
  169:23 171:3,11
  171:14,17,20,22
  171:24 172:1,4
  219:8,8,14,17,20
  235:13,13,23
  274:8,11,15,21
  275:1,4,7
**single**  155:23
  158:23 175:18
  186:15 252:11
  265:23
**sir**  56:13,19 59:14
  214:24 215:6
  216:25 217:1
**sit**  145:21 158:12
  175:3 211:25
  212:19
**sitting**  56:17
  60:25 90:13
  122:21,25 175:12
  176:9 193:7 214:2
**situated**  216:18
**situation**  187:18
  203:1 209:2,25
  221:11 223:2,10
  225:21 236:7
  284:21
**situations**  203:23
  293:24
**six**  65:4 74:10
  84:3 94:13 269:3
**sixth**  120:9 265:4
**size**  74:17 75:1
**skeptical**  285:6
**skip**  129:10
  142:15
**sledding**  30:5
**sleeves**  176:10
**slide**  139:9 151:10
  153:3
**slight**  280:19

**slightly**  74:9
  130:12 258:11
  291:15 292:23
**slip**  125:8
**small**  113:23
  126:21 291:24
**smaller**  43:12
  175:21
**smart**  253:15
**smith**  3:12 6:19
  16:1 212:24
**soft**  99:11
**sold**  160:6 163:19
  222:23
**solely**  92:24 287:9
**solicitation**  55:17
  298:6
**solicitor**  10:10
**solutions**  17:5
  299:21
**solvency**  132:5
  133:7,23 134:17
  159:2
**solvent**  134:2,18
  134:23 195:6
  211:11,13,13
  234:12 235:4,8,16
  236:3,10
**somebody**  25:8
  77:17 78:3 178:1
  198:4 200:12
**someone's**  183:23
**somewhat**  209:2
  285:5
**sonia**  14:7
**soon**  141:6 145:9
  145:18 158:9
  202:18 206:18
  212:17 236:23
  247:1
**sooner**  206:3
  291:5

**sorry**  20:3 32:21
  44:7 49:10 61:16
  63:16 74:14 85:14
  101:22 103:18
  109:7 124:11
  130:9 131:15
  133:8 151:4
  156:20 164:24
  167:10 190:21
  193:20 197:11
  198:10 225:16
  228:15 232:1
  237:4 241:16
  243:25,25 256:19
  256:23 261:9
  267:13,17 271:3
  284:13
**sort**  25:6 29:25
  149:7 173:9
  189:19,23 191:1
  193:6 202:24
  207:23 225:16,17
  275:21 286:21
**sorts**  146:10
**sounds**  74:24
**source**  80:23
  233:24
**sources**  87:1
  138:8,9,10
**south**  11:3 45:24
  46:5,13
**southern**  1:3 10:3
  275:10
**spahr**  12:9 48:10
**speak**  44:23
  222:15
**speaker**  214:4,15
  214:17 295:21
**speaking**  173:16
  223:1 248:10
  249:7 264:10
**speaks**  66:21

[special - suggested]                                                              Page 56

special 249:15
specific 112:2
  154:2 161:8
  238:15,16 247:5
  256:3 277:19
specifically 25:8
  66:21 91:8 96:21
  100:22 110:6
  199:22 202:1
  274:12
specified 68:4,15
  152:22 156:3
speculating 69:10
  69:12 70:3 72:16
  73:5
speculation 95:5
speculative
  139:18 164:10
speed 232:17
spend 45:2 96:18
  180:6
spent 24:8 118:23
  217:10 266:3
  271:2
split 67:2
spoke 202:17
st 19:19
staff 25:17
stage 239:1 249:6
stand 56:7 60:14
  111:23 186:21
  187:13 289:24
standard 151:9
standards 138:22
  139:7 155:20
  195:11
standing 148:19
  150:19 159:9
  244:15,18,23
standpoint 188:6
stands 289:18
start 20:12 94:1
  262:1

started 266:1
starting 77:7
  86:16 87:4 107:8
  148:1 154:22
  176:20 261:23
starts 94:13 180:4
state 44:24 52:19
  52:19 62:15 74:1
  84:4 97:18 99:14
  146:9 289:1,5
stated 54:12 86:12
  123:14
statement 36:20
  94:17 114:4,15
  122:19 132:9,14
  132:16,18,19,25
  133:9,12,14,15
  134:8 136:8
  141:21 165:10
  204:5,9 205:1
  220:15 234:21
  235:3 266:12
statements 42:13
  42:16 48:11
  188:20
states 1:2,16 9:12
  10:2 46:4 52:17
  91:20 103:20
  208:14
stating 134:23
status 199:2 218:5
  289:10
stay 52:15,22
  54:18 158:9
  217:17 218:20
steen 13:1
steering 173:9
step 59:14 85:11
  89:25 136:18
stick 248:15
stipulation 21:14
  22:19 24:17 46:6
  49:2 212:1

