## EXHIBIT B

**Bernstein Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
SEARS HOLDINGS CORPORATION, *et al.*,     :        Case No. 18-23538 (SHL)
                                          :
                Debtors.                  :        (Jointly Administered)
                                          :
---------------------------------------------------------------x

### DECLARATION OF LLOYD BERNSTEIN IN SUPPORT OF REPLY OF THE CHUBB COMPANIES IN SUPPORT OF MOTION OF THE CHUBB COMPANIES FOR ENTRY OF AN ORDER (I) RULING THAT DEFAULT JUDGMENT, SETTLEMENT AGREEMENTS AND STATE COURT ORDERS ARE EACH VOID *AB INITIO* PURSUANT TO 11 U.S.C. §§ 105(a) AND 362(a) AND WITHOUT EFFECT; AND (II) GRANTING RELATED RELIEF

I, Lloyd Bernstein, declare as follows:

1.      I am an attorney admitted to practice law in the State of Washington, and I am a shareholder of the law firm of Bullivant Houser Bailey PC ("Bullivant Houser").

2.      I submit this declaration (the "Declaration") in support of the *Reply of the Chubb Companies in Support of Motion of the Chubb Companies for Entry of an Order (I) Declaring that Default Judgment, Settlement Agreements and State Court Orders Are Each Void Ab Initio Pursuant to 11 U.S.C. §§ 105(a) and 362(a) and Without Effect; and (II) Grating Related Relief* (the "Reply").[1]  The facts set forth herein are true, of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

3.      On or about October 13, 2021 (the "Retention Date"), ACE American retained Bullivant Houser as ACE American's defense counsel in the State Court Action.

---

[1] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Reply and/or the *Motion of the Chubb Companies for Entry of an Order (I) Ruling that Default Judgment, Settlement Agreements and State Court Orders Are Each Void Ab Initio Pursuant to 11 U.S.C. §§ 105(a) and 362(a) and Without Effect; and (II) Granting Related Relief* [ECF No. 10661] (the "Motion"), as applicable.

4.      Since the Retention Date, Bullivant Houser has represented and continues to represent ACE American in the State Court Action and in connection with the claims asserted by Plaintiff against ACE American in the Second Amended Complaint.

5.      Prior to the Retention Date, on or about August 12, 2021, Plaintiff's counsel and counsel to Mr. Edwin Miguel sent a letter to ACE American (the "IFCA Letter"), which stated that, pursuant to the Insurance Fair Conduct Act, ACE American is requested to "cure" certain actions within 20 days of receipt of the IFCA Letter.  The IFCA Letter did not reference or disclose the Default Judgment, the First Settlement Agreement, the Second Settlement Agreement, the Settlement Order, or any documents in connection with any of the foregoing.  A true and correct copy of the IFCA Letter is attached hereto as **Exhibit A**.

6.      On or about July 29, 2022, in response to ACE American's first request for production, Plaintiff produced and provided to ACE American Plaintiff's first document production ("First Production Response").

7.      The First Production Response contained, among other documents and information, copies of the Demand Letter, First Settlement Agreement, Second Settlement Email, and Draft Second Settlement Agreement (collectively, the "Production Documents").

8.      On September 16, 2022, I conducted a virtual deposition of Mr. Miguel using Zoom.  A true and correct copy of the transcript of Mr. Miguel's deposition is attached hereto as **Exhibit B**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of November 2022, at Portland, Oregon.

*/s/ Lloyd Bernstein*
LLOYD BERNSTEIN

# **EXHIBIT A**

**IFCA Letter**

# LAW OFFICES OF TERENCE F. TRAVERSO, P.S.

1408 140TH PLACE NORTHEAST, SUITE 140
BELLEVUE, WASHINGTON 98007
PHONE: (425) 453-0115
FAX: (425) 412-4060

August 12, 2021

Ace American Insurance Company
436 Walnut Street
P.O. Box 1000
Philadelphia, Pennsylvania 19106

Re:   Claimant:          Shelley Hawkins
      Your insured:      Edwin Miguel
      Account:           A&E Factory Service, LLC
      Your claim no.:    A161120 5013-0004
      Loss date:         11/16/16

To Whom It Concerns:

Attached at page 2 of this letter is a notice and signature page.

Thank you for your anticipated cooperation.

Very truly yours,

   s/Terence Traverso

Terence F. Traverso

TFT:dz
cc: client

Pursuant to the Insurance Fair Conduct Act your company is respectfully requested to cure all of the following within 20 days of receipt of this letter:

- Comply with duties under the contract and applicable law.
- Conduct a reasonable investigation.
- Attempt in good faith to effectuate fair and equitable settlements of the claims.
- Pay the reasonable amount of damages and other amounts caused.
- Adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.
- Comply with all insurance regulations.
- Refrain from compelling your insured to submit to litigation by offering substantially less than the amounts ultimately recovered in such actions or proceedings.

Thank you for your courtesies.

Very truly yours,

Sean B. Malcolm
Attorney for Edwin Miguel

Very truly yours,

Terence F. Traverso
Attorney for Shelley Hawkins

Ace American Insurance Company
August 12, 2021
Page 3

## CERTIFICATE OF SERVICE

I declare under penalty of perjury under the laws of the State of Washington that I caused a copy of this document to be served upon the following:

> Ace American Insurance Company
> 436 Walnut Street
> P.O. Box 1000
> Philadelphia, Pennsylvania 19106
>
> Insurance Fair Conduct Act
> Office of the Insurance Commissioner
> P.O. Box 40255
> Olympia, Washington 98504

by sending to the foregoing by First Class U.S. Mail a true copy thereof, placed in a sealed envelope addressed as listed above and deposited at Bellevue, Washington on the date below, and that postage thereon was fully prepaid.

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge.

Dated this 12th day of August, 2021, at Bellevue, Washington.

Donna Ziegler
Donna Ziegler

## **EXHIBIT B**

**Miguel Deposition Transcript**

```
 1        SUPERIOR COURT OF WASHINGTON, SNOHOMISH COUNTY
 2   _____
 3   SHELLEY S. HAWKINS,           )
 4   individually and as           )
 5   assignee of Edwin G.          )
 6   Miguel,                       )
 7             Plaintiff,          ) No. 18-2-08480-31
 8      vs.                        )
 9   ACE AMERICAN INSURANCE        )
10   COMPANY, a foreign            )
11   insurer; EDWIN G. MIGUEL;     )
12   FATEMAH S. ALSUWAIDAN; and    )
13   DOES AND DOE INSURANCE        )
14   COMPANIES 1-5,                )
15             Defendants.         )
16   _____
17         DEPOSITION UPON ORAL EXAMINATION OF
18                    EDWIN MIGUEL
19                     VIA ZOOM
20   _____
21          3:00 P.M., SEPTEMBER 16, 2022
22      WITNESS LOCATED IN:  REDMOND, WASHINGTON
23
24   REPORTED BY:  BETSY E. DECATER, RPR, CCR 3109
25
```

Page 1

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      TERRENCE F. TRAVERSO
        Law Offices of Terence F. Traverso, P.S.
 5      1408 140th Place NE
        Suite 140
 6      Bellevue, Washington 98007
        (425) 453-0115
 7      assistant1@traversolaw.com
 8
 9   FOR THE DEFENDANT:
10      SEAN B. MALCOLM
        Malcolm Law Firm PLLC
11      8201 164th Avenue NE
        Suite 200
12      Redmond, Washington 98052-7615
        (206) 659-9514
13      sean@kirklandtriallawyer.com
14
15   ON BEHALF OF ACE AMERICAN INSURANCE:
16      LLOYD BERNSTEIN
        Bullivant Houser Bailey PC
17      One SW Columbia Street
        Suite 800
18      Portland, Oregon 97204-4022
        (503) 228-6351
19      lloyd.bernstein@bullivant.com
20
21
22
23
24
25
```

Page 2

```
 1                I N D E X
 2
 3   EXAMINATION BY:                      PAGE(S)
 4     MR. BERNSTEIN                      4
 5
 6
 7
 8   EXHIBITS FOR IDENTIFICATION          PAGE
 9
     Exhibit 1   Letter - 8/26/20
10               Traverso to Miguel       20
11   Exhibit 2   Settlement Agreement
                 10/9/20                  37
12
     Exhibit 3   Settlement Agreement
13               6/23/21                  42
14   Exhibit 4   Response to Requests for
                 Production               52
15
16
17
18
19
20
21
22
23
24
25
                                 Page 3
```

