```
                                                        Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 18-23538-shl

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    SEARS HOLDINGS CORPORATION,

 8

 9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   November 3, 2022

17                   2:08 PM

18

19

20

21    B E F O R E :

22    HON SEAN H. LANE

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  A. VARGAS
```

Page 2

1    HEARING re Omnibus Hearing

2

3    HEARING re Doc. #10661 Motion Of The Chubb Companies For

4    Entry Of An Order (I) Ruling That Default Judgment,

5    Settlement Agreements And State Court Orders Are Void Ab

6    Initio Pursuant To 11 U.S.C. I 05(a) and 362(a) And Without

7    Effect; And (II) Granting Related Relief

8

9    HEARING re Doc. #10648 Second Final Joint Application of

10   Paul E. Harner, as Fee Examiner and Ballard Spahr LLP, as

11   Counsel to the Fee Examiner, for Allowance of Compensation

12   for Professional Services Rendered and Reimbursement of

13   Actual and Necessary Expenses Incurred from July 1, 2022

14   Through August 31, 2022

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   WEIL, GOTSHAL & MANGES LLP

4         Attorneys for the Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8   BY:  PHIL DIDONATO

9         GARRETT A. FAIL

10

11   DUANE MORRIS LLP

12         Attorneys for The Chubb Companies

13         30 South 17th Street

14         Philadelphia, PA 19355

15

16   BY:  CATHERINE HEITZENRATER

17

18   BULLIVANT HOUSER

19         Attorneys for The Chubb Companies

20         One SW Columbia Street, Suite 800

21         Portland, OR 97204

22

23   BY:  RICHARD WILLIAMS

24

25

Page 4

1  FOSTER GARVEY PC

2       Attorneys for Shelley Hawkins

3       1111 Third Avenue, Suite 3000

4       Seattle, WA 98101

5

6  BY:  DAN YOUNGBLUT

7

8  SHEPPARD MULLIN LLP

9       Fee Examiner

10       30 Rockefeller Plaza

11       New York, NY 10112

12

13  BY:  PAUL HARNER

14

15  BALLARD SPAHR LLP

16       Attorneys for the Fee Examiner

17       919 North Market Street, 11th Floor

18       Wilmington, DE 19801

19

20  BY:  TOBEY DALUZ

21

22

23

24

25

Page 5

1    HALPERIN BATTAGLIA BENZIJA

2         Attorneys for Realtor Carl Ireland

3         40 Wall Street, 37th Floor

4         New York, NY 10005

5

6    BY:  DONNA H. LIEBERMAN

7

8    ALSO PRESENT TELEPHONICALLY:

9    SARA BRAUNER

10   ERIKA L. MORABITO

11   BRITTANY J. NELSONO

12   NATAN BANE

13   BRIANNA B. BLITTER

14   KEVIN ECKHARDT

15   UDAY GORREPATI

16   TAYLOR HARRISON

17   JENNIFER SUE KOOCKOGEY-LAJOIE

18   CHRISTOPHER STAUBLE

19   JOSEPH SZYDIO

20

21

22

23

24

25

1        P R O C E E D I N G S

2            THE COURT:  Good afternoon.  This is Judge Sean

3    Lane in the United States Bankruptcy Court for the Southern

4    District of New York, and we are here for the afternoon

5    calendar, which starts at 2:00 with Sears Holding

6    Corporation, a Chapter 11 case and omnibus hearing.  So let

7    me find out who is here on behalf of the Debtors.  Oh, hold

8    on a second.  Good afternoon.  This is Judge Sean Lane in

9    the United States Bankruptcy Court for the Southern District

10   of New York, and we are here this afternoon for an afternoon

11   calendar starting at 2:00, and the matter that's on for 2:00

12   is Sears Holding Corporation, a Chapter 11 case.  So we'll

13   start by getting appearances.  Let me find out who's here on

14   behalf of the Debtors.

15           MR. DIDONATO:  Hi.  Good afternoon, Your Honor.

16   Phil DiDonato, Weil Gotshal for the Debtors, and I'm here

17   with Garrett Fail as well.

18           MR. FAIL:  Good afternoon, Your Honor.

19           THE COURT:  All right.  Good afternoon.  And let

20   me find out who's here on behalf of the Official Committee.

21           MR. DIDONATO:  Your Honor, the Chapter 11 plan

22   went effective --

23           THE COURT:  Oh.

24           MR. DIDONATO:  -- and we filed a notice, so the

25   Committee has been disbanded.

1            THE COURT:  All right.  Thank you very much.  So

2     let me find out who's here on behalf of The Chubb Companies

3     who filed the motion.

4            MS. HEITZENRATER:  Good afternoon, Your Honor.

5     Catherine Heitzenrater of Duane Morris LLP for The Chubb

6     Companies, and I am joined by Richard Williams of Bullivant

7     Houser.

8            THE COURT:  All right.  And on behalf of the

9     parties responding to that motion, that is Shelley S.

10    Hawkins.

11           MR. YOUNGBLUT:  Good afternoon, Your Honor.  Or

12    good morning here from cloudy Seattle.  Dan Youngblut

13    appearing on behalf of Shelley Hawkins from the law firm of

14    Foster Garvey.

15           THE COURT:  All right.  And let me find out who

16    else is here in terms of getting appearances.

17           MR. HARNER:  Good afternoon, Your Honor.  Paul

18    Harner of Sheppard Mullin LLP in New York appearing as the

19    fee examiner, and with me is Tobey Daluz of the Ballard Law

20    Firm in Philadelphia who is counsel to the fee examiner.

21           THE COURT:  All right.  Good afternoon to you

22    both.  And any other appearances?

23           MS. LIEBERMAN:  Good afternoon, Your Honor.  Donna

24    Lieberman, Halperin Battaglia Benzija for Relator Carl

25    Ireland, and hopefully I am just monitoring this afternoon.

1              THE COURT:  All right.  Good afternoon to you as

2    well.  All right.  So I do have a copy of the Notice of

3    Agenda that was filed on the docket that contains a fee

4    matter and then a contested matter.  And so I'll turn it

5    over to Debtor's counsel first to see if there's any

6    preliminary matters before we dive into the Agenda.

7              MR. DIDONATO:  Thank you, Judge.  Nothing.

8    Nothing before the Agenda.

9              THE COURT:  All right.  So then I guess we will

10   turn first to Roman Numeral I, Number I, the second final

11   joint application of the fee examiner and Ballard Spahr as

12   counsel for the fee examiner.  And I'll turn that over to

13   the fee examiner or -- and/or his counsel.

