**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                          :
                                               :         **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*      :
                                               :         **Case No. 18-23538 (SHL)**
                                               :
          Debtors.[1]                          :         **(Jointly Administered)**
-------------------------------------------------------------x

## AFFIDAVIT OF PUBLICATION

I, Liz Santodomingo, depose and say that I am employed by Kroll Restructuring Administration LLC ("***Kroll***")[2], the claims and noticing agent for the Debtors in the above-captioned chapter 11 cases.

This Affidavit of Publication includes sworn statements verifying that the Notice of the Occurrence of Effective Date as conformed for publication, was published in the national edition of *New York Times* on November 3, 2022, as described on **Exhibit A** attached hereto.

*[Remainder of page intentionally left blank]*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Effective March 29, 2022, Prime Clerk LLC changed its name to Kroll Restructuring Administration LLC.

Dated: November 8, 2022

*/s/ Liz Santodomingo*
Liz Santodomingo

State of New York
County of New York

Subscribed and sworn to (or affirmed) before me on November 8, 2022, by Liz Santodomingo, proved to me on the bases of satisfactory evidence to be the person who executed this Affidavit.

*/s/ OLEG BITMAN*
Notary Public, State of New York
No. 01BI6339574
Qualified in Queens County
Commission Expires April 4, 2024

SRF 65163

**<u>Exhibit A</u>**



**The New York Times**

620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

November 03,  **20**22

I, Shannon Schmidt, in my capacity as a Principal Clerk of the Publisher of **The New York Times** a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of **The New York Times** on the following date or dates, to wit on

November 03, 2022- pg. B3 (NYT & Natl)

*Shannon Schmidt*

Sworn to me this 3rd day of
November, 2022

*Ellen Herb*

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**ELECTIONS | LEGAL**

# In the Homestretch, Falsehoods Circulate Over Vote Problems



A drop box in Maricopa County, Ariz., a focal point of conspiracy theorists around the 2020 election. Claims of ballot-stuffing at drop boxes have resurfaced.

REBECCA NOBLE FOR THE NEW YORK TIMES

FROM FIRST BUSINESS PAGE

app TikTok and social media sites popular with right-wing users like Truth Social, Rumble and Telegram, according to the data research firms Zignal and Graphika and researchers.

"People are primed, much more mobilized and more soaked in conspiracy theories," said Mike Caulfield, a research scientist who studies election misinformation at the University of Washington's Center for an Informed Public.

Here are some of the most widespread falsehoods and rumors related to voting.

## No, voting machines aren't rigged.

President Donald J. Trump and his allies falsely claimed in 2020 that ballot-tabulating machines had changed votes for him to votes for Joseph R. Biden Jr. They claimed the voting machines were connected to the internet, allowing corrupt election officials and outsiders to tamper with the equipment.

While voting machines sometimes encounter programming errors, they are rare, and the equipment is tested before and after Election Day, election officials said. For example, in Maricopa County, Ariz., a political battleground and focal point of conspiracy theorists around the 2020 election, four independent auditors check the security of the equipment, which does not connect to the internet.

Even so, falsehoods about the machines have picked up online in recent weeks.

On Twitter, "voting machines" has been a top voting-related narrative related to the midterm elections, with more than 89,888 mentions in October, nearly double the 49,765 mentions during the same month in 2021 but down from 191,391 in October before the midterm elections in 2018, according to Zignal.

Last month, a Wisconsin state representative said voting machines in the state were connected to the internet. Equipment makers and security experts rejected the claim, but Mr. Trump seized on the falsehood and posted the Wisconsin official's statement on

Truth Social, his social media site.

"Rigged Election, what a mess," he wrote. The post was shared more than 5,000 times and liked more than 13,000 times.

Mike Lindell, the chief executive of MyPillow and a Trump supporter, was featured last week in several interviews on the videosharing site Rumble saying that voting machines were connected to the internet and had been tampered with to steal elections. One of his interviews on Rumble was viewed more than 20,000 times.

## No, ballot fraud isn't rampant.

Over the past month, there were more than 365,592 mentions of "voter fraud" on Twitter, up 25 percent from October 2018, according to Zignal.

Claims of voter fraud have often centered on ballot drop boxes. One false theory involves Democrats paying people to stuff the boxes with illegal ballots. The idea was stoked by the May release of the film "2000 Mules," which asserted with little evidence that illegal drop box stuffing took place. In September, the filmmaker and conservative group True the Vote released a 25-minute video online hoping to bolster the claims.

