**Hearing Date/Time: May 17, 2023 at 11:00 a.m.**
**Objection Deadline: May 5, 2023 at 4:00 p.m.**

**HALPERIN BATTAGLIA BENZIJA, LLP**
Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Email: ahalperin@halperinlaw.net
Email: dlieberman@halperinlaw.net

*Counsel to Relator Carl Ireland,*
*Administrator of the Estate of James Garbe*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
In re                                                                 :
                                                                          :      Chapter 11
SEARS HOLDINGS CORPORATION,                   :
                                                                          :      Case No. 18-23538 (SHL)
           Liquidating Debtor.[1]                              :
                                                                          :
---------------------------------------------------------- x

**AMENDED MOTION OF RELATOR CARL IRELAND, ADMINISTRATOR OF THE ESTATE OF JAMES GARBE, FOR AN ORDER: (I) DETERMINING THE VALUE OF THE COLLATERAL SECURING THE CLAIMS OF CO-MORTGAGEES RELATOR AND THE UNITED STATES AS OF THE DATE OF SALE OF SUCH COLLATERAL; (II) DETERMINING THE AMOUNT OF ANY DIMINUTION IN THE VALUE OF SUCH COLLATERAL THEREAFTER; (III) ALLOWING THE SECURED AND SUPERPRIORITY ADMINISTRATIVE CLAIMS OF RELATOR AND THE UNITED STATES; (IV) DIRECTING PAYMENT OF SUCH ALLOWED SECURED AND SUPERPRIORITY ADMINISTRATIVE CLAIMS; AND (V) GRANTING RELATED RELIEF**

**TO THE HONORABLE SEAN H. LANE,**
**UNITED STATES BANKRUPTCY JUDGE:**

---

[1] On January 11, 2023, the Court entered the Order (I) Entering Final Decree closing Certain of the Chapter 11 Cases and (II) Granting Related Relief [D.N. 10776], closing the affiliated chapter 11 cases and directing that all motions, notices, and other pleadings relating to any of the affiliated debtors (Sears Holdings Corporation and its affiliated debtors being the "Debtors") be filed in this case. The location of the Liquidating Trust for the Debtors is c/o M3 Advisory Partners, LP, 1700 Broadway, 19th Floor, New York, NY 10019.

On August 21, 2019, Relator Carl Ireland, Administrator of the Estate of James Garbe ("Relator") made a motion pursuant to sections 105(a), 361, 363(e), 506(a), and 507(b) of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 3012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and certain Orders of this Court, seeking the entry of an order: (i) determining the value of Relator's collateral, and hence, the value of Relator's secured claim, as of the sale of such collateral pursuant to the Sale Order (defined below); (ii) determining the amount of any diminution in the value of the collateral thereafter; (iii) directing payment of Relator's secured and superpriority administrative claims;[2] and (iv) granting related relief [D.N. 4931] (the "Original Motion").

The Debtors' time in which to respond to the Original Motion was extended several times at the request of the Debtors, and a response was filed on March 18, 2020 [D.N. 7471] (the "Response"). Relator filed a reply on April 17, 2020 [D.N. 7828] ("Relator's Reply") and, a few days later, Relator's co-mortgagee, the United States, filed a Letter on Behalf of the United States of America to Join in the Motion Filed by the Relator Carl Ireland to the Extent He Seeks Adequate Protection for the Relator and the Government [D.N. 7836] (the "Government's Letter").

The hearing to consider the Original Motion was likewise adjourned several times by agreement of the parties, initially while the parties discussed the possibility of settlement, and later without date in recognition of the fact that the Debtors did not have enough cash for the Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the "Plan") to become effective. The Plan was confirmed by Order dated October 15, 2019

---

[2] Relator's co-mortgagee with respect to the collateral is the United States of America, as more fully discussed in the Statement of Facts.

[D.N. 5370] (the "<u>Confirmation Order</u>"), but the Effective Date did not occur until October 29, 2022, more than three years later.

Relator submits this Amended Motion for an Order: (I) Determining the Value of the Collateral Securing the Claims of Co-Mortgagees Relator and the United States as of the Sale of Such Collateral; (II) Determining the Amount of Any Diminution in the Value of the Collateral Thereafter; (III) Allowing the Secured and Superpriority Administrative Claims of Relator and the United States; (IV) Directing Payment of Such Allowed Secured and Superpriority Administrative Claims; and (V) Granting Related Relief (the "<u>Amended Motion</u>"). Relator has amended the Original Motion to reflect developments in the bankruptcy cases since the filing of the Original Motion, and to include information set forth in the Response, Relator's Reply, and the Government's Letter. In support of the Amended Motion, Relator respectfully states as follows:

<u>**OVERVIEW**</u>

1.      Relator, together with the United States of America (the "<u>Mortgagees</u>"), is party to the settlement of a litigation against certain of the above-captioned debtors (together with their affiliated debtors, the "<u>Debtors</u>") that was brought under the federal False Claims Act and analogous State statutes. The settlement agreement (the "<u>Settlement Agreement</u>"), which was approved by the United States District Court, Southern District of Illinois, resolved claims of $375 million in damages and $110 billion in statutory penalties for $59 million.

2.      As of the commencement of the Debtors' bankruptcy cases, more than $26 million remained due under the Settlement Agreement, and a portion of the Debtors' payment obligation was secured by a perfected first mortgage lien, held by Relator and the United States as co-mortgagees, on real property known as Sears Distribution Center #8975 in Puerto Rico

(defined below as the Puerto Rico Property) and the proceeds of the same. Relator's proof of claim reflects that the secured portion of the claim as of the bar date was at least $18,190,144.82 (the "Secured Claim"), based on the $17.4 million face amount of the mortgage, plus (per the mortgage note) 1.5% interest per year and attorneys' fees.

3.      Relator has asserted and protected the Secured Claim and related rights throughout these bankruptcy cases. At the onset of the cases, Relator objected to the priming or dilution of the mortgage lien under the DIP Orders (defined below) and, as a result of that objection, protections were added to both the Senior and the Junior DIP Orders. Each of the DIP Orders states in pertinent part that: "[n]othing herein, including the Carve-Out, shall be deemed to prime or be otherwise made senior or *pari passu* to any valid, perfected and non-avoidable security interests or liens" of Relator or the United States in the Puerto Rico Property" [D.N. 955, ¶ 65; D.N. 1436, ¶64].

4.      Relator similarly sought to protect his rights in connection with the proposed sale of the Debtors' assets, and filed an objection stating that he did not consent to the sale of the Puerto Rico Property absent payment in full of the mortgage obligations at the closing of the sale. The Court approved the sale of the Debtors' assets, including the Puerto Rico Property, but recognized that the Mortgagees were entitled to protection of the value of their Secured Claim. Judge Drain therefore included language in the Sale Order (defined below) granting the Mortgagees replacement liens on proceeds from the sale of the Puerto Rico Property and adequate protection in the form of a superpriority administrative claim. *See* Sale Order [D.N. 2507], ¶ 71. The Sale Order also specifically authorized the Mortgagees to bring by motion before this Court the issues of the value of the Puerto Rico Property, the allocation of sale proceeds with respect to that property, and other, related disputes.

