**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- x

In re                                                                                  :

                                                                                          :          **Chapter 11**

**SEARS HOLDINGS CORPORATION,**                         :

                                                                                          :          **Case No. 18-23538 (SHL)**

                      **Liquidating Debtor.[1]**                        :

                                                                                          :

--------------------------------------------------------------- x


## DECLARATION OF STEPHEN M. TILLERY


I, Stephen M. Tillery, make the following Declaration pursuant to 28 U.S.C. § 1746:

1.        I am a member of the law firm of Korein Tillery, LLC.  Korein Tillery was

counsel to Relator Carl Ireland, Administrator of the Estate of James Garbe, and his predecessor

in interest, James Garbe, in the litigation captioned *United States ex rel. Garbe v. Kmart Corp.*,

No. 12-cv-881, U.S. District Court, Southern District of Illinois (the "District Court Action"),

which resulted in a $59 million settlement in favor of the plaintiffs secured by real property of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (19870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC ,Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None): SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

certain of the Debtors, as more fully described below.

2.      I submit this Declaration in support of the *Amended Motion of Relator Carl Ireland, Administrator of the Estate of James Garbe, For An Order: (i) Determining the Value of Collateral Securing the Claims of Co-Mortgagees Relator and the U.S. as of the Sale of Such Collateral; (ii) Determining the Amount of Any Diminution in the Amount of the Sales Proceeds Allocable To Such Collateral After the Sale; (iii) Allowing the Secured and Superpriority Administrative Claims of Relator and the U.S.; (iv) Directing Payment of Such Allowed Secured and Superpriority Administrative Claims; and (v) Granting Related Relief* (the "Amended Motion"). Except where otherwise specifically indicated, I have personal knowledge of the following facts and, if called upon to testify, I could and would testify competently thereto.

**The Underlying Litigation and Settlement**

3.      The District Court Action was a "whistleblower" (*qui tam*) action for multiple violations of the federal False Claims Act ("FCA") and analogous State laws. The damages alleged in the District Court Action exceeded $375 million in actual damages, before trebling, and $110 billion in statutory penalties. Defendant Kmart filed four motions for partial summary judgment in the case, all of which were denied, and Kmart subsequently appealed those rulings to the Seventh Circuit Court of Appeals. After losing before the Seventh Circuit (*see United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 627 (2017)), Kmart, Sears, and their affiliates engaged in settlement negotiations with the plaintiffs which resulted in a Settlement Agreement, a true and correct copy of which is attached to this Declaration as **Exhibit 1**. The Settlement Agreement was approved by Order of the District

Court, and that Order was entered on January 19, 2018 [District Court Action, ECF D.N. 497].[2] (Court approval of settlement of claims under the FCA is required by statute.)

4.      The Settlement Agreement provided for a payment of $59 million in three installments, with the first tranche due shortly after the effective date of the Settlement Agreement, and the second and third tranches due on the first and second year anniversaries of the effective date.  Per the express terms of the Settlement Agreement, the second and third payments were to be secured by first mortgages on two pieces of real property and the proceeds of the same: (1) a distribution center in Florida; and (2) a distribution center and warehouse property in Puerto Rico (defined in the Motion as the "Puerto Rico Property").  The co-mortgagees on those two mortgages were Relator and the United States of America (together, the "Mortgagees").

5.      The Settlement Agreement required that the mortgage liens be first monetary liens on the properties, and dictated how the face amounts of the mortgages would be determined. Sears was required to obtain an appraisal from one of three specified appraisal firms.  Sears had obtained an appraisal of the Puerto Rico Property from one of those firms—Cushman & Wakefield—in 2017, and provided that appraisal report to Relator and the United States prior to settlement.

6.      I reviewed that appraisal report, which determined the "as dark" value of the Puerto Rico Property to be $17.4 million and a hypothetical "as leased" operating value of the property to be $22.1 million as of January 24, 2017.  The mortgaged property was being operated as a distribution center and warehouse at the time of the appraisal and thereafter, but per the

---

[2] The docket of the District Court Action is available on PACER (https://ecf.ilsd.uscourts.gov/cgi-bin/iquery.pl?942257962474472-L_1_0-1).

negotiated terms of the Settlement Agreement, the "as dark" number was used to fix the face amount of the mortgage.

7.    The copy of the initial appraisal report that Korein Tillery received was marked "confidential," so I have not attached it to this Declaration. I note, however, that the report was signed by Stephen E. Saunders of Cushman & Wakefield Regional, Inc., whose office is in Orlando, Florida, and by Pedro A. Pons and Esteban Lamadrid of Pons & Lamadrid Appraisers, whose office is in San Juan, Puerto Rico. (As discussed below, we hired Pons & Lamadrid Appraisers to provide an updated appraisal in early 2019.)

8.    The parties had their professionals prepare the documents necessary to implement the Settlement Agreement and properly perfect the first mortgage granted under that agreement. Korein Tillery was involved in the drafting of the documents identified below and worked alongside Miguel A. Blanco Fuertes of Blanco Fuertes & Associates LLC, a real estate law firm based in San Juan, Puerto Rico, to ensure that the documents complied with the laws of the Commonwealth of Puerto Rico and that the mortgage lien was properly recorded. True and correct copies of the executed mortgage documents relating to the Puerto Rico Property (the "Mortgage Documents") are attached to this Declaration as follows:

**Exhibit 2**:    Mortgage Note Pledge and Security Agreement, dated as of January 12, 2018;
**Exhibit 3**:    Mortgage Note, dated as of January 12, 2018; and
**Exhibit 4**:    Certified Deed of Constitution of Mortgage, dated as of January 12, 2018.

The mortgage lien attached to the Puerto Rico Property upon the execution of the Deed of Constitution of Mortgage on January 12, 2018.

9.    Pursuant to Korein Tillery's directions, certified copies of the Deed of Constitution of Mortgage issued by the acting Notary Public, Mr. Blanco Fuertes, were promptly submitted for recordation to the Registry of Property of Puerto Rico, Third Section of San Juan and Fourth Section of San Juan, in order to perfect the mortgage lien on the Puerto Rico Property

4

in accordance with the laws of the Commonwealth of Puerto Rico. Two certified copies were necessary because the Puerto Rico Property is comprised of two improved parcels of land. The certified copies were filed/recorded in the public office (the Real Property Registry), as authorized by law, on January 16, 2018. I have compared the copy annexed to this Declaration with the original that was filed/recorded, and certify it is correct.

10.    Mr. Blanco Fuertes received confirmation of the recordation of the notices— generally referred to as "recording slips"—via email from the Real Property Registry, and forwarded those emails to Korein Tillery for our records. The recording slips are issued only after the Registrar of Property has scrutinized the filed documents and determined that all legal requirements have been satisfied and that the Deed of Constitution of Mortgage is a legal, valid, and enforceable lien under the laws of the Commonwealth of Puerto Rico.

11.    Because the original recording slips were in Spanish, at Korein Tillery's request, Mr. Blanco Fuertes, who authorized the Deed of Constitution of Mortgage, executed a Notarial Act providing a translation of the recording slips, and attesting that the English translation is an exact and correct translation from the Spanish version. (While the original recording slips were prepared and filed in January 2018, the translation of the slips into English was done after the commencement of the Sears/Kmart bankruptcy cases, in preparation for the filing of a motion with this Court.) The Notarial Act, which is attached to this Declaration as **Exhibit 5**, includes a copy of the original of each recording slip in its original Spanish version, as well as the English translation. I have compared the copies of the Spanish recording slips attached to the Notarial Act with the original that was forwarded to Korein Tillery in early 2018, and certify it is the same document. Upon the issuance of the recording slips, the date of the filing of the Deed of Constitution of Mortgage, January 16, 2018, became the effective date of recordation.

5

12.     Korein Tillery also directed and authorized Mr. Blanco Fuertes to order title abstracts through a Puerto Rico-based title insurance agency.  Title searches of the two parcels that comprise the Puerto Rico Property were done on August 1, 2019 by the Puerto Rico-based firm Professional Title Services.  The title abstracts that were issued in connection with that search confirm that the mortgage recordation date is in fact January 16, 2018.  The title abstracts also indicate that, as of August 1, 2019, the lien of the Mortgagees is the only monetary lien of record on the Puerto Rico Property. (There is an easement in favor of the Puerto Rico Aqueduct and Sewer Authority and a right of way easement.) Copies of the August 1, 2019 title abstracts (the "Title Abstracts") are attached to this Declaration as **Exhibit 6**.  The abstracts summarize the official records searched and examined by the title insurance agency.  The underlying records are publicly available for examination or copying or both.

13.     The first payment due under the Settlement Agreement was paid in January 2018. In April 2018, however, Korein Tillery was contacted by representatives of Sears and Kmart about amending the Settlement Agreement.  Their reason for the proposed amendment was that Sears and Kmart wished to sell the Florida property upon which Relator and the United States held a first mortgage.

14.     The parties began discussing an amendment to the Settlement Agreement in April 2018, and entered into a letter amendment dated as of August 23, 2018 (the "Amendment"), which was approved by the District Court on August 24, 2018 [District Court Action, ECF D.N. 517].  A true and correct copy of the Amendment is attached to this Declaration as **Exhibit 7**.

15.     The Amendment permitted the sale of the Florida property, and required that Sears and Kmart: (i) pay the Mortgagees $12.8 million from the proceeds of the property, upon the closing; (ii) pay the balance of the second installment payment—$7.2 million—by December 2018; and (iii) escrow $1.6 million by December 2018 so that, after the balance of the second

6

installment payment was made, the escrowed amount and the remaining mortgage upon the

Puerto Rico Property would together fully secure the third (and final) installment payment of $19

million.

16.     The payment of $12.8 million, which was the face amount of the Relator/U.S.

mortgage on the Florida property, was made to the Mortgagees following the sale of the Florida

property.  The payment in the amount of $7.2 million that was due in December 2018, however,

was not made and, to my knowledge, no funds were ever escrowed.  Korein Tillery has

confirmed with counsel to the United States, Assistant U.S. Attorney Peter Aronoff, that no

further payments were received by the United States nor was the time for such payment

extended.  Sears, Kmart, and their subsidiaries are therefore in breach of the Settlement

Agreement, as amended.

**The Bankruptcy Filing and the Events that Followed**

17.     Certain of the Debtors filed petitions for relief under Chapter 11 of the

Bankruptcy Code on October 15, 2018, while other Debtors filed shortly thereafter (October 15,

2018 is defined in the Motion as the "Commencement Date.").

18.     As of the Commencement Date, the amount that was unpaid under the Settlement

Agreement exceeded $26 million, and the Mortgagees held a perfected first mortgage on the

Puerto Rico Property in the face amount of $17.4 million (which was $1.6 million less than the

$19 million amount of security the Mortgagees were entitled to hold during the second year of

the settlement payout period).  As set forth in the Mortgage Note, the mortgage also secured the

payment of interest at an annual rate of 1.5%, as well as the payment of attorneys' fees and

expenses.  Relator timely filed a proof of claim that calculated a secured claim of $18.2 million

for itself and its co-mortgagee—$17.4 million, plus 1.5% interest per year and attorneys' fees.

7

19.     Relator objected to the proposed priming of the Mortgagees' lien during the bankruptcy cases, resulting in appropriate language being added to the DIP Orders entered by the Bankruptcy Court.  As a result, the Mortgagees have continued to hold a first priority lien on the Puerto Rico Property and the proceeds thereof throughout these cases, and no party has liens that primed or were *pari passu* with that mortgage lien.

20.     Relator also objected to the proposed sale of the Puerto Rico Property, as there was no provision for the satisfaction of the mortgage obligation upon or after the sale.  The Bankruptcy Court authorized the sale, but certain rights were granted to the Mortgagees in the Sale Order.

21.     Once Korein Tillery was aware that the sale was going forward and was expected to close in February 2019, it was clear that a current appraisal of the Puerto Rico Property would be needed to address the property's value at the time of the sale.  Korein Tillery thus contacted Pons & Lamadrid Appraisers, the same Puerto Rico-based appraisal firm that Cushman & Wakefield had worked with in connection with the previous appraisal of the Puerto Rico Property.  Another attorney at Korein Tillery working under my supervision, Peter Rocque, engaged Pons & Lamadrid on behalf of Relator, asking the firm to prepare a current appraisal of the Puerto Rico Property.

22.     On April 5, 2019, Korein Tillery received the new appraisal, which appraised the Puerto Rico Property as of March 15, 2019, the date the appraiser inspected the property (the "Current Appraisal").  The Current Appraisal determined the "as is" market value of the Puerto Rico Property to be $22.1 million.

23.     Korein Tillery provided a copy of the Current Appraisal to Relator's counsel in the bankruptcy cases and, after consulting with Relator, authorized them to share the Current Appraisal with counsel to the Debtors in April 2019.

8

24.     I note that the August 1, 2019 Title Abstracts indicate that deeds of transfer of the property were submitted in May 2019 by Sears and the buyer, Transform Distribution Holdco, evidencing the sale and transfer of the property from Sears to Transform.  Each of the Title Abstracts indicates the purchase price for that parcel, with a purchase price of $17,792,950 for the larger parcel and a purchase price of $2,977,050 for the smaller parcel, for a total purchase price of $20,770,000 for the Puerto Rico Property in the Sears/Transform sale transaction.

25.     After reviewing the Title Abstracts, Korein Tillery asked its Puerto Rico counsel to obtain copies of the deeds of transfer themselves.  Copies of the deeds of transfer, both of which are dated May 8, 2019 (the "Deeds of Transfer"), were obtained from the Puerto Rico Real Property Registrar and are attached to this Declaration as **Exhibit 8**. (The exhibit is voluminous because both Deeds of Transfer include certified copies of this Court's Sale Order.)

26.     Each of the Deeds of Transfer acknowledges the Mortgagees' mortgage, and reflects that there are no other recorded mortgages or monetary liens on either of the parcels which comprise the Puerto Rico Property.  *See* Exhibit 8, page 3 of each Deed of Transfer. The Deeds of Transfer also state as follows:

> Two: Purchase Price.  The Property is sold for a purchase price equal to the amount of SEVENTEEN MILLION SEVEN HUNDRED NINETY-TWO THOUSAND NINE HUNDRED FIFTY DOLLARS ($17,792,950.00), the receipt of which is hereby acknowledged.

*See* Deed of Transfer, Distribution Center, page 4.

> Two: Purchase Price.  The Property is sold for a purchase price equal to the amount of TWO MILLION NINE HUNDRED SEVENTY-SEVEN THOUSAND FIFTY DOLLARS ($2,977.050.00), the receipt of which is hereby acknowledged.

*See* Deed of Transfer, Outlet Store, page 4.

27.     Thus, the Deeds of Transfer themselves provide "best evidence" of the market value of the parcels that constitute the Puerto Rico Property, as the parcels themselves were sold

9

in the marketplace, with approval of this Court.  The market value of the Mortgagees' collateral, as stated by Sears and the buyer, exceeded the amount of the secured claim by approximately $2.5 million.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   3/16/23

Stephen M. Tillery

## **Exhibit 1**

## SETTLEMENT AGREEMENT

This Settlement Agreement (Agreement) is entered into among the United States of America, acting through the United States Department of Justice, the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS), the Defense Health Agency (DHA), acting on behalf of the TRICARE Program; Defendant Kmart Corporation (Kmart); Sears Holding Corporation (SHC) as security provider; Relator Carl Ireland, as guardian of James Garbe and his estate, having previously been substituted as Relator (Relator)(hereafter collectively referred to as "the Parties"), through their authorized representatives.

## RECITALS

A.    Kmart Corporation, a Delaware Corporation, operates in-store pharmacies throughout the United States, Puerto Rico and the U.S. Virgin Islands.  Kmart Corporation is wholly owned and operated by Sears Holdings Corporation, a Delaware Corporation which is headquartered in Hoffman Estates, Illinois.

B.    James Garbe, a former Kmart pharmacist, filed a *qui tam* action against Kmart in the United States District Court for the Central District of California captioned *U.S., et al., ex rel. Garbe v. Kmart Corporation*, Case No. CV08-04669 (C.D. Cal.), pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §3730(b); state FCA statutes; and the California Insurance Fraud Prevention Act, Cal. Ins. Code § 1871, *et seq.*, and the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS § 92 (the "Civil Action").  After the United States elected not to intervene in the Civil Action, the case was transferred to the Southern District of Illinois and assigned the case number 3:12-cv-00881-MJR-PM (S.D. Ill.).  On August 8, 2017, Carl Ireland, as guardian of both Mr. Garbe and Mr. Garbe's estate, was substituted as Relator in the Civil Action.

*U.S. ex rel. Garbe v. Kmart*

C.    The United States and Relator contend that Kmart submitted or caused to be submitted claims for payment to (i) the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 ("Medicare"); (ii) the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"); and (iii) (the TRICARE Program, 10 U.S.C. §§ 1071-1110b ("TRICARE")(collectively, the "Government Healthcare Programs").

D.    The United States and Relator allege that Kmart submitted false prescription reimbursement claims to the Government Healthcare Programs from September 1, 2004 to December 31, 2016 in connection with discounted generic drug prices that were available to enrolled members of Kmart's Retail Maintenance Program and other discount generic drug programs.  Specifically, the United States and Relator allege that, to the extent the Government Healthcare Programs (or, in the case of Medicare Part D, the Part D sponsors' contracts) defined "usual and customary price" to include discounted generic drug prices offered to enrolled members of Kmart's discount generic drug programs, Kmart failed to include those discounted generic drug prices when billing the Government Healthcare Programs.  The United States and Relator allege that, as a result of Kmart's actions, Kmart received reimbursement amounts that were higher than it was entitled to receive.  Kmart's conduct is referred to below as the "Covered Conduct."

E.    Relator, the Medicaid Participating States (as defined in separate state settlement agreements), the California Insurance Commissioner, and the Illinois Attorney General contend that Kmart submitted or caused to be submitted false prescription reimbursement claims to Medicaid and certain private insurance companies ("CA/IL private insurance companies") from September 1, 2004 to December 31, 2016 in connection with discounted generic drug prices that were available to enrolled members as a part of Kmart's Retail Maintenance Program and other discount generic drug programs.  The claims of Relator, Medicaid Participating States, California

*U.S. ex rel. Garbe v. Kmart*

Insurance Commissioner, and the Illinois Attorney General, under the state FCA statutes, the California Insurance Fraud Prevention Act, Cal. Ins. Code § 1871, *et seq.*, and the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS § 92, as identified in Paragraph B above, are addressed in separate state settlement agreements.

F.     This Settlement Agreement is neither an admission of liability by Kmart nor a concession by the United States that its claims are not well founded.

G.     Relator claims entitlement under 31 U.S.C. § 3730(d), and any and all applicable analogous provisions in the state FCA statutes, the California Insurance Fraud Prevention Act, or the Illinois Insurance Claim Fraud Prevention Act, to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.     Kmart agrees to pay a total of $59,000,000 (the "Settlement Amount") to settle the Civil Action as follows:  $39,056,891.41 (FCA share) to the United States and Medicaid Participating States to resolve their FCA claims, $3,000,000 (State Insurance Share) to the California Insurance Commissioner and the Illinois Attorney General to resolve the California Insurance Fraud Prevention Act and Illinois Insurance Claim Fraud Prevention Act claims, and $16,943,108.59 (Relator Fee Share) to Relator for his attorneys' fees and costs.  Kmart agrees to pay the Settlement Amount in three installments (the "Settlement Payments") as follows:  Kmart shall pay $20,000,000 no later than fourteen (14) days after Effective Date (defined in paragraph 31 below) of this Agreement; the second payment of $20,000,000 shall be due on the one year anniversary of the Effective Date of this Agreement; the third and final payment of $19,000,000

*U.S. ex rel. Garbe v. Kmart*

3

shall be due on the two year anniversary of the Effective Date of this Agreement.  The Parties

agree that no interest will be paid on the Settlement Payments.  Each of the Settlement Payments

will be divided on a pro rata basis among the United States, the Medicaid Participating States,

the California Insurance Commissioner, the Illinois Attorney General, and Relator  (with said pro

rata Settlement Payments amounts agreed to separately between the United States, the Medicaid

Participating States, the California Insurance Commissioner, the Illinois Attorney General, and

Relator).  The United States, the Medicaid Participating States, the California Insurance

Commissioner, the Illinois Attorney General, and Relator will provide Kmart with the wiring

instructions as well as the amount of their pro rata Settlement Payments amounts at least ten (10)

days prior to the date each of the three payments will become due.

      2.      Kmart and SHC agree that the United States, Medicaid Participating States, the

California Insurance Commissioner, the Illinois Attorney General, and Relator are not, without

being granted security for the payment obligations set forth in Paragraph 1 above, adequately

protected in the event of Kmart's default on any such obligations.  Therefore, Kmart and SHC

will secure the Settlement Payments by executing and recording mortgages and/or other

necessary documentation required to create first priority liens, in favor of the United States and

Relator, on real properties owned by Kmart and/or SHC that have "as dark" appraised values, as

determined by Cushman & Wakefield, CBRE, or JLL, or by another reputable third-party

commercial real estate appraiser deemed acceptable to the United States and Relator, in the

aggregate of at least (i) $30,000,000 until Kmart makes the second Settlement Payment; and (ii)

$19,000,000, until Kmart makes the third Settlement Payment.  The procedures for creating and

perfecting such first priority liens and releasing such first priority liens, including the

responsibility for payment of all costs and expenses incurred therewith, shall be governed by this

Agreement.

*U.S. ex rel. Garbe v. Kmart*

a.    The initial real properties that are subject to this Agreement, include but are not limited to:  (a) Sears Distribution Center #8975, Road #176 Km 0.5 Cupey Bajo, San Juan, Cupey Ward, PR 00926; and (b) Sears Distribution Center #8825, 3825 Forsyth Road, Winter Park, Orange County, FL 32792.  Kmart and SHC agree that in the event that Kmart or SHC were to file for bankruptcy, these assets are not essential to an effective reorganization of Kmart's or SHC's estate.  Kmart and SHC further agree that in the event Kmart or SHC were to file for bankruptcy, they waive any right to contest or oppose any motion by the United States or Relator to obtain relief from the automatic stay to pursue any and all rights and remedies under this Agreement and any mortgages or other real estate documents, including, but not limited to, foreclosing on the real properties encumbered by such mortgages.

b.    At any time after the Effective Date and prior to making the last installment payment, Kmart may request the consent of the United States and Relator to release the liens encumbering one or more of the real properties securing the Settlement Payments and to substitute other real estate appraised by Cushman & Wakefield, CBRE, JLL, or by another reputable third-party commercial real estate appraiser deemed acceptable to the United States and Relator, at an equal or greater value (valued on an "as dark" basis), as collateral for the Settlement Payments.  The United States and Relator shall not unreasonably withhold consent to Kmart's substitution request so long as the request complies with the terms of this Agreement.  Upon any release and substitution, the United States and Relator shall continue to maintain a first priority lien on real property with a total aggregate value, on an "as dark" basis, of not less than $30,000,000 until Kmart makes the second Settlement Payment, and of not less than $19,000,000 until Kmart makes the third Settlement Payment.

c.    To initiate such a release and substitution, Kmart will give written notice, requesting that the United States and Relator consent to the release of the applicable real

*U.S. ex rel. Garbe v. Kmart*

property. The written notice shall be accompanied by an appraisal report, issued within 120 days of the written request for release and substitution, of the real property that will remain in place as security for the Settlement Payments, as well as, to the extent a lien must be granted on substitute real property to meet the minimum security amount, the real property to be substituted. Such appraisals must be issued by Cushman & Wakefield, CBRE, or JLL, or by another reputable third-party commercial real estate appraiser acceptable to the United States and Relator. If the United States or Relator seek to confirm any appraised value presented by Kmart, the United States and Relator shall agree to use one of the remaining two firms that Kmart did not use for the substitute appraisal work (or another reputable third-party commercial real estate appraiser approved by Kmart). Relator shall be responsible for cost of the second appraisal report if the second appraisal firm's valuation of the subject properties is over five (5) percent higher than the value reached by the first appraiser; otherwise Kmart will pay for the cost of the second appraisal report. If the necessary appraisals show that the substituted property is of an equal or greater value than the released property (valued on an "as dark" basis), and no dispute of property valuation exists, the United States and Relator shall complete the necessary documentation to release their security interests that encumber such real property and such documents as are necessary to encumber the replacement property and provide title insurance insuring the first lien position of Relator and the United States. In the event that a review of Kmart's initial appraisal is solicited by the United States or Relator and the second appraisal report generates a dispute about the value of the applicable real property that is five (5) percent or more lower than the value of Kmart's appraisal, then the Parties agree that the third appraisal firm listed above that has not yet been engaged (or another reputable third-party commercial real estate appraiser deemed acceptable to the United States, Relator, and Kmart) shall review all appraisal work and determine a value for the applicable real property. The Parties agree that the third appraisal

*U.S. ex rel. Garbe v. Kmart*

firm's value shall be final and binding if the third appraisal's valuation is between the first two.

If the third appraisal firm's valuation is lower than lowest the valuation from the two other firms

or higher than the highest valuation from the two other firms, then an average of the valuations

of the three appraisal firms will be used to determine value of the subject properties.   If a third

appraisal firm's work is necessary, the third appraisal firm's costs shall be paid by Kmart.

    d.  Kmart agrees to maintain the properties in substantially the same condition

that each property was in at the time of the appraisals that were produced to the Parties prior to

entering this Agreement.  If a property sustains damage at any time before the third Settlement

Payment is made, Kmart will evaluate such damage, and make any repairs necessary to restore

the condition of the property to substantially the same condition it was in at the time of the

appraisals performed and produced to the Parties prior to entering into this Agreement.  The

purpose of Kmart's obligation to repair damage is to ensure that the United States and Relator

maintain a first priority lien on real property with a total aggregate value, on an "as dark" basis,

of not less than $30,000,000 until Kmart makes the second Settlement Payment, and of not less

than $19,000,000 until Kmart makes the third Settlement Payment.  If, at any time before the

third Settlement Payment is made, the Relator or the United States provides reasonable notice

requesting access to inspect the condition of the properties, Kmart shall provide access within a

reasonable amount of time.

    e.  Except as otherwise specified above in Paragraph 2.c., describing the

limited circumstances wherein Relator may be responsible for the cost of the second appraisal

report, all expenses associated with recording first priority liens on the initial real properties and

expenses associated with any request by Kmart for release and substitution of properties,

including but not limited to all mortgage-related expenses, reasonable legal fees (for real estate

*U.S. ex rel. Garbe v. Kmart*

counsel only), stamp taxes, costs of title insurance, and appraisal costs shall be paid by Kmart and/or SHC.

3.      If Kmart fails to complete any of the Settlement Payments by the dates due, Kmart shall be in default of its payment obligations (Default). The United States will provide written notice of the Default to Kmart and Kmart shall have the opportunity to cure such Default within seven (7) days from the date of receipt of the notice. Notice of default will be delivered to: General Counsel and SHC Legal Intake, Sears Holdings Corporation, 3333 Beverly Road Hoffman Estates, Illinois 60179, or to such other representative as Kmart shall designate in advance in writing. If Kmart fails to cure such Default within seven (7) days of receiving the Notice of Default, the United States and Relator may bring a foreclosure action or any other appropriate action or proceeding to enable the United States and Relator to enforce and realize upon the security interests in the real property securing the Settlement Payments and will apply any proceeds received in connection with such actions to complete Kmart's payment obligations pursuant to this Agreement and to cover any costs incurred in connection with the foreclosure and sale of the property (or properties), up to the full Settlement Amount.

4.      Conditioned upon the United States receiving its share of each of the three Settlement Payments from Kmart, the United States agrees that it shall pay to Relator by electronic funds transfer, twenty-nine (29) percent of each such payment received under the Agreement, as soon as feasible after receipt of each payment. Relator agrees that if any payment from Kmart to the United States is avoided in bankruptcy, Relator will return his share of the avoided payment to the United States within seven (7) days of receiving written notice from the United States that it has determined that the United States has a legal obligation to return any payments it has received from Kmart under this Agreement.

*U.S. ex rel. Garbe v. Kmart*

8

5.      Subject to the exceptions in Paragraph 8 (concerning excluded claims) below, and conditioned upon Kmart's full payment of the Settlement Amount and subject to Paragraph 20 below, the United States releases Kmart and its corporate parents, subsidiaries, affiliates, predecessors, successors, current and former officers, directors, employees, and agents (collectively, "Kmart"), from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

6.      In consideration of the obligations of Kmart set forth in this Agreement, and conditioned upon Kmart's full payment of the Settlement Amount and subject to Paragraph 20 below, DHA agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from the TRICARE Program against Kmart and its corporate parents, subsidiaries, affiliates, predecessors, successors, current and former officers, directors, employees, and agents under 32 C.F.R. § 199.9 for the Covered Conduct, except as reserved in this Paragraph and in Paragraph 8 (concerning excluded claims), below.  DHA expressly reserves authority to exclude Kmart from the TRICARE Program under 32 C.F.R. §§199.9 (f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii) (mandatory exclusion), based upon the Covered Conduct.  Nothing in this Paragraph precludes DHA or the TRICARE Program from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

7.      Subject to the exceptions in Paragraph 8 below, and conditioned upon Kmart's full payment of the Settlement Amount and Relator Fee Share and subject to Paragraph 20 below, Relator, for himself and for his heirs, successors, attorneys, agents, and assigns, releases

*U.S. ex rel. Garbe v. Kmart*

Kmart and its corporate parents, subsidiaries, affiliates, predecessors, successors, current and

former officers, directors, employees, and agents from any claim, liability or cause of action, at

law or in equity, that the Relator, on his own behalf or on behalf of any other party, has had,

currently has, or may in the future have, arising out of or in any way relating to the Civil Action,

the Covered Conduct or any other fact or matter regarding Relator's employment with Kmart,

including, but not limited to, any civil monetary claim the Relator has or may have on behalf of

the United States, the Medicaid Participating States, or California or Illinois, for the Covered

Conduct or the Civil Action under the False Claims Act, 31 U.S.C. §§ 3729-3733, any state FCA

statutes, or the California Insurance Fraud Prevention Act, Cal. Ins. Code §1871 et seq., or the

Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92, to include any claims

for expenses or attorney's fees and costs under those or other statutes or any other common law

or equitable cause of action.

       8.     Notwithstanding the releases given in paragraphs 5 and 6 of this Agreement, or

any other term of this Agreement, the following claims of the United States are specifically

reserved and are not released:

        a.     Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

        b.     Any criminal liability;

        c.     Except as explicitly stated in this Agreement, any administrative liability, including mandatory and permissive exclusion from Federal health care programs;

        d.     Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

        e.     Any liability based upon obligations created by this Agreement;

        f.     Any liability of individuals, except as expressly provided herein;

*U.S. ex rel. Garbe v. Kmart*

g.      Any liability for express or implied warranty claims or other claims for

defective or deficient products or services, including quality of goods and

services; or

h.      Any liability for failure to deliver goods or services due.

9.      Relator and his heirs, successors, attorneys, agents, and assigns shall not object to

this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under

all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).  Conditioned upon Relator's receipt

of the payments described in Paragraph 4, Relator and his heirs, successors, attorneys, agents,

and assigns fully and finally release, waive, and forever discharge the United States, its agencies,

officers, agents, employees, and servants, from any claims arising from the filing of the Civil

Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this

Agreement and/or the Civil Action.

10.     Beyond the public financial disclosures of its corporate parent Sears Holdings

Corporation (Public Disclosures), Kmart has provided sworn financial disclosure statements

(Financial Statements) and Public Disclosures to the United States and the United States has

relied on the accuracy and completeness of those Financial Statements and Public Disclosures in

reaching this Agreement. Kmart warrants that the Financial Statements and Public Disclosures

are complete, accurate, and current, as of their date of submission, consistent with any

clarifications and/or exceptions contained therein or otherwise documented between Kmart and

the United States at the time.  If the United States learns of asset(s) in which Kmart had an

interest at the time of this Agreement that were not disclosed in the Financial Statements or

Public Disclosures, or if the United States learns of any misrepresentation by Kmart on, or in

connection with, the Financial Statements or Public Disclosures, and if such nondisclosure or

misrepresentation changes the estimated net worth set forth in the Financial Statements or Public

*U.S. ex rel. Garbe v. Kmart*

11

Disclosures by $4,000,000 or more, the United States may at its option: (a) rescind this

Agreement and file suit based on the Covered Conduct, or (b) let the Agreement stand and

collect the full Settlement Amount plus one hundred percent (100%) of the value of the net worth

of Kmart previously undisclosed. Kmart agrees not to contest any collection action undertaken

by the United States pursuant to this provision if instituted before the last Settlement Payment is

made, and immediately to pay the United States all reasonable costs incurred in such an action,

including attorney's fees and expenses.

11.    In the event that the United States, pursuant to Paragraph 10 (concerning

disclosure of assets), above, opts to rescind this Agreement, Kmart agrees not to plead, argue, or

otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or

similar theories, to any civil or administrative claims that (a) are filed by the United States within

60 (sixty) calendar days of written notification to Kmart that this Agreement has been rescinded,

and (b) relate to the Covered Conduct, except to the extent these defenses were available on the

Effective Date of this Agreement. Any such rescission shall also constitute a rescission of its

Agreement between Relator and Kmart.

12.    Kmart waives and shall not assert any defenses Kmart may have to any criminal

prosecution or administrative action relating to the Covered Conduct that may be based in whole

or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the

Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution,

this Agreement bars a remedy sought in such criminal prosecution or administrative action.

Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by

the United States concerning the characterization of the Settlement Amount for purposes of the

Internal Revenue laws, Title 26 of the United States Code.

*U.S. ex rel. Garbe v. Kmart*

13.    Kmart fully and finally releases the United States, its agencies, officers, agents,

employees, and servants, from any claims (including attorney's fees, costs, and expenses of

every kind and however denominated) that Kmart has asserted, could have asserted, or may

assert in the future against the United States, its agencies, officers, agents, employees, and

servants, related to the Covered Conduct and the United States' investigation and prosecution

thereof.

14.    Kmart fully and finally releases the Relator and his heirs, successors, assigns,

attorneys, and agents from any claims (including attorney's fees, costs, and expenses of every

kind and however denominated) that Kmart has asserted, could have asserted, or may assert in

the future against the Relator, related to the Covered Conduct and the Relator's investigation and

prosecution thereof.

15.    The Settlement Amount shall not be decreased as a result of the denial of claims

for payment now being withheld from payment by any Medicare contractor (*e.g.*, Medicare

Administrative Contractor, fiscal intermediary, carrier), TRICARE contractor, or any state payer,

related to the Covered Conduct; and Kmart agrees not to resubmit to any Medicare contractor,

TRICARE contractor, or any state payer any previously denied claims related to the Covered

Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such

pending appeals.

16.    Kmart agrees to the following:

a.    Unallowable Costs Defined:  All costs (as defined in the Federal

Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social

Security Act, 42 U.S.C. §§ 1395-1395kkk-1 and 1396-1396w-5; and the regulations and official

program directives promulgated thereunder) incurred by or on behalf of Kmart, its present or

former officers, directors, employees, shareholders, and agents in connection with:

*U.S. ex rel. Garbe v. Kmart*

(1)    the matters covered by this Agreement;

(2)    the United States' audit(s) and civil investigation(s) of the matters covered

by this Agreement;

(3)    Kmart's investigation, defense, and corrective actions undertaken in

response to the United States' audit(s) and civil investigation in

connection with the matters covered by this Agreement (including

attorney's fees);

(4)    the negotiation and performance of this Agreement; and

(5)    the payments Kmart makes to the United States or Participating States·

pursuant to this Agreement and any payments that Kmart may make to

Relator, including costs and attorneys' fees

are unallowable costs for government contracting purposes and under the Medicare Program,

Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program

(FEHBP) (hereinafter referred to as Unallowable Costs).

b.    Future Treatment of Unallowable Costs:  Unallowable Costs shall be

separately determined and accounted for by Kmart, and Kmart shall not charge such

Unallowable Costs directly or indirectly to any contracts with the United States or any State

Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost

statement, information statement, or payment request submitted by Kmart or any of its

subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c.    Treatment of Unallowable Costs Previously Submitted for Payment:

Kmart further agrees that within 90 days of the Effective Date of this Agreement it shall identify

to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and

Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph)

*U.S. ex rel. Garbe v. Kmart*

included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Kmart or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Kmart agrees that the United States, at a minimum, shall be entitled to recoup from Kmart any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Kmart or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Kmart or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

      d.     Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Kmart's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

17.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraphs 5, 6, 7, 9, 13, and 14 or Paragraph 18 (waiver for beneficiaries paragraph), below.

18.     Kmart agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors,

*U.S. ex rel. Garbe v. Kmart*

legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

19.    Kmart warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and shall remain solvent notwithstanding payment of the initial Settlement Payment.  Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to Kmart, within the meaning of 11 U.S.C. § 547(c)(1), and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange.  Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Kmart was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

20.    If Kmart commences, or a third party commences, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking to have any order for relief of Kmart's debts, or seeking to adjudicate Kmart as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, or other similar official for Kmart or for all or any substantial part of Kmart's assets, Kmart agrees as follows:

a.    Kmart's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. § 547, and Kmart shall not argue or otherwise take the position in any such case, proceeding, or action that:  (i) Kmart's obligations under this Agreement may be avoided under 11 U.S.C. § 547; (ii) Kmart was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment made to the United States or Relator; or (iii) the

*U.S. ex rel. Garbe v. Kmart*

mutual promises, covenants, and obligations set forth in this Agreement do not constitute a

contemporaneous exchange for new value given to Kmart.

      b.     If Kmart's obligations under this Agreement are avoided for any reason,

including, but not limited to, through the exercise of a trustee's avoidance powers under the

Bankruptcy Code, the United States, at its sole option, may rescind the releases in this

Agreement and bring any civil and/or administrative claim, action, or proceeding against Kmart

for the claims that would otherwise be covered by the releases provided in Paragraphs 5 and 6

above. Kmart agrees that (i) any such claims, actions, or proceedings brought by the United

States are not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) as a result of the

action, case, or proceedings described in the first clause of this Paragraph because it would be an

exercise of the United States' police and regulatory power to protect public policy and public

health, safety and welfare, Kmart shall not argue or otherwise contend that the United States'

claims, actions, or proceedings are subject to an automatic stay; (ii) Kmart shall not plead, argue,

or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or

similar theories, to any such civil or administrative claims, actions, or proceeding that are

brought by the United States within sixty (60) calendar days of written notification to Kmart that

the releases have been rescinded pursuant to this Paragraph, except to the extent such defenses

were available on the Effective Date of the Agreement; and (iii) the United States has a valid

claim against Kmart in the amount of $111,000,000 and Relator has a valid claim against Kmart

in the amount of $16,943,108.59 for attorneys' fees and costs and $3,000,000 for state insurance

claims, and the United States and Relator may pursue their claims in the case, action, or

proceeding referenced in the first clause of this Paragraph, as well as in any other case, action, or

proceeding.

*U.S. ex rel. Garbe v. Kmart*

c.       Kmart acknowledges that its agreements in this Paragraph are provided in exchange for valuable consideration provided in this Agreement.

21.      Upon receipt of the initial Settlement Payment described in Paragraph 1, above, the Parties shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant to Rule 41(a)(1), subject to the terms of this Agreement. The Court, however, will retain jurisdiction to enforce this Agreement. The release by the United States shall be with prejudice as to the Covered Conduct and without prejudice as to any other claims. The release by Relator shall be with prejudice as to all claims.

22.      Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

23.      Each party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

24.      This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Southern District of Illinois. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

25.      This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties. Additionally, as noted above, separate settlement agreements have been executed with the Medicaid Participating States, the California Insurance Commissioner, and the Illinois Attorney General.

26.      The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

*U.S. ex rel. Garbe v. Kmart*

27.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

28.     This Agreement is binding on Kmart's successors, transferees, heirs, and assigns.

29.     This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

30.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

31.     This Agreement is effective on the date of signature of the last signatory to this Agreement and the execution of the separate settlement agreements entered into by the Medicaid Participating States, the California Insurance Commissioner, and the Illinois Attorney General, whichever comes latest (Effective Date of this Agreement). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

### THE UNITED STATES OF AMERICA

DATED: 12/18/17        BY: _____
                              Alice Pang
                              Trial Attorney
                              Commercial Litigation Branch
                              Civil Division
                              United States Department of Justice

DATED: 12/20/17        BY: _____
                              Gerald Burke
                              Assistant United States Attorney
                              Southern District of Illinois

*U.S. ex rel. Garbe v. Kmart*

19

DATED: 11/27/2017          BY:    BLEY.PAUL.NICHOL    Digitally signed by
                                  AS.1099873821       BLEY.PAUL.NICHOLAS.1099873821
                                                      DN: c=US, o=U.S. Government, ou=DoD, ou=PKI,
                                                      ou=DHA, cn=BLEY.PAUL.NICHOLAS.1099873821
                                                      Date: 2017.11.27 13:19:07 -05'00'

                                  LEIGH A. BRADLEY
                                  General Counsel
                                  Defense Health Agency
                                  United States Department of Defense

*U.S. ex rel. Garbe v. Kmart*

KMART CORPORATION - DEFENDANT

DATED: 12/22/17    BY: _____

~~Mark Semisch~~    DEPUTY GENERAL COUNSEL
~~General Counsel~~    AND ASSISTANT SECRETARY
Sears Holding Corporation


DATED: 12/15/17    BY: _____

Catherine M. O'Neil
William F. Johnson
Christopher C. Burris
King & Spalding LLP
Counsel for Defendant

*U.S. ex rel. Garbe v. Kmart*

21

JAMES GARBE - RELATOR

DATED: 11-27-17    BY: _____ as Guardian
Carl Ireland
Guardian for James Garbe and his estate
Relator

DATED: 12-8-2017 BY: _____
Stephen Tillery
Robert L. King
Aaron M. Zigler
Peter O. Rocque
Korein Tillery, LLC
Counsel for Relator

*U.S. ex rel. Garbe v. Kmart*

22

# **Exhibit 2**

## MORTGAGE NOTE

**VALUE: $17,400,000**                    **DUE:  December 22, 2019**

**FOR VALUE RECEIVED**, the undersigned promises to pay to the order of **THE UNITED STATES OF AMERICA** and **CARL IRELAND**, as guardian for James Garbe and his estate, as joint and several creditors (*acreedores solidarios*) the principal sum of **SEVENTEEN MILLION FOUR HUNDRED THOUSAND DOLLARS ($17,400,000.00)**, with interest on the unpaid balance at a rate equal to one point five percent (1.5%) per annum.  Interest due under this Mortgage Note shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed from the date of this Mortgage Note until full payment hereof (including the first day but excluding the last day).  Payments of interest and principal hereunder shall be made at the office or domicile of the holder of this Mortgage Note or the person entitled to enforce the instrument within the Commonwealth of Puerto Rico, or at such other place as the holder of this Mortgage Note or the person entitled to enforce the instrument may from time to time designate in writing.

Anything herein to the contrary notwithstanding, if the rate of interest required to be paid hereunder exceeds the maximum rate lawfully chargeable, the rate of interest to be paid shall be automatically reduced to the maximum rate lawfully chargeable so that no amounts shall be charged which are in excess thereof, and, in the event it should be determined that any excess over such highest lawful rate has been charged or received, the holder hereof or the person entitled to enforce the instrument shall promptly refund such excess to the undersigned.

In the event the holder of this Mortgage Note or the person entitled to enforce the instrument resorts to any court (including any bankruptcy court) or initiates mortgage foreclosure proceedings, regardless of its nature, to collect in full or in part the principal amount hereof and/or any interest accrued thereon, the undersigned shall pay to said holder or person entitled to enforce the instrument a sum of up to five percent (5%) of the principal balance hereof for the actual aggregate cost of the disbursements, expenses and reasonable attorneys' fees which may be incurred by the holder hereof or the person entitled to enforce the instrument, which amount shall immediately become liquid, due and payable upon the filing of the petition or complaint.

The undersigned, and all others who may become liable for all or any part of this obligation, whether as maker, principal, surety, guarantor or endorser, shall be jointly and severally ("solidariamente") liable and jointly and severally ("solidariamente") waive demand, presentment, protest, notice of dishonor and non-payment and any and all lack of diligence or delays in collection or enforcement hereof, and expressly agree and consent (i) to any extension of time, modification of the terms of payment, release of any party liable for this obligation, release, substitution or exchange of any property, real or personal, tangible or intangible, guaranteeing payment of the mortgage securing this Mortgage Note, and (ii) that any other indulgence or forbearance may be made without notice to said party, and without in any way affecting the liability of any party obligated hereunder.

Payments of both principal and interest are to be made in lawful money of the United States of America.

This Mortgage Note is secured by a mortgage constituted pursuant to Deed Number Two (2) of Constitution of Mortgage executed on the date hereof before Notary Public Miguel Agustín Blanco Fuertes(the "Deed of Mortgage"), and the holder of this Mortgage Note or the person entitled to enforce the instrument is entitled to the rights, benefits and security of all of the provisions and conditions set forth in the Deed of Mortgage and in any pledge agreement or other instrument executed by the undersigned assigning, pledging, or otherwise encumbering this Mortgage Note as security for the obligations described therein, and may enforce the agreements of the undersigned contained in the Deed of Mortgage and in each of said agreements or instruments, and may exercise the remedies provided thereby or otherwise in respect thereof without being required first to foreclosure on the pledge or other lien or encumbrances so constituted upon this Mortgage Note, all in accordance with the terms of the Deed of Mortgage and said agreements or instruments. No reference herein to the Deed of Mortgage and said agreements or instruments and no provision of this Mortgage Note or of said agreements or instruments shall alter or impair the obligations of the undersigned hereunder, which are continuing, absolute and unconditional, nor shall such reference affect the negotiability hereof under the Commercial Transactions Act of Puerto Rico, or any other applicable law.

The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a) if default shall be made in the due and punctual payment of any principal of and/or interest on this Mortgage Note when and as the same shall become due and payable; or

(b) if default shall be made by the undersigned in the due performance of and/or compliance with any of the terms of the Deed of Mortgage; or



(c) if a default or an event of default shall exist under this Mortgage Note, or under any document or agreement pursuant to which this Mortgage Note is pledged, assigned, or otherwise encumbered; or

(d) if any material representation or warranty of the undersigned made herein or in any document or agreement pursuant to which this Mortgage Note is pledged, assigned, or otherwise encumbered shall be false in any material respect on the date when made.

(e) If the Mortgagor defaults or breaches any of the terms of the Settlement Agreement entered into between Mortgagor and Mortgagee on December twenty-two (22), two thousand seventeen (2017).

Upon the occurrence of any Event of Default (in addition to any other remedies for which the holder of this Mortgage Note or the person entitled to enforce the instrument may be entitled under this Mortgage Note, the Deed of Mortgage, or any document or agreement pursuant to which this Mortgage Note is pledged, assigned, or otherwise encumbered), then, upon expiration of any applicable notice, grace and/or cure period, the entire principal amount of this Mortgage Note at the time outstanding shall, at the option of the holder of this Mortgage Note or the person entitled to enforce the instrument, become immediately due and payable without notice or demand. Failure to exercise this option shall

not constitute a waiver of the right to exercise such option in the event of any subsequent default. The undersigned will pay all costs and expenses incurred by or on behalf of the holder of this Mortgage Note or the person entitled to enforce the instrument (including, without limitation, reasonable attorneys' fees and expenses) in enforcing this Mortgage Note or the Deed of Mortgage, or occasioned by any default or Event of Default hereunder.

The undersigned hereby waives presentment for payment, demand, protest, notice of dishonor hereof, and further hereby waives all benefit of valuation, appraisement, and execution laws. The holder hereof or the person entitled to enforce the instrument may extend the time of payment of this Mortgage Note, postpone the enforcement hereof, grant any other indulgence and add or release any party primarily or secondarily liable hereon, without affecting or diminishing the right or recourse of the holder hereof or the person entitled to enforce the instrument against the makers, endorsers and all parties to this Mortgage Note, which right is hereby expressly reserved.

In San Juan, Puerto Rico, this twelfth (12th) day of January, two thousand eighteen (2018).

SEARS ROEBUCK DE PUERTO RICO, INC.

By: _____.
Name: Dilia María Peña Fontanes
Title: Controller

Affidavit Number: -2888-

Acknowledged and subscribed before me by Dilia María Peña Fontanes, of legal age, married, executive, and resident of San Juan, Puerto Rico, as Controller of **SEARS ROEBUCK DE PUERTO RICO, INC.**, personally known to me. In San Juan, Puerto Rico, this twelfth (12th) day of January, two thousand eighteen (2018).



NOTARY PUBLIC



**Exhibit 3**

## MORTGAGE NOTE PLEDGE AND SECURITY AGREEMENT

This **MORTGAGE NOTE PLEDGE AND SECURITY AGREEMENT** (this "Agreement") dated January 12, 2017, made by **SEARS ROEBUCK DE PUERTO RICO, INC.**, a corporation organized and existing under the laws of the State of Delaware, and duly authorized to engage in trade or business in the Commonwealth of Puerto Rico as pledgor (the "Pledgor"), in favor of the **UNITED STATES OF AMERICA** acting through the United States Department of Justice, Civil Division, Commercial Litigation Branch in turn represented by the Assistant U.S. Attorney, Chief Civil Division, Héctor E. Ramírez Carbó, who is of legal age, married, attorney-at-law and resident of Guayama, Puerto Rico (the "United States") and Carl Ireland Curtiss, of legal age, married, attorney-at-law and resident of the State of Ohio as guardian for James Garbe and his estate in his role as Relator under a *qui tam* action filed by James Garbe against Kmart Corporation ("Kmart") in the United States District Court for the Central District of California captioned *U.S., et al., ex rel. Garbe v. Kmart Corporation*, Case No. CV08-04669 (C.D.Cal.) and subsequently transferred to the United States District Court for the Southern District of Illinois, Case Number 3:12-cv-00881-MJR-PM (S.D. Ill.), who in turn is herein represented by his true and lawful attorney-in-fact, Alexandra L. Pérez Pérez, of legal age, married, attorney-at-law and resident of San Juan, Puerto Rico (the "Relator" and together with the United States hereinafter collectively referred to as the "Pledgees" and individually a "Pledgee").

### WITNESSETH:

**WHEREAS,** James Garbe, a former Kmart pharmacist, filed a *qui tam* action against Kmart in the United States District Court for the Central District of California captioned *U.S., et al., ex rel. Garbe v. Kmart Corporation*, Case No. CV08-04669 (C.D. Cal.), pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §3730(b); state FCA statutes; and the California Insurance Fraud Prevention Act, Cal. Ins. Code § 1871, *et seq.*, and the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS § 92 (the "Civil Action");



**WHEREAS,** the parties to the Civil Action, through their authorized representatives have entered into a Settlement Agreement effective on the 22nd day of December, 2017 (the "Settlement Agreement");

**WHEREAS,** in the Settlement Agreement, Kmart and Sears Holding Corporation agreed to pledge real estate as collateral to secure the Settlement Payments (as such term is defined in the Settlement Agreement) as set forth in the Settlement Agreement.

**NOW, THEREFORE**, in consideration of the premises and the agreements herein contained and in order to induce the Pledgees to enter into the Settlement Agreement, the Pledgor hereby agrees with the Pledgees as follows:

**1. Definitions.** Reference is hereby made to the Settlement Agreement for a statement of the terms thereof. All capitalized terms used herein that are not otherwise defined shall have the meanings set forth in the Settlement Agreement.

**2. Pledge and Grant of Security Interest.** As collateral security for all of the Obligations (as defined below), the Pledgor hereby delivers, pledges and assigns to the Pledgees, and grants to the Pledgees, a continuing lien on and security interest in all of the following collateral (hereinafter the "Pledged Collateral"):

(a) Mortgage Note in the stated principal amount of SEVENTEEN MILLION FOUR HUNDRED THOUSAND DOLLARS ($17,400,000.00) bearing affidavit number 2888 of Notary Public

Miguel Agustín Blanco Fuertes, secured by a mortgage constituted pursuant to Deed Number Two (2) executed on even date herewith before the same Notary Public; and

(b) All proceeds of the foregoing including, without limitation, cash proceeds.

The Pledgor agrees that the mortgage described above (the "Mortgage") shall secure, through the pledge of the mortgage note identified above (the "Mortgage Note"), any and all of the Obligations (as hereinafter defined). The Mortgage constitutes a mortgage lien on those certain properties of Pledgor with an aggregate surface area of 14.9929 *cuerdas* located in the Municipality of San Juan, Puerto Rico, one of which is recorded in the Registry of Property, Third Section of San Juan, at page 221 of volume 466 of Monacillos, property number 17,328, property tax identification number 087-061-851-37-001 and the other recorded in the Registry of Property , Fourth Section of San Juan at page 181 of volume 302 of Rio Piedras Sur, property number 9,717, property tax identification number 087-061-058-07-001 (collectively the "Realty").

**3. Security for Obligations.** This Agreement secures the payment of all obligations of every kind and character now or hereafter existing (whether matured or unmatured, contingent or liquidated) of Kmart due to the Pledgees under the Settlement Agreement, as such agreement may hereafter be amended or otherwise modified from time to time, whether for principal, interest, fees, expenses, reimbursement, indemnification or otherwise (all such obligations being the "Obligations"). Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts that constitute part of the Obligations, including without limitation the Settlement Payments due to the Pledgees or any other amount that would be owed to the Pledgees under the Settlement Agreement.




**4. Representations and Warranties.** Pledgor represents and warrants as follows:

(a) This Agreement, the Mortgage Note and the Mortgage have been duly authorized, executed and delivered by the Pledgor, and such instruments are the legal, valid and binding obligations of the Pledgor, enforceable against the Pledgor in accordance with their respective terms.

(b) No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the constitution of the Mortgage (except for the filing of a certified copy of the Deed of Mortgage described in Section 2(a) hereof at the Registry of Property of Puerto Rico, Fifth Section of San Juan) or the pledge of the Pledged Collateral pursuant to this Agreement or for the due execution, delivery or performance of this Agreement, the Mortgage Note or the Mortgage by the Pledgor, or (ii) for the exercise by each of the Pledgees of any of their respective rights and remedies hereunder or under the Settlement Agreement, the Mortgage Note or the Mortgage.

(c) The Pledgor is and will be at all times the owner of the Pledged Collateral, free and clear of any lien or other charge or encumbrance or rights of third parties, except for the lien created by this Agreement and those other encumbrances set forth on Schedule B of the title insurance policy obtained by the Pledgees in connection with the execution of this Agreement (collectively the "Permitted Encumbrances"). Except for this Agreement no other instrument similar in effect covering the Pledged Collateral is in effect.

(d) The Pledgor is the owner of record, with valid, good and marketable fee simple *(pleno dominio)* title to the Realty, free and clear of all liens, charges, encumbrances and rights of third parties except for the Permitted Encumbrances.

(e) The Mortgage constitutes a mortgage lien on the property identified therein, and is not subject or subordinated to any prior liens, charges, encumbrances or rights of third parties.

(f) This Agreement creates a valid lien in favor of the Pledgees on the Pledged Collateral as security for the Obligations. The Pledgees possession of the Mortgage Note pursuant to the terms of this Agreement results in the perfection of such lien. Such lien constitutes a perfected first priority lien. All actions necessary or desirable to perfect and protect such lien have been duly taken.

(g) The exercise by each of the Pledgees of any of their respective rights and remedies under the Settlement Agreement, hereunder or under the Mortgage will not contravene any law or any contractual restriction binding on or affecting the Pledgor or any of its properties.

**5. Covenants.** Pertaining to the Pledge Collateral for so long as any of the Obligations shall remain outstanding:

(a) The Pledgor will, at its expense, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that any of the Pledgees may reasonably determine are necessary (i) to perfect and protect the lien purported to be created hereby and by the Mortgage; (ii) to enable any of the Pledgees to exercise and enforce its rights and remedies under the Settlement Agreement or hereunder in respect of the Pledged Collateral and under the Mortgage in respect of the Realty and the Mortgaged Property; and (iii) to otherwise effect the purposes of this Agreement and the Mortgage, including, without limitation, executing and filing such other documents, or amendments hereto or thereto, as may be necessary to perfect and preserve the lien purported to be created hereby and by the Mortgage.

(b) The Pledgor shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of or transfer, or grant an option with respect to, or permit any such disposition to occur with respect to, the Pledged Collateral or the Realty, or any part thereof or (ii) create, incur, assume or permit to exist any lien, security interest, or other charge or encumbrance or any other type of preferential arrangement upon or with respect to the Pledged Collateral or the Realty, or any part thereof, except for the liens created under this Agreement with respect to the Pledged Collateral and the liens created pursuant to and described in the Mortgage with respect to the Realty and the Mortgaged Property (as such term is defined in the Mortgage).

(c) The Pledgor will not take or fail to take any action that would in any manner impair the value or enforceability of the lien of the Pledgees on the Pledged Collateral.

(d) The Pledgor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against the Realty or the Mortgaged Property, except to the extent that the validity thereof is being contested in good faith by proper proceedings which stay the imposition of any penalty, fine or lien resulting from the non-payment thereof and with respect to which adequate reserves have been made and set aside for the payment thereof.

(e) The Pledgor shall, promptly on written demand therefor by any Pledgee, deliver to such Pledgee evidence of the Pledgor's ownership of any of the Pledged Collateral, the Realty and the Mortgaged Property.

(f) The Pledgor will, at its expense, maintain the Realty insured at all times as required under Section 6 of this Agreement.

3

(g) The Pledgor will comply in all material respects with all laws, ordinances, and regulations affecting the Realty and the Mortgaged Property.

(h)    The Pledgor hereby irrevocably appoints the Pledgees as the Pledgor's attorney-in-fact and proxy, with full authority in the place and stead of the Pledgor and in the name of the Pledgor or otherwise, from time to time in the Pledgees' discretion, if an Event of Default (as such term is defined in Section 8 herof) shall have occurred and be continuing, to take any action and to execute any instrument that the Pledgees may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, (i) to obtain and adjust insurance required to be paid to the Pledgees with respect to the Realty or the Mortgaged Property, (ii) to pay taxes, assessments or other charges or claims that the Pledgees in good faith believe to be then due with respect to the Pledged Collateral, the Realty or the Mortgaged Property, (iii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipt for moneys due and to become due under or in respect of the Pledged Collateral, the Realty or the Mortgaged Property, (iv) to receive, indorse and collect any drafts or other instruments, documents and chattel paper, and (v) to file any claims or take any action or institute any proceedings which either of the Pledgees may deem necessary to enforce the rights of the Pledgees with respect to the Pledged Collateral, the Realty and the Mortgaged Property. Pledgor hereby ratifies and approves all acts of the attorney-in-fact.

(i) If the Pledgor fails to perform any agreement contained herein or in Mortgage, upon written notice to Pledgor either one of the Pledgees may itself perform, or cause performance of, such agreement or obligation, and the expenses of the Pledgee taking such action incurred in connection therewith shall be payable by the Pledgor pursuant to the terms hereof.

(j) The powers conferred on the Pledgees under this Agreement are solely to protect the interests of the Pledgees in the Pledged Collateral, the Realty and the Mortgaged Property, and shall not impose any duty on either one of the Pledgees to exercise any such powers. Except for the safe custody of any Pledged Collateral in their possession and the accounting for monies actually received by them hereunder, the Pledgees shall not have any liability or duty as to any Pledged Collateral, the Realty or the Mortgaged Property or as to the taking of any necessary steps to preserve any rights pertaining to the Pledged Collateral, the Realty or the Mortgaged Property.

**6. Insurance; Casualty and Condemnation**

6.1 Insurance Policies; Flood Insurance.

(a)    The Pledgor shall obtain and maintain, or cause to be maintained, insurance for the Pledgor and the Mortgaged Property providing at least the following coverages:

(i)    so called "All Risk" or "Special Perils" property insurance on the Mortgaged Property;

(A)    in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) without depreciation;

(B)    with no co-insurance requirement, or otherwise waiving all co-insurance provisions;

(C)      providing for no deductible in excess of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "Required Deductible") for all such "All Risk" or "Special Perils" property insurance coverage or such higher deductible if the Pledgor provides the Pledgees with cash or a letter of credit in an amount equal to the difference between the actual deductible and the Required Deductible; and

(D)      containing "Ordinance or Law Coverage" covering "Demolition Expense" of and the replacement value for the "Undamaged Portion" as well as the increased cost to reconstruct following a loss due to enforcement of laws and building regulations or ordinances regulating construction following a loss.

In addition, the Pledgor shall obtain (x) Earthquake insurance in form and substance reasonably satisfactory to Pledgor in the event the Mortgaged Property is located in an area with a high degree of seismic activity in an amount equal to the lesser (1) or 100% of the total insured value of the Mortgaged Property or (2) $30,000,000.00 prior to the second Settlement Payment and $19,000,000 prior to the third Settlement Payment and (y) Named Windstorm insurance, in form and substance reasonably satisfactory to the Pledgees in the event Windstorm coverage is excluded from the "All Risk" or "Special Perils" coverage, in an amount equal to the lesser of (1) 100% of the total insured value of the Mortgaged Property or (2) $30,000,000.00 prior to the second Settlement Payment and $19,000,000 prior to the third Settlement Payment, provided that deductibles for the insurance required pursuant to clause (x) or (y) shall not be greater than five percent (5%) of the total  insured value at the Mortgaged Property.

In addition, if the Mortgaged Property is at any time a Flood Hazard Property (as such term is defined in Section 12 hereof), then the Pledgor shall provide to the Pledgees the Flood Insurance Documents (as such term is defined in Section 12 hereof) with respect thereto.  Unless the Pledgor provides the Pledgees with the Flood Insurance Documents, the Pledgees may purchase Flood Insurance (as such term is defined in Section 12 hereof) meeting the requirements of clause (iii) of the definition of "Flood Insurance Documents" at the Pledgor's expense to protect the interests of the Pledgees. The Pledgor shall cooperate with the Pledgees in connection with compliance with the Flood Laws (as such term is defined in Section 12 hereof), including by providing any information reasonably required by the Pledgees in order to confirm compliance with the Flood Laws.  If a Flood Redesignation (as such term is defined in Section 12 hereof) shall occur with respect to the Mortgaged Property, the Pledgees shall obtain a completed Flood Hazard Determination (as such term is defined in Section 12 hereof) with respect to the Mortgaged Property, and the Pledgor shall provide to the Pledgees the Flood Insurance Documents with respect thereto by not later forty-five (45) days after the date of the Flood Redesignation or any earlier date required by the Flood Laws.  The Pledgor shall give to the Pledgees written notice of any Flood Compliance Event (as such term is defined in Section 12 hereof) (other than a Flood Redesignation) not less than forty-five (45) days prior to such Flood Compliance Event.  For avoidance of doubt, the Pledgor shall provide, or re-provide, as the case may be, to the Pledgees the Flood Insurance Documents by not later than the date of the Flood Compliance Event and as a condition precedent to the occurrence of such Flood Compliance Event.

(ii)      Commercial General Liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Mortgaged Property, such insurance:

(A)      to be on the so called "occurrence" form with a limit of not less than One Million and No/100 Dollars ($1,000,000) per occurrence and Two Million and No/100 Dollars ($2,000,000) in the aggregate; and

(B)      to continue at not less than the aforesaid limit until required to be changed by the Pledgees in writing by reason of changed economic conditions making such protection inadequate; and

(iii)      at all times during which structural construction, repairs or alterations are being made, and only if the Mortgaged Property coverage form does not otherwise apply, the insurance provided for in subsection (i) shall be written on a Builder's Risk Completed Value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Mortgaged Property or no exclusion thereof, (4) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) without depreciation, and (5) written on a no-coinsurance form, or otherwise waiving all co-insurance provisions;

(iv)      if applicable, Comprehensive Boiler and Machinery insurance covering all pressure vessels and steam boilers (if any), mechanical equipment and electrical systems at the Mortgaged Property in amounts as shall be reasonably required by the Pledgees on terms consistent with the commercial property insurance policy required under subsection (i) above;

(v)      Umbrella Liability insurance in an amount not less than One Million and No/100 Dollars ($1,000,000) per occurrence;

(vi)      commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles in the amount of $1,000,000 per occurrence;

(vii)      the Policies (as such term is defined hereinafter) will not contain an exclusion for acts of terrorism or if the Terrorism Risk Insurance Program Reauthorization Act of 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time) is not in effect and such Policies contain an exclusion for acts of terrorism, then provided that terrorism insurance is commercially available, the Pledgor shall obtain, to the extent available, a stand-alone policy that provides the same coverage as the Policies would have if such exclusion did not exist; provided, however, (x) that such stand-alone policy may have a deductible that is reasonable for such stand-alone policies with respect to properties similar to the Mortgaged Property and reasonable for the geographic region where the Mortgaged Property is located, so long as in no event shall such deductible exceed $50,000.00, and (y) Pledgor shall not be required to spend on terrorism insurance coverage more than two times the amount of the insurance premium that is payable at such time in respect of the property and business interruption/rental loss insurance required hereunder on a standalone-basis (without giving effect to the cost of terrorism and earthquake components of such casualty and business interruption/rental loss insurance), and if the cost of terrorism insurance exceeds such amount, Pledgor shall purchase the maximum amount of terrorism insurance available with funds equal to such amount; and

(viii)      upon sixty (60) days' notice, such other insurance and in such reasonable amounts as the Pledgees from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Mortgaged Property located in or around the region in which the Mortgaged Property is located if such other insurance is recommended by an independent, third party insurance consultant commissioned by any of the Pledgees and agreeable to the Pledgor, whose agreement will not be unreasonably withheld.  The Pledgees agrees that it shall be responsible for all fees and expenses incurred in connection with the aforementioned insurance consultant.

All insurance provided for in this Section 6.1 shall be obtained under valid and enforceable policies (collectively, the "Policies" or, in the singular, the "Policy"), and shall be subject to the confirmation by

6

the Pledgees that the insurance companies, amounts, deductibles, loss payees and insureds satisfy the requirements expressly set forth herein. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in Puerto Rico and having a claims paying ability rating of "A-" by Standard & Poor's Financial Services, LLC ("S&P"). Not less than ten (10) days prior to the expiration dates of the Policies furnished to the Pledgees, certificates of insurance, including all applicable mortgagee clauses and additional insured policy language, accompanied by evidence satisfactory to the Pledgees of payment of the premiums due (the "Insurance Premiums"), shall be delivered by the Pledgor to the Pledgees.

(b)    All Policies provided for or contemplated by Section 6.1(a), shall name the Pledgor as the insured and the Pledgees as the additional insured, as its interests may appear, and in the case of all risk property coverage, including but not limited to boiler and machinery, flood and earthquake insurance, shall contain a so called New York standard non-contributing mortgagee clause in favor of the Pledgees providing that the loss thereunder shall be payable to the Pledgees as a Loss Payee.

(c)    As respects the Mortgaged Property coverage required herein;

(i)    no act or negligence of the Pledgor, or anyone acting for the Pledgor, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as the Pledgees are concerned;

(ii)    to the extent statutorily permitted, the Policies shall not be canceled without at least thirty (30) days' notice to the Pledgees; and

(iii)    the Pledgees shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(d)    If at any time the Pledgees are not in receipt of written evidence that all Policies are in full force and effect, the Pledgees shall have the right, with written notice to Pledgor (of at least fifteen (15) Business Days unless either one of the Pledgees has a reasonable good faith belief that one or more of the Policies is not in full force and effect), to take such action as either one of the Pledgees reasonably deems necessary to protect the Pledgees' interests in the Mortgaged Property, including, without limitation, obtaining such insurance coverage as either one of the Pledgees in its sole discretion deems appropriate. The insurance may, but need not, protect the Pledgor's interest. The coverages that either one of the Pledgees purchases may not pay any claim that the Pledgor makes or any claim that is made against the Pledgor in connection with the Mortgaged Property. The Pledgor may later cancel any insurance purchased by either of the Pledgees, but only after providing the Pledgees with evidence that the Pledgor has obtained insurance as required by this Agreement. All premiums incurred by either of the Pledgees in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by the Pledgor to the corresponding Pledgee upon demand and, until paid, shall be secured by the Mortgage and shall bear interest at the interest rate sets forth in the Mortgage Note. The costs of the insurance may be added to the Obligations. The cost of the insurance may be more than the cost of insurance the Pledgor may be able to obtain on its own.

(e)    Such Policies may be "blanket policies" covering multiple locations so long as the coverages for the Mortgaged Property provide the protections listed above.

6.2 Casualty; Application of Proceeds.

(a)    Right to Adjust.

(i)    If the Mortgaged Property or any part thereof is damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), the Pledgor shall give prompt written notice thereof to the Pledgees, generally describing the nature and extent of such Casualty.  Unless otherwise expressly provided in this Agreement, following the occurrence of a Casualty, the Pledgor, regardless of whether proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the portion(s) of the Mortgaged Property to the extent practicable to be of at least equal value and of substantially the same character as prior to the Casualty, all in accordance with the terms hereof.

(ii)    In the event of a Casualty that involves a loss that does not exceed $1,000,000.00, and provided that no Event of Default has occurred and be continuing, the Pledgor may settle and adjust such claim, as long as such adjustment is carried out in a competent and timely manner. In such case, the Pledgor shall collect and receive any proceeds from the Pledgees and apply such proceeds to Restoration (as such term is defined hereinafter) in the Pledgor's discretion.



(iii)    In the event of a Casualty that involves a loss that exceeds $1,000,000.00, Pledgor may settle and adjust such claim only with the written consent of both Pledgees and the Pledgees shall have the opportunity to participate, at the Pledgor's cost in any such adjustments.

(iv)    Subject to Section 6.2(a)(ii), the proceeds of any Policy shall be due and payable solely to the Pledgees for their ratable benefit, and held and applied in accordance with the terms hereof.

(b)    Borrower's Right to Apply to Restoration.

(i)    In the event of a Casualty or a Condemnation (as such term is defined hereinafter), the Pledgees shall apply the proceeds (after reimbursement of any reasonable expenses incurred by the Pledgees) to reimburse the Pledgor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property (the "Restoration") in the manner required hereby, provided and on the condition that:

(A)    no Event of Default shall have occurred and be then continuing;

(B)    the Restoration can be completed by the earliest to occur of:

(1)    the 365th day following receipt of the proceeds; and

(2)    the day scheduled for the third and last Settlement Payment.

(C)    The Pledgor shall (1) commence settlement of the insurance claim within thirty (30) days after the date of the Casualty, (2) diligently pursue the preparation of plans and specifications, the issuance of all necessary permits and approvals, the execution of construction contracts, and all other actions necessary to commence Restoration, (3) commence Restoration as soon as

8

reasonably practicable (but in no event later than sixty (60) days after completion of the matters referred to in clause (2) above, and (4) diligently pursue each of the same to satisfactory completion;

(D)    Pledgor has delivered to the Pledgees an appraisal conducted by Cushman & Wakefield, CBRE or JLL of the Mortgaged Property stating a "as dark" appraised value for the Mortgaged Property of at least $17,400,000.00;

(E)    the Mortgaged Property and the use thereof after the Restoration will be in compliance with and permitted under all legal requirements, including, without limitation, all applicable zoning laws, ordinances, rules and regulations; and

(F)    the Restoration shall be done and completed by the Pledgor in an expeditious and diligent fashion and in compliance with all legal requirements and insurance requirements.

If any of the conditions set forth in the proviso in this subsection (b)(i) is not satisfied, then, notwithstanding anything herein to the contrary, or in the Settlement Agreement, the proceeds shall be applied to the prepayment of the Settlement Payments.

(ii)    Subject to Section 6.2.(a)(ii), the proceeds shall be held by the Pledgees for their ratable benefit, and, until disbursed in accordance with the provisions hereof, shall constitute additional security for the Obligations under the Mortgage. The proceeds shall be disbursed by the Pledgees to, or as directed by, the Pledgor from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to the Pledgees that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full (less the Restoration Retainage as such term is hereinafter defined), and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Mortgaged Property which have not either been fully bonded to the reasonable satisfaction of the Pledgees and discharged of record or in the alternative fully insured to the reasonable satisfaction of the Pledgees by a title company.

(iii)    Subject to Section 6.2(a)(iii), if the cost of the Restoration exceeds $1,000,000.00 and the proceeds are provided to the Pledgor to rebuild in accordance with Section 6.2(b)(i), then the following shall apply: (a) all plans and specifications required in connection with the Restoration shall be subject to prior reasonable review and acceptance in all respects by the Pledgees and by an independent consulting engineer or other person selected by the Pledgees after consultation with the Pledgor (the "Restoration Consultant"), (b) no approval of the plans and specifications or working drawings for any Restoration or other alterations of the Mortgaged Property shall create any responsibility or liability on behalf of either Pledgee, or the Restoration Consultant for their completeness, design, sufficiency or their compliance with legal requirements or insurance requirements and (c) all out-of-pocket costs and expenses incurred by the Pledgees in connection with making the proceeds available for the Restoration including, without limitation, reasonable legal fees and disbursements and the Restoration Consultant's fees, shall be paid by Pledgor.

(iv)    In the context of a Restoration that exceeds $1,000,000.00, the Pledgees in no event shall be obligated to make disbursements of the proceeds in excess of an amount equal

to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Restoration Consultant, minus the Restoration Retainage; provided that, upon completion of each identifiable design element of the Restoration, and subject to the provisions of the last sentence of this paragraph (iv), the Pledgees shall release the related portion of the Restoration Retainage for the purpose of paying the contractors and other obligees with respect to such design element. The term "Restoration Retainage" means an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Restoration Consultant. The Restoration Retainage shall in no event, and notwithstanding anything to the contrary set forth herein, be less than the amount actually held back by the Pledgor from contractors, subcontractors and materialmen engaged in the Restoration. The Restoration Retainage shall not be released until the Restoration Consultant certifies to the Pledgees that the Restoration has been completed in accordance with the provisions of this Section 6.2(b) and that all approvals necessary for the re-occupancy and use of the Mortgaged Property have been obtained from all appropriate governmental authorities, and the Pledgees receives evidence reasonably satisfactory to the Pledgees that the costs of the Restoration have been paid in full or will be paid in full out of the Restoration Retainage; provided, however, that the Pledgees will release the portion of the Restoration Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Restoration Consultant certifies to the Pledgees that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by the Pledgees. If required by the Pledgees, the release of any such portion of the Restoration Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)    The Pledger shall not be obligated to make disbursements of proceeds more frequently than once every calendar month.

(vi)    If at any time the proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of the Pledgees, be sufficient to pay in full the balance of the costs which are estimated by the Restoration Consultant to be incurred in connection with the completion of the Restoration, the Pledgor shall deposit the deficiency (the "Net Proceeds Deficiency") in immediately available funds with the Pledgees before any further disbursement of proceeds shall be made. The Net Proceeds Deficiency deposited with the Pledgees shall be held by the Pledgees and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the proceeds, and until so disbursed pursuant to this Section 6.2(b) shall constitute additional security for the Obligations under the Mortgage.

(vii)    The excess, if any, of the proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with the Pledgees after the Restoration Consultant certifies to the Pledgees that the Restoration has been completed in accordance with the provisions of this Section 6.2(b), and the receipt by the Pledgees of evidence reasonably satisfactory to them that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by the Pledgees to the Pledgor, provided no Event of Default shall have occurred and be continuing.

6.3 Condemnation.    The Pledgor shall promptly give the Pledgees written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Mortgaged Property (a "Condemnation") and shall deliver to the Pledgees copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Pledgor, regardless of whether Proceeds are available, shall promptly proceed to the Restoration the same to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to

10

be effected in accordance with the terms of this Agreement applicable to Restorations. If the loss is less than $1,000,000.00 and no Restoration is required hereunder, the Pledgor may retain the award if no Event of Default has occurred and be continuing.

Provided no Event of Default has occurred and is continuing, (x) in the event of a Condemnation where the loss does not exceed $1,000,000.00, the Pledgor may settle and compromise such Proceeds, provided that the same is effected in a competent and timely manner, and (y) in the event of a Condemnation where the loss exceeds $1,000,000.00 , the Pledgor may settle and compromise the award only with the consent of Pledgees and the Pledgees shall have the opportunity to participate, at the Pledgor's cost, in any litigation and settlement discussions in respect thereof. Notwithstanding any Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), the Pledgor shall continue to pay the Obligations under the Settlement Agreement at the time and in the manner provided for therein. The Pledgor shall cause any award that is payable to the Pledgor to be paid directly to the Pledgees, to be held and applied in accordance with the terms hereof.

6.4 Payment of Obligations. No Casualty or Condemnation shall affect the Pledgor's continuing obligation to pay the Settlement Payments.

7.  **Remedies Upon Default.** If any default or event of default on the part of Kmart under the Settlement Agreement shall have occurred and be continuing (each an "Event of Default"):

    (a)  Either one of the Pledgees, acting singly may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it at law or in equity, all of the rights and remedies of a secured party under the applicable laws of the Commonwealth of Puerto Rico. Without limiting the generality of the foregoing, each Pledgee, acting singly may foreclose the Mortgage without first exercising any rights to foreclose on the Pledged Collateral.

    (b)  All cash proceeds in respect of any sale of, collection from, or other realization upon the Pledged Collateral and/or received by the Pledgee that filed the mortgage foreclosure action shall be applied in whole against the Obligations which shall be distributed between the Pledgees on a pro rata basis as provided in Section 1 of the Settlement Agreement. Any surplus of such cash or cash proceeds held by the Pledgees and remaining after payment in full of all of the Obligations shall be paid over to the Pledgor or to such person as may be lawfully entitled to receive such surplus in accordance with the Settlement Agreement.

8.  **Foreclosure of Mortgage.** If the Mortgage is foreclosed upon the occurrence of an Event of Default, the Mortgaged Property covered thereunder, or any interest therein, may, at the discretion of the Pledgee asserting the foreclosure action, be sold in one or more parcels or in several interests or portions and in any order or manner. Pledgor waives and releases any right to have any of the Realty or the Mortgaged Property marshaled.

9.  **Indemnity and Expenses.** The Pledgor agrees to indemnify each Pledgee from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement and the Mortgage (including, without limitation, enforcement of this Agreement and the Mortgage). The Pledgor will upon demand of the Pledgees pay to the Pledgees the amount of any and all costs and expenses, including the fees and expenses of their respective real estate counsel and of any experts and agents, which any of the Pledgees may incur in connection with (i) the administration of this Agreement and of the Mortgage, (ii) the custody, preservation or the sale of, collection from, or other realization upon, the Pledged Collateral, the Realty and the Mortgaged Property, (iii) the exercise or enforcement of any

of the rights of any of the Pledgees hereunder or under the Mortgage, or (iv) the failure by the Pledgor to perform or observe any of the provisions hereof or of the Mortgage. Such costs, expenses and fees shall be secured by the lien of the pledge made hereunder.

10. **Lien Interest Absolute.** Except as otherwise expressly provided herein and in the Settlement Agreement, all rights of the Pledgees hereunder and the lien created hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional, and shall not be affected or released in any way, irrespective of:

    (a) Any lack of validity or enforceability of the Settlement Agreement, the Mortgage Note, the Mortgage, or any other agreement or instrument relating thereto, so long as indefeasible payment in full in cash has not been received by the Pledgees with respect to any outstanding Obligations; or

    (b) Any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of, or any consent to departure from, this Agreement, the Mortgage, the Mortgage Note, the Settlement Agreement or any other related document, including, but not limited to, (i) any increase or decrease in any such Obligations and (ii) any amendment of the Settlement Agreement or any other related document; or

    (c) Any taking and holding of collateral (which term for purposes of this Agreement includes, but is not limited to, the Pledged Collateral) or additional guaranties for all or any of the Obligations; any amendment, alteration, exchange, substitution, transfer, enforcement, waiver or subordination of any collateral or guaranty; or the termination, release or non-perfection of any collateral (other than with respect to the Pledged Collateral, the Realty and/or the Mortgaged Property) or guaranty or any consent to departure from any security agreement or guaranty with respect thereto; or

    (d) Any manner of application of collateral, or proceeds thereof, to all or any of the Obligations or the manner of sale of any collateral; or

    (e) Any consent by any Pledgee to (i) a change, restructuring or termination of the corporate or partnership structure or existence, as the case may be, of the Pledgor or any of its affiliates and (ii) any corresponding restructuring of, or any other restructuring of the Obligations or any portion thereof; or

    (f) Any modification, compromise, settlement or release by the any of the Pledgees, or, by operation of law or otherwise, collection or other liquidation of the Obligations or the liability of the Pledgor or any guarantor, or of any collateral, in whole or in part, and any refusal of payment by the any of the Pledgees, in whole or in part, from any obligor or guarantor in connection with any of the Obligations, whether or not with notice to, or further assent by, or any reservation of rights against, the Pledgor.

    Without limiting the generality of the foregoing, the Pledgor hereby consents to, and hereby agrees, that the rights of the Pledgees hereunder, and the liability of the Pledgor hereunder, shall not be affected by any and all releases of any collateral (other than any Pledged Collateral specifically released by the Pledgees) from the liens created by the Settlement Agreement or any other agreement or instrument. This Agreement shall continue to be so long as any of the Obligations shall remain outstanding.

**11.    Notices.** All notices and other communications provided for hereunder shall be in writing and shall be mailed, faxed, e-mailed or delivered, to the address set forth in the Settlement Agreement, all in the manner and to be effective as provided in the Settlement Agreement.

**12.   Defined Terms.**

As used in this Agreement, the following terms shall have the meanings specified below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Business Day" means any day of the year that is not a Saturday, Sunday or other day on which commercial banks in New York City or Puerto Rico are authorized or required by law to remain closed.

"Flood Compliance Event" means the occurrence a Flood Redesignation with respect to the Mortgaged Property.

"Flood Hazard Determination" means a "Life-of-Loan" FEMA Standard Flood Hazard Determination obtained by the Pledgees.

"Flood Hazard Property" means the Mortgaged Property to the extent that, on the relevant date of determination, the Mortgaged Property includes a building and, as shown on a Flood Hazard Determination, such building is located in a Special Flood Hazard Area.

"Flood Insurance" means (a) federally-backed flood insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program or (b) to the extent permitted by the Flood Laws, a private flood insurance policy from a financially sound and reputable insurance company that is not an affiliate of the Pledgor.

"Flood Insurance Documents" means (a) evidence as to whether the Mortgaged Property is a Flood Hazard Property pursuant to a Flood Hazard Determination, and (b) if the Mortgaged Property is a Flood Hazard Property, (i) evidence as to whether the community in which the Mortgaged Property is located is participating in the National Flood Insurance Program, (ii) the Pledgor's written acknowledgment of receipt of written notification from the Pledgees as to the fact that the Mortgaged Property is a Flood Hazard Property and as to whether the community in which such Flood Hazard Property is located is participating in the National Flood Insurance Program and (iii) copies of the Pledgor's application for a Flood Insurance policy plus proof of premium payment, a declaration page confirming that Flood Insurance has been issued, or such other evidence of Flood Insurance, in an amount equal to at least the amount required by the Flood Laws and naming the Pledgees as sole loss payee and mortgagee, and otherwise including terms satisfactory to the Pledgees.

"Flood Laws" means the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, and as the same may be further amended, modified or supplemented, and including the regulations issued thereunder.

"Flood Redesignation" means the designation of the Mortgaged Property as a Flood Hazard Property where such property was not a Flood Hazard Property previous to such designation.

13

13.  **Miscellaneous.**

(a) No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Pledgor and each of the Pledgees and no waiver of any provision of this Agreement, and no consent to any departure by the Pledgor therefrom, shall be effective unless it is in writing and signed by the either of the Pledgees, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure on the part of the any of the Pledgees to exercise, and no delay in exercising, any right hereunder, under the Mortgage, the Settlement Agreement or any other related document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

(b) The rights and remedies of the Pledgees provided herein, in the Mortgage, in the Settlement Agreement and in any of the other related documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Pledgees hereunder, under the Mortgage, the Settlement Agreement or under any other related document against any party thereto are not conditional or contingent on any attempt by the Pledgees to exercise any of their respective rights under any document related to the Settlement Agreement against such party or against any other person.

(c) Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(d) This Agreement creates a continuing security interest in the Pledged Collateral and shall (i) remain in full force and effect until the payment in full of the Obligations, (ii) be binding upon the Pledgor, its successors and assigns, and (iii) inure, together with the rights and remedies of the Pledgees hereunder, to the benefit of each of the Pledgees and their respective successors, transferees and assigns.  None of the rights and obligations of the Pledgor hereunder may be assigned or otherwise transferred without the prior written acceptance of each of the Pledgees.

(e) Upon payment in full of the Obligations, the Pledgees shall, upon the Pledgor's request and at the Pledgor's expense, surrender the Pledged Collateral, with any necessary endorsement, to the Pledgor.

(f) This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.

(g) In the event of any inconsistency between this Agreement and the Settlement Agreement relating to collateral security provisions, the terms hereof shall be controlling as necessary to create, preserve and/or maintain a valid, enforceable and perfected lien upon the Pledged Collateral and in all matters related to insurance requirements, the application of insurance proceeds to a Restoration in the context of a Casualty or of an award in the context of a Condemnation, but otherwise, the provisions of the Settlement Agreement shall be controlling.

(h) THE PLEDGOR AND EACH OF THE PLEDGEES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

14

**IN WITNESS WHEREOF**, the Pledgor has caused this Agreement to be executed and delivered by its duly Authorized Representative as of the date first above written.

**SEARS ROEBUCK DE PUERTO RICO, INC.**

By: _____
Name: Dilia María Peña Fontanes
Title:   Controller

Affidavit No. -2889-

　　　Acknowledged and subscribed before me in San Juan, Puerto Rico, on this 12th day of January, 2018 by the following person who is personally known to me: Dilia María Peña Fontanes, of legal age, married, executive and resident of San Juan, Puerto Rico, in her capacity as Controller of **SEARS ROEBUCK DE PUERTO RICO, INC.**

_____
Notary Public

**ACCEPTED AND AGREED TO**
**AND POSSESSION OF THE PLEDGED COLLATERAL ACKNOWLEDGED,**
as of the day above indicated:

**JAMES GARBE – RELATOR,**
**by Carl Ireland, as guardian for**
**James Garbe and his estate**

By: _____
Name: Alexandra L. Pérez Pérez
Title:   Attorney-in-Fact



**THE UNITED STATES OF AMERICA**,
through the United States Department of Justice, Civil Division,
Commercial Litigation Branch

By: _____
Name: Héctor E. Ramírez Carbó
Title: Assistant U.S. Attorney, Chief Civil Division

## **Exhibit 4**

---On the same date of its execution I issued a first partial certified copy of this Deed to be filed at the Third Section of San Juan of the Registry of Property and the second partial certified copy to be filed at the Fourth Section of San Juan of the Registry of Property both at the request of Carl Ireland Curtiss, as guardian of James Garbe and his estate.--------------------

---I ATTEST---------------



------------------ **NUMBER TWO (2)** ------------------

-------- **DEED OF CONSTITUTION OF MORTGAGE** ---------

---In the City of San Juan, Commonwealth of Puerto Rico, this twelfth (12th) day of January, two thousand eighteen (2018). -------------------------

------------------ **BEFORE ME** --------------------

---**MIGUEL AGUSTÍN BLANCO FUERTES**, Attorney at Law and Notary Public in and for the Commonwealth of Puerto Rico, with residence located in the Municipality of San Juan, Puerto Rico and offices located at Two Hundred Nine (209) Muñoz Rivera Avenue, Popular Center Building, Suite Fourteen Thirty-four (1434), in the Hato Rey Sector of the Municipality of San Juan, Puerto Rico. ------------

-------------------- **APPEAR** ----------------------

---**AS PARTY OF THE FIRST PART: SEARS ROEBUCK DE PUERTO RICO, INC.**, a corporation organized and existing under the laws of the State of Delaware, and duly authorized to do business in the Commonwealth of Puerto Rico (hereinafter referred to as the "Mortgagor"), represented herein by its Controller, Dilia María Peña Fontanes, also known as Dilia Peña, of legal age, married, executive, and resident of San Juan, Puerto Rico, a duly appointed officer of the Mortgagor, whose authority to appear herein is evidenced by a Secretary's Certificate executed by Joe Jordan, as Vice President and Controller of the Mortgagor, on the second (2nd) day of January, two thousand eighteen (2018) before Notary Public Laura A. Novak, a Notary Public in and for the Cook County, State of Illinois, whose commission to act as Notary on the execution date of the aforesaid Secretary's Certificate is evidenced

1

by a Certificate issued by Jesse White, as the Secretary of State of the State Illinois. ------------**AS PARTY OF THE SECOND PART: THE UNITED STATES OF AMERICA**, acting through the United States Department of Justice, Civil Division, Commercial Litigation Branch (hereinafter referred to as the "Mortgagee I")in turn represented through Assistant United States District Attorney, Héctor E. Ramírez Carbó, who is of legal age, married, attorney-at-law and resident of Guayama, Puerto Rico who is empowered to appear herein pursuant to the terms of a redelegation letter issued on December four (4), two thousand seventeen (2017) under the purview of the United States Attorneys' Manual, Section Four Hyphen One Point Three Hundred (4-1.300); and **CARL IRELAND CURTISS**, of legal age, married, attorney-at-law and resident of the State of Ohio, as guardian for James Garbe and his estate as Relator under a *qui tam* action filed by James Garbe against Kmart Corporation in the United States District Court for the Central District of California captioned U.S., et al., ex rel. *Garbe v. Kmart Corporation*, Case Number CV zero, eight, hyphen, zero, four, six, six, nine (No. CV08-04669) (C.D.Cal.) and subsequently transferred to the United States District Court for the Southern District of Illinois, Case Number three, colon, one, two, hyphen, cv, hyphen, zero, zero, eight, eight, one, hyphen, MJR, hyphen, PM (3:12-cv-00881-MJR-PM) (S.D. Ill.) (hereinafter referred to as the "Mortgagee II, and together with the Mortgage I, hereinafter collectively referred to as the "Mortgagee"), in turn represented through his Attorney-in-Fact, Alexandra L. Pérez Pérez, who is



2

of legal age, married, attorney-at-law and resident of San Juan, Puerto Rico, whose authority to appear herein in representation of the aforesaid appearing party is evidenced by a Special Power of Attorney executed in Wood County, State of Ohio on the eighth(8th) day of December, two thousand seventeen (2017), acknowledged by Notary Shannon Joseph, whose commission to act as Notary on the execution date of the aforesaid Special Power of Attorney is evidenced by a Certificate of Official Character issued by Cindy A. Hofner, as Clerk of Courts, Wood County, State of Ohio. The aforesaid Special Power of Attorney was protocolized under the laws of the Commonwealth of Puerto Rico pursuant to Deed Number One (1) executed in San Juan, Puerto Rico on the twelfth (12th) day of January, two thousand eighteen (2018) before the undersigned Notary Public. ------ ---Pursuant to Article Ten (10) of the Registry of Property of the Commonwealth of Puerto Rico Act, Act Number Two Hundred Ten (210) of December eight (8), two thousand fifteen (2015) (the "Registry Act"), I, the Notary, certify that the Secretary's Certificate, aforesaid redelegation letter and the aforesaid Deed of Protocolization of Special Power of Attorney, as the case may be, which attest to the respective representative capacity of the natural persons appearing on behalf of the appearing parties, comply with the requirements of Puerto Rico law. ------------------------------------------- ---I, the Notary, do hereby certify that I personally know the natural persons appearing on behalf of the Mortgagor and the Mortgagee, and from their statements I also attest as to their age, civil



3

status, occupation and residence. They assure me that they have, and in my judgment they do have, the legal capacity and knowledge of the English language necessary for this act, and for that purpose, they freely and voluntarily: --------------------------

--------------------- **STATE**----------------------

---**FIRST**: <u>The Property</u>: The Mortgagor is the owner of record with valid, good, insurable and marketable fee simple title ("pleno dominio") of the real properties described in paragraph TWENTY-SECOND of this Deed (hereinafter collectively referred to as the "Property"). --------------------------------

---**SECOND**: <u>The Mortgage Note</u>: Simultaneously herewith Mortgagor has subscribed before the undersigned Notary a Mortgage Note (hereinafter referred to as the "Mortgage Note"), which is literally transcribed in paragraph THIRTEENTH hereof. ------------------------------------------

---**THIRD**: <u>Creation of the Mortgage</u>: In order to guarantee and secure: ----------------------------

-----(i) The full and complete payment of the principal of the Mortgage Note and the interest accruing thereon, as herein established. ----------

-----(ii) The performance and observance of the terms and conditions contained herein and in the Mortgage Note. ------------------------------------

---Mortgagor hereby constitutes and creates a voluntary mortgage (hereinafter referred to as the "Mortgage") and security interest in favor of the Mortgagee or any future holder or transferee of the Mortgage Note, or the person entitled to enforce the instrument, on the following properties (hereinafter collectively referred to as the "Mortgaged



4

Property"): -------------------------------------
-----(a) the Property, which is described in
paragraph TWENTY-SECOND of this Deed; -------------
-----(b) all of Mortgagor's buildings, structures,
additions, fixtures, improvements, appurtenances
and facilities now located thereon and all new
buildings and structures, additions, fixtures, and
improvements hereafter erected or placed or
constructed on the Property and all materials
intended for the construction, reconstruction,
alteration and repair of such buildings, structures,
fixtures or improvements now or hereafter erected
thereon or hereafter constructed, all of which
materials shall be deemed to be included within the
Mortgaged Property immediately upon the delivery
thereof to the Property; -------------------------
-----(c) all of the rights, title and interest of
the Mortgagor in and to all and singular the
tenements, hereditaments, rights of way, easements,
appendages and appurtenances, licenses, passages,
waters, water rights, riparian rights, and other
rights, liberties and privileges thereof or in any
way or hereafter appertaining, including any other
claim at law or in equity, franchise or license and
the reversion and reversions, and remainder and
remainders thereof and any other property belonging
or appertaining to the Mortgaged Property, and all
of the right, title and interest of the Mortgagor
and/or the Property in and to any streets, ways,
alleys, strips or gores of land adjoining the
Mortgaged Property or any part thereof; -----------
-----(d) all indemnities to which Mortgagor and the
Mortgagee may be entitled under any policy of



5

insurance covering the Mortgaged Property or any part thereof, subject to the terms of section five (5) of paragraph FOURTH hereof; -------------------------(e) all of the Mortgagor's rights, title and interest to all furniture, furnishings, fixtures, machinery, apparatus and equipment, now or hereafter located on the Property, or located in, or used, or procured for use, in connection with the operation, maintenance or protection of any of the buildings, structures, improvements or facilities located or to be located in the Property, including, without limitation, lighting, plumbing, sanitary, air conditioning equipment and fire protection systems, now owned or hereafter acquired by the Mortgagor, which under the Civil Code of Puerto Rico may properly be characterized or classified as real or immovable property either by nature or by destination; and ----------------------------------------(f) all renewals and replacements of, substitutions for and additions to the Property, and all other property, real, personal or mixed, now owned or hereafter acquired by Mortgagor or in any way appertaining to such Property or any part thereof, as well as all lands which may be consolidated or grouped with the Property. -----------**FOURTH**: <u>Obligations of Mortgagor</u>: The Mortgagor agrees as follows: ----------------------------------One: To satisfy the debt as set forth in the Mortgage Note. ----------------------------------Two: To pay prior to delinquency and without requiring any notice from Mortgagee, all Impositions (as defined below) and satisfy any claim, lien or encumbrance against the Mortgaged Property which may



6

be or become senior to this Mortgage, and to permit no default or delinquency on any other lien, encumbrance or charge against the Mortgaged Property, unless and to the extent only that any such item is being contested in good faith by appropriate proceedings and appropriate reserves have been set aside with respect thereto in conformity with generally accepted accounting principles in effect from time to time in the United States of America. --------------------------------

-----Three: To maintain the Mortgaged Property as required under any pledge agreement or other instrument under which the Mortgage Note is assigned or pledged.  In the event the Mortgagor fails to care for and maintain in good condition the buildings existing upon or that may in the future be constructed on the Mortgaged Property or the improvements to the same, the Mortgagee, after giving reasonable prior written notice to Mortgagor and reasonable time to remedy, may make such repairs as in its judgment may be necessary for the preservation of the Mortgaged Property and its appurtenances, and the total sum thus invested shall be considered as due and payable and shall be secured by the Mortgage herein constituted. ---------------

-----Four: To pay all reasonable costs, expenses and disbursements, including a reasonable amount for attorneys' fees, as well as all reasonable expenses incurred or satisfied by the Mortgagee at any time for perfection of title of the Mortgaged Property, and all such costs, expenses and disbursements of Mortgagee, if satisfied by Mortgagee, shall be secured in their entirety by the Mortgage herein



7

constituted. --------------------------------------

-----Five: To keep the Mortgaged Property insured against such hazards and with such coverage as may be required under any pledge agreement or other instrument under which the Mortgage Note is assigned or pledged Such insurance policies (including, without limitation, the corresponding flood insurance policy, as applicable) shall be in form and in amounts and with insurance companies acceptable to the Mortgagee. ----------------------

-----Six: To furnish Mortgagee within ten (10) business days after request in person, or within twenty (20) business days after request by mail, a written statement duly acknowledging the amount due on or secured by this Mortgage or the Mortgage Note, whether for principal or interest and whether any offsets or defenses exist against such debt. ------

-----Seven: To comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the Mortgaged Property and the operation thereof. -------------------------------------------

-----Eight: To deliver to Mortgagee with reasonable promptness such information with respect to the Mortgaged Property as Mortgagee may reasonably request from time to time. -----------------------

---**FIFTH**: <u>Condemnation</u>: In the event of a taking of all or any part of the Mortgaged Property as a result of or in lieu of condemnation or eminent domain, Mortgagee shall be entitled to receive all awards and payments made on account of such taking up to the amount secured hereby or as provided in the pledge agreement or other instrument under which the Mortgage Note is assigned or pledged.    Mortgagor



8

will pay all costs and reasonable expenses (including, without limitation, reasonable attorneys' fees and expenses) of Mortgagee in connection with any such taking and seeking and obtaining any award or payment in respect thereof. All awards and payments collected by Mortgagee, after deducting therefrom all costs and reasonable expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in the seeking and obtaining thereof, shall be applied by Mortgagee as set forth in the pledge agreement or other instrument under which the Mortgage Note is assigned or pledged. ------------------------------

---**SIXTH**: <u>Additional Advances</u>: If Mortgagor should fail to make punctual payment of any Impositions (as such term is defined below), or should fail to maintain insurance coverage on the Mortgaged Property, or any part thereof, as required from time to time by the Mortgagee, or should fail to discharge any mortgage, lien, encumbrance or charge upon the Mortgaged Property, or any part thereof, which is prohibited herein or by the terms of the pledge agreement or other instrument under which the Mortgage Note is assigned or pledged, or should fail to maintain the Mortgaged Property in good condition or should fail to clean the Mortgaged Property from any Lead Based Paint or remediate any environmental condition as required by any applicable laws and regulations, or should fail to perform any other term or covenant hereof or of such pledge agreement or other instrument under which the Mortgage Note is pledged or assigned, then Mortgagee, after giving prior notice to Mortgagor, but without consent of or



9

demand upon Mortgagor and without waiving or releasing any obligation or default, may (but shall be under no obligation to) advance such funds as may in Mortgagee's judgment be needed for the purpose of performing such terms or covenants and Mortgagee may, in such event, take such other and further action as it may consider necessary or appropriate for such purposes. All sums so advanced or paid by Mortgagee and all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred, together with interest thereon at the interest rate set forth in the Mortgage Note from the date of payment or incurring, shall constitute additional Indebtedness (as defined below) secured by this Mortgage and shall be paid by Mortgagor to Mortgagee on demand.

---**SEVENTH**: Further Assurances; Additional Security: Mortgagor, at its expense, will execute, acknowledge, deliver and record all such instruments and take all such action as Mortgagee from time to time may reasonably request for better assuring to Mortgagee the property and rights hereby mortgaged and assigned or intended so to be. Without notice to or consent of Mortgagor, and without impairment of the lien of, and rights under this Mortgage, Mortgagee may take (but Mortgagor shall not be obligated to furnish) from Mortgagor or from any other person or persons additional security for the Mortgage Note or for the obligations of the Mortgagor secured by the assignment or pledge of the Mortgage Note; and neither the giving of this Mortgage nor the acceptance of any such additional security shall prevent Mortgagee from resorting



10

first to such additional security, or to the security created by this Mortgage, in either case without affecting Mortgagee's lien and rights under this Mortgage. ------------------------------------

---**EIGHTH**: Foreclosure Valuation: In compliance with Article Eighty (80) of the Registry Act, Mortgagor hereby declares and agrees that the value of the Mortgaged Property is as set forth in Paragraph FOURTEENTH hereof under the title "Foreclosure Valuation". ---------------------------------------

---**NINTH**: Default; Remedies; Foreclosure: The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder: ------(a) if default shall be made in the due and punctual payment of any principal of and/or interest on the Mortgage Note when and as the same shall become due and payable; or ------------------------

-----(b) if default shall be made by Mortgagor in the due performance of and/or compliance with any of the terms of this Mortgage; or --------------------

-----(c) if a default or an event of default shall exist under the Mortgage Note, or under any document or agreement pursuant to which the Mortgage Note is pledged, assigned, or otherwise encumbered; or ----

-----(d) if any material representation or warranty of Mortgagor made herein or in any document or agreement pursuant to which the Mortgage Note is pledged, assigned, or otherwise encumbered shall be false in any material respect on the date when made.

-----(e) If the Mortgagor defaults or breaches any of the terms of the Settlement Agreement entered into between Mortgagor and Mortgagee on December twenty-two (22), two thousand seventeen (2017). ---



---Upon the occurrence of any Event of Default (in addition to any other remedies for which the holder of the Mortgage Note or the person entitled to enforce the instrument may be entitled under this Mortgage, the Mortgage Note, or any document or agreement pursuant to which the Mortgage Note is pledged, assigned, or otherwise encumbered), then, upon expiration of any applicable notice, grace and/or cure period, the entire principal amount of the Mortgage Note at the time outstanding shall, at the option of the holder of the Mortgage Note or the person entitled to enforce the instrument, become immediately due and payable without notice or demand.  Failure to exercise this option shall not constitute a waiver of the right to exercise such option in the event of any subsequent default. Mortgagor will pay all costs and expenses incurred by or on behalf of the holder of the Mortgage Note or the person entitled to enforce the instrument (including, without limitation, reasonable attorneys' fees and expenses) in enforcing the Mortgage Note or this Mortgage, or occasioned by any default or Event of Default hereunder. ------------

---Mortgagee may, at its option, upon the occurrence of an Event of Default, proceed to enforce the payment of the Mortgage Note in accordance with the terms hereof and thereof and/or foreclose the lien of this Mortgage as against all or any part of the Mortgaged Property (by summary proceedings or otherwise) and have the same sold under the judgment or decree of a court of competent jurisdiction and/or exercise any other remedies provided by the laws of the Commonwealth of Puerto Rico. ----------



---**TENTH**: <u>Expenses of Deed; Recording Fees; Cancellation of Mortgage</u>: All costs and expenses relating to the drafting, preparation and execution of this Deed, its filing and recording in the corresponding section of the Registry of Property of Puerto Rico, the cancellation of any liens or encumbrances affecting the Property, and the eventual cancellation of this Mortgage shall be for the account of the Mortgagor. Should the Mortgagor satisfy in full the Mortgage Note and the obligations for which the Mortgage Note is pledged or assigned as collateral security in the time and manner heretofore set forth, and comply with, and diligently execute, all agreements and stipulations herein set forth, then Mortgagee shall endorse the Mortgage Note without recourse, representations or warranties or shall endorse the same for cancellation purposes only, delivering the Mortgage Note so endorsed to the Mortgagor. Mortgagor shall be responsible for all costs and expenses relating to the cancellation of this Mortgage. -------------

---**ELEVENTH**: <u>Definitions</u>: As used in this Mortgage, the following terms are defined as follows: (a) "Impositions" shall mean all real estate and other taxes, all assessments made (including, without limitation, all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof or while this Mortgage is in force), water, sewer, electricity, utility and other rents, rates and charges, excises, levies, license fees, permit fees, inspection fees and other authorization fees and other charges, in each case whether general or special, ordinary or



13

extraordinary, or foreseen or unforeseen of every character (including all penalties or interest thereon) which at any time are assessed, levied, confirmed or imposed on or in respect of or be a lien upon (i) the Mortgaged Property or any part thereof or any rents, issues, income, profits or earnings therefrom or any estate, right or interest therein or (ii) any occupancy, use or possession of or sales from the Mortgaged Property or any part thereof or (iii) this Mortgage, any interest hereon or any other payments due from the Mortgagor under the terms of this Mortgage; excepting, however, the income taxes now or hereafter imposed by the United States of America under the Internal Revenue Code, as amended, and by the Commonwealth of Puerto Rico under the Internal Revenue Code of Puerto Rico, as amended, the Municipal License Tax Act, as amended, or under any other Act of Congress or Act of the Legislature of Puerto Rico of the same nature, modifying, amending, or substituting the statutes above mentioned, as long as they do not become a lien on the Mortgaged Property; (b) "Indebtedness" shall mean (i) the Impositions; (ii) principal and interest of the Mortgage Note; (iii) the Additional Credits referenced in paragraph FOURTEENTH of this Deed; and (iv) any and all payments which Mortgagor is or may be obliged to make under this Deed or under the pledge agreement or other instrument under which the Mortgage Note is pledged or assigned. ---------
---**TWELFTH**: <u>Successors and Assigns</u>: All the terms of this Mortgage shall apply to and be binding upon the successors and assigns of Mortgagor and all persons claiming under or through Mortgagor or any such



14

successor or assign, and shall inure to the benefit of Mortgagee and any transferee of the Mortgage Note. Neither this Mortgage nor any term hereof may be changed, waived, discharged or terminated verbally, but only by a public deed executed by the Mortgagee, notice of which is endorsed on the Mortgage Note. ------------------------------------

---**THIRTEENTH**: <u>The Mortgage Note</u>: The Mortgage Note referred to in paragraph SECOND of this Deed is literally transcribed herein as follows: ----------

----------------- "**<u>MORTGAGE NOTE</u>** ------------------

---**VALUE:** **$17,400,000** ----------------------------

---**DUE:** **December 22, 2019** ------------------------

---**FOR VALUE RECEIVED,** the undersigned promises to pay to the order of **THE UNITED STATES OF AMERICA** and **CARL IRELAND**, as guardian for James Garbe and his estate, as joint and several creditors (*acreedores solidarios*) the principal sum of **SEVENTEEN MILLION FOUR HUNDRED THOUSAND DOLLARS ($17,400,000.00),** with interest on the unpaid balance at a rate equal to one point five percent (1.5%) per annum.  Interest due under this Mortgage Note shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed from the date of this Mortgage Note until full payment hereof (including the first day but excluding the last day).  Payments of interest and principal hereunder shall be made at the office or domicile of the holder of this Mortgage Note or the person entitled to enforce the instrument within the Commonwealth of Puerto Rico, or at such other place as the holder of this Mortgage Note or the person entitled to enforce the instrument may from time to time designate in writing. ----------------------------------------

---Anything herein to the contrary notwithstanding, if the rate of interest required to be paid hereunder exceeds the maximum rate lawfully chargeable, the rate of interest to be paid shall be automatically reduced to the maximum rate lawfully chargeable so that no amounts shall be charged which are in excess thereof, and, in the event it should be determined that any excess over such highest lawful rate has been charged or received, the holder hereof or the person entitled to enforce the instrument shall promptly refund such excess to the undersigned. ---

---In the event the holder of this Mortgage Note or the person entitled to enforce the instrument resorts to any court (including any bankruptcy court) or initiates mortgage foreclosure proceedings, regardless of its nature, to collect in full or in part the principal amount hereof and/or



15

any interest accrued thereon, the undersigned shall pay to said holder or person entitled to enforce the instrument a sum of up to five percent (5%) of the principal balance hereof for the actual aggregate cost of the disbursements, expenses and reasonable attorneys' fees which may be incurred by the holder hereof or the person entitled to enforce the instrument, which amount shall immediately become liquid, due and payable upon the filing of the petition or complaint. ---------------------------

---The undersigned, and all others who may become liable for all or any part of this obligation, whether as maker, principal, surety, guarantor or endorser, shall be jointly and severally ("solidariamente") liable and jointly and severally ("solidariamente") waive demand, presentment, protest, notice of dishonor and non-payment and any and all lack of diligence or delays in collection or enforcement hereof, and expressly agree and consent (i) to any extension of time, modification of the terms of payment, release of any party liable for this obligation, release, substitution or exchange of any property, real or personal, tangible or intangible, guaranteeing payment of the mortgage securing this Mortgage Note, and (ii) that any other indulgence or forbearance may be made without notice to said party, and without in any way affecting the liability of any party obligated hereunder. -------

---Payments of both principal and interest are to be made in lawful money of the United States of America.

---This Mortgage Note is secured by a mortgage constituted pursuant to Deed Number Two(2) of Constitution of Mortgage executed on the date hereof before Notary Public Miguel Agustín Blanco Fuertes(the "Deed of Mortgage"), and the holder of this Mortgage Note or the person entitled to enforce the instrument is entitled to the rights, benefits and security of all of the provisions and conditions set forth in the Deed of Mortgage and in any pledge agreement or other instrument executed by the undersigned assigning, pledging, or otherwise encumbering this Mortgage Note as security for the obligations described therein, and may enforce the agreements of the undersigned contained in the Deed of Mortgage and in each of said agreements or instruments, and may exercise the remedies provided thereby or otherwise in respect thereof without being required first to foreclosure on the pledge or other lien or encumbrances so constituted upon this Mortgage Note, all in accordance with the terms of the Deed of Mortgage and said agreements or instruments. No reference herein to the Deed of Mortgage and said agreements or instruments and no provision of this Mortgage Note or of said agreements or instruments shall alter or impair the obligations of the undersigned hereunder, which are continuing, absolute and unconditional, nor shall such reference affect the negotiability hereof under the Commercial Transactions Act of Puerto Rico, or any other applicable law. ------------------------

---The occurrence of any one or more of the following events shall constitute an "Event of Default"



16

hereunder: ----------------------------------------

-----(a) if default shall be made in the due and punctual payment of any principal of and/or interest on this Mortgage Note when and as the same shall become due and payable; or -----------------------

-----(b) if default shall be made by the undersigned in the due performance of and/or compliance with any of the terms of the Deed of Mortgage; or ----------

-----(c) if a default or an event of default shall exist under this Mortgage Note, or under any document or agreement pursuant to which this Mortgage Note is pledged, assigned, or otherwise encumbered; or ----------------------------------

-----(d) if any material representation or warranty of the undersigned made herein or in any document or agreement pursuant to which this Mortgage Note is pledged, assigned, or otherwise encumbered shall be false in any material respect on the date when made.

-----(e) If the Mortgagor defaults or breaches any of the terms of the Settlement Agreement entered into between Mortgagor and Mortgagee on December twenty-two (22), two thousand seventeen (2017). ---

---Upon the occurrence of any Event of Default (in addition to any other remedies for which the holder of this Mortgage Note or the person entitled to enforce the instrument may be entitled under this Mortgage Note, the Deed of Mortgage, or any document or agreement pursuant to which this Mortgage Note is pledged, assigned, or otherwise encumbered), then, upon expiration of any applicable notice, grace and/or cure period, the entire principal amount of this Mortgage Note at the time outstanding shall, at the option of the holder of this Mortgage Note or the person entitled to enforce the instrument, become immediately due and payable without notice or demand.  Failure to exercise this option shall not constitute a waiver of the right to exercise such option in the event of any subsequent default.  The undersigned will pay all costs and expenses incurred by or on behalf of the holder of this Mortgage Note or the person entitled to enforce the instrument (including, without limitation, reasonable attorneys' fees and expenses) in enforcing this Mortgage Note or the Deed of Mortgage, or occasioned by any default or Event of Default hereunder. -----

---The undersigned hereby waives presentment for payment, demand, protest, notice of dishonor hereof, and further hereby waives all benefit of valuation, appraisement, and execution laws. The holder hereof or the person entitled to enforce the instrument may extend the time of payment of this Mortgage Note, postpone the enforcement hereof, grant any other indulgence and add or release any party primarily or secondarily liable hereon, without affecting or diminishing the right or recourse of the holder hereof or the person entitled to enforce the instrument against the makers, endorsers and all parties to this Mortgage Note, which right is hereby expressly reserved. ----------------------------



17

---In San Juan, Puerto Rico, this twelfth (12th) day of January, two thousand eighteen (2018). ---------

-----**SEARS ROEBUCK DE PUERTO RICO, INC.** -----------
-----By: (Signed) Dilia María Peña Fontanes -------
-----Name: Dilia María Peña Fontanes --------------
-----Title: Controller --------------------------

---Affidavit Number: -2888- ---------------------

---Acknowledged and subscribed before me by Dilia María Peña Fontanes, of legal age, married, executive, and resident of San Juan, Puerto Rico, as Controller of **SEARS ROEBUCK DE PUERTO RICO, INC.**, personally known to me.  In San Juan, Puerto Rico, this twelfth (12th) day of January, two thousand eighteen (2018). --------------------------------

-------(Signed) Miguel Agustín Blanco Fuertes -----
----------------NOTARY PUBLIC ---------------------
---------------(Notarial Seal)" --------------------

---**FOURTEENTH**: <u>Mortgage Sums</u>: --------------------

-----(i) The amount of the mortgage credit constituted and created to secure payment of the Mortgage Note is SEVENTEEN MILLION FOUR HUNDRED THOUSAND DOLLARS ($17,400,000.00), which is the foreclosure valuation for the first auction in the event of foreclosure. Property I (as such term is defined in the TWENTY SECOND PARAGRAPH of this Deed) responds for FIFTEEN MILLION FOUR HUNDRED EIGHTY THOUSAND DOLLARS ($15,480,000.00) and Property II (as such term is defined in the TWENTY SECOND PARAGRAPH of this Deed) responds for ONE MILLION NINE HUNDRED TWENTY THOUSAND DOLLARS ($1,920,000.00). -----------------------------------

-----(ii) As permitted under Article Sixty-six (66) of the Registry Act, the mortgaged lien constituted hereunder shall secure five (5) annuities of interest of the Mortgage Note. --------------------

-----(iii) Pursuant to Article Ninety-four (94) of the Registry Act, the Mortgagor covenants and agrees that the Mortgaged Property shall secure the attorney's fees and costs incurred by the Mortgagee



18

in any judicial action filed to foreclose this Mortgage or collect any amounts owed under the Mortgage Note up to the amount of EIGHT HUNDRED SEVENTY THOUSAND DOLLARS ($870,000.00). Property I (as such term is defined in the TWENTY SECOND PARAGRAPH of this Deed) responds for SEVEN HUNDRED SEVENTY THREE THOUSAND NINE HUNDRED FIFTY TWO DOLLARS ($773,952.00) and Property II (as such term is defined in the TWENTY SECOND PARAGRAPH of this Deed) responds for NINETY SIX THOUSAND FORTY EIGHT DOLLARS ($96,048.00). ----------------------------

---**FIFTEENTH:** Mortgagor Warranties and Representations: Mortgagor represents and warrants that: ----------------------------------------------

-----(i) It is the owner with valid, good, insurable and marketable fee simple title ("pleno dominio") to the Mortgaged Property and to all rights and titles appertaining thereto. ----------------------------



-----(ii) It has good and lawful authority to mortgage the Mortgaged Property and all rights appertaining thereto, in the manner and form hereby mortgaged. ----------------------------------------

-----(iii) The Mortgaged Property is free and clear of all liens and encumbrances whatsoever on a parity with or superior to the liens of this Mortgage, except for those set forth in paragraph TWENTY-SECOND of this Deed, if any and the Permitted Encumbrances as defined in the pledge agreement under which the Mortgage Note is assigned or pledged as security. --------------------------------------

-----(iv) The Mortgaged Property is free from unpaid taxes and assessments. --------------------------

-----(v) It will warrant and defend said Mortgaged

19

Property and the validity and priority of this Mortgage against all and every person or persons claiming the same or any part thereof. ----------------------(vi) It will execute whatever additional documents or instruments may be necessary to record this Deed as a mortgage lien on the Mortgaged Property in the Registry of Property of Puerto Rico as required by Mortgagee. ------------------------

---**SIXTEENTH:** <u>Notice</u>: All notices or demands in writing sent by registered or certified mail, return receipt requested, through the United States mail, addressed to the owner of record of the Mortgaged Property shall constitute sufficient notice and demand upon the Mortgagor in any of the cases required by this instrument or by the relevant provisions of law.  The Mortgagor will give immediate notice by mail to the Mortgagee of any proposed condemnation proceedings and of any fire, damage, or other casualty to the Mortgaged Property or of any conveyance transfer or change of ownership of the fee.  The holder of the Mortgage Note or the person entitled to enforce the instrument, its agents or servants shall have the right to inspect the Mortgaged Property from time to time during normal business hours and as often as the Mortgagee may reasonably request. ---------------------------

---**SEVENTEENTH:** <u>Waiver of Moratorium and Redemption</u>: The Mortgagor, to the full extent that it may lawfully do so, agrees that it will not at any time insist upon or plead or in any way take advantage of, and hereby waives, any redemption or moratorium law now or hereafter in force and effect which would prevent or hinder the enforcement of the provisions



20

of this Deed or any rights or remedies the Mortgagee may have hereunder or by law. --------------------

---**EIGHTEENTH**: <u>Rights of Way, Easements and Similar Entitlements</u>: The Mortgagor will maintain, preserve and renew all rights of way, easements, apparent signs, grants, privileges, licenses and franchises reasonably necessary for the use of the Mortgaged Property from time to time and will not, without the prior written consent of the Mortgagee, initiate, join in or consent to any private restrictive covenant, zoning ordinance, or other public or private restriction as to the use of the Mortgaged Property which could have a material adverse effect on the Mortgaged Property. -----------------------

---**NINETEENTH**: <u>Mortgage Interest Not Usurious</u>: ----

---Anything herein to the contrary notwithstanding, the obligations of the Mortgagor under this Mortgage shall be subject to the limitation that payments of interest shall not be required to the extent that receipt of any such payment by the Mortgagee would be contrary to provisions of law applicable to the Mortgagee limiting the maximum rate of interest which may be charged or collected by the Mortgagee.

---**TWENTY**: <u>Indemnification</u>: Mortgagor will protect, indemnify and save harmless Mortgagee, its officers, directors and employees from and against any liabilities, obligations, damages, penalties, claims, causes of action, costs, charges and expenses (including, without limitation, attorneys' fees and expenses) which may be imposed upon or incurred by or asserted against Mortgagee, except those caused by Mortgagee, its agents or employees, by reason of (a) any accident, injury or damage to



21

any person or property occurring on or about the Mortgaged Property or any part thereof; (b) any use or condition of the Mortgaged Property or any part thereof; (c) any failure of the Mortgagor to perform or comply with any of the provisions hereof, including, without limitation, the provisions of paragraph TWENTY-FOURTH of this Deed; or (d) any necessity to defend any of the rights, title or interest conveyed or created by this Mortgage. ------Upon receipt by Mortgagee of a notice of any claim or of the commencement of any action against Mortgagee in respect to the above indemnity or to any indemnity or contribution agreement contained herein, Mortgagee will promptly give written notice of the claim or commencement of action to Mortgagor. In case such notice or any such claim or action shall be given, Mortgagor may assume the defense of such claim or action, including the employment of counsel and payment of expenses.  Mortgagee shall have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of Mortgagee unless the employment of such counsel shall have been authorized in writing by the Mortgagor or if Mortgagor shall not promptly have employed counsel to take charge of the defense of such claim or action or Mortgagee shall have reasonably concluded that there may be defenses available to it which are different from or additional to those available to Mortgagor (in which case Mortgagor shall not have the right to direct the defense of such claim or action on behalf of the Mortgagee), in any of which events such fees and expenses shall be borne by the Mortgagor. ---------



22

---Any amounts payable to Mortgagee under this paragraph TWENTY which are not paid within ten (10) days after written demand therefor by Mortgagee shall bear interest at the rate set forth in the Mortgage Note, from the date of such demand, and such amounts, together with interest, shall be deemed indebtedness secured by this Mortgage. The rights granted to Mortgagee under this paragraph shall survive payment of the Mortgage Note. -------

---**TWENTY-FIRST**: <u>Limitations on Liens</u>: Except with the prior written consent of Mortgagee, Mortgagor shall not create, assume, incur or suffer to exist any mortgage, pledge, lien, charge or other security interest or encumbrance on the Mortgaged Property or any part thereof other than the following: --------

-----(a) the lien of the mortgage constituted pursuant to the terms of this Deed; ---------------

-----(b) those set forth in paragraph TWENTY-SECOND of this Deed; ------------------------------------

-----(c) those permitted under any pledge agreement or other instrument under which the Mortgage Note is pledged or assigned and under any trust agreement, credit agreement or loan agreement secured thereby.

---**TWENTY-SECOND**: <u>Description of the Property</u>: The Property is described in the Registry of Property of Puerto Rico, in the Spanish language as follows: --

-----A. "**RUSTICA**: Predio de terreno radicado en el Barrio Monacillos del término municipal de Río Piedras, compuesto de 7.6575 cuerdas equivalentes a 30,096.9387 metros cuadrados, marcada como Parcela "A" en el plano de inscripción aprobado y certificado por la Junta de Planificación caso No.60-1820. En colindancia, por el Norte con la Parcela "C" y "E" de la finca principal de la cual se segrega; por el Sur, con franja de terreno del Estado Libre Asociado de Puerto Rico y por la Carretera Estatal No.176; por el Este, colinda con una franja libre a dedicarse al Gobierno del Estado Libre Asociado de Puerto Rico, cuya franja se denomina parcela "B" en el plano de inscripción la



23

cual colinda con la orilla Oeste del Río Piedras ye s de 10.00 metros de ancho; y por el Oeste, con la Carretera Estatal No.176 y la parcela "E" de la finca principal de la cual se hace segregación." --------

-----Recorded at 221 of volume 466 of Monacillos, property number 17,328, Registry of Property of Puerto Rico, Third Section of San Juan (hereinafter referred to as "Property I"). --------------------

---Mortgagor acquired title to Property I pursuant to Deed Number Six (6) executed in San Juan, Puerto Rico on June seven (7), nineteen hundred sixty-one (1961), before Notary Public William Beverly, recorded in the Registry of Property of Puerto Rico, Third (3rd) Section of San Juan at the overleaf of page 221 of volume 466 of Monacillos, property number 17,328, second(2nd) inscription. -------------------------------------

-----Property I is free and clear of liens and encumbrances. -------------------------------------

-----B. **"RUSTICA:** Parcela de terreno sita en el Barrio Cupey del término de Río Piedras, compuesta de 28,831.70 metros cuadrados, equivalentes a 7.3354 cuerdas, en colindancias, por el Norte, en una línea quebrada de 128.29 metros de longitud, con el Río Piedras y en otra distancia recta de 220.24 metros de longitud, siguiendo el eje de la Quebrada Guaracanal ya canalizada con la finca Mariana de la Universidad de Puerto Rico; por el Este, en una línea quebrada de 194.37 metros de longitud, con el remanente de la finca principal propiedad de la Sucesión de Guillermo S. Pierluisi; por el Sur, en una distancia de 68.39 metros, con una franja de terreno que se segregó de la misma Finca principal y de dedicó a uso público para el Ensanche de la Carretera Estatal No.176; y por el Oeste, en una distancia quebrada de 323.62 metros, con el Río Piedras." -----------------------------------------

-----Recorded at page 181 of volumen 302 of Río Piedras Sur, property number 9,717, Registry of Property of Puerto Rico, Fourth Section of San Juan (hereinafter referred to as "Property II"). -------

---Mortgagor acquired title to Property II pursuant to a consolidation of parcels effected by Deed Number Five (5) executed in San Juan, Puerto Rico on March twenty-one (21), nineteen hundred seventy-nine (1979), before Notary Public Juan M. Casse



24

Ballesteros, recorded in the Registry of Property of Puerto Rico, Fourth (4th) Section of San Juan at page 181 of volume 302 of Río Piedras Sur, property number 9,717, first (1st) inscription. ------------ ---Property II is subject to the following liens and encumbrances: ------------------------------------ -----(a) By its origin Property II is subject to an easement in favor of the Puerto Rico Aqueduct and Sewer Authority and to a right of way easement. --- -----(b) By itself Property II is free and clear of liens and encumbrances. -------------------------- ---**TWENTY-THIRD**: <u>Miscellaneous</u>: ------------------- -----(a) The headings of the paragraphs of this Deed have been inserted for convenience or reference only and shall in no way define, modify or restrict any of the provisions hereof. ------------------------ -----(b) If any one or more of the provisions contained herein or in the Mortgage Note shall be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof or thereof, but each shall be considered as if such illegal, invalid or unenforceable provision had never been included. -- -----(c) No failure or delay on the part of the Mortgagee in exercising any power or right hereunder shall operate as a waiver thereof or a waiver of any other term, provision or condition hereof (no single or partial exercise of any such right or power shall preclude any other or further exercise thereof or the exercise of any other right or power hereunder) and all rights and remedies of the Mortgagee hereunder are cumulative and shall not be deemed



25

exclusive of any rights or remedies provided by law.
-----(d) No change, amendment, modification, cancellation or discharge of this Deed, or any part hereof shall be valid unless contained in a public instrument executed by Mortgagor and Mortgagee hereto or their respective successors and assigns. -----(e) Time is of the essence with respect to each and every covenant, agreement and obligation of Mortgagor under this Deed and the Mortgage Note. -- ---**TWENTY-FOURTH**: <u>Environmental Matters</u>: ---------- -----(a) <u>Hazardous Substances</u>. The Mortgagor shall: -------(i) not store (except in strict compliance with all laws, ordinances, and regulations pertaining thereto), dispose of, release or allow the release of any hazardous substance, solid waste or oil, as defined in forty-two (42) United States Code ("USC") Sections nine six zero one (9601) <u>et sequitur</u>, forty-two (42) USC Sections six nine zero one (6901) <u>et sequitur</u>, fifteen (15) USC sections two six zero one (2601) <u>et sequitur</u>, and the regulations promulgated thereunder, and all applicable federal, state and local laws, rules and regulations, on the Mortgaged Property; ----------- -------(ii) neither directly nor indirectly transport or arrange for the transport of any hazardous substance or oil (except in strict compliance with all laws, ordinances and regulations pertaining thereto); ----------------------------- -------(iii) in the event of any change in the laws governing the assessment, release or removal of hazardous substances, which change would lead a prudent lender to require additional testing to avail itself of any statutory insurance or limited



liability, take all such action (including, without limitation, the conducting of engineering tests at the sole expense of the Mortgagor) to confirm that no hazardous substance or oil is or ever was stored, released or disposed of on the Mortgaged Property; and ----------------------------------------------------(iv) provide the Mortgagee with written notice: (aa) upon the Mortgagor obtaining knowledge of the release of any hazardous substance or oil at or from the Mortgaged Property; (bb) upon the Mortgagor's receipt of any notice to such effect from any federal, state, or other governmental authority making an assessment of any expense incurred in connection with the containment, removal or remediation of any hazardous substance or oil at or from the Mortgaged Property for which the Mortgagor may be liable or for which expense a lien may be imposed on the Mortgaged Property. ------------For purposes of this paragraph TWENTY-FOURTH, the terms "hazardous substance" and "release" shall have the meanings specified in the Comprehensive Environmental Response, Compensation and Liability Act of nineteen hundred eighty (1980), forty two (42) USC Sections nine six zero one (9601) <u>et sequitur</u> (hereinafter referred to as "CERCLA"), and the terms "solid waste" and "disposal" (or "disposed") shall have the meanings specified in the Resource Conservation and Recovery Act of nineteen hundred seventy six (1976), forty two (42) USC Sections six nine zero one (6901) <u>et sequitur</u> (hereinafter referred to as "RCRA"), and regulations promulgated thereunder; provided, in the event either CERCLA or RCRA is amended so as to broaden



27

the meaning of any term defined thereby, such broader meaning shall apply as of the effective date of such amendment and provided further, to the extent that the laws of the jurisdiction where the Mortgaged Property is located establish a meaning for "hazardous substance", "release", "solid waste", or "disposal" which is broader than specified in either CERCLA and RCRA, such broader meaning shall apply. ------------------------------------------

-----(b) <u>Environmental Assessment</u>. In addition to the Mortgagee's rights under Section (a) (iii) of this paragraph TWENTY-FOURTH, the Mortgagee may, if it has reasonable basis for such request, without regard to whether Mortgagor is in default hereunder or under the Mortgage Note, require that Mortgagor obtain one or more environmental assessments of the Mortgaged Property prepared by a geohydrologist, an independent engineer or other qualified consultant or expert approved by the Mortgagee evaluating or confirming (i) whether any hazardous substances or other toxic substances are present in the soil or water at or adjacent to the Mortgaged Property and (ii) whether the use and operation of the Mortgaged Property comply with all applicable federal, state and local laws, rules and regulations (herein called "Environmental Laws") relating to air quality, environmental control, release of oil, hazardous material, hazardous wastes and hazardous substances, and any and all other applicable environmental laws. Environmental assessments may include detailed visual inspections of the Mortgaged Property, including, without limitation, any and all storage area, and the taking of soil samples, surface water



28

samples and ground water samples, as well as such other investigations or analyses as are necessary or appropriate for a complete determination of the compliance of the Mortgaged Property and the use and operation thereof with all applicable Environmental Laws. --------------------------------------------

---**TWENTY-FIFTH**: <u>Insurance</u>: Pursuant to Article Sixty One (61) of the Registry Act, this Mortgage shall be extensive to, and shall cover, all indemnities to which the Mortgagor may be entitled under any policy or policies of insurance covering the Mortgaged Property or any part thereof, and Mortgagee shall be entitled to receive directly from the underwriter(s) all payments which become due under any such policy(ies) of insurance. Such payments after deducting therefrom all costs and expenses (including, without limitation, attorneys' fees and expenses) incurred in the collection thereof, shall be applied as set forth in the pledge agreement or other instrument under which the Mortgage Note is pledged or assigned. -------------

-------------------- **ACCEPTANCE** --------------------
---The appearing parties ratify, confirm and accept this Deed because the same has been drawn in accordance with their instructions. ---------------
---I, the Notary, do hereby certify that this document was read by the appearing parties; that I, the Notary, and the said appearing parties can read and understand the English language; that I, the Notary, advised the appearing parties of the legal effects of this document, and in particular to the following: (a) that title reports were prepared by an independent third party and not by the



29

undersigned Notary; (b) that a certified copy of this Deed must be filed for recordation in the Registry; (c) of the possibility that other documents affecting the rights herein created are filed for recordation prior to the execution and/or filing of a certified copy of this Deed and of the preference or seniority that said intervening liens, encumbrances and/or rights may gain by such prior execution or earlier filing in the Registry; (d) of the desirability of verifying the status of liens and encumbrances on the Property as may appear from the Registry on this date and of the adverse consequences which may result from the failure to do so; (e) of the possible existence and pendency of additional unrecorded statutory liens and real property taxes (including the statutory legal mortgage in favor of the Commonwealth of Puerto Rico); (f) of the Lead Based Paint Hazard Act disclosure requirements and implications, including the fact that the existence of lead based painting on the Property might increase the costs of performing improvements on the Property; and (g) that if the Property is located in a flood prone area, the owner and any occupant thereof shall observe and comply with the requirements and provisions of the Flood Zone Regulations. ------------I, the Notary, do hereby certify that the appearing parties after reading this Deed, signed the same, and initialed every page hereof in my presence; that this document was executed by the appearing parties before me, the Notary, after waiving their right to request the presence of witnesses of which right I apprised them. ---------



30

---I further certify as to everything stated or contained herein. ------------------------------- ---TO ALL OF WHICH, under my signature, seal, mark and flourish, I, the Notary, do hereby ATTEST. ----





**Sello**

$120
01/12/2018
$19,141.00
Sello de Rentas Internas
00016-2018-0112-59192058

**Sello**

$203
01/12/2018
$1,915.00
Sellos Asistencia Legal Ley 244
00016-2018-0112-59192063

**Sello**

$115
01/12/2018
$1.00
Impuesto Notarial
00016-2018-0112-59192030

## Exhibit 5

In the city of San Juan, Commonwealth of Puerto Rico, on this ninth (9h) day of August, two thousand nineteen (2019). ----------------------------------

---I, **MIGUEL AGUSTÍN BLANCO FUERTES**, Attorney at Law and Notary Public in and for the Commonwealth of Puerto Rico, with offices located at Two Hundred Nine (209) Muñoz Rivera Avenue, Popular Center Building, Suite Fourteen Thirty-four (1434), in the Hato Rey Sector of the Municipality of San Juan, Puerto Rico.--------------------------------------------

---**FIRST:** That on the twelfth (12th) day of January, two thousand eighteen (2018), Sears Roebuck de Puerto Rico, Inc., a corporation organized and existing under the laws of the State of Delaware, duly authorized to do business in the Commonwealth of Puerto Rico, as the mortgagor, and the United States of America, acting through the United States Department of Justice, Civil Division, Commercial Litigation Branch, and Carl Ireland, as guardian for James Garbe, as mortgagees, executed Deed Number Two (2) of Constitution of Mortgage in San Juan, Puerto Rico before the subscribing Notary Public for the purpose of attaching and perfecting a mortgage lien to guarantee and secure in favor of aforesad mortgagees, the full and complete payment of that certain mortgage note executed on that same date bearing affidavit number two thousand eight hundred eighty-eight (2888) of the subscribing Notary Public for the principal sum of Seventeen Million Four Hundred Thousand Dollars ($17,400,000.00) and interest accruing thereon (the "Deed of Mortgage"). ------------------------------------------------

---**SECOND:** The Deed of Mortgage encumbers the following two (2) properties: ---------------------------------------------------------------------

------**Property I**.------------------------------------------------------------------

---"RUSTICA: Predio de terreno radicado en el Barrio Monacillos del término municipal de Río Piedras, compuesto de 7.6575 cuerdas equivalentes a 30,096.9387 metros cuadrados, marcada como Parcela "A" en el plano de inscripción aprobado y certificado por la Junta de Planificación caso No.60-1820. En colindancia, por el Norte con la Parcela "C" y "E" de la finca principal de la cual se segrega; por el Sur, con franja



Oeste del Río Piedras y es de 10.00 metros de ancho; y por el Oeste, con la Carretera Estatal No. 176." En la parcela "E" de lo finca principal de la cual se hace segregación.

---Property I is recorded at 221 of volume 466 of Monacillos, property number 17,328, Registry of Property of Puerto Rico, Third Section of San Juan.------------------------------------------------------------------------------------

------**Property II**. ------------------------------------------------------------------

---"RUSTICA: Parcela de terreno sita en el Barrio Cupey del término de Río Piedras, compuesta de 28,831.70 metros cuadrados, equivalentes a 7.3354 cuerdas, en colindancias, por el Norte, en una línea quebrada de 128.29 metros de longitud, con el Río Piedras y en otra distancia recta de 220.24 metros de longitud, siguiendo el eje de la Quebrada Guaracanal ya canalizada con la finca Mariana de la Universidad de Puerto Rico; por el Este, en una línea quebrada de 194.37 metros de longitud, con el remanente de la finca principal propiedad de la Sucesión de Guillermo S. Pierluisi; por el Sur, en una distancia de 68.39 metros, con una franja de terreno que se segregó de la misma finca principal y de dedicó a uso público para el Ensanche de la Carretera Estatal No.176; y por el Oeste, en una distancia quebrada de 323.62 metros, con el Río Piedras." ------------------------------

---Property II is recorded at page 181 of volume 302 of Río Piedras Sur, property number 9,717, Registry of Property of Puerto Rico, Fourth Section of San Juan. ------------------------------------------------------------------------------

---**THIRD:** After the execution of the Deed of Mortgage, the subscribing Notary Public issued certified copies of the Deed of Mortgage that were promptly submitted for recordation in the Registry of Property of Puerto Rico, Third Section of San Juan and in the Registry of Property of Puerto Rico, Fourth Section of San Juan, both on January sixteen (16), two thousand eighteen (2018) in order to perfect the mortgage lien. On that same date, the Registry of Property of Puerto Rico, Third Section of San Juan issued a presentation slip which is attached to and made part of this Notarial Act, as its **Exhibit I** and the Registry of Property of Puerto Rico, Fourth Section of San Juan issued the presentation slip attached hereto and made a part hereof as its **Exhibit II**.------------------------------------------------------------

---**FOURTH:** On the fifth (5th) day of July, two thousand eighteen (2018), the subscribing Notary Public received a confirmation via electronic mail of the recordation of the Deed of Mortgage in connection with Property II



---Miguel A. Blanco----------------------------------------------------

---From:    KARIBE    -Digital    Registry    of    the    Property
KaribeSvcAcct@justicia.pr.gov ----------------------------------------

---Sent: Thursday, July five (5), Two Thousand Eighteen (2018) five thirty pm (5:30pm) ----------------------------------------------------------

---To: Miguel A. Blanco; raul.delatorre@popular.com -------------------

---Subject: Registry of the Property – Notification Entry: 2018-003307-SJ04 ----------------------------------------------------------------

---The document Public Deed Number Two (2) of January twelve (12), two thousand eighteen (2018) before/by notary MIGUEL A. BLANCO FUERTES filed at entry 2018-003307-SJ04 of the San Juan Section: Section IV of the Digital Registry of the Property of Puerto Rico has been recorded on July five (5), two thousand eighteen (2018), five twenty-seven pm (5:27pm). Recorded at property number 9717, second (2nd) inscription.

---Paid rights: Seven Thousand Six Hundred Thirty Dollars ($7,630.00) ---

---Rights paid in excess: Zero Dollars ($0.00)----------------------------

---Attached letter of credit for rights paid in excess, IF ANY. ----------------

---If your document was not presented in digital format, you have thirty (30) days to pick up the physical document. --------------------------------------

---Letter of credit usage policy: -----------------------------------------

---You may use the letter of credit when presenting a document for inscription. The letter of credit will only be accepted when presenting in person; therefore, the letter of credit will NOT be accepted when presenting in digital format.-------------------------------------------------------

--------------------------[Department of Justice Logo] -----------------------

-------------------------------Department of Justice ----------------------------

---Digital Registry of the Property of the Commonwealth of Puerto Rico --

-------------------------------[Logo of Karibe]"----------------------------------

---**FIFTH:** On the twenty-sixth (26th) day of July, two thousand eighteen (2018), the subscribing Notary Public received a confirmation via electronic mail of the recordation of the Deed of Mortgage in connection with Property I, which is attached to and made a part hereof as its **Exhibit IV**. The notification was received in the Spanish language and is translated to the English language as follows: ---------------------------------------------

---"Miguel A. Blanco---------------------------------------------------

---From:    KARIBE    -Digital    Registry    of    the    Property
KaribeSvcAcct@justicia.pr.gov ----------------------------------------

---Sent: Thursday, July twenty-six (26), Two Thousand Eighteen (2018) two fifteen pm (2:15pm) ----------------------------------------------

---To: Miguel A. Blanco; raul.delatorre@popular.com -------------------

---Subject: Registry of the Property – Notification Entry: 2018-003297-SJ03 ----------------------------------------------------------------

----"The document Public Deed Number Two (2) of January twelve (12),



pm (2.12pm). Recorded at property number 17328, third (3rd) inscription.
---Paid eights/36/28 -or Sixty One Thousand Eight Hundred Seventy Dollars
($61,870.00)-------------------------------------------------------------------------------
---Rights paid in excess: Zero Dollars ($0.00)--------------------------------------
---Attached letter of credit for rights paid in excess, IF ANY. ----------------
---If your document was not presented in digital format, you have thirty (30)
days to pick up the physical document.----------------------------------------------
---Letter of credit usage policy: ----------------------------------------------------
---You may use the letter of credit when presenting a document for
inscription. The letter of credit will only be accepted when presenting in
person; therefore, the letter of credit will NOT be accepted when presenting
in digital format.----------------------------------------------------------------------
-------------------------------Department of Justice ------------------------------
---Digital Registry of the Property of the Commonwealth of Puerto Rico --
--------------------------------[Logo of Karibe]"------------------------------

---**SIXTH:** With the recordation of the Deed of Mortgage in the Third and

Fourth Sections of San Juan of the Registry of Property of Puerto Rico

respectively, the mortgage lien affecting Property I and Property II has been

perfected. As provided by Article Nineteen (19) of the Real Property

Registry Act of the Commonwealth of Puerto Rico of Two Thousan Fifteen

(2015), Act Number Two Hundred Ten (210) of December Eight (8), Two

Thousand Fifteen (2015), the effective date of recordation of the Deed of

Mortgage is the date of filing of the Deed of Mortgage, to wit January

sixteen (16), two thousand eighteen (2018).------------------------------------

---**SEVENTH:** I, the subscribing Notary Public, certify and give faith that

the translations incorporated as part of this Public Instrument were

requested by the dual morgagee, Carl Ireland, as guardian for James Garbe

and the aforesaid translations for the recording slips are true and exact to

the Spanish text received by the undersigned Notary Public via electronic

mail. -------------------------------------------------------------------------------

---I, the Notary Public, do hereby certify as to everything stated or contained

in this instrument. I, the Notary Public, ATTEST AND GIVE FAITH. ----



| Franklin Aviles Santa | Departamento de Justicia |
| Registrador Teléfono: 787-765-1770 | Registro de la Propiedad San Juan: Sección III |

| Modo de Presentación: Personal | Fecha y Hora de Presentación: 16 de enero de 2018, 12:51PM |

| Asiento | Sección |

| **2018-003297-SJ03** | San Juan: Sección III |

| Documento Presentado: | Datos del Presentante: |

| Naturaleza: | Notarial | Nombre: | RAUL DE LA TORRE |
| Tipo de Documento: | Escritura Pública | Teléfono: | 787-238-1039 |
| Número de Escritura: | 2 | Correo Electrónico: | raul.delatorre@popular.com |
| Fecha: | 12 de enero de 2018 | Dirección: | |
| Lugar de Otorgamiento: | San Juan | P. O. BOX 6428   SAN JUAN PUERTO RICO 00914 | |
| Notario: | MIGUEL A BLANCO FUERTES | Observaciones: | |
| Correo Electrónico: | mblanco@blanco-fuertes.com | SAW | |
| Email | , | | |

## TRANSACCIONES

| Transacción | Valor | A Favor De | Datos de Finca |
|---|---|---|---|
| Hipoteca | $15,480,000.00 | The United States of America | Finca: 17328, Demarcación: Monacillos, Número Catastro: , Localización: MONACILLOS, A- |

## ARANCELES

Exento: NO

| Concepto | No. Serie | Fecha | Cantidad |
|---|---|---|---|
| Código Político | 00016-2018-0112-59192126 | 1/12/2018 | $0.50 |
| Comprobante de Presentación | 00016-2018-0112-59192196 | 1/12/2018 | $15.00 |
| Comprobante de Inscripción | 00016-2018-0112-59192118 | 1/12/2018 | $56,920.00 |
| Comprobante de Inscripción | 2016CR0600695 | 6/22/2016 | $4,950.00 |

## DOCUMENTOS COMPLEMENTARIOS

| Tipo de Documento | Descripción |
|---|---|
| No hay documentos complementarios | |

## PLANOS

| Numero de Caso | Numero de Plano |
|---|---|

Departamento de Justicia
Registro de la Propiedad
San Juan: Sección IV

**Modo de Presentación:** Personal

**Fecha y Hora de Presentación:** 16 de enero de 2018, 1:01PM

**Asiento**

**Sección**

# 2018-003307-SJ04

San Juan: Sección IV

**Documento Presentado:**

**Datos del Presentante:**

| | | | |
|---|---|---|---|
| Naturaleza: | Notarial | Nombre: | RAUL DE LA TORRE |
| Tipo de Documento: | Escritura Pública | Teléfono: | 787-238-1039 |
| Número de Escritura: | 2 | Correo Electrónico: | raul.delatorre@popular.com |
| Fecha: | 12 de enero de 2018 | Dirección: | |
| Lugar de Otorgamiento: | San Juan | P. O. BOX 6428   SAN JUAN  PUERTO RICO 00914 | |
| Notario: | MIGUEL A BLANCO FUERTES | Observaciones: | |
| Correo Electrónico: | mblanco@blanco-fuertes.com | SAW | |
| Email | , | | |

**TRANSACCIONES**

| Transacción | Valor | A Favor De | Datos de Finca |
|---|---|---|---|
| Hipoteca | $1,920,000.00 | The United States of America | Finca: 9717, Demarcación: Rio Piedras Sur, Número Catastro: , Localización: CUPEY, - |

**ARANCELES**

| Concepto | No. Serie | Fecha | Exento: NO Cantidad |
|---|---|---|---|
| Código Político | 00016-2018-0112-59192139 | 1/12/2018 | $0.50 |
| Comprobante de Presentación | 00016-2018-0112-59192105 | 1/12/2018 | $15.00 |
| Comprobante de Inscripción | 00016-2018-0112-59192160 | 1/12/2018 | $7,630.00 |

**DOCUMENTOS COMPLEMENTARIOS**

| Tipo de Documento | Descripción |
|---|---|
| No hay documentos complementarios | |

**PLANOS**

| Numero de Caso | Numero de Plano |
|---|---|
| | |

**From:** Karibe - Registro Inmobiliario Digital <karibe@rid.pr.gov>
**Sent:** Thursday, July 5, 2018 5:35 PM
**To:** Miguel A. Blanco; raul.delatorre@popular.com
**Subject:** Registro de la Propiedad - Notificación asiento: 2018-003307-SJ04

El documento Escritura Pública 2 de 12 de enero de 2018 ante/por el notario MIGUEL A BLANCO FUERTES presentado al asiento 2018-003307-SJ04 en la Sección San Juan: Sección IV del Registro Inmobiliario Digital de Puerto Rico ha sido inscrito el 5 de julio de 2018, 5:27PM. Inscrito en la finca 9717, inscripción 2

Derechos devengados $7630.00
Derechos consignados en exceso $0.00
Se adjunta carta de crédito por los derechos consignados en exceso, SI ALGUNO.

Si su documento no fue presentado en formato digital, tiene 30 días para recoger el documento físico.

Política de uso de carta de crédito:
Podrá utilizar la carta de crédito al momento de presentar un documento para inscripción. Solamente se aceptará la carta de crédito en la presentación personal; por tanto, la carta de crédito NO será aceptada en la presentación por internet.



**Departamento de Justicia**

**Registro Inmobiliario Digital del
Estado Libre Asociado de Puerto Rico**





Subject:

Miguel A. Blanco, raul.delatorre@popular.com
Registro de la Propiedad - Notificación asiento 2018-003297-SJ03

El documento Escritura Pública 2 de 12 de enero de 2018 ante/por el notario MIGUEL A BLANCO FUERTES presentado al asiento 2018-003297-SJ03 en la Sección San Juan: Sección III del Registro Inmobiliario Digital de Puerto Rico ha sido inscrito el 26 de julio de 2018, 2:12PM. Inscrito en la finca 17328, inscripción 3

Derechos devengados $61870.00
Derechos consignados en exceso $0.00
Se adjunta carta de crédito por los derechos consignados en exceso, SI ALGUNO.

Si su documento no fue presentado en formato digital, tiene 30 días para recoger el documento físico.

Política de uso de carta de crédito:
Podrá utilizar la carta de crédito al momento de presentar un documento para inscripción. Solamente se aceptará la carta de crédito en la presentación personal; por tanto, la carta de crédito NO será aceptada en la presentación por internet.



**Departamento de Justicia**

**Registro Inmobiliario Digital del
Estado Libre Asociado de Puerto Rico**





**<u>Exhibit 6</u>**

**Professional Title Services**

5869 Isla Verde Ave. Apt. 1209 I
CAROLINA, PUERTO RICO 00979

CEL: (787) 413-3181
ATH Móvil: (787) 403-9814
lmhprotitle@mac.com

NOTICE

"NUESTRA RESPONSABILIDAD POR ERRORES, OMISIONES O NEGLIGENCIA COMETIDA EN EL PROCESO DE INVESTIGACIÓN, RECOPILACIÓN DE INFORMACIÓN Y / O EN LA REDACCIÓN DE ESTUDIOS DE TITULO ESTA LIMITADA A LA CANTIDAD PAGADA POR EL ESTUDIO DE TITULO. PARA MAYOR PROTECCIÓN LE RECOMENDAMOS QUE ADQUIERA UN SEGURO DE TITULO Y UNA CERTIFICACIÓN REGISTRAL."

CASE:  POPULAR INSURANCE - SEARS

PROPERTY:  No. 17328 recorded at page 221 of volume 466 of Monacillos, Registry of Property, 3rd. Section of San Juan.

DESCRIPTION:

RUSTICA: Predio de terreno radicado en el Barrio Monacillos del término municipal de Río Piedras, compuesto de 7.6575 cuerdas equivalentes a 30,096.9387 metros cuadrados, marcada como Parcela "A" en el plano de inscripción aprobado y certificado por la Junta de Planificación caso No.60-1820. En colindancia, por el Norte con la Parcela "C" y "E" de la finca principal de la cual se segrega; por el Sur, con franja de terreno del Estado Libre Asociado de Puerto Rico y por la Carretera Estatal No.176; por el Este, colinda con una franja libre a dedicarse al Gobierno del Estado Libre Asociado de Puerto Rico, cuya franja se denomina parcela "B" en el plano de inscripción la cual colinda con la orilla Oeste del Río Piedras y es de 10.00 metros de ancho; y por el Oeste, con la Carretera Estatal No.176 y la parcela "E" de la finca principal de la cual se hace segregación.

ORIGIN:

It was segregated from Property No.3248, recorded at page 183 of volume 90 of Monacillos.

OWNER OF RECORD:

It is vested in favor of TRANSFORM DISTRIBUTION CENTER HOLDCO, LLC, who acquired by title of purchase from Sears Roebuck De Puerto Rico Inc., for the price of $17,792,950.00 as per Deed No.18, executed in San Juan, on May 8, 2019, before Notary Public Carla Suzette D'Almeida Aracena, recorded at volume Karibe of Monacillos, Property No.17328, 4th. inscription.

LIENS AND ENCUMBRANCES:

1.-    By its origin

a.-    It is free of Liens and Encumbrances

2.-    MORTGAGE: In the principal amount of $17,400,000.00, over this and another Property, responding this property of $15,480,000.00, with yearly interests at 1.50% due on December 22, 2019 to secure a Note in favor of United States of America; Carl Ireland Curtiss representing James Garbes per Deed No.2, executed in San Juan, on January 12, 2018, before Notary Public Miguel A. Blanco Fuertes recorded at volume Karibe of Monacillos, Property No.17328, 3rd. inscription.

REVISED:  Books of local and federal attachments, book of judgments and electronic log until August 1st., 2019.

AUGUST 1st., 2019.- Realizado personalmente en el Registro 10:00 AM
LMH

**Professional Title Services**

5869 Isla Verde Ave. Apt. 1209 I
CAROLINA, PUERTO RICO 00979

CEL: (787) 413-3181
ATH Móvil: (787) 403-9814
lmhprotitle@mac.com

NOTICE

*"NUESTRA RESPONSABILIDAD POR ERRORES, OMISIONES O NEGLIGENCIA COMETIDA EN EL PROCESO DE INVESTIGACIÓN, RECOPILACIÓN DE INFORMACIÓN Y / O EN LA REDACCIÓN DE ESTUDIOS DE TÍTULO ESTÁ LIMITADA A LA CANTIDAD PAGADA POR EL ESTUDIO DE TÍTULO. PARA MAYOR PROTECCIÓN LE RECOMENDAMOS QUE ADQUIERA UN SEGURO DE TÍTULO Y UNA CERTIFICACIÓN REGISTRAL".*

CASE:  POPULAR INSURANCE - SEARS

PROPERTY:  No.9717 recorded at page 181 of volume 302 of Río Piedras Sur , Registry of Property, 4th. Section of San Juan.

DESCRIPTION:

RUSTICA: Parcela de terreno sita en el Barrio Cupey del término de Río Piedras, compuesta de 28,831.70 metros cuadrados, equivalentes a 7.3354 cuerdas, en colindancias, por el Norte, en una línea quebrada de 128.29 metros de longitud, con el Río Piedras y en otra distancia recta de 220.24 metros de longitud, siguiendo el eje de la Quebrada Guaracanal ya canalizada con la finca Mariana de la Universidad de Puerto Rico; por el Este, en una línea quebrada de 194.37 metros de longitud, con el remanente de la finca principal propiedad de la Sucesión de Guillermo S. Pierluisi; por el Sur, en una distancia de 68.39 metros, con una franja de terreno que se segregó de la misma finca principal y de dedicó a uso público para el Ensanche de la Carretera Estatal No.176; y por el Oeste, en una distancia quebrada de 323.62 metros, con el Río Piedras.

ORIGIN:
It was formed by grouping of Property No.9712 of 4,104.83 square meters; Property No.9713 of 787.86 square meters; Property No.9714 of 1,498.15 square meters; recorded at pages 171, 173 and 175  of volume 302 of  Río Piedras Sur  and Property No.9370 of 22,694.290 square meters, recorded at page 91 of volume 291 of Río Piedras Sur.

OWNER OF RECORD:

It is vested in favor of SEARS ROEBUCK DE PUERTO RICO INC., who acquired by title of grouping in its favor with a value of  $65,092.36, as per Deed No.5, executed in San Juan, on March 21, 1979 before Notary Public Juan M. Casse Ballesteros, recorded at page 181 of volume 302 of Río Piedras Sur , Property No.9717, 1st. inscription.

LIENS AND ENCUMBRANCES:
1.-    By its origin
a.-    Easement in favor of the Puerto Rico Water Authority
b.-    Access easement

2.-    MORTGAGE: In the principal amount of $17,400,000.00, over this and anotgher Property, responding this property of $1,920,000.00, with yearly interests at 1.50% due on December 22, 2019 to secure a Note in favor of United States of America; Carl Ireland Curtiss representing James Garbeas per Deed No.2, executed in San Juan, on January 12, 2018, before Notary Public Miguel A. Blanco Fuertes, recorded at volume Karibe of Monacillos, Property No.9717, 2nd. inscription.

DOCUMENT PENDING:
Entry 2019-055743-SJ04.- Date:  May 30, 2019.
Deed No.19, executed in San Juan, on May 8, 2019, before Notary Public Carla Suzette D'Almeida Aracena, by Sears Roebuck De Puerto Rico Inc., of SALE to TRANSFORM DISTRIBUTION CENTER HOLDCO, LLC, for the price of $2,977,050.00.

It accompanies Order dated February 8, 2019 Approving the Asset Purchase Agreement in Case No.18-23538 (RDD) of the U.S Bankruptcy Court Southern District of New York.

**<u>Exhibit 7</u>**

**U.S. Department of Justice**

Civil Division

MDG:DRA:APang
46-12C-4297

Tel. (202) 514-6846

_Washington, DC 20530_

August 23, 2018

_Via electronic transmission_

Mr. William F. Johnson
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036

      Re:    _U.S. ex rel. Garbe v. Kmart Corp._, Case No. 12-CV-881-NJR-PMF (S.D. Ill.)

Dear Bill:

      You have informed counsel for the United States and Relator that your client, Kmart Corporation, wishes to sell Sears Distribution Center #8825, located at 3825 Forsyth Road, Winter Park, Orange County, FL 32792 (the "Florida Property"). The United States and Relator are joint mortgagees of the Florida Property, which currently serves as part of the security for the three Settlement Payments under Paragraph 2 of the Federal Settlement Agreement (effective December 22, 2017), and which was executed by the United States, Relator, and Kmart to resolve the above-caption False Claims Act case. Separate state agreements were executed by Participating States to resolve the state claims in the above-captioned action. In exchange for an agreement by the United States and Relator to release their mortgage interest in the Florida Property, Kmart has offered to pay Plaintiffs (the United States, Relator, and Participating States) $12,800,000 from the proceeds of the sale of the property at closing. This payment will serve as a partial advance on the second Settlement Payment of $20,000,000 due on December 22, 2018, pursuant to Paragraph 1 of the Federal Settlement Agreement. The remaining $7,200,000 for the second Settlement Payment will be paid by Kmart on or before December 22, 2018. In addition, Kmart will deposit $1,600,000 for the benefit of the United States and Relator in a sole order escrow no later than December 22, 2018. The escrow and the Sears Distribution Center #8975, Road #176 Km 0.5 Cupey Bajo, San Juan, Cupey Ward, Puerto Rico 00926 (the "Puerto Rico

Property") together will serve as partial security for the third and final Settlement Payment of $19,000,000 that Kmart will pay Plaintiffs on or before December 22, 2019.

Subject to Kmart's compliance with the terms outlined above, the United States and Relator agree to amend the payment and security terms in Paragraphs 1 and 2 of the Federal Settlement Agreement as follows:

1. The United States and Relator agree to release the mortgage they hold on the Florida Property at the closing for the sale of the Florida Property in exchange for Kmart's agreement to pay, as set forth herein, the United States and Relator $12,800,000 (the "as dark" value of the property) at the closing from the proceeds of the sale of the Florida property.

2. The Parties agree that the executed release of the mortgage held by the United States and Relator on the Florida Property will be held in escrow by Chicago Title & Trust Company until closing, at which time it will be released in exchange for the $12,800,000 payment.

3. Kmart agrees to pay the remaining $7,200,000 of the $20,000,000 second Settlement Payment by December 22, 2018, as required under the Federal Settlement Agreement.

4. Kmart also agrees to deposit $1,600,000 in a sole order escrow for the benefit of Plaintiffs by December 22, 2018. The escrow, together with the mortgage encumbering the Puerto Rico Property, will serve as the sole security for the third and final Settlement Payment of $19,000,000 that Kmart will make by December 22, 2019.

5. Kmart hereby declares and affirms that its obligation to deposit $1,600,000 in a sole order escrow for the benefit of Plaintiffs by December 22, 2018, constitutes an "Obligation" under and secured by that certain Mortgage Note Pledge and Security Agreement dated January 12, 2018, made by Sears Roebuck de Puerto Rico, Inc., as pledgor in favor of the following pledgees: (i) United States of America, acting through the United States Department of Civil Justice, Civil Division; and (ii) Carl Ireland, as administrator of the estate of James Garbe in his role as Relator in the named *qui tam* action (Puerto Rico Mortgage Note Pledge and Security Agreement). *See* § 3 of the Puerto Rico Mortgage Note Pledge and Security Agreement. By virtue of the Puerto Rico Mortgage Note Pledge and Security Agreement, Sears Roebuck de Puerto Rico, Inc. pledged and assigned to the named pledgees and granted to the pledgees a continuing lien on and security interest in that certain mortgage note in the principal amount of $17,400,000, bearing Affidavit Number 2888 of Notary Public Miguel Agustín Blanco Fuertes (Puerto Rico Mortgage Note), in turn secured by a fee mortgage encumbering the Puerto Rico Property, constituted pursuant to Deed Number 2 executed on January 12, 2018, before Notary Public Miguel Agustín Blanco Fuertes (Puerto Rico Mortgage and together with the Puerto Rico Mortgage Note Pledge and Security Agreement and the Puerto Rico Mortgage Note, the Puerto Rico Security Documents).

6. Kmart, SHC, and Sears Roebuck de Puerto Rico, Inc. hereby ratify and confirm the pledge and security interest constituted by the Puerto Rico Mortgage Note Pledge and

Security Agreement over the Puerto Rico Mortgage Note as collateral security for all obligations of Kmart under the Federal Settlement Agreement, as modified by this Amendment and, likewise, ratify and confirm the fee mortgage lien of the Puerto Rico Mortgage.

7. Kmart, SHC, and Sears Roebuck de Puerto Rico, Inc. acknowledge and accept that this Amendment does not constitute a novation of the Federal Settlement Agreement.

8. The Parties agree that Kmart's failure to deposit the $1,600,000 sole order escrow no later than December 22, 2018, would constitute a material breach of the Federal Settlement Agreement, as modified by this Amendment and under the Puerto Rico Security Documents, thus entitling the United States and Relator to all legal remedies under the Puerto Rico Security Documents, including the foreclosure of the pledge over the Puerto Rico Mortgage Note and the foreclosure of the Puerto Rico Mortgage, provided Kmart does not cure such default in its payment obligations within seven (7) days of receiving written notice of the default from the United States. *See* Federal Settlement Agreement ¶ 3.

9. Other than in connection with any prepayment of the third and final Settlement Payment, Kmart agrees not to request the release or substitution of the mortgage held by the United States and Relator on the Puerto Rico Property before December 22, 2019, after Kmart's third and final Settlement Payment is made.

10. At or before closing on the sale of the Florida Property, Kmart shall reimburse Relator's counsel for all attorneys' fees of the Sugar Felsenthal Grais & Helsinger law firm, attorney Miguel Blanco, and JLL appraisers' fees incurred in connection with this Amendment.

11. All other provisions, terms, and conditions contained in the Federal Settlement Agreement, as amended, shall remain in full force and effect.

12. This Amendment is effective on the date of signature of the last signatory. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Amendment.

All other terms of the Federal Settlement Agreement remain unchanged and in effect. Please countersign a copy of this letter to confirm Kmart's agreement with the terms outlined above. The counter signature of counsel for Relator to this letter will confirm that Relator also agrees with the terms outlined above.

Sincerely,

Allie Pang
Trial Attorney
Commercial Litigation Branch

- 4 -

AGREED BY:

KMART CORPORATION - DEFENDANT

DATED: 8/23/18    BY: _____
                       Stephen L. Sitley
                       General Counsel and Chief Compliance Officer
                       Sears Holding Corporation

DATED: 8/23/18    BY: _____
                       William F. Johnson
                       Christopher C. Burris
                       King & Spalding LLP
                       Counsel for Defendant


SEARS ROEBUCK DE PUERTO RICO, INC. - PUERTO RICO SECURITY PROVIDER

DATED: 8/23/18    BY: _____

- 5 -

### CARL IRELAND - RELATOR

DATED:  *8-23-18*          BY:  _____  *Administrator*

Carl Ireland, Relator
Administrator of the Estate of James Garbe

DATED:  *8/23/18*          BY:  _____

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
Peter O. Rocque
Korein Tillery LLC
Counsel for Relator

## Exhibit 8

---------- **(Store #8975; Location: Río Piedras - Adjacent Land)** ----------
---In San Juan, Puerto Rico, this eighth (8th) day of May, two thousand nineteen (2019). --------------------------------------------------------------------------
-------------------------------------- **BEFORE ME** ------------------------------------
---CARLA SUZETTE D'ALMEIDA ARACENA, Attorney-at-Law and Notary in and for the Commonwealth of Puerto Rico, with residence in Guaynabo, Puerto Rico, and offices on the building located at Two Hundred Seventy (270) Muñoz Rivera Avenue, Hato Rey, San Juan, Puerto Rico. -------------
--------------------------------------- **APPEAR** --------------------------------------
---AS PARTY OF THE FIRST PART: SEARS, ROEBUCK OF PUERTO RICO, INC., a corporation organized and existing under the laws of Puerto Rico, represented herein by its attorney-in-fact, Antonio Escudero Viera, of legal age, married, attorney and resident of San Juan, Puerto Rico, who is duly authorized to appear herein pursuant to a Special Power of Attorney executed by its Director and Corporate Secretary, Luke Valentino, on March first (1st), two thousand nineteen (2019) before Notary Public Laura A. Novak, a Notary Public for the State of Illinois whose commission has been verified pursuant to a Certificate issued by the Department of the State of Illinois and subscribed by Jesse White as Secretary of State of the State of Illinois on March five (5), two thousand nineteen (2019), as protocolized by Deed Number Two (2) executed on March seven (7), two thousand nineteen (2019) before the undersigned Notary. Hereinafter referred to as the "Seller". -----------------------------------------------------------------
---AS PARTY OF THE SECOND PART: TRANSFORM DISTRIBUTION CENTER HOLDCO LLC, a Delaware limited liability company, represented herein by Adriana Emille Pérez Rentas, of legal age, married to Julián Alfonso Ramírez Lohner, attorney-at-law and resident of Guaynabo, Puerto Rico, who is duly authorized to appear herein pursuant to that certain Special Power of Attorney executed by its Vice-President, Harold Talisman, on March seven (7), two thousand nineteen (2019) before Notary Public Julie A. Munich, a Notary Public for the State of Florida whose commission has been verified pursuant to a Certificate issued by the Department of the

liquidation, and reference will be made to such Purchaser and Seller together with the

Seller the "Appearing Parties."---------------------------------------------------------------

--I, THE NOTARY, certify that I personally know the representatives of the

Appearing Parties, and through their statements I certify as to their age,

civil status, profession and residence. They assure me that they have, and

in my judgment they do have, the necessary legal capacity to execute this

instrument, as well as sufficient understanding of the English language, and

therefore, they freely and voluntarily--------------------------------------------------------

-------------------------------------------- **STATE** -------------------------------------------

---FIRST: <u>Order; Asset Purchase; Description of Real Property; Title; Liens</u>

<u>and Encumbrances; Cadaster Number</u>. ----------------------------------------------

-----One. On February eight (8), two thousand nineteen (2019), the United

States Bankruptcy Court for the Southern District of New York (the "Court")

issued an order (the "Order"), with respect to Chapter Eleven (11) Case

Number eighteen, dash, two, three, five, three, eight, parenthesis, R, D, D

(18-23538 (RDD)), approving an asset purchase agreement between

Sears Holdings Corporation and its subsidiaries, and Transform Holdco

LLC (the "Asset Purchase"). A certified copy of the Order is attached hereto

as Exhibit A. The Order issued by the Court authorizes Seller to sell at a

public auction to the highest bidder several parcels of land, including a

certain parcel of land located in the Municipality of San Juan, Puerto Rico,

described in the Spanish language in the Registry of Property of Puerto

Rico, Third Section of San Juan (the "Registry") as follows (the "Property"):

-----"RUSTICA: Parcela de terreno sito en el Barrio Cupey del término de
Río Piedras, compuesta de veintiocho mil ochocientos treinta y uno punto
setenta (28,831.70) metros cuadrados, equivalentes a siete punto tres mil
trescientos cincuenta y cuatro (7.3354) cuerdas. En lindes por el NORTE:
en una línea quebrada de ciento veintiocho punto veintinueve (128.29)
metros de longitud, con el Río Piedras y en otra distancia recta de
doscientos veinte punto veinticuatro (220.24) metros de longitud, siguiendo
el eje de la Quebrada Guaracanal ya canalizada, con la finca Marina de la
Universidad de Puerto Rico, ESTE: en una línea quebrada de ciento
noventa y cuatro punto treinta y siete (194.37) metros de longitud, con el
Remanente de la finca principal de la Sucesión de Guillermo S. Pierluisi;
SUR: en una distancia de sesenta y ocho punto treinta y nueve (68.39)
metros, con una franja de terreno que se segrego de la misma finca
principal y se dedicó a uso público para el ensanche e la Carretera Estatal
PR ciento setenta y seis (PR 176); OESTE: en una distancia quebrada de
trescientos veintitrés punto setenta y dos (323.72) metros, con el Río



owner of one (1) of three hundred two (302) of Río Piedras South, property number nine thousand seven hundred seventeen (9,717), first (1st) inscription. ------------------------------------------------------------

-----Seller represents that the Property has the following cadastre number assigned by the Municipal Revenues Collection Center ("CRIM," for its Spanish acronym): 087-061-058-07-000. -------------------------------------------

-----The Property is subject to the following liens and encumbrances: ------

-------(i) By its origin, it is subject to a right-of-way easement and easement in favor of the Puerto Rico Acqueducts and Sewer Authority. -----------------

-------(ii) By itself, it is subject to a mortgage securing a mortgage note in favor of the United States of America and Carl Ireland Curtiss, as guardian for James Garbe and his estate, as joint and several creditors (*acreedores solidarios*), in the principal amount Seventeen Million Four Hundred Thousand Dollars ($17,400,000.00), for which the Property secures One Million Nine Hundred Twenty Thousand Dollars ($1,920,000.00), with interest at the rate of one point five percent (1.5%) per annum and constituted pursuant to Deed Number Thirty-Two (32) executed on January twelve (12), two thousand eighteen (2018) before Notary Miguel A. Blanco Fuertes, recorded in the Registry at the Karibe volume of the Fourth (IV) Section of San Juan, property number property number nine thousand seven hundred seventeen (9,717) of Río Piedras South, second (2nd) and last inscription (the "Mortgage"). Paragraph R of the Order provides for the cancellation of the Mortgage, which shall be executed at a later date and a certified copy of which Deed of Cancellation of Mortgage will be filed in the Registry for recordation purposes after the filing of this Deed. ---------------

---SECOND: The Appearing Parties state that they have agreed to the purchase and sale of the Property, and they carry out the aforesaid purchase and sale under the following terms and conditions: -----------------

--------------------------- **CLAUSES AND CONDITIONS** -------------------------

-----One: <u>Conveyance</u>. The Seller hereby remises, releases, grants, sells and conveys to the Pucharser, and the Purchaser hereby purchases,

AER
APR



subject to the covenants, restrictions, reservations, rights-of-way, roadways, plats, easements, servitudes, taxes, assessments, encumbrances, liens, covenants, conditions, obligations and liabilities and all other matters as they may appear of record and without any warranty or representation (express, implied, statutory or otherwise), except that the Seller warrants that Seller is possessed of the Property and has not previously conveyed any fee title to the Property. --------------------

-----Two: <u>Purchase Price</u>. The Property is sold for a purchase price equal to the amount of TWO MILLION NINE HUNDRED SEVENTY-SEVEN THOUSAND FIFTY DOLLARS ($2,977,050.00), the receipt of which is hereby acknowledged. ----------------------------------------------------------------

-----Three: <u>Legal Possession</u>. By virtue of this Deed and without any further formality, Seller delivers possession of the Property to Purchaser and Purchaser accepts the same. Seller expressly warrants to Purchaser the legal and peaceful physical possession in fee simple title ("pleno dominio") of the Property sold. ----------------------------------------------------------------

----Four: <u>Real Estate Taxes and Assessments</u>. All real estate taxes and assessments with respect to the Property for any period of time prior to the date of this Deed shall be for the account of the Seller and for any period of time thereafter for the account of the Purchaser. Seller further agrees that in connection with the foregoing, it shall be responsible for any real property taxes on improvements located on the Property that may not have been assessed by taxing authorities as of the date of this Deed for any period of time prior to the date of this Deed. Seller states and Purchaser acknowledges that Seller furnished to Purchaser evidence of payment of all real estate taxes and assessments due and payable with respect to the Property that were due prior to the date of this Deed.--------------------------

-----Five: <u>Additional Documentation</u>. The Appearing Parties further agree to execute and deliver any additional document which may be necessary to record this Deed in the Registry of the Property. ---------------------------------

-----Six: <u>Title Report</u>. The Appearing Parties accept that the title search



internal revenue, legal assistance and notarial stamps for the first certified copy of this Deed and the vouchers for the recordation hereof in the Registry shall be for the account of the Purchaser. ------------------------------

---FOURTH: <u>Request to the Registrar</u>. The Honorable Registrar of the Property is respectfully requested to record the conveyance and transfer of the Property in fee simple (*pleno dominio*) in favor of the Purchaser, so that the records of the Registry under his/her authority will attest to this fact.---

----------------------------------------WARNINGS----------------------------------------

---FIFTH: The Notary warns the Appearing Parties that, if the Property object of this transaction is situated within a floodable zone, the present or future owners of the Property, including any person in possession thereof, are required by law to observe and comply with the requirements and provisions of the floodable zones regulations as provided in section Three (3) of Act Number eleven (11) of March eight (8), ninteen hundred eighty-eight (1988) (23 LPRA section 225 (g)). Non compliance with these regulations constitute an unlawful act. The Appearing Parties accept that they have been advised of the dispositions of this law, they understand the legal responsibilities arising therefrom, and they bind themselves to comply with such regulations, in the event said law may apply to them.--------------

---SIXTH: The Appearing Parties are hereby informed, specifically the Purchaser, that if the house that is located in the Property were built prior to the year nineteen hundred seventy-eight (1978), the same are subject to the Federal Law for the Reduction of the Caused Risks for the Painting with the Component of Lead (42 U.S.C. Section 4851 et sec.). This law and its regulations impose upon the Seller, its agents and the real estate brokers, the obligation (i) to disclose any knowledge of the presence of paint with the component of lead or of any well-known danger in the Property associated with this; to provide any report or evaluation that Seller has available regarding this matter; (ii) to provide time so that the Purchaser inspects the Property to determine the existence or non-



complement with their signatures confirming the compliance of the requirements of the above mentioned federal law. Copies of this document must be conserved by the Seller and its agent for a period of three (3) years. It is noticed, also that not fulfilling the requirements of this law exposes the Seller and its agent to joint and several liability for any damages that may arise in the future.------------------------------------------------

---SEVENTH: The Appearing Parties likewise recognize to have examined copies of certifications issued by the CRIM of real estate taxes owed in connection with the Property. The Purchaser acknowledges that it will record the transfer of the Property in the records of CRIM, so that the subsequent notifications of the collections of the real estate taxes related to the Property are sent to the Purchaser. The Seller represents and warrants that there are no arrears or delays in the payments of the real estate taxes assessed in connection with the Property. ------------------------

---EIGHTH: Purchaser acknowledges that it has done a thorough examination of the Property and is fully aware of the state of current condition and deterioration thereof and accepts and acquires the same as is, waiving any claim against the Seller for any defect or hidden defect or apparent design and/or construction, and all defects caused by the use or wear and the consequences of the passage of time, mechanical breakdown property, including but not limited to cracks, leaks in walls, ceilings and floors, or loosening of plaster or tiles, floor recessed impedance sanitary lines, and/or aqueducts or any class; or damage to power lines. Purchaser acknowledges that the Seller did not act in any way as a designer, developer, builder or developer of the Property. --------------------------------

-------**ACCEPTANCE, ADDITIONAL WARNINGS AND EXECUTION** -----

---The representatives of the Appearing Parties hereby accept this Deed as drafted and I, the Notary, gave them the necessary legal warnings concerning the execution of this Deed and they were fully advised by me thereon. Specifically, I also advised them of the following:--------------------

------(a) any liens or encumbrances affecting title to the Property that may



property, and not by the undersigned Notary, to which title abstract and report the parties irrevocably acquiesce, and I, the Notary, assume no responsibility as to the accuracy, correctness, and/or completeness of said title abstract or report; --------------------------------------

------(c) it is convenient for the parties to obtain a certification from the Registry prior to the execution of this Deed, but it is also advisable to verify the status of liens and encumbrances on Property as they may appear from the Registry on the date hereof and of the adverse consequences which may result from the failure to do so; -------------------------------------------------

------(d) this Deed must be promptly filed for recordation in the Registry in order to be effective as against third parties; --------------------------------------

------(e) the possible existence and pendency of unrecorded statutory liens, including but not limited to, the statutory preferred lien in favor of the Commonwealth of Puerto Rico for unpaid property taxes; and ---------------

------(f) notwithstanding the statements made by the parties hereto, the transactions contained in this Deed are subject to scrutiny by the corresponding local and federal taxing authorities which may result in the imposition of taxes. -------------------------------------------------------------------

---I also advised the representatives of the Appearing Parties as to their right to read the Deed by themselves, which they did, and to have witnesses present on the execution thereof, which they waived. After having read the contents of this Deed, the representatives of the Appearing Parties fully ratified and confirmed all statements included herein as the true and correct embodiment of the Appearing Parties' stipulations, terms and conditions, and thereupon signed this Deed before me, the Notary, having also written their initials on each and every page of this Deed. -----

---TO ALL OF WHICH, under my signature and seal, signing and sealing the same according to law, I, the undersigned Notary, under my signature, seal, mark and flourish DO HEREBY CERTIFY AND ATTEST. ---------------







**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re                                            :        **Chapter 11**
                                                 :
**SEARS HOLDINGS CORPORATION,** *et al.,*        :        **Case No. 18-23538 (RDD)**
                                                 :
                                                 :
Debtors.[1]                                       :        **(Jointly Administered)**
------------------------------------------------------------x

### ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS AND BUYER, (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated November 1, 2018 (Docket No. 429) (the "Sale Motion"),[2] filed

by the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, the entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United

States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004,

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]   Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Motion.

6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and

Rules 6004-1, 6005-1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy

Court for the Southern District of New York (the "Local Rules"), authorizing and approving the

sale of the Acquired Assets and the assumption and assignment of certain executory contracts and

unexpired leases of the Debtors in connection therewith; and the Court having entered this Court's

prior order, dated November 19, 2018 (Docket No. 816) including the schedule as revised by the

*Global Bidding Procedures Process Letter* filed with the Bankruptcy Court on November 21, 2018

(Docket No. 862) (together, the "Bidding Procedures Order"), approving competitive bidding

procedures for the Acquired Assets (the "Bidding Procedures") and granting certain related relief;

and Transform Holdco LLC (the "Buyer") having submitted the highest or otherwise best bid for

the Acquired Assets, as reflected in the Asset Purchase Agreement (as defined below); and the

Court having conducted a hearing on the Sale Motion (the "Hearing" or the "Sale Hearing")

commenced on February 4, 2019, at which time all interested parties were offered an opportunity

to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the

Sale Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of January 17,

2019 by and among the Buyer and the Sellers party thereto (including each Debtor and certain

other subsidiaries of Sears Holdings Corporation, the ("Sellers") (as may be amended, restated,

amended and restated from time to time, including pursuant to that certain Amendment No. 1 to

Asset Purchase Agreement, by and among the Buyer and the Sellers, the "Asset Purchase

Agreement"),[3] a copy of which is attached hereto as Exhibit B, whereby the Sellers have agreed,

subject to Court approval, among other things, to sell the Acquired Assets to the Buyer, including,




---

[3] Amendment No. 1 to the Asset Purchase Agreement was filed in substantially final form on February 7, 2019 at Docket No. 2456 (the "**APA Amendment**"). Upon closing and execution the Debtors will file the executed version of the APA Amendment with the Court.

2

without limitation, (x) the Assigned Agreements (including any Additional Contracts) that will be assumed and assigned to Buyer or designated, as applicable, each on the terms and conditions set forth in the Asset Purchase Agreement and (y) designation rights ("Designation Rights") for certain Designatable Leases (the sale of such Acquired Assets, collectively, the "Sale Transaction"), (iii) the Bidding Procedures Order and the record of the hearing before the Court on November 15, 2018 at which the Bidding Procedures Order was approved, (iv) the ability of the Buyer to submit its Credit Bid pursuant to Asset Purchase Agreement section 3.1(b) (the "Credit Bid"), (iv) the objections to the Sale Motion that have not been resolved or adjourned and all related pleadings, and (v) the record of the evidentiary Hearing before the Court commenced on February 4, 2019, at which the Court authorized the Buyer's Credit Bid (as approved pursuant to this Sale Order), including the arguments and representations of counsel made, and the evidence proffered or adduced, at the Hearing; and it appearing that due and sufficient notice of the Sale Motion, the Asset Purchase Agreement, the Bidding Procedures Order, and the form of this order (the "Sale Order") have been provided in accordance with the Bidding Procedures Order and the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (Docket No. 405) (the "Amended Case Management Order"); and, except as otherwise provided for herein, all objections to the Sale Motion having been withdrawn, resolved, or overruled as provided in this Sale Order; and, after due deliberation and for the reasons stated in the Court's bench ruling at the Hearing, it appearing that the relief granted herein is in the best interests of the Debtors, their estates and creditors and all parties in interest in these chapter 11 cases; and good and sufficient cause appearing therefor, it is hereby



3

### FOUND AND DETERMINED THAT:

A.      **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing.  This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Sale Motion, the Sale Transaction and the property of the Debtors' estates, including the Acquired Assets, pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) that this Court can decide by a final order under the United States Constitution.  Venue of these chapter 11 cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.





C.      **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Local Rules 6004-1, 6005-1 and 6006-1, and the Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order Number 383 in the United States Bankruptcy Court for the Southern District of New York.

D.      **Final Order**.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  The Debtors have demonstrated compelling circumstances and a good,

4

sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. In the absence of a stay pending appeal, Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset Purchase Agreement at any time after entry of this Sale Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

E.      **Notice and Opportunity to Object**.  Actual written notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Sale Motion, the Sale Transaction, the sale of the Acquired Assets that are owned by the Debtors free and clear of any Claims (as defined below), the assumption and assignment of the Assigned Agreements, the Auction, the Bidding Procedures, and the relief requested in the Sale Motion has been given, as required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Amended Case Management Order, and the Bidding Procedures Order.



F.      **Title to the Acquired Assets**.  The Acquired Assets that are owned by the Debtors constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  Except as provided in the Asset Purchase Agreement, the Debtors are the sole and rightful owners of such Acquired Assets that are owned by the Debtors with all right, title and interest to transfer and convey the Acquired Assets to the Buyer, and no other person has any ownership right, title, or interests therein.

G.      **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Sale Motion, the Sale Transaction, the Asset Purchase Agreement, and all related agreements (the "Related Agreements").  The Debtors' entry into and performance under the Asset Purchase Agreement and

Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their estates, creditors and other parties in interest; and (iii) are reasonable and appropriate under the circumstances.  The Debtors have demonstrated compelling circumstances for the Sale Transaction outside: (i) the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the value of the Debtors' estates.  Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Price set forth in the Asset Purchase Agreement constitutes the highest or otherwise best offer received for the Acquired Assets; (ii) the Asset Purchase Agreement and the transactions contemplated thereby present the best opportunity to maximize the value of the Acquired Assets, whether on a going concern basis or otherwise, and avoid decline and devaluation of the Acquired Assets that would occur in an immediate liquidation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase Agreement, recoveries to creditors will be diminished; and (iv) the value of the Debtors' estates will be maximized through the sale of the Acquired Assets pursuant to the Asset Purchase Agreement.

       H.    **Compliance with Bidding Procedures**.  The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders, and were the result of arms'-length negotiations.  Further, the Bidding Procedures afforded notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the

Acquired Assets. The Debtors, ESL, the Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects except as properly waived in the exercise of their fiduciary duties in accordance with such Procedures. The Buyer subjected its bid to the competitive Bidding Procedures approved by this Court and the Buyer was found eligible to participate in the Auction and was the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance with the Bidding Procedures Order and Bidding Procedures.

I.     **Sale Process**.  (i) The Debtors and their advisors, including Lazard Frères & Co. LLC, engaged in a robust and extensive marketing and sale process through the postpetition sale process pursuant to the Bidding Procedures Order and the Bidding Procedures; (ii) the Debtors and their advisors conducted a fair and open sale process; (iii) the sale process, the Bidding Procedures and the Auction were non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets; and (iv) the process conducted by the Debtors pursuant to the Bidding Procedures obtained the highest or otherwise best value for the Acquired Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result.

J.     **Fair Consideration; Highest or Best Value**.  The consideration to be paid by the Buyer under the Asset Purchase Agreement, including, without limitation, the Credit Bid Amount (as hereinafter defined) and the Credit Bid Release Consideration: (i) constitutes fair and reasonable consideration for the Acquired Assets; (ii) is the highest or best offer for the Acquired Assets; (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practically available alternative; (iv) constitutes fair and reasonably equivalent value and full and adequate consideration, under the Bankruptcy Code and the Uniform

7

Fraudulent Transfer Act; (v) constitutes fair consideration under the Uniform Fraudulent Conveyance Act; and (vi) constitutes reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing. Such consideration constitutes the highest or best bid for the Acquired Assets. Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets is fair and reasonable. Pursuant to Section 3.1(c) of the Asset Purchase Agreement, the Purchase Price may include cash in the amount of the outstanding obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date under: (A) the IP/Ground Lease Term Loan Facility (the "IP/Ground Lease Buyout Amount"); (B) the FILO Facility (the "FILO Facility Buyout Amount"); and (C) the Real Estate Loan 2020 (the "Real Estate Loan 2020 Buyout Amount", together with the IP/Ground Lease Buyout Amount and the FILO Facility Buyout Amount, the "Buyout Amounts") unless such lender(s) provide written confirmation to the Sellers that such cash payment and the obligations owed to lenders by the Sellers under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, are permanently waived and discharged against the Sellers. Pursuant to Section 3.1 of the Asset Purchase Agreement, to the extent payable, each Buyout Amount, if applicable, shall be deposited and held in separate segregated accounts of the Debtors and the Liens of the lenders other than Buyer or its affiliates under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, shall attach to the cash proceeds held in the applicable designated segregated account in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two (2) business days following the Closing Date and shall not otherwise be used by the Debtors without

further order of the Bankruptcy Court (the mechanic referred to in this sentence and the preceding sentence shall be referred to herein as the "<u>Buyout Option</u>"). Such Purchase Price, including the Credit Bid Amount, the Credit Bid Release Consideration, the Buyout Option, and other good and valuable consideration provided in connection with the Sale Transaction, constitutes the highest or best bid for the Acquired Assets. Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets is fair and reasonable.

Without limiting the foregoing, no objection was raised to the Sale Motion on the basis that the creditors of any particular Debtor were improperly prejudiced by the proposed sale, including by the credit bid feature of the proposed sale. Based on the evidence before the Court, the sale consideration under the proposed sale that does not constitute a credit bid constitutes adequate consideration for the Acquired Assets of each Debtor when added to the credit bid consideration, and such consideration does disadvantage the creditors of any particular Debtor except as permitted by the Bankruptcy Code.

K.    **ESL Secured Claims**. In accordance with the Asset Purchase Agreement, effective upon the Closing Date ESL's Claims (as defined below) against the Debtors arising under the: (i) IP/Ground Lease Term Loan Facility; (ii) FILO Facility; (iii) Real Estate Loan 2020; (iv) Second Lien Term Loan; (v) Second Lien Line of Credit Facility; (vi) Second Lien PIK Notes; and (vii) Citi L/C Facility (together with the security interests securing any of the Claims of ESL described in the preceding sub-clauses (i)-(vii), collectively, the "<u>ESL Claims</u>"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code in the amounts set forth on <u>Exhibit G</u> to the Asset Purchase Agreement, as reduced by the Credit Bid set forth in Section 3.1(b) of the Asset Purchase Agreement. Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, ESL or, to the extent any of the ESL Claims are assigned to

Buyer prior to the Closing Date, Buyer is hereby authorized to credit bid (or cause to be credit bid) the ESL Claims and to use such ESL Claims as a portion of the Purchase Price (the "ESL Credit Bid Amount") as set forth in Section 3.1(b) of the Asset Purchase Agreement (subject, in the case of the security interest securing the Claims described in subclauses (iv), (v) and (vi) of this Paragraph K, anything in this Order to the contrary notwithstanding, to delivery of the written consent of the Collateral Agent for such security interest).  In addition, the transfer of Acquired Assets constituting "Collateral" under that certain Amended and Restated Security Agreement by and among Sears Holdings Corporation and Wilmington Trust, National Association in its capacity as Collateral Agent (the "Second Lien Collateral Agent") dated as of March 20, 2018 (as may be amended, restated, amended and restated or otherwise modified in accordance with its terms from time to time) (the "Second Lien Security Agreement") has been, or will be, directed by ESL as the "Required Secured Parties" under the Second Lien Security Agreement pursuant to one or more direction letters delivered to the Second Lien Collateral Agent (the "Second Lien Consent").  The Second Lien Consent binds all parties holding debt under the Second Lien Term Loan, Second Lien Line of Credit Facility and Second Lien PIK Notes in their capacity as such (collectively, the "Senior Second Lien Creditors", and their claims against the Debtors under such debt document, the "Senior Second Lien Claims").  The Senior Second Lien Claims shall be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid.  Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, the Second Lien Collateral Agent is hereby authorized to credit bid the Senior Second Lien Claims as a portion of the Purchase Price (the "2L Credit Bid Amount", together with the ESL Credit Bid Amount (without duplication), the "Credit Bid Amount").  At the Auction, pursuant to the Asset



Purchase Agreement, the Buyer agreed to pay the Purchase Price, which includes the Credit Bid Amount.

L.      **Cyrus Claims**.  Effective upon the Closing Date, Cyrus' Claims (as defined below) arising under: (g) the Final Junior DIP Order[4] (the "Junior DIP Secured Obligations"[5]); (h) the Citi L/C Facility; (i) the Second Lien PIK Notes[6] (the "Cyrus Second Lien Notes Claims"); and (j) the IP/Ground Lease Term Loan Facility (the "Cyrus IP/GL Claims") together with the security interests securing any of the Claims described in the preceding sub-clauses (g)-(j), collectively the "Cyrus Claims"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid.

M.      **No Successor or Other Derivative Liability**.  The sale and transfer of the Acquired Assets of the Debtors to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of the Assigned Agreements, will not subject the Buyer or ESL to any liability (including any successor liability) under any laws, including any bulk-transfer laws, or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories, with respect to the operation of the Debtors' business prior to the Closing, and for each Assigned Agreement, the applicable Assumption Effective Date, except that, upon the Closing or such other date as specified in the Asset Purchase Agreement, the Buyer shall become liable for the applicable Assumed Liabilities.  The Buyer: (i) is not, and shall not be considered or deemed a mere continuation of,

---

[4]    The "Final Junior DIP Order" shall mean the *Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1436).

[5]    The "Junior DIP Secured Obligations" shall have the meaning ascribed to it in the Final Junior DIP Order.

[6]    As such term is defined in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* (Docket No. 3).

or successor to, the Debtors in any respect; (ii) has not, *de facto* or otherwise, merged with or into the Debtors; and (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors and there is no continuity of enterprise between the Debtors and the Buyer. Accordingly, the Buyer is not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement, and except with respect to any Assumed Liabilities or as otherwise set forth in the Asset Purchase Agreement, Buyer's acquisition of the Acquired Assets from the Debtors shall be free and clear of any "successor liability" claims of any nature whatsoever. Buyer would not purchase the Acquired Assets but for the protections against any claims based upon "successor liability" theories as specified herein. Notwithstanding the foregoing, nothing herein shall apply with respect to the Reserved Lease Issues.

N.    **Transition Agreements**.

(i)    The Services Agreement, as contemplated by the Asset Purchase Agreement, and as summarized on the record of the Sale Hearing, has been filed at Docket No. 2455 in a substantially final form, which is being negotiated by the parties and remains subject to a full reservation of rights among the parties.[7]

(ii)    The Employee Lease Agreement, as contemplated by the Asset Purchase Agreement has been filed at Docket No. 2453 in a substantially final form, which is being negotiated by the parties and remains subject to a full reservation of rights among the parties.[8]

---

[7] Upon closing and execution the Debtors will file the executed version of the Services Agreement with the Court.

[8] Upon closing and execution the Debtors will file the executed version of the Employee Lease Agreement with the Court.

O.    <u>**Good Faith; No Collusion**</u>.    The Asset Purchase Agreement and each of the

Transactions were negotiated, proposed, and entered into by the Debtors, their management, their

boards of directors or equivalent governing bodies, and representatives and the Buyer and its

management, board of directors or equivalent governing body, officers, directors, employees,

agents, members, managers and representatives, including ESL, in good faith, without collusion

or fraud, and from arms'-length bargaining positions.  The Buyer is a "good faith purchaser" and

the Buyer, and ESL are acting in good faith within the meaning of section 363(m) of the

Bankruptcy Code and, as such, are entitled to all the protections afforded thereby through the date

of the Hearing and in closing the proposed transaction.  In the absence of any Person obtaining a

stay pending appeal, effective upon the Closing, it shall be deemed that neither the Debtors, ESL,

nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase

Agreement to be avoided or costs and damages to be imposed under section 363(n) of the

Bankruptcy Code.  The Buyer and ESL have proceeded in good faith in all respects in that, among

other things: (i) the Buyer, and ESL have recognized that the Debtors were free to deal with any

other party in interest in acquiring the Acquired Assets; (ii) the Buyer, and ESL have complied

with the applicable provisions of the Bidding Procedures Order; (iii) the Buyer's bid was subjected

to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all

payments to be made by the Buyer and all other material agreements or arrangements entered into

by the Buyer, ESL and the Debtors in connection with the Sale Transaction have been disclosed

and are appropriate. The sale price in respect of the Acquired Assets was not controlled by any

agreement among potential bidders and neither the Debtors, ESL nor the Buyer have engaged in

collusion, fraud, or any conduct that would cause or permit the Asset Purchase Agreement to be

avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or that

would prevent the application of section 363(m) of the Bankruptcy Code. Accordingly, neither the Asset Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code. Specifically, neither ESL nor the Buyer has acted in a collusive manner with any Person or entity.

P. **Notice**. As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate, and sufficient notice of the Sale Motion, the Bidding Procedures (including the bidding process and the deadline for submitting bids and the Auction), the Sale Hearing, the Sale Transaction, the proposed Sale Order attached to the Asset Purchase Agreement, and the other relief requested in the Sale Motion was provided by the Debtors; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Bidding Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, the proposed Sale Order, or any of the relief requested in the Sale Motion, except as otherwise provided paragraphs FF.34 and FF.38 of this Sale Order, is required. With respect to Persons whose identities are not reasonably ascertained by the Debtors, in accordance with the Bidding Procedures Order, a notice containing the results of the Auction was published on the Prime Clerk website on January 18, 2019 (Docket No. 1730).

Q. **Cure Notice**. As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Sale Hearing, the Assumption and Assignment Notice (as defined in the Bidding Procedures Order) on each counterparty to a Potential Transferred Agreement, dated January 18, 2019, January 23, 2019, and January 31, 2019, which provided the Debtors' intent to assume and assign such Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an

executory contract or lease) and notice of the related proposed Cure Costs upon each non-debtor

counterparty to such Potential Transferred Agreements. The service of the Assumption and

Assignment Notice was timely, good, sufficient and appropriate under the circumstances and no

further notice need be given with respect to the Cure Costs for the assumption and assignment of

the Assigned Agreements, including without limitation the Designatable Leases and any

Additional Contracts that were listed as Potential Transferred Agreements; provided, however,

that further notice is required as provided for in paragraphs FF.34 and FF.38 herein. *See Notice of*

*Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired*

*Leases in Connection with Global Sale Transaction* (Docket No. 1731); *see also Supplemental*

*Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and*

*Unexpired Leases in Connection with Global Sale Transaction* (Docket No. 1774); *see also*

*Affidavits of Service* (Docket Nos. 1969, 2132, 2162); *see also Second Supplemental Notice of*

*Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired*

*Leases in Connection with Global Sale Transaction; see also Affidavit of Service* (Docket No.

2314); *see also Affidavit of Service* (Docket No. 2417) . All non-debtor parties to the

Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an

executory contract or lease and was listed on the *Notice of Cure Costs and Potential Assumption*

*and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale*

*Transaction* or *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of*

*Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction*) have had

a reasonable opportunity to object both to the Cure Costs listed on the applicable Assumption and

Assignment Notice and, for Assigned Agreements other than Designatable Leases and Additional

Contracts (to the extent the Additional Contracts are executory contracts), to the assumption and

assignment of the Assigned Agreements to the Buyer in accordance with the Bidding Procedures

Order.

R.      <u>**Satisfaction of Section 363(f) Standards**</u>.  Except as expressly provided for in this

Sale Order, the Debtors may sell the Acquired Assets that are owned by the Debtors free and clear

of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the

Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests,

of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties,

conditional sales or title retention agreements, hypothecations, preferences, debts, easements,

suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign

domestic governmental entity, taxes (including foreign, state and local taxes), covenants,

restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for

reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other

interests of any kind or nature whatsoever against any of the Debtors or the Acquired Assets owned

by them, including, without limitation, any debts arising under or out of, in connection with, or in

any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual

commitments, restrictions, product liability claims, environmental liabilities, employment or labor

law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan

claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the

Debtors, any claims under, or trusts or liens created by, PACA,[9] and any derivative, vicarious,

transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes

of action (whether in law or in equity, under any law, statute, rule or regulation of the United

---

[9]     "<u>PACA</u>" means The Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§499a, et seq.) or the Packers and Stockyards Act (7 U.S.C. §§181 et seq.) or any similar state laws.



States, any state, territory, or possession thereof or the District of Columbia), whether arising prior

to or subsequent to the commencement of these chapter 11 cases, whether known or unknown,

contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled

or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed,

recorded or unrecorded, contingent or non-contingent, material or non-material statutory or non-

statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or

otherwise arising under or out of, in connection with, or in any way related to any of the Debtors,

any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses

before the effective time of the Closing and for each Assigned Agreement (subject to the payment

of Cure Costs as required under section 365(b) of the Bankruptcy Code), the applicable



Assumption Effective Date, pursuant to the Asset Purchase Agreement, or the transfer of any of

the Debtors' interests in the Acquired Assets to the Buyer, and all Excluded Liabilities;

(collectively, excluding any Assumed Liabilities, the "Claims"), because, in each case, one or more

of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied;

provided, however, that, nothing herein shall be deemed, or construed as, a ruling or determination

by this Court that the Assumed Liabilities encumber the Acquired Assets.  Without limiting the

generality of the foregoing, "Claims" shall include any and all liabilities or obligations whatsoever

arising under or out of, in connection with, or in any way relating to: (1) any of the employee

benefit plans, including any Claims related to unpaid contributions or current or potential

withdrawal or termination liability; (2) any of the Debtors' collective bargaining agreements; (3)

the Worker Adjustment and Retraining Notification Act of 1988; and (4) any of the Debtors'

current and former employees.  Those holders of Claims who did not timely object (or who

ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed

to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors. All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against the Buyer or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.

S.     The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Acquired Assets that are owned by the Debtors was not free and clear of all Claims, if the Buyer would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities related to the Business that will not be assumed by the Buyer, as described in the Asset Purchase Agreement, or if the Credit Bid Release or the Credit Bid were not components of the Sale Transaction. A sale of the Acquired Assets owned by the Debtors other than one free and clear of all Claims would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

T.     The total consideration to be provided under the Asset Purchase Agreement reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the

Bankruptcy Code, with title to and possession of the Acquired Assets owned by the Debtors free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

U.      As of the Closing, the transfer of the Acquired Assets of the Debtors to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Buyer with all rights, title and interest of the Debtors in, and to, the Acquired Assets, free and clear of all Claims.

V.      **Assumption and Assignment of Assigned Agreements**.  The assumption and assignment of the Assigned Agreements are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Assigned Agreements (i) is necessary to sell the Acquired Assets to the Buyer, (ii) allows the Debtors to sell their business to the Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assigned Agreements, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Agreements.

W.      **Validity of the Transfer**.  As of the Closing, the transfer of the Acquired Assets to the Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims against the Debtors.  The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and

19



all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

X.  **Corporate Power and Authority.**  The Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate or other action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) upon entry of this Sale Order, other than as set forth in the Asset Purchase Agreement (including, without limitation, with respect to antitrust matters), need no consent or approval from any other person to consummate the Sale Transaction.

Y.  **Valid and Binding Contract.**  The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms. The Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia. None of the Debtors nor the Buyer is, or will be, entering into the Asset Purchase Agreement and transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose.  The Asset Purchase Agreement and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without

posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

Z.      The Sale Transaction does not constitute a *de facto* plan of reorganization or liquidation as it does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors; (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests or extend debt maturities.  Entry into the Asset Purchase Agreement and the Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan for the Debtors.  Entry into the Asset Purchase Agreement does not constitute a *sub rosa* chapter 11 plan.

AA.     **Valid and Binding Release**.  The proposed compromise and resolution embodied in the Credit Bid Release (as defined below and as reflected in Section 9.13 of the Asset Purchase Agreement) is reasonable and appropriate and a valid exercise of the Debtors' business judgment, and the consideration provided for in the Asset Purchase Agreement, including the Credit Bid Release Consideration and other good and valuable consideration provided to the Debtors and their Estates in connection with the Sale Transaction, constitutes fair and appropriate consideration for the Credit Bid Release.  The Credit Bid Release is required by the Buyer in order to enter into and perform in accordance with the Sale Transaction and providing such release is in the best interests of the Debtors, their estates, creditors and other parties in interest.  The Claims and causes of action released through the Credit Bid Release are complex and in the absence of the release would involve extended and expensive litigation, the outcome of which would be uncertain.

BB.    **Debtor Authorization of Non-Debtor Subsidiary Action or Inaction.**    The proposed Sale Transaction requires certain of the Debtors to take certain actions with respect to Sears Re, KCD IP, LLC, and the other Foreign Subsidiaries. As further described in the Asset Purchase Agreement, the Sale Transaction contemplates the purchase of the KCD Notes effective upon receipt of the consent of the Bermuda Monetary Authority or any other applicable Bermuda regulatory authority, to authorize the sale of the KCD Notes to Buyer (the "KCD Notes Purchase"). The Asset Purchase Agreement includes other conditions with respect to the KCD Notes that have been satisfied. First, Sears Re has agreed to be bound by the terms of the Asset Purchase Agreement prior to the deadline described therein. Additionally, as further described in Section 9.14 of the Asset Purchase Agreement, and to the extent provided for in and in accordance with the Asset Purchase Agreement, the Sale Transaction contemplates certain restrictions upon Sellers' and their Affiliates' (including KCD IP, LLC's) ability to sell, transfer, assign, encumber, license, sublicense or otherwise grant certain rights or take or fail to take certain actions related to the KCD IP or to amend, terminate, renew, or fail to take certain actions with respect to, certain Contracts related to the KCD IP (the "KCD IP Restrictions"). In accordance with Section 9.14 of the Asset Purchase Agreement, Sellers caused KCD IP, LLC to agree to grant, effective as of the Closing, the Exclusive License (the "KCD Exclusive License Right"). The terms of the KCD Exclusive License Right shall be set forth in an exclusive license agreement, which agreement shall be executed contemporaneous with the Closing. Prior to such time that the BMA Consent is obtained and pursuant to the Services Agreement, the Buyer shall provide services to the Sellers sufficient to perform the PA Liabilities in exchange for which the Sellers shall pay certain consideration to the Buyer (the "KCD Servicing Right"). Pursuant to Section 9.14 of the Asset Purchase Agreement, the Debtors have agreed to certain restrictions on Sellers' and their Affiliates ability

to sell, assign, or transfer in any way any equity interests in KCD IP, LLC without requiring a condition that the purchaser in such sale, assignment or transfer agrees to the limitations set forth in Section 9.14 therein (the "KCD Equity Transfer Restriction Right" and together with the KCD IP Restrictions, and the KCD Exclusive License Right, the "KCD IP Related Rights"). The Sellers' obligation to transfer the KCD Notes and the Buyer's obligation to assume the PA liabilities is dependent upon obtaining the BMA Consent. Furthermore, the Sellers have agreed to use reasonable best efforts to cause each of the Foreign Subsidiaries to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered to the Buyer or the applicable Assignee, all right, title and interest of each of the Foreign Subsidiaries in, to or under the Acquired Foreign Assets, and, in certain circumstances, the Buyer may acquire all of the equity interests in any Foreign Subsidiary and minority equity interests held by non-U.S. Persons or Subsidiaries holding such minority equity interests (the "Foreign Assets Rights") as provided in the Asset Purchase Agreement. Each of the KCD Notes Purchase, the KCD IP Related Rights and the Foreign Assets Rights are required by Buyer and are reasonable and appropriate exercises of the Debtors' business judgment and the consideration provided by the Buyer (including the assumption of the Assumed Liabilities) constitutes fair and appropriate consideration to the Debtors and the non-Debtor Sellers.

CC.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.    The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Buyer intend to close the Sale Transaction as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction.

contemplated by the Asset Purchase Agreement. Accordingly, there is cause to lift the stay

contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to this Sale Order, except

with respect to adjourned matters.

DD.    **Personally Identifiable Information**. As contemplated in the Bidding Procedures

Order, and subject to the terms of this Sale Order, the sale to the Buyer under the Asset Purchase

Agreement of any personally identifiable information (as such term is defined in section 101(41A)

of the Bankruptcy Code) and private health information about individuals is either consistent with

the privacy policy of the Debtors in effect on the date of commencement of these chapter 11 cases

or consistent with the recommendations of the Consumer Privacy Ombudsman appointed in these

chapter 11 cases, as may be modified by agreement of the Parties and the Consumer Privacy

Ombudsman, and satisfies the requirements of section 363(b)(1)(A).



EE.    **Legal and Factual Bases**. The legal and factual bases set forth in the Motion and

at the Sale Hearing establish just cause for the relief granted herein.

FF.    **Necessity of Order.** The Buyer would not consummate the transactions absent the

relief provided for in this Sale Order.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    **Motion is Granted**. The Sale Motion and the relief requested therein to the extent

not previously granted by this Court pursuant to the Bidding Procedures Order is granted and

approved solely to the extent set forth herein.

2.    **Findings of Fact and Conclusions**. The Court's findings of fact and conclusions

of law in the Bidding Procedures Order and the record of the hearing with respect to the Bidding

Procedures Order are incorporated herein by reference.

3.      **Objections Overruled**.  All objections, to the Sale Motion or the relief requested

therein, and any joinders thereto, that have not been withdrawn with prejudice, waived, settled, or

otherwise resolved as announced to the Court at the Sale Hearing or by stipulation filed with the

Court, and all reservations of rights included therein, are hereby overruled on the merits and with

prejudice; provided that the objections filed to the proposed Cure Costs for the Contracts and

Leases on the Initial Assigned Agreements list attached hereto as <u>Exhibit A</u> are preserved and will

be treated in accordance with paragraph 29 of this Sale Order; provided further that: (i) all timely

filed objections to the assumption and assignment of a Contract or Lease that is not an Initial

Assigned Agreement, including, without limitation, as to adequate assurance of future

performance and to the payment of all amounts due and owing and performance of all other

obligations under a Contract or Lease, but not as to any other objections to approval of the Sale

Transaction itself pursuant to section 363 of the Bankruptcy Code, are adjourned and all parties'

rights as to such issues are fully preserved and will be determined if and to the extent the applicable

Contract or Lease is designated for assumption and assignment pursuant to the procedures

described in this Sale Order; (ii) no finding of fact or conclusion of law set forth herein with respect

to the assumption and assignment of the Initial Assigned Agreements shall apply, be binding upon,

be law of the case, or operate to collaterally estop any issue, with respect to the assumption and

assignment of any other Contract or Lease, other than with respect to the Initial Assigned

Agreements; (iii) no Contract or Lease with a Debtor other than the Initial Assigned Agreements

as set forth in <u>Exhibit A</u> shall be part of the Acquired Assets unless and until assumption and

assignment of such Contract or Lease is approved in accordance with the procedures in this Sale

Order; (iv) notwithstanding anything to the contrary herein, including, without limitation,

paragraphs M, R, FF.27, and 28, nothing in this Sale Order shall be a determination of the terms



and conditions of the assumption and assignment of any Contract or Lease not on Exhibit A,
including, without limitation, the Assignee's obligations in connection with the same; and
(v) notwithstanding anything herein or in the Asset Purchase Agreement or any related document
to the contrary, all parties' rights are fully reserved with respect to (x) all issues relating to the
Buyer's, any other Assignee's and/or the Debtors' obligations to comply with all terms, conditions,
covenants and obligations, whether related to the pre- or post-assignment period and (y) the issues
set forth in clauses (a) and (b) of paragraph 59 of this Order (the "Reserved Lease Issues").  All
holders of Claims or other persons and entities (including any counterparties to Initial Assigned
Agreements identified on Exhibit A hereto) that failed to timely object, or withdrew their
objections to the Sale Motion, the Sale Transaction, or this Sale Order are deemed to consent to
the relief granted herein for all purposes, including pursuant to section 363(f)(2) of the Bankruptcy
Code, except to the extent that the procedures described herein provide otherwise.  Each holder of
any Claim against the Debtors, their estates, or any of the Acquired Assets owned by the Debtors:
(i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or
is deemed to have consented to the Sale Transaction; (ii) could be compelled, in a legal or equitable
proceeding, to accept money satisfaction of such Claim; or (iii) otherwise falls within the
provisions of section 363(f) of the Bankruptcy Code.

4.    **Notice**.  Notice of the Sale Motion and the Sale Hearing was adequate, appropriate,
fair and equitable under the circumstances and complied in all respects with section 102(1) of the
Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the Amended Case Management
Order, and the Bidding Procedures Order.

5.    **Fair Purchase Price**.    The consideration provided by the Buyer under the
Asset Purchase Agreement, including the portion of the Purchase Price that is the Credit Bid

Amount, the Credit Bid Release Consideration, and the Buyout Option is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.  The Credit Bid constitutes a valid, duly authorized credit bid and is proper under the Bidding Procedures Order, sections 363(b) and 363(k) of the Bankruptcy Code, the applicable Prepetition Loan Documents (as defined in the Final DIP Order) and applicable law.  The consideration given by the Buyer shall constitute valid and valuable consideration for the Credit Bid Release.



6.     **Approval of the Asset Purchase Agreement**.  Except as expressly provided herein with respect to the assumption and assignment of contracts and leases (other than Initial Assigned Agreements), the Asset Purchase Agreement, all ancillary documents filed therewith or described therein, the Credit Bid and all other transactions contemplated therein (including, but not limited to, all ancillary agreements contemplated thereby) and all of the terms and conditions thereof, including, without limitation, the Credit Bid pursuant to section 363(k) of the Bankruptcy Code of the Credit Bid Amount, are hereby approved.  The failure specifically to include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement (including, but not limited to, all ancillary agreements and Related Agreements contemplated thereby) be authorized and approved in its entirety, except as provided herein.



7.      **Approval of the Credit Bid Release**.  As set forth in Section 9.13 of the Asset

Purchase Agreement:

                (a)      Effective upon the Closing, in consideration for the payment by

Buyer of the Credit Bid Release Consideration, and other good and valuable consideration

provided to the Debtors and their estates by ESL in connection with the Transactions, each Debtor,

for itself and its estate, and on behalf of each of its Subsidiaries and controlled Affiliates (each of

the foregoing, a "Seller Releasing Party" and together, the "Seller Releasing Parties"), hereby

absolutely, unconditionally and irrevocably: (i) releases and forever discharges ESL from any and

all Released Estate Claims, whether foreseen or unforeseen, contingent or actual, and whether now

known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may

have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid,

challenge, dispute or collaterally attack the ESL Claims; provided, however, that the assertion of

any Claim other than a Released Estate Claim shall not be deemed to violate Section 9.13(a)(ii) of

the Asset Purchase Agreement.



                (b)      Effective upon the Closing, the ESL Claims against the Debtors

shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy

Code in the amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the

credit bid set forth in Section 3.1(b) of the Asset Purchase Agreement.

                (c)      After giving effect to the credit bid set forth in Section 3.1(b) of the

Asset Purchase Agreement, ESL shall be entitled to assert any deficiency Claims, Claims arising

under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may

have against the Debtors and their estates in the Chapter 11 Cases, provided that: (i) no Claims or

causes of action of ESL shall have recourse to, or any other right of recovery from, any Claims or



causes of action of the Debtors or their estates related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or cause of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing; (ii) any ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the Claims and causes of action described in the preceding clause (c)(i); provided that, in the event that, in the absence of this clause (c)(ii), any such proceeds to the Debtors or their estates would have resulted in distributions in respect of such ESL Claims in excess of $50 million, the right, on account of the ESL Claims, to receive such distributions in excess of $50 million shall be treated as an unsecured claim and receive pro rata recoveries with general unsecured claims other than the Claims and causes of action described in the preceding clause (c)(i); and (iii) notwithstanding any order of the Bankruptcy Court to the contrary or section 1129 of the Bankruptcy Code, it shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part.

   (d)  Section 9.13 of the Asset Purchase Agreement, and all statements or negotiations relating hereto, shall be governed by Federal Rule of Evidence 408 and any corresponding state rules of evidence. Without limiting the foregoing, neither Section 9.13 of the Asset Purchase Agreement nor any statements or negotiations relating hereto shall be offered or



received in evidence in any proceeding for any purpose other than to enforce the terms of Section 9.13.

(e)    The release set forth in Section 9.13 of the Asset Purchase Agreement and in paragraphs 7(a)-(d) hereof shall be referred to herein as the "Credit Bid Release". The Credit Bid Release is hereby approved in its entirety, and the Credit Bid Release Consideration and the other consideration provided by Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration for the Credit Bid Release. The Seller Releasing Parties and ESL are authorized and directed to perform under the Credit Bid Release pursuant to its terms and to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising under the Credit Bid Release.

8.    **Approval of Cyrus Release**. Effective upon the Closing, each Seller Releasing Party, hereby absolutely, unconditionally and irrevocably: (i) releases and forever discharges the Cyrus Related Parties from any and all Released Cyrus Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge dispute or collaterally attack the Cyrus Claims. "Released Cyrus Claims" shall mean any and all Claims and causes of action of the Debtors and their estates against the Cyrus Related Parties arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code; (ii) equitable principles of subordination or recharacterization; or (iii) any other applicable Law that could be asserted to challenge the allowance of the Cyrus Claims. Effective upon the Closing, the Cyrus Claims against the Debtors shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code, as reduced by any

amounts included in the Credit Bid. After giving effect to the Credit Bid, the Cyrus Related Parties shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and their estates in the Chapter 11 Cases, subject to any defenses of the Debtors to any such claims that might be asserted by Cyrus or any claims of the Debtors against Cyrus, including in connection with any claims or causes of action relating to the medium term notes matters that are the subject of Rule 2004 examination by the Debtors and the Creditors' Committee. All such claims of the Debtors and their estates are fully preserved (other than the Released Cyrus Claims). For the avoidance of doubt, the Cyrus Release shall be no broader than the Credit Bid Release set forth in paragraph 7(a) of this Sale Order. The release set forth in this paragraph shall be referred to herein as the "Cyrus Release". The Cyrus Release is hereby approved in its entirety and the consideration provided by the Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration for the Cyrus Release. The Seller Releasing Parties and the Cyrus Related Parties are authorized and directed to perform under the Cyrus Release pursuant to its terms and to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising under the Cyrus Release.

9.    **Discharge of Credit Bid Claims**.    Upon the Closing Date, the portion of the ESL Claims and the Cyrus Claims that is used as part of the Credit Bid shall be deemed discharged against the Debtors and satisfied in full. For the avoidance of doubt, the ESL Claims and the Cyrus Claims shall remain outstanding against the Debtors and their estates with respect to all amounts other than the amount that is Credit Bid in accordance with Section 3.1(b) of the Asset Purchase Agreement.

10.    **Approval of Debtor Authorization of Non-Debtor Subsidiary Action or Inaction**.  The Debtors are authorized and directed to perform their obligations in accordance with the Asset Purchase Agreement, their obligations with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets Rights, including to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets Rights.  The Debtors are hereby authorized in accordance with section 105(a) of the Bankruptcy Code, to cause KCD IP, LLC to execute and deliver to Buyer, such documents or other instruments as may be necessary to license the KCD IP to the Buyer as provided in the Asset Purchase Agreement, subject in all respects to KCD's compliance with the terms of the KCD Prepetition Agreements and the KCD Indenture.  Notwithstanding anything provided for herein, nothing in this Order authorizes the assumption or assignment of any prepetition license agreements between KCD and any of the Sellers, as well as any agreements between KCD and Sears Holdings Management Corporation and/or Sears Brands Business Unit Corporation, or the Trademark Security Agreement between KCD and U.S. Bank, National Association ("KCD Indenture Trustee") (such agreements, collectively, the "KCD Prepetition Agreements"). In the event the Debtors seek to assume or assign any or all of the KCD Prepetition Agreements in the future, such assumption or assignment may only be approved on not less than ten (10) days' notice to the KCD Indenture Trustee, Pension Benefit Guaranty Corporation, and all parties to such KCD Pre-Petition Agreements (as the case may be), and an opportunity for the KCD Indenture Trustee and such parties to object to any such assumption and assignment and any proposed cure amounts.  Furthermore, nothing in this Order in any way abridges, waives or modifies the rights of the KCD Indenture Trustee under or in

connection the KCD Indenture or the collateral provided thereunder or under the KCD Pre-Petition Agreements. This Order is without prejudice to, and does not alter or amend the KCD Indenture Trustee's rights or ability to take any action consistent with its duties or obligations arising under the KCD Indenture or under the KCD Pre-Petition Agreements, and all such rights are expressly preserved. Further, nothing in this Order shall prejudice or impact the rights of the holders of the KCD Notes to exercise any rights they may have under the KCD Indenture, including without limitation their right to direct the KCD Indenture Trustee.

11.    **Consummation of Sale Transaction**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the Asset Purchase Agreement and the Related Agreements and to close and consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, the Related Agreements, and this Sale Order.

(a)    Approval of Conversion of Subsidiaries.  As set forth in Section 9.2(a) of the Asset Purchase Agreement, the Debtors are required (subject to certain qualifications and exceptions) to take actions as instructed by Buyer in order to secure and preserve the qualifications of certain of the transactions contemplated by the Asset Purchase Agreement as reorganizations for U.S. federal income tax purposes in connection with which Buyer bears responsibility for any consequential tax or costs. In accordance with such instructions, the Debtors may be directed to convert any of the corporate subsidiaries of Sears Holding Corporation into limited liability companies whether on or before the Closing Date of the Asset Purchase

Agreement or anytime afterwards. The Debtors are hereby authorized to convert any such corporate subsidiaries of Sears Holding Corporation to limited liability companies as directed by Buyer in accordance with Section 9.2(a) of the Asset Purchase Agreement.

(b) Approval of the Steps Described in Schedule 9.2. As set forth in Section 9.2(a) of the Asset Purchase Agreement, the Debtors are required (subject to certain qualifications and exceptions) to take actions as instructed by Buyer in order to secure and preserve the qualifications of certain of the transactions contemplated by the Asset Purchase Agreement as reorganizations for U.S. federal income tax purposes in connection with which Buyer bears responsibility for any consequential tax or costs. In accordance with such instructions, the Debtors are required to take the steps described in Schedule 9.2 of the Asset Purchase Agreement as soon as practicable after the Closing. The Debtors are hereby authorized to take the steps described in Schedule 9.2 of the Asset Purchase Agreement.

12. The Debtors, their affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be necessary or desirable to implement the Asset Purchase Agreement and Related Agreements, including the transfer and the assignment of all the Acquired Assets, and the assumption and assignment of all the Assigned Agreements, and to take all further actions as may be (i) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to the Buyer's possession, the Acquired Assets or (ii) necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement or to implement the Sale Transaction, including pursuant to this Sale Order, all without further order of the Court.



13.     All Persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Buyer as of the Closing or at such later time as the Buyer reasonably requests. To the extent required by the Asset Purchase Agreement, the Debtors agree to exercise commercially reasonable efforts to assist the Buyer in assuring that all Persons that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtors before the Closing Date or (ii) the Buyer on or after the Closing Date.

14.     All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets owned by the Debtors to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; provided that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

15.     Each Assignee has provided or will provide, as applicable, adequate assurance of future performance of and under the Initial Assigned Agreements, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

16.     **Direction to Creditors and Parties in Interest**.  On the Closing, each of the Debtors' creditors and the holders of any Claims are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims in the Acquired Assets, if any, as such Claims may otherwise exist.

17.     **Direction to Government Agencies**.  Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or

instruments or who may be required to report or insure any title in or to the Acquired Assets, is

hereby authorized and directed to accept any and all documents and instruments necessary and

appropriate to consummate the Sale Transaction contemplated by the Asset Purchase Agreement

and approved by this Sale Order.  The Buyer and Seller are each authorized to designate a power

of attorney regarding the conveyance of properties in Puerto Rico for recording purposes which

properties may be described in such power of attorney including the following: (i) Fajardo:

Property registered at page 178 of volume 514 of Fajardo, Registry of Property of Puerto Rico,

property number 19,514; (ii) Guayama: Property registered at page 7 of volume 382 of Guayama,

Registry of Property of Puerto Rico, property number 13,562; and (iii) Río Piedras site 8975 is

composed of two properties: (x) property registered at page 221 of volume 466 of Monacillos,

Registry of Property of Puerto Rico San Juan V Section, property number 17,328, and (y) property

registered at page 181 of volume 302 of Río Piedras, Registry of the Property of Puerto Rico San

Juan V Section, property 9,717.

18.    **Assumption of Protection Agreement Obligations**.    Pursuant to and in

accordance with Section 2.3(e) of the Asset Purchase Agreement, the Buyer has expressly assumed

Sellers' obligations (the "Assumed Protection Agreement Obligations") with respect to warranties

and protection agreements or other services contracts (other than warranties relating to Intellectual

Property) for the goods and services of Sellers sold or performed prior to the Closing, including

any obligations owed by Sears Re to any Seller in respect of reinsurance of such warranties and

protection agreements (collectively, the "Assumed Protection Agreements").  To the fullest extent

permitted by applicable law, the Buyer is authorized to  operate in place of the Sellers with respect

to the Assumed Protection Agreements and to take any actions contemplated to be taken by the

Sellers thereunder, including collecting any amounts payable by any counterparty to any such

Assumed Protection Agreement and performing the Assumed Protection Agreement Obligations.

The Court hereby orders that the Sellers and all other parties in interest shall cooperate in respect

of Buyer's operation in place of the Sellers under the Assumed Protection Agreements, including,

without limitation, by furnishing such documents or records as are necessary to the Buyer to

perform the Assumed Protection Agreement Obligations without interruption.  Moreover, except

for good cause based on violations of Law unrelated to the assumption by the Buyer of the

Assumed Protection Agreement Obligations occurring pursuant to the Asset Purchase Agreement

and this Sale Order, no regulatory agency (including, without limitation, any state insurance

regulator) shall interrupt Buyer's performance of the Assumed Protection Agreement Obligations

from and after the Closing Date without first obtaining relief from this Court. The Buyer may

continue to perform the Assumed Protection Agreement Obligations under any existing licenses

or permits of the Sellers, with no interruption of the right of the Buyer to so perform, until any

required licenses and permits have been transferred to the Buyer by Sellers, or new licenses and

permits have been issued to the Buyer.

19.    **Transfer of the Acquired Assets Free and Clear**.  Pursuant to sections

105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the

Acquired Assets owned by the Debtors, including, without limitation, Designated Agreements (as

defined below) in accordance with the terms of the Asset Purchase Agreement and this Sale Order.

The Acquired Assets shall be transferred to the Buyer in accordance with the terms of the Asset

Purchase Agreement and this Sale Order, and upon the Closing, such transfer shall: (i) be valid,

legal, binding and effective; (ii) vest the Buyer with all right, title and interest of the Debtors in

the Acquired Assets; and (iii) be free and clear of all Claims against the Debtors and the Acquired

Assets owned by the Debtors (including Claims of any Governmental Authority) in accordance

with section 363(f) of the Bankruptcy Code, with the net proceeds of the Sale Transaction from
the Acquired Assets upon which the DIP ABL Lenders (as defined in the Final DIP Order) have a
first lien being used to repay in full in cash all DIP ABL Secured Obligations (as defined in the
Final DIP Order) on the Closing and all other Claims (including, without limitation, contingent
indemnification obligations) that represent interests in property shall attach to the net proceeds of
the Sale Transaction, in the same order of their priority and with the same validity, force and effect
which they now have against the Acquired Assets, subject to any claims and defenses the Debtors
may possess with respect thereto, in each case immediately before the Closing.  The cash portion
of the Purchase Price, to the extent payable, that is paid in connection with a Buyout Option shall
be deposited and held in segregated accounts in accordance with Section 3.1 of the Asset Purchase
Agreement with the Liens of any lenders other than Buyer or Affiliates attaching to the cash
proceeds held in the applicable designated segregated account in the same order of priority and
with the same validity, force and effect as the original Liens of such lenders, and such proceeds
shall be released to such lenders within two (2) business days following the Closing Date and shall
not otherwise be used by the Debtors without further order of the Bankruptcy Court.
Notwithstanding anything to the contrary herein or in the Asset Purchase Agreement, nothing in
this Order shall approve the sale or transfer of any Acquired Assets of non-Debtors free and clear
of Claims pursuant to section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing or
any other provision of this Sale Order or the Asset Purchase Agreement to the contrary, the transfer
of the Acquired Assets to the Buyer shall not be free and clear of, and shall not impair in any respect,
any (A) setoff or recoupment rights or other affirmative defenses to payment held by either: (1) any
party to an Initial Assigned Agreement (other than the Debtors), including, without limitation,
Cross Country Home Service, Inc., that timely filed an objection preserving such right or defense,

pursuant to the terms of such Assigned Agreements and applicable law, including without

limitation any valid return and credit rights under such Assigned Agreements; (2) any party to an

Assigned Agreement (other than the Debtors) that is not an Initial Assigned Agreement on Exhibit

A that filed a timely objection preserving such right or defense, including, without limitation, the

Amazon entities listed in the exhibits to the objection filed as Docket No. 1986 (collectively,

"Amazon"), Cardinal Health 110, LLC ("CH 110"), Cardinal Health 112, LLC ("CH 112"), and

Cardinal Health PR 120, Inc. ("CH PR 120," and together with CH 110 and CH 112, collectively

hereinafter "Cardinal Health"), LG Electronics USA, Inc. ("LGEUS") and LG Electronics

Alabama, Inc.(collectively with LGEUS and each individually, "LG") and Valvoline LLC,

pursuant to the terms of such Assigned Agreements, (I) the Alliance Agreement (as defined

in Limited Objection And Reservation of Rights Of LG Electronics USA, Inc. And LG Electronics

Alabama, Inc. To The Global Asset Sale Transaction; Notice of Cure Costs and Potential

Assumption And Assignment of Executory Contracts And Unexpired Leases in Connection With

Global Sale Transaction; and Supplemental Notice of Cure Costs and Potential Assumption and

Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale

Transactions, Docket No. 2079 (the "LG Limited Objection and Reservation of Rights")), (II) the

Kenmore Supply Agreement and MSA, as defined in the LG Limited Objection and Reservation

of Rights, and (III) all other contracts giving rise to the Acquired Receivables,

and/or (IV) applicable law, including without limitation, any valid return and credit rights; all

amounts owing under the MSA; all rebates; credits; allowances; credit memos; and accruals under

such Assigned Agreements and the other foregoing agreements, and the applicable non-Debtor

counterparty shall subsequently provide a notice setting forth the monetary amount of rights of

recoupment and setoff believed to be currently outstanding as of the time of receipt of the applicable





Designated Lease Notice or Designated Additional Contract Notice to counsel for the Debtors and

the Buyer on or before eight (8) days after such non-Debtor counterparty's and such counterparty's

counsel's (if known) receipt of the applicable Designated Lease Notice or Designated Additional

Contract Notice (with any disputes over such amount resolved as provided in paragraph 35 of this

Sale Order), or (3) any party that filed a timely objection and is an obligor on any Acquired

Receivables, including, without limitation, Amazon, Cardinal Health, LG and Valvoline LLC,

pursuant to the terms of the contracts giving rise to such Acquired Receivables and/or applicable

law, whether or not such contracts are being assumed and assigned by the Debtors to the Buyer,

including without limitation, any valid return, refund and credit rights; all amounts owing under

the MSA; allowances; rebates; credits; credit memos; and accruals under such contracts, and (B)

rights of LGEUS to directly sell Sears Branded Products Safety Stock (as defined in the Kenmore

Supply Agreement) and/or Finished Goods (as defined in the Kenmore Supply Agreement) in

accordance with ¶8.C.ii and ¶8.F of the Kenmore Supply Agreement (as defined in the LG Limited

Objection and Reservation of Rights), including, without limitation, the obligations and

restrictions imposed on LGEUS thereunder. Notwithstanding the foregoing, with respect to those

tenants and subtenants that filed an objection to the sale, all rights are reserved with respect to (i)

all tenants' or subtenants' rights to assert validly enforceable rights under section 365(h) or Section

363(e) of the Bankruptcy Code and applicable agreements and state law and objections to the

ability of the Debtors to assume and assign leases or sell real property free and clear of tenants' or

subtenants' interests under Section 363(f) of the Bankruptcy Code (and Debtors' or Buyers' rights

to contest such rights) and (ii) the Debtors' rights to assume or reject a lease or sublease where the

Debtor is the landlord or sub-landlord and all tenants' or subtenants' objections to the same,

including, without limitation, objections to the assumption and assignment of leases or the sale of

real property free and clear of tenants' or subtenants' rights and interests, whether under section

363(f) of the Bankruptcy Code or otherwise.  In the event that the parties are unable to resolve the

issues in the pending objections, these issues will be set for hearing on a mutually convenient date

after closing.  Notwithstanding anything in this Sale Order or otherwise to the contrary, any

Acquired Assets or Designatable Leases that are subject to or encumbered by a lease or sublease

held by a tenant or subtenant as applicable, remains subject to or encumbered by such lease or

sublease on and after the Closing, subject to a further hearing on a date to be determined or an

agreed upon resolution by such tenant or subtenant, the Debtors, and Buyer.

20.    This Sale Order: (i) shall be effective as a determination that, as of the Closing, all

Claims against the Debtors have been unconditionally released, discharged and terminated as to

the Acquired Assets, and that the conveyances and transfers described herein have been effected;

and (ii) is and shall be binding upon and govern the acts of all persons, including all filing agents,

filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental departments, secretaries of state, federal, state,

county and local officials and all other persons who may be required by operation of law, the duties

of their office, or contract, to accept, file, register or otherwise record or release any documents or

instruments that reflect that the Buyer is the assignee and owner of the Acquired Assets free and

clear of all Claims, or who may be required to report or insure any title or state of title in or to any

lease (all such entities being referred to as "Recording Officers").  All Recording Officers are

authorized and specifically directed to strike recorded Claims against the Acquired Assets owned

by the Debtors recorded prior to the date of this Sale Order.  A certified copy of this Sale Order

may be filed with the appropriate Recording Officers to evidence cancellation of any recorded

Claims against the Acquired Assets recorded prior to the date of this Sale Order.  All Recording

Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

21.    Following the Closing, no holder of any Claim against the Debtors or their estates shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in these chapter 11 cases.

22.    Except as expressly set forth herein or in the Asset Purchase Agreement, the Buyer Related Parties and their successors and assigns shall have no liability for any Claim against the Debtors or the Debtors' estates or Excluded Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Employee Plans and any participation or other agreements related to the Employee Plans, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to: (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act

of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (U) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

23.    If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Acquired Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Claims (collectively, the "Release Documents") the Person has with respect to the Debtors or the Acquired Assets or otherwise, then

with regard to the Acquired Assets that are purchased by the Buyer pursuant to the Asset Purchase Agreement and this Sale Order: (i) the Debtors are hereby authorized and directed to, and the Buyer is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the Acquired Assets; (ii) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets; and (iii) the Buyer may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Acquired Assets other than liabilities expressly assumed under the Asset Purchase Agreement; provided that, notwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Sellers nor Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

24.    On the Closing Date, and subject to the terms of this Sale Order, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer by the Debtors of the Acquired Assets acquired under the Asset Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Debtors' right, title, and interest in and to the Acquired Assets to the Buyer.

25.    To the extent permitted by applicable Law and in accordance with the terms of the Asset Purchase Agreement and the Related Agreements, during the Management Services Period,





the applicable Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective (the "Management Services"). Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, Buyer and its Affiliated Designees are appointed as agent of such Seller to manage, control and operate each of: (i) the Acquired Properties; (ii) Occupancy Leased Premises; and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties"). Pursuant to their appointment as Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion (in each case, subject to the terms and conditions of any applicable leases or Restrictive Covenants (as defined below)) and collect and retain all revenues generated by each Managed Property. All existing licenses or permits applicable to the business shall remain in place for the Buyer's or its Applicable Designee or its Applicable Designee benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures and, in furtherance thereof, the Management Services to be provided to the Buyer and its Affiliated Designees pursuant to Section 8.8(b) of the Asset Purchase Agreement are hereby approved in their entirety. Moreover, except for good cause based on violations of Law unrelated to the assumption by the Buyer and its Affiliated Designees of the existing licenses and permits applicable to the business occurring pursuant to the Asset Purchase Agreement and this Sale Order, no licensing or permitting authority or other regulatory agency shall interrupt Buyer's



or any Affiliated Designee's operation of the business from and after the Closing Date without first obtaining relief from this Court. To the extent that Buyer seeks to designate to any person other than Buyer, including Buyer's Affiliates, prior written notice shall be provided to any landlord of the applicable property.

26.    **Transition Services**.

(a)    Pursuant to the Asset Purchase Agreement, the Parties shall enter into a Services Agreement on the Closing Date pursuant to which, effective as of the Closing Date, Sellers shall provide to Buyer and Buyer shall provide to Sellers, as applicable, certain services for a transitional period following the Closing Date. The Buyer and the Sellers are hereby authorized to execute and deliver any additional documentation as contemplated by the Asset Purchase Agreement, and to perform all such other and further acts as may be required under or in connection with the Services Agreement, including executing the Services Agreement and performing and receiving services thereunder. The Debtors shall serve a copy of the Services Agreement upon all parties that provide services to the Debtors that are subject to the Services Agreement within two (2) Business Days of execution. A form of the Services Agreement (subject to modification in advance of execution) has been filed with the Court and was summarized to the Court at the Hearing. All such parties' rights are reserved, and if any such party raises an issue with respect to the terms of the Services Agreement, which cannot be resolved by agreement of the parties, such issue will be heard by the Court on an expedited basis.

(b)    Pursuant to the Asset Purchase Agreement, the Parties shall execute, effective as of the Closing Date, the Occupancy Agreement and the Seller Occupancy Agreement pursuant to which Sellers shall provide Buyer and Buyer shall provide Sellers, as applicable, with the right to occupy and operate certain of the Acquired Assets and the Designated Leases following

46

the Closing Date.  The Buyer and the Sellers are hereby authorized to enter into, execute and

deliver any additional documentation as contemplated by the Asset Purchase Agreement, with

respect to the Occupancy Agreement and the Seller Occupancy Agreement and to perform all such

other and further acts as may be required under or in connection with the Occupancy Agreement

and the Seller Occupancy Agreement.

     (c)  Notwithstanding any other provision of this Sale Order, if the

Debtors, after the Closing, remain the owners of any pharmacy scripts, prescription lists or any

Inventory (as defined in the Asset Purchase Agreement) consisting of prescription medication or

related pharmaceutical Inventory (the "Pharmacy Collateral") or any other Acquired Assets solely

to effect an orderly transition of such Acquired Assets to the Buyer (such Acquired Assets,

including any Pharmacy Collateral, the "Transition Assets"), including, without limitation, to

allow time to resolve regulatory or other legal issues, (i) such Transition Assets shall be free and

clear of any and all Claims in accordance with the terms of this Sale Order as if such Transition

Assets were transferred to the Buyer as of the Closing and (ii) the Debtors are hereby authorized

to grant to the agent (the "Transform ABL Agent"), for the benefit of itself, the lenders and the

other credit parties under the ABL Financing (as defined in the Asset Purchase Agreement)

(collectively, the "Transform Credit Parties"), continuing, valid, binding and non-avoidable,

automatically and properly perfected first priority liens on and security interests in the Transition

Assets to the same extent the Transform ABL Agent would have a lien in such Transition Assets

had ownership been transferred to the Buyer at Closing (the "Transition Liens") as security for the

full and prompt performance and payment when due (whether at stated maturity, by acceleration

or otherwise) of all obligations under the financing documents evidencing the ABL Financing (the

"Transform Financing Documents") and the Debtors shall honor the Transition Liens as if the

Debtors were parties to the Transform Financing Documents, and had granted the liens thereunder. The Transition Liens granted by the Debtors shall be deemed automatically and properly perfected valid and enforceable simultaneously with the occurrence of Closing pursuant to the terms of this Sale Order without the necessity of the execution of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Credit Parties of any Transition Assets. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to (a) permit the Debtors to grant the Transition Liens and (b) permit the Transform Credit Parties to take any and all actions and exercise any and all remedies with respect to the Transition Liens as if such liens were granted under the Transform Financing Documents; *provided, however*, that the Buyer shall bear any costs incurred by the Debtors in connection with the Transition Liens, including participating in or responding to any enforcement actions taken by the Transform Credit Parties with respect to the Transition Assets or the Transition Liens. Immediately upon transfer of any of the Transition Assets to the Buyer, (i) the Transition Assets so transferred shall become subject in all respects to the liens and security interests granted for the benefit of the Transform Credit Parties under the Transform Financing Documents and (ii) the respective Transition Lien over the applicable transferred Transition Assets shall terminate and be of no further force or effect against the Debtors. The Debtors and their successors and assigns are hereby prohibited from granting any lien, mortgage, encumbrance or any other interest, other than the Transition Liens, on all or a portion of the Transition Assets, and any lien, mortgage, encumbrance, or any other interest in contravention of this paragraph, including any liens or claims related to adequate protection under the Final DIP Order (as defined below), the Junior DIP Order or any other order of this Court, shall be void *ab initio*. The Court shall retain jurisdiction to enforce the Transition Liens and any



disputes among the Transform Credit Parties, the Debtors and/or the Buyer with respect to the Transition Liens.

(d)     Notwithstanding any other provision of this Sale Order, if the Debtors, after the Closing, remain the owners of any Acquired Assets that are collateral of the Real Estate Financing, solely to effect an orderly transition of such Acquired Assets to the Buyer (such Acquired Assets, the "Transition Real Estate Assets"), including, without limitation, to allow time to resolve regulatory or other legal issues, (i) such Transition Assets shall be free and clear of any and all Claims in accordance with the terms of this Sale Order as if such Transition Assets were transferred to the Buyer as of the Closing and (ii) the Debtors are hereby authorized to grant to the agent (the "Transform Real Estate Agent"), for the benefit of itself and the lenders under the Real Estate Financing (as defined in the Asset Purchase Agreement) (collectively, the "Transform Real Estate Credit Parties"), continuing, valid, binding and non-avoidable, automatically and properly perfected first priority liens on and security interests in the Transition Real Estate Assets to the same extent the Transform Real Estate Agent would have a lien in such Transition Real Estate Assets had ownership been transferred to the Buyer at Closing (the "Transition Real Estate Liens") as security for the full and prompt performance and payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations under the financing documents evidencing the Real Estate Financing (the "Transform Real Estate Financing Documents") and the Debtors shall honor the Transition Real Estate Liens as if the Debtors were parties to the Transform Real Estate Financing Documents, and had granted the liens thereunder.  The Transition Real Estate Liens granted by the Debtors shall be deemed automatically and properly perfected and valid and enforceable simultaneously with the occurrence of Closing pursuant to the terms of this Sale Order without the necessity of the execution of security agreements, control agreements, pledge

agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Credit Parties of any Transition Assets. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to (a) permit the Debtors to grant the Transition Real Estate Liens and (b) permit the Transform Real Estate Credit Parties to take any and all actions and exercise any and all remedies with respect to the Transition Real Estate Liens as if such liens were granted under the Transform Real Estate Financing Documents; *provided, however*, that the Buyer shall bear any costs incurred by the Debtors in connection with participating in or responding to any enforcement actions taken by the Transform Real Estate Credit Parties with respect to the Transition Real Estate Assets or the Transition Real Estate Liens. Immediately upon transfer of any of the Transition Real Estate Assets to the Buyer, (i) the Transition Real Estate Assets so transferred shall become subject in all respects to the liens and security interests granted for the benefit of the Transform Real Estate Credit Parties under the Transform Real Estate Financing Documents and (ii) the respective Transition Real Estate Lien over the applicable transferred Transition Real Estate Assets shall terminate and be of no further force or effect against the Debtors. The Debtors and their successors and assigns are hereby prohibited from granting any lien, mortgage, encumbrance or any other interest, other than the Transition Real Estate Liens, on all or a portion of the Transition Real Estate Assets, and any lien, mortgage, encumbrance, or any other interest in contravention of this paragraph, including any liens or claims related to adequate protection under the Final DIP Order (as defined below), the Junior DIP Order or any other order of this Court, shall be void *ab initio*. The Court shall retain jurisdiction to enforce the Transition Real Estate Liens and any disputes among the Transform Real Estate Credit Parties, the Debtors and/or the Buyer with respect to the Transition Real Estate Liens.



(e)      Notwithstanding the foregoing, any liens granted under paragraphs 26(c) and (d), above, shall not include those unexpired leases of nonresidential real property where any lessor has consent rights over the granting of any such lien and/or the affected lease prohibits the granting of such lien but, in that event, shall include, and be limited to, the proceeds of the prospective disposition of those leases.

(f)      Any and all proceeds from the sale of Transition Assets, whenever arising, including all Pharmacy Receivables (as defined in the ABL Financing and the Transform Financing Documents) and Credit Card Receivables (collectively, the "Transition Proceeds") shall be treated as Acquired Assets and be free and clear of any and all liens and Claims in accordance with the terms of this Sale Order as if such Transition Proceeds were transferred to the Buyer as of the Closing, and shall automatically and without any further action become subject to the first priority liens and security interests of the Transform Credit Parties under the Transform Financing Documents pursuant to the terms of this Sale Order without the necessity of the execution of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Credit Parties of any Transition Proceeds.

(g)      Pursuant to the Asset Purchase Agreement, the Parties shall enter into an Employee Lease Agreement on the Closing Date pursuant to which, effective as of the Closing Date, Sellers shall provide to the Buyer the services of certain Business Employees for a transitional period.  The Buyer and the Sellers are hereby authorized to execute and deliver any additional documentation as contemplated by the Asset Purchase Agreement, and to perform all such other and further acts as may be required under or in connection with the Employee Lease



Agreement, including executing the Employee Lease Agreement and performing and receiving services thereunder.

27.    <u>**No Successor or Other Derivative Liability**</u>.  By virtue of the Sale Transaction, the Buyer Related Parties and their affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Buyer Related Parties have not assumed nor are they in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Assumed Liabilities. Except as expressly set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Acquired Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date; provided, however, that nothing herein shall

limit the liability or obligations of Buyer or any Assignee of a Contract or Lease with respect to the Reserved Lease Issues.

28.    **Assumption and Assignment of Assigned Agreements**.  Subject to paragraph 29, and conditioned upon the occurrence of the Closing Date and paragraphs 33 to 43 with respect to Designatable Leases and Additional Contracts, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assigned Agreements to the Buyer free and clear of all Claims to the extent set forth in this Sale Order, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Agreements to the Buyer as provided in the Asset Purchase Agreement.  With respect to each of the Assigned Agreements, the Buyer, in accordance with the provisions of the Asset Purchase Agreement, has cured or will cure before the Closing Date or the Assumption Effective Date, or have provided adequate assurance of the prompt cure after the Closing of, any monetary default required to be cured with respect to the Assigned Agreements under section 365(b)(1) of the Bankruptcy Code, and the Buyer has provided adequate assurance of future performance under the Assigned Agreements in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the non-debtor counterparties to such Assigned Agreements.   Upon the applicable Assumption Effective Date with respect to an Assigned Agreement, the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such Assigned Agreement and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to breach of such Assigned Agreement occurring after such assumption and assignment to Buyer as provided in section 365(k).  Buyer acknowledges and agrees that from and after the applicable Assumption Effective Date with respect to an Assigned Agreement, subject to

and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each of such Assigned Agreement in its entirety, including any indemnification obligations expressly contained in such Assigned Agreement that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order.  The assumption by the Debtors and assignment to the Buyer of any Assigned Agreement shall not be a default under such Assigned Agreement.  In accordance with the terms of the Asset Purchase Agreement, with respect to liabilities from any Assumed 503(b)(9) Claims, Buyer shall not be obligated to make any payments in respect of such liabilities until the earlier of: (i) the date that is 120 days following the closing of the sale; and (ii) the date on which a chapter 11 plan is confirmed by the Court with respect to the Debtors; provided further in accordance with the terms of the Asset Purchase Agreement, that with respect to the liabilities from any Other Payables, Buyer shall not be obligated to make any payments in respect of such liabilities until the later of: (i) the Closing Date; and (ii) the date that the applicable obligation thereunder becomes due in the ordinary course of business; provided further, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Specified Payables, or any other administrative or priority claim of the Sellers pursuant to the terms of the Asset Purchase Agreement is a general unsecured contractual obligation of the Buyer owed solely to the Sellers.

29.    Provided that assumption of a Contract has been approved by the Bankruptcy Court, all Cure Costs that have not been waived by, or as to which an objection has been filed by, or that have not been otherwise addressed in an alternate arrangement with, any non-debtor party to an Assigned Agreement shall be: (i) paid in cash by the Buyers, on or before the Assumption Effective Date as to the undisputed amounts and (ii) reserved against the establishment of a cash reserve as to any disputed cure amounts by Buyer at least two (2) days after the Assumption Effective Date



(a "<u>Cure Cost Reserve</u>") and paid promptly upon resolution of any such disputed Cure

Cost; provided that to the extent a new agreement by and between the Buyer and the counterparty

to the applicable Assigned Agreement is entered into, such agreement shall provide for the Buyer's

payment of applicable Cure Costs in an amount agreed to by the Buyer and the counterparty, and

any such agreement shall require the counterparty's waiver of any and all prepetition claims against

the Debtors based on the Assigned Agreement, and any damage claims arising out of the rejection

of any such Assigned Agreement, and the Debtors shall have no liability therefor in accordance

with the terms of the Asset Purchase Agreement on the applicable Assumption Effective Date to

the extent provided in section 365(k) of the Bankruptcy Code.  Payment of Cure Costs as required

under section 365(b) of the Bankruptcy Code with respect to the Initial Assigned Agreements

identified on Exhibit A hereto (including the Citi Card Agreement (as defined below)), shall: (i)

be in full satisfaction and cure of any and all defaults under these Assigned Agreements, whether

monetary or non-monetary; and (ii) compensate the non-Debtor counterparty for any actual

pecuniary loss resulting from such defaults.  For the avoidance of doubt, and pursuant to Section

8.9 of the Asset Purchase Agreement, notwithstanding that certain Amended and Restated Master

Lease Agreement (the "<u>Sparrow Master Lease</u>"), dated as of March 14, 2018, by and between

certain of the Debtors, as lessee, and SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate

(TX), LLC, as lessors (collectively, the "<u>Sparrow Entities</u>") being designated an Initial Assigned

Agreement, the Buyer reserves all of its rights with respect to any rent that was due and owing to

the Sparrow Entities under the Sparrow Master Lease and that remains unpaid as of the Closing

Date, and the Debtors reserve all of their rights and objections with respect thereto.

30.    The Debtors served all counterparties to the Initial Assigned Agreements, identified

on Exhibit A hereto (including the Citi Card Agreement), with an Assumption and Assignment



Notice and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Buyer has passed. Accordingly, unless an objection to the proposed Cure Costs or Adequate Assurance Information with respect to the Buyer was filed and served before the applicable deadline, each non-Debtor party to an Initial Assigned Agreement is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

31.    Nothing in this Sale Order shall affect the rights of the Buyer, to the extent such rights are provided in the Asset Purchase Agreement, to add or remove any Potential Transferred Agreement to or from the list of Assigned Agreements set forth in the Asset Purchase Agreement in accordance with the terms thereof. All of the requirements of sections 365(b) and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, solely with respect to the Initial Assigned Agreements identified on Exhibit A hereto (including the Citi Card Agreement). The Buyer has satisfied its adequate assurance of future performance requirements with respect to the Initial Assigned Agreements identified on Exhibit A hereto (including the Citi Card Agreement) and in connection therewith has presented sufficient evidence regarding the Buyer's business plan and demonstrated it is sufficiently capitalized to comply with the necessary obligations under the Initial Assigned Agreements, identified on Exhibit A hereto (including the Citi Card Agreement). All objections to the Debtors', Buyer's or any other Assignee's adequate assurance of financial performance that were timely filed (other than adequate assurance objections that related to the Initial Assigned Agreements identified on Exhibit A hereto (including the Citi Card Agreement)



are fully reserved pending further hearing of this Court and nothing in this Sale Order shall limit such objections in any respect.

32.    To the extent a counterparty to an Assigned Agreement failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the Assumption and Assignment Notice and any such counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates.

33.    **Designation Rights Procedures**.  The Debtors are authorized, at the direction of the Buyer pursuant to the Asset Purchase Agreement, to seek to assume and to assign pursuant to sections 363 and 365 of the Bankruptcy Code, the Designatable Leases and any Additional Contracts that the Buyer designates for assumption and assignment in accordance with the Asset Purchase Agreement and this Sale Order including to a permitted Assignee, as applicable.  Each of the Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts) constitutes an unexpired lease or executory contract within the meaning of section 365 of the Bankruptcy Code and, at the Buyer's election, will be deemed assumed and assigned by the Debtors on the Assumption Effective Date subject to compliance with and the procedures set forth in the Asset Purchase Agreement and herein.[10]   The assumption of any liabilities under a Designatable Lease or such Additional Contracts that are assumed by an Assignee shall constitute a legal, valid and effective delegation of all liabilities thereunder to the applicable Assignee and, following payment of all amounts required to be paid by agreement of the parties or an order of the Court, and except as expressly set forth in the Asset Purchase

---

[10] In the case of any conflict between the provisions of the Asset Purchase Agreement and this Order, this Order shall govern.

Agreement or this Sale Order, shall divest the Debtors of all liability with respect to such Designatable Lease or Additional Contract for any breach of such Designatable Lease or Additional Contract occurring after the applicable Designation Assignment Date or any breach of such Additional Contract after the applicable date on which such Additional Contract is assigned to the applicable Assignee in accordance with Section 2.9 of the Asset Purchase Agreement, in each case, to the extent provided in section 365(k) of the Bankruptcy Code.

34.     The Debtors served all counterparties to the Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts) listed as Potential Transferred Agreements ("Designatable Contract Counterparties") with an Assumption and Assignment Notice and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Buyer has passed.[11]   Accordingly, unless an objection to the proposed Cure Costs or Adequate Assurance Information with respect to the Buyer was filed and served before the applicable deadline (a "Filed Objection"), the applicable Designatable Contract Counterparty is forever barred from objecting to (i) the Cure Costs and from asserting any additional cure or other amounts with respect to the applicable Designatable Lease or Additional Contract in the event it is assumed and/or assigned by an Assignee, except to the extent such Cure Costs further accrue (being subject to further credits, debits, and adjustments in accordance with

---

[11] The Debtors served all counterparties to Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an executory contract or lease and was listed on the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction or Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction) with an Assumption and Assignment Notice and as of the date of entry of this Sale Order, the deadline to object to Cure Costs has passed.  See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction (Docket No. 1731); see also Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction (Docket No. 1774); see also Affidavits of Service (Docket Nos. 1969, 2132, 2162); see also Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; see also Affidavit of Service (Docket No. 2314); see also Affidavit of Service (Docket No. 2417).]

the terms of the applicable underlying Lease or Contract) following the Debtors' filing of the applicable Assumption and Assignment Notice or (ii) adequate assurance of future performance by the Buyer; provided, however, that in the event that an Additional Contract was not listed as a Potential Transferred Agreement, and accordingly, no Assumption and Assignment notice was served upon the applicable Designatable Contract Counterparty, such Designatable Contract Counterparty shall have eight (8) days after the date on which the applicable supplemental Assumption and Assignment Notice is filed with the Court and served on the applicable Designatable Contract Counterparty (the "Supplemental Additional Contract Cure Objection Deadline"), to: (a) object to the applicable proposed Cure Costs for such Additional Contract and the assumption and assignment of the Additional Contract (the "Supplemental Additional Contract Cure Cost Objection"); and (b) serve the Supplemental Additional Contract Cure Cost Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Buyer on or before the Supplemental Additional Contract Cure Objection Deadline; provided, further, however that in the event that a Designatable Contract Counterparty timely asserted a Filed Objection such counterparty shall be permitted to object solely on the basis of an objection to cure costs for such Designatable Lease or Additional Contract or the assumption and assignment of the Designatable Lease or Additional Contract that could not have been raised in its prior objection, until the applicable Designatable Contract Assumption and Assignment Objection Deadline (as defined below).

35.    With respect to any Filed Objection, to the extent that the applicable Contract or Lease is designated for assumption and assignment, a Designated Lease Notice or Designated Additional Contract Notice, as applicable, shall be served on the Designatable Contract Counterparty, and the Buyer and the applicable counterparty shall have authority to compromise,



settle or otherwise resolve any Filed Objections without further order of the Court. If the Debtors,

the Buyer and the applicable counterparty determine that the objection cannot be resolved without

judicial intervention, then the Filed Objection will be determined by the Court (following request

for a hearing by the Debtors and/or the Buyer and/or the applicable counterparty filed with the

Court and on no less than ten (10) days' notice to the other party).

36.      Except as set forth in paragraphs 29 to 35, all Designatable Contract Counterparties'

rights under section 365 with respect to the assumption and assignment of the Designatable Leases

and Additional Contracts pursuant to the Bankruptcy Code (including, without limitation, as to the

provision of adequate assurance of future performance if the Designatable Leases are designated

to a third party or with respect to the provision of adequate assurance of future performance of the

Buyer if a Filed Objection was timely served) are reserved pending delivery of a notice from Seller

to the applicable Designatable Contract Counterparty (i) pursuant to Section 5.2(b) of the Asset

Purchase Agreement (a "<u>Designated Lease Notice</u>") following Sellers' receipt of a Buyer

Assumption Notice or (ii) promptly following Sellers' receipt of a notice indicating that an

Additional Contract has been designated for assignment or assumption and assignment pursuant

to Section 2.9 of the Asset Purchase Agreement (a "<u>Designated Additional Contract Notice</u>") and

are subject to the procedures and provisions set forth in Paragraphs 37 to 44 and 59 below.

37.      Each Designated Lease Notice will set forth the following information, to the best

of the Debtors' knowledge:  (a) the street address of the real property that is the subject of such

Designatable Lease; (b) the name and address of the counterparty of such Designatable Lease (and

their counsel, if known); (c) a description of the deadlines and procedures for filing objections to

the Designated Lease Notice; (d) the identity of the proposed assignee; (e) information intended

to  provide  the  counterparty  to  the  Designatable  Lease  with  adequate  assurance  of  future



performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, if and only if such Designatable Lease is proposed to be assigned to a third party and (f) the proposed Cure Costs associated with such Designatable Lease; provided, however, that if adequate assurance information is provided pursuant to this paragraph, such adequate assurance information shall be kept strictly confidential and not be used for any purpose other than to (a) evaluate whether adequate assurance requirements under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3) have been satisfied, and (b) to support any objection to adequate assurance provided by any party including the Buyer and its affiliates.

38.    During the Designation Rights Period, the Buyer may designate any Designatable Lease or Additional Contract for assumption and assignment in accordance with the terms of the Asset Purchase Agreement and this Sale Order.  In such event, the Debtors shall file with the Court and serve on the applicable Designatable Contract Counterparty a Designated Lease Notice or Designated Additional Contract Notice, together with any applicable Assignment and Assumption of Lease or other applicable assignment agreement with respect to an Additional Contract.  If the proposed Assignee is not the Buyer, the Debtors shall also deliver to the applicable Designatable Contract Counterparty (and deliver by email or facsimile to counsel for the applicable Designatable Contract Counterparty, if such counsel has filed a notice of appearance in the Bankruptcy Cases) evidence of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code with respect to the applicable Designatable Lease or Additional Contract that is proposed to be assumed and assigned to such Assignee.

39.    Any party seeking to object to the assumption and assignment of any Designatable Lease or Additional Contract to a proposed Assignee that is not the Buyer on any basis other than the Cure Costs (including, but not limited to, objections to adequate assurance of future

performance if such Designatable Leases are designated to a third party or with respect to the

provision of adequate assurance of future performance of the Buyer if a Filed Objection was timely

served), must (a) file a written objection in compliance with the Bankruptcy Rules and the Local

Rules (a "Designatable Contract Assumption and Assignment Objection") with the Court, so that

such objection is filed no later than eight (8) days after the date on which (i) the applicable

Designated Lease Notice or Designated Additional Contract Notice is filed with the Court and (ii)

evidence of adequate assurance of future performance required pursuant to the preceding sentence

is served on the applicable Designatable Contract Counterparty (the "Designatable Contract

Assumption and Assignment Objection Deadline"), and (b) serve the Designatable Contract

Assumption and Assignment Objection (by email, facsimile or hand delivery) so that it is actually

received by counsel for the Debtors and the Buyer on or before the Designatable Contract

Assumption and Assignment Objection Deadline.

40.    If no Filed Objection has been filed, or Designatable Contract Assumption and

Assignment Objection has been filed by the Designatable Contract Assumption and Assignment

Objection Deadline, this Sale Order shall serve as approval of the assumption and assignment of

the applicable Designatable Contract or Additional Contract.  If a Filed Objection has been filed,

or a Designatable Contract Assumption and Assignment Objection is timely filed and not

withdrawn or resolved, the Debtors, the Buyer and the objecting Designatable Contract

Counterparty shall have authority to compromise, settle or otherwise resolve any objections

without further order of the Court.  If the Debtors, the Buyer and the objecting Designatable

Contract Counterparty determine that the objection cannot be resolved without judicial

intervention, then the determination of the assumption and assignment of the Designatable Lease

or Additional Contract will be determined by the Court on a date to be scheduled by any of the

Debtors, the Buyer or the objecting Designatable Contract Counterparty (which hearing date shall be no sooner than ten (10) business days following the date of filing of the Designated Lease Notice or Designated Additional Contract Notice), unless the Debtors, the Buyer and the applicable Designatable Contract Counterparty agree otherwise.

41.    Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, the Buyer shall, on the applicable Assumption Effective Date for a Designatable Lease or Additional Contract, cure all nonmonetary defaults solely to the extent required under section 365 of the Bankruptcy Code and pay to the applicable Designatable Contract Counterparty all undisputed Cure Costs and other such undisputed amounts required with respect to such Designatable Lease or Additional Contract, solely to the extent designated for assumption by the Sellers and assignment to Buyer by written notice from Buyer to Sellers delivered prior to the end of the Designation Rights Period (the "Designated Agreements").  Upon assumption and assignment of any Designated Agreement, the Debtors and the estates shall be relieved of any liability for breach of such Designated Agreement pursuant to section 365(k) of the Bankruptcy Code; provided that, except as expressly provided herein or in the Asset Purchase Agreement or Related Agreements, and except for any obligations in respect of the Reserved Lease Issues, neither the Buyer (except to the extent such obligations constitute Cure Costs) nor the applicable Assignee shall have any obligations under any Designated Agreement that is an Acquired Lease or related Assigned Agreement in respect of any portion of any year-end (or other) adjustment (including, without limitation, for royalties, rents, utilities, taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under any of the Acquired Leases or any other Assigned Agreements for the calendar year in which the applicable Lease Assignment occurs attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y) for any previous

63



calendar year, and the Sellers shall fully indemnify and hold harmless the Buyer and the applicable Assignee with respect thereto.

42.    Solely in connection with the Initial Assigned Agreements listed on Exhibit A, upon the applicable Assumption Effective Date, any provision in any Assigned Agreement that purports to declare a breach or default as a result of a change or transfer of control or any interest in respect of the Debtors is unenforceable and all Assigned Agreements shall remain in full force and effect notwithstanding assignment thereof.  Solely in connection with the Initial Assigned Agreements listed on Exhibit A, no sections or provisions of any Assigned Agreements, that in any way purport to: (i) prohibit, restrict, or condition the Debtors' assignment of such Assigned Agreement (including, but not limited to, the conditioning of such assignment on the consent of any non-debtor party to such Assigned Agreement); (ii) provide for the cancellation, or modification of the terms of the Assigned Agreement based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such Assigned Agreement upon assignment thereof; or (iv) provide for any rights of first refusal on a contract counterparty's part, or any recapture or termination rights in favor of a contract counterparty, or any right of a Landlord to take an assignment or sublease from a tenant, shall have any force or effect with respect to the grant and honoring of the Designation Rights or the rights under Section 2.9 of the Asset Purchase Agreement in accordance with this Sale Order and the Asset Purchase Agreement and assignments of Assigned Agreements by the Debtors in accordance therewith, because they constitute unenforceable antiassignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  Upon assumption and assignment of any Designatable

Lease or Additional Contract pursuant to the procedures set forth herein and in the Asset Purchase Agreement, the applicable Assignee shall enjoy all of the rights and benefits, and shall assume all obligations, under each such Assigned Agreement as of the applicable Assumption Effective Date.

43.    Solely in connection with the Initial Assigned Agreements listed on Exhibit A, upon the applicable Assumption Effective Date, except as otherwise expressly agreed by the Buyer and the applicable Designatable Contract Counterparty, notwithstanding any provision in any Designatable Lease that purports to prohibit, restrict or condition such action, upon the assumption and assignment of such Designatable Lease to an Assignee in accordance with the terms of the Asset Purchase Agreement, (x) the applicable Assignee shall be authorized to: (i) use the applicable Lease Premises (as defined in the Asset Purchase Agreement), subject to section 365(b)(3) of the Bankruptcy Code, as a retail store (and related goods and services) upon consummation of the assumption and assignment of such Designatable Lease to such Assignee in accordance with the terms of the Asset Purchase Agreement; (ii) operate such Lease Premises under the Buyer's trade name or any other trade name which the Buyer owns or is authorized to use (including any of the Debtors' trade names); (iii) make such alterations and modifications to the applicable Lease Premises (including signage, together with appropriate changes to existing tenant signage in the respective shopping center or mall, including panels on all pylons, monuments, directional and other ground and off-premises signs where Sellers are presently represented) deemed necessary by such Assignee (subject to all applicable laws including all applicable municipal codes) as are necessary or desirable for such Assignee to conform such Lease Premises to the prototypical retail store (or such Assignee's typical retail store); (iv) remain "dark" with respect to such Lease Premises after such assumption and assignment until the date that is necessary to permit such Assignee to remodel, restock, re-fixture, change signage and/or until

completion of the work described in clause (iii) above (so long as such date is not more than one

hundred fifty (150) days after the applicable Designation Assignment Date) or such later date as

may be reasonably required for the restoration of the such Lease Premises following any applicable

Casualty / Condemnation Event; and (v) exercise, utilize or take advantage of any renewal options

and any other current or future rights, benefits, privileges, and options granted or provided to the

Debtors under such Designated Agreement (including all of the same which may be described or

designated as, or purport to be, "personal" to the Debtors or to a named entity in such Designated

Agreement or to be exercisable only by the Debtors or by a named entity or an entity operating

under a specific trade name)  and (y) neither the Buyer nor the applicable Assignee shall have any

responsibility or liability for any Excluded Asset-Sale Taxes and Excluded Asset-Reorganization

Taxes.  For the avoidance of doubt, all rights of the counterparties to any applicable Designatable

Lease are fully reserved in connection with any of the foregoing actions.



44.    To the extent that any IP License is designated for assumption and assignment

pursuant to Section 2.9 of the Asset Purchase Agreement, on the Assumption Effective Date, such

agreement, including the rights and obligations thereunder, will be deemed to have been assumed

and assigned to the Buyer as of the Closing Date.

45.    ***Ipso Facto* Clauses Ineffective**.  Except as otherwise specifically provided for by

order of this Court or the Asset Purchase Agreement, the Assigned Agreements shall be transferred

to, and remain in full force and effect for the benefit of, the Buyer or, for applicable Designated

Agreements, the Assignee in accordance with their respective terms, including all obligations of

the Buyer or, for applicable Designated Agreements, the Assignee as the assignee of the Assigned

Agreements, notwithstanding any provision in any such Assigned Agreements (including, without

limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that

prohibits, restricts or conditions such assignment or transfer. There shall be no, and all non-Debtor parties to any Assigned Agreements are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer, any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assigned Agreements or the Closing.

46.    Except as otherwise specifically provided for by order of this Court, upon the Debtors' assignment of the Assigned Agreements to the Buyer under the provisions of this Sale Order and full payment of all Cure Costs as required under section 365(b) of the Bankruptcy Code, no default shall exist under any Assigned Agreements, and no counterparty to any Assigned Agreements shall be permitted to declare a default by any Debtor or the Buyer or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Agreement. Any provision in an Assigned Agreement that prohibits or conditions the assignment of such Assigned Agreement or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, refuse to renew, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect solely in connection with the transfer thereof pursuant to this Sale Order. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Agreement shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Agreement.

47.    **Statutory Mootness**. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code. The Sale

Transaction contemplated by the Asset Purchase Agreement is undertaken by the Buyer and ESL without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Acquired Assets owned by the Debtors to the Buyer, free and clear of Claims, unless such authorization is duly stayed before the Closing of the Sale Transaction pending such appeal.  The Debtors and the Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Sale Order.

48.    **No Avoidance of Asset Purchase Agreement**.  Neither the Debtors nor the Buyer Related Parties have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  Accordingly, the Asset Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreement or the Sale Transaction.

49.    **Waiver of Bankruptcy Rules 6004(h), 6006(d) and 7062**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Time is of the essence in closing the Sale Transaction and the Debtors and the Buyer intend to close the Sale Transaction as soon as practicable.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or

risk its appeal will be foreclosed as moot. This Sale Order constitutes a final order upon which the Debtors and the Buyer are entitled to rely. This paragraph 49 shall not apply to Reserved Lease Issues.

50. **Personally Identifiable Information**. After appointment of the Consumer Privacy Ombudsman in these chapter 11 cases, in accordance with section 332 of the Bankruptcy Code, and after giving due consideration to the facts, circumstances and conditions of the Asset Purchase Agreement, as well as the report (as supplemented) of the Consumer Privacy Ombudsman filed with the Court which Buyer agrees to comply with, no showing was made that the sale of personally identifiable information or private health information contemplated in the Asset Purchase Agreement, subject to the terms of this Sale Order, would violate applicable nonbankruptcy law; provided that pre-Closing costs of the Consumer Privacy Ombudsman shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand, to the extent such costs are incurred in relation to the Transactions.

51. **Distribution and Application of Sale Proceeds**.

(a) At the Closing, the Buyer shall pay to the Sellers (in accordance with the terms of the Asset Purchase Agreement), the balance of the purchase price remaining due and owing under the Asset Purchase Agreement. The proceeds of the Sale Transaction shall be applied as provided in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 955) ("Final DIP Order"), including to repay at the Closing the DIP ABL Secured Obligations (as defined in the Final DIP Order) in full in cash from the sale of those Acquired Assets upon which the DIP



ABL Credit Parties have a first lien, including all costs and expenses of the DIP ABL Credit Parties

set forth in the applicable pay off letter, without the need for any professional for the DIP ABL

Credit Parties to deliver or serve any invoices to any other party (including those parties identified

in paragraph 19(f) of the Final DIP Order). Notwithstanding the foregoing the Securities

Consideration shall be distributed as provided in Schedule 9.2 of the Asset Purchase Agreement.

The methodology for allocation of proceeds shall be as set forth in the Asset Purchase Agreement.

(b)    With respect to the Cyrus Claims: (i) up to $350 million of Junior

DIP Secured Obligations outstanding under the Junior DIP Order, including all fees, adequate

protection amounts due and owing, and interest thereon, may be rolled into a new financing of the

Buyer (the "Exit Financing Facility") on the Closing; and (ii) the Cyrus LC Facility Claims will

be rolled over into a new letter of credit facility with the Buyer, and such claims shall be deemed

satisfied and fully discharged against the Debtors.

(c)    If any order under section 1112 of the Bankruptcy Code is entered

in the cases, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy

Code), that this Sale Order, including the rights granted to Buyer hereunder, shall remain effective

and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest. This

Sale Order shall not be modified by any chapter 11 plan confirmed in the cases or by any

subsequent orders of the Court.

52.    **Binding Effect of Sale Order**. The terms and provisions of the Asset Purchase

Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit

of, the Debtors, their estates and their creditors, non-debtor affiliates, any affected third parties, all

holders of equity interests in the Debtors, all holders of any claims, whether known or unknown,

against the Debtors, any holders of Claims against or on all or any portion of the Acquired Assets



owned by the Debtors, including, but not limited to all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' chapter 11 cases, and each of their respective affiliates, successors and assigns. The Asset Purchase Agreement and the Sale Order shall inure to the benefit of the Debtors, their estates and creditors, the Buyer and their respective successors and assigns. The Asset Purchase Agreement, the Sale Transaction and this Sale Order shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

53.     **Conflicts; Precedence**. In the event that there is a direct conflict between the terms of this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order, the Asset Purchase Agreement and any documents executed in connection therewith shall govern, in that order. Nothing contained in any chapter 11 plan hereafter confirmed in these chapter 11 cases, any order confirming such plan, or in any other order of any type or kind entered in these chapter 11 cases (including, without limitation, any order entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

54.     **Modification of Asset Purchase Agreement**. The Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; <u>provided</u> that any such



modification, amendment or supplement does not materially change the terms of the Asset

Purchase Agreement or Related Agreements, documents or other instruments.

55.    **Bulk Sales; Taxes**.    No bulk sales law, bulk transfer law or similar law of any state

or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply in any

way to the transactions contemplated by the Asset Purchase Agreement, the Sale Motion or this

Sale Order.    Except as otherwise expressly provided in the Asset Purchase Agreement, all

obligations of the Debtors relating to taxes, whether arising under any law, by the Asset Purchase

Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

56.    **Lease Deposits and Security**.    The Buyer shall not be required, pursuant to section

365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with

respect to any Initial Assigned Agreement to the extent not previously provided by the Debtors.

All timely Filed Objections that have asserted requests pursuant to section 365(l) of the Bankruptcy

Code or otherwise, to provide any additional deposit or security with respect to any Assigned

Agreement other than the Initial Assigned Agreements are hereby adjourned to a hearing at a future

date with all parties' rights reserved.

57.    **Automatic Stay**.    The Buyer shall not be required to seek or obtain relief from the

automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the

Asset Purchase Agreement, and Related Agreements, documents or other instruments.    The

automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent

necessary to implement the provisions of this Sale Order.

58.    **Retention of Jurisdiction**.    This Court shall retain exclusive jurisdiction to, among

other things, interpret, enforce and implement the terms and provisions of this Sale Order and the

Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of



each of the agreements executed in connection therewith), to adjudicate disputes related to this

Sale Order or the Asset Purchase Agreement (and such other related agreements, documents or

other instruments) and to enforce the injunctions set forth herein.

59.    **Restrictive Covenants; Master Leases**.

(a)    Nothing herein or in the Asset Purchase Agreement or any related

document shall authorize, absent further order of the Court or agreement among the Debtors or the

Buyer, on the one hand, and the applicable non-Debtor counterparty, on the other hand, the sale of

any real estate property owned by any of the Debtors, free and clear of (and shall not extinguish

or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets that

limit or condition the permitted use of the property such as easements, reciprocal easement

agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively,

"Restrictive Covenants") that are not executory or that run with the land.  To the extent that the

Debtors or any other party seek to assume and assign any real estate leases to which a Debtor is a

party free and clear of any Restrictive Covenant, the Debtors or such party shall file a notice that

describes the Restrictive Covenant that the party is seeking to extinguish or otherwise diminish

and any non-Debtor counterparty to a Restrictive Covenant will have fourteen (14) calendar days

from the filing and service of notice of such requested relief to file and serve an objection thereto;

any such issues shall be determined by the Court or otherwise resolved consensually prior to the

effectiveness of the assignment of any Lease, and all rights, remedies, and positions of all parties

with respect to any such relief are preserved.

(b)    Nothing in this Sale Order, the Asset Purchase Agreement, or any

other related agreements, documents or other instruments shall be deemed to authorize or shall be

argued to permit the Debtors, the Buyer, or any Proposed Assignee, their agents or advisors to take



any action in connection with an unexpired master lease of nonresidential real property to which a Debtor is a party (each such lease, a "<u>Master Lease</u>") that is not in compliance with, or that would result in a default or breach under, such Master Lease, without an amendment to or waiver under such Master Lease, in accordance with its terms and all consents required for such amendment or waiver under such Master Lease.  To the extent that the Debtors or any other party seek to sever a Master Lease for any reason prior to an assumption and assignment of such Master Lease in accordance with the terms of this Sale Order, the Debtors shall file a notice that describes the nature and reason of such severing, and any non-Debtor counterparty to such Master Lease will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any lease, and all rights, remedies, and positions of all parties with respect to any such relief are preserved.

60.    <u>**Stand Alone L/C Facility**</u>. As of the Closing Date, all obligations of the applicable Debtors with respect to the Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among such Debtors, Citibank, N.A., as administrative agent and issuing bank (collectively, "<u>Citi</u>") and letter of credit lenders party thereto (the "<u>LC lenders</u>") (as amended from time to time, the "<u>Citi Letter of Credit Agreement</u>") shall be assumed by the applicable Buyer Affiliate, all obligations of any Debtor thereunder (other than any contingent obligations (including contingent indemnification obligations) that are not yet due and payable) shall be terminated and all collateral provided by the Debtors to secure such obligations shall be released (other than such liens securing contingent indemnification obligations in respect of the Citi Letter of Credit Agreement, which liens shall attach to the net proceeds of the Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the

Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing).

61.    **Existing Wells and BAML Letters of Credit**.    Notwithstanding the termination of the DIP ABL Facility (as defined in the Final DIP Order), each of the outstanding letters of credit issued by Bank of America, N.A. and Wells Fargo Bank, National Association, pursuant to the DIP ABL Facility, will remain outstanding after the Closing Date in accordance with their respective terms so long as such letters of credit are either (1) cash collateralized in an amount of up to 105% of the face amount of such letters of credit to secure the reimbursement obligations of the Debtors (and their successors and assigns) with respect to such letters of credit on the Closing Date, pursuant to one or more cash collateral agreements between the Buyer and each of Bank of America, N.A. and Wells Fargo Bank, National Association, as Issuing Lenders under the applicable cash collateral agreement (such letters of credit, the "Cash Collateralized Letters of Credit" and such cash collateral agreements, the "Cash Collateral Agreements"), and/or (2) backstopped in an amount of up to 105% of the face amount of such letters of credit to secure the reimbursement obligations of the Debtors (and their successors and assigns) with respect to such letters of credit on the Closing Date (such letters of credit, the "Backstopped Letters of Credit").    The security interests securing the obligations under the DIP ABL Facility, including the security interests securing obligations with respect to each letter of credit issued under the DIP ABL Facility, whether a Cash Collateralized Letter of Credit or a Backstopped Letter of Credit, will be terminated so that such obligations of any Debtors under the DIP ABL Facility are no longer secured by the collateral granted by the Debtors under the DIP ABL Facility, and all such obligations of such Debtors under the DIP ABL Facility will be terminated (other than (x) any contingent obligations that are not yet due and payable and (y) obligations with respect to the Cash

Collateralized Letters of Credit or Backstopped Letters of Credit, which in the case of this clause

(y) are being cash collateralized or backstopped by the Buyers pursuant to this paragraph). For the

avoidance of doubt, the cash collateral provided for the Cash Collateralized Letter of Credit shall

not be property of the Debtors or their estates. The automatic stay imposed under section 362(a)

of the Bankruptcy Code shall not apply to the Cash Collateral Agreements or the cash collateral

provided therefor.  The Buyer shall bear any costs incurred by the Debtors in connection with any

Cash Collateralized Letters of Credit or Backstopped Letters of Credit, including any fees payable

thereon.   For the avoidance of doubt, the Debtors shall not be party to, nor have rights or

obligations under, any letter of credit that backstops the Backstopped Letters of Credit.

62.    **Direction to Creditors and Parties in Interest**.

(a)    In connection with the Credit Bid, each agent, trustee, collateral

agent or similar person (each, a "Credit Bid Claim Agent") that is party to an indenture, credit

agreement, security agreement or any similar document or instrument (each, a "Credit Bid Claim

Document") in respect of the credit bid claims is authorized to execute such documents and take

all other actions, in accordance with, and subject to the terms of, the applicable Credit Bid Claim

Document, as may be necessary to facilitate the Credit Bid, including, without limitation, the *pro*

*rata* allocation and distribution of equity securities of the Buyer (pro rata within each class of

creditors), to all creditors holding any obligations of any one or more of the Debtors which are the

subject of the Credit Bid (the "Credit Bid Obligations"), including without limitation, the non-ESL

holders of the Credit Bid Obligations, and the acknowledgment of the reduction in principal

amount of the remaining Credit Bid Obligations as a result of, and in the amount of, the Credit

Bid, such reduction to be made *pro rata* to all holders of the Credit Bid Obligations by class of

Creditor, including, without limitation, the non-ESL holders of the Credit Bid Obligations.  Each

Credit Bid Claim Agent may rely fully on all amounts of equity securities of the Buyer delivered and allocated to it, and the amount of the reduction in the principal amount to be applied to the Credit Bid Obligations for which the Credit Bid Claim Agent is acting in such capacity, as certified by ESL or the Buyer and the applicable Debtor(s) in a written certificate (the "Certificate") to be delivered to the relevant Credit Bid Claim Agent at or prior to the Closing. The Credit Bid Claim Agent may, but shall not be obligated to, make any review or investigation of the accuracy of any of the calculations or numbers set forth in such Certificate. On the Closing Date, Buyer shall pay to each Credit Bid Claim Agent the reasonable fees and expenses invoiced on or prior to the Closing Date (including its reasonable attorneys' fees and disbursements) incurred in connection with the facilitation of the Credit Bid. Anything in this Sale Order to the contrary notwithstanding, nothing in this Order is intended to, or shall, modify or amend the terms and conditions of the Second Lien Security Agreement, all of which shall remain in full force and effect; provided, however, that this sentence shall not impact in any way the sale of the Acquired Assets (including, for the avoidance of doubt, the Transition Assets regardless of whether the Debtors retain title pursuant to the Transition Services Agreement) free and clear of all liens and Claims arising under, in connection with or in any way related to the Second Lien Security Agreement.

(b)    Each Credit Bid Claim Agent is hereby released and exculpated from any Claim, cause of action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Credit Bid and the facilitation thereof and any transaction contemplated in connection therewith, other than any such Claim, cause of action, obligation, suit, judgment, damage, demand, loss, or liability stemming from the actual fraud, willful misconduct, or gross negligence of any such Credit Bid Claims Agent.



63.     **Citibank Credit Card Agreements**.  Pursuant to this Order, the Debtors are

assuming and assigning (i) that certain Second Amended and Restated Program Agreement, dated

as of October 3, 2018 (the "Citibank Credit Card Program Agreement"), by and among Sears,

Roebuck and Co., Sears Brands Business Unit Corporation, the Other Sears Parties (as defined

therein) that are parties thereto, and Citibank, N.A. ("Citi"), (ii) the New Merchant Agreement (as

defined in the Citibank Credit Card Program Agreement) and (iii) the Marketing Agreement (as

defined in the Citibank Credit Card Program Agreement). The Citibank Credit Card Program

Agreement, the New Merchant Agreement, and the Marketing Agreement are collectively referred

to as the "Citibank Credit Card Agreements." Nothing in this Order, the Asset Purchase Agreement

or any other Sale Transaction document, and neither the Sale Transaction itself nor any act taken

in connection with the Sale Transaction, shall impair, invalidate, limit, waive, forfeit or otherwise

render ineffective any right of Citi arising under or recognized by any Citibank Credit Card

Agreement, including any right in accordance with the terms and conditions of the Citibank Credit

Card Agreements to (x) to draw on the "Eligible Letter of Credit" funded under the Citibank Credit



Card Program Agreement, in Citi's sole discretion, (a) to discharge or satisfy contingent liabilities

arising under any Integrated Agreement (as defined in the Citibank Credit Card Program

Agreement) or (b) to otherwise reimburse Citi for any losses arising out of amounts owing under

any Integrated Agreement, in each case of (a) or (b), whether arising prior to, on, or after the

Closing Date and whether owed by Seller or Buyer; (y) if such Eligible Letter of Credit is not

renewed or replaced in accordance with Section 8.8 of the Citibank Credit Card Program

Agreement, to draw on such Eligible Letter of Credit and maintain the reserve by retaining the

amount of such draw; and (z) to recoup, setoff or deduct amounts owing to Citi under any of the



Citibank Credit Card Agreements in accordance with the terms thereof, in each case, whether such

amounts owed arose prior to, on, or after the Closing Date and whether owed by Seller or Buyer.

64.    <u>Chubb</u>.    Notwithstanding anything to the contrary in the Motion, the Global

Bidding Procedures, the Global Bidding Procedures Order, the Asset Purchase Agreement, any

cure notice or assumption notice (including, but not limited to, any Assumption and Assignment

Notice), or this Sale Order (i) none of the insurance policies or any related agreements

(collectively, the "<u>Chubb Insurance Contracts</u>") issued by any of ACE American Insurance

Company, ACE Fire Underwriters Insurance Company, ACE Property and Casualty Insurance

Company, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance

Company, Westchester Fire Insurance Company, Illinois Union Insurance Company, Federal

Insurance Company, or their respective affiliates or successors (collectively, the "<u>Chubb

Companies</u>"), or, except as set forth herein, any rights, benefits, claims, rights to payment and/or

recoveries under the Chubb Insurance Contracts shall be sold, assigned or otherwise transferred to

the Buyer in connection with the Global Asset Sale Transaction; and (ii) nothing shall alter, modify

or otherwise amend the terms or conditions of the Chubb Insurance Contracts; provided, however,

that to the extent any claim seeking insurance policy proceeds under any insurance policies

included in the Chubb Insurance Contracts arises with respect to the Business or any Acquired

Assets, the Debtors may pursue such claims for such insurance proceeds in accordance with the

terms of the insurance policies included in the Chubb Insurance Contracts (and shall pursue such

claims if requested by Buyer), and, if applicable, turn over to the Buyer any proceeds in respect of

such claims in accordance with section 2.1(q) of the Asset Purchase Agreement (each, a "<u>Proceed

Turnover</u>"); provided, further, however, that the Chubb Companies shall not have any duty to





effectuate a Proceed Turnover or liability related to a Proceed Turnover except as provided in the Chubb Insurance Contracts.

65.    **National Distribution Centers**.  Notwithstanding anything to the contrary herein, the proposed sale of the Kmart-owned property in Greensboro, North Carolina designated as property 30961 and leased to National Distribution Centers (NDC) shall be carved out from this Order, and the proposed sale of this property and all issues raised by NDC in its limited objection (Docket No. 1864) (the "NDC Limited Objection") and supplement thereto (Docket No. 2376) with respect to the Parking Lot Lease (as defined in the NDC Limited Objection) shall be adjourned for consideration on a future hearing date to be agreed by the parties.

66.    **Bank of America Agreements**.  Pursuant to this Sale Order, the Debtors are assuming and assigning certain agreements governing the issuance, administration, and servicing of certain credit cards and credit card programs and certain private label letters of credit (such agreements, the "Bank of America Program Agreements") by Bank of America, N.A. ("Bank of America").  Nothing in this Order, the Asset Purchase Agreement or any other Sale Transaction document, and neither the Sale Transaction itself nor any act taken in connection with the Sale Transaction, shall impair, invalidate, limit, waive, forfeit or otherwise render ineffective any right of Bank of America arising under or recognized by any of the Bank of America Program Agreements, including any right in accordance with the terms and conditions of the Bank of America Program Agreements, to (a) discharge or satisfy contingent liabilities arising under any Bank of America Program Agreement whether arising prior to, on, or after the Closing Date and whether owed by Seller or Buyer; (b) otherwise reimburse Bank of America for any losses arising out of amounts owing under any Bank of America Program Agreement whether arising prior to, on, or after the Closing Date and whether owed by Seller or Buyer; and (c) recoup, setoff or deduct

amounts owing to Bank of America under any of the Bank of America Program Agreements in accordance with the terms thereof, in each case, whether such amounts owed arose prior to, on, or after the Closing Date and whether owed by Seller or Buyer. Further, Bank of America shall have no responsibility or liability for any service disruptions that might occur as a result of any account ownership changes or regulatory requirements that might result from the consummation of the Sale Transaction.

67.    **Governmental Units**.  Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (including but not limited to environmental laws or regulations), and any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order. Nothing contained in this Order or in the Asset Purchase Agreement shall in any way diminish the obligation of any entity, including the Debtors, to comply with environmental laws. Nothing in this Order or the Asset Purchase Agreement authorizes the transfer to the Buyer of any licenses, permits, registrations, or governmental authorizations and approvals without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

68.    **Transition Use Limitation**.  No provision of this Sale Order, the Sale Motion, or the Asset Purchase Agreement shall authorize the Debtors or the Buyer as applicable to use any software or other intellectual property (the "Proprietary Information") owned by or licensed from, or any software-related services provided by, SAP Industries, Inc. and its affiliates SAP America, Inc. and Concur Technologies, Inc. (collectively, "SAP") and Oracle America, Inc. including its partner Rimini Street (collectively, "Oracle"), to the benefit of any other party under any Services

Agreement or otherwise to the extent prohibited by the contracts governing such Proprietary Information or software-related services.

69. **Consent.** No provision of this Sale Order, the Sale Motion, or the Asset Purchase Agreement shall authorize the Debtors or the Buyer as applicable to transfer or sell any Proprietary Information to the Buyer licensed from SAP, Oracle, Microsoft Corporation and its wholly-owned affiliates, Microsoft Licensing, GP, and Microsoft Online, Inc. (collectively, "Microsoft"), LinkedIn Corporation, as applicable, absent the consent of SAP, Oracle, Microsoft, or LinkedIn Corporation, as applicable, to the extent such consent is required under the applicable agreement and such provision is enforceable under applicable law.

70. **Pay-Down of Real Estate 2020 Loan**. Pursuant to Section 11.8 of the Asset Purchase Agreement, to the extent not previously provided, at least one (1) Business Day prior to the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including, without limitation the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* (Docket No. 1393) (the "Cascade Paydown"). The Sellers are hereby authorized and directed to (i) make the Cascade Paydown at or prior to Closing and (ii) pay to Cascade Investment, L.L.C. at Closing an amount in cash to be specified in writing by Cascade Investment, L.L.C. and ESL, which payment shall be funded from (and shall not exceed) the Deposit Amount.

71. **Mortgage Adequate Protection**. Notwithstanding anything to the contrary contained herein or in the Asset Purchase Agreement or related documents, upon the closing of

the Sale Transaction, Relator Carl Ireland, as Administrator of the Estate of James Garbe, and the

United States  (the "Mortgagees") as holders of liens on the real property known as Location

#8975, Cupey Bajo, San Juan, Puerto Rico (the "Property") shall be entitled to a lien against the

sale proceeds of the Property in the same order of priority as existing on the date of entry of this

Sale Order and a superpriority administrative expense claim against the Debtors as adequate

protection pursuant to sections 361, 363(e) and 507(b) of the Bankruptcy Code arising from the

sale of such Property to satisfy any diminution of the value of such replacement lien post-Closing.

All parties' rights to object to the priority, validity, amount, and extent of such asserted liens and

superpriority  claim  or  the  obligations  relating  thereto  are  preserved.    The  Debtors'  and

Mortgagees' rights as to the amount of the allocation of proceeds from the Sale Transaction to the

Property and any valuation of the Property are preserved and any disputes shall be determined by

the Bankruptcy Court, upon motion by any of the Debtors or the Mortgagees.

Dated:  February 8, 2019
         White Plains, New York

_____/s/Robert D. Drain_____
                    THE HONORABLE ROBERT D. DRAIN
                    UNITED STATES BANKRUPTCY JUDGE

I hereby attest and certify on 2/20/19
that this document is a full, true and correct
copy of the original filed on the court's
electronic case filing system.

Clerk, US Bankruptcy Court, SDNY

By: _____  Deputy Clerk

83



--------------**(Store #8975; Location: Río Piedras - Warehouse)**------------

---In San Juan, Puerto Rico, this eighth (8th) day of May, two thousand nineteen (2019). --------------------------------------------------------------------------

--------------------------------------- **BEFORE ME**-----------------------------------

---CARLA SUZETTE D'ALMEIDA ARACENA, Attorney-at-Law and Notary in and for the Commonwealth of Puerto Rico, with residence in Guaynabo, Puerto Rico, and offices on the building located at Two Hundred Seventy (270) Muñoz Rivera Avenue, Hato Rey, San Juan, Puerto Rico.--------------

------------------------------------------ **APPEAR**------------------------------------

---AS PARTY OF THE FIRST PART: SEARS, ROEBUCK OF PUERTO RICO, INC., a corporation organized and existing under the laws of Puerto Rico, represented herein by its attorney-in-fact, Antonio Escudero Viera, of legal age, married, attorney and resident of San Juan, Puerto Rico, who is duly authorized to appear herein pursuant to a Special Power of Attorney executed by its Director and Corporate Secretary, Luke Valentino, on March first (1st), two thousand nineteen (2019) before Notary Public Laura A. Novak, a Notary Public for the State of Illinois whose commission has been verified pursuant to a Certificate issued by the Department of the State of Illinois and subscribed by Jesse White as Secretary of State of the State of Illinois on March five (5), two thousand nineteen (2019), as protocolized by Deed Number Two (2) executed on March seven (7), two thousand nineteen (2019) before the undersigned Notary. Hereinafter referred to as the "Seller".-----------------------------------------------------------------

---AS PARTY OF THE SECOND PART: TRANSFORM DISTRIBUTION CENTER HOLDCO LLC, a Delaware limited liability company, represented herein by Adriana Emille Pérez Rentas, of legal age, married to Julián Alfonso Ramírez Lohner, attorney-at-law and resident of Guaynabo, Puerto Rico, who is duly authorized to appear herein pursuant to that certain Special Power of Attorney executed by its Vice-President, Harold Talisman, on March seven (7), two thousand nineteen (2019) before Notary Public Julie A. Munich, a Notary Public for the State of Florida whose commission has been verified pursuant to a Certificate issued by the Department of the



...tiqu... referred to as the Seller and together with the

Seller the "Appearing Parties".----------------------------------------------------------

--I, THE NOTARY, certify that I personally know the representatives of the Appearing Parties, and through their statements I certify as to their age, civil status, profession and residence. They assure me that they have, and in my judgment they do have, the necessary legal capacity to execute this instrument, as well as sufficient understanding of the English language, and therefore, they freely and voluntarily--------------------------------------------------

----------------------------------------- **STATE** -----------------------------------------

---FIRST: <u>Order; Asset Purchase; Description of Real Property; Title; Liens and Encumbrances; Cadaster Number</u>. --------------------------------------------

-----One. On February eight (8), two thousand nineteen (2019), the United States Bankruptcy Court for the Southern District of New York (the "Court") issued an order (the "Order"), with respect to Chapter Eleven (11) Case Number eighteen, dash, two, three, five, three, eight, parenthesis, R, D, D (18-23538 (RDD)), approving an asset purchase agreement between Sears Holdings Corporation and its subsidiaries, and Transform Holdco LLC (the "Asset Purchase"). A certified copy of the Order is attached hereto as <u>Exhibit A</u>. The Order issued by the Court authorizes Seller to sell at a public auction to the highest bidder several parcels of land, including a certain parcel of land located in the Municipality of San Juan, Puerto Rico, described in the Spanish language in the Registry of Property of Puerto Rico, Third Section of San Juan (the "Registry") as follows (the "Property"):

-----"RUSTICA: Predio de terreno radicado en el Barrio Monacillos del término municipal de Río Piedras, compuesto de siete punto seis mil quinientos setenta y cinco (7.6575) cuerdas, equivalentes a treinta mil noventa y seis punto nueve mil trescientos ochenta y siete metros cuadrados (30,096.9387) metros cuadrados, marcada parcela "A" en el Plano de Inscripción aprobado y certificado por la Junta de Planificación, caso número sesenta raya uno ocho dos cero (60-1820). En colindancia por el NORTE, con la Parcela "C" y "E" de la finca principal de la cual se segrega; por el SUR, con franja de terreno del Estado Libre Asociado de Puerto Rico, y por la Carretera Estatal número ciento setenta y seis (176); y por el ESTE, colinda con franja libre a dedicase al Gobierno del Estado Libre Asociado de Puerto Rico, cuya franja se denomina Parcela "B" en el Plano de Inscripción, la cual colinda con la orilla Oeste, de Río Piedras y es de diez (10) metros de ancho; por el OESTE, con la Carretera Estatal número ciento setenta y seis (176) y la Parcela "E" de la finca principal de la cual se hace la segregación."----------------------------------------------------

Monacillos, property number seventeen thousand three hundred twenty-eight (17,328), second (2nd) inscription.----------------------------------------------

-----Seller represents that the Property has the following cadastre number assigned by the Municipal Revenues Collection Center ("CRIM," for its Spanish acronym): 087-061-851-37-001. -------------------------------------------

-----The Property is subject to the following liens and encumbrances: ------

-------(i) By its origin, it is free and clear of liens and encumbrances. --------

-------(ii) By itself, it is subject to a mortgage securing a mortgage note in favor of the United States of America and Carl Ireland Curtiss, as guardian for James Garbe and his estate, as joint and several creditors (*acreedores solidarios*), in the principal amount Seventeen Million Four Hundred Thousand Dollars ($17,400,000.00), for which the Property secures Fifteen Million Four Hundred Eighty Thousand Dollars ($15,480,000.00), with interest at the rate of one point five percent (1.5%) per annum and constituted pursuant to Deed Number Thirty-Two (32) executed on January twelve (12), two thousand eighteen (2018) before Notary Miguel A. Blanco Fuertes, recorded in the Registry at the Karibe volume of the Third (III) Section of San Juan, property number seventeen thousand three hundred twenty-eight (17,328) of Monacillos, third (3rd) and last inscription. Paragraph R of the Order provides for the cancellation of the Mortgage, which shall be executed at a later date and a certified copy of which Deed of Cancellation of Mortgage will be filed in the Registry for recordation purposes after the filing of this Deed. ------------------------------------------------

---SECOND: The Appearing Parties state that they have agreed to the purchase and sale of the Property, and they carry out the aforesaid purchase and sale under the following terms and conditions:------------------

----------------------------CLAUSES AND CONDITIONS -------------------------

-----One: Conveyance. The Seller hereby remises, releases, grants, sells and conveys to the Pucharser, and the Purchaser hereby purchases, accepts and receives from the Seller, in accordance with the Order, the Property, together with all its rights, structures, improvements, immunities,



liabilities and all other matters as they may appear of record and without any warranty or representation (express, implied, statutory or otherwise), except that the Seller warrants that Seller is possessed of the Property and has not previously conveyed any fee title to the Property. --------------------

-----Two: <u>Purchase Price</u>. The Property is sold for a purchase price equal to the amount of SEVENTEEN MILLION SEVEN HUNDRED NINETY-TWO THOUSAND NINE HUNDRED FIFTY DOLLARS ($17,792,950.00), the receipt of which is hereby acknowledged.--------------------------------------

-----Three: <u>Legal Possession</u>. By virtue of this Deed and without any further formality, Seller delivers possession of the Property to Purchaser and Purchaser accepts the same. Seller expressly warrants to Purchaser the legal and peaceful physical possession in fee simple title ("pleno dominio") of the Property sold. --------------------------------------------------------------------

----Four: <u>Real Estate Taxes and Assessments</u>. All real estate taxes and assessments with respect to the Property for any period of time prior to the date of this Deed shall be for the account of the Seller and for any period of time thereafter for the account of the Purchaser. Seller further agrees that in connection with the foregoing, it shall be responsible for any real property taxes on improvements located on the Property that may not have been assessed by taxing authorities as of the date of this Deed for any period of time prior to the date of this Deed. Seller states and Purchaser acknowledges that Seller furnished to Purchaser evidence of payment of all real estate taxes and assessments due and payable with respect to the Property that were due prior to the date of this Deed.--------------------------

-----Five: <u>Additional Documentation</u>. The Appearing Parties further agree to execute and deliver any additional document which may be necessary to record this Deed in the Registry of the Property. ---------------------------------

-----Six: <u>Title Report</u>. The Appearing Parties accept that the title search report was prepared by an independent third party; and not by the undersigned Notary.--------------------------------------------------------------------



by whoever and the recordation hereof in the Registry shall be for the account of the Purchaser. -----------------------------

---FOURTH: _Request to the Registrar_. The Honorable Registrar of the Property is respectfully requested to record the conveyance and transfer of the Property in fee simple (_pleno dominio_) in favor of the Purchaser, so that the records of the Registry under his/her authority will attest to this fact.---

----------------------------------------WARNINGS----------------------------------------

---FIFTH: The Notary warns the Appearing Parties that, if the Property object of this transaction is situated within a floodable zone, the present or future owners of the Property, including any person in possession thereof, are required by law to observe and comply with the requirements and provisions of the floodable zones regulations as provided in section Three (3) of Act Number eleven (11) of March eight (8), ninteen hundred eighty-eight (1988) (23 LPRA section 225 (g)). Non compliance with these regulations constitute an unlawful act. The Appearing Parties accept that they have been advised of the dispositions of this law, they understand the legal responsibilities arising therefrom, and they bind themselves to comply with such regulations, in the event said law may apply to them.--------------

---SIXTH: The Appearing Parties are hereby informed, specifically the Purchaser, that if the house that is located in the Property were built prior to the year nineteen hundred seventy-eight (1978), the same are subject to the Federal Law for the Reduction of the Caused Risks for the Painting with the Component of Lead (42 U.S.C. Section 4851 et sec.). This law and its regulations impose upon the Seller, its agents and the real estate brokers, the obligation (i) to disclose any knowledge of the presence of paint with the component of lead or of any well-known danger in the Property associated with this; to provide any report or evaluation that Seller has available regarding this matter; (ii) to provide time so that the Purchaser inspects the Property to determine the existence or non-existence of lead painting on the Property; and (iii) to provide an informative pamphlet prepared by the Agency for the Environmental Protection



three (3) years. It is noticed, also that not fulfilling the requirements of this law exposes the Seller and its agent to joint and several liability for any damages that may arise in the future.---------------------------------------------

---SEVENTH: The Appearing Parties likewise recognize to have examined copies of certifications issued by the CRIM of real estate taxes owed in connection with the Property. The Purchaser acknowledges that it will record the transfer of the Property in the records of CRIM, so that the subsequent notifications of the collections of the real estate taxes related to the Property are sent to the Purchaser. The Seller represents and warrants that there are no arrears or delays in the payments of the real estate taxes assessed in connection with the Property. ------------------------

---EIGHTH: Purchaser acknowledges that it has done a thorough examination of the Property and is fully aware of the state of current condition and deterioration thereof and accepts and acquires the same as is, waiving any claim against the Seller for any defect or hidden defect or apparent design and/or construction, and all defects caused by the use or wear and the consequences of the passage of time, mechanical breakdown property, including but not limited to cracks, leaks in walls, ceilings and floors, or loosening of plaster or tiles, floor recessed impedance sanitary lines, and/or aqueducts or any class; or damage to power lines. Purchaser acknowledges that the Seller did not act in any way as a designer, developer, builder or developer of the Property. ---------------------------------

-------ACCEPTANCE, ADDITIONAL WARNINGS AND EXECUTION -----

---The representatives of the Appearing Parties hereby accept this Deed as drafted and I, the Notary, gave them the necessary legal warnings concerning the execution of this Deed and they were fully advised by me thereon. Specifically, I also advised them of the following:---------------------

------(a) any liens or encumbrances affecting title to the Property that may be filed for recordation prior to the filing of this Deed may be legally binding and could take precedence over this Deed; --------------------------------------



completeness of said title abstract or report; --------------------------------------

------(c) it is convenient for the parties to obtain a certification from the Registry prior to the execution of this Deed, but it is also advisable to verify the status of liens and encumbrances on Property as they may appear from the Registry on the date hereof and of the adverse consequences which may result from the failure to do so; -------------------------------------------------

------(d) this Deed must be promptly filed for recordation in the Registry in order to be effective as against third parties; ----------------------------------------

------(e) the possible existence and pendency of unrecorded statutory liens, including but not limited to, the statutory preferred lien in favor of the Commonwealth of Puerto Rico for unpaid property taxes; and ---------------

------(f) notwithstanding the statements made by the parties hereto, the transactions contained in this Deed are subject to scrutiny by the corresponding local and federal taxing authorities which may result in the imposition of taxes. -------------------------------------------------------------------------

---I also advised the representatives of the Appearing Parties as to their right to read the Deed by themselves, which they did, and to have witnesses present on the execution thereof, which they waived. After having read the contents of this Deed, the representatives of the Appearing Parties fully ratified and confirmed all statements included herein as the true and correct embodiment of the Appearing Parties' stipulations, terms and conditions, and thereupon signed this Deed before me, the Notary, having also written their initials on each and every page of this Deed. -----

---TO ALL OF WHICH, under my signature and seal, signing and sealing the same according to law, I, the undersigned Notary, under my signature, seal, mark and flourish DO HEREBY CERTIFY AND ATTEST. --------------







**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

In re                        :        **Chapter 11**

                           :

**SEARS HOLDINGS CORPORATION**, *et al.*,  :        **Case No. 18-23538 (RDD)**

                           :

                           :

              Debtors.[1]     :        **(Jointly Administered)**

--------------------------------------------------------------x

### ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS AND BUYER, (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated November 1, 2018 (Docket No. 429) (the "Sale Motion"),[2] filed

by the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, the entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United

States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004,



---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]    Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Motion.



6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and

Rules 6004-1, 6005-1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy

Court for the Southern District of New York (the "Local Rules"), authorizing and approving the

sale of the Acquired Assets and the assumption and assignment of certain executory contracts and

unexpired leases of the Debtors in connection therewith; and the Court having entered this Court's

prior order, dated November 19, 2018 (Docket No. 816) including the schedule as revised by the

*Global Bidding Procedures Process Letter* filed with the Bankruptcy Court on November 21, 2018

(Docket No. 862) (together, the "Bidding Procedures Order"), approving competitive bidding

procedures for the Acquired Assets (the "Bidding Procedures") and granting certain related relief;

and Transform Holdco LLC (the "Buyer") having submitted the highest or otherwise best bid for

the Acquired Assets, as reflected in the Asset Purchase Agreement (as defined below); and the

Court having conducted a hearing on the Sale Motion (the "Hearing" or the "Sale Hearing")

commenced on February 4, 2019, at which time all interested parties were offered an opportunity

to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the

Sale Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of January 17,

2019 by and among the Buyer and the Sellers party thereto (including each Debtor and certain

other subsidiaries of Sears Holdings Corporation, the ("Sellers") (as may be amended, restated,

amended and restated from time to time, including pursuant to that certain Amendment No. 1 to

Asset Purchase Agreement, by and among the Buyer and the Sellers, the "Asset Purchase

Agreement"),[3] a copy of which is attached hereto as Exhibit B, whereby the Sellers have agreed,

subject to Court approval, among other things, to sell the Acquired Assets to the Buyer, including,





---

[3] Amendment No. 1 to the Asset Purchase Agreement was filed in substantially final form on February 7, 2019 at
Docket No. 2456 (the "**APA Amendment**"). Upon closing and execution the Debtors will file the executed version
of the APA Amendment with the Court.



without limitation, (x) the Assigned Agreements (including any Additional Contracts) that will be assumed and assigned to Buyer or designated, as applicable, each on the terms and conditions set forth in the Asset Purchase Agreement and (y) designation rights ("Designation Rights") for certain Designatable Leases (the sale of such Acquired Assets, collectively, the "Sale Transaction"), (iii) the Bidding Procedures Order and the record of the hearing before the Court on November 15, 2018 at which the Bidding Procedures Order was approved, (iv) the ability of the Buyer to submit its Credit Bid pursuant to Asset Purchase Agreement section 3.1(b) (the "Credit Bid"), (iv) the objections to the Sale Motion that have not been resolved or adjourned and all related pleadings, and (v) the record of the evidentiary Hearing before the Court commenced on February 4, 2019, at which the Court authorized the Buyer's Credit Bid (as approved pursuant to this Sale Order), including the arguments and representations of counsel made, and the evidence proffered or adduced, at the Hearing; and it appearing that due and sufficient notice of the Sale Motion, the Asset Purchase Agreement, the Bidding Procedures Order, and the form of this order (the "Sale Order") have been provided in accordance with the Bidding Procedures Order and the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (Docket No. 405) (the "Amended Case Management Order"); and, except as otherwise provided for herein, all objections to the Sale Motion having been withdrawn, resolved, or overruled as provided in this Sale Order; and, after due deliberation and for the reasons stated in the Court's bench ruling at the Hearing, it appearing that the relief granted herein is in the best interests of the Debtors, their estates and creditors and all parties in interest in these chapter 11 cases; and good and sufficient cause appearing therefor, it is hereby



## FOUND AND DETERMINED THAT:

A.    <u>**Fed. R. Bankr. P. 7052**</u>.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing.  This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

B.    <u>**Jurisdiction and Venue**</u>.  This Court has jurisdiction over the Sale Motion, the Sale Transaction and the property of the Debtors' estates, including the Acquired Assets, pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) that this Court can decide by a final order under the United States Constitution.  Venue of these chapter 11 cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.    <u>**Statutory and Rule Predicates**</u>.  The statutory and other legal predicates for the relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Local Rules 6004-1, 6005-1 and 6006-1, and the Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order Number 383 in the United States Bankruptcy Court for the Southern District of New York.

D.    <u>**Final Order**</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  The Debtors have demonstrated compelling circumstances and a good,




4

sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. In the absence of a stay pending appeal, Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset Purchase Agreement at any time after entry of this Sale Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

E. **Notice and Opportunity to Object**.  Actual written notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Sale Motion, the Sale Transaction, the sale of the Acquired Assets that are owned by the Debtors free and clear of any Claims (as defined below), the assumption and assignment of the Assigned Agreements, the Auction, the Bidding Procedures, and the relief requested in the Sale Motion has been given, as required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Amended Case Management Order, and the Bidding Procedures Order.



F. **Title to the Acquired Assets**.  The Acquired Assets that are owned by the Debtors constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  Except as provided in the Asset Purchase Agreement, the Debtors are the sole and rightful owners of such Acquired Assets that are owned by the Debtors with all right, title and interest to transfer and convey the Acquired Assets to the Buyer, and no other person has any ownership right, title, or interests therein.

G. **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Sale Motion, the Sale Transaction, the Asset Purchase Agreement, and all related agreements (the "Related Agreements").  The Debtors' entry into and performance under the Asset Purchase Agreement and

Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their estates, creditors and other parties in interest; and (iii) are reasonable and appropriate under the circumstances.  The Debtors have demonstrated compelling circumstances for the Sale Transaction outside: (i) the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the value of the Debtors' estates.  Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Price set forth in the Asset Purchase Agreement constitutes the highest or otherwise best offer received for the Acquired Assets; (ii) the Asset Purchase Agreement and the transactions contemplated thereby present the best opportunity to maximize the value of the Acquired Assets, whether on a going concern basis or otherwise, and avoid decline and devaluation of the Acquired Assets that would occur in an immediate liquidation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase Agreement, recoveries to creditors will be diminished; and (iv) the value of the Debtors' estates will be maximized through the sale of the Acquired Assets pursuant to the Asset Purchase Agreement.

H.    **Compliance with Bidding Procedures**.    The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders, and were the result of arms'-length negotiations.  Further, the Bidding Procedures afforded notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the

Acquired Assets. The Debtors, ESL, the Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects except as properly waived in the exercise of their fiduciary duties in accordance with such Procedures. The Buyer subjected its bid to the competitive Bidding Procedures approved by this Court and the Buyer was found eligible to participate in the Auction and was the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance with the Bidding Procedures Order and Bidding Procedures.

I.    **Sale Process**. (i) The Debtors and their advisors, including Lazard Frères & Co. LLC, engaged in a robust and extensive marketing and sale process through the postpetition sale process pursuant to the Bidding Procedures Order and the Bidding Procedures; (ii) the Debtors and their advisors conducted a fair and open sale process; (iii) the sale process, the Bidding Procedures and the Auction were non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets; and (iv) the process conducted by the Debtors pursuant to the Bidding Procedures obtained the highest or otherwise best value for the Acquired Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result.

J.    **Fair Consideration; Highest or Best Value**. The consideration to be paid by the Buyer under the Asset Purchase Agreement, including, without limitation, the Credit Bid Amount (as hereinafter defined) and the Credit Bid Release Consideration: (i) constitutes fair and reasonable consideration for the Acquired Assets; (ii) is the highest or best offer for the Acquired Assets; (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practically available alternative; (iv) constitutes fair and reasonably equivalent value and full and adequate consideration, under the Bankruptcy Code and the Uniform

Fraudulent Transfer Act; (v) constitutes fair consideration under the Uniform Fraudulent

Conveyance Act; and (vi) constitutes reasonably equivalent value, fair consideration and fair value

under any other applicable laws of the United States, any state, territory or possession or the

District of Columbia or any other applicable jurisdiction with laws substantially similar to the

foregoing. Such consideration constitutes the highest or best bid for the Acquired Assets. Under

the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets

is fair and reasonable. Pursuant to Section 3.1(c) of the Asset Purchase Agreement, the

Purchase Price may include cash in the amount of the outstanding obligations owed to lenders

other than Buyer or its Affiliates as of the Closing Date under: (A) the IP/Ground Lease Term

Loan Facility (the "IP/Ground Lease Buyout Amount"); (B) the FILO Facility (the "FILO Facility

Buyout Amount"); and (C) the Real Estate Loan 2020 (the "Real Estate Loan 2020 Buyout

Amount", together with the IP/Ground Lease Buyout Amount and the FILO Facility Buyout

Amount, the "Buyout Amounts") unless such lender(s) provide written confirmation to the Sellers

that such cash payment and the obligations owed to lenders by the Sellers under the IP/Ground

Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, are

permanently waived and discharged against the Sellers. Pursuant to Section 3.1 of the Asset

Purchase Agreement, to the extent payable, each Buyout Amount, if applicable, shall be deposited

and held in separate segregated accounts of the Debtors and the Liens of the lenders other than

Buyer or its affiliates under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real

Estate Loan 2020, as applicable, shall attach to the cash proceeds held in the applicable designated

segregated account in the same order of priority and with the same validity, force and effect as the

original Liens of such lenders, and such proceeds shall be released to such lenders within two (2)

business days following the Closing Date and shall not otherwise be used by the Debtors without

---

further order of the Bankruptcy Court (the mechanic referred to in this sentence and the preceding sentence shall be referred to herein as the "Buyout Option"). Such Purchase Price, including the Credit Bid Amount, the Credit Bid Release Consideration, the Buyout Option, and other good and valuable consideration provided in connection with the Sale Transaction, constitutes the highest or best bid for the Acquired Assets. Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets is fair and reasonable.

Without limiting the foregoing, no objection was raised to the Sale Motion on the basis that the creditors of any particular Debtor were improperly prejudiced by the proposed sale, including by the credit bid feature of the proposed sale. Based on the evidence before the Court, the sale consideration under the proposed sale that does not constitute a credit bid constitutes adequate consideration for the Acquired Assets of each Debtor when added to the credit bid consideration, and such consideration does disadvantage the creditors of any particular Debtor except as permitted by the Bankruptcy Code.



K.    **ESL Secured Claims**. In accordance with the Asset Purchase Agreement, effective upon the Closing Date ESL's Claims (as defined below) against the Debtors arising under the: (i) IP/Ground Lease Term Loan Facility; (ii) FILO Facility; (iii) Real Estate Loan 2020; (iv) Second Lien Term Loan; (v) Second Lien Line of Credit Facility; (vi) Second Lien PIK Notes; and (vii) Citi L/C Facility (together with the security interests securing any of the Claims of ESL described in the preceding sub-clauses (i)-(vii), collectively, the "ESL Claims"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code in the amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the Credit Bid set forth in Section 3.1(b) of the Asset Purchase Agreement. Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, ESL or, to the extent any of the ESL Claims are assigned to

Buyer prior to the Closing Date, Buyer is hereby authorized to credit bid (or cause to be credit bid)

the ESL Claims and to use such ESL Claims as a portion of the Purchase Price (the "ESL Credit

Bid Amount") as set forth in Section 3.1(b) of the Asset Purchase Agreement (subject, in the case

of the security interest securing the Claims described in subclauses (iv), (v) and (vi) of this

Paragraph K, anything in this Order to the contrary notwithstanding, to delivery of the written

consent of the Collateral Agent for such security interest).  In addition, the transfer of Acquired

Assets constituting "Collateral" under that certain Amended and Restated Security Agreement by

and among Sears Holdings Corporation and Wilmington Trust, National Association in its capacity

as Collateral Agent (the "Second Lien Collateral Agent") dated as of March 20, 2018 (as may be

amended, restated, amended and restated or otherwise modified in accordance with its terms from

time to time) (the "Second Lien Security Agreement") has been, or will be, directed by ESL as the

"Required Secured Parties" under the Second Lien Security Agreement pursuant to one or more

direction letters delivered to the Second Lien Collateral Agent (the "Second Lien Consent").  The

Second Lien Consent binds all parties holding debt under the Second Lien Term Loan, Second

Lien Line of Credit Facility and Second Lien PIK Notes in their capacity as such (collectively, the

"Senior Second Lien Creditors", and their claims against the Debtors under such debt document,

the "Senior Second Lien Claims").  The Senior Second Lien Claims shall be deemed allowed for

all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts

included in the Credit Bid.  Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order,

the Second Lien Collateral Agent is hereby authorized to credit bid the Senior Second Lien Claims

as a portion of the Purchase Price (the "2L Credit Bid Amount", together with the ESL Credit Bid

Amount (without duplication), the "Credit Bid Amount").  At the Auction, pursuant to the Asset



Purchase Agreement, the Buyer agreed to pay the Purchase Price, which includes the Credit Bid Amount.

L.    **Cyrus Claims**.  Effective upon the Closing Date, Cyrus' Claims (as defined below) arising under: (g) the Final Junior DIP Order[4] (the "Junior DIP Secured Obligations"[5]); (h) the Citi L/C Facility; (i) the Second Lien PIK Notes[6] (the "Cyrus Second Lien Notes Claims"); and (j) the IP/Ground Lease Term Loan Facility (the "Cyrus IP/GL Claims") together with the security interests securing any of the Claims described in the preceding sub-clauses (g)-(j), collectively the "Cyrus Claims"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid.

M.    **No Successor or Other Derivative Liability**.  The sale and transfer of the Acquired Assets of the Debtors to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of the Assigned Agreements, will not subject the Buyer or ESL to any liability (including any successor liability) under any laws, including any bulk-transfer laws, or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories, with respect to the operation of the Debtors' business prior to the Closing, and for each Assigned Agreement, the applicable Assumption Effective Date, except that, upon the Closing or such other date as specified in the Asset Purchase Agreement, the Buyer shall become liable for the applicable Assumed Liabilities.  The Buyer: (i) is not, and shall not be considered or deemed a mere continuation of,

---

[4]    The "Final Junior DIP Order" shall mean the *Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1436).

[5]    The "Junior DIP Secured Obligations" shall have the meaning ascribed to it in the Final Junior DIP Order.

[6]    As such term is defined in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* (Docket No. 3).

or successor to, the Debtors in any respect; (ii) has not, *de facto* or otherwise, merged with or into the Debtors; and (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors and there is no continuity of enterprise between the Debtors and the Buyer.  Accordingly, the Buyer is not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement, and except with respect to any Assumed Liabilities or as otherwise set forth in the Asset Purchase Agreement, Buyer's acquisition of the Acquired Assets from the Debtors shall be free and clear of any "successor liability" claims of any nature whatsoever.  Buyer would not purchase the Acquired Assets but for the protections against any claims based upon "successor liability" theories as specified herein.  Notwithstanding the foregoing, nothing herein shall apply with respect to the Reserved Lease Issues.

N.    **Transition Agreements**.

(i)    The Services Agreement, as contemplated by the Asset Purchase Agreement, and as summarized on the record of the Sale Hearing, has been filed at Docket No. 2455 in a substantially final form, which is being negotiated by the parties and remains subject to a full reservation of rights among the parties.[7]

(ii)    The Employee Lease Agreement, as contemplated by the Asset Purchase Agreement has been filed at Docket No. 2453 in a substantially final form, which is being negotiated by the parties and remains subject to a full reservation of rights among the parties.[8]

---

[7] Upon closing and execution the Debtors will file the executed version of the Services Agreement with the Court.

[8] Upon closing and execution the Debtors will file the executed version of the Employee Lease Agreement with the Court.

O.    **Good Faith; No Collusion**.  The Asset Purchase Agreement and each of the Transactions were negotiated, proposed, and entered into by the Debtors, their management, their boards of directors or equivalent governing bodies, and representatives and the Buyer and its management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, including ESL, in good faith, without collusion or fraud, and from arms'-length bargaining positions.  The Buyer is a "good faith purchaser" and the Buyer, and ESL are acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to all the protections afforded thereby through the date of the Hearing and in closing the proposed transaction.  In the absence of any Person obtaining a stay pending appeal, effective upon the Closing, it shall be deemed that neither the Debtors, ESL, nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  The Buyer and ESL have proceeded in good faith in all respects in that, among other things: (i) the Buyer, and ESL have recognized that the Debtors were free to deal with any other party in interest in acquiring the Acquired Assets; (ii) the Buyer, and ESL have complied with the applicable provisions of the Bidding Procedures Order; (iii) the Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Buyer and all other material agreements or arrangements entered into by the Buyer, ESL and the Debtors in connection with the Sale Transaction have been disclosed and are appropriate. The sale price in respect of the Acquired Assets was not controlled by any agreement among potential bidders and neither the Debtors, ESL nor the Buyer have engaged in collusion, fraud, or any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or that

would prevent the application of section 363(m) of the Bankruptcy Code.  Accordingly, neither the Asset Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code. Specifically, neither ESL nor the Buyer has acted in a collusive manner with any Person or entity.

P.    **Notice**.  As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate, and sufficient notice of the Sale Motion, the Bidding Procedures (including the bidding process and the deadline for submitting bids and the Auction), the Sale Hearing, the Sale Transaction, the proposed Sale Order attached to the Asset Purchase Agreement, and the other relief requested in the Sale Motion was provided by the Debtors; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Bidding Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, the proposed Sale Order, or any of the relief requested in the Sale Motion, except as otherwise provided paragraphs FF.34 and FF.38 of this Sale Order, is required.  With respect to Persons whose identities are not reasonably ascertained by the Debtors, in accordance with the Bidding Procedures Order, a notice containing the results of the Auction was published on the Prime Clerk website on January 18, 2019 (Docket No. 1730).

Q.    **Cure Notice**.  As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Sale Hearing, the Assumption and Assignment Notice (as defined in the Bidding Procedures Order) on each counterparty to a Potential Transferred Agreement, dated January 18, 2019, January 23, 2019, and January 31, 2019, which provided the Debtors' intent to assume and assign such Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an

executory contract or lease) and notice of the related proposed Cure Costs upon each non-debtor counterparty to such Potential Transferred Agreements. The service of the Assumption and Assignment Notice was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Assigned Agreements, including without limitation the Designatable Leases and any Additional Contracts that were listed as Potential Transferred Agreements; provided, however, that further notice is required as provided for in paragraphs FF.34 and FF.38 herein. *See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (Docket No. 1731); *see also Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (Docket No. 1774); *see also Affidavits of Service* (Docket Nos. 1969, 2132, 2162); *see also Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; see also Affidavit of Service* (Docket No. 2314); *see also Affidavit of Service* (Docket No. 2417) . All non-debtor parties to the Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an executory contract or lease and was listed on the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* or *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction*) have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Assumption and Assignment Notice and, for Assigned Agreements other than Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts), to the assumption and

assignment of the Assigned Agreements to the Buyer in accordance with the Bidding Procedures Order.



R.    **Satisfaction of Section 363(f) Standards**.  Except as expressly provided for in this Sale Order, the Debtors may sell the Acquired Assets that are owned by the Debtors free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever against any of the Debtors or the Acquired Assets owned by them, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors, any claims under, or trusts or liens created by, PACA,[9] and any derivative, vicarious, transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United

---

[9]    "PACA" means The Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§499a, et seq.) or the Packers and Stockyards Act (7 U.S.C. §§181 et seq.) or any similar state laws.

States, any state, territory, or possession thereof or the District of Columbia), whether arising prior

to or subsequent to the commencement of these chapter 11 cases, whether known or unknown,

contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled

or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed,

recorded or unrecorded, contingent or non-contingent, material or non-material statutory or non-

statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or

otherwise arising under or out of, in connection with, or in any way related to any of the Debtors,

any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses

before the effective time of the Closing and for each Assigned Agreement (subject to the payment

of Cure Costs as required under section 365(b) of the Bankruptcy Code), the applicable

Assumption Effective Date, pursuant to the Asset Purchase Agreement, or the transfer of any of

the Debtors' interests in the Acquired Assets to the Buyer, and all Excluded Liabilities;

(collectively, excluding any Assumed Liabilities, the "Claims"), because, in each case, one or more

of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied;

provided, however, that, nothing herein shall be deemed, or construed as, a ruling or determination

by this Court that the Assumed Liabilities encumber the Acquired Assets.  Without limiting the

generality of the foregoing, "Claims" shall include any and all liabilities or obligations whatsoever

arising under or out of, in connection with, or in any way relating to: (1) any of the employee

benefit plans, including any Claims related to unpaid contributions or current or potential

withdrawal or termination liability; (2) any of the Debtors' collective bargaining agreements; (3)

the Worker Adjustment and Retraining Notification Act of 1988; and (4) any of the Debtors'

current and former employees.  Those holders of Claims who did not timely object (or who

ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed



to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors. All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against the Buyer or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.

S.      The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Acquired Assets that are owned by the Debtors was not free and clear of all Claims, if the Buyer would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities related to the Business that will not be assumed by the Buyer, as described in the Asset Purchase Agreement, or if the Credit Bid Release or the Credit Bid were not components of the Sale Transaction. A sale of the Acquired Assets owned by the Debtors other than one free and clear of all Claims would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

T.      The total consideration to be provided under the Asset Purchase Agreement reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the

Bankruptcy Code, with title to and possession of the Acquired Assets owned by the Debtors free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

U.     As of the Closing, the transfer of the Acquired Assets of the Debtors to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Buyer with all rights, title and interest of the Debtors in, and to, the Acquired Assets, free and clear of all Claims.

V.     **Assumption and Assignment of Assigned Agreements**.   The assumption and assignment of the Assigned Agreements are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Debtors' sound business judgment.   Specifically, the assumption and assignment of the Assigned Agreements (i) is necessary to sell the Acquired Assets to the Buyer, (ii) allows the Debtors to sell their business to the Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assigned Agreements, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Agreements.

W.     **Validity of the Transfer**.   As of the Closing, the transfer of the Acquired Assets to the Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims against the Debtors.   The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and

19



all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

X.      **Corporate Power and Authority.**  The Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate or other action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) upon entry of this Sale Order, other than as set forth in the Asset Purchase Agreement (including, without limitation, with respect to antitrust matters), need no consent or approval from any other person to consummate the Sale Transaction.

Y.      **Valid and Binding Contract.**  The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms. The Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia. None of the Debtors nor the Buyer is, or will be, entering into the Asset Purchase Agreement and transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose.  The Asset Purchase Agreement and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without

posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

Z.    The Sale Transaction does not constitute a *de facto* plan of reorganization or liquidation as it does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors; (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests or extend debt maturities. Entry into the Asset Purchase Agreement and the Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan for the Debtors. Entry into the Asset Purchase Agreement does not constitute a *sub rosa* chapter 11 plan.

AA.    **Valid and Binding Release**. The proposed compromise and resolution embodied in the Credit Bid Release (as defined below and as reflected in Section 9.13 of the Asset Purchase Agreement) is reasonable and appropriate and a valid exercise of the Debtors' business judgment, and the consideration provided for in the Asset Purchase Agreement, including the Credit Bid Release Consideration and other good and valuable consideration provided to the Debtors and their Estates in connection with the Sale Transaction, constitutes fair and appropriate consideration for the Credit Bid Release. The Credit Bid Release is required by the Buyer in order to enter into and perform in accordance with the Sale Transaction and providing such release is in the best interests of the Debtors, their estates, creditors and other parties in interest. The Claims and causes of action released through the Credit Bid Release are complex and in the absence of the release would involve extended and expensive litigation, the outcome of which would be uncertain.

BB.    **Debtor Authorization of Non-Debtor Subsidiary Action or Inaction.** The proposed Sale Transaction requires certain of the Debtors to take certain actions with respect to Sears Re, KCD IP, LLC, and the other Foreign Subsidiaries. As further described in the Asset Purchase Agreement, the Sale Transaction contemplates the purchase of the KCD Notes effective upon receipt of the consent of the Bermuda Monetary Authority or any other applicable Bermuda regulatory authority, to authorize the sale of the KCD Notes to Buyer (the "KCD Notes Purchase"). The Asset Purchase Agreement includes other conditions with respect to the KCD Notes that have been satisfied. First, Sears Re has agreed to be bound by the terms of the Asset Purchase Agreement prior to the deadline described therein. Additionally, as further described in Section 9.14 of the Asset Purchase Agreement, and to the extent provided for in and in accordance with the Asset Purchase Agreement, the Sale Transaction contemplates certain restrictions upon Sellers' and their Affiliates' (including KCD IP, LLC's) ability to sell, transfer, assign, encumber, license, sublicense or otherwise grant certain rights or take or fail to take certain actions related to the KCD IP or to amend, terminate, renew, or fail to take certain actions with respect to, certain Contracts related to the KCD IP (the "KCD IP Restrictions"). In accordance with Section 9.14 of the Asset Purchase Agreement, Sellers caused KCD IP, LLC to agree to grant, effective as of the Closing, the Exclusive License (the "KCD Exclusive License Right"). The terms of the KCD Exclusive License Right shall be set forth in an exclusive license agreement, which agreement shall be executed contemporaneous with the Closing. Prior to such time that the BMA Consent is obtained and pursuant to the Services Agreement, the Buyer shall provide services to the Sellers sufficient to perform the PA Liabilities in exchange for which the Sellers shall pay certain consideration to the Buyer (the "KCD Servicing Right"). Pursuant to Section 9.14 of the Asset Purchase Agreement, the Debtors have agreed to certain restrictions on Sellers' and their Affiliates ability

to sell, assign, or transfer in any way any equity interests in KCD IP, LLC without requiring a condition that the purchaser in such sale, assignment or transfer agrees to the limitations set forth in Section 9.14 therein (the "KCD Equity Transfer Restriction Right" and together with the KCD IP Restrictions, and the KCD Exclusive License Right, the "KCD IP Related Rights").  The Sellers' obligation to transfer the KCD Notes and the Buyer's obligation to assume the PA liabilities is dependent upon obtaining the BMA Consent.  Furthermore, the Sellers have agreed to use reasonable best efforts to cause each of the Foreign Subsidiaries to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered to the Buyer or the applicable Assignee, all right, title and interest of each of the Foreign Subsidiaries in, to or under the Acquired Foreign Assets, and, in certain circumstances, the Buyer may acquire all of the equity interests in any Foreign Subsidiary and minority equity interests held by non-U.S. Persons or Subsidiaries holding such minority equity interests (the "Foreign Assets Rights") as provided in the Asset Purchase Agreement.  Each of the KCD Notes Purchase, the KCD IP Related Rights and the Foreign Assets Rights are required by Buyer and are reasonable and appropriate exercises of the Debtors' business judgment and the consideration provided by the Buyer (including the assumption of the Assumed Liabilities) constitutes fair and appropriate consideration to the Debtors and the non-Debtor Sellers.

CC.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Buyer intend to close the Sale Transaction as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction.  In

contemplated by the Asset Purchase Agreement. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to this Sale Order, except with respect to adjourned matters.

DD.    **Personally Identifiable Information**. As contemplated in the Bidding Procedures Order, and subject to the terms of this Sale Order, the sale to the Buyer under the Asset Purchase Agreement of any personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) and private health information about individuals is either consistent with the privacy policy of the Debtors in effect on the date of commencement of these chapter 11 cases or consistent with the recommendations of the Consumer Privacy Ombudsman appointed in these chapter 11 cases, as may be modified by agreement of the Parties and the Consumer Privacy Ombudsman, and satisfies the requirements of section 363(b)(1)(A).

EE.    **Legal and Factual Bases**. The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

FF.    **Necessity of Order.** The Buyer would not consummate the transactions absent the relief provided for in this Sale Order.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    **Motion is Granted**. The Sale Motion and the relief requested therein to the extent not previously granted by this Court pursuant to the Bidding Procedures Order is granted and approved solely to the extent set forth herein.

2.    **Findings of Fact and Conclusions**. The Court's findings of fact and conclusions of law in the Bidding Procedures Order and the record of the hearing with respect to the Bidding Procedures Order are incorporated herein by reference.





3.    **Objections Overruled**.  All objections, to the Sale Motion or the relief requested therein, and any joinders thereto, that have not been withdrawn with prejudice, waived, settled, or otherwise resolved as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice; provided that the objections filed to the proposed Cure Costs for the Contracts and Leases on the Initial Assigned Agreements list attached hereto as <u>Exhibit A</u> are preserved and will be treated in accordance with paragraph 29 of this Sale Order; provided further that: (i) all timely filed objections to the assumption and assignment of a Contract or Lease that is not an Initial Assigned Agreement, including, without limitation, as to adequate assurance of future performance and to the payment of all amounts due and owing and performance of all other obligations under a Contract or Lease, but not as to any other objections to approval of the Sale Transaction itself pursuant to section 363 of the Bankruptcy Code, are adjourned and all parties' rights as to such issues are fully preserved and will be determined if and to the extent the applicable Contract or Lease is designated for assumption and assignment pursuant to the procedures described in this Sale Order; (ii) no finding of fact or conclusion of law set forth herein with respect to the assumption and assignment of the Initial Assigned Agreements shall apply, be binding upon, be law of the case, or operate to collaterally estop any issue, with respect to the assumption and assignment of any other Contract or Lease, other than with respect to the Initial Assigned Agreements; (iii) no Contract or Lease with a Debtor other than the Initial Assigned Agreements as set forth in <u>Exhibit A</u> shall be part of the Acquired Assets unless and until assumption and assignment of such Contract or Lease is approved in accordance with the procedures in this Sale Order; (iv) notwithstanding anything to the contrary herein, including, without limitation, paragraphs M, R, FF, 27, and 28, nothing in this Sale Order shall be a determination of the terms

and conditions of the assumption and assignment of any Contract or Lease not on Exhibit A, including, without limitation, the Assignee's obligations in connection with the same; and (v) notwithstanding anything herein or in the Asset Purchase Agreement or any related document to the contrary, all parties' rights are fully reserved with respect to (x) all issues relating to the Buyer's, any other Assignee's and/or the Debtors' obligations to comply with all terms, conditions, covenants and obligations, whether related to the pre- or post-assignment period and (y) the issues set forth in clauses (a) and (b) of paragraph 59 of this Order (the "Reserved Lease Issues"). All holders of Claims or other persons and entities (including any counterparties to Initial Assigned Agreements identified on Exhibit A hereto) that failed to timely object, or withdrew their objections to the Sale Motion, the Sale Transaction, or this Sale Order are deemed to consent to the relief granted herein for all purposes, including pursuant to section 363(f)(2) of the Bankruptcy Code, except to the extent that the procedures described herein provide otherwise. Each holder of any Claim against the Debtors, their estates, or any of the Acquired Assets owned by the Debtors: (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction; (ii) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such Claim; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.



4.    **Notice**. Notice of the Sale Motion and the Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the Amended Case Management Order, and the Bidding Procedures Order.

5.    **Fair Purchase Price**.    The consideration provided by the Buyer under the Asset Purchase Agreement, including the portion of the Purchase Price that is the Credit Bid

Amount, the Credit Bid Release Consideration, and the Buyout Option is fair and reasonable and

constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent

Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii)

reasonably equivalent value, fair consideration and fair value under any other applicable laws of

the United States, any state, territory or possession or the District of Columbia.  The Credit Bid

constitutes a valid, duly authorized credit bid and is proper under the Bidding Procedures Order,

sections 363(b) and 363(k) of the Bankruptcy Code, the applicable Prepetition Loan Documents

(as defined in the Final DIP Order) and applicable law.  The consideration given by the Buyer shall

constitute valid and valuable consideration for the Credit Bid Release.



6.    **Approval of the Asset Purchase Agreement**.  Except as expressly provided herein

with respect to the assumption and assignment of contracts and leases (other than Initial Assigned

Agreements), the Asset Purchase Agreement, all ancillary documents filed therewith or described

therein, the Credit Bid and all other transactions contemplated therein (including, but not limited

to, all ancillary agreements contemplated thereby) and all of the terms and conditions thereof,

including, without limitation, the Credit Bid pursuant to section 363(k) of the Bankruptcy Code of

the Credit Bid Amount, are hereby approved.  The failure specifically to include any particular

provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the

effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement

(including, but not limited to, all ancillary agreements and Related Agreements contemplated

thereby) be authorized and approved in its entirety, except as provided herein.



7.      **Approval of the Credit Bid Release**.  As set forth in Section 9.13 of the Asset
Purchase Agreement:

(a)      Effective upon the Closing, in consideration for the payment by
Buyer of the Credit Bid Release Consideration, and other good and valuable consideration
provided to the Debtors and their estates by ESL in connection with the Transactions, each Debtor,
for itself and its estate, and on behalf of each of its Subsidiaries and controlled Affiliates (each of
the foregoing, a "Seller Releasing Party" and together, the "Seller Releasing Parties"), hereby
absolutely, unconditionally and irrevocably: (i) releases and forever discharges ESL from any and
all Released Estate Claims, whether foreseen or unforeseen, contingent or actual, and whether now
known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may
have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid,
challenge, dispute or collaterally attack the ESL Claims; provided, however, that the assertion of
any Claim other than a Released Estate Claim shall not be deemed to violate Section 9.13(a)(ii) of
the Asset Purchase Agreement.

(b)      Effective upon the Closing, the ESL Claims against the Debtors
shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy
Code in the amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the
credit bid set forth in Section 3.1(b) of the Asset Purchase Agreement.

(c)      After giving effect to the credit bid set forth in Section 3.1(b) of the
Asset Purchase Agreement, ESL shall be entitled to assert any deficiency Claims, Claims arising
under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may
have against the Debtors and their estates in the Chapter 11 Cases, provided that: (i) no Claims or
causes of action of ESL shall have recourse to, or any other right of recovery from, any Claims or

28



causes of action of the Debtors or their estates related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or cause of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing; (ii) any ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the Claims and causes of action described in the preceding clause (c)(i); provided that, in the event that, in the absence of this clause (c)(ii), any such proceeds to the Debtors or their estates would have resulted in distributions in respect of such ESL Claims in excess of $50 million, the right, on account of the ESL Claims, to receive such distributions in excess of $50 million shall be treated as an unsecured claim and receive pro rata recoveries with general unsecured claims other than the Claims and causes of action described in the preceding clause (c)(i); and (iii) notwithstanding any order of the Bankruptcy Court to the contrary or section 1129 of the Bankruptcy Code, it shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part.

(d)    Section 9.13 of the Asset Purchase Agreement, and all statements or negotiations relating hereto, shall be governed by Federal Rule of Evidence 408 and any corresponding state rules of evidence.  Without limiting the foregoing, neither Section 9.13 of the Asset Purchase Agreement nor any statements or negotiations relating hereto shall be offered or



received in evidence in any proceeding for any purpose other than to enforce the terms of Section 9.13.

(e)     The release set forth in Section 9.13 of the Asset Purchase Agreement and in paragraphs 7(a)-(d) hereof shall be referred to herein as the "Credit Bid Release". The Credit Bid Release is hereby approved in its entirety, and the Credit Bid Release Consideration and the other consideration provided by Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration for the Credit Bid Release. The Seller Releasing Parties and ESL are authorized and directed to perform under the Credit Bid Release pursuant to its terms and to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising under the Credit Bid Release.

8.     **Approval of Cyrus Release**. Effective upon the Closing, each Seller Releasing Party, hereby absolutely, unconditionally and irrevocably: (i) releases and forever discharges the Cyrus Related Parties from any and all Released Cyrus Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge dispute or collaterally attack the Cyrus Claims. "Released Cyrus Claims" shall mean any and all Claims and causes of action of the Debtors and their estates against the Cyrus Related Parties arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code; (ii) equitable principles of subordination or recharacterization; or (iii) any other applicable Law that could be asserted to challenge the allowance of the Cyrus Claims. Effective upon the Closing, the Cyrus Claims against the Debtors shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code, as reduced by any

amounts included in the Credit Bid.  After giving effect to the Credit Bid, the Cyrus Related Parties

shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the

Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and

their estates in the Chapter 11 Cases, subject to any defenses of the Debtors to any such claims

that might be asserted by Cyrus or any claims of the Debtors against Cyrus, including in connection

with any claims or causes of action relating to the medium term notes matters that are the subject

of Rule 2004 examination by the Debtors and the Creditors' Committee.  All such claims of the

Debtors and their estates are fully preserved (other than the Released Cyrus Claims).  For the

avoidance of doubt, the Cyrus Release shall be no broader than the Credit Bid Release set forth in

paragraph 7(a) of this Sale Order.  The release set forth in this paragraph shall be referred to herein

as the "Cyrus Release".  The Cyrus Release is hereby approved in its entirety and the consideration

provided by the Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration

for the Cyrus Release.  The Seller Releasing Parties and the Cyrus Related Parties are authorized

and directed to perform under the Cyrus Release pursuant to its terms and to take any and all

actions, including, without limitation, execution and delivery of any documents or papers as may

be reasonably necessary to perform or appropriate to implement their obligations arising under

Cyrus Release.

9.    **Discharge of Credit Bid Claims**.  Upon the Closing Date, the portion of the ESL

Claims and the Cyrus Claims that is used as part of the Credit Bid shall be deemed discharged

against the Debtors and satisfied in full.  For the avoidance of doubt, the ESL Claims and the Cyrus

Claims shall remain outstanding against the Debtors and their estates with respect to all amounts

other than the amount that is Credit Bid in accordance with Section 3.1(b) of the Asset Purchase

Agreement.

10.    **Approval of Debtor Authorization of Non-Debtor Subsidiary Action or Inaction**.  The Debtors are authorized and directed to perform their obligations in accordance with the Asset Purchase Agreement, their obligations with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets Rights, including to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets Rights.  The Debtors are hereby authorized in accordance with section 105(a) of the Bankruptcy Code, to cause KCD IP, LLC to execute and deliver to Buyer, such documents or other instruments as may be necessary to license the KCD IP to the Buyer as provided in the Asset Purchase Agreement, subject in all respects to KCD's compliance with the terms of the KCD Prepetition Agreements and the KCD Indenture.  Notwithstanding anything provided for herein, nothing in this Order authorizes the assumption or assignment of any prepetition license agreements between KCD and any of the Sellers, as well as any agreements between KCD and Sears Holdings Management Corporation and/or Sears Brands Business Unit Corporation, or the Trademark Security Agreement between KCD and U.S. Bank, National Association ("KCD Indenture Trustee") (such agreements, collectively, the "KCD Prepetition Agreements").  In the event the Debtors seek to assume or assign any or all of the KCD Prepetition Agreements in the future, such assumption or assignment may only be approved on not less than ten (10) days' notice to the KCD Indenture Trustee, Pension Benefit Guaranty Corporation, and all parties to such KCD Pre-Petition Agreements (as the case may be), and an opportunity for the KCD Indenture Trustee and such parties to object to any such assumption and assignment and any proposed cure amounts.  Furthermore, nothing in this Order in any way abridges, waives or modifies the rights of the KCD Indenture Trustee under or in

connection the KCD Indenture or the collateral provided thereunder or under the KCD Pre-Petition Agreements. This Order is without prejudice to, and does not alter or amend the KCD Indenture Trustee's rights or ability to take any action consistent with its duties or obligations arising under the KCD Indenture or under the KCD Pre-Petition Agreements, and all such rights are expressly preserved. Further, nothing in this Order shall prejudice or impact the rights of the holders of the KCD Notes to exercise any rights they may have under the KCD Indenture, including without limitation their right to direct the KCD Indenture Trustee.

11. **Consummation of Sale Transaction**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the Asset Purchase Agreement and the Related Agreements and to close and consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, the Related Agreements, and this Sale Order.

(a) Approval of Conversion of Subsidiaries. As set forth in Section 9.2(a) of the Asset Purchase Agreement, the Debtors are required (subject to certain qualifications and exceptions) to take actions as instructed by Buyer in order to secure and preserve the qualifications of certain of the transactions contemplated by the Asset Purchase Agreement as reorganizations for U.S. federal income tax purposes in connection with which Buyer bears responsibility for any consequential tax or costs. In accordance with such instructions, the Debtors may be directed to convert any of the corporate subsidiaries of Sears Holding Corporation into limited liability companies whether on or before the Closing Date of the Asset Purchase

33

Agreement or anytime afterwards. The Debtors are hereby authorized to convert any such corporate subsidiaries of Sears Holding Corporation to limited liability companies as directed by Buyer in accordance with Section 9.2(a) of the Asset Purchase Agreement.

(b) Approval of the Steps Described in Schedule 9.2. As set forth in Section 9.2(a) of the Asset Purchase Agreement, the Debtors are required (subject to certain qualifications and exceptions) to take actions as instructed by Buyer in order to secure and preserve the qualifications of certain of the transactions contemplated by the Asset Purchase Agreement as reorganizations for U.S. federal income tax purposes in connection with which Buyer bears responsibility for any consequential tax or costs. In accordance with such instructions, the Debtors are required to take the steps described in Schedule 9.2 of the Asset Purchase Agreement as soon as practicable after the Closing. The Debtors are hereby authorized to take the steps described in Schedule 9.2 of the Asset Purchase Agreement.

12. The Debtors, their affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be necessary or desirable to implement the Asset Purchase Agreement and Related Agreements, including the transfer and the assignment of all the Acquired Assets, and the assumption and assignment of all the Assigned Agreements, and to take all further actions as may be (i) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to the Buyer's possession, the Acquired Assets or (ii) necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement or to implement the Sale Transaction, including pursuant to this Sale Order, all without further order of the Court.



34

13.     All Persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Buyer as of the Closing or at such later time as the Buyer reasonably requests.  To the extent required by the Asset Purchase Agreement, the Debtors agree to exercise commercially reasonable efforts to assist the Buyer in assuring that all Persons that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtors before the Closing Date or (ii) the Buyer on or after the Closing Date.

14.     All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets owned by the Debtors to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; provided that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

15.     Each Assignee has provided or will provide, as applicable, adequate assurance of future performance of and under the Initial Assigned Agreements, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

16.     **Direction to Creditors and Parties in Interest**.  On the Closing, each of the Debtors' creditors and the holders of any Claims are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims in the Acquired Assets, if any, as such Claims may otherwise exist.

17.     **Direction to Government Agencies**.  Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or

35

instruments or who may be required to report or insure any title in or to the Acquired Assets, is

hereby authorized and directed to accept any and all documents and instruments necessary and

appropriate to consummate the Sale Transaction contemplated by the Asset Purchase Agreement

and approved by this Sale Order.  The Buyer and Seller are each authorized to designate a power

of attorney regarding the conveyance of properties in Puerto Rico for recording purposes which

properties may be described in such power of attorney including the following: (i) Fajardo:

Property registered at page 178 of volume 514 of Fajardo, Registry of Property of Puerto Rico,

property number 19,514; (ii) Guayama: Property registered at page 7 of volume 382 of Guayama,

Registry of Property of Puerto Rico, property number 13,562; and (iii) Río Piedras site 8975 is

composed of two properties: (x) property registered at page 221 of volume 466 of Monacillos,

Registry of Property of Puerto Rico San Juan V Section, property number 17,328, and (y) property

registered at page 181 of volume 302 of Río Piedras, Registry of the Property of Puerto Rico San

Juan V Section, property 9,717.

18.    **Assumption of Protection Agreement Obligations**.    Pursuant to and in

accordance with Section 2.3(e) of the Asset Purchase Agreement, the Buyer has expressly assumed

Sellers' obligations (the "Assumed Protection Agreement Obligations") with respect to warranties

and protection agreements or other services contracts (other than warranties relating to Intellectual

Property) for the goods and services of Sellers sold or performed prior to the Closing, including

any obligations owed by Sears Re to any Seller in respect of reinsurance of such warranties and

protection agreements (collectively, the "Assumed Protection Agreements").  To the fullest extent

permitted by applicable law, the Buyer is authorized to  operate in place of the Sellers with respect

to the Assumed Protection Agreements and to take any actions contemplated to be taken by the

Sellers thereunder, including collecting any amounts payable by any counterparty to any such

Assumed Protection Agreement and performing the Assumed Protection Agreement Obligations. The Court hereby orders that the Sellers and all other parties in interest shall cooperate in respect of Buyer's operation in place of the Sellers under the Assumed Protection Agreements, including, without limitation, by furnishing such documents or records as are necessary to the Buyer to perform the Assumed Protection Agreement Obligations without interruption. Moreover, except for good cause based on violations of Law unrelated to the assumption by the Buyer of the Assumed Protection Agreement Obligations occurring pursuant to the Asset Purchase Agreement and this Sale Order, no regulatory agency (including, without limitation, any state insurance regulator) shall interrupt Buyer's performance of the Assumed Protection Agreement Obligations from and after the Closing Date without first obtaining relief from this Court. The Buyer may continue to perform the Assumed Protection Agreement Obligations under any existing licenses or permits of the Sellers, with no interruption of the right of the Buyer to so perform, until any required licenses and permits have been transferred to the Buyer by Sellers, or new licenses and permits have been issued to the Buyer.

19. **Transfer of the Acquired Assets Free and Clear**. Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets owned by the Debtors, including, without limitation, Designated Agreements (as defined below) in accordance with the terms of the Asset Purchase Agreement and this Sale Order. The Acquired Assets shall be transferred to the Buyer in accordance with the terms of the Asset Purchase Agreement and this Sale Order, and upon the Closing, such transfer shall: (i) be valid, legal, binding and effective; (ii) vest the Buyer with all right, title and interest of the Debtors in the Acquired Assets; and (iii) be free and clear of all Claims against the Debtors and the Acquired Assets owned by the Debtors (including Claims of any Governmental Authority) in accordance

37

with section 363(f) of the Bankruptcy Code, with the net proceeds of the Sale Transaction from

the Acquired Assets upon which the DIP ABL Lenders (as defined in the Final DIP Order) have a

first lien being used to repay in full in cash all DIP ABL Secured Obligations (as defined in the

Final DIP Order) on the Closing and all other Claims (including, without limitation, contingent

indemnification obligations) that represent interests in property shall attach to the net proceeds of

the Sale Transaction, in the same order of their priority and with the same validity, force and effect

which they now have against the Acquired Assets, subject to any claims and defenses the Debtors

may possess with respect thereto, in each case immediately before the Closing.  The cash portion

of the Purchase Price, to the extent payable, that is paid in connection with a Buyout Option shall

be deposited and held in segregated accounts in accordance with Section 3.1 of the Asset Purchase

Agreement with the Liens of any lenders other than Buyer or Affiliates attaching to the cash

proceeds held in the applicable designated segregated account in the same order of priority and

with the same validity, force and effect as the original Liens of such lenders, and such proceeds

shall be released to such lenders within two (2) business days following the Closing Date and shall

not otherwise be used by the Debtors without further order of the Bankruptcy Court.

Notwithstanding anything to the contrary herein or in the Asset Purchase Agreement, nothing in

this Order shall approve the sale or transfer of any Acquired Assets of non-Debtors free and clear

of Claims pursuant to section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing or

any other provision of this Sale Order or the Asset Purchase Agreement to the contrary, the transfer

of the Acquired Assets to the Buyer shall not be free and clear of, and shall not impair in any respect,

any (A) setoff or recoupment rights or other affirmative defenses to payment held by either: (1) any

party to an Initial Assigned Agreement (other than the Debtors), including, without limitation,

Cross Country Home Service, Inc., that timely filed an objection preserving such right or defense,



pursuant to the terms of such Assigned Agreements and applicable law, including without limitation any valid return and credit rights under such Assigned Agreements; (2) any party to an Assigned Agreement (other than the Debtors) that is not an Initial Assigned Agreement on Exhibit A that filed a timely objection preserving such right or defense, including, without limitation, the Amazon entities listed in the exhibits to the objection filed as Docket No. 1986 (collectively, "Amazon"), Cardinal Health 110, LLC ("CH 110"), Cardinal Health 112, LLC ("CH 112"), and Cardinal Health PR 120, Inc. ("CH PR 120," and together with CH 110 and CH 112, collectively hereinafter "Cardinal Health"), LG Electronics USA, Inc. ("LGEUS") and LG Electronics Alabama, Inc.(collectively with LGEUS and each individually, "LG") and Valvoline LLC, pursuant to the terms of such Assigned Agreements, (I) the Alliance Agreement (as defined in Limited Objection And Reservation of Rights Of LG Electronics USA, Inc. And LG Electronics Alabama, Inc. To The Global Asset Sale Transaction; Notice of Cure Costs and Potential Assumption And Assignment of Executory Contracts And Unexpired Leases in Connection With Global Sale Transaction; and Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transactions, Docket No. 2079 (the "LG Limited Objection and Reservation of Rights")), (II) the Kenmore Supply Agreement and MSA, as defined in the LG Limited Objection and Reservation of Rights, and (III) all other contracts giving rise to the Acquired Receivables, and/or (IV) applicable law, including without limitation, any valid return and credit rights; all amounts owing under the MSA; all rebates; credits; allowances; credit memos; and accruals under such Assigned Agreements and the other foregoing agreements, and the applicable non-Debtor counterparty shall subsequently provide a notice setting forth the monetary amount of rights of recoupment and setoff believed to be currently outstanding as of the time of receipt of the applicable



Designated Lease Notice or Designated Additional Contract Notice to counsel for the Debtors and the Buyer on or before eight (8) days after such non-Debtor counterparty's and such counterparty's counsel's (if known) receipt of the applicable Designated Lease Notice or Designated Additional Contract Notice (with any disputes over such amount resolved as provided in paragraph 35 of this Sale Order), or (3) any party that filed a timely objection and is an obligor on any Acquired Receivables, including, without limitation, Amazon, Cardinal Health, LG and Valvoline LLC, pursuant to the terms of the contracts giving rise to such Acquired Receivables and/or applicable law, whether or not such contracts are being assumed and assigned by the Debtors to the Buyer, including without limitation, any valid return, refund and credit rights; all amounts owing under the MSA; allowances; rebates; credits; credit memos; and accruals under such contracts, and (B) rights of LGEUS to directly sell Sears Branded Products Safety Stock (as defined in the Kenmore Supply Agreement) and/or Finished Goods (as defined in the Kenmore Supply Agreement) in accordance with ¶8.C.ii and ¶8.F of the Kenmore Supply Agreement (as defined in the LG Limited Objection and Reservation of Rights), including, without limitation, the obligations and restrictions imposed on LGEUS thereunder. Notwithstanding the foregoing, with respect to those tenants and subtenants that filed an objection to the sale, all rights are reserved with respect to (i) all tenants' or subtenants' rights to assert validly enforceable rights under section 365(h) or Section 363(e) of the Bankruptcy Code and applicable agreements and state law and objections to the ability of the Debtors to assume and assign leases or sell real property free and clear of tenants' or subtenants' interests under Section 363(f) of the Bankruptcy Code (and Debtors' or Buyers' rights to contest such rights) and (ii) the Debtors' rights to assume or reject a lease or sublease where the Debtor is the landlord or sub-landlord and all tenants' or subtenants' objections to the same, including, without limitation, objections to the assumption and assignment of leases or the sale of



real property free and clear of tenants' or subtenants' rights and interests, whether under section

363(f) of the Bankruptcy Code or otherwise.  In the event that the parties are unable to resolve the

issues in the pending objections, these issues will be set for hearing on a mutually convenient date

after closing.  Notwithstanding anything in this Sale Order or otherwise to the contrary, any

Acquired Assets or Designatable Leases that are subject to or encumbered by a lease or sublease

held by a tenant or subtenant as applicable, remains subject to or encumbered by such lease or

sublease on and after the Closing, subject to a further hearing on a date to be determined or an

agreed upon resolution by such tenant or subtenant, the Debtors, and Buyer.

20.     This Sale Order: (i) shall be effective as a determination that, as of the Closing, all

Claims against the Debtors have been unconditionally released, discharged and terminated as to

the Acquired Assets, and that the conveyances and transfers described herein have been effected;

and (ii) is and shall be binding upon and govern the acts of all persons, including all filing agents,

filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental departments, secretaries of state, federal, state,

county and local officials and all other persons who may be required by operation of law, the duties

of their office, or contract, to accept, file, register or otherwise record or release any documents or

instruments that reflect that the Buyer is the assignee and owner of the Acquired Assets free and

clear of all Claims, or who may be required to report or insure any title or state of title in or to any

lease (all such entities being referred to as "Recording Officers").  All Recording Officers are

authorized and specifically directed to strike recorded Claims against the Acquired Assets owned

by the Debtors recorded prior to the date of this Sale Order.  A certified copy of this Sale Order

may be filed with the appropriate Recording Officers to evidence cancellation of any recorded

Claims against the Acquired Assets recorded prior to the date of this Sale Order.  All Recording

Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

21.    Following the Closing, no holder of any Claim against the Debtors or their estates shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in these chapter 11 cases.

22.    Except as expressly set forth herein or in the Asset Purchase Agreement, the Buyer Related Parties and their successors and assigns shall have no liability for any Claim against the Debtors or the Debtors' estates or Excluded Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Employee Plans and any participation or other agreements related to the Employee Plans, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to: (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act

of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the

Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and

Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the

Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act

of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local

discrimination laws; (L) state and local unemployment compensation laws or any other similar

state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal

employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules

relating to, wages, benefits, employment or termination of employment with any or all Debtors or

any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or

federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without

limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act,

42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws;

(T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation,

the Internal Revenue Code of 1986, as amended; and (U) any common law doctrine of *de facto*

merger or successor or transferee liability, successor-in-interest liability theory or any other theory

of or related to successor liability.

23.    If any Person that has filed financing statements, mortgages, mechanic's liens, *lis*

*pendens* or other documents or agreements evidencing Claims against or in the Debtors or the

Acquired Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing,

in proper form for filing and executed by the appropriate parties, termination statements,

instruments of satisfaction, or, as appropriate, releases of all Claims (collectively, the "Release

Documents") the Person has with respect to the Debtors or the Acquired Assets or otherwise, then

with regard to the Acquired Assets that are purchased by the Buyer pursuant to the Asset Purchase

Agreement and this Sale Order: (i) the Debtors are hereby authorized and directed to, and the

Buyer is hereby authorized to, execute and file such statements, instruments, releases and other

documents on behalf of the person with respect to the Acquired Assets; (ii) the Buyer is hereby

authorized to file, register or otherwise record a certified copy of this Sale Order, which, once

filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all

Claims against the Acquired Assets; and (iii) the Buyer may seek in this Court or any other court

to compel appropriate persons to execute termination statements, instruments of satisfaction, and

releases of all Claims with respect to the Acquired Assets other than liabilities expressly assumed

under the Asset Purchase Agreement; provided that, notwithstanding anything in this Sale Order

or the Asset Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-

executing, and neither the Sellers nor Buyer shall be required to execute or file releases,

termination statements, assignments, consents, or other instruments in order to effectuate,

consummate, and implement the provisions of this Sale Order.  This Sale Order is deemed to be in

recordable form sufficient to be placed in the filing or recording system of each and every federal,

state, county or local government agency, department or office.

24.    On the Closing Date, and subject to the terms of this Sale Order, this Sale Order

shall be considered and constitute for any and all purposes a full and complete general assignment,

conveyance and transfer by the Debtors of the Acquired Assets acquired under the Asset Purchase

Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and

interest in all of the Debtors' right, title, and interest in and to the Acquired Assets to the Buyer.

25.    To the extent permitted by applicable Law and in accordance with the terms of the

Asset Purchase Agreement and the Related Agreements, during the Management Services Period,





the applicable Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective (the "Management Services"). Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, Buyer and its Affiliated Designees are appointed as agent of such Seller to manage, control and operate each of: (i) the Acquired Properties; (ii) Occupancy Leased Premises; and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties"). Pursuant to their appointment as Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion (in each case, subject to the terms and conditions of any applicable leases or Restrictive Covenants (as defined below)) and collect and retain all revenues generated by each Managed Property. All existing licenses or permits applicable to the business shall remain in place for the Buyer's or its Applicable Designee or its Applicable Designee benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures and, in furtherance thereof, the Management Services to be provided to the Buyer and its Affiliated Designees pursuant to Section 8.8(b) of the Asset Purchase Agreement are hereby approved in their entirety. Moreover, except for good cause based on violations of Law unrelated to the assumption by the Buyer and its Affiliated Designees of the existing licenses and permits applicable to the business occurring pursuant to the Asset Purchase Agreement and this Sale Order, no licensing or permitting authority or other regulatory agency shall interrupt Buyer's

or any Affiliated Designee's operation of the business from and after the Closing Date without

first obtaining relief from this Court.  To the extent that Buyer seeks to designate to any person

other than Buyer, including Buyer's Affiliates, prior written notice shall be provided to any

landlord of the applicable property.

    26.    **Transition Services**.

        (a)    Pursuant to the Asset Purchase Agreement, the Parties shall enter

into a Services Agreement on the Closing Date pursuant to which, effective as of the Closing Date,

Sellers shall provide to Buyer and Buyer shall provide to Sellers, as applicable, certain services

for a transitional period following the Closing Date.  The Buyer and the Sellers are hereby

authorized to execute and deliver any additional documentation as contemplated by the Asset

Purchase Agreement, and to perform all such other and further acts as may be required under or in

connection with the Services Agreement, including executing the Services Agreement and

performing and receiving services thereunder.  The Debtors shall serve a copy of the Services

Agreement upon all parties that provide services to the Debtors that are subject to the Services

Agreement within two (2) Business Days of execution.  A form of the Services Agreement (subject

to modification in advance of execution) has been filed with the Court and was summarized to the

Court at the Hearing. All such parties' rights are reserved, and if any such party raises an issue

with respect to the terms of the Services Agreement, which cannot be resolved by agreement of

the parties, such issue will be heard by the Court on an expedited basis.

        (b)    Pursuant to the Asset Purchase Agreement, the Parties shall execute,

effective as of the Closing Date, the Occupancy Agreement and the Seller Occupancy Agreement

pursuant to which Sellers shall provide Buyer and Buyer shall provide Sellers, as applicable, with

the right to occupy and operate certain of the Acquired Assets and the Designated Leases following

the Closing Date.  The Buyer and the Sellers are hereby authorized to enter into, execute and

deliver any additional documentation as contemplated by the Asset Purchase Agreement, with

respect to the Occupancy Agreement and the Seller Occupancy Agreement and to perform all such

other and further acts as may be required under or in connection with the Occupancy Agreement

and the Seller Occupancy Agreement.

           (c)      Notwithstanding any other provision of this Sale Order, if the

Debtors, after the Closing, remain the owners of any pharmacy scripts, prescription lists or any

Inventory (as defined in the Asset Purchase Agreement) consisting of prescription medication or

related pharmaceutical Inventory (the "Pharmacy Collateral") or any other Acquired Assets solely

to effect an orderly transition of such Acquired Assets to the Buyer (such Acquired Assets,

including any Pharmacy Collateral, the "Transition Assets"), including, without limitation, to

allow time to resolve regulatory or other legal issues, (i) such Transition Assets shall be free and

clear of any and all Claims in accordance with the terms of this Sale Order as if such Transition

Assets were transferred to the Buyer as of the Closing and (ii) the Debtors are hereby authorized

to grant to the agent (the "Transform ABL Agent"), for the benefit of itself, the lenders and the

other credit parties under the ABL Financing (as defined in the Asset Purchase Agreement)

(collectively, the "Transform Credit Parties"), continuing, valid, binding and non-avoidable,

automatically and properly perfected first priority liens on and security interests in the Transition

Assets to the same extent the Transform ABL Agent would have a lien in such Transition Assets

had ownership been transferred to the Buyer at Closing (the "Transition Liens") as security for the

full and prompt performance and payment when due (whether at stated maturity, by acceleration

or otherwise) of all obligations under the financing documents evidencing the ABL Financing (the

"Transform Financing Documents") and the Debtors shall honor the Transition Liens as if the

Debtors were parties to the Transform Financing Documents, and had granted the liens thereunder.

The Transition Liens granted by the Debtors shall be deemed automatically and properly perfected

valid and enforceable simultaneously with the occurrence of Closing pursuant to the terms of this

Sale Order without the necessity of the execution of security agreements, control agreements,

pledge agreements, financing statements, mortgages, schedules or other similar documents, or the

possession or control of the Transform Credit Parties of any Transition Assets.  The automatic stay

imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to (a) permit

the Debtors to grant the Transition Liens and (b) permit the Transform Credit Parties to take any

and all actions and exercise any and all remedies with respect to the Transition Liens as if such

liens were granted under the Transform Financing Documents; *provided, however*, that the Buyer

shall bear any costs incurred by the Debtors in connection with the Transition Liens, including

participating in or responding to any enforcement actions taken by the Transform Credit Parties

with respect to the Transition Assets or the Transition Liens.  Immediately upon transfer of any of

the Transition Assets to the Buyer, (i) the Transition Assets so transferred shall become subject in

all respects to the liens and security interests granted for the benefit of the Transform Credit Parties

under the Transform Financing Documents and (ii) the respective Transition Lien over the

applicable transferred Transition Assets shall terminate and be of no further force or effect against

the Debtors.  The Debtors and their successors and assigns are hereby prohibited from granting

any lien, mortgage, encumbrance or any other interest, other than the Transition Liens, on all or a

portion of the Transition Assets, and any lien, mortgage, encumbrance, or any other interest in

contravention of this paragraph, including any liens or claims related to adequate protection under

the Final DIP Order (as defined below), the Junior DIP Order or any other order of this Court, shall

be void *ab initio*.  The Court shall retain jurisdiction to enforce the Transition Liens and any

disputes among the Transform Credit Parties, the Debtors and/or the Buyer with respect to the Transition Liens.

(d)     Notwithstanding any other provision of this Sale Order, if the Debtors, after the Closing, remain the owners of any Acquired Assets that are collateral of the Real Estate Financing, solely to effect an orderly transition of such Acquired Assets to the Buyer (such Acquired Assets, the "Transition Real Estate Assets"), including, without limitation, to allow time to resolve regulatory or other legal issues, (i) such Transition Assets shall be free and clear of any and all Claims in accordance with the terms of this Sale Order as if such Transition Assets were transferred to the Buyer as of the Closing and (ii) the Debtors are hereby authorized to grant to the agent (the "Transform Real Estate Agent"), for the benefit of itself and the lenders under the Real Estate Financing (as defined in the Asset Purchase Agreement) (collectively, the "Transform Real Estate Credit Parties"), continuing, valid, binding and non-avoidable, automatically and properly perfected first priority liens on and security interests in the Transition Real Estate Assets to the same extent the Transform Real Estate Agent would have a lien in such Transition Real Estate Assets had ownership been transferred to the Buyer at Closing (the "Transition Real Estate Liens") as security for the full and prompt performance and payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations under the financing documents evidencing the Real Estate Financing (the "Transform Real Estate Financing Documents") and the Debtors shall honor the Transition Real Estate Liens as if the Debtors were parties to the Transform Real Estate Financing Documents, and had granted the liens thereunder.  The Transition Real Estate Liens granted by the Debtors shall be deemed automatically and properly perfected and valid and enforceable simultaneously with the occurrence of Closing pursuant to the terms of this Sale Order without the necessity of the execution of security agreements, control agreements, pledge



49

agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Credit Parties of any Transition Assets. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to (a) permit the Debtors to grant the Transition Real Estate Liens and (b) permit the Transform Real Estate Credit Parties to take any and all actions and exercise any and all remedies with respect to the Transition Real Estate Liens as if such liens were granted under the Transform Real Estate Financing Documents; *provided, however*, that the Buyer shall bear any costs incurred by the Debtors in connection with participating in or responding to any enforcement actions taken by the Transform Real Estate Credit Parties with respect to the Transition Real Estate Assets or the Transition Real Estate Liens. Immediately upon transfer of any of the Transition Real Estate Assets to the Buyer, (i) the Transition Real Estate Assets so transferred shall become subject in all respects to the liens and security interests granted for the benefit of the Transform Real Estate Credit Parties under the Transform Real Estate Financing Documents and (ii) the respective Transition Real Estate Lien over the applicable transferred Transition Real Estate Assets shall terminate and be of no further force or effect against the Debtors. The Debtors and their successors and assigns are hereby prohibited from granting any lien, mortgage, encumbrance or any other interest, other than the Transition Real Estate Liens, on all or a portion of the Transition Real Estate Assets, and any lien, mortgage, encumbrance, or any other interest in contravention of this paragraph, including any liens or claims related to adequate protection under the Final DIP Order (as defined below), the Junior DIP Order or any other order of this Court, shall be void *ab initio*. The Court shall retain jurisdiction to enforce the Transition Real Estate Liens and any disputes among the Transform Real Estate Credit Parties, the Debtors and/or the Buyer with respect to the Transition Real Estate Liens.



(e)     Notwithstanding the foregoing, any liens granted under paragraphs 26(c) and (d), above, shall not include those unexpired leases of nonresidential real property where any lessor has consent rights over the granting of any such lien and/or the affected lease prohibits the granting of such lien but, in that event, shall include, and be limited to, the proceeds of the prospective disposition of those leases.

(f)     Any and all proceeds from the sale of Transition Assets, whenever arising, including all Pharmacy Receivables (as defined in the ABL Financing and the Transform Financing Documents) and Credit Card Receivables (collectively, the "Transition Proceeds") shall be treated as Acquired Assets and be free and clear of any and all liens and Claims in accordance with the terms of this Sale Order as if such Transition Proceeds were transferred to the Buyer as of the Closing, and shall automatically and without any further action become subject to the first priority liens and security interests of the Transform Credit Parties under the Transform Financing Documents pursuant to the terms of this Sale Order without the necessity of the execution of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Credit Parties of any Transition Proceeds.

(g)     Pursuant to the Asset Purchase Agreement, the Parties shall enter into an Employee Lease Agreement on the Closing Date pursuant to which, effective as of the Closing Date, Sellers shall provide to the Buyer the services of certain Business Employees for a transitional period.  The Buyer and the Sellers are hereby authorized to execute and deliver any additional documentation as contemplated by the Asset Purchase Agreement, and to perform all such other and further acts as may be required under or in connection with the Employee Lease



Agreement, including executing the Employee Lease Agreement and performing and receiving services thereunder.

27.    **No Successor or Other Derivative Liability**.  By virtue of the Sale Transaction, the Buyer Related Parties and their affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Buyer Related Parties have not assumed nor are they in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Assumed Liabilities. Except as expressly set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Acquired Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date; provided, however, that nothing herein shall



limit the liability or obligations of Buyer or any Assignee of a Contract or Lease with respect to the Reserved Lease Issues.

28.    **Assumption and Assignment of Assigned Agreements**. Subject to paragraph 29, and conditioned upon the occurrence of the Closing Date and paragraphs 33 to 43 with respect to Designatable Leases and Additional Contracts, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assigned Agreements to the Buyer free and clear of all Claims to the extent set forth in this Sale Order, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Agreements to the Buyer as provided in the Asset Purchase Agreement.  With respect to each of the Assigned Agreements, the Buyer, in accordance with the provisions of the Asset Purchase Agreement, has cured or will cure before the Closing Date or the Assumption Effective Date, or have provided adequate assurance of the prompt cure after the Closing of, any monetary default required to be cured with respect to the Assigned Agreements under section 365(b)(1) of the Bankruptcy Code, and the Buyer has provided adequate assurance of future performance under the Assigned Agreements in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the non-debtor counterparties to such Assigned Agreements.  Upon the applicable Assumption Effective Date with respect to an Assigned Agreement, the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such Assigned Agreement and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to breach of such Assigned Agreement occurring after such assumption and assignment to Buyer as provided in section 365(k).  Buyer acknowledges and agrees that from and after the applicable Assumption Effective Date with respect to an Assigned Agreement, subject to

and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each of such Assigned Agreement in its entirety, including any indemnification obligations expressly contained in such Assigned Agreement that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order. The assumption by the Debtors and assignment to the Buyer of any Assigned Agreement shall not be a default under such Assigned Agreement. In accordance with the terms of the Asset Purchase Agreement, with respect to liabilities from any Assumed 503(b)(9) Claims, Buyer shall not be obligated to make any payments in respect of such liabilities until the earlier of: (i) the date that is 120 days following the closing of the sale; and (ii) the date on which a chapter 11 plan is confirmed by the Court with respect to the Debtors; provided further in accordance with the terms of the Asset Purchase Agreement, that with respect to the liabilities from any Other Payables, Buyer shall not be obligated to make any payments in respect of such liabilities until the later of: (i) the Closing Date; and (ii) the date that the applicable obligation thereunder becomes due in the ordinary course of business; provided further, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Specified Payables, or any other administrative or priority claim of the Sellers pursuant to the terms of the Asset Purchase Agreement is a general unsecured contractual obligation of the Buyer owed solely to the Sellers.

29.    Provided that assumption of a Contract has been approved by the Bankruptcy Court, all Cure Costs that have not been waived by, or as to which an objection has been filed by, or that have not been otherwise addressed in an alternate arrangement with, any non-debtor party to an Assigned Agreement shall be: (i) paid in cash by the Buyers, on or before the Assumption Effective Date as to the undisputed amounts and (ii) reserved against the establishment of a cash reserve as to any disputed cure amounts by Buyer at least two (2) days after the Assumption Effective Date

(a "<u>Cure Cost Reserve</u>") and paid promptly upon resolution of any such disputed Cure

Cost; provided that to the extent a new agreement by and between the Buyer and the counterparty

to the applicable Assigned Agreement is entered into, such agreement shall provide for the Buyer's

payment of applicable Cure Costs in an amount agreed to by the Buyer and the counterparty, and

any such agreement shall require the counterparty's waiver of any and all prepetition claims against

the Debtors based on the Assigned Agreement, and any damage claims arising out of the rejection

of any such Assigned Agreement, and the Debtors shall have no liability therefor in accordance

with the terms of the Asset Purchase Agreement on the applicable Assumption Effective Date to

the extent provided in section 365(k) of the Bankruptcy Code.  Payment of Cure Costs as required

under section 365(b) of the Bankruptcy Code with respect to the Initial Assigned Agreements

identified on Exhibit A hereto (including the Citi Card Agreement (as defined below)), shall: (i)

be in full satisfaction and cure of any and all defaults under these Assigned Agreements, whether

monetary or non-monetary; and (ii) compensate the non-Debtor counterparty for any actual

pecuniary loss resulting from such defaults.  For the avoidance of doubt, and pursuant to Section

8.9 of the Asset Purchase Agreement, notwithstanding that certain Amended and Restated Master

Lease Agreement (the "<u>Sparrow Master Lease</u>"), dated as of March 14, 2018, by and between

certain of the Debtors, as lessee, and SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate

(TX), LLC, as lessors (collectively, the "<u>Sparrow Entities</u>") being designated an Initial Assigned

Agreement, the Buyer reserves all of its rights with respect to any rent that was due and owing to

the Sparrow Entities under the Sparrow Master Lease and that remains unpaid as of the Closing

Date, and the Debtors reserve all of their rights and objections with respect thereto.

30.    The Debtors served all counterparties to the Initial Assigned Agreements, identified

on Exhibit A hereto (including the Citi Card Agreement), with an Assumption and Assignment



Notice and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Buyer has passed. Accordingly, unless an objection to the proposed Cure Costs or Adequate Assurance Information with respect to the Buyer was filed and served before the applicable deadline, each non-Debtor party to an Initial Assigned Agreement is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

31.    Nothing in this Sale Order shall affect the rights of the Buyer, to the extent such rights are provided in the Asset Purchase Agreement, to add or remove any Potential Transferred Agreement to or from the list of Assigned Agreements set forth in the Asset Purchase Agreement in accordance with the terms thereof. All of the requirements of sections 365(b) and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, solely with respect to the Initial Assigned Agreements identified on Exhibit A hereto (including the Citi Card Agreement). The Buyer has satisfied its adequate assurance of future performance requirements with respect to the Initial Assigned Agreements identified on Exhibit A hereto (including the Citi Card Agreement) and in connection therewith has presented sufficient evidence regarding the Buyer's business plan and demonstrated it is sufficiently capitalized to comply with the necessary obligations under the Initial Assigned Agreements, identified on Exhibit A hereto (including the Citi Card Agreement). All objections to the Debtors', Buyer's or any other Assignee's adequate assurance of financial performance that were timely filed (other than adequate assurance objections that related to the Initial Assigned Agreements identified on Exhibit A hereto (including the Citi Card Agreement)





are fully reserved pending further hearing of this Court and nothing in this Sale Order shall limit such objections in any respect.

32.    To the extent a counterparty to an Assigned Agreement failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the Assumption and Assignment Notice and any such counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates.

33.    **Designation Rights Procedures**.  The Debtors are authorized, at the direction of the Buyer pursuant to the Asset Purchase Agreement, to seek to assume and to assign pursuant to sections 363 and 365 of the Bankruptcy Code, the Designatable Leases and any Additional Contracts that the Buyer designates for assumption and assignment in accordance with the Asset Purchase Agreement and this Sale Order including to a permitted Assignee, as applicable.  Each of the Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts) constitutes an unexpired lease or executory contract within the meaning of section 365 of the Bankruptcy Code and, at the Buyer's election, will be deemed assumed and assigned by the Debtors on the Assumption Effective Date subject to compliance with and the procedures set forth in the Asset Purchase Agreement and herein.[10]   The assumption of any liabilities under a Designatable Lease or such Additional Contracts that are assumed by an Assignee shall constitute a legal, valid and effective delegation of all liabilities thereunder to the applicable Assignee and, following payment of all amounts required to be paid by agreement of the parties or an order of the Court, and except as expressly set forth in the Asset Purchase

---

[10] In the case of any conflict between the provisions of the Asset Purchase Agreement and this Order, this Order shall govern.

Agreement or this Sale Order, shall divest the Debtors of all liability with respect to such Designatable Lease or Additional Contract for any breach of such Designatable Lease or Additional Contract occurring after the applicable Designation Assignment Date or any breach of such Additional Contract after the applicable date on which such Additional Contract is assigned to the applicable Assignee in accordance with Section 2.9 of the Asset Purchase Agreement, in each case, to the extent provided in section 365(k) of the Bankruptcy Code.

34.    The Debtors served all counterparties to the Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts) listed as Potential Transferred Agreements ("Designatable Contract Counterparties") with an Assumption and Assignment Notice and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Buyer has passed.[11]    Accordingly, unless an objection to the proposed Cure Costs or Adequate Assurance Information with respect to the Buyer was filed and served before the applicable deadline (a "Filed Objection"), the applicable Designatable Contract Counterparty is forever barred from objecting to (i) the Cure Costs and from asserting any additional cure or other amounts with respect to the applicable Designatable Lease or Additional Contract in the event it is assumed and/or assigned by an Assignee, except to the extent such Cure Costs further accrue (being subject to further credits, debits, and adjustments in accordance with

---

[11] The Debtors served all counterparties to Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an executory contract or lease and was listed on the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction or Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction) with an Assumption and Assignment Notice and as of the date of entry of this Sale Order, the deadline to object to Cure Costs has passed.  See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction (Docket No. 1731); see also Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction (Docket No. 1774); see also Affidavits of Service (Docket Nos. 1969, 2132, 2162); see also Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; see also Affidavit of Service (Docket No. 2314); see also Affidavit of Service (Docket No. 2417).]

the terms of the applicable underlying Lease or Contract) following the Debtors' filing of the applicable Assumption and Assignment Notice or (ii) adequate assurance of future performance by the Buyer; provided, however, that in the event that an Additional Contract was not listed as a Potential Transferred Agreement, and accordingly, no Assumption and Assignment notice was served upon the applicable Designatable Contract Counterparty, such Designatable Contract Counterparty shall have eight (8) days after the date on which the applicable supplemental Assumption and Assignment Notice is filed with the Court and served on the applicable Designatable Contract Counterparty (the "Supplemental Additional Contract Cure Objection Deadline"), to: (a) object to the applicable proposed Cure Costs for such Additional Contract and the assumption and assignment of the Additional Contract (the "Supplemental Additional Contract Cure Cost Objection"); and (b) serve the Supplemental Additional Contract Cure Cost Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Buyer on or before the Supplemental Additional Contract Cure Objection Deadline; provided, further, however that in the event that a Designatable Contract Counterparty timely asserted a Filed Objection such counterparty shall be permitted to object solely on the basis of an objection to cure costs for such Designatable Lease or Additional Contract or the assumption and assignment of the Designatable Lease or Additional Contract that could not have been raised in its prior objection, until the applicable Designatable Contract Assumption and Assignment Objection Deadline (as defined below).

35.    With respect to any Filed Objection, to the extent that the applicable Contract or Lease is designated for assumption and assignment, a Designated Lease Notice or Designated Additional Contract Notice, as applicable, shall be served on the Designatable Contract Counterparty, and the Buyer and the applicable counterparty shall have authority to compromise,



settle or otherwise resolve any Filed Objections without further order of the Court. If the Debtors,

the Buyer and the applicable counterparty determine that the objection cannot be resolved without

judicial intervention, then the Filed Objection will be determined by the Court (following request

for a hearing by the Debtors and/or the Buyer and/or the applicable counterparty filed with the

Court and on no less than ten (10) days' notice to the other party).

36.    Except as set forth in paragraphs 29 to 35, all Designatable Contract Counterparties'

rights under section 365 with respect to the assumption and assignment of the Designatable Leases

and Additional Contracts pursuant to the Bankruptcy Code (including, without limitation, as to the

provision of adequate assurance of future performance if the Designatable Leases are designated

to a third party or with respect to the provision of adequate assurance of future performance of the

Buyer if a Filed Objection was timely served) are reserved pending delivery of a notice from Seller

to the applicable Designatable Contract Counterparty (i) pursuant to Section 5.2(b) of the Asset

Purchase Agreement (a "Designated Lease Notice") following Sellers' receipt of a Buyer

Assumption Notice or (ii) promptly following Sellers' receipt of a notice indicating that an

Additional Contract has been designated for assignment or assumption and assignment pursuant

to Section 2.9 of the Asset Purchase Agreement (a "Designated Additional Contract Notice") and

are subject to the procedures and provisions set forth in Paragraphs 37 to 44 and 59 below.

37.    Each Designated Lease Notice will set forth the following information, to the best

of the Debtors' knowledge:  (a) the street address of the real property that is the subject of such

Designatable Lease; (b) the name and address of the counterparty of such Designatable Lease (and

their counsel, if known); (c) a description of the deadlines and procedures for filing objections to

the Designated Lease Notice; (d) the identity of the proposed assignee; (e) information intended

to  provide  the  counterparty  to  the  Designatable  Lease  with  adequate  assurance  of  future



60

performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy

Code, if and only if such Designatable Lease is proposed to be assigned to a third party and (f) the

proposed Cure Costs associated with such Designatable Lease; provided, however, that if adequate

assurance information is provided pursuant to this paragraph, such adequate assurance information

shall be kept strictly confidential and  not be used for any purpose other than to (a) evaluate whether

adequate assurance requirements under Bankruptcy Code section 365(f)(2)(B) and, if applicable,

Bankruptcy Code section 365(b)(3) have been satisfied, and (b) to support any objection to

adequate assurance provided by any party including the Buyer and its affiliates.

38.    During the Designation Rights Period, the Buyer may designate any Designatable

Lease or Additional Contract for assumption and assignment in accordance with the terms of the

Asset Purchase Agreement and this Sale Order.  In such event, the Debtors shall file with the Court

and serve on the applicable Designatable Contract Counterparty a Designated Lease Notice or

Designated Additional Contract Notice, together with any applicable Assignment and Assumption

of Lease or other applicable assignment agreement with respect to an Additional Contract.  If the

proposed Assignee is not the Buyer, the Debtors shall also deliver to the applicable Designatable

Contract Counterparty (and deliver by email or facsimile to counsel for the applicable Designatable

Contract Counterparty, if such counsel has filed a notice of appearance in the Bankruptcy Cases)

evidence of adequate assurance of future performance within the meaning of section 365 of the

Bankruptcy Code with respect to the applicable Designatable Lease or Additional Contract that is

proposed to be assumed and assigned to such Assignee.

39.    Any party seeking to object to the assumption and assignment of any Designatable

Lease or Additional Contract to a proposed Assignee that is not the Buyer on any basis other than

the Cure Costs (including, but not limited to, objections to adequate assurance of future

performance if such Designatable Leases are designated to a third party or with respect to the provision of adequate assurance of future performance of the Buyer if a Filed Objection was timely served), must (a) file a written objection in compliance with the Bankruptcy Rules and the Local Rules (a "Designatable Contract Assumption and Assignment Objection") with the Court, so that such objection is filed no later than eight (8) days after the date on which (i) the applicable Designated Lease Notice or Designated Additional Contract Notice is filed with the Court and (ii) evidence of adequate assurance of future performance required pursuant to the preceding sentence is served on the applicable Designatable Contract Counterparty (the "Designatable Contract Assumption and Assignment Objection Deadline"), and (b) serve the Designatable Contract Assumption and Assignment Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Buyer on or before the Designatable Contract Assumption and Assignment Objection Deadline.

40.    If no Filed Objection has been filed, or Designatable Contract Assumption and Assignment Objection has been filed by the Designatable Contract Assumption and Assignment Objection Deadline, this Sale Order shall serve as approval of the assumption and assignment of the applicable Designatable Contract or Additional Contract. If a Filed Objection has been filed, or a Designatable Contract Assumption and Assignment Objection is timely filed and not withdrawn or resolved, the Debtors, the Buyer and the objecting Designatable Contract Counterparty shall have authority to compromise, settle or otherwise resolve any objections without further order of the Court. If the Debtors, the Buyer and the objecting Designatable Contract Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Designatable Lease or Additional Contract will be determined by the Court on a date to be scheduled by any of the

Debtors, the Buyer or the objecting Designatable Contract Counterparty (which hearing date shall be no sooner than ten (10) business days following the date of filing of the Designated Lease Notice or Designated Additional Contract Notice), unless the Debtors, the Buyer and the applicable Designatable Contract Counterparty agree otherwise.

41.    Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, the Buyer shall, on the applicable Assumption Effective Date for a Designatable Lease or Additional Contract, cure all nonmonetary defaults solely to the extent required under section 365 of the Bankruptcy Code and pay to the applicable Designatable Contract Counterparty all undisputed Cure Costs and other such undisputed amounts required with respect to such Designatable Lease or Additional Contract, solely to the extent designated for assumption by the Sellers and assignment to Buyer by written notice from Buyer to Sellers delivered prior to the end of the Designation Rights Period (the "Designated Agreements"). Upon assumption and assignment of any Designated Agreement, the Debtors and the estates shall be relieved of any liability for breach of such Designated Agreement pursuant to section 365(k) of the Bankruptcy Code; provided that, except as expressly provided herein or in the Asset Purchase Agreement or Related Agreements, and except for any obligations in respect of the Reserved Lease Issues, neither the Buyer (except to the extent such obligations constitute Cure Costs) nor the applicable Assignee shall have any obligations under any Designated Agreement that is an Acquired Lease or related Assigned Agreement in respect of any portion of any year-end (or other) adjustment (including, without limitation, for royalties, rents, utilities, taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under any of the Acquired Leases or any other Assigned Agreements for the calendar year in which the applicable Lease Assignment occurs attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y) for any previous

calendar year, and the Sellers shall fully indemnify and hold harmless the Buyer and the applicable

Assignee with respect thereto.

42.    Solely in connection with the Initial Assigned Agreements listed on Exhibit A, upon

the applicable Assumption Effective Date, any provision in any Assigned Agreement that purports

to declare a breach or default as a result of a change or transfer of control or any interest in respect

of the Debtors is unenforceable and all Assigned Agreements shall remain in full force and effect

notwithstanding assignment thereof.  Solely in connection with the Initial Assigned Agreements

listed on Exhibit A, no sections or provisions of any Assigned Agreements, that in any way purport

to: (i) prohibit, restrict, or condition the Debtors' assignment of such Assigned Agreement

(including, but not limited to, the conditioning of such assignment on the consent of any non-

debtor party to such Assigned Agreement); (ii) provide for the cancellation, or modification of the

terms of the Assigned Agreement based on the filing of a bankruptcy case, the financial condition

of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called

"profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of

the non-debtor third party to such Assigned Agreement upon assignment thereof; or (iv) provide

for any rights of first refusal on a contract counterparty's part, or any recapture or termination

rights in favor of a contract counterparty, or any right of a Landlord to take an assignment or

sublease from a tenant, shall have any force or effect with respect to the grant and honoring of the

Designation Rights or the rights under Section 2.9 of the Asset Purchase Agreement in accordance

with this Sale Order and the Asset Purchase Agreement and assignments of Assigned Agreements

by the Debtors in accordance therewith, because they constitute unenforceable antiassignment

provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under

section 365(e) of the Bankruptcy Code.  Upon assumption and assignment of any Designatable

Lease or Additional Contract pursuant to the procedures set forth herein and in the Asset Purchase

Agreement, the applicable Assignee shall enjoy all of the rights and benefits, and shall assume all

obligations, under each such Assigned Agreement as of the applicable Assumption Effective Date.

43.    Solely in connection with the Initial Assigned Agreements listed on Exhibit A, upon

the applicable Assumption Effective Date, except as otherwise expressly agreed by the Buyer and

the applicable Designatable Contract Counterparty, notwithstanding any provision in any

Designatable Lease that purports to prohibit, restrict or condition such action, upon the assumption

and assignment of such Designatable Lease to an Assignee in accordance with the terms of the

Asset Purchase Agreement, (x) the applicable Assignee shall be authorized to: (i) use the

applicable Lease Premises (as defined in the Asset Purchase Agreement), subject to section

365(b)(3) of the Bankruptcy Code, as a retail store (and related goods and services) upon

consummation of the assumption and assignment of such Designatable Lease to such Assignee in

accordance with the terms of the Asset Purchase Agreement; (ii) operate such Lease Premises

under the Buyer's trade name or any other trade name which the Buyer owns or is authorized to

use (including any of the Debtors' trade names); (iii) make such alterations and modifications to

the applicable Lease Premises (including signage, together with appropriate changes to existing

tenant signage in the respective shopping center or mall, including panels on all pylons,

monuments, directional and other ground and off-premises signs where Sellers are presently

represented) deemed necessary by such Assignee (subject to all applicable laws including all

applicable municipal codes) as are necessary or desirable for such Assignee to conform such Lease

Premises to the prototypical retail store (or such Assignee's typical retail store); (iv) remain "dark"

with respect to such Lease Premises after such assumption and assignment until the date that is

necessary to permit such Assignee to remodel, restock, re-fixture, change signage and/or until



completion of the work described in clause (iii) above (so long as such date is not more than one hundred fifty (150) days after the applicable Designation Assignment Date) or such later date as may be reasonably required for the restoration of the such Lease Premises following any applicable Casualty / Condemnation Event; and (v) exercise, utilize or take advantage of any renewal options and any other current or future rights, benefits, privileges, and options granted or provided to the Debtors under such Designated Agreement (including all of the same which may be described or designated as, or purport to be, "personal" to the Debtors or to a named entity in such Designated Agreement or to be exercisable only by the Debtors or by a named entity or an entity operating under a specific trade name)  and (y) neither the Buyer nor the applicable Assignee shall have any responsibility or liability for any Excluded Asset-Sale Taxes and Excluded Asset-Reorganization Taxes.  For the avoidance of doubt, all rights of the counterparties to any applicable Designatable Lease are fully reserved in connection with any of the foregoing actions.

44.    To the extent that any IP License is designated for assumption and assignment pursuant to Section 2.9 of the Asset Purchase Agreement, on the Assumption Effective Date, such agreement, including the rights and obligations thereunder, will be deemed to have been assumed and assigned to the Buyer as of the Closing Date.

45.    *Ipso Facto* **Clauses Ineffective**.  Except as otherwise specifically provided for by order of this Court or the Asset Purchase Agreement, the Assigned Agreements shall be transferred to, and remain in full force and effect for the benefit of, the Buyer or, for applicable Designated Agreements, the Assignee in accordance with their respective terms, including all obligations of the Buyer or, for applicable Designated Agreements, the Assignee as the assignee of the Assigned Agreements, notwithstanding any provision in any such Assigned Agreements (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that



prohibits, restricts or conditions such assignment or transfer. There shall be no, and all non-Debtor parties to any Assigned Agreements are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer, any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assigned Agreements or the Closing.

46.    Except as otherwise specifically provided for by order of this Court, upon the Debtors' assignment of the Assigned Agreements to the Buyer under the provisions of this Sale Order and full payment of all Cure Costs as required under section 365(b) of the Bankruptcy Code, no default shall exist under any Assigned Agreements, and no counterparty to any Assigned Agreements shall be permitted to declare a default by any Debtor or the Buyer or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Agreement. Any provision in an Assigned Agreement that prohibits or conditions the assignment of such Assigned Agreement or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, refuse to renew, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect solely in connection with the transfer thereof pursuant to this Sale Order. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Agreement shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Agreement.

47.    **Statutory Mootness**. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code. The Sale

Transaction contemplated by the Asset Purchase Agreement is undertaken by the Buyer and ESL without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Acquired Assets owned by the Debtors to the Buyer, free and clear of Claims, unless such authorization is duly stayed before the Closing of the Sale Transaction pending such appeal. The Debtors and the Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Sale Order.

48.      **No Avoidance of Asset Purchase Agreement**. Neither the Debtors nor the Buyer Related Parties have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Asset Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreement or the Sale Transaction.

49.      **Waiver of Bankruptcy Rules 6004(h), 6006(d) and 7062**. Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Sale Transaction and the Debtors and the Buyer intend to close the Sale Transaction as soon as practicable. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or



risk its appeal will be foreclosed as moot. This Sale Order constitutes a final order upon which the Debtors and the Buyer are entitled to rely. This paragraph 49 shall not apply to Reserved Lease Issues.

50. **Personally Identifiable Information**. After appointment of the Consumer Privacy Ombudsman in these chapter 11 cases, in accordance with section 332 of the Bankruptcy Code, and after giving due consideration to the facts, circumstances and conditions of the Asset Purchase Agreement, as well as the report (as supplemented) of the Consumer Privacy Ombudsman filed with the Court which Buyer agrees to comply with, no showing was made that the sale of personally identifiable information or private health information contemplated in the Asset Purchase Agreement, subject to the terms of this Sale Order, would violate applicable nonbankruptcy law; provided that pre-Closing costs of the Consumer Privacy Ombudsman shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand, to the extent such costs are incurred in relation to the Transactions.

51. **Distribution and Application of Sale Proceeds**.

(a) At the Closing, the Buyer shall pay to the Sellers (in accordance with the terms of the Asset Purchase Agreement), the balance of the purchase price remaining due and owing under the Asset Purchase Agreement. The proceeds of the Sale Transaction shall be applied as provided in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 955) ("Final DIP Order"), including to repay at the Closing the DIP ABL Secured Obligations (as defined in the Final DIP Order) in full in cash from the sale of those Acquired Assets upon which the DIP

ABL Credit Parties have a first lien, including all costs and expenses of the DIP ABL Credit Parties

set forth in the applicable pay off letter, without the need for any professional for the DIP ABL

Credit Parties to deliver or serve any invoices to any other party (including those parties identified

in paragraph 19(f) of the Final DIP Order). Notwithstanding the foregoing the Securities

Consideration shall be distributed as provided in Schedule 9.2 of the Asset Purchase Agreement.

The methodology for allocation of proceeds shall be as set forth in the Asset Purchase Agreement.

(b)    With respect to the Cyrus Claims: (i) up to $350 million of Junior

DIP Secured Obligations outstanding under the Junior DIP Order, including all fees, adequate

protection amounts due and owing, and interest thereon, may be rolled into a new financing of the

Buyer (the "Exit Financing Facility") on the Closing; and (ii) the Cyrus LC Facility Claims will

be rolled over into a new letter of credit facility with the Buyer, and such claims shall be deemed

satisfied and fully discharged against the Debtors.

(c)    If any order under section 1112 of the Bankruptcy Code is entered

in the cases, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy

Code), that this Sale Order, including the rights granted to Buyer hereunder, shall remain effective

and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest. This

Sale Order shall not be modified by any chapter 11 plan confirmed in the cases or by any

subsequent orders of the Court.

52.    **Binding Effect of Sale Order**.  The terms and provisions of the Asset Purchase

Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit

of, the Debtors, their estates and their creditors, non-debtor affiliates, any affected third parties, all

holders of equity interests in the Debtors, all holders of any claims, whether known or unknown,

against the Debtors, any holders of Claims against or on all or any portion of the Acquired Assets

owned by the Debtors, including, but not limited to all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' chapter 11 cases, and each of their respective affiliates, successors and assigns. The Asset Purchase Agreement and the Sale Order shall inure to the benefit of the Debtors, their estates and creditors, the Buyer and their respective successors and assigns. The Asset Purchase Agreement, the Sale Transaction and this Sale Order shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

53.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order, the Asset Purchase Agreement and any documents executed in connection therewith shall govern, in that order.  Nothing contained in any chapter 11 plan hereafter confirmed in these chapter 11 cases, any order confirming such plan, or in any other order of any type or kind entered in these chapter 11 cases (including, without limitation, any order entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

54.    **Modification of Asset Purchase Agreement**.  The Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such



modification, amendment or supplement does not materially change the terms of the Asset Purchase Agreement or Related Agreements, documents or other instruments.

55.    **Bulk Sales; Taxes**.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply in any way to the transactions contemplated by the Asset Purchase Agreement, the Sale Motion or this Sale Order.  Except as otherwise expressly provided in the Asset Purchase Agreement, all obligations of the Debtors relating to taxes, whether arising under any law, by the Asset Purchase Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

56.    **Lease Deposits and Security**.  The Buyer shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Initial Assigned Agreement to the extent not previously provided by the Debtors. All timely Filed Objections that have asserted requests pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Assigned Agreement other than the Initial Assigned Agreements are hereby adjourned to a hearing at a future date with all parties' rights reserved.

57.    **Automatic Stay**.  The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement, and Related Agreements, documents or other instruments.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

58.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of



each of the agreements executed in connection therewith), to adjudicate disputes related to this Sale Order or the Asset Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

59.    **Restrictive Covenants; Master Leases**.

(a)    Nothing herein or in the Asset Purchase Agreement or any related document shall authorize, absent further order of the Court or agreement among the Debtors or the Buyer, on the one hand, and the applicable non-Debtor counterparty, on the other hand, the sale of any real estate property owned by any of the Debtors, free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants") that are not executory or that run with the land. To the extent that the Debtors or any other party seek to assume and assign any real estate leases to which a Debtor is a party free and clear of any Restrictive Covenant, the Debtors or such party shall file a notice that describes the Restrictive Covenant that the party is seeking to extinguish or otherwise diminish and any non-Debtor counterparty to a Restrictive Covenant will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any Lease, and all rights, remedies, and positions of all parties with respect to any such relief are preserved.

(b)    Nothing in this Sale Order, the Asset Purchase Agreement, or any other related agreements, documents or other instruments shall be deemed to authorize or shall be argued to permit the Debtors, the Buyer, or any Proposed Assignee, their agents or advisors to take



any action in connection with an unexpired master lease of nonresidential real property to which a Debtor is a party (each such lease, a "Master Lease") that is not in compliance with, or that would result in a default or breach under, such Master Lease, without an amendment to or waiver under such Master Lease, in accordance with its terms and all consents required for such amendment or waiver under such Master Lease.  To the extent that the Debtors or any other party seek to sever a Master Lease for any reason prior to an assumption and assignment of such Master Lease in accordance with the terms of this Sale Order, the Debtors shall file a notice that describes the nature and reason of such severing, and any non-Debtor counterparty to such Master Lease will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any lease, and all rights, remedies, and positions of all parties with respect to any such relief are preserved.

60.    **Stand Alone L/C Facility**. As of the Closing Date, all obligations of the applicable Debtors with respect to the Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among such Debtors, Citibank, N.A., as administrative agent and issuing bank (collectively, "Citi") and letter of credit lenders party thereto (the "LC lenders") (as amended from time to time, the "Citi Letter of Credit Agreement") shall be assumed by the applicable Buyer Affiliate, all obligations of any Debtor thereunder (other than any contingent obligations (including contingent indemnification obligations) that are not yet due and payable) shall be terminated and all collateral provided by the Debtors to secure such obligations shall be released (other than such liens securing contingent indemnification obligations in respect of the Citi Letter of Credit Agreement, which liens shall attach to the net proceeds of the Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the

74

Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing).

61.    **Existing Wells and BAML Letters of Credit**.    Notwithstanding the termination of the DIP ABL Facility (as defined in the Final DIP Order), each of the outstanding letters of credit issued by Bank of America, N.A. and Wells Fargo Bank, National Association, pursuant to the DIP ABL Facility, will remain outstanding after the Closing Date in accordance with their respective terms so long as such letters of credit are either (1) cash collateralized in an amount of up to 105% of the face amount of such letters of credit to secure the reimbursement obligations of the Debtors (and their successors and assigns) with respect to such letters of credit on the Closing Date, pursuant to one or more cash collateral agreements between the Buyer and each of Bank of America, N.A. and Wells Fargo Bank, National Association, as Issuing Lenders under the applicable cash collateral agreement (such letters of credit, the "Cash Collateralized Letters of Credit" and such cash collateral agreements, the "Cash Collateral Agreements"), and/or (2) backstopped in an amount of up to 105% of the face amount of such letters of credit to secure the reimbursement obligations of the Debtors (and their successors and assigns) with respect to such letters of credit on the Closing Date (such letters of credit, the "Backstopped Letters of Credit").    The security interests securing the obligations under the DIP ABL Facility, including the security interests securing obligations with respect to each letter of credit issued under the DIP ABL Facility, whether a Cash Collateralized Letter of Credit or a Backstopped Letter of Credit, will be terminated so that such obligations of any Debtors under the DIP ABL Facility are no longer secured by the collateral granted by the Debtors under the DIP ABL Facility, and all such obligations of such Debtors under the DIP ABL Facility will be terminated (other than (x) any contingent obligations that are not yet due and payable and (y) obligations with respect to the Cash

Collateralized Letters of Credit or Backstopped Letters of Credit, which in the case of this clause

(y) are being cash collateralized or backstopped by the Buyers pursuant to this paragraph). For the

avoidance of doubt, the cash collateral provided for the Cash Collateralized Letter of Credit shall

not be property of the Debtors or their estates. The automatic stay imposed under section 362(a)

of the Bankruptcy Code shall not apply to the Cash Collateral Agreements or the cash collateral

provided therefor.  The Buyer shall bear any costs incurred by the Debtors in connection with any

Cash Collateralized Letters of Credit or Backstopped Letters of Credit, including any fees payable

thereon.  For the avoidance of doubt, the Debtors shall not be party to, nor have rights or

obligations under, any letter of credit that backstops the Backstopped Letters of Credit.

62.    **Direction to Creditors and Parties in Interest**.

(a)    In connection with the Credit Bid, each agent, trustee, collateral

agent or similar person (each, a "Credit Bid Claim Agent") that is party to an indenture, credit

agreement, security agreement or any similar document or instrument (each, a "Credit Bid Claim

Document") in respect of the credit bid claims is authorized to execute such documents and take

all other actions, in accordance with, and subject to the terms of, the applicable Credit Bid Claim

Document, as may be necessary to facilitate the Credit Bid, including, without limitation, the *pro*

*rata* allocation and distribution of equity securities of the Buyer (pro rata within each class of

creditors), to all creditors holding any obligations of any one or more of the Debtors which are the

subject of the Credit Bid (the "Credit Bid Obligations"), including without limitation, the non-ESL

holders of the Credit Bid Obligations, and the acknowledgment of the reduction in principal

amount of the remaining Credit Bid Obligations as a result of, and in the amount of, the Credit

Bid, such reduction to be made *pro rata* to all holders of the Credit Bid Obligations by class of

Creditor, including, without limitation, the non-ESL holders of the Credit Bid Obligations.  Each

Credit Bid Claim Agent may rely fully on all amounts of equity securities of the Buyer delivered and allocated to it, and the amount of the reduction in the principal amount to be applied to the Credit Bid Obligations for which the Credit Bid Claim Agent is acting in such capacity, as certified by ESL or the Buyer and the applicable Debtor(s) in a written certificate (the "Certificate") to be delivered to the relevant Credit Bid Claim Agent at or prior to the Closing. The Credit Bid Claim Agent may, but shall not be obligated to, make any review or investigation of the accuracy of any of the calculations or numbers set forth in such Certificate. On the Closing Date, Buyer shall pay to each Credit Bid Claim Agent the reasonable fees and expenses invoiced on or prior to the Closing Date (including its reasonable attorneys' fees and disbursements) incurred in connection with the facilitation of the Credit Bid. Anything in this Sale Order to the contrary notwithstanding, nothing in this Order is intended to, or shall, modify or amend the terms and conditions of the Second Lien Security Agreement, all of which shall remain in full force and effect; provided, however, that this sentence shall not impact in any way the sale of the Acquired Assets (including, for the avoidance of doubt, the Transition Assets regardless of whether the Debtors retain title pursuant to the Transition Services Agreement) free and clear of all liens and Claims arising under, in connection with or in any way related to the Second Lien Security Agreement.

(b)    Each Credit Bid Claim Agent is hereby released and exculpated from any Claim, cause of action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Credit Bid and the facilitation thereof and any transaction contemplated in connection therewith, other than any such Claim, cause of action, obligation, suit, judgment, damage, demand, loss, or liability stemming from the actual fraud, willful misconduct, or gross negligence of any such Credit Bid Claims Agent.



63.   **Citibank Credit Card Agreements**.   Pursuant to this Order, the Debtors are

assuming and assigning (i) that certain Second Amended and Restated Program Agreement, dated

as of October 3, 2018 (the "Citibank Credit Card Program Agreement"), by and among Sears,

Roebuck and Co., Sears Brands Business Unit Corporation, the Other Sears Parties (as defined

therein) that are parties thereto, and Citibank, N.A. ("Citi"), (ii) the New Merchant Agreement (as

defined in the Citibank Credit Card Program Agreement) and (iii) the Marketing Agreement (as

defined in the Citibank Credit Card Program Agreement). The Citibank Credit Card Program

Agreement, the New Merchant Agreement, and the Marketing Agreement are collectively referred

to as the "Citibank Credit Card Agreements." Nothing in this Order, the Asset Purchase Agreement

or any other Sale Transaction document, and neither the Sale Transaction itself nor any act taken

in connection with the Sale Transaction, shall impair, invalidate, limit, waive, forfeit or otherwise

render ineffective any right of Citi arising under or recognized by any Citibank Credit Card

Agreement, including any right in accordance with the terms and conditions of the Citibank Credit

Card Agreements to (x) to draw on the "Eligible Letter of Credit" funded under the Citibank Credit

Card Program Agreement, in Citi's sole discretion, (a) to discharge or satisfy contingent liabilities

arising under any Integrated Agreement (as defined in the Citibank Credit Card Program

Agreement) or (b) to otherwise reimburse Citi for any losses arising out of amounts owing under

any Integrated Agreement, in each case of (a) or (b), whether arising prior to, on, or after the

Closing Date and whether owed by Seller or Buyer; (y) if such Eligible Letter of Credit is not

renewed or replaced in accordance with Section 8.8 of the Citibank Credit Card Program

Agreement, to draw on such Eligible Letter of Credit and maintain the reserve by retaining the

amount of such draw; and (z) to recoup, setoff or deduct amounts owing to Citi under any of the





Citibank Credit Card Agreements in accordance with the terms thereof, in each case, whether such

amounts owed arose prior to, on, or after the Closing Date and whether owed by Seller or Buyer.

64.    <u>Chubb</u>.    Notwithstanding anything to the contrary in the Motion, the Global

Bidding Procedures, the Global Bidding Procedures Order, the Asset Purchase Agreement, any

cure notice or assumption notice (including, but not limited to, any Assumption and Assignment

Notice), or this Sale Order (i) none of the insurance policies or any related agreements

(collectively, the "<u>Chubb Insurance Contracts</u>") issued by any of ACE American Insurance

Company, ACE Fire Underwriters Insurance Company, ACE Property and Casualty Insurance

Company, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance

Company, Westchester Fire Insurance Company, Illinois Union Insurance Company, Federal

Insurance Company, or their respective affiliates or successors (collectively, the "<u>Chubb</u>

<u>Companies</u>"), or, except as set forth herein, any rights, benefits, claims, rights to payment and/or

recoveries under the Chubb Insurance Contracts shall be sold, assigned or otherwise transferred to

the Buyer in connection with the Global Asset Sale Transaction; and (ii) nothing shall alter, modify

or otherwise amend the terms or conditions of the Chubb Insurance Contracts; provided, however,

that to the extent any claim seeking insurance policy proceeds under any insurance policies

included in the Chubb Insurance Contracts arises with respect to the Business or any Acquired

Assets, the Debtors may pursue such claims for such insurance proceeds in accordance with the

terms of the insurance policies included in the Chubb Insurance Contracts (and shall pursue such

claims if requested by Buyer), and, if applicable, turn over to the Buyer any proceeds in respect of

such claims in accordance with section 2.1(q) of the Asset Purchase Agreement (each, a "<u>Proceed</u>

<u>Turnover</u>"); provided, further, however, that the Chubb Companies shall not have any duty to





effectuate a Proceed Turnover or liability related to a Proceed Turnover except as provided in the Chubb Insurance Contracts.

65.    **National Distribution Centers**.  Notwithstanding anything to the contrary herein, the proposed sale of the Kmart-owned property in Greensboro, North Carolina designated as property 30961 and leased to National Distribution Centers (NDC) shall be carved out from this Order, and the proposed sale of this property and all issues raised by NDC in its limited objection (Docket No. 1864) (the "NDC Limited Objection") and supplement thereto (Docket No. 2376) with respect to the Parking Lot Lease (as defined in the NDC Limited Objection) shall be adjourned for consideration on a future hearing date to be agreed by the parties.

66.    **Bank of America Agreements**.  Pursuant to this Sale Order, the Debtors are assuming and assigning certain agreements governing the issuance, administration, and servicing of certain credit cards and credit card programs and certain private label letters of credit (such agreements, the "Bank of America Program Agreements") by Bank of America, N.A. ("Bank of America").  Nothing in this Order, the Asset Purchase Agreement or any other Sale Transaction document, and neither the Sale Transaction itself nor any act taken in connection with the Sale Transaction, shall impair, invalidate, limit, waive, forfeit or otherwise render ineffective any right of Bank of America arising under or recognized by any of the Bank of America Program Agreements, including any right in accordance with the terms and conditions of the Bank of America Program Agreements, to (a) discharge or satisfy contingent liabilities arising under any Bank of America Program Agreement whether arising prior to, on, or after the Closing Date and whether owed by Seller or Buyer; (b) otherwise reimburse Bank of America for any losses arising out of amounts owing under any Bank of America Program Agreement whether arising prior to, on, or after the Closing Date and whether owed by Seller or Buyer; and (c) recoup, setoff or deduct

amounts owing to Bank of America under any of the Bank of America Program Agreements in accordance with the terms thereof, in each case, whether such amounts owed arose prior to, on, or after the Closing Date and whether owed by Seller or Buyer. Further, Bank of America shall have no responsibility or liability for any service disruptions that might occur as a result of any account ownership changes or regulatory requirements that might result from the consummation of the Sale Transaction.

67.    <u>Governmental Units</u>.  Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (including but not limited to  environmental laws or regulations), and any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Asset Purchase Agreement shall in any way  diminish the obligation of any entity, including the Debtors, to comply with environmental laws.  Nothing in this Order or the Asset Purchase Agreement authorizes the transfer to the Buyer of any licenses, permits, registrations, or governmental authorizations and approvals without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

68.    <u>Transition Use Limitation</u>.  No provision of this Sale Order, the Sale Motion, or the Asset Purchase Agreement shall authorize the Debtors or the Buyer as applicable to use any software or other intellectual property (the "<u>Proprietary Information</u>") owned by or licensed from, or any software-related services provided by, SAP Industries, Inc. and its affiliates SAP America, Inc. and Concur Technologies, Inc. (collectively, "<u>SAP</u>") and Oracle America, Inc. including its partner Rimini Street (collectively, "<u>Oracle</u>"), to the benefit of any other party under any Services

Agreement or otherwise to the extent prohibited by the contracts governing such Proprietary Information or software-related services.

69.    **Consent.**  No provision of this Sale Order, the Sale Motion, or the Asset Purchase Agreement shall authorize the Debtors or the Buyer as applicable to transfer or sell any Proprietary Information to the Buyer licensed from SAP, Oracle, Microsoft Corporation and its wholly-owned affiliates, Microsoft Licensing, GP, and Microsoft Online, Inc. (collectively, "Microsoft"), LinkedIn Corporation, as applicable, absent the consent of SAP, Oracle, Microsoft, or LinkedIn Corporation, as applicable, to the extent such consent is required under the applicable agreement and such provision is enforceable under applicable law.

70.    **Pay-Down of Real Estate 2020 Loan**.  Pursuant to Section 11.8 of the Asset Purchase Agreement, to the extent not previously provided, at least one (1) Business Day prior to the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including, without limitation the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* (Docket No. 1393) (the "Cascade Paydown").  The Sellers are hereby authorized and directed to (i) make the Cascade Paydown at or prior to Closing and (ii) pay to Cascade Investment, L.L.C. at Closing an amount in cash to be specified in writing by Cascade Investment, L.L.C. and ESL, which payment shall be funded from (and shall not exceed) the Deposit Amount.



71.    **Mortgage Adequate Protection**.  Notwithstanding anything to the contrary contained herein or in the Asset Purchase Agreement or related documents, upon the closing of

the Sale Transaction, Relator Carl Ireland, as Administrator of the Estate of James Garbe, and the

United States  (the "Mortgagees") as holders of liens on the real property known as Location

#8975, Cupey Bajo, San Juan, Puerto Rico (the "Property") shall be entitled to a lien against the

sale proceeds of the Property in the same order of priority as existing on the date of entry of this

Sale Order and a superpriority administrative expense claim against the Debtors as adequate

protection pursuant to sections 361, 363(e) and 507(b) of the Bankruptcy Code arising from the

sale of such Property to satisfy any diminution of the value of such replacement lien post-Closing.

All parties' rights to object to the priority, validity, amount, and extent of such asserted liens and

superpriority  claim  or  the  obligations  relating  thereto  are  preserved.    The  Debtors'  and

Mortgagees' rights as to the amount of the allocation of proceeds from the Sale Transaction to the

Property and any valuation of the Property are preserved and any disputes shall be determined by

the Bankruptcy Court, upon motion by any of the Debtors or the Mortgagees.

Dated:  February 8, 2019
        White Plains, New York

                                    _____/s/Robert D. Drain_____
                                    THE HONORABLE ROBERT D. DRAIN
                                    UNITED STATES BANKRUPTCY JUDGE

I hereby attest and certify on 2/20/19
that this document is a full, true and correct
copy of the original filed on the court's
electronic case filing system.

Clerk, US Bankruptcy Court, SDNY

By: _____  Deputy Clerk

