Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-shl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDING CORPORATION, et al.,

8

9           Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                   United States Bankruptcy Court

12                   300 Quarropas Street, Room 248

13                   White Plains, NY 10601

14

15

16                   April 13, 2023

17                   11:11 AM

18

19

20

21   B E F O R E :

22   HON. SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  A. VARGAS

1    HEARING re Doc. #10832 Notice Of Agenda

2

3    HEARING re Doc. #10800 Order Scheduling status conference

4    Re: Beau LeBaron

5

6    HEARING re Doc. #10825 Notice Of Hearing/Notice of status

7    conference Re: Beau LeBaron

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   WEIL GOTSHAL MANGES LLP

4        Attorneys for Debtors and SRZ Liquidating Trust

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:   GARRETT A. FAIL

9        PHILIP DIDONATO

10        FURQAAN SIDDIQUI

11

12   ALSO PRESENT:

13        Beau LeBaron, Pro Se

14        William Murray, M3 Partners

15

16

17

18

19

20

21

22

23

24

25

Page 4

1          P R O C E E D I N G S

2          THE COURT:  So, with that we'll move on to the

3     11:00 matter, which is Sears Holdings Corporation.  And so,

4     let me find out who is here for that case, and I will start

5     with Mr. LeBaron.

6          MR. LEBARON:  Yes, I'm here.

7          THE COURT:  All right.  Good morning to you, sir.

8          MR. LEBARON:  Good morning.

9          THE COURT:  And then let me find out who else is

10    here for that case, including the Liquidating Trust?

11         MR. FAIL:  Good morning, Judge.  Garrett Fail,

12    Weil Gotshal & Manges for the Liquidating Trust, and with me

13    in the virtual courtroom is Mr. Bill Murphy from M3 on

14    behalf of the Liquidating Trust.

15         THE COURT:  All right.  Good morning.

16         MR. FAIL:  I also have my colleagues, Phil

17    DiDonato and Furqaan Siddiqui here, as well.   Thanks.

18         THE COURT:  All right.  Good morning to you all.

19    And so, let me see if I can set the stage here because this

20    conference was set at my request, my understanding is that

21    Mr. LeBaron was, I believe, a contract employee for the

22    Debtors and he filed a proof of claim and had some questions

23    and issues.  There were some pleadings back and forth and I

24    think where it was left off in front of Judge Drain some

25    time ago, was that the parties were going to have a

1   discussion and then figure out, sort of, what next steps,

2   whether there's some things they could agree upon, things

3   that they profoundly disagreed upon.  And so, at a certain

4   point I inherited the case when Judge Drain retired, and I

5   did get some inquiries from Mr. LeBaron and thought that

6   lack of -- sometimes if people don't know where things

7   stand, it leads to some confusion and some inefficiencies.

8           So, I thought it made sense to just have brief

9   status conference to sort of check in and see where things

10  are and where we go from here to try to wrap up any issues.

11  That might mean agreements, it might mean having a matter

12  that needs to be litigated, it could look a lot of different

13  ways, but clarity is always good.  So, I thought since Mr.

14  LeBaron, you had the questions, I thought it made sense to

15  hear from Mr. Fail first just to sort of set the stage on

16  things and then we can take it from there.  So, Mr. Fail?

17          MR. FAIL:  Thank you, Judge, and thanks for

18  setting this up.  So, you're right about the procedural

19  posture.  There were claims that Mr. LeBaron filed a year

20  after the unsecured -- general unsecured bar date and the

21  pre-petition bar date, and six months after confirmation, we

22  had a hearing before Judge Drain, who basically eliminated

23  the duplicate claims and said that Mr. LeBaron could have

24  another opportunity to try to justify the late filing of the

25  claims to have them be addressed, and that's where it's been

Page 6

1    left off in Court.

2              Subsequently, and, you know, throughout the course

3    of this, Your Honor has received correspondence, Judge Drain

4    has received correspondence.  We have here, I think, by last

5    counts, there's somewhere between 300 and 400 emails that

6    we've received from Mr. LeBaron.  If -- but I think, there's

7    a simple way to kind of frame this.  And if it please the

8    Court, my colleague, Mr. Siddiqui can put up an exhibit.

9    But let me just start out at a high level to frame this,

10   Judge.  We're not looking to spend a lot of estate resources

11   on this, and I think we're looking for the most efficient

12   way to bring this to a conclusion.