stood 229:7
stop 46:11 162:22
  174:3 246:21
  255:10 258:16
stopping 30:2
store 162:24
straight 27:22
  54:7
strauss 9:1
street 1:17 9:14
  10:4,19 12:3,11
  15:3,12 16:21
  19:4
strike 75:12 84:2
  98:18 129:20
striking 29:24
strong 17:3
  202:23 213:2
struck 28:16
  190:16
structure 207:16
struggling 178:11
stuff 188:8
subcommittee
  148:8
subcon 207:16
subject 22:23 47:1
  68:8 110:18
  111:16 167:3,6
  172:1,2 195:7
  203:22 225:9
  249:1 250:20
submit 29:14 42:5
  78:23,24 138:2
  213:20 214:3
  228:3 239:19
  243:18 244:5
  251:21 257:11
submitted 56:24
  59:20 60:8,22
  61:5,22 90:3,11
  205:19 213:23
  298:9,12,15

subsection 106:24
subsections
  272:20
substantial 111:5
  111:5,6 115:15
  184:21 185:21
  205:21 295:11
substantially
  85:22 194:21
  222:23
substantive
  151:18,18 154:7
  154:15,17 204:11
  235:25 236:1
  291:18 293:11,17
  293:23 294:1
substitution
  195:20
subtract 106:11
subtracting
  130:19
subtracts 106:1
succeed 215:16
succeeding
  287:12
success 186:9
  212:13
successful 195:14
successfully
  266:20
sue 250:4 273:16
sued 42:24 226:6
  226:9,12 236:17
  287:3
sufficient 31:24
  79:7 93:1 143:24
  197:3 282:2
suggest 24:13
  146:25 245:15
  277:17
suggested 147:11
  287:18 295:17

**suggesting** 32:23
218:10 246:3
**suggestion** 29:17
149:11
**suite** 8:16 9:15
12:4 15:4,22
16:22 19:20
299:23
**sum** 287:25
**summarize** 98:4
99:18,21
**summarized**
100:5
**summarizing**
100:15
**summary** 165:2
249:7,20 250:19
250:21
**summer** 155:13
**sunny** 8:9 166:8
219:8 235:13
**super** 208:20
**superior** 209:14
209:18
**superpriority**
212:5,6 234:18
**superseding**
264:14 265:3
**supplement** 57:15
141:24
**supplemental** 5:5
5:16,24 6:1,3,7
60:10,24 83:15,21
83:25 198:9
298:14
**suppliers** 243:16
**supply** 284:22
**support** 4:2 23:2
23:22 28:11,14,19
30:21 42:4 139:8
155:9,13 172:14
182:7 186:21
249:23 295:9

**supporting** 20:21
**supportive** 251:8
251:10
**supports** 172:21
247:22
**suppose** 181:24
290:12
**supposed** 39:21
124:2 127:14
222:14 238:12
**sure** 25:8 26:17
33:10,13 36:25
46:12,16 51:13
61:20 64:25 70:13
88:19 92:4,11
94:13 109:9
120:16 130:15
132:7 139:10
141:12 144:16
145:12 147:16
149:4 160:16
167:16 172:23
174:4,5 178:2
198:14 203:22
214:4,18 228:25
234:23 245:2
246:12 248:6
249:23 267:14
273:12 276:24
289:9,19 290:22
294:13
**surety** 45:18
**surplus** 132:10,16
132:17,17
**surprise** 30:11
228:14,16
**surprised** 158:15
**surprising** 228:25
**surviving** 130:16
**suspended** 165:15
**sweetheart** 281:2
**swing** 253:4

**swords** 172:14
**sworn** 56:11
60:18 90:7
**system** 98:22 99:2
99:11
**systems** 98:11,14
98:24,24

**t**

**t** 15:7 56:12 60:19
297:3,3 298:3
299:1,1
**table** 186:1 190:3
191:7,16 209:10
220:14 245:23
286:6
**tabulation** 55:17
298:7
**tail** 72:22 75:6
**take** 32:19 39:17
41:4 42:25 56:6
61:12 65:7 68:11
72:24 73:4 74:8,9
74:12 75:7 79:16
79:24 80:5,8
86:17 90:5 108:13
115:13,17,22
116:17 117:8,20
117:22 118:6,9,15
119:6 128:7 137:3
151:24 159:7
171:22 178:20
180:1 193:19
199:24 223:16,23
223:24 224:9
231:4,23 233:25
235:16 238:21
240:7 245:21
246:3,18 277:16
277:25 284:1
286:11
**taken** 68:23 77:23
78:9 115:11
165:16 188:3