```
 1        REDMOND, WASHINGTON; SEPTEMBER 16, 2022
 2                   3:00 P.M.
 3                   --oOo--
 4
 5             EDWIN MIGUEL,
 6   sworn as a witness by the Certified Court Reporter,
 7             testified as follows:
 8
 9                  EXAMINATION
10   BY MR. BERNSTEIN:
11      Q.  Good afternoon, Mr. Miguel.  My name is Lloyd
12   Bernstein.  I represent ACE Insurance in a lawsuit that
13   is being brought by Ms. Hawkins with respect to a motor
14   vehicle accident that you were involved in wherein you
15   later assigned your rights against my client to Ms.
16   Hawkins.  Do you understand that?
17      A.  Yes.
18      Q.  You have your attorney sitting next to you?
19      A.  Yes.
20      Q.  Before we get started with the deposition, just a
21   couple of ground rules to go through.  Have you ever
22   been deposed before?
23      A.  No, sir.  Don't mind me, I'm kind of nervous
24   here.
25      Q.  Completely understand.  So I'll go slow and at
                                 Page 4
```

| | |
|---|---|
| 1 | least I'll lay out the rules from my perspective and we |
| 2 | can kind of go from there.  So this is my opportunity to |
| 3 | ask you questions about this lawsuit.  Do you understand |
| 4 | that? |
| 5 | A.  Yeah. |
| 6 | Q.  I'm the attorney for ACE Insurance in this |
| 7 | matter.  You have your attorney there.  If at any time |
| 8 | you need to take a break, you just let us know.  I would |
| 9 | ask that you answer any question that's pending and then |
| 10 | we can take a break for whatever reason you need.  Okay? |
| 11 | A.  Okay. |
| 12 | Q.  You got to remember to keep giving verbal |
| 13 | responses.  Head shakes, nods, while you and I and |
| 14 | everybody on the Brady Bunch Zoom here will see it, the |
| 15 | court reporter needs a verbal response to put down on |
| 16 | the record.  You understand that? |
| 17 | A.  Yes. |
| 18 | Q.  The questions that I ask and the answers that you |
| 19 | give, the court reporter's typing that and is making a |
| 20 | transcript that you'll have an opportunity to review. |
| 21 | So let's try not to talk over each other.  Try to speak |
| 22 | up.  And then if you have any questions, you just let us |
| 23 | know.  Okay? |
| 24 | A.  Yes. |
| 25 | Q.  If I ask you a question that you don't |

Page 5

| | |
|---|---|
| 1 | understand, just tell me.  Okay? |
| 2 | A.  Yes. |
| 3 | Q.  To prepare for your deposition today, did you |
| 4 | review any documents? |
| 5 | A.  I did. |
| 6 | Q.  What did you review? |
| 7 | A.  I reviewed the documents that I have signed here. |
| 8 | Q.  And when you say documents you have signed, is |
| 9 | that the settlement agreements? |
| 10 | A.  Yes. |
| 11 | Q.  Did you review any other documents in preparation |
| 12 | for today's deposition? |
| 13 | A.  Whatever I have in front of me is what I got. |
| 14 | Q.  So the four exhibits that your attorney printed |
| 15 | out for you prior to the proceeding today? |
| 16 | A.  Yes. |
| 17 | Q.  Other than those four documents, you didn't |
| 18 | review anything else? |
| 19 | A.  No. |
| 20 | Q.  Other than speaking with Mr. Malcolm, did you |
| 21 | speak with anybody else to prepare for today? |
| 22 | A.  No. |
| 23 | Q.  If you could, sir, will you please tell me where |
| 24 | you currently reside? |
| 25 | A.  I reside 17805 29th Drive SE, Bothell, Washington |

Page 6

1   96 -- I mean, 9801 -- sorry, 98012.

2   Q.  How long have you resided at that address?

3   A.  Since 2017, so -- yeah.

4   Q.  And you own that home?

5   A.  No, sir.  I rent.

6   Q.  Are you currently married?

7   A.  No.

8   Q.  Do you have any kids?

9   A.  Yes.

10   Q.  Can you briefly give me your education starting

11   with high school and anything post high school?

12   A.  High school I went in Hawaii.  I'm originally

13   from Hawaii, went to Pahoa High School, graduated 1990.

14   Then after high school I went straight to trade school,

15   to Universal Technical Institute, to study hands on with

16   refrigeration and air-conditioning technology.  Then

17   that's -- that's the schools that I went to.

18   Q.  When did you first move to Washington?

19   A.  When I moved to Washington, that was in 2012 of

20   July.  And before then after high -- after tech school,

21   I moved back to Hawaii and then started working for

22   Sears since 1992.  Then I transferred to Washington to

23   work with Sears, which is Sears, Inc.

24   Q.  And that was 2012?

25   A.  Yes, sir.

1   Q.  I understand you're no longer currently employed

2   with Sears; is that correct?

3   A.  That's correct.

4   Q.  When did your employment with Sears end?

5   A.  2019 of April, the ending part of April.

6   Q.  In your last role with Sears, what did you do for

7   them?  What was your job?

8   A.  I did the same thing as I always did in Hawaii is

9   repair technician.  I go house to house, I drive to

10   customer's home and repair their appliances.

11   MR. MALCOLM:  Could we just take a 30 second

12   break here?  I just want to get him some water.

13   (Recess taken.)

14   Q.  (BY MR. BERNSTEIN)  I believe you said you're

15   currently not married.  Have you been previously

16   married?

17   A.  No, sir.

18   Q.  How many kids do you have?

19   A.  I have one originally from a previous one and

20   then three with the one I'm with now.

21   Q.  And the woman that you're with now, does she

22   reside with you?

23   A.  Yes, sir.

24   Q.  And how long have you been with her?

25   A.  Going on 14 years.

1    Q.  What's her name?

2    A.  Sasha King.

3    Q.  What was your job title at Sears before you left?

4    A.  I was a service technician.

5    Q.  Where are you currently employed?

6    A.  Electrolux Branded Service.

7    Q.  Can you say the name again?

8    A.  Electrolux Branded Service.  So it's an appliance

9  place too.  I repair appliances but basically Electrolux

10 Frigidaire brand.

11   Q.  And could you spell the name of your employer for

12 the court reporter, please.

13   A.  Electrolux, E-L-E-C-T-R-O-L-U-X.

14   Q.  Thank you.  Do you have a job title there?

15   A.  Also in-home technician and repair appliances.

16   Q.  Any other employment currently?

17   A.  No, just that.

18   Q.  And what prompted the change from Sears to the

19 new place?

20   A.  Well, difference from work and going to newer

21 career in the area, better benefits, better team, less

22 stress.  Working with Sears is a lot of stress from

23 since the -- because we deal with, you know, different

24 appliances, going into homes and different appliances.

25 Here, Electrolux, I only repair our name brand

                                              Page 9

1  Electrolux and Frigidaire and nothing else.  So less

2  stress.

3    Q.  And so the stress was the result of just having a

4  whole host of different types of appliances that you had

5  to know to provide repairs?

6    A.  Yes.

7    Q.  What are your hours for a typical day while you

8  were at Sears?

9    A.  Oh, boy.  That's another thing.  So it was from

10 8:00 to even sometimes till late, late at night.  So I

11 would work 12 hours or 13 hours sometimes a day.

12   Q.  And I understand at the time of the motor vehicle

13 accident we'll talk about here shortly, you were driving

14 a Sears van.  Was that a regulation van?

15   A.  Yes.

16   Q.  You had the same van?

17   A.  Yes.  That we would drive to -- to the mall and

18 hop into van.  So we wouldn't take it home.  We would

19 always leave it there at the base -- well, we call it

20 base -- which is the mall parking lot.

21   Q.  But you would grab the same van each time each

22 day?

23   A.  Yes, sir, which was assigned to me.

24   Q.  Typically just one person in the van, or how many

25 technicians in the van?

                                             Page 10

1    A.  Only one.

2    Q.  I want to talk about the motor vehicle accident

3  of November 16, 2016.  I recognize it's been some time

4  and so I want to go through with you, give me your best

5  recollection.  At the time of that accident, you were

6  working for Sears; is that correct?

7    A.  Yes, sir.

8    Q.  And where were you coming from and where were you

9  going to?

10    A.  I was heading to another home to do a repair.

11  This was late afternoon, I guess, already, running kind

12  of late.  So I was on the freeway on I-5 heading

13  northbound, I believe, at that time, yeah.

14    Q.  And why don't you give me your best recollection

15  of how the accident occurred?

16    A.  Again, I was, you know, working late, rushing,

17  that was rush hour traffic heading northbound to my next

18  call.  And I just was switching lane -- you know, coming

19  out from, I guess if I remember, probably coming out

20  from a gas station from the off ramp and then getting

21  onto I-5.  Then all of a sudden, you know, I switch lane

22  by looking towards my left, and then off all of a sudden

23  boom, I hit a red Jeep and I presume another car in

24  front of us -- in front of the red Jeep also.  So three

25  cars.  But the red Jeep just stopped instantly right in

                                    Page 11

1  front of me while I was changing -- while I was looking

2  towards my left to switch lanes.

3    Q.  Did you see brake lights prior to making impact

4  with the rear of the red Jeep?

5    A.  Yes.

6    Q.  How fast would you estimate you were going at the

7  time of the impact?

8    A.  That time was traffic -- I don't know, actually,

9  how fast I was going.

10    Q.  Do you have an estimate?

11    A.  I would say, because I was coming out from there

12  and there was traffic, so 45, 50.  It was busy.

13    Q.  And you said you saw the brake lights.  Was it

14  instantaneous brake lights, hit your brakes, impact, or

15  was there some time between the lights and you getting

16  on your brakes prior to impact?

17    A.  It happened so fast that I don't recall.  So I --

18  it just happened and I braked instantly.

19    Q.  And I understand from the police report you

20  impacted the rear of the red Jeep, correct?

21    A.  Yes, which was tourist.  They also came out and

22  asked me while I was already in shock if I was all

23  right.  So they were fine, I presume.

24    Q.  And then is it your understanding that the car

25  that you hit, I guess it's a Ford Edge, I'm looking at

                                    Page 12

1   the --

2      A.  I don't know.  Yeah.  Sorry.

3      Q.  I apologize.  Were you aware at the time that the

4   vehicle you rear-ended then hit the vehicle in front of

5   it, Ms. Hawkins?

6      A.  At that time I don't know.  Because I didn't even

7   get out from my van.  I was in shock.  I know I hit the

8   red van, but then there was another car in front.

9      Q.  At any point after the accident, did you get out

10  to assess the scene?

11     A.  Just my van and the one in front of me.

12     Q.  Did you look at the car in front the van -- the

13  car in front of you that was also involved in the

14  accident?

15     A.  At that time I seen it but not -- not as much as

16  I looked at the one that I hit the worst.

17     Q.  How would you describe the damage to the vehicle

18  you struck from the rear?

19        MR. TRAVERSO:  Objection; foundation;

20  speculation.

21        MR. MALCOLM:  That's okay.

22     A.  I don't know I was supposed to answer.  The

23  damage with that was pretty smashed on the back door,

24  the hatch.  So it was caved in.  And my van was caved in

25  a little bit, I believe I remember.  I'm sorry, it was

                                              Page 13

1   back, you know, 2016.  That's long.

2      Q.  (MR. BERNSTEIN)  Airbags in the van, do you know

3   if there were airbags in the van?

4      A.  They did not deploy and I believe, if I recall, I

5   don't think so the Jeep or Edge didn't deploy at all

6   too.  So they probably hit their brakes enough and

7   rolled or something.

8         MR. TRAVERSO:  Object and move to strike the last

9   part as lack of knowledge and speculation.  I should

10  clarify, lack of personal knowledge.

11     Q.  (BY MR. BERNSTEIN)  So at some point you got out

12  of your van after the accident?

13     A.  Yes, after the accident.

14     Q.  You looked at the car or the vehicle in front of

15  you that you struck, correct?

16     A.  Yes.

17     Q.  Did you look at Ms. Hawkins' vehicle, the vehicle

18  in front of the car that you struck?

19     A.  No.

20        MS. TRAVERSO:  Objection; asked and answered.

21     A.  I don't recall or anything.  But the one I was

22  concerned is the one that I hit.

23     Q.  (BY MR. BERNSTEIN)  Did you speak with the driver

24  of the car that you hit?

25     A.  Yeah, they approached me.  I was in the van, they

                                              Page 14

1  came out of their car and say are you all right.  And I
2  said, at this point, no, I'm shocked.
3     Q.  Did you get medical attention at the scene?
4     A.  No.
5     Q.  Do you know if any of the people involved in the
6  accident got medical attention at the scene?
7     A.  No, because there were no ambulances, State
8  Patrol.
9     Q.  At any point while at the accident scene, did you
10 speak with Ms. Hawkins, the driver of the vehicle in the
11 front of the accident?
12    A.  No.
13    Q.  At some point in time did the police come on the
14 scene?
15    A.  Yes.
16    Q.  You spoke with the police about the accident?
17    A.  Yes.  I told them briefly what happened and
18 exchanged -- I gave them the insurance card,
19 registration, whatever they needed, and my license.
20    Q.  The insurance information you provided the
21 police, was that your own personal insurance or was that
22 insurance provided to you through Sears?
23    A.  I believe that was through Sears.  It's not my
24 personal.  It's whatever that was in with the van, that
25 we had in the van.

1     Q.  The folks in the vehicle that you struck from
2  behind, did they appear to be injured to you in any way?
3        MR. TRAVERSO:  Objection; speculation;
4  foundation.
5     A.  No.
6     Q.  (BY MR. BERNSTEIN)  No blood or cuts or anything
7  like that?
8     A.  No, not that I know of.
9     Q.  Okay.  Did they tell you when you spoke with them
10 that they thought they were injured in any way?
11    A.  Not -- no, because they came to check up on me.
12    Q.  Do you know if the folks in the vehicle that you
13 struck went and talked with Ms. Hawkins, the driver of
14 the vehicle in front of them?
15    A.  I don't recall.  Like what I said, I was in my
16 van shocked.
17    Q.  Other than talking to the police at the scene,
18 did you have any follow-up conversations with the police
19 relative to this accident?
20    A.  Only when he gave me the paperwork of exchanging
21 of people who were involved, that's it.  And then from
22 there he asked to call a tow truck for me because we
23 were in the middle of the road -- I mean, freeway.
24    Q.  So that discussion with the police officer about
25 exchanging information and the tow truck was still at

| | |
|---|---|
| 1 | the scene? |
| 2 | A.  Yes. |
| 3 | Q.  Any follow up with the police officer or any |
| 4 | police officers after that, after leaving the scene |
| 5 | about the accident? |
| 6 | A.  No.  I had -- I have reported already when I got |
| 7 | into an accident to my supervisor, told him that I got |
| 8 | into an accident.  So they knew. |
| 9 | Q.  And, I'm sorry, maybe I'm not making myself |
| 10 | clear.  I'm just wondering if you had any follow up with |
| 11 | the police after the accident, after leaving the scene? |
| 12 | A.  No, nothing. |
| 13 | Q.  Who was your supervisor at Sears at the time of |
| 14 | the accident? |
| 15 | A.  I had several.  The supervisors at that time, one |
| 16 | was Kumar, I believe, I'm not sure, his first name was |
| 17 | and then after that was Brad Clever. |
| 18 | Q.  Do you recall which of your supervisors you |
| 19 | reported the accident to? |
| 20 | A.  Yes.  I did report it to them and told them what |
| 21 | happened. |
| 22 | Q.  Was it Kumar or was it Brad Clever? |
| 23 | A.  At that time it was Kumar. |
| 24 | Q.  Did you call him from the scene, the accident |
| 25 | scene? |

| | |
|---|---|
| 1 | A.  Yes, sir.  And then protocol for us was to get |
| 2 | checked at the doctors and, you know, do a pee test the |
| 3 | day after. |
| 4 | Q.  Did you get checked at the doctors? |
| 5 | A.  Yes, sir. |
| 6 | Q.  And what do you recall the doctor telling you at |
| 7 | that visit? |
| 8 | A.  Nothing, because all I had to do was just give |
| 9 | them my pee. |
| 10 | Q.  And I assume the urine was for a drug test? |
| 11 | A.  Yes. |
| 12 | Q.  Came back negative? |
| 13 | A.  I believe so. |
| 14 | MR. TRAVERSO:  That's personal health |
| 15 | information, Counsel, that's not at issue in this |
| 16 | lawsuit. |
| 17 | Q.  (BY MR. BERNSTEIN)  And no further medical |
| 18 | treatment relative to the motor vehicle accident? |
| 19 | A.  No. |