14             MR. HARNER:  Good afternoon, Your Honor.  It's

15   again Paul Harner as -- appearing as the fee examiner with

16   Mr. Daluz as counsel for the fee examiner.  This second

17   final fee application essentially is for the period

18   beginning on July 1st of this year and through the

19   conclusion of the case.  As Mr. Fail indicated, the notice

20   of effective date of the plan was filed recently and

21   occurred only a matter of days ago.  There have been no

22   objections filed to this second final fee application either

23   as to the fee examiner's fees or Ballard Spahr's fees.  And

24   accordingly, unless the Court has any questions, in the

25   absence of such objections, we would request that the Court

Page 9

1    approve the application as filed.

2         THE COURT:  All right.  Thank you very much.  Is

3    there any party who wishes to be heard in connection with

4    this application of the fee examiner and his counsel?  All

5    right.  Hearing no responses, I did take a look at the

6    application as well as the backup certification in support

7    and the fee statements as well as some of the entries on the

8    docket.  Judge Drain certainly has -- he kept himself

9    involved to try to get a lot of things resolved in this

10   case.  I have chided him that he perhaps needs to look up

11   the definition of the word retire in the dictionary.  But he

12   graciously did that so that he could preside and bring to a

13   conclusion things with which he was very familiar.

14         And so not being familiar, I took a look at the

15   docket to just get up to speed on all the great and glorious

16   things that have been going on up through August 31st in

17   this case.  And so based on the materials I have before me

18   and my review of the docket, I'm happy to grant this

19   application as appropriate under the facts and circumstances

20   and applicable law, and to please submit a proposed order

21   electronically to us so we can get that entered.  Thank you

22   very much.

23         MR. HARNER:  Your Honor, we'll -- I apologize,

24   Your Honor.  I think I talked over you right at the end.  We

25   intend to settle an order with the Debtors and upload it on

1   the system in due course.  And with that instruction, Your

2   Honor, may Mr. Daluz and I be excused for the remainder of

3   the hearing?

4           THE COURT:  Absolutely.  And I reject your

5   apology.  The -- these Zoom hearings are a bit challenging

6   in that regard, and so all good, yes.  And please go about

7   the rest of your day.  Be well.

8           MR. HARNER:  Thank you very much, Your Honor.

9           MR. DALUZ:  (Indiscernible), Your Honor.

10          THE COURT:  All right.  Thank you.  And so with

11  that, the next matter on the Agenda is the contested matter,

12  which is Number II, the motion of The Chubbs Companies for

13  an entry for various relief relating to an alleged violation

14  of the automatic stay.  And so it is The Chubb Companies'

15  motions, so I thought I would hear from them first, and then

16  I'll hear from the objecting party, and then from anybody

17  else who wishes to be heard.

18          I will just as -- by way of sort of helping to

19  tell you what you need to do or not need to do, I have

20  looked very carefully at the papers, all the papers that

21  were filed, the motion, the objection, the reply.  I have

22  timelines put together of the events here, so I mention that

23  just because when I was in your shoes, you never know how

24  much time the judge has or hasn't been able to spend on the

25  papers.  And so oftentimes you sort of have to start in the

Page 11

1    beginning kind of mindset and go through everything chapter

2    and verse.  So you don't have to do that here.  So instead,

3    I can kind of say probably will cut you off and ask a bunch

4    of questions that I have regarding your different positions.

5    So with that, I'll turn it over to The Chubb Companies.

6            MS. HEITZENRATER:  Thank you, Your Honor.  Again,

7    Catherine Heitzenrater of Duane Morris LLP for The Chubb

8    Companies.  Then I'm also, as I noted before, joined by

9    Richard Williams from Bullivant Houser, who's working on

10   behalf of Ace American, one of The Chubb Companies in the

11   state court action.  So thank you, Your Honor, for your

12   instruction.  I will not belabor all of the facts here given

13   that you have a good handle on them.

14           I do want to focus on three main points today, and

15   the first is that the motion is properly before the Court.

16   The second is that the Court has the ability to grant the

17   requested relief, and the third is that the requested relief

18   is necessary to right the wrongs of the stay violations and

19   to protect the sanctity of the automatic stay.

20           THE COURT:  So let me -- at the risk again of

21   interrupting what no doubt is a beautiful presentation, jump

22   to some questions I had about Number III.

23           MS. HEITZENRATER:  Okay.

24           THE COURT:  It seems like there's no dispute that

25   -- I mean, the three events are the default judgment, the

Page 12

```
 1   first settlement, and the second settlement.  The default

 2   judgment was vacated, and the first settlement never became,

 3   I guess, effective.  And you can debate what that means or

 4   not, but I guess it wasn't court approved.  So assuming that

 5   I agree with you that those events, which occurred before

 6   the stay was lifted or amended to allow actions, are void ab

 7   initio, does that ruling have any practical effect as to

 8   those two first events, the default judgment and the first

 9   settlement?

10              MS. HEITZENRATER:  I think it would have a

11   practical effect, Your Honor.  I think it would be helpful

12   for the state court to know that that is indeed the case.

13   It's also our position, Your Honor, that the vacating of the

14   default judgment simply to make way for the larger

15   confession of judgment that was gotten only through the

16   second settlement agreement, you know, doesn't undermine the

17   fact that those things were stay violations and that

18   everything that occurred after is based on those things that

19   were void.

20              THE COURT:  All right.  So as to the third

21   component here, which is the second settlement, it seems

22   pretty clear that that happened after the stay was lifted.

23   And if I'm -- so if I'm right that the settlement between a

24   debtor and a non-debtor, there were some attempts in state

25   court to essentially challenge that.  And if that's not
```

Page 13

1   technically a stay violation because it happened -- I

2   understand you're sort of, to borrow from criminal law,

3   fruit-of-the-poisonous-tree kind of argument, but if the

4   validity of that has already been challenged in state court

5   and is between a debtor and non-debtor, I guess my question

6   is sort of one about federalism and what my role here

7   properly is and isn't.

8           So to make a long question even longer, I

9   understand the idea of policing the automatic stay, and so I

10  get it for the first two events.  But for the third event,

11  I'm not quite sure what it is that I'm -- you're asking me

12  to actually do because I don't have a -- I don't think I

13  have -- it's appropriate for me to be the one to essentially

14  challenge the bona fides of the settlement.  That I think

15  has to go to state court.