Conspiracy theories about the handling of ballots by election officials are also circulating on social media. According to one unsubstantiated theory, election officials are purposely confusing voters over the kinds of pens that can be used to mark ballots — and declaring that ballots marked with Sharpie pens aren't counted.

Those false claims, which have

circulated since 2020, resurfaced in July when a Maricopa County election office sent an advisory suggesting that voters use felt-tip pens on their ballots. The advisory created a backlash online, with several voters posting on Twitter and Facebook that they would instead use blue ballpoint pens because they worried that ballots marked with felt-tip pens provided at polling stations would not be counted.

## No, dead people and illegal immigrants aren't being exploited.

False rumors of voting by dead people and illegal immigrants have long circulated, including after the 2020 election in states such as Arizona, Virginia, Nevada, Pennsylvania, Michigan and Georgia. In all of these states, a small fraction of ballots were cast in the names of dead individuals.

The trope has reared its head again online ahead of the midterms.

Politicians including Representative Matt Gaetz, Republican of Florida, have recently said without evidence that Democrats want immigrants who are in the

United States illegally to vote.

"Any illegal alien who attempts to vote in our elections should be arrested and deported," Mr. Gaetz tweeted on Sunday. His post was shared more than 7,000 times and liked more than 48,000 times.

Last week, Texas Scorecard, a self-described citizen journalism group, posted a video on YouTube claiming without evidence that Beto O'Rourke, the Democratic candidate for governor in Texas, had sent pre-filled voter registration applications to dead people. Texas officials validate all voter registration applications. The video was viewed 5,000 times.

## No, voting by mail isn't untrustworthy.

Some Republican candidates and voters are using social media to cast doubt on whether ballots sent by mail or submitted into drop boxes are counted. "Mail-in voting" and "mail-in ballots" have been mentioned over 338,528 times in the past month on Twitter, up from 137,507 in the October 2021 and 114,039 in October 2018, according to Zignal.

Conspiracy theorists also seized on a story last month of the

burning of a mail truck that was allegedly carrying ballots in Georgia. Images of the burning truck were spread across social media as a sign of cheating in the election, even though an election official later said there were no ballots on the truck.

Social media users have used such incidents to warn against mail-in voting. The hashtag #GetOutAndVoteInPerson has spread widely on Telegram from communities with pro-Trump, Christian, military and election conspiracy theory leanings, said Kyle Weiss, a researcher at Graphika.

Voting by mail has taken place for more than 150 years, and fraud is extremely rare, according to the Brennan Center, a nonprofit voter rights organization. In rural areas and for low-income and disabled voters, voting by mail is often the only option. Rules for mail-in voting and the use of drop boxes vary by state.

## No, delays in counting votes are not irregularities.

Official results for many races on Tuesday won't be announced that night and may not be for days because the counting of votes could take longer. Some social media users are focusing on potential counting delays to raise suspicions of election irregularities, state officials and voting experts said.

Last Thursday, Senator Ted Cruz, Republican of Texas, responded to a news report that Pennsylvania's top elections official expected official vote counting to take days. "Why is it only Democrat blue cities that take 'days' to count their votes?" he tweeted. "The rest of the country manages to get it done on election night." The tweet was shared more than 5,500 times and liked 19,200 times.

Tallying a final count typically takes days in some states because of the many mail-in votes. In Pennsylvania, officials can begin counting mail-in ballots only on Tuesday morning. In Arizona, election officials said the count could take more than a week because a bipartisan processing board had to certify mail-in ballot signatures. If any ballots are questioned, the law allows five days for the ballot to be reviewed and tallied.

---

# CVS and Walgreens Near $10 Billion Deal to Settle Opioid Lawsuits

FROM FIRST BUSINESS PAGE

Law School.

Citing recent court decisions, she added: "Things weren't looking super for them, so it makes sense that they were finally coming to the table. And I'm guessing the rest of the defendants are going to follow."

In a sign that others may indeed follow, a person familiar with the negotiations said that Walmart had agreed to pay $3.1 billion in its settlement negotiations. The company declined to comment.

"We're a lot closer to the end today than we were yesterday," said Jayne Conroy, a lawyer on the negotiating committee who represents cities and counties.

CVS and Walgreens disclosed the tentative agreement in government filings. Finalization is conditional on an overwhelming majority of plaintiffs signing on, they said.