5.       According to the Debtors' public statements and filings with this Court, the sale

transaction closed on February 11, 2019, and the total value of the consideration for the Debtors'

assets was in excess of $5.2 billion. A few weeks after the closing of the sale, Relator obtained

an appraisal of the Puerto Rico Property from the appraiser that the Debtors had previously used

in connection with the Settlement Agreement.  The new appraisal valued the property at more

than $22.7 million. Moreover, in May 2019, *the Debtors and their Buyer* (defined below) filed a

deed of transfer with the Puerto Rico Property Registry, which stated that the purchase price for

the Puerto Rico Property was $20,770,000.[3] While the appraised amount is somewhat higher

than the purchase price of $20,770,000 disclosed in the deeds of transfer, both the appraised

value and the purchase price disclosed by the Debtors and the Buyer are well in excess of the

amount of the Secured Claim.[4]

6.       After the Original Motion was filed, but before it was heard, a multi-day hearing

was held to consider the confirmation of the Debtors' Plan. The Debtors conceded in numerous

documents filed with the Court and at the confirmation hearing that they did not have sufficient

cash for the Plan to become effective and did not know when there would be sufficient funds.

The Debtors nonetheless sought the immediate entry of an order confirming the Plan.

7.       During the confirmation hearing, Relator raised doubts about whether the

Mortgagees were and would continue to be adequately protected, given the Debtors' lack of

sufficient cash and the uncertain nature of other assets, and the fact that the estates would be

---

[3] True and correct copies of both the deed of transfer and the appraisal are attached as Exhibit A (8) and Exhibit E (1), respectively.

[4] Approximately ten months after the bankruptcy sale transaction closed, the Debtors engaged a different appraiser to value the Puerto Rico Property. In a report issued in February 2020 and referenced in the Response to the Original Motion, that appraiser assigned a value of $16.9 million to the Puerto Rico Property. The Debtors noted in their Response that the difference between the appraisal obtained by the Debtors and that obtained by Relator is $5,180,000, and opined that settlement of the valuation question is "not an insurmountable task." Response [D.N. 7471], ¶ 16.

{00334408.4 / 1274-001 }

continuing to spend money and even making distributions to creditors junior in priority to the

Secured Claim of the Mortgagees in advance of the Plan's effective date. Under the

administrative settlement procedures that were finalized during the confirmation hearing, holders

of administrative claims that did not "opt-out" of the administrative settlement procedures could

begin to get partial distributions on account of their allowed administrative claims as early as

December 2019. In effect, distributions would be (and have been) made from the Mortgagees'

sale proceeds—not to the Mortgagees, but to holders of administrative claims that hold no liens

on assets or superpriority administrative claims.

8.      The Court ultimately confirmed the Plan, but in response to Relator's concerns,

granted the Mortgagees additional adequate protection. The confirmation order entered on

October 15, 2019 (the "Confirmation Order") provided the Mortgagees with adequate protection

in the form of liens on Total Assets (as defined in the Plan), in addition to and without altering

the rights, replacement liens, and superpriority administrative claims granted in the Sale Order.

*See* Confirmation Order [D.N. 5370], ¶ 65.

9.      During much of the three years and eight months between the closing of the sale

and the effective date of the Plan, monthly operating reports and then quarterly status reports

filed by the Debtors evidenced that tens of millions of dollars were leaving the bankruptcy

estates. At periodic status conferences in 2020, 2021, and 2022, the Debtors acknowledged that

they still did not have enough cash for their Plan to become effective.

10.     That did not change until the summer of 2022, when a settlement was reached

with, among others, Edward Lampert and related defendants, and the Debtors and the Committee

filed their "Joint Motion of Debtors and Official Committee of Unsecured Creditors for Entry of

an Order Approving Settlement Agreements, Granting Certain Related Relief and Authorizing

Certain Nonmaterial Plan Modifications in Furtherance of the Effective Date of the Plan" [D.N. 10566] (the "9019 Motion"). The 9019 Motion sought the approval of a settlement that would realize approximately $180 million for the Debtors and, per the 9019 Motion and related documents, would provide enough cash for the Plan to become effective.

11.     At a hearing before the Court on August 31, 2022, Judge Drain heard arguments regarding both the 9019 Motion and an application for substantial contribution that had been filed immediately after the 9019 Motion by an *ad hoc* group of administrative claimants [D.N. 10580]. (Relator filed a statement and reservation of rights with respect to the latter.) Judge Drain questioned the Debtors' professionals closely about the amounts that were needed for distributions and reserves in order for the Plan's effective date to occur, and made specific inquiry about the reserve of funds for the Secured Claim. The Court was advised that $18.2 million would be reserved for that claim. *See* August 31, 2022 hearing transcript [D.N. 10655]("9019 Settlement Transcript"), 37: 23-25; 38; 39: 3-13.  Excerpts from the 9019 Settlement Transcript are attached as **Exhibit B** hereto.

12.     The Effective Date of the Plan occurred on October 29, 2022, more than three and a half years after the sale of the Puerto Rico Property by the Debtors and more than three years after the entry of the Confirmation Order. *See* Notice of Occurrence of Effective Date [D.N. 10693]. And during that time, other claims, junior in right to the Secured Claim, have received payment on account of their claims while Relator still has received nothing. Relator respectfully submits that it is past time for the Secured Claim to be allowed and paid in full. For that reason, by this Amended Motion, Relator has updated his Original Motion to reflect recent events, and to

once again seek the allowance and payment of the Secured Claim to Relator and the United States.[5]

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. §157(b)(2), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. In addition, the Court retains jurisdiction over the matters addressed herein pursuant to paragraphs 65 and 67 of the Confirmation Order and Article XVI of the Plan.

14.     The statutory predicates for the relief requested herein are sections 105(a), 361, 363(e), 506(a), and 507(b) of the Bankruptcy Code, as supplemented by Bankruptcy Rule 3012, the DIP Orders, the Sale Order, and the Confirmation Order.

## STATEMENT OF FACTS

**(A)     The Basis of Relator's Claim**

15.     In July 2008, a Kmart pharmacist named James Garbe filed an action under the False Claims Act ("FCA") and analogous State statutes in the United States District Court, Central District of California, alleging that, since at least 2004, Kmart Corporation and its affiliates had been knowingly submitting false reimbursement claims for prescription drugs to government healthcare programs like Medicare Part D, Medicaid, and Tricare.[6] The case was subsequently transferred to the United States District Court, Southern District of Illinois, and

---

[5] The amount of the secured obligation continues to increase, as the mortgage documents secure payment of attorneys' fees and expenses in connection with the enforcement of the Mortgagees' rights (specifically including the enforcement of rights in a bankruptcy proceeding). Relator thus reserves his right to amend or supplement this Amended Motion to reflect such additional amounts as may have accrued or may continue to accrue until the claim is paid.

[6] The *qui tam* action commenced by Mr. Garbe under the FCA is colloquially known as a "whistleblower" case.

docketed as *United States ex rel. Garbe v. Kmart Corp.*, Case No. 12-cv-881 (the "District Court Action").

16.    In addition to Mr. Garbe, the plaintiffs in the District Court Action included the United States of America and numerous States.[7] The calculation of damages in the FCA case was in the range of $375 million in actual damages (after trebling) and $110 billion in statutory penalties. There was a significant amount of litigation, including motions for partial summary judgment by the defendant, the denial of those motions, and an unsuccessful appeal by the defendant to the Seventh Circuit. After losing before the Seventh Circuit (*see United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 627 (2017)), Sears, Kmart, and their affiliates engaged in settlement negotiations with the Plaintiffs. A settlement was ultimately reached between Relator, the United States, and numerous States, on the one hand, and Kmart Corporation and Sears Holdings Corporation, on the other. The parties subsequently executed a settlement agreement, which was approved by the District Court on January 19, 2018, and which is referred to in this Amended Motion as the "Settlement Agreement."[8] (Court approval of FCA settlements is required by statute.) A copy of the Settlement Agreement is **Exhibit 1** to the Declaration of Stephen M. Tillery (the "Tillery Declaration"), which is attached to this Motion as **Exhibit A**.