13             Can Mr. Siddiqui share his screen?

14             THE COURT:  Sure.  That would be fine.

15             MR. FAIL:  Thank you.

16             THE COURT:  And again, my only caveat is, today's

17   the status, we're not going to have a knock down/drag out

18   fight.  Okay.

19             MR. FAIL:  This is simply a status conference to

20   establish -- 100 percent not looking for -- not looking to

21   adjudicate anything.  Oh, I think you need to -- the Court

22   would need to allow Mr. Siddiqui to share his screen.

23             THE COURT:  All right.

24             CLERK:  (Indiscernible.)

25             THE COURT:  Can we -- hold on a second.  Can we

Page 7

```
 1    share the -- allow someone to share their screen with us?

 2              CLERK:  For someone else to share a screen?

 3              THE COURT:  Yeah.  Counsel.

 4              CLERK:  Can you show me (indiscernible).

 5              THE COURT:  Hold on, one minute.

 6              MR. FAIL:  Thank you.

 7              THE COURT:  Seems to be the morning for

 8    interesting technical things, so my apologies.

 9              MR. FAIL:  You know what, Judge?  We don't -- if

10    it's -- if it's troubling, we don't have to do it.  I can

11    walk you through it.

12              THE COURT:  We'll give it 45 seconds and if we can

13    make it work, great, if not, just --

14              MR. FAIL:  Absolutely.

15              THE COURT:  So, I know the "national emergency"

16    will be over May 11th, but for those of us who are not 35

17    and younger, it can't happen soon enough.  So -- all right.

18    And I shouldn't say that because I have a son who does

19    computer science stuff, so he had to get the gene from

20    somewhere, but I'm just too out of date, so I'm mortified to

21    admit.

22              CLERK:  Okay, I'm going to make him a co-host.

23              THE COURT:  All right.  Hold on a second.  We're

24    going to make you a co-host, which should allow you to share

25    your screen.
```

Page 8

1           CLERK:  And then once he's done --

2           THE COURT:  All right.  Give it a shot.

3           MR. FAIL:  Thank you, Judge.

4           THE COURT:  Oh, don't thank me because you know I

5    had nothing to do with it.

6           MR. FAIL:  Well, I'd say --

7           THE COURT:  All right.

8           MR. FAIL:  So, this is -- this is a summary of

9    what the Debtor and then the Liquidating Trust has been able

10   to discern has been asserted in the claims in the various

11   pleadings.  Obviously, Mr. LeBaron could correct or bring us

12   up to date.  But since I'm going first, this is what we see

13   he was seeking, a total of $70,000.  So, just to put it all

14   in perspective, you know, we don't want to spend a ton on

15   this.  But if we break it down in the right-hand column, I

16   think just for the Court to remind itself and for Mr.

17   LeBaron, the Debtor filed bankruptcy on October 15th, 2008 -

18   - '18, 2018, wrong case, 2018.  And so, everything before

19   that we're calling pre-petition, so that's $21,000 out of

20   the $70,000.  Pursuant to the Bankruptcy Code, as you know,

21   Judge and for Mr. LeBaron, certain amounts, up to $12,850 in

22   this case, could possibly be entitled to priority.

23   Otherwise, the rest is a general unsecured claim, which, as

24   Your Honor knows and for Mr. LeBaron's benefit, are not

25   currently receiving distributions and, you know, the

Page 9

1   likelihood that they will is remote.  So, from the first

2   column of pre-Petition claims, what folks could be playing

3   for, you know, is $12,850.

4           Then there was a year -- there was a post-petition

5   period where the Debtors operated for only a few months

6   before selling their assets and their business and

7   operations to transform.  So, the post-petition period,

8   while the Debtors were in operation, we can discern that

9   there's roughly $13,300 being asserted there.  And then the

10  other half that's being asserted, appears to be for a period

11  where the Debtors did not run the business or a business

12  that Mr. LeBaron continued to work for.  So, just at a super

13  high level, 50 percent could possibly be on our watch, 50

14  percent is not.