190:4 223:5
244:22 268:13
**takes** 37:10 38:9
98:4 253:4
**talk** 64:8 85:2
149:18,18 151:8
155:14 158:12
175:9 187:20
197:14 221:15
236:12 238:18
246:4 251:7
290:21 295:16
**talked** 74:20
121:18 144:7
152:13 163:25
192:20 202:17
**talking** 32:8,8
100:11,12 113:24
116:15 117:9
118:12 122:7
131:9 151:11
156:6 165:9
176:10 194:17
219:3 222:22
225:6 231:1,6,11
238:14,15,22
239:8,12 240:2
243:25 248:19
252:23,24,24
253:2,12,17,23,25
255:5 258:18
259:12,22 260:8
262:4 264:4,18
278:10 279:23
285:21 288:6,11
293:22
**talks** 63:4 103:17
105:23 119:9
198:17 275:25
**tannor** 2:15 18:9
150:11,22
**tannor's** 150:25

| | | | |
|---|---|---|---|
| **tarter** 18:1 | 209:1 233:21 | 277:16,25 298:10 | 281:9 282:23 |
| **tautological** | **terminated** 77:17 | 298:13,16 | **think** 20:5 23:7 |
| 147:20 | **termination** 21:9 | **tex** 275:14 | 28:2,5 30:10,15 |
| **tautology** 96:16 | 24:15 77:10,13,17 | **texas** 275:10 | 30:19 32:15 33:24 |
| **tax** 126:5,9,14 | 77:20,22 78:3,8 | **thank** 24:20,21 | 34:2,11,23 42:2 |
| 275:25 | 78:23,25 152:25 | 25:25 27:11,13 | 42:24 46:19 47:24 |
| **team** 4:25 13:18 | 207:15 224:11 | 33:14 35:2 44:13 | 49:18,19 50:12 |
| 160:3 | **terms** 21:7 26:3 | 48:15,16 51:16 | 51:23 52:12,25 |
| **technically** 22:19 | 27:19 28:10,13 | 52:4 53:8,9 59:11 | 53:13 54:6 55:3 |
| **teed** 28:14 29:14 | 43:23 45:21 47:4 | 59:14,15 60:4 | 58:20 59:2 64:2 |
| **teeth** 200:9 | 82:17 140:4 | 63:14 79:2 85:7 | 64:16 65:5 66:22 |
| **telephone** 276:22 | 144:14 152:12 | 86:10,23 88:15,16 | 67:14 68:17,22 |
| **telephonic** 199:1 | 155:23 158:17 | 89:22 90:1 109:20 | 69:25 70:19 71:12 |
| **telephonically** | 162:21 173:4 | 110:8 126:18 | 72:24 73:17,20 |
| 12:7,15,16 13:23 | 175:12 186:18 | 136:2 151:3 203:8 | 80:2,20 83:18,18 |
| 14:7,23 15:25 | 188:6 190:9,11,12 | 207:1 208:6,7 | 85:2 109:12 |
| 16:25 18:6 19:8 | 196:2 213:10 | 212:22 214:18 | 114:15 115:12,21 |
| 19:23 288:25 | 241:22 249:21 | 219:6,7,25 271:18 | 116:21 117:8 |
| **teligent** 180:19,23 | **test** 205:3 248:10 | 276:20 283:4 | 128:2 129:17 |
| 184:9 | **tested** 164:8 | 288:19 290:2 | 132:4 137:6 |
| **tell** 36:15 41:14 | **testified** 138:9 | **thanks** 27:14 | 138:13,17 140:6,9 |
| 42:17 45:6 58:3 | 259:3 | 44:14 55:19 203:9 | 144:10,13 145:10 |
| 70:13 71:7 93:16 | **testify** 196:6 | 206:25 | 145:18 146:13 |
| 113:22 120:14 | **testimony** 55:15 | **theory** 193:19 | 152:6 153:3 155:2 |
| 129:14 137:8 | 56:16,21,24 60:22 | 199:25 | 155:20 156:14,21 |
| 166:2 220:6,9 | 61:1,5 64:16 71:2 | **thing** 33:9 42:14 | 157:6,8,24 158:5 |
| 226:22 227:7 | 71:13 72:3,5,17 | 52:14 140:7 171:3 | 162:7,12 164:1,9 |
| 240:20 246:17 | 86:13 89:1,18 | 172:24 196:19 | 164:14 165:13 |
| 254:11,18 284:10 | 90:11,14,20 | 197:8 217:25 | 167:1 168:13 |
| 287:21 | 103:11 104:24 | 243:13 244:4 | 169:23,23 170:21 |
| **telling** 41:11 | 109:17 113:9,11 | 249:17 251:11,13 | 171:22 172:6,16 |
| 134:1 218:19 | 114:8 138:5,14,17 | 271:7 | 172:22 173:2,13 |
| 229:2 246:1 264:6 | 138:18 139:8,16 | **things** 29:6 35:16 | 174:9,13 175:5,8 |
| **tells** 283:20 | 139:19 151:22 | 42:3,25 62:17 | 175:24 178:18 |
| **ten** 118:23 167:19 | 155:1 164:12 | 86:17 97:18 | 179:23 180:8 |
| 196:1 217:10 | 168:21 170:13 | 146:10,16 187:19 | 181:15,22,25 |
| **tenants** 139:24 | 209:25 233:17 | 195:23 197:1 | 182:5,14 183:3 |
| **tend** 277:3 | 237:2 238:19 | 199:2,6 201:13 | 184:19 185:1,20 |
| **tens** 98:3 118:13 | 239:1,2,20 246:14 | 203:19,24 204:13 | 186:7,10,17 |
| **tentative** 79:15 | 251:22 252:23 | 206:6 211:9 | 187:10,11,18 |
| **tenth** 39:2 | 253:10,12,25 | 216:10 220:6,7,23 | 188:5 189:9,14 |
| **term** 36:6 66:2 | 257:14 258:8 | 223:15 229:13 | 190:13,24 191:8 |
| 145:15 150:24 | 270:24 277:5,10 | 245:1 280:21 | 191:18 193:1,5,9 |