| 20 | Q.  Did Sears have you fill out any paperwork for the |
| 21 | accident? |
| 22 | A.  I believe so, if I -- I don't remember if it was |
| 23 | -- it's been a while. |
| 24 | Q.  Sure.  So you believe they have, you just don't |
| 25 | recall exactly what it was.  Is that a fair statement? |

1    A.  Yeah.  Because I know I had to go to the doctors

2  and give them my urine.  So I actually gave them a

3  report of what happened, so they know actually what was,

4  you know, the accident.

5    Q.  Did Sears require that you fill out any paperwork

6  sort of describing how the accident occurred, what

7  happened, those types of things?

8    A.  Yeah, yeah, I did that because they have like a

9  pre check on accidents report, so then that way we can

10  give it to the employer, which I did.

11    Q.  And so whatever this form was, you filled it out

12  and you gave it to who at Sears?

13    A.  Kumar.  I gave it to Kumar at that time.

14    Q.  After providing this form to Kumar and reporting

15  the accident the day of, any follow-up conversations

16  with your supervisors about the accident itself?

17    A.  Nothing at all.

18    Q.  Did you ever check in with them to see if they

19  needed any additional information from you about the

20  accident?

21    A.  No.  I believe they would have called me

22  immediately if they needed more information.

23    Q.  At some point in time you got served with a

24  lawsuit from Ms. Hawkins in 2018, correct?

25    A.  Yes.

Page 19

1    Q.  From the time of reporting the accident to Sears

2  until you got served with a lawsuit, had you had

3  conversations with anybody at Sears about the accident?

4    A.  Yes, I did.  I did give them the subpoena, the

5  lawsuit, to my supervisor at that time Brad Clever.

6    Q.  But prior to giving them the subpoena and the

7  lawsuit after initially reporting the accident, in that

8  window had you had any conversations with either of your

9  supervisors about the accident?

10    A.  No.

11    Q.  Did they require you to fill out any additional

12  information?

13    A.  No.

14    Q.  Were you ever contacted by anyone from Sears

15  insurance, the insurance company about the accident?

16    A.  Never, none.

17    Q.  What I'd like to do is mark as Exhibit 1 there's

18  an August 26th, 2020 letter.

19    MR. BERNSTEIN:  Mr. Malcolm, if you can give that

20  to your client or I can share it on the screen real

21  quick so we're all on the same page.

22    MR. MALCOLM:  He has it.

23    (Deposition Exhibit No. 1 was marked for

24  identification.)

25    Q.  (BY MR. BERNSTEIN)  Can you see the letter on the

Page 20

1  screen?

2      A.  Yes, sir.  I have it in front of me also.

3      Q.  Okay.  We'll mark this as Exhibit 1.  This is an

4  August 26, 2020 letter from Mr. Traverso to yourself.

5  Is this the first notice you got of the lawsuit against

6  you by Ms. Hawkins?

7      A.  Yes.

8      Q.  And is this -- when you talk about the subpoena

9  and the suit, is this how you received it with this

10  letter?

11     A.  Yes.  I was shocked with this.

12     Q.  Why were you shocked?

13     A.  Because being that I got involved with the

14  accident like this and I get somebody here coming after

15  me when I work for a big company at the time and, you

16  know, I was by myself.  It was like looking at this here

17  with dollar signs here, where the hell am I going to get

18  this?  I mean, nobody had, you know, represent me or

19  even tell me about this until I get subpoena.  And, you

20  know, even right now just looking at it, I'm just

21  stressed out.  Because I remember back then when I seen

22  this is like how I'm going to, you know, pay this when I

23  don't even have it.

24     Q.  When you received this, did you go and speak to

25  an attorney?

Page 21

1      A.  No.  I -- I just was lost right there.

2      Q.  Did you bring this documentation to your

3  supervisor at Sears?

4      A.  I don't know because I probably did bring it up,

5  but I don't remember showing it.  But --

6      Q.  So let me see if I can understand.  You got this

7  letter with the subpoena and the lawsuit, correct?

8      A.  Yes.

9      Q.  At some point in time, did you give Sears any of

10  this documentation?

11     A.  I don't know.  I probably did.

12     Q.  Do you recall who that would have been, whether

13  it was either Kumar or Brad?

14     A.  It would have been Brad, if anything, because,

15  like -- like I would have argued this and said, you

16  know, why somebody helping me out on this?

17         MR. TRAVERSO:  Mr. Bernstein, you understand

18  you're showing him the wrong letter?

19         MR. BERNSTEIN:  I'm showing him a letter of

20  August 26, 2020.

21         MR. TRAVERSO:  It's not the document with the

22  lawsuit.  This is not the letter that contained the 2018

23  summons and complaint.  This is the letter from 2020.

24         MR. BERNSTEIN:  Got it.  Thank you.  Thank you,

25  Mr. Traverso.

Page 22

1    Q.  (BY MR. BERNSTEIN)  In 2018 -- let me just kind
2    of back it up and unwind it.
3         At some point in time, you were served with a
4    copy of the lawsuit Ms. Hawkins had started, correct?
5    A.  Yes.
6    Q.  And that's what you would have given to Sears at
7    the time?
8    A.  Yeah.  If anything, it was pertaining to this,
9    yeah, it would have been something that I've handed over
10   to them because it was an accident that happened and
11   thinking, you know, I don't know what to do.  Like I
12   said, I was shocked with this and nervous about these
13   numbers that I don't have.
14   Q.  Separate from the numbers from Exhibit 1, let's
15   not focus on Exhibit 1 at the moment --
16        MR. MALCOLM:  Well, maybe can you take it off the
17   screen, then, because it's a little confusing.
18        MR. BERNSTEIN:  Got it.
19   Q.  (BY MR. BERNSTEIN)  When you were first given
20   papers about the lawsuit Ms. Hawkins commenced against
21   you and you provided it to Brad at Sears --
22   A.  Yes.
23   Q.  -- do you recall having conversation with Brad as
24   to what would be the next step?
25   A.  Not that I know of.  I just handed it over, and

Page 23

1    then I presumed that they would hand it over to the --
2    his supervisor or HR or whoever handles these accidents.
3    I really don't know how they, you know, do these.
4    Q.  So when you handed over the suit to Brad, did he
5    give you any instructions on things that you should do?
6    A.  No.
7    Q.  And at that time, did you seek to retain an
8    attorney to assist you?
9    A.  At that time I was still -- I was lost, I was
10   totally lost and like, again, I mean, nobody is there
11   for me when I've -- I'm left with that.
12   Q.  So after you handed the paperwork off -- and I'll
13   put Exhibit 1 back on.  Between the time of handing the
14   notice of the lawsuit off to Sears and getting this
15   letter from Mr. Traverso, had you had any other
16   conversations with Brad or anyone at Sears?
17   A.  No.
18   Q.  Had you spoken about the lawsuit with anyone
19   prior to receiving this August 26, 2020 letter?
20   A.  No.  Just to my supervisor, that's it.
21   Q.  And after handing off the lawsuit to your
22   supervisor, were there any follow-up conversations with
23   him about the status of the lawsuit, what was happening?
24   A.  No.  All I did was just hand it to them and
25   supposedly they would take care of it because I work

Page 24

1 under Sears and they were my supervisors, and if
2 anything else came up they would have to, you know, get
3 in touch with me.  But this was more likely about me.
4    Q.  Okay.  And just trying to put the sequence in
5 line here, prior to receiving Exhibit 1, the August 26,
6 2020 letter, you had already left Sears, correct?
7    A.  Yes.
8    Q.  When you departed Sears, did you have any
9 conversations with anybody about what was happening with
10 the lawsuit or what you needed to do now that you were
11 leaving Sears?
12    A.  No.  You mean talk to anybody?
13    Q.  Anybody at Sears --
14    A.  Oh, no.
15    Q.  When you were a party in 2019, any conversations
16 with anybody at Sears, your supervisors or otherwise
17 about what's happening with the lawsuit Ms. Hawkins
18 commenced and if there was anything you needed to do?
19    A.  No.
20    Q.  When you received this August 26, 2020 letter
21 from Mr. Traverso, did you take this to Sears?
22    A.  I don't remember.  Maybe I did.  But, again -- I
23 take that back.  This was in 2020, so I wasn't with
24 Sears anymore.  I brought it up to the manager being
25 that I still had the phone number.

                                        Page 25

1    Q.  That would have been Kumar or Brad?
2    A.  Well, at that time I remember -- it wasn't with
3 Kumar at that time because I had a new supervisor, which
4 was Brad already.  And at that time I remember somebody
5 tried getting me back to Sears, which was the district
6 manager, and that was Aaron Barber.  And he was just
7 trying to get me back.  So I ask him about this, and he
8 said that it was out of his hands, that's it.
9    Q.  So when you received Exhibit 1, did you provide
10 Mr. -- was it Aaron Barber, is that the name?
11    A.  No, I did not provide him anything because he
12 called me to try and hire me back.
13    Q.  So let me break this down.  When you received
14 Exhibit 1, did you make any contact with Sears to ask
15 them what was going on?
16    A.  No.
17    Q.  At some point in time Mr. Barber contacted you
18 about coming back to Sears.  Do you know when that was
19 relative to the date of Exhibit 1?
20    A.  I don't know off -- it was a while back, so I
21 can't recall.
22    Q.  When you got Exhibit 1, did you call Mr.
23 Traverso?
24    A.  Yes.
25    Q.  Do you know when that would have been relative to

                                        Page 26

| | |
|---|---|
| 1 | receiving Exhibit 1?  A day?  A week? |
| 2 | A.  I don't know when.  But as I read this, then, |
| 3 | yeah, I called.  Because I didn't know where I'm going |
| 4 | to get the money to pay all this, so I called him. |
| 5 | Q.  Exhibit 1 references a judgment in the amount of |
| 6 | $440,827.  Do you see that? |
| 7 | A.  Yes. |
| 8 | Q.  Did you ask him for a copy of that judgment? |
| 9 | A.  I don't remember. |
| 10 | Q.  In your conversation with Mr. Traverso, did he |
| 11 | state to you that if you didn't agree to what he was |
| 12 | proposing in his letter that he would try to pursue and |
| 13 | enforce a judgment against you? |
| 14 | A.  That's what this paper says, yes. |
| 15 | Q.  Okay.  But I'm asking you in your conversation |
| 16 | with him, did he convey that to you in the conversation? |
| 17 | A.  Yeah. |
| 18 | Q.  When you spoke with Mr. Traverso, did he suggest |
| 19 | that you get a lawyer before speaking with him? |
| 20 | A.  Yes. |
| 21 | Q.  And did you get a lawyer before you spoke with |
| 22 | Mr. Traverso on the phone in response to Exhibit 1? |
| 23 | A.  That's when I got to, yeah, to Sean. |
| 24 | Q.  But I'm asking you if you got to Sean before you |
| 25 | had the conversation with Mr. Traverso? |

Page 27

| | |
|---|---|
| 1 | A.  Can you repeat that again? |
| 2 | Q.  Sure.  Mr. Traverso told you on the phone |
| 3 | conversation that you had with him after you received |
| 4 | Exhibit 1 that you may want to get a lawyer, correct? |
| 5 | A.  Yes. |
| 6 | Q.  At that point did you stop speaking with Mr. |
| 7 | Traverso, get a lawyer and then call him back? |
| 8 | A.  At that time when he said, you know, I can get a |
| 9 | lawyer and then he -- I can talk to him, so from there |
| 10 | is when I got Sean. |
| 11 | Q.  Okay.  So prior to getting Sean, you had a |
| 12 | conversation with Mr. Traverso; is that correct?  I'm |
| 13 | understanding you correct? |
| 14 | A.  Pertaining to this letter, yes, I called him. |
| 15 | Q.  And did Mr. Traverso ever suggest to you that |
| 16 | the -- that you take this letter and the default |
| 17 | judgment in the 440,000 to Sears and ask them for help? |
| 18 | A.  I can't recall.  I don't remember him saying that |
| 19 | or anything.  All I know was this was me.  Nobody was |
| 20 | helping me, and I was already -- I already left Sears at |
| 21 | that time, so... |
| 22 | Q.  Yeah.  So I'm just asking you if that was a |
| 23 | suggestion made by Mr. Traverso at the time of the |
| 24 | conversation? |
| 25 | A.  To seek a lawyer? |

Page 28

1    Q.  No; to take the letter and the default judgment

2    to Sears.

3    MR. MALCOLM:  Objection; asked and answered.

4    A.  I don't remember him saying or anything.

5    Q.  (BY MR. BERNSTEIN)  Did you discuss with him why

6    he wanted you to bring the financial paperwork

7    referenced in Exhibit 1?

8    A.  I don't remember.

9    Q.  The letter goes on to say that "I can free you

10    from this judgment and subpoena, however," and then he

11    suggests that you give him a call but that you not

12    contact your insurance company.  Do you see that?

13    MR. TRAVERSO:  Objection; argumentative.  The

14    document speaks for itself.

15    MR. BERNSTEIN:  I'm asking him if he sees it.

16    A.  Yeah, I see it.

17    MR. TRAVERSO:  Same objection.

18    Q.  (BY MR. BERNSTEIN)  And when you called Mr.

19    Traverso, did you ask him why you shouldn't call your

20    insurance company?

21    A.  I did not ask -- I don't remember asking him

22    that.  It just was pertaining, again, to this letter.  I

23    don't know because I was -- you know, again, I'm

24    shocked.  Today I'm shocked.

25    Q.  And did you discuss at all why he suggests -- Mr.

Page 29

1    Traverso suggests in his letter if you do discuss it

2    with your insurance company that he won't work with you

3    to get out from under this judgment?

4    MR. TRAVERSO:  Objection; misstates the document.

5    A.  I don't remember.

6    Q.  (BY MR. BERNSTEIN)  Did you ever appear at his

7    office as the letter requests?

8    A.  No.  I spoke to him over the phone.

9    Q.  Was it just the one phone conference?

10    A.  I don't remember, one or two.

11    Q.  Did Mr. Traverso ever discuss with you that if

12    you didn't pay the judgment and work with him that you

13    could end up in bankruptcy?

14    MR. TRAVERSO:  Objection; assumes facts not in

15    evidence.

16    MR. BERNSTEIN:  I am asking him if he ever had

17    that conversation.

18    A.  No.  I just couldn't think of how I would pay

19    this.

20    Q.  (BY MR. BERNSTEIN)  After working -- or

21    discussing the letter with Mr. Traverso, did you -- when

22    did he recommend to you that you call or get in touch

23    with Mr. Malcolm?

24    MR. TRAVERSO:  Objection; misstates the

25    testimony; assumes facts not in evidence.

Page 30

1       MR. MALCOLM:  Object to the form.

2   Q.  (MR. BERNSTEIN)  Let me try it again.

3     When did Mr. Traverso recommend that you call Mr.

4  Malcolm?

5       MR. TRAVERSO:  Objection; misstates the testimony

6  and assumes facts not in evidence.

7   Q.  (BY MR. BERNSTEIN)  Did I understand your

8  testimony that Mr. Traverso recommended Mr. Malcolm to

9  you?

10      MR. TRAVERSO:  Objection; there's been no

11  testimony from the witness to that effect.  It misstates

12  the testimony and assumes facts not in evidence and it's

13  leading.

14      MR. MALCOLM:  Object to the form.

15   Q.  (BY MR. BERNSTEIN)  Did I understand your

16  testimony correctly?

17      MR. TRAVERSO:  Same objections.

18      MR. MALCOLM:  Object to the form.

19   Q.  (BY MR. BERNSTEIN)  You can answer it.

20      MR. TRAVERSO:  And it's argumentative.

21      MR. MALCOLM:  If you understand.

22   A.  No, I'm lost.

23   Q.  (BY MR. BERNSTEIN)  Okay.  Fair enough.  Let me

24  try it again.  Who recommended Mr. Malcolm to you?

25      MR. TRAVERSO:  Objection; argumentative; and

Page 31

1  misstates the witness's testimony and assumes facts not

2  in evidence.

3      MR. BERNSTEIN:  It doesn't misstate anything.

4  I'm asking him who recommended.

5      MR. TRAVERSO:  The witness has never testified

6  that anybody recommended Mr. Malcolm.  He never

7  testified that I recommended Mr. Malcolm.  You're being

8  argumentative and putting your own words in the

9  witness's mouth, or attempting to, Mr. Bernstein.

10  That's why I'm objecting is it assumes facts not in

11  evidence, it's argumentative and it mischaracterizes

12  what the witness did testify to.

13   Q.  (BY MR. BERNSTEIN)  Did Mr. Traverso recommend

14  Mr. Malcolm as an attorney you could seek to assist you

15  in response to the lawsuit?

16      MR. TRAVERSO:  Objection; vague.

17   A.  To seek to know more about this, yes.

18   Q.  (BY MR. BERNSTEIN)  So Mr. Malcolm was

19  recommended to you by Mr. Traverso; is that correct?

20      MR. TRAVERSO:  Objection; vague.

21      MR. MALCOLM:  Object to the form.

22   A.  I'm supposed to answer that?

23   Q.  (BY MR. BERNSTEIN)  Yes.

24   A.  So I -- I needed somebody to represent me, so

25  that's who I got was Sean.

Page 32