16          Like, oh, is there something coercive or collusive

17  or whatever.  That, to me, seems to be something that the

18  state court was asked to look at and did, and so I'm

19  struggling with what my role is as to that third event.

20          MS. HEITZENRATER:  So you're right.  Your Honor,

21  we're not asking you to rule that the second settlement

22  agreement was itself coercive.  We're not asking you to rule

23  on the substance of that.  What we're asking you to do is

24  say that a settlement that is based on stay violations that

25  were undisclosed to this court cannot -- is not effective.

Page 14

1    It is also --

2          THE COURT:  But how do I know that?  So he had

3    counsel, and there are various statements on the record

4    about things.  I suppose if I could identify the impact on

5    the Debtor, because after all the stay protection is to

6    protect the Debtor, then we could sort of anchor our inquiry

7    that way, but I don't have that here.  So I really am

8    struggling with what the analysis is supposed to be, and I

9    didn't really see any case law that was cited to me that

10   sort of adopted a fruit-of-the-poisonous-tree kind of an

11   analysis.

12          They all seem to have something else going on that

13   the -- you know, the Debtor had this impact or whether it

14   was -- it was still covered by the stay or something else.

15   And so I was sort of struggling to sort of figure out what

16   -- if you were to ask me to write a decision what the

17   decision would actually look like in your favor on this

18   third event.

19          MS. HEITZENRATER:  What it would look like, Your

20   Honor, is a ruling that, if a plaintiff violates the

21   automatic stay for two years, comes to a bankruptcy court

22   and asks to lift the stay without disclosing those stay

23   violations, that using the -- those stay violations, which

24   were void, cannot inure to the benefit of that claimant.

25          THE COURT:  I --

Page 15

1            MS. HEITZENRATER:  That that would permit --

2            THE COURT:  I got you up to using those stay

3    violations.  So I don't know quite -- I understand

4    practically what you mean.  You mean to say that the past is

5    prolonged to this third event, but I -- if I have a

6    statement from the party and from counsel saying, well, we

7    went through it, we looked at it, and this is what we came

8    up with.  And if there's -- you know, I'm having trouble

9    understanding, you know, this is sort of used, it seems to

10   inevitably seems to be a way of collaterally attacking the

11   validity of that settlement.  I don't know if you can do --

12   get the relief you want without essentially doing that to

13   say the settlement's improper.

14           MS. HEITZENRATER:  Well, I think, Your Honor, the

15   reason that it's improper is because it is based on those

16   prior improper actions.  And I think that the -- that Mr.

17   Miguel's statement in his affidavit is belied by his

18   deposition testimony, which says that he signed both

19   settlement agreements due to his stress related to --

20           THE COURT:  But that's a collateral attack on the

21   settlement, right?  I don't know that I have -- I don't

22   really want to turn this into a jurisdictional treatise, but

23   I don't know how -- my jurisdiction for this I understand is

24   really anchored in the automatic stay.  And I think some of

25   these arguments have already been presented to the state

Page 16

```
 1   court.  So I'm wondering what I can appropriately address or
 2   not on that.  Because again, I understand you said I don't
 3   want a collaterally attack that thing here, but when you
 4   describe what it is that the substance of the argument, it
 5   seems an awful lot like a collateral attack I've got to say.
 6            MS. HEITZENRATER:  Well, Your Honor, these
 7   arguments have not been made at the state court.  The result
 8   of -- you know, the impact of them being -- these actions
 9   being void as a violation of the automatic stay has not been
10   made at the state court.  Do you think that it has --
11            THE COURT:  No, but hasn't the argument been made
12   that the settlement was improper and that it was the -- so
13   explain to me what actually -- rather than have me guess and
14   then have you try to straighten me out, what is -- actually
15   was presented to the state court and what was the ruling?
16            MS. HEITZENRATER:  Your Honor, if it's all right
17   with you, I might pass that question to Richard Williams who
18   is better versed, I would say, in the detailed facts of what
19   has and hasn't been presented to the state court.
20            THE COURT:  Oh, that would be fine.  Mr. Williams?
21            MR. WILLIAMS:  Good morning, Your Honor.  So I
22   assume, Your Honor, are you speaking of the reasonableness
23   hearing that occurred where the court basically -- the state
24   court blessed the settlement agreement?
25            THE COURT:  Yeah.
```

```
 1              MR. WILLIAMS:  That -- okay.  So that -- at that

 2    posture, what was submitted to the court without any oral

 3    argument was simply Mr. Traverse's declaration, Miguel's

 4    declaration.  It was by all accounts an unopposed motion

 5    where the court, you know, from our position at least, the

 6    court did not have all of the pertinent facts of the

 7    bankruptcy stay or anything like that before them.  So in

 8    that respect, it wasn't -- you know, it's not the same

 9    issues that are being brought up today I guess if that makes

10    sense.  We're not trying to relitigate --

11              THE COURT:  Yeah.  No, no.

12              MR. WILLIAMS:  -- the (indiscernible).

13              THE COURT:  I got it.  There was essentially a

14    record presented.  There wasn't really a live controversy

15    about any of those issues.  And so before I go any further,

16    I do want to make it clear that I think there was a fairly

17    egregious violation of the stay as the first two items,

18    right?  I don't think it's disputed.  Essentially I

19    understand the argument to be that that particular improper

20    set of actions has been defanged by having the default

21    vacated and the first settlement didn't amount to anything.

22              But I guess -- and I don't know if this is for

23    you, Mr. Williams, or for other counsel, if the

24    reasonableness of the settlement is before the state court

25    and you didn't have these, isn't this another issue to
```

Page 18

1    present to the state court about, you know, whether it's

2    improper influence or the things that this person felt like

3    they couldn't say no to or whatever it is?  I just don't --

4    I just -- it seems like for me to do something like

5    essentially vacate the third settlement -- see, I am by

6    necessity saying that even though the stay had been lifted,

7    that there was something improper about that settlement or

8    that process, which seems to me to be the -- you know, the

9    province of the state court between two non-debtors.  Am I

10   missing something on that?  And again, I'll -- I don't know

11   who's the right person to chime in on that.