Josh Stein, the attorney general of North Carolina, who is on the executive committee of states handling the negotiations, confirmed the company's announcements. "While significant work remains, a broad coalition of states, in cooperation with lawyers representing the subdivisions, is making progress in our negotiations with CVS and Walgreens, and we are hopeful that we will be able to reach a final agreement on all terms," he said.

As litigation and settlement talks inched to conclusion, the opioid crisis continues to worsen. Overdose deaths — now largely from illicit street opioids like fentanyl and counterfeit prescription pills — rose to record levels last year, according to federal data.

Of the groups of defendants in the opioid litigation, the pharmacies were the last to be named and often the most eager to test the strength of their arguments in court. But in August, a federal judge ordered CVS, Walgreens and Walmart to pay $650 million to two Ohio counties. As the companies sensed that things weren't going their way, they also settled other cases brought in Florida and West Virginia and by two New York counties.

For years, the pharmacies maintained that they bore no responsibility for the epidemic — that they had only filled prescriptions of government-approved medications ordered by doctors.

But plaintiffs' lawyers argued that companies had turned a blind eye to the vast quantities of prescription opioids they were dispensing and the potential for diversion, ignoring warning flags.

Both CVS and Walgreens said their settlement agreements represented no admission of wrongdoing.

CVS said that under the agreement, the company would pay $4.9 billion to states and municipalities over the next 10 years and about $130 million to tribes.

"We are pleased to resolve these longstanding claims, and putting them behind us is in the best interest of all parties, as well as our customers, colleagues and shareholders," said Thomas Moriarty, the chief policy officer and general counsel for CVS Health. "We are committed to working with states, municipalities and tribes, and will continue our own important initiatives to help reduce the illegitimate use of prescription opioids."

Walgreens said it would pay $4.79 billion over 15 years to the states and $154.5 million to the tribes. It would also pay $753.5 million in lawyers' fees and costs over six years. (CVS did not disclose what it would pay lawyers.)

"This settlement framework will allow us to keep our focus on the health and well being of our customers and patients, while making positive contributions to address the opioid crisis," Walgreens said in a statement.

It is unclear how many states, municipalities and tribes will agree to these proposals, particularly given how protracted and contentious negotiations have been.

Walgreens's announcement does

not resolve a trial, starting Monday in San Francisco federal court, to determine the amount the company must pay to the city and county, which are seeking $8.1 billion over 15 years, to abate the cost of the ongoing opioid epidemic. Walgreen's deal also doesn't encompass a recently concluded New Mexico trial before a state judge, who has yet to issue a decision.

Although lawsuits against a number of companies still remain, with the announcement of the CVS and Walgreens deals, attention will be shifting to how the funds will be distributed and used.

Ms. Conroy said that some initial funds from earlier settlements had already been sent to communities and that, with the allocation structure in place dictating the portion each state and its municipalities get, the funds would only grow as resolutions continued.

But Ms. Lahav said that despite billions of dollars in settlements having already been announced, "They are a drop in the bucket compared to the damage, which is ongoing and massive."

And she said that although the ongoing epidemic has largely shifted to black market drugs, it began more than 20 years ago with the abuse of the government-

approved medications. "When you have a regulatory process that fails, sometimes there just isn't enough funding to cover the costs," she said.

The interests are being offered as a single lot, "as is, where-is", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party and each bidder must make its own inquiry regarding the Interests. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties, and similar taxes incurred in connection with the purchase of the Interests.



Walgreens said it would pay $4.79 billion over 15 years to state governments and $154.5 million to tribes.

JOHN TAGGART FOR THE NEW YORK TIMES

### NOTICE OF SALE
SUPREME COURT COUNTY OF NEW YORK, NYCS 1996-2 TRUST, AND THE BANK OF NEW YORK MELLON AS COLLATERAL AGENT AND CUSTODIAN FOR THE NYCS 1998-2 TRUST, Plaintiff, vs. LL STORAGE LLC, ET AL., Defendant(s).

Pursuant to a Judgment of Foreclosure and Sale dated June 17, 2022 and duly entered on July 1, 2022, I, the undersigned Referee will sell at public auction at the portico of the New York County Courthouse, 60 Centre Street, New York, NY on December 7, 2022 at 2:15 pm, premises known as 466 East 79th Street - Storage Unit 21E, New York, NY 10075. All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, Block 1472 and Lot 1202. Approximate amount of judgment is $389,235.54 plus interest and costs. Premises will be sold subject to provisions of filed Judgment Index # 850123/2020. COVID-19 safety protocols will be followed at the foreclosure sale.