17.    Pursuant to the terms of the Settlement Agreement, Kmart and Sears were obligated to pay a total of $59 million in three installments. A payment of $20 million was due within 14 days of the Settlement Agreement's effective date of December 22, 2017, another

---

[7] On August 21, 2018, the District Court granted Relator's motion to substitute Carl Ireland, the Administrator of the Estate of James Garbe, as the Relator in the District Court Action.

[8] The docket of the District Court Action is available on PACER and the Order approving the Settlement Agreement appears at ECF D.N. 497.

{00334408.4 / 1274-001 }

payment of $20 million was due on the one year anniversary of the effective date, and a final

payment of $19 million was due on the second anniversary of the effective date.

**(B)     The Granting of Mortgages and Liens**

18.      The Settlement Agreement required Kmart and Sears to secure the second and

third payments by executing mortgages that would create first priority mortgage liens in favor of

Relator and the United States on two pieces of commercial real estate owned by the Debtors. *See*

Settlement Agreement, ¶ 2. The Settlement Agreement identified the two properties—(1) a

distribution center in Florida, and (2) a distribution center and warehouse (with an accompanying

outlet store) in Puerto Rico—and established a procedure for determining the face amounts of the

mortgages. Specifically, appraisals of the "as dark" values of the properties would be provided

by one of three appraisal firms (or another firm, if agreed to by the parties), and those "as dark"

values would be the face amounts of the mortgages.

19.      Sears provided Relator and the United States with an appraisal report that it had

obtained from one of the approved appraisers in 2017 for the property known as Sears

Distribution Center #8975, Cupey Bajo, San Juan, Puerto Rico (the "<u>Puerto Rico Property</u>"). The

appraiser, Cushman & Wakefield, worked with Pons & Lamadrid Appraisers in Puerto Rico, and

they jointly provided a report (the "<u>Initial Appraisal</u>") that set the "as dark" value of the Puerto

Rico Property at $17.4 million and the "as leased" operating value of the property at $22.1

million, as of February 2017.[9] The report was signed by Stephen E. Saunders of Cushman &

---

[9] Because Sears identified the Initial Appraisal as "confidential," it has not been attached to the Tillery Declaration. Relator is not aware of any reason for continuing to treat the report as confidential (or for treating it as confidential in the first instance) and has no objection to the release of the document. Alternatively, if the Liquidating Trust believes that there is a reason for the original appraisal report to be treated as confidential, Relator is prepared to stipulate to it being filed under seal, provided there are no restrictions on giving the report to this Court and using the report in any related hearings.

{00334408.4 / 1274-001 }

Wakefield Regional, Inc., and by Pedro A. Pons and Esteban Lamadrid of Pons & Lamadrid Appraisers. *See* Tillery Declaration, ¶¶ 5-7.

20.     The face amount of the mortgage for the Puerto Rico Property was thus fixed at the "as dark" value of $17.4 million, as required by the Settlement Agreement. The parties had their professionals prepare the additional documents needed to implement the Settlement Agreement, including the Mortgage Note, a mortgage note pledge and security agreement, and a certified deed of constitution of mortgage, the last being the document required to attach a mortgage lien to realty in Puerto Rico. *See* Article 57 of the Real Property Registry Act of the Commonwealth of Puerto Rico of 2015, Act Number 210 of December 8, 2015.[10] Copies of these documents (the "Mortgage Documents") are attached to Relator's proof of claim [Claim No. 15292], and are **Exhibits 2 through 4** to the Tillery Declaration.

21.     The Puerto Rico Property is comprised of two parcels, and certified copies of the deed of constitution of mortgage were filed at the Puerto Rico Real Property Registry on January 16, 2018 in connection with both of the parcels. *See* Tillery Declaration, ¶ 9. Relator received confirmation of the recordation of the notices—generally referred to as "recording slips"—via email from the Real Property Registry in July 2018. Pursuant to Article 229 of the Real Property Registry Act of the Commonwealth of Puerto Rico of 2015, Act Number 210 of December 8, 2015, the recording slips are issued only after the Registrar of Property has scrutinized the filed documents, and determined that all legal requirements have been satisfied and that the deed of constitution of mortgage is a legal, valid, and enforceable lien under the laws of the Commonwealth of Puerto Rico. A Notarial Act that translates the recording slips (the originals of

---

[10] Relator is advised by Puerto Rico-based counsel that the statutes referenced in paragraphs 20 and 21 hereof are not currently available in English online.

which are in Spanish) is attached to the Tillery Declaration as **Exhibit 5,** together with copies of the original recording slips. *See also* Tillery Declaration, ¶¶ 9-11. The Notarial Act is executed pursuant to Article 30, Act Number 75 of July 2, 1987, as amended, and Rules 37 and 38 of the Notarial Rules and Regulations adopted on August 1, 1995.

22.     Upon the issuance of the recording slips, the date of the filing of the deed of constitution of mortgage, January 16, 2018 became the effective date of recordation.[11] The Mortgage is therefore perfected under the laws of the Commonwealth of Puerto Rico as of that date, pursuant to Article 19 of the Real Property Registry Act of the Commonwealth of Puerto Rico of 2015, Act Number 210 of December 8, 2015. Title abstracts issued on August 1, 2019 for the two parcels (the "Title Abstracts") also evidence that the Mortgagees' mortgage lien was recorded on January 16, 2018 (well before the Debtors' bankruptcy filings) and further state that there are no other recorded monetary liens or mortgages on the Puerto Rico Property. The Title Abstracts are attached to the Tillery Declaration as **Exhibit 6**. *See* Tillery Declaration, ¶12.

23.     The Mortgage Documents, including the Mortgage Note and the deed of constitution of mortgage, evidence a first mortgage and liens on the Puerto Rico Property and all proceeds of the property (including, without limitation, any cash proceeds), and partially secure the Debtors' payment obligations under the Settlement Agreement. The Mortgage Documents also authorize mortgage interest at the rate of 1.5% per annum and the payment of attorneys' fees and expenses in connection with the enforcement of Mortgagees' rights, including in a bankruptcy proceeding, and explicitly secure those obligations as well.

---

[11] As set forth in the Tillery Declaration, litigation counsel to Relator worked closely with Puerto Rico-based real estate counsel to make certain that everything was done in compliance with the laws of Puerto Rico. *See* Tillery Declaration, ¶ 8.

{00334408.4 / 1274-001 }

24.     The liens on the Puerto Rico Property were timely and properly recorded in the appropriate municipality (San Juan) and, as of the Commencement Date (defined below), the Mortgagees held a perfected first mortgage lien on the Puerto Rico Property.

**(C)     The Amendment of the Settlement Agreement and the Debtors' Breach of the Same**

25.     Sears and Kmart initiated discussions with the Mortgagees about the possible amendment of the Settlement Agreement in April 2018, to allow for the sale of the distribution center in Florida (the other property that secured a portion of the amount due under the Settlement Agreement). The Settlement Agreement was amended by the parties pursuant to a letter agreement (the "Amendment") that was approved by the District Court on August 24, 2018, with the Amendment requiring that Kmart and Sears make a payment of $12.8 million upon the closing of the Florida property from the proceeds of that sale, and pay the balance of the second installment payment—$7.2 million—by December 2018. *See* Tillery Declaration, ¶¶ 13-15. The Amendment also required Kmart and Sears to escrow an additional $1.6 million by December 2018, so that after the balance of the second installment payment was made, the escrowed amount and the remaining mortgage upon the Puerto Rico Property would fully secure the third (and final) installment payment of $19 million. A copy of the Amendment is attached as **Exhibit 7** to the Tillery Declaration.

26.     Kmart and Sears defaulted in the performance of their obligations under the Settlement Agreement. They did not pay the $7.2 million that was due in December 2018 and, to Relator's knowledge, they never escrowed the additional $1.6 million or made any provision for the final installment payment of $19 million. *See* Tillery Declaration, ¶ 16.