15          Another way to slice this, looking at the pre-

16  petition period, as I said is, $12,850 out of the $21,000 is

17  possibly money good from the (indiscernible).  So, a total

18  of $26,216.37 by our calculations is what we're possibly

19  talking about paying out, $26,216.  You know, this isn't a

20  hearing, but just so Mr. LeBaron can hear that this

21  Liquidating Trust has reviewed and given consideration to

22  the claims that are currently late and not really pending in

23  our view.  But he's seeking, in the first two lines, wages

24  and vacation wages.  According to the records that we have,

25  he wasn't a salaried waged employee.  He was entirely

Page 10

1   compensation based.  So, there's no basis that we have to

2   allow the $13,000, roughly, that's being sought for those

3   categories.

4          The next two categories of unlawful deductions and

5   commissions relate, as best we can tell, Mr. LeBaron sold

6   jobs for the Sears Home Improvements business, and then

7   before they were paid for, they were canceled or there were

8   issues with them.  And pursuant to the company policy on how

9   commissioned salespeople are compensated, if the company

10  doesn't get paid or the jobs don't go through, then the

11  salespeople don't earn a commission.  So, as best we can

12  tell, that's what he's claiming, but, you know, we don't

13  believe there's an entitlement to it.

14         There's $20,000 being sought through an Employee

15  Benefit Plan.  We don't have a record of anything like that.

16  The Debtors' records and now the Trust records show that

17  there was a Plan that Mr. LeBaron withdrew from and a

18  balance of less than $300 was transferred and he should have

19  had access to it, so we don't think that there's merits to

20  that.

21         And then the remainder appears to be on

22  Transform's watch, if anything, so we don't have any kind of

23  record or liability for that.  We're not looking to kind of

24  make anybody's life harder, certainly not looking to take up

25  this Court's time or Mr. LeBaron's time pursuing recoveries

Page 11

1    where there can't be any.  We're happy to try to find a way

2    to end this in an efficient way, whether it's today or

3    shortly thereafter.  But given Mr. LeBaron's pro se status,

4    you know, expect that we would want the Court to bless and

5    relieve us all, from any further burdens if there was

6    anything offered or paid.

7           But wanted to let this Court know and Mr. LeBaron

8    know that the Trustee, due to consideration to the merits of

9    the allegations, and unfortunately just don't see -- just

10   don't see the liability here.

11          THE COURT:  All right.  So, Mr. LeBaron, I'm happy

12   to hear from you, but let me just see if I can distill a

13   couple of things that I think you should think about.  And I

14   think we can stop the screen sharing now, so -- great.

15   Thank you.

16          MR. FAIL:  Thank you.

17          MR. LEBARON:  Thank you.

18          THE COURT:  So, whenever we have claims that are

19   filed, it's my duty as a Judge then to adjudicate claim

20   objections, figure out how things should be treated.  And

21   there are a couple of things that, without deciding the

22   merits of any arguments, there are things that I see would

23   have to be decided by me if there's a litigated proceeding,

24   meaning people can't agree on something.  One is, what is

25   actually on the Debtor's watch and what's on the new

Page 12

```
 1    company's watch, so when the new company took over.  Now, I
 2    realize from your perspective, that's not a great thing to
 3    hear, right.  Because from your point of view, you're
 4    working and it's -- but the reality is in Bankruptcy Court,
 5    that I have jurisdiction here in the Court by virtue of
 6    these cases over the Debtor and what happened to the Debtor
 7    after the Plan was confirmed, and a new buyer who comes in
 8    and runs the business and may have liabilities by virtue of
 9    things like people working there, is not something that is -
10    - if that's the case, truly the case, then that's something
11    that isn't necessarily part of the bankruptcy for purposes
12    of a claim.  It's not a very -- again, not a very helpful
13    thing to hear as a claimant because you're not viewing the
14    world that way at all, which I completely understand.  But
15    it's something that, in the interest of sort of full
16    disclosure to just tell you some things to think about and,
17    sort of, where we might go from here.  So, that's one
18    aspect.
19            Another aspect is, I understand there's -- you
20    heard something about a late filed claim.  There's lots of
21    rules and case law about a late filed claim and what happens
22    is, that if someone objects to that, then I have to decide
23    it under the applicable legal standard, which is something
24    that is set well before I took the bench 12 and a half years
25    ago, something called the excusable neglect standard, and
```

1    look at that issue.  So, that's another, sort of, big

2    picture issue out there.