[think - transferred]                                                                    Page 59

197:8 198:12
202:24 203:7
204:15 205:19
206:19 207:24,24
207:25 210:3
212:14 216:24
219:2 220:2,14,23
223:15 224:3
226:1,1,8,8 229:4
231:19 232:25
233:6 235:14,15
238:12,21,22
239:3,11 240:15
242:18,22 243:1
245:7 248:7
252:14 253:4
256:9 257:13,20
258:7 262:14
267:18 270:11,21
271:11,13,25
272:2 273:13
275:12,13,18
276:10,17 277:10
278:3 279:6,10
280:8,21 283:5
288:17 290:14
291:1,7 292:1,3,6
293:20 294:20
295:18 296:5
**thinking** 95:6
150:7 258:2
**third** 11:18 13:12
33:18 34:25 51:2
59:6 120:9 146:5
178:10,11 247:18
295:5
**thirty** 269:3
**thomas** 13:6
16:15
**thought** 27:24
67:16 88:25 89:17
118:24 133:8
146:25 174:11

178:5 192:12
196:13 201:13
286:18
**thousand** 269:11
**thousands** 246:20
249:11
**three** 19:3 35:8
55:24,24 57:8
70:2,3 72:20
97:17 99:18,23
116:20 124:6,8
159:25 168:4
173:6 180:17
187:5 189:14
215:10 235:24
237:2 240:10
241:10,21 266:17
286:2
**throwing** 216:10
**tiering** 29:6
**time** 20:22 24:8
27:24 42:3 54:7
58:10 84:6 90:2
94:6,9,18,21 96:8
96:15,18 99:14,22
129:6 133:23
137:3 143:14
145:22 146:13
152:13 156:18
180:7 184:2 185:8
187:22 189:14
190:1,23 192:22
197:2 203:16
206:23 210:25
215:6 228:8,20
238:3 240:10
246:18,22 247:5
279:2,18 281:10
283:19 286:16
290:10,21
**timely** 177:5
**times** 67:15 97:20
207:12

**timing** 82:4 86:11
171:17 182:24
183:4 188:5
221:12
**tired** 295:21
**today** 27:8 29:11
29:15,18 32:9
34:5 35:8 37:15
38:20 40:18,19,23
40:25 41:24 43:21
49:8 51:22 56:17
60:25 63:7 64:1
64:13 65:16,22
66:3,11 67:7 69:7
73:3 75:10 90:13
111:20,23 113:16
113:25 114:19
122:21,25 130:6
135:1,8,9,11,17
141:14 155:8
171:21 187:13
188:21,24 189:2
189:11 192:16
193:7 196:7
202:13,17 204:7
208:14 220:10
230:2,23 242:25
244:25 285:21,22
287:23 288:3
289:23
**today's** 286:10
**todd** 15:25
**toe** 171:21
**toggle** 207:16
**togut** 18:8 150:22
**told** 214:1,1 227:8
227:19,25 228:9
228:11 250:14
258:4 260:8
**tom** 288:24
**tomorrow** 163:15
261:9

**ton** 188:22
**tons** 76:16
**tooth** 241:10
**top** 68:16 130:13
134:20 198:11
221:13 222:14
254:9 263:4
269:14 270:4
**topics** 82:21 154:4
**total** 64:9 87:11
97:23 102:19
119:20 130:16
199:7
**totaling** 71:4
261:20 267:9
**totality** 54:1
**tough** 30:5
**toys** 179:23
180:18 188:11
**track** 258:24
**tracked** 99:24
**tracker** 133:7
**tracking** 73:14,18
99:23 144:23
**traction** 173:10
**trade** 41:14 283:7
283:11,13 287:23
288:3
**traders** 35:22
242:7
**trafficking** 274:5
**transaction**
116:13 149:17
**transactions**
146:9
**transcribed** 7:24
**transcriber**
299:13
**transcript** 299:4
**transcripts** 190:6
**transferred** 22:2
272:15 274:2