```
1      Q.  I understand.  How did you get Sean's name?
2      A.  He called me.
3      Q.  Sean called you?
4      A.  Yes.
5      Q.  Did Mr. Traverso ever suggest that you call Sean?
6      A.  He -- he recommended probably but not -- not a
7   name until I got a call, but to seek for a lawyer, an
8   attorney, because he can't help me.
9      Q.  I understand that.  But in your conversation with
10  Mr. Traverso, did he suggest to you that Mr. Malcolm
11  could be a lawyer you could call or seek counsel from in
12  response to the lawsuit?
13     A.  Yes.
14     Q.  And did you call Mr. Malcolm or Mr. Malcolm call
15  you, the first contact?
16     A.  I don't remember either -- I think he called me.
17     Q.  So Mr. Traverso recommended Mr. Malcolm or as a
18  name as somebody you could consult with, and before you
19  can call him he called you.  Do I have that correct?
20         MR. TRAVERSO:  Objection; misstates the
21  testimony.  It's compound.  It's also argumentative and
22  mischaracterizes the witness's testimony.
23         MR. MALCOLM:  Object to the form.
24     Q.  (BY MR. BERNSTEIN)  Do I have the understanding
25  correct?
                                              Page 33
```

```
1         MR. TRAVERSO:  Same objections.
2         MR. BERNSTEIN:  That's fine.
3      Q.  (BY MR. BERNSTEIN)  I'm just trying to get the
4   timing sequence.
5         MR. TRAVERSO:  No, you're trying to do a lot more
6   than that, Counsel.  So my objections to the question
7   have been noted.
8         MR. BERNSTEIN:  They have.
9         MR. MALCOLM:  Lloyd, for starters, you might want
10  to take that exhibit off.  There's a little one inch
11  face of you, so it's a little hard for anybody to
12  concentrate on what you're saying.
13     Q.  (BY MR. BERNSTEIN)  Trying to get the timing of
14  when you first got contacted by Mr. Malcolm.  Okay.
15         As I understand it, you had a phone conversation
16  with Mr. Traverso following receipt of Exhibit 1, the
17  August 26, 2020 letter, correct?
18     A.  Yeah.
19     Q.  In that phone conversation with Mr. Traverso
20  following receipt of Exhibit 1, he indicated to you that
21  Mr. Malcolm is an attorney that you could seek counsel
22  from to assist you.  Do I understand that correctly?
23     A.  Yes.
24     Q.  And then do I understand that Mr. Malcolm
25  contacted you before you contacted him?
                                              Page 34
```

1    A.  Yes.

2         MR. MALCOLM:  Again, objection to the form on

3    that question as well.

4    Q.  (BY MR. BERNSTEIN)  Did Mr. Traverso recommend

5    any other lawyers to you --

6         MR. MALCOLM:  Objection; argumentative.

7    Q.  (BY MR. BERNSTEIN)  -- in that first

8    conversation?

9         MR. TRAVERSO:  Objection; argumentative;

10    misstates the witness's testimony.

11         MR. BERNSTEIN:  I'm asking him if he did.

12         MR. TRAVERSO:  No, you're not.  Your question

13    just assumed a fact that's not in evidence, which if

14    you'd let me finish my objection I'll make.  So I'll

15    start over.  The objections are argumentative; it

16    assumes facts not in evidence; mischaracterizes the

17    witness's testimony; and assumes facts -- I guess I

18    already said that, misstates the witness's testimony.

19    Now you can answer.

20    Q.  (BY MR. BERNSTEIN)  Did he ever suggest any other

21    lawyers to you other than Mr. Malcolm?

22    A.  No, nobody else.

23         THE WITNESS:  Can I have a break?  I want to use

24    the restroom.

25         (Recess taken.)

Page 35

1    Q.  (BY MR. BERNSTEIN)  Do you recall, Mr. Miguel,

2    approximately how long your first conversation with Mr.

3    Traverso was, how much time you spent with him on the

4    phone?

5    A.  No.  I don't remember how long it was.

6    Q.  After having your phone conversation with Mr.

7    Traverso prior to Mr. Malcolm calling you, did you

8    contact Sears about the situation?

9    A.  I don't remember at that time.  But just to

10    clarify that, I could have called Mal -- Sean Malcolm at

11    that time or either left the message and he called me

12    back, just to clarify that.  But other than that, I

13    don't remember if I did call back because I wasn't

14    working with Sears at that time and the last

15    conversation that I had was with Brad Clever and he kind

16    of like dish me on the side.  He just tried getting me

17    back to work for Sears, which I denied.

18    Q.  Did Mr. Traverso provide you with a contact

19    number for Mr. Malcolm?

20    A.  I don't recall on that if I -- again, I maybe

21    called him and left a message and he called me.

22    Q.  I'm wondering if Mr. Traverso gave you the number

23    to call or did you look it up yourself?

24    A.  I did not look it up.  I just was -- I don't

25    remember at that time.

Page 36

1     Q. Did you speak with any other lawyers relative to
2 this lawsuit or Mr. Traverso's August 20 letter, Exhibit
3 1?
4     A. No.
5     Q. Have you signed an agreement with Mr. Malcolm for
6 him to be your lawyer?
7     A. Yes.
8     Q. Do you know when that agreement was signed?
9     A. Don't remember.
10     Q. Would it have been soon after that first phone
11 call with him?
12     A. Probably after that, yeah.
13     (Deposition Exhibit No. 2 was marked for
14 identification.)
15     Q. (BY MR. BERNSTEIN) If you could put in front of
16 you of, Exhibit 2, which is a Settlement Agreement With
17 Assignment of Rights and Covenants, and if you go to the
18 last page, it is an agreement signed October 9, 2020?
19     A. The last page?
20     Q. Yeah. If you look at the last page, there's
21 signature dates for you and all the lawyers and
22 everybody else dated October 9, 2020.
23     A. Yeah.
24     Q. Do you have that one in front of you?
25     A. Yes, sir.

Page 37

1     Q. Is that your signature on the last page on top of
2 the Edwin Miguel signature line?
3     A. Yes.
4     Q. At any time prior to signing the settlement
5 agreement, were you ever provided with a copy of the ACE
6 Insurance policy for Sears?
7     A. No. But, again, I was already not working for
8 Sears, so I had no info or anything about it.
9     Q. And prior to signing the settlement agreement,
10 did you have any conversations with anyone at ACE about
11 the lawsuit against you?
12     MR. TRAVERSO: Objection; lack of foundation,
13 personal knowledge.
14     A. No.
15     MR. BERNSTEIN: He doesn't have personal
16 knowledge to tell me if he had any conversations?
17     MR. TRAVERSO: No. Your question was compound
18 too, so I'll object to it on that basis. But if you
19 think about why it's compound, you'll understand why it
20 was lacking foundation.
21     Q. (BY MR. BERNSTEIN) Did you have any
22 conversations with anyone at ACE prior to signing the
23 settlement agreement?
24     A. No.
25     MR. TRAVERSO: Objection. Same objections and

Page 38

1    asked and answered.  I guess at this point I need to
2    move to strike as being redundant.  It's already been
3    asked and answered.
4        Q.  (BY MR. BERNSTEIN)  Was it your understanding
5    that you were agreeing to settle the matter with Ms.
6    Hawkins for the amount of the default judgment that Mr.
7    Traverso talked to you about, $443,000 plus?
8            MR. MALCOLM:  Object to the form.
9        A.  It was to a point where what I signed here so
10   then I don't get penalized for this amount.
11       Q.  (BY MR. BERNSTEIN)  The amount of the default
12   judgment for 443,000?
13       A.  Yes.
14       Q.  If you'll turn to page 6 of Exhibit 2, or it's
15   got a Bates stamp that says Miguel 00077 --
16       A.  Yeah.
17       Q.  -- the section Purpose of the Settlement, do you
18   see that?
19       A.  Yes.
20       Q.  And if you come down to the bottom starting at
21   line 24, do you see how it has line numbers on the side?
22       A.  Yes.
23       Q.  It reads "Defendant Miguel further acknowledges
24   and warrants that to his knowledge the insurer has not
25   denied coverage but has fully accepted coverage of

1    plaintiff's claims."  Do you see that?
2        A.  Yes.
3        Q.  From whom did you get that knowledge?
4        A.  This knowledge was from the paper that I got from
5    my attorney.
6        Q.  Was it your understanding that in signing this
7    paperwork Ms. Hawkins agreed not to enforce the 443,000
8    judgment she had against you?
9            MR. TRAVERSO:  Object; calls for a legal
10   conclusion.
11           MR. BERNSTEIN:  I'm asking his understanding.
12           MR. TRAVERSO:  Same objection.
13       A.  Yes.
14       Q.  (BY MR. BERNSTEIN)  And was it also your
15   understanding that by signing this settlement agreement
16   Ms. Hawkins agreed not to pursue collection of that
17   against your personal assets?
18           MR. TRAVERSO:  Object; legal conclusion.
19       A.  Yes.
20       Q.  (BY MR. BERNSTEIN)  And was it also your
21   understanding that by signing the settlement agreement
22   Ms. Hawkins agreed not to continue to pursue the
23   litigation against you?
24           MR. TRAVERSO:  Object; calls for a legal
25   conclusion.

1    A.  Yes.

2    Q.  (BY MR. BERNSTEIN)  Is that your understanding?

3    A.  Yes.

4    Q.  Was it your understanding that by signing this

5    agreement all the claims Ms. Hawkins were bringing

6    against you were now resolved?

7         MR. TRAVERSO:  Object; calls for a legal

8    conclusion and vague.

9         MR. MALCOLM:  Object to the form.

10    A.  I don't -- what was that?  I don't understand.

11    Q.  (BY MR. BERNSTEIN)  Sure.  Was it your

12    understanding by signing this settlement agreement, all

13    of Ms. Hawkins's claims against you were now resolved?

14         MR. TRAVERSO:  Same objections.

15         MR. MALCOLM:  Object to the form.

16    A.  Yes.

17    Q.  (BY MR. BERNSTEIN)  If you turn to page 9 of the

18    agreement, under the Information to Be Provided section,

19    do you see that?

20    A.  Yes.

21    Q.  It says, "Upon request by Plaintiff, Defendant

22    Miguel shall provide declaration under oath stating

23    details of his contacts with the insurer and the

24    employer following the collision."  Did you ever provide

25    such a declaration to your knowledge?

Page 41

1    A.  Not -- not to anyone, no.  To my Sears?

2    Q.  To anyone.

3    A.  No, not that I know of.  Remember on this --

4         (Deposition Exhibit No. 3 was marked for

5    identification.)

6    Q.  (BY MR. BERNSTEIN)  You can grab the next

7    exhibit, which is Settlement Agreement with Assignment

8    of Rights and Covenants, and this is the one that has a

9    date next to your signature line of 6/23/21.  You see

10    that?

11    A.  Yes.

12    Q.  Mr. Miguel, after signing Exhibit 2, the prior

13    exhibit, did you ever provide a copy of it to Sears?

14         MR. MALCOLM:  Object to the form.

15    A.  No.  Again, I wasn't -- I wasn't working for

16    them.

17    Q.  (BY MR. BERNSTEIN)  And looking at Exhibit 3,

18    that last page dated 6/23/21, the signature line for

19    Edwin Miguel, is that your signature?

20    A.  Yes.

21    Q.  What's your understanding as to why a new

22    settlement agreement was being proposed?

23         MR. TRAVERSO:  Objection; vague; calls for

24    speculation; lacks foundation.

25         MR. MALCOLM:  Object to the form.  Also object to

Page 42

1  the extent that you're seeking information that's

2  protected by the attorney-client privilege and the work

3  product doctrine. You can answer with respect to

4  anything that's not related to any communications

5  between you and I, if you remember.

6     A.  Pertaining to this, I've been stressed a lot with

7  all this so -- there's so much things that's going on in

8  my life that just looking at this again is making me

9  stressful and I don't know what to say. I mean --

10    Q.  (BY MR. BERNSTEIN)  Okay. You signed a

11 settlement agreement back in October 9, 2020, Exhibit 2?

12    A.  Yeah.

13    Q.  What was your understanding as to why you were

14 being asked to sign a new settlement agreement with Ms.

15 Hawkins?

16    MR. TRAVERSO:  Same objections. And it's been

17 asked and answered.

18    MR. MALCOLM:  Same objections.

19    A.  Well, the thing is that nobody had represent me

20 besides my lawyer, nobody had help -- I was abandoned,

21 let's just put it that way. Nobody -- the company that

22 I worked for was supposed to deal with all of this. I

23 mean, I'm just so stressed. I mean, in life with having

24 this upon me and embarrassment of what I did -- I know I

25 did wrong. But, again, you know, I mean, in my life, I

Page 43

1  mean, I got to deal with this, and every day it is --

2  especially now that we're back thinking about this and

3  going back is like it's starting all over again. I get

4  this swing moods, so you understand the way how I feel.

5     Q.  (BY MR. BERNSTEIN)  Okay. And I appreciate that

6  and I apologize if I'm making you re-live it all, but

7  I'm trying to understand. You signed a settlement

8  agreement back in October of 2020 and it was your

9  understanding that that ended your dispute, the lawsuit

10 with Ms. Hawkins?

11    MR. TRAVERSO:  Objection; misstates the

12 testimony.

13    Q.  (BY MR. BERNSTEIN)  Now I'm trying to understand

14 why you are signing a new settlement agreement in June

15 2021?

16    MR. TRAVERSO:  Objection; misstates the testimony

17 and there's no question before the witness.

18    MR. MALCOLM:  Object to form.

19    MR. BERNSTEIN:  There is a question.

20    A.  Well, again, I mean, my life. I mean, for what I

21 go through in my life, it's going downhill. So it's --

22 it ruins my credit and everything financially. I'm --

23 I'm -- I look back at this, I mean, it's -- it's like

24 it's on me. I mean, I'm not in -- I'm getting old and

25 I'm getting in probably worse health because of all

Page 44

1  these things that happening to me presuming in stress,

2  so.

3      Q.  (BY MR. BERNSTEIN)  How is this -- how is it

4  impacting your credit?

5      A.  What -- what I went through, meaning with my job

6  that I had and people just abandon me, you know, with

7  everything.

8      Q.  Who abandoned you?

9      A.  Sears, the insurance.

10     Q.  Okay.  So am I understanding you correctly that

11  the reason why you signed a new settlement agreement in

12  '21 was because you were upset with Sears and the

13  insurance company for not taking care of you?

14     MR. TRAVERSO:  Objection; misstates the

15  testimony; argumentative.

16     A.  It's not just upset.  I mean, it's both upset and

17  stressful.  I mean, put yourself in my shoe, you know, I

18  have a family that I take care of.  I have a mother back

19  home that I go to, and it's -- it's hard to have this

20  thing lingering me and financially going up and down.

21  Even with my new job, I just got back, you know, with

22  that new job.

23     Q.  (BY MR. BERNSTEIN)  And I understand that.  But

24  in October of 2020 you had signed an agreement that had

25  brought an end to Ms. Hawkins's claims against you.

                                        Page 45

1      MR. TRAVERSO:  Objection; argumentative.

2      Q.  (BY MR. BERNSTEIN)  Right?

3      MR. TRAVERSO:  Misstates the testimony.

4      A.  But, again, you got to understand what I'm going

5  through right now.  Again, I have to get people to

6  support me here and do this.  I mean, nothing's free.

7      Q.  (BY MR. BERNSTEIN)  So the settlement agreement

8  you signed in October of 2020 was for the amount of the

9  default judgment of $443,000.  Exhibit 3, the settlement

10  agreement in June of 2021 is for a million-five.  Do you

11  see that?

12     MR. TRAVERSO:  Objection; vague.  And the

13  documents speak for themselves.

14     Q.  (MR. BERNSTEIN)  What's your understanding as to

15  why now you're signing a settlement agreement in June of

16  '21 for a $1,500,000 as opposed to the 443,000 and

17  change you signed back in October of 2020?

18     MR. MALCOLM:  Object to the form to the extent

19  the question asks for attorney-client privileged

20  communications.  You can answer if you know other than

21  anything that you and I discussed.

22     A.  I -- I mean, this is -- it's a lot of stress.  I

23  mean, financially, again, I mean, losses in here going

24  through this.  I mean, I just got back to work.  I mean,

25  I can lose track, my health issue is bad pertaining to

                                        Page 46

1    all of this.  I mean, I'm coming back to this again and

2    I'm already stressed out trying to answer this to you.

3       Q.  (BY MR. BERNSTEIN)  Is it your understanding that

4    some part of the million-five that's agreed to in

5    Exhibit 3 you get compensated for, you get a piece of if

6    it's recovered from the insurance company?

7       MR. TRAVERSO:  Objection; argumentative;

8    compound.

9       MR. MALCOLM:  Object to the form.  Answer if you

10    know.

11       A.  It's what this document says, yeah.  I mean, I'm

12    part of this where I'm, again, I mean, I'm going through

13    this day by day.  My health issue.  I mean, it's a lot

14    of stress of this if you look at it.  I mean, I don't

15    have this kind of payments that I have to try and, you

16    know, pay off, no.

17       Q.  (BY MR. BERNSTEIN)  What payments do you have to

18    try to pay off?

19       A.  I mean, with this judgment and all that stuff

20    that, you know, that subpoena came up to me.  I'm just

21    totally stress.  I mean, it affected my life, I can tell

22    you that.  My life, my family life.

23       Q.  Okay.

24       A.  It's been pain and suffering.

25       Q.  I understand that.  But I'm trying to understand

Page 47

1    why you signed a separate -- a second settlement

2    agreement with Ms. Hawkins for a million-five.  Is it

3    your understanding that you get some of that

4    million-five if it's recovered?

5       A.  I can't even think.  I need something to drink,

6    water, more water.

7       MR. MALCOLM:  Okay.  He wants to take a break.

8       MR. BERNSTEIN:  That's fine.

9       (Recess taken.)

10       Q.  (BY MR. BERNSTEIN)  Is it your understanding that

11    you are obligated by either of these agreements to pay

12    Ms. Hawkins any money?

13       MR. TRAVERSO:  Objection; vague; calls for a

14    legal conclusion.

15       MR. MALCOLM:  Object to the form.

16       A.  If I'm seeing this, yeah, but I don't recall.  I

17    have -- I have to, you know, talk to my lawyer about it.

18       Q.  (BY MR. BERNSTEIN)  And do you have an

19    understanding as to why the first settlement agreement

20    in the amount of 443,000 was later changed to a second

21    settlement agreement in the amount of 1,500,000 relative

22    to Ms. Hawkins's damages?

23       MR. TRAVERSO:  Objection; argumentative and

24    misstates the documents.

25       A.  This is between my lawyer and I.  I don't recall

Page 48

1  anything.

2  Q.  (BY MR. BERNSTEIN)  Other than conversations

3  you've had with your lawyer, and I don't want to hear

4  about those, you have no independent understanding as to

5  why you were asked to sign a second settlement

6  agreement?

7  MR. MALCOLM:  Object to the form.

8  A.  This is, again, with my lawyer.

9  Q.  (BY MR. BERNSTEIN)  And do you have an

10  understanding as to whether or not you will recover any

11  amount of money in this lawsuit against ACE Insurance?

12  MR. TRAVERSO:  Objection; it calls for a legal

13  conclusion.

14  A.  Again, it's with my lawyer.

15  Q.  (BY MR. BERNSTEIN)  And is it your understanding

16  that the reason why you signed a second settlement

17  agreement that went from the 443 to a million-five was

18  so that you could recover your own damages against the

19  insurance company?

20  MR. TRAVERSO:  Objection; assumes facts not in

21  evidence; mischaracterizes the witness's testimony; and

22  it's argumentative.

23  MR. MALCOLM:  Object to the form and object to

24  the extent that you're seeking attorney-client

25  privileged communications and instruct him not to answer

Page 49

1  based on that.  If there's anything that you can answer

2  that's not based on our communication, you can answer.

3  A.  Not that I recall, no.

4  Q.  (BY MR. BERNSTEIN)  In this lawsuit you are

5  claiming that you have sustained emotional distress as a

6  result of Sears and the insurance company not taking

7  care of you.  Do I understand that correctly?

8  A.  Yes.

9  MR. TRAVERSO:  Objection; legal conclusion.

10  Q.  (BY MR. BERNSTEIN)  Have you gone to see any

11  doctors with respect to the emotional distress you claim

12  you're experiencing?

13  A.  No.  I just move on with my life and try to

14  survive.  It's embarrassing moment for me to go out and

15  seek help like that.  So the ones I speak to is my

16  family and my lawyer.

17  Q.  No outside counseling or therapist?

18  A.  Friends.

19  Q.  But no outside counseling or therapist?

20  MR. MALCOLM:  Object to the form; asked and

21  answered.

22  A.  No.

23  Q.  (BY MR. BERNSTEIN)  Have you had to pay your

24  lawyer any out-of-pocket expenses as a result of Ms.

25  Hawkins's lawsuit against you?

Page 50

1      A.  This, again, is between me and my lawyer.

2      Q.  I'm just asking you if you've paid him anything?

3      A.  No, at this time.

4      Q.  You testified earlier that you believe this has

5   damaged your credit.  Have you run any credit reports?

6      A.  Oh, definitely, yes.

7      Q.  And how -- what's your understanding as to how

8   it's impacted your credit?

9      A.  It's going down and also I'm about to file BK.

10  So it's affected me a lot.

11     Q.  And is it your testimony that you're about to

12  file bankruptcy because of Ms. Hawkins's lawsuit against

13  you?

14     A.  No.  It's -- it's all being stressed out, life,

15  surviving.  I live paycheck to paycheck.  My family's

16  first, then me.

17     Q.  Am I understanding that your financial situation

18  that you're currently in is causing you daily stress?

19     A.  Yes.

20     Q.  And I just want to make sure I'm clear.  You're

21  not testifying that you're filing for bankruptcy because

22  of this lawsuit by Ms. Hawkins against you?

23         MR. MALCOLM:  Object to the form.

24     A.  It's -- it's something that I'm looking into.  I

25  have not filed yet, but it's to a point with all this

                                              Page 51

1   stress upon me, yes.

2      Q.  (BY MR. BERNSTEIN)  Okay.  You keep saying all

3   this stress upon you.  Are you continually stressed?

4   Prior to coming to today's deposition, have you been

5   stressed about Ms. Hawkins's lawsuit against you?

6      A.  Yes.  Definitely, yes.  Every time I look at this

7   paper, I'm already stressed out.

8      Q.  But prior to coming to the deposition here today,

9   when was the last time you looked at anything relative

10  to Ms. Hawkins's lawsuit against you?

11     A.  Once in a while here I see it.  I mean, I'm

12  looking back.  I mean, it's in front of me.  I mean,

13  it's a bother.  I mean, every day.  I mean, I have it at

14  home.  I put it away at home.  But, again, it's there in

15  my drawer.  I mean, it's bothering me every day.

16     Q.  And you understand as a result of the settlement

17  agreement, Ms. Hawkins cannot collect the million-five

18  from you, correct?

19     A.  Yes.

20         (Deposition Exhibit No. 4 was marked for

21  identification.)

22     Q.  (BY MR. BERNSTEIN)  If you can grab the last

23  exhibit, Exhibit 4, which is Defendant Edwin Miguel's

24  Responses to Defendant ACE American Insurance Company's

25  First Requests for Production.  Do you have that

                                              Page 52

1  pleading in front of you?

2     A.  Yes.

3     Q.  Have you seen this document before?

4     A.  I don't recall this.  Did I sign this?

5     Q.  I'm sorry?

6     A.  Oh, yeah, yeah, yeah, yeah.

7     Q.  Have you seen this document before?

8     A.  Yes.

9     Q.  If you'll turn to page 5, there is -- at the top

10  it says request for production No. 3, all documents

11  relating to any communications between you and Sears

12  relating to the accident.  Do you see that?

13     A.  Yeah.

14     Q.  And then you'll see response, and then the last

15  sentence says "most of my communications with Sears were

16  verbal."

17     A.  That's correct.

18     Q.  Did you ever take any notes of your conversations

19  with Sears?

20     A.  No.

21     Q.  Did you ever e-mail folks at Sears?

22     A.  No.  Because, again, I -- I haven't been working

23  for them since then.

24     Q.  Okay.  I'm just --

25     A.  And, no, I don't have no -- any other contacts to

Page 53

1  get ahold of them.

2     Q.  You said at some point Brad had called you about

3  following up about trying to bring you back?

4     A.  It wasn't Brad.  It was Aaron, and that's the

5  last --

6     Q.  Sorry.

7     A.  That was the last communication that I had with

8  him.  And I brought it up and then he just dished me out

9  because all he called me for was try to get me back to

10  work for Sears.  And then he said "I have nothing to do

11  with that."

12     Q.  Did you ask him who at Sears you may be able to

13  contact about the lawsuit and what was happening?

14     A.  All he said was HR and you can speak with HR and

15  I didn't have that number at that time already.

16     Q.  Did you ask him for the number?

17     A.  No, he wouldn't give me -- he just said no and

18  hung up because I wouldn't go back to work for them.

19     Q.  Did you text message with anybody at Sears

20  relative to this lawsuit?

21     A.  No.

22     Q.  Did you provide your counsel with any documents

23  in response to this request from ACE for documentation?

24     A.  No documents.  I did not have any documents from

25  the insurance or anybody from Sears.  Again, I was

Page 54

1   abandoned.

2     Q.  Did you provide any mall -- excuse me.  Did you

3   provide Mr. Malcolm any documents with respect to

4   responding to this request for production or relative to

5   this lawsuit?

6     A.  No.  For the record, I did not even know who the

7   insurance company was at, if you're pertaining to these

8   documents in front of me.  I did not know even know who

9   ACE American Insurance was.

10      MR. BERNSTEIN:  I'm going to take a quick break,

11  just look at my notes and see if there's anything else

12  to follow up on and we'll finish up.  Give me five

13  minutes, please.

14      (Recess taken.)

15    Q.  (BY MR. BERNSTEIN)  Mr. Miguel, do you believe

16  that Ms. Hawkins is entitled to 1.5 million for the

17  injuries she sustained in the accident you were involved

18  in on November 16?

19      MR. MALCOLM:  Object to the form.

20    A.  I really don't know.

21      MR. BERNSTEIN:  I have no further questions at

22  this time.  I'm going to reserve my right pending any

23  further supplemental discovery from the case or Mr.

24  Malcolm.  I'd also Betsy if we could get this transcript

25  turned around on an expedited basis and I would work

                                        Page 55

1   with you on what that entails and the cost.

2       MR. TRAVERSO:  No questions.

3       MR. MALCOLM:  Reserve.

4         (Deposition concluded at 4:45 p.m.)

5         (Signature was reserved.)

6                 * * * * *

                                        Page 56