12           MS. HEITZENRATER:  I can take that one, Your

13   Honor.  From our perspective, we think that you do have the

14   authority to weigh in on that and essentially to say that

15   these egregious violations of the automatic stay do sort of

16   roll over into a second settlement agreement and

17   (indiscernible) --

18           THE COURT:  But wouldn't I have to have evidence

19   on that?  Isn't that something -- right, so they had a

20   reasonableness hearing.  If you knew all these things at the

21   time, you could've contested it, and you would've had it --

22   it's not reasonable given all these things.  So I certainly

23   am more than happy to say that I find that there was an

24   egregious violation of the stay in seeking the default

25   judgment and in negotiating the first settlement, and

Page 19

```
 1   everything up to and just before the stay was lifted, and

 2   that there was, you know, a disappointing lack of candor

 3   with the court in coming in and seeking that without saying,

 4   hey, by the way, you should know, Judge, in the interest of

 5   full transparency.

 6            But I'm having trouble with the last thing you

 7   want me to do, which is to say to nuke the settlement.  I

 8   don't know -- I don't want to bless the settlement, but my

 9   question is whether the appropriate thing to do is to say I

10   can tell you that there's an egregious violation of the stay

11   and on -- these two events, and the degree to which those

12   improper actions led to an improper settlement that I'll

13   leave to the province of the trial court to consider in

14   light of all the facts and circumstances, and to let that

15   court do what they think is appropriate upon proper

16   application.

17            It's just that I think I'd need to have a --

18   essentially a reasonableness hearing on the settlement in

19   order to do that, and that's where I -- that pesky

20   federalism doctrine kicks in where I just don't know how far

21   -- I certainly, again, have no problem making very clear

22   what my views are about the violation of the stay.  And I

23   don't -- and that even if the default was vacated and the

24   first settlement wasn't effectuated, it's a serious

25   violation.  And we -- you know, it's hard to know what would
```

Page 20

1    happen if you unring the bell and all that sort of stuff,

2    and we need to be very careful in policing those -- that

3    line.

4              But as to the reasonableness of the settlement

5    between two non-debtors in state court in the state court

6    action, that I'm having some concerns about going that far

7    and anchoring that in an automatic stay decision.  So I

8    don't know if you have anything else to say.  I know I just

9    gave a speech, but as I said, I've spent a bunch of time

10   looking at these papers and thinking about the papers.  So

11   you sort of had me at hello on the first two events and that

12   they are void ab initio because they are.

13             It's the third one that I'm just struggling with.

14   I don't want to reward a violation of the automatic stay.

15   Nobody who sits in this chair wants to do that, but I just

16   am having trouble with the mechanics of what relief would

17   look like as to that third event.  But again, counsel, I

18   appreciate the colloquy back and forth.  So you can feel

19   free to address that or anything else that you wanted to say

20   before I peppered you with a million questions.

21             MS. HEITZENRATER:  No, I appreciate that, Your

22   Honor.  I'm happy to address standing and jurisdiction and

23   those sorts of matters.  But if Your Honor doesn't feel like

24   you need argument on those, I'm also happy to defer.

25             THE COURT:  Well, I guess I would say if you -- I

Page 21

1   don't know if any of what you were planning to say touches

2   on this discussion we're having here about this third event

3   and the implications for what I can appropriately do or

4   can't, that may in fact be a jurisdictional issue in terms

5   of what I can do and what I can't do.  But -- so I certainly

6   would be interested in hearing your views on that.

7            MS. HEITZENRATER:  Okay.  Well, thank you, Your

8   Honor.  I do think that the -- from a jurisdictional

9   perspective, and I certainly understood Your Honor's point

10  with respect to impact on the estate, but I think that that

11  goes to related to jurisdiction as opposed to what we have

12  here, which is clearly arising under jurisdiction.  So I do

13  think that this court plainly has jurisdiction under 1334 of

14  the Bankruptcy Code because issues related to the

15  application of the automatic stay arise under the Bankruptcy

16  Code.

17           And the Second Circuit has specifically found that

18  any relief for a violation of the stay must be sought in

19  bankruptcy court.  And so from that perspective, I don't

20  think it's particularly new, Your Honor, from our pleadings,

21  but we do think that the jurisdiction is there.

22           THE COURT:  All right.  That's helpful.  Anything

23  else, counsel?  Or do you want to defer any other comments

24  until I hear from the other side?

25           MS. HEITZENRATER:  I think we have touched on

Page 22

1   largely the remainder of my argument, Your Honor, in the

2   colloquy.

3           THE COURT:  All right.  All right.  Thank you very

4   much.  And again, I appreciate your willingness to sort of

5   have a discussion out loud.  It's very helpful even if it

6   does violence to your presentation.  I appreciate that

7   having been on the other side, and so with that, let me hear

8   from the other side.

9           MR. YOUNGBLUT:  Well, good afternoon, Your Honor.

10  And again, good morning here in cloudy Seattle.  Thank you

11  for the opportunity to appear here today.  Just as a couple

12  of brief housekeeping matters before I get into the bulk of

13  it, Your Honor, I'm appearing alone today because Mr.

14  Traverso, who is Shelley Hawkins' primary counsel and really

15  the only lawyer involved in the Washington state court

16  litigation is actually in the hospital right now with his

17  wife who is delivering a baby girl.

18          THE COURT:  Oh, good.  I thought --

19          MR. YOUNGBLUT:  As (indiscernible) --

20          THE COURT:  -- you were going the inevitable

21  because of COVID and that was going to (indiscernible), so

22  that's happy event.  Congratulations perhaps prematurely,

23  perhaps not, these things happen very quickly to him.  And

24  that -- I would characterize that as a very fair excuse.

25          MR. YOUNGBLUT:  A fair excuse, Your Honor, and

Page 23

1   very exciting for Mr. Traverse.  So perhaps less so for me

2   because I'm less familiar with state court litigation and

3   I'll be presenting our whole argument, but that's okay.

4            THE COURT:  That's...

5            MR. YOUNGBLUT:  And Your Honor, I have my remarks

6   here.  I had, frankly, a longer form version and a shorter

7   form version.  I'm going to pivot over to the shorter form

8   version, but you know, I understand Your Honor is very

9   familiar, as you mentioned, with all the pleadings and the

10  facts.  So please feel free to do violence, interrupt, let

11  me know where you want me to go.  I will take no offense.

12           THE COURT:  So I will take you up on your kind

13  offer and certainly --

14           MR. YOUNGBLUT:  Sure.

15           THE COURT:  -- return to where I was chatting with

16  counsel for Chubb, which is I don't think there's any debate

17  that the two events are the first two events, that is the

18  defaults and the first settlement agreement violate the

19  automatic stay.  I think everybody would agree with that.