Brian Lederman, Esq., Referee
Browne, LLP, 156 West 56th Street, Suite 902, New York, New York 10019, Attorneys for Plaintiff

**UCC Public Sale Notice**
Please take notice that Jones Lang LaSalle Americas, Inc. ("JLL"), on behalf of AVONE COMMERCIAL REAL ESTATE DEBT MASTER FUND, L.P. a Cayman Islands exempted limited partnership (the "Secured Party"), offers for sale at public auction on January 12, 2023 at 10:00 am EST on the front steps of the New York County Supreme Court Building, located at 60 Centre Street, New York, New York 10007, as well as via remote participation via videoconference via Zoom videoconference, in connection with a Uniform Commercial Code sale, 100% of the limited liability company membership interests in PLAYS EAST BUILDING 4 LLC, a Delaware limited liability company (the "Mortgage Borrower"), which is the sole owner of the property (the "Property") commonly known as the Flats at East Bank, located at 1055 Old River Rd, Cleveland, Ohio 44113 (the "Interests"). The Interests are owned by Plats East Building 4 Member LLC, a Delaware limited liability company, which has pledged 100% of its interests in the Mortgage Borrower to secure the obligations of Plats East Building 4 Member LLC, 950 Main Ave, Suite 190, Cleveland, Ohio 44113-7206 (the "Mezzanine Borrower").

The Secured Party, as secured party, intends to sell the Interests to the highest qualified bidder in connection with a public UCC foreclosure. The sale of the Interests is being conducted to enforce the rights of the Secured Party with respect to, and in accordance with, the terms of that certain Mezzanine Loan Agreement. The Secured Party is offering the Interests for sale in connection with the foreclosure on the pledge of such Interests. The Interests are being offered subject to all requirements and restrictions as provided in that certain Membership Interest Pledge and Security Agreement. The sale of the Interests is subject to additional terms of sale as may be announced at the time of the sale. Interested parties who do not contact JLL to express interest may be barred. Further information regarding the terms of sale and bidding on the Interests, and the foreclosure sale, can be obtained by contacting JLL using the contact information below.

Contact Information for Jones Lang LaSalle Americas, Inc.: Brett Rosenberg, (212) 812-5926, brett.rosenberg@jll.com

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

In re SEARS HOLDINGS | Chapter 11
CORPORATION, et al., | Case No. 18-23538 (SMB)
Debtors. | (Jointly Administered)

**NOTICE OF ENTRY OF ORDER GRANTING MOTIONS**

On October 11, 2019, the Honorable Robert D. Drain of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered the Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan Of Sears Holdings Corporation And Its Affiliated Debtors and (II) Granting Related Relief [Docket No. 5370] (the "Confirmation Order") confirming the Second Amended Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors [ECF No. 5293] (including all exhibits and schedules thereto, and as may be further amended, supplemented, or modified the "Plan").

PLEASE TAKE NOTICE that on October 15, 2022, all conditions precedent to the Effective Date of the Plan were satisfied or waived in accordance with the Plan and the Plan was substantially consummated. Accordingly, the Effective Date of the Plan has occurred. All of the Effective Date, the permanent injunction set forth in Article X.F of the Plan became effective.

PLEASE TAKE FURTHER NOTICE that pursuant to the Plan Injunction, except as expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or interests in any or all of the Debtors are permanently enjoined from taking any of the following actions against the Debtors or their property: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of any such Claim or interest; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors on account of any such Claim or interest; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Debtors or the property or interests in the property of the Debtors on account of any such Claim or interest; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of any such Claim or interest, to the extent permitted by applicable law.

The Plan (as well as all related documents) are available free of charge by accessing the website of the Debtors' claims and noticing agent, Prime Clerk LLC at https://restructuring.primeclerk.com/sears or by calling (844) 384-4460 (Toll Free) or +1 (347) 859-8446 (International). You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at http://www.nysb.uscourts.gov.

Dated: October 17, 2022, New York, New York. WEIL, GOTSHAL & MANGES LLP, 767 Fifth Avenue, New York, New York 10153, Ray C. Schrock, P.C., Jacqueline Marcus (admitted pro hac vice), Garrett A. Fail, Sunny Singh. Attorneys for Debtors.