**(D)     Events During the Bankruptcy Cases**

{00334408.4 / 1274-001 }

27.     Beginning on October 15, 2018 (the "Commencement Date"), less than two
months after the District Court's approval of the Amendment, each of the above-captioned
Debtors commenced a voluntary case with this Court under chapter 11 of title 11 of the
Bankruptcy Code. The Debtors' chapter 11 cases were consolidated for procedural purposes only
and jointly administered under Chapter 11 Case No. 18-23538 (RDD). Prior to the Effective Date
of the Plan, the Debtors were authorized to operate their businesses and manage their properties
as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**(i)     The DIP Financing Orders**

28.     As of the Commencement Date, Relator and the United States had a first priority,
perfected mortgage lien on the Puerto Rico Property and the proceeds thereof (the "Mortgage
Lien"). For that reason, Relator timely filed a *Limited Objection to the Debtors' Motion for
Authority to (a) Obtain Post-Petition Financing, (b) Use Cash Collateral, (c) Grant Certain
Protections to Prepetition Secured Parties, and (d) Schedule Second Interim Hearing and Final
Hearing* [D.N. 550], objecting to the proposed priming of the Mortgagees' liens or the granting
of liens that were *pari passu* therewith.

29.     Relator and the Debtors were able to agree upon language for the final orders
approving both the senior and the junior DIP financing facilities. The DIP Orders state:

> Notwithstanding anything to the contrary contained herein (including, but not limited to,
> paragraphs iv, 13, and 14 hereof), nothing herein, including the Carve-Out, shall be
> deemed to prime or be otherwise made senior or pari passu to any valid, perfected and
> non-avoidable security interests or liens held by (i) SHLD Lendco, LLC or Cyrus Capital
> Partners, L.P. under the IP/Ground Lease Term Loan or (ii) Relator Carl Ireland,
> Administrator of the Estate of James Garbe, and the other parties to the Garbe settlement
> agreement sharing in that security interest with Garbe (such security interests and liens
> the "Specified Security Interests"). All parties' rights to object to the priority, validity,
> amount, and extent of the Specified Security Interests and the claims secured thereby
> (and all objections and defenses of the holders of the Specified Security Interests) are
> hereby fully preserved. All rights and remedies of the Debtors in respect of the Specified
> Security Interests, including, but not limited to, the right to seek to surcharge and to seek


to impose the remedy of marshaling (and, in each case, all objections and defenses of the holders of the Specified Security Interests) are hereby fully preserved. All rights of the holders of the Specified Security Interests to seek relief from the automatic stay of section 362 of the Bankruptcy Code, to seek adequate protection of the Specified Security Interests, and/or other permissible secured creditor rights, including the right to object to any relief sought pursuant to the Debtors' reserved rights, are hereby fully reserved.

*See* Senior DIP Order [D.N. 955], ¶ 65 and Junior DIP Order [D.N. 1436], ¶ 64. The first priority liens and security interests of the Mortgagees in the Puerto Rico Property were thereby preserved, and not diluted or subordinated in any manner.

### (ii)    The Proposed Sale and Relator's Objection

30.    The Debtors also embarked upon a marketing and sale process early on in these cases, during which they negotiated an asset purchase agreement with ESL Investments, Inc. (the "Buyer"),[12] which directly or indirectly owned 48.4% of the common stock of Debtor Sears Holdings as of the Commencement Date.

31.    The Buyer proposed to purchase substantially all of the Debtors' assets, including approximately 425 of the Debtors' retail stores, as well as other owned and leased real estate, including the Puerto Rico Property. The proposed transaction also contemplated the sale of inventory, receivables, intellectual property, data, certain claims, security deposits and insurance proceeds, cash held in the retail stores and foreign assets, and the release of certain claims against the Buyer and its principal.

32.    After some negotiations between the Buyer and the Debtors, the value of the bid, as disclosed to the Court and announced in the press, was approximately $5.2 billion. The proposed sale proceeds included cash, credit bids, assumption of certain liabilities and

---

[12] ESL ultimately created new entities, Transform Holdco LLC and other "Transform" entities, to serve (collectively) as the Buyer.

obligations, the satisfaction and release of amounts due under the junior DIP financing facility, the satisfaction and release of amounts due and commitments under the Citibank letter of credit facility, cure costs, and certain employment and severance obligations.[13]

33.    Relator timely filed a *Limited Objection and Reservation of Rights to the Debtors' Proposed Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith and (IV) Granting Related Relief* [D.N. 1931] (the "Sale Objection"), stating that he did not consent to the sale of the Puerto Rico Property free and clear of the Mortgage Lien, absent payment in full of the amount of the Mortgage Lien. Relator calculated the amount of the Mortgage Lien to be in excess of $18 million as of the date of the Sale Objection.[14]

34.    The Sale Objection cited section 363(f) of the Bankruptcy Code and the relevant provisions of the DIP Orders, and noted that Relator would consider consenting to the sale of the Puerto Rico Property free and clear of the Mortgage Lien "provided that safeguards of his rights as to valuation are included in the Order that the Relator determines are sufficient to ensure a fair and proper valuation and allocation of sale proceeds, as well as the prompt turnover of such proceeds upon resolution of allocation." *See* Sale Objection [D.N. 1931], ¶ 10. Relator was concerned about the allocation of sale proceeds because no information had been provided in the Debtors' filings about what value had been attached to the Debtors' various assets.

---

[13] The Debtors' summary of the purchase price under the asset purchase agreement appears at pages 45-47 of the Debtors' second amended disclosure statement [D.N. 4390].

[14] The deadline for filing sale objections was more than two months prior to the April 10, 2019 deadline for filing claims in these cases.

{00334408.4 / 1274-001 }

35.     A hearing to consider the proposed sale began on February 4, 2019 and concluded on February 7, 2019. Most of the hearing was evidentiary in nature and devoted to challenges to the sale raised by the committee of unsecured creditors, but other objections, including that of Relator, were heard on February 7th. During that portion of the hearing, the Court and Relator learned the Debtors had waived the provisions of the bidding procedures and the asset purchase agreement that required the Buyer (per the bidding procedures) and the Debtors and the Buyer (per the asset purchase agreement) to allocate the sale proceeds among various assets. In response to questioning by Judge Drain, Debtors' counsel stated: "[w]e took a global view as to what consideration was being provided to the company and we understood that the entire business would have to be valued as a whole." *See* February 7, 2019 hearing transcript [D.N. 2886] ("Sale Hearing Transcript"), 48:7-10.  Excerpts of the Sale Hearing Transcript are attached as **Exhibit C** hereto.

36.     During the course of the sale hearing, the Court heard from Relator's counsel about the primary points raised in Relator's Sale Objection, specifically that: (i) Relator did not consent to the sale of his collateral; and (ii) Relator wanted assurances that if the Mortgage Lien on the Puerto Rico Property was not going to be paid in full upon the sale closing, that cash in the amount of the Mortgage Lien would be segregated and reserved, particularly given concerns about the Debtors' administrative solvency. *See generally*, Sale Hearing Transcript, 167: 13-25; 168: 1-25; 169: 1-25; 170: 1-25; 171: 1-14.  Relator proposed that funds be escrowed for the Secured Claim, a request which the Debtors opposed.

37.     The Court responded to these arguments by stating:

> "I think you need to give them that protection lien on assets then. I don't know how they are protected otherwise." 169:15-17.

"They have superpriority where they are actually covered, then I think that's –
you can litigate what the actual value was and what you're entitled to be paid."
169:21-22.

"[T]his is a first lien on this property. It's worth what it's worth and it can't be
paid just by a, you know, just saying we're going to pay you some day. They need
to have a – indubitable equivalent in something." 170: 19-23.