3           And I guess the third big picture issue is that

4    Mr. Fail mentioned different buckets, timeframe-wise, of

5    claims and certain things pre-petition, post-petition, and

6    then after the sale.  And those can be very relevant in

7    understanding treatment because unfortunately, there's a lot

8    of bad news to hand out in bankruptcy.  And he mentioned

9    unsecured claimants right now not getting anything in the

10   case and that is -- that is my understanding, as well.

11          Now, there are certain categories of claims that

12   are treated different than general unsecured claims and he

13   mentioned priority claims, and they are in their own

14   separate category.  And there are certain things that

15   trigger that status and other things that don't.  And there

16   are some very specific rules set forth in the Bankruptcy

17   Code, we don't make them up on the fly.  They have to do

18   with timing and kinds of things, the kind of claim that it

19   is.  And so, that's -- that gets a little -- it's a little

20   less -- it's a big point, but in terms of figuring that

21   stuff out, it's very detailed, so you have to look at the

22   counterclaim, you have to look at the time, and all those

23   things.  You don't necessarily get there, depending on how

24   the first two issues might be looked at, one is the late

25   file claim and the other is, who -- on whose watch the

Page 14

1    liability is incurred.

2           So, those are three things that jump out to me as

3    a judge that would have to be decided.  And so, here's --

4    I'm happy to going to hear from you in one second.  My

5    thought with something like this is to give the parties a

6    brief chance to have a conversation and see if they can work

7    something out that's efficient here and makes sense for all

8    sides.  If you did, you would come back to me in Court to

9    ask me to bless that settlement so that it would be a full

10   and final resolution of things, and that's fine.

11          MR. LEBARON:  Right.

12          THE COURT:  If you don't reach an agreement,

13   that's fine too.  Then what -- the next step would be to

14   have a hearing and to figure out, to resolve any outstanding

15   objections there are.  But what I would want to do is set a

16   timeframe for all that, so people sort of know they have a

17   certain amount of time to negotiate.  And then after that,

18   people can file whatever additional pleadings they want and

19   then we'll set a hearing.

20          So, my thought is that setting some timeframes are

21   always helpful because this has obviously hung around for a

22   while.  It's not in anybody's best interest to have that

23   happen.  So, it's a good idea to get this done one way or

24   the other at a certain point.

25          So, my thought would be to give people, say 45

Page 15

1    days, 60 days to chat, then set a deadline for any

2    additional submissions that might make sense, and then we

3    could schedule a hearing if it comes to that.  So, I'm

4    trying to give you my perspective on where we are, the

5    issues that I see and what procedure would look like to go

6    from where we are to the end.

7              And so, with that, Mr. LeBaron, anything that you

8    wanted to ask about or information you wanted to pass along,

9    recognizing that we're not litigating any of these claims

10   today.

11             MR. LEBARON:  I'll be very quick.

12             THE COURT:  Yep.

13             MR. LEBARON:  Okay, so, first of all, thank you

14   Court for letting -- setting me something.  I know that Mr.

15   Fail received a lot of emails from me, and I apologize for

16   all the messages.  I was taking care of my mom here during

17   that time, and it was somewhat of a difficult time because I

18   was just extremely busy.  You know, taking care of person

19   with cancer at that point was a full-time job for me.

20             THE COURT:  I'm sorry to hear that.

21             MR. LEBARON:  So, I -- my (indiscernible) came

22   sporadically in between here, and I apologize for a lot of

23   my emotional outbursts during that time.  I was pretty -- I

24   don't know, I was in the moment, if you know what I mean.

25             So, with that being said, with regards to the

1    numbers that you guys were talking about, I really would

2    appreciate some kind of numbers, some kind of date because

3    as far as I see it, I was let go from Sears at 6/12/2019.  I

4    believe that sounds about correct.  And when you're talking

5    about the pre-petition, the $12,850, then you said something

6    about $26,000 regarding the various -- in between the pre-

7    petition and for the time when Transform actually takes

8    over.  What happened here is really, a large amount of this

9    number was sent to you guys by the California Labor Board.

10   So, I went to the California Labor Board thinking this was

11   the route.