**transfers** 69:18 146:10 250:16,20 250:22

**transform** 3:25 4:4,23 5:8,11 42:21 46:25 47:1 66:8,12,14,17,19 66:24 67:1,3,6,8,8 67:11,12,22 68:8 68:14,23 69:5 81:3 110:14 111:2 111:21 112:9,24 113:6,13 114:18 116:13 129:15,15 129:17,20 135:15 152:1 166:15 169:23 170:10 171:8 195:12,19 197:4 204:4 251:3 257:20 284:22 288:16

**transform's** 69:2 112:17 113:3,17 113:25 114:6 128:24 288:17

**transformed** 99:17 249:17

**transforms** 107:2

**transier** 56:1,6,14 56:23 57:1,7,10 59:13,16 62:8 76:10 138:5 140:22 297:6 298:8

**transit** 165:8 166:9 168:6,11 169:24 170:9 255:7 278:4,5

**transitioning** 200:19

**treat** 47:24 278:17

**treated** 23:12 48:4 161:20 174:8

197:21 276:7 280:2,20

**treatment** 33:9,22 41:4 177:25 178:14,16

**treatments** 181:3

**trial** 228:21

**trials** 71:21

**tribunal** 215:4

**tried** 27:7 138:17 151:23 273:17

**troubled** 163:5 222:6,16

**true** 68:23 83:9 84:22 112:16,22 113:8,16 117:23 118:20 123:6 124:7 158:23 201:18,20,21 209:20 299:5

**trust** 4:10 5:5 17:16 22:2 25:7 25:18 57:11,18,21 58:1,4,22 59:25 60:5 61:10 62:9 70:22 90:19 93:14 116:25 122:14 141:3 142:1 148:15 152:19 154:19 204:23 215:15,17 218:15 223:23 224:2 226:20 227:1 240:25 272:15 273:20,22,25 291:13 298:18

**trustee** 4:11 9:12 17:17 27:23 185:6 231:21 232:4,8,17 232:18,19 233:22 234:2,6 235:1 236:7 237:25 240:15,21 241:4

242:12,13,16,18 242:20 291:14 295:18,24 296:9

**trustee's** 31:6 37:3 243:18 271:21

**trustees** 236:16

**try** 24:9 38:1 137:21 167:12 175:1,19 188:15 191:20,21 192:6 273:19 295:22

**trying** 29:22 30:12 71:11 80:11 80:25 127:18,19 155:23 173:7 185:25 187:18 202:25 218:13 227:14,16 241:24 266:2 279:6

**tuesday** 141:17

**tune** 211:14

**turn** 55:20 62:14 67:19 69:16 73:6 77:6 81:8 99:8 100:23 103:16 119:8 121:17 124:9 126:19 136:7 187:24 198:10 248:11

**turned** 24:12

**twelve** 57:23

**twentieth** 5:2 11:9

**twenty** 70:8 80:24

**twice** 37:16

**two** 31:21 35:13 35:21 37:2 41:19 41:21 42:3 50:4 50:19 52:2 58:21 60:8,22 70:3 72:15 103:12 104:25 105:9 116:20 122:9

125:1 156:20,21 181:3 183:4 215:10,10 220:23 222:18 239:22 241:21 242:5 246:22 248:19 250:14 251:1 253:14 259:7 271:24 284:15

**tx** 8:17

**type** 68:10 82:10 125:15 126:9 156:2 181:23 224:10 229:8,25 265:2

**types** 31:21 117:12 146:16 203:22 280:21

**typical** 25:2,9

**u**

**u** 90:8 297:14

**u.s.** 1:25 9:11,13 10:1,9 27:23 31:6 37:3 157:21 185:6 208:15 243:18 271:21

**ucc** 58:6,22

**uh** 146:15,18 149:9 156:24 165:6 178:13 182:9 183:19 273:11

**ultimate** 75:1 82:5 175:16 250:9

**ultimately** 73:2 108:13 157:18 173:11 178:16 185:5 188:4 190:10 193:9,20 193:21 195:8 197:6,10 202:11 204:24,24 207:21 286:1

[unable - versus]                                                                    Page 61

**unable** 113:13
**unanimity** 241:18
**unanimously**
  201:4
**uncertain** 211:10
**unclear** 69:8
  235:21
**uncontested**
  20:17
**uncontroverted**
  138:19 139:7,19
  248:22
**undeniable**
  159:13
**underestimate**
  197:13
**underlying** 27:5
  33:25 52:19
  210:24 225:18
**understand** 33:17
  52:12 56:20 62:16
  66:22 71:12 76:15
  85:21 88:4,8 92:4
  101:10 109:9,10
  109:10 112:13
  123:9 126:20
  127:18,20 145:25
  161:19 170:5
  171:10,19 174:5
  178:24 189:4
  196:21 202:20
  210:7 218:17
  219:1,4 220:20
  236:9 237:18
  238:10 243:17
  247:21 251:5
  252:6 253:1,24
  262:23 264:19
  271:17 272:11,17
  273:25 279:19
  282:7 284:14
  285:7,9 288:6
  290:3,8