```
1              REPORTER'S CERTIFICATE
2      I, BETSY E. DECATER, the undersigned Certified Court
3   Reporter, pursuant to RCW 5.28.010 authorized to
4   administer oaths and affirmations in and for the State
5   of Washington, do hereby certify that the sworn
6   testimony and/or proceedings, a transcript of which is
7   attached, was given before me at the time and place
8   stated therein; that any and/or all witness(es) were
9   duly sworn to testify to the truth; that the sworn
10  testimony and/or proceedings were by me stenographically
11  recorded and transcribed under my supervision, to the
12  best of my ability; that the foregoing transcript
13  contains a full, true, and accurate record of all the
14  sworn testimony and/or proceedings given and occurring
15  at the time and place stated in the transcript; that a
16  review of which was requested; that I am in no way
17  related to any party to the matter, nor to any counsel,
18  nor do I have any financial interest in the event of the
19  cause.
20      WITNESS MY HAND and DIGITAL SIGNATURE this 18th day
21  of September, 2022.
22
23  BETSY E. DECATER, RPR
    Washington Certified Court Reporter, CCR 3109
24
25
                                        Page 57
```

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

```
1   SEAN B. MALCOLM, ESQ.
2   sean@kirklandtriallawyer.com
3                               September 18, 2022
4   RE: HAWKINS VS. ACE AMERICAN INSURANCE
5      SEPTEMBER 16, 2022, EDWIN MIGUEL (5431264)
6      The above-referenced transcript is available for
7   review.
8      Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  calendar-pnw@veritext.com
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19      If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22              Yours,
23              Veritext Legal Solutions
24
25
                                        Page 58
```

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

```
 1   HAWKINS VS. ACE AMERICAN INSURANCE

 2   EDWIN MIGUEL (5431264)

 3                E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____  _____

24   WITNESS                           Date

25

                                           Page 59
```

```
 1   HAWKINS VS. ACE AMERICAN INSURANCE

 2   EDWIN MIGUEL (5431264)

 3           ACKNOWLEDGEMENT OF DEPONENT

 4      I, EDWIN MIGUEL, do hereby declare that I

 5   have read the foregoing transcript, I have made any

 6   corrections, additions, or changes I deemed necessary as

 7   noted above to be appended hereto, and that the same is

 8   a true, correct and complete transcript of the testimony

 9   given by me.

10

11   _____  _____

12   EDWIN MIGUEL                      Date

13   *If notary is required

14           SUBSCRIBED AND SWORN TO BEFORE ME THIS

15           _____ DAY OF _____, 20____.