20  Is that right?

21           MR. YOUNGBLUT:  Your Honor, I want to say that,

22  you know, just as an initial remark and then I'll address

23  your question directly, I can't sit here with a straight

24  face and say it is my favorite fact pattern of all time.  I

25  can't.

Page 24

1           THE COURT:  No.  Well, that's where I think you

2    can just simply say, yes, they do and move on.  Because I

3    think it's hard to argue that they don't, and that's

4    probably a conversation that you don't want to have with a

5    bankruptcy judge.  But let me -- I'll move on from there.

6    So the -- my concern is no bankruptcy judge ever wants to

7    reward a party for violating the automatic stay, right?

8    Bankruptcy is poorly understood in a lot of orders, and

9    state court judges have their hands full with plenty of

10   other substantive things.  That's completely understandable.

11           And whenever bankruptcy judges get things to try

12   to understand, like a separation and divorce decree and its

13   impact on bankruptcy, we -- we're walking the other side of

14   that line.  And so I certainly -- none of this is meant as a

15   disrespect for the state court, but they may be like, well,

16   whatever.  It's not -- you know, somebody will tell me if

17   it's a problem.  If not, I'm going to go ahead.

18           But it's pretty clear that there are violations of

19   the stay as to the default and as to the first settlement

20   agreement.  I understand those have essentially been

21   defanged by virtue of the default being vacated and the

22   first settlement really being superseded by the second

23   settlement.  So your -- opposing counsel is sort of

24   grappling with the notion that there's something

25   fundamentally unfair about the second settlement because

Page 25

1   it's -- it has the history of everything that leads up to

2   it.  And the question is, is that -- how does that history

3   play into whatever the requested relief is.  So I am

4   concerned about not rewarding what is improper bankruptcy

5   behavior in terms of violating the automatic stay by virtue

6   of a blessing, although I don't think I would ever go that

7   far, the second settlement.  And so what can you tell me in

8   response to that concern?

9           MR. YOUNGBLUT:  Well, Your Honor, I think there

10  are sort of two narrative streams going on here.  I think

11  one is in the Ace American side of things.  I think there's

12  a lot of factual speculation.  There's a lot of emphasis on,

13  you know, Miguel was stressed.  Why was he stressed?  Stuff

14  like that.  And then there's the factual record that you

15  have before this Court, which is that once the stay relief

16  order was entered on April 5, 2021, the parties renegotiated

17  a settlement, a brand new settlement.  It did look a lot

18  like the first settlement.  No one can dispute that.

19          But Miguel was represented by counsel.  Counsel

20  could've advised him, you know, hey, you know, look at all

21  these egregious actions that Plaintiff's counsel undertook.

22  You know, we think you should contest that.  Or you know,

23  hey, let's get Ace American involved here, and I'm happy to

24  go into Ace American's involvement or lack thereof if Your

25  Honor deems it relevant.  But the fact of the matter is the

Page 26

1    evidence before this Court in the form of the declaration

2    from Miguel sworn under penalty of perjury, the declaration

3    from Miguel's attorney sworn under penalty of perjury is

4    that they entered into the second settlement agreement

5    freely, voluntarily, and upon advice of counsel because it

6    was a good deal for Miguel.

7            THE COURT:  I get that, but putting aside looking

8    into the minds of those individuals, which I think is not

9    for me, the -- my right to settle then actually was for a

10   number three times higher than the default.  And --

11           MR. YOUNGBLUT:  I --

12           THE COURT:  -- and I would say that that's not a

13   normal fact pattern, right?  So -- and I don't have to know

14   a lot of anybody's state of mind to have that -- have me

15   raise an eyebrow.  So what can you tell me about

16   understanding that?

17           MR. YOUNGBLUT:  Your Honor, the settlement amount

18   -- I apologize preemptively because Mr. Traverse obviously

19   is more versed in that than I am, but my understanding is

20   that the change in the number -- and I'm going to use round

21   numbers just for ease of argumentation -- from about 500,000

22   to about 1.5 million was due to an evolution of the damages

23   that the Plaintiff suffered as a result of the car accident.

24   Default judgment was obtained --

25           THE COURT:  Right, but the default is for a sum

1    certain, and then you get whatever you get because you've

2    already liquidated the amount to a certain amount.  And you

3    get interest or whatever else it is, and you don't get more.

4    I don't know how you get more, right?  Because the case is

5    concluded and it's stare decisis, res judicata, collateral

6    estoppel, whatever label you want to throw on it.  So it's

7    not an open matter.  It's not like, you know, so say you had

8    a default, as might be the case in a federal court, on

9    liability in a default.  So the judge issues a default issue

10   on liability.  And since I don't know what the damages are,

11   it's not a sum certain, I'm going to hold an inquest to

12   figure out damages because that's what you do in the federal

13   system, and that's still open.

14           And then the number that's in the complaint is

15   450,000, but the number that you end up after the inquest is

16   1.5 because, well, it's just a moving number.  But there is

17   a judgment with a liquidated amount.  So again, I appreciate

18   that you're pitch-hitting here, so -- and I know this is

19   pretty much in the weeds, but that's a fact that sort of is

20   hard to miss.  And so, you know, so someone says, well, the

21   counsel was chosen by him.  And I'm like, well, but I have a

22   -- there's a declaration saying we all made this, you know,

23   settlement for whatever.

24           But the number does jump out at me in the context

25   of saying like, well, these people were using the default as

Page 28

1    a -- sort of a sword, which is not uncommon and not

2    necessarily improper, except the default itself is void ab

3    initio.  So what -- anything else you can tell me on that

4    particular point?

5         MR. YOUNGBLUT:  Yeah.  Yes, Your Honor.  I think

6    I'd make three observations with respect to that.  I think

7    one is to the extent Your Honor is prepared to rule today or

8    whenever Your Honor issues a ruling, that the default

9    judgment is void ab initio, then I think those ideas about

10   being like we'll have the case in, you know, similar

11   documents.  I think those are tossed to the side.  The

12   default judgment being void ab initio --

13        THE COURT:  No, it's your client --

14        MR. YOUNGBLUT:  -- (indiscernible).

15        THE COURT:  -- I don't think gets the benefit of

16   that.  It's being declared void ab initio not for your

17   benefit, right?  It's being declared void ab initio because

18   your client took actions that it shouldn't have taken given

19   the existence of the bankruptcy and the stay.  And so I

20   don't know that you could benefit from that.  Again, it's as

21   if it never happened, which is if, you know, just a typical

22   lawyer concept that the rest of the world has trouble

23   understanding that you've literally unrung the bell.  But I

24   don't think you can say, well, because it never happened

25   void ab initio, it doesn't exist for purposes of

Page 29

1  understanding the fact pattern and whether there was sort an

2  undue influence here.