38.    Following the conclusion of the sale hearing, the parties attempted to draft
language for the proposed sale order that would reflect the Court's comments and
determinations. However, there were differences of opinion about appropriate language, and
ultimately, the Debtors' counsel submitted a proposed order to the Court via email, Relator's
counsel commented on it, and the Court made such revisions to the proposed language that it
deemed appropriate.

39.    The Sale Order, as entered, provides in pertinent part:

**Mortgage Adequate Protection**. Notwithstanding anything to the contrary contained
herein or in the Asset Purchase Agreement or related documents, upon the closing of the
Sale Transaction, Relator Carl Ireland, as Administrator of the Estate of James Garbe,
and the United States (the "Mortgagees") as holders of liens on the real property known
as Location #8975, Cupey Bajo, San Juan, Puerto Rico (the "Property") shall be entitled
to a lien against the sale proceeds of the Property in the same order of priority as existing
on the date of entry of this Sale Order and a superpriority administrative expense claim
against the Debtors as adequate protection pursuant to sections 361, 363(e), and 507(b) of
the Bankruptcy Code arising from the sale of such Property to satisfy any diminution of
the value of such replacement lien post-Closing. All parties' rights to object to the
priority, validity, amount, and extent of such asserted liens and superpriority claim or the
obligations relating thereto are preserved. The Debtors' and Mortgagees' rights as to the
amount of the allocation of proceeds from the Sale Transaction to the Property and any
valuation of the Property are preserved and any disputes shall be determined by the
Bankruptcy Court, upon motion by any of the Debtors or the Mortgagees.

*See* Sale Order [D.N. 2507], ¶ 71. The Sale Order placed no restrictions on the sources of
recovery from the Debtors with respect to the superpriority claim, thereby making the funds in
the Wind-down Account, among other things, available to satisfy such claim.

40.    Unfortunately, Relator's concern about the dissipation of funds by the Debtors absent an escrow requirement proved warranted. The Debtors' monthly operating reports for the months after the sale indicated that the Debtors had: (i) unrestricted cash and cash equivalents of $24 million and restricted cash of $211 million as of March 2, 2019; (ii) unrestricted cash and cash equivalents of $9 million and restricted cash of $195 million as of April 6, 2019; (iii) unrestricted cash and cash equivalents of $14 million and restricted cash of $150 million as of May 4, 2019; and (iv) unrestricted cash and cash equivalents of $7 million and restricted cash of $139 million as of June 1, 2019. Further, unpaid post-petition vendor payables were $45,700,351 as of June 1, 2019[15] [D.N. 3199, 3596, 4241, 4590].

**(iii)    Relator's Proof of Claim**

41.    Relator timely filed a proof of claim prior to the general bar date in these cases, asserting a total claim of $26,200,000.00 against all of the Debtors as of the Commencement Date.[16] The proof of claim (the "Claim") was recorded as Claim No. 15292 and a copy of the Claim (without exhibits) is attached hereto as **Exhibit D**. The Claim included an addendum which explained the nature of the claim, and that the Secured Claim was held by Relator and the United States as co-mortgagees. (The United States also timely filed a proof of claim, prior to the bar date for governmental entities.)

42.    As set forth in the Claim, the secured portion of the Claim (defined herein as the Secured Claim) totals $18,190,144.82. That amount is based upon the terms of: (i) the Settlement Agreement, which provided the procedures for determining the face amount of the mortgage

---

[15] The Debtors noted in their operating reports that there was a dispute between them and the Buyer about who was liable for such vendor payables.
[16] Pursuant to a stipulation that was approved by the Court, Relator was authorized to file a single claim against all of the Debtors [D.N. 3081].

($17.4 million); and (ii) the Mortgage Note, which reflects that face amount and provides for interest of 1.5% per year and attorneys' fees and expenses in connection with the enforcement of the Mortgagees' rights under the Mortgage Note (including in a bankruptcy proceeding).[17]

### (iv)    The New Appraisal and the Deeds of Transfer

43.    The Sale Order was entered on February 8, 2019 and the Debtors subsequently represented in filings with the Court that the sale transaction closed on February 11, 2019. Recognizing that the value of the Puerto Rico Property on or about the time of the sale closing would be critical to any discussion of the property's value, Relator promptly made arrangements to obtain a current appraisal of the Puerto Rico Property.

44.    As stated in the Tillery Declaration, Relator, through the counsel that represented him in the underlying lawsuit, engaged Pons & Lamadrid Appraisers (the "Appraisers"), the same Puerto Rico-based appraisal firm that had been engaged for the Initial Appraisal of the Sears property. The Declaration of Esteban Lamadrid, formerly of Pons & Lamadrid Appraisers and now of Lamadrid Appraisers, is attached to this Motion as **Exhibit E** (the "Lamadrid Declaration") and the appraisal report is attached to the Lamadrid Declaration as **Exhibit 1**. As set forth in the appraisal report, appraisers from Pons & Lamadrid were permitted access to the Puerto Rico Property in March 2019, and a new appraisal report was provided to Relator on April 5, 2019 (the "Current Appraisal").

45.    The Current Appraisal evaluated the Puerto Rico Property, which is on a 632,072 square foot site and includes a 302,928 square foot warehouse/distribution center and a 36,472 square foot outlet store. *See* Current Appraisal, pages v-vi. The Current Appraisal discussed both

---

[17] This amount is subject to increase for additional interest and fees incurred since the proof of claim was filed. The attorney's fees included in the Secured Claim were calculated as of March 2019.

Puerto Rico's economic situation and the impact of the two hurricanes that struck the island in September 2017. It also noted that the property was in good condition and appropriately zoned (as light industrial) for its everyday use.[18]

46.    The Appraisers employed several different means of analyzing value, including the highest and best use analysis, the income capitalization approach, and the sales comparison approach, with the last being viewed as the most relevant. The Current Appraisal assigned the Puerto Rico Property an "as dark" value of $16.6 million, an "as leased" value of $22.3 million and an "as is" market value of $22.1 million.[19]

47.    Relator provided a copy of the Current Appraisal to the Debtors' counsel on April 29, 2019, along with the Mortgage Note and a letter providing the history of Relator's claim and details about the calculation of the claim, particularly the Secured Claim. Given the values provided in the Current Appraisal, especially the $22.1 million "as is" valuation,[20] Relator was and is confident that the value of the Puerto Rico Property as of the sale closing was well in excess of the amount due under the Mortgage Note. That amount was $18,190,144.82 as of the date Relator's Claim was filed and, given Relator's right to attorneys' fees and interest, continues to increase.

---

[18] The Appraisers were not asked to do a title search and, perhaps because all the signage at the Puerto Rico Property continued to say "Sears" (as evidenced by the photographs in the Current Appraisal), the Current Appraisal refers to the Puerto Rico Property as a "Sears" property, with the distribution center being owner-occupied and the outlet store being leased to an affiliate. In fact, upon the sale closing, the Puerto Rico Property became the Buyer's property.

[19] Relator notes that, while the Settlement Agreement relied on an "as dark" appraisal to determine the face amount of the mortgage, there was no such agreement or other requirement for an appraisal valuing the Puerto Rico Property as of the closing of the bankruptcy sale.

[20] The Settlement Agreement provided that the property's "as dark" value would be used to determine the face amount of the mortgage. But for purposes of determining the property's value as of its sale to Transform Holdco, LLC, Relator submits that the "as is" value was the appropriate reference point, since a business was operating on the property.

{00334408.4 / 1274-001 }

48.    Moreover, in connection with the preparation of the Original Motion, Relator obtained the Title Abstracts for the two parcels of real estate that comprise the Puerto Rico Property. *See* Tillery Declaration, **Exhibit 6**. Those Title Abstracts evidence that the Mortgagees' mortgage lien is the only monetary lien listed on either parcel, and that the mortgage lien was duly recorded on January 16, 2018.