12           THE COURT:  Right.

13           MR. LEBARON:  And they decided to submit it for

14   me, and when they put it through, you know, the $20,000 was,

15   sort of, life insurance policy, and I thought I was

16   considered a W-2 commissioned compensation project

17   consultant.  So, I was actually a W-2 employee as far as I

18   know.  I wasn't a contract vendor.  I'm being shown as one.

19   I believe I'm -- maybe I'm being shown different in the

20   wrong zone for this payment because truly, this is regarding

21   wages.  These issues are not in California, wages are wages,

22   and I was a W-2 employee.  I get a W-2, you know, tax form.

23   Taxes were paid, my insurance was paid.  They paid for my

24   expenses.  I was in training.  I met all those standards in

25   California.

Page 17

1          So, I think in that area, I'm not exempt, I'm

2     actually an employee.  And I think in that sense, I believe

3     the Labor Board, when they sent me to you, is the idea was

4     that I was gunning for a certain amount, but the pre-

5     petition amount I wasn't allowed to come after, according to

6     them.  That was the Labor Board.  I was already late to the

7     bar date at that point.  And I guess my only statement to

8     Mr. Fail is this, I was required by Sears to run

9     appointments every day from the 11th of November, the

10    beginning of basically the bar date, I guess the notice went

11    out, which I don't even remember ever seeing a notice.  I

12    know around April the 9th I was told of the notice of some

13    kind, and we were told to ignore that as if we were working

14    for Sears still.  Keep working.  And we worked every day,

15    five days a week for 16 hours a day, we were fielding

16    appointments.  There's no time for anything else.  You do

17    that, then you go home, and you turn in the orders you make.

18    I knew one mindset:  make revenue for the employer.  They

19    needed us to generate revenue.  And that was for the -- as

20    far as I'm concerned, for these entire activities, this

21    bankruptcy.  I was trying to help the Debtor by generating

22    revenue for everything I did.  That was my goal.  So, now

23    I'm going to have a war with them --

24          THE COURT:  Mr. LeBaron, one thing that I'll ask

25    Mr. Fail, whether this would be helpful or not, I don't know

```
 1    if you have -- if he has a W-2, if that would be helpful to

 2    share with you where you all have a full -- sort of a full

 3    set of information on this or not.

 4              MR. FAIL:  I don't think it matters, Judge.  I

 5    mean, I appreciate it.  I'm happy to --

 6              MR. LEBARON:  (Indiscernible) --

 7              THE COURT:  Hold on.  Hold on, Mr. LeBaron, I just

 8    asked Mr. Fail a question, so we can't talk at the same

 9    time.  So, go ahead, Mr. Fail.

10              MR. LEBARON:  Sure.

11              MR. FAIL:  I don't think it matters for our

12    purposes because I was using the categorization not, you

13    know -- whether it's commission and he's owed that or not,

14    the way that we read what he was asking for seemed to be an

15    hourly wage and an hourly vacation.  It's just unclear to us

16    what he is asking for because we're not looking to litigate,

17    you know, excusable neglect, you know, and have five

18    different trials to just get to the merits, Judge.  It's

19    just unclear what he's asking for.  I don't think the W-2

20    matters though.

21              THE COURT:  All right.  So, here's -- so what I'd

22    like to do is to give you a chance to chat and what I think

23    Mr. LeBaron would be helpful is, the California Labor Board

24    is not -- does not necessarily view these things the same

25    way the bankruptcy world does.
```

1           MR. FAIL:  Right.

2           THE COURT:  The Bankruptcy Code trumps all that.

3    And again, for your purposes, it makes life a little

4    confusing, more than a little confusing.

5           MR. LEBARON:  I agree.

6           THE COURT:  So, what I think would be helpful is

7    to do this.  I'm going to give you 60 days to have

8    conversations and see if you can work something out that's

9    sufficient.  In the next two weeks though, Mr. LeBaron, I

10   think it would be helpful to send an email, just one, just

11   one email --

12          MR. LEBARON:  I get you.

13          THE COURT:  -- and it would contain the following

14   information: very plain statement, not dressed up in the

15   categories of the California Labor Board, as to what you

16   think you're entitled to.  So, if it's wages and benefits,

17   it's wages and benefits, and for what periods of time.  And

18   you mentioned the date when you think things ended, then

19   that's -- that would be helpful to have that as well.