**understanding**
  50:1 58:5 61:21
  72:23 76:10 77:14
  78:14 82:9 95:14
  97:3 101:13 112:4
  117:1 122:15
  123:3 126:22
  188:24 200:16
  221:25 222:2
**understood** 46:18
  158:10 290:2
**undertook** 164:5
**undisputed** 39:12
  41:6 138:3 155:1
  220:19 223:17
  233:22
**unduly** 27:4
  248:12
**unfair** 243:14,18
**unfairness** 154:17
**unfortunately**
  202:13
**unhappy** 273:18
**unidentified**
  214:4,15,17
  295:21
**unique** 193:13
  209:20
**unit** 5:16 11:17
  15:2 49:23
**united** 1:2,16 9:12
  10:2 91:20 208:14
**universe** 240:8
**unknown** 194:5
  269:10
**unnecessary**
  94:10
**unorthodox**
  203:21
**unreasonable**
  246:2 248:12
**unrefuted** 138:6
  186:10

**unresolved** 95:8
**unrestricted** 63:5
  63:8
**unsecured** 9:2
  21:24 22:3,13,23
  28:15 101:9,20
  116:3,9,16 119:14
  119:23 152:16,17
  153:8,10 154:24
  204:17 207:7
  241:2,5 273:19
  277:9 278:14,17
  292:4,8,16 294:23
  295:2,11
**unsecureds**
  195:16
**unusual** 209:2,24
**updated** 43:9
**upfront** 28:2
  31:11
**upside** 173:14
**upwards** 206:8
  207:8
**urge** 216:23,24
  285:24
**usa** 5:22 19:2
**use** 130:14 134:3
  200:20 239:21
**uses** 128:15
  138:10,13
**ust's** 2:19
**usually** 72:19
  225:21 249:8
**utilize** 100:3

**v**

**v** 199:15
**vacate** 228:6
  230:3
**vacated** 229:14
**vague** 277:10
**valid** 210:3
  264:12

**valuable** 140:13
  164:10
**value** 30:7 214:2
  215:22
**valueless** 210:6
**variable** 79:24
**variance** 199:4
**varick** 9:14
**varies** 38:16
**various** 43:9 87:1
  155:20 199:6
  251:23
**vedder** 18:15
**vehicle** 4:13
**vendor** 35:10,12
  36:1 81:16,22
  84:12,23 95:17
  108:2,15,20 109:4
  120:20 186:25
  222:4 224:5
  254:20
**vendors** 36:1,3,7
  95:3 96:1,9 108:7
  108:14 109:13
  120:6,12,20,21,23
  121:3 131:8
  187:21 220:11
  222:2,5,8,10,13
  229:22,23 230:17
  243:15 252:1
  255:8 258:21
  262:21 267:5
  283:11,13,25,25
  284:9,22 285:15
  285:17
**verge** 285:18
**veritext** 299:21
**versa** 169:14
**version** 21:3
**versus** 82:5 95:15
  167:6 192:16
  194:12 241:10,21
  294:3

[vested - want]                                                                                  Page 62