16

17

18           _____

19           NOTARY PUBLIC

20

21

22

23

24

25

                                           Page 60
```

**[00077 - acknowledgement]**

| 0 |
| --- |
| **00077**  39:15 |

| 1 |
| --- |
| **1**  3:9 20:17,23<br>21:3 23:14,15<br>24:13 25:5 26:9<br>26:14,19,22 27:1<br>27:5,22 28:4<br>29:7 34:16,20<br>37:3<br>**1,500,000**  46:16<br>48:21<br>**1-5**  1:14<br>**1.5**  55:16<br>**10/9/20**  3:11<br>**12**  10:11<br>**13**  10:11<br>**14**  8:25<br>**140**  2:5<br>**1408**  2:5<br>**140th**  2:5<br>**16**  1:21 4:1 11:3<br>55:18 58:5<br>**164th**  2:11<br>**17805**  6:25<br>**18**  58:3<br>**18-2-08480-31**<br>1:7<br>**18th**  57:20<br>**1990**  7:13<br>**19916**  57:22<br>**1992**  7:22 |

| 2 |
| --- |
| **2**  3:11 37:13,16<br>39:14 42:12<br>43:11 |

| 20  3:10 37:2 |
| --- |
| 60:15<br>**200**  2:11<br>**2012**  7:19,24<br>**2016**  11:3 14:1<br>**2017**  7:3<br>**2018**  19:24 22:22<br>23:1<br>**2019**  8:5 25:15<br>**2020**  20:18 21:4<br>22:20,23 24:19<br>25:6,20,23 34:17<br>37:18,22 43:11<br>44:8 45:24 46:8<br>46:17<br>**2021**  44:15 46:10<br>**2022**  1:21 4:1<br>57:21 58:3,5<br>**206**  2:12<br>**21**  45:12 46:16<br>**228-6351**  2:18<br>**24**  39:21<br>**26**  21:4 22:20<br>24:19 25:5,20<br>34:17<br>**26th**  20:18<br>**29th**  6:25 |

| 3 |
| --- |
| **3**  3:12 42:4,17<br>46:9 47:5 53:10<br>**30**  8:11 58:17<br>**3109**  1:24 57:23<br>**37**  3:11<br>**3:00**  1:21 4:2 |

| 4 |
| --- |
| **4**  3:4,14 52:20,23<br>**42**  3:13<br>**425**  2:6<br>**440,000**  28:17<br>**440,827**  27:6<br>**443**  49:17<br>**443,000**  39:7,12<br>40:7 46:9,16<br>48:20<br>**45**  12:12<br>**453-0115**  2:6<br>**4:45**  56:4 |

| 5 |
| --- |
| **5**  11:12,21 53:9<br>**5.28.010**  57:3<br>**50**  12:12<br>**503**  2:18<br>**52**  3:14<br>**5431264**  58:5<br>59:2 60:2 |

| 6 |
| --- |
| **6**  39:14<br>**6/23/21**  3:13<br>42:9,18<br>**659-9514**  2:12 |

| 8 |
| --- |
| **8/26/20**  3:9<br>**800**  2:17<br>**8201**  2:11<br>**8:00**  10:10 |

| 9 |
| --- |
| **9**  37:18,22 41:17<br>43:11<br>**96**  7:1 |

| 97204-4022  2:18 |
| --- |
| **98007**  2:6<br>**9801**  7:1<br>**98012**  7:1<br>**98052-7615**  2:12 |

| a |
| --- |
| **aaron**  26:6,10<br>54:4<br>**abandon**  45:6<br>**abandoned**<br>43:20 45:8 55:1<br>**ability**  57:12<br>**able**  54:12<br>**accepted**  39:25<br>**accident**  4:14<br>10:13 11:2,5,15<br>13:9,14 14:12,13<br>15:6,9,11,16<br>16:19 17:5,7,8<br>17:11,14,19,24<br>18:18,21 19:4,6<br>19:15,16,20 20:1<br>20:3,7,9,15<br>21:14 23:10<br>53:12 55:17<br>**accidents**  19:9<br>24:2<br>**accuracy**  58:9<br>**accurate**  57:13<br>**ace**  1:9 2:15 4:12<br>5:6 38:5,10,22<br>49:11 52:24<br>54:23 55:9 58:4<br>59:1 60:1<br>**acknowledge...**<br>60:3 |

**[acknowledges - believe]**

| acknowledges |
| --- |
| 39:23<br>**acknowledgm...**<br>58:12<br>**additional**  19:19<br>20:11<br>**additions**  60:6<br>**address**  7:2<br>**administer**  57:4<br>**affirmations**<br>57:4<br>**afternoon**  4:11<br>11:11<br>**agree**  27:11<br>**agreed**  40:7,16<br>40:22 47:4<br>**agreeing**  39:5<br>**agreement**  3:11<br>3:12 37:5,8,16<br>37:18 38:5,9,23<br>40:15,21 41:5,12<br>41:18 42:7,22<br>43:11,14 44:8,14<br>45:11,24 46:7,10<br>46:15 48:2,19,21<br>49:6,17 52:17<br>**agreements**  6:9<br>48:11<br>**ahold**  54:1<br>**air**  7:16<br>**airbags**  14:2,3<br>**allotted**  58:20<br>**alsuwaidan**  1:12<br>**ambulances**  15:7<br>**american**  1:9<br>2:15 52:24 55:9<br>58:4 59:1 60:1 |

| amount  27:5 |
| --- |
| 39:6,10,11 46:8<br>48:20,21 49:11<br>**answer**  5:9<br>13:22 31:19<br>32:22 35:19<br>43:3 46:20 47:2<br>47:9 49:25 50:1<br>50:2<br>**answered**  14:20<br>29:3 39:1,3<br>43:17 50:21<br>**answers**  5:18<br>**anybody**  6:21<br>20:3 25:9,12,13<br>25:16 32:6<br>34:11 54:19,25<br>**anymore**  25:24<br>**apologize**  13:3<br>44:6<br>**appear**  16:2 30:6<br>**appended**  60:7<br>**appliance**  9:8<br>**appliances**  8:10<br>9:9,15,24,24<br>10:4<br>**applicable**  58:8<br>**appreciate**  44:5<br>**approached**<br>14:25<br>**approximately**<br>36:2<br>**april**  8:5,5<br>**area**  9:21<br>**argued**  22:15<br>**argumentative**<br>29:13 31:20,25<br>32:8,11 33:21 |

| 35:6,9,15 45:15 |
| --- |
| 46:1 47:7 48:23<br>49:22<br>**asked**  12:22<br>14:20 16:22<br>29:3 39:1,3<br>43:14,17 49:5<br>50:2<br>**asking**  27:15,24<br>28:22 29:15,21<br>30:16 32:4<br>35:11 40:11<br>51:2<br>**asks**  46:19<br>**assess**  13:10<br>**assets**  40:17<br>**assigned**  4:15<br>10:23<br>**assignee**  1:5<br>**assignment**<br>37:17 42:7<br>**assist**  24:8 32:14<br>34:22<br>**assistant1**  2:7<br>**assume**  18:10<br>**assumed**  35:13<br>**assumes**  30:14<br>30:25 31:6,12<br>32:1,10 35:16,17<br>49:20<br>**attached**  57:7<br>58:11<br>**attempting**  32:9<br>**attention**  15:3,6<br>**attorney**  4:18<br>5:6,7 6:14 21:25<br>24:8 32:14 33:8<br>34:21 40:5 43:2 |

| 46:19 49:24 |
| --- |
| 58:13<br>**august**  20:18<br>21:4 22:20<br>24:19 25:5,20<br>34:17 37:2<br>**authorized**  57:3<br>**available**  58:6<br>**avenue**  2:11<br>**aware**  13:3 |

| b |
| --- |
| **b**  2:10 58:1<br>**back**  7:21 13:23<br>14:1 18:12<br>21:21 23:2<br>24:13 25:23<br>26:5,7,12,18,20<br>28:7 36:12,13,17<br>43:11 44:2,3,8<br>44:23 45:18,21<br>46:17,24 47:1<br>52:12 54:3,9,18<br>**bad**  46:25<br>**bailey**  2:16<br>**bankruptcy**<br>30:13 51:12,21<br>**barber**  26:6,10<br>26:17<br>**base**  10:19,20<br>**based**  50:1,2<br>**basically**  9:9<br>**basis**  38:18<br>55:25<br>**bates**  39:15<br>**behalf**  2:15<br>**believe**  8:14<br>11:13 13:25 |

[believe - communication]

| | | c | |
|---|---|---|---|
| 14:4 15:23 | blood  16:6 | | change  9:18 |
| 17:16 18:13,22 | boom  11:23 | c  2:1 9:13 | 46:17 59:4,7,10 |
| 18:24 19:21 | bothell  6:25 | calendar  58:15 | 59:13,16,19 |
| 51:4 55:15 | bother  52:13 | call  10:19 11:18 | changed  48:20 |
| bellevue  2:6 | bothering  52:15 | 16:22 17:24 | changes  58:10 |
| benefits  9:21 | bottom  39:20 | 26:22 28:7 | 60:6 |
| bernstein  2:16 | boy  10:9 | 29:11,19 30:22 | changing  12:1 |
| 3:4 4:10,12 8:14 | brad  17:17,22 | 31:3 33:5,7,11 | check  16:11 19:9 |
| 14:2,11,23 16:6 | 20:5 22:13,14 | 33:14,14,19 | 19:18 |
| 18:17 20:19,25 | 23:21,23 24:4,16 | 36:13,23 37:11 | checked  18:2,4 |
| 22:17,19,24 23:1 | 26:1,4 36:15 | called  19:21 | claim  50:11 |
| 23:18,19 29:5,15 | 54:2,4 | 26:12 27:3,4 | claiming  50:5 |
| 29:18 30:6,16,20 | brady  5:14 | 28:14 29:18 | claims  40:1 41:5 |
| 31:2,7,15,19,23 | brake  12:3,13,14 | 33:2,3,16,19 | 41:13 45:25 |
| 32:3,9,13,18,23 | braked  12:18 | 36:10,11,21,21 | clarify  14:10 |
| 33:24 34:2,3,8 | brakes  12:14,16 | 54:2,9 | 36:10,12 |
| 34:13 35:4,7,11 | 14:6 | calling  36:7 | clear  17:10 |
| 35:20 36:1 | brand  9:10,25 | calls  40:9,24 | 51:20 |
| 37:15 38:15,21 | branded  9:6,8 | 41:7 42:23 | clever  17:17,22 |
| 39:4,11 40:11,14 | break  5:8,10 | 48:13 49:12 | 20:5 36:15 |
| 40:20 41:2,11,17 | 8:12 26:13 | car  11:23 12:24 | client  4:15 20:20 |
| 42:6,17 43:10 | 35:23 48:7 | 13:8,12,13 14:14 | 43:2 46:19 |
| 44:5,13,19 45:3 | 55:10 | 14:18,24 15:1 | 49:24 |
| 45:23 46:2,7,14 | briefly  7:10 | card  15:18 | collect  52:17 |
| 47:3,17 48:8,10 | 15:17 | care  24:25 45:13 | collection  40:16 |
| 48:18 49:2,9,15 | bring  22:2,4 | 45:18 50:7 | collision  41:24 |
| 50:4,10,23 52:2 | 29:6 54:3 | career  9:21 | columbia  2:17 |
| 52:22 55:10,15 | bringing  41:5 | cars  11:25 | come  15:13 |
| 55:21 | brought  4:13 | case  55:23 | 39:20 |
| best  11:4,14 | 25:24 45:25 | cause  57:19 | coming  11:8,18 |
| 57:12 | 54:8 | causing  51:18 | 11:19 12:11 |
| betsy  1:24 55:24 | bullivant  2:16 | caved  13:24,24 | 21:14 26:18 |
| 57:2,23 | bullivant.com | ccr  1:24 57:23 | 47:1 52:4,8 |
| better  9:21,21 | 2:19 | certificate  57:1 | commenced |
| big  21:15 | bunch  5:14 | certified  4:6 | 23:20 25:18 |
| bit  13:25 | busy  12:12 | 57:2,23 | communication |
| bk  51:9 | | certify  57:5 | 50:2 54:7 |

Page 3

[communications - different]

| | | | |
|---|---|---|---|
| communications | contacts  41:23 | 58:14 | days  58:17 |
| 43:4 46:20 | 53:25 | counseling  50:17 | deal  9:23 43:22 |
| 49:25 53:11,15 | contained  22:22 | 50:19 | 44:1 |
| companies  1:14 | contains  57:13 | county  1:1 | decater  1:24 |
| company  1:10 | continually  52:3 | couple  4:21 | 57:2,23 |
| 20:15 21:15 | continue  40:22 | court  1:1 4:6 | declaration |
| 29:12,20 30:2 | conversation | 5:15,19 9:12 | 41:22,25 |
| 43:21 45:13 | 23:23 27:10,15 | 57:2,23 | declare  60:4 |
| 47:6 49:19 50:6 | 27:16,25 28:3,12 | covenants  37:17 | deemed  60:6 |
| 55:7 | 28:24 30:17 | 42:8 | default  28:16 |
| company's  52:24 | 33:9 34:15,19 | coverage  39:25 | 29:1 39:6,11 |
| compensated | 35:8 36:2,6,15 | 39:25 | 46:9 |
| 47:5 | conversations | credit  44:22 45:4 | defendant  2:9 |
| complaint  22:23 | 16:18 19:15 | 51:5,5,8 | 39:23 41:21 |
| complete  60:8 | 20:3,8 24:16,22 | currently  6:24 | 52:23,24 |
| completed  58:17 | 25:9,15 38:10,16 | 7:6 8:1,15 9:5 | defendants  1:15 |
| completely  4:25 | 38:22 49:2 | 9:16 51:18 | definitely  51:6 |
| compound  33:21 | 53:18 | customer's  8:10 | 52:6 |
| 38:17,19 47:8 | convey  27:16 | cuts  16:6 | denied  36:17 |
| concentrate | copies  58:14 | d | 39:25 |
| 34:12 | copy  23:4 27:8 | | departed  25:8 |
| concerned  14:22 | 38:5 42:13 | d  3:1 | deploy  14:4,5 |
| concluded  56:4 | correct  8:2,3 | daily  51:18 | deponent  58:13 |
| conclusion  40:10 | 11:6 12:20 | damage  13:17 | 60:3 |
| 40:18,25 41:8 | 14:15 19:24 | 13:23 | deposed  4:22 |
| 48:14 49:13 | 22:7 23:4 25:6 | damaged  51:5 | deposing  58:13 |
| 50:9 | 28:4,12,13 32:19 | damages  48:22 | deposition  1:17 |
| conditioning | 33:19,25 34:17 | 49:18 | 4:20 6:3,12 |
| 7:16 | 52:18 53:17 | date  26:19 42:9 | 20:23 37:13 |
| conference  30:9 | 60:8 | 59:24 60:12 | 42:4 52:4,8,20 |
| confusing  23:17 | corrections  60:6 | dated  37:22 | 56:4 |
| consult  33:18 | correctly  31:16 | 42:18 | describe  13:17 |
| contact  26:14 | 34:22 45:10 | dates  37:21 | describing  19:6 |
| 29:12 33:15 | 50:7 | day  10:7,11,22 | details  41:23 |
| 36:8,18 54:13 | cost  56:1 | 18:3 19:15 27:1 | difference  9:20 |
| contacted  20:14 | counsel  18:15 | 44:1 47:13,13 | different  9:23,24 |
| 26:17 34:14,25 | 33:11 34:6,21 | 52:13,15 57:20 | 10:4 |
| 34:25 | 54:22 57:17 | 60:15 | |

Page 4

**[digital - five]**

digital  57:20
discovery  55:23
discuss  29:5,25
  30:1,11
discussed  46:21
discussing  30:21
discussion  16:24
dish  36:16
dished  54:8
dispute  44:9
distress  50:5,11
district  26:5
doctor  18:6
doctors  18:2,4
  19:1 50:11
doctrine  43:3
document  22:21
  29:14 30:4
  47:11 53:3,7
documentation
  22:2,10 54:23
documents  6:4,7
  6:8,11,17 46:13
  48:24 53:10
  54:22,24,24 55:3
  55:8
doe  1:13
dollar  21:17
door  13:23
downhill  44:21
drawer  52:15
drink  48:5
drive  6:25 8:9
  10:17
driver  14:23
  15:10 16:13
driving  10:13

**e**

drug  18:10
duly  57:9

e  1:24 2:1,1 3:1
  9:13,13 53:21
  57:2,23 59:3,3,3
earlier  51:4
edge  12:25 14:5
education  7:10