3          I don't -- it doesn't -- I don't think it works

4  that way because then I can't sort of assess what the impact

5  is on the third event and whether that -- counsel's granting

6  the relief that's requested.  So other thoughts you might

7  have on that?

8          MR. YOUNGBLUT:  Yes, Your Honor.  I understand the

9  point you're making, and two more points on this, Your

10  Honor.  At the time the second settlement agreement was

11  executed, and part and parcel of that was the confession of

12  judgment, which has the higher number that Your Honor's

13  referring to, Miguel was represented by counsel.  Counsel

14  has a fiduciary duty to Miguel, and counsel could have said

15  -- and I'm just speculating here, I'm obviously not Miguel's

16  counsel -- you know, hey, we shouldn't agree to a 1.5

17  million figure.  We had this, you know, lower figure, the

18  500,000, just to use a round number again, let's stick with

19  that.

20          Miguel didn't.  Miguel and his counsel agreed to

21  the higher number.  And then perhaps more importantly, Your

22  Honor, that settlement was put forth to the state court, and

23  the state court has an independent obligation under

24  Washington law to assess the reasonableness of any

25  settlement that was before --

1           THE COURT:  Right, but if they --

2           MR. YOUNGBLUT:  -- a court.

3           THE COURT:  If they don't know the facts, they

4    can't necessarily do that, right?

5           MR. YOUNGBLUT:  Well, that's certainly true, Your

6    Honor.  I wasn't there for the reasonableness hearing.  I

7    don't know if it was very robust, not robust.  I frankly

8    just wasn't --

9           THE COURT:  No, but I'm saying nobody really --

10          MR. YOUNGBLUT:  -- there, but --

11          THE COURT:  -- nobody knew -- I understand the

12   representation from Chubb is that nobody -- Chubb didn't

13   know of the -- that this was going on, was in violation of

14   the automatic stay, and it's unclear whether there was any

15   record made at all as to the impact or lack thereof of the

16   bankruptcy on this because the record's blank on that.  So I

17   assume it wasn't -- I don't want to flatter myself.  People

18   aren't going to address that unless they think there's a

19   reason to address it, and it sounds like it wasn't addressed

20   at all.

21          MR. YOUNGBLUT:  Your Honor, I frankly -- I'm just

22   not certain as to how, when, and under what circumstances

23   the bankruptcy law stay extension order, if you will, was

24   addressed in the state court.  But you know, what I can say

25   is the settlement was approved by the state court at a

Page 31

1    reasonableness hearing.  I don't want to say reapprove, but

2    there was a decision from the state court a little less than

3    a month ago which sets forth a whole bunch of facts that I

4    think have dispelled the notion that Ace American didn't

5    really know what was going on here.  And the state court in

6    this October 7th ruling states pretty clearly that this --

7    the agreement, the settlement agreement that is as approved

8    by the state court is no longer subject to collateral attack

9    under state law.

10            THE COURT:  All right.  So what else would you

11   like to tell me in the context of the motion?

12            MR. YOUNGBLUT:  Well, Your Honor, I think I'm

13   going to jettison my full remarks here and just say -- you

14   know, I want to reiterate I'm a bankruptcy lawyer by

15   training.  So I get the importance of the automatic stay.

16   And like I said, Your Honor, this is not my favorite fact

17   pattern.  I can't say that.  What I can say with a straight

18   face is that I don't think the facts and the law support the

19   relief that Ace American is seeking here.

20            As Your Honor observed, what Ace American is

21   essentially advancing is somewhat akin to a fruit-of-the-

22   poisonous-tree idea.  I've been calling it in my head the

23   Tracing Doctrine, but it's the same basic thing.  And Your

24   Honor, I just don't think there's any legal support for

25   that.  And I would refer Your Honor respectfully to the

Page 32

1    Bolus, I believe I'm pronouncing that correctly, case.  The

2    report -- the reporter cite being 2022 Westlaw 3948685 from

3    the Bankruptcy Court for the Middle District of

4    Pennsylvania.  And there, I think there was a much closer

5    connection between an order that violated the automatic stay

6    and one that the court found did not.

7              And I think here, it's much clearer that the

8    second settlement agreement and the two related state court

9    orders that followed are standalone.  Second settlement

10   agreement being executed two and a half months after the

11   stay relief order, the state court orders following that

12   being brought to the state court's attention by way of

13   motions filed well after the stay relief order.  And I just

14   don't think there's any legal support for that Tracing

15   Doctrine.

16             And Your Honor, I know we've also -- the papers

17   refer a lot to jurisdiction and waiver and standing.  And

18   you know, I think our positions are fairly clear in the

19   papers there.  If Your Honor has any questions on those, I'd

20   be happy to into that or anything else Your Honor might want

21   to consider.  But with that, I'm happy to rest and take any

22   other questions Your Honor may have.

23             THE COURT:  All right.  So let me ask you if you

24   have any oppositions or objection to a ruling that the first

25   -- that the default and the first settlement are void ab

Page 33

1    initio given the existence of the stay.

2              MR. YOUNGBLUT:  Your Honor, that's on -- that's a

3    hard question for me to answer.  I think in a vacuum, no, I

4    do not oppose that.  However, a lot of what I had in my

5    prepared remarks, which I can pivot to just very briefly

6    here, goes to this notion of I'm just not sure why, given

7    that the default judgment had been vacated and the first

8    settlement agreement is totally dead, exactly why that

9    relief would be necessary for --

10             THE COURT:  Well --

11             MR. YOUNGBLUT:  -- Ace American.  To me it's

12   almost (indiscernible).

13             THE COURT:  -- I guess my thought would be to the

14   extent that I'm uncomfortable essentially holding what might

15   be akin to a reasonableness hearing on the second

16   settlement, my thought would be to essentially give the

17   state court an appropriate set of views by the bankruptcy

18   court as to the bankruptcy issues by saying let there be no

19   mistake, the first default and the first settlement are void

20   ab initio because they violate the automatic stay.  They

21   were entered into before that stay was lifted.