49.    In addition, the first of the Title Abstracts lists Transform Distribution Center Holdco, LLC as the owner of the property, and references a deed of transfer executed on May 8, 2019 and a sale by Sears to Transform for the price of $17,792,950. The second of the Title Abstracts shows Sears as the owner of record, but refers to a deed of transfer executed on May 8, 2019 stating that the second parcel has also been sold to Transform Distribution for a purchase price of $2,977,050. (That Title Abstract identifies the May 2019 deed of transfer as a "document pending.") **The Title Abstracts thereby reflected a total sale price for the Puerto Rico Property of $20,770,000 in connection with the bankruptcy sale.**

50.    As set forth in the Tillery Declaration, after reviewing the Title Abstracts, Relator's counsel in the underlying litigation directed its counsel in Puerto Rico to obtain copies of the deeds of transfer themselves from the Puerto Rico Real Property Registrar. *See* Tillery Declaration, ¶ 25. Copies of the deeds of transfer, both of which are dated May 8, 2019 (the "Deeds of Transfer") are attached to the Tillery Declaration as **Exhibit 8**. The Deeds of Transfer acknowledge the Mortgagees' mortgage and its January 16, 2018 recording date, and show no other mortgage liens or other monetary liens on the Puerto Rico Property.

51.    Perhaps more significantly, the Deeds of Transfer, which state that they are submitted by both Sears and Transform Distribution, disclose the purchase price for the two

parcels and acknowledge receipt of the purchase price by Sears—an amount totaling

$20,770,000. The Deeds of Transfer state as follows:

> Two: <u>Purchase Price</u>.  The Property is sold for a purchase price equal to the amount of SEVENTEEN MILLION SEVEN HUNDRED NINETY-TWO THOUSAND NINE HUNDRED FIFTY DOLLARS ($17,792,950.00), the receipt of which is hereby acknowledged.

*See* Deed of Transfer, Distribution Center, page 4.

> Two: <u>Purchase Price</u>.  The Property is sold for a purchase price equal to the amount of TWO MILLION NINE HUNDRED SEVENTY-SEVEN THOUSAND FIFTY DOLLARS ($2,977.050.00), the receipt of which is hereby acknowledged.

*See* Deed of Transfer, Outlet Store, page 4.

> **(v)     The Confirmation of the Plan and Subsequent Developments**

52.     As noted earlier, after the filing of the Original Motion but before a hearing on that motion, a hearing took place over three days to consider the confirmation of the Debtors' Plan. Relator raised concerns at that hearing about the value of the Mortgagees' replacement liens and the adequacy of the adequate protection, given the Debtors' deteriorating cash position, the uncertain value of the Debtors' remaining non-cash assets, the continuing costs of the cases, and the Debtors' intent to make distributions to creditors junior in priority to the Mortgagees prior to the Effective Date of the Plan. (The approval of the administrative settlement procedures was included in the Confirmation Order.)

53.     While the Court denied Relator's request that funds be segregated for the Mortgagees' Secured Claim, the Court determined that circumstances warranted a grant of additional adequate protection in the form of liens on the Debtors' Total Assets (as that term is defined in the Plan). As a result, the following provision was added to the Confirmation Order:

> Relator Carl Ireland, as Administrator of the Estate of James Garbe, and the United States ("**Mortgagees**") as holders of liens on the real property known as Location #8975, Cupey Bajo, San Juan, Puerto Rico (the "**Property**") shall continue to have (i) a lien against the

sale proceeds of the Property and (ii) a superpriority administrative expense claim against the Debtors as adequate protection arising from the sale of such Property to satisfy any diminution of value of such replacement lien post-Closing, on the terms and conditions set forth in the Sale Order (the "**Sale Order Grants**"). In addition to the Sale Order Grants, Mortgagees shall also have a replacement lien against Total Assets as additional adequate protection ("**Additional Adequate Protection Replacement Lien**"). The Additional Adequate Protection Replacement Lien shall be subject to the Carve-Out, other than as provided for pursuant to the Sale Order Grants. The Debtors' rights to object to the priority, validity, amount, and extent of Mortgagees' initial liens on the Property are preserved, as are the Mortgagees' rights to assert additional amounts due. The Additional Adequate Protection Replacement Lien granted by this Confirmation Order shall be senior to all other liens against the Total Assets and shall not supersede or otherwise modify or diminish the Sale Order Grants. Mortgagees reserve their rights to request that the Court require the Debtors to establish a cash reserve prior to the Effective Date based upon changes in facts and circumstances. The Debtors' and the Creditors' Committee's rights to object to any such request are also reserved.

*See* Confirmation Order [D.N. 5370], ¶65.

54.    Several months after the entry of the Confirmation Order, the Debtors filed their Response to the Original Motion. The Response did not address the fact that Sears and the Buyer advised the Puerto Rico Real Property Registrar that the sale price paid for the Puerto Rico Property was $20,770,000, but stated that on December 10, 2019 (ten months after the sale closed), the Debtors engaged an appraiser to provide an appraisal of the property. That appraiser valued the Puerto Rico Property at $16,920,000, approximately $3.8 million less than the amount the Debtors and Buyer represented as the purchase price in connection with the bankruptcy sale, $1.3 million less than the amount of the Secured Claim, and $5.2 million less than the amount of the Current Appraisal. Response [D.N. 7471], ¶ 15.

55.    However, the Debtors noted in their Response that, given the appraisal numbers, settlement of the valuation issue was not "an insurmountable task" and stated they were "hopeful that the parties will be able to agree on a valuation prior to the Effective Date, when Relator is rightfully entitled to payment, to obviate the need to litigate the issue." Response, ¶¶ 16, 15. They also asserted that there was no need to address Relator's superpriority administrative claim,

given the Court's grant of additional adequate protection to the Mortgagees in the Confirmation

Order in the form of a lien on Total Assets. Response, ¶ 17.

### (vi)    The Lampert Settlement and the 9019 Motion

56.    The parties continued to adjourn the hearing to consider the Original Motion, but

the question of reserves for the Secured Claim was again addressed by the Court during the

hearing to consider the 9019 Motion. On August 31, 2022, Judge Drain heard arguments

regarding (i) the 9019 Motion [D.N. 10566], which sought approval of a global settlement of

litigation against Edward Lampert and others, and (ii) an application for substantial contribution

filed by an *ad hoc* group of administrative claimants [D.N. 10580].[21] Judge Drain asked a

number of questions at the hearing about the amounts needed upon the effective date of the Plan

to: (i) make all required distributions to creditors and professionals; (ii) establish cash reserves

for disputed claims; and (iii) fund the operations of the Liquidating Trust that would succeed the

Debtors, and whether the cash that the Debtors would realize from the Lampert settlement, when

added to the funds then held by the Debtors, would be sufficient for such purposes.

57.    The Court was assured that the consummation of the settlement would produce

sufficient cash for the Plan to become effective. The Court then made specific inquiry about the

reserve of funds for the Secured Claim, and was advised by the Debtors that $18.2 million would

be reserved for that claim. *See* 9019 Settlement Transcript, 37:23-25; 38: 1-25; 39: 1-13. The

9019 Motion was granted by Order dated September 2, 2022 [D.N. 10629], and the Effective

Date of the Plan occurred on October 29, 2022. *See* Notice of Occurrence of Effective Date

---

[21] As previously noted, Relator filed a reservation of rights in connection with the substantial contribution
application.

[D.N. 10693]. As of the date of this Amended Motion, no payment has been made with respect to the Secured Claim.