20          MR. LEBARON:  Okay.

21          THE COURT:  And so -- and if you have a question

22   about timing, meaning that you don't understand particular

23   elements of some dates that Mr. Fail mentioned or where he's

24   getting those dates, you can put those questions in there.

25   And also, just for ease of just everybody on the same page,

1    I would enclose a copy of whatever W-2, most recent W-2 you

2    have in terms of your employment status because I think

3    that's what will -- my sense is, I could be wrong, but my

4    sense is that will really govern whatever your claim really

5    is because it would be, whatever I was entitled to get as an

6    employee for these periods of time, and then that way nobody

7    has to guess.

8            And if you could do that in about two weeks, send

9    one email, so just a short statement, shouldn't be 15 pages,

10   should be more like three or four, you can put a chart and

11   whatever you think is the clearest way to explain it.  Don't

12   worry about whatever the California Labor Board said --

13            MR. LEBARON:  I will do that.

14            THE COURT:  -- and just explain it in plain

15   English.  And then Mr. Fail will have then a couple of weeks

16   to get back to you -- two weeks to get back to you.  He can

17   do something in writing.  Also, put in your contact

18   information so that he can respond or somebody that he works

19   with can respond.  And then you also then have a little bit

20   of time to have a discussion.

21            If the discussion goes somewhere and you want to

22   put something in front of me for approval, great.  I will

23   say, I think Mr. Fail mentioned it a few times and he's

24   right, that the process for resolving claims objections is -

25   - it's about fairness and everybody being heard, which is

Page 21

1    great, but it also means that a small claim will often take

2    the same amount of court time as the large claim.

3                MR. LEBARON:  Okay.

4                THE COURT:  And it means that it's going to take

5    time of yours and of the Liquidating Trust and of a lot of

6    folks.  And there are times when that makes a lot of sense,

7    and there's time when it makes less sense.  I am the person

8    who has to decide these things if people can't agree and

9    that's what I'll do.  But it doesn't necessarily mean that

10   having me decide is the most wise course of action.

11               MR. LEBARON:  I got you.

12               THE COURT:  Now, you know -- so, for all these

13   things, there -- the more issues there are to litigate, that

14   means the more things that I have to decide and the more

15   time we might spend in court.  It also means that more legal

16   jeopardy that folks have in terms of the success of their

17   claim, as a matter of going ahead with Court.  That's all

18   for you to judge in the first instance.  I'll look at it

19   when it comes to me if I have to decide.

20               So, what I'll do is, I'm going to ask Mr. Fail to

21   put together a letter just with a schedule and it'll have --

22   the schedule will have two weeks from today that you submit

23   something to him, two weeks after that, he or somebody at

24   his office gets back to you with a response, gives you about

25   another 30 days to discuss.  If that doesn't work and you

1    don't reach your resolution, which again, most things in

2    Bankruptcy Court, most things do get resolved that way --

3         MR. LEBARON:  (Indiscernible) --

4         THE COURT:  -- because people recognize that

5    litigating in front of me, while I certainly like to think

6    I'm a nice, pleasant person, is not the best way to spend

7    your time in life.  If that doesn't work, then what I would

8    ask is that we put together a deadline for people to file

9    any other submissions that they want to make, and I think

10   probably would make sense for Mr. Fail to go first to say

11   here's what his objection is, what he wants to pursue in

12   terms of objecting to your claim, and that can be some, you

13   know, probably 75 days out.  I would think if we're talking

14   about 60 days to chat, 75 days and then Mr. LeBaron, you can

15   have another couple of weeks to respond to that.  And then

16   you can leave open a hearing date and we'll probably tie it

17   to an omnibus hearing date.  But we'll make sure to give

18   everybody plenty of notice so that people could make time in

19   their schedules.  And that's how we would do it.

20        What I might encourage, and I'd be open to

21   suggestions this way, is if we're going to have a hearing,

22   rather than having just argument is to have an evidentiary

23   hearing, just have one hearing, do it all at the same time

24   so folks don't have to come back more than once.  But you're

25   closer to it than I am, so since it -- since Mr. Fail, on

1    behalf of the Liquidating Trust, would be the party making

2    the objection, I'll leave it to him in the first instance as

3    to what his request would be, whether he wanted to have an

4    evidentiary hearing and just address everything at once or

5    whether he thinks it's appropriate to just have essentially

6    an argument without any testimony or need for evidence.