| | | | |
|---|---|---|---|
| **vested** 22:6 24:18 | **waivable** 144:7 | 133:2,5,11,17 | 258:19,23 259:6 |
| **vice** 169:13 | **waived** 22:5 | 134:15 135:22 | 259:12,18,21 |
| **victims** 286:13 | 142:14 289:2,6 | 158:19 174:20 | 260:4,7,10,14,19 |
| **vietnam** 17:7 | **waiver** 153:1 | 188:18 189:13 | 261:3,14,18,23 |
| 283:15 | 176:14 | 190:13 192:3 | 262:1,4,7,9,11,16 |
| **view** 88:9 119:13 | **walk** 27:20 86:17 | 219:23 220:21 | 262:20,25 263:3,7 |
| 189:12 196:23 | 129:2 189:8 | 221:1,15,18,21,24 | 263:11,14,17,20 |
| 198:3 288:14 | 295:14 | 223:8,10 224:8,18 | 263:23 264:4,15 |
| **views** 293:19 | **walked** 155:19 | 224:23 225:2,13 | 264:21,23 265:1,5 |
| **village** 18:16 | 192:18 | 226:4,7,15,17,23 | 265:8,10,16,21,24 |
| 50:18 51:2,21 | **walking** 126:22 | 227:7,11,14,16,21 | 266:5,8,17,22,24 |
| **violates** 40:25 | **walks** 171:5 | 227:25 228:8,12 | 267:2,5,7,14,18 |
| **violating** 276:1 | **wall** 15:12 | 228:18,22,25 | 267:21,24 268:3,6 |
| **violations** 52:9 | **wallender** 140:24 | 229:12,19,25 | 268:10,16,19,21 |
| **virtually** 192:10 | **walsh** 19:1 | 230:7,9,14,16,20 | 268:24 269:1,3,9 |
| **visionary** 239:14 | **wander** 13:15 | 230:22 231:2,6,11 | 269:14,18,22 |
| 239:17 248:12 | 35:5,7,7 36:15,18 | 231:14,17 232:4 | 270:1,5,23 271:4 |
| 249:21 | 36:21,25 37:2,18 | 233:3,6,14,16,21 | 271:5,13,16,18 |
| **voice** 149:4 | 38:5,9,12,15,23 | 234:1,7,9,14,19 | 277:4 283:12 |
| **void** 228:23 | 38:25 39:6,11,16 | 235:10 236:7,22 | 287:18 295:16 |
| **volume** 100:10,15 | 39:20 40:8,11,13 | 237:1,7,13,21,23 | 296:2 297:6,7,9 |
| **voluntary** 29:5 | 40:16,19,21 41:2 | 238:2,4,10,18 | 297:11 |
| 206:4 | 41:5,17,22,25 | 239:7,10,13,18 | **want** 28:2,23 |
| **vote** 149:11,12 | 42:2,14,17,23 | 240:15,20 241:8 | 31:17 34:9 35:16 |
| 152:24 294:3 | 43:18 44:1,13 | 241:13,16,20,24 | 38:18,19 40:5 |
| **votes** 55:17 | 57:2,6,7 58:16 | 242:4,13,16,24 | 42:19 45:2 52:2 |
| 241:10 294:24 | 59:11 62:4,5 | 243:6,10,24 244:2 | 56:25 61:11,20 |
| 298:7 | 63:18,21 67:18 | 244:4,10,12,17,21 | 67:5 70:9 79:3 |
| **voting** 291:22,23 | 71:13,14,18 72:10 | 244:24 245:7,14 | 81:7 83:15 85:8 |
| 294:4,11 295:4 | 75:12,13 76:8,24 | 245:17,22,24 | 86:15 93:7 94:12 |
| **vu** 118:22 | 77:4,5 79:2 83:4 | 246:5,8,12,17 | 102:7 123:18 |
| | 83:20,24 85:4,7 | 247:11,16,21,25 | 132:24,25 136:10 |
| **w** | 88:18,21 89:6,8 | 248:3,6,8 249:23 | 136:23 139:15 |
| **wacker** 2:13 11:3 | 89:17,22 93:10,11 | 250:11,13,18,21 | 140:16 144:14,16 |
| 45:24 46:5,13 | 96:17,19,24 99:6 | 251:4,7,11,16,21 | 144:17 145:9,18 |
| **wait** 38:19,21 | 99:7 101:22,24,25 | 252:17,20,23 | 147:5,6 156:7 |
| 39:21 40:4,5 | 104:23 105:19,21 | 253:12,23,25 | 159:15 164:13,16 |
| 183:9,11 203:25 | 106:21,22 107:23 | 254:8,11,13,15,17 | 172:15 174:5 |
| 206:3 232:22 | 110:10,13 112:21 | 254:20 255:4,14 | 175:10 177:8 |
| 266:1 286:2 | 112:23 113:5,15 | 255:16,18,20,24 | 178:25 180:14 |
| **waited** 280:3 | 116:6,14 118:24 | 256:1,6,15,18,19 | 182:12 189:8 |
| **waiting** 20:3 | 119:4,7 124:13 | 256:21,25 257:3 | 193:12 200:8 |
| 145:21 | 126:1,12 132:23 | 257:11 258:7,13 | 203:17,19 204:13 |

[want - work]                                                                          Page 63

207:21 208:25
213:9 217:17
219:25 222:7
223:13 240:17
242:22 245:3,4
259:9 262:20
271:24 275:8
279:19 281:24
283:4 288:8,9,22
291:16,21 295:16
295:17 296:2,5,10
**wanted** 20:4
46:20 51:13 52:14
145:8 147:14,16
150:23 167:15
170:8 172:18,22
172:25 178:2
186:21 191:3
192:24 195:23,24
277:3 289:1,5
**wanting** 165:23
200:24
**wants** 39:17
187:20 207:20
225:22
**warranted** 287:9
288:14
**washington** 10:13
10:20 19:19 292:7
**waste** 152:8
**watching** 191:2
**water** 114:11,13
**waterfall** 222:15
**wax** 249:4
**way** 29:23 30:3
37:3 43:24 50:12
85:1 95:23 108:19
109:2,3 140:4
142:24 144:4
147:11 178:7,17
189:19 190:9
210:5 218:20
225:2 235:8 242:2