edwin  1:5,11,18
  4:5 38:2 42:19
  52:23 58:5 59:2
  60:2,4,12
effect  31:11
either  20:8 22:13
  33:16 36:11
  48:11
electrolux  9:6,8
  9:9,13,25 10:1
embarrassing
  50:14
embarrassment
  43:24
emotional  50:5
  50:11
employed  8:1
  9:5
employer  9:11
  19:10 41:24
employment  8:4
  9:16
ended  13:4 44:9
enforce  27:13
  40:7
entails  56:1
entitled  55:16

**e** (cont.)

errata  58:11,13
  58:17
es  57:8
especially  44:2
esq  58:1
estimate  12:6,10
event  57:18
everybody  5:14
  37:22
evidence  30:15
  30:25 31:6,12
  32:2,11 35:13,16
  49:21
exactly  18:25
examination
  1:17 3:3 4:9
exchanged  15:18
exchanging
  16:20,25
excuse  55:2
exhibit  3:9,11,12
  3:14 20:17,23
  21:3 23:14,15
  24:13 25:5 26:9
  26:14,19,22 27:1
  27:5,22 28:4
  29:7 34:10,16,20
  37:2,13,16 39:14
  42:4,7,12,13,17
  43:11 46:9 47:5
  52:20,23,23
exhibits  3:8 6:14
expedited  55:25
expenses  50:24
experiencing
  50:12
extent  43:1
  46:18 49:24

**f**

f  2:4,4
face  34:11
fact  35:13
facts  30:14,25
fails  58:19
fair  18:25 31:23
family  45:18
  47:22 50:16
family's  51:15
fast  12:6,9,17
fatemah  1:12
feel  44:4
file  51:9,12
filed  51:25
filing  51:17
fill  18:20 19:5
  20:11
filled  19:11
financial  29:6
  51:17 57:18
financially  44:22
  45:20 46:23
fine  12:23 34:2
  48:8
finish  35:14
  55:12
firm  2:10
first  7:18 17:16
  21:5 23:19
  33:15 34:14
  35:7 36:2 37:10
  48:19 51:16
  52:25
five  46:10 47:4
  48:2,4 49:17

**[five - hung]**

52:17 55:12
focus  23:15
folks  16:1,12
  53:21
follow  16:18
  17:3,10 19:15
  24:22 55:12
following  34:16
  34:20 41:24
  54:3
follows  4:7
ford  12:25
foregoing  57:12
  60:5
foreign  1:10
form  19:11,14
  31:1,14,18 32:21
  33:23 35:2 39:8
  41:9,15 42:14,25
  44:18 46:18
  47:9 48:15 49:7
  49:23 50:20
  51:23 55:19
foundation
  13:19 16:4
  38:12,20 42:24
four  6:14,17
free  29:9 46:6
freeway  11:12
  16:23
friends  50:18
frigidaire  9:10
  10:1
front  6:13 11:24
  11:24 12:1 13:4
  13:8,11,12,13
  14:14,18 15:11
  16:14 21:2

37:15,24 52:12
53:1 55:8
full  57:13
fully  39:25
further  18:17
  39:23 55:21,23

**g**

g  1:5,11
gas  11:20
getting  11:20
  12:15 24:14
  26:5 28:11
  36:16 44:24,25
give  5:19 7:10
  11:4,14 18:8
  19:2,10 20:4,19
  22:9 24:5 29:11
  54:17 55:12
given  23:6,19
  57:7,14 60:9
giving  5:12 20:6
go  4:21,25 5:2
  8:9 11:4 19:1
  21:24 37:17
  44:21 45:19
  50:14 54:18
goes  29:9
going  8:25 9:20
  9:24 11:9 12:6,9
  21:17,22 26:15
  27:3 43:7 44:3
  44:21 45:20
  46:4,23 47:12
  51:9 55:10,22
good  4:11
grab  10:21 42:6
  52:22

graduated  7:13
ground  4:21
guess  11:11,19
  12:25 35:17
  39:1

**h**

h  59:3
hand  24:1,24
  57:20
handed  23:9,25
  24:14
handing  24:13
  24:21
handles  24:2
hands  7:15 26:8
happened  12:17
  12:18 15:17
  17:21 19:3,7
  23:10
happening  24:23
  25:9,17 45:1
  54:13
hard  34:11
  45:19
hatch  13:24
hawaii  7:12,13
  7:21 8:8
hawkins  1:3
  4:13,16 13:5
  14:17 15:10
  16:13 19:24
  21:6 23:4,20
  25:17 39:6 40:7
  40:16,22 41:5
  43:15 44:10
  48:2,12 51:22
  52:17 55:16

58:4 59:1 60:1
hawkins's  41:13
  45:25 48:22
  50:25 51:12
  52:5,10
head  5:13
heading  11:10
  11:12,17
health  18:14
  44:25 46:25
  47:13
hear  49:3
hell  21:17
help  28:17 33:8
  43:20 50:15
helping  22:16
  28:20
hereto  60:7
high  7:11,11,12
  7:13,14,20
hire  26:12
hit  11:23 12:14
  12:25 13:4,7,16
  14:6,22,24
home  7:4 8:10
  9:15 10:18
  11:10 45:19
  52:14,14
homes  9:24
hop  10:18
host  10:4
hour  11:17
hours  10:7,11,11
house  8:9,9
houser  2:16
hr  24:2 54:14,14
hung  54:18

Page 5

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

Page 6

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

**[identification - letter]**

**i**

identification
3:8 20:24 37:14
42:5 52:21
immediately
19:22
impact 12:3,7,14
12:16
impacted 12:20
51:8
impacting 45:4
inch 34:10
independent
49:4
indicated 34:20
individually 1:4
info 38:8
information
15:20 16:25
18:15 19:19,22
20:12 41:18
43:1
initially 20:7
injured 16:2,10
injuries 55:17
instantaneous
12:14
instantly 11:25
12:18
institute 7:15
instruct 49:25
instructions 24:5
insurance 1:9,13
2:15 4:12 5:6
15:18,20,21,22
20:15,15 29:12
29:20 30:2 38:6
45:9,13 47:6

49:11,19 50:6
52:24 54:25
55:7,9 58:4 59:1
60:1
insurer 1:11
39:24 41:23
interest 57:18
involved 4:14
13:13 15:5
16:21 21:13
55:17
issue 18:15
46:25 47:13

**j**

jeep 11:23,24,25
12:4,20 14:5
job 8:7 9:3,14
45:5,21,22
judgment 27:5,8
27:13 28:17
29:1,10 30:3,12
39:6,12 40:8
46:9 47:19
july 7:20
june 44:14 46:10
46:15

**k**

keep 5:12 52:2
kids 7:8 8:18
kind 4:23 5:2
11:11 23:1
36:15 47:15
king 9:2
kirklandtrialla...
2:13 58:2
knew 17:8

know 5:8,23
9:23 10:5 11:16
11:18,21 12:8
13:2,6,7,22 14:1
14:2 15:5 16:8
16:12 18:2 19:1
19:3,4 21:16,18
21:20,22 22:4,11
22:16 23:11,11
23:25 24:3,3
25:2 26:18,20,25
27:2,3 28:8,19
29:23,23 32:17
37:8 42:3 43:9
43:24,25 45:6,17
45:21 46:20
47:10,16,20
48:17 55:6,8,8
55:20
knowledge 14:9
14:10 38:13,16
39:24 40:3,4
41:25
kumar 17:16,22
17:23 19:13,13
19:14 22:13
26:1,3

**l**

l 9:13,13
lack 14:9,10
38:12
lacking 38:20
lacks 42:24
lane 11:18,21
lanes 12:2
late 10:10,10
11:11,12,16

law 2:4,10
lawsuit 4:12 5:3
18:16 19:24
20:2,5,7 21:5
22:7,22 23:4,20
24:14,18,21,23
25:10,17 32:15
33:12 37:2
38:11 44:9
49:11 50:4,25
51:12,22 52:5,10
54:13,20 55:5
lawyer 27:19,21
28:4,7,9,25 33:7
33:11 37:6
43:20 48:17,25
49:3,8,14 50:16
50:24 51:1
lawyers 35:5,21
37:1,21
lay 5:1
leading 31:13
leave 10:19
leaving 17:4,11
25:11
left 9:3 11:22
12:2 24:11 25:6
28:20 36:11,21
legal 40:9,18,24
41:7 48:14
49:12 50:9
58:23
letter 3:9 20:18
20:25 21:4,10
22:7,18,19,22,23
24:15,19 25:6,20
27:12 28:14,16
29:1,9,22 30:1,7

**[letter - nervous]**

30:21 34:17
37:2
license 15:19
31:22
life 43:8,23,25
44:20,21 47:21
47:22,22 50:13
51:14
lights 12:3,13,14
12:15
line 25:5 38:2
39:21,21 42:9,18
59:4,7,10,13,16
59:19
lingering 45:20
litigation 40:23
little 13:25 23:17
34:10,11
live 44:6 51:15
lloyd 2:16 4:11
34:9
lloyd.bernstein
2:19
located 1:22
long 7:2 8:24
14:1 36:2,5
longer 8:1
look 13:12 14:17
36:23,24 37:20
44:23 47:14
52:6 55:11
looked 13:16
14:14 52:9
looking 11:22
12:1,25 21:16,20
42:17 43:8
51:24 52:12
lose 46:25

losses 46:23
lost 22:1 24:9,10
31:22
lot 9:22 10:20
34:5 43:6 46:22
47:13 51:10

**m**

mail 53:21
making 5:19
12:3 17:9 43:8
44:6
mal 36:10
malcolm 2:10,10
6:20 8:11 13:21
20:19,22 23:16
29:3 30:23 31:1
31:4,8,14,18,21
31:24 32:6,7,14
32:18,21 33:10
33:14,14,17,23
34:9,14,21,24
35:2,6,21 36:7
36:10,19 37:5
39:8 41:9,15
42:14,25 43:18
44:18 46:18
47:9 48:7,15
49:7,23 50:20
51:23 55:3,19,24
56:3 58:1
mall 10:17,20
55:2
manager 25:24
26:6
mark 20:17 21:3
marked 20:23
37:13 42:4

52:20
married 7:6 8:15
8:16
matter 5:7 39:5
57:17
mean 7:1 16:23
21:18 24:10
25:12 43:9,23,23
43:25 44:1,20,20
44:23,24 45:16
45:17 46:6,22,23
46:23,24,24 47:1
47:11,12,13,14
47:19,21 52:11
52:12,12,13,13
52:15
meaning 45:5
medical 15:3,6
18:17
message 36:11
36:21 54:19
middle 16:23
miguel 1:6,11,18
3:10 4:5,11 36:1
38:2 39:15,23
41:22 42:12,19
55:15 58:5 59:2
60:2,4,12
miguel's 52:23
million 46:10
47:4 48:2,4
49:17 52:17
55:16
mind 6:23
minutes 55:13
mischaracterizes
32:11 33:22
35:16 49:21

misstate 32:3
misstates 30:4
30:24 31:5,11
32:1 33:20
35:10,18 44:11
44:16 45:14
46:3 48:24
moment 23:15
50:14
money 27:4
48:12 49:11
moods 44:4
mother 45:18
motor 4:13
10:12 11:2
18:18
mouth 32:9
move 7:18 14:8
39:2 50:13
moved 7:19,21

**n**

n 2:1 3:1
name 4:11 9:1,7
9:11,25 17:16
26:10 33:1,7,18
ne 2:5,11
necessary 60:6
need 5:8,10 39:1
48:5
needed 15:19
19:19,22 25:10
25:18 32:24
needs 5:15
negative 18:12
nervous 4:23
23:12

Page 7
Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

Page 8
Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

**[never - plaintiff]**

| | | | |
|---|---|---|---|
| never 20:16 32:5 32:6 | 48:15 49:7,23,23 50:20 51:23 55:19 | 44:5 45:10 47:23 48:7 52:2 53:24 | part 8:5 14:9 47:4,12 |
| new 9:19 26:3 42:21 43:14 44:14 45:11,21 45:22 | objecting 32:10 objection 13:19 14:20 16:3 29:3 29:13,17 30:4,14 30:24 31:5,10,25 32:16,20 33:20 35:2,6,9,14 38:12,25 40:12 42:23 44:11,16 45:14 46:1,12 47:7 48:13,23 49:12,20 50:9 | old 44:24 once 52:11 ones 50:15 ooo 4:3 opportunity 5:2 5:20 opposed 46:16 oral 1:17 oregon 2:18 originally 7:12 8:19 outside 50:17,19 | party 25:15 57:17 patrol 15:8 pay 21:22 27:4 30:12,18 47:16 47:18 48:11 50:23 paycheck 51:15 51:15 payments 47:15 47:17 pc 2:16 pee 18:2,9 penalized 39:10 |
| newer 9:20 night 10:10 nods 5:13 northbound 11:13,17 notary 60:13,19 note 58:10 noted 34:7 60:7 notes 53:18 55:11 nothing's 46:6 notice 21:5 24:14 november 11:3 55:18 number 25:25 36:19,22 54:15 54:16 numbers 23:13 23:14 39:21 | | | |
| | | **p** | pending 5:9 55:22 |
| | objections 31:17 34:1,6 35:15 38:25 41:14 43:16,18 obligated 48:11 occurred 11:15 19:6 occurring 57:14 october 37:18,22 43:11 44:8 45:24 46:8,17 office 30:7 officer 16:24 17:3 officers 17:4 offices 2:4 oh 10:9 25:14 51:6 53:6 okay 5:10,11,23 6:1 13:21 16:9 21:3 25:4 27:15 28:11 31:23 34:14 43:10 | p 2:1,1 p.m. 1:21 4:2 56:4 p.s. 2:4 page 3:3,8 20:21 37:18,19,20 38:1 39:14 41:17 42:18 53:9 59:4 59:7,10,13,16,19 pahoa 7:13 paid 51:2 pain 47:24 paper 27:14 40:4 52:7 papers 23:20 paperwork 16:20 18:20 19:5 24:12 29:6 40:7 parking 10:20 | people 15:5 16:21 45:6 46:5 person 10:24 personal 14:10 15:21,24 18:14 38:13,15 40:17 perspective 5:1 pertaining 23:8 28:14 29:22 43:6 46:25 55:7 phone 25:25 27:22 28:2 30:8 30:9 34:15,19 36:4,6 37:10 piece 47:5 place 2:5 9:9,19 57:7,15 plaintiff 1:7 2:3 41:21 |
| **o** | | | |
| o 9:13 oath 41:22 oaths 57:4 object 14:8 31:1 31:14,18 32:21 33:23 38:18 39:8 40:9,18,24 41:7,9,15 42:14 42:25,25 44:18 46:18 47:9 | | | |

**[plaintiff's - relating]**

| | | | |
|---|---|---|---|
| plaintiff's 40:1 pleading 53:1 please 6:23 9:12 55:13 pllc 2:10 plus 39:7 pnw 58:15 pocket 50:24 point 13:9 14:11 15:2,9,13 19:23 22:9 23:3 26:17 28:6 39:1,9 51:25 54:2 police 12:19 15:13,16,21 16:17,18,24 17:3 17:4,11 policy 38:6 portland 2:18 post 7:11 pre 19:9 preparation 6:11 prepare 6:3,21 presume 11:23 12:23 presumed 24:1 presuming 45:1 pretty 13:23 previous 8:19 previously 8:15 printed 6:14 prior 6:15 12:3 12:16 20:6 24:19 25:5 28:11 36:7 38:4 38:9,22 42:12 52:4,8 | privilege 43:2 privileged 46:19 49:25 probably 11:19 14:6 22:4,11 33:6 37:12 44:25 proceeding 6:15 proceedings 57:6,10,14 product 43:3 production 3:14 52:25 53:10 55:4 prompted 9:18 proposed 42:22 proposing 27:12 protected 43:2 protocol 18:1 provide 10:5 26:9,11 36:18 41:22,24 42:13 54:22 55:2,3 provided 15:20 15:22 23:21 38:5 41:18 providing 19:14 public 60:19 purpose 39:17 pursuant 57:3 pursue 27:12 40:16,22 put 5:15 24:13 25:4 37:15 43:21 45:17 52:14 putting 32:8 | **q** | receiving 24:19 25:5 27:1 recess 8:13 35:25 48:9 55:14 recognize 11:3 recollection 11:5 11:14 recommend 30:22 31:3 32:13 35:4 recommended 31:8,24 32:4,6,7 32:19 33:6,17 record 5:16 55:6 57:13 recorded 57:11 recover 49:10,18 recovered 47:6 48:4 red 11:23,24,25 12:4,20 13:8 redmond 1:22 2:12 4:1 redundant 39:2 referenced 29:7 58:6 references 27:5 refrigeration 7:16 registration 15:19 regulation 10:14 related 43:4 57:17 relating 53:11 53:12 |