22             And to the extent, you know, the request by Chubb

23   for the Court to analyze the second settlement in light of

24   those violations of the automatic stay calls -- might call

25   for something that is sort of akin to or part of what would

Page 34

1   be a reasonableness hearing as to whether something's

2   appropriate or not.  Whether there was some inappropriate

3   leverage as a result of improper actions in violation of the

4   automatic stay, that that's really something for the state

5   court to consider in the first instance between these two

6   non-debtors.  But then I'd want to make an appropriate

7   record for the state court to assess it and that they don't

8   have any doubts about what it means -- all these events mean

9   from bankruptcy point of view.

10          And that's why I think it might be relevant that

11  it's not a meaningless act to do that so that the state

12  court could say we didn't know anything about this.  And so

13  we'll assess what it all means or doesn't mean, but the

14  bankruptcy court has told us -- now given us direction about

15  what -- how to consider for purposes of the bankruptcy.

16          MR. YOUNGBLUT:  And Your Honor, that seems like,

17  between the two of these, that that's the direction Your

18  Honor wants to go.  I would respectfully request that any

19  ruling or order from this court be equally clear as to what

20  I call the latter three targets of Ace American's motion,

21  i.e. the second settlement agreement.  Your Honor, we feel

22  very strongly that all those things occurring well after --

23  clearly after the stay relief order was entered on April 5,

24  2021, that those are not stay violations.  And Your Honor, I

25  think the concern from our side --

1              THE COURT:  Well -- yeah, go ahead.

2              MR. YOUNGBLUT:  Oh, I was just going to say the

3    concern from our side, Your Honor, is that the -- having a

4    federal court's declaration or ruling that the first

5    settlement agreement and the default judgment violate the

6    stay can really be sort of used to confuse the notion in the

7    state court.  As Your Honor pointed out, state courts are --

8    they're jacks --

9              THE COURT:  Well --

10             MR. YOUNGBLUT:  -- of all trades, right?  They're

11   doing divorces (indiscernible) --

12             THE COURT:  Yes, and no.

13             MR. YOUNGBLUT:  Yes, Your Honor.

14             THE COURT:  I mean, but it's pretty clear that

15   they are, right?  So I don't really see any version of this

16   where the -- I would conclude otherwise.  And so from your

17   point of view having me not issue an order saying that the

18   third one is a violation of the automatic stay is somewhat

19   of a victory.  But at the same time, you know, I trust the

20   state courts to have an appropriately sophisticated view of

21   things and to say, well, we'll sort of figure this out.

22             And there may be rulings we've made before or not,

23   and counsel can come back, and we'll do what we're going to

24   do in terms of it.  But I have trouble separating out the

25   reasonableness of the settlement from the issues that are

Page 36

1    being raised here about, well, you know, maybe because of

2    the default and the ability to use the default, that's why

3    someone ended up with this settlement.  And then the second

4    settlement was really the first settlement, and that's all.

5    And so I don't know that I have a clear path in the case law

6    to actually say that that second settlement under these

7    facts is a violation of the automatic stay.

8            But I do have concerns about whether the first two

9    events, which I think are void ab initio, were somehow part

10   and parcel of the decision-making process where people ended

11   up in a certain spot.  And again, I don't know that.  And

12   for me to make that decision, I'm also then moonlighting as

13   a state court judge who has -- who sees cases like this all

14   the time and says, no, I know how to consider these sort of

15   things and what I should think about for a settlement or not

16   settlement, and reasonableness, or -- and all that sort of

17   stuff so under the applicable state law statutes.

18           So that's the other reason why I just think I'm

19   going to -- I would -- I bump into that.  And that probably

20   not the best place for me to be.  So anything else, counsel?

21           MR. YOUNGBLUT:  No, Your Honor.  I think -- just

22   to wrap up real quickly, I think, you know, Your Honor,

23   you've made yourself very clear with respect to the default

24   judgment and the first settlement agreement.  I understand

25   Your Honor.  You know, I would just again respectfully

Page 37

1    request that any ruling -- I don't think it's far out of

2    bounds to say the second settlement agreement is not a

3    violation of the automatic stay.  And then that leaves the

4    issue of, well, is the second settlement agreement

5    reasonable?  Was it obtained as a result of coercion or

6    harassment or threats?  That leaves all of those issues

7    appropriately with the state court, but at least sets the

8    record clear as to what all -- who therefore has the

9    bankruptcy implications of the various five events that Ace

10   American is challenging.  And with that, Your Honor, I'm

11   happy to rest.

12          THE COURT:  All right.  And before I ask for any

13   final remarks from Chubb, I didn't know if the Debtor had

14   anything that it wanted to express on the record.  After

15   all, the automatic stay is something meant to protect the

16   Debtor.  And I know that there was an agreement between

17   Chubb and the Debtor here.  And so with that, anything from

18   Debtor's counsel?

19          MR. DIDONATO:  Thank you, Your Honor.  Again, for

20   the record, Phil DiDonato, Weil Gotshal for the Debtors.  We

21   don't have a position to take on this dispute.  We -- as I'm

22   sure you noticed, we didn't file anything in connection, and

23   so we're really here just to observe today.  Happy to answer

24   any questions you have, but nothing from us at this time.

25          THE COURT:  All right.  And I guess in taking that

Page 38

1   no position -- position of no position, that it's -- it

2   doesn't impact the Debtor's states or cases in any way,

3   shape, or form?

4           MR. DIDONATO:  That's correct, Your Honor.

5           THE COURT:  All right.  Thank you.  All right.

6   With that, let me hear any final remarks or rebuttal remarks

7   from counsel for Chubb.

8           MS. HEITZENRATER:  Thank you, Your Honor.  I just

9   have one thing that sort of came to me as you were having

10  your colloquy with Mr. Youngblut, which is that when the

11  stay was extended to Miguel in January of 2019, that should

12  have stopped the action.  So when the stay relief order was

13  entered, the parties should have been in the position that

14  they were in, in January of 2019.  They clearly were not.