## BASES FOR RELIEF REQUESTED

58.    By this Amended Motion, Relator seeks an Order: (I) Determining the Value of the Collateral Securing the Claims of Co-Mortgagees Relator and the United States as of the Sale of Such Collateral; (II) Determining the Amount of Any Diminution in the Value of Such Collateral Thereafter; (III) Allowing the Secured and Superpriority Administrative Claims of Relator and the United States; (IV) Directing Payment of Such Allowed Secured and Superpriority Administrative Claims; and (V) Granting Related Relief.[22]

59.    From before the Commencement Date and continuously through the date of the sale closing, Relator and the United States held a perfected first mortgage lien on the Puerto Rico Property and the proceeds of that property. Pursuant to the clear terms of the DIP Orders, the Mortgage Lien was not primed during these cases, nor was anyone granted *pari passu* rights with respect to the Mortgagees' collateral. Relator also objected to the sale of the Puerto Rico Property and, as a result, the Mortgagees were granted replacement liens and (to the extent of diminution in the value of the Mortgage Liens) adequate protection in the form of superpriority administrative claims to protect their rights as secured creditors.

60.    At the confirmation hearing, after hearing testimony and representations from the Debtors' professionals acknowledging that the Debtors did not have enough cash for their Plan to become effective,[23] Relator raised concerns about whether the Secured Claim was adequately

---

[22] As Relator has always clearly stated, the United States was his co-mortgagee on the Puerto Rico Property. The Settlement Agreement sets forth how the face amount of the mortgage and the interest thereon are to be allocated, while the amount due for attorneys' fees is payable solely to Relator.

[23] While the Debtors' professionals were not quite this blunt, the testimony and statements on the record made it clear that the Debtors had no idea when they would have enough cash for the Plan to become effective.

protected.[24] Judge Drain addressed Relator's well-founded concerns in the Confirmation Order,

granting the Mortgagees additional adequate protection in the form of a lien on the Debtors'

Total Assets.

61.    Valuation of the collateral is a less complex issue here than in many bankruptcy

cases, given the Current Appraisal obtained by Relator and the filings of the Debtors and the

Buyer with the Puerto Rico Real Property Registrar. Both place a value on the collateral as of the

sale date that is well in excess of the amount of the Secured Claim. The Current Appraisal values

the Puerto Rico Property at approximately $22.1 million, while the Deeds of Transfer jointly

filed by Sears and the Buyer disclose that the amount paid for the Puerto Rico Property as part of

the bankruptcy sale was more than $20.7 million. The *lower* of those two numbers exceeds the

amount of the Secured Claim by $2.5 million.

62.    Section 506(a)(1) of the Bankruptcy Code provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an
> interest…is a secured claim to the extent of the value of such creditor's interest in the
> estate's interest in such property…and is an unsecured claim to the extent that the value
> of such creditor's interest or the amount so subject to setoff is less than the amount of
> such allowed claim. Such value shall be determined in light of the purpose of the
> valuation and of the proposed disposition or use of such property, and in conjunction with
> any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1). The Secured Claim was secured by a perfected first mortgage on the

Puerto Rico Property as of the Commencement Date and, as evidenced by the clear language of

both the Junior and Senior DIP Orders, the bankruptcy financing arrangements did not change

this. Therefore, the Secured Claim was indisputably a secured claim pursuant to Section

---

[24] As we now know, the Debtors did not have enough cash for the effective date of the Plan to occur until a global
settlement of the Lampert litigation and certain other actions was reached.

506(a)(1) of the Bankruptcy Code as of the date that the sale closed.[25] Moreover, the values

ascribed to the Puerto Rico Property as part of the larger sale of the Debtors' assets make it clear

that it was a fully secured claim.

63.     The Court heard Relator's objection to the proposed sale of the Puerto Rico

Property, and addressed that objection in the Sale Order by granting the Mortgagees a

replacement lien on the proceeds of their collateral and adequate protection under section 361 of

the Bankruptcy Code in the form of a superpriority administrative claim. The Court subsequently

provided additional adequate protection to the Mortgagees in the Confirmation Order in the form

of a lien on the Debtors' Total Assets. (As the Debtors' themselves noted in their Response to

Relator's Original Motion, the grant of the lien on the Total Assets likely rendered the

superpriority administrative claim redundant.) Thus, by Orders and by statute, the Mortgagees

have a lien on Total Assets and a superpriority claim for the diminution of the value of their

replacement lien after the closing of the sale.

**(A)    The Value of the Secured Claim as of the Sale Closing**

64.     It is well-established that the value of collateral under section 506(a) of the

Bankruptcy Code should be determined "in light of the purpose of the valuation and the

proposed disposition or use of such property." *Assocs. Commercial Corp. v. Rush*, 520 U.S. 953,

961-62 (1997); *Menorah Congregation & Religious Ctr. v. Feldman (In re Menorah*

*Congregation & Religious Center),* 554 B.R. 675, 689-90 (Bankr. S.D.N.Y. 2016) ("*Menorah*");

*In re Residential Capital, LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013). Here, the purpose of

the valuation is to determine the value of the Puerto Rico Property as of the closing of the going

---

[25] As noted earlier, Relator's Claim clearly states that the Secured Claim is calculated to be at least $18,190,144.82, *i.e.* the $17.4 million face amount of the mortgage plus interest and attorneys' fees (both as specifically provided for in the Mortgage Note).

concern sale of the Debtors' business, in order to determine the amount of sales proceeds
properly allocable to the Mortgagees.

65.     The task of valuing the collateral as of the sale closing is made easier here by the
statements of the Debtors and the Buyer. The Debtors have repeatedly and consistently stated
that the consideration they received in connection with the sale of their assets was in excess of
$5.2 billion, and they summarized the nature of that consideration in their disclosure statement.
Moreover, after the closing of the sale transaction, the Debtors and the Buyer filed Deeds of
Transfer with the Puerto Rico Real Property Registry stating that the Puerto Rico Property was
sold to Transform Distribution for a purchase price totaling $20,770,000, an amount that is
somewhat less than the value set in the Current Appraisal (discussed below), but $2.5 million
more than the amount of the Secured Claim. *See Good Gateway, LLC v. NRCT, LLC (In re Bay
Circle Props., LLC)*, 646 B.R. 348, 358 (Bankr. N.D. Ga. 2022)(value of the collateral that was
sold was the amount of the credit bid for that property).  Notably, the Deeds of Transfer also
acknowledge receipt of the sale proceeds by Sears.

66.     In addition, prior to the filing of the Deeds of Transfer by the Debtors and the
Buyer, Relator made arrangements for an updated appraisal of the Puerto Rico Property,
contacting and engaging the respected Puerto Rico-based appraisal firm that had been used in
connection with Sears' 2017 appraisal of the property. The Appraisers were able to gain access
to the Puerto Rico Property and conduct a physical inspection of the facilities in March 2019.
The Current Appraisal values the property as of March 15, 2019, just weeks after the sale closed.

67.     The three most widely recognized valuation methods for real property are
discussed in the *Menorah* decision, 554 B.R. at 690-696, and are: (i) the income capitalization
approach, for a property that is income-producing; (ii) the comparable sales approach, for a

property in an active commercial market; and (iii) the cost or land development approach, minus

depreciation, for a property that is a rarely traded specialty. *See United States v. Certain Prop. in*

*Manhattan*, 403 F.2d 800, 802 (2d Cir. 1968); *see also In re Chait Props.*, 2013 Bankr. LEXIS

3746, at *10-11; *In re Ricci-Breen*, 2015 Bankr. LEXIS 2909 at *16 (Bankr. S.D.N.Y. Aug. 31,

2015);  *In re Fortune Smooth (U.S.) Ltd.*, 1993 Bankr. LEXIS 2377, at *5-6 (Bankr. S.D.N.Y.