7    Again, you're in a better position to judge that than I am.

8            So, Mr. LeBaron --

9            MR. LEBARON:  May I ask a question, please?

10           THE COURT:  -- go ahead.  Yeah, please.

11           MR. LEBARON:  Sorry to interrupt you, sir.  I

12   actually have a question for Mr. Fail.  Do you have the

13   compensation policy from California only for consultants?

14   Do you have a copy of that?  And if not, I could send you a

15   copy of that.  I think it might help and I think also what

16   might help is --

17           MR. FAIL:  I'm happy to review that.  That might

18   be helpful, so I appreciate that, and we can certainly speak

19   -- that would be fine.  Why don't you send that to me and

20   then --

21           MR. LEBARON:  I'm going to send that to you guys.

22   I'm also going to send you, in my initial claim there's two

23   Excel sheets, one large one that's got all of the

24   information from all of my pay, from all the specific

25   payouts.  It's really all pre-petition there only.  So,

1    whatever came after the petition at that point, the number

2    after pre-petition -- to me, it was about $23,000, so your

3    number $26,000 is about right.  You're sitting around

4    $26,000, I think.  The real number -- because the rest --

5    that was when I was with Transform as far as I'm concerned

6    and that is in California.  I'm still having a hearing based

7    on this right now.

8              THE COURT:  Yeah.  Well, I think --

9              MR. LEBARON:  That's Transform (indiscernible).

10   So, there's a big split.

11             THE COURT:  Yeah, I think there is definitely a --

12   unless I've got -- we all have the facts wrong, there's

13   definitely a big dividing line once Transform takes over --

14             MR. LEBARON:  There is.

15             THE COURT:  -- and that's one of the reasons why

16   having a conversation makes some sense just because the

17   claim itself is going to be sort of half of whatever had

18   been contemplated just by virtue of the Transform sort of

19   situation.  So, all right.  So, what I'm going to ask Mr.

20   Fail to do is to draft a schedule.  It can be just in a

21   letter.  He'll send a copy to you; he'll send it to me.

22   What I normally do in those circumstances is, I write the

23   schedule is approved, so ordered.  I put my name on it and

24   date on it, everybody gets a copy, and then you all will go

25   ahead and exchange information and chat.  And then if we

1   need to get things decided, what I'll probably do is, I'll

2   wait to get the papers.  If I have a question about what

3   kind of a hearing makes sense, we'll have another short chat

4   about that.  It won't be as long as this one.  It'll

5   probably be five or 10 minutes, but just so everybody's on

6   the same page.  Hopefully, we can do that very briefly.  And

7   we'll get it resolved one way or the other because a

8   resolution, I think that's the one thing everybody agrees is

9   in everybody's best interest.

10          So, we will do that.  And with that, Mr. LeBaron,

11   any other questions you might have?

12          MR. LEBARON:  That's it.  Thank you very much.

13          THE COURT:  All right.

14          MR. FAIL:  Judge, I just want to say, we may also,

15   and I appreciate you gave us the flexibility to determine at

16   a later date, if it's necessary, the Court could also

17   estimate without further needs.  We'll try to do everything

18   we can to try to avoid any of this, and if not, we'll do our

19   best to minimize --

20          THE COURT:  I'm open to creative solutions.  I'm

21   open to creative solutions --

22          MR. FAIL:  All right, I appreciate it.

23          THE COURT:  -- that might cut the Gordian knot, to

24   quote a phrase.  All right.  Well, thank you very much for

25   your time this morning.

Page 26

1          MR. FAIL:  Thank you for your time, Judge.

2          THE COURT:  And I'll be talking to you all in the

3    not-too-distant future and have a good afternoon.

4          MR. LEBARON:  Thank you very much.

5          THE COURT:  Thank you.

6          (Whereupon these proceedings were concluded at

7    11:41 AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 27

1                          I N D E X

2

3                          RULINGS

4                                              Page        Line

5    Set aside 60 days to attempt to settle    19          7

6    Mr. Fail will put together a schedule

7    For Court approval.                        24          20

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 28

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 17, 2023