247:20 258:8
282:3 284:8 285:5
288:2 292:24
**ways** 37:2 158:1
**we've** 22:10,20
23:5 28:16 30:12
45:25 47:9 48:20
65:6,25 67:16
71:24,25 72:6
79:15 84:16 100:2
120:21 132:7
138:1 140:4 144:7
153:25 155:4,19
156:11 158:22
170:1 171:7 180:9
186:7,8,12 187:12
187:14 189:3
196:14 202:16,17
203:15 204:2
206:6 208:22
211:3 212:12
213:24 235:19
258:1 271:2
288:20 296:7
**wedge** 191:10
**week** 35:16 51:24
77:23 78:9 102:14
102:14,14 143:13
143:14 144:25
223:5 224:9 243:4
283:19 295:20
**weekly** 99:20
199:6
**weeks** 103:12
105:1,9 259:7
**weigh** 199:13
**weihai** 3:7 6:21
15:19 288:25
**weil** 8:2,13 20:7
27:16 44:15 50:9
55:23 123:12
137:18 175:21
192:10 290:9

**went** 109:2 117:18
151:23 163:25
192:25 193:3
194:25 196:20
201:24 203:18
260:4 269:6
273:17 275:18
**west** 15:3 19:19
**westfield** 12:5
**white** 1:18
**whitebox** 4:8
53:21,24 187:6
**who've** 249:25
**wholeheartedly**
205:25
**wholly** 138:6
**william** 7:25
20:21 56:12,23
90:3,8 140:22
297:6,10,11,12
298:8 299:4,17
**willing** 42:22 65:4
82:14 183:11
245:20
**wilmington** 4:10
5:5 12:13 17:16
59:25 60:5 61:10
90:19 291:13
298:18
**wilson** 10:22
**win** 257:17 260:24
**wind** 159:6 186:4
**winddown** 30:9
**window** 198:3
**winners** 2:17 16:2
212:24 213:1,13
213:21 215:16
217:14
**winning** 252:6
**wish** 55:8 56:18
61:1,7 90:13,16
**withdraw** 23:1
50:5,23 150:14

151:2
**withdrawing** 50:2
52:4,4,6
**witness** 55:4
56:11,13,19,22
58:15 59:15 60:18
60:20 61:2 67:16
72:6 79:13,22
80:2,14,17,20
81:1,24 82:6,9,13
82:23 83:2 90:1,7
90:9,15 104:2,11
104:13,17,21
105:5,13,17
107:22 109:8,16
109:20,24 110:2,8
113:13 116:11
123:25 124:17,21
124:25 125:3,7,15
125:21 126:7
134:13 215:22
297:5
**witnesses** 55:24
55:25 124:6
224:12 237:2
246:14 251:24
257:14 258:10
**wollmuth** 19:10
**won** 241:9
**wondering** 163:16
**word** 120:17
128:15 129:20
235:24 239:21
254:25
**words** 168:20
186:22 277:24
**work** 26:2 99:17
138:16 143:15
144:9 163:10
174:13 176:4,23
186:12 191:20
192:20,22 198:14
199:17 206:10

[work - zimmerman]                                                                    Page 64

212:1,20 221:9
243:8 283:5
**worked** 40:3
59:24 142:25
143:1 192:11
202:21 207:18
**working** 24:8 80:6
85:25 149:7
175:24 206:19
220:1 286:10
**works** 77:13
181:8 225:11
232:13
**world** 84:16,20,22
95:8,11,22 107:11
107:17 108:1,10
108:18 109:19
110:4,6 118:2
193:15,16,17
198:7 236:18
242:8 243:1 252:8
284:9
**world's** 3:21
**worldwide** 4:25
13:18
**worried** 229:5,6
**worse** 135:11,12
135:13 187:24
194:10
**worth** 28:5 34:17
212:10 273:13
**wouldn't** 143:14
196:6
**wraps** 54:4
**write** 26:13
278:16
**written** 169:12
225:15
**wrong** 39:23
40:15 124:24
224:6 225:12
226:14,18 231:14
231:17 235:24

238:13,15,17
**wrote** 42:19
**ww** 48:25

### x

**x** 1:6,14 65:3
247:13 297:1
298:1,3
**xx** 53:20

### y

**y** 90:8 247:14
297:3
**yeah** 48:4 49:19
52:24 55:3 61:16
67:16 76:20 80:20
91:7 124:17
146:24 147:4
154:9 163:9,22
165:1,4,12 166:3
167:9,17 168:2
169:5,14 171:11
171:20 174:10,24
175:8 178:9
180:24 181:1
182:14 183:15,22
185:1 201:21
214:23 244:4
254:11 262:7
271:15 278:21
290:11
**year** 41:19 70:6
74:5 80:9 97:11
128:12 204:3
**years** 50:25 71:11
72:12,14,20 75:7
97:3 98:15 99:1
117:23 118:10,15
231:23 238:22,24
240:2,3,5,7,10
247:23 257:13
286:2
**yep** 259:12
**yesterday** 42:20
49:10 119:1

201:14 202:18
209:7 246:6
**yoo** 15:18
**york** 1:3,18 8:5
9:5,16 10:3,5
11:12,19 12:21
13:4,13,21 14:12
14:21 15:14 16:5
17:11,19 18:4,11
18:20

### z

**zach** 9:9
**zero** 107:2,7
111:14 112:23
220:19 223:20
224:5,21 237:14
254:5
**zimmerman**
19:17