| | | question 5:9,25 34:6 35:3,12 38:17 44:17,19 46:19 questions 5:3,18 5:22 55:21 56:2 quick 20:21 55:10 | |
| | | **r** | |
| | | r 2:1 9:13 59:3,3 ramp 11:20 rcw 57:3 read 27:2 58:9 60:5 reads 39:23 real 20:20 really 24:3 55:20 rear 12:4,20 13:4,18 reason 5:10 45:11 49:16 58:11 59:6,9,12 59:15,18,21 recall 12:17 14:4 14:21 16:15 17:18 18:6,25 22:12 23:23 26:21 28:18 36:1,20 48:16,25 50:3 53:4 receipt 34:16,20 58:18 received 21:9,24 25:20 26:9,13 28:3 | |

[relative - separate]

| | | | |
|---|---|---|---|
| **relative** 16:19 18:18 26:19,25 37:1 48:21 52:9 54:20 55:4 | **requests** 3:14 30:7 52:25 **require** 19:5 20:11 | **role** 8:6 **rolled** 14:7 **rpr** 1:24 57:23 **ruins** 44:22 | 15:22,23 17:13 18:20 19:5,12 20:1,3,14 22:3,9 23:6,21 24:14,16 |
| **remember** 5:12 11:19 13:25 18:22 21:21 22:5 25:22 26:2 26:4 27:9 28:18 29:4,8,21 30:5 30:10 33:16 36:5,9,13,25 37:9 42:3 43:5 | **required** 60:13 **reserve** 55:22 56:3 **reserved** 56:5 **reside** 6:24,25 8:22 **resided** 7:2 **resolved** 41:6,13 | **rules** 4:21 5:1 **run** 51:5 **running** 11:11 **rush** 11:17 **rushing** 11:16 --- **s** **s** 1:3,12 2:1 3:3 59:3 | 25:1,6,8,11,13 25:16,21,24 26:5 26:14,18 28:17 28:20 29:2 36:8 36:14,17 38:6,8 42:1,13 45:9,12 50:6 53:11,15,19 53:21 54:10,12 54:19,25 |
| **rent** 7:5 **repair** 8:9,10 9:9 9:15,25 11:10 **repairs** 10:5 **repeat** 28:1 | **respect** 4:13 43:3 50:11 55:3 **responding** 55:4 **response** 3:14 5:15 27:22 32:15 33:12 | **sasha** 9:2 **saw** 12:13 **saying** 28:18 29:4 34:12 52:2 **says** 27:14 39:15 | **second** 8:11 48:1 48:20 49:5,16 **section** 39:17 41:18 **see** 5:14 12:3 |
| **report** 12:19 17:20 19:3,9 **reported** 1:24 17:6,19 **reporter** 4:6 5:15 9:12 57:3 57:23 | 53:14 54:23 **responses** 5:13 52:24 **restroom** 35:24 **result** 10:3 50:6 50:24 52:16 **retain** 24:7 | 41:21 47:11 53:10,15 **scene** 13:10 15:3 15:6,9,14 16:17 17:1,4,11,24,25 **school** 7:11,11 7:12,13,14,14,20 | 19:18 20:25 22:6 27:6 29:12 29:16 39:18,21 40:1 41:19 42:9 46:11 50:10 52:11 53:12,14 55:11 |
| **reporter's** 5:19 57:1 **reporting** 19:14 20:1,7 **reports** 51:5 **represent** 4:12 | **return** 58:13,17 **review** 5:20 6:4 6:6,11,18 57:16 58:7 **reviewed** 6:7 **right** 11:25 | **schools** 7:17 **screen** 20:20 21:1 23:17 **se** 6:25 **sean** 2:10,13 27:23,24 28:10 | **seeing** 48:16 **seek** 24:7 28:25 32:14,17 33:7,11 34:21 50:15 **seeking** 43:1 49:24 |
| 21:18 32:24 43:19 **request** 41:21 53:10 54:23 55:4 **requested** 57:16 | 12:23 15:1 21:20 22:1 46:2 46:5 55:22 **rights** 4:15 37:17 42:8 **road** 16:23 | 28:11 32:25 33:3,5 36:10 58:1,2 **sean's** 33:1 **sears** 7:22,23,23 8:2,4,6 9:3,18,22 10:8,14 11:6 | **seen** 13:15 21:21 53:3,7 **sees** 29:15 **sent** 58:14 **sentence** 53:15 **separate** 23:14 48:1 |

[september - sure]

| | | | |
|---|---|---|---|
| **september** 1:21 4:1 57:21 58:3,5 **sequence** 25:4 34:4 | 43:10 44:7 45:11,24 46:8,17 48:1 49:16 58:20 | 42:24 **spell** 9:11 **spent** 36:3 **spoke** 15:16 16:9 27:18,21 30:8 | **struck** 13:18 14:15,18 16:1,13 **study** 7:15 **stuff** 47:19 **subpoena** 20:4,6 |
| **served** 19:23 20:2 23:3 **service** 9:4,6,8 **settle** 39:5 **settlement** 3:11 3:12 6:9 37:16 38:4,9,23 39:17 40:15,21 41:12 42:7,22 43:11,14 44:7,14 45:11 46:7,9,15 48:1 48:19,21 49:5,16 52:16 | **signing** 38:4,9 38:22 40:6,15,21 41:4,12 42:12 44:14 46:15 **signs** 21:17 **sir** 4:23 6:23 7:5 7:25 8:17,23 10:23 11:7 18:1 18:5 21:2 37:25 **sitting** 4:18 **situation** 36:8 51:17 **slow** 4:25 | **spoken** 24:18 **stamp** 39:15 **start** 35:15 **started** 4:20 7:21 23:4 **starters** 34:9 **starting** 7:10 39:20 44:3 **state** 15:7 27:11 57:4 **stated** 57:8,15 **statement** 18:25 | 21:8,19 22:7 29:10 47:20 **subscribed** 60:14 **sudden** 11:21,22 **suffering** 47:24 **suggest** 27:18 28:15 33:5,10 35:20 **suggestion** 28:23 **suggests** 29:11 29:25 30:1 **suit** 21:9 24:4 |
| **shakes** 5:13 **share** 20:20 **sheet** 58:11 **shelley** 1:3 **shock** 12:22 13:7 **shocked** 15:2 16:16 21:11,12 23:12 29:24,24 **shoe** 45:17 | **smashed** 13:23 **snohomish** 1:1 **solutions** 58:23 **somebody** 21:14 22:16 26:4 32:24 33:18 **soon** 37:10 | **stating** 41:22 **station** 11:20 **status** 24:23 **stenographically** 57:10 **step** 23:24 **stop** 28:6 **stopped** 11:25 | **suite** 2:5,11,17 **summons** 22:23 **superior** 1:1 **supervision** 57:11 **supervisor** 17:7 17:13 20:5 22:3 24:2,20,22 26:3 |
| **shortly** 10:13 **showing** 22:5,18 22:19 **side** 36:16 39:21 **sign** 43:14 49:5 53:4 58:12 **signature** 37:21 38:1,2 42:9,18 42:19 56:5 57:20,22 **signed** 6:7,8 37:5 37:8,18 39:9 | **sorry** 7:1 13:2 13:25 17:9 53:5 54:6 **sort** 19:6 **speak** 5:21 6:21 14:23 15:10 21:24 37:1 46:13 50:15 54:14 **speaking** 6:20 27:19 28:6 **speaks** 29:14 **speculation** 13:20 14:9 16:3 | **straight** 7:14 **street** 2:17 **stress** 9:22,22 10:2,3 45:1 46:22 47:14,21 51:18 52:1,3 **stressed** 21:21 43:6,23 47:2 51:14 52:3,5,7 **stressful** 43:9 45:17 **strike** 14:8 39:2 | **supervisors** 17:15,18 19:16 20:9 25:1,16 **supplemental** 55:23 **support** 46:6 **supposed** 13:22 32:22 43:22 **supposedly** 24:25 **sure** 17:16 18:24 28:2 41:11 |

**[sure - try]**

51:20
**survive** 50:14
**surviving** 51:15
**sustained** 50:5
  55:17
**sw** 2:17
**swing** 44:4
**switch** 11:21
  12:2
**switching** 11:18
**sworn** 4:6 57:5,9
  57:9,14 60:14

**t**

**t** 9:13 59:3,3
**take** 5:8,10 8:11
  10:18 23:16
  24:25 25:21,23
  28:16 29:1
  34:10 45:18
  48:7 53:18
  55:10
**taken** 8:13 35:25
  48:9 55:14
**talk** 5:21 10:13
  11:2 21:8 25:12
  28:9 48:17
**talked** 16:13
  39:7
**talking** 16:17
**team** 9:21
**tech** 7:20
**technical** 7:15
**technician** 8:9
  9:4,15
**technicians**
  10:25

**technology** 7:16
**tell** 6:1,23 16:9
  21:19 38:16
  47:21
**telling** 18:6
**terence** 2:4
**terrence** 2:4
**test** 18:2,10
**testified** 4:7 32:5
  32:7 51:4
**testify** 32:12
  57:9
**testifying** 51:21
**testimony** 30:25
  31:5,8,11,12,16
  32:1 33:21,22
  35:10,17,18
  44:12,16 45:15
  46:3 49:21
  51:11 57:6,10,14
  58:9,18 60:8
**text** 54:19
**thank** 9:14 22:24
  22:24
**therapist** 50:17
  50:19
**thing** 8:8 10:9
  43:19 45:20
**things** 19:7 24:3
  24:5 43:7 45:1
**think** 14:5 30:18
  33:16 38:19
  48:5
**thinking** 23:11
  44:2
**thought** 16:10
**three** 8:20 11:24

**till** 10:10
**time** 5:7 10:12
  10:21 11:3,5,13
  12:7,8,15 13:3,6
  13:15 15:13
  17:13,15,23
  19:13,23 20:1,5
  21:15 22:9 23:3
  23:7 24:7,9,13
  26:2,3,4,17 28:8
  28:21,23 36:3,9
  36:11,14,25 38:4
  51:3 52:6,9
  54:15 55:22
  57:7,15 58:19
**timeframe** 58:8
**timing** 34:4,13
**title** 9:3,14
**today** 6:3,15,21
  29:24 52:8
**today's** 6:12
  52:4
**told** 15:17 17:7
  17:20 28:2
**top** 38:1 53:9
**totally** 24:10
  47:21
**touch** 25:3 30:22
**tourist** 12:21
**tow** 16:22,25
**track** 46:25
**trade** 7:14
**traffic** 11:17
  12:8,12
**transcribed**
  57:11
**transcript** 5:20
  55:24 57:6,12,15

58:6,20 60:5,8
**transferred** 7:22
**traverso** 2:4,4
  3:10 13:19 14:8
  14:20 16:3
  18:14 21:4
  22:17,21,25
  24:15 25:21
  26:23 27:10,18
  27:22,25 28:2,7
  28:12,15,23
  29:13,17,19 30:1
  30:4,11,14,21,24
  31:3,5,8,10,17
  31:20,25 32:5,13
  32:16,19,20 33:5
  33:10,17,20 34:1
  34:5,16,19 35:4
  35:9,12 36:3,7
  36:18,22 38:12
  38:17,25 39:7
  40:9,12,18,24
  41:7,14 42:23
  43:16 44:11,16
  45:14 46:1,3,12
  47:7 48:13,23
  49:12,20 50:9
  56:2
**traverso's** 37:2
**traversolaw.com**
  2:7
**treatment** 18:18
**tried** 26:5 36:16
**truck** 16:22,25
**true** 57:13 60:8
**truth** 57:9
**try** 5:21,21
  26:12 27:12

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

**[try - zoom]**

31:2,24 47:15,18
50:13 54:9
**trying** 25:4 26:7
  34:3,5,13 44:7
  44:13 47:2,25
  54:3
**turn** 39:14 41:17
  53:9
**turned** 55:25
**two** 30:10
**types** 10:4 19:7
**typical** 10:7
**typically** 10:24
**typing** 5:19

**u**

**u** 9:13
**undersigned**
  57:2
**understand** 4:16
  4:25 5:3,16 6:1
  8:1 10:12 12:19
  22:6,17 31:7,15
  31:21 33:1,9
  34:15,22,24
  38:19 41:10
  44:4,7,13 45:23
  46:4 47:25,25
  50:7 52:16
**understanding**
  12:24 28:13
  33:24 39:4 40:6
  40:11,15,21 41:2
  41:4,12 42:21
  43:13 44:9
  45:10 46:14
  47:3 48:3,10,19
  49:4,10,15 51:7

51:17
**universal** 7:15
**unwind** 23:2
**upset** 45:12,16
  45:16
**urine** 18:10 19:2
**use** 35:23

**v**

**vague** 32:16,20
  41:8 42:23
  46:12 48:13
**van** 10:14,14,16
  10:18,21,24,25
  13:7,8,11,12,24
  14:2,3,12,25
  15:24,25 16:16
**vehicle** 4:14
  10:12 11:2 13:4
  13:4,17 14:14,17
  14:17 15:10
  16:1,12,14 18:18
**verbal** 5:12,15
  53:16
**verify** 58:9
**veritext** 58:14,23
**veritext.com**
  58:15
**visit** 18:7
**vs** 1:8 58:4 59:1
  60:1

**w**

**want** 8:12 11:2,4
  28:4 34:9 35:23
  49:3 51:20
**wanted** 29:6
**wants** 48:7

**warrants** 39:24
**washington** 1:1
  1:22 2:6,12 4:1
  6:25 7:18,19,22
  57:5,23
**water** 8:12 48:6
  48:6
**way** 16:2,10 19:9
  43:21 44:4
  57:16
**week** 27:1
**went** 7:12,13,14
  7:17 16:13 45:5
  49:17
**window** 20:8
**witness** 1:22 4:6
  31:11 32:5,12
  35:23 44:17
  57:8,20 58:8,10
  58:12,19 59:24
**witness's** 32:1,9
  33:22 35:10,17
  35:18 49:21
**woman** 8:21
**wondering**
  17:10 36:22
**words** 32:8
**work** 7:23 9:20
  10:11 21:15
  24:25 30:2,12
  36:17 43:2
  46:24 54:10,18
  55:25
**worked** 43:22
**working** 7:21
  9:22 11:6,16
  30:20 36:14
  38:7 42:15

53:22
**worse** 44:25
**worst** 13:16
**wrong** 22:18
  43:25

**x**

**x** 3:1 9:13

**y**

**yeah** 5:5 7:3
  11:13 13:2
  14:25 19:1,8,8
  23:8,9 27:3,17
  27:23 28:22
  29:16 34:18
  37:12,20,23
  39:16 43:12
  47:11 48:16
  53:6,6,6,6,13
**years** 8:25

**z**

**zoom** 1:19 5:14

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

Washington State Court Rules

Rule CR 30

Depositions Upon Oral Examination


(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed the
deposition shall be submitted to the witness for
Examination and shall be read to or by the witness,
unless such examination and reading are waived by
the witness and by the parties. Any changes in
Form or substance which the witness desires to make
shall be entered upon the deposition by the officer
with a statement of the reasons given by the
Witness for making them. The deposition shall then
be signed by the witness, unless the parties by
stipulation waive the signing or the witness
Is ill or cannot be found or refuses to sign. If
the deposition is not signed by the witness within
30 days of its submission to the witness, the
Officer shall sign it and state on the record the
fact of the waiver or of the illness or absence of
the witness or the fact of the refusal to sign
Together with the reason, if any, given therefor;
and the deposition may then be used as fully as
though signed unless on a motion to suppress under

Rule 32(d)(4) the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.




DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.