15          So essentially what we are asking for this Court

16  to do is to put the parties in the position that they should

17  have been in, in January of 2019 -- or I'm sorry, when the

18  stay relief order was entered, which is as it was in January

19  of 2019.  And I think that the Court has the jurisdiction to

20  do that, has a rising under jurisdiction to enforce the

21  automatic stay, and to ensure that -- you know, that the --

22  there is an essentially a road map for future claimants to

23  take similar actions to simply ignore the protections of the

24  Bankruptcy Code.

25          THE COURT:  Well, I guess my struggle with that is

Page 39

1   that I haven't found cases that actually go down that road

2   where essentially the stay -- the argument from the other

3   side is that the stay is essentially harmless or deminimis.

4   Again, I'm not saying that.  So for the first and second

5   event, I'm finding that they're void ad initio because they

6   clearly are.  So I'm not finding sort of a Tracing case that

7   goes as far as you want me to go.

8          And the other thing I'm concerned about is the

9   cases that -- and you have to be very careful about laying

10  down hard and fast rules in this area because the minute you

11  think you understand all the potential fact patterns, a new

12  one pops along, this case being a good case in point.  And

13  so -- but most of the cases that sort of take I would say

14  more attenuated steps, but I'm struggling with how else to

15  say it, but more aggressive steps on the automatic stay tend

16  to be ones that where you've got an implication on the

17  Debtor's estates or the case or the plan.

18          And I don't have that here.  So in bankruptcy

19  they've always -- you know, it's always sort of a -- kind of

20  a theory that you always have to be wary of someone invoking

21  somebody else's equities.  And so I understand your

22  frustration from your client's point of view, but at the

23  same time, you know, there's a question about, well,

24  couldn't they just turn around enter into the same

25  settlement now?  And you know, I don't think there's

Page 40

1    anything that would prevent them from doing that.  So the

2    most I -- so that's why I'm sort of stumbling towards or

3    leaning towards a view where essentially I make clear what

4    my bankruptcy judge views are on the way things went down,

5    what was proper and what was improper, and then how that

6    impacts the decision.  The reasonableness is something for

7    the state court to assess.  Because I -- so if you had a

8    case that you wanted me to look at for purposes of this

9    Tracing/fruit-of-the-poisonous-tree kind of doctrine, what

10   case would you ask me to look at?

11           MS. HEITZENRATER:  Well, Your Honor, while we are

12   focused on candor to the Court, we haven't cited one because

13   we haven't found one either.  So I do think that these are

14   tricky issues.  It is a very unique fact pattern, and we

15   appreciate Your Honor grappling with them in the way that

16   you clearly are.  It is certainly our position that you have

17   the authority to enter the relief that we're requesting

18   under 28 USC 1334, but I unfortunately do not have a case to

19   point you to that has done this before.

20           THE COURT:  All right.  And I guess -- thinking

21   along those lines, I guess the argument that you have is,

22   Judge, we don't really know how these things are going to

23   work out in the fullness of time and whether they're going

24   to have an impact on the Debtor's estate or not.  And -- but

25   people don't know that at the time.  And so you can't reward

Page 41

1    people for violating the automatic stay.  And obviously,

2    that's not my intent at all.  That's why I think any order

3    coming out of this has to make clear that those first two

4    events, in fact, are void ab initio.  Because if nothing

5    else, it helps the state court understand how these things

6    work for any future cases that may come up and gets the word

7    out.  So, all right.  Anything else, counsel?

8              MS. HEITZENRATER:  Not from me, Your Honor.  Thank

9    you.

10             THE COURT:  All right.  And Mr. Williams, again,

11   because we're not here in-person where you can lean over and

12   talk to each other, I don't know if you had anything else

13   you wanted to add.

14             MR. WILLIAMS:  No, Your Honor.

15             THE COURT:  All right.

16             MR. WILLIAMS:  Thank you.

17             THE COURT:  All right.  I do look forward to

18   seeing you all some day in court in person.  That would be

19   nice.  So I'm going to take this matter under advisement and

20   endeavor to get you all an answer promptly.  This saga has

21   been playing out for an extended period of time, and so I

22   don't have a -- you know, I'm cognizant that you don't want

23   to delay it even further.  But I will endeavor to get you an

24   answer promptly.  And what I'll probably do is have chambers

25   contact you all and then let you know when I'm going to read

Page 42

1  a decision onto the record, a bench ruling.  So -- but we'll

2  be in touch promptly.  And with that, the matter is

3  submitted.

4            And so with that, I will go back to Debtor's

5  counsel to ask if there's anything else that we need to

6  address here on the record today.

7            MR. DIDONATO:  Thank you, Judge.  Nothing further.

8  Appreciate your time as always, and look forward to seeing

9  you next time.

10           THE COURT:  All right.  And by the way, I will

11 say, since I've been trying to get the word out to counsel,

12 my -- speaking of being in-person or not being in-person, my

13 intent if COVID cooperates, and that's something I shouldn't

14 even say out loud, is to try to really set up hybrid

15 hearings in the not-too-distant future where people then can

16 participate however they want to participate.

17           I recognize that cases can benefit from getting

18 people together for negotiations.  I had a case just the

19 other day where it was so clear that people would've

20 benefited from being in the courtroom.  So that's my intent.

21 If the COVID numbers behave and stay the way are or go down,

22 to try to do that so that people can say, you know, I'm

23 going to be here in-person.  Or they can say, no, I don't

24 feel so good, so I'm going to stay home and participate by

25 Zoom.

Page 43

1          But we can just deal with whatever is appropriate.

2     And you all then can decide based on your cases whether you

3     want to be here in-person and sort of get the word out.

4     Because you know, frankly, much better than I do as to

5     whether that kind of in-person communication is useful or

6     not.  I just figured I'd let you know I think judges are

7     pretty much -- and courts are pretty much all over the map,

8     I think, on things.  But that's my hope is to basically have

9     our cake and eat it too.  So that way people don't have to

10    worry am I on an in-person day or a COVID day.  No, you just

11    come however you feel comfortable consistent with your

12    medical situation.  So that's the hope in the not-too-

13    distant future, but we'll keep you informed.  And with that,

14    thank you very much and we'll be in touch soon about a bench

15    ruling.

16          MR. DIDONATO:  Thanks, Judge.

17          MS. HEITZENRATER:  Thank you, Your Honor.

18          MR. YOUNGBLUT:  Thank you, Your Honor.

19          (Whereupon these proceedings were concluded at

20    3:03 PM)

21

22

23

24

25

Page 44

1                          I N D E X

2

3                              RULINGS

4                                              Page        Line

5

6    Fee Examiner Motion Granted                9           18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 45

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 7, 2022