July 8, 1993).

68.     The Current Appraisal discusses all three of the valuation methods for real

property noted above, and applies both the income capitalization approach and the comparable

sales approach to determine the value of the Puerto Rico Property.[26] Because the Puerto Rico

Property derives its income from its operations as a warehouse and distribution facility, and not

from the leasing of the real estate to third parties, the Appraisers correctly based the income

capitalization analysis on commercial rent prices and terms for comparable properties in the

same market, as well as the customary costs and expenses related to the ownership and

maintenance of such properties. After evaluating these factors, the Current Appraisal values the

Puerto Rico Property at $22.3 million under the income capitalization approach.

69.     The Appraisers also applied the comparable sales approach. They evaluated three

recent transactions in the local real estate market involving comparable properties, detailed the

similarities and differences between the Puerto Rico Property and the other properties, and made

appropriate adjustments for differences. Based upon their analysis of warehouse/distribution

center sales, the Appraisers determined the Puerto Rico Property had an appraised value of

approximately $22.1 million under the comparable sales approach. They noted their belief that

---

[26] The Current Appraisal notes that the third approach, the cost approach (which estimates the current cost of
reproducing or replacing the current property), is "adequate when the structures are relatively new, with minimal
obsolescence." The Appraisers note that because of market conditions and difficulty in estimating obsolescence, the
cost approach is not commonly used by buyers. *See* Current Appraisal, page 51.

{00334408.4 / 1274-001 }

the comparable sales approach was the best approach for valuing the Puerto Rico Property, and opined that the value of the property was $22.1 million.

70.     Both the appraised value, per the Appraisers engaged by Relator, and the actual sale price of $20,770,000, as disclosed by the Debtors and the Buyer in their joint filing with the Puerto Rico Real Property Registrar, are well in excess of the amount of the Secured Claim. Therefore, Relator respectfully submits that the amount due under the Mortgage Note—at least $18,190,144.82—was fully secured by the Mortgagees' replacement lien on the sales proceeds.

**(B)     Diminution in Value Since the Sale Closing**

71.     The Sale Order grants Relator and the United States a superpriority administrative claim against the Debtors for any diminution in the value of their replacement liens. It places no restrictions on which of the Debtors' assets the Mortgagees can look to for satisfaction of that claim. Relator is unsure of precisely how much of the sale proceeds realized by the Debtors have been dissipated since the February 11, 2019 closing of the sale transaction (unsurprisingly, since the Debtors' were not required to segregate proceeds from the sale), but as noted above, the Debtors' monthly operating reports for the months following the closing of the sale—monthly reports for the periods ending on March 2, April 6, May 4, and June 1, 2019—evidence that the amount of cash in the Debtors' possession steadily declined and were used for many purposes and payments of claims other than the Secured Claim. The operating reports show that the amount of unrestricted cash decreased from $24 million to $7 million and the amount of restricted cash decreased from $211 million to $139 million between March 2 and June 1, 2019,[27] as the Debtors continued to expend funds to pay the ongoing costs of the wind-down of

---

[27] The operating report for the month ending June 2, 2019 also noted post-petition amounts due to vendors in excess of $45 million [D.N. 4590].

their business and sale of their remaining assets, including professional fees and costs [D.N. 3199, 3596, 4241, 4590].

72.    The Confirmation Order granted the Mortgagees additional adequate protection in the form of a lien on Total Assets, in recognition of the reality that the Debtors did not have sufficient cash in October 2019 for the Plan to become effective and the fact that Relator had cause for concern. Eight months after the sale closed, the Debtors were not in a financial position to pay allowed claims and reserve funds for disputed claims. Moreover, the Confirmation Order approved administrative settlement procedures which permitted tens of millions of dollars to be paid by the Debtors to holders of administrative claims beginning in December 2019, further depleting the Debtors' cash while paying nothing to the Mortgagees on account of their Secured Claim.[28]

**(C)    Allowance and Payment of the Secured Claim**

73.    The Debtors have been aware of the Secured Claim since the earliest days of these cases, if not before. The terms and priority of the Mortgage Lien were established pursuant to a Settlement Agreement that was approved by Order of the U.S. District Court, and Relator reminded the Debtors of the existence of the Settlement Agreement and the Mortgage Lien in connection with the hearings to consider Senior and Junior DIP financing, the sale hearing, and the confirmation hearing. These bankruptcy cases are now more than four years old, no objection has been filed to the Secured Claim, and the Effective Date has occurred.

74.    The Mortgagees are entitled to adequate protection with respect to any diminution in the value of their collateral—the Puerto Rico Property and the proceeds thereof—since the

---

[28] To the extent the Debtors seek to surcharge Relator's collateral for preservation of value under section 506(c) of the Bankruptcy Code, such relief should be denied because it was the Debtors that benefitted from the sale process, not Relator, whose collateral has remained consistent in value at all relevant times. Relator reserves the right to brief the surcharge issue if raised by the Debtors.

sale, and there has undoubtedly been diminution as the Mortgagees have been forced to sit and

wait while the Debtors spent cash. Such adequate protection includes both an additional lien on

Total Assets and a superpriority administrative claim, per the Sale Order and the Confirmation

Order. And at the hearing on August 31, 2022 regarding the 9019 Motion, the Debtors

represented to the Court that the settlement at issue would provide the Debtors with sufficient

cash for the Effective Date to occur, including a reserve of $18.2 million for the Secured Claim.

It is now past time for the Secured Claim to be recognized as an allowed claim and for the

Mortgagees to be paid.

## **RESERVATION OF RIGHTS**

75.    Relator expressly reserves any and all rights to supplement or further amend this

Amended Motion, including to seek discovery on the Debtors' filings with the Puerto Rico Real

Property Registry and dissipation of the sale proceeds, as well as any other issues that may be

relevant to this dispute.

{00334408.4 / 1274-001 }

## <u>CONCLUSION</u>

WHEREFORE, Relator respectfully requests that the Court grant this Amended Motion,

allowing the Secured Claim in an amount of no less than $18,190,144.82, directing prompt

payment from the funds which the Court directed and the Debtors represented would be reserved

for the Secured Claim, and granting Relator such other and further relief as this Court deems just

and proper.

Dated: New York, New York
      March 31, 2023

                                       Respectfully submitted,

                                       **HALPERIN BATTAGLIA BENZIJA, LLP**

                                       */s/ Alan D. Halperin*
                                       Alan D. Halperin, Esq.
                                       Donna H. Lieberman, Esq.
                                         40 Wall Street, 37th Floor
                                       New York, NY 10005
                                       Telephone: (212) 765-9100
                                       ahalperin@halperinlaw.net
                                       dlieberman@halperinlaw.net

                                       *Counsel to Relator Carl Ireland, Administrator for*
                                       *the Estate of James Garbe*

# EXHIBITS TO AMENDED MOTION

**Exhibit A** –Declaration of Stephen M. Tillery
        1 - Settlement Agreement
        2 – Puerto Rico Mortgage Note
        3 – Mortgage Note Pledge and Security Agreement
        4 – Certified Deed of Constitution of Mortgage
        5 – Notarial Act of Mr. Banco Fuertes with translation of recording slips
        6 – Title Abstracts from Puerto Rico Insurance Company (2)
        7 – Amendment to Settlement Agreement
        8 – Deeds of Transfer (2)

**Exhibit B –** Extracts from 9019 Settlement Transcript, August 31, 2022 [D.N. 10655]

**Exhibit C -** Extracts from Sale Hearing Transcript, February 7, 2019 [D.N. 2886]

**Exhibit D** – Relator Proof of Claim, with addendum

**Exhibit E** – Declaration of Appraiser Estaban Lamadrid
        1 - Appraisal